*One Police Plaza*

# DA: No Crime to Throw Cop Whistleblower in Psych Ward

December 3, 2012

Neither the NYPD nor Jamaica Hospital committed a crime when they forcibly took whistleblower cop Adrian Schoolcraft from his home and held him in the hospital's psych ward against his will for three days.

So says Queens District Attorney Richard Brown, whose office conducted a criminal investigation of the incident together with the NYPD's Internal Affairs Bureau.

According to a draft report, which was obtained by *NYPD Confidential,* Brown concluded that both the police and the hospital doctors acted reasonably because they believed Schoolcraft to be an emotionally disturbed person [EDP].

"Medical personnel at Jamaica Hospital made their own independent assessment … determining that Mr. Schoolcraft's hospital admission was medically required," the draft report reads.

"While the conduct of police and medical personnel may give rise to questions as to the decision-making process to restrain Mr. Schoolcraft and the medical decision to admit him as a psychiatric patient, the credible evidence does not support the allegation that the actions taken by police or medical personnel were with criminal intent."

At the time of the incident, on Oct 31, 2009, Schoolcraft had become something of a department piñata after he alleged that commanders in the 81st precinct in Brooklyn, where he worked, had doctored crime statistics to make the city appear safer than it actually is.

Brown's report notes that, prior to his forced hospitalization, Schoolcraft had been placed on restricted duty for medical reasons, and his shield and gun taken from him.

"On Oct. 31 he left his post at the precinct without express permission," Brown's report reads, "advising a sergeant he was leaving sick, and thereafter failed to respond to inquiries at his home. Given his medical status and his statement to his supervisor, police responded to his residence. When their numerous calls went unheeded and he failed to respond to numerous attempts by them at his door to determine his condition, the police entered the premises with a key obtained from his landlord."

A law enforcement official familiar with Brown's report said the police officers who entered his apartment initially wanted Schoolcraft to return to the precinct. The official said that after agreeing, Schoolcraft spoke by phone with his father and changed his mind.

Emergency medical personnel then determined that Schoolcraft needed medical assistance, the report reads. After initially agreeing to go to the hospital and walking to an ambulance, Mr. Schoolcraft returned to his apartment and refused medical treatment, said the report.

"That is when they concluded that he was an EDP," the law enforcement official said.

An attorney familiar with Schoolcraft's case said that Brown's report would not affect Schoolcraft's $50-million lawsuit against the city. Legally, the standard for criminality is different and much higher than for civil liability, the attorney said. "Practically, to the extent that the public views the report as exonerating the police department, the report could affect how the public perceives Schoolcraft," the attorney added.

Filed in the summer of 2010, Schoolcraft's lawsuit alleges that the police department kidnapped and conspired with Jamaica Hospital to imprison Schoolcraft with no medical justification in retaliation for his whistle-blowing.

The attorney, who spoke on condition of anonymity, also noted that Brown's office is perceived as "police friendly."

Speaking on condition of anonymity, a top official in the DA's office said, "This office is fact and law friendly and we go wherever the facts and the law take us regardless of who that makes happy or unhappy."

One person who questioned the report's conclusions was Frank Serpico, who blew the whistle on the NYPD's systemic and pervasive corruption 40 years ago. Serpico, who has befriended Schoolcraft, pointed out that questioning Schoolcraft's mental state "was exactly what they did to me."

Just before the *NY Times* published Serpico's corruption allegations across its front pages in 1970, Times publisher Arthur Sulzberger received a phone call. The caller warned him against publishing Serpico's allegations because, the caller said, Serpico was unstable and not to be trusted. The caller was then Mayor John Lindsay.

"We seem to have gotten nowhere in 40 years," Serpico said. "You put a sane man in a psycho ward and it's not a crime?

"We have the same rhetoric and the same cover up," he said.

An internal police investigation subsequently confirmed Schoolcraft's charges against his precinct commanders, resulting in the discipline or transfers of four of its top officers.

Amidst concerns by police union officials and two academics that such downgrading was city-wide, Police Commissioner Ray Kelly announced, in January 2011, the appointment of a blue-ribbon fact-finding committee composed of three former prosecutors.

Although Kelly promised a report within three to six months, none has been produced nearly two years later.

Meanwhile, the Schoolcrafts, father and son, have been struggling both emotionally and financially, say people who know them. They have moved to the Albany area. They are said to have no money coming in and may be evicted from their home because of their inability to pay rent.

Jon Norinsberg, whom Adrian Schoolcraft recently fired as his lawyer, declined comment on Brown's report.

Richard Gilbert, a Manhattan attorney whom Schoolcraft has hired to replace Norinsberg, declined comment on any aspect of the case.

Schoolcraft could not be reached for comment.

**THE NYPD'S LONG ARM.** Nearly six months after a graffiti artist spray-painted the Brooklyn Bridge, exposing a giant hole in Police Commissioner Ray Kelly's anti-terrorism safety net, the NYPD has caught up with him.

This graffiti artist had somehow managed to tag his name — *Lewy* — on what Kelly has maintained is an iconic terrorist target — and one that he has claimed has been literally under police watch day and night.

Readers of *NYPD Confidential* may remember that attacking the Brooklyn Bridge was one of the so-called 14 plots against the city that Kelly once took credit for stopping single-handedly. He has subsequently acknowledged that the FBI had helped to foil virtually all of them.

None of Kelly's plots got more mileage than that of the Brooklyn Bridge.

In 2002, after lyman Faris — an Ohio trucker who reported to the highest levels of Al Qaeda —abandoned his plan to dismember the bridge, Kelly concocted the fairytale that Faris did so only after spotting NYPD patrol cars at the bridge's entry ramps.

Hahaha. While Faris's plan was real, the real reason he abandoned his plan was because he realized he lacked the necessary "gas cutters" to sever the bridge's suspension cables. [See *NYPD Confidential* July 9, 2012.]

Although Kelly has maintained that patrol cars continued to guard the bridge's entry ramps round the-clock and that a police boat patrols nearby in the East River, this *Lewy* was somehow able last June to climb to one of the bridge's stanchions 119 feet over the East River and tag his name in three places.

So how did *Lewy* do it? Did he use a rope? A scaffold? Lights? Did he have accomplices? How long did all this take him? Most important, where were the cops in those patrol cars at the entry ramps and in the police boat? Perhaps a *Lewy* mole inside the NYPD put a sleeping potion in their coffee.

According to the NYPD's Public Information Office, *Lewy* was identified last week as Enno Tianen, 32, who the police said had been arrested numerous times for writing the same tag throughout the city. The department said he would be charged with criminal mischief in the second degree for making graffiti and with criminal mischief in the third degree for possessing a graffiti instrument. There was no mention of terrorism charges.

**EMENDATION.** Two weeks ago this column reported that Serpico maintained that his having been shot months before the Knapp Commission began hearings in 1971 was the result of the police department's "setting him up." Michael Armstrong, the counsel to the Knapp Commission and currently the head of the Mayor's Commission to Combat Police Corruption, took exception to that sentence and wrote:: "Frank, at the time, emphatically and repeatedly denied to me that he had any belief that he had been set up to be shot by anyone, much less by the "Department" as part of some sort of official revenge. He was angry that his fellow cops didn't come to his aid fast enough, but specifically rejected the idea that they had deliberately put him in harm's way."

*Edited by Donald Forst*

_____

Copyright © 2012 Leonard Levitt