UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                        Plaintiff,                DECLARATION
      -against-

                                                      10-CV-06005 (RWS)
THE CITY OF NEW YORK, et al.,

                        Defendants.
----------------------------------------------------------------X

       I, WALTER A. KRETZ, JR., declare under penalty of perjury that the following is true and correct:

       1.     I am a member of Scoppetta Seiff Kretz & Abercrombie, attorneys for defendant Deputy Inspector Steven Mauriello in his official and individual capacities. We first appeared on behalf of Steven Mauriello on May 24, 2012. The original Complaint in this action had been filed by the plaintiff on August 10, 2010. The New York City Law Department originally represented Steven Mauriello, and filed an Answer on his behalf and on behalf of the City of New York and all individual City defendants on December 2, 2010, after plaintiff had served an Amended Complaint. Plaintiff filed a Second Amended Complaint on October 1, 2012, and we filed an Answer to that Second Amended Complaint on behalf of defendant Mauriello on January 10, 2013.

Relief Sought

       2.     I submit this Declaration in support of defendant Mauriello's motion for leave to file an amended Answer to assert counterclaims, annexed as Exhibit A. The proposed counterclaims are state law claims against plaintiff in

his individual capacity for tortious interference with defendant Mauriello's employment relationship with the City of New York and prima facie tort. We also ask the Court in its discretion to exercise supplemental jurisdiction over defendant Mauriello's counterclaims, and to find the counterclaims are timely. Finally, we ask the Court to grant such other relief as it deems just.

Summary of Argument

3. Defendant Mauriello's counterclaims are so related to plaintiff's claims as to form part of "the same case or controversy" warranting this Court's exercise of supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a). As recited in our memorandum of law, an alternative expression of the "same case or controversy" requirement of section 1367(a), which, again, is satisfied here, is whether the claims "derive from a common nucleus of operative fact." In addition, the Court "should freely give leave" to defendant Mauriello to amend his Answer to add the counterclaims pursuant to Rule 15(a)(2) of the Federal Rules because "justice so requires". Finally, pursuant to section 203(d) of the New York Civil Practice Law and Rules, the counterclaims are timely asserted as the applicable statutes of limitations were tolled as of the date plaintiff filed his original complaint.

Defendant Mauriello's Counterclaims

4. The proposed counterclaims allege plaintiff's tortious interference with defendant Mauriello's employment with the NYPD and prima facie tort, based principally upon plaintiff's enactment of a plan devised with the aid of his father, who apparently has had some experience suing police departments both as an employee and as a private citizen. As revealed in a

2

recording plaintiff made on October 7, 2009, of a conversation he had with his father while plaintiff was on his way to meet for the first time with the NYPD Quality Assurance Division (QAD), the plan was to "fuck [Mauriello] over" while laying a false foundation for claims plaintiff intended to assert against the City.

5.     Plaintiff intended to carry out the plan, in part, by making unfounded and/or exaggerated accusations against the supervising officers of the 81st Precinct, which plaintiff and his father hoped would make Mauriello the "scapegoat" for the alleged wrongdoing in the 81st Precinct and throughout the NYPD, and thus cause Mauriello to get fired.

6.     To help create the appearance that the alleged wrongdoing was real – that crime reports routinely were improperly downgraded – plaintiff caused at least three incidents, two involving grand larceny and one burglary, all reported directly to him, to be recorded instead as lost property, and caused at least three other incidents of crime not to be recorded at all.  Thus, while plaintiff identified thirteen instances to QAD of improper crime reporting, he actually was responsible for six such incidents.  His plan apparently anticipated that the crime victims would later return to the 81st Precinct -- and in some instances it appears plaintiff reached out to them to do so -- to complain that their reports were not taken or not followed up.  This then would result in documentation of improper handling of crime reports that QAD could readily discover.

7.     Plaintiff's plan later included the sensationalized publication in the press of selective recordings plaintiff had secretly made in the 81st Precinct over a period of perhaps three years or longer.  While the recordings no doubt include statements of behind-the-door bravado, there is no evidence that the way

3

in which plaintiff urged that the statements be misconstrued, as if constituting proof of wrongdoing, is anything close to the actual performance of the officers in the 81st Precinct. Yet, the damage desired by plaintiff inevitably has to some extent occurred.

   8. Finally, plaintiff's plan culminated in the August 2013 release of a book authored by Graham A. Rayman, *The NYPD Tapes, A Shocking Story of Cops, Cover-Ups, and Courage,* written with the apparent input and assistance of plaintiff and his father. (See Exhibit B.) The book purports to be an accurate account of plaintiff's background and experience in the NYPD up until the events of October 31, 2009. Perhaps one unintended consequence of the book, however, is that it reveals elements of the scheme adopted by plaintiff and his father, which might help us to prove just how malicious a scheme it has been.

   9. While plaintiff's plan ultimately was not as successful as plaintiff and his father might have hoped with respect to getting Mauriello fired, the counterclaims allege that Mauriello has indeed undeservedly suffered and may continue to suffer as a result of the scheme maliciously set in motion by the plaintiff.

Plaintiff's Deceit

   10. Part of plaintiff's plan for enactment of the scheme to do harm to Mauriello -- not just by interfering in his employment relationship with the NYPD, but also in maliciously damaging his reputation -- was for plaintiff to hold himself out to QAD as a police officer concerned about the safety of his fellow officers and the rights of the residents in the substantially African American community served by the 81st Precinct. In truth, however, as revealed by

4

plaintiff's October 7, 2009, recording of his conversation with his father, plaintiff had little regard for his fellow officers, and apparently even less regard for African Americans. Plaintiff's actual goal apparently was not to assist his fellow officers or the people of the 81st Precinct. It was to do harm to Mauriello while fabricating support for claims he intended to bring, and has brought in this case, against the City and his supervising officers.

11. With respect to his fellow police officers, plaintiff said to his father "ain't nobody my friend" in the NYPD, and, as far as he was concerned, if any fellow officers in the NYPD were to suffer an adverse impact from what plaintiff intended to report to QAD, "none of these guys came to my fucking aid when [the NYPD] started coming at me, so they fucking asked for it."

12. Plaintiff also reveals when speaking to his father just how dishonestly he would, and ultimately did, express himself to QAD by speaking of his purported concern for the people in the predominantly minority community served by the 81st Precinct. In response to an inaudible question from his father, apparently about whether one or more officers with whom plaintiff had worked would be supportive of him, plaintiff told his father the other officers would not be helpful, explaining that those officers and he "just worked together so we wouldn't have to work with any niggers."

13. While it is appalling enough that a New York City police officer would harbor such racist sentiments, especially when serving a predominantly African American community, his decision to pretend otherwise to bolster his malicious scheme to harm Mauriello, while at the same time trying to

5

create the appearance of a basis for his unfounded claims of retaliation, is that much more despicable.

Summary of Plaintiff's Version of the Case

14. The essence of plaintiff's case is as follows. He refused to comply with the quotas allegedly imposed upon him in the 81st Precinct. As a result, he received a sub-standard evaluation for 2008, after receiving a lower evaluation for 2007 than he had in previous years. He indicated he was appealing his 2008 evaluation, and thereafter suffered retaliation. During that period, he visited an NYPD physician, who referred him to an NYPD psychiatrist, who then determined his shield and gun should be taken from him, which plaintiff suggests was an act of retaliation. While then serving as the telephone switchboard operator at the 81st Precinct, plaintiff began to compile records he claims support the existence of quotas, unlawful stops and frisks, and improper crime reporting. He contacted IAB. IAB referred him to QAD. IAB and QAD commenced investigations. He claims others found out the IAB and QAD investigations were triggered by his complaints, and they then retaliated against plaintiff by removing him from his home on October 31, 2009, and taking him to Jamaica Hospital.

Summary of Defendant Mauriello's Version of the Case

15. Mauriello's defense essentially will include the following. He signed off on plaintiff's 2008 evaluation as the Commanding Officer, and otherwise had no involvement in the preparation of the evaluation. A meeting was called by Mauriello at plaintiff's request to discuss the evaluation and plaintiff's potential appeal of it. The meeting, which plaintiff also secretly

6

recorded, was attended by plaintiff, his union delegate, and all of his supervising officers from the 81st Precinct.  The discussion centered on plaintiff's diminished performance on the job in 2007 and 2008, and the efforts the supervising officers had made to get him to be more engaged and productive.  Plaintiff suggested that past events in which he was involved, such as CCRB complaints and interviews by the FBI and IAB, had caused him to be disillusioned and discouraged him from being fully engaged on the job.  Still, he indicated he intended to appeal the evaluation because he thought his rating was miscalculated and believed it was based upon his failure to achieve specific numbers (i.e., quotas) in the categories of police activity considered in the evaluation.  It was explained to him that he was wrong in both respects.

16.   Soon after the meeting, unbeknownst to Mauriello, plaintiff was seen by the Department physician who referred plaintiff to the Department psychiatrist, who determined that plaintiff's gun and shield should be taken from him.  Prior to October 31, 2009, Mauriello never learned the reason plaintiff's gun and shield had been taken from him.   In any event, in the ensuing six months leading up to October 31, 2009, plaintiff served as the telephone switchboard operator at the 81st Precinct without significant incident.  At some point in the latter half of that period, officers from the 81st Precinct were called down to IAB and then later to QAD, but Mauriello did not know why they were being called down.  On October 31, 2009, Mauriello had not yet learned that complaints plaintiff had made triggered the QAD and IAB investigations.  In fact, shortly before October 31, 2009, Mauriello called QAD and inquired whether there was anything he should be concerned about since officers of the 81st Precinct had

been notified to appear at QAD. He was told there was nothing to be concerned about.

17. On October 31, 2009, Mauriello had little to do with the events relating to the plaintiff, and was not the person in charge at plaintiff's home. Nothing Mauriello or anyone else did on October 31, 2009, as far as he knew, had anything to do with revenge of any kind, for past events or otherwise. As far as Mauriello knew, the events of October 31, 2009, were triggered by plaintiff's unusual and ultimately bizarre behavior and were undertaken to make sure plaintiff was not about to cause harm to himself or anyone else.

18. To support Mauriello's defense, as well as his counterclaims, we will rely, among other things, on the recording of the conversation between plaintiff and his father on October 7, 2009 – which was produced by the City, apparently from recordings IAB was able to retrieve from the computer in plaintiff's apartment. The recording of that conversation was not produced by plaintiff in discovery, though plaintiff did produce the balance of his October 7th recording containing the QAD interview that followed the conversation with his father. In any event, we intend to show through the recording of the conversation between plaintiff and his father, as well as through other recordings, that plaintiff's complaints to QAD, and to IAB, were materially false and designed purely to do Mauriello harm and to create unfounded support for plaintiff's intended claims against the City for retaliation.

19. Additional support for Mauriello's defense, and his counterclaims, will include the complaint reports plaintiff mishandled as described above.

8

The Common Nucleus of Operative Fact

20. For purposes of this motion, it does not matter which version of the case ultimately proves to be true. What matters is that defendant Mauriello's counterclaims arise from the same transactions and occurrences and are part of the same case or controversy, as the claims in plaintiff's complaint. Plaintiff alleges that he was motivated to do good by criticizing his supervising officers, and suffered retaliation for doing so. Defendant Mauriello claims plaintiff was not motivated to do good, but instead was hell-bent on revenge against Mauriello for approving plaintiff's sub-standard evaluation, while also creating unfounded support for the claims he intended to bring against the City and the NYPD.

21. Neither plaintiff nor any of the other parties would suffer any prejudice by the allowance of defendant Mauriello's counterclaims, as the facts and circumstances relating to the counterclaims also bear directly on the validity of plaintiff's claims and will be fully explored in this case, beginning with the party depositions, none of which have been taken, other than the first day of an expected three-day deposition of the plaintiff.

CONCLUSION

22. Based upon the foregoing and defendant Mauriello's memorandum of law, we respectfully request: i) that the Court find supplemental jurisdiction would be properly exercised over defendant Mauriello's proposed counterclaims (see Exhibit A); ii) that the Court grant defendant Mauriello leave to serve the proposed Answer Amended With Counterclaims; iii) that the Court

find the proposed counterclaims are timely asserted; and iv) that the Court grant such other relief as it deems just.

Declaration executed on September 24, 2013.

_____
Walter A. Kretz, Jr., (WK-4645)