1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------X
    ADRIAN SCHOOLCRAFT,
3                                            PLAINTIFF,

4              -against-      Case No.:
                             10 CV 6005
5
    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
6   MARINO, Tax ID. 873220, Individually and
    in his Official Capacity, ASSISTANT CHIEF
7   PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
    Tax Id. 912370, Individually and
8   in his Official Capacity, DEPUTY INSPECTOR
    STEVEN MAURIELLO, Tax Id. 895117, Individually
9   and in his Official Capacity, CAPTAIN THEODORE
    LAUTERBORN, Tax Id. 897840, Individually and
10  in his Official Capacity, LIEUTENANT WILLIAM
    GOUGH, Tax Id. 919124, Individually and
11  in his Official Capacity, SGT. FREDERICK SAWYER,
    Shield No. 2567, Individually and
12  in his Official Capacity, SERGEANT KURT DUNCAN,
    Shield No. 2483, Individually and
13  in his Official Capacity, LIEUTENANT CHRISTOPHER
    BROSCHART, Tax Id. 915354, Individually and
14  in his Official Capacity, LIEUTENANT TIMOTHY
    CAUGHEY, Tax Id. 885374, Individually and
15  in his Official Capacity, SERGEANT SHANTEL JAMES,
    Shield No. 3004, Individually and
16  in his Official Capacity, and P.O.'s "JOHN DOE"
    #1-50, Individually and in their Official Capacity,
17  (the name John Doe being fictitious, as the true
    names are presently unknown)(collectively
18  referred to as "NYPD Defendants"), JAMAICA
    HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
19  Individually and in his Official Capacity,
    DR. LILLIAN ALDANA-BERNIER, Individually and
20  in her Official Capacity, and JAMAICA HOSPITAL
    MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
21  Individually and in their Official Capacity,
    (the name John Doe being fictitious, as the
22  true names are presently unknown),

23                                        DEFENDANT.
    ------------------------------------------X

24

25  (Continued... )

1        DATE: SEPTEMBER 26, 2013

2        TIME: 10:10 A.M

3

4        VIDEO DEPOSITION of the Plaintiff, ADRIAN

5    SCHOOLCRAFT, taken by the respective parties, pursuant to a

6    Court Order and to the Federal Rules of Civil Procedure,

7    held at the offices of Scoppetta, Seiff, Kretz &

8    Abercrombie, Esqs, 444 Madison Avenue, New York New York,

9    10022 before Elizabeth Forero, a Notary Public of the State

10   of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SCHOOLCRAFT

1  in dealing with that?

2      A.    Dealing with?

3      Q.    With being made an example of for reasons you

4  felt were inappropriate?

5      A.    I believe, eventually.  I don't know if I put it

6  that way to them.  At that time I was dealing with a

7  private attorney.

8      Q.    What did the private attorney do for you?

9      A.    He wrote a letter.

10     Q.    To?

11     A.    To Inspector Mauriello.

12     Q.    What did the letter say?

13     A.    It was in regards to pointing out inconsistencies

14  in the evaluation, and I believed it requested a

15  resolution.  I haven't reviewed it in a while.

16           MR. KRETZ:  Resuming at fifteen thirteen.

17     Q.    Who are you referring to there we just work

18  together?

19     A.    Astor.

20     Q.    Had your father asked about Astor?

21     A.    I believe, he is asking me to -- A-S-T-O-R --

22  Astor went to IAB, and he asked me something to the effect

23  can he help.  Then that's when I quoted him why we became

24  partners.  That was his quote.

25     Q.    When you say we just worked together because we

A. SCHOOLCRAFT

1    didn't want to work with niggers, that was you quoting

2    Astor?

3        A.    Correct.

4        Q.    That was something Astor said to you sometime in

5    the past?

6        A.    It was approximately late 2005 when I came back

7    from leave.  He was -- I don't think he had a permanent

8    partner.  When I returned, he approached me and said why

9    don't we just partner up or else, something the effect, we

10   are going to have to work with one of these niggers.

11              MR. KRETZ:  Resuming at twelve forty.

12              MR. SMITH:  Did you say twelve forty?

13              MR. KRETZ:  Yes, I went back.  Stopping at

14         thirteen twenty-seven.

15       Q.    You were intending on conveying to QUAD you were

16   concerned about the safety of police officers and the

17   safety of the community?

18       A.    Correct.

19       Q.    Did you believe that?

20       A.    Yes.

21              MR. SMITH:  So the record is clear the last

22         quote was we were helping the criminals more than

23         we were helping the people who we were supposed

24         to be helping, the public.

25              MR. KRETZ:  Thank you.

A. SCHOOLCRAFT

1    Q.    You are referring to the other officers who were

2  asking for what?  When you say they fucking asked for it,

3  what are you referring to?

4              MR. KRETZ:  And that is at fifteen ten.

5    A.    When I was going to report this stuff, it was

6  going to come down on them those officers.

7    Q.    And your comment there is they fucking asked for

8  it, if it does come down on them because they didn't help

9  you?

10   A.    If that is what I said, I don't recall if I said

11  it just like that.  But I basically wrote them off for

12  helping me.

13   Q.    That is your voice on the recording; isn't it?

14   A.    Correct.

15              MR. KRETZ:  Resuming at fifteen twelve.

16   Q.    So your testimony here today is, when you say on

17  that tape, we just worked together so we won't have to work

18  with niggers, that is not a statement from you, it's you

19  quoting Officer Astor?

20   A.    That is me stating when he approached me what he

21  said.

22   Q.    You are quoting him?

23   A.    Correct, but I am making the statement but it is

24  based on that quote.

25   Q.    You are speaking on the recording?

A. SCHOOLCRAFT

1    A.    Correct.

2    Q.    You say that statement that is on the recording?

3    A.    Correct.

4    Q.    Did you agree with that statement?

5    A.    Did I agree with the statement?

6    Q.    With the statement that is made on that

7    recording, we just work together because we didn't want to

8    work with niggers?

9    A.    No, that statement was made and that's why Astor

10   approached me.  And we worked together because we were, I

11   guess we were more closely -- some offices have a temper,

12   and some officers are lazy -- we were -- he was good at

13   paperwork.  I was good at paperwork.  We mixed together

14   well.  His comment I think was more towards a specific few

15   he was concerned about being stuck with.  That may be he

16   was working with already.

17   Q.    So he at the time of that conversation said to

18   you let's work together so we don't have to work with any

19   niggers?

20   A.    At the time of this conversation?

21   Q.    At the time you are quoting whenever that

22   conversation took place 2005, did he say to you let's work

23   together to so we don't have to work with any niggers?

24   A.    Something to that effect.

25   Q.    What did you say in response?

A. SCHOOLCRAFT

1    A.    I said, okay.

2    Q.    You had no problem with that?

3    A.    I had no problem working with him.

4    Q.    With working with a guy that says to you, let's

5  work together so we don't have work with any niggers, you

6  had no problems with that?

7                    MR. SMITH:  Objection to form.

8    A.    Correct.

9    Q.    Then four years later when your father asks you

10  in effect can Astor help us.  You say to your father, oh,

11  no, we just work together because we didn't want to work

12  with any niggers.  And that was intended to convey that was

13  what Astor felt but you did not?

14    A.    I think what he was trying to imply is we were

15  friends in some way other than we just worked together.

16  And, he, ah, that is what I was conveying to him, the only

17  reason Astor agreed that we were partners was to prevent

18  being stuck with just anyone, who he is referring to as a

19  nigger.

20    Q.    You think that if Astor had such feelings, he

21  wouldn't be supportive of you in the effort you were

22  undertaking going to QUAD?

23                    MR. SMITH:  Objection to form.

24    A.    No, I think what my father was assuming we were

25  friends and that in some way he had some power answering

A. SCHOOLCRAFT

1    phones at IAB to assist me in some way.

2        Q.      That was your way of saying you were not friends?

3        A.      That's a dead end.

4        Q.      I don't think he will help me.  We just work

5    together because we didn't want to work with any niggers.

6        A.      Correct, that's what I said.

7        Q.      Your testimony today is that is not how you

8    personally felt, you had no problem working with African

9    American officers?

10       A.      I did not, not based on African American but

11   based on professionalism, behavior.

12                   MR. KRETZ:  Fifteen fifty, ah, I don't need

13                   to play the rest of the recording, but I can

14                   represent that at approximately the twenty-four

15                   minute point it sounds look you enter the QUAD

16                   offices.

17                   MR. SMITH:  Can I look at that CD.

18                   MR. KRETZ:  Yes.  Can we have this marked as

19                   Defendants' E.

20                   (Whereupon, the aforementioned audio disc

21                   was marked as Defendants' Exhibit E for

22                   identification as of this date by the Reporter.)

23                   MR. SMITH:  Before she marks that, so this

24                   is, ah, I am going to request a copy of this.

25                   MR. KRETZ:  I will provide you with a copy.