# EXHIBIT E



# THE
# NYPD
# TAPES

## A SHOCKING STORY OF COPS,

## COVER-UPS, AND COURAGE

### GRAHAM A. RAYMAN

Meyer's lieutenant, Leighton Myrie, concurred. "P.O. Schoolcraft is a competent member of the 81st Precinct. His disposition is consistently courteous and we expect great things from P.O. Schoolcraft in the future."

By the end of 2005, crime in the 81st Precinct had dropped by 3.5 percent. Commissioner Kelly had sent Impact cops to the area for six months to patrol what was known as the Fulton-Nostrand Avenue business district and then ordered another six-month stint. Community activists started a campaign to change the neighborhood's unofficial motto from "Bed-Stuy Do or Die" to "Bed-Stuy and Proud Of It." The effort failed because the original slogan was so intertwined with the lore of the area.

In April 2006, Schoolcraft made his first formal foray into raising issues in the command, when he wrote a memo to Deputy Inspector Robert Brower about forced overtime. "This 49 is to notify you of a serious problem within the precinct, that I feel has now become a chronic safety issue. The problem that I'm reporting to you is forced overtime. Police officers are being forced to work double shifts and/or give up their regular days off, always at the last moment.

"Forced overtime is issued by department civilians who don't seem to be concerned about the safety of police officers and the public they serve. I'm also concerned that we could be violating department policy and/or state law by working so many days without a day off. I feel that this policy is leading to an increase in civilian complaints, sick days, accidents and injuries."

How the commander reacted to this memo is unclear from the record, but nothing changed. Schoolcraft was tilting at windmills.

Crime dropped in the precinct by 1.9 percent in 2006, and Schoolcraft's bosses gave him a rating of 3.5 on his performance evaluation again. The only black mark in his personnel record was that someone filed a complaint disputing a ticket that he wrote.

His father was impressed. "He was successful in the NYPD because he could deal in these weird, oppressive environments," Larry Schoolcraft said.

Though Schoolcraft was enjoying the good graces of his bosses for the moment, performance evaluations are strange documents. The reality was that much of a police officer's job involved interacting with citizens. Those interactions were difficult to quantify. How, for example, do you put a number to the fact that a cop picked up a child who had fallen off his bike, or helped an old lady cross the street, or diffused a brewing street fight

44    THE NYPD TAPES

In October 2006, a new executive officer arrived in the 81st Precinct. His name was Steven Mauriello. When Mauriello was promoted to precinct commander a year later, it would spell the beginning of the end of Schoolcraft's police career.

In June 2007, Adrian had a conflict with a Lieutenant Jones over whether he was properly authorized to leave work to help his wheelchair-ridden father get home from the hospital.

Schoolcraft was so irritated by the exchange that he wrote another notarized letter to the precinct's commanding officer. In the letter, Schoolcraft alleged that Jones threatened to punish the whole shift of officers for what Schoolcraft did.

"Every violation that I usually put in the minor violations I'm writing CD's for, so you can thank somebody for that," Jones said, according to the letter. "Schoolcraft, see me when you're finished."

"This is a formal complaint regarding the conduct of Lt. Jones," Schoolcraft wrote. "His retaliatory threats were intended to create a hostile work environment for myself and other officers."

By December 2007, perhaps because he had begun questioning things, Schoolcraft's rating dropped to a 3, which was still at standards, but teetering on the edge of unsatisfactory. The precinct's crime rate dropped 1 percent.

For the year, he had made 620 radio runs, done 71 vertical patrols, written 34 tickets, written 6 C summonses, and made 9 arrests. Those numbers were lower than his 2006 totals.

In the evaluation Sergeant William Meyer wrote: "He at times needs direction or prompting to resolve problems. He at times needs extra guidance to meet goals and deadlines. He does need extra motivation to perform his assignments and meet performance goals." This is the first time his evaluation sank to pedestrian margins.

police duties, he was chasing a doctorate in philosophy and had two master's degrees. He had been one of the first officers sent overseas by Kelly to perform counterterrorism work and he had been stationed in Amman, Jordan, and Mumbai, India, in 2006, when Al Qaeda operatives killed dozens of people in a series of coordinated attacks. Later, he would be made one of the youngest precinct commanders in the city.

Durk told Del Pozo that Schoolcraft had evidence of misconduct in the precinct, including downgrading of crime reports and pressure to make quotas. Del Pozo opened a file on Schoolcraft's claims and referred the downgrading allegation to the Quality Assurance Division, the NYPD unit that audited crime statistics. Each year, QAD produced audits of stats in each of the 76 precincts in the city and also performed special investigations. Its work was very quiet and very closely held by the NYPD. Few people outside the department even knew about the unit.

On September 2, Schoolcraft sent a letter to Mauriello asking that the appeal of his evaluation be sent to the Brooklyn North command. Mauriello apparently did nothing.

And the ball started to roll faster.



On August 17, a woman walked into the station house to report that her cell phone had been stolen. Mauriello wandered by the desk, according to a recording, and initially checked with Schoolcraft about his restricted duty status. Mauriello then brought the woman into his office to talk to her about the phone.

"What's he saying to her in there right now?" Schoolcraft wondered to himself with amusement, assuming that Mauriello was trying to convince the woman to drop her complaint. "It was a friend, blah, blah, blah."

The pressure for numbers continued, as August came to a close. Following a shooting during the overnight shift, a sergeant told his officers, "Do some community visits, C summonses over there, the usual bullshit."

Since "activity" was tallied on a monthly basis, the final days of August became yet another chance to harangue cops on their productivity. "It's the 26th. If you don't have your activity, it would be a really good time to get

"You know what, you can't have me as a partner doing that kind of shit," the female cop says. "'Cause I'll be like, 'Can you fucking clean that shit up?'"

On September 12, Schoolcraft heard about other downgrading incidents, when a fellow officer told him, "A lot of 61s, if it's a robbery, they'll make it a petty larceny. I saw a 61, at t/p/o [time and place of occurrence], civilian punched in the face, menaced with a gun, and his wallet was removed, and they wrote 'lost property.'"

As September drew to a close, the officers once again heard about getting their numbers up in advance of the deadline. "If your activity's been down, the last quarter is a good time to bring it up, because that's when your evaluation is going to be done," a sergeant said. "We all know this job is 'what have you done for me lately.' This is crunch time," he said. "This is game seven of the World Series, the bases are loaded and you're at bat right now.

"It's all a game, ladies and gentlemen," he adds. "We do what we're supposed to, the negative attention goes somewhere else. That's what we want."

Mauriello turned to the precinct's police union delegate, Richie Brown, to advise Schoolcraft to pick up his activity. "The CO [commanding officer] wants to know if everyone is happy and he also stated he can make you work more as long as they pay you," Brown told Schoolcraft on September 29.

On October 4, the precinct bosses issued a new edict: Cops can't take robbery reports on the street. They had to send complainants to the detective squad. "Don't take robbery 61s [complaints]. Send them to the squad." Schoolcraft saw this order, which was repeated three or four times through the month, as a clear attempt to reduce the number of robberies.

In essence, the precinct was adding a procedural hurdle to filing crime complaints. When a person gets robbed, they call 911 to report the crime. Now the cops would respond by telling the victim to go to the station house to file their report. Perhaps the victim has to go to work. Perhaps they have to care for a child. Aside from the inconvenience, the other insidious thing about this order was that it delayed the start of a criminal investigation. Most crimes that are solved are solved fairly quickly. Any delay ruins the one advantage that police have.

in instances of minor misconduct. In most instances, police commanders would have simply waited until he returned to work and written him up for going home early.

At worst, the misconduct would have resulted in a suspension and the loss of some vacation days. For some reason, Schoolcraft had received the worst kind of special treatment.

Schoolcraft was like Lewis Carroll's Alice. He had been pulled through the looking glass and landed in a world where the standard rules of physics didn't apply, and things were going to get substantially worse.



Schoolcraft was in an ambulance on his way to Jamaica Hospital Medical Center, a private institution overlooking the Van Wyck Expressway that had benefitted greatly from both government backing and the largesse of private donors. One building in the complex was named for developer Donald Trump.

Lieutenant Broschart, who had been ordered to accompany Schoolcraft to the hospital, later told investigators that Schoolcraft's attitude changed in the ambulance. He was cooperative with the paramedics, smiling and answering questions.

Schoolcraft remembered it differently. He was still in the chair. He tried to question the paramedics, but they were only interested in checking his conduction. He asked Broschart to remove the handcuffs, but the lieutenant told him to wait until they got to the hospital.

What is striking about this is that the medical "crisis" that Marino had spun in Adrian's apartment became irrelevant. It wasn't mentioned again.

Schoolcraft reached the emergency room after 10 p.m. Other than a few hospital documents, there is no independent record of the next six days, except for a ten-page single-spaced account Schoolcraft himself wrote. There is no mention in either the Brooklyn North files or the Internal Affairs files of what took place behind the hospital walls.

Broschart took Schoolcraft to a gurney, handcuffed him to a railing, and placed him in a hallway under relentless fluorescent lights.

Schoolcraft begged Broschart to loosen the cuffs. "I kept asking them, 'Why am I under arrest, why am I not free to leave?'" he said. "'Why am

and meet with the newspaper's bigwigs to demand Levitt's firing. The bosses at *Newsday* wisely ignored the demand.

In the email to Levitt, Larry and Adrian detailed the sequence of the previous two months and then wrote, "We both understand if you don't believe this could really happen, either did I." This was an understatement. Levitt later wrote, somewhat regretfully, that at that point, when he received that first message, he just didn't believe the story.

And then Larry and Adrian pulled out of town. They left the hotel room behind, took Amtrak back to Johnstown, and lived in a cramped one-bedroom apartment in a small cookie-cutter complex just off North Comrie Avenue, down the street from Glenda's Florist and Greenhouse. It was a retreat, sure, but whether right or wrong, Adrian was concerned that if he remained in the city, he would be further harassed by the NYPD. But the distance didn't help him. It turned out that the arms of the department were a lot longer than he thought.

In the study, the retired NYPD bosses told them that CompStat increased pressure to downgrade crime complaints. Half of the supervisors who responded to the survey told them they had seen a crime complaint altered and thought it was unethical. Based on their survey, Eterno and Silverman concluded that CompStat crime statistics "warranted careful scrutiny."

"As crime goes down, the pressure to maintain it got great," a retired boss told the professors. "It was a numbers game."

Kelly's spokesman, Paul Browne, dismissed the study as biased and unscientific. He claimed, wrongly it turns out, that it was paid for by the unions. And the pro-NYPD *Daily News* editorial board attacked the two professors, writing that they had "libeled the NYPD and every police officer who worked his or her butt off in the long, hard fight to make New York City safer."

The *Daily News* downplayed the extent of statistical manipulation, as "a handful of superior officers caught in penny ante dodges." "All those shenanigans combined are minuscule compared with the plunge in crime," the *News* editorial concluded. "Do Eterno and Silverman believe that the NYPD is hiding hundreds if not thousands of killings? If so, where are the bodies?"

Meanwhile, on February 18, IAB opened another investigation into the fact that Schoolcraft was not residing within the city. This was a violation of the residency requirement, but one that many police officers, including police bosses, violate with impunity. Again, it seemed like the department was looking for every bit of leverage with which to squeeze Schoolcraft.

★

On February 22, Schoolcraft sat down with aides of Councilman Vallone and recorded it. Also present were retired lieutenant Anthony Miranda, who was the head of the Latino Officers Association and had remained active in police issues, and another retired cop. The purpose of the meeting was to basically convince Vallone to get involved. On the recording, one of his aides told Schoolcraft that the councilman took the allegations very seriously.

"They gotta continue to show higher numbers," Miranda said. "That's where the abusive nature of CompStat comes in. It was first just to make commanders aware. Now it's about getting their numbers. All these things need to the abuse."

Miranda added, "If you, as a cop, file complaints, there's more of a tendency to refer you to psych services. If you aren't hitting the quota, that becomes part of the it. And that ruins a person's career."

Schoolcraft chimed in: "Being referred to psych services is like being thrown down into a well and trying to climb out with a shoe string."

Miranda suggested Vallone create a website where cops could provide information on downgrading. "Mmhm," Vallone's aide said. "Mmhm. We have to get ready for 5 o'clock. Thanks for coming by."

The other aide asked about Adrian's status.

"Screwed," he said. "They're probably going to fire me. But I'll probably be able to be a big help to Mr. Vallone in my civil suit in acquiring court orders. So perhaps that can be of help. I would like to have some safe guarantee. Perhaps you can ask Mr. Vallone."

"Yeah, we'll be in touch," the aide said, almost dismissively.

Despite what was said in the meeting, it went nowhere tangible. Vallone did nothing of consequence afterward, and, to the Schoolcrafts, it served as yet another example that the people and agencies who were supposed to monitor the NYPD were not willing to do their jobs. The Schoolcrafts didn't hear from Vallone's office again.



In late March 2010, largely because they thought the press coverage had been too narrow, the Schoolcrafts contacted Paul Moses, a former *New York Newsday* editor and reporter teaching journalism at Brooklyn College, who put them in touch with me at the *Village Voice*. Schoolcraft initially sent a cryptic email to me containing an excerpt from a tape of Sergeant Huffman telling officers not to take robbery complaints in the field but to refer them to the detective squad.

"I hope to collaborate with you on reporting the whole story on my investigations, objectively, without misquotes," Schoolcraft wrote.

In a second email, he wrote, "Nothing has changed regarding my status. On suspension, and they won't give me a department trial...Pay me or fire me...I'm never quitting...Never!"

There was an initial correspondence by email, and then I drove up to Johnstown on March 16.

The town was clearly depressed, stuck between the last vestiges of industry, a modest farm community, and the inevitable Walmart and chain stores that contrive to suck the life from any small town. The Schoolcrafts lived in a small cookie-cutter apartment complex that looked like it had been thrown up in a week.

Their one-bedroom apartment was disheveled and messy. The kitchen was piled with dirty dishes. There was something of a dog smell. The carpet was worn and pitted. A fuzzy television buzzed in the background. Larry slept on a sofa. Adrian had the bedroom, which contained a desk, a chair, a mattress on the floor, and plastic containers of papers and computer parts. After the interview, Adrian walked outside for a couple of photos. He was using a cane.

"How many recordings do you have?" I asked.

"Oh, about 1,000 hours," Adrian replied. "Roll calls, patrol, the locker room, stuff in the station house."

"Um, over how long?"

"About 18 months."

I paused to take this in for a moment. No police officer in NYPD history had ever recorded 1,000 hours inside a precinct on his own. Sure, officers involved in undercover Internal Affairs investigations had done more limited recordings. But this was unprecedented. Schoolcraft had done it alone. Most cops would have been put off by the danger of getting caught. And he wanted it to go public.

"A lot of it is personal conversations between cops about their wives and girlfriends, and stuff like that, and I don't think any of that should be put in the paper," Schoolcraft added.

There was more discussion, and then I suggested, "Well, why don't you send me the roll calls on a disk, and we'll see what's there." Schoolcraft agreed. A couple of days after this visit, a single CD arrived in an envelope at my office at the *Village Voice*. It took weeks for me to transcribe the recordings into coherent form and then make sense of them.

On May 4 and May 11, the *Voice* published the first two articles in a five-part series with the recordings as the centerpiece. The first article examined crime stat manipulation and quotas. The second article looked at whether certain orders given by precinct bosses led to civil rights violations on the street.

Larry Schoolcraft said. "We lost some momentum there, but we didn't really noticed that until much later."

By October 1, the Schoolcrafts were so frustrated they were talking about firing their lawyers. "They haven't done shit for two years, and now they just want to rush everything," Larry fumed on October 1, a coolish Monday afternoon. "They want to barebones it and shove it in front of a jury. They keep saying this case is not an indictment of the NYPD, but it is."

They were also upset that Norinsberg couldn't stop Sweet from ordering Adrian to be deposed for a third time.

"It all comes down to communication," Larry said. "This case is too important."

Schoolcraft, having already been deposed once, was set to be deposed twice more on October 11 and October 25. Meanwhile, not one of the city's witnesses had been deposed by Norinsberg.

On October 14, after Adrian returned from that second deposition with the city, father and son had had enough of their lawyers. That Sunday afternoon, they sat down and drafted a letter firing Norinsberg, Fitch, and Cohen from the case.

On Thursday, November 7, Adrian finally finished editing the letter to Norinsberg into a single terse paragraph and sent it to his lawyer via certified mail. Larry gave me and Levitt, the highly regarded police reporter and author, a heads up.

Levitt, the next morning, immediately called Norinsberg and asked him for comment. Norinsberg had not yet seen the letter, and he was furious. According to Levitt's subsequent column, Norinsberg said, "The father wants us to go after Kelly [Police Commissioner Ray Kelly], Bloomberg [Mayor Michael Bloomberg], the FBI, everyone under the sun. We've had a complete communications breakdown."

"This comes completely out of the blue," Norinsberg continued, ignoring the conflict of the previous months. "Adrian has stayed in my house and we've never had a bad word. Until I hear otherwise from Adrian, I'm still representing him."

Levitt, paraphrasing, wrote that Norinsberg had told him "the Schoolcrafts' behavior has become increasingly bizarre."