```
 1   E3ddschc                    Conference

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------x

 4   ADRIAN SCHOOLCRAFT,

 5              Plaintiff,

 6         v.                               10 CV 6005 (RWS)

 7   THE CITY OF NEW YORK, et al.,

 8              Defendants.

 9   ------------------------------x
                                         New York, N.Y.
10                                       March 13, 2014
                                         2:00 p.m.
11   Before:

12                   HON. ROBERT W. SWEET,

13                                       District Judge

14                         APPEARANCES

15   NATHANIAL B. SMITH
          Attorney for Plaintiff
16
     JOHN LENOIR
17        Attorney for Plaintiff

18   MICHAEL A. CARDOZO
          Corporation Counsel for the
19        City of New York
          Attorney for City Defendants
20   BY:  SUZANNA PUBLICKER METTHAM
          RYAN G. SHAFFER
21
     SCOPPETTA SEIFF KRETZ & ABERCROMBIE
22        Attorneys for Defendant Steven Mauriello
     BY:  WALTER A. KRETZ, JR.
23
     MARTIN CLEARWATER & BELL LLP
24        Attorneys for Defendant Jamaica Hospital
     BY:  GREGORY JOHN RADOMISLI
25
```

2

1                    APPEARANCES CONTINUED

2

3    IVONE, DEVINE and JENSEN, LLP
          Attorneys for Defendant
          Dr. Isak Isakov
4    BY:  BRIAN E. LEE

5    CALLAN, KOSTER, BRADY & BRENNAN, LLP
          Attorneys for Defendant
6         Dr. Lilian Aldana-Bernier
     BY:  PAUL F. CALLAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Please, be seated.  Thanks very much.
 2              I am going to take as our text the March 5 letter from
 3   the city.
 4              Have all the witnesses now been identified by the
 5   plaintiff?
 6              MS. METTHAM:  Well, your Honor, plaintiff identified
 7   one witness.  However, he did so nearly a month after the Court
 8   had ordered him.
 9              THE COURT:  That wasn't quite my question.  My
10   question was, have all the witnesses now been identified?
11              MR. LENOIR:  Yes, your Honor.  I believe so from the
12   plaintiff's side.
13              THE COURT:  All right.  OK.  So I think that sort of
14   takes care of that.
15              Who is the late witness?
16              MS. METTHAM:  Your Honor, the witness is an individual
17   by the name of Joe Ferrara.  City defendants seek to have him
18   precluded as a witness based on plaintiff's failure to comply
19   with the Court's order and the fact that plaintiff had known of
20   this witness for three-and-a-half years prior to the
21   identification.
22              THE COURT:  OK.  Is there a real problem with this
23   witness?
24              MS. METTHAM:  We don't believe he is relevant in any
25   way but --
```

```
 1              THE COURT:  OK.  All right.  So we've solved that.
 2    Everybody has been identified.
 3              Second, subpoenas.  Now, let's see if we could figure
 4    this out.  The plaintiff has sought depositions of the Jamaica
 5    Hospital defendants, correct?  And we haven't agreed on -- you
 6    haven't been able to work out whether or not those depositions
 7    are going to be taken.  Yes?
 8              MR. RADOMISLI:  Well, they designated two emergency
 9    medical technicians who were at the plaintiff's home.  The only
10    issue is if your Honor needs to extend discovery, then
11    certainly they will be produced.
12              THE COURT:  OK.
13              MR. LENOIR:  We have also asked for the hospital to be
14    deposed, and we could not really discuss the time or who would
15    be the person representing the hospital for deposition.
16              MR. RADOMISLI:  They were supposed to serve a 30(b)(6)
17    notice and an identification.  So that hadn't been done.
18              THE COURT:  That had been done?
19              MR. RADOMISLI:  Had not been done.
20              THE COURT:  What is the problem?
21              MR. RADOMISLI:  I don't know.  They just haven't
22    served it.  They haven't identified anyone other than the two
23    EMTs is what I am trying to say.
24              THE COURT:  Do you want a 30(b)(6) witness from the
25    hospital?  What do you want?
```

1          MR. LENOIR:  To depose the hospital itself regarding

2     its policy --

3          THE COURT:  Yes.  But I drove by the hospital the

4     other day and, oddly enough, it can't speak.  Now, who do you

5     want?

6          MR. LENOIR:  We don't know who the hospital would want

7     to represent it, whether it is counsel or -- but somebody who

8     would speak on behalf of the hospital.

9          THE COURT:  Well, it sounds like a 30(b)(6) witness,

10    doesn't it?

11         MR. RADOMISLI:  Yes.

12         THE COURT:  It sounds like you want to designate

13    somebody to testify on behalf of the hospital.

14         MR. RADOMISLI:  About what?

15         THE COURT:  Well, I suspect it is about the incident.

16         MR. RADOMISLI:  They've already deposed --

17         THE COURT:  No.  No.  I understand that.  But I don't

18    know what he wants to ask them.  Nor do you.  But somebody

19    who -- you don't know who you want?

20         MR. LENOIR:  Well, we want, I guess, a 30(b)(6), but

21    someone to speak on behalf of the hospital regarding their

22    policies for admitting patients in the context of Officer

23    Schoolcraft.

24         THE COURT:  OK.  I take it -- wait a minute.  Let's

25    see if we can be clear.  Patients admitted under claims of

```
1    what?

2                MR. LENOIR:  Emotionally disturbed persons.

3                THE COURT:  OK.  All right.  We solved that.  You all

4    can get together on a schedule.

5                Now, subpoenas.  I mean, is that it for the hospital?

6                MR. RADOMISLI:  As far as the hospital witnesses go?

7                THE COURT:  Yes.

8                MR. RADOMISLI:  I believe so.

9                THE COURT:  OK.  How about the city?

10               MR. SHAFFER:  Your Honor, it is the city's position

11   that plaintiff, he waived his right to depose the witnesses he

12   is now seeking to depose by waiting until the last minute to

13   seek their depositions.  He has known about these witnesses who

14   are defendants since 2011, and then he seeks to depose them on

15   a two-week expedited schedule without conferring with anybody,

16   knowing full well that all of the other depositions took months

17   to schedule.  And he does so in an attempt to basically garner

18   an extension of discovery from the Court by saying, oh, I

19   couldn't have possibly known who I wanted to depose without

20   deposing the first ten witnesses, which makes no sense because

21   he has known about all of these people since 2011.  In fact,

22   they were identified in his own initial disclosures, some of

23   them.

24               THE COURT:  Yes.

25               MR. SHAFFER:  So our position is that he has waived
```

1    his right to depose them and by waiting until the last minute

2    and then just unilaterally selecting dates to depose them.

3              THE COURT:  What are we talking about in terms of

4    numbers?

5              MR. SHAFFER:  I believe seven additional witnesses,

6    all of whom their identities have been known for years in this

7    case.

8              THE COURT:  These are not defendants?

9              MR. SHAFFER:  Six of them are defendants.  I believe

10   one of them is a nonparty city employee.

11             THE COURT:  And the six defendants have not been

12   deposed?

13             MR. SHAFFER:  No.  And no formal notice was ever

14   served until, I believe, 28 days before the close of discovery,

15   seeking to depose them within a matter of two weeks.

16             THE COURT:  And then who is the additional person?

17             MR. SHAFFER:  It is an NYPD sergeant who is not named

18   as a defendant but has been identified as a witness by both

19   sides, I believe.  And he was not present on the night of the

20   incident.

21             THE COURT:  All right.  So the plaintiff can take

22   those seven depositions and we'll talk about scheduling.  That

23   is something that you will have to work out but we'll talk

24   about it.

25             MR. SHAFFER:  Your Honor.

```
 1              THE COURT:  Yes.
 2              MR. SHAFFER:  If I may ask, could the Court preclude
 3    plaintiff from noticing any additional depositions of people he
 4    has got identities of at this point?  We are so late in the
 5    game here.
 6              THE COURT:  Oh, yes.  All right.  Unless there is
 7    something that's presented today, there are no further
 8    discovery demands -- depositions, documents, etc., etc. --
 9    unless there is something that comes up today.
10              MR. SHAFFER:  OK.
11              THE COURT:  Now, document demands.  Do I have the
12    sense that that was resolved, or am I wrong?
13              MR. SHAFFER:  Not resolved.
14              THE COURT:  OK.  And the city's position is that the
15    document demands recently served are duplicative and largely
16    have been complied with.
17              MR. SHAFFER:  Some are duplicative.  The remainder for
18    the most part are just blatantly irrelevant to the case.
19              Just a brief example, your Honor:  Requests for
20    several years worth of logs relating to vehicles towed in the
21    81st Precinct, with no connection to Mr. Schoolcraft or any of
22    the defendants.
23              And it's the city's position that serving duplicative
24    and irrelevant complaints is an abuse of the discovery process.
25              THE COURT:  OK.  Now, duplicative, that should be --
```

1    and you all conferred about this but you couldn't agree,

2    correct?

3              MR. SHAFFER:  Plaintiff's position, I believe, is that

4    it is city defendants' burden to identify which demands are

5    duplicative, which is illogical because he could keep

6    submitting duplicative demands requiring us to respond and say

7    you've already done this.

8              It is our position that he has an obligation to review

9    the over 10,000 pages of document which he has already received

10   and decide if he has already gotten what he's asking for,

11   rather than put the burden on us to sit there and review his

12   demands, our responses, and type out a response that that says

13   this is objectionable for all of these reasons plus the fact

14   that it is duplicative.

15             THE COURT:  Is it the city's view that they have

16   responded to all the document demands?

17             MR. SHAFFER:  Not all of them, your Honor.

18             THE COURT:  OK.

19             MR. SHAFFER:  But the ones that have not been

20   responded to, many of them are just patently irrelevant.

21             THE COURT:  Yes.  OK.

22             So now how am I going to deal with the allegedly

23   irrelevant demands?  I don't have those, do I?

24             MR. SHAFFER:  I don't believe you do, your Honor, but

25   what might be appropriate would be, first, for plaintiff to

1    remove the duplicative demands from the -- there are two sets

2    of demands that were served, totaling like 115 different

3    document requests.  The majority of the second set, which were

4    completely untimely, are repetitive of the first set.  So we

5    have repetitive between the two sets, repetitive of demands

6    previously asserted and responded to, and then also irrelevant.

7           THE COURT:  Yes.  Now, how am I going to deal with the

8    irrelevant ones?  I guess, OK.  All right.  Let's do it this

9    way.

10          The city's position is that they have complied with

11   all except the irrelevant demands.  If the plaintiff thinks

12   that position is unfounded, they will come forth and specify

13   the documents -- I mean, the demands that have not been met.

14          As for the irrelevant demands, I guess the position of

15   the city is that the demand is improper because it is

16   irrelevant.  So you will have to tell me what the demands are

17   and why they are irrelevant, and we will deal with that next

18   week.

19          Unless you would have a different schedule.  Would you

20   like to have a different schedule?  That's fine with me.

21          Have we resolved that?

22          (Pause)

23          Well, I guess we have.  OK.  We will have to talk

24   about -- I am over to Roman 3, the February 28th scheduling

25   order.  We are going to have to struggle with that, obviously.

1          The city's direction to witnesses not to answer

2    questions, that has been resolved, hasn't it?

3          MR. SMITH:  I don't believe so, your Honor.  There

4    were a litany of directions not to answer and --

5          THE COURT:  This is the issue -- correct me if I am

6    wrong -- this is the medical issue?

7          MR. SMITH:  Well, the medical issue was just a very

8    small piece of it.  Mr. Marino, Mr. Lauterborn, Mr. Caughey,

9    they were given countless instructions not to answer questions

10    about prior charges that have been brought against them --

11          THE COURT:  OK.  OK.  Yeah, it's medical issues and

12    it's disciplinary proceedings, right?

13          Now, the city has given me in its letter a bunch of

14    authorities for the proposition that, you know, 10 years,

15    felonies, and whatever those other limitations are.  What's

16    wrong with the city's position?

17          MR. SMITH:  Well, the rule on 10 years -- well, let's

18    back up on the city's position.

19          I would ask, for example, Mr. Marino a question like

20    have you ever been charged with any kind of corruption or

21    excessive force or any other charges against you, and similar

22    kinds of questions were directed at the other police officers.

23    The instruction not to answer was -- now I understand it --

24    that the city would tell the witness if it was within the

25    10-year period immediately before that Halloween night that

1    they went into Officer Schoolcraft's house and it related to

2    one of the claims in the complaint, then you can answer the

3    question.

4         THE COURT:  Yes.

5         MR. SMITH:  So there are two problems with that.  One

6    is that the 10-year limitation is based on a federal rule of

7    evidence that governs the admissibility of criminal convictions

8    that are stale.  And in order for me to find out whether or not

9    there is anything in these individuals' backgrounds that would

10   justify further inquiry, I need in a deposition to be able to

11   inquire about that background.

12        So what the city has done is said that there is this

13   rule of evidence that says you can't introduce, unless it is

14   directly relevant, uncharged --

15        THE COURT:  Let me just back up just for a second.

16   Sorry.

17        MR. SMITH:  That is all right.

18        THE COURT:  These depositions have been taken, yes?

19        MR. SMITH:  Yes.  The ones that we are speaking about

20   now, yes.

21        THE COURT:  Let me just ask the city.  It is your

22   position that you would not have objected to any excessive

23   force incidents so that the incidents that are involved,

24   whatever they may be, are not related to the kinds of claims

25   here?

1          MS. METTHAM:  Yes, your Honor.  My limitation was 10

2     years prior to the incident to the date of the deposition.  It

3     was allegations that involved truth or veracity and allegations

4     that were similar to the claims made against the individual

5     defendants in the case.  So excessive force was one that we

6     allowed them to answer within the 10-year period.

7          And I would also point out plaintiff has said that our

8     position is based solely on the federal rule's limitation of 10

9     years.  But it's not just that.  It's also case law regarding

10    disciplinary discovery, stating that if it's beyond 10 years

11    before the incident it wouldn't be admissible at trial and,

12    therefore, it is not likely to lead to the discovery of

13    admissible evidence.

14         I would also just point out, your Honor, that during

15    these depositions we repeatedly asked the plaintiff to call the

16    Court to avoid this issue.  I explicitly told plaintiff that if

17    your Court issued a ruling, the witness would answer --

18         THE COURT:  OK.

19         MR. SMITH:  Your Honor, may I just respond briefly to

20    this position the city has taken?

21         THE COURT:  Sure.

22         MR. SMITH:  I remember pointblank, for example, asking

23    Mr. Marino whether or not he ever had any charges or complaints

24    of excessive force lodged against him, and the city directed

25    him not to answer that question.  And I know because there's

media out there that while I think he was either on duty or off
duty he did assault somebody.  And it was a magazine article;
it was maybe 5/10 years ago, I don't even know the date.  But I
am entitled to make inquiry about whether or not the same
person who used excessive force -- we are talking about a
deposition.  There is a difference between asking -- in a
deposition I'm asking, well, tell me about this excessive force
complaint, what was it, when was it.  And so what's happening
here is that I don't have any opportunity to make I think
limited inquiry at a deposition about the individual's
background and history so that I'm in a position to address the
question about whether or not at trial a particular incident
should be excluded at trial.

So it is like because I don't know anything, I'm never
going to know anything.  And, you know, I don't think that is
the law.  I mean, I think there are reasons why you are given
more latitude in a deposition to make inquiry about basic
background things.  Have you ever been arrested?  Have you ever
been convicted of a crime?  Have you ever had any charges
against you?  So that's one problem I have.

The other problem is that there are at least 12 causes
of action laid out in the complaint.  They are complex.
Substantive due process.  Procedural due process.  So a
direction to a witness not to answer questions that are not
relevant to the issues in the case is really an invitation by

1     the witness to decide what he thinks is relevant and then

2     answer the question with some unexpressed idea about what that

3     is.  And --

4            MS. METTHAM:  Your Honor, that is blatantly false.

5     And if plaintiff actually had part of a deposition to support

6     that, he would have attached to it to his motion.  I did not

7     direct the witness to answer only questions relating to the

8     complaint and allowing the witness to decide what that was.  I

9     specifically listed what the allegations were.  I had spelled

10    that out for Mr. Smith during the deposition.

11           Additionally, Mr. Smith's statement that I directed

12    the witness not to answer any questions about excessive force

13    is also false.  And if plaintiff had a cite to that in the

14    record, he would have included it.

15           I directed the witness not to answer unless it was

16    within 10 years prior to the incident and it involved a claim

17    relating to the case.

18           THE COURT:  I take it that at some point the plaintiff

19    has asked for records of disciplinary proceedings and so on?

20           MS. METTHAM:  Yes, back in --

21           THE COURT:  And all of that has been produced?

22           MS. METTHAM:  And city defendants, when we responded

23    to the discovery demands, we made similar objections and

24    limited our discovery in written discovery to 10 years of a

25    related nature.  So plaintiff has been aware of the city's

1    position of this for two-and-a-half years.

2              THE COURT:  By the way, is there only one witness as

3    to which the medical issue is a problem?

4              MS. METTHAM:  Yes, your Honor.  I believe so.

5              THE COURT:  And that is the steroids?

6              MS. METTHAM:  Yes, your Honor.

7              MR. SMITH:  Well, we're getting a little bit -- there

8    is -- Mr. Marino, Deputy Chief Marino, was charged, according

9    to the documents that were produced, for possession of illegal

10   narcotics and some sort of corruption.  That's what the

11   documents reflect.  That's the only information that I have

12   about that.  And so I made inquiry, or tried to make inquiry

13   at --

14             THE COURT:  Excuse me.  What documentary -- what are

15   the documents?

16             MR. SMITH:  These are heavily redacted printouts from

17   an NYPD database which lists the disciplinary history and

18   incidence histories of the particular defendants in this case.

19   I think it is called a CCI or CPI index.

20             THE COURT:  OK.

21             MR. SMITH:  And so --

22             MS. METTHAM:  No, it does not include the terms

23   corruption and illegal narcotics.

24             MR. SMITH:  Well, it used the word narcotics and it

25   used the word corruption.  So I wanted to ask the witness, who

1    is a principal defendant in this case, what was it about, and I

2    was told I am not allowed to inquire about that.  I mean,

3    directions not to answer shouldn't be happening at all in a

4    deposition.  And this is one of the main witnesses in the case.

5          And I will find the transcript reference, but I'm

6    pretty sure I asked him about excessive force because I knew

7    about this incident from a magazine article, and I was cut off

8    about that.  I was also cut off about inquiring about pending

9    charges that are against him by the NYPD.  Yeah.

10          So, you know, there is a lot of redacted stuff.  There

11   is little snippets of information I am given, but even when I

12   prod the witness about it at a deposition I am cut off.  I

13   don't think that is right, Judge.

14          MS. METTHAM:  Your Honor, plaintiff has made no

15   showing for why he would need information regarding a

16   defendant's alleged steroid use.  As I listed in the letter of

17   March 7th, the officer has a privacy right.  He has health

18   rights.  He has not made his health an issue in this case.  He

19   does not have to be forced to make his medical records

20   available to public view.

21          Additionally, whether defendant Marino used any human

22   growth hormone in past years has no bearing on the case at

23   issue, and the plaintiff has made no showing of relevancy.

24          MR. SMITH:  Your Honor, I wasn't asking for his

25   medical records.  There was a charge against him for corruption

1    and narcotics use, and I was inquiring about what's the status

2    of these charges, what is this based on.  I didn't ask for his

3    medical file.

4              THE COURT:  Let me ask the city, are there any pending

5    charges now?

6              MS. METTHAM:  About the human growth hormone?

7              THE COURT:  Against Marino.

8              MS. METTHAM:  I have not checked it to know if they

9    are still pending as of today, your Honor.

10             THE COURT:  Well, it would appear to me if there are

11   pending charges, the plaintiff should know about them.

12             MS. METTHAM:  I don't believe there are any about the

13   human growth hormone, your Honor.

14             THE COURT:  About.

15             MS. METTHAM:  The human growth hormone issue.  Those

16   have been closed for years.

17             THE COURT:  Well --

18             MS. METTHAM:  Your Honor, just to be clear, he was not

19   accused of using illegal narcotics.  He was accused of, I

20   believe the exact -- I can't remember the exact language but it

21   has to do with using a substance not permitted by the NYPD.

22             MR. SMITH:  Your Honor, while you are mulling over

23   this issue, I mean, there is a reference in the transcript of

24   Mr. Marino's deposition where I said, "There is a reference

25   on" -- and this is page 147, line 3 of the attorney's eyes only

1   portion of the deposition transcript.

2           "There is a reference on the second page to the charge

3   and spec that you wrongfully, without just cause, punched one

4   person in the face and pushed one person into a wall.  Do you

5   have any recollection about that incident?"

6           And then Ms. Mettham objected and said, "I'm not going

7   to allow him to answer questions that's about incidents that

8   predate October 31, 2009 by more than 10 years, as they are

9   significantly attenuated."

10          And so --

11          MS. METTHAM:  Which is exactly what I told your Honor

12  I said.

13          MR. SMITH:  So let's assume -- I don't know, but let's

14  assume that this incident happened on a period outside this

15  10-year window.  That's not a proper basis.  That might be a

16  proper basis to exclude that act at trial if I were trying to

17  use that, but it is not a proper basis to cut off inquiry by me

18  about what happened.  All I have here is a question and no

19  answer.  You know, so I don't think that's the right way to

20  handle this.

21          THE COURT:  I take it that this is some incident about

22  which the Department has no records?

23          MS. METTHAM:  No, I don't believe that is accurate,

24  your Honor.

25          THE COURT:  So the Department did conduct an inquiry,

```
 1    did do something?

 2              MS. METTHAM:  Correct.  However, again, this is 10

 3    years prior to the date of incident.  So we're now talking 15

 4    years prior.  And as cited in my motion -- and plaintiff has

 5    provided no case law to the opposite -- there have been

 6    discovery rulings limiting discovery, not just admissibility at

 7    trial, based on disciplinary matters being too attenuated or

 8    too unrelated to the matter.

 9              THE COURT:  And you're representing to me that this

10    was 15 years ago?

11              MS. METTHAM:  That it was at least 10 years prior to

12    October 31, 2009.  So it could be 14-and-a-half as of right

13    now.

14              THE COURT:  All right.  I am going to exclude it.

15              The medical issue as far as Marino is concerned, it

16    seems to me the point there is conceivably -- look, what I'm

17    thinking is this:  If he was -- how about this?  An inquiry as

18    to whether at the time of the incident, or today, he has been

19    given any prescriptions for mind-altering -- I shouldn't say

20    "mind-altering," but anything, doctors' prescriptions that

21    would relate to veracity.

22              MS. METTHAM:  That would relate to veracity, not to

23    anything else?

24              THE COURT:  Well --

25              MS. METTHAM:  Your Honor, I do have case law stating
```

1    that a police officer's mental health is not placed at issue

2    solely by virtue of allegations of excessive force.

3              THE COURT:  No.  I am not talking about mental health.

4    I am talking about whether at the time of the incident he

5    was -- well, why don't we just put it this way.

6              The steroids, assuming that's what it was about, which

7    the record doesn't indicate, I don't think would have any

8    effect on veracity or the incident itself.

9              MS. METTHAM:  Correct, your Honor.

10             MR. SMITH:  I don't quarrel with that.  But if the

11   witness was presented with charges and he testified and there

12   is information out there about his prior testimony, I mean, I

13   don't even have an opportunity to find out if there was

14   testimony, whether or not he testified, whether or not there

15   were issues raised about his credibility.  I mean, these are

16   issues that are --

17             THE COURT:  You mean on whatever the charges were with

18   respect to his use of prohibited --

19             MR. SMITH:  Yeah.  He was accused of some pretty

20   serious things by his employer, and there was an adjudication,

21   I think, of that but I don't really know for certain.  But

22   there was a process involved there where he testified about

23   whether or not he did or he didn't do anything, and that goes

24   to -- you know, his prior testimony goes to credibility.

25             And yet, again, I'm still -- I'm not even in a

```
1    position to make inquiry about what happened at these hearings.
2    And I know that he was brought up on charges within the past 10
3    years.  That much I know.
4           MS. METTHAM:  Your Honor, this is just a blatant
5    fishing expedition.  By plaintiff's logic, any allegation
6    against the officer such as coming to work 15 minutes late, any
7    investigation of that officer would therefore go to credibility
8    because he might have said that his car broke down when it
9    really didn't.  This really has no bearing.
10          And, additionally, these interviews --
11          MR. SMITH:  We are talking about corruption and
12   narcotics use.  We are not talking about minor charges here.
13          THE COURT:  Yes.  You had better leave that --
14          MR. SMITH:  Yes.
15          MS. METTHAM:  Your Honor, the other issues is that
16   interviews of the witness during that investigation do
17   implicate his medical records, his private health history.
18          Again, plaintiff by merely speculating that possibly
19   the witness may have said a false statement during an
20   interrogation, for which he has no basis to believe that -- and
21   there have been, I can represent, no charges brought against
22   the officer for that -- is just blatant -- it is a fishing
23   expedition.  There is no relevance to this current
24   investigation, to this current case.
25          THE COURT:  The city does have, obviously, the record
```

or records relating to these charges and their disposition?

MS. METTHAM: Yes, your Honor.

THE COURT: OK. Produce them for attorneys' eyes only.

MS. METTHAM: Just to be clear, your Honor, are you talking about the entire investigative file, or are you referring to just the closing --

THE COURT: Well, whatever the charges were and whatever the disposition was.

MS. METTHAM: Are you permitting plaintiff to re-question the witness about those matters?

THE COURT: No, not at this time.

MS. METTHAM: Thank you, your Honor.

THE COURT: OK. The city's direction -- OK. The suggestive objections, I'm not going to review the transcripts and the city's objections. I trust that they will not be inappropriate.

The Queens DA file. Now, the only point of this, as I understand it, is the identification of an expert witness who reviewed the DA's materials and rendered some kind of an opinion.

MS. METTHAM: That's more or less accurate, your Honor. The only thing I would mention is that the expert was obtained pursuant to a Grand Jury subpoena, and a motion had to be made to state criminal court to allow him access to the

```
 1    other subpoenaed Grand Jury materials.
 2              THE COURT:  Right.  And all of that happened, and then
 3    he or she presumably rendered an opinion.
 4              MS. METTHAM:  Yes, your Honor.
 5              THE COURT:  OK.  And so the only point here is the
 6    identification of that person, right?
 7              MR. SMITH:  And, well, I mean, frankly, no.  This is
 8    an onion that gets unraveled over a period of time.
 9              There was a redacted document which --
10              THE COURT:  No.  No.  Forget that.  All you want is
11    the identification of this witness?
12              MR. SMITH:  No.  No.  I also want the pieces of his
13    opinion that were redacted to be unredacted so that I can read
14    them more than the one time that I read them before finding out
15    that this was being removed and, in my view, improperly, and
16    alerting the city that this electronic redaction could be
17    removed.
18              THE COURT:  No.  But what you're asking for is part of
19    the Grand Jury minutes?
20              MR. SMITH:  No.  I am not, your Honor.
21              MS. METTHAM:  No.
22              MR. SMITH:  Let's back up a whole lot here.
23              What happened was that the Queens DA issued some
24    subpoenas.  They did not, as far as I understand it, impanel a
25    grand jury.  There was no grand jury minutes.  There was no
```

1    grand jury testimony.  Pursuant to that subpoena, they obtained

2    copies of the Jamaica Hospital medical records, the same ones

3    that are in spades in this case.

4            THE COURT:  Yes.

5            MR. SMITH:  And the Queens DA hired an expert, showed

6    those records to the expert, and he rendered an opinion.

7    And --

8            THE COURT:  To the DA?

9            MR. SMITH:  To the DA, that's correct.  And not a very

10    favorable review, from what I remember, saying that they --

11            THE COURT:  Whatever.

12            MR. SMITH:  Whatever.  So the records, there is

13    nothing confidential about them.  They are in spades available

14    in this case.

15            So my initial concern is that on what basis were you

16    redacting --

17            THE COURT:  Well, forget about the redaction.  The

18    issue is you would like to see the report which he rendered to

19    the DA?

20            MR. SMITH:  Yes.  Well, in this case what I want to

21    see is the Assistant District Attorney's memo which --

22            THE COURT:  No.  Forget that.

23            MR. SMITH:  Well, there is parts of it I have and

24    parts of it that I don't.

25            THE COURT:  Well, whatever you've got, you got.  But

```
 1    it doesn't seem -- so what?  So the Assistant DA did whatever
 2    he did.  Who cares?
 3            MR. SMITH:  Well, you are right in the sense that what
 4    I want to do is know what the expert said.
 5            THE COURT:  Yes.  I would think so.
 6            Now, why doesn't he get the report?
 7            MS. METTHAM:  Your Honor, the grand jury was never
 8    convened.  However, the District Attorney subpoenaed the
 9    documents in order to impanel a grand jury pursuant New York
10    State law.  New York State law says that grand jury proceedings
11    are secret, and if the Queens County DA or myself were to
12    produce them without a court's order, we would be committing a
13    felony under New York State law.  Now, New York State law is
14    more expansive than the federal law on this topic, so documents
15    gathered for a grand jury, whether or not that grand jury was
16    convened, would be protected under New York State law.  We
17    believe that the federal court should grant comity to the state
18    court on this issue of Grand Jury secrecy.  Regardless of that,
19    whether the federal court decides to grant comity, the expert
20    only reviewed subpoenaed documents, which plaintiff, quite
21    frankly, already has.
22            THE COURT:  Yes.
23            MS. METTHAM:  So this expert's opinion is only based
24    on subpoenaed documents and grants nothing new materially to
25    this case.
```

1          THE COURT:  Except that he doesn't know what the

2     opinion was.

3          MS. METTHAM:  And, your Honor, my position is that the

4     opinion should not matter.  The District Attorney is not a

5     defendant in this case.

6          THE COURT:  Well, let's put it this way.  If it turns

7     out that whatever the opinion is, he thinks that plaintiff

8     feels that that opinion is relevant and might want to call the

9     expert --

10         MS. METTHAM:  I don't know how the plaintiff could,

11    though, your Honor.  He was not a treating physician --

12         THE COURT:  Well, those are all different issues.  You

13    mean -- you think the opinion is irrelevant.  Well, I don't

14    know.

15         MR. LEE:  Your Honor, can I be heard on this?

16         What he is trying to do is he is trying to get a free

17    opinion in this case when he doesn't have an opinion, he

18    doesn't have an expert against --

19         THE COURT:  Well, maybe he is and maybe it won't work.

20         MR. LEE:  By it is a different standard in a DA -- in

21    a grand jury proceeding than it is in this litigation.  So he

22    shouldn't be allowed to --

23         THE COURT:  Actually, it wasn't a grand jury

24    proceeding.  I mean, there wasn't a grand jury proceeding.

25    What there was was DA subpoenas for a grand jury that was not

1    convened.

2           MR. LEE:  Correct.

3           THE COURT:  Well, I don't know if that makes a

4    tremendous amount of difference.

5           MR. LEE:  Here's the problem.  Let's assume -- and

6    Mr. Smith has represented a couple of times what the doctor

7    said in other places.  Let's assume he's critical of Jamaica

8    Hospital or the doctors.  We don't know what documents he had.

9    We don't know if the standard that he's --

10          THE COURT:  Well, whether it is admissible or not, who

11   knows.

12          MS. METTHAM:  Though, your Honor, I would also be

13   concerned that the expert, again, was hired by the DA's office

14   to do an investigation.  They consulted with him.  And his

15   expert opinion is based on their discussions with him.  And I

16   am concerned that the majority of his testimony would not only

17   involve subpoenaing these grand jury documents but also involve

18   attorney-client privilege or attorney work product.  That is

19   another concern of mine, that we're also getting into the

20   intricacies of the DA's decision not to prosecute in this

21   matter, which we don't believe that plaintiff should be

22   entitled to.

23          THE COURT:  Let's do this.  Produce the opinion

24   unredacted, for attorneys' eyes only, and I don't think it is

25   going to be admissible but I don't determine that now.

1          MS. METTHAM:  And, your Honor, if I may?  May we

2     request a written opinion for that decision, to that effect

3     that we can produce to our clients to allow us to release the

4     document?

5          THE COURT:  You just got it.

6          MS. METTHAM:  Would I be able to submit an order for

7     your Honor to sign?

8          THE COURT:  Sure.

9          MS. METTHAM:  OK.  Thank you.

10          THE COURT:  Sure.

11          MR. SMITH:  Your Honor, while we are on that subject,

12     the redaction issue, like I said, is a little bit --

13          THE COURT:  I'm not going to get into that now.

14          MR. LEE:  Could I just say one more thing on that,

15     your Honor?

16          THE COURT:  Sure.

17          MR. LEE:  I understand your ruling.

18          Let's assume that the doctor, whoever the doctor is,

19     did not issue a written opinion and the only opinion is

20     documented in some notes that would be in this file.  You are

21     not directing them to produce a written opinion by the doctor?

22          THE COURT:  Well, no.  If there is a written opinion,

23     yes.

24          MR. LEE:  OK.

25          THE COURT:  Otherwise no.

1          MR. LEE:  Thank you, your Honor.

2          THE COURT:  Yes.  Now, where are we?  Oh, the waiver.

3   That seems to me to be resolved.

4          MS. METTHAM:  Your Honor, this has admittedly gone on

5   much longer than it ever should have.  The issue is that we

6   believe plaintiff waived the attorney-client privilege by

7   sharing the document with other people.

8          THE COURT:  Yes.

9          MS. METTHAM:  I told plaintiff I don't know how many

10  times that if plaintiff says he never shared the document with

11  someone, I don't want it.

12         THE COURT:  Yes.  Yes.  But now the plaintiff says --

13  correct me if I am wrong -- yeah, I'll show you the letter, but

14  that's not going to be a general waiver of the privilege.

15         MS. METTHAM:  Correct.

16         THE COURT:  That seems to me satisfactory.

17         MS. METTHAM:  Your Honor, my concern is this, is that

18  plaintiff will not state to defendants whether he did share

19  that letter with anyone.  He won't sign an affidavit to that

20  effect, and he won't sit for a deposition to that effect.  So

21  when plaintiff reserved his rights to the attorney-client

22  privilege but gives us the document, he allows himself to

23  later, if we try to use it in any manner, to say you can't

24  because there is an attorney-client privilege and we never

25  waived it, which is why I just asked that he sign --

1          THE COURT:  Well, let's be clear.  I think the

2     plaintiff may be examined on it, and he has waived the

3     privilege with respect to that letter.

4          MR. SMITH:  Your Honor, let me just clarify something.

5     The idea here was they wanted him to come down and do a

6     deposition on whether or not he sent this letter --

7          THE COURT:  Yes, because they want to use the letter.

8          MR. SMITH:  I know.  That's why I said --

9          THE COURT:  And they are going to be able to.

10          MR. SMITH:  But that's why --

11          THE COURT:  Unless we go through all this rinky-dink

12     about whether the guy actually got the letter, the report.

13          MR. SMITH:  That's what I'm concerned about.  We are

14     going to go through that rinky-dink because they have issued --

15     they filed a motion with the Court to compel Graham Rayman to

16     produce the records.  So this issue is not going to end.

17          THE COURT:  I appreciate that, but that would be

18     obviated if he concedes that he sent the letter.

19          MR. SMITH:  He doesn't concede that he sent the

20     letter.  I'm trying to just cut this inquiry off.  Because what

21     they want to do is take his deposition and then make a motion

22     saying compel the letter, and then they are going to ask for

23     more discovery because they are going to say, oh, you lied

24     about not sending the letter.  And I'm just saying here.  Take

25     the letter.  Let's stop the waste of time.  That was my

1    thinking.

2              THE COURT:  Yes.  But the letter --

3              MS. METTHAM:  Your Honor, plaintiff never gave the

4    letter to Graham Rayman.  There is no issue for Graham Rayman

5    to bring to this.

6              Graham Rayman will also say, we're told, that he never

7    got it from plaintiff.  So if plaintiff signs the affidavit,

8    there is no deposition.  If Graham Rayman says he didn't get it

9    from him, there is no issue.

10             I just would like to know if plaintiff is asserting

11   that he waived the right or not, and if he did not waive the

12   right, I don't think that I am entitled to the document.  If he

13   did waive that, then I think we are entitled to the document.

14   It is as simple as that.

15             THE COURT:  I agree.  But how do we get there?

16             MR. SMITH:  So, I mean, hypothetically, if I say the

17   plaintiff will sign an affidavit or say in a deposition that he

18   did not send this letter terminating his prior counsel to

19   anybody other than the prior counsel, is that the end of it?

20   Do I then have to have --

21             THE COURT:  I take it, it is the end of it unless the

22   city doesn't believe that and wants to challenge it.

23             MR. SMITH:  That is the point of why I'm saying here

24   take it, just agree with me that it is not a waiver full-blown.

25   That's why I am trying to cut this off, because I don't think

1    it is going to stop.

2          So I produce him for a deposition.  Then they are

3    going to say, well, we challenge it because we think you did

4    waive it even though you say you didn't waive it.  Then you

5    say, well, Mr. Smith, turn it over, and then we are off to the

6    races again on this.

7          And the big issue here is plaintiff sent a letter

8    firing his prior lawyer.  I mean, this is a major consequence

9    in this case?

10          MS. METTHAM:  Your Honor, I can represent that if

11    plaintiff puts in an affidavit, that he signs before a notary,

12    and says I did not share this with anyone else besides my prior

13    counsel and if Graham Rayman does not come in here and say,

14    actually, he gave it to me and showed it to me, we don't have

15    any further avenues for inquiry.

16          THE COURT:  Yes.  But you just added the question of

17    whether or not you would accept that representation.

18          MS. METTHAM:  Well, I would accept the representation

19    in the absence of a document -- you know, somebody else having

20    the document proving that plaintiff lied.  I'm not -- we're not

21    trying to --

22          THE COURT:  All I'm saying is the representation is

23    not going to eliminate the reporter's deposition, however that

24    turns out.

25          MS. METTHAM:  We are not seeking the reporter's

```
1    deposition, your Honor.  We are solely seeking documents from
2    the reporter.  And I am not seeking to question the reporter
3    about his relationship with Adrian Schoolcraft.
4           THE COURT:  I know this is next week, or whenever it
5    is, but where is that you --
6           MS. METTHAM:  We filed a motion, I believe it was on
7    March 5th -- I could be wrong on the date -- compelling
8    Mr. Rayman to comply with our subpoena.  I actually spoke with
9    Mr. --
10          THE COURT:  And the subpoena was directed to the
11   letter?
12          MS. METTHAM:  To the document, a few other documents
13   as well, your Honor.  But, yes, it is a subpoena for documents,
14   not for testimony.
15          THE COURT:  Well, I take it that the plaintiff will
16   not sign an affidavit saying I did not send the letter, and so
17   I suppose this inquiry has to go on.  If he does sign such a
18   letter, the city is going to seek to verify that he did not in
19   fact send it.  Now, whether that -- how that discovery issue is
20   going to work out is still before us.
21          So what does the plaintiff want to do under these
22   circumstances?
23          MR. SMITH:  What I'm suggesting, and it is just a
24   suggestion -- and I was trying to negotiate with the city about
25   this -- is say, look, you want to take the guy's deposition on
```

```
1    this issue about whether or not he sent the letter.  Take the
2    letter as long as you agree with me it is not a waiver, and
3    then we're done.  You can go attack him about his credibility
4    on 7,000 other things.  But this is an easy way, because,
5    frankly, I read the letter.  It's not a huge document, it's
6    three sentences.  And in my, you know, opinion, which has been
7    wrong as many times as right, it is not earthshattering
8    attorney-client material.
9              THE COURT:  Oh, I remember now.  Now I remember the
10   letter.  This is the media letter?
11             MS. METTHAM:  Yes, your Honor.
12             THE COURT:  Ah.
13             MR. SMITH:  A media letter?
14             MR. LENOIR:  No.  That's somebody's interpretation of
15   it.
16             MR. SMITH:  Oh, yeah.  Maybe somebody is interpreting
17   it that way or misinterpreting it that way but --
18             THE COURT:  Whatever.
19             MR. SMITH:  This was a letter that the plaintiff sent
20   to John Norinsberg terminating Mr. Norinsberg.
21             THE COURT:  Well --
22             MR. SMITH:  Your Honor, I would be more than willing
23   to submit the letter in camera for you to review it, and you
24   can look at it.  I don't know what you meant by a "media
25   letter."  It's not a media letter.  It's not about the media.
```

1     It's about ending a relationship in three sentences with not a

2     lot of, you know, personal confidences being revealed.

3              But I know, from too many years of being in

4     litigation, that this is not the -- if he does a deposition,

5     then they subpoena Graham Rayman and they get a copy of the

6     letter, or they don't get a copy of the letter, we're never

7     going to end with this, and you know that as well as I do.  So

8     I'm saying take the letter.  They say no, no, no, we don't want

9     the letter.  So what they're fishing for here -- what this all

10    proves to me is they're fishing for some other way to

11    manufacture an argument about the plaintiff's credibility.

12             THE COURT:  OK.  What we'll do is you'll produce the

13    letter.  The letter will not constitute a waiver of the

14    privilege under these particular circumstances but only with

15    respect to the letter and its communications.

16             MS. METTHAM:  So, your Honor, if defendants were to

17    seek to rely on that letter at a future date?

18             THE COURT:  Well, we'll cross those bridges when we

19    get to them.

20             MS. METTHAM:  OK.  Yes, your Honor.

21             THE COURT:  Now where are we?  The father's documents.

22    Is that an issue?

23             MR. KRETZ:  Yes, it is, your Honor.  Mr. Schoolcraft,

24    the father, was heard on a recording that I believe he made

25    indicating to the NYPD, I believe, that they will not succeed

in preventing Adrian Schoolcraft from telling his story by
stealing all of his records from his apartment because he, the
father, had three copies of everything Adrian ever created.

So we heard that on the recording.  And when we went
to his deposition we asked him about that.  And he said it's
true and it's all in his garage and he didn't have an
opportunity to look through it and we were welcome to come and
do that.

So I contacted Adrian's attorneys, really out of
courtesy.  Mr. Schoolcraft was to have reviewed those records
and to have produced anything contained in those records for
his deposition, which we took up in Albany.  But he said he
didn't have an opportunity to get at them.  So he welcomed us
to do it.

So I contacted Mr. Smith to inquire whether he wanted
to facilitate this review.  And he has objected because he said
having the attorneys for the defendants go to Mr. Schoolcraft's
home would be a traumatic experience for Adrian because Adrian
lives there as well.

So what we're simply asking for is a direction that
the plaintiff not interfere with that process, and we will
accommodate him in whatever way we can so that he is not
traumatized by our visit there.  We don't intend to go into the
house.  We intend to look into the garage.  We are happy to
have the stuff transported to another location.

1           Your Honor, the appearance has been throughout the

2    case that there was a selective production of recordings.

3           THE COURT:  Yes.  I understand.

4           MR. KRETZ:  Frankly, many of the recordings are

5    damning, if you will, of Mr. Schoolcraft, that is, Adrian.  But

6    there is much that hasn't been produced, and presumably they

7    either didn't help him or they may have hurt him.

8           In addition --

9           THE COURT:  What does the plaintiff want to do?

10          MR. SMITH:  Your Honor, well, procedurally, there is a

11   problem with this because they're trying to enforce a subpoena

12   against me that was issued out of the Northern District against

13   Larry Schoolcraft, the father.  OK?  And so Mr. Kretz contacted

14   me and said we want to come to the plaintiff's home to look at

15   these records.  And I said, you know, that's really not

16   appropriate.

17          THE COURT:  What do you want to do?

18          MR. SMITH:  I want them to identify what documents --

19          THE COURT:  No.  That they can't do because how could

20   they identify them?  No.  No.  They are going to get the

21   documents.

22          How do you want to manage this?

23          MR. SMITH:  Well, I think the best way to manage it

24   would be to have Mr. Schoolcraft, the father, make copies of

25   whatever --

1          THE COURT:  No.  No good.

2          MR. SMITH:  I don't have control over him, your Honor.

3     I mean, he's not my client.

4          THE COURT:  Oh, so you're saying this whole discussion

5     has to take place in the Northern District?

6          MR. SMITH:  If they want to enforce a subpoena

7     against --

8          THE COURT:  They do want to enforce a subpoena.

9          MR. SMITH:  Then they have to go to the Northern

10    District.

11         THE COURT:  And you and your client are not going --

12    your client is not going to cooperate with that?

13         MR. SMITH:  No.  What I tried to do was to limit the

14    aggravation associated with this by having Mr. Schoolcraft, Sr.

15    produce to me a copy of whatever he said he has, and then I

16    would turn it over to them.  As opposed to having a horde of

17    lawyers going into Mr. Schoolcraft, the father and the son's

18    home, ostensively to do the same thing.

19         The backdrop for this is that Mr. Schoolcraft, the

20    father, the father said I have three copies of everything.  You

21    know, I mean, I don't know if he has three copies of

22    everything.  But in any event, if it was a normal case, he

23    would be directed by --

24         THE COURT:  Well, one thing that we certainly can

25    establish is that it is not.

1            MR. SMITH:  OK.  Well --

2            MR. KRETZ:  Your Honor, Adrian Schoolcraft --

3            THE COURT:  Let me make this suggestion.

4       Why don't you and defense counsel, one defense

5  counsel, go up and look at the records together and determine

6  whether you either -- you eminent folks don't have to do that,

7  you can send a slave if you want to, but look at the records

8  and then determine whether (A) they are relevant, and if they

9  are, how they should be produced.

10           MR. KRETZ:  That's fine, your Honor.

11      I would just like to point out, one of the appearances

12  that the plaintiff is trying to create is that NYPD stole

13  records.  He had mountains of them and they stole them.  So he

14  couldn't make his case about all the corruption in the NYPD.

15      The truth is, as far as I know, nobody at the NYPD

16  stole anything.  And there is no such mountain of documents,

17  and there was no such mountain of wrongdoing and there is

18  nothing to all this.  But if he shows me an empty garage,

19  that's fine, it just makes our point.  By all means we will

20  make those arrangements, your Honor.  Thank you.

21           MR. LEE:  One more thing, your Honor.

22      The city defendants and the medical defendants, we

23  have different issues than the city has.  What if there is one

24  city attorney and one medical attorney for this inspection?

25           MR. KRETZ:  As long as it is Mr. Lee, your Honor, I am

```
 1    all in favor of that.
 2              MR. RADOMISLI:  I object.
 3              THE COURT:  How is that?  Do you think you can keep
 4    the peace even if there is two to one?
 5              MR. SMITH:  Yeah, I can handle that.  Frankly, Judge,
 6    I mean, all kidding aside, I was concerned about, you know, an
 7    entourage, because you may not remember this but after
 8    Schoolcraft, he went back --
 9              THE COURT:  Enough already.
10              MR. SMITH:  All right.
11              THE COURT:  Three people.  OK.
12              MR. SMITH:  Well, Mr. Kretz and Mr. Lee.
13              THE COURT:  All right.  OK.  So everybody has got to
14    suffer.  If you're going to suffer, they've got to suffer.  I
15    understand.
16              MR. SMITH:  No, that's not it at all, your Honor.  I
17    frankly know that they will be respectful of my concerns.
18              THE COURT:  Got you.  OK.
19              And besides which --
20              MR. KRETZ:  As will all defense counsel.
21              THE COURT:  Spring is coming and it may be nice up
22    there.
23              MR. CALLAN:  Your Honor, as the one other medical
24    defendant in the case, I would just ask if our designated
25    representatives would be able to take photographs of whatever
```

1    piles of documents exist in the garage as part of the

2    inspection process.

3          THE COURT:  I'm not going to get into that.  No.  I

4    mean, I'm not -- the next thing you know, I'm going to be going

5    up and invading another judge's district.  Oh, no, I am not

6    going to do that.  OK.

7          Oh, now more yellow.  I signed the opinion today

8    granting reconsideration and permitting the amendment.

9          MR. KRETZ:  Thank you, your Honor.

10          THE COURT:  So if that raises an issue, I'll be here.

11          I'm not quite clear on the locker investigation issue.

12    Wait a minute.

13          MS. METTHAM:  Your Honor, I can clarify for you.  This

14    hasn't really been briefed.

15          What happened is is that Adrian Schoolcraft had a

16    couple of lockers in the 81st Precinct.  They were supposed to

17    have been sealed following his suspension, but at some point

18    after he left the seals were broken and they started being used

19    in regular rotation again.

20          We discovered this last year during the inspection of

21    the 81st Precinct.  IAB immediately launched an investigation

22    into what happened to the lockers, why had these seals been

23    broken.  I had been in communication with the NYPD about this

24    investigation throughout.  It was on hold for a short period of

25    time because the union delegate who had been responsible for

```
 1   giving the locker out to police officers had been retired.  I
 2   understand that he was interviewed about two weeks ago.  They
 3   expect the investigation to be closing in the next couple of
 4   weeks.  They said it is at the end.
 5           And so there is no closing file right now for
 6   Mr. Smith to have access to.  There have been some
 7   interrogations, some; interviews, but there is no actual
 8   closing file to get access to.  I believe that the file should
 9   be ready to be produced by May 1st.
10           THE COURT:  By?
11           MS. METTHAM:  May 1st.
12           THE COURT:  OK.  Does that end the issue?
13           MR. SMITH:  Well, I mean, no, because there is also
14   the contents.  We asked -- actually, the way this whole thing
15   unraveled was we asked for the contents of his lockers, which
16   had his own personal stuff as well as some of the crime reports
17   and other things that, you know, could have been pertinent to
18   this case.  And we went to the 81st Precinct and during the
19   inspection in September, six months ago, learned that the
20   lockers that had been sealed pursuant to orders had been
21   unsealed.  And that's when the city represented that they're
22   launching an investigation, and it's apparently been ongoing
23   for six months but they need another three months to finish it.
24   So we want to know what was in the lockers and we want to know
25   why these lockers were broken into or opened up or what the
```

44

1   circumstances were.

2           And May 1 means that, by my count, it's taken them

3   nine months to figure this out.  And so I don't understand why

4   we can't get any information about what happened to the

5   contents of this locker before May 1st.

6           MS. METTHAM:  Your Honor, number one, they have not

7   recovered any of the contents of the locker, so it is a moot

8   point for the production of the contents.

9           In terms of the closing --

10          MR. SMITH:  That just raises a whole host of

11  questions.  Deputy Inspector Mauriello was the commander at the

12  time and now he's got reconsideration.  He's going to have to

13  come back and explain a lot of things about what happened to

14  that locker as well as some of the other issues that are

15  unraveled by that.  So --

16          THE COURT:  OK.  I take it the city's position is that

17  there are no documents or objects that were retained or

18  obtained from the locker?

19          MS. METTHAM:  Correct, your Honor.

20          MR. SMITH:  That's not possible.  I mean, he had two

21  lockers there.  He left --

22          THE COURT:  Who knows.

23          MR. SMITH:  I need some sort of --

24          THE COURT:  Who knows where they went.  But the city

25  is saying now there are no documents to be produced.

1            MS. METTHAM:  And, your Honor, I would also just point

2     out, it is not that May 1st is when it will finally close; it

3     is that they just finished interviewing the PBA rep.  There may

4     be a couple more conclusory interviews that they may have to do

5     if they get more information.  But they do expect to close --

6     the IAB group that is investigating, to close their

7     investigation in the next couple of weeks.  And it then has to

8     be presented to a steering committee, and after the steering

9     committee it will get produced to myself and then I will be

10    able to produce the documents by May 1st.  So it is not that

11    it's -- you know, it is not that IAB is dragging their feet.

12    There are a lot of steps.

13           THE COURT:  All of that is the city's procedural

14    posture, I mean, with respect to the investigation and so on.

15           But I think the city should take the position with

16    respect to the subpoena for whatever was in the lockers, the

17    city should take the position that, whatever your position will

18    be, I don't think the investigation should alter the power of

19    the plaintiff to obtain whatever was in the lockers that the

20    city gathered.

21           MS. METTHAM:  Exactly, your Honor.  And that would

22    have been our position.  However, there have been no contents

23    recovered to date to produce to plaintiff.

24           THE COURT:  Well, that's obviously not going to be the

25    end of the story.  So that's where we are with that.

1          OK.  Now, that leaves us with the -- and there may be

2     some other things, but it seems to me the next step is

3     scheduling.  And I think we ought to be fairly precise about

4     that as best we can.

5          What this really boils down to, folks, is do we want

6     to try this in May or in the fall?

7          MR. RADOMISLI:  Your Honor.

8          THE COURT:  Yes.

9          MR. RADOMISLI:  There hasn't even been expert

10    discovery exchanged yet and certainly --

11         THE COURT:  Well, then that answers the question.

12         Fact discovery, when do you all want to finish that?

13         MR. SMITH:  Your Honor, I've, in a March 3, 2014

14    letter that I sent to the Court, I set a proposed discovery

15    order outlining -- identifying the witnesses that I know I want

16    to take as of today, having a proposed fact discovery of

17    June 14.  And I don't know what the Court ruled on the requests

18    to have the other witnesses come back but we can modify that.

19         But my proposal was that 30 days after fact discovery

20    ends on June 14th, that the plaintiff would then produce his

21    expert disclosures, and then 30 days after that the defendants

22    would do theirs.  And we would have a window of a few weeks

23    over the summer, in August, I'm afraid, to do any depositions,

24    and then have this case ready for trial in September.

25         That was my proposal and it is my proposal.

```
 1              THE COURT:  Yes.

 2              MR. RADOMISLI:  Your Honor, as I pointed out in one of

 3    my letters to your Honor, certainly Jamaica Hospital, as I'm

 4    sure the other medical defendants, too, intend to make summary

 5    judgment motions.  So we can't just skip to trial right after

 6    expert discovery is over.  And the prior orders did have

 7    provisions for timing of summary judgment motions.

 8              MR. SMITH:  I mean, we can work in, frankly, a very

 9    short schedule for motions.

10              THE COURT:  Now, close of fact discovery, why do you

11    think it has to go to mid-June?

12              MR. SMITH:  Well, if history is a lesson, taking

13    depositions in this case -- I mean, there are a lot of lawyers

14    around.  Schedules change.  It took me pretty much, you know --

15    and I'm not saying I was the only one who was responsible for

16    some of the delays, but I'm not saying the defendants were.

17    I'm just saying the reality is that the number of witnesses --

18              THE COURT:  Look, what depositions remain, fact?

19              MR. SMITH:  Fact are Weiss; Gough, G-o-u-g-h; Sawyer;

20    Duncan; Jessica Marquez; Sal Sangianetti,

21    S-a-n-g-i-a-n-e-t-t-i; Shantel James; Christopher Broschart;

22    Timothy Trainor, and a 30(b)(6) of Jamaica Hospital and a

23    30(b)(6) of the city.  So by my count, that's one, two, three,

24    four, five, six, seven, eight, nine, ten, eleven --

25              THE COURT:  And Mauriello.
```

1          MR. SMITH:  And now for sure Mauriello, with the

2    reconsideration granted, so that's 12.  And, you know, I mean,

3    to get, you know, a set of five lawyers and a witness and a

4    court reporter, you know, there, it takes time.  So that's why

5    I'm suggesting that June is a realistic date.

6          MS. METTHAM:  And, your Honor, if I may?

7          Now that your Honor has stated that plaintiff is not

8    precluded from relying on his witness Joe Ferrara, the city

9    defendants would also seek leave to depose that nonparty.

10         THE COURT:  OK.  So that's one more.

11         Well, what do you all think?  Can you do that?  What

12   was your date, June 14th?

13         MR. SMITH:  My date was June 14th for fact discovery

14   and then 30 days and 30 days for experts.

15         THE COURT:  Well, anybody have any objection to that?

16         MS. METTHAM:  Your Honor, I don't have an objection to

17   the date.  But plaintiff's order as written has again specific

18   dates listed for these defendants and nonparty depositions, but

19   plaintiff has not spoken with codefendants, with defendants, or

20   the individuals.

21         THE COURT:  All right.  Well, let's do this.  OK.  So

22   we will extend the fact discovery to June 14th.  The parties

23   will meet and confer next week on the schedule and resolve it.

24         If you don't resolve it, you will be back here next

25   week -- a week from now.  I mean, on the regular motion day?

1   What is today?  Let me see.  OK.  Life is -- suppose I gave you

2   10 days.  In other words, you get the schedule or be back here

3   on the 26th.

4        MR. SMITH:  That works for me, your Honor, because

5   I've got a week's trial next week before Judge Marrero so I

6   really wouldn't be able to sit down and hammer this out before

7   then.  So sometime before that we can sit down and --

8        MR. LEE:  I have, your Honor, the original scheduling

9   order on my computer.  We can take the June 14th date and just

10  push all the other dates based on that.  I will submit it

11  tomorrow to all counsel.

12       MR. SMITH:  OK.

13       THE COURT:  Atta boy.  OK.  Then you submit it to all

14  counsel tomorrow, and if you don't agree you are back here on

15  the 19th.

16       MR. SMITH:  That's next week, your Honor.  I am on

17  trial next week before Judge Marrero.

18       THE COURT:  He lets you have lunch, doesn't he?

19       MR. SMITH:  I've never tried a case before him so I

20  don't know.

21       THE COURT:  I'm sure he lets you have lunch.  And just

22  tell him that you have a matter with me at noon on the 19th,

23  and ask him if he would release you for 20 minutes for that.

24       MR. SMITH:  OK.  But the reason why I was late here

25  was because I was talking with Judge Marrero and had to

```
1   terminate that encounter because of this encounter.
2             THE COURT:  Yes.  Well, all right.  All right.  I'll
3   be -- it grovels me to be pleasant but I will say the 26th,
4   then.
5             MR. SHAFFER:  Your Honor --
6             THE COURT:  If you are still before Marrero, I would
7   hold you in contempt if you are not here.
8             Yes.
9             MR. SHAFFER:  May I ask for just one point of
10  clarification?
11            THE COURT:  Sure.
12            MR. SHAFFER:  It's the case that aside from Inspector
13  Mauriello, the Court is not going to allow plaintiff to recall
14  any of the witnesses who have already been deposed, is that
15  correct?
16            THE COURT:  Well, that was something that we hadn't
17  really addressed.
18            MR. SMITH:  Well, I mean --
19            THE COURT:  I think we covered everything but --
20            MR. SMITH:  There were -- in my application, there
21  were four people who I wanted to come back.  Mauriello was one
22  of them but that's been resolved.
23            THE COURT:  All right.  You can get Mauriello.
24            MR. SMITH:  So the other ones were Marino, Caughey and
25  Lauterborn.  And like I said in this letter, there are a litany
```

```
 1     of questions that I put to these witnesses that, you know, they
 2     said that we're not going to answer them.  And we really
 3     haven't, you know, resolved whether or not those instructions
 4     to those witnesses were proper.
 5          And we also haven't resolved an interesting issue
 6     about the Marino deposition because he -- when I asked him what
 7     did he do to prepare for his deposition, he said, among other
 8     things, that he reviewed a transcript --
 9          THE COURT:  Yeah.  That transcript thing is -- forget
10     about the transcript.
11          MR. SMITH:  Oh, I missed the boat on that?
12          THE COURT:  What?
13          MR. SMITH:  Did I miss the boat on that?
14          THE COURT:  No.  I'm sorry.  We hadn't discussed it.
15          I meant by that I read the positions on that, and
16     there is no need to produce the transcript.
17          MR. SMITH:  OK.  All right.
18          THE COURT:  So that eliminates that.
19          MR. SMITH:  Yes.  Respectfully, I thought you would
20     come out the other way.  But in any event, he was also
21     instructed not to answer questions about prior charges, prior
22     convictions, about the claims of corruption against him.  So,
23     you know, I mean, I don't think that's proper.
24          THE COURT:  Didn't we just --
25          MR. SMITH:  I think we covered one issue, which is
```

```
 1    whether or not a 15-year-old excessive force charge was

 2    something that I could inquire about, and I understood your

 3    Honor to be saying no.

 4              THE COURT:  No.

 5              MR. SMITH:  But, you know, there are a lot of other

 6    things here.

 7              THE COURT:  Well, I gather not, from the city's

 8    position.

 9              MR. SMITH:  Well, of course not.  From their position,

10    I'm not entitled to ask any questions that are at all, you

11    know, probing of, you know, potential misdeeds by their

12    witness.  I mean, that's not a surprise.  I'm just surprised

13    that they can prevail on some of that.

14              THE COURT:  The answer is no.

15              MR. SHAFFER:  Thank you, your Honor.

16              MR. RADOMISLI:  Your Honor, if I may?

17              In light of your Honor's comments earlier today that

18    there will be no further discovery unless issues are raised

19    today, I would like to ask your Honor to direct the plaintiff's

20    attorney to respond to my contention interrogatories which were

21    served, and, also, we are still waiting for duplicate copies of

22    photographs that were taken of Jamaica Hospital some nine

23    months ago.

24              In addition, your Honor, I would appreciate it if your

25    Honor could direct plaintiff's counsel to respond to my
```

1    contention interrogatories before the city turns over that

2    unredacted report, because I would like to know their

3    contentions, not the city's DA's experts.

4             THE COURT:  OK.

5             MR. SMITH:  Let me try and address that.  It is an

6    easy one.  I think the photographs were sent to all of you guys

7    along with the deposition videos and -- isn't that true?

8             MR. RADOMISLI:  I didn't see them but I understand

9    they were sent.

10            MS. METTHAM:  I just received them.

11            MR. SMITH:  OK.  So those were packaged by --

12            MR. RADOMISLI:  Fine.  I believe you.

13            MR. SMITH:  The contention interrogatories, they need

14   leave in order to be able to serve contention interrogatories.

15            And the contention interrogatories that Jamaica

16   Hospital served weren't really contention interrogatories.  And

17   contention interrogatories, if they are appropriate, should be

18   done after discovery is completed.  Because the whole purpose

19   is now that you've completed discovery and if you get

20   permission from the Court, you can get -- there is an

21   opportunity for all sides to nail down the contentions of the

22   parties.

23            So, you know, I think that the request was premature.

24   I objected to it in the original scheduling order for a host of

25   reasons, the most important being is that it is just a huge

```
1    amount of work for no real gain.  And, you know, I still
2    maintain that contention interrogatories are a useless and
3    burdensome exercise, and there is a reason why you need
4    permission in order to serve them.
5            MR. RADOMISLI:  I don't believe you need permission,
6    your Honor.  But in any event, there were three
7    interrogatories.  It is hardly burdensome.  And they directly
8    asked questions other than physicians who have been named, in
9    other words, other than Dr. Aldana-Bernier and Dr. Isakov, does
10   plaintiff contend that any other physician departed from
11   accepted standards of care when Adrian Schoolcraft was treated
12   at Jamaica Hospital.  If so, identify him.  Does plaintiff
13   contend, other than the named physicians, that any physicians
14   or nurses at Jamaica Hospital intentionally inflicted emotional
15   distress.
16           These go directly to the heart of the state claims.  I
17   think they are three or four interrogatories.  They can be
18   answered very directly, assuming that he had ever had an expert
19   review the chart.
20           MR. SMITH:  Let me just respond to that, if you don't
21   mind.
22           The whole point -- I mean, I want to take Jamaica
23   Hospital, the 30(b)(6) of Jamaica Hospital, and, you know, and
24   also --
25           THE COURT:  How about this?
```

```
1              MR. RADOMISLI:  The 30(b)(6), your Honor, we have

2      already established earlier today is going to be about the

3      policies and procedures when an EDP comes into the Jamaica

4      Hospital.  That's what Mr. Lenoir said today.

5              MR. SMITH:  There is a lot of issues that I want to

6      cover on the 30(b)(6)'s.  It is not just one issue.

7              MR. RADOMISLI:  Apparently there is only one issue

8      because that is what your co-counsel said today.

9              MR. SMITH:  Well --

10             THE COURT:  All right.  Now, don't get desperate.

11             So indicate to the hospital to say there are issues

12     other than the admissions policy, indicate to the hospital what

13     those other matters are on which you want the hospital witness

14     to testify.  And I am assuming that once you have done that,

15     that will be settled.  If it is not, we'll deal with that on

16     the 29th.  So make that designation within a week.

17             MS. METTHAM:  Your Honor, if I may?

18             I have to confess, I did not notice until just now

19     that plaintiff's proposed scheduling order included a city

20     30(b)(6) witness.  City defendants have not been served with a

21     30(b)(6) notice.  So we would ask that by a date certain that

22     plaintiff provide a proper 30(b)(6) notice.

23             THE COURT:  When do you want to do that?

24             MR. SMITH:  I don't have a problem serving a proper

25     30(b)(6) notice if it's just a question of what were we doing
```

 1    in discovery here and trying to figure out the timing of that.

 2    I do have a trial starting next week.  So I would like a little

 3    bit of room here.  One week for me puts me in a real bind but

 4    two weeks doesn't.

 5            THE COURT:  Well, OK.  So designate within two weeks

 6    both to the city and to the hospital.

 7            MR. RADOMISLI:  Your Honor, can I still get responses

 8    to my contention interrogatories, please?

 9            THE COURT:  Now, the answers to the contention

10    interrogatories will be due two weeks after the completion of

11    those depositions.

12            MR. RADOMISLI:  Thank you.

13            THE COURT:  Now, what else?

14            MR. KRETZ:  Perhaps finally, your Honor.  May

15    plaintiff and I have until we finalize the discovery schedule

16    the opportunity to identify any additional depositions we need

17    to do now that Mauriello's counterclaims are going forward?  So

18    we identify them quickly and we make sure --

19            THE COURT:  Yes.

20            MR. KRETZ:  OK.  Thank you.

21            THE COURT:  June 14th.  So what is a reasonable

22    schedule for -- two weeks later for the designation of

23    plaintiff's experts.  So that would be, say, June 30th.  And

24    two weeks later the defense, if any, for experts.

25            MS. METTHAM:  Your Honor, I believe, if I'm not

1    mistaken, that in prior discovery orders defendants were given

2    a month.

3              Is that correct, Ryan?

4              THE COURT:  Well, yeah, but if we're trying to get

5    this all done over the summer --

6              MS. METTHAM:  Well, I understand, your Honor.  The

7    only issue is that plaintiff has had as long as discovery to

8    submit his plaintiff's expert report, and our rebuttal expert

9    will only have two weeks to know what the expert is actually

10   opining on.

11             THE COURT:  OK.  So we'll say, then, June 30th for the

12   plaintiff and July 28th for the defense.

13             And don't you think that those depositions -- the

14   depositions to be completed by, what would you think?

15   September 8th?

16             MR. RADOMISLI:  Psychiatrists, your Honor, are known

17   for going away in the month of August.

18             MR. LEE:  That is true.  They have an APA convention

19   every year in August.  That is really a true statement.

20             MR. RADOMISLI:  So to the extent that we would have to

21   produce --

22             THE COURT:  So do you think maybe complete any expert

23   discovery by September 19?

24             MR. RADOMISLI:  Thank you, your Honor.

25             THE COURT:  And the Pretrial Order.

1          Now, motions.  The expert -- whatever happens on

2    expert discovery is not going to affect the motions, is it?

3          MR. RADOMISLI:  It will for the medical defendants,

4    your Honor, because in order for them to be able to bring a

5    cause of action against us, they will need an expert to say

6    that there was a departure from accepted standards of care.

7          THE COURT:  OK.  So I guess that means any motions

8    should be made returnable October 1st, and we set the case down

9    for trial on October 13th.

10          How does that sound?

11          MR. SMITH:  The trial date sounds great to me, your

12   Honor, but just a point of clarification.

13          If the motion is going to be returnable 10/1, do you

14   mean that a fully submitted motion will be ready for your Honor

15   by 10/1 or --

16          THE COURT:  Yes.

17          MR. SMITH:  OK.

18          THE COURT:  I am going to hear it on the 1st.

19          MR. SMITH:  OK.  Then we will have to work together to

20   have a schedule for that.

21          THE COURT:  Yes.

22          MR. RADOMISLI:  In that case, your Honor, I would

23   actually like a firm date for the plaintiff's expert, because I

24   don't want to be in a position where the plaintiff's expert

25   can't be deposed until September 19th, and by then it will be

```
 1   too late for us to be able to make a summary judgment.

 2            MR. SMITH:  You are going to a report from an expert

 3   on 6/30.

 4            MR. RADOMISLI:  Then maybe we could do the plaintiff's

 5   expert deposition by the end of July as well?

 6            MR. SMITH:  OK.

 7            THE COURT:  Is that possible?

 8            MR. SMITH:  Yeah.  Why not?  That is OK.

 9            THE COURT:  OK.

10            MR. SMITH:  All right.  Plaintiff's medical expert by

11   7/31.  OK.

12            MR. RADOMISLI:  Thank you.

13            THE COURT:  And I would say the Pretrial Order on

14   October 1st.

15            What have I forgotten?  What have you forgotten?

16            MR. SMITH:  Well, I came in a little late.  There are

17   some document demands that I served on the Jamaica Hospital

18   defendants and the city defendants, and the city defendants

19   haven't responded formally yet.  And Jamaica Hospital responded

20   with a ton of boilerplate objections, refusing to produce any

21   information.

22            And the only reason why I am raising that is because I

23   heard, you know, somebody say that anything that is not

24   mentioned today shall never ever be -- unless it is mentioned

25   today, it shall never ever be mentioned again.  So I want to
```

```
1     mention that I got these supplement document demands based on

2     mostly the information I learned --

3               THE COURT:  The demands on the city we resolved.

4               MR. SMITH:  OK.

5               THE COURT:  My recollection, although that was two

6     hours ago, my recollection is that the city takes the position

7     they have satisfied your demands except for those demands which

8     they consider to be irrelevant.  As to those, they are going to

9     specify and we're going to hear that issue but I don't remember

10    when.

11              MS. METTHAM:  We had said next week, your Honor, for

12    that issue.  Though when Mr. Smith arrived --

13              THE COURT:  Let's do it on the 29th.

14              MS. METTHAM:  But is it the 26th?

15              THE COURT:  Well, whatever that was.

16              MS. METTHAM:  Wednesday, the 26th, I believe.

17              MR. RADOMISLI:  Your Honor, we responded to the

18    plaintiff's attorney's document demands.  They were hardly

19    boilerplate responses.  I mean, plaintiff's counsel asks for

20    financial information regarding Jamaica Hospital.  What

21    possible bearing does that have on the treatment that was

22    rendered to Adrian Schoolcraft?  None, your Honor, is what I

23    would say.

24              MR. SMITH:  Well, respectfully, a lot, from my

25    perspective.  Dr. Bernier testified that she, on average for
```

1   the 10-year period preceding the time that she decided to

2   commit Officer Schoolcraft, that she -- 2,000 involuntary

3   commitments a year she did at the rate of approximately, based

4   on a five-day week schedule, eight involuntary commitments a

5   day.

6             And so I served requests on Jamaica Hospital asking

7   for information about whether or not financial considerations

8   play a part in the evaluation of the performance of doctors

9   that are admitting patients and also trying to get information

10  about how much revenue the hospital generates from involuntary

11  commitments.  The Doctor did --

12            THE COURT:  I take it those are questions that would

13  be appropriate to the 30(b)(6) witness.

14            MR. SMITH:  Absolutely.

15            MR. RADOMISLI:  Arguably, but those weren't --

16  plaintiff's counsel didn't serve interrogatories --

17            MR. SMITH:  These were documented.  To the extent that

18  you track performance based on involuntaries or to the extent

19  you track how much money you earn from involuntary

20  commitments --

21            THE COURT:  If --

22            MR. RADOMISLI:  Your Honor, we previously responded to

23  plaintiff's former counsel's document requests regarding

24  performance evaluations.  We've already responded to that, and

25  that's what I put in my response.  "See prior response."  If

```
 1   plaintiff's counsel hasn't reviewed that, that is not my fault.

 2           MR. SMITH:  No, I have reviewed it.  I'm just saying

 3   that, you know, we might have an issue here about whether or

 4   not they have turned over the information that I've requested.

 5   And maybe --

 6           MR. RADOMISLI:  Then why am I hearing about it three

 7   years later?

 8           MR. SMITH:  Frankly, I was very surprised that the

 9   Doctor said that she on average for the past 10 years has been

10   committing eight people a day and --

11           MR. RADOMISLI:  That doesn't give me much confidence

12   either.

13           THE COURT:  Let's be clear.  If there are any -- look,

14   I think the best thing to do is to have this issue raised with

15   the 30(b)(6) witness.  If there are any documents that relate

16   to an evaluation of doctors based on commitments, they should

17   be produced.

18           MR. RADOMISLI:  Based on the number of commitments?

19           THE COURT:  Yes.  OK.  Now, is there anything else?

20           (Pause)

21           I look forward to seeing you all again and again.  Why

22   I didn't refer this to the Magistrate is a mystery to me now --

23           MS. METTHAM:  Thank you, your Honor.

24           THE COURT:  -- except humanity.

25                                    -   -   -
```