DAVID S. KORZENIK
Miller Korzenik Sommers LLP
488 Madison Avenue, Suite 1120
New York, NY 10022
Phone:  212-752-9200
*Attorneys for Graham Rayman*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                *Plaintiff*,

   -v-

CITY OF NEW YORK, et. al.,

                *Defendants*
-----------------------------------------------------------X

Civil Action No. 10-cv-6005 (RWS)

**DECLARATION OF GRAHAM RAYMAN
IN SUPPORT OF OPPOSITION TO MOTION TO COMPEL DOCUMENTS
AND CROSS-MOTION TO QUASH SUBPOENA**

GRAHAM RAYMAN declares as follows:

1. I am a freelance journalist, formerly employed by the Village Voice. I have been a reporter for 24 years, covering crime, courts, politics and a range of other beats here in New York City for the Voice, and before that for Newsday.

2. In 2010, I wrote a series of articles in the Village Voice, "The NYPD Tapes." That series was based on interviews with many sources, including Adrian Schoolcraft, and on numerous materials, including digital recordings made by Schoolcraft. My book, also titled "The NYPD Tapes," was published by Palgrave Macmillan in 2013. The Book and the Articles exposed manipulation of crime statistics in the NYPD and provided evidence of civil rights violations and illegal quotas – issues of critical public concern to everyday New Yorkers.

3. In the ensuing months and years, the NYPD was obliged to start investigations and take disciplinary action. The Schoolcraft recordings were used in *Floyd v. City of New York*, the landmark stop-and-frisk class action lawsuit. The subject of stop-and-frisk covered in the Book and Articles became an issue of growing and important public debate and arguably affected the mayoral election and a range of public policy issues – not just in New York City but in other cities as well. The work led to coverage in a wide range of publications, including a number of columns in The New York Times by Jim Dwyer (see, for example, http://www.nytimes.com/2012/03/09/nyregion/officer-sues-claiming-police-retaliation-for-truth-telling.html?_r=0).  Even years after the series was published, this work is still being cited. (See, for example, a Ta-Nehisi Coates column in the Atlantic Monthly on the national policy implications of profiling, available at http://www.theatlantic.com/politics/archive/2013/07/profiling-comes-to-the-white-

1

house/277943/.) Since the series ran, I have received hundreds of messages from New Yorkers, and people around the country, including members of the law enforcement community, thanking me for reporting these issues. Thus, this work is a clear example of public interest journalism, the kind of work that often requires tremendous time, effort and resources.

4. I faced many challenges in reporting this story. City officials, including those running the Police Department, did not want to discuss the Schoolcraft matter or its implications, or even provide a single document about it. Members of the NYPD would not speak with me for the record out of a real fear for their jobs. And so there was no way I could have covered these issues, critical to the public interest, had my sources not been able to trust me.

5. The journalist's privilege exists to permit sources to trust reporters. The privilege may not be absolute in all circumstances, but it is crucial to the efficacy of important public interest reporting. The only way I can do my job – indeed the only way any reporter can do his or her job – is if I can convince sources to trust me. If sources think that the government or any litigant can just reach into our work three years later and use the power of subpoena to compel us to turn over documents and sources and turn journalists into witnesses against them or even for them, then no one will trust us, and stories like the ones I wrote about the NYPD will never be told.

6. For that reason I do not wish to accommodate demands for the materials I obtained in the course of my newsgathering for this story but will provide only such documents as I am obliged to produce – documents the Court in its fair judgment determines the reporter's privilege does not protect.

2

7. The federal reporter's privilege may not be as firm as the New York State Shield Law. But I trust that the Court, as it balances the factors to be considered in this case, will take into account the nature and value of reports on the subject matter of my Book and Articles as well as the necessity of journalists being able to maintain the trust of their sources, who in the end are the life-blood of what we do. To do otherwise would have a chilling effect on newsgathering as it would impede reporting on matters of significant public interest.

8. I note as well that the underlying lawsuit does not directly concern the issues I covered. The litigation is, at its heart, an employment dispute. Both sides have ample material to adjudicate the dispute on their own without imposing on third-party journalists. It seems that the City merely wants me to open my files so it can sift through them in search of anything that might impeach Schoolcraft. That is a sideshow that I need not be called upon to support. The City has abundant material, alternative sources, witnesses and depositions with which to make its case. It is interesting to observe that the City has no idea what the materials it seeks contain. The materials that are "responsive" to its requests would likely be disadvantageous to its case, yet it still wants to sift through them.

9. Granting the City's requests would raise further complications because, despite the City's contrary assertion, Adrian Schoolcraft was certainly not my only source for this work. I did have confidential sources and confidentiality agreements. While those confidences may not be implicated in the City's more targeted requests for specific documents (Nos. 1-13), Nos. 14-23 request a broad range of documents, often described as anything "not otherwise listed above." These requests are quite likely to encompass material I received

in confidence. Further, although the City contends otherwise, the very act of describing the material in my possession and identifying the documents that would be privileged would not only be burdensome but would also force me to reveal privileged information.

10. Finally, I never made any payments to Adrian or Larry Schoolcraft, nor am I aware of any payments ever made to them by the Village Voice or Palgrave Macmillan. I did have a discussion with Larry Schoolcraft about payment for the use of photographs, but nothing came of that and I did not pay him for any material.

For these reasons, I request that the Court deny the City's motion to compel and grant my motion to quash the City's document subpoena to me, to which I timely objected. See Objections, Attached as Exhibit C to the City's Mettham Declaration.

I declare under penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Executed in New York, N.Y.
on March 28, 2014.

_____
Graham Rayman