LAW OFFICE OF
## NATHANIEL B. SMITH

ATTORNEY AT LAW
111 BROADWAY
NEW YORK. NEW YORK 10006

NATHANIEL B. SMITH

TEL: (212) 227-7062
FAX: (212) 346-4665

April 24, 2014

Honorable Robert W. Sweet
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

*Schoolcraft v. The City of New York, et al.,*
*10-cv-6005 (RWS)*

Dear Judge Sweet:

I am writing to the Court as one of the counsel for Plaintiff, Police Officer
Adrian Schoolcraft, in opposition to the April 15, 2014 letter-motion for a
protective order by Defendant Jamaica Hospital Medical Center ("Jamaica
Hospital").  For the reasons set forth below, the motion should be denied in its
entirety and Jamaica Hospital should be directed to produce the appropriate
representatives for its deposition.

*Background*

The discovery record in the case has so far developed the following facts
that are relevant background for this motion.

On the evening of October 31, 2009, Defendant, Deputy Chief Michael
Marino, ordered four of his subordinate officers (including a Captain, a Lieutenant,
and a Sergeant) to handcuff Office Schoolcraft and physically remove him from
his home and take him to Jamaica Hospital as an "emotionally disturbed person."
While in the custody of Jamaica Hospital later that evening and still under the *de
facto* control of the NYPD, NYPD personnel handcuffed Officer Schoolcraft to a

LAW OFFICE OF
NATHANIEL B. SMITH

hospital gurney, even though Officer Schoolcraft was not – according to all NYPD
personnel who have testified – under arrest or otherwise accused of any crime.
And, when Officer Schoolcraft attempted later the following morning to use the
public telephone in the Jamaica Hospital Emergency Room, other NYPD personnel
physically forced Officer Schoolcraft down on his hospital gurney and handcuffed
his other hand to the other side of the gurney.

According to Officer Schoolcraft's medical chart, the handcuff on his right
wrist was squeezed so tight that his hand turned numb from lack of proper blood
circulation. Despite being aware of this medical condition, Jamaica Hospital did
nothing to remedy this punitive condition created by the NYPD, a condition that
was flatly prohibited by Jamaica Hospital's written policy on the use of physical
restrains on patients. Indeed, Defendant, Doctor Lilian Aldana-Bernier, testified
that good and accepted medical practice required that handcuffs causing redness to
the writ must be loosened. (Bernier Deposition Transcript ("Tr.") at 126; Exhibit 1
hereto.)

For six days, from late October 31, 2009 until the afternoon of November 6,
2009, Officer Schoolcraft was kept first by the NYPD and then by Jamaica
Hospital against his will in the Medical Emergency Room, the Psychiatric
Emergency Room, and the Psychiatric Ward at Jamaica Hospital. During that time
he was under the "care" of Defendant Doctor Lilian Aldana-Bernier, the
emergency room psychiatrist who authorized his initial commitment, and
Defendant Isak Isakov, the attending psychiatrist at the Psychiatric Ward who
"confirmed" the initial commitment decision by Dr. Bernier.

The first mental health assessment of Officer Schoolcraft was conducted on
November 1, 2009 at 6:30 a.m. by a resident, Dr. Khin Mar Lwin, who
recommended a psychiatric evaluation because NYPD Sergeant Shantel James --
who lacked any personal knowledge of the facts -- told Dr. Lwin that Officer
Schoolcraft had been acting "bizarre," and that he had refused to open his home
door and "barricaded himself" in his home. It also reported that Officer
Schoolcraft was "paranoid about his supervisors" and became "agitated,
uncooperative and verbally abusive." (*Id.* at 86-92.) At the time of this initial
assessment, there was nothing in the medical chart or record showing that Officer
Schoolcraft was a danger to himself or others. (*Id.* at 94-96.) Instead, Dr. Lwin
recommended that Officer Schoolcraft be held over for an evaluation by the
Psychiatric Emergency Room with a diagnosis of "psychotic disorder, NOS [*i.e.,*
not otherwise specified]."

Later that day, after being transferred to the Psychiatric Emergency Room, Officer Schoolcraft was evaluated by another resident, Dr. Khwaja Khusro Tariq, who also recommended that Officer Schoolcraft be "held and stabilized" against his will. (*Id.* at 109-112.)

On the following day, November 2, 2009, Defendant Dr. Bernier evaluated Officer Schoolcraft at 3:10 pm. (Tr. at 68-69 & 85-86.) According to her deposition testimony, Dr. Bernier made the decision to admit Officer Schoolcraft because he was a police officer with access to weapons, and had reportedly been previously acting bizarre and agitated and was currently delusional. (*Id.* at 149-50.) Dr. Bernier testified that it was her understanding of hospital practice and the governing laws on involuntary admissions that a patient could be involuntarily committed when the patient is acting bizarre or agitated. (*Id.* at 93-94.) While admitting that Officer Schoolcraft was not acting bizarre or agitated at the time of her evaluation of him, Dr. Bernier testified that his beliefs about his supervisors being in a conspiracy against him reflected paranoia. (*Id.* at 171-72.)

Jamaica Hospital policy, the New York Mental Hygiene Law, and the U.S. Constitution require an assessment of a substantial likelihood of dangerousness as manifested by suicidal or homicidal acts. *Rodriguez v. City of New York*, 72 F. 3d 1051, 1061 (2d Cir. 1995) (involuntary commitment is a massive curtailment of liberty, and due process "does not permit the involuntary hospitalization of a person who is not a danger to herself or others"). Nevertheless, Dr. Bernier testified that her decision to involuntarily admit Officer Schoolcraft was not because she concluded that there was a substantial risk of dangerous conduct but because there was a "potential risk" of dangerous conduct. (*Id.* at 243-44.) Indeed, in an apparent departure from hospital policy and law, she testified that *any* potential risk would result in her decision to admit:

> Q. So if there is any potential at all, you want to make sure that the patient is safe, correct?
> A. Correct.
> Q. And if there is any potential at all, you want to make sure the community is safe, correct?
> A. That's correct.
> Q. And if there is any potential at all, you were going to admit Mr. Schoolcraft, correct?
> MR. LEE: Objection to form.
> A. With all of those reasons, yes, I would have to admit him.

LAW OFFICE OF
NATHANIEL B. SMITH
(*Id.* at 248-49.)

Defendant Dr. Isakov, who confirmed Officer Schoolcraft's involuntary commitment by Dr. Bernier, also testified that so long as there is any level of risk of dangerousness a patient should be admitted involuntarily. (Isakov Tr. at 98; Exhibit 2 hereto.) He also testified that that level of risk assessment comports with good and accepted medical practice and his understanding of Mental Hygiene Law § 9.39. (*Id.* at 99.)

Dr. Isakov first saw Office Schoolcraft on November 4, 2009 at Unit 3 at Jamaica Hospital. (*Id.* at 116-17.)   According to his notes in the patient chart, his diagnosis was a "questionable diagnosis" of paranoia and he admitted Office Schoolcraft to Unit 3 for further evaluation. (*Id.* at 127-28 & 146-61 & 164-70.) At the time of his decision, Dr. Isakov noted in the chart that Officer Schoolcraft did not show any tendency to cause serious harm to himself or others, (*id.* at 170-71), another apparent departure from hospital policy and law.

### The Motion for A Protective Order

As noted above, in its motion for a protective order Jamaica Hospital has objected to every single one of the plaintiff's enumerated subject matters set forth in the plaintiff's Rule 30(b)(6) Notice of Deposition.   The grounds for the objections are privilege, over breath, and relevancy.   None of those objections are well-founded.

1.   *Performance Evaluations of Psychiatrists.*   During the course of her deposition, Dr. Bernier testified that she sees on average about 3,000 patients a year as an Emergency Room Admitting Psychiatrist and that she admits involuntarily about 2,000 of these patients a year. (Bernier Tr. at 71-72.) Based on her work schedule, therefore, she averages about seven to eight involuntary admissions a day.   And based on the hospitalization bills charged Officer Schoolcraft for his six-day stay, Dr. Bernier's decision to involuntarily admit patients with insurance coverage generates over $10 million a year in revenues for Jamaica Hospital.   Based on these facts showing a clear financial incentive to admit patients involuntarily, plaintiff has requested that Jamaica Hospital produce a witness with knowledge of the factors that are considered by the hospital in assessing the performance of their staff psychiatrists.

Jamaica Hospital objects on three grounds: the request is overly broad because it is not limited to the two doctors who are defendants in this action; the

LAW OFFICE OF
NATHANIEL B. SMITH

request seeks irrelevant information; and the request seeks privileged information.
These objections should be overruled.

First, the request is not overly broad because the issue to be examined is the
role that financial incentives play in the evaluation process of Jamaica Hospital
Psychiatrists. The inquiry is to determine whether financial considerations come
into play generally in the assessment of their performance and whether those
general considerations are applicable to the two doctors whose decisions are at
issue.

Second, the information is relevant. The volume of patients involuntarily
committed by staff psychiatrists such as Dr. Bernier on a daily basis and the
significant revenues to be generated for the hospital from those decisions, requires
inquiry into whether medical considerations are colored by financial
considerations. Inquiry into these financial motivations are relevant to the question
whether the medical defendants substantially departed from good and accepted
medical practice (and law) in involuntarily committing Officer Schoolcraft without
a showing of dangerousness as a condition to an involuntarily admission. *See
Rodriguez*, 72 F.3d at 1063 (noting that the law requires a physician to make a
*medical* decision). The information about financial considerations is also relevant
to any defense by the two doctor defendants that they are entitled to qualified
immunity under 42 U.S.C. § 1893. Financial considerations of a private actor
acting under color of state law tend to show that the underlying reasons for
affording an individual qualified immunity for actions taken in good faith do not
apply where financial considerations play role in the decision-making process.
*See, e.g. Tewksbury v. Dowling*, 169 F. Supp. 2d 103, 113-14 (E.D.N.Y. 2001).

Third, the claim of privilege should be rejected as inapposite. The privilege
invoked by Jamaica Hospital is a state-law rule that applies to records generated
for a medical or quality assurance review function. *Logue v. Velez*, 92 N.Y. 2d 13
(1998). Here, the plaintiff is not seeking the records of any investigation into
alleged malpractice by either of the two doctor defendants but the factors that the
hospital looks at in making performance evaluations. Moreover, while Jamaica
Hospital does cite Magistrate Judge Fox's decision in *Francis v United States*,
2011 U.S. Dist. Lexis 59762 (S.D.N.Y. May 31, 2011), that decision "stands alone
among the courts within this Circuit" and thus there is a substantial issue about
whether any such privilege ought to be recognized by this Court. *Zikianda v.
County of Albany*, 2013 U.S. Dist. Lexis 32073 at * 10 (N.D. N.Y. Mar. 8, 2013)

LAW OFFICE OF
NATHANIEL B. SMITH

2.    *Corporate Witness on Involuntary Admissions Policies.*
Jamaica Hospital objects to having to produce a witness to testify about its
involuntary admission policies.  Since the purpose of the Rule 30(b)(6) procedure
is to examine the entity about its policies and other relevant information, the fact
that depositions of the admitting and attending doctors have been taken is not a
proper objection.  Indeed, since it appears from the depositions of the two doctors
that they departed from hospital policy, the plaintiff is entitled to make specific
inquiry about whether the hospital believes that the doctors' statements about
hospital policy did in fact comply with hospital policy.

3.    *Corporate Witness of Voting Policies.*  During his deposition,
Defendant Isakov testified that based on a vague, unwritten hospital policy Officer
Schoolcraft may have been given the opportunity to vote in the November 4, 2009
mayoral election between former Mayor Bloomberg and the challenger, William
C. Thompson.  Since Officer Schoolcraft testified that he was denied the right to
vote while he was involuntarily committed, the issue is relevant and Jamaica
Hospital should be required to produce a witness to provide any information about
this alleged policy.

4.    *Financial Revenues and Statistics.*  Plaintiff's Rule 30(b)(6)
Notice requested that Jamaica Hospital produce a witness who can provide
statistical and financial information for a five year period from 2003 through 2009
about:  (1) the average stay of an involuntary patient; (2) the amount of revenues
derived from those stays; (3) the sources of those revenues (i.e., insurance, private
pay, and governmental sources); (4) the number of involuntary commitments that
generate no revenue, if any; and (5) financial statements the ten-year period from
2000 till 2010 for the hospital so that a context for the information about
involuntary admissions can be assessed.  Jamaica Hospital claims that this
information is overly broad and irrelevant.  For the reasons noted above, the
information is relevant to the integrity of Jamaica Hospital's staff psychiatrists'
involuntary commitment decisions and to qualified immunity claims.  Indeed, as
noted below in item # 5, it appears that the availability of insurance coverage, not
any assessment of dangerousness, was the central consideration in the decision to
admit Officer Schoolcraft and in the decision to release him.

5.    *Insurance Coverage.*  Jamaica Hospital objects to having to
produce a witness who can provide information about how the availability of
insurance played a role in its decision to involuntarily commit Officer Schoolcraft.
When Officer Schoolcraft was first taken to the hospital, he refused to provide his
insurance information because he did not believe that he should have been forced

LAW OFFICE OF
NATHANIEL B. SMITH

to go to the hospital in the first place and objected to having his insurance company charged for services that he did not want. Nevertheless, according to information in the medical file, Jamaica Hospital was able to obtain information about the identity of Officer Schoolcraft's insurance carrier. Jamaica Hospital then repeatedly sought approval for several days, and on November 3, 2009, it obtained insurance company approval to admit Officer Schoolcraft to the psychiatric ward – the same day, Dr. Bernier signed the form formally ordering his admission to the psychiatric ward. Moreover, Jamaica Hospital released Officer Schoolcraft on November 6, 2009, which was precisely the limit of the time that the insurance company apparently authorized his involuntary commitment. Under these circumstances, Jamaica Hospital should be required to produce a witness who can provide admissible evidence about the process whereby it obtained approval for reimbursement for Officer Schoolcraft's involuntary commitment.

6.      *Security Systems.* During the plaintiff's physical inspection of Jamaica Hospital there were at least three different kinds of security cameras observed mounted throughout the facility. The hospital's counsel, however, has represented that the hospital has no recorded images of Officer Schoolcraft. Jamaica Hospital should be required to produce a witness with knowledge of the facts pertaining to the use, operation and storage of its security cameras in October and November 2009.

7.      *Different Kinds of Wards.* During the depositions of Dr. Bernier and Dr. Isakov, there was testimony about the different kinds of psychiatric wards operated by the hospital. Thus, the hospital should be required to produce a witness who can explain the various types of wards in its operations and why Officer Schoolcraft was place in one particular ward.

8.      *Relationship Between Jamaica Hospital and Several Individuals.* During discovery is this case, the hospital's relationship with several other individuals having some relation to the hospital has developed. A corporate witness ought to be required to explain who these potential witnesses are.

9.      *Relationship Between Jamaica Hospital Security Staff or Medical Staff and the NYPD in 2008 or 2009.* One of the important issues raised in the pleadings in this case is the relationship between the NYPD and Jamaica Hospital. In order to understand the nature and implications of that relationship to the involuntary commitment of the plaintiff, the plaintiff has requested that the hospital produce a witness with knowledge of the relationship in 2008 or 2009 between any of its security staff or medical staff and any NYPD personnel. While

LAW OFFICE OF
NATHANIEL B. SMITH

this subject matter certainly would require Jamaica Hospital to conduct a good faith investigation, it has failed to provide any specific reason about why this request is overly broad.  For example, it was failed to explain how many of it employees would fall into these categories and in the absence of any concrete showing of burden, the Court should reject this conclusory objection.

       10.    *Corporate Structure*.  Since Jamaica Hospital appears to be a not-for profit entity, it should be required to produce a witness to provide basis information about the nature and purposes of its operations.

       *         *         *

       For these reasons, the motion for a protective order should be denied.

                       Respectfully submitted,

                       Nathaniel B. Smith

By Hand
cc: All Counsel (with encl.)
Via Email