E49BSCHM                         Motion

 1  UNITED STATES DISTRICT COURT

 2  SOUTHERN DISTRICT OF NEW YORK
    -------------------------------x
 3
    ADRIAN SCHOOLCRAFT,
 4
                    Plaintiff,
 5
              v.                           10 CV 6005 (RWS)
 6
    THE CITY OF NEW YORK, et al.,
 7
                    Defendants.
 8
    -------------------------------x
 9                                         New York, N.Y.
                                           April 9, 2014
10                                         12:18 p.m.
    Before:
11
                       HON. ROBERT W. SWEET,
12
                                           District Judge
13
                           APPEARANCES
14
    NATHANIAL B. SMITH
15       Attorney for Plaintiff

16
    MICHAEL A. CARDOZO
17       Corporation Counsel for the
         City of New York
18       Attorney for City Defendants
    BY:  SUZANNA PUBLICKER METTHAM
19
    SCOPPETTA SEIFF KRETZ & ABERCROMBIE
20       Attorneys for Defendant Steven Mauriello
    BY:  WALTER A. KRETZ, JR.
21
    MARTIN CLEARWATER & BELL LLP
22       Attorneys for Defendant Jamaica Hospital
    BY:  GREGORY JOHN RADOMISLI
23

24

25

E49BSCHM                          Motion

1                              APPEARANCES CONTINUED

2

3    IVONE, DEVINE and JENSEN, LLP
          Attorneys for Defendant
          Dr. Isak Isakov
4    BY:  ROBERT DEVINE

5    CALLAN, KOSTER, BRADY & BRENNAN, LLP
          Attorneys for Defendant
6         Dr. Lilian Aldana-Bernier
     BY:  MATTHEW J. KOSTER

7

8    MILLER KORZENIK SOMMERS LLP
          Attorneys for Respondent Graham Rayman
9    BY:  DAVID S. KORZENIK
          MONA HOUCK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          (Case called)

3          MR. KORZENIK:  We're the new kids on the block.  We

4     represent the journalist Graham Rayman, who's subpoena is at

5     issue today.  I'm David Korzenik, K-O-R-Z-E-N-I-K, of Miller

6     Korzenik Sommers on behalf of Graham Rayman.

7          MS. HOUCK:  Mona Houck of the same firm.  H-O-U-C-K.

8          THE COURT:  And the City?

9          MS. PUBLICKER METTHAM:  Suzanna Publicker Mettham with

10    Corporation Counsel for City defendants.

11         THE COURT:  Yes.  I'll hear from the City.

12         MS. PUBLICKER METTHAM:  Thank you, your Honor.

13         We're here today because during the course of

14    discovery in this matter, we learned that Mr. Schoolcraft,

15    plaintiff, and his father, Larry Schoolcraft, had provided

16    certain documents to Mr. Rayman, who was then a reporter for

17    the --

18         THE COURT:  May I?  Forgive the interruption, but this

19    is not the only-- we've got another First Amendment.  That's

20    not your fault.  I mean, well, it is your fault sort of that

21    you got into this in the first place, but we've got another

22    First Amendment issue.  And I think it might be helpful-- I

23    think the one thing that we should get established is the

24    availability or unavailability of the materials which you

25    seek.

E49BSCHM                          Motion

1              And so if you would be kind enough and just go through

2         what it is you want and why you think that-- I know why you

3         think that the respondent has the materials, but if you'll just

4         tell me the basis for your conclusion that the -- that

5         Schoolcraft does not end it.  Okay?

6              MS. PUBLICKER METTHAM:  Yes, your Honor.  So, for

7         example, subpoena request numbers 5, 14 and 16, these are

8         written statements of Mr. Schoolcraft.  Number 5 especially, we

9         learned that --

10             THE COURT:  Yes, that's the statement at the time of

11        the incident.

12             MS. PUBLICKER METTHAM:  Yes, your Honor.

13             THE COURT:  Yes, okay.  But what is-- what did

14        Schoolcraft say about that?

15             MS. PUBLICKER METTHAM:  Mr. Schoolcraft said he had

16        created this document and had given it to Mr. Rayman, but that

17        he is no longer in possession of that document.

18             THE COURT:  And he's testified to that?

19             MS. PUBLICKER METTHAM:  He did, your Honor.

20             THE COURT:  Okay.  What's next?  E-mails sent to

21        Graham Rayman.

22             THE COURT:  Right.  The same thing?

23             MS. PUBLICKER METTHAM:  Same thing.  He no longer has

24        access to those e-mails.

25             THE COURT:  Okay.  Next.

1           MS. PUBLICKER METTHAM:  Recordings.  Now, we have

2   received a number of recordings in this case.  The concern is

3   that the book mentions a number of other recordings that we

4   have not received and it mentions that plaintiff was in

5   possession of thousands of hours of recordings, which we

6   certainly have not received.

7           When we asked plaintiff and plaintiff's counsel about

8   providing all documents, they stated that they had provided all

9   that they were in current possession of.  So to the extent that

10  there are --

11          THE COURT:  Just forgive me.  Schoolcraft has

12  testified that he does not have the recordings.

13          MS. PUBLICKER METTHAM:  He has testified that he gave

14  us all of the recordings he had.

15          THE COURT:  That he has.

16          MS. PUBLICKER METTHAM:  Yes.

17          THE COURT:  And of course there is this issue about

18  the fiddling around with the recordings.  So you want--

19  presumably you want to check that.

20          MS. PUBLICKER METTHAM:  Yes, your Honor.

21          THE COURT:  But he's given you everything he has.

22          MS. PUBLICKER METTHAM:  Yes.  Our concern is that in

23  the book there are a number of recordings that are mentioned

24  that are not on the recordings provided by plaintiff that lead

25  us to believe that additional recordings were provided to

1    Mr. Rayman.

2              THE COURT:  Okay.  What's next?

3              MS. PUBLICKER METTHAM:  Crime complaint reports.

4    These are the allegedly stolen report from plaintiff's

5    apartment on February 31st, 2009.  He stated in deposition that

6    he does not have these documents because they were stolen from

7    him.  However, it sounds like crime complaint reports were

8    given to Mr. Rayman by plaintiff after the incident.

9              Shall I move on?

10             THE COURT:  Anything else?

11             MS. PUBLICKER METTHAM:  Yes, there are more items just

12   on that one.

13             THE COURT:  Okay.  I want to get your position about

14   their unavailability.

15             MS. PUBLICKER METTHAM:  So plaintiff has stated he

16   does not have these documents because he has stated that they

17   were stolen from him.

18             THE COURT:  Right.

19             MS. PUBLICKER METTHAM:  However, according to the

20   book, these documents were produced.

21             THE COURT:  Okay.  But the plaintiff has testified

22   that he does not have those reports.

23             MS. PUBLICKER METTHAM:  Correct.  Just one slight

24   issue on this one, is that plaintiff did testify-- or, I'm

25   sorry, strike that.  That according to the book and to

E49BSCHM                           Motion

newspaper articles, plaintiff had provided these documents to

another reporter as well.  So Mr. Korzenik has raised the

question of whether they're unavailable if they were also given

to another court reporter-- or, I'm sorry, another news

reporter.

          THE COURT:  Another reporter.

          MS. PUBLICKER METTHAM:  Yes.

          The next issue is memoranda written from plaintiff to

the NYPD.  There's a question about whether these documents

have ever existed.  Plaintiff testified that he wrote two

memoranda to the former commanding officer of the 81st Precinct

in 2006 and 2007.  This detailed, according to plaintiff,

misconduct that he was reporting and blowing the whistle.

          The NYPD has undertaken an extensive review and has

found no evidence that these memoranda were ever given to a

member of the NYPD.

          We have asked plaintiff to produce them and he has

testified he is not in possession of these documents.

          THE COURT:  What makes you think Mr. Rayman has them?

          MS. PUBLICKER METTHAM:  Because they were mentioned in

his book, described in the book.

          Additionally, documents have been requested from Larry

Schoolcraft, plaintiff's father.  Larry Schoolcraft, the issue

that we broached with your Honor at the court conference last

month, testified that he had three copies in triplicate of

1    every document that Adrian Schoolcraft was given, but even

2    though he was subpoenaed and the Court in the Northern District

3    of New York ordered him to produce those documents, at his

4    deposition he failed to produce them and has not produced them

5    to date.

6              THE COURT:  Has he stated that he doesn't have them?

7              MS. PUBLICKER METTHAM:  He stated-- and I may ask

8    Mr. Kretz to help me on this issue since I was not personally

9    present for his deposition -- but that he's not sure whether he

10   had them or not, but he could not access the garage in which

11   the documents were being held, which--

12             MR. KRETZ:  If I may, your Honor, at his deposition, I

13   think it was in late fall, he said he did have those documents

14   and they were in his garage.  Walter Kretz for defendant

15   Mauriello.  And we then followed up and sought an opportunity

16   to review those records.

17             We addressed it with your Honor and we arranged to

18   have plaintiff and two of the defense counsel go to

19   Mr. Schoolcraft's home and look at the records in the garage.

20   When I called Mr. Schoolcraft to make that arrangement, because

21   plaintiff's counsel said they didn't want to be involved in

22   that process, Mr. Schoolcraft had told me he had cleaned out

23   his garage for a six-month period prior to his deposition,

24   didn't recall seeing anything in there, and threw away -- I

25   forget what word -- truckloads full of things which he doesn't

think included any records and doesn't think there's anything

left in his garage that would consist of copies of those

records.

        And so as far as he knows, nothing exists on his

premises.  And anything he once had was turned over to

Mr. Schoolcraft, that is Adrian Schoolcraft's prior counsel,

Jon Norinsberg.

        So I've written to plaintiff's counsel to see if he

could confirm that Mr. Norinsberg turned everything over to

them and he has since turned over everything to us, and I still

have no response to that question.

        So we still don't know whether we've gotten everything

they have or not for sure.

        THE COURT:  What do we do about that?

        MR. SMITH:  Nathanial Smith for the plaintiff.  I,

too, spoke to Larry Schoolcraft, the father, and he told me a

lot of things.  But I want to just provide a little background

for this because it's being presented in a way that is-- I

think it's trying to paint the plaintiff in a negative way.

        THE COURT:  Look, all we're trying to find out is did

he throw the stuff away?

        MR. KORZENIK:  He said yes, right?

        MR. SMITH:  What Larry Schoolcraft told me was not

that he threw everything away, but two things:  That he said in

a recording somewhere, "Oh, they better not steal my son's

1    stuff because I've got three copies of everything."  That was

2    hyperbole.  It was not really an accurate statement.  But more

3    importantly the thing that he did tell me was that when the

4    case actually started, he did give information to Norinsberg,

5    who was the lawyer who filed the case initially.

6            THE COURT:  Right.

7            MR. SMITH:  Now, that file has gone from Norinsberg to

8    another law firm, Levine & Gilbert, and then it came to me.

9            THE COURT:  And as far as you know, that is the file.

10           MR. SMITH:  Yes.

11           THE COURT:  And as far as you know, there is no such

12   document of the-- there's no Schoolcraft documents.  I mean

13   documents that could be identified as Larry Schoolcraft's.

14           MR. SMITH:  Yes, that's true.  But, I mean, it's

15   almost impossible to really discern some of this.  There's

16   nothing that says Larry Schoolcraft's files are in there.

17           THE COURT:  Right.

18           MR. SMITH:  I have --

19           THE COURT:  Well, then let's back up.  Let me ask the

20   City, do you have-- you don't know-- or do you?  Do you have

21   any specific documents which I guess would apply not only to

22   this file, which-- in other words, if I were to grant your

23   motion to compel, what would you have the-- what would you have

24   the author produce?  I mean, unless he can identify-- you would

25   say any documents he received identified as Larry Schoolcraft

1    documents?

2              MS. PUBLICKER METTHAM:  I would ask for documents

3    received from Larry Schoolcraft.

4              THE COURT:  Okay.

5              MS. PUBLICKER METTHAM:  Correct, your Honor.

6              THE COURT:  All right.  Okay.  Anything further on the

7    unavailability of those documents?

8              MS. PUBLICKER METTHAM:  No, I believe that's it, your

9    Honor.

10             THE COURT:  Anything else?

11             MS. PUBLICKER METTHAM:  No, your Honor.  Thank you.

12             THE COURT:  Yes.

13             MR. KORZENIK:  If I may begin with just a brief

14   comment about why we have opposed this motion.

15             THE COURT:  I understand.

16             MR. KORZENIK:  I think your Honor has dealt with these

17   before.

18             THE COURT:  Yes, yes.  I understand, as best one can,

19   I understand the law in this area, but I'd be pleased to hear

20   anything you want to tell me.

21             MR. KORZENIK:  Well, I won't give you a lecture on

22   anything.  It looks like you have a seminar on the First

23   Amendment stuff up ahead with other cases.  But the main thing

24   I'd like to make clear is this was a hard story for Graham

25   Rayman to report.  It took a lot of work, a lot of footwork,

1   and a lot of trust with many different sources including the

2   Schoolcrafts to get it.  It was a tremendously important story

3   for the City and beyond in terms of public policy issues, in

4   terms of stop and frisk and so on.  I won't bore you with that.

5   But the most significant thing to this journalist is that he be

6   able to speak to sources and have them trust him and not have

7   them imagine that he will easily become a witness either

8   against them or even for them.

9           We believe and we feel that if journalists easily are

10  compelled to become witnesses or suppliers of data and

11  information and documents to litigants, that this will impair

12  their independence and their ability to get important stories

13  of this kind.  We do not wish to be a witness for either side

14  and we do not wish to either help or hinder any of their cases.

15  We wish to report, report important stories, as Graham Rayman

16  did here.

17          So I'll leave it at that, but I think that the

18  statement I made is consistent with the principle that the

19  Gonzalez case in the Second Circuit expresses about why it is

20  that even nonconfidential materials are to be protected when

21  they are sought from journalists.

22          Now, we are mindful that the-- there are two groups of

23  demands.  One of them speak to particular documents that the

24  City seems to believe exist or seems to think that our book

25  refers to.  Some of that is really quite overstated.  For

1    example, the thousand hours of tapes that Schoolcraft

2    supposedly took.  All our book says is that Schoolcraft said

3    that he took a thousand hours of tapes.  That doesn't mean that

4    we have them.  What we most were concerned about was the roll

5    call tapes.  And we have, no doubt, some of them and have

6    referred to those in the book.

7         What the City wants us to do, wants to be able to do,

8    is to sift through our tapes to see if they've got all of them,

9    to see if their collection is complete.  They don't know

10   specifically whether we have something that they don't have.

11   They don't know what the tape might be that they're looking

12   for.  They just want to check completeness.

13        There's another issue here.  What is the need for

14   this?  They themselves argued to your Honor at another motion

15   that these things have very little to do with the case, the

16   issue about stop and frisk and so on.  The employment issues

17   here that are active don't really relate to whether or not

18   particular statements were made in the roll call.

19        There's a broader thing here that I think is

20   problematic.  When I read their motion to compel and I looked

21   at their discovery, I couldn't really judge what specifically

22   this case is about because they don't really connect up

23   anything that they want with any particular cause of action nor

24   any element of a particular cause of action.  And what was

25   amazing is that when I saw their reply to our papers, they

1   still don't do that even though we had established, and they

2   understand, what the *Gonzalez* test really calls for.

3           Now, it's possible that some of the things that they

4   seek may actually be things that are germane to a state cause

5   of action, in which case New York State's shield law, which is

6   a lot better than the federal privilege, would apply.  But we

7   don't know that.  So what's happening in our blindness, in our

8   uncertainty as to what cause of action it supposedly relates

9   to, because they've never laid a predicate for that, we're sort

10  of operating on the *Gonzalez* standard.  But even on that weak

11  standard, they've not stepped forward with anything

12  informative.

13          So that if the standard is to tell us that the

14  particular document sought-- they're not always particular as

15  to what it is.  It's just something.  It could be a tape.

16  There are a few particular things, but many of them are not.

17  There's just general sort of groups of documents.  They don't

18  really know-- they have no idea whether the document exists in

19  many cases.  They have no idea what the documents contain in

20  most of these cases.  They have -- no specific or particular

21  document is requested or identified often, except in one case,

22  and no particular need is given.  These particular documents

23  are not identified to be valuable to a particular cause of

24  action.  None of them are ever named in either their motion

25  papers or their reply papers or to even an element of those

E49BSCHM                         Motion

1    causes of action.  So we're still in the blind as to whether it

2    applies to a state claim, in which my privilege is stronger, or

3    to a federal claim or to both.  They don't say.

4            Now, the other thing is-- here's what I think has

5    happened.  When I saw their reply and I realized what they're

6    really looking for, what's happened here is they're kind of at

7    the end of litigation discovery with all of the usual

8    unhappiness that emerges at the end, discontent about what

9    discovery has or may not have been given, and offense at what

10   they think may have been withheld.  People looking for grounds

11   to impeach other people.

12           It's pretty clear from the reply that they're not

13   talking about needing a document for a particular element of a

14   claim.  What they need it for-- I'll give you just in their own

15   discussion the first thing in the reply, where they talk about

16   the requests 514 and 16-- the statement, the one document that

17   is the most specific is the one about the statement that Adrian

18   Schoolcraft apparently wrote afterward.  What they're looking

19   for is an ability to impeach him.

20           Now, it struck me at the end, after I read this, that

21   they're not really connecting it up with the case.  What

22   they're looking for is a way to show that Schoolcraft didn't

23   turn over stuff he should have.  Schoolcraft can be impeached

24   on all these things and we want to be able to show that he's a

25   liar.

E49BSCHM                          Motion

1          For that reason, I want to put before the Court and

2     note the Court to the Central Park Jogger case, where this

3     issue, reporter's privilege, came before Judge Batts and

4     Magistrate Judge Ellis made it clear that impeachment is not

5     one of the significant issues in a case.

6          What's happening is that they're seeking documents

7     that largely relate to satellite issues, that we all

8     unfortunately suffer with at the end of litigations, but they

9     don't relate to any core issue in the case.  They don't relate

10    to what *Gonzalez* says we have to show is a significant issue in

11    the case.

12         And Judge Batts points out, and I think there's other

13    cases that support it in the McCray case -- and I can give you

14    a cite.  We can give your Honor a copy if you wish -- McCray

15    Richardson Santana litigation, and I can hand that up if your

16    Honor wishes.  But I realize at the end of all of this that

17    this is really what this is all about.  And I've sort of come

18    to the end of seeing both their initial papers and their reply

19    papers and to see that it's about sideshows.  It's not really

20    about something that is core to their needs.

21         The other thing that is troubling is that in the

22    second half of their requests, and even the ones that they're

23    more specific about, they're doing what *Gonzalez* says you

24    can't.  And whatever *Gonzalez* may say, the one thing that it

25    really lays down pretty clearly is that you can't go sifting

E49BSCHM                          Motion

1    through a journalist's files to see that you've got everything

2    or to see if there might be something that might be useful to

3    you.  That's what they're really trying to do here.

4            It's most egregious in their request number 13 to 21,

5    where they basically are shotgun requests that just say

6    anything you got from Schoolcraft, anything, e-mails.  They

7    have no idea what these e-mails contain.  They don't even know

8    the Schoolcraft statement that he made.

9            And let's go back to that because it's an interesting

10   one because it's the best one that I think they've got here.

11   They don't know what it says, but now the question is, is that

12   unavailable to them?  And it's interesting.  The courts

13   flip-flop on some of this when it comes to videos and so on.

14   But the interesting thing is that the question really is, is

15   the information contained in that particular document or audio

16   or video, is that information available to people by other

17   means?  And Batts treats it the way that I think it should go.

18   Judge Jones did the same thing.  And another case, I keep

19   forgetting the name of it, but it's *United States v. Grant*.

20   But the issue is not whether the particular tape is available,

21   not whether the particular document is available, but whether

22   the information in it is available by other means.

23           So now we have the Schoolcraft document in which he

24   describes what had happened to him, but what happened to him in

25   the hospital is something to which many, many witnesses were

1    exposed.  Schoolcraft himself was there.  A deposition is taken

2    of Schoolcraft to find out what happens.  Many doctors were

3    present at different times.  There are hospital reports

4    presumably throughout.  All of that is available through

5    depositions and documents from the hospital.

6         Police officers were in and out of the this,

7    overseeing and managing his-- how he was processed and moved

8    through the hospital.  All of those people are there and saw

9    this.  It's not as if you have a particular event that nobody

10   else saw.  So in that sense I think Batts is correct, Judge

11   Jones is correct in the sense that they are analyzing it not

12   from the point of whether the particular physical document is

13   unavailable, but whether the information sought is available by

14   other means.

15        So I would ask that your Honor consider it in that

16   frame as well.

17        So there are a variety of other issues that I would

18   point to.  Some of this also, I think, is very cumulative.

19   They already have a lot of this material by other means.  The

20   tapes, for example, of roll call, we don't really know whether

21   they don't have a complete set.  And so suppose they are

22   missing one or two of them?  How does that really have any kind

23   of impact on this litigation?  They have some.  I suppose

24   that's valuable, but I don't see how it really relates to a

25   significant issue in this case.  That was their burden.  And

E49BSCHM                        Motion

1    not only did they not show it, they didn't even try to show

2    it.

3            I'll leave it with that and hope that maybe

4    Ms. Mettham will raise some points and I can address those.

5            THE COURT:  Thank you.

6            MS. PUBLICKER METTHAM:  Thank you, your Honor.  I'd

7    like first to address Mr. Korzenik's argument that because

8    there are pending state law claims, that a separate standard

9    should be applied to them.

10            If your Honor reviews the case cited by Mr. Korzenik

11    himself, *Von Bulow v. Von Bulow*, it argues that according to

12    the legislative history of Rule 501, the senate report clearly

13    states that it is intended that the federal law of privileges

14    should be applied with respect to pendent state law claims when

15    they arise in a federal question case.

16            It's the City's position that this is a federal

17    question case.  That is why we are here before your Honor in

18    the Southern District of New York.  While there are pendent

19    state law claims, the focus here is a 1983 civil rights action.

20    And according to the legislative history of 501, the state law

21    claims should also have the federal privilege, journalist

22    privilege, applied.

23            I would also take issue with Mr. Korzenik's argument

24    that we believe that these issues don't really matter.  He has

25    misconstrued the City's position.  What matters in this case is

E49BSCHM                              Motion

1   whether and how Mr. Schoolcraft reported on his claims of

2   misconduct within the NYPD.

3          While the City doesn't believe that a full

4   investigation or mini-trials should be launched into each

5   allegation of misconduct, whether and how Mr. Schoolcraft

6   reported that misconduct is what's relevant to this case as

7   Mr. Schoolcraft is alleging claims of retaliation.

8          In regards to the new cases cited by Mr. Korzenik,

9   which were never mentioned in his opposition, such as *In re*

10  *McCray*, in the *Graham* case, as they were not cited by Mr.

11  Korzenik, I don't have a reply at this time.  And if your Honor

12  is going to rely on those, I would seek the opportunity to

13  brief this new issue raised.

14         However, I would state that this really is not a

15  sideshow.  These are the relevant matters to plaintiff's claim

16  which, by the way, is over four hundred paragraphs.  Whether

17  Mr. Schoolcraft-- if he created a document, which he says he

18  did, contemporaneous with his confinement, in which he makes

19  allegations which he later changes, I think that that is not

20  just a sideshow; that is not just impeachment material.  That

21  goes to the heart of this matter, what allegedly happened.

22         And while Mr. Korzenik states that this evidence,

23  including the statement written by Mr. Schoolcraft and these

24  e-mails, are all just cumulative, to the extent City defendants

25  have never received any of these documents, just

Mr. Schoolcraft's recollection, which was faded four years

later, we don't believe this is cumulative.  And at the end of

the day, we don't have a single document that we've requested.

So it's not that we have these already and we're seeking to see

what Mr. Rayman has.  We're trying to get the documents created

and sent by the Schoolcrafts to Mr. Rayman.

And, again, I would also state that in terms of the

deposition testimony, obviously there is a dispute between

Mr. Schoolcraft and all of the defendants on what happened at

that time.  So there is no-- there's no overarching, clear,

true factual account.  This document we're seeking is to show

how Mr. Schoolcraft perceived the events at the time of the

incident and in e-mails following that and how he recorded the

NYPD prior to his confinement.

Thank you, your Honor.

THE COURT:  I'll reserve decision.  Thanks very much.

MR. SMITH:  Your Honor, may I have just one minute?

THE COURT:  Yes.

MR. SMITH:  I just want to state a concern of mine or

stake out a position here.  Because what I'm hearing is that,

and what I believe is the case, is that Mr. Schoolcraft had

some papers and he gave a lot of those papers, I think all of

them, to his lawyer, but some of them actually may have been

provided to Mr. Rayman, who did do extensive prelitigation

research into what happened here and wrote thereafter many

 1   articles which ultimately led to actually the filing of this

 2   case.

 3           The only reason why I'm rising here is because I don't

 4   want anybody to say that the plaintiff took the position that

 5   these documents should not be turned over because I'm

 6   envisioning that the City in a trial would want to make an

 7   argument that there ought to be an adverse inference against

 8   the plaintiff because these documents, which are not

 9   available --

10           THE COURT:  Well, thanks a lot.  That's a trial issue.

11   We'll deal with it.  Right now we've got enough.

12           MR. SMITH:  Okay.  All right.  I just wanted to state

13   that.  I don't have an objection --

14           THE COURT:  That's fine.  We'll struggle with that

15   when it happens.

16           Okay.  Thank you all very much.  Reserve decision.

17           (Adjourned)

18

19

20

21

22

23

24

25