```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADRIAN SCHOOLCRAFT,

                Plaintiff,

           v.                            10 CV 6005 (RWS)

THE CITY OF NEW YORK, ET AL.,

                Defendants.

------------------------------x
                                         New York, N.Y.
                                         April 30, 2014
                                         12:02 p.m.

Before:
                     HON. ROBERT W. SWEET

                                             District Judge

                         APPEARANCES

NATHANIEL B. SMITH
     Attorney for Plaintiff Adrian Schoolcraft

MARTIN CLEARWATER & BELL
     Attorney for Defendant Jamaica Hospital
BY:  GREGORY J. RADOMISLI

SCOPPETTA SEIFF KRETZ & ABERCROMBIE
     Attorney for Defendant Deputy Inspector Steven Mauriello
BY:  WALTER A. KRETZ, JR.

IVONE, DEVINE & JENSEN
     Attorney for Defendant
BY:  ROBERT DEVINE

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
     Attorney for City Defendants
BY:  RYAN G. SHAFFER

CALLAN, KOSTER, BRADY & BRENNAN
     Attorney for Defendant Dr. Lillian Aldana-Bernier
BY:  MATTHEW J. KOSTER
```

1              (In open court; case called)
2              MR. SMITH:  How are you, your Honor?
3              THE COURT:  Actually I have a little cold.  But I'm
4    better now that you ask.  Or I was up until this argument.
5              So who is going to do what to me today?
6              MR. SMITH:  We have the calendar, such as it is,
7    Jamaica Hospital has made a motion for protective order
8    saying --
9              THE COURT:  Yes, yes.  Okay.  I'll hear from the
10   hospital.
11             MR. RADOMISLLI:  Thank you, your Honor.  Greg
12   Radomislli from Martin Clearwater & Bell.
13             As we indicated in our papers, there is really one
14   issue here, even though it's both a medical malpractice claim
15   and a violation of the Section 1983, because in order to show a
16   violation of Section 1983 in these circumstances they have to
17   show that there was a departure from accepted standards of
18   care.
19             The only issue is to determine whether there was a
20   departure from accepted standards of care deals with how the
21   psychiatrist who treated the plaintiff behaved.  Any policy
22   regarding alleged financial incentives or anything like that
23   has absolutely no bearing on plaintiff's allegations that
24   Dr. Aldana-Bernier should not have admitted the plaintiff.
25             The plaintiff's 30(b)(6) notice is all-encompassing.

1    It asks for financial information, statistics, revenues
2    regarding involuntary hospitalization.  But significantly, none
3    of that has anything to do with the allegations against the
4    codefendants, which are the physicians.
5         As this Court previously held, there are no
6    allegations regarding Jamaica Hospital Medical Center policy.
7    There is no Monell claim here.  So the only thing that counts,
8    if you will, is what Dr. Aldana-Bernier and what Dr. Isakov, as
9    the basis for their decisions.  And the plaintiff has already
10   asked them questions about that.
11        In terms of the request for peer review and quality
12   assurance materials, those are clearly, in addition to being
13   not relevant, privileged under the education law and the public
14   health law.
15        Now plaintiffs's counsel refers to this one case,
16   Tiesinga, but that case is not opposite because in that case
17   they were talking about the issue of whether there was going to
18   be a federal quality assurance privilege.
19        The basis for the privilege that we're asserting is
20   codified in New York law by the education law and the public
21   health law.  And the cases that have respected those privileges
22   have done so when the major issue is whether there was a
23   departure from accepted standard of care; in other words, when
24   there was a medical malpractice case.  And those policy
25   considerations are implicated here because to show a violation

1  of the Mental Hygiene Law they would have to show that there
2  was a departure.
3  　　　　So, I'm not asking the Court to recognize a federal
4  privilege.  I'm just asking the Court to recognize that the
5  policy considerations behind the state statutes are implicated.
6  And there are a number of cases that have recognized that
7  privilege.
8  　　　　In terms of going on as far as policies on involuntary
9  admissions.  The plaintiff's attorney has already questioned
10 Dr. Aldana-Bernier and Dr. Isakov about the basis for their
11 decisions and we've already provided a copy of those policies.
12 There is no need to produce a 30(b)(6) witness on that issue
13 particularly because, according to the plaintiff's letter, the
14 only reason he wants a 30(b)(6) witness on that issue is to see
15 if the hospital agrees with the codefendant's testimony about
16 whether or not they followed hospital policy.  And both under
17 this U.S. ex rel. Tiesinga v. Dianon Systems, Inc., 240 F.R.D.
18 40, it clearly states that they cannot elicit opinion testimony
19 or expert opinion testimony from a corporate witness.
20 　　　　The plaintiff then wants to question the 30(b)(6)
21 witness voting policies.  Again, they've already asked the
22 codefendant physicians about those policies.  We've indicated
23 that if there's a written policy, we will provide it.  And
24 there is no allegation in the complaint that he was -- that
25 there was -- that he was deprived of his right to vote.

1            The plaintiff's attorney wants to question a 30(b)(6)
2    witness, the security system, and whether or not the security
3    cameras were videotaping patients.  Again, that has absolutely
4    no bearing on this case.  First of all, we've already said
5    that, according to Jamaica Hospital, nothing is recorded.
6    Secondly, it's not like anything happened on the ward that
7    they're claiming that the video camera would have recorded and
8    therefore it goes to some issue in the case because the only
9    issue here is whether he was properly admitted and whether he
10   was properly kept in the hospital until he was discharged.
11   There's nothing on the security cameras:  A. nothing was
12   videotaped; B. there is no question about -- I think he says
13   the operation, storage of security.
14            He wants a 30(b)(6) witness to ask about the different
15   psychiatric wards on the hospital.  Well, he already questioned
16   the two doctors who are involved.
17            As I indicated in my letter, the plaintiff's whole
18   theory in this case is that the plaintiff should not have been
19   admitted to any psychiatric ward.  So what difference does it
20   make which ward he was ultimately admitted on?  But in any
21   event, the codefendant physicians testified about that.  You
22   don't need a corporate representative from the hospital to do
23   so.
24            He then asks for a corporate witness to testify about
25   the relationship, if any, between Dr. Vivek, Dr. Luel, and

1    somebody named Shirley Huntley.
2         Again, plaintiff's counsel asks codefendant physicians
3    about Dr. Vivek and Dr. Luel.  There is no question that
4    Dr. Vivek is associated with the hospital.  Dr. Luel was the
5    psychiatrist who the plaintiff's father found to treat the son
6    after he was discharged.  And I've asked in my letter, in my
7    good faith attempt to resolve this, who Shirley Huntley is, but
8    plaintiff's counsel has still not told me.  As far as I know
9    her name has never come up throughout this.
10        Finally, the plaintiff's counsel wants a 30(b) witness
11   to testify about the relationship, if any, between any:  One,
12   security personnel; two, social worker; three, nurse; four, or
13   doctor at Jamaica Hospital and any former or present active
14   member of the NYPD.
15        I don't think it's reasonable to expect a corporate
16   witness to know who every single member of its staff -- first
17   of all, I don't know what the relationship is.  I mean if they
18   went to grade school together does that constitute a
19   relationship?  But in any event, it's still totally not
20   relevant because there is no -- I mean I just don't see it.
21   But more importantly it's just an impossible burden to -- I'm
22   supposed to go around asking everybody:  Hey, do you know
23   anybody at the NYPD?  And expect a corporate representative to
24   know everyone it associates with.
25        Lastly, plaintiff wants a 30(b)(6) witness to talk

1   about the corporate structure of the hospital, but he does not

2   indicate in any way how the information he seeks is relevant to

3   the claims.

4            So for those reasons, we believe that a 30(b)(6)

5   witness in this case is simply not appropriate given the scope.

6   Thank you.

7            MR. SMITH:  Your Honor, the hospital's position is

8   that we've already taken the depositions of the two individual

9   defendants.  And essentially there's absolutely no need to take

10  the deposition of the corporate defendant because they've

11  already testified.  But, the purpose of the 30(b)(6) is to

12  determine when an entity is a party what the entity says.  It's

13  not -- I mean if they were to say that everything that Bernier

14  said was our corporate policy with respect to involuntary

15  admissions, then maybe that would be a way of circumventing

16  that.  But they're not offering that.  As I indicated, I think

17  there are some substantial departures from the actual written

18  policy promulgated by the hospital about what's required in

19  order to admit somebody involuntarily.  So just as a broadbrush

20  the idea that we've already had these depositions of these

21  witnesses so you don't need -- I don't think that really

22  carries the day.

23           More importantly, I want to focus on what I think is

24  the real key issue in this motion, which is that information

25  about what was going on at the hospital and why the hospital

was acting the way it was acting. And what I've learned in discovery is that Schoolcraft was held for three days in limbo, and then the same day that the hospital got knowledge that they were going to get paid through insurance, they then admitted him to the hospital.

What initially happened is that on 10-31-09 Schoolcraft was brought to the hospital against his will. They asked him for insurance information. And he said I'm not giving you my insurance information. I don't belong here. I'm not crazy. Let me go. My supervisors brought me here in cuffs and I don't belong here.

So he refused to provide insurance coverage. And for three days he was held first in the emergency room and then in the psychiatric emergency room before any determination was made by a physician that he was an appropriate subject for an involuntary admission.

Like I said, on November 3 the hospital involuntarily admitted him and signed the forms required by state law to have him committed against his will predicated on the idea that he was dangerous to himself.

That was the same day that the hospital got information from Schoolcraft's insurance carrier that they would pay for a stay. The insurance carrier -- the notes in the medical file reflect that the authorization from the carrier was for from November 3 until November 6. It was on

1    November 6, three days later, that the hospital discharged
2    Schoolcraft.  And so that piece of information suggests to me
3    that sound medical judgment wasn't the only thing driving the
4    decision to admit Schoolcraft, which was delayed for three days
5    until coverage was available, and then the decision to
6    discharge him, which was made after the money had run out.  So
7    that's one piece of important information that we've obtained
8    in discovery that goes to this issue about statistics and
9    finances and insurance.
10            The other piece is that the doctor who made the
11    decision to admit Schoolcraft, Bernier, testified that on
12    average over the course of a year she admits involuntarily
13    about 2,000 patients every year.  And based on her schedule,
14    that's 7 or 8 involuntary admissions a day.  She could not
15    provide any kind of timeline about how much time she spent
16    actually reviewing and meeting with Schoolcraft.  And based on
17    what I see as an exceedingly high number of people being
18    admitted involuntarily, we propounded requests not only for
19    30(b)(6) but also for documents going to several questions,
20    which is:  One:  Hospital, are financial considerations
21    something that you consider in making decisions about the
22    performance of your doctors?  Secondly, is insurance or the
23    availability of insurance something that you consider in terms
24    of deciding whether or not to admit or not to admit somebody or
25    to discharge somebody?

1    So, to me the question here, going just to this
2    question of what was going on and why was Jamaica Hospital
3    acting the way it was acting, these are pretty important issues
4    in this case.
5    The information is relevant because there's a cause of
6    action in the complaint for negligent supervision and control.
7    That's the seventh or the eighth claim.  It's also this
8    information about the motivations for -- why the doctors of the
9    hospital were acting is relevant because both the hospital and
10   the doctors have put their good faith in issue here.  They have
11   said that we only exercised sound medical judgment.  And
12   Jamaica Hospital in its answer alleges as an affirmative
13   defense that it has qualified immunity.  It also alleges that
14   at all times it acted in good faith.  Similarly, Dr. Isakov
15   alleges as an affirmative defense that all of his actions were
16   undertaken with justification and probable cause and in good
17   faith.  And then Bernier also alleges that her evaluation and
18   treatment of Schoolcraft was privileged under the law and that
19   she had immunity.
20   So all of these defendants have put in issue their
21   good faith in their own pleadings.  And so, the purpose of
22   these examinations, both by the 30(b)(6) and the requests for
23   further information, goes to this question about whether or not
24   the people who were making this decision were being motivated
25   exclusively, as they say, by the sound well-being of the

1    patient or whether or not financial or insurance considerations
2    colored that decision.
3           I have a Second Circuit case.  In looking at their
4    reply it's not directly on point.  It's a prisoner's rights
5    case alleging deliberate indifference to medical needs.  And it
6    was on a motion to dismiss.  It's not a discovery motion.  But
7    the circuit said in this case, which is Chance v. Armstrong,
8    143 F.3d 698.  In sustaining the cause of action by this pro se
9    prisoner, "Crucially he has also alleged that Dr. Moore and
10   Dr. Murphy recommended extraction of his teeth not on the basis
11   of their medical views but because of monetary incentives.
12   This allegation of ulterior motives, if proven true, would show
13   that the defendants had a culpable state of mind and that their
14   choice of treatment was intentionally wrong and did not derive
15   from sound medical judgment."
16          The only reason why I'm bringing that up is because I
17   think it highlights what I thought was an obvious proposition
18   which is that when you're bringing a claim for negligence or
19   any kind of tort against a party, what they did and why they
20   did it and the financial and other motivations underlying their
21   conduct are relevant and important in assessing whether or not
22   the conduct was negligent and whether or not the defenses in
23   this case, good faith defenses are valid.  So for all of those
24   reasons I think that it's appropriate to permit us to take
25   examination of the hospital on those issues.

1          The security system.  When we went to do the
2  inspection there were cameras everywhere.  Counsel informally
3  has told me that there is no cameras but -- there is no footage
4  available.  What happened in the ward, I don't know if there
5  was -- if there were any cameras of that.  I've been told that
6  there's not.  But a witness ought to be able say:  Yeah, we
7  have security cameras, or we discard them, or we don't save
8  them, or whatever, something by the defendant party to say that
9  ought to be appropriate.

10         But the other thing that's disturbing about this and
11 the reason why I'm pressing the issue is because Schoolcraft
12 was brought into the emergency room on a gurney and he was
13 cuffed with one hand.  And then -- and that was the night of
14 October 31, 2009.  The next morning, while still in the
15 emergency room, NYPD personnel came in, saw him on the
16 telephone, and immediately went over to him, threw him on the
17 gurney and then double cuffed him so that he could no longer
18 move around or, more importantly, use the telephone.  I'm sure
19 that at trial there's going to be a different spin on that, but
20 that's the plaintiff's perspective on what happened.  And if
21 there were cameras that captured that incident, it would be
22 relevant to know that.  And if there's not, then it would be
23 relevant to know that.

24         The other important issue I just want to stress, and
25 then I'll sit down, is that we're trying in discovery to find

out whether or not Jamaica Hospital personnel who were involved in the decisions relating to Schoolcraft have a relationship with the NYPD informally or otherwise.  And I don't know whether or not the security personnel at Jamaica Hospital, for example, ever worked for the NYPD.

I do know, because just two days ago defendant Duncan testified that well when you're a police officer or sergeant you can get off-duty work.  You just go through this process and you can get assigned security at a bank or something else.  He said he didn't know anything about doing security work for the hospital.  But in any event, if the people who were directly involved in the Schoolcraft matter have a relationship with the NYPD during this period of time.  I'm not talking about now.  The request was in '08 and '09.  Similarly, you know, the other doctors, do they know somebody from the NYPD?  Have they ever worked for the NYPD?  If there's some sort of relationship like that, then obviously that would be a very important piece of information.

I understand counsel's arguments well how is one administrator going to know, you know, the life history of everybody who works for our hospital.  If that was my request it would be a pretty good objection.  But it's not.  What I've asked for are security personnel, nurses, doctors, the people who were at the facility in this period of time, '08 and '09.  It might be a little bit of an investigation, but it ought to

1  be done.  Do they have that kind of a relationship?  They know
2  better than me how burdensome that would be, the number of
3  people involved, and the complexities or lack of complexity
4  about making a determination about that.
5          THE COURT:  Well, I can see security.  I don't see the
6  nurses.  They didn't have any hand in this.
7          MR. SMITH:  Well, I mean --
8          THE COURT:  Social workers, they didn't have any hand.
9          MR. SMITH:  There was one nurse, there were two
10 residents, and there was a social worker who did have direct
11 contact with Schoolcraft.  A nurse actually went over to one of
12 the police officers and said:  His hand is blue.  Can you
13 loosen the cuff?  And she was told no.
14         There's a medical chart.  The medical chart -- if we
15 wanted to try and narrow this down --
16         THE COURT:  Forgive me.  Were there any hospital
17 security involved in any of this?
18         MR. SMITH:  So far as I know no hospital security put
19 their hands on Schoolcraft or acted in a way to control his
20 bodily activities.  That was done by NYPD people who were
21 sitting on him until Schoolcraft was brought to the psychiatric
22 emergency room where you go behind double doors with cameras
23 and you're not leaving there without somebody saying okay.  So
24 that's the extent of my knowledge about the security
25 personnel's involvement in this.  I don't know.  I hope that

1     answers your question.
2              And like I said before, I think the corporate
3     structure.  I just want to know:  What is this entity?  What's
4     its business purpose?  Is it a not-for-profit?
5              These are kind of minor matters.  I don't think
6     they're all that important in the scheme of things.  But you
7     are a defendant.  You are an entity.  You ought to have to
8     answer on behalf of yourself as an entity and not say
9     informally:  Well, you took the deposition of this person who
10    works for us so I don't need to show up and answer questions
11    about who I am or what I did.
12             THE COURT:  Well, what is it that you want this
13    witness to testify to?  The corporate structure?
14             MR. SMITH:  Yeah.  Who are you?  How do you exist?
15    Are you, in fact, a not-for-profit?  How many people employ
16    you?  Who are the officers?  Who are the decision makers?
17             It's not an extensive subject matter.  And, frankly,
18    it's not all that critical.  But it is important in the sense
19    that Jamaica Hospital is a defendant and they ought to, just
20    like any other legal party, have to appear and answer questions
21    that are pertinent to the case.
22             MR. RADOMISLLI:  Answer questions that are pertinent
23    to the case.  That's the key.
24             None of the topics that the plaintiff's attorney seeks
25    to depose of this 30(b)(6) witness have any bearing on the

1   case.  There are issues that could have been asked, but those
2   are not the subject of his 30(b)(6).
3              I would just like to make a couple quick points.  One
4   is he keeps saying:  The hospital decided this, the hospital
5   did that.  There are two decision makers in this case, both
6   attending physicians.  They are the only ones who made the
7   decisions.  One of them made the decision to admit.  The other
8   made the decision to discharge.  It's their rationale that's at
9   stake and their rationale that's in question.
10             And as far as qualified immunity goes.  Because there
11  are no longer any civil rights claims against the hospital, the
12  qualified immunity issue as to Jamaica Hospital is no longer
13  relevant.  And the qualified immunity as to the codefendant
14  physicians goes to their good faith.  And they've already been
15  questioned about what their motives are.
16             Secondly, plaintiff's counsel said that he's bringing
17  a negligence action.  Negligence has nothing to do with
18  motivation.  If they were motivated by something, that would be
19  an intentional act.  Negligence is:  Oops we did not do the
20  right thing by mistake.
21             So, whatever -- what's he saying?  It was potentially
22  or not?  And it goes against their entire theory of this case,
23  which is that the only reason that the plaintiff was
24  hospitalized was because the doctors were working in
25  conjunction with the NYPD.  There's nothing to do with this

1  financial issue.  I mean it's like saying if -- has nothing to
2  do with the financial issues.  And every single person who has
3  testified, by the way, has testified that they are not aware of
4  any -- they have no relationship between the Jamaica Hospital
5  and NYPD.  Even if there were.  So what?  What does that got to
6  do with Dr. Aldana's decision to admit the patient and
7  Dr. Isakov's treatment while he was on the floor?  Nothing
8  whatsoever, your Honor.
9              THE COURT:  Thank you all.  Anybody else want to be
10  heard on this?
11              The 30(b)(6) witness will testify with respect to four
12  elements:  The evaluation process of the doctors; second, the
13  admissibility policy of the hospital, and included in that will
14  be any determinations made by the hospital as part of their
15  policies with respect to allocation to different wards.  The
16  third element will be the use and operation of the security
17  cameras.  And the fourth will be the corporate structure of the
18  hospital.
19              Anything further?
20              Thank you all.
21              MR. SMITH:  There is on the calendar, your Honor, my
22  motion to strike.
23              THE COURT:  Oh, yes.  I mean further on this issue.
24              MR. SMITH:  Right, right.
25              THE COURT:  Okay.  Yes.  The motion to strike.

1  Anybody want to be heard?
2           MR. KRETZ:  Your Honor, may we approach very quickly,
3  Mr. Smith and I?
4           THE COURT:  Sure.
5           (Discussion off the record at sidebar).
6           THE COURT:  I'll take it on submission.  Thank you.
7           Thank you all.
8           MR. KRETZ:  Thank you, Judge.
9           THE COURT:  Good bye.
10          (Adjourned)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25