E5sQschC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    ADRIAN SCHOOLCRAFT, et al.
3                  Plaintiffs

4            v.                          10 CV 6005 (RWS)
    THE CITY OF NEW YORK
5                  Defendant

6   ------------------------------x
                                      New York, N.Y.
7                                     May 28 2014
                                      12:00 p.m.
8
    Before:
9                       HON. ROBERT W. SWEET
                                      District Judge
10
                          APPEARANCES
11
    NATHANIEL B. SMITH
12      Attorney for Plaintiff Schoolcraft

13  JOHN D. LENOIR
        Attorney for Plaintiff Schoolcraft
14
    NEW YORK CITY LAW DEPARTMENT
15      Attorney for Defendant NYC
    RYAN G. SHAFFER
16

17  MARTIN CLEARWATER & BELL LLP
        Attorney for Defendant Jamaica Hospital
18  GREGORY J. RADOMISLI

19  IVONE DEVINE & JENSEN LLP
        Attorney for Defendant Isakov
20  BRIAN E. LEE

21  CALLAN KOSTER BRADY & BRENNAN LLP
        Attorney for Defendant Aldana-Bernier
22  MATTHEW J. KOSTER

23

24

25

E5sQschC

```
1              (In open court; case called)
2              THE COURT:  Thank you.  Be seated.
3              No opposition?  Schoolcraft.  Yes, I'll hear from
4     them.  I guess the best way to do this is to take the City's
5     letter of May 16 and just go down through those topics, unless
6     you all have a better way of doing this.  Let me ask the
7     plaintiff, as to C, can you clarify it?
8              MR. SMITH:  C is -- you mean E, your Honor?
9              THE COURT:  I'm sorry.  Yes, I guess I do.  Sorry.
10    Yes, E.
11             MR. SMITH:  I thought I did clarify it in my letter.
12    What I am looking for is a witness, and this also relates to my
13    request for documents.  I am looking for instances where a
14    member of the service has been retaliated against for reporting
15    corruption or misconduct.  What that is relevant to is to the
16    Monell claim against the City of New York.  I've cited several
17    cases where police officers were retaliated against because
18    they violated this blue wall of silence or this code of
19    silence, which is pretty well documented within the NYPD.  So
20    what I am trying to do is get a witness and also get documents
21    relevant to the issue --
22             THE COURT:  Let me just cut you off.
23             MR. SMITH:  Sure.
24             THE COURT:  The City isn't going to concede that there
25    was any retaliation.
```

E5sQschC

1          MR. SMITH:  In this case, no.

2          THE COURT:  Correct?

3          MR. SHAFFER:  No, your Honor.

4          THE COURT:  What?

5          MR. SHAFFER:  No, we are not going to.

6          THE COURT:  Yes, so, you can't define it by

7    retaliation.  You've got to -- I don't know how you're going to

8    define it through a 30(b)(6) witness.  You don't want all

9    disciplinary reports against officers, my God.

10          MR. SMITH:  No.  No.  No.  No.  No.  No.  What I am

11   looking for is -- well, I know from my own research and

12   reported decisions that there are about 12 cases reported in

13   this circuit where police officers claim that they went and

14   they saw some sort of misconduct --

15          THE COURT:  Yes.  Yes.  I'm sure there are such cases,

16   but the question is for a 30(b)(6) witness, how are you going

17   to define what it is that he is supposed to look for?

18          MR. SMITH:  There should be somebody within the trials

19   area who is a commissioner or a deputy commissioner within the

20   police department who has been responsible for prosecuting or

21   not prosecuting members of the NYPD who are accused of

22   punishing police officers who were probably subordinate to them

23   for violating this code of silence.  So, if you have a guy like

24   Schoolcraft -- this is the question, Judge:  In this case --

25          THE COURT:  Well, wait.  Look, are you saying you want

1  testimony about charges brought against an officer who has done

2  what?

3  MR. SMITH:  Who has been disciplined -- I want to know

4  if the City has ever disciplined any officer for taking action

5  against another officer who reported misconduct or corruption.

6  That's the area that I am trying to inquire about.  The reason

7  why I am trying to make --

8  THE COURT:  I don't care about your reasons.  I'm just

9  trying to get at -- does the City understand what that request

10  is?  I am having a little trouble.

11  MR. SHAFFER:  Not entirely, your Honor.  I will say

12  that to the extent I do understand it -- and I read the cases

13  Mr. Smith has relied upon in his response to my letter -- I

14  read those cases as showing plaintiffs who were able to bring

15  forth this information on their own.  The individuals that they

16  noted themselves were properly retained experts; not a policy

17  witness from the police department.  So at this point the

18  plaintiff has --

19  THE COURT:  Look, maybe we could do it this way, and

20  we know how it will come out.  Ask a 30(b)(6) witness is there

21  any policy with respect to disciplinary actions -- I don't know

22  how to formulate it.

23  MR. SHAFFER:  I think that is the problem, your Honor.

24  There is no evidence other than plaintiff's own allegation of

25  anything like this even existing.  So we can't just pull

E5sQschC

somebody out of thin air to testify to something that plaintiff

wants them to say.

THE COURT:  If we can't figure out a way to describe

what you want, I don't see how we can see how we can ask the

City to provide it.

MR. SMITH:  Let me try again.  I'll try to narrow it

down.  There should be within -- there is a separate department

within the police department that prosecutes --

THE COURT:  Of course, yes.

MR. SMITH:  -- disciplinary actions.

THE COURT:  Yes.  Yes.

MR. SMITH:  And there's a commissioner and a deputy

commissioner.

THE COURT:  Yes.  Yes.

MR. SMITH:  I'm sorry.  I'm sorry.  But I'm trying to

be as specific as I can because this is important evidence in

the claim against the City.  And since the Mollen Commission

many years ago said that there is this established code of

silence where cops who speak out against corruption and

misconduct is fully well-known, what I am trying to find out

is, does the City of New York have a real policy that actually

results in disciplinary action against members of the service

for punishing people who are alleged to be rats because they

have pointed out corruption like the corruption that

Schoolcraft pointed out here.

E5sQschC

1          THE COURT:  OK.  That's the inquiry to the 30(b)(6)

2     witness.  I promise you, I know what the answer is going to be,

3     but OK.

4          MR. SMITH:  All right.

5          THE COURT:  That is E.  Now, H.

6          MR. SMITH:  Your Honor, while we're on that subject,

7     before we jump off the 30(b)(6), I've also asked for documents

8     relative to complaints that were filed by officers such as

9     Schoolcraft who said "I did my job.  My job is if I see

10     misconduct, I" --

11          THE COURT:  No.  No.  Look, action against officers

12     who have filed what kind of complaints?

13          MR. SMITH:  I know about 12 cases.

14          THE COURT:  No.  No.  Describe it.

15          MR. SMITH:  Complaints for retaliation against the

16     City of New York because the officers were forced out --

17          THE COURT:  We're back to that again.

18          MR. SMITH:  -- were punished in some way, were

19     isolated, were forced to retire early.  I have listed about 12

20     examples from reported decisions.

21          THE COURT:  No.  No.  Yes, I understand that.

22          MR. SMITH:  So I've asked the City to produce to me

23     claims relating to these allegations and similar types of

24     allegations.  It goes to the same issue about --

25          THE COURT:  You see, you don't agree as to the nature

E5sQschC

1   of the 12 cases.  That's one of the issues.

2            MR. SHAFFER:  Your Honor, with respect to those 12

3   case, they're publicly reported decisions.  Plaintiff was free

4   at any point during this litigation to contact those people.

5            THE COURT:  Oh, sure.

6            MR. SHAFFER:  He hasn't done that.

7            THE COURT:  Be that as it may, he is trying to find

8   out -- under E, I think I finally got it, and, of course, the

9   City is going to say no, there isn't any such policy.  I don't

10  know how to get anything more than that -- well, any documents

11  relating to such a policy, OK.

12           MR. SHAFFER:  Your Honor, to be clear, the Court is

13  not ordering us to produce any documents specific to claims

14  made by other officers at any point in time, right?  Just

15  documents specific to policy.

16           THE COURT:  No.  No.  I'm saying, it's a policy.  It's

17  a policy.

18           The problem, Mr. Smith is, I can't get a grip on -- is

19  there any generic violation in those 12 cases, in other words,

20  where they say there's a violation of some provision?

21           MR. SMITH:  No.  I think that there's -- I think --

22           THE COURT:  I know what you think.

23           MR. SMITH:  I know, but I am just trying to articulate

24  it, and I'm not making this up.  There was a detailed

25  commission report called the Mollen Commission report that

E5sQschC

documents this practice which is unwritten where if a cop says

"that's wrong" and then goes to the appropriate authorities

within the police department and says, "This happened, and

under my obligation as a police officer, I'm informing you that

this conduct is going on," there's, as far as I know, no

process whereby the police department will actually protect

that person.  In fact, my information is that that person will

be treated like a rat.

        THE COURT:  Now, wait.  Suppose we try this:  Cases --

how many cases of -- ye gods, that isn't going to work either.

I was going to say how many cases are there where officers have

complained about police practices.  Well, good Lord, that is

such a large universe, that wouldn't get us anywhere.

        MR. SMITH:  What I am talking about are officers who

have said, "I'm being punished because I spoke out about my

superior's misconduct".

        THE COURT:  But how does that case arise?  That is my

point.

        MR. SMITH:  The only ways that I see it arising are in

the reported decisions where a cop is forced to retire --

        THE COURT:  Yes, you've got reported decisions, but

other than that, how are you going to define that situation?

        MR. SMITH:  I'm assuming that the City will produce

somebody with knowledge about its disciplinary process in this

area, and will be able to provide me with some information

E5sQschC

1     about what, if anything, the City does when a police officer

2     says, "I'm being punished because I spoke out."

3              THE COURT:  Yes, but that's --

4              MR. SMITH:  This might be a big area, but it's a

5     pertinent area.

6              THE COURT:  I would love to get that information for

7     you if we could formulate it in some sensible fashion which I

8     just don't see because they're going to take the position that

9     there is no such policy.

10              MR. SMITH:  Maybe I just have to wait and take this

11     deputy commissioner or whoever this witness is with knowledge

12     and see what they say about what the police department does

13     under these circumstances.  I have 13 examples over the past

14     15, 20 years where people are documented as saying "I had a rat

15     put in my locker, I lost my job, I was forced to retire, I

16     ended up in New Jersey."

17              THE COURT:  But what I am trying to get you to do, Mr.

18     Smith, is to define the proceeding that flowed from that in

19     such a way that it could be identified.

20              MR. SMITH:  Unfortunately, I am not smart enough or

21     sophisticated enough about the NYPD --

22              THE COURT:  If we can't figure out what we want to ask

23     them, then we're stuck.

24              MR. SMITH:  The general subject matter is:  Have you,

25     Mr. Commissioner or Assistant Commissioner --

E5sQschC

1          THE COURT:  Whatever.

2          MR. SMITH:   -- prosecuted cops for retaliating

3    against other cops because you perceive that they violated the

4    code.

5          THE COURT:  Yes, and that question is going to be

6    asked, is there a policy for doing that, and the answer is

7    going to be no, but, yes, OK.  I guess we've gone as far as we

8    can.

9          H:   Training.  What would you like there?

10         MR. SMITH:  There are several subject matters that are

11   very general that I just want to have a witness explain to me

12   what the general process is at the police department; how do

13   they go about training generally.  I don't want to know all of

14   the subject matters, but what's the process whereby a police

15   officer is initially trained and then how does the police

16   department maintain the level of training throughout an

17   officer's career.  But there are other general areas that I'm

18   interested in.  Over time, how does --

19         THE COURT:  Let's stick with the training.

20         MR. SMITH:  OK.

21         THE COURT:  What you want is a description of the

22   training procedures in the department and any description of

23   methods that keep officers up to date on the latest training

24   requirements.

25         MR. SMITH:  Precisely.

11

E5sQschC

1            THE COURT:  That seems easy.

2            MR. SHAFFER:  Your Honor, the problem is, as I noted

3    in my letter and in my response to plaintiff's letter, there

4    are types of training.

5            THE COURT:  Yes, well, he'll describe those.

6            MR. SHAFFER:  We can't identify a witness until

7    plaintiff identifies what types of training he's talking about.

8            THE COURT:  No.  No.  Somebody who is familiar with

9    the overall training program of the department, how they do

10   training generally.  Then if he wants something further, he'll

11   have to ask for it.

12           MR. SHAFFER:  Your Honor, the problem still remains

13   that that deposition on that topic alone could last days.

14           THE COURT:  Well, it won't.

15           MR. SHAFFER:  And if Mr. Smith doesn't specify what

16   types of training he wants to know about, I mean, there is

17   nothing in this case that would be concerned with how officers

18   receive training on first aid generally or driving a car

19   generally.  They spend six to eight months at the police

20   academy.  That training alone could be questioned for days and

21   days.

22           THE COURT:  Oh, sure, well -- I take it that there is

23   somebody in the department that has the task of educating

24   officers and being sure that they're well trained, and I think

25   all they do is describe that process in general terms, and

E5sQschC

 1    after that I would -- OK.

 2            MR. SHAFFER:  Your Honor, I understand your thinking

 3    about behind that, but --

 4            THE COURT:  Well, as you said, he's not going to ask

 5    about driving cars or whatever.

 6            Let me ask you this, Mr. Smith:  Are there any

 7    specific areas that you are particularly concerned about?

 8            MR. SMITH:  No.  It's really a very general thing.

 9            THE COURT:  Then somebody who will describe the

10    training process for patrolmen.  Patrolmen?

11            MR. SMITH:  Yes, patrolmen.

12            MR. SHAFFER:  Your Honor, again, that topic is too

13    over broad.  The deposition could last days on end.

14            THE COURT:  It's not going to last days on end.  If it

15    is more than three hours on this subject, you can cut it off.

16            MR. SMITH:  It's not going to be three hours.

17            MR. SHAFFER:  Your Honor, could we limit it to 30

18    minutes if it's this general?  I mean, we have had about 15

19    depositions.

20            THE COURT:  It will be somewhere between 30 minutes

21    and three hours.  OK.  Wow.

22            I:  Overtime.  What do you want in overtime?  By the

23    way, how is that relevant?

24            MR. SMITH:  As Officer Schoolcraft described in his

25    deposition, parts of which I think were quoted in the various

E5sQschC

letters, if a police officer wanted overtime, he was told he

had to meet the quotas.  So, if you want to go and take an

extra day to make some money here, there was a quid pro quo at

the 81st precinct with respect to overtime.  If you want to get

extra work, you have to deliver two arrests this month.

THE COURT:  So you want somebody to testify as to does

such a policy exist?

MR. SMITH:  Yes.  And I want somebody from the police

department or from the City of New York to say that the proper

allocation of overtime is based on these considerations, and

I'd be very surprised if they say complying with a quota is one

of them.

THE COURT:  So you want somebody who can testify as to

what are the requirements or what are the conditions under

which an officer is granted overtime?

MR. SMITH:  Yes.

THE COURT:  OK.

MR. SHAFFER:  Your Honor, again, as I noted in my

letter, the request was never clear as to whether it was

specific to the 81 precinct.

THE COURT:  I think, yes, as to the 81.  Then if there

are any overriding departmental requirements, that as well.

MR. SHAFFER:  Your Honor, again, the same with the

overtime as there was with the training, there are different

types of overtime.  There's overtime that results from officers

E5sQschC

making an arrest near the end of their tour as opposed to

overtime that's required because there's not enough officers

available.

THE COURT:  Somebody can explain all of that.  OK.

J:  Gun amnesty.

MR. SMITH:  On three occasions, Officer Schoolcraft

reported to the internal investigators that individuals were

brought into the 81st precinct, and then when they were told

about a gun amnesty program, they said, "Oh, well, I can get a

gun."  This was in Bed Stuy.  So they'd either have somebody

bring a gun or they'd go out and get a gun; and instead of

being granted the hundred dollars or the amnesty, they were

cuffed.

And what Schoolcraft says is that this was done

because of this insane drive for arrests, particularly gun

arrests, that was going on at the time.  So, like the training,

like the overtime, I'd like to have a City witness say "The gun

amnesty program works like this, and, no, you're not supposed

to sucker people into bringing guns so that you can get a

collar for the month and please your CO.

THE COURT:  That sounds reasonable.

MR. SHAFFER:  Your Honor, I agree that the question in

a vacuum it sounds reasonable, but it has nothing to do with

this case.  And in fact, he said he already knows the answer.

THE COURT:  OK.  I'll permit it.  Description of the

1    gun amnesty program requirements.  OK.

2             Leaving aside the privilege issue, and I don't mean to

3    reach any decision about that, but what is it that you would

4    want?

5             MR. SMITH:  I think the privilege issue is really the

6    net --

7             THE COURT:  Skip the privilege issue for a moment.

8             MR. SMITH:  What I'm looking for is -- again, it's

9    rooted in the facts.  Schoolcraft was subject to mounting

10   retaliation within the 81st precinct.  Eventually he goes to

11   IAB, and then goes to QUAD and reports internally the things

12   that are happening to him.

13            THE COURT:  Yes.

14            MR. SMITH:  And that culminates in him leaving the

15   precinct on the day, this October 31st day, early; and when he

16   gets home, reports to IAB that he is being menaced by one of

17   the defendants with a handgun, and he's scared and he needs

18   help.  And from my perspective, rather than coming to the aid

19   of this officer who was trying to do his job and provide

20   information to these two internal agencies that are supposed to

21   be reporting and watchdogs, they completely ignored his plea

22   for help.  Then when he's released from the hospital -- and,

23   again, this is a little bit rhetorical but not terribly -- they

24   literally pounced on him and started investigating him.

25            So, what I want to know is all of their operating

E5sQschC

procedures that govern the way IAB and QUAD conduct their

affairs because, it seems to me -- and this ties in with this

blue code -- if somebody who is member of the service reports

misconduct, they end up getting punished by the institution,

and there ought to be some rules and procedures that protect

Officer Schoolcraft in these circumstances.

            THE COURT:  OK.

            MR. SMITH:  So that is what I am looking for.  Are

there these guidelines that govern how the watchdog protects

the key witness.

            THE COURT:  OK.  That seems satisfactory.  It would be

guidelines with respect to the treatment of complaints.  Yes?

            MR. SMITH:  Yes.

            THE COURT:  Any problem from the City?

            MR. SHAFFER:  Yes, your Honor.  I don't think that the

privilege issue can be brushed aside.  However, even before you

reach that issue, plaintiff already has the findings of these

two investigations.  He has the files.  They've been disclosed

years ago.

            THE COURT:  Yes, I know that.  Right.

            MR. SHAFFER:  So, to impose upon the City to have to

describe the process by which --

            THE COURT:  No.  No.  The question is, are there

guidelines with respect to the treatment of any officer who

makes a complaint.

E5sQschC

1           MR. SHAFFER:  That is duplicative of topic E, it

2      sounds like, in terms of what is done to people who are

3      complained about.

4           THE COURT:  Well, in any case, I'll permit it, OK.

5           Letter L.

6           MR. SHAFFER:  Your Honor, I have to ask if the Court

7      can be more clear as to what Mr. Smith is going to be able to

8      ask the witness about as to IAB and quality assurance division.

9      It's not clear what limitations are going to be placed on his

10     questioning and the case as it progresses --

11          THE COURT:  Certainly any procedures, that means

12     presumably any written procedures or acknowledged procedures

13     with respect to the treatment of people who file complaints.

14          MR. SHAFFER:  Your Honor, prior to today, plaintiff's

15     been provided with IAB's procedural guide and asked to identify

16     to the City what topics within that guide would be relevant to

17     him, and he never responded.  Now we're here today and it's

18     still not clear what he wants to ask about.

19          THE COURT:  OK.

20          MR. SHAFFER:  So I would ask the Court to preclude him

21     from questioning on that topic because he's already got the

22     procedural guide.

23          THE COURT:  No, I'll leave it where it is.  If you

24     look at L, it certainly is over broad.  Adjudicating command

25     disciplines, good Lord.  How are we going to deal with that?

E5sQschC

1             MR. SMITH:  Well, since I wrote this letter --

2             THE COURT:  I do have 20 cases involving Chief

3      Esposito, for example, so these things are out there.  I don't

4      know what you want.

5             MR. SMITH:  What I am looking for is a general

6      statement by a police department witness or city witness that

7      could tell me that there are -- the way I characterize this

8      request, and maybe it is -- I'm looking for a description of

9      how the police department goes about documenting various

10     activities.  The activities are training, crime reporting and

11     command disciplines.

12            I'm not asking for the underlying potential subject

13     matters below all of those things, but what I am asking for is

14     a witness from the police department to tell me, yes, we do

15     training and this is the way we document it.

16            THE COURT:  Well, we've done the training.

17            MR. SMITH:  Yes.  And the same thing is true with

18     crime reporting and command disciplines.  Part of the heart of

19     the case is that victims of crimes or alleged victims of crimes

20     would come in and pieces of paper would or would not be

21     created.  What I am looking for is somebody to explain to me

22     how that process is supposed to be documented.

23            Similarly, Schoolcraft was issued drafts unsigned or

24     sometimes signed command disciplines.  I total about eight, but

25     not all have been documented.  Most of them were never

E5sQschC

1   presented to Schoolcraft, but they exist in paper format.

2          THE COURT:  Wait a minute.  At least I've got a

3   glimmer of something.  In other words, the process of issuing

4   and recording command discipline.

5          MR. SMITH:  Yes.

6          THE COURT:  Fine.

7          MR. SMITH:  And the same thing for the process of

8   recording and documenting reports of crimes, generally.

9          THE COURT:  All right.  That's fine.  You mean what

10  happens when you come to the station house.

11         MR. SMITH:  Yes.

12         THE COURT:  OK.

13         MR. SHAFFER:  Your Honor, plaintiff worked in a police

14  precinct and took complaints and he's got the findings of an

15  investigation into his allegations that complaints were not

16  taken properly.

17         THE COURT:  Well, I'll permit it.  What is it with

18  respect to COMPSTAT and TRAFFICSTAT.

19         MR. SMITH:  The genesis of this case is twofold:  One,

20  there is pressure being put on Schoolcraft and other officers

21  to satisfy certain quotas for certain kinds of quality of life

22  infractions, stops and frisks.  They were in my view

23  exclusively evaluated based on the numbers of stops, the number

24  of C-summonses and the number of arrests that they delivered on

25  a monthly basis.

1          The other aspect of this is that Schoolcraft was

2     reporting people would come to the precinct, they would report

3     their car is stolen, they were beaten up, and their phone was

4     taken; and as a regular part of the practice of being a police

5     officer at the 81st precinct, there was pressure put directly

6     on the police officers to downgrade or suppress or put in the

7     wastepaper basket reports of criminal activity.

8          The reasons why those pressures were being put on

9     police officers was because the commanding officers and the

10    executive officers at the precincts were showing up at weekly

11    COMPSTAT and TRAFFICSTAT meetings and they were being told,

12    "your numbers here are up.  Get them down.  Stop this.  Why is

13    this happening."

14         THE COURT:  Forgive me, but hadn't we done this whole

15    COMPSTAT and all of that?  You've got all that.

16         MR. SMITH:  No, I don't.

17         THE COURT:  I thought we had worked out that where

18    there were tapes, you were going to get them; where there were

19    reports, you were going to get them.

20         MR. SMITH:  I may look like Jon Norinsberg, but I'm

21    not.  That was in the Stinson case, your Honor, and your Honor

22    wrote a decision authorizing the plaintiff in the Stinson case

23    to get certain excerpts from the COMPSTAT videos.  He was the

24    lawyer on the case two years ago.  I've been educated by your

25    court decision on that.

E5sQschC

```
1              THE COURT:  OK.

2              MR. SMITH:  So I haven't gotten the information in

3    this case.  The information I want is, one, a city witness to

4    tell me what COMPSTAT and TRAFFICSTAT are and how they operate.

5    More importantly, Marino, Mauriello and Lauterborn, according

6    to the testimony, went to these meetings and received

7    instructions and directions from COMPSTAT senior people about

8    the operations of their respective commands.  I've asked for

9    those videos because Mauriello was the guy who was coming to

10   the precinct and he --

11             THE COURT:  Hold the phone.

12             MR. SMITH:  Sorry.

13             THE COURT:  Hold the phone.  Videos of COMPSTAT

14   meetings at the 81st precinct.  By the way, are these

15   precinct-wide -- no, they don't.

16             MR. SMITH:  What I understand is that --

17             THE COURT:  Hold it just a second?

18             MR. SHAFFER:  Your Honor, if I may.

19             THE COURT:  Yes.

20             MR. SHAFFER:  Mr. Smith seems to want information

21   about what the commanding officers of the 81, what information

22   they were getting and what direction they were receiving at

23   COMPSTAT.

24             THE COURT:  Yes.

25             MR. SHAFFER:  He has deposed those people, and he in
```

E5sQschC

1      fact asked Chief Marino at his deposition over our objection,

2      and he answered the questions.  So to now ask for a policy

3      witness to reiterate what has already been asked or what he

4      forgot to ask of other individuals is inappropriate.

5              We're two weeks from the close of discovery here.

6      This isn't a proper way of obtaining additional information

7      which you didn't get from a prior witness because you forgot to

8      ask for it.

9              MR. SMITH:  Excuse me.  If I can respond to that.  I

10     asked Marino and I asked Mauriello generally.  They went to

11     COMPSTAT meetings and they told me they were videotaped at the

12     depositions, and since then I've requested copies of the

13     excerpts from their appearances because if they were getting

14     pressure to keep up the --

15             THE COURT:  No.  No.  I understand the issue.  I don't

16     see any utility in a City 30(b)(6) witness testifying as to how

17     COMPSTAT works because that is not going to get you anything.

18     Somebody could describe how COMPSTAT works.  It's a lot of

19     figures that come in here and there, it's analyzed and blah,

20     blah, blah.  That's not going to get you what you want.

21             MR. SMITH:  What I really need is the direct pressure

22     from top brass to the defendants.

23             THE COURT:  If, in fact, it exists, of course.

24             MR. SMITH:  Yes.

25             THE COURT:  Yes.  But the most, it seems to me, as

E5sQschC

```
1    counsel says, you've deposed those involved.  If there is any

2    documentation of the COMPSTAT meetings relating to the 81st, I

3    think those documents should be produced.  I doubt if there is,

4    but if there is --

5            MR. SMITH:  What I remember from the Stinson decision,

6    your Honor, is that initially the City was asked to produce any

7    memos or notes of the meetings.  Then those were given to the

8    plaintiff, and from there he was asked to try and be more

9    specific about what he --

10           THE COURT:  Let's do the document first.

11           MR. SMITH:  All right.

12           THE COURT:  And let's see what happens.  Life is hard.

13   How many letters are there in the alphabet?  We're up to N.

14   Well, that's not too bad.  OK.

15           Well, N mystifies me.

16           MR. SMITH:  Again, this is one of these very general

17   subject matters, what are the available means of communicating

18   within the police department:  Radio, cell phone, email.  It's

19   probably --

20           THE COURT:  All of the above one presumes.

21           MR. SMITH:  This is much ado about nothing.  I would

22   assume this would be a no brainer, but instead it's all out

23   war.

24           THE COURT:  Well, what do you expect somebody to say?

25           MR. SHAFFER:  Your Honor, if we're going to be asked
```

E5sQschC

1      to produce a policy witness who can say that an officer can

2      shout to another officer down the street and say, "Hey, I need

3      your help," we are going to be here all day, or all week, or

4      all month.  I just don't think that this document especially is

5      appropriate.  It illustrates the point I was trying to make

6      earlier.

7                THE COURT:  Let's do it this way:  To have the witness

8      testify as to the procedures for officers to make complaints

9      about what?  We don't want bathroom complaints.

10               MR. SHAFFER:  Your Honor, I think the request was

11     about how officers and subordinates can communicate with their

12     supervisors; meaning, if I need to get in touch with my

13     sergeant while I'm in a car and he's at the station house, how

14     can I do that?

15               THE COURT:  No.  No.  No.  I think it's the procedures

16     for making any complaints about -- I don't know.

17               MR. SHAFFER:  Your Honor, these not what the request

18     was.  It says:  How can officers/employees communicate with

19     their supervisors?  That is a most overbroad and irrelevant

20     topic.

21               THE COURT:  I agree.  I don't know really what you

22     want.  What do you want?

23               MR. SMITH:  What I want is for a witness to say, very

24     simply, we're talking about 15 minutes.  What I really want to

25     establish is -- I've got to ground these requests in the facts.

E5sQschC

1          On the day that Schoolcraft was hauled out of his

2     house, he had been earlier menaced by a tenant with a gun.

3          THE COURT:  Yes.  Yes.  I am familiar with the

4     incident.

5          MR. SMITH:  Yes.  I know.  We all are.  And I'm sorry

6     about that.

7          THE COURT:  It's all right.

8          MR. SMITH:  That same lieutenant had taken

9     Schoolcraft's memo book, that big fat leather thing.

10          THE COURT:  Yes.  Yes.

11          MR. SMITH:  And he kept it for three hours.  This is

12     all out of his testimony.  He photocopied certain pages out his

13     memo book that were unusual; i.e, they had references to QUAD

14     and IAB in them.  Made two copies of them.  Put one copy in

15     Mauriello's, his commanding officer's desk drawer, and didn't

16     communicate these facts to him by Blackberry, email, telephone,

17     radio or any other way.

18          And Mauriello when asked about it said,  "I didn't

19     know about this until way after the fact."  So, this is an

20     example about how, respectfully, police officers will make

21     statements about things that just don't make sense.

22          So, for this fellow to do this and then to say that he

23     didn't speak to his commanding officer about these unusual

24     entries in Schoolcraft's memo book about QUAD and IAB until

25     after Schoolcraft had been put in Jamaica Hospital, I want a

E5sQschC

1  witness to say yes, there are a litany of ways that a

2  lieutenant in the police department can communicate with his

3  commanding officer about anything.  That's all I'm really

4  interested in.

5          THE COURT:  I think the City will confess to that.

6          MR. SMITH:  If we can get a confession, then we don't

7  need a witness.

8          MR. SHAFFER:  It's common sense.  I don't know what

9  I'm supposed to say.

10          THE COURT:  Not a thing.

11          MR. SHAFFER:  Thank you.

12          THE COURT:  All right.  O:  You've already got that,

13  don't you?

14          MR. SMITH:  Yes.

15          THE COURT:  B:  Well, that's post the event, right?

16  So who cares?

17          MR. SMITH:  Well, it's not post.  That's what they

18  say.  What happened was defendant Marino --

19          THE COURT:  Forgive me, it is post the event, is it

20  not?

21          MR. SMITH:  No, that's incorrect.

22          What happened is that deputy chief defendant Marino

23  was the commanding officer of the 75th precinct and when he was

24  assigned to the 75th precinct, he imposed across the board a

25  minimum quota or he increased the quota.  And as a result of

E5sQschC

| 1 | that, police officers, with the assistance of their union,
| 2 | challenged that quota and the punishments that were being meted
| 3 | out by him for not complying with that quota.

| 4 | That conflict led to a 2006 arbitrator's decision
| 5 | which said that Marino's imposition of a quota was unlawful.
| 6 | What I am asking for is the City to produce a witness to say,
| 7 | OK -- I'm not interested in their deliverative processes, but
| 8 | what did you do, if anything, in response to this finding that
| 9 | the says that the defendant -- and Marino -- I'm not just
| 10 | fishing here.  Marino was the commanding officer of the 75th.

| 11 | THE COURT:  No.  No.  That's fine.  Any description of
| 12 | any departmental -- I take it, it would be across the
| 13 | department?

| 14 | MR. SMITH:  Yes.

| 15 | THE COURT:  Departmental action taken with respect to
| 16 | the arbitrator's decision.

| 17 | MR. SHAFFER:  Your Honor, if I understand the
| 18 | arbitrator's decision and what Mr. Smith just described, it
| 19 | pertains to a different precinct, and it is only being raised
| 20 | here because it involves a defendant who is a party to this
| 21 | action.

| 22 | THE COURT:  No, I'll permit it.  I think that's it.
| 23 | Thank you all.  I look forward to our next meeting.

| 24 | MR. SMITH:  We've got a lot more, your Honor, I'm
| 25 | afraid.

E5sQschC

```
 1              THE COURT:  Oh, yes?

 2              MR. SMITH:  Yes.  I started with numbers for my

 3     request.  If it's not on the Court's calendar and you want to

 4     come back next week, I'm fine with that; but in my letter of

 5     responding to the City's request, I put in a May 22 letter.

 6              THE COURT:  I have it.

 7              MR. SMITH:  There are, I'm afraid to say, 11 separate

 8     subject matters, many of which have already been discussed.

 9              THE COURT:  I thought we dealt with all of them.

10              MR. SMITH:  Not all of them.

11              THE COURT:  Well, so far I'm down to -- I've down to

12     gun amnesty.

13              MR. SMITH:  Starting on page 9 of my letter.

14              THE COURT:  What's the problem with one?

15              MR. SMITH:  I got two pages from the City --

16              THE COURT:  No, I'm asking the defense.

17              MR. SHAFFER:  The problem is that we already provided

18     the information to the plaintiff on April 14 about crimes that

19     were reported on the evening of the incident.

20              THE COURT:  So that's done.

21              MR. SMITH:  It's not really done.  That's the problem,

22     is that I got two -- I they can hand them up your Honor.

23              THE COURT:  No.

24              MR. SMITH:  I'll describe them to you.  I got two

25     pieces of paper.  They were put together.  I don't think
```

E5sQschC

```
1    they're in an admissible format.  They should have been on a

2    COMPSTAT letterhead.  It looks like somebody from somewhere who

3    designated something else as the source printed up two

4    spreadsheets listing a bunch of numbers and various crimes.

5    This is not the kind of document I am ever going to be able to

6    offer at trial.  It's not authentic.  It doesn't even look

7    authentic.  More importantly, there are documents that are

8    generated by COMPSTAT -- this is attorneys' eyes only -- but

9    it's an official document that identifies what crimes are

10   happening where and when.  This spreadsheet that looks like it

11   was created by a paralegal is not really what I was looking

12   for.

13           I was looking for police department records with the

14   crime activities in these two precincts and city-wide on a

15   particular date, and I get these two papers that, respectfully,

16   I think they're inadequate.  If I was a juror, I'd look at them

17   and say it looks like my kindergarten kid put this together.

18           MR. SHAFFER:  Your Honor, because what Mr. Smith is

19   asking for doesn't exist in the format he wants it in shouldn't

20   require the City to do anything more than it's done, which is

21   take data that has been provided to him in a larger format and

22   summarize it down, pretty much as a courtesy to him, and now

23   we're here arguing over it's not good enough.

24           THE COURT:  Your position is that you have provided

25   the COMPSTAT information.
```

E5sQschC

```
 1              MR. SHAFFER:  It doesn't exist on letterhead or in a

 2    format that he wants because the City doesn't maintain the

 3    data, as I understand, it on a day-by-day basis.  We sought to

 4    obtain the information and reduce it down for him to the day in

 5    question, and we gave it to him.

 6              THE COURT:  OK.

 7              MR. SMITH:  Then the way to handle it, my suggestion,

 8    would be to have a person with knowledge say, yes, these two

 9    pieces of paper --

10              THE COURT:  Well, you're talking about admissibility

11    now.

12              MR. SMITH:  And authenticity and are these actually

13    created and how were they created.

14              THE COURT:  Yes.  OK.  If we get to that, if you want

15    to use it, we'll have to deal with it.

16              MR. SMITH:  OK.

17              THE COURT:  I think we've done 2 the best we could.  3

18    we've done.

19              MR. SMITH:  Well, 3 we have done.  We haven't really

20    done 2 from my perspective.

21              THE COURT:  I think we have from my perspective.

22              MR. SMITH:  Well, you're the Judge.

23              THE COURT:  Yes, I know.

24              MR. SMITH:  4 is a very important subject matter

25    about, it goes to --
```

E5sQschC

1          THE COURT:  Hold it.  Just a second.  Yes.  OK.  We're

2     talking about any evaluations of Schoolcraft during that

3     period, right?

4          MR. SMITH:  No.  No.  I'm sorry.  Let me explain.

5     When I talked -- the first day of his commanding officer's

6     deposition, Mauriello, he said that Schoolcraft's numbers

7     across the board -- he said his performance was terrible; that

8     the numbers that he had in the various categories they tracked,

9     among others are arrest summonses, verticals, 250s, were way,

10    way below the normal numbers of other police officers in the

11    81st precinct who were within his command.  And I said -- and

12    it's based on those numbers, that's why you gave Schoolcraft

13    this failing evaluation, which put his job at jeopardy.  And he

14    said yes.

15         So based on that, I requested that the City provide me

16    with performance numbers for the other comparable police

17    officers in the 81st precinct who Mauriello himself was in

18    effect comparing Schoolcraft too.

19         THE COURT:  Of course we don't know how many -- what

20    are we talking about?

21         MR. SHAFFER:  Your Honor, as I put in my response for

22    plaintiff's request, at any given time there's approximately

23    190 officers assigned to command.  Assuming that during the

24    period plaintiff cites, those officers never left and new

25    officers never came, you're talking about over 5,000 pages of

E5sQschC

documents.  Now, in the inevitable instance with officers

coming and going, you'd have probably 15- to 20,000 pieces of

paper that would have to be searched in order to respond to

this request.  You're talking about individuals who are being

supervised by different people at different times.  It's not

only relevant, it's overbroad, and it's burdensome for the City

to have to search through each individual officer's personnel

file for their evaluations that were written while they were

assigned to this particular precinct.

            MR. SMITH:  Your Honor, may I respond to that just

briefly?

            THE COURT:  Well, here is the problem, it would have

to be a reasonable limitation.

            MR. SMITH:  I have a solution to that --

            THE COURT:  Yes.

            MR. SMITH:  If you don't mind me interrupting because

Mauriello said there were quarterlies and dailies or monthlies.

He also said there are annualized -- what he said in his

deposition is that he looked at Schoolcraft's annualized

numbers, and it was based on those annualized numbers for the

year, 2008, this guy is terrible.  He's a loser.  He's a zero.

Fail him.  He also said that those same annualized numbers

exist for all the other officers in the command.

            THE COURT:  They do, but that --

            MR. SMITH:  So, we're not talking about 5,000 or

E5sQschC

1    15,000 pages.  We're talking about at that time in January of

2    2009 Schoolcraft was given a failing evaluation, there were

3    probably 125 police officers in the precinct all of who have

4    the same analyzed summary, and the City can easily get that.

5    We're talking about less than 200 pages.

6                THE COURT:  So, the analyzed summary for the officers

7    in that precinct at that time.

8                MR. SMITH:  Yes.

9                MR. SHAFFER:  Your Honor, it's still not clear how

10   that would be relevant if these people are permitted to --

11               THE COURT:  Well, that's a different issue.  I'll

12   permit it.

13               MR. SHAFFER:  Plaintiff has his own evaluations.  He

14   can see the basis for his evaluation.  So why does he need to

15   compare that to strictly to numbers of other officers.

16               THE COURT:  He gets it.

17               MR. SMITH:  I am going to withdraw 5.

18               THE COURT:  Oh, good.  Hot dog.

19               MR. SMITH:  6 is well, come on --

20               THE COURT:  We'll skip 6, don't you think?

21               MR. SMITH:  No, I don't.

22               THE COURT:  Well, who cares?

23               MR. SMITH:  The plaintiff cares.

24               THE COURT:  It's not relevant to the case is what I am

25   trying say.  Forgive me.

E5sQschC

1          MR. SMITH:  7 are the logs of the various documents

2     that are relevant to Schoolcraft's -- the City has produced to

3     me a poor quality of a photocopy of the command discipline log.

4     There should be, and what I've asked for is, the inspection of

5     the originals that are maintained at the precinct; not just the

6     command discipline log, but the training log, the tow log, the

7     sick logs and the gun amnesty logs.  These are books that are

8     maintained at the precinct that document or should document

9     behavior going on in the precinct at the time.

10          THE COURT:  Well, I don't see any problem in your

11     inspecting those.

12          MR. SMITH:  Neither do I.

13          MR. SHAFFER:  Your Honor, he has been provided with

14     the log that's relevant here.  To the extent that the copy is

15     not good, he could ask for a better copy.  To my knowledge,

16     I've not been asked -- and neither have my co-counsel, who,

17     unfortunately, couldn't be here today -- for a better copy.

18     There are reasonable solutions to these requests.  To bring a

19     motion to before the Court and waste the time that's being

20     wasted today.  And then we're asking for logs about towing

21     cars.

22          THE COURT:  We're just talking about legibility,

23     that's easy.

24          MR. SHAFFER:  Understood.  But then you have requests

25     for logs that are entirely irrelevant, like cars being towed in

1     the 81st precinct.  Your Honor, I don't mean to beat a dead

2     horse here, but it's not relevant.  Cars being towed?

3           THE COURT:  Well, I don't know.  It may or may not be.

4     It's discovery.  Road tow log.

5           MR. SHAFFER:  It's not likely to lead to any

6     admissible evidence, which is the standard.

7           THE COURT:  OK, but legible copies.

8           MR. SHAFFER:  Of which logs, your Honor.

9           THE COURT:  The command discipline, training, road

10    tow, sick and gun amnesty.  We've done the Queens DA.

11          MR. SMITH:  Well, not entirely.  What I understand

12    about that is you have to circle back a little bit.

13          THE COURT:  Well, I don't think the DA's here, right?

14          MR. SMITH:  No, that's not the issue.  There was some

15    information that was redacted from a report by a prosecutor in

16    the Queens DA.  It created this whole unraveling because when

17    I -- the information that I was able to unredact showed me that

18    the Queens DA hired an expert, and the expert said that Jamaica

19    Hospital, in sum or substance relied on very conclusory ideas

20    in order to make this decision to commit Schoolcraft.

21          Your Honor said to the City produce any report

22    generated by the expert.  The City has explained to me that the

23    expert did not generate a report.  What he did was orally

24    communicate his findings to the Queens DA, and that oral

25    finding was then memorialized in his report, which has been

E5sQschC

1    redacted.

2              So, I am trying to get the substance of the expert's

3    opinion on the issue.  I think the only place it resides is in

4    three or four paragraphs of this report which had been

5    previously redacted.

6              MR. SHAFFER:  Your Honor, if I may, I think your Honor

7    is correct in that we dealt with this issue previously and the

8    Court ordered City defendants to produce a report error to the

9    extent one existed, and expressly refused to order the City

10   defendants to unredact any notes made by the district attorney.

11   In compliance with that order, plaintiff was informed that

12   there was no report to produce and that the issue was dealt

13   with.

14             THE COURT:  OK.

15             MR. SMITH:  We skipped over 8, your Honor, which is

16   previously the Court had directed the City to produce findings

17   on the trial against the defendant Marino.  They provided me

18   with a conclusory summary of the charges, and that was it.  My

19   understanding of the process is that there is a quasi-judicial

20   process involved where --

21             THE COURT:  Well, I think it the City's position is

22   they have given you what they have.

23             MR. SHAFFER:  Your Honor, our position is we've given

24   plaintiff what the Court ordered us to provide, which is what

25   we had.  That was provided on March 25?

E5sQschC

| | |
|---|---|
| 1 | THE COURT:  Is there anything else? |
| 2 | MR. SHAFFER:  There's nothing else because the Court |
| 3 | didn't order production of the entire file.  Your Honor ordered |
| 4 | us to produce whatever the charges were and whatever the |
| 5 | disposition was, and that's what was produced. |
| 6 | THE COURT:  OK. |
| 7 | MR. SMITH:  I don't want to belabor this too much, but |
| 8 | there should of have been a report generated -- my |
| 9 | understanding is that deputy commissioner conducted a trial, |
| 10 | and just like a magistrate judge, issued a report and a |
| 11 | recommendation that was sent up to the commissioner to say this |
| 12 | is my recommendation about how we should discipline or not |
| 13 | discipline this particular officer, and then the commissioner |
| 14 | says yes or no.  All I have is the yes or no, and the nature of |
| 15 | the summary charges which have already been produced and what I |
| 16 | know about.  What I am trying to find out here is what were the |
| 17 | findings against this key defendant in the case.  I can go on |
| 18 | Google and find out the adjudication.  So that's what I'm |
| 19 | looking for. |
| 20 | THE COURT:  What good is it going to do you?  How is |
| 21 | that going to -- you're talking in terms of cross-examination, |
| 22 | etc., etc. |
| 23 | MR. SMITH:  And credibility. |
| 24 | THE COURT:  Well, OK.  If there is a report to the |
| 25 | commissioner, as you say, produce it. |

E5sQschC

1          MR. SHAFFER:  Your Honor, I would ask the Court for

2    clarification as to why the previous ruling has changed because

3    this request --

4          THE COURT:  Because I've re-thought it.  Thank you.

5          MR. SHAFFER:  So exactly what are we being ordered to

6    produce at this point?

7          THE COURT:  Well, is there a report?

8          MR. SHAFFER:  At this point I can't say yes or no.

9          THE COURT:  If there is a report of the hearing to the

10   commissioner, whatever that report is.

11         As to 10, if you've got it -- do you have it, do you

12   know?

13         MR. SHAFFER:  Your Honor?

14         THE COURT:  Yes.

15         MR. SHAFFER:  You're addressing me?

16         THE COURT:  Yes.  10.

17         MR. SHAFFER:  I can't say yes or no.  The reason for

18   that is because the request has been made two weeks before the

19   close of discovery.  It's untimely.  For that reason, it should

20   be denied.

21         THE COURT:  If you've got it, produce it.

22         What's the City's position with respect to 11?

23         MR. SHAFFER:  First off, it's irrelevant.  Second,

24   again, it's untimely.  If we are to address and the order to

25   produce documents pertaining to every one of plaintiff's

E5sQschC

1    allegations, many of which have no basis in fact or logic, we

2    would -- I mean, discovery in this case would never end.

3              THE COURT:  This is certainly a possibility.

4              MR. SHAFFER:  I could think of any number of things

5    that could be asked for, and then we would be forced to

6    undertake a search.

7              THE COURT:  I don't see the relevance of the Weiss

8    (ph) matter.

9              MR. SMITH:  Can I try and explain that to your Honor?

10             THE COURT:  Sure.

11             MR. SMITH:  One of the acts of misconduct that was

12   reported by Schoolcraft to IAB was that Weiss, along with his

13   supervising Officer Caughey, who was the same guy with the gun,

14   on October 31 broke into the commanding officer's office and

15   took out of Weiss's personnel file certain documents that were

16   relevant to the consideration of Weiss's pending promotion to

17   become a lieutenant.  When I took Caughey's deposition, he

18   admitted actually going into the file and taking documents out

19   of Weiss's file.  He said he did that because there was an

20   ongoing review board going on for Weiss's promotion, and that

21   the review board had asked him to provide a copy of various

22   documents within Weiss's file.

23             So I said to the City, please provide me with whatever

24   was transmitted by Weiss or Caughey to this review board

25   because this doesn't seem to add up to me.  If the review board

E5sQschC

1    needed information, it would have gone through normal kind of

2    paperwork channels and not asked the person who is being

3    reviewed to go get copies of his personnel file.  So that is

4    the relevance of it.  It goes directly to one of Schoolcraft's

5    specific allegations that was --

6            THE COURT:  OK.  No.

7            MR. SMITH:  Then we have only one more subject matter,

8    your Honor.  That is not with respect to the City but with

9    respect to Jamaica Hospital.

10           MR. RADOMISLI:  Thank you.

11           MR. SMITH:  If you don't mind, I'd like to just

12   explain the background for that.

13           THE COURT:  So you want the two doctors?

14           MR. SMITH:  Yes.

15           THE COURT:  What's the problem?

16           MR. RADOMISLI:  Your Honor, we identified these

17   doctors over three years ago, and now we're waiting till two

18   weeks before the end of discovery to identify them.

19           Leaving that aside, the only reason the plaintiff's

20   counsel wants to take these doctors' depositions is because

21   Sergeant James testified that she did not give them the

22   information that is recorded.  Doctors are obligated to keep

23   accurate records.  There is no reason to think that this doctor

24   is going to come in, so we're going to spend hours and hours on

25   the note that's already been testified to, and say "my note is

E5sQschC

1    inaccurate."

2              If your Honor would like something, we could produce

3    an affidavit from her saying that, yes, I will attest to the

4    accuracy of my note as I believed it then; it was my impression

5    at the time that Sergeant James gave me that information;

6    that's why I wrote it down.

7              THE COURT:  Forgive me.  Have they been deposed?

8              MR. RADOMISLI:  The other doctors have been deposed.

9    The attending physicians have been deposed.

10              THE COURT:  Who wrote the note.

11              MR. RADOMISLI:  Who relied on this note.

12              THE COURT:  But these are the ones that wrote the

13    note.

14              MR. RADOMISLI:  There's one that wrote the note who

15    was never noticed.  Now because there's a contradictory

16    statement, he wants to take that deposition.  That

17    contradictory statement could be done with an affidavit.

18              THE COURT:  I'll permit it.

19              MR. RADOMISLI:  Could we at least limit it to an hour,

20    your Honor?

21              THE COURT:  Sure.

22              MR. RADOMISLI:  Thank you, your Honor.

23

24              THE COURT:  Thank you all.  I look forward to seeing

25    you all again soon.

E5sQschC

1              MR. SMITH:  An hour for each?

2              THE COURT:  Yes.

3              MR. RADOMISLI:  There is one doctor who wrote it.

4      Another who cosigned it.

5              THE COURT:  OK.  No more than an hour for each.

6              MR. SMITH:  Thank you.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25