# EXHIBIT E

Schoolcraft v. The City of New York, et al.
10 CV 6005 (RWS)

**EXPERT REPORT OF ELI B. SILVERMAN, PH.D. & JOHN A. ETERNO, PH.D.**

We, Eli B. Silverman, Ph. D. and John A. Eterno, Ph.D., have been retained by the law office of Nathanial B Smith to provide expert opinions in the case of Adrian Schoolcraft, Plaintiff v. City of New York et al., Defendants.  We have reviewed materials sent to us, a listing of which is attached as Appendix B to this application.

We will be providing expert testimony on the management approach of the NYPD, the blue wall of silence, basic police procedure, and how these bear upon the plaintiff's claims in this case.

### Compstat as a Performance Management System

Compstat (short for compare statistics) is the NYPD's central performance management accountability device, introduced in 1994, whereby commanders are held responsible for crime in their areas.  Compstat features up-to-date computerized crime data, crime analysis and advanced crime mapping as the basis for regularized interactive crime strategy meetings.  As originally designed, Compstat strategy meetings were also viewed as a mechanism to devolve resources and authority to local commanders so they could craft crime strategies to particular local conditions.

Since information is key to a police department's ability to manage crime, the department made a concerted effort to overcome the lag of three to six months in its reporting of crime statistics. This new updated data first appeared in a document known as the Compstat (comparative statistics) book. This book, compiled on a city wide patrol borough and precinct basis originally included current weekly, monthly and year to date statistics for criminal complaints and arrests for major felony categories and violations. As the years progressed, the

2

range of information expanded widely to include summonses, stop and frisk encounters, quality

of life violations and numerous other activities. Decision makers were provided with more

reliable and timely data at their disposal through the streamlining and sharing of information

retrieval and crime mapping.

Although crime mapping was not new for the NYPD, the Compstat book and crime

strategy meetings supplanted previous pin mapping by integrating the use of sophisticated

computer technologies and software mapping capability with statistical analyses and deployment

data. The original 1994 twice weekly Compstat crime strategy meetings represented the first time

multiple sources of crime information were gathered for display before all key organizational

members at meetings devoted solely to fighting crime. Commanders are ranked and evaluated

based on their comparative crime statistics, anticrime plans, related law enforcement activities,

and the ability to articulate these at meetings. Commanders who do not measure up are often

reassigned to other positions.

## Compstat Consequences

The bulk of New York City's crime reduction has taken place since 1994 when Compstat

and other police reforms were introduced. The NYPD repeatedly publicizes an astounding 80

percent drop in index crime since 1990. New York City's reported dramatic crime decline has

drawn widespread attention to the NYPD from professionals, criminologists, law enforcement,

politicians, the media, and the general public. The Compstat crime reduction system has been

frequently emulated in other cities where former NYPD officials took over as Chief. These

include, among others, the cities of Minneapolis, Newark, Chicago, New Orleans, Raleigh,

3

Miami, Baltimore and Philadelphia (Anderson, 2001: 4; Clines, 2001: 15; Weissenstein, 2003: 27).

Some scholars attribute New York and some other cities crime declines almost exclusively to the practices of the police and in particular to Compstat (Bratton, 1998; Kelling & Coles, 1998; Kelling & Sousa, 2001; Maple, 1999; Zimring, 2011).   Other research demonstrates less confidence in the police's role in the crime decline. (Bowling, 1999; Conklin, 2003; Greenberg, 2013; Harcourt, 2001; Karmen, 2000; Messner et al., 2007; Rosenfeld & Forango, 2014; Rosenfeld, Forango, & Rengifo, 2007).   Regardless of which explanation one accepts, the mayor, police commissioner and other government officials' rhetoric has consistently repeated the decrease in index crime.  It became the focal point, the narrative, of both the Giuliani and Bloomberg administrations.

Maintaining the narrative that crime will go down regardless of headcount (loss of thousands of officers), budgetary restrictions, respecting Constitutional rights (see *Floyd v. City of New York*), and respecting its own officers (including apparent reprisals against the plaintiff and other whistleblowers) has become management's priority.  There is considerable evidence that the NYPD leadership, particularly from 2002 to 2012, has altered and misused Compstat. Management has, especially through Compstat, placed enormous pressures on all ranks to write summonses, conduct stop and frisks, make arrests and the like to be reflected in the Compstat figures. The evidence of overwhelming pressures which lead to illegal quotas on summonses, arrests, and forcible stops as well as downgrading crime reports is reflected in union statements, media accounts, non NYPD data sources, accounts of whistleblowers, court cases (*Floyd v. City of New York)* and our research.

4

**Union Statements**

There have been many statements by the unions regarding downgrading crime reports and illegal quotas.  One pertinent press release appeared on May 23, 2004.  The Patrolmen's Benevolent Association and the Sergeant's Benevolent Association (the NYPD's unions for officers and sergeants respectively) issued a joint press release reporting widespread downgrading of reports.  It boldly states,

> Our own members tell us that they have been conditioned to write crime complaints to misdemeanors rather than felonies because of the abuse they receive from superior officers worried about their careers.  The case of the 10th precinct where a 7% decrease became a 50% increase is a shocking example of what is occurring throughout the city in many station houses.  It is a truth that is widely known by members of the department and now we have to see if the police commissioner has the courage to face the truth and do what is right for the city. (PBA/SBA Press Release, 2004).

A PBA article by then treasurer Robert Zink (2004, n.p.) elucidates:

> ...The department's middle managers will do anything to avoid being dragged onto the carpet at the weekly Compstat meetings. They are, by nature, ambitious people who lust for promotions, and rising crime rates won't help anybody's career...So how do you fake a crime decrease? It's pretty simple. Don't file reports, misclassify crimes from felonies to misdemeanors, under-value the property lost to crime so it's not a felony, and report a series of crimes as a single event. A particularly insidious way to fudge the numbers is to make it difficult or impossible for people to report crimes — in other words, make the victims feel like criminals...

On May 15, 2003 the PBA issued a press release in which PBA President Patrick Lynch stated, "Today, as we launch our 'Don't Blame the Cop' campaign, we are sharing hard evidence

that our police officers are being pressured to write high-priced summonses at the risk of

reassignment or other punitive action." The PBA has consistently referred to these pressures.

**Media Accounts**

These union observations were also echoed in periodicals and other media accounts.

Although reports of misclassification surfaced even earlier, 2004 marked a year in which

significant reporting first emerged. Ten years after Compstat was introduced in 1994, *Newsday*

offered a series of articles depicting alterations in crime reports. The first article, published on

March 21, 2004, examined a three year, twenty-six percent crime decline in the 50th precinct.

> Some cops who worked in the 50th precinct, though, say numbers don't
> tell the whole story. They say the dip, and subsequent 11 percent rise in
> crime in the first 10 weeks after the precinct commander's departure
> raises questions about the way crimes were reported under his command.
> Many in the department, officers as well as supervisors, point to an
> atmosphere of apprehension in the NYPD since the advent of Compstat,
> the computerized system used to track crime trends. *Although even the
> most ardent critics agree Compstat has helped reduce serious crime to
> levels not seen in four decades, some say that there is such pressure on
> precinct commanders to keep crime down that some look for ways to
> reclassify major crimes so rates appears lower.* (Parascandola & Levitt,
> 2004, italics added)

The article recounts specific instances of questionable crime reporting. Several of the

cases refer to police refusing to take reports, constantly questioning complainants and

downgrading crimes. The former precinct commander was described by his subordinates as "an

aggressive commander whose scrutiny sometimes took the form of personally reviewing crime

complaints two and three times to determine whether they were felonies, or could be

downgraded" (Parascandola &Levitt, 2004). Our research has uncovered current occurrences of

similar practices.

A 2004 *New York Times* article reporting on the 2003 FBI crime statistics for New York

City, noted the Mayor's and the police union's disagreement on the authenticity of the statistics.

> The PBA has charged that precinct commanders feel such intense pressure to drive down crime that they 'cook the books,' reducing the severity of crimes on paper to avoid recording them among the seven index crimes reported to the FBI. (Rashbaum, 2004)

Media reports regarding pressures imposed on officers also surfaced on local television.

ABC local news investigative reporter Jim Hoffer (2010, May 25) has offered several related

pieces. One piece portrays Commissioner Kelly's response,

> Emails we received from current NYPD officers suggest quota pressures play a role. One writes: "THEY CONSTANTLY WANT YOU TO VIOLATE PEOPLES' RIGHTS AND MAKE FALSE STATEMENTS TO GET THE ARREST." Another officer writes: "COMMANDS PUT OUT A LIST EVERY MONTH OF THOSE WHO DON'T HAVE AN AREST, LABELING YOU A ZERO." Commissioner Kelly is unapologetic. I'm proud of the record of the men and women of the Department, because I know that we are saving lives," he said. Crime in New York remains at record lows, but recent Justice Department numbers show other cities are also experiencing record low levels of crime, including cities that don't use quota driven police tactics.

**Whistleblowers**

Whistleblowers have provided audiotapes indicating that crime reports are manipulated.

Officers Adrian Schoolcraft (plaintiff), Adyl Polanco, Sergeant Robert Borrelli and others

produced ample evidence of manipulation. Indeed, Officer Schoolcraft's allegations have since

been confirmed by the departments own 'secret' internal investigation exposed by a reporter

(Rayman, 2012; Appendix B QAD Report). One example of the level of manipulation from

Schoolcraft's tapes is supervisors at roll calls instructing entire shifts of officers not to take

robbery reports if victims are not willing to return to the station house – clearly violating

7

department training and procedures.   We note that all three of these whistleblowers were, in some way, disciplined by the organization.  Officers Schoolcraft and Polanco were suspended. Sergeant Borrelli was transferred to the Bronx from a quiet precinct in the Rockaways where he worked for many years directly after he made his allegations.   We note that these whistleblowers have had to contend with what is known as the "Blue Wall of Silence."

**Blue Wall of Silence**

The Blue Wall of Silence is a phrase that is used to describe a police culture that prizes intense loyalty, unity and solidarity among police officers to the extent that any officer reporting the wrongdoing of another officer would be in violation of the code and subject to retaliation. This code of silence has been observed in studies and reports of many police departments throughout the world.

In New York City, this issue has also repeatedly emerged. The 1972 Knapp Commission Report exposed an organized system of payoffs from narcotics dealers and businessmen. The Commission pointed to a "blue wall of silence" which failed to disclose this "widespread corruption." Twenty years later, the 1994 Mollen Commission report pointed to the same blue wall of silence: "The Code of Silence and other attitudes of police officers that existed at the time of the Knapp Commission continue to nurture police corruption and impede efforts at corruption control." (Mollen, 1994, p. 51) Although the Mollen and Knapp Commissions uncovered different varieties of corruption, both gauged it similarly. They underscored the police culture of silence, scandal-avoidance, mutual protection and a distant, often hostile, "us versus them" mindset of the NYPD.

The Blue Wall is bolstered by the solidarity and closed ranks of police officers and their dependence on one another for mutual safety and the perception of a distant, nonresponsive, non-appreciative headquarters and public. As the Mollen Commission noted, "The pervasiveness of the code of silence is itself alarming." (p. 53) Consequently, those who violate the code are either

8

shunned, ostracized, retaliated against, punished or in some cases harmed. These are some of the reasons why whistle-blowing is so difficult regardless of the issue --whether it be officer errors, misconduct, acquisitive crimes, illegal brutality or filling out false records.  In fact, the Mollen Commission uncovered officers falsifying documents such as arrest reports, warrants and evidence for an illegal arrest or search reports. To blow the whistle on unwarranted activities is not easy.  The blue wall of silence is a powerful deterrent.

**Blue Wall and Forcible Hospitalization of Police Officer Schoolcraft**

The "blue wall of silence" likely contributed to actions taken against Officer Schoolcraft. Photographs of his locker indicate he was labeled as a "rat".  This conduct, if true, is consistent with uniformed member retaliation.  The Unusual Report written by the NYPD duty captain on the day that Officer Schoolcraft was forcibly hospitalized raises many questions.  The report, for example, is missing at least two key elements: how Officer Schoolcraft was specifically determined to be emotionally disturbed and what happened to the tape recorder that was found on him.

An emotionally disturbed person is defined as, "A person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others." (see NYPD Patrol Guide 216-05).  Based on the audiotape, Officer Schoolcraft is clearly lucid and answering questions.  His weapons have already been taken from him.  There is no indication that he is going to harm himself or others.  The Patrol Guide requires the NYPD to explain how they "reasonably believe" Officer Schoolcraft is "mentally ill or temporarily deranged" such that his conduct "is likely to result in serious injury to himself or others."  In fact, we note that in the Unusual Report Officer Schoolcraft's department assigned psychologist stated very explicitly that *"…Mr.*

9

*Schoolcraft was not a danger to himself or others…"* This is a very specific statement directly
on point that appears to have been ignored by the officers on the scene. We note that the report
indicates that, "His [Officer Schoolcraft's] actions were deemed that of a potentially emotionally
disturbed person by Lieutenant Hanlon of FDNY and she determined that he would not be
allowed to refuse medical attention due to his irrational behavior." Two issues with this are: 1.
The EMT only states he is "potentially" emotionally disturbed which is *not* emotionally
disturbed and, 2. According to police procedure a police officer, not an EMT, must *reasonably
believe that the person being taken into forcible custody is mentally ill or temporarily deranged
and this behavior is likely to cause serious injury to himself or others*. There was no indication
of this in the Unusual Report. The audiotape clearly indicates that Chief Marino orders Officer
Schoolcraft into custody but no reasonable basis for his decision is articulated. We also point out
that the writer of the Unusual Report determines it important to note that copies of complaint
reports are in Schoolcraft's apartment but fails to point out the running tape recorder found on
Officer Schoolcraft. Additionally, the duty captain refers the complaint reports to Internal
Affairs for follow-up (which is referred to Quality Assurance which, in turn, confirms Officer
Schoolcraft's allegations about the corrupt activity in the precinct). Again, there is no mention
of a tape recorder which was found on Officer Schoolcraft that recorded the incident. Proper
police procedure requires mention of this tape recorder in the apartment. The fact that this is not
mentioned would appear to be a glaring omission. Interestingly, another active recorder captured
the audio of this incident and this second recording device was recovered by IAB a week later.
The fact that IAB found this recorder critical and the other officers found the first recorder
meaningless is totally contradictory.

10

Lastly, we also question the initial entry into the apartment. What was the exigent circumstance? If it was his health, once Officer Schoolcraft was seen in the apartment in good condition, the emergency no longer existed and the officers should have immediately vacated. If any actions appeared "emotionally disturbed" they occurred after they entered the apartment. In fact, if they occurred, they apparently were the direct result of the actions of NYPD. Having a team of armed officers and EMT's in your home, all refusing to leave, remaining in the apartment without permission would likely upset any normal person. In fact, Officer Schoolcraft's basic 4th Amendment rights appeared to have been violated in terms of protecting his property (the tape recorder), armed officers and EMT's not leaving his apartment, and forcibly removing him from his apartment without justification. We also note that the Unusual Report does not indicate that the Legal Bureau was either consulted or notified at any point. The Bureau has staff attorneys available 24 hours a day, 7 days a week. In this very unusual situation in which the police forcibly entered a uniformed member of the service's home and forcibly took him into custody as an EDP, it would have been exceedingly prudent to contact the Legal Bureau for advice as well as notify them directly.

**Hospital Data**

Hospital data, available through 2006, raises serious questions regarding crime report manipulation particularly with respect to assaults, thusly providing additional reasons for studying the phenomenon of crime reporting manipulation. New York City's Department of Health and Mental Hygiene statistics indicate that in 1999 there were 25,181 visits to emergency rooms throughout the City for assault. In 2006 there were 47,779 visits. This represents a 90 percent increase in visits for assault while the NYPD reported a substantial decline. Even more a

11

concern is visits to emergency rooms for firearms assaults which skyrocketed as well. In 1999 there were 224 visits and in 2006 they count 514 visits – a 129 percent increase. (New York City Health and Hospitals Corporation. 2011).

### Lack of transparency

The NYPD's lack of transparency (i.e. openness to non-partisan research and requests from outside the agency) makes value-neutral scientific study difficult yet at the same time more urgent. NYPD has rebuffed scrutiny of its written crime reports even from official government bodies. For example, Mark Pomerantz, a former federal prosecutor who chaired New York City's Commission to Combat Corruption (a Mayoral agency) was denied permission by the police department to view its crime reports (Rashbaum, 2005). His appeal to Mayor Bloomberg was rebuffed resulting in Mr. Pomerantz's resignation.

Under mounting pressure from public disclosures of crime report manipulation, in January 2011 Commissioner Raymond Kelly appointed three former federal prosecutors to review NYPD's crime report auditing practices. The report (released 2 years later than its promised date) does not examine written complaints but merely reviews the auditing system. Even this report raised serious questions. For example, the report indicates "…the persistence of 'egregious' errors in certain precincts despite the pre-finalization review of the complaint reports by supervisors may be construed to support the conclusion that complaint reports are not meaningfully or at least proficiently reviewed at the precinct level—or, in the worst light, that the reviewing supervisors are complicit in the downgrading…" (NYPD, 2013, p. 47)

A 2013 report by then Public Advocate Bill de Blasio described the NYPD as one of the City agencies least responsive to FOIL requests. The Public Advocate designated the Department

as one of only two agencies to receive a failing grade since "28% of the NYPD answered requests took more than 60 days to process [and] 31% of requests received no response." (NYC Public Advocate, 2013, 13)

**Additional Information from Audiotapes from Officer Schoolcraft (plaintiff)**

The roll call of October 12, 2009 is particularly revealing. At this roll call the supervisor is heard stating, "You know we been popping up with those robberies, whatever. The best thing I can say...if the complainant does not want to go back to the squad [detectives], then there is no 61 taken. That's it..." (Schoolcraft, 2009) . This clearly violates department guidelines.

The audiotapes reveal how headquarters number's focus has been interpreted by lower level precinct supervisors and even precinct commanders. Compstat's extreme pressure is translated into not taking reports, questioning the veracity of victims, downgrading reports, haranguing officers about callbacks by supervisors, attempting to figure out what a district attorney will do, and, in general, keeping the numbers of index crimes down in any way possible – regardless of consequences.

As if this were not bizarre enough, the Quality Assurance Division's (QAD) report on Schoolcraft's allegations of crime downgrading in the 81st precinct remained hidden from the public until reporter Graham Rayman discovered it in 2012. It was dated June 2010 – the exact time the police department was denying contradictory revelations. This QUAD report confirms nearly all of Officer Schoolcraft's allegations and our findings.

**Our Research**

13

In 2008 and 2012 we conducted studies of NYPD using accepted social science methods as evidenced by 2 peer reviewed journal articles and an academic book (Eterno & Silverman 2012; 2010a; 2010b).   Our first study was conducted in 2008.  We sent a survey to all retired members of the Captain's Endowment Association which includes the ranks of Captain and above.  A very important feature of the survey is that it was anonymous.  Social science research suggests that anonymity leads to more truthful responses to sensitive questions (Babbie,1989; Bradburn, 1983; Dillman, Smyth, & Christianson, 2009; Neuman, 2000). We received a total of 491 completed questionnaires.  We examined the data comparing those who worked after 1994 (the first year of Compstat) and those who worked before.

A second study was conducted in 2012.  This study replicated and confirmed the results of our 2008 study using a different sample.  We used anonymity in this study as well.  The sample is retired officers who are on the "active retiree database" maintained by NYPD.  We had 1,962 responses of all ranks.

Tabular analyses of both surveys indicate that there was widespread pressure on officers. The two surveys results are also very similar giving us confidence that what we are reporting is an accurate representation of what occurred in the NYPD.    We present 4 crosstabs from our 2012 survey and 3 crosstabs from our 2008 survey.   The first 3 from 2012 show markedly increased pressure in the most recent category (2002 to 2012) to write summonses, make arrests, and conduct forcible stops.  These results are strong and statistically significant.  Additionally, the last crosstab for the 2012 survey indicates that as pressures increased regarding summonses, arrests and stops, concurrently, pressure to obey Constitutional rights *decreased* – a questionable combination, at best.  Our 2008 survey with Captains and above shows similar results regarding pressures to generate summonses, make arrests and conduct forcible stops.  That study also

14

shows stronger pressures in the Compstat period.  Again the results are statistically significant and strong.

We also note that both surveys indicate the manipulation of crime reports in recent times. The 2012 survey shows approximately double the level of manipulation in 2002 to 2012 compared to the previous two eras.  This result is statistically significant and strong.  Our 2008 survey with a completely different sample shows report manipulation in the Compstat era.  As we write in our book, "Of the 160 respondents who were aware of any changes, over half (53.8 percent) indicated that the changes observed were highly unethical.  An additional 23.8 percent indicated the changes were moderately unethical." (Eterno and Silverman, 2012, p.34)

15

## 2012 SURVEY FINDINGS – SUMMONS PRESSURE (1)

*Crosstab - Year categorized \* Summons pressure categorized*

|  |  |  | year categorized | | | |
|---|---|---|---|---|---|---|
|  |  |  | before 1995 | 1995 until 2001 | 2002 until 2012 | Total |
| summons pressure categorized | low | Count | 132 | 58 | 93 | 283 |
|  |  | % within year categorized | 24.7% | 16.2% | 11.0% | 16.3% |
|  | medium | Count | 203 | 124 | 233 | 560 |
|  |  | % within year categorized | 38.0% | 34.6% | 27.5% | 32.2% |
|  | high | Count | 199 | 176 | 522 | 897 |
|  |  | % within year categorized | 37.3% | 49.2% | 61.6% | 51.6% |
| Total |  | Count | 534 | 358 | 848 | 1740 |
|  |  | % within year categorized | 100.0% | 100.0% | 100.0% | 100.0% |

*Gamma* = .32  p< .000
*Kendall's tau b* =.203 p< .000

16

## 2012 SURVEY FINDINGS ARREST PRESSURE (2)

*Crosstab – Year categorized by arrest pressure categorized*

| | | | year categorized | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | before 1995 | 1995 until 2001 | 2002 until 2012 | Total |
| arrest pressure categorized | low | Count | 191 | 77 | 111 | 379 |
| | | % within year categorized | 36.2% | 21.2% | 13.2% | 21.9% |
| | medium | Count | 240 | 158 | 316 | 714 |
| | | % within year categorized | 45.5% | 43.5% | 37.5% | 41.2% |
| | high | Count | 97 | 128 | 415 | 640 |
| | | % within year categorized | 18.4% | 35.3% | 49.3% | 36.9% |
| Total | | Count | 528 | 363 | 842 | 1733 |
| | | % within year categorized | 100.0% | 100.0% | 100.0% | 100.0% |

*Gamma*= .422 p<.000
*Kendall's tau b* =.277 p< .000

## 2012 SURVEY FINDINGS STOP PRESSURE (3)

*Crosstab - year categorized * stop pressure categorized*

| | | | year categorized | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | before 1995 | 1995 until 2001 | 2002 until 2012 | Total |
| stop pressure categorized | low | Count | 297 | 127 | 205 | 629 |
| | | % within year categorized | 57.8% | 36.7% | 24.4% | 37.0% |
| | medium | Count | 170 | 153 | 341 | 664 |
| | | % within year categorized | 33.1% | 44.2% | 40.5% | 39.0% |
| | high | Count | 47 | 66 | 295 | 408 |
| | | % within year categorized | 9.1% | 19.1% | 35.1% | 24.0% |
| Total | | Count | 514 | 346 | 841 | 1701 |
| | | % within year categorized | 100.0% | 100.0% | 100.0% | 100.0% |

*Gamma*= .461  p<000
*Kendall's tau b* =.302 p<000

18

## 2012 SURVEY FINDINGS RIGHTS PRESSURE (4)

*Crosstab y- Year categorized * Pressure to Obey Constitutional rights categorized*

| | | | year categorized | | | |
|---|---|---|---|---|---|---|
| | | | before 1995 | 1995 until 2001 | 2002 until 2012 | Total |
| obey constitutional rights pressure categorized | low | Count | 109 | 63 | 187 | 359 |
| | | % within year categorized | 20.7% | 17.2% | 22.1% | 20.6% |
| | medium | Count | 183 | 132 | 357 | 672 |
| | | % within year categorized | 34.7% | 36.0% | 42.2% | 38.6% |
| | high | Count | 235 | 172 | 302 | 709 |
| | | % within year categorized | 44.6% | 46.9% | 35.7% | 40.7% |
| Total | | Count | 527 | 367 | 846 | 1740 |
| | | % within year categorized | 100.0% | 100.0% | 100.0% | 100.0% |

*Gamma*= -.106 p<002
*Kendall's tau b* = -.067 p< .000

## 2008 SURVEY FINDINGS SUMMONS PRESSURE (1)

*Crosstab – Year * Pressure to increase summonses*

| | | | Did you serve on NYPD after 1994 | | |
|---|---|---|---|---|---|
| | | | No | Yes | Total |
| increase summonses categorized | low | Count | 39 | 29 | 68 |
| | | % within Did you serve on NYPD after 1994 | 27.7% | 9.3% | 15.0% |
| | medium | Count | 66 | 143 | 209 |
| | | % within Did you serve on NYPD after 1994 | 46.8% | 45.7% | 46.0% |
| | high | Count | 36 | 141 | 177 |
| | | % within Did you serve on NYPD after 1994 | 25.5% | 45.0% | 39.0% |
| Total | | Count | 141 | 313 | 454 |
| | | % within Did you serve on NYPD after 1994 | 100.0% | 100.0% | 100.0% |

*Gamma*=.431  p<.000
*Kendall's tau c* = .238 p< .000

20

## 2008 SURVEY FINDINGS ARREST PRESSURE (2)

*Crosstab – Year * Pressure to increase arrests categorized*

| | | | Did you serve on NYPD after 1994 | | |
|---|---|---|---|---|---|
| | | | No | Yes | Total |
| increase arrests categorized | low | Count | 43 | 26 | 69 |
| | | % within Did you serve on NYPD after 1994 | 30.9% | 8.3% | 15.2% |
| | medium | Count | 73 | 155 | 228 |
| | | % within Did you serve on NYPD after 1994 | 52.5% | 49.2% | 50.2% |
| | high | Count | 23 | 134 | 157 |
| | | % within Did you serve on NYPD after 1994 | 16.5% | 42.5% | 34.6% |
| Total | | Count | 139 | 315 | 454 |
| | | % within Did you serve on NYPD after 1994 | 100.0% | 100.0% | 100.0% |

*Gamma*=.571 p<.000
*Kendall's tau c* = .313  p< .000

## 2008 SURVEY FINDINGS STOP PRESSURE (3)

*Crosstab – Year * Pressure to increase stop and frisk*

|  |  |  | Did you serve on NYPD after 1994 | | |
|---|---|---|---|---|---|
|  |  |  | No | Yes | Total |
| increase stops and frisk categorized | low | Count | 75 | 71 | 146 |
|  |  | % within Did you serve on NYPD after 1994 | 54.7% | 22.5% | 32.3% |
|  | medium | Count | 55 | 155 | 210 |
|  |  | % within Did you serve on NYPD after 1994 | 40.1% | 49.2% | 46.5% |
|  | high | Count | 7 | 89 | 96 |
|  |  | % within Did you serve on NYPD after 1994 | 5.1% | 28.3% | 21.2% |
| Total |  | Count | 137 | 315 | 452 |
|  |  | % within Did you serve on NYPD after 1994 | 100.0% | 100.0% | 100.0% |

*Gamma*=.617 p<.000
*Kendall's tau b* =.347  p< .000

22

**2012 Survey - Knowledge of Crime Manipulation & Retirement Category**

|  |  | Period 1<br>1981-1993 | Period 2<br>1994-2001 | Period 3<br>2002-2012 | N |
|---|---|---|---|---|---|
| No |  | 327<br>(69.7%) | 264<br>(65.5%) | 383<br>(44.5%) | 974 |
| Yes | 1-2 times | 15 | 19 | 44 | 78 |
|  | 3-5 times | 55 | 66 | 188 | 309 |
|  | 5+ times | 72<br>(30.3%) | 54<br>(34.5%) | 245<br>(55.5%) | 371 |
|  | n | 469 | 403 | 860 | 1732 |
|  | Missing | 15 | 12 | 11 | 38 |
|  | N | 484 | 415 | 871 | 1770 |

**Statistics:**

Gamma [ordinal by ordinal]        $0.337^{***}$

$^{***}$ $p < 0.001$

23

## Impact on Police Officer Schoolcraft

Compstat began as a vital performance management system designed to address crime and quality of life issues through up to date crime statistics, coupled with computer technology crime mapping in an organizational environment designed to integrate and coordinate all relevant NYPD units. Yet over time Compstat morphed into an instrument utilized by the NYPD leadership to centralize decision making in order to record numbers that reflect lower index crime and higher officer activity regarding arrests, summonses and stop and frisks. The centralization of decision making and reduction of lower level flexibility, autonomy and discretion parallels a national study of U.S. police departments (not including New York City) which have adapted the Compstat system (Weisburd et al., 2001).

Since 2002, political and police pressure mounted to sustain the crime reduction phenomenon of previous years. Up until 2002, the first year of Mr. Bloomberg's administration, crime was already down 60 percent. Leveling off was not considered an official option. Demands to produce numbers have triggered the expansion of NYPD activities that "work" but without maintaining an eye on the structural health of the organization. The remedies are akin to doubling a medication of 5 milligrams to 10 milligrams since the current prescription seemed to work well. More of the same strategic medicine is introduced regardless of warnings about possible side effects. Massive deployment to address quality-of-life crimes becomes favored over more surgical strikes. Inadequate evaluation and tactical intensification has also been accompanied by increased centralization. Special units, such as narcotics enforcement and warrant enforcement became increasingly directed from above. In effect a centralization thrust has been superimposed on decentralized reforms. But centralization now has a powerful weapon in its arsenal--Compstat.

24

Compstat, in many senses, had been turned on its head. Instead of a tool to reevaluate objectives and tactics and scan the environment for future trends, the information from computer-generated comparative statistics became known for only its most visible aspects--crime mapping and deployment activity. Greater information was used to bear down on the management of many street operations. Numbers, sometimes any numbers, rule the day. This ratcheted system, in the words of one participant is "wound up too tight." A 20-year veteran Brooklyn detective put it this way, "Compstat is everything. People are tired of being harassed, searched and frisked, and run off the streets. People are fed up; the cops are, too." (Marzulli & O'Shaughnessy, 2000).

In a highly charged political atmosphere, the NYPD's ability to accomplish short-term success has been amplified by Compstat. And what happens when painstaking and constant lessons of implementation are neglected for the quick fix? The short-haul dominates. The NYPD, preoccupied by the crisis du jour, has little time or inclination to reflect on its mission and alternative strategies.

As it relates to this case, Officer Schoolcraft is a victim of the NYPD's Compstat numbers game and the 'blue wall of silence.' Quotas, illegal stops, downgrading crime numbers were endemic during his street time as a member of the NYPD. The Quality Assurance Division memorandum confirms his allegations. The *Floyd* case adds further evidence. Our studies provide additional confirmation. Beyond all this, photographs of his locker indicate that he was labeled a "rat". The informal system based on the blue wall of silence led to the NYPD's abuse of authority whereby Schoolcraft was forcibly detained for six days in a mental hospital without an aided card or proper notification being filed – in flagrant violation of department policy (see

PG 216-01 & 216-03).   The NYPD tried to hide evidence of what happened in his apartment –
failing to mention (in the Unusual Report) the first tape recorder found on Officer Schoolcraft.

As we have seen, other whistleblowers were punished as well (e.g., Sergeant Borelli's
transfer and Police Officer Adyl Polanco's suspension).   There is a clear pattern of abuse and
retaliation by the NYPD.   Officer Schoolcraft clearly tried in earnest to do the right thing – to
notify superiors who belatedly confirmed his allegations.   In return, they forcibly transported him
to the hospital.   Officer Schoolcraft is not an EDP but an honest, hard-working police officer
trying to expose misconduct.

References

Anderson, D. C. (2001). Crime control by the numbers: Compstat yields new lessons for the
police and the replication of a good idea. *Ford Foundation Report.* New York

Babbie, E.R. (1989). *The Practice of Social Research.* 5th ed. Belmont, CA: Wordsworth.

Bowling, B. (1999). The rise and fall of New York murder: Zero tolerance or crack's decline?
*British Journal of Criminology* 34: 531-54.

Bradburn, N.M. (1983). Response effects. In *Handbook of Survey Research*, eds. Peter H. Rossi,
James D. Wright, and Andy B. Anderson, New York: Academic Press.

Bratton, W. (1998). *Turnaround: How America's Top Cop Reversed the Crime Epidemic.*
Random House.

Clines, F. X. (2001, January 3). Baltimore gladly breaks 10 year homicide streak.
*New York Times,* A11.

Conklin, J. E. (2003). *Why Crime Rates Fell?* Boston: Allyn & Bacon.

Dillman, D.A., J.D. Smyth, and L. Melani Christian. (2009). *Internet, Mail and Mixed Mode Surveys: The Tailored Design Method.* Hoboken, NY: John Wiley & Sons.

Eterno, J.A., & Silverman, E.B. (2010a). Understanding Police Management: A Typology of the Underside of Compstat. *Professional Issues in Criminal Justice. 5* (2&3): 11-28.

Eterno, John. A. & Silverman, Eli B. (2010b). The NYPD's Compstat: compare statistics or compose statistics?. *International Journal of Police Science & Management*, 12(3), 426-449.

Eterno, John A, & Silverman, E. B. (2012). *The Crime Numbers Game: Management by Manipulation.* Boca Raton, FL: CRC Press.

Greenberg, D. F. (2014). Studying New York City's Crime Decline: Methodological Issues. *Justice Quarterly 31*(1): 154-188.

Harcourt, B.E. (2001). Illusion of Order: The False Promise of Broken Windows Policing. Cambridge, Mass.: Harvard University Press.

Health and Hospitals Corporation, New York City. (2011)
http://www.nyc.gov/html/hhc/html/home/home.shtml

Hoffer, J. (2010, May 25). "Kelly responds to our NYPD quotas investigation." ABC Television News Report. http://abclocal.go.com//story?section=news/investigators&id=7461355

Karmen, A. (2000). *New York Murder Mystery: The True Story behind the Crime Crash of the 1990s.* New York: NYU Press.

Kelling, G. L., & Coles, C.M. (1998). *Fixing Broken Windows: Restoring Order and Reducing Crime In Our Communities.* Free Press.

Kelling G.L., & Sousa, W.H. (2001). Do police matter? An analysis of the impact of New York City's police reforms (Civic Report No. 22). New York: Manhattan Institute.

Knapp Commission Records, Lloyd Sealy Library Special Collections, John Jay College of
    Criminal Justice (view upon appointment only)

Maple, J. (1999). *The Crime Fighter: How You Can Make Your Community Crime Free.* New
    York: Doubleday.

Marzulli, J. & O'Shaughnessy, P. (2000, April 6). Cops feeling gun shy. *New York Daily News.*
    p. 17

Messner, S.F., Galea, S.,Tardiff, K.J., Tracy, M., Bucciarelli, A., Markham Piper, T, Frye, V.
    and Vlahov, D. (2007). Policing, drugs, and the homicide decline in New York City in
    the 1990s. Criminology 45: 385-413.

Mollen Commission, 1994, Report, The City of New York Commission to Investigate
    Allegations of Police Corruption and the Anti-Corruption Procedures of the Police
    Department, July 7, retrieved at
    http://www.parc.info/client_files/special%20Reports/4%20-
    %20Mollen%20Commission%20-%20NYPD.pdf

Neuman, W. L. (2000). *Social Research Methods: Qualitative and Quantitative Approaches.* 4th
    ed. Boston: Allyn and Bacon.

NYPD (2013). The Report Of The Crime Reporting Review Committee To Commissioner
    Raymond W. Kelly Concerning Compstat Auditing. David Kelley and Sharon
    McCarthy. April 8.
    http://www.nyc.gov/html/nypd/downloads/pdf/public_information/crime_reporting_revie
    w_committee_final_report_2013.pdf

New York City Police Department Patrol Guide. Unpublished New York City Government
    Document.

28

New York City Public Advocate. (2013). Breaking through Bureaucracy: Evaluating

    Government Responsiveness to Information Requests in New York City  (Bill di Blasio).

    At http://advocate.nyc.gov/sites/advocate.nyc.gov/files/deBlasioFOILReport_0.pdf

Parascandola , R. and Levitt, L. (2004, March 22). Police statistics: Numbers

    scrutinized. *New York Newsday*, 14.

PBA/SBA Release (2004). *Unions call for crime stat audit and crime reporting policy change.*

    (2004, March 23). Retrieved from http://www.nycpba.org/archive/releases/04/pr040323-

    stats.html

PBA Release (2003, May 15).  *Evident of ticket quotas and 'Don't Blame the Cop' Campaign*

    http://www.nycpba.org/archive/releases/03/pr030515-quotas.html.

Rashbaum, W. (2004, May 25). "Crime declines, but union and mayor spar over data,". *New*

    *York Times*, http://www.nytimes.com/2004/05/25/nyregion/crime-declines-but-union-

    and-mayor-spar-over-

    data.html?scp=1&sq=crime+declines%2C+but+union+and+mayor+spar+over+data&st=

    nyt

Rashbaum, W.K. (2005 April 22). Police Corruption Panel is Losing its Chairman. The New

    York Times (New York),

    http://query.nytimes.com/gst/fullpage.html?res=9D0CE7DF1431F931A15757C0A9639C

    8B63http://query.nytimes.com/gst/fullpage.html?res=9D0CE7DF1431F931A15757C0A9

    639C8B63

Rayman, Graham. (2012 March 7).  The NYPD Tapes Confirmed.  *The Village Voice* (New

    York), http://www.villagevoice.com/2012-03-07/news/the-nypd-tapes-confirmed/

29

Schoolcraft, A. (2009). *Schoolcraft tapes* [Tape Recordings 81 Precinct Roll Call on October 12]

    from Rayman (2010, May 4). Retrieved on January 3, 2011 from

    http://img.villagevoice.com/player/?i=4767708.

Weisburd, D., Mastrofski, S.D., McNally A.M., Greenspan, R. & Willis, J.J. (2001).

    Compstatand Organizational Change: Findings From a National Survey (Report

    submitted to the National Institute of Justice by the Police Foundation).

Weissenstein, M. (2003). Call on NY's top cops: NYPD brass recruited by other

    cities to lower crime rates. *Newsday*, January 2.


Zimring, Franklin E. (2011).  "The City that Became Safe: New York and the Future of Crime

    Control." Unpublished article retrieved on August 4, 2011 from

    http://www.scribd.com/doc/48102346/Zimring-Journal-Article

Zink, R. (2004, summer). The trouble with Compstat. PBA Magazine. Retrieved from

    http://www.nycpba.org/publications/mag-04-summer/compstat.html on 29 December

    2010.

Signature _____ Date: _____

Eli B. Silverman, Ph.D.

Signature _____ Date: _____

John A. Eterno, Ph.D.