E9HPSCHC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADRIAN SCHOOLCRAFT,

              Plaintiff,

         v.                          10 CV 6005 (RWS)

THE CITY OF NEW YORK, ET AL.,

              Defendants.

------------------------------x
                                    New York, N.Y.
                                    September 17, 2014
                                    12:01 p.m.

Before:

                  HON. ROBERT W. SWEET,

                                    District Judge

                        APPEARANCES

LAW OFFICE OF NATHANIEL B. SMITH
     Attorney for Plaintiff
BY:  NATHANIEL B. SMITH
          AND
LAW OFFICE OF JOHN DAVID LENOIR
BY:  JOHN DAVID LENOIR


NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendants City of New York, NYCPD and
     individual officers
BY:  SUZANNA PUBLICKER METTHAM
     RYAN GLENN SHAFFER


SEIFF KRETZ & ABERCROMBIE
     Attorneys for Defendant Deputy Inspector Steven Mauriello
BY:  WALTER A. KRETZ, JR.

E9HPSCHC

1                          APPEARANCES (CONT'D)

2     MARTIN CLEARWATER & BELL, LLP
           Attorneys for Defendant Jamaica Hospital Medical Center
3     BY:  GREGORY J. RADOMISLI

4
      IVONE DEVINE AND JENSEN, LLP
5          Attorneys for Defendant Dr. Isak Isakov
      BY:  BRIAN E. LEE
6

7     CALLAN, KOSTER, BRADY & BRENNAN, LLP
           Attorneys for Defendant Dr. Lillian Aldana-Bernier
8     BY:  MATTHEW J. KOSTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E9HPSCHC

```
1              (In open court)

2              (Case called)

3              MS. METTHAM:  Good afternoon, your Honor.  We're here

4    for a motion to compel expert discovery from plaintiff's

5    expert.  I don't know if you would like to start with the

6    easiest part or the more difficult one.

7              THE COURT:  That's hard.  Well, do whatever you think

8    is the most persuasive.

9              MS. METTHAM:  Well, then I won't start with the most

10   difficult one for your Honor.  Your Honor, plaintiff has

11   identified two police practices experts, Eli Silverman and Joe

12   Eterno, and he's presented an expert report for these

13   individuals.  The expert report is very lengthy, and within

14   that expert report, the experts cite to a large amount of data,

15   information and research which has not been produced by

16   plaintiff during discovery or by the experts as part of their

17   expert report or in a publicly available format in their list

18   of references that the defendants can access.

19              This data is extremely integral to the City defendants

20   and Defendant Mauriello's ability to challenge these experts on

21   issues of CompStat pressure, on issues of police management

22   practices, and therefore.  We've asked plaintiff to produce it.

23   He has refused, saying that since, for example, their survey on

24   which some of this data is based was done unrelated to this

25   case, it shouldn't have to be produced.
```

E9HPSCHC

1          So what we're seeking from that, those two surveys

2    done by Professor Silverman and Eterno from 2008 and 2012 which

3    they've cited and used in their expert report, one, is raw

4    data.  So they received surveys from hundreds and thousands of

5    retired police officers.  We would like the actual data from

6    those surveys.

7          Now, the surveys are anonymous.  We're not seeking the

8    names of the individuals or identifying information about them,

9    but we are seeking the results from the raw data of the surveys

10   they've completed so that we can compare answers.  For example,

11   the year in which the individual retired, to the amount of

12   pressure they claim to have been subjected to in an effort

13   actually to limit this to the time period relevant to this

14   case, since the individuals surveyed by Silverman and Eterno

15   have ranged from retirees in the first half of the 20th century

16   to as recent as the last two years.

17         We're also seeking narrative responses, as both

18   surveys included narrative sections which allowed the

19   respondents to expound personally about their feelings, which

20   the authors, Professor Silverman and Eterno, said they relied

21   on in coming to their opinions.  So we'd like to see the full

22   narrative responses to understand what data was relied on by

23   the experts.

24         Moving away from the survey, the experts also relied

25   on what they called hospital data from 2006 from the Health and

5

E9HPSCHC

1    Hospital Corporation, but in the references section, it's just

2    a link to the Health and Hospitals Corporations' website.

3    There's no link to any specific data, research, survey on which

4    they relied.  We have no idea what they're referencing.

5            They've also mentioned a number of nonpublic sources

6    such as PBA statements which were not made public.  To access

7    these statements, you need a membership in the Patrolman's

8    Benevolent Association.  We've asked that these documents on

9    which they've relied and cited to in their report be provided

10   to defendants.

11           And, additionally, they've included information about

12   other whistleblowers that are not a part of the Schoolcraft

13   matter, a Sergeant Borrelli and an Officer Polanco.  They've

14   cited to recordings and documents on which the experts have

15   relied that have never been produced to defendants in discovery

16   in this case and have not been produced afterwards.  So, you

17   know, we're seeking what we believe rule 26 provides, which is

18   the data and information on which the experts relied in coming

19   to the conclusions in their report.

20           THE COURT:  Anything else?

21           MS. METTHAM:  That is the first issue.  Would you like

22   me to address the other ones as well?

23           THE COURT:  Sure.

24           MS. METTHAM:  Sure.  The next issue, your Honor, is

25   plaintiffs have -- or plaintiff has limited us; so we've asked

E9HPSCHC

 1   for a certain of the experts to have a day and a half, and

 2   other ones two days of deposition testimony.  He's only agreed

 3   to produce them each for one day.  Plaintiff's position was

 4   that all five different sets of defendants' counsel can depose

 5   them within the seven hours and then, if required, later could

 6   move the Court for additional time after the first deposition.

 7            Given that there are five different sets of defendants

 8   who are all defending against claims made in these expert

 9   reports, we require additional time.  We know this in advance.

10   We have spoken among ourselves.  It is not our intention to be

11   duplicative in any fashion in the questioning of these experts,

12   but I don't think it's reasonable for expert reports that are

13   dozens of pages long to have only seven hours of deposition

14   testimony by five different sets of defendants with very

15   different liabilities.

16            THE COURT:  What do you want, a day and a half?

17            MS. METTHAM:  For Dr. Lubit, I believe it's two days.

18   For the one of the medical experts and for Professors Silverman

19   and Eterno, a day and a half each.

20            THE COURT:  Does the city have any experts?

21            MS. METTHAM:  At this time, we do not, your Honor.

22            THE COURT:  At this time, do you still have time to

23   designate?

24            MS. METTHAM:  Well, your Honor, we do still have

25   tomorrow.  The problem is, without the survey data, we don't

E9HPSCHC

1   know if we need an expert to analyze the data for us and what

2   format.

3             THE COURT:  All right.  Thank you.

4             MS. METTHAM:  However, I am aware that the other

5   defendants have hired experts and do intend to provide expert

6   reports.

7             THE COURT:  Any agreement on those, the time for

8   those?

9             MS. METTHAM:  On the time for the depositions of

10  those?  The Court had provided previously a time line for the

11  deposition of defendants' experts.

12            THE COURT:  But I'm talking about the duration, any

13  agreement?

14            MS. METTHAM:  No, there have not been yet, your Honor.

15  However, we believe that would be a bit of an easier matter as,

16  you know, we haven't seen the expert reports, they are not due,

17  at the very earliest until tomorrow.

18            THE COURT:  Okay.

19            MS. METTHAM:  But, you know, it would mostly be

20  rebutting plaintiff's expert, not an indictment of all other

21  defendants.

22            THE COURT:  All right.

23            MS. METTHAM:  I hope.

24            THE COURT:  Anything else?

25            MS. METTHAM:  Yes, your Honor.  On a list of cases on

E9HPSCHC

which -- in which the plaintiff's experts have given testimony

in the last four years, as required by rule 26, plaintiff

agreed in his opposition to provide such a list.  We just ask

that your Honor order him to do so by a date certain, since the

depositions are beginning a week from today.

Additionally is the issue of the expert's

compensation.  Plaintiff has provided us with generally, you

know, these experts charge X amount per day and X amount per

hour, but he has not provided us with the amounts that they

were actually compensated for the study.  Defendants believe

that, according to rule 26, a party must provide the actual

compensation paid for the study.  Plaintiff has not done so.

Additionally on the compensation angle, plaintiff has

demanded that the defendant pay, No. 1, in advance for the

expert's deposition time and also that defendants pay all of

the expenses for the travel and travel time of his experts, who

are apparently coming from out of state and from hours away.

Defendants challenge that.  There's case law from the

Southern District stating that plaintiff can find an expert

within the district without having to burden the defendants

with the cost of that expense.  Additionally, that travel time

is improper as it could be used for preparation time, which we

are already paying his experts for.

Finally, I had actually brought up the issue with

plaintiff over a month ago that the City cannot pay in advance

E9HPSCHC

for these depositions without certain information.  We need

invoices, we need tax identification numbers, we need receipts,

you know, being we have to go through these certain processes

which take two to three weeks, at least, which I informed

plaintiff of.  He hasn't yet provided us with the information,

even if we were to agree to pay in advance, to do so.

So we ask that your Honor allow defendants to pay the

experts after the deposition for the actual hours expended and

only for preparation time and actual deposition time.  Thank

you, your Honor.

THE COURT:  Anything from the plaintiff?

MR. SMITH:  Yes, your Honor.  On the last issue about

compensating the plaintiff's experts, that's a new issue.  It

wasn't in the letter.  I can address it now, but I don't have

the case authority that I think supports their position on

that.  So I think it's a little bit out of school to bring that

up since it was not in the letters.

THE COURT:  Well, the payment after, rather than

before, that seems simple.  Doesn't it?

MR. SMITH:  Yes.  It's a question of how much.

THE COURT:  Well, how much.  Doesn't it seem clear

that the rates have to be stated and the past compensation has

to be stated?

MR. SMITH:  That has been done, and the approximate --

THE COURT:  I didn't understand that from what the

1    City just told me.

2            MR. SMITH:  No, they said they're willing to pay for

3    deposition time and prep --

4            THE COURT:  No, no.

5            MR. SMITH:  It's the travel time that I'm hearing that

6    they're saying --

7            THE COURT:  The travel time is agreed it's too much.

8            All right.  Okay.  So but the City also wants the

9    amounts that they've been paid in the past for the study.

10           MR. SMITH:  And I've provided that information.  I

11   said this is how much they get paid, this is how much they're

12   charging me on an hourly basis either for the time that they're

13   doing for me, or one of the doctors says I charge for testimony

14   deposition or trial on a half day or full day.

15           THE COURT:  I'm hearing a disconnect.  Yes, ma'am?

16           MS. METTHAM:  Your Honor, he has provided the general

17   rates.  He has not actually told us how much plaintiff has paid

18   him for the study.  That's what we're seeking, is what he's

19   actually compensated the experts.

20           MR. SMITH:  Well, all right.  Fine.  I don't think

21   they're entitled to that information, but they can certainly

22   ask the expert in a deposition how much have you billed, how

23   much have you been paid, but we're getting a little bit out of

24   school here.  The rules don't authorize any of their requests

25   for all of this information from the experts, which I'd like to

1   get to the heart of the motion before us today.

2            THE COURT:  Yes, well, okay.  But I don't see any

3   reason not to give them the amounts.  Although, obviously,

4   that's something that can be covered in the deposition.

5            MR. SMITH:  It seems to me that that's --

6            THE COURT:  Yes.

7            MR. SMITH:  I mean, that's the right way to handle it.

8            THE COURT:  As far as all the exhibits, the data,

9   we'll just say data.  Why not?

10            MR. SMITH:  Okay.

11            THE COURT:  Raw data, for example, on the surveys.

12            MR. SMITH:  Right.  I'd be happy to address that.  The

13   federal rules clearly provide what an expert is required to

14   disclose in an expert report, and what they're required to turn

15   over is information that they relied upon in preparing the

16   report.

17            And notwithstanding what the City has said, we have

18   done that.  We have provided them with the information that

19   they relied upon in generating their reports.  So, for example,

20   both of them wrote a book in 2012, Crime Numbers Game.  It's --

21   and Mr. Silverman wrote an earlier book in 1994 about CompStat

22   and about how CompStat has changed over the years from actually

23   what was a very good idea into an idea that created

24   inappropriate incentives.

25            Anyhow, the rules don't authorize the defendants to

E9HPSCHC

request and do not obligate the experts to turn over all of the

information that they generated over the many years that

they've been studying this area.  One of the areas that they

studied in 2008, and then with a follow up in 2009, was a

survey that they sent out to a lot of retired captains and

above.

          They reported on those surveys.  They reported on the

survey -- on one of them in this book.  In fact, the questions

and the answers are in a summary, which I sent along with my

letter.  So they've been working on police CompStat issues for

many, many years.

          What the City wants to do is say, well, you rely on

your findings from 2008; so we're entitled to all of the data

that was -- that was used and created in order to reach that

conclusion.

          The point -- my point is that they didn't, in

preparing these reports, rely on any of that raw data or

anything else.  In the academic literature that they are

familiar with and that they contributed to, they relied on many

things.  And they cited in an appendix many of these --

          THE COURT:  But their report here.

          MR. SMITH:  Their report here refers to the results of

the 2008 and the 2012 survey and, I mean, there's --

          THE COURT:  Well, so they should provide the 2008

survey.

E9HPSCHC

1          MR. SMITH:  That has already been -- that's in their

2     book.  The survey's in their book and the data -- what the City

3     wants to do is have them go get file cabinets from almost a

4     decade ago and pull out all of that, and challenge it.  And the

5     rules don't authorize that.  They're required to turn over the

6     stuff that they looked at in generating their report.

7          If this is correct, then every expert who ever relies

8     on anything that they ever said in the past, has to turn over

9     all of the research that they ever conducted in order to rely

10    on a piece of work that they did in the past.  That's why I say

11    in order to resolve this motion fairly, you have to look at

12    what the rule requires.  The rule doesn't require full-blown

13    discovery about everything.

14          The experts are not parties in a civil litigation.

15    They are providing information about what they looked at in

16    order to generate their report.  The irony about this is that

17    in the Floyd case, they already took Silverman's deposition on

18    the 2008 survey, and they got the information that Judge

19    Scheindlin in that case gave them.  And Eli Silverman, Dr. Eli

20    Silverman testified in the Floyd case, and Judge Scheindlin

21    already found that the surveys show that there was CompStat

22    pressure being generated on supervisors in the periods under

23    discussion.

24          So they could rely on their prior writings.  They

25    could also rely on Judge Scheindlin's findings in the Floyd

1    case, a finding after a bench trial on a fact.  So without any

2    explicit authorization in the federal rules, it's really unfair

3    to these experts to require them to open up all of their file

4    cabinets for all of their research if they --

5             THE COURT:  What was Judge Scheindlin's determination

6    with respect to what the experts had to supply?

7             MS. METTHAM:  Your Honor, if I may?

8             MR. SMITH:  I'll answer that question.

9             MS. METTHAM:  To begin with, your Honor, plaintiff

10   misstated to the Court on multiple occasions.  Eli Silverman

11   was not an expert in the Floyd trial.  I was trial counsel in

12   that matter.  I'm very familiar with it.  Eli Silverman was a

13   fact witness that was identified very belatedly.  Judge

14   Scheindlin allowed only limited discovery, both limited

15   discovery and deposition testimony.

16            MR. SMITH:  Your Honor, I object to the interruption.

17   I really do.

18            THE COURT:  Well, let's let the plaintiff finish.

19            MS. METTHAM:  Okay.

20            THE COURT:  Okay.  So what did Scheindlin do?

21            MR. SMITH:  Judge Scheindlin, in her opinion and order

22   resolving the Floyd case, this is --

23            THE COURT:  I don't care about the substance.  I'm

24   only interested in what did she do on the issue of the expert

25   report and the data that underlay it.

E9HPSCHC

1          MR. SMITH:  Oh, what she did was she said you can take

2     Silverman's deposition, you can have the surveys, not all the

3     underlying data.  And they took his deposition and then

4     Silverman testified at the Floyd trial about the subject, and

5     the Court found that --

6          THE COURT:  Okay.  All right.

7          MR. SMITH:  -- that there was this --

8          THE COURT:  In other words, the survey, the data

9     underlying the surveys is appropriate to be turned over.

10          MR. SMITH:  She did not order the underlying data to

11     be turned over.  She ordered the surveys, which are the

12     questions.  What happened was they had a 20-question

13     questionnaire, and they mailed them out to retired guys, and

14     then they got a whole bunch of responses.  And then they took

15     all that data and they compiled it into summaries.  And the

16     summaries are in the report.

17          And the actual raw data, they didn't have to produce.

18     They told me that -- you know, they don't want to have to open

19     up their entire files to the City or to anybody else about

20     their research.  It's a never-ending problem for them.  I mean,

21     this is their --

22          THE COURT:  Anything else you want to tell me?

23          MR. SMITH:  Yes.  It's not just the raw data that

24     they're asking for.  It's electronic databases used to compile

25     these surveys.  They're asking for their notes on those

16

E9HPSCHC

1    surveys.  They didn't rely on these notes in creating the

2    report for this case.  They're asking for a list of other

3    researchers or professors who aided them in their prior survey

4    research, drafts of articles and surveys used by them in the

5    past.

6         THE COURT:  But none of this has been referred to in

7    the report?

8         MR. SMITH:  No, none of it.  The raw data wasn't

9    referred to in the report either.

10         THE COURT:  No, I know, but the survey was in the

11    report.

12         MR. SMITH:  The conclusions from the surveys were.

13         THE COURT:  Yes.

14         MR. SMITH:  That's true.  So I think I've covered that

15    first issue.  I would just say, you know, Judge, if you look at

16    rule 26, it does not open up the experts to this kind of

17    full-blown discovery.  The rules are very clear.

18         If you sit and you read it, it says that they've got

19    to turn over what they relied on.  And I told the experts that

20    if you want to protect yourself and you don't want to open

21    yourself up to everything, don't rely on anything, and then you

22    won't have to turn it over.  And so now, if the City is

23    actually successful in this motion, they're going to -- they've

24    asked me to reconsider even using the surveys because it's

25    unfair to them.  But anyhow, I'll cross that bridge when I have

E9HPSCHC

1    to.

2              Moving on to the seven-hour issue versus a day and a

3    half to two days.  You know, I hate to be a stickler for

4    technicalities, but the federal rules say presumptively seven

5    hours.  And if the defendant or plaintiff thinks they need more

6    than seven, they have to make a record, they have to show how

7    they need more.

8              All we hear is a lot of conclusionary statements about

9    how, well, there's five defendants and, of course, we need a

10   day and a half or two days.  But there's no -- there's been no

11   showing here that they actually require this.  I had to limit

12   myself to a day for some of the principal defendants in this

13   case.  Mauriello was only a day and not a nickel more, and this

14   is a huge fact witness in this case.

15             These experts have rendered detailed reports

16   expressing their opinions.  They've provided resumes.  They've

17   provided prior testimony.  These defendants are perfectly

18   capable, I think, of focusing in on what they need, and if they

19   can show that they need more, the rules require that they do

20   that.  And I respectfully submit to you they haven't shown that

21   they need more.  They just say that they need more.

22             I think that covers it.  I'll address this issue about

23   the time list and the amount of the payments now or I'll

24   address it in writing.  I did some research to support the

25   propositions that these experts are entitled to one-half of

E9HPSCHC

1    their travel time.  They're coming from Providence, Rhode

2    Island, the Upper West Side, West Chester and Long Island; so

3    we're not talking about the other end of the country or the

4    world.

5            In any event, I've asked for one-half of their hourly

6    rate, which is consistent with my understanding of the case law

7    in this circuit.  And I also ask, because the experts asked me,

8    to get the money upfront because they don't want to have to

9    chase after the defendants to get paid after the depositions.

10   I agree with your Honor, it's easier to do it after, but it's

11   their time.  They ought to be paid for their time.  And if you

12   want, I'll submit the authority that I have for the position

13   I've taken.  I don't think it's necessary, but I'd be happy to

14   do so.

15           THE COURT:  Okay.  Thank you.

16           MS. METTHAM:  Your Honor, first address --

17           THE COURT:  Excuse the interruption.

18           MS. METTHAM:  Sure.

19           THE COURT:  This is something that the City must face

20   all the time.

21           MS. METTHAM:  Which part?

22           THE COURT:  This business about bills and so on and

23   advance payments.

24           MS. METTHAM:  And typically we pay the experts after

25   the expert's deposition has been taken.

E9HPSCHC

1         THE COURT:  Let me put it to you differently.  Have

2    you ever advanced the money?

3         MS. METTHAM:  I have.

4         THE COURT:  Okay.  Good.

5         MS. METTHAM:  But when I've paid the expert in

6    advance, I was given an invoice by the plaintiff about a month

7    prior with all of the information required.  It was a

8    straightforward issue.  I paid him.  The check actually got

9    there the day before, but --

10        THE COURT:  Okay.

11        MS. METTHAM:  -- typically we pay after.

12        To address the issue of Scheindlin, again, I must

13   stress, your Honor, that Professor Silverman was not an expert

14   in that case.  And the reason that's important is that her

15   decisions were very much motivated by the fact that he was not

16   an expert in that case.

17        So plaintiff is also mistaken that we did receive

18   underlying data from the surveys.  We also received the full

19   narrative data from the surveys

20        THE COURT:  I'm sorry?

21        MS. METTHAM:  We did receive narrative data from the

22   surveys in Floyd.  So Professor Silverman and Eterno had

23   narrative responses to certain questions in their surveys in

24   2008 and 2012.  Judge Scheindlin ordered them to produce

25   certain of those narrative responses from the underlying data.

E9HPSCHC

```
 1              THE COURT:  I'm not getting word.

 2              MS. METTHAM:  Narrative, summaries?  The area where

 3    the respondent to the survey was able to expound without

 4    checking a multiple-choice question.  So the raw data from the

 5    actual survey, what the respondent's typed or hand wrote,

 6    which --

 7              THE COURT:  Was produced?

 8              MS. METTHAM:  It was produced.

 9              THE COURT:  And it will be here.

10              MS. METTHAM:  I would hope so, your Honor.

11              THE COURT:  Yes, it will be here.  Okay?

12              MS. METTHAM:  Yes, your Honor.

13              THE COURT:  And that's consistent with what Judge

14    Scheindlin did?

15              MS. METTHAM:  Yes, she did order the narrative --

16              THE COURT:  Okay.

17              MS. METTHAM:  -- information.

18              THE COURT:  Okay.

19              MS. METTHAM:  In terms of the other data, the reason

20    that there is a difference here in terms of the actual survey

21    responses is that in the Floyd matter, because he wasn't an

22    expert, and Professor Silverman was very limited in what he was

23    allowed to testify on.  And he was only allowed to testify on

24    the pressures that they believed came from stop, question and

25    frisk information.  That was only one of about 24 questions in
```

E9HPSCHC

1    the survey.  So all of his discovery, his deposition, his trial

2    testimony was limited to stop, question and frisk pressures.

3            In this matter, the plaintiff's experts have used the

4    survey data and responses in a much broader way.  They're

5    talking about CompStat data generally on stop, question, frisk,

6    on summonses, on arrests.  They talk about the pressure of

7    CompStat to -- the impact on constitutional rights.

8            And the issue, your Honor, here is with them as

9    experts, we need to probe their survey so that we can make an

10   appropriate Daubert and Kumho Tire motion to exclude these

11   experts based on how they've conducted the survey on the age,

12   the numbers of the retirees, when they retired, what kind of

13   pressure.

14           For example, your Honor, plaintiff's experts -- and

15   this is Exhibit E to my September 4th motion of their report

16   and starting on Page 16 are the survey findings.  And in the

17   survey findings the experts have lumped responses into these

18   subjective categories of low, medium and high and found that

19   retirees who retired before 1995 felt one way, from 1995 to

20   2001 felt another, and 2002 until 2012 felt a different way.

21           The reason we need the underlying data is that we

22   don't believe that these categories are appropriate.  We don't

23   believe that cutting it off before 1995 -- we think that if you

24   changed that year, so if the respondent said he retired in

25   2000, that we want to see what retirees in that year said.

E9HPSCHC

1   Instead of saying plaintiff's experts' category of low, we want

2   to know if they said a one, a two or a three in response.

3          We just simply need more qualitatively data to be able

4   to analyze their survey and to challenge their survey

5   responses.  And plaintiff here has said that his experts are

6   not relying on this data in their report, but again, I would

7   direct the Court, respectfully, to the report starting on

8   Page 14, where they spend a dozen pages talking about the 2008,

9   2012 expert -- I mean surveys, going through the survey

10  findings and linking it to this case.  So instead of simply

11  saying we've done a survey in the past and this has kind of

12  changed our opinion, they've heavily relied on it in this

13  matter.

14         And in terms of the other data on which they've

15  relied, No. 1, I would direct the Court to Federal Civil

16  Procedure 262(b)(2), which requires an expert to include the

17  facts or data considered by the witness in forming their

18  opinions.  So contrary to plaintiff's opinion that the federal

19  rules simply don't require an expert to provide this

20  information, it's pretty clearly written that if an expert

21  relies on data or information, they must include that in their

22  expert report.

23         And while the survey is one part, plaintiff's experts

24  also spend a large amount of time talking qualitatively about

25  CompStat, mentioning non-NYPD data sources which aren't

1    identified anywhere in the footnote, in the references.  They

2    make their own opinions about evidence that NYPD leadership

3    altered and misused CompStat, that the CompStat crime reduction

4    system has been emulated in other cities.

5           They're relying on a lot of information which they

6    haven't provided data or information on, and we're seeking to

7    get that data so that we can challenge this report

8    appropriately, your Honor.

9           MR. SMITH:  Can I respond to that, your Honor?

10          THE COURT:  I think we will have what we'll call the

11   Scheindlin rule for the 2008, 2012 surveys.  Any identified

12   fact or literature will be produced.  The depositions will be a

13   day, with the understanding that if more is needed, an

14   application will be made, and there will be no additional

15   travel time or anything of that kind.  You know, the trouble

16   with that is we're just putting off that problem, but, okay.

17          Well, let's back up a little bit.  Okay.  I guess what

18   we should do is you'll tell me -- it's totally predictable, but

19   you'll tell me when these depositions are scheduled, and we

20   will have a conference at the close of the day to determine

21   whether or not there should be additional.  Now, quite frankly,

22   I'm pretty sure there will be, but okay, we'll see.

23          MS. METTHAM:  Your Honor, if I may interrupt to ask a

24   question about how that would work in reality in that with five

25   separate defendants, you know, if we're all supposed to split

E9HPSCHC

1    the first seven hours, you know, if one defendant --

2            THE COURT:  You can do whatever you want to do.  With

3    such an array of such skilled and experienced lawyers, I

4    wouldn't dare contemplate how you should split up your time or

5    who does what with which and to whom.  And if somebody can come

6    forward and say this is an area that I want to examine on and

7    it hasn't been covered, well, we'll hear it.

8            MS. METTHAM:  And, your Honor, might I just ask that

9    if a defendant were to finish questioning to allow time for

10   another defendant, that they would not, you know, give up any

11   rights to additional questioning on the second date, if the

12   Court were to grant such a motion?

13           THE COURT:  Well, okay.  That's interesting.  The

14   plaintiffs will provide an invoice for one-half the travel

15   time.  You know, really.  Well, all right.  And what have I

16   missed, anything?

17           MR. SMITH:  There's one thing that I need to raise

18   now, which is the City is saying tomorrow their expert reports

19   are due and they're not going to provide any, and I'm concerned

20   that this is going to scuttle the schedule that we already

21   have.

22           THE COURT:  Well, listen, enough is enough.  Okay.

23   Thank you all.

24           MR. KOSTER:  Your Honor?

25           THE COURT:  I thought so.

1              MS. METTHAM:  Just real quick, your Honor.  I just

2       want a clarification.  When you told plaintiff that he must

3       provide identified facts or literature, to be more specific,

4       you know, is plaintiff required to provide the narratives?  Is

5       he required to provide the survey responses?

6              THE COURT:  Yes.  And that was done in the Scheindlin.

7              MS. METTHAM:  Not all of the survey responses were

8       provided in Floyd.

9              THE COURT:  What was the distinction?

10             MS. METTHAM:  So the narrative responses, the

11      long-form written responses were provided but not all of the

12      multiple choice underlying data was provided.  And, again, your

13      Honor, the multiple choice is what we believe is relevant so

14      that we can look into the actual years that these

15      individuals --

16             THE COURT:  All right.  You can have the multiple

17      choice and the narratives.

18             MS. METTHAM:  Thank you, your Honor.

19             MR. RADOMISLI:  Your Honor, I don't think your Honor

20      ruled on whether we have to pay in advance or not.

21             THE COURT:  Say it again?

22             MR. RADOMISLI:  I'm not sure whether your Honor ruled

23      on whether we have to pay in advance, or we can see how much

24      time is actually spent.

25             THE COURT:  Well, the transportation in advance.  And

E9HPSCHC

```
1   I would think that you can't pay in advance when you don't know

2   how long it's going to go; so....

3              MR. RADOMISLI:  Thank you, your Honor.

4              THE COURT:  Yes.

5              MR. KOSTER:  Your Honor, regarding the deadline to

6   respond to plaintiff's expert discovery, based on your last

7   order from plaintiff's motion to compel, there are still

8   several depositions that the parties have to complete,

9   including medical defendants.  I represent Dr. Aldana-Bernier.

10             In the interest of not having to provide potential

11  multiple expert reports, whether any reports will be changed or

12  altered based on further deposition testimony, I'd ask for an

13  extension of time for the defendants to respond.  And I'm

14  willing -- and I think we'll all be willing to grant the

15  plaintiff the courtesy that if he needs to amend his expert

16  report based on the deposition testimony that will be

17  forthcoming --

18             THE COURT:  That seems to make sense.

19             MR. KOSTER:  -- that he's allowed to do so.

20             MR. SMITH:  No, it doesn't make sense.  We have a

21  schedule.  I'm trying to get this case ready for trial, your

22  Honor.  All the defendants' expert reports are due tomorrow.

23  Last month, in August, I worked very hard with all of my

24  experts to get expert reports served pursuant to the scheduling

25  order, and now I'm being told that we're not going to have what
```

E9HPSCHC

1    we're supposed to have, or because you dropped your pencil,

2    we're not going to give it to you and, you know --

3            THE COURT:  Wait a minute.

4            MR. SMITH:  Well --

5            THE COURT:  Factually, are the experts, all the expert

6    depositions scheduled?

7            MR. SMITH:  Mine are.  They haven't even designated

8    who their experts are yet, and now I'm hearing that, although

9    they were supposed to do it tomorrow --

10           THE COURT:  They will do it tomorrow.

11           MR. SMITH:  -- it's not going to happen.

12           THE COURT:  They will do it tomorrow.

13           MR. KOSTER:  Your Honor, just in that sense, I believe

14   Mr. Smith has misrepresented certain things to the Court in

15   which he was granted multiple extensions of time to file his

16   expert reports.  This simple request for a short extension on

17   behalf of the defendants, I don't think is unreasonable.

18           THE COURT:  Well, designate.  If you have to change

19   the designation or make another determination, you can try to

20   do that later based on subsequent events.  I don't know how

21   successful it will be.

22           MR. KOSTER:  Thank you, your Honor.

23           MR. SHAFFER:  Your Honor, Ryan Shaffer for the City

24   defendants.  Just to give your Honor an idea of something that

25   is coming your way, so to speak.

E9HPSCHC

```
 1              Last Friday Mr. Smith identified an additional 17,
 2     perhaps more, fact witnesses despite the fact that he was
 3     ordered to identify those witnesses back in February.  The City
 4     defendants do intend to put it in a letter to your Honor
 5     addressing this issue, but since the issue of scheduling is
 6     sort of on the table, I wanted to let your Honor know that that
 7     is coming in your direction.
 8              THE COURT:  And I take it you're resisting the
 9     additional fact witnesses?
10              MR. SHAFFER:  Right, because we're seven months past
11     the deadline to have disclosed those witnesses and two months
12     past the deadline for all the fact discovery to be completed.
13              MR. SMITH:  What I did, your Honor, is as I've
14     continued my investigation into the facts of this case -- Now,
15     look, this is bushwhacking.
16              THE COURT:  Of course.
17              MR. SMITH:  Of course it is.
18              THE COURT:  What, is that unusual?
19              MR. SMITH:  No.  So then allow me the opportunity to
20     provide a fulsome response.
21              THE COURT:  No, no.  I understand, but I'm wondering,
22     tell me about the schedule, which I'm sort of lost on.
23              MR. SMITH:  I'd be happy to.  It's right here.  I can
24     hand it up to you.  The schedule -- the last schedule was
25     July 18, and it provided firm dates for fact discovery, expert
```

E9HPSCHC

1    discovery and motions.  Based on scheduling problems with the

2    depositions, your Honor, in a letter, an endorsed order moved

3    back all of the dates set forth in this schedule one week.

4    That was on consent.

5         And right now, we're scheduled to have all dispositive

6    motions returnable in this courtroom November 5, and we're

7    supposed to have expert disclosure completed by October 16th;

8    so....

9         THE COURT:  Now, fact witnesses, when they were

10   supposed to be -- that was supposed to be completed by --

11        MR. SMITH:  There was no deadline for identifying fact

12   witnesses.  My understanding is that you have an ongoing

13   obligation to supplement your disclosures.  The only deadline

14   that I'm aware of that the Court imposed on me was we -- I'm

15   sorry, we're going to have to step back.

16        Five or six months ago I learned that there were a

17   large number of police officers who responded to a website

18   called Schoolcraft For Justice, and I obtained from prior

19   counsel a stack of e-mails and correspondence from many, many

20   police officers responding --

21        THE COURT:  Okay.

22        MR. SMITH:  -- to basically B2s, and I was concerned

23   about confidentiality.  And your Honor said if you want to use

24   any of these police officers, you have to identify them out of

25   this stack.  And I did I identified one Lieutenant, whose name

1    was Joe Ferraro.

2            THE COURT:  Okay.

3            MR. SMITH:  And because he, for reasons -- I

4    identified him out of that stack and the City took his

5    deposition.  He also tape recorded one of the other defendants

6    for conduct that was going on at the eight-one.

7            So in the context of discovery, I've also -- informal

8    discovery, I've discovered that there are many police officers

9    that have brought claims for retaliation against the Police

10   Department for similar kinds of activities, and I served

11   document demands and interrogatories on the City probably in

12   February of this year saying give me information about any

13   claims of retaliation.

14           They objected.  Your Honor, unfortunately, from my

15   perspective, agreed, and so they were not required to turn over

16   any of that information.  When your Honor told me to

17   supplement, recently, Schoolcraft's financial and emotional

18   distress damages, I also went through and identified all of

19   those police officers who I had made document requests for in

20   February as people who made have knowledge about -- that's

21   relevant to this case, and that's what happened.

22           And I think I have a continuing obligation to do that.

23   If I had more information about those officers, I would have

24   provided that, but the only information I was able to get was

25   from, you know, a Daily news article or reported decision or

E9HPSCHC

1    something like that.  And so that is, from my perspective as

2    the counsel for the plaintiff, what happened.

3              THE COURT:  But --

4              MR. SMITH:  So, you know, I mean, the NYPD has the

5    names of these people who I believe may have information.  I

6    don't -- I mean, I don't even have sufficient data right now to

7    send out an investigator for all of them, but I thought, given

8    the fact that I was told to supplement my discovery, and given

9    the fact that I wanted to make sure that I was taking this

10   position that these people may have information --

11             THE COURT:  Okay.  I think we'll pass it now, and

12   we'll have a further discussion.  But let me ask the City.  It

13   sounds to me as if maybe I made a mistake on the --

14             MR. SMITH:  There were about twelve, roughly around

15   twelve police officers who, according to reported decisions or

16   newspaper articles, made claims that they were retaliated

17   against because they objected to --

18             THE COURT:  When you say made claims, I mean, what did

19   they do?

20             MR. SMITH:  Well, bring a lawsuit in Federal Court or

21   defended a -- this came up in a few contexts this way.  They

22   were actually disciplined for -- I don't remember the name of

23   this officer, but there was one report/decision where an

24   officer was given charges because he issued a bogus summons,

25   and he was -- in an administrative proceeding he was charged

E9HPSCHC

1    with doing something improper.

2              THE COURT:  I'm trying to figure out what it is and

3    how did you identify what you wanted the City to give you?

4              MR. SMITH:  Well, in this officer, whose name I don't

5    remember, the decision that I'm referring to is an

6    administrative decision which discussed how the officer's

7    defense to the charge that he issued a summons improperly, this

8    was in Staten Island, was pressure on him on a regular basis to

9    issue summonses to satisfy a quota.  And so his defense to,

10   yeah, I made up a bogus summons was, you made me do it.

11             And so I asked -- I identified him, and I apologize I

12   don't remember his name, but there's a list of like 15, 12,

13   something like that, of these officers who have made myriad

14   types of claims alleging that they were being punished

15   because --

16             THE COURT:  I'm trying to understand.  You said they

17   made claims.

18             MR. SMITH:  Yes.

19             THE COURT:  What is it that they've made claims, for

20   what, against the City?  I mean, what would the City know?

21             MR. SMITH:  I don't know.  I mean, sitting here today,

22   I don't have my file.  I don't have my information.  I really

23   feel I won't be able to answer your questions more accurately.

24             THE COURT:  Okay.  We'll pass all of that and wait for

25   the --

E9HPSCHC

1          MR. SMITH:  Okay.

2          THE COURT:  We'll have to have a conference at

3   whatever time you all think is feasible with respect to the

4   schedule.  Okay.  Thank you, all.

5          MR. SMITH:  Thank you.

6          MS. METTHAM:  Thank you, your Honor.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25