**EXHIBIT 8**

Page 1

1
2  UNITED STATES DISTRICT COURT
3  EASTERN DISTRICT OF NEW YORK
4  - - - - - - - - - - - - - - - - - -
5  ADRIAN SCHOOLCRAFT,
6                     Plaintiff,
7           -against- Index No.
                      10CIV-6005 (RWS)
8
   THE CITY OF NEW YORK, DEPUTY CHIEF
9  MICHAEL MARINO, Tax Id. 873220,
   Individually and in his Official
10 Capacity, ASSISTANT CHIEF PATROL
   BOROUGH BROOKLYN NORTH GERALD NELSON,
11 Tax Id. 912370, Individually and in his
   Official Capacity, DEPUTY INSPECTOR
12 STEVEN MAURIELLO, Tax Id. 895117,
   Individually and in his Official
13 Capacity, CAPTAIN THEODORE LAUTERBORN,
   Tax Id. 897840, Individually and in his
14 Official Capacity, LIEUTENANT JOSEPH
   GOFF, Tax Id. 894025, Individually and
15 in his Official Capacity, stg. Frederick
   Sawyer, Shield No. 2576, Individually
16 and in his Official Capacity, SERGEANT
   KURT DUNCAN, Shield No. 2483,
17 Individually and in his Official
   Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18 Tax Id. 885374, Individually and in his
   Official Capacity, SERGEANT SHANTEL
19 JAMES, Shield No. 3004, and P.O.'s "JOHN
   DOE" 1-50, Individually and in their
20 Official Capacity (the name John Doe
   being fictitious, as the true names are
21 presently unknown)(collectively referred
   to as "NYPD defendants"), JAMAICA
22 HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
   Individually and in his Official
23 Capacity, DR. LILIAN ALDANA-BERNIER,
   Individually and in her Official Capacity
24 and JAMAICA HOSPITAL MEDICAL CENTER
   EMPLOYEES "JOHN DOE" # 1-50, Individually
25
   (Continued)

Page 2

1

2   and in their Official Capacity (the name
    John Doe being fictitious, as the true
3   names are presently unknown),

4
    Defendants.

5
    - - - - - - - - - - - - - - - - - - - -x

6
                        111 Broadway
7                       New York, New York
8                       February 12, 2014
                        10:21 a.m.
9

10      VIDEOTAPED DEPOSITION of DR. ISAK
11  ISAKOV, one of the Defendants in the
12  above-entitled action, held at the above
13  time and place, taken before Margaret
14  Scully-Ayers, a Shorthand Reporter and
15  Notary Public of the State of New York,
16  pursuant to the Federal Rules of Civil
17  Procedure.

18

19                  *       *       *

20

21

22

23

24

25

```
 1                    I. ISAKOV
 2   is what I thought you said the first
 3   time.
 4        A.     That's my understanding.
 5   Again, I may say no language of law how
 6   it should be.  It's my, as a physician,
 7   understanding what I do when I admit
 8   person under this condition.
 9        Q.     That's all I can ask you to do,
10   Doctor, thank you.
11             If I'm wrong you tell me.  I
12   want to understand.
13             If a patient has a mental
14   illness and is in need of care and
15   observation under the statute, it's your
16   understanding you can admit him to the
17   hospital, correct?
18        A.     Yes.
19        Q.     Against his will, correct?
20        A.     Against his will, yes, if he
21   don't understand the necessity of
22   admission and I feel it need immediate
23   attention and observation.
24        Q.     If he needs immediate attention
25   and observation because of a mental
```

```
 1                    I. ISAKOV
 2   illness, you believe under the statue you
 3   can admit him against his will, correct?
 4        A.    Yes.
 5              MR. DEVINE:  Just those factors?
 6              MR. SUCKLE:  Yes.
 7        A.    There is a potential danger if
 8   he would not be admitted and sent home.
 9        Q.    You're adding to what I said,
10   there has to be also a potential danger?
11        A.    Right.
12        Q.    And that potential danger is
13   what you use as your standard for whether
14   or not you can admit somebody who has a
15   mental illness in need of observation and
16   care, correct?
17        A.    Yes.
18        Q.    And that potential danger, you
19   decide whether or not from your
20   evaluation whether or not that person has
21   had a potential danger, yes?
22        A.    Yes.
23        Q.    You were talking about you are
24   not a lawyer so you are not -- when I was
25   reading the words "substantial risk,"
```

1                    I.  ISAKOV

2    that's lawyer language; that's not the

3    language you would use, correct?

4                 MR. RADOMISLI:  Objection to

5         form.

6         A.    Substantial risk of physical

7    harm to himself.

8         Q.    That's more than potential

9    danger, correct?

10        A.    Let me put you this way; for

11   example, if a person will say, yes, I

12   want to kill myself.  It will be

13   straightforward risk to harm himself.

14        Q.    That is a substantial risk?

15        A.    I don't know if you call it

16   substantial.  It's a definite risk.

17              If the person conducts himself

18   in the way that you feel this can

19   potentially be harmful, then it can be

20   indirectly.  He is not saying, yes, I'm

21   going to kill somebody or I kill myself

22   but how he conduct himself putting

23   himself at risk that he may under this

24   situation in this emotional condition if

25   he was not under observation in safe

1                    I. ISAKOV

2    environment, he may do something that may

3    be harmful.  And to protect him, yes, you

4    can admit him against his will if he

5    doesn't want to do it voluntary.

6         Q.    So if somebody may harm

7    themselves and have this mental illness

8    that needs to be observed and treated,

9    you can admit them?

10        A.    Yes.

11        Q.    When you say they may harm

12   themselves, you are not comfortable using

13   the words "substantial risk," correct?

14             MR. RADOMISLI:  Objection.

15        Q.    You are not comfortable with

16   the words.  I asked you about it.  You

17   said --

18        A.    What I comfortable with and it

19   probably will pertain to this case that

20   even if he did not say that I will kill

21   myself or somebody, it says conduct

22   demonstrated this potential danger.

23        Q.    And this potential danger is

24   that he may --

25        A.    That can be --

Page 98

```
 1                  I. ISAKOV
 2      Q.     -- may harm himself?
 3      A.     May, yes.
 4      Q.     May?
 5      A.     Correct.
 6      Q.     And that may, when you say "may
 7   harm himself," is that different than
 8   potentially might harm himself?
 9      A.     I don't know how to separate
10   them.  Potential it's high risk, low
11   risk, medium risk; but it doesn't matter
12   what level the risk.  If there is a risk,
13   I think it's my duty to protect the
14   patient.
15      Q.     So it doesn't matter what level
16   of risk so long as you perceive a risk,
17   you are got going to admit him?
18      A.     Yes, right.
19      Q.     And that's how you teach the
20   residents at Jamaica Hospital when you
21   teach them?
22      A.     I teach psychopharmacology.  I
23   don't teach the law.
24      Q.     That's your understanding of
25   the standard?
```

Page 99

1                          I.  ISAKOV

2        A.    My understanding, yes.

3        Q.    And have you told us your

4   understanding of the standard for

5   admitting a patient under 9.39 of the

6   Mental Hygiene Law?

7        A.    Right.

8        Q.    And you believe that that

9   standard comports with good and accepted

10  medical practice, correct?

11       A.    Yes.

12       Q.    I have a few more of these I

13  want to go through just because I can.

14             One more, this is Exhibit 75,

15  and do you know what that is?

16       A.    Physical conduct.  It's a part

17  of the rule of the unit.

18       Q.    Those are rules and regulations

19  of Jamaica Hospital as they existed in

20  2009?

21       A.    Probably.

22       Q.    It talks about there should be

23  no sexual contact between patients,

24  correct?

25       A.    Yes.