# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

                    Plaintiff,

                  -against-

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
MARINO, Tax Id. 873220, Individually and in his Official Capacity,
ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH
GERALD NELSON, Tax Id. 912370, Individually and in his Official
Capacity, DEPUTY INSPECTOR STEVEN MAURIELLO, Tax Id.
895117, Individually and in his Official Capacity, CAPTAIN
THEODORE LAUTERBORN, Tax Id. 897840, Individually and in
his Official Capacity, LIEUTENANT JOSEPH GOFF, Tax Id.
894025, Individually and in his Official Capacity, SGT.
FREDERICK SAWYER, Shield No. 2576, Individually and in his
Official Capacity, SERGEANT KURT DUNCAN, Shield No. 2483,
Individually and in his Official Capacity, LIEUTENANT
CHRISTOPHER BROSCHART, Tax Id. 915354, Individually and in
his Official Capacity, LIEUTENANT TIMOTHY CAUGHEY, Tax
Id. 885374, Individually and in his Official Capacity, SERGEANT
SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE" #1-
50, Individually and in their Official Capacity (the name John Doe
being fictitious, as the true names are presently unknown)
(collectively referred to as "NYPD defendants"), JAMAICA
HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV, Individually
and in his Official Capacity, DR. LILIAN ALDANA-BERNIER,
Individually and in her Official Capacity and JAMAICA HOSPITAL
MEDICAL CENTER EMPLOYEE'S "JOHN DOE" # 1-50,
Individually and in their Official Capacity (the name John Doe being
fictitious, as the true names are presently unknown),

                  Defendants.
-------------------------------------------------------------------------------X

**AMENDED**
**COMPLAINT**

**10 CV 06005**

**JURY TRIAL**
**DEMANDED**

**ECF CASE**

      Plaintiff ADRIAN SCHOOLCRAFT by his attorneys, Jon Norinsberg and Cohen & Fitch

LLP, complaining of the defendants, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.      This action seeks redress for a coordinated and concentrated effort by high ranking officials within the New York City Police Department (hereinafter "NYPD") to silence, intimidate, threaten and retaliate against plaintiff ADRIAN SCHOOLCRAFT, for his documentation and disclosure of corruption with the NYPD. Specifically, that the NYPD had established an illegal quota policy for the issuance of summonses and arrests and that defendants were falsifying and instructing police officers to suborn perjury on police reports in order to distort COMPSTAT statistics. In order to prevent disclosure of these illegal and unconstitutional acts, which would have revealed rampant NYPD corruption, defendants unlawfully entered plaintiff's home, had him forcibly removed in handcuffs, seized his personal effects, including evidence he had gathered documenting NYPD corruption and had him admitted to Jamaica Hospital Center against his will, under false and perjurious information that plaintiff was "emotionally disturbed". Thereafter defendant officers conspired with Jamaica Hospital Center personnel to have plaintiff involuntarily committed in its psychiatric ward for six (6) days, all in an effort to tarnish plaintiff's reputation and discredit his allegations should he succeed in disclosing evidence of widespread corruption within the NYPD.

## JURISDICTION

3.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is

founded upon 28 U.S.C. §§ 1331 and 1343.

## VENUE

4.      Venue is properly laid in the Southern District of New York under U.S.C. § 1391(c), in that the defendant City of New York is a municipal corporation that resides in the Southern District of New York.  Further, this matter is inextricably interwoven to a related proceeding currently pending in the Southern District of New York, Stinson et. al v. City of New York et. al, (RWS) 10 CV 4228.

## JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.      Plaintiff ADRIAN SCHOOLCRAFT is a Caucasian male, a citizen of the United States, and at all relevant times a resident of the City and State of New York.

7.      Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.      Defendant CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

9.      That at all times hereinafter mentioned, the individually named defendants DEPUTY CHIEF MICHAEL MARINO, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH GERALD NELSON, DEPUTY INSPECTOR STEVEN MAURIELLO,

CAPTAIN   THEODORE   LAUTERBORN,   LIEUTENANT   TIMOTHY   CAUGHEY,
SERGEANT   SHANTEL   JAMES,   LIEUTENANTANT   JOSEPH   GOFF,   SERGEANT
FREDERICK   SAWYER,   SERGEANT   KURT   DUNCAN,   LIEUTENANT   CHRISTOPHER
BROSCHART and P.O.'s "JOHN DOE" #1-50 were duly sworn police officers of said
department and were acting under the supervision of said department and according to their
official duties.

10.     That at all times hereinafter mentioned the NYPD defendants, either personally or
through their employees, were acting under color of state law and/or in compliance with the
official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of
New York.

11.     Each and all of the acts of the NYPD defendants alleged herein were done by said
defendants while acting within the scope of their employment by defendant THE CITY OF NEW
YORK.

12.     Each and all of the acts of the NYPD defendants alleged herein were done by said
defendants while acting in furtherance of their employment by defendant THE CITY OF NEW
YORK.

13.     Defendant the JAMAICA HOSPITAL MEDICAL CENTER (hereinafter
"JHMC") is a privately owned hospital located at 8900 Van Wyck Expressway, Jamaica, New
York, 11418 and performs all functions of a hospital.

14.     That at all times hereinafter mentioned the defendant, JHMC, was a domestic
corporation duly organized and existing under and by virtue of the laws of the State of New
York.

15.     That at all times hereinafter mentioned, defendant   JHMC owned, operated,

managed and controlled a certain hospital for the treatment of the sick and ailing in the County of Queens, State of New York, and as such held itself out as duly qualified to render proper and adequate hospital service for the treatment of the sick and ailing in the County of Queens, State of New York, and as such held itself out as duly qualified to render proper and adequate hospital, medical and surgical services to members of the general public, including plaintiff.

16.     That at all times hereinafter mentioned, defendant DR. ISAK ISAKOV, was a physician duly licensed to practice medicine in the State of New York, and as such held himself out as duly qualified to render proper and adequate medical services to members of the general public, including plaintiff.

17.     That at all times hereinafter mentioned, defendant DR. ISAK ISAKOV was the attending physician of the Psychiatric Department of JHMC, and was an employee, agent, servant and/or independent contractor retained by JHMC to render medical services, care and treatment patients seeking medical care at JHMC.

18.     That at all times hereinafter mentioned, defendant DR. LILIAN ALDANA-BERNIER, was a physician duly licensed to practice medicine in the State of New York, and as such, held herself out as duly qualified to render proper and adequate medical services to members of the general public, including plaintiff.

19.     That at all times hereinafter mentioned, defendant DR. LILIAN ALDANA-BERNIER was the admitting physician of the Psychiatric Department of JHMC, and was an employee, agent, servant and/or independent contractor retained by JHMC to render medical services, care and treatment patients seeking medical care at JHMC.

20.     That at all times hereinafter mentioned, the defendants JHMC EMPLOYEE'S "JOHN DOE" # 1-50 were working for and were acting under the supervision of JHMC

according to their official duties.

## FACTUAL BACKGROUND

**Plaintiff's Exemplary Career In the U.S. Navy and NYPD**

21.  Plaintiff ADRIAN SCHOOLCRAFT is a New York City Police Officer and has been employed by the New York City Police Department ("NYPD") since July, 2002.

22.  Prior to the events set forth below, plaintiff ADRIAN SCHOOLCRAFT was a decorated New York City police officer and United States Navy veteran.

23.  From 1993 to 1997, plaintiff ADRIAN SCHOOLCRAFT served honorably in the United States Navy.

24.  During this time, plaintiff ADRIAN SCHOOLCRAFT received several commendations, including the "National Defense Service Medal" and the "First Good Conduct Medal."

25.  After four years of distinguished service on the USS Blue Ridge, plaintiff ADRIAN SCHOOLCRAFT received an honorable discharge from the United States Navy on July 22, 1997.

26.  Thereafter, plaintiff ADRIAN SCHOOLCRAFT, whose father was a police officer, decided to join the New York City Police Department in July 2002.

27.  Fourteen months after joining the NYPD, plaintiff began working at the 81st Precinct, where he remained until October 31, 2009.

28.  In total, plaintiff ADRIAN SCHOOLCRAFT worked for six years at the 81st Precinct.

29.  During this time, plaintiff ADRIAN SCHOOLCRAFT became the senior patrol officer on the 4:00 p.m. to 12:00 p.m. at the 81st Precinct.

30.     In this capacity, plaintiff ADRIAN SCHOOLCRAFT was often sought out by other police officers for his knowledge, experience and sound judgment in handling difficult work situations.

31.     In his seven year career with the NYPD, plaintiff ADRIAN SCHOOLCRAFT had an exemplary record and in fact received multiple commendations for his work as a police officer.

32.     For example, On October 28, 2006, plaintiff received a "Meritorious Police Duty Medal" for his "outstanding performance" as a police officer.

33.     Similarly, on June 4, 2008, plaintiff received an award from the NYPD for his "dedication to the New York City Police Department and to the City of New York."

**Plaintiff Witnesses Enforcement of an Illegal Quota Policy for Summonses and Arrests**

34.     During his time at the 81st precinct, plaintiff began to observe a pattern and practice of supervisors enforcing a *de facto* quota policy requiring police officers to issue a certain number summons and arrests per month.

35.     Additionally, plaintiff observed that personal performance evaluations were almost entirely based on adherence to this quota and officers failing to meet the required amount were subject to work related consequences, such as loss of overtime, tour changes and denial of vacation days.

36.     Further, in October 2006, directly coinciding with defendant DEPUTY INSPECTOR STEVEN MAURIELLO's assignment to the 81st precinct, plaintiff and his fellow police officers started to receive explicit threats of tour transfers, undesirable assignments, poor performance evaluations and other adverse consequences for failure to meet their monthly arrest and summons quotas.

37.     These admonishments to adhere to monthly quotas were repeatedly emphasized by the defendant officers at the daily roll calls in the 81st precinct throughout plaintiff's employment.

38.     For example, on December 8, 2008, Defendant MAURIELLO berated his officers for not writing enough summonses per month: "I SEE EIGHT FUCKING SUMMONSES FOR A 20 DAY PERIOD OR A MONTH. IF YOU MESS UP, HOW THE HELL DO YOU WANT ME TO DO THE RIGHT THING BY YOU?"

39.     Defendant MAURIELLO repeatedly drove home this message, explicitly threatening to move officers out of their platoons if they did not make their numbers. For example, on October 28, 2008, MAURIELLO shouted out to his officers: "IF YOU DON'T WORK, AND I GET THE SAME NAMES BACK AGAIN, *I'M MOVING YOU. YOU'RE GOING TO GO TO ANOTHER PLATOON!*"

40.     Defendants' illegal quota policy was enforced not just by Mauriello, but by other high-ranking members of the 81st Precinct. For example, on January 28, 2009, Sergeant Raymond Stukes stated: "I TOLD YOU GUYS LAST MONTH: THEY ARE LOOKING AT THESE NUMBERS, AND PEOPLE ARE GOING TO GET MOVED ... THEY CAN MAKE YOUR JOB REAL UNCOMFORTABLE, AND WE ALL KNOW WHAT THAT MEANS."

41.     On December 8, 2008, another Sergeant made similar threats: "WHEN I TELL YOU TO GET YOUR ACTIVITY UP, ITS FOR A REASON, BECAUSE THEY ARE LOOKING TO MOVE PEOPLE, AND HE'S SERIOUS .... THERE'S PEOPLE IN HERE THAT MAY NOT BE HERE NEXT MONTH."

42.     Additionally, on October 18, 2009 another Sergeant made it explicitly clear to the subordinate officers that "AGAIN, IT'S ALL ABOUT THE NUMBERS."

**Officers Were Being Instructed to Make Arrests and Issue Summonses Without Probable Cause**

43.     In fact, defendants were so obsessed with making their "numbers" that they literally instructed officers to make arrests when there was *no* evidence of any criminal activity whatsoever.

44.     For example, on October 31, 2008, Mauriello ordered his officers to arrest virtually *everybody* they came in contact with at 120 Chauncey Street in Brooklyn, with or without probable cause: "EVERYBODY GOES. I DON'T CARE. YOU'RE ON 120 CHAUNCEY AND THEY'RE POPPING CHAMPAGNE? YOKE E'M.   PUT THEM THROUGH THE SYSTEM.     THEY GOT BANDANNAS ON, ARREST THEM. EVERYBODY GOES TONIGHT.  THEY'RE UNDERAGE? FUCK IT."

45.     Similar orders were given by a Sergeant on November 23, 2008.  "IF THEY'RE ON A CORNER, MAKE 'EM MOVE.  IF THEY DON'T WANT TO MOVE, LOCK 'EM UP. DONE DEAL.  YOU CAN ALWAYS ARTICULATE [A CHARGE] LATER."

46.     Thus, police officers at the 81st Precinct were being instructed to arrest  and summons fully innocent people for crimes that never occurred for nothing more than standing on a street corner in their neighborhoods and then "articulate" or create a charge later.

**NYPD Policy Making Officials Were the Driving Force Behind This Quota and Policy**

47.     Defendants' myopic obsession with quotas came straight from the highest ranking officials in the New York City Police Department.

48.     For example, Chief of Transportation MICHAEL SCAGNELLI, a three star Chief, was quoted as saying: "HOW MANY SUPERSTARS AND HOW MANY LOSERS DO WE HAVE, HOW MANY SUMMONSES DOES THE SQUAD WRITE.  WE NEED MORE ACTIVITY, IF YOUR PRODUCTIVITY FALLS BELOW PAR EITHER YOU OR THE C.O.

IS GOING TO HAVE TO ANSWER."

49. Another high-ranking official at the 81st Precinct, Lieutenant Delafuente, actually gave specific numbers that must be met by each officer: "[CAPTAIN STARKY] WANTS AT LEAST 3 SEATBELTS (SUMMONSES), 1 CELL PHONE (SUMMONS) AND 11 OTHERS (SUMMONSES)."

**Plaintiff Refuses to Comply with the NYPD's Unlawful Quota Policy, Leading to Increased Pressure and Scrutiny from His Supervisors**

50. Unlike many of his colleagues, plaintiff ADRIAN SCHOOLCRAFT refused to issue or to be coerced to issue unwarranted and illegal summonses and arrest innocent people in the absence of probable cause simply to meet a quota.

51. As a direct result of this "non-compliance," in January 2009, plaintiff ADRIAN SCHOOLCRAFT began to be scrutinized and increasingly pressured by his supervisors and commanding officer's to increase his "ACTIVITY" (i.e. not writing enough summons and making arrests), or face possible low performance evaluations and tour/command reassignment.

52. Specifically, on January 13, 2009, plaintiff was summoned to a meeting with LT. RAFAEL MASCOL, who commanded him to increase his "OVERALL ACTIVITY," or he would be placed on "PERFORMANCE MONITORING" and be subject to "LOW QUARTERLY EVALUATIONS."

53. Further, when plaintiff requested an explanation of the lieutenant's definition of "ACTIVITY," MASCOL explicitly referenced the need to increase his issuance of summonses and arrests.

**Plaintiff Receives a Poor Evaluation Based On His Low Summons "Activity"**

54. On January 29, 2009, plaintiff did, in fact, receive a poor performance evaluation as a result of his failure to issue the mandated number of summons and arrests required by his

supervisors and Borough chief.

55. Specifically, plaintiff received an overall rating of 2.5 out of 5.0, despite the fact that the average of his scores based on the number of categories contained in the evaluation should have been markedly higher than 2.5.

56. For example, plaintiff's average for "performance areas" was actually 3.75, and contained no rating which was less than 3.0. Similarly, plaintiff's average for "behavior dimensions" was 3.25, still well above the 2.5 rating that he received.

57. In addition, the balance of the evaluation contained the following praise for plaintiff:

> P.O. Schoolcraft shows good community interaction by eliciting information from witnesses and victims. He also mediates problems between disputing individuals and provides counseling when families have conflicts. P.O. Schoolcraft is able to complete arrest forms accurately and completely [and] is able to fingerprint, photograph and process all arrest related paperwork.

58. Thus, it is clear that plaintiff's failure to meet the NYPD summons/arrests quota – which plaintiff's supervisors termed "poor activity" and attributed to plaintiff's "unwilling[ness] to change his approach to meeting performance standards" – was the *real* reason why plaintiff received such a poor performance evaluation.

**Plaintiff Challenges His Low Work Evaluation, Resulting in Intense Scrutiny By His Supervisors**

59. Thereafter, plaintiff immediately informed his supervisors of his intention to appeal his evaluation based on the fact that they had either miscalculated their overall rating or he had been evaluated on an illegal and unconstitutional basis (i.e. not meeting arrest/summons quota).

60. On February 1, 2009, following plaintiff's disclosure of his intention to appeal, a

poster that read "IF YOU DON'T LIKE YOUR JOB THEN MAYBE YOU SHOULD GET ANOTHER JOB" was posted to plaintiff's locker.

61.    On February 3, 2009, Sgt. Meyer, the Squad Sergeant at the 81st Precinct, directly pressured plaintiff to increase his summons activity: "WHY DON'T YOU JUST CONFORM? THEY WANT A BOOK (20 SUMMONSES), SO EVERYONE WRITES 15 (SUMMONSES). YOU COULD GET AWAY WITH 10 OR 12 (SUMMONSES) AND A COLLAR (ARREST)."

62.    Following that incident, on February 20, 2009 plaintiff ADRIAN SCHOOLCRAFT was approached by defendant MASCOL who informed plaintiff that the only way plaintiff improve future performance evaluations, was if plaintiff raised his "ACTIVITY," by writing "MORE SUMMONSES" and being "MORE PROACTIVE."

63.    In response to this ultimatum, plaintiff ADRIAN SCHOOLCRAFT informed defendant MASCOL that he would try to improve his activity but that he would not write illegal summonses or arrest people in the absence of probable cause to believe that a summonsable or arrestable offense had been committed.

**Defendants Attempt To "Strong-Arm" Plaintiff Into Dropping His Appeal**

64.    Thereafter, on February 25, 2009, plaintiff ADRIAN SCHOOLCRAFT was commanded to a meeting with all of the supervisors at the 81st Precinct to discuss the appeal of his evaluation.

65.    The meeting was attended by, amongst others DEPUTY INSPECTOR STEVEN MAURIELLO, SERGEANT WEISS, LIEUTENANT DELAFUENTE, CAPTAIN THEODORE LAUTERBORN, LIEUTENANT RAFAEL MASCOL, LIEUTENANT TIMOTHY CAUGHEY, and SERGEANT RAYMOND STUKES.

66.    During this meeting, the aforementioned supervisors repeatedly attempted to

discourage plaintiff from appealing his performance evaluation and implicitly threatened plaintiff with retaliation if he pursued the issue.

67.     Specifically, in an aggressive, threatening tone, the supervising officers expressed their "concern" that the appeal would be reviewed by DEPUTY CHIEF MICHAEL MARINO and "HE'S GOING TO LOOK AT YOUR EVALUATION, HE MAY PULL UP ALL YOUR ACTIVITY AND THEN HE'S GOING TO SAY YOU WANT TO KNOW WHAT YOUR EVALUATION IS? LOOK AT THE ACTIVITY, WHAT ARE YOU FUCKING KIDDING ME?! KNOWING HIM, HE'S GOING TO TALK A LOT OF SHIT."

68.     In fact, the sole purpose of the meeting was that plaintiff had an insufficient number of summonses and arrests and as such his evaluation was warranted.

69.     The commanding officers at this meeting repeatedly informed plaintiff that he could get a higher evaluation if he would raise his activity, but when plaintiff repeatedly requested an explanation as to the definition of "activity" he was repeatedly informed he needed to write more summonses and arrests.

70.     Specifically, plaintiff was informed in sum and substance "HOW ARE WE GOING TO JUDGE SOMEBODY THAT HAS TEN COLLARS THROUGH THE YEAR AND MAYBE 25 SUMMONSES THROUGH THE YEAR, COMPARED TO SOMEONE WHO'S GOT 4 COLLARS WITH 14 SUMMONSES THROUGH THE YEAR? THERE'S GOT TO BE SOME VARIATION. THE SQUAD SERGEANT MAKES A DETERMINATION WHO IS TOP GUYS ARE, COMPARED TO HIS LOWER GUYS. THAT'S HOW ITS DONE."

71.     Then, in a blatantly transparent act of intimidation, supervisors then referenced police officers who had previously been terminated or transferred as a result of vocalizing objections to their evaluations.

72.     This meeting was an overt attempt to silence plaintiff's appeal because of the supervisor's prior knowledge of the illegality of issuing substandard performance evaluations -- based on an officer's failure to meet a summons quota, which had been firmly established by the Labor Arbitration Tribunal more than three years earlier.

**The NYPD's Quota Policy: Struck Down As Illegal in January 2006**

73.     In fact, the NYPD had previously been found to be in violation of New York State Labor Law Section 215-a, which makes it illegal to issue poor evaluations for an officer's failure to meet the requirement of for an established summons quota.  See In the Matter of P.B.A. and City of New York Case # A-10699-04.

74.     The aforementioned decision was based on Police Officer David Velez's appeal of his 2005 performance evaluation from the 75th precinct, which was based entirely on his failure to meet the minimum summons quota. (Id.)

75.     In that matter, P.O. Velez presented evidence that the then Commanding Officer of the 75th precinct, CHIEF MICHAEL MARINO, a named defendant in the instant matter, issued a directive that officers must meet "a quota of 10 (ten) summons per month" and "that the police officers in squad A-1 received lower marks on their evaluations if the officers did not meet 'this minimum requirement.'" (Id at 9).

76.     Additionally, CHIEF MICHAEL MARINO reduced this directive to writing and distributed it to all of the supervisors in the 75th Precinct.  (Id.)

77.     The aforementioned written directive ordered that supervising officers were required to evaluate officers based on their adherence to the minimum quota of summonses and arrests. Id.

78.     As a result of CHIEF MARINO's directive, Sgt. Lurch issued a memo to all

officers in the 75th precinct "remind[ing] [officers] that a FAILURE TO WRITE THE REQUIRED AMOUNT OF SUMMONSES AND FAILURE TO MAKE THE REQUIRED NUMBER OF ARREST FOR EACH RATING PERIOD WILL RESULT IN SUBSTANDARD PERFORMANCE RATINGS." (Id at 10).

79.     The aforementioned memo was entitled "Squad Activity Expectations," and the word "activity" in that memo was specifically referring to the requisite number of summonses needed to meet the quota, which is unequivocal evidence of the fact that P.O. SCHOOLCRAFT's own low evaluation in the present matter based on his "poor *activity*" directly correlates to a failure to meet an illegal summons/arrest quota.

80.     While defendants denied the existence of any quota, the arbitrator emphatically rejected defendants' claims:

> The Arbitrator finds that C.O. Marino's writing and Sergeant Lurch's memo *could not have been clearer*: "failure to write the required amount of summonses ... will result in substandard performance ratings ..." Further, the asterisk in the goal column makes it clear that [these] "goals" are monthly, quarterly and yearly. The Arbitrator is *completely persuaded* that the "goals" column on this memo meets the definition in Labor Law Section 215-a for "quota" ... [Thus], the New York Police Department violated New York State Labor Law Section 215-a by establishing and maintaining a summons quota ...
> (Id. at 11, 27) (emphasis added).

81.     Notwithstanding this finding, the chief perpetrator of this unlawful policy, MICHAEL MARINO, was subsequently promoted by the NYPD and is now the Deputy Chief of Patrol Borough Brooklyn North, in charge of supervising the entire Borough, which is also where the 81st precinct is located.

82.     Given the existence of the aforementioned related appeal and subsequent decision, it is clear that February 25, 2009 "meeting" was an obvious effort to prevent plaintiff's

appeal, to avoid the repercussions to defendants which could follow if they were found to have violated the previous order, and engaged in this illegal quota practice once again.

83.     Furthermore, this "meeting" was an attempt to prevent plaintiff from exposing the NYPD's pattern and practice of falsifying training logs during roll calls, in which commanding officers would require patrol officers to sign a log indicating that they had received training that day on various police subjects, when in fact, they had received no such training from their supervisors.

**Plaintiff Refuses to Drop His Appeal and Instead Directly Challenges the NYPD's Unlawful Quota Policy**

84.     It is clear that February 25, 2009 "meeting" was an obvious effort to prevent plaintiff's appeal to avoid the repercussions to defendants which could follow.

85.     Notwithstanding their implicit threats and veiled tactics of intimidation, plaintiff informed the group that he would pursue the appeal.

86.     Thereafter, on March 11, 2009, plaintiff's counsel, Brown & Gropper, wrote a letter to defendant MAURIELLO which directly challenged the NYPD's unlawful quota policy and the use of this policy as a basis for plaintiff's performance evaluation. Specifically, in this letter, plaintiff's counsel wrote as follows:

> We are concerned that our client's negative evaluation is based *not* on the factors set forth in Patrol Guide 205-48, but rather on his alleged *lack of "activity" related to his number of arrests and summons issued.* Yet, Patrol Guide 205-48 makes no reference to "activity" levels. Furthermore, we are unaware of any Patrol Guide provision which defines how much "activity" is required to achieve a satisfactory evaluation.

**Plaintiff's Refusal to Drop His Appeal Results in Increased Harassment and Intimidation by His Superior Officers**

87.     As a result of plaintiff's intention to pursue his appeal, plaintiff's supervisors at

the 81st Precinct began to create an increasingly hostile work environment for him.

88.     Specifically, on March 16, 2009, defendant CAUGHEY issued plaintiff a written reprimand for not documenting in his memo book that he had used the bathroom facility on his assigned post.

89.     Defendant CAUGHEY also confiscated plaintiff's memo book and made a photocopy of plaintiff's official notes, which documented defendants' previous misconduct, and more specifically, that of SGT. WEISS.

90.     That same day plaintiff reported the incident to the duty Captain, defendant LAUTERBORN.

91.     Plaintiff requested that defendant LAUTERBORN document this act of retaliation against him in a report.

92.     Defendant LAUTERBORN responded to this request in sum and substance: "WHAT DO YOU WANT TO REPORT? DIDN'T WE TELL YOU WHEN YOU LEFT HERE THAT THERE'S GONNA BE A LOT MORE SUPERVISION? THAT'S WHAT HAPPENS... YOU THINK THAT THIS IS... YOU KNOW... RETALIATION... THIS IS A MATTER OF SUPERVISION."

93.     Defendant LAUTERBORN further warned plaintiff that, after the threat of a transfer, "THE DEVIL YOU KNOW IS MUCH BETTER THAN THE DEVIL YOU DON'T," and that from this point onward, plaintiff better "CROSS YOUR I(S) AND DOT YOUR T(S)."

94.     During this conversation, defendant LAUTERBORN informed plaintiff that he was being carefully monitored because of his "POOR PERFORMANCE" and suggested that it should not be a surprise now if even minor infractions result in disciplinary action, even if they had not previously resulted in such action.

95.     Defendant LAUTERBORN further informed plaintiff that he was being placed on "PERFORMANCE MONITORING" because his "NUMBERS" were not sufficient and that defendant MAURIELLO was a "FANATIC" about ensuring officers have high "ACTIVITY," implicitly threatening to transfer plaintiff should he not increase his "ACTIVITY."

96.     As he had previously informed defendant MASCOL, plaintiff reiterated to defendant LAUTERBORN that he would work to improve his  "ACTIVITY" but refused to issue illegal summonses or make false arrests absent probable cause of a crime or violation, to which defendant LAUTERBORN responded by openly mocking plaintiff:  "YOU WANT TO BE 'MR. COMMUNITY', IS THAT WHAT YOUR DOING?!"

97.     Defendant LAUTERBORN proceeded to provide plaintiff with examples of situations where plaintiff could make arrests or issue summonses to increase his activity despite, the fact that there had been "NO VIOLATION OF LAW."

98.     Specifically, defendant LAUTERBORN instructed plaintiff to approach and detain young adults merely for sitting in front of a high crime building, regardless of probable cause or reasonable suspicion.

99.     Further defendant LAUTERBORN then suggested that were he to hear one of those individuals curse during this interaction, it would then be appropriate to arrest them despite having committed "NO VIOLATION OF LAW," because the police can not appear "SOFT" in these neighborhoods.

**Defendants Attempt to Isolate and Separate Plaintiff from His Fellow Officers**

100.     In a further effort to intimidate plaintiff, in March of 2009 defendants also began to isolate plaintiff ADRIAN SCHOOLCRAFT from his fellow officers by threatening and actually disciplining Police Officer Chan, for simply talking to plaintiff.

101. As a result fellow police officers at the 81st precinct consistently avoided plaintiff out of fear that supervisors would retaliate against them.

**Defendants Escalate Their Intimidation Tactics by Taking Away Plaintiff's Gun and Shield**

102. Thereafter, plaintiff learned from P.O. ZUCKER of the 81st Precinct that defendants were attempting to execute a scenario portraying plaintiff as being psychologically unfit to work, in which plaintiff would be involuntarily committed to a hospital.

103. Specifically, on March 16, 2009, defendant WEISS was overheard stating, in reference to plaintiff: "I'M GOING TO HAVE HIM PSYCHED."

104. In April of 2009, defendants saw an opportunity to pursue this scheme when plaintiff had a legitimate health issue.

105. In furtherance of this plan, plaintiff was required to consult NYPD psychologist Dr. Catherine Lamstein for a psychological evaluation following an unrelated examination by NYPD police surgeon, Joseph Cuffio, M.D., for chest pains he experienced on April 3, 2009.

106. During his examination with Dr. Lamstein, plaintiff disclosed the existence of illegal NYPD policies and practices and other corruption he had observed over the past year.

107. At the conclusion of Dr. Lamstein's examination, and immediately following plaintiff's disclosure of rampant corruption within the 81st Precinct, Dr. Lamstein abruptly excused herself from the room for several minutes and suddenly returned only to inform plaintiff that he was required to immediately surrender his gun and shield.

**Plaintiff's Appeal Is Suddenly Closed Without His Knowledge or Consent**

108. On April 14, 2009, the following day, plaintiff's performance evaluation appeal was "coincidentally" and inexplicably closed, without a hearing or notice of any kind as to the basis of the closure.

109.    It should be noted that while the appeal was closed in fact on April 14, 2009, plaintiff was not made aware of this fact until a much later date.

110.    Despite being denied any information regarding his appeal, plaintiff continued to relentlessly inquire about the appeal process, when and if a hearing would ever be scheduled or held, to which NYPD officials repeatedly refused to disclose any information, and feigned ignorance.

111.    Additionally, plaintiff repeatedly sent letters to the Patrolman's Benevolent Association (hereinafter "PBA") and their lawyers, in furtherance of pressing his appeal, to which they repeatedly informed him that they could not help.

**Defendants Attempt To Further Isolate and Degrade Plaintiff by Assigning Him to the Telephone Switchboard**

112.    Thereafter, throughout the summer of 2009, plaintiff continued to be systematically isolated from the remainder of the precinct in the form of reassignment to telephone switchboard duty.

113.    While there plaintiff was subjected to overt attempts of intimidation and harassment in the form of fellow police officers and supervising officers referring to him as a "ZERO" and/or the "HOUSE MOUSE."

114.    Additionally, throughout his reassignment, plaintiff witnessed further evidence of continued corruption and subornation of perjury on numerous occasions in the form of officers, commanding and subordinate, falsifying information contained in complainant crime reports (UF-61's) and/or failing to issue them altogether in the face of reported crime.

115.    During the same period, despite having his gun and shield removed due to his alleged psychological instability and/or concerns for his and his fellow officers' safety, plaintiff was assigned to voucher loaded weapons and was assigned to handle arrests.

**Plaintiff Reports the Corruption He Has Witnessed To Internal Affairs**

116.    On August 18, 2009, in response to this campaign of retaliation and intimidation, plaintiff's father, Larry Schoolcraft, contacted David Durk, a former NYPD Detective who had assisted Frank Serpico in the 1970s in uncovering corruption within the NYPD to seek his counsel regarding the proper actions to be taken.

117.    Following that conversation, David Durk contacted Brandon Del Pozo at the Internal Affairs Bureau ("IAB") to apprise him of the corruption within the 81st precinct.

118.    Thereafter, on August 20, 2009 plaintiff contacted IAB directly, by filing an Unusual Incident Report (UF-49), alleging that defendant CAUGHEY -- ironically the *Integrity Control Officer* for the 81st precinct -- had unlawfully entered a locked office at the precinct and removed potentially damaging documents from SGT. WEISS' personnel file, all at the behest of SGT. WEISS.

119.    Specifically, in this report, entitled "CORRUPTION INVOLVING THE INTEGRITY CONTROL PROGRAM OF THE 81ST PRECINCT", plaintiff alleged as follows:

> Sergeant Steven Weiss (Assistant Integrity Control Officer, 81st Precinct), assisted by his supervisor, a Lieutenant Timothy Caughey (Integrity Control Officer, 81st Precinct"), did intentionally enter, without permission or authority, a locked office containing sensitive department files, and removed documents pertaining to Civilian Complaints that were inside Sgt. Weiss's Department Personnel Folder ... [These] documents were a potential obstacle with regards to Sgt. Weiss' future Evaluation and Promotion to New York City Police Lieutenant. Sgt. Weiss has since been promoted to New York City Police Lieutenant and is no longer assigned to the 81st Precinct...It would appear [that] Sgt. Weiss has benefitted greatly from his action(s).

120.    This complaint was sent directly to Chief Charles V. Campisi, Chief of the Internal Affairs Bureau, via certified mail on August 20, 2009.

**Plaintiff's Superiors Become Aware of Plaintiff's Complaints to Internal Affairs**

121.    Almost immediately after informing IAB of these illegal practices and widespread corruption at the 81st Precinct, IAB detectives repeatedly left messages for plaintiff at the 81st Precinct, despite the explicit duty of IAB to keep such complaints confidential, effectively and implicitly alerting plaintiff's superiors that he was now actively working with IAB on investigations, criminal in nature, concerning the 81st Precinct.

122.    On September 2, 2009, plaintiff sent a written request to defendant STEVEN MAURIELLO requesting in writing that the appeal of his evaluation be sent directly to the Patrol Borough Brooklyn North immediately.

123.    Not only did defendant STEVEN MAURIELLO fail to issue any response to this request, but he had never even previously sent the appeal -- as he was *mandated* to -- nor did he ever inform plaintiff that his appeal had been closed in April, despite plaintiff's repeated inquiries.

**Plaintiff Reveals Rampant Illegal Conduct At the 81st Precinct to the Quality Assurance Division of the NYPD**

124.    Thereafter, on October 7, 2009, during the course of a three hour meeting with the Quality Assurance Division ("QAD"), plaintiff described in detail repeated instances of police misconduct he had witnessed in the 81st Precinct, including but not limited to, commanding and supervising officers' manipulation of crime statistics and enforcement of illegal quota policies.

125.    On October 14, 2009, one week following the aforesaid meeting with QAD, plaintiff was officially placed on performance monitoring by the employee management division of the NYPD.

126.    On October 19, 2009, in an increasingly desperate attempt to suppress plaintiff's disclosure of the corruption and deceptive practices plaguing the 81st Precinct,   defendant

CAUGHEY issued a precinct-wide personnel memo to all personnel of the 81st Precinct ordering any and all calls from IAB be first directed to his office, regardless of the specific officer IAB was attempting to contact.

127.  On October 21, 2009, plaintiff was interviewed by telephone by members of the "Group I" Internal Affairs Bureau regarding his allegations of misconduct against defendants CAUGHEY and WEISS.

128.  On October 21, 2009, with deliberate indifference to plaintiff's safety and welfare, IAB attempted to contact plaintiff to discuss the substance of the UF-49 he had filed against defendant CAUGHEY on August 20, 2009, a call which was routed first to defendant CAUGHEY who was also the subject of the complaint.

**Plaintiff Continues to Pursue His Appeal But To No Avail**

129.  Thereafter on October 28, 2009, still unaware that his appeal had been closed, plaintiff contacted SGT DEVINO to arrange a meeting regarding the status of his appeal.

130.  At this meeting SGT DEVINO informed plaintiff that she was ignorant to the status of plaintiff's appeal and feigned sentiments of surprise and disbelief that the process was still ongoing.

131.  Thereafter, plaintiff's father, Larry Schoolcraft, contacted Mayor Bloomberg's office to report the repeated and continuing instances of corruption within the 81st Precinct, to which plaintiff had bore witness, and to inquire as to the reason plaintiff was being deprived the right to appeal his performance evaluation.

**On October 31, 2009 Plaintiff is Menaced at Work by Lt. Caughey, Whom Plaintiff Had Previously Reported to Internal Affairs**

132.  Thereafter, on October 31, 2009, upon commencement of his tour of duty, defendant CAUGHEY confronted plaintiff and immediately ordered plaintiff to surrender his

memo book.

133.    Upon confiscation of his memobook, defendant CAUGHEY proceeded to lock himself in a room for three hours in order to make copies of plaintiff's notes contained therein, which at this point now included specific instances of the corruption and illegal activity plaintiff had documented in preparation for his report to Commissioner Kelly.

134.    Following defendant CAUGHEY's confiscation of plaintiff's memobook, defendant CAUGHEY began to exhibit menacing and threatening behavior towards plaintiff.

135.    Specifically, defendant CAUGHEY with one hand near his gun, made continuous menacing gestures directed at plaintiff in an apparent response to the evidence of corruption contained within plaintiff's memobook implicating defendants.

**Plaintiff Leaves Work One Hour Early After Receiving Permission To Do So From Sgt. Huffman**

136.    Thereafter, at approximately 2:30 p.m. on October 31, 2008, Plaintiff was advised by civilian employee P.A.A. Boston, who had become aware of defendant CAUGHEY's increasingly threatening behavior, that plaintiff's safety may be in jeopardy.

137.    As a result of this admonishment and plaintiff's independent observations, plaintiff's fear consequently manifested itself in feelings of sickness, at which time plaintiff elected to go home rather than subject himself to potential physical harm from defendant CAUGHEY.

138.    At approximately 2:45 p.m. on October 31, 2009, less than one hour before his tour was scheduled to end, plaintiff sought permission to take sick leave, which he submitted to SERGEANT RASHEENA HUFFMAN.

139.    In response to plaintiff's request, SERGEANT HUFFMAN approved plaintiff's release, but following plaintiff's departure. HUFFMAN subsequently and without reason

rescinded her approval via voicemail to plaintiff's cell phone, ordering him back to the precinct immediately.

140. Immediately upon plaintiff's arrival at his home, plaintiff contacted IAB to report defendant CAUGHEY's threatening behavior.

141. Thereafter, plaintiff, fearful of the impending retaliatory acts to follow, contacted his father, Larry Schoolcraft, to report and document what had just transpired, after which plaintiff attempted to sleep in an effort to alleviate his feelings of illness.

142. While asleep, plaintiff received a voicemail message on his phone from Dr. Lamstein -- who had last seen plaintiff on October 27, 2009, and who knew first-hand that plaintiff had no psychiatric disorders whatsoever -- who was clearly bewildered as to why defendants required plaintiff to return to command, despite her repeated advisements to plaintiff's supervisors that in her medical and professional opinion, plaintiff posed no threat to himself or others. Dr. Lamstein nevertheless admonished plaintiff, presumably at defendants' direction, that if he did not return immediately, this would "[BLOW] UP TO A MUCH BIGGER MESS THAN [PLAINTIFF] WOULD WANT."

**The NYPD Threatens a "City-Wide Search" For Plaintiff If He Does Not Return To Work**

143. Additionally, on about or in between the aforesaid correspondence, defendant LAUTERBORN contacted Larry Schoolcraft inquiring as to plaintiff's whereabouts.

144. In response, at approximately 7:40 p.m. on October 31, 2009, Larry Schoolcraft returned the call and explained to defendant LAUTERBORN that he had communicated with his son who had informed him that he was at home, feeling sick and wanted to rest, to which defendant LAUTERBORN responded in sum and substance "[SHOULD PLAINTIFF NOT RETURN TO COMMAND], THIS IS GOING TO GET TO BE A LARGE SCALE

EVENT…WHEN THE BELLS AND WHISTLES GO OFF ITS GOING TO BE A CITY WIDE

SEARCH FOR ADRIAN SCHOOLCRAFT."

145.    Following that statement, Larry Schoolcraft inquired as to the urgency of Adrian's

return to the command that same day, to which defendant LAUTERBORN gave no legitimate

explanation and instead, in an increasingly threatening manner, advised plaintiff's father that

things were going to escalate should plaintiff not return immediately.

**Defendants Unlawfully Enter Plaintiff's Home and Illegally Seize Him in Order to Prevent
Him From Disclosing to the Public His Findings of Corruption**

146.    Thereafter, on October 31, 2009 at approximately 9:38 p.m., plaintiff, who was

lawfully present inside of his home located at 8260 88th Place, Apt. 2L, Glendale, NY 11385,

was confronted with approximately ten (10) armed high ranking police officers, including but not

limited to, CHIEF MICHAEL MARINO, PAUL BROWN, and STEVEN MAURIELLO, who

unlawfully entered his home without a warrant, permission, or other legally permissible reason to

do so.

147.    In addition, at least two members of the Emergency Services Unit – dressed in

full riot gear with helmets and tasers – also illegally entered plaintiff's apartment.

148.    Upon defendants' unlawful entry into plaintiff's home, the aforementioned

defendants ordered plaintiff to get dressed and commanded him to return to the 81st Precinct

without any legitimate or lawful explanation.

149.    In a remarkable display of calmness under the circumstances, plaintiff repeatedly

and composedly requested the reasons why defendants were unlawfully in his home

commanding him back to work against his will, to which defendants pretextually responded that

they were "worried" and "concerned" for plaintiff's safety and wellbeing despite plaintiff's

repeated assurances that he was merely feeling sick and not in any way a danger to himself or

others and despite the fact that plaintiff's own NYPD appointed psychologist had previously informed defendants that same day that any such fears were medically unfounded.

150.    Immediately thereafter, plaintiff was informed that he was under suspension for leaving work early that day.

151.    Further, plaintiff expressly acknowledged that were there work related consequences for his departure, defendants should simply follow the normal protocol and file the proper paperwork to which plaintiff would respond accordingly.

**Defendants Threaten To Treat Plaintiff as an "Emotionally Disturbed Person" If He Does Not Leave His Apartment "Voluntarily"**

152.    Despite plaintiff's overwhelmingly reasonable response, which was in total and utter compliance with NYPD protocol and practice, defendants responded with a continued refusal to leave plaintiff's home, subsequently ordering him while armed, to the hospital illegally and against his will, to which plaintiff responded by repeatedly asserting his rights under New York law to refuse unwanted medical treatment.

153.    In retaliation to plaintiff's assertion of his rights, and with the knowledge that plaintiff potentially possessed evidence of defendants' criminal activity and corruption, defendant MICHAEL MARINO responded with the following ultimatum: "YOU HAVE A CHOICE. YOU GET UP LIKE A MAN AND PUT YOUR SHOES ON AND WALK INTO THAT BUS [ambulance], OR THEY'RE GOING TO TREAT YOU AS AN E.D.P. [emotionally disturbed person] AND THAT MEANS HANDCUFFS."

154.    Immediately thereafter, a series of verbal exchanges occurred between plaintiff and defendant CHIEF MARINO, in which plaintiff calmly and repeatedly expressed to defendants that he was refusing any more medical attention and refused to be involuntarily removed from his home.

155.    Aware that his attempts to threaten and coerce plaintiff into complicity with defendants' unlawful scheme to otherwise silence plaintiff were futile, defendant CHIEF MICHAEL MARINO impatiently stated in sum and substance: "ALL RIGHT, JUST TAKE HIM, I CAN'T FUCKING STAND HIM ANYMORE" and commanded that the police officers present at the location to forcibly take plaintiff into custody.

156.    At all relevant times on October 31, 2009, defendant CHIEF GERALD NELSON was aware of defendant MARINO's actions and in fact, expressly authorized defendant MARINO to unlawfully enter plaintiff's residence, remove plaintiff against his will, and involuntarily confine plaintiff in a psychiatric ward.

**Plaintiff Is Violently Attacked and Forcibly Removed From His Own Home against His Will**

157.    Immediately thereafter, several defendant police officers, including defendants LT. JOSEPH GOFF, SGT. KURT DUNCAN, and LT. CHRISTOPHER BROSCHART, pulled plaintiff out of his bed, physically assaulted him, tore his clothes as they threw him to the floor, illegally strip-searched him and violently handcuffed him with his arms behind his back, causing excruciating pain to his wrists, shoulders, arms, neck and back.

158.    With plaintiff bound on the floor, alluding to the option plaintiff had been given of ignoring corruption and illegality, defendant CHIEF MARINO walked over to him and with his boot on plaintiff's face, stated: "IT DIDN'T HAVE TO BE LIKE THIS."

159.    Defendant CHIEF MARINO then sat on plaintiff's bed as his officers, following his commands, illegally searched plaintiff's body and recovered a digital recorder that plaintiff was holding.  Afraid of what plaintiff might have recorded during this incident, defendant CHIEF MARINO illegally seized the recorder himself, stating contemptuously that plaintiff was "BEING CUTE" by trying to record the incident.

160.    Additionally, NYPD spokesperson Paul Brown was present outside of plaintiff's apartment during the aforementioned illegal home invasion on October 31, 2009, for the sole purpose of providing to any potential members of the media who might be present during this abduction a false and misleading account of the facts and circumstances surrounding plaintiff's involuntary confinement.

**Defendants Conduct an Illegal Search of Plaintiff's Apartment, Seizing Evidence of Misconduct by the NYPD**

161.    Thereafter, defendants illegally searched plaintiff's home and illegally seized substantial evidence of corruption within the 81st Precinct which plaintiff had gathered detailing the enforcement of illegal quotas and the perjurious manipulation of police reports, as well as plaintiff's notes regarding his complaints against the 81st precinct.

162.    Specifically, defendants illegally seized a draft of his Report to the Police Commissioner, Raymond Kelly, entitled "A Patrolman's Report to the Commissioner," and details of his collaboration with retired New York City Police Detective/Lieutenant David Durk. as well as the aforementioned digital tape recorder.

163.    In fact, plaintiff's landlord specifically observed defendants leave plaintiff's apartment carrying multiple manila folders in their hands.

164.    Following defendants' illegal entry, search and seizure of plaintiff's home, person and effects, plaintiff was then placed in restraints and carried from his home against his will in full view of friends and neighbors by multiple armed members of the New York City Police Department.

**Defendants Make Blatantly False and Misleading Statements to the Hospital, Resulting in Plaintiff's Confinement in the Psychiatric Ward**

165.    Thereafter, defendants involuntarily transported plaintiff to the Jamaica Hospital

psychiatric ward, in an intentional and premeditated fashion and convinced doctors to have plaintiff involuntarily admitted as an emotionally disturbed person.

166. Specifically defendants falsely claimed that plaintiff "LEFT WORK EARLY AFTER GETTING AGITATED AND CURSING HIS SUPERVISOR" and that the police "FOLLOWED HIM HOME AND HE HAD BARRICADED HIMSELF, AND THE DOOR HAD TO BE BROKEN TO GET TO HIM."

167. It should be noted that the aforementioned false and perjured statements were emphatically proven false by plaintiff's landlord, who provided information that plaintiff's door was never forcibly entered, but in fact the landlord had provided keys to defendant MARINO in response to the false pretense provided by defendants that plaintiff was "suicidal."

168. Further, defendants also falsely claimed that plaintiff "INITIALLY AGREED TO GO WITH THEM FOR EVALUATION, BUT ONCE OUTSIDE, HE *RAN* AND HAD TO BE *CHASED*."

169. These statements were also proven to be demonstrably false by EMT records, which clearly and flatly refute defendants' claims that plaintiff "ran" away and "had to be chased".

170. At no point on October 31, 2009 did plaintiff exhibit or engage in any of the behavior that defendants' falsely alleged in order to secure plaintiff's involuntary confinement.

**Plaintiff Is Handcuffed and Restrained in the Emergency Room, Where He is Denied Fundamental Rights and Treated as a Criminal**

171. After his arrival to Jamaica Hospital, plaintiff was handcuffed to a gurney for more than nine hours, during which time he was denied use of phone, water, food or bathroom facilities.

172. When plaintiff was finally allowed to make a phone call at approximately 6:00

a.m., one of the NYPD members watching over him, SGT. FREDERICK SAWYER, said out loud: "HEY, I THOUGHT PERPS WEREN'T ALLOWED TO USE THE PHONE." Thereafter, SGT. SAWYER forcibly disconnected the phone and hung it up, thereby instantly terminating plaintiff's phone call.

173.   SGT. SAWYER then said "OKAY, NOW!", at which point SGT. SAWYER, assisted by five other members of the New York City Police department – including SGT. SHANTEL JAMES, P.O. RAYMOND MILLER and P.O. ARTUR SADOWSKI, and two armed police officers – forcibly grabbed plaintiff's hair, head and body, and threw him back on top of the gurney which he had been standing next to when making the phone call. SGT. SAWYER then placed a second handcuff on plaintiff's left hand so tightly that it caused excruciating pain, and caused his hand to turn blue.

**Plaintiff Spends Three Full Days In The Emergency Room of the Psychiatric Ward**

174.   From October 31, 2009 through November 2, 2009, plaintiff was involuntarily confined in the emergency room of the psychiatric ward of Jamaica Hospital.

175.   While there plaintiff was kept involuntarily confined with other psychiatric patients in a room that had no windows and was secured by double locked sequential doors, with a security guard present at all times standing outside.

176.   During this time, plaintiff was forced to relinquish all of his clothing and personal possessions.  The only clothing plaintiff was given was a hospital gown.  He was not even allowed to wear underwear.

177.   Further, during the first three days in the hospital, plaintiff was not even given a bed to sleep in.  Rather, he was forced to sleep every night on a gurney located in the hallway of the emergency room of the psychiatric ward.  As a result, there were always lights on and

plaintiff had no privacy whatsoever.

178.    Most importantly, during this time, plaintiff was denied access to the outside world. Plaintiff repeatedly requested an opportunity to speak with internal affairs, and to have photographs taken of his multiple bruises, but these requests were steadfastly ignored by doctors and hospital staff.

179.    After three days, plaintiff was formally admitted into the psychiatric ward at JHMC, where he spent the remainder of his confinement.

180.    During this time, plaintiff was forced to cohabit with individuals who had severe psychiatric disorders and engaged in bizarre and unsettling behavior.

181.    For example, one patient routinely combed his hair with feces, while another patient continuously walked around the unit wearing bloody bandages on his wrists and neck.

182.    Additionally, another patient tried repeatedly and persistently to induce herself to vomit, which she succeeded in doing right near plaintiff. Still other patients in the unit would routinely scream and yell until they were forcibly sedated.

183.    There were no clocks in the unit, nor were there any mirrors.   Plaintiff ADRIAN SCHOOLCRAFT was completely cut off from the outside world, and there was nothing he could do it about it.

**Plaintiff's Involuntary Confinement Continues for Six Full Days, in Clear Violation of New York Law**

184.    For six full days, plaintiff ADRIAN SCHOOLCRAFT was confined against his will in the psychiatric ward of Jamaica Hospital.

185.    This confinement was unlawful, illegal and in clear violation of both New York law and the Constitution of the United States.

186.    There was no medical basis whatsoever for detaining plaintiff ADRIAN

SCHOOLCRAFT in a psychiatric ward, much less for six days.

187.    To the contrary, hospital records make clear that plaintiff ADRIAN
SCHOOLCRAFT was at all times, lucid, rational and fully coherent and exhibited no signs
whatsoever of presenting a danger to himself or to others.  In fact as defendant ISAKOF himself
noted:

> During the observation in the unit without taking any medications,
> patient was appropriate in interaction, calm and not agitated.  He
> denied suicidal or homicidal ideations.  He was not experiencing
> any paranoid ideations, but was concerned about issues in the
> precinct.  After observation for a few days on the unit, *there were*
> *no significant psychiatric symptoms* to treat with medications.

188.    In fact, from the *very outset*, when plaintiff was first examined at JHMC, it was
manifestly clear that plaintiff was *not* in need of any psychiatric treatment, much less involuntary
confinement in a psychiatric ward. As the hospital itself noted about plaintiff:

> He is coherent, relevant with goal directed speech and good eye
> contact.   He is irritable with appropriate affect.   He denies
> hallucination ... He denies suicidal ideation, homicidal ideation at
> the present time.  His memory and concentration is intact.  He is
> alert and oriented ....

189.    Plaintiff's clear mental state was so obvious that one of the doctors who initially
examined plaintiff stated out loud that it was "ridiculous" that he was even brought to the
hospital, and assured plaintiff that he would be going home shortly.

190.    Notwithstanding this fact, and despite the objective medical evidence
documenting that plaintiff did not meet the psychological criteria of an emotionally disturbed
patient requiring confinement, plaintiff remained unlawfully and involuntarily detained without
any justification for six (6) days.

191.    Additionally, plaintiff was denied the right to vote on November 3, 2009, despite
repeated requests to do so, a fact that is even documented in the medical records of JHMC.

192.    On November 5, 2009, plaintiff was suddenly deemed safe, despite no change in plaintiff's prior behavior, and released from Jamaica Hospital.

193.    In detaining plaintiff ADRIAN SCHOOLCRAFT for six full days against his will, defendant JHMC violated the express provisions of Mental Hygiene Law § 9.39(a).  This statute provides, <u>inter alia</u>, that a patient may *not* be detained against his will unless there is either 1) a "substantial risk of physical harm to himself as manifested by threats or attempts at suicide or other conduct demonstrating that he is dangerous to himself" or 2) "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."

194.    Additionally, defendant ALDANA-BERNIER violated the express provisions of Mental Hygiene Law § 9.39(a) she failed to perform the necessary tests and examinations in order to determine that plaintiff was either 1) a "substantial risk of physical harm to himself as manifested by threats or attempts at suicide or other conduct demonstrating that he is dangerous to himself" or 2) "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."

195.    Further, defendant ALDANA-BERNIER falsified hospital reports in order to secure plaintiffs continued confinement in the psychiatric ward when she noted "PATIENT IS A DANGER TO HIMSELF," without performing any medical test to substantiate this.

196.    As defendant JHMC's own records make clear, neither of these criteria was even remotely satisfied.    Accordingly, defendant's continued detention of plaintiff ADRIAN SCHOOLCRAFT was a gross violation of legal, medical and ethical standards, and as such, was a clear departure from good and accepted medical practices.

197.    Finally, as a final insult, following his release from JHMC, plaintiff actually

received a bill in the amount of $7,185.00 for his *involuntary* confinement, for which JHMC actually collected money.

**The NYPD's Crucial Role In Ensuring Plaintiff's Continued Detention At Jamaica Hospital**

198.    Upon information and belief, all of the aforementioned acts up to and including plaintiff's involuntary confinement were part of a deliberate, concentrated and premeditated effort to silence plaintiff and intimidate any other members of the NYPD who sought to disclose the plague of corruption and illegalities within the department.

199.    In furtherance of this objective, the NYPD defendants entered plaintiff's home on October 31, 2009 and illegally seized plaintiff and evidence of NYPD corruption and misconduct plaintiff had previously gathered.

200.    In furtherance of this objective, the NYPD defendants conspired to, and did intentionally falsify evidence and submitted it to JHMC staff for the sole purpose of having plaintiff committed to its psychiatric ward in an effort to silence, intimidate, threaten or otherwise deem plaintiff incredible should the evidence of corruption and misconduct within plaintiff's possession ever surface.

201.    In furtherance of this objective, the NYPD defendants maintained contact with JHMC for the six (6) days to ensure that plaintiff ADRIAN SCHOOLCRAFT remained at the hospital, and did so for the sole purpose of ensuring that JHMC continued to detain plaintiff.

202.    In fact, when questioned by plaintiff about his release date, defendant ISAKOV responded that he "WANTED TO HEAR FROM THE [POLICE] DEPARTMENT FIRST" before he could answer that question and tell plaintiff when he would be released.

203.    In allowing the NYPD to dictate the medical policy at JHMC, and in utterly disregarding the legal requirements of Mental Hygiene law § 9.39(a) by ignoring objective

medical evidence that plaintiff was *not* a danger to himself or others, defendant JHMC departed from good and accepted medical practice by unlawfully and involuntarily confining plaintiff for six days.

204.    Additionally, defendant JHMC, in furtherance of its agreement and conspiracy with NYPD officials, explicitly and/or tacitly formed an agreement to involuntarily confine plaintiff despite objective medical evidence mandating his release, as a "favor" to defendant officers in furtherance of their scheme to ultimately silence plaintiff and/or otherwise impeach his credibility.

**Defendants' Egregious Conduct Forces Plaintiff To Move Upstate, Yet Defendants' Campaign of Harassment And Intimidation Continues**

205.    As a result of the forgoing, the NYPD defendants, through a campaign of harassment and intimidation, forced plaintiff to move to upstate New York, approximately three hundred fifty (350) miles away from New York City.

206.    Notwithstanding this move, between December 2009 and continuing on through the present, armed NYPD officials continued their relentless efforts to silence, harass and/or otherwise harm plaintiff and his father in the form of making over a dozen appearances at his home in upstate New York.

207.    During these "visits", the NYPD has dispatched teams of armed detectives and other armed members of the New York City Police Department to harass and intimidate plaintiff by pounding and kicking on his door and shouting "NYPD. WE KNOW YOU'RE IN THERE, OPEN UP!!!"

208.    In one instance, on December 9, 2009, an armed NYPD Sergeant drove three hundred fifty (350) miles outside of NYPD jurisdiction – on taxpayer's money – merely to "spy" on plaintiff through his bedroom window.

209.    In response to this blatant and endless attempt to continuously harass and intimidate plaintiff, plaintiff moved his bed out of said bedroom in order to prevent imminent physical and emotional harm upon his person.

210.    Notwithstanding this action, armed NYPD officials continue, up and through the present, to come to his home, repeatedly pound on his door, photograph him, and engage in efforts designed to purposefully intimidate and harass plaintiff in a tireless effort to silence him once and for all.

**Defendants' Pattern of Misconduct and Unlawful Behavior, and the NYPD's Deliberate Indifference to Disciplining Supervising Officers.**

211.    The incidents set forth above were not isolated events, but rather, were part of an ongoing pattern of illegal and unlawful conduct on the part of the defendants herein.

212.    In fact, many of the NYPD defendants named in this action have been the subject of internal affairs investigations and/or departmental hearings concerning allegations of misconduct, as set forth below.

**Defendant Marino's Prior Misconduct**

213.    For example, in October 2007, more than a year prior to the incidents alleged herein, defendant CHIEF MICHAEL MARINO was the subject of a high-profile investigation involving the illegal distribution of anabolic steroids and human growth hormone at a Brooklyn pharmacy.

214.    Specifically, defendant CHIEF MICHAEL MARINO was implicated in this scandal when investigators raided Lowen's pharmacy in Bay Ridge, Brooklyn, seizing an estimated $7 million worth of steroids and human growth hormone.

215.    As a result of this raid, investigators found steroid prescriptions for Marino, as well as six other members of the NYPD.

216.    Despite his denial of the use and/or distribution of illegal and illicit contraband, defendant CHIEF MICHAEL MARINO had previously acknowledged publicly of having miraculously "bulked up from 152 pounds to 190", resulting in "eighteen inch arms" and an ability to "bench press 350 pounds".

217.    Further, on September 25, 2009 – just one month prior to the events described herein – defendant MARINO faced an internal NYPD trial arising from his illegal use of steroids, in which it was alleged that defendant CHIEF MARINO violated the NYPD's drug policy by using testosterone for bodybuilding purposes.

218.    Despite these allegations and NYPD's ongoing investigation, absolutely none of defendant MARINO's authority or duty was modified in any way.

**Defendant Nelson's Prior Misconduct**

219.    Defendant CHIEF GERALD NELSON has also been the subject of at least two NYPD internal investigations for grossly improper and unprofessional conduct.

220.    The first incident took place on February 25, 2005, when defendant Nelson, then chief of the School Safety Division, addressed 850 School Safety Agents from Queens.

221.    During this address, defendant CHIEF GERALD NELSON referred to students' mothers as "bitches" who should be knocked down, handcuffed and arrested when they interfere with an agent's work.

222.    Specifically, CHIEF GERALD NELSON instructed the agents as follows: "THESE MOTHERS, WHO ARE REAL BITCHES, NEED TO BE BODY SLAMMED DOWN TO THE GROUND, CUFFED AND ARRESTED."

223.    As a result, defendant CHIEF GERALD NELSON was allegedly *reprimanded* by NYPD Commissioner Raymond Kelly for these grossly improper remarks, however, defendant

CHIEF GERALD NELSON was never actually given any meaningful punishment by the NYPD.

224.    To the contrary, on December 23, 2006 – less than two years after the subject incident – defendant CHIEF GERALD NELSON was astonishingly promoted to Borough Commander of Brooklyn North, notwithstanding the incident which took place on February 25, 2005.

225.    Additionally, in June 2008, defendant CHIEF GERALD NELSON, once again engaged in grossly improper conduct resulting in another internal affairs investigation.

226.    Specifically, on June 10, 2008, P.O. Shelron Smikle made a report to the Internal Affairs Bureau that a Sergeant at the 83rd precinct had called him a "NIGGER."

227.    Thereafter, IAB "leaked" this complaint to defendant CHIEF GERALD NELSON – just as it had "leaked" plaintiff's IAB complaint to his supervisors at the 81st Precinct – leading defendant Nelson to order P.O. Smikle and his partner, P.O. Blanch O'Neal, to appear at his office.

228.    The aforesaid meeting occurred on June 12, 2008 wherein defendant CHIEF GERALD NELSON berated both officers for having filed the complaint, stating: "WE HAVE FRIENDS ON THE IAB AND YOU'RE FULL OF SHIT!"

229.    Defendant Nelson then continued his tirade, screaming: "SO WHAT IF HE CALLED YOU A NIGGER? IF YOU CAN'T HANDLE IT, RESIGN!"

230.    Thereafter, defendant CHIEF GERALD NELSON referred to P.O. Smikle as a "DOLLAR VAN DRIVER", and told him to "GO BACK TO YOUR COUNTRY," and instructed him to "GET THE FUCK OUT OF MY OFFICE!"

231.    Subsequently, in retaliation to any officers who made their complaints public, defendant CHIEF GERALD NELSON threatened: "IF I SEE THIS IN THE PAPER, I WILL

DISCIPLINE THEM AGAIN. I DON'T NEED THIS IN MY CAREER."

232.    Despite these allegations and NYPD's ongoing investigation, absolutely none of defendant NELSON's authority or duty was modified in any way.

**Defendant Mauriello's Misconduct**

233.    Defendant MAURIELLO has also been the subject of an internal affairs investigation.

234.    As a direct result of plaintiff ADRIAN SCHOOLCRAFT'S allegations, IAB is investigating defendant MAURIELLO's manipulation of crime statistics.

235.    Specifically, defendant MAURIELLO routinely fabricated crime reports resulting in violent felonies being downgraded to petty misdemeanors, creating the appearance that the 81st Precinct's crime rate was much lower statistically than in reality.

236.    Further, defendant MAURIELLO also commanded officers to increase their "activity" and meet their quotas, instructing them on how to take people into custody illegally and without probable cause.

237.    Additionally, as evidence of these directives, Sgt. Raymond Stukes and Officer Hector Tirado of the 81st Precinct were recently indicted for their perjurious testimony regarding an incident where they had falsely alleged that they had bore witness to an individual (an undercover IAB agent) attempt to sell bootleg cigarettes to two people, when in fact it had never occurred.

238.    Notwithstanding the fact that plaintiff's aforementioned allegations against defendant MAURIELLO were confirmed by the internal affairs investigation, absolutely none of defendant MAURIELLO's authority or duty was modified in any way.

239.    As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT sustained, *inter*

*alia*, bodily injuries, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of his constitutional rights.

240.    As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was caused to suffer physical injuries to his head, neck, back and arms, was involuntarily confined to hospital treatment and was forced to incur substantial expenses.

### FIRST CLAIM FOR RELIEF
### DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983

241.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "240" with the same force and effect as if fully set forth herein.

242.    All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

243.    All of the aforementioned acts deprived plaintiff ADRIAN SCHOOLCRAFT of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

244.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

245.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all

under the supervision of ranking officers of said department.

246.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

247.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "246" with the same force and effect as if fully set forth herein.

248.    As a result of the aforesaid conduct by defendants, plaintiff was subjected to illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

249.    As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, he was put in fear for his safety, and he was humiliated and subjected to handcuffing and other physical restraints, without probable cause.

## THREE CLAIM FOR RELIEF
## MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C. § 1983

250.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "249" with the same force and effect as if fully set forth herein.

251.    Defendants issued legal process to place plaintiff ADRIAN SCHOOLCRAFT under arrest.

252.    Defendants arrested plaintiff in order to obtain collateral objectives outside the legitimate ends of the legal process.

253.    Defendants arrested plaintiff in order to obtain the collateral objective of

preventing plaintiff from appealing his performance evaluation.

254.    Defendants arrested plaintiff in order to obtain the collateral objective of preventing plaintiff from disclosing the aforementioned evidence of NYPD misconduct and corruption plaintiff had been collecting and documenting.

255.    Defendants acted with intent to do harm to plaintiff ADRIAN SCHOOLCRAFT, without excuse or justification.

256.    As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, he was put in fear for his safety, and he was humiliated and subjected to handcuffing and other physical restraints, without probable cause.

## FOURTH CLAIM FOR RELIEF
## EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

257.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "256" with the same force and effect as if fully set forth herein.

258.    The level of force employed by defendants was objectively unreasonable and in violation of the constitutional rights of the plaintiff.

259.    As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT sustained, *inter alia*, bodily injuries, mental anguish, shock, fright, apprehension, embarrassment, and humiliation, and deprivation of his constitutional rights.

## FIFTH CLAIM FOR RELIEF
## FAILURE TO INTERCEDE UNDER 42 U.S.C. § 1983

260.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "259" with the same force and effect as if fully set forth herein.

261.    The defendants had an affirmative duty to intercede when plaintiff's constitutional rights were being violated in defendants' presence by the use of excessive force.

262.    Defendants further violated plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

263.    The defendants had an affirmative duty to intercede when plaintiff's constitutional rights were being violated in defendants' presence by falsifying evidence of probable cause to arrest plaintiff.

264.    As a result of the defendants' failure to intercede when plaintiff's constitutional rights were being violated in defendants' presence, plaintiff sustained, *inter alia*, physical and emotional injuries.

## SIXTH CLAIM FOR RELIEF
## UNLAWFUL SEARCH AND ENTRY UNDER 42 U.S.C. § 1983

265.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "264" with the same force and effect as if fully set forth herein.

266.    As a result of the aforesaid conduct by defendants, plaintiff's home and possessions were illegally and improperly entered without consent, a valid warrant, probable cause, privilege or consent, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

267.    As a result of the aforesaid conduct by the defendants, plaintiff's home was entered illegally at a time not prescribed in the warrant, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

268.     As a result of the aforesaid conduct by the defendants, plaintiff ADRIAN

SCHOOLCRAFT was not provided a copy of said warrant upon his request, in violation of his

constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the

Constitution of the United States.

269.     As a result of the aforesaid conduct by defendants, plaintiff's home and

possessions were illegally and improperly searched without any warrant, probable cause,

privilege or consent, in violation of his constitutional rights as set forth in the Fourth, Fifth and

Fourteenth Amendments to the Constitution of the United States.

**SEVENTH CLAIM FOR RELIEF**
**INVOLUNTARY CONFINEMENT UNDER 42 U.S.C. § 1983**

270.     Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs numbered "1" through "269" with the same force and effect as if fully set forth

herein.

271.     Despite plaintiff's numerous statements to Jamaica Hospital Center physicians

and staff that he was refusing medical treatment and plaintiff's numerous requests to be released

from the Jamaica Hospital Center, plaintiff remained unlawfully detained and involuntarily

confined to hospital treatment without any justification for six (6) days.

272.     Defendant JHMC, through its agents and employees, unlawfully and involuntarily

confined plaintiff to JHMC for six (6) days without plaintiff's permission, consent or any lawful

basis for doing so, in violation of his constitutional rights as set forth in the Fourth, Fifth and

Fourteenth Amendments to the Constitution of the United States.

273.     Further, defendants JHMC, ISAKOV and ALDANA-BERNIER violated

plaintiffs rights under the New York State Mental Hygiene law § 9.39(a) when they failed to

perform the proper and necessary tests to determine that plaintiff was either 1) a "substantial risk

of physical harm to himself as manifested by threats or attempts at suicide or other conduct demonstrating that he is dangerous to himself" or 2) "a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."

274. As a result of the aforesaid conduct by defendants, plaintiff was unlawfully detained and involuntarily confined to hospital treatment without any justification, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

275. As a result of the aforesaid conduct by the defendants, plaintiff was deprived of his substantive and procedural due process rights, as set forth in the Fifth and Fourteenth Amendments to the Constitution of the United States.

276. As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was involuntarily confined to hospital treatment and was forced to incur substantial expenses.

## EIGHTH CLAIM FOR RELIEF
## CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS UNDER 42 U.S.C. § 1983

277. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "276" as if the same were more fully set forth at length herein

278. Defendants conspired and acted in concert to do whatever was necessary, lawful or not, to cause the arrest, imprisonment, and involuntary confinement of plaintiff ADRIAN SCHOOLCRAFT.

279. Throughout the period of the conspiracy, the defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for

plaintiff's rights under the Constitution and laws of the United States, without probable or reasonable cause to believe plaintiff committed any crime or any other lawful basis for doing so.

280. Pursuant to the conspiracy, the conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of plaintiff ADRIAN SCHOOLCRAFT: (a) manufactured false evidence; (b) unlawfully entered plaintiff's home; (c) illegally seized plaintiff's property; (d) verbally and physically threatened plaintiff in an attempt to silence him; (e) stalked and menaced plaintiff at his home; and (b) pressured, bribed, coerced and induced individuals to have plaintiff involuntarily confined to hospital treatment without his consent or any other lawful basis for doing so.

281. The aforesaid conduct of defendants operated to deprive plaintiff ADRIAN SCHOOLCRAFT of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, his rights:

     i.     Not to be deprived of liberty without due process of law;

     ii.     To be free from seizure and arrest not based upon probable cause;

     iii.     Not to have excessive force imposed upon him;

     iv.     Not to have summary punishment imposed upon him; and

     v.     To receive equal protection under the law.

282. As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT was deprived of his liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was involuntarily confined to hospital treatment and was forced to incur substantial expenses.

## NINTH CLAIM FOR RELIEF
## VIOLATION OF DUE PROCESS UNDER 42 U.S.C. § 1983

283.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "282" with the same force and effect as if fully set forth herein.

284.    As a result of the aforesaid conduct by defendants, plaintiff was deprived of his liberty and involuntarily confined for six (6) days in the psychiatric ward of JHMC without, notice, hearing or any opportunity to be heard and challenge the aforesaid confinement in violation of his procedural due process rights as set forth in the Fifth and Fourteenth Amendments to the Constitution of the United States.

## TENTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

285.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "284" with the same force and effect as if fully set forth herein.

286.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

287.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department included, but were not limited to:

    i.    Creating a quotas system for NYPD subordinate officers requiring the officers to issue a certain number of summonses per month and year regardless of probable cause;

    ii.    Creating a policy of awarding incentives to officers who meet or exceed the

required number of summonses to be issued according to NYPD's quota;

iii.  Creating a policy of punishing officers who fail to meet the required number of summonses established by NYPD's quota;

iv.  Intimidating and threatening police officers with retaliation when said police officers challenge unlawful NYPD quota policies;

v.  Intimidating and threatening police officers with retaliation when said police officers attempt to disclose instances of NYPD corruption and police misconduct;

vi.  Retaliating against police officers with suspensions and disciplinary hearings who disclose or attempt to disclose  NYPD corruption and police misconduct;

vii.  Displaying a deliberate indifference to disciplining supervisors, despite allegations of illegal and/or unconstitutional conduct; and

viii.  Intentionally "leaking" officers IAB complaints - which IAB is duty bound to keep confidential – for purposes of alerting NYPD personnel and other supervisory officers, whom are the subject of the complaints, in an ongoing effort to discourage future IAB complaints and/or silence those in existence.

288.   The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as has been recently publicized in the matters Police Officer's Adhyl Polanco and Frank Pallestro.

289.   The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by plaintiff as alleged herein.

290.   Additionally, the NYPD's deliberate indifference to proper training, supervising and/or disciplining of policy making officials such as defendants MARINO, NELSON and MAURIELLO constituted explicit and/or tacit approval of their illegal and unconstitutional conduct.

291.   Further, the NYPD's deliberate indifference to proper training and supervision of the Internal Affairs Bureau regarding maintaining the confidentiality of complainants constitutes

implicit and/or tacit approval of illegal and unconstitutional conduct thereby discouraging the disclosure of illegal and unconstitutional acts in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

292.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, plaintiff ADRIAN SCHOOLCRAFT was subjected to unlawful and excessive force resulting in permanent and disabling injuries.

293.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating plaintiff's constitutional rights.

294.    Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of plaintiff ADRIAN SCHOOLCRAFT's constitutional rights.

295.    The acts complained were a direct and proximate result of the usages, practices, procedures and rules of the City of New York and the New York City Police Department, which constituted deliberate indifference to the safety, well-being and constitutional rights of plaintiff.

296.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by plaintiff as alleged herein.

      i.   Not to be deprived of liberty without due process of law;

     ii.   To be free from seizure and arrest not based upon probable cause;

    iii.   Not to have excessive force imposed upon him;

    iv.   Not to have summary punishment imposed upon him; and

v.  To receive equal protection under the law.

## PENDANT STATE CLAIMS

297.  Plaintiff repeats, reiterates and  realleges each and every allegation contained in paragraphs numbered "1" through "296" with the same force and effect as if fully set forth herein.

298.  On or about January 27, 2010, and within (90) days after the claim herein accrued, the plaintiff duly served upon, presented to and filed with defendant THE CITY OF NEW YORK, a Notice of Claim setting forth all facts and information required under the General Municipal Law § 50 (e).

299.  Defendant THE CITY OF NEW YORK has wholly neglected or refused to make an adjustment or payment thereof and more than thirty (30) days have elapsed since the presentation of such claim as aforesaid.

300.  Upon information and belief, defendant THE CITY OF NEW YORK has not yet demanded a hearing pursuant to General Municipal Law § 50-h.

301.  This action was commenced within one (1) year and ninety (90) days after the cause of action herein accrued.

302.  Plaintiff has complied with all conditions precedent to maintaining the instant action.

303.  This action falls within one or more of the exceptions as outlined in C.P.L.R. § 1602.

## FIRST CLAIM FOR RELIEF UNDER N.Y. STATE LAW: ASSAULT

304.  Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "303" with the same force and effect as if fully set forth

herein.

305.    Defendants' aforementioned actions placed plaintiff in apprehension of imminent harmful and offensive bodily contact.

306.    As a result of defendants' conduct, plaintiff has suffered physical pain and mental anguish, together with shock, fright, apprehension, embarrassment, and humiliation.

### SECOND CLAIM FOR RELIEF UNDER N.Y. STATE LAW: BATTERY

307.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "306" with the same force and effect as if fully set forth herein.

308.    Defendant police officers touched plaintiff in a harmful and offensive manner.

309.    Defendant police officers did so without privilege or consent from plaintiff.

310.    As a result of defendants' conduct, plaintiff has suffered physical pain and mental anguish, together with shock, fright, apprehension, embarrassment and humiliation.

### THIRD CLAIM FOR RELIEF UNDER N.Y. STATE LAW: FALSE ARREST

311.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "310" with the same force and effect as if fully set forth herein.

312.    Defendant police officers arrested plaintiff ADRIAN SCHOOLCRAFT in the absence of probable cause and without a warrant.

313.    As a result of  the aforesaid conduct by defendants, plaintiff ADRIAN SCHOOLCRAFT  was subjected to an illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and by the defendants.  The aforesaid actions by the defendants constituted a deprivation of the

plaintiff's rights.

314.    As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT was deprived of his liberty, was denied fundamental rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was involuntarily confined to hospital treatment, was forced to incur substantial expenses and had his personal and professional reputation destroyed.

## FOURTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW: FALSE IMPRISONMENT

315.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "314" with the same force and effect as if fully set forth herein.

316.    As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT was falsely imprisoned, his liberty was restricted for an extended period of time, was put in fear for his safety, was humiliated and subjected to handcuffing, and other physical restraints.

317.    Plaintiff was conscious of said confinement and did not consent to same.

318.    The confinement of plaintiff was without probable cause and was not otherwise privileged.

319.    As a result of the aforementioned conduct, plaintiff has suffered physical and mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

320.    As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT was deprived of his liberty, was denied fundamental rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was involuntarily confined to hospital treatment, was forced to incur substantial expenses and had his personal and professional reputation destroyed.

## FIFTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

321.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "320" with the same force and effect as if fully set forth herein.

322.    The aforementioned conduct was extreme and outrageous, and exceeded all reasonable bounds of decency.

323.    The aforementioned conduct was committed by defendants while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

324.    The aforementioned conduct was committed by defendants while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.

325.    The aforementioned conduct was committed by defendants while acting within the scope of their employment by defendant JAMAICA HOSPITAL CENTER.

326.    The aforementioned conduct was committed by defendants while acting in furtherance of their employment by defendant JAMAICA HOSPITAL CENTER.

327.    The aforementioned conduct was intentional and done for the sole purpose of causing severe emotional distress to plaintiff.

328.    As a result of the aforementioned conduct, plaintiff suffered severe emotional distress, physical and mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

329.    As a result of the foregoing, plaintiff ADRIAN SCHOOLCRAFT was deprived of his liberty, was denied fundamental rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was involuntarily confined to hospital treatment, was forced to incur substantial expenses and had his personal and professional reputation destroyed.

## SIXTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW:
## NEGLIGENT HIRING/TRAINING/SUPERVISION/RETENTION
### (Defendant City of New York)

330.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "329" with the same force and effect as if fully set forth herein.

**Negligent Retention and Supervision of Defendant Marino**

331.   Defendant CITY OF NEW YORK was on notice that defendant Marino had a volatile, explosive temperament and was wholly unfit for duty as Assistant Chief of Patrol Borough Brooklyn North charged with the responsibility of overseeing all the precincts in Kings County.

332.   Specifically, the CITY OF NEW YORK was on notice of the fact that Marino had violent propensities and an explosive temperament which would and did result in numerous instances of excessive force and physical altercations.

333.   Additional evidence of the CITY's negligence is apparent from even a cursory review of defendant MARINO's record since the inception of his career in the NYPD, which is replete with history "force complaints."

334.   Illustrative of defendant MARINO's violent tendency was an incident in which he physically assaulted the patron of a restaurant in Bensonhurst for uttering profanities directed at the NYPD.

335.   Further evidence of his unfitness for his NYPD assignment should have been apparent when he threatened physical violence and removal of sick/vacation days from an officer who refused to discuss his "activity" with MARINO.

336.   Upon information and belief, MARINO's vicious and violent propensity earned

him the nickname "ELEPHANT BALLS."

337.   Additionally, defendant MARINO also engaged in multiple unrelated acts of misconduct during his career with the NYPD, which resulted in numerous departmental hearings.

338.   In one such instance, Marino was specifically identified by another police officer -- in sworn deposition testimony – as having engaged in an illegal and unlawful conduct.

339.   Moreover, as previously stated, CHIEF MARINO was also directly linked to a scandal involving his possession and use of anabolic steroids and human growth hormone.

340.   However, CHIEF MARINO was never disciplined in any way for his involvement in that incident despite the fact that five other implicated officers were all placed on modified duty and forced to hand over their guns and badges.

341.   Finally, as previously stated, CHIEF MARINO was found to be directly responsible for violating New York State Labor Law in 2006 by implementing an unlawful quota policy in the 75th Precinct.

342.   Following that finding, the CITY OF NEW YORK not only failed to discipline him but in fact promoted him from the commanding officer of the 75th Precinct to Assistant Chief Patrol Borough Brooklyn North.

343.   As a result of the foregoing acts of unlawful conduct and/or grossly improper behavior by defendant MARINO, defendant City of New York knew, or should have known, that defendant MARINO was wholly unfit for any of position of command, much less Assistant Borough Chief.

344.   Notwithstanding defendant Marino's history of unlawful and improper conduct, however, defendant CITY OF NEW YORK failed to take proper disciplinary action against CHIEF MARINO, and failed to otherwise modify or limit defendant Marino's responsibilities or

position of command.

345.   To the contrary, the NYPD actually rewarded defendant Marino for his misconduct by *promoting* him to Assistant Borough Chief Brooklyn North – which includes the 81st Precinct – leading directly to the events which took place on October 31, 2009.

346.   Defendants' negligent retention and supervision of defendant Marino was the direct and proximate cause of the injuries sustained by plaintiff on October 31, 2009 and thereafter.

347.   As a result of the foregoing negligent acts and omissions by defendant CITY OF NEW YORK, plaintiff ADRIAN SCHOOLCRAFT has suffered physical and mental injury, pain and trauma, together with embarrassment, humiliation shock, fright, and loss of freedom.

348.   Defendant CITY OF NEW YORK selected, hired, trained, retained, assigned and supervised all members of said its Police Department, including the defendants individually named above.

349.   Defendant CITY OF NEW YORK was negligent and careless when it selected, hired, trained, retained, assigned, and supervised all members of its Police Department including the defendants individually named above.

350.   Defendant CITY OF NEW YORK was negligent and careless when it repeatedly failed to act and/or discipline supervisory personnel in the face of obvious evidence of corruption and misconduct.

**Negligence in Failing to Keep IAB Complaints Confidential**

351.   Defendant CITY OF NEW YORK was further negligent and careless when it repeatedly allowed allegedly confidential IAB complaints regarding supervisory personnel to be "leaked" to the very same officials of who were the subjects of the complaints.

352.    Additionally defendant CITY OF NEW YORK was on notice that IAB was failing to keep complaints of corruption and illegality confidential due to a similar "leak" in the 42nd Precinct regarding allegations of illegality which occurred in September, 2009 involving P.O. Frank Pallestro.

353.    Further defendant CITY OF NEW YORK was on notice that IAB was failing to keep complaints of corruption and illegality confidential due to a similar "leak" in the 42nd Precinct regarding allegations of illegality involving P.O. Adhyl Polanco.

## SEVENTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW
## MEDICAL MALPRACTICE

354.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "353" with the same force and effect as if fully set forth herein.

355.    That JHMC,  its agents, officials, doctors, nurses, physician's assistants, servants, employees, and/or independent contractors, including, but not limited to, DR. ISAK ISAKOV, and DR. LILIAN ALDANA-BERNIER, jointly and severally, and individually, departed from good and accepted standards of medical care, and were negligent and careless in the service rendered for and on behalf of plaintiff ADRIAN SCHOOLCRAFT, in failing to timely diagnose and render proper treatment to decedent; in failing to recognize that he was not emotionally disturbed and in need of involuntary confinement; in improperly and negligently documenting decedent's medical conditions on his chart on the basis of unsubstantiated hearsay; in failing to properly interpret the diagnostic tests that were performed; in failing to call for or request necessary additional diagnostic tests and studies; in failing to properly and timely obtain consults; in failing to hire a competent and efficient staff; in negligently hiring, retaining, supervising and controlling staff, doctors, nurses and other personnel; in forming a diagnosis

solely based on non-medical professionals and/or staff's non expert and unprofessional lay opinion.

356.    That the defendants herein, their  agents, officials, doctors, nurses, physician's assistants, servants and employees  were further negligent and careless and violated accepted medical practices, medical customs and medical standards in that defendants, jointly and/or severally, failed to have an adequate, competent and/or sufficient nursing staff and/or other personnel to properly diagnose plaintiff which would have ensured his prompt and immediate release under the foreseeable circumstances; failed to have proper supervision of hospital-employed and/or affiliated physicians; failed to conform to the Joint Commission of Accreditation of Hospitals insofar as the making and/or keeping of hospital records; in failed to promulgate and/or enforce rules, regulations and guidelines as to proper psychiatric care; and failed to timely and/or properly carry out orders.

357.    That as a result of the negligence and carelessness of the defendants herein, plaintiff was caused to and did sustain the severe consequence of being involuntarily confined against his will for six days, when there was no medical or professional basis to do so.

## EIGHTH CLAIM FOR RELIEF UNDER N.Y. STATE LAW:
## NEGLIGENT HIRING/TRAINING/SUPERVISION/RETENTION
### (Defendant JHMC)

358.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "357" with the same force and effect as if fully set forth herein.

359.    Defendant JHMC selected, hired, trained, retained, assigned and supervised all members of its staff, including the defendants individually named above.

360.    Defendant JHMC was negligent and careless when it selected, hired, trained,

retained, assigned, and supervised all members of its staff including the defendants individually named above.

361.    Due to the negligence of the defendants as set forth above, plaintiff suffered physical and mental injury, pain and trauma, together with embarrassment, humiliation shock, fright, and loss of freedom.

362.    By reason of the aforesaid conduct by defendants, plaintiff ADRIAN SCHOOLCRAFT requests the following relief:

A.    Compensatory damages in the amount of twenty five million dollars ($25,000,000);

B.    Punitive damages in the amount of twenty five million dollars ($25,000,000.00);

C.    An award of reasonable attorney's fees pursuant to 42 U.S.C. § 1988, as well as costs and disbursements; and

D.    Any further relief as the Court may find just and proper.

WHEREFORE, plaintiff ADRIAN SCHOOLCRAFT demands judgment in the sum of twenty five million dollars ($25,000,000.00) in compensatory damages, twenty five million ($25,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

Dated: New York, New York
       September 10, 2010

BY:    _____
       JON L. NORINSBERG (JN2133)
       Attorney for Plaintiff
       225 Broadway, Suite 2700
       New York, New York 10007
       (212) 791-5396
       Norinsberg@aol.com

BY:    _____
       COHEN & FITCH LLP

Gerald Cohen (GC0414)
Joshua Fitch (JF2813)
Attorneys for Plaintiff
225 Broadway, Suite 2700
New York, New York 10007
(212) 374-9115
gcohen@cohenfitch.com
jfitch@cohenfitch.com