$667-82155$

Page 1

1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   -------------------------------------------X
4   ADRIAN SCHOOLCRAFT,
5                         Plaintiff,
6
                                    Case No:
7        - against -              10 CV 06005
8
    THE CITY OF NEW YORK, ET AL.,
9
10                        Defendants.
11  -------------------------------------------X
12                      220 East 42nd Street
                        New York, New York
13
                        July 7, 2014
14                      10:06 a.m.
15
16
17  DEPOSITION OF VINOD DHAR, M.D., pursuant to
18  Notice, taken at the above place, date and
19  time, before DENISE ZIVKU, a Notary Public
20  within and for the State of New York.
21
22
23
24
25

Page 2

1
2
A P P E A R A N C E S:
3
4     NATHANIEL B. SMITH, ESQ.
           Attorneys for Plaintiff
5          111 Broadway
           New York, New York 10006
6
7
      JOHN LENOIR, ESQ.
8     Attorneys for Plaintiff
           829 Third Street NE
9          Washington, D.C. 20002
10
11    NEW YORK CITY LAW DEPARTMENT
      OFFICE OF CORPORATION COUNSEL
12    Attorneys for Defendant
      THE CITY OF NEW YORK
13         100 Church Street
           New York, New York 10007
14    BY:   SUZANNA PUBLICKER METTHAM, ESQ.
15
16    SCOPPETTA SEIFF KRETZ & ABERCROMBIE
      Attorneys for Defendant
17    STEVEN MAURIELLO
           444 Madison Avenue
18         New York, New York 10022
      BY:   MARIANA OLENKO, ESQ.
19
20
      IVONE, DEVINE & JENSEN, LLP
21    Attorneys for Defendant
      DR. ISAK ISAKOV
22         2001 Marcus Avenue
           Lake Success, New York 11042
23    BY:   BRIAN LEE, ESQ.
24
      (Continued.)
25

Page 3

1
2
3    (Continued.)
4

      CALLAN, KOSTER, BRADY & BRENNAN, LLP
5     Attorneys for Defendant
      DR. LILIAN ALDANA-BERNIER
6          One Whitehall Street
           New York, New York 10004
7     BY:   PAUL F. CALLAN, ESQ.
8
9     MARTIN CLEARWATER & BELL, LLP
      Attorneys for Defendant
10    JAMAICA HOSPITAL MEDICAL CENTER
           220 East 42nd Street
11         New York, New York 10017
      BY:   GREGORY RADOMISLI, ESQ.
12
13
14
   Also Present:
15
   Roy Lubit, M.D.
16
   Magdalena Bauza
17
18
19
20
21
22
23
24
25

Page 4

1

2    S T I P U L A T I O N S:

3    IT IS HEREBY STIPULATED AND AGREED by and

4    between the attorneys for the respective

5    parties hereto, that this examination may be

6    sworn to before any Notary Public.

7

8    IT IS FURTHER STIPULATED AND AGREED that the

9    filing and certification of the said

10   examination shall be waived.

11

12   IT IS FURTHER STIPULATED AND AGREED that all

13   objections to questions, except as to the

14   form of the question, shall be reserved for

15   the time of trial.

16

17

18

19

20

21

22

23

24

25

Page 5

1

2          MR. SMITH: Going on the record,

3      it's 10:06 on July 7, 2014. We are at

4      the offices of Martin Clearwater and

5      Bell, 220 East 42nd Street. Here for

6      the deposition of Jamaica Hospital on

7      the policy issues identified by the

8      court.

9          MR. RADOMISLI: Yes. Just a

10     couple of things. One, pursuant to the

11     federal rules, we reserve the right to

12     review and make corrections to the

13     transcript.

14          Secondly, plaintiff's counsel

15     has brought Dr. Roy Lubit, L-u-b-i-t,

16     with him today. He has represented him

17     as his expert. So there are two

18     things. One, we will object to any

19     other expert being identified insofar

20     as the psychiatric issues, given that

21     Dr. Lubit is here today.

22          Secondly, in light of Judge

23     Sweet's prior ruling that all

24     objections will be reserved for trial,

25     I am not going to bust this deposition

Page 6

1

2     on the grounds that I believe that Dr.

3     Lubit does not have a right to be here.

4          However, we reserve our right to

5     take the position at trial that this

6     entire deposition transcript is annuled

7     as a result of Dr. Lubit's presence and

8     that it should not be and cannot be

9     used for any purpose, whether it be

10    impeachment or any other reason at the

11    time of trial.

12         MR. SMITH:  Okay, and of course,

13    the plaintiff disagrees with the

14    assertions by defense counsel that the

15    doctor is not entitled to be here.  I

16    also disagree with the assertion that

17    somehow him being here as an agent of a

18    party somehow precludes some other

19    agent for appearing on some other

20    occasion.  I know of no law or basis

21    and reason for such a position.

22         Finally, there is no basis that

23    I can see for reserving some right at

24    an unknown date for some unknown reason

25    to maintain an objection to this

Page 7

1

2          deposition, which is now going forward.

3                Would you mind swearing in the

4          witness.

5  V I N O D   D H A R, a Witness herein,

6  having been first duly sworn by a Notary

7  Public within and for the State of New York,

8  was examined and testified as follows:

9

10  EXAMINATION BY

11  MR. SMITH:

12

13        Q.    Will you state your name and

14  address for the record, please.

15        A.    My first name is V-i-n-o-d, V as

16  "Victor" last name is Dhar, D as "David"

17  h-a-r, address is Jamaica Hospital, 8900 Van

18  Wyck Expressway, Jamaica.

19                MR. SMITH:  Counsel, as we've

20          done in the past with some of the other

21          witnesses, I understand the witness has

22          provided his business address.  That's

23          fine with me.  I don't want to pry into

24          any kind of personal residence issues,

25          but I would only need the residence

1           VINOD DHAR, M.D.

2      information if at the time of trial or

3      some other hearing, I would need to

4      serve process on the doctor.

5           Given that, would you agree to

6      accept service of any papers that I

7      need to serve on the doctor for him to

8      appear as the 30(b)(6) witness in any

9      future proceedings.

10          MR. RADOMISLI:  If he's still an

11     employee of Jamaica Hospital at the

12     time, we would accept service, but

13     otherwise we would not.  If you just

14     want to ask him his address, you might

15     be better off.

16     Q.     All right, would you mind

17 providing us with your address, Doctor?

18     A.     My home address is 60, 6-0

19 Juniper Lane, Syosset, New York.

20     Q.     Where are you currently working?

21     A.     I work at Jamaica Medical

22 Hospital.

23     Q.     What's your title?

24     A.     I am currently the associate

25 chairman of the department of psychiatry.

Page 9

1               VINOD DHAR, M.D.

2        Q.     How long have you had that

3    position?

4        A.     I have had that position for

5    five -- almost nine years.  Actually at

6    Jamaica Hospital it would be seven years.

7        Q.     Have you had any other positions

8    while working at Jamaica Hospital?

9        A.     Yes.  I started as an attending.

10   Then the unit chief, and I went to Flushing

11   Hospital.  That's where I got my promotion

12   to associate chairman.

13       Q.     What's the relationship between

14   Flushing Hospital and Jamaica Hospital?

15             MR. RADOMISLI:  Objection to

16        form.  You can answer.

17       A.     In 1999 Jamaica Hospital took

18   over Flushing Hospital and came under the

19   umbrella Medisys Network.  So it was part of

20   the consortium in the same department.

21       Q.     When did you start working at

22   Jamaica as an attending?

23       A.     That was 1996.

24       Q.     And?

25       A.     To 1999 and then from 1999 to

1                    VINOD DHAR, M.D.

2    2007, I was at Flushing.

3         Q.     When you were attending, were

4    you an attending in the psychiatric ward?

5         A.     I was inpatient psychiatric

6    unit.

7         Q.     Is that the same thing as being

8    in a ward?

9         A.     Yeah.

10        Q.     You also mentioned that you were

11   unit chief, what was that?

12        A.     Well, unit chief is responsible

13   for the both administrative and clinical

14   aspects of the inpatient unit, one unit.

15        Q.     What was your title at Flushing

16   Hospital?

17        A.     It started with the unit chief

18   and as we progressed in Flushing, then I

19   became the assistant director of inpatient

20   services and then the associate chairman of

21   the entire department.

22        Q.     Prior to joining Jamaica

23   Hospital in 1999, did you have any other

24   work?

25        A.     Yes.  I was in Dayton, Dayton

Page 11

```
1                    VINOD DHAR, M.D.
2    Mental Health Center from 1990 to 1995, '96.
3        Q.      What did you do in Dayton?
4        A.      I was an attending there.
5        Q.      Where is Dayton?
6        A.      Dayton, Ohio.
7        Q.      What did you do from 1996 -- so
8    '96 you went to Jamaica?
9        A.      Jamaica.
10       Q.      Before Dayton what did you do?
11       A.      I did my training at New York
12   Medical College, Valhalla.
13       Q.      What do you mean by saying you
14   did your training there?
15       A.      I did residency training in
16   psychiatry, general psychiatry.
17       Q.      How long was that?
18       A.      That was three years.  Then I
19   did two years of a fellowship in child
20   psychiatry.
21       Q.      Where?
22       A.      Same place, New York --
23   Westchester Medical Center.
24       Q.      Prior to being at New York
25   Medical College as a resident, what did you
```

```
 1                  VINOD DHAR, M.D.
 2     do?
 3         A.     I was in India.  I came here
 4     after I did medical schooling in India.
 5         Q.     So you went to medical school in
 6     India?
 7         A.     Yes.
 8         Q.     Which one?
 9         A.     It's called Medical College,
10     Government Medical in Kashmir.  State of
11     Kashmir.
12         Q.     What were the years of your
13     training at New York Medical College?
14         A.     That would be from 1981 to '86.
15         Q.     And from '86 to 90, what did you
16     do?
17         A.     I worked as an attending at
18     State Hospital, Harlem Valley Psychiatric
19     Center.
20         Q.     Where is that?
21         A.     It's Wingdale, Upstate,
22     New York.
23         Q.     Have you had any other forms of
24     employment, other than at State Hospital,
25     Dayton and Jamaica Hospital?
```

Page 13

1                    VINOD DHAR, M.D.

2        A.      No.

3                MR. RADOMISLI:  And Flushing.

4        Q.      Right and Flushing.  I meant to

5    include Flushing in that since they merged

6    with Jamaica, right?

7        A.      Yes.

8        Q.      So I will just restate that

9    question just to make it clear.

10               Other than being at State

11   Hospital, Dayton, Flushing and Jamaica

12   Hospital, you had no other employment as a

13   psychiatrist?

14       A.      No.

15       Q.      Have you had any private

16   practice as a psychiatrist?

17       A.      I have -- I am currently in

18   private.  It is a part-time small practice,

19   been there since '92 or '93, not sure.

20       Q.      Where is that practice?

21       A.      That's in Forest Hills, Forest

22   Hills.

23       Q.      How much of your working time do

24   you spend at private practice, as opposed to

25   working at Jamaica?

Page 14

1                    VINOD DHAR, M.D.

2        A.       I spend -- I have 40 hours of

3    work at Jamaica and I spend 15 to 20 hours

4    at the most private practice.

5        Q.       So it's about a third of your

6    working time is the private practice; is

7    that fair to say?

8        A.       Yes.

9        Q.       Is it fair to say you have

10   experience making decisions about

11   involuntarily committing patients based on

12   your work experience with State, Dayton,

13   Flushing and Jamaica?

14       A.       Yes.  But mainly at Jamaica.

15       Q.       Can you give me an approximation

16   of the number of patients that you've made a

17   decision to involuntarily commit to a

18   psychiatric institution?

19            MR. RADOMISLI:  Objection.  This

20        witness is a 30(b)(6) witness and so he

21        could talk about the policy of the

22        hospital.  Anything he does personally

23        I am going to object.

24            MR. SMITH:  Are you instructing

25        him not to answer that question?

Page 15

1                    VINOD DHAR, M.D.

2              MR. RADOMISLI:  Yes.

3              MR. SMITH:  It's sort of just

4        getting his background about the issues

5        that he's going to be providing

6        information about.  You wouldn't object

7        if I asked if he was a doctor.  So I'm

8        not so sure getting some more pedigree

9        information about experience and

10       background is really inappropriate

11       instruction.

12             MR. RADOMISLI:  I think it is.

13       Q.     Well, is it fair to say that you

14  have extensive experience in involuntarily

15  committing patients?

16       A.     Yes.  I have experience because

17  I oversee the department.

18       Q.     Did State Hospital have an

19  involuntary policy?

20       A.     Yes, but State Hospital is

21  different and I am not familiar -- I wasn't

22  involved.  I was just treating the patients.

23  I don't know how the patients came there or

24  what status.

25       Q.     Well, as an attending at State

```
 1              VINOD DHAR, M.D.
 2   Hospital, did you make decisions to
 3   involuntarily commit patients to the
 4   psychiatric ward?
 5              MR. RADOMISLI:  Same objection.
 6        A.    No.
 7        Q.    I'm sorry?
 8              MR. RADOMISLI:  I said same
 9        objection, but he already answered the
10        question.
11        Q.    The answer was no?
12        A.    Objection.
13              MR. SMITH:  Was there an answer?
14              (Record read.)
15              MR. CALLAN:  Could you read back
16        the question and answer, please.
17              (Record read.)
18        Q.    As the assistant chair in the
19   department of psychiatric -- the department
20   of psychiatry at Jamaica Hospital, what are
21   your duties?
22        A.    My duties include to see -- to
23   oversee of the day-to-day running of the
24   department, both clinical and
25   administrative.
```

Page 17

```
 1                    VINOD DHAR, M.D.
 2        Q.        What are the day-to-day clinical
 3    duties?
 4        A.        That means finding out the
 5    patients that are in the ER inpatient, any
 6    problematic patients, any second opinions on
 7    any difficult patients and to attend the
 8    administrative meetings.
 9        Q.        So is it fair to say that in the
10    clinical part of your responsibilities at
11    Jamaica are to act as a supervisor for the
12    other psychiatrists that are working in the
13    emergency room and in the inpatient ward at
14    Jamaica Hospital?
15                  MR. RADOMISLI:   Objection to
16        form and on the grounds that it's a
17        legal conclusion.
18        A.        Yes.
19        Q.        Is the answer yes?
20        A.        Yes.
21        Q.        What did you do to prepare for
22    today's deposition?
23        A.        I don't think I did anything
24    about preparing for the deposition.
25        Q.        Did you review any documents?
```

Page 18

```
 1                VINOD DHAR, M.D.

 2      A.      I reviewed the regular policies.

 3      Q.      Can you describe for me what

 4  you're referring to?

 5      A.      The hospital policy.

 6      Q.      Which one?

 7      A.      The CPEP policy, actually.

 8      Q.      What's the CPEP policy?

 9      A.      CPEP is Comprehensive

10  Psychiatric Emergency Program and the

11  emergency room is part of the CPEP.

12      Q.      Did you review anything else?

13      A.      No.

14              MR. RADOMISLI:  You reviewed

15      other policies, correct?

16              THE WITNESS:  Other policies,

17      yes.

18      Q.      Tell me what policies you

19  reviewed?

20      A.      I reviewed the policy about our

21  emergency admissions and voluntary

22  admissions.

23      Q.      Anything else?

24      A.      Not that I can recall.

25      Q.      Did you speak to anybody, other
```

Page 19

1                    VINOD DHAR, M.D.
2    than your attorney, about your appearance
3    here today?
4         A.    My department chair knows about
5    that I'm here today.
6         Q.    Who is that?
7         A.    That's Dr. Vivek.
8         Q.    Other than informing your
9    chairman that you were going, did you
10   discuss anything about your testimony with
11   Dr. Vivek?
12        A.    I just informed him that I am
13   going there and he just told me to stay calm
14   and answer what you know.
15        Q.    And did you speak with anybody
16   else about your deposition?
17        A.    No.
18        Q.    Have you ever spoken with a Dr.
19   Isakov about this case?
20        A.    No.
21        Q.    Have you ever spoken with Dr.
22   Bernier about this case?
23        A.    No.
24        Q.    Have you ever spoken with
25   anybody, to your recollection, about Adrian

```
                                          Page 20
 1                 VINOD DHAR, M.D.
 2    Schoolcraft?
 3        A.      Actually, no, I haven't spoken
 4    about this case anytime.  No, I wasn't
 5    involved with this case, no.
 6        Q.      So I take it that you've never
 7    looked at the patient's chart in this case?
 8        A.      That's correct.  I never looked.
 9        Q.      And you never had any
10    discussions with anybody about the contents
11    of the chart?
12        A.      No.
13        Q.      That's correct, you never had
14    any discussions with anybody about --
15        A.      I never had any discussion, no.
16        Q.      One of the ground rules of the
17    depositions, I will just cover it now, is
18    it's important that you let me ask my whole
19    long meandering question, so that the court
20    reporter can take it down, give your lawyer
21    a chance to interject and then you get to
22    answer.
23        A.      I'm sorry.
24        Q.      No, it's okay, but if you
25    anticipate which is common, what I am asking
```

```
                                       Page 21
 1                 VINOD DHAR, M.D.
 2    you and you answer it, she has to stop
 3    taking down what I'm saying and break the
 4    transcript up and say what you're saying, so
 5    just take your time.
 6         A.      Sure.
 7         Q.      We're not in a hurry.
 8         A.      One thing that my chairman told
 9    me is just relax.
10         Q.      Well, I won't tell him.
11         A.      Okay.
12         Q.      The other really important
13    instruction is that since you're under oath,
14    it's important that you understand the
15    question, so if I ask you a question and
16    you're not sure about what I am asking you,
17    please let me know; okay?
18         A.      Sure.
19         Q.      Let show you what's been marked
20    as Exhibit 30 or Exhibit 130.  I have copies
21    for everybody.  This is a multipage document
22    containing several Jamaica policy statements
23    that were provided in discovery in this
24    case.
25         A.      Yeah.
```

Page 22

1                    VINOD DHAR, M.D.
2          Q.      Are you -- I'm going to ask you
3    a lot of questions about these documents,
4    but before we get into each individual
5    policy, you mentioned that you had looked at
6    a CPEP policy.  Is that in this collection?
7          A.      No.  This is exclusively for the
8    emergency room.
9          Q.      Which is exclusively for the
10   emergency room?
11         A.      This policy.
12              MR. RADOMISLI:  Well, in 2009
13        did they have the CPEP?
14              THE WITNESS:  No.
15              MR. SMITH:  Okay.  So I'm not
16        sure, Greg, that the documents that the
17        witness has testified that he looked at
18        has been produced?
19              MR. RADOMISLI:  I'm sure it
20        hasn't and I didn't know he looked at
21        it frankly, because as we just
22        established, there was no CPEP in 2009.
23              MR. SMITH:  Well, you
24        established it.  I didn't establish it.
25              MR. RADOMISLI:  You can --

Page 23

1              VINOD DHAR, M.D.

2              MR. SMITH:  In any event, I

3       understand and I'm not disputing that

4       fact with you, but just as a matter of

5       form, I would like to know what the

6       witness has reviewed in preparing for

7       the deposition.  I am going to make a

8       request for a copy of the CPEP policy.

9              MR. RADOMISLI:  CPEP.

10             MR. SMITH:  Whatever it is.

11      Have it produced.

12             MR. RADOMISLI:  Taken under

13      advisement.  Please follow-up in

14      writing.

15      Q.     You don't have a copy of that

16  policy with you, do you?

17      A.     No, I didn't bring it with me,

18  no.

19      Q.     Did you review, in preparing for

20  your deposition any of the policy statements

21  that are contained within Exhibit 130?

22      A.     Well, actually this is part of

23  the CPEP.  This is one of the components of

24  the CPEP.  It's not going to be different

25  from the policy of the CPEP.  The CPEP has

Page 24

1                    VINOD DHAR, M.D.

2      three components and this is one of the

3      components of the CPEP.

4                    MR. RADOMISLI:  Did you review

5           anything, other than the documents that

6           are in front of you today?

7                    THE WITNESS:  Yes.  A different

8           policy, but that doesn't -- called

9           from CPEP, Comprehensive thing about

10          the program, CPEP.

11          Q.      You see the first page of this

12     document?

13          A.      Yeah.

14          Q.      It's entitled Department of

15     Psychiatry Emergency Room Services.  See

16     that?

17          A.      Yeah.

18          Q.      This page, did you review this

19     page in preparing for your deposition?

20          A.      I mean, I didn't look at it for

21     preparing for the deposition, but I have

22     read it.  I know about it.

23          Q.      When was the last time you read

24     this page of this exhibit?

25          A.      I wouldn't recall the last time

1                    VINOD DHAR, M.D.

2    I read it.

3         Q.     You see on the bottom there's

4    some notations about review and revise?

5         A.     Hmm-mm.

6         Q.     And then there's some dates?

7         A.     Yes.

8         Q.     Do you see that?

9         A.     Yes.

10        Q.     Do you have any knowledge about

11   what those dates are?

12        A.     Well, when our policy is created

13   every year they're supposed to review and

14   update.  So this is what it means, it was

15   reviewed and revised.

16        Q.     Do you know who did the

17   reviewing and the revising?

18        A.     It is generally done by the

19   administrative staff, administrator and the

20   chairman.

21        Q.     And in October and

22   November 2009, who was the administrative

23   staff person involved from in the creation

24   of this policy?

25             MR. LEE:  Objection to the form.

Page 26

1                VINOD DHAR, M.D.
2        A.      I don't know.  He is not there
3    now.  I think his name was Mr. Mule.
4        Q.      Can you spell that for me?
5        A.      M-u-l-e.
6        Q.      Who was the chair?
7        A.      No, he -- the chair was Vivek,
8    Dr. Vivek.
9        Q.      Did you personally have any roll
10   in the review and revising of department of
11   psychiatric, psychiatry admission
12   procedures?
13       A.      Yes, review.
14       Q.      Were you part of a committee
15   that would regularly review this or was it
16   on an ad hoc basis that you would review the
17   procedure?
18       A.      On ad hoc basis.
19       Q.      See the second page of this
20   exhibit?
21       A.      Yes.
22       Q.      There is another policy
23   statement called involuntary legal status?
24       A.      Yeah.
25       Q.      Can you tell me what that

```
 1                    VINOD DHAR, M.D.
 2   statement is about?
 3        A.      Can I review it for a second?
 4        Q.      Yeah, sure.
 5        A.      This is 927.  That means any
 6   involuntary patient -- a patient who needs
 7   to be admitted to the hospital, psychiatric
 8   hospital on an involuntary basis can be
 9   admitted by what's called a two physician
10   certification.
11        Q.      And that's what this policy
12   provides for?
13        A.      Yes.
14        Q.      How many ways can a patient be
15   involuntary committed to the psychiatric
16   emergency room or the psychiatric ward at
17   Jamaica Hospital?
18             MR. RADOMISLI:  Objection to the
19        form.
20        A.      There are essentially only one
21   way -- two ways.  One is 939, and under that
22   article you can admit a patient who is
23   potentially dangerous to self or others to a
24   psychiatric emergency room.
25        Q.      What's the other way?
```

Page 28

1                    VINOD DHAR, M.D.

2        A.      Other way is the patient can be

3    admitted on 2PC.

4        Q.      And that's this 927?

5        A.      927, yeah.

6        Q.      How is 939 and 927, how are they

7    different?

8        A.      939 is when a patient comes

9    directly into the emergency room and he is

10   brought by -- there is a number of agencies

11   that can bring the patient there.  927 is

12   when a patient is transferred from other

13   hospital on an involuntary basis.

14       Q.      Is 939 what's known as an

15   emergency involuntary commitment?

16       A.      Yes.

17               MR. RADOMISLI:  Objection to

18       form.

19       Q.      What are the types of agencies

20   that bring in an individual under 939?

21       A.      I think there is a police

22   officer, director of community services,

23   physicians, psychiatrists, and family member

24   can apply or someone who is interested can

25   apply for patient put in application for

Page 29

```
 1                  VINOD DHAR, M.D.
 2    patient involuntary admission and through
 3    the court system.
 4                  MR. RADOMISLI:  He asked you
 5         about 939 only.
 6                  THE WITNESS:  Yeah.
 7         Q.      In order for a patient to be
 8    involuntary committed under 939, what
 9    medical or psychiatric conclusions need to
10    be made?
11                  MR. RADOMISLI:  I've given you a
12         little bit leeway, but you're going
13         beyond the scope.  If you're just
14         asking in general, you want to say
15         pursuant to the Jamaica Hospital
16         policy.
17                  MR. SMITH:  Okay.  All right,
18         that's fine.  I will restate the
19         question.
20                  MR. RADOMISLI:  Then he can look
21         at the policy if you want.
22                  MR. SMITH:  Well -- I don't want
23         him to just read back what the words on
24         the paper are.  I want to know how the
25         policy is actually applied and
```

1              VINOD DHAR, M.D.

2       effectuated.  If it was just to read

3       the piece of paper we wouldn't need a

4       witness.  I could just read it in my

5       office.

6              MR. RADOMISLI:  No. No.  I

7       understand that.  You can go through

8       the policy and ask him what it all

9       means.  That's fine, but it's just the

10      general.

11             MR. SMITH:  All right, okay.  So

12      then I will rephrase the question the

13      way your counsel has requested that I

14      do so.

15      Q.     Under Jamaica Hospital's policy,

16  what medical or psychiatric conclusions are

17  required in order to involuntarily commit a

18  patient to the hospital, either in the

19  psychiatric emergency room or in an

20  inpatient service area or a ward?

21             MR. RADOMISLI:  Under 939?

22             MR. SMITH:  Under 939.

23      A.     Patient has to be --

24             MR. SMITH:  The record should

25      reflect that counsel has just shown the

Page 31

```
 1                VINOD DHAR, M.D.
 2      witness the emergency admission policy
 3      of the hospital.
 4             MR. RADOMISLI:  Which is part of
 5      Exhibit 130.
 6             MR. SMITH:  Right, I know, but
 7      it's slightly suggestive of you to be
 8      showing him documents when I'm asking
 9      him questions.
10             MR. RADOMISLI:  I don't think
11      it's suggestive.
12             MR. LEE:  Wasn't the question
13      about the policy?
14             MR. SMITH:  You too now want to
15      join in on this?
16      Q.     Can you just answer my question,
17  please?
18      A.     A patient has to be a danger to
19  self or someone else.  That dangerousness or
20  patient has to be not capable of taking care
21  of himself for medical or his health or his
22  living arrangement.
23      Q.     And how do the staff at the
24  hospital make this determination about
25  dangerousness?
```

1                    VINOD DHAR, M.D.

2          A.      It's based on what the -- when

3    the patient comes to the hospital, the

4    report, accompanying person.  And then it is

5    evaluation by the psychiatrist.

6          Q.      Is there any methodology or a

7    checklist or some other factors that are

8    regularly looked at in effectuating the

9    Jamaica Hospital policy?

10         A.      Yeah.  I mean, there is about

11   policy regarding psychiatric evaluation, how

12   that is to be done, what is to be noted in

13   that evaluation, and based on that

14   evaluation you're to come up to a diagnosis

15   and then based on the diagnosis, you then

16   make a decision.

17         Q.      Are some of the factors that you

18   just identified -- let me rephrase that

19   question.

20              The factors that you just

21   identified for the psychiatric evaluation,

22   are those factors that are examined for

23   purposes of determining whether or not a

24   person has a mental illness or are they

25   looked at for purposes of determining

Page 33

1                    VINOD DHAR, M.D.
2    whether or not that person is a danger to
3    themselves or to others or is it just a
4    combination of things?
5          A.       Combination.
6          Q.       So can you tell me what are the
7    factors under the Jamaica Hospital policy
8    that are looked at in order to determine
9    whether or not a patient is dangerous to
10   himself or herself or others?
11         A.       Patients -- when patients are
12   brought in by any agency, and based on their
13   reports and what are the reasons why the
14   patient was coming in, brought to the
15   hospital and that would be the sort of the
16   starting point.
17         Q.       So that's the beginning of the
18   information that's required to find out what
19   the relator or the provider of the
20   information says, right?
21         A.       Yes.
22         Q.       Can you tell me what other
23   factors are looked at in making this
24   assessment?
25         A.       Well, there is you do the

Page 34

1              VINOD DHAR, M.D.

2   comprehensive psychiatric evaluation to see

3   whether the patient has any history of

4   mental illness.  On dangerousness you have

5   to see what are the circumstances under

6   which the patient was brought to the

7   hospital and were there any specific threats

8   made or what was mentioned.

9        Q.      I'm sorry, any specific what?

10       A.      Threats.

11       Q.      Anything else?

12       A.      Well, we're also going to the

13  background, history, if we have any

14  information resources at that time to get

15  the person's history.

16       Q.      Are there any standard guides

17  that are employed or used by Jamaica

18  Hospital in making this assessment of

19  dangerousness?

20              MR. RADOMISLI:  Can you read

21       that back.

22              (Record read.)

23       A.      Yes.

24              MR. RADOMISLI:  Just a second.

25              MR. LEE:  Can we agree that all

edit

Page 35

1                    VINOD DHAR, M.D.
2        of your questions are as these policies
3        existed in 2009, not as they currently
4        exist since?  The question was of a
5        present tense question?
6               MR. SMITH:  Was.  They've all
7        been like that.
8               MR. LEE:  Obviously, what was
9        the standard, if any, applied in 2009.
10              MR. SMITH:  Well, once I figure
11       out what the standard is, then I can
12       ask.
13              MR. LEE:  It may be different
14       now.
15              MR. SMITH:  Yeah, no, I know.
16              MR. RADOMISLI:  Well, I've been
17       interpreting it as 2009.
18       Q.      Can you just answer my question?
19              MR. SMITH:  I think your
20       suggestion is a good one, Brian, so I
21       will try and get to the bottom of the
22       issue right now.
23       Q.      Can you answer my question?
24       A.      Can you repeat the question?
25              (Record read.)

Page 36

```
 1                  VINOD DHAR, M.D.
 2              MR. RADOMISLI:  As part of the
 3       policy in 2009.
 4              MR. SMITH:  Yes, okay fine.
 5              MR. RADOMISLI:  Objection to
 6       form.
 7       A.      We have the policy in place
 8  now --
 9              MR. RADOMISLI:  Not now.  2009.
10       A.      2009 I'm not sure.  I'm -- I
11  don't recall of any checklist or any other
12  way of examining, other than based on the
13  history.
14       Q.      The history is this
15  comprehensive psychiatric evaluation?
16       A.      Yes.
17       Q.      How long does that typically
18  last?
19       A.      It lasts -- it can last anytime
20  anywhere from an hour or you may have to
21  redo the evaluation from time to time.
22       Q.      So it can take an hour or more?
23       A.      Yes.
24       Q.      What is or what are the
25  guidelines or the factors that Jamaica
```

Page 37

1           VINOD DHAR, M.D.
2    Hospital looks at today in making this
3    dangerousness assessment?
4           MR. RADOMISLI:  I'm going to
5       object and direct the witness not to
6       answer.
7           MR. SMITH:  Well, the only way
8       for me to get this is to find out
9       whether or not if he doesn't have a
10      specific recollection of what the
11      status was of a policy in 2009 I need
12      to be able to find out what he knows
13      about what the policy is today which he
14      clearly is capable of providing me and
15      then find out whether or not he has any
16      reason to think that it's changed since
17      2009.
18          MR. RADOMISLI:  Well, how could
19      he know if it's changed or not if he
20      doesn't recall what the policy is in
21      2009?
22          MR. SMITH:  Well, the question
23      as formed it's impossible, nobody has a
24      photograph memory about what was going
25      on in a particular place when you got a

Page 38

1                    VINOD DHAR, M.D.

2          moving entity.  So it's just -- if you

3          want to interfere with the examination

4          in this way, then you can go ahead and

5          do so and we will just have to bring

6          the doctor back.

7                    MR. RADOMISLI:  I don't want to

8          interfere.  I want to assert a

9          legitimate objection and I believe him

10         to testify about the policy today when

11         the treatment was in 2009 is a

12         legitimate basis for me to object and

13         direct him not to answer the question.

14                   MR. SMITH:  Well, it's not a

15         proper basis for direction not to

16         answer the question.  Since the judge

17         is away on vacation, you're just taking

18         advantage of that fact and we are just

19         going to have the witness come back and

20         come back to my office and I will make

21         the application if you're going to

22         stand by that instruction.

23                   MR. RADOMISLI:  How is what the

24         policy is today relevant to what's

25         pertinent in 2009?

Page 39

1            VINOD DHAR, M.D.
2              MR. SMITH:  I want to be able to
3       find out what the policy is today, so I
4       could find out whether or not he has
5       knowledge about whether or not it's
6       changed in the last five years.
7              MR. RADOMISLI:  Okay.  So why
8       don't you ask him if he knows whether
9       or not it's changed before --
10             MR. SMITH:  First, I need to
11      establish what it is.  This is really
12      getting absurd.  This is getting
13      absurd.  You want to play games with
14      me --
15             MR. RADOMISLI:  No, I don't want
16      to play --
17             MR. SMITH:  Then we'll just cut
18      it out and I will just make the
19      application now.
20             MR. RADOMISLI:  I don't want to
21      play games at all.  I want to be able
22      to --
23             MR. SMITH:  Well, you're playing
24      games --
25             MR. RADOMISLI:  -- I don't --

Page 40

```
 1              VINOD DHAR, M.D.
 2         MR. SMITH:  The witness can't
 3    tell me what the actual policy was five
 4    years ago, but the witness can
 5    certainly tell me generally what the
 6    policy has been over the past few years
 7    and whether or not it's changed.  Okay.
 8         MR. RADOMISLI:  Ask him if he
 9    knows whether or not it's changed.
10    Regardless what the policy is, you can
11    ask him do you know --
12         Q.    To your knowledge, sir, since
13  you joined or started working at Jamaica
14  Hospital, has its policy about assessing the
15  dangerousness of a patient changed?
16         A.    My knowledge it has.
17         Q.    How has it changed?
18         MR. LEE:  Just note my
19    objection.
20         MR. SMITH:  Great.
21         MR. RADOMISLI:  Between 2007 and
22    2009?
23         MR. SMITH:  No.
24         Q.    How has it changed in the
25  history of your career at Jamaica, how has
```

Page 41

1           VINOD DHAR, M.D.
2    the assessment of the dangerousness changed?
3           MR. RADOMISLI:  I dont' believe
4        he's permitted to answer or required to
5        answer questions about things that
6        occurred after 2009, including the
7        policy.
8           MR. SMITH:  So you're going to
9        direct him not to answer the question.
10          MR. RADOMISLI:  In that form.
11       If you want to limit to anything that
12       occurred while he was there --
13          MR. SMITH:  You just told me
14       because your co-counsel suggested it to
15       him that he doesn't have any
16       recollection about what the policy was
17       in 2009, okay.  So now I've asked the
18       question broadly and you're objecting
19       to that.  So if you want to continue to
20       interfere with my examination I'm going
21       to stop and I'll call the judge and I
22       will tell him what's going on and we
23       will decide and we'll be here all day
24       long with this nonsense.
25          MR. RADOMISLI:  If you want to

Page 42

```
 1              VINOD DHAR, M.D.
 2     call the judge and get a ruling now,
 3     that's fine with me.
 4              MR. LEE:  Let me just say I
 5     didn't suggest anything, other than --
 6              MR. SMITH:  Yes, you did.  You
 7     did.  You started this problem, Brian.
 8              MR. LEE:  This is what the
 9     deposition is about.  It's about the
10     policy --
11              MR. SMITH:  It's about you
12     getting in the way of my finding out
13     basic information policy.  That's what
14     it's about.
15              MR. LEE:  I respectfully
16     disagree with that.
17              MR. RADOMISLI:  If you're going
18     to call the court, please do in our
19     presence.
20              MR. SMITH:  We are going off the
21     record.
22              (Discussion off the record.)
23              MR. SMITH:  Going back on the
24     record.  It's 11:21.
25              While we were off the record for
```

Page 43

1                    VINOD DHAR, M.D.

2          about looks like 20, 25 minutes I

3          called the court at 10:54, I spoke with

4          Judge Sweet's law clerk, Adam Chen.  We

5          had a -- I think it was an on the

6          record discussion or an off the record

7          discussion about instructions not to

8          answer certain questions and Mr. Chen

9          said that since Judge Sweet is away, he

10         didn't know whether or not he was going

11         to be able to get back to us with a

12         ruling and we've waited or I've waited

13         approximately 25 minutes and there has

14         been no indication from the court that

15         we will get a ruling.  So I am going to

16         proceed with my examination and note

17         that I object to the needless

18         interference with the order and

19         methodology with which I wanted to take

20         this witness' deposition.

21             Q.    Can you turn, sir, to

22    Exhibit 130.  You have that still in front

23    of you?

24             A.    Yeah.

25             Q.    Do you have an emergency

1                    VINOD DHAR, M.D.

2    admission status policy, which is the

3    fourth, fifth and the sixth page of the

4    exhibit?

5          A.     The page number?

6          Q.     It's page number -- start on

7    page 17 and it goes through 19.

8          A.     Okay.

9          Q.     Yes.

10                MR. RADOMISLI:   Starting at 17.

11         Q.     Starting with 17, please.

12         A.     Okay, sure.

13         Q.     Are you familiar with this

14   policy statement?

15         A.     Yes, I'm familiar.

16         Q.     When was the last time, other

17   than just now, that you've read this

18   statement?

19         A.     This I read recently when I

20   reviewed the policy on CPEP.

21         Q.     So this was one of the policy

22   statements that was part of the statements

23   that you reviewed?

24         A.     CPEP.

25         Q.     Did you have any role in the

Page 45

```
 1              VINOD DHAR, M.D.
 2    creation of this document, this three-page
 3    document, which is pages 17, 18 and 19?
 4         A.     No.
 5         Q.     Who created this document?
 6         A.     This is created by the
 7    administration -- administrator and the
 8    chairman.
 9         Q.     Who are those people?
10         A.     Same people, Mr. Mule and Dr.
11    Vivek.
12         Q.     The administrator.  Is this what
13    we refer to as the 939 admission or
14    involuntary admission?
15         A.     That's correct.
16         Q.     In the second paragraph under
17    heading policy it says that the patient's
18    alleged to have a mental illness.  Do you
19    see that reference there to a mental
20    illness?
21         A.     Yeah.
22         Q.     Am I correct that one of things
23    that's required in order to admit somebody
24    involuntary is a medical or psychiatric
25    determination that an individual has a
```

```
1                    VINOD DHAR, M.D.
2    mental illness?
3                MR. RADOMISLI:  Objection.
4                MR. CALLAN:  Object to the form
5         of the question.
6         Q.    Is that correct?  You could
7    answer.
8         A.    Yes.
9         Q.    And am I correct that the
10   comprehensive psychiatric evaluation is the
11   means whereby a determination of this mental
12   illness issue is made?
13        A.    Yes.
14        Q.    You said the comprehensive
15   psychiatric evaluation, it takes an hour or
16   more?  Right, remember saying that?
17        A.    Yes.
18                MR. CALLAN:  Objection to the
19        form.  Are you talking about -- I just
20        want to know the timeframe you're
21        talking about.  Are you talking about
22        currently or in general or --
23                MR. SMITH:  I'm talking about in
24        general.
25                MR. CALLAN:  This is in general?
```

Page 47

1                    VINOD DHAR, M.D.

2              MR. SMITH:  Yes, this is in

3         general.

4              MR. CALLAN:  I object to the

5         form of the question and I also object

6         on the grounds that it's not relevant

7         as to what the current policy is.

8              MR. LEE:  I join.

9              MR. RADOMISLI:  Me too.

10        Q.      You said that the comprehensive

11   psychiatric evaluation takes an hour or

12   more, right?

13        A.      Yes.

14        Q.      Is the hour or more, is that the

15   assessment that's done by the professional

16   of the patient?

17        A.      By the psychiatrist.

18        Q.      So the psychiatrist spends at

19   least an hour with the patient; is that

20   correct?

21        A.      Yes.

22        Q.      Does the psychiatrist spend time

23   speaking with anybody else?

24        A.      The psychiatrist has to spend

25   time with the person who brings the patient

Page 48

1              VINOD DHAR, M.D.

2  in, the staff that saw the patient, the

3  family members or any other source of

4  information that he can get information

5  from.

6      Q.    Does the hospital policy provide

7  for the training for staff to conduct this

8  kind of assessment?

9      A.    Yes.

10     Q.    How?

11     A.    Well, if you're a -- you've done

12 a residency in psychiatry that makes you --

13 that qualifies you to do a psychiatric

14 examination.  Then there are from time to

15 time in-services and updates in the

16 psychiatry examination.

17     Q.    How long does it take the

18 resident to become qualified to do this

19 evaluation?

20          MR. RADOMISLI:  I am going to

21     object.  It's beyond the scope.  Don't

22     answer.

23          MR. SMITH:  Don't answer the

24     question?

25          MR. RADOMISLI:  It's beyond the

Page 49

1                VINOD DHAR, M.D.
2      scope of the deposition.
3            MR. SMITH:  So that's a
4      relevancy objection.
5            MR. RADOMISLI:  There is a court
6      order limiting this examination to the
7      policy and procedure at Jamaica
8      Hospital regarding involuntary
9      hospitalization.  That question does
10     not go to it.
11           MR. SMITH:  It doesn't?  What
12     does it go --
13           MR. RADOMISLI:  Training.
14           MR. SMITH:  It goes to how the
15     policy is effectuated at the hospital.
16     So I mean like I said before --
17           MR. RADOMISLI:  It doesn't.
18           MR. SMITH:  So how the hospital
19     or whether or not the hospital provides
20     any means for its personnel to figure
21     out whether or not somebody has a
22     mental illness isn't relevant to the
23     policy of hospital?
24           MR. RADOMISLI:  I thought you
25     already asked that question.

1          VINOD DHAR, M.D.
2              MR. SMITH:  I'm trying to find
3          out what the hospital does to find out
4          whether or not the people who are
5          making this assessment about mental
6          illness have any qualifications to do
7          so. You don't think that goes to their
8          policy?  Or maybe their policy is to
9          have people who have no medical
10         training at all to make these
11         assessments.  You want to tell me
12         whether or not that's an appropriate
13         question?
14         Q.      Doctor tell me this, do the
15    people who make the assessments under
16    Jamaica Hospital policy have any training or
17    any qualifications for making the decisions
18    they make?
19             MR. RADOMISLI:  Asked and
20         answered.
21         Q.      You can answer it again.  Do
22    they have any training, do they have any
23    experience, what experience do they have if
24    they have any?
25             MR. CALLAN:  Objection.

Page 51

1              VINOD DHAR, M.D.

2         MR. LEE:  Objection.

3         MR. RADOMISLI:  Objection.

4    That's beyond the scope and to the

5    form.

6         MR. SMITH:  You're telling him

7    not to answer that question?

8         MR. RADOMISLI:  It's an improper

9    question based on the court order

10   limiting this deposition.

11        MR. SMITH:  This is beyond the

12   -- you are doing whatever you can to

13   interfere with my ability to ask basic

14   questions --

15        MR. RADOMISLI:  I am just asking

16   you to comply with the court --

17        MR. SMITH:  No, you're not.

18   This is ridiculous.  I can read the

19   policy statement.  What you're

20   basically telling me is if I don't ask

21   you what it says in black and white on

22   the page he doesn't have to answer the

23   question.  I don't know how you're

24   interpreting this court order and you

25   haven't explained to me how.

Page 52

1          VINOD DHAR, M.D.

2          MR. RADOMISLI:  I'll tell you.

3     You could do what you did before, which

4     is ask him to explain all the terms

5     which are on the policy.

6          MR. SMITH:  All right, well, the

7     witness is going to have to come back

8     and I'm not going to do this at your

9     office any more.

10          MR. RADOMISLI:  Do you think

11     things would be going differently if we

12     were at your office?

13          MR. SMITH:  No, I am just not

14     going to accomodate you in the way that

15     you've requested that I accomodate you

16     in the past, because I've come up here,

17     brought my assistants and --

18          MR. RADOMISLI:  Entourage --

19          MR. SMITH:  -- And my files with

20     me and this is what I get.  So the

21     cooperation that I've extended to you

22     in the past is not going to come -- the

23     witness will have to come and come back

24     to my office.

25          MR. RADOMISLI:  We will see.

Page 53

```
 1              VINOD DHAR, M.D.
 2              MR. SMITH:  Right.  We will see.
 3      Q.      So how does Jamaica make sure
 4  that its policy about determining about
 5  whether or not somebody has a mental illness
 6  is complied with?
 7      A.      By psychiatric evaluation.
 8      Q.      How does Jamaica determine that
 9  the people doing the evaluation have any
10  qualifications to do that?
11              MR. RADOMISLI:  Objection.
12      Beyond the scope.
13      Q.      You want to answer my question?
14              MR. RADOMISLI:  No. I'm
15      objecting.  I'm directing him not to
16      answer.  It's beyond the scope of the
17      deposition given the court order.
18      Q.      What is the mental illness
19  within the meaning of this policy statement?
20      A.      Mental illness is any sort of
21  illness that meets the criteria of the
22  DSM-IV.
23      Q.      What are those?
24      A.      Well, there are different kinds
25  of mental illnesses.
```

Page 54

```
 1              VINOD DHAR, M.D.
 2       Q.      Tell me all of them.
 3              MR. RADOMISLI:  All of them?
 4       Q.      Yeah, I want to know what the
 5   mental illnesses that fall within the scope
 6   of this policy scope are?
 7              MR. RADOMISLI:  If -- you can't
 8          ask him to go through and recite the
 9          DSM-IV, but you can certainly --
10              MR. SMITH:  Excuse me, your
11          function here is to object.  If you
12          want to interfere, you can tell him not
13          to answer that question, but your
14          speeches are inappropriate.  Okay.  So
15          cut it out.  I'm done with the
16          interference.  Completely done.  You
17          can instruct him not to answer the
18          question.  You can object to the form
19          or you can leave.  Those are your
20          choices.  Which is it going to be?
21              MR. RADOMISLI:  Well, I'm not
22          going to limit myself to those options.
23          But for this particular question, I
24          will object to the form.
25       Q.      You want to answer the question,
```

Page 55

1                    VINOD DHAR, M.D.
2      please?  What are the mental illnesses that
3      fall within the scope of this term that fall
4      within this term that's in your policy
5      statement?
6                    MR. RADOMISLI:  Objection to the
7          form.
8                    THE WITNESS:  I can answer?
9                    MR. RADOMISLI:  Yes.
10         A.      Okay.  Mental illness is any
11     person, who because of mental illness,
12     mental illness means a number of diseases,
13     number of problems.  It could be from
14     schizophrenia, psychosis to depression, to
15     traumatic brain injury and that results in
16     symptoms causing harm to self or others.
17         Q.      Any other conditions that fall
18     within the definition of mental illness
19     within the policy statement?
20                   MR. RADOMISLI:  Objection to
21         form, asked and answered.  You can
22         answer.
23         A.      There are a number of diseases
24     under the DSM-IV, but this criteria is
25     specific for any condition that could lead

Page 56

```
 1              VINOD DHAR, M.D.
 2   to a person being harmed self and others.
 3   It could be from panic attack, it could be
 4   from acute anxiety, it could be from brief
 5   psychotic episode.  So there are a number
 6   illnesses which don't necessarily meet this
 7   criteria.
 8        Q.     Can you explain that answer?  I
 9   don't understand that.
10        A.      The patient is suffering from --
11   let me rephrase it.  Patient comes with a
12   behavior, certain behavior, we have to
13   determine whether that patient -- whether
14   the behavior is because of mental illness.
15   We have to do an examination to figure out
16   what kind of mental illness this patient is
17   suffering from.  But before we come to that,
18   we have to keep the patient in the emergency
19   room to figure out what's going on.
20        Q.      In the second paragraph of this
21   policy statement there is a phrase that
22   reads:  Patient's alleged to have a mental
23   illness for which immediate observation,
24   care and treatment in the hospital is
25   appropriate.  That's the first part of that
```

Page 57

1                    VINOD DHAR, M.D.
2    policy statement.  You see that?
3         A.     Yes.
4         Q.     Do I understand you to be
5    telling me that any kind of mental illness
6    can qualify for the type of mental illness
7    which can lead to an involuntary commitment
8    to the patient?
9                    MR. RADOMISLI:  Objection.
10        Scope.
11        A.     What I am saying is that patient
12   alleged to have mental illness for immediate
13   observation, care and treatment in the
14   hospital is appropriate can qualify for
15   that.
16        Q.     What I want to know, what are
17   the kinds of mental illnesses that are being
18   referred to in this policy statement?
19                    MR. RADOMISLI:  Asked and
20        answered.
21        A.     Same I mentioned before, any
22   kind of illness, any kind of behavior can
23   qualify for this statement.
24        Q.     So any mental illness; is that
25   fair to say?

Page 58

1                    VINOD DHAR, M.D.

2         A.      Yes.

3         Q.      And it says in the statement

4    here it's a mental illness for which

5    immediate observation, care and treatment is

6    appropriate?

7         A.      Yes.

8         Q.      Why does it have to be for

9    immediate observation, care and treatment?

10        A.      Because of the dangerousness.

11        Q.      When a patient is brought into

12   Jamaica Hospital and is being assessed under

13   this policy statement, does the

14   comprehensive psychiatric evaluation have to

15   be done right away?

16        A.      Not necessarily.  It can be done

17   in an unspecified time.  Immediately you

18   have to see whether there is any acute

19   symptoms that need to be controlled.  If the

20   patient is not cooperative, you cannot do

21   it, you cannot examine the patient, the

22   patient is not willing to be examined --

23   answer questions.  So it has to be -- it's

24   very -- it's actuality not specified what

25   exactly means immediate evaluation.  It

1                    VINOD DHAR, M.D.
2    could be as soon as the patient comes in you
3    can start the treatment or it could be until
4    the patient is willing to talk.
5          Q.      Does Jamaica Hospital have a
6    policy about when the comprehensive
7    psychiatric evaluation has to be conducted
8    by?
9          A.      There is not a policy, but it's
10   standard that within eight hours admission
11   to the emergency room and it also depends on
12   how busy the ER is.
13         Q.      Do I understand what you're
14   saying that there's no written policy at
15   Jamaica Hospital for when the psychiatric
16   evaluation has to be conducted by?
17         A.      Not that I'm familiar with.
18         Q.      But you're telling me there is a
19   practice of doing so?
20         A.      It's eight hours.
21         Q.      And that's not in writing?
22         A.      That's not in writing.
23         Q.      And it's eight hours depending
24   upon -- you also said it's eight hours, it
25   was also depending upon how busy the ER was?

Page 60

```
1                    VINOD DHAR, M.D.
2          A.      How busy the eye ER was.
3          Q.      When you're referring to the ER,
4     you're referring to the medical ER or the --
5          A.      No, referring to the
6     psychiatric.
7          Q.      So we're talking about the
8     psychiatric ER; is that correct?
9          A.      Yes.
10         Q.      How is this eight hour practice
11    communicated to the staff that are expected
12    to comply with it?
13         A.      It's done through in-services.
14         Q.      I don't understand what that
15    means.
16         A.      It means when you have staff
17    meetings, you talk about how -- within what
18    timeframe the assessment should be done and
19    how if there's a problem or anything whether
20    you need a second staff member.  That's how
21    it is taught to the staff.
22         Q.      So the eight-hour goal or
23    practice objective is discussed at staff
24    meetings; is that correct?
25                 MR. RADOMISLI:  Objection to the
```

Page 61

1              VINOD DHAR, M.D.

2      form.  You can answer.

3      A.     Yes, it's a in-service.  It is

4  our case conferences, in-services and staff

5  meetings.

6      Q.     This practice of the hospital of

7  having this comprehensive psychiatric

8  evaluation done within eight hours,

9  depending upon how busy the psych ER, that

10 evaluation has to be done by who under

11 the --

12     A.     The staff psychiatrist who has

13 been given by the privileges in the hospital

14 by credential committee and approved by the

15 chairman.

16     Q.     Who were the staff psychiatrists

17 in 2009 that were the ones that were

18 required to conduct this comprehensive

19 evaluation?

20          MR. RADOMISLI:  Objection to

21      form and the scope.

22          MR. CALLAN:  Join in the

23      objection.

24          MR. LEE:  Objection.

25          MR. RADOMISLI:  But you can

Page 62

1                    VINOD DHAR, M.D.

2        answer.

3        A.      The are a number of

4    psychiatrists who work in the emergency

5    room.  Some who are called on-call, meaning

6    they provide extra services during evening

7    and night hours, but the main person during

8    the daytime was Dr. Bernier.

9        Q.      Other than these on-call

10   psychiatrists and Dr. Bernier, was there

11   anybody else who could do the comprehensive

12   psychiatric evaluation in October or

13   November 2009?

14              MR. RADOMISLI:   Objection to

15       form and scope.

16       A.      I am not sure if we had

17   residents at that time, but if they're

18   residents, they could do it, resident

19   physician, under the supervision of the

20   attending psychiatrist.

21       Q.      When you say a resident, what do

22   you mean?

23       A.      Resident is a physician who is

24   undergoing postgraduate training in

25   psychiatry.

Page 63

1               VINOD DHAR, M.D.

2          Q.      Is there any requirement that

3     the resident have a certain level of

4     experience before they do a comprehensive

5     psychiatric evaluation?

6               MR. LEE:   Objection to the form.

7               MR. RADOMISLI:   Objection to the

8          form and beyond the scope.

9          A.      They have to be observed for

10    period of three months, six months and once

11    they -- the attending says that they're

12    qualified to -- that they can independently

13    make an assessment, regardless of whether

14    they make independent assessment or not, it

15    still has to be done under the supervision

16    of the psychiatrist.

17         Q.      What is this threshold three to

18    six month period called at Jamaica Hospital?

19         A.      It's not actually Jamaica

20    Hospital policy.   It's what's known as

21    residency program policy.   That a resident

22    will not be allowed to see patients

23    independently until the attending

24    psychiatrist supervising him or her is

25    confident that the resident can be

Page 64

1                    VINOD DHAR, M.D.
2    independent evaluation.
3         Q.      What is this threshold called at
4    Jamaica Hospital?
5         A.      I'm not aware of any specific
6    name.
7         Q.      Does Jamaica Hospital have any
8    requirements in it's policies for
9    documenting when a resident meets this
10   threshold so that they are considered
11   qualified to conduct a comprehensive
12   psychiatric evaluation?
13        A.      Not that I'm aware of.
14        Q.      So it's not the kind of thing
15   that gets put in the personnel file of the
16   resident?
17        A.      No.
18        Q.      Going back to the policy
19   statement on the emergency admission status
20   subject line.  It also says that there is a
21   reference here that patient alleged to have
22   mental illness and which is likely to result
23   in the serious harm to himself and others.
24   You see that?
25        A.      Yes.

Page 65

1              VINOD DHAR, M.D.

2        Q.      What is that policy statement

3    based on?

4        A.      That's based on the New York

5    State Mental Hygiene Law Article 9.

6        Q.      Did a lawyer assist Jamaica

7    Hospital in crafting this policy statement?

8        A.      I'm not aware of it.

9        Q.      I am sorry?

10       A.      I'm not aware.

11       Q.      Have you ever read the New York

12   Law on the Section 9.39?

13       A.      Yes, I have to.  Yes.

14       Q.      Does Jamaica Hospital's policy

15   endeavor to comply with Section 9.39 of the

16   Mental Hygiene Law?

17              MR. RADOMISLI:  As it existed in

18       2009?

19              MR. SMITH:  Yes.

20       A.      Yes.

21       Q.      Has the mental Hygiene Law

22   Section 9.39 changed since 2009?

23              MR. RADOMISLI:  Don't answer the

24       question.

25       Q.      Do you know whether or not

Page 66

1              VINOD DHAR, M.D.
2    Section 9.39 of the Mental Hygiene Law has
3    changed since 2009?
4              MR. RADOMISLI:  Read that back.
5              (Record read.)
6              MR. RADOMISLI:  I am going to
7         object.  He's not a lawyer.
8              MR. SMITH:  I am not asking for
9         a legal opinion.  I want to know
10        whether or not he knows if the statute
11        changed.  I have a copy of it.  You
12        want me to show it to him.  It hasn't
13        changed.
14             MR. RADOMISLI:  Are you
15        representing that it hasn't changed?
16             MR. SMITH:  Here's a copy of the
17        statute obtained from Lexis.  The
18        alleged date of history shows it was
19        created in '77 and it was amended most
20        recently in 1986.
21             MR. RADOMISLI:  Okay.
22             MR. SMITH:  I would still like
23        to know whether or not he thinks it's
24        changed 'cause there's so much at stake
25        here about moving target of the Jamaica

Page 67

1              VINOD DHAR, M.D.

2      Hospital over the past 15 years.

3              MR. RADOMISLI:  Well, but you've

4      already represented that it hasn't and

5      you have the policy in front of you.

6              MR. SMITH:  I know what the law

7      is, but he's the witness.  If he thinks

8      that the policy had changed or the law

9      has changed, which was the basis for

10     the policy, then he can tell me, but I

11     suspect that if you let him answer the

12     question he's going to say I don't know

13     if it's ever changed, it's been the

14     same ever since I have been at Jamaica

15     Hospital in 1996.  But maybe he will

16     say something else.  I don't know.

17             MR. RADOMISLI:  Do you know

18     whether it has changed?

19     A.      I'm not aware of any change, no.

20     Q.      Would you like to see a copy of

21     the law?

22             MR. RADOMISLI:  Well --

23     Q.      You said you read it before?

24     A.      Yeah.

25             MR. SMITH:  All right, so let's

Page 68

1               VINOD DHAR, M.D.

2       mark it.  Let's show it to the witness.

3               (Plaintiff's Exhibit 151,

4       document, was marked for identification

5       as of this date.)

6       Q.      Have you had the chance to look

7   at 9.39?

8       A.      Yes.

9       Q.      And you've said you read it

10  before?

11      A.      I have gone over it.

12      Q.      And you're not aware of any

13  changes in this statute, are you?

14      A.      I'm not aware, no.

15      Q.      It says at the bottom of the

16  first page, it says the director shall admit

17  such person.  You see that, sir?

18      A.      Hmm-mm.

19      Q.      You have to say or no. Just yes

20  or know.  Uh-huh comes out --

21      A.      Yes.

22      Q.      Okay.  It says only if a staff

23  physician of the hospital.  So that's a

24  staff physician that you're referring to

25  earlier, right?

Page 69

1              VINOD DHAR, M.D.

2        A.      That's the attending

3    psychiatrist.

4        Q.      Attending psychiatrist.   Okay.

5        A.      Yes.

6        Q.      It says that the director under

7    the statute shall admit the person.   Does

8    Jamaica have a director or somebody who

9    makes this decision or is that basically the

10   staff physician or attending who makes that

11   decision?

12       A.      It's the attending who makes the

13   decision.

14       Q.      So is there a director of the

15   hospital who is required to make the final

16   decision on admitting a patient pursuant to

17   Section 9.39?

18       A.      No.   There is no director or any

19   other person who is required to approve or

20   -- but it is done on the -- because director

21   -- it's staff psychiatrist in the hospital

22   -- in the emergency room is the one who

23   makes the decision.

24       Q.      Is there anybody who holds the

25   title of director at the hospital or is it

Page 70

1                  VINOD DHAR, M.D.
2  really chairman?
3        A.      Well, it's actually, there is a
4  medical director in the ER, psych ER.
5        Q.      Who is that?
6        A.      Dr. Bernier was the medical
7  director at that time.
8        Q.      What's the role of a medical
9  director, other than making these final
10  sign-off decisions on involuntaries?
11        A.      Basically overseeing, reviewing
12  all the cases and supervising residents and
13  nurses and other physicians.
14        Q.      All right, and then going back
15  to the policy statement, page 17, Exhibit
16  130 at the bottom of that page it says the
17  admitting physician must be licensed in New
18  York State.  You see that?
19        A.      Yes.
20        Q.      All right.  Is the admitting
21  physician within this policy the same as the
22  attending physician and the staff physician
23  as we have been discussing, is that all the
24  same person?
25                  MR. RADOMISLI:  Objection to

Page 71

1                VINOD DHAR, M.D.

2        form.

3        A.      Admitting physician would be

4    same, yes.

5        Q.      So the admitting physician is

6    the same as the staff physician, right?

7        A.      Well --

8                MR. RADOMISLI:  Objection to

9        form.

10       A.      -- it could be the staff

11   physician or it could be the director, any

12   of the physicians.

13       Q.      On the same page there is a

14   phrase likely to result in serious harm.  Do

15   you see that?

16       A.      Hmm-mm.

17       Q.      You have to say yes.

18       A.      Yes.  I'm sorry.

19       Q.      And then the policy defines

20   likelihood to result in serious harm in two

21   ways, numbered one and two.  You see that?

22       A.      Yeah.

23       Q.      And am I correct that the first

24   definition deals with categories of

25   dangerousness to oneself and the second

Page 72

1                    VINOD DHAR, M.D.

2    category deals with dangerousness to others?

3          A.      Yes.

4          Q.      You see the phrase manifested

5    by?

6          A.      Yes.

7          Q.      What does that mean?

8          A.      It could be any kind of behavior

9    that is out of control or violent behavior

10   or threats to some other people.

11         Q.      Am I correct that manifested by

12   requires that the patient either engage in

13   some conduct or makes some sort of statement

14   that suggests that the person is dangerous

15   to themselves?

16         A.      Yes.

17         Q.      It also goes on to say "Or other

18   conduct demonstrating that he is dangerous

19   to himself."  You see that?

20         A.      Yes.  Can you specify where?

21         Q.      In sub one --

22         A.      Yeah.

23         Q.      -- in the definition of

24   likelihood to result in serious harm there

25   is a phrase or other conduct demonstrating

Page 73

1                  VINOD DHAR, M.D.
2       that he is dangerous to himself.  You see
3       that?
4            A.     Yes.
5            Q.     What kind of conduct under the
6       Jamaica policy is the kind of conduct that
7       demonstrates that a person is a danger to
8       himself or herself?
9            A.     Any kind of behavior that a
10      person puts himself into any physical harm,
11      not able to provide for himself food,
12      clothing, shelter or medical treatment.
13           Q.     Is there any other conduct,
14      other than what you've just said, that is
15      the kind of conduct that demonstrates a
16      person that's a danger to themselves or --
17           A.     I am not aware of anything.
18           Q.     Does the conduct under this
19      policy have to be conduct that the admitting
20      or the staff physician observes?
21           A.     No.  It's based on the report
22      that we get from the person who brings the
23      patient in.
24           Q.     Is there any policy at Jamaica
25      about determining the reliability of the

Page 74

1              VINOD DHAR, M.D.

2    reported information?

3         A.     Well, there is no policy, but in

4    general, we, as the staff psychiatrist or

5    director, will try to get information from

6    other sources, but people who come to us

7    generally is reliable.

8         Q.     Why do you say that people who

9    come to you are generally reliable?

10        A.     The people who bring the

11   patients in.

12        Q.     No, I understand that's what

13   you're saying, but I'm saying why do you say

14   that they're generally reliable?

15        A.     Well, because we are -- we take

16   patients from police or from agency, they

17   bring the patient in there or family

18   members.

19        Q.     So is it the policy of Jamaica

20   Hospital to accept without question the

21   information that's provided by the police or

22   family members or some other provider or

23   relator of information?

24             MR. RADOMISLI:  Objection to the

25        form, asked and answered.  You can

1                    VINOD DHAR, M.D.

2          answer.

3          A.     Yes.   Until we find any other

4    resource that we have collateral

5    information.   Until then we are obligated to

6    keep that information as valid information.

7          Q.     You say that you're obligated to

8    keep that information as valid information,

9    what is that information based on?

10         A.     It's based on New York State

11   9.39.   That 9.39 emergency room under the

12   order of the commissioner we can receive and

13   retain a person until all the evaluations

14   are done.

15         Q.     No, I understand that 9.39 gives

16   Jamaica Hospital the ability to involuntary

17   commit somebody, but what I am trying to

18   find out is what's the basis for you saying

19   that you're obligated to accept as valid the

20   information that's provided to you by the

21   people who are relating the information to

22   you?

23              MR. RADOMISLI:   Objection to

24         form.   You can answer.

25         A.     Until we get the other

Page 76

1                VINOD DHAR, M.D.
2    information from collateral.
3         Q.      So if a family member comes into
4    Jamaica Hospital and relates information
5    about somebody it's Jamaica's practice or
6    policy to accept that information as true
7    without any assessments or attempt to
8    independently verify it?
9         A.      Yes.
10              MR. RADOMISLI:   Objection.
11              MR. LEE:   Objection.
12              MR. RADOMISLI:   And to form.
13        Q.      The next page of the policy
14   statement has under the headings procedure
15   number of categories, you see that?
16        A.      Yes.
17        Q.      Number one, there's a reference
18   here to following examination and interviews
19   other informants, which may be available
20   should the examining physician consider the
21   patient to meet the criteria above, he
22   should certify his finding on form OMH 474.
23   Do you see that?
24        A.      Yes.
25        Q.      There's a reference here to the

Page 77

```
1                    VINOD DHAR, M.D.
2    examining physician.   You see that?
3         A.    Yes.
4         Q.     Is the examining physician the
5    same person as the staff physician or
6    attending physician?
7         A.    Yes.
8         Q.     That's the same person who
9    conducted the comprehensive psychiatric
10   evaluation, right?
11                  MR. RADOMISLI:   Objection to
12        form.
13        A.    Yes.
14        Q.     And the form, what is this form
15   OMH 474?
16        A.      It's a form that when a
17   psychiatrist, attending psychiatrist in his
18   or clinical opinion finds that the patient
19   can be admitted on an involuntary basis and
20   there's a form there, you have to fill that
21   form with the justification why you think
22   the patient should be admitted and based on
23   information and whatever the collateral
24   information, what other sources of
25   information, that's form 474.
```

Page 78

1                    VINOD DHAR, M.D.

2        Q.        And the staff physician or the

3    attending physician, the one who has

4    conducted the comprehensive psychiatric

5    evaluation, they fill out the form if they

6    make the decision that the person should be

7    involuntarily committed; is that correct?

8        A.        Yes.

9        Q.        Are they required, under Jamaica

10   policy, to fill out that form at any

11   particular time in relation to when they

12   make their decision?

13       A.        As soon as the decision is made,

14   the patient needs to be admitted.

15       Q.        So the policy at Jamaica is to

16   have the form executed as soon as the

17   decision by the psychiatrist is made; is

18   that correct?

19       A.        Yes.

20       Q.        In the next paragraph there is a

21   reference to a number two.  Do you see that?

22       A.        Number two?

23       Q.        Yes.

24       A.        Yeah.

25       Q.        It says here the admitting

Page 79

1                    VINOD DHAR, M.D.

2    doctor will record on the form the names of

3    the people.  You see that?

4        A.    Yes.

5        Q.    And that's the admitting doctor

6    is the same as the examining doctor?

7        A.    As the examining doctor, yes.

8        Q.    I want to the show what's been

9    previously marked as Exhibit 131.  This came

10   from the chart or the file from this

11   particular patient, Schoolcraft was his

12   name.

13       A.    Okay.

14       Q.    I am not going to ask about

15   that, but I am going to ask you about the

16   form itself; okay?  All right?

17       A.    Okay.

18       Q.    So can you tell me what this

19   document is?

20       A.    This is a document known as

21   notice of status and rights to the emergency

22   admission.  This information is given to the

23   patient.  Copy of this information is given

24   to the patient explaining his rights and

25   what the protocol is going to be.

Page 80

1                    VINOD DHAR, M.D.

2          Q.     And is this document also

3     supposed to be given to the patient at the

4     same time as the 474 form is the filled out

5     by the staff physician?

6          A.     Yes.

7          Q.     And so is it policy at Jamaica

8     Hospital for the staff physician, if they

9     make a decision to involuntary commit, to

10    sign page 1 of the 747 and then hand the

11    patient this form notice of status and

12    rights?

13         A.     Yes.

14         Q.     And in this notice it says here,

15    in the form, in the printed form -- by the

16    way, this is a printed form that's created

17    by Jamaica Hospital or by?

18         A.     Department of the Office Mental

19    Health, New York State.

20         Q.     So Jamaica Hospital just gets

21    the form from the Department of Mental

22    Health?

23         A.     Yes.

24         Q.     So this form here says based

25    upon -- "base upon an examination by a staff

Page 81

1                VINOD DHAR, M.D.

2    physician you have been admitted as an

3    emergency status patient to this hospital

4    for persons with mental illness for

5    immediate observation, care and treatment.

6    Within 48 hours of the time of your

7    admission, you will examined by another

8    physician, who is a member of the

9    psychiatric staff of this hospital."  You

10   see that, sir?

11        A.      Yes.

12        Q.      Now, the phrase within 48 hours

13   of the time of your admission.  You see

14   that?

15        A.      Yes.

16        Q.      Under Jamaica's policies, when

17   does this 48-hour time period begin?

18        A.      It starts from the time this

19   form is filled -- the 747, the form is

20   signed, that is the time given for that.

21        Q.      Am I correct that the hospital

22   policy and practice is that the

23   comprehensive psychiatric evaluation is done

24   subject to the busyness of the emergency

25   room within eight hours; is that correct?

Page 82

1                    VINOD DHAR, M.D.

2        A.      Yes.

3        Q.      And then the evaluation should

4    be conducted within that eight-hour period,

5    correct?

6        A.      Yes.

7        Q.      Then after that comprehensive

8    psychiatric evaluation is done, then the

9    form for 747 is filled out and this notice

10   of rights is provided to the patient at that

11   time; is that correct?

12       A.      Yes.

13               MR. LEE:   Objection to the form.

14       Q.      And then is it the Jamaica

15   Hospital policy that within 48 hours of the

16   signing of the 474 form that a member of

17   psychiatric staff of the hospital has to

18   then do an evaluation of the patient?

19       A.      Yes.

20       Q.      Why is the second evaluation of

21   the patient by a member of the psychiatric

22   staff required?

23               MR. RADOMISLI:   Objection to

24       form.  Go ahead.

25       A.      It's a process of checks and

Page 83

1                    VINOD DHAR, M.D.
2      balances and make sure that admission was
3      done properly and that the patient met
4      criteria for admission.
5          Q.      If the initial or staff
6      physician gives a diagnosis and the
7      psychiatric staff member's diagnosis
8      disagrees with the initial assessment, is it
9      the Jamaica Hospital policy to then
10     discharge the patient?
11                 MR. RADOMISLI:   Read that back,
12          please.
13                 (Record read.)
14                 MR. LEE:   Note my objection to
15          the form.
16                 MR. RADOMISLI:   Objecting to the
17          form and also, beyond the scope of the
18          deposition, which deals within
19          involuntary admission.
20                 MR. SMITH:   That's what the
21          subject matter of the question is.
22                 MR. RADOMISLI:   Subject of the
23          matter of the question is discharging.
24          It's different.   Can you rephrase the
25          question?

1           VINOD DHAR, M.D.

2           MR. SMITH:  Are you instructing

3     him not to answer the question?

4           MR. RADOMISLI:  It's beyond the

5     scope.

6           MR. SMITH:  I'm not sure I

7     understand.

8           MR. RADOMISLI:  It's a little

9     nit picky.

10          MR. SMITH:  Yeah, to me it seems

11    very nit picky.

12          MR. RADOMISLI:  But I'll -- just

13    read it back one more time.

14          (Record read.)

15          MR. LEE:  Note my objection to

16    the form for the record.

17          MR. RADOMISLI:  Can you rephrase

18    the question in such a way that it

19    squarely fits within the scope of this

20    deposition?

21          MR. SMITH:  No, I can't.  This

22    is -- this is the -- you're mincing

23    words here.  Do you want to split

24    hairs?  Then you can split hairs all

25    you want.

Page 85

1          VINOD DHAR, M.D.

2          MR. RADOMISLI:  Then I will

3      because I am just going by what the

4      court order says and what you asked for

5      and what you asked for was a witness to

6      testify about the policy on involuntary

7      admissions.

8          MR. SMITH:  Right, okay, and so

9      you're telling me that the only time

10     that's relevant to make an inquiry

11     about the hospital's policy is the

12     moment that the staff physician signs

13     the piece of paper saying that yes, we

14     are going keep this person against

15     their will and that anything that

16     happens thereafter is completely

17     irrelevant to the scope of this

18     examination?  If you're saying that,

19     which is what I think you're saying

20     then you're taking an extremely narrow

21     view of the court order and needlessly

22     interfering with my deposition.

23         MR. RADOMISLI:  That isn't what

24     I'm saying.  Number two, it's not an

25     exceedingly narrow interpretation of

1              VINOD DHAR, M.D.

2       the court order, because when you

3       applied to -- when you served the

4       30(b)(6) and when -- subject to the

5       motion, you only asked about policies

6       regarding involuntary admission.  You

7       didn't say anything about the discharge

8       either in the application to the court

9       or in response to my objection or

10      during conference and therefore, there

11      is no court order -- the court order is

12      limited to involuntary admission.

13           MR. SMITH:  The second page of

14      the involuntary admission policy talks

15      about the second evaluation needing to

16      be done under the Jamaica policy.  So

17      you're telling me I can't ask questions

18      about the second assessment because the

19      patient has already been admitted.

20      Then I think we should really stop the

21      examination and I will make my

22      application.

23           MR. RADOMISLI:  I'm not saying

24      that you can't ask questions about the

25      second evaluation.  You can ask the

Page 87

1              VINOD DHAR, M.D.

2      question you just asked.

3            MR. SMITH:  Well, you don't get

4      to decide that.

5            MR. RADOMISLI:  No, the court

6      does and the court order says

7      involuntary admissions and that's what

8      you noticed in your 30(b)(6) and that's

9      what was subject of the court order is.

10            MR. SMITH:  So you're splitting

11      hairs and now you have it.

12            MR. RADOMISLI:  Not splitting

13      hairs.  Going by exactly what you asked

14      for.

15      Q.      If the second doctor disagrees,

16   what happens to the patient?

17            MR. LEE:  Objection to the form.

18            MR. RADOMISLI:  Disagrees with

19      what?

20            MR. SMITH:  The initial

21      assessment.

22            MR. LEE:  Objection to the form.

23            MR. RADOMISLI:  Objection to the

24      form, but you can answer it.

25      A.      If the second physician

1              VINOD DHAR, M.D.

2    disagrees with opinion of the first

3    physician, the second physician has to come

4    up with his own opinion as to why he thinks

5    the patient should or should not be kept in

6    the hospital.

7         Q.    Am I correct that if the staff

8    psychiatrist disagrees with the assessment

9    to keep the patient involuntarily in the

10   hospital, the patient is not discharged?

11             MR. LEE:   Objection.

12             MR. RADOMISLI:   Objection to the

13        form.

14        A.    If the second physician

15   disagrees with the diagnosis, then the

16   physician has to come up with a reason for

17   keeping the patient.

18        Q.    And is that burden on the second

19   physician based on a Jamaica policy

20   statement?

21        A.    Yes.

22        Q.    Where is that statement?

23        A.    It's part of the evaluation

24   because the reason this is done is to make

25   sure that all the information has been

```
 1                 VINOD DHAR, M.D.
 2   received, that the collateral information,
 3   and all other information from other sources
 4   is also reviewed and then a decision is made
 5   after 48 hours.
 6        Q.    So you're telling me that the
 7   initial decision really isn't the final
 8   decision.  That the final decision is really
 9   made once the staff psychiatrist makes the
10   decision within the 48-hour period?
11             MR. RADOMISLI:  Objection to
12        form.
13        Q.    Is that correct?
14        A.    Yes.
15             MR. LEE:  Objection.
16        Q.    And you're telling me that the
17   final decision by the staff psychiatrist is
18   made after additional information is
19   obtained from collateral sources?
20             MR. LEE:  Objection to the form.
21             MR. RADOMISLI:  Objection to
22        form.
23        A.    Yes.
24        Q.    What collateral sources is the
25   information obtained from?
```

Page 90

1              VINOD DHAR, M.D.

2        A.      It could be anything, any family

3    member, any agency, anywhere a patient can

4    say that you can get the information from

5    this source and whatever helps in making the

6    assessment and decision of the patient.

7        Q.      Are there any policy statements

8    laid out in Jamaica Hospital for how an

9    attending or staff psychiatrist makes this

10   investigation into this collateral source

11   information?

12       A.      There's no specific policy, but

13   there's practice that collateral information

14   has to be obtained.

15       Q.      And what is the practice about

16   getting collateral information?

17       A.      Any resources.

18       Q.      Did you say any resources?

19       A.      Any resources that the patient

20   has that you can get information about the

21   patient's condition.

22       Q.      So is Jamaica policy for doctors

23   to get any reasonable information that could

24   be relevant to their decision?

25       A.      Yes.

Page 91

1              VINOD DHAR, M.D.

2          Q.      In the second page of the

3     emergency admission status policy there is a

4     paragraph number 4.  It says that the

5     admitting doctor is responsible for assuring

6     the second examination is conducted within

7     48 hours.  You see that?

8          A.      Yes.

9          Q.      How does the admitting doctor go

10    about effectuating this policy of making

11    sure the second evaluation is done within

12    48 hours?

13         A.      The general practice is that

14    when a patient is admitted, the admitting

15    physician will inform the attending

16    physician, who is receiving the patient,

17    that this patient is being admitted and give

18    information and then also based on any new

19    patient that comes to the unit the time, the

20    signature and the time on page 1 will

21    determine what time the certification has to

22    be made.

23         Q.      So the date and the time is a

24    pretty important entry in the patient's

25    chart as to when they were involuntary

Page 92

1             VINOD DHAR, M.D.
2    admitted; is that right?
3              MR. RADOMISLI:   Objection to
4        form.
5              MR. LEE:   Objection.
6        A.     Yes.
7        Q.     Does the Jamaica Hospital policy
8    require that the admitting doctor consult
9    verbally with the second physician or can it
10   be done by simply having a file forwarded to
11   the second physician?
12       A.     General practice is to verbally
13   inform the attending.   Sometimes you don't
14   know who the attending is going to be.   So
15   you give the report to the nurse.   Nurse
16   gives the report to the nurse on the unit
17   and then they inform the doctor.   If it's
18   after-hours, in the morning.
19       Q.     In that same paragraph of the
20   policy statement it says that if the
21   admission occurs during routine weekday
22   hours, the admitting doctor will arrange for
23   the psychiatrist who has admitting
24   privileges to conduct the second examination
25   immediately.   You see that?

Page 93

1                    VINOD DHAR, M.D.
2          A.    Yes.
3          Q.    Why is it the policy of Jamaica
4    Hospital to have that second evaluation done
5    immediately?
6          A.    I'm not sure why the policy is
7    that.
8          Q.    The last sentence says that any
9    difficulty in making such arrangements is to
10   be immediately referred to the chairman or
11   one acting on his behalf.  You see that?
12         A.    Yes.
13         Q.    Is the reference to the chairman
14   is that Mr. Vivek -- Dr. Vivek?
15         A.    Dr. Vivek, yes.
16         Q.    And who are the individuals at
17   Jamaica Hospital who would be acting on the
18   chairman's behalf under this sentence?
19         A.    That would be me.
20         Q.    Have you been involved in making
21   sure that the second evaluation happens
22   immediately after the first one?
23         A.    Yes.
24         Q.    Is the reason why the second
25   evaluation has to be done as soon as

Page 94

1              VINOD DHAR, M.D.

2    possible after the first one, because the

3    patient is being held against their will?

4              MR. LEE:  Objection to the form.

5              MR. RADOMISLI:  Objection to

6         form and asked and answered.  Go ahead.

7         A.    I guess, yes, that's the reason.

8         Q.    Next paragraph number 5, there

9    is a statement in the Jamaica Hospital

10   policy to the effect that "should the

11   patient reject this suggestion to convert to

12   voluntary status and should the psychiatrist

13   find that the patient does not meet the

14   above criteria for emergency

15   hospitalization, he must immediately contact

16   the chairman or one acting on his behalf

17   prior to the completion of page number 2 of

18   OMH 474."  You see that reference?

19        A.    Yes.

20        Q.    Is this the second -- no, that's

21   a bad question.  Let me rephrase that.

22             Why does the Jamaica Hospital

23        policy provide that the psychiatrist

24        should immediately contact the chairman

25        or somebody acting on his behalf if he

Page 95

1                    VINOD DHAR, M.D.

2         disagrees with the initial assessment.

3                    MR. LEE:   Objection to the form

4         of the question.

5         A.        Because there are two physicians

6    from the same institution in giving two

7    different opinions.   So it's responsibility

8    of the chairman to make sure that the right

9    decision is made.

10        Q.        Is that responsibility of the

11   chairman, is that laid out in, to your

12   understanding, New York State Law 9.39?

13        A.        I'm not sure.

14        Q.        I gave you a copy of 9.39.

15   Would you mind looking at it and tell me

16   whether or not your understanding of this

17   provision for having the chairman referee

18   disagreements is part of the state law or

19   not?

20                   MR. RADOMISLI:   Objection.   He's

21        not required to interpret the law.

22                   MR. SMITH:   I'm not asking for

23        his interpretation of the law.

24                   MR. RADOMISLI:   You are.

25                   MR. SMITH:   No, I'm not.   I'm

Page 96

1                    VINOD DHAR, M.D.

2         asking if he knows anything about the

3         law.

4              MR. RADOMISLI:  He answered that

5         question.

6              MR. SMITH:  More specifically, I

7         want to know whether or not his

8         function of the chairman refereeing

9         disputes is, to his understanding, part

10        of New York State Law.

11             MR. RADOMISLI:  That's beyond

12        the scope.

13             MR. SMITH:  So you're going to

14        direct him not to answer --

15             MR. RADOMISLI:  I am going to

16        direct him not to answer questions that

17        requires him to interpret the law.

18        That's correct.

19        Q.      Doesn't your job as acting

20   chairman of the psychiatric department at

21   Jamaica Hospital require that you interpret

22   9.39 properly?

23        A.      May job is to make sure that the

24   clinical decisions are made properly.

25        Q.      My question is don't you think

Page 97

1              VINOD DHAR, M.D.

2    your job is to make sure that your staff is

3    complying with 9.39 when they involuntarily

4    commit people?

5         A.    Yes.

6         Q.    And in service of that

7    objective, you have familiarized yourself

8    with the statute, right?

9         A.    Yes.

10             MR. SMITH:  You're still going

11        to instruct this witness not to answer

12        those questions?

13             MR. RADOMISLI:  He can answer

14        that.

15        Q.    Does the policy statement about

16   having the chairman refereeing or be

17   consulted by this psychiatric attending

18   about a disagreement with the initial

19   assessment comply with New York State Law,

20   to your understanding?

21             MR. RADOMISLI:  Objection to

22        form.  You can answer.

23        A.    Say it again, can you repeat it?

24        Q.    Yes.  You have in front of you

25   9.39, right?

Page 98

1                    VINOD DHAR, M.D.

2          A.      Yes.

3          Q.      Is there a provision in the law,

4    to your understanding, that provides that

5    when the initial assessment and the second

6    assessment disagrees that the chairman is to

7    be consulted?

8          A.      Every hospital has a

9    departmental policy and a hospital policy

10   because we're working under the hospital.

11   So there's an internal policy to make sure

12   that all decisions are made according to the

13   law and based on the clinical decisions.

14         Q.      This is my question, Doctor, I

15   thought that the hospital policy was that

16   you need to have a initial assessment

17   confirmed by a second assessment as a

18   precaution to protect the patient; is that

19   right?

20         A.      Yes.

21         Q.      But the policy statement says

22   that if there's a disagreement, the patient

23   is not discharged, it says that there is a

24   conferral with the chairman and what I want

25   to know is whether or not you think that

1                VINOD DHAR, M.D.

2    this practice or this policy of conferring

3    with the chairman when there is a

4    disagreement is consistent or inconsistent

5    with your understanding of Section 9.39 of

6    the Mental Hygiene Law.

7                MR. RADOMISLI:  Objection to the

8         form.

9         A.    I won't be able to answer that

10   question whether it's consistent with 9.39,

11   but every hospital has an internal policy

12   and we are required, the chairman has the

13   responsibility of the entire department.  He

14   has to make sure that all decisions are made

15   correctly and he delegates that authority to

16   either me or the duty (phonetic) chief or

17   the attending physician.

18        Q.    Have you had occasion in the

19   past as the acting chairman or the assistant

20   chairman to act in this referee function?

21               MR. SMITH:  Can you just hold

22        that question a second.  This is the

23        court calling back I think.

24               Hello, oh, hi, yeah.  This is

25        Mr. Smith.  Mr. Chan?

1           VINOD DHAR, M.D.

2         CALLER:  This is Adam Chen from

3 Judge Sweet's Chambers.  How are you

4 doing?

5         MR. SMITH:  I'm doing well.

6 We're at the deposition and thank you

7 for getting back to me and you're on

8 speakerphone.  All counsel and the

9 witness and the court reporter are

10 present.

11         CALLER:  Okay.  So I have

12 instructions from the judge.  He told

13 me to let you guys know that all

14 objections can be made, but there are

15 no objections can be made not to answer

16 except on grounds of privilege.

17         MR. SMITH:  Okay.  Thank you

18 very much.

19         CALLER:  No problem.  Have a

20 good day.

21         MR. SMITH:  Okay, bye.  Did you

22 get that down?

23         All, right, I'm going to take a

24 five-minute break.

25         MR. CALLAN:  Yes.  Just in terms

Page 101

1                   VINOD DHAR, M.D.

2        of how much longer are we going to

3        lunch break, break now or are we going

4        to have lunch?

5               MR. SMITH:   I just want five

6        minutes to just regroup and see where I

7        need to come back.   This is

8        unfortunately -- we are going to go off

9        the record.   It's 12:35.

10              (Whereupon, a recess was taken.)

11              MR. SMITH:   Going on the record.

12        It's 1:41.

13        Q.      When we left off, Doctor, we

14    were talking about this conferral with the

15    chairman or the person acting on behalf of

16    the chairman.

17        A.      Yes.

18        Q.      When the situation where the

19    initial assessment gives a diagnosis and the

20    second assessment has a disagreement about

21    what that assessment is.   That was the

22    subject matter.   Have you in the past ever

23    acted as an intermediary for these types of

24    situations?

25        A.      Yes.

Page 102

1              VINOD DHAR, M.D.

2        Q.     So what is the hospital policy

3    with respect to how to address the

4    disagreement between the initial assessment

5    and the second assessment?

6              MR. RADOMISLI:  Object to the

7         form and substance, but you can answer.

8        A.     Well, it's always been the

9    customary practice of the hospital to get a

10   second opinion, because it's a question of

11   safety and we want to make sure that the

12   right decision is made.  And it has happened

13   before.

14       Q.     So do I understand you to be

15   saying that the hospital policy will be to

16   make sure that the second assessment is, in

17   fact, correct?

18       A.     If the second assessment is --

19   if there's a difference of opinion, then

20   there will be a second opinion.

21       Q.     Meaning third opinion actually?

22       A.     A third opinion, yes -- well --

23   okay, a third opinion, yeah.

24       Q.     And if the third opinion agrees

25   with the first opinion, will a patient then

1             VINOD DHAR, M.D.

2   be maintained in an involuntary status?

3        A.      If there is sufficient grounds

4   and the person who is doing the third

5   consultation or opinion will document that

6   in their notes or write a new form.

7        Q.      I'm not sure I asked the

8   question clearly, so I am going to restate

9   it.  If the first assessment is the person

10  should be involuntary comitted and attending

11  psychiatrist says no, I don't think so, I

12  think this person is either not suffering

13  from a mental illness or has not

14  demonstrated through words or conduct or

15  some other means, dangerousness, and so I

16  think the person should be released.  Under

17  those circumstances, the hospital practice

18  and policy is to go to the chairman or

19  somebody acting on behalf of the chairman,

20  right?

21       A.      Yes.

22       Q.      And that chairman or that person

23  acting on behalf of the chairman is another

24  medical professional, right?

25       A.      Yes.

Page 104

```
 1              VINOD DHAR, M.D.
 2        Q.      And they will hear the pros and
 3    the cons about the two different opinions,
 4    right?
 5        A.      Exactly.
 6        Q.      What I want to know is if the
 7    third person to make this assessment agrees
 8    with the first assessment, that the person
 9    should be involuntarily committed, will the
10    person be maintained in an involuntary
11    status or will they be discharged?
12              MR. RADOMISLI:  Objection to the
13         form and has no connection to the case,
14         but go ahead.
15        A.      It's not an option of discharge,
16    because you can keep a person on a voluntary
17    commitment.  So the option there is either
18    to convert the involuntary to voluntary.
19    The patient is willing to stay or yes, if
20    the third opinion is that the patient should
21    stay and we will keep the patient -- we may
22    even go for the fourth opinion, because we
23    are always acting for the safety of the
24    patient.  We would always -- err on the side
25    of the safety.
```

1                    VINOD DHAR, M.D.

2        Q.      When you say err on the side of

3    safety, what you say is err on the side of

4    maintaining them in the hospital against

5    their will?

6                MR. RADOMISLI:   Objection to

7        form.

8        Q.      Is that right?

9                MR. RADOMISLI:   Objection to

10       form.

11       A.      Depending on the circumstances

12   to what they came, safety if they are

13   dangerous to themselves or others, yes.

14       Q.      You recognize that dangerousness

15   is an assessment about what somebody may do

16   in the future, right?

17       A.      No, actually, no.  Dangerousness

18   is what the patient came in for.

19       Q.      So in order to make an

20   assessment about whether or not somebody is

21   dangerous, the medical professional has to

22   look into the past, right?

23       A.      Yes.

24       Q.      So they're not trying -- they

25   don't have a crystal ball and they're not

Page 106

1           VINOD DHAR, M.D.
2   trying to look in the future to make a
3   determination about what the person may do
4   in the future; is that correct?
5        A.     No.   We try to see what the
6   status is right now, what is the level of
7   dangerousness right now, and whether there
8   needs to be any treatment or any
9   intervention until we find that the patient
10  is safe to be discharged.
11       Q.     So my understanding is you're
12  saying that if, in the past, somebody had
13  acted in a way that suggested that they were
14  dangerous, but if they're no longer
15  currently acting under those conditions,
16  then everything else being equal, they would
17  be considered not dangerous?
18            MR. RADOMISLI:   According to
19       hospital policy.
20       Q.     According to hospital policy; is
21  that correct?
22       A.     Yes.
23       Q.     So that the critical time for
24  the initial decision under the 9.39, the
25  condition of the patient at the time that

1              VINOD DHAR, M.D.
2    the comprehensive psychiatric evaluation is
3    being done; is that correct?
4         A.    Yes.
5         Q.    You mentioned earlier today that
6    there was in-service training, do you
7    remember that?
8         A.    Yes.
9         Q.    What is that?
10        A.    In-service training is you can
11   say it's a class where the staff is updated
12   on the hospital policy or the recent
13   treatment changes or recent intervention.
14   That is like giving training.
15        Q.    Are there classes or training on
16   making assessments about dangerousness?
17        A.    Now, yes.
18        Q.    Are those handouts or Power
19   Point or some other form of communication?
20             MR. RADOMISLI:  Objection to the
21        extent that you're asking for
22        currently, but given the judge's
23        ruling, I have no choice but to let him
24        answer the question.
25        Q.    You can answer the question.

Page 108

1                    VINOD DHAR, M.D.

2              THE WITNESS:  I can?

3              MR. RADOMISLI:  I am obligated

4        to let you answer the question.

5        A.      Yes, we do have.  Now we have.

6        Q.      When did Jamaica Hospital start

7   having written presentations for in-service

8   training on the issue of dangerousness?

9              MR. RADOMISLI:  You're going

10        beyond the scope.

11             MR. SMITH:  No, I'm not at all.

12        I'm trying to understand what the

13        policy is, how the policy is

14        effectuated, and how its intent is

15        communicated to a physician that

16        actually implements it, so I don't

17        think I'm going beyond the scope.

18             MR. RADOMISLI:  You could answer

19        the question.

20        A.      Could you repeat the question?

21        Q.      I can't, but I will reformulate

22   it.

23             When did Jamaica Hospital start

24   having these in-service training sessions

25   with the staff, where the subject matter of

Page 109

1              VINOD DHAR, M.D.

2  dangerousness was taught?

3      A.      When we have actually at Jamaica

4  Hospital we have what's called grand rounds

5  and case conferences.  It started since

6  1995.  We have two to three grand rounds a

7  week.

8              MR. RADOMISLI:  He asked you

9      when.  Read back the question, please.

10     A.      We started earlier 1995, 1996.

11     Q.      So if I went to Jamaica Hospital

12  and I want to get a copy of this

13  presentation, could I do that?

14     A.      I don't know whether we used to

15  keep any records of those at that time or

16  not.

17     Q.      Does Jamaica Hospital have any

18  records today of what the training sessions

19  look like over the past five years?

20             MR. RADOMISLI:  Now I am going

21     to object because one of the things

22     that you asked to talk about was to

23     have a witness testify on this issue

24     and that was not permitted by the

25     court.

Page 110

1              VINOD DHAR, M.D.

2          MR. SMITH:  I don't remember

3      that, frankly.  All I am trying to do

4      is find out -- I will make the request

5      for the documents, if they exist, and

6      I'm not going to ask the witness any

7      more questions about the contents of

8      these documents, but if they do exist

9      and they had existed at the time, then

10     I think you should produce them.

11         MR. RADOMISLI:  Take that under

12     advisement.

13         MR. SMITH:  I'm just trying to

14     establish if they exist.

15         MR. RADOMISLI:  Then just -- you

16     haven't asked that, do you know whether

17     -- you didn't ask the when question.

18     You skipped over that.

19         MR. SMITH:  I did ask the when.

20     I just didn't get an answer.  I think

21     the answer was since 1995.

22         MR. RADOMISLI:  That was when --

23     Q.     Let me ask you this question, in

24  2009 there were in-service training classes

25  at Jamaica Hospital; is that right?

```
                                      Page 111
  1              VINOD DHAR, M.D.
  2        A.      Yes.
  3        Q.      In 2009 or as of 2009, those
  4   in-service training session included
  5   dangerousness assessment; is that right?
  6        A.      Yes.
  7        Q.      And those training sessions
  8   were, among other things, done verbally and
  9   in writing; is that correct?
 10              MR. RADOMISLI:   In 2009.
 11        Q.      In 2009?
 12        A.      Yes.  I can recall verbally and
 13   not in the writing there is case
 14   presentation, a slight Power Point
 15   presentation.
 16              MR. SMITH:   So I am going to
 17         make a request for the production of
 18         any written presentations that were in
 19         effect and utilized as of the end of
 20         2009 at Jamaica Hospital.
 21              MR. RADOMISLI:   Taken under
 22         advisement, please follow-up in
 23         writing, but it appears to me that this
 24         has come up and has already been ruled
 25         against and I'd appreciate that if I
```

Page 112

1                    VINOD DHAR, M.D.

2         show you that, then you'd agree to

3         withdraw the demand.

4                    MR. SMITH:  If you can show me

5         that the judge has considered this

6         issue and rejected my request for that

7         information and have also convinced me

8         that no new information has come to

9         light, which ought to make the judge

10        reconsider that, if, in fact, he's

11        taken that position and I will gladly

12        withdraw it.

13                   MR. RADOMISLI:  I can show you

14        where the judge considered it and not

15        granted it.

16                   MR. SMITH:  Moving on.

17        Q.        Now, earlier we talked about two

18   ways that the individual is involuntary

19   admitted to the hospital.  You remember that

20   generally?

21        A.        Yes.

22        Q.        Am I correct that there is a

23   third way, which is commonly known as the

24   CPEP way; is that a correct description?

25        A.        CPEP?

Page 113

1                    VINOD DHAR, M.D.

2        Q.      Yeah.

3        A.      How do you spell it?

4        Q.      C-P-E-A --  not --

5        A.      CPEP?

6        Q.      CPEP?

7        A.      Yeah.

8        Q.      Okay.  Maybe I'm just a little

9    bit confused.  There is the involuntary

10   under 9.39, which we already talked about

11   and then there was involuntary under 9.27,

12   which is the two physicians involuntary and

13   then is there is a third way known as this

14   CPEP?

15              MR. RADOMISLI:  CPEP.

16       Q.      CPEP?

17       A.      Comprehensive psychiatric

18   emergency program.

19       Q.      What is that?

20              MR. RADOMISLI:  Going beyond the

21       scope of the policy.  It's not in there

22       of --

23              MR. SMITH:  I'm going to save

24       you some breath.

25       Q.      Was this CPEP program instituted

```
 1                 VINOD DHAR, M.D.
 2   sometime after 2009?
 3        A.      Yes.  It has been only for a
 4   year now.
 5        Q.      Only for one year at Jamaica
 6   Hospital?
 7        A.      Yes.
 8        Q.      If you don't mind, please turn
 9   back to 130 of the involuntary emergency
10   admission status procedure.  We were on page
11   18.  Then bottom there is a number 6 and
12   this relates to a request for a court
13   hearing.
14        A.      Yes.
15        Q.      Can you describe for me what
16   this policy is in number 6 about the request
17   for a court hearing?
18        A.      Every patient that is admitted
19   on an involuntary basis has -- admitted to
20   the inpatient unit, has access to mental
21   health legal services.  And if they wish to
22   be discharged or the family wants, they want
23   to discharge the patient, they will discuss
24   with the doctor and if the physician
25   disagrees with them and feels that the
```

Page 115

1                  VINOD DHAR, M.D.
2    patient is not ready for discharge, then if
3    the patient or the family members can give
4    in writing to the mental health legal
5    service attorney, a notice that they wish to
6    be discharged, they will file a petition and
7    we will respond to that petition and within,
8    I think within seven days or five days of,
9    we will be going to the court in front of
10   the judge, supreme court judge.
11        Q.    Does the request to be
12   discharged have to be given by the mental
13   health legal services bureau or can it be
14   given by the patient?
15        A.    The patient gives it to the
16   mental health legal services.  He presents
17   them.  Or it could be their own attorneys.
18        Q.    The paragraph that I am
19   interested in, it says that if at any time
20   after, it's after admission of the patient,
21   a relative or a friend or the MHLS gives
22   written notice to the director of a request
23   for a court hearing, the director will
24   immediately deliver to the Supreme Court of
25   Queens County and to the mental health legal

1                    VINOD DHAR, M.D.

2      services, a copy of the notice and a copy of

3      patient records.  That's what the policy

4      statement says, right?

5           A.     Yes.

6           Q.     So do I understand the policy to

7      permit the patient to give the notice

8      required under this section to the

9      physician?

10          A.     I mean, according to the policy,

11     yes, but it generally comes from -- the

12     request generally comes from the attorney

13     who starts the process.

14          Q.     If a patient is in the

15     in-patient ward or unit and the attending is

16     talking with the patient and the patient

17     says I don't think I belong here, I want to

18     get out.  Is that sufficient to trigger this

19     policy for having the hospital petition the

20     supreme court?

21               MR. RADOMISLI:  Objection to

22          form.

23          A.     No, it's not sufficient.

24          Q.     Why not?

25          A.     Because based on the patient's

Page 117

1                    VINOD DHAR, M.D.

2    condition, depending on the diagnosis,

3    patient can change their mind 24 hours a

4    day.  Generally, when a patient says

5    something like that, you talk to them, you

6    talk to the family and they will agree to

7    take medication or not medication, unless we

8    come up with a safe discharge plan, most

9    patients stay back.  They will not insist

10   upon leaving, but at the same time we will

11   ask them or tell the mental health legal

12   service to please contact this patient, talk

13   to him and see what he deserves -- what he

14   wants.

15        Q.    So the notice that's required to

16   trigger this obligation on the part of the

17   hospital to go to supreme court, this must

18   be in writing?

19        A.    Yes.

20              MR. RADOMISLI:  Objection to

21        form.

22        Q.    It must be in writing?

23        A.    Yes.

24        Q.    Other than it being in writing,

25   does it have to say anything or do anything?

Page 118

1               VINOD DHAR, M.D.

2        A.     Well, it has to show the supreme

3    court why the physician thinks medical

4    necessity of the patient needs to stay in

5    the hospital.

6        Q.     No, I am talking about the

7    patient.  The patient's request to get out.

8    This section 6 here, as I understand it, is

9    a mechanism for involving the court, where a

10   patient says I want to leave and the

11   hospital says no, we think you should stay.

12   So there's a disagreement, right?

13       A.     Right.

14       Q.     So this section provides a

15   mechanism for petitioning the court to

16   resolve the issue about whether or not the

17   patient should kept against his or her will,

18   right?

19       A.     Right.

20       Q.     What I want to know, it says

21   here if at any time the patient or relative

22   or the mental health legal services gives

23   written notice, then this process starts.

24   What I want to know is, other than this

25   notice being in writing, is there anything

1                    VINOD DHAR, M.D.

2    else about the notice that's required under

3    this policy?

4         A.      No, from the patient.

5         Q.      So if a patient were to write on

6    a piece of paper and hand it to his

7    physician, I want to leave right now.  That

8    would be sufficient?

9         A.      That would be sufficient as long

10   as it's written, the notice will be process,

11   yes.

12        Q.      How long does the hospital take

13   under this policy to petition the court?

14        A.      As soon as possible.

15        Q.      In your experience, what is

16   that?

17        A.      It's about a week, because court

18   is only held on Tuesdays.  So by Friday of

19   that day if all the paperwork and everything

20   is ready, the court hearing will be on

21   Tuesday.

22        Q.      Turn to the next page of the

23   exhibit that you have in front of you.

24   There's a admissions from emergency room

25   policy statement.

Page 120

1              VINOD DHAR, M.D.

2        A.       44?

3        Q.       Yes, page 44.  You have that in

4    front of you?

5        A.       Hmm-mm.

6        Q.       What is this policy?

7        A.       This is the protocol involved in

8    transferring the patient or admitting the

9    patient from emergency room under the

10   inpatient unit.

11       Q.       From the medical emergency room?

12       A.       No. We're talking about from

13   psychiatric emergency room to psychiatric

14   inpatient unit.

15       Q.       I see.  So where it says here

16   the policy a patient may be admitted from

17   the emergency room to the psychiatric

18   inpatient unit only after the evaluation in

19   the emergency room by a member of the

20   department of psychiatry?

21       A.       Right.

22       Q.       The references in that policy

23   stating to the emergency room, are referring

24   to psychiatric emergency room?

25       A.       Psychiatric emergency room.

1                   VINOD DHAR, M.D.

2          Q.      And this case, Jamaica Hospital

3     has medical ER and a psychiatric ER; is that

4     right?

5          A.      That's right.

6          Q.      And in 2009, that was also true,

7     Jamaica Hospital had a medical ER and a

8     psychiatric ER?

9          A.      Yes.

10         Q.      In the procedures it says each

11    patient admitted to the psychiatric

12    inpatient unit should have a medical

13    clearance documented in the medical records

14    by the emergency room staff.  You see that?

15         A.      Yes.

16         Q.      Does that mean that all of the

17    patient's medical records are taken from the

18    psych ER and then sent up to the ward.  Is

19    that what this means?

20         A.      Yes.  I think what this means is

21    that before admitting the patient to the

22    psychiatric inpatient, we had to do what's

23    called a medical clearance, meaning patient

24    has to go on physical and medical clearance

25    and that's done by a internist, not by a

Page 122

1             VINOD DHAR, M.D.

2    psychiatrist or a primary care physician.

3    And if they are medically stable and don't

4    need any acute medical treatment, they will

5    be admitted to psychiatric inpatient.  Or

6    they will be followed by medical attending.

7         Q.      If a patient comes to the

8    hospital through the medical ER --

9         A.      Yes.

10        Q.      -- unit and is there a policy in

11   place for having a patient medically cleared

12   by the medical ER unit before the patient is

13   transferred to the psychiatric emergency

14   room?

15        A.      Yes.

16        Q.      Why is that?

17        A.      Because when a patient comes to

18   the medical ER, that's considered as a

19   medical emergency and before we transfer the

20   patient to psychiatric ER, we want to make

21   sure that they don't need any acute medical

22   care.

23        Q.      Does this policy that we are

24   looking at right here, page 44, does this

25   policy require that the records of the

Page 123

1                   VINOD DHAR, M.D.

2    documents in the medical records obtained

3    when the patient goes into the medical ER

4    that those records be transmitted to the

5    psychiatric ER?

6         A.     Yes.

7         Q.     So in the circumstances when a

8    patient comes into the hospital first

9    through the medical emergency room, am I

10   correct then that it's the policy to have

11   that entire file sent to psychiatric

12   emergency room?

13        A.     Yes.

14        Q.     And then in the procedures,

15   there is a list of A, B, C and D.  Do you

16   see that?

17        A.     Yes.

18        Q.     There are these references to

19   these tests CBC, CMP and any other blood

20   test felt by the examining physician to be

21   clinically indicated, you see that?

22        A.     Yes.

23        Q.     What is CMC and CMP?

24        A.     CBC means basically your blood

25   count, about the red cells and the white

Page 124

1               VINOD DHAR, M.D.

2    cells any differential count.  CMP means

3    your comprehensive metabolic profile, means

4    your liver enzymes, your kidney enzymes,

5    your muscle enzymes, all comprehensive

6    testing is done.

7         Q.      Why is that done?

8         A.      Because psychiatric patient who

9    take medications, like any other medication,

10   can have some side-effects and in order to

11   make sure that there are no changes, so we

12   need to have a baseline workup.  So that if

13   there are any changes we know that it's

14   because of this treatment or this medication

15   and also, to rule out any condition that has

16   been silent there and patient not knowing.

17   In our patients -- most of our patients

18   don't take care of themselves.  They are

19   chronically sick patients.  They don't care

20   of their medical problems and that's why

21   this provision was made that they would have

22   a separate physical examination.

23        Q.      On the next page is number 5,

24   talks about the admitting psychiatrist will

25   be responsible for determining that valid

1              VINOD DHAR, M.D.
2    legal papers are completed, what is that
3    referring to?
4         A.     That's referring to same form
5    that we talked about, form 747.
6         Q.     And it goes on to say "in the
7    case of involuntary admission a licensed
8    emergency room physician may act as a
9    certifier."  What is that a reference to?
10        A.     It's the same thing that
11   certifier in this emergency room will be
12   admitting psychiatrist.
13        Q.     Then the next paragraph says
14   "the emergency room staff calls the
15   inpatient unit for bed assignments."
16        A.     Yes.
17        Q.     What is that?
18        A.     Well, when you admit the patient
19   you need to have a bed on the inpatient
20   unit.  And so once you admit the patient,
21   you need to know what bed patient will be
22   assigned.  They say the patient going to bed
23   204 because that bed is available right now.
24   So the patient will be admitted to bed 204.
25   You could see on the record there is

1                    VINOD DHAR, M.D.

2    admitted to bed 204.

3         Q.     Would that availability of a bed

4    assignment have an impact on whether or not

5    somebody is going to be admitted

6    involuntarily to the hospital?

7                    MR. RADOMISLI:  Objection to

8         form.

9         A.     Yes.

10        Q.     Why?

11        A.     I'm jumping here.  Because if we

12   need to admit the patient on an involuntary

13   basis, we have to have a bed available

14   inpatient.  If we don't have a bed, then we

15   make arrangements for the patient to be

16   transferred to some other hospital where

17   beds are available.

18        Q.     What other hospitals does

19   Jamaica Hospital avail itself of to

20   effectuate this practice or policy?

21        A.     Well, we available all the

22   hospitals in Queens.  We call LIJ, Elmhurst

23   Hospital, there used to be this hospital

24   that's closed now and whatever hospital --

25   Gracey Square, we sent patients sometimes.

1                VINOD DHAR, M.D.

2        Q.      What about the availability of

3    insurance, does that have any impact on

4    whether or not a patient will be

5    involuntarily admitted to the hospital?

6                MR. RADOMISLI:  This is now

7         beyond what's already been covered.  So

8         I am going to direct him not to answer.

9                MR. SMITH:  The judge's ruling

10        was very clear.

11               MR. RADOMISLI:  Well -- doesn't

12        mean it's beyond the scope of court

13        order.

14               MR. SMITH:  Well, I think the

15        judge was very clear that no objections

16        with instructions not to answer will be

17        made except to preserve privilege.

18               MR. RADOMISLI:  I'm sure he was

19        not considering whether it would be

20        within the scope of the EBT.  I mean,

21        there is still some basic parameters

22        and that's what the -- what's the

23        purpose -- that's what needs to be

24        adhered to.

25        Q.      Turn back to page 17, the

Page 128

1                    VINOD DHAR, M.D.

2    emergency admission status policy, there's a

3    phrase substantial risk of physical harm.

4    You see that?

5        A.      Yes.

6        Q.      How is that risk measured?

7        A.      Like I mentioned before, there

8    is no specific tools.  It is measured based

9    on the history available, circumstances

10   patients coming to the emergency room and

11   the collateral information.

12       Q.      How does the hospital go about

13   measuring whether or not the risk of

14   physical harm is substantial?

15              MR. RADOMISLI:  Objection to the

16       form.  You could answer.

17       A.      It's not really defined.  It's

18   clinical judgment and based on that clinical

19   judgment, you make a determination.

20       Q.      Can a patient be held pursuant

21   to this emergency status policy if the

22   patient is acting bizarre?

23       A.      Yes.

24       Q.      Can a patient be involuntarily

25   committed under this policy if they're

1                    VINOD DHAR, M.D.
2    acting in an agitated manner?
3                    MR. RADOMISLI:   Objection to the
4         form.
5         A.      Any other conduct what's
6    mentioned in the law based on the clinical
7    judgment, any other behavior can be
8    considered as a risk.  Yes, patients can be
9    put in the emergency room if they're
10   agitated or they're acting bizarre.
11        Q.      Is there anything more that is
12   required, other than a label or the
13   conclusion that the person is acting
14   bizarre?
15                   MR. RADOMISLI:   Object to the
16        form.  Go ahead.
17        A.      That is a sense of the
18   evaluation that when a patient comes or the
19   person comes, any definition by others, the
20   admitting physician has to determine what
21   does it mean by being bizarre and how does
22   that impact the dangerousness of the
23   patient.
24        Q.      Can you define for me what kind
25   of the behavior qualifies as bizarre

Page 130

1                    VINOD DHAR, M.D.

2    behavior that is sufficient to involuntarily

3    commit somebody under this policy of

4    Jamaica's?

5              MR. RADOMISLI:  Objection to

6         form.

7         A.     I can give a number of examples.

8    Patient is at home, locks himself up,

9    threatens his mother or he goes out, takes

10   his clothes off, runs around the

11   neighborhood, stands in front of -- on the

12   traffic light and starts preaching Bible and

13   any -- or starts running around the traffic

14   or highway, walking on the highway.

15        Q.     Is it your view that all of that

16   behavior would qualify somebody for

17   involuntary commitment in the hospital?

18             MR. RADOMISLI:  Under this

19        policy?

20        Q.     Under this policy?

21             MR. RADOMISLI:  Objection to

22        form.

23        A.     Yes.  Whatever called them to

24   come to the hospital and then determination

25   will be made whether they remain risk or

1               VINOD DHAR, M.D.

2    dangerousness.  Then they will qualify for

3    admission.

4         Q.     I don't understand that answer.

5    Can you explain that?

6         A.     All patients that come with

7    bizarre behavior doesn't necessarily qualify

8    for inpatient hospitalization.  If we

9    determine that it's because of a mental

10   illness or some emotional disturbance, then

11   we can make assessment of patient being

12   admitted to the hospital or in the absence

13   of mental illness, if the behavior causes

14   potential risk of harm to himself, then we

15   can admit the patient.

16        Q.     Is it a potential risk or is it

17   a substantial risk that is required under

18   the hospital's policy for involuntary --

19        A.     Substantial risk.  I'm sorry.

20        Q.     It's a substantial risk; is that

21   correct?  So it's not sufficient if there is

22   a potential risk, in other words to admit;

23   isn't that right?

24             MR. RADOMISLI:  Pursuant to the

25        policy.

Page 132

1                    VINOD DHAR, M.D.
2        Q.      Pursuant to the policy?
3        A.      Substantial risk is to prevent
4   the potential risk.
5        Q.      My question is if you have a
6   risk, but it's only a potential risk, is
7   that sufficient to qualify as a substantial
8   risk under the policy?
9        A.      Under the policy, yes.
10       Q.      So any risk is a substantial
11  risk under the policy?
12       A.      Under the policy for 9.39, yes.
13       Q.      Why is that?
14       A.      Safety.
15       Q.      The safety of whom?
16       A.      The person.
17       Q.      What does the term substantial
18  risk mean to you, Doctor?
19       A.      It's a very undefined term that
20  is used by different agencies by different
21  professionals.  There's a patient in the
22  nursing home, there is a patient coming from
23  -- patient living in the home by himself, he
24  is -- has no food, has no heat, and if the
25  neighbors complain that he's smelling.  So

Page 133

```
1              VINOD DHAR, M.D.
2   somebody will go there and make an
3   assessment and if what they find there is
4   potentially a dangerous situation, they will
5   remove the patient and bring to the
6   emergency room.  So there is a substantial,
7   as well as, potential.
8       Q.      Isn't there a difference in your
9   mind between any risk and substantial risk?
10             MR. RADOMISLI:  I'm going to
11         object to the extent you're asking for
12         his mind.  If you want to ask whether
13         it's a policy --
14             MR. SMITH:  Okay.  Fine.  I will
15         ask what the policy is and see if he
16         thinks there's any distinction either
17         because we are mincing words here.
18       Q.      Under the Jamaica Hospital
19   policy, is there any difference between a
20   potential or any potential risk of
21   dangerousness and a substantial risk of
22   dangerousness?
23       A.      Again, it's a clinical judgment.
24   I don't think it's defined in the policy.
25       Q.      In your opinion, is there a
```

Page 134

1          VINOD DHAR, M.D.

2     difference between any potential risk and a

3     substantial risk of dangerousness?

4              MR. RADOMISLI:  He is here as a

5          30(b)(6) witness.

6          Q.     Okay.  You can answer the

7     question.

8              MR. RADOMISLI:  No, he can't.

9              MR. SMITH:  You're instructing

10         him not to answer that question?

11             MR. RADOMISLI:  It's not proper

12         of a 30(b)(6) witness.  You know that.

13             MR. SMITH:  No, I don't.

14             MR. RADOMISLI:  I cited a case.

15         Don't answer that question.  It's not

16         proper.

17         Q.     Does the term substantial risk,

18     as defined in the Jamaica Hospital policy,

19     include any risk of harm?

20         A.     Yes.

21         Q.     So under Jamaica's policy, any

22     possible risk is a sufficient basis in which

23     to involuntary admit somebody, because of

24     the conclusion that they are dangerous to

25     themselves or others; is that correct?

Page 135

1                    VINOD DHAR, M.D.

2                MR. RADOMISLI:  Objection to the

3       form.

4       A.      Yes.

5       Q.      Is part of Jamaica's policy in

6  making this assessment about risk of

7  dangerousness to seek out to protect the

8  community, as well as, the patient?

9       A.      Both.

10      Q.      I'm sorry?

11      A.      Both patient, as well as, the

12  community.

13      Q.      Why is the hospital involved in

14  seeking out to make the community safe?

15                MR. RADOMISLI:  Objection to

16      form.

17      A.      Because article 9.39 is safety

18  for patient and others.

19      Q.      So Jamaica Hospital views one of

20  its roles under 9.39 is to make the

21  community safe?

22                MR. RADOMISLI:  Objection to

23      form.

24      A.      I don't think it's question of

25  making the community safe.  It's making --

Page 136

1                    VINOD DHAR, M.D.

2      actually, yes, it's a mental and as a

3      patient rule in the Jamaica Hospital will

4      not discharge the patient if we find out

5      that the patient can be potentially risk of

6      the community.  Yes, we hold him.

7          Q.     But you not only hold him, but

8      you will admit him involuntary if you think

9      there's a risk to the community, right?

10              MR. RADOMISLI:  Objection to

11         form.

12         A.     Right.

13         Q.     And you will do so even if you

14     think there is only a potential risk to the

15     community; is that right?

16              MR. RADOMISLI:  Objection to

17         form.

18         A.     Yes.

19         Q.     Is there a distinction in your

20     mind between admitting a patient involuntary

21     and committing a patient involuntarily?

22              MR. RADOMISLI:  Objection.

23         A.     Involuntary commitment is the

24     legal term and admission is the medical

25     term.

1                VINOD DHAR, M.D.

2        Q.      But the way we have been using

3    it today, they both mean the same thing?

4        A.      Same thing, yes.

5        Q.      Does Jamaica's policy on the

6    assessment of patients for dangerousness,

7    include within it, a concept of hold and

8    stabilize a patient?

9        A.      Hold and admit.  Not stabilize.

10       Q.      What does that mean, hold and

11   admit?

12       A.      Hold, evaluate and if necessary,

13   admit.

14       Q.      Are you familiar with the phrase

15   hold and stabilize?

16       A.      There is, but emergency rooms

17   are not meant for stabilizing.  There is a

18   timeframe and the volume and if I may add,

19   that's why new CPEP came into being.

20              MR. RADOMISLI:  You're talking

21         about psychiatric?

22              THE WITNESS:  I'm talking about

23         psychiatric, yeah.

24       Q.      Why did the CPEP come into play?

25              MR. RADOMISLI:  Objection, but

Page 138

1              VINOD DHAR, M.D.

2        he's already --

3        A.      Because CPEP has a provision for

4   72-hour observation.

5        Q.      What is that about?

6              MR. RADOMISLI:  We are really

7        getting beyond.

8              MR. SMITH:  I know, but I'm

9        trying to understand -- the phrase hold

10       and stabilize was used in case with

11       respect to this plaintiff.  I am trying

12       to understand whether or not that's

13       part of the policy and practice of

14       Jamaica Hospital.

15             MR. RADOMISLI:  Can you just

16       tell me where it was used 'cause it

17       doesn't sound familiar to me?

18             MR. SMITH:  You have the chart

19       right there.

20             THE WITNESS:  I can -- I can --

21             MR. RADOMISLI:  Nat, I will talk

22       to you outside.

23             MR. SMITH:  Okay, good.  We're

24       going off the record.  It's 2:28.

25             (Whereupon, a recess was taken.)

Page 139

1            VINOD DHAR, M.D.

2            MR. SMITH:  Back on the record.

3       It's 2:37.

4       Q.      This term hold and stabilize,

5  can you tell me what that means?

6       A.      Well, actually it doesn't mean

7  much.  The term actually is hold and

8  reevaluate.  Some people use this term and

9  I'm not familiar why they use this term.

10  It's possible sometimes the patient can be

11  treated within 24 hours or until all the

12  information is available to make a final

13  determination.

14       Q.      Doesn't Jamaica Hospital's

15  policy require that when a patient's brought

16  in reportedly with a mental illness and

17  reportedly engaging in conduct and making

18  statements that create a substantial risk of

19  physical harm, that a staff doctor conduct a

20  comprehensive psychiatric as soon as

21  possible, right?

22            MR. RADOMISLI:  Objection, asked

23       and answered.

24       A.      Right.

25       Q.      And there's no room in Jamaica

1              VINOD DHAR, M.D.

2   policy for holding a person for a period of

3   time while an assessment is yet to be done;

4   isn't that correct?

5              MR. RADOMISLI:   Objection to the

6        form.   You could answer.

7        Q.     You can answer.

8              MR. RADOMISLI:   If you

9        understand.

10       A.     Yeah.   Technically after 24

11   hours in the ER the standard of care, I

12   don't think it's in the policy, that gives

13   you time to make an evaluation and

14   assessment and determination whether or not

15   you want to admit the patient or discharge

16   the patient.

17       Q.     So this 24-hour period, you're

18   saying there's no policy that's laying out a

19   24-hour period?

20       A.     There is no time determination

21   about that.

22       Q.     So in 2009, there was no policy

23   at the hospital that required that a patient

24   brought in for an alleged mental illness be

25   evaluated as soon as possible?

1                    VINOD DHAR, M.D.

2               MR. RADOMISLI:   Objection to

3        form.

4        A.       As soon as possible.

5        Q.       The policy was to do the

6    evaluation as soon as possible, right?

7        A.       Yeah.

8        Q.       But earlier when I was asking

9    you questions about the difference between a

10   potential risk or any risk or substantial

11   risk, I think you said if there's any risk

12   that the patient would act in the dangerous

13   manner that the hospital could admit; do you

14   remember that?

15               MR. LEE:   Objection to the form.

16               MR. RADOMISLI:   Objection to the

17        form.

18        Q.       Do you remember that?

19        A.       Yes.

20        Q.       When you said, yes, it's

21   possible for the hospital to the admit, did

22   you mean that it was possible for the

23   hospital to admit on an involuntary basis?

24        A.       Yes.

25        Q.       So just to be clear, you weren't

1          VINOD DHAR, M.D.

2    saying that the patient could be admitted on

3    a voluntary basis when we were talking about

4    doing assessments about dangerousness; is

5    that right?

6          A.     Yes.  Only involuntary, yeah.

7          Q.     When a patient is brought to the

8    hospital as potential involuntary admission

9    under 9.39, was there any policy at the

10   hospital with respect to restraining that

11   person or patient?

12               MR. RADOMISLI:  Objection to the

13        form.

14         A.     Depends upon the circumstances,

15   the patient is out of control and poses a

16   danger to the staff, yelling, he will be

17   restrained.  Now there is a difference

18   between restrained, a mental health

19   restrained and restrained by other means.

20   We do restrain the patients, yes.

21         Q.     How does Jamaica restrain

22   patients?

23         A.     If patient is out of control

24   according to OMH guideline, it's called a

25   four point restrain.  We tie the patient

Page 143

1                VINOD DHAR, M.D.
2    with the help of the staff, the clinical
3    staff, and until make sure they are safe and
4    meanwhile, they're given treatment,
5    medication, counseling and then they are
6    released and it should not last more than
7    one hour.
8              MR. SMITH:  I want to show you
9         what's being marked as Exhibit 152.
10             (Plaintiff's Exhibit 152,
11        document, was marked for identification
12        as of this date.)
13             MR. SMITH:  This is a seven-page
14        policy statement produced by Jamaica
15        Hospital in this case in discovery.
16        Q.    Is this the Jamaica Hospital
17   department of psychiatry policy on the use
18   of restraints?
19             MR. RADOMISLI:  Don't answer the
20        question.  You know this is beyond the
21        scope.  It wasn't even part of your
22        application.  This deposition is to
23        deal with involuntary admission and
24        this is beyond the scope.
25        Q.    Is it consistent with the

Page 144

1                    VINOD DHAR, M.D.

2     hospital's policy to permit a patient to be

3     handcuffed using steel handcuffs?

4                    MR. RADOMISLI:  Beyond the

5          scope.  You know it's beyond the scope.

6          Don't answer the question.

7          Q.     Is it consistent with the

8     hospital's policy to double-cuff a patient

9     to a hospital gurney?

10                   MR. RADOMISLI:  It's beyond the

11         scope of the deposition and the court's

12         order.

13         Q.     When a patient is being assessed

14    for involuntary admission, is it consistent

15    or inconsistent with hospital policy to

16    permit restraints to be used, such that,

17    circulation of the patient is being

18    interfered with?

19                   MR. RADOMISLI:  It is beyond the

20         scope of the deposition, which is

21         limited to policy on involuntary

22         admission, per court order.

23                   MR. SMITH:  That's what I'm

24         asking about.

25         Q.     Can locked restraints ever be

Page 145

1                    VINOD DHAR, M.D.

2    used on involuntary patients?

3              MR. RADOMISLI:  Objection.

4        Don't answer the question.  It's beyond

5        the scope according to the court.

6              MR. SMITH:  Does not go beyond

7        the scope.

8              MR. RADOMISLI:  Has nothing to

9        do with involuntary admission.

10             MR. SMITH:  Just asking if it

11       has to do with involuntary admission.

12       I will ask it again, just so it's

13       clear.

14       Q.    Are the use of locked restraints

15   consistent or inconsistent with Jamaica's

16   policy with respect to involuntary

17   admissions or people being considered for

18   involuntary admissions to the hospital for

19   dangerousness assessments?

20             MR. RADOMISLI:  That's beyond

21       the scope, because you're going to a

22       policy other than a policy on

23       involuntary commitment.

24             MR. SMITH:  The judge has

25       already directed you not to instruct

Page 146

1              VINOD DHAR, M.D.
2        the witness not to answer questions,
3        other than for privileged purposes and
4        now you're vagrantly violating the
5        judge's orders.
6             MR. RADOMISLI:  It's not my
7        intention to violate the judge's order.
8        I don't think what was anticipated is
9        that you abuse this deposition to go
10       beyond what was a previously court
11       ordered limited scope deposition, and
12       actually, come to think of it, it's my
13       position you're violating the prior
14       court order by asking these questions
15       because the scope of this examination
16       was specifically limited to the policy
17       on involuntary commitment --
18       involuntary hospitalization.
19            MR. SMITH:  Well, I know.  I
20       understand, you've just said that.  I
21       don't think how what the policies of
22       the hospital are -- you know, Greg, I
23       will try one more time and this
24       document that I have just shown this
25       witness was produced by your office.

Page 147

1           VINOD DHAR, M.D.

2      It comes from the department of

3      psychiatric.  It says department of

4      psychiatric, psychiatry manual and it's

5      governing the use of restraints for

6      patients who are there, among other

7      things, involuntarily and so I don't

8      know what else to say.

9           MR. RADOMISLI:  I don't now what

10     else to say either.  I am not disputing

11     that.  You didn't ask for the witness

12     to testify about this policy when it

13     was discussed before the court, as far

14     as I recall.  If you did ask for it, it

15     wasn't granted because there are only

16     four topics that are permitted to ask

17     this 30(b)(6) witness about.  This is

18     not one of those topics.  The use of

19     restraints is not one of those topics.

20          I'd also add that you already

21     asked Dr. Lewin about this issue

22     because she did her evaluation while

23     your client was in the handcuffs, where

24     I did not restrict you, because there

25     was no prior court order.  Here there

Page 148

1              VINOD DHAR, M.D.

2        is.

3              MR. SMITH:  We are going to go

4        off the record.  I want to talk with my

5        colleague and see how we're going to

6        proceed.  It's 14:50.

7              (Whereupon, a recess was taken.)

8              MR. SMITH:  Going back on the

9        record.  It's 14:54.

10        Q.      Doctor, I just have a few more

11   questions then I'm done.  Subject to having

12   you brought back, because your counsel has

13   interfered with some of my questions, but

14   for today at least.

15              If a patient is brought into the

16   medical emergency room, is there anything in

17   the Jamaica Hospital policy that includes

18   the comprehensive psychological evaluation

19   being conducted while a patient is in the

20   medical emergency room as opposed to waiting

21   until the patient is the transferred, if the

22   patient is transferred to the psychiatric

23   emergency room?

24              MR. RADOMISLI:  Objection to

25        form.

Page 149

1                    VINOD DHAR, M.D.

2        A.        You cannot do a comprehensive

3    evaluation.  You can do what's called a

4    psychiatric consult.  That means based on

5    the information and based on the mental

6    status, you make a determination whether the

7    patient will stay in the medical ER or he

8    can be transferred to psych ER needing

9    psychiatric treatment.

10       Q.        Who makes that decision?

11       A.        Psychiatrist.

12       Q.        So why can't the psychiatrist do

13   the full blown comprehensive psychiatric

14   evaluation in the medical ER?

15              MR. RADOMISLI:   Objection to

16        form.

17       A.        It's a comprehensive evaluation.

18   Medical ER is very busy, don't have all the

19   information and especially if there is a

20   risk of dangerousness and if there is no

21   need for medical treatment, then the patient

22   will be transferred to psychiatry.

23       Q.        Who does this consultation as

24   opposed to this comprehensive psychiatric

25   evaluation?

Page 150

1                    VINOD DHAR, M.D.

2        A.        It is done by a psychiatrist, a

3    staff psychiatrist.

4        Q.        Then does that consultation then

5    trigger the 48-hour period and the

6    requirements that the patient be given the

7    notices and the rights that we talked about

8    earlier?

9        A.        No.

10       Q.        Why not?

11       A.        The 48 hours starts the minute

12   the patient is admitted and registers in the

13   psych ER.

14       Q.        What authority is there in

15   Jamaica's policies to hold somebody in the

16   medical ER prior to a comprehensive

17   psychiatric examination being conducted?

18            MR. RADOMISLI:   Objection to

19       form.   Go ahead.

20       A.        Because patient is kept in the

21   medical emergency room only to make sure

22   that there's no acute medical problems and

23   necessity for discharge or medical -- or

24   psychiatric treatment.   That is the premise

25   of the consultant.   Based on the information

Page 151

```
 1                VINOD DHAR, M.D.
 2   that the patient can be discharged, whether
 3   the patient doesn't have an acute illness or
 4   suffered some illness and there's a sense of
 5   dangerousness.  Then that will be taken to
 6   the psychiatric emergency room.
 7        Q.     My question is what authority in
 8   Jamaica's policy is there, if there is any,
 9   to hold somebody against their will
10   involuntarily in the medical ER before the
11   comprehensive psychological evaluation is
12   conducted?
13             MR. RADOMISLI:  Objection to
14        form.
15        A.     They have the patient is --
16   until the patient is medically cleared, they
17   will hold the patient.
18        Q.     What I want to know is what
19   authority does the hospital have for holding
20   the patient under those circumstances?
21             MR. RADOMISLI:  Objection.
22        A.     I think medical ER policy.
23        Q.     Is there a written policy that
24   authorizes Jamaica Hospital to hold a
25   patient pending a psychiatric consult?
```

Page 152

1              VINOD DHAR, M.D.

2        A.     Yes.

3              MR. RADOMISLI:   Objection.

4        Q.     And is that in writing, that

5   policy?

6        A.      It has to be, but if you look

7   at 9.39 there is a provision there that any

8   psych emergency room doctor can transfer the

9   patient to psychiatric emergency room.  Any

10  medical emergency room physician can

11  transfer patient to psychiatric emergency

12  room per 939.

13       Q.    But if that was done under

14  Section 939, then Section 939 would have

15  been invoked and the timeframes required by

16  939 would start running; isn't that right?

17       A.     That's right, but the hospital

18  policy is patient not to be -- until the

19  patient is transferred to psychiatric

20  emergency room, the 939 will start at that

21  time.

22       Q.     I understand that, Doctor.  What

23  I want to know, if the patient is brought

24  into the medical ER and is being held

25  against their will, but they have not been

Page 153

1               VINOD DHAR, M.D.

2  evaluated by a psychiatrist, either in an

3  informal consultation or a comprehensive, is

4  there any authority in the hospital's

5  written policies for holding that person

6  against their will prior to them being

7  assessed by a psychiatrist?

8               MR. RADOMISLI:  Objection to

9        form.

10       A.    I am sure there is a policy.  It

11 again, depends on the clinical judgment of

12 the medical ER doctor.  If they feel that

13 the patient needs to be restricted pending a

14 psychiatric evaluation, they have that

15 authority to keep the patient under

16 observation.

17              MR. SMITH:  I'm going to make

18       the request for the production of that

19       policy statement.

20       Q.    What authority are you referring

21 to?

22              MR. RADOMISLI:  Objection to

23       form.

24       A.    The hospital -- I'm not sure

25 about what authority the medical people

Page 154

1               VINOD DHAR, M.D.
2    have, but there has been policy.
3          Q.     Other than Section 9.39, are you
4    aware of any other rule that allows a
5    hospital to hold somebody against their will
6    for purposes of an involuntary commitment
7    for mental illness that has a substantial
8    risk of dangerousness associated with it?
9               MR. RADOMISLI:   Objection.
10         A.     939 is only for mental health.
11   Emergency rooms, medical emergency rooms,
12   have their own policy by department of
13   health, DOH.  So that will be covered under
14   their jurisdiction.  939 starts only when a
15   patient is transferred to psychiatric
16   emergency room, which is the designated 939
17   hospital.  Every hospital does not have a
18   939 room.
19         Q.     In 2009, did Jamaica have a 939
20   room?
21         A.     Yes.
22         Q.     And a 939 room is a separate
23   psychiatric emergency room, right?
24         A.     Yes.
25         Q.     And that's what it was in 2009,

Page 155

1                    VINOD DHAR, M.D.

2    correct?

3        A.      Yes.

4        Q.      In this case, the patient was

5    brought into the hospital on late in the

6    evening of October 31, 2009 and he was not

7    evaluated by Dr. Bernier until November 2,

8    2009 and then the form was not executed by

9    Dr. Bernier until November 3, 2009.  What I

10   want to know is during the period from when

11   the patient was first brought into the

12   hospital up until the point that Dr. Bernier

13   signed the form 7 point -- 474, what was the

14   authority that the hospital had for holding

15   that patient?

16            MR. RADOMISLI:  Objection.

17       A.      I cannot answer.

18       Q.      You can't answer it.

19            MR. SMITH:  All right, subject

20          to the questions that weren't answered,

21          I don't have any more questions at this

22          time.  I am going to make an

23          application to the court to have the

24          witness brought back.  The judge is

25          away.  We waited for more than a half

Page 156

VINOD DHAR, M.D.

1
2      an hour to get a ruling the first time
3      and so I'm not going to hold the
4      deposition for that purpose now.
5              MR. RADOMISLI:  Well, we did get
6      a ruling and so if there are questions
7      that you want to ask, other than the
8      ones that I objected to on the ground
9      that they were beyond the scope of the
10     deposition, I suggest you ask them.
11     Otherwise, they should not part of your
12     application, because you have the
13     opportunity now.
14             The only objections I would be
15     asserting is if it's beyond the scope
16     pursuant to a prior court order or
17     under privilege.
18             So do you have anything that
19     doesn't fall within that?
20             MR. SMITH:  I don't have any
21     more questions, other than the
22     questions that you refused to let the
23     witness answer and any rational
24     follow-ups from the answers that he
25     gave.

Page 157

1        VINOD DHAR, M.D.

2            MR. RADOMISLI:  On the grounds

3        -- refused to let the witness answer on

4        the grounds that they were beyond the

5        scope of the deposition.  Correct.

6            MR. SMITH:  Well, you've

7        instructed him not to answer a lot of

8        questions.  I don't know if you were so

9        clear about the scope, but I think

10       we're on the same page here.  If I had

11       something else that was clearly not in

12       an area that you and I had a

13       disagreement about, I'd ask it, but

14       nothing else comes mind.

15           MR. RADOMISLI:  What I'm saying

16       is if you want to make your

17       application, you can make the

18       application insofar as I objected to

19       questions and didn't let him answer

20       questions on the grounds that they were

21       beyond the scope of the deposition.

22       Any other objections that I may have

23       made, I am not permitted to make

24       pursuant to the court's order.  So if

25       there are any other questions, other

Page 158

1                    VINOD DHAR, M.D.
2          than the ones I objected to on the
3          grounds of beyond the scope, those you
4          have the opportunity to ask now and if
5          you don't, then I am going to argue
6          that they should not be part of your
7          application.
8                    MR. SMITH:  Okay.
9     EXAMINATION BY
10    MR. CALLAN:
11         Q.       Doctor, I represent Dr.
12    Aldana-Bernier in this lawsuit.  Can you
13    tell me, sir, do you have a recollection
14    back in November 2009, what your general
15    work schedule was, what hours you'd be at
16    the hospital?
17         A.       Generally 8:30 to 4:30.  I am
18    on-call all the time.
19         Q.       Do you get into the hospital on
20    the weekends, as well as Monday to Friday?
21         A.       I do come on the weekends if
22    there is a need.
23         Q.       And your position in the chain
24    of command in psychiatry is you were the
25    number two person; is that correct?

Page 159

1               VINOD DHAR, M.D.

2        A.        Number two, right.

3        Q.        So Dr. Aldana-Bernier would

4   report to you in the chain of command?

5        A.        She does report to me, yes.

6        Q.        With respect to the Adrian

7   Schoolcraft matter, I think you've said you

8   had no involvement in the case; is that

9   right?

10       A.        I had no involvement in the case

11   as far as legal proceedings and the

12   treatment is concerned.

13       Q.        Is it possible that you spoke to

14   Dr. Aldana-Bernier about Adrian Schoolcraft

15   at any time during his treatment in the

16   psychiatric emergency room?

17              MR. SMITH:   Objection to form.

18       Q.        You could answer.

19       A.        It's possible.

20       Q.        Now, you made some general

21   comments about comprehensive psychiatric

22   evaluation of patients.   Is it accurate to

23   say, sir, that a comprehensive evaluation of

24   a psychiatric patient would include

25   reference to matters that may have happened

Page 160

1                    VINOD DHAR, M.D.
2      in the initial admission stage to the
3      medical emergency room, would that be part
4      of the whole evaluation process?
5           A.      Even before that.  Certainly
6      proceeding --
7           Q.      So certainly anything that the
8      ER residents became aware of, if noted in
9      the record or communicated to the
10     psychiatric staff, would certainly be
11     considered, that could be considered in a
12     comprehensive evaluation; is that correct,
13     sir?
14                  MR. SMITH:  Objection.
15          Objection to form.  Leading.
16          A.      Yes.
17          Q.      And if hypothetically, the
18     police said something indicating that the
19     patient was a threat to himself or somebody
20     else, and I'm not just talking about Mr.
21     Schoolcraft, I'm talking about patients in
22     general, that would be something that would
23     be considered in a comprehensive evaluation?
24                  MR. SMITH:  Objection.  Leading.
25          A.      Yes.

Page 161

1          VINOD DHAR, M.D.

2          MR. CALLAN:  I have no further

3      questions.

4          MR. LEE:  I just have one.

5   EXAMINATION BY

6   MR. LEE:

7      Q.     Under the Jamaica policy under

8   939, once the first doctor signs the form,

9   that patient is admitted to the hospital,

10  correct?

11     A.     Yes.

12         MR. SMITH:  You mean once the

13     patient or once the doctor?

14         THE WITNESS:  Patient doesn't

15     sign any forms.  The doctor.

16     Q.     Once the first doctor signs the

17  form under 9.39, even pending the 48-hour

18  evaluation, once the first doctor signs, the

19  patient is admitted to the hospital?

20     A.     Yes.  I mean, that form is

21  signed only when the determination is made

22  that the patient needs to be admitted.

23         MR. LEE:  Thank you.

24         MR. SMITH:  Just a follow-up on

25     that.

Page 162

1                    VINOD DHAR, M.D.

2    EXAMINATION BY

3    MR. SMITH:

4        Q.      Is there any reason why a doctor

5    at Jamaica would make a decision on one day

6    and then delay signing the form until the

7    next day?

8                    MR. RADOMISLI:   Objection,

9          speculation, but go ahead.

10       A.      When you make a decision that

11   patient needs to be admitted on the

12   psychiatric grounds, then you had to do all

13   this blood work and everything else to get

14   the medical clearance.  So the actual

15   admission date or time is different than

16   when the doctor says that patient needs to

17   be hospitalized, because all the other

18   things are to be considered.

19       Q.      I am not sure you're answering

20   my question.  My question is if the

21   patient's assessment has been conducted and

22   the comprehensive evaluation has been

23   conducted and medical examination has been

24   conducted, is there any reason why this

25   staff psychiatrist in the psych ER would

Page 163

1                    VINOD DHAR, M.D.

2       wait a day when signing the form admitting

3       the patient?

4                    MR. RADOMISLI:   Objection to the

5               form and substance, but you can answer.

6               A.       There are number of factors,

7       yes.  Availability of the bed.  We don't

8       know whether the patient admitted to Jamaica

9       or transferred somewhere else and if the

10      patient has insurance, we need to get the

11      authorization approved for the insurance

12      company.

13              Q.       Any other reasons?

14              A.       Not that I am aware of.

15              Q.       In this case, the patient was a

16      member of the police department.  Are you

17      aware of any practices or policies at

18      Jamaica that requires that a involuntary

19      admission of a police officer has to be

20      reviewed by somebody else, other than the

21      initial assessment conducted by the staff

22      physician?

23              A.       As far I am concerned, there is

24      no such policy, the physician does clinical

25      work and they do the determination.

Page 164

1                 VINOD DHAR, M.D.

2       Q.      Is there anything about a

3   patient being a member of the police

4   department that changes the hospital policy

5   with respect to how an involuntary admission

6   is conducted?

7       A.      Absolutely not.   There is

8   relevance.

9            MR. SMITH:   All right, thank

10       you.   Going off the record.   It's

11       15:12.

12            (Time noted:   3:12 p.m.)

13   _____

14            VINOD DHAR, M.D.

15

16

17   Subscribed and sworn to before me this

18

19   _____day of _____2014.

20

21   _____, Notary

22   Public.

23

24

25

Page 165

1                       I-N-D-E-X

2

3    WITNESS              ATTORNEY          PAGE

4    VINOD DHAR         MR. SMITH         5,161

5                       MR. CALLAN          158

6                       MR. LEE             161

7

8                   E-X-H-I-B-I-T-S

9    PLAINTIFF'S          DOCUMENT              PAGE

10   151               Document             68

11   152               Document            143

12   ***ALL EXHIBITS RETAINED BY ATTORNEY***

13

14   INFORMATION REQUESTED              PAGE

15   Request documents                    110

16   Request written presentations        111

17   Request policy statement             153

18

19

20

21

22

23

24

25

Page 166

1

2                          CERTIFICATE

3

4            I, DENISE ZIVKU, a Professional Reporter

5    and Notary Public within and for the State of New

6    York, do hereby certify:

7

8            That VINOD DHAR, M.D., the witness whose

9    deposition is hereinbefore set forth, was duly

10   sworn by me and that the within transcript is a

11   true record of the testimony given by such

12   witness.

13

14           I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage and that I am in no way interested in

17   the outcome of this matter.

18

19       IN WITNESS WHEREOF, I have hereunto set my

20   hand this 28th day of July, 2014.

21

22

23   _____

24           DENISE ZIVKU

25

Page 167

1          WITNESS'S CORRECTION SHEET

2     PAGE \ LINE \ CORRECTION

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19

                    _____

20                        VINOD DHAR, M.D.

21

22    Subscribed and sworn to before me

23    this _____ day of _____, 2014

24    _____, Notary Public.

25

[& - actuality]                                             Page 1

| & | | | |
|---|---|---|---|

**&**

**&** 2:16,20 3:4,9

**0**

**06005** 1:7

**1**

**1** 80:10 91:20
**10** 1:7
**100** 2:13
**10004** 3:6
**10006** 2:5
**10007** 2:13
**10017** 3:11
**10022** 2:18
**10:06** 1:14 5:3
**10:54** 43:3
**110** 165:15
**11042** 2:22
**111** 2:5 165:16
**11:21** 42:24
**12:35** 101:9
**130** 21:20 23:21
   31:5 43:22 70:16
   114:9
**131** 79:9
**143** 165:11
**14:50** 148:6
**14:54** 148:9
**15** 14:3 67:2
**151** 68:3 165:10
**152** 143:9,10 165:11
**153** 165:17
**158** 165:5
**15:12** 164:11
**161** 165:6
**17** 44:7,10,11 45:3
   70:15 127:25
**18** 45:3 114:11
**19** 44:7 45:3
**1981** 12:14
**1986** 66:20
**1990** 11:2
**1995** 11:2 109:6,10
   110:21

**1996** 9:23 11:7
   67:15 109:10
**1999** 9:17,25,25
   10:23
**1:41** 101:12

**2**

**2** 94:17 155:7
**20** 14:3 43:2
**20002** 2:9
**2001** 2:22
**2007** 10:2 40:21
**2009** 22:12,22 25:22
   35:3,9,17 36:3,9,10
   37:11,17,21 38:11
   38:25 40:22 41:6,17
   61:17 62:13 65:18
   65:22 66:3 110:24
   111:3,3,10,11,20
   114:2 121:6 140:22
   154:19,25 155:6,8,9
   158:14
**2014** 1:13 5:3
   164:19 166:20
   167:23
**204** 125:23,24 126:2
**220** 1:12 3:10 5:5
**24** 117:3 139:11
   140:10,17,19
**25** 43:2,13
**28th** 166:20
**2:28** 138:24
**2:37** 139:3
**2pc** 28:3

**3**

**3** 155:9
**30** 8:8 14:20 21:20
   86:4 87:8 134:5,12
   147:17
**31** 155:6
**3:12** 164:12

**4**

**4** 91:4

**40** 14:2
**42nd** 1:12 3:10 5:5
**44** 120:2,3 122:24
**444** 2:17
**474** 76:22 77:15,25
   80:4 82:16 94:18
   155:13
**48** 81:6,12,17 82:15
   89:5,10 91:7,12
   150:5,11 161:17
**4:30** 158:17

**5**

**5** 94:8 124:23
**5,161** 165:4

**6**

**6** 8:8 14:20 86:4
   87:8 114:11,16
   118:8 134:5,12
   147:17
**6-0** 8:18
**60** 8:18
**68** 165:10

**7**

**7** 1:13 5:3 155:13
**72** 138:4
**747** 80:10 81:19
   82:9 125:5
**77** 66:19

**8**

**829** 2:8
**86** 12:14,15
**8900** 7:17
**8:30** 158:17

**9**

**9** 65:5
**9.27** 113:11
**9.39** 65:12,15,22
   66:2 68:7 69:17
   75:11,15 95:12
   96:22 97:3,25 99:5
   99:10 106:24
   113:10 132:12

135:17,20 142:9
   152:7 154:3 161:17
**9.39.** 75:11 95:14
**90** 12:15
**92** 13:19
**927** 27:5 28:4,5,6,11
**93** 13:19
**939** 27:21 28:6,8,14
   28:20 29:5,8 30:21
   30:22 45:13 152:12
   152:14,14,16,20
   154:10,14,16,18,19
   154:22 161:8
**96** 11:2,8

**a**

**a.m.** 1:14
**abercrombie** 2:16
**ability** 51:13 75:16
**able** 37:12 39:2,21
   43:11 73:11 99:9
**absence** 131:12
**absolutely** 164:7
**absurd** 39:12,13
**abuse** 146:9
**accept** 8:6,12 74:20
   75:19 76:6
**access** 114:20
**accomodate** 52:14
   52:15
**accompanying** 32:4
**accurate** 159:22
**act** 17:11 99:20
   125:8 141:12
**acted** 101:23 106:13
**acting** 93:11,17
   94:16,25 96:19
   99:19 101:15
   103:19,23 104:23
   106:15 128:22
   129:2,10,13
**action** 166:15
**actual** 40:3 162:14
**actuality** 58:24

**acute** 56:4 58:18
    122:4,21 150:22
    151:3
**ad** 26:16,18
**adam** 43:4 100:2
**add** 137:18 147:20
**additional** 89:18
**address** 7:14,17,22
    8:14,17,18 102:3
**adhered** 127:24
**administration** 45:7
**administrative**
    10:13 16:25 17:8
    25:19,22
**administrator** 25:19
    45:7,12
**admission** 26:11
    29:2 31:2 44:2
    45:13,14 59:10
    64:19 79:22 81:7,13
    83:2,4,19 86:6,12
    86:14 91:3 92:21
    114:10 115:20
    125:7 128:2 131:3
    136:24 142:8
    143:23 144:14,22
    145:9,11 160:2
    162:15 163:19
    164:5
**admissions** 18:21,22
    85:7 87:7 119:24
    145:17,18
**admit** 27:22 45:23
    68:16 69:7 125:18
    125:20 126:12
    131:15,22 134:23
    136:8 137:9,11,13
    140:15 141:13,21
    141:23
**admitted** 27:7,9
    28:3 77:19,22 78:14
    81:2 86:19 91:14,17
    92:2 112:19 114:18
    114:19 120:16
    121:11 122:5

125:24 126:2,5
    127:5 131:12 142:2
    150:12 161:9,19,22
    162:11 163:8
**admitting** 69:16
    70:17,20 71:3,5
    73:19 78:25 79:5
    91:5,9,14 92:8,22
    92:23 120:8 121:21
    124:24 125:12
    129:20 136:20
    163:2
**adrian** 1:4 19:25
    159:6,14
**advantage** 38:18
**advisement** 23:13
    110:12 111:22
**agencies** 28:10,19
    132:20
**agency** 33:12 74:16
    90:3
**agent** 6:17,19
**agitated** 129:2,10
**ago** 40:4
**agree** 8:5 34:25
    112:2 117:6
**agreed** 4:3,8,12
**agrees** 102:24 104:7
**ahead** 38:4 82:24
    94:6 104:14 129:16
    150:19 162:9
**al** 1:8
**aldana** 3:5 158:12
    159:3,14
**alleged** 45:18 56:22
    57:12 64:21 66:18
    140:24
**allowed** 63:22
**allows** 154:4
**amended** 66:19
**annuled** 6:6
**answer** 9:16 14:25
    16:11,13,16 17:19
    19:14 20:22 21:2
    31:16 35:18,23 37:6

38:13,16 41:4,5,9
    43:8 46:7 48:22,23
    50:21 51:7,22 53:13
    53:16 54:13,17,25
    55:8,22 56:8 58:23
    61:2 62:2 65:23
    67:11 75:2,24 84:3
    87:24 96:14,16
    97:11,13,22 99:9
    100:15 102:7
    107:24,25 108:4,18
    110:20,21 127:8,16
    128:16 131:4 134:6
    134:10,15 140:6,7
    143:19 144:6 145:4
    146:2 155:17,18
    156:23 157:3,7,19
    159:18 163:5
**answered** 16:9
    50:20 55:21 57:20
    74:25 94:6 96:4
    139:23 155:20
**answering** 162:19
**answers** 156:24
**anticipate** 20:25
**anticipated** 146:8
**anxiety** 56:4
**anybody** 18:25
    19:15,25 20:10,14
    47:23 62:11 69:24
**anytime** 20:4 36:19
**appear** 8:8
**appearance** 19:2
**appearing** 6:19
**appears** 111:23
**application** 28:25
    38:21 39:19 86:8,22
    143:22 155:23
    156:12 157:17,18
    158:7
**applied** 29:25 35:9
    86:3
**apply** 28:24,25
**appreciate** 111:25

**appropriate** 50:12
    56:25 57:14 58:6
**approve** 69:19
**approved** 61:14
    163:11
**approximately**
    43:13
**approximation**
    14:15
**area** 30:20 157:12
**argue** 158:5
**arrange** 92:22
**arrangement** 31:22
**arrangements** 93:9
    126:15
**article** 27:22 65:5
    135:17
**asked** 15:7 29:4
    41:17 49:25 50:19
    55:21 57:19 74:25
    85:4,5 86:5 87:2,13
    94:6 103:7 109:8,22
    110:16 139:22
    147:21
**asking** 20:25 21:16
    29:14 31:8 51:15
    66:8 95:22 96:2
    107:21 133:11
    141:8 144:24
    145:10 146:14
**aspects** 10:14
**assert** 38:8
**asserting** 156:15
**assertion** 6:16
**assertions** 6:14
**assessed** 58:12
    144:13 153:7
**assessing** 40:14
**assessment** 33:24
    34:18 37:3 41:2
    47:15 48:8 50:5
    60:18 63:13,14 83:8
    86:18 87:21 88:8
    90:6 95:2 97:19
    98:5,6,16,17 101:19

101:20,21 102:4,5
102:16,18 103:9
104:7,8 105:15,20
111:5 131:11 133:3
135:6 137:6 140:3
140:14 162:21
163:21
**assessments** 50:11
  50:15 76:7 107:16
  142:4 145:19
**assigned** 125:22
**assignment** 126:4
**assignments** 125:15
**assist** 65:6
**assistant** 10:19
  16:18 99:19
**assistants** 52:17
**associate** 8:24 9:12
  10:20
**associated** 154:8
**assuring** 91:5
**attack** 56:3
**attempt** 76:7
**attend** 17:7
**attending** 9:9,22
  10:3,4 11:4 12:17
  15:25 62:20 63:11
  63:23 69:2,4,10,12
  70:22 77:6,17 78:3
  90:9 91:15 92:13,14
  97:17 99:17 103:10
  116:15 122:6
**attorney** 19:2 115:5
  116:12 165:3,12
**attorneys** 2:4,8,12
  2:16,21 3:5,9 4:4
  115:17
**authority** 99:15
  150:14 151:7,19
  153:4,15,20,25
  155:14
**authorization**
  163:11
**authorizes** 151:24

**avail** 126:19
**availability** 126:3
  127:2 163:7
**available** 76:19
  125:23 126:13,17
  126:21 128:9
  139:12
**avenue** 2:17,22
**aware** 64:5,13 65:8
  65:10 67:19 68:12
  68:14 73:17 154:4
  160:8 163:14,17

### b

**b** 2:4 5:15 8:8 14:20
  86:4 87:8 123:15
  134:5,12 147:17
  165:8
**back** 16:15 29:23
  34:21 38:6,19,20
  42:23 43:11 52:7,23
  64:18 66:4 70:14
  83:11 84:13 99:23
  100:7 101:7 109:9
  114:9 117:9 127:25
  139:2 148:8,12
  155:24 158:14
**background** 15:4,10
  34:13
**bad** 94:21
**balances** 83:2
**ball** 105:25
**base** 80:25
**based** 14:11 32:2,13
  32:15 33:12 36:12
  51:9 65:3,4 73:21
  75:9,10 77:22 80:24
  88:19 91:18 98:13
  116:25 128:8,18
  129:6 149:4,5
  150:25
**baseline** 124:12
**basic** 42:13 51:13
  127:21

**basically** 51:20 69:9
  70:11 123:24
**basis** 6:20,22 26:16
  26:18 27:8 28:13
  38:12,15 67:9 75:18
  77:19 114:19
  126:13 134:22
  141:23 142:3
**bauza** 3:16
**bed** 125:15,19,21,22
  125:23,24 126:2,3
  126:13,14 163:7
**beds** 126:17
**beginning** 33:17
**behalf** 93:11,18
  94:16,25 101:15
  103:19,23
**behavior** 56:12,12
  56:14 57:22 72:8,9
  73:9 129:7,25 130:2
  130:16 131:7,13
**believe** 6:2 38:9 41:3
**bell** 3:9 5:5
**belong** 116:17
**bernier** 3:5 19:22
  62:8,10 70:6 155:7
  155:9,12 158:12
  159:3,14
**better** 8:15
**beyond** 29:13 48:21
  48:25 51:4,11 53:12
  53:16 63:8 83:17
  84:4 96:11 108:10
  108:17 113:20
  127:7,12 138:7
  143:20,24 144:4,5
  144:10,19 145:4,6
  145:20 146:10
  156:9,15 157:4,21
  158:3
**bible** 130:12
**bit** 29:12 113:9
**bizarre** 128:22
  129:10,14,21,25
  131:7

**black** 51:21
**blood** 123:19,24
  162:13 166:15
**blown** 149:13
**bottom** 25:3 35:21
  68:15 70:16 114:11
**brady** 3:4
**brain** 55:15
**break** 21:3 100:24
  101:3,3
**breath** 113:24
**brennan** 3:4
**brian** 2:23 35:20
  42:7
**brief** 56:4
**bring** 23:17 28:11
  28:20 38:5 74:10,17
  133:5
**brings** 47:25 73:22
**broadly** 41:18
**broadway** 2:5
**brought** 5:15 28:10
  33:12,14 34:6 52:17
  58:11 139:15
  140:24 142:7
  148:12,15 152:23
  155:5,11,24
**burden** 88:18
**bureau** 115:13
**business** 7:22
**bust** 5:25
**busy** 59:12,25 60:2
  61:9 149:18
**busyness** 81:24
**bye** 100:21

### c

**c** 2:2 113:4 123:15
**call** 41:21 42:2,18
  62:5,9 126:22
  158:18
**callan** 3:4,7 16:15
  46:4,18,25 47:4
  50:25 61:22 100:25
  158:10 161:2 165:5

[called - components]                                                          Page 4

**called** 12:9 24:8
26:23 27:9 43:3
62:5 63:18 64:3
109:4 121:23
130:23 142:24
149:3
**caller** 100:2,11,19
**calling** 99:23
**calls** 125:14
**calm** 19:13
**capable** 31:20 37:14
**care** 31:20 56:24
57:13 58:5,9 81:5
122:2,22 124:18,19
140:11
**career** 40:25
**case** 1:6 19:19,22
20:4,5,7 21:24 61:4
104:13 109:5
111:13 121:2 125:7
134:14 138:10
143:15 155:4 159:8
159:10 163:15
**cases** 70:12
**categories** 71:24
76:15
**category** 72:2
**cause** 66:24 138:16
**causes** 131:13
**causing** 55:16
**cbc** 123:19,24
**cells** 123:25 124:2
**center** 3:10 11:2,23
12:19
**certain** 43:8 56:12
63:3
**certainly** 40:5 54:9
160:5,7,10
**certificate** 166:2
**certification** 4:9
27:10 91:21
**certifier** 125:9,11
**certify** 76:22 166:6
166:14

**chain** 158:23 159:4
**chair** 16:18 19:4
26:6,7
**chairman** 8:25 9:12
10:20 19:9 21:8
25:20 45:8 61:15
70:2 93:10,13 94:16
94:24 95:8,11,17
96:8,20 97:16 98:6
98:24 99:3,12,19,20
101:15,16 103:18
103:19,22,23
**chairman's** 93:18
**chambers** 100:3
**chan** 99:25
**chance** 20:21 68:6
**change** 67:19 117:3
**changed** 37:16,19
39:6,9 40:7,9,15,17
40:24 41:2 65:22
66:3,11,13,15,24
67:8,9,13,18
**changes** 68:13
107:13 124:11,13
164:4
**chart** 20:7,11 79:10
91:25 138:18
**checklist** 32:7 36:11
**checks** 82:25
**chen** 43:4,8 100:2
**chief** 9:10 10:11,12
10:17 99:16
**child** 11:19
**choice** 107:23
**choices** 54:20
**chronically** 124:19
**church** 2:13
**circulation** 144:17
**circumstances** 34:5
103:17 105:11
123:7 128:9 142:14
151:20
**cited** 134:14
**city** 1:8 2:11,12

**class** 107:11
**classes** 107:15
110:24
**clear** 13:9 127:10,15
141:25 145:13
157:9
**clearance** 121:13,23
121:24 162:14
**cleared** 122:11
151:16
**clearly** 37:14 103:8
157:11
**clearwater** 3:9 5:4
**clerk** 43:4
**client** 147:23
**clinical** 10:13 16:24
17:2,10 77:18 96:24
98:13 128:18,18
129:6 133:23 143:2
153:11 163:24
**clinically** 123:21
**closed** 126:24
**clothes** 130:10
**clothing** 73:12
**cmc** 123:23
**cmp** 123:19,23
124:2
**collateral** 75:4 76:2
77:23 89:2,19,24
90:10,13,16 128:11
**colleague** 148:5
**collection** 22:6
**college** 11:12,25
12:9,13
**combination** 33:4,5
**come** 32:14 38:19,20
52:7,16,22,23,23
56:17 74:6,9 88:3
88:16 101:7 111:24
112:8 117:8 130:24
131:6 137:24
146:12 158:21
**comes** 28:8 32:3
56:11 59:2 68:20
76:3 91:19 116:11

116:12 122:7,17
123:8 129:18,19
147:2 157:14
**coming** 33:14
128:10 132:22
**comitted** 103:10
**command** 158:24
159:4
**comments** 159:21
**commissioner** 75:12
**commit** 14:17 16:3
30:17 75:17 80:9
97:4 130:3
**commitment** 28:15
57:7 104:17 130:17
136:23 145:23
146:17 154:6
**committed** 27:15
29:8 78:7 104:9
128:25
**committee** 26:14
61:14
**committing** 14:11
15:15 136:21
**common** 20:25
**commonly** 112:23
**communicated**
60:11 108:15 160:9
**communication**
107:19
**community** 28:22
135:8,12,14,21,25
136:6,9,15
**company** 163:12
**complain** 132:25
**completed** 125:2
**completely** 54:16
85:16
**completion** 94:17
**complied** 53:6
**comply** 51:16 60:12
65:15 97:19
**complying** 97:3
**components** 23:23
24:2,3

**comprehensive** 18:9 24:9 34:2 36:15 46:10,14 47:10 58:14 59:6 61:7,18 62:11 63:4 64:11 77:9 78:4 81:23 82:7 107:2 113:17 124:3,5 139:20 148:18 149:2,13,17 149:24 150:16 151:11 153:3 159:21,23 160:12 160:23 162:22

**concept** 137:7

**concerned** 159:12 163:23

**conclusion** 17:17 129:13 134:24

**conclusions** 29:9 30:16

**condition** 55:25 90:21 106:25 117:2 124:15

**conditions** 55:17 106:15

**conduct** 48:7 61:18 64:11 72:13,18,25 73:5,6,13,15,18,19 92:24 103:14 129:5 139:17,19

**conducted** 59:7,16 77:9 78:4 82:4 91:6 148:19 150:17 151:12 162:21,23 162:24 163:21 164:6

**conference** 86:10

**conferences** 61:4 109:5

**conferral** 98:24 101:14

**conferring** 99:2

**confident** 63:25

**confirmed** 98:17

**confused** 113:9

**connection** 104:13

**cons** 104:3

**consider** 76:20

**considered** 64:10 106:17 112:5,14 122:18 129:8 145:17 160:11,11 160:23 162:18

**considering** 127:19

**consistent** 99:4,10 143:25 144:7,14 145:15

**consortium** 9:20

**consult** 92:8 149:4 151:25

**consultant** 150:25

**consultation** 103:5 149:23 150:4 153:3

**consulted** 97:17 98:7

**contact** 94:15,24 117:12

**contained** 23:21

**containing** 21:22

**contents** 20:10 110:7

**continue** 41:19

**continued** 2:24 3:3

**control** 72:9 142:15 142:23

**controlled** 58:19

**convert** 94:11 104:18

**convinced** 112:7

**cooperation** 52:21

**cooperative** 58:20

**copies** 21:20

**copy** 23:8,15 66:11 66:16 67:20 79:23 95:14 109:12 116:2 116:2

**corporation** 2:11

**correct** 18:15 20:8 20:13 45:15,22 46:6

46:9 47:20 60:8,24 71:23 72:11 78:7,18 81:21,25 82:5,11 88:7 89:13 96:18 102:17 106:4,21 107:3 111:9 112:22 112:24 123:10 131:21 134:25 140:4 155:2 157:5 158:25 160:12 161:10

**correction** 167:1,2

**corrections** 5:12

**correctly** 99:15

**counsel** 2:11 5:14 6:14 7:19 30:13,25 41:14 100:8 148:12

**counseling** 143:5

**count** 123:25 124:2

**county** 115:25

**couple** 5:10

**course** 6:12

**court** 1:2 5:8 20:19 29:3 42:18 43:3,14 49:5 51:9,16,24 53:17 85:4,21 86:2 86:8,11,11 87:5,6,9 99:23 100:9 109:25 114:12,17 115:9,10 115:23,24 116:20 117:17 118:3,9,15 119:13,17,20 127:12 144:22 145:5 146:10,14 147:13,25 155:23 156:16

**court's** 144:11 157:24

**cover** 20:17

**covered** 127:7 154:13

**cpep** 18:7,8,9,11 22:6,13,22 23:8,9 23:23,24,25,25 24:3 24:9,10 44:20,24

112:24,25 113:5,6 113:14,15,16,25 137:19,24 138:3

**crafting** 65:7

**create** 139:18

**created** 25:12 45:5,6 66:19 80:16

**creation** 25:23 45:2

**credential** 61:14

**criteria** 53:21 55:24 56:7 76:21 83:4 94:14

**critical** 106:23

**crystal** 105:25

**cuff** 144:8

**current** 47:7

**currently** 8:20,24 13:17 35:3 46:22 106:15 107:22

**customary** 102:9

**cut** 39:17 54:15

**cv** 1:7

## d

**d** 7:5,5,15,16 123:15 165:1

**d.c.** 2:9

**danger** 31:18 33:2 73:7,16 142:16

**dangerous** 27:23 33:9 72:14,18 73:2 105:13,21 106:14 106:17 133:4 134:24 141:12

**dangerousness** 31:19,25 34:4,19 37:3 40:15 41:2 58:10 71:25 72:2 103:15 105:14,17 106:7 107:16 108:8 109:2 111:5 129:22 131:2 133:21,22 134:3 135:7 137:6 142:4 145:19 149:20 151:5 154:8

[date - discharge]                                                                                Page 6

**date** 1:18 6:24 66:18
  68:5 91:23 143:12
  162:15
**dates** 25:6,11
**david** 7:16
**day** 16:23,23 17:2,2
  41:23 100:20 117:4
  119:19 162:5,7
  163:2 164:19
  166:20 167:23
**days** 115:8,8
**daytime** 62:8
**dayton** 10:25,25
  11:3,5,6,10 12:25
  13:11 14:12
**deal** 143:23
**deals** 71:24 72:2
  83:18
**decide** 41:23 87:4
**decision** 14:17 32:16
  69:9,11,13,16,23
  78:6,12,13,17 80:9
  89:4,7,8,8,10,17
  90:6,24 95:9 102:12
  106:24 149:10
  162:5,10
**decisions** 14:10 16:2
  50:17 70:10 96:24
  98:12,13 99:14
**defendant** 2:12,16
  2:21 3:5,9
**defendants** 1:10
**defense** 6:14
**define** 129:24
**defined** 128:17
  133:24 134:18
**defines** 71:19
**definition** 55:18
  71:24 72:23 129:19
**delay** 162:6
**delegates** 99:15
**deliver** 115:24
**demand** 112:3
**demonstrated**
  103:14

**demonstrates** 73:7
  73:15
**demonstrating**
  72:18,25
**denise** 1:19 166:4,24
**department** 2:11
  8:25 9:20 10:21
  15:17 16:19,19,24
  19:4 24:14 26:10
  80:18,21 96:20
  99:13 120:20
  143:17 147:2,3
  154:12 163:16
  164:4
**departmental** 98:9
**depending** 59:23,25
  61:9 105:11 117:2
**depends** 59:11
  142:14 153:11
**deposition** 1:17 5:6
  5:25 6:6 7:2 17:22
  17:24 19:16 23:7,20
  24:19,21 42:9 43:20
  49:2 51:10 53:17
  83:18 84:20 85:22
  100:6 143:22
  144:11,20 146:9,11
  156:4,10 157:5,21
  166:9
**depositions** 20:17
**depression** 55:14
**describe** 18:3
  114:15
**description** 112:24
**deserves** 117:13
**designated** 154:16
**determination**
  31:24 45:25 46:11
  106:3 128:19
  130:24 139:13
  140:14,20 149:6
  161:21 163:25
**determine** 33:8 53:8
  56:13 91:21 129:20
  131:9

**determining** 32:23
  32:25 53:4 73:25
  124:25
**devine** 2:20
**dhar** 1:17 7:16 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1
  17:1 18:1 19:1 20:1
  21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1
  29:1 30:1 31:1 32:1
  33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1
  41:1 42:1 43:1 44:1
  45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1
  53:1 54:1 55:1 56:1
  57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1
  65:1 66:1 67:1 68:1
  69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1
  77:1 78:1 79:1 80:1
  81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1
  89:1 90:1 91:1 92:1
  93:1 94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1 108:1
  109:1 110:1 111:1
  112:1 113:1 114:1
  115:1 116:1 117:1
  118:1 119:1 120:1
  121:1 122:1 123:1
  124:1 125:1 126:1
  127:1 128:1 129:1
  130:1 131:1 132:1
  133:1 134:1 135:1
  136:1 137:1 138:1
  139:1 140:1 141:1
  142:1 143:1 144:1
  145:1 146:1 147:1
  148:1 149:1 150:1

  151:1 152:1 153:1
  154:1 155:1 156:1
  157:1 158:1 159:1
  160:1 161:1 162:1
  163:1 164:1,16
  165:4 166:8 167:20
**diagnosis** 32:14,15
  83:6,7 88:15 101:19
  117:2
**difference** 102:19
  133:8,19 134:2
  141:9 142:17
**different** 15:21
  23:24 24:7 28:7
  35:13 53:24 83:24
  95:7 104:3 132:20
  132:20 162:15
**differential** 124:2
**differently** 52:11
**difficult** 17:7
**difficulty** 93:9
**direct** 37:5 38:13
  41:9 96:14,16 127:8
**directed** 145:25
**directing** 53:15
**direction** 38:15
**directly** 28:9
**director** 10:19 28:22
  68:16 69:6,8,14,18
  69:20,25 70:4,7,9
  71:11 74:5 115:22
  115:23
**disagree** 6:16 42:16
**disagreement** 97:18
  98:22 99:4 101:20
  102:4 118:12
  157:13
**disagreements**
  95:18
**disagrees** 6:13 83:8
  87:15,18 88:2,8,15
  95:2 98:6 114:25
**discharge** 83:10
  86:7 104:15 114:23
  115:2 117:8 136:4

140:15 150:23
**discharged** 88:10
  98:23 104:11
  106:10 114:22
  115:6,12 151:2
**discharging** 83:23
**discovery** 21:23
  143:15
**discuss** 19:10
  114:23
**discussed** 60:23
  147:13
**discussing** 70:23
**discussion** 20:15
  42:22 43:6,7
**discussions** 20:10,14
**diseases** 55:12,23
**disputes** 96:9
**disputing** 23:3
  147:10
**distinction** 133:16
  136:19
**district** 1:2,2
**disturbance** 131:10
**doctor** 6:15 8:4,7,17
  15:7 38:6 50:14
  79:2,5,6,7 87:15
  91:5,9 92:8,17,22
  98:14 101:13
  114:24 132:18
  139:19 148:10
  152:8,22 153:12
  158:11 161:8,13,15
  161:16,18 162:4,16
**doctors** 90:22
**document** 21:21
  24:12 45:2,3,5 68:4
  79:19,20 80:2 103:5
  143:11 146:24
  165:9,10,11
**documented** 121:13
**documenting** 64:9
**documents** 17:25
  22:3,16 24:5 31:8
  110:5,8 123:2

165:15
**doh** 154:13
**doing** 51:12 53:9
  59:19 100:4,5 103:4
  142:4
**double** 144:8
**dr** 2:21 3:5 5:15,21
  6:2,7 19:7,11,18,21
  26:8 45:10 62:8,10
  70:6 93:14,15
  147:21 155:7,9,12
  158:11 159:3,14
**dsm** 53:22 54:9
  55:24
**duly** 7:6 166:9
**duties** 16:21,22 17:3
**duty** 99:16

### e

**e** 2:2,2 26:5 113:4
  165:1,8
**earlier** 68:25 107:5
  109:10 112:17
  141:8 150:8
**east** 1:12 3:10 5:5
**ebt** 127:20
**effect** 94:10 111:19
**effects** 124:10
**effectuate** 126:20
**effectuated** 30:2
  49:15 108:14
**effectuating** 32:8
  91:10
**eight** 59:10,20,23,24
  60:10,22 61:8 81:25
  82:4
**either** 30:18 72:12
  86:8 99:16 103:12
  104:17 133:16
  147:10 153:2
**elmhurst** 126:22
**emergency** 17:13
  18:10,11,21 22:8,10
  24:15 27:16,24 28:9
  28:15 30:19 31:2

43:25 56:18 59:11
  62:4 64:19 69:22
  75:11 79:21 81:3,24
  91:3 94:14 113:18
  114:9 119:24 120:9
  120:11,13,17,19,23
  120:24,25 121:14
  122:13,19 123:9,12
  125:8,11,14 128:2
  128:10,21 129:9
  133:6 137:16
  148:16,20,23
  150:21 151:6 152:8
  152:9,10,11,20
  154:11,11,16,23
  159:16 160:3
**emotional** 131:10
**employed** 34:17
**employee** 8:11
**employment** 12:24
  13:12
**endeavor** 65:15
**engage** 72:12
**engaging** 139:17
**entire** 6:6 10:21
  99:13 123:11
**entitled** 6:15 24:14
**entity** 38:2
**entourage** 52:18
**entry** 91:24
**enzymes** 124:4,4,5
**episode** 56:5
**equal** 106:16
**er** 17:5 59:12,25
  60:2,3,4,8 61:9 70:4
  70:4 121:3,3,7,8,18
  122:8,12,18,20
  123:3,5 140:11
  149:7,8,14,18
  150:13,16 151:10
  151:22 152:24
  153:12 160:8
  162:25
**err** 104:24 105:2,3

**especially** 149:19
**esq** 2:4,7,14,18,23
  3:7,11
**essentially** 27:20
**establish** 22:24
  39:11 110:14
**established** 22:22,24
**et** 1:8
**evaluate** 137:12
**evaluated** 140:25
  153:2 155:7
**evaluation** 32:5,11
  32:13,14,21 34:2
  36:15,21 46:10,15
  47:11 48:19 53:7,9
  58:14,25 59:7,16
  61:8,10,19 62:12
  63:5 64:2,12 77:10
  78:5 81:23 82:3,8
  82:18,20 86:15,25
  88:23 91:11 93:4,21
  93:25 107:2 120:18
  129:18 140:13
  141:6 147:22
  148:18 149:3,14,17
  149:25 151:11
  153:14 159:22,23
  160:4,12,23 161:18
  162:22
**evaluations** 75:13
**evening** 62:6 155:6
**event** 23:2
**everybody** 21:21
**exactly** 58:25 87:13
  104:5
**examination** 4:5,10
  7:10 38:3 41:20
  43:16 48:14,16 49:6
  56:15 76:18 80:25
  85:18 86:21 91:6
  92:24 124:22
  146:15 150:17
  158:9 161:5 162:2
  162:23

examine 58:21
examined 7:8 32:22
  58:22 81:7
examining 36:12
  76:20 77:2,4 79:6,7
  123:20
examples 130:7
exceedingly 85:25
exclusively 22:7,9
excuse 54:10
executed 78:16
  155:8
exhibit 21:20,20
  23:21 24:24 26:20
  31:5 43:22 44:4
  68:3 70:15 79:9
  119:23 143:9,10
exhibits 165:12
exist 35:4 110:5,8,14
existed 35:3 65:17
  110:9
expected 60:11
experience 14:10,12
  15:9,14,16 50:23,23
  63:4 119:15
expert 5:17,19
explain 52:4 56:8
  131:5
explained 51:25
explaining 79:24
expressway 7:18
extended 52:21
extensive 15:14
extent 107:21
  133:11
extra 62:6
extremely 85:20
eye 60:2

**f**

f 3:7
fact 23:4 38:18
  102:17 112:10
factors 32:7,17,20
  32:22 33:7,23 36:25

163:6
fair 14:7,9 15:13
  17:9 57:25
fall 54:5 55:3,3,17
  156:19
familiar 15:21 44:13
  44:15 59:17 137:14
  138:17 139:9
familiarized 97:7
family 28:23 48:3
  74:17,22 76:3 90:2
  114:22 115:3 117:6
far 147:13 159:11
  163:23
federal 5:11
feel 153:12
feels 114:25
fellowship 11:19
felt 123:20
fifth 44:3
figure 35:10 49:20
  56:15,19
file 64:15 79:10
  92:10 115:6 123:11
files 52:19
filing 4:9
fill 77:20 78:5,10
filled 80:4 81:19
  82:9
final 69:15 70:9
  89:7,8,17 139:12
finally 6:22
find 33:18 37:8,12
  37:15 39:3,4 50:2,3
  75:3,18 94:13 106:9
  110:4 133:3 136:4
finding 17:4 42:12
  76:22
finds 77:18
fine 7:23 29:18 30:9
  36:4 42:3 133:14
first 7:6,15 24:11
  39:10 56:25 68:16
  71:23 88:2 93:22
  94:2 102:25 103:9

104:8 123:8 155:11
  156:2 161:8,16,18
fits 84:19
five 9:5 39:6 40:3
  100:24 101:5
  109:19 115:8
flushing 9:10,14,18
  10:2,15,18 13:3,4,5
  13:11 14:13
follow 23:13 111:22
  156:24 161:24
followed 122:6
following 76:18
follows 7:8
food 73:11 132:24
forest 13:21,21
form 4:14 9:16
  17:16 23:5 25:25
  27:19 28:18 36:6
  41:10 46:4,19 47:5
  51:5 54:18,24 55:7
  55:21 61:2,21 62:15
  63:6,8 71:2,9 74:25
  75:24 76:12,22
  77:12,14,14,16,20
  77:21,25 78:5,10,16
  79:2,16 80:4,11,15
  80:15,16,21,24
  81:19,19 82:9,13,16
  82:24 83:15,17
  84:16 87:17,22,24
  88:13 89:12,20,22
  92:4 94:4,6 95:3
  97:22 99:8 102:7
  103:6 104:13 105:7
  105:10 107:19
  116:22 117:21
  125:4,5 126:8
  128:16 129:4,16
  130:6,22 135:3,16
  135:23 136:11,17
  140:6 141:3,15,17
  142:13 148:25
  149:16 150:19
  151:14 153:9,23

155:8,13 159:17
  160:15 161:8,17,20
  162:6 163:2,5
formed 37:23
forms 12:23 161:15
forth 166:9
forward 7:2
forwarded 92:10
four 142:25 147:16
fourth 44:3 104:22
frankly 22:21 110:3
friday 119:18
  158:20
friend 115:21
front 24:6 43:22
  67:5 97:24 115:9
  119:23 120:4
  130:11
full 149:13
function 54:11 96:8
  99:20
further 4:8,12 161:2
  166:14
future 8:9 105:16
  106:2,4

**g**

games 39:13,21,24
general 11:16 29:14
  30:10 46:22,24,25
  47:3 74:4 91:13
  92:12 158:14
  159:20 160:22
generally 25:18 40:5
  74:7,9,14 112:20
  116:11,12 117:4
  158:17
getting 15:4,8 39:12
  39:12 42:12 90:16
  100:7 138:7
give 14:15 20:20
  91:17 92:15 115:3
  116:7 130:7
given 5:20 8:5 29:11
  53:17 61:13 79:22

79:23 80:3 81:20
107:22 115:12,14
143:4 150:6 166:11
**gives** 75:15 83:6
92:16 101:19
115:15,21 118:22
140:12
**giving** 95:6 107:14
**gladly** 112:11
**go** 30:7 38:4 49:10
49:12 54:8 82:24
91:9 94:6 101:8
103:18 104:14,22
117:17 121:24
128:12 129:16
133:2 145:6 146:9
148:3 150:19 162:9
**goal** 60:22
**goes** 44:7 49:14 50:7
72:17 123:3 125:6
130:9
**going** 5:2,25 7:2
14:23 15:5 19:9,13
22:2 23:7,24 29:12
34:12 37:4,24 38:19
38:21 41:8,20,22
42:17,20,23 43:10
43:15 48:20 52:7,8
52:11,14,22 54:20
54:22 56:19 64:18
66:6 67:12 70:14
79:14,15,25 85:3,14
87:13 92:14 96:13
96:15 97:10 100:23
101:2,3,8,11 103:8
108:9,17 109:20
110:6 111:16
113:20,23 115:9
125:22 126:5 127:8
133:10 138:24
145:21 148:3,5,8
153:17 155:22
156:3 158:5 164:10
**good** 35:20 100:20
138:23

**governing** 147:5
**government** 12:10
**gracey** 126:25
**grand** 109:4,6
**granted** 112:15
147:15
**great** 40:20
**greg** 22:16 146:22
**gregory** 3:11
**ground** 20:16 156:8
**grounds** 6:2 17:16
47:6 100:16 103:3
157:2,4,20 158:3
162:12
**guess** 94:7
**guideline** 142:24
**guidelines** 36:25
**guides** 34:16
**gurney** 144:9
**guys** 100:13

**h**

**h** 7:5,17 165:8
**hairs** 84:24,24 87:11
87:13
**half** 155:25
**hand** 80:10 119:6
166:20
**handcuffed** 144:3
**handcuffs** 144:3
147:23
**handouts** 107:18
**happened** 102:12
159:25
**happens** 85:16
87:16 93:21
**harlem** 12:18
**harm** 55:16 64:23
71:14,20 72:24
73:10 128:3,14
131:14 134:19
139:19
**harmed** 56:2
**heading** 45:17

**headings** 76:14
**health** 11:2 31:21
80:19,22 114:21
115:4,13,16,25
117:11 118:22
142:18 154:10,13
**hear** 104:2
**hearing** 8:3 114:13
114:17 115:23
119:20
**heat** 132:24
**held** 94:3 119:18
128:20 152:24
**hello** 99:24
**help** 143:2
**helps** 90:5
**hereinbefore** 166:9
**hereto** 4:5
**hereunto** 166:19
**hi** 99:24
**highway** 130:14,14
**hills** 13:21,22
**history** 34:3,13,15
36:13,14 40:25
66:18 128:9
**hmm** 25:5 68:18
71:16 120:5
**hoc** 26:16,18
**hold** 99:21 136:6,7
137:7,9,10,12,15
138:9 139:4,7
150:15 151:9,17,24
154:5 156:3
**holding** 140:2
151:19 153:5
155:14
**holds** 69:24
**home** 8:18 130:8
132:22,23
**hospital** 3:10 5:6
7:17 8:11,22 9:6,8
9:11,14,14,17,18
10:16,23 12:18,24
12:25 13:11,12
14:22 15:18,20 16:2

16:20 17:14 18:5
27:7,8,17 28:13
29:15 30:18 31:3,24
32:3,9 33:7,15 34:7
34:18 37:2 40:14
48:6 49:8,15,18,19
49:23 50:3,16 56:24
57:14 58:12 59:5,15
61:6,13 63:18,20
64:4,7 65:7 67:2,15
68:23 69:15,21,25
74:20 75:16 76:4
80:8,17,20 81:3,9
81:21 82:15,17 83:9
88:6,10 90:8 92:7
93:4,17 94:9,22
96:21 98:8,9,10,15
99:11 102:2,9,15
103:17 105:4
106:19,20 107:12
108:6,23 109:4,11
109:17 110:25
111:20 112:19
114:6 116:19
117:17 118:5,11
119:12 121:2,7
122:8 123:8 126:6
126:16,19,23,23,24
127:5 128:12
130:17,24 131:12
133:18 134:18
135:13,19 136:3
138:14 140:23
141:13,21,23 142:8
142:10 143:15,16
144:9,15 145:18
146:22 148:17
151:19,24 152:17
153:24 154:5,17,17
155:5,12,14 158:16
158:19 161:9,19
164:4
**hospital's** 30:15
65:14 85:11 131:18
139:14 144:2,8

153:4
hospitalization 49:9
   94:15 131:8 146:18
hospitalized 162:17
hospitals 126:18,22
hour 36:20,22 46:15
   47:11,14,19 60:10
   60:22 81:17 82:4
   89:10 138:4 140:17
   140:19 143:7 150:5
   156:2 161:17
hours 14:2,3 59:10
   59:20,23,24 61:8
   62:7 81:6,12,25
   82:15 89:5 91:7,12
   92:18,22 117:3
   139:11 140:11
   150:11 158:15
huh 68:20
hurry 21:7
hygiene 65:5,16,21
   66:2 99:6
hypothetically
   160:17

           i

identification 68:4
   143:11
identified 5:7,19
   32:18,21
illness 32:24 34:4
   45:18,20 46:2,12
   49:22 50:6 53:5,18
   53:20,21 55:10,11
   55:12,18 56:14,16
   56:23 57:5,6,12,22
   57:24 58:4 64:22
   81:4 103:13 131:10
   131:13 139:16
   140:24 151:3,4
   154:7
illnesses 53:25 54:5
   55:2 56:6 57:17
immediate 56:23
   57:12 58:5,9,25

81:5
immediately 58:17
   92:25 93:5,10,22
   94:15,24 115:24
impact 126:4 127:3
   129:22
impeachment 6:10
implements 108:16
important 20:18
   21:12,14 91:24
impossible 37:23
improper 51:8
inappropriate 15:10
   54:14
include 13:5 16:22
   134:19 137:7
   159:24
included 111:4
includes 148:17
including 41:6
inconsistent 99:4
   144:15 145:15
independent 63:14
   64:2
independently
   63:12,23 76:8
india 12:3,4,6
indicated 123:21
indicating 160:18
indication 43:14
individual 22:4
   28:20 45:25 112:18
individuals 93:16
inform 91:15 92:13
   92:17
informal 153:3
informants 76:19
information 8:2
   15:6,9 33:18,20
   34:14 42:13 48:4,4
   74:2,5,21,23 75:5,6
   75:6,8,8,9,20,21
   76:2,4,6 77:23,24
   77:25 79:22,23
   88:25 89:2,3,18,25

90:4,11,13,16,20,23
   91:18 112:7,8
   128:11 139:12
   149:5,19 150:25
   165:14
informed 19:12
informing 19:8
initial 83:5,8 87:20
   89:7 95:2 97:18
   98:5,16 101:19
   102:4 106:24 160:2
   163:21
injury 55:15
inpatient 10:5,14,19
   17:5,13 30:20
   114:20 120:10,14
   120:18 121:12,22
   122:5 125:15,19
   126:14 131:8
inquiry 85:10
insist 117:9
insofar 5:19 157:18
instituted 113:25
institution 14:18
   95:6
instruct 54:17 97:11
   145:25
instructed 157:7
instructing 14:24
   84:2 134:9
instruction 15:11
   21:13 38:22
instructions 43:7
   100:12 127:16
insurance 127:3
   163:10,11
intent 108:14
intention 146:7
interested 28:24
   115:19 166:16
interfere 38:3,8
   41:20 51:13 54:12
interfered 144:18
   148:13

interference 43:18
   54:16
interfering 85:22
interject 20:21
intermediary
   101:23
internal 98:11 99:11
internist 121:25
interpret 95:21
   96:17,21
interpretation 85:25
   95:23
interpreting 35:17
   51:24
intervention 106:9
   107:13
interviews 76:18
investigation 90:10
invoked 152:15
involuntaries 70:10
involuntarily 14:11
   14:17 15:14 16:3
   30:17 78:7 88:9
   97:3 104:9 126:6
   127:5 128:24 130:2
   136:21 147:7
   151:10
involuntary 15:19
   26:23 27:6,8,15
   28:13,15 29:2,8
   45:14,24 49:8 57:7
   75:16 77:19 80:9
   83:19 85:6 86:6,12
   86:14 87:7 91:25
   103:2,10 104:10,18
   112:18 113:9,11,12
   114:9,19 125:7
   126:12 130:17
   131:18 134:23
   136:8,20,23 141:23
   142:6,8 143:23
   144:14,21 145:2,9
   145:11,16,18,23
   146:17,18 154:6
   163:18 164:5

**involved** 15:22 20:5
25:23 93:20 120:7
135:13
**involvement** 159:8
159:10
**involving** 118:9
**irrelevant** 85:17
**isak** 2:21
**isakov** 2:21 19:19
**issue** 35:22 46:12
108:8 109:23 112:6
118:16 147:21
**issues** 5:7,20 7:24
15:4
**iv** 53:22 54:9 55:24
**ivone** 2:20

**j**

**jamaica** 3:10 5:6
7:17,18 8:11,21 9:6
9:8,14,17,22 10:22
11:8,9 12:25 13:6
13:11,25 14:3,13,14
16:20 17:11,14
21:22 27:17 29:15
30:15 32:9 33:7
34:17 36:25 40:13
40:25 49:7 50:16
53:3,8 58:12 59:5
59:15 63:18,19 64:4
64:7 65:6,14 66:25
67:14 69:8 73:6,24
74:19 75:16 76:4
78:9,15 80:7,17,20
82:14 83:9 86:16
88:19 90:8,22 92:7
93:3,17 94:9,22
96:21 108:6,23
109:3,11,17 110:25
111:20 114:5 121:2
121:7 126:19
133:18 134:18
135:19 136:3
138:14 139:14,25
142:21 143:14,16

148:17 151:24
154:19 161:7 162:5
163:8,18
**jamaica's** 76:5
81:16 130:4 134:21
135:5 137:5 145:15
150:15 151:8
**jensen** 2:20
**job** 96:19,23 97:2
**john** 2:7
**join** 31:15 47:8
61:22
**joined** 40:13
**joining** 10:22
**judge** 5:22 38:16
41:21 42:2 43:4,9
100:3,12 112:5,9,14
115:10,10 127:15
145:24 155:24
**judge's** 107:22
127:9 146:5,7
**judgment** 128:18,19
129:7 133:23
153:11
**july** 1:13 5:3 166:20
**jumping** 126:11
**juniper** 8:19
**jurisdiction** 154:14
**justification** 77:21

**k**

**kashmir** 12:10,11
**keep** 56:18 75:6,8
85:14 88:9 104:16
104:21 109:15
153:15
**keeping** 88:17
**kept** 88:5 118:17
150:20
**kidney** 124:4
**kind** 7:24 48:8
56:16 57:5,22,22
64:14 72:8 73:5,6,9
73:15 129:24

**kinds** 53:24 57:17
**know** 6:20 15:23
19:14 21:17 22:20
23:5 24:22 25:16
26:2 29:24 31:6
35:15 37:19 40:11
43:10 46:20 51:23
54:4 57:16 65:25
66:9,23 67:6,12,16
67:17 68:20 92:14
96:7 98:25 100:13
104:6 109:14
110:16 118:20,24
124:13 125:21
134:12 138:8
143:20 144:5
146:19,22 147:8
151:18 152:23
155:10 157:8 163:8
**knowing** 124:16
**knowledge** 25:10
39:5 40:12,16
**known** 28:14 63:20
79:20 112:23
113:13
**knows** 19:4 37:12
39:8 40:9 66:10
96:2
**koster** 3:4
**kretz** 2:16

**l**

**l** 4:2 5:15 26:5
**label** 129:12
**laid** 90:8 95:11
**lake** 2:22
**lane** 8:19
**lasts** 36:19
**late** 155:5
**law** 2:11 6:20 43:4
65:5,12,16,21 66:2
67:6,8,21 95:12,18
95:21,23 96:3,10,17
97:19 98:3,13 99:6
129:6

**lawsuit** 158:12
**lawyer** 20:20 65:6
66:7
**laying** 140:18
**lead** 55:25 57:7
**leading** 160:15,24
**leave** 54:19 118:10
119:7
**leaving** 117:10
**lee** 2:23 25:25 31:12
34:25 35:8,13 40:18
42:4,8,15 47:8 51:2
61:24 63:6 76:11
82:13 83:14 84:15
87:17,22 88:11
89:15,20 92:5 94:4
95:3 141:15 161:4,6
161:23 165:6
**leeway** 29:12
**left** 101:13
**legal** 17:17 26:23
66:9 114:21 115:4
115:13,16,25
117:11 118:22
125:2 136:24
159:11
**legitimate** 38:9,12
**lenoir** 2:7
**level** 63:3 106:6
**lewin** 147:21
**lexis** 66:17
**licensed** 70:17 125:7
**light** 5:22 112:9
130:12
**lij** 126:22
**likelihood** 71:20
72:24
**lilian** 3:5
**limit** 41:11 54:22
**limited** 86:12
144:21 146:11,16
**limiting** 49:6 51:10
**line** 64:20 167:2
**list** 123:15

**little** 29:12 84:8
113:8
**liver** 124:4
**living** 31:22 132:23
**llp** 2:20 3:4,9
**locked** 144:25
145:14
**locks** 130:8
**long** 9:2 11:17 20:19
36:17 41:24 48:17
119:9,12
**longer** 101:2 106:14
**look** 24:20 29:20
68:6 105:22 106:2
109:19 152:6
**looked** 20:7,8 22:5
22:17,20 32:8,25
33:8,23
**looking** 95:15
122:24
**looks** 37:2 43:2
**lot** 22:3 157:7
**lubit** 3:15 5:15,21
6:3
**lubit's** 6:7
**lunch** 101:3,4

**m**

**m** 26:5
**m.d.** 1:17 3:15 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1

69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1,19
166:8 167:20
**madison** 2:17
**magdalena** 3:16
**main** 62:7
**maintain** 6:25
**maintained** 103:2
104:10
**maintaining** 105:4
**making** 14:10 33:23
34:18 37:2 50:5,17
70:9 90:5 91:10
93:9,20 107:16
135:6,25,25 139:17
**manifested** 72:4,11

**manner** 129:2
141:13
**manual** 147:4
**marcus** 2:22
**mariana** 2:18
**mark** 68:2
**marked** 21:19 68:4
79:9 143:9,11
**marriage** 166:16
**martin** 3:9 5:4
**matter** 23:4 83:21
83:23 101:22
108:25 159:7
166:17
**matters** 159:25
**mauriello** 2:17
**mean** 11:13 24:20
32:10 49:16 62:22
72:7 116:10 121:16
127:12,20 129:21
132:18 137:3,10
139:6 141:22
161:12,20
**meandering** 20:19
**meaning** 53:19 62:5
102:21 121:23
**means** 17:4 25:14
27:5 30:9 46:11
49:20 55:12 58:25
60:15,16 103:15
121:19,20 123:24
124:2,3 139:5
142:19 149:4
**meant** 13:4 137:17
**measured** 128:6,8
**measuring** 128:13
**mechanism** 118:9
118:15
**medical** 3:10 8:21
11:12,23,25 12:4,5
12:9,10,13 29:9
30:16 31:21 45:24
50:9 60:4 70:4,6,8
73:12 103:24
105:21 118:3

120:11 121:3,7,12
121:13,17,23,24
122:4,6,8,12,18,19
122:21 123:2,3,9
124:20 136:24
148:16,20 149:7,14
149:18,21 150:16
150:21,22,23
151:10,22 152:10
152:24 153:12,25
154:11 160:3
162:14,23
**medically** 122:3,11
151:16
**medication** 117:7,7
124:9,14 143:5
**medications** 124:9
**medisys** 9:19
**meet** 56:6 76:21
94:13
**meetings** 17:8 60:17
60:24 61:5
**meets** 53:21 64:9
**member** 28:23
60:20 76:3 81:8
82:16,21 90:3
120:19 163:16
164:3
**member's** 83:7
**members** 48:3 74:18
74:22 115:3
**memory** 37:24
**mental** 11:2 32:24
34:4 45:18,19 46:2
46:11 49:22 50:5
53:5,18,20,25 54:5
55:2,10,11,12,18
56:14,16,22 57:5,6
57:12,17,24 58:4
64:22 65:5,16,21
66:2 80:18,21 81:4
99:6 103:13 114:20
115:4,12,16,25
117:11 118:22
131:9,13 136:2

139:16 140:24
142:18 149:5 154:7
154:10
**mentioned** 10:10
22:5 34:8 57:21
107:5 128:7 129:6
**merged** 13:5
**met** 83:3
**metabolic** 124:3
**methodology** 32:6
43:19
**mettham** 2:14
**mhls** 115:21
**mincing** 84:22
133:17
**mind** 7:3 8:16 95:15
114:8 117:3 133:9
133:12 136:20
157:14
**minute** 100:24
150:11
**minutes** 43:2,13
101:6
**mm** 25:5 68:18
71:16 120:5
**moment** 85:12
**monday** 158:20
**month** 63:18
**months** 63:10,10
**morning** 92:18
**mother** 130:9
**motion** 86:5
**moving** 38:2 66:25
112:16
**mule** 26:3 45:10
**multipage** 21:21
**muscle** 124:5

**n**

**n** 2:2 4:2 7:5,15
165:1
**name** 7:13,15,16
26:3 64:6 79:12
**names** 79:2

**narrow** 85:20,25
**nat** 138:21
**nathaniel** 2:4
**ne** 2:8
**necessarily** 56:6
58:16 131:7
**necessary** 137:12
**necessity** 118:4
150:23
**need** 7:25 8:3,7 29:9
30:3 37:11 39:10
58:19 60:20 98:16
101:7 122:4,21
124:12 125:19,21
126:12 149:21
158:22 163:10
**needing** 86:15 149:8
**needless** 43:17
**needlessly** 85:21
**needs** 27:6 78:14
106:8 118:4 127:23
153:13 161:22
162:11,16
**neighborhood**
130:11
**neighbors** 132:25
**network** 9:19
**never** 20:6,8,9,13,15
**new** 1:2,8,12,12,20
2:5,5,11,12,13,13,18
2:18,22 3:6,6,11,11
7:7 8:19 11:11,22
11:24 12:13,22 65:4
65:11 70:17 75:10
80:19 91:18 95:12
96:10 97:19 103:6
112:8 137:19 166:5
**night** 62:7
**nine** 9:5
**nit** 84:9,11
**nonsense** 41:24
**notary** 1:19 4:6 7:6
164:21 166:5
167:24

**notations** 25:4
**note** 40:18 43:16
83:14 84:15
**noted** 32:12 160:8
164:12
**notes** 103:6
**notice** 1:18 79:21
80:11,14 82:9 115:5
115:22 116:2,7
117:15 118:23,25
119:2,10
**noticed** 87:8
**notices** 150:7
**november** 25:22
62:13 155:7,9
158:14
**number** 14:16 28:10
44:5,6 55:12,13,23
56:5 62:3 76:15,17
78:21,22 85:24 91:4
94:8,17 114:11,16
124:23 130:7
158:25 159:2 163:6
**numbered** 71:21
**nurse** 92:15,15,16
**nurses** 70:13
**nursing** 132:22

**o**

**o** 4:2 7:5,15
**oath** 21:13
**object** 5:18 14:23
15:6 37:5 38:12
43:17 46:4 47:4,5
48:21 54:11,18,24
66:7 102:6 109:21
129:15 133:11
**objected** 156:8
157:18 158:2
**objecting** 41:18
53:15 83:16
**objection** 6:25 9:15
14:19 16:5,9,12
17:15 25:25 27:18
28:17 36:5 38:9

40:19 46:3,18 49:4
50:25 51:2,3 53:11
55:6,20 57:9 60:25
61:20,23,24 62:14
63:6,7 70:25 71:8
74:24 75:23 76:10
76:11 77:11 82:13
82:23 83:14 84:15
86:9 87:17,22,23
88:11,12 89:11,15
89:20,21 92:3,5
94:4,5 95:3,20
97:21 99:7 104:12
105:6,9 107:20
116:21 117:20
126:7 128:15 129:3
130:5,21 135:2,15
135:22 136:10,16
136:22 137:25
139:22 140:5 141:2
141:15,16 142:12
145:3 148:24
149:15 150:18
151:13,21 152:3
153:8,22 154:9
155:16 159:17
160:14,15,24 162:8
163:4
**objections** 4:13 5:24
100:14,15 127:15
156:14 157:22
**objective** 60:23 97:7
**obligated** 75:5,7,19
108:3
**obligation** 117:16
**observation** 56:23
57:13 58:5,9 81:5
138:4 153:16
**observed** 63:9
**observes** 73:20
**obtained** 66:17
89:19,25 90:14
123:2
**obviously** 35:8

**occasion** 6:20 99:18
**occurred** 41:6,12
**occurs** 92:21
**october** 25:21 62:12
  155:6
**office** 2:11 30:5
  38:20 52:9,12,24
  80:18 146:25
**officer** 28:22 163:19
**offices** 5:4
**oh** 99:24
**ohio** 11:6
**okay** 6:12 20:24
  21:11,17 22:15
  29:17 30:11 36:4
  39:7 40:7 41:17
  44:8,12 54:14 55:10
  66:21 68:22 69:4
  79:13,16,17 85:8
  100:11,17,21
  102:23 113:8
  133:14 134:6
  138:23 158:8
**olenko** 2:18
**omh** 76:22 77:15
  94:18 142:24
**once** 35:10 63:10
  89:9 125:20 161:8
  161:12,13,16,18
**ones** 61:17 156:8
  158:2
**oneself** 71:25
**opinion** 66:9 77:18
  88:2,4 102:10,19,20
  102:21,22,23,24,25
  103:5 104:20,22
  133:25
**opinions** 17:6 95:7
  104:3
**opportunity** 156:13
  158:4
**opposed** 13:24
  148:20 149:24
**option** 104:15,17

**options** 54:22
**order** 29:7 30:17
  33:8 43:18 45:23
  49:6 51:9,24 53:17
  75:12 85:4,21 86:2
  86:11,11 87:6,9
  105:19 124:10
  127:13 144:12,22
  146:7,14 147:25
  156:16 157:24
**ordered** 146:11
**orders** 146:5
**ought** 112:9
**outcome** 166:17
**outside** 138:22
**oversee** 15:17 16:23
**overseeing** 70:11

**p**

**p** 2:2,2 4:2 113:4
**p.m.** 164:12
**page** 24:11,18,19,24
  26:19 44:3,5,6,7
  45:2 51:22 68:16
  70:15,16 71:13
  76:13 80:10 86:13
  91:2,20 94:17
  114:10 119:22
  120:3 122:24
  124:23 127:25
  143:13 157:10
  165:3,9,14 167:2
**pages** 45:3
**panic** 56:3
**paper** 29:24 30:3
  85:13 119:6
**papers** 8:6 125:2
**paperwork** 119:19
**paragraph** 45:16
  56:20 78:20 91:4
  92:19 94:8 115:18
  125:13
**parameters** 127:21
**part** 9:19 13:18
  17:10 18:11 23:22

  26:14 31:4 36:2
  44:22 56:25 88:23
  95:18 96:9 117:16
  135:5 138:13
  143:21 156:11
  158:6 160:3
**particular** 37:25
  54:23 78:11 79:11
**parties** 4:5 166:15
**party** 6:18
**patient** 27:6,6,14,22
  28:2,8,11,12,25
  29:2,7 30:18,23
  31:18,20 32:3 33:9
  33:14 34:3,6 40:15
  47:16,19,25 48:2
  56:10,11,13,16,18
  57:8,11 58:11,20,21
  58:22 59:2,4 64:21
  69:16 72:12 73:23
  74:17 76:21 77:18
  77:22 78:14 79:11
  79:23,24 80:3,11
  81:3 82:10,18,21
  83:3,10 86:19 87:16
  88:5,9,10,17 90:3,6
  90:19 91:14,16,17
  91:19 94:3,11,13
  98:18,22 102:25
  104:19,20,21,24
  105:18 106:9,25
  114:18,23 115:2,3
  115:14,15,20 116:3
  116:7,14,15,16,16
  117:3,4,12 118:4,7
  118:10,17,21 119:4
  119:5 120:8,9,16
  121:11,21,23 122:7
  122:11,12,17,20
  123:3,8 124:8,16
  125:18,20,21,22,24
  126:12,15 127:4
  128:20,22,24
  129:18,23 130:8
  131:11,15 132:21

  132:22,23 133:5
  135:8,11,18 136:3,4
  136:5,20,21 137:8
  139:10 140:15,16
  140:23 141:12
  142:2,7,11,15,23,25
  144:2,8,13,17
  148:15,19,21,22
  149:7,21 150:6,12
  150:20 151:2,3,15
  151:16,17,20,25
  152:9,11,18,19,23
  153:13,15 154:15
  155:4,11,15 159:24
  160:19 161:9,13,14
  161:19,22 162:11
  162:16 163:3,8,10
  163:15 164:3
**patient's** 20:7 45:17
  56:22 90:21 91:24
  116:25 118:7
  121:17 139:15
  162:21
**patients** 14:11,16
  15:15,22,23 16:3
  17:5,6,7 33:11,11
  63:22 74:11,16
  117:9 124:17,17,19
  126:25 128:10
  129:8 131:6 137:6
  142:20,22 145:2
  147:6 159:22
  160:21
**paul** 3:7
**pedigree** 15:8
**pending** 151:25
  153:13 161:17
**people** 45:9,10 50:4
  50:9,15 53:9 72:10
  74:6,8,10 75:21
  79:3 97:4 139:8
  145:17 153:25
**period** 63:10,18
  81:17 82:4 89:10
  140:2,17,19 150:5

155:10
**permit**  116:7 144:2
144:16
**permitted**  41:4
109:24 147:16
157:23
**person**  25:23 32:4
32:24 33:2 47:25
55:11 56:2 62:7
68:17 69:7,19 70:24
72:14 73:7,10,16,22
75:13 77:5,8 78:6
85:14 101:15 103:4
103:9,12,16,22
104:7,8,10,16 106:3
129:13,19 132:16
140:2 142:11 153:5
158:25
**person's**  34:15
**personal**  7:24
**personally**  14:22
26:9
**personnel**  49:20
64:15
**persons**  81:4
**pertinent**  38:25
**petition**  115:6,7
116:19 119:13
**petitioning**  118:15
**phonetic**  99:16
**photograph**  37:24
**phrase**  56:21 71:14
72:4,25 81:12 128:3
137:14 138:9
**physical**  73:10
121:24 124:22
128:3,14 139:19
**physician**  27:9
62:19,23 68:23,24
69:10 70:17,21,22
70:22 71:3,5,6,11
73:20 76:20 77:2,4
77:5,6 78:2,3 80:5,8
81:2,8 83:6 85:12
87:25 88:3,3,14,16

88:19 91:15,16 92:9
92:11 99:17 108:15
114:24 116:9 118:3
119:7 122:2 123:20
125:8 129:20
152:10 163:22,24
**physicians**  28:23
70:13 71:12 95:5
113:12
**picky**  84:9,11
**piece**  30:3 85:13
119:6
**place**  1:18 11:22
36:7 37:25 122:11
**plaintiff**  1:5 2:4,8
6:13 138:11
**plaintiff's**  5:14 68:3
143:10 165:9
**plan**  117:8
**play**  39:13,16,21
137:24
**playing**  39:23
**please**  7:14 16:16
21:17 23:13 31:17
42:18 44:11 55:2
83:12 109:9 111:22
114:8 117:12
**point**  33:16 107:19
111:14 142:25
155:12,13
**police**  28:21 74:16
74:21 160:18
163:16,19 164:3
**policies**  18:2,15,16
18:18 35:2 64:8
81:16 86:5 146:21
150:15 153:5
163:17
**policy**  5:7 14:21
15:19 18:5,7,8,20
21:22 22:5,6,11
23:8,16,20,25 24:8
25:12,24 26:22
27:11 29:16,21,25
30:8,15 31:2,13

32:9,11 33:7 36:3,7
37:11,13,20 38:10
38:24 39:3 40:3,6
40:10,14 41:7,16
42:10,13 44:2,14,20
44:21 45:17 47:7
48:6 49:7,15,23
50:8,8,16 51:19
52:5 53:4,19 54:6
55:4,19 56:21 57:2
57:18 58:13 59:6,9
59:14 63:20,21
64:18 65:2,7,14
67:5,8,10 70:15,21
71:19 73:6,19,24
74:3,19 76:6,13
78:10,15 80:7 81:22
82:15 83:9 85:6,11
86:14,16 88:19 90:7
90:12,22 91:3,10
92:7,20 93:3,6
94:10,23 97:15 98:9
98:9,11,15,21 99:2
99:11 102:2,15
103:18 106:19,20
107:12 108:13,13
113:21 114:16
116:3,6,10,19 119:3
119:13,25 120:6,16
120:22 122:10,23
122:25 123:10
126:20 128:2,21,25
130:3,19,20 131:18
131:25 132:2,8,9,11
132:12 133:13,15
133:19,24 134:18
134:21 135:5 137:5
138:13 139:15
140:2,12,18,22
141:5 142:9 143:14
143:17 144:2,8,15
144:21 145:16,22
145:22 146:16
147:12 148:17
151:8,22,23 152:5

152:18 153:10,19
154:2,12 161:7
163:24 164:4
165:17
**poses**  142:15
**position**  6:5,21 9:3,4
112:11 146:13
158:23
**positions**  9:7
**possible**  94:2 119:14
134:22 139:10,21
140:25 141:4,6,21
141:22 159:13,19
**postgraduate**  62:24
**potential**  131:14,16
131:22 132:4,6
133:7,20,20 134:2
136:14 141:10
142:8
**potentially**  27:23
133:4 136:5
**power**  107:18
111:14
**practice**  13:16,18,20
13:24 14:4,6 59:19
60:10,23 61:6 76:5
81:22 90:13,15
91:13 92:12 99:2
102:9 103:17
126:20 138:13
**practices**  163:17
**preaching**  130:12
**precaution**  98:18
**precludes**  6:18
**premise**  150:24
**prepare**  17:21
**preparing**  17:24
23:6,19 24:19,21
**presence**  6:7 42:19
**present**  3:14 35:5
100:10
**presentation**  109:13
111:14,15
**presentations**  108:7
111:18 165:16

**presents** 115:16
**preserve** 127:17
**pretty** 91:24
**prevent** 132:3
**previously** 79:9
  146:10
**primary** 122:2
**printed** 80:15,16
**prior** 5:23 10:22
  11:24 94:17 146:13
  147:25 150:16
  153:6 156:16
**private** 13:15,18,24
  14:4,6
**privilege** 100:16
  127:17 156:17
**privileged** 146:3
**privileges** 61:13
  92:24
**problem** 42:7 60:19
  100:19
**problematic** 17:6
**problems** 55:13
  124:20 150:22
**procedure** 26:17
  49:7 76:14 114:10
**procedures** 26:12
  121:10 123:14
**proceed** 43:16 148:6
**proceeding** 160:6
**proceedings** 8:9
  159:11
**process** 8:4 82:25
  116:13 118:23
  119:10 160:4
**produce** 110:10
**produced** 22:18
  23:11 143:14
  146:25
**production** 111:17
  153:18
**professional** 47:15
  103:24 105:21
  166:4

**professionals**
  132:21
**profile** 124:3
**program** 18:10
  24:10 63:21 113:18
  113:25
**progressed** 10:18
**promotion** 9:11
**proper** 38:15 134:11
  134:16
**properly** 83:3 96:22
  96:24
**pros** 104:2
**protect** 98:18 135:7
**protocol** 79:25
  120:7
**provide** 48:6 62:6
  73:11 94:23
**provided** 7:22 21:23
  74:21 75:20 82:10
**provider** 33:19
  74:22
**provides** 27:12
  49:19 98:4 118:14
**providing** 8:17 15:5
  37:14
**provision** 95:17
  98:3 124:21 138:3
  152:7
**pry** 7:23
**psych** 61:9 70:4
  121:18 149:8
  150:13 152:8
  162:25
**psychiatric** 5:20
  10:4,5 12:18 14:18
  16:4,19 18:10 26:11
  27:7,15,16,24 29:9
  30:16,19 32:11,21
  34:2 36:15 45:24
  46:10,15 47:11
  48:13 53:7 58:14
  59:7,15 60:6,8 61:7
  62:12 63:5 64:12
  77:9 78:4 81:9,23

82:8,17,21 83:7
  96:20 97:17 107:2
  113:17 120:13,13
  120:17,24,25 121:3
  121:8,11,22 122:5
  122:13,20 123:5,11
  124:8 137:21,23
  139:20 147:3,4
  148:22 149:4,9,13
  149:24 150:17,24
  151:6,25 152:9,11
  152:19 153:14
  154:15,23 159:16
  159:21,24 160:10
  162:12
**psychiatrist** 13:13
  13:16 32:5 47:17,18
  47:22,24 61:12
  62:20 63:16,24 69:3
  69:4,21 74:4 77:17
  77:17 78:17 88:8
  89:9,17 90:9 92:23
  94:12,23 103:11
  122:2 124:24
  125:12 149:11,12
  150:2,3 153:2,7
  162:25
**psychiatrists** 17:12
  28:23 61:16 62:4,10
**psychiatry** 8:25
  11:16,16,20 16:20
  24:15 26:11 48:12
  48:16 62:25 120:20
  143:17 147:4
  149:22 158:24
**psychological**
  148:18 151:11
**psychosis** 55:14
**psychotic** 56:5
**public** 1:19 4:6 7:7
  164:22 166:5
  167:24
**publicker** 2:14
**purpose** 6:9 127:23
  156:4

**purposes** 32:23,25
  146:3 154:6
**pursuant** 1:17 5:10
  29:15 69:16 128:20
  131:24 132:2
  156:16 157:24
**put** 28:25 64:15
  129:9
**puts** 73:10

## q

**qualifications** 50:6
  50:17 53:10
**qualified** 48:18
  63:12 64:11
**qualifies** 48:13
  129:25
**qualify** 57:6,14,23
  130:16 131:2,7
  132:7
**queens** 115:25
  126:22
**question** 4:14 13:9
  14:25 16:10,16
  20:19 21:15,15
  29:19 30:12 31:12
  31:16 32:19 35:4,5
  35:18,23,24 37:22
  38:13,16 41:9,18
  46:5 47:5 48:24
  49:9,25 50:13 51:7
  51:9,23 53:13 54:13
  54:18,23,25 65:24
  67:12 74:20 83:21
  83:23,25 84:3,18
  87:2 94:21 95:4
  96:5,25 98:14 99:10
  99:22 102:10 103:8
  107:24,25 108:4,19
  108:20 109:9
  110:17,23 132:5
  134:7,10,15 135:24
  143:20 144:6 145:4
  151:7 162:20,20

**questions** 4:13 22:3
31:9 35:2 41:5 43:8
51:14 58:23 86:17
86:24 96:16 97:12
110:7 141:9 146:2
146:14 148:11,13
155:20,21 156:6,21
156:22 157:8,19,20
157:25 161:3

**r**

**r** 2:2 7:5,17
**radomisli** 3:11 5:9
8:10 9:15 13:3
14:19 15:2,12 16:5
16:8 17:15 18:14
22:12,19,25 23:9,12
24:4 27:18 28:17
29:4,11,20 30:6,21
31:4,10 34:20,24
35:16 36:2,5,9 37:4
37:18 38:7,23 39:7
39:15,20,25 40:8,21
41:3,10,25 42:17
44:10 46:3 47:9
48:20,25 49:5,13,17
49:24 50:19 51:3,8
51:15 52:2,10,18,25
53:11,14 54:3,7,21
55:6,9,20 57:9,19
60:25 61:20,25
62:14 63:7 65:17,23
66:4,6,14,21 67:3
67:17,22 70:25 71:8
74:24 75:23 76:10
76:12 77:11 82:23
83:11,16,22 84:4,8
84:12,17 85:2,23
86:23 87:5,12,18,23
88:12 89:11,21 92:3
94:5 95:20,24 96:4
96:11,15 97:13,21
99:7 102:6 104:12
105:6,9 106:18
107:20 108:3,9,18

109:8,20 110:11,15
110:22 111:10,21
112:13 113:15,20
116:21 117:20
126:7 127:6,11,18
128:15 129:3,15
130:5,18,21 131:24
133:10 134:4,8,11
134:14 135:2,15,22
136:10,16,22
137:20,25 138:6,15
138:21 139:22
140:5,8 141:2,16
142:12 143:19
144:4,10,19 145:3,8
145:20 146:6 147:9
148:24 149:15
150:18 151:13,21
152:3 153:8,22
154:9 155:16 156:5
157:2,15 162:8
163:4
**rational** 156:23
**read** 16:14,15,17
24:22,23 25:2 29:23
30:2,4 34:20,22
35:25 44:17,19
51:18 65:11 66:4,5
67:23 68:9 83:11,13
84:13,14 109:9
**reads** 56:22
**ready** 115:2 119:20
**really** 15:10 21:12
39:11 70:2 86:20
89:7,8 128:17 138:6
**reason** 6:10,21,24
37:16 88:16,24
93:24 94:7 162:4,24
**reasonable** 90:23
**reasons** 33:13
163:13
**recall** 18:24 24:25
36:11 37:20 111:12
147:14

**receive** 75:12
**received** 89:2
**receiving** 91:16
**recess** 101:10
138:25 148:7
**recite** 54:8
**recognize** 105:14
**recollection** 19:25
37:10 41:16 158:13
**reconsider** 112:10
**record** 5:2 7:14
16:14,17 30:24
34:22 35:25 42:21
42:22,24,25 43:6,6
66:5 79:2 83:13
84:14,16 101:9,11
125:25 138:24
139:2 148:4,9 160:9
164:10 166:11
**records** 109:15,18
116:3 121:13,17
122:25 123:2,4
**red** 123:25
**redo** 36:21
**reevaluate** 139:8
**refer** 45:13
**referee** 95:17 99:20
**refereeing** 96:8
97:16
**reference** 45:19
64:21 76:17,25
78:21 93:13 94:18
125:9 159:25
**references** 120:22
123:18
**referred** 57:18
93:10
**referring** 18:4 60:3
60:4,5 68:24 120:23
125:3,4 153:20
**reflect** 30:25
**reformulate** 108:21
**refused** 156:22
157:3

**regarding** 32:11
49:8 86:6
**regardless** 40:10
63:13
**registers** 150:12
**regroup** 101:6
**regular** 18:2
**regularly** 26:15 32:8
**reject** 94:11
**rejected** 112:6
**related** 166:14
**relates** 76:4 114:12
**relating** 75:21
**relation** 78:11
**relationship** 9:13
**relative** 115:21
118:21
**relator** 33:19 74:23
**relax** 21:9
**released** 103:16
143:6
**relevance** 164:8
**relevancy** 49:4
**relevant** 38:24 47:6
49:22 85:10 90:24
**reliability** 73:25
**reliable** 74:7,9,14
**remain** 130:25
**remember** 46:16
107:7 110:2 112:19
141:14,18
**remove** 133:5
**repeat** 35:24 97:23
108:20
**rephrase** 30:12
32:18 56:11 83:24
84:17 94:21
**report** 32:4 73:21
92:15,16 159:4,5
**reported** 74:2
**reportedly** 139:16
139:17
**reporter** 20:20
100:9 166:4

[reports - says]                                                          Page 18

**reports** 33:13
**represent** 158:11
**represented** 5:16
  67:4
**representing** 66:15
**request** 23:8 110:4
  111:17 112:6
  114:12,16 115:11
  115:22 116:12
  118:7 153:18
  165:15,16,17
**requested** 30:13
  52:15 165:14
**require** 92:8 96:21
  122:25 139:15
**required** 30:17
  33:18 41:4 45:23
  61:18 69:15,19 78:9
  82:22 95:21 99:12
  116:8 117:15 119:2
  129:12 131:17
  140:23 152:15
**requirement** 63:2
**requirements** 64:8
  150:6
**requires** 72:12
  96:17 163:18
**reserve** 5:11 6:4
**reserved** 4:14 5:24
**reserving** 6:23
**residence** 7:24,25
**residency** 11:15
  48:12 63:21
**resident** 11:25 48:18
  62:18,21,23 63:3,21
  63:25 64:9,16
**residents** 62:17,18
  70:12 160:8
**resolve** 118:16
**resource** 75:4
**resources** 34:14
  90:17,18,19
**respect** 102:3
  138:11 142:10
  145:16 159:6 164:5

**respectfully** 42:15
**respective** 4:4
**respond** 115:7
**response** 86:9
**responsibilities**
  17:10
**responsibility** 95:7
  95:10 99:13
**responsible** 10:12
  91:5 124:25
**restate** 13:8 29:18
  103:8
**restrain** 142:20,21
  142:25
**restrained** 142:17
  142:18,19,19
**restraining** 142:10
**restraints** 143:18
  144:16,25 145:14
  147:5,19
**restrict** 147:24
**restricted** 153:13
**result** 6:7 64:22
  71:14,20 72:24
**results** 55:15
**retain** 75:13
**retained** 165:12
**review** 5:12 17:25
  18:12 23:19 24:4,18
  25:4,13 26:10,13,15
  26:16 27:3
**reviewed** 18:2,14,19
  18:20 23:6 25:15
  44:20,23 89:4
  163:20
**reviewing** 25:17
  70:11
**revise** 25:4
**revised** 25:15
**revising** 25:17 26:10
**ridiculous** 51:18
**right** 5:11 6:3,4,23
  8:16 13:4,6 29:17
  30:11 31:6 33:20
  35:22 46:16 47:12

52:6 53:2 58:15
  67:25 68:25 70:14
  70:20 71:6 77:10
  79:16 85:8 92:2
  95:8 97:8,25 98:19
  100:23 102:12
  103:20,24 104:4
  105:8,16,22 106:6,7
  110:25 111:5 116:4
  118:12,13,18,19
  119:7 120:21 121:4
  121:5 122:24
  125:23 131:23
  136:9,12,15 138:19
  139:21,24 141:6
  142:5 152:16,17
  154:23 155:19
  159:2,9 164:9
**rights** 79:21,24
  80:12 82:10 150:7
**risk** 128:3,6,13
  129:8 130:25
  131:14,16,17,19,20
  131:22 132:3,4,6,6
  132:8,10,11,18
  133:9,9,20,21 134:2
  134:3,17,19,22
  135:6 136:5,9,14
  139:18 141:10,10
  141:11,11 149:20
  154:8
**role** 44:25 70:8
**roles** 135:20
**roll** 26:9
**room** 17:13 18:11
  22:8,10 24:15 27:16
  27:24 28:9 30:19
  56:19 59:11 62:5
  69:22 75:11 81:25
  119:24 120:9,11,13
  120:17,19,23,24,25
  121:14 122:14
  123:9,12 125:8,11
  125:14 128:10
  129:9 133:6 139:25

148:16,20,23
  150:21 151:6 152:8
  152:9,10,12,20
  154:16,18,20,22,23
  159:16 160:3
**rooms** 137:16
  154:11,11
**rounds** 109:4,6
**routine** 92:21
**roy** 3:15 5:15
**rule** 124:15 136:3
  154:4
**ruled** 111:24
**rules** 5:11 20:16
**ruling** 5:23 42:2
  43:12,15 107:23
  127:9 156:2,6
**running** 16:23
  130:13 152:16
**runs** 130:10

                    s

**s** 2:2 4:2,2 165:8
**safe** 106:10 117:8
  135:14,21,25 143:3
**safety** 102:11
  104:23,25 105:3,12
  132:14,15 135:17
**save** 113:23
**saw** 48:2
**saying** 11:13 21:3,4
  46:16 57:11 59:14
  74:13,13 75:18
  85:13,18,19,24
  86:23 102:15
  106:12 140:18
  142:2 157:15
**says** 33:20 45:17
  51:21 58:3 63:11
  64:20 68:15,16,22
  69:6 70:16 78:25
  80:14,24 85:4 87:6
  91:4 92:20 93:8
  98:21,23 103:11
  115:19 116:4,17

[says - speaking]                                                                    Page 19

117:4 118:10,11,20
120:15 121:10
125:13 147:3
162:16
**schedule** 158:15
**schizophrenia** 55:14
**school** 12:5
**schoolcraft** 1:4 20:2
79:11 159:7,14
160:21
**schooling** 12:4
**scope** 29:13 48:21
49:2 51:4 53:12,16
54:5,6 55:3 57:10
61:21 62:15 63:8
83:17 84:5,19 85:17
96:12 108:10,17
113:21 127:12,20
143:21,24 144:5,5
144:11,20 145:5,7
145:21 146:11,15
156:9,15 157:5,9,21
158:3
**scoppetta** 2:16
**second** 17:6 26:19
27:3 34:24 45:16
56:20 60:20 71:25
82:20 86:13,15,18
86:25 87:15,25 88:3
88:14,18 91:2,6,11
92:9,11,24 93:4,21
93:24 94:20 98:5,17
99:22 101:20 102:5
102:10,16,18,20
**secondly** 5:14,22
**section** 65:12,15,22
66:2 69:17 99:5
116:8 118:8,14
152:14,14 154:3
**see** 6:23 16:22 24:11
24:15 25:3,8 26:19
34:2,5 45:19 52:25
53:2 57:2 58:18
63:22 64:24 67:20
68:17 70:18 71:15

71:21 72:4,19 73:2
76:15,23 77:2 78:21
79:3 81:10,13 91:7
92:25 93:11 94:18
101:6 106:5 117:13
120:15 121:14
123:16,21 125:25
128:4 133:15 148:5
**seek** 135:7
**seeking** 135:14
**seiff** 2:16
**self** 27:23 31:19
55:16 56:2
**sense** 129:17 151:4
**sent** 121:18 123:11
126:25
**sentence** 93:8,18
**separate** 124:22
154:22
**serious** 64:23 71:14
71:20 72:24
**serve** 8:4,7
**served** 86:3
**service** 8:6,12 30:20
61:3 97:6 107:6,10
108:7,24 110:24
111:4 115:5 117:12
**services** 10:20 24:15
28:22 48:15 60:13
61:4 62:6 114:21
115:13,16 116:2
118:22
**session** 111:4
**sessions** 108:24
109:18 111:7
**set** 166:9,19
**seven** 9:6 115:8
143:13
**sheet** 167:1
**shelter** 73:12
**show** 21:19 66:12
68:2 79:8 112:2,4
112:13 118:2 143:8
**showing** 31:8

**shown** 30:25 146:24
**shows** 66:18
**sick** 124:19
**side** 104:24 105:2,3
124:10
**sign** 70:10 80:10
161:15
**signature** 91:20
**signed** 81:20 155:13
161:21
**signing** 82:16 162:6
163:2
**signs** 85:12 161:8,16
161:18
**silent** 124:16
**simply** 92:10
**sir** 40:12 43:21
68:17 81:10 158:13
159:23 160:13
**situation** 101:18
133:4
**situations** 101:24
**six** 63:10,18
**sixth** 44:3
**skipped** 110:18
**slight** 111:14
**slightly** 31:7
**small** 13:18
**smelling** 132:25
**smith** 2:4 5:2 6:12
7:11,19 14:24 15:3
16:13 22:15,23 23:2
23:10 29:17,22
30:11,22,24 31:6,14
35:6,10,15,19 36:4
37:7,22 38:14 39:2
39:10,17,23 40:2,20
40:23 41:8,13 42:6
42:11,20,23 46:23
47:2 48:23 49:3,11
49:14,18 50:2 51:6
51:11,17 52:6,13,19
53:2 54:10 65:19
66:8,16,22 67:6,25
83:20 84:2,6,10,21

85:8 86:13 87:3,10
87:20 95:22,25 96:6
96:13 97:10 99:21
99:25 100:5,17,21
101:5,11 108:11
110:2,13,19 111:16
112:4,16 113:23
127:9,14 133:14
134:9,13 138:8,18
138:23 139:2 143:8
143:13 144:23
145:6,10,24 146:19
148:3,8 153:17
155:19 156:20
157:6 158:8 159:17
160:14,24 161:12
161:24 162:3 164:9
165:4
**somebody** 45:23
49:21 53:5 69:8
75:17 76:5 94:25
103:19 105:15,20
106:12 126:5 130:3
130:16 133:2
134:23 150:15
151:9 154:5 160:19
163:20
**soon** 59:2 78:13,16
93:25 119:14
139:20 140:25
141:4,6
**sorry** 16:7 20:23
34:9 65:9 71:18
131:19 135:10
**sort** 15:3 33:15
53:20 72:13
**sound** 138:17
**source** 48:3 90:5,10
**sources** 74:6 77:24
89:3,19,24
**southern** 1:2
**speak** 18:25 19:15
**speakerphone** 100:8
**speaking** 47:23

**specific** 34:7,9 37:10 55:25 64:5 90:12 128:8

**specifically** 96:6 146:16

**specified** 58:24

**specify** 72:20

**speculation** 162:9

**speeches** 54:14

**spell** 26:4 113:3

**spend** 13:24 14:2,3 47:22,24

**spends** 47:18

**split** 84:23,24

**splitting** 87:10,12

**spoke** 43:3 159:13

**spoken** 19:18,21,24 20:3

**square** 126:25

**squarely** 84:19

**stabilize** 137:8,9,15 138:10 139:4

**stabilizing** 137:17

**stable** 122:3

**staff** 25:19,23 31:23 48:2,7 60:11,16,20 60:21,23 61:4,12,16 68:22,24 69:10,21 70:22 71:6,10 73:20 74:4 77:5 78:2 80:5 80:8,25 81:9 82:17 82:22 83:5,7 85:12 88:7 89:9,17 90:9 97:2 107:11 108:25 121:14 125:14 139:19 142:16 143:2,3 150:3 160:10 162:25 163:21

**stage** 160:2

**stake** 66:24

**stand** 38:22

**standard** 34:16 35:9 35:11 59:10 140:11

**stands** 130:11

**start** 9:21 44:6 59:3 108:6,23 152:16,20

**started** 9:9 10:17 40:13 42:7 109:5,10

**starting** 33:16 44:10 44:11

**starts** 81:18 116:13 118:23 130:12,13 150:11 154:14

**state** 1:20 7:7,13 12:10,18,24 13:10 14:12 15:18,20,25 65:5 70:18 75:10 80:19 95:12,18 96:10 97:19 166:5

**statement** 26:23 27:2 44:14,18 51:19 53:19 55:5,19 56:21 57:2,18,23 58:3,13 64:19 65:2,7 70:15 72:13 76:14 88:20 88:22 92:20 94:9 97:15 98:21 116:4 119:25 143:14 153:19 165:17

**statements** 21:22 23:20 44:22,22 90:7 139:18

**states** 1:2

**stating** 120:23

**status** 15:24 26:23 37:11 44:2 64:19 79:21 80:11 81:3 91:3 94:12 103:2 104:11 106:6 114:10 128:2,21 149:6

**statute** 66:10,17 68:13 69:7 97:8

**stay** 19:13 104:19,21 117:9 118:4,11 149:7

**steel** 144:3

**steven** 2:17

**stipulated** 4:3,8,12

**stop** 21:2 41:21 86:20

**street** 1:12 2:8,13 3:6,10 5:5

**sub** 72:21

**subject** 64:20 81:24 83:21,22 86:4 87:9 101:22 108:25 148:11 155:19

**subscribed** 164:17 167:22

**substance** 102:7 163:5

**substantial** 128:3,14 131:17,19,20 132:3 132:7,10,17 133:6,9 133:21 134:3,17 139:18 141:10 154:7

**success** 2:22

**suffered** 151:4

**suffering** 56:10,17 103:12

**sufficient** 103:3 116:18,23 119:8,9 130:2 131:21 132:7 134:22

**suggest** 42:5 156:10

**suggested** 41:14 106:13

**suggestion** 35:20 94:11

**suggestive** 31:7,11

**suggests** 72:14

**supervising** 63:24 70:12

**supervision** 62:19 63:15

**supervisor** 17:11

**supposed** 25:13 80:3

**supreme** 115:10,24 116:20 117:17 118:2

**sure** 13:19 15:8 21:6 21:16,18 22:16,19 27:4 36:10 44:12 53:3 62:16 83:2 84:6 88:25 91:11 93:6,21 95:8,13 96:23 97:2 98:11 99:14 102:11,16 103:7 122:21 124:11 127:18 143:3 150:21 153:10,24 162:19

**suspect** 67:11

**suzanna** 2:14

**swearing** 7:3

**sweet** 43:9

**sweet's** 5:23 43:4 100:3

**sworn** 4:6 7:6 164:17 166:10 167:22

**symptoms** 55:16 58:19

**syosset** 8:19

**system** 29:3

**t**

**t** 4:2,2 5:15 165:8

**take** 6:5 20:6,20 21:5 36:22 43:19 48:17 74:15 100:23 110:11 117:7 119:12 124:9,18

**taken** 1:18 23:12 101:10 111:21 112:11 121:17 138:25 148:7 151:5

**takes** 46:15 47:11 130:9

**talk** 14:21 59:4 60:17 109:22 117:5 117:6,12 138:21 148:4

**talked** 112:17 113:10 125:5 150:7

**talking** 46:19,21,21
  46:23 60:7 101:14
  116:16 118:6
  120:12 137:20,22
  142:3 160:20,21
**talks** 86:14 124:24
**target** 66:25
**taught** 60:21 109:2
**technically** 140:10
**tell** 18:18 21:10
  26:25 33:6,22 40:3
  40:5 41:22 50:11,14
  52:2 54:2,12 67:10
  79:18 95:15 117:11
  138:16 139:5
  158:13
**telling** 51:6,20 57:5
  59:18 85:9 86:17
  89:6,16
**tense** 35:5
**term** 55:3,4 132:17
  132:19 134:17
  136:24,25 139:4,7,8
  139:9
**terms** 52:4 100:25
**test** 123:20
**testified** 7:8 22:17
**testify** 38:10 85:6
  109:23 147:12
**testimony** 19:10
  166:11
**testing** 124:6
**tests** 123:19
**thank** 100:6,17
  161:23 164:9
**thing** 10:7 21:8 24:9
  64:14 125:10 137:3
  137:4
**things** 5:10,18 33:4
  41:5 45:22 52:11
  109:21 111:8 147:7
  162:18
**think** 15:12 17:23
  26:3 28:21 31:10
  35:19 37:16 43:5

50:7 52:10 77:21
  85:19 86:20 96:25
  98:25 99:23 103:11
  103:12,16 108:17
  110:10,20 115:8
  116:17 118:11
  121:20 127:14
  133:24 135:24
  136:8,14 140:12
  141:11 146:8,12,21
  151:22 157:9 159:7
**thinks** 66:23 67:7
  88:4 118:3 133:16
**third** 2:8 14:5
  102:21,22,23,24
  103:4 104:7,20
  112:23 113:13
**thought** 49:24 98:15
**threat** 160:19
**threatens** 130:9
**threats** 34:7,10
  72:10
**three** 11:18 24:2
  45:2 63:10,17 109:6
**threshold** 63:17
  64:3,10
**tie** 142:25
**time** 1:19 4:15 6:11
  8:2,12 13:18,23
  14:6 21:5 24:23,25
  34:14 36:21,21
  44:16 47:22,25
  48:14,15 58:17
  62:17 70:7 78:11
  80:4 81:6,13,17,18
  81:20 82:11 84:13
  85:9 91:19,20,21,23
  106:23,25 109:15
  110:9 115:19
  117:10 118:21
  140:3,13,20 146:23
  152:21 155:22
  156:2 158:18
  159:15 162:15
  164:12

**timeframe** 46:20
  60:18 137:18
**timeframes** 152:15
**title** 8:23 10:15
  69:25
**today** 5:16,21 19:3,5
  24:6 37:2,13 38:10
  38:24 39:3 107:5
  109:18 137:3
  148:14
**today's** 17:22
**told** 19:13 21:8
  41:13 100:12
**tools** 128:8
**topics** 147:16,18,19
**traffic** 130:12,13
**training** 11:11,14,15
  12:13 48:7 49:13
  50:10,16,22 62:24
  107:6,10,14,15
  108:8,24 109:18
  110:24 111:4,7
**transcript** 5:13 6:6
  21:4 166:10
**transfer** 122:19
  152:8,11
**transferred** 28:12
  122:13 126:16
  148:21,22 149:8,22
  152:19 154:15
  163:9
**transferring** 120:8
**transmitted** 123:4
**traumatic** 55:15
**treated** 139:11
**treating** 15:22
**treatment** 38:11
  56:24 57:13 58:5,9
  59:3 73:12 81:5
  106:8 107:13 122:4
  124:14 143:4 149:9
  149:21 150:24
  159:12,15
**trial** 4:15 5:24 6:5
  6:11 8:2

**trigger** 116:18
  117:16 150:5
**true** 76:6 121:6
  166:11
**try** 35:21 74:5 106:5
  146:23
**trying** 50:2 75:17
  105:24 106:2
  108:12 110:3,13
  138:9,11
**tuesday** 119:21
**tuesdays** 119:18
**turn** 43:21 114:8
  119:22 127:25
**two** 5:17 11:19 27:9
  27:21 71:20,21
  78:21,22 85:24 95:5
  95:6 104:3 109:6
  112:17 113:12
  158:25 159:2
**type** 57:6
**types** 28:19 101:23
**typically** 36:17

**u**

**u** 4:2 5:15 26:5
**uh** 68:20
**umbrella** 9:19
**undefined** 132:19
**undergoing** 62:24
**understand** 7:21
  21:14 23:3 30:7
  56:9 57:4 59:13
  60:14 74:12 75:15
  84:7 102:14 108:12
  116:6 118:8 131:4
  138:9,12 140:9
  146:20 152:22
**understanding**
  95:12,16 96:9 97:20
  98:4 99:5 106:11
**unfortunately** 101:8
**unit** 9:10 10:6,11,12
  10:14,14,17 91:19
  92:16 114:20

Case 1:10-cv-06005-RWS Document 295-26 Filed 12/18/14 Page 188 of 190

116:15 120:10,14
120:18 121:12
122:10,12 125:15
125:20
**united** 1:2
**unknown** 6:24,24
**unspecified** 58:17
**update** 25:14
**updated** 107:11
**updates** 48:15
**ups** 156:24
**upstate** 12:21
**use** 139:8,9 143:17
145:14 147:5,18
**utilized** 111:19

**v**

**v** 7:5,15,15
**vacation** 38:17
**vagrantly** 146:4
**valhalla** 11:12
**valid** 75:6,8,19
124:25
**valley** 12:18
**van** 7:17
**verbally** 92:9,12
111:8,12
**verify** 76:8
**victor** 7:16
**view** 85:21 130:15
**views** 135:19
**vinod** 1:17 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1

62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1,14 165:4
166:8 167:20
**violate** 146:7
**violating** 146:4,13
**violent** 72:9
**vivek** 19:7,11 26:7,8
45:11 93:14,14,15
**volume** 137:18
**voluntary** 18:21
94:12 104:16,18
142:3

**w**

**wait** 163:2
**waited** 43:12,12
155:25
**waiting** 148:20
**waived** 4:10
**walking** 130:14
**want** 7:23 8:14
29:14,21,22,24
31:14 38:3,7,8 39:2
39:13,15,20,21
41:11,19,25 46:20
50:11 53:13 54:4,12
54:25 57:16 66:9,12
79:8 84:23,25 96:7
98:24 101:5 102:11
104:6 109:12
114:22 116:17
118:10,20,24 119:7
122:20 133:12
140:15 143:8 148:4
151:18 152:23
155:10 156:7
157:16
**wanted** 43:19
**wants** 114:22
117:14
**ward** 10:4,8 16:4
17:13 27:16 30:20
116:15 121:18
**washington** 2:9
**way** 27:21,25 28:2
30:13 36:12 37:7
38:4 42:12 52:14
80:16 84:18 106:13
112:23,24 113:13
137:2 166:16
**ways** 27:14,21 71:21
112:18
**we've** 7:19 43:12
**week** 109:7 119:17
**weekday** 92:21
**weekends** 158:20,21

**went** 9:10 11:8 12:5
109:11
**westchester** 11:23
**whereof** 166:19
**white** 51:21 123:25
**whitehall** 3:6
**willing** 58:22 59:4
104:19
**wingdale** 12:21
**wish** 114:21 115:5
**withdraw** 112:3,12
**witness** 7:4,5,21 8:8
14:20,20 18:16
22:14,17 23:6 24:7
29:6 30:4 31:2 37:5
38:19 40:2,4 43:20
52:7,23 55:8 67:7
68:2 85:5 97:11
100:9 108:2 109:23
110:6 134:5,12
137:22 138:20
146:2,25 147:11,17
155:24 156:23
157:3 161:14 165:3
166:8,12,19
**witness's** 167:1
**witnesses** 7:21
**words** 29:23 84:23
103:14 131:22
133:17
**work** 8:21 10:24
14:3,12 62:4 158:15
162:13 163:25
**worked** 12:17
**working** 8:20 9:8,21
13:23,25 14:6 17:12
40:13 98:10
**workup** 124:12
**write** 103:6 119:5
**writing** 23:14 59:21
59:22 111:9,13,23
115:4 117:18,22,24
118:25 152:4
**written** 59:14 108:7
111:18 115:22

118:23 119:10
151:23 153:5
165:16
**wyck** 7:18

| **x** |
| --- |

**x** 1:3,11 165:1,8

| **y** |
| --- |

**yeah** 10:9 21:25
24:13,17 26:24 27:4
28:5 29:6 32:10
35:15 43:24 45:21
54:4 67:24 71:22
72:22 78:24 84:10
99:24 102:23 113:2
113:7 137:23
140:10 141:7 142:6
**year** 25:13 114:4,5
**years** 9:5,6 11:18,19
12:12 39:6 40:4,6
67:2 109:19
**yelling** 142:16
**york** 1:2,8,12,12,20
2:5,5,11,12,13,13,18
2:18,22 3:6,6,11,11
7:7 8:19 11:11,22
11:24 12:13,22 65:4
65:11 70:18 75:10
80:19 95:12 96:10
97:19 166:6

| **z** |
| --- |

**zivku** 1:19 166:4,24