```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ---------------------------------------------------X
      ADRIAN SCHOOLCRAFT,
 3
                                        PLAINTIFF,
 4             -against-               Case No:
                                       10 Civ. 6005
 5                        (RWS)

 6    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
      Tax Id. 873220, Individually and in his Official
 7    Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
      NORTH GERALD NELSON, Tax Id. 912370, Individually
 8    And in his Official Capacity, DEPUTY INSPECTOR
      STEVEN MAURIELLO, Tax Id. 895117, Individually and
 9    In his Official Capacity, CAPTAIN THEODORE
      LAUTERBORN, Tax Id. 897840, Individually and in his
10    Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
      919124, Individually and in his Official Capacity,
11    SGT. FREDERICK SAWYER, Shield No. 2576, Individually
      and in his Official Capacity, SERGEANT KURT DUNCAN,
12    Shield No. 2483, Individually and in his Official
      Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
13    915354, Individually and in his Official Capacity,
      LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
14    Individually and in his Official Capacity, SERGEANT
      SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
15    #1-50, Individually and in their Official Capacity
      (the name John Doe being fictitious, as the true
16    names are presently unknown) (collectively referred
      to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
17    CENTER, DR. ISAK ISAKOV, Individually and in his
      Official Capacity, DR. LILIAN ALDANA-BERNIER,
18    Individually and in her Official Capacity and
      JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
19    DOE" # 1-50, Individually and in their Official
      Capacity (the name John Doe being fictitious, as
20    The true names are presently unknown),

21                                     DEFENDANTS.
      ---------------------------------------------------X
22

23                        DATE: October 11, 2012

24                        TIME: 10:20 A.M.

25    (Continued  ...)
```

2

```
 1
 2                        DATE: October 11, 2012
 3                        TIME: 10:20 A.M.
 4
 5
 6              VIDEOTAPED DEPOSITION of the
 7     Plaintiff, ADRIAN SCHOOLCRAFT, taken by the
 8     Respective Parties, pursuant to a Notice and
 9     to the Federal Rules of Civil Procedure, held at
10     the offices of the New York City Law Department,
11     100 Church Street, New York, New York 10007, before
12     Nathan MacCormack, a Notary Public of the State of
13     New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    A P P E A R A N C E S:

 2    JON L. NORINSBERG, ESQ.
           Attorney for Plaintiff
 3         ADRIAN SCHOOLCRAFT
           225 Broadway, Suite 2700
 4         New York, New York  10007
           BY: JON L. NORINSBERG, ESQ.

 5
      COHEN & FITCH, LLP
 6         Attorneys for Plaintiff
           ADRIAN SCHOOLCRAFT
 7         233 Broadway, Suite 1800
           New York, New York 10279
 8         BY: GERALD COHEN, ESQ.
                   - and -
 9             JOHN MEEHAN, ESQ.

10    MICHAEL A. CARDOZO, ESQ.
      CORPORATION COUNSEL
11    NEW YORK CITY LAW DEPARTMENT
           Attorneys for the Defendants
12         THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
           Tax Id. 873220, Individually and in his Official
13         Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
           NORTH GERALD NELSON, Tax Id. 912370, Individually
14         and in his Official Capacity, CAPTAIN THEODORE
           LAUTERBORN, Tax Id. 897840, Individually and in his
15         Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
           919124, Individually and in his Official Capacity,
16         SGT. FREDERICK SAWYER, Shield No. 2576, Individually
           and in his Official Capacity, SERGEANT KURT DUNCAN,
17         Shield No. 2483, Individually and in his Official
           Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
18         915354, Individually and in his Official Capacity,
           LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
19         Individually and in his Official Capacity, SERGEANT
           SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
20         #1-50, Individually and in their Official Capacity
           (the name John Doe being fictitious, as the true
21         names are presently unknown) (collectively referred
           to as "NYPD defendants")
22         100 Church Street
           New York, New York 10007
23         BY: SUZANNA PUBLICKER, ESQ.,
               ASSISTANT CORPORATION COUNSEL and
24         QIANA SMITH, ESQ., SENIOR CORPORATION COUNSEL
           File #: 2010-033074
25         Control #: HHH05718
      (Continued  ...)
```

4

```
 1     A P P E A R A N C E S (CONT'D.):

 2
       MARTIN, CLEARWATER & BELL, LLP
 3             Attorneys for the Defendant
               JAMAICA HOSPITAL MEDICAL CENTER
 4             220 East 42nd Street, 13th Floor
               New York, New York 10017
 5             BY: GREGORY JOHN RADOMISLI, ESQ.
               File:  667-82153
 6

 7
       IVONE, DEVINE & JENSEN, LLP
 8             Attorneys for the Defendant
               DR. ISAK ISAKOV
 9             2001 Marcus Avenue, Suite N100
               Lake Success, New York 11042
10             BY: BRIAN E. LEE, ESQ.

11

12     CALLAN, KOSTER, BRADY & BRENNAN, LLP
               Attorneys for Defendant
13             LILLIAN ALDANA-BERNIER
               1 Whitehall Street
14             New York, New York 10004
               BY: MEREDITH B. BORG, ESQ.
15             File #: 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-33S

16

17     SCOPPETTA, SEIFF, KRETZ & ABERCROMBIE, ESQS.
               Attorneys for Defendant
18             DEPUTY INSPECTOR STEVEN MAURIELLO
               444 Madison Avenue, 30th Floor
19             New York, New York 10022
               BY: WALTER ALLOYSIUS KRETZ, JR., ESQ.
20

21     ALSO PRESENT:
               ROBERT E. HORGAN, VIDEOGRAPHER
22

23             *            *            *

24

25
```

A. SCHOOLCRAFT

1       THE VIDEOGRAPHER:  We are now on the record,

2   beginning approximately 10:20 a.m. on October 11,

3   2012.  My name is Robert Horgan, legal

4   videographer with Diamond Reporting and Legal

5   Video, based in Brooklyn, New York.

6       This is the deposition of Adrian

7   Schoolcraft, taken on behalf of Defendant.  This

8   deposition is being held at the New York City Law

9   Department, 100 Church Street, New York, New York

10  in the United States District Court, Southern

11  District of New York.

12      The caption of the case is Adrian

13  Schoolcraft, Plaintiff, against the City of

14  New York, et al., Defendants; Civil Action number

15  10 Civ. 6005.

16      Counsel will now please identify

17  themselves, their firms and the parties they

18  represent.

19      MR. NORINSBERG:  Jon Norinsberg; on behalf

20  of Plaintiff, Adrian Schoolcraft.

21      MR. COHEN:  Gerald Cohen; Cohen and Fitch,

22  LLP, on behalf of Plaintiff, Adrian Schoolcraft.

23      MR. KRETZ:  Walter Kretz; Scoppetta, Seiff,

24  Kretz and Abercrombie, on behalf of Defendant,

25  Steven Mauriello.

A. SCHOOLCRAFT

1        MR. RADOMISLI:  Gregory Radomisli; for

2   Martin, Clearwater, and Bell, for Jamaica

3   Hospital Medical Center.

4        MS. BORG:  Meredith Borg; from Callan,

5   Koster, Brady & Brennan, on behalf of

6   Dr. Aldana-Bernier.

7        MR. LEE:  Brian Lee; from Ivone, Devine and

8   Jensen, LLP, on behalf of Dr. Isakov.

9        MS. SMITH:  Qiana Smith-Williams; New York

10   City Law Department, on behalf of City

11   defendants, with the exception of Defendant

12   Mauriello.

13        MS. PUBLICKER:  Suzanna Publicker; with

14   Office of the Corporation Counsel, representing

15   city defendants, with the exception of Defendant

16   Mauriello.

17        MR. VIDEOGRAPHER:  The Court Reporter is

18   Nathan MacCormack, with Diamond Reporting.

19        Mr. MacCormack, please swear in the Witness.

20   A D R I A N   S C H O O L C R A F T, called as a witness,

21   having been first duly sworn by a Notary Public of the

22   State of New York, was examined and testified as follows:

23   EXAMINATION BY

24   MS. PUBLICKER:

25        Q.   Good morning, Mr. Schoolcraft.  My name is

A. SCHOOLCRAFT

1      A.      The -- I don't know the specific number, but I

2    believe my attorneys have all the recordings.  If --

3    perhaps they could be added up; I never added them up.

4      Q.      Did you give your attorneys all recordings that

5    were relevant to this matter?

6      A.      I believe they have all the recordings, yes.

7              MS. PUBLICKER:  To the extent not already

8              produced, I would request production of all

9              recordings in this matter.

10     Q.      Did you record every single one of your tours on

11   command?

12     A.      I don't believe so, no.

13     Q.      How did you choose what to record?

14     A.      I didn't -- it wasn't always my choice.  It was a

15   technology new to me.  I don't believe -- like, you asked

16   me if my father ever recorded -- I don't believe the

17   technology was there.  These devices require power,

18   batteries, the batteries go dead.

19             This is stuff that I didn't know.  And there were

20   times where I had the recorder, but there were no

21   recordings.  What was the question -- did I answer the

22   question?

23     Q.      Did you attempt to record every one of your tours

24   on command?

25     A.      I don't recall any attempt to -- to record

A. SCHOOLCRAFT

1    performance evaluation?

2              MR. NORINSBERG:  Objection.

3    A.    What was the question, again?

4    Q.    At some point in time, while you were assigned to

5    the 81st Precinct, did you receive an acceptable

6    performance evaluation?

7              MR. NORINSBERG:  Objection.

8    A.    To the best of my memory, I accepted all the

9    other evaluations that were just passing.

10   Q.    When you say you "accepted," what do you mean?

11   A.    You don't appeal it.  You sign off on it, without

12   an appeal.

13   Q.    So you found those to be acceptable?

14   A.    If I didn't, I wasn't aware of any other

15   resolution.

16   Q.    What years did you receive acceptable performance

17   evaluations?

18   A.    I believe 2007 -- I didn't appeal any other year,

19   any other evaluation.  I wasn't aware of the appeal

20   process.  I was just aware that it was a passing score.

21   Life was a lot easier if you don't appeal or don't contest

22   your supervisors.

23   Q.    So what was the first year that you received what

24   you believed to be an unacceptable performance evaluation?

25   A.    What was the year, or when I received it?

A. SCHOOLCRAFT

1     Q.    What was the year?

2     A.    It was 2008.

3     Q.    When did you receive that evaluation?

4     A.    It was some time, early 2009.

5     Q.    Are you alleging that it's improper for the

6    police department to consider the number of summonses

7    and/or arrests that an officer makes in evaluating his

8    performance?

9            MR. NORINSBERG:  Objection.  You can answer.

10    A.    Yes.  I believe that's wrong.

11    Q.    Are there any circumstances in which you believe

12   it would be appropriate for the police department to

13   consider the number of summonses and/or arrests that an

14   officer makes in evaluating his performance?

15           MR. NORINSBERG:  Objection.

16    A.    I don't believe so, no.

17    Q.    Which of an officer's duties do you believe the

18   police department should consider when evaluating that

19   officer?

20    A.    Professionalism, how they respond to calls for

21   service, how those calls for service are handled.

22   Underneath how those calls are handled, how those reports

23   are filed or kept, an officer's handwriting, a detective's

24   ability or -- or an investigator's ability to investigate

25   that primary report.

49

A. SCHOOLCRAFT

1       Q.      Sorry to interrupt.  You didn't think that the

2    recordings would help the I.A.B. in their investigation of

3    your allegations?

4       A.      I didn't believe so, at that time.

5       Q.      Are you alleging that you were placed on

6    performance monitoring because of your meeting with the

7    I.A.B.?

8                   MR. NORINSBERG:  Objection.

9       A.      Again, I don't recall being placed on performance

10   monitoring.

11      Q.      How many summonses were officers of the

12   81st Precinct required to issue under the de facto policy?

13      A.      I don't recall any specific number, but there

14   were numbers given on the recordings.  Off the top of my

15   head, I can't remember.  But it was always around -- they

16   wanted a book, a book of summonses, 20 summonses.  It was

17   always around -- it could have been a little more, could

18   have been a little less.

19              I understood it to be at least 10, but they

20   wanted a book, 20 summonses.  And that's all I remember,

21   off the top of my head in general.  The recordings, they

22   give numbers.

23      Q.      Do you know why that number fluctuated?

24                  MR. NORINSBERG:  Objection.

25      A.      I believe it had to do with the officer, what he

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

A. SCHOOLCRAFT

1     -- what he paid the month before, what he did the month

2     before.  If that officer wanted a particular day off, that

3     officer's duties, are they assigned to traffic, patrol, or

4     some other enforcement; S.N.E.U., crime, units that are not

5     involved with patrol.  I don't believe it was the same for

6     everyone.

7          Q.     You said what the officers "paid" the month

8     before.  You are not referring to money, are you?

9          A.     No.

10         Q.     Who told you that officers at the 81st Precinct

11    were required to issue a book of summonses?

12                MR. NORINSBERG:  Objection.

13         A.     Say that again.

14         Q.     Who told you that you were required to issue a

15    book of summonses?

16                MR. NORINSBERG:  Objection.

17         A.     Again, I don't recall any specific supervisor or

18    any specific time.  Perhaps it's on the recordings, I think

19    it is.  But it was general knowledge to every police

20    officer that I was aware, that I knew, a book.  They had

21    to -- a book would make the boss happy.

22         Q.     Do you recall on any specific occasion, being

23    told by a supervisor that you needed to bring a book of

24    summonses back at the end of the month?

25         A.     I don't recall any specific conversation.  But

A. SCHOOLCRAFT

1    yes, we were told not -- again, not specifically a book,

2    but terms like, "more activity," or "more summonses," "more

3    arrests."

4          They didn't always give a number, or a minimum or

5    maximum, certainly never a maximum.  And again, the

6    recordings, I think there are some very clear quotes that

7    state numbers that they wanted at that time from officers.

8    Q.    Did a union delegate ever tell you about a number

9    of summonses you were required to issue?

10   A.    I don't recall a union delegate ever giving a

11   specific number, no.

12   Q.    Who were the union delegates at the

13   81st Precinct?

14          MR. NORINSBERG:  At what time?

15   Q.    At the time of the de facto policy you are

16   referring to.

17          MR. NORINSBERG:  Objection.

18   A.    I know there were three; I don't remember the

19   names.  There were three, like the different shifts.

20   Q.    Did you ever fail to make the number of required

21   summons in a month?

22   A.    Yeah.  I don't believe I -- I don't believe I

23   handed in the number of summonses that they were happy

24   with, no.

25   Q.    Have you ever turned in the number of summonses

A. SCHOOLCRAFT

1    A.    I don't know if I did, specifically.  But I was

2    aware other officers that wanted overtime would have to

3    adhere to the policy in order to explain how they could

4    have that overtime.

5    Q.    But you personally, do you, sitting here today,

6    recall ever losing overtime for failing to issue a certain

7    number of summonses?

8    A.    As I sit here today, I don't recall losing

9    overtime.

10   Q.    What officers did you observe lose overtime for

11   failing to issue a certain number of summonses?

12   A.    I don't recall any specify officer.  I just

13   recall that that was the general -- if an officer wanted

14   overtime, they would have to explain it.  And when there

15   was overtime, I recall being addressed by supervisors.  It

16   was understood.

17          The number was "two and two"; two summonses and

18   two 250's.  If the officer made a collar, they wanted the

19   -- the supervisor wanted that collar, that arrest to be

20   250'd.  And I think they -- you still weren't required to

21   do the summonses.  But it was "two and two," that was the

22   phrase.

23   Q.    When you say "two and two," what do you mean?

24   A.    Two summonses, two 250's, two stop, question and

25   frisks.

A. SCHOOLCRAFT

1      Q.     Per month?

2      A.     Per that overtime, per when you are -- that

3   mandated overtime, or if you requested it.

4      Q.     So if I understand you, an officer who was given

5   overtime, was required to issue two summonses and make two

6   arrests during that overtime shift?

7                MR. NORINSBERG:  Objection.

8      A.     As a minimum, yes.

9      Q.     At a minimum.

10               MR. NORINSBERG:  I think you misjudged.  He

11               said two -

12               MS. PUBLICKER:  He just said yes.

13               MR. NORINSBERG:  No, but he said two

14               summonses and two 250's.

15               MR. COHEN:  He said it two times.

16               MR. NORINSBERG:  He said it two times, then

17               you rephrased it the wrong way.

18               MS. PUBLICKER:  And then he said "yes."  I

19               am sorry if I misphrased it, but --

20               MR. NORINSBERG:  Do you want to clarify,

21               Adrian?

22               THE WITNESS:  What was the question?

23      Q.     When you say "two and two," you are saying -- if

24   I misstated you, then -- two summonses and two 250's, or

25   two summonses and two arrests per overtime shift?

A. SCHOOLCRAFT

1      A.      Two summonses and two 250's, two and two.

2      Q.      Okay.  What happened if they did not make that

3   two and two during their overtime shift?

4      A.      I don't believe they would -- they would not be

5   able to ask for overtime anymore.

6      Q.      Can you name a single person who was subject to

7   that policy?

8      A.      Not specifically.  But I believe you can -- the

9   overtime is documented very well.  You could see a pattern

10  of certain officers that have become dependent on overtime.

11     Q.      But have you ever seen an officer be refused

12  overtime because they did not hit the quota policy for

13  summons, you referred to earlier?

14     A.      I don't specifically -- I don't specifically

15  recall any officer or exact time.  But that was general

16  knowledge.

17     Q.      Did you ever suffer a tour change as a result of

18  failing to issue a certain number of summonses per month?

19     A.      No. I don't -- I was on the same tour for --

20  maybe three years straight.

21     Q.      Do you observe another officer suffer that

22  penalty?

23     A.      I don't recall any specific officer.  But I

24  recall officers getting in trouble.  In order to get back

25  to their desired tour, they would have to produce summonses

A. SCHOOLCRAFT

1    and arrests, more.

2        Q.    When you say was "officers in trouble," what do

3    you mean?

4        A.    A command discipline; in trouble, any numerous

5    reasons, violations or misconduct of the patrol guide.

6        Q.    Are these unrelated to the summons quota policy

7    you have referred to?

8        A.    What do you mean, "unrelated"?

9        Q.    So as I understand what you are stating, is that

10   officers would get in trouble, in some way, receive a

11   command discipline for a violation of department rules and

12   they would have their tour changed.

13            And then in order for them to make it back to

14   their preferred time, the original tour, they would have to

15   issue a certain number of summons; is that correct?

16       A.    Correct.

17       Q.    To -- so it's not that the officers had a tour

18   change because they failed to meet the quota policy that

19   you referred to, but that they had to make more summonses

20   in order to go back to the original tour?

21            MR. NORINSBERG:   Objection.

22       A.    There were instances like that.   But I believe

23   there were officers that had tour changes, vacation days

24   denied, overtime denied, based on the illegal quota policy.

25       Q.    Can you name one officer who that happened to?

A. SCHOOLCRAFT

1    A.    I don't -- I can't recall any specific officer,

2    but -- or one specific time.  But it was general knowledge,

3    you don't get overtime if you don't pay the rent; you don't

4    get your days off granted if you don't pay the rent.  If

5    you get in trouble, you have got to pay more rent.

6    Q.    Would anything refresh your recollection as to an

7    officer who had his tour changed because of the quota

8    policy?

9              MR. NORINSBERG:  Objection.

10   A.    There might be recordings or documents that I

11   haven't seen that could refresh -- it's possible.

12   Q.    Are there any that you have seen in the past, but

13   don't have in front of you, that would refresh your

14   recollection?

15             MR. NORINSBERG:  Objection.

16   A.    To the best of my memory, I haven't.  But it's

17   possible.

18   Q.    Were you ever denied vacation days as a result of

19   failing to issue a certain number of summonses?

20   A.    Whether -- there were vacation picks.  I never

21   had a vacation pick denied, and I -- it was such general

22   knowledge that, if you are not paying the rent, you are not

23   going to be granted a day off when you request it.

24             So I don't recall me, myself specifically, being

25   denied a day off.  But it was general knowledge.  That was

A. SCHOOLCRAFT

1   one of the --

2       Q.    Can you name a single officer who was denied a

3   day off because of failing to meet the quota policy?

4       A.    I don't specifically recall a name or a specific

5   time when an officer told me or I overheard.

6       Q.    During the point in time when you were receiving

7   acceptable performance evaluations, were you issuing the

8   number of summonses necessary to meet the de facto summons

9   policy?

10              MR. NORINSBERG:   Objection.

11      A.    Again, I wasn't keeping track of -- I was going

12  out there and answering calls, whatever my duty was for

13  that tour.  I never kept track of the number of summonses

14  and arrests I was doing.

15              If I had an arrest, I processed the arrest.  And

16  if I was assigned to court, I went to court.  And whatever

17  detail I was part of, I just -- I didn't keep track of

18  that.

19      Q.    We need to take a break now to change the tape

20  and the recording.

21              THE VIDEOGRAPHER:   The time is 11:48 a.m.,

22              this is the end of tape one.  We are going off

23              the record.

24              (Whereupon, an off-the-record discussion was

25              held, and a break was had.)

A. SCHOOLCRAFT

1      A.      Again, other than knowing -- I wasn't privy to

2      that investigation.  I don't know exactly -- I don't recall

3      exactly who was involved with what, at what time.

4      Q.      Have you personally ever alleged that any other

5      individual defendants were involved in the downgrading of

6      crime complaints, besides Defendant Mauriello?

7      A.      I would have to review the Complaint.  Off the

8      top of my head, I don't recall.  But I believe so, it's in

9      the Complaint.

10     Q.      If I read you a name of the defendants in this

11     lawsuit, can tell me if you have ever alleged that they

12     were involved in crime Complaint manipulation?

13     A.      Off the top of my head at this moment, I would

14     have to -- if it's in the Complaint -- maybe not just by

15     hearing the name, but I am sure I addressed those issues in

16     the Complaint.  Or in general, maybe I --

17     Q.      Based on your recollection, sitting here today,

18     was Deputy Chief Michael Marino involved in crime Complaint

19     manipulation?

20                     MR. NORINSBERG:  Objection.

21     A.      Not that I am aware of.

22     Q.      Assistant Chief Gerald Nelson?

23                     MR. NORINSBERG:  Objection.

24     A.      Not that I am aware of.

25     Q.      Sergeant Kurt Duncan?

A. SCHOOLCRAFT

1          A.      I don't remember the ones before that.  The

2     different being -- I believe Caughey's behavior was

3     reflective of me appealing my 2008 evaluation.

4          Q.      When did you appeal your 2008 performance

5     evaluation?

6          A.      I believe it was early 2009.

7          Q.      You claimed that you used to be the senior patrol

8     officer in the 81st Precinct; is that correct?

9          A.      I believe so, yes.

10         Q.      What is the senior patrol officer?

11         A.      It would be the -- one of the officers with more

12    time than other officers.

13         Q.      How do you become the senior patrol officer?

14         A.      You would acquire more time on patrol than an

15    officer would not -- with less time.

16         Q.      So it's just based on the number of hours you

17    have been a police officer?

18         A.      Probably days, years.  I don't know how they

19    would approximate it.

20         Q.      What were your duties as a senior patrol officer?

21         A.      Same as any patrolman.

22         Q.      Did you ever take the sergeant's exam?

23         A.      I don't recall ever taking the sergeant's exam,

24    no.

25         Q.      Why not?

A. SCHOOLCRAFT

1          MR. NORINSBERG:   Objection.

2     A.    Again, it's just -- I believe it was just a title

3     separating officers; like Officer Chan, he had the same

4     amount of time I had.  He was -- he was considered a senior

5     officer.

6          It wasn't a specific job title.  It was -- when

7     other officers needed help, we were usually expected to

8     know how to handle whatever they -- whatever question they

9     had, through experience.

10    Q.    Your Complaint states that beginning in March,

11    2009, the defendants began to isolate you from your fellow

12    officers; is that correct?

13    A.    Yes.

14    Q.    Which defendants isolated you from your fellow

15    officers?

16    A.    I don't recall any specific supervisor.  But I

17    was just aware that officers were being written up for --

18    for just talking to me.

19    Q.    How did you know that that was the fault of the

20    defendants in this case?

21    A.    They were the ones writing them up.

22    Q.    Who wrote them up?

23    A.    I don't recall the specific supervisor.

24    Q.    Who was written up?

25    A.    I believe Officer Chan was; the others, I don't

A. SCHOOLCRAFT

1    recall if they were.  I recall that incident.

2        Q.    Which defendant disciplined Officer Chan for

3    speaking to you?

4        A.    I am not sure if it is a defendant.  I don't

5    recall who --

6        Q.    Did you witness it?

7        A.    I may have been there, he may have told me.

8        Q.    Had you started recording your fellow officers

9    prior to March, 2009?

10       A.    I believe there were recordings.

11       Q.    Did any of your fellow officers know that you

12   were recording them at that time?

13             MR. NORINSBERG:  Objection.

14       A.    I don't believe so, no.

15       Q.    If your fellow officers knew that you were

16   recording them, how do you think they would have felt about

17   it?

18             MR. NORINSBERG:  Objection.

19             MR. COHEN:  Objection.

20       A.    I don't know what they would have thought.

21       Q.    Is it possible that your fellow officers isolated

22   themselves from you, because they suspected you were

23   recording them?

24             MR. NORINSBERG:  Objection.

25       A.    I don't believe that's possible.

A. SCHOOLCRAFT

1       Q.      Why not?

2       A.      I don't believe anyone knew that I was recording

3    or anyone was recording.  I don't think it was that

4    uncommon.

5       Q.      I believe your Complaint states that you learned

6    from Police Officer Zucker that the defendants were

7    attempting to execute a scenario, portraying you as

8    psychologically unfit to work, in which you would be

9    involuntary committed to a hospital; is that correct?

10      A.      I don't recall that, specifically.  But I recall

11   Officer Zucker telling me -- and I don't remember the

12   specific date.  It was -- Officer Zucker informed me that

13   Sergeant Weiss had -- was trying to E.D.P. -- no, I'm

14   sorry, psyche me out, he used the term "psyche."

15              "They were going to psyche you that day."  I

16   don't recall the exact day they were referring to.  But he

17   said Weiss pulled out the patrol guide, and there was an

18   argument between him and another supervisor -- I can't

19   remember who it was -- as to how I would be psyched.

20              THE REPORTER:  That was E.D.P., you said?

21              THE WITNESS:  It was E.D.P., but then I

22              corrected it.  Zucker used the word "psyched," to

23              the best of my memory.

24      Q.      Did you record the conversation with Officer

25   Zucker?

A. SCHOOLCRAFT

1     A.     I don't believe so.  It's possible, but I don't

2   believe so.

3     Q.     Did Officer Zucker say that he heard Sergeant

4   Weiss saying that to anyone else?

5     A.     I believe he told me there was an argument

6   between another supervisor telling him to be to behave, and

7   basically asking him what was -- what was he trying to do

8   or accomplish.  And Zucker overheard the response, "To

9   psyche him and remove his guns."

10    Q.     When was that conversation?

11    A.     I don't recall the specific date.  But I believe

12  the Complaint has the date.

13    Q.     Do you recall if it was before or after April,

14  2009?

15    A.     I think it's before.

16    Q.     Did you go to a hospital in April of 2009?

17    A.     I don't recall any specific date going to the

18  hospital, but it's possible.

19    Q.     Did you seek medical treatment in April of 2009?

20    A.     It's possible.

21    Q.     What were your symptoms when you went to the

22  hospital in April of 2009?

23           MR. NORINSBERG:  Objection.

24    A.     I would have to look at the medical records on

25  that.  I don't recall that specific month or year, if I

A. SCHOOLCRAFT

1      Q.      Did you give Dr. Sure a copy of your "49" about
2   corruption involving the Integrity Control Program of the
3   81st Precinct?
4              MR. NORINSBERG:   Objection.
5      A.      I don't recall ever giving him any department
6   documents, no.
7      Q.      Do you know who Dr. Lambstein is?
8      A.      Yes.
9      Q.      Who is she?
10     A.      I believe she was the -- she is assigned -- a
11  psychiatrist assigned to the police department's medical
12  division.
13     Q.      When did you first speak with Dr. Lambstein?
14     A.      I don't recall the specific date.  It was some
15  time, early 2009.
16     Q.      Were you ordered to undergo a psychological
17  examination in 2009?
18     A.      I don't believe so, no.  Well, if that was why I
19  was there; it was a consult of some kind.  I don't know if
20  it was -- I guess speaking to her was the exam, so yes.  I
21  would -- if that meeting was the exam, or evaluation, then
22  yes, it would have been.
23     Q.      What did you discuss with Dr. Lambstein at that
24  first meeting?
25     A.      I don't recall.  I recall addressing the

A. SCHOOLCRAFT

1    misconduct in the 81st Precinct, and answering her

2    questions.  I don't recall if she asked questions about

3    when I was a child and stuff.  I can't remember every

4    question she asked.

5              But I recall getting into the misconduct and the

6    81st Precinct and the stress it was causing on officers.

7         Q.    What happened as a result of your examination by

8    Dr. Lambstein?

9         A.    As a result, right after that examination, I was

10   modified slash restricted.

11        Q.    What do you understand "modified and restricted"

12   to mean?

13        A.    It was never explained to me.  What I did know

14   is, your gun and shield is removed.  And you are -- but I

15   never received any instruction on what I was, other than

16   other than a restricted or modified police officer.

17        Q.    How many guns did you own or possess in April of

18   2009?

19              MR. NORINSBERG:  Objection.

20        A.    To the best of my recollection, I owned two.

21        Q.    As a police officer, were you required to inform

22   the N.Y.P.D. of all guns that you owned?

23        A.    Yes, I believe so.

24        Q.    Did you inform the N.Y.P.D. of all of the guns

25   that you owned in April of 2009?

A. SCHOOLCRAFT

1    to turn in all guns in your possession, or just all guns

2    you owned?

3        A.    It was my understanding, all the guns I owned.

4        Q.    So in your understanding, you were allowed to

5    possess other people's guns, but not your own?

6                MR. NORINSBERG:  Objection.

7        A.    It was my understanding that they -- they were

8    only asking for the guns that I own, correct.

9        Q.    Do you believe that defendant -- sorry, strike

10   that.  Is it your belief that any of the defendants

11   consulted with Dr. Lambstein before her decision to remove

12   your gun and shield?

13                MR. COHEN:  Objection.

14       A.    I am not aware of that happening, no.

15       Q.    Did Dr. Lambstein ever tell you that she

16   discussed your allegations with any of the defendants?

17       A.    If she did, I don't recall.

18       Q.    Did Dr. Lambstein ever tell you why your weapons

19   were taken away?

20       A.    To the best of my memory, she said it was because

21   of the chest pains.

22       Q.    What chest pains are you speaking of?

23       A.    Around that time, that's -- I think that's why I

24   went and saw my internist.  It's the same time period, I

25   was experiencing minor chest pains.

A. SCHOOLCRAFT

1      Q.      On October 31, 2009, did you state in reference

2    to Defendant Mauriello, "I would like to at least have a

3    fucking chance to go in a gun battle with him"?

4      A.      What was that again?

5      Q.      Did you state on October 31, 2009, in reference

6    to Defendant Mauriello, "I would like to have at least a

7    fucking chance to go in a gun battle with him"?

8      A.      I don't recall making -- ever making a statement

9    like that.

10     Q.      Do you recall making that statement about anyone,

11   not including Defendant Mauriello?

12     A.      I don't recall ever making that statement about

13   anyone, no.

14     Q.      On October 31, 2009, do you recall stating in

15   reference to a recording device, "How long do you think

16   that'll fucking stay on me, after they fucking kill me?"

17     A.      Again, I don't recall making that statement, but

18   it's possible.

19     Q.      Who did you make that statement to?

20     A.      I would have to hear the recording.

21     Q.      But sitting here right now, you don't recall who

22   you made that statement to?

23     A.      No.

24     Q.      Had anyone at the N.Y.P.D. threatened to kill you

25   prior to you making this statement?

A. SCHOOLCRAFT

1          MR. NORINSBERG:   Objection.

2      A.    I didn't receive any explicit threat, no.

3      Q.    Did you receive any implicit threat?

4      A.    I felt Caughey's behavior that day was menacing

5  and threatening.

6      Q.    And you believed that he was threatening to kill

7  you?

8          MR. NORINSBERG:   Objection.

9      A.    I believe his behavior was menacing, and

10 intimidating and threatening.

11     Q.    Besides Lieutenant Caughey, were you in fear from

12 any other member of the N.Y.P.D.?

13     A.    I don't recall any exact -- I was concerned; I

14 don't know if I would define it at fear.  Maybe at certain

15 times, I was more concerned towards the end of the day.

16     Q.    Who were you concerned about at the end of the

17 day?

18     A.    Mostly, Lieutenant Caughey.

19     Q.    Did you tell anyone on October 31, 2009, that

20 "Mom is speaking to me"?

21     A.    I don't recall ever making that statement, no.

22     Q.    Do you recall making a statement on October 31,

23 2009, "I have heard guys say that I am six-foot four and

24 that I lift motorcycles over my head"?

25     A.    I don't recall ever making that statement.

A. SCHOOLCRAFT

1    Q.    On October 31, 2009, do you recall telling

2  anyone, "Mentally, I am not that stable"?

3    A.    I don't recall ever saying -- ever making that

4  statement.  But if you have the recordings to these, I

5  would be happy to listen to them and verify them.

6    Q.    I am just asking if you recall ever making these

7  statements?

8    A.    I don't recall ever making these statements.  But

9  if you have a recording of these exact statements, as you

10 are telling me, I would be happy to verify it through the

11 recording.

12   Q.    Did there come a time when you left work on

13 October 31, 2009?

14   A.    Yes.

15   Q.    When did you first decide to leave work that day?

16   A.    I don't remember the approximate time.  It was

17 some time between 2:30 and 3:30 or 2:00 and 3:30, probably.

18   Q.    When were you supposed to leave work that day?

19   A.    I believe the end of shift is 15:30.

20   Q.    So 3:30?

21   A.    15:00 -- yeah, 3:00 or 3:30.

22   Q.    Why did you want to leave early that day?

23   A.    I was feeling under the weather.  But primarily,

24 I was concerned about Lieutenant Caughey's behavior.

25   Q.    What were you concerned about?

A. SCHOOLCRAFT

1      A.      I was concerned that my safety and well-being was

2      -- I was concerned with my safety and well-being, the way

3      that he was behaving.

4      Q.      What, specifically, about your safety were you

5      concerned about?

6      A.      Specifically, my safety and well-being, my person

7      being harmed.

8      Q.      Were you afraid that he was going to injure you?

9      A.      I don't recall any specific -- any specific thing

10     that I thought he would do to me.  I was just concerned,

11     and I felt it was appropriate to remove myself from that

12     situation.

13     Q.      Is there a procedure for leaving work early?

14     A.      Other than notifying your supervisor, I am not

15     aware of -- I guess it depends on what -- why you are

16     leaving.

17     Q.      Have you ever been disciplined for not following

18     sick leave procedures before?

19     A.      I don't believe so.  It's possible, probably;

20     it's a complicated procedure.

21     Q.      How is it complicated?

22     A.      There's -- it's like six pages.  But as far as

23     being at work and notifying anyone else, other than your

24     immediate supervisor, regarding that situation, I am not

25     aware of any other steps.

A. SCHOOLCRAFT

1          tape, as well.

2                  MR. VIDEOGRAPHER:  The time is 1:31 p.m.

3          This will end tape two.  We are going off the

4          record.

5                  (Whereupon, an hour lunch break was taken.)

6                  (Whereupon, three groups of photographs were

7          marked as Defendants' Exhibits A, B and C for

8          identification.)

9                  MR. VIDEOGRAPHER:  We are back on record.

10          The time is 2:40 p.m. on October 11, 2012, and

11          this begins tape three of today's deposition of

12          Adrian Schoolcraft.

13     Q.    Mr. Schoolcraft, did there come a time on

14   October 31, 2009 when police officers arrived at your

15   apartment?

16     A.    Yes.

17     Q.    What time did you first notice that police

18   officers had arrived at your apartment?

19     A.    I don't recall a specific time, but it was in the

20   afternoon.

21     Q.    How long had you been in your apartment when the

22   police officers first arrived there?

23     A.    Maybe an hour, maybe less, maybe a little more.

24     Q.    When the officers arrived at your apartment, did

25   they knock on your door?

A. SCHOOLCRAFT

1     A.     I recall when they first arrived there, they
2  were -- they were knocking on the door.
3     Q.     Did they say anything to you at that time?
4     A.     If they did, I don't recall any specific
5  statements.
6     Q.     Did they identify themselves as police officers?
7     A.     If they did, I don't recall.
8     Q.     How did you know they were police officers?
9     A.     At that time, I don't believe I was certain that
10 there were officers knocking at my door.
11    Q.     Did you answer the door?
12    A.     No.
13    Q.     Why not?
14    A.     At that time -- earlier, or later?
15    Q.     When the officers first began knocking on your
16 door, why did you not answer the door?
17    A.     Assuming I knew they were officers, I just wasn't
18 feeling well and I -- I wouldn't have answered the door for
19 anyone at that time.  But as the night progressed, as their
20 presence increased, it was -- I didn't answer my door out
21 of fear of why they were there.
22    Q.     What were you afraid of?
23    A.     I was afraid for my safety and well-being.  And I
24 felt by them all being there was disproportionate to
25 someone going home sick early, an hour early at the end of

A. SCHOOLCRAFT

1    trust to reach out to.

2        Q.    Did you call I.A.B. before or after people

3    arrived at your door?

4        A.    To the best of my memory, it was before.

5        Q.    Did you try to contact I.A.B. after people

6    arrived at your door?

7        A.    I don't recall trying.  But I believe -- it's

8    possible, but I don't recall.

9        Q.    How did you know that the officer -- police

10   officer presence had increased over time?

11       A.    I could see it out the window, out the front and

12   the back, the flashing lights into my room and the back of

13   the building.

14       Q.    Did you speak with Dr. Lambstein on October 31,

15   2009?

16       A.    I don't recall having a conversation with her.  I

17   don't believe so, no.

18       Q.    Did Dr. Lambstein call you on October 31, 2009?

19       A.    I believe she did.

20       Q.    Do you answer her phone call?

21       A.    I don't believe I did, no.

22       Q.    Why not?

23       A.    I don't believe I was aware that she was calling

24   at the time.  Perhaps I was sleeping or -- I believe I have

25   a message of hers.

A. SCHOOLCRAFT

1    actually call anyone?

2         A.    If I knew who to call, I would have called them.

3    I don't know who calls off the police.

4         Q.    So did you make a call to anyone on October 31,

5    2009?

6         A.    Other than Internal Affairs, no.

7         Q.    But you called Internal Affairs before the police

8    arrived at your apartment?

9         A.    Correct.

10        Q.    Did there come a time when officers entered your

11   apartment?

12        A.    Yes.

13        Q.    How long after you arrived home on October 31,

14   2009, did officers enter your apartment?

15        A.    I don't recall any specific time.  When they came

16   in, it was dark out.  I believe the recordings mark the

17   time and date of when they entered.

18        Q.    Are the time and date on the recordings you

19   provided accurate?

20        A.    I believe they are.

21        Q.    How long had officers been knocking on your door

22   until they entered your apartment on October 31, 2009?

23        A.    How long they were knocking -- I assume ever

24   since it started, that afternoon.

25        Q.    How did the officers enter your apartment?

A. SCHOOLCRAFT

1     police department, that makes that determination.

2          Q.    Have you ever declared someone an emotionally

3     disturbed person?

4          A.    I don't believe so, no.

5          Q.    On the occasions when you have interacted with an

6     emotionally disturbed person, on how many occasions has

7     that individual been sent to the hospital?

8                MR. NORINSBERG:  Objection.

9          A.    If I could remember every single time, I could

10    probably answer that question.  But I don't -- I would

11    assume if they were deemed E.D.P., they would have to go to

12    a hospital.

13         Q.    Have you dealt with E.D.P.'s on many occasions?

14         A.    I wouldn't know how to quantify "many."  Over

15    seven years, I recall -- I don't recall any specific

16    incident involving any one E.D.P.

17         Q.    How many officers used force against you on

18    October 31, 2009, in your apartment?

19                MR. NORINSBERG:  Objection.  You can answer.

20         A.    Approximately four to five.

21         Q.    You have mentioned Sergeant Duncan and Lieutenant

22    Gough.  Who else used force against you in your apartment

23    on October 31, 2009?

24         A.    Lieutenant Broschart and Chief Marino.

25         Q.    What force did Lieutenant Broschart use against

A. SCHOOLCRAFT

1    I saw it go that night.

2        Q.    Where was the recorder that captured the home

3    invasion?

4        A.    It was on a shelf next to my bed.

5        Q.    But the officers did not notice that one?

6                    MR. NORINSBERG:   Objection.

7        A.    I don't believe they did.

8        Q.    In your Complaint, you allege that Chief Nelson

9    was aware of Chief Marino's actions; is that correct?

10       A.    Yes, I believe so.

11       Q.    What actions are you talking about?

12       A.    Coming to -- coming to my home and -- what

13   happened.

14       Q.    How do you know that Chief Nelson was aware of

15   Chief Marino's actions?

16       A.    I believe he was, because I believe Chief Nelson

17   was aware of what was going on.  And I believe he sent

18   Chief Marino.

19       Q.    Why do you believe he was aware of what was going

20   on?

21       A.    I believe he was made aware -- I don't know

22   exactly how it happened.  But I believe -- I believe he was

23   aware.

24       Q.    Was Chief Nelson at your apartment on October 31,

25   2009?

A. SCHOOLCRAFT

1      A.      I don't recall seeing him.  But there were a lot

2   of -- he is another person I would recognize.  I don't

3   recall seeing him, specifically.

4      Q.      What does Chief Nelson look like?

5      A.      He is a -- he is pretty tall, six foot, Black

6   male, an older gentleman, salt and pepper hair.  I think he

7   has a mustache, he might not.

8      Q.      So you believe that Chief Nelson expressly

9   authorized Chief Marino to enter your apartment?

10     A.      I believe it's possible.

11     Q.      Why do you believe that?

12     A.      Again, it was either Chief Marino acting on his

13  own, or someone above him telling him.

14     Q.      Why do you believe that someone is Chief Nelson?

15     A.      I believe that's Chief Marino's -- his, his

16  immediate boss.

17     Q.      At some point after you were removed from your

18  apartment on October 31, 2009, were you taken to Jamaica

19  Hospital?

20     A.      I'm sorry, say that again.

21     Q.      At some point after you were removed from your

22  apartment on October 31, 2009, were you taken to Jamaica

23  Hospital?

24     A.      Yes.

25     Q.      Were you transported straight to Jamaica

A. SCHOOLCRAFT

1    Q.    You called your father more than once from the

2  hospital?

3    A.    Yes.

4    Q.    How many times did you call your father on

5  October 31, 2009?

6    A.    To the best of my memory, two, three times,

7  approximately.

8    Q.    Did you see any nurses or doctors during the

9  first nine hours that you have alleged you were denied food

10  and water?

11    A.    Yes.

12    Q.    How many nurses and doctors did you see in that

13  first nine hours?

14    A.    Approximately, maybe two nurses and at least two

15  doctors.

16    Q.    Do you know the names of those nurses and

17  doctors?

18    A.    No.

19    Q.    You claim that Sergeant Sawyer assaulted you in

20  Jamaica Hospital; is that correct?

21    A.    Yes, correct.

22    Q.    How did he assault you?

23    A.    He -- well, him and at least four other officers

24  -- there came a point where they stopped bringing me the

25  phone.  At one point, I got out of gurney, and I had to

A. SCHOOLCRAFT

1    drag the gurney with me to the phone, because I became

2    aware that my father was trying to get ahold of me.  And I

3    contacted him from a phone.

4         Sergeant Sawyer arrived some time the next

5    morning, and he saw me on the phone.  He approached the

6    midnight sergeant, the Black female, and he said to her, "I

7    thought perps weren't supposed to get phone calls."  And he

8    walked over to the phone and hung up the phone and it

9    stopped my call.

10        And then that's when he -- it sounded like he

11   said "okay, now," or something to that effect.  And then

12   Officer Miller was on the other side of the gurney.  He

13   grabbed my arm, and two more officers in uniform grabbed my

14   legs and body, and Sawyer grabbed my head and my hair.

15        And then they put me back onto the gurney,

16   slammed me onto the gurney and my left hand was then

17   handcuffed.  And I was double-handcuffed to a gurney.

18   Q.    So Sergeant Sawyer, you stated, was holding your

19   head and your hair at that time?

20   A.    Correct, more pulling my hair.

21   Q.    Who was holding your right hand?

22   A.    The right hand was secured to the gurney, it was

23   -- the left hand, Officer Miller grabbed that arm.  And I

24   think Sergeant James was also holding that arm.  And that's

25   when they cuffed it.

A. SCHOOLCRAFT

1      Q.      With how much force were you thrown on the

2   gurney?

3      A.      It was a little softer than the floor before,

4   because there was padding on the gurney.  But it was -- I

5   was grabbed and pulled, and no one was standing on my legs.

6   It was not as painful as in my home.  But it was -- having

7   my hair pulled was probably the most painful.

8      Q.      Did Sergeant James injure you in any way?

9      A.      I don't recall if her grabbing me -- if I

10   sustained any injuries from her.

11      Q.      What injuries did you sustain from having

12   Sergeant Sawyer pull your hair?

13      A.      It wasn't that -- after Officer Miller applied

14   the cuffs, they were a little too tight.  Sawyer said

15   something to the effect, "Can you believe this fucking

16   guy?"  And then he walked over to me, leaned over and said,

17   "This is what happens" -- in sum and substance, to the best

18   of my memory, he said, "This is -- this is what happens to

19   fucking rats."

20          And then he put both his hands around my wrists,

21   pressing the cuffs together until they wouldn't -- until

22   they wouldn't go any further.

23      Q.      Could you explain what you mean by he was

24   pressing your wrists together.

25      A.      How handcuffs work, they are one-sided, you close

A. SCHOOLCRAFT

1    that the possibility of them coming back and doing it

2    again, I felt they would do that.

3        Q.    Over the next few days, once you were released

4    from the hospital, how did you feel?

5        A.    The next -- slightly exhilarated, being free.  I

6    definitely felt better being -- having my liberty back and

7    feeling free.  But I believe very shortly after that, I am

8    not sure if I caught something else in there or it was the

9    flu from the Halloween night finally coming on, but I

10   experienced a sore throat and flu-like symptoms, and I was

11   sick for a while.  But I felt better -- I felt good, but I

12   was under the weather.

13       Q.    Why do you think the defendants entered your home

14   and had you committed to Jamaica Hospital Medical Center?

15           MR. NORINSBERG:  Objection.  You can answer.

16       A.    I believe it was because I was reporting

17   misconduct and corruption committed by supervisors in the

18   New York City Police Department.

19       Q.    Who did you report -- who did you report?

20       A.    Who did I report what to?

21       Q.    About misconduct in the police department.

22       A.    To the best of my memory, there's -- most of it

23   is documented, I believe.  I reported Sergeant Weiss,

24   Lieutenant Caughey, Deputy Inspector Mauriello.

25           And I believe how the -- the tampering with the

A. SCHOOLCRAFT

1   crime reports was directed towards the entire

2   administration of the 81st Precinct.  If there was -- off

3   the top of my head, I remember them, specifically.

4       Q.    I am going to hand you what has been marked as

5   Defendants' Exhibit A (handing).  I have copies for

6   Counsel.  We have to take a break to change the tape.  So 1

7   will give you an opportunity to review these while we are

8   taking a short break.

9               MR. VIDEOGRAPHER:  The time is 4:17 p.m.,

10              this is the end of tape three.  We are going off

11              record.

12              (Whereupon, a break was had.)

13              MR. VIDEOGRAPHER:  We are back on record.

14              The time is 4:26 p.m. on October 11, 2012.  And

15              this begins tape four of today's deposition of

16              Adrian Schoolcraft.

17      Q.    Right before we took a break, I handed you

18  Defendants' Exhibit A, which is a nine-page document

19  bearing Bates numbers NYC 3278 through NYC 3286.  Have you

20  had an opportunity to review these documents during the

21  break?

22      A.    I just -- I am reviewing them now.

23            Okay.

24      Q.    Have you seen these photographs before today?

25      A.    I don't believe so , no.

A. SCHOOLCRAFT

1     A.     Yes.

2     Q.     Was anything removed from your memo book when he

3  gave it back to you?

4     A.     I don't believe so.  I reviewed it.  If there was

5  anything missing, I don't recall being aware of it.

6     Q.     Was your memo book defaced in any manner when you

7  got it back?

8     A.     There were certain pages with -- I don't know

9  about "defaced," but there were pages with certain notes on

10 them regarding corruption or misconduct that were

11 earmarked.  They were bent in the corner, or folded over.

12    Q.     Were any of your notes blacked out?

13    A.     I don't recall anything being blacked out.

14    Q.     So Defendant Caughey did not destroy any evidence

15 in your memo book; is that correct?

16    A.     I don't know.  I don't recall how carefully I

17 reviewed the memo book.  I only had it for -- I believe

18 that memo book is with Internal Affairs investigators right

19 now.  I don't recall anything being blacked out.  I just

20 remember the pages, certain pages were folded.

21    Q.     Did any defendant ever tell you not to speak to

22 the media?

23    A.     Not in those exact words, no.

24    Q.     Did they tell you in any words, not to speak to

25 the media?

A. SCHOOLCRAFT

1    A.    Not in any explicit words, no.

2    Q.    Did they tell you in any implicit manner?

3    A.    Yes.

4    Q.    How?

5    A.    The home invasion, Halloween night.  And

6    following that, following my suspension, they continued

7    to -- they drove hundreds of miles to bang on my door,

8    question my neighbors, photograph me outside -- from

9    outside, inside my apartment.  And I took that as --

10   Q.    Did any defendant ever tell you not to speak to

11   the media?

12              MR. NORINSBERG:  Objection.

13   A.    Not in words, no.

14   Q.    You claim that the defendants forced you to move

15   upstate; is that correct?

16   A.    Well, I had no other option of where to go.  I

17   felt safer upstate, the farther -- I felt that was far

18   enough away, out of their jurisdiction, that I wouldn't

19   be -- Halloween night 2009, wouldn't happen again.

20   Q.    When did you move upstate?

21   A.    It was maybe a week -- two weeks after being

22   released.

23   Q.    You claim that the officers' visits to upstate

24   New York were to silent, harass, and/or otherwise harm you

25   and your father; is that correct?

A. SCHOOLCRAFT

1    Q.    Were you alleging that by coming to your home in
2    Johnstown, that the defendants were implicitly telling you
3    not to go to the media?

4    A.    I believe the -- the banging on the door, waiting
5    outside my apartment, were explicit threats to -- to not
6    push this any further.

7    Q.    Prior to October 31, 2009, had you ever told
8    anyone at the N.Y.P.D. that you intended to go to the
9    media?

10   A.    I'm sorry, what was the time?

11   Q.    Prior to October 31, 2009, had you ever told
12   anyone at the N.Y.P.D. that you intended to go to the
13   media?

14   A.    I don't believe I -- I don't recall ever talking
15   about the media, ever, before October 31, 2009, to anyone.

16   Q.    When was the first time you discussed going to
17   the media?

18   A.    Some time after -- recently, after October 31,
19   2009, approximately -- maybe two months after.  Or maybe
20   sooner after I was -- it became apparent that my union was
21   not going to help me or protect me.

22        And I felt that the seriousness of this
23   misconduct, I felt safer if anyone had any interest in it,
24   to put it out in the public.

25   Q.    When did you first go to your union about your

A. SCHOOLCRAFT

1    an officer they reviewed had appealed the review?

2                    MR. NORINSBERG:  Objection.

3        A.    I am not aware if they would be punished just by

4    an officer appealing an evaluation.  I don't feel it would

5    be punishment, having to explain something you documented

6    and signed.

7        Q.    Aside from the recordings that you have provided

8    to your attorneys and the crime complaints that you

9    mentioned prior, is there any other evidence of N.Y.P.D.

10   misconduct and corruption that you had in your possession

11   on October 31, 2009?

12       A.    I believe my attorneys have everything, to the

13   best of my knowledge.

14       Q.    Do you know what "charges and specifications"

15   are?

16       A.    Yes.

17       Q.    What are "charges and specifications"?

18       A.    I believe that's the term used for charges

19   brought against an officer in the police department and the

20   specific -- the specifics of that charge.  I believe it's

21   just a list of the charges, and the specifics of those

22   charges.

23       Q.    Did the N.Y.P.D. officers that visited your home

24   in Johnstown ever tell you why they were there?

25       A.    I only recall answering the door once.  And I

A. SCHOOLCRAFT

1    can't remember what she handed me, if it was a copy of

2    charges and specifications, or something else.  I don't

3    recall what it was.  But in words, it wasn't explained to

4    me, no.

5        Q.    Did you ever ask the individuals who visited your

6    home in Johnstown what they were doing there?

7        A.    Before I could ask -- when I did answer that

8    door, I didn't know she was a New York City Police Officer.

9    She was dressed in plainclothes.

10            And as soon as I opened the door, I saw the video

11    camera and who I believe is Sergeant O'Hare, standing on

12    the stairway, with his hand on his gun, when I opened the

13    door.  So she handed me the envelope, I closed door.  I may

14    have said -- shake my hand, "Yes, I understand."  But I

15    abruptly closed the door.

16       Q.    All the other occasions, when officers visited

17    your home in Johnstown and knocked on your door, did you

18    ever speak to those officers?

19       A.    No.  And they were banging on the door.

20       Q.    So when they were banging on the door, did you

21    ever ask them what they were doing there?

22       A.    I don't recall communicating with any of them.

23       Q.    Why didn't you?

24       A.    It was -- I believe their behavior was

25    threatening and intimidating.  I really felt that it was

A. SCHOOLCRAFT

1        Q.      Who do you believe has spoken out against the

2   alleged N.Y.P.D. quota policy?

3        A.      Off the top of my head, I can't recall an exact

4   name, but -- I believe one of them is, Adhyl Polanco.  I

5   think the other one's first name is Frank -- Frank

6   Palestro.  I may be saying the name wrong; Palestro or

7   Palestri.

8              There is a -- I believe his name is Valez; is --

9   or was in the 75th Precinct at one time.  That was a while

10  back.  I can't recall, but I do believe there is more.  But

11  I don't recall at this time, who exactly.

12       Q.      Do you claim that the defendants wanted to

13  prevent you from speaking about certain issues?

14              MR. NORINSBERG:  Objection.

15       A.      Yes.

16       Q.      What issues do you believe they wanted to keep

17  you from speaking about?

18       A.      Corruption and misconduct in the 81st Precinct,

19  the illegal quota policy, the tampering with evidence of

20  crimes, manipulating the crime reports, the actual

21  documents themselves, falsifying training logs, supervisors

22  sanitizing the personnel files to help their advancement.

23       Q.      Which defendant, specifically, do you believe

24  wanted to prevent you from speaking about those issues?

25       A.      I believe they all wanted -- benefited, if I had

A. SCHOOLCRAFT

1    stopped pushing the issue.

2       Q.    Every single named defendant from the N.Y.P.D.,

3    you believe, would have benefited, if you did not speak out

4    against the issues you just mentioned?

5             MR. NORINSBERG:  Objection.

6       A.    In some way or another, yes.

7       Q.    How did you intend to speak out about the issues

8    you just described?

9       A.    Well at first, I felt it could be resolved within

10   the department, with the investigations.  But after

11   Halloween night, I became aware that they weren't -- it

12   would -- I think that's what convinced me that the public

13   had to be made aware, directly.

14      Q.    Since you decided that the public needed to be

15   made aware directly, have any defendants taken any steps to

16   prevent you from speaking out?

17            MR. NORINSBERG:  Objection.

18      A.    I believe so, yes.

19      Q.    What steps have they taken?

20            MR. NORINSBERG:  Objection.

21      A.    The driving some 300 miles to bang on my door,

22   and stand outside or park outside my apartment and prevent

23   me from going anywhere, creating that fear that they were

24   going to come in.

25      Q.    Did you eventually speak out against the issues

A. SCHOOLCRAFT

1     believe so.

2          Q.     Who did you believe leaked information on I.A.B.

3     Complaints to the defendant?

4          A.     I don't think we know yet.  I don't believe we

5     know yet.

6          Q.     Why do you believe they leaked the information?

7          A.     Lieutenant Caughey's behavior October 31, 2009.

8     I believe he was aware in some form or another that there

9     was a -- maybe not the Complaint against him, but it was

10    certainly timely.  I believe he was at least aware that

11    there were Complaints against the precinct, made by me.

12         Q.     Do you believe he could have learned this

13    information from your memo book?

14         A.     On the 31st of October , 2009?

15         Q.     Yes.

16         A.     I would have to review the notes again.  But

17    again, how would he know to review the memo book?

18         Q.     Do you believe that if I.A.B. had not leaked

19    information on you to the defendants, that the October 31,

20    2009, incident would not have happened?

21                MR. NORINSBERG:  Objection.

22         A.     I believe it's possible that it would not have

23    happened.

24         Q.     In 2008, did you intend to go public with your

25    knowledge with N.Y.P.D. corruption and police misconduct?

A. SCHOOLCRAFT

1      A.      When?

2      Q.      In 2008?

3      A.      I don't believe I ever intended before

4   October 31, 2009.  I don't believe it ever crossed my mind,

5   going outside the department.  I -- to the best of my

6   memory, I still believed that there were -- that there were

7   certain parts of -- that once -- once I brought the

8   evidence forward, that the department would have to resolve

9   the issues of misconduct in the 81st Precinct.  And it

10  would be handled inside -- inside the department.

11     Q.      So in February of 2009, you did not intend to go

12  public with your knowledge of N.Y.P.D. corruption and

13  misconduct; is that correct?

14     A.      On what date?

15     Q.      In February of 2009?

16     A.      In February of 2009, to the best of my memory, I

17  don't recall ever thinking about going to the public or to

18  any media source.

19     Q.      When did you believe -- sorry, strike that.

20             When do you believe that members the N.Y.P.D.

21  first learned about your intention to disclose N.Y.P.D.

22  police misconduct, publicly?

23             MR. NORINSBERG:  Objection.

24     A.      I don't know if they -- I don't what they

25  believed or when they believed it.  They may have just

A. SCHOOLCRAFT

1    assumed that it might have happened, or what would happen.

2        Q.    Do you have an e-mail account?

3        A.    Yes.

4        Q.    What is your e-mail account?

5              MR. NORINSBERG:  Objection.

6        A.    Schoolcraft@gmail.com, S-C-H-O-O-L-C-R-A-F-T at

7    gmail.com.

8        Q.    Have you sent any e-mails regarding this

9    incident?

10       A.    Regarding this incident?

11       Q.    Have you sent any e-mails regarding the

12   allegations complained of in your Complaint?

13       A.    I don't recall sending any e-mails.

14       Q.    Have you ever written online, with regard to the

15   events alleged in your Complaint?

16       A.    What do you mean by writing online?

17       Q.    Have you ever written for any online publication

18   about the incident alleged in your Complaint?

19       A.    I haven't written anything online.  There were

20   media -- I have been to the media since October 31, 2009.

21       Q.    How many times have you spoken to the media since

22   October 31, 2009?

23       A.    Approximately six or seven times; maybe more,

24   maybe less.

25       Q.    Have you written down any account of the events

A. SCHOOLCRAFT

1    alleged in your Complaint or the injuries you are claiming

2    as a result of those events alleged in your Complaint?

3              MR. NORINSBERG:  Objection.

4        A.    To the best of my memory, the Complaint is the

5    most detailed account that was prepared by my attorneys.

6        Q.    Have you ever prepared an account of what

7    happened?

8        A.    I don't believe so, no.

9        Q.    Have you made any audio or video recordings of

10   statements, regarding the events alleged in your Complaint?

11             MR. NORINSBERG:  Objection.

12       A.    There were recordings in the Complaint.

13       Q.    Since October 31, 2009, have you made any audio

14   or visual recordings of your statements, recounting what

15   happened on October 31, 2009?

16             MR. NORINSBERG:  Objection.

17       A.    There was one -- This American Life, that was a

18   radio show.  I didn't produce the recording, I didn't make

19   a recording of it myself.  It was a show.

20       Q.    When did you first go to the media about your

21   allegations of downgrading crime and alleged quotas?

22       A.    I believe it was early 2010.

23       Q.    How early in 2010?

24       A.    I don't recall.  Maybe it was late 2009, some

25   time in that time frame.

A. SCHOOLCRAFT

1    Q.    With whom did you first speak from the media?

2    A.    I believe the first -- I remember the first

3    article was the Daily News.

4    Q.    With whom did you speak at the Daily News?

5    A.    Rocco Parascandola, to the best of my memory.

6              THE REPORTER:  One more time?

7              THE WITNESS:  To the best of my memory,

8              Rocco Parascandola.

9    Q.    With whom did you speak next?

10   A.    I might have the order wrong, but I believe This

11   American Life -- well, no.  I believe the next one was --

12   to the best of my memory, was The Village Voice.

13   Q.    With whom The Village Voice did you speak?

14   A.    Graham Rayman.

15   Q.    When did you first speak with Graham Rayman?

16   A.    It would have been a couple weeks before The

17   Village Voice had their first article; two weeks to a

18   month, maybe.

19   Q.    How many times have you spoken with Graham

20   Rayman?

21   A.    I really don't recall how many times I spoke with

22   him.

23   Q.    More than five?

24   A.    Again, I would have to remember every time.

25   Approximately, I can't think of a number.  He would call

A. SCHOOLCRAFT

1    and check up on me.  And pretty much after we talked, he

2    ran some articles, and --

3    Q.    When was the last time you spoke to Graham

4    Rayman?

5    A.    The last time -- I believe he contacted me early

6    -- early 2012.

7    Q.    What did you speak about in early 2012 with

8    Graham Rayman?

9    A.    I don't recall the specific conversation.  I

10   believe it would be to just touch base with me, an update

11   on what he was doing or what was going on.  He would ask me

12   if I was okay, and if I knew of anything that was going on.

13   It would be something general, like that.

14   Q.    In what format did you speak?

15   A.    I believe it was over phone.  I don't recall the

16   last time I saw him.

17   Q.    How frequently do you speak to him?

18         MR. NORINSBERG:    Objection.

19   A.    I don't speak to him frequently at all.  If it

20   was 2012, it would have been early 2012.

21   Q.    Have you ever spoken to Graham Rayman about a

22   Quality Assurance Division report on the 81st Precinct?

23   A.    No, I don't -- no.

24   Q.    Have you personally seen the Quality Assurance

25   Division report on the 81st Precinct?

A. SCHOOLCRAFT

1    Q.    Have you shared that CD with anyone else?

2    A.    No, I did not.

3    Q.    Does your father have access to that CD?

4    A.    I don't -- no.  I don't believe that's possible,

5    no.

6    Q.    Why not?

7    A.    He would need a computer.  He is technically

8    insufficient when it comes to computers.  Him being aware

9    of what disc it was on, or what was on it, I don't believe.

10    Q.    But does your father have access to the actual

11    CD?

12                    MR. NORINSBERG:  Objection.

13    A.    It's not in a locked safe.  But I don't believe

14    he is -- he has ever even seen the CD.

15    Q.    Is it in the same home you share with him?

16    A.    I was -- yes.

17    Q.    Did you ever print the Q.A.D. report?

18    A.    No.

19    Q.    How many interviews have you given to the media

20    about your allegations in this Complaint?

21                    MR. NORINSBERG:  Objection.

22    A.    Approximately six, seven; maybe more, less, at

23    least six or seven.

24    Q.    Did the N.Y.P.D. officers visiting your home

25    following the October 31, 2009 incident affect your

A. SCHOOLCRAFT

1    decision to speak to the media?

2        A.    I believe they attempted to, yes.

3        Q.    Did they succeed?

4        A.    I don't believe they succeeded in me speaking to

5    the media.  But they -- I don't -- I don't believe they

6    provided information to these reporters, when they

7    contacted the department.  No, they did not succeed.

8        Q.    Did the police visits to your house in Johnstown

9    discourage you in any way from talking to the media?

10        A.    No.  I don't believe so.  They created that --

11    there was fear and intimidation.  But it would -- but it

12    also encouraged me, how important the issues were.

13        Q.    Was your father ever a police officer?

14        A.    Yes.

15        Q.    Where was your father a police officer?

16        A.    The United States Army.  To the best of my

17    memory, University Park, Texas, and Fort Worth, Texas.

18        Q.    Do you know under what circumstances your father

19    left the Army?

20            MR. NORINSBERG:  Objection.

21        A.    I believe he served his time and went -- similar

22    to me, just went into the private sector.

23        Q.    Do you know under what circumstances your father

24    left the University Park Police?

25            MR. NORINSBERG:  Objection.

A. SCHOOLCRAFT

1    Q.     Have you contacted any elected officials or

2    representatives?

3    A.     Yes.  Senator Farley, upstate.  I have contacted

4    Albert Vann, Peter Vallone, Jr.  There may be more -- I --

5    that's all I can remember right now.

6    Q.     Whom did you contact at the Queens County D.A.'s

7    office?

8    A.     Can't remember his name specifically, or her

9    name.  I believe the first person I talked to was a female.

10   Q.     How did you contact them?

11   A.     By phone.

12   Q.     When did you first contact them?

13   A.     Some time, late 2009, early 2010, around that

14   time.

15   Q.     What was the result of that contact?

16   A.     I don't recall any results.  I do recall meeting

17   with someone from the Queens D.A. later on.  I don't recall

18   the specific date, but it was -- after we filed the

19   lawsuit.  I remember they were from the Queens D.A., from

20   Judge Brown's --

21   Q.     What was that meeting about?

22   A.     It was regarding -- well, I intended it to be

23   about the -- being pulled out of my home, arrested, falsely

24   arrested and taken out of my home Halloween night, 2009.

25   And I believe that's what we did discuss that night.

A. SCHOOLCRAFT

1      Q.      Whom did you contact at the Department of

2    Justice?

3      A.      I don't recall any names off the top of my head.

4    There were two females and a male.

5      Q.      When did you first contact them?

6      A.      I believe -- they may have contacted us.  I could

7    be wrong -- again, that would be -- that may have been

8    before I saw the Queens D.A.; the meeting, at least.

9      Q.      How did you contact them?

10                    MR. NORINSBERG:   Objection.

11     A.      Again, I don't remember -- I believe they

12   contacted us.  I think this was after some articles, and

13   possibly a radio show.  And then they contacted us.  I

14   believe -- to the best of my memory, they contacted us.

15   And I cooperated with meeting them.

16     Q.      How many times did you meet with the Department

17   of Justice?

18     A.      To the best of my memory, it was once.

19     Q.      Whom did you contact at Senator Farley's office?

20     A.      Senator Farley.

21     Q.      When did you first contact him?

22     A.      It was by letter.  There would be a date on it,

23   so -- I don't recall the specific date.  It was some time

24   in 2010.

25                    MS. PUBLICKER:   I would call for production

A. SCHOOLCRAFT

1           of the letter you sent to Senator Farley.

2      Q.    What was the content of that letter?

3      A.    I would have to review the letter.  I really

4  don't recall specifically what it was about.

5      Q.    Have you written letters to anyone else about the

6  allegations in your Complaint?

7      A.    I don't believe so, no.  I don't recall any

8  other.

9      Q.    Have you ever been contacted by the Federal

10  Bureau of Investigation?

11      A.    I believe my father notified them when the

12  incident happened.  I don't believe they -- I don't recall

13  talking to anyone specifically.  But they -- they never

14  contacted us.

15      Q.    Had you ever spoken to the F.B.I. prior to

16  October 31, 2009?

17      A.    I don't recall any specific -- specifically

18  speaking to someone from the F.B.I., no.

19      Q.    Whom did you contact at Councilman Vann's office?

20      A.    It would have been one of his aides.  I don't

21  recall speaking with Councilman Vann, himself.

22      Q.    When did you first contact Councilman Vann's

23  office?

24      A.    It would have been some time, 2010, probably.

25      Q.    How did you contact his office?

A. SCHOOLCRAFT

1      A.      If I contacted them, it would have been by phone.

2  I don't think it was by letter.  I don't recall exactly how

3  we met, but I recall having a meeting.

4      Q.      You had a meeting with Councilman Vann?

5      A.      No.  With a couple of his aides.

6      Q.      How many times did you meet with members of

7  Councilman Vann's office?

8      A.      To the best of my memory, it was once.

9      Q.      Were there any notes taken at that meeting?

10     A.      I am not sure.

11     Q.      Whom did you -- whom did you contact at

12  Councilman Vallone's office?

13     A.      Whom did I contact at --

14     Q.      Yes.

15     A.      I don't recall them contacting me or if -- if

16  they contacted me or if I reached out to them.  I don't

17  recall, specifically, how we came into Vann's office.

18     Q.      When did that first contact occur?

19     A.      I believe it was some time, 2010.

20     Q.      What was the content of your communication with

21  them?

22     A.      To the best of my memory, it was concerning the

23  -- the tampering with crime reports.

24     Q.      What was the result of that communication?

25     A.      I am not aware of any results.

A. SCHOOLCRAFT

1    Q.    Are you familiar with the class action lawsuit of

2    Floyd versus the City of New York?

3    A.    Sounds familiar.

4    Q.    Are you aware that there is a class action

5    alleging that the N.Y.P.D. stopped and frisked individuals

6    without reasonable suspicion, and based on race?

7    A.    If that's what the Complaint says.

8    Q.    Are you aware of that?

9    A.    I may have been.  I may have read that somewhere;

10   it sounds like mine.

11   Q.    Are you aware that the attorneys in Floyd allege

12   that your tapes support their theory that stops are made

13   without reasonable suspicion, in order to fulfill an

14   alleged quota?

15           MR. NORINSBERG:  Objection.

16   A.    Whose report?

17   Q.    According to the representatives in the Floyd

18   class action.

19           MR. NORINSBERG:  Objection.

20   A.    That they want what?

21   Q.    That they believe your tapes support the

22   allegation that stops are made without reasonable

23   suspicion, in order to fill an alleged quota?

24           MR. NORINSBERG:  Objection.

25   A.    If that's -- if that's their statement.

A. SCHOOLCRAFT

1     Q.     Have you spoken with lawyers in the Floyd class

2    action?

3     A.     I don't recall -- there may have been an

4    affidavit.  I recall a couple affidavits.  Again, if I knew

5    who the attorneys were.

6             I am aware of the Center For Constitutional

7    Rights, I believe I did affidavit for the Stenson case.  It

8    may have been an affidavit where I -- I don't know.  I

9    would need more details.

10    Q.     Do you intend to testify at the Floyd class

11   action trial?

12             MR. NORINSBERG:  Objection.

13    A.     I intend to cooperate with anyone who I can help

14   with stopping this behavior.

15    Q.     Were you ever subpoenaed to testify in the Floyd

16   class action?

17    A.     I don't believe -- if I receive a subpoena, my

18   attorneys would know.  I don't believe so, no.

19    Q.     Do you intend to testify in the Stenson class

20   action case, if that case proceeds to trial?

21             MR. NORINSBERG:  Objection.

22    A.     I will cooperate -- especially since he is my

23   attorney.  I believe there is a strong possibility, if he

24   wants me to.

25             If he feels I can help, again, stop these

A. SCHOOLCRAFT

1    unofficial policies that are pushed -- the pressure created

2    to -- I believe it will also help patrolmen out there.

3        Q.    How so?

4        A.    By -- by stopping this pressure from supervisors,

5    the upper management of the police department, relieve some

6    of this pressure from this illegal quota.

7        Q.    Do you think that officers have to make out false

8    summonses in order to meet the alleged quota?

9        A.    I believe there is -- the possibility is very

10   strong.

11       Q.    Do you believe there is not enough violation

12   activity in the 81st Precinct to enable an honest officer

13   to make the alleged quota?

14               MR. NORINSBERG:  Objection.

15       A.    Unless that officer is God, and they see

16   everything, I don't think anyone can answer that question.

17   Certainly, if the reports -- the reports of crimes weren't

18   tampered with or changed, we would know a lot more about

19   what's really happening.  And those issues themselves would

20   be addressed.

21               And instead of throwing this net over the entire

22   community, and treating everyone like a perpetrator of a

23   crime.  I believe there are better ways to police in these

24   urban areas, or anywhere.  It really applies to anyone, any

25   community.

A. SCHOOLCRAFT

1    Q.    How do you believe that the City of New York is

2    responsible for your injuries in this case?

3    A.    It was the New York City Police Department that

4    sent officers to my home to assault, arrest me and lock me

5    up.

6    Q.    Anything else?

7    A.    Anything else with what?

8    Q.    Is there any other way in which you believe the

9    City of New York is responsible for your injuries in this

10   case?

11         MR. NORINSBERG:   Objection.

12   A.    Without reviewing the Complaint, the details,

13   nothing is coming to my memory right now.  But yeah, I am

14   sure there are other ways.  It's a very large Complaint.

15   Q.    What are your specific claims against Sergeant

16   Duncan?

17   A.    Specifically, regarding the assault and the

18   arrest.  And he had some involvement with the emergency

19   medical technicians in my house.

20   Q.    When you say "the assault," do you mean the

21   handcuffing?

22   A.    And throwing me on the floor.

23   Q.    What are your claims against Lieutenant Caughey?

24   A.    Lieutenant Caughey, specifically, was -- the --

25   the fear and intimidation he created, from his behavior.

A. SCHOOLCRAFT

1     Q.     Anything else?

2     A.     And I believe he is -- he is involved in the

3     documentation -- the lies, I believe he has reported me for

4     fraud.  And I am sure he was involved with what Sergeant

5     James was telling the hospital, in order to have me locked

6     away.  I believe that's a strong possibility.

7     Q.     How are you sure that he was involved with

8     Sergeant James talking to the hospital?

9              MR. NORINSBERG:  Objection.

10    A.     Again, the timeliness of his concern.  I believe

11    he was aware of the complaints I had made against the

12    81st Precinct and him.  It would have benefited him to --

13    that's what leads me to believe that there's a strong

14    possibility.

15    Q.     Did he assault you in any way?

16    A.     No.  I don't recall -- no, he never touched me.

17    Q.     What are your claims against Chief Marino?

18    A.     He would be part of the physical damage, and he

19    ordered the E.D.P.

20    Q.     Anything else?

21    A.     I am sure -- to the best of my memory, again, I

22    am sure there is more in the documentation of what he did

23    after -- in order to have me locked up.

24    Q.     What are your complaints against Lieutenant

25    Gough?