2/21/10 - <u>Timeline of PES contacts with P.O. Adrian Schoolcraft</u>

**4/13/09** – MOS referred to PES by District Surgeon Dr. Ciuffo for acute anxiety secondary to stress on job. Dr. Lamstein at PES interviewed MOS on same day. MOS complained of chest pains for over one year, stomach problems and trouble sleeping. There were no medical findings. PO Schoolcraft had been to an emergency room, and was prescribed psychotropic medications by his personal physician. Work problems were cited- getting below standards evaluations due to low activity; told to write more summonses and 250s that he disagreed with; claimed that he was assigned to a footpost in front of a building that generates lawsuits against cops. He alleged that other officers wrote false summonses. He hired a lawyer to fight his low evaluation. At Dr. Lamstein's request, PO Schoolcraft signed releases of information to speak with the physician who prescribed the medication, and to get records from the emergency room visit.

**4/14/09**- Dr. Lamstein discussed the case with Dr. Propper, supervising psychologist at PES. MOS placed on restricted duty due to his anxiety symptoms and use of psychotropic medications.

**4/15/09** – Dr. Lamstein spoke with MOS and informed him of psych R/D decision. MOS was not happy with the decision. MOS verbally withdrew releases of information he had signed. Dr. Lamstein asked him to put that request in writing as well.

**5/22/09** – MOS rescinded the ROI in writing in a formal legal statement signed by a notary.

**7/27/09** – Dr. Lamstein met with MOS at PES. He reported that he no longer felt stressed about anything, and that every one of his physical symptoms of stress was completely better. He denied taking medication for any reason. He said things were better at work since he was on restricted duty because he was left alone, was not getting written up, and they could no longer stick him on a foot post "in front of the most dangerous building in the precinct," or force him to do overtime. Dr. Lamstein urged PO Schoolcraft to get stress management counseling, and at the officer's request recommended two books.

**10/13/09** – Dr. Propper received a call from Sgt. Bonilla in the Police Commissioner's office informing PES that MOS' father called "City Hall" and complained to a Deputy Mayor's assistant that his son was never told why he is on R/D.

**10/27/09** – Dr. Lamstein returned from vacation and met with MOS to make sure he was clear about the reason he is on R/D. Dr. Lamstein again explained in detail that he was on restricted duty because he had significant physical manifestations of stress that were causing distress, and that he would benefit from treatment. He continued to report that he no longer had physical symptoms of stress and no longer felt stressed at work. He said he called therapists Dr. Lamstein had recommended, but none took his insurance. Dr. Lamstein offered to help him find an in-network therapist who specializes in stress management, and he expressed appreciation for that assistance. Dr. Lamstein soon mailed him a list of psychologists in his preferred location who accepted his insurance and specialized in anxiety and stress management.

**10/31/09** – Dr. Lamstein was the psychologist on pager duty when MOS went AWOL. Capt. Lauterborn, MOS' XO at the 81 Pct., kept Dr. Lamstein informed throughout the night. Capt. Lauterborn reported underlying issues with MOS at the command that might have precipitated his going AWOL. He said MOS had made allegations against others and the Department's investigation of those allegations had picked up that week. About 4 PO's and 2 civilians were called down for questioning that week. Notifications were in telephone message log so MOS knew who was going. He went up to them upon their return, trying to get information from them about what they were asked. While MOS was still missing, Dr. Lamstein left a message on MOS' cell phone urging him to call her or his Captain, or return to his home or command.

**11/2/09** – Dr. Lamstein received a call from Sgt. DeGrabrizio, IAB Group 31. Dr. Lamstein provided general information about MOS and the reason he is on psych R/D.

**11/2/09** – Dr. Lamstein received a call from MOS' father, Larry Schoolcraft. He yelled throughout the conversation in an accusatory, threatening and insulting tone of voice. He was angry because of the events of 10/31. He vaguely threatened legal action and hung up on Dr. Lamstein.

**11/4/09** – Dr. Lamstein received a call from Sgt. Scott, IAB Group 1. Sgt. said he interviewed MOS at Jamaica Hospital and PO Schoolcraft signed a release of information authorizing the hospital to release information to the NYPD. Sgt. reported that MOS' father was still alleging that Dr. Lamstein never told MOS why he is on R/D.
   – Dr. Lamstein returned a call from MOS' father, Larry Schoolcraft. He was polite and friendly during this call. He said they just had a meeting at the hospital at 2 PM which he had hoped Dr. Lamstein would be able to attend. Dr. Lamstein said that she would be happy to speak with MOS' treatment providers at the hospital as long as PO Schoolcraft signed a release of information authorizing it. He thanked Dr. Lamstein and ended the call courteously.

**11/9/09** – Dr. Lamstein spoke with Jamaica Hospital, Christine McMahon, MSW after a few days of leaving each other messages. She said MOS refused to sign a release of information allowing NYPD to release information to the hospital. She said MOS was discharged on 11/6/09 with a follow-up plan of a scheduled appointment with a psychiatrist. She said he had some weird beliefs but was not a danger to himself or others.
   - Dr. Lamstein received a call from IAB Group 1, Sgt. Scott and Lt. Crisalli. They reported that they went to MOS' home on 11/6 after he was discharged from the hospital. MOS told IAB that he was kept at Jamaica Hospital because a counselor there used to work at the NYPD and is in cahoots with the NYPD, and the Department wanted him kept there. He had many digital recording devices in his home. He provided recordings to IAB as evidence of what he said was mistreatment by the NYPD on 10/31/09. The recordings included his side of phone conversations with his father and revealed that he had a rifle in his home (despite being on "no firearms" status) and was concerned that the NYPD might ask him to go to a hospital to take a drug test.

**11/30/09** – Dr. Lamstein spoke with IAB Group 1, Lt. Crisalli. Confirmed that IAB did recover the rifle.

**12/1/09** – At the request of Lt. Mascol of the 81 Pct., Dr. Lamstein tried calling MOS with the hope that perhaps he would return the call. This was part of ongoing efforts to notify MOS to report to 1PP for reinstatement. It was unsuccessful.

**1/19/10** – Dr. Lamstein received a release of information from Fulton-Montgomery VA Primary Care Practice. It requested PES send them "last office notes" and a medication list. It said MOS had an appointment scheduled with them on 1/20/10. On 1/20/01, Dr. Lamstein spoke with Louis at the VA clinic and explained that PES only saw MOS for an evaluation of his psychological fitness to perform police work and that PES were not treatment providers. He did not think they needed this type of records.