Page 1

1    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------------------X

3    ADRIAN SCHOOLCRAFT,

4                        Plaintiff,

5
                                      Case No:

6        - against -              10 CV 06005

7

     THE CITY OF NEW YORK, ET AL.,

8

9                     Defendants.

10   ------------------------------------------X

11                   100 Church Street

                     New York, New York

12

                     January 30, 2014

13                   10:22 a.m.

14

15

16

17   DEPOSITION OF CATHERINE LAMSTEIN-REISS, M.D.,

18   pursuant to Subpoena, taken at the above

19   place, date and time, before DENISE ZIVKU, a

20   Notary Public within and for the State of

21   New York.

22

23

24

25

Page 2

```
1      A P P E A R A N C E S:

2
3         NATHANIEL B. SMITH, ESQ.
               Attorneys for Plaintiff
4              111 Broadway
               New York, New York 10006
5
6
          JOHN LENOIR, ESQ.
7         Attorneys for Plaintiff
               829 Third Street NE
8              Washington, D.C. 20002
9
10     NEW YORK CITY LAW DEPARTMENT
       OFFICE OF CORPORATION COUNSEL
11     Attorneys for Defendant
       THE CITY OF NEW YORK
12             100 Church Street
               New York, New York 10007
13     BY:   SUZANNA PUBLICKER METTHAM, ESQ.
14
15     SCOPPETTA SEIFF KRETZ & ABERCROMBIE
       Attorneys for Defendant
16     STEVEN MAURIELLO
               444 Madison Avenue
17             New York, New York 10022
       BY:   WALTER A. KRETZ, JR., ESQ.
18
19
       IVONE, DEVINE & JENSEN, LLP
20     Attorneys for Defendant
       DR. ISAK ISAKOV
21             2001 Marcus Avenue
               Lake Success, New York 11042
22     BY:   WILLIAM ROBERT DEVINE, ESQ.
23
                   (Continued.)
24
25
```

1                (Continued.)

2

3        CALLAN, KOSTER, BRADY & BRENNAN, LLP
         Attorneys for Defendant
4        DR. LILIAN ALDANA-BERNIER
              One Whitehall Street
5             New York, New York 10004
         BY:   PAUL CALLAN, ESQ.
6             MATTHEW J. KOSTER, ESQ.

7

8        MARTIN CLEARWATER & BELL, LLP
         Attorneys for Defendant
9        JAMAICA HOSPITAL MEDICAL CENTER
              220 East 42nd Street
10            New York, New York 10017
         BY:   BRIAN OSTERMAN, ESQ.

11

12                Also Present:  Magdalena Bauza

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1       S T I P U L A T I O N S:

2

3           IT IS HEREBY STIPULATED AND AGREED by and

4           between the attorneys for the respective

5           parties hereto, that this examination may

6           be sworn to before any Notary Public.

7

8           IT IS FURTHER STIPULATED AND AGREED that the

9           filing and certification of the said

10          examination shall be waived.

11

12          IT IS FURTHER STIPULATED AND AGREED that all

13          objections to questions, except as to the

14          form of the question, shall be reserved for

15          the time of trial.

16

17

18

19

20

21

22

23

24

25

Page 5

1

2      CATHERINE LAMSTEIN-REISS, M.D., a

3      Nonparty witness herein, having been

4      first duly sworn by a Notary Public

5      within and for the State of New York, was

6      examined and testified as follows:

7

8  EXAMINATION BY

9  MR. SMITH:

10

11      Q.      Will you state your name and

12  address for the record, please.

13      A.      Catherine Lamstein-Reiss, M.D.,

14  NYPD Psych Evaluation Section, 59-17

15  Junction Boulevard, Corona, New York 11368.

16          MR. SMITH:  We are going on the

17      record, it's 10:22.  We are at Law

18      Department at 100 Church Street about

19      to begin the deposition of Dr.

20      Lamstein.

21          THE WITNESS:  Correct.

22          MR. SMITH:  Before we begin with

23      the witness, Suzanna, as we have done

24      in the past with other witness who are

25      in the employ of the City of New York,

Page 84

1                 C. LAMSTEIN-REISS, M.D.

2        Q.      Isn't that what you do?

3        A.      That's one type of referral that

4    we might get.

5        Q.      Is that the type of referral

6    that you got in the Schoolcraft matter?

7                 MS. PUBLICKER METTHAM:

8        Objection.

9        A.      No.

10       Q.      What type of referral did you

11   get in the Schoolcraft matter?

12       A.      That was a telephone referral

13   from -- I'm sorry, not -- may have been

14   telephone, but either way that was a

15   referral from his district surgeon.  That

16   wasn't like a commanding officer, or duty

17   captain thinking there might be a

18   psychological problem removing the gun

19   pending our evaluation.  This was the

20   district surgeon became aware of

21   psychological issues with the officer and

22   referred to us for an evaluation.

23       Q.      How do you know that the

24   district surgeon didn't become aware of

25   psychological issues as a result of

Page 85

```
 1            C. LAMSTEIN-REISS, M.D.
 2   discussion with a commanding officer in
 3   Schoolcraft's case?
 4            MS. PUBLICKER METTHAM:
 5       Objection.
 6       A.     All I know is that -- all I know
 7   is the information that the officer provided
 8   to the district surgeon.
 9       Q.     What I want know is what
10   knowledge do you have about the sources of
11   information that the district surgeon had
12   available to him when he made the referral
13   to you?
14            MS. PUBLICKER METTHAM:
15       Objection.
16       A.     All I know is the information
17   that the officer provided to him was
18   sufficient for the referral.  I didn't ask
19   him did you speak to anybody else about
20   anything else.  If there's anything else
21   that's relevant, if information comes from a
22   command, the district surgeon simply would
23   tell us that.  That's the reason for the
24   referral.
25       Q.     Did the district surgeon tell
```

Page 86

```
 1                C. LAMSTEIN-REISS, M.D.
 2   you sources of his information that formed
 3   the basis for his referral?
 4                MS. PUBLICKER METTHAM:
 5        Objection.
 6        A.      I don't recall.  The assumption
 7   is it came from the officer.
 8        Q.      Doctor, I'm not here to try and
 9   make assumptions.  Okay.  You're here,
10   you're under oath and if you have a
11   recollection of something, please provide
12   it, but I don't want you guessing, I don't
13   want you making assumptions; is that
14   understood?
15        A.      That's understood.
16        Q.      All right.  So I am going to ask
17   the question again just so it's clear.  Did
18   the district surgeon, in this case Ciuffo,
19   tell you what the sources of information he
20   had which formed the basis for his referral
21   to you?
22                MS. PUBLICKER METTHAM:
23        Objection.
24        A.      I don't recall with certainty.
25        Q.      What do you recall about him
```

Page 87

1              C. LAMSTEIN-REISS, M.D.

2   telling you the source of his information?

3        A.     I don't recall that with

4   certainty.

5        Q.     What do you mean by with

6   certainty?  Do you have any recollection of

7   the conversation with Ciuffo?

8              MS. PUBLICKER METTHAM:

9        Objection.

10       A.     I recall getting his --

11  actually, I would need to refer to the file

12  to see if I have a telephone referral.

13       Q.     So the answer to my question is

14  sitting here today, you do not have a

15  recollection of the actual conversation that

16  you had with Ciuffo about Schoolcraft; is

17  that correct?

18             MS. PUBLICKER METTHAM:

19       Objection.

20       A.     I recall deciding doing

21  administrative matters with the gun removal

22  -- not the gun removal, the administrative

23  matters with his duty status.  I know he

24  provided information to us that the officer

25  had anxiety secondary to stress on the job.

1             C. LAMSTEIN-REISS, M.D.

2    I don't recall with certainty if he said

3    specifically -- if he specifically said

4    where he got that information.  I don't have

5    a recollection of that.

6         Q.    I'm going to try to be more

7    clear.  If I'm asking you what your

8    recollection is about something, I'm not

9    asking you to draw inferences from other

10   information that you have secondary sources

11   about what that conversation was.  What I am

12   asking you is sitting here today, do you

13   have a recollection of a conversation that

14   you had with Ciuffo about Schoolcraft?

15             MS. PUBLICKER METTHAM:

16        Objection.  Asked and answered multiple

17        times.  You may answer again.

18        A.    I recall -- the only thing I

19   recall is the administrative matters.  I

20   don't recall -- I don't directly recall our

21   conversation administrative referral.  That

22   was a number of years ago.  I recall what

23   the information was.  I don't recall him

24   specifically saying where he got that

25   information.  I would need to refer to the

1              C. LAMSTEIN-REISS, M.D.

2    initial referral, which is in the records.

3         Q.      Your file?

4         A.      Correct.

5         Q.      All right, would you mind taking

6    a look at your file and seeing if looking at

7    that file refreshes your recollection about

8    the subject that I am asking you about,

9    which is, whether or not Ciuffo told you the

10   sources of his information which formed the

11   basis for his referral from the medical

12   division to PES?

13             MS. PUBLICKER METTHAM:   I would

14        prefer that you mark the actual

15        production as an exhibit so that we can

16        refer to the Bates Numbers.

17             MR. SMITH:   Yeah, if she could

18        just take a look at her -- I have a

19        full copy of the whole thing.

20        Q.      I just want you to take a look

21   at your originals, see if that refreshes

22   your recollection, that would be helpful.

23             MS. PUBLICKER METTHAM:   If it's

24        -- review that, see if you could find

25        that.   If it's one of the pages that I

1                C. LAMSTEIN-REISS, M.D.

2        removed, you can review those.

3                THE WITNESS:  It shouldn't be.

4                MR. SMITH:  While you're doing

5        that, I am going to mark as Exhibit 68,

6        the next exhibit, which has been Bates

7        Stamped NYC 2893 through 3032.

8                (Plaintiff's Exhibit 68,

9        document, was marked for identification

10       as of this date.)

11       A.      I don't -- I didn't document

12  that so all I had -- I can tell you what my

13  assumptions were about it, why I had that

14  assumption, but I don't have that Dr. Ciuffo

15  specifically where he -- specifically said

16  where he got that information.

17       Q.      What are you looking at?

18       A.      I was looking at my -- the note

19  of my telephone call with him.

20       Q.      What's the date?

21       A.      April 14, 2009.

22       Q.      This is a handwritten note by

23  you?

24       A.      Correct.

25       Q.      Dated April 14th?

1              C. LAMSTEIN-REISS, M.D.

2      A.      Correct.

3      Q.      Can you -- can I take a look at

4   that, please?

5              MS. PUBLICKER METTHAM:   I

6       believe the page she's looking at is

7       NYC -- now the Bates Numbers are cut

8       off on the bottom of this printout you

9       provided, but it appears to be 2997, is

10      what she was referring to.

11             MR. SMITH:   Thank you.

12     A.      About two-thirds down, T/C with

13   Dr. Ciuffo.

14     Q.      Can you read that entry into the

15   record, please.

16     A.      April 14, 2009 telephone contact

17   with Dr. Ciuffo.  Doctor taking MOS off

18   medical sick and restoring medically to full

19   duty.

20     Q.      And then that's your signature?

21     A.      That's my signature, yes.

22     Q.      There's some -- can I just see

23   the original of that, please?

24     A.      Then I also reviewed the written

25   referral he sent to us.

Page 92

1              C. LAMSTEIN-REISS, M.D.

2         Q.       Where is that written referral?

3         A.       The top of says:  Consultation

4    referral medical division.  Consultant's

5    report underneath.  Looks like this.  Should

6    be one of the oldest things in the file.

7              MR. SMITH:  It's Bates Number on

8         our copy is 2914.

9         Q.       Could I see the original to

10   that, please?

11        A.       Sure.

12        Q.       This page with the consultation

13   referral medical division form, that has a

14   reference to conversations you had with

15   Ciuffo?

16        A.       No, it's a written information

17   he provided to PES.

18        Q.       What is the information that he

19   provided to PES?

20        A.       We were asked to do an

21   evaluation, because the officer had acute

22   anxiety secondary distress on the job,

23   please evaluate.

24        Q.       All right, so what you were just

25   reading that's not your handwriting, that's

1              C. LAMSTEIN-REISS, M.D.
2    Ciuffo's handwriting?
3         A.      Dr. Ciuffo, yes.
4         Q.      Dr. Ciuffo.  What does that mean
5    acute anxiety second degree stress on the
6    job?
7         A.      Acute anxiety is -- means it's
8    not a chronic -- yeah, it's not a chronic
9    long term lifelong anxiety.  That he is
10   going through a period of increased anxiety
11   due to stress on the job.
12        Q.      Was this a diagnosis by Ciuffo
13   of the Schoolcraft's mental condition?
14             MS. PUBLICKER METTHAM:
15        Objection.
16        A.      That was Dr. Ciuffo's assessment
17   as it appears in his writings.
18             MR. SMITH:  2914.  You can't
19        read it in the copy.
20             MS. PUBLICKER METTHAM:   I
21        believe it's easier to read in the
22        first copy that was produced in 2010 or
23        2011.
24             MR. SMITH:  Right.
25        Q.      Now that you've looked at those

1              C. LAMSTEIN-REISS, M.D.

2    two entries in your file, does that refresh

3    your recollection at all on the issue of you

4    being told the sources of -- how do you

5    pronounce his name?

6         A.       Ciuffo.

7         Q.       Ciuffo's information about

8    Schoolcraft?

9         A.       Again, I do not recall his

10   specifically stating where he got that

11   information.  He may or may not have.  I

12   didn't document it.  I just had my

13   assumptions.

14        Q.       Right.  And the exercise of

15   trying to refresh a witness' recollection is

16   once they said I'm not sure, I don't really

17   remember, if you show them something

18   sometimes they go ah, now I remember and so

19   I'm asking you, after looking at these

20   entries, do you have any recollection that

21   has been recently refreshed by looking at

22   those entries?

23        A.       I do not.

24        Q.       How many times did you speak

25   with Dr. Ciuffo about Schoolcraft?

Page 95

1              C. LAMSTEIN-REISS, M.D.

2       A.      Once.

3       Q.      And that was on the 14th of

4    April, right, according to your notes?

5       A.      If that's the date on that note

6    that I just referred to then, yes.

7       Q.      It is.

8       A.      Okay, then, yes.

9       Q.      Do you have any recollection of

10   the substance of that conversation, other

11   than what you've already told me?

12      A.      I don't recall.

13      Q.      After you stopped seeing

14   Schoolcraft, did you ever have any

15   conversation with Ciuffo about Schoolcraft?

16      A.      No.

17      Q.      Am I correct that the only time

18   you can recall having any conversation with

19   Ciuffo about Schoolcraft was that one

20   occasion?

21      A.      Correct.

22      Q.      Why don't you take a look at

23   Exhibit 68, which is a photocopy of your

24   file, at least I believe it is a photocopy

25   of your file.

Page 113

C. LAMSTEIN-REISS, M.D.

1
2   necessarily fitness for duty issues.  That
3   for his own sake would be good to discuss
4   with a therapist should he want too.
5           I also recommended he see a
6   psychiatrist for an evaluation 'cause two
7   different doctors had prescribed psychiatric
8   medication to him.  One he finished taking
9   and one he hadn't started and it wasn't
10  clear to me why one of those was prescribed
11  and, I just, as a matter of course always
12  think it's better if someone sees a
13  psychiatrist for psychiatric medication
14  instead of their primary doctor.
15      Q.      Did you tell Schoolcraft that he
16  didn't need medication?
17              MS. PUBLICKER METTHAM:
18      Objection.
19      A.      I told him that after he told me
20  -- not at the first appointment.  I told him
21  that at the second and third appointment
22  when he told me he no longer had no
23  symptoms.
24      Q.      So you did tell him that he
25  didn't medication, right?

Page 149

1              C. LAMSTEIN-REISS, M.D.
2     to know that should stressful -- when
3     stressful things happen with his life again
4     that these symptoms would not reoccur.  We
5     need a significant period of time to know
6     that things really are calm and it's
7     possible.  It's not something that I had
8     discussed with supervisors at that point,
9     but it's possible that we might have been
10    able to return him to full duty without
11    being able to speak to the doctor who
12    prescribed the Seroquel.  Some doctor
13    thought he needed an antipsychotic and it
14    would not be prudent of us to give someone
15    back their gun in position of police
16    authority without knowing why that was.
17         Q.     Well, did you ever find out why
18    some physician prescribed Seroquel?
19         A.     The officer refused to allow me
20    to obtain that information.
21         Q.     Who was it that prescribed
22    Seroquel?
23         A.     Dr. Sure.
24         Q.     How do you know that Dr. Sure
25    prescribed Seroquel?

Page 203

1              C. LAMSTEIN-REISS, M.D.

2         Q.    Okay.  So --

3         A.    -- as well as my treatment

4    recommendations.

5         Q.    He came back into your office

6    after your conversation with Knour and you

7    told him that his guns were being removed?

8         A.    It was a temporary removal

9    pending a more complete discussion and

10   supervision the following day with my direct

11   supervisor, yes.  At this point, it was

12   after hours.  It was after normal business

13   hours.  So I was the only one there.

14        Q.    What time was this?

15        A.    Don't know.

16        Q.    Why were you seeing him after

17   hours?

18              MS. PUBLICKER METTHAM:

19        Objection.

20        A.    Because we always have coverage

21   24/7.  The way it works is every day there

22   is someone who is -- who we call the 10 to 6

23   person, who works 10 to 6 and if the case

24   comes in too late in the afternoon to be

25   seen by someone working a regular tour, but

1              C. LAMSTEIN-REISS, M.D.

2   report that gets sent out.  We have our case

3   records and we have like a fill in the blank

4   form that just says that the gun should be

5   removed.  Not any kind of evaluation, just

6   that the guns were removed and that we're

7   requesting a new ID card and so on.

8        Q.      Okay.  Going back to the

9   typewritten timeline that you've created.

10  The entry -- there's an entry 10/31/09.  You

11  were the psychologist on pager duty.  You

12  see that?

13       A.      I do.

14       Q.      And you got a call from Captain

15  Lauterborn?

16       A.      Yes.

17       Q.      Do you remember getting that

18  call from Captain Lauterborn?

19       A.      More specifically, Captain

20  Lauterborn called the sick desk supervisor,

21  who then called the psychologist on pager

22  duty requesting I respond and in response to

23  that request I called Captain Lauterborn

24  back.  So he didn't call me directly.

25       Q.      Did Captain Lauterborn know that

1            C. LAMSTEIN-REISS, M.D.

2   you were the psychologist that had seen

3   Schoolcraft when he called?

4            MS. PUBLICKER METTHAM:

5       Objection.

6       A.      I don't believe he did.  What

7   happens is they call the sick desk

8   supervisor, who looks up and sees who is on

9   duty and they call whoever is on duty.

10      Q.      So on October 31, 2009, you

11  happened to be on pager duty?

12      A.      Correct.

13      Q.      So Captain Lauterborn called the

14  sick desk and he was looking for somebody

15  from the psychological evaluation services?

16           MS. PUBLICKER METTHAM:

17      Objection.

18      A.      Psychological evaluation

19  section.  Although, the psychological

20  services section, which does pre-employment

21  screening, they also do pager duty.  He was

22  looking for a department psychologist to

23  give him a call to consult about the

24  situation.

25      Q.      Did you tell Captain Lauterborn

Page 319

1              C. LAMSTEIN-REISS, M.D.

2   you had evaluated and met with Schoolcraft?

3        A.     Yes.

4        Q.     And told him that during the

5   conversation that you had with him on

6   October 31st?

7        A.     Yes.

8        Q.     What else did you tell Captain

9   Lauterborn?

10       A.     He was asking me if there was

11  any reason to be concerned about the fact

12  that he went AWOL and that he seemed to be

13  upset and said he had stomach pains and

14  should they be concerned, do they need to go

15  look for him, make sure he's okay.

16  Typically, in that situation they do.  He

17  said he wasn't sure they wanted to suspend

18  him, because they thought this was more of a

19  psychological problem as opposed to a

20  disciplinary one and so he wanted to consult

21  with me.

22              I told him that as of the last

23  time I saw him, which was a few days

24  earlier, I had no reason to think he was a

25  danger to himself or others.  Never

Page 320

1              C. LAMSTEIN-REISS, M.D.

2    expressed thoughts of suicide.  It didn't

3    seem to be anything that serious that would

4    lead me to be concerned.  However, he had

5    also never acted like that before.  He never

6    went AWOL, leaving even though he was told

7    to stay and was now saying he had stomach

8    pains, while being visibly upset.  So I did

9    not know if that meant something new

10   happened that led him to be so upset that he

11   was acting in a different manner going AWOL

12   and that kind of stuff and led to a

13   reoccurrence of stomach pains badly enough

14   that he did that or maybe the stomach pains

15   never went away to begin with and I wasn't

16   sure and that my evaluation is -- even

17   though, I was not saying this person is

18   suicidal, he's had these thoughts, you must

19   -- it was nothing like that.  I had no

20   reason to think he was, except my evaluation

21   was only as good as the last time I saw

22   them.

23            So if something happened since

24   then or they're acting different since then,

25   that may be different.  And so I thought he

Page 321

1               C. LAMSTEIN-REISS, M.D.

2     absolutely did need to find him and make

3     sure that he was okay.

4          Q.        Was your sharing of information

5     about Schoolcraft with Lauterborn a

6     violation of Schoolcraft's privacy?

7               MS. PUBLICKER METTHAM:

8          Objection.

9          A.        No.  This is -- they're not

10    treatment records.  Whenever they come to

11    our office before they -- before I allow

12    them to open their mouth on all, I make sure

13    that they know that the interview is on the

14    record only within the department and only

15    on a need to know basis, so within that it

16    is on the record.

17               So in this case, someone is AWOL

18    and they're upset and they leave and they

19    say their stomach hurts and they're acting

20    in that manner, I deemed there was a need to

21    know, for him to know some basic information

22    about why he was on restricted duty.  Not

23    information like, you know, whether or not

24    his father used -- had any kind of drug

25    problem, whether or not he's had sex in the

Page 325

1        C. LAMSTEIN-REISS, M.D.
2      believe you're 2899 and 282, Mr. Smith?
3          MR. SMITH:  I'm actually
4      referring to 2901, with the ledger and
5      pager.
6          MS. PUBLICKER METTHAM:  It is
7      D282, it is but 2901.
8          Q.    So is there a rather long entry
9   for 10/31 in your file, Doctor?
10         A.    I don't know what you consider
11  rather long, but it's --
12         Q.    Four pages?
13         A.    One, two, three, four and a
14  third, yes.
15         Q.    All right, can you just read
16  that into the record.
17         A.    Sure.  Pager duties regarding
18  P.O. Adrian Schoolcraft, 10/31/09, on left
19  of the page I noted that I was on at 17:40
20  hours.  Page number 455 refers to the sick
21  desk log of my being put on duty.  I noted
22  below that that I was off duty at 21:40
23  hours.  Back to the main text in the body.
24  10/31/09.  Telephone contact with sick desk
25  Sergeant Kloos.

Page 326

1              C. LAMSTEIN-REISS, M.D.

2              MS. PUBLICKER METTHAM:

3         K-l-o-o-s.

4         A.     Yes.  I believe that's the

5    spelling.  It's possible I'm wrong about the

6    spelling.  MOS was at work today.  He

7    slammed sick report on the sergeant's desk

8    and said he was going out sick.  Sergeant

9    told him to stick around.  He refused and

10   left.  Didn't follow procedure.  Typically,

11   they called sick desk and get authorization

12   and wait for command to arrange coverage.

13   MOS was working on the telephone

14   switchboard.  MOS did not go straight home.

15   Cops are at his home waiting for his

16   arrival.  They called MOS on his cell phone.

17   They think he picked up and then hung up.

18   Since then no answer.  They are thinking of

19   suspending him, but they suspect it is more

20   of psych problem.  XO of MOS's command, the

21   81 Precinct, is Captain Lauterborn and

22   requests response from PES and I signed my

23   name.

24        Q.     The is information that you

25   received from Sergeant Kloos from the sick

Page 327

1          C. LAMSTEIN-REISS, M.D.

2     desk?

3          A.     Correct.

4          Q.     All right, please continue.

5          A.     It will be more clear as I'm

6     reading through the notes, but it's possible

7     that the part about possibly not suspending

8     him because they thought it might be more of

9     a psych problem, that may have come

10    secondhand through Sergeant Kloos.  If it

11    came directly, it would be the rest the

12    notes.

13               Telephone contact with Captain

14    Lauterborn.  MOS doing a 7 to 3 day tour

15    today at TS all day, meaning telephone

16    switchboard all day.  All was fine.  He

17    typically keeps to self and doesn't converse

18    much with other officer and did same today.

19    Nothing seemed out of ordinary.  2:00 p.m.,

20    he went down to locker room, changed and

21    then put a sick report on sergeant's desk

22    and said going sick.  He wrote that he had

23    stomach pain.  Sergeant tried to stop him,

24    but he left anyway.  Underlying issues.  MOS

25    has made allegations against others.

Page 328

1              C. LAMSTEIN-REISS, M.D.
2    Department's investigation of these
3    allegations picked up this week and it
4    snowballed from there.  This week about four
5    P.O.'s and two civilian people were called
6    down for questioning.  MOS goes up to them
7    and asked about it.  Notifications are in
8    telephone message log, so he knows who is
9    going.  When they return, he tries to
10   intercept them and get information from them
11   about what he was asked -- about -- it
12   should have been what they were asked.  Or
13   that thought the person was a he.  Anyway,
14   that's what it says what he was asked.
15   Today was first tour back after RDOs.  Not
16   sure what happened today that triggered him
17   to leave like that.
18              Delegates, peers, sergeants and
19   Captain Lauterborn all left him messages and
20   asked him to go back to command.  A
21   lieutenant is at him home.  His car is
22   there.  Landlord said MOS may have been
23   there earlier.  Can usually hear MOS's
24   footsteps when home.  MOS not home.
25              Next entry, I left a message on

Page 329

1              C. LAMSTEIN-REISS, M.D.

2    MOS's cell phone.  I gave my cell number and

3    Captain Lauterborn's cell phone.  I told him

4    that the Captain said he could just return

5    to his home if didn't want to go to the

6    command.  I urged him to go home or call his

7    captain, so this could be resolved quickly

8    and easily without need for a city-wide

9    mobilization to search for him or

10   disciplinary action, like suspension.  Much

11   easier to just resolve it quickly and easily

12   now.  I explained that everyone is just

13   concerned for his safety and they want to

14   make sure everyone is okay.

15              Next entry, telephone contact

16   with Captain Lauterborn.  I informed captain

17   that I left message on MOS's cell phone as

18   described above.  I suggested that captain

19   call MOS's father because that's the person

20   he is closest to and the person who is most

21   likely to know his whereabouts.  Captain

22   will call undersigned when locates or hears

23   from MOS, signed my name.

24              Next entry at 20:15 hours.

25   Telephone contact with Captain Lauterborn.

1              C. LAMSTEIN-REISS, M.D.

2    Still no word from MOS. Captain called MOS's

3    father, who also hadn't heard from him.

4    Father, quote, had some issues, end quote,

5    over the phone -- over phone, but eventually

6    understood captain's point of view and

7    confirmed. Hoping father will call MOS and

8    encourage him to go home. Captain will go

9    to MOS's home. It's possible he's home, but

10   not answering phone. I asked if the

11   landlord has a spare key. He said yes and

12   captain has it, but legal issues with using.

13   Have to have cause. Hoping to avoid going

14   that route.

15        Q.      What were those legal issues?

16        A.      I didn't ask. I don't know.

17               MS. PUBLICKER METTHAM:

18        Objection.

19        Q.      All right, go ahead?

20        A.      And I signed my name. 20:40

21   hours the next entry -- I'm sorry 21:40

22   hours is the next entry. Telephone contact

23   with Sergeant Kloos. Sick desk off duty

24   since not known when MOS might be located

25   and I signed my name.

Page 331

1          C. LAMSTEIN-REISS, M.D.

2               Then next page on the top

3   regarding Adrian Schoolcraft addendum to

4   10/31/09 note of telephone contact with

5   Captain Lauterborn at approximately 17:50

6   hours.  Delayed entry made on 10/14/10.  In

7   reviewing folder, the below information was

8   found to not be documented in prior note,

9   but is clear in undersigned's memory.

10  Captain Lauterborn asked if MOS was suicidal

11  or depressed because he needed to know how

12  concerned they should be about MOS's safety

13  given his going AWOL.  Not answering phone

14  calls, not answering door of home, but his

15  car was there, et cetera.

16        Q.    Can I stop you right there.

17  When did you make this entry?

18        A.    October 14, 2010.

19        Q.    October what?

20        A.    14, 2010.

21        Q.    Can I see the original that

22  you're reading from?

23        A.    Sure.

24        Q.    How do you know that you made

25  this entry on October 24, 2010?