Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case 1:10-cv-06005-RWS
- - - - - - - - - - - - - - - - - -x
ADRIAN SCHOOLCRAFT,
                              Plaintiff,
          -against-
THE CITY OF NEW YORK, DEPUTY CHIEF
MICHAEL MARINO, Tax Id. 873220,
Individually and in his Official
Capacity, ASSISTANT CHIEF Patrol
Borough Brooklyn NORTH GERALD NELSON,
Tax Id. 912370, Individually and in his
official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax Id. 895117,
individually and in his Official
Capacity, CAPTAIN THEODORE LAUTERBORN,
Tax Id. 897840, Individually and in his
Official Capacity, LIEUTENANT WILLIAM
GOUGH, Tax Id. 919124, Individually and
in his Official Capacity, SGT.
FREDERICK SAWYER, Shield No. 2576,
Individually and in his Official
Capacity, SERGEANT KURT DUNCAN, Shield
No. 2483, Individually and in his
Official Capacity, LIEUTENANT
CHRISTOPHER BROSCHART, Tax Id. 915354,
Individually and in his Official
Capacity, LIEUTENANT TIMOTHY CAUGHEY,
Tax Id. 885374, Individually and in his
Official Capacity, SERGEANT SHANTEL
JAMES, Shield No. 3004, Individually
and in her Official Capacity,
LIEUTENANT THOMAS HANLEY, Tax Id.
879761, Individually and in his
Official Capacity,CAPTAIN TIMOTHY
TRAINER, Tax Id. 899922, Individually
and in his Official Capacity,
(Caption continued on following page.)
```

CAPTION:(continued)
SERGEANT SONDRA WILSON, Shield No. 5172, Individually and in her Official Capacity, SERGEANT ROBERT W. O'HARE, Tax Id. 916960, Individually and in his Official Capacity, SERGEANT RICHARD WALE, Shield No. 3099 and P.O.'s "JOE DOE" # 1-50, Individually and in their Official Capacity (the name John Doe being fictitious, as the true names are presently unknown), (collectively referred to as "NYPD defendants"), FDNY LIEUTENANT ELISE HANLON, individually and in her Official Capacity as a lieutenant with the New York City Fire Department, JAMAICA HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV, Individually and in his Official Capacity, DR. LILIAN ALDANA-BERNIER, Individually and in her Official Capacity and JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN DOE" # 1-50, Individually and in their Official Capacity (the name John Doe being fictitious, as the true names are presently unknown),

                                    Defendants.
- - - - - - - - - - - - - - - - - -x
                111 Broadway
                New York, New York
                October 8, 2013
                10:17 a.m.
     DEPOSITION of MICHAEL MARINO, held at the above time and place, taken before Al-Furquan Baker, a Shorthand Reporter and Notary Public of the State of New York, pursuant to the Federal Rules of Civil Procedure, Order and stipulations between Counsel.

```
 1
 2    APPEARANCES:
 3
 4        LAW OFFICES OF NATHANIEL B. SMITH
          Attorneys for Plaintiff
 5            111 Broadway
              New York, New York  10006
 6
          BY:  NATHANIEL B. SMITH, ESQ.
 7
 8
 9
          NYC LAW DEPARTMENT
10        CORPORATION COUNSEL
          Attorneys for Chief Michael Marino
11        and All City Defendants
              100 Church Street
12            New York, New York  10007
13        BY:  SUZANNA PUBLICKER METTHAM, ESQ.
14
15
16        CALLAN KOSTER BRADY & BRENNAN, LLP
          Attorneys for Defendant Lilian
17        Aldana-Bernier
              One Whitehall Street
18            New York, New York  10004
19        BY:  MEREDITH B. BORG, ESQ.
20
21    (Continued on following page.)
22
23
24
25
```

1
2    APPEARANCES: (Continued)
3
        SCOPPETTA SEIFF KRETZ & ABERCROMBIE
4       Attorneys for Steven Mauriello
            444 Madison Avenue
5           New York, New York  10022
6    BY:  WALTER A. KRETZ, ESQ.
7
8
9       MARTIN CLEARWATER & BELL
        Attorneys for Jamaica Hospital
10      Medical Center
            220 East 42nd Street
11          New York, New York 10017
12   BY:  BRIAN OSTERMAN, ESQ.
13
14
15      IVONE DEVINE & JENSEN, LLP
        Attorneys for Dr. Isak Isakov
16          2001 Marcus Avenue
            Lake Success, New York  11042
17
     BY:  BRIAN E. LEE, ESQ.
18
19
20   A L S O    P R E S E N T:
21
        MAGDALENA BAUZA
22      JOHN LENIR
23
24
25

1
2        STIPULATIONS
3
4     IT IS HEREBY STIPULATED AND AGREED,
5  by and among counsel for the respective
6  parties hereto, that the filing,
7  sealing and certification of the within
8  deposition shall be and the same are
9  hereby waived;
10       IT IS FURTHER STIPULATED AND AGREED
11  that all objections, except as to form
12  of the question, shall be reserved to
13  the time of the trial;
14       IT IS FURTHER STIPULATED AND AGREED
15  that the within deposition may be
16  signed before any Notary Public with
17  the same force and effect as if signed
18  and sworn to before the Court.
19
20
21              *     *     *
22
23
24
25

1      M. Marino
2      MR. SMITH:  Okay.
3          So we're on the record.  It's
4      10:20.
5          We're beginning the
6      deposition of Chief Michael Marino.
7      It's being videotaped, and the
8      court reporter is taking down the
9      testimony.  And it's being
10     videotaped at 111 Broadway, Suite
11     Number 1305, October 8, 2013.
12  M I C H A E L     M A R I N O,
13     the Witness herein, having first
14     been duly sworn by the Notary
15     Public, was examined and testified
16     as follows:
17  EXAMINATION BY
18  MR. SMITH:
19     Q.    Good morning, chief.
20           How are you?
21     A.    Good morning, counselor.
22           I'm fine.
23     Q.    I know from reviewing some of
24  the documents that you have some
25  familiarity with this process.

Page 228

M. Marino

1
2   A.   A situation.
3   Q.   They used the term "caper"?
4   A.   No.
5   Q.   What, to the best of your
6   recollection, did they say?
7   A.   A bag of shit.
8   Q.   And what's that a reference
9   to?
10          MS. PUBLICKER METTHAM:
11      Objection.
12          You can answer.
13  A.   Just what it sounds like.  A
14  situation, an unpleasant situation.
15  Q.   Did they tell you anything
16  else about their situation?
17  A.   Oh, yes.
18  Q.   Would you mind sharing that
19  with us?
20  A.   Sure.
21       They told me that a police
22  officer left at around 14:00, which
23  would be 2:00 p.m.  He was ordered not
24  to go, and he left.  They told me that
25  the officer was acting irrationally,

1          M. Marino
2  that he had had psychiatric evaluations
3  in the past and that he had been
4  answering his cellphone and that he
5  stopped.  And they believed that the
6  officer was, already had or was going
7  to hurt himself.
8      Q.    Do you remember who told you
9  this?
10     A.    I can't say.  I believe it
11 was Captain Lauterborn, but I really
12 can't say.
13     Q.    Did they say anything else to
14 you?
15     A.    Yes.
16     Q.    What else did they say?
17     A.    They told me that their plan
18 was to go to his house and get the key
19 from the landlord and let themselves in
20 and see if he was in the apartment.
21     Q.    Did they tell you anything
22 else?
23     A.    No.
24     Q.    Did you say anything in
25 response?

Page 230

1                     M. Marino
2     A.     Yes.
3     Q.     What did you say?
4     A.     I asked him who they notified
5 so far because it had been a couple of
6 hours since this disappearance of the
7 officer.
8           And then I instructed them
9 that they were to notify operations and
10 get his plate number out and notify the
11 Emergency Service unit.
12           And that under no
13 circumstances were they to let
14 themselves into that house alone like
15 that, and that they could respond to
16 his house with emergency service
17 following the proper procedures.
18           And if he answered the door,
19 see if he needs medical help. If he
20 doesn't answer the door, under no
21 circumstances were they to go in until
22 my arrival.
23     Q.     Why did you tell them that
24 they were not to go into his house?
25     A.     You have a police officer who

```
 1                    M. Marino
 2   you think is going to hurt himself and
 3   he's at that level of anxiety, if you
 4   just can go into the house like that,
 5   you may push his hand where he may hurt
 6   himself or try to hurt you or you would
 7   have to hurt him.
 8             It's a dangerous situation.
 9   It's got to be handled properly.
10             The whole idea is to prevent
11   him from hurting himself, not to
12   aggravate it.
13        Q.   Did you tell them anything
14   else?
15        A.   I don't think that I said
16   much more than that at that time, no.
17        Q.   Were these orders that you
18   were giving them?
19        A.   Yes, they were.
20        Q.   Do you know whether or not
21   they made any notes of these orders in
22   their memo books or anywhere else?
23             MS. PUBLICKER METTHAM:
24        Objection.
25             You can answer.
```

1           M. Marino
2      A.     I don't remember any.
3      Q.     All right.
4              When you got to the landing
5  on the second floor, what discussions
6  do you recall?
7      A.     I was informed that there
8  were two officers in the backyard and
9  one lieutenant, as I said, in the
10 front.  They had been there for a
11 while.  And they were all soaked from
12 the rain.  Emergency Services had been
13 attempting to establish some kind of
14 contact with no result.
15             And at one point it was
16 related to me that the landlord firmly
17 believed that Schoolcraft was still
18 inside because he had heard him moving
19 around, but hadn't heard any movement
20 for an hour.
21             But he couldn't have left
22 because there are police officers
23 surrounding the premise and in the
24 hallway.
25     Q.     Who provided this information

M. Marino

```
 1                  M. Marino
 2   they had spoken to Adrian Schoolcraft's
 3   father before you entered into this
 4   course of action?
 5       A.    I don't remember that, no.
 6       Q.    Did Captain Lauterborn at any
 7   time ever tell you that he had
 8   conversations with Larry Schoolcraft
 9   before you entered into this course of
10   action to enter Adrian's apartment?
11       A.    No, nobody told me that.
12       Q.    What time of the day was it
13   when you entered into this course of
14   action?
15       A.    I couldn't say.
16       Q.    It was dark outside?
17       A.    I believe that it was.
18       Q.    After having this
19   conversation with the officers on the
20   landing, what happened next?
21       A.    The Emergency Service
22   officers opened the door as I asked
23   them to.  And you can see inside to the
24   left (indicating).  It was a door open
25   inwards from left to right
```