Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
ADRIAN SCHOOLCRAFT,

               Plaintiff,

                            Case No:
  - against -             10 CV 06005

THE CITY OF NEW YORK, ET AL.,

             Defendants.
------------------------------------------X

          111 Broadway
          New York, New York

          May 15, 2014
          10:28 a.m.


DEPOSITION OF SALVATORE SANGENITI, pursuant to Notice, taken at the above place, date and time, before DENISE ZIVKU, a Notary Public within and for the State of New York.

VERITEXT REPORTING COMPANY
212-267-6868    www.veritext.com    516-608-2400

```
 1      A P P E A R A N C E S:
 2
 3      NATHANIEL B. SMITH, ESQ.
             Attorneys for Plaintiff
 4           111 Broadway
             New York, New York 10006
 5
 6
        JOHN LENOIR, ESQ.
 7      Attorneys for Plaintiff
             829 Third Street NE
 8           Washington, D.C. 20002
 9
10      NEW YORK CITY LAW DEPARTMENT
        OFFICE OF CORPORATION COUNSEL
11      Attorneys for Defendant
        THE CITY OF NEW YORK
12           100 Church Street
             New York, New York 10007
13      BY:  SUZANNA PUBLICKER METTHAM, ESQ.
14
15      SCOPPETTA SEIFF KRETZ & ABERCROMBIE
        Attorneys for Defendant
16      STEVEN MAURIELLO
             444 Madison Avenue
17           New York, New York 10022
        BY:  WALTER A. KRETZ, JR., ESQ.
18
19
        IVONE, DEVINE & JENSEN, LLP
20      Attorneys for Defendant
        DR. ISAK ISAKOV
21           2001 Marcus Avenue
             Lake Success, New York 11042
22      BY:  BRIAN LEE, ESQ.
23
                    (Continued.)
24
25
```

1

(Continued.)

2

3    CALLAN, KOSTER, BRADY & BRENNAN, LLP
      Attorneys for Defendant

4    DR. LILIAN ALDANA-BERNIER
        One Whitehall Street

5         New York, New York 10004
   BY:  STEFANI MILLER, ESQ.

6

7

   MARTIN CLEARWATER & BELL, LLP

8    Attorneys for Defendant
   JAMAICA HOSPITAL MEDICAL CENTER

9         220 East 42nd Street
        New York, New York 10017

10   BY:  GREGORY J. RADOMISLI, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1  S T I P U L A T I O N S:
2         IT IS HEREBY STIPULATED AND AGREED by
3  and between the attorneys for the respective
4  parties hereto, that this examination may be
5  sworn to before any Notary Public.
6
7         IT IS FURTHER STIPULATED AND AGREED
8  that the filing and certification of the said
9  examination shall be waived.
10
11        IT IS FURTHER STIPULATED AND AGREED
12 that all objections to questions, except as to
13 the form of the question, shall be reserved
14 for the time of trial.
15
16
17
18
19
20
21
22
23
24
25

1
2          Q.      This is the videotaped
3   deposition of Sal Sangeniti.
4          A.      Yes.
5                  MR. SMITH:  And we are at the my
6   office at 111 Broadway.  It's May 15,
7   2014.
8                  MR. RADOMISLI:  I just want to
9   state pursuant to the Federal Rules, we
10  reserve the right to review and correct
11  the deposition transcript and also,
12  it's a videotaped deposition.  The
13  deposition just happens to be you're
14  videotaping it.
15                 MR. SMITH:  Right.  Understood.
16  I am videotaping the deposition and the
17  court reporter is here taking the
18  deposition.
19                 Would you mind swearing in the
20  witness.
21  S A L V A T O R E     S A N G E N I T I, a
22  Witness herein, having been first duly sworn
23  by a Notary Public within and for the State
24  of New York, was examined and testified as
25  follows:

```
                                              Page 19
 1                    S. SANGENITI
 2        Q.     What is emergency management?
 3        A.     Overseeing it would take like
 4   mass casualty incidents and break it down
 5   and give you what you needed to do while at
 6   the scene of these assignments.
 7        Q.     When did you graduate high
 8   school?
 9        A.     1978.
10               MR. RADOMISLI:  -- didn't
11        graduate high school.
12        A.     Oh, I'm sorry, I didn't graduate
13   high school.
14        Q.     Oh, I'm sorry.  Okay.  What was
15   your -- after you finished your course of
16   studying as a young person, what was your
17   first form of employment?
18        A.     Health and Hospitals
19   Corporation.
20        Q.     Is it fair to say your first
21   gainful work was an EMT?
22        A.     As -- yeah.
23        Q.     Yes?
24        A.     Yes.
25        Q.     What kind of training did you
```

Page 20

S. SANGENITI

1
2  have in order to get that position?
3      A.     You needed to attend an
4  emergency medical technician course.
5      Q.     And you did?
6      A.     I did.  1980.
7      Q.     You passed that course in 1980?
8      A.     Yes.
9      Q.     And what did you do from 1980 to
10 1984?
11     A.     Probably numerous jobs.
12     Q.     As an EMT or other things?
13     A.     Other things.
14     Q.     Can you tell me what those other
15 jobs were?
16     A.     I worked in a bakery, I worked
17 for a security company at Kennedy Airport.
18 That's probably what I --
19     Q.     Were you a security guard at
20 Kennedy?
21     A.     We did the screening for to get
22 onto the plane.  That was prior to TSA.
23     Q.     And then in 1984 you started
24 actively working as an EMT?
25     A.     Yes.

Page 45

1                    S. SANGENITI
2    were police vehicles, patrol cars, ESU
3    trucks.
4         Q.    What are Jimmys?
5         A.    Blazers, I'm sorry.
6         Q.    Is that a four-wheel upright
7    vehicle?
8         A.    I think so, yes.
9         Q.    What kinds of trucks, other than
10   the ESU trucks were at the scene?
11        A.    Just the patrol cars.
12        Q.    How many ESU vehicles were at
13   the scene?
14        A.    I think just one.
15        Q.    Did you see any ESU personnel at
16   the scene?
17        A.    I saw one ESU officer.
18        Q.    How was that one ESU officer
19   attired?
20        A.    In uniform.
21        Q.    Did you see civilians on the
22   street?
23        A.    No.
24        Q.    What time of the day or evening
25   was it when you got there?

Page 46

1         S. SANGENITI
2         MR. RADOMISLI:  You could look
3    at records.
4         Q.    Yeah, if you want to look at the
5    PCR.
6         A.    9:06.  So 9:00.
7         Q.    About 9:00 you got to the scene?
8         A.    Correct.
9         Q.    When you got to the scene, you
10   really had no information about what kind of
11   circumstances or situation you were
12   responding to, right?
13        A.    Correct.  It was an unknown
14   condition.  That's what came over the
15   terminal.
16        Q.    Is that common to get an
17   unknown?
18        A.    Oh, sure.  It's whatever is
19   conveyed to the 911 operator.
20        Q.    When you got to the scene where
21   did you park?
22        A.    By the corner of Myrtle Avenue
23   and 88 Place.
24        Q.    How long was the drive from
25   where you were at when you got the

Page 93

S. SANGENITI

2  retake it?
3     A.    Oh, sure.
4     Q.    It happens frequently?
5           MR. RADOMISLI:  Objection.
6     A.    It happens.
7     Q.    Does it happen that the reason
8  why the numbers seem different is because
9  you had a hard time hearing?
10    A.    No.
11    Q.    No. Then why is it important
12 that the room be quiet?
13    A.    It assists you in evaluating the
14 condition.
15    Q.    So if a radio was blaring in the
16 background while you're taking blood
17 pressure, that would interfere with your
18 ability to hear or take a blood pressure
19 reading, right?
20          MR. RADOMISLI:  Objection.
21    A.    Yes.
22    Q.    What blood pressure reading did
23 you get from Officer Schoolcraft?
24    A.    Like 160 over 120.
25    Q.    The record should reflect that

Page 94

1            S. SANGENITI
2   you're looking at the second page of the PCR
3   and you're looking at assessment for the
4   first of the initial assessment; is that
5   right?
6        A.    Correct.
7        Q.    You don't, sitting here today,
8   remember getting that reading, you're just
9   relying on the PCR, right?
10       A.    Correct.
11       Q.    Other than getting the top and
12  bottom number, what else did you do when you
13  were taking Schoolcraft's vitals?
14       A.    His pulse, taking his pulse, his
15  respiration, listening to his lungs.
16       Q.    Did you listen to his lungs?
17       A.    I did.
18       Q.    Did you take his pulse?
19       A.    I did.
20       Q.    Are these readings here, 120 for
21  pulse and 20 for respiration, the readings
22  that you got?
23       A.    Yes.
24       Q.    Did you make those entries on
25  this chart?

1              S. SANGENITI
2    document is all Marquez?
3        A.    Correct.
4        Q.    None of it's yours?
5        A.    Correct.
6        Q.    What does the blood pressure
7    reading of 160 over 120 mean to you?
8        A.    Person's in hypertensive -- not
9    really hypertensive crisis.
10       Q.    What does that mean?
11       A.    It's -- normal blood pressure is
12   approximately 110 over 70, 120 over 80, 160
13   over 120 is a little high.
14       Q.    Is that an emergency situation?
15       A.    We were there so, yeah, sure.
16       Q.    No, I didn't ask you about that.
17       A.    Is that condition, yes.
18       Q.    So 160 over 120 is an emergency
19   situation?
20       A.    Yes.
21       Q.    Does, in your experience, a
22   blood pressure reading like that require you
23   immediately take the person to the hospital?
24       A.    After evaluation, yes.
25       Q.    Did you take Schoolcraft to the

Page 159

1        S. SANGENITI
2   A.   No.
3   Q.   Did you tell anybody at the
4  scene that Officer Schoolcraft had to go to
5  the hospital against his will?
6   A.   No.
7   Q.   Other than the suggestions that
8  you made to the Schoolcraft that he ought to
9  go to the hospital, as indicated on the tape
10 recording you just listened to, did you tell
11 anybody else at the scene that Officer
12 Schoolcraft had to go to the hospital?
13          MR. RADOMISLI: Objection to
14      form.
15  A.   Lieutenant Hanlon was the only
16 individual.
17  Q.   You told her that he had to go
18 to the hospital?
19          MR. RADOMISLI: Objection to
20      form.
21  A.   Yes.
22  Q.   When did you tell her that?
23  A.   While I was -- after evaluating
24 him for his blood pressure.
25  Q.   Did you hear yourself saying