# ORIGINAL

1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -----------------------------------------X
      ADRIAN SCHOOLCRAFT,
 3                                    PLAINTIFF,

 4               -against-      Case No.:
                                10 CV 6005
 5
      THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
 6    MARINO, Tax ID. 873220, Individually and
      in his Official Capacity, ASSISTANT CHIEF
 7    PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
      Tax Id. 912370, Individually and
 8    in his Official Capacity, DEPUTY INSPECTOR
      STEVEN MAURIELLO, Tax Id. 895117, Individually
 9    and in his Official Capacity, CAPTAIN THEODORE
      LAUTERBORN, Tax Id. 897840, Individually and
10    in his Official Capacity, LIEUTENANT WILLIAM
      GOUGH, Tax Id. 919124, Individually and
11    in his Official Capacity, SGT. FREDERICK SAWYER,
      Shield No. 2567, Individually and
12    in his Official Capacity, SERGEANT KURT DUNCAN,
      Shield No. 2483, Individually and
13    in his Official Capacity, LIEUTENANT CHRISTOPHER
      BROSCHART, Tax Id. 915354, Individually and
14    in his Official Capacity, LIEUTENANT TIMOTHY
      CAUGHEY, Tax Id. 885374, Individually and
15    in his Official Capacity, SERGEANT SHANTEL JAMES,
      Shield No. 3004, Individually and
16    in his Official Capacity, and P.O.'s "JOHN DOE"
      #1-50, Individually and in their Official Capacity,
17    (the name John Doe being fictitious, as the true
      names are presently unknown)(collectively
18    referred to as "NYPD Defendants"), JAMAICA
      HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
19    Individually and in his Official Capacity,
      DR. LILLIAN ALDANA-BERNIER, Individually and
20    in her Official Capacity, and JAMAICA HOSPITAL
      MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
21    Individually and in their Official Capacity,
      (the name John Doe being fictitious, as the
22    true names are presently unknown),

23                                    DEFENDANT.
      -----------------------------------------X
24

25    (Continued... )
```

2

1                          DATE: SEPTEMBER 26, 2013

2                          TIME: 10:10 A.M

3

4              VIDEO DEPOSITION of the Plaintiff, ADRIAN

5     SCHOOLCRAFT, taken by the respective parties, pursuant to a

6     Court Order and to the Federal Rules of Civil Procedure,

7     held at the offices of Scoppetta, Seiff, Kretz &

8     Abercrombie, Esqs, 444 Madison Avenue, New York New York,

9     10022 before Elizabeth Forero, a Notary Public of the State

10    of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2    LAW OFFICE OF NATHANIEL B. SMITH
              Attorneys for the Plaintiff
 3            ADRIAN SCHOOLCRAFT
              111 Broadway
 4            New York, New York 10006
              BY: NATHANIEL B. SMITH, ESQ.
 5                    -AND-
              JOHN LENIOR, ESQ.

 6
      MICHAEL CARDOZO, ESQ.
 7            CORPORATION COUNSEL
              NEW YORK CITY LAW DEPARTMENT
 8            Attorneys for Defendants
              THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
 9            MARINO, Tax ID. 873220, Individually and
              in his Official Capacity, ASSISTANT CHIEF
10            PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
              Tax Id. 912370, Individually and
11            in his Official Capacity, DEPUTY INSPECTOR
              STEVEN MAURIELLO, Tax Id. 895117, Individually
12            and in his Official Capacity, CAPTAIN THEODORE
              LAUTERBORN, Tax Id. 897840, Individually and
13            in his Official Capacity, LIEUTENANT WILLIAM
              GOUGH, Tax Id. 919124, Individually and
14            in his Official Capacity, SGT. FREDERICK SAWYER,
              Shield No. 2567, Individually and
15            in his Official Capacity, SERGEANT KURT DUNCAN,
              Shield No. 2483, Individually and
16            in his Official Capacity, LIEUTENANT CHRISTOPHER
              BROSCHART, Tax Id. 915354, Individually and
17            in his Official Capacity, LIEUTENANT TIMOTHY
              CAUGHEY, Tax Id. 885374, Individually and
18            in his Official Capacity, SERGEANT SHANTEL JAMES,
              Shield No. 3004, Individually and
19            in his Official Capacity, and P.O.'s "JOHN DOE"
              #1-50, Individually and in their Official Capacity,
20            (the name John Doe being fictitious, as the true
              names are presently unknown)(collectively
21            referred to as "NYPD Defendants")
              100 Church Street
22            New York, New York 10007
              BY: SUZANNA METTHAM, ESQ.
23                    -AND-
              RYAN SHAFFER, ESQ.
24            File #: 2010-033074
              Control #: SSS08994
25    (Continued...)
```

4

```
1    A P P E A R A N C E S

2    MARTIN, CLEARWATER & BELL, LLP
             Attorneys for the Defendant
3            JAMAICA HOSPITAL MEDICAL CENTER
             220 East 42nd Street
4            New York, New York 10017
             BY: GREGORY JOHN RADOMISLI, ESQ.
5            File #: 667-82153

6

7    IVONE, DEVINE & JENSEN, LLP
             Attorneys for the Defendant
8            DR. ISAK ISAKOV
             2001 Marcus Avenue
9            Lake Success, New York 11042
             BY: BRIAN E. LEE, ESQ.
10

11   CALLAN, KOSTER, BRADY & BRENNAN, LLP
             Attorneys for the Defendant
12           LILLIAN ALDANA-BERNIER
             One Whitehall Street
13           New York, New York 10004
             BY: BRUCE BRADY, ESQ.
14           File #: 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-33S

15   SCOPPETTA, SEIFF, KRETZ & ABERCROMBIE, ESQS.
             Attorneys for the Defendant
16           DEPUTY INSPECTOR STEVEN MAURIELLO
             444 Madison Avenue
17           New York, New York 10022
             BY: WALTER ALLOYSIUS KRETZ, JR., ESQ.
18           File #: 2010-033074

19

     ALSO PRESENT: PETER BENIMOFF, VIDEOGRAPHER
20                  MAGDALENA BAUBA

21                   *           *           *

22

23

24

25
```

A. SCHOOLCRAFT

1      A.      I don't believe so, no.

2      Q.      Did you ever tell anyone else you were recording

3    on the job other than your father and Durk?

4      A.      No.

5      Q.      Did anyone else in the 81st Precinct indicate to

6    you they were recording on the job?

7      A.      No, I don't believe so.

8      Q.      Do you know whether or not anyone else recorded

9    on the job as well at the 81?

10     A.      Not that I am aware of.

11     Q.      Did anyone ever say to you they thought you were

12   recording on the job?

13     A.      In the February 2009 meeting, I believe it was

14   Sergeant Weiss that asked me if I was recording.

15     Q.      What did you tell him?

16     A.      I said -- I don't know if I responded, but I

17   probably said, no.

18     Q.      You said no I just have my radio.

19     A.      I had my radio off.  At that time officers were,

20   if they were being berated by their supervisors, they would

21   click their radio button and that's how they would record

22   that instance.  So that is how I played off that question,

23   but I may have said no.

24     Q.      So up until October 31st, 2009, or November 1st,

25   2009, no one in the 81st Precinct as far as you know was

A. SCHOOLCRAFT

1    aware you were recording on the job?

2        A.    Correct, as far as I know.

3        Q.    So once the recordings were on the computer,

4    sorry, do you still have the computer you had back in 2009?

5        A.    No.

6        Q.    How did you -- did you preserve the recordings

7    you downloaded to your computer when you stopped using it?

8        A.    I believe my attorneys already had those

9    recordings.

10       Q.    Did you give them your computer or did you

11   download your recordings and give the recordings to your

12   attorney?

13       A.    I believe they received them on a disc or a

14   couple of discs.

15       Q.    Did you do that?

16       A.    I believe so, yes.

17       Q.    At the time you intended to transfer to those

18   discs every recording you had made that still existed?

19       A.    Correct.

20       Q.    Have you read to the Raymond book?

21       A.    The Raymond book?

22       Q.    Graham Raymond.

23       A.    No, I haven't read it.

24       Q.    In there he described the practice you followed

25   as far as recording on the job.  I guess he indicates you

A. SCHOOLCRAFT

1    recorded whole tours, every day and went home and

2    downloaded the recordings at the end of the day and that

3    was the routine.  Did you ever tell him that?

4                MR. SMITH:  Objection to form.  You can

5                answer.

6        A.      No.

7        Q.      Do you know whether somebody else told him that?

8                MR. SMITH:  Objection.

9        A.      I don't if anybody else told him that.

10       Q.      Have you ever spoken with Raymond?

11       A.      I have spoken with Raymond.

12       Q.      How many times?

13       A.      Well, it has been years since I have spoken to

14   him.  At least a couple of dozen times.

15       Q.      When is the last time you spoke with him?

16       A.      I believe it was 2012 in that period.

17       Q.      Why have you not spoken to him since?

18       A.      I haven't -- I don't know -- well, I believe that

19   is around the time that I was being accused of giving him

20   information.  And there was no -- basically I had

21   attorneys -- I had -- that wasn't the only reason I went to

22   the media, but I guess -- I can't say what my attorneys

23   have told me -- but it was better to -- since it was going

24   to be in trial that's when it will be public.

25       Q.      When was the first time you spoke to Raymond?

133

A. SCHOOLCRAFT

1      A.      Early 2010.

2      Q.      How did that come about?

3      A.      I don't recall.  I probably e-mailed him

4      underneath an article.

5      Q.      You think you reached out to him?

6      A.      I believe so.

7      Q.      Thereafter, did you ever meet with him?

8      A.      I met him a few times.

9      Q.      A few, literally three times?

10             MR. SMITH:  He said a few.

11             MR. KRETZ:  A few is three.

12     A.      At least three.

13     Q.      Did you provide any documents or information to

14     him?

15     A.      I don't recall what I gave him.  In the

16     beginning, I think it was just information.

17     Q.      Just conversation?

18     A.      I don't recall giving him documents or him

19     showing interest in documents.

20     Q.      You just spoke with him in the beginning?

21     A.      To the best of my memory, yes.

22     Q.      Did you ever communicate with him by e-mail?

23     A.      Yes.

24     Q.      Did you ever provide any attachments to e-mails

25     for him?

150

A. SCHOOLCRAFT

1    Q.    Did that correspond to the use of this laptop or

2    were you using it at the library as well?

3    A.    I was using it at the library.

4    Q.    And you continue to use now it on the laptop?

5    A.    Yes.

6    Q.    Do you use if for all your e-mail or just your

7    e-mail for your attorneys?

8    A.    I only have one e-mail for all e-mails.

9    Q.    I just want to check.  In the transcript from

10   your first deposition session you indicated that your

11   e-mail address at that time from October 2012 was

12   Schoolcraft@Gmail.com.

13   A.    SchoolcraftAP@Gmail.com that would have been a

14   mistake, if I did say that.  But, no, actually I believe

15   that when I reviewed that all the letters were spelled out.

16   I could be wrong.  I believe it was S-C-H and -- if it is

17   not in there it is a mistake. It's not in there.

18   Schoolcraft, S-C-H-O-O-L-C-R-A-F-T, A as in Adam or Adrian,

19   P as in Paris at Gmail dot com.

20   Q.    Getting back to Mr. Raymond, when did you first

21   communicate with him, sometime in 2010?

22   A.    I believe it would be early 2010.

23   Q.    When is the last time you communicated with him?

24   A.    2012, summer 2012.

25   Q.    Was it your custom to printout e-mail that you

A. SCHOOLCRAFT

```
 1          twenty minutes left.  That's it.
 2               MR. SMITH:  You are prepared to start right
 3          now.
 4               MR. KRETZ:  I have twenty minutes or ten
 5          minutes or whatever.
 6               MR. SMITH:  Make up your mind.  We have
 7          already waisted a half an hour of your time as
 8          far as I am concerned.
 9     BY MR. KRETZ:
10       Q.    Mr. Schoolcraft, do you believe the events of
11     October 31st, 2009, at your at apartment and thereafter,
12     were the acts of retaliation by members of the NYPD?
13       A.    Yes.
14       Q.    Who do you think was retaliating against you?
15       A.    Inspect Mauriello and his administration.
16       Q.    Who in his administration do you think was
17     retaliating against you as opposed to doing whatever it was
18     they were assigned to do on that evening?  Who in
19     particular was retaliating against you?
20       A.    Inspector Mauriello was there.  Captain
21     Lauterborn was there.
22       Q.    Who do you think was retaliating against you that
23     night?
24               MR. SMITH:  He is answering the question.
25       A.    That would be the supervisors from the 81st
```

A. SCHOOLCRAFT

1    Precinct coming over to Glendale, Queens into that

2    precinct, that would be like you stated not performing

3    their duties where they are supposed to be.  And they were

4    at my home.

5        Q.    So any supervisor from the 81 that came to your

6    home you think was retaliating against you?

7        A.    Correct.

8        Q.    That is Mauriello, Lauterborn, who else?

9        A.    Marino, Chief Marino was there.

10       Q.    He is not from the 81?

11       A.    He was from Brooklyn North.  He was out of his

12   borough.

13       Q.    He was the highest ranking officer there?

14       A.    I don't believe so, no.

15       Q.    Who else was there that was higher ranking than

16   him?

17       A.    I guess uniformed, yes.

18       Q.    Was there anybody in a non uniform that was

19   higher ranking?

20       A.    I believe the deputy commissioner of public

21   information is, I am not sure how that works, but I believe

22   he is a civilian.

23       Q.    You believe he was there?

24       A.    Well, I saw him there.

25       Q.    Anyone else?  Was that person Paul Brown?

188

A. SCHOOLCRAFT

1     A.     Correct.

2     Q.     Was he retaliating against you?

3     A.     I would consider that retaliation.  I don't know

4     why he was there.

5     Q.     Why would he have been retaliating against you?

6     What would he have wanted to retaliate against you for?

7     A.     I am only theorizing he was there because of what

8     I was reporting.

9     Q.     Do you have any evidence to support he knew what

10    you were reporting an?

11                   MR. SMITH:  Objection to form.

12    Q.     He went there because he learned of that?

13    A.     Not at this time, no.

14    Q.     How about Marino, was he retaliating against you?

15    A.     Yes.

16    Q.     Why was he retaliating against you?

17    A.     Maybe retaliation, I mean he was there assisting,

18    yes, fine it is retaliation.

19    Q.     Who else, next Mauriello, why do you think he

20    would be retaliating against you?

21    A.     Because I reported him to QUAD.

22    Q.     Do you have any evidence indicating to you that

23    he knew you reported him to QUAD or complained about him to

24    QUAD?

25    A.     It is my understanding that we do have documents,

A. SCHOOLCRAFT

1    an IAB interview or something.

2        Q.    I am asking what indicated that to you.  What is

3    it you are talking about that you know?

4        A.    That I know now?

5        Q.    If you know it now or then, whenever you knew it,

6    what indicated to you Mauriello was retaliating against you

7    because you reported him to QUAD?

8        A.    Well, was that one question?

9        Q.    Let me start over.

10       A.    The second part I can answer.

11       Q.    Do you have any indication that Mauriello knew

12   you complained about him to QUAD?

13       A.    I believe we do.

14       Q.    I am asking you.  What do you know?

15            MR. SMITH:   Independent of any discussions

16            you may have had with your attorneys which I

17            asked you to exclude from the answer.

18       A.    Other than that, I don't know.

19       Q.    When did you first suspect he knew you had

20   complained about him to QUAD?

21       A.    It would been definitely October 31st, 2009.

22       Q.    You suspect that because he was there?

23       A.    Well, their behavior.

24       Q.    What did Mauriello do that night to indicate to

25   you he was aware you had complained to QUAD?

A. SCHOOLCRAFT

1     A.     I believe he caused it.

2     Q.     Caused what?

3     A.     Caused the hoopla, all the officers.  He blocked

4    off my street with his company car, his Blazer, he had at

5    the time.

6     Q.     Anything else?

7     A.     Not that I recall right now.

8     Q.     How did you he act towards you?

9     A.     He was there in my home and like you're coming

10   with me, come on get up and go, something to that effect.

11    Q.     Then what did you do?

12    A.     Then I don't know.

13    Q.     Anything else you can point to that indicated to

14   you that he knew you had complained about him to QUAD?

15    A.     Right now I don't remember anything else.

16    Q.     Term Mauriello Special is that an expression you

17   used or did others use it as well?

18    A.     I believe, if I didn't use it, I was familiar

19   with it.  We were aware of it.  It was brought up in roll

20   calls.

21    Q.     Did it indicate any kind of impropriety as far as

22   you were concerned?

23    A.     I believe so.

24    Q.     What was the impropriety?

25    A.     A Mauriello Special was another term for a bag of

A. SCHOOLCRAFT

1    Q.    Well, who might you give a recording device to?

2           MR. SMITH:  Objection to form.

3    A.    No one other than my father.

4    Q.    Other than your father you can't think of anyone

5    to whom you might have gifted this recording device?

6    A.    Correct.

7    Q.    Or sold?

8    A.    Correct.

9    Q.    Now, in your Second Amended Complaint are you

10   aware you added claims relating to NYPD visits to your home

11   in John's Town, New York?

12   A.    I believe so.

13   Q.    What is your understanding why NYPD officers

14   visited your home in John's Town, New York in December

15   2009?

16   A.    To intimidate and harass me.

17   Q.    Why do you believe that?

18   A.    Because of their actions on Halloween, on October

19   31st, 2009 and the misconduct and criminal allegations I

20   made against various supervisors of the New York City

21   Police Department.

22   Q.    Were all of the NYPD officers who visited your

23   home in John's Town, New York the same who were in your

24   apartment on October 31st, 2009?

25          MR. SMITH:  Objection to form.

200

A. SCHOOLCRAFT

1      A.     I don't know.

2      Q.     What specifically did the NYPD officers who

3  visited your home in John's Town, New York do that made you

4  believe you they were intimidating and harassing you?

5             MR. SMITH:  Objection to form.

6      A.     Banging on my door, posting themselves outside my

7  apartment, intimidating me, preventing me from leaving.

8      Q.     How were they intimidating you?

9      A.     They were armed and standing by either my

10  apartment door or right outside my apartment complex,

11  building or parked at the entrance exit to the apartment

12  complex.

13     Q.     Aside from officers who are on modified

14  restricted duty, do most police officers carry a weapon?

15     A.     I believe so.

16     Q.     So why did you believe it was strange these

17  officers were armed?

18     A.     I never said it was strange they were armed.

19     Q.     You but believe it was a fact that contributed to

20  your belief they intimidated you; is that correct?

21     A.     That's correct.

22     Q.     Why did the fact officers who generally carry

23  guns, who were carrying guns on this day, indicate to you

24  they were intimidating you?

25     A.     Because they had guns, and at one time, when I

A. SCHOOLCRAFT

1    did answer the door the officer, he may have been a

2    sergeant, had his hand on his gun.

3        Q.    You carried a gun for years; is that correct?

4        A.    Correct.

5        Q.    In a resting position, did you ever leave your

6    hand on your service weapon?

7        A.    What was that?  Leave my hand where?

8        Q.    Did you ever place your hand on your service

9    weapon while in a resting position?

10       A.    I believe so.

11       Q.    Now, you said you answered the door -

12       A.    Did you say arresting or resting?

13       Q.    Resting.

14       A.    No.

15       Q.    You never in a resting position just placed your

16   hand on your gun?

17       A.    I don't believe so, no.  Again, I want to point

18   out that officer was in plain clothes.

19       Q.    Do police officers who are on duty in plain

20   clothes typically carry weapons?

21       A.    I believe so.

22       Q.    You said you answered the door once; is that

23   correct?

24       A.    To the best of my memory, it was one time, and a

25   black female was knocking and pounding on the door.  My

A. SCHOOLCRAFT

1  father answered it.  She convinced him to convince me to.

2  I believe, they gave me a letter.

3      Q.     So she is the individual who you referred to as

4  having her hand on her service weapon?

5      A.     No, it was a male standing on the stairs out of

6  the view of the camera.

7      Q.     Can you describe that male?

8      A.     Approximately, well, he was standing on a step.

9  I would say he was about five ten.  He was the same male

10  sitting with Lieutenant Gough as they were posted outside

11  in my apartment complex.  He had a mustache, and I believe

12  gray and white colored hair, mustache and hair. But that

13  wasn't Gough that had his hand on his gun.

14      Q.     What ethnicity was this individual, to the best

15  of your ability?

16      A.     Which one?

17      Q.     The male?

18      A.     The one with his hand on his gun?

19      Q.     Yes.

20      A.     White male.

21      Q.     About how old?

22      A.     Approximately thirty-five to forty-five years

23  old.

24      Q.     On what date did this occur where you opened the

25  door for the officers?

A. SCHOOLCRAFT

1      A.      I don't recall the specific date.

2      Q.      Can you give me a month and a year?

3      A.      I am sure we can.

4      Q.      Sitting here today, can you?

5      A.      Not off the top of my head, no.

6      Q.      Do you recall if it was in 2009?

7      A.      It may have been.

8      Q.      It is your belief today that you only opened the

9   door on one occasion; is that correct?

10     A.      I believe so.

11     Q.      Do you believe the officers who visited your home

12   in John's Town were doing so in order to silence you?

13     A.      To intimidate me.

14     Q.      But not to silence you?

15     A.      That would fall under intimidation, yes, silence

16   me, I would agree with that.

17     Q.      What they do that communicated to you they wanted

18   to silence you?

19             MR. SMITH:  Other than want he already

20             testified about?

21     A.      Their behavior, standing outside my apartment,

22   banging on the doors, disturbing the neighbors, calling the

23   local police getting them involved, posting themselves at

24   my apartment door, outside my apartment building at the

25   entrance and exit of my apartment complex.

204

A. SCHOOLCRAFT

1      Q.      Did the officers ever say anything specifically

2   to you that indicated to you they were trying to silence

3   you?

4      A.      I don't recall any specific comment.

5      Q.      Would anything refresh your recollection about

6   whether they said anything to you?

7      A.      It is possible.

8      Q.      What?

9      A.      I don't know.

10     Q.      There is nothing you can think of today?

11     A.      Not that I am aware of today.

12     Q.      Did any officers threaten you since October 31st,

13  2009.

14     A.      That officer with his hand on his gun and the

15  other one banging on the door.

16     Q.      They threatened you by knocking on the door?

17     A.      Banging on the door, kicking the door.

18     Q.      How do you know they were kicking the door?

19     A.      They left scuff marks on the bottom of the door.

20     Q.      You checked the door before and after they

21  arrived?

22     A.      Correct.

23     Q.      How many times did they kick your door?

24     A.      At least once, at least one occasion where they

25  were kicking the door and there were scuff marks.

A. SCHOOLCRAFT

```
1     Q.      Did they say anything to threaten you?

2     A.      I don't recall any specific comments.

3     Q.      Did they say anything to threaten your father?

4     A.      I don't recall any specific comments made towards

5   him.

6     Q.      When was last the time NYPD officers visited you

7   in upstate New York?

8     A.      I don't know.

9     Q.      You don't know?

10    A.      Correct.

11    Q.      When was the last time you know of officers

12  visiting you in upstate New York?

13    A.      I don't recall any specific date or time but I

14  believe it went on through late 2010, to the best of my

15  memory.

16    Q.      Do you believe the officers visited you in 2011?

17    A.      I am not aware of it, no.

18    Q.      What about 2012?

19    A.      Not that I am aware of.

20    Q.      How many times did NYPD officers visit you in

21  upstate New York?

22    A.      Off the top of my head, sitting here right now, I

23  don't recall.

24    Q.      Can you give me an approximation?

25    A.      Six times approximately.
```

A. SCHOOLCRAFT

1    Q.    When did they start visiting you in upstate New
2    York?
3    A.    I think December 2009.
4    Q.    Your Second Amended Complaint states that a
5    defendant yelled, NYPD, we know you are in there in open
6    up.  In December 2009, do you know which defendant officer
7    allegedly yelled that?
8    A.    No.
9    Q.    How many times did an officer yell NYPD we know
10   you're in there open up?
11   A.    At least once.
12   Q.    Was it a male voice or a female voice?
13   A.    I believe it was male.
14   Q.    Did you look through your peephole when you heard
15   that?
16   A.    I may have, but they were, it was covered with
17   something.
18   Q.    You can't describe that officer?
19   A.    No.
20   Q.    Did you say anything in response to the officer
21   stating NYPD we know you're in there open up?
22   A.    I don't recall making any response.
23   Q.    Why not?
24   A.    If they knew I was in there, were they going to
25   kick the door in again?  I don't know.  I had no response

207

A. SCHOOLCRAFT

1    to give them.

2         Q.    Do you know why the officers were at your

3    apartment?

4                   MR. SMITH:  Objection to form.

5         A.    To intimidate and harass me.

6         Q.    At the time is that what you believed?

7         A.    I believe that now.

8         Q.    Do you believe that is the only reason officers

9    visited your home in John's Town, New York?

10        A.    Yes.

11        Q.    Which officer allegedly spied through your

12   bedroom window?

13        A.    I don't know.

14        Q.    Could you describe that officer?

15        A.    He was wearing a puffy jacket, short, buzz cut,

16   his skin was darker than white, approximately thirty to

17   thirty-five years old, wearing jeans.

18        Q.    So this is a male?

19        A.    Correct.

20        Q.    Any other identifying characteristics of this

21   individual?

22        A.    His hair, if it wasn't buzzed, it was short

23   cropped, neat, dark-colored hair.

24        Q.    Had you seen this individual on any other

25   occasions?

A. SCHOOLCRAFT

1    Hanley, attempted to silence, harass or otherwise harm you;

2    is that correct?

3                    MR. SMITH:  Do you want to show him the

4                    Complaint?  It is a ninety-five page document so

5                    you are asking him does he have a recollection of

6                    that allegation in the Second Amendment

7                    Complaint?

8                    MS. METTHAM:  No, I am wondering if that is

9                    an allegation of his.

10    Q.    Do you believe defendant, Hanley, attempted to

11    silence, harass or otherwise harm you?

12    A.    Yes.

13    Q.    How did he attempt to harm you?

14    A.    If he was one of the officers there.

15    Q.    When you say there on October 31st, 2009?

16    A.    That and post October 31st, 2009 upstate.

17    Q.    What officers tried to harm up in upstate New

18    York following October 31st, 2009?

19    A.    I believe any officer, especially the ones

20    banking on the door.  I don't know what their intent was.

21    I believe their intent was to harm me.

22    Q.    Do you have any statements they gave you to

23    support that belief?

24    A.    Off the top of my head right now, I don't recall

25    any statements.

A. SCHOOLCRAFT

1    Q.    Do you have any recording that with substantiate

2    your claim that officers tried to harm you in upstate New

3    York?

4    A.    I don't recall hearing any recordings.

5    Q.    When was the last time you saw defendant, Hanley?

6    A.    I don't know what he looks like.  I don't know

7    who he is.

8    Q.    Have you ever interacted with defendant, Hanley,

9    before October 31st, 2009?

10   A.    Who.

11   Q.    Defendant, Hanley?

12   A.    I am not aware if I did.

13   Q.    Do you have any reason to believe defendant,

14   Hanley, was aware of your recordings at the 81st Precinct

15   before the "Village Voice" article was published?

16   A.    I don't know.

17   Q.    Is there anything that would refresh your

18   recollection about that?

19   A.    About?

20   Q.    Whether or not you believe he was aware of the

21   recordings before the "Village Voice" article?

22   A.    It is possible.

23   Q.    It is possible you would have a document that

24   would refresh your recollection?

25   A.    Not that I have.  I haven't seen anything that

A. SCHOOLCRAFT

1    indicates he knew, whoever he was, knew anything.

2        Q.     Did defendant, Hanley, ever work at any precincts

3    at the same time you were assigned there?

4        A.     His name does not sound familiar.

5        Q.     Prior to October 31st, 2009 had you any made any

6    IAB complaints against defendant, Hanley?

7        A.     I don't believe so.

8        Q.     Are you alleging defendant, Hanley, conspired

9    against you with any other defendants in this matter?

10       A.     I believe that is alleged in the complaint.

11       Q.     How do you believe he conspired with other

12   defendants?

13       A.     If he was one of the officers that showed up

14   Halloween night and post October 31st, 2009 upstate in

15   John's Town at my home or my apartment at that time.

16       Q.     If defendant, Hanley, was not present at your

17   apartment on October 31st, 2009, how do you believe he

18   conspired with other defendants in this matter?

19              MR. SMITH:  Objection to form.

20       A.     I am not aware of him having any other

21   involvement or any involvement at all.

22       Q.     Can you please physically describe defendant,

23   Robert O'Hare?

24       A.     I don't believe I know who that is.

25       Q.     Why are you suing him?

A. SCHOOLCRAFT

1     A.     I believe my attorneys found out who was driving

2   up to my apartment in John's Town, New York.

3     Q.     You believe he is an individual who drove up to

4   your apartment in John's Town, New York?

5     A.     That's what my attorneys believe so.

6     Q.     Do you have any reason to believe that personally

7   aside from what your attorneys have told you?

8     A.     No.

9            MR. SMITH:  I just want to caution you Mr.

10           Schoolcraft.

11           MS. METTHAM:  I said aside from what your

12           attorneys told you.

13           MR. SMITH:  Stop interrupting me.  Your

14           persistent interrupting is very unprofessional.

15           Officer Schoolcraft, I want to remind you if you

16           are asked a question, if you have any knowledge

17           or aware of, on its face could you call for

18           information about discussions you may have had

19           with your counsel, I just want to remind you, you

20           are not to reveal any privileged communications.

21     Q.     When you did not answer the door to officers when

22   living in John's Town, New York, was that because you knew

23   the officers were trying to serve you with papers?

24     A.     If they were trying to serve me with papers, I

25   instructed my PBA attorney, Stuart London, well, I asked

A. SCHOOLCRAFT

1    is.

2        Q.      So do you have any reason to believe that

3    defendant, Trainor, entered or searched any of your

4    residences at any time?

5        A.      Other than there were several individuals who I

6    did not see or recognize on October 31st, 2009 he could

7    very well be one of those individuals.  I have not seen

8    photographs.

9        Q.      You have already described, I believe, five

10   individuals who visited you in John's Town.  I am going to

11   list those five as I understand them right now.  I believe

12   you stated there was a black female who answered the door,

13   that's number one.  Number two, was a male, five foot ten,

14   with gray and white hair between the ages thirty-five to

15   forty-five, that was number two.  Number three was William

16   Gough.  Number 4 was, I believe, Duncan; is that Kurt

17   Duncan?

18       A.      Correct.

19       Q.      And then I believe you described a fifth

20   individual who was short with darker than white skin with a

21   buzz cut between ages thirty to forty-five that's number

22   five?

23       A.      I believe I said thirty to thirty-five.  He could

24   have been thirty to forty.  He appeared much younger and

25   more agile.  It may have just been the pose I saw him in.

A. SCHOOLCRAFT

```
 1              MR. SMITH:  That was guy the in the tree;
 2         right.
 3              THE WITNESS:  Well, that appears to, at
 4         least attempted to climb a tree or jumped out of
 5         the tree.
 6    Q.    Did you ever see that individual in a tree?
 7    A.    No.
 8    Q.    Besides those five individuals I just listed how
 9  many others individuals visited you in John's Town, New
10  York?
11    A.    I believe there were more, but I don't recall
12  their descriptions.  I recall one time seeing three
13  females.  But I don't if they had been there before or not.
14    Q.    Was the black female described as officer number
15  one, one of those three females?
16    A.    I couldn't tell you.
17    Q.    Could you describe those three females that
18  visited you in John's Town, New York that you believe were
19  from the NYPD?
20    A.    At least one of them was a white female with hair
21  shoulder length and there was at least one black female.  I
22  can't remember the third one, but I believe it was three.
23    Q.    And you are not sure if the black female you are
24  describing to me now is the same as the one you described
25  earlier?
```

A. SCHOOLCRAFT

1        A.      Which one?

2        Q.      The black female.

3        A.      There was a black female when I took a picture of

4    a male, there was a black female holding a camera, I could

5    not tell who she because.  The black female holding the

6    camera when I saw the male with the white and gray hair or

7    dark, more salt and pepper style hair, and a mustache with

8    his hand on his gun, she was different than, well, that was

9    when the black female that I answered, that I met at the

10   door, she was in a headdress and dressed nicely.  She

11   appeared in like an African garb.  It was not pants and a

12   shirt.  It was a covering.

13       Q.      When you say headdress, what do you mean?

14       A.      She was wearing something on her head.

15       Q.      You lifted your hand approximately twelve inches

16   above your head.  Was it that large?

17       A.      It was up there.  It was like, she was dressed, I

18   believe, it was purple. She didn't look messy.  She looked

19   nice and calm and quiet.

20       Q.      But you believed she was there to attempt to harm

21   you?

22       A.      I don't believe she was, but that was the same

23   time the individual was standing on the stair with his hand

24   on his gun, in plain clothes, without a duty belt.

25       Q.      How tall was this female you are describing?

226

A. SCHOOLCRAFT

1    A.    Including the?

2    Q.    Without the headdress.

3    A.    I recall her being pretty tall.

4    Q.    When you say pretty tall, what do you mean?

5    A.    I think we were eye to eye.  Not too far off.

6    Q.    How tall are you?

7    A.    Approximately six foot.

8    Q.    Could you describe her in any greater detail?

9    A.    Black female, the clothes she was wearing, I

10   don't know what they call it, it was a dress of some kind.

11   And I believe she was wearing something on her head, to the

12   best of my memory.

13   Q.    You believe she was with the NYPD?

14   A.    She introduced herself to the best of my memory.

15   Q.    How did you she introduce herself?

16   A.    I don't recall but the other black female had a

17   video camera.  I am assuming it is on video.

18   Q.    So at the time you opened door, and you saw a

19   black female in a headdress and full purple dress?

20   A.    It may not have been purple, to the best of my

21   memory, she was dressed in nice clothing.

22   Q.    On the date you saw this individual and opened

23   door and there was a male with her, was that also the same

24   occasion, there was another separate black female that was

25   recording from the car; is that correct?

A. SCHOOLCRAFT

1        A.      No, she was there in the building recording the

2   contact with the this other female.

3        Q.      So she was in the building as well?

4        A.      Yes.

5        Q.      So there were two back females and one white male

6   in your building at that time?

7        A.      Correct, that I could see.

8        Q.      Could you describe the other black female who was

9   present at that time?

10       A.      The one holding the camera?

11       Q.      Yes.

12       A.      I don't remember.  I think she was shorter, and I

13  believe she was wearing a hat, and plain clothes.

14       Q.      When you say plain clothes, what do you mean?

15       A.      It was just regular clothes.  She was not in

16  uniform.

17       Q.      Was she wearing jeans?

18       A.      I don't recall.

19       Q.      What she wearing a suit?

20       A.      I don't recall.

21       Q.      What kind of hat was she wearing?

22       A.      I believe it was a, I don't know how you call it,

23  but a painter's cap or it had a brim on it, it wasn't a

24  baseball cap.  I don't know what they call it.

25       Q.      Was it a winter cap?

228

A. SCHOOLCRAFT

1      A.     It could have been.

2      Q.     What color was this?

3      A.     I think she was in tan clothing, to the best of

4   my memory.

5      Q.     Was she wearing glasses?

6      A.     I don't recall.

7      Q.     Did you speak to her?

8      A.     No.

9      Q.     Did she do anything to make you believe she

10  wanted to harm you?

11     A.     I don't believe so.  I don't recall.  I don't

12  recall looking at her again after I looked at the

13  individual on the stairs.

14     Q.     Did any of the black females that visited you at

15  your apartment do or say anything that made you believe

16  they wanted to harm you?

17     A.     No.

18     Q.     Did any of the black females who visited you at

19  your apartment in John's Town, New York do or saying

20  anything to threaten your father?

21     A.     To the best of my memory, I don't recall hearing

22  female voices yelling.

23     Q.     Did any of the black female officers who visited

24  you at John's Town, New York, do anything or say anything

25  that you took to be intimidation?

A. SCHOOLCRAFT

1      A.      No, I don't recall any specific incident, no.

2      Q.      You stated that at least one white female visited

3   your apartment; is that correct?

4      A.      When the three females came, it appeared there

5   were no males, there was a white female.

6      Q.      Did that white female do or say anything to make

7   you believe she wanted to cause you harm?

8      A.      I don't recall any specific statement made by any

9   of them.

10     Q.      Did she do anything that made you believe she

11  wanted to harm you in anyway?

12     A.      I don't believe they were banging on the door

13  or --

14     Q.      Did any female do anything that you took to be

15  intimidation when they visited you in John's Town, New

16  York?

17     A.      Not that I recall right now.

18     Q.      Turning back to defendant, Captain Trainor, do

19  you have any reason to believe that Captain Trainor falsely

20  manufactured any evidence against you?

21     A.      Not that I am aware of.

22     Q.      Do you have any reason to believe that defendant,

23  Captain Trainor, did anything to silence, harass or

24  otherwise harm you?

25     A.      I don't have any knowledge of that, no.

A. SCHOOLCRAFT

1    seized any of your property at any time?

2         A.    Not that I am aware of.

3         Q.    Do you believe the defendant, Sondra Wilson, had

4    anything to do with your confinement at your Jamaica

5    Hospital Medical Center?

6         A.    Not that I am aware of.

7         Q.    Do you believe that defendant, Sondra Wilson,

8    falsely manufactured any evidence against you?

9         A.    Not that I am aware of.

10        Q.    Do you believe that defendant, Sondra Wilson, has

11   attempted to silence, harass, or otherwise harm you?

12        A.    If she's one, again, you are throwing the silence

13   in there, if she was one of the officers upstate I would

14   throw her in the silence category.  But I don't recall ever

15   hearing a female voice bark out we are here open up.  I

16   don't know of any of them kicking the door or banging on

17   the door.

18        Q.    Do you believe by simply going to John's Town,

19   New York officers were trying to silence you?

20        A.    Yes.

21        Q.    So you said you had interacted with a Sergeant

22   Sondra Wilson before October 31st, 2009?

23        A.    I believe that was her name.  That name sounds

24   familiar.

25        Q.    In what circumstances, did you interact with