Page 1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------X
3   ADRIAN SCHOOLCRAFT,
4                           Plaintiff,
5
                                        Case No:
6            - against -                10 CV 06005
7
    THE CITY OF NEW YORK, ET AL.,
8
9                         Defendants.
10  ------------------------------------------------X
11                  111 Broadway
                    New York, New York
12
                    April 11, 2014
13                  10:21 a.m.
14
15
16  DEPOSITION OF WILLIAM GOUGH, pursuant to
17  Notice, taken at the above place, date and
18  time, before DENISE ZIVKU, a Notary Public
19  within and for the State of New York.
20
21
22
23
24
25

Page 54

1       CONFIDENTIAL - WILLIAM GOUGH
2     the record.
3           (Whereupon, a recess was taken.)
4           MR. SMITH:  We're going back on
5     the record, it's 11:29.
6       Q.    The exhibits that you have in
7     front of you, Lieutenant, let's take them
8     one at a time.  The one that's 95, is this a
9     memorandum that you prepared on January 20,
10    2010?
11      A.    I believe so.
12      Q.    Is that your signature?
13      A.    Yes, it is.
14      Q.    And is this a report of a
15    surveillance that you conducted as a
16    lieutenant in Brooklyn North?
17      A.    Yes.
18      Q.    How did you get this assignment?
19          MS. PUBLICKER METTHAM:
20    Objection.  You could answer.
21      A.    Captain Timothy Trainor.
22      Q.    He told you to do this?
23      A.    Yes.
24      Q.    What did he tell you to do?
25          MS. PUBLICKER METTHAM:

Page 55

CONFIDENTIAL - WILLIAM GOUGH

Objection.  You could answer.

A. He specifically told me to go to the residence where Officer Schoolcraft was staying and attempted to serve him with a notice to be restored to duty.

Q. Was that the first time you were told to go to the residence of Schoolcraft?

A. I believe so -- can I clarify that?

Q. Yeah, of course you can.

A. We were told on October 31, 2009 to go to his actual residence. This would be the residence of his father.

Q. I will rephrase that question because that's a good point. I understand that you responded to Officer Schoolcraft's home in Queens, right?

A. Yes.

Q. So putting that aside, was January 20, 2010 the first time that you were told by your supervisors to go to try and deliver papers to Officer Schoolcraft in upstate?

A. To best of my recollection, yes.

Page 56

1          CONFIDENTIAL - WILLIAM GOUGH
2      Q.      And your commanding officer told
3  you to serve some legal papers, is that what
4  he was telling you to do?
5              MS. PUBLICKER METTHAM:
6      Objection.  You could answer.
7      A.      Could you be more -- could you
8  clarify legal papers?
9      Q.      Did you have papers with you
10  that you were trying to deliver?
11      A.      Yes.
12      Q.      What were those papers?
13      A.      To the best of my recollection,
14  it was the order for restoration.
15      Q.      What is an order of restoration.
16      A.      It's simply an order that states
17  that the police department would like him to
18  return on a certain time and date to be
19  restored to duty.
20      Q.      Had you ever done that
21  previously?
22      A.      No.
23      Q.      Have you ever been licensed to
24  serve of process?
25              MS. PUBLICKER METTHAM:

Page 227

1        WILLIAM GOUGH
2    Q.    Did it appear to you at any time
3 that the response was excessive?
4           MS. PUBLICKER METTHAM:
5    Objection.  You can answer.
6    A.    No.
7    Q.    It was an appropriate response
8 under the circumstances?
9           MS. PUBLICKER METTHAM:
10   Objection.  You could answer.
11   A.    Yes.
12   Q.    As of the time that you went
13 into Schoolcraft's residence on October 31,
14 2009 for that first occasion, did you have
15 any knowledge that Schoolcraft had been
16 taping other members of the service?
17   A.    No.
18   Q.    When did you first learn of
19 that?
20   A.    I don't recall.
21   Q.    When you reported to the
22 Schoolcraft residence on October 31, 2009,
23 did you know that his guns had been removed?
24   A.    Yes.
25   Q.    How did you know that?

```
 1                    WILLIAM GOUGH
 2              MS. PUBLICKER METTHAM:
 3         Objection, asked and answered multiple
 4         times, but you can answer again.
 5         A.      The first phone call I received
 6    from -- the first time I was advised of the
 7    situation that he walked out of work, they
 8    advised me that his gun has been removed.
 9    He was on restricted duty status.
10         Q.      That's the individual you don't
11    remember who it was, right?
12         A.      Right.
13         Q.      Do you remember that person
14    telling you that he had his guns removed for
15    psychological reasons?
16              MS. PUBLICKER METTHAM:
17         Objection, asked and answered multiple
18         times.  You may answer again.
19         A.      Yes.
20         Q.      Are there other reasons, other
21    than psychological reasons, for why a member
22    of service could have their guns removed?
23              MS. PUBLICKER METTHAM:
24         Objection, asked and answered, as well.
25         You can answer again.
```