$\mathcal{SF}$ 270

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------X
     ADRIAN SCHOOLCRAFT,
4
                                    PLAINTIFF,
5
              -against-            Case No:
6                                  10CV6005(WS)

7    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
     MARINO, Tax Id. 873220, Individually and in
8    his Official Capacity, ASSISTANT CHIEF
     PATROL BOROUGH BROOKLYN NORTH GERALD
9    NELSON, Tax ID. 912370, Individually and in
     his Official Capacity, DEPUTY INSPECTOR
10   STEVEN MAURIELLO, Tax ID. 895117,
     Individually and in his Official Capacity,
11   CAPTAIN THEORDORE LAUTERBORN, Tax ID.
     897840, Individually an din his Official
12   Capacity, LIEUTENANT JOSEPH GOUGH, Tax ID.
     919124, Individually and in his Official
13   Capacity, SGT. FREDERICK SAWYER, Shield No.
     2576, Individually and in his Official
14   Capacity, SERGEANT KURT DUNCAN, Shield NO.
     2483, Individually and in his Official
15   Capacity, LIEUTENANT CHRISTOPHER BROSCHART,
     Tax ID. 915354, Individually and in his
16   Official Capacity, LT. TIMOTHY CAUGHEY, Tax
     ID. No. 885374, Individually and in his
17   Official Capacity SERGEANT SHANTEL JAMES,
     Shield No. 3004, Individually and in her
18   Official Capacity, SERGEANT RICHARD WALL,
     Shield No. 3099, Individually and in his
19   Official Capacity, SERGEANT ROBERT W.
     O'HARE, Tax ID. 916960, Individually and in
20   his Official Capacity, SERGEANT SONDRA
     WILSON, Shield No. 5172, Individually and
21   in her Official Capacity, LIEUTENANT THOMAS
     HALEY, Tax ID. 879761, Individually and in
22   his Official Capacity, CAPTAIN TIMOTHY'
     TRAINOR, Tax ID. 899922. Individually and
23   in her Official Capacity, and P.O.'s "JOHN
     DOE" #1-50. Individually and  in their
24   Official Capacity (the name John Doe being
     fictitious, as the true names are presently
25   unknown) (collectively referred to as "City
     Defendants"), FDNY LIEUTENANT ELISE HANLON,

271

```
 1

 2    Individually and in her Official Capacity
      as a Lieutenant with the New York City Fire
 3    Department, JAMAICA HOSPITAL MEDICAL
      CENTER, DR. ISAK ISAKOV, Individually and
 4    in his Official Capacity, DR. LILIAN
      ALDANA-BERNIER, Individually and in his
 5    Official Capacity and JAMAICA HOSPITAL
      MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
 6    Individually and in their Official Capacity
      (the name John Doe being fictitious, as the
 7    true names are presently unknown)

 8                          DEFENDANT.
      ----------------------------------------X
 9

10              DATE: September 27, 2013

11              TIME: 10:12 a.m.

12

13

14              CONTINUED DEPOSITION of the

15    Plaintiff, ADRIAN SCHOOLCRAFT, taken by the

16    Respective Parties, pursuant to a Court

17    Order and to the Federal Rules of Civil

18    Procedure, held at the offices of Callan,

19    Koster, Brady & Brennan, LLP, One Whitehall

20    Street, New York, New York 10004, before

21    Pamela Ortalano, a Notary Public of the

22    State of New York.

23

24

25
```

272

1

2      A P P E A R A N C E S:

3

4      NATHANIEL SMITH, ESQ.
          Attorney for the Plaintiff
5      ADRIAN SCHOOLCRAFT
          111 Broadway
6      New York, New York 10006
          BY: NATHANIEL SMITH, ESQ.

7

8

          JOHN LENOIR, ESQ.
9          Attorneys for the Plaintiff
          ADRIAN SCHOOLCRAFT
10         829 Third Street NE
          Washington, DC 20002
11         BY: JOHN LENOIR, ESQ.

12

13     MICHAEL A. CARDOZO, ESQ.
          CORPORATION COUNSEL
14     NEW YORK CITY LAW DEPARTMENT
          Attorneys for the Defendant
15     THE CITY OF NEW YORK
          100 Church Street
16     New York, New York 10007
          BY: SUZANNA PUBLICKER METTHAM, ESQ.
17         File #2010-033074

18

19     SCOPPETTA SEIFF KRETZ & ABERCROMBIE
          Attorneys for the Defendant
20     STEVEN MAURIELLO
          444 Madison Avenue, 30th Floor
21     New York, New York 10022
          BY: WALTER A. KRETZ, JR., ESQ.

22

23     (Appearances continued on next page.)

24

25

273

1

2       A P P E A R A N C E: (Continued)

3

4       MARTIN, CLEARWATER & BELL, LLP
            Attorneys for the Defendant
5       JAMAICA HOSPITAL MEDICAL CENTER
            220 East 42nd Street, 13th Floor
6       New York, New York 10017
            BY: GREGORY J. RADOMISLI, ESQ.
7       File #: 667-82153

8

9       IVONE, DEVINE & JENSEN, LLP
            Attorneys for the Defendant
10      DR. ISAK ISAKOV
            2001 Marcus Avenue, Suite N100
11      Lake Success, New York 11042
            BY: BRIAN E. LEE, ESQ.
12

13

14

15      CALLAN KOSTER BRADY & BRENNAN, LLP
            Attorneys for the Defendant
16      LILLIAN ALDANA-BERNIER
            One Whitehall Street
17      New York, New York 10004
            BY: BRUCE M. BRADY, ESQ.
18              -and-
            MEREDITH BORG, ESQ.
19      File #: 090.155440

20

21
        ALSO PRESENT:
22
            MAGDALENA BAUZA
23

24
                *          *          *
25

```
 1                    A. SCHOOLCRAFT
 2    don't recall.
 3         Q.    Well, do you recall any reason
 4    why you might have put them on a disk?
 5              MR. SMITH:  Objection to the
 6          form.
 7         Q.    -- before October 31, 2009?
 8              MR. SMITH:  Same objection.
 9         A.    The only reason I could think
10    of is to preserve it.
11         Q.    Well, did you preserve any of
12    them and make any disks before October 31,
13    2009?
14         A.    It's possible.
15         Q.    I'm not asking you if it's
16    possible.  Did you or did you not do it?
17         A.    If I have in my possession
18    disks containing audio recordings relevant
19    to this case, I would have given them to my
20    attorney.
21         Q.    Other than your attorney, did
22    you also give copies of those recordings to
23    the reporter at the Village Voice?
24         A.    I believe so, yes.
25         Q.    When did you first have any
```

```
 1                    A. SCHOOLCRAFT
 2    contact with the reporter from the Village
 3    Voice, Mr. Rayman?
 4         A.    I would say early 2010.
 5         Q.    Did you reach out to him or did
 6    he reach out to you?
 7         A.    I believe I contacted him.
 8         Q.    How did you contact him?
 9         A.    Either by phone or e-mail.
10         Q.    Was he the first reporter that
11    you contacted in connection with this
12    matter?
13         A.    He was the first reporter I
14    contacted, correct.
15         Q.    Had you been contacted by any
16    other reporters prior to that?
17         A.    Prior to --
18         Q.    Your reaching out to
19    Mr. Rayman?
20         A.    Did I contact them, or did I
21    have contact with the reporters?
22         Q.    No.  You said that he was the
23    first one you contacted.
24         A.    Correct.
25         Q.    My question was, did any other
```

```
 1                    A. SCHOOLCRAFT

 2    reporter contact you before that?

 3         A.    Yes.

 4         Q.    Who was that?

 5         A.    It was the Daily News, Rocco

 6    Parascandola.

 7         Q.    How did he contact you?

 8         A.    My father contacted the Daily

 9    News, and The New York Times, I believe.

10    He contacted The New York Times, the Daily

11    News and possibly others after October 31,

12    that night probably, October 31, 2009.

13         Q.    And at some point one or more

14    of them reached out to you?

15         A.    The only one that I recall at

16    that time was the Daily News.

17         Q.    How soon after the events at

18    Jamaica Hospital did the reporter from the

19    Daily News get in touch with you?

20         A.    I believe I saw him within a

21    month.

22         Q.    And how did it come about that

23    you saw or met with him?

24         A.    He -- he came to Johnstown, New

25    York to my apartment.
```

```
 1                    A. SCHOOLCRAFT
 2          Q.    Did your father meet with him
 3   at the same time?
 4          A.    Yes.
 5          Q.    How long was the meeting?
 6          A.    Approximately a half hour.
 7          Q.    Did you ever speak or meet with
 8   the same reporter again?
 9          A.    I have -- I've seen him, like,
10   at the Court building.
11          Q.    I mean directly interact with
12   him.
13          A.    Regarding a report, or -- I
14   mean I've seen him.  No.  No.  I mean he
15   may have shook my hand.
16          Q.    Discussed this case with him?
17          A.    To the best of my memory, once
18   with him.
19                MR. SMITH:  And that was the
20          time up in Johnstown.
21                THE WITNESS:  Right.
22          A.    Meeting him one on one.
23          Q.    Right.  Did you correspond with
24   him through e-mail?
25          A.    I believe so, or by phone.
```

311

```
 1                     A. SCHOOLCRAFT
 2              It may have been a little
 3      before.  It may have been spring.
 4          Q.    Sure.  Spring, summer, 2010,
 5      whenever it was, it was operational, wasn't
 6      it?
 7          A.    It was, with notable problems.
 8      It was acting different.
 9          Q.    And when you got it up to
10      Johnstown, you made copies of the audio
11      recordings to disks up in Johnstown, right?
12          A.    I believe that's when I made
13      the copies.
14          Q.    When you made the copies to
15      disks up in Johnstown, you left the
16      recordings on the computer, as well, right?
17          A.    Say that again.
18          Q.    When you made the copies of the
19      recordings to disks up in Johnstown, you
20      also left the recordings on the computer?
21          A.    I believe they were copies, if
22      they were copies.
23          Q.    Now, you said that you gave
24      copies of the disks to your attorneys?
25          A.    I believe that's how they --
```

```
 1                    A. SCHOOLCRAFT
 2    I've seen the disks and they look like my
 3    disks.
 4         Q.    Well, don't you remember giving
 5    copies of the recordings to your attorneys?
 6         A.    No, but I can't imagine what
 7    else it would have been.  If it was
 8    something else, I don't recall it being
 9    anything other than like a CD disk.
10         Q.    Other than CD's, did you make
11    copies of the recordings to any other
12    media?
13         A.    To the best of my memory, no.
14         Q.    Did you give copies of the
15    recordings to the reporter at the Village
16    Voice, Mr. Rayman?
17         A.    I believe so, yes.
18         Q.    And you're aware that he wrote
19    a series of articles called the NYPD Tapes?
20         A.    Yes.
21         Q.    Did you give him copies of all
22    of the recordings that you had?
23         A.    I don't know if I gave him all
24    of the recordings.
25         Q.    Going back to the period of
```

315

```
 1                    A. SCHOOLCRAFT
 2          Q.    When did you start using the
 3    computer at the library up in Johnstown for
 4    e-mails?
 5          A.
 6                 MR. SMITH:  Objection to the
 7           form of the question.
 8          A.    I would say it was around early
 9    2010.
10          Q.    Was it before or after you had
11    moved your computer from Queens up to
12    Johnstown?
13          A.    Before.
14          Q.    When you started --
15          A.    I'm sorry.  And after.  There
16    was -- I didn't have internet.
17          Q.    Yes.  My question was just when
18    you first started using it.
19          A.    Okay.
20          Q.    So, you first started using it
21    before you brought your computer from
22    Queens up, right?
23          A.    I believe so because of the
24    contact with the reporters.  I believe
25    there was contact and communication and
```

```
 1                    A. SCHOOLCRAFT
 2    trying to find attorneys, reaching out to
 3    attorneys.
 4              MR. SMITH:  Mr. Schoolcraft,
 5         you're here to provide your best
 6         recollection.  We can all draw
 7         inferences about what you may or may
 8         have not done based on the
 9         circumstances, but the questions are
10         asking for your recollection.  If he
11         wants to know what might have
12         happened, he'll ask you that.
13              THE WITNESS:  Thanks.
14         Q.    When you got your computer from
15    Queens up to Johnstown, you didn't have
16    internet for that computer, is that what
17    you're saying?
18              MR. SMITH:  I don't understand
19         that question.
20         A.    To the best of my memory, no, I
21    didn't have internet.
22         Q.    And that's one of the principal
23    reasons you were using the one at the
24    library?
25         A.    I believe so, yes.
```

```
 1                    A. SCHOOLCRAFT
 2        Q.    At some point you established
 3   another e-mail account other than the one
 4   at Time Warner?
 5        A.    I believe so, yes.
 6        Q.    What was that e-mail address?
 7        A.    To the best of my memory, I
 8   think it would have been similar to my -- I
 9   always used my name in there somewhere but
10   I think it was Hot Mail -- it may have been
11   Google, but I don't recall the exact
12   address.
13        Q.    How long did you use that
14   e-mail address?
15        A.    I think a couple years.
16        Q.    And you don't remember the
17   e-mail address?
18        A.    It was sporadic.  I didn't
19   check my e-mail every day.
20        Q.    Well, you were corresponding
21   with reporters through that e-mail address;
22   correct?
23        A.    Over a period of a couple
24   years.
25        Q.    And you provided your e-mail
```

```
 1                   A. SCHOOLCRAFT
 2    an Amazon account but you don't need to
 3    sign to that.  I don't recall purchasing
 4    anything.
 5         Q.    So, are you telling us that the
 6    reason you changed your e-mail address or
 7    opened your current e-mail address is
 8    because you didn't remember your password
 9    to your old e-mail address?
10         A.    Correct.
11         Q.    I got to touch on something
12    that was covered a little bit yesterday but
13    I just want to fill in some blanks, and
14    that is the ten-page typewritten account of
15    what happened at Jamaica Hospital.
16              MR. SMITH:  Can we take a short
17         break before we jump to the new
18         subject matter.
19              MR. BRADY:  Absolutely.
20         Absolutely.
21              (Recess taken from 11:08 a.m.
22         to 11:24 a.m.)
23         Q.    Yesterday, Mr. Schoolcraft,
24    there was an allusion to a ten-page account
25    of what happened at Jamaica Hospital while
```

```
 1                A. SCHOOLCRAFT
 2   you were there.  Did you yourself, prepare
 3   that account?
 4               MR. SMITH:  Objection to the
 5        form.
 6               You can answer.
 7        A.    I don't recall if it was
 8   specifically ten pages but I recall
 9   preparing an account of what happened.
10        Q.    Okay?
11        A.    (Continuing) From I believe it
12   starts at Halloween, the night of October
13   31, 2009 on through to the hospital and
14   being released.
15        Q.    Just on page 141 of
16   Mr. Rayman's book, I'll just read one
17   sentence and ask you some questions about
18   it.  "Other than a few hospital documents,
19   there is no independent record of the next
20   six days except for a ten-page,
21   single-spaced account Schoolcraft himself
22   wrote."
23               As far as you know, is that
24   referring to this statement you drew up or
25   you wrote up?
```

323

```
 1                    A. SCHOOLCRAFT
 2        A.    I believe so, but again, the
 3   one I'm thinking of it starts at
 4   Halloween -- the night of October 31, 2009.
 5        Q.    Sure.  And covers the period of
 6   time that you were at the hospital?
 7        A.    Correct.
 8        Q.    And you gave a copy of that
 9   document to Mr. Rayman?
10              MR. SMITH:  Objection to the
11         form.
12        A.    I don't recall giving him a
13   copy.  If I specifically gave it to him
14   or -- I don't know if my attorney may have,
15   but that sounds like he's referring to that
16   document.  I wouldn't know of another one
17   that he's referring to.
18        Q.    Okay.  Now, as I understand it,
19   this is a document you typed up on the
20   computer at the library in Johnstown?
21        A.    To the best of my memory, it
22   would have been around that time, and that
23   would have been the computer that I used.
24        Q.    Can you be a little more
25   precise about "around that time"?
```

324

                    A. SCHOOLCRAFT

1

2        A.    Well, yeah, that time I don't

3    recall using another computer.  The --

4    because that document was created years

5    ago.  That was in the beginning.  That was

6    what I --

7        Q.    That's what I'm trying to focus

8    in on.  When did you prepare the document?

9        A.    I believe it was prepared early

10   2000 -- early 2010.

11       Q.    And did you prepare that

12   document around the time that you spoke to

13   Mr. Rayman or started dealing with

14   Mr. Rayman?

15       A.    No, I believe it was before

16   that.

17       Q.    So, it wasn't specifically for

18   his edification?

19       A.    No.  I believe I gave the Daily

20   News a copy, also, and this was what I used

21   when I was interviewing attorneys or an

22   attorney at the time in order to not leave

23   anything out or forget anything of the

24   events.

25       Q.    And did you prepare that

                    A. SCHOOLCRAFT

1
2    document before you brought your computer
3    from Queens up to Johnstown?
4         A.    I believe so.
5         Q.    When you say you used it in the
6    process of interviewing an attorney, who
7    are you referring to?
8         A.    To the best of my memory, the
9    first attorney I talked to was -- I believe
10   he was running for comptroller at the time.
11   I can't remember his name.  He was running
12   for elected position in the city at the
13   time, or it was just at that election that
14   week.  I can't grab the name right now.  I
15   believe he was running for either public
16   advocate or comp -- no, I think public
17   advocate was DiBlasio, or they were running
18   against each other.  He may have been
19   running for publish advocate or
20   comptroller.
21        Q.    When was it that you had an
22   interaction with that person?
23        A.    I believe it was within the
24   week after I was released.
25        Q.    So, at what point did you use

326

```
 1                    A. SCHOOLCRAFT
 2    the ten-page document in connection with
 3    interviewing him?
 4         A.    Well, I think it was after that
 5    interview that I realized I needed to -- I
 6    needed to have some kind of an order or a
 7    way to deliver everything that happened
 8    more efficiently.
 9         Q.    Was one of the purposes of
10    preparing that document to put down your
11    recollections when they were freshest?
12         A.    Correct.
13         Q.    So, you would have a complete
14    account according to your best memory,
15    right?
16              MR. SMITH:  Objection to the
17         form.
18         A.    I believe that's why I created
19    it.
20         Q.    Did you try and make it as
21    complete as possible?
22              MR. SMITH:  Objection to form.
23         A.    I believe I attempted to make
24    it as complete as possible, with the
25    knowledge that I knew at that time.
```

327

```
 1              A. SCHOOLCRAFT
 2         Q.    The attorney that you
 3    contacted, the first attorney you
 4    contacted, whatever his name is, this was
 5    sometime in November of 2009?
 6         A.    I believe so.  Correct.
 7         Q.    Are you saying that it was
 8    during the course of that interaction that
 9    led you to realize you should write
10    something down and fully document the
11    events?
12         A.    In more -- yes.
13         Q.    When did you sit down and do
14    that?
15         A.    It would have been sometime
16    within approximately a couple months after
17    that, or a month.
18         Q.    So, sometime in maybe December
19    or January?
20         A.    That's possible.
21         Q.    I'm not asking what's possible.
22    I'm asking for your best recollection.
23         A.    To the best of my memory, it
24    was approximately around that time.
25         Q.    So you typed this up on the
```

328

```
1                    A. SCHOOLCRAFT
2      computer in the library, right?
3           A.    To the best of my memory, yes.
4           Q.    Were you able to save a copy of
5      it on the library computer?
6           A.    I don't believe you are.
7           Q.    Were you able to save a copy of
8      it on a removable media on the library
9      computer, like a flash drive?
10          A.    I believe -- I believe you can
11     save it to a disk, and again, I don't
12     recall having a flash drive at that time.
13     I may have been using a disk.
14          Q.    And you saved it to a disk?
15          A.    I believe so.
16          Q.    Did you provide a copy of that
17     statement to this attorney you had spoken
18     to in November?
19               MR. SMITH:  Objection to the
20          form.  I don't understand that
21          question.  He just said that -- well,
22          go ahead.  I don't understand the
23          question.
24          A.    I don't recall if I eventually
25     did or not.  We -- we -- I had contacted
```

                        A. SCHOOLCRAFT

1
2    him with a few questions.  He appeared --
3    he sounded annoyed, frankly, and I became
4    aware that I was -- I felt like I was being
5    led on into believing that he was going
6    to --
7                MR. SMITH:  Let's not get into
8           your discussions with this attorney
9           who you were reaching out for.
10        Q.    Yes.  It's just did you give
11   him a copy of the statement?
12        A.    I don't believe so.
13        Q.    Did you, or somebody on your
14   behalf, give a copy of the statement to
15   Mr. Rayman?
16        A.    If it was, it would have been
17   my attorney.
18        Q.    You did give a copy of that
19   statement to some attorney, right?
20        A.    Yes.
21        Q.    Who did you give it to?
22        A.    I believe my attorneys at the
23   time, John Norinsberg, had a copy because
24   we used that to create the Complaint.
25        Q.    Did you give a copy of the

```
 1                    A. SCHOOLCRAFT
 2    statement to anyone else?
 3         A.    Right after the first attorney,
 4    it was two partners.  It will be simple
 5    enough to find out their name but I don't
 6    remember their names.  I believe that that
 7    was ready by then.  I believe I had it then
 8    and that was a better delivery that time, a
 9    better interview with an attorney, because
10    of that document and what I was trying to
11    convey to those attorneys.
12         Q.    Who are you referring?
13         A.    Mosely & Jackson.  It just came
14    to me.  I believe their office is in the
15    Empire State Building, to the best of my
16    memory, or it could have been the Chrysler
17    Building.
18         Q.    Was that before you encountered
19    Mr. Norinsberg?
20         A.    Yes.  Yes.
21         Q.    Did you give a copy of the
22    statement to your father?
23         A.    I don't believe he's ever --
24    he's ever read it or seen it, but under his
25    advice that document was created.
```

331

```
 1                    A. SCHOOLCRAFT
 2          Q.    What do you mean?
 3          A.    I don't know if I -- I believe
 4   I knew I had to do it anyway, but he -- he
 5   advised me to make sure that I document
 6   what happened, and while I was in -- while
 7   I was locked up and talked to him on the
 8   phone, he advised me to take notes.
 9          Q.    Did you give a copy of the
10   statement to anyone else?
11          A.    The next attorney was Jonathan
12   Moore, and I think he -- I think he
13   received a copy.
14          Q.    And that was also before you
15   encountered Mr. Norinsberg?
16          A.    Yes.
17          Q.    Did you give a copy of the
18   statement to anyone else?
19          A.    I don't believe so, no.
20          Q.    And by "anyone," I mean to
21   include any reporters.
22          A.    I believe I may have given a
23   copy -- I don't see any reason why I
24   wouldn't have given a copy to Mr. Rayman.
25          Q.    Understood.  Any other
```

```
 1                    A. SCHOOLCRAFT
 2    reporters?
 3         A.    I'm not sure if before
 4    Norinsberg, the time period that you're
 5    talking about.  Mr. Rayman's interest
 6    seemed to be in --
 7         Q.    No, not his interest.  Any
 8    other reporters?  Did you give a copy of
 9    the statement to any other reporters other
10    than Mr. Rayman?
11              MR. SMITH:  Wait a minute.  He
12          said he wasn't sure.  He said maybe
13          his attorney gave it to him.
14              MR. BRADY:  Fair enough.
15              MR. SMITH:  Subject to that
16          observation, you can answer.
17         A.    I could have given it to Rayman
18    myself.
19         Q.    My question is do you know
20    whether or not that statement was given to
21    any other reporters, either by you or
22    someone on your behalf?
23         A.    To the best of my memory, no.
24    I don't believe so.
25         Q.    Mr. Schoolcraft, where is the
```