UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                            Plaintiff,

          -against-

                                                    10-CV-06005 (RWS)

THE CITY OF NEW YORK, et al.,

                            Defendants.
-------------------------------------------------------------X

DEPUTY INSPECTOR STEVEN MAURIELLO'S MEMORANDUM
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Preliminary Statement –
The Claims Against Steven Mauriello Are Unsustainable

          Defendant Steven Mauriello, a Deputy Inspector in the New York

City Police Department (NYPD), was the commanding Officer of the 81st Precinct

in Bedford Stuyvesant, Brooklyn, on October 31, 2009, when the events occurred

that allegedly caused plaintiff harm and gave rise to the claims asserted in the

Second Amended Complaint (SAC) (Docket Entry 103).[1]  Despite all of the

fanfare, plaintiff does not have a claim against Steven Mauriello upon which relief

can be granted.

          The claims asserted against defendants are summarized in

paragraph 2 of the SAC, as follows:

> In order to prevent disclosure of . . . illegal and
> unconstitutional acts [an illegal NYPD quota policy  for the
> issuance of summonses and arrests, and the falsifying of
> complaint reports in order to distort COMPSTAT statistics],
> which would have revealed rampant NYPD corruption,
> defendants unlawfully entered plaintiff's home [on October

---

[1] Plaintiff has filed a motion for leave to file a Third Amended Complaint (TAC).  The proposed
amendments do not change the allegations in the SAC to which we refer throughout this memorandum and
our Statement of Material Facts, unless otherwise indicated.

> 31, 2009], had him forcibly removed in handcuffs, seized his personal effects, including evidence he had gathered documenting NYPD corruption[,] and had him admitted to Jamaica Hospital Center[JHC] against his will, under false and perjurious information that plaintiff was 'emotionally disturbed'.  Thereafter defendant officers conspired with [JHC] personnel to have plaintiff involuntarily committed in the psychiatric ward for six (6) days, all in an effort to tarnish plaintiff's reputation and discredit his allegations . . . .

Steven Mauriello emphatically denies any involvement in an alleged illegal NYPD quota policy or any alleged practice within the NYPD of falsifying complaint reports in order to distort COMPSTAT statistics.  Yet, for purposes of this motion, he does not challenge such allegations.[2]   Instead, as discussed below, we seek summary judgment dismissing the claims asserted against Steven Mauriello because there is no evidence he tried to stop Adrian Schoolcraft from disclosing what he believed about such wrongdoing following his suspension (see Point I); there is no evidence he violated Schoolcraft's constitutional rights or caused him any compensable harm (see Points I and II); there is no evidence he conspired with anyone to do so; and the conspiracy claim is unsustainable as a matter of law in any event (see Point III).

On October 31, 2009, the individual NYPD defendants simply responded in good faith and with great restraint to an unexpected, evolving set of increasingly bizarre circumstances that were not of their doing.[3]  Whether or not that is so, for purposes of this motion on behalf of Steven Mauriello, it is beyond

---

[2] Administrative charges were brought against Steven Mauriello in October 2010 based in part on an audit conducted by NYPD's Quality Assurance Division (QAD), apparently triggered by Schoolcraft's allegations.  QAD reviewed approximately 1200 complaints prepared by the 81st Precinct in a twelve-month period and found that less than two percent were improperly prepared.  Mauriello's charges fault him for his role in only one of those reports.

[3] "Bizarre" is a term volunteered by John Eterno, one of plaintiff's experts on police procedure, when asked at his deposition about plaintiff's behavior on October 31, 2009.  (See Exhibit BH, Eterno Dep. Tr.)

dispute that he was not present for or involved in the actions ultimately taken that allegedly harmed plaintiff and gave rise to his claims (see Point II), and the claim that he conspired to have plaintiff's constitutional rights violated is unsustainable on the law and the facts.

Deputy Chief Michael Marino was in charge at the scene as the highest-ranking NYPD officer present (SMF53-66, 83).[4]  Other than following him and members of NYPD's Emergency Services Unit (ESU) into plaintiff's apartment on the initial entry (the first entry) (SMF 77), and other than stepping into plaintiff's bedroom during the first entry to briefly speak with him (for less than a minute) at the direction of Chief Marino (SMF 84-85), Steven Mauriello immediately left the apartment and never re-entered (SMF 86-88).  Chief Marino has testified about his belief that the first entry was lawful under the circumstances, and Mauriello certainly concurred.  (See Point II.A(v)(b).)

No harm was caused to plaintiff while Mauriello was in the apartment during the first entry or at any time during the first entry after Mauriello left (SMF 96).  To the extent plaintiff alleges he suffered any harm, it would only have occurred during a second entry by NYPD defendants into plaintiff's apartment prompted by plaintiff's sudden decision to go back inside (SMF 105).  Mauriello did not participate in the second entry and simply was not present for and did not participate in any of the allegedly harmful conduct about which plaintiff complains (SMF 108-28).

---

[4] SMF citations are to the Statement of Material Facts submitted in support of Steven Mauriello's motion.

Plaintiff secretly recorded the events in his apartment on October 31, 2009, and we submit as Exhibit S a copy of that entire recording, which lasts for a total of approximately 30 minutes (SMF 2).  Plaintiff also secretly recorded meetings and conversations on the job for the previous 18 months or more.  In addition to submitting certain of those recordings on disk in support of our motion, we also set forth the entire recorded conversation between Mauriello and the plaintiff in the apartment on October 31, 2009 (SMF 85).  What ever may have been plaintiff's purpose in secretly recording his work-related activities, they clearly help demonstrate that plaintiff's claims against Steven Mauriello are unsustainable.

Steven Mauriello did not have any physical contact with plaintiff and did not threaten him in any way (SMF 127-28).  He was no longer present during the first entry by the time plaintiff agreed to go back to the precinct, then claimed to be sick and unwilling to go (SMF 111-28).  Mauriello thus was not present when plaintiff was examined by an EMT and the decision was made that he should go to the hospital for a medical exam (SMF 111-28).  Mauriello did not ever re-enter the apartment, and was not present during the second entry when Schoolcraft was suspended. He was not consulted about and did not express an opinion on whether plaintiff should be declared an emotionally disturbed person (EDP) (SMF 111-28), and he was not present when plaintiff was declared an EDP (SMF 111-28).  He also was not present when plaintiff was handcuffed, and he did not direct anyone to apply handcuffs (SMF 111-28).  He did not direct or participate in the alleged forcible removal of plaintiff from his apartment that

4

occurred during the second entry (SMF 111-28).  Thus, he was not present for

the removal and did not know why it occurred (SMF 111-28).

Steven Mauriello also was not present for or aware of the alleged

removal during the second entry of any of plaintiff's personal property, including

any alleged removal of evidence plaintiff claims to have gathered of NYPD

corruption (SMF 122-23).  No such removal of property or evidence occurred

during the first entry, and Mauriello is not aware of any such removal during the

second entry (SMF 122-23).  He did not direct anyone to remove any property,

and was not present when any such removal would have occurred (SMF 122-

23).

Finally, Steven Mauriello did not go to Jamaica Hospital, did not

communicate with anyone at Jamaica Hospital, and did not direct any officer to

do so (SMF 133-34).  Any communication at the hospital by the attending officers

was engaged in by them in the normal course, and Steven Mauriello did not

instruct them on what to say (SMF 134).

There is no genuine dispute about any of the froregoing

information, and there simply is no basis for plaintiff's claims against Steven

Mauriello.

Material Facts
Not Genuinely In Dispute

Rather than re-state in their entirety the material facts not genuinely

in dispute, we rely on the Statement of Material Facts submitted with these

motion papers, supported by its annexed exhibits.  We will make reference to

those facts throughout this memorandum, as needed.  We also submit an

Affidavit by Steven Mauriello to address certain details not directly or clearly addressed in discovery.

Summary of Argument

A.      First Amendment Prior Restraint Claim Fails Against Mauriello

With respect to plaintiff's claim for violation of his First Amendment rights (see SAC Second Claim For Relief ¶¶ 261-77), this Court has ruled, in an Opinion entered September 10, 2012 (Docket Entry 99), affirming two earlier rulings (Docket Entries 83 and 95), that plaintiff does not have a claim for First Amendment retaliation – arising out of the events prior to plaintiff's suspension on October 31, 2009, or any time thereafter.  The Court, however, did allow plaintiff to assert a First Amendment prior restraint claim – but only with respect to events following plaintiff's suspension on October 31, 2009.

As we understand it, because plaintiff was suspended (though not terminated), moved upstate several days after leaving the hospital (SAC ¶ 215), rebuffed any efforts by the NYPD to communicate with him upstate (SAC ¶ 216; SMF 143-47), and allegedly had been intending to speak out to the media and the public at large as a private citizen, the Court concluded in the September 10, 2012 Opinion, at the pleading stage, that he became entitled to First Amendment protection from prior restraint as of the moment he was suspended on October 31, 2009.

As we discuss below, in light of what has been disclosed about plaintiff arranging to meet with the NYPD during and after his stay at Jamaica Hospital (SMF 136-42), including meeting with NYPD representatives in his Queens apartment after his release from the hospital (SMF 137-42), and about

6

NYPD efforts to communicate with him upstate starting some time in December 2009 (SAC ¶ 215; SMF 143-47), we believe the earliest the First Amendment prior restraint protection should be deemed to have taken hold is when plaintiff moved upstate, and perhaps even later, when he first rebuffed the NYPD efforts to reach him.

In any case, whether the prior restraint protection took hold at the moment of plaintiff's suspension on October 31, 2009, or when plaintiff moved upstate in early to mid-November (SMF 143), or when NYPD first tried to contact him upstate in December (SMF 144), Steven Mauriello did not participate in any of the alleged wrongful conduct following plaintiff's suspension that constitutes prior restraint of plaintiff's First Amendment rights.  See Point I.

Thus, Steven Mauriello seeks dismissal of the prior restraint claim to the extent asserted against him because it simply is unfounded.

B.    Other Claims Of Constitutional Violations By Mauriello Are Unfounded

To the extent plaintiff alleges violations by Steven Mauriello of his constitutional rights resulting from false arrest (SAC Third Claim For Relief ¶¶ 278-87)), malicious abuse of process (SAC Fourth Claim For Relief ¶¶ 281-87), excessive force (SAC Fifth Claim For Relief ¶¶ 288-90), failure to intercede (SAC Sixth Claim For Relief ¶¶ 291-95) or unlawful search and entry (SAC Seventh Claim For Relief ¶¶ 296-300), those claims must fail as a matter of law.

The principal reason the claims should be dismissed is simple: other thanentering plaintiff's apartment for only three minutes during the first entry, Steven Mauriello did not engage in, or even witness, any of the allegedly wrongful conduct plaintiff claims violated his constitutional rights or caused him

harm, all of which allegedly occurred during the second entry (SMF 107-28).

(See Point II.)  With respect to his brief entry into the apartment, it was made

under the direction of Deputy Chief Marino in good faith out of concern for

plaintiff's well being.  More importantly, no matter what improper motive plaintiff

would attribute to defendants in making the first entry, the first entry did not

cause plaintiff any harm (SMF 107-28), and clearly was not engaged in for that

purpose.


C.     Claim Of Conspiracy To Violate Constitutional Rights
       Fails As To Mauriello (And All Other Defendants)

             In plaintiff's Ninth Claim For Relief, he alleges that the individual

defendants conspired to violate plaintiff's civil rights, which allegedly occurred

during the second entry into Schoolcraft's apartment (SAC ¶¶ 308, 310).  The

alleged violation consisted of declaring plaintiff an EDP, handcuffing him,

carrying him out of his apartment and taking him to Jamaica Hospital (SAC ¶¶

307-11).  This conspiracy claim must fail for several reasons:

       i.   Intracorporate Conspiracy Doctrine bars Conspiracy Claim

             As we discuss below, plaintiff's claim of a conspiracy among the

individual NYPD defendants is barred as a matter of law pursuant to the intra-

corporate conspiracy doctrine.  As plaintiff repeatedly alleges in the SAC,

defendants acted at all times within the scope of their employment and in

furtherance of their duties as NYPD employees (SAC ¶¶ 2, 10-12, 51, 256-60

and 321-31).   Under such circumstances, there can be no viable conspiracy

claim.  (See Point III.)

ii.  <u>There was no Conspiracy prior to the Second Entry (or after)</u>

As we also discuss fully below, there clearly could not have been a conspiracy already in place among the defendants when they arrived at the scene to do what ultimately was done during the second entry.  At the point in time when plaintiff was walking to the ambulance after the first entry to go to the hospital for a medical exam (SMF 105-10), the defendants had no reason to expect there would be a second entry.  If there had been a conspiracy to harm plaintiff as allegedly occurred during the second entry, defendants would not have waited until that unlikely and unexpected second entry to cause such harm.  There had been ample opportunity to harm plaintiff well before the second entry, but defendants simply did not do so for one reason that must be deemed obvious and beyond dispute – they had not gone there to cause plaintiff harm.

iii.  <u>Mauriello did not Conspire about or Join the Second Entry</u>

Steven Mauriello not only was not present for the alleged wrongdoing during the second entry (SMF 109-28), but also did not have any opportunity to speak with any of the other defendants once plaintiff started to go back inside (SMF109-28).  He thus did not have any chance to conspire with them about harming plaintiff or violating his constitutional rights when they re-entered the apartment.

iv.  <u>Second Entry was Response to Events, not</u>
<u>   Furtherance of any Conspiracy_____</u>

The NYPD officers who took the allegedly wrongful actions during the second entry, including the Deputy Chief in charge at the scene, did so only when they followed plaintiff as he suddenly decided to go back inside (SMF 111-

12).  They reacted to an unexpected occurrence, and handled the evolving situation as reasonably as possible under the circumstances.  Nothing about the circumstances, however, supports the conclusion they were acting in furtherance of a conspiracy agreed upon at some earlier time.  The only possible "conspiracy" would have been an agreement reached on the spot during the second entry.  It would have involved only the NYPD personnel who made the second entry and simply would have been an implicit agreement to take the allegedly harmful action that is the basis for plaintiff's claims as the events were unfolding.  As such, the "conspiracy" claim is redundant of the claims asserted by plaintiff directly against those who participated in the second entry.

In any event, Mauriello did not participate in the second entry and there is no evidence he conspired, or even could have conspired, with the other officers about it as they suddenly and unexpectedly followed Schoolcraft back into the apartment (SMF 111-15).

D.    State Law Claims

Plaintiff's state law claims for assault, battery, false arrest, false imprisonment and intentional infliction of emotional distress, to the extent asserted against Steven Mauriello, also should be dismissed as a matter of law for the same reasons the federal counterparts of those claims should be dismissed -- there is no evidence Steven Mauriello engaged in, or even witnessed, any of the allegedly wrongful conduct.  (See Point IV.)[5]

---

[5]  We do not address plaintiff's First Claim For Relief as plaintiff has acknowledged in his motion to file a Third Amended Complaint that it was not proper to assert such a claim.  We also do not address the Eighth, Tenth and Twelfth Claims For Relief (there is no Eleventh) as they are not asserted against Mauriello.

<u>Argument</u>

<u>POINT I</u>

PLAINTIFF'S SECOND CLAIM FOR RELIEF PURSUANT
TO 42 U.S.C. § 1983, FOR POST-SUSPENSION
PRIOR RESTRAINT OF PLAINTIFF'S FIRST AMENDMENT RIGHTS,
FAILS AS A MATTER OF LAW AGAINST DEFENDANT MAURIELLO
BECAUSE MAURIELLO WAS NOT PRESENT FOR AND DID NOT
PARTICIPATE IN ANY OF THE ALLEGED WRONGFUL CONDUCT

A.      <u>Plaintiff's First Amendment Prior Restraint Claim</u>

In an Opinion filed June 14, 2012 (Docket Entry 83), this Court

properly decided plaintiff does not have a First Amendment retaliation claim and

could not amend the First Amended Complaint to assert one.  The Court affirmed

that conclusion in an Opinion entered July 20, 2012 (Docket Entry 95), denying

plaintiff's motion for reconsideration.  Plaintiff then moved again for leave to

amend the First Amended Complaint to assert not only a First Amendment

retaliation claim with respect to the actions of the defendants following his

suspension on October 31, 2009, but also a First Amendment prior restraint

claim with respect to those same actions.  (See Docket Entry 98.)  The Court, in

an Opinion entered September 10, 2012 (Docket Entry 99), granted that motion

only to the extent of allowing plaintiff to assert a prior restraint claim limited to

defendants' actions following plaintiff's suspension on October 31, 2009.

In so ruling, the Court relied, as it was required to do at the

pleading stage, on plaintiff's allegations i) that once he was suspended he no

longer had a duty to report the alleged wrongdoing to the NYPD (SAC ¶¶ 270-

72), thus affording him First Amendment prior restraint protection for any public

disclosure he might have been intending to make, as a citizen rather than as a

police officer (SAC ¶ 270), and ii) that defendants' actions after suspending

plaintiff allegedly were an "attempt to impose [a] prior restraint on plaintiff's

speech . . . to the media and the public at large" (SAC ¶ 273).

Thus, the speech deserving of protection was plaintiff's

contemplated communication with the media and the general public (SAC ¶ 270).

The prior restraint providing the basis for the claim allegedly commenced during

the second entry into plaintiff's apartment, after plaintiff was suspended (SAC ¶

270-72).   It consisted of declaring plaintiff an EDP, handcuffing plaintiff, carrying

him downstairs, and placing him in an ambulance to be taken to Jamaica

Hospital.  Thereafter, it consisted of influencing plaintiff's admission to Jamaica

Hospital, and then, commencing in December 2009 and continuing through at

least June 2010, regularly visiting plaintiff's upstate residence to make contact

with him, though being repeatedly rebuffed (SAC ¶¶ 175-80).

Steven Mauriello was not present for, or in any way involved in, any

of the alleged prior restraint.  To the extent the Second Claim For Relief is

asserted against Mauriello, it should be dismissed.

B.    Commencement Date Of Plaintiff's Right To Prior Restraint Protection

Respectfully, now that discovery has revealed plaintiff's actions

prior to moving upstate (SMF 135-42), as well as the timing of NYPD's rebuffed

attempts to contact him upstate (SMF 143-47), we submit that the First

Amendment prior restraint protection should not take hold as of the instant

plaintiff was suspended.  Instead, it should take hold either when plaintiff moved

upstate in mid-November or when NYPD first tried to contact him upstate in

December and was rebuffed.

First, a suspended officer such as Schoolcraft continues to be a member of the service and his suspension did not relieve him of the obligation to report wrongdoing to the department.  (SMF 135; see Exhibit AN,  NYPD Patrol Guide § 207-21, in effect at the time, which provides "[a]ll members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware.")  [Case cites]

Second, while we accept for purposes of this motion this Court's recognition in the Opinion of September 10, 2012 (Docket Entry 99), that circumstances existing after an NYPD officer is suspended might allow First Amendment prior restraint protection to take hold, we respectfully submit this should not mean the protection automatically takes hold at the moment of the suspension, which is what plaintiff alleges (SAC ¶ 270).  Instead, in line with this Court's reasoning, the protection should take hold only when the officer becomes so far removed from his service as a police officer after his suspension as to essentially forego any opportunity to be heard by the NYPD and relieve himself of any further obligation to report wrongdoing to the NYPD or cooperate in its fact-finding.

Discovery has revealed that Schoolcraft reached out to IAB while in Jamaica Hospital (SMF 136) and arranged to meet twice with NYPD representatives before he left the hospital (SMF 136).  We also know that after his release from the hospital on November 6, 2009, Schoolcraft arranged to meet again with NYPD representatives in his Queens apartment (SMF 137-42), who then requested a second meeting at the apartment.  At the first meeting in the apartment, plaintiff not only demonstrated what had happened on October 31,

13

2009, but also provided the NYPD representatives with recordings he had made of those events, as well as just a select few of the secret recordings he had made of earlier conversations (SMF 137-42).  At the second meeting in the apartment, plaintiff was asked, and after initially denying its existence, agreed to turn over his father's high-powered shotgun, which plaintiff improperly had in his possession and had hidden under his mattress before defendants entered his apartment on October 31, 2009 (SMF 140-42).

Some time shortly after plaintiff met with NYPD representatives in his Queens apartment, he moved upstate (SAC ¶¶ 215-20).  Then in December 2009, NYPD made its first attempt to contact him upstate (SAC ¶ 216; SMF 144). The stated purpose of the upstate visits was to personally serve plaintiff with notice of his re-suspension, orders for plaintiff to report to work, and his department charges (SMF 145).  Plaintiff apparently chose not to speak to the visitors or to appear as directed (SMF146), and it became clear he had no interest in communicating further with the NYPD.

Thus, we respectfully submit that the earliest point in time when plaintiff should be afforded First Amendment prior restraint protection, in line with the Court's reasoning in its September 10, 2012 Opinion (Docket Entry 99), would be after his last meeting with NYPD in his Queens apartment following his release from the hospital (SMF 137-42).  Even more in keeping with the purpose of the prior restraint protection in this instance, the most appropriate point in time for it to take hold would be once plaintiff moved upstate "hundreds of miles outside the NYPD's jurisdiction" (Opinion entered September 10, 2012 Docket Entry 99), and then shut off all communication with the NYPD and refused to

appear as directed.  Only then might plaintiff be deemed to have abandoned his

role as a member of the service of the NYPD and "sought to exercise his First

Amendment rights 'as a citizen,' rather than 'as a government employee.'"  (See

Opinion entered September 10, 2012, at 15.)[6]

C.     No Prior Restraint By Mauriello

Whether plaintiff's First Amendment prior restraint protection took

hold from the moment of his suspension during the second entry into the

apartment, several days later when he met in his Queens apartment with NYPD

representatives, or when he moved upstate and rebuffed all communication with

the NYPD, the prior restraint claim against Mauriello must fail as a matter of law

because Mauriello was not at all involved in any of the post-suspension conduct

allegedly constituting the wrongful prior restraint.  The record is clear:  When

plaintiff was suspended, Mauriello was not present (SMF 86-87).  Mauriello also

was not present for anything that transpired at the scene thereafter, other than to

observe from the street as Schoolcraft was being carried out of the house in a

chair to the waiting ambulance (SMF 88-128).

In addition, to the extent papers allegedly were removed from

Schoolcraft's apartment in an alleged attempt to interfere with his media

communications after he was suspended, Steven Mauriello was not present, was

not consulted, and never observed any such removal (SMF 107, 122-23).  (In

---

[6]      It must be noted that there is nothing in the record that anyone at the NYPD had any reason to believe plaintiff was trying to communicate with the media while he was upstate; nothing in the record to indicate the visits by the NYPD to plaintiff's upstate residence were for the purpose of intimidating him from communicating with the media, and, there certainly is nothing to indicate Schoolcraft was at all intimidated or that his speech was at all chilled.  As it turned out, Schoolcraft began communicating with the media almost immediately.

fact, plaintiff has been unable to provide any evidence that papers of any kind actually were removed from his apartment.)

There also is no evidence Steven Mauriello ever went to Jamaica Hospital; no evidence he ever spoke with anyone at Jamaica Hospital; no evidence he spoke to any officers to convey any message to Jamaica Hospital; and no evidence anyone at Jamaica Hospital ever relied or claimed to rely on anything conveyed by Mauriello (SMF133-34).

Finally, Steven Mauriello had no involvement with any attempts to contact Schoolcraft once he moved upstate.   Those efforts were conducted by the Brooklyn North Investigations Unit (BNIU) and IAB, and at no time did BNIU or IAB inform Mauriello of their actions or seek to consult with him in any way (SMF 147).

It is fundamental to any claim brought pursuant to 42 U.S.C. § 1983 for violation of one's constitutional rights that "'personal involvement of defendants in the alleged constitutional violation is a prerequisite to an award of damages . . . .'" Chamberlain v. City of White Plains, 986 F.Supp.2d 363, (p.29) n.9 (S.D.N.Y. 2013), quoting Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001).  Here, there is no basis for alleging any such personal involvement by Steve Mauriello in the alleged prior restraint of plaintiff's First Amendment rights. The claim against him therefore should be dismissed.

<u>POINT II</u>

PLAINTIFF'S THIRD THROUGH SEVENTH CLAIMS FOR RELIEF
UNDER 42 U.S.C. § 1983, FOR FALSE ARREST,
MALICIOUS ABUSE OF PROCESS, EXCESSIVE FORCE,
FAILURE TO INTERCEDE AND UNLAWFUL SEARCH AND ENTRY,
FAIL AS A MATTER OF LAW AGAINST DEFENDANT MAURIELLO

A.    With Respect To Each Claim For An Alleged Constitutional Violation,
      <u>Each Individual Defendant Is Liable Only For His Own Misconduct</u>

The absence of personal involvement of Steven Mauriello in the alleged constitutional violation that requires dismissal of the First Amendment prior restraint claim against him also requires dismissal of the other claims for violation of plaintiff's constitutional rights to the extent they are alleged against Mauriello.

The guiding principle with respect to each of the plaintiff's individual claims for violation of specific constitutional rights is best expressed by the United States Supreme Court as follows:  "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Perhaps more precisely, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." <u>Ashcroft v.</u> <u>Iqbal,</u> 556 U.S. 662, 676 (2009).   <u>See</u> <u>Farid v. Ellen</u>, 593 F.3d 233, 249 (2d.Cir 2010) (plaintiff must allege facts demonstrating "personal involvement of [each defendant] in alleged constitutional deprivations"); <u>and</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir 1994) ("it is well settled in this Circuit that 'personal involvement of defendant in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983'") (citation omitted).

i. Mauriello not Present for or Involved in the Alleged Arrest, which Occurred during the Second Entry – Third Claim for Relief against Mauriello should be Dismissed

As the Second Circuit has explained, "[f]alse arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment." Covington v. City of New York, 171 F.3d 117, 125 (2d Cir. 1999).

Assuming for purposes of this motion on behalf of Steven Mauriello that plaintiff has properly alleged the elements of an unlawful arrest and there is a genuine dispute over the truth of those allegations, there nonetheless is no dispute that plaintiff was not "arrested" until he went back inside his apartment after walking out to the ambulance (SMF 105).  Only certain of the NYPD defendants followed him (the second entry) (SMF 112), and, while inside, they placed handcuffs on the plaintiff, lifted him into a chair and carried him out of the apartment.

It is beyond dispute that Steve Mauriello was not present for those activities, was not supervising those activities, and had no involvement in them (SMF 85-128).  Plaintiff's secret recording of the events (Exhibit S) alone is enough to establish that Mauriello was not involved.

The Third Claim For Relief, to the extent it is alleged against Mauriello, should be dismissed.

ii. Mauriello not Present for or Involved in the Alleged Malicious Abuse of Process, which Occurred During the Second Entry – Fourth Claim for Relief against Mauriello should be Dismissed

In all of the same respects that Mauriello was not present for or involved in, and did not supervise, the arrest of the plaintiff that allegedly took

place during the "second entry" into plaintiff's apartment by certain of the NYPD

defendants, so, too, was he not involved in the alleged "malicious abuse of

process" (Plaintiff's Fourth Claim For Relief (SAC ¶¶ 281-87)).  Based upon the

stated allegations, we understand that the malicious abuse of process claim

essentially alleges that plaintiff's arrest was made for malicious purposes.  While

there is no evidence that the NYPD defendants who "arrested" plaintiff were

motivated by anything other than the circumstances with which they were

confronted, and exercised terrific restraint utterly at odds with malice, there also

is no doubt that, in any case, Mauriello did not participate in the arrest and played

no role in its occurrence.

The Fourth Claim For Relief, to the extent it is asserted against

Mauriello, should be dismissed.

iii. Mauriello not present for the Use of any Force, which Occurred only during the Second Entry – Fifth Claim for Relief against Mauriello should be Dismissed_____

The Fifth Claim For Relief for the alleged use of excessive force,

which only could be referring to the force used to place handcuffs on plaintiff and

lift him into a chair, should be dismissed to the extent it is alleged against

Mauriello for the same reasons the claims for false arrest and malicious abuse of

process should be dismissed.  Mauriello was not personally involved.

iv. Mauriello did not Fail to Intercede when Plaintiff's Constitutional Rights Allegedly were being Violated during the Second Entry – the Sixth Claim for Relief against Mauriello should be Dismissed_____ __

The Sixth Claim For Relief, which, like all of the other claims, does

not specify the defendants against whom it is asserted, alleges that "[a]s a result

of the defendants' failure to intercede when plaintiff's constitutional rights were

being violated in defendants' presence, plaintiff sustained, *inter alia*, physical and emotional injuries" (SAC ¶ 295).

This claim, too, must be dismissed to the extent it is alleged against Steven Mauriello.  It is beyond dispute that he did not re-enter the apartment during the second entry (and was not in the apartment for most of the first entry). He therefore could not have witnessed any of the alleged constitutional violations – essentially consisting of prior restraint of speech, false arrest, abuse of process excessive force and illegal search.  For all intents and purposes, since Mauriello did not witness the alleged constitutional violations, and had no reason to believe constitutional violations were occurring in the apartment during the second entry, he cannot be held liable for failing to intervene.

This is especially so given that the officers allegedly involved in the constitutional violations that occurred during the second entry were being supervised in the apartment by an officer of higher rank than Mauriello.

It bears repeating, as explained in K.D. v. White Plains School District:

> [P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.  In other words, a supervisory official cannot be held liable solely on the basis of the acts or omissions of his subordinates; the supervisor must be personally involved in the alleged deprivation, and there must be 'an alleged causal link between the supervisor's actions (or inactions) and the injury.'

921 F.Supp.2d at 206 (citations omitted).  Here, it is clear there was no personal involvement by Mauriello in the events that took place in the apartment during much of the first entry and the entirety of the second entry.   He did not witness

what transpired and simply was not in a position to intervene.  Surely, there was

no causal link between his "inaction" down on the street when the NYPD

defendants re-entered the apartment, supervised by an officer of higher rank

than Mauriello, and the actions they took when they re-entered (SMF 111-12).

The Sixth claim For Relief, to the extent it is asserted against

Mauriello, should be dismissed.

> v. The Warrantless Entry into Plaintiff's Apartment was Justified; Mauriello
> did not participate in or Conduct any Search of Schoolcraft's
> Apartment, and was Unaware one had been Conducted (there also is
> no evidence one occurred) – the Seventh Claim for Relief therefore
> should be Dismissed_____

Plaintiff's Seventh Claim For Relief (SAC ¶¶ 296 – 300) alleges the

entry into plaintiff's apartment was unlawful and that an unlawful search of his

apartment was conducted during the second entry.  To the extent either basis for

the Seventh Claim For Relief is relied upon to assert the claim against Mauriello,

the claim should be dismissed.

> a. Alleged Search Occurred during Second Entry – Mauriello not Liable

Paragraphs 169 through 171 of the SAC make clear that the

alleged illegal search of plaintiff's home occurred during the second entry into his

apartment.  Thus, Mauriello was not present, could not have participated and

was otherwise not involved.  (There also is no evidence any such search

occurred.)  Consequently, the Seventh Claim For Relief, to the extent it is alleged

against Mauriello for participating in the alleged unlawful search, is unsustainable

for the same reasons the other claims of constitutional violations are

unsustainable against him.

b. Mauriello's Brief Stay in Schoolcraft's Apartment during the
First Entry did not Violate his Constitutional Rights and,
in any event, was Justified under the Circumstances, thus Affording
him Qualified Immunity, Shielding him from Going to Trial

The Second Circuit has made clear the general rule that

"[w]arrantless searches inside a home are presumptively unreasonable [but]

'police officers may enter a dwelling without a warrant to render emergency aid

and assistance to a person whom they reasonable believe to be in distress and

in need of that assistance.' Courts must apply an objective standard to determine

the reasonableness of the officer's belief.  However, '[t]his probable cause

requirement [ ] must be applied by reference to the circumstances then

confronting the officer . . . .'" Tierney v. Davidson, 133 F.3d 189, 196-97 (2d Cir.

1998) (citations omitted).

In other words, officers making a presumptively unlawful

warrantless entry will be shielded from liability by application of the qualified

immunity doctrine "'if (1) their conduct does not violate clearly established

constitutional rights, or (2) it was objectively reasonable for them to believe their

acts did not violate those rights.'" Southerland v. City of New York, 680 F.3d

127,141 (2d Cir. 2012)(citations omitted).

As the Second Circuit further explained in Southerland, "[i]n this

Circuit, '[e]ven when the law is 'clearly established,' and the scope of an official's

permissible conduct is 'clearly defined,' the qualified immunity defense also

protects an official if it was 'objectively reasonable' for him at the time of the

challenged action to believe his acts were lawful.'  In other words, [the officer] is

also entitled to qualified immunity 'if officers of reasonable competence could

disagree on the legality of the action at issue in its particular factual context.'" Id. at 141 (citations omitted).

Thus, while the law is clearly established that a warrantless entry is unlawful absent exigent circumstances, whether the scope of the defendants' permissible conduct is clearly defined is more complicated.  It is one thing to know exigent circumstances are required to make a warrantless entry, but it is another thing to know whether the existing situation constitutes exigent circumstances.  The issue here is whether it was objectively reasonable for the defendants to believe exigent circumstances existed – that is, whether the first entry into plaintiff's apartment was justified to render emergency assistance to Schoolcraft or to protect Schoolcraft from imminent injury.  More precisely, the issue in this instance is whether it was objectively reasonable for Chief Marino to decide to have the NYPD personnel at the site make the first entry into the apartment out of concern that Schoolcraft was at risk of harming himself.

We think that any officer of reasonable competence would agree that the first entry into Schoolcraft's apartment was justified under the circumstances.  Even if that were not so, there can be no doubt, applying a reasonably objective standard, that at least some officers of reasonable competence would conclude the entry was justified.

Schoolcraft had left work early, without approval, suddenly claiming to be sick, after exhibiting no sickness for the first seven hours of his tour (SMF 35).  He did not respond to immediate efforts to reach him on his cell phone (SMF 45-76), so a Lieutenant was sent to his apartment to see if he could make contact with him (SMF 46).   Repeated knocks on Schoolcraft's door yielded no

response.  His car was located in the neighborhood, but persistent efforts

thereafter to reach him were all to no avail.  His location could not be confirmed

and his condition was unknown.  It was known that he was on restricted duty as

directed by the NYPD Medical Division, and, as the day carried into night, it was

learned that the Psychiatric Evaluation Services Unit had issued that directive

(SMF 70-77).

The NYPD personnel on the street outside plaintiff's residence did

not know plaintiff was awake and watching them.  They also did not know that

plaintiff regularly spoke with his father over the telephone during that time (SMF

68).  After several hours, they were told by the father, who was in upstate New

York, that he had spoken earlier to the plaintiff over the telephone (SMF 69).  The

father, however, could not arrange to have his son take a moment to speak with

Captain Lauterborn or Dr. Lamstein, the NYPD doctor who had placed him on

restricted duty six months earlier, which she continued when she had last seen

him just four days earlier (SMF 13-23).  Dr. Lamstein had left a message for

Schoolcraft, which he clearly received (SMF 74-77), imploring him to call her

back so the situation could be resolved quickly, without further escalation (SMF

74-77).  He did not call.  According to the father, plaintiff had taken some Nyquil,

and was sleeping.  The police should be credited with suspecting this was a lie,

which it turned out to be (SMF 67).

When the police were told by the landlord of noises being heard in

the apartment, the decision was made by Chief Marino to have a contingent of

NYPD, FDNY and EMS personnel enter Schoolcraft's apartment as he continued

to be unresponsive.  Without regard for the condition exhibited by Schoolcraft

once the first entry was made, the existing circumstances preceding the entry provided ample justification for it.

Who among all of the NYPD personnel at the scene would have wanted to be the one to insist they forego entry only to later find that Schoolcraft had harmed himself and could have been saved if entry had been made, or was about to harm himself in a way that could have been avoided if entry were made. Clearly, entry was the wiser, more appropriate, more considerate and least invasive thing to do to try to ensure Schoolcraft's well-being.

Upon making the first entry, once it appeared Schoolcraft was unharmed and potentially not at risk of harming himself, Chief Marino, then Deputy Inspector Mauriello, and then Captain Lauterborn, instructed him he was to return to the precinct with them for routine questioning about what had transpired. Schoolcraft agreed, but then refused after speaking with his father and claiming not to feel well. When it was determined by EMS that Schoolcraft was in need of immediate medical attention, Schoolcraft agreed to go to the hospital in the ambulance for a medical examination. All then exited the apartment after a total of sixteen minutes from the moment of the initial entry (SMF 104). (Mauriello had left after only three minutes.) All indications were that the correct decision had been made, achieving the maximum benefit with the least amount of distress. (All of the foregoing is confirmed by the recording opf the events secretly made by the plaintiff, SM Exhibit S.)

While it may be true that violent action after a warrantless entry does not mean the entry itself was unlawful, clearly the absence of any impropriety after an entry is a reliable indicator that the entry was made for only

legitimate purposes – in this case to ensure the safety of Schoolcraft.  It certainly should be dispositive on the issue of whether the defendants believed in good faith that the entry was lawful.  There were indicators that gave rise to a genuine cause for concern, and once entry was made, nothing was done to cause plaintiff any harm.

Chamberlain v. City of White Plains, supra, provides useful guidance.  In Chamberlain, the Court confronted a claim of an unlawful entry by White Plains police officers into an apartment where a medical alert device had accidentally been triggered.  When the occupant did not respond to calls about his well-being, the police were called by the life-alert service and responded to the scene.  When the police arrived, they spoke through the door with the occupant who said he did not call for them and was not in need of assistance -- a message he repeated several times over the next couple of hours.  Because there had been EDP calls to that location in the past according to the police computer, and because the police were told the occupant had psychiatric issues, the police ignored the request from the life alert service to cancel the call and continued to try to get the occupant to open the door.  The occupant refused. 986 F.Supp.2d at (p.23).

The police ultimately forced their way into the apartment, tasered the occupant, and then shot and killed him when the taser proved ineffective because by then the occupant allegedly was wielding a knife.  Id.

Thus, in Chamberlain, with respect to the decision to enter the premises, the occupant of the apartment clearly was present, very vocal in refusing police requests to gain entry, and insistent that he did not call for police

assistance and wanted them to leave.  In this case, on the other hand,

Schoolcraft was a police officer on restricted duty who oddly left work early, and

whose whereabouts and condition were unknown.  He then was completely

unresponsive over a period of seven hours to the efforts of the police to make

contact with him.  Concern and suspicion about his condition only increased as

time went by and he continued to be unresponsive.

      The Court in <u>Chamberlain</u> – despite the extremely violent action

ultimately taken by the police once they forced their way into the apartment --

reasoned as follows in reaching the conclusion that "[t]he Amended Complaint

fails to state a claim for unlawful entry on which relief can be granted."  986

F.Supp.2d at (p.28):

> A warrantless entry into an individual's home is
> reasonable if exigent circumstances exist that require
> police officers to immediately enter the property.
> Under the emergency aid doctrine, an exigency exists
> if the officers reasonably believe it is necessary to
> 'render emergency assistance to an injured occupant
> or to protect an occupant from imminent injury,'  This
> test is purely objective and is based on the 'totality of
> the circumstances confronting law enforcement
> agents in the particular case'; the core inquiry is
> 'whether the facts, as they appeared at the moment of
> entry, would lead a reasonable, experienced officer,
> to believe that there was an urgent need to render aid
> or take action.'

<u>Id</u>. (citations omitted).  The Court concluded as follows:

> Under [the] circumstances, a reasonable, experienced
> officer would be justified in concluding that entry into
> the apartment was necessary.  . . .  [T]he officers
> could have reasonably concluded that Chamberlain
> was in need of medical attention or posed a threat to
> himself or other possible occupants of the apartment.
> The officers were justified in demanding to undertake

a visual inspection of the premises to confirm that no
one was in distress.

Id. (citations omitted).  So, too, here.

Thus, even if the Court were unable to conclude that the first entry

into Schoolcraft's apartment was lawful, Mauriello and all other NYPD, EMT and

FDNY defendants who participated in the first entry should be protected from suit

by the doctrine of qualified immunity.  See K.D. v. City of White Plains, supra,

921 F.Supp.2d 197, 212.  See also Randle v. Alexander, 960 F.Supp.2d 457,

479 (S.D.N.Y. 2013), quoting Cerrone v. Brown, 246 F.3d 194, 199 (2d Cir

2001)).[7]

As the Court in K.D. explained:

'Qualified immunity was created to shield government
officials from civil liability for the performance of
discretionary functions so long as their conduct does
not violate clearly established statutory or
constitutional rights of which a reasonable person
would have known.'

K.D., 921 F.Supp.2d at 213, quoting Atwater v. City of Lago Vista, 532 U.S. 318,

367 (2001) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  See Doninger

v. Niehoff, 642 F.3d 334, 345 (2d Cir. 2011).

In Hernandez v. City of New York, this Court explained that the

qualified immunity doctrine is "'an entitlement not to stand trial or face the other

burdens of litigation,'" 2004 WL 2624675 at 9 (S.D.N.Y. 2004), quoting Saucier v.

Katz, 533 U.S. 194, 200 (2001), and that the "immunity is 'effectively lost if a

case is erroneously permitted to go to trial.'"  Id., quoting Mitchell v. Forsyth, 472

_____

[7] Actually, the Court has the discretion to rule first on the application of the qualified immunity doctrine.  If
the Court were to agree with defendant Mauriello that he is entitled to qualified immunity for his decision
to join in the first entry, the Court could forego ruling on whether the first entry itself was a violation of
plaintiff's constitutional rights.  See K.D., 921 F.Supp.2d at 213.

U.S. 511, 526 (1985).  As this Court further instructed in Hernandez, "it is necessary that 'qualified immunity questions should be resolved at the 'earliest possible stage of litigation,' to satisfy the goal of the doctrine."  Hernandez, supra, at 9.

Since "[t]he question of qualified immunity is independent from the merits of the underlying action and must be examined independent of underlying . . . claims," id., the issue to be resolved is "whether the conduct at issue would violate clearly established rights."  Id.  As expressed by the K.D. Court, "'[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  K.D., 921 F.Supp.2d at 213, quoting Fabrikant v. French, 691 F.3d 193, 212 (2d Cir 2012). See Webster v. City of New York, 333 F.Supp.2d 184, 203-4 (S.D.N.Y. 2004)(RWS) (qualified immunity is granted if "'reasonable officers would disagree on the constitutionality of the [defendants'] actions,'" quoting Cerrone, 246 F.3d at 203).

As the Court in K.D. explained:

The Supreme Court has instructed that when a qualified immunity defense is asserted, a court should consider the specific scope and nature of a defendant's qualified immunity claim . . . [as] a determination of whether the right at issue was clearly established must be undertaken in light of the specific context of the case, not a broad general proposition. In other words, the Court must ask whether the right at issue was established in a particularized sense so that the contours of the right [were] clear to a reasonable official.  Although a case directly on point is not required to demonstrate that a right is clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.

921 F.Supp.2d at 213 (citations and internal quotations omitted).

Here, it simply cannot be said, in the "specific context of th[is] case," that it would have been clear to any objectively reasonable officer that making the first entry into Schoolcraft's apartment was unlawful. See Webster, supra. Plaintiff purposefully did not respond to reasonable efforts by the NYPD to make contact with him over a period of seven hours, after plaintiff left work early without approval, suddenly claiming to be sick. At a minimum, reasonable officers would differ and debate whether the first entry into Schoolcraft's apartment was unlawful, and there is no case law that places the question "beyond debate." In reality, it would have been irresponsible for any officer to have left the scene without entering Schoolcraft's apartment and confirming his well-being.

Consequently, Mauriello should be protected from a claim for unlawful entry pursuant to the doctrine of qualified immunity, and the Seventh Claim For Relief, to the extent it is asserted against him, should be dismissed.

POINT III

PLAINTIFF'S NINTH CLAIM FOR RELIEF FOR
CONSPIRACY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS
UNDER 42 U.S.C. § 1983 FAILS AS A MATTER OF LAW
AGAINST DEFENDANT MAURIELLO PURSUANT TO THE
INTRACORPORATE CONSPIRACY DOCTRINE AND
THE ABSENCE OF ANY VIABLE CONSPIRACY TO CAUSE
A VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

A.     Elements Of A 1983 Conspiracy Claim

The Second Circuit opinion most often quoted for its recitation of the elements of a conspiracy claim pursuant to 42 U.S.C. § 1983 is Pangburn v.

Culbertson, 200 F.3d 65 (2d Cir. 1999).  According to the Second Circuit in

Pangburn,

> [t]o prove a [section] 1983 conspiracy, a plaintiff must
> show:  (1) an agreement between two or more state actors
> or between a state actor and a private party; (2) to act in
> concert to inflict an unconstitutional injury; and (3) an overt
> act done in furtherance of that goal causing damages.

Id. at 72.  See Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999).)  The Court

acknowledged in Pangburn that "conspiracies are by their nature very secretive

operations and may have to be proven by circumstantial, rather than direct,

evidence."  Id.

> As the Second Circuit more recently has explained, however,

> [c]omplaints containing only conclusory, vague, or general
> allegations that the defendants have engaged in a conspiracy to
> deprive the plaintiff of his constitutional rights are properly
> dismissed; diffuse or expansive allegations are insufficient, unless
> amplified by specific instances of misconduct.

Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002).  Even more

recently, the Second Circuit has explained further that "a plaintiff 'must provide

some factual basis supporting a meeting of the minds, such that defendants

entered into an agreement, express or tacit, to achieve the unlawful end.'"  Webb

v. Goord, 340 F.3d 105, 110 (2d Cir. 2003), quoting Romer v. Morgenthau, 119

F.Supp.2d 346, 363 (S.D.N.Y. 2000).

> As discussed below, plaintiff's conspiracy claim is barred by the

intracorporate conspiracy doctrine and should be dismissed.  Even if it were not

barred, however, the claim is factually unsustainable, especially as it relates to

Steven Mauriello.

31

B.   Intracorporate Conspiracy Doctrine Bars Claim Of Conspiracy
     By The Individual NYPD Defendants_____

        A claim that the individual NYPD defendants conspired to violate

plaintiff's constitutional rights can not proceed against them because they are

employees of a single entity, and therefore "are legally incapable of conspiring

together."  Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008).  See Hermann v.

Moore, 576 F.2d 453, 459 (2d Cir. 1078); K.D. v. White Plains School District,

921 F.Supp.2d 197, 210 (S.D.N.Y. 2013); Dilworth v. Goldberg, 914 F.Supp.2d

433, 467 (S.D.N.Y. 2012) (citing Anemone v. Metropolitan Transp. Authority, 419

F.Supp.2d 602, 604 (S.D.N.Y. 2006), affirmed on other grounds, 629 F.3d 97 (2d

Cir. 2011)); and Nimkoff v. Dollhausen, 751 F.Supp.2d 455, 466-67 (E.D.N.Y.

2010).

        This intracorporate conspiracy doctrine has been repeatedly

applied to section 1983 conspiracy claims by the District Courts in the Second

Circuit, though the Second Circuit itself has not yet had to render an opinion on

its application.  See Chamberlain v. City of White Plains, 986 F.Supp.2d 363

(S.D.N.Y. 2013); and Anemone v. Metropolitan Transp. Authority, 629 F.3d 97,

121 (2d Cir. 2011) (aff'g on other grounds 419 F.Supp.2d 602 (S.D.N.Y. 2006)

(since Court below found the individual defendants did not violate plaintiff's

constitutional rights, it concluded "we need not decide whether they can properly

be charged with conspiring to violate these rights under § 1983").)

        The District Court in Anemone, supra, persuasively expressed the

rationale for applying the intracorproate conspiracy doctrine to section 1983

claims as follows:

[T]he doctrine's logic is sound.  A civil rights conspiracy requires an agreement between two or more actors to inflict an unconstitutional injury.  This 'two or more actors' requirement cannot be satisfied where all of the alleged conspirators are employees of a single entity and acting within the scope of their employment as agents of that entity.  Although an exception to the doctrine applies when individual employees are 'pursuing personal interests wholly separate and apart from the entity,' this exception is of no use to [plaintiff] here because he alleges that all of the individual defendants were acting within the scope of their employment when they violated his constitutional rights, and he claims that the acts of firing and stigmatizing him 'were taken pursuant to official policy, practice and custom'.

Although the intracorporate conspiracy doctrine limits the liability of individual defendants belonging to the same public entity in certain cases, [plaintiff's] contention that the doctrine grants public employees 'a license to conspire to violate a persons [*sic*]  constitutional rights with impunity' sounds a false alarm.  Even without a Section 1983 conspiracy claim, a plaintiff who suffers a constitutional injury can still assert direct Section 1983 claims against each and every public employee who participated in the deprivation in his or her individual capacity seeking both compensatory and punitive damages.  Additionally, a claim for damages against the municipal entity brought under <u>Monell</u>  . . . , is not as narrowly circumscribed as plaintiff suggests.  Indeed, [plaintiff's] complaint itself, which includes individual claims against several . . . officials and a <u>Monell</u> claim directly against the [public entity], illustrates the many avenues of relief open to a victim of a constitutional deprivation.

419 F.Supp.2d at 604 (citations omitted).  So, too here.

The Second Circuit has adopted the intracorporate conspiracy doctrine in the comparable context of conspiracy claims pursuant to 42 U.S.C. § 1985 [cites], and no rationale has been articulated for the Second Circuit or any other Court to do otherwise with respect to 1983 claims.

Plaintiff's Ninth Claim For Relief therefore should be dismissed against Steven Mauriello and all other defendants based upon the intracorporate conspiracy doctrine.

C.   The Personal Interest Exception To The Intracorporate
     Conspiracy Doctrine Does Not Apply

We anticipate plaintiff will resort to the personal interest exception to the intracorporate conspiracy doctrine as a means of avoiding dismissal of his conspiracy claim.  There is no doubt that a personal interest exception has been recognized, but, as the District Court in Anemone explained, it applies only when the individual defendants "'are pursuing interests wholly separate and apart from the entity'" by which they are employed.  K.D., supra, 921 F.Supp.2d at 210, quoting Quinn v. Nassau Cnty. Police Dep't, 53 F.Supp.2d 347, 360 (E.D.N.Y. 1999) (emphasis added).

In addition, as the Second Circuit held when applying the exception in the context of a section 1985 claim, for the exception to apply, "[t]he plaintiff must . . . allege that [the defendants] acted other than in the normal course of their corporate duties."  Girard v. 94th St. and Fifth Ave. Corp., 530 F.2d 66, 72 (2d Cir. 1976)).  See also Dilworth, supra, 914 F.Supp.2d at 466.

Without these requirements -- that the personal interests allegedly being pursued must be wholly separate and apart from the employer's interests, and that defendants must not have been acting in the normal course of their duties -- the personal interest exception would swallow the intracorporate conspiracy doctrine, as personal interest always comes into play to some degree. [cases]

In a particular\ly thoughtful opinion explaining the meaning of the intracorporate conspiracy doctrine and the "[t]horny questions about its application," Roniger v. McCall, 72 F.Supp.2d 433, 441 (S.D.N.Y. 1999) (Roniger II), this Court addressed "a degree of uncertainty in the law" relating to the doctrine. Id. at 438. Numerous cases decided since then appear to have settled much of what concerned the Court in Roniger II. Still, even at the time the Court issued Roniger II, it acknowledged an earlier ruling by the Seventh Circuit "that an employee must be motivated 'solely' by personal bias or exclusively personal interests in order for the personal interest exception to apply." Id. at 440, citing Hartman v. Board of Trustees, 4 F.3d 465, 470 (7th Cir. 1993).

Ultimately, this Court determined in Roniger II that the standard to be used in evaluating the personal interest exception was whether the defendants were "motivated solely by personal interest distinct from [their employer]." 72 F.Supp.2d at 441. See also Salgado v. City of New York, 2001 WL 2900051 at 8 (S.D.N.Y. 2001) (this Court, two years after Roniger II, favorably cited and adopted the holdings of other courts that the personal interest exception requires that employees be motivated "solely" by personal interest or bias).

In this case, the SAC repeatedly alleges, without alternative, that the defendants were acting in furtherance of their employment and in the normal course of their duties. Specifically, the SAC alleges that the individual defendants acted at all times "under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York" (SAC ¶ 10), and "[e]ach and all of the acts of the

35

NYPD defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant the City of New York" (SAC ¶ 11) and "in furtherance of their employment" (SAC ¶ 12).  See also SAC ¶¶ 256-60 and ¶¶ 321-31.

In addition, plaintiff clearly alleges in the SAC that there was a "coordinated and concentrated effort by high ranking officials within the [NYPD] to silence, intimidate, threaten and retaliate against plaintiff . . . for his documentation and disclosure of corruption with[in] the NYPD" (SAC ¶ 2), and that "[d]efendants' myopic obsession with quotas came straight from the highest ranking officials in the [NYPD]" (SAC ¶51).

Accepting the truth of the cited allegations in the SAC for purposes of this motion, they establish that the personal interest exception to the intracorporate conspiracy doctrine does not apply.   It simply cannot be said that the actions taken during the second entry into plaintiff's apartment – when the only alleged harm was suffered by plaintiff -- were in furtherance of interests "wholly distinct" from those of the NYPD; nor can it be said the defendants who made that second entry were acting other than in the normal course of their duties, as plaintiff has alleged without qualification.  See Dilworth v. Goldberg, supra, 914 F.Supp.2d at 466; K.D., supra; Quinn, supra; Hartline, supra.

D.     No Evidence Defendants Conspired to Violate
       Plaintiff's Constitutional Rights_____

       i.  The Alleged Conspiracy

In the Ninth Claim For Relief, plaintiff alleges "[d]efendants conspired . . . to do whatever was necessary, lawful or not, to cause the arrest,

imprisonment, and involuntary confinement of plaintiff . . . " (SAC ¶ 308).  The

claim further alleges as follows (SAC ¶ 310):

> Pursuant to the conspiracy, the conspirators, and their
> employees, agents and servants, intentionally, recklessly,
> negligently, and/or with complete indifference to the rights
> of plaintiff . . .:  (a) manufactured false evidence; (b)
> unlawfully entered plaintiff's home; (c) illegally seized
> plaintiff's property; (d) verbally and physically threatened
> plaintiff in an attempt to silence him; (e) stalked and
> menaced plaintiff at his home; and [f] pressured, bribed,
> coerced and induced individuals to have plaintiff
> involuntarily confined to hospital treatment without his
> consent or any other lawful basis for doing so.

Although the pleadings do not specify the defendants who allegedly participated

in the conspiracy or when the conspiracy was hatched, the SAC clearly indicates

the conspiracy was "to do whatever was necessary, lawful or not, to cause the

arrest, imprisonment, and involuntary confinement of plaintiff," all of which

allegedly occurred during or after the second entry into Schoolcraft's apartment

(SAC ¶ 308).

According to the SAC, the purpose of the conspiracy was "to

tarnish plaintiff's reputation and discredit his allegations" of "an illegal quota

policy" and the misclassification of complaints (SAC ¶ 2).

    ii.  The Alleged Culmination of the Conspiracy -- The Arrest,
        <u>Imprisonment and Involuntary Confinement of the Plaintiff</u>

The "arrest" of the plaintiff alleged in paragraph 308 of the SAC

occurred when handcuffs were placed on plaintiff during the second entry into his

apartment.  The alleged "imprisonment" followed the placing of the handcuffs and

would have involved carrying plaintiff out of his apartment and placing him in an

ambulance to be taken to Jamaica Hospital.  The "involuntary confinement"

alleged in paragraph 308 apparently refers to the supposed efforts of the NYPD

defendants to have plaintiff admitted to Jamaica Hospital.  Steven Mauriello was

not present for or involved in any of that alleged activity, and, in any event, it is

genuinely beyond dispute that none of it was in furtherance of the alleged

conspiracy.

      iii.    The Two Entries into Plaintiff's Apartment
                  <u>Demonstrate the Absence of a Conspiracy</u>

Plaintiff alleges in paragraph 310 that in furtherance of the

conspiracy defendants "unlawfully entered plaintiff's home."  There were two

entries into plaintiff's apartment, however, and the SAC does not acknowledge or

distinguish the two.  We will presume for purposes of this motion that plaintiff

intends for his allegation to mean that both entries were in furtherance of the

alleged conspiracy.  In fact, the occurrence of two entries illustrates the complete

absence of any conspiracy.

We discussed above in Point II.A.(v)(b) that the first entry into

plaintiff's apartment was justified.  Whether or not that is so, for purposes of the

conspiracy claim, what matters is that no harm was caused to plaintiff during the

first entry, and plaintiff ultimately left the apartment to go to the hospital for a

medical exam (SMF 100-04).  If there had been a conspiracy in place to violate

plaintiff's constitutional rights, defendants would not have allowed plaintiff to

leave the apartment unscathed after the first entry.  They simply would not have

waited until the unexpected and extremely unlikely second entry – an event

completely beyond their control -- to act on their allegedly pre-existing conspiracy

to violate plaintiff's rights.  Instead, they would have taken their planned action

during the first entry, and probably would have made the first entry a lot sooner, because the first entry is the only entry they ever were likely to make and would be the only chance they would get to fulfill the goal of the alleged conspiracy.[8]

In other words, what the uneventful end to the first entry reveals is that there had never been a conspiracy in place to violate plaintiff's constitutional rights.  The second entry was merely an event unto itself, and the actions taken by the NYPD defendants who participated in the second entry was merely a response to the circumstances as they existed at that time.  Plaintiff suddenly and unexpectedly returned to his apartment, and certain of the NYPD defendants followed him believing it was appropriate to do so.  What ever else might be said about the second entry, there is no basis to conclude it was in furtherance of a conspiracy to violate plaintiff's constitutional rights.

Had plaintiff gotten in the ambulance after the first entry, the second entry would not have happened, and the absence of a conspiracy would have been resoundingly confirmed.

iv. The Fact that the Two Entries into the Apartment Illustrate the Absence of a Conspiracy, is Affirmed by Consideration of when the Alleged Conspiracy might have been Hatched -- which only could have been on October 31, 2009 at the time of the Second Entry, which is to say Not at All

Analysis of when the alleged conspiracy might have been agreed upon again makes it especially clear there never was a conspiracy to violate plaintiff's constitutional rights.  In the SAC, plaintiff recites as background his

---

[8] In fact, defendants had no reason to expect they ever would have had to respond to plaintiff's residence in the first place.  They simply could not have anticipated the events earlier in the day that put them in that position, and not even the wildest imagination could conclude defendants somehow conspired to make it happen.  Theoretically, defendants could have conspired before they got to plaintiff's residence, but if that were so, they, again, would have violated plaintiff's rights during the first entry.

experience in the 81st Precinct since 2006.  For purposes of this motion, we do not challenge his allegations.  We do, however, consider them immaterial to plaintiff's claims, as they do nothing to create any basis for a finding that a conspiracy had been hatched to violate plaintiff's constitutional rights as allegedly occurred on October 31, 2009.

Neither plaintiff nor anyone on his behalf expressed his purported objection to illegal quotas or crime misclassification until David Durk did so on August 31, 2009 (SMF 120-21).  Before that, plaintiff occasionally expressed concern about his failure to sufficiently engage in the kind of police-related activity required of him, and about people retaliating against him because he intended to appeal his poor evaluation, but nothing else (SMF 1-28).  Consequently, any adverse treatment plaintiff allegedly suffered prior to the date Durk spoke to Del Pozo had only to do with his poor performance, his evaluation and his plan to appeal.  There simply is no indication anything was done throughout that time to silence him from objecting about illegal quotas or crime misclassification (only pressure him to do his job), as no one at NYPD knew he had any such complaints (Mauriello Affidavit ¶ 5; SMF 1-28).  Thus, there could not have been any conspiracy hatched prior to August 31, 2009, to violate plaintiff's constitutional rights on account of such unrevealed objections.

For the period from August 31, 2009, through October 30, 2009, we again do not challenge plaintiff's allegation that one or more of the defendants learned about Schoolcraft's complaints to IAB and QAD.  The facts are in dispute and can not and need not be resolved for purposes of this motion.  What matters is that during that period nothing was done to Adrian Schoolcraft by anyone at

NYPD that was in furtherance of any conspiracy to silence him or violate his constitutional rights, or that otherwise caused him any cognizable harm.

The question is, then, whether there is a basis for plaintiff to proceed against Steven Mauriello on a claim that he and other defendants conspired to violate plaintiff's constitutional rights on October 31, 2009 -- in an effort to silence him from objecting about illegal quotas and crime reporting -- and ultimately did violate his constitutional rights, during the second entry into plaintiff's apartment. The answer, based upon the law and the undisputed facts, quite clearly is no – plaintiff can not maintain such a claim against Steven Mauriello (and should not be permitted to do so against any of the other defendants).

Until the second entry and the events that then ensued, the conduct of defendants at plaintiff's residence included the following: waiting outside of plaintiff's apartment while they tried to establish direct contact with him over a period of seven hours; speaking with plaintiff's father; speaking with Dr. Lamstein ; having Dr. Lamstein try to reach plaintiff on the telephone and then leaving him a message to call her so the situation could be defused; entering plaintiff's apartment using a key from the landlord; directing plaintiff to return immediately to the precinct for questioning, along with two other officers, about his early, unauthorized departure from work; and then encouraging plaintiff to instead follow the advice of EMS and go to the hospital in the ambulance.

Such conduct not only did not give rise to a constitutional violation by Steven Mauriello or anyone else that would be compensable pursuant to 42

41

U.S.C. § 1983, but also makes clear that a conspiracy had not been agreed upon.

    v.  <u>The Conspiracy Claim against Steven Mauriello should be Dismissed</u>

        Based upon the foregoing, the Ninth Claim For Relief for conspiracy to violate plaintiff's constitutional rights, to the extent it is alleged against Steven Mauriello, should be dismissed.  First and foremost, it is barred as a matter of law pursuant to the intracorporate conspiracy doctrine; and the personal interest exception does not apply.  In addition, there is no evidence a conspiracy ever existed, and Mauriello played no role and had no involvement in the second entry, which is the only time a conspiracy could have been hatched and acted upon (though in that case it is far-fetched to consider it a conspiracy at all).

POINT IV

PLAINTIFF'S STATE CLAIMS FOR ASSAULT,<br>
BATTERY, FALSE ARREST, FALSE IMPRISONMENT<br>
AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>
ALL FAIL TO STATE A CLAIM UPON WHICH RELIEF<br>
CAN BE GRANTED AS A MATTER OF LAW

        Plaintiff's state law claims should be dismissed to the extent they are alleged against Steven Mauriello for the same reasons the counterpart federal claims should be dismissed – because the alleged wrongdoing took place during the second entry, when Mauriello was not present.

<u>Conclusion</u>

Based upon all of the foregoing, the claims asserted against Steven Mauriello should be dismissed in their entirety.

Dated:  New York, New York
December 22, 2014

SCOPPETTA SEIFF KRETZ & ABERCROMBIE
Attorneys for Defendant STEVEN MAURIELLO


By: _____
Walter A. Kretz, Jr., (WK-4645)
444 Madison Avenue, 30th Floor
New York, NY  10022
wakretz@seiffkretz.com
212-371-4500