SM Exhibit F

Page 1

1    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------------------------X

3    ADRIAN SCHOOLCRAFT,

4                         Plaintiff,

5
                                      Case No:

6         - against -              10 CV 06005

7

     THE CITY OF NEW YORK, ET AL.,

8

9                         Defendants.

10   ------------------------------------------------X

11                   100 Church Street

                     New York, New York

12

                     January 30, 2014

13                   10:22 a.m.

14

15

16

17   DEPOSITION OF CATHERINE LAMSTEIN-REISS, M.D.,

18   pursuant to Subpoena, taken at the above

19   place, date and time, before DENISE ZIVKU, a

20   Notary Public within and for the State of

21   New York.

22

23

24

25

Page 55

```
1                C. LAMSTEIN-REISS, M.D.
2         Objection.
3         A.      I think they report to their
4    chief surgeon as well as the CO.  I don't
5    really know who is the person they directly
6    report to.  It's not really -- I don't --
7         Q.      I'm asking you a different
8    question.  If you don't know, that's fine.
9    If you know, I would like to know.  What is
10   the chain within the medical division?
11                MS. PUBLICKER METTHAM:
12        Objection.
13        A.      That is a very broad question.
14   It's a bunch of different units within the
15   medical division.  I don't know everybody's
16   chain of command.  I can tell you with
17   certainty my chain of command.
18        Q.      I got that.
19        A.      Yeah.
20        Q.      All right.  You told me that
21   Ciuffo, C-i-u-f-f-o, he was the district
22   surgeon in the medical division in 2009?
23        A.      Dr. Ciuffo, yes.
24        Q.      Ciuffo, okay.  I will try and
25   keep that straight.  Do you know Dr. Ciuffo?
```

Page 56

1                C. LAMSTEIN-REISS, M.D.

2         A.        I know him in that we've spoken

3    on the phone regarding cases.  I don't

4    believe I ever met him in person.  I might

5    have at some point over the years.

6         Q.        Did you ever speak to him about

7    Schoolcraft?

8         A.        I would have to refer to the

9    case folder to be certain -- actually yes, I

10   did speak with him.  I did speak with him in

11   the beginning shortly after he -- my first

12   evaluation with Officer Schoolcraft.

13        Q.        What did you discuss with him?

14        A.        The officer's status, both

15   psychologically and medically.  He was -- he

16   went out sick with a -- when he called out

17   sick he used a medical code saying he was

18   sick medically.  He then, either directly or

19   indirectly, informed the surgeon that there

20   were psychological factors.  So the referral

21   got made to us.  So we could not take him

22   off of sick report.  I determined that he

23   was able to work on restricted duty basis.

24   He did not need to be out sick

25   psychologically, but I couldn't take him off

Page 57

C. LAMSTEIN-REISS, M.D.

1
2  sick report, because he was not out sick
3  with a psychological code.  So the district
4  surgeon did his own assessment medically and
5  determined that he was medically fit for
6  full duty and, so he medically restored his
7  status and we psychologically put him on
8  restricted duty.  That was sort of just
9  coordinating the administrative aspect.
10        Q.       When you say we put him on
11  restricted status, what are you referring
12  to?
13        A.       The psychological evaluation
14  section.
15        Q.       Who was involved in the
16  decision?
17        A.       Myself and Dr. Propper.
18        Q.       Do you remember the conversation
19  that you had with Dr. Ciuffo?
20        A.       I don't recall except what's in
21  my notes.  I don't have any direct memory of
22  that conversation.
23        Q.       What have you done to prepare
24  for today's deposition?
25        A.       I reviewed the full case folder.

1            C. LAMSTEIN-REISS, M.D.

2    I didn't review the candidate's testing

3    portion of it.  I reviewed my case folder

4    from PES.

5            Q.      You reviewed the file that's in

6    front of you right now?

7            A.      Correct, but I did not review

8    the part that was from the psychological

9    section, which is like the pre-employment

10   training.  I read that at some point years

11   ago.  I didn't recently re-read that.

12           Q.      When did you read the case file?

13           A.      I read it yesterday.  I also

14   read it a few weeks ago.

15           Q.      You read the whole thing, other

16   than those pre-employment --

17           A.      Yes.

18           Q.      You read the notes that have

19   been removed from the file, right?

20           A.      Yes.

21           Q.      What else did you review?

22           A.      I discussed it with counsel,

23   reviewed information with counsel.

24           Q.      When you say counsel, who are

25   you referring to?

Page 146

```
 1              C. LAMSTEIN-REISS, M.D.
 2   Provided MOS with psycho education.  In that
 3   paragraph.
 4              MS. PUBLICKER METTHAM:  I will
 5       just note for the record it's also
 6       found on the document bearing Bates
 7       Number D306.
 8       A.       It may be also in here too, but
 9   that's --
10       Q.       What's the date of this entry?
11       A.       April 13, 2009.
12       Q.       Where did you see that date?  Is
13   that on the prior page?
14       A.       Yes.
15       Q.       At the top where the f-i-f-t
16   something O Adrian Schoolcraft?
17       A.       Say cont for c-o-n-t, like
18   continuation of F/F meaning face-to-face
19   with DO Adrian Schoolcraft on 4/13/09.
20              MS. PUBLICKER METTHAM:  And
21       again, this page is NYC2996 and NYC --
22       or I'm sorry D305.
23       Q.       Can you read the entry that
24   you're referring to feedback given to MOS,
25   after that what does the entry say?
```

Page 147

C. LAMSTEIN-REISS, M.D.

1

2     A.      Sure.  Provided MOS with psycho

3 education on mind body connection and urged

4 him to see a psychologist who specializes in

5 that.  He agreed.  Also, recommended a

6 medication evaluation with a psychiatrist

7 instead of his primary care physician, but

8 he declined, preferring to avoid meds if

9 possible.

10          MR. CALLAN:  Off the record.

11          (Discussion off the record.)

12     Q.      Is there a reference in your

13 notes to you recommending that he do

14 long-term therapy?

15     A.      I believe there is.  Let me find

16 it.  I don't see it my notes.  However, it's

17 very clear in my mind.  The initial

18 interview and I may have -- if I did mention

19 it in the subsequent interviews, it will be

20 on the recordings.

21     Q.      So you don't see a reference in

22 your file recommending long-term therapy; is

23 that right?

24     A.      I don't, because that was not

25 what was most important for the fitness for

```
 1              C. LAMSTEIN-REISS, M.D.
 2   duty evaluation.  It was for his own
 3   personal benefit.
 4        Q.     So, it wasn't that important; is
 5   that what you're saying to me?
 6              MS. PUBLICKER METTHAM:
 7        Objection.
 8        A.     To the decision about at what
 9   point we would return him to full duty work
10   whether or not he dealt with those issues
11   would not have been an issue, as far as
12   fitness for police duty.  For his own
13   personal life satisfaction, it would have
14   been helpful.
15        Q.     What did Schoolcraft have to do
16   in order to return to full duty?
17              MS. PUBLICKER METTHAM:
18        Objection.
19        A.     He would have, you know, he
20   would have needed to have been assessed as
21   being psychologically fit for full duty.  My
22   biggest concerns would be that he was
23   asymptomatic for a period of time.  I would
24   have felt much better about returning him
25   had he done the stress management training
```

Page 149

C. LAMSTEIN-REISS, M.D.

1

2  to know that should stressful -- when

3  stressful things happen with his life again

4  that these symptoms would not reoccur.  We

5  need a significant period of time to know

6  that things really are calm and it's

7  possible.  It's not something that I had

8  discussed with supervisors at that point,

9  but it's possible that we might have been

10  able to return him to full duty without

11  being able to speak to the doctor who

12  prescribed the Seroquel.  Some doctor

13  thought he needed an antipsychotic and it

14  would not be prudent of us to give someone

15  back their gun in position of police

16  authority without knowing why that was.

17        Q.      Well, did you ever find out why

18  some physician prescribed Seroquel?

19        A.      The officer refused to allow me

20  to obtain that information.

21        Q.      Who was it that prescribed

22  Seroquel?

23        A.      Dr. Sure.

24        Q.      How do you know that Dr. Sure

25  prescribed Seroquel?

Page 150

1              C. LAMSTEIN-REISS, M.D.

2      A.      Because Officer Schoolcraft told

3  me that he did and that Officer Schoolcraft

4  told me he was not sure why it was

5  prescribed.

6      Q.      Don't you, as a doctor reviewing

7  the fitness for duty of a police officer,

8  have a right to gain access to his medical

9  file?

10     A.      No.  We do not have a right to

11  do that without his written permission.  We

12  do have a right to say that the person

13  cannot be cleared to go back to full duty if

14  we don't have it.  But he is not required to

15  release his personal medical information if

16  he does not want to.

17     Q.      So am I correct that you would

18  not have returned Schoolcraft to full duty

19  without getting a release from him to talk

20  to Dr. Sure about why Sure prescribed

21  Seroquel?

22              MS. PUBLICKER METTHAM:

23      Objection.

24     A.      I don't know because I do not

25  make those decisions by myself and I had not

Page 177

```
 1              C. LAMSTEIN-REISS, M.D.
 2    this three-page document Bates Stamped 2895
 3    through 2897?
 4         A.      In it's briefest format.
 5         Q.      Are there any errors in it that
 6    you're aware of?
 7              MS. PUBLICKER METTHAM:
 8         Objection.
 9         A.      No, there are no errors.  I tend
10    to be more detailed, my directors prefer
11    things more brief --
12         Q.      -- I just want to know if there
13    are any errors --
14         A.      There are no errors there may be
15    things that I would have thought were
16    pertinent to put in and my director said ah,
17    we don't need that.  Stick to the basics.
18         Q.      Sitting here today there is no
19    mistakes in here, right?
20              MS. PUBLICKER METTHAM:
21         Objection.
22         A.      To the best of my knowledge.
23         Q.      The first line says 4/13/09 MOS
24    referred to PES.
25              MS. PUBLICKER METTHAM:   That's
```

Page 178

1                    C. LAMSTEIN-REISS, M.D.

2          the second line.

3                    MR. SMITH:   Whatever.

4          Q.      Do you see that reference?

5          A.      I do.

6          Q.      And that's a reference to the

7     document we looked at before, the

8     consultation referral sheet, right?

9                    MS. PUBLICKER METTHAM:

10         Objection.

11         A.      Yes.

12         Q.      Do you know whether or not

13    Ciuffo made any notes of his meeting with

14    Schoolcraft?

15                   MS. PUBLICKER METTHAM:

16         Objection.

17         A.      I do not know.  Aside from the

18    referral form to us.  I don't know if he

19    made any other notes.

20         Q.      Would it be common, to your

21    understanding, that District Surgeon Ciuffo

22    would be make notes before making a

23    referral, such as the referral he made to

24    PES?

25                   MS. PUBLICKER METTHAM:

Page 179

1              C. LAMSTEIN-REISS, M.D.

2         Objection.

3         A.    I would imagine so, but I don't

4    know I never talked with him about how he

5    keeps records.

6              MR. SMITH:  All right, I am

7              going to make a request for the

8              production of any references to ^

9              Schoolcraft by District Surgeon Ciuffo.

10             MS. PUBLICKER METTHAM:  Take the

11             request under advisement.  I ask that

12             you put it in writing.

13        Q.    The next line says that you

14   interviewed Schoolcraft the next day, right?

15             MS. PUBLICKER METTHAM:

16        Objection.

17        A.    The same day.

18        Q.    I'm sorry.  You're right, the

19   same day.  So you interviewed Schoolcraft on

20   October 13, 2009; is that right?

21             MS. PUBLICKER METTHAM:

22        Objection.  You mean April?

23        A.    Yes.

24        Q.    April 13, 2009, you interviewed

25   Schoolcraft; is that right?

Page 180

1              C. LAMSTEIN-REISS, M.D.

2       A.      Yes.

3       Q.      How long was that interview?

4       A.      I do not know.  I don't document

5    when I start and end interviews.

6       Q.      Are your notes in this exhibit

7    for that interview that day?

8       A.      Yes.

9       Q.      Can you please locate them and

10   read them to me, please?

11      A.      There are a few pages of notes

12   which suggest to me it was a longer

13   interview.  I recall it being a long

14   interview, but I can't tell you exactly how

15   long.

16              MS. PUBLICKER METTHAM:   I

17         believe that's page D302 in the prior

18         production.

19      Q.      Can you please read your notes

20   on your interview with Schoolcraft on April

21   13, 2009?

22      A.      Sure and where I have

23   abbreviation and acronyms, do you want me to

24   read what it stands for?

25      Q.      Yeah, I appreciate that.

```
 1              C. LAMSTEIN-REISS, M.D.
 2       A.       Okay.  April 13, 2009,
 3   face-to-face with Police Officer Adrian
 4   Schoolcraft, on job since 2002.  Male
 5   33-years old, chest pains for about one
 6   year, started in work situation like heat
 7   and heavy gear on, chest tightness, EKG
 8   normal.  A few weeks ago on April 3, 2009,
 9   was off-duty at home and felt bad, felt
10   weak, chest tightness, could feel heart
11   thumping, never -- a little out of order
12   here, but had nerve symptoms in his arms,
13   not rapid heartbeat, felt like heart does
14   when doesn't sleep well.
15              Went to the ER at Forest Hills
16   gave injection of Lorazepam and woke up
17   feeling great.  Took one one milligram each
18   of the next two nights, but didn't help.
19   Last few months started getting blisters on
20   feet.  I asked if he had more foot posts
21   now.  He replied yes, since November, but I
22   am more comfortable on foot than in RMP;
23   cars are too small for me, people smoke in
24   cars at command.
25              Was in Navy before this and
```

Page 182

1            C. LAMSTEIN-REISS, M.D.

2    knows how to wrap blisters in moleskin,

3    would rather work alone, stomach problems

4    about six months, diarrhea and constipation.

5    No meds for it.  About one month ago PCP

6    prescribed Seroquel.  I asked if that was

7    for sleep or stomach.  He said for sleeping

8    I think.  Doesn't want --

9        Q.      Can I interrupt you for a

10   second?

11       A.      Sure.

12       Q.      Is the Seroquel the medication

13   you were referring to earlier the

14   antipsychotic?

15       A.      Yes.  Which is why it made no

16   sense that he was saying it was prescribed

17   for stomach stuff.

18       Q.      Well, that's your question, you

19   asked him was he prescribed for sleep or for

20   his stomach; is that right?

21       A.      Right.

22       Q.      And he told you that he thought

23   it was for sleeping, right?

24       A.      He thought in response to my

25   asking that.

Page 183

```
 1              C. LAMSTEIN-REISS, M.D.
 2        Q.        Is Seroquel something that's
 3   also prescribed for stomach ailments?
 4              MS. PUBLICKER METTHAM:
 5        Objection.
 6        A.        Not to my knowledge.
 7        Q.        So why are you asking him about
 8   why or whether or not it was prescribed in
 9   his understanding for sleep or stomach?
10              MS. PUBLICKER METTHAM:
11        Objection.
12        A.        Because the context of
13   discussing medical was that he was not
14   taking any medication for the stomach
15   problem and then he said one month ago his
16   doctor prescribed Seroquel.  So I wasn't
17   sure what that would relate -- how that
18   would relate to stomach problems.
19        Q.        Okay.  All right.  Please
20   continue.  Thank you.
21        A.        Doesn't want meds.  Until
22   recently hadn't seen a doctor since got out
23   of military.  Trouble sleeping about three
24   months.  I asked more about that.  He works
25   4 to 12.  I asked other questions.  Goes to
```

Page 184

1              C. LAMSTEIN-REISS, M.D.

2    bed around 5:00 a.m. I asked if that's

3    because he can't sleep and he said depends

4    on how tour went.  May have notes and

5    paperwork to complete.  Has TV on.  Gets up

6    around 1 or 2:00 p.m.  I asked if he wakes

7    up during night.  He said no.  I asked if he

8    falls asleep at 5:00 or gets in bed at 5:00

9    he said sleeps at 5:00.

10        Q.    Can you just hold on a second.

11   Where were you just reading from?

12        A.    The top of the next page.  It

13   starts with, wake up during night.

14             MS. PUBLICKER METTHAM:  The top

15        of page NYC2993 and D301.

16        Q.    Oh, I see it's the prior page in

17   the first production in the second page --

18   all right, go ahead.

19        A.    So eight hours and he said

20   right.  So I asked a follow-up question.  He

21   says that's once every two or to three days.

22   If has errands to do, gets up 9 to

23   10:00 a.m. to get it done.  So four to

24   five hours of sleep.  I asked other

25   questions.  He gets eight hours on RDOs, his

Page 185

1                C. LAMSTEIN-REISS, M.D.
2       regular days off from work.  During work
3       week, three out of five days gets four to
4       five hours.  Feels rundown, wonders when it
5       will stop, when he can work regular hours.
6       Others seem to handle it well.  Quote, I eat
7       crap, end quote, when at work.  Wants to
8       stop eating meat for ethical reasons, but
9       keeps on putting it off because doesn't cook
10      and hard to carry food around on foot post.
11      Got referrals to see nutritionist and
12      psychiatrist.  Wants a better lifestyle.
13      Drinks too much soda, not diet, sometimes
14      walks to the Seven-Eleven at 3:00 a.m. for
15      junk food.  I asked if he had any work
16      problems.  He said has been told to write
17      more summonses.  In January got eval saying
18      2.5 below standards and recommended
19      transfer.  He appealed it.  Next day had
20      sign on locker saying, quote, if you don't
21      like your job get another one, end quote.
22      Bosses and delegates don't even know how to
23      go about doing an appeal.  He hired a labor
24      attorney at a cost of $5,000 retainer.  Top
25      of the next page.  You have that page

Page 186

1              C. LAMSTEIN-REISS, M.D.
2    number?  Starts with union won't help.
3              MS. PUBLICKER METTHAM:  2994 and
4        D303.
5        A.      Union won't help and delegate --
6        Q.      The top of that page says
7    continuation of --
8        A.      I'm sorry.  Continuation of
9    4/13/09 face-to-face with P.O. Adrian
10   Schoolcraft.
11       Q.      All right, continue, please.
12       A.      Sure.  Union won't help and
13   delegates don't know what to do.  Eval says
14   he's been retrained and counseled, but he
15   never was.  No warning.  2/25/09 MOS
16   delegate and eight to nine supervisors in a
17   room, including CO and XO, ICO, assistant
18   ICO and admin lieutenant.  They said he has
19   low activity.  Others writ fakes summonses
20   and command won't do anything about it.
21   They write --
22       Q.      Can you stop right there for a
23   second?
24       A.      Sure.
25       Q.      What did you understand fake

Page 300

1              C. LAMSTEIN-REISS, M.D.

2    file; is that right?

3              MS. PUBLICKER METTHAM:  And it

4         looks like it's also on D291.

5              THE WITNESS:  Yeah, and that

6         doesn't have the other handwriting on

7         top.

8              MS. PUBLICKER METTHAM:  Right.

9         Q.    Do you know who Deputy Mayor

10   Skyler's assistant was?

11        A.    I do not.

12        Q.    Who is Deputy Mayor Skyler?

13        A.    I believe he's the Deputy Mayor

14   of the City of New York at the time.  I

15   never heard of him before.

16        Q.    Then you met with Schoolcraft

17   when you returned from vacation a few days

18   of this contact, right, from Bonilla?

19        A.    I think it was about two weeks

20   later, but yes, on my first day back.

21        Q.    October 27th, right?

22        A.    Yes.

23        Q.    That's the meeting that was

24   recorded by Schoolcraft, right?

25        A.    Yes.

Page 301

1              C. LAMSTEIN-REISS, M.D.

2        Q.        And you recently listened to

3    that?

4        A.        About two weeks ago.

5        Q.        And am I correct that you told

6    Schoolcraft that he was not your patient?

7        A.        Correct -- well, actually, I

8    don't remember if I said that.  What I can

9    tell you is that he was not my patient.  I

10   don't remember if I told him on that date

11   that he was not my patient.

12       Q.        Did you tell him that it was not

13   your function to provide him with a

14   diagnosis?

15       A.        Again, I don't remember if I

16   said that on that date, but it is not my

17   function to provide a diagnosis, unless I am

18   recommending someone for disability

19   retirement.  That's the only time we provide

20   a diagnosis.

21       Q.        Did you tell him on that date or

22   any other date that it was not in your

23   function to provide him with treatment?

24       A.        I do not remember, but I can

25   tell you that we do not provide treatment.

Page 302

1          C. LAMSTEIN-REISS, M.D.

2      Q.      Did you tell him on the date or

3  the earlier time that you spoke to him in

4  July that he could not have a copy of his

5  file that you maintained on him?

6      A.      I don't remember if and when I

7  said that, but I would have said that

8  requests like that go to the NYPD's legal

9  bureau and typically they do not release

10 full case folders to officers.  So what they

11 do release is if we were recommending

12 someone for a disability retirement and they

13 were contesting it, they would sign a

14 release and that would typically authorize

15 us to release that the report recommending

16 the disability retirement to, either their

17 attorney or their mental health treatment

18 provider.

19     Q.      Do you recall Schoolcraft making

20 a request for his file?

21     A.      I don't recall.

22     Q.      But if he had requested his

23 file, you would have declined that request,

24 right?

25              MS. PUBLICKER METTHAM:

Page 303

1              C. LAMSTEIN-REISS, M.D.

2      Objection.

3      A.      Right.  I'm not authorized to

4  just give people copies of their file.

5      Q.      Am I correct that on October

6  27th, you told Schoolcraft that he doesn't

7  need medication?

8              MS. PUBLICKER METTHAM:

9      Objection.  Asked and answered.  You

10     can answer again.

11     A.      On October 27th?

12     Q.      Yes.

13     A.      On that date I believed he --

14 based on his reporting that he hadn't had

15 symptoms in a while, it was my belief that

16 he did not need medication.

17     Q.      Did you also, as of that date,

18 tell him that he didn't need to go see a

19 psychiatrist?

20     A.      Yes.

21     Q.      Am I correct that on that date

22 that you encouraged him to do the cognitive

23 behavioral therapy that you recommended

24 earlier in the year, right?

25     A.      Yes.

Page 304

C. LAMSTEIN-REISS, M.D.

1

2      Q.      And did you tell Schoolcraft

3  that his complaints about management

4  violating NYPD policy was really not your

5  concern?

6           MS. PUBLICKER METTHAM:

7      Objection.

8      A.      I don't remember whether I said

9  that or not.  That would not be a concern in

10  his fitness for duty evaluation.  Whether or

11  not he still had physical symptoms of stress

12  or whether or not he had learned ways to

13  prevent that from happening in the future.

14  Those are things that relate to our

15  decision.  My purpose is doing a fitness for

16  duty evaluation.  I'm not IAB.

17      Q.      Did you tell him on October 27th

18  that you didn't think he needs to see a

19  psychiatrist?

20           MS. PUBLICKER METTHAM:

21      Objection.  Just asked and answered.

22      A.      I did just answer that.

23      Q.      You did and the answer was?

24      A.      I did not think he needed a

25  psychiatrist, because he was reporting that

Page 305

```
 1              C. LAMSTEIN-REISS, M.D.
 2    he no longer had symptoms.  What I did think
 3    -- a reason to see a psychiatrist would be
 4    for medication or evaluation to see if he
 5    needed medication.  I thought -- although,
 6    some of them do therapy, I thought his best
 7    option for successful treatment would be
 8    seeing a psychologist who specialized in
 9    CBT, specifically learning stress management
10    techniques and anxiety reduction techniques.
11    Since he wasn't real interested in exploring
12    other things, that at least would -- it was
13    not clear to me if he really no longer had
14    symptoms or if he was just saying that to
15    get off restricted duty.  Either way, even
16    if the symptoms magically went away after a
17    year as soon as he went on restricted duty,
18    either way we would feel a lot better
19    returning him to work had he learned ways of
20    preventing that.
21         Q.     Did you tell --
22         A.     And I did wonder if maybe he
23    still had the symptoms.
24         Q.     Did you tell him on October 27th
25    that he was -- had what you characterized
```

Page 306

```
 1              C. LAMSTEIN-REISS, M.D.
 2   was sort of anxiety disorder that was not
 3   severe?
 4              MS. PUBLICKER METTHAM:
 5        Objection.
 6        A.      I do not know.
 7        Q.      You don't remember?
 8        A.      I don't remember exactly what I
 9   said.  If you want you can play the tape and
10   ask me if that's what I said, but I don't
11   know if -- what exactly I said.  I know his
12   anxiety disorder at that point did not seem
13   that severe.  Whether or not I said that and
14   used those words, I really, I don't have a
15   recollection.
16        Q.      As of October 27th, it was your
17   opinion that he was fine?
18              MS. PUBLICKER METTHAM:
19        Objection.
20        A.      I don't know what you mean by
21   fine.
22        Q.      Well, what was your opinion of
23   his mental state as of October 27, 2009?
24        A.      I suspected that the symptoms
25   hadn't gone away and he just said that
```

Page 307

```
 1           C. LAMSTEIN-REISS, M.D.
 2    because he didn't want to be on restricted
 3    duty.  Because he had them for -- some
 4    symptoms up to a year and they went away as
 5    soon as he was on restricted duty.  Not
 6    likely to happen without treatment, unless
 7    being on restricted duty reduced the sources
 8    of his stress.  Although, he said he found
 9    inside work no less stressful than outside
10    work.  Although, on a different date he said
11    that it was less stressful, because his
12    bosses were leaving him alone since he was
13    doing inside work.  He said both.  So I
14    really did not know if he was still having
15    those symptoms and saying he didn't just to
16    get back on full duty or if he -- if he
17    really did get better.  I wasn't sure.
18         Q.     Did he present himself to you as
19    coherent on October 27th?
20         A.     Coherent, yes.
21         Q.     And oriented in and of an
22    appropriate way?
23         A.     Yes.
24         Q.     And did he appear to suffering
25    from any kind of anxiety to you?
```

Page 308

1              C. LAMSTEIN-REISS, M.D.

2         A.      I was not sure.  He did not

3    appear anxious in the interview, but he had

4    previously reported symptoms that lasted up

5    to a year and then sometimes people don't

6    want to be on restricted duty so they right

7    away say oh, no, I'm better now.  I don't

8    need this.  I had it before.  I don't have

9    it now.  I was not sure.  One of the reasons

10   we like to, you know, wait a period of time

11   to see if things reverse in a way that is

12   more apparent.

13        Q.      Other than him reporting to you

14   that the physical manifestations that he had

15   mentioned to you earlier were no longer

16   manifesting themselves, is there anything

17   else about his demeanor, or speech that

18   suggested to you that he was suffering from

19   some sort of mental Illness?

20             MS. PUBLICKER METTHAM:

21        Objection.

22        A.      You said based on his --

23   specifically his behavior or speech?

24        Q.      Yeah, behavior or speech or

25   demeanor?

Page 309

1          C. LAMSTEIN-REISS, M.D.

2          MS. PUBLICKER METTHAM:

3      Objection.

4      A.      Not on that day in that

5  interview, but based on -- we don't make our

6  impressions just based on limited things

7  like that.

8      Q.      Have you ever had any

9  discussions with anybody at Jamaica Hospital

10 about Schoolcraft?

11     A.      I spoke to a social worker

12 there.

13     Q.      Is that Christine Mc Mann?

14     A.      Yes.

15     Q.      What did you discuss with her?

16     A.      That's all in the records.  I

17 can reference my notes if you would like.

18     Q.      Do you have a recollection of

19 what you discussed with her?

20     A.      I have a recollection that I

21 think she wanted to consult with me about

22 him and my history with him.  I told her I

23 would be happy to do so as long as he signed

24 a release of information consent form

25 authorizing that.  I think maybe a few days

C. LAMSTEIN-REISS, M.D.

later we spoke and she said he did not sign a release. That he didn't want to sign the release until he knew what was in the report and I told her that there is no report. There's no comprehensive evaluation report already done. And we, in those kind of situations, we provide the information verbally. We don't send them copies of our full record and she said she understood that. She explained it to him, but he didn't seem to believe it and the only thing she told me about him was that he had some -- I don't know if she said odd beliefs or strange beliefs or weird beliefs, some words like that, but that he was not a danger. Oh, and that he was discharged and I would have reference my notes to be certain, but I think she said he was -- part of the discharge planning, they set him up with an out patient follow-up with a psychiatrist. I would have to reference my notes to be absolutely certain of that, but I believe she said they referred him to a psychiatrist.

Page 228

1              C. LAMSTEIN-REISS, M.D.
2      while drinking heavily.
3           Q.      Okay.  So in any event, your
4      conclusion here is that he had two blackouts
5      while drinking; is that your conclusion?
6           A.      Correct.
7           Q.      You can continue.
8           A.      I asked how many physical fights
9      he had since his appointment to the police
10     department, not including line of duty
11     incidents.  He said none and the second page
12     I asked if his arrest activity is average
13     given his command and assignment or above or
14     below average, given his command assignment.
15     I noted that he had low activity and I wrote
16     see notes, since that's something he had
17     already discussed during the main part of
18     the interview in the handwritten notes?
19          Q.      Can I stop you there and ask you
20     about that?  Did he tell you that he had low
21     activity or that's a conclusion that you
22     drew based on something?
23          A.      He told me that his supervisors
24     told him that he had low activity and that
25     his annual evaluation said that he had low

Page 229

```
 1              C. LAMSTEIN-REISS, M.D.
 2     activity.
 3        Q.      Did he also tell you that he
 4     didn't think his activity was low?
 5              MS. PUBLICKER METTHAM:
 6        Objection.
 7        A.      He said -- he thought his
 8     numbers were lower, but that he did not
 9     characterize that activity.  He thought he
10     was a still very active cop.  He just didn't
11     have numbers to show for it.
12        Q.      All right.  Why is the number as
13     this entry of a few or many arrests relevant
14     to a fitness for duty evaluation?
15              MS. PUBLICKER METTHAM:
16        Objection.
17        A.      We are finding out about overall
18     psychological functions.  If someone has a
19     lot of activity the assumption is they're a
20     very active cop, they're hardworking.  If
21     someone has significantly low activity, the
22     assumption is -- what -- then again, I
23     always ask given your command and
24     assignment.  Some precincts are very high
25     crime precincts.  Some are very low crime
```

Page 230

```
1              C. LAMSTEIN-REISS, M.D.
2    precincts and so that's why I want to know
3    compared to the type of assignment you have
4    and the command you're in, compared to that
5    would you say you're average, above or below
6    average.
7                (Whereupon, Mr. Callan left
8         deposition room.   Time noted 4:53 p.m.)
9         Q.      How do you define activity?
10              MS. PUBLICKER METTHAM:
11    Objection.
12        A.      Arrest and summonses.  And I ask
13    them to tell me whether it's an average
14    given that above or below.
15        Q.      Is that arrests per month and
16    per quarter and summonses --
17        A.      I ask in general.  Given your
18    command and assignment, would you say your
19    activity is average given that or above or
20    below average.  They answer that --
21        Q.      You just --
22        A.      -- whatever makes the most sense
23    for them.
24        Q.      So you just focus on what they
25    consider their numbers to be for their
```

Page 231

1                C. LAMSTEIN-REISS, M.D.

2    command?

3        A.     Right.  I don't contact the

4    command and find out what is average and

5    what is their numbers.  You know, it's just

6    a general ballpark where they say they're

7    below average, average.  Most people are

8    average.

9        Q.     What does a low number or few

10   activities, few arrests or few summonses;

11   what is that relevant to in accessing

12   somebody's fitness for duty?

13               MS. PUBLICKER METTHAM:

14       Objection.

15       A.     Given someone's command and

16   assignment, if someone is working in a very

17   low crime precinct, I would expect them to

18   not have that much activity.  If they are

19   working in a precinct that has a lot of

20   crime, if they're working in a precinct

21   they're out, they have a patrol assignment

22   and they -- it's a very high crime

23   neighborhood and they have very, very, few

24   summonses or arrests, it would appear that

25   they're, you know, there's crime all around

Page 232

```
 1            C. LAMSTEIN-REISS, M.D.
 2   them and they're not working very hard in
 3   making arrests or issuing summonses.
 4        Q.    So why is that relevant to an
 5   assessment by a psychologist if they're
 6   fitness for duty?
 7        A.    It is --
 8            MS. PUBLICKER METTHAM:
 9   Objection.
10        A.    -- one of many things that we
11   consider.  It might tell us about their
12   general personality.  It might tell us if
13   they're too anxious or depressed.  It might
14   lead to that.  If they just aren't such hard
15   workers.  It may or may not be a factor.
16   This form is just all the general different
17   things about their personal and
18   psychological and medical and work history
19   that kind of touch on a broad number of
20   areas to see if there's anything that might
21   be of concern.
22        Q.    So if somebody has low activity
23   for their precinct, that's an indication
24   that maybe they're not fit for duty; is that
25   right?
```

Page 233

```
 1            C. LAMSTEIN-REISS, M.D.
 2            MS. PUBLICKER METTHAM:
 3      Objection.
 4      A.      That in and of itself, no.
 5      Q.      No, but is a factor that
 6  supports a conclusion that everything else
 7  being equal is less fit for duty than
 8  somebody else, who has greater activity?
 9      A.      No.
10            MS. PUBLICKER METTHAM:
11      Objection.
12      A.      You're drawing -- sorry, go
13  ahead.
14      Q.      Well, it's your form.  I want to
15  know this information elicited on your form.
16  Am I correct that if somebody reports too
17  few a number of arrests or too few a number
18  of summonses for the area they work in, does
19  that indicate to you that they're not fit
20  for duty?
21            MS. PUBLICKER METTHAM:
22      Objection.
23      A.      No.
24      Q.      Does it provide any information
25  in service of trying to make an assessment
```

Page 234

1            C. LAMSTEIN-REISS, M.D.
2    about whether somebody is fit for duty?
3             MS. PUBLICKER METTHAM:
4       Objection.
5       A.      It could.  It may or may not.
6       Q.      In what way would a low number
7    of arrests or summonses indicate or inform
8    you about making a decision about whether or
9    not somebody is fit for duty?
10            MS. PUBLICKER METTHAM:
11       Objection.
12       A.      Everything is on a case-by-case
13   basis, so how it may or may not be relevant
14   would depend on that particular person.  For
15   example, it might lead us to think, well
16   maybe they're just not a great worker, but
17   that's not a psychological issue or it could
18   be that if they're reporting really
19   impairing levels like very, very severe
20   levels of anxiety or depression and their
21   activity has dropped as a result, then that
22   might show that their work performance has
23   deteriorated as their anxiety or depression
24   got worse.  That could be a factor.  It may
25   or may not be an issue.

Page 235

C. LAMSTEIN-REISS, M.D.

1                    C. LAMSTEIN-REISS, M.D.

2     Q.     Is it possible that too much

3  activity would be relevant to an assessment

4  of factors for whether or not a police

5  officer is fit for duty?

6          MS. PUBLICKER METTHAM:

7     Objection.

8     A.     It could, typically it doesn't.

9  It could.

10     Q.     You can't think of an example

11  where somebody had so many arrests or so

12  many summonses that that led you to

13  consider that factor as supporting a

14  conclusion that somebody was not fit for

15  duty; is that right?

16          MS. PUBLICKER METTHAM:

17     Objection.

18     A.     I do not recall anyone I seen

19  where that was the case.  I could think of a

20  hypothetical example of how that might

21  occur, but it's not something I seen in my

22  13 years.

23     Q.     Okay.  Keep reading, please.

24     A.     Next category is necessary

25  force used.  Said he has used physical

Page 236

1              C. LAMSTEIN-REISS, M.D.

2    force.  He has not used his firearm or

3    nightstick.  He has used mace.  Currently on

4    third one.  It's empty for last two years.

5    Putting off getting it replaced.  Used three

6    to four times.  One can during Republican

7    National Convention.  Department had them

8    using it a lot.

9              Reactions.  I asked how many

10   CCRBs he's had, meaning Civilian Complaint

11   Review Board complaints.

12        Q.     Where are you reading from?

13        A.     Under reaction, necessary force

14   used.

15        Q.     Oh, I see in number of CCRBs

16   directly under that.

17        A.     Under reaction I asked how many

18   CCRB's they've had.  He said numerous in

19   quotes.  He was not sure how much of those

20   were substantiated.  Some accused him of

21   racism and racial slurs.  Not true, just

22   gave summonses or said can't be in park

23   after dark, et cetera.  They say slurs

24   against him, not other way around.  Never

25   placed on disciplinary monitoring.  Meaning

Page 237

1             C. LAMSTEIN-REISS, M.D.

2    for excessive CCRBs, but just found out

3    he's on some kind of, quote, secret precinct

4    level probation, end quote.  Few in command

5    still talk to him because one got written up

6    for, quote, unnecessary conversation, end

7    quote, when talking with MOS.

8         Q.    Can I stop you right there?

9         A.    Hmm-mm.

10        Q.    Did he tell you that he was on

11   some sort of precinct level review?

12             MS. PUBLICKER METTHAM:

13        Objection.

14        Q.    Or monitoring?

15             MS. PUBLICKER METTHAM:

16        Objection.

17        A.    What he said was that he was on

18   some kind of, quote, secret precinct level

19   probation, end quote.

20        Q.    What did you understand that to

21   mean when he told you that?

22        A.    I have never heard of any kind

23   of a secret precinct level probation.

24        Q.    Have you ever heard of cops

25   being disciplined by fellow officers or

Page 238

```
 1              C. LAMSTEIN-REISS, M.D.
 2    superior officers?
 3              MS. PUBLICKER METTHAM:
 4       Objection.
 5       A.     Yes.  There's a whole procedure
 6    for that.
 7       Q.     Have you ever heard of a blue
 8    wall of silence?
 9              MS. PUBLICKER METTHAM:
10       Objection.
11       A.     I have heard that term used.
12       Q.     Have you ever heard of cops
13    being punished or retaliated against for
14    speaking out against misconduct in the
15    police department?
16              MS. PUBLICKER METTHAM:
17       Objection.
18       A.     I am not aware of any specific
19    examples.  It -- I imagine it probably
20    happened at some point.  I don't have
21    examples.  It may have happened.  It may not
22    have happened.  I really don't know.
23       Q.     Was Schoolcraft the first
24    officer to come to you and complain to you
25    about mistreatment by his supervisor about
```

Page 239

```
 1              C. LAMSTEIN-REISS, M.D.
 2    what he perceived as improper conduct?
 3              MS. PUBLICKER METTHAM:
 4         Objection.
 5         A.      Say that again.
 6         Q.      Was Schoolcraft the first person
 7    to come to you and report what he perceived
 8    as inappropriate conduct by his superiors?
 9              MS. PUBLICKER METTHAM:
10         Objection.
11         A.      I don't remember.
12         Q.      Has anybody ever complained to
13    you about having a quota imposed on them as
14    police officers?
15              MS. PUBLICKER METTHAM:
16         Objection.
17         A.      I think some officers complained
18    about having to meet activity goals and
19    thinking that was a quota.  That's been a
20    question that's outside of my purview
21    whether or not -- whether that's a quota,
22    whether that's activity goals.
23         Q.      Have you ever had an experience
24    where a member of the service complained to
25    you about downgrading or misreporting or not
```

Page 240

```
 1              C. LAMSTEIN-REISS, M.D.
 2   filing crime reports?
 3              MS. PUBLICKER METTHAM:
 4        Objection.
 5        A.      Not that I recall.  There might
 6   be one.  I can't remember if he specifically
 7   complained about that to me.  He might have.
 8        Q.      And who was that?
 9              MS. PUBLICKER METTHAM:
10        Objection.  I am not going to allow her
11        to answer regarding a individual she
12        evaluated without a medical release.
13        Q.      All right.  You don't have to
14   give me the name.  Without providing the
15   name, who was this person?
16              MS. PUBLICKER METTHAM:
17        Objection.  Without providing any
18        information about his identify that
19        could identify him as one of your --
20        A.      It was one person who...
21        Q.      Let me ask you the question this
22   way, was this a member of the service?
23        A.      Yes.
24        Q.      Was he in patrol?
25        A.      Yes.
```

Page 241

1              C. LAMSTEIN-REISS, M.D.

2        Q.      Was he a he?

3        A.      I think I already said he, so

4   sure, he.  That narrows it down to about

5   half the police department.  I guess I'm not

6   revealing too much about his identity.

7        Q.      More than half I'd say.  Did

8   Schoolcraft raise concerns with you about

9   not reporting crimes properly?

10              MS. PUBLICKER METTHAM:

11        Objection.

12        A.      I don't think he did.  I will

13   have to check my notes, but I don't think he

14   did.  What he did he say was other people

15   were writing fake summonses, which I took to

16   mean people making up everything, just to

17   turn in more activity, which I would imagine

18   it would be found it that these are people

19   who don't even exist.

20        Q.      So sitting here today, you don't

21   have a recollection of him complaining about

22   downgrading or failing to report crimes

23   accurately; is that right?

24              MS. PUBLICKER METTHAM:

25        Objection.

```
 1               C. LAMSTEIN-REISS, M.D.
 2       A.       I'm pretty certain he did not.
 3       Q.       Why are you certain about that?
 4       A.       I said I'm pretty certain.
 5       Q.       Why are you pretty certain?
 6             MS. PUBLICKER METTHAM:
 7       Objection.
 8       A.       He did not.  Because I don't
 9   remember it and I probably would have noted
10   that.  What I noted was that he said people
11   write fake summonses and no one cares.  They
12   only care that his activity was low.
13       Q.       Did he tell you that he had
14   concerns about being required to report
15   training when he hadn't received any
16   training?
17             MS. PUBLICKER METTHAM:
18       Objection.
19       A.       That he was required to report
20   training that he did not have, no, he did
21   not tell me that.
22       Q.       Okay, did he have any complaints
23   to you about training?
24       A.       Yes.
25       Q.       What were those complaints
```

Page 243

1                C. LAMSTEIN-REISS, M.D.

2    about?

3        A.      He wanted more training than he

4    had received.

5        Q.      So he never told you that he had

6    to sign off on training that he never

7    received, right?

8        A.      No.

9        Q.      Okay.  You can keep reading.

10       A.      I stopped mid sentence or the

11   end of a sentence, but few in command still

12   talk to him, because one got written up for,

13   quote, unnecessary conversation, end quote,

14   when talking with MOS since appealed

15   evaluation recently.

16       Q.      Do you understand that to be a

17   form of retaliation against him?

18              MS. PUBLICKER METTHAM:

19       Objection.

20       A.      I understood that he believed

21   that was a form of retaliation against him.

22       Q.      And you understood that he was

23   believing that people at his precinct

24   weren't speaking to him, right?

25              MS. PUBLICKER METTHAM:

Page 244

1                    C. LAMSTEIN-REISS, M.D.

2        Objection.

3        A.      Yes, that was his belief as he

4    related to me.

5        Q.      And he stated to you that his

6    belief that people weren't speaking to him

7    was because the people who did speak to him

8    were getting CD'd (phonetic), right?

9                    MS. PUBLICKER METTHAM:

10       Objection.

11       Q.      Or getting written up?

12                   MS. PUBLICKER METTHAM:

13       Objection.

14       A.      He said one person was written

15   up and he believed it was due to that.

16       Q.      My question to you is did you

17   understand that he was telling you that he

18   believed that people were not speaking to

19   him because there were people being written

20   up for speaking to him?

21                   MR. KRETZ:   Objection.

22                   MS. PUBLICKER METTHAM:

23       Objection.

24       A.      That's what he was relating.

25       Q.      Okay.  Keep going, please.

Page 245

1                 C. LAMSTEIN-REISS, M.D.

2          A.        ICO lieutenant took memo book

3     when on post.  MOS made complaints and duty

4     captain angry.  Duty captain was his own XO

5     and said they have to watch him closely.

6          Q.        What did you understand about

7     him telling you about the duty captain being

8     angry?

9                    MS. PUBLICKER METTHAM:

10        Objection.

11         A.        I really -- I wasn't sure that

12    there was a dispute between him about

13    whether or not he deserved a low evaluation

14    rating.

15         Q.        Did you ever inquire to him

16    about why the duty captain was angry at him?

17         A.        I believe he was referring to

18    being angry that he was appealing his

19    evaluation.  That's what he was saying.

20    That was my assumption at the time.

21         Q.        Okay, please continue.

22         A.        I asked when that was, he said

23    approximately March 16th.

24         Q.        Of 2009?

25         A.        Yes.  I didn't write that, but

Page 246

```
 1              C. LAMSTEIN-REISS, M.D.
 2   that's what I was referring to.
 3       Q.      Did you understand that he was
 4   being watched closely as of March 31, 2009?
 5              MS. PUBLICKER METTHAM:
 6       Objection.
 7       A.      As of March 31st?
 8       Q.      Yes.
 9              MS. PUBLICKER METTHAM:
10       Objection.
11       A.      It's my understanding he told me
12   that his XO said they have to watch him
13   closely.  Whether or not -- I have no
14   knowledge of whether or not these things
15   actually occurred.  I know that that's what
16   he told me.
17       Q.      Did you ever draw any
18   conclusions about whether or not what he was
19   telling you was true or not?
20              MS. PUBLICKER METTHAM:
21       Objection.
22       A.      It's not my place to investigate
23   that.  So I did not draw any conclusion.
24       Q.      You didn't draw any conclusion
25   then about whether or not what he was saying
```

```
 1              C. LAMSTEIN-REISS, M.D.
 2    was true or not?
 3         A.      Correct.
 4         Q.      Have you ever drawn any
 5    conclusions about whether or not what he was
 6    telling you about what was going on at the
 7    command level with managers was true?
 8              MS. PUBLICKER METTHAM:
 9         Objection.
10         A.      I have not.  I did not.  That's
11    not something I investigated.
12         Q.      Did it ever enter your mind that
13    Schoolcraft was justified in his concerns
14    about the 81st Precinct supervision of him?
15              MS. PUBLICKER METTHAM:
16         Objection.
17         A.      That was one possibility, but
18    either way, that's not what leads to the
19    fitness for duty decision to remove his
20    guns.  It's the symptoms he's experiencing
21    and reaction to that.
22         Q.      Well, my question is did you
23    ever reach a conclusion that Officer
24    Schoolcraft's concerns about how he was
25    being supervised were legitimate?
```

Page 248

```
 1            C. LAMSTEIN-REISS, M.D.
 2              MR. KRETZ:  Objection.
 3              MS. PUBLICKER METTHAM:
 4       Objection.
 5       A.      How he was being supervised.
 6  Can you be more specific?
 7       Q.      No, how he was being -- he was
 8  reporting to you that he's got concerns
 9  about how first --
10       A.      Right.
11       Q.      What he's being told to do and
12  how he's being treated by supervisors,
13  right; isn't that the fair to say?
14       A.      Correct.
15       Q.      Did you ever form a conclusion
16  in your mind at any time after that oh,
17  yeah, he was being treated badly by
18  supervisors?
19              MS. PUBLICKER METTHAM:
20       Objection.
21       A.      I did not form a conclusion
22  about that.
23       Q.      All right.  Can you keep
24  reading, please.
25       A.      Sure.  Physical status general
```

Page 249

1              C. LAMSTEIN-REISS, M.D.

2    health I wrote see notes since those issues

3    were already assessed --

4         Q.      Where are you reading from?

5         A.      Physical status.

6         Q.      What about history of

7    psychological problems --

8         A.      We're above that.  We haven't

9    gotten to that yet.  Above that.

10        Q.      Oh, okay.  Thank you.

11             MS. PUBLICKER METTHAM:  I will

12        just note Matthew Koster is joining us

13        now.

14             (Time noted:  5:12 p.m.)

15        A.      General health just wrote see

16   notes, since that had already been discussed

17   earlier in the interview.  Sick time on job.

18   Out sick a few weeks, hardly ever or hardly

19   never went sick.  He was never chronic sick.

20   Hospitalizations kept in the emergency room

21   overnight recently.  Current medication,

22   none.  Took Lorazepam for two days.

23        Q.      What is Lorazepam?

24        A.      It's an antianxiety medication

25   in the class of drugs called benzodiazepine.

Page 250

C. LAMSTEIN-REISS, M.D.

1

2     Q.       What was your understanding as

3     to where he got that drug from?

4         A.       The Forest Hills Hospital

5     emergency room.  They gave him an injection

6     of it and then they gave him a prescription

7     for a two-day supply or they gave him two

8     pills.  Something like that.

9         Q.       As of the time that you were

10    taking these notes, did you know whether or

11    not Schoolcraft had taken any of the

12    Seroquel?

13        A.       I can't know with certainty, but

14    he told me he did not.

15        Q.       Do you have any reason to

16    believe that he provided that information to

17    you inaccurately?

18             MS. PUBLICKER METTHAM:

19        Objection.

20        A.       No.  He seemed most open during

21    his initial interview.  So I believed him

22    when he said that he got the prescription

23    for it, but he wasn't taking it.

24        Q.       When you say he got the

25    prescription, you mean he got the piece of

Page 257

```
 1              C. LAMSTEIN-REISS, M.D.
 2        Objection.
 3        Q.      For years that had been going
 4   on, right?
 5              MS. PUBLICKER METTHAM:
 6        Objection.
 7        A.      Some of it was more recently.
 8   He was still trying to find homes for some
 9   of the animals.  He was still dealing with
10   stress about the fact that he still hadn't
11   file his tax returns.
12        Q.      Isn't it true that he started to
13   have physical manifestations of stress
14   within a year of when he presented himself
15   to you?
16              MS. PUBLICKER METTHAM:
17        Objection.
18        A.      What he told me is that the
19   physical manifestations started about a year
20   earlier and he told me it was only his
21   recent evaluation that was low and that he
22   was told that he had to increase his
23   activity.  So my understanding was that that
24   was -- that came -- the demand for telling
25   him he had low activity was after the
```

Page 258

```
1             C. LAMSTEIN-REISS, M.D.
2    physical manifestations started.  That was
3    my understanding.
4        Q.     So it's your understanding that
5    he got the bad evaluation after he started
6    having these physical manifestations?
7             MS. PUBLICKER METTHAM:
8        Objection.
9        A.     Yes.
10       Q.     When did the physical
11   manifestations begin, about a year before
12   you met him?
13       A.     Yes, that's what he reported.
14       Q.     So he reported to you that he
15   started having physical manifestations of
16   the stress as of the spring of 2008?
17            MS. PUBLICKER METTHAM:
18       Objection.
19       A.     Approximately.  He wasn't
20   certain exactly, but about a year earlier.
21       Q.     Did he report to you that he had
22   any physical manifestations of stress before
23   the spring of 2008?
24       A.     He did not.
25       Q.     Can you tell me what events went
```

Page 280

1                C. LAMSTEIN-REISS, M.D.

2   on restricted duty --on sick, that's a very

3   rare occasion, right?  Is that what you're

4   saying?

5        A.     I wouldn't say it's rare.  It's

6   people who are either -- typically, when

7   they're hospitalized, they would be out

8   sick.  Sometimes when they come out of a

9   hospital they attend a day treatment program

10  for a while.  We would certainly keep them

11  out to sick to attend that program or --

12  after that most people are able to return to

13  working inside, nonenforcement duty.  There

14  are some people who just might be too

15  agoraphobic, too psychotic.  Things that

16  would really just make them unable to answer

17  phones, do filing that kind of stuff.

18               (Whereupon Ms. Bauza left the

19        deposition, time noted 5:49.)

20       Q.     When you're put on restricted

21  duty, does that automatically mean that your

22  gun is removed?

23       A.     Yes.

24       Q.     Does that automatically mean

25  that your shield is removed?