SM Exhibit P

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
ADRIAN SCHOOLCRAFT,

                    Plaintiff,

                                    Case No:
        - against -                 10 CV 06005

THE CITY OF NEW YORK, ET AL.,

                    Defendants.
------------------------------------------X
                    111 Broadway
                    New York, New York

                    January 6, 2014
                    2:31 p.m.
```

DEPOSITION OF SERGEANT RASHEENA HUFFMAN, pursuant to Subpoena, taken at the above place, date and time, before DENISE ZIVKU, a Notary Public within and for the State of New York.

1           RASHEENA HUFFMAN
2       Q.    You can omit reading the rest of
3   that entry.  That's just particular about an
4   individual.  Thank you.
5             These activities here vouchering
6   certain items, was that something that was
7   within the scope of Schoolcraft's duties at
8   the TS desk?
9       A.    Yeah, at TS desk, yeah.
10      Q.    With are the duties of somebody
11  who is stationed at the TS desk as of
12  October 2009?
13            MS. PUBLICKER METTHAM:
14      Objection.  You can answer.
15      A.    The TS operator, they answer the
16  phones, they help complainants that come
17  into the precinct at the window and they get
18  the property for the complainant.  Like
19  let's say -- not even complainant.
20  Individual was arrested and now he's coming
21  to pick up his property.  Then the TS
22  operator may go into the property room, get
23  the property, come to me and then I'll look
24  at it, signed it off and put it in the log
25  and he'll give him back the property.

Page 47

RASHEENA HUFFMAN

Q. So this is a reference that Officer Schoolcraft doing that, correct?

A. Yes.

Q. As the TS operator, is that person also responsible for vouchering evidence and firearms and paraphernalia?

MS. PUBLICKER METTHAM: Objection. You can answer.

A. No, not responsible for it. That stuff is usually the arresting officer.

Q. So the TS desk vouchers evidence?

MS. PUBLICKER METTHAM: Objection. You could answer.

A. It depends on the situation. Evidence is -- when you say evidence, there is arrest evidence. The arresting officer normally does that. Not the TS operator. The TS operator usually gets the property that someone comes into the command to retrieve and they get it out the property room and give it back to them. That's just for safekeeping.

Q. Have you seen the TS officer at

1          RASHEENA HUFFMAN
2     A.     I believe he said that.
3     Q.     Did you say something in
4  response to that?
5     A.     I don't remember what I said in
6  response.  I know that he put a sick report
7  in my hand.  I'm like sick report, you know,
8  that's not what people do.  That's not
9  common.
10    Q.     I think I have -- we have an
11 excerpt that we're going to play back.  See
12 if you can help us in what was said between
13 you and Officer Schoolcraft.  While we're
14 opening that up --
15    A.     Okay.
16    Q.     -- let me ask you some more
17 questions about this entry in the command
18 log.  There's an entry here that says I
19 explained that if he's sick a supervisor has
20 to approve.  Do you see that reference?
21    A.     Yes.
22    Q.     Okay.  What's that based on that
23 a supervisor has to approve if he's going
24 sick?
25            MS. PUBLICKER METTHAM:

Page 68

1         RASHEENA HUFFMAN
2     Objection.
3     A.     Yes, pretty much he can't -- an
4  officer can't just come and say I don't feel
5  well, I'm going sick and just leave.
6     Q.     Okay.  When you put down this
7  entry a supervisor has to approve, you're
8  referring to yourself?
9     A.     Yes, me, sick desk supervisor.
10 When you go sick if you want to go
11 administratively sick then you get
12 permission from the desk.  If you go regular
13 sick, then you got to go to the district
14 surgeon, which if you went regular sick to
15 the medical division.
16    Q.     I just want to understand.  It
17 says here a supervisor has to approve.  Were
18 you referring to you having to approve or
19 somebody else having to approve him going
20 sick?
21    A.     Depends on what sick you go.
22    Q.     No.  No.  What I want to know is
23 what's in your mind here.  You said that you
24 explained to him that a supervisor has to
25 approve his request to go sick?  See that

Page 69

RASHEENA HUFFMAN

entry there?

A. And I explained that --

Q. What I want to know is what supervisor are you referring to when you made --

A. It's the supervisor in general.

Q. You've got to let me finish the question. This entry in the command log and it says I explained that if he's sick a supervisor has to approve.

A. Yes.

Q. Okay. What I want to know is what supervisor are you referring to when you made that entry in the command log?

A. Doesn't have to just be me, could be a supervisor in general.

Q. I'm not asking about a theoretical potential answer to my question. I want to know what you were thinking when you wrote this entry?

    MS. PUBLICKER METTHAM:
    Objection. Asked and answered. She
    testified to what she was thinking
    which was any officer.

Page 70

RASHEENA HUFFMAN

MR. SMITH: No, please don't provide her with her answers --

MS. PUBLICKER METTHAM: This is what she testified to three times.

MR. SMITH: Please, it's not.

Q. What supervisor were you referring to when you made this entry?

A. When I made this statement, like I said, I said in quotes, he comes to the desk and I explained if he's sick a supervisor has to approve. A supervisor could be me, it could be a lieutenant, it could be the sick desk supervisor, it could be district surgeon. It's a supervisor.

Q. Okay. Did you give him approval?

A. No, I did not.

Q. Why not?

A. Because he did not request sick from me.

Q. I thought you said he put a slip on your desk --

A. You can't do it that way. You can't just fill out a sick report on your

Page 76

1         RASHEENA HUFFMAN
2     A.    Yes.
3     Q.    Why did you make the entry sick
4 desk Sergeant Baer, B-a-e-r?
5     A.    I don't know.  Maybe I spoke to
6 a supervisor there and wanted to put the
7 name of the supervisor.  I don't know.
8     Q.    What is the entry -- can you
9 read the entry on the first page of
10 Plaintiff's Exhibit 26, the handwritten
11 entry by you?
12    A.    Sergeant Huffman called P.O.
13 Robert sick desk at 14:30 hours, states P.O.
14 Schoolcraft didn't call in sick.
15    Q.    Why did you call the sick desk
16 at 14:30 hours?
17    A.    Because he left the precinct
18 without going sick the proper way.
19    Q.    If he had called the sick desk,
20 would that have been the proper way?
21    A.    I called to see if he went sick.
22    Q.    You're not answering my
23 question, ma'am.  I said if he had called
24 the sick desk, would that have been the
25 proper way?

```
                                                    Page 77
 1              RASHEENA HUFFMAN
 2         MS. PUBLICKER METTHAM:
 3     Objection.  You can answer.
 4     A.      If he had called the sick desk,
 5  he would still have had to speak to a
 6  supervisor and let them know that he was not
 7  feeling well and then after that we would
 8  call the sick desk and speak to the sick
 9  desk and let them know that we have a MOS
10  that's, either A, being treated at the
11  precinct by EMS or going to a hospital and
12  is requesting to go sick.
13     Q.      So the answer to my question is
14  no, if he had called the sick desk that
15  still would not have been the proper way to
16  go sick; is that right.
17         MS. PUBLICKER METTHAM:
18     Objection.  Objection.  Asked and
19     answered.  You can answer again.
20     A.      I still had to check to see if
21  he called the sick desk.
22     Q.      What's that based on?
23         MS. PUBLICKER METTHAM:
24     Objection.  You can answer.
25     A.      What happened?
```

Page 86

1            RASHEENA HUFFMAN
2      A.    Hmm-hmm.
3      Q.    Can you remember what the next
4  thing that happened with respect to
5  Schoolcraft?
6      A.    I know that I had to have
7  notified a supervisor, who exactly it was
8  and how I did, I don't remember.
9      Q.    Did somebody tell you to call
10 the sick desk?
11     A.    Yes.
12     Q.    Who?
13     A.    I believe it was Inspector
14 Mauriello.
15     Q.    You remember that part?
16     A.    I believe.  It could have been
17 Captain Lauterborn.  I don't remember
18 exactly who it was, but I had to call to
19 check to make sure that if he went sick, was
20 he out sick, what's going on with him.
21     Q.    And what was the next thing you
22 remember doing with respect to Schoolcraft?
23     A.    I believe I had to call his cell
24 phone or his house phone and see if can get
25 him back to come to the precinct and do it

Page 87

1  RASHEENA HUFFMAN
2  the right way.  I believe I had to call his
3  house or something like that and left a
4  message for him.  Tell him to call the
5  precinct or come back.
6      Q.    Did somebody tell you to make a
7  phone call to Schoolcraft?
8      A.    A higher supervisor.
9      Q.    Do you remember which one?
10     A.    Either Captain Lauterborn or
11 Inspector Mauriello, I believe.
12     Q.    Did you leave a message with
13 Officer Schoolcraft?
14     A.    I believe I did.
15     Q.    And what did you say in that
16 message or messages?
17     A.    I don't know exact words, but if
18 you could call the precinct, get in contact
19 with us, come back to the precinct, go sick
20 the proper way.  It was a message.  I didn't
21 verbally speak to him.
22     Q.    Okay, so you left a message on
23 his voice message?
24     A.    Yes.
25           MR. SMITH:  Can you read back