SM Exhibit Y

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------

ADRIAN SCHOOLCRAFT,

                                    Plaintiff,

            -against-


THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO, Tax ID. 873220, Individually and in his Official Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH GERALD NELSON, Tax Id. 912370, Individually and in his Official Capacity, DEPUTY INSPECTOR STEVEN MAURIELLO, Tax Id. 895117, Individually and in his Official Capacity, CAPTAIN THEODORE LAUTERBORN, Tax Id. 897840, Individually and in his Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id. 919124, Individually and in his Official Capacity, ST. FREDERICK SAWYER, Shield No. 2567, Individually and in his Official Capacity, SERGEANT KURT DUNCAN Shield No. 2583, Individually and in his Official Capacity, LIEUTENANT CHRISTOPHER BROSCHART,

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 2

```
 2   Tax Id. 915354, Individually and in his
 3   Official Capacity, LIEUTENANT TIMOTHY
 4   CAUGHEY, Tax Id. 885374, Individually and
 5   in his Official Capacity, SERGEANT SHANTEL
 6   JAMES, Shield No. 3004, Individually and in
 7   his Official Capacity, and P.O.'s"JOHN DOE"
 8   #1-50, Individually and in their Official
 9   Capacity, (the name John Doe being
10   fictitious, as the true names are presently
11   unknown) (collectively referred to as "NYPD
12   Defendants"), JAMAICA HOSPITAL MEDICAL
13   CENTER, DR. ISAK ISAKOV, Individually and
14   in his Official Capacity, DR. LILLIAN
15   ALDANA-BERNIER, Individually and in her
16   Official Capacity, and JAMAICA HOSPITAL
17   MEDICAL CENTER EMPLOYEE'S"JOHN DOE" #1-50,
18   Individually and in their Official
19   Capacity, (the name John Doe being
20   fictitious, as the true names are presently
21   unknown),
22                              Defendants.
23   ------------------------------------------
24            111 Broadway
25            New York, New York
```

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 3

```
 1
 2              November 7, 2013
 3              10:10 A.M.
 4
 5       ATTORNEYS' EYES ONLY CONFIDENTIAL
 6   PORTION of DEPOSITION of THEODORE
 7   LAUTERBORN, the Defendant in the
 8   above-entitled action, held at the above
 9   time and place, taken before Dawn Miller, a
10   Notary Public of the State of New York,
11   pursuant to court order and stipulations
12   between Counsel.
13                  *   *   *
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2      Q.    Did you consider this a transfer
 3   or demotion or promotion transfer in
 4   November 2009?
 5            MS. METTHAM: Objection. You
 6    can answer.
 7      A.    Transfer.
 8      Q.    Was there any change in your pay
 9   grade?
10      A.    No.
11      Q.    Was there any change in your
12   title?
13      A.    No.
14      Q.    Who made the decision to transfer
15   you?
16            MS. METTHAM: Objection. You
17    can answer.
18      A.    Specifically, I don't know.
19      Q.    Do you have any understanding, at
20   all, as to who was involved in the decision
21   to transfer you?
22      A.    No.
23      Q.    What's your date of birth?
24            MS. METTHAM: Objection.  I'll
25    allow him to answer with the year of
```

```
 1
 2        his birth.
 3        Q.    All right.  What is the year of
 4   your birth?
 5        A.    1969.
 6        Q.    Where do you, currently, reside?
 7              MS. METTHAM:  Objection.  I
 8        will only allow you to answer whether
 9        you live in the five boroughs.
10        A.    I live within the five boroughs.
11        Q.    Have you provided an address to
12   the court reporter?
13        A.    As to?
14        Q.    Your address?
15        A.    My home address, no.
16        Q.    What address have you provided?
17        A.    My employer's address.
18        Q.    What is that?
19        A.    One Police Plaza.
20        Q.    I understand.
21              MR. SMITH:  I think we have
22        done this before, Suzanna.  Will the
23        Law Department accept a subpoena for
24        trial for Captain Lauterborn in the
25        event that one needs to be issued?
```

1
2         MS. METTHAM: If he's still
3    employed by the NYPD at the time of
4    trial, we will accept a subpoena on
5    his behalf.
6         MR. SMITH:  If he's not
7    employed, will you provide me with a
8    contact address including home
9    address, emergency contact information
10   so if I need to, I can issue a
11   subpoena for your appearance.
12        MS. METTHAM: In no case would
13   I provide you with his emergency
14   contact information but we would take
15   it under advisement and help to secure
16   a subpoena on him at that time if it
17   were so necessary.
18        MR. SMITH:  Okay.
19   Q.    Are you being represented in the
20 action?
21   A.    Yes, I am.
22   Q.    By whom?
23   A.    By the New York City Law
24 Department.
25   Q.    Do you have any understanding as

1
2  phone, this could end." Is that a correct
3  statement?
4           MS. METTHAM: Objection. You
5     can answer.
6     A.   Again, that appears to be
7  correct.
8     Q.   Am I correct, that as of the time
9  that you were having this conversation with
10 Larry Schoolcraft, if Adrian Schoolcraft
11 had called you on the phone and told you he
12 was okay, you would have stopped your
13 investigation into the whereabouts of
14 Officer Schoolcraft; is that correct?
15          MS. METTHAM: Objection. Asked
16    and answered.
17          MR. KRETZ: Objection.
18    A.   Early on, yes, that was my
19 intention of this, if I heard from Adrian
20 Schoolcraft on the phone and I felt
21 everything was okay with him, he was just
22 sick, it probably, yes, would have ended at
23 that point.
24    Q.   In fact, isn't it also true that
25 if Larry Schoolcraft had acted as an

```
 1
 2   intermediary and had communicated to you
 3   that he spoke to Adrian and confirmed to
 4   you that Adrian was okay, that you would
 5   have been satisfied and your investigation
 6   into the whereabouts and condition of
 7   Officer Schoolcraft would have stopped?
 8            MS. METTHAM: Objection. You
 9      can answer.
10      A.   At the time, I wanted to go that
11   way but as I was talking to Mr.
12   Schoolcraft, I really wasn't sure about his
13   authentic declaration of him as far as his
14   whereabouts it was gonna be acceptable but,
15   again, it was all in the situation, I would
16   have to take that, you know, more of the
17   atmosphere of the conversation into
18   consideration as to whether or not I was
19   going to do that.
20      Q.   I think I understand what you're
21   saying to me.  I just want to clarify.
22            Am I correct; there was a point
23   during the day of October 31st 2009 when
24   you would have been satisfied with a report
25   back from the father that the son was okay;
```

1
2  is that a fair statement.
3          MS. METTHAM: Objection. You
4     can answer.
5     A.    Again, all things being
6  considered, I would have probably used his
7  father, yeah.
8          MR. KRETZ:  Objection.
9     Q.    Then is it also fair to say that
10 during the course of the day, your
11 willingness to accept the father's
12 statement that he was okay, no longer
13 became something you were willing to
14 accept; is that right?
15         MS. METTHAM: Objection. You
16    can answer.
17    A.    Pretty much.
18    Q.    Isn't it true that later on that
19 day you felt that it was important that
20 you, at least, be able to speak to Officer
21 Schoolcraft; isn't that correct?
22         MS. METTHAM: Objection. You
23    can answer.
24    A.    That's correct.
25    Q.    If you had spoken, at least at

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 70

2  some point during the day to Officer
3  Schoolcraft, there was a point in time
4  where merely speaking to him would have
5  been sufficient to satisfy your concerns
6  about his whereabouts and condition?
7          MS. METTHAM: Objection. You
8     can answer.
9          MR. KRETZ:  Objection.
10    A.    Again, that was early on in the
11 investigation.
12    Q.    I just want to make the record
13 clear.  That doesn't -- I understand what
14 you're saying.  I don't think the record is
15 clear about that you're saying.
16          Early on in the investigation
17 into the condition and whereabouts of
18 Officer Schoolcraft, there was a point
19 where simply speaking to Officer
20 Schoolcraft on the phone would have
21 satisfied your concerns; is that correct?
22          MS. METTHAM: Objection.  Asked
23     and answer.  You can answer again.
24    A.    That's correct.
25          MR. KRETZ:  Objection.

```
 2   to me or they would have the doctor call me
 3   but I don't remember, you know, having that
 4   type of conversation one hundred percent.
 5   But a doctor got back to me during the day.
 6       Q.   Am I correct; that in your P.G.
 7   you were asked by IAB whether or not you
 8   conferred with the Medical Division; isn't
 9   that correct?  You were asked that
10   question?
11       A.   If I conferred with the Medical
12   Division at all that day, yes.
13       Q.   IAB asked you that question, you
14   told them that you called out to them but
15   you never spoke them; isn't that right?
16            MS. METTHAM: Objection.
17       Misstates prior testimony and the
18       testimony you read from the P.G. You
19       can answer.
20            MR. KRETZ:  Objection.
21       A.   Yes, I mean, I wasn't recalling
22   correctly but eventually I did get in touch
23   with a doctor and spoke to a female doctor.
24       Q.   I understand that.  What I want
25   to know is, whether or not the statements
```

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 106

2  that you made to IAB were, in fact, a
3  mistake?
4     A.   There was some of it that was a
5  mistake.
6     Q.   One of the mistakes was that you
7  told IAB that you called out to the Medical
8  Division but you forgot about the call and
9  you did speak to them?
10          MS. METTHAM: Objection.
11    A.   That's what I said here.
12    Q.   In fact, in hindsight, looking at
13 other things, you now realize you forgot
14 about that conversation; you did have a
15 conversation with somebody in the Medical
16 Division, isn't that right?
17          MS. METTHAM: Objection. You
18    can answer.
19    A.   That's correct.
20    Q.   Turning to Page 67 of the
21 transcript; am I correct, that you told IAB
22 that you did not see any department
23 property in Schoolcraft's residence on
24 October 31st 2009?
25    A.   That's what I remember, yeah.

LAUTERBORN

Page 210

1
2  residence; do you see that?
3         MS. METTHAM: Can you give us
4     the line?
5         MR. SMITH:  Top of the page.
6     A.    Yes.
7     Q.    Did you dispatch Broschart to go
8  to Schoolcraft's residence, right?
9     A.    Yes.
10    Q.    When Broschart got there and
11 learned what he learned from the landlord,
12 did he then convey to you the fact that the
13 landlord had told Broschart that they
14 believed that Schoolcraft was in his house?
15        MS. METTHAM: Objection.
16    A.    At some point, he did, yeah.
17    Q.    At some point before you entered,
18 right?
19    A.    Yes.
20    Q.    Later on in that same section of
21 Page 2, you refer to a conversation that
22 you had with Dr. Lamstein; do you see that?
23    A.    Yes.
24    Q.    Is it correct she told you she
25 didn't think Schoolcraft was a threat to

1
2                  MS. METTHAM: Objection. You
3       can answer.
4       A.     Going through the proper
5  procedures, yes.
6       Q.     I suspect the proper procedure is
7  to fill out a Sick Report?
8       A.     Not at that point.
9       Q.     Well, that's what he did.  He
10 filled out a Sick Report; didn't he?
11      A.     There has to be further
12 notification being made and I never saw a
13 Sick Report he wrote out.
14      Q.     You never saw a Sick Report?
15      A.     I don't remember seeing one.
16      Q.     I show you what's been marked as
17 Exhibit Number 26.
18                 MR. SMITH:  Mark this as
19      Plaintiff's 26.   Bates Stamp Number
20      NYC 286061.
21             (Sick Report was marked as
22      Plaintiff's Exhibit 26 for
23      identification.  Exhibit retained by
24      counsel.)
25      Q.     Do you recognize this as a Sick

1
2   the time, female Sergeant.
3       Q.    She said something to you?
4       A.    I asked.  I think I asked her.  I
5   don't know how it came about but he didn't
6   call in his sick or neither did she, if
7   that's the case.
8       Q.    She could have called it in, too?
9       A.    If Schoolcraft was unable to.
10      Q.    She could have called it in or he
11  could have called it in, right?
12              MS. METTHAM: Objection.
13      A.    Since Adrian Schoolcraft was
14  there, he could call it in.  If somebody
15  calls in sick from home, the Sergeant would
16  call the Medical Division for that person.
17      Q.    It's your understanding that if
18  somebody is on duty or about to report to
19  duty and they report to a superior that
20  they're sick and they're too sick to
21  actually fill out the whole report,
22  somebody else can do it for them; is that
23  right?
24              MS. METTHAM: Objection.
25      A.    If they were too sick, they felt

```
 1
 2      Q.     Who did you reach out to?
 3      A.     I had the Sergeant ask amongst
 4  the Police Officers that were working that
 5  day if they had Schoolcraft's personal cell
 6  phone number so that we could call it.
 7      Q.     Did you get an answer to that
 8  question?
 9      A.     I recall that she had spoke a
10  Police Officer that had his cell phone who
11  tried calling it.  I'm not sure if that
12  person left a message or not but it went to
13  voicemail, he never picked up.
14      Q.     What was the next thing you did?
15      A.     Then I could still try to have
16  the Sergeant reach out to him with his cell
17  phone hoping that he would pickup.
18      Q.     What was the next thing that
19  happened after that?
20      A.     At a certain point, Inspector
21  Mauriello comes in, I let him know what was
22  going on.  Then more members of the 4 to 12
23  tour were coming in.  I had asked the
24  Sergeant to check in with those Police
25  Officers and see if they had his cell phone
```

LAUTERBORN

Page 289

```
 1
 2    and if there was somebody else that could
 3    reach out to him.
 4         Q.    When you told Mauriello what was
 5    going on, what did he tell you?
 6         A.    I gave him the run-down of what
 7    happened a short time ago and he asked me
 8    what I was doing and I told him, "We are
 9    trying to reach out to him and see the
10    extent of his sickness and why he left the
11    way he did."
12         Q.    Did Mauriello tell you to notify
13    anybody about your investigation into
14    Schoolcraft's status or sickness?
15              MS. METTHAM: Objection. You
16       can answer.
17         A.    No, I don't believe he did.
18         Q.    What happened next?
19         A.    Again, in summary, there was a
20    new tour coming in.  I had approached
21    Lieutenant Broschart about him having to go
22    to Adrian Schoolcraft's house to see if he
23    went home.
24         Q.    You told Broschart to go to his
25    home and find out if he was there; is that
```

LAUTERBORN

Page 290

1
2   right?
3       A.      Yes.
4       Q.      What happened next?
5       A.      I was waiting for Broschart to
6   get to his house to see the results of
7   that.
8       Q.      You were waiting at the 81?
9       A.      Yes.
10      Q.      Did Broschart eventually report
11  back to you?
12      A.      Yes, he did.
13      Q.      When did he do that?
14      A.      I don't know the exact time but
15  there was a point where he either -- he
16  reached out to me or I called him.  From
17  what I could remember, he said he tried
18  knocking on the door, yelling Adrian's
19  name, there was no answer.  He interviewed
20  the landlord who said that he had come
21  home.  I don't know if he said he saw him
22  come home or he heard him upstairs, and
23  Lieutenant Broschart thought that he saw
24  movement through the front window, he lived
25  on the second floor, but he couldn't be one