SM Exhibit AP

**INVESTIGATING OFFICER'S REPORT**
PD 313-153 (Rev. 2-87)-31

From: Sgt. Wayne Chu                                                          Cmd: **SIU**

Case #: **M09-1973**                    Log #: **09-41517**            SIU #: **01-148-09**

Accompanying Investigator(s): N/A

Case Investigator: **Sgt. Alroy Scott**

Allegation: **DRV-OTHER DEPT RULES/PROCEDURES; DRV-MISUSE OF TIME**

Subject: **Interview of PO Schoolcraft, Mr. Schoolcraft, and Jamaica Hospital Staff**

Subject Officer(s): **DC Marino, DI Mauriello, Capt. Lauterborn, Lt. Caughey, et al.**

Time: **1400**                          Day: **Wednesday**              Date: **11/04/09**

1. On the above date and time, I/O was present at Jamaica Hospital, Psychiatric Suite 3, at the request Mr. Larry Schoolcraft, father of C/V PO Schoolcraft, regarding a meeting with the Jamaica Hospital Psychiatric staff.

2. I/Os met with C/V PO Schoolcraft, who has been admitted into Jamaica Hospital for psychiatric evaluation, Mr. Schoolcraft, Dr. Isak Isakov, Psychiatrist, and Ms. Cynthia McMahon, Social Worker, Psych 3. The meeting took place in the dayroom of the Psychiatric 3 Facility.

3. Dr. Isakov's office #718-206-7300; Social Worker McMahon's office #718-206-7320.

4. At the onset of the meeting, it was evident that Mr. Schoolcraft along with PO Schoolcraft had a prearranged meeting with the psychiatrist, Dr. Isakov, and Social Worker McMahon to discuss PO Schoolcraft's status as a patient. Mr. Schoolcraft's request of an IAB I/O to be present was to act as a witness on their behalf. Mr. Schoolcraft requested of I/O if the interview could be audio and video recorded. I/O advised Mr. Schoolcraft that the interview could be audio taped if the medical staff did not object. Dr. Isakov and S/W McMahon offered no objection, on the basis that the patient (PO Schoolcraft) did not object. Mr. Schoolcraft was informed that the meeting would not be videotaped, and that the memorializing of the interview was for confidential case investigation purposes (no copies released to C/V Schoolcraft).

5. Mr. Schoolcraft immediately pressed Dr. Isakov and S/W McMahon on the reason why his son (PO Schoolcraft) was still "detained" in the hospital. He also expressed concern as to why he was not notified by the hospital that his son was admitted. Mr. Schoolcraft then questioned S/W McMahon as to her role or involvement with PO Schoolcraft, and demanded from her any and all paperwork necessitating the hospitalization of his son. Mr. Schoolcraft appeared to be emotional (i.e. upset and agitated) and expressed his concerns in a demanding tone toward the medical staff. (It was later revealed through casual conversation with Mr. Schoolcraft that he was informed that S/W McMahon was a former NYPD employee, forming Mr. Schoolcraft's belief that S/W McMahon is complicit with NYPD in detaining his son in the psychiatric facility). S/W McMahon cordially responded to Mr. Schoolcraft's questions that she is a licensed social worker, and that she is part of the team in assessing patients at intake and for discharge.

6. PO Schoolcraft also interjected, stating he wanted to know why up until now, he has not been informed by the medical staff as to the reason he is "incarcerated". Dr. Isakov explained to PO Schoolcraft that he is not incarcerated. PO Schoolcraft responded if he was free to leave, at which point Mr. Schoolcraft got up and directed his son to leave, with the two of them leaving the room temporarily. (The Psych 3 facility is controlled access facility). It did not appear that neither PO Schoolcraft nor Mr. Schoolcraft made any physical attempt to leave the facility, but walked out of the

room in a display of theatrics. Dr. Isakov invited Mr. Schoolcraft to meet with the hospital administrator on another floor, however Mr. Schoolcraft declined on the belief that he would not be permitted back to the Psychiatric facility.

7. PO Schoolcraft recounted the events which transpired on Sat, 10/31/09. Although PO Schoolcraft was already interviewed, he re-elicited his statement of events to I/O, which are documented as follows;

- On this date he performed a regular day tour, assigned to T/S. At approx 0800 hrs, Lt. Caughey, the 081 Pct ICO, requested his Activity Log for inspection and signature (Lt. Timothy Caughey, tax ⎡       ⎤). Lt. Caughey retained his memo-book for approx three hours. At the time, Lt. Caughey, in civilian attire, had his firearm affixed to his waist, but was covered by his shirt. When his memo-book was returned, he noticed Lt. Caughey's firearm now prominently visible, with the tail of shirt pulled behind the holster. PO Schoolcraft perceived this as threat against him after Lt. Caughey observed notes in his memo-book, including notes pertaining to Sgt. Huffman of stating during roll call that cell phone robbery complaints are not to be taken, and that the complainants have to be interviewed by the Squad. Lt. Caughey then called Sgt. Huffman, the Desk Officer (Sgt. Rasheena Huffman, tax ⎡       ⎤) into his office. When Sgt. Huffman returned to the Desk, "her attitude toward him changed." He also noted that throughout the remainder of the day that Lt. Caughey was watching him from a distance, with PAA Boston, 124 Room clerk, telling him that Lt. Caughey was eyeballing him and to be careful. PO Schoolcraft also noticed an unusual absence of personnel walking by the T/S, leading him to believe that something bad was going to happen, and as a result he started to feel ill, specifically in his stomach.
- PO Schoolcraft filled out a Sick Leave Report, which is filled out when UMOS are reporting sick, handed it to Sgt. Huffman and informed her that he was not feeling well, had abdominal pains, and was going home. Sgt. Huffman was on her cell phone at the time, paused her conversation, told him, "I can give you lost time, if you go sick it is a Line of Duty, and I have to do the paperwork." Sgt. Huffman resumed her cell phone conversation, also observed Lt. Broschart, the 3rd platoon lieutenant at the desk (Lt. Christopher Broschart, tax # ⎡       ⎤).
- He went home, notified the Command Center of menacing by Lt. Caughey, took some Nyquil medication for his sinuses and fell asleep. When he woke up, he observed ESU officers inside his apartment pointing a flashlight in his face, stating to him, "Let me see your hands, what is this all about." After ESU determined he was not armed, they left the room, and DI Mauriello and Capt. Lauterborn entered (DI Steven Mauriello, tax ⎡       ⎤ CO, 81 Pct; Capt. Theodore Lauterborn, tax # ⎡       ⎤ XO, 81 Pct). They stated to him, "Come on, let's go, we're going back to the 81." He informed them that he was not going anywhere, and observed Capt. Lauterborn of "scanning" his apartment.
- Deputy Chief Michael Marino, PBBN, then entered the bedroom, stated, "Come on, be a man, let's go," and questioned him if he was now disobeying a lawful order. PO Schoolcraft complied, grabbed his digital recorder and cell phone, and accompanied them downstairs. Stated around this time, he was on the phone with his father, who told him not to go with them. When he exited out of the building, he observed that his street was blocked off with Dept vehicles, and that his neighbors were watching the scene. He then told the officers, "I'll go to the hospital on my own, thank you," turned around and proceeded back towards his apartment. Stated that Capt. Lauterborn followed him back into his apartment.
- During this second time in the apartment, with EMS present, DC Marino came back in, again stated, "Are you going to be a man and come with us?" PO Schoolcraft refused. An EMS tech stated to DC Marino that his "vitals were tacky," DC Marino gave a hand signal, at which time at least two officers were involved in restraining him, with each officer grabbing an arm, pulling it back, and cuffing him. He stated one of the officers was Lt. Gough, and the other was a male/black/bald, both of whom were from Patrol Borough Brooklyn North Investigations Unit. During this time, while trying to look up and behind, DC Marino placed his foot on the left side of his face, causing friction of the right side of his face against the bedroom floor carpet. Stated this was done so that he would not be able to see what they were doing to him.

CONFIDENTIAL

NYC00004467

- While he was restrained, the male/black/bald PBBN-IU MOS went through his pockets, removed his digital recorder (described as Olympus WS331M, black, w/ USB port), handed it to DC Marino, whom then placed it on a nearby shelf. DC Marino stated, "Look, he's trying to be cute," referring to the possession of the digital recorder. DC Marino then directed the PBBN-IU MOS to conduct a thorough search of his person, while he was seated on PO Schoolcraft's bed. After the search was conducted, Lt. Gough and the other PBBN-IU MOS propped him up to face DC Marino, whom then stated to him, "Officer Schoolcraft, we're just trying to help you," while having a smirk on his face. DC Marino also stated, "I don't know who you are, but you know who I am" and "I never thought I would see the day I see a cop locked up."
- While in the bedroom, he observed DC Marino retrieve his digital recorder with his left hand, transfer it to his right hand, and then place the recorder into the right pocket of his duty jacket. He also believed his house keys were retained.
- Based on the above incident he informed the I/O that he was making a complaint against DC Marino, and that he "needs to charged with Attempted Murder," on the basis that DC Marino, "stomped on his face, and gave the order to have him assaulted." When asked to articulate in what manner DC Marino attempted to kill him, PO Schoolcraft stated DC Marino covered his face by stepping on him, and authorized the manner in which he was restrained, that if his life was terminated as a result, they could account for it as an accident. He alleged that he was physically abducted and held captive against his will, consequently putting his life in peril.
- PO Schoolcraft also made the formal complaint of FADO-Unnecessary Force against Lt. Gough and the male/black/bald counterpart from PBBN-IU.
- He also alleged DC Marino, DI Mauriello, and Capt. Lauterborn of "illegal search and seizure" while they were in his apartment scanning and touching items.

8. PO Schoolcraft was transported to Jamaica Hospital, via EMS, from his residence. He was accompanied by Lt. Broschart, 81 Pct, in the ambulance. Sgt. James, 81 Pct, relieved Lt. Broschart at the hospital. PO Schoolcraft stated he was making a formal complaint against Lt. Broshchart and Sgt. James for refusing his request to notify IAB, and against Lt. Broschart for FADO-Unnecessary Force, in that he refused to loosen the cuffs which were causing him discomfort. He heard Sgt. James speaking on a cell phone stating, "Schoolcraft is wallowing out."

9. On Sun, 11/01/09, in the morning, Sgt. Sawyer (Sgt. Frederick Sawyer, tax         , 81 Pct) arrived, along with PO Miller (tax         ). During this time, he had got up from the gurney, with one arm cuffed to the side of the gurney, walked over to a landline phone to answer a call for him. Sgt. Sawyer stated to Sgt. James, "Why are you letting the perp use the phone." Sgt. James had pushed the gurney back, Sgt. Sawyer pushed him back onto the gurney and cuffed his free hand to the side, now resulting in him being cuffed on both arms to the sides of the gurney. PO Schoolcraft stated he was making complaints against Sgt. Sawyer and PO Miller for FADO-Unnecessary Force in that they intentionally cuffed him too tight, resulting in complaint of pain and discomfort.

10. Mr. Schoolcraft relayed the following information relative to the concern brought forth by his son, PO Schoolcraft:
    - Described himself as PO Schoolcraft's lifeline. Mr. Schoolcraft acknowledged and confirmed that he was on the phone with his son and told him not to follow the officers back to the 81 Pct, out of concern of his safety.
    - He and his son hail from upstate New York. PO Schoolcraft went to college at Univ of Texas and obtained employment with Motorola in Texas. Moved back to NY to assist in the care of his mother (Mr. Schoolcraft's wife) until her demise due to breast cancer.
    - Through his conversations with his son, he believed that an organized effort was under way to hurt his son, as a result of his son not looking the other way regarding the Department's treatment of civilians.
    - Stated PO Schoolcraft was always a quiet, reserved person. PO Schoolcraft was always an advocate for animals. While on patrol, PO Schoolcraft initiated some police action in the form of taking reports for animal cruelty and taking animals into the command that apparently were abused. He was informed by his superiors

- that the Dept does not take reports for animal cruelty and investigations of this nature are not conducted. He was also ostracized by some of his colleagues initiating complaints of animal cruelty.
- PO Schoolcraft was disenchanted with the Departments zero-tolerance policy, where the issuance of summons and arrests take precedence over services calls to the public, and his concern that UF61s are not processed properly, with the only action taken is to nullify the complainant/victims' report of crime.
- Mr. Schoolcraft's law enforcement career spanned from 1975 – 2001 with the following agencies: Military Police, Austin (TX) PD, University Park (Dallas, TX) PD, and Fort Worth Marshals Office (TX).
- Mr. Schoolcraft cited a novel on NYPD culture, 'Target Blue' by Robert Daly, that he had read some time ago, and followed up with contemporary novels of NYPD, as well as NYPD guidelines and procedures. He also reached out to Ret/Lt. David Durk, tax #      , and was counseled by Ret/Lt. Durk on how to address PO Schoolcraft's complaints. Mr. Schoolcraft believed that Ret/Lt. Durk's conversations with PO Schoolcraft were revealed, and triggered the incidents of negative interaction in the 81 Pct, principally by Capt. Lauterborn. Believed that Ret/Lt. Durk's communication was intercepted, also believed that their own phones are 'tapped' as well.
- Mr. Schoolcraft alleged that it is an orchestrated effort to keep "his son out of circulation" by keeping him confined in a hospital. DI Mauriello knew that he was being watched by PO Schoolcraft of his inappropriate conduct pertaining to command operations, that DI Mauriello did not know how to handle him, so he reached out to his "rabbi" – DC Marino, who came down to help him out. Expressed frustration that PO Schoolcraft was denied of his liberty to vote on Election Day (11/03/09) as a result of his hospital confinement.
- His belief was reinforced when he was trying to call the hospital attempting to locate and speak to his son. Was told by the nurse that the "cops were running the show." Cited Nurse Lynn (or Lin) and Dr. Cyrus as witnesses.
- Mr. Schoolcraft believes that his son, PO Schoolcraft, was trying to bring change to the Dept in his documenting and reporting of inappropriate conduct in the Dept. Stated that there exists an "atmosphere exists that breeds corruption just like a hothouse breeds flowers."

11. PO Schoolcraft added the following statements:
    - Stated to his day, he has not been informed by Dr. Lamstein, Dept. Psychologist, why he was place on restricted duty since April 2009, when he initially reported sick for abdominal pain.
    - Stated he has been on RD, but have been assigned arrests and assigned to unload and invoice firearms.
    - Believed the hospital was misled by false reports by members of the Dept, resulting in his continued confinement.
    - Lt. Thomas Crawford, tax          , 81 Pct Special Operations Lt, is known as the "Shredder" for his reputation of getting rid of UF61s. Claimed there was a picture of Lt. Crawford's head on top of a paper shredder in the Anti-Crime office.
    - Claimed a Patrol Borough Brooklyn North executive, whose photo appears in the Borough office, is the one who orchestrated the event at his residence. Believed that he is retired MOS. Describe only as someone of a "gruff" appearance.
    - Disputes the hospital's claim that he is paranoid because he believes armed officers are out to hurt him.
    - Believed that his landlord, Teddy, is complicit in this because he is friends with a Lt. Belfuente who lives next door. Lt. Belfuente signed off on his low evaluation. (Dept Roster did not list any Lt. Belfuente or similar name).
    - Was interviewed by Quality Assurance Division for three hours, and then placed on Force Monitoring seven days later.
    - Observed a sign affixed to his locker, "Get another job."
    - Wanted to know if his digital recorder was invoiced, as well as any other property.

12. Dr. Isakov explained to PO Schoolcraft that an assessment of his psychiatric condition is still being conducted, including any information pertaining to the

CONFIDENTIAL
NYC00004469

     removal of his firearms by the Medical Division would be taken into consideration. PO Schoolcraft was advised that on Thursday of every week, a mental health patient attorney meets with new patients to address any concerns, including of any petition for discharge, with hearings before a judge scheduled for Tuesday of every week. Additionally, PO Schoolcraft was notified an assessment is mandated to be conducted within 72 hours.

13. Photographs were taken of C/V PO Schoolcraft. The only noted marks were light colored bruises on the bottom part of the upper arm (fleshy part of the tricep muscle). No other visible injuries observed, including to the facial region.

14. I/O informed PO Schoolcraft and Mr. Schoolcraft that any concerns or issues pertaining to his confinement in the hospital were not within the purview of IAB.

15. Mr. Schoolcraft stated he may be reached at 646-957-2486, temporarily staying at the Best Western Inn nearby Jamaica Hospital.

16. The above interview was digitally recorded, memorialized on audio CD, marked ads Attachment A. Photographs of PO Schoolcraft marked as Attachment B.

**ACTIVE CASE**

| Time Spent | Vehicle(s) | Expense Incurred |
|---|---|---|
| Clerical: 240 min | Dept. No: 4838 | N/A |
| Observation: 0 min | Pvt. No: | |
| Interview: 1 hr 45 min | | |
| Travel: 120 min | | |

Invest Ofc: _Sgt. Wayne Chu_   Supr: _Lt. Nicholas McAteer_

Commander: _DI David A. Grossi_

WS # 40

Attach# 1