UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK

-------------------------------------------------------------x

ADRIAN SCHOOLCRAFT,

                                             10–cv-6005 (RWS)

                      Plaintiff,

        -against-                    *MEMORANDUM OF LAW*
                                        *IN SUPPORT OF PLAINTIFF'S*
                                        *SUMMARY JUDGMENT*
                                        *MOTION*

THE CITY OF NEW YORK, *et al.*,

                              Defendants.

-------------------------------------------------------------x

*Preliminary Statement*

     Plaintiff, Police Officer Adrian Schoolcraft ("Officer Schoolcraft"), submits this memorandum of law in support of his motion for partial summary judgment.  The motion seeks the following relief:

     (1)  dismissal of Defendant, Deputy Inspector Steven Mauriello's counterclaims for tortious interference with his employment relationship and for *prima facie* tort on the grounds that there is no evidence to support several of the essential elements of those claims;

     (2) a judicial determination as a matter of law that the NYPD defendants' warrantless entry into Officer Schoolcraft's home on October 31, 2009 violated the Fourth Amendment's search and seizure provisions and that the NYPD defendants who made that entry lacked any specific and objectively reasonable basis that could justify their warrantless entry into Officer Schoolcraft's home;

     (3)  a judicial determination that the defendants' conduct in entering, remaining

in, and re-entering, Officer Schoolcraft's home, in assaulting and handcuffing him, and in detaining and forcing him to Jamaica Hospital as an "emotionally disturbed person" violated Officer Schoolcraft's constitutional rights and that no objectively reasonable grounds exist that could justify the defendants' conduct or their determination that Officer Schoolcraft was an "emotionally disturbed person;" and

      (4)  a judicial determination that the forced and involuntary hospitalization of Officer Schoolcraft by Jamaica Hospital and Doctors Bernier and Isakov violated Officer Schoolcraft's rights by involuntarily committing him without any determination that there was a substantial risk that he was dangerous, as required by law.

*Statement of Facts*

      On July 1, 2002, Officer Schoolcraft joined the New York City Police Department ("NYPD"), and for most of his career, he was assigned as a Patrol Officer in the 81st Precinct, which is located in the Bedford Stuyvesant neighborhood of Brooklyn.[1]   The 81st Precinct is one of ten Precincts that are located in the geographical area  known as "Patrol Borough Brooklyn North."   As a Patrol Officer, Officer Schoolcraft was a fine officer who ably and satisfactorily performed his duties and received satisfactory or better performance reviews for most of his career.[2]

---

[1] Plaintiff's Motion Exhibit 1 (hereinafter "PMX") at NYC 0001 (oath of office, dated 7-1-02).
[2] PMX 1:  NYC 005-007 (fine officer with great potential); 043-44 ("extremely competent" and an "asset for the department); 045-46 ("highly competent"); 087-91 ("fine officer with great potential"); 176-81 ("well-rounded officer" and a "steady and reliable performer").  For the years 2003, 2004, 2005 and 2006, Officer Schoolcraft received yearly performance evaluations of 3.5,

In October of 2006, the NYPD assigned Defendant Steven Mauriello to be the Executive Officer of the 81st Precinct.[3]  As the Executive Officer, Mauriello was the second in command at the 81st Precinct.  According to Mauriello, he requested that transfer because it was his stated desire to become a commanding officer of an NYPD Precinct.[4]

After Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft and other officers at the 81st Precinct began getting increasingly greater pressure at roll calls to achieve quotas on their number of arrests, summons and stops and to falsify documentation about the receipt of training during roll calls.[5]  Because Officer Schoolcraft had concerns about the lawfulness of these directions, he eventually began tape recording roll calls at the 81st Precinct.[6]

Coincident with Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft's performance evaluations began to decline.[7]  For 2007, Officer Schoolcraft received a 3.0 rating, which was the equivalent of a marginally satisfactory rating.[8]  In that evaluation, Officer Schoolcraft was criticized for not achieving "activity goals" and

---

4.0, 3.5 and 3.5, respectively.  (PMX 1:  NYC 398-400, 171-72; 176-78 & 179-81.)    It was only in 2007, after Defendant Mauriello became the Executive Officer and then the Commanding Officer of the 81st Precinct in 2007 and 2008 that Officer Schoolcraft's yearly performance ratings dropped to 3.0 in 2007 and 2.5 in 2008.  (PMX 1:  NYC 186-88 & 173-75.)
[3] PMX 2:  SM 340-43.
[4] PMX 3:  Mauriello Tr. 48:15 ("I wanted to go back to be an XO and earn my way back up again.")
[5] PMX 4:  Schoolcraft Tr.  29:13-30:12 & 32:24-33:5.
[6] *Id.*
[7] *See* n. 2 *supra*.
[8] PMX 1:  NYC 065-69.

"performance goals," which are coded phrases that refer to numerical quotas imposed on Patrol Officers.[9]

After being the Executive Officer at the 81st Precinct for one year, "One Police Plaza" made the decision on December 1, 2007 to promote DI Mauriello to the position as Commanding Officer of the 81st Precinct, and later he received a promotion to the title of Deputy Inspector ("DI").[10]  Under the command of DI Mauriello, the pressure to maintain numbers increased and Officer Schoolcraft's performance evaluations came under even greater scrutiny.

During the course of second, third and fourth quarters of 2008, Officer Schoolcraft's supervisors persistently criticized him for his low "activity" and his failure to meet activity standards.[11]   Based on these criticisms, in January of 2009, DI Mauriello gave Officer Schoolcraft a failing evaluation of 2.5.[12]   Tracking the negative comments during the course of the year, DI Mauriello's 2008 performance evaluation

---

[9] *See generally Floyd v City of New York*, 959 F. Supp. 2d 540, 590, 596, 599 & n. 264 (S.D.N.Y.  2013) (the increase in the number of stops was achieved by pressure on commanders at CompStat meetings to increase numbers and commanders in turn pressured mid-level mangers and line officers to generate numbers; abundant evidence that supervisors directed officers to meet numerical goals for stops, arrests and other enforcement activity as well as threating officers with negative consequences if they did not achieve those goals; "supervisors must evaluate officers based on their activity numbers, with particular emphasis on summons, stops, and arrests, [and] officers whose numbers are too low should be subject to increasingly serious discipline if their low numbers persist")

[10] PMX 3:  Mauriello Tr. 51:12-25.

[11] PMX 5 (PX 21): NYC 106 (as of May 2, 2008, "needs improvement in area of activity"); NYC 110 (as of July 4, 2008, "activity is still substandard and is unacceptable" and was instructed "on productivity expectations'); NYC 116 (as of October 1, 2009, "does not meet activity standards" and has been told about his "low activity"); NYC 122 (as of January 1, 2009, Officer Schoolcraft has been counseled on "his poor activity which is unacceptable").

[12] PMX 1 (PX 51)(NYC 070-72); PMX 3: Mauriello Tr. 190:23-196:25.

recommended that Officer Schoolcraft be transferred because of his "poor activity," for his "approach to meeting the performance standards" and for his disregard of the "activity standards" of an NYPD Police Officer.[13]

Officer Schoolcraft objected to this evaluation and informed his superiors that he wanted to appeal the failing evaluation.[14]   The appeal process involved the transmission of paperwork to the next level of the command structure, which was the Brooklyn North Patrol Borough, headed by Defendant Chief Gerald Nelson and Defendant Deputy Chief Michael Marino.[15]

At around this time, a poster appeared on Officer Schoolcraft's locker containing the words:  "IF YOU DON'T LIKE YOUR JOB, THEN MAYBE YOU SHOULD GET ANOTHER JOB."[16] Another handwritten note that later appeared on his locker stated:  "shut up, you idiot."[17]

On February 25, 2009, Officer Schoolcraft met with several supervisors at the 81st Precinct, including DI Mauriello, and his new Executive Officer, Defendant Captain Theodore Lauterborn.[18]  During the meeting, Officer Schoolcraft confirmed his intent to appeal the failing 2008 performance evaluation and repeatedly asked for

---

[13] PMX 1 (PX 51) at NYC 071).
[14] PMX 3:  Mauriello Tr. 190:18.
[15] PMX 3:  Mauriello Tr. 192:4 ("Chief Marino has an appeal board with borough inspectors").
[16] PMX 6:  NYC 12004.
[17] PMX 6:  NYC 12005.
[18] PMX 1:  NYC 191 (Schoolcraft memo book entry).

information about what numbers are required of him.[19]   At the end of the meeting,

another of the 81st Precinct supervisors, Defendant Steven Weiss, specifically asked

Officer Schoolcraft if he was recording the meeting.[20]

In either late February or March of 2009, Mauriello went to the main office for

Patrol Borough Brooklyn North with Sergeant Weiss from the 81st Precinct and met

with Deputy Chief Marino about Officer Schoolcraft's appeal of his failing 2008

evaluation and about Mauriello's wish to transfer Schoolcraft out of the Precinct.[21]   DI

Mauriello requested that Officer Schoolcraft be transferred, and Deputy Chief Marino

denied that request at that time for lack of paperwork.[22]

On March 11, 2009, a labor attorney for Officer Schoolcraft, James A. Brown,

Esq., wrote DI Mauriello a letter about Officer Schoolcraft's appeal of his failing

evaluation.[23]   Among other things, the letter documented previously-raised concerns

about "numerical goals" being used improperly in performance evaluations:  "We are

concerned that our client's negative evaluation is based not on the factors set forth in

Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of

---

[19] PMX 3:  Mauriello Tr. 190:18.
[20]   PMX 3:  Mauriello Tr. 326; PMX 6:  Weiss Tr. 111:7-114;12 (recalls believing that
Schoolcraft was recording and recalled asking Schoolcraft if he was recording the meeting in
February 2009 about the appeal but denies ever discussing that belief with Mauriello or
Executive Officer Lauterborn or Lieutenant Caughey).
[21] PMX 6:  Weiss Tr. 178:12-181:4; PMX 7:  Marino Tr. 196:13-200:6; PMX 3:  Mauriello Tr.
276:15-277:15.
[22] *Id.*
[23] PMX 8 (PX 57 & 22).

arrests and summons issued.[24]   After receiving the letter, DI Mauriello told Chief

Nelson about it and forwarded it to Patrol Borough Brooklyn North as part of the appeal

process.[25]

A few days later, on about March 15, 2009, while Officer Schoolcraft was on

patrol, Defendant Weiss issued to Officer Schoolcraft a command discipline for being

"off post" and having "unnecessary conversation" with another patrol officer.[26]

Officer Schoolcraft believed that he was being punished for the letter from his lawyer

and for appealing his evaluation, and as a result, made a formal request on his radio that

the Duty Captain for Patrol Borough Brooklyn North respond to the scene.[27]

In response, Defendant Lauterborn, who claimed to have been the Duty Captain

at the time, had Officer Schoolcraft brought back to the 81st Precinct.  According to

Officer Schoolcraft's recording of the meeting with Captain Lauterborn, Lauterborn

told Officer Schoolcraft that after the February meeting at the 81st Precinct to discuss his

appeal, he should not be surprised by the fact that he was going to get a lot more

"supervision" by the 81st Precinct supervisors and that the 81st Precinct supervisors were

now paying "closer attention" to him.[28]   Captain Lauterborn also told Officer

Schoolcraft that "this is gonna go on;" that he has "a long road ahead" of him; that

---

[24] PMX 8:  *Id.* at p. 2.
[25] PMX 3:  Mauriello Tr. 247:11-254:16.
[26] PMX 9 at NYC 00081 (PX 168).
[27] PMX 6:  Weiss Tr. 98:2-19; PMX 10:  Lauterborn Tr. 177:12-21 & 183:19-186:12
[28] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45, & 28:50-31:30.
The recording is attached at part of a compact disk accompanying this motion together with other
records relevant to the motion.

going forward, he needs to "cross your t's and dot your i's;" and that the "supervision"
was "coming down hard" on him not just in the past two nights but since the day he
walked out of the appeal meeting in February of 2009.[29]

The same day that Officer Schoolcraft spoke to Captain Lauterborn, Sergeant
Weiss began reviewing police procedures on how to have Officer Schoolcraft
psychologically evaluated.[30]  Shortly after that, Sergeant Weiss contacted the NYPD's
Early Intervention Unit and reported that he was "concerned" about the level of Office
Schoolcraft's "mental distress."[31]  Sergeant Weiss also did Internet research on Officer
Schoolcraft and found a news article in a local upstate newspaper about a burglary at his
father's home and forwarded that article to the Early Intervention Unit.[32]

Within a week or two of Sergeant Weiss' contacting the Early Intervention Unit,
Officer Schoolcraft was placed on modified or restricted duty without any law
enforcement or patrol duties and his gun and shield were removed.[33]  According to the
NYPD psychologist who testified that she was directly involved in the decision to place
Officer Schoolcraft on limited duty, Officer Schoolcraft was suffering from the physical
manifestations of stress.[34]  Based on that opinion, she recommended cognitive
behavioral therapy or stress management training to improve coping skills and to reduce

---

[29] PMX 11:  Id. at 30:00-31:30.
[30] PMX 6:  Weiss Tr. 120:6-121:2.
[31] PMX 6:  Weiss Tr. 99:14-101:4.
[32] PMX 6:  Weiss Tr. 103:6-109:3
[33] PMX 6:  Weiss Tr. 101:24-102:10.
[34] PMX 12:  Lamstein Tr. 172:21-174:20.

the physical symptoms of stress.[35]   The NYPD psychologist did not recommend any

medication, did not believe that Officer Schoolcraft was psychotic, and did not believe

that Officer Schoolcraft was dangerous to himself or others.[36]

As a result of being placed on limited duty, Officer Schoolcraft was assigned to

work at the 81st Precinct as the Telephone Switchboard operator, essentially taking calls

to the Precinct and handling walk-ins by members of the public.[37]  He held that position

from April 2009 through the end of October 2009.

While on limited duty, Officer Schoolcraft continued his attempts to challenge

his failing 2008 performance evaluation.[38]  He also started reporting misconduct by his

supervisors at the 81st Precinct.

On August 20, 2009, Officer Schoolcraft reported to the Internal Affairs Bureau

("IAB") on "corruption involving the integrity control program" at the 81st Precinct by

the Integrity Control Officer, Defendant Lieutenant Caughey and Assistant Integrity

Control Officer, Defendant Weiss.[39]   In addition, on August 31, 2009, a former

member of the service, David Dirk, reported that Officer Schoolcraft was the victim of

---

[35] PMX 12:  Lamstein Tr. 105:22-107:4.
[36] PMX 12:  Lamstein Tr. 113:15-115:2, 153:10-17, & 285:3-23.
[37] PMX 13:  Huffman Tr. 46:10-25.
[38] On September 2, 20109, Officer Schoolcraft wrote a memorandum to DI Mauriello requesting (again) that his appeal be processed and Mauriello testified that he received the memorandum and forwarded it to the Sergeant at Patrol Borough Brooklyn North who handled the paperwork for appeals.  (PMX 14: (PX 58) & PMX 3:  Mauriello Tr. 269:4-274:14).
[39] PMX 15:  Schoolcraft Report (PX 40).

retaliation by his supervisors.[40]

On September 2, 2009, Officer Schoolcraft spoke with IAB and reported that DI Mauriello was pressuring his staff to downgrade or suppress crime reporting and that under the direction of DI Mauriello police officers were being directed to make arrests and issue summonses in "violation of people's civil rights."[41]  According to the IAB report, Officer Schoolcraft also stated that he received his failing evaluation "because he doesn't believe in summons and arrest quotas" and that police officers "are being forced to sign the training log even though they don't get the necessary training."[42]

On October 7, 2009, Officer Schoolcraft met with investigators from the NYPD's Quality Assurance Division ("QAD").[43]  At the meeting, Officer Schoolcraft reported in greater detail about the nature of the downgrading and suppression of major crime reporting at the 81st Precinct.[44]  While QAD undertook to conduct an investigation into those allegations, it also referred Officer Schoolcraft's other misconduct allegations to IAB.[45]

By the end of October of 2009, it was common knowledge within the 81st Precinct that the Precinct was under investigation and that Officer Schoolcraft was involved in reporting the misconduct that led to that investigation.  Sometime earlier

---

[40] PMX 16 (NYC 4785-86) (Attorneys' Eyes Only ("AEO") designation, filed under seal).
[41] PMX 16 (NYC 4316-18) (Confidential designation, filed under seal).
[42] *Id.*
[43]  PMX 16 at NYC 5158 (PX 169; NYC 5153-5248).
[44] *Id.* at 5158-60.
[45] *Id.* at 5159 & 5220.

that year, Captain Lauterborn learned from DI Mauriello of a QAD investigation of the 81st Precinct.[46]   In addition, towards the end of October, an 81st Precinct Sergeant told DI Mauriello that QAD was calling down officers and based on that tip, DI Mauriello called up an Inspector from QAD, who confirmed that there was an investigation.[47]

Indeed, this was not surprising news.   Earlier in the year, there was persistent speculation at the 81st Precinct that Officer Schoolcraft was tape recording at the Precinct.[48]   In addition, Captain Lauterborn testified that as the QAD investigation was heating up, he allegedly received complaints from other officers interviewed by QAD that Officer Schoolcraft was asking them questions about their QAD interviews and informed DI Mauriello about Officer Schoolcraft's alleged conduct.[49]   Moreover, supervisors at the 81st Precinct knew from their practice of inspecting or "scratching" memo books that Officer Schoolcraft's memo book contained the name of an IAB officer.[50]   Finally, on October 19th Lieutenant Caughey issued a written order to all officers in the command that all inquiries from IAB must be reported directly to him.[51]

On October 31, 2009 – the last day that Officer Schoolcraft reported to the 81st Precinct – he worked the day tour and conducted his regular duties at the Telephone

---

[46] PMX 10:  Lauterborn Tr. 278:17-280:19
[47] PMX 3:  Mauriello Tr. 330:15-332:23 & 450:22-452:18.
[48] PMX 10:  Lauterborn Tr. 278:17-280:19.
[49] PMX 10:  Lauterborn Tr. 86:22-95:2.  While Officer Schoolcraft denies doing this, the fact that it was said by Defendant Lauterborn goes to his state of mind and beliefs about Officer Schoolcraft.
[50] PMX 10:  Lauterborn Tr. 86:22-99:20 & 114:14-118:16
[51] PMX17  (Caughey Memo).

Switchboard desk.  During the course of that morning, Lieutenant Caughey took Officer Schoolcraft's memo book to "scratch it" and instead, kept it for several hours.[52]  While in his office, Lieutenant Caughey made two photocopies of the *entire* memo book because he saw "unusual" entries in it.[53]  Lieutenant Caughey kept one copy for himself and put the other copy in DI Inspector Mauriello's office desk.[54]

When he returned the memo book to Officer Schoolcraft later that day, Officer Schoolcraft noticed (and became alarmed) that several pages of the memo book containing his entries about corruption or misconduct were earmarked or folded down.[55] Officer Schoolcraft grew more alarmed during the course of the day when Lieutenant Caughey started acting toward Officer Schoolcraft in a menacing manner.[56]  Indeed, one of the civilian workers at the Precinct, Police Administrative Aide ("PAA") Curtis Boston, saw Lieutenant Caughey walk by Officer Schoolcraft that day in an unusual manner and twice during the course of that morning PAA Boston and Officer Schoolcraft discussed Lieutenant Caughey's unusual behavior toward Officer Schoolcraft.[57]  PAA Boston specifically recalled that Officer Schoolcraft told her that he felt uncomfortable about Lieutenant Caughey's behavior and that Officer Schoolcraft asked her to document her reasons for why she believed Lieutenant Caughey was acting

---

[52] PMX 4:  Schoolcraft Tr.  202:22-203:20; PMX 18:  Caughey Tr. 120:18-121:19.
[53] PMX 18: Caughey Tr. 122:11-20.
[54] PMX 8:  Caughey Tr. 127:24-128:15.
[55] PMX 4:  Schoolcraft Tr. 202:22-203:11.
[56] PMX 4:  Schoolcraft Tr. 118:3-25-120:10;
[57] PMX 19:  Boston Tr. 64:17-65:5 & 77:15-86:13.

in a suspicious manner.[58]

About one hour before the end of his scheduled day, Officer Schoolcraft told his supervisor, Sergeant Huffman that he was not feeling well and was going home.[59]  At the time, Sergeant Huffman told Officer Schoolcraft that that was "okay."[60]   Officer Schoolcraft also submitted to Sergeant Huffman a sick report, which could have been a basis for authorizing him to take "administrative sick" for the day.[61]   As Officer Schoolcraft was leaving the precinct, however, Sergeant Huffman told Officer Schoolcraft that he could take "lost time"[62] and Officer Schoolcraft told her that that would be fine, although he would have preferred sick time.[63]

At about 3:30 pm,  Officer Schoolcraft got home, which was located at 82-60 Eighty-Eighth Place, Queens, New York, and telephonically notified IAB of Lieutenant's Caughey's menacing behavior.[64]   Officer Schoolcraft specifically informed IAB that he felt threatened, retaliated against, and in danger as a result of Lieutenant Caughey's menacing behavior.[65]

About one hour later, at about 4:20 pm, a Sergeant Krohley, from the 104th

---

[58] PMX 19:  Boston Tr. 77:15-86:13 & 109:16-112:5.
[59] PMX 13:  Huffman Tr. 66:20-67:2 & 71:3-75:9.
[60] PMX 13:  Huffman Tr. 74:11-19.
[61] PMX 13:  Huffman Tr. 68:6-15 (administrative sick can be approved by the desk sergeant); PMX 20:  Valenti Tr. 14:20-16:13 (same).
[62] PMX 13:  Huffman Tr. 80:12-20.
[63] PMX 4:  Schoolcraft Tr. 123:23-124:14
[64] PMX 4:  Schoolcraft Tr. 126:3-127:18.   The call to IAB is also recorded and identified as DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma; PMX  11.
[65] *Id.* at 19:40-26:10.

Precinct, went to Officer Schoolcraft's home with his driver.  Sergeant Krohley rang the

bell for Officer Schoolcraft's apartment, which was on the second floor of a three-family

house, and when there was no answer, he spoke to the landlady, Carol Stretmoyer, who

told him that she believed that Officer Schoolcraft had left about thirty minutes ago.[66]

She also informed Sergeant Krohley that Officer Schoolcraft has a car, which was parked

on the street.  Sergeant Krohley determined that the car was registered in the name of

Officer Schoolcraft's father.[67]

 At about 5:00 pm, Lieutenant Broschart from the 81st Precinct arrived at the

scene, and Sergeant Krohley briefed Lieutenant Broschart on the facts he had determined

since arriving at the scene.[68]  Lieutenant Broschart was under orders from DI Mauriello

and Captain Lauterborn to go to Officer Schoolcraft's home and bring him back to the

Precinct.[69]  After arriving at the scene, Lieutenant Broschart also knocked on the door,

and when there was no answer, he updated Captain Lauterborn by telephone that Officer

Schoolcraft was not home and that the landlady had told him that he might have left.[70]

Captain Lauterborn told Lieutenant Broschart to stand by and wait to see if Officer

Schoolcraft returned.[71]

--------

[66] PMX 16 (NYC 4643) (AEO designation).

[67] *Id.*

[68] PMX 16:  (NYC 4643) (AEO designation); *see also* PMX 11:
DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma at 40:52 (noting that at 4:18 pm
a black Impala in front of Officer Schoolcraft's house and his door bell being rung).

[69] PMX  20:  Broschart Tr. 87:17-88:20.

[70] PMX  20:  Broschart Tr. 100:25-104:20.

[71] *Id.*

Later that evening, Captain Lauterborn spoke with NYPD Psychologist Lamstein. According to Psychologist Lamstein's notes of the call, Captain Lauterborn told her that Officer Schoolcraft left early that day and the "underlying issue" was that Officer Schoolcraft "has made allegations against others" and the "dept's investigation of those allegations picked up this week & it snowballed from there."[72]   Psychologist Lamstein told Captain Lauterborn that she had seen Officer Schoolcraft just a few days ago and that she "had no reason to think [Officer Schoolcraft] was a danger to himself or others."[73]

At about 7:40 pm that night, after speaking with Psychologist Lamstein, Captain Lauterborn also called Officer Schoolcraft's father and told the father that Officer Schoolcraft left without permission and had to return to the 81st Precinct that night.[74]  The father told Captain Lauterborn that he spoke to his son earlier that day, that his son told him he felt sick in his stomach with a tummy ache and was going home and would call him when he woke up.[75]  Lauterborn told the father that he needs to "physically talk to" Officer Schoolcraft and "resolve things" and the situation is not going to "wait until the morning."[76]  Lauterborn insisted that he had to talk to Officer Schoolcraft "in person"

---

[72] PMX 22 at NYC 282(PX 29); PMX 12:  Lamstein Tr. 327:13-328:4.
[73] PMX 12:  Lamstein Tr. 319:24-25; *see also* PMX 23 Lauterborn Report (PX 16), 10-31-09 at p. NYC 00095 ("She stated that although she did not believe he was an immediate threat to himself or others his firearms were removed because of emotional distress caused by issues of anger and resentment against the Department.").
[74] PMX 11:  WS.331M_31October2009_LCS_ReturnPhoneCall to Capt. Lauterborn at 3:38-5:15.
[75] *Id.*
[76] *Id.* at 6:20-37.

and not "over the phone."[77]  He also stated that the "situation was going to escalate as the

night goes on " and that "no one is going in or out of that house he lives in because there

are police all over it."[78]  If Officer Schoolcraft was there, Captain Lauterborn said that

"eventually we are going to make our way in."[79]

Although the father assured Captain Lauterborn that his son was fine and was

probably sleeping, Captain Lauterborn insisted that it was not going to "end here" and

that Officer Schoolcraft should report to the Lieutenant on the scene outside his home.[80]

At 9:45 pm that night, after waiting five hours outside Officer Schoolcraft's home,

the NYPD took a key from the landlord and entered his home.[81]  That entry, which was

made without a warrant, was made by at least ten supervisory NYPD officers.  The entry

team was led by three Emergency Services Unit officers, who were followed by Deputy

Chief Marino, DI Mauriello, Captain Lauterborn, Lieutenant Broschart, and three

members of the Brooklyn North Investigation Unit (Lieutenant William Gough, Sergeant

Kurt Dunkin, and Sergeant Raymond Hawkins).[82]  At the time of their entry, the house

was also surrounded by numerous other members of the NYPD, including DI Keith

Green, the commanding officer of the 104th Precinct, Lieutenant Thomas Crawford (81st

Precinct); Sergeant Kevin Scanlon (104th Precinct); and several Police Officers who were

---

[77] *Id.* at 8:00-05.
[78] *Id.* at 9:55-10:06.
[79] *Id*. at 10:10-20.
[80] *Id.* at 10:55-11:00.
[81] PMX 16 at NYC 00432 (2145 entry made into apartment).
[82] PMX 3:  Mauriello Tr. 349:13-350:21.

acting either as drivers for the supervisors at the scene or had set up a barricade to block off street traffic.[83]  Also responding to the scene was FDNY Lieutenant Hanlon and two Jamaica Hospital Emergency Medical Technicians ("EMT").[84]

According to Deputy Chief Marino and DI Mauriello, the warrantless entry into Officer Schoolcraft's home was justified by their concerns for his "well-being."[85] Although Deputy Chief Marino admitted that he had no information that Officer Schoolcraft had threatened to hurt himself or others,[86] and although Psychologist Lamstein had told Captain Lauterborn that to her knowledge he was not a threat to himself or others, they allegedly believed that he was "possibly" an emotionally disturbed person because he had been sent (by them) to psychological services earlier that year, had been put on restricted duty without a gun and had left work early, allegedly against orders.[87]

Upon entry, the Emergency Services Unit officers moved into Officer Schoolcraft's' bedroom with their guns drawn, wearing bulletproof vests and helmets and carrying tactical shields.[88]  Officer Schoolcraft was lying on his bed and it appeared that

---

[83] *Id.* at NYC 000429.
[84] PMX 16 at NYC 431.
[85] PMX 7:  Marino Tr. 255:15 ("I was thinking about Schoolcraft's safety") & 256:9-18 (believed there was "a possibility of" him being an emotionally disturbed person); *but see id.* at 258:5-16 (no information that Officer Schoolcraft had threatened to hurt himself or others). PMX 3:  Mauriello Tr.  357:24-358:22 (entry made out of concern for his well-being and safety).
[86] PMX 7:  Marino Tr. at 258:5-16.
[87] PMX 3:  Mauriello Tr.  357:24-358:22.
[88] PMX 24:  Duncan Tr.  119:4-120:19; PMX 25:  Gough Tr. 141:4-25.

he was either watching TV or had just woke up.[89]  As reflected by the first moments of a

recording captured by Officer Schoolcraft's voice-activated digital recorder, one of the

Emergency Service Unit officers asked Officer Schoolcraft, "You okay?" to which

Officer Schoolcraft replied, "Yeah, I think so."  Once DI Mauriello entered his bedroom,

he ordered Officer Schoolcraft to return to the 81st Precinct.[90]  The audio recording is on a

compact disk being submitted to the Court together with other recordings relevant to the

facts and issues raised by this motion.

As reflected by the recording, Officer Schoolcraft refused to return to the Precinct,

notwithstanding numerous threats and orders.  Eventually, however, Officer Schoolcraft

succumbed to threats by Captain Lauterborn and Lieutenant Gough, and said he would go

under protest.[91]  Then a few moments later, Officer Schoolcraft stated that he had to sit

down because he was not feeling well and agreed to receive medical attention.[92]

While Officer Schoolcraft was being examined by Jamaica Hospital EMT

Salvatore Sangeniti, who had previously responded to the scene with an FDNY EMT

supervisor, Deputy Chief Marino returned to Officer Schoolcraft's bedroom and berated

Officer Schoolcraft about feeling sick.[93]  And at the very moment when EMT Sangeniti

started taking Officer Schoolcraft's blood pressure, Deputy Chief Marino, in a loud and

---

[89] PMX 24:  Duncan Tr. 127:11-20 (laying there on his bed watching TV); PMX 3:  Mauriello Tr. 359:2-5 (the TV was on).

[90] PMX 3:  Mauriello Tr. 356:11-357:15;  PMX 11:  (DS.50_31October 2009_HomeInvasion.wma at 2:48).

[91] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40.

[92] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40.

[93] PMX 11:DS.50_31October 2009_HomeInvasion.wma at 9:07-12:12.

angry tone of voice, suspended Officer Schoolcraft.[94]

Based on the circumstances confronting Officer Schoolcraft, he agreed to go to the hospital associated with his primary care physician, which was Forest Hills Hospital, to have his blood pressure checked out.[95]  When it became clear to Officer Schoolcraft, however, that the NYPD was going to take him to Jamaica Hospital (which has a psychiatric ward), Office Schoolcraft refused further medical attention and went back to his apartment.[96]

As reflected in the second part of the recording of the events in his home that time, Officer Schoolcraft returned to his apartment, laid back down in his bed and refused further orders first by Captain Lauterborn and then by Deputy Chief Marino who returned again to his home and entered without permission.[97]  Eventually, Deputy Chief Marino declared Officer Schoolcraft an "emotionally disturbed person" (also known as an "EDP") and Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough and Sergeant Duncan grabbed Officer Schoolcraft from his bed, threw him on the floor of his bedroom

---

[94] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 11:00-12:12; PMX 26:  Sangeniti Tr. 144:16-148:3 (Sangeniti confirming that at the point when Deputy Chief Marino suspends Officer Schoolcraft he was taking his blood pressure; testimony based on the sounds made when taking blood pressure).

[95] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 13:00-14:10.

[96] PMX 4:  Schoolcraft Tr.  149:7-151:2.  This part of the sequence of events that evening outside his home were not captured by the recorder that was in his bedroom.  Although Officer Schoolcraft also had a voice-activated digital recorder in his pocket that evening, Deputy Chief Marino took possession of that device later in the evening and since then that recorder has disappeared and the last Officer Schoolcraft saw of it was when Deputy Chief Marion put it in his pocket.  PMX 4:  Schoolcraft Tr. 194:14-21.

[97] PMX 4:   Schoolcraft Tr. 1:4-155:8 (Lauterborn pursued Schoolcraft back into his apartment and physically prevented him from shutting  the doors behind him as he returned); PMX 11: DS.50_31October 2009_HomeInvasion.wma at 17:50-22:00.

and cuffed him with his hands behind his back.[98]

More specifically, while Officer Schoolcraft was prone on the floor and Gough and Duncan were forcing his wrists into handcuffs, Broschart stepped on the backs of his legs, Lauterborn held him down with his hands, and Deputy Chief Marino put his boot on Officer Schoolcraft's face as he tried to turn his neck around to see what was being done to his body.[99]  After the handcuffs were secured, Officer Schoolcraft was then forced into an ESU chair, taken to the ambulance, placed on a stretcher with his hands cuffed behind his back, and driven to Jamaica Hospital by the two Jamaica Hospital EMTs.  Lieutenant Broschart rode in the back of the ambulance to maintain custody of Officer Schoolcraft.[100]

While the NYPD officers were in his apartment, they searched his person and his apartment and seized a voice-activated digital recorder taken from his pocket as well as several files belonging to Officer Schoolcraft, including copies of crime reports reflecting the downgrading of crimes he reported to IAB and notes in a folder marked "Report to the Commissioner.[101]  (They did not know about or seize the voice-activated digital recorder that captured the events in the apartment that evening.)

Officer Schoolcraft arrived at Jamaica Hospital's Emergency Room later that night

---

[98] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 21:30 -23:51.
[99]  PMX 4:  Schoolcraft Tr. 166:21-168:19; PMX 21:  Broschart Tr. 167:16-169:17; PMX 10: Lauterborn Tr. 322:23-323:9.
[100] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 22:00-28:27 (removal from apartment); PMX 21:  Broschart Tr. 177:22-178:11 & 182:7-183:8 (escort to hospital).
[101] PMX 4:  Schoolcraft Tr. 173:12-177:17.

and spent the night handcuffed to a gurney in the Emergency Room.  Hospital medical

records or the "chart" reflect that he was in custody of the NYPD the entire time.[102]

Admissions in depositions shows that Officer Schoolcraft was cuffed and under the

custody of Lieutenant Broschart until the Lieutenant was relieved at about midnight by

Defendant, Sergeant James, who was also from the 81st Precinct.   Sergeant James

remained there until the morning.[103]

The following morning Defendant, Sergeant Frederick Sawyer, another supervisor

from the 81st Precinct, was sent to Jamaica Hospital to relieve Sergeant James.  When

Sawyer got to the hospital, he saw Officer Schoolcraft on the telephone and, according to

Sawyer, he ordered him to get off the telephone.[104]  When Officer Schoolcraft did not

comply with that order, Sergeant Sawyer, Sergeant James, and their two drivers

physically forced Officer Schoolcraft onto the gurney and handcuffed his other hand to

the gurney, leaving him in a fully shackled position on the gurney.[105]  When Sawyer

applied the cuffs to Officer Schoolcraft, he used both hands to squeeze the cuffs tighter

and said "this is what happens to rats."[106]

Later that morning, the two sets of handcuffs were removed and Officer

Schoolcraft was wheeled into the Jamaica Hospital Psychiatric Emergency Room to be

---

[102] PMX 27:  Jamaica Hospital Chart (PX 69 at JHMC  58) (Emergency Department Nursing
Notes). Plaintiff's counsel has paginated the chart as "JHMC _."
[103] PMX 28:  James Tr. 53:18-20, 59:17-60:16 & 67:14-71:16 .
[104] PMX 29:  Sawyer Tr. 139:25-146:15.
[105] PMX 29:  Sawyer Tr. 139:25-146:15 & 153:14-156:16.
[106] PMX 4:   Schoolcraft Tr. 186:11-22.  Defendant Sawyer denies making this statement but
does admit to double cuffing Officer Schoolcraft.  PMX 29:  Sawyer Tr. 160:14.

held against his will for further "observation."[107]

Two days later, on November 3, 2009, Doctor Bernier ordered Officer Schoolcraft's involuntary hospitalization, even though there was nothing in the chart that suggested that Officer Schoolcraft was dangerous.  After the paperwork was filled out, Officer Schoolcraft was taken from the Psychiatric Emergency Room to a psychiatric ward in the hospital.[108]

The next day, November 4, 2009, Doctor Isakov, who was an attending doctor on the psychiatric ward, confirmed Dr. Bernier's decision to involuntarily hospitalize Officer Schoolcraft.[109]  As noted above, that decision was reached even though there was nothing in the chart that suggested that Officer Schoolcraft was dangerous to himself or others.[110] Indeed, both Doctor Bernier and Doctor Isakov testified at their depositions that they admitted Officer Schoolcraft on the ground that any possible or potential risk of dangerousness was a sufficient basis for their commitment decision.[111]  Moreover, Dr. Dhar, who was the Jamaica Hospital witness in this action, also testified that it was the policy and practice of the hospital to involuntarily commit a patient based on any possibility that the person was dangerous.[112]

On November 6, 2009, after a forced stay lasting six days, Jamaica Hospital

---

[107] PMX 27:  Medical Chart (PX 69) at JHMC 45.
[108] *Id.* at 91.
[109] PMX 27 (PX 69) at p. 46.
[110]  *See* PMX 30:  Report of Dr. Roy Lubit at p. 13-14.
[111] PMX 31:  Bernier Tr. 248-49; PMX 32:  Isakov Tr. 94-98
[112] PMX 33:   Dhar Tr. 132-35.

released Officer Schoolcraft from its custody, the same day that insurance coverage for his forced stay expired.[113]

After Officer Schoolcraft was released from Jamaica Hospital, he moved to Johnstown, New York (just south of the Adirondacks) and for the next six months was relentlessly harassed by the NYPD, which sent NYPD and local police officers on at least twelve separate occasions to bang on his door, spy on him, and videotape him or his father. Indeed, on at least two occasions, Lieutenant Gough and Sergeant Duncan, two of the individual defendants who attacked Officer Schoolcraft in his home on October 31, 2009, traveled north over 200 miles to his home to deliver papers to him that could have just as easily been sent to him by certified mail.[114]

*Procedural History*

This action was commenced on August 10, 2010 by the filing of the initial summons and complaint. The pleadings have been amended several times with Officer Schoolcraft filing his Second Amended Complaint on October 18, 2012 (Motion Exhibit 40). Thereafter, Defendant Mauriello obtained leave to amend his Answer to assert two counterclaims against Officer Schoolcraft for tortious interference with prospective employment relations and for *prima facie* tort (Motion Exhibit 34). More recently, on December 4, 2014, Officer Schoolcraft filed a motion to amend his complaint to add and to drop certain claims and allegations. That motion is currently scheduled for submission

---

[113] PMX 27 (Medical Chart) at JHMC 128 ("The case is certified from 11/3/09 through 11/6/09. Next review will be with Dan of Aetna…．").
[114] PMX 16 at 3876.

on December 31, 2014.

*Argument*

1. *The Summary Judgment Standard.*

In *Thompson v. Bosswick,* 855 F. Supp. 2d 67 (S.D.N.Y. 2012), the

Court set forth the well-established summary judgment standard:

> "Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The courts do not try issues of fact on a motion for summary judgment, but, rather, determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.*" Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law. *Rodriguez v. City of N.Y.,* 72 F.3d 1051, 1060-61 (2d Cir. 1995). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir. 1994)(citations omitted). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998).

> When deciding a motion for summary judgment, a court must remain mindful of the fact that summary judgment is "an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury." *H & M Hennes &*

*Mauritz LP v. Skanska USA Bldg., Inc.*, 617 F. Supp. 2d 152, 155 (E.D.N.Y. 2008)."

*Id.* at 75-76.

### 2.  *Mauriello's Counterclaims Should Be Dismissed as a Matter of Law.*

In his Counterclaims, DI Mauriello asserts a claim against Officer Schoolcraft for damages based on two legal theories:  (A) tortious interference with prospective employment relations; and (B) *prima facie* tort.[115]  The gravamen of the claim is that Officer Schoolcraft made false statements about DI Mauriello to QAD on October 7, 2009 and that those false statements damaged his reputation with his employer, the NYPD, and caused him emotional stress.[116]  Although the two legal theories are related, they have certain distinct elements and are addressed below separately.

### A.  *Tortious Interference*

The elements of a claim for tortious interference with prospective employment relations, which is an extension of the doctrine of tortious interference with prospective business opportunity, has the following elements:  (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted for the sole purpose of inflicting intentional harm to the plaintiff or employed wrongful means.[117]  As this Court held in *Thompson v. Bosswick,*[118] to establish this claim the plaintiff must "demonstrate *direct* interference with a third party, that is the

---

[115] PMX 34:  Counterclaims at ¶2; Dkt # 231.
[116] *Id.* at ¶¶ 4, 8-9 & 13.
[117] *Posner v. Lewis*, 18 N.Y.3d 566, 942 N.Y.S.2d 447, 450 n. 2 (2012).
[118] 855 F. Supp. 2d 67, 83 (S.D.N.Y. 2012).

defendant must direct some activities toward the third party and convince the third party not to enter into a business relationship with the plaintiff. "[119]

Moreover, the injury to those relations must be concrete; a plaintiff claiming an injury to his employment relationship must identify a specific relationship that he was prevented from entering into as a result of the defendant's alleged interference.[120] Indeed, the law in New York on this claim requires a direct causal connection between the alleged wrongful interference and the loss of that specific prospective opportunity. Thus, a plaintiff such as Mauriello "must also demonstrate that a contract would have been entered into 'but for' the defendants' conduct."[121]

Under these standards, there are several fatal defects in Mauriello's claim. There is no evidence that Officer Schoolcraft *directly* interfered with any *specific* employment opportunity presented to DI Mauriello. Nor is there any evidence that Officer Schoolcraft's report of misconduct to QAD or IAB was done for the *sole* purpose of causing Mauriello intentional harm, an essential element of his claim that is even belied by Mauriello's own pleading.[122] Similarly, there is no evidence that any of Officer

---

[119] *Id.* at 83 (citation omitted; emphasis added).

[120] *Baker v. The Guardian Life Ins. Co*., 12 A .D. 3d 285, 286, 785 N.Y.S.2d 437 (1st Dept. 2004).

[121] *American Preferred Prescription, Inc. v. Health Management, Inc.,* 252 A.D. 2d 414, 417, 678 N.Y.S.2d 1, 5 (1st Dept. 1998) (summary judgment granted to defendant where plaintiff's "sketchy factual assertions do not demonstrate that plaintiff would have entered into any type of contractual relation with the hospitals 'but for' defendants' conduct, and the claim for tortious interference with those relationships should be dismissed.").

[122] PMX 34 (Counterclaim ¶3(ii) (alleged conduct designed to "sanction" Mauriello "but also to thereby create support for the claims plaintiff was planning to assert in a lawsuit he intended to bring against the NYPD…."). At the time that Officer Schoolcraft was reporting misconduct, he

Schoolcraft's conduct can be properly characterized as "wrongful means" as that phrase

has been define (*i.e.,* criminal or fraudulent conduct).   Nor can Mauriello show that it was

the alleged interference by Officer Schoolcraft that *caused* him any damages.   Indeed,

since 2009 DI Mauriello has not suffered any cut in pay or demotion and cannot point to

any specific job opening that he was denied because of Officer Schoolcraft's statements

to QAD or IAB.   Thus, he cannot even show actual damages.

DI Mauriello was a material witnesses in the stop and frisk case recently tried in

this Courthouse before District Court Judge Shira A. Scheindlin, *Floyd v. City of New

York*, 08-cv-1034 (SAS) (Dkt. # 298).   In that testimony, DI Mauriello stated that *after*

the quota allegations were made against him as the commanding officer of the 81st

Precinct, he was transferred on July 3, 2010 to become the Executive Officer of Transit

Borough Brooklyn and Queens.   According to DI Mauriello's testimony before Judge

Scheindlin, at the time of the transfer, the Chief of Patrol for the entire NYPD told DI

Mauriello that he was doing a "really good job at the 81st Precinct" and that he wanted to

reward him with the new position.[123]   While Mauriello did not claim then that the transfer

was a promotion,  he did considered it a transfer to a position as "second commander to

---

was not planning a lawsuit against the NYPD such as the one now before the Court.  Instead, he
was considering his legal options with regard to challenging the 2008 failing evaluation that DI
Mauriello gave him earlier that year.  (PMX 4:  Schoolcraft Tr. 11-26-13 at 42:7-45:22.)   In fact,
he had already sent, through his attorney a letter to DI Mauriello challenging his 2008
evaluation.  (PMX 8).

[123] PMX 35:  Mauriello *Floyd* Testimony (PX 48) at 1829:25-1831:11.

more officers."[124]  While technically not a "promotion," it was "a reward for the job [he] did at the 81st Precinct."[125]

Thus, based on his sworn testimony in the *Floyd* case, Mauriello cannot claim that he has suffered any damage to his status at the NYPD.  That testimony in that case alone ought to be a sufficient basis alone to grant this motion, but other facts established in discovery in this case reveal additional grounds that support this motion.

In his deposition in this case, DI Mauriello testified that soon after the news broke in a February 2010 *Daily News* article about the investigation into downgrading major crimes at the 81st Precinct, he attended a Patrol Borough Brooklyn North supervisors meeting.  At the meeting his direct supervisor, Deputy Chief Marino, told DI Mauriello not to worry about the negative press because he did not believe it.[126]   In addition, according to Mauriello, Deputy Chief Marino and the thirty-five other supervisors in the room told DI Mauriello that they supported him.[127]  Thus, even if the news story was based on something that Officer Schoolcraft said or did, Mauriello's admissions demonstrate that nothing Officer Schoolcraft said or did caused him any cognizable harm.

Nor can DI Mauriello claim that he was denied some specific position or promotion.  At his deposition, DI Mauriello testified that he has not made *any* efforts to

---

[124] *Id.* at 1831:17.
[125] *Id.*  at 1836:25.
[126] PMX 3:  Mauriello Tr. 98:12-103:25.
[127] *Id.* at 103:16-25

change his position at the NYPD since October 2009 and that he has not made any requests for any changes in his position since October 2009.[128]   The only information that Mauriello could provide at his deposition was that he had vague, casual and very general discussions in the summer of 2011 with his now-retired supervisor, Transit Bureau Chief Diaz, and with his successor, Joseph Fox, who told him that any transfers or promotions would likely have to wait until the *case* is over and that until then they could not "push for him."[129]

Since Mauriello's tortious interference claim requires that he present admissible evidence that Officer Schoolcraft *directly* interfered with a specific opportunity, the claim should be dismissed as a matter of law. Without admissible evidence that the statements made by Officer Schoolcraft to QAD or IAB caused Mauriello to lose a specific opportunity, the claim is fatally flawed.

Yet there are even more critical flaws in Mauriello's claim.  As noted above, Mauriello must also show that Officer Schoolcraft's statements were made for the *sole purpose* of intentionally inflicting harm on Mauriello or that Officer Schoolcraft used wrongful means to inflict that harm.  Under New York law, "if the defendant's interest is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct."[130]  Since Mauriello's pleading and the record shows that Officer Schoolcraft was motivated by the fact that he

---

[128] *Id.* at 419:4-420:10.
[129] *Id.* at 466:11-470:9.
[130] *PPX Enterprises v. Audio Fidelity Enterprises,* 818 F. 2d 266, 269 (2d Cir. 1987).

wanted to challenge his failing evaluation,[131] the sole purpose test cannot be satisfied.[132]

Nor can DI Mauriello show that Officer Schoolcraft's conduct in speaking to QAD or IAB constitutes wrongful means. Courts have consistently required that the means employed be "criminal or fraudulent conduct"[133] or "threats" or similar kinds of conduct.[134] At best, Mauriello can claim only in the most general terms that Officer Schoolcraft made derogatory statements about him or the 81st Precinct (notably he does not assert a defamation claim and fails utterly to provide any kind of specificity about what particular statements of fact that Officer Schoolcraft allegedly made of, or concerning, him). Since DI Mauriello does not even attempt to set out a claim for "defamation" he cannot and does not contend that the separate cause of action for

---

[131] PMX 34(Counterclaim ¶3(ii) (alleged conduct designed to "sanction" Mauriello "but also to thereby create support for the claims plaintiff was planning to assert in a lawsuit he intended to bring against the NYPD…."). At the time that Officer Schoolcraft was reporting misconduct, he was not planning a lawsuit against the NYPD such as the one now before the Court. Instead, he was considering his legal options with regard to challenging the 2008 failing evaluation that DI Mauriello gave him earlier that year. (PMX 4: Schoolcraft Tr. 11-26-13 at 42:7-45:22.) In fact, he had already sent, through his attorney a letter to DI Mauriello challenging his 2008 evaluation. (PMX 8).

[132] *Durham Ind. v. North River Inc. Co.,* 673 F. 2d 37, 40 (2d Cir. 1982) ("the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injure and damage another."); *Hoesten v. Best,* 34 A.D. 3d 143, 159, 821 N.Y.S.2d 40, 52 (1st Dept. 2006) ("no evidence that Best acted solely for the purpose of harming plaintiff"); *Mill v Mount Sinai Medical Center,* 288 A.D. 2d 72, 733 N.Y.S. 2d 26 (1st Dept. 2001) (statements made within scope of defendant's employment duties demonstrates that the statements were not for the sole purpose of inflicting intentional harm). *See also Marcella v. ARP Films, Inc.,* 778 F. 2d 112, 119 ((2d Cir. 1985) (sole purpose element of claim for *prima facie* tort not satisfied when "there are other motives, such as profit, self-interest, or business advantage").

[133] *PPX Enterprises v. Audio Fidelity Enterprises,* 818 F. 2d 266, 269 (2d Cir. 1987).

[134] *Hoesten v. Best,* 34 A.D. 3d 143, 159, 821 N.Y.S.2d 40, 52 (1st Dept. 2006); *Miller, supra,* statements by supervisor about employee's lack of qualifications not wrongful means).

defamation satisfies that aspect of the claim for tortious interference with prospective advantage.

Mauriello also cannot raise a genuine issue of fact on the issue of causation, particularly in the light of the substantial record evidence that any "injury" to his career is based on the NYPD's own findings of his own misconduct and conduct unbecoming an Executive Police Supervisor.   Official findings by two NYPD investigative agencies – IAB and QAD – show that DI Mauriello personally committed misconduct and improperly permitted rampant downgrading and suppression of crime reporting at the 81st Precinct while under his command.

After Officer Schoolcraft was assaulted on October 31, 2009, IAB began an investigation into whether DI Mauriello knew about or suspected at the time of his entry into Officer Schoolcraft's home that IAB or QAD was investigating the 81st Precinct. IAB also made investigation into whether Mauriello knew about the contents of Officer Schoolcraft's memo book at the time he forced his way into his apartment.  During the course of those investigations, DI Mauriello was interviewed under oath by IAB, and at his interview DI Mauriello made materially false statements about his knowledge about the existence of an investigation into his Precinct and Officer Schoolcraft's memo book.[135]   Based on these findings, IAB recommended that formal charges against Mauriello be filed, and those charges are *still* pending.[136]

---

[135] PMX 15 (PX 144) (confidential designation)
[136] PMX 3:  Mauriello Tr.  635:3-651:6.

In addition, in 2010, QAD issued a report on its investigation.  In that report, QAD finds:

REACTED PORTION - FILED UNDER SEAL

[137]

Given these findings against DI Mauriello, there cannot be any genuine issue of material fact on whether the statements made by Officer Schoolcraft *caused* DI Mauriello damage to his employment relationship with the NYPD.[138]  Indeed, the fact that these conclusions were reached by governmental agencies raise an important – and dispositive -- immunity issue in this case.

The New York Court of Appeals has stated that "[t]he best interests of the public are advanced by the exposure of those guilty of offenses against the public and by the unfettered dissemination of the truth about such wrongdoers.  Such a person is entitled to immunity from civil suit at the hands of the one exposed, for the truth is not to be shackled by fear of a civil action for damages."[139]  The general scope of that immunity

---

[137] PMX 16 (PX 169) at NYC 5205 (emphasis added) (AEO designation; filed under seal) (redacted ECF version).
[138] *Catskill Dev. LLC, v. Park Place Entm't Corp.*, 547 F. 3d 115, 133 (2d Cir. 2008) (plaintiff must show both wrongful means and that the wrongful acts were the proximate cause of the alleged injury), *cert. denied*, 556 U.S. 1166 (2009).
[139] *Brandt v. Winchell*, 3 N.Y. 2d 628, 170 N.Y.S. 2d 828 (1958).

was recently re-affirmed by the Court of Appeals in *Posner v. Lewis*,[140] except that the

court in *Posner* refused to extend the absolute privilege articulated in *Brandt* to protect a

criminal blackmail scheme.[141]

This Court has already ruled that Officer Schoolcraft was acting in his official

capacity as a Police Officer when he reported misconduct to IAB and QAD.[142]  Since

there is no evidence that Officer Schoolcraft engaged in blackmail or any other type of

criminal conduct, absolute immunity requires dismissal of this claim as well as the related

claim for *prima facie* tort, which is addressed next.

### B.  Prima Facie Tort

The elements of a claim for *prima facie* tort are "(1) the intentional infliction of

harm, (2) which results in special damages, (3) without excuse or justification, (4) by an

act or series of acts which would otherwise be lawful.  In addition, there can be no

recovery under this theory unless malevolence is the sole motive for the defendant's

otherwise lawful act or in other words, unless defendant acts from disinterested

---

[140] 18 N.Y.3d 566, 942 N.Y.S.2d 447 (2012).

[141] *Id.* at 572.

[142] *Schoolcraft v. City of New York*, 2012 U. S. Dist. Lexis 82888 at * 22 & *27 ((June 14, 2012) (plaintiff's speech to IAB and QAD analogous to the unprotected speech in *Garcetti* and its progeny).   The Court should note that in rendering this decision, the Court relied extensively on a decision by Judge Jones in *Matthews v. City of New York*, 2012 U.S. Dist. Lexis 53213 (S.D.N.Y. Apr. 12, 2012), which also found that an NYPD Police Officers' speech was not entitled to First Amendment protection.  Since then, however, the Supreme Court in *Lane v. Franks*, __ U.S. __, 134 S. Ct. 2369 (June 19, 2014) held that the critical inquiry under *Garcetti* is whether the speech was part of the ordinary job functions of the public employee, and in the light of *Lane*, the same issue in *Matthews* is now on appeal to the Second Circuit is *sub judice*. In the event that the Second Circuit applies the *Lane* analysis to *Matthews*, then Officer Schoolcraft will seek to re-assert those First Amendment claims previously dismissed by the Court on the ground that the law has changed since the decision was rendered.

malevolence."[143]

For the reasons already set forth above, DI Mauriello cannot establish a genuine issue of material fact on the causation and the sole motivation requirements.  Nor can he overcome *Brandt* absolute immunity.

The *prima facie* tort claim also fails because DI Maureillo does not plead and cannot establish a jury issue on the requirement of special damages.  Nothing in his pleading even attempts to satisfy this requirement and the only thing that he could offer of any numerical nature at his deposition was the entirely speculative claim that he could have been promoted to the position of Inspector with a $8,000 or $9,000 a year increase in pay.[144]  Even though no one ever told him that he was being considered for that promotion, DI Inspector believes it is "automatic" because he knows of other Deputy Inspectors who have been promoted.[145]  Since this claim is utterly speculative, it must be dismissed for this reason as well.

 3.  *The Entry, Search, Seizure and Assault Lack Any Justification As a Matter of Law.*

By this motion Officer Schoolcraft requests that the Court determine as a matter of law that the individual defendants who entered his apartment on October 31, 2009 without a warrant violated the Fourth Amendment and that no reasonable person could have concluded that emergency exigent circumstances existed that would justify that

---

[143] *Posner*, *supra*, at 568 n. 1.
[144] PMX 3:   Mauriello Tr. 578:24-582:7.
[145] *Id.*

entry.[146]   By this motion, Officer Schoolcraft also requests that the Court determine that the act of remaining in the home, the act of re-entering the home, and the searches, seizures and detainment of Officer Schoolcraft also violated Officer Schoolcraft's rights under the Fourth Amendment.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."[147]   Warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable.[148]

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.  The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.  Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."[149]

The power of the police to force themselves into a home is a "grave concern" not only to the individual but to a society which chooses to dwell in reasonable security and

---

[146] The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[147] *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006) (citations omitted).
[148] *Id.* (citations omitted).
[149] *Id.* (citations omitted).

freedom.[150]  For this reason "the police bear a heavy burden when attempting to

demonstrate an urgent need that might justify warrantless searches or arrests."[151]  Thus:

> Before agents of the government may invade the sanctity of the
> home, the *burden* is on the government to demonstrate exigent
> circumstances that *overcome the presumption* of unreasonableness
> that attached to all warrantless home entries.[152]

The NYPD defendants cannot establish their heavy burden of proving that Officer

Schoolcraft was dangerous to himself or anyone else.  Indeed, they cannot point to a

single fact that would or could lead a rational person to conclude that he was in any kind

of imminent danger.  Summary judgment on the issue, therefore, is appropriate because it

will narrow the *genuine* issues of fact for trial.

When the ten NYPD officials made their initial entry, the proffered reason was a

belief that Office Schoolcraft might hurt himself.  Yet Deputy Chief Marino admitted that

he had *no information* that Officer Schoolcraft was a threat to himself or others.[153]

Indeed, that evening NYPD Psychologist Lamstein confirmed to Captain Lauterborn that

he was not, as of just three days ago, a danger to himself or others.  Finally, Officer

Schoolcraft's *father* told Captain Lauterborn that evening that he spoke to his son that

afternoon, that his son sounded fine, that he went home feeling sick with a tummy ache,

and was probably sleeping.

---

[150] *Welsh v Wisconsin,* 466 U.S. 740 749 (1984) (quoting Justice Jackson in *Johnson v United States*, 333 U.S. 10, 13-14  (1948)).
[151] *Id.* at 749-750.
[152] *Id.* at 743 (emphasis added).
[153] PMX 7:  Marino Tr. at 258:5-16 (no information that Officer Schoolcraft had threatened to hurt himself or others).

In an attempt to demonstrate exigent circumstances, the NYPD defendants claim that Officer Schoolcraft left work early and without permission and was on limited duty with no guns or shield.  Since it is undisputed that he told the Desk Sergeant that he was sick and going home, the fact that he left early or without permission would certainly justify reasonable follow-up and even disciplinary action.  But it is surely a stretch to suggest that those facts would lead a reasonable person to conclude that Officer Schoolcraft was in imminent danger of hurting himself or others.  And the fact that he had no guns ought to have lessened any concern, not heightened it, particularly since he had been on limited duty for the past seven months.

Indeed, the NYPD defendants' delay demonstrates that there was no genuine "emergency" and that there was no objectively reasonable belief that Officer Schoolcraft was in *imminent* danger.  The NYPD first arrived at his home at about 4:30 pm and did not enter until 9:45 pm, which was more than five hours after the first officer arrived at the scene.  Moreover, the only relevant information they obtained during that five-hour waiting period was that an NYPD psychologist said he was not dangerous and his father said he was fine and probably sleeping.

While "short delays between an officer's arrival at the scene of an alleged crime and the officer's entry of the premises do not necessarily negate the situation's exigency," courts will require that "a reasonably productive investigation be conducted during the period of the delay aimed at determining if exigent circumstances were objectively

present."[154]

Here, the only information obtained during the NYPD's exceedingly long delay was that there was no emergency. "Exigent circumstances exist when there is an 'urgent need to render aid' because someone is 'in distress' or 'injured' or threatened with 'imminent injury.' A warrantless entry is not objectively reasonable where it is based on mere surmise as opposed to objective facts reasonably suggesting that an actual emergency involving human safety existed."[155] "[T]he "mere 'possibility of danger' does not make it objectively reasonable to believe that the circumstances were exigent."[156] Instead, the police "must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion."[157]

Simply put, "the belated decision to enter was inconsistent with an objective sense of urgency."[158] Since the NYPD defendants who made that entry (Marino, Mauriello, Lauterborn, Broschart, Gough, Duncan and Hawkins) cannot satisfy their heavy burden by pointing to objectively reasonable facts justifying their entry, the Court should hold that the entry was unlawful as a matter of law.

The NYPD defendants' conduct immediately after their entry not only confirms

---

[154] *Unites States v. Sikut*, 488 F. Supp. 2d 291, 310 (W.D.N.Y. 2007), *adopted,* 2007 U.S. Dist. Lexis 35995 (W.D.N.Y. May 16, 2007) (granting motion by defendant to suppress evidence obtained based on a home entry that, as a matter of law, as not justified by exigent circumstances).

[155] *Rivera v. Leto*, 2008 U.S. Dist. Lexis 96680 at * 12 (S.D.N.Y. Nov. 25, 2008) (denying motion for summary judgment by police who made warrantless entry) (citations and original editorial alterations omitted).

[156] *Id.* (quoting *Hurlman v. Rice*, 927 F. 2d 74, 81 (2d Cir. 1992)).

[157] *Sikut*, *supra*, at 307 (citing and quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

[158] *Id.* at 311.

that the initial entry was unlawful but constitutes additional grounds for a determination

by this Court that their subsequent conduct was also unlawful as a matter of law.  When

the ten NYPD officers entered Officer Schoolcraft's apartment, it is undisputed that they

saw him in bed, the television in his bedroom was on, and he looked like he just woke

up.[159]  At that moment, the Constitution (as well as common sense and a healthy regard

for basic notions of common curtsey) required them to leave.[160]

"Like a warrantless entry into a home, a warrantless search inside a home is

presumptively unreasonable.  It must be strictly circumscribed by the exigencies which

justify its initiation."[161]  "The officer's post-entry conduct must be carefully limited to

achieving the objective which justified the entry – the officer may do no more than is

reasonably necessary to ascertain whether someone is in need of assistance and to

provide that assistance."[162]

Rather than leaving, Deputy Chief Marino, DI Mauriello, Captain Lauterborn and

Lieutenant Gough ordered Officer Schoolcraft to return to the 81st Precinct "to explain"

why he left.  And when he ultimately refused to go to Jamaica Hospital, Deputy Chief

Marino declared him an "EDP" and Lieutenant Gough and Sergeant Duncan dragged him

---

[159]   PMX 24:  Duncan Tr. 127:11-20 (laying there on his bed watching TV); PMX 3:  Mauriello Tr. 359:2-5 (the TV was on and Schoolcraft's eyes were red and is hair was standing up).
[160] *Sikut,* 488 F. Supp. 2d at 313 ("Once the officers became aware of such facts [showing no exigency], they were required by the Fourth Amendment to leave the apartment.") (citing *Mincey v. Arizon,* 437 U. S. at 393).
[161] *Rivera, supra,* at *17 (citing and quoting *Mincey v. Arizona,* 437 U.S. 385 (1978) and 3 Wayne LaFave, *Search and Seizure,* § 6.6(a) at 400-01 (3d ed. 1996)).
[162] *Rivera,* 2008 U.S. Dist. Lexis 96680 at * 17 (quoting *Tierney v. Davidson,* 133 F. 3d 189, 197-98  (2d Cir. 1998) (citing and quoting 3 Wayne LaFave, *Search and Seizure,* § 6.6(a) at 400-01 (3d ed. 1996)).

off his bed, threw him on the floor, and with the assistance of Lieutenant Broschart and

Captain Lauterborn, who were holding him down on the floor, and with the assistance of

Deputy Chief Marino, who put his boot on Officer Schoolcraft's face, they rear cuffed

him, searched him, shackled him into an ESU chair and removed him to the Jamaica

Hospital ambulance waiting on the street.

There is simply no evidence in the record that could support a rational finding by a

jury that Officer Schoolcraft appeared to be mentally ill or that he was conducting

himself in a manner likely to result in serious harm to himself or others, as required by

the law.[163]   Accordingly, assaulting and cuffing Officer Schoolcraft and taking him in

---

[163] Section 9.41 of the Mental Hygiene Law sets forth the powers of the police when dealing with emotionally disturbed persons.  That section provides:

§ 9.41.  Emergency admissions for immediate observation, care, and treatment; powers of certain peace officers and police officers. [Until July 1, 2016 (see 1989 note below), § 9.41 reads as set out below:] Any peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is **likely to result in serious harm** to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place, in which event, such officer shall immediately notify the director of community services or, if there be none, the health officer of the city or county of such action. (emphasis added).

And the term "likely to result in serious harm" is specifically defined:  "likelihood to result in serious harm" or "likely to result in serious harm" means (a) *a substantial risk of physical harm* to the person *as manifested by threats* of or *attempts* at suicide or serious bodily harm *or other conduct* demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm. MHL § 9.01 (emphasis added).   The phrase "likely to result is serious harm" is precisely and stringently defined by the statute.  *Rueda v. Charmaine*, 17 N.Y. 3d 522, 528 (2011).  Accordingly, the Court should reject any attempts by the defendants to permit generalities to cloud the exacting

custody to the hospital to be committed as dangerous and mentally ill violated his rights under the Fourth and Fifth Amendments.[164]

Although the defendants contend that Officer Schoolcraft's blood pressure was very high and that that condition justified taking him into custody and forcing him to get treatment, those facts does not raise a genuine issue of material fact on the question of dangerousness for several reasons.  First, the EMT who took the blood pressure reading at the precise moment Deputy Chief Marino suspended Officer Schoolcraft testified to the patently obvious fact that the tense circumstances could cause anybody's blood pressure to rise.[165]  Second, Officer Schoolcraft's expert report by Dr. Halpren-Ruder, an emergency room doctor with 30 years experience, provides conclusive and unrebutted evidence that the blood pressure reading taken from Officer Schoolcraft did not provide any medically meaningful information precisely because of the well-known fact that stressful events will alter a person's blood pressure.[166]  Third, the fact that someone has high blood pressure, even dangerously high blood pressure, does not mean that they lose

standards required by the law to protect the liberty of the people.

[164] *Kerman v. City of New York*, 261 F. 3d 229, 240 & n. 7  (2d Cir. 2001) (Fourth Amendment protects a person from being improperly detained by the police for transport to the hospital); *Kerman v. City of New York,* 374 F. 3d 93, 110-11 (2d Cir. 2004) (law clearly established that a state cannot constitutionally confine a non-dangerous person who is capable of surviving in freedom); *Tsesarskaya v. City of New York*, 843 F. Supp. 2d 466 (S.D.N.Y. 2012) (summary judgment denied for police invoking MHL § 9.41 because the law requires a dangerousness assessment).

[165] PMX  26:  Sangeniti Tr. 93:22-100:25 (160/120 reading was a high blood pressure reading that could be explained by the stressful circumstances under which it was taken).

[166] PMX 36 (Report by Dr. Halpren-Ruder) at p. 1 ("the recorded vital signs lack[ed] meaningful medical significance as it is well established that acute psychological and/or physical stress can raise blood pressure significantly.")

the well-established constitutional right to refuse medical treatment.[167]

The audio recording of the events that occurred in Officer Schoolcraft's apartment that night demonstrate that there is no *genuine* issue of material fact and that the NYPD defendants violated Officer Schoolcraft's constitutional rights by assaulting him, by placing him in custody as an "EDP" for transport to a psychiatric facility, and by using force to do so without any justification or authorization permitted by law.  Where the evidence is clear, summary judgment can and should be entered, even in favor of a plaintiff.

In *Cameron v City of New York*,[168] the Second Circuit affirmed the denial of a plaintiff's motion for judgment as a matter of law.  The plaintiff offered a video of her arrest that strongly suggested that the police officer's version of the events was untrue. The Second Circuit noted that the evidence was very strong but nevertheless affirmed the denial of the plaintiff's motion for judgment as a matter of law because the video was not continuous, and was in fact a series of photographs shot at a two-second frequency. Thus, it was possible that the plaintiff's claim was undercut by acts not captured on the film, and under the circumstances the Second Circuit was not able to rule as a matter of law for the plaintiff.

---

[167] *Green v. City of New York*, 465 F. 3d 65, 84 & n. 13 (2d Cir. 2006) ("Dangerousness to one's self cannot be read to include a competent adult's right to refuse treatment because competent adults have a well-established right to refuse medical treatment.")   The FDNY Lieutenant at the scene testified that a person, such as Officer Schoolcraft, who had decisional capacity, has the right to refuse medical attention.  PMX 37:  Hanlon Tr. 77:3-78:4
[168] 598 F. 3d 50 (2d Cir. 2010).

In this case, the tape recording of the events of October 31, 2009 is continuous, and it and the other undisputed facts in the record conclusively demonstrate that the NYPD had *no* grounds for deeming Officer Schoolcraft an EDP or putting him in custody. The *Cameron* case sets forth the standard governing this argument:

> We review the denial of a motion for judgment as a matter of law *de novo*, and will grant the motion only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant] on that issue." *Fed. R. Civ. P. 50(a)(1); see also Olivier v. Robert L. Yeager Mental Health Ctr., 398 F.3d 183, 188 (2d Cir. 2005)*. We "must draw all reasonable inferences in favor of the nonmoving party, and . . . may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*. But "[o]ur obligation to draw all reasonable inferences in favor of [the non-movant] does not mean we must credit a version of the facts that is belied by the record. *Tabbaa v. Chertoff, 509 F.3d 89, 93 n.1 (2d Cir. 2007)*. Accordingly, we "give credence to . . . that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves, 530 U.S. at 151* (internal quotation marks omitted). When a movant presents "[i]ncontrovertible evidence . . . such as a relevant videotape whose accuracy is unchallenged," we will grant the movant's motion for judgment as a matter of law if that evidence "so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner, 494 F.3d at 371; see also Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*.[169]

Similarly, the Supreme Court in *Scott v. Harris*,[170] recently held that a court is not required to shut its eyes and cover its ears when ruling on a summary judgment motion:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. That was the case here with regard to the

---

[169] *Id. at 59-60.*
[170] 550 U.S. 372 (2007).

factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.[171]

The claim that Officer Schoolcraft was dangerous is just the type of visible fiction that should be rejected as a matter of law by the Court.

### 4. *The Medical Defendants' Decision to Involuntarily Commit Officer Schoolcraft Based on "Any Possibility" of Dangerousness Violated His Constitutional Rights.*

The undisputed facts and admissions by the defendants at their depositions demonstrate that Jamaica Hospital had a *de facto* policy and practice of involuntarily committing patients who presented *any potential risk* of dangerousness.   And the undisputed facts and deposition admissions also demonstrate that both Jamaica Hospital's attending emergency room physician (Defendant Bernier) and its attending physician in the psychiatric ward (Defendant Isakov) made their commitment decision based on the conclusion that Officer Schoolcraft presented only a possible or potential risk of dangerousness.

Based on these admissions, Officer Schoolcraft is entitled to summary judgment on the issue of liability because state and federal law explicitly require that an involuntary commitment decision be based on a *substantial risk of dangerousness*.  By departing from the explicit statutory standards established under New York law, Jamaica Hospital, Dr. Bernier and Dr. Isakov are therefore liable for false imprisonment and for violations

---

[171]*Id*. at 380-81.

of Officer Schoolcraft's constitutional rights to liberty, freedom and due process.[172]  They are also liable as a matter of law for negligence *per se*, based on their admitted statutory violation.[173]

Section 9.39 of the New York State Mental Hygiene Law is the governing statutory provision for an emergency involuntary commitment.[174]  Generally, the statute provides that a doctor can involuntary commit a person on an emergency basis provided that the doctor finds (i) that the person has a mental illness; (ii) that the person requires immediate care, and (iii) that there has been established a *likelihood of serious harm* to the patient or others.

To protect a patient's rights, likelihood of serious harm is "precisely and stringently" defined[175] in the statute to mean either:

"1. *substantial risk* of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

2. *a substantial risk* of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of

---

[172] *See, e.g., DeMarco v. Sadiker*, 952 F. Supp. 134, 141 (E.D.N.Y. 1996) (common law false imprisonment claim against doctor arising from involuntary commitment requires proof that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of it; (3) the plaintiff did not consent; and (4) that the confinement was not otherwise privileged; privilege issue turns on whether the defendant complied with the New York Mental Hygiene Law, which is also an essential defense to a claim for violation of the patient's constitutional claims).
[173] *See* n. 186-188 and accompanying text *infra*.
[174]   MHL § 9.39.
[175] *Rueda v. Charmaine*, 17 N.Y.2d 522, 528 (2011).

serious physical harm."[176]

The medical defendants were not free to simply disregard the law. In *Rodriguez v. City of New York*,[177] the Second Circuit held that an assessment of a person's dangerousness is *required* by the due process clause of the Constitution.[178] *Rodriguez* also holds that due process requires that "the decision to order an involuntary emergency commitment be made in accordance with a standard that promises *some* reasonable degree of accuracy."[179] Thus, by effectively writing the substantial risk element out of the law and making a commitment decision based on mere possibilities, the medical defendants removed an important procedural and substantive safeguard required by the law, thereby subjecting patients to wandering vagaries and untethered speculations about mere possibilities of danger.

To establish a valid defense against a claim under Section 1983 for deprivation of an involuntarily committed patient's constitutional rights to due process and liberty, the medical defendants must satisfy Section 9.39 of the Mental Hygiene Law. Compliance with Section 9.39 is also required as a defense to a Section 1983 claim of unlawful imprisonment and the parallel common law claims. In *Project Release v. Prevost*,[180] the Second Circuit held that the provisions of Section 9.39 facially satisfy the due process

---

[176] *Id.* (emphasis added).
[177] 72 F. 3d 1051 (2d Cir. 1995).
[178] *Id.* at 1061 ("As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others.")
[179] *Id.* at 1062 (emphasis added).
[180] 722 F. 2d 960, 972-74 (2d Cir. 1983).

clauses of the Fifth and Fourteenth Amendments.  In addition, District Courts within the

Second Circuit have held that compliance with Section 9.39 can establish the privilege

defense to a claim for unlawful imprisonment.[181]  Thus, a finding of a substantial risk of

dangerousness is an *essential* requirement under state and federal law, and the medical

defendants were not free to simply disregard it.

Since the deposition of the Rule 30(b)(6) witness for Jamaica Hospital (Dr. Dhar)

as well as the depositions of Defendants Dr. Bernier and Dr. Isakov, the two doctors who

made the decisions to commit and to retain Officer Schoolcraft in the Jamaica Hospital

psychiatric facility, show that Officer Schoolcraft was involuntarily committed based on

a hospital policy and practice that violated Officer Schoolcraft's constitutional rights,

there is no genuine issue for trial on the issue of their liability.  Thus, the motion should

be granted.

The medical defendants may argue that its "official" or written policy document

tracks the requirements of Mental Hygiene Law Section 9.39 by requiring a substantial

risk of dangerousness.  Indeed, the pre-printed admission form filled out by Dr. Bernier,

which authorized Officer Schoolcraft's commitment, calls for a finding of a substantial

risk of dangerousness.  Similarly, the formal hospital policy statement mimics the

"substantial risk" language of the statute.[182]

---

[181]   *See, e.g., Tewksbury v. Dowling,* 169 F. Supp. 103, 112 (E.D.N.Y. 2001); *see also Ruhlmann v. Smith*, 323 F. Supp. 2d 356, 360 (N.D.N.Y. 2004) (whether confinement was privileged depended on whether Section 9.39 was satisfied); *see also DeMarco, supra,* at 141.

[182]*See* PMX 38: Emergency Admission Form (PX 171); PMX 39:  JHMC Department of

But all three Jamaica Hospital medical witnesses testified in deposition that any *potential risk* of dangerousness was all that was required to commit someone involuntarily to their psychiatric facility.  The admitting doctor who signed the pre-printed form, Defendant Bernier, testified at her deposition that if there was any potential risk that Officer Schoolcraft was dangerous she would have committed him involuntarily.[183]  Similarly, Dr. Isakov, the attending doctor at the psychiatric ward who co-signed the same form, confirming Dr. Bernier's commitment decision, testified that no matter what the level of risk (low, medium, high), if he perceived that there is any potential risk of dangerousness, he would involuntarily commit.[184]  Finally, the Rule 30(b)(6) witness for the hospital, Dr. Dhar, testified that the policy and practice at Jamaica Hospital was to involuntarily commit a patient where there was *any* risk of dangerousness.[185]  Thus, the written policy document cannot trump the undisputed facts about the *de facto* policy or its application in this case.

Based on these undisputed facts, Jamaica Hospital is also liable for negligence *per se* as a matter of law.  Under the common law, a defendant is negligent for failing to exercise that degree of care that a reasonably prudent person would have exercised under the same circumstances.   On the other hand, violation of a statute that imposes a specific

---

Psychiatry Manual on Emergency Admissions (PX 70).
[183] PMX 31: Bernier Tr. 248-49.
[184] PMX 32:  Isakov Tr. 94-98.
[185] PMX 33:  Dhar Tr. 132-35.

duty constitutes negligence *per se*.[186]  When a statute (such as Section 9.39) is designed to protect a particular class of persons against a particular type of harm and it is invoked by a member of the protected class, a court may, in furtherance of the statutory purpose, interpret the statute as creating an additional standard of care.[187] Violation of such a statutory standard, if unexcused, constitutes negligence *per se* so that the violating party must be found negligent if the violation is proved.[188]  Thus, the Court should find that Jamaica Hospital, Dr. Bernier, and Dr. Isakov violated of Section 9.39 when they committed Officer Schoolcraft under an "any possibility" standard, not the "substantial risk" standard required by that express statutory requirement.

---

[186] *See Van Gaasbeck v. Webatuck Cent. School Dist. No. 1,* 21 N.Y.2d 239, 243, 287 N.Y.S.2d 77 (1967); *Elliott v. City of New York*, 95 N.Y.2d 730, 734 (2001).
[187] *See Trimarco v. Klein,* 56 N.Y.2d 98, 108, 451 N.Y.S.2d 52(1982); *Martin v. Herzog,* 228 N.Y. 164, 168, 126 N.E. 814 (1920); Restatement, Torts 2d, § 286; 1 PJI [2d ed.], pp. 152–153.
[188] *See generally* 2 Harper & James, *Law of Torts*, § 17.6; *Dance v. Town of Southampton*, 95 A.D.2d 442, 445-50, 467 N.Y.S.2d 203, 206-08 (2d Dept. 1983).

*Conclusion*

DI Mauriello's counterclaims should be dismissed as a matter of law because he cannot establish several of the essential elements of his common law claims.

Summary judgment should be granted on the issue of liability against the NYPD defendants for the warrantless entry, the warrantless search and their unlawful imprisonment of Officer Schoolcraft.

Summary judgment should also be granted on the issue of liability against the medical defendants for their unlawful and unprivileged decision to involuntarily detain Officer Schoolcraft.

Dated:  December 23, 2014

*s/NBS*

_____

Nathaniel B. Smith

*s/JL*

_____

John Lenoir
