# PLAINTIFF'S MOTION
# EXHIBIT 3

Page 48

1                   S. MAURIELLO

2    CO, and then I went to become executive

3    officer at 81st Precinct in 2006.

4         Q.    Did you consider the move from

5    being a CO at the borough crimes unit to

6    the XO of the eight one to be a demotion?

7         A.    No.

8         Q.    Lateral transfer?

9         A.    No, I chose it because I want

10   to become a commanding officer of a

11   precinct.  At the time I thought it was

12   in line being a commanding officer at

13   borough crime, but there were other

14   people ahead of me I guess with less

15   time.  I wanted to go back to be an XO

16   and earn my way back up again.

17        Q.    Who were the lieutenants that

18   reported to you when you were the

19   commanding officer at the Brooklyn North

20   borough crimes unit?

21        A.    Lieutenant Furiello [phonetic]

22   and Lieutenant Galazzo [phonetic].

23        Q.    What about the sergeants, what

24   were the names of the sergeants?

25        A.    Smith, Zefferin [phonetic],

Page 51

                         S. MAURIELLO

1
2        Q.     Am I correct that the first
3    time you worked with Lieutenant
4    Delafuente is when you went to the eight
5    one as the XO?
6        A.     Yes, sir.
7        Q.     Am I correct that the first
8    time that you got to know Lieutenant
9    Caughey was when you reported as the XO
10   to the eight one in 2006?
11       A.     Yes, sir.
12       Q.     How long were you the XO at the
13   eight one?
14       A.     I believe a year.
15       Q.     What was your next assignment?
16       A.     Commanding officer at the 81st
17   Precinct.
18       Q.     Who made that decision?
19       A.     One Police Plaza.
20       Q.     You don't know who in
21   particular had any role in that?
22       A.     No.
23       Q.     Do you recall the date that you
24   became the CO?
25       A.     I think December 1, 2007.  I

1           S. MAURIELLO

2       Q.     What about Lieutenant Caughey,

3   when is the last time that you spoke with

4   him?

5       A.     I haven't talked to him since I

6   left the precinct.

7       Q.     What about Chief Marino, when

8   was the last time you spoke with Chief

9   Marino?

10      A.     I think I might have seen him

11  at a COMPSTAT a year ago.

12      Q.     When was the last time that you

13  spoke with him about the case or about

14  the situation or about Officer

15  Schoolcraft?

16          MS. PUBLICKER METTHAM:

17      Objection.

18      A.     I guess after the newspaper

19  article, the Daily News article.

20  February 2010 I know it came out.  It was

21  public knowledge then.  We all didn't

22  know.

23      Q.     What did you discuss with Chief

24  Marino about the Daily News article?

25      A.     You know, it was that he don't

Page 99

                    S. MAURIELLO

1
2   believe, you know, hang in there.
3        Q.    Chief Marino told you he didn't
4   believe the statements that were in the
5   February 2010 Daily News article; is that
6   what you're saying?
7        A.    Yes.
8        Q.    What were the statements that
9   to your understanding Chief Marino was
10  saying he didn't believe?
11       A.    The whole article in general.
12  It was a character assassination, you
13  know, again, it wasn't -- a commanding
14  officer being at the borough and then
15  afterwards everybody's leaving.  It was
16  in the newspaper that day, had to go down
17  there.  Everybody read it.  Everybody
18  read the Daily News, so, you know...
19       Q.    What was it about the Daily
20  News article that cast you in bad light?
21       A.    It was a two-page article.  It
22  was a front page, you know, didn't know
23  it was coming, you know, and some of the
24  stuff was inaccurate.  I think they
25  should have done a retraction.

Page 100

```
 1                S. MAURIELLO
 2           Two of the complaints that
 3    Officer Schoolcraft brought to the
 4    attention of the quote/unquote, Daily
 5    News and QAD really had nothing to do
 6    with the 81st Precinct.  It really had to
 7    do with other commands first had the
 8    opportunity to take the report.  They
 9    have should have took the report.
10           Somehow I don't know anything
11    about these incidents until I go down to
12    QAD in May and I'm reading articles I
13    don't know anything about these people.
14    I never heard of this stuff, so, you
15    know.
16       Q.    I'm not sure I asked a clear
17    question.
18           Can you tell me what is it
19    about the February 2010 article that cast
20    you in a negative light?
21       A.    Listen, he said I was purposely
22    misclassifying reports.  We purposely
23    were throwing them in the garbage pail.
24    I got -- from there, you know, I got to
25    read the report.  I haven't looked at
```

1                    S. MAURIELLO

2    that article in a long time.  There's

3    been other articles afterwards.

4        Q.    When the article came out, you

5    remember having a discussion with Chief

6    Marino about the subject of the article,

7    right?

8        A.    Because it was a -- not only

9    Chief Marino, there was other people.

10   This was the front page of the Daily

11   News.  When you open up the paper, it's

12   two pages -- my picture was in it.

13   Officer Schoolcraft's picture in it, you

14   know, so how you not going to talk about

15   it.  My family sees it.  Everybody sees

16   it.

17       Q.    Mr. Marino?

18       A.    Mr. Marino?

19       Q.    Inspector Marino -- Mauriello.

20   Two mistakes.

21       A.    It wasn't me.

22       Q.    Mr. Mauriello, I don't know how

23   you want to be addressed.  I will try to

24   get it correct.

25            I understand there was an

Page 102

                    S. MAURIELLO

1
2    article in the Daily News with a picture
3    of you in it.  I'm sure a lot of people
4    talked about it and you talked to a lot
5    of people about it including your wife,
6    kids, friends, everybody else.
7            I'm just focussing on the
8    conversation that you had with Chief
9    Marino about the Daily News article, can
10   we just stay on that?
11           MR. KRETZ:  You then asked him
12      what cast him in a bad light so he
13      told you the brief conversation with
14      Marino.
15           MR. SMITH:  Now we are going to
16      go back to the brief conversation with
17      Chief Marino.
18      Q.    Can you tell me what it was
19   that you said to him, what it was that he
20   said to you?
21      A.     If I remember, it was after
22   commanding officer being at the borough.
23   It was over.  He came up to me, he said,
24   "Keep your head up there.  I have been in
25   the paper before.  Don't worry about it.

Page 103

1                    S. MAURIELLO
2    I don't believe it."  That was it.  I
3    left.
4                    I didn't want to interact with
5    too many people that day because, you
6    know, it's kind of -- especially when,
7    you know, you do things by the book in
8    life.  I do.  I base myself on honor and
9    integrity.  I was raised the right way.
10   When you read an article with this false
11   -- so that day I really didn't want to
12   talk to anybody.  That was it.
13       Q.    Do you recall anything that you
14   said to Chief Marino?
15       A.    "Thank you."  That's it.
16       Q.    So is it fair to say that Chief
17   Marino came up to you unsolicited and
18   said, I support you, don't worry about
19   it?
20       A.    It's fair to say everybody in
21   that room came up to me unsolicited and
22   said they supported me.  So you want to
23   talk about 35 people in that room so not
24   only Chief Marino, everybody in that
25   room.

```
 1              S. MAURIELLO
 2      A.     They both have to sign it.
 3             MR. KRETZ:  Whose handwriting is
 4      this?
 5             THE WITNESS:  I don't know.
 6             MR. LEE:  What is the Bates
 7      number?
 8             MR. SMITH:  126.
 9             THE WITNESS:  He is asking about
10      the signature.
11      Q.     No.  I was asking about the box
12   underneath, 7, whose handwriting is that?
13      A.     I don't know.  I assume
14   Sergeant Stukes.
15      Q.     When was the first time at that
16   you saw this document?
17      A.     Honestly, right now.
18      Q.     As of the time of this meeting,
19   is it correct that Officer Schoolcraft
20   said he wanted to appeal his evaluation?
21      A.     Yes, I think 30 days before.
22   He had 30 days to appeal it.
23      Q.     So can you turn your attention
24   back to Exhibit 51.
25             [Witness complying.]
```

Page 191

1              S. MAURIELLO

2      Q.     Which is the 2008 performance

3  evaluation for Schoolcraft.

4              Do you have that from front of

5  you?

6      A.     It's 70.

7      Q.     Yes, 70 through 72.

8      A.     Yes.

9      Q.     Do you have that document in

10  front of you?

11     A.     Uh-huh.

12     Q.     This is the 2.5, right?

13     A.     Yes.

14     Q.     In the upper right-hand corner

15  there is a reference to a recommendation

16  of a transfer, what is that?

17     A.     Sergeant Stukes recommended to

18  transfer him.  He wasn't taking well to

19  instructions.  I reviewed and agreed.  We

20  went with that evaluation to transfer him

21  to another precinct.

22     Q.     What happened with -- so you

23  tried to transfer Schoolcraft?

24     A.     What the evaluation says, what

25  is your recommendation, transfer him.

Page 192

1              S. MAURIELLO
2   They have an appeal board like I went the
3   year before with people that get 2.5.
4              Chief Marino has an appeal
5   board with borough inspectors and they
6   bring in ICO and the CO.  I guess that
7   was the recommendation when they went in
8   to transfer him.
9        Q.    I'm not sure I understand.  I
10  will try to ask a more clear question.
11             Is that your signature on the
12  last page of that document?
13       A.    Yes.
14       Q.    Did you sign this document on
15  April 27th, 2009?
16       A.    Yes.  I believe I signed the
17  document the day he appealed it, you
18  know, we all signed it that February.
19       Q.    So why is it -- is that your
20  handwriting --
21       A.    Yes.
22       Q.    -- next to your signature where
23  it gives the date 4/27/09?
24       A.    Yes.
25       Q.    Why did you date it 4/27/09?

Page 193

S. MAURIELLO

2      A.      It was dated I believe back in
3    February.   When you appeal you send the
4    evaluation over to the borough 'cause the
5    higher borough has to do it.   It was sent
6    over to the borough.   I don't know the
7    reason why another one had to be done.
8              We also give Officer
9    Schoolcraft the information to do what he
10   had to do to write a letter.   The first
11   time he wrote a letter was September.   I
12   don't know why.   This is dated April.   I
13   don't know if they lost the letter,
14   didn't want to do it over again, whether
15   it was dated.   He signed it in the
16   office.   Everybody signed it.   He's
17   appealing it.   It was well known he was
18   going to appeal it.   And we sent to the
19   borough.   It's out of my hands now.
20       Q.      As of February 2009, the
21   paperwork was sent to the borough?
22       A.      Yes.
23       Q.      As of February 2009, you were
24   recommending to the borough that
25   Schoolcraft be transferred; is that

Page 194

                    S. MAURIELLO
1
2    correct?
3         A.    As a reviewer, yes.
4         Q.    You signed off on the request
5    that Schoolcraft be transferred, right?
6         A.    Yes.
7         Q.    And that was initially a
8    reference or a suggestion by Stukes that
9    you agreed with?
10        A.    And Delafuente.
11        Q.    So both you, Stukes, and
12   Delafuente believed that Schoolcraft
13   should be transferred as of February
14   2009; is that correct?
15        A.    Yes.
16        Q.    Why didn't that happen?
17        A.    I don't know.  I got a lot of
18   other people who were transferred into me
19   for the same evaluation so....
20        Q.    You see the number 2.5 in the
21   lower left-hand corner for overall
22   evaluation?
23        A.    Down here?
24        Q.    You see that 2.5?
25        A.    Yes, sir.

1              S. MAURIELLO

2      Q.     How is that calculated?

3              MS. PUBLICKER METTHAM:

4      Objection.

5      A.     By the points, by his quarterly

6  points added up.  There is a patrol guide

7  procedure.  I forget the number that

8  states if you have less than 40, it's 2.5

9  or below.

10             If for any reason you have less

11  than 40 and you get higher than a 2.5,

12  you have to be able to justify it in the

13  comments and performance monitoring will

14  not take it unless you can justify why

15  you're getting the lower points rating

16  and you're going to give him the higher

17  rating.

18     Q.     The six and the nine that I

19  showed you for the second and third

20  quarter 2008, those are the two numbers

21  that come into play in calculating this

22  2.5; is that correct?

23     A.     Yes.

24     Q.     So you agree with me that since

25  the quarterly ratings are subjective but

1                 S. MAURIELLO

2  this overall rating is also subjective,

3  right?

4       A.    If you added the points up, the

5  points come up below 40, the patrol guide

6  procedure says below 40, you get 2.5 on

7  top of recommendations.

8       Q.    I understand that.  I'm just

9  trying to make sure I understand what is

10  going on here.

11            Am I correct that the 2.5 is

12  based on the quarterly evaluation

13  numbers, right?

14            MS. PUBLICKER METTHAM:

15       Objection.

16       A.    Yes.

17       Q.    If you get less than 40 in a

18  calendar year, that means you get a 2.5,

19  correct?

20       A.    Yes.

21       Q.    It's also correct that the

22  quarterly evaluation numbers are a

23  subjective assessment by the supervisors

24  of the performance of the officer, right?

25       A.    Yes.

Page 247

```
 1                S. MAURIELLO
 2       Objection.
 3            MR. KRETZ:   Objection.
 4            You may answer.
 5       A.    No.
 6       Q.    I'm going to show you what's
 7  being marked as the next exhibit, 57.
 8            MR. SMITH:   This was actually
 9       previously marked as 22, I don't have
10       a 22.  Let's mark this as 57 as well.
11            [The document was hereby marked
12       as Plaintiff's Exhibit 57 for
13       identification, as of this date.]
14            This is a two-page document NYC
15       2846 to 47.  It's a letter from James
16       Brown to Steven Mauriello, dated March
17       11th, 2009.
18       Q.    Have you ever seen this
19  document before?
20       A.    Yes.
21       Q.    When did you see it for the
22  first time?
23       A.    I guess sometime in March.
24       Q.    Of 2009?
25       A.    Of 2009.
```

Page 248

1                    S. MAURIELLO

2        Q.     Did you review it when you

3    received it?

4        A.     Yes.

5        Q.     Did you forward it to anybody?

6        A.     Yes.

7        Q.     Who did you forward it to?

8        A.     I called up Chief Nelson,

9    two-star chief of the borough.  I told

10   him I got a letter from an attorney from

11   an officer who is appealing his

12   evaluation.  He said send it to up to the

13   borough, let it follow up the

14   evaluation,, and it will go to proper

15   channels to him, and he will give it to

16   his review board.

17       Q.     How did you send this to Chief

18   Nelson?

19              MR. KRETZ:  Objection.

20              MS. PUBLICKER METTHAM:

21       Objection.

22       A.     I had someone hand-deliver it

23   to his officer in an envelope.

24              MR. SMITH:  I'm going to call

25       for the production of the copy or the

```
1              S. MAURIELLO
2    original of the document that was
3    delivered to Chief Nelson as testified
4    by Inspector Mauriello.
5         MS. PUBLICKER METTHAM:   I
6    request that you make that request in
7    writing.
8         I would also ask if you believe
9    there is anything different with this
10   copy than the original?
11        MR. SMITH:  Well, the Witness
12   said there was an original letter sent
13   but it was misplaced and then another
14   one was sent.
15        MS. PUBLICKER METTHAM:  When --
16        MR. SMITH:  That's my
17   understanding.  Apparently there is
18   some sort of file at the borough level
19   that I haven't seen before so that's
20   what I'm looking for.
21        I understand from all of the
22   commotion, maybe I misunderstood
23   something so that leaves me to some
24   questions.
25        MR. KRETZ:  He said he got the
```

Page 250

1                    S. MAURIELLO
2        letter and sent it on.  That's all.
3               MR. SMITH:  Let's just go back.
4               THE WITNESS:  The evaluation I
5        got was sent to the borough before the
6        letter, the letter came after.
7        Q.      Right.  In February 2009 you
8    shipped out paperwork to the borough,
9    right?
10       A.      Yes.
11       Q.      Didn't you tell me that some of
12   that paperwork got misplaced or mislaid;
13   that's why it had to be resent?
14       A.      I said I don't know why we had
15   to do another one in April 2009 when I
16   signed another one.  That's all I said.
17       Q.      Do you agree with me that the
18   reason for having to resign all of that
19   documentation has something to do with
20   the fact there was not adequate
21   documentation although there was at the
22   time that you sent this stuff up in your
23   view of the documentation?
24               MR. KRETZ:  Objection.
25       A.      Take a look in the computer

Page 251

```
 1                S. MAURIELLO
 2   too.
 3            MR. KRETZ:  I believe they have
 4       been produced to you.  I don't
 5       understand why there is a need for an
 6       original of one you got copied of.
 7            MR. SMITH:  I'm trying to
 8       explain why.  It appears to me there
 9       was not a clear record what was
10       transmitted to the eight one to the
11       borough relating to this appeal.  If
12       you're telling me you produced
13       everything, fine.
14            MS. PUBLICKER METTHAM:  My
15       question is:  Do you believe there is
16       a difference between the original and
17       the copy that you have been produced?
18            MR. SMITH:  I know there is.
19       This one has an ICO fax transmittal
20       sheet on it showing this was
21       photocopied.
22            MS. PUBLICKER METTHAM:  Sent to
23       IAB.
24            MR. SMITH:  Right, so there is
25       another copy hand-delivered according
```

Page 252

1                    S. MAURIELLO
2        to the borough and there is probably a
3        file in the borough.
4              MS. PUBLICKER METTHAM:  Well, it
5        --
6              MR. SMITH:  Let me finish if you
7        want me to answer your question.
8              There is probably a file in the
9        borough pertaining that to appeal and
10       I want a copy of it.
11             MS. PUBLICKER METTHAM:  That's
12       been produced.  I also state that what
13       you just said are not mutually
14       exclusive facts, that there is a
15       document in the file and the copy we
16       have has a fax number from the ICO
17       which was sent to IAB.
18             MR. SMITH:  All right.  I don't
19       want to waste anymore time.
20       Q.    You called Chief Nelson and
21   told him you got this letter, right?
22       A.    Right.
23       Q.    And he told you to send it on
24   up and you sent it on up, right?
25       A.    Yes.

1                    S. MAURIELLO

2        Q.     Did you have any discussions

3    with anybody else about this letter?

4        A.     No.

5        Q.     Did you talk to anybody at the

6    eight one who reported to you about this

7    letter?

8        A.     Not that I recall, no.

9        Q.     So all of these guys who you

10   met at the appeal meeting, you didn't

11   tell them about this letter?

12       A.     I don't recall.

13       Q.     You don't remember?

14       A.     No, I don't.

15       Q.     The first paragraph of the

16   letter says that they are writing this

17   because of the two five that Officer

18   Schoolcraft got, and we have been asked

19   by our client to assist him with his

20   pending appeal.  Do you see that?

21       A.     Yes.

22       Q.     When you got this letter in

23   March 2009, you believed there was a

24   pending appeal and it had been shipped up

25   to the borough, right?

Page 254

1                    S. MAURIELLO

2        A.     Yes.

3        Q.      There is also a reference in

4    the next paragraph to, quote, it is our

5    understanding, referring to Officer

6    Schoolcraft's lawyers, it's our

7    understanding that a final decision from

8    command has not yet been rendered.

9              Do you have any understanding

10   as to what that is in reference to?

11              MS. PUBLICKER METTHAM:

12        Objection.

13        A.     It's an appeal that could be

14   overturned by the borough.  That's what

15   he's trying -- that's why they are

16   appealing.

17        Q.     In the next page of this

18   document, the first full paragraph, the

19   lawyer for Schoolcraft says that they are

20   concerned that the two five negative

21   evaluation he got related to the number

22   of arrests and summonses that he issued.

23              Do you see that reference?

24        A.     Yes, sir.

25        Q.      Is it fair to say that's an

Page 269

1              S. MAURIELLO

2              MR. SMITH:  Mark the next

3      exhibit as Exhibit 58.

4              [The document was hereby marked

5      as Plaintiff's Exhibit 58 for

6      identification, as of this date.]

7              MR. SMITH:  I have multiple

8      copies of Exhibit 58.

9              This for the record is a

10     one-page document NYC2626.  It's a

11     memo from Officer Schoolcraft to

12     Deputy Inspector Mauriello dated

13     September 2, 2009.

14     Q.    Have you ever seen this

15  document before, Inspector?

16     A.    Yes.

17     Q.    When did you see it for the

18  first time?

19     A.    Sometime in September.

20     Q.    Of '09?

21     A.    '09, yeah.  Sorry.

22     Q.    Did you review it when you

23  received it?

24     A.    I was kind of surprised because

25  the evaluation was in February.  If he

1               S. MAURIELLO

2    wanted to appeal it, I figure he sent a

3    letter already up.  Now it's September.

4    I was a little taken aback by this.

5         Q.    You were taken aback because

6    you believed that Officer Schoolcraft

7    wanted to appeal this in February '09,

8    right?

9         A.    That's what the patrol guide

10   states, that's what he said.  We gave him

11   the patrol guide and he's supposed to --

12   within 30 days he was supposed to send it

13   up to the borough above us for the appeal

14   so I thought it was already taken care

15   of.  I don't understand this.

16        Q.    What was it that you gave

17   Officer Schoolcraft that would lay out

18   his appeal process?

19        A.    I believe that Lieutenant

20   Mascol handed him over how to appeal an

21   evaluation.  He handed that document over

22   and also a document of the patrol guide

23   where the points add up to what your

24   score is.

25        Q.    Is the document about how to

Page 271

```
 1              S. MAURIELLO
 2   appeal an evaluation, is that a patrol
 3   guide procedure?
 4       A.    Yes.
 5       Q.    And at the appeal meeting, you
 6   saw Lieutenant Mascol hand Officer
 7   Schoolcraft copies of those procedures?
 8       A.    Yes.  You can actually hear it.
 9   He was reading it off.  You hear him.
10       Q.    Because you listened to the
11   tape recording and you are telling me you
12   can actually hear it being done.  I
13   understand that.
14            My question is:  You actually
15   saw Mascol do that, hand the patrol guide
16   procedure to Schoolcraft; is that right?
17       A.    Yes.
18            MS. PUBLICKER METTHAM:  For the
19        record it's Mascol?
20            MR. SMITH:  Thank you.
21            THE WITNESS:  Mascol.
22   M-A-S-C-O-L.  You thought it was a W.
23            MR. SMITH:  I don't think
24        anymore.  It's almost five.
25       Q.    When you got this letter, you
```

Page 272

```
1              S. MAURIELLO
2    were surprised to get it because you
3    thought he already had taken the steps
4    necessary to appeal his evaluation?
5         A.    Yeah.   The patrol procedure
6    says within 30 days you have to send it
7    up.
8         Q.    What did he have to do other
9    than check the little box in the
10   performance evaluation to appeal it?
11        A.    I believe, if you have it front
12   of you, the patrol guide says he has to
13   write a letter to the borough saying he's
14   appealing it.
15        Q.    And the little box is
16   insufficient?
17        A.    The patrol guide procedure says
18   you are supposed to send a letter up
19   there so it wasn't.
20        Q.    Do you know what happened to
21   his appeal?
22        A.    Sent to the borough.
23        Q.    What did they do with it?
24        A.    I thought they already came up
25   with something.  I don't know.
```

Page 273

S. MAURIELLO

1

2      Q.    You have no idea what happened?

3      A.    I don't know why he waited five

4   months to send it too.

5      Q.    I didn't ask you that question.

6      A.    I don't know what happened with

7   the evaluation, no.

8      Q.    Did you take any steps after

9   receiving this memo?

10      A.    I called up the borough, talked

11   to Sergeant Devino, and I said, "I got

12   something in the mail.  You guys should

13   have already have this already."

14           THE REPORTER:  Sergeant?

15           THE WITNESS:  Devino.

16           MS. PUBLICKER METTHAM:

17      D-E-V-I-N-O.

18      Q.    Who is Sergeant Devino?

19      A.    I think the personnel sergeant.

20   I think she handles the stuff for the

21   chief, appeal for Chief Marino or Chief

22   Silks, one of the two.

23      Q.    Devino reports to Silks and

24   Marino?

25      A.    Actually, she reports to

Page 274

1                   S. MAURIELLO

2    Nelson, but when she's the personnel

3    sergeant on that side when it comes to

4    appeals, she goes to one of those two

5    other chiefs handling those appeals.

6        Q.    When you called up Devino, what

7    did she tell you?

8        A.    She said, "They have it."

9        Q.    They have what?

10        A.    They have the evaluation, his

11    appeal.

12        Q.    So --

13        A.    I don't --

14        Q.    -- you took that to mean that

15    Schoolcraft did take the steps necessary

16    to appeal it, right?

17        A.    I took it they have the

18    evaluation that you said you don't know

19    where it went, they had it.

20        Q.    Let's back up.  You got this

21    memo, you said to me you were surprised

22    because he had already taken steps to

23    appeal it, right?

24        A.    Yes.

25        Q.    You contacted Sergeant Devino,

Page 276

S. MAURIELLO

1
2       A.      No.

3       Q.      So you didn't discuss it with
4   anybody at the appeal meeting?

5       A.      The appeal meeting was back in
6   February '09.  This is September '09.
7   This is five months before this.

8       Q.      Five months after this?

9       A.      This is after.  Everybody in
10  the appeal meeting heard he wanted to
11  appeal.  There was nothing to discuss
12  about it.  He said he wanted to appeal.
13  They told him what to do.  This is five
14  months later.  After.

15      Q.      Did you ever discuss Officer
16  Schoolcraft's appeal with Chief Marino?

17      A.      I think there came a time we
18  did talk.

19      Q.      When was that?

20      A.      I think right after when he
21  appealed it.

22      Q.      When was that?

23      A.      February or beginning of March.

24      Q.      What did you discuss?

25      A.      Officer appealing his

1                    S. MAURIELLO
2    evaluation part of the 2.5.  I said, "We
3    think he might need a change of scenery
4    to benefit him.  He seems not to be happy
5    in the 81st Precinct.  He doesn't take
6    well to his supervision.  We think maybe
7    he can go to Greenpoint, nine four
8    precinct, may be better for him, maybe he
9    will like the work over there better."
10        Q.    What did Chief Marino did?
11        A.    He will look into it.
12        Q.    Did you have any other
13   discussions with Chief Marino about the
14   appeal?
15        A.    No.
16        Q.    Do you recall any discussions
17   that you ever had with Chief Marino about
18   Officer Schoolcraft other than that one?
19        A.    No.  The night of.
20        Q.    The Halloween night?
21        A.    Halloween night.
22        Q.    Other than this discussion
23   about the appeal and other than Halloween
24   night discussions, you never had any
25   other discussions with Chief Marino about

Page 326

1                    S. MAURIELLO
2    mind that Officer Schoolcraft had been
3    tape recording at the eight one?
4              MR. KRETZ:  Objection.
5         A.    No.  On the appeal meeting if
6    you listen to the tape, Sergeant Weiss
7    asked him, "Are you tape recording this?"
8    when it was all over.  At no time did I
9    think an officer would be tape recording
10   a fellow officer, so no.
11        Q.    You would agree with me there
12   were some individuals at the February
13   appeal meeting that believed that Officer
14   Schoolcraft was taping, right?
15             MR. KRETZ:  Objection.
16             MS. PUBLICKER METTHAM:
17        Objection.
18        A.    He kept saying, "What is the
19   number?  What's the standard?"  So we
20   didn't understand what he meant by that.
21        Q.    I understand that.  But my
22   question to you is:  At the conclusion of
23   that meeting, you understood that certain
24   members of the service who participated
25   in that meeting believed that Officer

Page 330

```
 1                  S. MAURIELLO
 2       Q.     At that PG or meeting, Chief
 3  Marino and Brooklyn North investigations
 4  personnel were there, right?
 5       A.     Captain Lauterborn, yes.
 6       Q.     Captain Lauterborn, you, and
 7  other people, correct?
 8       A.     That was about it.
 9       Q.     That was in the context of that
10  meeting that the subject of Officer
11  Schoolcraft having a tape recorder came
12  up?
13       A.     Yes, along with complaint
14  reports and calling a criminal.
15       Q.     Inspector, when was the first
16  time that you became aware that QAD was
17  doing any kind of investigation of the
18  eight one?
19       A.     I believe there was a telephone
20  message near the end of October calling
21  down two cops to QAD.
22       Q.     How did you become aware of
23  that telephone message?
24       A.     I believe my crime analysis
25  sergeant asked me what this is about.
```

1              S. MAURIELLO
2      Q.    Who is your crime analysis
3  sergeant?
4      A.    Sergeant Seymour [phonetic].
5      Q.    What did you tell Sergeant
6  Seymour?
7      A.    I said, "Let me make a phone
8  call over there."
9      Q.    Who did you call?
10      A.    I spoke to Inspector Cronin,
11  who is now Chief Cronin.
12      Q.    What did Cronin tell you?
13      A.    I just asked her, "There is a
14  telephone message here.  Anything I
15  should worry about?"  She said,
16  "Anonymous letter.  They're going to
17  investigate.  No big deal."
18      Q.    She didn't tell you what the
19  investigation was about?
20      A.    Nope.
21      Q.    Did she tell you anything about
22  the investigation?
23      A.    No, she didn't.
24      Q.    Was there a time before that
25  conversation that you had with somebody

Page 332

```
 1              S. MAURIELLO
 2   at QAD where you suspected that maybe QAD
 3   was with doing an investigation into the
 4   eight one?
 5        A.    No.
 6        Q.    So the first hint that you had
 7   of any kind of QAD investigation at the
 8   eight one was sometime near the end of
 9   October when a crime analysis sergeant
10   brought to your attention the fact there
11   were these phone messages, right?
12        A.    Yeah, telephone messages.
13   That's the first.
14        Q.    Do you know what day that was,
15   whenever that came down?
16        A.    It had to be whenever it came
17   down.  Whenever I was working.  I don't
18   know if I was at PMI or whenever I first
19   went back.
20        Q.    Who were the officers being
21   called down?
22        A.    I think Deck [phonetic] and
23   maybe Santana.
24        Q.    When were you at PMI that
25   month?
```

Page 349

1                    S. MAURIELLO

2  in?

3       A.     They went in first.  Chief

4  Marino was behind them.  Myself and Teddy

5  walked in.  It's a small apartment.

6  Chief told me to handle it so myself and

7  Captain Lauterborn walked around

8  everybody into a small room where he was

9  sitting on the bed.  He was sitting up on

10  the bed.  And I said, "Adrian, what

11  happened today?  We were all worried

12  about you."

13       Q.     Let me just interrupt you if

14  you don't mind, Inspector.  Who was in

15  the apartment at this time?

16       A.     The three ESU, the chief,

17  myself, the captain, Lauterborn, the

18  investigations unit, and I think

19  Lieutenant Brosschart.

20       Q.     Ten people; is that right?

21       A.     I guess so.

22       Q.     Well, let's, I want to nail

23  this down if you don't mind.

24             There was three ESU people?

25       A.     Uh-huh, yes.

Page 350

```
 1                   S. MAURIELLO
 2      Q.     Marino?
 3      A.     Yes.
 4      Q.     Captain Lauterborn?
 5      A.     Yes.
 6      Q.     And three people from Brooklyn
 7   investigations?
 8      A.     Yes.
 9      Q.     And Lieutenant Brosschart?
10      A.     Yes.
11      Q.     And yourself?
12      A.     Yes.
13      Q.     Anybody else?
14      A.     I think people, EMS might have
15   been in the hallway or downstairs, I
16   don't know.
17      Q.     But those ten people including
18   yourself were in Officer Schoolcraft's
19   apartment when you were speaking to him
20   in front of his bed, right?
21      A.     As far as I know, yes.
22      Q.     Then what happened?
23      A.     Myself and Captain Lauterborn
24   was in his bedroom which connected to the
25   room when you first walked in.  I said,
```

Page 356

S. MAURIELLO

1

2    Q.    Is that your voice, Inspector

3  Mauriello, saying that the last you saw

4  Officer Schoolcraft was back at the

5  precinct and you were worried about him?

6    A.    Yes, we were all worried about

7  your safety and wellbeing.

8          MR. KRETZ:  That's your voice?

9    Q.    That's your voice, right?

10   A.    Yes.

11         MR. SMITH:  I'm going to play

12    the recording at 2.48.

13         [Whereupon, a recording is

14    playing.]

15   Q.    Did you just hear that part of

16  the tape which says, "Well, you're gonna

17  come back to the precinct with us"?

18   A.    Yes.

19   Q.    Was that your voice?

20   A.    Sounded like me, yes.

21   Q.    Do you have any reason to think

22  that wasn't you?

23   A.    Who knows if he spliced tapes,

24  I don't know.

25   Q.    You can speculate about a lot

Page 357

1               S. MAURIELLO
2    of things.
3               Sitting here today, I'm asking
4    you whether you have any reason to
5    believe that wasn't your voice?
6        A.    That's my voice.
7        Q.    So you did tell Officer
8    Schoolcraft, "Well, you're going to come
9    back to the precinct with us"; isn't that
10   right?
11       A.    Yes.
12       Q.    So playing that piece of the
13   recording refreshes your recollection
14   about that; is that fair to say?
15       A.    Yes, it does, sir.
16       Q.    Why did you tell Officer
17   Schoolcraft that he was going to come
18   back to the precinct with you?
19       A.    Because he left the precinct.
20   It was discussed with Chief Marino he was
21   there and he was AWOL.  We were making
22   sure he didn't hurt himself.  He left the
23   precinct without permission so....
24       Q.    Is there some provision in the
25   patrol guide that authorized you to go

Page 358

```
 1              S. MAURIELLO
 2  into Officer Schoolcraft's home and order
 3  him to return to the precinct because he
 4  was absent without leave?
 5          MR. KRETZ:  Objection.
 6          MS. PUBLICKER METTHAM:
 7      Objection.
 8      A.    First of all, we went to the
 9  house to make sure he didn't hurt
10  himself.  You hear me saying that on the
11  tape.  So that was the reason.  We're
12  making sure he was all right.  We're
13  worrying he had his gun and shield taken.
14  We don't know what's the reason for.  He
15  don't answer the phone.  He doesn't
16  answer anybody's phone calls.  He was not
17  answering the door when they're knocking
18  on the door.  He's not answering the
19  door.  All right, God forbid if he hung
20  himself, took pills, carbon monoxide, who
21  knows.  We are going there for his well
22  being.
23          Now, his well being is all
24  right, now, he's got to answer why you
25  left the precinct.
```

1              S. MAURIELLO
2      Q.     So when you entered the
3  apartment and you saw he was watching
4  television?
5      A.     The television was on.
6      Q.     Physically, he was fine, right?
7             MR. KRETZ:  Objection.
8             MS. PUBLICKER METTHAM:
9      Objection.
10      A.     His hair was sticking up, his
11  eyes were beat red like a possum.
12      Q.     Didn't you just testify you
13  were concerned about his well being and
14  now you can see he was okay and now
15  you're moving onto whether or not he's
16  going to have to answer for leaving?
17             MR. KRETZ:  Now you're trying to
18      get him to make a statement about his
19      health condition.  You're asking too
20      much.
21             MR. SMITH:  I want his opinion.
22      I appreciate you don't interrupt.
23      A.     I went in there.  I said that.
24  He got confrontational in my face.  I
25  removed myself from the situation, and

Page 419

                    CONTINUED- STEVEN MAURIELLO
 1
 2   one you had?
 3        A.      Yes.  Yes.
 4        Q.      Can you please turn to page 37
 5   of Exhibit 139.  On the top of that page
 6   there is a request for any documents
 7   relating to any searches for employment that
 8   you have undertaken since October of 2009.
 9   Do you see that, sir?
10        A.      Yes.
11        Q.      The response here is "not
12   applicable."  Do you see that?
13        A.      Yes, sir.
14        Q.      Does this mean that since
15   October of 2009, you have not made any
16   efforts to seek any form of employment?
17        A.      Yes.
18        Q.      Since October of 2009, have you
19   sought to change your position, either as
20   the commanding officer of the 81st Precinct
21   or the executive officer of Transit?
22        A.      When you make captain or above
23   and you get a command, there's no way really
24   you could put in for another command.  It's
25   all done by the police commissioner.  I

Page 420

```
 1          CONTINUED- STEVEN MAURIELLO
 2    never put in for anything of movement.
 3    Usually when you're a cop, sergeant,
 4    lieutenant, you do career path, you put in
 5    for OCCB.
 6          Q.     So what you're telling me is
 7    that since October of '09, and maybe even
 8    before that, you haven't made any requests
 9    to the NYPD to be moved; is that correct?
10          A.     That's correct.
11          Q.     On the next page in response to
12    request number 37, which relates to the
13    pending charges and specs against you by the
14    NYPD, there is a statement here that a "Bill
15    of Particulars provided to Steven Mauriello
16    relating to those charges will be provided."
17    You see that?
18          A.     Yes, sir.
19          Q.     What is that a reference to?
20          A.     I don't -- I think my lawyers
21    have it and that's with, I guess, the
22    advocate's office gave to my lawyer for the
23    charges.
24          Q.     I see.  So you never seen this
25    Bill of Particulars?
```

Page 450

1              CONTINUED- STEVEN MAURIELLO
2     file and he was, I guess, I think gang -- he
3     said my reputation precedes me and that I am
4     very well liked amongst the rank and file.
5              Q.      When did you first meet Korakis?
6              A.      I think he was a lieutenant in
7     Brooklyn North Gang.  It might have been
8     2006, the XO or 2007, the CO, but because
9     they worked upstairs.  So it was hello and
10    goodbye.
11             Q.      You just know him on a
12    professional basis?
13             A.      Yes.
14             Q.      Is that a yes?
15             A.      Yes.
16             Q.      You ever socialize with him?
17             A.      Never.
18             Q.      Do you know what his phone
19    number is?
20             A.      I believe I have it, yes.  I
21    don't have it on me, but I do have it.
22             Q.      We skipped ahead in the list.
23    We were talking about Mary Cronin and that's
24    what led you to Korakis.  Let me go just
25    back to Cronin.  Is the information that

Page 451

1      CONTINUED- STEVEN MAURIELLO
2  you, Cronin has, to your understanding,
3  limited to the information that Korakis
4  provided you about the discussion with
5  Cronin and Schwartz or is there some other
6  information that you think Cronin has, as
7  well, about the nature and extent of the
8  damages to you?
9      A.     I don't know.  I don't know if
10 she has anything.  When -- I guess when the
11 telephone message came down for two cops to
12 go down to QAD I was off.  The sergeant
13 called me with QAD's number and I talked to
14 her and it basically was like very brief and
15 she said -- I just asked her two cops are
16 going down there, you think I should worry
17 about it.  She said no, just an anonymous
18 complaint, don't worry about it, don't give
19 it a second thought.  That was it.  So she
20 was very professional.
21     Q.     When did you have that
22 conversation about the two cops being called
23 down?
24     A.     This had to be -- whenever the
25 telephone message came down for the two

Page 452

CONTINUED- STEVEN MAURIELLO

cops, I believe, Sergeant Seymour called me
up and said someone's going down to QAD, do
you know anything about it. No, I don't
know anything about. I was off. And I said
give me the phone number, let me find out
and I just talked to her. She said no,
there's an anonymous complaint, don't worry
about it, don't give it a second thought and
I left it alone.

Q. Do you remember when that
conversation with Cronin was?

A. It was in October. Whenever the
telephone message came down.

Q. Was it in October, before the
October 31st incident with Officer
Schoolcraft?

A. Yes.

Q. How many days or weeks before
the October 31st incident with Officer
Schoolcraft did you have a conversation with
Inspector or Chief Cronin about the two cops
from the 81 being called down?

A. It was definitely before the
cops went down there, Deck and Santana.

Page 466

```
 1          CONTINUED- STEVEN MAURIELLO
 2      off the record for just a second.  It's
 3      11:57.
 4             (Discussion off the record.)
 5             MR. SMITH:  Going back on the
 6      record.  It's 11:58.
 7      Q.     Does Del Pozo have any other
 8  information about your claims or your
 9  damages?
10      A.     Not that I know of.
11      Q.     The next person on the list is
12  Bureau Chief Diaz.
13      A.     He was the chief of Transit when
14  I first got transferred.
15      Q.     What information does he have?
16      A.     He's very highly regarded on the
17  NYPD.  Just that I went to him one time to
18  see if any way of move up, promotion or move
19  somewhere else and he said was it's too
20  soon, we have to wait till this whole case
21  is over with.
22      Q.     When did you approach him?
23      A.     Had to be before he left.  So
24  had to be within the first -- I was
25  transferred there 2010.  So it had to be
```

```
1            CONTINUED- STEVEN MAURIELLO
2    anywhere beginning 2011.  A year from I was
3    there.
4        Q.      Well, what date were you
5    transferred to Transit?
6        A.      Now I'm getting mixed up here.
7    2010, July 3rd I think it came down, but I
8    think July 7th was the official date.
9        Q.      Did you know it was coming
10   before it hit the tape?
11       A.      What was coming?
12       Q.      The transfer.
13       A.      No.  I was surprised.
14       Q.      How many days or weeks or months
15   after your transfer to Transit did you have
16   the conversation with Diaz about another
17   position or promotion?
18       A.      About a year.
19       Q.      So it's fair to say the
20   conversation with Diaz took place sometime
21   in the summer 2011?
22       A.      Yes.  Just, I guess, they had
23   annual meetings or every six months they
24   would meet, the bureau chiefs would meet
25   with Commissioner Kelly and go over every
```

Page 468

```
 1          CONTINUED- STEVEN MAURIELLO
 2  personnel under his jurisdiction --
 3  underneath him, all the executives.  And he
 4  said, you know, I said good things to
 5  Commissioner Kelly on your behalf.  I said
 6  any way I'm moving up, moving to some other
 7  position.  He said too soon.  Not until this
 8  whole thing is over with.
 9      Q.      When he said not until this
10  whole thing is over with, what was your
11  understanding of what he was referring to?
12      A.      I guess not until these articles
13  in the newspaper are over with, not until
14  this lawsuit is over with.
15      Q.      What did he tell Commissioner
16  Kelly about you?
17      A.      I don't know.
18      Q.      Where is Diaz today?
19      A.      He's retired.  I think he's --
20  maybe head of security of MTA.
21      Q.      Do you know where he lives?
22      A.      No.
23      Q.      Purely a professional
24  relationship with him?
25      A.      Professional, yes.
```

Page 469

1          CONTINUED- STEVEN MAURIELLO

2          Q.     What information does Diaz have

3     about your claims, other than what you've

4     already provided me with?

5          A.     Just that my career is on hold

6     until, I guess, or the lawsuit is over and

7     all the public sensationalism.

8          Q.     Did he lead you to believe that

9     once the lawsuit is over with that your

10    career would be, get back on track?

11         A.     He led me to believe that he'd

12    push for me, yes.

13         Q.     Do you believe that once the

14    lawsuit's over, that your career will be

15    back on track?

16         A.     Four years ago I thought so.

17    Right now, I don't know.  I really don't.

18         Q.     Next person is Bureau Chief

19    Joseph Fox.

20         A.     Yes.

21         Q.     Who is that?

22         A.     He's the Chief of Transit.

23         Q.     Is he in the chain of command

24    higher than Diaz or lower than or on the

25    same level as Diaz?

Page 470

1           CONTINUED- STEVEN MAURIELLO

2       A.      Same level.

3       Q.      What does Fox know about your

4   claim and damages?

5       A.      Just that, the same thing, that

6   I went to him and he said the same thing.

7   When this is all over and the lawsuit's all

8   over and everything's all over, then he'll

9   go to push for me.  Right now he can't.

10      Q.      When did you have this

11  conversation with Fox?

12      A.      I'm going to say I had it -- I

13  had it twice, twice.

14      Q.      When did you have these two

15  conversations with Fox?

16      A.      I would say one when

17  Commissioner Kelly was still here.  One

18  right around when they named Commissioner

19  Bratton was coming.

20      Q.      Bratton?

21      A.      Bratton.

22      Q.      Can you provide me with any

23  greater level of specificity about when you

24  had a conversation with Fox?

25      A.      I believe the second one around

Page 578

```
 1          CONTINUED- STEVEN MAURIELLO
 2      Q.      Kind of sort of?
 3      A.      Yeah, friends going out.  I
 4  wasn't really ready to date anybody.
 5      Q.      She doesn't work for the police
 6  department?
 7      A.      No.  No.
 8      Q.      She's a nurse in a private
 9  hospital or state or city hospital?
10      A.      No, she's like a nurse that
11  works for a company.  She goes to peoples'
12  houses.  She's a nurse that -- RN.
13      Q.      You don't know the name of the
14  company she works for?
15      A.      No.
16      Q.      The next paragraph you say --
17  you're identifying your damages --
18          MR. SMITH:  Let's take a short
19      break.  It's 15:06.  Just going off the
20      record.
21          (Whereupon, a recess was taken.)
22          MR. SMITH:  Going back on the
23      record.  It's 15:26.
24      Q.      The next paragraph refers to
25  damages and there's a statement here that
```

Page 579

             CONTINUED- STEVEN MAURIELLO
1
2    the total amount of damages are "lost wages
3    of 8,000 to 9,000 per year, emotional
4    distress damages and reputational harm, an
5    unspecified amount not to exceed $2
6    million."  You see those references, sir?
7         A.     Yes, sir.
8         Q.     Those are your claimed damages
9    in your counterclaim?
10        A.     Yes, sir.
11        Q.     The loss of wages of $8,000 to
12   $9,000 a year, what's that based on?
13        A.     Inspector -- I think the
14   difference between inspector and deputy
15   inspector.
16        Q.     Do you believe that you would
17   have been promoted to inspector, but for the
18   media coverage about your career?
19        A.     Yes, sir.
20        Q.     Did anybody at the NYPD tell you
21   that you were being considered for promotion
22   to inspector?
23        A.     No.
24        Q.     Is the promotion to the position
25   of inspector a promotion that automatically

Page 580

1            CONTINUED- STEVEN MAURIELLO

2     follows from being deputy inspector?

3                 MR. KRETZ:   Objection to the

4        form.

5        A.     Yes.

6        Q.     How many deputy inspectors are

7     there in the NYPD?

8        A.     I don't know.

9        Q.     How many inspectors are there in

10    the NYPD?

11       A.     I don't know.

12       Q.     How does one receive the

13    promotion from deputy inspector to

14    inspector?

15       A.     Sometimes it's by longevity.

16    I've been a deputy inspector for six years

17    now.  Sometimes it's how long you have been

18    in the command to get another promotion.

19    Sometimes they move you to another command

20    or they move you to another spot that's

21    promotional when you have too much time as

22    deputy inspector.

23       Q.     Can you explain that answer to

24    me, please?

25       A.     Yes.  When you're deputy

Page 581

```
 1          CONTINUED- STEVEN MAURIELLO
 2   inspector and run the command, there's a
 3   chance you can make full inspector in the
 4   same command by longevity.  If you're still
 5   there for a couple more years, you could be
 6   full inspector if they deem to promote you.
 7   If they move you to another unit, say
 8   narcotics or another precinct, district,
 9   housing, they could promote you again.  They
10   usually try to move people, deputy inspector
11   to an inspector spot.
12        Q.     How many inspector spots are
13   there in the NYPD?
14        A.     I don't know.
15        Q.     Who makes the decision to
16   promote deputy inspectors to inspectors?
17        A.     Police commissioner.
18        Q.     Does the police commissioner get
19   any information from anybody else?
20        A.     I don't know.
21        Q.     Do you have any sense of how
22   long it takes for somebody who is a deputy
23   inspector to be promoted to an inspector
24   position?
25        A.     No, but I know for quite a few
```

Page 582

1          CONTINUED- STEVEN MAURIELLO

2     people that were captains when I was deputy

3     inspector, now they're inspectors.

4          Q.     Who were those people?

5          A.     The list -- I'll recall.  I have

6     to remember.  There is a bunch of them.  I

7     look on the sheet all the time.

8          Q.     Do you know any deputy

9     inspectors who became inspectors when you

10    were deputy inspector and still are?

11         A.     And still are?

12         Q.     Let me rephrase that question.

13    You're telling me that there are some

14    captains that you know of who have, since

15    you became deputy inspector, they have

16    achieved title of inspector; is that

17    correct?

18         A.     Yes, sir.

19         Q.     If I leave a space in the

20    transcript, would you provide me with the

21    names of those?

22         A.     Yeah, think about it.  Yes.

23    Insert:  _____

24

25         Q.     Can you tell me of any other