# PLAINTIFF'S MOTION
# EXHIBIT 4

A. SCHOOLCRAFT

1    A.    To the best of my memory, it was it was a short

2    time after that.  I think it was Summer, 2010.

3    Q.    Do you owe your landlord any money for that

4    address?

5              MR. NORINSBERG:  Objection.

6    A.    Yes.

7    Q.    How much do you owe the landlord?

8    A.    I -- I imagine thousands, a few thousand dollars.

9    Q.    When did you begin surreptitiously recording your

10   coworkers?

11             MR. NORINSBERG:  Objection.

12   A.    What does "surreptitiously" mean, what is that?

13   Q.    When did you begin recording your coworkers

14   without their knowledge?

15             MR. NORINSBERG:  Objection.  You can answer.

16   A.    I don't recall any date when I started.  In 2006,

17   2007 or 2008, some time around that period.

18   Q.    Why did you begin recording your coworkers

19   without their knowledge?

20             MR. NORINSBERG:  Objection.

21   A.    There wasn't any one specific reason.  I was

22   documenting the roll calls, where officers receive orders

23   pertaining to their duties throughout the day.  I was

24   particularly concerned about how they reference training

25   and sign the training log, and -- they wanted officers to

A. SCHOOLCRAFT

1  just sign the training log. And most of the time, we

2  didn't receive any training that I became aware of, was

3  mandated by police headquarters.

4          And I heard other officers talk about how

5  recorders can back you up from accusations made by people

6  on the street, and stuff like that. It wasn't any one

7  particular reason. It was -- it was to document the roll

8  calls and the falsifying the training log, and those -- I

9  don't recall any other particular issue or specific issue.

10  Q.    Did you think at the time you made these

11  recordings, that you would be suing the City at some later

12  date?

13  A.    No.

14  Q.    Did anyone suggest to you that you record your

15  coworkers without their knowledge?

16  A.    I don't recall any suggestion.

17  Q.    Did your father ever suggest to you that you

18  record your coworkers without their knowledge?

19  A.    No.

20  Q.    Do you know if your father has ever recorded his

21  coworkers without their knowledge?

22  A.    I don't believe so, no.

23  Q.    How many recordings have you made that are

24  related to your claims in this lawsuit?

25          MR. NORINSBERG: Objection. You can answer.

A. SCHOOLCRAFT

1    anything, exactly.  There was no way to know when something

2    would happen.

3    Q.    Did you record just the roll calls, or did you

4    record as well, other portions of your tour?

5    A.    There were times where I think there are -- there

6    are -- where I didn't go back to my locker and put the

7    recorder back, and the recorder would go on until I did

8    that.  It would be after roll call.  There may have been

9    times like that.

10    But I don't recall recording the entire day or --

11    you know, I don't remember how long or when exactly I would

12    have the recorder.

13    Q.    So it was not your intention, though, to record

14    your actual tours on command?

15    MR. NORINSBERG:  Objection.

16    A.    You mean including the roll call?

17    Q.    Excluding the roll call.

18    A.    I don't believe I ever intended to record the

19    entire tour.  I didn't know if I had the technology; I

20    didn't know if it would run that long.  My intent was to

21    catch -- to document the roll calls, the official, "This is

22    your duty today, this is what we want you to do, and sign

23    the training log."

24    Q.    Why did you feel you had to record those roll

25    calls?

A. SCHOOLCRAFT

1    A.    Again, the falsifying the training we were

2    receiving, numerous times, instructions on how to increase

3    our activity.  What I was hearing was, "Arrest people or

4    summons people without probable cause."  And I had a -- I

5    had concerns about those orders.

6    Q.    What did you intend to do with those recordings?

7    A.    What did I intend to do?

8    Q.    Yes.

9    A.    I had no -- I was just documenting -- I was just

10   documenting and somewhat corroborating to myself what was

11   being said.  I had no -- I didn't start any investigation

12   at that time.  I was just -- again, learning the

13   technology, and hearing what was said.

14   Q.    So when you first started recording, you had no

15   intention of sharing these recordings with anyone?

16   A.    No.  I didn't think of anyone who would be

17   concerned.  I never -- I didn't think about it.  What I was

18   documenting was a pattern, not any specific one recording.

19   But a pattern over a period of time of this -- of what

20   supervisors were telling patrolmen.

21   Q.    Did you save every recording that you made?

22   A.    I don't believe so.

23   Q.    Did you delete recordings?

24   A.    Not intentionally.  Again, there were times where

25   the battery would go dead transferring the recording to the

A. SCHOOLCRAFT

1      A.      I don't recall if I had lunch with anyone or

2      where we went.

3      Q.      Your Complaint states that Lieutenant Caughey was

4      menacing and threatening to you, by keeping his hand on his

5      gun on October 31, 2009; is that correct?

6      A.      Correct.

7      Q.      Did you believe he was going to shoot you?

8      A.      At the time, I believed his behavior was

9      inappropriate.  And I -- I felt anything was possible.

10     Q.      Did you believe that anyone from the N.Y.P.D. was

11     going to use their firearm against you on October 31, 2009?

12     A.      I don't recall specifically thinking that, no.

13     Q.      Had anyone from the N.Y.P.D. ever threatened you

14     with a firearm prior to October 31, 2009?

15     A.      I don't believe so, no.

16     Q.      You allege that P.A.A. Boston told you that she

17     also believed Defendant Caughey was menacing that day; is

18     that correct?

19     A.      Yes.

20     Q.      Did you record that statement by her?

21     A.      I don't know if -- I don't know -- I haven't

22     heard that recording; it's possible.

23     Q.      Did she tell you why she thought Lieutenant

24     Caughey was menacing?

25     A.      I don't remember if she did or not.

A. SCHOOLCRAFT

1    Q.    On October 31, 2009, did you state in reference
2    to Defendant Mauriello, "I would like to at least have a
3    fucking chance to go in a gun battle with him"?
4    A.    What was that again?
5    Q.    Did you state on October 31, 2009, in reference
6    to Defendant Mauriello, "I would like to have at least a
7    fucking chance to go in a gun battle with him"?
8    A.    I don't recall making -- ever making a statement
9    like that.
10   Q.    Do you recall making that statement about anyone,
11   not including Defendant Mauriello?
12   A.    I don't recall ever making that statement about
13   anyone, no.
14   Q.    On October 31, 2009, do you recall stating in
15   reference to a recording device, "How long do you think
16   that'll fucking stay on me, after they fucking kill me?"
17   A.    Again, I don't recall making that statement, but
18   it's possible.
19   Q.    Who did you make that statement to?
20   A.    I would have to hear the recording.
21   Q.    But sitting here right now, you don't recall who
22   you made that statement to?
23   A.    No.
24   Q.    Had anyone at the N.Y.P.D. threatened to kill you
25   prior to you making this statement?

A. SCHOOLCRAFT

1          MR. NORINSBERG:  Objection.

2     A.     I didn't receive any explicit threat, no.

3     Q.     Did you receive any implicit threat?

4     A.     I felt Caughey's behavior that day was menacing

5     and threatening.

6     Q.     And you believed that he was threatening to kill

7     you?

8          MR. NORINSBERG:  Objection.

9     A.     I believe his behavior was menacing, and

10    intimidating and threatening.

11    Q.     Besides Lieutenant Caughey, were you in fear from

12    any other member of the N.Y.P.D.?

13    A.     I don't recall any exact -- I was concerned; I

14    don't know if I would define it at fear.  Maybe at certain

15    times, I was more concerned towards the end of the day.

16    Q.     Who were you concerned about at the end of the

17    day?

18    A.     Mostly, Lieutenant Caughey.

19    Q.     Did you tell anyone on October 31, 2009, that

20    "Mom is speaking to me"?

21    A.     I don't recall ever making that statement, no.

22    Q.     Do you recall making a statement on October 31,

23    2009, "I have heard guys say that I am six-foot four and

24    that I lift motorcycles over my head"?

25    A.     I don't recall ever making that statement.

A. SCHOOLCRAFT

1     Q.     Did you follow the procedure for leaving work

2   early on October 31, 2009?

3     A.     I believe so, yes.

4     Q.     Whom did you ask to leave early?

5     A.     I believe her name was Sergeant Huffman,

6   something like that.

7     Q.     How did you ask her to leave early?

8     A.     I informed her -- I believe I told her I had an

9   upset stomach, and I gave her a -- a slip with my -- with

10   all my information on it; my name, my address where I would

11   be.  And I told her "I don't feel well."  And I turned in

12   all the paperwork I was involved with.  And that was it.

13     Q.     What paperwork did you give her?

14     A.     Referring to what I was working on, or the slip?

15     Q.     What did you give her?

16     A.     I gave her -- it's referred to as a sick slip.  I

17   am not sure the exact form number, but the slip is what

18   officers fill out when they go sick.

19     Q.     Did you give her other documents at the same time

20   you gave the sick slip?

21     A.     I don't recall giving her any specific other

22   documents that I gave her at that time, no.

23     Q.     Did Sergeant Huffman tell you that you cannot

24   leave unless you wanted lost time?

25     A.     I believe she said something to that effect.  And

A. SCHOOLCRAFT

1    I said "lost time is fine," to the best of my memory, "lost

2    time is fine."  But then I think she said the lost time had

3    to be authorized.

4            And I didn't feel the lost time would have been

5    authorized.  I preferred -- I was feeling under the

6    weather, and I preferred to go regular sick.

7    Q.    But you recall agreeing to lost time?

8    A.    I don't recall agreeing to lost time.  It's

9    possible, if that was -- if she would have allowed it, then

10   I would have agreed to it.  But I didn't feel lost time

11   would have been granted.

12   Q.    So when she said you can take lost time, what did

13   you say to her?

14   A.    It would be something to the effect, "That's

15   fine."

16   Q.    Did you speak with Police Officer Yadira

17   Rodriguez, after you asked to leave work early?

18   A.    I don't recall speaking to Yadira Rodriguez, no.

19   Q.    Do you recall speaking with Police Officer Craig

20   Rudy after you asked to leave work early?

21   A.    I don't recall any specific conversation with any

22   officers.

23   Q.    Did you believe that you were leaving work early

24   against the orders of Sergeant Huffman?

25   A.    No.  I didn't believe that, no.

A. SCHOOLCRAFT

1    leaving the precinct on October 31, 2009?

2         A.    I don't recall speaking to him, no.

3         Q.    What happened, after you left the precinct?

4         A.    To the best of my memory, I drove home.  I got

5    home, I notified I.A.B. of -- by phone, I notified I.A.B.

6    of Caughey's behavior.  I addressed my upset stomach or --

7    they were flu symptoms, with NyQuil.

8              And I -- I recall talking to my father.  And

9    then -- then I laid down to go to sleep.  And then the

10   details after that, are in the recording.

11        Q.    Why did you notify I.A.B. of Caughey's behavior?

12        A.    I felt his behavior should have been

13   investigated.

14        Q.    How so?

15        A.    How would they investigate it?

16        Q.    I am sorry, that was an unclear question.  Why

17   did you believe that Caughey's behavior needed to be

18   addressed by the I.A.B.?

19        A.    He was acting in an -- in a bizarre, unusual

20   manner; pacing around me, carrying his firearm in an

21   improper fashion.  Ms. Boston called me on the phone and

22   told me he was pacing around me and staring at me.  And I

23   just had a general concern about what his problem was with

24   me.

25        Q.    So what did you want I.A.B. to do?

A. SCHOOLCRAFT

1    A.    I assumed that they would ask him -- ask him why

2    he was behaving that way, that day.

3    Q.    And that was why you called I.A.B., was so that

4    they could ask Defendant Caughey why he was behaving the

5    way he was?

6    A.    To investigate in general, his behavior.  And I

7    believe -- I don't know if I -- in that phone call, I

8    addressed that I was concerned about the Complaint that I

9    had filed against him, just a little over a month before

10   that.  But it's possible, I did; it's possible I didn't.

11   Q.    What Complaint had you filed against him a month

12   before that?

13   A.    I don't remember the details.  But off the top of

14   my head, it was regarding him and another supervisor

15   working together to obtain that supervisor's personnel

16   file, to take out command disciplines and Civilian

17   Complaint Review Board reports that would affect that

18   supervisor's promotion.

19   Q.    Were you aware that C.C.R.B. records, or Civilian

20   Complaint Review Board records, are hosted on a database by

21   the C.C.R.B., that is not accessible to the N.Y.P.D.?

22                MR. NORINSBERG:  Objection.

23   A.    I assume that they would have their own records.

24   Q.    So why do you believe that Lieutenant Caughey and

25   this other officer would destroy records that existed in a

A. SCHOOLCRAFT

1    Q.    You have listened to that recording.  Could you

2  hear what was being said on the recording?

3    A.    I don't believe I have heard what was being said

4  on the recording.

5    Q.    Which EMT took your blood pressure?

6    A.    The male.

7    Q.    Did you agree to go to the hospital at any time?

8    A.    Yes.

9    Q.    Why did you agree to go to the hospital?

10    A.    I felt it would be safer than where I was.  I

11  felt, possibly, the hospital would be a safer place, in

12  public view.  And it would -- it would get all of those

13  police supervisors out of my home.  I thought they would

14  leave.

15    Q.    What happened after you agreed to go to the

16  hospital?

17    A.    To the best of my memory, I followed EMS

18  downstairs, we walked outside towards the ambulance, a male

19  in a white shirt -- a white police uniform shirt approached

20  the male EMS as we were walking toward the ambulance.

21        And he stated in some manner, he said "Jamaica?"

22  And the male EMS stated "Yeah."  At that moment, I RMA'd,

23  refused medical attention to the female, who was behind me.

24  And I walked back to my home.

25    Q.    Could you describe the white shirt police

A. SCHOOLCRAFT

1    officer.

2        A.      He was male, wearing a uniform hat.  And I don't

3    believe I had ever seen him before.

4        Q.      How tall was he?

5        A.      He was about the same height as the EMS, male

6    EMS.

7        Q.      Approximately how tall was the EMS, male?

8        A.      I don't recall.  They were about -- approximately

9    the same size.

10       Q.      Taller than you?

11       A.      I don't believe they are -- they were taller than

12   me, no.

13       Q.      Why did you refuse medical attention?

14       A.      I wasn't familiar with Jamaica Hospital.  I was

15   familiar with Forest Hills Hospital, and I believed I had

16   the right to choose which hospital I could go to.

17               And I believe that was the police department's

18   intent, to convince the personnel that that's the hospital

19   they wanted me to go to.

20       Q.      Why did you believe that?

21       A.      The way they were communicating with each other,

22   I didn't feel it was appropriate that EMS was sharing

23   medical information with them.  I felt there was no -- I

24   don't even feel the exam was that objective.

25               I just didn't -- I just didn't feel safe going

A. SCHOOLCRAFT

1   with them anymore, since I had no control over where I was

2   going.

3        Q.    You did not believe the test of your blood

4   pressure was objective?

5              MR. NORINSBERG:   Objection.

6        A.    I felt whatever number they gave was appropriate

7   for what was happening; a chief invading my home, I felt it

8   was -- appropriate.

9        Q.    Did the EMS technicians explain to you why they

10  were taking you to Jamaica?

11       A.    If they did, I don't recall any specific reason,

12  other than the high blood pressure.

13       Q.    Did you ask to go to Forest Hills?

14       A.    Yes.

15       Q.    What was the response?

16       A.    I don't recall any response, other than -- they

17  may have said "okay."  I don't recall their exact response.

18       Q.    Is Jamaica closer to your apartment than Forest

19  Hills?

20       A.    If it is, it's fractions.

21       Q.    Were you on the phone with anyone when you

22  entered the ambulance, or approached the ambulance?

23       A.    I may have been; I don't remember.

24       Q.    With whom were you speaking?

25       A.    If it was anyone, I believe it would be my

A. SCHOOLCRAFT

1   your apartment?

2       A.      I don't know if there was another chief.  I

3   didn't recognize another chief.

4       Q.      Did anyone try to stop you from returning to your

5   apartment?

6       A.      I don't recall anyone stepping in front of me.

7   But as I was entering my home, Captain Lauterborn pushed

8   his way into the house behind me, not allowing me to shut

9   the door behind me.

10      Q.      How did he push his way in?

11      A.      He pushes like a football tackle.

12      Q.      He tackled you?

13      A.      No.  Like a football tackle would guard.  He used

14  his arm and he shoved the door against the wall abruptly.

15  And he did it again, and he did it again to the door to my

16  apartment.

17      Q.      I am sorry, I am not understanding.  He used his

18  football tackle on what?

19              MR. NORINSBERG:  Objection.

20      A.      The comparison to a tackle -- in football, you

21  block -- maybe it was a block, but it was a push, if you

22  don't want to use the football analogy.

23              But he used his arm, I believe it would be his

24  right arm, to push the door open and slammed the door open

25  against the wall.  And then he did it again on the second

A. SCHOOLCRAFT

1    door, he did it again on the third door.

2         Q.    So I guess that's where the confusion is.  What

3    are the three doors you are speaking of?

4         A.    There's a door to enter the house, then there's a

5    door about four feet from that door with a lock on it.  And

6    then up the stairs to my room, is another door with a lock

7    on it.

8         Q.    And so he pushed his way through all three doors,

9    is what you are saying; is that correct?

10        A.    Preventing me from securing the doors, correct,

11   from keeping them out.

12        Q.    So what happened when you -- when you returned to

13   your apartment?

14        A.    To the best of my memory, I -- I went back to my

15   bed and I laid down.

16        Q.    How far behind you was Defendant Lauterborn on

17   your way up the stairs?

18        A.    He was directly behind me.  I could feel his

19   breath on my neck.

20        Q.    But he didn't touch you at that time?

21        A.    I wasn't -- I certainly wasn't pushed or shoved.

22   He just -- he kept the doors open.

23        Q.    And were you running up the stairs?

24        A.    No.  At no time was I running.

25        Q.    So you were walking up the stairs?

A. SCHOOLCRAFT

1     A.     Correct.

2     Q.     And he was walking behind you?

3     A.     I believe he was.

4     Q.     When you entered your apartment, you walked into

5  your bedroom; is that correct?

6     A.     Correct.

7     Q.     And then you laid back down?

8     A.     Yes.

9     Q.     What happened next?

10     A.     After I laid down, they tried talking me into

11  going with them, again.  I don't remember exactly the

12  sequence of -- if I leave anything out, again the recording

13  would show details.

14          But after that, Chief Marino came back.  I

15  remember him saying, "Be a man.  Get up, walk out, or we

16  are going to E.D.P. you."  I recall that conversation going

17  back and forth; the choices he was giving me, to do what

18  they said, or I would be E.D.P.'d.

19     Q.     What were your choices?

20     A.     To go with him or get in the -- to the best of my

21  memory, either get in the ambulance, which meant going with

22  them, or I would be E.D.P.'d and forced out.

23     Q.     So did Chief Marino give you the option of

24  voluntarily going to the hospital?

25     A.     He gave an option, yes.

166

A. SCHOOLCRAFT

1    police department, that makes that determination.

2       Q.    Have you ever declared someone an emotionally

3    disturbed person?

4       A.    I don't believe so, no.

5       Q.    On the occasions when you have interacted with an

6    emotionally disturbed person, on how many occasions has

7    that individual been sent to the hospital?

8              MR. NORINSBERG:  Objection.

9       A.    If I could remember every single time, I could

10   probably answer that question.  But I don't -- I would

11   assume if they were deemed E.D.P., they would have to go to

12   a hospital.

13      Q.    Have you dealt with E.D.P.'s on many occasions?

14      A.    I wouldn't know how to quantify "many."  Over

15   seven years, I recall -- I don't recall any specific

16   incident involving any one E.D.P.

17      Q.    How many officers used force against you on

18   October 31, 2009, in your apartment?

19             MR. NORINSBERG:  Objection.  You can answer.

20      A.    Approximately four to five.

21      Q.    You have mentioned Sergeant Duncan and Lieutenant

22   Gough.  Who else used force against you in your apartment

23   on October 31, 2009?

24      A.    Lieutenant Broschart and Chief Marino.

25      Q.    What force did Lieutenant Broschart use against

A. SCHOOLCRAFT

1    you?

2    A.    He was standing on my legs.

3    .Q.    When was he standing on your legs?

4    A.    After they slammed me on the floor.

5    Q.    How was he standing on your legs?

6    A.    Like a -- like he would be standing on the floor,

7    but my legs were underneath his feet.

8    Q.    On your calf, on your thigh?

9    A.    I believe -- it was the upper thigh, upper thigh,

10   rear leg.  I was on my stomach.  And it was apparent -- I

11   mean, I could see him until Chief Marino put his foot over

12   my face, so I couldn't see who was doing what.

13   Q.    So Lieutenant Broschart stepped on the back of

14   your thigh while you were on your stomach?

15   A.    He stood on the back of my thighs.

16   Q.    Did he jump?

17   A.    I don't recall any jumping, but I recall the

18   pressure.

19   Q.    How long was he standing on your upper thighs?

20   A.    I believe he got off after the -- when they

21   turned me over for the search, he was definitely not on my

22   legs anymore.

23   Q.    So was he on your thighs while they were trying

24   to handcuff you, or after they handcuffed you?

25   A.    It was right after I got slammed on the floor.

A. SCHOOLCRAFT

1     Q.      Was he -- so if he is standing on the back of

2    your thighs, were each of his feet on one of your legs?

3     A.      Correct.

4     Q.      Which way was he facing?

5     A.      He was -- the front of his body would have been

6    facing the direction of my head.

7     Q.      Now, you stated that Chief Marino stepped on your

8    face; is that correct?

9     A.      Correct.

10     Q.      When he stepped on your face, did he lift his

11    other leg off the ground?

12     A.      What do you mean, the other leg that wasn't --

13    the other leg or the foot that wasn't on my face?

14     Q.      Correct.

15     A.      I don't believe so.  I believe I would have felt

16    that pressure.

17     Q.      On a scale of one to 10, how much pain were you

18    in when Defendant Marino stepped on your face?

19     A.      Eight or nine.

20     Q.      Do you have any -- did you have any bruises from

21    having your face stepped on?

22     A.      I believe I had an abrasion for a couple days.

23     Q.      How large of an abrasion?

24     A.      I wasn't -- I didn't have access to a mirror for

25    a few days.  If there wasn't an actual abrasion, you could

A. SCHOOLCRAFT

1    A.    I don't recall every exact time -- I certainly

2    don't recall ever seeing him in person.  But I believe his

3    photograph is on the wall of some precincts or

4    headquarters.

5          I don't recall exactly where I -- where I saw

6    him, but -- he was certainly familiar to me.  And I know

7    him to be the Deputy Commissioner of Public Information,

8    Paul Browne.

9    Q.    You allege that the police removed certain

10   documents from your apartment after they -- excuse me,

11   strike that.

12         You allege that police removed certain documents

13   from your apartment, after you were taken into the

14   ambulance; is that correct?

15   A.    Yes.  I believe there were multiple documents

16   removed from my home.

17   Q.    What documents do you believe were removed from

18   your home?

19   A.    The only one specifically that I recognized gone

20   was a folder containing notes -- I had written on the

21   folder, "Report to the Commissioner," it was a -- notes

22   regarding my investigating misconduct and corruption.  And

23   I was going to compile a report from a patrolman's

24   perspective, to the police commissioner.

25   Q.    Were any other documents taken?

A. SCHOOLCRAFT

1    A.    I believe -- I believe -- I never located a lot

2    of Complaint reports.  But the actual number, I don't

3    specifically remember.

4    Q.    What is the proper method of maintaining N.Y.P.D.

5    Complaint reports?

6              MR. NORINSBERG:   Objection.

7    A.    The proper method would be to keep them secured

8    in some fashion or other.

9    Q.    Were you supposed to keep N.Y.P.D. Complaint

10   reports in your apartment?

11   A.    I felt it was necessary to conduct my

12   investigation, and to help the Quality Assurance Division.

13   Like they instructed me to keep my -- anything else I find,

14   to bring to them.  It felt -- at the time, it felt safer

15   than keeping them in my locker at work.

16             But no, I feel it was appropriate to have these

17   documents.  I was not sharing this information with anyone,

18   other than the department investigators.

19   Q.    How many N.Y.P.D. Complaint reports did you have

20   in your apartment?

21   A.    The approximate number, I would not be able to --

22   I can't recall all the ones I had.

23   Q.    More than 100?

24   A.    Again, I can't approximate the number because I

25   never -- I didn't keep a log of -- I never expected anyone

A. SCHOOLCRAFT

1    to remove it from my home.

2        Q.    Well, did you have a box full of Complaint

3    reports?

4        A.    I would say there was a container full of

5    documents regarding -- regarding issues with the

6    department.  And there were certainly folders that were

7    missing from that container, when I went back to the house.

8        Q.    How large was that container?

9        A.    I would -- I don't recall that size that

10   container was, exactly.  It was a normal-size box, or a

11   plastic container; but normal-sized, not large, not small.

12       Q.    Are we talking a banker's box or an outdoor

13   storage box?

14              MR. NORINSBERG:  Objection.

15       A.    Probably a little larger than a banker's box.

16       Q.    Did the officers take all of your documents?

17       A.    No.  I don't believe they found all of them, no.

18       Q.    There were more that were hidden?

19       A.    I believe the documents I secured with the

20   Quality Assurance Division were still with them.

21       Q.    So the officers who came to your apartment took

22   all of the documents from your apartment?

23              MR. NORINSBERG:  Objection.

24       A.    All of what documents?

25       Q.    Well, all of the N.Y.P.D. records that you have

A. SCHOOLCRAFT

1    stated, did they take all of them from your apartment or

2    did they leave some?

3        A.    I don't recall the documents -- I don't recall.

4        Q.    Did they take the whole box?

5        A.    No.   I don't -- it was obvious, the container I

6    am referring to was -- was disturbed, but not completely

7    taken.   Just -- there was stuff in files and stuff.   The

8    other stuff would have been copies of patrol guide pages

9    and stuff like that.

10            It was -- it was more like, the 61's, I know for

11   sure, and the Report to the Commissioner, the notes on the

12   Report to the Commissioner.   And I don't specifically

13   recall what else is missing other than the -- the recorder

14   that Marino took.

15       Q.    You state that Marino took a recording of yours?

16       A.    Yes.

17       Q.    What recording did he take?

18            MR. NORINSBERG:   Recorder.

19       A.    He took the actual hardware, the digital voice

20   recorder.

21       Q.    What was on that digital voice recorder?

22       A.    Some roll calls.

23       Q.    What roll calls were on there?

24       A.    I don't know, specifically.   I would have to hear

25   it.

A. SCHOOLCRAFT

1    Q.    Had you downloaded the roll calls from that

2    recorder to your computer?

3    A.    I don't believe so.

4    Q.    Were you recording the incident with the officers

5    in your apartment on that tape recorder?

6    A.    No -- I believed it was on, at the time that was

7    happening, yes.  But I don't have that recorder's

8    recording.

9    Q.    So you had two recorders at the time of the

10   incident on October 31, 2009?

11   A.    I had at least two recorders, yes.

12   Q.    How many recorders did you have?

13   A.    I had the one that picked up the -- the

14   Halloween, the actual home invasion, and the recorder that

15   was in my pocket.

16   Q.    And which one did Chief Marino take?

17   A.    The one they found, when they were searching me.

18   Q.    What brand was that one?

19   A.    It was an Olympus.

20   Q.    Is this the one that looked lick a watch?

21   A.    No.

22   Q.    Is the one that captured the home invasion, the

23   one that looked like a watch?

24   A.    No.

25   Q.    So how many tape recorders did you have?

A. SCHOOLCRAFT

1                    MS. PUBLICKER:  L-U-E-L.

2        Q.    In total, how many doctors did you speak with at

3    Jamaica Hospital?

4        A.    At least -- at least four, maybe more.

5        Q.    When were you released from the hospital?

6        A.    I believe it was Friday, late afternoon.

7        Q.    Where did you go after you were released from the

8    hospital?

9        A.    I went to a hotel.

10       Q.    What hotel did you go to?

11       A.    I don't recall the name.  But it's across the

12   street from the hospital.

13       Q.    Why did you go to a hotel?

14       A.    My father had a room there, and there was nowhere

15   else for me to go.

16       Q.    Did your father have a room there before

17   October 31, 2009?

18       A.    No.

19       Q.    Where was your father living on October 31, 2009?

20       A.    I believe it was 196 County Highway 107.

21       Q.    Why did you not go home?

22       A.    I didn't have -- they had confiscated the keys to

23   my apartment.  And I didn't feel safe there.

24       Q.    Why didn't you feel safe there?

25       A.    I felt that once they learned that I was out,

A. SCHOOLCRAFT

1    Q.    Did you record that conversation?

2    A.    I don't believe.  I am assuming the Internal

3    Affairs investigators were recording it, like they should

4    have been.

5    Q.    Why do you assume that?

6    A.    Because they were Internal Affairs investigators,

7    and I believe my accusations were that -- were serious

8    enough to warrant a recording of conversation.

9    Q.    I will take that picture back (handing).

10          Did they tell you they were recording you when

11   you returned to your apartment, after you left the

12   hospital?

13   A.    I don't recall anyone telling me that they were

14   recording me.

15   Q.    You were interviewed by I.A.B.  when you were in

16   the hospital; is that correct?

17   A.    Correct.

18   Q.    When you were interviewed at the hospital, did

19   I.A.B. tell you you were being recorded at that time?

20   A.    I don't recall anyone ever telling me I was being

21   recorded.

22   Q.    You claim that Lieutenant Caughey took your memo

23   book on October 31, 2009; is that correct?

24   A.    Correct.

25   Q.    Did he give your memo book back to you?

A. SCHOOLCRAFT

1    A.    Yes.

2    Q.    Was anything removed from your memo book when he

3    gave it back to you?

4    A.    I don't believe so.  I reviewed it.  If there was

5    anything missing, I don't recall being aware of it.

6    Q.    Was your memo book defaced in any manner when you

7    got it back?

8    A.    There were certain pages with -- I don't know

9    about "defaced," but there were pages with certain notes on

10   them regarding corruption or misconduct that were

11   earmarked.  They were bent in the corner, or folded over.

12   Q.    Were any of your notes blacked out?

13   A.    I don't recall anything being blacked out.

14   Q.    So Defendant Caughey did not destroy any evidence

15   in your memo book; is that correct?

16   A.    I don't know.  I don't recall how carefully I

17   reviewed the memo book.  I only had it for -- I believe

18   that memo book is with Internal Affairs investigators right

19   now.  I don't recall anything being blacked out.  I just

20   remember the pages, certain pages were folded.

21   Q.    Did any defendant ever tell you not to speak to

22   the media?

23   A.    Not in those exact words, no.

24   Q.    Did they tell you in any words, not to speak to

25   the media?

A. SCHOOLCRAFT

1    Q.    What you meant there when you said that's the way

2  to fuck him over --

3    A.    Make him answer for his actions.

4    Q.    How did you expect to do that?

5    A.    I expected the Department to take him out of that

6  position and at least admonish him.

7    Q.    Was there something about going to court you

8  thought might happen as a result of this?

9    A.    At the time I was trying to appeal an annual

10  evaluation.  And after meeting with Inspector Mauriello and

11  others he made reference to a lawsuit, and that gave me the

12  impression he wasn't going to try to mitigate within the

13  precinct or the Department.  I was probably going to have

14  to find some other way of resolving my employment issue.

15  As far as having the failing evaluation which that starts a

16  paper trial to being fired.

17    Q.    So it is a paper trial to the person who is being

18  evaluated gets fired, meaning you?

19    A.    That is what I believe; correct.

20    Q.    You intended to sue him and the Department over

21  that evaluations?

22    A.    I believe that was possibly the only way that was

23  going to be handled.  At the time of this conversation,

24  October 7, 2009, I believe I was now referring back to the

25  PBA.  I was communicating with Stuart London, who is an

43

A. SCHOOLCRAFT

1    attorney with the PBA.

2              MR. SMITH:  And we are not going to talk

3              about any discussions or advice given to you.  I

4              will provide information about your beliefs and

5              expectations and the background for that, but you

6              will not be disclosing the contents of

7              communication with counsel which would include a

8              lawyer at the PBA.

9              MR. KRETZ: Do you want to give him the whole

10             chapter on attorney/client privilege.

11             MR. SMITH:  Only as much as is necessary.

12   A.    That's an easy one anyway.

13   Q.    I agree.

14   A.    Glad you agree. I can't remember the question.

15   You asked me about a lawsuit.

16   Q.    Yeah.

17   A.    I believe, it doesn't have to be in a courtroom,

18   but I thought maybe once, I can't remember when I first met

19   Stuart London, but I kinda got the feeling it was not going

20   to be a problem.  He was going to be able to handle it

21   amicably.  But I don't know, I had the feeling and this is

22   a few months after first meeting Mr. London, and I've

23   written more letters to the union.  It looked more and more

24   like it was going to have to be, I was going to have to

25   find another private attorney, and possibly file a lawsuit.

44

A. SCHOOLCRAFT

1      Q.      You had in mind as of the date of this

2    conversation October 7, 2007 you would be in a lawsuit

3    against the NYPD and Mr. Mauriello and others?

4      A.      That question sounded complicated.

5      Q.      As of the date October 7, 2009, your assumption

6    at that point was you would end up in a lawsuit that you

7    would commence against the NYPD?

8      A.      I don't know who it would be against, but

9    regarding my employment.  That I had already seeked counsel

10   regarding these issues with a private attorney.

11     Q.      You told us that.  So, what you had in mind was,

12   you would bring a lawsuit relating to your evaluation

13   whatever that form might be?

14     A.      Assuming that I had one after seeking counsel.  I

15   am assuming that would be the only way to resolve this

16   regarding the employment.

17     Q.      Did you expect in that lawsuit to challenge your

18   modified duty status in the Department?

19     A.      Say that again.

20     Q.      You had in mind that you would be involved in a

21   lawsuit.  And you had in mind that lawsuit would involve

22   your evaluation if a lawyer said you could bring such a

23   suit.  And now I am asking whether you had also in mind if

24   that lawsuit would involve your modified duty status in the

25   Department?

A. SCHOOLCRAFT

 1     A.      When you say evaluation, you mean the annual

 2   evaluation I was given by Inspector Mauriello?

 3     Q.      Is that what you were referring to?

 4     A.      Yes, I think you divided both of them, but there

 5   were two evaluations. One caused the modification, I guess,

 6   the psych evaluation.

 7     Q.      I was talking about your performance evaluation.

 8   Did you understand, did you have in mind that the lawsuit

 9   you might bring would also involve a challenge to your

10   modified duty status?

11     A.      I don't know if I was aware that would have

12   played into that.  But I was bringing that issue up on how

13   to contest that with my union.

14     Q.      Did you want to sue about your modified duty

15   status?

16     A.      At that time I felt it could been resolved still.

17   Even though it had happened, I still didn't see any

18   documentation on it.  I was using references, to the best

19   of my memory, I referenced the bell that can't be unrung.

20   But still I had no documentation on what they were doing.

21   Can we go back in time and everyone say knock it off and

22   behave.

23     Q.      Let's go back to February of 2009.  Wasn't there

24   a meeting in February with all your supervising officers

25   where your evaluation was discussed?