# PLAINTIFF'S MOTION
# EXHIBIT 13

RASHEENA HUFFMAN

exchange between you and Schoolcraft, not the second one. So I was wondering if you know whether or not your copy is different from my copy?

MS. PUBLICKER METTHAM:

Objection. I will state that the copy that was played for the sergeant was produced in the course of the discovery.

A. Can I say something?

Q. Yeah, of course.

A. Supposedly he passed me a property voucher and a sick report. I don't know which one was on top. So I don't recall saying oh, okay, but if I did say it, it could have been because he passed me a property voucher and then I see a sick report. I don't know.

Q. Do you recall him coming up to you that first time and saying I don't feel well, I need to go home?

A. Okay. He said that, yes.

Q. Do you recall him saying that to you?

RASHEENA HUFFMAN

A. I believe he said that.

Q. Did you say something in response to that?

A. I don't remember what I said in response. I know that he put a sick report in my hand. I'm like sick report, you know, that's not what people do. That's not common.

Q. I think I have -- we have an excerpt that we're going to play back. See if you can help us in what was said between you and Officer Schoolcraft. While we're opening that up --

A. Okay.

Q. -- let me ask you some more questions about this entry in the command log. There's an entry here that says I explained that if he's sick a supervisor has to approve. Do you see that reference?

A. Yes.

Q. Okay. What's that based on that a supervisor has to approve if he's going sick?

MS. PUBLICKER METTHAM:

RASHEENA HUFFMAN

Objection.

A. Yes, pretty much he can't -- an officer can't just come and say I don't feel well, I'm going sick and just leave.

Q. Okay. When you put down this entry a supervisor has to approve, you're referring to yourself?

A. Yes, me, sick desk supervisor. When you go sick if you want to go administratively sick then you get permission from the desk. If you go regular sick, then you got to go to the district surgeon, which if you went regular sick to the medical division.

Q. I just want to understand. It says here a supervisor has to approve. Were you referring to you having to approve or somebody else having to approve him going sick?

A. Depends on what sick you go.

Q. No. No. What I want to know is what's in your mind here. You said that you explained to him that a supervisor has to approve his request to go sick? See that

RASHEENA HUFFMAN

own. The proper way --

Q. Didn't he walk up to you say he don't feel well, I need to go home?

A. That's not the way you do it, though.

Q. But I'm saying he did that though, he said to you I don't feel well, I need --

A. He --

Q. -- to go home; is that right? It's a yes or no.

A. He didn't -- he did it walking away. He did not stand there and have a conversation civilly with me and let me know that he was sick. He did it and walked away. He gave me a sick report and walked away.

Q. Okay. So you don't think he was asking you for permission to go sick?

A. No. He just said -- he stated I'm sick.

Q. And so you didn't approve his request to go sick; is that right?

MS. PUBLICKER METTHAM:

RASHEENA HUFFMAN

Objection. You could answer.

A. He didn't request to go sick.

Q. He didn't request to go sick --

A. He stated he was sick.

MR. SMITH: So maybe we should play this recording. This is DS 50 October 31, 2009 day tour Lieutenant Caughey menacing went sick. It starts at 7:1946.

(Whereupon, a tape recording was played.)

MS. PUBLICKER METTHAM: What time did it stop?

MR. SMITH: It stopped at 720.28.

Q. Did you hear Officer Schoolcraft say to you I don't feel well, I need to go home?

A. I heard him say that there.

Q. Did you hear yourself responding oh, okay?

A. When I -- if I said oh, okay, I did not --

Q. My question is did you hear you

RASHEENA HUFFMAN

say --

A. He dropped it on my lap and kept walking.

Q. Ma'am, we are going to be here until next week if you don't answer my questions. Okay. So my question to you is I just played a recording --

A. And I --

Q. And my question to you is did you hear you saying oh, okay?

A. Okay. If I said oh, okay, he's dropping the slip report on my lap and keeping walking away. If you say you wanted to go sick or if you're not feeling well, if you want to go home and I say oh, okay and you dropped the report and keep walking, that's not going sick the proper way.

Q. Did you say oh, okay, yes or no?

A. Like I said, I did not hear it clearly just now.

Q. Would you like me to replay it again for you?

A. -- it wasn't that I approved the sick.

RASHEENA HUFFMAN

Q. All right, well, we will play it again for you so that you can hear it.

MR. SMITH: It starts at 720.20.

Q. And my question to you is whether or not you can hear yourself saying oh, okay, and that's the only question I'm asking you.

(Whereupon, a tape recording was played.)

Q. Did you hear yourself say oh, okay --

A. Yes.

Q. -- in response to Officer Schoolcraft --

A. Yes.

Q. -- saying I don't feel well, I need to go home?

A. Yes.

Q. Thank you.

A. He didn't say he wants to go sick. If he says he wants to go home he could fill out a 28 report and go home. You don't have to go sick.

Q. You did hear yourself saying oh,

RASHEENA HUFFMAN

okay to him in response --

A. Yes, and he gave me a sick report, not a 28.

Q. You did hear yourself saying oh, okay in response to him saying to you I don't feel well, I need to go home; is that correct?

A. Yes.

Q. Thank you. Can I show you a document that was previously marked as --

A. And he kept walking away.

Q. -- Exhibit 28. I'm sorry I misspoke. I'm going to show you what's been previously marked as Exhibit 26. Is that the sick report worksheet that Officer Schoolcraft put on your lap on October 31, 2009?

A. Yeah.

Q. Is that your handwriting on the top part of this document?

A. Top part, yes.

Q. Is that your handwriting on the second page of this exhibit on the right-hand column?

MS. PUBLICKER METTHAM:
Objection. You can answer.
A. If he had called the sick desk, he would still have had to speak to a supervisor and let them know that he was not feeling well and then after that we would call the sick desk and speak to the sick desk and let them know that we have a MOS that's, either A, being treated at the precinct by EMS or going to a hospital and is requesting to go sick.
Q. So the answer to my question is no, if he had called the sick desk that still would not have been the proper way to go sick; is that right.
MS. PUBLICKER METTHAM:
Objection. Objection. Asked and answered. You can answer again.
A. I still had to check to see if he called the sick desk.
Q. What's that based on?
MS. PUBLICKER METTHAM:
Objection. You can answer.
A. What happened?

RASHEENA HUFFMAN

Q. Where does that come from; is there a patrol guide procedure that says he has to call the sick desk?

MS. PUBLICKER METTHAM:

Objection. You can answer.

A. Then he have to call the sick desk. When you're home and you're not feeling well, you call the precinct and let them know that you're requesting admin or regular sick. The supervisor at the desk will authorize the admin sick and if you're not feeling well, you just let them know that you're going regular sick and then you go see the district surgeon the following day, if you're going regular sick. The district surgeon is going to determine if you're going to be out sick. Admin sick you don't need to go see the district surgeon.

Q. Is it possible for an officer who is working inside the precinct to become sick and go home or is there some --

A. Yes. It happen all the time, but they usually take lost time. If he don't feel well then they go sick the next

RASHEENA HUFFMAN

tour, but if they're like having chest pains or they really, really not feeling bad then we call an ambulance of which is the bus to the precinct and they will go to the hospital and they will go sick from there.

Q. So one of the ways that Officer Schoolcraft could have properly left the precinct was to have taken lost time?

A. He could have took lost time.

Q. And that would have been a proper way to leave the precinct; is that correct?

A. If they were requesting lost time --

MS. PUBLICKER METTHAM:

Objection.

A. -- from me and I could authorize some lost time because he wasn't feeling well. Which I would have been more than likely have done or if he wanted to go sick then I would have called the bus to the precinct and then contact the sick desk and he would have went sick and he would have got a sick report number, SR number, to put

into the log and let the department know that he's out sick.

Q. Didn't you offer him lost time?

A. I don't know. He didn't request lost time.

Q. I didn't ask you about what he requested --

A. -- I do recall --

Q. -- I asked you whether or not you offered him lost time?

A. I do recall -- I believe I recall offering him lost time when he came back upstairs when P.O. Rudi went to get him and bring him back to the desk --

Q. So you did offer him lost time, right?

A. I recall that.

Q. If he had said yes, I'll take lost time that would have been an appropriate way for him to leave the precinct; is that correct?

A. Yeah, he fill out a 28 slip, I sign it and then --

Q. So the answer to my question is

yes, that would have been a proper way for him to leave the precinct?

MR. KRETZ: Objection.

MS. PUBLICKER METTHAM:

Objection. Misstates prior testimony.

Q. Is that correct?

A. Yes.

Q. In your entry in the command log in the next line of the entry that we're referring to, am I correct that you say if he don't feel well do he need a bus or lost time; is that what that entry says?

A. Yes.

Q. Okay, so did you tell Schoolcraft that he, either should get a bus or take lost time?

A. Yes.

Q. And a bus refers to an ambulance coming, correct?

A. That's the same thing. Do you need a bus.

Q. And lost time refers to him filling out a 28; is that correct?

A. Yes.

Q. And the effect on the officer taking lost time, do they just get less hours pay for that week?

MS. PUBLICKER METTHAM:

Objection.

A. No. If you have time on the books, then it won't affect your pay at all.

Q. It will offset if you have time on the books then you use up that time; is that right?

A. Yeah. Depends on if he was leaving 14:00, then he would be taking an hour and a half lost time.

Q. Further on the entry, am I reading it correctly where it says I, referring to you, say Schoolcraft, you can't just leave like that. And Schoolcraft, you can't just leave like that is in quotes?

A. Yes.

Q. So those were words that you spoke to Officer Schoolcraft; is that correct?

A. Yes.

Q. And you made these entries based

RASHEENA HUFFMAN

on your recollection of what happened that day, right?

A. Yes. I made the entry that day.

Q. How much time elapsed between time of the events reflected in the entry and the making of the entry by you?

A. I don't recall.

Q. You further say in the entry, "he keeped walking and ignores me." Is that correct? Is that what it said?

A. Ignores, yes.

Q. Did you say anything else to him?

A. I don't recall saying anything else. He kept walking.

Q. I'm sorry?

A. I don't recall saying anything else. He kept walking.

Q. I'm not sure I understand that answer. My question is, other than saying you can't just leave like that, did you say anything else to him?

A. I asked him for lost time, I asked him do he want a bus, like that.

RASHEENA HUFFMAN

Those things.

Q. Right. I understand. You've already told me about those things --

A. Okay. No, I don't recall anything.

Q. -- other than that --

A. No.

Q. And other than this entry here that I just read to you, did you say anything else to him?

A. No. He left the precinct.

Q. After he left the precinct what did you do?

MS. PUBLICKER METTHAM:

Objection. You could answer.

A. I believe I notified Inspector Mauriello.

Q. How you notify Inspector Mauriello?

A. I don't recall exactly. I don't think I went into his cell phone. I don't believe I called him on his cell phone. I believe I went into his office and let him know that he left. I'm not sure. Somebody,

RASHEENA HUFFMAN

I notified a higher boss. I think it was Inspector Mauriello or Captain Lauterborn.

Q. Do you remember how you notified whoever it was?

A. It was verbally.

Q. Was it on the phone?

A. Had to be. I didn't call anybody on the phone.

Q. You did not call someone on the phone?

A. I don't remember calling nobody on the phone.

Q. Do you recall having a discussion with somebody one-on-one with Lauterborn or Mauriello that day?

A. I don't know. It was five years ago. I don't remember.

Q. I understand it was five years ago and I'm not trying to get you to remember things that don't happen. I am trying to get you to tell me what you remember about the events, okay, and to the extent that you have a recollection I am entitled to; okay?

RASHEENA HUFFMAN

A. Hmm-hmm.

Q. Can you remember what the next thing that happened with respect to Schoolcraft?

A. I know that I had to have notified a supervisor, who exactly it was and how I did, I don't remember.

Q. Did somebody tell you to call the sick desk?

A. Yes.

Q. Who?

A. I believe it was Inspector Mauriello.

Q. You remember that part?

A. I believe. It could have been Captain Lauterborn. I don't remember exactly who it was, but I had to call to check to make sure that if he went sick, was he out sick, what's going on with him.

Q. And what was the next thing you remember doing with respect to Schoolcraft?

A. I believe I had to call his cell phone or his house phone and see if can get him back to come to the precinct and do it