# PLAINTIFF'S MOTION
# EXHIBIT 30



**Roy Lubit MD, Ph.D.**



165 West End Ave 3K
New York, NY 10023

Board Certifications
Psychiatry and Neurology
Child & Adolescent Psychiatry
Forensic Psychiatry

roylubit@rcn.com
917-846-7829

August 11, 2014

Re: Schoolcraft

**Background Information**

    I was asked by Nat Smith, lawyer for Adrian Schoolcraft, to review records from Jamaica Hospital, read the depositions of Dr. Isakov and Dr. Bernier-Bernier, interview Mr. Schoolcraft, and to then assess whether Mr. Schoolcraft being held in the Jamaica Hospital Emergency Room against his will, and then committed to the psychiatric ward at Jamaica Hospital on November 1, 2009 for several days was medically appropriate. I was also asked to opine on what psychological damages have occurred as a result of his being held against his will and various actions of the police beginning in 2009.

    I am board certified in Psychiatry and Neurology, board certified in Forensic Psychiatry and board certified in Child and Adolescent Psychiatry. I have written on psychiatric ethics. I have evaluated well over a thousand individuals for admission and possible commitment to various hospitals as well as evaluating whether committed patients should be allowed to leave the hospital. I have served as acting medical director of two state hospitals. I have been appointed as a neutral evaluator by courts on more than a hundred occasions.

    Mr. Schoolcraft worked as a police officer for six years for NYPD. He experienced harassment after he began to make complaints to Internal Affairs that his superiors were lying about crime numbers, presumably to make themselves look better to their superiors. He was given an unsatisfactory evaluation. He left work early on October 31, 2009 stating he was not feeling well. Police then went to his home to speak with him. He did not answer the door. The police obtained the key from the landlord and entered without his permission. He reports that he agreed to go to Forest Hills Hospital but when he heard he was being taken to Jamaica Hospital he walked back into his home and lay down. The police grabbed him, handcuffed and brought to the medical ER at Jamaica Hospital. ER staff noted bruises on his arms when he was at the hospital. The police asserted that he had run and they captured him. He told the doctor at Jamaica Hospital that he had seen corruption (misreporting of numbers) at his police precinct. He denied thoughts of harming himself or others, was generally calm, and stated he wanted to leave. He was assessed as possibly delusional and was diagnosed with psychosis NOS. After 2 ½ to 3 days in the ER he was committed to the psychiatric ward and prescribed anti psychotics (which he refused to

1

take). He was discharged on November 6. Although multiple officers from IAB came to see him on November 2, hospital staff did not seek to obtain information from IAB as to whether Mr. Schoolcraft's concerns about the police were reasonable or were delusions until November 5, 2014. Even after the meeting with IAB, when the doctor wrote that Mr. Schoolcraft had no thoughts of hurting himself or others, he was not allowed to leave until he had made an appointment with an outside psychiatrist.

**Sources of Information**
- Interviews of Mr. Schoolcraft
- Hospital Records from Jamaica Hospital
- Deposition of Dr. Bernier-Bernier
- Deposition of Dr. Isakov
- Dr. Lamstein's Records
- Deposition of Dr. Patel
- Deposition of Vinod Dhar
- Deposition of Mr. Schoolcraft
- Policy and Procedure Manual, Department of Psychiatry, Jamaica Hospital ER Services,
- Police psychologicalevaluation in 2002

**Jamaica Hospital Records**

Mr. Schoolcraft, BD 6/21/75, was brought to the emergency room of Jamaica Hospital on November 1, 2009. The nurse's note states that Mr. Schoolcraft reported that he had an argument with his supervisor, left work, went home and refused to come out when the police came. The note also reports that he failed his psychological exam by the police department a year ago and his gun was taken. Mr. Schoolcraft reported that he believes his superiors are falsifying crime statistics to gain promotions. He also believes his superiors are out to get him. (There is no indication in the nurses' notes of what he meant by this.) The nurses' notes describe him as calm, cooperative, and to be relaxing.

The psychiatric consult dated 11/1/09 at 6:30 AM stated that Mr. Schoolcraft reported that his supervisors are hiding robbery and assault cases to get promotions.

Hospital notes stated that Sergeant James reported that Mr. Schoolcraft left work early after becoming agitated and cursing at a supervisor. The police then followed Mr. Schoolcraft home, he barricaded himself and they had to break the door to get in. Once they were outside of his apartment he ran. They chased him and brought him to the ER in handcuffs. In the medical ER he allegedly became agitated, uncooperative and verbally abusive over using the phone and said they are all against me. [There was no statement in the hospital note concerning what Mr. Schoolcraft meant by this.] The note said he was "? paranoid about his supervisors" A doctor in the ER wrote that he discussed the case with Sergeant James and Dr. Patel and Dr. Nwaishianyii. The ER doctor diagnosed Psychosis NOS.

A nursing note on November 1 said that Mr. Schoolcraft's right wrist was red, that a police officer was made aware and was asked to loosen the cuff, but the officer refused.

A note dated 11/1/09 stated that Mr. Schoolcraft had been reporting irregularities at work to Internal Affairs. He said that his superiors were underreporting crime to earn more merit. Because of this they went to his apartment where the landlord let them in, he

was manhandled by the police and brought into the hospital. The note said he had visible bruises on his arms. He was diagnosed with psychosis NOS, rule out paranoid schizophrenia and found to have paranoid delusions. He was prescribed antipsychotic medication.

On 11/2 Dr. Slowick wrote that he assessed Mr. Schoolcraft to be uncooperative and guarded because he said he did not know why they came to his home and why they took his gun. He was still complaining of pain in his wrist.

A note from 11/2/09 stated that Mr. Schoolcraft had been interviewed by three sergeants and a detective from Internal Affairs.

The social work admission note (11/3/09) reported that Mr. Schoolcraft said that if he lost his job he would return to Texas, his home state, and start over. He denied feeling depressed. The social worker called Mr. Schoolcraft's father who stated his son had no psychiatric history.

The psychiatrist's admission note written on 11/4/09 diagnosed Mr. Schoolcraft with psychosis NOS.

The discharge summary stated that Mr. Schoolcraft was admitted to the psychiatric ward (from the ER) on November 3, 2009 and discharged on November 6, 2009. The note states that after leaving work he took Nyquil and was woken with people in his room. They asked him to go to the precinct, he refused and they brought him to the ER of Jamaica Hospital in handcuffs. Dr. Isakov wrote that Mr. Schoolcraft was not experiencing paranoid ideations, but was concerned about issues in the precinct. Diagnosis was adjustment disorder with anxiety.

**Interview of Mr. Schoolcraft June 30, 2014**

Mr. Schoolcraft (BD 6/21/75) was born in Killen, Texas. Mr. Schoolcraft said that he has one sister (one year younger), his father was a police officer and his mother was a trust officer at a bank. He was not abused as a child. His mother became a diabetic when he was ten years old and was in the hospital a lot. She died in 2003.

In high school Mr. Schoolcraft had friends, participated in sports, and did not get into trouble. He did not have any unusual anxiety or depression, he did not abuse drugs or alcohol and was not a discipline problem. He graduated James Martin High School in Arlington, Texas in June of 1993. Prior to graduating he signed up for the US Navy. He spent four years in the US Navy reaching the rank of E4. He did not have any article 15s (non judicial punishments in the military). He left because he did not want to be career military and his mother was ill. In the Navy he had friends and would do things with other sailors when not on duty including, going out, scuba diving and white water kayaking. After serving in the Navy he spent 1 ½ years at Fulton Montgomery Community College and then transferred to UT Austin to study science. He left when he obtained a job with Motorola working in a factory that made microchips. He worked for Motorola for three years. When his mother was diagnosed with cancer, he moved to upstate NY in 2001. His parents had moved to NY around 1995. He spent his time working in a factory and taking care of his mother. On July 1, 2002 he joined the NY Police Force. He was in the first class of police recruits that graduated after 9/11.

He was assigned to the 75th Precinct in East NY. After six months he was transferred to the 81st precinct (Bedford Stuyvesant). Prior to 2008 his evaluations were average, never sub par. Around 2005 there was increased pressure from superiors to produce more summons and arrests. In 2007 the pressure increased further when a new captain came in.

3

The number of summons done increased. Meanwhile, many accident write-ups would disappear. Large numbers of accidents were not helpful to the higher ups. At roll call patrol officers would be told to sign the training log, although there was no actual training given at that time.

Mr. Schoolcraft was not writing as many summons and doing as many arrests as the department wished, and therefore he was told he would likely have a poor review in 2008. Fearing that he would be fired, he spoke with his father who had been a union president for the police in Fort Worth, Texas. In January of 2009 he received a failing evaluation. He appealed it, which got him into even more trouble with his supervisor. A month later Deputy Inspector Moriello and several other supervisors met with him and told him that he needed to redeem himself. After this he was written up for not being on post when he was actually on post. He was also written up for having an unnecessary conversation with another officer. At some point he began to tape record roll calls in which officers were pressured to produce more summons and 250s (stop, question, frisk). He was assigned overtime duty on his day off and called in sick. He went to the LIJ ER. He was very anxious and was given Ativan. As a result he needed to see the NYPD surgeon. He was given medication by his private doctor, but stopped taking it after 3 days because it did not help him sleep. The district surgeon accused him of malingering because there was nothing wrong with him. He told the doctor about the quota issue. He was then sent to see Dr. Lamstein. He was given restricted duty, including taking his shield and gun.

On October 7, 2009 he had a three hour meeting with Quality Assurance (part of Internal Affairs). He was called in because his father had made calls to a retired NY police Lieutenant (David Durk) who then called IAB. He also spoke to his union. At this time Mr. Schoolcraft was very anxious, worried what his superiors would complain about next, and what he would be written up for. His sleep was poor, he would think about all of the problems at work.

After the meeting with Quality Assurance, believing that his activity log would never be looked at since he only worked inside of the police station, he wrote about the problems in the police department he was witnessing in his activity log. He was, however, asked to produce his activity log by Lieutenant Caughey who then read the log. After this Lieutenant Caughey began to circle around Mr. Schoolcraft who was sitting at the telephone switch board. Mr. Schoolcraft walked away. Later Lieutenant Caughey started leaning over Mr. Schoolcraft. Mr. Schoolcraft saw that Lieutenant Caughey's gun was in his pocket in an unusual way and that it might fall out. He worried that Lieutenant Caughey's gun could fall out and that Lieutenant Caughey would then accuse Mr. Schoolcraft of taking his gun. He called his father who told him to go home. Mr. Schoolcraft told the desk officer he was sick and that he had to go home. She asked if you would take "loss" time and he said OK.

An hour later, around 3:30 PM, officers came to his home. Mr. Schoolcraft lives on the second floor of a house. The police knocked on his door. Having made complaints about them and their having found out he had been making complaints, he was frightened of them and therefore ignored them. Mr. Schoolcraft saw that several police cars had come along with an ambulance, an FDNY truck, and ESU. They had put down yellow tape. The landlord gave the police a key and they entered his apartment at 9PM, searched his property, took his tape recorder and kicked his things around. They insisted that he return to the 81st precinct. He was told he could not just go out sick. Mr. Schoolcraft told them that he was OK, but he didn't feel well. They asked if he wanted an ambulance, and he said

4

yes. The EMT said that his blood pressure was high. He agreed to go to Forest Hills Hospital. As he was walking to the ambulance he heard the EMT say that they were taking him to Jamaica Hospital. He turned around and went back to his apartment. The police then pushed their way into his apartment. He lay down on his bed and refused to go with them. The police were very rough with him. He thinks that they wanted him to react in order to justify what they were doing. He was slammed on the floor, on his stomach. They stepped on his back causing him to have trouble breathing and he started to black out and lost his vision. At this point he feared for his life.

He was brought to the Jamaica Hospital ER late on the evening of October 31 where he saw a medical doctor. Mr. Schoolcraft then saw Dr. Lwin who spoke to him for no more than ten minutes. He told Dr. Lwin that his bosses came to his home and arrested him who he had reported for committing crimes. He denied saying that they were all out to get him. There seemed to be a communication barrier. His father called, and Sergeant James told the nurse to tell his father to call the 81st Precinct since they were taking him back there. Mr. Schoolcraft stated that he would not return to the 81st Precinct. Another doctor saw him for about three minutes when he was in the psychiatric ER on Sunday.

One of Mr. Schoolcraft's hands was handcuffed to the gurney and one was free initially. They would not give him a phone so he reached for one near him and called his father in order to get help. Sergeant Sawyer came by and said that "perps" are not supposed to be making calls. Sergeant Sawyer then hung up the phone Mr. Schoolcraft was using. Officer Miller then cuffed Mr. Schoolcraft's free hand, grabbed his leg and twisted his head. In a short period of time his hand turned blue. Sergeant Sawyer said that this is what happens to "f__ing rats". Sergeant James, Dr. Lwin and Yeager (ESU) seemed to be disagreeing. Mr. Schoolcraft's cuffs were finally removed and he was then sent to the psych ER in the morning.

Dr. Bernier saw him on Monday for less than 20 minutes. Mr. Schoolcraft asked people including nurses to take pictures of the bruises he received when the police grabbed him and threw him on the ground in his apartment.

Monday afternoon Sergeant Scott, who had previously had contact with him, and other officers from IAB came to see Mr. Schoolcraft.

On Tuesday he was transferred to the psychiatry ward. The social worker, McCall, saw him for ten or fifteen minutes. He spoke with the MHLS lawyer for 20 minutes.

On Wednesday, when Dr. Isakov met with Mr. Schoolcraft and his father, his father asked Dr. Isakov why his son was being held. Dr. Isakov said that Mr. Schoolcraft was not being held. Mr. Schoolcraft and his father then said OK we're leaving and started to walk out. Alarms were then set off and Mr. Schoolcraft was not allowed to leave.

After leaving Jamaica Hospital he went to see Dr. Luell once for two hours in Forest Hills.

Since 2009 Mr. Schoolcraft has been living in upstate NY with his father. He said he has not had a girlfriend since 2009. When asked about friends he said he has people he is friendly with but because he is embarrassed about what has happened he keeps people at a distance. He said that his sleep is irregular (he can generally sleep if there are no recent stresses), his appetite is OK, his concentration is not at its best, he is able to enjoy watching a movie. His energy is down. He does not have thoughts about death. He spends his time taking care of his father and dogs that have been rescued.

When asked if anyone else has done strange things to hurt him he said no. He applied for roughly one hundred jobs. Only one business even responded that they had gotten his application. He does odd jobs, and would take a job if one became available, and looks around the community for work. Previously he had gone to the employment center in Gloversville but he did not obtain any work from doing that. The police have repeatedly come to his area and kept an eye on him. He fears being out in the open and vulnerable to them if he gets a job. He also thinks no one will hire him because employers will google him and see what has happened.

When he sees the type of cars the police used to come up to his area, he thinks about his being hurt by the police including being restrained and physically attacked in his apartment. Going out alone also leads him to think about these times. He feels that the police will come and harass him again. When he took pictures of the hospital and precinct with his lawyers these memories were stirred up. Coming to NYC leads him to feel anxious and on edge when he is not with someone. He is upset that people got away with how they treated him.

He avoids police. He is concerned it will happen again. He is concerned to put his name on Amtrak tickets since the police may then be able to know when he is coming to the city. He avoids talking about what happens. In the past he believed that people cared about wrong things being done to people, but now he feels people don't care and that there is a lot of bad stuff going on in the world. It is upsetting to him that people can get away with the type of things that were done to him. He feels sickened by the way police abuse their power and get away with it. During quiet times walking or driving he is almost constantly thinking about what happened and how to prevent it from happening to himself and others. When thinking about what happened he feels disgust, anger and fear of what they are capable of and what they are allowed to do. He used to be comfortable walking around the city but is not now. He only goes to the city if he has to.

Mental Status

Mr. Schoolcraft was cooperative and pleasant. There were no abnormal movements, his eye contact was normal, he demonstrated a full range of affect, his mood was euthymic. He was appropriately dressed and groomed. He was heavy set. He was alert and oriented to person, time and place. His speech was normally paced and goal directed. There were no loose associations. He could recall three objects after two minutes. He could add 15 and 17, and multiple 6 x 4. He denied hallucinations and delusions. He could do serial 7s. When asked what an apple and banana had in common he said fruit. When asked what he would do if he smelled smoke in a theater, he said he would go to the lobby and inform someone.

**Deposition of Dr. Bernier**

Dr. Bernier stated that in October 2013 she was director of the psychiatric emergency room at Jamaica Hospital. She said that she was the only attending psychiatrist in the emergency room.

Dr. Bernier stated that a restraint is applied on a patient who is a danger to himself or others, or is very aggressive, agitated or violent. They usually come in soft restraints applied for two hours and staff must monitor the restraints every 15 minutes to make sure there is no impairment of circulation. Once a patient comes into the hospital and is a

patient of the hospital physicians make the decisions about restraints. The police officers do not have a role in this. Mr. Schoolcraft was psychiatrically evaluated because a consult was called saying that he was acting bizarrely.

When asked if she had any reason to believe that Mr. Schoolcraft's statements that he did not have homicidal and suicidal thoughts were not true she said "But you are missing the point in there when he is paranoid about his supervisors". She went on to say Mr. Schoolcraft was being held because he was paranoid and agitated, uncooperative, verbally abusive while he was in the medical ER and they had to find out why he was agitated and behaving bizarre. (p90-91)

When asked what behavior he had that was bizarre Dr. Bernier said that he barricaded himself, would not open then door and they had to break into his apartment.

When asked if under section 9.39 if a patient can be held because they are acting bizarre, Dr. Bernier said yes. (p93) When asked if under section 9.39 an individual can be held because they are agitated Dr. Bernier answered yes. (p94)

The hospital record noted on Nov 2, 2009 that a nurse reported that Mr. Schoolcraft had redness on his right wrist with the handcuff, the police were notified and requested to loosen it but refused. Mr. Schoolcraft had also reported to the nurse that his wrist was numb.

When asked the basis of her opinion that Mr. Schoolcraft needed admission Dr. Bernier said that he had to barricade himself, he was acting bizarre, he was agitated in the ER, that he was a police officer and that she was trying to prevent another case of the Navy Yard disaster. Dr. Bernier said that she thinks its is easier for a police officer to have access to guns.

Dr. Bernier agreed that Mr. Schoolcraft was calm when she evaluated him. She went on to say that Mr. Schoolcraft said that there was a possible conspiracy against him, that there was a problem between him and his supervisors and that this is a form of psychosis, paranoia.

Dr. Bernier stated that she did not write his history down because she agreed with the notes of the resident.

Dr. Bernier went on to say that Mr. Schoolcraft was a police officer talking about this conspiracy theory and that she believed he had access to weapons. She later went on to say he had barricaded himself in his house, he was bizarre and agitated when brought in. Because of these she felt he had to be admitted although he had already been under observation for 2 ½ to 3 days. Dr. Bernier does not recall speaking to any of the police officers. She did not speak to anyone from Internal Affairs and did not speak with Mr. Schoolcraft's father.

Dr. Bernier felt that he was a potential risk that he might hurt himself or others. Dr. Bernier appeared to define potential risk as any risk at all.

There was a note from 11/2/2009 that IAB came to the hospital at 5PM. Dr. Bernier signed the admission forms on 11/3/09. One of the officers gave his card and it was taped to the chart. Dr. Bernier made her decision to admit on 11/1/09.

When asked if there was anything that Internal Affairs could said that would change her mind about admission of Mr. Schoolcraft, Dr. Bernier replied by asking if Internal Affairs is reliable. She said that she would have to assess them too.

**Deposition of Dr. Isakov**

Dr. Isakov said (p98) "Potential it's high risk, low risk, medium risk; but it doesn't matter what level the risk. If there is a risk, I think it's my duty to protect the patient." When then asked "So it doesn't matter what level of risk so long as you perceive a risk, you are got going to admit him?" Dr. Isakov replied "Yes, right." Dr. Isakov later said of Mr. Schoolcraft "I was surprised that he decided to sue me because I thought that I did a great job helping him....I mean I did very it fast. He did not spend too much time in the hospital, and I was able in this small amount of time collect enough information, have the meeting with people that he wanted to meet with, and make the decision to send him out." (p110)

Dr. Isakov said that Mr. Schoolcraft was under significant emotional distress and exhibited symptoms of paranoid psychosis. "This combination of the emotional stress, paranoid symptom making patient to become a potential danger to do something to himself or to others. This is what my understanding why he was admitted to the hospital....the stress that he was in, the symptoms that he exhibited put him in potential danger if he is not in safe environment if he would be stressed further, he may go and harm himself or harm somebody else."

When asked why she did not call Internal Affairs, Dr. Isakov said: "The reason I did not call when I evaluated the patient and he mentioned to me that police department or his department they are framing him, they are against him, they were out to get him; I did not feel that it will be in the best of patient interest if I just listen to the people who he doesn't believe, doesn't trust. I wanted to get more information from the people who knows him from different perspective like family, like friend, if he has any significant others. ...maybe he is saying what is saying is definitely going on. Without me knowing all of the information, not having all of information, I wasn't comfortable right away to put the diagnosis of paranoid; but I didn't want to hundred percent rule out paranoid. I wanted to keep on the diagnosis. It will be further evaluation to prove or disprove it."

When asked if he was admitted under the mental hygiene law because he had paranoid ideations Dr. Isakov said "they follow the rules to 9.39. Says if there is allegation that he has mental illness, there is symptoms of mental illness, the need for immediate attention and there is potential danger if he will be sent home in this situation". (p140)  He also stated that "under the paranoid ideations there is unpredictable what is the next thing they will do if they not get help." (142)

Dr. Isakov noted that Mr. Schoolcraft refused to take the medication they prescribed.

Dr. Isakov stated that Mr. Schoolcraft was admitted in order to evaluate him, but also stated that this was not the only reason. Dr. Isakov wrote that Mr. Schoolcraft "expressed questionable paranoid quality ideas about corruption and cover ups in precinct. He also wrote "Patient very anxious, suspicious, afraid that his superiors in the police department wanted to get rid of him, quote/unquote...The patient showed the following psychiatric signs and symptoms: anxiety and paranoid quality ideations." In response to the question on part E "Does the patient show tendency to cause serious harm to himself?" she marked no and "To others" she marked no.

On November 5, 2009 Dr. Isakov wrote "reiterated his story again and still wanted to take legal action against his precinct, but not expressing any physical threats to anybody and not expressing suicidal ideations. ...not exhibiting psychotic behavior or thoughts....he became much more appropriate. He is able to communicate appropriately. He wasn't so irritable like before, wasn't so anxious, wasn't uncooperative......I admitted because of level

of stress. His mental condition required inpatient admission, and if I will not do it, I was not sure that will be outcome if he would be discharged; that's why I admitted him to cool down situation, to take the danger away and then send him out." There was agreement he would be released when he made an appointment with a psychiatrist. "And I told him then I need to contact your psychiatrist, get appointment, and then I will be able to discharge." "We cannot send somebody that he will see and if something in between will happen, we are liable that we didn't arrange appointment....Because something may happen and if will happen the way we did not give him appointment to see and that's why he didn't see appointment, yes, I will be liable for not arranging appropriate discharge....I mentioned to Mr. Schoolcraft that if you want to leave today, then we will make appointment with our clinic."

On p 190 Dr. Isakov noted that he left the room when Mr. Schoolcraft's father and an officer from Internal Affairs began to argue about the police department not addressing the issue properly. Dr. Isakov felt it had nothing to do with the family meeting they were planning and Mr. Schoolcraft's treatment.

Dr. Isakov said (p193) "There is a lot of information that pointing out to the dangerous situation that in the past because gun was taken away and we don't have that clear answer why it was taken away. The police decided after he left his duty on the date of admission, they decided to come to his house. That mean they felt did something dangerous that they decided go to someone house and visit him. That's when he came, that the conduct of him, the way he presented in the emergency room and the first day of admission on the unit. Also showed with instability that we feel is the reason to keep him in the hospital."

Dr. Isakov said (p200) "I don't know substantial. I would like to grade the risk is high, the risk is medium, the risk is low because the low risk also could be substantial....Substantial, it means that the risk make you to make decision that you don't want to take this risk that you need to do something to avoid something bad to happen, reach the threshold where you would say no, its enough risk in this case to keep him in the hospital."

When asked if there is a scientific method or standard for risk assessment Dr. Isakov said that "There is a lot of different research psychiatrists or academic psychiatrists coming up with different scales how to assess better, but there is no standard scale that everybody use."

## Dr. Lamstein's Records

On April 13, 2009 Dr. Lamstein recommended cognitive behavioral therapy to help deal with stress and improve coping skills. He was noted to be anxious due to stress. Mr. Schoolcraft was referred for anxiety with chest pain, difficulty sleeping and stomach problems. He reported being pressured to write more summonses and received a poor evaluation due to low activity. His personal physician wrote for psychotropic medication. He was put on restricted duty due to his anxiety symptoms and use of psychotropic medication. July 29, 2009 Mr. Schoolcraft reported he no longer felt stressed and his physical symptoms had gone away. A note from November 9, 2009 stated that a social worker at the hospital, Christine McMahon, said that Mr. Schoolcraft had weird beliefs but was not deemed to be a danger.

9

**Deposition of Vinod Dhar Associate Chairman, Jamaica Hospital Department of Psychiatry**

Dr. Dhar was Associate Chairman of Jamaica Hospital's Department of Psychiatry in 2009 and continues in that position. He said that any risk is sufficient to commit an individual. He said that the 48 hours period before the second commitment paper needs to be done when the first note is signed. A comprehensive evaluation, needed to commit an individual, takes an hour or more of interviewing the interview, in addition to speaking with collaterals. Agitation and bizarre behavior are each sufficient to commit an individual.

**Department of Psychiatry, Jamaica Hospital, ER Services, Policy and Procedure Manual**

The policy for commitment applies to "Patients alleged to have a mental illness for which immediate observation, care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others, may be admitted under this provision for a period of 15 days. Likelihood to result in serious harm is defined as: substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself; or a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."

**CONCLUSION**

**To a reasonable degree of medical certainty, the doctors and Jamaica hospital staff who evaluated Mr. Schoolcraft did not have an adequate medical or legal basis for holding him against his will, keeping him in the hospital against his will, and committing him to the hospital against his will. Their actions violated both NY Statutory Law, as well as Jamaica Hospital policy. To a reasonable degree of medical certainty, their evaluations and medical decisions fell far short of accepted clinical practice, and raise serious questions of deliberate indifference.** In addition, the doctors and hospital staff were derelict in their duty to Mr. Schoolcraft in allowing the police to keep him in handcuffs and to have a handcuff so tight it impaired circulation to his hand. This is both outside of standard and accepted clinical practice and raises serious questions of deliberate indifference. The Jamaica Hospital staff also violated Mr. Schoolcraft's rights to confidentiality when providing information to the police about Mr. Schoolcraft, when staff spoke to police about Mr. Schoolcraft in the emergency room. To a reasonable degree of medical certainty the evaluations done by the various psychiatrists who saw Mr. Schoolcraft were unacceptably brief and failed to gather crucial information.

To commit a person to the hospital and hold him against his will, a doctor must assess that the person presents a substantial risk of harm to himself or others as a result of mental illness, or is unable to care for basic needs as a result of mental illness, thus placing himself at risk. Accepted clinical practice entails gathering all available relevant, significant information; applying current scientific knowledge; and analyzing the situation via structured professional judgment, as taught in residency programs. The doctors fell short on all three bases for accepted clinical decision making. The doctors:

1. failed to gather adequate information about what Mr. Schoolcraft had done and believed concerning his allegation of corruption by superiors;

2.   failed to reasonably interpret the information they had, and instead repeatedly jumped to inappropriate conclusions about the meaning of pieces of information rather than seeking information to find out what the information really meant;

3.   failed to call and speak with people in the Police Department's Internal Affairs Bureau in order to see if Mr. Schoolcraft's statements of corruption were paranoid, or a misperception, or were justified;

4.   failed to explore if his beliefs were likely to lead him to engage in dangerous behavior;

5.   appear to have lacked basic knowledge concerning the NY law concerning commitment as well as their own hospital's written policies

6.   appear to lack current scientific knowledge about how to assess dangerousness.

The failure of any of these six means that the work was below accepted professional standards. The repeated failure to do a reasonable assessment of Mr. Schoolcraft in order to determine if he truly needed inpatient commitment, along with the fact that the doctors new or should have known that committing a person against their will to the hospital (particularly someone who had never before had a psychiatric admission) would be very harmful to him, raises very serious questions of deliberate indifference. What they did is analogous to a doctor performing a needless operation, because he failed to do a reasonable evaluation before deciding to operate.

Once Mr. Schoolcraft was in their care, against his will, the Jamaica Hospital staff was responsible for protecting him from abuse by others. Mr. Schoolcraft was held in the hospital by the hospital's authority, kept in handcuffs and was even blocked from making a phone call for a significant period. He was helpless and at the mercy of anyone who sought to mistreat him. Allowing the police to tighten Mr. Schoolcraft's handcuffs, cutting off the circulation, was a violation of this duty and raises questions of deliberate indifference. An analogy may help to illustrate the seriousness of their failure to act. If an officer in the police or the military gives a subordinate an illegal order to hurt someone the subordinate is culpable if he or she obeys the illegal order. In this situation, the hospital staff should not have acted as if they were subordinate to the police. As Dr. Bernier testified, once in the hospital Mr. Schoolcraft was in their care and not under the control of the police. The hospital staff should have acted as if there were subordinate to the police. It would have been much easier for the hospital staff to insist that the handcuffs be replaced by restraints, and/or call superiors to stop the police from abusing Mr. Schoolcraft with the handcuffs, than it would be for a soldier to disobey the illegal order of a superior. No one did this however.

## Post Traumatic Stress Disorder

Mr. Schoolcraft is suffering from post traumatic stress disorder as a result of the abuse he suffered at the hands of the police and in the hospital. He feared for his life when the police were physically abusing him. He has intrusive recollections of the abuse and time in the hospital much of the time. His view of the world has been adversely affected and he no longer feels justice will be done or that wrongful behavior will remedied. He avoids talking about what occurred when he can and avoids NYC as much as he can. He is anxious when in NY if he is alone. He's not making close connections with people. He says he is in hiding. He is often on edge and has decreased concentration. He startles more than he used to. He is more irritable than he used to be.

11

Failure to Appropriately Analyze the Significance of The Information They Had

The first error the staff and doctors of Jamaica Hospital made was to interpret the information that was initially available to mean that Mr. Schoolcraft suffered from paranoid delusions. A note dated 11/1/09 stated that Mr. Schoolcraft had been reporting irregularities at work to Internal Affairs. He said that his superiors were underreporting crime to earn more merit. He said that because he had made complaints, the police went to his apartment, when he refused to open the door the landlord let the police in, he was manhandled by the police and brought into the hospital. The note said he had visible bruises on his arms.

Mr. Schoolcraft's assertions are not the type of allegations delusional individuals make. Delusional thoughts typically take a very different form. Examples of typical paranoid delusions would include believing that his superiors had been replaced by aliens, or that the police were trying to control his brain with radio waves. Believing that someone is misreporting numbers would be unusual content for delusions. To assume that Mr. Schoolcraft's complaints that superiors were reporting inaccurate numbers to make themselves look better, were delusions rather than true statements or perhaps the result of misinterpretation is not a reasonable medical judgment by the doctors.

In terms of his report that the police mistreating him, this is also something that happens. The nursing note of November 1, 2009, stating that Mr. Schoolcraft's right wrist was red, the police officer was made aware and was asked to loosen the cuff, but refused, should have been seen as strong support for Mr. Schoolcraft's statements that the police were not behaving appropriately. Moreover, the bruises on his arms should have been seen as additional support. That Mr. Schoolcraft would not let the police in his apartment is not bizarre behavior. It showed good judgment given that they had no search or arrest warrant and that they were angry at him for reporting corruption. Altogether, the information the hospital had did not support a conclusion that Mr. Schoolcraft had a mental illness, or was likely to engage in dangerous behavior, other than the danger inherent in reporting on improprieties by the police. Nevertheless, the doctor stated he had "? paranoid delusions", diagnosed Mr. Schoolcraft with psychosis NOS, rule out paranoid schizophrenia, and prescribed antipsychotic medication.

Failure to Make Reasonable Efforts to Gather Crucial Information

Failure to appreciate that it was unlikely that Mr. Schoolcraft was delusional, was not the only error and unreasonable judgment. The hospital and doctors failed to make reasonable efforts to gather information to assess Mr. Schoolcraft's symptoms and mental state. Believing that his statements about the police might be delusions (but might also be true), the doctors needed to actively gather additional information, rather than pausing their search. The doctors should both have had deeper discussions with Mr. Schoolcraft concerning the corruption he alleged (such as what was his basis for believing it) and should have spoken with Internal Affairs as soon as possible, to assess if Mr. Schoolcraft was or was not delusional. On November 2 four officers from Internal Affairs came to see Mr. Schoolcraft and one left his card. The doctor in the ER should have spoken with them when they came to visit, and should have called IAB if it was not possible to speak with any of the four officers who visited at the time of their visits. The explanation given by Dr. Bernier for why she did not do this makes little sense. When asked if there was anything that Internal Affairs could have said that would change her mind about admission of Mr. Schoolcraft she replied by asking if Internal Affairs is reliable. She said that she would have to assess them too. It is not logical to be so hesitant to trust the words of

12

Internal Affairs that she did not call them, but she so trusted the second hand words of the police who Mr. Schoolcraft was saying were engaged in corruption that she used it as essentially the sole basis for committing him to the hospital.

Failing to call key collaterals ( in this, IAB) is outside standard practice. It is standard practice in these situations to gather information from collateral sources. For the doctor to accept negative information about Mr. Schoolcraft from the police, who he was complaining about to IAB, but to fail to even speak to those who could provide solid information that Mr. Schoolcraft's beliefs were not delusions, is impossible to understand. If the doctor wondered about the credibility of IAB why did she accept the credibility of the police? Why did she not ask someone what IAB was? Brief reflection indicates IAB would be more credible than the police in this situation. IAB would have much less reason to lie to the hospital and say that Mr. Schoolcraft was making valid complaints if in fact he was delusional. On the other hand the police had strong reasons to make false complaints against Mr. Schoolcraft. Had the doctors done this simple task they would have found out that, in fact, Mr. Schoolcraft was reporting misconduct to them and that such misconduct occurs. Her actions raise serious questions of deliberate indifference.

Another serious omission by the doctors and hospital was their failing to gather more information about what Mr. Schoolcraft had actually done, rather than accepting the conclusory statements of the police. The report that Mr. Schoolcraft barricaded himself and behaved bizarrely could and should have been explored as to what actually happened. There is a tremendous difference between refusing to open the door for someone you do not want to enter your house who has no right to enter, and piling up furniture behind the door to keep out someone who has a legal right to enter. There is no discussion by the doctors of what they meant when they wrote down that he had barricaded himself. It is not appropriate to accept such conclusory terms. Mr. Schoolcraft refusing to open the door is neither barricading himself nor bizarre. Without asking further questions to find out what actually occurred, it was inappropriate to say that Mr. Schoolcraft behaved bizarrely or to use the claim that he barricaded himself as a basis for committing him.

There was also markedly inadequate exploration of Mr. Schoolcraft's concerns about the behavior of the police. His concern that the police were misreporting numbers and wanted to fire him are not typical delusions. They are things that could readily be true. Even if they were delusions, they are very unlikely to be the source of dangerous behavior.

Throughout the hospital notes one sees a marked lack of information, a failure to gather the key information that doctors are supposed to gather when doing dangerousness assessments, and a failure to reasonably analyze the information available. Consistent with this, Mr. Schoolcraft reports that the doctors spent very little time with him. An analogous situation would be a surgeon assuming that a child's abdominal pain was due to appendicitis and therefore deciding to operate, without doing an adequate evaluation to see if the pain was due to appendicitis or simply gastroenteritis.

Even if Mr. Schoolcraft had been paranoid about the police this was not adequate reason to hold him. The doctors decided to detain and eventually commit Mr. Schoolcraft although he gave no indication of have thoughts of hurting himself or others. The leap the doctors made from the possibility that he was paranoid to his presenting a substantial danger to himself or others was inappropriate and a departure from the standard of care. In fact, he was repeatedly

13

described as calm and repeatedly denied having thoughts of hurting himself or others. Even when an individual has thoughts of harming himself or others, the individual should not automatically be committed. There is a substantial difference between having thoughts of harming oneself or others, having a concrete plan for what one might do, and acting on the plan. Even if it had been true that Mr. Schoolcraft had paranoid ideations about the police and had barricaded himself, this was not, in and of itself, adequate reason to commit him. It was crucial to assess what actions Mr. Schoolcraft was reasonably likely to take as a result of the beliefs. If they had asked Mr. Schoolcraft he would, in all likelihood, have said that he was dealing with his belief that people in the police department were doing inappropriate things by informing Internal Affairs. One could go further and ask what he would have done if Internal Affairs did not deal with the problem to his satisfaction. Unless Mr. Schoolcraft indicated that he was going to deal with the problem by attacking someone, or himself, there was no reason to hospitalize him. To provide an analogy, individuals who are chronically ill or chronically in pain at times attempt suicide. Moreover, depressed individuals sometimes attempt suicide. It is not, however, appropriate to hospitalize all of these individuals simply because they are depressed or chronically ill and they are at a higher risk than the average person to engage in self-harm. Similarly, it is not appropriate to commit someone simply because the individual may have some paranoid thoughts.

The social worker eventually asked the crucial question: what he would do if he lost his job. He said he would return to Texas and start over. That Mr. Schoolcraft had a safe plan to deal with the problem indicated that there was little risk of danger. This question should have been asked much sooner and by the doctors. Once the social worker wrote it in the chart the doctors had crucial information that Mr. Schoolcraft did not pose a substantial risk danger to himself or others and he should have been released. In line with this, on November 5, 2009 the doctor wrote that Mr. Schoolcraft "reiterated his story again and still wanted to take legal action against his precinct, but not expressing any physical threats to anybody and not expressing suicidal ideations." This is the sort of information the doctors should have gathered when Mr. Schoolcraft first came to the ER. Even if Mr. Schoolcraft had been delusional, given that his plan for dealing with the beliefs was not dangerous, there was no basis for commitment.

Further compounding their violation of his rights, even after the doctor wrote that Mr. Schoolcraft was not homicidal or suicidal, he refused to immediately release Mr. Schoolcraft. His release was made contingent on him having an appointment with a therapist. The reason the psychiatrist gave for continuing to hold Mr. Schoolcraft was that the doctor feared he would be liable if anything happened. The doctor did not state that he felt that holding Mr. Schoolcraft until he had an actual appointment with a therapist increased Mr. Schoolcraft's safety. To detain a patient against his will for the benefit of the doctor, rather than for the benefit of the patient, is inappropriate and violates medical ethics.

To hospitalize someone who has given no indication of having thoughts of harming oneself or others, and no indication that the person is unable to take care of his basic needs, is very unusual. One might appropriately commit such an individual if the person had a clear history of violence to oneself or others when psychotic, and the individual was clearly sliding rapidly into a psychotic state. This was not the case with Mr. Schoolcraft, however.

Another failure to gather appropriate information concerned apparent failure to assess for the presence of absence of the factors which research has shown are predictive of violence. The doctor's notes and testimony did not provide evidence that they paid

14

attention to these factors. I saw no consideration of the vast majority of risk factors that are generally felt to be important in assessing the risk of violence to others (history of violence, anger, intent to engage in violence, impulsivity, command auditory hallucinations to do violence, history of childhood abuse, history of head trauma, history of your father going to jail, prior history of psychiatric commitment, psychopathy) or oneself (past suicide attempt. hopelessness, marked embarrassment, thoughts of suicide, impulsivity, substance abuse, isolation, relative who committed suicide, psychopathy). There are many questions one should ask when assessing whether someone presents a substantial risk of harm to himself or others including whether the individual has any intention to harm himself or others, whether there is any past history of violence to self or others, what circumstances might lead the person to engage in violence, current level of stress, how they are planning to deal with whatever stresses they currently have that you are worried could lead them to violence, the presence of major depression or bipolar disorder, a history of psychopathy or other personality disorder, the presence of substance abuse, evidence of poor impulse control (perhaps from head trauma or ADHD or substance abuse), socioeconomic class, other recent stresses, whether the person is working, what the person has that they are living for, serious recent loss or embarrassment, family history of violence or suicide attempt, sense of hopelessness or worthlessness, future plans, sense of desperation.

To summarize this section, the doctors and hospital staff failed to do a reasonable search for information to assess if Mr. Schoolcraft was delusional and failed to do a reasonable search to assess if he presented a danger to himself or others based on his being delusional. Even if Mr. Schoolcraft had actually been paranoid about the police, the hospital did not have a basis for committing him unless there was a significant risk that he would act on these beliefs in a dangerous way. The doctors needed to ask what Mr. Schoolcraft planned to do as a result of his beliefs. Taking legal action, and speaking with IAB, is not a reason to commit someone. At no time did Mr. Schoolcraft indicate an intention to engage in violence to himself or others as a result of his beliefs. It was not appropriate for the doctors to fail to address and report on this issue until November 5. In sum, there was no indication that Mr. Schoolcraft had either any intention to harm himself or others, nor any indication that he had any of the known risk factors for violence and suicide, and no indication that the doctors even sought to find out whether he had such risk factors. The problem was not simply a failure to exercise reasonable medical judgment. It was a failure to expend the time and energy needed to gather basic information needed to make a reasonable medical judgment.

Inappropriate Diagnosis

It was inappropriate to diagnosis Mr. Schoolcraft with psychosis NOS with the information available and what the doctors were thinking. In the note preceding the diagnosis the doctor wrote "? paranoid ideation". Given that there were no other signs of psychosis, if the doctors were not sure that he was delusional, it was inappropriate to render a diagnosis of psychosis. A possibility of paranoid ideation is not an adequate basis to diagnosis psychosis. The proper diagnosis would be "rule out psychosis NOS". In addition, what they thought might be delusional, his complaint of corruption, would be a very unusual delusion.

15

It was also inappropriate to prescribe Mr. Schoolcraft antipsychotic medication based on the information they had.

## Lack of Knowledge of Legal Commitment Criteria

Another serious problem was that Dr. Bernier did not know the legal/statutory criteria for commitment. Her assertion at her deposition that any risk of danger, rather than a substantial risk of harm, is the criteria for admission is incorrect. One of the most crucial things that psychiatrists are taught in their residency training are the proper criteria for commitment. For a psychiatrist who spends almost all of her time in the emergency room evaluating and committing patients to not know the legal criteria for commitment is very disturbing This is like an abdominal surgeon not knowing the differential diagnosis for abdominal pain, not being aware that there were causes that did not call for surgery, and therefore unnecessarily operating on someone. A general surgeon cannot reasonable do his job if he does not know the differential diagnosis for abdominal pain and a psychiatrist cannot make proper decisions on commitment if he or she does not know the statutory criteria.

This raises serious questions about the hospital's supervision of staff. Even minimal reasonable levels of supervision would have brought to the attention of Dr. Bernier's superiors that she was not doing adequate assessments of the people she was committing to the hospital and that she did not understand the law.

The statement by Dr. Isakov that he thought Mr. Schoolcraft should be pleased with the treatment he received and how quickly information was gathered so that he could be released, shows a deliberate indifference or fundamental lack of understanding of how serious it is to hospitalize someone against their will. Doctors must have understanding of the destructive impact of commitment in order to weigh the relative costs and benefits and make an appropriate decision. To draw an analogy, what would one think of a doctor who decided to give a patient medication without having an appreciation of the serious and harmful side effects that the medication almost always has on patients.

## Problems with the Work of Dr. Bernier

Dr. Bernier showed a clear lack of knowledge or concern for the statutory basis for committing a patient. When asked if she had any reason to believe Mr. Schoolcraft's statements that he did not have homicidal and suicidal thoughts were not true she said "But you are missing the point in there when he is paranoid about his supervisors". She went on to say Mr. Schoolcraft was being held because he was paranoid and agitated, uncooperative, verbally abusive while he was in the medical ER and they had to find out why he was agitated and behaving bizarre. (p90-91) When asked if under section 9.39 if a patient can be held because they are acting bizarre, Dr. Bernier said yes. (p93) When asked if under section 9.39 an individual can be held because they are agitated Dr. Bernier answered yes. (p94) Even if Dr. Bernier had been correct that Mr. Schoolcraft was agitated at one point in the ER, that Mr. Schoolcraft's belief that corruption existed in the police force was due to paranoia, and that Mr. Schoolcraft had barricaded himself, this was not a sufficient basis for committing him. There had to be a connection between his alleged mental illness and a substantial risk that he would engage in harmful behavior.

Contrary to Dr. Bernier's assertion that she has the authority to commit someone to the hospital because the person is agitated or behaving bizarrely, NYS law 9.39 states that one can

only hospitalize a patient against his will if the patient presents a substantial danger to himself or others (or is unable to care for his basic needs) as a result of a mental illness. In addition, the conclusion that Mr. Schoolcraft's behavior was bizarre appears to be without basis. Being agitated when assaulted by the police, forcibly brought into the ER, threatened with commitment and refused use of a phone is not a bizarre or psychopathologic reaction. Moreover, in general Mr. Schoolcraft was reported to be calm, not agitated. Mr. Schoolcraft allegedly barricading himself in his house is also not bizarre. Not letting your supervisors enter your apartment is a reasonable thing to do, particularly for a whistleblower who had been making complaints about them, and being agitated and uncooperative and trying to run away when they are is not a sign of psychopathology or bizarre behavior. Dr. Bernier could have checked into the various versions of what happened by speaking with the police to find out more about what actually happened rather than accepting conclusory words. Given how crucial this allegation was to her decision to commit Mr. Schoolcraft, Dr. Bernier should have made calls to collateral ( such as IAB, the father, the landlord, to others that they or the patient identified) to gather key information. Moreover, given the police refusing to loosen the handcuffs on Mr. Schoolcraft the doctor had further reason to question their statements and actions and to accept Mr. Schoolcraft's assertions.

Dr. Bernier did not do the basic data gathering that was required to begin to assess if Mr. Schoolcraft was mentally ill and if he presented a danger to himself and others. She does not recall speaking to any of the police officers and she said that she did not speak to anyone from Internal Affairs and did not speak with Mr. Schoolcraft's father. Dr. Bernier justified her decision to commit Mr. Schoolcraft by saying that he was a police officer talking about this conspiracy theory and that she believed he had access to weapons. She later went on to say he had barricaded himself in his house, and that he was bizarre and agitated when brought in. Once again these are conclusory statements that need to be explained. Moreover, hospital records show that Mr. Schoolcraft was generally calm, despite the high stress of being held in the hospital against his will. For Dr. Bernier to commit Mr. Schoolcraft without seeking to obtain information by speaking with the police, speaking with Mr. Schoolcraft's father, and speaking to Internal Affairs was outside of standard practice. For the hospital to fail to gather key information from these sources during the 2 ½ to 3 days he was in the emergency department prior to admission to the psychiatric ward does not comport with clinical standards.

When asked if there was anything that Internal Affairs could have said that would change her mind about admission of Mr. Schoolcraft, Dr. Bernier replied by asking if Internal Affairs is reliable. It makes little sense that she so questioned the reliability of Internal Affairs that she did not speak with them, but she accepted the second hand statements of people relating what the police allegedly said.

To a reasonable degree of medical certainty Dr. Bernier failed to give her decision to commit Mr. Schoolcraft the time or attention such a serious act must be given. There are times when commitment decisions can be done quickly, such as when a patient says he has strong homicidal or suicidal thoughts that he does not believe he can control. In the case of Mr. Schoolcraft, however, the reasons for commitment were so weak and vague that further data gathering and further analysis were requisite. To hold Mr. Schoolcraft against his will and commit him to the hospital, both of which have serious adverse effects, without doing a reasonable evaluation of the need for doing so raises serious questions of deliberate indifference.

Dr. Bernier repeatedly referred to the Navy Yard Shooting. The Navy Yard Shooting was very different. It highlights the importance of doing a proper evaluation. According to CNN, "Aaron Alexis was under 'the delusional belief that he was being controlled or influenced

17

by extremely low frequency electromagnetic waves' before he embarked on a bloody shooting rampage at the Washington Navy Yard, an FBI official said Wednesday. . . .Alexis had arrived in the capital area on August 25 for a contracting project, a few weeks after he told police in Newport, Rhode Island, that he'd heard 'voices' emanating from the walls of hotels he'd been staying at. . . . (his criminal record) includes a 2004 arrest in Seattle, when he was accused of shooting the tires of a man's truck in an anger-fueled 'blackout,' according to a police report. . . . Another arrest came in August 2008 in DeKalb County, Georgia, on a disorderly conduct charge. Two years later, Alexis was arrested in Fort Worth, Texas -- but never charged -- over an allegation that he fired a gun through the ceiling of his apartment. . . . That was the year, 2010, that the Navy moved to discharge Alexis due to what military officials described as a "pattern of misconduct" including insubordination, disorderly conduct, unauthorized absences from work and at least one instance of drunkenness." (Greg Botelho and Joe Sterling, CNN September 26, 2013) The Navy Yard incident underscores the value of doing a proper evaluation. The Navy Yard shooter had a clear delusion, one in which he was being seriously hurt and from which he could not escape, he also had auditory hallucinations, multiple arrests, multiple incidents of shooting, alcohol abuse and a pattern of insubordination. Mr. Schoolcraft, on the other hand, only reported that his supervisors were misreporting numbers and were now harassing him for reporting on them, something that is both very believable and would be very unusual content for a delusion. Suspicious individuals may incorrectly believe people are misreporting when they are not, but it is not generally a delusion (fixed false belief unresponsive to logical argument and not a culturally based belief.)

<u>Problems with the Work of Dr. Isakov</u>

Dr. Isakov failed to gather readily available information concerning whether or not Mr. Schoolcraft was paranoid. Dr. Isakov left the meeting with Internal Affairs and Mr. Schoolcraft's father when Mr. Schoolcraft's father was upset about the slow way that that IAB responded to Mr. Schoolcraft's complaints. Dr. Isakov said that he felt that this was not what the meeting was about, he was only interested in speaking about Mr. Schoolcraft's treatment. Dr. Isakov put the cart before the horse. In order to decide if Mr. Schoolcraft even needed treatment he needed to find out whether his complaints about actions of the police were based in reasonable assessments of his observations, or whether he was suffering from paranoid delusions, or whether he was not delusional but was overly sensitive and anxious and misinterpreted what he was seeing. Hearing what Internal Affairs and Mr. Schoolcraft's father were saying would likely be crucial in making this assessment. He should have stayed in the meeting to gain a better understanding of what was going on so she could assess Mr. Schoolcraft's mental status and issues and need for treatment.

Dr. Isakov's deposition shows that his method of analyzing the risk and gathering information fell below acceptable standards. He said that he did not know what a substantial risk meant, that a low risk could be substantial. He defined substantial in a circular way saying that it is when you decide to hospitalize the person.

According to the dictionary, substantial means: of considerable importance. In general we do not commit people who present a low risk or even a risk mildly greater than that presented by the average person. Everyone presents some risk. Almost anyone could, under enough stress, become angry and either strike out or be at risk for an accident due to being distracted. Anyone who drinks and has a car and who might then drive with impaired reflexes presents a risk. Anyone who is stressed and might therefore be distracted when driving or crossing the street has

an increased risk. Doctors do not hospitalize everyone with an above average risk of doing harm to himself or others, much less anyone with any risk. The deprivation of liberty would be enormous. Commitment requires a substantial risk, a risk significantly greater than that which the average person presents.

Dr. Isakov's belief that the police taking away Mr. Schoolcraft's gun and coming to his house to see him were prominent signs that he was dangerous, and that these, in combination with his reportedly being upset and not cooperative in the ER, were adequate ground to keep him in the hospital for days is simply not true. It is markedly speculative to go from each of these issues, or the combination of them, to finding Mr. Schoolcraft to present a substantial risk of harm. Having had his gun removed long before does not mean he is dangerous to himself or others. In addition to making unjustified leap of logic, it appears that once again Dr. Isakov did not engage in a reasonable search for information. There is no indication that Dr. Isakov took the time to ask a police officer the reasons for which a policeman could have his gun removed. Given that he was seen by a psychologist months before and was not committed, or ordered into treatment or sent to the ER (only his gun was removed), one could interpret this to mean that he was not dangerous. The statement that the police would not have gone to his house unless they felt he presented a danger is also an unjustified leap of logic. Moreover, even if it was true, this is not grounds for committing him. The police are neither trained nor have the statutory authority to decide if someone needs to be committed. They only have the authority to bring an individual to a hospital where psychiatrist can make this determination. Concerning Mr. Schoolcraft's behavior in the ER, it is very understandable, that an individual would be upset and not very cooperative if manhandled, placed in handcuffs (much less handcuffs that were excessively tightened), forced to go to the ER and at risk for being committed. To be calm in such a situation would be unusual.

Dr. Isakov's explanation of why he failed to call the police to gather more information is illogical. He said "I did not feel that it will be in the best of patient interest if I just listen to the people who he doesn't believe, doesn't trust. I wanted to get more information from the people who know him from different perspective like family, like friend, if he has any significant others. ...maybe he is saying what is saying is definitely going on." IAB was in the best position to tell him if Mr. Schoolcraft was delusional or speaking the truth, or had misinterpreted information. To fail to obtain information from the entity that was in the best position to clearly assert that Mr. Schoolcraft was not delusional makes no sense. Moreover, his stated reasons for not calling IAB, that he did not want to only obtain information from people Mr. Schoolcraft does not trust, does not support his decision to not call IAB. Speaking to IAB did not preclude him from speaking with Mr. Schoolcraft's family and friends.

If Dr. Isakov did not feel that the police could be trusted and did not have relevant information he should not have accepted what had been written on paper about Mr. Schoolcraft's behavior, and he should not have confirmed the hospitalized him. If he felt their statements had value then he needed to better assess those statements by speaking with the people who made them, obtain more details about what they saw and thought, and speaking to IAB. It is outside standard practice to unquestionably accept the judgment of the police that someone presents a substantial risk of danger and should be committed involuntarily.

On November 5, 2009 Dr. Isakov wrote "reiterated his story again and still wanted to take legal action against his precinct, but not expressing any physical threats to anybody and not expressing suicidal ideations. ...not exhibiting psychotic behavior or thoughts....he became much more appropriate. He is able to communicate appropriately. He wasn't so irritable like

before, wasn't so anxious, wasn't uncooperative." It was inappropriate for Dr. Isakov to hold Mr. Schoolcraft after the meeting with IAB and his father, at which he found out that there was a sound basis for Mr. Schoolcraft's complaints and concerns about the police. Dr. Isakov's stated reasons for continuing to hold Mr. Schoolcraft were that he would be liable if he went out and did something, and that it was hospital policy to see to it that a patient had an appointment before leaving. Holding someone against his will is very serious. Dr. Isakov clearly had no legal basis for doing so once the meeting had occurred and she no longer saw him as dangerous. Hospital policy and worrying that she would be liable if she made a mistake in her assessment are in no way acceptable reasons for holding someone against his will. Doctors have a fiduciary responsibility to patients and are required to place the patient's interests first. To keep someone locked up for one's own well-being is extremely serious.

Even before the meeting, Dr. Isakov, had inadequate basis to continue to hold Mr. Schoolcraft. On November 4 in response to the question, does the patient show tendency to cause serious harm to himself?" he marked no and "To others" he marked no.

Dr. Isakov's discharge note presented a straightforward and fair representation of the situation. Dr. Isakov wrote that Mr. Schoolcraft was admitted to the psychiatric ward (from the ER) on November 3, 2009 and discharged on November 6, 2009. The note states that after leaving work he took Nyquil and was woken with people in his room. They asked him to go to the precinct, he refused and they brought him to the ER of Jamaica Hospital in handcuffs. Dr. Isakov wrote that Mr. Schoolcraft was not experiencing paranoid ideations, but was concerned about issues in the precinct. Diagnosis was adjustment disorder with anxiety. There is a remarkable difference between this description of the situation and what was written at the time of admission. Dr. Isakov should have written the same note and never admitted Mr. Schoolcraft to the ward. Moreover, the first doctor who saw him could have written this note. The only thing that happened between the time of admission to the ward and discharge to change the description and assessment was that Dr. Isakov had spoken to an officer from Internal Affairs, which could and should have been done on November 2 at the very latest, and spoke with Mr. Schoolcraft's father, which should have occurred on November 1 if not October 31. The description Dr. Isakov gave of the situation on November 6 could have been written days before. Dr. Isakov appears to have been seriously indifferent to the fact that he was depriving Mr. Schoolcraft of his liberty, and engaging in an act that would seriously stigmatize Mr. Schoolcraft, and cause significant emotional, social and career harm.

Delusions and Dangerousness

A delusion is a fixed false belief unresponsive to logical argument and not based in the person's culture. One of the first questions to ask when evaluating if someone is delusional is the basis for the belief. If the person has a reasonable basis for the belief it is not a delusion. Even if a belief sounds rather preposterous, it is not necessarily delusional. You need to see if it is a fixed belief unresponsive to logical argument. In addition, you need to see if there is a reasonable basis for the belief. One could say that the delusional belief was that the police were after him. To assess if there is any possible basis to this, one first needs to ask what he means by that. His belief that he was at risk for being fired after he made complaints about superiors and received a poor evaluation is certainly not a delusion. To say that they are harassing him is also not a delusion. If there was any question about that, the way he was treated in the ER should have ended any question. The failure to explore what his negative beliefs about the police were, and therefore whether he was or was not delusional, was unacceptable medical practice. A

20

medical analogy may help. If a doctor sees a patient with a 102 temperature and prescribes penicillin without any reasonable assessment of whether it is viral and antibiotics are of no value, or a urinary tract infection that requires a different antibiotic, is unacceptable practice.

When asked if he was admitted under the mental hygiene law because he had paranoid ideations Dr. Isakov said "they follow the rules to 9.39. Says if there is allegation that he has mental illness, there is symptoms of mental illness, the need for immediate attention and there is potential danger if he will be sent home in this situation". (p140) He also stated that "under the paranoid ideations there is unpredictable what is the next thing they will do if they not get help." (142) Dr. Isakov appears to be saying yes, that he was admitted because he believes he had paranoid ideations. There are a number of problems with Dr. Isakov's answer. First, paranoid ideations alone are not sufficient to hospitalize someone. Research has shown that delusions rarely lead to violence, unless there is also considerable anger. Substance abuse and anti social personality disorder with also contributing factors. (Jeremy Coid et all 2013 The Relationship Between Delusions and Violence Findings From the East London First Episode Psychosis Study. JAMA)

Violation of Mr. Schoolcraft's Rights to Freedom

There is a chain of things one must establish to hospitalize a person against their will under section 9.39 in a case such as this. If any link in the chain does not exist then the chain fails and it is inappropriate to commit the person. First you need to see if the person is mentally ill. Then you need to establish that the individual has symptoms as a result of mental illness. Then you need to establish that as a result of those symptoms there is a substantial risk that the individual will behave in a way resulting in significant harm. The doctors failed to do any of these, much less all of them. Instead, the doctors accepted conclusory statements from the police without gathering adequate details to assess if Mr. Schoolcraft had a mental illness.

Dr. Isakov and Dr. Bernier, as well as Dr. Patel and Dr. Lwin violated the policies of Jamaica Hospital Department of Psychiatry. The policy says that to commit someone there must be a substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself; or a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm. Mr. Schoolcraft did not engage in any acts of self harm and he did not manifest or engage in any homicidal or other violent behavior which placed others in reasonable fear of serious bodily harm. Also deeply concerning, Dr. Dhar, vice chairman of the department of psychiatry, equated substantial risk of harm with any risk of harm. By his definition almost everyone would be committable at some point in their lives. Anyone who is upset and or stressed (and therefore able to be diagnosed with an adjustment reaction) and not at their best driving, or who drinks and drives, or who is very angry with a spouse or child or neighbor is at some risk for engaging in behavior that risks harm to oneself or others. One could argue that every cigarette smoker would fit the criteria as articulated by Dr. Dhar. Everyone who is depressed or stressed is at some increased risk for being in harms way or doing harm, since the person might go further downhill and might become suicidal. Everyone who has a history of psychosis is at risk for harm since the psychosis may recur under stress (or even without stress) and the person might then have symptoms that

21

might lead the person to act in dangerous ways. There is a very good reason that the state legislature used the phrase "substantial risk of harm" rather than any risk of harm.

The depositions and hospital papers suggest that there was no apparent consideration of the seriousness of the violation of liberty and constitutional rights and no consideration of the harm that is one by hospitalizing someone against their will. Doctors are trained to consider the potential harm of courses of treatment and to weight the risk and seriousness of harm by treating against the risk and magnitude of potential benefit. There is no indication that the various doctors who treated Mr. Schoolcraft did this calculus. Rather, especially Dr. Isakov, was concerned about the risk to herself if he released Mr. Schoolcraft without his first having set up an appointment.

The policy manual states that the admitting doctor will be responsible for assuring that a second examination of the patient is conducted within 48 hours of admission, for the purpose of confirmation of need for emergency admission. If the admission occurs during routine weekday hours, the admitting doctor will arrange for a psychiatrist with admitting privileges to conduct this second examination immediately. This indicates an appropriate concern about the seriousness of taking away an individual's liberty. However, the hospital did not follow the spirit of this policy. If a second evaluation should be done immediately during regular working hours then it is only logical that it should be done as soon as regular working hours commence if the person came in on the weekend. This was not, however, done. Mr. Schoolcraft was brought into the hospital on Saturday night. He was evaluated on Sunday November 1 at 6:30 in the morning. Dr. Bernier, however, did not sign the forms for commitment until Tuesday November 3, at which point he was admitted to the psychiatric ward from the psychiatric emergency room. Dr. Bernier did not sign the second commitment form until after 1PM on November 3, more than 48 hours after the first psychiatric consult and almost three days after Mr. Schoolcraft was first brought to the ER. Holding someone against their will is very serious. Psychiatry departments should have provisions to bring someone in just as surgery and anesthesia have provisions to bring someone in from home in an emergency. At the very least, evaluations should be done first thing Monday morning. It is inappropriate, and circumvention of the spirit that people should be evaluated and a decision made as soon as soon as possible, to not begin count the 48 or 72 hours until they must have the second evaluation or be released from the time of the first evaluation, rather than from the time at which they are first held against their will.

The inappropriate commitment of Mr. Schoolcraft has had very serious consequences for his mental health, social life and work life. There is strong reason to believe that the inappropriate commitment and ensuing situations have interfered with his ability to obtain a job. Moreover, his having a history of being psychiatrically committed prevents him from carrying a gun and therefore bars him from working as a policeman. His embarrassment over the situation has led him to avoid NYC.

Other Violations of Mr. Schoolcraft's Rights

There is an additional very serious issue, the misuse of restraints by the ER. Dr. Bernier said that once a patient is in the ER that the doctor is in charge of the use of restraints, not the police. In addition, it is significant to note that Mr. Schoolcraft was not under arrest, he was not charged with a crime, he was brought in by the police as a patient in need of help. What actually happened, however, was that the police refused to ease his restraint when he requested it, and in fact tightened it, cutting off his circulation in response to his request. A second restraint was

reportedly placed on him when he tried to call his father, something the staff should have helped him to do, not something the staff reasonably prevented him from doing. It was inappropriate of the hospital staff to allow the police to control the patient's restraints and a dereliction of their duty to allow the police to use restraints in a way that was grossly inappropriate and abusive. The hospital staff had a fiduciary responsibility to the patient once he was in their care. With him held against his will they had a responsibility to protect him from abuse since he could not defend himself. They failed to do this, allowing the police to mistreat him. Moreover, there is no indication that the ER staff attempted to call superiors about the inappropriate behavior of the police or that they even objected to it.

An additional violation is that it appears that the staff discussed the case with the police. While it was appropriate to obtain information from the police, it was not appropriate to provide them with any information. Mr. Schoolcraft was not under arrest, he was their patient, and he had complete rights to privacy. The staff violated his rights to confidentiality.

Actions of the Police on October 31, 2009

There are many things that can be said about the inappropriate actions of the police on October 31, 2009. From a medical perspective it was immensely inappropriate and dangerous to manhandle and physically assault a man believed to be suffering from dangerous levels of high blood pressure. If the reason the police were bringing Mr. Schoolcraft to the Jamaica Hospital ER had indeed been for high blood pressure, assaulting him, and physically restraining him was grossly inappropriate. Rather than helping a man with hypertension it risked causing just the disaster that they were allegedly attempting to prevent. It would have been far better to simply let the person be and/or to let EMU handle it.

I reserve the write to make changes to the report based upon new information coming to my attention and if I find typos or other inadvertent errors in the report.

s\ *Roy Lubit*

---

Roy Lubit MD, Ph.D.

23