# PLAINTIFF'S MOTION
# EXHIBIT 35

1  executive officer of the transit borough of Bronx and Queens?
2  A. I was the commanding officer of the 81st Precinct.
3  Q. Is it accurate that you became the commanding officer of
4  the 81st Precinct in December 2007?
5  A. Yes, it is.
6  Q. Before that you spent a year as the executive officer of
7  the 81st Precinct, correct?
8  A. Yes.
9  Q. Who was the CO when you were the executive officer?
10 A. Deputy Inspector Robert Brower.
11 Q. The 81st Precinct is in the patrol borough Brooklyn North,
12 correct?
13 A. Yes.
14 Q. As the commanding officer of the 81st Precinct, you
15 reported directly to Deputy Chief Marino, correct?
16 A. I reported directly to Chief Gerald Nelson, who is the
17 commanding officer, and also Chief Marino, who is the executive
18 officer.
19 Q. Deputy Chief Marino was the executive officer of patrol
20 borough Brooklyn North?
21 A. Yes.
22 Q. And Chief Nelson is a two star chief, he was the borough
23 commander for Brooklyn North?
24 A. Yes.
25 Q. You're aware, are you not, that an allegation was made

D428FLO2                       Mauriello - direct

```
 1   against you during your tenure at the 81st Precinct that quotas
 2   were maintained in the 81st Precinct?  You're aware of that
 3   allegation, correct?
 4   A.   The allegation, yes.
 5   Q.   You deny that allegation, is that correct?
 6   A.   Of course.
 7   Q.   But you know that that allegation was made against you,
 8   correct?
 9   A.   Yes.
10   Q.   At some point, you were investigated by the NYPD about
11   these allegations, were you not?
12   A.   Yes.
13   Q.   Subsequent to that -- well, let me ask you.
14            At some point you transferred from the 81st Precinct
15   to your new position as the executive officer of transit
16   borough Brooklyn and Queens, correct?
17   A.   Bronx and Queens.
18   Q.   Bronx and Queens.  I'm sorry.
19            That was on July 3, 2010 when that was communicated to
20   you?
21   A.   Yes.
22   Q.   That was told to you by Chief Hall, correct?
23   A.   Yes.  He called me up.
24   Q.   Chief Hall is the chief of patrol for the entire New York
25   City Police Department, correct?
```

Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 31 of 177      1831
D428FLO2                           Mauriello - direct

1   A.   Yes.
2   Q.   When he talked to you on July 3, 2010, this was after
3   allegations had been made against you, correct?
4   A.   Yes.
5   Q.   When he talked to you, he said you were doing a really good
6   job at the 81st Precinct, right?
7   A.   Yes, he did.
8   Q.   In fact, he wanted to reward you by giving you the position
9   of executive officer of transit borough Bronx and Queens,
10  correct?
11  A.   Yes.
12  Q.   And you considered that a promotion, right?
13  A.   I considered it a transfer.
14  Q.   You considered it a promotion as well, right, in the sense
15  you're going to a more important position than what you were
16  in, correct?
17  A.   No.  I mean, I am going to be second commander to more
18  officers.
19  Q.   So that's a step up for you, correct?
20            THE COURT:  Did you view it that way?
21            THE WITNESS:  No.
22            THE COURT:  You thought it was lateral?
23            THE WITNESS:  Yes.
24  Q.   Did you view it as a demotion?
25  A.   No.

1  Q. Now, you're familiar with the Office of the Chief of
2  Department, correct?
3  A. Yes, sir.
4  Q. You're aware, are you not, that the Office of the Chief of
5  Department investigates some civilian complaints that are
6  referred to them either by CCRB or other agencies within the
7  police department, correct?
8  A. Yes, sir.
9  Q. Some of those allegations -- withdraw that.
10        Allegations of an improper stop and frisk are
11 investigated occasionally by the Office of the Chief of
12 Department, correct?
13 A. Usually it's if someone got a summons. It doesn't have to
14 do with force or abuse or discourtesy or offensive language.
15 Then it goes to the chief of department.
16 Q. What about stop and frisk, is it your testimony that you
17 don't recall the Office of the Chief of Department
18 investigating allegations of improper stop and frisk?
19 A. I don't recall reviewing any.
20 Q. But you do know that when the Office of the Chief of
21 Department is investigating a case, that they refer the case to
22 the precinct where the allegation took place, correct?
23 A. They refer it to the borough, and then the borough sends it
24 to the precinct.
25 Q. So when you were the commanding officer of the 81st

1   Precinct, investigations of officers by the Office of the Chief
2   of Department at some point came across your desk, correct?
3   A.  Yes.
4   Q.  And you would refer those out within the precinct for
5   investigation, correct?
6   A.  They would get referred to my administrative lieutenant,
7   and then he would give it to the ICO, or if it's an allegation
8   against a lieutenant, my XO would do the investigation.
9           MR. MOORE:  One second, your Honor.
10  Q.  When you say ICO, you're referring to a position known as
11  the integrity control officer, correct?
12  A.  Yes.
13  Q.  What does the integrity control officer of a precinct do?
14  A.  He is making sure all the officers are following the rules
15  and regulations.
16  Q.  Of the New York City Police Department, correct?
17  A.  Of the New York City Police Department.
18  Q.  As well as being ethical in how they are police officers,
19  correct?
20  A.  Of course.
21  Q.  Occasionally, the ICO would farm those investigations out
22  to sergeants as well?
23  A.  Yes.
24  Q.  So it wouldn't be uncommon for a sergeant who supervised an
25  officer to be asked to investigate an allegation against that

Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 34 of 177   1834
D428FLO2                         Mauriello - direct

1  officer that he supervised, correct?
2  A.  As long as the sergeant wasn't personally on the scene when
3  the allegation was made.
4  Q.  But assuming he wasn't on the scene, he could still be
5  called to investigate an officer that he supervises, correct?
6  A.  Yes.
7  Q.  What you're saying is the only limitation would be, if in
8  fact he was on the scene, then you would find somebody else to
9  do the investigation, correct?
10 A.  Yes.
11 Q.  After that investigation was completed, they would come
12 back to your desk, right?
13 A.  When it was all done, it would come back to my desk.
14 Q.  And you would review it and send it back on to the borough?
15 A.  Yes.  Well, I review it, send it to my lieutenant, make
16 sure we have to file it, send it to the borough.
17 Q.  During the time you were the commanding officer of the 81st
18 Precinct, you don't ever recall receiving a recommendation from
19 the Office of the Chief of Department to discipline any officer
20 that had conducted an illegal stop and frisk, right?
21 A.  To the best of my knowledge, no.
22 Q.  You know what CompStat is, do you not?
23 A.  Yes, I do.
24 Q.  Tell us what CompStat is.
25 A.  CompStat is --

1   Q.  Just briefly. I know it's a long process.
2   A.  CompStat brings down a borough. If it's Brooklyn North, it
3   will bring down ten precincts, housing and transit, that work
4   in that area, and they would go over crime trends and crime
5   spikes and violence.
6   Q.  On occasion you would attend CompStat meetings in your role
7   as the commanding officer of the 81st Precinct, correct?
8   A.  Yes. And I still go to CompStat.
9   Q.  I'm sorry?
10  A.  I still go there as an XO.
11  Q.  You still go there as the executive officer of the transit
12  borough, correct?
13  A.  Of course.
14  Q.  Is it your testimony that from time to time UF-250s would
15  be discussed at CompStat meetings?
16  A.  My testimony was that when we go to CompStat, we talk about
17  a crime trend, and they want to know what my plan is and my
18  deployment, and they will put it up on the map. And then they
19  will see what time the crime was happening and what my
20  enforcement is and the violence around it. And I did testify
21  saying the only time they talk about a 250 was if they did
22  their own -- I guess before we went to CompStat -- they ran a
23  sampling, and if somebody might have been wanted that we
24  stopped on a 250, then my officers might not have known it,
25  they might bring up, this guy you stopped was in the area, he

D428FLO2                        Mauriello - direct

1   is a bad guy, he has got an active warrant, and put the picture
2   up. That's the only time they ever talk about 250s.
3   Q. In your experience, they don't actually pull out an
4   individual 250, generally, and discuss the circumstances of
5   what is in that document, correct?
6   A. No, they don't do that.
7   Q. And you said the purpose is to analyze crime trends and you
8   look at the location and then you match it with the
9   enforcement, correct?
10  A. We do a plan. They put it up on a map. We have a robbery
11  spike in, say, a certain area, let's say Sector Allen, and I
12  might put a plan out, a foot post or anticrime. They will look
13  at it. If the robbery is happening between 3 in the afternoon
14  and 11 at night, they will look to see what kind of enforcement
15  I have between 3 in the afternoon and 11 at night.
16          THE COURT: I would like to interrupt now just to stop
17  for the morning recess and reconvene at quarter of on that
18  clock.
19          (Recess)
20  BY MR. MOORE:
21  Q. Inspector Mauriello, when Chief Hall told you were going to
22  the transit borough, he described it as a reward, correct?
23  A. Yes.
24  Q. So I suppose that's technically not a promotion, but it's a
25  reward for the job you did at the 81st Precinct, correct?