# PLAINTIFF'S MOTION
# EXHIBIT 36

Emergency Medicine review in the matter of Adrian Schoolcraft v City of New York, et al. 10-cv-6005 (RSW)

**Part one**
Review of services provided by emergency medical technicians in and around Mr. Schoolcraft's home

As surmised from the EMS record (5581845), EMS was dispatched to Mr. Schoolcraft's home at 21:06 hrs. on October 31, 2009. This was apparently in response to a Police Department call. They arrived nine minutes later however police were involved with obtaining access to the patient and so the EMS team documents that they did not contact the patient until 21:40 hrs. EMS notes that they found Mr. Schoolcraft, a "34 year old male, ambulatory, alert and oriented." The plaintiff "took Nyquil" but "denied taking any other medications." He complained of abdominal pain, nausea and dizziness. Staff 1 at 21:45 hrs. reportedly took a set of vital signs, including blood pressure. and is recorded as being 160/120 with a pulse of 120 and respirations of 20. Staff 2 at 21:55 hrs. reportedly took a second set of vital signs. and is recorded as 160/110 with a pulse of 118 and respirations of 20. A physical exam reportedly performed by EMS "reveals negative shortness of breath, negative cyanosis, lung sounds clear, bilaterally, negative chest pain, abdomen soft in all four quadrants." Further history states that the patient had been "nauseous for one day, negative vomiting." My review of a taped record of the social conditions in the patient's home at that time revealed that he was under some significant duress, thereby rendering the recorded vital signs lacking in meaningful medical significance as it is well established that acute psychological and/or physical stress can raise blood pressure significantly. (1)

It would appear that the abdominal pain and nausea were of concern to EMS however, review of the audio record reveals that the hypertension was of greater concern. Despite this concern, it should be noted that a third blood pressure was not obtained during the subsequent 30 minutes with the patient arriving at hospital at 22:25 hours. The emergency medical technician's failure to document a stable or stabilizing blood pressure is unsafe. The standard of care is to repeat pressures of this nature with some frequency, usually 10 to 15 minutes.

During my review of the audiotape, and in my conversations with the patient, there is evidence that the patient did not want to be transferred for an evaluation at a hospital. Such refusal is within the patient's rights. If in fact, such a refusal has been voiced, EMS must either respect it or carefully document why it was not respected. Central to the action of intentionally overriding the patient stated desires is the demonstration that the patient is non compos mentis. That is, it must be documented that a condition was present wherein a person of average intelligence and reason would, given the situation, agree that transfer to a healthcare facility is an appropriate action. Alternatively, it must be demonstrated that imminent danger to life is present. Neither of these standards was met in evaluating the appropriateness of this patient's transfer to the Jamaica Hospital. This failure to respect and honor the patient's legitimate and appropriate desires initiated the chain of events that resulted in an unjustifiable hospital hospital admission.

**Part two**
Review services provided in the Emergency Department (ED) of the Jamaica
Hospital Medical Center, Jamaica, NY.

Time log:

| | | |
|---|---|---|
| EMS reported arrival: | 22:25 | 31OCT2009 |
| ED triage: | 23:03 | 31OCT2009 |
| ED MD: | 00:05 | 01NOV2009 |
| Medical eval. Completed | 00:14 | 01NOV2009 |
| Psychiatric consult called | 01:43 | 01NOV2009 |
| Seen by Psyche | 06:30 | 01NOV2009 |
| Report & xfer to Psyche ED | 06:58 | 01NOV2009 |
| Triage in Psyche ED | 13:44 | 01NOV2009 |
| Transfer to inpt Psyche | 14:06 | 03NOV2009 |

Blood Pressure
This patient's blood pressure (as well as abdominal pain) was of concern by the EMS
workers. Triage provided after arrival in the ED revealed a blood pressure of
139/80.  Over the course of this patient's care in the medical and psychiatric EDs,
his blood pressure remained stable.  It should be concluded that the hypertensive
readings obtained by the EMT workers were due to acute stress and without
underlying pathology.

Abdominal Pain
The EMT workers documented complaints of abdominal pain with nausea and
dizziness but without vomiting and diarrhea. In the ED, the attending physician,
apparently working from a template record, notes approximately 15 hours of mid-
epigastric discomfort, which is sharp, intermittent and improves without
intervention. The review of systems notes as negative both psychiatric and
gastrointestinal complaints.  The physical exam was essentially negative, including
the examination of the abdomen.  Laboratory evaluation included a CBC, pulse
oximmetry, lipase, amylase, and a comprehensive chemistry profile.  These
evaluations were all non-revealing.   The ED physician concluded that the patient
was stable from a gastrointestinal point of view and cleared the patient for
psychiatric evaluation.

 Psychiatric Evaluation
There is significant emergency medicine literature describing what medical
evaluations should be accomplished in the ED so as to be certain that a psychiatric
condition is clearly differentiated from a medical condition (2). Although it is not
common that such a condition is discovered in the ED there are obvious dire
consequences associated with placing a medically unstable patient on a psychiatric
ward. This standard evaluation includes the documented consideration of
conditions that may mimic a psychiatric condition but in fact be due to other causes.

Emergency Medicine Review, Schoolcraft v NYC  11AUG2014                    P3

My review of the documentation present reveals only that a CT scan of the head was ordered so as to rule out the presence of central nervous system lesions that could produce psychiatric-like presentation. This study was unrevealing. Not addressed was an evaluation for the presence of pharmacologic agents that could significantly alter this patient's mental status. In my experience, a drug screen is a standard part of this evaluation. These screens are commercially available and with simply a urine specimen can detect, among others, ethanol, hallucinogens, narcotics, sedatives and amphetamines. In general, the psychiatric evaluation does not occur until either the substances screened for are shown to be absent or the substances so identified as present would be reasonably expected to clear from the patient's body.

In my conversation with the Mr Schoolcraft, I specifically asked whether he had been able to provide a urine specimen. He answered to the affirmative. It does occasionally happen that a patient will not provide such a specimen, but in this case, that was not the instance. If fact, the chart documents that the toxicology screen was cancelled.

Progressing to the psychiatric aspect of the ED physician's duties, it is critical that the ED physicians convince themselves that a psychiatric emergency is present. That is, there needs to be a condition where the patient presents with historical or physical exam findings that would predict that the patient has a condition that rises to the standard of a substantial, immanent life threat to the patient or other persons. While it is true that not all psychiatric admissions need to rise to that standard, such as a voluntary admission where the patient perceives their schizophrenia is out of control, this standard must certainly be met for involuntary admissions. In that an involuntary admission clearly intrudes into the patient's civil rights, concordance by two healthcare professionals is critical. A documented conversation between the two healthcare professionals assures that details of the case are not omitted and that all facts are fully considered by the two professionals. In fact, in my opinion, and to a reasonable degree of medical certainty, this patient should have been released from the ED as it was never demonstrated in the record that he was of substantial risk of danger to self or others. In my practice, I involve not only a mental health provider but nursing staff as well. With three-part concordance I can be more certain that what I am about to do is the right thing for the patient.

Documentation present in the chart fails to demonstrate that the ED attending had independently evaluated this patient's psychiatric condition or discussed that evaluation with the psychiatric professional seeing this patient at the ED attending's request. This failure improperly deprived the patient of a complete evaluation that was critical to avoid an action that improperly deprived the patient of his civil rights.

Separately, there is some question as to how various providers in the ED became aware of the patients possible past psychiatric history. Not only may this have been a violation of the patient's rights under the HIPPA legislation, but it may have additionally tainted this patient's ED evaluation.

Emergency Medicine Review, Schoolcraft v NYC  11AUG2014                    P4

## Summary

Prehospital, there were concerns of hypertension and abdominal pain, which fairly
rapidly became nonissues after just a few hours in the ED.  Attention was fairly
rapidly turned to psychiatric issues. The ED attending failed in his duty to
appropriately evaluate this patient on two fronts. First, usual and customary
evaluations for conditions that may mimic a psychiatric presentation did not occur.
Secondly, the ED attending failed to accomplish and communicate an adequate
psychiatric evaluation on his own.  In my opinion, and to a reasonable degree of
medical certainty, there were significant failures of medical practice that led to an
action that intruded upon the patient's civil rights.


Dan Halpren-Ruder M.D., Ph.D.                    11AUG2014

References:

(1): Zimmerman RS and Frohlich ED Stress and hypertension: J Hypertens
Suppl. 1990 Sep;8(4):S103-7.

(2): www.njha.com_media_3107_Clearance ProtocolsForAcutePsyPatients.pdf

# R O B I N   A N D   D A N   H A L P R E N - R U D E R

| 40 Stimson Ave | 401-273-0822 (H) |
|---|---|
| Providence, RI  02906 - 3218 | 401-322-9040 (H) |
| Robin's EM: hris4@aol.com | Dan's EM: drdanhr@gmail.com |
| Robin's Cell: 401-339-0769 | Dan's Cell: 401-339-0771 |

# F A X   C O V E R   S H E E T

**DATE: 10 AUGUST 2014**

**TO:JOHN LENOIR**

**PHONE: 202-492-3739**

**FAX: 646-417-7245**

**RE: SPEEDCRAFT**

Number of pages including cover sheet: 5

## *Message*

Plz text to confirm receipt.

You can call me anytime to discuss -- 401-339-0771

### CONFIDENTIALITY NOTICE

The documents accompanying this facsimile transmission contain legally privileged and confidential information. The information is intended only for the use of the recipient named above.  If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or exploitation of, or the taking of any action in reliance on the contents of this facsimile, is strictly prohibited.  If you have received this facsimile in error, please notify us immediately by either the telephone or e-mail access noted above to arrange for return of the original documents to us at our expense. Our sincere apologies for any inconvenience this error may have caused.