UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                        Plaintiff,                        AFFIDAVIT

    -against-

                                                    10-CV-06005 (RWS)

THE CITY OF NEW YORK, et al.,

                        Defendants.
------------------------------------------------------------X

STATE OF NEW YORK
                ss.:
COUNTY OF NASSAU

        STEVEN MAURIELLO, being duly sworn, says:

        1.    I am a defendant in this action and am fully familiar with the matters at issue as they relate to the period of my service as Commanding Officer of the 81st Precinct in Bedford Stuyvesant, Brooklyn.

        2.    I submit this Affidavit in support of my motion for summary judgment seeking dismissal of the claims alleged against me by the plaintiff.

        3.    Adrian Schoolcraft was a member of the New York City Police Department, serving as a police officer in the 81st Precinct until his suspension on October 31, 2009.  Prior to his suspension, he was on restricted duty, without a shield or a right to possess a firearm.  He had been placed on restricted duty in April 2009 by the NYPD Medical Division for reason not disclosed to me or any other members of the service.

        4.    Neither Adrian Schoolcraft nor anyone on his behalf ever complained or expressed any objection to me or to anyone known to me about illegal quotas or crime misclassification.  He secretly recorded his time at work for

at least eighteen months, and I know of no mention by him in any of those recordings of illegal quotas or crime misclassification. I also know of no document in which he expresses any complaint or objection to me or anyone in my command about those subjects.

5. Any adverse treatment of Schoolcraft on the job that he might point to would have resulted from more closely monitoring him following his poor performance and below-standard evaluation for 2008, as discussed with him at a February 25, 2009, meeting. (SM Exhibit D.) Not long after that meeting, Schoolcraft was placed on restricted duty in April 2009, and was assigned to work at the telephone switchboard desk. Nothing about the way he was treated had anything to do with the claims he apparently later expressed regarding alleged illegal quotas and crime misclassification. I certainly know nothing of any alleged conspiracy to harm Schoolcraft or to violate his constitutional rights – on October 31, 2009, or at any other time.

6. On October 31, 2009, I arrived at the 81st Precinct as Schoolcraft was walking down to the locker room. I only learned later what had transpired regarding his decision to leave work early without permission, claiming to be sick. On his recording of his entire day tour on October 31, 2009, you can hear me saying hello to Schoolcraft as we passed each other as I was entering the precinct. (SM Exhibit Q at 7:20.30-7:20.40; SM Exhibit C, Mauriello Dep. p. 305, ll.13-17.)

7. On October 31, 2009, Captain Theodore Lauterborn was the Executive Officer of the 81st Precinct (the position below Commanding Officer in the chain of authority in a precinct.). He also was assigned for the day to be the

2

Duty Captain for Patrol Borough Brooklyn North (PBBN), which is a rotational assignment for Captains and above assigned to the precincts in the entire Brooklyn North area. (SM Exhibit AB.) Initially, Captain Lauterborn directed the response to Schoolcraft's early departure from work, and kept me informed.

8. Later in the evening of October 31, 2009, Chief Michael Marino, the Assistant Chief and Executive Officer of PBBN, now retired, came into my office and told me he wanted me to follow him out to Schoolcraft's residence in Queens, where Captain Lauterborn and members of the Special Investigations Unit of PBBN had gathered in an effort to locate Schoolcraft and determine his condition. According to the 81st Precinct Command Log, Chief Marino had spoken to me at approximately 8:35 p.m. (SM Exhibit AF, 81st Precinct Command Log; SM Exhibit C, Mauriello Dep p. 336:16-23.)

9. I arrived at the scene, driven by Lieutenant Crawford, who was familiar with the area, at approximately the same time as Chief Marino. Chief Marino was the highest ranking member of the NYPD at the scene and the person in charge of the scene for the NYPD.

10. Chief Marino directed that arrangements be made to have an Emergency Medical Services (EMS) unit (i.e., an ambulance) respond to Schoolcraft's residence, as well as an NYPD Emergency Services Unit.

11. Chief Marino decided at the scene that a "soft entry" should be made into Adrian Schoolcraft's apartment, apparently meaning that if Adrian Schoolcraft again did not respond to the knocks on his apartment door, we would enter without having ESU don helmets or any kind of body armor.

3

12.     At approximately 9:45 p.m., the following people climbed the interior stairs to gain entry with a key into Schoolcraft's second-floor apartment (the first entry): two officers from ESU, Chief Marino, me, Captain Lauterborn, the three officers from PBBN SIU (Gough, Hawkins and Duncan), followed by FDNY EMS Lieutenant Elise Hanlon, and then by two EMT's from Jamaica Hospital.

13. The ESU officers opened the apartment door with a key. They entered Schoolcraft's apartment first and spoke to him, asking first that he show his hands. After approximately a minute, Chief Marino spoke with Schoolcraft, and then after a little more than another minute, I was directed to speak to with Schoolcraft by Chief Marino, which I did for approximately 35 seconds, as follows:

> Mauriello: Adrian, what happened today?
> Adrian: I wasn't feeling well, I left.
> Mauriello: That's it? You weren't feeling well. Your sergeant told you to stay, right?
> Schoolcraft: No, she didn't say anything. She was talking on her cell phone.
> Mauriello: You got everybody worried, we are worried about your safety.
> Schoolcraft: Worried about what?
> Mauriello: What do you mean, worried about what? They tried calling you, everybody(s) been calling you. Captain Lauterborn's been calling, everyone has been calling you, your father has been calling you. You're not answering. We were worried about anything that happens. That's what we are worried about. God forbid. You just walk out of the precinct. I say hello to you today that was the last I saw you. You know, that's what we are worried about, your safety, your well-being.
> Schoolcraft: Alright, I'm fine.
> Mauriello: Well, you are going to come back to the precinct with us.
> Schoolcraft: Well…if I'm forced to. It's against my will.
> Mauriello: Against your will? OK Teddy [referring to Captain Lauterborn], you handle this.

(SM Exhibit S at 2:15-3:00.]

4

14. It appeared to me that Schoolcraft was agitated speaking to him, which is why I said "alright, Teddy you handle this." Having been in the apartment for only three minutes, I then immediately walked out of the bedroom, out of the apartment, down the stairs and out of the house on to the street, never to enter the building or the apartment again, never to speak or interact in any way with Schoolcraft again, and never to exercise any authority at the scene with respect to anything to do with Schoolcraft. I never had any physical contact with Schoolcraft and did not threaten him in any way.

15. Schoolcraft did not suffer any physical harm during the brief period I was in the apartment during the first entry, and when Schoolcraft walked out of the house at the end of the first entry there did not appear to be any indication of any harm having been suffered by him at all.

16. I did not see and do not know of any removal of Schoolcraft's papers or property during the brief period I was in the apartment during the first entry and I am unaware of any such removal during the remainder of the first entry or during the second entry.

17. From a distance out on the street, I saw Schoolcraft walk out of the house and toward the ambulance, and it appeared the situation had been resolved. Then, suddenly, Schoolcraft apparently turned around and headed back to his apartment. He was immediately followed by Chief Marino, Captain Lauterborn and the SIU crew (Duncan, Hawkins and Gough).

18. I did not speak to anyone who had been in the apartment before they followed Schoolcraft back inside. I did not direct anyone to do anything, and I did not follow plaintiff back to the apartment or take any other

action when plaintiff headed back to the apartment, other than to wait outside on the street pending further developments. I never re-enter the apartment.

19. I was not consulted and did not express an opinion on whether plaintiff should be suspended. I was not present when plaintiff was suspended. I was not consulted about and did not express an opinion on whether plaintiff should be declared an emotionally disturbed person (EDP). I was not present when plaintiff was declared an EDP. I did not arrest Schoolcraft, never directed anyone to arrest him, and was not present when, if ever, he was placed under arrest. I was not present when plaintiff was handcuffed, and had not directed anyone to apply handcuffs. Finally, I did not direct or participate in the alleged forcible removal of plaintiff from his apartment after the second entry.

20. I waited outside of the house until I saw everyone exit the house with Schoolcraft being carried in a chair to the ambulance, and then I returned to the 81st Precinct for the formal, recorded interviews of Sergeant Huffman and P.O. Rodriguez, who had witnessed Schoolcraft's early departure from work without approval.

21. I never went to Jamaica Hospital and never spoke to anyone at Jamaica Hospital.

22. I was unaware of the efforts of the Brooklyn North Investigations Unit (BNIU) or any other NYPD unit to contact Schoolcraft upstate.

23. Throughout the events of October 31, 2009, I was acting at all times in the normal course of my duties and in furtherance of the NYPD's interests.

6

WHEREFORE, it is respectfully requested that the Court grant summary judgment dismissing the claims asserted against me in the Second Amended Complaint, and awarding such other relief to me as the Court deems just.

_____
Steven Mauriello

Sworn to before me this

22nd day of December, 2014

_____
Notary Public

WALTER A. KRETZ, JR.
Notary Public, State of New York
No. 02KR4945274
Qualified in Suffolk County
Commission Expires 02/03/17