SM Exhibit B

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------X
    ADRIAN SCHOOLCRAFT,
3
                                    PLAINTIFF,
4             -against-            Case No:
                                   10 Civ. 6005
5                        (RWS)

6   THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
    Tax Id. 873220, Individually and in his Official
7   Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
    NORTH GERALD NELSON, Tax Id. 912370, Individually
8   And in his Official Capacity, DEPUTY INSPECTOR
    STEVEN MAURIELLO, Tax Id. 895117, Individually and
9   In his Official Capacity, CAPTAIN THEODORE
    LAUTERBORN, Tax Id. 897840, Individually and in his
10  Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
    919124, Individually and in his Official Capacity,
11  SGT. FREDERICK SAWYER, Shield No. 2576, Individually
    and in his Official Capacity, SERGEANT KURT DUNCAN,
12  Shield No. 2483, Individually and in his Official
    Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
13  915354, Individually and in his Official Capacity,
    LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
14  Individually and in his Official Capacity, SERGEANT
    SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
15  #1-50, Individually and in their Official Capacity
    (the name John Doe being fictitious, as the true
16  names are presently unknown) (collectively referred
    to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
17  CENTER, DR. ISAK ISAKOV, Individually and in his
    Official Capacity, DR. LILIAN ALDANA-BERNIER,
18  Individually and in her Official Capacity and
    JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
19  DOE" # 1-50, Individually and in their Official
    Capacity (the name John Doe being fictitious, as
20  The true names are presently unknown),

21                                  DEFENDANTS.
    ------------------------------------------------X
22

23                      DATE: October 11, 2012

24                      TIME: 10:20 A.M.

25  (Continued  ...)
```

2

1

2                              DATE: October 11, 2012

3                              TIME: 10:20 A.M.

4

5

6                    VIDEOTAPED DEPOSITION of the

7    Plaintiff, ADRIAN SCHOOLCRAFT, taken by the

8    Respective Parties, pursuant to a Notice and

9    to the Federal Rules of Civil Procedure, held at

10   the offices of the New York City Law Department,

11   100 Church Street, New York, New York 10007, before

12   Nathan MacCormack, a Notary Public of the State of

13   New York.

14

15

16

17

18

19

20

21

22

23

24

25

A. SCHOOLCRAFT

1          I believed -- you know, something as small as

2     handwriting, behavior, how you conduct yourself out in

3     public and with your colleagues.  There's numerous -- I am

4     not a supervisor.  I am sure there are numerous things to

5     consider when evaluating your personnel, not an illegal

6     quota policy that pressures police officers into harassing

7     the public.

8          Q.    Did there come a time when you were placed on

9     level one performance monitoring?

10         A.    I wasn't aware of it, no.

11         Q.    You were never told that you were placed on level

12    one performance monitoring?

13         A.    To the best of my memory, I believe there was a

14    meeting with Captain Lauterborn, where he mentioned

15    performance monitoring.

16          But I was aware that I would have to be aware of

17    that through paperwork.  A supervisor would have to

18    actually sit down with me and tell me what level I was on.

19    And no, I don't believe I was officially placed on any type

20    of monitoring.

21         Q.    When was that conversation you had with Defendant

22    Lauterborn?

23         A.    I don't recall exactly when.  But I -- I believe

24    it was early 2009, February, maybe, February.

25         Q.    What exactly did Defendant Lauterborn tell you at

A. SCHOOLCRAFT

1    that meeting?

2       A.    I don't recall the specific conversation, but I

3    believe it's on a recording.

4       Q.    Did he tell you that you were going to be placed

5    on performance monitoring?

6       A.    I don't recall specifically what he said during

7    that conversation, but again, it's recorded.  Everything he

8    says, I think is -- I think you can hear.

9       Q.    Why did he tell you were going to be placed on

10   performance monitoring?

11              MR. NORINSBERG:  Objection.

12      A.    Again, the recording probably tells the whole

13   story.  He probably says why, if he does.  If he doesn't, I

14   don't know.

15      Q.    Do you recall -- based on your recollection, not

16   based on the recording -- what Defendant Lauterborn told

17   you about the reason for placing you on performance

18   monitoring?

19      A.    I would have to actually review the recording.

20      Q.    You don't have any recollection here today?

21      A.    At this moment, off the top of my head, no.

22      Q.    Have you ever told another officer that you were

23   on performance monitoring?

24      A.    I don't believe so, no.

25      Q.    Did there come a time when you reported alleged

A. SCHOOLCRAFT

1    misconduct in the 81st Precinct to the Quality Assurance

2    Division, or Q.A.D.?

3        A.    Yes.

4        Q.    When did you first approach Q.A.D. about the

5    alleged misconduct you observed?

6        A.    I was called in.  I believe it was either

7    September or October, 2009.  Q.A.D. had contacted me, and

8    they wanted to have what was called a GO-15 questions; I

9    believe that's the term, GO-15.

10       Q.    So you did not contact Q.A.D., yourself?

11       A.    I returned their message.  But I did not contact

12   Q.A.D. myself, no.

13       Q.    Do you know why Q.A.D. contacted you?

14       A.    It was based -- I think it came down from

15   Internal Affairs.

16       Q.    Did you contact Internal Affairs about the

17   alleged misconduct you had observed?

18       A.    To the best of my memory, I recall talking to

19   Internal Affairs, yes.

20       Q.    When did you first talk to Internal Affairs?

21       A.    I would say Summer, 2009.

22       Q.    This was after the meeting with Defendant

23   Lauterborn, about placing you on performance monitoring?

24       A.    I believe so, yes.

25       Q.    Why did you approach I.A.B.?

A. SCHOOLCRAFT

1    A.    It wasn't any one specific thing.  It was -- I

2    became concerned about the tampering with evidence of

3    crimes; with regard to the crime reports, supervisors were

4    changing the -- either the summary or the actual

5    designation of that -- of that summary.

6          I believe I told them about the quota, and the

7    falsifying the training logs, the falsifying the training

8    in general.  I believe that's all that I told them.

9    Q.    How did you contact them?

10   A.    To the best of my memory, it was -- again, they

11   contacted me.  I had reached out for help to a retired

12   police officer, and he contacted someone that he believed

13   was Internal Affairs.

14   Q.    So you did not contact I.A.B. directly,

15   initially?

16   A.    Correct.  I returned their messages and

17   cooperated with whatever they asked, to the best, at that

18   time, of what I had.

19   Q.    What is the name of the retired the N.Y.P.D.

20   officer that you contacted?

21   A.    David Durk.

22   Q.    How did you know David Durk?

23   A.    I didn't know him.  He wrote a book, I believe

24   the book I was reading out of was called The Crusader.

25   Q.    Why did you contact him?

A. SCHOOLCRAFT

1   misconduct in the 81st Precinct, and answering her

2   questions.  I don't recall if she asked questions about

3   when I was a child and stuff.  I can't remember every

4   question she asked.

5          But I recall getting into the misconduct and the

6   81st Precinct and the stress it was causing on officers.

7   Q.     What happened as a result of your examination by

8   Dr. Lambstein?

9   A.     As a result, right after that examination, I was

10  modified slash restricted.

11  Q.     What do you understand "modified and restricted"

12  to mean?

13  A.     It was never explained to me.  What I did know

14  is, your gun and shield is removed.  And you are -- but I

15  never received any instruction on what I was, other than

16  other than a restricted or modified police officer.

17  Q.     How many guns did you own or possess in April of

18  2009?

19         MR. NORINSBERG:  Objection.

20  A.     To the best of my recollection, I owned two.

21  Q.     As a police officer, were you required to inform

22  the N.Y.P.D. of all guns that you owned?

23  A.     Yes, I believe so.

24  Q.     Did you inform the N.Y.P.D. of all of the guns

25  that you owned in April of 2009?

A. SCHOOLCRAFT

1    A.    I believe so, yes.

2    Q.    Were all of your guns legally registered?

3    A.    I assumed, through department channels, yes.

4    Q.    When you say that your gun and shield were taken

5    away, were you required to turn in all of your guns?

6    A.    Yes.

7    Q.    Did you return all of your guns?

8    A.    Yes.

9    Q.    So as of October, 2009, you did not have any guns

10   in your possession?

11   A.    I had -- I was made aware that -- my father

12   reminded me that I had his rifle in my apartment, yes.

13   Q.    So you had -- you owned two guns in April of

14   2009.  Did you have possession of your father's gun at the

15   time?

16   A.    Yes.  I had possession.  But again, I forgot

17   about it until he reminded me October 31, 2009.

18   Q.    Where was that gun kept in your apartment,

19   between April 2009 and October of 2009?

20   A.    To the best of my memory, it was between a shelf

21   and a wall inside the living room.

22   Q.    So it was not in plain view?

23   A.    I mean, you could see the case.  To the best of

24   my memory, I think you could see the case.

25   Q.    Was it your understanding that you were supposed

A. SCHOOLCRAFT

1    to turn in all guns in your possession, or just all guns

2    you owned?

3        A.    It was my understanding, all the guns I owned.

4        Q.    So in your understanding, you were allowed to

5    possess other people's guns, but not your own?

6                MR. NORINSBERG:  Objection.

7        A.    It was my understanding that they -- they were

8    only asking for the guns that I own, correct.

9        Q.    Do you believe that defendant -- sorry, strike

10   that.  Is it your belief that any of the defendants

11   consulted with Dr. Lambstein before her decision to remove

12   your gun and shield?

13               MR. COHEN:  Objection.

14       A.    I am not aware of that happening, no.

15       Q.    Did Dr. Lambstein ever tell you that she

16   discussed your allegations with any of the defendants?

17       A.    If she did, I don't recall.

18       Q.    Did Dr. Lambstein ever tell you why your weapons

19   were taken away?

20       A.    To the best of my memory, she said it was because

21   of the chest pains.

22       Q.    What chest pains are you speaking of?

23       A.    Around that time, that's -- I think that's why I

24   went and saw my internist.  It's the same time period, I

25   was experiencing minor chest pains.

A. SCHOOLCRAFT

1    Q.    And you went to see your internist for these
2  chest pains?
3    A.    I believe that's -- that's at least one of the
4  reasons.  It would be approximately around that time.
5    Q.    How were you treated by your internist for those
6  chest pains?
7    A.    I think -- I think you said I was excused for a
8  week.  I believe -- you said "rest."  If there was anything
9  else, I don't recall.
10   Q.    Did he tell you that you had a heart condition?
11   A.    I don't remember him saying "a heart condition."
12   Q.    Did he give you any specific diagnosis?
13   A.    He may have.
14   Q.    Do you recall what that diagnosis is?
15   A.    No.  Not off the top of my head, no.
16   Q.    Did Dr. Lambstein ever tell you how you could
17 regain your weapons?
18   A.    I don't recall her ever saying when or how I
19 would be taken off of restriction or modification.
20   Q.    Did she tell you to go see one someone for talk
21 therapy?
22   A.    I remember her referencing a couple books, and I
23 purchased those books.  And she kept referencing anger, and
24 I said the issues were not anger.  It's possible.  Talk
25 therapy doesn't sound familiar, no.

A. SCHOOLCRAFT

1    Q.    Did she tell you to go speak to someone about

2    your issues?

3    A.    It's possible, but it wasn't -- I don't think I

4    understood exactly who I was supposed to go see.

5    Q.    Did she ever make any recommendations of somebody

6    to go see?

7    A.    It's possible.  I believe in October, 2009, I

8    finally expressed that I was -- that I wanted to know why I

9    was on modification -- or modified, restricted.

10         And -- and I believe, I recall her -- or she said

11   she was going to send me a list of names, or she gave me a

12   list of names.

13   Q.    Did you go see someone?

14   A.    I don't -- I don't believe so, no.

15   Q.    Why not?

16   A.    I didn't -- again, until she -- if she ever gave

17   me the list, I wasn't aware of who I was supposed to go see

18   or what the -- what they wanted to do.

19   Q.    Did you want to get your guns back?

20   A.    I wanted to go back to the normal duty.  I wasn't

21   concerned about the gun.  I was concerned about being a

22   patrolman again, and --

23   Q.    Could you work as a police officer without a gun?

24   A.    I don't -- in -- police officers are faced with

25   dangerous situations, sometimes.  And in order to defend

A. SCHOOLCRAFT

1    themselves and the public, I do believe a gun is necessary.

2            But I believe no, not as a patrolman out on the

3    street, in patrol car, on foot post; that doesn't seem

4    right, no.

5      Q.    What jobs can an officer perform in the

6    81st Precinct without a shield or gun?

7               MR. NORINSBERG:  Objection.

8      A.    I am not aware of any jobs that they can't

9    perform.

10              THE REPORTER:  That they can't perform?

11     A.    That they can't perform, unless they are disabled

12   in some way.  I think you can be modified if you are

13   disabled, too.

14     Q.    Who was your direct supervisor on October 31,

15   2009?

16     A.    Whoever the desk sergeant was, I believe would be

17   my direct supervisor.

18     Q.    Is it common practice for supervisors to review

19   the memo books of police officers?

20     A.    I believe it's common for supervisors to review

21   memo books for police officers on patrol, not assigned in

22   precinct.

23     Q.    What is it called when a supervisor reviews the

24   memo book of a police officer?

25     A.    It's referred to as a scratch.

A. SCHOOLCRAFT

1    Q.    Were you aware that as a police officer, your

2    memo book would be scratched by a supervisory officer in

3    October of 2009?

4               MR. NORINSBERG:   Objection to the form.

5    A.    I am aware it was.  I didn't -- I wasn't aware

6    that it would be, no.  I didn't expect it to be, either.

7    Q.    Why not?

8    A.    Because I was assigned to the precinct, assigned

9    inside the precinct.

10   Q.    From April 2009 until October 31, 2009, was your

11   memo book ever scratched?

12   A.    I don't believe so, no.

13   Q.    Did you include notations about your

14   conversations and meetings with I.A.B. and Q.A.D. in your

15   memo book?

16   A.    I believe they were, yes.

17   Q.    Did you believe it was your duty as an N.Y.P.D.

18   officer to document corruption and other misconduct?

19   A.    Yes.

20   Q.    The incident you complain of in your lawsuit

21   occurred on October 31, 2009; is that correct?

22   A.    What was the question, again?

23   Q.    The incident that you complain of in your lawsuit

24   occurred on October 31, 2009; is that correct?

25   A.    Correct, one of the incidents.

A. SCHOOLCRAFT

1    Q.    What time did you wake up in the morning of

2  October 31, 2009?

3    A.    I don't recall any specific time; early morning.

4    Q.    How did you feel that day?

5    A.    I don't recall exactly, but it's hard to

6  determine that early in the morning.  I was used to working

7  nights.  Probably, if I was -- probably a little under the

8  weather.

9    Q.    How was your health in the two weeks prior to

10  that day?

11    A.    To the best of any knowledge, I don't recall any

12  problems.

13    Q.    So you woke up feeling under the weather?

14    A.    I am sure just waking up, a little groggy;

15  October, probably a little cool out.  But to the best of my

16  memory, I think that -- that day, I felt a little fluey, a

17  little under the weather.

18    Q.    Did you have any alcohol the day before?

19    A.    No.

20    Q.    Did you have any alcohol on October 31, 2009?

21    A.    No.

22    Q.    Did you take any medication on October 30, 2009?

23    A.    Over-the-counter.  When I returned home, I recall

24  having a dose of NyQuil.

25    Q.    On October 30, 2009?

A. SCHOOLCRAFT

1     A.     I'm sorry, October 31, 2009.

2     Q.     On October 30, 2009, the day before the incident,

3   did you have any medication?

4     A.     I don't believe so, no.

5     Q.     On October 31, 2009, you just mentioned that you

6   had NyQuil; is that correct?

7     A.     Correct.

8     Q.     Did you take any other medication on October 31,

9   2009?

10    A.     I don't believe so, no.

11    Q.     What time did you arrive at work on October 31,

12  2009?

13    A.     To the best of my memory, around 6:00 or 7:00.

14    Q.     And what was your tour that day?

15    A.     It was a day tour.

16    Q.     So what are the hours of the day tour?

17    A.     To the best of my memory, it begins somewhere

18  between 6:00 and 7:00, or 7:00 and 8:00.

19    Q.     What was your assignment on October 31, 2009?

20    A.     To the best of my recollection, it was -- I

21  recall working the telephone switchboard operator.  I don't

22  recall specifically what I was assigned on paper, though.

23    Q.     Your Complaint states that you were often sought

24  out by other police officers for your sound judgement, and

25  handling difficult work situations; is that correct?

A. SCHOOLCRAFT

1    A.    I was concerned that my safety and well-being was

2    -- I was concerned with my safety and well-being, the way

3    that he was behaving.

4    Q.    What, specifically, about your safety were you

5    concerned about?

6    A.    Specifically, my safety and well-being, my person

7    being harmed.

8    Q.    Were you afraid that he was going to injure you?

9    A.    I don't recall any specific -- any specific thing

10   that I thought he would do to me.  I was just concerned,

11   and I felt it was appropriate to remove myself from that

12   situation.

13   Q.    Is there a procedure for leaving work early?

14   A.    Other than notifying your supervisor, I am not

15   aware of -- I guess it depends on what -- why you are

16   leaving.

17   Q.    Have you ever been disciplined for not following

18   sick leave procedures before?

19   A.    I don't believe so.  It's possible, probably;

20   it's a complicated procedure.

21   Q.    How is it complicated?

22   A.    There's -- it's like six pages.  But as far as

23   being at work and notifying anyone else, other than your

24   immediate supervisor, regarding that situation, I am not

25   aware of any other steps.

A. SCHOOLCRAFT

1    Q.    Did you follow the procedure for leaving work

2  early on October 31, 2009?

3    A.    I believe so, yes.

4    Q.    Whom did you ask to leave early?

5    A.    I believe her name was Sergeant Huffman,

6  something like that.

7    Q.    How did you ask her to leave early?

8    A.    I informed her -- I believe I told her I had an

9  upset stomach, and I gave her a -- a slip with my -- with

10  all my information on it; my name, my address where I would

11  be.  And I told her "I don't feel well."  And I turned in

12  all the paperwork I was involved with.  And that was it.

13    Q.    What paperwork did you give her?

14    A.    Referring to what I was working on, or the slip?

15    Q.    What did you give her?

16    A.    I gave her -- it's referred to as a sick slip.  I

17  am not sure the exact form number, but the slip is what

18  officers fill out when they go sick.

19    Q.    Did you give her other documents at the same time

20  you gave the sick slip?

21    A.    I don't recall giving her any specific other

22  documents that I gave her at that time, no.

23    Q.    Did Sergeant Huffman tell you that you cannot

24  leave unless you wanted lost time?

25    A.    I believe she said something to that effect.  And

A. SCHOOLCRAFT

1    I said "lost time is fine," to the best of my memory, "lost

2    time is fine."  But then I think she said the lost time had

3    to be authorized.

4          And I didn't feel the lost time would have been

5    authorized.  I preferred -- I was feeling under the

6    weather, and I preferred to go regular sick.

7        Q.    But you recall agreeing to lost time?

8        A.    I don't recall agreeing to lost time.  It's

9    possible, if that was -- if she would have allowed it, then

10   I would have agreed to it.  But I didn't feel lost time

11   would have been granted.

12       Q.    So when she said you can take lost time, what did

13   you say to her?

14       A.    It would be something to the effect, "That's

15   fine."

16       Q.    Did you speak with Police Officer Yadira

17   Rodriguez, after you asked to leave work early?

18       A.    I don't recall speaking to Yadira Rodriguez, no.

19       Q.    Do you recall speaking with Police Officer Craig

20   Rudy after you asked to leave work early?

21       A.    I don't recall any specific conversation with any

22   officers.

23       Q.    Did you believe that you were leaving work early

24   against the orders of Sergeant Huffman?

25       A.    No.  I didn't believe that, no.

A. SCHOOLCRAFT

1    A.    I turned on the recording when I heard the key.

2    And when it became -- that they were either attempting to

3    come in or they were coming.

4    Q.    Where was the recording device?

5    A.    It was -- it was on a shelf, next to my bed.

6    Q.    How many officers entered your apartment at that

7    time?

8    A.    Over a dozen.

9    Q.    Do you know the names of the officers who entered

10   your apartment?

11   A.    Not all of them.

12   Q.    Please tell me the names of the officers that you

13   know, that entered your apartment at that time.

14   A.    I recognized Chief Marino, Deputy Inspector

15   Mauriello, Captain Lauterborn.  And off the top of my head,

16   I don't recall the others, if I knew their names at that

17   time.

18   Q.    Please describe the other officers who were

19   present at that time.

20   A.    There were at least two Emergency Service Unit

21   officers, at least one chief in uniform, there were -- it

22   seem like they were more plainclothes, wearing slacks and

23   button-ups, business attire.  That's the best of my memory.

24   Q.    What did the E.S.U. officers look like?

25   A.    They were in -- their full entry gear,

A. SCHOOLCRAFT

1  flashlight, guns out.

2    Q.    Were they male?

3    A.    I believe both of them were male.

4    Q.    What race were the officers?

5    A.    I believe they were White, they appeared to be

6  White.

7    Q.    What color hair did the E.S.U. officers have?

8    A.    I don't -- I don't specifically recall the color

9  of their hair.

10    Q.    How tall were they?

11    A.    One was taller than the other, I remember that.

12  But I don't recall any way to judge their height.

13    Q.    Were there any distinguishing features about

14  these two officers?

15    A.    After the light was shined in my eyes, my eyes

16  weren't -- for a few minutes, they weren't -- I didn't

17  recall -- I was concerned about the guns.

18        And eventually they re-holstered their guns.

19  And -- but I don't recall, at this time, any specific

20  details on those specific officers.

21    Q.    What kind of guns did they have?

22    A.    It was sidearms, pistols.

23    Q.    Do you know what make and model?

24    A.    I don't believe so, no.

25    Q.    Did you recognize the chief that entered the

A. SCHOOLCRAFT

1    Q.    You have listened to that recording.  Could you
2  hear what was being said on the recording?
3    A.    I don't believe I have heard what was being said
4  on the recording.
5    Q.    Which EMT took your blood pressure?
6    A.    The male.
7    Q.    Did you agree to go to the hospital at any time?
8    A.    Yes.
9    Q.    Why did you agree to go to the hospital?
10   A.    I felt it would be safer than where I was.  I
11  felt, possibly, the hospital would be a safer place, in
12  public view.  And it would -- it would get all of those
13  police supervisors out of my home.  I thought they would
14  leave.
15   Q.    What happened after you agreed to go to the
16  hospital?
17   A.    To the best of my memory, I followed EMS
18  downstairs, we walked outside towards the ambulance, a male
19  in a white shirt -- a white police uniform shirt approached
20  the male EMS as we were walking toward the ambulance.
21        And he stated in some manner, he said "Jamaica?"
22  And the male EMS stated "Yeah."  At that moment, I RMA'd,
23  refused medical attention to the female, who was behind me.
24  And I walked back to my home.
25   Q.    Could you describe the white shirt police

A. SCHOOLCRAFT

1   officer.

2      A.    He was male, wearing a uniform hat.  And I don't

3   believe I had ever seen him before.

4      Q.    How tall was he?

5      A.    He was about the same height as the EMS, male

6   EMS.

7      Q.    Approximately how tall was the EMS, male?

8      A.    I don't recall.  They were about -- approximately

9   the same size.

10      Q.    Taller than you?

11      A.    I don't believe they are -- they were taller than

12   me, no.

13      Q.    Why did you refuse medical attention?

14      A.    I wasn't familiar with Jamaica Hospital.  I was

15   familiar with Forest Hills Hospital, and I believed I had

16   the right to choose which hospital I could go to.

17          And I believe that was the police department's

18   intent, to convince the personnel that that's the hospital

19   they wanted me to go to.

20      Q.    Why did you believe that?

21      A.    The way they were communicating with each other,

22   I didn't feel it was appropriate that EMS was sharing

23   medical information with them.  I felt there was no -- I

24   don't even feel the exam was that objective.

25          I just didn't -- I just didn't feel safe going

A. SCHOOLCRAFT

1     A.     Yes.

2     Q.     Was anything removed from your memo book when he

3    gave it back to you?

4     A.     I don't believe so.  I reviewed it.  If there was

5    anything missing, I don't recall being aware of it.

6     Q.     Was your memo book defaced in any manner when you

7    got it back?

8     A.     There were certain pages with -- I don't know

9    about "defaced," but there were pages with certain notes on

10   them regarding corruption or misconduct that were

11   earmarked.  They were bent in the corner, or folded over.

12    Q.     Were any of your notes blacked out?

13    A.     I don't recall anything being blacked out.

14    Q.     So Defendant Caughey did not destroy any evidence

15   in your memo book; is that correct?

16    A.     I don't know.  I don't recall how carefully I

17   reviewed the memo book.  I only had it for -- I believe

18   that memo book is with Internal Affairs investigators right

19   now.  I don't recall anything being blacked out.  I just

20   remember the pages, certain pages were folded.

21    Q.     Did any defendant ever tell you not to speak to

22   the media?

23    A.     Not in those exact words, no.

24    Q.     Did they tell you in any words, not to speak to

25   the media?

A. SCHOOLCRAFT

1    A.    Not in any explicit words, no.

2    Q.    Did they tell you in any implicit manner?

3    A.    Yes.

4    Q.    How?

5    A.    The home invasion, Halloween night.  And

6    following that, following my suspension, they continued

7    to -- they drove hundreds of miles to bang on my door,

8    question my neighbors, photograph me outside -- from

9    outside, inside my apartment.  And I took that as --

10   Q.    Did any defendant ever tell you not to speak to

11   the media?

12               MR. NORINSBERG:  Objection.

13   A.    Not in words, no.

14   Q.    You claim that the defendants forced you to move

15   upstate; is that correct?

16   A.    Well, I had no other option of where to go.  I

17   felt safer upstate, the farther -- I felt that was far

18   enough away, out of their jurisdiction, that I wouldn't

19   be -- Halloween night 2009, wouldn't happen again.

20   Q.    When did you move upstate?

21   A.    It was maybe a week -- two weeks after being

22   released.

23   Q.    You claim that the officers' visits to upstate

24   New York were to silent, harass, and/or otherwise harm you

25   and your father; is that correct?

# ORIGINAL

1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------X
      ADRIAN SCHOOLCRAFT,
 3                                      PLAINTIFF,

 4              -against-        Case No.:
                                10 CV 6005
 5
      THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
 6    MARINO, Tax ID. 873220, Individually and
      in his Official Capacity, ASSISTANT CHIEF
 7    PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
      Tax Id. 912370, Individually and
 8    in his Official Capacity, DEPUTY INSPECTOR
      STEVEN MAURIELLO, Tax Id. 895117, Individually
 9    and in his Official Capacity, CAPTAIN THEODORE
      LAUTERBORN, Tax Id. 897840, Individually and
10    in his Official Capacity, LIEUTENANT WILLIAM
      GOUGH, Tax Id. 919124, Individually and
11    in his Official Capacity, SGT. FREDERICK SAWYER,
      Shield No. 2567, Individually and
12    in his Official Capacity, SERGEANT KURT DUNCAN,
      Shield No. 2483, Individually and
13    in his Official Capacity, LIEUTENANT CHRISTOPHER
      BROSCHART, Tax Id. 915354, Individually and
14    in his Official Capacity, LIEUTENANT TIMOTHY
      CAUGHEY, Tax Id. 885374, Individually and
15    in his Official Capacity, SERGEANT SHANTEL JAMES,
      Shield No. 3004, Individually and
16    in his Official Capacity, and P.O.'s "JOHN DOE"
      #1-50, Individually and in their Official Capacity,
17    (the name John Doe being fictitious, as the true
      names are presently unknown)(collectively
18    referred to as "NYPD Defendants"), JAMAICA
      HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
19    Individually and in his Official Capacity,
      DR. LILLIAN ALDANA-BERNIER, Individually and
20    in her Official Capacity, and JAMAICA HOSPITAL
      MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
21    Individually and in their Official Capacity,
      (the name John Doe being fictitious, as the
22    true names are presently unknown),

23                                      DEFENDANT.
      ------------------------------------------X
24

25    (Continued... )
```

2

1                    DATE: SEPTEMBER 26, 2013

2                    TIME: 10:10 A.M

3

4          VIDEO DEPOSITION of the Plaintiff, ADRIAN

5     SCHOOLCRAFT, taken by the respective parties, pursuant to a

6     Court Order and to the Federal Rules of Civil Procedure,

7     held at the offices of Scoppetta, Seiff, Kretz &

8     Abercrombie, Esqs, 444 Madison Avenue, New York New York,

9     10022 before Elizabeth Forero, a Notary Public of the State

10    of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SCHOOLCRAFT

1    Q.    We will get to that.

2    A.    I am sorry if I went off.  You cut me off.  I

3    just wanted to -- and also I didn't exactly know -- I had

4    never been to QUAD before.  I don't think I ever heard of

5    QUAD before IAB contacted me.  So I think -- um -- I --

6    there was just -- I didn't feel comfortable contacting my

7    unit.  I didn't know who to contact around me because

8    basically I was reporting misconduct inside the precinct.

9    I didn't really trust my union or union delegates for that

10   fact.  He was the only person I really trusted.

11   Q.    How is it that it came about that you and QUAD

12   were in touch with each other?

13              MR. SMITH:  Object to form.  You can answer.

14   A.    It is my understanding if someone makes a

15   complaint police officer, civilian, it enters a complaint

16   system of some kind.  It may not start at IAB.  It may

17   start at QUAD.  But then QUAD will say, this is my

18   understanding now.  I didn't know at the time.

19   Q.    I am asking how did you get in touch with QUAD?

20   If that is your answer, fine.

21   A.    I will make it short.  I will tell you the

22   sequence of events.  A retired police lieutenant contacted,

23   I don't believe he referred him to as a friend at that

24   time, he may have, but he contacted a Captain Brandon

25   Delposo, who I believe was assigned to IAB at the time.

A. SCHOOLCRAFT

1   And then based on what that retired lieutenant told him, I

2   was contacted by IAB.  And then whatever I told IAB either

3   all of it or some of it, was then applied to QUAD what they

4   handle, what they investigate.  I don't really know what

5   the difference is.

6       Q.      You were contacted by QUAD?

7       A.      Correct.

8               MR. SMITH:  Please let him ask a whole

9               question.  It is not like normal conversation.

10              He gets to ask his whole question.  You get to

11              hear it.  I get to object if I want to.  It is

12              not like normal conversation.  Go ahead.

13      Q.      Your initial contact with IAB, was that initiated

14   by you or IAB?

15              MR. SMITH:  Object to form.

16      A.      The very first conversation I had I believe his

17   name was Lieutenant Brill from QUAD he was calling me.

18      Q.      I am asking you about IAB now.

19      A.      I am sorry.  I thought you said QUAD.  IAB called

20   me I want to say it was August 2009 or early September

21   2009.  I don't remember ever meeting one in person.

22      Q.      What did IAB call you about?

23      A.      I don't remember how it started, but it was, I

24   think off the top of my head, I recall a little bit what I

25   told them, but they were calling me.  I'm assuming what the

A. SCHOOLCRAFT

1  retired lieutenant told his IAB contact, was why they were

2  contacting me.

3      Q.    Had you filed a complaint with IAB?

4      A.    I don't know if, oh, well, yeah, there was a 49 I

5  gave IAB regarding Lieutenant Coy and Sergeant Weiss.

6      Q.    Did that precede the contact that this retired

7  captain, I think you said, retired lieutenant, had made to

8  IAB?

9      A.    We're right in the -- I would have to look at

10  dates -- we are right in same, I think that was August

11  September.

12     Q.    So as you sit here today, you don't know the

13  sequence of events whether you filed a complaint with IAB

14  before this person contacted IAB on your behalf?

15            MR. SMITH:  Objection to form.

16     A.    I don't believe I know exactly when he contacted.

17     Q.    Did you ask that person to contact IAB on your

18  behalf?

19     A.    No.

20     Q.    Who was that?

21     A.    Retired Lieutenant David Durk.

22     Q.    Do you refer to him as an uncle?

23     A.    I may have to one of the IAB investigators when

24  he asked me who I reached out to.

25     Q.    Did you have a close personal relationship with

A. SCHOOLCRAFT

1          answer.

2     Q.    To the 81.

3     A.    I don't how he would become aware, but I believe

4     he was aware that there may be people questioned over that

5     incident.

6     Q.    By there was no mention of the incident?

7           MR. SMITH:   To whom?

8     Q.    By Coy in the memo, by anyone else, there was

9     never any indication explicitly from anybody that you sent

10    a complaint to IAB?

11    A.    Correct.

12    Q.    Because of the timing of it, you are assuming he

13    must have found out?

14    A.    Correct.

15          MR. SMITH:   And the contents.

16    Q.    Have you since learned whether Coy had been told

17    about your complaint to IAB as of that date?

18    A.    I have no knowledge of that.

19    Q.    Did there come a time, when you where first

20    contacted by QUAD, did you then tell anybody about it?

21    A.    I may have told the QUAD investigators but I am

22    not sure.

23    Q.    I am sorry.  Did you tell anybody you had been

24    contacted by QUAD?

25    A.    I didn't tell anyone, no.

167

A. SCHOOLCRAFT

1    Q.    Did you tell your father?

2    A.    I don't recall -- no, my father knew. I don't

3  recall knowing -- but I believe there was a notification in

4  the telephone log. It was actually documented. I believe

5  that's where it was that QUAD was calling the precinct and

6  giving me a notification for roll call to send me, to

7  assign me a day to go down there.

8    Q.    That notification came in?

9    A.    Correct, I was notified.

10   Q.    But no mention of what the reason was?

11   A.    That it was a GO15 or something like that.

12   Q.    Did you ever tell anyone you were called down to

13  QUAD as a result of the issues you had raised with IAB?

14   A.    I don't recall telling anyone but I recall

15  officers, I believe, Officer Santana was a -- she got a

16  notification. She approached me about it. I don't know if

17  she read it out of the message log, but she told me, she

18  asked me what is this and where is this, directions was

19  what she was seeking. I think I referred to QUAD as some

20  form of IAB. I don't know if I told her I went.

21   Q.    Do you know why she was notified to go to QUAD?

22   A.    I believe a lot of officers were notified.

23   Q.    Do you know why she was?

24   A.    I don't know.

25   Q.    You didn't know if it was related to your matter

A. SCHOOLCRAFT

1    or something else?

2    A.    Correct.  I am not sure.

3    Q.    She asked you before she went to QUAD, what it

4    was and where it was, and all these kinds of things.  Did

5    you speak with her after she returned from Quad?

6    A.    I don't believe so.

7    Q.    Did you speak with Officer Deck when he returned

8    from QUAD?

9    A.    I don't recall any conversation with him about

10   QUAD.

11   Q.    Were you aware he went down to QUAD?

12   A.    I believe Santana told me they were both notified

13   to go at the same time and neither of them were sure where

14   to go.

15   Q.    You didn't speak to Deck or Santana after they

16   went down to QUAD?

17   A.    I don't recall any conversation with them.

18   Q.    Did you speak to anyone about your visit to QUAD,

19   your interview with QUAD?

20   A.    I don't believe so, no.

21   Q.    Did you speak to anyone about the fact Deck and

22   Santana went down to QUAD?

23   A.    No, I don't believe so.

24   Q.    Did you tell anybody you though they went down

25   because of what you told QUAD?

A. SCHOOLCRAFT

1      A.      To the best of my memory, I didn't tell anyone

2   about, I followed the investigator's instructions.

3      Q.      Did Captain Lauterborn ever talk to you about

4   approaching Deck and Santana after they had gone down to

5   QUAD?

6      A.      No.

7      Q.      So Deck and Santana were called down to QUAD.

8   Did they know you were called down to QUAD?  Did you tell

9   them that?

10     A.      After she approached me, I may have stated that I

11  was just there, and I know where it is.  I believe it was

12  across the street from the 77th Precinct.

13     Q.      Did you tell her anything else?

14     A.      No.  I don't recall sharing anything with her.

15     Q.      Did you speak with anyone else about the fact you

16  had gone to QUAD or Santana had gone to QUAD, or Deck had

17  gone to QUAD at any time prior to October 31st?

18     A.      My father knew I was going.  I may brought it up

19  with Durk and the IAB investigator I was talking to.  But

20  no one was assigned to the 81st Precinct, I don't believe I

21  told anyone.

22     Q.      Do you believe anybody found out you had been

23  down to QUAD?

24              MR. SMITH:  Asked and answered.

25     A.      I believe that is possible.

A. SCHOOLCRAFT

1    Q.    I asked before about IAB.  And we talked about

2    Coy.  Now I am asking about QUAD.

3              MR. SMITH:  Bearing that distinction in mind

4              if there is one.

5    Q.    Do you have any recollection of anybody finding

6    out you had been down to QUAD?

7    A.    No.

8    Q.    Did anybody ever indicate to you they knew Deck

9    and Santana went down to QUAD?

10   A.    I believe Santana told me she was going.

11   Q.    Did anybody else aside from Deck and Santana tell

12   you they understood Deck and Santana went down?  Like come

13   to you and ask, do you know why they went down or what's

14   going on?

15   A.    No, I don't recall any conversation like that.

16   Q.    Do you recall any conversation by anyone relating

17   to QUAD and any complaint you might have made to QUAD or

18   the fact you got called down to QUAD at any time prior to

19   October 31st?

20   A.    Only Santana asked me directions, and I believe

21   she asked me what QUAD was.

22   Q.    You told me that.  So you do have some reason in

23   your mind to believe Coy knew you had been in touch with

24   IAB.  But you don't have any reason to indicate that

25   anybody knew you had been in touch with QUAD or complained

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

A. SCHOOLCRAFT

1   QUAD as of October 31st?

2       A.     I don't think that -- you asked me if I did know

3   of anyone.  I am not aware of anyone, no.

4       Q.     Do you have any reason to believe anybody did

5   know you had been down to QUAD?

6               MR. SMITH:  Objection to form.

7       A.     Well, there was a another memo put out by Maskal,

8   regarding TS operators, which is what I was assigned to,

9   not doing complaint reports.  It wasn't a 49.  It wasn't a

10  form like Coy's.  But it was something to the effect that

11  he told me I wasn't supposed to be taking reports, because

12  I was still taking reports that were coming into the

13  precinct, and he wanted that to stop.

14      Q.     When was that issued?

15      A.     I want to say October 24th, sometime in October.

16      Q.     Did that create suspicion in your mind at that

17  time he might have known?

18      A.     Well, everybody's mind there was an issue with,

19  well, I don't know what everyone was thinking, but there

20  was an issue with complaint reports taken in the precinct.

21  I guess I don't connect that one to the QUAD.

22      Q.     So anything else occur prior to the events of

23  October 31st which led you to believe anyone in the 81 knew

24  you had spoken to IAB or you had spoken to QUAD other than

25  the Coy memo, you told us about, and possibly the Maskal

A. SCHOOLCRAFT

1     memo you told us about, anything else to indicate to you

2     anyone was aware you had spoken to IAB or QUAD?

3        A.     Not that I had spoken to them, no.

4        Q.     And the only thing otherwise known was that Deck

5     and Santana went to QUAD?

6        A.     Nothing.

7        Q.     When you say nothing, you emphasized nothing?

8        A.     I believe so.  I believe there was a telephone

9     message log of QUAD, of me going to QUAD, and I don't

10    believe there are any others before that.  So I think

11    anybody who reads that log that is out in the open.

12       Q.     Would know you got called down and Deck got

13    called down and Santana got called down?

14       A.     Or whoever got called down.

15       Q.     Anything to indicate that anybody knew you had

16    gone down and complained about anything other than what we

17    already covered?

18       A.     That telephone message log.

19       Q.     Telephone message log, okay.  Was there any

20    conduct by anyone other than two memos you identified by

21    Coy and Maskal that indicated to you people were aware you

22    complained to IAB and QUAD?

23              MR. SMITH:  Objection to form.

24       A.     Sitting here now, I don't recall anything.  It is

25    possible, but I don't recall.  I am sure there is

A. SCHOOLCRAFT

1    something.  It is possible, but I don't remember.

2        Q.    When you left the 81 early on October 31st and

3    went home, did anything happen from that point through the

4    rest of the night that indicated to you anyone knew you had

5    complained to IAB or to QUAD?

6                MR. SMITH:  Objection to form.

7        Q.    Did you have any reason to believe --

8        A.    From the time I left the --

9        Q.    At that point in time or at any time through the

10   night did you have any reason to believe anyone found out

11   you had complained to IAB or QUAD?

12               MR. SMITH:  Objection to form.

13       A.    Yes.

14       Q.    What did you find out?

15       A.    That they -- that they were -- they stationed a

16   lieutenant outside my door, and then it became what this

17   complaint is about.

18       Q.    So by their actions you believe it indicates that

19   they knew?

20       A.    Correct.

21       Q.    Do you have anything else what anybody said or

22   suggested or acted in away that made it clear they knew

23   specifically that you complained to QUAD or IAB?

24               MR. SMITH:  Objection to form.

25       A.    The way they were acting Halloween night.

A. SCHOOLCRAFT

1    Q.    At your house?

2    A.    Correct.

3    Q.    Anything before that?

4    A.    Before?

5    Q.    Anything that gave you an indication that they

6    found out you had been in touch with QUAD or IAB or you had

7    complained to QUAD or IAB?

8              MR. SMITH:  Objection to form.

9    A.    Are we still after I left?

10   Q.    Other than what you already told me, about the

11   memo?

12   A.    October 31st day, sometime short after roll call,

13   Lieutenant Coy asked for my memo book which contained notes

14   of -- I would have to review those copies that I received

15   from that memo book.  But when I received that memo book

16   back, I noticed he had curled some of the pages where the

17   notes were on and I was aware that he was aware I was

18   documenting certain statements at roll call, and who was

19   making those statements, and what the statements were.

20   Q.    You did all that in your memo book?

21   A.    I don't know of anywhere else I would have done

22   it.

23   Q.    So these notes you believe indicated to him that

24   you had complained to IAB and QUAD?

25   A.    I don't recall writing anything down saying I

A. SCHOOLCRAFT

1    went to -- I don't know.  Maybe in my memo book.  I don't

2    know if I put the QUAD meeting in.  I don't know if I took

3    that with me and documented that day or just put it as a, I

4    am not sure what it, it may -- I will have to review that.

5    I don't know what I put for the day that I went to QUAD.

6        Q.    When is the last time you looked at your memo

7    book?

8        A.    Well, the copies of the memo book.  I think we

9    have those.

10       Q.    The question is:  When did you last look at it?

11       A.    Years.

12       Q.    You have not looked at any entries in your memo

13    book for years?

14       A.    Correct.

15       Q.    What is your recollection as to what in your memo

16    book would have indicated to Coy you had complained to IAB

17    or QUAD?

18              MR. SMITH:  Objection to the form.

19       Q.    What specific entries did you make that would

20    have indicated that to him?

21       A.    To the best of my memory, as specific as I can be

22    right now, the day October 7, 2009.  I don't know I may

23    have put just the time I showed up at 300 Gold Street, and

24    who I saw.  I might have put that there.  And there were

25    other notes, statements that supervisors were making at

A. SCHOOLCRAFT

1    roll call about how to handled a 30 if the victim won't get

2    in the car and come back to the station don't take the

3    report, something to that effect.  I don't remember if I

4    put the QUAD meeting in my memo book.

5       Q.    But as say anyone that looked at the telephone

6    message book but would know you were called down to QUAD,

7    so that in and of itself, wouldn't indicate you were

8    complaining to QUAD.  Was there any note you made in your

9    memo book that indicates you complained QUAD and was

10   supposed to have appear there when they called you down?

11              MR. SMITH:  Objection to form.

12      A.    I don't believe so, no.

13      Q.    Do you believe there was anything in there that

14   indicated to Coy, first let me ask explicitly that you

15   complained to the IAB?

16      A.    I don't believe so.

17      Q.    Anything that indicated explicitly that you

18   complained to QUAD?

19      A.    I don't believe so.

20      Q.    Anything you believe indicated explicitly would

21   have conveyed to Coy if he saw it that you had complained

22   to IAB?

23      A.    I don't believe so.

24      Q.    Anything in there that would have explicitly have

25   conveyed to Coy when he reviewed your memo book, if he

A. SCHOOLCRAFT

1    looked at the entry, that you had complained to QUAD?

2        A.      I dont believe so.

3        Q.      When you left work October 31st, did you do so

4    because you didn't feel well or did you do so because you

5    were afraid of Coy?

6        A.      I was afraid of Coy.

7        Q.      Did he say anything threatening to you?

8        A.      I don't recall him saying anything.

9        Q.      It might been your father who said or it was

10   attributed to your father, Coy was trying to lure you into

11   some back room in the precinct.  Did that ever occur?

12       A.      Maybe in my description of his behavior he may

13   have theorized that, but he didn't have a fish pole with

14   something on the other end.

15       Q.      I understand.  Did you believe he was trying to

16   get you in a back room in the precinct so he could do harm

17   to you?

18       A.      I don't believe -- I don't know if he wanted to

19   do that or not.

20       Q.      I didn't read anything you said to indicate that.

21   I just wanted to clear that up.

22       A.      Right.

23       Q.      When was the last time you saw Coy on October

24   31st?

25       A.      That would be about an hour before I left, 1

244

A. SCHOOLCRAFT

1    A.    I don't recall.

2    Q.    Did you see the pins he had on his uniform?

3    A.    If I did, I don't remember.

4    Q.    Was he wearing a jacket?

5    A.    No.

6    Q.    Had you ever seen this individual before?

7    A.    I don't recall the face.  I saw him ask the

8  question.  I saw the EMS response.  And then I turned, that

9  supervisor approached from the right side, she was on the

10 left side.  I turned around.  I said, I'm RMA.  I am fine.

11 I am not going to wherever you are taking me.

12   Q.    This is the same female you saw in your

13 apartment?

14   A.    Correct.

15   Q.    Did the female you are describing discuss your

16 health with you beside asking about any allergies?

17   A.    I don't recall any other conversation with her,

18 no.

19   Q.    Did the female EMS you described tell you your

20 pulse was too high?

21   A.    I believe the male stated that.

22   Q.    Did the female EMS tell you your blood pressure

23 was too high?

24   A.    I don't recall her stating that.

25   Q.    Do you believe the male EMS officer was lying