SM Exhibit Y

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------

ADRIAN SCHOOLCRAFT,

                                  Plaintiff,

         -against-

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO, Tax ID. 873220, Individually and in his Official Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH GERALD NELSON, Tax Id. 912370, Individually and in his Official Capacity, DEPUTY INSPECTOR STEVEN MAURIELLO, Tax Id. 895117, Individually and in his Official Capacity, CAPTAIN THEODORE LAUTERBORN, Tax Id. 897840, Individually and in his Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id. 919124, Individually and in his Official Capacity, ST. FREDERICK SAWYER, Shield No. 2567, Individually and in his Official Capacity, SERGEANT KURT DUNCAN Shield No. 2583, Individually and in his Official Capacity, LIEUTENANT CHRISTOPHER BROSCHART,

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 2

```
 1
 2    Tax Id. 915354, Individually and in his
 3    Official Capacity, LIEUTENANT TIMOTHY
 4    CAUGHEY, Tax Id. 885374, Individually and
 5    in his Official Capacity, SERGEANT SHANTEL
 6    JAMES, Shield No. 3004, Individually and in
 7    his Official Capacity, and P.O.'s"JOHN DOE"
 8    #1-50, Individually and in their Official
 9    Capacity, (the name John Doe being
10    fictitious, as the true names are presently
11    unknown) (collectively referred to as "NYPD
12    Defendants"), JAMAICA HOSPITAL MEDICAL
13    CENTER, DR. ISAK ISAKOV, Individually and
14    in his Official Capacity, DR. LILLIAN
15    ALDANA-BERNIER, Individually and in her
16    Official Capacity, and JAMAICA HOSPITAL
17    MEDICAL CENTER EMPLOYEE'S"JOHN DOE" #1-50,
18    Individually and in their Official
19    Capacity, (the name John Doe being
20    fictitious, as the true names are presently
21    unknown),
22                              Defendants.
23    ------------------------------------------
24              111 Broadway
25              New York, New York
```

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 3

```
 1
 2              November 7, 2013
 3              10:10 A.M.
 4
 5      ATTORNEYS' EYES ONLY CONFIDENTIAL
 6   PORTION of DEPOSITION of THEODORE
 7   LAUTERBORN, the Defendant in the
 8   above-entitled action, held at the above
 9   time and place, taken before Dawn Miller, a
10   Notary Public of the State of New York,
11   pursuant to court order and stipulations
12   between Counsel.
13                  *   *   *
14
15
16
17
18
19
20
21
22
23
24
25
```

LAUTERBORN

Page 13

```
 1
 2      Q.      Did you consider this a transfer
 3   or demotion or promotion transfer in
 4   November 2009?
 5              MS. METTHAM: Objection. You
 6     can answer.
 7      A.      Transfer.
 8      Q.      Was there any change in your pay
 9   grade?
10      A.      No.
11      Q.      Was there any change in your
12   title?
13      A.      No.
14      Q.      Who made the decision to transfer
15   you?
16              MS. METTHAM: Objection. You
17     can answer.
18      A.      Specifically, I don't know.
19      Q.      Do you have any understanding, at
20   all, as to who was involved in the decision
21   to transfer you?
22      A.      No.
23      Q.      What's your date of birth?
24              MS. METTHAM: Objection.  I'll
25     allow him to answer with the year of
```

```
 1
 2         his birth.
 3     Q.    All right.  What is the year of
 4  your birth?
 5     A.    1969.
 6     Q.    Where do you, currently, reside?
 7           MS. METTHAM:  Objection.  I
 8     will only allow you to answer whether
 9     you live in the five boroughs.
10     A.    I live within the five boroughs.
11     Q.    Have you provided an address to
12  the court reporter?
13     A.    As to?
14     Q.    Your address?
15     A.    My home address, no.
16     Q.    What address have you provided?
17     A.    My employer's address.
18     Q.    What is that?
19     A.    One Police Plaza.
20     Q.    I understand.
21           MR. SMITH:  I think we have
22     done this before, Suzanna.  Will the
23     Law Department accept a subpoena for
24     trial for Captain Lauterborn in the
25     event that one needs to be issued?
```

LAUTERBORN

Page 15

1
2          MS. METTHAM: If he's still
3     employed by the NYPD at the time of
4     trial, we will accept a subpoena on
5     his behalf.
6          MR. SMITH:  If he's not
7     employed, will you provide me with a
8     contact address including home
9     address, emergency contact information
10    so if I need to, I can issue a
11    subpoena for your appearance.
12         MS. METTHAM: In no case would
13    I provide you with his emergency
14    contact information but we would take
15    it under advisement and help to secure
16    a subpoena on him at that time if it
17    were so necessary.
18         MR. SMITH:  Okay.
19    Q.     Are you being represented in the
20  action?
21    A.     Yes, I am.
22    Q.     By whom?
23    A.     By the New York City Law
24  Department.
25    Q.     Do you have any understanding as

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

Page 67

```
 1
 2    phone, this could end." Is that a correct
 3    statement?
 4              MS. METTHAM: Objection. You
 5       can answer.
 6       A.    Again, that appears to be
 7    correct.
 8       Q.    Am I correct, that as of the time
 9    that you were having this conversation with
10    Larry Schoolcraft, if Adrian Schoolcraft
11    had called you on the phone and told you he
12    was okay, you would have stopped your
13    investigation into the whereabouts of
14    Officer Schoolcraft; is that correct?
15              MS. METTHAM: Objection.  Asked
16       and answered.
17              MR. KRETZ:  Objection.
18       A.    Early on, yes, that was my
19    intention of this, if I heard from Adrian
20    Schoolcraft on the phone and I felt
21    everything was okay with him, he was just
22    sick, it probably, yes, would have ended at
23    that point.
24       Q.    In fact, isn't it also true that
25    if Larry Schoolcraft had acted as an
```

```
 1
 2    intermediary and had communicated to you
 3    that he spoke to Adrian and confirmed to
 4    you that Adrian was okay, that you would
 5    have been satisfied and your investigation
 6    into the whereabouts and condition of
 7    Officer Schoolcraft would have stopped?
 8              MS. METTHAM: Objection. You
 9       can answer.
10       A.    At the time, I wanted to go that
11    way but as I was talking to Mr.
12    Schoolcraft, I really wasn't sure about his
13    authentic declaration of him as far as his
14    whereabouts it was gonna be acceptable but,
15    again, it was all in the situation, I would
16    have to take that, you know, more of the
17    atmosphere of the conversation into
18    consideration as to whether or not I was
19    going to do that.
20       Q.    I think I understand what you're
21    saying to me. I just want to clarify.
22              Am I correct; there was a point
23    during the day of October 31st 2009 when
24    you would have been satisfied with a report
25    back from the father that the son was okay;
```

1
2  is that a fair statement.
3          MS. METTHAM: Objection. You
4     can answer.
5     A.    Again, all things being
6  considered, I would have probably used his
7  father, yeah.
8          MR. KRETZ:  Objection.
9     Q.    Then is it also fair to say that
10 during the course of the day, your
11 willingness to accept the father's
12 statement that he was okay, no longer
13 became something you were willing to
14 accept; is that right?
15         MS. METTHAM: Objection. You
16    can answer.
17    A.    Pretty much.
18    Q.    Isn't it true that later on that
19 day you felt that it was important that
20 you, at least, be able to speak to Officer
21 Schoolcraft; isn't that correct?
22         MS. METTHAM: Objection. You
23    can answer.
24    A.    That's correct.
25    Q.    If you had spoken, at least at

1
2  some point during the day to Officer
3  Schoolcraft, there was a point in time
4  where merely speaking to him would have
5  been sufficient to satisfy your concerns
6  about his whereabouts and condition?
7           MS. METTHAM: Objection. You
8     can answer.
9           MR. KRETZ:  Objection.
10    A.    Again, that was early on in the
11 investigation.
12    Q.    I just want to make the record
13 clear.  That doesn't -- I understand what
14 you're saying.  I don't think the record is
15 clear about that you're saying.
16           Early on in the investigation
17 into the condition and whereabouts of
18 Officer Schoolcraft, there was a point
19 where simply speaking to Officer
20 Schoolcraft on the phone would have
21 satisfied your concerns; is that correct?
22           MS. METTHAM: Objection.  Asked
23     and answer.  You can answer again.
24    A.    That's correct.
25           MR. KRETZ:   Objection.

1
2  to me or they would have the doctor call me
3  but I don't remember, you know, having that
4  type of conversation one hundred percent.
5  But a doctor got back to me during the day.
6        Q.    Am I correct; that in your P.G.
7  you were asked by IAB whether or not you
8  conferred with the Medical Division; isn't
9  that correct?  You were asked that
10 question?
11       A.    If I conferred with the Medical
12 Division at all that day, yes.
13       Q.    IAB asked you that question, you
14 told them that you called out to them but
15 you never spoke them; isn't that right?
16            MS. METTHAM: Objection.
17       Misstates prior testimony and the
18       testimony you read from the P.G. You
19       can answer.
20            MR. KRETZ:  Objection.
21       A.    Yes, I mean, I wasn't recalling
22 correctly but eventually I did get in touch
23 with a doctor and spoke to a female doctor.
24       Q.    I understand that.  What I want
25 to know is, whether or not the statements

LAUTERBORN - ATTORNEYS' EYES ONLY CONFIDENTIAL

2  that you made to IAB were, in fact, a
3  mistake?
4      A.     There was some of it that was a
5  mistake.
6      Q.     One of the mistakes was that you
7  told IAB that you called out to the Medical
8  Division but you forgot about the call and
9  you did speak to them?
10             MS. METTHAM: Objection.
11     A.     That's what I said here.
12     Q.     In fact, in hindsight, looking at
13 other things, you now realize you forgot
14 about that conversation; you did have a
15 conversation with somebody in the Medical
16 Division, isn't that right?
17             MS. METTHAM: Objection. You
18    can answer.
19     A.     That's correct.
20     Q.     Turning to Page 67 of the
21 transcript; am I correct, that you told IAB
22 that you did not see any department
23 property in Schoolcraft's residence on
24 October 31st 2009?
25     A.     That's what I remember, yeah.

1
2   residence; do you see that?
3           MS. METTHAM: Can you give us
4   the line?
5           MR. SMITH: Top of the page.
6       A.   Yes.
7       Q.   Did you dispatch Broschart to go
8   to Schoolcraft's residence, right?
9       A.   Yes.
10      Q.   When Broschart got there and
11  learned what he learned from the landlord,
12  did he then convey to you the fact that the
13  landlord had told Broschart that they
14  believed that Schoolcraft was in his house?
15          MS. METTHAM: Objection.
16      A.   At some point, he did, yeah.
17      Q.   At some point before you entered,
18  right?
19      A.   Yes.
20      Q.   Later on in that same section of
21  Page 2, you refer to a conversation that
22  you had with Dr. Lamstein; do you see that?
23      A.   Yes.
24      Q.   Is it correct she told you she
25  didn't think Schoolcraft was a threat to

1
2            MS. METTHAM: Objection. You
3     can answer.
4     A.    Going through the proper
5  procedures, yes.
6     Q.    I suspect the proper procedure is
7  to fill out a Sick Report?
8     A.    Not at that point.
9     Q.    Well, that's what he did.  He
10 filled out a Sick Report; didn't he?
11    A.    There has to be further
12 notification being made and I never saw a
13 Sick Report he wrote out.
14    Q.    You never saw a Sick Report?
15    A.    I don't remember seeing one.
16    Q.    I show you what's been marked as
17 Exhibit Number 26.
18           MR. SMITH:  Mark this as
19     Plaintiff's 26.  Bates Stamp Number
20     NYC 286061.
21           (Sick Report was marked as
22     Plaintiff's Exhibit 26 for
23     identification.  Exhibit retained by
24     counsel.)
25    Q.    Do you recognize this as a Sick

1
2   the time, female Sergeant.
3       Q.    She said something to you?
4       A.    I asked.  I think I asked her.  I
5   don't know how it came about but he didn't
6   call in his sick or neither did she, if
7   that's the case.
8       Q.    She could have called it in, too?
9       A.    If Schoolcraft was unable to.
10      Q.    She could have called it in or he
11  could have called it in, right?
12            MS. METTHAM: Objection.
13      A.    Since Adrian Schoolcraft was
14  there, he could call it in.  If somebody
15  calls in sick from home, the Sergeant would
16  call the Medical Division for that person.
17      Q.    It's your understanding that if
18  somebody is on duty or about to report to
19  duty and they report to a superior that
20  they're sick and they're too sick to
21  actually fill out the whole report,
22  somebody else can do it for them; is that
23  right?
24            MS. METTHAM: Objection.
25      A.    If they were too sick, they felt

1
2      Q.    Who did you reach out to?
3      A.    I had the Sergeant ask amongst
4  the Police Officers that were working that
5  day if they had Schoolcraft's personal cell
6  phone number so that we could call it.
7      Q.    Did you get an answer to that
8  question?
9      A.    I recall that she had spoke a
10 Police Officer that had his cell phone who
11 tried calling it.  I'm not sure if that
12 person left a message or not but it went to
13 voicemail, he never picked up.
14     Q.    What was the next thing you did?
15     A.    Then I could still try to have
16 the Sergeant reach out to him with his cell
17 phone hoping that he would pickup.
18     Q.    What was the next thing that
19 happened after that?
20     A.    At a certain point, Inspector
21 Mauriello comes in, I let him know what was
22 going on.  Then more members of the 4 to 12
23 tour were coming in.  I had asked the
24 Sergeant to check in with those Police
25 Officers and see if they had his cell phone

1
2   and if there was somebody else that could
3   reach out to him.
4       Q.   When you told Mauriello what was
5   going on, what did he tell you?
6       A.   I gave him the run-down of what
7   happened a short time ago and he asked me
8   what I was doing and I told him, "We are
9   trying to reach out to him and see the
10  extent of his sickness and why he left the
11  way he did."
12      Q.   Did Mauriello tell you to notify
13  anybody about your investigation into
14  Schoolcraft's status or sickness?
15           MS. METTHAM: Objection. You
16      can answer.
17      A.   No, I don't believe he did.
18      Q.   What happened next?
19      A.   Again, in summary, there was a
20  new tour coming in. I had approached
21  Lieutenant Broschart about him having to go
22  to Adrian Schoolcraft's house to see if he
23  went home.
24      Q.   You told Broschart to go to his
25  home and find out if he was there; is that

```
 1
 2   right?
 3        A.      Yes.
 4        Q.      What happened next?
 5        A.      I was waiting for Broschart to
 6   get to his house to see the results of
 7   that.
 8        Q.      You were waiting at the 81?
 9        A.      Yes.
10        Q.      Did Broschart eventually report
11   back to you?
12        A.      Yes, he did.
13        Q.      When did he do that?
14        A.      I don't know the exact time but
15   there was a point where he either -- he
16   reached out to me or I called him.  From
17   what I could remember, he said he tried
18   knocking on the door, yelling Adrian's
19   name, there was no answer.  He interviewed
20   the landlord who said that he had come
21   home.  I don't know if he said he saw him
22   come home or he heard him upstairs, and
23   Lieutenant Broschart thought that he saw
24   movement through the front window, he lived
25   on the second floor, but he couldn't be one
```