SM Exhibit AD

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    Case 1:10-cv-06005-RWS
 5    - - - - - - - - - - - - - - -x
 6    ADRIAN SCHOOLCRAFT,
 7                        Plaintiff,
 8          -against-
 9    THE CITY OF NEW YORK, DEPUTY CHIEF
      MICHAEL MARINO, Tax Id. 873220,
10    Individually and in his Official
      Capacity, ASSISTANT CHIEF Patrol
11    Borough Brooklyn NORTH GERALD NELSON,
      Tax Id. 912370, Individually and in his
12    official Capacity, DEPUTY INSPECTOR
      STEVEN MAURIELLO, Tax Id. 895117,
13    individually and in his Official
      Capacity, CAPTAIN THEODORE LAUTERBORN,
14    Tax Id. 897840, Individually and in his
      Official Capacity, LIEUTENANT WILLIAM
15    GOUGH, Tax Id. 919124, Individually and
      in his Official Capacity, SGT.
16    FREDERICK SAWYER, Shield No. 2576,
      Individually and in his Official
17    Capacity, SERGEANT KURT DUNCAN, Shield
      No. 2483, Individually and in his
18    Official Capacity, LIEUTENANT
      CHRISTOPHER BROSCHART, Tax Id. 915354,
19    Individually and in his Official
      Capacity, LIEUTENANT TIMOTHY CAUGHEY,
20    Tax Id. 885374, Individually and in his
      Official Capacity, SERGEANT SHANTEL
21    JAMES, Shield No. 3004, Individually
      and in her Official Capacity,
22    LIEUTENANT THOMAS HANLEY, Tax Id.
      879761, Individually and in his
23    Official Capacity,CAPTAIN TIMOTHY
      TRAINER, Tax Id. 899922, Individually
24    and in his Official Capacity,
25    (Caption continued on following page.)
```

Page 2

1
2    CAPTION:(continued)
3    SERGEANT SONDRA WILSON, Shield No.
     5172, Individually and in her Official
4    Capacity, SERGEANT ROBERT W. O'HARE,
     Tax Id. 916960, Individually and in his
5    Official Capacity, SERGEANT RICHARD
     WALE, Shield No. 3099 and P.O.'s "JOE
6    DOE" # 1-50, Individually and in their
     Official Capacity (the name John Doe
7    being fictitious, as the true names are
     presently unknown), (collectively
8    referred to as "NYPD defendants"), FDNY
     LIEUTENANT ELISE HANLON, individually
9    and in her Official Capacity as a
     lieutenant with the New York City Fire
10   Department, JAMAICA HOSPITAL MEDICAL
     CENTER, DR. ISAK ISAKOV, Individually
11   and in his Official Capacity, DR.
     LILIAN ALDANA-BERNIER, Individually and
12   in her Official Capacity and JAMAICA
     HOSPITAL MEDICAL CENTER EMPLOYEE'S
13   "JOHN DOE" # 1-50, Individually and in
     their Official Capacity (the name John
14   Doe being fictitious, as the true names
     are presently unknown),
15
                         Defendants.
16   - - - - - - - - - - - - - - - - - - -x
                    111 Broadway
17                  New York, New York
18                  October 8, 2013
                    10:17 a.m.
19        DEPOSITION of MICHAEL MARINO, held
20   at the above time and place, taken
21   before Al-Furquan Baker, a Shorthand
22   Reporter and Notary Public of the State
23   of New York, pursuant to the Federal
24   Rules of Civil Procedure, Order and
25   stipulations between Counsel.

Page 218

1              M. Marino

2          MR. SMITH:   And now we're

3      going back on the record, and it's

4      3:06 still.

5  BY MR. SMITH:

6          Q.    What was your tour of duty on

7  October 31, 2009?

8          A.    Some type of 3:00 to 11:00.

9  3:00 in the afternoon to 11:00 at

10 night.

11         Q.    And what was your first

12 involvement in this event or incident?

13             MS. PUBLICKER METTHAM:

14     Objection.

15             You can answer.

16         A.    I was driving into the

17 parking lot of the 81st Precinct.

18         Q.    I'm sorry?

19         A.    I was driving into the

20 parking lot --

21         Q.    When was this?

22         A.    -- of the 81st.

23             Sometime around 5:00 or so

24 because it was dusk.

25         Q.    Were you driving with

Page 219

1                M. Marino

2    anybody?

3        A.    No.

4        Q.    And why were you going to the

5    81st?

6        A.    Just making my rounds of all

7    the precincts.

8        Q.    You were the XO of Borough

9    North at that time?

10       A.    Patrol Borough Brooklyn

11   North, yes, sir.

12       Q.    And geographically what does

13   that area entail?

14       A.    It has ten precincts.

15       Q.    What are those ten precincts?

16       A.    73rd, 75th.  73rd is

17   Brownsville.  75th is East New York.

18   77 is Bedford Stuyvesant -- I'm sorry,

19   Crown Heights is the 77th.  79th is

20   Bedford Stuyvesant.  81st is also

21   Bedford Stuyvesant.  83rd is Bushwick.

22   84th is Downtown Brooklyn.  88th is

23   Fort Greene.  The 90th is Williamsburg.

24   And the 94th is Greenpoint.

25       Q.    What about the 78th?

1                M. Marino

2        A.      The 78th is Brooklyn South,

3   sir.

4        Q.      And is it your habit to tour

5   or stop off at all the precincts on a

6   regular basis?

7        A.      No.

8                MS. PUBLICKER METTHAM:

9        Objection.

10               You can answer.

11       A.      No.

12       Q.      You said that your first

13  involvement in this incident was

14  driving into the parking lot of the

15  81st as part of your regular rounds.

16               What did you mean by regular

17  rounds?

18       A.      I did not say regular rounds.

19  It was Halloween night.  I had asked

20  that there be executive coverage in

21  each of the precincts late.  And so I

22  worked at the same hours.

23       Q.      But did you have a habit of

24  driving around to the various precincts

25  at all?

Page 221

1          M. Marino
2          MS. PUBLICKER METTHAM:
3     Objection.
4          You can answer.
5     A.     Not on a daily basis, no.
6     Q.     So why were you driving to
7 the 81st that day?
8     A.     Because I was checking all
9 the commands because it was Halloween
10 night. Checking to make sure that the
11 executives were in, checking the posts,
12 checking that there aren't any illegal
13 activities going on.
14    Q.     So when you drove to the
15 81st, it was your intent to drive to
16 all of the commands within your
17 jurisdiction; is that right?
18         MS. PUBLICKER METTHAM:
19    Objection.
20         You can answer.
21    A.     I don't know if I would have
22 hit them all. I can't say that.
23    Q.     Well, was it your intention
24 to hit as many of them as possible?
25         MS. PUBLICKER METTHAM:

1          M. Marino

2     Objection.

3          You can answer.

4     A.    Yes.

5     Q.    And you were going to as many

6  precinct commands as possible because

7  you wanted to make sure that the

8  commanding officers were at the

9  precinct; is that right?

10    A.    I was just checking on the

11 executive coverage, checking on the

12 posts and checking on illegal activity.

13    Q.    And do you mean by that you

14 wanted to make sure that the commanding

15 officer was at the precinct that night;

16 is that what you were checking on?

17          MS. PUBLICKER METTHAM:

18    Objection.

19          You can answer.

20    A.    I had instructed that the XO

21 and the commanding officer should close

22 as a general rule.

23    Q.    And what does that mean for

24 the XO to open and the CO to close?

25    A.    He works the early one, the

1           M. Marino

2    CO works the late one.

3       Q.    And what was the early one?

4       A.    Whatever it was.  10:00 to

5    6:00 at night.  11:00 to 7:00.  9:00 to

6    5:00.  Whatever they deemed it to be.

7       Q.    And this was an order that

8    you issued for your jurisdiction

9    because it was Halloween night?

10          MS. PUBLICKER METTHAM:

11    Objection.

12          You can answer.

13       A.    Correct.

14       Q.    And how was that order

15    transmitted?

16       A.    Usually on a phone call.

17       Q.    And what happened as you were

18    going to the driving lot or the parking

19    lot of the 81st?

20       A.    As I pulled in, I saw Captain

21    Lauterborn in the lot standing in the

22    lot speaking with some members of the

23    Brooklyn North investigations unit.

24       Q.    Captain Lauterborn, he was

25    the XO at the time, right?

Page 224

1                    M. Marino

2      A.      Yes.

3      Q.      The XO of the 81st?

4      A.      Yes, he was.

5      Q.      And at the time Mauriello was

6  the CO; is that right?

7      A.      Correct.

8      Q.      Was Mauriello at the CO at

9  that time?

10              MS. PUBLICKER METTHAM:

11     Objection.

12              You can answer.

13     A.      I did not believe that he

14  was, no.

15     Q.      Where was Mauriello?

16              MS. PUBLICKER METTHAM:

17     Objection.

18              You can answer.

19     A.      I assume he was home.

20     Q.      When you entered the parking

21  lot at the 81st and you saw Captain

22  Lauterborn, did you recognize that

23  individual to be Captain Lauterborn or

24  did you later confirm that that was

25  Captain Lauterborn?

Page 225

1              M. Marino

2         MS. PUBLICKER METTHAM:

3    Objection.

4         You can answer.

5    A.    I knew it was him.

6    Q.    And who were the other

7    individuals that he was speaking with?

8    A.    Members from the Patrol

9    Borough Brooklyn North investigations

10   unit.

11   Q.    Who were they?

12   A.    I don't remember exactly.

13   Lieutenant William Gough, Sergeant Ray

14   Hawkins.  I think Sergeant Duncan was

15   there, but I don't remember.  And it

16   may have been another person.  I don't

17   recall.

18   Q.    And you also recognized the

19   individuals from the Brooklyn

20   investigation unit, Hawkins and Duncan?

21   A.    Brooklyn North, yes.

22   Q.    Brooklyn North

23   Investigations?

24   A.    Yes.

25   Q.    I mean, and you knew them

Page 226

1                    M. Marino
2   on-site as being those individuals --
3        A.    Yes.
4        Q.    What is the function of the
5   Brooklyn North Investigations Unit?
6        A.    They worked directly for the
7   commanding officer of the borough.
8   They handled any internal investigation
9   that the commanding officer deems fit.
10  As well as being assigned the cases
11  from IAB that IAB deems can be handled
12  by them rather than IAB.
13       Q.    And who was the commanding
14  officer of the borough at that time?
15       A.    Assistant Chief Gerald
16  Nelson.
17       Q.    So when you saw Gough,
18  Hawkins and Duncan there, you
19  understood that they were there at the
20  direction of either IAB or Nelson?
21            MS. PUBLICKER METTHAM:
22       Objection.
23            You can answer.
24       A.    No.
25       Q.    What's your understanding of

Page 227

1                    M. Marino
2    why they were there?
3         A.    I didn't know why they were
4    there.
5         Q.    Was this fourth person that
6    was there with them also from patrol
7    borough investigations?
8              MS. PUBLICKER METTHAM:
9         Objection.
10             You can answer.
11        A.    I believe there was a fourth
12   person.  And if there was, yes, he
13   would have been from investigations.
14        Q.    And as you entered the
15   parking lot of the 81st, what happened?
16        A.    Just talking to him in the
17   lot.
18        Q.    Who did you start talking
19   with?
20        A.    All of them.
21        Q.    And what did they say?
22        A.    They said they had a caper
23   going on.
24        Q.    What is a caper, to your
25   understanding?

Page 228

1                    M. Marino

2        A.      A situation.

3        Q.      They used the term "caper"?

4        A.      No.

5        Q.      What, to the best of your

6   recollection, did they say?

7        A.      A bag of shit.

8        Q.      And what's that a reference

9   to?

10               MS. PUBLICKER METTHAM:

11       Objection.

12               You can answer.

13       A.      Just what it sounds like.  A

14   situation, an unpleasant situation.

15       Q.      Did they tell you anything

16   else about their situation?

17       A.      Oh, yes.

18       Q.      Would you mind sharing that

19   with us?

20       A.      Sure.

21               They told me that a police

22   officer left at around 14:00, which

23   would be 2:00 p.m.  He was ordered not

24   to go, and he left.  They told me that

25   the officer was acting irrationally,

Page 229

1                    M. Marino
2    that he had had psychiatric evaluations
3    in the past and that he had been
4    answering his cellphone and that he
5    stopped.  And they believed that the
6    officer was, already had or was going
7    to hurt himself.
8         Q.    Do you remember who told you
9    this?
10        A.    I can't say.  I believe it
11   was Captain Lauterborn, but I really
12   can't say.
13        Q.    Did they say anything else to
14   you?
15        A.    Yes.
16        Q.    What else did they say?
17        A.    They told me that their plan
18   was to go to his house and get the key
19   from the landlord and let themselves in
20   and see if he was in the apartment.
21        Q.    Did they tell you anything
22   else?
23        A.    No.
24        Q.    Did you say anything in
25   response?

Page 230

M. Marino

2  A.   Yes.

3  Q.   What did you say?

4  A.   I asked him who they notified

5  so far because it had been a couple of

6  hours since this disappearance of the

7  officer.

8       And then I instructed them

9  that they were to notify operations and

10 get his plate number out and notify the

11 Emergency Service unit.

12      And that under no

13 circumstances were they to let

14 themselves into that house alone like

15 that, and that they could respond to

16 his house with emergency service

17 following the proper procedures.

18      And if he answered the door,

19 see if he needs medical help.  If he

20 doesn't answer the door, under no

21 circumstances were they to go in until

22 my arrival.

23 Q.   Why did you tell them that

24 they were not to go into his house?

25 A.   You have a police officer who

Page 237

1                    M. Marino
2      pertinent to that, yes.
3          Q.      Okay.
4                  Are there any other patrol
5      guide procedures that would be
6      pertinent to the creation of the
7      performance evaluation that is set
8      forth as Plaintiff's Exhibit Number 12?
9          A.      Not that I can think of at
10     this time.
11         Q.      Okay.
12                 We were talking about your
13     discussion with Captain Lauterborn and
14     the Brooklyn North investigators in the
15     parking lot, and I'm not sure where we
16     left off.
17                 So after that conversation
18     was finished, you said that you went on
19     with your tours at the borough.
20                 Do you know what the other
21     individuals who were members of that
22     meeting did?
23         A.      Yes.
24         Q.      What did they do?
25         A.      They went to Adrian

```
 1                    M. Marino
 2   Schoolcraft's residence.
 3      Q.      All of them together drove to
 4   the Schoolcraft's residence; is that
 5   right?
 6                MS. PUBLICKER METTHAM:
 7      Objection.
 8                You can answer.
 9      A.      I think so.
10      Q.      And the reason why you think
11   so is because you told them to do so?
12                MS. PUBLICKER METTHAM:
13      Objection.
14                You can answer.
15      A.      I told them to go there.  How
16   they got there and who went with who, I
17   don't know.  I'm assuming they went
18   together, but I couldn't say.
19      Q.      What was the next
20   communication or event that occurred in
21   relation to Adrian Schoolcraft that
22   day?
23                MS. PUBLICKER METTHAM:
24      Objection.
25                You can answer.
```

Page 239

```
 1                    M. Marino
 2        A.    As I previously stated, I got
 3   a call on the phone that they got no
 4   response, that they were all set up,
 5   the Emergency Service was set up there
 6   and they believed he was inside the
 7   apartment.
 8        Q.    Okay.
 9             And that was a call that you
10   mentioned that you got from Captain
11   Lauterborn?
12        A.    I said I believed it was.
13   I'm not sure.
14        Q.    I know.
15             So you got a phone call for
16   sure telling you that they were at the
17   residence and they believed he was
18   there and you believe that that came
19   from Captain Lauterborn; is that
20   correct?
21             MS. PUBLICKER METTHAM:
22        Objection.
23             You can answer.
24        A.    Yes.
25        Q.    All right.
```

Page 240

```
 1              M. Marino
 2          And that call came to you on
 3   your work cellphone; is that right?
 4      A.     To the best of my
 5   recollection, yes.
 6      Q.     And Emergency Services was
 7   also at the premises at the time?
 8              MS. PUBLICKER METTHAM:
 9      Objection.
10              You can answer.
11      A.     Yes.
12      Q.     Anybody else?
13      A.     At that time I didn't know
14   who else was there.
15      Q.     And what did you say during
16   this conversation?
17      A.     Something to the effect of
18   okay, I'm coming, don't do anything
19   till I get there.
20      Q.     Did you say anything else?
21      A.     That's to the best of my
22   recollection.
23      Q.     How long did it take you to
24   get from where you were at until you
25   got to the residence?
```

Page 241

1                    M. Marino

2        A.      I would say no longer than

3    20 minutes.

4        Q.      What time of the day did you

5    get to the residence of Adrian

6    Schoolcraft?

7        A.      I couldn't say.

8        Q.      Was it dark outside?

9        A.      I believe it was.

10       Q.      Was it raining outside?

11       A.      I believe it was.

12       Q.      When you got to Adrian

13   Schoolcraft's residence or the street,

14   what did you see?

15       A.      It was a lot of police

16   vehicles there.  There were ambulances

17   there.  An Emergency Service truck was

18   there.  There was a lieutenant in front

19   soaked to the skin.

20       Q.      What was the lieutenant's

21   name?

22       A.      I don't know.

23       Q.      Was it Broschart?

24       A.      I don't know.

25       Q.      Who else was at the scene?

Page 250

1                    M. Marino

2        Q.      Did they have shields?

3        A.      I don't recall.

4        Q.      Did they have helmets?

5        A.      I don't recall.

6        Q.      How long was this discussion

7    on the landing on the 2nd floor?

8        A.      Not long.

9        Q.      Minutes?

10       A.      Yes.

11       Q.      Did you say anything to them?

12       A.      Yes.

13       Q.      What did you say to them?

14       A.      When it was relayed to me --

15   the landlord's statement was that he

16   had given us a key.  I now became very

17   concerned for Schoolcraft's safety.

18              And I told the Emergency

19   Service they were not going to enter,

20   but they were just going to use the key

21   and open the door.  Just pop it open

22   and I wanted it to be stated in a loud

23   voice that I can hear:

24              Adrian, this is the police.

25       We're here to help you.  Please

Page 251

1              M. Marino

2      come to the door.  If you don't

3      come to the door, we're going to

4      come in, but we're not going to

5      hurt you.

6          Q.    Is that what you told them

7      you wanted to have happen?

8          A.    Yes.

9          Q.    Was this planned course of

10     action something that was authorized by

11     anything in the patrol guide?

12              MS. PUBLICKER METTHAM:

13          Objection.

14              You can answer.

15          A.    It was nothing in the patrol

16     guide that says you can open the door

17     and state in a loud voice:

18              Adrian, we're coming in.

19          This is the police.  Come to the

20          door.  We're not looking to hurt

21          you.

22          Q.    So the answer to my question

23     is there is nothing in the patrol guide

24     that you're familiar with that

25     authorizes that course of action; is

Page 271

1                    M. Marino

2        Q.    Did Captain Lauterborn enter

3    the residence?

4        A.    I believe he did, yes.

5        Q.    At around the same time that

6    you entered?

7        A.    I believe so, yes.

8        Q.    Did Captain Lauterborn tell

9    Officer Schoolcraft that he had to come

10   back to the 81st Precinct?

11       A.    I believe he may have, yes.

12       Q.    And did Mauriello tell

13   Schoolcraft that he had to come back to

14   the precinct?

15       A.    I don't remember that.

16       Q.    Was it proper for Lauterborn

17   to tell Schoolcraft to come back to the

18   81st Precinct?

19             MS. PUBLICKER METTHAM:

20       Objection.

21             You can answer.

22       A.    Yes.

23       Q.    Why would it be proper for

24   Lauterborn to tell Schoolcraft to

25   return to the 81st Precinct?

Page 272

1                M. Marino
2           MS. PUBLICKER METTHAM:
3      Objection.
4                You can answer.
5      A.     It's quite a common and
6  accepted practice that when a police
7  officer is involved in some kind of
8  incident, that they're all ordered back
9  to the police stationhouse where we can
10 figure out exactly what happened.
11     Q.     Is that a practice that is
12 set forth in the patrol guide?
13          MS. PUBLICKER METTHAM:
14     Objection.
15          You can answer.
16     A.     I don't believe so.
17     Q.     Is that practice set forth in
18 any other orders or rules or
19 regulations of the New York City Police
20 Department?
21          MS. PUBLICKER METTHAM:
22     Objection.
23          You can answer.
24     A.     I think where it says obey
25 any lawful order of a ranking

Page 273

1                  M. Marino
2    supervisor, I think it's covered under
3    that, yes.
4        Q.    Under that very general
5    concept that in a paramilitary
6    organization subordinate officers are
7    expected to comply with the lawful
8    orders of a superior, right?
9        A.    Yes.
10              MS. PUBLICKER METTHAM:
11       Objection.
12       Q.    But there's no specific
13   patrol guide or rule or regulation that
14   you are aware of that authorizes
15   requiring a police officer to return to
16   the precinct; is that right?
17              MS. PUBLICKER METTHAM:
18       Objection.
19              You can answer.
20       A.    There is nothing that says
21   that Officer Adrian Schoolcraft can be
22   ordered back from his apartment by
23   Captain Lauterborn, no.
24       Q.    Well, that's more narrow.
25              What I want to know is

Page 280

1                    M. Marino

2    officers who were on the landing and

3    with you at the entry point?

4        A.    I believe they were, yes.

5        Q.    Did you say anything to them

6    or did they say anything to you?

7        A.    I spoke to them.

8        Q.    What did you say to them?

9        A.    I thanked them for coming and

10   that it was a stressful situation and,

11   you know, they helped their fellow

12   officer and that was it.

13       Q.    Did they say anything to you?

14       A.    I don't know.  Thank you.

15       Q.    What did you do next?

16       A.    I saw Adrian Schoolcraft

17   walking to the ambulance as I was

18   talking to them.

19       Q.    Where was the ambulance?

20       A.    Behind me on the right side

21   of the street (indicating).

22       Q.    Behind you on the right side

23   of the street as you are facing the

24   house?

25       A.    No, facing up the street.

Page 286

```
 1                M. Marino
 2        Q.     Does the name Hanlon refresh
 3   your recollection?
 4        A.     Not one bit.
 5        Q.     Did you at any time ever know
 6   her name?
 7        A.     No.
 8        Q.     All right.
 9               So the female paramedic
10   lieutenant came up to you when you were
11   talking with the group of ESU guys,
12   right?
13        A.     Correct.
14        Q.     And did you say anything in
15   response to her?
16        A.     Yes.
17        Q.     What did you say?
18        A.     I told her I would go to the
19   bus and speak to him, the ambulance,
20   and speak to him.
21        Q.     And did she say?  Anything in
22   response to that?
23        A.     Yes.
24        Q.     What did she say?
25        A.     She told me it was, it's too
```

Page 287

1                    M. Marino
2   late that he went back in his
3   apartment.
4        Q.    She said what?
5        A.    It's too late, he went back
6   to his apartment.  Something to that
7   effect.  That's not verbatim.
8        Q.    What did you say?
9        A.    Oh shit.
10       Q.    Anything else?
11       A.    He went back to his
12  apartment.
13       Q.    No, but did you say anything
14  else --
15       A.    To her --
16       Q.    Let me just finish my whole
17  question, so we have a clear record.
18             Did you say anything else
19  other than oh, shit?
20       A.    No.
21       Q.    All right.
22             What did you do next?
23       A.    I went into his apartment.
24       Q.    Was the door to the home on
25  the first floor open?