SM Exhibit AJ

Report Under
M #09-1973
Log# 09-41517
SIU# 01-148-09

## POLICE DEPARTMENT
## CITY OF NEW YORK

October 7, 2010

**From:**    Commanding Officer, Internal Affairs Bureau, Special Investigations Unit

**To:**    Chief of Internal Affairs

**Subject:**    **INTERIM REPORT ON INTERNAL AFFAIRS BUREAU INVESTIGATION**

1.    The following is an interim overview of the Internal Affairs Bureau investigation of allegations made by and pertaining to Police Officer Adrian Schoolcraft, Tax REDACTED assigned to the 81 Precinct. This is a preliminary report and the investigation is ongoing.

### ALLEGATIONS

2.    The following logs were generated in connection with this investigation:

    a.    This case was initiated on August 24, 2009 by a notarized letter sent by P.O. Schoolcraft to IAB alleging that Sgt. Steven Weiss, Tax REDACTED 81 Precinct, and Lt. Timothy Caughey, Tax REDACTED, 81 Precinct Integrity Control Officer (ICO), accessed without authorization a secure cabinet and removed documents pertaining to civilian complaints lodged against Sgt. Weiss. The letter stated that P.O. Schoolcraft learned of this misconduct from a member of the 81 Precinct administrative staff. (The informant was subsequently identified as PAA Monique Carter, Tax REDACTED, 81 Precinct, Clerical Aide to the Commanding Officer.)

    b.    On August 31, 2009, retired Lt. David Durk, Tax REDACTED, reported to IAB that P.O. Schoolcraft was the victim of retaliation from his supervisors because of his lack of productivity.

    c.    On October 31, 2009, Mr. Larry Schoolcraft, father of P.O. Schoolcraft, reported to IAB that his son left work on that day because he did not feel well. He alleged that his son also felt threatened because another MOS had displayed a firearm in a threatening manner to P.O. Schoolcraft. Mr. Schoolcraft further alleged that Capt. Theodore Lauterborn, Tax REDACTED, Executive Officer of the 81 Precinct, and other MOS broke into his son's residence and forcibly removed his son to Jamaica Hospital. Mr. Schoolcraft also alleged that these MOS

D000406

a. Capt. Lauterborn, in the course of his duties as the Executive Officer, regularly reviewed P.O. Schoolcraft's and other officers' activity reports concerning productivity including verticals, arrests, aided reports, summons, accident reports, UF-250s and sick time. He considered P.O. Schoolcraft to have been an active officer and an overall "nice guy" when Capt. Lauterborn arrived at the 81 Precinct in July 2008. P.O. Schoolcraft's productivity and general disposition changed for the worse over time. P.O. Schoolcraft had been reassigned as the telephone switchboard operator during the spring of 2009 because he was on restricted duty following removal of his firearms.

b. P.O. Schoolcraft's immediate supervisor at the 81 Precinct was Sgt. Raymond Stukes,[5] Tax (REDACTED) whom Capt. Lauterborn described as a competent supervisor who was "on top of his game."

c. On October 31, 2009, shortly after 1415 hours, Capt. Lauterborn was informed by Sgt. Huffman that P.O. Schoolcraft left his assignment as the telephone switchboard operator because he was not feeling well. Capt. Lauterborn told Sgt. Huffman to direct P.O. Schoolcraft to Capt. Lauterborn's office. Capt. Lauterborn then learned from Sgt. Huffman that P.O. Schoolcraft had changed his clothes and was leaving the precinct station house. Capt. Lauterborn went to the parking lot in search of P.O. Schoolcraft without success.

d. When Capt. Lauterborn returned to the front desk, Sgt. Huffman informed him that P.O. Schoolcraft had suddenly stated he was not feeling well and intended to leave.

e. Capt. Lauterborn briefed D.I. Mauriello, who instructed Capt. Lauterborn to keep him apprised of the situation. Capt. Lauterborn felt that P.O. Schoolcraft's behavior was abnormal, and he felt increasingly uncomfortable as time passed and he heard nothing from P.O. Schoolcraft. Capt. Lauterborn called P.O. Schoolcraft's emergency contact, his father, Larry Schoolcraft. No one answered the telephone, and Capt. Lauterborn directed Lt. Christopher Broschart, the 81 Precinct 3rd Platoon Commander, to go to P.O. Schoolcraft's residence to determine whether he was home and to check on his well-being. A short time later, Capt. Lauterborn learned that Lt. Broschart received no response when he rang P.O. Schoolcraft's doorbell.

f. Near the same time, Capt. Lauterborn received a return phone call from Larry Schoolcraft. During the call, Mr. Schoolcraft was angry and agitated, claiming there was a conspiracy against his son, that his son was "being set up," and that Larry Schoolcraft would have Capt. Lauterborn fired. In a second phone call, Larry Schoolcraft told Capt. Lauterborn that his son was at his own residence but there was no need for anyone to worry about him. Mr. Schoolcraft also stated that his son, with whom he had recently spoken, knew there were officers outside his residence. Capt. Lauterborn explained to Mr. Schoolcraft he was not comfortable not speaking with P.O. Schoolcraft, and requested that he convey to his son to open the door and speak to Lt. Broschart, so that everyone could be put at ease about his condition. At this request, Mr. Schoolcraft became angry again, stating in substance, "You don't want another Lt. Pigott do you?"[6]

---

[5] Sgt. Stukes has subsequently been suspended and arrested in connection with failing an IAB Integrity Test.
[6] Lt. Michael Pigott, Tax (REDACTED), ESU, committed suicide in October 2008.

11

  e. Lt. Caughey denied retaliating against P.O. Schoolcraft in any manner

Interview of EMS Lieutenant Elise Hanlon

38. FDNY EMS Lt. Elise Hanlon was interviewed by Sgt. Alroy Scott, IAB, and stated in substance as follows:

  a. Lt. Hanlon was requested to respond to a call for a barricaded EDP by a non-FDNY basic life support unit that works out of Jamaica Hospital. Lt. Hanlon was directed by NYPD personnel to stand by with two EMT's while entry was made into the patient's apartment.

  b. Lt. Hanlon supervised the medical evaluation of P.O. Schoolcraft, which resulted in a determination that he had high blood pressure. He also complained of stomach pain. An NYPD officer then asked about P.O. Schoolcraft's medical condition, and in response P.O. Schoolcraft "went bananas." She observed shouting back and forth between the NYPD supervisors and P.O. Schoolcraft, who was acting irrationally and belligerently to the supervisors.

  c. P.O. Schoolcraft initially agreed to seek medical treatment, and he accompanied EMS personnel to the ambulance. He then exited the ambulance and re-entered his apartment. EMS personnel did not enter his apartment a second time.[18] ESU members then removed P.O. Schoolcraft from the apartment and strapped to an EMS chair. Lt. Hanlon was unsure whether he was handcuffed, though she is certain that he was not hog-tied.

  d. After a second medical assessment, P.O. Schoolcraft complained of chest pains. EMS protocols dictate that a patient with high blood pressure and chest pains can only refuse medical treatment after speaking with a physician on the telephone, which did not occur because P.O. Schoolcraft was forcibly removed by ESU personnel and restrained. Lt. Hanlon did not discuss with NYPD personnel P.O. Schoolcraft's status as a patient or whether he was classified as an EDP. She simply treated him as a medical patient who also was in need of a mental health evaluation. No one discussed to which hospital P.O. Schoolcraft would be removed in order to receive treatment, as the hospital is pre-determined at the time the job is dispatched. In this instance, Jamaica Hospital had been pre-designated.

Approximate Timeline of October 31, 2009

39. Based on interviews and inspection of relevant documents, including command logs, the following is a timeline reflecting the approximate time of events on October 31, 2009:

| | |
|---|---|
| 1415 | P.O. Schoolcraft informs Sgt. Huffman he is sick, and subsequently leaves the 81 Precinct. |
| | Sgt. Huffman informs Capt. Lauterborn of the same. |
| 1445 | Capt. Lauterborn is unable to locate P.O. Schoolcraft and directs Lt. Broschart to P.O. Schoolcraft's residence |
| | Capt. Lauterborn speaks to Larry Schoolcraft |

---

[18] Other investigative findings lead to the conclusion that EMS did re-enter the apartment.

D000431

| | |
|---|---|
| 1615 | A.C. Nelson notified of P.O. Schoolcraft as AWOL by D.I. Mauriello. |
| 2035 | D.C. Marino signs command log at the 81 Precinct. |
| 2057 | EMS requested to P.O. Schoolcraft's residence. |
| 2109 | ESU requested to P.O. Schoolcraft's residence. |
| 2124 | Operations Unit notified by Capt. Lauterborn. |
| 2130 | D.C. Marino on scene. |
| 2140 | Hostage Negotiations notified by Operations. |
| 2145 | Entry made into apartment. |
| 2155 | Hostage Negotiations cancelled by D.C. Marino. |
| 2200 | P.O. Schoolcraft removed to Jamaica Hospital. |

## CONCLUSIONS OF THE INVESTIGATION TO DATE

40. The investigation has determined that P.O. Adrian Schoolcraft left the 81 Precinct on October 31, 2009 prior to the expiration of his tour without permission. This conclusion is corroborated by PG 206-13 hearings of the MOS involved, statements made by P.O. Schoolcraft, and a review of audio recordings provided to investigators by P.O. Schoolcraft. The audio tapes also make clear that P.O. Schoolcraft was aware of the police presence outside his apartment and chose not to cooperate with the officers.

41. The investigation has not established a nexus between the misconduct reported to the Department by P.O. Schoolcraft and the subsequent events of October 31, 2009, and his confinement at Jamaica Hospital. Of the MOS interviewed, only Capt. Lauterborn admitted to suspecting that P.O. Schoolcraft may have been involved in the ongoing QAD investigation at the 81 Precinct. At the same time, Capt. Lauterborn credibly stated that his suspicions had no bearing on the sequence of events regarding P.O. Schoolcraft's AWOL investigation and suspension.

42. D.I. Mauriello's claims that he was unaware of P.O. Schoolcraft's possible involvement in the QAD investigation are not credible. Capt. Lauterborn credibly stated that he discussed with D.I. Mauriello P.O. Schoolcraft's questioning of officers who had been interviewed by QAD. D.I. Mauriello also told Capt. Lauterborn that he suspected P.O. Schoolcraft had recorded D.I. Mauriello's review of P.O. Schoolcraft's 2008 activity reports. In sum, D.I. Mauriello's claim that he had no knowledge of P.O. Schoolcraft lodging a complaint with the Department lacks credibility.

43. A review of the tapes provided by P.O Schoolcraft demonstrate that he was being coached on what to say to QAD by his father, and the two individuals appear to have orchestrated the AWOL event. At the same time, this conclusion does not mitigate the fact that information P.O. Schoolcraft reported to QAD contains accuracies. The Department's response to P.O. Schoolcraft being AWOL and charges and specifications being preferred against him appear to be a just result of his own misconduct by leaving the 81 Precinct before the end of his tour without permission, and possessing a rifle without authorization. P.O. Schoolcraft has refused to participate in additional interviews with IAB investigators, and without his cooperation, questions remain unanswered regarding his motivation for the AWOL incident and subsequent events.

D000432