SM Exhibit AO

**POLICE DEPARTMENT**
**CITY OF NEW YORK**

**M # 09-1973**     **Log# 09-41517**     **SIU# 01-148-09**

**From:** Sergeant Alroy Scott, Special Investigations Unit

**Date/Time:** November 3, 2009 /1600 hrs.

**Allegation:** DRV-Other

**Subject:** Interview of PO Schoolcraft at Jamaica Hospital

---

(KD) 08/24/09 @ 1500 HRS***DRV-OTHER***Dt McGonagle, Group 1, forwarded the following complaint to the C/C by fax, letter reads as follows: PO Schoolcraft, Tax # 931186, 81 pct, reports that an unidentified person from DI Mauriello's, C.O. 81 Pct, Administrative Staff, has reported that S/O's Sgt Weiss, Tax # _____ 81 pct and Lt Caughey, Tax # _____ 81 pct, broke in and entered, without permission or authority, a locked office containing sensitive department files, and removed documents pertaining to Civilian Complaints that were inside of Sgt Weiss's Department Personnel Folder. The source states that the files would have been an obstacle to the evaluation and promotion of Sgt Weiss to NYPD lieutenant. Sgt Weiss has since been promoted to lieutenant. DI Grossi recommends OG back to Group 1. (KD)

---

1. On the above date and approximate time, the undersigned investigating officer is noting that an interview was conducted with the C/V at Jamaica Hospital on November 2, 2009 at approximately 2130 hours. This interview was in regards to IAB Log # 09-55071, in which the C/V was suspended for non compliance of a lawful order from a ranking member of the service on October 31, 2009 at approximately 2140 hours. Below is a brief synopsis' of the interview:

- In sum and substance PO Schoolcraft stated that he left work on the above date because he felt something was going to happen to him. He stated that he was about to be set up by Lt. Caughey. The C/V stated that Lt. Caughey asked for his memo book at approximately 0805 hours and returned it to him at approximately 1100 hours. He stated that this was unusual for Lt. Caughey to do because he hasn't signed his memo book in months nor has he observed him sign any other MOS memo books. PO Schoolcraft further stated that he would note in his activity log dates and times Lt. Caughey entered the room where the files are. He stated that this added in his suspicion that something was going to happen to him. He stated that he felt that Lt. Caughey was menacing him by exposing his firearm to him in that manner. He explained the Lt. Caughey had his firearm secured on his waist with his shirt tucked behind it leaving it exposed. This he stated caused him alarm. He also stated that felt that Lt. Caughey was looking at him in a strange way that made him feel uncomfortable coupled with other MOS telling him that Lt. Caughey was looking at him. PO Schoolcraft stated that he had a sixth sense about something bad. He also informed the undersigned that he was in contact with his father via telephone and his father recommended him to get out of there and go sick. PO Schoolcraft stated that at approximately 1415 hours he filled out a sick slip that the T/S operator fills out when they call Lefrak and handed it to the Desk Officer, Sgt. Huffman. He stated that Sgt. Huffman was talking on her phone and told him to wait a minute. He then decided to go down to change his clothes. He stated that he came back up and Sgt. Huffman told him that he could not go sick and that she would grant him lost time or call a bus for him. He then stated that he responded to Sgt. Huffman that he didn't feel well and wanted to go home, so he left. He added that he didn't want them to know where he was going because he felt like something bad was going to happen. PO Schoolcraft continued to state that once he got home he took some Nyquil and laid down to relax. PO Schoolcraft then states that he was awakened by two flashing lights in his face by members of ESU. He stated that they order him to place his hands up in the air and that he was to go with them. He stated that the officer denied telling him where he was going and why. He stated the CO and the XO was present in his apartment when the incident was occurring. He further stated that he rejected their demands. He stated to the officers that he wasn't going anywhere and laid back down. He then stated that Chief Marino came over to him and directed him to get up and go with him back to the station house to settle this. He then stated that he was asked if he was disobeying a lawful order. PO Schoolcraft stated

CONFIDENTIAL                                                                                                                                                      NYC00004478

that he replied "a lawful order, I'm sitting on my bed in my apartment and you pushed your way in". He then stated that the officers then retreated into the living room and EMS came in to take a look at his vital signs. He then states that EMS informed him that his vital signs were bad and that he needed to go with them to the hospital. He agreed to go but wanted to go to Forest Hills Hospital because that's where allegedly his doctor is affiliated with. PO Schoolcraft then explained that he got dress and left his apartment with the officers and EMS personnel. He stated when he got outside of his building, he noticed that there were numerous police vehicles present, including his C/O's car which was blocking the street. He explained that he felt that something was going to happen so he decided to tell the EMS personnel and the officers present, that he didn't feel well and that he would go to the hospital later on. He then described that he walked away back towards his house and proceeded to enter his apartment. He stated that he tried to close the door behind him to no avail because the XO was pushing his way in behind him. He stated to the undersigned that he did attempt to close the door behind him but he couldn't. He stated that he then went to his bed and laid down again. PO Schoolcraft then stated that Chief Marino ordered him out of bed. He stated that he replied no, he doesn't feel good. At this time he described observing Chief Marino making a hand motion and then stated to him, "I guess we have to do this the hard way". PO Schoolcraft then stated that about five (5) officers then dragged him out of the bed and slammed him on the floor and that Chief Marino put his foot right over his eyes and rubbed his face into the floor with his foot. He also stated while the officer pulled him off the bed, they held his arms in a Chinese torture position to twist and cause him pain. PO Schoolcraft stated that he observed Chief Marino find his tape recorder on his bed. He stated that Chief Marino then told the others check his pockets because he was being cute and that he had recording devices. He stated that before he was secured to an orange chair and removed to the hospital he observed Chief Marino take his recorder and placed it into his jacket pocket. In addition he stated that a bald black guy was searching his apartment. He stated while at the hospital he was cuffed to his gurney for several hours and the officers refused to loosen them. He explained that they were tight causing him to have pain in his wrist. He also stated while at the hospital he was refused telephone calls from his father. He continued to state while he was in the E/R he was informed by medical personnel that he had signs of schizophrenia. When asked by the I/O's what medication has he been taking, he stated that they have been giving him Risperdal. (Risperdal: is medication that is used to treat schizophrenia in adults and adolescents ages 13-17 years.) During the interview, PO Schoolcraft did admit to the undersigned that he left work because he felt uncomfortable not because he wasn't feeling well.

2. During the above interview the undersigned was not able to take pictures. PO Schoolcraft described that Chief Marino rubbed his face with his foot on the floor. The undersigned did not see any marks on PO Schoolcraft's face indicating that actually happened. The undersigned did observe a black bruise between his biceps and triceps on his left arm that was about 6" long and 3" in width. This was the only mark / bruise that the undersigned observed. Also during this interview, PO Schoolcraft signed a HIPAA Release form granting the undersigned permission to access his medical records for the incident date.

3. The above interview was recorded and secured according to Group # 1 procedures. The recording was assigned Group # 1 Tape Serial # 09- 086.

| TIME SPENT | VEHICLES | EXPENSES |
|---|---|---|
| Clerical: 2 hour | Dept Auto# N/A | N/A |
| Observation: N/A | Pvt Auto #: N/A | |

Sgt. Alroy Scott
**Case Investigator**

Lt. Nicholas McAteer
**Team Leader / Case Supervisor**

D.I. David A. Grossi
**Commanding Officer**

W/S# 30
ATT: A

CONFIDENTIAL
NYC00004479