SM Exhibit AS

POLICE DEPARTMENT
CITY OF NEW YORK

**M # 09-1973**      **Log# 09-41517**      **SIU# 01-148-09**

**From:** Sergeant Alroy Scott, Special Investigations Unit

**Date/Time:** November 11, 2009 / 2100 hrs.

**Allegation:** DRV-Other

**Subject:** Retrieval of Firearm from PO Schoolcraft's residence

---

(KD) 08/24/09 @ 1500 HRS***DRV-OTHER***Dt McGonagle, Group 1, forwarded the following complaint to the C/C by fax, letter reads as follows: PO Schoolcraft, Tax # 931186, 81 pct, reports that an unidentified person from DI Mauriello's, C.O. 81 Pct, Administrative Staff, has reported that S/O's Sgt Weiss, Tax #_____, 81 pct and Lt Caughey, Tax #_____, 81 pct, broke in and entered, without permission or authority, a locked office containing sensitive department files, and removed documents pertaining to Civilian Complaints that were inside of Sgt Weiss's Department Personnel Folder. The source states that the files would have been an obstacle to the evaluation and promotion of Sgt Weiss to NYPD lieutenant. Sgt Weiss has since been promoted to lieutenant. DI Grossi recommends OG back to Group 1. (KD)

---

1.      On the above date and approximate time, the undersigned investigating officer is noting that on November 9, 2009 the undersigned reviewed Folder D recordings # 1-3 on the Digital Voice Recorder that the undersigned obtained from PO Schoolcraft. While reviewing recording # 1 in Folder "D", the undersigned did hear PO Schoolcraft acknowledging that he was in possession of a firearm. During recording # 1, PO Schoolcraft is asked by an unknown male, presumably, his father, Larry Schoolcraft, "Adrian, where's the rifle?" PO Schoolcraft stated to the male that it is not hidden. The unidentified male then tells PO Schoolcraft that he should put it away. PO Schoolcraft then asks the unidentified male if under his bed is in plain site? The unidentified male then states "No!" You then hear PO Schoolcraft walk away to an unknown location and then come back. You continue to hear PO Schoolcraft placing something underneath his bed. The unidentified male states to PO Schoolcraft that they (referring to the police) would need a search warrant now because it's not in plain view.

2.      The undersigned immediately informed Lt. Crisalli and Lt. McAteer of the I/O's investigative findings. It was recommended that a conferral be made to DI Grossi in regards. After conferral with DI Grossi, it was ordered that the undersigned contact the departments Legal Bureau to confirm what our legal grounds base on the information that was obtained and to confer back with him before any further actions are taken.

3.      The undersigned conferred with Sgt. Bonner, Legal Bureau, and was informed that the undersigned obtained the recording device and retrieval of the information was within the scope of the law. Sgt. Bonner also stated that based on the information the undersigned had enough probable cause to inquire about the alleged weapon but was advised that he could not search the C/V's residence without a warrant. The aforementioned information was given to DI Grossi.

4.      A short time later it was recommended that the undersigned make an attempt to retrieve the alleged firearm from the C/V. At approximately 1830 hours, the undersigned, Lt. McAteer, Sgt. Chu and Det. Thomas arrived at the C/V residence of 82-60 88th Place, located in the confines of the 104th precinct in an attempt to retrieve the alleged firearm. After several negative telephone call attempts to the C/V, the undersigned contacted the C/V's father, Larry Schoolcraft and inquired about his son whereabouts. Mr. Schoolcraft explained to the undersigned that PO Schoolcraft wasn't feeling well and that they were at the doctor's office on Queens Blvd. Mr. Schoolcraft agreed to meeting the I/O back at the C/V's residence to review the "crime scene" and to discuss the investigation with his supervisor if he and PO Schoolcraft can be picked up from the Queens Blvd. location. The undersigned agreed. Sgt. Chu and Det. Thomas retrieved the C/V and Mr. Schoolcraft. The C/V invited the undersigned and accompanying investigators into his apartment. Before entering the C/V's apartment, Lt. McAteer asked PO Schoolcraft if he had any type of weapons, long arms or rifles present in

home that wasn't suppose to be in possession of. PO Schoolcraft denied having any type of weapons in his possession. As we entered the apartment the weapon was not in plain view. At this time Lt. McAteer engages in conversation with the C/V and Mr. Schoolcraft in reference to the investigation. During the conversation, the C/V exhibited hastiness and asked several times during his conversation with Lt. McAteer, what did he wanted to know so that the questioning would end. PO Schoolcraft eventually reiterated what he had reported to the undersigned to Lt. McAteer. Lt. McAteer, while standing in the bedroom where the firearm was allegedly located, asked the C/V if he was in possession of any firearms. PO Schoolcraft again denied having or being in possession of any firearm. Lt. McAteer informed PO Schoolcraft that before he had arrived at the C/V's apartment, he had an opportunity to review several of the recordings that was on the digital recording device that he had given to the undersigned. Lt. McAteer revealed to the C/V that he knew of the conversation that he had pertaining to the firearm. Lt. McAteer then asked PO Schoolcraft again if he was in possession of any firearms. The C/V denied having any type of weapons in his possession. Lt. McAteer asked the C/V if he would grant him permission to look underneath his bed for the alleged weapon. The C/V denied Lt. McAteer permission. The undersigned then called Mr. Schoolcraft into the bedroom and revealed to him that the I/O's knew that the C/V had a weapon underneath his bed based on the recorded telephone conversation between them. Mr. Schoolcraft admitted that a rifle was underneath the C/V's bed and that he told him to keep it there for his protection. Mr. Schoolcraft also stated that the weapon was his and that the C/V was holding it because he didn't have anything to protect himself since the department had taken the C/V's guns away. Mr. Schoolcraft stated to the I/O's that he had put the firearm underneath the C/V's bed. Mr. Schoolcraft gave Lt. McAteer permission to take possession of his firearm and claimed that it's not the C/V's. Mr. Schoolcraft called the rifle his little "pea shooter". Mr. Schoolcraft also advised the undersigned that the weapon underneath the C/V bed was one of thirty-three firearms the he owns. Lt. McAteer retrieved a black canvas type carrying case containing a High Point Firearms 9mm rifle model # 995 serial # B43323, with a laser beam attached, four magazines, 10 live rounds inside of a clear plastic bag and one box of Speer Gold Dot, containing 44 live rounds of NYPD regulation hollow point ammunition from underneath the C/V's bed. The C/V admitted to Lt. McAteer that he was aware of the fact that he did not have permission to be in possession of any firearms since his removal of firearms was in place. The C/V did admit to Lt. McAteer that he knew that the firearm was underneath his bed. Lt. McAteer advised the C/V and Mr. Schoolcraft the weapon well be vouched and secured by the NYPD for safekeeping until this case is resolved. The C/V informed the I/O's that as far as he is concerned, he is not employed by the New York City Police Department anymore. Mr. Schoolcraft continued to apologize for the C/V for being in possession of the aforesaid firearm and insisted that the C/V felt stupid for lying to the I/O's. The firearm was removed from the C/V's apartment without incident. The undersigned informed the C/V and Mr. Schoolcraft that they would have to be honest with the I/O's during the investigation into the alleged allegations from hear on out. The C/V and Mr. Schoolcraft agreed. After some further conversation pertaining to the investigation of the aforementioned case, the I/O's left the location.

5.      Subsequently the above firearm was taken to ESS Unit # 2 and was rendered safe, by PO Taylor. A firearms inquiry/trace was conducted and yielded negative results. The firearm was vouched under PCI # K319299 and delivered to the Property Clerks Office for safekeeping. This case will remain open.

6.      For your information.

Sgt. Alroy Scott
Case Investigator

Lt. Nicholas McAteer
Team Leader / Case Supervisor

D.I. David A. Grossi
Commanding Officer

W/S# 44
ATT: A, B

CONFIDENTIAL

NYC00004460