```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------X
     ADRIAN SCHOOLCRAFT,
 3
                                              PLAINTIFF,
 4                   -against-            Case No:
                                          10 Civ. 6005
 5                        (RWS)

 6   THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
     Tax Id. 873220, Individually and in his Official
 7   Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
     NORTH GERALD NELSON, Tax Id. 912370, Individually
 8   And in his Official Capacity, DEPUTY INSPECTOR
     STEVEN MAURIELLO, Tax Id. 895117, Individually and
 9   In his Official Capacity, CAPTAIN THEODORE
     LAUTERBORN, Tax Id. 897840, Individually and in his
10   Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
     919124, Individually and in his Official Capacity,
11   SGT. FREDERICK SAWYER, Shield No. 2576, Individually
     and in his Official Capacity, SERGEANT KURT DUNCAN,
12   Shield No. 2483, Individually and in his Official
     Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
13   915354, Individually and in his Official Capacity,
     LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
14   Individually and in his Official Capacity, SERGEANT
     SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
15   #1-50, Individually and in their Official Capacity
     (the name John Doe being fictitious, as the true
16   names are presently unknown) (collectively referred
     to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
17   CENTER, DR. ISAK ISAKOV, Individually and in his
     Official Capacity, DR. LILIAN ALDANA-BERNIER,
18   Individually and in her Official Capacity and
     JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
19   DOE" # 1-50, Individually and in their Official
     Capacity (the name John Doe being fictitious, as
20   The true names are presently unknown),

21                                        DEFENDANTS.
     ------------------------------------------------X
22

23                  DATE:  October 11, 2012

24                  TIME:  10:20 A.M.

25   (Continued ...)
```



DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

```
 1
 2                    DATE: October 11, 2012
 3                    TIME: 10:20 A.M.
 4
 5
 6              VIDEOTAPED DEPOSITION of the
 7    Plaintiff, ADRIAN SCHOOLCRAFT, taken by the
 8    Respective Parties, pursuant to a Notice and
 9    to the Federal Rules of Civil Procedure, held at
10    the offices of the New York City Law Department,
11    100 Church Street, New York, New York 10007, before
12    Nathan MacCormack, a Notary Public of the State of
13    New York.
14
15
16
17
18
19
20
21
22
23
24
25
```

1    Q.    Now, you said "lock people up." That would be an
2    arrest, correct?
3    A.    Correct.
4    Q.    I am asking specifically about summonses, so I
5    ask that you please confine your answers just with
6    summonses. Have you been trained to issue summonses
7    without probable cause?
8    A.    It's difficult for me to discern the difference
9    between the two. Summonses are issued in lieu of an
10   arrest. Summonses specifically, I believe -- I don't
11   recall any exact incident.
12         But again, I know there are recordings that
13   probably state that; summonses, arrests, 250's, what they
14   deemed activity.
15   Q.    And these recordings, you recall them stating
16   that a summons should be issued, even in the absence of
17   probable cause?
18              MR. NORINSBERG: Objection.
19   A.    That's how I took some of the instructions.
20   Q.    Have you ever personally observed another officer
21   issue a summons, without probable cause?
22   A.    It's hard to go back to and give an exact time
23   and date. But yes, I have seen it.
24   Q.    How many times?
25   A.    It's hard to approximate how many times. There's

A. SCHOOLCRAFT

1  A.  I don't know if I did, specifically. But I was
2  aware other officers that wanted overtime would have to
3  adhere to the policy in order to explain how they could
4  have that overtime.
5  Q.  But you personally, do you, sitting here today,
6  recall ever losing overtime for failing to issue a certain
7  number of summonses?
8  A.  As I sit here today, I don't recall losing
9  overtime.
10 Q.  What officers did you observe lose overtime for
11 failing to issue a certain number of summonses?
12 A.  I don't recall any specify officer. I just
13 recall that that was the general -- if an officer wanted
14 overtime, they would have to explain it. And when there
15 was overtime, I recall being addressed by supervisors. It
16 was understood.
17     The number was "two and two"; two summonses and
18 two 250's. If the officer made a collar, they wanted the
19 -- the supervisor wanted that collar, that arrest to be
20 250'd. And I think they -- you still weren't required to
21 do the summonses. But it was "two and two," that was the
22 phrase.
23 Q.  When you say "two and two," what do you mean?
24 A.  Two summonses, two 250's, two stop, question and
25 frisks.

A. SCHOOLCRAFT

1	Q.	Per month?

2	A.	Per that overtime, per when you are -- that

3	mandated overtime, or if you requested it.

4	Q.	So if I understand you, an officer who was given

5	overtime, was required to issue two summonses and make two

6	arrests during that overtime shift?

7		MR. NORINSBERG:  Objection.

8	A.	As a minimum, yes.

9	Q.	At a minimum.

10		MR. NORINSBERG:  I think you misjudged.  He

11		said two -

12		MS. PUBLICKER:  He just said yes.

13		MR. NORINSBERG:  No, but he said two

14		summonses and two 250's.

15		MR. COHEN:  He said it two times.

16		MR. NORINSBERG:  He said it two times, then

17		you rephrased it the wrong way.

18		MS. PUBLICKER:  And then he said "yes."  I

19		am sorry if I misphrased it, but --

20		MR. NORINSBERG:  Do you want to clarify,

21		Adrian?

22		THE WITNESS:  What was the question?

23	Q.	When you say "two and two," you are saying -- if

24	I misstated you, then -- two summonses and two 250's, or

25	two summonses and two arrests per overtime shift?

A. SCHOOLCRAFT

1    A.    Two summonses and two 250's, two and two.

2    Q.    Okay. What happened if they did not make that
3    two and two during their overtime shift?

4    A.    I don't believe they would -- they would not be
5    able to ask for overtime anymore.

6    Q.    Can you name a single person who was subject to
7    that policy?

8    A.    Not specifically. But I believe you can -- the
9    overtime is documented very well. You could see a pattern
10   of certain officers that have become dependent on overtime.

11   Q.    But have you ever seen an officer be refused
12   overtime because they did not hit the quota policy for
13   summons, you referred to earlier?

14   A.    I don't specifically -- I don't specifically
15   recall any officer or exact time. But that was general
16   knowledge.

17   Q.    Did you ever suffer a tour change as a result of
18   failing to issue a certain number of summonses per month?

19   A.    No. I don't -- I was on the same tour for --
20   maybe three years straight.

21   Q.    Do you observe another officer suffer that
22   penalty?

23   A.    I don't recall any specific officer. But I
24   recall officers getting in trouble. In order to get back
25   to their desired tour, they would have to produce summonses

know what number to give.
Q. More than 10?
A. I believe it was a lot. But I don't remember any specific number.
Q. And when did these conversations begin?
MR. NORINSBERG: Objection.
A. I don't recall any specific time or -- the specific supervisor. But again, the recordings, I can identify -- I can identify those, and the supervisors I noted in the Complaint.
Q. So aside from the recordings in this matter, did you have any conversations, one on one, with the supervisor about your summons activity, prior to your 2008 performance evaluation?
MR. NORINSBERG: Objection.
A. I believe so, yes.
Q. How many?
MR. NORINSBERG: Objection.
A. I couldn't even approximate the number of times the supervisors would approach us or me, the number of summonses and arrests and 250's.
Q. What supervisor spoke to you about your summons, arrests and 250's, personally?
A. We are still before the evaluation?
Q. Correct.

1   has ever been denied their vacation picks, no.

2       Q.   While you were assigned to the 81st Precinct,
3   were you aware of officers being required to make a certain
4   number of stop, question and frisks, or UF-250 forms?

5       A.   What was that time frame again?  The same
6   question, you don't have to rephrase it.

7       Q.   While you were assigned to the 81st Precinct,
8   okay, yes?

9       A.   Please repeat the question.

10      Q.   While you were assigned to the 81st Precinct,
11  were you aware of other officers being required to make a
12  certain number of stop, question and frisks, or UF-250's?

13      A.   Yes.

14      Q.   How many stops were officers required to conduct?

15      A.   Again, it would depend on the officer, what unit
16  he is assigned with.  Off the top of my head, I don't
17  recall any specific number, but the recordings -- the
18  conversations, the roll calls, that did address the number
19  of 250's.  I believe I have recordings that state times and
20  dates and people involved.

21      Q.   How many stops was a patrol officer required to
22  conduct in the 81st Precinct?

23      A.   I don't recall ever being given a specific number
24  on 250's, other than the -- if you are assigned overtime,
25  it was two and two, two summonses, two 250's.  I don't

A. SCHOOLCRAFT

1   recall any specific supervisor or any specific time. But
2   there were times where -- where they wanted a car to bring
3   at least two 250's or even individual officers, at least
4   two 250's for that shift.
5          But I don't believe -- it's possible they are
6   stating that in the recording. But I don't believe they
7   give a -- it's possible that I heard an exact number on the
8   250's, but I don't recall at this time.
9      Q.   Did a union delegate ever tell you about a number
10  of 250's that were required to be turned in?
11     A.   I don't recall union delegates addressing
12  numbers.
13     Q.   Did anyone ever tell you to conduct a stop,
14  question and frisk, even if you did not have reasonable
15  suspicion?
16     A.   Yes.
17     Q.   How many times?
18     A.   I can't approximate the number of times. There
19  were recordings -- I believe there are multiple recordings
20  of supervisors telling officers to articulate a charge
21  later: "If you summons someone, 250 them; if you 250 them,
22  summons them." There is no way to approximate how many
23  times we were instructed to falsify a 250.
24     Q.   What is the sum and substance of the recordings
25  you just made reference to?

A. SCHOOLCRAFT

1            MR. NORINSBERG: Objection,
2        mischaracterization of testimony.
3    A.   I don't believe so. I don't believe all of them
4    -- they weren't all intended to show just that type of
5    misconduct. There was also the falsifying the training
6    log, when there was no training, in fact.
7    Q.   Besides the recordings, were you trained to issue
8    250's or conduct stop, question and frisks, even if you did
9    not have reasonable suspicion?
10           MR. NORINSBERG: Objection to the form.
11   A.   I believe so, yes.
12   Q.   When did you receive that training?
13   A.   Again, I would have to listen to the recordings.
14   Q.   Well, my question asked you for "other than
15   recordings"?
16   A.   I cannot -- at this time, I cannot give you any
17   specific date or any specific supervisor. But again, the
18   recordings speak for themselves.
19   Q.   Did you lose overtime for failing to issue a
20   certain number of 250's?
21   A.   I don't believe -- I probably.
22   Q.   When?
23   A.   To the best -- again, probably. I wouldn't know
24   if I lost overtime, if they didn't give me overtime. I
25   don't know. A supervisor may be able to answer that

1   question.

2   Q.   How many times did you request overtime but were
3   denied?

4   A.   I don't recall ever requesting overtime.

5   Q.   Did you observe any other officers lose overtime
6   for failing to issue a certain number of 250's?

7   A.   I don't recall any specific officer or any
8   specific time.  But it was general knowledge, if you didn't
9   pay the rent, you did not get what you asked for.

10   Q.   Have you ever suffered a change of tour, as a
11   result of failing to issue a certain number of UF250's?

12   A.   If you include the losing proposition collars, I
13   would say yes.

14   Q.   How many times was your tour changed because you
15   failed to issue a certain number of 250's?

16   A.   I don't recall how many times.

17   Q.   What was the certain number of 250's you were
18   required to issue, when you had your tour changed for
19   failing to reach that number?

20            MR. NORINSBERG:  Objection.

21   A.   What was that again?

22   Q.   So you said that you did suffer a change of tour
23   for failing to issue a certain number of 250's; that is
24   correct?

25   A.   That I stated what?

1   Q.   That you did suffer a change of tour for failing
2   to issue a certain number of 250's?
3   A.   I don't recall making that statement, no.
4   Q.   You didn't just state that, no?
5        MR. NORINSBERG:  Objection.
6   A.   I don't believe so, no.
7   Q.   So you have never suffered a change of tour as a
8   result of failing to issue a certain number of 250's?
9   A.   Maybe I misheard the question.  The losing
10  proposition -- the intent of assigning officers to losing
11  proposition, the assigned arresting officers was to give
12  them more arrests, more bodies.
13  Q.   We are talking about 250's, here.
14  A.   Then that would have been -- I didn't understand
15  the question at that time.
16  Q.   Did you ever have your tour changed as a result
17  of failing to issue a certain number of UF-250's?
18  A.   I don't believe so, no.
19  Q.   Have you ever observed another officer suffer
20  that penalty?
21  A.   I don't recall any specific officer or any
22  conversation.
23  Q.   Have you ever been denied vacation days as a
24  result of failing to issue a certain number of 250's?
25  A.   Again, if I requested a vacation day that wasn't

1   a pick, I don't recall ever requesting a day that wasn't my
2   pick.
3       Q.   Have you ever stopped someone without reasonable
4   suspicion?
5       A.   No.  I don't believe, no.
6       Q.   Other than roll call, have you been trained on
7   how to issue UF-250's?
8       A.   I don't recall any other training regarding
9   250's, no.
10      Q.   Other than roll call, have you received any other
11  training on when you can stop someone, based on reasonable
12  suspicion?
13      A.   Perhaps in a law class in the police academy.  I
14  am sure they went over stop, question and frisks, and
15  reasonable suspicion and probable cause.
16      Q.   And at the academy, what did they teach you
17  about, when you can stop someone?
18      A.   I don't recall, specifically.  But it was my
19  understanding you can stop someone when you reasonably
20  suspect that they have or are about to commit a crime.
21      Q.   Have you personally observed another officer stop
22  someone without reasonable suspicion?
23      A.   Yes.
24      Q.   How many times?
25      A.   I can't approximate.  I don't remember every

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------------X
     ADRIAN SCHOOLCRAFT,
 3                                          PLAINTIFF,

 4                  -against-      Case No.:
                                   10 CV 6005
 5
     THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
 6   MARINO, Tax ID. 873220, Individually and
     in his Official Capacity, ASSISTANT CHIEF
 7   PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
     Tax Id. 912370, Individually and
 8   in his Official Capacity, DEPUTY INSPECTOR
     STEVEN MAURIELLO, Tax Id. 895117, Individually
 9   and in his Official Capacity, CAPTAIN THEODORE
     LAUTERBORN, Tax Id. 897840, Individually and
10   in his Official Capacity, LIEUTENANT WILLIAM
     GOUGH, Tax Id. 919124, Individually and
11   in his Official Capacity, SGT. FREDERICK SAWYER,
     Shield No. 2567, Individually and
12   in his Official Capacity, SERGEANT KURT DUNCAN,
     Shield No. 2483, Individually and
13   in his Official Capacity, LIEUTENANT CHRISTOPHER
     BROSCHART, Tax Id. 915354, Individually and
14   in his Official Capacity, LIEUTENANT TIMOTHY
     CAUGHEY, Tax Id. 885374, Individually and
15   in his Official Capacity, SERGEANT SHANTEL JAMES,
     Shield No. 3004, Individually and
16   in his Official Capacity, and P.O.'s "JOHN DOE"
     #1-50, Individually and in their Official Capacity,
17   (the name John Doe being fictitious, as the true
     names are presently unknown)(collectively
18   referred to as "NYPD Defendants"), JAMAICA
     HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
19   Individually and in his Official Capacity,
     DR. LILLIAN ALDANA-BERNIER, Individually and
20   in her Official Capacity, and JAMAICA HOSPITAL
     MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
21   Individually and in their Official Capacity,
     (the name John Doe being fictitious, as the
22   true names are presently unknown),

23                                          DEFENDANT.
     ----------------------------------------X
24

25   (Continued... )
```

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

```
1                    DATE: SEPTEMBER 26, 2013
2                    TIME: 10:10 A.M
3
4          VIDEO DEPOSITION of the Plaintiff, ADRIAN
5   SCHOOLCRAFT, taken by the respective parties, pursuant to a
6   Court Order and to the Federal Rules of Civil Procedure,
7   held at the offices of Scoppetta, Seiff, Kretz &
8   Abercrombie, Esqs, 444 Madison Avenue, New York New York,
9   10022 before Elizabeth Forero, a Notary Public of the State
10  of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

51
A. SCHOOLCRAFT

1  And the rest of that was just is everything's okay,
2  everything will be okay, and just comply.
3       Q.    Did Sergeant Myer participate in your 2008
4  evaluation?
5       A.    If he did, I am not aware.
6       Q.    Prior to receiving your 2008 evaluation the
7  question was:  Who told you a specific number?
8             MR. SMITH:  That wasn't the question but you
9             can ask that.
10            MR. KRETZ:  A while back it was.
11      A.    The time -- what were you talking about?
12      Q.    Who had told you directly a specific number you
13 had to produce and you mentioned DelaFunte, I believe?
14      A.    Correct.
15      Q.    That was before your 2008 evaluation?
16      A.    I don't remember the date of that.
17      Q.    Well, you said --
18      A.    It was a roll call.
19      Q.    It was a roll call.  You said when you received
20 your 2008 evaluation you considered it a retaliation.  And
21 then you indicated areas of your activity were highlighted
22 on your activity report.
23      A.    I believe it was a document with boxes that
24 looked similar to my activity report.  It may have been
25 because I think they sum up all the numbers at the end of

1   the year.  It may been that document, but it was obviously
2   the areas of summonses and arrests and 250s and it was
3   green highlighter.
4       Q.    Did you get the evaluation you got because you
5   were not performing at the level your supervising officers
6   thought you ought to be performing at or they were
7   retaliating against you for something?
8             MR. SMITH:  Objection to form.
9       Q.    Or are those the same in your mind?
10      A.    Well, you just confused me.  The question is --
11      Q.    You said the evaluation exhibited retaliation
12  against you.  Right?  And I asked what was the retaliation
13  for?  And you told me that your numbers were highlighted on
14  your activity report.  So you think they retaliated against
15  you because you didn't have high enough numbers on your
16  activity report?
17      A.    I believe that's the reason; correct.
18      Q.    As opposed to being critical of you for not
19  performing as fully they think you should have performed on
20  the job?
21            MR. SMITH:  Objection to the form.
22      A.    Performing at just what their definition of
23  activity or performing as an officer overall?  I think I
24  can answer that question.  I believe I was performing my
25  duties as a police officer to the best of my ability.  That

1  is how I feel they should have evaluated me not just based
2  on their narrow highlighted definition of activity.
3      Q.   You believe they evaluated you the way they did
4  purely based upon your numbers not being high enough?
5      A.   Correct.
6      Q.   Did you believe at the time there was a specific
7  number in each category that was required?
8      A.   I am not aware of a specific number.
9      Q.   You don't know whether your evaluation
10 constituted criticism of you for inactivity or constituted
11 retaliation against you for failing to achieve certain
12 numbers?
13          MR. SMITH:  Objection to form.
14     A.   I haven't reviewed the evaluation in a long time.
15 On the evaluation there are summaries --
16     Q.   This is what I am trying to get at.  Was the
17 evaluation a criticism of your performance or was it
18 retaliation for something?
19          MR. SMITH:  Wait.  Objection.
20     A.   I believe it was a retaliation.
21     Q.   And the retaliation for something was, you didn't
22 show enough activity?
23          MR. SMITH:  Objection to form.  This has
24          been asked and answered several times.  Excuse
25          me.  You are asking him to speculate about why