667-82153

CERTIFIED
TRANSCRIPT

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -

ADRIAN SCHOOLCRAFT,

                              Plaintiff,

        -against- Index No.
                  10CIV-6005 (RWS)

THE CITY OF NEW YORK, DEPUTY CHIEF
MICHAEL MARINO, Tax Id. 873220,
Individually and in his Official
Capacity, ASSISTANT CHIEF PATROL
BOROUGH BROOKLYN NORTH GERALD NELSON,
Tax Id. 912370, Individually and in his
Official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax Id. 895117,
Individually and in his Official
Capacity, CAPTAIN THEODORE LAUTERBORN,
Tax Id. 897840, Individually and in his
Official Capacity, LIEUTENANT JOSEPH
GOFF, Tax Id. 894025, Individually and
in his Official Capacity, stg. Frederick
Sawyer, Shield No. 2576, Individually
and in his Official Capacity, SERGEANT
KURT DUNCAN, Shield No. 2483,
Individually and in his Official
Capacity, LIEUTENANT TIMOTHY CAUGHEY,
Tax Id. 885374, Individually and in his
Official Capacity, SERGEANT SHANTEL
JAMES, Shield No. 3004, and P.O.'s "JOHN
DOE" 1-50, Individually and in their
Official Capacity (the name John Doe
being fictitious, as the true names are
presently unknown)(collectively referred
to as "NYPD defendants"), JAMAICA
HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
Individually and in his Official
Capacity, DR. LILIAN ALDANA-BERNIER,
Individually and in her Official Capacity
and JAMAICA HOSPITAL MEDICAL CENTER
EMPLOYEES "JOHN DOE" # 1-50, Individually

(Continued)

Page 2

1
2     and in their Official Capacity (the name
      John Doe being fictitious, as the true
3     names are presently unknown),
4
      Defendants.
5
          - - - - - - - - - - - - - - - - - - - -x
6
                          220 42nd Street
7                         New York, New York
8                         May 30, 2014
                          10:28 a.m.
9
10     VIDEOTAPED DEPOSITION of ANTHONY J.
11    MAFFIA, a Witness on behalf of one of the
12    Defendants, JAMAICA HOSPITAL MEDICAL
13    CENTER, in the above-entitled action,
14    held at the above time and place, taken
15    before Margaret Scully-Ayers, a Shorthand
16    Reporter and Notary Public of the State
17    of New York, pursuant to Order and the
18    Federal Rules of Civil Procedure.
19
20                *        *        *
21
22
23
24
25

Page 3

1

2   APPEARANCES:

3

    NATHANIEL SMITH, ESQ.
4   Attorney for Plaintiff
        111 Broadway
5       Suite 1305
        New York, New York 10006

6

7

    JOHN LENOIR, ESQ.
8   Attorney for Plaintiff
        829 Third Street NE
9       Washington, DC 20002
10  BY:  NOT PRESENT

11

12  SUCKLE SCHLESINGER PLLC
    Attorneys for Plaintiff
13      224 West 35th Street
        Suite 1200
14      New York, New York 10001
15  BY:  NOT PRESENT

16

17  ZACHARY W. CARTER, ESQ.
    Corporation Counsel
18  Attorneys for Defendant
    THE CITY OF NEW YORK
19      100 Church Street
        New York, New York  10007
20
    BY:  RYAN SHAFFER, ESQ.
21  File # 2010-033074

22

23

24

    (Appearances continued on next page.)
25

Page 4

```
 1
 2    APPEARANCES CONTINUED
 3
      SCOPPETTA, SEIFF, KRETZ & ABERCROMBIE,
 4    ESQS.
      Attorneys for Defendant
 5    STEVEN MAURIELLO
          444 Madison Avenue
 6        30th Floor
          New York, New York 10022
 7
      BY:  WALTER A. KRETZ, JR., ESQ.
 8
 9
10    MARTIN, CLEARWATER & BELL, LLP
      Attorneys for Defendant
11    JAMAICA HOSPITAL MEDICAL CENTER
          220 42nd Street
12        13th Floor
          New York, New York  10017
13
      BY:  GREGORY RADOMISLI, ESQ.
14    File # 667-82153
15
16
      IVONE, DEVINE & JENSEN, LLP
17    Attorneys for Defendant
      DR. ISAK ISAKOV
18        2001 Marcus Avenue
          Suite N100
19        Lake Success, New York 11042
20    BY:  MICHAEL T. IVONE, ESQ.
21
22    (Appearances continued on next page.)
23
24
25
```

Page 5

1

2    APPEARANCES CONTINUED

3

4    CALLAN, KOSTER, BRADY & BRENNAN, LLP
     Attorneys for Defendant

5    LILIAN ALDANA-BERNIER
         One Whitehall Street

6       New York, New York 10004

7    BY:  PAUL CALLAN, ESQ.
     File # 090.155440

8

9

10

11

12

                 *          *          *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1

2                STIPULATIONS

3      IT IS HEREBY STIPULATED AND AGREED, by

4   and among counsel for the respective

5   parties hereto, that the filing, sealing

6   and certification of the within

7   deposition shall be and the same are

8   hereby waived;

9      IT IS FURTHER STIPULATED AND AGREED

10  that all objections, except as to form of

11  the question, shall be reserved to the

12  time of the trial;

13     IT IS FURTHER STIPULATED AND AGREED

14  that the within deposition may be signed

15  before any Notary Public with the same

16  force and effect as if signed and sworn

17  to before the Court.

18

19              *       *       *

20

21

22

23

24

25

Page 7

1

2          MR. SMITH:   Going on the record

3      10:28.

4          This is the videotape deposition

5      of Jamaica Hospital.   We are at the

6      offices of Martin, Clearwater & Bell

7      at 220 East 42nd Street.

8          And would you mind swearing in

9      the Witness, please.

10         [Whereupon, an oath was

11     administered.]

12  A N T H O N Y   J.   M A F F I A, the Witness

13  herein, having first been duly sworn by the

14  Notary Public, was examined and testified as

15  follows:

16  EXAMINATION BY MR. SMITH:

17     Q.    What is your name?

18     A.    Anthony J. Maffia.

19     Q.    Where do you reside?

20     A.    722 Willow Road, Franklin

21  Square, New York 11010.

22         MR. RADOMISLI:   Pursuant to the

23     federal rules, we reserve our right to

24     review and make corrections to the

25     transcript.

Page 8

1                    A. MAFFIA

2              MR. SMITH:   Okay.

3       Q.     Good morning, Mr. Maffia.   Is

4   that how you pronounce it?

5       A.     Correct.

6       Q.     My name is Nathaniel Smith, and

7   I'm an attorney.   I represent Adrian

8   Schoolcraft who was an individual who

9   brought a claim against Jamaica Hospital.

10  He was admitted against his will by

11  Jamaica Hospital, and he brought a

12  lawsuit against Jamaica Hospital and

13  others.

14              There's a few rules and

15  procedures.   I'm sure your counsel spoke

16  with you about them; the rules and

17  procedures.   I just want to clarify that

18  we both agree on them at the beginning of

19  the record.   Okay?

20       A.     Okay.

21       Q.     Is that all right?

22       A.     Okay.

23       Q.     If I ask you a question and you

24  don't understand, will you please let me

25  know?

Page 9

1                     A. MAFFIA

2        A.      Okay.

3        Q.      You've just been sworn to tell

4    the truth so it's important that you do

5    that but also important that you

6    understand my questions because if I ask

7    a question and you answer, I'm going to

8    assume and the record is going to assume

9    that you understood the question.

10                 If you have any concerns about

11   the question, please let me know and I

12   will do my best to rephrase it.  Okay?

13       A.      Okay.

14       Q.      Have you ever been deposed

15   before?

16       A.      No.

17       Q.      Who are you currently employed

18   by?

19       A.      Jamaica Hospital Medical

20   Center.

21       Q.      What is your position there?

22       A.      Vice president of psychiatry.

23       Q.      How long have you been the vice

24   president of psychiatry?

25       A.      Since 1995.

```
 1               A. MAFFIA
 2          MR. IVONE:  Read that back.
 3          [The requested portion of the
 4     record was read.]
 5     Q.    Is there a department within
 6  Jamaica Hospital that you work in?
 7     A.    Yes, the Department of
 8  Psychiatry.
 9     Q.    How long have you worked within
10  the Department of Psychiatry at Jamaica
11  Hospital?
12     A.    Since 1995.
13     Q.    Can you describe for me the
14  organizational structure of the
15  Department of Psychiatry?
16          MR. RADOMISLI:  Objection to
17     form.
18          But you can answer the question.
19     A.    The organizational structure is
20  that there is a vice president, myself,
21  who reports to the chief operating
22  officer of the hospital.
23          There is clinical chairman who
24  reports to the chief operating officer,
25  the medical board, and the president of
```

```
 1                    A. MAFFIA
 2     the hospital; and he takes care of all
 3     clinical matters.
 4            And I take care of --
 5     responsible for the administrative
 6     matters.
 7         Q.    What is the name of the
 8     individual who was in charge of the
 9     clinical matters?
10         A.    Dr. Seeth, S-E-E-T-H, first
11     name; last name Vivek, V-I-V-E-K.  He's a
12     physician.
13         Q.    Are you a physician?
14         A.    I am not.
15         Q.    Do you report to the same
16     individuals that Vivek reports to?
17         A.    Well, he reports to the medical
18     board, and I report to the chief
19     operating officer and the president.
20            He reports to the medical
21     board, the chief operating officer, and
22     the president.
23         Q.    Who is the chief operating
24     officer?
25         A.    William Lynch.
```

```
1              A. MAFFIA
2       Q.    Have you reported to Lynch
3   throughout your tenure and Jamaica
4   Hospital?
5       A.    No.
6       Q.    Who else was the chief
7   operating officer?
8       A.    Prior to Mr. Lynch was Mr.
9   Bruce Flanz, F-L-A-N-Z, first name Bruce.
10      Q.    When did Lynch become the chief
11  operating officer?
12      A.    About one year ago.
13      Q.    In 2009 Flanz was the chief
14  operating officer of the hospital?
15      A.    That's correct.
16      Q.    As the vice president, what are
17  your duties?
18      A.    My duties are administrative in
19  nature.
20      Q.    Can you explain that in a
21  little bit more detail?
22      A.    I'm responsible for program
23  development; budgets; finance; grant
24  writing; any other administrative issues;
25  development of space; construction; those
```

Page 13

```
 1              A. MAFFIA
 2    types of things.
 3        Q.     Exclusively for the Department
 4    of Psychiatry?
 5        A.     That's correct.
 6        Q.     When you say "program
 7    development," what kind of program
 8    development are you referring to?
 9        A.     To new ideas and concepts for
10    different types of programs we can
11    utilize at the hospital to assist the
12    community; for instance, operations that
13    would help patients utilize a mental
14    health clinic more than an inpatient
15    setting, a CPEP, Comprehensive
16    Psychiatric Emergency Program.
17        Q.     Was there a CPEP at the
18    hospital in 2009?
19        A.     No.
20        Q.     When did a CPEP operation
21    commence at the hospital?
22        A.     Last year.
23        Q.     Was it that last year that
24    there were renovations done to the
25    psychiatric emergency room?
```

Page 14

1                    A. MAFFIA

2       A.    That's correct.

3       Q.    And those renovations were done

4   in order to obtain the CPEP

5   authorization?

6       A.    That's correct.

7       Q.    What kind of psychiatric

8   facility did the hospital have in 2009?

9       A.    They had a mental health

10  clinic, a psychiatric emergency

11  department, and two psychiatric inpatient

12  units.

13            MR. IVONE:  I'm sorry.

14            THE WITNESS:  Two psychiatric

15       inpatient units.

16            MR. RADOMISLI:  Off the record.

17            [Discussion held off the

18       record.]

19       Q.    You said there was a clinic at

20  the hospital?

21       A.    Uh-huh.

22       Q.    What did the clinic do?

23       A.    Sees outpatients.

24       Q.    And the psychiatric ER, what

25  does that do?

```
 1                    A. MAFFIA
 2      A.      Sees emergency patients.
 3      Q.      What are emergency patients?
 4      A.      Patients that are brought in
 5   requiring emergency care either by
 6   ambulance, by police, by families or
 7   themselves.
 8      Q.      What are the circumstances
 9   under which patients require emergency
10   care?
11              MR. RADOMISLI:  Objection, goes
12         beyond the scope.
13              Don't answer the question.
14              MR. SMITH:  Don't answer the
15         question?
16              MR. RADOMISLI:  You are limited
17         by court order.
18              MR. SMITH:  Well, I'm not going
19         to quibble with you about that, but I
20         think I need a little bit of latitude
21         to understand the nature of the
22         operations and all the other areas.
23              So give me a little bit of
24         latitude so we won't get into an
25         unnecessary delay.
```

Page 16

1              A. MAFFIA
2              MR. RADOMISLI:   The question is
3        --
4              MR. SMITH:   I understand what
5        the court order was.   I think you do
6        to.
7              So I'm suggesting give me a
8        little bit of latitude and if you
9        think I'm really going beyond the
10       limitations, that might be a good
11       point to tell the Witness not to
12       answer the question.
13             MR. RADOMISLI:   I think the
14       question that you just asked goes
15       beyond it.
16       Q.    The two wards that you
17   mentioned, units, what do they do?
18       A.    They see psychiatric patients.
19       Q.    Where are they located?
20       A.    They are on the second and
21   third floor of what is known as the C
22   building at the hospital.
23       Q.    Is there any difference between
24   the two units?
25       A.    No.

```
1                    A. MAFFIA
2       Q.      How many beds in each unit?
3       A.      Twenty-five.
4       Q.      What is your year of birth?
5       A.      1949.
6       Q.      What is your highest level of
7  education?
8       A.      Master's degree.
9       Q.      In what?
10      A.      Social work.
11      Q.      When did you get that?
12      A.      1977.
13      Q.      From where?
14      A.      Adelphi University.
15      Q.      What did you do after that?
16      A.      Worked at what was Booth
17 Memorial Medical Center, now New York
18 Hospital Queens.
19      Q.      Doing what?
20      A.      Social work.
21      Q.      What was your next form of
22 employment?
23      A.      Winthrop University Hospital.
24      Q.      Doing what?
25      A.      Social work.  I was the
```

Page 18

```
 1                    A. MAFFIA
 2    assistant director of social work there.
 3         Q.    What was your next form of
 4    employment?
 5         A.    Jamaica Hospital.  I was the
 6    director of social work there.
 7         Q.    When did you start working at
 8    Jamaica Hospital?
 9         A.    1986.
10         Q.    What were your duties as a
11    director of social work in 1986?
12         A.    To supervise and direct the
13    social work services at the hospital.
14         Q.    What are the social work
15    services at the hospital?
16              MR. RADOMISLI:  What were they
17         back in 1986?
18              MR. SMITH:  No, what are they.
19         A.    Now?
20         Q.    Yes.
21         A.    I'm not the director of social
22    work anymore.
23         Q.    At the time that you were, what
24    were the social work activities?
25              MR. RADOMISLI:  Objection.
```

Page 19

1                    A. MAFFIA
2               But you can answer.
3        A.      They provided discharge
4    planning services to the patients in the
5    hospital.
6        Q.      Anything else?
7        A.      Also counseling services to the
8    same patients and their families.
9        Q.      What kind of counseling?
10       A.      Counseling around discharge,
11   assistance at home, basically, medical
12   social work.  It wasn't psychiatric
13   social work.
14       Q.      What did you do next?
15       A.      In 1995 I was promoted to vice
16   president of psychiatry at Jamaica
17   Hospital.
18       Q.      Those are the duties that you
19   have and that's the title that you have
20   today?
21       A.      That's correct.
22       Q.      Was your work as a social
23   worker prior to coming to Jamaica
24   Hospital medical social work?
25       A.      Yes.

```
                                      Page 20
 1                  A. MAFFIA
 2       Q.    Did it also involve psychiatric
 3   social work?
 4       A.    At Winthrop the answer -- yeah,
 5   and at Jamaica -- Booth also.  It was
 6   limited experience in psychiatry there at
 7   Winthrop.  I had some experience in
 8   psychiatric social work there.
 9       Q.    What was your experience in the
10   psychiatric social work?
11       A.    There was a psychiatric unit at
12   Winthrop, and I supervised the social
13   work there.
14       Q.    Do you have any training in
15   psychiatric social work?
16       A.    Social work is social work.
17   Psychiatry is only the division that you
18   work in.
19       Q.    Is that an answer to my
20   question?
21       A.    [Indicating.]
22       Q.    Yes?
23       A.    Yes.
24             If you are a social worker in a
25   psychiatric setting, that's where you
```

Page 21

1                    A. MAFFIA

2      work.  If you were a social worker in a

3      medical setting, you do social work in a

4      medical setting.

5              The differentiation is the type

6      of social work you provide.  Social work

7      in general as a service or diploma is

8      social work.

9          Q.    Do you have any licenses?

10         A.    Yes.

11         Q.    What licenses do you have?

12         A.    I am LCSW, a licensed clinical

13     social worker.

14         Q.    Any other licenses?

15         A.    No.

16         Q.    As a licensed social worker,

17     did you have to take any examinations?

18         A.    Yes.

19         Q.    Who administered those

20     examinations?

21         A.    The State of New York.

22         Q.    Do you also have to have

23     certain educational requirement?

24         A.    Master's degree.

25         Q.    Either in your studies to

Page 22

```
 1                    A. MAFFIA
 2    obtain your master's degree or in your
 3    studies to obtain any prior degrees, did
 4    you have any training in psychiatric
 5    social work?
 6              MR. RADOMISLI:  Objection.
 7              You can answer.
 8       A.    No.
 9       Q.    Have you ever had any training
10    in psychiatric social work?
11              MR. RADOMISLI:  Asked and
12         answered.
13              You can answer.
14       A.    Yes.
15       Q.    What was your training in
16    psychiatric social work?
17       A.    When I worked at Booth Memorial
18    Medical Center, there was as psychiatric
19    unit there.  I provided services there
20    and was supervised by the director of the
21    department.
22       Q.    And that was the extent of your
23    training in psychiatric social work?
24              MR. RADOMISLI:  Objection to
25         form.
```

```
 1              A. MAFFIA
 2         MR. SMITH:  You can answer.
 3    A.    At Booth.
 4    Q.    How were you trained?
 5         MR. RADOMISLI:  He is not here
 6    as a personal witness.  He is here as
 7    a corporate witness.
 8         MR. SMITH:  But I'm trying to
 9    understand the foundation for the
10    subject matters I'm going to ask him
11    about.
12         MR. RADOMISLI:  Well, I'm not
13    sure that that question goes to the
14    issues.  I'm not going to give you a
15    hard time, but at some point --
16         MR. SMITH:  Okay.  I'm just
17    trying to find out what his training
18    was in psychiatric social work in
19    forms not only from his experience and
20    the level of his foundation for the
21    testimony.
22         MR. RADOMISLI:  Not really.  The
23    foundation of his testimony is his
24    role as VP director and VP in
25    psychiatric.
```

Page 24

1              A. MAFFIA

2         MR. SMITH:  I'm not going to go

3     into this in great detail.

4         Q.    Sir, can you just briefly

5     describe for me what training you got for

6     psychiatric social work?

7         A.    I received training also at

8     Winthrop when I was a supervisor of the

9     unit there and there were educational

10    programs that I would attend along with

11    other social workers and team members.

12        Q.    What were these educational

13    program about?

14        A.    They would be called case

15    conferences, grand rounds, individual

16    conferences about certain patients with

17    psychiatrists who would discuss the

18    patients.

19        Q.    Have you ever received any

20    training in order to determine whether or

21    not a patient is a danger to themselves

22    or others?

23        MR. RADOMISLI:  Objection.

24        I'm going to direct him not to

25    answer.  It's beyond the scope.

Page 25

```
 1              A. MAFFIA
 2       Q.     At Jamaica Hospital, do you
 3   have any role in making assessment of
 4   dangerousness of individuals who are
 5   mentally ill or have been alleged to be
 6   mentally ill?
 7       A.     No, the physicians do that.
 8       Q.     What did you do to prepare for
 9   today's deposition?
10       A.     Met with the attorneys or
11   attorney.
12       Q.     When?
13       A.     Over about a two- or three-week
14   period probably.
15       Q.     My question was when?
16       A.     When, sorry.  Once a week for
17   the last three weeks.
18            MR. RADOMISLI:  Don't look at
19       me.
20            THE WITNESS:  I apologize.  I'm
21       just trying to remember.
22            MR. SMITH:  Did you say don't
23       look at him?
24            MR. RADOMISLI:  Don't look at
25       me.  I can't give you the answer.
```

1                    A. MAFFIA

2       Q.     How many times did you meet,

3    How many times did you meet with the

4    attorney for Jamaica Hospital in this

5    case?

6       A.     Three times.

7       Q.     How long were each of these

8    meetings?

9       A.     Between hour and a half to two

10   hours.

11      Q.     Did you look at any documents?

12      A.     Yes.

13      Q.     What documents did you look at?

14      A.     Some of the policies that the

15   Department of Psychiatry has.

16      Q.     How many policies did you look

17   at?

18      A.     I don't know, several.

19      Q.     Did you look at anything else

20   other than Department of Psychiatry

21   policies?

22      A.     No.

23      Q.     What were the policies about?

24      A.     One policy was about

25   involuntary admission.

Page 27

1                    A. MAFFIA

2      Q.    What were the other policies

3  about?

4      A.    Similar.

5      Q.    I don't know what that means.

6      A.    There was some policies about

7  involuntary admission and some of the

8  issues surrounding the mental hygiene law

9  and the policies.  I looked at those.

10     Q.    I'm not sure you're answering

11  my question.

12           What policies of the hospital

13  did you look at in preparing for your

14  deposition?

15     A.    It was a policy on involuntary

16  admissions.

17     Q.    You told me about that.

18     A.    Right.

19     Q.    What other policies did you

20  look at in preparing for your deposition?

21     A.    I can't recall.  I know it was

22  that one.  I don't recall.  I'm sorry.

23     Q.    Who were the attorneys that you

24  met with on those three occasions when

25  you prepared for your deposition?

Page 28

```
 1                    A. MAFFIA
 2      A.    On all three occasions, counsel
 3   present [indicating], also there was
 4   another attorney that we met with Mr.
 5   Thrope, T-H-R-O-P-E.
 6      Q.    Who is Mr. Thrope?
 7      A.    He was one of the attorneys for
 8   the hospital.
 9      Q.    Does he work for Martin,
10   Clearwater & Bell?
11      A.    No, he does not.
12      Q.    He is in-house counsel for the
13   hospital?
14      A.    No, he works for a firm.  I
15   don't know.
16            In-house, does that mean we
17   employ him and he works at the hospital?
18   I don't understand.
19      Q.    What is the name of the firm?
20      A.    Foley & Lardner.
21      Q.    It's your understanding he was
22   the attorney representing the hospital?
23      A.    That's correct.
24      Q.    Was there anybody else present?
25      A.    Yes.
```

Page 29

1              A. MAFFIA

2      Q.     Who?

3      A.     Dr. Vivek was present at one

4  meeting.

5      Q.     Anybody else present at any of

6  these meetings?

7      A.     No.

8      Q.     Is Dr. Vivek your peer, your

9  superior, or your subordinate at the

10  hospital?

11      A.     He is --

12              MR. RADOMISLI:   Objection to

13      form.

14      A.     He is a peer.

15      Q.     Have you spoken with anybody

16  else at the hospital about your

17  deposition?

18      A.     No.

19      Q.     Have you done anything else

20  other than meet with the attorneys and

21  Dr. Vivek on the three occasions and

22  looked at the policy documents that you

23  mentioned?

24      A.     Say that again.

25      Q.     I'll be happy to.

Page 30

1                    A. MAFFIA

2              Other than meeting the

3      attorneys on these three occasions --

4      A.      Uh-huh.

5      Q.      -- and other than looking at

6      these policy documents for the hospital,

7      did you do anything else to prepare for

8      today's deposition?

9              MR. RADOMISLI:  Other than Dr.

10         Vivek.

11             MR. SMITH:  He was at one of the

12         meetings.

13             THE WITNESS:  Right.

14     Q.      Other than being in these three

15     meetings and other than looking at these

16     policy documents, did you do anything

17     else to prepare for your deposition?

18     A.      No.

19     Q.      What is your understanding of

20     the subject matter that you are here to

21     testify about?

22     A.      I'm here to testify about four

23     issues:  One was about structure of the

24     hospital; something about cameras;

25     policies; and I forget the fourth one.

Page 31

1                    A. MAFFIA
2    I'm sorry.
3         Q.    Was the fourth one performance
4    evaluations at the hospital for doctors?
5         A.    Yes [indicating].
6         Q.    Is that correct?
7         A.    Yes.   Sorry.
8         Q.    Does the hospital have any
9    procedures, protocols, or practice with
10   respect to doing evaluations on the
11   performance of doctors that work for it?
12        A.    Yes.
13        Q.    What are those?
14        A.    They get a yearly evaluation.
15        Q.    Is there a policy document that
16   describes what that yearly evaluation
17   covers?
18        A.    The evaluation which I'm
19   somewhat familiar with has the tenet of
20   what the evaluation is about; what the
21   doctor is evaluated on.   It kind of
22   serves as the policy and the evaluation
23   tool.
24        Q.    Can you explain that answer?
25        A.    In other words, on the

Page 32

1              A. MAFFIA

2    evaluation there are things that the

3    doctor was evaluated on and that serves

4    as the policy.

5              Is there a policy they get a

6    yearly evaluation, the answer is yes.

7        Q.    So there is a form of

8    evaluation used to evaluation doctors?

9        A.    That's correct, right.

10       Q.    And the form covers certain

11   subject matters; is that correct?

12       A.    Yes.

13       Q.    And are you telling me that the

14   hospital policy about what the factors

15   are in order to assess the performance of

16   the doctors who works at the hospital are

17   set forth in the form?

18       A.    Yes.

19             MR. SMITH:   I request the

20        production of the form, Jamaica

21        Hospital evaluation that was employed

22        to evaluate doctors for the period

23        2007, '8, '9.

24             MR. RADOMISLI:   Taken under

25        advisement.  Please follow up in

Page 33

1                    A. MAFFIA

2        writing.

3        Q.      Have you looked at that form

4    recently?

5        A.      Yes, just perused it briefly.

6        Q.      When?

7        A.      During one of our conversations

8    with the attorneys.

9        Q.      What do you recall about the

10   form?

11       A.      It has certain items that the

12   physicians are evaluated on.

13       Q.      What are the items?

14       A.      Their ability to relate to

15   patients, ability to relate to staff, the

16   ability to work on an interdisciplinary

17   team, those are some of the items.

18       Q.      I would like to know all of the

19   items.

20       A.      I couldn't recount them all.

21       Q.      Do you have them here today?

22       A.      I don't have them.

23       Q.      So you're not ready to testify

24   about the subject matter of the

25   evaluation process for doctors at Jamaica

```
                                    Page 34

 1                 A. MAFFIA
 2   Hospital, are you?
 3        A.    I don't --
 4             MR. RADOMISLI:  Objection to
 5        form.
 6        A.    I don't do the evaluations.
 7        Q.    So you are not prepared to talk
 8   to me about what the evaluations of
 9   doctors are, right?
10             MR. RADOMISLI:  Objection.  He
11        is --
12             MR. SMITH:  You can object.  You
13        can instruct him not to answer
14        questions.  Please don't make any
15        speeches.
16             MR. RADOMISLI:  I'm going to
17        object to that question.
18             MR. SMITH:  You can answer.
19             MR. RADOMISLI:  He cannot
20        answer.  He is here to answer
21        questions about the evaluation
22        process.
23             MR. SMITH:  Stop.  You're
24        interrupting my examination.
25        Q.    Do you want to answer my
```

Page 35

```
 1                    A. MAFFIA
 2   question, please?
 3             MR. RADOMISLI:  No.
 4             MR. SMITH:  You're telling him
 5        not to answer a question about whether
 6        or not he is prepared to answer as to
 7        the subject matter that the Court
 8        directed him to appear before me and
 9        answer.  Is that what you're doing?
10             MR. RADOMISLI:  No.  The form of
11        the question is improper.
12             MR. SMITH:  Fine.  If the form
13        is improper, the form is improper; but
14        to instruct him not to answer the
15        question because of that is completely
16        improper, okay, and you know it so
17        stop it.
18             MR. RADOMISLI:  Don't raise your
19        voice.
20             MR. SMITH:  I'm not raising my
21        voice.  I'm frustrated every time I
22        ask a question I try to get basic
23        information, I get stall tactics like
24        this.
25             MR. RADOMISLI:  Stall tactics?
```

1          A. MAFFIA

2          MR. SMITH:  I'm asking the

3     Witness whether or not he is prepared

4     to testify about one of the subject

5     matters that the Court directed you to

6     produce him on.

7          MR. RADOMISLI:  Fine.

8          MR. SMITH:  And you're

9     instructing not to answer that

10    question.

11         MR. RADOMISLI:  Not in that

12    form.  Don't ask it in the negative.

13    Ask a positive question.

14    Q.    Are you prepared to testify on

15    the subject matters of the performance

16    evaluation process for doctors at Jamaica

17    Hospital?

18    A.    I can testify as to -- ask me a

19    question and I try to help you.

20    Q.    I just asked you a question,

21    sir.  Do you want to answer my question?

22         Are you prepared to testify

23    about the factors that go into the

24    evaluation of doctors at Jamaica

25    Hospital?

```
 1                  A. MAFFIA
 2       A.    I know what some of the factors
 3  are.
 4       Q.    But some of the factors you
 5  don't know?
 6       A.    That's correct.  I can't
 7  remember all of them.
 8            MR. SMITH:  My suggestion,
 9       Counsel, is you either get me a copy
10       of this form now and I show it to the
11       Witness or we are going to have to
12       come back.
13            MR. RADOMISLI:  He can testify
14       about the evaluation process.  You
15       specifically asked for documents
16       before the court conference, and the
17       Court did not allow you to get it.
18            He is here to talk about the
19       evaluation process of the doctors.  It
20       doesn't necessarily mean it's
21       exhaustive, every single item.  He can
22       tell you what he can tell you.  He is
23       prepared to tell you about the
24       process.
25            MR. SMITH:  I don't mean to
```

Page 38

```
 1              A. MAFFIA
 2     lecture you about the law.  The fact
 3     is he has an obligation to study the
 4     subject matter of the 30(b)(6) witness
 5     and come here prepared to provide
 6     information, complete information
 7     about the subject matter.
 8          To me he has not done that
 9     because he says I don't know some of
10     the factors but I don't know all of
11     them, and I looked at the form but I
12     can't remember everything.
13          So, again, I suggest to you, you
14     get me the form and you present it to
15     the Witness that he looked at recently
16     so we can complete this witness's
17     examination, or we were going to have
18     to have another fight.  It's up to
19     you.
20          MR. RADOMISLI:  The Witness is
21     prepared to answer your questions.
22     It's not a memory test.
23          If you want to ask him about
24     certain things whether X is
25     considered, Y is considered, go ahead.
```

Page 39

1              A. MAFFIA

2      He is not here to reiterate the entire

3      form.  He is not required to do that.

4      He is familiar enough with the process

5      and the what factors are considered.

6              The fact that he may not be able

7      to remember every single one, does not

8      disqualify him as a competent witness.

9              MR. SMITH:  Well, I disagree

10     with you.

11             So you are not going to get that

12     form so we can complete his

13     examination?

14             MR. RADOMISLI:  I'll think about

15     it.  Move onto other topics.

16             MR. SMITH:  That's reasonable.

17             We will leave the performance

18     evaluation subject matter and come

19     back to that later.

20     Q.    What is the organizational or

21  corporate structure of Jamaica Hospital?

22             MR. IVONE:  Read that back.

23             [The requested portion of the

24     record was read.]

25     A.    Jamaica Hospital has a board of

Page 40

```
1                A. MAFFIA
2    trustees with a chairman and then there
3    are several officers on the board, board
4    members.  Under that is the president and
5    CEO of the hospital.  Underneath the
6    president and CEO is the chief operating
7    officer and the chief financial officer.
8    Kind of across from that is the medical
9    board.  Underneath the medical board who
10   has a president, there are the clinical
11   chairmen which also report to the
12   president and CFO and COO; and there are
13   vice presidents underneath the president
14   and the chief operating officer.
15   Underneath the vice presidents are
16   various administrators and directors of
17   services.
18             Jamaica Hospital is
19   not-for-profit hospital.
20        Q.    Who is the chairman?
21        A.    The board of trustees?
22        Q.    Yes.
23        A.    Neil Phillips.
24        Q.    Who is the president of the
25   hospital?
```

```
                                    Page 41

 1                    A. MAFFIA

 2       A.    Mr. Bruce Flanz.

 3       Q.    And the CEO?

 4       A.    He is the CEO.

 5       Q.    And the COO?

 6       A.    Mr. William Lynch.

 7       Q.    And the CFO?

 8       A.    Mounir, M-O-U-N-I-R; last name

 9   Doss, D-O-S-S.

10       Q.    How many vice presidents are

11   there?

12       A.    I believe there are six.

13       Q.    What are their titles other

14   than yours?

15       A.    There is a vice president for

16   finance; vice president ambulatory care,

17   vice president for

18   rehabilitation/transitional care

19   services.  I'm trying to remember, jeez.

20   I'm missing something.  I'm sorry.  I

21   will remember.

22       Q.    If it comes to your mind, let

23   me know?

24       A.    I apologize.

25             Vice president of nursing, Miss
```

1                A. MAFFIA
2    Holley, H-O-L-L-E-Y.
3        Q.    Does the hospital have separate
4    departments?
5        A.    Yes.
6        Q.    Who are those?
7        A.    There are quite a few.  Are you
8    talking about clinical departments?
9        Q.    I want to know about the
10   organizational structure.
11       A.    The Department of Surgery; the
12   Department of Medicine; Department of
13   OB/GYN; Department of Pediatrics.  There
14   is the Department of Rehabilitation
15   Medicine; pediatrics, and Department of
16   Anesthesia, Emergency Department, there a
17   whole series of other departments:
18   pulmonary; respiratory; social work;
19   quality improvement.  There's dozens.
20       Q.    I would like know to the extent
21   that you have to rattle off those
22   departments, I would like to know what
23   they are.
24       A.    Let's see.  I mentioned
25   respiratory, instruction, engineering,

Page 43

```
 1                    A. MAFFIA

 2   housekeeping, plant operations, human

 3   resources, there is the Finance

 4   Department, Benefits Department,

 5   Department of Nursing, Department of

 6   Ambulatory Care, case management, the

 7   list goes kind of on and on.

 8        Q.    Who runs the Emergency

 9   Department?

10        A.    Dr. Doughlin.  He is the

11   chairman of emergency medicine.

12        Q.    Who runs the Finance

13   Department?

14        A.    Mounir Doss, the chief

15   financial officer.

16        Q.    Is the Finance Department

17   responsible for determining whether or

18   not services the hospital provides will

19   be covered by insurance, among other

20   things?

21        A.    I can't answer your question

22   the way you phrased it.  Could you just

23   ask it another way?  I'm sorry.

24        Q.    Is there a particular

25   department within the hospital
```

Page 44

1                    A. MAFFIA

2    responsible for determining whether or

3    not the hospital will be reimbursed by

4    insurance or some other third-party

5    payer?

6         A.    The Finance Department would

7    usually bill or send the bills out to the

8    insurance company.

9         Q.    Which department contacts

10   insurance companies to find out whether

11   or not a service to be provided will be

12   covered?

13        A.    Usually, it would be the

14   Finance Department and case management.

15        Q.    Who runs case management?

16        A.    Cheryl Mersten, M-E-R-S-T-E-N,

17   I believe.  She runs case management.

18        Q.    Is there a Security Department?

19        A.    Yes, there is.  I left that

20   out.

21        Q.    Who runs the Security

22   Department?

23        A.    Presently.

24        Q.    Yes?

25        A.    Mr. Charles Neacy, N-E-A-C-Y.

Page 45

1                    A. MAFFIA

2     Q.    Who ran security in 2009?

3     A.    I think it was a Mr. Martinez.

4     Q.    What was his first name?

5     A.    Francisco.  I might be wrong

6  about that.  I believe it was him.

7     Q.    How many people worked in the

8  Security Department?

9     A.    I don't know.

10     Q.    Any of them formal NYPD?

11     A.    I don't know that either.

12     Q.    Who are the other directors of

13  the Security Department who you can think

14  of?

15     A.    Previous directors?

16     Q.    Yes.

17     A.    There was prior to Mr.

18  Martinez, there was a Clarence Herring.

19     Q.    Can you spell that?

20     A.    H-E-R-R-I-N-G?

21     Q.    Anybody else?

22     A.    Prior to him was a gentleman by

23  the name of David McJolly, M-C-J-O-L-L-Y.

24     Q.    And prior to him?

25     A.    A gentleman by the name of

Page 46

```
 1                    A. MAFFIA
 2    Buster Stratton.
 3        Q.    Prior to Stratton?
 4        A.    I don't know.  I'm sorry.
 5        Q.    I have exhausted your
 6    knowledge?
 7        A.    Right, it's before my time.
 8              MR. RADOMISLI:  Off the record.
 9              [Discussion held off the
10        record.]
11              MR. SMITH:  Going off the
12        record, 11:13 a.m.
13              [Whereupon, at 11:13 a.m., a
14        recess was taken.]
15              [Whereupon, at 11:13 a.m., the
16        testimony continued.]
17              MR. SMITH:  Going on the record.
18        It's still 11:13.  We were just off
19        for a few seconds.
20        Q.    Is the Security Department at
21    Jamaica Hospital the department that's
22    responsible for the operations of
23    security cameras?
24        A.    Yes.
25        Q.    What kind of security cameras
```

1                    A. MAFFIA

2      were at Jamaica Hospital in

3      October/November 2009?

4           A.    The cameras were broken.

5           Q.    So there were cameras in the

6      hospital, but they were broken?

7           A.    That's correct.

8           Q.    How many cameras were there in

9      the hospital?

10          A.    In the entire hospital?

11          Q.    Yes.

12          A.    I couldn't even begin to guess.

13                MR. SMITH:   I think that

14          question was a little bit poorly

15          formed, very badly, poorly formed.

16          Q.    How many camera systems were

17      there in the hospital in October 2009?

18          A.    There was one system.

19          Q.    Just to clarify my bad

20      question:  And that system had various

21      cameras located throughout the hospital?

22          A.    [Indicating.]

23          Q.    Is that correct?

24          A.    Yes, that's correct.

25          Q.    Including cameras in the

```
 1                    A. MAFFIA
 2   emergency room?
 3        A.     In which emergency room?
 4        Q.     How many emergency rooms are
 5   there?
 6        A.     Two.
 7        Q.     Is there a difference between
 8   the two?
 9        A.     Sure:  One is medicine/surgery.
10   One is psychiatry.
11        Q.     I see.  Isn't the psychiatric
12   emergency room adjacent --
13        A.     Yes.
14             MR. RADOMISLI:  Let him finish.
15             THE WITNESS:  I apologize.  I'm
16        sorry.
17             MR. RADOMISLI:  You're doing
18        fine.
19             MR. SMITH:  I think so too.
20             THE WITNESS:  I don't know if
21        that's good or bad.  Sorry.
22             MR. SMITH:  In terms of
23        answering and breaking from the normal
24        casual conversation, in my view,
25        you're fine.
```

Page 49

1                    A. MAFFIA

2        Q.      In 2009, the psychiatric ER was

3    directly to the left of the emergency

4    room when you walked in through the

5    double doors and faced the nurses'

6    station, right?

7        A.      That's correct.

8        Q.      And were there security cameras

9    in the medical ER area?

10       A.      Yes.

11       Q.      Were there security cameras in

12   the psychiatric ER section of the

13   hospital at the same time in November

14   2009?

15       A.      Yes.

16       Q.      Were there also cameras in the

17   entrance way to the hospital, the

18   entryway to the emergency room at the

19   hospital?

20       A.      I'm not sure what you mean.

21   Which entryway?

22       Q.      When a patient is brought to

23   the hospital in the ambulance, the

24   ambulance parks in a certain location?

25       A.      Yes, that's correct.

```
 1                    A. MAFFIA
 2      Q.      Four or five different parking
 3  spots, correct?
 4      A.      [Indicating.]
 5      Q.      Is that correct?
 6      A.      Yes.
 7      Q.      And the patient is brought
 8  through some doors to the hospital.   To
 9  the right is the emergency room, right?
10      A.      Yes.
11      Q.      Are there cameras in the area
12  of the interior of the hospital, right
13  there?
14      A.      Yes.
15      Q.      Are there cameras in the
16  exterior showing what is going on
17  directly outside the hospital where the
18  ambulances park?
19      A.      I can't answer that for sure.
20      Q.      Were there also cameras in the
21  wards of the hospital in October 2009?
22      A.      What do you mean by wards?
23      Q.      All right.
24              Was there a camera system in
25  the two psychiatric wards at Jamaica
```

Page 51

1              A. MAFFIA
2  Hospital in October 2009?
3      A.    Yes.   They were broken then.
4      Q.    I got that.  I just want to
5  know whether or not there were little
6  cameras there set up but weren't working,
7  right?
8      A.    No, they weren't.
9      Q.    How long had they been broken
10 as of October 31, 2009?
11     A.    They had been nonoperational
12 probably since 2003.  I'm guessing at the
13 year, but it's a long time.
14     Q.    Why did the hospital permit the
15 cameras system to remain inoperable for
16 such a long period of time?
17     A.    Because the cost of replacing
18 all of them because the machinery was
19 old, outdated, and they didn't have the
20 money to do it.
21     Q.    When did the hospital fix the
22 security camera system?
23     A.    The hospital, as far as I know,
24 fixed the security system only in the
25 Department of Psychiatry and that was

Page 52

```
 1                A. MAFFIA
 2   after we got grant money to do it.
 3       Q.    When was that?
 4       A.    We did the new CPEP I guess
 5   that was 2011/2012 when the construction
 6   took place.
 7       Q.    When you say that the camera
 8   system at the hospital was broken in
 9   2009, does that mean it was completely
10   inoperable in any fashion?
11       A.    That's correct.
12       Q.    Have you looked at the hospital
13   chart with respect to Schoolcraft?
14       A.    No.
15       Q.    Have you ever looked at the law
16   governing involuntary admissions in the
17   state of New York?
18       A.    Not the entire law.
19       Q.    What parts of the law have you
20   looked at?
21       A.    The parts that are in the
22   policy.
23               MR. SMITH:  I want to mark this
24       as Exhibit 130.
25               [The document was hereby marked
```

Page 53

```
 1              A. MAFFIA

 2     as Plaintiff's Exhibit 130 for

 3     identification, as of this date by

 4     the attorney.]

 5          MR. SMITH:  Let's take a

 6     five-minute break.

 7          Going off the record.  It's

 8     11:21.

 9          [Discussion held off the

10     record.]

11          [Whereupon, at 11:21 a.m., a

12     recess was taken.]

13          [Whereupon, at 11:36 a.m., the

14     testimony continued.]

15          MR. SMITH:  Back on the record.

16     It's 11:36.

17          Off the record I marked as

18     Exhibit 130 a group of documents that

19     came from the Jamaica Hospital

20     production.  They don't have Bates

21     stamp numbers on them, but they were,

22     I believe, the sections from the

23     production by Jamaica Hospital

24     relevant to Jamaica Hospital policies

25     regarding its admission procedures at
```

1              A. MAFFIA

2       the hospital.

3              MR. RADOMISLI:  Just so the

4       record is clear, we served them on

5       August 5, 2011.

6              MR. SMITH:  Right.

7       Q.     Have you had a chance to look

8    at the document part of 130, sir?

9       A.     Yes.

10       Q.     Were these all of the documents

11    that you looked at in preparing for your

12    deposition, or were they just some of

13    them?

14       A.     These are the ones.

15       Q.     These are all of the ones?

16       A.     Yes.

17       Q.     Can you tell me what the

18    documents that are Exhibit 130 are,

19    generally?

20       A.     Generally, one is the Emergency

21    Admission Procedure and that lists the

22    section of New York State Mental Hygiene

23    Law for admission.

24              The next page is the

25    Involuntary Legal Status Admission Policy

Page 55

1                    A. MAFFIA

2    when someone is brought to the hospital

3    and evaluated by the physician.

4           The next one is the Emergency

5    Admission Status where the mental hygiene

6    law would apply and how the physician

7    would evaluate a patient based on the

8    law, what the procedure would be.

9           And the last, I think it's the

10   last one, it's the admission from the

11   emergency room to the floor to the

12   inpatient unit and what that would

13   entail.

14      Q.    Are there any other pertinent

15   policies with respect to the hospital

16   that aren't set forth here in connection

17   to a decision to admit on an involuntary

18   basis an individual?

19      A.    No, I believe this is all.

20      Q.    On the third page of that

21   document at the bottom there is

22   indication of reviewed, revised, and a

23   series of dates.

24           Do you see that?

25      A.    Yes, I do.

Page 56

```
 1                    A. MAFFIA
 2       Q.    Who is involved in the
 3  reviewing and revising the Jamaica
 4  Hospital involuntary hospital procedures?
 5       A.    That would be the physicians,
 6  the chairman the associate chairman.
 7             These are policies for
 8  physicians so they would review those.
 9       Q.    And the chairman is Dr. Vivek?
10       A.    That's correct.
11       Q.    Who is the associate chairman?
12       A.    Dr. Vinod, V-I-N-O-D; last name
13  Dhar, D-H-A-R.
14       Q.    And Vivek and Dhar were the
15  chairman and associate chairman of the
16  Psychiatric Department in 2009?
17       A.    Yes.
18       Q.    And they are currently in those
19  positions; is that true?
20       A.    Yes, Dr. Vivek was the
21  chairman.  I have to remember when doctor
22  Dhar came back.
23             You will have to excuse me, we
24  had changes in personnel and I don't
25  exactly recall when Dr. Dhar came.
```

```
 1              A. MAFFIA
 2      Q.    Who was Dhar's predecessor?
 3      A.    Dr. Bamji.  He was not there at
 4  the time.
 5      Q.    In October of '09?
 6      A.    Yes.
 7      Q.    So Dhar was?
 8      A.    I believe he was there.  I can
 9  check and make sure.  I don't want to....
10      Q.    How did you spell the other
11  individual's name?
12      A.    Bamji, B-A-M-J-I.  First name
13  is Dinshaw, D-I-N-S-H-A-W.
14      Q.    Is there anybody else at the
15  hospital responsible for participating in
16  the review and the revision of policies
17  with respect to involuntary admissions?
18      A.    It would be those people.
19      Q.    Anybody else?
20      A.    I don't believe so.
21      Q.    Were you at all involved in
22  that activity?
23      A.    I was involved only that I had
24  read them and -- but the physicians are
25  the ones that are really involved with
```

```
 1                A. MAFFIA
 2   the particular use of this.
 3        Q.    On the second page of this
 4   document, there is a caption for a policy
 5   called, "Involuntary Legal Status."
 6        A.    Yes.
 7        Q.    When does this policy apply?
 8        A.    Well, the involuntary legal
 9   status would apply if the patient is ill,
10   mentally ill, and for some reasons does
11   not feel that they need to be admitted or
12   the physician feels for some reason that
13   they need to be admitted.
14        Q.    Do you know whether or not
15   Schoolcraft was admitted under this
16   policy?
17             MR. RADOMISLI:  Objection to
18        form.
19        Q.    Under the policy in front of
20   you right now.
21             MR. RADOMISLI:  That's the 927?
22             MR. IVONE:  Isn't that a
23        psychiatric decision?
24             MR. SMITH:  Forget about it.  I
25        withdraw the question.
```

1                    A. MAFFIA

2       Q.     You see on the second page of

3   Exhibit 130, there is a "Procedure"

4   heading, do you see that?

5       A.     Uh-huh, yes.

6       Q.     It says, 1, "An application for

7   the admission of patient under this

8   status will be made by any person."

9              Do you see that?

10      A.     Yes.

11      Q.     Who are the individuals who can

12  make an application for admission under

13  this procedure?

14      A.     It says in the policy, "An

15  application for admission of a patient

16  under this status may be made by any

17  person with whom the patient resides:

18  father or mother; husband or wife;

19  brother or sister; or the child of any

20  person or the nearest available relative;

21  the committee of such a person, an

22  officer of any public or well-recognized

23  charitable institution, agency, or home

24  in who's institution the person resides;

25  the director of community/service social

Page 60

1                    A. MAFFIA

2      service official; the director of the

3      hospital or designee."

4           Q.    Do you know whether or not the

5      Plaintiff, Officer Schoolcraft, in this

6      case, was committed under this procedure?

7           A.    I don't.

8           Q.    Turn to the next policy

9      document called, "Emergency Admission

10     Status."

11          A.    Okay.

12               MR. IVONE:   What page number?

13               MR. SMITH:   A page number on the

14          bottom of 17.  It's about five pages

15          in.

16          Q.    Do you see in the reviewed

17     portion of this document the series of

18     dates?

19          A.    Yes.

20          Q.    There is a review date of April

21     '09; also a review date of April 2010.

22          A.    Yes.

23          Q.    Am I correct that every April,

24     the hospital would undergo a review and

25     make any revisions that the people doing

Page 61

```
 1              A. MAFFIA
 2    the review thought were appropriate in
 3    April?
 4         A.    Yes.
 5         Q.    It looks like there was a
 6    review done between April '09 and April
 7    2010.
 8              Do you know if there were any
 9    changes to this policy document during
10    that year period?
11         A.    No, I don't.
12         Q.    Who would know?
13         A.    Probably the physicians who
14    reviewed it, the chairman, the associate
15    chairman.  I don't know that there were
16    any revisions done.
17              MR. RADOMISLI:  Off the record.
18              MR. SMITH:  Off the record.
19         It's 11:46.
20              [Discussion held off the
21         record.]
22              [Whereupon, at 11:46 a.m., a
23         recess was taken.]
24              [Whereupon, at 11:47 a.m., the
25         testimony continued.]
```

Page 62

```
 1              A. MAFFIA
 2          MR. SMITH:  Going back on the
 3      record.  It's 11:47.
 4          Counsel and I have discussed
 5      this document.  I think counsel for
 6      the hospital want's to make a
 7      statement.
 8          MR. RADOMISLI:  Yes.
 9          It's my understanding it just
10      says "reviewed."  It was reviewed and
11      not revised.
12          In contract, if you look at the
13      admission for the emergency room
14      policy, it has reviewed dates and also
15      a couple of dates where it was
16      revised.
17          It's my understanding as far as
18      the Emergency Admission Status policy,
19      the one we produced and marked today,
20      was the one in effect in 2009.
21          MR. SMITH:  Thank you.
22      Q.   The Emergency Admission Status
23  policy says, reading the first part,
24  "Jamaica Hospital Medical Center will
25  admit appropriate patients in emergency
```

1                    A. MAFFIA

2    situation under New York State Mental

3    Hygiene Law Article 9.39 with careful

4    attention to the preservation of their

5    legal rights as well as their safety."

6              Do you see that, sir?

7         A.    Yes, I do.

8         Q.    Is this one of the policy

9    statements of the hospital that you

10   reviewed, studied, prepared to appear

11   today for?

12        A.    Yes.

13        Q.    The reference to emergency

14   situations, can you explain to me what

15   the emergency situations are there are

16   being referenced in this statement?

17        A.    They would be anybody who would

18   be presenting a danger to themselves or

19   others.

20        Q.    And the reference to careful

21   attention, what does that mean?

22        A.    To make sure that the patients

23   are treated properly and that the proper

24   evaluations by the physicians are done.

25        Q.    Why is careful attention

Page 64

```
 1              A. MAFFIA
 2   required under Jamaica Hospital policy?
 3        A.     Because it's the patient's
 4   right to have a careful review and to get
 5   the best medical care possible.
 6        Q.     You agree with me involuntary
 7   admission is a deprivation of a person's
 8   right to freedom on some level?
 9             MR. RADOMISLI:  Objection.
10             MR. CALLAN:  Objection.
11             MR. RADOMISLI:  Don't answer the
12        question.
13             MR. SMITH:  On what basis are
14        you instructing the Witness not to
15        answer that question?
16             MR. RADOMISLI:  Beyond the scope
17        of the deposition.
18        Q.     The next sentence reads,
19   "Patients alleged to have a mental
20   illness for which immediate observation,
21   care, and treatment in the hospital is
22   appropriate and is likely to result in
23   serious harm to himself and others, may
24   be admitted under this provision for a
25   period of 15 days."
```

1                A. MAFFIA

2           Do you see that?

3      A.    Yes, I do.

4      Q.    Is this another one of the

5  policy statements that you studied?

6      A.    Yes.

7      Q.    The phrase "mental illness,"

8  what does that mean?

9      A.    What does the phrase "mental

10  illness" mean?  In this context, I'm

11  assuming that would be the physician's

12  decision to determine what the mental

13  illness is.

14           Mental illness can be a wide

15  range and variety of things.  That's

16  where the physicians have to make that

17  determination.

18      Q.    The physicians have to make a

19  determination whether or not the patient

20  has a mental illness, right?

21      A.    Uh-huh.

22      Q.    Is that correct?

23      A.    Right.

24      Q.    What I want to know is what is

25  Jamaica Hospital's definition of a mental

```
 1                    A. MAFFIA
 2   illness under this policy?
 3        A.    It would the same definitions
 4   that are set down in the DSM 5, then the
 5   DSM 4.
 6        Q.    What are those?
 7        A.    It's an entire book full of
 8   definitions.
 9             MR. IVONE:  You are basically
10        asking him to make a decision as a
11        physician.
12             MR. SMITH:  I'm asking him to
13        explain Jamaica Hospital's policy and
14        some of the terms in its policy.
15             MR. IVONE:  You are going beyond
16        that.
17             MR. SMITH:  I disagree with you
18        so....
19        Q.    Did I understand you to be
20   saying that Jamaica Hospital defines
21   mental illness as all of the categories
22   that are set forth in the DSM?
23        A.    I would say the answer to that
24   is partially, yes, that's correct.  You
25   need to understand that some of that is
```

```
 1                    A. MAFFIA
 2   governed by the state law.
 3        Q.    I'm not asking about the law.
 4   I'm asking you --
 5        A.    That's what I'm saying.  It's
 6   governed by the state law.
 7              MR. SMITH:  I'm going to
 8        rephrase the question.
 9        Q.    Under this policy how does
10   Jamaica Hospital define the term or the
11   phrase "mental illness"?
12        A.    I don't know that I can answer
13   that.
14              MR. RADOMISLI:  Asked and
15        answered.
16        Q.    Why can't you answer that
17   question?
18        A.    Because the term is a broad
19   term and I'm not a physician so I can't
20   make a determination based on each
21   individual case that comes.  That's not
22   happening here.  So I can't give you that
23   answer.  It's much to general.
24        Q.    And you can't provide me with a
25   general definition of mental illness?
```

Page 68

1              A. MAFFIA

2          MR. CALLAN:  Objection.  You are

3      asking him for a medical conclusion,

4      Counsel.

5          MR. SMITH:  I'm asking him to

6      explain a phrase in the Jamaica

7      Hospital policy.

8          MR. CALLAN:  Which is defined by

9      the physicians who work for Jamaica

10     Hospital, not somebody who is an

11     administrator.

12         MR. SMITH:  Then maybe we need a

13     medical person to come here and

14     explain this to us.  That's a question

15     I'm going to tender to Jamaica

16     Hospital's counsel.

17         MR. RADOMISLI:  He testified, as

18     far as I recall, that the definition

19     of mental illness is what is based on

20     the DSM so he anticipated that

21     question.  What is the next question?

22         MR. SMITH:  The next question is

23     and still was:  Can he provide a

24     general definition of mental illness

25     as defined under the hospital policy?

```
 1              A. MAFFIA
 2         MR. RADOMISLI:  And he --
 3         MR. SMITH:  His answer to that
 4     is no, I can't, right?
 5         MR. RADOMISLI:  His answer was
 6     the reference to the DSM.
 7     Q.    Let me ask the question again:
 8 Can you provide a general definition of
 9 mental illness?
10     A.    No, I can't do that with
11 certainty here because the term is so
12 broad and the amount of the information
13 you would have to have would be so long,
14 I couldn't put it in five words or ten
15 words.  It would be something best asked
16 a physician about, not me.
17     Q.    The policy statement goes on to
18 say that for a patient whose alleged to
19 have a mental illness for which immediate
20 observation, care, and treatment is
21 appropriate.
22         Do you see that?
23     A.    Yes.
24     Q.    Can you explain to me what this
25 phrase "immediate observation, care, and
```

Page 70

```
 1                    A. MAFFIA
 2   treatment" means?
 3       A.     The care and treatment would be
 4   up to the physician and so would the
 5   immediate observation.
 6              If the physician sees the
 7   patient and feels the patients needs to
 8   be admitted to the emergency room, they
 9   will.
10       Q.    The policy goes to say that
11   likelihood to result in serious harm is
12   defined as, and there are two
13   subcategories.
14              The first one says "Substantial
15   risk of physical harm to himself as
16   manifested by threats of or attempts at
17   suicide or serious bodily harm or other
18   conduct demonstrating he is dangerous to
19   himself; or 2, a substantial risk of
20   physical harm to other persons as
21   manifested by homicidal or other violent
22   behavior by which others are placed in
23   reasonable fear of serious physical
24   harm."
25              Do you see those references,
```

Page 71

1                   A. MAFFIA

2    sir?

3         A.     Yes, I do.

4         Q.     In both subcategory 1 and 2,

5    there is a reference to substantial risk.

6                Do you see that?

7         A.     Yes, I do.

8         Q.     What does that mean?

9                MR. IVONE:   Objection to that.

10        It requires a physician to make that

11        determination as to what is or is not

12        substantial risk.

13               MR. CALLAN:   I join.

14               MR. IVONE:   You can't ask this

15        witness to be describing that.

16               MR. RADOMISLI:   Is it the

17        physician who determines what

18        substantial risk is?

19               THE WITNESS:   Of course.

20        Q.     So you are unable to provide me

21   with the definition of this phrase

22   "substantial risk"; is that correct?

23        A.     That's correct.

24        Q.     Does the decision to

25   involuntarily admit a patient at Jamaica

Page 72

```
 1               A. MAFFIA
 2   Hospital require that the patient take
 3   any kind of action as opposed to having
 4   any kind of thoughts which suggest that
 5   the patient is either dangerous to
 6   himself, herself, or others?
 7           MR. RADOMISLI:  Objection to the
 8      form.
 9           MR. IVONE:  Read that back.
10           [The requested portion of the
11      record was read.]
12           MR. IVONE:  Objection.  He can't
13      make these decisions to respond to
14      that.  He is not a physician to be
15      able to do that.  I object very
16      strongly.
17           They may have had physicians
18      here having seen -- those are the
19      ones, not this witness.
20           MR. SMITH:  Well --
21           MR. RADOMISLI:  Or your own
22      expert.
23           MR. SMITH:  Yes, well, I
24      understand your objection.
25      Q.    I guess my question is:  In
```

```
 1                    A. MAFFIA
 2   light of that objection, do you agree
 3   with that objection the person to whom
 4   these questions should be directed is the
 5   physician at Jamaica Hospital, not
 6   yourself?
 7             MR. IVONE:  He can't make the
 8        decision to whom you have to direct
 9        your question.  You can't direct it to
10        him.
11             MR. SMITH:  I want to know
12        whether or not he agrees with you.
13             MR. IVONE:  It's whether he can
14        answer it.
15             MR. SMITH:  What I'm saying to
16        the Witness, does he agree with you he
17        is not the proper person to be asking
18        and answering theses question.
19             MR. RADOMISLI:  The problem is
20        he just testified about what the
21        policy is.  You're asking about the
22        application of the policy.  The
23        application of the policy is not what
24        he's here to testify about.
25             MR. SMITH:  I think you are
```

Page 74

1               A. MAFFIA

2       splitting hairs.

3            MR. RADOMISLI:  I'm not.  You

4       asked the Court to talk about other

5       things, and all he said was, Judge

6       Sweet said it's the admissibility

7       policy of the hospital and included in

8       that would be any determination made

9       by the hospital part of that policy

10      with respect to allocation to

11      different wards.

12           He can testify this is what the

13      policy is and can tell you about the

14      policy, but you can't ask him about

15      the application of the policy.

16           MR. SMITH:  I'm afraid he can't

17      even explain to me what the policy

18      means.  I think, I don't know, that

19      you agree with me that he can't do

20      that, certainly other counsel have

21      indicated they think that the Witness

22      is not capable of telling me what the

23      phrases in the policy mean.

24           If you agree with their

25      objection, I think you would agree

1                    A. MAFFIA
2       with me we need another person with
3       the capacity to explain what these
4       terms mean; i.e., a physician.
5            If you don't agree with that, it
6       seems to me you have to allow me to
7       inquire about this.
8            Frankly, they might be right,
9       this objection is well-founded.  This
10      is the witness presented to me to
11      provide testimony about the policy of
12      Jamaica Hospital with respect to
13      involuntary admissions.
14           MR. RADOMISLI:  Right.
15           MR. SMITH:  So we either get
16      another doctor or I'm going to
17      continue with this witness without
18      prejudice to asking that somebody with
19      better knowledge shows up.
20           MR. RADOMISLI:  His testimony
21      was it's up to the physician to make
22      that determination, that's the answer.
23           MR. SMITH:  I'm going to ask the
24      Witness another question.
25      Q.    Sir, Mr. Maffia, do you agree

Page 76

1                    A. MAFFIA

2    with the objection that was just made by

3    counsel for Dr. Isakov?

4              MR. IVONE:  My name is Ivone.

5         You can't really ask him to make

6         a decision as to whether I'm right or

7         wrong.  That's what you asked him to

8         do.

9              MR. SMITH:  I want to know

10        whether he agrees with you that --

11             MR. IVONE:  That's not his

12        function, to make a decision as to

13        whether I'm right or wrong.

14             MR. CALLAN:  I don't think he's

15        gone to law school and to judge

16        whether an objection is valid or

17        invalid.

18             MR. RADOMISLI:  Objection to

19        that question.

20        Q.   Do you believe that you are

21    capable of providing testimony to me

22    today about the meaning of the hospital

23    policy that's before you?

24             MR. RADOMISLI:  Well, objection.

25        He doesn't know what you are going to

```
 1                  A. MAFFIA
 2      ask so....
 3      Q.    Can you answer the question,
 4  please?
 5      A.    Repeat it.
 6            [The requested portion of the
 7      record was read.]
 8      A.    I can discuss the policy, but I
 9  can't discuss any part that a physician
10  would play in the implementation,
11  evaluation of the policy as it regards to
12  patients.
13      Q.    I don't understand that
14  distinction.  I'm going to try this
15  question again:  Does the hospital policy
16  with respect to involuntary admissions
17  require as a condition of involuntary
18  admission that the patient take any
19  affirmative steps or manifest any kind of
20  conduct as opposed to only requiring that
21  the patient entertain certain kinds of
22  thoughts?
23      A.    To the best of my knowledge, it
24  could be and may be both.
25      Q.    Can you explain that answer to
```

Page 78

1                    A. MAFFIA

2    me both?

3         A.    You can either think it or act

4    it.

5         Q.    And so the patient could either

6    think dangerous thoughts or act with

7    conduct that is construed as dangerous

8    and that could be sufficient to

9    involuntarily admit the patient; is that

10   that's correct?

11              MR. RADOMISLI:  Objection.

12              Don't answer.

13              MR. SMITH:  What basis?

14              MR. RADOMISLI:  Beyond the

15        scope.  You're asking about the

16        application of the policy, not to tell

17        you what the policy is.

18              MR. SMITH:  I think we are going

19        to have to have another witness come

20        and explain some of these phrases in

21        this document to me.

22              Without waving that position,

23        I'm going to continue with this

24        examination of this witness.

25              MR. RADOMISLI:  From my

Page 79

```
1                    A. MAFFIA
2       perspective, you were able to ask both
3       doctors who actually implemented the
4       policy about the policy at their
5       depositions, and it's also you're
6       asking for essentially expert
7       testimony from a corporate witness
8       which is not permitted.
9            MR. SMITH:  I'm not asking for
10      expert testimony.  I'm asking Jamaica
11      Hospital to explain to me its policy,
12      that's what I'm asking.
13           So far I haven't heard anything
14      by Jamaica Hospital explaining what
15      this policy it has actually means.
16           MR. RADOMISLI:  He said that the
17      policy is determined by the physician.
18           MR. SMITH:  Then I need to speak
19      to a physician.
20           MR. RADOMISLI:  And you did.
21           MR. SMITH:  No, who speaks on
22      behalf of the hospital, not on behalf
23      of himself or herself.
24           Let's go on.
25      Q.    On the second page of the
```

Page 80

```
 1                    A. MAFFIA
 2    document, Procedure 1, "Following an
 3    examination and interviews with other
 4    informants which may be available should
 5    the examining physician consider the
 6    patient to meet the criteria before he
 7    should certify this finding on Form OMH
 8    474."
 9              Do you see that?
10        A.    I do.
11        Q.    Where it says, "following an
12    examination," what examination is being
13    referred to there?
14        A.    That would be the psychiatric
15    assessment.
16        Q.    And when a patient is brought
17    into the hospital, when should the
18    psychiatric assessment be conducted?
19              MR. RADOMISLI:  According to the
20        policy?
21              MR. SMITH:  Yes.
22              MR. RADOMISLI:  Review the
23        policy, see if there is anything in
24        there about that.
25        A.    This is the admitting doctor
```

Page 81

```
 1                   A. MAFFIA
 2    should be responsible for this
 3    assuring --
 4              MR. RADOMISLI:  He is asking
 5         when does the first one have to be
 6         done, is there anything in this policy
 7         that says that?
 8              THE WITNESS:  I don't see
 9         anything.
10         Q.   Do you know when the first
11    psychiatric evaluation should be
12    conducted?
13              MR. RADOMISLI:  Objection.
14              Don't answer the question.
15              MR. SMITH:  Because there is
16         nothing written in the policy, you are
17         telling him not to answer the
18         question?
19              MR. RADOMISLI:  That's correct.
20              MR. SMITH:  I'm going to have to
21         take this up with the Court.
22         Q.   It says here in the Jamaica
23    Hospital policy, there is a reference to
24    informants.
25              Do you see?
```

Page 82

```
 1              A. MAFFIA
 2      A.    I do.
 3      Q.    What does that mean?
 4      A.    That means anybody who brought
 5  the patient in who has information about
 6  the patient.
 7      Q.    Are doctors required to conduct
 8  an investigation prior to making a
 9  decision to involuntarily admit a
10  patient?
11          MR. RADOMISLI:  Objection.
12          Don't answer it.
13          MR. SMITH:  On what basis?
14          MR. RADOMISLI:  A, it goes
15      beyond the scope of the deposition; B,
16      you are asking him to comment on care
17      rendered by codefendants which is not
18      proper; C, he is not a doctor.  He is
19      telling you what the policy is.
20          MR. SMITH:  I disagree.  He is
21      not telling me what the policy is.
22      He's telling me that I can read the
23      words on the page.  And you are
24      telling him if it's not on the page,
25      don't answer the question.
```

Page 83

```
 1              A. MAFFIA
 2          We can play this game, but it's
 3      a game.  It's not real from my
 4      perspective.
 5          MR. RADOMISLI:  It's real from
 6      perspective.  The order is very clear.
 7      Q.    There is a reference on line 6
 8  to a patient being able to give written
 9  notice.
10          Do you see that?
11      A.    Number 6?
12      Q.    "If at any time after
13  admission, the patient or relative or
14  friend or the MHLS gives written notice
15  to the director of request for a court
16  hearing."
17          Do you see that?
18      A.    Yes, yes, I do.
19      Q.    What constitutes a written
20  notice under the policy?
21      A.    A written notice, you can give
22  them a letter.
23      Q.    Is a letter the only kind of
24  written notice that's required under the
25  policy?
```

Page 84

1                    A. MAFFIA

2        A.    I don't know.

3        Q.    If a patient says I want to get

4    out, would you please put that down in

5    the hospital chart --

6        A.    You could --

7        Q.    -- is that written notice?

8        A.    Yes.

9              Also, do you know what MHLS is?

10       Q.    Is that Mental Health Law

11   Services?

12       A.    Legal services, yeah.

13             This means that every year a

14   patient on the inpatient service has

15   legal counsel representation.

16             MR. RADOMISLI:  Objection to the

17        form of the last question because it

18        talks about a court hearing, not I

19        want to get out.

20       Q.    The next policy statement,

21   Admissions to Emergency Room subject

22   matter --

23             MR. IVONE:  Is that 7?

24             MR. SMITH:  No, this is the next

25        policy statement staring on page 44.

Page 85

1             A. MAFFIA

2         MR. IVONE:  Okay.

3         MR. SMITH:  Goes onto 45,

4     Caption subject, Admissions

5     to Emergency Room.

6         MR. IVONE:  I have it.

7     Q.    Is this the procedure for

8  taking a patient from the psychiatric

9  emergency room to one of the wards?

10    A.    Yes.

11    Q.    On the next page, No. 3, "It's

12  the responsibility of the admitting

13  psychiatrist to determine if the patient

14  is medically suitable for the inpatient

15  unit."

16         Do you see that?

17    A.    Yes.

18    Q.    What are the circumstances

19  under which an individual would not be

20  medically suitable for the inpatient

21  unit?

22         MR. IVONE:  Doesn't that state

23     who makes that decision here, "the

24     admitting psychiatrist."

25         MR. SMITH:  That's what it says

```
 1                    A. MAFFIA
 2       here.  I agree with you.
 3              MR. IVONE:  How can he answer
 4       the question?
 5       Q.     Can you answer the question?
 6       A.     The physician makes the
 7   determination about admission.
 8       Q.     Can you answer my question,
 9   sir?
10              MR. RADOMISLI:  He just did.
11       Q.     Yes or no?
12       A.     No.
13       Q.     Am I correct that the hospital
14   policy on involuntary admission requires
15   the physicians to make a determination
16   about whether or not a patient is a
17   danger to themselves or others?
18       A.     Yes.
19       Q.     Under the hospital policy, what
20   is the degree of likelihood that the
21   patient will engage in dangerousness
22   that's required in order to involuntarily
23   admit a patient?
24              MR. RADOMISLI:  Objection.
25       A.     I'm sorry?
```

Page 87

```
 1              A. MAFFIA
 2          MR. RADOMISLI:  You can answer.
 3          MR. IVONE:  Can you please read
 4     that back.
 5          [The requested portion of the
 6     record was read.]
 7          MR. IVONE:  Objection to this
 8     witness answering such a question.
 9     Q.   Can you answer the question,
10 please?
11          MR. IVONE:  It's a medical
12     decision.
13          MR. RADOMISLI:  That's going to
14     be his answer.
15     Q.   Can you answer my question,
16 please?
17     A.   It's a medical decision.
18     Q.   Are you capable of providing
19 information about the level of potential
20 risk that is required in order to
21 involuntarily admit a patient?
22          MR. IVONE:  Objection.
23          MR. RADOMISLI:  Objection to
24     form.
25          You can answer.
```

1               A. MAFFIA

2     A.    It's a medical question. The

3 physician determines.

4     Q.    So you can't provide

5 information on that, is that what are

6 you're telling me?

7     A.    The physician does.

8     Q.    You're not answering the

9 question. I understand the physician

10 said that.

11           Are you telling me you are not

12 capable of providing that information?

13     A.    I'm not a physician.

14     Q.    And therefore you are not

15 capable of providing me with the

16 information I'm requesting; is that

17 correct?

18     A.    Yes.

19           MR. RADOMISLI: Objection to

20     form.

21     Q.    In Dr. Bernier's deposition,

22 she testified that if there was any

23 potential risk of dangerousness that she

24 would involuntarily admit the patient.

25           Is that consistent with

Page 89

```
 1              A. MAFFIA
 2   hospital policy?
 3           MR. RADOMISLI:  Objection.
 4           Don't answer the question.
 5           Beyond the scope.
 6      Q.    At Dr. Isakov's deposition, he
 7   said that it doesn't matter, this is from
 8   page 98.
 9           "It doesn't matter what level
10   of risk, if there is a risk, I think it's
11   my duty to protect the patient.
12           There was a follow-up question.
13           "Question:  So it doesn't
14   matter what level of risk so long as you
15   perceive a risk, you are going to admit
16   him?
17           "Answer, Yes, right."
18           Is that testimony by Dr. Isakov
19   consistent with hospital policy on the
20   determination of whether or not to
21   involuntarily admit a patient based on a
22   dangerousness assessment?
23           MR. RADOMISLI:  Objection.
24           Don't answer the question.
25           MR. IVONE:  Objection.
```

Page 90

1                    A. MAFFIA

2              MR. CALLAN:  Objection.

3        Q.     Does hospital policy require

4    that when police officers present an

5    individual to the hospital that the

6    police officers sign any documents or

7    make any certifications when tendering a

8    patient for assessment by the Psychiatric

9    Department?

10             MR. RADOMISLI:  Read that back,

11        please.

12             [The requested portion of the

13        record was read.]

14             MR. IVONE:  Objection.

15             MR. RADOMISLI:  Objection,

16        beyond the scope.

17             MR. SMITH:  Are you instructing

18        him not to answer that question also?

19             MR. RADOMISLI:  It's beyond the

20        scope.

21             MR. SMITH:  Yes, and he is

22        instructed not to answer the question?

23             MR. RADOMISLI:  Yes.

24             Just read it back one more time

25        for me.

Page 91

1                 A. MAFFIA
2            [The requested portion of the
3       record was read.]
4            [A document was hereby marked
5       as Plaintiff's Exhibit 131 for
6       identification, as of this date.]
7       Q.    I'm going to show you what I'm
8  marking as Plaintiff's Exhibit 131.  This
9  is a one-page document that comes out of
10 a hospital chart.
11           Are you familiar with this
12 form?
13      A.    Yes.
14      Q.    What is this form?
15      A.    Notice of Status and Rights of
16 Emergency Admission.
17      Q.    Is this a document that's
18 required under hospital policy to be
19 given to patients who are involuntarily
20 committed at the hospital?
21           MR. RADOMISLI:  Objection to
22      form.
23           You can answer.
24      A.    Yes.
25      Q.    Do you see in the upper

Page 92

```
 1              A. MAFFIA
 2  right-hand corner, there is a date that's
 3  handwritten in there?
 4         MR. RADOMISLI:  I'm not going to
 5      let him testify about the form.
 6         MR. SMITH:  So if I ask him what
 7      this form is, what some of the
 8      language on the form says, you are not
 9      going to allow him to answer it?
10         MR. RADOMISLI:  Well, maybe I'll
11      allow him to answer questions
12      regarding the language on the form;
13      certainly nothing handwritten by
14      somebody else.
15         MR. SMITH:  All right.
16      Q.   Directly to the left of the
17  handwritten portion, what does that say?
18      A.   Where am I looking at?  What
19  are you talking about?
20      Q.   Do you see "Date of Arrival At
21  Hospital"?
22      A.   Okay.
23      Q.   Do you see that?
24      A.   Yes.
25         MR. IVONE:  Sorry.  Where are
```

Page 93

```
 1                    A. MAFFIA
 2       you talking about?
 3            MR. SMITH:  Do you see the date
 4       11/1 or 11/3 in handwriting on the
 5       upper right-hand portion by your
 6       thumb?
 7            MR. RADOMISLI:  That's a
 8       question to the attorney.
 9       Q.   Directly to the left of that
10  handwriting there is a column, "Date of
11  Arrival at Hospital," right?
12       A.   Okay.  Yes.
13       Q.   In this form, what is that a
14  reference to?
15       A.   On this form what is that date
16  a reference to?
17       Q.   Yes.  What are you supposed to
18  write, date of arrival at the hospital,
19  what date are you supposed to put down?
20            MR. RADOMISLI:  Is there a
21       policy that governs what date you put
22       down?  Look at the policy.
23            THE WITNESS:  No.
24       Q.   Is that defined in the policy?
25       A.   I don't think so.
```

Page 94

1                    A. MAFFIA

2              MR. RADOMISLI:  Then it's beyond

3        the scope.

4        Q.    Aren't you supposed to put down

5    the date that the patient got to the

6    hospital on this form, this notice?

7              MR. RADOMISLI:  Objection, asked

8        and answered.

9              Don't answer the question.

10             MR. SMITH:  Don't answer the

11        question?

12             MR. RADOMISLI:  Right, because

13        he testified it wasn't in the policy.

14        Q.    Doesn't this form that was

15    created by the hospital require the

16    information about when the patient got to

17    the hospital to be recorded in the notice

18    that is given to the patient?

19        A.    This is given to the patient,

20    yes.

21        Q.    The form is given to the

22    patient, right?

23        A.    Yes.

24        Q.    And somebody from the hospital

25    is supposed to write the date that the

Page 95

1                    A. MAFFIA
2  patient got to the hospital, right?
3           MR. RADOMISLI:  Is that in the
4       policy?  Look at the policy, testify
5       about the policy.
6           THE WITNESS:  No, it's not in
7       the policy.
8       Q.  So there is nothing in the
9  hospital policy about recording when the
10  patient gets to the hospital; is that
11  right?
12          MR. RADOMISLI:  About the policy
13      we have before looking at?
14          MR. SMITH:  Right.
15      Q.  There is nothing in the
16  involuntary admissions policy at Jamaica
17  Hospital that would require there be some
18  sort of documentation of when the patient
19  got to the hospital; is that correct?
20      A.  There's not in this policy, no.
21      Q.  So that's correct?
22      A.  Right, yes.
23      Q.  I have shown you all of the
24  documents --
25      A.  Yes.

```
 1              A. MAFFIA
 2       Q.    -- that I believe are the
 3   hospital policy and you told me that's
 4   all of it.  So there is nothing else,
 5   there is no other pieces of paper I
 6   should be looking for?
 7            MR. RADOMISLI:  Pertaining to
 8         involuntary admissions?
 9            MR. SMITH:  Yes.
10       Q.    Pertaining to involuntary
11   admissions, right?
12       A.    Yes.
13       Q.    So there is no policy about
14   involuntaries where the hospital required
15   documentation of when the patient got to
16   the hospital; is that correct?
17            MR. RADOMISLI:  Objection.
18       Q.    In the policy?
19            MR. RADOMISLI:  Asked and
20         answered.
21            You can answer again.
22       A.    In the policy there is none.
23       Q.    Who created that form, Exhibit
24   131, not the handwriting, just the
25   preprinted form?
```

Page 97

```
 1              A. MAFFIA
 2      A.     I believe the Office of Mental
 3  Health.
 4      Q.     New York State?
 5      A.     Yes.
 6      Q.     Does hospital policy permit an
 7  individual to be held for observation for
 8  a period of time before psychiatric
 9  assessment is conducted of the patient?
10      A.     The psychiatric assessment, you
11  are talking about the emergency room or
12  on the floor?
13      Q.     I'm talking about anywhere, for
14  any reason.
15      A.     If a patients to the --
16             MR. IVONE:  Aren't you asking a
17      question that's statutory?  Some other
18      questions --
19      Q.     Would you please answer my
20  question?
21      A.     If the patient comes to the
22  emergency room, the psychiatric
23  assessment is done in the emergency room.
24      Q.     Is there anything in Jamaica
25  Hospital policy that authorizes an
```

```
 1                    A. MAFFIA
 2   individual to be held for observation
 3   prior to a psychiatric assessment?
 4            MR. IVONE:  Read that back.
 5            [The requested portion of the
 6        record was read.]
 7        A.    Are we talking about a
 8   psychiatric emergency room or any
 9   emergency room anywhere in the hospital?
10        Q.    Under any circumstances, sir.
11            MR. IVONE:  Objection.  Isn't
12        this a decision by a physician to
13        decide that?
14        Q.    Would you answer my question,
15   please?
16            MR. IVONE:  Objection.
17            MR. RADOMISLI:  Review the
18        policy and answer his question.
19        A.    In the Emergency Department in
20   psychiatry when a patient goes in, he
21   gets the psychiatric assessment.
22            If he is in the another
23   emergency room for other reasons like the
24   medical emergency room, that evaluation
25   would have to be done by a consulting
```

Page 99

1                    A. MAFFIA
2    psychiatrist.
3         Q.    You are not answering my
4    question.
5              Is there anywhere in Jamaica
6    Hospital policy some sort of
7    authorization to hold a patient before
8    the patient is psychologically evaluated?
9         A.    I'm sorry.  I can't answer
10   that, I don't know.
11        Q.    In this case Schoolcraft was
12   brought to the hospital on the night of
13   October 31, 2009, and he was
14   psychologically assessed the following
15   day.
16              Is there anything in Jamaica
17   Hospital policy that authorizes it or
18   permits any of its employees to hold a
19   patient against the patient's will before
20   the patient has been evaluated for
21   involuntary admission?
22        A.    I don't believe that I know
23   that.
24        Q.    Does hospital policy require
25   physicians to consider the safety of the

Page 100

1          A. MAFFIA
2    community in making involuntary admission
3    decisions?
4        A.    The admission decision is based
5    on the 9.39 regulation from the mental
6    hygiene law which is again a danger to
7    self or others.  The physician makes that
8    determination.
9        Q.    So does the hospital policy
10   require physicians to protect the
11   community?
12           MR. RADOMISLI:  Objection to
13       form.
14           You can answer.
15       A.    Yes.
16       Q.    What are the factors involved
17   in making an involuntary commitment
18   decision?
19       A.    The physician has to evaluate
20   the patient as it states in the law.
21   They have to determine if the patient is
22   a danger to himself or others.
23       Q.    Are you capable of providing me
24   with information about how that decision
25   is made on a particularized basis?

1              A. MAFFIA

2      A.    No, because the psychiatric

3  assessment is done by the physician.

4      Q.    Is there any time requirement

5  in the hospital policy governing when a

6  second evaluation must be done in order

7  to maintain a patient's status as an

8  involuntary?

9      A.    I think that's in the policy.

10  Let me check the policy.  I think it's

11  "The admitting doctor will be responsible

12  for" --

13             THE REPORTER:  You have to slow

14      down.

15      Q.    You don't have to read it out

16  loud.  Take a look and tell me whether or

17  not there is such a requirement.

18      A.    Yes.  It's conducted.

19      Q.    What is the requirement?

20      A.    Conducted within 48 hours of

21  admission.

22      Q.    So the second evaluation has to

23  be done within 48 hours of admission?

24      A.    Uh-huh.

25             THE REPORTER:  Yes?

Page 102

1              A. MAFFIA

2           THE WITNESS:  Yes.

3       Q.    When you say that the second

4   evaluation has to be done within 48 hour

5   of the admission, do you mean the second

6   evaluation has to be done within 48 hours

7   of the initial decision to involuntarily

8   admit the patient?

9       A.    No.  It says "admission."  So

10  if the patient is admitted, then within

11  48 hours of the admission, they would do

12  the evaluation.

13      Q.    That's admission.  If the

14  patient is admitted in the medical, is

15  that a reference to medical admission?

16           MR. RADOMISLI:  Objection to

17      form.

18      A.    No.

19      Q.    What is that a reference to?

20      A.    We are talking about the

21  Psychiatric Department here.

22      Q.    So the 48 hour clock begins

23  when the patient is admitted in the

24  psychiatric unit, right?

25      A.    It says here, patient is --

Page 103

1                    A. MAFFIA
2       "The evaluation/examination is conducted
3       within 48 hours of admission."
4           Q.    And the term "admission," is
5       referring to the admission of the patient
6       by the psychiatric emergency room, right?
7                    MR. RADOMISLI:  Objection to
8           form.
9                    Can you rephrase it?
10          Q.    The term "admission" refers to
11      admission of the patient by the
12      Psychiatric Department of the hospital;
13      is that right.
14                   MR. RADOMISLI:  Objection to
15          form.
16                   You can answer.
17          A.    If a patient --
18                   MR. RADOMISLI:  Just answer his
19          question.  If you can't answer the
20          question, tell him.
21                   Read it back.
22                   [The requested portion of the
23          record was read.]
24          A.    Yes.
25                   MR. SMITH:  Can you get me that

1                    A. MAFFIA

2        performance evaluation form?

3                MR. RADOMISLI:  Because that

4        portion is going to be marked

5        confidential.

6                Off the record.

7                [Discussion held off the

8        record.]

9                MR. SMITH:  Going off the

10       record.  It's 12:36.

11               [Discussion held off the

12       record.]

13               [Whereupon, at 12:36 p.m., a

14       recess was taken.]

15               [Whereupon, at 12:44 p.m., the

16       testimony continued.]

17               MR. SMITH:  Back on the record

18       12:44.

19               MR. RADOMISLI:  Plaintiff's

20       counsel and I had an off-the-record

21       conversation, and I indicated that I

22       will consider bringing back a doctor

23       to testify solely on behalf of Jamaica

24       Hospital to testify about the

25       admissibility policy of the hospital.

Page 105

1              A. MAFFIA

2          I will let plaintiff's counsel

3      know within two weeks and everybody

4      else as well whether we will

5      voluntarily produce a witness, a

6      physician witness, from the hospital

7      to testify about that particular

8      issue.

9          MR. SMITH:  Okay.

10         MR. RADOMISLI:  Now, let's go to

11     the confidential portion of the

12     deposition.

13         [Whereupon, the following is

14     deemed confidential:]

15

16

17

18

19

20

21

22

23

24

25

1              A. MAFFIA

2          [The document was hereby marked

3      as Plaintiff's Exhibit 132 for

4      identification, as of this date by

5      the attorney and deemed

6      confidential.]

7          MR. SMITH:  I'm placing before

8      the Witness a document an 11-page

9      document stamped Plaintiff's Exhibit

10     132 and also been labeled by Jamaica

11     Hospital's counsel as confidential,

12     entitled, "Jamaica Hospital Job

13     Description Performance Evaluation."

14         Do you mind if I get a copy of

15     that too?

16         MR. RADOMISLI:  Sorry.  Sure.

17         THE WITNESS:  Here.

18         MR. SMITH:  You should have the

19     one with the sticker on it if there

20     are any questions about the copying.

21     Q.    Mr. Maffia, is this the form of

22  evaluation that you had mentioned earlier

23  in your testimony?

24     A.    Yes, it is.

25     Q.    And you looked at that form in

1                    A. MAFFIA
2    preparing for your testimony today?
3         A.    Yes.
4         Q.    Are there any other forms or
5    any other documents that are relevant to
6    an assessment of the performance of a
7    doctor at Jamaica Hospital?
8              MR. RADOMISLI:   Objection to
9         form.
10        A.    [Indicating.]
11        Q.    You have to answer yes or no.
12        A.    Are there any others, no, I
13   don't believe.
14        Q.    Do you see on the first page
15   there is a reference to ADA codes?
16        A.    Right.
17        Q.    What are those?
18        A.    Um -- those are, um -- I'm
19   trying to remember because they are in
20   the back, the Americans with Disabilities
21   Act codes.  If you turn to page --
22        Q.    I see this is the list on page
23   5.
24        A.    Right, so if you --
25              MR. RADOMISLI:   Answer the

1                    A. MAFFIA

2        question.

3        Q.     These are references to

4    categorizing the various work categories

5    either within or outside of the Americans

6    with Disabilities Act Essential Job

7    Functions?

8        A.     Yes.

9        Q.     Who was the one that filled out

10   or prepared these forms with respect to

11   individual psychiatrists in the

12   Psychiatric Department of Jamaica

13   Hospital?

14       A.     Who does the evaluations?

15       Q.     Yes.

16       A.     The physicians are evaluated by

17   the unit chief.

18       Q.     Who were or was the unit chief

19   in October 2009?

20       A.     I believe this was a Dr.

21   Edelman, Martha Edelman, E-D-E-L-M-A-N.

22       Q.     Does this evaluation apply to

23   doctors or psychiatrists who work in the

24   emergency room as well and doctors or

25   psychiatrists that work in the various

Page 109

1                    A.  MAFFIA

2    wards?

3        A.    Yes.

4        Q.    Does the evaluation process

5    track the number of patients that a

6    doctor sees during a period of time?

7        A.    No.

8        Q.    Does the evaluation process at

9    Jamaica Hospital track the amount of

10   revenue that a physician generates or

11   assists in generating for purposes of

12   assessing the performance of the doctor?

13       A.    No.

14       Q.    Does the evaluation process

15   keep track of whether or not a physician

16   or psychiatrist in the Psychiatric

17   Department maintain levels of training?

18       A.    Well, there is a -- yes, it

19   does.

20       Q.    Where is that on the form?

21       A.    There is a skill competency

22   check on the second page and....

23       Q.    What are you referring to,

24   specifically?

25       A.    I'm sorry.  It says "Skills."

```
 1                    A. MAFFIA
 2   So those competencies would have to be
 3   fulfilled.
 4              If you also look at "Learning
 5   Resources."
 6        Q.    What page are you at?
 7        A.    I think it looks like page 6.
 8        Q.    What are those?
 9        A.    So those would be things that
10   the supervisor would assess and evaluate
11   the physician on.
12              It says, "the application of
13   knowledge and of skills appropriate to
14   care of patients."
15        Q.    Where were you just reading
16   from?
17        A.    I'm sorry under, "Criteria for
18   Success."
19        Q.    Yes.
20        A.    Number 1.
21        Q.    Thank you.
22              Is the process for evaluating
23   Dr. Bernier the same as the process for
24   evaluating Dr. Isakov?
25        A.    The process, yes.
```

Page 111

1                    A. MAFFIA

2      Q.    Does the hospital generate

3  statistics on length of stay of

4  involuntary admission patients?

5                MR. RADOMISLI:  Don't answer the

6      question.

7                Beyond the scope.

8      Q.    On page 7 there is some

9  information requested by the form.

10               Can you explain to me how this

11  relates to the performance of a

12  physician?

13     A.    Yes.  It's performance

14  criteria, knowledge and ability, skills

15  you would have to demonstrate.

16               Now on this form, it's a

17  generic form used for all the evaluations

18  so some of the areas don't apply; for

19  instance, neo relates to infants.  We are

20  not going to evaluate on that.  It's a

21  general form.

22               If you go to the next page, it

23  says "Adulthood, 19 to 65."  We would be

24  using these criteria.

25     Q.    These are criteria to measure

Page 112

1              A. MAFFIA
2    the performance of the doctor or the
3    patient?
4       A.     The physician so that they know
5    the general components of some of the
6    things that they have to be involved in.
7       Q.     For example, No. 7 in the
8    category "Adulthood, 19 to 65 years,"
9    "Impact of Drug and/or Alcohol Abuse,"
10   the column to the right, done or not
11   done.
12              What if somebody were to check
13   the box done with respect to that
14   category, what would that mean with
15   respect to the performance of the
16   physician?
17      A.     Means that there was some
18   education that they received during the
19   year or supervision that they had
20   surrounding that issue.
21      Q.     So the items 1 through 10
22   reflect areas that physicians were
23   provided information about during the
24   course of the year?
25      A.     Yes.

Page 113

A. MAFFIA

1

2     Q.    On page 10 there is a reference

3  under "Critical Skills" column to

4  "Psychiatric Presentations."

5            Do you see that?

6     A.    Sorry, I'm getting there, yes.

7     Q.    Page 10 under "Critical Skills"

8  at the bottom it says, "Psychiatric

9  Presentations.  What is that a reference

10 to?

11    A.    I'm not exactly sure because I

12 don't do the evaluations, but I believe

13 it had to do with how patients present.

14    Q.    What does that have to do with

15 how doctors perform?

16    A.    The ability to diagnose

17 patients.

18    Q.    In reviewing the performance of

19 physicians in the Psychiatric Department

20 at Jamaica Hospital, does the hospital

21 keep track of the number of patients seen

22 by a doctor on an annual basis?

23    A.    No.

24    Q.    So the number of patients that

25 a psychiatrist sees on an annual basis is

Page 114

1                    A. MAFFIA

2   irrelevant of an evaluation of their

3   performance; is that correct?

4       A.    I'm trying to frame an answer

5   so that I can give you the correct view.

6             The way physicians are assigned

7   patients is done by the unit chief.  They

8   get a specific group of patients to see.

9   They are supposed to see those patients.

10            We keep track of the amount of

11  the patients that come to our unit who

12  are admitted so the unit chief tracks how

13  many patients the doctors will see.

14            We don't keep a log on how many

15  they see every year, but they are given a

16  certain groups of patients to see.

17            If there were 25 beds, the

18  doctors divide the patients.  The unit

19  chief gets less because he has

20  administrative work to do.

21      Q.    So am I correct that the volume

22  or number of patients seen by a

23  psychiatrist is not a factor in the

24  evaluation of the performance of the

25  doctor?

1                    A. MAFFIA

2       A.    Not necessarily, no.

3       Q.    I don't know what you mean by

4    not necessarily.

5       A.    The quality is more important

6    in many cases than the amount.  The

7    amount are prescribed, as I mentioned,

8    each staff doctor gets nine or ten

9    patients each.  The unit chief gets the

10   remainder.

11      Q.    So the work is evenly

12   distributed, right, is that what you're

13   saying?

14      A.    Pretty much, yes, but the unit

15   chief gets less because he has

16   administrative work.

17      Q.    What about the psychiatrist not

18   on the admissions floor but psychiatrists

19   making decisions about whether or not to

20   voluntarily admit patients, are they

21   evaluated in the numbers of patients that

22   they see or the number of patients that

23   they admit?

24      A.    Can I clarify, can I ask a

25   question.

Page 116

1                    A. MAFFIA

2        Q.    Sure.

3        A.    Are you talking about the

4    psychiatrists in the emergency room.

5        Q.    Yes.

6        A.    Or the psychiatrists that are

7    consultants on the medical side?

8        Q.    Both, actually.

9        A.    So admission to psychiatry is

10   based on acuity.

11              MR. RADOMISLI:  Listen to his

12       question.  The evaluation of the

13       psychiatrist.

14              THE WITNESS:  Okay.

15              MR. RADOMISLI:  Are they

16       evaluated -- when psychiatrists are in

17       the emergency room, is part of their

18       evaluation based on the number of

19       patients they decide to move on to

20       involuntarily admission to the

21       hospital?

22              THE WITNESS:  No, absolutely

23       not.

24              [Whereupon, the following is not

25       deemed confidential:]

Page 117

```
 1              A. MAFFIA
 2         MR. SMITH:  Thank you, Mr.
 3    Maffia.  I don't have anymore
 4    questions at this time.
 5         MR. CALLAN:  No questions.
 6         [TIME NOTED:  1:04 p.m.]
 7    _____
           ANTHONY J. MAFFIA
 8
 9

      _____
10    Subscribed and sworn to
      before me this _____
11    day of _____, 2014.
12    _____
           Notary Public
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 118

1
2                    I N D E X
3

WITNESS        EXAMINATION BY        PAGE

4
5  A. Maffia  Mr. Smith              7
6
7
8
9              E X H I B I T S
10  PLAINTIFF'S      DESCRIPTION         PAGE
11  Exhibit 130      Group of documents 52/53
12  Exhibit 131      Page of hospital
                     Chart              91
13
    Exhibit 132      Confidential
14                   Document           105
15
16  Attorney Smith has retained all exhibits.
17
              CONFIDENTIAL PORTIONS
18            Page to  Page
19             106       116
20
21                REQUESTS
              Page to  Line
22
               32       19
23
24
25

Page 119

1

2                    CERTIFICATION

3

4       I, MARGARET SCULLY-AYERS, a Notary

5  Public for and within the State of New

6  York, do hereby certify:

7       That the witness whose testimony as

8  herein set forth, was duly sworn by me;

9  and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12       I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I

15  am in no way interested in the outcome of

16  this matter.

17       IN WITNESS WHEREOF, I have hereunto

18  set my hand this 18th day of June, 2014.

19

20  _____

21     MARGARET SCULLY-AYERS

22              *       *       *

23

24

25

Page 120

1
2                    ERRATA SHEET
          VERITEXT/NEW YORK REPORTING, LLC
3
   CASE NAME: Adrian Schoolcraft -v- The
4  City of New York et al.
   DATE OF DEPOSITION: May 30, 2014
5  WITNESS' NAME: Anthony J. Maffia
6  PAGE/LINE(S)/      CHANGE              REASON
   ____/_____/_____/_____
7  ____/_____/_____/_____
   ____/_____/_____/_____
8  ____/_____/_____/_____
   ____/_____/_____/_____
9  ____/_____/_____/_____
   ____/_____/_____/_____
10 ____/_____/_____/_____
   ____/_____/_____/_____
11 ____/_____/_____/_____
   ____/_____/_____/_____
12 ____/_____/_____/_____
   ____/_____/_____/_____
13 ____/_____/_____/_____
   ____/_____/_____/_____
14 ____/_____/_____/_____
   ____/_____/_____/_____
15 ____/_____/_____/_____
   ____/_____/_____/_____
16 ____/_____/_____/_____
   ____/_____/_____/_____
17 ____/_____/_____/_____
   ____/_____/_____/_____
18 ____/_____/_____/_____
   ____/_____/_____/_____
19 ____/_____/_____/_____
20
          _____
21              ANTHONY J. MAFFIA
22 SUBSCRIBED AND SWORN TO
   BEFORE ME THIS_____DAY
23 OF_____, 2014.
24 _____
          NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

| & |
|---|
| **&**  4:3,10,16 5:4 7:6 28:10,20 |

| 0 |
|---|
| **09**  57:5 60:21 61:6 |
| **090.155440**  5:7 |

| 1 |
|---|
| **1**  59:6 71:4 80:2 110:20 112:21 |
| **1-50**  1:19,24 |
| **10**  112:21 113:2,7 |
| **100**  3:19 |
| **10001**  3:14 |
| **10004**  5:6 |
| **10006**  3:5 |
| **10007**  3:19 |
| **10017**  4:12 |
| **10022**  4:6 |
| **105**  118:14 |
| **106**  118:19 |
| **10:28**  2:8 7:3 |
| **10civ**  1:7 |
| **11**  106:8 |
| **11/1**  93:4 |
| **11/3**  93:4 |
| **11010**  7:21 |
| **11042**  4:19 |
| **111**  3:4 |
| **116**  118:19 |
| **11:13**  46:12,13,15 46:18 |
| **11:21**  53:8,11 |
| **11:36**  53:13,16 |
| **11:46**  61:19,22 |
| **11:47**  61:24 62:3 |
| **1200**  3:13 |
| **12:36**  104:10,13 |
| **12:44**  104:15,18 |
| **130**  52:24 53:2,18 54:8,18 59:3 118:11 |
| **1305**  3:5 |
| **131**  91:5,8 96:24 118:12 |

| 132 |
|---|
| **132**  106:3,10 118:13 |
| **13th**  4:12 |
| **15**  64:25 |
| **17**  60:14 |
| **18th**  119:18 |
| **19**  111:23 112:8 118:22 |
| **1949**  17:5 |
| **1977**  17:12 |
| **1986**  18:9,11,17 |
| **1995**  9:25 10:12 19:15 |
| **1:04**  117:6 |

| 2 |
|---|
| **2**  70:19 71:4 |
| **20002**  3:9 |
| **2001**  4:18 |
| **2003**  51:12 |
| **2007**  32:23 |
| **2009**  12:13 13:18 14:8 45:2 47:3,17 49:2,14 50:21 51:2 51:10 52:9 56:16 62:20 99:13 108:19 |
| **2010**  60:21 61:7 |
| **2010-033074**  3:21 |
| **2011**  54:5 |
| **2011/2012**  52:5 |
| **2014**  2:8 117:11 119:18 120:4,23 |
| **220**  2:6 4:11 7:7 |
| **224**  3:13 |
| **2483**  1:16 |
| **25**  114:17 |
| **2576**  1:15 |

| 3 |
|---|
| **3**  85:11 |
| **30**  2:8 38:4 120:4 |
| **3004**  1:19 |
| **30th**  4:6 |
| **31**  51:10 99:13 |
| **32**  118:22 |
| **35th**  3:13 |

| 4 |
|---|
| **4**  66:5 |
| **42nd**  2:6 4:11 7:7 |
| **44**  84:25 |
| **444**  4:5 |
| **45**  85:3 |
| **474**  80:8 |
| **48**  101:20,23 102:4 102:6,11,22 103:3 |

| 5 |
|---|
| **5**  54:5 66:4 107:23 |
| **52/53**  118:11 |

| 6 |
|---|
| **6**  38:4 83:7,11 110:7 |
| **6005**  1:7 |
| **65**  111:23 112:8 |
| **667-82153**  4:14 |

| 7 |
|---|
| **7**  84:23 111:8 112:7 118:5 |
| **722**  7:20 |

| 8 |
|---|
| **8**  32:23 |
| **829**  3:8 |
| **873220**  1:9 |
| **885374**  1:18 |
| **894025**  1:14 |
| **895117**  1:12 |
| **897840**  1:13 |

| 9 |
|---|
| **9**  32:23 |
| **9.39**  63:3 100:5 |
| **91**  118:12 |
| **912370**  1:11 |
| **927**  58:21 |
| **98**  89:8 |

| a |
|---|
| **a.m.**  2:8 46:12,13,15 53:11,13 61:22,24 |
| **abercrombie**  4:3 |
| **ability**  33:14,15,16 111:14 113:16 |

**able**  39:6 72:15 79:2 83:8
**absolutely**  116:22
**abuse**  112:9
**act**  78:3,6 107:21 108:6
**action**  2:13 72:3 119:14
**activities**  18:24
**activity**  57:22
**acuity**  116:10
**ada**  107:15
**adelphi**  17:14
**adjacent**  48:12
**administered**  7:11 21:19
**administrative**  11:5 12:18,24 114:20 115:16
**administrator**  68:11
**administrators** 40:16
**admissibility**  74:6 104:25
**admission**  26:25 27:7 53:25 54:21,23 54:25 55:5,10 59:7 59:12,15 60:9 62:13 62:18,22 64:7 77:18 83:13 86:7,14 91:16 99:21 100:2,4 101:21,23 102:5,9 102:11,13,15 103:3 103:4,5,10,11 111:4 116:9,20
**admissions**  27:16 52:16 57:17 75:13 77:16 84:21 85:4 95:16 96:8,11 115:18
**admit**  55:17 62:25 71:25 78:9 82:9 86:23 87:21 88:24 89:15,21 102:8 115:20,23

**admitted** 8:10 58:11
58:13,15 64:24 70:8
102:10,14,23
114:12
**admitting** 80:25
85:12,24 101:11
**adrian** 1:5 8:7 120:3
**adulthood** 111:23
112:8
**advisement** 32:25
**affirmative** 77:19
**afraid** 74:16
**agency** 59:23
**ago** 12:12
**agree** 8:18 64:6 73:2
73:16 74:19,24,25
75:5,25 86:2
**agreed** 6:3,9,13
**agrees** 73:12 76:10
**ahead** 38:25
**al** 120:4
**alcohol** 112:9
**aldana** 1:23 5:5
**alleged** 25:5 64:19
69:18
**allocation** 74:10
**allow** 37:17 75:6
92:9,11
**ambulance** 15:6
49:23,24
**ambulances** 50:18
**ambulatory** 41:16
43:6
**americans** 107:20
108:5
**amount** 69:12 109:9
114:10 115:6,7
**anesthesia** 42:16
**annual** 113:22,25
**answer** 9:7 10:18
15:13,14 16:12 19:2
20:4,19 22:7,13
23:2 24:25 25:25
31:24 32:6 34:13,18
34:20,20,25 35:5,6

35:9,14 36:9,21
38:21 43:21 50:19
64:11,15 66:23
67:12,16,23 69:3,5
73:14 75:22 77:3,25
78:12 81:14,17
82:12,25 86:3,5,8
87:2,9,14,15,25
89:4,17,24 90:18,22
91:23 92:9,11 94:9
94:10 96:21 97:19
98:14,18 99:9
100:14 103:16,18
103:19 107:11,25
111:5 114:4
**answered** 22:12
67:15 94:8 96:20
**answering** 27:10
48:23 73:18 87:8
88:8 99:3
**anthony** 2:10 7:18
117:7 120:5,21
**anticipated** 68:20
**anybody** 28:24 29:5
29:15 45:21 57:14
57:19 63:17 82:4
**anymore** 18:22
117:3
**apologize** 25:20
41:24 48:15
**appear** 35:8 63:10
**appearances** 3:2,24
4:2,22 5:2
**application** 59:6,12
59:15 73:22,23
74:15 78:16 110:12
**apply** 55:6 58:7,9
108:22 111:18
**appropriate** 61:2
62:25 64:22 69:21
110:13
**april** 60:20,21,23
61:3,6,6
**area** 49:9 50:11

**areas** 15:22 111:18
112:22
**arrival** 92:20 93:11
93:18
**article** 63:3
**asked** 16:14 22:11
36:20 37:15 67:14
69:15 74:4 76:7
94:7 96:19
**asking** 36:2 66:10
66:12 67:3,4 68:3,5
73:17,21 75:18
78:15 79:6,9,10,12
81:4 82:16 97:16
**assess** 32:15 110:10
**assessed** 99:14
**assessing** 109:12
**assessment** 25:3
80:15,18 89:22 90:8
97:9,10,23 98:3,21
101:3 107:6
**assigned** 114:6
**assist** 13:11
**assistance** 19:11
**assistant** 1:10 18:2
**assists** 109:11
**associate** 56:6,11,15
61:14
**assume** 9:8,8
**assuming** 65:11
**assuring** 81:3
**attempts** 70:16
**attend** 24:10
**attention** 63:4,21,25
**attorney** 3:4,8 8:7
25:11 26:4 28:4,22
53:4 93:8 106:5
118:16
**attorneys** 3:12,18
4:4,10,17 5:4 25:10
27:23 28:7 29:20
30:3 33:8
**august** 54:5
**authorization** 14:5
99:7

**authorizes** 97:25
99:17
**available** 59:20 80:4
**avenue** 4:5,18
**ayers** 2:15 119:4,21

**b**

**b** 38:4 57:12 82:15
118:9
**back** 10:2 18:17
37:12 39:19,22
53:15 56:22 62:2
72:9 87:4 90:10,24
98:4 103:21 104:17
104:22 107:20
**bad** 47:19 48:21
**badly** 47:15
**bamji** 57:3,12
**based** 55:7 67:20
68:19 89:21 100:4
116:10,18
**basic** 35:22
**basically** 19:11 66:9
**basis** 55:18 64:13
78:13 82:13 100:25
113:22,25
**bates** 53:20
**beds** 17:2 114:17
**beginning** 8:18
**begins** 102:22
**behalf** 2:11 79:22,22
104:23
**behavior** 70:22
**believe** 41:12 44:17
45:6 53:22 55:19
57:8,20 76:20 96:2
97:2 99:22 107:13
108:20 113:12
**bell** 4:10 7:6 28:10
**benefits** 43:4
**bernier** 1:23 5:5
110:23
**bernier's** 88:21
**best** 9:12 64:5 69:15
77:23

| | | | |
|---|---|---|---|
| **better** 75:19 | **c** | **certain** 21:23 24:16 | **clear** 54:4 83:6 |
| **beyond** 15:12 16:9 | | 32:10 33:11 38:24 | **clearwater** 4:10 7:6 |
| 16:15 24:25 64:16 | **c** 16:21 44:25 45:23 | 49:24 77:21 114:16 | 28:10 |
| 66:15 78:14 82:15 | 82:18 | **certainly** 74:20 | **clinic** 13:14 14:10 |
| 89:5 90:16,19 94:2 | **callan** 5:4,7 64:10 | 92:13 | 14:19,22 |
| 111:7 | 68:2,8 71:13 76:14 | **certainty** 69:11 | **clinical** 10:23 11:3,9 |
| **bill** 44:7 | 90:2 117:5 | **certification** 6:6 | 21:12 40:10 42:8 |
| **bills** 44:7 | **called** 24:14 58:5 | 119:2 | **clock** 102:22 |
| **birth** 17:4 | 60:9 | **certifications** 90:7 | **codefendants** 82:17 |
| **bit** 12:21 15:20,23 | **camera** 47:16 50:24 | **certify** 80:7 119:6 | **codes** 107:15,21 |
| 16:8 47:14 | 51:22 52:7 | 119:12 | **collectively** 1:21 |
| **blood** 119:14 | **cameras** 30:24 | **cfo** 40:12 41:7 | **column** 93:10 |
| **board** 10:25 11:18 | 46:23,25 47:4,5,8 | **chairman** 10:23 | 112:10 113:3 |
| 11:21 39:25 40:3,3 | 47:21,25 49:8,11,16 | 40:2,20 43:11 56:6 | **come** 37:12 38:5 |
| 40:9,9,21 | 50:11,15,20 51:6,15 | 56:6,9,11,15,15,21 | 39:18 68:13 78:19 |
| **bodily** 70:17 | **capable** 74:22 76:21 | 61:14,15 | 114:11 |
| **book** 66:7 | 87:18 88:12,15 | **chairmen** 40:11 | **comes** 41:22 67:21 |
| **booth** 17:16 20:5 | 100:23 | **chance** 54:7 | 91:9 97:21 |
| 22:17 23:3 | **capacity** 1:10,11,13 | **change** 120:6 | **coming** 19:23 |
| **borough** 1:10 | 1:14,15,16,17,18,20 | **changes** 56:24 61:9 | **commence** 13:21 |
| **bottom** 55:21 60:14 | 1:23,23 2:2 75:3 | **charge** 11:8 | **comment** 82:16 |
| 113:8 | **captain** 1:13 | **charitable** 59:23 | **commission** 120:25 |
| **box** 112:13 | **caption** 58:4 85:4 | **charles** 44:25 | **commitment** 100:17 |
| **brady** 5:4 | **care** 11:2,4 15:5,10 | **chart** 52:13 84:5 | **committed** 60:6 |
| **break** 53:6 | 41:16,18 43:6 64:5 | 91:10 118:12 | 91:20 |
| **breaking** 48:23 | 64:21 69:20,25 70:3 | **check** 57:9 101:10 | **committee** 59:21 |
| **brennan** 5:4 | 82:16 110:14 | 109:22 112:12 | **community** 13:12 |
| **briefly** 24:4 33:5 | **careful** 63:3,20,25 | **cheryl** 44:16 | 59:25 100:2,11 |
| **bringing** 104:22 | 64:4 | **chief** 1:8,10 10:21 | **companies** 44:10 |
| **broad** 67:18 69:12 | **carter** 3:17 | 10:24 11:18,21,23 | **company** 44:8 |
| **broadway** 3:4 | **case** 24:14 26:5 43:6 | 12:6,10,13 40:6,7 | **competencies** 110:2 |
| **broken** 47:4,6 51:3 | 44:14,15,17 60:6 | 40:14 43:14 108:17 | **competency** 109:21 |
| 51:9 52:8 | 67:21 99:11 120:3 | 108:18 114:7,12,19 | **competent** 39:8 |
| **brooklyn** 1:10 | **cases** 115:6 | 115:9,15 | **complete** 38:6,16 |
| **brother** 59:19 | **casual** 48:24 | **child** 59:19 | 39:12 |
| **brought** 8:9,11 15:4 | **categories** 66:21 | **church** 3:19 | **completely** 35:15 |
| 49:22 50:7 55:2 | 108:4 | **circumstances** 15:8 | 52:9 |
| 80:16 82:4 99:12 | **categorizing** 108:4 | 85:18 98:10 | **components** 112:5 |
| **bruce** 12:9,9 41:2 | **category** 112:8,14 | **city** 1:8 3:18 120:4 | **comprehensive** |
| **budgets** 12:23 | **caughey** 1:17 | **civil** 2:18 | 13:15 |
| **building** 16:22 | **center** 1:22,24 2:13 | **claim** 8:9 | **concepts** 13:9 |
| **buster** 46:2 | 4:11 9:20 17:17 | **clarence** 45:18 | **concerns** 9:10 |
| | 22:18 62:24 | **clarify** 8:17 47:19 | **conclusion** 68:3 |
| | **ceo** 40:5,6 41:3,4 | 115:24 | **condition** 77:17 |

conduct  70:18 77:20
  78:7 82:7
conducted  80:18
  81:12 97:9 101:18
  101:20 103:2
conference  37:16
conferences  24:15
  24:16
confidential  104:5
  105:11,14 106:6,11
  116:25 118:13,17
connection  55:16
consider  80:5 99:25
  104:22
considered  38:25,25
  39:5
consistent  88:25
  89:19
constitutes  83:19
construction  12:25
  52:5
construed  78:7
consultants  116:7
consulting  98:25
contacts  44:9
context  65:10
continue  75:17
  78:23
continued  1:25 3:24
  4:2,22 5:2 46:16
  53:14 61:25 104:16
contract  62:12
conversation  48:24
  104:21
conversations  33:7
coo  40:12 41:5
copy  37:9 106:14
copying  106:20
corner  92:2
corporate  23:7
  39:21 79:7
corporation  3:17
correct  8:5 12:15
  13:5 14:2,6 19:21
  28:23 31:6 32:9,11

37:6 47:7,23,24
  49:7,25 50:3,5
  52:11 56:10 60:23
  65:22 66:24 71:22
  71:23 78:10 81:19
  86:13 88:17 95:19
  95:21 96:16 114:3,5
  114:21
corrections  7:24
cost  51:17
counsel  3:17 6:4
  8:15 28:2,12 37:9
  62:4,5 68:4,16
  74:20 76:3 84:15
  104:20 105:2
  106:11
counseling  19:7,9
  19:10
couple  62:15
course  71:19 112:24
court  1:2 6:17 15:17
  16:5 35:7 36:5
  37:16,17 74:4 81:21
  83:15 84:18
covered  43:19 44:12
covers  31:17 32:10
cpep  13:15,17,20
  14:4 52:4
created  94:15 96:23
criteria  80:6 110:17
  111:14,24,25
critical  113:3,7
currently  9:17
  56:18

**d**

d  41:9 56:12,13
  57:13 108:21 118:2
danger  24:21 63:18
  86:17 100:6,22
dangerous  70:18
  72:5 78:6,7
dangerousness  25:4
  86:21 88:23 89:22

date  53:3 60:20,21
  91:6 92:2,20 93:3
  93:10,15,18,19,21
  94:5,25 106:4 120:4
dates  55:23 60:18
  62:14,15
david  45:23
day  99:15 117:11
  119:18 120:22
days  64:25
dc  3:9
decide  98:13 116:19
decision  55:17 58:23
  65:12 66:10 71:24
  73:8 76:6,12 82:9
  85:23 87:12,17
  98:12 100:4,18,24
  102:7
decisions  72:13
  100:3 115:19
deemed  105:14
  106:5 116:25
defendant  3:18 4:4
  4:10,17 5:4
defendants  1:21 2:4
  2:12
define  67:10
defined  68:8,25
  70:12 93:24
defines  66:20
definition  65:25
  67:25 68:18,24 69:8
  71:21
definitions  66:3,8
degree  17:8 21:24
  22:2 86:20
degrees  22:3
delay  15:25
demonstrate  111:15
demonstrating
  70:18
department  10:5,7
  10:10,15 13:3 14:11
  22:21 26:15,20
  42:11,12,12,13,14

42:15,16 43:4,4,5,5
  43:9,13,16,25 44:6
  44:9,14,18,22 45:8
  45:13 46:20,21
  51:25 56:16 90:9
  98:19 102:21
  103:12 108:12
  109:17 113:19
departments  42:4,8
  42:17,22
deposed  9:14
deposition  2:10 6:7
  6:14 7:4 25:9 27:14
  27:20,25 29:17 30:8
  30:17 54:12 64:17
  82:15 88:21 89:6
  105:12 120:4
depositions  79:5
deprivation  64:7
deputy  1:8,11
describe  10:13 24:5
describes  31:16
describing  71:15
description  106:13
  118:10
designee  60:3
detail  12:21 24:3
determination
  65:17,19 67:20
  71:11 74:8 75:22
  86:7,15 89:20 100:8
determine  24:20
  65:12 85:13 100:21
determined  79:17
determines  71:17
  88:3
determining  43:17
  44:2
development  12:23
  12:25 13:7,8
devine  4:16
dhar  56:13,14,22,25
  57:7
dhar's  57:2

[diagnose - exhibit]                                                                          Page 5

diagnose  113:16
difference  16:23
  48:7
different  13:10 50:2
  74:11
differentiation  21:5
dinshaw  57:13
diploma  21:7
direct  18:12 24:24
  73:8,9
directed  35:8 36:5
  73:4
directly  49:3 50:17
  92:16 93:9
director  18:2,6,11
  18:21 22:20 23:24
  59:25 60:2 83:15
directors  40:16
  45:12,15
disabilities  107:20
  108:6
disagree  39:9 66:17
  82:20
discharge  19:3,10
discuss  24:17 77:8,9
discussed  62:4
discussion  14:17
  46:9 53:9 61:20
  104:7,11
disqualify  39:8
distinction  77:14
distributed  115:12
district  1:2,3
divide  114:18
division  20:17
doctor  31:21 32:3
  56:21 75:16 80:25
  82:18 101:11
  104:22 107:7 109:6
  109:12 112:2
  113:22 114:25
  115:8
doctors  31:4,11 32:8
  32:16,22 33:25 34:9
  36:16,24 37:19 79:3

82:7 108:23,24
  113:15 114:13,18
document  31:15
  52:25 54:8 55:21
  58:4 60:9,17 61:9
  62:5 78:21 80:2
  91:4,9,17 106:2,8,9
  118:14
documentation
  95:18 96:15
documents  26:11,13
  29:22 30:6,16 37:15
  53:18 54:10,18 90:6
  95:24 107:5 118:11
doe  1:19,20,24 2:2
doing  17:19,24
  31:10 35:9 48:17
  60:25
doors  49:5 50:8
doss  41:9 43:14
double  49:5
doughlin  43:10
dozens  42:19
dr  1:22,23 4:17
  11:10 29:3,8,21
  30:9 43:10 56:9,12
  56:20,25 57:3 76:3
  88:21 89:6,18
  108:20 110:23,24
drug  112:9
dsm  66:4,5,22 68:20
  69:6
duly  7:13 119:8
duncan  1:16
duties  12:17,18
  18:10 19:18
duty  89:11

e

e  11:10,10,11 28:5
  42:2 44:16,16,25
  45:20 108:21,21
  118:2,9
earlier  106:22

east  7:7
eastern  1:3
edelman  108:21,21
education  17:7
  112:18
educational  21:23
  24:9,12
effect  6:16 62:20
either  15:5 21:25
  37:9 45:11 72:5
  75:15 78:3,5 108:5
emergency  13:16,25
  14:10 15:2,3,5,9
  42:16 43:8,11 48:2
  48:3,4,12 49:3,18
  50:9 54:20 55:4,11
  60:9 62:13,18,22,25
  63:13,15 70:8 84:21
  85:5,9 91:16 97:11
  97:22,23 98:8,9,19
  98:23,24 103:6
  108:24 116:4,17
employ  28:17
employed  9:17
  32:21
employees  1:24
  99:18
employment  17:22
  18:4
engage  86:21
engineering  42:25
entail  55:13
entertain  77:21
entire  39:2 47:10
  52:18 66:7
entitled  2:13 106:12
entrance  49:17
entryway  49:18,21
er  14:24 49:2,9,12
errata  120:2
esq  3:3,7,17,20 4:7
  4:13,20 5:7
esqs  4:4
essential  108:6

essentially  79:6
et  120:4
evaluate  32:22 55:7
  100:19 110:10
  111:20
evaluated  31:21
  32:3 33:12 55:3
  99:8,20 108:16
  115:21 116:16
evaluating  110:22
  110:24
evaluation  31:14,16
  31:18,20,22 32:2,6
  32:8,8,21 33:25
  34:21 36:16,24
  37:14,19 39:18
  77:11 81:11 98:24
  101:6,22 102:4,6,12
  103:2 104:2 106:13
  106:22 108:22
  109:4,8,14 114:2,24
  116:12,18
evaluations  31:4,10
  34:6,8 63:24 108:14
  111:17 113:12
evenly  115:11
everybody  105:3
exactly  56:25
  113:11
examination  7:16
  34:24 38:17 39:13
  78:24 80:3,12,12
  103:2 118:3
examinations  21:17
  21:20
examined  7:14
examining  80:5
example  112:7
exclusively  13:3
excuse  56:23
exhausted  46:5
exhaustive  37:21
exhibit  52:24 53:2
  53:18 54:18 59:3
  91:5,8 96:23 106:3

106:9 118:11,12,13
exhibits  118:16
experience  20:6,7,9
  23:19
expert  72:22 79:6,10
expires  120:25
explain  12:20 31:24
  63:14 66:13 68:6,14
  69:24 74:17 75:3
  77:25 78:20 79:11
  111:10
explaining  79:14
extent  22:22 42:20
exterior  50:16

**f**

f  7:12,12 12:9
faced  49:5
facility  14:8
fact  38:2 39:6
factor  114:23
factors  32:14 36:23
  37:2,4 38:10 39:5
  100:16
familiar  31:19 39:4
  91:11
families  15:6 19:8
far  51:23 62:17
  68:18 79:13
fashion  52:10
father  59:18
fear  70:23
federal  2:18 7:23
feel  58:11
feels  58:12 70:7
fictitious  1:20 2:2
fight  38:18
file  3:21 4:14 5:7
filing  6:5
filled  108:9
finance  12:23 41:16
  43:3,12,16 44:6,14
financial  40:7 43:15
find  23:17 44:10

finding  80:7
fine  35:12 36:7
  48:18,25
finish  48:14
firm  28:14,19
first  7:13 11:10 12:9
  45:4 57:12 62:23
  70:14 81:5,10
  107:14
five  17:3 50:2 53:6
  60:14 69:14
fix  51:21
fixed  51:24
flanz  12:9,13 41:2
floor  4:6,12 16:21
  55:11 97:12 115:18
foley  28:20
follow  32:25 89:12
following  80:2,11
  99:14 105:13
  116:24
follows  7:15
force  6:16
forget  30:25 58:24
form  6:10 10:17
  17:21 18:3 22:25
  29:13 32:7,10,17,20
  33:3,10 34:5 35:10
  35:12,13 36:12
  37:10 38:11,14 39:3
  39:12 58:18 72:8
  80:7 84:17 87:24
  88:20 91:12,14,22
  92:5,7,8,12 93:13
  93:15 94:6,14,21
  96:23,25 100:13
  102:17 103:8,15
  104:2 106:21,25
  107:9 109:20 111:9
  111:16,17,21
formal  45:10
formed  47:15,15
forms  23:19 107:4
  108:10

forth  32:17 55:16
  66:22 119:8
foundation  23:9,20
  23:23
founded  75:9
four  30:22 50:2
fourth  30:25 31:3
frame  114:4
francisco  45:5
franklin  7:20
frankly  75:8
frederick  1:15
freedom  64:8
friend  83:14
front  58:19
frustrated  35:21
fulfilled  110:3
full  66:7
function  76:12
functions  108:7
further  6:9,13
  119:12

**g**

g  45:20
game  83:2,3
general  21:7 67:23
  67:25 68:24 69:8
  111:21 112:5
generally  54:19,20
generate  111:2
generates  109:10
generating  109:11
generic  111:17
gentleman  45:22,25
gerald  1:10
getting  113:6
give  15:23 16:7
  23:14 25:25 67:22
  83:8,21 114:5
given  91:19 94:18
  94:19,21 114:15
  119:10
gives  83:14

go  24:2 36:23 38:25
  79:24 105:10
  111:22
goes  15:11 16:14
  23:13 43:7 69:17
  70:10 82:14 85:3
  98:20
goff  1:14
going  7:2 9:7,8
  15:18 16:9 23:10,14
  24:2,24 34:16 37:11
  38:17 39:11 46:11
  46:17 50:16 53:7
  62:2 66:15 67:7
  68:15 75:16,23
  76:25 77:14 78:18
  78:23 81:20 87:13
  89:15 91:7 92:4,9
  104:4,9 111:20
good  8:3 16:10
  48:21
governed  67:2,6
governing  52:16
  101:5
governs  93:21
grand  24:15
grant  12:23 52:2
great  24:3
gregory  4:13
group  53:18 114:8
  118:11
groups  114:16
guess  47:12 52:4
  72:25
guessing  51:12
gyn  42:13

**h**

h  7:12 11:10 28:5
  42:2 45:20 56:13
  57:13 118:9
hairs  74:2
half  26:9
hand  92:2 93:5
  119:18

[handwriting - issues]                                                    Page 7

handwriting   93:4
  93:10 96:24
handwritten   92:3
  92:13,17
happening   67:22
happy   29:25
hard   23:15
harm   64:23 70:11
  70:15,17,20,24
heading   59:4
health   13:14 14:9
  84:10 97:3
heard   79:13
hearing   83:16 84:18
held   2:14 14:17 46:9
  53:9 61:20 97:7
  98:2 104:7,11
help   13:13 36:19
hereto   6:5
hereunto   119:17
herring   45:18
highest   17:6
hold   99:7,18
holley   42:2
home   19:11 59:23
homicidal   70:21
hospital   1:22,24
  2:12 4:11 7:5 8:9,11
  8:12 9:19 10:6,11
  10:22 11:2 12:4,14
  13:11,18,21 14:8,20
  16:22 17:18,23 18:5
  18:8,13,15 19:5,17
  19:24 25:2 26:4
  27:12 28:8,13,17,22
  29:10,16 30:6,24
  31:4,8 32:14,16,21
  34:2 36:17,25 39:21
  39:25 40:5,18,19,25
  42:3 43:18,25 44:3
  46:21 47:2,6,9,10
  47:17,21 49:13,17
  49:19,23 50:8,12,17
  50:21 51:2,14,21,23
  52:8,12 53:19,23,24

54:2 55:2,15 56:4,4
  57:15 60:3,24 62:6
  62:24 63:9 64:2,21
  66:20 67:10 68:7,10
  68:25 72:2 73:5
  74:7,9 75:12 76:22
  77:15 79:11,14,22
  80:17 81:23 84:5
  86:13,19 89:2,19
  90:3,5 91:10,18,20
  92:21 93:11,18 94:6
  94:15,17,24 95:2,9
  95:10,17,19 96:3,14
  96:16 97:6,25 98:9
  99:6,12,17,24 100:9
  101:5 103:12
  104:24,25 105:6
  106:12 107:7
  108:13 109:9 111:2
  113:20,20 116:21
  118:12
hospital's   65:25
  66:13 68:16 106:11
hour   26:9 102:4,22
hours   26:10 101:20
  101:23 102:6,11
  103:3
house   28:12,16
housekeeping   43:2
huh   14:21 30:4 59:5
  65:21 101:24
human   43:2
husband   59:18
hygiene   27:8 54:22
  55:5 63:3 100:6

**i**

i.e.   75:4
ideas   13:9
identification   53:3
  91:6 106:4
illness   64:20 65:7,10
  65:13,14,20 66:2,21
  67:11,25 68:19,24
  69:9,19

immediate   64:20
  69:19,25 70:5
impact   112:9
implementation
  77:10
implemented   79:3
important   9:4,5
  115:5
improper   35:11,13
  35:13,16
improvement   42:19
included   74:7
including   47:25
index   1:7
indicated   74:21
  104:21
indicating   20:21
  28:3 31:5 47:22
  50:4 107:10
indication   55:22
individual   8:8 11:8
  24:15 55:18 67:21
  85:19 90:5 97:7
  98:2 108:11
individual's   57:11
individually   1:9,11
  1:12,13,14,15,17,18
  1:19,22,23,24
individuals   11:16
  25:4 59:11
infants   111:19
informants   80:4
  81:24
information   35:23
  38:6,6 69:12 82:5
  87:19 88:5,12,16
  94:16 100:24 111:9
  112:23
initial   102:7
inoperable   51:15
  52:10
inpatient   13:14
  14:11,15 55:12
  84:14 85:14,20

inquire   75:7
inspector   1:11
instance   13:12
  111:19
institution   59:23,24
instruct   34:13 35:14
instructed   90:22
instructing   36:9
  64:14 90:17
instruction   42:25
insurance   43:19
  44:4,8,10
interdisciplinary
  33:16
interested   119:15
interior   50:12
interrupting   34:24
interviews   80:3
invalid   76:17
investigation   82:8
involuntaries   96:14
involuntarily   71:25
  78:9 82:9 86:22
  87:21 88:24 89:21
  91:19 102:7 116:20
involuntary   26:25
  27:7,15 52:16 54:25
  55:17 56:4 57:17
  58:5,8 64:6 75:13
  77:16,17 86:14
  95:16 96:8,10 99:21
  100:2,17 101:8
  111:4
involve   20:2
involved   56:2 57:21
  57:23,25 100:16
  112:6
irrelevant   114:2
isak   1:22 4:17
isakov   1:22 4:17
  76:3 89:18 110:24
isakov's   89:6
issue   105:8 112:20
issues   12:24 23:14
  27:8 30:23

**item** 37:21
**items** 33:11,13,17
  33:19 112:21
**ivone** 4:16,20 10:2
  14:13 39:22 58:22
  60:12 66:9,15 71:9
  71:14 72:9,12 73:7
  73:13 76:4,4,11
  84:23 85:2,6,22
  86:3 87:3,7,11,22
  89:25 90:14 92:25
  97:16 98:4,11,16

### j

**j** 2:10 7:12,18 45:23
  57:12 117:7 120:5
  120:21
**jamaica** 1:21,24
  2:12 4:11 7:5 8:9,11
  8:12 9:19 10:6,10
  12:3 18:5,8 19:16
  19:23 20:5 25:2
  26:4 32:20 33:25
  36:16,24 39:21,25
  40:18 46:21 47:2
  50:25 53:19,23,24
  56:3 62:24 64:2
  65:25 66:13,20
  67:10 68:6,9,15
  71:25 73:5 75:12
  79:10,14 81:22
  95:16 97:24 99:5,16
  104:23 106:10,12
  107:7 108:12 109:9
  113:20
**james** 1:19
**jeez** 41:19
**jensen** 4:16
**job** 106:12 108:6
**john** 1:19,20,24 2:2
  3:7
**join** 71:13
**joseph** 1:14
**jr** 4:7

**judge** 74:5 76:15
**june** 119:18

### k

**k** 11:11
**keep** 109:15 113:21
  114:10,14
**kind** 13:7 14:7 19:9
  31:21 40:8 43:7
  46:25 72:3,4 77:19
  83:23
**kinds** 77:21
**know** 8:25 9:11
  26:18 27:5,21 28:15
  33:18 35:16 37:2,5
  38:9,10 41:23 42:9
  42:20,22 45:9,11
  46:4 48:20 51:5,23
  58:14 60:4 61:8,12
  61:15 65:24 67:12
  73:11 74:18 76:9,25
  81:10 84:2,9 99:10
  99:22 105:3 112:4
  115:3
**knowledge** 46:6
  75:19 77:23 110:13
  111:14
**known** 16:21
**koster** 5:4
**kretz** 4:3,7
**kurt** 1:16

### l

**l** 12:9 42:2,2 45:23
  45:23 108:21
**labeled** 106:10
**lake** 4:19
**language** 92:8,12
**lardner** 28:20
**latitude** 15:20,24
  16:8
**lauterborn** 1:13
**law** 27:8 38:2 52:15
  52:18,19 54:23 55:6
  55:8 63:3 67:2,3,6
  76:15 84:10 100:6

**100:20
**lawsuit** 8:12
**lcsw** 21:12
**learning** 110:4
**leave** 39:17
**lecture** 38:2
**left** 44:19 49:3 92:16
  93:9
**legal** 54:25 58:5,8
  63:5 84:12,15
**length** 111:3
**lenoir** 3:7
**letter** 83:22,23
**level** 17:6 23:20 64:8
  87:19 89:9,14
**levels** 109:17
**licensed** 21:12,16
**licenses** 21:9,11,14
**lieutenant** 1:14,17
**light** 73:2
**likelihood** 70:11
  86:20
**lilian** 1:23 5:5
**limitations** 16:10
**limited** 15:16 20:6
**line** 83:7 118:21
  120:6
**list** 43:7 107:22
**listen** 116:11
**lists** 54:21
**little** 12:21 15:20,23
  16:8 47:14 51:5
**llc** 120:2
**llp** 4:10,16 5:4
**located** 16:19 47:21
**location** 49:24
**log** 114:14
**long** 9:23 10:9 26:7
  51:9,13,16 69:13
  89:14
**look** 25:18,23,24
  26:11,13,16,19
  27:13,20 54:7 62:12
  93:22 95:4 101:16
  110:4

**looked** 27:9 29:22
  33:3 38:11,15 52:12
  52:15,20 54:11
  106:25
**looking** 30:5,15
  92:18 95:13 96:6
**looks** 61:5 110:7
**loud** 101:16
**lynch** 11:25 12:2,8
  12:10 41:6

### m

**m** 7:12 41:8 44:16
  45:23 57:12 108:21
**machinery** 51:18
**madison** 4:5
**maffia** 2:11 7:18 8:1
  8:3 9:1 10:1 11:1
  12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1
  20:1 21:1 22:1 23:1
  24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1
  32:1 33:1 34:1 35:1
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1
  56:1 57:1 58:1 59:1
  60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1
  68:1 69:1 70:1 71:1
  72:1 73:1 74:1 75:1
  75:25 76:1 77:1
  78:1 79:1 80:1 81:1
  82:1 83:1 84:1 85:1
  86:1 87:1 88:1 89:1
  90:1 91:1 92:1 93:1
  94:1 95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
  106:21 107:1 108:1
  109:1 110:1 111:1

112:1 113:1 114:1
115:1 116:1 117:1,3
117:7 118:5 120:5
120:21
**maintain** 101:7
109:17
**making** 25:3 82:8
100:2,17 115:19
**management** 43:6
44:14,15,17
**manifest** 77:19
**manifested** 70:16,21
**marcus** 4:18
**margaret** 2:15 119:4
119:21
**marino** 1:9
**mark** 52:23
**marked** 52:25 53:17
62:19 91:4 104:4
106:2
**marking** 91:8
**marriage** 119:14
**martha** 108:21
**martin** 4:10 7:6 28:9
**martinez** 45:3,18
**master's** 17:8 21:24
22:2
**matter** 30:20 33:24
35:7 38:4,7 39:18
84:22 89:7,9,14
119:16
**matters** 11:3,6,9
23:10 32:11 36:5,15
**mauriello** 1:12 4:5
**mcjolly** 45:23
**mean** 28:16 37:20
37:25 49:20 50:22
52:9 63:21 65:8,10
71:8 74:23 75:4
82:3 102:5 112:14
115:3
**meaning** 76:22
**means** 27:5 70:2
74:18 79:15 82:4
84:13 112:17

**measure** 111:25
**medical** 1:22,24
2:12 4:11 9:19
10:25 11:17,20
17:17 19:11,24 21:3
21:4 22:18 40:8,9
49:9 62:24 64:5
68:3,13 87:11,17
88:2 98:24 102:14
102:15 116:7
**medically** 85:14,20
**medicine** 42:12,15
43:11 48:9
**meet** 26:2,3 29:20
80:6
**meeting** 29:4 30:2
**meetings** 26:8 29:6
30:12,15
**members** 24:11 40:4
**memorial** 17:17
22:17
**memory** 38:22
**mental** 13:13 14:9
27:8 54:22 55:5
63:2 64:19 65:7,9
65:12,14,20,25
66:21 67:11,25
68:19,24 69:9,19
84:10 97:2 100:5
**mentally** 25:5,6
58:10
**mentioned** 16:17
29:23 42:24 106:22
115:7
**mersten** 44:16
**met** 25:10 27:24
28:4
**mhls** 83:14 84:9
**michael** 1:9 4:20
**mind** 7:8 41:22
106:14
**minute** 53:6
**missing** 41:20
**money** 51:20 52:2

**morning** 8:3
**mother** 59:18
**mounir** 41:8 43:14
**move** 39:15 116:19

**n**

**n** 7:12,12 12:9 41:8
44:16,25 45:20
56:12 57:13 108:21
118:2
**n100** 4:18
**name** 1:20 2:2 7:17
8:6 11:7,11,11 12:9
28:19 41:8 45:4,23
45:25 56:12 57:11
57:12 76:4 120:3,5
**names** 1:20 2:3
**nathaniel** 3:3 8:6
**nature** 12:19 15:21
**ne** 3:8
**neacy** 44:25
**nearest** 59:20
**necessarily** 37:20
115:2,4
**need** 15:20 58:11,13
66:25 68:12 75:2
79:18
**needs** 70:7
**negative** 36:12
**neil** 40:23
**nelson** 1:10
**neo** 111:19
**new** 1:3,8 2:7,7,17
3:5,5,14,14,18,19,19
4:6,6,12,12,19 5:6,6
7:21 13:9 17:17
21:21 52:4,17 54:22
63:2 97:4 119:5
120:2,4
**night** 99:12
**nine** 115:8
**nonoperational**
51:11
**normal** 48:23

**north** 1:10
**notary** 2:16 6:15
7:14 117:12 119:4
120:24
**noted** 117:6
**notice** 83:9,14,20,21
83:24 84:7 91:15
94:6,17
**november** 47:3
49:13
**number** 60:12,13
83:11 109:5 110:20
113:21,24 114:22
115:22 116:18
**numbers** 53:21
115:21
**nurses** 49:5
**nursing** 41:25 43:5
**nypd** 1:21 45:10

**o**

**o** 7:12 28:5 41:8,9
42:2 45:23 56:12
**oath** 7:10
**ob** 42:13
**object** 34:12,17
72:15
**objection** 10:16
15:11 18:25 22:6,24
24:23 29:12 34:4,10
58:17 64:9,10 68:2
71:9 72:7,12,24
73:2,3 74:25 75:9
76:2,16,18,24 78:11
81:13 82:11 84:16
86:24 87:7,22,23
88:19 89:3,23,25
90:2,14,15 91:21
94:7 96:17 98:11,16
100:12 102:16
103:7,14 107:8
**objections** 6:10
**obligation** 38:3
**observation** 64:20
69:20,25 70:5 97:7

[observation - plant]                                                    Page 10

98:2
obtain 14:4 22:2,3
occasions 27:24
28:2 29:21 30:3
october 47:3,17
50:21 51:2,10 57:5
99:13 108:19
office 97:2
officer 10:22,24
11:19,21,24 12:7,11
12:14 40:7,7,14
43:15 59:22 60:5
officers 40:3 90:4,6
offices 7:6
official 1:9,11,12,14
1:15,16,17,18,20,22
1:23 2:2 60:2
okay 8:2,19,20,22
9:2,12,13 23:16
35:16 60:11 85:2
92:22 93:12 105:9
116:14
old 51:19
omh 80:7
once 25:16
ones 54:14,15 57:25
72:19
operating 10:21,24
11:19,21,23 12:7,11
12:14 40:6,14
operation 13:20
operations 13:12
15:22 43:2 46:22
opposed 72:3 77:20
order 2:17 14:4
15:17 16:5 24:20
32:15 83:6 86:22
87:20 101:6
organizational
10:14,19 39:20
42:10
outcome 119:15
outdated 51:19
outpatients 14:23

outside 50:17 108:5

**p**

p 28:5
p.m. 104:13,15
117:6
p.o.'s 1:19
page 3:24 4:22
54:24 55:20 58:3
59:2 60:12,13 79:25
82:23,24 84:25
85:11 89:8 91:9
106:8 107:14,21,22
109:22 110:6,7
111:8,22 113:2,7
118:3,10,12,18,18
118:21 120:6
pages 60:14
paper 96:5
park 50:18
parking 50:2
parks 49:24
part 54:8 62:23 74:9
77:9 116:17
partially 66:24
participating 57:15
particular 43:24
58:2 105:7
particularized
100:25
parties 6:5 119:13
parts 52:19,21
party 44:4
patient 24:21 49:22
50:7 55:7 58:9 59:7
59:15,17 65:19
69:18 70:7 71:25
72:2,5 77:18,21
78:5,9 80:6,16 82:5
82:6,10 83:8,13
84:3,14 85:8,13
86:16,21,23 87:21
88:24 89:11,21 90:8
94:5,16,18,19,22
95:2,10,18 96:15

97:9,21 98:20 99:7
99:8,19,20 100:20
100:21 102:8,10,14
102:23,25 103:5,11
103:17 112:3
patient's 64:3 99:19
101:7
patients 13:13 15:2
15:3,4,9 16:18 19:4
19:8 24:16,18 33:15
62:25 63:22 64:19
70:7 77:12 91:19
97:15 109:5 110:14
111:4 113:13,17,21
113:24 114:7,8,9,11
114:13,16,18,22
115:9,20,21,22
116:19
patrol 1:10
paul 5:7
payer 44:5
pediatrics 42:13,15
peer 29:8,14
people 45:7 57:18
60:25
perceive 89:15
perform 113:15
performance 31:3
31:11 32:15 36:15
39:17 104:2 106:13
107:6 109:12
111:11,13 112:2,15
113:18 114:3,24
period 25:14 32:22
51:16 61:10 64:25
97:8 109:6
permit 51:14 97:6
permits 99:18
permitted 79:8
person 59:8,17,20
59:21,24 68:13 73:3
73:17 75:2
person's 64:7
personal 23:6

personnel 56:24
persons 70:20
perspective 79:2
83:4,6
pertaining 96:7,10
pertinent 55:14
perused 33:5
phillips 40:23
phrase 65:7,9 67:11
68:6 69:25 71:21
phrased 43:22
phrases 74:23 78:20
physical 70:15,20
70:23
physician 11:12,13
55:3,6 58:12 66:11
67:19 69:16 70:4,6
71:10,17 72:14 73:5
75:4,21 77:9 79:17
79:19 80:5 86:6
88:3,7,9,13 98:12
100:7,19 101:3
105:6 109:10,15
110:11 111:12
112:4,16
physician's 65:11
physicians 25:7
33:12 56:5,8 57:24
61:13 63:24 65:16
65:18 68:9 72:17
86:15 99:25 100:10
108:16 112:22
113:19 114:6
pieces 96:5
place 2:14 52:6
placed 70:22
placing 106:7
plaintiff 1:6 3:4,8,12
60:5
plaintiff's 53:2 91:5
91:8 104:19 105:2
106:3,9 118:10
planning 19:4
plant 43:2

**play** 77:10 83:2
**please** 7:9 8:24 9:11
  32:25 34:14 35:2
  77:4 84:4 87:3,10
  87:16 90:11 97:19
  98:15
**pllc** 3:12
**point** 16:11 23:15
**police** 15:6 90:4,6
**policies** 26:14,16,21
  26:23 27:2,6,9,12
  27:19 30:25 53:24
  55:15 56:7 57:16
**policy** 26:24 27:15
  29:22 30:6,16 31:15
  31:22 32:4,5,14
  52:22 54:25 58:4,7
  58:16,19 59:14 60:8
  61:9 62:14,18,23
  63:8 64:2 65:5 66:2
  66:13,14 67:9 68:7
  68:25 69:17 70:10
  73:21,22,23 74:7,9
  74:13,14,15,17,23
  75:11 76:23 77:8,11
  77:15 78:16,17 79:4
  79:4,11,15,17 80:20
  80:23 81:6,16,23
  82:19,21 83:20,25
  84:20,25 86:14,19
  89:2,19 90:3 91:18
  93:21,22,24 94:13
  95:4,4,5,7,9,12,16
  95:20 96:3,13,18,22
  97:6,25 98:18 99:6
  99:17,24 100:9
  101:5,9,10 104:25
**poorly** 47:14,15
**portion** 10:3 39:23
  60:17 72:10 77:6
  87:5 90:12 91:2
  92:17 93:5 98:5
  103:22 104:4
  105:11

**portions** 118:17
**position** 9:21 78:22
**positions** 56:19
**positive** 36:13
**possible** 64:5
**potential** 87:19
  88:23
**practice** 31:9
**predecessor** 57:2
**prejudice** 75:18
**prepare** 25:8 30:7
  30:17
**prepared** 27:25 34:7
  35:6 36:3,14,22
  37:23 38:5,21 63:10
  108:10
**preparing** 27:13,20
  54:11 107:2
**preprinted** 96:25
**prescribed** 115:7
**present** 3:10,15 28:3
  28:24 29:3,5 38:14
  90:4 113:13
**presentations** 113:4
  113:9
**presented** 75:10
**presenting** 63:18
**presently** 1:21 2:3
  44:23
**preservation** 63:4
**president** 9:22,24
  10:20,25 11:19,22
  12:16 19:16 40:4,6
  40:10,12,13,24
  41:15,16,17,25
**presidents** 40:13,15
  41:10
**pretty** 115:14
**previous** 45:15
**prior** 12:8 19:23
  22:3 45:17,22,24
  46:3 82:8 98:3
**probably** 25:14
  51:12 61:13

**problem** 73:19
**procedure** 2:18
  54:21 55:8 59:3,13
  60:6 80:2 85:7
**procedures** 8:15,17
  31:9 53:25 56:4
**process** 33:25 34:22
  36:16 37:14,19,24
  39:4 109:4,8,14
  110:22,23,25
**produce** 36:6 105:5
**produced** 62:19
**production** 32:20
  53:20,23
**profit** 40:19
**program** 12:22 13:6
  13:7,16 24:13
**programs** 13:10
  24:10
**promoted** 19:15
**pronounce** 8:4
**proper** 63:23 73:17
  82:18
**properly** 63:23
**protect** 89:11
  100:10
**protocols** 31:9
**provide** 21:6 38:5
  67:24 68:23 69:8
  71:20 75:11 88:4
**provided** 19:3 22:19
  44:11 112:23
**provides** 43:18
**providing** 76:21
  87:18 88:12,15
  100:23
**provision** 64:24
**psychiatric** 13:16,25
  14:7,10,11,14,24
  16:18 19:12 20:2,8
  20:10,11,15,25 22:4
  22:10,16,18,23
  23:18,25 24:6 48:11
  49:2,12 50:25 56:16
  58:23 80:14,18

  81:11 85:8 90:8
  97:8,10,22 98:3,8
  98:21 101:2 102:21
  102:24 103:6,12
  108:12 109:16
  113:4,8,19
**psychiatrist** 85:13
  85:24 99:2 109:16
  113:25 114:23
  115:17 116:13
**psychiatrists** 24:17
  108:11,23,25
  115:18 116:4,6,16
**psychiatry** 9:22,24
  10:8,10,15 13:4
  19:16 20:6,17 26:15
  26:20 48:10 51:25
  98:20 116:9
**psychologically**
  99:8,14
**public** 2:16 6:15
  7:14 59:22 117:12
  119:5 120:24
**pulmonary** 42:18
**purposes** 109:11
**pursuant** 2:17 7:22
**put** 69:14 84:4
  93:19,21 94:4

       **q**
**quality** 42:19 115:5
**queens** 17:18
**question** 6:11 8:23
  9:7,9,11 10:18
  15:13,15 16:2,12,14
  20:20 23:13 25:15
  27:11 34:17 35:2,5
  35:11,15,22 36:10
  36:13,19,20,21
  43:21 47:14,20
  58:25 64:12,15 67:8
  67:17 68:14,21,21
  68:22 69:7 72:25
  73:9,18 75:24 76:19
  77:3,15 81:14,18

82:25 84:17 86:4,5
86:8 87:8,9,15 88:2
88:9 89:4,12,13,24
90:18,22 93:8 94:9
94:11 97:17,20
98:14,18 99:4
103:19,20 108:2
111:6 115:25
116:12
**questions** 9:6 34:14
34:21 38:21 73:4
92:11 97:18 106:20
117:4,5
**quibble** 15:19
**quite** 42:7

**r**

**r** 28:5 41:8 44:16
45:20,20 56:13
**radomisli** 4:13 7:22
10:16 14:16 15:11
15:16 16:2,13 18:16
18:25 22:6,11,24
23:5,12,22 24:23
25:18,24 29:12 30:9
32:24 34:4,10,16,19
35:3,10,18,25 36:7
36:11 37:13 38:20
39:14 46:8 48:14,17
54:3 58:17,21 61:17
62:8 64:9,11,16
67:14 68:17 69:2,5
71:16 72:7,21 73:19
74:3 75:14,20 76:18
76:24 78:11,14,25
79:16,20 80:19,22
81:4,13,19 82:11,14
83:5 84:16 86:10,24
87:2,13,23 88:19
89:3,23 90:10,15,19
90:23 91:21 92:4,10
93:7,20 94:2,7,12
95:3,12 96:7,17,19
98:17 100:12
102:16 103:7,14,18

104:3,19 105:10
106:16 107:8,25
111:5 116:11,15
**raise** 35:18
**raising** 35:20
**ran** 45:2
**range** 65:15
**rattle** 42:21
**read** 10:2,4 39:22,24
57:24 72:9,11 77:7
82:22 87:3,6 90:10
90:13,24 91:3 98:4
98:6 101:15 103:21
103:23
**reading** 62:23
110:15
**reads** 64:18
**ready** 33:23
**real** 83:3,5
**really** 16:9 23:22
57:25 76:5
**reason** 58:12 97:14
120:6
**reasonable** 39:16
70:23
**reasons** 58:10 98:23
**recall** 27:21,22 33:9
56:25 68:18
**received** 24:7,19
112:18
**recess** 46:14 53:12
61:23 104:14
**recognized** 59:22
**record** 7:2 8:19 9:8
10:4 14:16,18 39:24
46:8,10,12,17 53:7
53:10,15,17 54:4
61:17,18,21 62:3
72:11 77:7 87:6
90:13 91:3 98:6
103:23 104:6,8,10
104:12,17,20
119:10
**recorded** 94:17

**recording** 95:9
**recount** 33:20
**reference** 63:13,20
69:6 71:5 81:23
83:7 93:14,16
102:15,19 107:15
113:2,9
**referenced** 63:16
**references** 70:25
108:3
**referred** 1:21 80:13
**referring** 13:8 103:5
109:23
**refers** 103:10
**reflect** 112:22
**regarding** 53:25
92:12
**regards** 77:11
**regulation** 100:5
**rehabilitation** 41:18
42:14
**reimbursed** 44:3
**reiterate** 39:2
**relate** 33:14,15
**related** 119:13
**relates** 111:11,19
**relative** 59:20 83:13
**relevant** 53:24
107:5
**remain** 51:15
**remainder** 115:10
**remember** 25:21
37:7 38:12 39:7
41:19,21 56:21
107:19
**rendered** 82:17
**renovations** 13:24
14:3
**repeat** 77:5
**rephrase** 9:12 67:8
103:9
**replacing** 51:17
**report** 11:15,18
40:11

**reported** 12:2
**reporter** 2:16
101:13,25
**reporting** 120:2
**reports** 10:21,24
11:16,17,20
**represent** 8:7
**representation**
84:15
**representing** 28:22
**request** 32:19 83:15
**requested** 10:3
39:23 72:10 77:6
87:5 90:12 91:2
98:5 103:22 111:9
**requesting** 88:16
**requests** 118:21
**require** 15:9 72:2
77:17 90:3 94:15
95:17 99:24 100:10
**required** 39:3 64:2
82:7 83:24 86:22
87:20 91:18 96:14
**requirement** 21:23
101:4,17,19
**requires** 71:10
86:14
**requiring** 15:5
77:20
**reserve** 7:23
**reserved** 6:11
**reside** 7:19
**resides** 59:17,24
**resources** 43:3
110:5
**respect** 31:10 52:13
55:15 57:17 74:10
75:12 77:16 108:10
112:13,15
**respective** 6:4
**respiratory** 42:18
42:25
**respond** 72:13
**responsibility** 85:12

**responsible** 11:5
12:22 43:17 44:2
46:22 57:15 81:2
101:11
**result** 64:22 70:11
**retained** 118:16
**revenue** 109:10
**review** 7:24 56:8
57:16 60:20,21,24
61:2,6 64:4 80:22
98:17
**reviewed** 55:22
60:16 61:14 62:10
62:10,14 63:10
**reviewing** 56:3
113:18
**revised** 55:22 62:11
62:16
**revising** 56:3
**revision** 57:16
**revisions** 60:25
61:16
**right** 7:23 8:21
27:18 30:13 32:9
34:9 46:7 49:6 50:9
50:9,12,23 51:7
54:6 58:20 64:4,8
65:20,23 69:4 75:8
75:14 76:6,13 89:17
92:2,15 93:5,11
94:12,22 95:2,11,14
95:22 96:11 102:24
103:6,13 107:16,24
112:10 115:12
**rights** 63:5 91:15
**risk** 70:15,19 71:5
71:12,18,22 87:20
88:23 89:10,10,14
89:15
**road** 7:20
**role** 23:24 25:3
**room** 13:25 48:2,3
48:12 49:4,18 50:9
55:11 62:13 70:8
84:21 85:5,9 97:11

97:22,23 98:8,9,23
98:24 103:6 108:24
116:4,17
**rooms** 48:4
**rounds** 24:15
**rules** 2:18 7:23 8:14
8:16
**runs** 43:8,12 44:15
44:17,21
**rws** 1:7
**ryan** 3:20

**s**

**s** 11:10 41:9,9 44:16
57:13 118:9 120:6
**safety** 63:5 99:25
**sawyer** 1:15
**saying** 66:20 67:5
73:15 115:13
**says** 38:9 59:6,14
62:10,23 70:14
80:11 81:7,22 84:3
85:25 92:8 102:9,25
109:25 110:12
111:23 113:8
**schlesinger** 3:12
**school** 76:15
**schoolcraft** 1:5 8:8
52:13 58:15 60:5
99:11 120:3
**scope** 15:12 24:25
64:16 78:15 82:15
89:5 90:16,20 94:3
111:7
**scoppetta** 4:3
**scully** 2:15 119:4,21
**sealing** 6:5
**second** 16:20 58:3
59:2 79:25 101:6,22
102:3,5 109:22
**seconds** 46:19
**section** 49:12 54:22
**sections** 53:22
**security** 44:18,21
45:2,8,13 46:20,23

46:25 49:8,11 51:22
51:24
**see** 16:18 42:24
48:11 55:24 59:2,4
59:9 60:16 63:6
65:2 69:22 70:25
71:6 80:9,23 81:8
81:25 83:10,17
85:16 91:25 92:20
92:23 93:3 107:14
107:22 113:5 114:8
114:9,13,15,16
115:22
**seen** 72:18 113:21
114:22
**sees** 14:23 15:2 70:6
109:6 113:25
**seeth** 11:10
**seiff** 4:3
**self** 100:7
**send** 44:7
**sentence** 64:18
**separate** 42:3
**sergeant** 1:16,18
**series** 42:17 55:23
60:17
**serious** 64:23 70:11
70:17,23
**served** 54:4
**serves** 31:22 32:3
**service** 21:7 44:11
59:25 60:2 84:14
**services** 18:13,15
19:4,7 22:19 40:17
41:19 43:18 84:11
84:12
**set** 32:17 51:6 55:16
66:4,22 119:8,18
**setting** 13:15 20:25
21:3,4
**shaffer** 3:20
**shantel** 1:18
**sheet** 120:2
**shield** 1:15,16,19

**shorthand** 2:15
**show** 37:10 91:7
**showing** 50:16
**shown** 95:23
**shows** 75:19
**side** 116:7
**sign** 90:6
**signed** 6:14,16
**similar** 27:4
**single** 37:21 39:7
**sir** 24:4 36:21 54:8
63:6 71:2 75:25
86:9 98:10
**sister** 59:19
**situation** 63:2
**situations** 63:14,15
**six** 41:12
**skill** 109:21
**skills** 109:25 110:13
111:14 113:3,7
**slow** 101:13
**smith** 3:3 7:2,16 8:2
8:6 15:14,18 16:4
18:18 23:2,8,16
24:2 25:22 30:11
32:19 34:12,18,23
35:4,12,20 36:2,8
37:8,25 39:9,16
46:11,17 47:13
48:19,22 52:23 53:5
53:15 54:6 58:24
60:13 61:18 62:2,21
64:13 66:12,17 67:7
68:5,12,22 69:3
72:20,23 73:11,15
73:25 74:16 75:15
75:23 76:9 78:13,18
79:9,18,21 80:21
81:15,20 82:13,20
84:24 85:3,25 90:17
90:21 92:6,15 93:3
94:10 95:14 96:9
103:25 104:9,17
105:9 106:7,18
117:2 118:5,16

[social - think] Page 14

social 17:10,20,25
  18:2,6,11,13,14,21
  18:24 19:12,13,22
  19:24 20:3,8,10,12
  20:15,16,16,24 21:2
  21:3,6,6,8,13,16
  22:5,10,16,23 23:18
  24:6,11 42:18 59:25
solely 104:23
somebody 68:10
  75:18 92:14 94:24
  112:12
somewhat 31:19
sorry 14:13 25:16
  27:22 31:2,7 41:20
  43:23 46:4 48:16,21
  86:25 92:25 99:9
  106:16 109:25
  110:17 113:6
sort 95:18 99:6
space 12:25
speak 79:18
speaks 79:21
specific 114:8
specifically 37:15
  109:24
speeches 34:15
spell 45:19 57:10
splitting 74:2
spoke 8:15
spoken 29:15
spots 50:3
square 7:21
staff 33:15 115:8
stall 35:23,25
stamp 53:21
stamped 106:9
staring 84:25
start 18:7
state 2:16 21:21
  52:17 54:22 63:2
  67:2,6 85:22 97:4
  119:5
statement 62:7
  63:16 69:17 84:20

84:25
statements 63:9
  65:5
states 1:2 100:20
station 49:6
statistics 111:3
status 54:25 55:5
  58:5,9 59:8,16
  60:10 62:18,22
  91:15 101:7
statutory 97:17
stay 111:3
steps 77:19
steven 1:12 4:5
stg 1:15
sticker 106:19
stipulated 6:3,9,13
stipulations 6:2
stop 34:23 35:17
stratton 46:2,3
street 2:6 3:8,13,19
  4:11 5:5 7:7
strongly 72:16
structure 10:14,19
  30:23 39:21 42:10
studied 63:10 65:5
studies 21:25 22:3
study 38:3
subcategories 70:13
subcategory 71:4
subject 23:10 30:20
  32:11 33:24 35:7
  36:4,15 38:4,7
  39:18 84:21 85:4
subordinate 29:9
subscribed 117:10
  120:22
substantial 70:14,19
  71:5,12,18,22
success 4:19 110:18
suckle 3:12
sufficient 78:8
suggest 38:13 72:4
suggesting 16:7

suggestion 37:8
suicide 70:17
suitable 85:14,20
suite 3:5,13 4:18
superior 29:9
supervise 18:12
supervised 20:12
  22:20
supervision 112:19
supervisor 24:8
  110:10
supposed 93:17,19
  94:4,25 114:9
sure 8:15 23:13
  27:10 48:9 49:20
  50:19 57:9 63:22
  106:16 113:11
  116:2
surgery 42:11 48:9
surrounding 27:8
  112:20
swearing 7:8
sweet 74:6
sworn 6:16 7:13 9:3
  117:10 119:8
  120:22
system 47:18,20
  50:24 51:15,22,24
  52:8
systems 47:16

t

t 4:20 7:12 11:10
  28:5 44:16 118:9
tactics 35:23,25
take 11:4 21:17 53:5
  72:2 77:18 81:21
  101:16
taken 2:14 32:24
  46:14 53:12 61:23
  104:14
takes 11:2
talk 34:7 37:18 74:4
talking 42:8 92:19
  93:2 97:11,13 98:7

102:20 116:3
talks 84:18
tax 1:9,11,12,13,14
  1:18
team 24:11 33:17
tell 9:3 16:11 37:22
  37:22,23 54:17
  74:13 78:16 101:16
  103:20
telling 32:13 35:4
  74:22 81:17 82:19
  82:21,22,24 88:6,11
ten 69:14 115:8
tender 68:15
tendering 90:7
tenet 31:19
tenure 12:3
term 67:10,18,19
  69:11 103:4,10
terms 48:22 66:14
  75:4
test 38:22
testified 7:14 68:17
  73:20 88:22 94:13
testify 30:21,22
  33:23 36:4,14,18,22
  37:13 73:24 74:12
  92:5 95:4 104:23,24
  105:7
testimony 23:21,23
  46:16 53:14 61:25
  75:11,20 76:21 79:7
  79:10 89:18 104:16
  106:23 107:2 119:7
  119:10
thank 62:21 110:21
  117:2
theodore 1:13
theses 73:18
things 13:2 32:2
  38:24 43:20 65:15
  74:5 110:9 112:6
think 15:20 16:5,9
  16:13 39:14 45:3,13
  47:13 48:19 55:9

[think - worked]

62:5 73:25 74:18,21
74:25 76:14 78:3,6
78:18 89:10 93:25
101:9,10 110:7
**third**  3:8 16:21 44:4
55:20
**thought**  61:2
**thoughts**  72:4 77:22
78:6
**threats**  70:16
**three**  25:13,17 26:6
27:24 28:2 29:21
30:3,14
**thrope**  28:5,6
**thumb**  93:6
**time**  2:14 6:12 18:23
23:15 35:21 46:7
49:13 51:13,16 57:4
83:12 90:24 97:8
101:4 109:6 117:4,6
**times**  26:2,3,6
**timothy**  1:17
**title**  19:19
**titles**  41:13
**today**  19:20 33:21
62:19 63:11 76:22
107:2
**today's**  25:9 30:8
**told**  27:17 96:3
**tool**  31:23
**topics**  39:15
**track**  109:5,9,15
113:21 114:10
**tracks**  114:12
**trained**  23:4
**training**  20:14 22:4
22:9,15,23 23:17
24:5,7,20 109:17
**transcript**  7:25
119:9
**transitional**  41:18
**treated**  63:23
**treatment**  64:21
69:20 70:2,3

**trial**  6:12
**true**  1:20 2:2 56:19
119:9
**trustees**  40:2,21
**truth**  9:4
**try**  35:22 36:19
77:14
**trying**  23:8,17 25:21
41:19 107:19 114:4
**turn**  60:8 107:21
**twenty**  17:3
**two**  14:11,14 16:16
16:24 25:13 26:9
48:6,8 50:25 70:12
105:3
**type**  21:5
**types**  13:2,10

**u**

**u**  41:8
**uh**  14:21 30:4 59:5
65:21 101:24
**um**  107:18,18
**unable**  71:20
**undergo**  60:24
**underneath**  40:5,9
40:13,15
**understand**  8:24 9:6
15:21 16:4 23:9
28:18 66:19,25
72:24 77:13 88:9
**understanding**
28:21 30:19 62:9,17
**understood**  9:9
**unit**  17:2 20:11
22:19 24:9 55:12
85:15,21 102:24
108:17,18 114:7,11
114:12,18 115:9,14
**united**  1:2
**units**  14:12,15 16:17
16:24
**university**  17:14,23
**unknown**  1:21 2:3

**unnecessary**  15:25
**upper**  91:25 93:5
**use**  58:2
**usually**  44:7,13
**utilize**  13:11,13

**v**

**v**  11:11,11 56:12
120:3
**valid**  76:16
**variety**  65:15
**various**  40:16 47:20
108:4,25
**veritext**  120:2
**vice**  9:22,23 10:20
12:16 19:15 40:13
40:15 41:10,15,16
41:17,25
**videotape**  7:4
**videotaped**  2:10
**view**  48:24 114:5
**vinod**  56:12
**violent**  70:21
**vivek**  11:11,16 29:3
29:8,21 30:10 56:9
56:14,20
**voice**  35:19,21
**volume**  114:21
**voluntarily**  105:5
115:20
**vp**  23:24,24

**w**

**w**  3:17 57:13
**waived**  6:8
**walked**  49:4
**walter**  4:7
**want**  8:17 34:25
36:21 38:23 42:9
51:4 52:23 57:9
65:24 73:11 76:9
84:3,19
**want's**  62:6
**wards**  16:16 50:21
50:22,25 74:11 85:9
109:2

**washington**  3:9
**waving**  78:22
**way**  43:22,23 49:17
114:6 119:15
**week**  25:13,16
**weeks**  25:17 105:3
**west**  3:13
**whereof**  119:17
**whitehall**  5:5
**wide**  65:14
**wife**  59:18
**william**  11:25 41:6
**willow**  7:20
**winthrop**  17:23 20:4
20:7,12 24:8
**withdraw**  58:25
**witness**  2:11 7:9,12
14:14 16:11 23:6,7
25:20 30:13 36:3
37:11 38:4,15,20
39:8 48:15,20 64:14
71:15,19 72:19
73:16 74:21 75:10
75:17,24 78:19,24
79:7 81:8 87:8
93:23 95:6 102:2
105:5,6 106:8,17
116:14,22 118:3
119:7,11,17 120:5
**witness's**  38:16
**words**  31:25 69:14
69:15 82:23
**work**  10:6 17:10,20
17:25 18:2,6,11,13
18:14,22,24 19:12
19:13,22,24 20:3,8
20:10,13,15,16,16
20:18 21:2,3,6,6,8
22:5,10,16,23 23:18
24:6 28:9 31:11
33:16 42:18 68:9
108:4,23,25 114:20
115:11,16
**worked**  10:9 17:16
22:17 45:7

VERITEXT REPORTING COMPANY
www.veritext.com

[worker - zachary]

**worker**   19:23 20:24
  21:2,13,16
**workers**   24:11
**working**   18:7 51:6
**works**   28:14,17
  32:16
**write**   93:18 94:25
**writing**   12:24 33:2
**written**   81:16 83:8
  83:14,19,21,24 84:7
**wrong**   45:5 76:7,13

**x**

**x**   2:5 38:24 118:2,9

**y**

**y**   7:12 38:25 42:2
  44:25 45:23
**yeah**   20:4 84:12
**year**   12:12 13:22,23
  17:4 51:13 61:10
  84:13 112:19,24
  114:15
**yearly**   31:14,16 32:6
**years**   112:8
**york**   1:3,8 2:7,7,17
  3:5,5,14,14,18,19,19
  4:6,6,12,12,19 5:6,6
  7:21 17:17 21:21
  52:17 54:22 63:2
  97:4 119:6 120:2,4

**z**

**z**   12:9
**zachary**   3:17