UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ADRIAN SCHOOLCRAFT,

                                PLAINTIFF,

        -against-           Case No:
                            10CV6005(WS)

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
MARINO, Tax Id. 873220, Individually and in
his Official Capacity, ASSISTANT CHIEF
PATROL BOROUGH BROOKLYN NORTH GERALD
NELSON, Tax ID. 912370, Individually and in
his Official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax ID. 895117,
Individually and in his Official Capacity,
CAPTAIN THEORDORE LAUTERBORN, Tax ID.
897840, Individually an din his Official
Capacity, LIEUTENANT JOSEPH GOUGH, Tax ID.
919124, Individually and in his Official
Capacity, SGT. FREDERICK SAWYER, Shield No.
2576, Individually and in his Official
Capacity, SERGEANT KURT DUNCAN, Shield NO.
2483, Individually and in his Official
Capacity, LIEUTENANT CHRISTOPHER BROSCHART,
Tax ID. 915354, Individually and in his
Official Capacity, LT. TIMOTHY CAUGHEY, Tax
ID. No. 885374, Individually and in his
Official Capacity SERGEANT SHANTEL JAMES,
Shield No. 3004, Individually and in her
Official Capacity, SERGEANT RICHARD WALL,
Shield No. 3099, Individually and in his
Official Capacity, SERGEANT ROBERT W.
O'HARE, Tax ID. 916960, Individually and in
his Official Capacity, SERGEANT SONDRA
WILSON, Shield No. 5172, Individually and
in her Official Capacity, LIEUTENANT THOMAS
HALEY, Tax ID. 879761, Individually and in
his Official Capacity, CAPTAIN TIMOTHY'
TRAINOR, Tax ID. 899922. Individually and
in her Official Capacity, and P.O.'s "JOHN
DOE" #1-50. Individually and in their
Official Capacity (the name John Doe being
fictitious, as the true names are presently
unknown) (collectively referred to as "City

```
 1
 2   Individually and in her Official Capacity
     as a Lieutenant with the New York City Fire
 3   Department, JAMAICA HOSPITAL MEDICAL
     CENTER, DR. ISAK ISAKOV, Individually and
 4   in his Official Capacity, DR. LILIAN
     ALDANA-BERNIER, Individually and in his
 5   Official Capacity and JAMAICA HOSPITAL
     MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
 6   Individually and in their Official Capacity
     (the name John Doe being fictitious, as the
 7   true names are presently unknown)
 8                            DEFENDANT.
     -------------------------------------------X
 9
10            DATE: September 27, 2013
11            TIME: 10:12 a.m.
12
13
14         CONTINUED DEPOSITION of the
15   Plaintiff, ADRIAN SCHOOLCRAFT, taken by the
16   Respective Parties, pursuant to a Court
17   Order and to the Federal Rules of Civil
18   Procedure, held at the offices of Callan,
19   Koster, Brady & Brennan, LLP, One Whitehall
20   Street, New York, New York 10004, before
21   Pamela Ortalano, a Notary Public of the
22   State of New York.
23
24
25
```

```
 1                A. SCHOOLCRAFT
 2    A D R I A N   S C H O O L C R A F T ,
 3    called as a witness, having been first duly
 4    sworn by a Notary Public of the State of
 5    New York, was examined and testified as
 6    follows:
 7    EXAMINATION BY
 8    MR. BRADY:
 9         Q.    Please state your name for the
10    record.
11         A.    Adrian Schoolcraft.
12         Q.    What is your address?
13         A.    196 County Highway 107,
14    Johnstown, New York 12095.
15         Q.    Good morning, Mr. Schoolcraft.
16         A.    Good morning.
17         Q.    Yesterday I introduced myself.
18    It's Bruce Brady.  I represent Dr.
19    Aldana-Bernier.  Do you know who she is?
20         A.    She's one of the doctors at the
21    Jamaica Hospital.  I'm not sure which one.
22         Q.    You can't associate that name
23    with any of the particular doctors you
24    encountered at Jamaica?
25         A.    I believe it was the second
```

```
                                            Page 435
 1              A. SCHOOLCRAFT
 2      A.    I don't recall.
 3            MR. SMITH: Generally, did he
 4    give that information.
 5            MR. LEE: Right.
 6            MR. SMITH: Yes or no.
 7      A.    I don't recall him explaining
 8    anything to me other than asking me what
 9    happened.
10      Q.    While you were in Jamaica
11    Hospital, were you afraid for your own
12    safety if you were going to be released?
13      A.    I don't recall feeling -- no, I
14    recall wanting to be released.
15      Q.    Were you concerned about what
16    the police might do to you after you were
17    released?
18      A.    I don't think I was thinking
19    about that at the time. The mission at
20    that time was to get out, and if there was
21    a problem outside the hospital, then I
22    would deal with that then.
23      Q.    Now, can you tell me what
24    happened at the meeting between yourself,
25    your dad, Dr. Isakov, the social worker
```

1       A. SCHOOLCRAFT
2  and -- was it one person from IAB?
3       A.    Yes.
4       Q.    What took place in that
5  meeting?
6       A.    My father confronted Dr. Isakov
7  in trying to get a reason for being -- for
8  me being involuntarily committed to the
9  hospital.
10      Q.    Did Dr. Isakov respond to that?
11      A.    His response was, some -- to
12 the best of my memory, nobody's here
13 against their will.  We are just waiting
14 for word from his employer, or I think he
15 said NYPD.
16      Q.    He said he was waiting for word
17 from your employer?
18      A.    Correct.
19      Q.    Did he ask you for permission
20 to speak to Dr. Lamstein?
21      A.    He did not personally, no.
22      Q.    Did somebody tell you that he
23 wanted permission to speak to Dr. Lamstein?
24      A.    No.
25      Q.    Did you ever refuse him the

```
 1                A. SCHOOLCRAFT
 2   ability to speak to Dr. Lamstein about your
 3   evaluation?
 4        A.    I refused to sign a HIPAA, if
 5   that's the -- what he wanted, but if he had
 6   asked me, yes, I would have refused.
 7        Q.    When you spoke with Dr. Isakov
 8   in any of your meetings with him, you
 9   explained to him that you had seen Dr.
10   Lamstein; correct?
11        A.    Yes.
12        Q.    And you explained what your
13   interactions with her had consisted of?
14        A.    Correct. Any di -- first of
15   all, I don't believe any diagnosis she did
16   give, I don't believe she was -- I don't
17   believe I was her patient and anything I
18   believe she modified or restricted me, so I
19   believe there were issues in documents that
20   she created that I wanted to contest and I
21   wanted Dr. Isakov's opinion about my mental
22   health to be independent of the people I
23   was reporting corruption about, my job in
24   general.
25        Q.    Dr. Lamstein was the one
```

```
 1              A. SCHOOLCRAFT
 2   responsible for taking your gun away;
 3   correct?
 4        A.   She was, correct.
 5        Q.   And you told that to Dr.
 6   Isakov; correct?
 7        A.   In some fashion, yes.  I
 8   believe he was aware.
 9        Q.   So, it was reasonable for Dr.
10   Isakov to want to find out why that was;
11   correct?
12             MR. SMITH: Objection to the
13        form.
14        A.   I think I answered that.  If he
15   asked me for those documents, I would have
16   explained to him that whatever she wrote
17   is -- I want to contest.  If -- I wanted
18   Dr. Isakov to have an independent opinion
19   about my mental health.  I didn't want
20   that, but I felt that was the only way out
21   of there other than giving him documents
22   that I've never seen by someone who is not
23   my doctor; who is my, in fact, my employer.
24        Q.   When you were seeing Dr.
25   Lamstein, she did explain that she was not
```