UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

                                                    Plaintiff,

                                -against-

THE CITY OF NEW YORK, et al.,

                                                    Defendants.

-------------------------------------------------------------------------x

**CITY DEFENDANTS'
STATEMENT
PURSUANT TO
LOCAL CIVIL RULE
56.1**

10 Civ. 6005 (RWS)

      Defendants the City of New York, Deputy Chief Michael Marino, Assistant Chief Gerald

Nelson, Captain Theodore Lauterborn, Lieutenant William Gough, Sergeant Frederick Sawyer,

Sergeant Kurt Duncan, Lieutenant Christopher Broschart, Lieutenant Timothy Caughey,

Lieutenant Shantel James, Sergeant Richard Wall, Sergeant Robert W. O'Hare, Sergeant Sondra

Wilson, Lieutenant Thomas Hanley, Captain Timothy Trainor, and FDNY Lieutenant Elise

Hanlon (collectively "City Defendants"), by their attorney, Zachary W. Carter, Corporation

Counsel of the City of New York, submit this statement pursuant to Rule 56.1 of the Local Civil

Rules of United States District Court for the Southern District of New York to set forth the

material facts as to which defendants contend there are no genuine issues to be tried.

## PLAINTIFF'S BACKGROUND AT THE NYPD

      1.     Plaintiff, Adrian Schoolcraft joined the New York City Police Department

(hereinafter "NYPD") in 2002. (Plaintiff's Second Amended Complaint, annexed as Exhibit A to

the December 22, 2014 Declaration of Suzanna P. Mettham (hereinafter "Mettham Decl.") at

¶30,).

2.      Shortly after becoming a Police Officer Plaintiff was assigned to work at the 81st Police Precinct. (Exhibit A at ¶ 31).

3.      No NYPD Police Officer in the 81st Precinct lost overtime for not meeting an alleged quota. (Deposition of Adrian Schoolcraft dated October 11, 2012, annexed as Exhibit B to Mettham Decl. at 61:10-12).

4.      No NYPD Police Officer in the 81st Precinct lost the ability to request overtime for not meeting an alleged quota. (Exhibit B at 62:4-63:10).

5.      No NYPD Police Officer had to issue certain number of summonses to return to their chosen tour in the 81st Precinct. (Exhibit B at 64:17-65:5).

6.      No NYPD Police Officer in the 81st Precinct was denied a day off for failing to meet an alleged quota policy. (Exhibit B at 66:2-5).

7.      Plaintiff does not know the specific number of summonses or arrests that officers at the 81st Precinct were required to issue pursuant to an alleged quota policy. (Exhibit B at 49:11-22, 70:11-16).

8.      Plaintiff is not aware of a single incident where a supervisor ordered him to issue a specific number of summonses or make a certain number of arrests. (Exhibit B at 50:14-51:7, 71:7-15).

9.      In 2008, while Plaintiff was assigned to the 81st Precinct, he received a performance evaluation that he did not accept. (Exhibit B at 42:23-43:2).

10.      In early 2009, Plaintiff appealed his 2008 performance evaluation. (Exhibit B at 97:4-6).

11.      Plaintiff believes that he was isolated from his fellow officers in the 81st Precinct. (Exhibit B at 99:10-100:25).

12.    Plaintiff believes that he was the victim of a conspiracy to falsely portray him as psychologically unbalanced. Schoolcraft (Exhibit B at 101:01-102:12).

**REMOVAL OF PLAINTIFF'S GUN AND SHIELD**

13.    Plaintiff visited his personal physician, Dr. Hertzel K. Sure, M.D., on April 6, 2009. (Relevant Portions of Dr. Sure Medical Records, annexed as Exhibit C to the Mettham Decl.).

14.    Dr. Sure prescribed Plaintiff Seroquel, an anti-psychotic medication (Timeline of Plaintiff's Contacts with the Psychological Evaluation Section, annexed as Exhibit D to the Mettham Decl.; Relevant Portions of Deposition of Dr. Lamstein-Reiss dated January 30, 2014, annexed as Exhibit E to the Mettham Decl. at 113:5-14, 149:21-23).

15.    On April 6, 2009, Dr. Sure wrote a letter to the NYPD excusing Plaintiff from work for eight days. (Exhibit C).

16.    Following Plaintiff's visit with Dr. Sure, Plaintiff was referred to the New York City Police Department's Psychological Evaluation Section. (Exhibit E at 84:10-95:16).

17. Plaintiff was referred to Dr. Catherine Lamstein-Reiss, an NYPD psychologist. (Exhibit E at 84:10-95:16).

18.    On April 13, 2009, Plaintiff consulted with Dr. Catherine Lamstein-Reiss. (Exhibit B at 105:7-15; Exhibit D)

19.    Dr. Catherine Lamstein-Reiss placed Plaintiff on restricted duty due to his anxiety. (Exhibit B at 106:7-16; Exhibit D; Exhibit E at 203:5-13).

20.    Following the consultation with Dr. Lamstein-Reiss, Plaintiff's gun and shield were removed from him on April 13, 2009. (Exhibit B at 106:7-16; Exhibit D; Exhibit E at 203:5-13).

- 3 -

21.     None of the defendants consulted with Dr. Lamstein-Reiss prior to Plaintiff's gun and shield being removed. (Exhibit B at 108:9-14).

22.     Plaintiff remained on restricted duty up to and including October 31, 2009. (Exhibit D).

## OCTOBER 31, 2009 – 81ST PRECINCT

23.     On October 31, 2009 Plaintiff abruptly left work, reporting that he was sick. (Relevant Portions of Deposition of Captain Theodore Lauterborn dated November 7, 2013, annexed as Exhibit F to the Mettham Decl. at 281:22-25).

24.     Plaintiff left work without permission. (Exhibit F at 235:23-236:4).

25.     Plaintiff left work without following the NYPD's proper procedure. (Exhibit F at 235:23-236:4).

26.     Following Plaintiff's abrupt departure, Captain Lauterborn contacted the NYPD sick desk supervisor. (Exhibit D; Exhibit E at 317:17-24).

27.     The NYPD sick desk supervisor informed Dr. Lamstein-Reiss to contact Captain Lauterborn because Dr. Lamstein-Reiss was the psychologist on duty on October 31, 2009. (Exhibit D; Exhibit E 317:17-24).

28.     Captain Lauterborn reached out to the NYPD sick desk supervisor because he was concerned about Plaintiff's wellbeing. (Exhibit E 319:8-321:3).

29.     Dr. Lamstein-Reiss told Captain Lauterborn that she had evaluated Plaintiff's mental health prior to October 31, 2009 and most recently on or about October 28, 2009. (Exhibit E at 318:25-319:3).

30.     Dr. Lamstein-Reiss told Captain Lauterborn that he "absolutely needed" to find Plaintiff and "make sure that he was ok," despite the fact that she had just seen him three

days prior and he did not appear to be a danger to himself or others at the time. (Exhibit E at 319:8-321:3).

## OCTOBER 31, 2009 – ENTRY INTO PLAINTIFF'S APARTMENT

31.     On October 31, 2009, Lieutenant Christopher Broschart, Captain Theodore Lauterborn, a patrol sergeant, and police officer from the 104th Police Precinct went to 82-60 80th Place, Glendale, New York, Plaintiff's home, out of concern for his safety. (Exhibit B at 132:24-133:25; Exhibit F at 340: 9-20; Relevant Portions of Deposition of Deputy Chief Michael Marino dated October 8, 2013 at 228:20-231:12 annexed to the Mettham Decl. as Exhibit G).

32.     When Lieutenant Broschart and Captain Lauterborn arrived at Plaintiff's home, they knocked on the door from the early afternoon until it was dark out. (Exhibit B at 132:24-133:25, 137:15-24; Exhibit F 290:10-291:5, 298:10-17).

33.     Plaintiff did not answer the door. (Exhibit B at 132:24-133:25, 137:15-24).

34.     On October 31, 2009, Dr. Lamstein-Reiss attempted to contact Plaintiff by calling him on his cell phone. (Exhibit B at 135:14-25, Exhibit D; Exhibit E 325:8-331:15).

35.     Plaintiff did not answer Dr. Lamstein-Reiss's phone call. (Exhibit B at 135:14-25, Exhibit D, Exhibit E 325:8-331:15).

36.     Plaintiff's landlord initially heard Plaintiff moving around inside of his upstairs apartment, but then heard no movement. (Exhibit G at 248:3-24).

37.     Lieutenant Broschart remained outside of Plaintiff's apartment for approximately four hours, and never saw or heard Plaintiff. (Relevant Portions of Deposition of Lieutenant Christopher Broschart dated June 18, 2014 at 104:4-20, annexed as Exhibit H to the Mettham Decl.).

- 5 -

38.     Chief Marino believed that Plaintiff was still in his apartment. (Exhibit G at 248:3-24, 259:12-17).

39.     Defendants Broschart, Lauterborn, and Mauriello were aware on October 31, 2009 that Plaintiff's gun and shield had previously been removed from him. (Exhibit H at 106:5-9; Relevant Portions of Deposition of Deputy Inspector Steven Mauriello dated December 20, 2013, annexed as Exhibit I to the Mettham Decl. at 334:6-21).

40.     Captain Lauterborn obtained a key to Plaintiff's apartment from his landlord. (Exhibit F at 299:20-300:3).

41.     The NYPD Emergency Services Unit used a key to enter Plaintiff's apartment on October 31, 2009. (Exhibit F at 307:12-21).

42.     The Emergency Services Unit was concerned for Plaintiff's safety. (Exhibit B at 137:10-17, Exhibit F 340:9-20; Exhibit G at 228:20-231:12).

**OCTOBER 31, 2009 – MEDICAL TREATMENT**

43.     At 9:06 p.m., Emergency Medical Technicians arrived at Plaintiff's apartment. (Relevant Portions of Deposition of Sal Sangeniti, dated May 15, 2014, annexed as Exhibit J to Mettham Decl. at 45:24-46:8).

44.     Once inside of Plaintiff's apartment, Emergency Medical Technicians were informed by Plaintiff that he was suffering from abdominal pain, nausea, dizziness, and chest pains. (Patient Care Report, annexed to the Mettham Decl. as Exhibit K).

45.     Plaintiff's pulse and blood pressure was taken by EMT Sal Sangianiti. (Exhibit J at 93:22-24, 94:11-15).

46.     Sal Sangianetti has been a trained EMT since 1980. (Exhibit J at 19:25-20:8).

47.     Plaintiff's pulse was 120 beats per minute. (Exhibit J at 94:18-23).

48.     Plaintiff's blood pressure was 160 over 120. (Exhibit J at 96:6-24).

49.     A blood pressure reading of 160 over 120 is an emergency situation that requires treatment at a hospital. (Exhibit J at 96:6-24).

50.     EMT Sangianetti told Lieutenant Elise Hanlon that Plaintiff's medical condition required medical attention at a hospital. (Exhibit J at 159:7-21).

51.     Plaintiff was held at Jamaica Hospital Medical Center pursuant to New York State Mental Hygiene Law Section 9.39 until November 6, 2009. (Relevant Pages from Plaintiff's Jamaica Hospital Medical Center File, annexed as Exhibit RR to Mettham Decl.).

52.     Plaintiff believes that there is a "strong possibility" that Lieutenant Timothy Caughey and Sergeant Shantel James conspired to have him "locked away" at Jamaica Hospital Medical Center, but does not know when or where any agreement to hold Plaintiff at Jamaica Hospital Medical Center against his will was made, the nature of such an agreement, or the specific acts performed in furtherance of this alleged agreement. (Exhibit A; Exhibit B at 287:1-14).

53.     Lieutenant Caughey and Sergeant James did not have any discussions about Adrian Schoolcraft on October 31, 2009. (Relevant Portions of Deposition of Sergeant Shantel James, dated May 12, 2014, annexed as Exhibit R to Mettham Decl. at 46:3-6).

54.     Sergeant James does not know Lieutenant Caughey. (Exhibit R at 46:13-14).

## OCTOBER 31, 2009 – PLAINTIFF'S ALLEGATIONS OF FORCE

55.     Plaintiff only alleges that Lieutenant Christopher Broschart, Deputy Chief Michael Marino, Lieutenant William Gough, and Sergeant Kurt Duncan used excessive force used against him inside his apartment. (Exhibit B at 166:22-24).

56.     Plaintiff only alleges that Sergeant Frederick Sawyer and Sergeant Shantel James used excessive force against him inside the Jamaica Hospital Medical Center. (Exhibit B at 184:19-186:10).

57.     Plaintiff's only claims against Assistant Chief Gerald Nelson are that "[a]t all relevant times on October 31, 2009, defendant CHIEF GERALD NELSON was aware of defendant MARINO's actions and in fact, expressly authorized defendant MARINO to unlawfully enter Plaintiff's residence, remove Plaintiff against his will, and involuntarily confine Plaintiff in a psychiatric ward." (Exhibit A at ¶163; Exhibit B at 88:17-24, 179:8-180:16).

58.     Plaintiff only believes that Assistant Chief Gerald Nelson was aware of, or authorized, Deputy Chief Marino's actions on October 31, 2009 because Assistant Chief Nelson is Deputy Chief Marino's immediate boss. (Exhibit B at 179:8-180:16).

59.     Plaintiff's claims against Lieutenant Caughey are "the fear and intimidation he created, from his behavior," in reference to actions inside the 81st Precinct stationhouse on October 31, 2009, *not* any actions that occurred at Plaintiff's residence. (Exhibit B at 286:23-25).

60.     Plaintiff believes that Lieutenant Caughey's behavior inside the 81st Precinct on October 31, 2009 was "menacing, and intimidating and threatening." (Exhibit B at 120:3-10).

61.     Plaintiff believes that he was "menaced" by Lieutenant Caughey with an intent to silence him. (Exhibit B at 119:14-122:12; 227:12-228:4).

62.     Lieutenant Caughey never used any force against Plaintiff. (Exhibit B at 287:15-16).

**POST-OCTOBER 31, 2009 VISITS TO PLAINTIFF'S HOME IN JOHNSTOWN, NY**

63.     Officers visited Plaintiff's home in upstate New York about six times from December 2009 through 2010, but not thereafter. (Relevant Portions of Deposition of Adrian Schoolcraft dated September 26, 2013, annexed as Exhibit L to Mettham Decl. at 205:6-25).

64.     Plaintiff does not know specifically who visited his home from December 2009 through 2010 and what they said to constitute an alleged attempt to deprive him of his First Amendment rights. (Exhibit L at 212:10-215:8; 223:9-229:17; 234:10-20).

65.     Plaintiff opened the door only once to accept an NYPD delivery. (Exhibit B at 220:23-221:19; Exhibit L at 201:22-203:10).

66.     Plaintiff never communicated with the officers who visited him in Johnstown, New York. (Exhibit B at 221:20-222:1).

67.     The motivation for the visitations by the NYPD to Plaintiff's residence in Johnstown, New York was to serve Plaintiff with charges and specifications and a notification to appear, wherein if he returned to work, he would be placed back on the payroll. (Exhibit B at 220:23-221:15; Relevant Portions of Deposition of Lieutenant William Gough, dated April 11, 2014, annexed as Exhibit N to Mettham Decl. at 54:18-55:6; 56:2-19; Letter titled "Suspension from Duty and Notification to Appear while on Suspension" dated December 9, 2010, annexed as Exhibit V to Mettham Decl.; Letter titled "Notification to Appear for Restoration to Duty" dated January 19, 2010, annexed as Exhibit W to Mettham Decl.; Letter titled "Notification to

Appear for Restoration to Duty" dated January 11, 2010, annexed as Exhibit X to Mettham Decl.; Email from Captain Timothy Trainor to Louis Luciani, Liju Thotam, and Mark Berger dated January 12, 2010, annexed as Exhibit Y to Mettham Decl.; Email from Captain Timothy Trainor to Louis Luciani, Liju Thotam, and Mark Berger dated January 18, 2010, annexed as Exhibit Z to Mettham Decl.; Letter "Notification to Appear for Restoration to Duty" dated January 20, 2010, titled annexed as Exhibit AA to Mettham Decl.; Email from Captain Timothy Trainor to Louis Luciani, Liju Thotam, and Mark Berger dated January 20, 2010, annexed as Exhibit BB to Mettham Decl.; Letter titled "Notification to Appear for Restoration to Duty" dated January 31, 2010, annexed as Exhibit CC to Mettham Decl.; Email from Captain Timothy Trainor to Louis Luciani, Liju Thotam, and Mark Berger dated February 1, 2010, annexed as Exhibit DD to Mettham Decl.; Letter titled "Notification to Appear for Restoration to Duty" dated February 3, 2010, annexed as Exhibit EE to Mettham Decl.).

68.     No defendant ever told Plaintiff not to speak to the media or said anything that indicated to Plaintiff that they were trying to silence him. (Exhibit B at 203:21-204:13; Exhibit L at 204:1-11; 234:10-20).

69.     Plaintiff believes that City Defendants' intent to silence him was an attempt to prevent him from pursuing his internal complaints. (Exhibit B at 195:13-196:3; Exhibit L at 186:10-190:7).

70.     Plaintiff was suspended on October 31, 2009 for refusing to return to the 81st Precinct after being accused of leaving without authorization. (Charges and Specifications Issued against Adrian Schoolcraft, annexed as Exhibit QQ to Mettham Decl.).

71.     Plaintiff was re-suspended for refusing to return to work after he was released from JHMC on November 6, 2009. (Exhibit QQ).

## PLAINTIFF'S COMMUNICATIONS WITH THE MEDIA

72.     Plaintiff's allegations first became public in The Daily News on February 1, 2010. (Rocco Parascandola, Brooklyn's 81st Precinct probed by NYPD for fudging stats; felonies allegedly marked as misdemeanors, N.Y. Daily News, Feb. 1, 2010, annexed as Exhibit M to Mettham Decl.).

73.     Plaintiff decided after his October 31, 2009 involuntary commitment to go to the media. (Exhibit B at 206:11-24; 267:20-25).

74.     Prior to November 1, 2009, no one assigned to the 81st Precinct was aware that Plaintiff was recording his fellow police officers. (Exhibit L at 130:11-131:2).

75.     Prior to November 1, 2009, Plaintiff never intended to go public with his allegations of misconduct. (Exhibit B at 264:24-266:1).

76.     A Daily News reporter contacted Plaintiff within a month after Plaintiff's suspension. (Deposition of Adrian Schoolcraft dated September 27, 2013, annexed as Exhibit O to Mettham Decl., at 292:17-293:25.

77.     Plaintiff corresponded with reporters and attorneys via e-mail for "a couple years" beginning in 2010. (Exhibit O at 315:2-317:24).

78.     Plaintiff spoke numerous times with The Daily News, This American Life and The Village Voice in late 2009 and/or early 2010 through 2012. (Exhibit B at 267:13-269:23).

79.     Plaintiff wrote a summary of his Jamaica Hospital Medical Center confinement and provided that summary to The Village Voice, The Daily News, and his various attorneys. (Exhibit O at 321:23-332:24).

80.     Plaintiff began communicating with and providing his audio recordings of police officers within the 81st Precinct to Village Voice reporter Graham Rayman in early 2010 and continued to communicate with him through the summer of 2012. (Exhibit L at 150:20-24; Exhibit O at 290:25-291:4).

81.     Plaintiff gave copies of recordings of individuals within his command to Graham Rayman and Plaintiff's attorneys. (Exhibit O at 311:9-312:17).

82.     Plaintiff gave all of his recordings of individuals in his command to his attorneys. (Exhibit B at 31:4-6).

83.     Plaintiff spoke with Graham Rayman "a couple dozen times" from early 2010 through 2012. (Exhibit L at 132:10-133:1).

84.     As of October 2012, Plaintiff had given six or seven interviews to the media. (Exhibit B at 271:19-23).

85.     Plaintiff contacted State Senator Hugh T. Farley in 2010. (Exhibit B at 278:1-5; 279:19-280:4).

86.     Plaintiff contacted New York City Councilman Albert Vann in 2010. (Exhibit B at 280:19-281:10).

87.     Plaintiff contacted New York City Councilman Peter Vallone in 2010. (Exhibit B at 281:11-25).

88.     Plaintiff contacted the Queens District Attorney in late 2009 or early 2010. (Exhibit B at 278:16-279:15).

89.     Plaintiff contacted the United States Department of Justice. (Exhibit B at 279:16-18).

90.     Plaintiff contacted Plaintiffs' counsel in the matter of <u>Floyd v. City of New York</u>, 08 CV 1034 (SAS), and provided supporting affidavits. (Exhibit B at 282:1-284:2).

91.     Plaintiff was never dissuaded from speaking to the media. (Exhibit B at 271:24-272:12).

92.     The defendants actually "encouraged" Plaintiff to speak to the media. (Exhibit B at 271:24-272:12).

## PLAINTIFF'S COMMUNICATIONS WITH INVESTIGATORS AT THE NYPD

93.     During his recorded interviews with internal investigators at the NYPD, Plaintiff told NYPD investigators that he did not want to be anonymous and that he was not concerned with confidentiality. (Recording of Interview of Plaintiff by Quality Assurance Division, annexed as Exhibit OO to Mettham Decl.; Transcript of Exhibit OO, annexed as Exhibit PP to Mettham Decl. at 3:15-22).

94.     The complaint specifically identifies Lieutenant Timothy Caughey as the individual that Internal Affairs Bureau contacted and he is the only person with whom IAB is accused of trying to discuss the merits of Plaintiff's accusations. (Exhibit A at ¶ 135).

95.     No employee of the NYPD intentionally leaked information about Plaintiff's IAB complaint. (Exhibit B at 264:2-5).

## DISCIPLINE OF DEFENDANTS

96.     Deputy Inspector Steven Mauriello was brought up on charges and specifications based on allegations of crime complaint manipulation that were made against him by Plaintiff. (Charges and Specifications Issued against Steven Mauriello, annexed as Exhibit NN to Mettham Decl.).

97.     There have been no substantiated incidents involving any allegation that any physical force whatsoever was used by Deputy Chief Michael Marino in any incident. (Civilian Complaint Review Board history for Deputy Chief Michael Marino, annexed as Exhibit FF to Mettham Decl.; Central Personnel Index for Deputy Chief Michael Marino, annexed as Exhibit GG to Mettham Decl.; Internal Affairs Bureau Officer Resume for Deputy Chief Michael Marino, annexed as Exhibit HH to Mettham Decl.).

98.     There are no substantiated allegations of unlawful search or seizure, conspiracy, or retaliation against Deputy Chief Michael Marino, Deputy Inspector Steven Mauriello, or Assistant Chief Gerald Nelson. (Exhibit FF; Exhibit GG; Exhibit HH; Civilian Complaint Review Board history for Deputy Inspector Steven Mauriello, annexed as Exhibit II to Mettham Decl.; Central Personnel Index for Deputy Inspector Steven Mauriello, annexed as Exhibit JJ to Mettham Decl.; Internal Affairs Bureau Officer Resume for Deputy Inspector Steven Mauriello, annexed as Exhibit KK to Mettham Decl.; Central Personnel Index for Assistant Chief Gerald Nelson, annexed as Exhibit LL to Mettham Decl.; Internal Affairs Bureau Officer Resume for Assistant Chief Gerald Nelson, annexed as Exhibit MM to Mettham Decl.).

## ALLEGATIONS OF RETALIATION

99.     Plaintiff only alleges that three other officers, Adhyl Polanco, (Exhibit A at ¶ 323) Frank Pallestro, (Exhibit A at ¶ 323) and Joseph Ferrara (Relevant Portions of Deposition of Joseph Ferrara, dated June 5, 2014, annexed as Exhibit S to Mettham Decl. at 150:11-13; 152:4-17; 165:17-166:24) were treated similarly to him and were retaliated against for claimed whistleblowing.

100.     Plaintiff's belief that Frank Pallestro was retaliated against due to a quota policy is based only on news reports. (Exhibit A at ¶ 323).

101.     Plaintiff did not attend any disciplinary hearing for disclosing or attempting to disclose NYPD corruption and police misconduct. (Exhibit A).

102.     Plaintiff only alleges that Adhyl Polanco and Frank Pallestro intentionally leaked IAB complaints. (Exhibit A at ¶¶ 387-388).

103.     Frank Pallestro alleges that retaliation against him began in September 2009. (Exhibit A at ¶387).

104.     Adhyl Polanco alleges that retaliation against him occurred in September to December 2009. (Relevant Portions of Deposition of Adhyl Polanco, annexed as Exhibit T to Mettham Decl. at 15:10-16:9; 41:15-42:20.

105.     The New York City Police Department is a model police department and its practices are within the standards of police departments throughout the United States, and certainly New York State. (Relevant Portions of Deposition of John Eterno, dated October 17, 2014, annexed as Exhibit T to Mettham Decl. at 63:8-13).

## ADDITIONAL UNDISPUTED FACTS

106.     Plaintiff has never issued a summons or made an arrest without probable cause. (Exhibit B at 54:13-15, 74:24-75:2).

107.     Plaintiff does not recall the specifics of any incident where he saw another police officer issue a summons or make an arrest absent probable cause. (Exhibit B at 56:20-58:17, 76:4-17).

108.     Plaintiff claims to have applied for approximately fifty jobs since October 2009, but has never been given a reason why none have been offered to him. (Exhibit B at 252:14-253:12).

Dated: New York, New York
January 30, 2015

ZACHARY W. CARTER
Corporation Counsel of the
City of New York
Attorney for City Defendants
100 Church Street, Room 3-212
New York, New York 10007
(212) 356-2372

By:  _____/s_____
Ryan G. Shaffer
Senior Counsel

cc:     Nathaniel Smith (By ECF)
        *Attorneys for Plaintiff*

        Gregory John Radomisli (By ECF)
        MARTIN CLEARWATER & BELL LLP
        *Attorneys for Jamaica Hospital Medical Center*

        Brian Lee (By ECF)
        IVONE, DEVINE & JENSEN, LLP
        *Attorneys for Dr. Isak Isakov*

        Paul Callan (By ECF)
        CALLAN, KOSTER, BRADY & BRENNAN, LLP
        *Attorneys for Lillian Aldana-Bernier*

        Walter Kretz (By ECF)
        SEIFF KRETZ & ABERCROMBIE
        *Attorney for Defendant Mauriello*