UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

                            Plaintiff,          10-CV-6005 (RWS)

           -against-

                                  **PLAINTIFF'S RULE 56 STATEMENT**

THE CITY OF NEW YORK, *et al.*,

                            Defendants.

---------------------------------------------------------X

Pursuant to the Local Rules of the Court, Plaintiff submits that the following are the material and undisputed facts which entitle the Plaintiff to summary judgment in his favor as a matter of law.

1. On July 1, 2002, Officer Schoolcraft joined the New York City Police Department ("NYPD"), and for most of his career, he was assigned as a Patrol Officer in the 81st Precinct, which is located in the Bedford Stuyvesant neighborhood of Brooklyn.[1]

2. The 81st Precinct is one of ten Precincts that are located in the geographical area  known as "Patrol Borough Brooklyn North." As a Patrol Officer, Officer Schoolcraft was a fine officer who

---

[1] Plaintiff's Motion Exhibit 1 (hereinafter "PMX") at NYC 0001 (oath of office, dated 7-1-02).

ably and satisfactorily performed his duties and received

satisfactory or better performance reviews for most of his career.[2]

3.   In October of 2006, the NYPD assigned Defendant Steven

Mauriello to be the Executive Officer of the 81st Precinct.[3]  As the

Executive Officer, Mauriello was the second in command at the

81st Precinct.  According to Mauriello, he requested that transfer

because it was his stated desire to become a commanding officer

of an NYPD Precinct.[4]

4.   After Defendant Mauriello's arrival at the 81st Precinct, Officer

Schoolcraft and other officers at the 81st Precinct began getting

increasingly greater pressure at roll calls to achieve quotas on their

number of arrests, summons and stops and to falsify

documentation about the receipt of training during roll calls.[5]

5.   Because Officer Schoolcraft had concerns about the lawfulness of

these directions, he eventually began tape recording roll calls at the

---

[2] PMX  1:  NYC 005-007 (fine officer with great potential); 043-44 ("extremely
competent" and an "asset for the department); 045-46 ("highly competent"); 087-91
("fine officer with great potential"); 176-81 ("well-rounded officer" and a "steady and
reliable performer").  For the years 2003, 2004, 2005 and 2006, Officer Schoolcraft
received yearly performance evaluations of 3.5, 4.0, 3.5 and 3.5, respectively.  (NYC
398-400, 171-72; 176-78 & 179-81.)    It was only in 2007, after Defendant Mauriello
became the Executive Officer and then the Commanding Officer of the 81st Precinct in
2007 and 2008 that Officer Schoolcraft's yearly performance ratings dropped to 3.0 in
2007 and 2.5 in 2008.  (NYC 186-88 & 173-75.)
[3] PMX 2:  SM 340-43.
[4] PMX 34:  Mauriello Tr. 48:15 ("I wanted to go back to be an XO and earn my way back
up again.")
[5] PMX 4:  Schoolcraft Tr.  29:13-30:12 & 32:24-33:5.

81st Precinct.[6]

6.  Coincident with Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft's performance evaluations began to decline.[7] For 2007, Officer Schoolcraft received a 3.0 rating, which was the equivalent of a marginally satisfactory rating.[8]

7.  In that evaluation, Officer Schoolcraft was criticized for not achieving "activity goals" and "performance goals," which are coded phrases that refer to numerical quotas imposed on Patrol Officers.[9]

8.  After being the Executive Officer at the 81st Precinct for one year, "One Police Plaza" made the decision on December 1, 2007 to promote DI Mauriello to the position as Commanding Officer of the 81st Precinct, and later he received a promotion to the title of Deputy Inspector ("DI").[10]

9.  Under the command of DI Mauriello, the pressure to maintain

---

[6] *Id.*

[7] *See* n. 2 *supra*.

[8] PMX 1:  NYC 065-69.

[9] *See generally Floyd v City of New York*, 959 F. Supp. 2d 540, 590, 596, 599 & n. 264 (S.D.N.Y.  2013) (increase in stops achieved by pressure on commanders at CompStat meetings to increase numbers and commanders in turn pressures mid-level mangers and line officers to generate numbers; abundant evidence that supervisors directed officers to meet numerical goals for stops, arrests and other enforcement activity as well as threating officers with negative consequences if they did not achieve those goals; "supervisors must evaluate officers based on their activity numbers, with particular emphasis on summons, stops, and arrests, [and] officers whose numbers are too low should be subject to increasingly serious discipline if their low numbers persist")

[10] PMX  3:  Mauriello Tr. 51:12-25.

numbers increased and Officer Schoolcraft's performance

evaluations came under even greater scrutiny.

10.   During the course of second, third and fourth quarters of 2008,

Officer Schoolcraft's supervisors persistently criticized him for his

low "activity" and his failure to meet activity standards.[11]

11.   Based on these criticisms, in January of 2009, DI Mauriello gave

Officer Schoolcraft a failing evaluation of 2.5.[12]

12.  Tracking the negative comments during the course of the year, DI

Mauriello's 2008 performance evaluation recommended that

Officer Schoolcraft be transferred because of his "poor activity,"

for his "approach to meeting the performance standards" and for

his disregard of the "activity standards" of an NYPD Police

Officer.[13]

13. Officer Schoolcraft objected to this evaluation and informed his

superiors that he wanted to appeal the failing evaluation.[14]

14. The appeal process involved the transmission of paperwork to the

next level of the command structure, which was the Brooklyn

---

[11] PMX (PX 21): NYC 106 (as of May 2, 2008, "needs improvement in area of activity"); NYC 110 (as of July 4, 2008, "activity is still substandard and is unacceptable" and was instructed "on productivity expectations'); NYC 116 (as of October 1, 2009, "does not meet activity standards" and has been told about his "low activity"); NYC 122 (as of January 1, 2009, Officer Schoolcraft has been counseled on "his poor activity which is unacceptable").
[12] PMX 5 (PX 51); PMX 3: Mauriello Tr. 190:23-196:25.
[13] PMX 5 (PX 51) at NYC 071)
[14] PMX  3:  Mauriello Tr. 190:18.

North Patrol Borough, headed by Defendant Chief Gerald Nelson and Defendant Deputy Chief Michael Marino.[15]

15. At around this time, a poster appeared on Officer Schoolcraft's locker containing the words: "IF YOU DON'T LIKE YOUR JOB, THEN MAYBE YOU SHOULD GET ANOTHER JOB."[16]

16. Another handwritten note that later appeared on his locker stated: "shut up, you idiot."[17]

17. On February 25, 2009, Officer Schoolcraft met with several supervisors at the 81st Precinct, including DI Mauriello, and his new Executive Officer, Defendant Captain Theodore Lauterborn.[18]

18. During the meeting, Officer Schoolcraft confirmed his intent to appeal the failing 2008 performance evaluation and repeatedly asked for information about what numbers are required of him.[19]

19. At the end of the meeting, another of the 81st Precinct supervisors, Defendant Steven Weiss specifically asked Officer Schoolcraft if he was recording the meeting.[20]

---

[15] PMX 3: Mauriello Tr. 192:4 ("Chief Marino has an appeal board with borough inspectors").
[16] PMX 1: NYC 12003.
[17] PMX 1: NYC 12005.
[18] PMX 1: NYC 191.
[19] PMX 3: Mauriello Tr. 190:18.
[20] PMX 3: Mauriello Tr. 326; PMX 6: Weiss Tr. 111:7-114;12 (recalls believing that Schoolcraft was recording and recalled asking Schoolcraft if he was recording the meeting in February 2009 about the appeal but denies ever discussing that belief with Mauriello or Executive Officer Lauterborn or Lieutenant Caughey).

20. In either late February or March of 2009, Mauriello went to the main office for Patrol Borough Brooklyn North with Sergeant Weiss from the 81st Precinct and met with Deputy Chief Marino about Officer Schoolcraft's appeal of his failing 2008 evaluation and about Mauriello's wish to transfer Schoolcraft out of the Precinct.[21]

21. DI Mauriello requested that Officer Schoolcraft be transferred, and Deputy Chief Marino denied that request at that time for lack of paperwork.[22]

22. On March 11, 2009, a labor attorney for Officer Schoolcraft, James A. Brown, Esq., wrote DI Mauriello a letter about Officer Schoolcraft's appeal of his failing evaluation.[23]   Among other things, the letter documented previously-raised concerns about "numerical goals" being used improperly in performance evaluations:  "We are concerned that our client's negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of arrests and summons issued.[24]

---

[21] PMX  6:  Weiss Tr. 178:12-181:4; PMX 7:  Marino Tr. 196:13-200:6; PMX 3:  Mauriello Tr. 276:15-277:15.
[22] *Id.*
[23] PMX 8 (PX 57 & 22).
[24] PMX  8:  *Id.* at p. 2.

23. After receiving the letter, DI Mauriello told Chief Nelson about it and forwarded it to Patrol Borough Brooklyn North as part of the appeal process.[25]

24. A few days later, on about March 15, 2009, while Officer Schoolcraft was on patrol, Defendant Weiss issued to Officer Schoolcraft a command discipline for being "off post" and having "unnecessary conversation" with another patrol officer.[26]

25. Officer Schoolcraft believed that he was being punished for the letter from his lawyer and for appealing his evaluation, and as a result, made a formal request on his radio that the Duty Captain for Patrol Borough Brooklyn North respond to the scene.[27]

26. In response, Defendant Lauterborn, who claimed to have been the Duty Captain at the time, had Officer Schoolcraft brought back to the 81st Precinct.  According to Officer Schoolcraft's recording of the meeting with Captain Lauterborn, Lauterborn told Officer Schoolcraft that after the February meeting at the 81st Precinct to discuss his appeal, he should not be surprised by the fact that he was going to get a lot more "supervision" by the 81st Precinct supervisors and that the 81st Precinct supervisors were now paying

---

[25] PMX  3:  Mauriello Tr. 247:11-254:16.
[26] PMX 9 at NYC 00081 (PX 168 ).
[27] PMX 6:  Weiss Tr. 98:2-19; PMX 10:  Lauterborn Tr. 177:12-21 & 183:19-186:12

"closer attention" to him.[28]

27.  Captain Lauterborn also told Officer Schoolcraft that "this is
gonna go on;" that he has "a long road ahead" of him; that going
forward, he needs to "cross your t's and dot your i's;" and that the
"supervision" was "coming down hard" on him not just in the past
two nights but since the day he walked out of the appeal meeting
in February of 2009.[29]

28. The same day that Officer Schoolcraft spoke to Captain
Lauterborn, Sergeant Weiss began reviewing police procedures on
how to have Officer Schoolcraft psychologically evaluated.[30]

29.  Shortly after that, Sergeant Weiss contacted the NYPD's Early
Intervention Unit and reported that he was "concerned" about the
level of Office Schoolcraft's "mental distress."[31]

30. Sergeant Weiss also did Internet research on Officer Schoolcraft
and found a news article in a local upstate newspaper about a
burglary at his father's home and forwarded that article to the
Early Intervention Unit.[32]

31.  Within a week or two of Sergeant Weiss' contacting the Early

---

[28] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45__28:50-
31:30.   The recording is attached at part of a compact disk accompanying this motion
together with other records relevant to the motion.
[29] PMX  11:  Id. at 30:00-31:30.
[30] PMX  6:  Weiss Tr. 120:6-121:2.
[31] PMX  6:  Weiss Tr. 99:14-101:4.
[32] PMX  6:  Weiss Tr. 103:6-109:3

Intervention Unit, Officer Schoolcraft was placed on modified or restricted duty without any law enforcement or patrol duties and his gun and shield were removed.[33]

32. According to the NYPD psychologist who testified that she was directly involved in the decision to place Officer Schoolcraft on limited duty, Officer Schoolcraft was suffering from the physical manifestations of stress.[34]  Based on that opinion, she recommended cognitive behavioral therapy or stress management training to improve coping skills and to reduce the physical symptoms of stress.[35]

33. The NYPD psychologist did not recommend any medication, did not believe that Officer Schoolcraft was psychotic, and did not believe that Officer Schoolcraft was dangerous to himself or others.[36]

34.  As a result of being placed on limited duty, Officer Schoolcraft was assigned to work at the 81st Precinct as the Telephone Switchboard operator, essentially taking calls to the Precinct and handling walk-ins by members of the public.[37]

---

[33] PMX  6:  Weiss Tr. 101:24-102:10.
[34] PMX  12:  Lamstein Tr. 172:21-174:20
[35] PMX  12:  Lamstein Tr. 105:22-107:4.
[36] PMX  12:  Lamstein Tr. 113:15-115:2, 153:10-17, & 285:3-23.
[37] PMX  13:  Huffman Tr. 46:10-25.

35. He held that position from April 2009 through the end of October 2009.

36. While on limited duty, Officer Schoolcraft continued his attempts to challenge his failing 2008 performance evaluation.[38]

37. He also started reporting misconduct by his supervisors at the 81st Precinct.

38. On August 20, 2009, Officer Schoolcraft reported to the Internal Affairs Bureau ("IAB") on "corruption involving the integrity control program" at the 81st Precinct by the Integrity Control Officer, Defendant Lieutenant Caughey and Assistant Integrity Control Officer, Defendant Weiss.[39]

39. In addition, on August 31, 2009, a former member of the service, David Dirk, reported that Officer Schoolcraft was the victim of retaliation by his supervisors.[40]

40. On September 2, 2009, Officer Schoolcraft spoke with IAB and reported that DI Mauriello was pressuring his staff to downgrade or suppress crime reporting and that under the direction of DI

---

[38] On September 2, 20109, Officer Schoolcraft wrote a memorandum to DI Mauriello requesting (again) that his appeal be processed and Mauriello testified that he received the memorandum and forwarded it to the Sergeant at Patrol Borough Brooklyn North who handled the paperwork for appeals.  (PMX 14: (PX 58) & PMX  3:  Mauriello Tr. 269:4-274:14).

[39] PMX 15:  Schoolcraft Report (PX 40).

[40] PMX 15 (NYC 4785-86) (Attorneys' Eyes Only ("AEO") designation, filed under seal).

Mauriello police officers were being directed to make arrests and issue summonses "in violation of people's civil rights."[41]

41.   According to the IAB report, Officer Schoolcraft also stated that he received his failing evaluation "because he doesn't believe in summons and arrest quotas" and that police officers "are being forced to sign the training log even though they don't get the necessary training."[42]

42. On October 7, 2009, Officer Schoolcraft met with investigators from the NYPD's Quality Assurance Division ("QAD").[43]  At the meeting, Officer Schoolcraft reported in greater detail about the nature of the downgrading and suppression of major crime reporting at the 81st Precinct.[44]

43. While QAD undertook to conduct an investigation into those allegations, it also referred Officer Schoolcraft's other misconduct allegations to IAB.[45]

44. By the end of October of 2009, it was common knowledge with the 81st Precinct that the Precinct was under investigation and that Officer Schoolcraft was involved in reporting the misconduct that

---

[41] PMX 16 (NYC 4316-18) (Confidential designation, filed under seal).
[42] *Id.*
[43]  PMX 16 at NYC 5158 (PX 169; NYC 5153-5248).
[44] *Id.* at 5158-60.
[45] *Id.* at 5159 & 5220.

led to that investigation.

45. Sometime earlier that year, Captain Lauterborn learned from DI Mauriello of a QAD investigation of the 81st Precinct.[46]

46. In addition, towards the end of October, an 81st Precinct Sergeant told DI Mauriello that QAD was calling down officers and based on that tip, DI Mauriello called up an Inspector from QAD, who confirmed that there was an investigation.[47]

47. Earlier in the year, there was persistent speculation at the 81st Precinct that Officer Schoolcraft was tape recording at the Precinct.[48]

48. In addition, Captain Lauterborn testified that as the QAD investigation was heating up, he allegedly received complaints from other officers interviewed by QAD that Officer Schoolcraft was asking them questions about their QAD interviews and informed DI Mauriello about Officer Schoolcraft's alleged conduct.[49]

49. Moreover, supervisors at the 81st Precinct knew from their practice of inspecting or "scratching" memo books that Officer

---

[46] PMX 10:  Lauterborn Tr. 278:17-280:19
[47] PMX 3:  Mauriello Tr. 330:15-332:23 & 450:22-452:18.
[48] PMX 10:  Lauterborn Tr. 278:17-280:19.
[49] PMX 10:  Lauterborn Tr. 86:22-95:2.  While Officer Schoolcraft denies doing this, the fact that it was stated by Defendant Lauterborn goes to his state of mind and beliefs about Officer Schoolcraft.

Schoolcraft's memo book contained the name of an IAB officer.[50]

Finally, on October 19th Lieutenant Caughey issued a written order

to all officers in the command that all inquiries from IAB must be

reported directly to him.[51]

50. On October 31, 2009 – the last day that Officer Schoolcraft

reported to the 81st Precinct – he worked the day tour and

conducted his regular duties at the Telephone Switchboard desk.

51.  During the course of that morning, Lieutenant Caughey took

Officer Schoolcraft's memo book to "scratch it" and instead, kept

it for several hours.[52]

52.  While in his office, Lieutenant Caughey made two photocopies of

the *entire* memo book because he saw "unusual" entries in it.[53]

Lieutenant Caughey kept one copy for himself and put the other

copy in DI Inspector Mauriello's office desk.[54]

53.  When he returned the memo book to Officer Schoolcraft later that

day, Officer Schoolcraft noticed (and became alarmed) that several

pages of the memo book containing his entries about corruption or

---

[50] PMX  10:  Lauterborn Tr. 86:22-99:20 & 114:14-118:16
[51] PMX 17  (Caughey Memo).
[52] PMX  4:  Schoolcraft Tr.  202:22-203:20; PMX 18:  Caughey Tr. 120:18-121:19.
[53] PMX  18:  Caughey Tr. 122:11-20.
[54] PMX  18:  Caughey Tr. 127:24-128:15.

misconduct were earmarked or folded down.[55]

54.  Officer Schoolcraft grew more alarmed during the course of the day when Lieutenant Caughey started acting toward Officer Schoolcraft in a menacing manner.[56]

55. One of the civilian workers at the Precinct, Police Administrative Aide ("PAA") Curtis Boston, saw Lieutenant Caughey walk by Officer Schoolcraft that day in an unusual manner and twice during the course of that morning PAA Boston and Officer Schoolcraft discussed Lieutenant Caughey's unusual behavior toward Officer Schoolcraft.[57]

56.  PAA Boston specifically recalled that Officer Schoolcraft told her that he felt uncomfortable about Lieutenant Caughey's behavior and that Officer Schoolcraft asked her to document her reasons for why she believed Lieutenant Caughey was acting in a suspicious manner.[58]

57. About one hour before the end of his scheduled day, Officer Schoolcraft told his supervisor, Sergeant Huffman that he was not feeling well and was going home.[59]  At the time, Sergeant

---

[55]PMX  4:  Schoolcrfaft Tr. 202:22-203-11.
[56] PMX  4:  Schoolcraft Tr. 118:3-25-120:10;
[57] PMX  19:  Boston Tr. 64:17-65:5 & 77:15-86:13.
[58] PMX  19:  Boston Tr. 77:15-86:13 & 109:16-112:5.
[59] PMX  13:  Huffman Tr. 66:20-67:2 & 71:3-75:9.

Huffman told Officer Schoolcraft that that was "okay."[60]

58.  Officer Schoolcraft also submitted to Sergeant Huffman a sick

report, which could have been a basis for authorizing him to take

"administrative sick" for the day.[61]

59.  As Officer Schoolcraft was leaving the precinct, however,

Sergeant Huffman told Officer Schoolcraft that he could take "lost

time"[62] and Officer Schoolcraft told her that that would be fine,

although he would have preferred sick time.[63]

60. At about 3:30 pm,  Officer Schoolcraft got home, which was

located at 82-60 Eighty-Eighth Place, Queens, New York, and

telephonically notified IAB of Lieutenant's Caughey's menacing

behavior.[64]

61.  Officer Schoolcraft specifically informed IAB that he felt

threatened, retaliated against, and in danger as a result of

Lieutenant Caughey's menacing behavior.[65]

62. About one hour later, at about 4:20 pm, a Sergeant Krohley, from

the 104th Precinct, went to Officer Schoolcraft's home with his

---

[60] PMX  13:  Huffman Tr. 74:11-19.
[61] PMX  13:  Huffman Tr. 68:6-15 (administrative sick can be approved by the desk
sergeant); PMX 20:  Valenti Tr. 14:20-16:13 (same).
[62] PMX  13:  Huffman Tr. 80:12-20.
[63] PMX  4:  Schoolcraft Tr. 123:23-124:14
[64] PMX  4:  Schoolcraft Tr. 126:3-127:18.   The call to IAB is also recorded and
identified as DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma; PMX  11.
[65] *Id.* at 19:40-26:10.

driver.  Sergeant Krohley rang the bell for Officer Schoolcraft's

apartment, which was on the second floor of a three-family

house, and when there was no answer, he spoke to the landlady,

Carol Stretmoyer, who told him that she believed that Officer

Schoolcraft had left about thirty minutes ago.[66]

63.  Stretmoyer also informed Sergeant Krohley that Officer

Schoolcraft has a car, which was parked on the street.  Sergeant

Krohley determined that the car was registered in the name of

Officer Schoolcraft's father.[67]

64.  At about 5:00 pm, Lieutenant Broschart from the 81st Precinct

arrived at the scene, and Sergeant Krohley briefed Lieutenant

Broschart on the facts he had determined since arriving at the

scene.[68]

65.  Lieutenant Broschart was under orders from DI Mauriello and

Captain Lauterborn to go to Officer Schoolcraft's home and bring

him back to the Precinct.[69]

66.  After arriving at the scene, Lieutenant Broschart also knocked on

the door, and when there was no answer, he updated Captain

---

[66] PMX 16 (NYC 4643) (AEO designation).
[67] *Id.*
[68] PMX 16:  (NYC 4643) (AEO designation); *see also* PMX 11:
DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma at 40:52 (noting that at
4:18 pm a black Impala in front of Officer Schoolcraft's house and his door bell being
rung).
[69] PMX  20:  Broschart Tr. 87:17-88:20.

Lauterborn by telephone that Officer Schoolcraft was not home and that the landlady had told him that he might have left.[70]

67. Captain Lauterborn told Lieutenant Broschart to stand by and wait to see if Officer Schoolcraft returned.[71]

68. Later that evening, Captain Lauterborn spoke with NYPD Psychologist Lamstein.  According to Psychologist Lamstein's notes of the call, Captain Lauterborn told her that Officer Schoolcraft left early that day and the "underlying issue" was that Officer Schoolcraft "has made allegations against others" and the "dept's investigation of those allegations picked up this week & it snowballed from there."[72]

69. Psychologist Lamstein told Captain Lauterborn that she had seen Officer Schoolcraft just a few days ago and that she "had no reason to think [Officer Schoolcraft] was a danger to himself or others."[73]

70. At about 7:40 pm that night, after speaking with Psychologist Lamstein, Captain Lauterborn also called Officer Schoolcraft's father and told the father that Officer Schoolcraft left without

---

[70] PMX  20:  Broschart Tr. 100:25-104:20.
[71] *Id.*
[72] PMX 22 at NYC 282(PX 29); PMX 12:  Lamstein Tr. 327:13-328:4.
[73] PMX 12:  Lamstein Tr. 319:24-25; *see also* PMX 23 Lauterborn Report (PX 16), 10-31-09 at p. NYC 00095 ("She stated that although she did not believe he was an immediate threat to himself or others his firearms were removed because of emotional distress caused by issues of anger and resentment against the Department.").

permission and had to return to the 81st Precinct that night.[74]

71.  The father told Captain Lauterborn that he spoke to his son earlier that day, that his son told him he felt sick in his stomach with a tummy ache and was going home and would call him when he woke up.[75]

72.  Lauterborn told the father that he needs to "physically talk to" Officer Schoolcraft and "resolve things" and the situation is not going to "wait until the morning."[76]  Lauterborn insisted that he had to talk to Officer Schoolcraft "in person" and not "over the phone."[77]  He also stated that the "situation was going to escalate as the night goes on" and that "no one is going in or out of that house he lives in because there are police all over it."[78]  If Officer Schoolcraft was there, Captain Lauterborn said that "eventually we are going to make our way in."[79]

73. Although the father assured Captain Lauterborn that his son was fine and was probably sleeping, Captain Lauterborn insisted that it was not going to "end here" and that Officer Schoolcraft should

---

[74] PMX 11:  WS.331M_31October2009_LCS_ReturnPhoneCall to Capt. Lauterborn at 3:38-5:15.
[75] *Id.*
[76] *Id.* at 6:20-37.
[77] *Id.* at 8:00-05.
[78] *Id. 9:55-10:06*
[79] *Id*. at 10:10-20.

report to the Lieutenant on the scene outside his home.[80]

74. At 9:45 pm that night, after waiting five hours outside Officer
    Schoolcraft's home, the NYPD took a key from the landlord and
    entered his home.[81]

75. That entry, which was made without a warrant, was made by at
    least ten supervisory NYPD officers.

76. The entry team was led by three Emergency Services Unit
    officers, who were followed by Deputy Chief Marino, DI
    Mauriello, Captain Lauterborn, Lieutenant Broschart, and three
    members of the Brooklyn North Investigation Unit (Lieutenant
    William Gough, Sergeant Kurt Dunkin, and Sergeant Raymond
    Hawkins).[82]

77. At the time of their entry, the house was also surrounded by
    numerous other members of the NYPD, including DI Keith
    Green, the commanding officer of the 104th Precinct, Lieutenant
    Thomas Crawford (81st Precinct); Sergeant Kevin Scanlon (104th
    Precinct); and several Police Officers who were acting either as
    drivers for the supervisors at the scene or had set up a barricade

---

[80] *Id.* at 10:55-11:00.
[81] PMX 16 at NYC 00432 (2145 entry made into apartment).
[82] PMX 3: Mauriello Tr. 349:13-350:21.

to block off street traffic.[83]

78. Also responding to the scene was FDNY Lieutenant Hanlon and
two Jamaica Hospital Emergency Medical Technicians
("EMT").[84]

79. According to Deputy Chief Marino and DI Mauriello, the
warrantless entry into Officer Schoolcraft's home was justified
by their concerns for his "well-being."[85]

80. Deputy Chief Marino admitted that he had no information that
Officer Schoolcraft had threatened to hurt himself or others,[86]

81. Psychologist Lamstein had told Captain Lauterborn that evening
that to her knowledge he was not a threat to himself or others,
they allegedly believed that he was "possibly" an emotionally
disturbed person because he had been sent (by them) to
psychological services earlier that year, had been put on restricted
duty without a gun and had left work early, allegedly against
orders.[87]

82. Upon entry, the Emergency Services Unit officers moved into

---

[83] *Id.* at NYC 000429.
[84] PMX  16 at NYC 431.
[85] PMX  7:  Marino Tr. 255:15 ("I was thinking about Schoolcraft's safety") & 256:9-18
(believed there was "a possibility of" him being an emotionally disturbed person); *but see
id.* at 258:5-16 (no information that Officer Schoolcraft had threatened to hurt himself or
others).  PMX 3:  Mauriello Tr.  357:24-358:22 (entry made out of concern for his well-
being and safety).
[86] PMX  7:  Marino Tr. at 258:5-16.
[87] PMX  3:  Mauriello Tr.  357:24-358:22.

Officer Schoolcraft's' bedroom with their guns drawn, wearing bulletproof vests and helmets and carrying tactical shields.[88]

83.  Officer Schoolcraft was lying on his bed and it appeared that he was either watching TV or had just woke up.[89]

84. As reflected by the first moments of a recording captured by Officer Schoolcraft's voice-activated digital recorder, one of the Emergency Service Unit officers asked Officer Schoolcraft, "You okay?" to which Officer Schoolcraft replied, "Yeah, I think so."

85.  Once DI Mauriello entered his bedroom, he ordered Officer Schoolcraft to return to the 81st Precinct.[90]

86. As reflected by the recording, Officer Schoolcraft refused to return to the Precinct, notwithstanding numerous threats and orders.  Eventually, however, Officer Schoolcraft succumbed to threats by Captain Lauterborn and Lieutenant Gough, and said he would go under protest.[91]

87. Then a few moments later, Officer Schoolcraft stated that he had to sit down because he was not feeling well and agreed to receive

---

[88] PMX  24:  Duncan Tr.  119:4-120:19; PMX 25:  Gough Tr. 141:4-25.
[89] PMX  24:   Duncan Tr. 127:11-20 (laying there on his bed watching TV); PMX 3: Mauriello Tr. 359:2-5 (the TV was on).
[90] PMX  3:  Mauriello Tr. 356:11-357:15;  PMX 11:  (DS.50_31October 2009_HomeInvasion.wma at 2:48).
[91] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40

medical attention.[92]

88.  While Officer Schoolcraft was being examined by Jamaica
     Hospital EMT Salvatore Sangeniti, who had previously
     responded to the scene with an FDNY EMT supervisor, Deputy
     Chief Marino returned to Officer Schoolcraft's bedroom and
     berated  Officer Schoolcraft about feeling sick.[93]

89. And at the very moment when EMT Sangeniti started taking
    Officer Schoolcraft's blood pressure, Deputy Chief Marino, in a
    loud and angry tone of voice, suspended Officer Schoolcraft.[94]

90.  Based on the circumstances confronting Officer Schoolcraft, he
     agreed to go to the hospital associated with his primary care
     physician, which was Forest Hills Hospital, to have his blood
     pressure checked out.[95]

91. When it became clear to Officer Schoolcraft, however, that the
    NYPD was going to take him to Jamaica Hospital (which has a
    psychiatric ward), Office Schoolcraft refused further medical
    attention and went back to his apartment.[96]

---

[92] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40.

[93] PMX 11:DS.50_31October 2009_HomeInvasion.wma at 9:07-12:12.

[94] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 11:00-12:12; PMX 26:
Sangeniti Tr. 144:16-148:3 (Sangeniti confirming that at the point when Deputy Chief
Marino suspends Officer Schoolcraft he was taking his blood pressure; testimony based
on the sounds made when taking blood pressure).

[95] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 13:00-14:10.

[96] PMX 4:  Schoolcraft Tr.  149:7-151:2.

92. As reflected in the second part of the recording of the events in his home that time, Officer Schoolcraft returned to his apartment, laid back down in his bed and refused further orders first by Captain Lauterborn and then by Deputy Chief Marino who returned again to his home and entered without permission.[97]

93.  Deputy Chief Marino declared Officer Schoolcraft an "emotionally disturbed person" (also known as an "EDP") and Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough and Sergeant Duncan grabbed Officer Schoolcraft from his bed, threw him on the floor of his bedroom and cuffed him with his hands behind his back.[98]

94. While Officer Schoolcraft was prone on the floor and Gough and Duncan were forcing his wrists into handcuffs, Broschart stepped on the backs of his legs, Lauterborn held him down with his hands, and Deputy Chief Marino put his boot on Officer Schoolcraft's face as he tried to turn his neck around to see what was being done to his body.[99]

95. After the handcuffs were secured, Officer Schoolcraft was then

---

[97] PMX  4:   Schoolcraft Tr. 1:4-155:8 (Lauterborn pursued Schoolcraft back into his apartment and physically prevented him from shutting  the doors behind him as he returned); PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 17:50-22:00.
[98] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 21:30 -23:51.
[99]  PMX 4:  Schoolcraft Tr. 166:21-168:19; PMX 21:  Broschart Tr. 167:16-169:17; PMX 10:  Lauterborn Tr. 322:23-323:9.

forced into an ESU chair, taken to the ambulance, placed on a stretcher with his hands cuffed behind his back, and driven to Jamaica Hospital by the two Jamaica Hospital EMTs.

96. Lieutenant Broschart rode in the back of the ambulance to maintain custody of Officer Schoolcraft.[100]

97. While the NYPD officers were in his apartment, they searched his person and his apartment and seized a voice-activated digital recorder taken from his pocket as well as several files belonging to Officer Schoolcraft, including copies of crime reports reflecting the downgrading of crimes he reported to IAB and notes in a folder marked "Report to the Commissioner.[101]

98. Officer Schoolcraft arrived at Jamaica Hospital's Emergency Room later that night and spent the night handcuffed to a gurney in the Emergency Room.

99. Hospital medical records or the "chart" reflect that he was in custody of the NYPD the entire time.[102]

100. Officer Schoolcraft was cuffed and under the custody of Lieutenant Broschart until the Lieutenant was relieved at about midnight by Defendant, Sergeant James, who was also from the

---

[100] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 22:00-28:27; .
[101] PMX 4: Schoolcraft Tr. 173:12-177:17.
[102] PMX 27: Jamaica Hospital Chart (PX 69 at JHMC 58) (Emergency Department Nursing Notes). Plaintiff's counsel has paginated the chart as "JHMC _."

81st Precinct, and Sergeant James remained there until the morning.[103]

101.   On November 1, 2009,Defendant, Sergeant Frederick Sawyer, another supervisor from the 81st Precinct, was sent to Jamaica Hospital to relieve Sergeant James.  When Sawyer got to the hospital, he saw Officer Schoolcraft on the telephone and, according to Sawyer, he ordered him to get off the telephone.[104]

102.   When Officer Schoolcraft did not comply with that order, Sergeant Sawyer, Sergeant James, and their two drivers physically forced Officer Schoolcraft onto the gurney and handcuffed his other hand to the gurney, leaving him in a fully shackled position on the gurney.[105]

103.   When Sawyer applied the cuffs to Officer Schoolcraft, he used both hands to squeeze the cuffs tighter and said "this is what happens to rats."[106]

104.   Later that morning, the two sets of handcuffs were removed and Officer Schoolcraft was wheeled into the Jamaica Hospital Psychiatric Emergency Room to be held against his will for

---

[103] PMX  28:  James Tr. 53:18-20, 59:17-60:16 & 67:14-71:16 .
[104] PMX  29:  Sawyer Tr. 139:25-146:15.
[105] PMX  29:  Sawyer Tr. 139:25-146:15 & 153:14-156:16.
[106] PMX  4:   Schoolcraft Tr. 186:11-22..

further "observation."[107]

105.   On November 3, 2009, Doctor Bernier ordered Officer

Schoolcraft's involuntary hospitalization.

106.   Dr. Bernier's decision was made even though there was

nothing in the chart that suggested that Officer Schoolcraft was

dangerous.

107.   After the paperwork was filled out, Officer Schoolcraft was

taken from the Psychiatric Emergency Room to a psychiatric

ward in the hospital.[108]

108.   On November 4, 2009, Doctor Isakov, who was an attending

doctor on the psychiatric ward, confirmed Dr. Bernier's decision

to involuntarily hospitalize Officer Schoolcraft.[109]

109.   That decision was reached even though there was nothing in

the chart that suggested that Officer Schoolcraft was dangerous to

himself or others.[110]

110.   Doctor Bernier and Doctor Isakov testified at their depositions

that they admitted Officer Schoolcraft on the ground that any

possible or potential risk of dangerousness was a sufficient basis

---

[107] PMX 27:   Medical Chart (PX 69) at JHMC 45.
[108] *Id.* at 91.
[109] PMX 27 (PX 69) at p. 46.
[110] *See* PMX 30:   Report of Dr. Roy Lubit at p. 13-14.

for their commitment decision.[111]

111.   Dr. Dhar, who was the Jamaica Hospital witness in this action, also testified that it was the policy and practice of the hospital to involuntarily commit a patient based on any possibility that the person was dangerous.[112]

112.   On November 6, 2009, after a forced stay lasting six days, Jamaica Hospital released Officer Schoolcraft from its custody, the same day that insurance coverage for his forced stay expired.[113]

113.   After Officer Schoolcraft was released from Jamaica Hospital, he moved to Johnstown, New York and for the next six months was relentlessly harassed by the NYPD, which sent NYPD and local police officers on at least twelve separate occasions to bang on his door, spy on him, and videotape him or his father.

114.   In January 2010 and in February 2010, Lieutenant Gough and Sergeant Duncan traveled with others north over 200 miles to his home to deliver papers to him that could have just as easily been sent to him by certified mail.[114]

---

[111] PMX  31:  Bernier Tr. 248-49; PMX 32:  Isakov Tr. 94-98
[112] PMX  33:  Dhar Tr. 132-35.
[113] PMX  27 (Medical Chart) at JHMC 128 ("The case is certified from 11/3/09 through 11/6/09. Next review will be with Dan of Aetna….").
[114] PMX 16 at 3876.

115.   DI Mauriello was a witnesses in the stop and frisk case recently tried in this Courthouse before District Court Judge Shira A. Scheindlin, *Floyd v. City of New York*, 08-cv-1034 (SAS) (Dkt. # 298).  In that testimony, DI Mauriello stated that *after* the quota allegations were made against him as the commanding officer of the 81st Precinct, he was transferred on July 3, 2010 to become the Executive Officer of Transit Borough Brooklyn and Queens.  According to DI Mauriello's testimony before Judge Scheindlin, at the time of the transfer, the Chief of Patrol for the entire NYPD told DI Mauriello that he was doing a "really good job at the 81st Precinct" and that he wanted to reward him with the new position.[115]

116.   While Mauriello did not claim then that the transfer was a promotion, he did considered it a transfer to a position as "second commander to more officers."[116]

117.   While technically not a "promotion," it was "a reward for the job [he] did at the 81st Precinct."[117]

118.   Mauriello has not suffered any damage to his status at the NYPD.

---

[115] PMX 35:  Mauriello *Floyd* Testimony (PX 48) at 1829:25-1831:11.
[116] *Id.* at 1831:17.
[117] *Id.*  at 1836:25.

119.   In his deposition in this case, DI Mauriello testified that soon after the news broke in a February 2010 *Daily News* article about the investigation into downgrading major crimes at the 81st Precinct, he attended a Patrol Borough Brooklyn North supervisors meeting.  At the meeting his direct supervisor, Deputy Chief Marino, told DI Mauriello not to worry about the negative press because he did not believe it.[118]

120.   In addition, according to Mauriello, Deputy Chief Marino and the thirty-five other supervisors in the room told DI Mauriello that they supported him.[119]

121.   Mauriello does not claim that he was denied some specific position or promotion.  At his deposition, DI Mauriello testified that he has not made *any* efforts to change his position at the NYPD since October 2009 and that he has not made any requests for any changes in his position since October 2009.[120]

122.   The only information that Mauriello could provide at his deposition was that he had discussions in the summer of 2011 with his now-retired supervisor, Transit Bureau Chief Diaz, and his successor, Joseph Fox, who told him that any transfers or

---

[118] PMX  3:  Mauriello Tr. 98:12-103:25.
[119] *Id.* at 103:16-25
[120] *Id.* at 419:4-420:10.

promotions would likely have to wait until the case is over and that until then they could not "push for him."[121]

123.   Mauriello has no evidence that Officer Schoolcraft's statements to QAD or IAB were made for the *sole purpose* of intentionally inflicting harm on Mauriello or that Officer Schoolcraft used wrongful means to inflict that harm.

124.   Mauriello's Counterclaims say that Officer Schoolcraft was motivated by a lawsuit.

125.   Official findings by two NYPD investigative agencies – IAB and QAD –  show that DI Mauriello personally committed misconduct and improperly permitted rampant downgrading and suppression of crime reporting at the 81st Precinct while under his command.

126.   After October 31, 2009, IAB began an investigation into whether DI Mauriello knew about or suspected at the time of his entry into Officer Schoolcraft's home that IAB or QAD was investigating the 81st Precinct.  IAB also made investigation into whether Mauriello knew about the contents of Officer Schoolcraft's memo book at the time he forced his way into his apartment.

---

[121] *Id.* at 466:11-470:9.

127. During the course of those investigations, DI Mauriello was required to be interviewed under oath by IAB, and at his interview DI Mauriello made materially false statements about his knowledge about the existence of an investigation into his Precinct and Officer Schoolcraft's memo book.[122]

128. IAB has recommended that formal charges against Mauriello be filed, and those charges are still pending.

129. In 2010, QAD issued a report on its investigation, stating: "In summary, although some upgrades were made during the course of 2008 and 2009, the findings illustrate severe deficiencies in the overall crime reporting process as a whole beginning with the initial interaction of complainants attempting to file reports, the supervisor's review and finalization of the reports submitted and continuing with inordinate delay in changing, improper classifications. These conclusions, coupled with the significant

---

[122] PMX 15 (PX 144) (confidential designation)

amount of reports found not to have been entered into the Omni-System is disturbing."[123]

Dated:  December 22, 2014

s/NBS

_____

Nathaniel B. Smith
111 Broadway – Suite 1305
New York, NY 10006
212-2227-7062

---

[123] PMX 16 (PX 169) at NYC 5205 (AEO designation; filed under seal) (redacted ECF version).