UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

                                                             Plaintiff,

                          -against-

                                                                                    10-CV-06005 (RWS)

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
Tax Id. 873220, Individually and in his official capacity, ASSISTANT
CHIEF PATROL BOROUGH BROOKLYN NORTH GERALD
NELSON, Tax Id. 912370, Individually and in his Official Capacity,
DEPUTY INSPECTOR STEVEN MAURIELLO, Tax Id. 895117,
Individually and in his    Official Capacity, CAPTAIN THEODORE
LAUTERBORN, Tax Id. 897840, Individually and in his Official
Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id. 919124,
Individually and in his Official Capacity, SGT. FREDERICK
SAWYER, Shield No. 2576, Individually and in his Official Capacity,
SERGEANT KURT DUNCAN, Shield No. 2483, Individually and in
his Official Capacity, LIEUTENANT CHRISTOPHER BROSCHART,
Tax Id. 915354, Individually and in his Official Capacity,
LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374 Individually
and in his Official Capacity, SERGEANT SHANTEL JAMES, Shield
No. 3004, Individually and in her Official Capacity, LIEUTENANT
THOMAS HANLEY, Tax Id. 879761, Individually and in his Official
Capacity, CAPTAIN TIMOTHY TRAINER, Tax Id. 899922,
Individually and in his Official Capacity, SERGEANT SONDRA
WILSON, Shield No. 5172, Individually and in her Official Capacity,
SERGEANT ROBERT W. O'HARE, Tax Id. 916960, Individually
and in his Official Capacity, SERGEANT RICHARD WALL, Shield
No. 3099 and P.O.'s "JOHN DOE" #1-50, Individually and in their
Official Capacity, (the name John Doe being fictitious, as the true
names are presently unknown), (collectively referred to as "NYPD
defendants"), FDNY LIEUTENANT ELISE HANLON, Individually
and in her Official Capacity as a lieutenant with the New York City
Fire Department, JAMAICA HOSPITAL MEDICAL CENTER, DR.
ISAK ISAKOV, Individually and in his Official Capacity, DR. LILIAN
ALDANA-BERNIER, Individually and in her Official Capacity and
JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
DOE" #1-50, Individually and in their Official Capacity (the name
John Doe being fictitious, as the true names are presently
unknown),                                                             Defendants.
------------------------------------------------------------------------------------X

DEFENDANT MAURIELLO'S STATEMENT OF MATERIAL FACTS
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT DISMISSING
THE CLAIMS AGAINST HIM IN THE THIRD AMENDED COMPLAINT

Defendant STEVEN MAURIELLO, by his attorneys, SCOPPETTA SEIFF KRETZ & ABERCROMBIE, for his Statement of Material Facts pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Civil Rule 56.1(a) of the Local Rules for the Southern and Eastern Districts of New York, in support of his motion for summary judgment dismissing the claims asserted against him in the Third Amended Complaint, sets forth the following material facts as to which there is no genuine issue to be tried:

Background – Appeal Meeting -- No Objection by Plaintiff
to Illegal Quotas or Crime Misclassification_____

1.      On February 25, 2009, a meeting was held at the 81st Precinct regarding plaintiff's poor performance evaluation for 2008 (appeal meeting).  (TAC ¶ 68; AS2 pp 45-46; SM Exhibit C, Mauriello Dep. pp.131-132; SM Exhibit A, Plaintiff's Evaluation for 2008.)[1]

2.      Plaintiff secretly recorded the appeal writing, which was attended by all of his supervisors as well as by Deputy Inspector Steven Mauriello, the Commanding Officer of the 81st Precinct.  (TAC ¶ 69; SM Exhibit D is a disk with a copy of the recording, which is approximately sixty-one minutes long.  The recording will not be submitted electronically.  This disk and all other disks used as exhibits in support of this motion will be submitted with the courtesy copy of the motion papers delivered to the Court.)

3.      Plaintiff was told his performance would be more closely monitored due to his poor evaluation.  (SM Exhibit D at 55:00-58:00, appeal

---

[1] TAC refers to the Third Amended Complaint.  Plaintiff was deposed on three occasions – October 11, 2012 , September 26, 2013, and September 27, 2013.  We refer to the transcripts as AS1, AS2 and AS3, respectively because they were not consecutively paginated.  We attach the cited pages as part of a single exhibit – SM Exhibit B.  The exhibits submitted in support of this motion are referred to as "SM Exhibit".

meeting recording; AS1 p. 44; SM Exhibit E, plaintiff's recording of conversation with Lauterborn; Mauriello Affidavit ¶ 5.)

4.     Throughout the appeal meeting, plaintiff did not express any concern regarding the alleged wrongdoing about which he now complains – illegal quotas and crime misclassification.  Instead, he spoke about not knowing how much activity is needed and that the numbers on his evaluation were not adding up correctly.  (SM Exhibit D.)

Background – Conversation with Captain Lauterborn -- No Objection
by Plaintiff to Illegal Quotas or Crime Misclassification_____

5.     On March 16, 2009, plaintiff spoke with Captain Theodore Lauterborn, the Executive Officer of the 81st Precinct, who was serving that day as the Duty Captain for Patrol Borough Brooklyn North (PBBN).  (TAC ¶ 94; Mauriello Affidavit ¶ 7.)  Plaintiff secretly recorded the conversation, in which they discussed, among other things, the heightened monitoring of plaintiff and his displeasure with it.  (A copy of the recording of the conversation, which is approximately thirty-five minutes long, is submitted as SM Exhibit E.)

6.     In the March 16, 2009, conversation with Captain Lauterborn, plaintiff explained his feelings as follows:  "I just feel my safety and the public's safety is [sic] being compromised because of the acts of retaliation . . . because of [the] appeal." (SM Exhibit E at 0:08-0:25 and 4:10-4:20; TAC ¶ 91.)

7.     In the March 16, 2009, conversation with Captain Lauterborn, plaintiff expressed no objection and made no mention of illegal quotas or improper crime reporting.  (SM Exhibit E at 21:00-23:00.)

Background – Restricted Duty -- No Objection by Plaintiff
to Illegal quotas or Crime Misclassification

   8. On April 3, 2009, plaintiff independently went to a hospital emergency room because of symptoms of stress and anxiety and received an injection of medication commonly used to treat anxiety. The hospital also gave plaintiff a prescription for anti-anxiety medication, which he took on each of the next two nights.  (SM Exhibit F, Lamstein Dep. pp. 181, l. 8-24 and 249-250.)

   9. On April 6, 2009, plaintiff went to see his private physician, Dr. Sure, who indicated plaintiff should not return to work until April 14, 2009. (SM Exhibit G, Dr. Sure written excuse from work.)

   10. As required by NYPD procedures, after being out sick on the advice of Dr. Sure, plaintiff then had to be seen by an NYPD doctor before returning to work.  (SM Exhibit H, NYPD Patrol Guide 205-01, Reporting Sick.)

   11. Plaintiff was seen by Dr. Ciuffo of the NYPD on April 13, 2009. (SM Exhibit I, Consultation Referral by NYPD Medical Division.)

   12. After plaintiff reported to the medical division he was suffering from stress on the job, Dr. Ciuffo referred plaintiff to Dr. Lamstein of the NYPD Psychological Evaluation Services Unit for a psychological examination. (SM Exhibit I; SM Exhibit F, Lamstein Dep. p. 56, ll. 14-21.)

   13. Plaintiff went directly to Dr. Lamstein on April 13, 2009. (SM Exhibit I; SM Exhibit J, Lamstein notes; Lamstein Dep. pp.177-179, ll.23-25.)

   14. On April 13, 2009, Dr. Lamstein indicated in her Consultation Report a diagnosis of "stress/anxiety" and recommended "psychotherapy", specifically cognitive behavioral therapy "to improve coping skills [and] reduce physical symptoms of stress."  Dr. Lamstein indicated that she was concerned

4

that Schoolcraft's primary care physician had recently prescribed a medication known for being anti-psychotic, but still noted his prognosis was "good, with treatment."  (SM Exhibit I, "Consultation Report" by Dr. Lamstein; SM Exhibit J, Lamstein notes; SM Exhibit F, Lamstein Dep. p. 149, ll.4-16.)

15.     Based on the information available, Dr. Lamstein placed Schoolcraft on restricted duty which included an automatic placement in a "NO FIREARMS STATUS." Dr. Lamstein sent a restricted duty memo to the NYPD Medical Division, indicating she was requiring removal of plaintiff's firearms, shield, and active duty identification card as of April 13, 2009.  (SM Exhibit K, Restricted Duty Memo; SM Exhibit F, Lamstein Dep. pp. 56, ll.14-23 and 280, ll.20-23; and SM Exhibit B, AS1 p. 106, ll.11-16.)

16.     Dr. Lamstein also indicated in her notes that she "urge[d]" Schoolcraft to see a psychologist.  (SM Exhibit J; SM Exhibit F, Lamstein Dep. p. 147, l.2-8; SM Exhibit L, Lamstein timeline created for Psychological Services Unit.)

17.     Plaintiff returned to see Dr. Lamstein on July 27, 2009. (SM Exhibits J, Dr. Lamstein notes; See SM Exhibit M, plaintiff's recording of visit with Dr. Lamstein; SM Exhibit L, Lamstein timeline.)

18.     Plaintiff returned again to see Dr. Lamstein on October 27, 2009.  (SM Exhibit J, Lamstein notes; SM Exhibit N, plaintiff recording of visit with Dr. Lamstein; SM Exhibit L, Lamstein timeline.)

19.     Dr. Lamstein concluded on July 27, 2009, and on October 27, 2009, that plaintiff should continue on restricted duty.  (SM Exhibits M and N;

SM Exhibit F, Lamstein Dep. pp. 306-307; SM Exhibits L, Lamstein timeline, and J, Lamstein notes.)

20.    On each occasion, Dr. Lamstein repeated her recommendation that Adrian Schoolcraft see a psychologist.  (SM Exhibits J, Lamstein notes, and L, Lamstein timeline, and SM Exhibit F, Lamstein Dep. at pp. 304-305.)

21.    Plaintiff never went to see a psychologist.  (See SM Exhibit B, AS1 p 110, l.7-18.)

22.    According the Dr. Lamstein, plaintiff complained on April 13, 2009, that he had recently received a poor performance evaluation and that his superiors had met with him in an effort to have plaintiff be a more active police officer.  (SM Exhibit J, and SM Exhibit F, Lamstein Dep. pp. 257-258.)

23.    Plaintiff never made any mention to Dr. Lamstein about illegal quotas or crime misclassification in any of their meetings, though he complained about pressure to improve his performance and increase his activity.  (SM Exhibit F, Lamstein Dep. pp. 241-242; and SM Exhibit J, Lamstein's notes.)

Background – No Objection by Plaintiff to Illegal Quotas or Crime
Misclassification Prior to August 31, 2009

24.    Neither plaintiff nor anyone on his behalf ever made known to anyone at NYPD any objection or complaint he might have had about illegal quotas or crime misclassification until David Durk did so on August 31, 2009.  (SM Exhibit B, AS1 47, l. 9-24; SM Exhibit O, IAB memo re: Durk call to Del Pozo; SM Exhibit J, Lamstein notes; SM Exhibit M, recording of Lamstein meeting; SM Exhibit E, recording of Lauterborn conversation; Mauriello Affidavit ¶¶ 4,5.)

25.      There is not a single document, nor a single recording in which plaintiff expresses any such objection about illegal quotas or crime misclassification before August 31, 2009.   (Mauriello Affidavit ¶ 4.)

26.      Any adverse treatment plaintiff allegedly suffered on the job prior to August 31, 2009, was performance related and could not have been in response to any objection plaintiff expressed about illegal quotas or crime misclassification because plaintiff had not expressed any such objection.  (SM Exhibit B, AS1 pp. 46-47; SM Exhibit J; Lamstein notes; SM Exhibits M and E; Mauriello Affidavit ¶ 5.)

27.      Schoolcraft told IAB on September 2, 2009, that, according to IAB, "he doesn't feel he is being retaliated against from the Members of his Command and has no problems with his supervisors and peers."  (SM Exhibit BG.)

28.      Prior to August 31, 2009, no conspiracy could have been hatched to violate plaintiff's constitutional rights as allegedly occurred on October 31, 2009, due to objections plaintiff might have had to illegal quotas or crime misclassification because plaintiff had not expressed any such objections. (See SM Exhibits J, M and E; Mauriello Affidavit ¶¶ 4, 5.)

August 31, 2009 through October 30, 2009 – No Conspiracy -- No Violations of Plaintiff's Constitutional Rights in Furtherance of the Alleged Conspiracy

29.      On August 31, 2009, David Durk (now deceased), a former employee of the NYPD, after receiving a call from Adrian Schoolcraft's father, Larry Schoolcraft (TAC ¶ 120) called Brandon Del Pozo an employee of the NYPD assigned at the time to the Internal Affairs Bureau (IAB). **(**SM Exhibit B AS2 pp. 10-12; SM Exhibit O, IAS memo re: Durk call to Del Pozo.)

30.     Durk told Del Pozo that Schoolcraft felt he was being retaliated against concerning his vacation and productivity, and believed he received a poor evaluation "because he doesn't believe in summons and arrst quotas." (SM Exhibit O, IAB memo of September 7, 2009.)

31.     Durk's conversation with Del Pozo was the first time plaintiff's alleged objections about illegal quotas and crime misclassification were made known to anyone at NYPD.

32.     For the period from August 31, 2009, through October 30, 2009 -- notwithstanding Durk's disclosure to Del Pozo, and any other alleged disclosures made to any of the defendants about plaintiff's objections to illegal quotas and crime misclassification, including any disclosures that might have been made to the defendants regarding plaintiff communicating to QAD and IAB about his objections to illegal quotas and crime misclassification, all of which we do not challenge for purposes of this motion -- nothing was done to Adrian Schoolcraft by anyone at NYPD that was in furtherance of the alleged conspiracy to violate his constitutional rights as allegedly occurred on October 31, 2009. (TAC ¶¶ 125-38; SM Exhibit B, AS2 pp. 166-77.)

October 31, 2009 – Plaintiff on Restricted Duty

33.     On October 31, 2009, Schoolcraft was a New York City police officer assigned to the 81st Precinct in Bedford-Stuyvesant, Brooklyn, and was serving on restricted duty, without authority to possess a gun or a shield (Mauriello Affidavit ¶ 3.)

34.     While on restricted duty, Schoolcraft was assigned to work as a telephone switchboard operator at the 81st Precinct, which included

8

responsibility for answering phones and retrieving vouchered property.   (SM Exhibit B, AS1 p. 114, ll.11-22; SM Exhibit P, Huffman Dep. pp. 46-47, l.15-24.)

October 31, 2009 – Plaintiff Secretly Recorded his Entire Day Tour and Substantially every Conversation in his Apartment_____

35.   Schoolcraft secretly recorded his entire tour of duty on October 31, 2009.  (SM Exhibit Q.)

36.   After leaving work on October 31, 2009, at approximately 2:30 p.m., Schoolcraft recorded conversations and events in his apartment throughout the rest of that day until the first entry was made by NYPD into his apartment at approximately 9:40 p.m.  (SM Exhibit R.)  Schoolcraft then separately recorded everything audible in his bedroom throughout the two entries into his apartment.  (SM Exhibit S.)

October 31, 2009 – Schoolcraft Leaves Early Without Approval after being "Menaced" by Lieutenant Caughey_____

37.   On October 31, 2009, at approximately 2:00 p.m., Schoolcraft told the desk officer on duty he did not feel well and was leaving work an hour early.  (SM Exhibit Q at 7:19.00-7:28.00, Schoolcraft's Day Tour; SM Exhibit B, AS1 123:22-124:4; SM Exhibit T, recording of interview of Desk Sergeant Rasheena Huffman on 10/31/09, at 2:00-3:00 and 6:45-7:20; SM Exhibit U, recording of Police Officer Rodriguez interview on 10/31/09 at 10:00-11:00.)

38.   For purposes of this motion, we do not dispute that Schoolcraft would later claim he left work early because he felt menaced by Lieutenant Timothy Caughey, the Integrity Control Officer of the 81st Precinct, believing Lieutenant Caughey would want to cause him harm (though plaintiff has

9

provided vastly different explanations of the cause for his concern).  (TAC ¶¶
139-42; SM Exhibit B, AS1 122:1-8; SM Exhibit V, Larry Schoolcraft secret
recording of 10/31/09 conversation with Lauterborn; SM Exhibit W, Lubit
(plaintiff's psychiatric expert) (Dep. Pp. 333-34, 337-38, 520-22.)[2]

      39.    For purposes of this motion, we do not dispute that
Schoolcraft may have believed Lieutenant Caughey would want to harm him
because Caughey would have seen references in Schoolcraft's memo book to
alleged "specific instances of the corruption and illegal activity plaintiff had
documented in preparation for his report to Commissioner Kelly."  (TAC ¶ 140;
SM Exhibit B, AS1 112:13-19 and AS1 203:14-20.)[3]

      40.    Schoolcraft's recording of his entire day tour does not reveal
anything said to Schoolcraft by Lieutenant Caughey other than an almost
inaudible request to see his memo book so Caughey could "scratch" it. (SM
Exhibit Q at 1:06.00-1:11.00.)

      41    As Schoolcraft walked out of the precinct, Steven Mauriello
was walking in and said hello to Adrian Schoolcraft.  (SM Exhibit Q at 7:20.30-
7:20.40) (Day Tour Recording; SM Exhibit C, SM Exhibit C, Mauriello Dep. p.
305, l.13-17; Mauriello Affidavit ¶ 6.)

---

[2] Lieutenant Caughey left work at approximately noon on October 31, 2009, two and a half hours before Adrian Schoolcraft decided to leave.  (SM Exhibit X, IAB Interview of Caughey, at 18:55-19:45.)

[3] The truth is that there are no explicit references in plaintiff's memo book to any alleged "specific instance[s] of . . . corruption and illegal activity."  There are references to only three incidents that might be an indication of impropriety.  One is on September 14, 2009, where Schoolcraft indicates "Training:  None, P.O. Hurley present "Sign the Training Log."  Another is a note indicating a charge of Assault in the Second Degree was changed to Assault in the Third Degree, but no further information is provided. Finally, there is a note indicating that a Sergeant Gallina said on October 5, 2009, "All I want is one collar a month."  (SM Exhibit BI, Schoolcraft Activity Log.)

42.     Schoolcraft did not get authorization to leave work early.
(SM Exhibit S at 3:00-4:30; SM Exhibit P,  Huffman Dep. pp. 67-70; SM Exhibit
Y, Lauterborn Dep. at 238, ll.6-13; SM Exhibits Q, Day Tour Recording, SM
Exhibit T, Huffman interview, and SM Exhibit U, Rodriguez interview.)

43.     According to the desk sergeant, Rasheena Huffman,
Schoolcraft left work early despite being told by her that he did not have authority
to do so.  (SM Exhibit T at 3:00-4:30; SM Exhibit Q at 7:26.20-7:27.20 and
7:30.15-7:40.00.)

44.     The desk sergeant called the NYPD centralized Sick Desk to
inquire whether Adrian Schoolcraft had called for permission to leave work early,
and was told he had not done so.  (SM Exhibit T at 6:00-7:00; SM Exhibit P,
Huffman Dep. pp. 76-77 and 86, ll.1-14; SM Exhibit Y, Lauterborn Dep. p. 241, ll.
3-7.)

October 31, 2009 – After Leaving Early, Schoolcraft Unresponsive – Broschart
Sent to Schoolcraft's Residence

45.     Shortly after Schoolcraft left the precinct, the desk officer
called Schoolcraft's cell phone, but the calls were not answered.  (SM Exhibit P,
Huffman Dep. p. 87, ll.6-14; SM Exhibit Y, Lauterborn Dep. p. 288, ll. 2-13; SM
Exhibit C, Mauriello Dep. p. 311, ll. 3-4.)

46.     Lieutenant Broschart of the 81st Precinct arrived at the 81st
Precinct to work the 4:00 to 12:00 shift.  He was instructed by Captain Lauterborn
to go with his driver to Schoolcraft's apartment which was in the 104th Precinct in
Queens and check to see if Schoolcraft had returned home.  (SM Exhibit Y,
Lauterborn  Dep. pp. 289-290; SM Exhibit Z, Broschart Dep. p. 87, ll.16-19.)

47.     The 104th Precinct was notified about Schoolcraft's status, and was asked to send an officer to his home.  (SM Exhibit C, Mauriello Dep. p. 308, ll.13-22).

48.     When Lieutenant Broschart and his driver arrived at Schoolcraft's residence at approximately 4:45 p.m., an officer from the 104th Precinct had already arrived.  (SM Exhibit Z, Broschart Dep. p. 29, l. 24-30; SM Exhibit AA, IAB memo.)

49.     Over a period of approximately four hours, Lieutenant Broschart knocked several times on the door to Schoolcraft's apartment, but there was no response.  (SM Exhibit Z, Broschart Dep. p. 104, ll. 4-16)

50.     On October 31, 2009, Captain Theodore Lauterborn was the Executive Officer of the 81st Precinct (the position below Commanding Officer in the chain of authority in a precinct).  (Mauriello Affidavit ¶ 7; SM Exhibit AB; SM Exhibit Y, Lauterborn Dep. pp. 13-15.)

51.     On October 31, 2009, Captain Lauterborn also was assigned for the day to be the PBBN Duty Captain, for the entire Brooklyn North area (SM Exhibit AB, Brooklyn North Duty Sheet.  (Mauriello Affidavit ¶ 7.)

October 31, 2009 – Captain Enlists SIU – Chief Marino Appears
and Takes Charge_____

52.     In his capacity as Duty Captain, Captain Lauterborn contacted the PBBN Special Investigations Unit (SIU) and asked that a crew report to the 81st Precinct to then respond to the scene of Schoolcraft's apartment.  (SM Exhibit AC, Gough Dep. p. 93, ll.12-21.)

53.     At all relevant times, defendant Michael Marino (now retired) was the PBBN Assistant Chief, or second in command, with supervisory authority

over all of the precincts in PBBN, including the 81st Precinct.  (SM Exhibit AD, Marino Dep. p. 219, ll. 4-11.)

54.    On October 31, 2009, Chief Marino met Captain Lauterborn and the SIU officers, Lieutenant William Gough and Sergeant Kurt Duncan, who had gathered at the 81st Precinct, in the precinct parking lot, as they prepared to go to Schoolcraft's apartment.  (SM Exhibit AD, Marino Dep. pp. 223-31; SM Exhibit AC, Gough Dep. pp. 113-114.)

55.    Chief Marino directed that the NYPD Operations division be notified and that arrangements be made to have an Emergency Services Unit (ESU) also respond to Schoolcraft's residence.  (SM Exhibit AD, Marino Dep. p. 230, ll. 4-11;  SM Exhibit AC, Gough Dep. pp. 113-114; SM Exhibit AE, Duncan Dep. p. 87, ll.12-13.]

56.    The role of ESU is to provide specialized assistance to other units of the NYPD.

57.    Chief Marino went inside the 81st Precinct stationhouse at approximately 8:35 p.m. (SM Exhibit AF, 81st Precinct Command Log; SM Exhibit AK, IAB memo re copy of Command Log) and told Mauriello, who was subordinate to Chief Marino, that he should follow Chief Marino to the scene of Schoolcraft's residence.  (SM Exhibit C, Mauriello Dep. p. 336, ll. 16-23; Mauriello Affidavit ¶ 8.)

58.    At approximately 8:30 p.m., Captain Lauterborn and the SIU crew, comprised of Lieutenant William Gough, Sergeant Kurt Duncan and Sergeant Hawkins, arrived at the scene of Schoolcraft's residence. (SM Exhibit AG, Gough IAB interview.)

59.     Before Captain Lauterborn arrived at the scene, he was informed by Lieutenant Broschart the landlord had heard creaking sounds from Schoolcraft's apartment on the second floor of a three-family house, which was the first indication of any activity in the apartment.  (SM Exhibit Z, Broschart Dep. pp. 104-105; SM Exhibit Y, Lauterborn Dep. p. 210, ll. 10-19.)

60.     In response, Captain Lauterborn ordered Lieutenant Broschart to ask the landlord of plaintiff's apartment if the landlord could provide NYPD with a key for plaintiff's apartment. (SM Exhibit Z, Broschart Dep. p. 110, ll. 10-14.)

61.     Emergency Medical Services (EMS) (i.e., an ambulance) also responded to Schoolcraft's residence.

62.     An EMS crew from Jamaica Hospital arrived at the location of Adrian Schoolcraft's apartment at approximately 9:15 p.m. (SM Exhibit AH, Hanlon Dep. p. 105, l. 6-9; SM Exhibit AI, IAB memo re: 911 Calls for Service.)

63.     An NYPD ESU crew was requested at the scene at 9:09 p.m. (SM Exhibit AI, IAB memo re: 911 Calls for Service.)

64.     Chief Marino, driving his own car, and Deputy Inspector Mauriello, driven by Lieutenant Crawford, arrived at the scene at approximately 9:30 p.m.  At the time Chief Marino arrived, ESU had already arrived at Schoolcraft's apartment.  (SM Exhibit AJ, IAB Interim report pp. 26-27; SM Exhibit AD, Marino Dep. pp. 237-241; SM Exhibit C, Mauriello Dep. pp. 339-340; Mauriello Affidavit ¶ 9.)

65.     By the time Chief Marino and Deputy Inspector Mauriello arrived, the landlord had provided Captain Lauterborn and Lieutenant Broschart

with a key to Adrian Schoolcraft's apartment. (SM Exhibit Z, Broschart Dep. p.

111, ll. 4-24; SM Exhibit C, Mauriello Dep. p. 341, ll. 2-12.)

66.     Chief Marino decided at the scene that a "soft entry" should

be made into Adrian Schoolcraft's apartment, apparently meaning that if Adrian

Schoolcraft again did not respond to the knocks on his apartment door, they

would enter without having ESU don helmets or any kind of body armor.  (SM

Exhibit AD, Marino Dep. pp. 250-251; SM Exhibit C, Mauriello Dep. p. 343.)

October 31, 2009 – Schoolcraft in Apartment Aware of Everything – Ignores all
Efforts by NYPD to Reach him_____

67.     During the nearly seven-hour period after Adrian Schoolcraft

left work and before entry was made into his apartment, Adrian Schoolcraft was

awake, fully aware of NYPD's efforts to reach him, and fully aware of the

gathering presence of NYPD, FDNY and EMS personnel outside his apartment

building.  (SM Exhibit R, Schoolcraft recordings in apartment.)

68.     While alone in his second-floor apartment with NYPD

personnel gathered outside on the street, plaintiff spoke several times over the

telephone with his father, who was upstate. (SM Exhibit R, Schoolcraft

recordings in apartment.)

69.     Captain Lauterborn also spoke with plaintiff's father while

Captain Lauterborn was trying to make contact with plaintiff.  (SM Exhibit V, Larry

Schoolcraft recording of conversation with Lauterborn; SM Exhibit AJ, IAB Interim

Report at 11, section f; SM Exhibit Y, Lauterborn Dep. pp. 67-70.)

70.     Captain Lauterborn spoke with Dr. Lamstein during the

hours he was trying to make contact with plaintiff, and asked Dr. Lamstein to see

if she could try to reach plaintiff over the telephone. (SM Exhibit L, Lamstein Timeline; SM Exhibit Y, Lauterborn Dep. pp. 105-106, ll. 6-19.)

71.     Despite his awareness of the efforts to reach him during that seven-hour period, Adrian Schoolcraft did not respond to any one of the many telephone calls or to any one of the many knocks on his apartment door.  (SM Exhibit R, Schoolcraft recording in apartment, including Lamstein phone message to Schoolcraft.)

72.     One of the telephone messages received by Adrian Schoolcraft was from Dr. Lamstein, the NYPD psychologist who had placed Adrian Schoolcraft on restricted duty more than six months earlier. (SM Exhibit R, Schoolcraft recordings in apartment, including Lamstein voicemail; SM Exhibit J, Lamstein notes.)

73.     Dr. Lamstein just four days earlier, on October 27, 2009, had met with Schoolcraft and continued him on restricted duty.  (SM Exhibit J, Lamstein notes.)

74.     Adrian Schoolcraft listened to Dr. Lamstein's message, then played it back to record it on one of his recorders.   (SM Exhibit R.)

75.     The message left by Dr. Lamstein was as follows:

Hi Officer Schoolcraft, Dr. Lamstein. I am the pager duty psychologist today and I got a call from Captain Lauterborn. I know I'm not the first call you're receiving so I'm sure you're aware that they're all looking for you and very concerned because you ran off without doing proper procedure and they're not sure if you're OK.

So right now they are trying to figure out if they supposed to do a whole city-wide high-level mobilization to find you or if you're OK and they're not sure if they are supposed to be doing that. So there are other people who left you a message asking you to return to the 8-1. I asked if it would also be OK if you just returned to your home and to send a Lt. there hoping to find you.

So I don't know what to tell them because as long as I've known you, I've had no concerns about you having thoughts about hurting yourself, I really really want to urge you to return to your home or call your Capitan or you can call me. Whatever this is, if you just return to your home and just resolve whatever this is quickly and easily otherwise it's just going to blow up to a bigger mess than you would want and I would really really hate to see that happen. I would much rather this, whatever this is, get reconciled very quickly and easily without a whole big city wide mobilization and suspensions and whatever else is being considered because this is not necessary, it can be resolved in two minutes.

[Gives phone numbers]. You can also just return home and resolve it with you there instead of at the precinct because I suggested that might be embarrassing for you.

So hope everything is OK and please give me a call.

(SM Exhibit R, Schoolcraft recordings in apartment, including Lamstein voicemail recording.)

76.     Adrian Schoolcraft did not call Dr. Lamstein or Captain Lauterborn, despite their requests that he do so.

77.     At approximately 9:45 p.m., the following people climbed the interior stairs to gain entry with a key into Schoolcraft's second-floor apartment (the first entry): two officers from ESU, Chief Marino, Deputy Inspector Mauriello, Captain Lauterborn, the three officers from PBBN SIU (Gough, Hawkins and Duncan), followed by FDNY EMS Lieutenant Elise Hanlon, and then by two EMT's from Jamaica Hospital.  (SM Exhibit B, AS1 pp. 139-140; SM Exhibit C, Mauriello Dep. pp. 345-346; SM Exhibit AC, Gough Dep. p. 140, ll.10-21; Mauriello Affidavit ¶ 12.)

78.     On October 31, 2009, Schoolcraft had set up a hidden recorder in his bedroom to record every sound that could be heard in his bedroom, including any sound heard in his bedroom in the event anyone entered

his apartment.  (SM Exhibit R, Schoolcraft recordings in apartment, including telephone conversation with father.)

79.     The hidden recorder did record every sound heard in Schoolcraft's bedroom from the moment ESU knocked on the apartment door, opened it with the key and entered for the first time, until the last person left the apartment for the final time on October 31, 2009.  (SM Exhibit S, Schoolcraft recording of two NYPD entries into apartment.)

80.      ESU is heard knocking on the apartment door and calling out "Adrian".  As the door apparently opens, a comment is made by one of the officers in a low voice, saying "He's on the bed."  In response, another officer asks "Is he alright?"  (SM Exhibit S at 0:45-1:00.)

81.     The ESU officers then address Adrian Schoolcraft directly, asking him to show his hands and asking him to assure them he is OK.  There is no indication of any aggressive conduct or the exertion of any physical force of any kind.  (SM Exhibit S at 1:00-1:10.)

82.     As the ESU officers and Schoolcraft are speaking, Chief Marino, apparently steps into the bedroom and speaks to Schoolcraft.   The exchange between them was as follows:

Marino: Adrian, you didn't hear us knocking on this door for a couple hours?

Schoolcraft: I drank some Nyquil.

Unidentified male voice: Adrian, sit up.

Marino: Adrian, you didn't hear us knocking on that door… for the last couple hours?

Schoolcraft: No, why would I be expecting anyone knocking at my door Chief?

Marino: I don't know Adrian, but normally if you hear someone knocking you get up and answer it. They were kicking on that door loud and yelling.

Schoolcraft: I wasn't feeling well.

Marino: You got a million people downstairs worried about your welfare, spending hours out here, worried about you. We've talked to your father, we've called your phone.

Schoolcraft: What did my father say?

Marino: I don't know Adrian, I didn't talk to him personally. Alright, sit down.

(SM Exhibit S at 1:20-1:50.)

83.    Chief Marino was in charge at the scene as the highest ranking NYPD officer present. (SM Exhibit AL, 216-05 of NYPD Patrol Guide Procedure for Emotionally Disturbed Persons; SM Exhibit C, Mauriello Dep. pp. 341, ll. 16-22, 343 and 361-362; Mauriello Affidavit ¶ 9.)

During First Entry, Mauriello Speaks Briefly to Schoolcraft, then Leaves
Apartment, Never to Return

84.    After speaking with Schoolcraft for less than a minute, Chief Marino said "Steve", indicating to Mauriello that Chief Marino wanted him to step into the bedroom and deal with the situation.  (SM Exhibit S at 1:20-1:55.)

85.     After a few moments, Mauriello steps into the bedroom and speaks to Schoolcraft.  The entire conversation between them lasted approximately forty-five seconds, as follows:

Mauriello: Adrian, what happened today?

Adrian: I wasn't feeling well, I left.

Mauriello: That's it? You weren't feeling well. Your sergeant told you to stay, right?

Schoolcraft: No, she didn't say anything. She was talking on her cell phone.

Mauriello: You got everybody worried, we are worried about your safety.

Schoolcraft: Worried about what?

Mauriello: What do you mean, worried about what? They tried calling you, everybody(s) been calling you. Captain Lauterborn's been calling, everyone has been calling you, your father has been calling you. You're not answering. We were worried about anything that happens. That's what we are worried about. God forbid. You just walk out of the precinct. I say hello to you today that was the last I saw you. You know, that's what we are worried about, your safety, your well-being.

Schoolcraft: Alright, I'm fine.

Mauriello: Well, you are going to come back to the precinct with us.

Schoolcraft: Well…if I'm forced to. It's against my will.

Mauriello: Against your will? OK Teddy [referring to Captain Lauterborn], you handle this.

(SM Exhibit S at 2:15-3:00.]

86.     It appeared to Mauriello that Schoolcraft was agitated speaking to him, which is why Mauriello said "alright, Teddy you handle this." (SM Exhibit C, Mauriello Dep. pp. 352-353; Mauriello Affidavit ¶ 14.)

87.     Mauriello then immediately walked out of the bedroom, out of the apartment, down the stairs and out of the house on to the street, never to enter the building or the apartment again, never to speak or interact in any way with Schoolcraft again, and never to exercise any authority at the scene with respect to anything to do with Schoolcraft.  (SM Exhibit C, Mauriello Dep. pp. 361-362, 370-375, 379, ll. 4-13 and 609; Mauriello Affidavit ¶ 14.)

88.     Steven Mauriello did not have any physical contact with plaintiff and did not threaten him in any way. (SM Exhibit S, recording of two NYPD entries into apartment; SM Exhibit C, Mauriello Dep. p. 353, ll.9-23; Mauriello Affidavit ¶ 14.)

89.     Captain Lauterborn then spoke with plaintiff over the course of the next several minutes.  Their dialogue included the following exchange:

Lauterborn: Get your stuff on, we are going back to the precinct.

Schoolcraft: I'm not going back to the precinct.

Lauterborn: Adrian, we are going to go back to the precinct.

Schoolcraft: For…?

Lauterborn: Because we are going to do it the right way. You can't just walk out of the command.

Schoolcraft: And do what?

Lauterborn: You can't just walk out of the command.

Schoolcraft: What's going to be done if I go back to the 8-1?

Lauterborn: What's gonna be done? We are going to investigate why you left.

Schoolcraft: I'm telling you why I left, I was feeling sick.

Lauterborn: Adrian, that's not the reason why you leave. Alright, you know that. You just don't put a thing on a desk,  you ask for permission.

Schoolcraft: I did ask permission.

Lauterborn: No you didn't.

Schoolcraft: She denied it.

Lauterborn: Alright, so you can't leave. You weren't given permission.

Schoolcraft: Well…I wasn't feeling well.

Lauterborn: She denied it, that's it. You have to sit there and wait until your permission is granted. Alright, if it's that bad then you're gonna go to the hospital from the precinct. You know better than to just slap a sick report on a desk and walk out.

Schoolcraft: I didn't do that. She embellished that I… she was on the cell phone.

Lauterborn: Alright, so then what did you do? Set it down? She told you [that] you can't leave and you left anyway, right?

Schoolcraft: I was going sick.

Lauterborn: And you left anyway? She told you [that] you can't leave? Right. You can't leave. That's the way it rolls. You can't go. Alright? So we

22

have to go back. So get your clothes on, whatever you have to do. People have

been calling you all day, I talked to your father. Alright?

(SM Exhibit S at 3:00-4:30.)

90.     Defendants made the first entry into the apartment to

establish contact with plaintiff and determine his condition.  (SM Exhibit S at

0:40-2:00; SM Exhibit AD, Marino Dep. pp. 250-251; SM Exhibit C, Mauriello

Dep. p. 343, ll. 4-12.)

October 31, 2009 – First Entry – Schoolcraft told to Return to Precinct for
Questioning with other Officers, but Objects_____

91.     Once entry was made into the apartment and plaintiff

appeared to be in reasonably good condition, Chief Marino, then Deputy

Inspector Mauriello, and then Captain Lauterborn explained to him that he was

being directed to return to the precinct. (SM Exhibit S, 0:40-4:30; SM Exhibit AD,

Marino Dep. pp. 271-273; SM Exhibit C, Mauriello Dep. pp. 356-358.)

92.     Plaintiff was directed to return to the precinct for questioning,

along with two officers – Huffman and Rodriguez -- who had witnessed his early

departure from work and were being detained at the precinct.  (SM Exhibits T

and U, recordings of Huffman and Rodriguez interviews at 81st Precinct.)

93.     Schoolcraft initially objected and refused orders from his

superior officers to come back to the precinct for an investigation as to why he

left the 81st precinct before the end of his tour after being denied permission to

leave.  (SM Exhibit S at 2:40-4:30.)

94.     The two officers who were witnesses were questioned at the

precinct shortly before midnight of October 31, 2009 as part of an investigation

into the incident.  (SM Exhibit C, Mauriello Dep. p.382, ll.5-10; SM Exhibits T and U, Huffman and Rodriguez interview recordings.)

95.   Such questioning after an unusual incident involving an NYPD officer is an established, common and accepted procedure of the NYPD. (SM Exhibit AD, Marino Dep. p. 272, ll.5-10; SM Exhibit C, Mauriello Dep. pp. 360-363; SM Exhibit BF, Patrol Guide Procedure 206-13.)

96.   Mauriello was not in Schoolcraft's apartment when all of the events allegedly occurred that form the basis for plaintiff's claims, whether for the remainder of the first entry or during the second entry.  (Mauriello Affidavit ¶¶ 14-21.)

October 31, 2009 – First Entry – Schoolcraft not Feeling Well – Agrees
to go to  Hospital – then Changes Mind

97.   After a discussion with Lieutenant Gough of PBBN SIU, plaintiff agreed to go back to the 81st Precinct as directed. (SM Exhibit S at 4:30-5:40.)

98.   After agreeing to return the 81st Precinct, plaintiff spoke on the phone with his father, Larry Schoolcraft, then indicated he did not feel well. (SM Exhibit S at 6:20-8:30.)

October 31, 2009 – First Entry – Plaintiff Medical Assistance by EMTs – told he
Needs to go to Hospital for Medical Exam – Plaintiff Again Agrees

99.   Upon hearing that plaintiff was not feeling well, NYPD officers asked plaintiff if he needed medical aid. When plaintiff indicated he needed aid, officers said "OK" and "we have an ambulance right outside." (SM Exhibit S at 8:30-8:40.)

100.    An EMT present at the scene determined plaintiff's pulse and blood pressure were elevated ("sky high)."  (SM Exhibit S at 11:40-12:40.)

10`.    The EMT, Sal Sangianetti, encouraged Schoolcraft to go directly to the hospital in the ambulance for an immediate medical exam.  (SM Exhibit S at 11:40-13:00.)

102.    Schoolcraft agreed to go to the hospital in the waiting ambulance. (SM Exhibit S at 12:50-13:00.)

103.    Plaintiff walked out of the apartment on his own, along with anyone else who had been in the apartment with him, and approached the ambulance. (SM Exhibit B, AS2 p. **244, ll. 7-10**; SM Exhibit AD, Marino Dep. p. 280, ll. 15-18; SM Exhibit C, Mauriello Dep. p. 377, ll. 2-9; Mauriello Afidavit ¶ 17; SM Exhibit Z, Broschart Dep. pp. 136-137.)

104.    A total of sixteen minutes had elapsed from the time ESU first opened the door to the apartment until the remaining officers and EMTs left the apartment with the expectation the ambulance would take plaintiff to the hospital for a medical exam.  (SM Exhibit S.)

105.    While approaching the ambulance, plaintiff was talking on the cell phone with his father, then, without saying anything, suddenly turned around and went back to his apartment. (SM Exhibit B, AS1 p. 149, ll.15-24; SM Exhibit AD, Marino Dep. pp. 286-287; Mauriello Afidavit ¶ 17; SM Exhibit AE, Duncan Dep. p. 156, ll. 21-23; SM Exhibit AM, Marquez Dep. p. 167, ll.8-17.)

October 31, 2009 – First Entry – No Conspiracy – No Constitutional Violation in Furtherance of Conspiracy – in Mauriello's Presence of After he Left_____

106.    Plaintiff did not suffer any physical harm during the brief period Mauriello was in the apartment during the first entry, and Mauriello is

unaware of any such harm being suffered by Schoolcraft any time during the remainder of the first entry.  (Mauriello Afidavit ¶ 15.)

107.    No removal of property or evidence occurred during the brief period Mauriello was in the apartment during the first entry (and Mauriello is unaware of any such removal during the remainder of the first entry or during the second entry).  (Mauriello Affidavit ¶ 16.)

108.    From a distance out on the street, Mauriello saw plaintiff walk out of the house and toward the ambulance.  (SM Exhibit C, Mauriello Dep. pp. 576-79; Mauriello Affidavit ¶ 17.)

109.    As plaintiff approached the ambulance, there was no reason to expect plaintiff would return to the apartment and no reason to expect there to be a need for a second entry. (SM Exhibit S; Mauriello Affidavit ¶ 17.)

110.    Defendants did not use any force against plaintiff prior to the second entry because they had not gone to plaintiff's residence to cause plaintiff harm.  (SM Exhibit S.)

October 31, 2009 -- Second Entry

111.    Mauriello did not say anything to plaintiff or anyone else as plaintiff turned around and then headed back to his apartment. (Mauriello Affidavit ¶ 18.)

112.    When Mauriello saw plaintiff go back inside, he saw Chief Marino, Captain Lauterborn and the SIU crew (Duncan, Hawkins and Gough), follow plaintiff back inside the house and upstairs to Schoolcraft's apartment. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-79; Mauriello Affidavit ¶ 17.)

113.    Mauriello did not direct anyone to follow Adrian Schoolcraft or to do anything about the fact that Adrian Schoolcraft was heading back to his apartment.  (SM Exhibit C, Mauriello Dep. pp. 376-79; Mauriello Affidavit ¶ 18.)

114.    Mauriello did not follow plaintiff back to the apartment or take any other action when plaintiff headed back to the apartment, other than to wait outside on the street pending further developments.  (SM Exhibit C, Mauriello Dep. p. 379; SM Exhibit S, recording of first and second entries; Mauriello Affidavit ¶ 18.)

115.    Mauriello did not ever re-enter the apartment. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 378-79; Mauriello Affidavit ¶ 18.)

116.    On October 31, 2009, Mauriello was not consulted and did not express an opinion on whether plaintiff should be suspended. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.)

117.    Mauriello was not present when plaintiff was suspended. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.)

118.    Mauriello was not consulted about and did not express an opinion on whether plaintiff should be declared an emotionally disturbed person (EDP).  (SM Exhibit S, recording of first and second entries; SM Exhibit C, pp. 376-81; Mauriello Affidavit ¶ 19.)

119.     Mauriello was not present when plaintiff was declared an EDP.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.)

120.     Mauriello did not arrest Adrian Schoolcraft, never directed anyone to arrest him, and was not present when, if ever, he was placed under arrest.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.)

121.     Mauriello was not present when plaintiff was handcuffed, and he had not directed anyone to apply handcuffs.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.)

122.     Mauriello was not present for or aware of the removal of any of plaintiff's personal property, including any alleged removal of evidence plaintiff claims to have gathered of NYPD corruption.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 16.)

123.     Mauriello did not direct anyone to remove any property. and did not direct or participate in the alleged forcible removal of plaintiff from his apartment during the second entry. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 16.)

124.     Mauriello waited outside of the house until he saw everyone exit the house with Adrian Schoolcraft being carried in a chair to the ambulance. (SM Exhibit S, SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 20.)

125.    The entire time that elapsed from the time plaintiff went back into his apartment until everyone left the apartment was approximately fifteen minutes.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. p. 379.)

126.    Steve Mauriello did not know what had happened in the apartment during the second entry, and he did not ever again speak to or interact with Adrian Schoolcraft.  (SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 14.)

127.    On October 31, 2009, Mauriello never touched Adrian Schoolcraft, never directed anyone to do so and never saw anyone do so.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶¶ 14,15.)

128.    On October 31, 2009, Mauriello never threatened Adrian Schoolcraft, never directed anyone to do so, and never saw anyone do so.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶¶ 14,15.)

October 31, 2009 – Second Entry – No conspiracy to violate Plaintiff's
Constitutional Rights

129.    As plaintiff's secret recording of the events in his apartment during the two entries by NYPD reveals, defendants did not ever, directly or indirectly, indicate any sentiment about causing plaintiff harm.  (SM Exhibit S, recording pf first and second entries.)

130.    The NYPD officers who took the allegedly wrongful actions during the second entry, did so only when plaintiff suddenly and unexpectedly decided to go back inside.  (SM Exhibit S, recording of first and second entries.)

131.   Mauriello did not have an opportunity to speak with any of the other defendants once plaintiff started to go back inside.  (SM Exhibit S; Mauriello Affidavit ¶ 18.)

132.   If there were a conspiracy by the defendants to do what they did to plaintiff during the second entry, which is the only time plaintiff allegedly was harmed, it would have to have been hatched in the moments they began following plaintiff as he suddenly started to go back into the apartment, or some time after the officers re-entered.  There is no indication that either occurred or could have occurred.

Jamaica Hospital

133.   Once plaintiff was in the ambulance, he was taken to Jamaica Hospital, accompanied by Lieutenant Broschart.  (SM Exhibit Z, Broschart Dep. pp. 182-85; SM Exhibit C, Mauriello Dep. pp. 380-81.)

134.   Mauriello did not go to Jamaica Hospital, did not communicate with anyone at Jamaica Hospital, did not direct any officer to do so, and he played no role with respect to anything that transpired at Jamaica Hospital.  (Mauriello Affidavit ¶ 21.)

Plaintiff's Post-suspension Meetings with NYPD

135.   A suspended officer such as Schoolcraft continues to be a member of the service and suspension does not relieve an officer of the obligation to report wrongdoing to the department.  See SM Exhibit AN,  NYPD Patrol Guide § 207-21, in effect at the time, which provides "[a]ll members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware.")

136.    Schoolcraft reached out to IAB while in Jamaica Hospital and arranged to meet twice with NYPD representatives before he left the hospital.  (SM Exhibits AO and AP.)

137.    After Schoolcraft's release from the hospital on November 6, 2009, he arranged to meet again with NYPD representatives from IAB in his Queens apartment. (SM Exhibits AQ and AR, IAB Memos.)

138.    At the meeting in his Queens apartment on November 6, 2009, plaintiff demonstrated what had happened on October 31, 2009. (SM Exhibits AQ and AR.)

139.    At the meeting in his Queens apartment, plaintiff provided the NYPD representatives with copies of the recordings he had made of the events in his apartment on October 31, 2009. (SM Exhibits AQ and AR.)

140.    Following the meeting in his Queens apartment, plaintiff was contacted by IAB and told IAB wanted to re-visit this apartment.  They met again at the premises on November 9, 2009, along with plaintiff's father.  (SM Exhibits AS and AT.)

141.    After denying there were any weapons on the premises, plaintiff ultimately acknowledged he had a high-powered shotgun.  IAB had learned of the shotgun from the recording of the two NYPD entries on October 31, 2009, in which plaintiff discusses the shotgun with his father and they agree he should hide it under his mattress before the NYPD makes its first entry.  (SM Exhibits AS and AT; SM Exhibit S.)

142.    Plaintiff turned the shotgun over to IAB because he was on restricted duty and not permitted to have possession of any firearms.  (SM Exhibit AS and AT.)

Efforts by NYPD to Contact Plaintiff at his Upstate Residence

143.    Some time shortly after plaintiff last met with NYPD representatives in his Queens apartment, he moved upstate (TAC ¶ 215).

144.    In December 2009, the NYPD BNIU made its first attempt to contact plaintiff upstate (TAC ¶ 216), and continued to do so thereafter.  (SM Exhibits AU – BB.)

145.    The purposes of the upstate visits were to personally serve plaintiff with department orders for plaintiff to report for duty, to renew his suspension, and to deliver his administrative charges.  (SM Exhibits AU – BB.)

146.    Plaintiff chose not to comply with the orders or appear as directed and, after some initial conversations, chose not to speak with the visiting NYPD personnel.  It thus became clear he had no interest in communicating further with the NYPD.   (SM Exhibits AU – BB.)

147.    At no time did BNIU or IAB inform Mauriello of their actions or seek to consult with him in any way about their efforts to contact Schoolcraft. (Mauriello Affidavit ¶ 22.)

No prior restraint of speech

148.    Plaintiff never indicated to anyone at the NYPD any intention to go to the media until there was a report in the media in February 2010 indicating he had done so.  (SM Exhibits BC, BD, BE, IAB Memos re media reports.)

149.    Plaintiff began speaking and meeting with the media without anyone's knowledge or interference.

150.    Plaintiff's speech was not at all chilled, as he had numerous contacts with the media throughout the period from December 2009 and June 2010, when defendants allegedly were subjecting him to prior restraint.  (SM Exhibits AU – BB and BC – BE.)

151.  Throughout the events of October 31, 2009, Steven Mauriello and all other NYPD defendants were acting at all times in the normal course of their duties and in furtherance of the NYPD's interests, as plaintiff concedes in the TAC (TAC ¶¶ 2, 10, 11, 12, 51, 240-44 and 302-12).

WHEREFORE, defendant Steven Mauriello requests judgment dismissing the claims alleged against him in the Third Amended Complaint in their entirety, and granting such other relief as the Court deems just, together with an award of costs.

Dated: New York, New York
        January 30, 2015

SCOPPETTA SEIFF KRETZ & ABERCROMBIE
Attorneys for Defendant STEVEN MAURIELLO

By: _____
        Walter A. Kretz, Jr., (WK-4645)
444 Madison Avenue, 30th Floor
New York, NY  10022
wakretz@seiffkretz.com
212-371-4500