GJR/da
82-82153

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

                        Plaintiff,

-against-

THE CITY OF NEW YORK, DEPUTY CHIEF
MICHAEL MARINO, Tax Id. 873220, Individually
and in his Official Capacity, ASSISTANT CHIEF
PATROL BOROUGH BROOKLYN NORTH
GERALD NELSON, Tax Id. 912370, Individually and
in his Official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax Id. 895117, Individually
and in his Official Capacity CAPTAIN THEODORE
LAUTERBORN, Tax Id. 897840, Individually and in
his Official Capacity, LIEUTENANT JOSEPH GOFF,
Tax Id. 894025, Individually and in his Official
Capacity, SGT. FREDERICK SAWYER, Shield No.
2576, Individually and in his Official Capacity,
SERGEANT KURT DUNCAN, Shield No. 2483,
Individually and in his Official Capacity,
LIEUTENANT CHRISTOPHER BROSCHART, Tax
Id. 915354, Individually and in his Official Capacity,
LIEUTENANT TIMOTHY CAUGHEY, Tax Id.
885374, Individually and in his Official Capacity,
SERGEANT SHANTEL JAMES, Shield No. 3004,
AND P.O.'s "JOHN DOE" #1-50, Individually and in
their Official Capacity (the name John Doe being
fictitious, as the true names are presently unknown)
(collectively referred to as "NYPD defendants"),
JAMAICA HOSPITAL MEDICAL CENTER, DR.
ISAK ISAKOV, Individually and in his Official
Capacity, DR. LILIAN ALDANA-BERNIER,
Individually and in her Official Capacity and
JAMAICA HOSPITAL MEDICAL CENTER
EMPLOYEE'S "JOHN DOE" # 1-50, Individually and
in their Official Capacity (the name John Doe being
fictitious, as the true names are presently unknown),

                        Defendants.

---------------------------------------------------------------X

**AMENDED RULE 56.1
STATEMENT**

Civil Action No.:
10 CIV 6005 (RWS)

**JURY TRIAL DEMANDED**

      Defendant JAMAICA HOSPITAL MEDICAL CENTER ("Jamaica Hospital"), by its

attorneys, Martin Clearwater & Bell LLP, submits the following statement of material facts

2433545_1

pursuant to Local Rule 56.1 of the United States District Court for the Southern District of New York in support of its motion for summary judgment. All citations to Exhibits A through KK are annexed to the Declaration of Gregory J. Radomisli filed on January 5, 2015 in support of the motion. A copy of Exhibit LL is attached to the Declaration of Gregory J. Radomisli filed on January 30, 2015.

1. On October 31, 2009, the plaintiff was employed as a police officer in the New York Police Department ("NYPD") (Exhibit K, p. 23).

2. Defendant Jamaica Hospital is a not-for-profit hospital (Exhibit FF, p. 40) (Exhibit LL, ¶17).

3. In 2009, defendant Jamaica Hospital had a mental health clinic, a psychiatric emergency department, and two psychiatric inpatient units (Exhibit FF, p 14).

4. In October 2009, codefendant Dr. Lilian Aldana-Bernier was an attending physician at Jamaica Hospital (Exhibit W, p. 18), and was the director of the psychiatric emergency room at Jamaica Hospital (Exhibit W, p. 20).

5. In October 2009, codefendant Dr. Isak Isakov was an attending physician at Jamaica Hospital (Exhibit X, p. 23).

6. In October and November 2009, non-party Dr. Khin Mar Lwin was a physician in the first year of her residency at Jamaica Hospital (Exhibit V, pp. 8-9).

7. In April 2009, the plaintiff was referred to Dr. Catherine Lamstein, a psychologist who worked at the New York City Police Department, because he was suffering from "psychological issues" (Exhibit M, pp. 84 and 102).

8. Those issues stemmed from the plaintiff's "anxiety secondary to the stress on the job" (*Id.,* p. 87).

2

9.      Dr. Lamstein evaluated the plaintiff and recommended cognitive behavioral therapy (*Id.*, p. 106).

10.      Dr. Lamstein also recommended that the plaintiff see a psychiatrist for an evaluation because two previous doctors had prescribed him psychiatric medication, one of which was an antipsychotic. (*Id.*, pp. 113, 149).

11.      The plaintiff was placed on restricted duty, and he was compelled to surrender his firearms (*Id.*, pp. 208, 289).

12.      On October 31, 2009, the plaintiff was working at the 81st Precinct, and was assigned to work as the telephone switchboard operator (Exhibit K, p. 112).

13.      The plaintiff left work early on October 31, 2009, but he failed to obtain the requisite permission necessary to leave work early, thereby failing to follow required police procedure (Exhibit O, pp. 235-236) (Exhibit K, p. 121) (Exhibit N, pp. 68, 73).

14.      The plaintiff dropped a sick report on the lap of the precinct's Desk Sergeant, Sergeant Rasheena Huffman, walked away, and left the precinct  (*Id.*, p. 73).

15.      Upon leaving work early on October 31, 2009, plaintiff went to his apartment (Exhibit K, p. 126), which was on the second floor of his apartment building (Exhibit K, p. 28).

16.      A number of his fellow officers began an investigation into his absence and arrived at his residence (Exhibit O, pp. 237 and 289-290) (Exhibit K, p. 132) (Exhibit P, p. 238).

17.      Upon arriving at the plaintiff's apartment, the police officers knocked on the plaintiff's door, but the plaintiff did not answer (Exhibit Q, p. 101).

18.      The officers became worried about the plaintiff's well-being (*Id.*, pp. 111-112).

3

19.     The plaintiff's fellow officers had tried calling his cellular telephone throughout the day but the plaintiff never answered the phone calls (Exhibit O, p. 288).

20.     The officers ultimately remained at the plaintiff's residence for approximately four hours (Exhibit Q, p. 104).

21.     They would occasionally knock on his door, but the plaintiff continued to not answer (*Id.* p. 104) (Exhibit O, p. 290).

22.     At one point, the plaintiff's landlord told the officers that he believed the plaintiff was inside his apartment because he could hear him moving (Exhibit Q, p. 104).

23.     The officers also noticed that the plaintiff's television set was on (*Id.*, p. 105).

24.     An ambulance was called to the scene (*Id.*, p. 119)

25.     The officers entered his apartment, where they found the plaintiff lying on his bed (Exhibit R, pp. 142-143).

26.     The plaintiff complained he was sick and that his stomach hurt (Exhibit P, p. 262) (Exhibit S, pp. 110-111).

27.     He was examined by an Emergency Medical Service Crew member (Exhibit S, p. 109), and it was recommended that he go to the hospital (Exhibit S, p. 114) (Exhibit Q, p. 164) (Exhibit R, p. 166) because he had high blood pressure (Exhibit R, p. 166) (Exhibit S, pp. 95 and 113) (Exhibit T, p. 96).

28.     The plaintiff agreed to go to the hospital and voluntarily walked to the ambulance, which was located on the street outside his apartment (Exhibit R, p. 166) (Exhibit S, p. 161).  Upon reaching the ambulance, the plaintiff turned around and returned to his second floor apartment (Exhibit S, p. 130) (Exhibit R, p. 177).

4

29.     A number of officers, including Chief Marino, followed the plaintiff back into his apartment (Exhibit P, pp. 287-288) (Exhibit K, p. 155).

30.     The EMS personnel remained by the ambulance, and did not enter the plaintiff's apartment again (Exhibit S, p. 193) (Exhibit T, pp. 114 and 118-119).

31.     The plaintiff refused medical attention (Exhibit K, p. 149) (Exhibit R, p. 177).

32.     Chief Marino then ordered the plaintiff to be handcuffed and transported to the hospital because he believed the plaintiff was an emotionally disturbed person (Exhibit P, p. 301) (Exhibit K, p. 155) (Exhibit R, pp. 186-187).

33.     The plaintiff was handcuffed and transported to the ambulance on a medical chair, where he was then placed on a stretcher in the ambulance (Exhibit K, p. 164) (Exhibit S, p. 196).

34.     The plaintiff was transported by ambulance to Jamaica Hospital (Exhibit Q, p. 185) (Exhibit K, pp. 180-181) (Exhibit L, p. 335).

35.     The plaintiff remained in handcuffs and was accompanied by NYPD Lieutenant Christopher Broschart (Exhibit L, pp. 335-336 and 341)

36.     The plaintiff arrived at Jamaica Hospital Medical Emergency Department, and was triaged at approximately 11:03 p.m. on October 31, 2009 (Exhibit U, p. 17).

37.     The records state that "EMS said the patient was behaving irrationally" (Exhibit U, p. 13).

38.     Plaintiff remained handcuffed upon his arrival at Jamaica Hospital (Exhibit L, p. 337).

39.     The plaintiff was examined and laboratory tests were taken (Exhibit U, pp. 13-14).  In addition, a CT Scan was ordered (Exhibit U, p. 115).

2433545_1

40.     No physical problems were found, other than erythematous impressions on both wrists (Exhibit U, p. 13).

41.     At 12:03 a.m. on November 1, Dr. Silas Nwaishieny examined the plaintiff and requested a psychiatric consultation (Exhibit U, pp. 13-14).

42.     Dr. Khin Mar Lwin, a psychiatric resident, performed the psychiatric consultation, which had been requested because the plaintiff had been acting "bizarre" (Exhibit U, pp. 4-6).

43.     According to the note, the plaintiff told Dr. Lwin that he was "worried about the situation" (Exhibit U, pp. 4-6).  He told her that "this is happening" because he had been discussing the internal affairs of the police department with his superiors and the Police Commissioner, that his supervisors were hiding information about robbery and assault cases to improve their statistics for their own advancement, that he has "documentation" about "this crime," and that he has been reporting his supervisors' actions for the past year (*Id.*).

44.     The NYPD officers who remained with the plaintiff at that time informed Dr. Lwin of the plaintiff's history and the events that occurred throughout the day, and said that that the plaintiff had left work early "after getting agitated and cursing [his] supervisor" (Exhibit U, pp. 4-6).

45.     Dr. Lwin was also told that the plaintiff had "barricaded himself" in his apartment, which required the NYPD to break the door down, and that the plaintiff had initially agreed to go to the Hospital for evaluation, but that once he was outside his house, he began to run, after which a chase ensued, and he was brought to the ED in handcuffs (Exhibit U, pp. 4-6) (Exhibit V, p. 45).

6

2433545_1

46.     Dr. Lwin was also advised that the plaintiff had previously been evaluated by an NYPD psychologist and that as a result, the plaintiff has not carried a gun or a badge for almost a year (Exhibit U, pp. 4-6).

47.     Dr. Lwin noted that while the plaintiff was in the ED before Dr. Lwin saw him, the plaintiff had become agitated, uncooperative and verbally abusive due to a discussion about using the telephone, and that he had told his treating physician that "they are all against me" (Exhibit U, pp. 4-6).

48.     Dr. Lwin performed a mental status examination and determined that the plaintiff was coherent and relevant, with goal-directed speech (Exhibit U, p. 5).   He was irritable with appropriate affect (*Id.*).

49.     Dr. Lwin noted that the plaintiff denied suicidal and homicidal ideation, but that he was "? paranoid about his supervisors" (Exhibit U, pp. 4-6).

50.     Dr. Lwin determined that the plaintiff's memory and concentration were intact, that he was alert and oriented, but that his insight and judgment were impaired (Exhibit U, p. 6).

51.     Dr. Lwin diagnosed the plaintiff with a Psychotic Disorder, Not Otherwise Specified ("NOS") (Exhibit U, p. 6).

52.     Dr. Lwin recommended continued one-to-one observation due to the plaintiff's unpredictable behavior and escape risk (Exhibit U, p. 6.).

53.     Dr. Lwin also recommended that the plaintiff be transferred to the Psychiatric Emergency Room for further observation after he was medically cleared (Exhibit U, p. 6.) (Exhibit V, p. 47).

54.    Dr. Indira Patel, a psychiatric attending physician, confirmed Dr. Lwin's diagnosis and treatment recommendations (Exhibit V, p. 47). A 6:30 a.m. note indicates that Dr. Lwin discussed the case with the attending physician, and that he concurred with the diagnosis and treatment recommendations (*Id.*) (Exhibit U, pp. 4-6) (Exhibit BB, p. 37).

55.    The plaintiff himself expressed that he had no complaints with regard to the care and treatment rendered by Dr. Lwin (Exhibit L, p. 497).

56.    As the attending physician in charge of the plaintiff at this time, Dr. Patel had the ultimate responsibility and was the decision-maker with regard to the plaintiff's care (Exhibit V, pp. 39-41 and 47) (Exhibit W, pp. 320-321).  Dr. Lwin, as the resident, could not make a decision with regards to the plaintiff's care without the approval of the attending physician (Exhibit V, pp. 39-41 and 476) (Exhibit W, pp. 320-321).

57.    At 6:56 a.m., Dr. Nwaishienyi indicated that the plaintiff would be transferred to the Psychiatric Emergency Department (Exhibit U, p. 14).

58.    Plaintiff's chart from the Medical Emergency Department indicates that the physicians thought that the plaintiff had been arrested (Exhibit U, pp. 4 and 13) (Exhibit V, p. 43).

59.    Sgt. Shantell James was afraid of the plaintiff while he was in the Medical Emergency Department (Exhibit GG, p. 77-78).

60.    The plaintiff testified that he believed he had been arrested (Exhibit L, pp. 453-454).

61.    On November 1, 2009 at 6:58 a.m., the Psychiatric Emergency Department was made aware that the plaintiff would be transferred from the Medical Emergency Department (Exhibit U, p. 16).

8

62.     The Jamaica Hospital chart indicates that the plaintiff was admitted to the Psychiatric Emergency Department under Dr. Aldana-Bernier's service on November 1, 2009, at 8:54 a.m. (Exhibit U, pp. 59-63).

63.     The plaintiff testified that he was transferred to the Psychiatric Emergency Department on November 1, 2009, early Sunday morning (Exhibit L, p. 345).

64.     The plaintiff testified that his handcuffs were removed when he was transferred to the Psychiatric Emergency Department (Exhibit L, p. 345).

65.     A Psychiatric Nursing Assessment Form was completed in the Psychiatric Emergency Department on November 1, 2009 at 9:00 a.m. (Exhibit U, pp. 61-63).

66.     Dr. Khwaja Khusro Tariq, a resident physician, performed a psychiatric consultation in the Psychiatric Emergency Department at 12:00 p.m. (Exhibit U, pp. 74-79).

67.     It is documented that the plaintiff had been brought to the ED because he had been "deemed to be paranoid and a danger to himself by his police sergeant" (Exhibit U, pp. 74-79).  Contusions were noted on the plaintiff's arms, but he was cooperative, with clear, spontaneous and relevant speech (Exhibit U, pp. 74-79).

68.     The plaintiff also expressed paranoid/persecutory delusions and paranoid thoughts (Exhibit U, pp. 74-79).

69.     The plaintiff told Dr. Tariq the he has been reporting irregularities at work to Internal Affairs for over a year, that his supervisors had been under-reporting crime statistics to advance their careers, that he had documentary proof thereof, and that, as a result, he was being "persecuted" (Exhibit U, pp. 74-79).

70.     The NYPD officer who remained with the plaintiff told Dr. Tariq that the plaintiff had been acting bizarre (Exhibit U, pp. 74-79).

9

2433545_1

71.     Dr. Tariq stated that the plaintiff was cooperative, but that he was angry, with constricted affect (Exhibit U, pp. 74-79).

72.     Dr. Tariq noted that the plaintiff had paranoid and persecutory delusions because he believed that he was being persecuted for having reported his supervisors' irregularities and corruptive behavior (Exhibit U, pp. 74-79).

73.     Dr. Tariq also determined that the plaintiff had poor insight and judgment (Exhibit U, pp. 74-79).

74.     Dr. Tariq diagnosed the plaintiff as suffering from Psychosis, NOS, Rule Out Schizophrenia, Paranoid Type (Exhibit U, pp. 74-79).

75.     At 1:40 p.m., Dr. Tariq wrote an Order for a head CT to be performed (Exhibit U, p. 82)

76.     At 15:38 and at 5:54, it was noted that the plaintiff had spoken with his father on the telephone (Exhibit U, p. 82).

77.     On November 2, 2009, the plaintiff was examined by Dr. Heron, who noted that the plaintiff had been taken to the Hospital because the NYPD thought he was paranoid and was a danger to himself (Exhibit U, pp. 64-67).

78.     The plaintiff's head CT was read as normal, per the 11/2/09 10:45 a.m. CT report (Exhibit U, p. 115).

79.     After the plaintiff was transferred to the Psychiatric ED, codefendant Dr. Lilian Aldana-Bernier took over his care as the attending psychiatrist while he was in the Psychiatric ED prior to his admission to the psychiatric unit (Exhibit W, p. 322).

2433545_1

80.     As the plaintiff's attending, Dr. Aldana-Bernier supervised the residents who evaluated the plaintiff in the Emergency Room prior to admission, as she had the ultimate responsibility to care for the plaintiff during her shift (Exhibit W, pp. 320-321).

81.     Dr. Aldana-Bernier determined that the plaintiff was a danger to himself because he was psychotic and paranoid, and would benefit from in-patient stabilization (Exhibit U, pp. 57-58) (Exhibit W, pp. 198 and 217).

82.     Dr. Aldana-Bernier indicated that she agreed with the previous evaluation by resident Dr. Tariq (Exhibit U, pp. 57-58) (Exhibit W, pp. 167 and 193).

83.     On November 3, 2009 at 1:20 p.m., codefendant Dr. Lilian Aldana-Bernier completed the Emergency Admission Form pursuant to Mental Hygiene Law §9.39 (Exhibit U, pp. 57-58).

84.     Dr. Aldana-Bernier made the decision to admit the patient to the psychiatric unit of Jamaica Hospital (Exhibit U, pp. 57-58) (Exhibit W, p. 107) (Exhibit X, pp. 222-223).

85.     Dr. Aldana-Bernier provided the plaintiff with written notice of his notice of his status and rights as an admitted patient on November 3, 2009 (Exhibit U, p. 55) (Exhibit W, p. 222).

86.     On November 4, 2009, codefendant Dr. Isak Isakov co-signed the Emergency Admission Form that was previously completed by Dr. Aldana-Bernier (Exhibit U, p. 58).

87.     Also on November 4, 2009, Dr. Isakov wrote the psychiatric admission note (Exhibit U, pp. 94-95).

88.     To obtain the information for the basis of his note, Dr. Isakov spoke to a social worker who previously evaluated the plaintiff, spoke to the plaintiff's father, and evaluated the plaintiff himself (Exhibit X, pp. 144-145).

2433545_1

89.   Dr. Isakov noted that the plaintiff told him that he had not been happy with how the police department was being run since his career started, that he had made multiple complaints which had not been addressed, and that, instead, he was "'declared' emotionally 'unstable'" (Exhibit U, p. 94).

90.   The plaintiff told Dr. Isakov that his gun had been taken away from him after a psychiatric evaluation was performed by an NYPD psychologist, and that, since then, he has started to collect the "evidence" to "prove his point," but then he became suspicious that "they are after him" (Exhibit U, p. 94).

91.   Dr. Isakov found the plaintiff to be suspicious, guarded, restless, and demanding to be discharged (Exhibit U, p. 95).

92.   The plaintiff denied suicidal and homicidal ideation, but Dr. Isakov noted that the plaintiff expressed questionably paranoid ideas about conspiracies and cover-ups in his precinct (Exhibit U, p. 95).

93.   Dr. Isakov noted that the plaintiff's cognition and memory were intact, but that his judgment and insight were limited (Exhibit U, p. 95).

94.   Dr. Isakov's diagnosis was Psychosis NOS, Rule Out Adjustment Disorder with Anxiety (Exhibit U, p. 95).

95.   On November 5, 2009, Dr. Isakov performed an evaluation of the plaintiff (Exhibit U, pp. 97-98).

96.   Dr. Isakov noted that although the plaintiff "reiterated his story" and still wanted "to take steps/action against his precinct," he did not express any physical threats to anyone (Exhibit U, pp. 97-98).

97.     The plaintiff refused to give permission for anyone at Jamaica Hospital to speak with the police psychiatrist who had previously evaluated him, but he agreed to see a psychotherapist after he was discharged (Exhibit U, pp. 97-98).

98.     On November 6, 2009, Dr. Isakov performed an evaluation of the plaintiff (Exhibit U, p. 99).

99.     Dr. Isakov noted that the plaintiff was compliant, was not in emotional distress, and was not expressing any paranoid ideation or making any threats (Exhibit U, p. 99).

100.    Dr. Isakov indicated that the plaintiff would be discharged after an appointment was made with an outside psychiatrist (Exhibit U, p. 99).

101.    Dr. Isakov composed the plaintiff's Discharge Summary (Exhibit U, pp. 41-42).

102.    Dr. Isakov discharged the plaintiff with a recommendation to follow up with a psychotherapist and, if he became symptomatic, to see a psychiatrist for medication (Exhibit U, pp. 41-42).

103.    Dr. Isakov's discharge diagnosis was Adjustment Disorder with Anxious Mood (Exhibit U, pp. 41-42).

104.    The plaintiff verbalized an understanding of the recommendation and was discharged on his own on November 6, 2009 (Exhibit U, p. 43).

105.    After his discharge from Jamaica Hospital on November 6, the plaintiff treated on only one occasion with private physician Dr. Steven Luell (Exhibit L, p. 417) (Exhibit U, p. 46) (Exhibit Y, p. 1).

106.    According to Dr. Luell's report, the plaintiff complained of stomach distress, anxiety, difficulty relaxing and insomnia, and his mood was depressed (Exhibit Y, p. 1).

13

2433545_1

107.    Dr. Luell diagnosed the plaintiff with Adjustment Disorder with Mixed Emotional Features, Rule Out Obsessive Compulsive Personality Disorder, and recommended that the plaintiff undergo a comprehensive psychiatric evaluation and counseling (Exhibit Y, pp. 1-2).

108.    The plaintiff did not follow those recommendations (Exhibit L, p. 417).

109.    The Policies and Procedures regarding restraints are from the Policy and Procedure Manual from the Psychiatric Emergency Department of Jamaica Hospital (Exhibit HH, p. 1).

110.    A physician in the Medical Emergency Department has authority to keep a patient under observation (Exhibit II, p. 153).

111.    The written policy of Jamaica Hospital Medical Center contains language regarding the criteria for involuntary hospitalization that is identical to the language in the Mental Hygiene Law (Exhibits NN and II).

112.    Deputy Chief Michael Marino never spoke to any personnel from Jamaica Hospital, including anyone who treated the plaintiff (Exhibit P, pp. 410-411).

113.    Capt. Theodore Lauterborn never spoke to any personnel from Jamaica Hospital, including doctors and nurses (Exhibit O, pp. 335-336).

114.    Lt. Timothy Caughey never spoke to any personnel from Jamaica Hospital, about the plaintiff (Exhibit MM, p. 4).

115.    Deputy Inspector Steven Mauriello did not have any contact with or speak to anyone, including doctors and nurses, at Jamaica Hospital (Exhibit MM, pp. 4-5).

116.    Sgt. Rasheena Huffman never spoke to anyone at Jamaica Hospital regarding the plaintiff (Exhibit N, pp. 174-175).

14

117.    Lt. Elise Hanlon never spoke with or had contact with any doctors, nurses or anyone else at Jamaica Hospital (Exhibit S, pp. 270-271).

118.    Capt. Timothy Trainor never spoke to anyone at Jamaica Hospital about the plaintiff (Exhibit MM, p. 6).

119.    Lt. William Gough never spoke with anyone at Jamaica Hospital regarding the plaintiff (Exhibit R, pp. 65-74).

120.    Lt. Steven Weiss never went to Jamaica Hospital and never directed anyone to say anything to anyone at Jamaica Hospital (Exhibit MM, pp. 8-9).

121.    Sgt. Kurt Duncan never had any contact with anyone at Jamaica Hospital (Exhibit MM, p. 9).

122.    Lt. Christopher Broschart did not give instructions to anyone at Jamaica Hospital as to what to do with plaintiff (Exhibit Q, pp. 260-261).

123.    Lt. Broschart testified that until a physician evaluated the plaintiff, he was in police custody (Exhibit Q, p. 192).

2433545_1

124.   Sgt. Shantel James denied having had any contact with anyone at Jamaica Hospital (Exhibit MM, pp. 10-11).

Dated:        New York, New York
              January 30, 2015

                                        Yours, etc.,

                                        MARTIN CLEARWATER & BELL LLP

                                        By: _____
                                              Gregory J. Radomisli (GJR – 2670)
                                        A Member of the Firm
                                        Attorneys for Defendant
                                        JAMAICA HOSPITAL MEDICAL CENTER
                                        220 East 42nd Street
                                        New York, New York 10017-5842
                                        (212) 697-3122

2433545_1

16