GJR/DA
82-82153

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

Plaintiff,

-against-

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
MARINO, Tax *Id.* 873220, Individually and in his Official
Capacity, ASSISTANT CHIEF PATROL BOROUGH
BROOKLYN NORTH GERALD NELSON, Tax *Id.* 912370,
Individually and in his Official Capacity, DEPUTY
INSPECTOR STEVEN MAURIELLO, Tax *Id.* 895117,
Individually and in his Official Capacity CAPTAIN
THEODORE LAUTERBORN, Tax *Id.* 897840, Individually
and in his Official Capacity, LIEUTENANT JOSEPH GOFF,
Tax *Id.* 894025, Individually and in his Official Capacity, SGT.
FREDERICK SAWYER, Shield No. 2576, Individually and in
his Official Capacity, SERGEANT KURT DUNCAN, Shield
No. 2483, Individually and in his Official Capacity,
LIEUTENANT CHRISTOPHER BROSCHART, Tax *Id.*
915354, Individually and in his Official Capacity,
LIEUTENANT TIMOTHY CAUGHEY, Tax *Id.* 885374,
Individually and in his Official Capacity, SERGEANT
SHANTEL JAMES, Shield No. 3004, AND P.O.'s "JOHN
DOE" #1-50, Individually and in their Official Capacity (the
name John Doe being fictitious, as the true names are presently
unknown) (collectively referred to as "NYPD defendants"),
JAMAICA HOSPITAL MEDICAL CENTER, DR. ISAK
ISAKOV, Individually and in his Official Capacity, DR.
LILIAN ALDANA-BERNIER, Individually and in her Official
Capacity and JAMAICA HOSPITAL MEDICAL CENTER
EMPLOYEE'S "JOHN DOE" # 1-50, Individually and in their
Official Capacity (the name John Doe being fictitious, as the
true names are presently unknown),

Defendants.

-------------------------------------------------------------------------------X

10 CIV 6005 (RWS)

**AMENDED MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**BY DEFENDANT JAMAICA HOSPITAL MEDICAL CENTER**

Of Counsel:   Gregory J. Radomisli (GJR- 2670)
              Brian Osterman (BO- 5881)

2461667_1

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

PROCEDURAL HISTORY .......................................................................1

STATEMENT OF PERTINENT FACTS AS TO JAMAICA HOSPITAL.....................2

STANDARD FOR SUMMARY JUDGMENT...............................................11

ARGUMENT

JAMAICA HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT
ON PLAINTIFF'S §1983 CLAIMS

      A.    Jamaica Hospital Medical Center cannot be subject
            to direct liability under 42 USC §1983

            1.    Jamaica Hospital Medical Center is not a "person." ................12

            2.    Lack of State Action.....................................................12

      B.    Jamaica Hospital Is Entitled to Summary Judgment
            On Plaintiff's Tenth Claim for Relief

            1.    Vicarious Liability......................................................16

                 a.    An Official Policy................................................. 17

                 b.    The direction of a policymaker.................................17

                 c.    A widespread custom............................................18

      C.    Jamaica Hospital Is Entitled to Summary Judgment
            On Plaintiff's Eight Claim for Relief Alleging
            Conspiracy to Violate Plaintiff's Civil Rights.................................20

POINT II

PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION
DIRECTLY AGAINST JHMC FOR MEDICAL MALPRACTICE...........................21

POINT III

DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT
ON PLAINTIFF'S CAUSE OF ACTION FOR MEDICAL MALPRACTICE
BECAUSE PLAINTIFF HAS NOT DEMONSTRATED AN ISSUE OF FACT

A.   Defendant has met its burden demonstrating
     that there are no issues of fact……………………………………….24

B.   Plaintiff's Experts' Reports are Insufficient
     to Rebut JHMC's *Prima Facie* Showing
     That It Is Entitled to Summary Judgment

     1.   Plaintiff's Experts Do Not Contend that the Jamaica
          Hospital Staff's Acts  and/or Omissions were
          "Substantially Below" Medical Standards………………………25

     2.   Dr. Lubit's Report and Opinion are Inadequate
          Because Dr. Lubit Does Not Establish the
          Standard of Care……………………………………………….27

     3.   Dr. Halpren-Ruder's Report and Opinion are
          Inadequate……………………………………………………….32

          a.   Services Provided by the EMTs…………………………33

          b.   Treatment at Jamaica Hospital……………………...…36

POINT IV

PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION
FOR FALSE ARREST OR FALSE IMPRISONMENT

A.   Plaintiff's Claim Must Be Dismissed Because
     Plaintiff Cannot Demonstrate that JHMC
     Committed Medical Malpractice………………………………………37

B.   Plaintiff's Detention was Otherwise Privileged…………………………39

POINT V

PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION
FOR NEGLIGENT HIRING, TRAINING OR SUPERVISION…………………………41

POINT VI

PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION
FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

    A.    Plaintiff Cannot Satisfy the Elements to State a Claim
for Intentional Infliction of Emotional Distress...............................43

    B.    Plaintiff's Cause of Action for Intentional Infliction of
Emotional Distress is Duplicative, and Should Therefore
Be Dismissed...........................................................................45

CONCLUSION.....................................................................................47

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted on behalf of defendant JAMAICA HOSPITAL MEDICAL CENTER in support of its motion for an Order dismissing plaintiff's Third Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PROCEDURAL HISTORY

Plaintiff filed a Summons and Complaint in the United States District Court, Southern District of New York, on or about August 10, 2010 (Exhibit A).[1]  Issue was joined by service and filing of a Verified Answer on behalf of defendant JAMAICA HOSPITAL MEDICAL CENTER ("JHMC" or "Jamaica Hospital") on September 7, 2010 (Exhibit B).  On or about September 12, 2010, plaintiff filed an Amended Summons and Complaint (Exhibit C).  On October 6, 2010, Jamaica Hospital filed a Verified Answer to the Amended Complaint (Exhibit D).

On October 12, 2010, Jamaica Hospital filed a motion to dismiss plaintiff's Amended Complaint  pursuant to Rules 8(a)(2), 12(b)(1), 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure with an accompanying Memorandum of Law (Exhibit E).  On May 5, 2011, this Court issued its Opinion on Jamaica Hospital's motion, dismissing all federal claims against Jamaica Hospital, finding that plaintiff failed to state a claim against Jamaica Hospital pursuant to 42 USC §1983 (Exhibit F).   This Court decided to exercise supplemental jurisdiction over the plaintiff's state- law claims against Jamaica Hospital (Exhibit F).

On October 1, 2012, plaintiff filed a Second Amended Complaint (Exhibit G). On October 15, 2012, Jamaica Hospital filed a Verified Answer to the Second Amended

---

[1] Exhibits "A" through "KK" were attached to the Declaration of Gregory J. Radomisli filed on January 5, 2015.  A copy of Plaintiff's Third Amended Complaint is attached as Exhibit "LL" to the January 30, 2015 Declaration of Gregory J. Radomisli.

Complaint (Exhibit H).

Following discovery, plaintiff moved to file a Third Amended Complaint, and this Court granted plaintiff's motion, allowing plaintiff to allege violations of 42 U.S.C. §1983 as against Jamaica Hospital. The Court also allowed the defendants to submit revised motions for summary judgment to address the allegations in plaintiff's Third Amended Complaint, attached to the January 30, 2015 Declaration of Gregory J. Radomisli as Exhibit LL.

Plaintiff's Third Amended Complaint asserts the following claims for relief against JHMC: Involuntary Confinement under 42 USC §1983 (Exhibit LL, ¶¶282-287), Conspiracy to Violate Plaintiff's Civil Rights under 42 USC §1983 (Exhibit LL, ¶¶288-292), Violation of Substantive and Procedural Due Process under 42 USC §1983 (Exhibit LL, ¶¶293-300), "Municipal Liability" under 42 USC §1983 (Exhibit LL, ¶311), as well as state-law causes of action sound in false imprisonment/false arrest (Exhibit LL, ¶¶327-336), intentional infliction of emotional distress (Exhibit LL, ¶¶337-345), medical malpractice (Exhibit LL, ¶¶362-365), and negligent hiring, training and supervision (Exhibit LL, ¶¶366-369).

On October 29, 2014, this Court ordered that all summary judgment motions be served by December 22, 2014 (Exhibit I), which was then superseded by this Court's January 16, 2015 Order, allowing the parties one week from the filing of the Third Amended Complaint to serve motions addressing the allegations therein. On November 4, 2014, this Court granted Jamaica Hospital's request allowing it to submit an additional 25 pages to its Memorandum of Law in support of its summary judgment motion (Exhibit J).

### STATEMENT OF PERTINENT FACTS AS TO JAMAICA HOSPITAL

At all relevant times, the plaintiff was a police officer in the New York Police Department ("NYPD") assigned to the 81st Precinct (Exhibit K, p. 23). In April 2009, he was referred to NYPD psychologist Dr. Catherine Lamstein for a psychological evaluation

because he was suffering from "psychological issues" (Exhibit M, pp. 84 and 102).  Those issues stemmed from the plaintiff's "anxiety secondary to the stress on the job" (*Id.,* p. 87).

Dr. Lamstein evaluated the plaintiff and recommended cognitive behavioral therapy (*Id.,* p. 106).  She also recommended that the plaintiff see a psychiatrist for an evaluation because two previous doctors had prescribed him psychiatric medication, one of which was an antipsychotic. (*Id.,* pp. 113, 149).  The plaintiff was placed on restricted duty, and he was compelled to surrender his firearms (*Id.,* pp. 208, 289).  The plaintiff continued to treat with Dr. Lamstein on multiple occasions through October 2009 (*Id.,* p. 61).

On October 31, 2009, the plaintiff was working at the 81st Precinct, and was assigned to work as the telephone switchboard operator (Exhibit K, p. 112).  He left work early on October 31, 2009, but he failed to obtain the requisite permission necessary to leave work early, thereby failing to follow required police procedure (Exhibit O, pp. 235-236) (Exhibit K, p. 121) (Exhibit N, pp. 68, 73).  Instead, he dropped a sick report on the lap of the precinct's Desk Sergeant, Sergeant Rasheena Huffman, walked away, and left the precinct (*Id.,* p. 73).

After leaving the precinct, he went to his apartment, which was on the second floor of his building (Exhibit K, pp. 126, 28).  A number of the plaintiff's fellow officers began an investigation into his absence, and went to the plaintiff's residence (Exhibit O, pp. 237, 289-90) (Exhibit K, pg. 132) (Exhibit P, p. 238).

Upon arriving at the plaintiff's apartment, the police officers knocked on the plaintiff's door, but the plaintiff did not answer (Exhibit Q, p. 101).  The officers became worried about the plaintiff's well-being (*Id.,* pp. 111-112).  His fellow officers had tried calling his cellular telephone throughout the day but the plaintiff never answered the phone calls (Exhibit O, p. 288).  The officers ultimately remained at the plaintiff's residence for approximately four

hours (Exhibit Q, p. 104).   They would occasionally knock on his door, but the plaintiff continued to not answer (*Id.* p. 104) (Exhibit O, p. 290).   At one point, the plaintiff's landlord told the officers that he believed the plaintiff was inside his apartment because he could hear him moving (Exhibit Q, p. 104).   The officers also noticed that the plaintiff's television set was on (*Id.*, p. 105).   An ambulance was called to the scene (Id., p. 119)

Eventually, the officers entered the plaintiff's apartment, where they found the plaintiff lying on his bed (Exhibit R, pp. 142-143).   He complained he was sick (Exhibit P, 262) (Exhibit S, p. 111).   He was examined by Salvatore Sanginetti, a member of Emergency Medical Services (*Id.*, p. 109) (Exhibit T, p. 88).   The plaintiff's blood pressure was elevated (*Id.*, p. 96).   He also complained that his stomach hurt, and that he was not feeling well (Exhibit S, p. 110).   Because the plaintiff's elevated blood pressure constituted an emergency situation (Exhibit T, p. 96), it was recommended that he go to the hospital (Exhibit S, p. 114) (Exhibit T, pp. 96-97) (Exhibit Q, p. 164) (Exhibit R, p. 166).

The plaintiff agreed to go to the hospital, and voluntarily walked to the ambulance, which was located on the street outside his apartment (Exhibit R, p. 166) (Exhibit S, p. 161). However, he subsequently changed his mind, turned around, and returned to his second floor apartment (Exhibit S, 130) (Exhibit R, p. 177).

A number of officers, including codefendant NYPD Chief Michael Marino, followed the plaintiff into his apartment (Exhibit P, pp. 287-288) (Exhibit K, p. 155).   The EMS personnel remained by the ambulance, and did not enter the plaintiff's apartment again (Exhibit S, p. 193) (Exhibit T, pp. 114, 118-119).   Although the plaintiff refused medical attention (Exhibit K, p. 149) (Exhibit R, p. 177), Chief Marino ordered the plaintiff to be handcuffed and transported to the hospital because he believed the plaintiff was an

emotionally disturbed person ("EDP") (Exhibit P, p. 301) (Exhibit K, p. 155) (Exhibit R, pp. 186-187) (Exhibit Q, p. 162).  The plaintiff was handcuffed and transported to the ambulance on a medical chair, and then placed on a stretcher in the ambulance (Exhibit K, p. 164) (Exhibit S, p. 196).

The plaintiff was transported by the ambulance to Jamaica Hospital  (Exhibit Q, p. 185) (Exhibit K, pp. 180-181) (Exhibit L, p. 335).   He remained in handcuffs, and was accompanied by NYPD Lieutenant Christopher Broschart. (Exhibit L, pp. 335-336, 341) (Exhibit Q, p. 185).

The plaintiff arrived at the Jamaica Hospital Emergency Department ("ED"), and was triaged at approximately 11:03 p.m. on October 31, 2009 (Exhibit U, p. 17).  It was noted in the Emergency Department record that "EMS said patient was behaving irrationally"  (*Id.*). The plaintiff was examined and laboratory tests were performed (*Id.*, pp. 13-14).  No physical problems were found, aside from erythematous impressions on both wrists due to the handcuffs  (*Id.*, p. 13).

At 12:03 a.m. on November 1, Dr. Silas Nwaishienyi examined the plaintiff and requested a psychiatric consultation (*Id.,* pp. 13-14).   The psychiatric consultation was performed by Jamaica Hospital psychiatric resident Dr. Khin Mar Lwin (*Id.,* pp. 4-6). According to her 6:30 a.m. note, a psychiatric consult was requested because the plaintiff had been acting "bizarre" (*Id.,* p. 4).  The plaintiff told Dr. Lwin that he had been experiencing abdominal pain at work, and therefore went home (*Id.*).  He admitted to having taken NyQuil earlier that evening (*Id.*).  According to the note, the plaintiff told Dr. Lwin that he was "worried about the situation" (*Id.*)  He told her that "this is happening" because he had been discussing the internal affairs of the police department with his superiors and the Police

Commissioner, that his supervisors were hiding information about robbery and assault cases to improve their statistics for their own advancement, that he has "documentation" about "this crime," and that he has been reporting his supervisors' actions for the past year (*Id.*).

The NYPD officers who remained with the plaintiff at that time informed Dr. Lwin of the plaintiff's history and the events that occurred throughout the day, and said that that the plaintiff had left work early "after getting agitated and cursing [his] supervisor" (*Id.*).   Dr. Lwin was also told that the plaintiff had "barricaded himself" in his apartment, which required the NYPD to break the door down, and that the plaintiff had initially agreed to go to the Hospital for evaluation, but that once he was outside his house, he began to run, after which a chase ensued, and he was brought to the ED in handcuffs (*Id.*) (Exhibit V, p. 45).  Dr. Lwin was also advised that the plaintiff had previously been evaluated by an NYPD psychiatrist and that as a result, the plaintiff has not carried a gun or a badge for almost a year (Exhibit U, pp. 4-6).

Dr. Lwin noted that while the plaintiff was in the ED before Dr. Lwin saw him, the plaintiff had become agitated, uncooperative and verbally abusive due to a discussion about using the telephone, and that he had told his treating physician that "they are all against me" (*Id.*).

Dr. Lwin performed a mental status examination and determined that the plaintiff was coherent and relevant, with goal-directed speech (*Id.*, p. 5).  He was irritable with appropriate affect (*Id.*).  Dr. Lwin noted that the plaintiff denied suicidal and homicidal ideation, but that he was "? paranoid about his supervisors" (*Id.*).  Dr. Lwin determined that the plaintiff's memory and concentration were intact, that he was alert and oriented, but that his insight and judgment were impaired (*Id.*, p. 6).  Dr. Lwin diagnosed the plaintiff with a Psychotic

Disorder, Not Otherwise Specified ("NOS") (*Id.*).  She recommended continued one-to-one observation due to the plaintiff's unpredictable behavior and escape risk (*Id.*).  She also recommended that the plaintiff be transferred to the Psychiatric Emergency Room for further observation after he was medically cleared (*Id.*) (Exhibit V, p. 47).

A 6:30 a.m. note indicates that Dr. Lwin discussed the case with the attending physician, and that he concurred with the diagnosis and treatment recommendations (Exhibit U, pp. 4-6) (Exhibit V, p. 39).

A Psychiatric Nursing Assessment Form was completed in the Psychiatric Emergency Department on November 1, 2009 at 9:00 a.m.  (Exhibit U, pp. 61-63).  It is documented that the plaintiff had been brought to the ED because he had been "deemed to be paranoid and a danger to himself by his police sergeant" (*Id.*).  Contusions were noted on the plaintiff's arms, but he was cooperative, with clear, spontaneous and relevant speech (*Id.*).  However, he also expressed paranoid/persecutory delusions and paranoid thoughts (*Id.*).

Dr. Khwaja Khusro Tariq, a resident physician, performed a psychiatric consultation in the Psychiatric Emergency Department at 12:00 p.m. (*Id.*, pp. 74-79).  The plaintiff told Dr. Tariq the he has been reporting irregularities at work to Internal Affairs for over a year, that his supervisors had been under-reporting crime statistics to advance their careers, that he had documentary proof thereof, and that, as a result, he was being "persecuted" (*Id.*).  The NYPD officer who remained with the plaintiff told Dr. Tariq that the plaintiff had been acting bizarre (*Id.*).  Dr. Tariq stated that the plaintiff was cooperative, but that he was angry, with constricted affect (*Id.*).  He noted that the plaintiff had paranoid and persecutory delusions because he believed that he was being persecuted for having reported his supervisors' irregularities and corruptive behavior (*Id.*).  Dr. Tariq also determined that the plaintiff had

poor insight and judgment (*Id.*).  He diagnosed the plaintiff as suffering from Psychosis, NOS,

Rule Out Schizophrenia, Paranoid Type  (*Id.*).

Dr. Tariq ordered a CT scan to be performed on November 1, 2009 (*Id.*, p. 82).  On

November 2, 2009, the plaintiff was examined by Dr. Heron, who noted that the plaintiff had

been taken to the Hospital because the NYPD thought he was paranoid and was a danger to

himself (*Id.*, pp. 64-67).   The plaintiff's head CT was read as normal, per the November 2,

2009 10:45 a.m. CT report (*Id.*, p. 115).

On November 2, 2009, codefendant Dr. Lilian Aldana-Bernier took over the plaintiff's

care as the attending psychiatrist while he was in the Psychiatric ED prior to his admission to

the psychiatric unit (Exhibit W, p. 322).  As the plaintiff's attending physician, Dr. Aldana-

Bernier supervised the residents who evaluated the plaintiff in the Emergency Room prior to

admission, and she had the ultimate responsibility for the plaintiff's care during her shift

(Exhibit W, pp. 320-321).  Dr. Aldana-Bernier determined that the plaintiff was a danger to

himself because he was psychotic and paranoid, and that he would benefit from in-patient

stabilization (Exhibit U, pp. 57-58) (Exhibit W, pp. 198, 217).  She also noted that she had

agreed with the previous evaluations by the psychiatric residents (Exhibit U, pp. 57-58)

(Exhibit W, pp. 167, 193).

On November 3, 2009 at 1:20 p.m., codefendant Dr. Lilian Aldana-Bernier completed

the Emergency Admission Form pursuant to Mental Hygiene Law §9.39 (Exhibit U, pp. 57-

58). Dr. Aldana-Bernier thereby made the decision to admit the patient to the psychiatric unit

of Jamaica Hospital (*Id.*) (Exhibit W, p. 107) (Exhibit X, pp. 222-223).  She also provided the

plaintiff with written notice of his notice of his status and rights as an admitted patient to the

hospital (Exhibit U, p. 55) (Exhibit W, p. 222).

On November 4, 2009, codefendant Dr. Isak Isakov co-signed the Emergency Admission Form that was previously completed by Dr. Aldana-Bernier (Exhibit U, p. 58).

That same day, November 4, 2009, Dr. Isakov wrote the psychiatric admission note (Exhibit W, pp. 94-95). To obtain the information he documented in his note, Dr. Isakov spoke to a social worker who had previously evaluated the plaintiff, spoke to the plaintiff's father, and evaluated the plaintiff himself (Exhibit X, pp. 144-145). Dr. Isakov noted that the plaintiff told him that he had not been happy with how the police department was being run since his career started, that he had made multiple complaints which had not been addressed, and that, instead, he was "'declared emotionally 'unstable'" (Exhibit U, p. 94). The plaintiff told him that his gun had been taken away from him after a psychiatric evaluation was performed by an NYPD psychologist, and that, since then, he has started to collect the "evidence" to "prove his point," but then he became suspicious that "they are after him" (*Id.*). Dr. Isakov found the plaintiff to be suspicious, guarded, restless, and demanding to be discharged (*Id.*, p. 95). The plaintiff denied suicidal and homicidal ideation, but Dr. Isakov noted that the plaintiff expressed questionably paranoid ideas about conspiracies and cover-ups in his precinct (*Id.*). Dr. Isakov noted that the plaintiff's cognition and memory were intact, but that his judgment and insight were limited, and diagnosed the plaintiff with Psychosis NOS, Rule Out Adjustment Disorder with Anxiety (*Id.*).

On November 5, 2009, Dr. Isakov noted that although the plaintiff "reiterated his story" and still wanted "to take steps/action against his precinct," he did not express any physical threats to anyone (*Id.*, pp. 97-98). The plaintiff refused to give permission for anyone at Jamaica Hospital to speak with the police psychiatrist who had previously evaluated him, but he agreed to see a psychotherapist after he was discharged (*Id.*).

On November 6, 2009, Dr. Isakov noted that the plaintiff was compliant, was not in emotional distress, and was not expressing any paranoid ideation or making any threats (*Id.*, p. 99). He indicated that the plaintiff would be discharged after an appointment was made with an outside psychiatrist, and he verbalized the importance of receiving follow up care (*Id.*).

Dr. Isakov wrote a Discharge Summary, in which he wrote that after observation for a few days on the unit, the plaintiff did not exhibit any significant psychiatric symptoms which needed to be treated with medication (*Id.*, pp. 41-42). He discharged the plaintiff with a recommendation to follow up with a psychotherapist and, if he became symptomatic, to see a psychiatrist for medication (*Id.*). The discharge diagnosis was Adjustment Disorder with Anxious Mood (*Id.*). The plaintiff verbalized an understanding of the recommendation, and was discharged on November 6, 2009 (*Id.*, p. 43).

Plaintiff has conceded that he has included Jamaica Hospital in his lawsuit because it is his belief that if an "independent and objective evaluation" had been performed, he would have been discharged much sooner than November 6, 2009 (Exhibit L, pp. 516-517). The plaintiff also testified that the only physicians who failed to perform this independent and objective evaluation during the course of his treatment at Jamaica Hospital were codefendants Dr. Aldana-Bernier and Dr. Isakov (Exhibit L, p. 517).

Pursuant to the discharge instructions, the plaintiff presented to private physician Dr. Steven Luell on November 9, 2009 (Exhibit Y, p. 1). According to Dr. Luell's report, the plaintiff complained of stomach distress, anxiety, difficulty relaxing and insomnia, and his mood was depressed (*Id.*). He diagnosed the plaintiff with Adjustment Disorder with Mixed Emotional Features, Rule Out Obsessive Compulsive Personality Disorder, and

recommended that the plaintiff undergo a comprehensive psychiatric evaluation and counseling (*Id.*, pp. 1-2). The plaintiff did not follow those recommendations (Exhibit L, p. 417).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is mandated when "there is no genuine issue as to any material fact and. . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). If the moving party can point to the absence of evidence to support an essential element of the nonmoving party's claim, summary judgment should be granted. *See Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). It is then the non-moving party's burden to set forth specific facts raising a genuine issue of fact for trial. *United States ex rel. Romano v. N.Y. Presbyterian*, 426 F.Supp.2d 174 (S.D.N.Y. 2006). However, a party cannot avoid summary judgment "merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Kraft v. City of New York*, 696 F.Supp.2d 403, 412 (S.D.N.Y. 2010).

## **ARGUMENT**

### **JAMAICA HOSPITAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S §1983 CLAIMS**

A.    Jamaica Hospital Medical Center cannot be subject to direct liability under 42 USC §1983

    1.    Jamaica Hospital Medical Center is not a "person."

Plaintiff's Seventh and Ninth Claims for relief sound in, respectively, Involuntary Confinement under 42 USC §1983 (Exhibit LL, ¶¶282-287) and Violation of Substantive and Procedural Due Process under 42 USC §1983 (Exhibit LL, ¶¶293-300).

Section 1983 of Title 42 of the United States Code provides, in relevant part: "Every person who, under color of any statute. . .subjects or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights. . . secured by the Constitution and laws, shall be liable to the party injured." 42 USC §1983. Thus, a §1983 action can only be maintained against a "person" who has deprived another of his or her constitutional rights. *See e.g. Reynolds v. Darrah*, 2011 U.S.Dist. LEXIS 113621 (S.D.N.Y. September 30, 2011). As the Court noted in *Reynolds*, "Jails, courts, corporations and law firms are not 'persons' within the meaning of §1983." 2011 U.S.Dist. LEXIS 113621 at *3. In *Eng v. Bellevue Hospital*, 2014 U.S.Dist. LEXIS 160887 (S.D.N.Y. July 8, 2014), this Court dismissed plaintiff's claims against Bellevue Hospital because it found that "a hospital is not a 'person' under 42 U.S.C. §1983." 2014 U.S.Dist. LEXIS 160887 at *12. Because Jamaica Hospital cannot be subject to liability under 42 USC §1983, Jamaica Hospital is entitled to summary judgment.

    2.    Lack of State Action

To state a claim under §1983, a plaintiff must allege that: 1) a right secured to him by

the Constitution or federal law was violated; and 2) the alleged violation was committed by a person acting under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S.Ct. 977 (1999). Section 1983 does not create any rights, but merely provides "a procedure for redress for deprivation of rights [already] established." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). There is no question that involuntary confinement constitutes a significant deprivation of liberty, requiring due process protection. *See e.g. Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804 (1979).

Private conduct, however, "no matter how discriminatory or wrongful," is not controlled by §1983, *see        Am Mfrs., supra*, 526 U.S. at 50, except in limited situations where a "private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (*quoting Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764 [1982]). The conduct of private actors can be attributed to the state for Section 1983 purposes *only* if "1) the State compelled the conduct, 2) there is a sufficiently close nexus between the State and the private conduct, or 3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State." *Hogan v. A.O. Fox Memorial Hosp.*, 346 Fed. App'x 627, 629 (2d Cir. 2009).

In this case, plaintiff's §1983 claims against Jamaica Hospital are based upon plaintiff's contention that JHMC had an official policy that did not conform to the requirements of the Mental Hygiene Law ("MHL") and that as a result, the plaintiff was involuntarily hospitalized in violation of his due process rights. JHMC, in fact, did not have an official policy that did not conform with the Mental Hygiene Law. The JHMC policy and MHL §9.39 are, in fact, identical. This Court, however, need not reach a determination as to whether Jamaica Hospital did, in fact, have such a policy because, as in *Antwi v. Montefiore*

*Medical Center*, 2014 U.S.Dist. LEXIS 161904 (S.D.N.Y. November 18, 2014), "[t]he pivotal issue in this case is whether Defendants were state actors when they hospitalized . . . Plaintiff against [his] will." *Id.* at *16.

This Court, by Judge Robert W. Sweet, issued the seminal decision finding that private hospitals and physicians do not act under color of law when a patient is involuntarily hospitalized. *See Doe v. Rosenberg*, 996 F.Supp. 343 (S.D.N.Y. 1998), *aff'd* 166 F.3d 508 (2d Cir. 1999). The Second Circuit recently reaffirmed this position in *McGugan v. Aldana-Bernier*, 752 F.3d 224 (2d Cir. 2014); *see also Antwi v. Montefiore Medical Center, supra*, 2014 U.S.Dist. LEXIS 161904, *16 (S.D.N.Y. November 18, 2014) ("[I]t is well-settled in the Second Circuit that a private hospital confining a patient under the New York MHL is not acting under color of state law"). As the *Antwi* Court noted, "[I]n numerous §1983 cases involving private hospitals and health care professionals, Southern District courts have found that none of the three tests for state action—'state compulsion,' 'public function,' and 'close nexus'—are satisfied." 2014 U.S.Dist. LEXIS 161904 at *17-18; *see also Amofa v. Bronx-Lebanon Hosp. Center*, 2006 U.S.Dist. LEXIS 83199 at *4 (S.D.N.Y. Nov. 13, 2006); *Turturro v. Continental Airlines*, 334 F.Supp.2d 383, 395-397 (S.D.N.Y. 2004); *Doe v. Harrison*, 254 F.Supp. 2d 338, 342-345 (S.D.N.Y. 2003).

Although JHMC did not have a policy that was not in conformity with the Mental Hygiene Law, its policy was the policy of a private hospital. That is not sufficient to constitute state action because private conduct, "no matter how discriminatory or wrongful," is not controlled by §1983. *Am Mfrs., supra*, 526 U.S. at 50; *see also Morris v. NYC HRA*, 2013 U.S. Dist. LEXIS 86623, *9-10 (E.D.N.Y. June 19, 2013) ("Village Care and Jamaica Hospital are both private entities that are not normally amenable to suits for damages pursuant

to 42 U.S.C. §1983. As the Supreme Court has held, 'the under-color-of-state-law element of §1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful'"); *Kia P. v. McIntyre*, 235 F.3d 749, 755-56 (2d Cir. 2000) (private hospital was not a state or municipal facility and therefore was not liable pursuant to §1983 unless it was acting as an instrumentality of the state); *Smolian v. Port Authority of New York and New Jersey*, 98 A.D.3d 1103 (2d Dept. 2012) (dismissing §1983 claim against Jamaica Hospital because it was not a state actor).

Plaintiff's allegation that JHMC had an "official policy" that did not conform to the requirements of the Mental Hygiene Law does not excuse him from having to initially establish that Jamaica Hospital is a state actor. For example, in *Gray v. Group Home*, 2013 U.S.Dist. LEXIS 147548 (E.D.N.Y. October 10, 2013), the Court noted that to prevail on a Section 1983 claim "against a municipality **or private entity acting under color of state law**, a plaintiff must show:   1) **actions taken under color of law**; 2) deprivation of a constitutional or statutory right; 3) causation; 4) damages; and 5) that an official policy of the municipality [**or private entity acting under color of state law**] caused the constitutional injury."   2013 U.S.Dist. LEXIS 147548 at *10 (emphasis added) (*citing Roe v. City of Waterbury*, 542 F.3d 31, 36 [2d Cir. 2008]).

In addition, as this Court recognized in *Doe*, "[c]ompliance with the procedures of the MHL, a statute that neither forces nor encourages involuntary commitments, does not convert private action into state action." 996 F.Supp. at 352. If *compliance* with the statute does not constitute state action, it is illogical to conclude that *not* complying with the statute, as plaintiff alleges, is somehow transformed into state action.

Similarly, this Court also noted in *Doe* that "the mere fact that a business is subject to

state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. Nor does the fact that the regulation is extensive and detailed. . . do so." 996 F.Supp. at 352 (*citing Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 [1974]). Consequently, the alleged failure to abide by a state regulation cannot constitute state action.

Plaintiff's counsel has not made any effort to establish that any of the defendants engaged in state action and, as such, cannot sustain a cause of action pursuant to 42 USC §1983. There is absolutely no evidence that would allow the conduct of private actors to be attributed to the state for §1983 purposes under the various tests. In the absence of state action, there can be no due process violation. Therefore, Jamaica Hospital's motion to dismiss the Seventh and Ninth Claims for Relief should be granted.

B.      Jamaica Hospital Is Entitled to Summary Judgment
On Plaintiff's Tenth Claim for Relief

1.      Vicarious Liability

Plaintiff's Tenth Claim for Relief sounds in "Municipal Liability." Presumably, plaintiff is trying to hold Jamaica Hospital liable under *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978), as applied to private parties.

In the context of private actors, private employers are not vicariously liable under §1983 for the constitutional torts of their employees "absent allegations of conduct pursuant to an official policy." *Dilworth v. Goldberg*, 914 F.Supp.2d 433, 452 (S.D.N.Y. 2012).[2] As

---

[2] Defendant JHMC adopts and incorporates by reference the arguments advanced by co-defendants Dr. Isak Isakov and Dr. Aldana-Bernier in their Memoranda of Law in support of their summary judgment motions to the extent they argue that neither physician was a state actor and therefore could not have deprived the plaintiff of due process (*see also* deposition testimony quoted in Exhibit MM demonstrating the absence of any contact between the NYPD and Jamaica Hospital personnel and defendant's Amended 56.1 Statement, ¶¶112-124). Consequently, JHMC cannot be held vicariously liable for their alleged civil rights violations. *See Michaels v. City of New York*, 2011 U.S.Dist. LEXIS 15806 (S.D.N.Y. February 16, 2011) (Absent a constitutional violation, no *Monell* liability can attach, even if plaintiff can demonstrate the existence of a municipal policy or practice).

this Court has recognized, the Supreme Court has identified at least two situations that constitute an official policy: "(1) where there is an officially promulgated policy as that term is generally understood. . . and (2) where a single act is taken by a municipal employee who, as a matter of State law, has final policymaking authority in the area in which the action was taken." *Schoolcraft v. City of New York,* 2011 U.S.Dist. LEXIS 48996, *12 (S.D.N.Y. May 5, 2011) (citations omitted).

### a.     An Official Policy

Plaintiff's counsel admits that the "official policy" of Jamaica Hospital conforms to the Mental Hygiene Law (p. 47, plaintiff's counsel's 12/23/14 Memorandum of Law). In addition, there is no dispute that Dr. Lilian Aldana-Bernier and Dr. Isak Isakov were the psychiatrists who admitted and treated the plaintiff, and there is nothing to suggest that they had *any* authority to make policy; in this case, they only made individual treatment decisions. Although they may have had discretion in terms of whether to admit and retain the plaintiff, discretionary authority is not the same as final policymaking authority. *See e.g., Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000). Therefore, the isolated decisions of Dr. Aldana-Bernier and Dr. Isakov to admit and retain the plaintiff, respectively, were individual patient decisions, and do not constitute acts by persons who have final policymaking authority.

### b.     The direction of a policymaker

Plaintiff's counsel has not alleged, and does not have evidence of, who had **"final policymaking authority"** at Jamaica Hospital, which is necessary to sustain a claim under this prong of the test for vicarious liability. *See Jeffes v. Barnes, supra,* 208 F.3d at 57 (emphasis

added). Although Dr. Dhar was the assistant chair of the Psychiatric Department (Exhibit "II", p. 16), the chair of the department was Dr. Vivek (Exhibit "II", p. 26). Furthermore, Dr. Dhar testified that he did not have any role in creating the Jamaica Hospital policy on involuntary admissions; rather, Dr. Vivek did (Exhibit "II", pp. 44-45). Therefore, based upon the evidence before this Court, plaintiff cannot sustain a cause of action against Jamaica Hospital for alleged §1983 violations as a result of a policymaker's "direction."

c.     A widespread custom

As this Court recognized in its decision, a "custom" need not receive formal approval by the appropriate decision maker. *Schoolcraft*, *supra*, 2011 U.S.Dist. LEXIS at *12. Rather, an act performed pursuant to a "custom" that has not been "formally approved by an appropriate decision maker" may subject an employer to liability "on the theory that the relevant practice is so widespread as to have the force of law" *Id.* at *12-13 (citation omitted). To prevail on that theory, the plaintiff must prove that "the custom at issue is well settled" and that it is "so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* at *13 (citations omitted). The unconstitutional practice must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Sorlucco v. New York City Police Department*, 971 F.2d 864, 871 (2d Cir. 1992).

Plaintiff's counsel has not alleged and cannot establish a widespread custom of depriving patients of their civil rights. In *Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006), the Court held that the plaintiff did not have sufficient evidence of a widespread custom to establish municipal liability because plaintiff could only point to one instance in which emergency personnel were not familiar with the correct protocol, and could not point to any other instances in which City personnel had engaged in actions similar to those in which

18

the defendants had engaged. *See Green*, 465 F.3d at 81.

Furthermore, when a plaintiff's constitutional rights have been violated by an employee's single tortious decision or course of action, "the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Amer. v. Town of West Harford*, 361 F.3d 113, 125-126 (2d Cir. 2004). A municipality or other employer will not be liable unless its policies were the "moving force" behind the alleged constitutional violation. *Barry v. New York City Police Dept.*, 2004 U.S. Dist. LEXIS 5951 (S.D.N.Y. April 7, 2004) (*citing Board of the County of Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997)). There must be a causal link between the custom or policy and the alleged wrongdoing. *Id.* Courts must apply "rigorous standards of culpability and causation. . . to ensure that the indirect-causation theory not result in the municipality's being 'held liable solely for the actions of its employee.'" *Id.* at 32 (*citing Jeffes v. Barnes*, 20 F.Supp.2d 204 [N.D.N.Y. 1998]).

The decision in *Warheit v. City of New York*, 2006 U.S.Dist. LEXIS 58167 (S.D.N.Y. August 15, 2006) is directly on point in this regard. In that case, the police brought the plaintiff to Bellevue Hospital, where he was involuntarily hospitalized. Plaintiff brought a cause of action for violation of his civil rights. The Court granted the defendant's motion for summary judgment and dismissed plaintiff's claim against the defendant hospital. The court noted that in order to sustain a *Monell* claim alleging violation of §1983 against the hospital, the plaintiff would have to establish a policy or custom

> to involuntarily commit patients to the hospital in violation of their substantive and procedural due process rights. This would require proof of a written directive or regulation by [defendant], an act by an [*sic*] policymaking employee at [defendant hospital], or a practice so widespread that it has the force of law at [the defendant hospital]. [Plaintiff] establishes none of these. All [plaintiff] pleads is that a number of

> physicians at [defendant hospital], none of whom worked in a
> policymaking capacity, committed him to [defendant hospital] on an
> emergency basis pursuant to New York's Mental Hygiene Law. ...  A
> single incident by persons without policymaking authority cannot create
> liability under *Monell*.  Were the Court to hold differently, it would in
> essence be holding [defendant hospital] liable in respondeat superior for
> the conduct of its employees.  This is exactly what *Monell* forbids.

*Warheit* at *27-38.   Here, as in *Warheit*, plaintiff cannot submit any evidence to refute

Jamaica Hospital's position that plaintiff cannot sustain a *Monell* claim.  Therefore, plaintiff's

Tenth Claim for Relief should be dismissed as to Jamaica Hospital.

> C.   Jamaica Hospital Is Entitled to Summary Judgment
> On Plaintiff's Eight Claim for Relief Alleging
> Conspiracy to Violate Plaintiff's Civil Rights

It is not entirely clear whether plaintiff's claim of a conspiracy to violate plaintiff's

civil rights is being asserted against Jamaica Hospital.  Assuming he is, the claim should be

dismissed.  For one thing, he pleads a conspiracy to violate plaintiff's civil rights "under 42

U.S.C. §1983," whereas that claim is governed by 42 U.S.C. §1985.  In any event, to sustain a

claim for conspiracy against state and private actors, plaintiff must prove that the private

actors were "jointly engaged with state officials" in a conspiracy to deprive the plaintiff of his

constitutional rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598 (1970).

Attached as Exhibit MM is the December 22, 2014 Declaration of Brian E. Lee, Esq.,

attorney for co-defendant Isak Isakov.  As demonstrated by the deposition testimony

excerpted in his Declaration, there is absolutely no proof from which a conspiracy can be

established.  To the contrary, the proof established that there could not possibly have been a

conspiracy.  Accordingly, the Eighth Claim for Relief should be dismissed.

2461667_1                                   20

## POINT II

### PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION
### DIRECTLY AGAINST JHMC FOR MEDICAL MALPRACTICE

To maintain an action for medical malpractice under New York law, a plaintiff must prove that the defendant breached the standard of care, and that the breach proximately caused the plaintiff's injuries. *See Berk v. St. Vincent's Hospital and Medical Center*, 380 F.Supp.2d 334 (S.D.N.Y. 2005); *DeCesare v. Kaminski*, 29 AD3d 379, 815 NYS2d 60 (1st Dept. 2006); *Perrone v. Grover*, 272 AD2d 312, 707 NYS2d 196 (2d Dept. 2000). In the absence of proof of such breach, or that such breach proximately caused the plaintiff's injuries, a medical malpractice action must be dismissed as a matter of law.

A plaintiff cannot sustain an independent cause of action for medical malpractice against a defendant hospital, however, when a plaintiff alleges various departures from the standard of care against all defendants, but fails to state how specific members of the hospital staff committed an act of malpractice independent from the patient's attending physicians. *See Suits v. Wyckoff Hgts. Med. Ctr.*, 84 AD3d 487, 489-490, 922 NYS2d 388 (1st Dept. 2011). Finding that plaintiffs in *Suits* could not sustain a cause of action arising out of any independent acts of malpractice against the defendant hospital, the Appellate Division, First Department, explained the following:

> Given that the only person identified by plaintiffs as being negligent was Dr. Abakporo [the attending physician] and that plaintiffs failed to distinguish any separate alleged acts and omissions of Wyckoff's staff, Wyckoff sustained its prima facie burden of establishing that there were no independent claims against it and that it can only be held vicariously liable for Dr. Abakporo. Plaintiffs did not specify any independent acts of negligence by Wyckoff's staff and 'our jurisprudence does not require a defendant [moving for summary judgment] to prove a negative on an issue as to which [it] does not bear the burden of proof.'

84 AD3d at 489-490 [citations omitted]. *See also Dendariarena v. Mt. Sinai Hospital*, 2012 Slip.Op. 31262(U) (N.Y.Sup. 2012); *Mercedes v. Farrelly*, 2012 N.Y.Misc.LEXIS 2032 (N.Y. Co. May 1, 2012) (granting summary judgment because plaintiffs failed to assert and/or prove a cause of action for medical malpractice as against the hospital itself, as opposed to plaintiffs' claims against the attending physicians).

In the Third Amended Complaint (Exhibit LL), plaintiff does not make any allegations of medical malpractice as to any specific members of the JHMC staff separate from the codefendant psychiatrists. Similarly, neither of plaintiff's experts identified any departures from accepted standards of care by any specific members of the JHMC staff, other than the codefendant psychiatrists. Therefore, plaintiff cannot maintain a cause of action for medical malpractice against JHMC directly, and that cause of action should be dismissed.

In *Bender v. Lowe*, 2011 U.SDist LEXIS 99053, *27 (S.D.N.Y. August 31, 2011), *aff'd* 2013 U.S. App. LEXIS 18218 (2d Cir. 2013), this Court rejected plaintiff's expert's opinion because the expert's report failed "to distinguish between the actions and treatment decisions of the three defendants," when the expert reached the general conclusion that all defendants had departed from accepted standards of care. As in *Bender*, the plaintiff's experts in this case do not mention any specific departures by any specific JHMC staff member in their reports (other than referring to the two codefendant psychiatrists). Dr. Roy Lubit, for example, wrote that "the doctors and Jamaica hospital staff who evaluated Mr. Schoolcraft" should not have retained him in the hospital or committed him (Exhibit Z, p. 10). He refers to "*their* evaluations and medical decisions" without identifying whose evaluations and decisions he is criticizing (*Id.*, emphasis added). Similarly, he opines that "the doctors and hospital staff" were "derelict in their duty," but does not mention anyone in particular (*Id.*).

Without providing specific names, he opines that "the doctors fell short" and that "the doctors" failed to take a number of steps Dr. Lubit believes should have been taken (*Id.*). As the decisions in *Suits* and *Bender* make clear, however, Dr. Lubit's opinion is not sufficient for plaintiff to defeat JHMC's motion for summary judgment.

Dr. Lubit's deposition testimony did not cure those defects. He testified as follows:

**Q:**    Doctor, can you tell me where in your report you identify anybody who saw this patient other than Dr. Aldana-Bernier and Dr. Isakov?

**A:**    I don't think I—I don't know how much I talked about or if I even mentioned the resident, because the responsibility—I was not told that he was—the resident was a party to the case, and certainly the attending in the emergency room had ultimate responsibility.

*        *        *

**Q:**    Do you mention any other person who departed, in your opinion, departed from accepted standards of care in your report?

**Mr. Smith**:    Objection to the form.

**A:**    I don't at this moment recall. . . Okay. On page 21. I mentioned Dr. Lwin and Dr. Patel as well.

**Q:**    Okay. And [you] write that they violated the policies of Jamaica Hospital Department of Psychiatry?

**A:**    Yes.

(Exhibit AA, pp. 80-83).

According to his report, however, the only portion of JHMC policy that Dr. Lubit claims Dr. Lwin and Dr. Patel had violated was the provision requiring a patient to be a substantial risk of harm to himself or others before admitting him to the hospital involuntarily (Exhibit Z, p. 21). However, <u>neither Dr. Lwin nor Dr. Patel admitted the plaintiff to the hospital</u> (Exhibit U, pp. 57-58) (Exhibit W, p. 107) (Exhibit X, pp. 222-223). Indeed, when asked whether Dr. Lwin violated the part of the policy quoted in his report, Dr. Lubit testified, "At this moment, as I think about it, she does not violate the part about admission" (Exhibit

AA, p. 84).   Similarly, he conceded that Dr. Patel did "not violate the portion [of the policy]

that I quoted [in my report], that is correct" (Exhibit AA, pp. 84-85).   Thus, Dr. Lubit

admitted that the only two physicians mentioned in his report (other than the codefendants)

did *not*, in fact, violate hospital policy (which could have been considered a departure from

accepted standards of care).   Accordingly, plaintiff cannot maintain a cause of action for

medical malpractice against JHMC.

## POINT III

### DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT
### ON PLAINTIFF'S CAUSE OF ACTION FOR MEDICAL MALPRACTICE
### BECAUSE PLAINTIFF HAS NOT DEMONSTRATED AN ISSUE OF FACT

A.      Defendant has met its burden demonstrating that there are no issues of fact

Attached as Exhibit "JJ" is the CV and report of Robert Levy, M.D.      Dr. Levy

graduated medical school from the Brown University School of Medicine in 1985.   He

performed a residency in Psychiatry at New York University Medical Center, which he

completed in 1989.   He is Board Certified in Psychiatry and Neurology, and is a Diplomate of

the American Board of Forensic Examiners.   He has worked at numerous hospitals, and is

currently an Associate Professor of Clinical Psychiatry at the NYU School of Medicine.

In his report, Dr. Levy opines to a reasonable degree of medical certainty that the

JHMC staff did not deviate from the standard of care (Exhibit JJ, p. 6).   He notes that there

was a reasonable basis to conclude that the plaintiff was psychiatrically ill and acutely

paranoid, and that the diagnosis of Psychosis NOS was appropriate (Exhibit JJ, p. 6).   He also

states that the plaintiff's admission to JHMC was predicated on credible views of significant

potential dangerousness, and that the JHMC staff had reasonable grounds to construe the

plaintiff as a potential danger to himself or others (Exhibit JJ, p. 6). As such, defendant met its burden entitling JHMC to summary judgment.

> B.   Plaintiff's Experts' Reports are Insufficient
>       to Rebut JHMC's *Prima Facie* Showing
>       That It Is Entitled to Summary Judgment

> 1.   Plaintiff's Experts Do Not Contend that the Jamaica Hospital Staff's Acts
>        and/or Omissions were "Substantially Below" Medical Standards.

Whether someone should be committed for psychiatric evaluation is a medical question to be determined by expert testimony. *Mittelman v. County of Rockland*, 2013 U.S.Dist. LEXIS 46382, *68 (S.D.N.Y. March 26, 2013). The decision is "based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." *Id.* (quotations omitted). Therefore, plaintiff is required to present expert testimony to sustain a cause of action for medical malpractice. *See Bender v. Lowe*, *supra*.

The expert need not merely opine that the psychiatrist departed from accepted standards of care. Rather, the expert must opine that the decision to commit a plaintiff "fell substantially below medical standards"; otherwise, the defendant is entitled to summary judgment. *See Mittelman* 2013 U.S.Dist. LEXIS at *69; *see also Drozdik v. City of New York*, 2003 U.S.Dist. LEXIS 2336 (S.D.N.Y. February 20, 2003); *Glass v. v. Mayas*, 794 F.Supp. 470 (E.D.N.Y. 1992), *aff'd* 984 F.2d 55, 57 (2d Cir. 1993) (summary judgment granted when plaintiff's "demeanor was variously described as . . . hostile, guarded, angry, suspicious, uncooperative and paranoid," and therefore decision to admit was not substantially below medical standards); *Katzman v. Khan*, 67 F.Supp.2d 103, 110 (E.D.N.Y. 1999), *aff'd* 242 F.3d 365 (2d Cir. 2000) (summary judgment granted when patient threatened his girlfriend and police observed that he was "behaving bizarrely and aggressively," and

therefore decision to admit was not substantially below medical standards); *Sumay v. City of New York Health and Hospitals*, 1998 U.S.Dist. LEXIS 5901, *17 (S.D.N.Y. April 28, 1998) (summary judgment granted when patient "arrived in the emergency room and became 'hostile, loud and argumentative' with a 'threatening' demeanor," and therefore decision to admit was not substantially below medical standards); *Richardson v. Nassau County Medical Center*, 840 F.Supp. 219 (E.D.N.Y. 1994).

In *Bender v. Lowe, supra*, the Court granted defendants' summary judgment motion. The defendants' expert in that case, like Dr. Levy in the case at bar, had "reviewed the records of Plaintiff's admission. . . and concluded that she 'received treatment that met the standard of care in the medical community.'" *Id.* at *31. The defendants' expert concluded "that based upon information available to [defendants] (including the NYPD and EMS reports, staff observations, and Plaintiff's refusal to cooperate), [they] were reasonable in concluding that the Plaintiff posed a danger to others and required continued care and observation on an involuntary basis." *Id.* This Court should draw the same conclusion.

Plaintiff's experts' failure to characterize the hospital staff's acts and/or omissions as "substantially below medical standards," thereby requiring dismissal of plaintiff's medical malpractice cause of action, is not mere semantics. For example, in *Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996), the Second Circuit upheld the district court's decision to grant summary judgment when plaintiff's expert concluded that a treatment decision "fell below minimally acceptable practice," but failed to "assert that it was substantially below accepted professional judgment." 88 F.3d at 75-76. Similarly, in *Bender v. Lowe*, the Court found that plaintiff's expert's report was not sufficient to create a disputed issue of material fact requiring denial of defendants' motions because the expert never stated that the treatment

decisions at issue fell "substantially below" medical standards. 2011 U.S. Dist. LEXIS 99053 at *25.  The same result was reached in *Kraft v. City of New York*, 696 F.Supp.2d 403, 416 (S.D.N.Y. 2010), where the Court granted summary judgment because, among other reasons, plaintiff's expert failed to conclude that the defendants' determinations "fell *substantially below* accepted medical standards" (emphasis added).  At no point in their reports did Dr. Lubit or Dr. Halpren-Ruder indicate that the JHMC staff's treatment decisions were "substantially below" accepted medical standards, and therefore JHMC is entitled to summary judgment.

2.   Dr. Lubit's Report and Opinion are Inadequate
       Because Dr. Lubit Does Not Establish the Standard of Care

To prove a case for medical malpractice involving involuntary commitment, a plaintiff must produce competent evidence of what medical standards govern the decision to order involuntary commitment, and evidence that the decision by a given individual defendant was not made in accordance with those standards. *See Olivier v. Robert L. Yeager Mental Health Center*, 398 F.3d 183, 190 (2d Cir. 2005).  Such a showing requires expert testimony. *Id.*

Significantly, an expert's failure to identify generally accepted standards "undercuts [the expert's] analysis of the individual defendants' performances, as he has no benchmark against which to judge the individual defendants." *Algarin v. New York City Dep't of Correction*, 460 F.Supp.2d 469, 477 (S.D.N.Y. 2006); *see also Bender*, 2011 U.S. Dist. LEXIS 99053 at *25.  In *Bender*, this Court criticized plaintiff's expert's report for failing to discuss any medical standards governing emergency admissions, and for failing to discuss basic treatment procedures for psychiatric patients when assessing whether a patient presents a danger to herself or others to determine if involuntary hospitalization is warranted.  As the

Court recognized in *Bender*, "Courts have routinely granted summary judgment where, as here, a plaintiff proffers expert testimony that fails to adequately set forth medical standards and analyze a physician's treatment decisions in light of those standards." *Id.* at *25-26 (emphasis added).

The Second Circuit has also held that in order to show that a defendant did not exercise ordinary and reasonable care, the plaintiff must show "what the accepted standards of practice were and that defendant deviated from those standards" through expert testimony. *Berk*, 380 F.Supp.2d at 342 (*citing Sitts v. United States*, 811 F.2d 736, 739-40 (2d Cir. 1987)).

In this case, plaintiff's experts failed to set forth the relevant medical standards required to sustain a claim for medical malpractice, and therefore summary judgment is appropriate. *See Bender*, 2011 U.S. Dist. LEXIS 99053 at *35. In his report, Dr. Lubit never explicitly stated the standard of care. Furthermore, at his deposition, Dr. Lubit acknowledged that he did not identify the standard of care at issue in this case, as it pertains to treatment rendered by the Jamaica Hospital staff. He testified as follows:

> **Q:** [M]y question is do you discuss the standard of care when a consulting psychiatrist is evaluating a patient in the medical emergency room?
>
> Mr. Smith:     Objection to form.
>
> **A:** I didn't write a dissertation on the standard of care. I evaluated whether these doctors met the standard of care.
>
> *          *          *
>
> **Q:** But you don't lay out the standard of care, do you?
>
> **A:** It would be almost impossible to, because then you'd have to lay out what one would have to do exactly in every contingency. It's—I mean I do to some extent describe the standard of care and what doctors are supposed to do and how they don't do it. But I didn't write a—I didn't write a book chapter on what the standard of care is. I put down key aspects of the standard of care and then explained why I did not think the doctors met that standard of

care.

> **Q:** Okay. And those key aspects in anywhere did you consider the standard of care for a psychiatrist who renders a consult in the medical emergency room?

> **Mr. Smith:** Objection to form.

> **A:** I do not think there is a difference between the standard of care for making a decision about certifying a patient, whether they are doing it in a psychiatric emergency room, or whether they're called to do it in the medical emergency room. …

> **Q:** When you say "certifying the patient" you mean for involuntary commitment?

> **A:** Yes.

(Exhibit AA, pp. 49-51).

As recently as October 20, 2014, this Court issued a decision implicitly criticizing the verbal gymnastics in which experts such as Dr. Lubit engage. In *Zeak v. United States of America*, 2014 U.S.Dist. LEXIS 148758 (S.D.N.Y. October 20, 2014), the Court stated that plaintiff's expert "repeatedly disclaimed the ability to define the standard of care." 2014 U.S.Dist. LEXIS at *23. The Court noted that plaintiff's expert was either "unable or unwilling to opine on the appropriate standard of care," and that as a result, the defendant was entitled to summary judgment. *Id.* Dr. Lubit's failure to establish the standard of care that was to have been met by any of the JHMC staff who treated the plaintiff before Dr. Aldana Bernier admitted him to the hospital necessitates dismissal of this cause of action.

Furthermore, the only physician who certified the patient for involuntary commitment was codefendant Dr. Aldana-Bernier, *not* the psychiatrist(s) who evaluated the plaintiff in the medical Emergency Department ("ED"). As Dr. Lwin's and Dr. Patel's testimony makes clear, their only role was to refer the plaintiff to the psychiatric Emergency Department for further observation—not to determine whether the plaintiff should be admitted to the hospital (Exhibit V, pp. 46-47) (Exhibit BB, pp. 31, 62-64, 65-66).

Although Dr. Lubit testified that the Jamaica Hospital staff "should have asked him [the plaintiff] several other questions [because] it would have been clear that he wasn't psychotic" (Exhibit AA, p. 54), his report does not indicate what questions should have been asked. More importantly, he testified that, in fact, <u>he did not know whether the questions had actually been asked</u> (Exhibit AA, pp. 173-175). That admission undermines the entire basis for Dr. Lubit's conclusions. Accordingly, the plaintiff cannot use Dr. Lubit to meet his burden to establish a question of fact as to whether Jamaica Hospital departed from accepted standards of care.

The conclusions in Dr. Lubit's report are no different than the conclusions drawn by the experts in *Bender* and *Algarin*, wherein each Court rejected the experts' opinions. In *Bender*, the plaintiff argued that the defendants failed to investigate the veracity of information provided by the police, but did not cite any authority in support of her contention that a physician must corroborate police reports or third party accounts where there is no indication they are unreliable. The Court found that that was one reason the expert report was insufficient to raise an issue of fact. 2011 U.S.Dist. LEXIS at *25.

Similarly, in *Algarin*, plaintiff's expert opined that it was incumbent upon the defendant psychiatrist to " 'explain the contradiction' when 'faced with a sharp contradiction between what has been reported about a patient. . . and what the patient is objectively demonstrating,' and that [the defendant physician] failed to make the 'required' phone calls to the Elmhurst doctors when plaintiff was not demonstrating any of the dangerousness that those doctors had reported." *Algarin* 460 F.Supp.2d at 478. This Court firmly rejected that opinion as inadequate because he did not use "any reliable principal or methodology" to reach his conclusions. *Id.*

In this case, Dr. Lubit repeatedly opines that the JHMC staff did not contact anyone at the Internal Affairs Bureau to substantiate plaintiff's story.  For example, in his report, Dr. Lubit opined that "the doctors" "failed to gather adequate information about what Mr. Schoolcraft had done and believed concerning his allegation of corruption by superiors"; "failed to reasonably interpret the information they had, and instead repeatedly jumped to inappropriate conclusions. . . rather than seeking information to find out what the information really meant"; and "failed to call and speak with people in the Police Department's Internal Affairs Bureau" (Exhibit Z , pp. 10-11; *see also* Exhibit AA at pp. 92-94, 100).  As in *Algarin*, those criticisms are not sufficient to establish a question of fact as to whether there was a departure from accepted standards of care.

Dr. Lubit also opined that the JHMC doctors "failed to explore if [plaintiff's] beliefs were likely to lead him to engage in dangerous behavior"; "*appear* to have lacked basic knowledge concerning the NY law concerning commitment as well as their own hospital's written policies"; and "*appear* to lack current scientific knowledge about how to assess dangerousness" (Exhibit Z, p. 11) (emphasis added).  Obviously, Dr. Lubit's references to "appearances" are meaningless, and cannot be the basis upon which to oppose defendant's motion for summary judgment.  Dr. Lubit's conclusion that the plaintiff's beliefs were not explored is inadequate because he does not state the basis for that conclusion.

A mere disagreement with the diagnosis of the treating physician is insufficient to raise a material issue of fact regarding the physician's treatment decisions.  *Bender v. Lowe*, 2011 U.SDist LEXIS 99053 at *27.    At best, Dr. Lubit expresses his disagreement with the conclusions drawn by the JHMC staff, and the decision to refer the plaintiff to the psychiatric emergency department so he could be re-evaluated.  Therefore, his opinion is not sufficient to

defeat defendant's motion.

### 3.   Dr. Halpren-Ruder's Report and Opinion are Inadequate

In his report, Dr. Halpren-Ruder wrote that the "ED attending" did not appropriately evaluate the plaintiff because the "usual and customary evaluations for conditions that may mimic a psychiatric presentation did not occur," and because the Emergency Department attending "failed to accomplish and communicate an adequate psychiatric evaluation of his own" (Exhibit CC, p. 4).  He concluded:  "In my opinion, to a reasonable degree of medical certainty, there were significant failures of medical practice that led to an action that intruded upon the patient's civil rights" (Exhibit CC, p.4); *see also* Exhibit CC, p. 3 (the ED attending's failure to perform his own psychiatric evaluation "deprived the patient of a complete evaluation that was critical to avoid an action that improperly deprived the patient of his civil rights").

It should initially be noted that this Court previously dismissed plaintiff's causes of action against JHMC for alleged civil rights violations. *See Schoolcraft v. City of New York*, 2011 U.S.Dist. LEXIS 48996 (S.D.N.Y. May 6, 2011).  The **only injury** Dr. Halpren-Ruder attributes to the care "the ED attending" allegedly failed to render, however, is a deprivation of plaintiff's civil rights.  Given that Dr. Halpren-Ruder's report does not indicate that the plaintiff suffered emotional or physical harm as a result of plaintiff's treatment at JHMC, and that JHMC cannot be held liable for an alleged violation of plaintiff's civil rights as a matter of law, plaintiff cannot establish, through Dr. Halpren-Ruder, that the alleged breach from the standard of care proximately caused the plaintiff's injuries.  *See Berk, supra*; *DeCesare, supra*; *Perrone, supra*.  Accordingly, JHMC is entitled to summary judgment, and the cause

of action for medical malpractice should be dismissed.

    a.    Services Provided by the EMTs

Even if Dr. Halpren-Ruder's opinion was admissible despite his failure to link the JHMC staff's alleged acts and/or omissions to an injury for which plaintiff could recover, however, Dr. Halpren-Ruder's testimony and report regarding his criticisms of the Emergency Medical Technicians ("EMT") are inadmissible because the EMTs are immune from liability as a matter of law.[3]  Section 9.59 of the New York Mental Hygiene Law states

    9.59  Immunity from liability.

    (a)  Notwithstanding any inconsistent provision of any general, special or local law, an ambulance service. . . any member thereof who is an emergency medical technician or an advanced emergency medical technician transporting a person to a hospital as authorized by this article. . . shall not be liable for damages for injuries alleged to have occurred by reason of an act or omission unless it is established that such injuries or such death was caused by gross negligence on the part of such emergency medical technician. . ..

In *Woody v. Astoria General Hospital, Inc.*, 264 AD2d 318, 694 NYS2d 41 (1st Dept. 1999), the Appellate Division, First Department, held that the defendant EMT was immune from liability for ordinary negligence because the decedent was being involuntarily transported from an emergency room to a psychiatric hospital.  As such, the defendant EMT could only be liable if his acts amounted to "gross negligence, i.e., evinced a 'reckless disregard' for the decedent's rights or 'intentional wrongdoing.'"  *Id.*; *See also Shinn v. City of New York*, 65 AD3d 621, 884 NYS2d 466 (2d Dept. 2009); *Cf. Rennix v. Jackson*, 2014 NY Slip Op. 50499(U) (Kings Co. 2014) (plaintiff's reliance on MHL 9.59 was misplaced because that statute only applies to EMTs who are engaged in transporting a person involuntarily to a psychiatric hospital).  Because the plaintiff in *Woody* could not demonstrate

---

[3] Entitlement to immunity on a state-law claim is a question of substantive state law.  *Napolitano v. Flynn*, 949 F.2d 617, 620-21 (2d Cir. 1991).

any indicia of gross negligence, the Court granted summary judgment to the defendants.

Even if the EMTs were not immune from liability, Dr. Halpren-Ruder's opinion regarding their care would be inadmissible and insufficient to oppose JHMC's motion because opinions based upon "incorrect factual assumptions that are not in evidence" are not reliable. *See Smith v. Target Corp.*, 2012 U.S.Dist. LEXIS 16526 (N.D.N.Y. November 20, 2012). Similarly, opinions based upon an "erroneous assumption" are not reliable, and should be excluded. *See Macaluso v. Herman Miller, Inc.*, 2005 U.S.Dist. LEXIS 3717 (S.D.N.Y. March 9, 2005). For an expert's opinion to be admissible, "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "Any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* at 266 (referring to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786 (1993)). The trial judge must "ensure that an expert's testimony rest on a reliable foundation." *Plew v. Limited Brands, Inc.*, 2012 U.S.Dist. LEXIS 14966, *12 (S.D.N.Y. February 6, 2012) (*citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167 (1999)); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002); *Harkabi v. Sandisk Corp.*, 2012 U.S.Dist. LEXIS 32833, *8-9 (S.D.N.Y. March 12, 2012); *Smith v. Target Corp.*, 2012 U.S.Dist. LEXIS at *27.

When he formulated his opinion which he memorialized in his report, Dr. Halpren-Ruder had not read plaintiff's deposition transcript, or the deposition transcripts of anyone who was in the plaintiff's home when the police and EMTs entered his apartment (Exhibit DD, pp. 15-16). Significantly, at his deposition, Dr. Halpren-Ruder acknowledged that it was possible that there would be deposition testimony by the witnesses in this case that could

change his opinions if he had been aware of what had been said at the depositions (Exhibit DD, p. 17). In fact, his opinion did change when he was told about the deposition testimony of some of the witnesses in plaintiff's home. For example, Dr. Halpren-Ruder's report states that the blood pressure readings while the plaintiff was in his apartment did not have any "meaningful medical significance" (Exhibit CC, p. 1), and that the EMS failed to take plaintiff's blood pressure after he was in the ambulance. (Exhibit CC, p. 1). He admitted at his deposition, however, that the plaintiff's elevated blood pressure was significant after he learned that one of the EMTs had testified that the plaintiff told him that his blood pressure was always high (Exhibit DD, p. 106 and Exhibit DD, p. 32-33). Despite the hyperbole in his report, Dr. Halpren-Ruder also admitted that the plaintiff's blood pressure returned to normal after he arrived at the hospital, and that the failure to take repeat blood pressures did not have any adverse consequences for the plaintiff (Exhibit DD, p. 34-35).

Similarly, despite Dr. Halpren-Ruder's claims that EMS should not have taken the plaintiff to the hospital after he was declared an Emotionally Disturbed Person ("EDP"), he acknowledged that he did not know what the term "EDP" meant (Exhibit DD, p. 41), that he did not know what components a police officer considers when declaring someone an EDP (Exhibit DD, pp. 45-46), and that he did not know the criteria for declaring someone to be an EDP (Exhibit DD, p. 93). Furthermore, he did not know if the standard he cited, to the effect that a patient has a right to refuse to be transferred to a hospital unless the patient is *non compos mentis*, was the standard in New York (Exhibit DD, pp. 84-86). Clearly, Dr. Halpren-Ruder did not have a legitimate basis upon which to render his opinions, and therefore plaintiff cannot rely upon his opinions to oppose JHMC's motion for summary judgment.

b.      Treatment at Jamaica Hospital

In his report, Dr. Halpren-Ruder wrote that the "ED attending" did not appropriately evaluate the plaintiff because the "usual and customary evaluations for conditions that may mimic a psychiatric presentation did not occur" and because the ED attending "failed to accomplish and communicate an adequate psychiatric evaluation of his own" (Exhibit CC, p. 4).

With respect to the "usual and customary evaluations," Dr. Halpren-Ruder cited a Consensus Statement on Medical Clearance Protocols for Acute Psychiatric Patients Referred for Inpatient Admissions (Exhibit CC, p. 2 and Exhibit EE) to support the opinion in his report that the personnel in the emergency room fell short (Exhibit DD, p. 49).   At his deposition, however, he acknowledged and that the Guidelines he cited in support of his opinion only came into effect *after* the plaintiff was hospitalized, and that he was not familiar with the standard of care in New York as of 2009  (Exhibit DD, p. 72).  Indeed, he testified that the *only* guidelines or literature he reviewed regarding the standard of care for the running of emergency departments were the post-2009 guidelines he cited in his report (Exhibit DD, pp. 131-132), and that he did not review anything that was in effect in 2009 (Exhibit DD, pp. 132-133). Accordingly, Dr. Halpren-Ruder's opinion lacks the appropriate foundation to be admissible.

Although Dr. Halpren-Ruder also criticized the failure of the ED staff to perform a toxicology screen, he admitted that that alleged failure did not cause any harm to the plaintiff (Exhibit DD, p. 61-62).  Therefore, even if the failure to perform a toxicology test could be considered a departure from accepted standards of care, that failure did not cause injury and, consequently, is not sufficient to establish a cause of action for medical malpractice. *See Berk,*

*supra*; *DeCesare*, *supra*; *Perrone*, *supra*.

Dr. Halpren-Ruder's statement in his report that he did not see any indication that there was a discussion between the psychiatric consult and ED attending is specifically belied by Dr. Lwin's deposition testimony (Exhibit V, p. 38, 41), which Dr. Halpren-Ruder admitted that he had not read (Exhibit DD, p. 66-67). Furthermore, Dr. Lwin's note in the JHMC chart specifically states that she *did* discuss the plaintiff with the attending physician (Dr. Nwaishienyi) (Exhibit U, p. 4-6). Accordingly, there is no basis for Dr. Halpren-Ruder's conclusion that "the ED attending failed to accomplish and communicate an adequate psychiatric evaluation on his own" (Exhibit CC, p. 4). Consequently, Dr. Halpren-Ruder's opinion is insufficient to rebut JHMC's showing that it is entitled to summary judgment on plaintiff's cause of action for medical malpractice.

## POINT IV

### PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION FOR FALSE ARREST OR FALSE IMPRISONMENT

A.     Plaintiff's Claim Must Be Dismissed Because
       Plaintiff Cannot Demonstrate that JHMC
       Committed Medical Malpractice

In New York, the tort of false arrest is synonymous with that of false imprisonment. *Kraft v. City of New York*, 696 F.Supp.2d 403, 421, n.8 (S.D.N.Y. 2010) (*citing Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991)). To establish a cause of action for false imprisonment, a plaintiff must establish that 1) the defendant intended to confine him; 2) the plaintiff was conscious of the confinement; 3) the plaintiff did not consent to the confinement; and 4) the confinement was not otherwise privileged. *Smith v. County of Nassau*, 34 NY2d 18, 22 (1974); *Hernandez v. City of New York*, 100 AD3d 433, 953 NYS2d 199 (1st Dept. 2012).

Commitment pursuant to Article 9 of the Mental Hygiene Law is privileged in the absence of medical malpractice. *Anthony v. City of New York*, 2001 U.S.Dist. LEXIS 8923 (S.D.N.Y. July 2, 2001); *Ferretti v. Town of Greenburgh*, 191 AD2d 608, 610, 595 NYS2d 494 (2d Dept. 1993). Therefore, "in order to prevail on her cause of action sounding in false imprisonment, the plaintiff must prove medical malpractice." *Ferretti v. Town of Greenburgh*, 191 AD2d 608, 610, 595 NYS2d 494, 497 (2d Dept. 1993). In *Anthony*, the Court granted summary judgment to New York City Health and Hospitals on plaintiff's claim for false imprisonment, finding that plaintiff did not provide evidence of medical malpractice.

Plaintiff's claim against JHMC for false imprisonment primarily focuses on the time he spent in the medical emergency room before Dr. Aldana-Bernier admitted him to the psychiatric floor, but the same standard applies. In *Lynch v. St. Lawrence National Bank*, 62 AD2d 1140, 404 NYS2d 484 (4th Dep't 1978), the justification for retaining a patient was extended to a medical context without reference to the Mental Hygiene Law. In that case, the Appellate Division, Fourth Department, affirmed the trial court's decision to dismiss plaintiff's causes of action for false arrest and false imprisonment against two physicians who were not psychiatrists. The Appellate Division stated, "The determination of such facts as may be necessary to make a proper medical diagnosis is a matter of professional judgment and the record contains no evidence that they deviated from contemporary medical standards." 62 AD2d at 1140, 404 NYS2d at 485.

As discussed in Points II and III, plaintiff has not presented any evidence that JHMC deviated from accepted standards of care. Consequently, plaintiff cannot state a claim for false imprisonment as to JHMC.

B.     Plaintiff's Detention was Otherwise Privileged

Even if plaintiff could create an issue of fact as to whether JHMC departed from accepted standards of care, plaintiff's claim for false imprisonment should still be dismissed. To state a cause of action for false imprisonment, the confinement must not be "otherwise privileged." *See Smith v. County of Nassau*, 34 NY2d 18, 22 (1974); *Hernandez v. City of New York*, 100 AD3d 433, 953 NYS2d 199 (1st Dept. 2012).   An act can be "otherwise privileged" for the purposes of defending a false imprisonment claim "if the defendant can show that his actions were justified by the law." *See Caban v. United States*, 728 F.2d 68, 72 (2d Cir. 1984); *See also Hudson v. State of New York*, 35 Misc.3d 241, 937 NYS2d 529 (Ct. of Claims, 2011) (confinement is privileged if imposed under color of law or regulation); *Frederick v. State of New York*, 23 Misc.3d 1008, 874 NYS2d 762 (Ct. of Claims, 2009). Interestingly, "the legal justification for an alleged false imprisonment need not be found in the substantive law of New York but may be found in some other pertinent body of law." *Caban v. United States*, 728 F.2d 68, 72-73 (2d Cir. 1984).

In this case, plaintiff's detention in the medical and psychiatric emergency rooms before Dr. Aldana-Bernier admitted him to the psychiatric floor was "otherwise privileged" pursuant to the Emergency Medical Treatment and Labor Act, 42 USC §1395dd ("EMTALA").  EMTALA states that if an individual seeks emergency care from a hospital with an emergency room, and if the hospital participates in the Medicare program,[4] then "the hospital must provide for an appropriate medical screening examination. . . to determine whether or not an emergency medical condition. . . exists." 42 USC §1395dd(a); *Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002).  If an emergency condition does

---

[4] Defendant concedes that JHMC is a hospital that accepts Medicare and has an emergency room.

exist, the hospital must "stabilize the medical condition" before discharging the patient.  42

USC §1395dd(b)(1)(A).

The Second Circuit characterized screening for an emergency medical condition, and

stabilizing the medical condition if it exists before discharging the patient, as "obligations"

"imposed" by EMTALA.  *See Hardy v. New York City Health & Hospitals Corp.*, 164 F.3d

789, 792 (2d Cir. 1999).  Therefore, a hospital is essentially prohibited from discharging a

patient who presents to the emergency room until it is determined whether an emergency

medical condition exists, lest the hospital run afoul of EMTALA.  *See Mallgren v.*

*Burkholder*, 2014 U.S.Dist. LEXIS 107256, * 18 (E.D.N.Y. August 5, 2014) (a hospital is

<u>federally mandated</u> to provide emergency medical services under EMTALA) (*citing Sykes v.*

*McPhillips*, 412 F.Supp.2d 197 (N.D.N.Y. 2006)).  Significantly, "[t]he appropriateness of the

screening examination is determined by reference to how the hospital treats other patients

who are perceived to have the same medical condition. . . That is true even if the hospital's

perception of a particular patient is based on a misdiagnosis."  *Brenord v. The Catholic*

*Medical Center of Brooklyn and Queens, Inc.*, 133 F.Supp.2d 179, 185 (E.D.N.Y. 2001)

(citations omitted).

Although Dr. Lubit disagreed that the plaintiff required a CT scan because he

disagreed with the JHMC staff's assessment that the plaintiff appeared to be psychotic, he

also testified "Well, given that they thought, given that they had the incorrect belief that he

had a significant possibility of being psychotic, it was appropriate to do. . .." (Exhibit AA, p.

54).  Dr. Lubit recognized that the purpose of the CT scan was to determine if there was an

organic cause which could be causing psychosis (Exhibit AA, p. 53), and conceded that "there

are things a CT scan could show that would indicate an emergency" (Exhibit AA, p. 63).  At

his deposition, Dr. Halpren-Ruder acknowledged that the Hospital was prohibited from discharging the plaintiff pursuant to EMTALA until the results of plaintiff's CT scan were reported, which was on November 2, 2009 at 10:45 a.m. (Exhibit DD, pp. 53-55). Accordingly, the plaintiff's retention in the emergency rooms before Dr. Aldana-Bernier admitted him to the psychiatric floor was "otherwise privileged" pursuant to EMTALA, and there can be no claim for false imprisonment as to JHMC.

## POINT V

## PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION FOR NEGLIGENT HIRING, TRAINING OR SUPERVISION

To state a cause of action for negligent hiring, training or supervision under New York law, "in addition to the standard elements of negligence, a plaintiff must show 1) that the tort-feasor and the defendant were in an employee-employer relationship; 2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and 3) that the tort was committed on the employer's premises." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations and quotations omitted); *Kenneth R. v. Roman Catholic Diocese*, 229 AD2d 159 (2d Dept. 1997); *Marilyn S. v. Independent Group Living Program, Inc.,* 73 AD3d 892 (2d Dept. 2010)

The Second Amended Complaint does not contain any allegations that the codefendant psychiatrists or any of the JHMC staff had a propensity to improperly hospitalize patients or to commit false arrest or false imprisonment, or that the Hospital should have known of such a propensity (Exhibit LL). The plaintiff also did not allege that JHMC "failed to investigate a prospective employee, notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." *Bouchard v. N.Y. Archdiocese*, 719 F.Supp.2d 255, 261 (S.D.N.Y. 2010) (citations and quotations omitted). Therefore, JHMC is

entitled to summary judgment.

Even if the plaintiff had made the necessary allegations, JHMC would be entitled to summary judgment because the plaintiff has not submitted any evidence of JHMC's hiring, training, supervision or retention policies-- either in general, or specifically in regard to any of the JHMC staff. Summary judgment is appropriate where there is no proof that the employer acted negligently in hiring, training or supervising the employee. *Hattar v. Carelli*, 2012 U.S.Dist. LEXIS 12985, *13-14 (S.D.N.Y. Jan. 11, 2012) (dismissing negligent hiring claim when plaintiff failed to adduce evidence that defendants improperly investigate any individual defendant when he was hired); *Tsesarskaya v. City of New York*, 843 F.Supp.2d 446 (S.D.N.Y. 2012) (summary judgment is appropriate when there is no proof that the employer acted negligently in hiring, training or supervising the employee); *Biggs v. City of New York*, 2010 U.S.Dist. LEXIS 1213332 (S.D.N.Y. Nov. 16, 2010); *Bouchard v. N.Y. Archdiocese*, 719 F.Supp.2d 255, 263 (S.D.N.Y. 2010); *Tatum v. City of New York*, 2009 U.S.Dist. LEXIS 3512 (S.D.N.Y. Jan. 20, 2009) (dismissing negligent hiring claim because plaintiff did not allege or substantiate that the employer knew or should have known of the employee's propensity to commit the act complained of, or failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to conduct an investigation).

A claim for negligent training also "requires evidence of deficiencies in the training of employees that, if corrected, would have avoided the alleged harm." *Hattar v. Carelli*, 2012 U.S.Dist. LEXIS 12985, *14 (S.D.N.Y. Jan. 11, 2012); *Baez v. JetBlue Airways*, 745 F.Supp.2d 214, 225 (E.D.N.Y. 2010). The Court in *Hattar* found that plaintiff did not have any evidence to support that claim and, therefore, dismissed the negligent training cause of

action.  For the same reasons, the Court in this case should dismiss plaintiff's claim for negligent training as well.

To sustain a claim for negligent supervision against an employer, plaintiff must also demonstrate that the employee was acting outside the scope of his employment.  *See Gurevich v. City of New York*, 2008 U.S.Dist. LEXIS 1800, *20 (S.D.N.Y. Jan. 10, 2008) (Because the defendants were acting within the scope of their employment, plaintiff's claim for negligent hiring and training was barred as a matter of law); *Hollins v. City of New York*, No. 10 Civ. 1650 (LGS) (S.D.N.Y. Mar. 3, 2014) (To establish a claim for negligent hiring, training and supervision, the defendant's actions must be outside the scope of his employment); *see also Velez v. City of New York*, 730 F.3d 128, 137 (2d Cir. 2013).  Plaintiff does not allege, and has no evidence to demonstrate, that any of the JHMC staff or the codefendant psychiatrists were acting outside the scope of their employment when they treated the plaintiff.  Therefore, plaintiff's cause of action for negligent supervision must be dismissed.

## POINT VI

### PLAINTIFF CANNOT MAINTAIN A CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A.   Plaintiff Cannot Satisfy the Elements to State a Claim for Intentional Infliction of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, plaintiff must prove the following elements:  "(1) extreme and outrageous conduct; (2) intent to cause or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Howell v. New York Post Co.*, 81 NY2d 115, 121 (1993); *see also Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996); *Slue v. New York University Medical Center*, 409 F.Supp.2d 349,

371 (S.D.N.Y. 2006); *Kraft, supra.*   The elements of a claim for intentional infliction of emotional distress are "rigorous and difficult to satisfy."   *Howell v. New York Post Co.*, 81 NY2d 115, 122 (1993).

To satisfy the first element, the conduct forming the basis of the allegation must be "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."   *Howell*, 81 NY2d at 122; *Fischer v. Maloney*, 43 NY2d 553, 557 (1978); *Slue*, 409 F.Supp.2d at 371 (recognizing that New York courts "require a very high threshold to establish a claim of intentional infliction of emotional distress").   Unless the conduct at issue is "sufficiently outrageous," plaintiff cannot establish a claim for intentional infliction of emotional distress. *See Kraft*, 696 F.Supp.2d at 423; *Howell*, 81 NY2d at 122; *Kirwin v. New York State Office of Mental Health*, 665 F. Supp. 1034 (E.D.N.Y. 1987) (citing *Murphy v. American Home Products, Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983)); *see also Cruz v. Ecolab Pest Elimination Div., Ecolab, Inc.*, 817 F. Supp. 388, 393 (S.D.N.Y. 1993) (Under New York law, liability for intentional infliction of emotional distress may be found only where conduct has been so outrageous in character and so extreme in degree as to go beyond all reasonable bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized community; allegations of conduct failing to rise to such extreme fail to state a cause of action); *George v. Hilaire Farm Nursing Home*, 622 F. Supp. 1349, 1354 (S.D.N.Y. 1985) (Claim of intentional infliction of emotional distress must be dismissed, absent showing of conduct by defendant exceeding all bounds usually tolerated by decent society); *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232 (1983).

Significantly, on a motion for summary judgment, "whether the conduct alleged may

reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine." *Hoffman v. County of Delaware*, 41 F.Supp.2d 195, 217 (N.D.N.Y. 1999) (dismissing intentional infliction of emotional distress claim in action in which plaintiff alleged violation of Article 9 of the Mental Hygiene Law); *Vumbaca v. Terminal One Group Association L.P.*, 859 F.Supp.2d 343, 377 (E.D.N.Y. 2012) (recognizing that whether conduct is sufficiently outrageous to satisfy the first element to state a claim is a matter of law); *Coliniatis v. Dimas*, 848 F. Supp. 462 (S.D.N.Y. 1994).

In *Wright v. City of New York*, 2001 U.S.Dist. LEXIS 8923 (S.D.N.Y. July 2, 2001), the plaintiff, a woman with Down's Syndrome whom the police had brought to Kings County Hospital, sued the New York City police for violation of her civil rights, and sued New York City Health and Hospitals Corporation for violation of due process, false imprisonment and intentional infliction of emotional distress when she was involuntarily hospitalized at Kings County Medical Center. The Court granted summary judgment to the defendants, finding that plaintiff "as a matter of law, provided insufficient evidence of extreme and outrageous conduct." 2001 U.S.Dist. LEXIS at *41. Several other Courts have also held that plaintiff cannot sustain a cause of action for intentional infliction of emotional distress in the context of false imprisonment and alleged violations of the Mental Hygiene Law. *See e.g. Nicholas v. City of Binghamton*, 2012 U.S. Dist. LEXIS 111736 (N.D.N.Y Aug. 7, 2012); *Kraft, supra*; *Hoffman*, 41 F.Supp.2d at 217. It is respectfully submitted that the conduct of about which plaintiffs complain is, as a matter of law, not sufficiently outrageous for plaintiff to state a claim for intentional infliction of emotional distress as to JHMC.

B.      Plaintiff's Cause of Action for Intentional Infliction of Emotional Distress
        is Duplicative, and Should Therefore Be Dismissed

New York Courts have held that "a cause of action for intentional infliction of emotional distress should not be entertained 'where the conduct complained of <u>falls well within</u> the ambit of other traditional tort liability.'" *Butler v. Delaware Otsego Corp.*, 203 A.D.2d 783, 784-785, 610 N.Y.S.2d 664, 665-666 (3d Dept. 1994) (emphasis original) (quoting *Sweeney v. Prisoners' Legal Servs. of New York*, 146 A.D.2d 1, 7, 538 N.Y.S.2d 370 (3d Dep't 1989); *see also Fischer v. Maloney*, 43 NY2d 553, 402 NYS2d 991 (1978) (Court of Appeals questioning whether the doctrine of liability for intentional infliction of emotional distress is applicable when the conduct complained of falls within the ambit of other traditional tort liability).

In *Twitchell v. Mackay*, 78 A.D.2d 125, 434 N.Y.S.2d 516 (4th Dept. 1980), the Appellate Division, Fourth Department, examined the various causes of action that could be brought against a physician, and found that if the physician "carried out his function in a negligent or improper fashion the fact remains that the legal concept for any malfeasance or misfeasance by defendant would quite properly fall under the label of medical malpractice." 78 A.D.2d at 129, 434 N.Y.S.2d at 519 (citing *Calhoun v. Grale*, 29 A.D.2d 766, 287 N.Y.S.2d 710 (2d Dep't 1968)). The Appellate Court reversed the trial Court and dismissed the cause of action alleging an intentional tort, finding that it did not allege a separate ground for recovery. The Court indicated that a physician's malfeasance or misfeasance, either of which may encompass <u>intentional</u> conduct, does not provide the basis for a cause of action separate and apart from a plaintiff's recovery under a traditional theory of medical malpractice. *See Travelers Property Casualty v. Weiner*, 174 Misc2d 831, 832-33, 666 NYS2d 392, 393 (Tompkins Co. 1997) (It is well-settled that efforts to adorn an intentional

tort cause of action with a companion negligence claim, based on the same act, must fail). Because plaintiff is asserting a cause of action for medical malpractice against JHMC for the same conduct that serves as the basis for his intentional infliction of emotional distress claim, the cause of action for the latter should be dismissed.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court grant defendant's motion and dismiss the Second Amended Complaint as to JAMAICA HOSPITAL MEDICAL CENTER in its entirety, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
      January 30, 2015

Respectfully submitted,

MARTIN CLEARWATER & BELL LLP


By: _____
Gregory J. Radomisli (GJR 2670)
Attorneys for Defendant
JAMAICA   HOSPITAL   MEDICAL
CENTER
220 East 42nd Street
New York, NY 10017
(212) 697-3122

2461667_1