Page 270

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X

ADRIAN SCHOOLCRAFT,

                              PLAINTIFF,

        -against-          Case No:
                           10CV6005(WS)

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
MARINO, Tax Id. 873220, Individually and in
his Official Capacity, ASSISTANT CHIEF
PATROL BOROUGH BROOKLYN NORTH GERALD
NELSON, Tax ID. 912370, Individually and in
his Official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax ID. 895117,
Individually and in his Official Capacity,
CAPTAIN THEORDORE LAUTERBORN, Tax ID.
897840, Individually an din his Official
Capacity, LIEUTENANT JOSEPH GOUGH, Tax ID.
919124, Individually and in his Official
Capacity, SGT. FREDERICK SAWYER, Shield No.
2576, Individually and in his Official
Capacity, SERGEANT KURT DUNCAN, Shield NO.
2483, Individually and in his Official
Capacity, LIEUTENANT CHRISTOPHER BROSCHART,
Tax ID. 915354, Individually and in his
Official Capacity, LT. TIMOTHY CAUGHEY, Tax
ID. No. 885374, Individually and in his
Official Capacity SERGEANT SHANTEL JAMES,
Shield No. 3004, Individually and in her
Official Capacity, SERGEANT RICHARD WALL,
Shield No. 3099, Individually and in his
Official Capacity, SERGEANT ROBERT W.
O'HARE, Tax ID. 916960, Individually and in
his Official Capacity, SERGEANT SONDRA
WILSON, Shield No. 5172, Individually and
in her Official Capacity, LIEUTENANT THOMAS
HALEY, Tax ID. 879761, Individually and in
his Official Capacity, CAPTAIN TIMOTHY'
TRAINOR, Tax ID. 899922. Individually and
in her Official Capacity, and P.O.'s "JOHN
DOE" #1-50. Individually and  in their
Official Capacity (the name John Doe being
fictitious, as the true names are presently
unknown) (collectively referred to as "City

1

2    Individually and in her Official Capacity
     as a Lieutenant with the New York City Fire
3    Department, JAMAICA HOSPITAL MEDICAL
     CENTER, DR. ISAK ISAKOV, Individually and
4    in his Official Capacity, DR. LILIAN
     ALDANA-BERNIER, Individually and in his
5    Official Capacity and JAMAICA HOSPITAL
     MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
6    Individually and in their Official Capacity
     (the name John Doe being fictitious, as the
7    true names are presently unknown)

8                        DEFENDANT.
    ------------------------------------------X
9

10               DATE: September 27, 2013

11               TIME: 10:12 a.m.

12

13

14            CONTINUED DEPOSITION of the

15    Plaintiff, ADRIAN SCHOOLCRAFT, taken by the

16    Respective Parties, pursuant to a Court

17    Order and to the Federal Rules of Civil

18    Procedure, held at the offices of Callan,

19    Koster, Brady & Brennan, LLP, One Whitehall

20    Street, New York, New York 10004, before

21    Pamela Ortalano, a Notary Public of the

22    State of New York.

23

24

25

```
 1                A. SCHOOLCRAFT

 2     A D R I A N   S C H O O L C R A F T ,

 3     called as a witness, having been first duly

 4     sworn by a Notary Public of the State of

 5     New York, was examined and testified as

 6     follows:

 7     EXAMINATION BY

 8     MR. BRADY:

 9          Q.    Please state your name for the

10     record.

11          A.    Adrian Schoolcraft.

12          Q.    What is your address?

13          A.    196 County Highway 107,

14     Johnstown, New York 12095.

15          Q.    Good morning, Mr. Schoolcraft.

16          A.    Good morning.

17          Q.    Yesterday I introduced myself.

18     It's Bruce Brady.  I represent Dr.

19     Aldana-Bernier.  Do you know who she is?

20          A.    She's one of the doctors at the

21     Jamaica Hospital.  I'm not sure which one.

22          Q.    You can't associate that name

23     with any of the particular doctors you

24     encountered at Jamaica?

25          A.    I believe it was the second
```

1                    A. SCHOOLCRAFT

2        A.    I don't recall.

3              MR. SMITH:  Generally, did he

4        give that information.

5              MR. LEE:  Right.

6              MR. SMITH:  Yes or no.

7        A.    I don't recall him explaining

8    anything to me other than asking me what

9    happened.

10       Q.    While you were in Jamaica

11   Hospital, were you afraid for your own

12   safety if you were going to be released?

13       A.    I don't recall feeling -- no, I

14   recall wanting to be released.

15       Q.    Were you concerned about what

16   the police might do to you after you were

17   released?

18       A.    I don't think I was thinking

19   about that at the time.  The mission at

20   that time was to get out, and if there was

21   a problem outside the hospital, then 1

22   would deal with that then.

23       Q.    Now, can you tell me what

24   happened at the meeting between yourself,

25   your dad, Dr. Isakov, the social worker

1                    A. SCHOOLCRAFT

2    and -- was it one person from IAB?

3         A.    Yes.

4         Q.    What took place in that

5    meeting?

6         A.    My father confronted Dr. Isakov

7    in trying to get a reason for being -- for

8    me being involuntarily committed to the

9    hospital.

10        Q.    Did Dr. Isakov respond to that?

11        A.    His response was, some -- to

12   the best of my memory, nobody's here

13   against their will.  We are just waiting

14   for word from his employer, or I think he

15   said NYPD.

16        Q.    He said he was waiting for word

17   from your employer?

18        A.    Correct.

19        Q.    Did he ask you for permission

20   to speak to Dr. Lamstein?

21        A.    He did not personally, no.

22        Q.    Did somebody tell you that he

23   wanted permission to speak to Dr. Lamstein?

24        A.    No.

25        Q.    Did you ever refuse him the

1                    A. SCHOOLCRAFT

2    ability to speak to Dr. Lamstein about your

3    evaluation?

4         A.    I refused to sign a HIPAA, if

5    that's the -- what he wanted, but if he had

6    asked me, yes, I would have refused.

7         Q.    When you spoke with Dr. Isakov

8    in any of your meetings with him, you

9    explained to him that you had seen Dr.

10   Lamstein; correct?

11        A.    Yes.

12        Q.    And you explained what your

13   interactions with her had consisted of?

14        A.    Correct. Any di -- first of

15   all, I don't believe any diagnosis she did

16   give, I don't believe she was -- I don't

17   believe I was her patient and anything I

18   believe she modified or restricted me, so I

19   believe there were issues in documents that

20   she created that I wanted to contest and I

21   wanted Dr. Isakov's opinion about my mental

22   health to be independent of the people I

23   was reporting corruption about, my job in

24   general.

25        Q.    Dr. Lamstein was the one

1                    A. SCHOOLCRAFT

2    responsible for taking your gun away;

3    correct?

4         A.    She was, correct.

5         Q.    And you told that to Dr.

6    Isakov; correct?

7         A.    In some fashion, yes.  I

8    believe he was aware.

9         Q.    So, it was reasonable for Dr.

10   Isakov to want to find out why that was;

11   correct?

12              MR. SMITH:  Objection to the

13         form.

14        A.    I think I answered that.  If he

15   asked me for those documents, I would have

16   explained to him that whatever she wrote

17   is -- I want to contest.  If -- I wanted

18   Dr. Isakov to have an independent opinion

19   about my mental health.  I didn't want

20   that, but I felt that was the only way out

21   of there other than giving him documents

22   that I've never seen by someone who is not

23   my doctor; who is my, in fact, my employer.

24        Q.    When you were seeing Dr.

25   Lamstein, she did explain that she was not