6C7-82155

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------X

4    ADRIAN SCHOOLCRAFT,

5                          Plaintiff,

6

                                  Case No:

7        - against -            10 CV 06005

8

     THE CITY OF NEW YORK, ET AL.,

9

10                       Defendants.

11   ------------------------------------------X

12                    220 East 42nd Street

                      New York, New York

13

                      July 7, 2014

14                    10:06 a.m.

15

16

17   DEPOSITION OF VINOD DHAR, M.D., pursuant to

18   Notice, taken at the above place, date and

19   time, before DENISE ZIVKU, a Notary Public

20   within and for the State of New York.

21

22

23

24

25

Page 2

```
 1
 2
    A P P E A R A N C E S:
 3
 4    NATHANIEL B. SMITH, ESQ.
          Attorneys for Plaintiff
 5        111 Broadway
          New York, New York 10006
 6
 7
    JOHN LENOIR, ESQ.
 8    Attorneys for Plaintiff
          829 Third Street NE
 9        Washington, D.C. 20002
10
11    NEW YORK CITY LAW DEPARTMENT
    OFFICE OF CORPORATION COUNSEL
12    Attorneys for Defendant
    THE CITY OF NEW YORK
13        100 Church Street
          New York, New York 10007
14    BY:   SUZANNA PUBLICKER METTHAM, ESQ.
15
16    SCOPPETTA SEIFF KRETZ & ABERCROMBIE
    Attorneys for Defendant
17    STEVEN MAURIELLO
          444 Madison Avenue
18        New York, New York 10022
    BY:   MARIANA OLENKO, ESQ.
19
20
    IVONE, DEVINE & JENSEN, LLP
21    Attorneys for Defendant
    DR. ISAK ISAKOV
22        2001 Marcus Avenue
          Lake Success, New York 11042
23    BY:   BRIAN LEE, ESQ.
24
    (Continued.)
25
```

Page 3

```
 1
 2
 3     (Continued.)
 4
         CALLAN, KOSTER, BRADY & BRENNAN, LLP
 5       Attorneys for Defendant
         DR. LILIAN ALDANA-BERNIER
 6            One Whitehall Street
              New York, New York 10004
 7       BY:   PAUL F. CALLAN, ESQ.
 8
 9       MARTIN CLEARWATER & BELL, LLP
         Attorneys for Defendant
10       JAMAICA HOSPITAL MEDICAL CENTER
              220 East 42nd Street
11            New York, New York 10017
         BY:   GREGORY RADOMISLI, ESQ.
12
13
14
       Also Present:
15
       Roy Lubit, M.D.
16
       Magdalena Bauza
17
18
19
20
21
22
23
24
25
```

Page 4

1
2    S T I P U L A T I O N S:
3    IT IS HEREBY STIPULATED AND AGREED by and
4    between the attorneys for the respective
5    parties hereto, that this examination may be
6    sworn to before any Notary Public.
7
8    IT IS FURTHER STIPULATED AND AGREED that the
9    filing and certification of the said
10   examination shall be waived.
11
12   IT IS FURTHER STIPULATED AND AGREED that all
13   objections to questions, except as to the
14   form of the question, shall be reserved for
15   the time of trial.
16
17
18
19
20
21
22
23
24
25

1

2          MR. SMITH:  Going on the record,

3     it's 10:06 on July 7, 2014.  We are at

4     the offices of Martin Clearwater and

5     Bell, 220 East 42nd Street.  Here for

6     the deposition of Jamaica Hospital on

7     the policy issues identified by the

8     court.

9          MR. RADOMISLI:  Yes.  Just a

10     couple of things.  One, pursuant to the

11     federal rules, we reserve the right to

12     review and make corrections to the

13     transcript.

14          Secondly, plaintiff's counsel

15     has brought Dr. Roy Lubit, L-u-b-i-t,

16     with him today.  He has represented him

17     as his expert.  So there are two

18     things.  One, we will object to any

19     other expert being identified insofar

20     as the psychiatric issues, given that

21     Dr. Lubit is here today.

22          Secondly, in light of Judge

23     Sweet's prior ruling that all

24     objections will be reserved for trial,

25     I am not going to bust this deposition

1

2      on the grounds that I believe that Dr.

3      Lubit does not have a right to be here.

4             However, we reserve our right to

5      take the position at trial that this

6      entire deposition transcript is annuled

7      as a result of Dr. Lubit's presence and

8      that it should not be and cannot be

9      used for any purpose, whether it be

10     impeachment or any other reason at the

11     time of trial.

12            MR. SMITH:  Okay, and of course,

13     the plaintiff disagrees with the

14     assertions by defense counsel that the

15     doctor is not entitled to be here.  I

16     also disagree with the assertion that

17     somehow him being here as an agent of a

18     party somehow precludes some other

19     agent for appearing on some other

20     occasion.  I know of no law or basis

21     and reason for such a position.

22            Finally, there is no basis that

23     I can see for reserving some right at

24     an unknown date for some unknown reason

25     to maintain an objection to this

Page 7

1
2        deposition, which is now going forward.
3            Would you mind swearing in the
4        witness.
5   V I N O D    D H A R, a Witness herein,
6   having been first duly sworn by a Notary
7   Public within and for the State of New York,
8   was examined and testified as follows:
9
10  EXAMINATION BY
11  MR. SMITH:
12
13      Q.     Will you state your name and
14  address for the record, please.
15      A.      My first name is V-i-n-o-d, V as
16  "Victor" last name is Dhar, D as "David"
17  h-a-r, address is Jamaica Hospital, 8900 Van
18  Wyck Expressway, Jamaica.
19            MR. SMITH:  Counsel, as we've
20        done in the past with some of the other
21        witnesses, I understand the witness has
22        provided his business address.  That's
23        fine with me.  I don't want to pry into
24        any kind of personal residence issues,
25        but I would only need the residence

```
1                VINOD DHAR, M.D.
2       information if at the time of trial or
3       some other hearing, I would need to
4       serve process on the doctor.
5                Given that, would you agree to
6       accept service of any papers that I
7       need to serve on the doctor for him to
8       appear as the 30(b)(6) witness in any
9       future proceedings.
10               MR. RADOMISLI:  If he's still an
11      employee of Jamaica Hospital at the
12      time, we would accept service, but
13      otherwise we would not.  If you just
14      want to ask him his address, you might
15      be better off.
16      Q.      All right, would you mind
17  providing us with your address, Doctor?
18      A.      My home address is 60, 6-0
19  Juniper Lane, Syosset, New York.
20      Q.      Where are you currently working?
21      A.      I work at Jamaica Medical
22  Hospital.
23      Q.      What's your title?
24      A.      I am currently the associate
25  chairman of the department of psychiatry.
```

Page 9

1              VINOD DHAR, M.D.

2        Q.      How long have you had that

3   position?

4        A.      I have had that position for

5   five -- almost nine years.  Actually at

6   Jamaica Hospital it would be seven years.

7        Q.      Have you had any other positions

8   while working at Jamaica Hospital?

9        A.      Yes.  I started as an attending.

10  Then the unit chief, and I went to Flushing

11  Hospital.  That's where I got my promotion

12  to associate chairman.

13       Q.      What's the relationship between

14  Flushing Hospital and Jamaica Hospital?

15            MR. RADOMISLI:  Objection to

16       form.  You can answer.

17       A.      In 1999 Jamaica Hospital took

18  over Flushing Hospital and came under the

19  umbrella Medisys Network.  So it was part of

20  the consortium in the same department.

21       Q.      When did you start working at

22  Jamaica as an attending?

23       A.      That was 1996.

24       Q.      And?

25       A.      To 1999 and then from 1999 to

1                VINOD DHAR, M.D.

2    2007, I was at Flushing.

3        Q.      When you were attending, were

4    you an attending in the psychiatric ward?

5        A.      I was inpatient psychiatric

6    unit.

7        Q.      Is that the same thing as being

8    in a ward?

9        A.      Yeah.

10       Q.      You also mentioned that you were

11   unit chief, what was that?

12       A.      Well, unit chief is responsible

13   for the both administrative and clinical

14   aspects of the inpatient unit, one unit.

15       Q.      What was your title at Flushing

16   Hospital?

17       A.      It started with the unit chief

18   and as we progressed in Flushing, then I

19   became the assistant director of inpatient

20   services and then the associate chairman of

21   the entire department.

22       Q.      Prior to joining Jamaica

23   Hospital in 1999, did you have any other

24   work?

25       A.      Yes.  I was in Dayton, Dayton

Page 11

1                    VINOD DHAR, M.D.

2    Mental Health Center from 1990 to 1995, '96.

3         Q.      What did you do in Dayton?

4         A.      I was an attending there.

5         Q.      Where is Dayton?

6         A.      Dayton, Ohio.

7         Q.      What did you do from 1996 -- so

8    '96 you went to Jamaica?

9         A.      Jamaica.

10        Q.      Before Dayton what did you do?

11        A.      I did my training at New York

12   Medical College, Valhalla.

13        Q.      What do you mean by saying you

14   did your training there?

15        A.      I did residency training in

16   psychiatry, general psychiatry.

17        Q.      How long was that?

18        A.      That was three years.  Then I

19   did two years of a fellowship in child

20   psychiatry.

21        Q.      Where?

22        A.      Same place, New York --

23   Westchester Medical Center.

24        Q.      Prior to being at New York

25   Medical College as a resident, what did you

Page 12

1                    VINOD DHAR, M.D.

2     do?

3          A.     I was in India.  I came here

4     after I did medical schooling in India.

5          Q.     So you went to medical school in

6     India?

7          A.     Yes.

8          Q.     Which one?

9          A.     It's called Medical College,

10    Government Medical in Kashmir.  State of

11    Kashmir.

12         Q.     What were the years of your

13    training at New York Medical College?

14         A.     That would be from 1981 to '86.

15         Q.     And from '86 to 90, what did you

16    do?

17         A.     I worked as an attending at

18    State Hospital, Harlem Valley Psychiatric

19    Center.

20         Q.     Where is that?

21         A.     It's Wingdale, Upstate,

22    New York.

23         Q.     Have you had any other forms of

24    employment, other than at State Hospital,

25    Dayton and Jamaica Hospital?

Page 13

1                    VINOD DHAR, M.D.

2        A.      No.

3                MR. RADOMISLI:   And Flushing.

4        Q.      Right and Flushing.  I meant to

5    include Flushing in that since they merged

6    with Jamaica, right?

7        A.      Yes.

8        Q.      So I will just restate that

9    question just to make it clear.

10               Other than being at State

11   Hospital, Dayton, Flushing and Jamaica

12   Hospital, you had no other employment as a

13   psychiatrist?

14       A.      No.

15       Q.      Have you had any private

16   practice as a psychiatrist?

17       A.      I have -- I am currently in

18   private.  It is a part-time small practice,

19   been there since '92 or '93, not sure.

20       Q.      Where is that practice?

21       A.      That's in Forest Hills, Forest

22   Hills.

23       Q.      How much of your working time do

24   you spend at private practice, as opposed to

25   working at Jamaica?

1             VINOD DHAR, M.D.

2       A.    I spend -- I have 40 hours of

3   work at Jamaica and I spend 15 to 20 hours

4   at the most private practice.

5       Q.    So it's about a third of your

6   working time is the private practice; is

7   that fair to say?

8       A.    Yes.

9       Q.    Is it fair to say you have

10  experience making decisions about

11  involuntarily committing patients based on

12  your work experience with State, Dayton,

13  Flushing and Jamaica?

14      A.    Yes.  But mainly at Jamaica.

15      Q.    Can you give me an approximation

16  of the number of patients that you've made a

17  decision to involuntarily commit to a

18  psychiatric institution?

19          MR. RADOMISLI:  Objection.  This

20      witness is a 30(b)(6) witness and so he

21      could talk about the policy of the

22      hospital.  Anything he does personally

23      I am going to object.

24          MR. SMITH:  Are you instructing

25      him not to answer that question?

Page 15

1           VINOD DHAR, M.D.
2           MR. RADOMISLI:  Yes.
3           MR. SMITH:  It's sort of just
4       getting his background about the issues
5       that he's going to be providing
6       information about.  You wouldn't object
7       if I asked if he was a doctor.  So I'm
8       not so sure getting some more pedigree
9       information about experence and
10      background is really inappropriate
11      instruction.
12          MR. RADOMISLI:  I think it is.
13      Q.     Well, is it fair to say that you
14  have extensive experience in involuntarily
15  committing patients?
16      A.     Yes.  I have experience because
17  I oversee the department.
18      Q.     Did State Hospital have an
19  involuntary policy?
20      A.     Yes, but State Hospital is
21  different and I am not familiar -- I wasn't
22  involved.  I was just treating the patients.
23  I don't know how the patients came there or
24  what status.
25      Q.     Well, as an attending at State

Page 16

```
 1                VINOD DHAR, M.D.
 2   Hospital, did you make decisions to
 3   involuntarily commit patients to the
 4   psychiatric ward?
 5              MR. RADOMISLI:  Same objection.
 6        A.    No.
 7        Q.    I'm sorry?
 8              MR. RADOMISLI:  I said same
 9        objection, but he already answered the
10        question.
11        Q.    The answer was no?
12        A.    Objection.
13              MR. SMITH:  Was there an answer?
14              (Record read.)
15              MR. CALLAN:  Could you read back
16        the question and answer, please.
17              (Record read.)
18        Q.    As the assistant chair in the
19   department of psychiatric -- the department
20   of psychiatry at Jamaica Hospital, what are
21   your duties?
22        A.    My duties include to see -- to
23   oversee of the day-to-day running of the
24   department, both clinical and
25   administrative.
```

1                VINOD DHAR, M.D.

2       Q.       What are the day-to-day clinical

3   duties?

4       A.       That means finding out the

5   patients that are in the ER inpatient, any

6   problematic patients, any second opinions on

7   any difficult patients and to attend the

8   administrative meetings.

9       Q.       So is it fair to say that in the

10  clinical part of your responsibilities at

11  Jamaica are to act as a supervisor for the

12  other psychiatrists that are working in the

13  emergency room and in the inpatient ward at

14  Jamaica Hospital?

15           MR. RADOMISLI:   Objection to

16       form and on the grounds that it's a

17       legal conclusion.

18      A.       Yes.

19      Q.       Is the answer yes?

20      A.       Yes.

21      Q.       What did you do to prepare for

22  today's deposition?

23      A.       I don't think I did anything

24  about preparing for the deposition.

25      Q.       Did you review any documents?

Page 18

1                VINOD DHAR, M.D.

2       A.     I reviewed the regular policies.

3       Q.     Can you describe for me what

4  you're referring to?

5       A.     The hospital policy.

6       Q.     Which one?

7       A.     The CPEP policy, actually.

8       Q.     What's the CPEP policy?

9       A.     CPEP is Comprehensive

10  Psychiatric Emergency Program and the

11  emergency room is part of the CPEP.

12      Q.     Did you review anything else?

13      A.     No.

14             MR. RADOMISLI:  You reviewed

15      other policies, correct?

16             THE WITNESS:  Other policies,

17      yes.

18      Q.     Tell me what policies you

19  reviewed?

20      A.     I reviewed the policy about our

21  emergency admissions and voluntary

22  admissions.

23      Q.     Anything else?

24      A.     Not that I can recall.

25      Q.     Did you speak to anybody, other

Page 19

1                    VINOD DHAR, M.D.
2    than your attorney, about your appearance
3    here today?
4         A.     My department chair knows about
5    that I'm here today.
6         Q.     Who is that?
7         A.     That's Dr. Vivek.
8         Q.     Other than informing your
9    chairman that you were going, did you
10   discuss anything about your testimony with
11   Dr. Vivek?
12        A.     I just informed him that I am
13   going there and he just told me to stay calm
14   and answer what you know.
15        Q.     And did you speak with anybody
16   else about your deposition?
17        A.     No.
18        Q.     Have you ever spoken with a Dr.
19   Isakov about this case?
20        A.     No.
21        Q.     Have you ever spoken with Dr.
22   Bernier about this case?
23        A.     No.
24        Q.     Have you ever spoken with
25   anybody, to your recollection, about Adrian

```
                                        Page 20
 1                  VINOD DHAR, M.D.
 2   Schoolcraft?
 3        A.     Actually, no, I haven't spoken
 4   about this case anytime.  No, I wasn't
 5   involved with this case, no.
 6        Q.     So I take it that you've never
 7   looked at the patient's chart in this case?
 8        A.     That's correct.  I never looked.
 9        Q.     And you never had any
10   discussions with anybody about the contents
11   of the chart?
12        A.     No.
13        Q.     That's correct, you never had
14   any discussions with anybody about --
15        A.     I never had any discussion, no.
16        Q.     One of the ground rules of the
17   depositions, I will just cover it now, is
18   it's important that you let me ask my whole
19   long meandering question, so that the court
20   reporter can take it down, give your lawyer
21   a chance to interject and then you get to
22   answer.
23        A.     I'm sorry.
24        Q.     No, it's okay, but if you
25   anticipate which is common, what I am asking
```

Page 21

```
1                   VINOD DHAR, M.D.
2    you and you answer it, she has to stop
3    taking down what I'm saying and break the
4    transcript up and say what you're saying, so
5    just take your time.
6         A.       Sure.
7         Q.       We're not in a hurry.
8         A.       One thing that my chairman told
9    me is just relax.
10        Q.       Well, I won't tell him.
11        A.       Okay.
12        Q.       The other really important
13   instruction is that since you're under oath,
14   it's important that you understand the
15   question, so if I ask you a question and
16   you're not sure about what I am asking you,
17   please let me know; okay?
18        A.       Sure.
19        Q.       Let show you what's been marked
20   as Exhibit 30 or Exhibit 130.  I have copies
21   for everybody.  This is a multipage document
22   containing several Jamaica policy statements
23   that were provided in discovery in this
24   case.
25        A.       Yeah.
```

Page 22

1               VINOD DHAR, M.D.
2        Q.      Are you -- I'm going to ask you
3    a lot of questions about these documents,
4    but before we get into each individual
5    policy, you mentioned that you had looked at
6    a CPEP policy.  Is that in this collection?
7        A.      No.  This is exclusively for the
8    emergency room.
9        Q.      Which is exclusively for the
10   emergency room?
11       A.      This policy.
12            MR. RADOMISLI:  Well, in 2009
13       did they have the CPEP?
14            THE WITNESS:  No.
15            MR. SMITH:  Okay.  So I'm not
16       sure, Greg, that the documents that the
17       witness has testified that he looked at
18       has been produced?
19            MR. RADOMISLI:  I'm sure it
20       hasn't and I didn't know he looked at
21       it frankly, because as we just
22       established, there was no CPEP in 2009.
23            MR. SMITH:  Well, you
24       established it.  I didn't establish it.
25            MR. RADOMISLI:  You can --

Page 23

1              VINOD DHAR, M.D.

2              MR. SMITH:  In any event, I

3       understand and I'm not disputing that

4       fact with you, but just as a matter of

5       form, I would like to know what the

6       witness has reviewed in preparing for

7       the deposition.  I am going to make a

8       request for a copy of the CPEP policy.

9              MR. RADOMISLI:  CPEP.

10              MR. SMITH:  Whatever it is.

11       Have it produced.

12              MR. RADOMISLI:  Taken under

13       advisement.  Please follow-up in

14       writing.

15       Q.      You don't have a copy of that

16  policy with you, do you?

17       A.      No, I didn't bring it with me,

18  no.

19       Q.      Did you review, in preparing for

20  your deposition any of the policy statements

21  that are contained within Exhibit 130?

22       A.      Well, actually this is part of

23  the CPEP.  This is one of the components of

24  the CPEP.  It's not going to be different

25  from the policy of the CPEP.  The CPEP has

```
                                    Page 24
 1                VINOD DHAR, M.D.
 2    three components and this is one of the
 3    components of the CPEP.
 4                MR. RADOMISLI:  Did you review
 5         anything, other than the documents that
 6         are in front of you today?
 7                THE WITNESS:  Yes.  A different
 8         policy, but that doesn't -- called
 9         from CPEP, Comprehensive thing about
10         the program, CPEP.
11         Q.    You see the first page of this
12    document?
13         A.    Yeah.
14         Q.    It's entitled Department of
15    Psychiatry Emergency Room Services.  See
16    that?
17         A.    Yeah.
18         Q.    This page, did you review this
19    page in preparing for your deposition?
20         A.    I mean, I didn't look at it for
21    preparing for the deposition, but I have
22    read it.  I know about it.
23         Q.    When was the last time you read
24    this page of this exhibit?
25         A.    I wouldn't recall the last time
```

1                    VINOD DHAR, M.D.

2    I read it.

3         Q.      You see on the bottom there's

4    some notations about review and revise?

5         A.      Hmm-mm.

6         Q.      And then there's some dates?

7         A.      Yes.

8         Q.      Do you see that?

9         A.      Yes.

10        Q.      Do you have any knowledge about

11   what those dates are?

12        A.      Well, when our policy is created

13   every year they're supposed to review and

14   update.  So this is what it means, it was

15   reviewed and revised.

16        Q.      Do you know who did the

17   reviewing and the revising?

18        A.       It is generally done by the

19   administrative staff, administrator and the

20   chairman.

21        Q.      And in October and

22   November 2009, who was the administrative

23   staff person involved from in the creation

24   of this policy?

25                MR. LEE:  Objection to the form.

Page 26

1              VINOD DHAR, M.D.

2        A.    I don't know.  He is not there

3    now.  I think his name was Mr. Mule.

4        Q.    Can you spell that for me?

5        A.    M-u-l-e.

6        Q.    Who was the chair?

7        A.    No, he -- the chair was Vivek,

8    Dr. Vivek.

9        Q.    Did you personally have any roll

10   in the review and revising of department of

11   psychiatric, psychiatry admission

12   procedures?

13       A.    Yes, review.

14       Q.    Were you part of a committee

15   that would regularly review this or was it

16   on an ad hoc basis that you would review the

17   procedure?

18       A.    On ad hoc basis.

19       Q.    See the second page of this

20   exhibit?

21       A.    Yes.

22       Q.    There is another policy

23   statement called involuntary legal status?

24       A.    Yeah.

25       Q.    Can you tell me what that

Page 27

```
 1                    VINOD DHAR, M.D.
 2    statement is about?
 3          A.       Can I review it for a second?
 4          Q.       Yeah, sure.
 5          A.       This is 927.  That means any
 6    involuntary patient -- a patient who needs
 7    to be admitted to the hospital, psychiatric
 8    hospital on an involuntary basis can be
 9    admitted by what's called a two physician
10    certification.
11          Q.       And that's what this policy
12    provides for?
13          A.       Yes.
14          Q.       How many ways can a patient be
15    involuntary committed to the psychiatric
16    emergency room or the psychiatric ward at
17    Jamaica Hospital?
18                   MR. RADOMISLI:  Objection to the
19          form.
20          A.       There are essentially only one
21    way -- two ways.  One is 939, and under that
22    article you can admit a patient who is
23    potentially dangerous to self or others to a
24    psychiatric emergency room.
25          Q.       What's the other way?
```

1                  VINOD DHAR, M.D.

2      A.      Other way is the patient can be

3   admitted on 2PC.

4      Q.      And that's this 927?

5      A.      927, yeah.

6      Q.      How is 939 and 927, how are they

7   different?

8      A.      939 is when a patient comes

9   directly into the emergency room and he is

10   brought by -- there is a number of agencies

11   that can bring the patient there.  927 is

12   when a patient is transferred from other

13   hospital on an involuntary basis.

14      Q.      Is 939 what's known as an

15   emergency involuntary commitment?

16      A.      Yes.

17              MR. RADOMISLI:  Objection to

18         form.

19      Q.      What are the types of agencies

20   that bring in an individual under 939?

21      A.      I think there is a police

22   officer, director of community services,

23   physicians, psychiatrists, and family member

24   can apply or someone who is interested can

25   apply for patient put in application for

```
1                    VINOD DHAR, M.D.
2    patient involuntary admission and through
3    the court system.
4              MR. RADOMISLI:  He asked you
5         about 939 only.
6              THE WITNESS:  Yeah.
7         Q.    In order for a patient to be
8    involuntary committed under 939, what
9    medical or psychiatric conclusions need to
10   be made?
11             MR. RADOMISLI:  I've given you a
12        little bit leeway, but you're going
13        beyond the scope.  If you're just
14        asking in general, you want to say
15        pursuant to the Jamaica Hospital
16        policy.
17             MR. SMITH:  Okay.  All right,
18        that's fine.  I will restate the
19        question.
20             MR. RADOMISLI:  Then he can look
21        at the policy if you want.
22             MR. SMITH:  Well -- I don't want
23        him to just read back what the words on
24        the paper are.  I want to know how the
25        policy is actually applied and
```

1              VINOD DHAR, M.D.

2      effectuated.  If it was just to read

3      the piece of paper we wouldn't need a

4      witness.  I could just read it in my

5      office.

6              MR. RADOMISLI:  No. No.  I

7      understand that.  You can go through

8      the policy and ask him what it all

9      means.  That's fine, but it's just the

10     general.

11             MR. SMITH:  All right, okay.  So

12     then I will rephrase the question the

13     way your counsel has requested that I

14     do so.

15     Q.      Under Jamaica Hospital's policy,

16 what medical or psychiatric conclusions are

17 required in order to involuntarily commit a

18 patient to the hospital, either in the

19 psychiatric emergency room or in an

20 inpatient service area or a ward?

21             MR. RADOMISLI:  Under 939?

22             MR. SMITH:  Under 939.

23     A.      Patient has to be --

24             MR. SMITH:  The record should

25     reflect that counsel has just shown the

Page 31

1                VINOD DHAR, M.D.

2        witness the emergency admission policy

3        of the hospital.

4                MR. RADOMISLI:  Which is part of

5        Exhibit 130.

6                MR. SMITH:  Right, I know, but

7        it's slightly suggestive of you to be

8        showing him documents when I'm asking

9        him questions.

10               MR. RADOMISLI:  I don't think

11       it's suggestive.

12               MR. LEE:  Wasn't the question

13       about the policy?

14               MR. SMITH:  You too now want to

15       join in on this?

16       Q.      Can you just answer my question,

17  please?

18       A.      A patient has to be a danger to

19  self or someone else.  That dangerousness or

20  patient has to be not capable of taking care

21  of himself for medical or his health or his

22  living arrangement.

23       Q.      And how do the staff at the

24  hospital make this determination about

25  dangerousness?

1          VINOD DHAR, M.D.

2      A.     It's based on what the -- when

3  the patient comes to the hospital, the

4  report, accompanying person.  And then it is

5  evaluation by the psychiatrist.

6      Q.     Is there any methodology or a

7  checklist or some other factors that are

8  regularly looked at in effectuating the

9  Jamaica Hospital policy?

10     A.     Yeah.  I mean, there is about

11 policy regarding psychiatric evaluation, how

12 that is to be done, what is to be noted in

13 that evaluation, and based on that

14 evaluation you're to come up to a diagnosis

15 and then based on the diagnosis, you then

16 make a decision.

17     Q.     Are some of the factors that you

18 just identified -- let me rephrase that

19 question.

20           The factors that you just

21 identified for the psychiatric evaluation,

22 are those factors that are examined for

23 purposes of determining whether or not a

24 person has a mental illness or are they

25 looked at for purposes of determining

Page 33

```
 1                VINOD DHAR, M.D.
 2    whether or not that person is a danger to
 3    themselves or to others or is it just a
 4    combination of things?
 5         A.      Combination.
 6         Q.      So can you tell me what are the
 7    factors under the Jamaica Hospital policy
 8    that are looked at in order to determine
 9    whether or not a patient is dangerous to
10    himself or herself or others?
11         A.      Patients -- when patients are
12    brought in by any agency, and based on their
13    reports and what are the reasons why the
14    patient was coming in, brought to the
15    hospital and that would be the sort of the
16    starting point.
17         Q.      So that's the beginning of the
18    information that's required to find out what
19    the relator or the provider of the
20    information says, right?
21         A.      Yes.
22         Q.      Can you tell me what other
23    factors are looked at in making this
24    assessment?
25         A.      Well, there is you do the
```

Page 34

1              VINOD DHAR, M.D.

2    comprehensive psychiatric evaluation to see

3    whether the patient has any history of

4    mental illness.  On dangerousness you have

5    to see what are the circumstances under

6    which the patient was brought to the

7    hospital and were there any specific threats

8    made or what was mentioned.

9         Q.     I'm sorry, any specific what?

10        A.     Threats.

11        Q.     Anything else?

12        A.     Well, we're also going to the

13   background, history, if we have any

14   information resources at that time to get

15   the person's history.

16        Q.     Are there any standard guides

17   that are employed or used by Jamaica

18   Hospital in making this assessment of

19   dangerousness?

20             MR. RADOMISLI:  Can you read

21        that back.

22             (Record read.)

23        A.     Yes.

24             MR. RADOMISLI:  Just a second.

25             MR. LEE:  Can we agree that all

Page 35

1               VINOD DHAR, M.D.
2       of your questions are as these policies
3       existed in 2009, not as they currently
4       exist since?  The question was of a
5       present tense question?
6               MR. SMITH:  Was.  They've all
7       been like that.
8               MR. LEE:  Obviously, what was
9       the standard, if any, applied in 2009.
10              MR. SMITH:  Well, once I figure
11      out what the standard is, then I can
12      ask.
13              MR. LEE:  It may be different
14      now.
15              MR. SMITH:  Yeah, no, I know.
16              MR. RADOMISLI:  Well, I've been
17      interpreting it as 2009.
18      Q.      Can you just answer my question?
19              MR. SMITH:  I think your
20      suggestion is a good one, Brian, so I
21      will try and get to the bottom of the
22      issue right now.
23      Q.      Can you answer my question?
24      A.      Can you repeat the question?
25              (Record read.)

Page 36

1                    VINOD DHAR, M.D.
2                    MR. RADOMISLI:  As part of the
3          policy in 2009.
4                    MR. SMITH:  Yes, okay fine.
5                    MR. RADOMISLI:  Objection to
6          form.
7          A.        We have the policy in place
8     now --
9                    MR. RADOMISLI:  Not now.  2009.
10         A.        2009 I'm not sure.  I'm -- I
11    don't recall of any checklist or any other
12    way of examining, other than based on the
13    history.
14         Q.        The history is this
15    comprehensive psychiatric evaluation?
16         A.        Yes.
17         Q.        How long does that typically
18    last?
19         A.        It lasts -- it can last anytime
20    anywhere from an hour or you may have to
21    redo the evaluation from time to time.
22         Q.        So it can take an hour or more?
23         A.        Yes.
24         Q.        What is or what are the
25    guidelines or the factors that Jamaica

Page 37

1                    VINOD DHAR, M.D.
2    Hospital looks at today in making this
3    dangerousness assessment?
4              MR. RADOMISLI:  I'm going to
5         object and direct the witness not to
6         answer.
7              MR. SMITH:  Well, the only way
8         for me to get this is to find out
9         whether or not if he doesn't have a
10        specific recollection of what the
11        status was of a policy in 2009 I need
12        to be able to find out what he knows
13        about what the policy is today which he
14        clearly is capable of providing me and
15        then find out whether or not he has any
16        reason to think that it's changed since
17        2009.
18             MR. RADOMISLI:  Well, how could
19        he know if it's changed or not if he
20        doesn't recall what the policy is in
21        2009?
22             MR. SMITH:  Well, the question
23        as formed it's impossible, nobody has a
24        photograph memory about what was going
25        on in a particular place when you got a

Page 38

1              VINOD DHAR, M.D.
2       moving entity.  So it's just -- if you
3       want to interfere with the examination
4       in this way, then you can go ahead and
5       do so and we will just have to bring
6       the doctor back.
7              MR. RADOMISLI:  I don't want to
8       interfere.  I want to assert a
9       legitimate objection and I believe him
10      to testify about the policy today when
11      the treatment was in 2009 is a
12      legitimate basis for me to object and
13      direct him not to answer the question.
14             MR. SMITH:  Well, it's not a
15      proper basis for direction not to
16      answer the question.  Since the judge
17      is away on vacation, you're just taking
18      advantage of that fact and we are just
19      going to have the witness come back and
20      come back to my office and I will make
21      the application if you're going to
22      stand by that instruction.
23             MR. RADOMISLI:  How is what the
24      policy is today relevant to what's
25      pertinent in 2009?

1              VINOD DHAR, M.D.

2              MR. SMITH:  I want to be able to

3     find out what the policy is today, so I

4     could find out whether or not he has

5     knowledge about whether or not it's

6     changed in the last five years.

7              MR. RADOMISLI:  Okay.  So why

8     don't you ask him if he knows whether

9     or not it's changed before --

10             MR. SMITH:  First, I need to

11    establish what it is.  This is really

12    getting absurd.  This is getting

13    absurd.  You want to play games with

14    me --

15             MR. RADOMISLI:  No, I don't want

16    to play --

17             MR. SMITH:  Then we'll just cut

18    it out and I will just make the

19    application now.

20             MR. RADOMISLI:  I don't want to

21    play games at all.  I want to be able

22    to --

23             MR. SMITH:  Well, you're playing

24    games --

25             MR. RADOMISLI:  -- I don't --

Page 40

1                    VINOD DHAR, M.D.

2              MR. SMITH:   The witness can't

3        tell me what the actual policy was five

4        years ago, but the witness can

5        certainly tell me generally what the

6        policy has been over the past few years

7        and whether or not it's changed.   Okay.

8              MR. RADOMISLI:   Ask him if he

9        knows whether or not it's changed.

10       Regardless what the policy is, you can

11       ask him do you know --

12       Q.       To your knowledge, sir, since

13   you joined or started working at Jamaica

14   Hospital, has its policy about assessing the

15   dangerousness of a patient changed?

16       A.       My knowledge it has.

17       Q.       How has it changed?

18             MR. LEE:   Just note my

19       objection.

20             MR. SMITH:   Great.

21             MR. RADOMISLI:   Between 2007 and

22       2009?

23             MR. SMITH:   No.

24       Q.       How has it changed in the

25   history of your career at Jamaica, how has

Page 41

1              VINOD DHAR, M.D.
2    the assessment of the dangerousness changed?
3              MR. RADOMISLI:  I dont' believe
4         he's permitted to answer or required to
5         answer questions about things that
6         occurred after 2009, including the
7         policy.
8              MR. SMITH:  So you're going to
9         direct him not to answer the question.
10             MR. RADOMISLI:  In that form.
11        If you want to limit to anything that
12        occurred while he was there --
13             MR. SMITH:  You just told me
14        because your co-counsel suggested it to
15        him that he doesn't have any
16        recollection about what the policy was
17        in 2009, okay.  So now I've asked the
18        question broadly and you're objecting
19        to that.  So if you want to continue to
20        interfere with my examination I'm going
21        to stop and I'll call the judge and I
22        will tell him what's going on and we
23        will decide and we'll be here all day
24        long with this nonsense.
25             MR. RADOMISLI:  If you want to

Page 42

```
 1            VINOD DHAR, M.D.
 2      call the judge and get a ruling now,
 3      that's fine with me.
 4            MR. LEE:  Let me just say I
 5      didn't suggest anything, other than --
 6            MR. SMITH:  Yes, you did.  You
 7      did.  You started this problem, Brian.
 8            MR. LEE:  This is what the
 9      deposition is about.  It's about the
10      policy --
11            MR. SMITH:  It's about you
12      getting in the way of my finding out
13      basic information policy.  That's what
14      it's about.
15            MR. LEE:  I respectfully
16      disagree with that.
17            MR. RADOMISLI:  If you're going
18      to call the court, please do in our
19      presence.
20            MR. SMITH:  We are going off the
21      record.
22            (Discussion off the record.)
23            MR. SMITH:  Going back on the
24      record.  It's 11:21.
25            While we were off the record for
```

Page 43

```
1                 VINOD DHAR, M.D.
2         about looks like 20, 25 minutes I
3         called the court at 10:54, I spoke with
4         Judge Sweet's law clerk, Adam Chen.  We
5         had a -- I think it was an on the
6         record discussion or an off the record
7         discussion about instructions not to
8         answer certain questions and Mr. Chen
9         said that since Judge Sweet is away, he
10        didn't know whether or not he was going
11        to be able to get back to us with a
12        ruling and we've waited or I've waited
13        approximately 25 minutes and there has
14        been no indication from the court that
15        we will get a ruling.  So I am going to
16        proceed with my examination and note
17        that I object to the needless
18        interference with the order and
19        methodology with which I wanted to take
20        this witness' deposition.
21             Q.    Can you turn, sir, to
22    Exhibit 130.  You have that still in front
23    of you?
24             A.    Yeah.
25             Q.    Do you have an emergency
```

Page 44

```
 1                    VINOD DHAR, M.D.
 2      admission status policy, which is the
 3      fourth, fifth and the sixth page of the
 4      exhibit?
 5           A.     The page number?
 6           Q.     It's page number -- start on
 7      page 17 and it goes through 19.
 8           A.     Okay.
 9           Q.     Yes.
10                  MR. RADOMISLI:   Starting at 17.
11           Q.     Starting with 17, please.
12           A.     Okay, sure.
13           Q.     Are you familiar with this
14      policy statement?
15           A.     Yes, I'm familiar.
16           Q.     When was the last time, other
17      than just now, that you've read this
18      statement?
19           A.     This I read recently when I
20      reviewed the policy on CPEP.
21           Q.     So this was one of the policy
22      statements that was part of the statements
23      that you reviewed?
24           A.     CPEP.
25           Q.     Did you have any role in the
```

1                    VINOD DHAR, M.D.
2    creation of this document, this three-page
3    document, which is pages 17, 18 and 19?
4          A.     No.
5          Q.     Who created this document?
6          A.     This is created by the
7    administration -- administrator and the
8    chairman.
9          Q.     Who are those people?
10         A.     Same people, Mr. Mule and Dr.
11   Vivek.
12         Q.     The administrator.  Is this what
13   we refer to as the 939 admission or
14   involuntary admission?
15         A.     That's correct.
16         Q.     In the second paragraph under
17   heading policy it says that the patient's
18   alleged to have a mental illness.  Do you
19   see that reference there to a mental
20   illness?
21         A.     Yeah.
22         Q.     Am I correct that one of things
23   that's required in order to admit somebody
24   involuntary is a medical or psychiatric
25   determination that an individual has a

Page 46

1                    VINOD DHAR, M.D.

2   mental illness?

3              MR. RADOMISLI:  Objection.

4              MR. CALLAN:  Object to the form

5        of the question.

6        Q.     Is that correct?  You could

7   answer.

8        A.     Yes.

9        Q.     And am I correct that the

10  comprehensive psychiatric evaluation is the

11  means whereby a determination of this mental

12  illness issue is made?

13       A.     Yes.

14       Q.     You said the comprehensive

15  psychiatric evaluation, it takes an hour or

16  more?  Right, remember saying that?

17       A.     Yes.

18              MR. CALLAN:  Objection to the

19        form.  Are you talking about -- I just

20        want to know the timeframe you're

21        talking about.  Are you talking about

22        currently or in general or --

23              MR. SMITH:  I'm talking about in

24        general.

25              MR. CALLAN:  This is in general?

                                        Page 47

1                   VINOD DHAR, M.D.
2              MR. SMITH:  Yes, this is in
3        general.
4              MR. CALLAN:  I object to the
5        form of the question and I also object
6        on the grounds that it's not relevant
7        as to what the current policy is.
8              MR. LEE:  I join.
9              MR. RADOMISLI:  Me too.
10       Q.     You said that the comprehensive
11  psychiatric evaluation takes an hour or
12  more, right?
13       A.     Yes.
14       Q.     Is the hour or more, is that the
15  assessment that's done by the professional
16  of the patient?
17       A.     By the psychiatrist.
18       Q.     So the psychiatrist spends at
19  least an hour with the patient; is that
20  correct?
21       A.     Yes.
22       Q.     Does the psychiatrist spend time
23  speaking with anybody else?
24       A.     The psychiatrist has to spend
25  time with the person who brings the patient

1                    VINOD DHAR, M.D.

2    in, the staff that saw the patient, the

3    family members or any other source of

4    information that he can get information

5    from.

6         Q.     Does the hospital policy provide

7    for the training for staff to conduct this

8    kind of assessment?

9         A.     Yes.

10        Q.     How?

11        A.     Well, if you're a -- you've done

12   a residency in psychiatry that makes you --

13   that qualifies you to do a psychiatric

14   examination.  Then there are from time to

15   time in-services and updates in the

16   psychiatry examination.

17        Q.     How long does it take the

18   resident to become qualified to do this

19   evaluation?

20             MR. RADOMISLI:  I am going to

21        object.  It's beyond the scope.  Don't

22        answer.

23             MR. SMITH:  Don't answer the

24        question?

25             MR. RADOMISLI:  It's beyond the

Page 49

1           VINOD DHAR, M.D.
2     scope of the deposition.
3           MR. SMITH:  So that's a
4     relevancy objection.
5           MR. RADOMISLI:  There is a court
6     order limiting this examination to the
7     policy and procedure at Jamaica
8     Hospital regarding involuntary
9     hospitalization.  That question does
10    not go to it.
11          MR. SMITH:  It doesn't?  What
12    does it go --
13          MR. RADOMISLI:  Training.
14          MR. SMITH:  It goes to how the
15    policy is effectuated at the hospital.
16    So I mean like I said before --
17          MR. RADOMISLI:  It doesn't.
18          MR. SMITH:  So how the hospital
19    or whether or not the hospital provides
20    any means for its personnel to figure
21    out whether or not somebody has a
22    mental illness isn't relevant to the
23    policy of hospital?
24          MR. RADOMISLI:  I thought you
25    already asked that question.

Page 50

1              VINOD DHAR, M.D.

2              MR. SMITH:  I'm trying to find

3        out what the hospital does to find out

4        whether or not the people who are

5        making this assessment about mental

6        illness have any qualifications to do

7        so. You don't think that goes to their

8        policy?  Or maybe their policy is to

9        have people who have no medical

10       training at all to make these

11       assessments.  You want to tell me

12       whether or not that's an appropriate

13       question?

14       Q.      Doctor tell me this, do the

15  people who make the assessments under

16  Jamaica Hospital policy have any training or

17  any qualifications for making the decisions

18  they make?

19              MR. RADOMISLI:  Asked and

20       answered.

21       Q.      You can answer it again.  Do

22  they have any training, do they have any

23  experience, what experience do they have if

24  they have any?

25              MR. CALLAN:  Objection.

1              VINOD DHAR, M.D.

2         MR. LEE:  Objection.

3         MR. RADOMISLI:  Objection.

4    That's beyond the scope and to the

5    form.

6         MR. SMITH:  You're telling him

7    not to answer that question?

8         MR. RADOMISLI:  It's an improper

9    question based on the court order

10   limiting this deposition.

11        MR. SMITH:  This is beyond the

12   -- you are doing whatever you can to

13   interfere with my ability to ask basic

14   questions --

15        MR. RADOMISLI:  I am just asking

16   you to comply with the court --

17        MR. SMITH:  No, you're not.

18   This is ridiculous.  I can read the

19   policy statement.  What you're

20   basically telling me is if I don't ask

21   you what it says in black and white on

22   the page he doesn't have to answer the

23   question.  I don't know how you're

24   interpreting this court order and you

25   haven't explained to me how.

1              VINOD DHAR, M.D.

2          MR. RADOMISLI:  I'll tell you.

3      You could do what you did before, which

4      is ask him to explain all the terms

5      which are on the policy.

6          MR. SMITH:  All right, well, the

7      witness is going to have to come back

8      and I'm not going to do this at your

9      office any more.

10         MR. RADOMISLI:  Do you think

11     things would be going differently if we

12     were at your office?

13         MR. SMITH:  No, I am just not

14     going to accomodate you in the way that

15     you've requested that I accomodate you

16     in the past, because I've come up here,

17     brought my assistants and --

18         MR. RADOMISLI:  Entourage --

19         MR. SMITH:  -- And my files with

20     me and this is what I get.  So the

21     cooperation that I've extended to you

22     in the past is not going to come -- the

23     witness will have to come and come back

24     to my office.

25         MR. RADOMISLI:  We will see.

Page 53

1              VINOD DHAR, M.D.
2              MR. SMITH:   Right.   We will see.
3       Q.      So how does Jamaica make sure
4    that its policy about determining about
5    whether or not somebody has a mental illness
6    is complied with?
7       A.      By psychiatric evaluation.
8       Q.      How does Jamaica determine that
9    the people doing the evaluation have any
10   qualifications to do that?
11              MR. RADOMISLI:   Objection.
12       Beyond the scope.
13       Q.      You want to answer my question?
14              MR. RADOMISLI:   No. I'm
15       objecting.   I'm directing him not to
16       answer.   It's beyond the scope of the
17       deposition given the court order.
18       Q.      What is the mental illness
19   within the meaning of this policy statement?
20       A.      Mental illness is any sort of
21   illness that meets the criteria of the
22   DSM-IV.
23       Q.      What are those?
24       A.      Well, there are different kinds
25   of mental illnesses.

Page 54

1          VINOD DHAR, M.D.

2     Q.     Tell me all of them.

3          MR. RADOMISLI:  All of them?

4     Q.     Yeah, I want to know what the

5     mental illnesses that fall within the scope

6     of this policy scope are?

7          MR. RADOMISLI:  If -- you can't

8          ask him to go through and recite the

9          DSM-IV, but you can certainly --

10          MR. SMITH:  Excuse me, your

11          function here is to object.  If you

12          want to interfere, you can tell him not

13          to answer that question, but your

14          speeches are inappropriate.  Okay.  So

15          cut it out.  I'm done with the

16          interference.  Completely done.  You

17          can instruct him not to answer the

18          question.  You can object to the form

19          or you can leave.  Those are your

20          choices.  Which is it going to be?

21          MR. RADOMISLI:  Well, I'm not

22          going to limit myself to those options.

23          But for this particular question, I

24          will object to the form.

25     Q.     You want to answer the question,

Page 55

1              VINOD DHAR, M.D.
2     please?  What are the mental illnesses that
3     fall within the scope of this term that fall
4     within this term that's in your policy
5     statement?
6              MR. RADOMISLI:  Objection to the
7         form.
8              THE WITNESS:  I can answer?
9              MR. RADOMISLI:  Yes.
10        A.      Okay.  Mental illness is any
11    person, who because of mental illness,
12    mental illness means a number of diseases,
13    number of problems.  It could be from
14    schizophrenia, psychosis to depression, to
15    traumatic brain injury and that results in
16    symptoms causing harm to self or others.
17        Q.      Any other conditions that fall
18    within the definition of mental illness
19    within the policy statement?
20             MR. RADOMISLI:  Objection to
21        form, asked and answered.  You can
22        answer.
23        A.      There are a number of diseases
24    under the DSM-IV, but this criteria is
25    specific for any condition that could lead

1                VINOD DHAR, M.D.
2    to a person being harmed self and others.
3    It could be from panic attack, it could be
4    from acute anxiety, it could be from brief
5    psychotic episode.  So there are a number
6    illnesses which don't necessarily meet this
7    criteria.
8         Q.     Can you explain that answer?  I
9    don't understand that.
10        A.     The patient is suffering from --
11   let me rephrase it.  Patient comes with a
12   behavior, certain behavior, we have to
13   determine whether that patient -- whether
14   the behavior is because of mental illness.
15   We have to do an examination to figure out
16   what kind of mental illness this patient is
17   suffering from.  But before we come to that,
18   we have to keep the patient in the emergency
19   room to figure out what's going on.
20        Q.     In the second paragraph of this
21   policy statement there is a phrase that
22   reads:  Patient's alleged to have a mental
23   illness for which immediate observation,
24   care and treatment in the hospital is
25   appropriate.  That's the first part of that

Page 57

1                VINOD DHAR, M.D.

2    policy statement.  You see that?

3        A.    Yes.

4        Q.    Do I understand you to be

5    telling me that any kind of mental illness

6    can qualify for the type of mental illness

7    which can lead to an involuntary commitment

8    to the patient?

9             MR. RADOMISLI:  Objection.

10       Scope.

11       A.    What I am saying is that patient

12   alleged to have mental illness for immediate

13   observation, care and treatment in the

14   hospital is appropriate can qualify for

15   that.

16       Q.    What I want to know, what are

17   the kinds of mental illnesses that are being

18   referred to in this policy statement?

19             MR. RADOMISLI:  Asked and

20       answered.

21       A.    Same I mentioned before, any

22   kind of illness, any kind of behavior can

23   qualify for this statement.

24       Q.    So any mental illness; is that

25   fair to say?

Page 58

1                    VINOD DHAR, M.D.

2        A.      Yes.

3        Q.      And it says in the statement

4   here it's a mental illness for which

5   immediate observation, care and treatment is

6   appropriate?

7        A.      Yes.

8        Q.      Why does it have to be for

9   immediate observation, care and treatment?

10        A.      Because of the dangerousness.

11        Q.      When a patient is brought into

12   Jamaica Hospital and is being assessed under

13   this policy statement, does the

14   comprehensive psychiatric evaluation have to

15   be done right away?

16        A.      Not necessarily.  It can be done

17   in an unspecified time.  Immediately you

18   have to see whether there is any acute

19   symptoms that need to be controlled.  If the

20   patient is not cooperative, you cannot do

21   it, you cannot examine the patient, the

22   patient is not willing to be examined --

23   answer questions.  So it has to be -- it's

24   very -- it's actuality not specified what

25   exactly means immediate evaluation.  It

1                    VINOD DHAR, M.D.

2    could be as soon as the patient comes in you

3    can start the treatment or it could be until

4    the patient is willing to talk.

5         Q.     Does Jamaica Hospital have a

6    policy about when the comprehensive

7    psychiatric evaluation has to be conducted

8    by?

9         A.     There is not a policy, but it's

10   standard that within eight hours admission

11   to the emergency room and it also depends on

12   how busy the ER is.

13        Q.     Do I understand what you're

14   saying that there's no written policy at

15   Jamaica Hospital for when the psychiatric

16   evaluation has to be conducted by?

17        A.     Not that I'm familiar with.

18        Q.     But you're telling me there is a

19   practice of doing so?

20        A.     It's eight hours.

21        Q.     And that's not in writing?

22        A.     That's not in writing.

23        Q.     And it's eight hours depending

24   upon -- you also said it's eight hours, it

25   was also depending upon how busy the ER was?

Page 60

1                    VINOD DHAR, M.D.

2        A.        How busy the eye ER was.

3        Q.        When you're referring to the ER,

4    you're referring to the medical ER or the --

5        A.        No, referring to the

6    psychiatric.

7        Q.        So we're talking about the

8    psychiatric ER; is that correct?

9        A.        Yes.

10       Q.        How is this eight hour practice

11   communicated to the staff that are expected

12   to comply with it?

13       A.        It's done through in-services.

14       Q.        I don't understand what that

15   means.

16       A.        It means when you have staff

17   meetings, you talk about how -- within what

18   timeframe the assessment should be done and

19   how if there's a problem or anything whether

20   you need a second staff member.  That's how

21   it is taught to the staff.

22       Q.        So the eight-hour goal or

23   practice objective is discussed at staff

24   meetings; is that correct?

25                 MR. RADOMISLI:  Objection to the

1                VINOD DHAR, M.D.

2        form.   You can answer.

3        A.     Yes, it's a in-service.   It is

4    our case conferences, in-services and staff

5    meetings.

6        Q.     This practice of the hospital of

7    having this comprehensive psychiatric

8    evaluation done within eight hours,

9    depending upon how busy the psych ER, that

10   evaluation has to be done by who under

11   the --

12       A.     The staff psychiatrist who has

13   been given by the privileges in the hospital

14   by credential committee and approved by the

15   chairman.

16       Q.     Who were the staff psychiatrists

17   in 2009 that were the ones that were

18   required to conduct this comprehensive

19   evaluation?

20            MR. RADOMISLI:   Objection to

21       form and the scope.

22            MR. CALLAN:   Join in the

23       objection.

24            MR. LEE:   Objection.

25            MR. RADOMISLI:   But you can

Page 62

1                    VINOD DHAR, M.D.

2        answer.

3        A.      The are a number of

4    psychiatrists who work in the emergency

5    room.  Some who are called on-call, meaning

6    they provide extra services during evening

7    and night hours, but the main person during

8    the daytime was Dr. Bernier.

9        Q.      Other than these on-call

10   psychiatrists and Dr. Bernier, was there

11   anybody else who could do the comprehensive

12   psychiatric evaluation in October or

13   November 2009?

14              MR. RADOMISLI:  Objection to

15       form and scope.

16       A.      I am not sure if we had

17   residents at that time, but if they're

18   residents, they could do it, resident

19   physician, under the supervision of the

20   attending psychiatrist.

21       Q.      When you say a resident, what do

22   you mean?

23       A.      Resident is a physician who is

24   undergoing postgraduate training in

25   psychiatry.

Page 63

1                     VINOD DHAR, M.D.

2          Q.     Is there any requirement that

3    the resident have a certain level of

4    experience before they do a comprehensive

5    psychiatric evaluation?

6                  MR. LEE:  Objection to the form.

7                  MR. RADOMISLI:  Objection to the

8          form and beyond the scope.

9          A.     They have to be observed for

10   period of three months, six months and once

11   they -- the attending says that they're

12   qualified to -- that they can independently

13   make an assessment, regardless of whether

14   they make independent assessment or not, it

15   still has to be done under the supervision

16   of the psychiatrist.

17         Q.     What is this threshold three to

18   six month period called at Jamaica Hospital?

19         A.     It's not actually Jamaica

20   Hospital policy.  It's what's known as

21   residency program policy.  That a resident

22   will not be allowed to see patients

23   independently until the attending

24   psychiatrist supervising him or her is

25   confident that the resident can be

Page 64

1                    VINOD DHAR, M.D.
2    independent evaluation.
3         Q.       What is this threshold called at
4    Jamaica Hospital?
5         A.       I'm not aware of any specific
6    name.
7         Q.       Does Jamaica Hospital have any
8    requirements in it's policies for
9    documenting when a resident meets this
10   threshold so that they are considered
11   qualified to conduct a comprehensive
12   psychiatric evaluation?
13        A.       Not that I'm aware of.
14        Q.       So it's not the kind of thing
15   that gets put in the personnel file of the
16   resident?
17        A.       No.
18        Q.       Going back to the policy
19   statement on the emergency admission status
20   subject line.  It also says that there is a
21   reference here that patient alleged to have
22   mental illness and which is likely to result
23   in the serious harm to himself and others.
24   You see that?
25        A.       Yes.

Page 65

1                    VINOD DHAR, M.D.

2        Q.      What is that policy statement

3   based on?

4        A.      That's based on the New York

5   State Mental Hygiene Law Article 9.

6        Q.      Did a lawyer assist Jamaica

7   Hospital in crafting this policy statement?

8        A.      I'm not aware of it.

9        Q.      I am sorry?

10       A.      I'm not aware.

11       Q.      Have you ever read the New York

12   Law on the Section 9.39?

13       A.      Yes, I have to.  Yes.

14       Q.      Does Jamaica Hospital's policy

15   endeavor to comply with Section 9.39 of the

16   Mental Hygiene Law?

17               MR. RADOMISLI:  As it existed in

18        2009?

19               MR. SMITH:  Yes.

20       A.      Yes.

21       Q.      Has the mental Hygiene Law

22   Section 9.39 changed since 2009?

23               MR. RADOMISLI:  Don't answer the

24        question.

25       Q.      Do you know whether or not

Page 66

1              VINOD DHAR, M.D.
2    Section 9.39 of the Mental Hygiene Law has
3    changed since 2009?
4              MR. RADOMISLI:  Read that back.
5              (Record read.)
6              MR. RADOMISLI:  I am going to
7        object.  He's not a lawyer.
8              MR. SMITH:  I am not asking for
9        a legal opinion.  I want to know
10       whether or not he knows if the statute
11       changed.  I have a copy of it.  You
12       want me to show it to him.  It hasn't
13       changed.
14             MR. RADOMISLI:  Are you
15       representing that it hasn't changed?
16             MR. SMITH:  Here's a copy of the
17       statute obtained from Lexis.  The
18       alleged date of history shows it was
19       created in '77 and it was amended most
20       recently in 1986.
21             MR. RADOMISLI:  Okay.
22             MR. SMITH:  I would still like
23       to know whether or not he thinks it's
24       changed 'cause there's so much at stake
25       here about moving target of the Jamaica

Page 67

1                 VINOD DHAR, M.D.
2         Hospital over the past 15 years.
3               MR. RADOMISLI:  Well, but you've
4         already represented that it hasn't and
5         you have the policy in front of you.
6               MR. SMITH:  I know what the law
7         is, but he's the witness.  If he thinks
8         that the policy had changed or the law
9         has changed, which was the basis for
10        the policy, then he can tell me, but I
11        suspect that if you let him answer the
12        question he's going to say I don't know
13        if it's ever changed, it's been the
14        same ever since I have been at Jamaica
15        Hospital in 1996.  But maybe he will
16        say something else.  I don't know.
17              MR. RADOMISLI:  Do you know
18        whether it has changed?
19        A.    I'm not aware of any change, no.
20        Q.    Would you like to see a copy of
21   the law?
22              MR. RADOMISLI:  Well --
23        Q.    You said you read it before?
24        A.    Yeah.
25              MR. SMITH:  All right, so let's

Page 68

1                    VINOD DHAR, M.D.
2          mark it.  Let's show it to the witness.
3                    (Plaintiff's Exhibit 151,
4          document, was marked for identification
5          as of this date.)
6          Q.     Have you had the chance to look
7     at 9.39?
8          A.     Yes.
9          Q.     And you've said you read it
10    before?
11         A.     I have gone over it.
12         Q.     And you're not aware of any
13    changes in this statute, are you?
14         A.     I'm not aware, no.
15         Q.     It says at the bottom of the
16    first page, it says the director shall admit
17    such person.  You see that, sir?
18         A.     Hmm-mm.
19         Q.     You have to say or no. Just yes
20    or know.  Uh-huh comes out --
21         A.     Yes.
22         Q.     Okay.  It says only if a staff
23    physician of the hospital.  So that's a
24    staff physician that you're referring to
25    earlier, right?

Page 69

1                    VINOD DHAR, M.D.

2          A.      That's the attending

3    psychiatrist.

4          Q.      Attending psychiatrist.   Okay.

5          A.      Yes.

6          Q.      It says that the director under

7    the statute shall admit the person.   Does

8    Jamaica have a director or somebody who

9    makes this decision or is that basically the

10   staff physician or attending who makes that

11   decision?

12         A.      It's the attending who makes the

13   decision.

14         Q.      So is there a director of the

15   hospital who is required to make the final

16   decision on admitting a patient pursuant to

17   Section 9.39?

18         A.      No.   There is no director or any

19   other person who is required to approve or

20   -- but it is done on the -- because director

21   -- it's staff psychiatrist in the hospital

22   -- in the emergency room is the one who

23   makes the decision.

24         Q.      Is there anybody who holds the

25   title of director at the hospital or is it

VINOD DHAR, M.D.

really chairman?

A. Well, it's actually, there is a medical director in the ER, psych ER.

Q. Who is that?

A. Dr. Bernier was the medical director at that time.

Q. What's the role of a medical director, other than making these final sign-off decisions on involuntaries?

A. Basically overseeing, reviewing all the cases and supervising residents and nurses and other physicians.

Q. All right, and then going back to the policy statement, page 17, Exhibit 130 at the bottom of that page it says the admitting physician must be licensed in New York State. You see that?

A. Yes.

Q. All right. Is the admitting physician within this policy the same as the attending physician and the staff physician as we have been discussing, is that all the same person?

MR. RADOMISLI: Objection to

Page 71

1                    VINOD DHAR, M.D.

2       form.

3       A.      Admitting physician would be

4   same, yes.

5       Q.      So the admitting physician is

6   the same as the staff physician, right?

7       A.      Well --

8               MR. RADOMISLI:   Objection to

9       form.

10      A.      -- it could be the staff

11  physician or it could be the director, any

12  of the physicians.

13      Q.      On the same page there is a

14  phrase likely to result in serious harm.  Do

15  you see that?

16      A.      Hmm-mm.

17      Q.      You have to say yes.

18      A.      Yes.  I'm sorry.

19      Q.      And then the policy defines

20  likelihood to result in serious harm in two

21  ways, numbered one and two.  You see that?

22      A.      Yeah.

23      Q.      And am I correct that the first

24  definition deals with categories of

25  dangerousness to oneself and the second

1                  VINOD DHAR, M.D.

2    category deals with dangerousness to others?

3         A.      Yes.

4         Q.      You see the phrase manifested

5    by?

6         A.      Yes.

7         Q.      What does that mean?

8         A.      It could be any kind of behavior

9    that is out of control or violent behavior

10   or threats to some other people.

11        Q.      Am I correct that manifested by

12   requires that the patient either engage in

13   some conduct or makes some sort of statement

14   that suggests that the person is dangerous

15   to themselves?

16        A.      Yes.

17        Q.      It also goes on to say "Or other

18   conduct demonstrating that he is dangerous

19   to himself."  You see that?

20        A.      Yes.  Can you specify where?

21        Q.      In sub one --

22        A.      Yeah.

23        Q.      -- in the definition of

24   likelihood to result in serious harm there

25   is a phrase or other conduct demonstrating

Page 73

1                    VINOD DHAR, M.D.

2      that he is dangerous to himself.  You see

3      that?

4            A.      Yes.

5            Q.      What kind of conduct under the

6      Jamaica policy is the kind of conduct that

7      demonstrates that a person is a danger to

8      himself or herself?

9            A.      Any kind of behavior that a

10     person puts himself into any physical harm,

11     not able to provide for himself food,

12     clothing, shelter or medical treatment.

13           Q.      Is there any other conduct,

14     other than what you've just said, that is

15     the kind of conduct that demonstrates a

16     person that's a danger to themselves or --

17           A.      I am not aware of anything.

18           Q.      Does the conduct under this

19     policy have to be conduct that the admitting

20     or the staff physician observes?

21           A.      No.  It's based on the report

22     that we get from the person who brings the

23     patient in.

24           Q.      Is there any policy at Jamaica

25     about determining the reliability of the

```
 1                VINOD DHAR, M.D.
 2   reported information?
 3        A.       Well, there is no policy, but in
 4   general, we, as the staff psychiatrist or
 5   director, will try to get information from
 6   other sources, but people who come to us
 7   generally is reliable.
 8        Q.       Why do you say that people who
 9   come to you are generally reliable?
10        A.       The people who bring the
11   patients in.
12        Q.       No, I understand that's what
13   you're saying, but I'm saying why do you say
14   that they're generally reliable?
15        A.       Well, because we are -- we take
16   patients from police or from agency, they
17   bring the patient in there or family
18   members.
19        Q.       So is it the policy of Jamaica
20   Hospital to accept without question the
21   information that's provided by the police or
22   family members or some other provider or
23   relator of information?
24                MR. RADOMISLI:  Objection to the
25        form, asked and answered.  You can
```

Page 75

1                    VINOD DHAR, M.D.

2        answer.

3        A.      Yes.   Until we find any other

4    resource that we have collateral

5    information.   Until then we are obligated to

6    keep that information as valid information.

7        Q.      You say that you're obligated to

8    keep that information as valid information,

9    what is that information based on?

10        A.      It's based on New York State

11    9.39.   That 9.39 emergency room under the

12    order of the commissioner we can receive and

13    retain a person until all the evaluations

14    are done.

15        Q.      No, I understand that 9.39 gives

16    Jamaica Hospital the ability to involuntary

17    commit somebody, but what I am trying to

18    find out is what's the basis for you saying

19    that you're obligated to accept as valid the

20    information that's provided to you by the

21    people who are relating the information to

22    you?

23               MR. RADOMISLI:   Objection to

24        form.   You can answer.

25        A.      Until we get the other

Page 76

1              VINOD DHAR, M.D.
2    information from collateral.
3        Q.      So if a family member comes into
4    Jamaica Hospital and relates information
5    about somebody it's Jamaica's practice or
6    policy to accept that information as true
7    without any assessments or attempt to
8    independently verify it?
9        A.      Yes.
10              MR. RADOMISLI:  Objection.
11              MR. LEE:  Objection.
12              MR. RADOMISLI:  And to form.
13       Q.      The next page of the policy
14   statement has under the headings procedure
15   number of categories, you see that?
16       A.      Yes.
17       Q.      Number one, there's a reference
18   here to following examination and interviews
19   other informants, which may be available
20   should the examining physician consider the
21   patient to meet the criteria above, he
22   should certify his finding on form OMH 474.
23   Do you see that?
24       A.      Yes.
25       Q.      There's a reference here to the

Page 77

1              VINOD DHAR, M.D.

2  examining physician.  You see that?

3       A.    Yes.

4       Q.    Is the examining physician the

5  same person as the staff physician or

6  attending physician?

7       A.    Yes.

8       Q.    That's the same person who

9  conducted the comprehensive psychiatric

10 evaluation, right?

11             MR. RADOMISLI:  Objection to

12      form.

13      A.    Yes.

14      Q.    And the form, what is this form

15 OMH 474?

16      A.    It's a form that when a

17 psychiatrist, attending psychiatrist in his

18 or clinical opinion finds that the patient

19 can be admitted on an involuntary basis and

20 there's a form there, you have to fill that

21 form with the justification why you think

22 the patient should be admitted and based on

23 information and whatever the collateral

24 information, what other sources of

25 information, that's form 474.

Page 78

1                  VINOD DHAR, M.D.

2        Q.      And the staff physician or the

3    attending physician, the one who has

4    conducted the comprehensive psychiatric

5    evaluation, they fill out the form if they

6    make the decision that the person should be

7    involuntarily committed; is that correct?

8        A.      Yes.

9        Q.      Are they required, under Jamaica

10   policy, to fill out that form at any

11   particular time in relation to when they

12   make their decision?

13       A.      As soon as the decision is made,

14   the patient needs to be admitted.

15       Q.      So the policy at Jamaica is to

16   have the form executed as soon as the

17   decision by the psychiatrist is made; is

18   that correct?

19       A.      Yes.

20       Q.      In the next paragraph there is a

21   reference to a number two.  Do you see that?

22       A.      Number two?

23       Q.      Yes.

24       A.      Yeah.

25       Q.      It says here the admitting

Page 79

1                   VINOD DHAR, M.D.
2    doctor will record on the form the names of
3    the people.  You see that?
4         A.     Yes.
5         Q.     And that's the admitting doctor
6    is the same as the examining doctor?
7         A.     As the examining doctor, yes.
8         Q.     I want to the show what's been
9    previously marked as Exhibit 131.  This came
10   from the chart or the file from this
11   particular patient, Schoolcraft was his
12   name.
13        A.     Okay.
14        Q.     I am not going to ask about
15   that, but I am going to ask you about the
16   form itself; okay?  All right?
17        A.     Okay.
18        Q.     So can you tell me what this
19   document is?
20        A.     This is a document known as
21   notice of status and rights to the emergency
22   admission.  This information is given to the
23   patient.  Copy of this information is given
24   to the patient explaining his rights and
25   what the protocol is going to be.

Page 80

1              VINOD DHAR, M.D.

2       Q.    And is this document also

3    supposed to be given to the patient at the

4    same time as the 474 form is the filled out

5    by the staff physician?

6       A.    Yes.

7       Q.    And so is it policy at Jamaica

8    Hospital for the staff physician, if they

9    make a decision to involuntary commit, to

10   sign page 1 of the 747 and then hand the

11   patient this form notice of status and

12   rights?

13      A.    Yes.

14      Q.    And in this notice it says here,

15   in the form, in the printed form -- by the

16   way, this is a printed form that's created

17   by Jamaica Hospital or by?

18      A.    Department of the Office Mental

19   Health, New York State.

20      Q.    So Jamaica Hospital just gets

21   the form from the Department of Mental

22   Health?

23      A.    Yes.

24      Q.    So this form here says based

25   upon -- "base upon an examination by a staff

Page 81

1                    VINOD DHAR, M.D.
2     physician you have been admitted as an
3     emergency status patient to this hospital
4     for persons with mental illness for
5     immediate observation, care and treatment.
6     Within 48 hours of the time of your
7     admission, you will examined by another
8     physician, who is a member of the
9     psychiatric staff of this hospital."  You
10    see that, sir?
11         A.     Yes.
12         Q.     Now, the phrase within 48 hours
13    of the time of your admission.  You see
14    that?
15         A.     Yes.
16         Q.     Under Jamaica's policies, when
17    does this 48-hour time period begin?
18         A.     It starts from the time this
19    form is filled -- the 747, the form is
20    signed, that is the time given for that.
21         Q.     Am I correct that the hospital
22    policy and practice is that the
23    comprehensive psychiatric evaluation is done
24    subject to the busyness of the emergency
25    room within eight hours; is that correct?

Page 82

1              VINOD DHAR, M.D.

2        A.      Yes.

3        Q.      And then the evaluation should

4    be conducted within that eight-hour period,

5    correct?

6        A.      Yes.

7        Q.      Then after that comprehensive

8    psychiatric evaluation is done, then the

9    form for 747 is filled out and this notice

10   of rights is provided to the patient at that

11   time; is that correct?

12       A.      Yes.

13              MR. LEE:  Objection to the form.

14       Q.      And then is it the Jamaica

15   Hospital policy that within 48 hours of the

16   signing of the 474 form that a member of

17   psychiatric staff of the hospital has to

18   then do an evaluation of the patient?

19       A.      Yes.

20       Q.      Why is the second evaluation of

21   the patient by a member of the psychiatric

22   staff required?

23              MR. RADOMISLI:  Objection to

24       form.  Go ahead.

25       A.      It's a process of checks and

Page 83

1                    VINOD DHAR, M.D.
2      balances and make sure that admission was
3      done properly and that the patient met
4      criteria for admission.
5          Q.      If the initial or staff
6      physician gives a diagnosis and the
7      psychiatric staff member's diagnosis
8      disagrees with the initial assessment, is it
9      the Jamaica Hospital policy to then
10     discharge the patient?
11                 MR. RADOMISLI:  Read that back,
12          please.
13                 (Record read.)
14                 MR. LEE:  Note my objection to
15          the form.
16                 MR. RADOMISLI:  Objecting to the
17          form and also, beyond the scope of the
18          deposition, which deals within
19          involuntary admission.
20                 MR. SMITH:  That's what the
21          subject matter of the question is.
22                 MR. RADOMISLI:  Subject of the
23          matter of the question is discharging.
24          It's different.  Can you rephrase the
25          question?

1              VINOD DHAR, M.D.
2         MR. SMITH:  Are you instructing
3    him not to answer the question?
4         MR. RADOMISLI:  It's beyond the
5    scope.
6         MR. SMITH:  I'm not sure I
7    understand.
8         MR. RADOMISLI:  It's a little
9    nit picky.
10        MR. SMITH:  Yeah, to me it seems
11   very nit picky.
12        MR. RADOMISLI:  But I'll -- just
13   read it back one more time.
14        (Record read.)
15        MR. LEE:  Note my objection to
16   the form for the record.
17        MR. RADOMISLI:  Can you rephrase
18   the question in such a way that it
19   squarely fits within the scope of this
20   deposition?
21        MR. SMITH:  No, I can't.  This
22   is -- this is the -- you're mincing
23   words here.  Do you want to split
24   hairs?  Then you can split hairs all
25   you want.

Page 85

1                VINOD DHAR, M.D.
2             MR. RADOMISLI:  Then I will
3        because I am just going by what the
4        court order says and what you asked for
5        and what you asked for was a witness to
6        testify about the policy on involuntary
7        admissions.
8             MR. SMITH:  Right, okay, and so
9        you're telling me that the only time
10       that's relevant to make an inquiry
11       about the hospital's policy is the
12       moment that the staff physician signs
13       the piece of paper saying that yes, we
14       are going keep this person against
15       their will and that anything that
16       happens thereafter is completely
17       irrelevant to the scope of this
18       examination?  If you're saying that,
19       which is what I think you're saying
20       then you're taking an extremely narrow
21       view of the court order and needlessly
22       interfering with my deposition.
23            MR. RADOMISLI:  That isn't what
24       I'm saying.  Number two, it's not an
25       exceedingly narrow interpretation of

1           VINOD DHAR, M.D.
2       the court order, because when you
3       applied to -- when you served the
4       30(b)(6) and when -- subject to the
5       motion, you only asked about policies
6       regarding involuntary admission.  You
7       didn't say anything about the discharge
8       either in the application to the court
9       or in response to my objection or
10      during conference and therefore, there
11      is no court order -- the court order is
12      limited to involuntary admission.
13          MR. SMITH:  The second page of
14      the involuntary admission policy talks
15      about the second evaluation needing to
16      be done under the Jamaica policy.  So
17      you're telling me I can't ask questions
18      about the second assessment because the
19      patient has already been admitted.
20      Then I think we should really stop the
21      examination and I will make my
22      application.
23          MR. RADOMISLI:  I'm not saying
24      that you can't ask questions about the
25      second evaluation.  You can ask the

Page 87

```
1              VINOD DHAR, M.D.
2       question you just asked.
3              MR. SMITH:  Well, you don't get
4       to decide that.
5              MR. RADOMISLI:  No, the court
6       does and the court order says
7       involuntary admissions and that's what
8       you noticed in your 30(b)(6) and that's
9       what was subject of the court order is.
10             MR. SMITH:  So you're splitting
11      hairs and now you have it.
12             MR. RADOMISLI:  Not splitting
13      hairs.  Going by exactly what you asked
14      for.
15      Q.     If the second doctor disagrees,
16  what happens to the patient?
17             MR. LEE:  Objection to the form.
18             MR. RADOMISLI:  Disagrees with
19      what?
20             MR. SMITH:  The initial
21      assessment.
22             MR. LEE:  Objection to the form.
23             MR. RADOMISLI:  Objection to the
24      form, but you can answer it.
25      A.     If the second physician
```

Page 88

1              VINOD DHAR, M.D.
2   disagrees with opinion of the first
3   physician, the second physician has to come
4   up with his own opinion as to why he thinks
5   the patient should or should not be kept in
6   the hospital.
7        Q.     Am I correct that if the staff
8   psychiatrist disagrees with the assessment
9   to keep the patient involuntarily in the
10  hospital, the patient is not discharged?
11             MR. LEE:   Objection.
12             MR. RADOMISLI:   Objection to the
13        form.
14        A.     If the second physician
15  disagrees with the diagnosis, then the
16  physician has to come up with a reason for
17  keeping the patient.
18        Q.     And is that burden on the second
19  physician based on a Jamaica policy
20  statement?
21        A.     Yes.
22        Q.     Where is that statement?
23        A.     It's part of the evaluation
24  because the reason this is done is to make
25  sure that all the information has been

```
 1                VINOD DHAR, M.D.
 2   received, that the collateral information,
 3   and all other information from other sources
 4   is also reviewed and then a decision is made
 5   after 48 hours.
 6        Q.     So you're telling me that the
 7   initial decision really isn't the final
 8   decision.  That the final decision is really
 9   made once the staff psychiatrist makes the
10   decision within the 48-hour period?
11              MR. RADOMISLI:  Objection to
12        form.
13        Q.     Is that correct?
14        A.     Yes.
15              MR. LEE:  Objection.
16        Q.     And you're telling me that the
17   final decision by the staff psychiatrist is
18   made after additional information is
19   obtained from collateral sources?
20              MR. LEE:  Objection to the form.
21              MR. RADOMISLI:  Objection to
22        form.
23        A.     Yes.
24        Q.     What collateral sources is the
25   information obtained from?
```

Page 90

1                  VINOD DHAR, M.D.
2        A.      It could be anything, any family
3    member, any agency, anywhere a patient can
4    say that you can get the information from
5    this source and whatever helps in making the
6    assessment and decision of the patient.
7        Q.      Are there any policy statements
8    laid out in Jamaica Hospital for how an
9    attending or staff psychiatrist makes this
10   investigation into this collateral source
11   information?
12       A.      There's no specific policy, but
13   there's practice that collateral information
14   has to be obtained.
15       Q.      And what is the practice about
16   getting collateral information?
17       A.      Any resources.
18       Q.      Did you say any resources?
19       A.      Any resources that the patient
20   has that you can get information about the
21   patient's condition.
22       Q.      So is Jamaica policy for doctors
23   to get any reasonable information that could
24   be relevant to their decision?
25       A.      Yes.

Page 91

1                    VINOD DHAR, M.D.
2          Q.      In the second page of the
3    emergency admission status policy there is a
4    paragraph number 4.  It says that the
5    admitting doctor is responsible for assuring
6    the second examination is conducted within
7    48 hours.  You see that?
8          A.      Yes.
9          Q.      How does the admitting doctor go
10   about effectuating this policy of making
11   sure the second evaluation is done within
12   48 hours?
13         A.      The general practice is that
14   when a patient is admitted, the admitting
15   physician will inform the attending
16   physician, who is receiving the patient,
17   that this patient is being admitted and give
18   information and then also based on any new
19   patient that comes to the unit the time, the
20   signature and the time on page 1 will
21   determine what time the certification has to
22   be made.
23         Q.      So the date and the time is a
24   pretty important entry in the patient's
25   chart as to when they were involuntary

1                 VINOD DHAR, M.D.

2   admitted; is that right?

3               MR. RADOMISLI:   Objection to

4       form.

5               MR. LEE:   Objection.

6       A.      Yes.

7       Q.      Does the Jamaica Hospital policy

8   require that the admitting doctor consult

9   verbally with the second physician or can it

10  be done by simply having a file forwarded to

11  the second physician?

12      A.      General practice is to verbally

13  inform the attending.   Sometimes you don't

14  know who the attending is going to be.   So

15  you give the report to the nurse.   Nurse

16  gives the report to the nurse on the unit

17  and then they inform the doctor.   If it's

18  after-hours, in the morning.

19      Q.      In that same paragraph of the

20  policy statement it says that if the

21  admission occurs during routine weekday

22  hours, the admitting doctor will arrange for

23  the psychiatrist who has admitting

24  privileges to conduct the second examination

25  immediately.   You see that?

1                    VINOD DHAR, M.D.

2          A.     Yes.

3          Q.     Why is it the policy of Jamaica

4    Hospital to have that second evaluation done

5    immediately?

6          A.     I'm not sure why the policy is

7    that.

8          Q.     The last sentence says that any

9    difficulty in making such arrangements is to

10   be immediately referred to the chairman or

11   one acting on his behalf.  You see that?

12         A.     Yes.

13         Q.     Is the reference to the chairman

14   is that Mr. Vivek -- Dr. Vivek?

15         A.     Dr. Vivek, yes.

16         Q.     And who are the individuals at

17   Jamaica Hospital who would be acting on the

18   chairman's behalf under this sentence?

19         A.     That would be me.

20         Q.     Have you been involved in making

21   sure that the second evaluation happens

22   immediately after the first one?

23         A.     Yes.

24         Q.     Is the reason why the second

25   evaluation has to be done as soon as

1              VINOD DHAR, M.D.

2    possible after the first one, because the

3    patient is being held against their will?

4              MR. LEE:  Objection to the form.

5              MR. RADOMISLI:  Objection to

6         form and asked and answered.  Go ahead.

7         A.    I guess, yes, that's the reason.

8         Q.    Next paragraph number 5, there

9    is a statement in the Jamaica Hospital

10   policy to the effect that "should the

11   patient reject this suggestion to convert to

12   voluntary status and should the psychiatrist

13   find that the patient does not meet the

14   above criteria for emergency

15   hospitalization, he must immediately contact

16   the chairman or one acting on his behalf

17   prior to the completion of page number 2 of

18   OMH 474."  You see that reference?

19        A.    Yes.

20        Q.    Is this the second -- no, that's

21   a bad question.  Let me rephrase that.

22             Why does the Jamaica Hospital

23        policy provide that the psychiatrist

24        should immediately contact the chairman

25        or somebody acting on his behalf if he

Page 95

1              VINOD DHAR, M.D.

2      disagrees with the initial assessment.

3              MR. LEE:  Objection to the form

4      of the question.

5      A.      Because there are two physicians

6   from the same institution in giving two

7   different opinions.  So it's responsibility

8   of the chairman to make sure that the right

9   decision is made.

10     Q.      Is that responsibility of the

11  chairman, is that laid out in, to your

12  understanding, New York State Law 9.39?

13     A.      I'm not sure.

14     Q.      I gave you a copy of 9.39.

15  Would you mind looking at it and tell me

16  whether or not your understanding of this

17  provision for having the chairman referee

18  disagreements is part of the state law or

19  not?

20             MR. RADOMISLI:  Objection.  He's

21     not required to interpret the law.

22             MR. SMITH:  I'm not asking for

23     his interpretation of the law.

24             MR. RADOMISLI:  You are.

25             MR. SMITH:  No, I'm not.  I'm

Page 96

1              VINOD DHAR, M.D.
2      asking if he knows anything about the
3      law.
4              MR. RADOMISLI:  He answered that
5      question.
6              MR. SMITH:  More specifically, I
7      want to know whether or not his
8      function of the chairman refereeing
9      disputes is, to his understanding, part
10     of New York State Law.
11             MR. RADOMISLI:  That's beyond
12     the scope.
13             MR. SMITH:  So you're going to
14     direct him not to answer --
15             MR. RADOMISLI:  I am going to
16     direct him not to answer questions that
17     requires him to interpret the law.
18     That's correct.
19     Q.      Doesn't your job as acting
20  chairman of the psychiatric department at
21  Jamaica Hospital require that you interpret
22  9.39 properly?
23     A.      May job is to make sure that the
24  clinical decisions are made properly.
25     Q.      My question is don't you think

1              VINOD DHAR, M.D.

2    your job is to make sure that your staff is

3    complying with 9.39 when they involuntarily

4    commit people?

5        A.      Yes.

6        Q.      And in service of that

7    objective, you have familiarized yourself

8    with the statute, right?

9        A.      Yes.

10             MR. SMITH:  You're still going

11        to instruct this witness not to answer

12        those questions?

13             MR. RADOMISLI:  He can answer

14        that.

15        Q.      Does the policy statement about

16   having the chairman refereeing or be

17   consulted by this psychiatric attending

18   about a disagreement with the initial

19   assessment comply with New York State Law,

20   to your understanding?

21             MR. RADOMISLI:  Objection to

22        form.  You can answer.

23        A.      Say it again, can you repeat it?

24        Q.      Yes.  You have in front of you

25   9.39, right?

Page 98

1              VINOD DHAR, M.D.

2        A.      Yes.

3        Q.      Is there a provision in the law,

4   to your understanding, that provides that

5   when the initial assessment and the second

6   assessment disagrees that the chairman is to

7   be consulted?

8        A.      Every hospital has a

9   departmental policy and a hospital policy

10  because we're working under the hospital.

11  So there's an internal policy to make sure

12  that all decisions are made according to the

13  law and based on the clinical decisions.

14       Q.      This is my question, Doctor, I

15  thought that the hospital policy was that

16  you need to have a initial assessment

17  confirmed by a second assessment as a

18  precaution to protect the patient; is that

19  right?

20       A.      Yes.

21       Q.      But the policy statement says

22  that if there's a disagreement, the patient

23  is not discharged, it says that there is a

24  conferral with the chairman and what I want

25  to know is whether or not you think that

Page 99

1             VINOD DHAR, M.D.
2   this practice or this policy of conferring
3   with the chairman when there is a
4   disagreement is consistent or inconsistent
5   with your understanding of Section 9.39 of
6   the Mental Hygiene Law.
7             MR. RADOMISLI:  Objection to the
8        form.
9        A.    I won't be able to answer that
10  question whether it's consistent with 9.39,
11  but every hospital has an internal policy
12  and we are required, the chairman has the
13  responsibility of the entire department.  He
14  has to make sure that all decisions are made
15  correctly and he delegates that authority to
16  either me or the duty (phonetic) chief or
17  the attending physician.
18       Q.    Have you had occasion in the
19  past as the acting chairman or the assistant
20  chairman to act in this referee function?
21            MR. SMITH:  Can you just hold
22       that question a second.  This is the
23       court calling back I think.
24            Hello, oh, hi, yeah.  This is
25       Mr. Smith.  Mr. Chan?

1              VINOD DHAR, M.D.
2              CALLER:  This is Adam Chen from
3     Judge Sweet's Chambers.  How are you
4     doing?
5              MR. SMITH:  I'm doing well.
6     We're at the deposition and thank you
7     for getting back to me and you're on
8     speakerphone.  All counsel and the
9     witness and the court reporter are
10    present.
11             CALLER:  Okay.  So I have
12    instructions from the judge.  He told
13    me to let you guys know that all
14    objections can be made, but there are
15    no objections can be made not to answer
16    except on grounds of privilege.
17             MR. SMITH:  Okay.  Thank you
18    very much.
19             CALLER:  No problem.  Have a
20    good day.
21             MR. SMITH:  Okay, bye.  Did you
22    get that down?
23             All, right, I'm going to take a
24    five-minute break.
25             MR. CALLAN:  Yes.  Just in terms

Page 101

1                    VINOD DHAR, M.D.

2         of how much longer are we going to

3         lunch break, break now or are we going

4         to have lunch?

5              MR. SMITH:  I just want five

6         minutes to just regroup and see where I

7         need to come back.  This is

8         unfortunately -- we are going to go off

9         the record.  It's 12:35.

10              (Whereupon, a recess was taken.)

11              MR. SMITH:  Going on the record.

12         It's 1:41.

13         Q.     When we left off, Doctor, we

14    were talking about this conferral with the

15    chairman or the person acting on behalf of

16    the chairman.

17         A.     Yes.

18         Q.     When the situation where the

19    initial assessment gives a diagnosis and the

20    second assessment has a disagreement about

21    what that assessment is.  That was the

22    subject matter.  Have you in the past ever

23    acted as an intermediary for these types of

24    situations?

25         A.     Yes.

1                   VINOD DHAR, M.D.

2       Q.      So what is the hospital policy

3   with respect to how to address the

4   disagreement between the initial assessment

5   and the second assessment?

6               MR. RADOMISLI:   Object to the

7       form and substance, but you can answer.

8       A.      Well, it's always been the

9   customary practice of the hospital to get a

10  second opinion, because it's a question of

11  safety and we want to make sure that the

12  right decision is made.  And it has happened

13  before.

14      Q.      So do I understand you to be

15  saying that the hospital policy will be to

16  make sure that the second assessment is, in

17  fact, correct?

18      A.      If the second assessment is --

19  if there's a difference of opinion, then

20  there will be a second opinion.

21      Q.      Meaning third opinion actually?

22      A.      A third opinion, yes -- well --

23  okay, a third opinion, yeah.

24      Q.      And if the third opinion agrees

25  with the first opinion, will a patient then

Page 103

1                   VINOD DHAR, M.D.
2    be maintained in an involuntary status?
3         A.     If there is sufficient grounds
4    and the person who is doing the third
5    consultation or opinion will document that
6    in their notes or write a new form.
7         Q.     I'm not sure I asked the
8    question clearly, so I am going to restate
9    it.  If the first assessment is the person
10   should be involuntary comitted and attending
11   psychiatrist says no, I don't think so, I
12   think this person is either not suffering
13   from a mental illness or has not
14   demonstrated through words or conduct or
15   some other means, dangerousness, and so I
16   think the person should be released.  Under
17   those circumstances, the hospital practice
18   and policy is to go to the chairman or
19   somebody acting on behalf of the chairman,
20   right?
21        A.     Yes.
22        Q.     And that chairman or that person
23   acting on behalf of the chairman is another
24   medical professional, right?
25        A.     Yes.

Page 104

1              VINOD DHAR, M.D.

2        Q.      And they will hear the pros and

3   the cons about the two different opinions,

4   right?

5        A.      Exactly.

6        Q.      What I want to know is if the

7   third person to make this assessment agrees

8   with the first assessment, that the person

9   should be involuntarily committed, will the

10  person be maintained in an involuntary

11  status or will they be discharged?

12              MR. RADOMISLI:  Objection to the

13         form and has no connection to the case,

14         but go ahead.

15       A.      It's not an option of discharge,

16  because you can keep a person on a voluntary

17  commitment.  So the option there is either

18  to convert the involuntary to voluntary.

19  The patient is willing to stay or yes, if

20  the third opinion is that the patient should

21  stay and we will keep the patient -- we may

22  even go for the fourth opinion, because we

23  are always acting for the safety of the

24  patient.  We would always -- err on the side

25  of the safety.

1                    VINOD DHAR, M.D.

2        Q.      When you say err on the side of

3    safety, what you say is err on the side of

4    maintaining them in the hospital against

5    their will?

6                MR. RADOMISLI:   Objection to

7        form.

8        Q.     Is that right?

9                MR. RADOMISLI:   Objection to

10       form.

11       A.      Depending on the circumstances

12   to what they came, safety if they are

13   dangerous to themselves or others, yes.

14       Q.      You recognize that dangerousness

15   is an assessment about what somebody may do

16   in the future, right?

17       A.      No, actually, no.  Dangerousness

18   is what the patient came in for.

19       Q.      So in order to make an

20   assessment about whether or not somebody is

21   dangerous, the medical professional has to

22   look into the past, right?

23       A.      Yes.

24       Q.      So they're not trying -- they

25   don't have a crystal ball and they're not

Page 106

1                  VINOD DHAR, M.D.
2    trying to look in the future to make a
3    determination about what the person may do
4    in the future; is that correct?
5         A.      No.   We try to see what the
6    status is right now, what is the level of
7    dangerousness right now, and whether there
8    needs to be any treatment or any
9    intervention until we find that the patient
10   is safe to be discharged.
11        Q.      So my understanding is you're
12   saying that if, in the past, somebody had
13   acted in a way that suggested that they were
14   dangerous, but if they're no longer
15   currently acting under those conditions,
16   then everything else being equal, they would
17   be considered not dangerous?
18             MR. RADOMISLI:   According to
19        hospital policy.
20        Q.      According to hospital policy; is
21   that correct?
22        A.      Yes.
23        Q.      So that the critical time for
24   the initial decision under the 9.39, the
25   condition of the patient at the time that

1                VINOD DHAR, M.D.

2    the comprehensive psychiatric evaluation is

3    being done; is that correct?

4         A.    Yes.

5         Q.    You mentioned earlier today that

6    there was in-service training, do you

7    remember that?

8         A.    Yes.

9         Q.    What is that?

10        A.    In-service training is you can

11   say it's a class where the staff is updated

12   on the hospital policy or the recent

13   treatment changes or recent intervention.

14   That is like giving training.

15        Q.    Are there classes or training on

16   making assessments about dangerousness?

17        A.    Now, yes.

18        Q.    Are those handouts or Power

19   Point or some other form of communication?

20             MR. RADOMISLI:  Objection to the

21        extent that you're asking for

22        currently, but given the judge's

23        ruling, I have no choice but to let him

24        answer the question.

25        Q.    You can answer the question.

Page 108

1              VINOD DHAR, M.D.
2              THE WITNESS:  I can?
3              MR. RADOMISLI:  I am obligated
4      to let you answer the question.
5      A.     Yes, we do have.  Now we have.
6      Q.     When did Jamaica Hospital start
7  having written presentations for in-service
8  training on the issue of dangerousness?
9              MR. RADOMISLI:  You're going
10     beyond the scope.
11             MR. SMITH:  No, I'm not at all.
12     I'm trying to understand what the
13     policy is, how the policy is
14     effectuated, and how its intent is
15     communicated to a physician that
16     actually implements it, so I don't
17     think I'm going beyond the scope.
18             MR. RADOMISLI:  You could answer
19     the question.
20     A.     Could you repeat the question?
21     Q.     I can't, but I will reformulate
22  it.
23             When did Jamaica Hospital start
24  having these in-service training sessions
25  with the staff, where the subject matter of

 1                    VINOD DHAR, M.D.

 2    dangerousness was taught?

 3         A.       When we have actually at Jamaica

 4    Hospital we have what's called grand rounds

 5    and case conferences.   It started since

 6    1995.   We have two to three grand rounds a

 7    week.

 8                    MR. RADOMISLI:   He asked you

 9         when.   Read back the question, please.

10         A.       We started earlier 1995, 1996.

11         Q.       So if I went to Jamaica Hospital

12    and I want to get a copy of this

13    presentation, could I do that?

14         A.       I don't know whether we used to

15    keep any records of those at that time or

16    not.

17         Q.       Does Jamaica Hospital have any

18    records today of what the training sessions

19    look like over the past five years?

20                    MR. RADOMISLI:   Now I am going

21         to object because one of the things

22         that you asked to talk about was to

23         have a witness testify on this issue

24         and that was not permitted by the

25         court.

```
 1              VINOD DHAR, M.D.
 2         MR. SMITH:  I don't remember
 3    that, frankly.  All I am trying to do
 4    is find out -- I will make the request
 5    for the documents, if they exist, and
 6    I'm not going to ask the witness any
 7    more questions about the contents of
 8    these documents, but if they do exist
 9    and they had existed at the time, then
10    I think you should produce them.
11         MR. RADOMISLI:  Take that under
12    advisement.
13         MR. SMITH:  I'm just trying to
14    establish if they exist.
15         MR. RADOMISLI:  Then just -- you
16    haven't asked that, do you know whether
17    -- you didn't ask the when question.
18    You skipped over that.
19         MR. SMITH:  I did ask the when.
20    I just didn't get an answer.  I think
21    the answer was since 1995.
22         MR. RADOMISLI:  That was when --
23    Q.     Let me ask you this question, in
24    2009 there were in-service training classes
25    at Jamaica Hospital; is that right?
```

Page 111

1                    VINOD DHAR, M.D.
2          A.      Yes.
3          Q.      In 2009 or as of 2009, those
4    in-service training session included
5    dangerousness assessment; is that right?
6          A.      Yes.
7          Q.      And those training sessions
8    were, among other things, done verbally and
9    in writing; is that correct?
10                 MR. RADOMISLI:   In 2009.
11         Q.      In 2009?
12         A.      Yes.  I can recall verbally and
13   not in the writing there is case
14   presentation, a slight Power Point
15   presentation.
16                 MR. SMITH:   So I am going to
17           make a request for the production of
18           any written presentations that were in
19           effect and utilized as of the end of
20           2009 at Jamaica Hospital.
21                 MR. RADOMISLI:   Taken under
22           advisement, please follow-up in
23           writing, but it appears to me that this
24           has come up and has already been ruled
25           against and I'd appreciate that if I

Page 112

```
 1              VINOD DHAR, M.D.
 2      show you that, then you'd agree to
 3      withdraw the demand.
 4              MR. SMITH:  If you can show me
 5      that the judge has considered this
 6      issue and rejected my request for that
 7      information and have also convinced me
 8      that no new information has come to
 9      light, which ought to make the judge
10      reconsider that, if, in fact, he's
11      taken that position and I will gladly
12      withdraw it.
13              MR. RADOMISLI:  I can show you
14      where the judge considered it and not
15      granted it.
16              MR. SMITH:  Moving on.
17      Q.      Now, earlier we talked about two
18  ways that the individual is involuntary
19  admitted to the hospital.  You remember that
20  generally?
21      A.      Yes.
22      Q.      Am I correct that there is a
23  third way, which is commonly known as the
24  CPEP way; is that a correct description?
25      A.      CPEP?
```

Page 113

1                    VINOD DHAR, M.D.

2        Q.      Yeah.

3        A.      How do you spell it?

4        Q.      C-P-E-A --  not --

5        A.      CPEP?

6        Q.      CPEP?

7        A.      Yeah.

8        Q.      Okay.  Maybe I'm just a little

9     bit confused.  There is the involuntary

10    under 9.39, which we already talked about

11    and then there was involuntary under 9.27,

12    which is the two physicians involuntary and

13    then is there is a third way known as this

14    CPEP?

15               MR. RADOMISLI:  CPEP.

16       Q.      CPEP?

17       A.      Comprehensive psychiatric

18    emergency program.

19       Q.      What is that?

20               MR. RADOMISLI:  Going beyond the

21         scope of the policy.  It's not in there

22         of --

23               MR. SMITH:  I'm going to save

24         you some breath.

25       Q.      Was this CPEP program instituted

Page 114

1              VINOD DHAR, M.D.

2    sometime after 2009?

3         A.     Yes.  It has been only for a

4    year now.

5         Q.     Only for one year at Jamaica

6    Hospital?

7         A.     Yes.

8         Q.     If you don't mind, please turn

9    back to 130 of the involuntary emergency

10   admission status procedure.  We were on page

11   18.  Then bottom there is a number 6 and

12   this relates to a request for a court

13   hearing.

14        A.     Yes.

15        Q.     Can you describe for me what

16   this policy is in number 6 about the request

17   for a court hearing?

18        A.     Every patient that is admitted

19   on an involuntary basis has -- admitted to

20   the inpatient unit, has access to mental

21   health legal services.  And if they wish to

22   be discharged or the family wants, they want

23   to discharge the patient, they will discuss

24   with the doctor and if the physician

25   disagrees with them and feels that the

Page 115

1                  VINOD DHAR, M.D.

2      patient is not ready for discharge, then if

3      the patient or the family members can give

4      in writing to the mental health legal

5      service attorney, a notice that they wish to

6      be discharged, they will file a petition and

7      we will respond to that petition and within,

8      I think within seven days or five days of,

9      we will be going to the court in front of

10     the judge, supreme court judge.

11          Q.     Does the request to be

12     discharged have to be given by the mental

13     health legal services bureau or can it be

14     given by the patient?

15          A.     The patient gives it to the

16     mental health legal services.  He presents

17     them.  Or it could be their own attorneys.

18          Q.     The paragraph that I am

19     interested in, it says that if at any time

20     after, it's after admission of the patient,

21     a relative or a friend or the MHLS gives

22     written notice to the director of a request

23     for a court hearing, the director will

24     immediately deliver to the Supreme Court of

25     Queens County and to the mental health legal

1                    VINOD DHAR, M.D.

2      services, a copy of the notice and a copy of

3      patient records.   That's what the policy

4      statement says, right?

5           A.     Yes.

6           Q.     So do I understand the policy to

7      permit the patient to give the notice

8      required under this section to the

9      physician?

10          A.     I mean, according to the policy,

11     yes, but it generally comes from -- the

12     request generally comes from the attorney

13     who starts the process.

14          Q.     If a patient is in the

15     in-patient ward or unit and the attending is

16     talking with the patient and the patient

17     says I don't think I belong here, I want to

18     get out.   Is that sufficient to trigger this

19     policy for having the hospital petition the

20     supreme court?

21                 MR. RADOMISLI:   Objection to

22          form.

23          A.     No, it's not sufficient.

24          Q.     Why not?

25          A.     Because based on the patient's

Page 117

1              VINOD DHAR, M.D.
2    condition, depending on the diagnosis,
3    patient can change their mind 24 hours a
4    day.  Generally, when a patient says
5    something like that, you talk to them, you
6    talk to the family and they will agree to
7    take medication or not medication, unless we
8    come up with a safe discharge plan, most
9    patients stay back.  They will not insist
10   upon leaving, but at the same time we will
11   ask them or tell the mental health legal
12   service to please contact this patient, talk
13   to him and see what he deserves -- what he
14   wants.
15        Q.     So the notice that's required to
16   trigger this obligation on the part of the
17   hospital to go to supreme court, this must
18   be in writing?
19        A.     Yes.
20               MR. RADOMISLI:  Objection to
21        form.
22        Q.     It must be in writing?
23        A.     Yes.
24        Q.     Other than it being in writing,
25   does it have to say anything or do anything?

1              VINOD DHAR, M.D.

2        A.      Well, it has to show the supreme

3    court why the physician thinks medical

4    necessity of the patient needs to stay in

5    the hospital.

6        Q.      No, I am talking about the

7    patient.  The patient's request to get out.

8    This section 6 here, as I understand it, is

9    a mechanism for involving the court, where a

10   patient says I want to leave and the

11   hospital says no, we think you should stay.

12   So there's a disagreement, right?

13       A.      Right.

14       Q.      So this section provides a

15   mechanism for petitioning the court to

16   resolve the issue about whether or not the

17   patient should kept against his or her will,

18   right?

19       A.      Right.

20       Q.      What I want to know, it says

21   here if at any time the patient or relative

22   or the mental health legal services gives

23   written notice, then this process starts.

24   What I want to know is, other than this

25   notice being in writing, is there anything

Page 119

1              VINOD DHAR, M.D.

2   else about the notice that's required under

3   this policy?

4       A.      No, from the patient.

5       Q.      So if a patient were to write on

6   a piece of paper and hand it to his

7   physician, I want to leave right now.  That

8   would be sufficient?

9       A.      That would be sufficient as long

10  as it's written, the notice will be process,

11  yes.

12      Q.      How long does the hospital take

13  under this policy to petition the court?

14      A.      As soon as possible.

15      Q.      In your experience, what is

16  that?

17      A.      It's about a week, because court

18  is only held on Tuesdays.  So by Friday of

19  that day if all the paperwork and everything

20  is ready, the court hearing will be on

21  Tuesday.

22      Q.      Turn to the next page of the

23  exhibit that you have in front of you.

24  There's a admissions from emergency room

25  policy statement.

1              VINOD DHAR, M.D.
2       A.      44?
3       Q.      Yes, page 44.  You have that in
4    front of you?
5       A.      Hmm-mm.
6       Q.      What is this policy?
7       A.      This is the protocol involved in
8    transferring the patient or admitting the
9    patient from emergency room under the
10   inpatient unit.
11      Q.      From the medical emergency room?
12      A.      No. We're talking about from
13   psychiatric emergency room to psychiatric
14   inpatient unit.
15      Q.      I see.  So where it says here
16   the policy a patient may be admitted from
17   the emergency room to the psychiatric
18   inpatient unit only after the evaluation in
19   the emergency room by a member of the
20   department of psychiatry?
21      A.      Right.
22      Q.      The references in that policy
23   stating to the emergency room, are referring
24   to psychiatric emergency room?
25      A.      Psychiatric emergency room.

Page 121

1             VINOD DHAR, M.D.

2        Q.      And this case, Jamaica Hospital

3    has medical ER and a psychiatric ER; is that

4    right?

5        A.      That's right.

6        Q.      And in 2009, that was also true,

7    Jamaica Hospital had a medical ER and a

8    psychiatric ER?

9        A.      Yes.

10       Q.      In the procedures it says each

11   patient admitted to the psychiatric

12   inpatient unit should have a medical

13   clearance documented in the medical records

14   by the emergency room staff.  You see that?

15       A.      Yes.

16       Q.      Does that mean that all of the

17   patient's medical records are taken from the

18   psych ER and then sent up to the ward.  Is

19   that what this means?

20       A.      Yes.  I think what this means is

21   that before admitting the patient to the

22   psychiatric inpatient, we had to do what's

23   called a medical clearance, meaning patient

24   has to go on physical and medical clearance

25   and that's done by a internist, not by a

Page 122

1              VINOD DHAR, M.D.

2    psychiatrist or a primary care physician.

3    And if they are medically stable and don't

4    need any acute medical treatment, they will

5    be admitted to psychiatric inpatient.  Or

6    they will be followed by medical attending.

7         Q.     If a patient comes to the

8    hospital through the medical ER --

9         A.     Yes.

10        Q.     -- unit and is there a policy in

11   place for having a patient medically cleared

12   by the medical ER unit before the patient is

13   transferred to the psychiatric emergency

14   room?

15        A.     Yes.

16        Q.     Why is that?

17        A.     Because when a patient comes to

18   the medical ER, that's considered as a

19   medical emergency and before we transfer the

20   patient to psychiatric ER, we want to make

21   sure that they don't need any acute medical

22   care.

23        Q.     Does this policy that we are

24   looking at right here, page 44, does this

25   policy require that the records of the

Page 123

1                    VINOD DHAR, M.D.
2    documents in the medical records obtained
3    when the patient goes into the medical ER
4    that those records be transmitted to the
5    psychiatric ER?
6          A.    Yes.
7          Q.       So in the circumstances when a
8    patient comes into the hospital first
9    through the medical emergency room, am I
10   correct then that it's the policy to have
11   that entire file sent to psychiatric
12   emergency room?
13         A.    Yes.
14         Q.    And then in the procedures,
15   there is a list of A, B, C and D.  Do you
16   see that?
17         A.    Yes.
18         Q.       There are these references to
19   these tests CBC, CMP and any other blood
20   test felt by the examining physician to be
21   clinically indicated, you see that?
22         A.    Yes.
23         Q.    What is CMC and CMP?
24         A.       CBC means basically your blood
25   count, about the red cells and the white

Page 124

1                    VINOD DHAR, M.D.

2       cells any differential count.  CMP means

3       your comprehensive metabolic profile, means

4       your liver enzymes, your kidney enzymes,

5       your muscle enzymes, all comprehensive

6       testing is done.

7            Q.     Why is that done?

8            A.     Because psychiatric patient who

9       take medications, like any other medication,

10      can have some side-effects and in order to

11      make sure that there are no changes, so we

12      need to have a baseline workup.  So that if

13      there are any changes we know that it's

14      because of this treatment or this medication

15      and also, to rule out any condition that has

16      been silent there and patient not knowing.

17      In our patients -- most of our patients

18      don't take care of themselves.  They are

19      chronically sick patients.  They don't care

20      of their medical problems and that's why

21      this provision was made that they would have

22      a separate physical examination.

23           Q.     On the next page is number 5,

24      talks about the admitting psychiatrist will

25      be responsible for determining that valid

1                VINOD DHAR, M.D.

2    legal papers are completed, what is that

3    referring to?

4         A.        That's referring to same form

5    that we talked about, form 747.

6         Q.        And it goes on to say "in the

7    case of involuntary admission a licensed

8    emergency room physician may act as a

9    certifier."  What is that a reference to?

10        A.        It's the same thing that

11   certifier in this emergency room will be

12   admitting psychiatrist.

13        Q.        Then the next paragraph says

14   "the emergency room staff calls the

15   inpatient unit for bed assignments."

16        A.        Yes.

17        Q.        What is that?

18        A.        Well, when you admit the patient

19   you need to have a bed on the inpatient

20   unit.  And so once you admit the patient,

21   you need to know what bed patient will be

22   assigned.  They say the patient going to bed

23   204 because that bed is available right now.

24   So the patient will be admitted to bed 204.

25   You could see on the record there is

Page 126

1                    VINOD DHAR, M.D.
2     admitted to bed 204.
3          Q.     Would that availability of a bed
4     assignment have an impact on whether or not
5     somebody is going to be admitted
6     involuntarily to the hospital?
7                    MR. RADOMISLI:   Objection to
8          form.
9          A.     Yes.
10         Q.     Why?
11         A.     I'm jumping here.   Because if we
12    need to admit the patient on an involuntary
13    basis, we have to have a bed available
14    inpatient.   If we don't have a bed, then we
15    make arrangements for the patient to be
16    transferred to some other hospital where
17    beds are available.
18         Q.     What other hospitals does
19    Jamaica Hospital avail itself of to
20    effectuate this practice or policy?
21         A.     Well, we available all the
22    hospitals in Queens.   We call LIJ, Elmhurst
23    Hospital, there used to be this hospital
24    that's closed now and whatever hospital --
25    Gracey Square, we sent patients sometimes.

1                    VINOD DHAR, M.D.

2        Q.      What about the availability of

3    insurance, does that have any impact on

4    whether or not a patient will be

5    involuntarily admitted to the hospital?

6                MR. RADOMISLI:  This is now

7        beyond what's already been covered.  So

8        I am going to direct him not to answer.

9                MR. SMITH:  The judge's ruling

10       was very clear.

11               MR. RADOMISLI:  Well -- doesn't

12       mean it's beyond the scope of court

13       order.

14               MR. SMITH:  Well, I think the

15       judge was very clear that no objections

16       with instructions not to answer will be

17       made except to preserve privilege.

18               MR. RADOMISLI:  I'm sure he was

19       not considering whether it would be

20       within the scope of the EBT.  I mean,

21       there is still some basic parameters

22       and that's what the -- what's the

23       purpose -- that's what needs to be

24       adhered to.

25       Q.      Turn back to page 17, the

Page 128

1                    VINOD DHAR, M.D.

2    emergency admission status policy, there's a

3    phrase substantial risk of physical harm.

4    You see that?

5          A.     Yes.

6          Q.     How is that risk measured?

7          A.     Like I mentioned before, there

8    is no specific tools.  It is measured based

9    on the history available, circumstances

10   patients coming to the emergency room and

11   the collateral information.

12         Q.     How does the hospital go about

13   measuring whether or not the risk of

14   physical harm is substantial?

15                MR. RADOMISLI:  Objection to the

16         form.  You could answer.

17         A.     It's not really defined.  It's

18   clinical judgment and based on that clinical

19   judgment, you make a determination.

20         Q.     Can a patient be held pursuant

21   to this emergency status policy if the

22   patient is acting bizarre?

23         A.     Yes.

24         Q.     Can a patient be involuntarily

25   committed under this policy if they're

Page 129

1                    VINOD DHAR, M.D.
2    acting in an agitated manner?
3                    MR. RADOMISLI:  Objection to the
4         form.
5         A.      Any other conduct what's
6    mentioned in the law based on the clinical
7    judgment, any other behavior can be
8    considered as a risk.  Yes, patients can be
9    put in the emergency room if they're
10   agitated or they're acting bizarre.
11        Q.      Is there anything more that is
12   required, other than a label or the
13   conclusion that the person is acting
14   bizarre?
15                   MR. RADOMISLI:  Object to the
16        form.  Go ahead.
17        A.      That is a sense of the
18   evaluation that when a patient comes or the
19   person comes, any definition by others, the
20   admitting physician has to determine what
21   does it mean by being bizarre and how does
22   that impact the dangerousness of the
23   patient.
24        Q.      Can you define for me what kind
25   of the behavior qualifies as bizarre

1                VINOD DHAR, M.D.

2   behavior that is sufficient to involuntarily

3   commit somebody under this policy of

4   Jamaica's?

5                MR. RADOMISLI:  Objection to

6        form.

7        A.      I can give a number of examples.

8   Patient is at home, locks himself up,

9   threatens his mother or he goes out, takes

10  his clothes off, runs around the

11  neighborhood, stands in front of -- on the

12  traffic light and starts preaching Bible and

13  any -- or starts running around the traffic

14  or highway, walking on the highway.

15       Q.      Is it your view that all of that

16  behavior would qualify somebody for

17  involuntary commitment in the hospital?

18                MR. RADOMISLI:  Under this

19       policy?

20       Q.      Under this policy?

21                MR. RADOMISLI:  Objection to

22       form.

23       A.      Yes.  Whatever called them to

24  come to the hospital and then determination

25  will be made whether they remain risk or

1                VINOD DHAR, M.D.

2     dangerousness.  Then they will qualify for

3     admission.

4          Q.     I don't understand that answer.

5     Can you explain that?

6          A.     All patients that come with

7     bizarre behavior doesn't necessarily qualify

8     for inpatient hospitalization.  If we

9     determine that it's because of a mental

10    illness or some emotional disturbance, then

11    we can make assessment of patient being

12    admitted to the hospital or in the absence

13    of mental illness, if the behavior causes

14    potential risk of harm to himself, then we

15    can admit the patient.

16         Q.     Is it a potential risk or is it

17    a substantial risk that is required under

18    the hospital's policy for involuntary --

19         A.     Substantial risk.  I'm sorry.

20         Q.     It's a substantial risk; is that

21    correct?  So it's not sufficient if there is

22    a potential risk, in other words to admit;

23    isn't that right?

24              MR. RADOMISLI:  Pursuant to the

25         policy.

Page 132

1              VINOD DHAR, M.D.

2        Q.      Pursuant to the policy?

3        A.      Substantial risk is to prevent

4   the potential risk.

5        Q.      My question is if you have a

6   risk, but it's only a potential risk, is

7   that sufficient to qualify as a substantial

8   risk under the policy?

9        A.      Under the policy, yes.

10       Q.      So any risk is a substantial

11  risk under the policy?

12       A.      Under the policy for 9.39, yes.

13       Q.      Why is that?

14       A.      Safety.

15       Q.      The safety of whom?

16       A.      The person.

17       Q.      What does the term substantial

18  risk mean to you, Doctor?

19       A.      It's a very undefined term that

20  is used by different agencies by different

21  professionals.  There's a patient in the

22  nursing home, there is a patient coming from

23  -- patient living in the home by himself, he

24  is -- has no food, has no heat, and if the

25  neighbors complain that he's smelling.  So

Page 133

1                    VINOD DHAR, M.D.

2    somebody will go there and make an

3    assessment and if what they find there is

4    potentially a dangerous situation, they will

5    remove the patient and bring to the

6    emergency room.  So there is a substantial,

7    as well as, potential.

8         Q.    Isn't there a difference in your

9    mind between any risk and substantial risk?

10              MR. RADOMISLI:  I'm going to

11         object to the extent you're asking for

12         his mind.  If you want to ask whether

13         it's a policy --

14              MR. SMITH:  Okay.  Fine.  I will

15         ask what the policy is and see if he

16         thinks there's any distinction either

17         because we are mincing words here.

18         Q.    Under the Jamaica Hospital

19    policy, is there any difference between a

20    potential or any potential risk of

21    dangerousness and a substantial risk of

22    dangerousness?

23         A.    Again, it's a clinical judgment.

24    I don't think it's defined in the policy.

25         Q.    In your opinion, is there a

Page 134

1               VINOD DHAR, M.D.

2    difference between any potential risk and a

3    substantial risk of dangerousness?

4               MR. RADOMISLI:  He is here as a

5        30(b)(6) witness.

6        Q.    Okay.  You can answer the

7    question.

8               MR. RADOMISLI:  No, he can't.

9               MR. SMITH:  You're instructing

10       him not to answer that question?

11              MR. RADOMISLI:  It's not proper

12       of a 30(b)(6) witness.  You know that.

13              MR. SMITH:  No, I don't.

14              MR. RADOMISLI:  I cited a case.

15       Don't answer that question.  It's not

16       proper.

17       Q.    Does the term substantial risk,

18   as defined in the Jamaica Hospital policy,

19   include any risk of harm?

20       A.    Yes.

21       Q.    So under Jamaica's policy, any

22   possible risk is a sufficient basis in which

23   to involuntary admit somebody, because of

24   the conclusion that they are dangerous to

25   themselves or others; is that correct?

Page 135

1              VINOD DHAR, M.D.

2              MR. RADOMISLI:   Objection to the

3       form.

4       A.      Yes.

5       Q.      Is part of Jamaica's policy in

6  making this assessment about risk of

7  dangerousness to seek out to protect the

8  community, as well as, the patient?

9       A.      Both.

10      Q.      I'm sorry?

11      A.      Both patient, as well as, the

12  community.

13      Q.      Why is the hospital involved in

14  seeking out to make the community safe?

15              MR. RADOMISLI:   Objection to

16      form.

17      A.      Because article 9.39 is safety

18  for patient and others.

19      Q.      So Jamaica Hospital views one of

20  its roles under 9.39 is to make the

21  community safe?

22              MR. RADOMISLI:   Objection to

23      form.

24      A.      I don't think it's question of

25  making the community safe.   It's making --

Page 136

1                    VINOD DHAR, M.D.
2    actually, yes, it's a mental and as a
3    patient rule in the Jamaica Hospital will
4    not discharge the patient if we find out
5    that the patient can be potentially risk of
6    the community.  Yes, we hold him.
7         Q.    But you not only hold him, but
8    you will admit him involuntary if you think
9    there's a risk to the community, right?
10              MR. RADOMISLI:  Objection to
11        form.
12        A.    Right.
13        Q.    And you will do so even if you
14   think there is only a potential risk to the
15   community; is that right?
16              MR. RADOMISLI:  Objection to
17        form.
18        A.    Yes.
19        Q.    Is there a distinction in your
20   mind between admitting a patient involuntary
21   and committing a patient involuntarily?
22              MR. RADOMISLI:  Objection.
23        A.    Involuntary commitment is the
24   legal term and admission is the medical
25   term.

Page 137

1              VINOD DHAR, M.D.

2      Q.     But the way we have been using

3  it today, they both mean the same thing?

4      A.     Same thing, yes.

5      Q.     Does Jamaica's policy on the

6  assessment of patients for dangerousness,

7  include within it, a concept of hold and

8  stabilize a patient?

9      A.     Hold and admit.  Not stabilize.

10     Q.     What does that mean, hold and

11 admit?

12     A.     Hold, evaluate and if necessary,

13 admit.

14     Q.     Are you familiar with the phrase

15 hold and stabilize?

16     A.     There is, but emergency rooms

17 are not meant for stabilizing.  There is a

18 timeframe and the volume and if I may add,

19 that's why new CPEP came into being.

20            MR. RADOMISLI:  You're talking

21      about psychiatric?

22            THE WITNESS:  I'm talking about

23      psychiatric, yeah.

24     Q.     Why did the CPEP come into play?

25            MR. RADOMISLI:  Objection, but

Page 138

1              VINOD DHAR, M.D.

2       he's already --

3       A.       Because CPEP has a provision for

4    72-hour observation.

5       Q.       What is that about?

6              MR. RADOMISLI:  We are really

7       getting beyond.

8              MR. SMITH:  I know, but I'm

9       trying to understand -- the phrase hold

10      and stabilize was used in case with

11      respect to this plaintiff.  I am trying

12      to understand whether or not that's

13      part of the policy and practice of

14      Jamaica Hospital.

15             MR. RADOMISLI:  Can you just

16      tell me where it was used 'cause it

17      doesn't sound familiar to me?

18             MR. SMITH:  You have the chart

19      right there.

20             THE WITNESS:  I can -- I can --

21             MR. RADOMISLI:  Nat, I will talk

22      to you outside.

23             MR. SMITH:  Okay, good.  We're

24      going off the record.  It's 2:28.

25             (Whereupon, a recess was taken.)

VINOD DHAR, M.D.

MR. SMITH: Back on the record. It's 2:37.

Q. This term hold and stabilize, can you tell me what that means?

A. Well, actually it doesn't mean much. The term actually is hold and reevaluate. Some people use this term and I'm not familiar why they use this term. It's possible sometimes the patient can be treated within 24 hours or until all the information is available to make a final determination.

Q. Doesn't Jamaica Hospital's policy require that when a patient's brought in reportedly with a mental illness and reportedly engaging in conduct and making statements that create a substantial risk of physical harm, that a staff doctor conduct a comprehensive psychiatric as soon as possible, right?

MR. RADOMISLI: Objection, asked and answered.

A. Right.

Q. And there's no room in Jamaica

Page 140

1                    VINOD DHAR, M.D.

2     policy for holding a person for a period of

3     time while an assessment is yet to be done;

4     isn't that correct?

5               MR. RADOMISLI:   Objection to the

6          form.  You could answer.

7          Q.    You can answer.

8               MR. RADOMISLI:  If you

9          understand.

10         A.    Yeah.  Technically after 24

11    hours in the ER the standard of care, I

12    don't think it's in the policy, that gives

13    you time to make an evaluation and

14    assessment and determination whether or not

15    you want to admit the patient or discharge

16    the patient.

17         Q.    So this 24-hour period, you're

18    saying there's no policy that's laying out a

19    24-hour period?

20         A.    There is no time determination

21    about that.

22         Q.    So in 2009, there was no policy

23    at the hospital that required that a patient

24    brought in for an alleged mental illness be

25    evaluated as soon as possible?

1              VINOD DHAR, M.D.

2              MR. RADOMISLI:  Objection to

3      form.

4      A.      As soon as possible.

5      Q.      The policy was to do the

6  evaluation as soon as possible, right?

7      A.      Yeah.

8      Q.      But earlier when I was asking

9  you questions about the difference between a

10 potential risk or any risk or substantial

11 risk, I think you said if there's any risk

12 that the patient would act in the dangerous

13 manner that the hospital could admit; do you

14 remember that?

15             MR. LEE:  Objection to the form.

16             MR. RADOMISLI:  Objection to the

17     form.

18     Q.      Do you remember that?

19     A.      Yes.

20     Q.      When you said, yes, it's

21 possible for the hospital to the admit, did

22 you mean that it was possible for the

23 hospital to admit on an involuntary basis?

24     A.      Yes.

25     Q.      So just to be clear, you weren't

1                    VINOD DHAR, M.D.
2    saying that the patient could be admitted on
3    a voluntary basis when we were talking about
4    doing assessments about dangerousness; is
5    that right?
6          A.     Yes.  Only involuntary, yeah.
7          Q.     When a patient is brought to the
8    hospital as potential involuntary admission
9    under 9.39, was there any policy at the
10   hospital with respect to restraining that
11   person or patient?
12                MR. RADOMISLI:  Objection to the
13         form.
14         A.     Depends upon the circumstances,
15   the patient is out of control and poses a
16   danger to the staff, yelling, he will be
17   restrained.  Now there is a difference
18   between restrained, a mental health
19   restrained and restrained by other means.
20   We do restrain the patients, yes.
21         Q.     How does Jamaica restrain
22   patients?
23         A.     If patient is out of control
24   according to OMH guideline, it's called a
25   four point restrain.  We tie the patient

1              VINOD DHAR, M.D.
2   with the help of the staff, the clinical
3   staff, and until make sure they are safe and
4   meanwhile, they're given treatment,
5   medication, counseling and then they are
6   released and it should not last more than
7   one hour.
8              MR. SMITH:  I want to show you
9       what's being marked as Exhibit 152.
10             (Plaintiff's Exhibit 152,
11       document, was marked for identification
12       as of this date.)
13             MR. SMITH:  This is a seven-page
14       policy statement produced by Jamaica
15       Hospital in this case in discovery.
16       Q.     Is this the Jamaica Hospital
17   department of psychiatry policy on the use
18   of restraints?
19             MR. RADOMISLI:  Don't answer the
20       question.  You know this is beyond the
21       scope.  It wasn't even part of your
22       application.  This deposition is to
23       deal with involuntary admission and
24       this is beyond the scope.
25       Q.     Is it consistent with the

Page 144

1          VINOD DHAR, M.D.
2    hospital's policy to permit a patient to be
3    handcuffed using steel handcuffs?
4              MR. RADOMISLI:  Beyond the
5         scope.  You know it's beyond the scope.
6         Don't answer the question.
7         Q.    Is it consistent with the
8    hospital's policy to double-cuff a patient
9    to a hospital gurney?
10              MR. RADOMISLI:  It's beyond the
11         scope of the deposition and the court's
12         order.
13         Q.    When a patient is being assessed
14    for involuntary admission, is it consistent
15    or inconsistent with hospital policy to
16    permit restraints to be used, such that,
17    circulation of the patient is being
18    interfered with?
19              MR. RADOMISLI:  It is beyond the
20         scope of the deposition, which is
21         limited to policy on involuntary
22         admission, per court order.
23              MR. SMITH:  That's what I'm
24         asking about.
25         Q.    Can locked restraints ever be

Page 145

1                    VINOD DHAR, M.D.

2   used on involuntary patients?

3                MR. RADOMISLI:   Objection.

4        Don't answer the question.   It's beyond

5        the scope according to the court.

6                MR. SMITH:   Does not go beyond

7        the scope.

8                MR. RADOMISLI:   Has nothing to

9        do with involuntary admission.

10               MR. SMITH:   Just asking if it

11       has to do with involuntary admission.

12       I will ask it again, just so it's

13       clear.

14       Q.      Are the use of locked restraints

15  consistent or inconsistent with Jamaica's

16  policy with respect to involuntary

17  admissions or people being considered for

18  involuntary admissions to the hospital for

19  dangerousness assessments?

20               MR. RADOMISLI:   That's beyond

21       the scope, because you're going to a

22       policy other than a policy on

23       involuntary commitment.

24               MR. SMITH:   The judge has

25       already directed you not to instruct

Page 146

1                    VINOD DHAR, M.D.
2        the witness not to answer questions,
3        other than for privileged purposes and
4        now you're vagrantly violating the
5        judge's orders.
6              MR. RADOMISLI:  It's not my
7        intention to violate the judge's order.
8        I don't think what was anticipated is
9        that you abuse this deposition to go
10       beyond what was a previously court
11       ordered limited scope deposition, and
12       actually, come to think of it, it's my
13       position you're violating the prior
14       court order by asking these questions
15       because the scope of this examination
16       was specifically limited to the policy
17       on involuntary commitment --
18       involuntary hospitalization.
19             MR. SMITH:  Well, I know.  I
20       understand, you've just said that.  I
21       don't think how what the policies of
22       the hospital are -- you know, Greg, I
23       will try one more time and this
24       document that I have just shown this
25       witness was produced by your office.

Page 147

1           VINOD DHAR, M.D.
2       It comes from the department of
3       psychiatric.  It says department of
4       psychiatric, psychiatry manual and it's
5       governing the use of restraints for
6       patients who are there, among other
7       things, involuntarily and so I don't
8       know what else to say.
9           MR. RADOMISLI:  I don't now what
10      else to say either.  I am not disputing
11      that.  You didn't ask for the witness
12      to testify about this policy when it
13      was discussed before the court, as far
14      as I recall.  If you did ask for it, it
15      wasn't granted because there are only
16      four topics that are permitted to ask
17      this 30(b)(6) witness about.  This is
18      not one of those topics.  The use of
19      restraints is not one of those topics.
20          I'd also add that you already
21      asked Dr. Lewin about this issue
22      because she did her evaluation while
23      your client was in the handcuffs, where
24      I did not restrict you, because there
25      was no prior court order.  Here there

Page 148

1              VINOD DHAR, M.D.

2       is.

3              MR. SMITH:  We are going to go

4       off the record.  I want to talk with my

5       colleague and see how we're going to

6       proceed.  It's 14:50.

7              (Whereupon, a recess was taken.)

8              MR. SMITH:  Going back on the

9       record.  It's 14:54.

10      Q.      Doctor, I just have a few more

11  questions then I'm done.  Subject to having

12  you brought back, because your counsel has

13  interfered with some of my questions, but

14  for today at least.

15              If a patient is brought into the

16  medical emergency room, is there anything in

17  the Jamaica Hospital policy that includes

18  the comprehensive psychological evaluation

19  being conducted while a patient is in the

20  medical emergency room as opposed to waiting

21  until the patient is the transferred, if the

22  patient is transferred to the psychiatric

23  emergency room?

24              MR. RADOMISLI:  Objection to

25      form.

Page 149

1                    VINOD DHAR, M.D.

2        A.       You cannot do a comprehensive

3   evaluation.  You can do what's called a

4   psychiatric consult.  That means based on

5   the information and based on the mental

6   status, you make a determination whether the

7   patient will stay in the medical ER or he

8   can be transferred to psych ER needing

9   psychiatric treatment.

10       Q.       Who makes that decision?

11       A.       Psychiatrist.

12       Q.       So why can't the psychiatrist do

13   the full blown comprehensive psychiatric

14   evaluation in the medical ER?

15            MR. RADOMISLI:   Objection to

16       form.

17       A.       It's a comprehensive evaluation.

18   Medical ER is very busy, don't have all the

19   information and especially if there is a

20   risk of dangerousness and if there is no

21   need for medical treatment, then the patient

22   will be transferred to psychiatry.

23       Q.       Who does this consultation as

24   opposed to this comprehensive psychiatric

25   evaluation?

Page 150

1                    VINOD DHAR, M.D.

2        A.       It is done by a psychiatrist, a

3    staff psychiatrist.

4        Q.       Then does that consultation then

5    trigger the 48-hour period and the

6    requirements that the patient be given the

7    notices and the rights that we talked about

8    earlier?

9        A.       No.

10       Q.       Why not?

11       A.       The 48 hours starts the minute

12   the patient is admitted and registers in the

13   psych ER.

14       Q.       What authority is there in

15   Jamaica's policies to hold somebody in the

16   medical ER prior to a comprehensive

17   psychiatric examination being conducted?

18              MR. RADOMISLI:   Objection to

19       form.  Go ahead.

20       A.       Because patient is kept in the

21   medical emergency room only to make sure

22   that there's no acute medical problems and

23   necessity for discharge or medical -- or

24   psychiatric treatment.  That is the premise

25   of the consultant.  Based on the information

Page 151

```
 1                 VINOD DHAR, M.D.
 2   that the patient can be discharged, whether
 3   the patient doesn't have an acute illness or
 4   suffered some illness and there's a sense of
 5   dangerousness.  Then that will be taken to
 6   the psychiatric emergency room.
 7        Q.    My question is what authority in
 8   Jamaica's policy is there, if there is any,
 9   to hold somebody against their will
10   involuntarily in the medical ER before the
11   comprehensive psychological evaluation is
12   conducted?
13             MR. RADOMISLI:  Objection to
14        form.
15        A.    They have the patient is --
16   until the patient is medically cleared, they
17   will hold the patient.
18        Q.    What I want to know is what
19   authority does the hospital have for holding
20   the patient under those circumstances?
21             MR. RADOMISLI:  Objection.
22        A.    I think medical ER policy.
23        Q.    Is there a written policy that
24   authorizes Jamaica Hospital to hold a
25   patient pending a psychiatric consult?
```

Page 152

1                    VINOD DHAR, M.D.

2        A.     Yes.

3               MR. RADOMISLI:   Objection.

4        Q.     And is that in writing, that

5    policy?

6        A.      It has to be, but if you look

7    at 9.39 there is a provision there that any

8    psych emergency room doctor can transfer the

9    patient to psychiatric emergency room.  Any

10   medical emergency room physician can

11   transfer patient to psychiatric emergency

12   room per 939.

13       Q.     But if that was done under

14   Section 939, then Section 939 would have

15   been invoked and the timeframes required by

16   939 would start running; isn't that right?

17       A.      That's right, but the hospital

18   policy is patient not to be -- until the

19   patient is transferred to psychiatric

20   emergency room, the 939 will start at that

21   time.

22       Q.      I understand that, Doctor.  What

23   I want to know, if the patient is brought

24   into the medical ER and is being held

25   against their will, but they have not been

Page 153

1                    VINOD DHAR, M.D.
2       evaluated by a psychiatrist, either in an
3       informal consultation or a comprehensive, is
4       there any authority in the hospital's
5       written policies for holding that person
6       against their will prior to them being
7       assessed by a psychiatrist?
8                    MR. RADOMISLI:  Objection to
9            form.
10           A.     I am sure there is a policy.  It
11      again, depends on the clinical judgment of
12      the medical ER doctor.  If they feel that
13      the patient needs to be restricted pending a
14      psychiatric evaluation, they have that
15      authority to keep the patient under
16      observation.
17                   MR. SMITH:  I'm going to make
18           the request for the production of that
19           policy statement.
20           Q.     What authority are you referring
21      to?
22                   MR. RADOMISLI:  Objection to
23           form.
24           A.     The hospital -- I'm not sure
25      about what authority the medical people

Page 154

1                    VINOD DHAR, M.D.

2    have, but there has been policy.

3         Q.      Other than Section 9.39, are you

4    aware of any other rule that allows a

5    hospital to hold somebody against their will

6    for purposes of an involuntary commitment

7    for mental illness that has a substantial

8    risk of dangerousness associated with it?

9              MR. RADOMISLI:   Objection.

10        A.      939 is only for mental health.

11   Emergency rooms, medical emergency rooms,

12   have their own policy by department of

13   health, DOH.  So that will be covered under

14   their jurisdiction.  939 starts only when a

15   patient is transferred to psychiatric

16   emergency room, which is the designated 939

17   hospital.  Every hospital does not have a

18   939 room.

19        Q.      In 2009, did Jamaica have a 939

20   room?

21        A.      Yes.

22        Q.      And a 939 room is a separate

23   psychiatric emergency room, right?

24        A.      Yes.

25        Q.      And that's what it was in 2009,

Page 155

1                    VINOD DHAR, M.D.
2    correct?
3        A.     Yes.
4        Q.     In this case, the patient was
5    brought into the hospital on late in the
6    evening of October 31, 2009 and he was not
7    evaluated by Dr. Bernier until November 2,
8    2009 and then the form was not executed by
9    Dr. Bernier until November 3, 2009.  What I
10   want to know is during the period from when
11   the patient was first brought into the
12   hospital up until the point that Dr. Bernier
13   signed the form 7 point -- 474, what was the
14   authority that the hospital had for holding
15   that patient?
16            MR. RADOMISLI:  Objection.
17       A.     I cannot answer.
18       Q.     You can't answer it.
19            MR. SMITH:  All right, subject
20        to the questions that weren't answered,
21        I don't have any more questions at this
22        time.  I am going to make an
23        application to the court to have the
24        witness brought back.  The judge is
25        away.  We waited for more than a half

Page 156

1                VINOD DHAR, M.D.
2        an hour to get a ruling the first time
3        and so I'm not going to hold the
4        deposition for that purpose now.
5                MR. RADOMISLI:  Well, we did get
6        a ruling and so if there are questions
7        that you want to ask, other than the
8        ones that I objected to on the ground
9        that they were beyond the scope of the
10       deposition, I suggest you ask them.
11       Otherwise, they should not part of your
12       application, because you have the
13       opportunity now.
14               The only objections I would be
15       asserting is if it's beyond the scope
16       pursuant to a prior court order or
17       under privilege.
18               So do you have anything that
19       doesn't fall within that?
20               MR. SMITH:  I don't have any
21       more questions, other than the
22       questions that you refused to let the
23       witness answer and any rational
24       follow-ups from the answers that he
25       gave.

Page 157

1              VINOD DHAR, M.D.
2              MR. RADOMISLI:  On the grounds
3      -- refused to let the witness answer on
4      the grounds that they were beyond the
5      scope of the deposition.  Correct.
6              MR. SMITH:  Well, you've
7      instructed him not to answer a lot of
8      questions.  I don't know if you were so
9      clear about the scope, but I think
10     we're on the same page here.  If I had
11     something else that was clearly not in
12     an area that you and I had a
13     disagreement about, I'd ask it, but
14     nothing else comes mind.
15             MR. RADOMISLI:  What I'm saying
16     is if you want to make your
17     application, you can make the
18     application insofar as I objected to
19     questions and didn't let him answer
20     questions on the grounds that they were
21     beyond the scope of the deposition.
22     Any other objections that I may have
23     made, I am not permitted to make
24     pursuant to the court's order.  So if
25     there are any other questions, other

Page 158

1                   VINOD DHAR, M.D.
2          than the ones I objected to on the
3          grounds of beyond the scope, those you
4          have the opportunity to ask now and if
5          you don't, then I am going to argue
6          that they should not be part of your
7          application.
8                   MR. SMITH:   Okay.
9    EXAMINATION BY
10   MR. CALLAN:
11          Q.      Doctor, I represent Dr.
12   Aldana-Bernier in this lawsuit.  Can you
13   tell me, sir, do you have a recollection
14   back in November 2009, what your general
15   work schedule was, what hours you'd be at
16   the hospital?
17          A.      Generally 8:30 to 4:30.  I am
18   on-call all the time.
19          Q.      Do you get into the hospital on
20   the weekends, as well as Monday to Friday?
21          A.      I do come on the weekends if
22   there is a need.
23          Q.      And your position in the chain
24   of command in psychiatry is you were the
25   number two person; is that correct?

```
 1              VINOD DHAR, M.D.
 2      A.      Number two, right.
 3      Q.      So Dr. Aldana-Bernier would
 4  report to you in the chain of command?
 5      A.      She does report to me, yes.
 6      Q.      With respect to the Adrian
 7  Schoolcraft matter, I think you've said you
 8  had no involvement in the case; is that
 9  right?
10      A.      I had no involvement in the case
11  as far as legal proceedings and the
12  treatment is concerned.
13      Q.      Is it possible that you spoke to
14  Dr. Aldana-Bernier about Adrian Schoolcraft
15  at any time during his treatment in the
16  psychiatric emergency room?
17              MR. SMITH:  Objection to form.
18      Q.      You could answer.
19      A.      It's possible.
20      Q.      Now, you made some general
21  comments about comprehensive psychiatric
22  evaluation of patients.  Is it accurate to
23  say, sir, that a comprehensive evaluation of
24  a psychiatric patient would include
25  reference to matters that may have happened
```

```
1              VINOD DHAR, M.D.
2   in the initial admission stage to the
3   medical emergency room, would that be part
4   of the whole evaluation process?
5       A.      Even before that.  Certainly
6   proceeding --
7       Q.      So certainly anything that the
8   ER residents became aware of, if noted in
9   the record or communicated to the
10  psychiatric staff, would certainly be
11  considered, that could be considered in a
12  comprehensive evaluation; is that correct,
13  sir?
14              MR. SMITH:  Objection.
15      Objection to form.  Leading.
16      A.      Yes.
17      Q.      And if hypothetically, the
18  police said something indicating that the
19  patient was a threat to himself or somebody
20  else, and I'm not just talking about Mr.
21  Schoolcraft, I'm talking about patients in
22  general, that would be something that would
23  be considered in a comprehensive evaluation?
24              MR. SMITH:  Objection.  Leading.
25      A.      Yes.
```

```
                                        Page 161
 1              VINOD DHAR, M.D.
 2              MR. CALLAN:  I have no further
 3      questions.
 4              MR. LEE:  I just have one.
 5  EXAMINATION BY
 6  MR. LEE:
 7      Q.     Under the Jamaica policy under
 8  939, once the first doctor signs the form,
 9  that patient is admitted to the hospital,
10  correct?
11      A.     Yes.
12              MR. SMITH:  You mean once the
13      patient or once the doctor?
14              THE WITNESS:  Patient doesn't
15      sign any forms.  The doctor.
16      Q.     Once the first doctor signs the
17  form under 9.39, even pending the 48-hour
18  evaluation, once the first doctor signs, the
19  patient is admitted to the hospital?
20      A.     Yes.  I mean, that form is
21  signed only when the determination is made
22  that the patient needs to be admitted.
23              MR. LEE:  Thank you.
24              MR. SMITH:  Just a follow-up on
25      that.
```

Page 162

1                    VINOD DHAR, M.D.

2    EXAMINATION BY

3    MR. SMITH:

4         Q.      Is there any reason why a doctor

5    at Jamaica would make a decision on one day

6    and then delay signing the form until the

7    next day?

8                    MR. RADOMISLI:  Objection,

9         speculation, but go ahead.

10        A.      When you make a decision that

11   patient needs to be admitted on the

12   psychiatric grounds, then you had to do all

13   this blood work and everything else to get

14   the medical clearance.  So the actual

15   admission date or time is different than

16   when the doctor says that patient needs to

17   be hospitalized, because all the other

18   things are to be considered.

19        Q.      I am not sure you're answering

20   my question.  My question is if the

21   patient's assessment has been conducted and

22   the comprehensive evaluation has been

23   conducted and medical examination has been

24   conducted, is there any reason why this

25   staff psychiatrist in the psych ER would

Page 163

1                    VINOD DHAR, M.D.
2    wait a day when signing the form admitting
3    the patient?
4              MR. RADOMISLI:   Objection to the
5         form and substance, but you can answer.
6         A.      There are number of factors,
7    yes.  Availability of the bed.  We don't
8    know whether the patient admitted to Jamaica
9    or transferred somewhere else and if the
10   patient has insurance, we need to get the
11   authorization approved for the insurance
12   company.
13        Q.      Any other reasons?
14        A.      Not that I am aware of.
15        Q.      In this case, the patient was a
16   member of the police department.  Are you
17   aware of any practices or policies at
18   Jamaica that requires that a involuntary
19   admission of a police officer has to be
20   reviewed by somebody else, other than the
21   initial assessment conducted by the staff
22   physician?
23        A.      As far I am concerned, there is
24   no such policy, the physician does clinical
25   work and they do the determination.

Page 164

VINOD DHAR, M.D.

1

2          Q.       Is there anything about a

3    patient being a member of the police

4    department that changes the hospital policy

5    with respect to how an involuntary admission

6    is conducted?

7          A.       Absolutely not.   There is

8    relevance.

9               MR. SMITH:   All right, thank

10         you.   Going off the record.   It's

11         15:12.

12              (Time noted:   3:12 p.m.)

13    _____

14              VINOD DHAR, M.D.

15

16

17   Subscribed and sworn to before me this

18

19   _____day of _____2014.

20

21   _____, Notary

22   Public.

23

24

25

```
                                              Page 165
 1                    I-N-D-E-X
 2
 3   WITNESS            ATTORNEY          PAGE
 4   VINOD DHAR         MR. SMITH         5,161
 5                      MR. CALLAN          158
 6                      MR. LEE             161
 7
 8                  E-X-H-I-B-I-T-S
 9   PLAINTIFF'S         DOCUMENT                PAGE
10   151                 Document                 68
11   152                 Document                143
12   ***ALL EXHIBITS RETAINED BY ATTORNEY***
13
14   INFORMATION REQUESTED                       PAGE
15   Request documents                           110
16   Request written presentations               111
17   Request policy statement                    153
18
19
20
21
22
23
24
25
```

Page 166

CERTIFICATE

1

2

3

4        I, DENISE ZIVKU, a Professional Reporter

5  and Notary Public within and for the State of New

6  York, do hereby certify:

7

8        That VINOD DHAR, M.D., the witness whose

9  deposition is hereinbefore set forth, was duly

10  sworn by me and that the within transcript is a

11  true record of the testimony given by such

12  witness.

13

14        I further certify that I am not related

15  to any of the parties to this action by blood or

16  marriage and that I am in no way interested in

17  the outcome of this matter.

18

19      IN WITNESS WHEREOF, I have hereunto set my

20  hand this 28th day of July, 2014.

21

22

23      _____

24        DENISE ZIVKU

25

Page 167

1               WITNESS'S CORRECTION SHEET

2      PAGE \ LINE \ CORRECTION

3      _____

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19

                        _____

20                          VINOD DHAR, M.D.

21

22     Subscribed and sworn to before me

23     this _____ day of _____, 2014

24     _____, Notary Public.

25

[& - actuality]

**&**

**&** 2:16,20 3:4,9

**0**

**06005** 1:7

**1**

**1** 80:10 91:20
**10** 1:7
**100** 2:13
**10004** 3:6
**10006** 2:5
**10007** 2:13
**10017** 3:11
**10022** 2:18
**10:06** 1:14 5:3
**10:54** 43:3
**110** 165:15
**11042** 2:22
**111** 2:5 165:16
**11:21** 42:24
**12:35** 101:9
**130** 21:20 23:21
  31:5 43:22 70:16
  114:9
**131** 79:9
**143** 165:11
**14:50** 148:6
**14:54** 148:9
**15** 14:3 67:2
**151** 68:3 165:10
**152** 143:9,10 165:11
**153** 165:17
**158** 165:5
**15:12** 164:11
**161** 165:6
**17** 44:7,10,11 45:3
  70:15 127:25
**18** 45:3 114:11
**19** 44:7 45:3
**1981** 12:14
**1986** 66:20
**1990** 11:2
**1995** 11:2 109:6,10
  110:21

**1996** 9:23 11:7
  67:15 109:10
**1999** 9:17,25,25
  10:23
**1:41** 101:12

**2**

**2** 94:17 155:7
**20** 14:3 43:2
**20002** 2:9
**2001** 2:22
**2007** 10:2 40:21
**2009** 22:12,22 25:22
  35:3,9,17 36:3,9,10
  37:11,17,21 38:11
  38:25 40:22 41:6,17
  61:17 62:13 65:18
  65:22 66:3 110:24
  111:3,3,10,11,20
  114:2 121:6 140:22
  154:19,25 155:6,8,9
  158:14
**2014** 1:13 5:3
  164:19 166:20
  167:23
**204** 125:23,24 126:2
**220** 1:12 3:10 5:5
**24** 117:3 139:11
  140:10,17,19
**25** 43:2,13
**28th** 166:20
**2:28** 138:24
**2:37** 139:3
**2pc** 28:3

**3**

**3** 155:9
**30** 8:8 14:20 21:20
  86:4 87:8 134:5,12
  147:17
**31** 155:6
**3:12** 164:12

**4**

**4** 91:4

**40** 14:2
**42nd** 1:12 3:10 5:5
**44** 120:2,3 122:24
**444** 2:17
**474** 76:22 77:15,25
  80:4 82:16 94:18
  155:13
**48** 81:6,12,17 82:15
  89:5,10 91:7,12
  150:5,11 161:17
**4:30** 158:17

**5**

**5** 94:8 124:23
**5,161** 165:4

**6**

**6** 8:8 14:20 86:4
  87:8 114:11,16
  118:8 134:5,12
  147:17
**6-0** 8:18
**60** 8:18
**68** 165:10

**7**

**7** 1:13 5:3 155:13
**72** 138:4
**747** 80:10 81:19
  82:9 125:5
**77** 66:19

**8**

**829** 2:8
**86** 12:14,15
**8900** 7:17
**8:30** 158:17

**9**

**9** 65:5
**9.27** 113:11
**9.39** 65:12,15,22
  66:2 68:7 69:17
  75:11,15 95:12
  96:22 97:3,25 99:5
  99:10 106:24
  113:10 132:12

**135**:17,20 142:9
  152:7 154:3 161:17
**9.39.** 75:11 95:14
**90** 12:15
**92** 13:19
**927** 27:5 28:4,5,6,11
**93** 13:19
**939** 27:21 28:6,8,14
  28:20 29:5,8 30:21
  30:22 45:13 152:12
  152:14,14,16,20
  154:10,14,16,18,19
  154:22 161:8
**96** 11:2,8

**a**

**a.m.** 1:14
**abercrombie** 2:16
**ability** 51:13 75:16
**able** 37:12 39:2,21
  43:11 73:11 99:9
**absence** 131:12
**absolutely** 164:7
**absurd** 39:12,13
**abuse** 146:9
**accept** 8:6,12 74:20
  75:19 76:6
**access** 114:20
**accomodate** 52:14
  52:15
**accompanying** 32:4
**accurate** 159:22
**act** 17:11 99:20
  125:8 141:12
**acted** 101:23 106:13
**acting** 93:11,17
  94:16,25 96:19
  99:19 101:15
  103:19,23 104:23
  106:15 128:22
  129:2,10,13
**action** 166:15
**actual** 40:3 162:14
**actuality** 58:24

[acute - assessment]

**acute** 56:4 58:18
  122:4,21 150:22
  151:3
**ad** 26:16,18
**adam** 43:4 100:2
**add** 137:18 147:20
**additional** 89:18
**address** 7:14,17,22
  8:14,17,18 102:3
**adhered** 127:24
**administration** 45:7
**administrative**
  10:13 16:25 17:8
  25:19,22
**administrator** 25:19
  45:7,12
**admission** 26:11
  29:2 31:2 44:2
  45:13,14 59:10
  64:19 79:22 81:7,13
  83:2,4,19 86:6,12
  86:14 91:3 92:21
  114:10 115:20
  125:7 128:2 131:3
  136:24 142:8
  143:23 144:14,22
  145:9,11 160:2
  162:15 163:19
  164:5
**admissions** 18:21,22
  85:7 87:7 119:24
  145:17,18
**admit** 27:22 45:23
  68:16 69:7 125:18
  125:20 126:12
  131:15,22 134:23
  136:8 137:9,11,13
  140:15 141:13,21
  141:23
**admitted** 27:7,9
  28:3 77:19,22 78:14
  81:2 86:19 91:14,17
  92:2 112:19 114:18
  114:19 120:16
  121:11 122:5

125:24 126:2,5
  127:5 131:12 142:2
  150:12 161:9,19,22
  162:11 163:8
**admitting** 69:16
  70:17,20 71:3,5
  73:19 78:25 79:5
  91:5,9,14 92:8,22
  92:23 120:8 121:21
  124:24 125:12
  129:20 136:20
  163:2
**adrian** 1:4 19:25
  159:6,14
**advantage** 38:18
**advisement** 23:13
  110:12 111:22
**agencies** 28:10,19
  132:20
**agency** 33:12 74:16
  90:3
**agent** 6:17,19
**agitated** 129:2,10
**ago** 40:4
**agree** 8:5 34:25
  112:2 117:6
**agreed** 4:3,8,12
**agrees** 102:24 104:7
**ahead** 38:4 82:24
  94:6 104:14 129:16
  150:19 162:9
**al** 1:8
**aldana** 3:5 158:12
  159:3,14
**alleged** 45:18 56:22
  57:12 64:21 66:18
  140:24
**allowed** 63:22
**allows** 154:4
**amended** 66:19
**annuled** 6:6
**answer** 9:16 14:25
  16:11,13,16 17:19
  19:14 20:22 21:2
  31:16 35:18,23 37:6

38:13,16 41:4,5,9
  43:8 46:7 48:22,23
  50:21 51:7,22 53:13
  53:16 54:13,17,25
  55:8,22 56:8 58:23
  61:2 62:2 65:23
  67:11 75:2,24 84:3
  87:24 96:14,16
  97:11,13,22 99:9
  100:15 102:7
  107:24,25 108:4,18
  110:20,21 127:8,16
  128:16 131:4 134:6
  134:10,15 140:6,7
  143:19 144:6 145:4
  146:2 155:17,18
  156:23 157:3,7,19
  159:18 163:5
**answered** 16:9
  50:20 55:21 57:20
  74:25 94:6 96:4
  139:23 155:20
**answering** 162:19
**answers** 156:24
**anticipate** 20:25
**anticipated** 146:8
**anxiety** 56:4
**anybody** 18:25
  19:15,25 20:10,14
  47:23 62:11 69:24
**anytime** 20:4 36:19
**appear** 8:8
**appearance** 19:2
**appearing** 6:19
**appears** 111:23
**application** 28:25
  38:21 39:19 86:8,22
  143:22 155:23
  156:12 157:17,18
  158:7
**applied** 29:25 35:9
  86:3
**apply** 28:24,25
**appreciate** 111:25

**appropriate** 50:12
  56:25 57:14 58:6
**approve** 69:19
**approved** 61:14
  163:11
**approximately**
  43:13
**approximation**
  14:15
**area** 30:20 157:12
**argue** 158:5
**arrange** 92:22
**arrangement** 31:22
**arrangements** 93:9
  126:15
**article** 27:22 65:5
  135:17
**asked** 15:7 29:4
  41:17 49:25 50:19
  55:21 57:19 74:25
  85:4,5 86:5 87:2,13
  94:6 103:7 109:8,22
  110:16 139:22
  147:21
**asking** 20:25 21:16
  29:14 31:8 51:15
  66:8 95:22 96:2
  107:21 133:11
  141:8 144:24
  145:10 146:14
**aspects** 10:14
**assert** 38:8
**asserting** 156:15
**assertion** 6:16
**assertions** 6:14
**assessed** 58:12
  144:13 153:7
**assessing** 40:14
**assessment** 33:24
  34:18 37:3 41:2
  47:15 48:8 50:5
  60:18 63:13,14 83:8
  86:18 87:21 88:8
  90:6 95:2 97:19
  98:5,6,16,17 101:19

101:20,21 102:4,5
102:16,18 103:9
104:7,8 105:15,20
111:5 131:11 133:3
135:6 137:6 140:3
140:14 162:21
163:21
**assessments** 50:11
50:15 76:7 107:16
142:4 145:19
**assigned** 125:22
**assignment** 126:4
**assignments** 125:15
**assist** 65:6
**assistant** 10:19
16:18 99:19
**assistants** 52:17
**associate** 8:24 9:12
10:20
**associated** 154:8
**assuring** 91:5
**attack** 56:3
**attempt** 76:7
**attend** 17:7
**attending** 9:9,22
10:3,4 11:4 12:17
15:25 62:20 63:11
63:23 69:2,4,10,12
70:22 77:6,17 78:3
90:9 91:15 92:13,14
97:17 99:17 103:10
116:15 122:6
**attorney** 19:2 115:5
116:12 165:3,12
**attorneys** 2:4,8,12
2:16,21 3:5,9 4:4
115:17
**authority** 99:15
150:14 151:7,19
153:4,15,20,25
155:14
**authorization**
163:11
**authorizes** 151:24

**avail** 126:19
**availability** 126:3
127:2 163:7
**available** 76:19
125:23 126:13,17
126:21 128:9
139:12
**avenue** 2:17,22
**aware** 64:5,13 65:8
65:10 67:19 68:12
68:14 73:17 154:4
160:8 163:14,17

**b**

**b** 2:4 5:15 8:8 14:20
86:4 87:8 123:15
134:5,12 147:17
165:8
**back** 16:15 29:23
34:21 38:6,19,20
42:23 43:11 52:7,23
64:18 66:4 70:14
83:11 84:13 99:23
100:7 101:7 109:9
114:9 117:9 127:25
139:2 148:8,12
155:24 158:14
**background** 15:4,10
34:13
**bad** 94:21
**balances** 83:2
**ball** 105:25
**base** 80:25
**based** 14:11 32:2,13
32:15 33:12 36:12
51:9 65:3,4 73:21
75:9,10 77:22 80:24
88:19 91:18 98:13
116:25 128:8,18
129:6 149:4,5
150:25
**baseline** 124:12
**basic** 42:13 51:13
127:21

**basically** 51:20 69:9
70:11 123:24
**basis** 6:20,22 26:16
26:18 27:8 28:13
38:12,15 67:9 75:18
77:19 114:19
126:13 134:22
141:23 142:3
**bauza** 3:16
**bed** 125:15,19,21,22
125:23,24 126:2,3
126:13,14 163:7
**beds** 126:17
**beginning** 33:17
**behalf** 93:11,18
94:16,25 101:15
103:19,23
**behavior** 56:12,12
56:14 57:22 72:8,9
73:9 129:7,25 130:2
130:16 131:7,13
**believe** 6:2 38:9 41:3
**bell** 3:9 5:5
**belong** 116:17
**bernier** 3:5 19:22
62:8,10 70:6 155:7
155:9,12 158:12
159:3,14
**better** 8:15
**beyond** 29:13 48:21
48:25 51:4,11 53:12
53:16 63:8 83:17
84:4 96:11 108:10
108:17 113:20
127:7,12 138:7
143:20,24 144:4,5
144:10,19 145:4,6
145:20 146:10
156:9,15 157:4,21
158:3
**bible** 130:12
**bit** 29:12 113:9
**bizarre** 128:22
129:10,14,21,25
131:7

**black** 51:21
**blood** 123:19,24
162:13 166:15
**blown** 149:13
**bottom** 25:3 35:21
68:15 70:16 114:11
**brady** 3:4
**brain** 55:15
**break** 21:3 100:24
101:3,3
**breath** 113:24
**brennan** 3:4
**brian** 2:23 35:20
42:7
**brief** 56:4
**bring** 23:17 28:11
28:20 38:5 74:10,17
133:5
**brings** 47:25 73:22
**broadly** 41:18
**broadway** 2:5
**brought** 5:15 28:10
33:12,14 34:6 52:17
58:11 139:15
140:24 142:7
148:12,15 152:23
155:5,11,24
**burden** 88:18
**bureau** 115:13
**business** 7:22
**bust** 5:25
**busy** 59:12,25 60:2
61:9 149:18
**busyness** 81:24
**bye** 100:21

**c**

**c** 2:2 113:4 123:15
**call** 41:21 42:2,18
62:5,9 126:22
158:18
**callan** 3:4,7 16:15
46:4,18,25 47:4
50:25 61:22 100:25
158:10 161:2 165:5

called  12:9 24:8
  26:23 27:9 43:3
  62:5 63:18 64:3
  109:4 121:23
  130:23 142:24
  149:3
caller  100:2,11,19
calling  99:23
calls  125:14
calm  19:13
capable  31:20 37:14
care  31:20 56:24
  57:13 58:5,9 81:5
  122:2,22 124:18,19
  140:11
career  40:25
case  1:6 19:19,22
  20:4,5,7 21:24 61:4
  104:13 109:5
  111:13 121:2 125:7
  134:14 138:10
  143:15 155:4 159:8
  159:10 163:15
cases  70:12
categories  71:24
  76:15
category  72:2
cause  66:24 138:16
causes  131:13
causing  55:16
cbc  123:19,24
cells  123:25 124:2
center  3:10 11:2,23
  12:19
certain  43:8 56:12
  63:3
certainly  40:5 54:9
  160:5,7,10
certificate  166:2
certification  4:9
  27:10 91:21
certifier  125:9,11
certify  76:22 166:6
  166:14

chain  158:23 159:4
chair  16:18 19:4
  26:6,7
chairman  8:25 9:12
  10:20 19:9 21:8
  25:20 45:8 61:15
  70:2 93:10,13 94:16
  94:24 95:8,11,17
  96:8,20 97:16 98:6
  98:24 99:3,12,19,20
  101:15,16 103:18
  103:19,22,23
chairman's  93:18
chambers  100:3
chan  99:25
chance  20:21 68:6
change  67:19 117:3
changed  37:16,19
  39:6,9 40:7,9,15,17
  40:24 41:2 65:22
  66:3,11,13,15,24
  67:8,9,13,18
changes  68:13
  107:13 124:11,13
  164:4
chart  20:7,11 79:10
  91:25 138:18
checklist  32:7 36:11
checks  82:25
chen  43:4,8 100:2
chief  9:10 10:11,12
  10:17 99:16
child  11:19
choice  107:23
choices  54:20
chronically  124:19
church  2:13
circulation  144:17
circumstances  34:5
  103:17 105:11
  123:7 128:9 142:14
  151:20
cited  134:14
city  1:8 2:11,12

class  107:11
classes  107:15
  110:24
clear  13:9 127:10,15
  141:25 145:13
  157:9
clearance  121:13,23
  121:24 162:14
cleared  122:11
  151:16
clearly  37:14 103:8
  157:11
clearwater  3:9 5:4
clerk  43:4
client  147:23
clinical  10:13 16:24
  17:2,10 77:18 96:24
  98:13 128:18,18
  129:6 133:23 143:2
  153:11 163:24
clinically  123:21
closed  126:24
clothes  130:10
clothing  73:12
cmc  123:23
cmp  123:19,23
  124:2
collateral  75:4 76:2
  77:23 89:2,19,24
  90:10,13,16 128:11
colleague  148:5
collection  22:6
college  11:12,25
  12:9,13
combination  33:4,5
come  32:14 38:19,20
  52:7,16,22,23,23
  56:17 74:6,9 88:3
  88:16 101:7 111:24
  112:8 117:8 130:24
  131:6 137:24
  146:12 158:21
comes  28:8 32:3
  56:11 59:2 68:20
  76:3 91:19 116:11

116:12 122:7,17
  123:8 129:18,19
  147:2 157:14
coming  33:14
  128:10 132:22
comitted  103:10
command  158:24
  159:4
comments  159:21
commissioner  75:12
commit  14:17 16:3
  30:17 75:17 80:9
  97:4 130:3
commitment  28:15
  57:7 104:17 130:17
  136:23 145:23
  146:17 154:6
committed  27:15
  29:8 78:7 104:9
  128:25
committee  26:14
  61:14
committing  14:11
  15:15 136:21
common  20:25
commonly  112:23
communicated
  60:11 108:15 160:9
communication
  107:19
community  28:22
  135:8,12,14,21,25
  136:6,9,15
company  163:12
complain  132:25
completed  125:2
completely  54:16
  85:16
completion  94:17
complied  53:6
comply  51:16 60:12
  65:15 97:19
complying  97:3
components  23:23
  24:2,3

**comprehensive** 18:9
24:9 34:2 36:15
46:10,14 47:10
58:14 59:6 61:7,18
62:11 63:4 64:11
77:9 78:4 81:23
82:7 107:2 113:17
124:3,5 139:20
148:18 149:2,13,17
149:24 150:16
151:11 153:3
159:21,23 160:12
160:23 162:22
**concept** 137:7
**concerned** 159:12
163:23
**conclusion** 17:17
129:13 134:24
**conclusions** 29:9
30:16
**condition** 55:25
90:21 106:25 117:2
124:15
**conditions** 55:17
106:15
**conduct** 48:7 61:18
64:11 72:13,18,25
73:5,6,13,15,18,19
92:24 103:14 129:5
139:17,19
**conducted** 59:7,16
77:9 78:4 82:4 91:6
148:19 150:17
151:12 162:21,23
162:24 163:21
164:6
**conference** 86:10
**conferences** 61:4
109:5
**conferral** 98:24
101:14
**conferring** 99:2
**confident** 63:25
**confirmed** 98:17

**confused** 113:9
**connection** 104:13
**cons** 104:3
**consider** 76:20
**considered** 64:10
106:17 112:5,14
122:18 129:8
145:17 160:11,11
160:23 162:18
**considering** 127:19
**consistent** 99:4,10
143:25 144:7,14
145:15
**consortium** 9:20
**consult** 92:8 149:4
151:25
**consultant** 150:25
**consultation** 103:5
149:23 150:4 153:3
**consulted** 97:17
98:7
**contact** 94:15,24
117:12
**contained** 23:21
**containing** 21:22
**contents** 20:10
110:7
**continue** 41:19
**continued** 2:24 3:3
**control** 72:9 142:15
142:23
**controlled** 58:19
**convert** 94:11
104:18
**convinced** 112:7
**cooperation** 52:21
**cooperative** 58:20
**copies** 21:20
**copy** 23:8,15 66:11
66:16 67:20 79:23
95:14 109:12 116:2
116:2
**corporation** 2:11
**correct** 18:15 20:8
20:13 45:15,22 46:6

46:9 47:20 60:8,24
71:23 72:11 78:7,18
81:21,25 82:5,11
88:7 89:13 96:18
102:17 106:4,21
107:3 111:9 112:22
112:24 123:10
131:21 134:25
140:4 155:2 157:5
158:25 160:12
161:10
**correction** 167:1,2
**corrections** 5:12
**correctly** 99:15
**counsel** 2:11 5:14
6:14 7:19 30:13,25
41:14 100:8 148:12
**counseling** 143:5
**count** 123:25 124:2
**county** 115:25
**couple** 5:10
**course** 6:12
**court** 1:2 5:8 20:19
29:3 42:18 43:3,14
49:5 51:9,16,24
53:17 85:4,21 86:2
86:8,11,11 87:5,6,9
99:23 100:9 109:25
114:12,17 115:9,10
115:23,24 116:20
117:17 118:3,9,15
119:13,17,20
127:12 144:22
145:5 146:10,14
147:13,25 155:23
156:16
**court's** 144:11
157:24
**cover** 20:17
**covered** 127:7
154:13
**cpep** 18:7,8,9,11
22:6,13,22 23:8,9
23:23,24,25,25 24:3
24:9,10 44:20,24

112:24,25 113:5,6
113:14,15,16,25
137:19,24 138:3
**crafting** 65:7
**create** 139:18
**created** 25:12 45:5,6
66:19 80:16
**creation** 25:23 45:2
**credential** 61:14
**criteria** 53:21 55:24
56:7 76:21 83:4
94:14
**critical** 106:23
**crystal** 105:25
**cuff** 144:8
**current** 47:7
**currently** 8:20,24
13:17 35:3 46:22
106:15 107:22
**customary** 102:9
**cut** 39:17 54:15
**cv** 1:7

**d**

**d** 7:5,5,15,16 123:15
165:1
**d.c.** 2:9
**danger** 31:18 33:2
73:7,16 142:16
**dangerous** 27:23
33:9 72:14,18 73:2
105:13,21 106:14
106:17 133:4
134:24 141:12
**dangerousness**
31:19,25 34:4,19
37:3 40:15 41:2
58:10 71:25 72:2
103:15 105:14,17
106:7 107:16 108:8
109:2 111:5 129:22
131:2 133:21,22
134:3 135:7 137:6
142:4 145:19
149:20 151:5 154:8

[date - discharge]

date  1:18 6:24 66:18
68:5 91:23 143:12
162:15
dates  25:6,11
david  7:16
day  16:23,23 17:2,2
41:23 100:20 117:4
119:19 162:5,7
163:2 164:19
166:20 167:23
days  115:8,8
daytime  62:8
dayton  10:25,25
11:3,5,6,10 12:25
13:11 14:12
deal  143:23
deals  71:24 72:2
83:18
decide  41:23 87:4
decision  14:17 32:16
69:9,11,13,16,23
78:6,12,13,17 80:9
89:4,7,8,8,10,17
90:6,24 95:9 102:12
106:24 149:10
162:5,10
decisions  14:10 16:2
50:17 70:10 96:24
98:12,13 99:14
defendant  2:12,16
2:21 3:5,9
defendants  1:10
defense  6:14
define  129:24
defined  128:17
133:24 134:18
defines  71:19
definition  55:18
71:24 72:23 129:19
delay  162:6
delegates  99:15
deliver  115:24
demand  112:3
demonstrated
103:14

demonstrates  73:7
73:15
demonstrating
72:18,25
denise  1:19 166:4,24
department  2:11
8:25 9:20 10:21
15:17 16:19,19,24
19:4 24:14 26:10
80:18,21 96:20
99:13 120:20
143:17 147:2,3
154:12 163:16
164:4
departmental  98:9
depending  59:23,25
61:9 105:11 117:2
depends  59:11
142:14 153:11
deposition  1:17 5:6
5:25 6:6 7:2 17:22
17:24 19:16 23:7,20
24:19,21 42:9 43:20
49:2 51:10 53:17
83:18 84:20 85:22
100:6 143:22
144:11,20 146:9,11
156:4,10 157:5,21
166:9
depositions  20:17
depression  55:14
describe  18:3
114:15
description  112:24
deserves  117:13
designated  154:16
determination
31:24 45:25 46:11
106:3 128:19
130:24 139:13
140:14,20 149:6
161:21 163:25
determine  33:8 53:8
56:13 91:21 129:20
131:9

determining  32:23
32:25 53:4 73:25
124:25
devine  2:20
dhar  1:17 7:16 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1

151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1,16
165:4 166:8 167:20
diagnosis  32:14,15
83:6,7 88:15 101:19
117:2
difference  102:19
133:8,19 134:2
141:9 142:17
different  15:21
23:24 24:7 28:7
35:13 53:24 83:24
95:7 104:3 132:20
132:20 162:15
differential  124:2
differently  52:11
difficult  17:7
difficulty  93:9
direct  37:5 38:13
41:9 96:14,16 127:8
directed  145:25
directing  53:15
direction  38:15
directly  28:9
director  10:19 28:22
68:16 69:6,8,14,18
69:20,25 70:4,7,9
71:11 74:5 115:22
115:23
disagree  6:16 42:16
disagreement  97:18
98:22 99:4 101:20
102:4 118:12
157:13
disagreements
95:18
disagrees  6:13 83:8
87:15,18 88:2,8,15
95:2 98:6 114:25
discharge  83:10
86:7 104:15 114:23
115:2 117:8 136:4

140:15 150:23
**discharged** 88:10
  98:23 104:11
  106:10 114:22
  115:6,12 151:2
**discharging** 83:23
**discovery** 21:23
  143:15
**discuss** 19:10
  114:23
**discussed** 60:23
  147:13
**discussing** 70:23
**discussion** 20:15
  42:22 43:6,7
**discussions** 20:10,14
**diseases** 55:12,23
**disputes** 96:9
**disputing** 23:3
  147:10
**distinction** 133:16
  136:19
**district** 1:2,2
**disturbance** 131:10
**doctor** 6:15 8:4,7,17
  15:7 38:6 50:14
  79:2,5,6,7 87:15
  91:5,9 92:8,17,22
  98:14 101:13
  114:24 132:18
  139:19 148:10
  152:8,22 153:12
  158:11 161:8,13,15
  161:16,18 162:4,16
**doctors** 90:22
**document** 21:21
  24:12 45:2,3,5 68:4
  79:19,20 80:2 103:5
  143:11 146:24
  165:9,10,11
**documented** 121:13
**documenting** 64:9
**documents** 17:25
  22:3,16 24:5 31:8
  110:5,8 123:2

165:15
**doh** 154:13
**doing** 51:12 53:9
  59:19 100:4,5 103:4
  142:4
**double** 144:8
**dr** 2:21 3:5 5:15,21
  6:2,7 19:7,11,18,21
  26:8 45:10 62:8,10
  70:6 93:14,15
  147:21 155:7,9,12
  158:11 159:3,14
**dsm** 53:22 54:9
  55:24
**duly** 7:6 166:9
**duties** 16:21,22 17:3
**duty** 99:16

**e**

**e** 2:2,2 26:5 113:4
  165:1,8
**earlier** 68:25 107:5
  109:10 112:17
  141:8 150:8
**east** 1:12 3:10 5:5
**ebt** 127:20
**effect** 94:10 111:19
**effects** 124:10
**effectuate** 126:20
**effectuated** 30:2
  49:15 108:14
**effectuating** 32:8
  91:10
**eight** 59:10,20,23,24
  60:10,22 61:8 81:25
  82:4
**either** 30:18 72:12
  86:8 99:16 103:12
  104:17 133:16
  147:10 153:2
**elmhurst** 126:22
**emergency** 17:13
  18:10,11,21 22:8,10
  24:15 27:16,24 28:9
  28:15 30:19 31:2

43:25 56:18 59:11
  62:4 64:19 69:22
  75:11 79:21 81:3,24
  91:3 94:14 113:18
  114:9 119:24 120:9
  120:11,13,17,19,23
  120:24,25 121:14
  122:13,19 123:9,12
  125:8,11,14 128:2
  128:10,21 129:9
  133:6 137:16
  148:16,20,23
  150:21 151:6 152:8
  152:9,10,11,20
  154:11,11,16,23
  159:16 160:3
**emotional** 131:10
**employed** 34:17
**employee** 8:11
**employment** 12:24
  13:12
**endeavor** 65:15
**engage** 72:12
**engaging** 139:17
**entire** 6:6 10:21
  99:13 123:11
**entitled** 6:15 24:14
**entity** 38:2
**entourage** 52:18
**entry** 91:24
**enzymes** 124:4,4,5
**episode** 56:5
**equal** 106:16
**er** 17:5 59:12,25
  60:2,3,4,8 61:9 70:4
  70:4 121:3,3,7,8,18
  122:8,12,18,20
  123:3,5 140:11
  149:7,8,14,18
  150:13,16 151:10
  151:22 152:24
  153:12 160:8
  162:25
**err** 104:24 105:2,3

**especially** 149:19
**esq** 2:4,7,14,18,23
  3:7,11
**essentially** 27:20
**establish** 22:24
  39:11 110:14
**established** 22:22,24
**et** 1:8
**evaluate** 137:12
**evaluated** 140:25
  153:2 155:7
**evaluation** 32:5,11
  32:13,14,21 34:2
  36:15,21 46:10,15
  47:11 48:19 53:7,9
  58:14,25 59:7,16
  61:8,10,19 62:12
  63:5 64:2,12 77:10
  78:5 81:23 82:3,8
  82:18,20 86:15,25
  88:23 91:11 93:4,21
  93:25 107:2 120:18
  129:18 140:13
  141:6 147:22
  148:18 149:3,14,17
  149:25 151:11
  153:14 159:22,23
  160:4,12,23 161:18
  162:22
**evaluations** 75:13
**evening** 62:6 155:6
**event** 23:2
**everybody** 21:21
**exactly** 58:25 87:13
  104:5
**examination** 4:5,10
  7:10 38:3 41:20
  43:16 48:14,16 49:6
  56:15 76:18 80:25
  85:18 86:21 91:6
  92:24 124:22
  146:15 150:17
  158:9 161:5 162:2
  162:23

| | | | |
|---|---|---|---|
| **examine** 58:21 | 163:6 | 104:8 123:8 155:11 | 155:8,13 159:17 |
| **examined** 7:8 32:22 | **fair** 14:7,9 15:13 | 156:2 161:8,16,18 | 160:15 161:8,17,20 |
| 58:22 81:7 | 17:9 57:25 | **fits** 84:19 | 162:6 163:2,5 |
| **examining** 36:12 | **fall** 54:5 55:3,3,17 | **five** 9:5 39:6 40:3 | **formed** 37:23 |
| 76:20 77:2,4 79:6,7 | 156:19 | 100:24 101:5 | **forms** 12:23 161:15 |
| 123:20 | **familiar** 15:21 44:13 | 109:19 115:8 | **forth** 166:9 |
| **examples** 130:7 | 44:15 59:17 137:14 | **flushing** 9:10,14,18 | **forward** 7:2 |
| **exceedingly** 85:25 | 138:17 139:9 | 10:2,15,18 13:3,4,5 | **forwarded** 92:10 |
| **exclusively** 22:7,9 | **familiarized** 97:7 | 13:11 14:13 | **four** 142:25 147:16 |
| **excuse** 54:10 | **family** 28:23 48:3 | **follow** 23:13 111:22 | **fourth** 44:3 104:22 |
| **executed** 78:16 | 74:17,22 76:3 90:2 | 156:24 161:24 | **frankly** 22:21 110:3 |
| 155:8 | 114:22 115:3 117:6 | **followed** 122:6 | **friday** 119:18 |
| **exhibit** 21:20,20 | **far** 147:13 159:11 | **following** 76:18 | 158:20 |
| 23:21 24:24 26:20 | 163:23 | **follows** 7:8 | **friend** 115:21 |
| 31:5 43:22 44:4 | **federal** 5:11 | **food** 73:11 132:24 | **front** 24:6 43:22 |
| 68:3 70:15 79:9 | **feel** 153:12 | **forest** 13:21,21 | 67:5 97:24 115:9 |
| 119:23 143:9,10 | **feels** 14:25 | **form** 4:14 9:16 | 119:23 120:4 |
| **exhibits** 165:12 | **fellowship** 11:19 | 17:16 23:5 25:25 | 130:11 |
| **exist** 35:4 110:5,8,14 | **felt** 123:20 | 27:19 28:18 36:6 | **full** 149:13 |
| **existed** 35:3 65:17 | **fifth** 44:3 | 41:10 46:4,19 47:5 | **function** 54:11 96:8 |
| 110:9 | **figure** 35:10 49:20 | 51:5 54:18,24 55:7 | 99:20 |
| **expected** 60:11 | 56:15,19 | 55:21 61:2,21 62:15 | **further** 4:8,12 161:2 |
| **experience** 14:10,12 | **file** 64:15 79:10 | 63:6,8 71:2,9 74:25 | 166:14 |
| 15:9,14,16 50:23,23 | 92:10 115:6 123:11 | 75:24 76:12,22 | **future** 8:9 105:16 |
| 63:4 119:15 | **files** 52:19 | 77:12,14,14,16,20 | 106:2,4 |
| **expert** 5:17,19 | **filing** 4:9 | 77:21,25 78:5,10,16 | |
| **explain** 52:4 56:8 | **fill** 77:20 78:5,10 | 79:2,16 80:4,11,15 | **g** |
| 131:5 | **filled** 80:4 81:19 | 80:15,16,21,24 | **games** 39:13,21,24 |
| **explained** 51:25 | 82:9 | 81:19,19 82:9,13,16 | **general** 11:16 29:14 |
| **explaining** 79:24 | **final** 69:15 70:9 | 82:24 83:15,17 | 30:10 46:22,24,25 |
| **expressway** 7:18 | 89:7,8,17 139:12 | 84:16 87:17,22,24 | 47:3 74:4 91:13 |
| **extended** 52:21 | **finally** 6:22 | 88:13 89:12,20,22 | 92:12 158:14 |
| **extensive** 15:14 | **find** 33:18 37:8,12 | 92:4 94:4,6 95:3 | 159:20 160:22 |
| **extent** 107:21 | 37:15 39:3,4 50:2,3 | 97:22 99:8 102:7 | **generally** 25:18 40:5 |
| 133:11 | 75:3,18 94:13 106:9 | 103:6 104:13 105:7 | 74:7,9,14 112:20 |
| **extra** 62:6 | 110:4 133:3 136:4 | 105:10 107:19 | 116:11,12 117:4 |
| **extremely** 85:20 | **finding** 17:4 42:12 | 116:22 117:21 | 158:17 |
| **eye** 60:2 | 76:22 | 125:4,5 126:8 | **getting** 15:4,8 39:12 |
| | **finds** 77:18 | 128:16 129:4,16 | 39:12 42:12 90:16 |
| **f** | **fine** 7:23 29:18 30:9 | 130:6,22 135:3,16 | 100:7 138:7 |
| **f** 3:7 | 36:4 42:3 133:14 | 135:23 136:11,17 | **give** 14:15 20:20 |
| **fact** 23:4 38:18 | **first** 7:6,15 24:11 | 140:6 141:3,15,17 | 91:17 92:15 115:3 |
| 102:17 112:10 | 39:10 56:25 68:16 | 142:13 148:25 | 116:7 130:7 |
| **factors** 32:7,17,20 | 71:23 88:2 93:22 | 149:16 150:19 | **given** 5:20 8:5 29:11 |
| 32:22 33:7,23 36:25 | 94:2 102:25 103:9 | 151:14 153:9,23 | 53:17 61:13 79:22 |

79:23 80:3 81:20
107:22 115:12,14
143:4 150:6 166:11
**gives** 75:15 83:6
92:16 101:19
115:15,21 118:22
140:12
**giving** 95:6 107:14
**gladly** 112:11
**go** 30:7 38:4 49:10
49:12 54:8 82:24
91:9 94:6 101:8
103:18 104:14,22
117:17 121:24
128:12 129:16
133:2 145:6 146:9
148:3 150:19 162:9
**goal** 60:22
**goes** 44:7 49:14 50:7
72:17 123:3 125:6
130:9
**going** 5:2,25 7:2
14:23 15:5 19:9,13
22:2 23:7,24 29:12
34:12 37:4,24 38:19
38:21 41:8,20,22
42:17,20,23 43:10
43:15 48:20 52:7,8
52:11,14,22 54:20
54:22 56:19 64:18
66:6 67:12 70:14
79:14,15,25 85:3,14
87:13 92:14 96:13
96:15 97:10 100:23
101:2,3,8,11 103:8
108:9,17 109:20
110:6 111:16
113:20,23 115:9
125:22 126:5 127:8
133:10 138:24
145:21 148:3,5,8
153:17 155:22
156:3 158:5 164:10
**good** 35:20 100:20
138:23

**governing** 147:5
**government** 12:10
**gracey** 126:25
**grand** 109:4,6
**granted** 112:15
147:15
**great** 40:20
**greg** 22:16 146:22
**gregory** 3:11
**ground** 20:16 156:8
**grounds** 6:2 17:16
47:6 100:16 103:3
157:2,4,20 158:3
162:12
**guess** 94:7
**guideline** 142:24
**guidelines** 36:25
**guides** 34:16
**gurney** 144:9
**guys** 100:13

**h**

**h** 7:5,17 165:8
**hairs** 84:24,24 87:11
87:13
**half** 155:25
**hand** 80:10 119:6
166:20
**handcuffed** 144:3
**handcuffs** 144:3
147:23
**handouts** 107:18
**happened** 102:12
159:25
**happens** 85:16
87:16 93:21
**harlem** 12:18
**harm** 55:16 64:23
71:14,20 72:24
73:10 128:3,14
131:14 134:19
139:19
**harmed** 56:2
**heading** 45:17

**headings** 76:14
**health** 11:2 31:21
80:19,22 114:21
115:4,13,16,25
117:11 118:22
142:18 154:10,13
**hear** 104:2
**hearing** 8:3 114:13
114:17 115:23
119:20
**heat** 132:24
**held** 94:3 119:18
128:20 152:24
**hello** 99:24
**help** 143:2
**helps** 90:5
**hereinbefore** 166:9
**hereto** 4:5
**hereunto** 166:19
**hi** 99:24
**highway** 130:14,14
**hills** 13:21,22
**history** 34:3,13,15
36:13,14 40:25
66:18 128:9
**hmm** 25:5 68:18
71:16 120:5
**hoc** 26:16,18
**hold** 99:21 136:6,7
137:7,9,10,12,15
138:9 139:4,7
150:15 151:9,17,24
154:5 156:3
**holding** 140:2
151:19 153:5
155:14
**holds** 69:24
**home** 8:18 130:8
132:22,23
**hospital** 3:10 5:6
7:17 8:11,22 9:6,8
9:11,14,14,17,18
10:16,23 12:18,24
12:25 13:11,12
14:22 15:18,20 16:2

16:20 17:14 18:5
27:7,8,17 28:13
29:15 30:18 31:3,24
32:3,9 33:7,15 34:7
34:18 37:2 40:14
48:6 49:8,15,18,19
49:23 50:3,16 56:24
57:14 58:12 59:5,15
61:6,13 63:18,20
64:4,7 65:7 67:2,15
68:23 69:15,21,25
74:20 75:16 76:4
80:8,17,20 81:3,9
81:21 82:15,17 83:9
88:6,10 90:8 92:7
93:4,17 94:9,22
96:21 98:8,9,10,15
99:11 102:2,9,15
103:17 105:4
106:19,20 107:12
108:6,23 109:4,11
109:17 110:25
111:20 112:19
114:6 116:19
117:17 118:5,11
119:12 121:2,7
122:8 123:8 126:6
126:16,19,23,23,24
127:5 128:12
130:17,24 131:12
133:18 134:18
135:13,19 136:3
138:14 140:23
141:13,21,23 142:8
142:10 143:15,16
144:9,15 145:18
146:22 148:17
151:19,24 152:17
153:24 154:5,17,17
155:5,12,14 158:16
158:19 161:9,19
164:4
**hospital's** 30:15
65:14 85:11 131:18
139:14 144:2,8

[hospital's - involuntary]

153:4
**hospitalization** 49:9
  94:15 131:8 146:18
**hospitalized** 162:17
**hospitals** 126:18,22
**hour** 36:20,22 46:15
  47:11,14,19 60:10
  60:22 81:17 82:4
  89:10 138:4 140:17
  140:19 143:7 150:5
  156:2 161:17
**hours** 14:2,3 59:10
  59:20,23,24 61:8
  62:7 81:6,12,25
  82:15 89:5 91:7,12
  92:18,22 117:3
  139:11 140:11
  150:11 158:15
**huh** 68:20
**hurry** 21:7
**hygiene** 65:5,16,21
  66:2 99:6
**hypothetically**
  160:17

              **i**

**identification** 68:4
  143:11
**identified** 5:7,19
  32:18,21
**illness** 32:24 34:4
  45:18,20 46:2,12
  49:22 50:6 53:5,18
  53:20,21 55:10,11
  55:12,18 56:14,16
  56:23 57:5,6,12,22
  57:24 58:4 64:22
  81:4 103:13 131:10
  131:13 139:16
  140:24 151:3,4
  154:7
**illnesses** 53:25 54:5
  55:2 56:6 57:17
**immediate** 56:23
  57:12 58:5,9,25

81:5
**immediately** 58:17
  92:25 93:5,10,22
  94:15,24 115:24
**impact** 126:4 127:3
  129:22
**impeachment** 6:10
**implements** 108:16
**important** 20:18
  21:12,14 91:24
**impossible** 37:23
**improper** 51:8
**inappropriate** 15:10
  54:14
**include** 13:5 16:22
  134:19 137:7
  159:24
**included** 111:4
**includes** 148:17
**including** 41:6
**inconsistent** 99:4
  144:15 145:15
**independent** 63:14
  64:2
**independently**
  63:12,23 76:8
**india** 12:3,4,6
**indicated** 123:21
**indicating** 160:18
**indication** 43:14
**individual** 22:4
  28:20 45:25 112:18
**individuals** 93:16
**inform** 91:15 92:13
  92:17
**informal** 153:3
**informants** 76:19
**information** 8:2
  15:6,9 33:18,20
  34:14 42:13 48:4,4
  74:2,5,21,23 75:5,6
  75:6,8,8,9,20,21
  76:2,4,6 77:23,24
  77:25 79:22,23
  88:25 89:2,3,18,25

90:4,11,13,16,20,23
  91:18 112:7,8
  128:11 139:12
  149:5,19 150:25
  165:14
**informed** 19:12
**informing** 19:8
**initial** 83:5,8 87:20
  89:7 95:2 97:18
  98:5,16 101:19
  102:4 106:24 160:2
  163:21
**injury** 55:15
**inpatient** 10:5,14,19
  17:5,13 30:20
  114:20 120:10,14
  120:18 121:12,22
  122:5 125:15,19
  126:14 131:8
**inquiry** 85:10
**insist** 117:9
**insofar** 5:19 157:18
**instituted** 113:25
**institution** 14:18
  95:6
**instruct** 54:17 97:11
  145:25
**instructed** 157:7
**instructing** 14:24
  84:2 134:9
**instruction** 15:11
  21:13 38:22
**instructions** 43:7
  100:12 127:16
**insurance** 127:3
  163:10,11
**intent** 108:14
**intention** 146:7
**interested** 28:24
  115:19 166:16
**interfere** 38:3,8
  41:20 51:13 54:12
**interfered** 144:18
  148:13

**interference** 43:18
  54:16
**interfering** 85:22
**interject** 20:21
**intermediary**
  101:23
**internal** 98:11 99:11
**internist** 121:25
**interpret** 95:21
  96:17,21
**interpretation** 85:25
  95:23
**interpreting** 35:17
  51:24
**intervention** 106:9
  107:13
**interviews** 76:18
**investigation** 90:10
**invoked** 152:15
**involuntaries** 70:10
**involuntarily** 14:11
  14:17 15:14 16:3
  30:17 78:7 88:9
  97:3 104:9 126:6
  127:5 128:24 130:2
  136:21 147:7
  151:10
**involuntary** 15:19
  26:23 27:6,8,15
  28:13,15 29:2,8
  45:14,24 49:8 57:7
  75:16 77:19 80:9
  83:19 85:6 86:6,12
  86:14 87:7 91:25
  103:2,10 104:10,18
  112:18 113:9,11,12
  114:9,19 125:7
  126:12 130:17
  131:18 134:23
  136:8,20,23 141:23
  142:6,8 143:23
  144:14,21 145:2,9
  145:11,16,18,23
  146:17,18 154:6
  163:18 164:5

**involved** 15:22 20:5
25:23 93:20 120:7
135:13
**involvement** 159:8
159:10
**involving** 118:9
**irrelevant** 85:17
**isak** 2:21
**isakov** 2:21 19:19
**issue** 35:22 46:12
108:8 109:23 112:6
118:16 147:21
**issues** 5:7,20 7:24
15:4
**iv** 53:22 54:9 55:24
**ivone** 2:20

**j**

**jamaica** 3:10 5:6
7:17,18 8:11,21 9:6
9:8,14,17,22 10:22
11:8,9 12:25 13:6
13:11,25 14:3,13,14
16:20 17:11,14
21:22 27:17 29:15
30:15 32:9 33:7
34:17 36:25 40:13
40:25 49:7 50:16
53:3,8 58:12 59:5
59:15 63:18,19 64:4
64:7 65:6,14 66:25
67:14 69:8 73:6,24
74:19 75:16 76:4
78:9,15 80:7,17,20
82:14 83:9 86:16
88:19 90:8,22 92:7
93:3,17 94:9,22
96:21 108:6,23
109:3,11,17 110:25
111:20 114:5 121:2
121:7 126:19
133:18 134:18
135:19 136:3
138:14 139:14,25
142:21 143:14,16

148:17 151:24
154:19 161:7 162:5
163:8,18
**jamaica's** 76:5
81:16 130:4 134:21
135:5 137:5 145:15
150:15 151:8
**jensen** 2:20
**job** 96:19,23 97:2
**john** 2:7
**join** 31:15 47:8
61:22
**joined** 40:13
**joining** 10:22
**judge** 5:22 38:16
41:21 42:2 43:4,9
100:3,12 112:5,9,14
115:10,10 127:15
145:24 155:24
**judge's** 107:22
127:9 146:5,7
**judgment** 128:18,19
129:7 133:23
153:11
**july** 1:13 5:3 166:20
**jumping** 126:11
**juniper** 8:19
**jurisdiction** 154:14
**justification** 77:21

**k**

**kashmir** 12:10,11
**keep** 56:18 75:6,8
85:14 88:9 104:16
104:21 109:15
153:15
**keeping** 88:17
**kept** 88:5 118:17
150:20
**kidney** 124:4
**kind** 7:24 48:8
56:16 57:5,22,22
64:14 72:8 73:5,6,9
73:15 129:24

**kinds** 53:24 57:17
**know** 6:20 15:23
19:14 21:17 22:20
23:5 24:22 25:16
26:2 29:24 31:6
35:15 37:19 40:11
43:10 46:20 51:23
54:4 57:16 65:25
66:9,23 67:6,12,16
67:17 68:20 92:14
96:7 98:25 100:13
104:6 109:14
110:16 118:20,24
124:13 125:21
134:12 138:8
143:20 144:5
146:19,22 147:8
151:18 152:23
155:10 157:8 163:8
**knowing** 124:16
**knowledge** 25:10
39:5 40:12,16
**known** 28:14 63:20
79:20 112:23
113:13
**knows** 19:4 37:12
39:8 40:9 66:10
96:2
**koster** 3:4
**kretz** 2:16

**l**

**l** 4:2 5:15 26:5
**label** 129:12
**laid** 90:8 95:11
**lake** 2:22
**lane** 8:19
**lasts** 36:19
**late** 155:5
**law** 2:11 6:20 43:4
65:5,12,16,21 66:2
67:6,8,21 95:12,18
95:21,23 96:3,10,17
97:19 98:3,13 99:6
129:6

**lawsuit** 158:12
**lawyer** 20:20 65:6
66:7
**laying** 140:18
**lead** 55:25 57:7
**leading** 160:15,24
**leave** 54:19 118:10
119:7
**leaving** 117:10
**lee** 2:23 25:25 31:12
34:25 35:8,13 40:18
42:4,8,15 47:8 51:2
61:24 63:6 76:11
82:13 83:14 84:15
87:17,22 88:11
89:15,20 92:5 94:4
95:3 141:15 161:4,6
161:23 165:6
**leeway** 29:12
**left** 101:13
**legal** 17:17 26:23
66:9 114:21 115:4
115:13,16,25
117:11 118:22
125:2 136:24
159:11
**legitimate** 38:9,12
**lenoir** 2:7
**level** 63:3 106:6
**lewin** 147:21
**lexis** 66:17
**licensed** 70:17 125:7
**light** 5:22 112:9
130:12
**lij** 126:22
**likelihood** 71:20
72:24
**lilian** 3:5
**limit** 41:11 54:22
**limited** 86:12
144:21 146:11,16
**limiting** 49:6 51:10
**line** 64:20 167:2
**list** 123:15

**little** 29:12 84:8
113:8
**liver** 124:4
**living** 31:22 132:23
**llp** 2:20 3:4,9
**locked** 144:25
145:14
**locks** 130:8
**long** 9:2 11:17 20:19
36:17 41:24 48:17
119:9,12
**longer** 101:2 106:14
**look** 24:20 29:20
68:6 105:22 106:2
109:19 152:6
**looked** 20:7,8 22:5
22:17,20 32:8,25
33:8,23
**looking** 95:15
122:24
**looks** 37:2 43:2
**lot** 22:3 157:7
**lubit** 3:15 5:15,21
6:3
**lubit's** 6:7
**lunch** 101:3,4

**m**

**m** 26:5
**m.d.** 1:17 3:15 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1

69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1,1
166:8 167:20
**madison** 2:17
**magdalena** 3:16
**main** 62:7
**maintain** 6:25
**maintained** 103:2
104:10
**maintaining** 105:4
**making** 14:10 33:23
34:18 37:2 50:5,17
70:9 90:5 91:10
93:9,20 107:16
135:6,25,25 139:17
**manifested** 72:4,11

**manner** 129:2
141:13
**manual** 147:4
**marcus** 2:22
**mariana** 2:18
**mark** 68:2
**marked** 21:19 68:4
79:9 143:9,11
**marriage** 166:16
**martin** 3:9 5:4
**matter** 23:4 83:21
83:23 101:22
108:25 159:7
166:17
**matters** 159:25
**mauriello** 2:17
**mean** 11:13 24:20
32:10 49:16 62:22
72:7 116:10 121:16
127:12,20 129:21
132:18 137:3,10
139:6 141:22
161:12,20
**meandering** 20:19
**meaning** 53:19 62:5
102:21 121:23
**means** 17:4 25:14
27:5 30:9 46:11
49:20 55:12 58:25
60:15,16 103:15
121:19,20 123:24
124:2,3 139:5
142:19 149:4
**meant** 13:4 137:17
**measured** 128:6,8
**measuring** 128:13
**mechanism** 118:9
118:15
**medical** 3:10 8:21
11:12,23,25 12:4,5
12:9,10,13 29:9
30:16 31:21 45:24
50:9 60:4 70:4,6,8
73:12 103:24
105:21 118:3

120:11 121:3,7,12
121:13,17,23,24
122:4,6,8,12,18,19
122:21 123:2,3,9
124:20 136:24
148:16,20 149:7,14
149:18,21 150:16
150:21,22,23
151:10,22 152:10
152:24 153:12,25
154:11 160:3
162:14,23
**medically** 122:3,11
151:16
**medication** 117:7,7
124:9,14 143:5
**medications** 124:9
**medisys** 9:19
**meet** 56:6 76:21
94:13
**meetings** 17:8 60:17
60:24 61:5
**meets** 53:21 64:9
**member** 28:23
60:20 76:3 81:8
82:16,21 90:3
120:19 163:16
164:3
**member's** 83:7
**members** 48:3 74:18
74:22 115:3
**memory** 37:24
**mental** 11:2 32:24
34:4 45:18,19 46:2
46:11 49:22 50:5
53:5,18,20,25 54:5
55:2,10,11,12,18
56:14,16,22 57:5,6
57:12,17,24 58:4
64:22 65:5,16,21
66:2 80:18,21 81:4
99:6 103:13 114:20
115:4,12,16,25
117:11 118:22
131:9,13 136:2

139:16 140:24
142:18 149:5 154:7
154:10
**mentioned**  10:10
22:5 34:8 57:21
107:5 128:7 129:6
**merged**  13:5
**met**  83:3
**metabolic**  124:3
**methodology**  32:6
43:19
**mettham**  2:14
**mhls**  115:21
**mincing**  84:22
133:17
**mind**  7:3 8:16 95:15
114:8 117:3 133:9
133:12 136:20
157:14
**minute**  100:24
150:11
**minutes**  43:2,13
101:6
**mm**  25:5 68:18
71:16 120:5
**moment**  85:12
**monday**  158:20
**month**  63:18
**months**  63:10,10
**morning**  92:18
**mother**  130:9
**motion**  86:5
**moving**  38:2 66:25
112:16
**mule**  26:3 45:10
**multipage**  21:21
**muscle**  124:5

**n**

**n**  2:2 4:2 7:5,15
165:1
**name**  7:13,15,16
26:3 64:6 79:12
**names**  79:2

**narrow**  85:20,25
**nat**  138:21
**nathaniel**  2:4
**ne**  2:8
**necessarily**  56:6
58:16 131:7
**necessary**  137:12
**necessity**  118:4
150:23
**need**  7:25 8:3,7 29:9
30:3 37:11 39:10
58:19 60:20 98:16
101:7 122:4,21
124:12 125:19,21
126:12 149:21
158:22 163:10
**needing**  86:15 149:8
**needless**  43:17
**needlessly**  85:21
**needs**  27:6 78:14
106:8 118:4 127:23
153:13 161:22
162:11,16
**neighborhood**
130:11
**neighbors**  132:25
**network**  9:19
**never**  20:6,8,9,13,15
**new**  1:2,8,12,12,20
2:5,5,11,12,13,13,18
2:18,22 3:6,6,11,11
7:7 8:19 11:11,22
11:24 12:13,22 65:4
65:11 70:17 75:10
80:19 91:18 95:12
96:10 97:19 103:6
112:8 137:19 166:5
**night**  62:7
**nine**  9:5
**nit**  84:9,11
**nonsense**  41:24
**notary**  1:19 4:6 7:6
164:21 166:5
167:24

**notations**  25:4
**note**  40:18 43:16
83:14 84:15
**noted**  32:12 160:8
164:12
**notes**  103:6
**notice**  1:18 79:21
80:11,14 82:9 115:5
115:22 116:2,7
117:15 118:23,25
119:2,10
**noticed**  87:8
**notices**  150:7
**november**  25:22
62:13 155:7,9
158:14
**number**  14:16 28:10
44:5,6 55:12,13,23
56:5 62:3 76:15,17
78:21,22 85:24 91:4
94:8,17 114:11,16
124:23 130:7
158:25 159:2 163:6
**numbered**  71:21
**nurse**  92:15,15,16
**nurses**  70:13
**nursing**  132:22

**o**

**o**  4:2 7:5,15
**oath**  21:13
**object**  5:18 14:23
15:6 37:5 38:12
43:17 46:4 47:4,5
48:21 54:11,18,24
66:7 102:6 109:21
129:15 133:11
**objected**  156:8
157:18 158:2
**objecting**  41:18
53:15 83:16
**objection**  6:25 9:15
14:19 16:5,9,12
17:15 25:25 27:18
28:17 36:5 38:9

40:19 46:3,18 49:4
50:25 51:2,3 53:11
55:6,20 57:9 60:25
61:20,23,24 62:14
63:6,7 70:25 71:8
74:24 75:23 76:10
76:11 77:11 82:13
82:23 83:14 84:15
86:9 87:17,22,23
88:11,12 89:11,15
89:20,21 92:3,5
94:4,5 95:3,20
97:21 99:7 104:12
105:6,9 107:20
116:21 117:20
126:7 128:15 129:3
130:5,21 135:2,15
135:22 136:10,16
136:22 137:25
139:22 140:5 141:2
141:15,16 142:12
145:3 148:24
149:15 150:18
151:13,21 152:3
153:8,22 154:9
155:16 159:17
160:14,15,24 162:8
163:4
**objections**  4:13 5:24
100:14,15 127:15
156:14 157:22
**objective**  60:23 97:7
**obligated**  75:5,7,19
108:3
**obligation**  117:16
**observation**  56:23
57:13 58:5,9 81:5
138:4 153:16
**observed**  63:9
**observes**  73:20
**obtained**  66:17
89:19,25 90:14
123:2
**obviously**  35:8

**occasion** 6:20 99:18
**occurred** 41:6,12
**occurs** 92:21
**october** 25:21 62:12
  155:6
**office** 2:11 30:5
  38:20 52:9,12,24
  80:18 146:25
**officer** 28:22 163:19
**offices** 5:4
**oh** 99:24
**ohio** 11:6
**okay** 6:12 20:24
  21:11,17 22:15
  29:17 30:11 36:4
  39:7 40:7 41:17
  44:8,12 54:14 55:10
  66:21 68:22 69:4
  79:13,16,17 85:8
  100:11,17,21
  102:23 113:8
  133:14 134:6
  138:23 158:8
**olenko** 2:18
**omh** 76:22 77:15
  94:18 142:24
**once** 35:10 63:10
  89:9 125:20 161:8
  161:12,13,16,18
**ones** 61:17 156:8
  158:2
**oneself** 71:25
**opinion** 66:9 77:18
  88:2,4 102:10,19,20
  102:21,22,23,24,25
  103:5 104:20,22
  133:25
**opinions** 17:6 95:7
  104:3
**opportunity** 156:13
  158:4
**opposed** 13:24
  148:20 149:24
**option** 104:15,17

**options** 54:22
**order** 29:7 30:17
  33:8 43:18 45:23
  49:6 51:9,24 53:17
  75:12 85:4,21 86:2
  86:11,11 87:6,9
  105:19 124:10
  127:13 144:12,22
  146:7,14 147:25
  156:16 157:24
**ordered** 146:11
**orders** 146:5
**ought** 112:9
**outcome** 166:17
**outside** 138:22
**oversee** 15:17 16:23
**overseeing** 70:11

**p**

**p** 2:2,2 4:2 113:4
**p.m.** 164:12
**page** 24:11,18,19,24
  26:19 44:3,5,6,7
  45:2 51:22 68:16
  70:15,16 71:13
  76:13 80:10 86:13
  91:2,20 94:17
  114:10 119:22
  120:3 122:24
  124:23 127:25
  143:13 157:10
  165:3,9,14 167:2
**pages** 45:3
**panic** 56:3
**paper** 29:24 30:3
  85:13 119:6
**papers** 8:6 125:2
**paperwork** 119:19
**paragraph** 45:16
  56:20 78:20 91:4
  92:19 94:8 115:18
  125:13
**parameters** 127:21
**part** 9:19 13:18
  17:10 18:11 23:22

26:14 31:4 36:2
  44:22 56:25 88:23
  95:18 96:9 117:16
  135:5 138:13
  143:21 156:11
  158:6 160:3
**particular** 37:25
  54:23 78:11 79:11
**parties** 4:5 166:15
**party** 6:18
**patient** 27:6,6,14,22
  28:2,8,11,12,25
  29:2,7 30:18,23
  31:18,20 32:3 33:9
  33:14 34:3,6 40:15
  47:16,19,25 48:2
  56:10,11,13,16,18
  57:8,11 58:11,20,21
  58:22 59:2,4 64:21
  69:16 72:12 73:23
  74:17 76:21 77:18
  77:22 78:14 79:11
  79:23,24 80:3,11
  81:3 82:10,18,21
  83:3,10 86:19 87:16
  88:5,9,10,17 90:3,6
  90:19 91:14,16,17
  91:19 94:3,11,13
  98:18,22 102:25
  104:19,20,21,24
  105:18 106:9,25
  114:18,23 115:2,3
  115:14,15,20 116:3
  116:7,14,15,16,16
  117:3,4,12 118:4,7
  118:10,17,21 119:4
  119:5 120:8,9,16
  121:11,21,23 122:7
  122:11,12,17,20
  123:3,8 124:8,16
  125:18,20,21,22,24
  126:12,15 127:4
  128:20,22,24
  129:18,23 130:8
  131:11,15 132:21

132:22,23 133:5
  135:8,11,18 136:3,4
  136:5,20,21 137:8
  139:10 140:15,16
  140:23 141:12
  142:2,7,11,15,23,25
  144:2,8,13,17
  148:15,19,21,22
  149:7,21 150:6,12
  150:20 151:2,3,15
  151:16,17,20,25
  152:9,11,18,19,23
  153:13,15 154:15
  155:4,11,15 159:24
  160:19 161:9,13,14
  161:19,22 162:11
  162:16 163:3,8,10
  163:15 164:3
**patient's** 20:7 45:17
  56:22 90:21 91:24
  116:25 118:7
  121:17 139:15
  162:21
**patients** 14:11,16
  15:15,22,23 16:3
  17:5,6,7 33:11,11
  63:22 74:11,16
  117:9 124:17,17,19
  126:25 128:10
  129:8 131:6 137:6
  142:20,22 145:2
  147:6 159:22
  160:21
**paul** 3:7
**pedigree** 15:8
**pending** 151:25
  153:13 161:17
**people** 45:9,10 50:4
  50:9,15 53:9 72:10
  74:6,8,10 75:21
  79:3 97:4 139:8
  145:17 153:25
**period** 63:10,18
  81:17 82:4 89:10
  140:2,17,19 150:5

155:10
**permit**  116:7 144:2
144:16
**permitted**  41:4
109:24 147:16
157:23
**person**  25:23 32:4
32:24 33:2 47:25
55:11 56:2 62:7
68:17 69:7,19 70:24
72:14 73:7,10,16,22
75:13 77:5,8 78:6
85:14 101:15 103:4
103:9,12,16,22
104:7,8,10,16 106:3
129:13,19 132:16
140:2 142:11 153:5
158:25
**person's**  34:15
**personal**  7:24
**personally**  14:22
26:9
**personnel**  49:20
64:15
**persons**  81:4
**pertinent**  38:25
**petition**  115:6,7
116:19 119:13
**petitioning**  118:15
**phonetic**  99:16
**photograph**  37:24
**phrase**  56:21 71:14
72:4,25 81:12 128:3
137:14 138:9
**physical**  73:10
121:24 124:22
128:3,14 139:19
**physician**  27:9
62:19,23 68:23,24
69:10 70:17,21,22
70:22 71:3,5,6,11
73:20 76:20 77:2,4
77:5,6 78:2,3 80:5,8
81:2,8 83:6 85:12
87:25 88:3,3,14,16

88:19 91:15,16 92:9
92:11 99:17 108:15
114:24 116:9 118:3
119:7 122:2 123:20
125:8 129:20
152:10 163:22,24
**physicians**  28:23
70:13 71:12 95:5
113:12
**picky**  84:9,11
**piece**  30:3 85:13
119:6
**place**  1:18 11:22
36:7 37:25 122:11
**plaintiff**  1:5 2:4,8
6:13 138:11
**plaintiff's**  5:14 68:3
143:10 165:9
**plan**  117:8
**play**  39:13,16,21
137:24
**playing**  39:23
**please**  7:14 16:16
21:17 23:13 31:17
42:18 44:11 55:2
83:12 109:11 122:11
114:8 117:12
**point**  33:16 107:19
111:14 142:25
155:12,13
**police**  28:21 74:16
74:21 160:18
163:16,19 164:3
**policies**  18:2,15,16
18:18 35:2 64:8
81:16 86:5 146:21
150:15 153:5
163:17
**policy**  5:7 14:21
15:19 18:5,7,8,20
21:22 22:5,6,11
23:8,16,20,25 24:8
25:12,24 26:22
27:11 29:16,21,25
30:8,15 31:2,13

32:9,11 33:7 36:3,7
37:11,13,20 38:10
38:24 39:3 40:3,6
40:10,14 41:7,16
42:10,13 44:2,14,20
44:21 45:17 47:7
48:6 49:7,15,23
50:8,8,16 51:19
52:5 53:4,19 54:6
55:4,19 56:21 57:2
57:18 58:13 59:6,9
59:14 63:20,21
64:18 65:2,7,14
67:5,8,10 70:15,21
71:19 73:6,19,24
74:3,19 76:6,13
78:10,15 80:7 81:22
82:15 83:9 85:6,11
86:14,16 88:19 90:7
90:12,22 91:3,10
92:7,20 93:3,6
94:10,23 97:15 98:9
98:9,11,15,21 99:2
99:11 102:2,15
103:18 106:19,20
107:12 108:13,13
113:21 114:16
116:3,6,10,19 119:3
119:13,25 120:6,16
120:22 122:10,23
122:25 123:10
126:20 128:2,21,25
130:3,19,20 131:18
131:25 132:2,8,9,11
132:12 133:13,15
133:19,24 134:18
134:21 135:5 137:5
138:13 139:15
140:2,12,18,22
141:5 142:9 143:14
143:17 144:2,8,15
144:21 145:16,22
145:22 146:16
147:12 148:17
151:8,22,23 152:5

152:18 153:10,19
154:2,12 161:7
163:24 164:4
165:17
**poses**  142:15
**position**  6:5,21 9:3,4
112:11 146:13
158:23
**positions**  9:7
**possible**  94:2 119:14
134:22 139:10,21
140:25 141:4,6,21
141:22 159:13,19
**postgraduate**  62:24
**potential**  131:14,16
131:22 132:4,6
133:7,20,20 134:2
136:14 141:10
142:8
**potentially**  27:23
133:4 136:5
**power**  107:18
111:14
**practice**  13:16,18,20
13:24 14:4,6 59:19
60:10,23 61:6 76:5
81:22 90:13,15
91:13 92:12 99:2
102:9 103:17
126:20 138:13
**practices**  163:17
**preaching**  130:12
**precaution**  98:18
**precludes**  6:18
**premise**  150:24
**prepare**  17:21
**preparing**  17:24
23:6,19 24:19,21
**presence**  6:7 42:19
**present**  3:14 35:5
100:10
**presentation**  109:13
111:14,15
**presentations**  108:7
111:18 165:16

presents 115:16
preserve 127:17
pretty 91:24
prevent 132:3
previously 79:9
  146:10
primary 122:2
printed 80:15,16
prior 5:23 10:22
  11:24 94:17 146:13
  147:25 150:16
  153:6 156:16
private 13:15,18,24
  14:4,6
privilege 100:16
  127:17 156:17
privileged 146:3
privileges 61:13
  92:24
problem 42:7 60:19
  100:19
problematic 17:6
problems 55:13
  124:20 150:22
procedure 26:17
  49:7 76:14 114:10
procedures 26:12
  121:10 123:14
proceed 43:16 148:6
proceeding 160:6
proceedings 8:9
  159:11
process 8:4 82:25
  116:13 118:23
  119:10 160:4
produce 110:10
produced 22:18
  23:11 143:14
  146:25
production 111:17
  153:18
professional 47:15
  103:24 105:21
  166:4

professionals
  132:21
profile 124:3
program 18:10
  24:10 63:21 113:18
  113:25
progressed 10:18
promotion 9:11
proper 38:15 134:11
  134:16
properly 83:3 96:22
  96:24
pros 104:2
protect 98:18 135:7
protocol 79:25
  120:7
provide 48:6 62:6
  73:11 94:23
provided 7:22 21:23
  74:21 75:20 82:10
provider 33:19
  74:22
provides 27:12
  49:19 98:4 118:14
providing 8:17 15:5
  37:14
provision 95:17
  98:3 124:21 138:3
  152:7
pry 7:23
psych 61:9 70:4
  121:18 149:8
  150:13 152:8
  162:25
psychiatric 5:20
  10:4,5 12:18 14:18
  16:4,19 18:10 26:11
  27:7,15,16,24 29:9
  30:16,19 32:11,21
  34:2 36:15 45:24
  46:10,15 47:11
  48:13 53:7 58:14
  59:7,15 60:6,8 61:7
  62:12 63:5 64:12
  77:9 78:4 81:9,23

82:8,17,21 83:7
  96:20 97:17 107:2
  113:17 120:13,13
  120:17,24,25 121:3
  121:8,11,22 122:5
  122:13,20 123:5,11
  124:8 137:21,23
  139:20 147:3,4
  148:22 149:4,9,13
  149:24 150:17,24
  151:6,25 152:9,11
  152:19 153:14
  154:15,23 159:16
  159:21,24 160:10
  162:12
psychiatrist 13:13
  13:16 32:5 47:17,18
  47:22,24 61:12
  62:20 63:16,24 69:3
  69:4,21 74:4 77:17
  77:17 78:17 88:8
  89:9,17 90:9 92:23
  94:12,23 103:11
  122:2 124:24
  125:12 149:11,12
  150:2,3 153:2,7
  162:25
psychiatrists 17:12
  28:23 61:16 62:4,10
psychiatry 8:25
  11:16,16,20 16:20
  24:15 26:11 48:12
  48:16 62:25 120:20
  143:17 147:4
  149:22 158:24
psychological
  148:18 151:11
psychosis 55:14
psychotic 56:5
public 1:19 4:6 7:7
  164:22 166:5
  167:24
publicker 2:14
purpose 6:9 127:23
  156:4

purposes 32:23,25
  146:3 154:6
pursuant 1:17 5:10
  29:15 69:16 128:20
  131:24 132:2
  156:16 157:24
put 28:25 64:15
  129:9
puts 73:10

q

qualifications 50:6
  50:17 53:10
qualified 48:18
  63:12 64:11
qualifies 48:13
  129:25
qualify 57:6,14,23
  130:16 131:2,7
  132:7
queens 115:25
  126:22
question 4:14 13:9
  14:25 16:10,16
  20:19 21:15,15
  29:19 30:12 31:12
  31:16 32:19 35:4,5
  35:18,23,24 37:22
  38:13,16 41:9,18
  46:5 47:5 48:24
  49:9,25 50:13 51:7
  51:9,23 53:13 54:13
  54:18,23,25 65:24
  67:12 74:20 83:21
  83:23,25 84:3,18
  87:2 94:21 95:4
  96:5,25 98:14 99:10
  99:22 102:10 103:8
  107:24,25 108:4,19
  108:20 109:9
  110:17,23 132:5
  134:7,10,15 135:24
  143:20 144:6 145:4
  151:7 162:20,20

questions 4:13 22:3
31:9 35:2 41:5 43:8
51:14 58:23 86:17
86:24 96:16 97:12
110:7 141:9 146:2
146:14 148:11,13
155:20,21 156:6,21
156:22 157:8,19,20
157:25 161:3

**r**

r 2:2 7:5,17
radomisli 3:11 5:9
8:10 9:15 13:3
14:19 15:2,12 16:5
16:8 17:15 18:14
22:12,19,25 23:9,12
24:4 27:18 28:17
29:4,11,20 30:6,21
31:4,10 34:20,24
35:16 36:2,5,9 37:4
37:18 38:7,23 39:7
39:15,20,25 40:8,21
41:3,10,25 42:17
44:10 46:3 47:9
48:20,25 49:5,13,17
49:24 50:19 51:3,8
51:15 52:2,10,18,25
53:11,14 54:3,7,21
55:6,9,20 57:9,19
60:25 61:20,25
62:14 63:7 65:17,23
66:4,6,14,21 67:3
67:17,22 70:25 71:8
74:24 75:23 76:10
76:12 77:11 82:23
83:11,16,22 84:4,8
84:12,17 85:2,23
86:23 87:5,12,18,23
88:12 89:11,21 92:3
94:5 95:20,24 96:4
96:11,15 97:13,21
99:7 102:6 104:12
105:6,9 106:18
107:20 108:3,9,18

109:8,20 110:11,15
110:22 111:10,21
112:13 113:15,20
116:21 117:20
126:7 127:6,11,18
128:15 129:3,15
130:5,18,21 131:24
133:10 134:4,8,11
134:14 135:2,15,22
136:10,16,22
137:20,25 138:6,15
138:21 139:22
140:5,8 141:2,16
142:12 143:19
144:4,10,19 145:3,8
145:20 146:6 147:9
148:24 149:15
150:18 151:13,21
152:3 153:8,22
154:9 155:16 156:5
157:2,15 162:8
163:4
rational 156:23
read 16:14,15,17
24:22,23 25:2 29:23
30:2,4 34:20,22
35:25 44:17,19
51:18 65:11 66:4,5
67:23 68:9 83:11,13
84:13,14 109:9
reads 56:22
ready 115:2 119:20
really 15:10 21:12
39:11 70:2 86:20
89:7,8 128:17 138:6
reason 6:10,21,24
37:16 88:16,24
93:24 94:7 162:4,24
reasonable 90:23
reasons 33:13
163:13
recall 18:24 24:25
36:11 37:20 111:12
147:14

receive 75:12
received 89:2
receiving 91:16
recess 101:10
138:25 148:7
recite 54:8
recognize 105:14
recollection 19:25
37:10 41:16 158:13
reconsider 112:10
record 5:2 7:14
16:14,17 30:24
34:22 35:25 42:21
42:22,24,25 43:6,6
66:5 79:2 83:13
84:14,16 101:9,11
125:25 138:24
139:2 148:4,9 160:9
164:10 166:11
records 109:15,18
116:3 121:13,17
122:25 123:2,4
red 123:25
redo 36:21
reevaluate 139:8
refer 45:13
referee 95:17 99:20
refereeing 96:8
97:16
reference 45:19
64:21 76:17,25
78:21 93:13 94:18
125:9 159:25
references 120:22
123:18
referred 57:18
93:10
referring 18:4 60:3
60:4,5 68:24 120:23
125:3,4 153:20
reflect 30:25
reformulate 108:21
refused 156:22
157:3

regarding 32:11
49:8 86:6
regardless 40:10
63:13
registers 150:12
regroup 101:6
regular 18:2
regularly 26:15 32:8
reject 94:11
rejected 112:6
related 166:14
relates 76:4 114:12
relating 75:21
relation 78:11
relationship 9:13
relative 115:21
118:21
relator 33:19 74:23
relax 21:9
released 103:16
143:6
relevance 164:8
relevancy 49:4
relevant 38:24 47:6
49:22 85:10 90:24
reliability 73:25
reliable 74:7,9,14
remain 130:25
remember 46:16
107:7 110:2 112:19
141:14,18
remove 133:5
repeat 35:24 97:23
108:20
rephrase 30:12
32:18 56:11 83:24
84:17 94:21
report 32:4 73:21
92:15,16 159:4,5
reported 74:2
reportedly 139:16
139:17
reporter 20:20
100:9 166:4

**reports** 33:13
**represent** 158:11
**represented** 5:16
  67:4
**representing** 66:15
**request** 23:8 110:4
  111:17 112:6
  114:12,16 115:11
  115:22 116:12
  118:7 153:18
  165:15,16,17
**requested** 30:13
  52:15 165:14
**require** 92:8 96:21
  122:25 139:15
**required** 30:17
  33:18 41:4 45:23
  61:18 69:15,19 78:9
  82:22 95:21 99:12
  116:8 117:15 119:2
  129:12 131:17
  140:23 152:15
**requirement** 63:2
**requirements** 64:8
  150:6
**requires** 72:12
  96:17 163:18
**reserve** 5:11 6:4
**reserved** 4:14 5:24
**reserving** 6:23
**residence** 7:24,25
**residency** 11:15
  48:12 63:21
**resident** 11:25 48:18
  62:18,21,23 63:3,21
  63:25 64:9,16
**residents** 62:17,18
  70:12 160:8
**resolve** 118:16
**resource** 75:4
**resources** 34:14
  90:17,18,19
**respect** 102:3
  138:11 142:10
  145:16 159:6 164:5

**respectfully** 42:15
**respective** 4:4
**respond** 115:7
**response** 86:9
**responsibilities**
  17:10
**responsibility** 95:7
  95:10 99:13
**responsible** 10:12
  91:5 124:25
**restate** 13:8 29:18
  103:8
**restrain** 142:20,21
  142:25
**restrained** 142:17
  142:18,19,19
**restraining** 142:10
**restraints** 143:18
  144:16,25 145:14
  147:5,19
**restrict** 147:24
**restricted** 153:13
**result** 6:7 64:22
  71:14,20 72:24
**results** 55:15
**retain** 75:13
**retained** 165:12
**review** 5:12 17:25
  18:12 23:19 24:4,18
  25:4,13 26:10,13,15
  26:16 27:3
**reviewed** 18:2,14,19
  18:20 23:6 25:15
  44:20,23 89:4
  163:20
**reviewing** 25:17
  70:11
**revise** 25:4
**revised** 25:15
**revising** 25:17 26:10
**ridiculous** 51:18
**right** 5:11 6:3,4,23
  8:16 13:4,6 29:17
  30:11 31:6 33:20
  35:22 46:16 47:12

52:6 53:2 58:15
  67:25 68:25 70:14
  70:20 71:6 77:10
  79:16 85:8 92:2
  95:8 97:8,25 98:19
  100:23 102:12
  103:20,24 104:4
  105:8,16,22 106:6,7
  110:25 111:5 116:4
  118:12,13,18,19
  119:7 120:21 121:4
  121:5 122:24
  125:23 131:23
  136:9,12,15 138:19
  139:21,24 141:6
  142:5 152:16,17
  154:23 155:19
  159:2,9 164:9
**rights** 79:21,24
  80:12 82:10 150:7
**risk** 128:3,6,13
  129:8 130:25
  131:14,16,17,19,20
  131:22 132:3,4,6,6
  132:8,10,11,18
  133:9,9,20,21 134:2
  134:3,17,19,22
  135:6 136:5,9,14
  139:18 141:10,10
  141:11,11 149:20
  154:8
**role** 44:25 70:8
**roles** 135:20
**roll** 26:9
**room** 17:13 18:11
  22:8,10 24:15 27:16
  27:24 28:9 30:19
  56:19 59:11 62:5
  69:22 75:11 81:25
  119:24 120:9,11,13
  120:17,19,23,24,25
  121:14 122:14
  123:9,12 125:8,11
  125:14 128:10
  129:9 133:6 139:25

148:16,20,23
  150:21 151:6 152:8
  152:9,10,12,20
  154:16,18,20,22,23
  159:16 160:3
**rooms** 137:16
  154:11,11
**rounds** 109:4,6
**routine** 92:21
**roy** 3:15 5:15
**rule** 124:15 136:3
  154:4
**ruled** 111:24
**rules** 5:11 20:16
**ruling** 5:23 42:2
  43:12,15 107:23
  127:9 156:2,6
**running** 16:23
  130:13 152:16
**runs** 130:10

**s**

**s** 2:2 4:2,2 165:8
**safe** 106:10 117:8
  135:14,21,25 143:3
**safety** 102:11
  104:23,25 105:3,12
  132:14,15 135:17
**save** 113:23
**saw** 48:2
**saying** 11:13 21:3,4
  46:16 57:11 59:14
  74:13,13 75:18
  85:13,18,19,24
  86:23 102:15
  106:12 140:18
  142:2 157:15
**says** 33:20 45:17
  51:21 58:3 63:11
  64:20 68:15,16,22
  69:6 70:16 78:25
  80:14,24 85:4 87:6
  91:4 92:20 93:8
  98:21,23 103:11
  115:19 116:4,17

[says - speaking]                                                                                          Page 19

117:4 118:10,11,20
120:15 121:10
125:13 147:3
162:16
**schedule**  158:15
**schizophrenia**  55:14
**school**  12:5
**schoolcraft**  1:4 20:2
79:11 159:7,14
160:21
**schooling**  12:4
**scope**  29:13 48:21
49:2 51:4 53:12,16
54:5,6 55:3 57:10
61:21 62:15 63:8
83:17 84:5,19 85:17
96:12 108:10,17
113:21 127:12,20
143:21,24 144:5,5
144:11,20 145:5,7
145:21 146:11,15
156:9,15 157:5,9,21
158:3
**scoppetta**  2:16
**second**  17:6 26:19
27:3 34:24 45:16
56:20 60:20 71:25
82:20 86:13,15,18
86:25 87:15,25 88:3
88:14,18 91:2,6,11
92:9,11,24 93:4,21
93:24 94:20 98:5,17
99:22 101:20 102:5
102:10,16,18,20
**secondly**  5:14,22
**section**  65:12,15,22
66:2 69:17 99:5
116:8 118:8,14
152:14,14 154:3
**see**  6:23 16:22 24:11
24:15 25:3,8 26:19
34:2,5 45:19 52:25
53:2 57:2 58:18
63:22 64:24 67:20
68:17 70:18 71:15

71:21 72:4,19 73:2
76:15,23 77:2 78:21
79:3 81:10,13 91:7
92:25 93:11 94:18
101:6 106:5 117:13
120:15 121:14
123:16,21 125:25
128:4 133:15 148:5
**seek**  135:7
**seeking**  135:14
**seiff**  2:16
**self**  27:23 31:19
55:16 56:2
**sense**  129:17 151:4
**sent**  121:18 123:11
126:25
**sentence**  93:8,18
**separate**  124:22
154:22
**serious**  64:23 71:14
71:20 72:24
**serve**  8:4,7
**served**  86:3
**service**  8:6,12 30:20
61:3 97:6 107:6,10
108:7,24 110:24
111:4 115:5 117:12
**services**  10:20 24:15
28:22 48:15 60:13
61:4 62:6 114:21
115:13,16 116:2
118:22
**session**  111:4
**sessions**  108:24
109:18 111:7
**set**  166:9,19
**seven**  9:6 115:8
143:13
**sheet**  167:1
**shelter**  73:12
**show**  21:19 66:12
68:2 79:8 112:2,4
112:13 118:2 143:8
**showing**  31:8

**shown**  30:25 146:24
**shows**  66:18
**sick**  124:19
**side**  104:24 105:2,3
124:10
**sign**  70:10 80:10
161:15
**signature**  91:20
**signed**  81:20 155:13
161:21
**signing**  82:16 162:6
163:2
**signs**  85:12 161:8,16
161:18
**silent**  124:16
**simply**  92:10
**sir**  40:12 43:21
68:17 81:10 158:13
159:23 160:13
**situation**  101:18
133:4
**situations**  101:24
**six**  63:10,18
**sixth**  44:3
**skipped**  110:18
**slight**  111:14
**slightly**  31:7
**small**  13:18
**smelling**  132:25
**smith**  2:4 5:2 6:12
7:11,19 14:24 15:3
16:13 22:15,23 23:2
23:10 29:17,22
30:11,22,24 31:6,14
35:6,10,15,19 36:4
37:7,22 38:14 39:2
39:10,17,23 40:2,20
40:23 41:8,13 42:6
42:11,20,23 46:23
47:2 48:23 49:3,11
49:14,18 50:2 51:6
51:11,17 52:6,13,19
53:2 54:10 65:19
66:8,16,22 67:6,25
83:20 84:2,6,10,21

85:8 86:13 87:3,10
87:20 95:22,25 96:6
96:13 97:10 99:21
99:25 100:5,17,21
101:5,11 108:11
110:2,13,19 111:16
112:4,16 113:23
127:9,14 133:14
134:9,13 138:8,18
138:23 139:2 143:8
143:13 144:23
145:6,10,24 146:19
148:3,8 153:17
155:19 156:20
157:6 158:8 159:17
160:14,24 161:12
161:24 162:3 164:9
165:4
**somebody**  45:23
49:21 53:5 69:8
75:17 76:5 94:25
103:19 105:15,20
106:12 126:5 130:3
130:16 133:2
134:23 150:15
151:9 154:5 160:19
163:20
**soon**  59:2 78:13,16
93:25 119:14
139:20 140:25
141:4,6
**sorry**  16:7 20:23
34:9 65:9 71:18
131:19 135:10
**sort**  15:3 33:15
53:20 72:13
**sound**  138:17
**source**  48:3 90:5,10
**sources**  74:6 77:24
89:3,19,24
**southern**  1:2
**speak**  18:25 19:15
**speakerphone**  100:8
**speaking**  47:23

specific  34:7,9 37:10 55:25 64:5 90:12 128:8
specifically  96:6 146:16
specified  58:24
specify  72:20
speculation  162:9
speeches  54:14
spell  26:4 113:3
spend  13:24 14:2,3 47:22,24
spends  47:18
split  84:23,24
splitting  87:10,12
spoke  43:3 159:13
spoken  19:18,21,24 20:3
square  126:25
squarely  84:19
stabilize  137:8,9,15 138:10 139:4
stabilizing  137:17
stable  122:3
staff  25:19,23 31:23 48:2,7 60:11,16,20 60:21,23 61:4,12,16 68:22,24 69:10,21 70:22 71:6,10 73:20 74:4 77:5 78:2 80:5 80:8,25 81:9 82:17 82:22 83:5,7 85:12 88:7 89:9,17 90:9 97:2 107:11 108:25 121:14 125:14 139:19 142:16 143:2,3 150:3 160:10 162:25 163:21
stage  160:2
stake  66:24
stand  38:22
standard  34:16 35:9 35:11 59:10 140:11

stands  130:11
start  9:21 44:6 59:3 108:6,23 152:16,20
started  9:9 10:17 40:13 42:7 109:5,10
starting  33:16 44:10 44:11
starts  81:18 116:13 118:23 130:12,13 150:11 154:14
state  1:20 7:7,13 12:10,18,24 13:10 14:12 15:18,20,25 65:5 70:18 75:10 80:19 95:12,18 96:10 97:19 166:5
statement  26:23 27:2 44:14,18 51:19 53:19 55:5,19 56:21 57:2,18,23 58:3,13 64:19 65:2,7 70:15 72:13 76:14 88:20 88:22 92:20 94:9 97:15 98:21 116:4 119:25 143:14 153:19 165:17
statements  21:22 23:20 44:22,22 90:7 139:18
states  1:2
stating  120:23
status  15:24 26:23 37:11 44:2 64:19 79:21 80:11 81:3 91:3 94:12 103:2 104:11 106:6 114:10 128:2,21 149:6
statute  66:10,17 68:13 69:7 97:8
stay  19:13 104:19,21 117:9 118:4,11 149:7
steel  144:3

steven  2:17
stipulated  4:3,8,12
stop  21:2 41:21 86:20
street  1:12 2:8,13 3:6,10 5:5
sub  72:21
subject  64:20 81:24 83:21,22 86:4 87:9 101:22 108:25 148:11 155:19
subscribed  164:17 167:22
substance  102:7 163:5
substantial  128:3,14 131:17,19,20 132:3 132:7,10,17 133:6,9 133:21 134:3,17 139:18 141:10 154:7
success  2:22
suffered  151:4
suffering  56:10,17 103:12
sufficient  103:3 116:18,23 119:8,9 130:2 131:21 132:7 134:22
suggest  42:5 156:10
suggested  41:14 106:13
suggestion  35:20 94:11
suggestive  31:7,11
suggests  72:14
supervising  63:24 70:12
supervision  62:19 63:15
supervisor  17:11
supposed  25:13 80:3
supreme  115:10,24 116:20 117:17 118:2

sure  13:19 15:8 21:6 21:16,18 22:16,19 27:4 36:10 44:12 53:3 62:16 83:2 84:6 88:25 91:11 93:6,21 95:8,13 96:23 97:2 98:11 99:14 102:11,16 103:7 122:21 124:11 127:18 143:3 150:21 153:10,24 162:19
suspect  67:11
suzanna  2:14
swearing  7:3
sweet  43:9
sweet's  5:23 43:4 100:3
sworn  4:6 7:6 164:17 166:10 167:22
symptoms  55:16 58:19
syosset  8:19
system  29:3

**t**

t  4:2,2 5:15 165:8
take  6:5 20:6,20 21:5 36:22 43:19 48:17 74:15 100:23 110:11 117:7 119:12 124:9,18
taken  1:18 23:12 101:10 111:21 112:11 121:17 138:25 148:7 151:5
takes  46:15 47:11 130:9
talk  14:21 59:4 60:17 109:22 117:5 117:6,12 138:21 148:4
talked  112:17 113:10 125:5 150:7

talking 46:19,21,21
46:23 60:7 101:14
116:16 118:6
120:12 137:20,22
142:3 160:20,21
talks 86:14 124:24
target 66:25
taught 60:21 109:2
technically 140:10
tell 18:18 21:10
26:25 33:6,22 40:3
40:5 41:22 50:11,14
52:2 54:2,12 67:10
79:18 95:15 117:11
138:16 139:5
158:13
telling 51:6,20 57:5
59:18 85:9 86:17
89:6,16
tense 35:5
term 55:3,4 132:17
132:19 134:17
136:24,25 139:4,7,8
139:9
terms 52:4 100:25
test 123:20
testified 7:8 22:17
testify 38:10 85:6
109:23 147:12
testimony 19:10
166:11
testing 124:6
tests 123:19
thank 100:6,17
161:23 164:9
thing 10:7 21:8 24:9
64:14 125:10 137:3
137:4
things 5:10,18 33:4
41:5 45:22 52:11
109:21 111:8 147:7
162:18
think 15:12 17:23
26:3 28:21 31:10
35:19 37:16 43:5

50:7 52:10 77:21
85:19 86:20 96:25
98:25 99:23 103:11
103:12,16 108:17
110:10,20 115:8
116:17 118:11
121:20 127:14
133:24 135:24
136:8,14 140:12
141:11 146:8,12,21
151:22 157:9 159:7
thinks 66:23 67:7
88:4 118:3 133:16
third 2:8 14:5
102:21,22,23,24
103:4 104:7,20
112:23 113:13
thought 49:24 98:15
threat 160:19
threatens 130:9
threats 34:7,10
72:10
three 11:18 24:2
45:2 63:10,17 109:6
threshold 63:17
64:3,10
tie 142:25
time 1:19 4:15 6:11
8:2,12 13:18,23
14:6 21:5 24:23,25
34:14 36:21,21
44:16 47:22,25
48:14,15 58:17
62:17 70:7 78:11
80:4 81:6,13,17,18
81:20 82:11 84:13
85:9 91:19,20,21,23
106:23,25 109:15
110:9 115:19
117:10 118:21
140:3,13,20 146:23
152:21 155:22
156:2 158:18
159:15 162:15
164:12

timeframe 46:20
60:18 137:18
timeframes 152:15
title 8:23 10:15
69:25
today 5:16,21 19:3,5
24:6 37:2,13 38:10
38:24 39:3 107:5
109:18 137:3
148:14
today's 17:22
told 19:13 21:8
41:13 100:12
tools 128:8
topics 147:16,18,19
traffic 130:12,13
training 11:11,14,15
12:13 48:7 49:13
50:10,16,22 62:24
107:6,10,14,15
108:8,24 109:18
110:24 111:4,7
transcript 5:13 6:6
21:4 166:10
transfer 122:19
152:8,11
transferred 28:12
122:13 126:16
148:21,22 149:8,22
152:19 154:15
163:9
transferring 120:8
transmitted 123:4
traumatic 55:15
treated 139:11
treating 15:22
treatment 38:11
56:24 57:13 58:5,9
59:3 73:12 81:5
106:8 107:13 122:4
124:14 143:4 149:9
149:21 150:24
159:12,15
trial 4:15 5:24 6:5
6:11 8:2

trigger 116:18
117:16 150:5
true 76:6 121:6
166:11
try 35:21 74:5 106:5
146:23
trying 50:2 75:17
105:24 106:2
108:12 110:3,13
138:9,11
tuesday 119:21
tuesdays 119:18
turn 43:21 114:8
119:22 127:25
two 5:17 11:19 27:9
27:21 71:20,21
78:21,22 85:24 95:5
95:6 104:3 109:6
112:17 113:12
158:25 159:2
type 57:6
types 28:19 101:23
typically 36:17

**u**

u 4:2 5:15 26:5
uh 68:20
umbrella 9:19
undefined 132:19
undergoing 62:24
understand 7:21
21:14 23:3 30:7
56:9 57:4 59:13
60:14 74:12 75:15
84:7 102:14 108:12
116:6 118:8 131:4
138:9,12 140:9
146:20 152:22
understanding
95:12,16 96:9 97:20
98:4 99:5 106:11
unfortunately 101:8
unit 9:10 10:6,11,12
10:14,14,17 91:19
92:16 114:20

[unit - written]                                    Page 22

116:15 120:10,14
120:18 121:12
122:10,12 125:15
125:20
**united**  1:2
**unknown**  6:24,24
**unspecified**  58:17
**update**  25:14
**updated**  107:11
**updates**  48:15
**ups**  156:24
**upstate**  12:21
**use**  139:8,9 143:17
145:14 147:5,18
**utilized**  111:19

**v**

**v**  7:5,15,15
**vacation**  38:17
**vagrantly**  146:4
**valhalla**  11:12
**valid**  75:6,8,19
124:25
**valley**  12:18
**van**  7:17
**verbally**  92:9,12
111:8,12
**verify**  76:8
**victor**  7:16
**view**  85:21 130:15
**views**  135:19
**vinod**  1:17 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1

62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1,14 165:4
166:8 167:20
**violate**  146:7
**violating**  146:4,13
**violent**  72:9
**vivek**  19:7,11 26:7,8
45:11 93:14,14,15
**volume**  137:18
**voluntary**  18:21
94:12 104:16,18
142:3

**w**

**wait**  163:2
**waited**  43:12,12
155:25
**waiting**  148:20
**waived**  4:10
**walking**  130:14
**want**  7:23 8:14
29:14,21,22,24
31:14 38:3,7,8 39:2
39:13,15,20,21
41:11,19,25 46:20
50:11 53:13 54:4,12
54:25 57:16 66:9,12
79:8 84:23,25 96:7
98:24 101:5 102:11
104:6 109:12
114:22 116:17
118:10,20,24 119:7
122:20 133:12
140:15 143:8 148:4
151:18 152:23
155:10 156:7
157:16
**wanted**  43:19
**wants**  114:22
117:14
**ward**  10:4,8 16:4
17:13 27:16 30:20
116:15 121:18
**washington**  2:9
**way**  27:21,25 28:2
30:13 36:12 37:7
38:4 42:12 52:14
80:16 84:18 106:13
112:23,24 113:13
137:2 166:16
**ways**  27:14,21 71:21
112:18
**we've**  7:19 43:12
**week**  109:7 119:17
**weekday**  92:21
**weekends**  158:20,21

**went**  9:10 11:8 12:5
109:11
**westchester**  11:23
**whereof**  166:19
**white**  51:21 123:25
**whitehall**  3:6
**willing**  58:22 59:4
104:19
**wingdale**  12:21
**wish**  114:21 115:5
**withdraw**  112:3,12
**witness**  7:4,5,21 8:8
14:20,20 18:16
22:14,17 23:6 24:7
29:6 30:4 31:2 37:5
38:19 40:2,4 43:20
52:7,23 55:8 67:7
68:2 85:5 97:11
100:9 108:2 109:23
110:6 134:5,12
137:22 138:20
146:2,25 147:11,17
155:24 156:23
157:3 161:14 165:3
166:8,12,19
**witness's**  167:1
**witnesses**  7:21
**words**  29:23 84:23
103:14 131:22
133:17
**work**  8:21 10:24
14:3,12 62:4 158:15
162:13 163:25
**worked**  12:17
**working**  8:20 9:8,21
13:23,25 14:6 17:12
40:13 98:10
**workup**  124:12
**write**  103:6 119:5
**writing**  23:14 59:21
59:22 111:9,13,23
115:4 117:18,22,24
118:25 152:4
**written**  59:14 108:7
111:18 115:22

**[written - zivku]**                                              Page 23

| |
|---|
| 118:23 119:10<br>151:23 153:5<br>165:16<br>**wyck**   7:18 |
| **x** |
| **x**   1:3,11 165:1,8 |
| **y** |
| **yeah**   10:9 21:25<br>24:13,17 26:24 27:4<br>28:5 29:6 32:10<br>35:15 43:24 45:21<br>54:4 67:24 71:22<br>72:22 78:24 84:10<br>99:24 102:23 113:2<br>113:7 137:23<br>140:10 141:7 142:6<br>**year**   25:13 114:4,5<br>**years**   9:5,6 11:18,19<br>12:12 39:6 40:4,6<br>67:2 109:19<br>**yelling**   142:16<br>**york**   1:2,8,12,12,20<br>2:5,5,11,12,13,13,18<br>2:18,22 3:6,6,11,11<br>7:7 8:19 11:11,22<br>11:24 12:13,22 65:4<br>65:11 70:18 75:10<br>80:19 95:12 96:10<br>97:19 166:6 |
| **z** |
| **zivku**   1:19 166:4,24 |