Page 1

1

2      UNITED STATES DISTRICT COURT
3      EASTERN DISTRICT OF NEW YORK
4      - - - - - - - - - - - - - - - - - -
5      ADRIAN SCHOOLCRAFT,
6                          Plaintiff,
7            -against- Index No.
                        10CIV-6005 (RWS)
8
       THE CITY OF NEW YORK, DEPUTY CHIEF
9      MICHAEL MARINO, Tax Id. 873220,
       Individually and in his Official
10     Capacity, ASSISTANT CHIEF PATROL
       BOROUGH BROOKLYN NORTH GERALD NELSON,
11     Tax Id. 912370, Individually and in his
       Official Capacity, DEPUTY INSPECTOR
12     STEVEN MAURIELLO, Tax Id. 895117,
       Individually and in his Official
13     Capacity, CAPTAIN THEODORE LAUTERBORN,
       Tax Id. 897840, Individually and in his
14     Official Capacity, LIEUTENANT JOSEPH
       GOFF, Tax Id. 894025, Individually and
15     in his Official Capacity, stg. Frederick
       Sawyer, Shield No. 2576, Individually
16     and in his Official Capacity, SERGEANT
       KURT DUNCAN, Shield No. 2483,
17     Individually and in his Official
       Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18     Tax Id. 885374, Individually and in his
       Official Capacity, SERGEANT SHANTEL
19     JAMES, Shield No. 3004, and P.O.'s "JOHN
       DOE" 1-50, Individually and in their
20     Official Capacity (the name John Doe
       being fictitious, as the true names are
21     presently unknown)(collectively referred
       to as "NYPD defendants"), JAMAICA
22     HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
       Individually and in his Official
23     Capacity, DR. LILIAN ALDANA-BERNIER,
       Individually and in her Official Capacity
24     and JAMAICA HOSPITAL MEDICAL CENTER
       EMPLOYEES "JOHN DOE" # 1-50, Individually
25

       (Continued)

Page 2

```
 1
 2   and in their Official Capacity (the name
      John Doe being fictitious, as the true
 3   names are presently unknown),
 4
      Defendants.
 5
      - - - - - - - - - - - - - - - - - -x
 6
                  111 Broadway
 7                New York, New York
 8                February 11, 2014
                  10:30 a.m.
 9
10       VIDEOTAPED DEPOSITION of DR. LILIAN
11   ALDANA-BERNIER, one of the Defendants in
12   the above-entitled action, held at the
13   above time and place, taken before
14   Margaret Scully-Ayers, a Shorthand
15   Reporter and Notary Public of the State
16   of New York, pursuant to the Federal
17   Rules of Civil Procedure.
18
19            *   *   *
20
21
22
23
24
25
```

Page 4

```
 1
 2   APPEARANCES CONTINUED
 3
      SCOPPETTA, SEIFF, KRETZ & ABERCROMBIE,
 4   ESQS.
      Attorneys for Defendant
 5   STEVEN MAURIELLO
         444 Madison Avenue
 6      30th Floor
         New York, New York 10022
 7
      BY: WALTER A. KRETZ, JR., ESQ.
 8
 9
10   MARTIN, CLEARWATER & BELL, LLP
      Attorneys for Defendant
11   JAMAICA HOSPITAL MEDICAL CENTER
         220 42nd Street
12      13th Floor
         New York, New York  10017
13
      BY:  GREG RADOMISLI, ESQ.
14   File # 667-82153
15
16
      IVONE, DEVINE & JENSEN, LLP
17   Attorneys for Defendant
      DR. ISAK ISAKOV
18      2001 Marcus Avenue
         Suite N100
19      Lake Success, New York 11042
20   BY:  BRIAN E. LEE, ESQ.
21
22   (Appearances continued on next page.)
23
24
25
```

Page 3

```
 1
 2   APPEARANCES:
 3
      NATHANIEL SMITH, ESQ.
 4   Attorney for Plaintiff
         111 Broadway
 5      New York, New York 10006
 6
 7   JOHN LENOIR, ESQ.
      Attorney for Plaintiff
 8      829 Third Street NE
         Washington, DC 20002
 9
10
      SUCKLE SCHLESINGER PLLC
11   Attorneys for Plaintiff
         224 West 35th Street
12      Suite 1200
         New York, New York 10001
13
      BY:  HOWARD SUCKLE, ESQ.
14
15
      ZACHARY W. CARTER, ESQ.
16   Corporation Counsel
      Attorneys for Defendant
17   THE CITY OF NEW YORK
         100 Church Street
18      New York, New York 10007
19   BY: RYAN SHAFFER, ESQ.
      File # 2010-033074
20
21
22
23   (Appearances continued on next page.)
24
25
```

Page 5

```
 1
 2   APPEARANCES CONTINUED
 3
 4   CALLAN, KOSTER, BRADY & BRENNAN, LLP
      Attorneys for Defendant
 5   LILIAN ALDANA-BERNIER
      One Whitehall Street
 6      New York, New York 10004
 7   BY:  PAUL CALLAN, ESQ.
      File # 090.155440
 8
 9
10
      ALSO PRESENT AT VARIOUS TIMES:  MAGDALENA
11                BAUZA
12
13
14            *   *   *
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1
2  STIPULATIONS
3  IT IS HEREBY STIPULATED AND AGREED, by
4  and among counsel for the respective
5  parties hereto, that the filing, sealing
6  and certification of the within
7  deposition shall be and the same are
8  hereby waived;
9  IT IS FURTHER STIPULATED AND AGREED
10 that all objections, except as to form of
11 the question, shall be reserved to the
12 time of the trial;
13 IT IS FURTHER STIPULATED AND AGREED
14 that the within deposition may be signed
15 before any Notary Public with the same
16 force and effect as if signed and sworn
17 to before the Court.
18
19          *   *   *
20
21
22
23
24
25

Page 7

1
2      MR. SMITH:  On the record at
3  10:29.  We are starting the deposition
4  of Dr. Lilian --
5      MR. CALLAN:  Aldana,
6  A-L-D-A-N-A, Bernier.
7      MR. SMITH:  Aldana-Bernier.
8      The deposition is being
9  videotaped.
10     We are at 111 Broadway, my
11 office, Nathaniel Smith, and today is
12 the 11th of February 2014.
13     You can swear the Witness in.
14 L I L I A N   A L D A N A -
15 B E R N I E R, the Witness herein, having
16 first been duly sworn by the Notary Public,
17 was examined and testified as follows:
18 EXAMINATION BY MR. SUCKLE:
19 Q.   What is your name?
20 A.   Lilian Aldana, hyphen, Bernier;
21 L-I-L-I-A-N, A-L-D-A-N-A, hyphen,
22 B-E-R-N-I-E-R.
23 Q.   Where do you reside?
24 A.   71 Parker Avenue, Maplewood,
25 New Jersey 07042.

Page 8

1      L. ALDANA-BERNIER
2  Q.   Good morning, Doctor.  My name
3  is Howard Suckle.  I represent Mr.
4  Schoolcraft in this matter, and I'll be
5  asking you some questions today.
6      Although I'm sure your attorney
7  has gone over some basic rules of a
8  deposition, let me just make sure we are
9  all are clear on them.
10     If at any time you don't
11 understand my question for any reason
12 whatsoever, please let me know because if
13 you do answer we are going to assume that
14 you understood the question.  Okay?
15 A.   Okay.
16 Q.   In addition while sometimes
17 during the course of a conversation, a
18 shake of the head or a nod may be an
19 appropriate answer when the answer is yes
20 or no.  Here we have a court reporter and
21 the court reporter needs to take down
22 everything that you say, everything I
23 say, and anything else said in the room.
24     If the answer is appropriately
25 yes or no, can you please use some type

Page 9

1      L. ALDANA-BERNIER
2  of word, say yes or no, opposed to
3  shaking your head?
4  A.   Yes.
5  Q.   Also in that vein, the reporter
6  needs to take down everything that you
7  and I say.  Although you may anticipate
8  what my question is going to be before I
9  finish, please let me finish it so the
10 reporter can take that down and then
11 begin to answer.  Okay?
12 A.   Yes.
13 Q.   Doctor, can you tell me what
14 you presently do for a living?
15 A.   I am a medical doctor,
16 psychiatrist specialty.
17 Q.   Where are you employed, if at
18 all?
19 A.   I am.  I'm working for Jamaica
20 Hospital.
21 Q.   When you say you work for
22 Jamaica Hospital, is that your employer?
23 A.   Yes.
24 Q.   How long have you been employed
25 by Jamaica Hospital?

3 (Pages 6 - 9)

Page 10

```
 1        L. ALDANA-BERNIER
 2    A.   From 1995 to the present.
 3    Q.   I don't want to know the
 4 details, but you are paid a salary,
 5 correct?
 6    A.   Yes.
 7    Q.   By Jamaica Hospital?
 8    A.   Yes.
 9    Q.   In other words when you see
10 patients, you don't bill them
11 independently, do you?
12    A.   No, I don't.
13    Q.   Doctor, can you tell me where
14 did you go to undergraduate school?
15    A.   I went to the Concordia
16 College.  That is for my BSN in the
17 Philippines.
18    Q.   Are you originally from the
19 Philippines?
20    A.   I am from the Philippines, yes.
21    Q.   That's where you were born?
22    A.   Yes.
23    Q.   What did you study at Concordia
24 College?
25    A.   That's bachelor's of science in
```

Page 11

```
 1        L. ALDANA-BERNIER
 2 nursing.
 3        MR. SMITH:  Sorry.  What was
 4    that bachelor's in?
 5        THE WITNESS:  In nursing.
 6    Q.   When did you complete that?
 7    A.   This was in 1973.
 8    Q.   After you completed your
 9 bachelor's in nursing, what did you do
10 with regards to your career or education?
11    A.   When I finished in March, I
12 work in the emergency room voluntarily
13 for the Far Eastern University.
14    Q.   How long did you do that?
15    A.   From March to November when I
16 came to the United States in 1973.
17    Q.   When you came to the United
18 States, for what purpose did you come to
19 the United States?
20    A.   The American dream.
21    Q.   Did you continue your education
22 or your career at that point?
23    A.   Yes, 1976 to '97 I took my
24 master's in nursing, minor in education
25 at the New York University.
```

Page 12

```
 1        L. ALDANA-BERNIER
 2    Q.   So you have a master's in
 3 nursing?
 4    A.   Yes.
 5    Q.   And education?
 6    A.   Yes.
 7    Q.   After you completed your
 8 master's in nursing and in education,
 9 what did you do next with regard to your
10 career and education?
11    A.   After that I went to medical
12 school from 1981 to 1986, University of
13 Santiago, Dominican Republic.
14    Q.   At some point you immigrated to
15 the Dominican Republic?
16    A.   Yes.
17    Q.   Did you become a citizen of the
18 Dominican Republic?
19    A.   No, I was a citizen of the
20 United States before I went there.
21    Q.   Just for the record, when did
22 you become a citizen?
23    A.   That was between '78 and '79.
24    Q.   While you were in medical
25 school, did you concentrate on any
```

Page 13

```
 1        L. ALDANA-BERNIER
 2 particular area of medicine?
 3    A.   At that point in medical
 4 school, no.
 5    Q.   Did you graduate from the
 6 University of Santiago?
 7    A.   Yes.
 8    Q.   What was your degree?
 9    A.   MD.
10    Q.   What did you do next after that
11 with regard to your career or education?
12    A.   In 1986 I had my externship at
13 the Elizabeth General Hospital in
14 psychiatry.
15    Q.   Where is that?
16    A.   In New Jersey.
17    Q.   How long did you do that?
18    A.   For a year.
19    Q.   After that what did you do next
20 with regard to your career or education?
21    A.   From '89 to '93, I had my
22 residency in psychiatry at the
23 Metropolitan Hospital here in Manhattan.
24    Q.   As a resident did you have to
25 rotate through other disciplines as well
```

4 (Pages 10 - 13)

Page 14

L. ALDANA-BERNIER

1
2 as psychiatry?
3    A.   Yes, we did internal medicine,
4 urology.
5    Q.   Any other disciplines you
6 rotated through?
7    A.   I choose my elective in
8 endocrine.
9    Q.   What is endocrine?
10    A.   Endocrine has to do with your
11 hormones.
12    Q.   Did you complete that
13 residency?
14    A.   I did in 1993.
15    Q.   After your residency what did
16 you do next with regard to your career or
17 education?
18    A.   After 1993 I had -- 1994 I work
19 at Kings County Hospital as an inpatient
20 doctor.
21    Q.   When you say "inpatient
22 doctor," what do you mean?
23    A.   Inpatient unit.
24    Q.   In psychiatry?
25    A.   Psychiatry inpatient unit.

Page 15

L. ALDANA-BERNIER

1
2    Q.   As an attending?
3    A.   Attending.
4    Q.   You were employed by Kings
5 County Hospital?
6    A.   Kings County Hospital.
7    Q.   That's a hospital run by the
8 City of New York?
9    A.   Yes, Brooklyn.
10    Q.   You were an employee of the
11 City of New York at that time?
12    A.   Yes.
13    Q.   We're early on now, and it's
14 okay, but if we keep running over each
15 and you're not letting me finish before
16 you answer, she is going to start hitting
17 me.
18         You have to let me finish
19 before you answer.  Okay?
20    A.   Okay.
21    Q.   How long were you an employee
22 of the City of New York?
23    A.   Can I count?
24    Q.   Take your time.
25    A.   I'm not sure.  Between eight to

Page 16

L. ALDANA-BERNIER

1
2 nine months.
3    Q.   While you were doing your
4 residency at Metropolitan, is that a City
5 hospital?
6    A.   It's a City hospital.
7    Q.   While you were there, were you
8 paid any money or given any stipend?
9    A.   Paid a salary.
10    Q.   So you were an employee at that
11 point too of the City of New York,
12 correct?
13    A.   Yes.
14    Q.   How long were you an employee
15 of Metropolitan?
16    A.   Four years.
17    Q.   After the inpatient attending
18 at Kings County Hospital, what did you do
19 next?
20    A.   I went to Coney Island
21 emergency room.
22    Q.   What did you do there?
23    A.   Emergency room attending.
24    Q.   Psychiatric?
25    A.   Psychiatric emergency room.

Page 17

L. ALDANA-BERNIER

1
2    Q.   Is Coney Island Hospital a City
3 hospital?
4    A.   City hospital.
5    Q.   How long did you work as an
6 attending at the Coney Island Hospital
7 for the City of New York?
8    A.   At the time maybe three months.
9    Q.   When you went from Kings to
10 Coney Island Hospital, was this a
11 transfer; did you leave one job and start
12 a new job?
13    A.   I left one job to start a new
14 job.
15    Q.   After what year was it that you
16 worked at Coney Island Hospital?
17    A.   That was 1995.
18    Q.   After Coney Island Hospital,
19 what did you do next?
20    A.   I went to Jamaica Hospital.
21    Q.   So you went to Jamaica Hospital
22 in 1995?
23    A.   '95.
24    Q.   And you have been employed
25 there ever since?

5 (Pages 14 - 17)

1        L. ALDANA-BERNIER
2     A.    Yes.
3     Q.    When you first got to Jamaica
4  Hospital, what was your position?
5     A.    I was working in the emergency
6  room as an attending psychiatrist.
7     Q.    And has that position changed
8  at all, have you changed your position at
9  Jamaica Hospital?
10    A.    As an attending? I'm still an
11 attending.
12    Q.    You are still in the same
13 position as in 1995?
14    A.    I'm an attending still in
15 Jamaica Hospital.
16    Q.    Were you anything other than an
17 attending at Jamaica Hospital?
18    A.    I was director of the emergency
19 room.
20    Q.    When were you the director of
21 the emergency room?
22    A.    I am not sure.  I don't
23 remember when, but I was acting director
24 and became the director.  Then I was
25 still an attending at Jamaica Hospital.

1        L. ALDANA-BERNIER
2     Q.    How many months or years were
3  you the acting director?
4     A.    How many years?
5     Q.    How long?
6     A.    Like -- I have no recollection.
7     Q.    Was it a year, two years, six
8  months, ten years?  Give me an idea.
9     A.    As acting, approximately one
10 year.
11    Q.    How about as director?
12    A.    Director, maybe ten years.
13    Q.    While you were the acting
14 director and director, were you actually
15 practicing medicine during that period of
16 time?
17    A.    Yes.
18    Q.    Well, was there any difference
19 in the job function as acting director or
20 director?
21    A.    No.  They were trying to find
22 something so you are just the acting
23 until they find a real director.
24    Q.    And they found you?
25    A.    Yeah, I have been there.  They

1        L. ALDANA-BERNIER
2  rather have somebody in there than take
3  somebody from outside.
4     Q.    When was the last time you were
5  in the role of director of the
6  psychiatric emergency room at Jamaica
7  Hospital?
8     A.    That was October 2013.
9     Q.    So in October 2009, you were
10 the director of the psychiatric emergency
11 room?
12    A.    Yes.
13    Q.    As a director of the
14 psychiatric emergency room in October
15 2009, what were your responsibilities and
16 functions?
17    A.    Director of emergency room, you
18 do have administrative responsibility.
19 You attend administrative meeting.  At
20 the same time, you were still do
21 clinicals, you still have the clinical
22 aspect.  You have to see the patients.
23 At the same time, you have to oversee the
24 residents and the other staff of the
25 emergency room.

1        L. ALDANA-BERNIER
2     Q.    As the director of the
3  emergency room, did you have any role in
4  creating or drafting any of the rules or
5  regulations of Jamaica Hospital emergency
6  room?
7     A.    Together with the other members
8  of the team or other administrators, yes,
9  I sit down with them and give my
10 feedback.
11    Q.    How much of your job in October
12 2009 as director involved administrative
13 work versus clinical work?
14    A.    I do more clinical.
15    Q.    You say more clinical?
16    A.    More clinical, yes.
17    Q.    Give me an idea how much of
18 your day or week was spent doing
19 administrative work versus clinical work?
20    A.    I do more clinical, but I was
21 the only psychiatrist in the emergency
22 room until -- go ahead?
23    Q.    Until when?
24    A.    Until they had given me a new
25 attending which was for only one year.

6 (Pages 18 - 21)

Page 22

L. ALDANA-BERNIER
1
2    Q.   When was that?
3    A.   In 2012/2013.
4    Q.   So October 2009 you were the
5  only attending psychiatric physician in
6  the psychiatric emergency room?
7    A.   Yes.
8    Q.   And did you have a set schedule
9  at the time during the day that you
10 worked?
11   A.   I go to work from eight
12 o'clock.
13   Q.   Until when?
14   A.   That depends, until finishing
15 my patient.  I cannot stay because
16 sometimes you work overtime, six o'clock,
17 seven o'clock.
18   Q.   What is the standard day?
19   A.   Eight to four.
20       I want you to know, I don't
21 stay until four o'clock.  I stay more
22 than that.
23   Q.   That's what I'm trying to find
24 out.
25       On an average day, if there is

Page 23

L. ALDANA-BERNIER
1
2  such a thing, how long do you stay at the
3  hospital?
4    A.   Maybe ten, 12 hours.
5    Q.   When I talked about
6  administrative responsibilities, to
7  oversee the residents, was that part of
8  that administrative responsibility, is
9  that clinical, or something else?
10   A.   That's more of your teaching
11 responsibilities.
12   Q.   How about overseeing the staff,
13 is that in addition to your
14 administrative responsibilities?
15   A.   Yes.
16   Q.   How much of your time was
17 devoted to doing clinical compared to all
18 of these other functions that you had as
19 director?
20   A.   I spend maybe out of the ten
21 hours, I spend eight hours clinical.
22   Q.   When you say "overseeing
23 staff," is that the nursing staff or
24 something else?
25   A.   Yes, nursing staff.

Page 24

L. ALDANA-BERNIER
1
2    Q.   In addition to having been the
3  only psychiatric physician employed at
4  the emergency room in October 2009, were
5  there other physicians who had privileges
6  in the emergency room; psychiatric I'm
7  talking about?
8    A.   Yes.
9    Q.   And how did that work, what
10 kind of association did other doctors
11 have with the psychiatric emergency room
12 that you are aware of?
13   A.   We divided in shifts.  One you
14 have that works from four to 12 and one
15 that work from 12 to eight.
16   Q.   When you say "one that works,"
17 since you were the only one employed,
18 what was the title of the people that
19 worked for the other two shifts?
20   A.   Also psychiatrists.
21   Q.   Were they employed by Jamaica
22 Hospital?
23   A.   Yes.
24   Q.   And that was in October 2009?
25   A.   Yes.

Page 25

L. ALDANA-BERNIER
1
2    Q.   Let me just clarify:  I thought
3  you said you were the only psychiatrist
4  working in the emergency room in October
5  2009.  Are you saying these other
6  psychiatrists were residents?
7    A.   I'm referring to the time you
8  were asking.  The time I work from eight
9  to four, I am the only psychiatrist.
10   Q.   So during your shift?
11   A.   During my shift.
12   Q.   In October 2009 who were the
13 other psychiatrists employed by Jamaica
14 Hospital that you are aware of in the
15 emergency room?
16       MR. RADOMISLI:  Objection to
17   form.
18   A.   When you saying other
19 psychiatrists, include the residents?
20   Q.   Let's not talk about residents
21 yet.  The other attendings.
22   A.   Who are the other?
23   Q.   Yes, who are the other
24 physicians that man those other shifts?
25   A.   I will not remember who those

7 (Pages 22 - 25)

Page 26

1    L. ALDANA-BERNIER
2  psychiatrist were.
3       MR. SMITH:  What was the answer?
4       MR. CALLAN:  She doesn't
5  remember.
6       [The requested portion of the
7  record was read.]
8    Q.   And working at Metropolitan,
9  Kings County Hospital, Coney Island
10 Hospital up until your job working with
11 Jamaica Hospital, did you ever encounter
12 patients brought in by police officers to
13 the emergency psychiatric unit?
14   A.   Did I ever encounter?
15   Q.   Yes.
16   A.   In all of the hospitals that I
17 worked?
18   Q.   Yes.
19   A.   Yes.
20   Q.   From October 2009 back into
21 your career, how many times did you
22 encounter patients who had been brought
23 to the psychiatric emergency room by
24 police officers?
25   A.   I will not remember.

Page 27

1    L. ALDANA-BERNIER
2    Q.   Hundreds of people, thousands
3  of people?
4    A.   Not hundreds.
5    Q.   How often in your career have
6  you encountered patients brought to the
7  psychiatric emergency room by police
8  officers?
9    A.   Repeat that question.
10   Q.   Sure.
11       In your career how many times
12 have you encountered patients being
13 brought to the emergency room by police
14 officers?
15   A.   I think I answered you.  I will
16 say I cannot remember.
17   Q.   Can you give me an estimate
18 what kind of number we are talking about:
19 ten times, five times, a hundred times?
20   A.   Well, I will be deceiving you
21 if I told you a number, right?
22   Q.   Can you give your best
23 estimate?
24   A.   Maybe ten.
25   Q.   In those ten or so times,

Page 28

1    L. ALDANA-BERNIER
2  understanding it's an estimate, do you
3  recall any of those patients being
4  brought in in handcuffs?
5    A.   Okay.  How do you want me to
6  answer that?
7    Q.   Yes or no.
8        Do you remember anybody, any of
9  those ten or so people, being brought in
10 in handcuffs?
11   A.   They were -- any time an
12 officer bring a patient, they are in
13 handcuffs.
14   Q.   Every single time that you
15 encountered officers bringing patients to
16 the hospital, they are in handcuffs in
17 your history?
18   A.   When an officer brings a
19 patient to the emergency room, they
20 usually are in handcuffs.
21   Q.   And they are usually under
22 arrest.
23   A.   Not all are under arrest.
24   Q.   When you say "they are not all
25 under arrest," what do you mean?

Page 29

1    L. ALDANA-BERNIER
2    A.   When they bring in a patient
3  very agitated, combative, violent,
4  depending on the nature of their call,
5  I'm sure they were being brought by
6  handcuffs.
7    Q.   And do you recall as you sit
8  here any of names of any of those
9  patients?
10   A.   No.
11   Q.   And do you recall as you sit
12 here a gentleman named Adrian Schoolcraft
13 from only your memory?
14   A.   Hold on.  You're saying from my
15 memory?
16   Q.   Yes.
17   A.   Because I have been reading the
18 chart.
19   Q.   Independent of the records, do
20 you have any memory of Adrian
21 Schoolcraft?
22       MR. CALLAN:  Objection to the
23   form of the question.
24       You can answer.
25   A.   No, I don't.

8 (Pages 26 - 29)

Page 30

L. ALDANA-BERNIER

1
2      Q.   Okay. Can't describe him
3  physically, can you?
4      A.   No.
5      Q.   So am I correct that your
6  entire memory of any care or treatment
7  you may have rendered to Mr. Schoolcraft
8  is contained in the hospital chart of
9  Jamaica Hospital?
10         MR. RADOMISLI: Objection to
11  form.
12         MR. CALLAN: I join in the
13  objection.
14         You can answer.
15     A.   From it, yes.
16     Q.   So your memory of care and
17  treatment of Mr. Schoolcraft comes from
18  the notes contained in the hospital chart
19  of Jamaica Hospital, correct?
20     A.   Yes.
21     Q.   And prior to coming here today,
22  did you review any documents?
23     A.   The same, yes.
24     Q.   What did you review?
25     A.   The records [indicating].

Page 31

L. ALDANA-BERNIER

1
2      Q.   When you say "the records,"
3  what records?
4      A.   The hospital records.
5      Q.   Of who?
6      A.   Of Mr. Schoolcraft.
7      Q.   Did you review the entire
8  hospital chart?
9      A.   Not the entire, just go through
10  maybe five pages.
11     Q.   What five pages did you look
12  at?
13     A.   Just going through
14  [indicating].
15     Q.   What was the nature of the
16  things you looked at?
17     A.   I want to the consult, and I
18  went through the notes of the resident.
19     Q.   Your consult and the --
20     A.   The consult of the resident and
21  the notes of the residents when the
22  resident was working in the emergency
23  room.
24     Q.   Your consult and the resident's
25  note in your --

Page 32

L. ALDANA-BERNIER

1
2      A.   Not my consult, a consult done
3  by the resident in the medical ER and the
4  notes of the resident when the patient
5  was in our psych unit.
6      Q.   The consult of the resident,
7  was that a psych ER consult?
8      A.   It was a psychiatric consult in
9  the medical ER.
10     Q.   And then you looked at notes
11  from the psych ER?
12     A.   From the psych ER.
13     Q.   Were any of those your notes?
14     A.   The notes of the residence.
15     Q.   Prior to coming here today and
16  since October 2009, have you ever looked
17  at any notes that you made in the chart?
18     A.   No.
19     Q.   So in anticipation of coming
20  here today before you came to this room,
21  did you look at any documents before
22  today?
23     A.   Yes, same notes.
24     Q.   Same notes.
25         In that entire time from

Page 33

L. ALDANA-BERNIER

1
2  October 2009 up until today, did you have
3  access to the entire Jamaica Hospital
4  chart, at least as you understood it to
5  be?
6      A.   No.
7      Q.   No one showed it to you?
8      A.   No.
9      Q.   Did you ask to review it?
10     A.   Before, but I was stopped.
11     Q.   Who stopped you?
12     A.   The hospital risk management.
13     Q.   So you at some point decided
14  you want to look at the chart, and risk
15  management asked you not to do that?
16     A.   The very, very first time, yes.
17  I don't remember when was that but was
18  risk management.
19     Q.   Was that when you received some
20  type of summons and complaint regarding
21  this lawsuit?
22     A.   Yes.
23     Q.   After that you knew you were
24  coming here to testify, correct,
25  somewhere before today someone told you

Page 34

L. ALDANA-BERNIER

1
2 have to testify, right?
3    A.   Yes.
4    Q.   In fact this is the second time
5 that you arrived in this room to testify,
6 correct?
7    A.   Yes.
8    Q.   In anticipation of either of
9 those two times, you never reviewed the
10 chart other than the notes you --
11    A.   You're right.
12    Q.   You never reviewed any chart
13 with your handwriting on it prior to
14 today?
15    A.   My handwriting?
16    Q.   Yes.
17    A.   I saw it.
18    Q.   So you read your handwriting or
19 your notes?
20    A.   Yes.
21    Q.   So now you have told me you
22 have read the consult of a resident,
23 psychiatric resident, in the medical ER
24 and the notes in the psychiatric ER?
25    A.   [Indicating.]

Page 35

L. ALDANA-BERNIER

1
2    Q.   And your notes?
3       MR. CALLAN:  Those were her
4    notes, Counsel.  I think that's the
5    confusion.
6       MR. SUCKLE:  I'll clarify.
7    Thank you.
8    A.   Yes.
9    Q.   As your counsel points out, the
10 psych ER notes included your notes?
11    A.   Yes.
12    Q.   Did you make any notes in the
13 chart that you were aware of that were
14 not done in the psych ER?
15    A.   No.
16    Q.   And did you review any other
17 documents in anticipation of coming here
18 to testify?
19    A.   No.
20    Q.   Did you read any transcripts of
21 any testimony prior to today?
22    A.   No.
23    Q.   Did you speak to anybody at
24 Jamaica Hospital regarding preparing for
25 testimony here today?

Page 36

L. ALDANA-BERNIER

1
2    A.   No.
3    Q.   Have you spoken to anybody at
4 Jamaica Hospital --
5       MR. SUCKLE:  Withdrawn.
6    Q.   Have you spoken to anybody at
7 Jamaica Hospital about your care and
8 treatment of Mr. Schoolcraft?
9    A.   No.
10    Q.   How about anybody else's care
11 and treatment of Mr. Schoolcraft?
12    A.   Who?
13    Q.   Have you ever spoken to anybody
14 at Jamaica Hospital about anybody else's
15 care and treatment of Mr. Schoolcraft?
16    A.   No.
17    Q.   Have you spoken to anybody from
18 the New York City Police Department
19 regarding your care and treatment of Mr.
20 Schoolcraft?
21    A.   No.
22    Q.   And just for the record, what
23 is risk management?  You said you spoke
24 to risk management.  What is that?
25    A.   They are the legal department.

Page 37

L. ALDANA-BERNIER

1
2       MR. SUCKLE:  Mark this 69.
3       [The document was hereby marked
4    as Plaintiff's Exhibit 69 for
5    identification, as of this date.]
6       MR. CALLAN:  I'll show you
7    what's been marked as Plaintiff's
8    Exhibit 69.
9       Counsel from Jamaica Hospital,
10    is that the hospital chart provided to
11    you by Jamaica Hospital for Adrian
12    Schoolcraft?
13       MR. RADOMISLI:  Yes.
14    Q.   I will ask you, do you know
15 what this is?
16    A.   That's our record.
17    Q.   When you say "our record," you
18 mean Jamaica Hospital's record?
19    A.   Jamaica Hospital record.
20    Q.   That record is created as part
21 of the business of Jamaica Hospital,
22 correct?
23    A.   Correct.
24    Q.   It's the business of Jamaica
25 Hospital to make that record?

10 (Pages 34 - 37)

Page 38

L. ALDANA-BERNIER

1
2   A.   You're right.
3   Q.   And that record is kept at
4   Jamaica Hospital as part of its regular
5   course of business, correct?
6   A.   Yes.
7   Q.   And entries in this chart were
8   made on or about the dates listed in
9   here?
10  A.   Yes.
11  Q.   Is this the record that you had
12  access to review prior to testifying here
13  today?
14  A.   Yes.
15  Q.   Or a copy of it?
16  A.   Or the copy, yes.
17  Q.   But you did have a chance to
18  review this original record here today
19  prior to testifying?
20  A.   Yes, when I came in here.
21  Q.   Can you tell me from your
22  review of the record before we go through
23  the record, generally what was your role,
24  if at all, was with regard to the care
25  and treatment of Mr. Schoolcraft?

Page 39

L. ALDANA-BERNIER

1
2   A.   What was my role in the care?
3   Q.   Yes.
4   A.   My role was I as soon as I came
5   to the emergency room, I had the
6   responsibility to go and see every
7   patient that was left over under my care
8   and Mr. Schoolcraft was one of them so I
9   had to, like, every other patient go and
10  see him, speak to him, evaluate him.
11  Q.   Evaluate him?
12  A.   Yes.
13       And then I have to read the
14  notes of the initial doctor who was the
15  resident that saw the patient. I have to
16  assess that note, and make my decision if
17  needed to be admitted.
18  Q.   In your training as a nurse,
19  did you learn about the creation of
20  hospital records?
21  A.   Did I what?
22  Q.   Did you learn about how to make
23  hospital records in your training as a
24  nurse?
25  A.   How to make hospital records?

Page 40

L. ALDANA-BERNIER

1
2   Q.   Yes.
3   A.   Yes.
4   Q.   Did you also learn how to make
5   hospital records during your training as
6   a physician?
7   A.   Yes.
8   Q.   And as a resident, did you
9   learn about how to make hospital records?
10  A.   Yes.
11  Q.   How about Kings County, did you
12  learn there about how to make hospital
13  records?
14  A.   Yes.
15  Q.   And the same for Coney Island
16  Hospital, correct?
17  A.   Yes.
18  Q.   And Jamaica Hospital as well?
19  A.   Yes.
20  Q.   In fact do you know what the
21  purpose of creating a hospital record is?
22  A.   That's to keep a file on the
23  patient.
24  Q.   Is that just to have a file, or
25  is there a medical purpose for creating a

Page 41

L. ALDANA-BERNIER

1
2   hospital record?
3   A.   Yes, a medical purpose for the
4   file to ascertain that the patient was in
5   that place when he was treated.
6   Q.   Just to know whether or know he
7   was physically in the place?
8   A.   It's a medical record of the
9   patient, complete medical record of the
10  patient.
11  Q.   When you say "complete medical
12  record," it's supposed to show the
13  treatment of a patient at a facility?
14  A.   Treatment, treatment plan, and
15  discharge plan.
16  Q.   If there is an evaluation of
17  the patient, the records are required to
18  have details of that evaluation, correct?
19  A.   Yes.
20  Q.   If there is an examination of
21  the patient, it's required to create
22  notes regarding that --
23       MR. CALLAN:  Objection.
24  A.   Yes.
25  Q.   Does good and accepted medical

11 (Pages 38 - 41)

Page 42

L. ALDANA-BERNIER

1 practice require when a physician
2 examines a patient they make a note of
3 that examination?
4 A.  Yes.
5 Q.  Does good and accepted medical
6 practice require when a physician makes
7 an evaluation of the patient, they need
8 to make a note of that evaluation?
9 A.  Yes.
10 Q.  And why do physicians make
11 notes of their examinations of patients
12 in hospital charts?
13 A.  Why do we make notes?
14 Q.  Yes.
15 A.  We have to make notes to make
16 sure that we have seen the patient, that
17 we have assessed what we are supposed to
18 be doing for the patient, and to make
19 sure there is a record that the patient
20 was assessed and evaluated and treated;
21 that's why we do it.
22 Q.  Isn't it also important to note
23 in the records either your examinations
24 or evaluation of a patient so that in the

Page 43

L. ALDANA-BERNIER

1 future someone else can read those
2 evaluations and examinations and
3 understand what took place?
4 A.  You're right.
5 Q.  You know in medicine sometimes
6 you are not the last physician to see a
7 patient, correct?
8 A.  That's right.
9 Q.  Especially in a hospital
10 setting?
11 A.  That's correct.
12 Q.  Sometimes you will evaluate or
13 see a patient and other physicians will
14 see a patient and evaluate them, correct?
15 A.  Yes.
16 Q.  And you know that other
17 physicians may want to review what
18 happened in the past, correct?
19 A.  That's correct.
20 Q.  That's one of the reasons for
21 creating a hospital record and notes in
22 the hospital, correct?
23 A.  That's correct.
24 Q.  In fact you testified that you

Page 44

L. ALDANA-BERNIER

1 went back and read some previous notes
2 that other physicians made in Mr.
3 Schoolcraft's chart during your care and
4 treatment of him, correct?
5 A.  That's correct.
6 Q.  It's important for you to have
7 notes from other physicians so you know
8 what their evaluations were, correct?
9 A.  That's correct.
10 Q.  Also to know what their
11 examinations were?
12 A.  That's correct.
13 Q.  And to know what they base
14 their examinations and evaluations on,
15 correct?
16 A.  That's correct.
17 Q.  The only way to know that would
18 be to read the chart and see what is
19 written down, correct?
20 MR. RADOMISLI:  Objection to
21 form.
22 A.  That's correct.
23 Q.  When you went and evaluated Mr.
24 Schoolcraft, did you actually speak to

Page 45

L. ALDANA-BERNIER

1 the residents that had written the notes
2 that you just described?
3 A.  I did not speak to the
4 residents.  I read his notes.
5 Q.  You relied on the records to
6 determine what previously had taken place
7 with Mr. Schoolcraft; is that what you're
8 saying?
9 A.  I read his notes.  I had to go
10 see the patient.
11 Q.  Do you know whether or not any
12 physician reviewed any of your records
13 after you treated Mr. Schoolcraft?
14 A.  I do not know if they reviewed
15 my records.
16 Q.  Do you know if they did?
17 A.  I'm sure they go and read the
18 notes.
19 Q.  When you examine a patient in
20 the psychiatric ER, is that a physical
21 examination, psychiatric examination, or
22 something else?
23 MR. LEE:  Objection to form.
24 A.  Psychiatric evaluation.

12 (Pages 42 - 45)

Page 46

L. ALDANA-BERNIER

1
2    Q.   Did you in October 2009 or
3 November 2009 have a standard practice
4 how you did a psychiatric examination?
5    A.   Yes, yes. Evaluate the patient
6 and get the history of present illness
7 and the past history and then you do a
8 mental status exam.
9    Q.   So you do history, past
10 history, and mental status exam?
11    A.   Yes.
12    Q.   And the history is gotten by
13 asking the patient questions?
14    A.   Yes.
15    Q.   And any other way that you get
16 the history?
17    A.   It's just through interaction.
18    Q.   With the patient?
19    A.   With the patient, yes.
20    Q.   So you ask a question, the
21 patient answers, so you get the history?
22    A.   Yes.
23    Q.   How about the past medical
24 history, same thing?
25    A.   Yeah, it's history, present

Page 47

L. ALDANA-BERNIER

1
2 illness, past history, past medical
3 history, and the mental status exam.
4    Q.   Everything but the mental
5 status exam is done by asking the patient
6 questions, getting answers, and writing
7 it down?
8    A.   Yes.
9    Q.   Why did you write those things
10 down?
11    A.   For records so that somebody
12 else when the next doctor comes will be
13 able to read the notes.
14    Q.   What is a mental status exam?
15    A.   A mental status exam is --
16 entails different questions like testing
17 cognitive function.
18    Q.   Conative function?
19    A.   Yes.
20       Testing his abstraction,
21 testing his thought process, testing the
22 thought content whether there is a
23 delusion, there is a hallucination, if he
24 was suicidal or homicidal; also includes
25 visual assessment which is looking at his

Page 48

L. ALDANA-BERNIER

1
2 appearance and also assessing his speech
3 and assessing his insight and judgment.
4    Q.   This is how you do your mental
5 status exam on all the psychiatric
6 patients --
7    A.   Yes.
8    Q.   You do your own examination,
9 correct?
10    A.   Yes.
11    Q.   Let's go to testing conative
12 functioning, how do you do that?
13    A.   Testing orientation, checking
14 his memory.
15    Q.   And you ask him questions?
16    A.   Yes.
17    Q.   You did a mental status
18 examination on Mr. Schoolcraft, right?
19    A.   Yes.
20    Q.   You asked him questions about
21 his memory, correct?
22    A.   We do that on all our patients.
23    Q.   You did that on Mr.
24 Schoolcraft, correct?
25    A.   We do it on all of our

Page 49

L. ALDANA-BERNIER

1
2 patients. I may have done on Mr.
3 Schoolcraft.
4    Q.   Any other things that you do
5 with regard to conative function in your
6 mental status examination?
7    A.   Usually the orientation and the
8 memory.
9    Q.   When you say "orientation,"
10 what do you mean?
11    A.   Asking what date is it today,
12 where are you right now, if he is aware
13 of his surrounding, where he was.
14    Q.   And good and accepted medical
15 practice requires you to perform this
16 mental status examination of his
17 cognitive functioning, correct?
18    A.   That's correct.
19    Q.   And to make a note of your
20 findings, correct?
21    A.   Correct.
22    Q.   And make a note of your
23 examination of his cognitive functioning,
24 correct?
25    A.   That's correct.

13 (Pages 46 - 49)

Page 50

1       L. ALDANA-BERNIER
2     Q.   You indicated obstruction
3 [sic], what is that?
4     A.   Trying to test the intellectual
5 capacity by giving problems or decision
6 making if you give a situation.
7     Q.   Did you perform this part of
8 the mental status examination on Mr.
9 Schoolcraft?
10    A.   We do that in all of our
11 patients. I may have done it
12 [indicating].
13    Q.   So you did it with Mr.
14 Schoolcraft?
15    A.   Yes.
16    Q.   He is one of your patients,
17 correct?
18    A.   Yeah.
19    Q.   And does good and accepted
20 medical practice require you perform this
21 obstruction [sic] test --
22        MR. CALLAN:  Objection.
23        MR. RADOMISLI:  Objection.
24    Q.   -- mental status examination?
25        MR. CALLAN:  Objection to the

Page 51

1       L. ALDANA-BERNIER
2 form of the question.
3        MR. SMITH:  It's abstraction.
4 You said obstruction.  Let's rephrase
5 that.
6     Q.   Does good and accepted medical
7 practice require you to perform this
8 abstraction test?
9     A.   Yes.
10    Q.   And to make notes of your
11 findings during that test?
12    A.   Yes.
13    Q.   Thought process, what is that?
14    A.   Thought process.
15    Q.   You said part of the test was
16 thought process?
17    A.   If he was thinking linear, is
18 he goal directed or is he was over --
19 going [sic] disorganized or loose.
20    Q.   Good and accepted medical
21 practice requires you to perform that
22 examination as part of your mental status
23 examination?
24    A.   Yes.
25    Q.   And you make notes of your

Page 52

1       L. ALDANA-BERNIER
2 findings, correct?
3     A.   Yes.
4     Q.   You talked about whether or not
5 part of the mental status examination is
6 whether or not someone is delusional?
7     A.   Yes.
8     Q.   How do you that?
9     A.   Delusional is false belief.
10    Q.   False belief?
11    A.   That's not in agreement with
12 one's culture.
13    Q.   How do you perform that test?
14    A.   You usually ask them or when
15 the patient comes and say somebody
16 running after me, somebody is chasing me,
17 or there is a conspiracy or plot against
18 me; that is a delusional belief, a false
19 belief.
20    Q.   How do you perform that test?
21    A.   They come and tell you.
22    Q.   You ask them?
23    A.   The patient tells you.
24    Q.   Have a conversation?
25    A.   Yes.

Page 53

1       L. ALDANA-BERNIER
2        THE REPORTER:  You have to slow
3 down.
4     Q.   And good and accepted medical
5 practice requires you to make a note of
6 that conversation, correct?
7     A.   Yes.
8     Q.   And to detail what the patient
9 says, correct?
10    A.   Yes.
11    Q.   For each of your patients,
12 correct?
13    A.   Yes.
14    Q.   And you did that with Mr.
15 Schoolcraft, correct?
16    A.   Yes.
17    Q.   Suicidal tendencies, you said
18 that was part of your mental status
19 examination --
20    A.   Yes.
21    Q.   -- what did you mean?
22    A.   We have to ask them if they
23 were suicidal, contemplating, if they are
24 -- if they have a plan.
25    Q.   And does good and accepted

14 (Pages 50 - 53)

Page 54

L. ALDANA-BERNIER
1
2 medical practice require you to make a
3 note of their responses to those
4 questions?
5     A.   Yes.
6     Q.   Did you ask Mr. Schoolcraft
7 those questions?
8     A.   Should have been asked.  I'm
9 sure asked.
10    Q.   Should have been asked?
11    A.   We ask for every patient.
12    Q.   So you asked it of Mr.
13 Schoolcraft?
14    A.   Yes.
15    Q.   Did you make a note of his
16 responses?
17        MR. CALLAN:  You can look at the
18 chart.
19        Are you asking from her memory
20 or --
21    Q.   If you recall?
22    A.   I do not recall if I did write
23 it.
24    Q.   But good and accepted medical
25 practice would require you to make a note

Page 55

L. ALDANA-BERNIER
1
2 of his responses to your questions
3 regarding suicidal tendencies?
4     A.   Yes.
5     Q.   How about homicidal tendencies,
6 how do you test for that?
7     A.   When a patient comes and tell
8 you he's has thoughts of hurting anyone,
9 and then you will ask him if he has a
10 plan, if he has a weapon.
11    Q.   Did you do this test on Mr.
12 Schoolcraft?
13    A.   Yes.
14    Q.   Did Mr. Schoolcraft have a plan
15 or a weapon?
16    A.   I will not remember.
17    Q.   Did you make any notes?  Does
18 good and accepted medical practice
19 require you to make a note of Mr.
20 Schoolcraft's responses to your question
21 regarding homicidal tendencies?
22    A.   I will not remember.
23    Q.   Does good and accepted medical
24 practice require you to make that note --
25    A.   Yes.

Page 56

L. ALDANA-BERNIER
1
2     Q.   -- regarding Mr. Schoolcraft's
3 response regarding homicidal tendencies?
4     A.   Yes.
5     Q.   And good and accepted medical
6 practice requires you to make a note of
7 both suicidal or homicidal
8 representations that the patient makes to
9 you as a physician, correct?
10    A.   Correct.
11    Q.   For every patient that makes
12 representation about a method by which
13 they were going to perform a suicide or a
14 homicide, you would make a note of that,
15 correct?
16    A.   Correct.
17    Q.   Because good and accepted
18 medical practice would require you to
19 make that note, correct?
20    A.   That's correct.
21    Q.   If there is no such note, the
22 patient didn't say it, correct?
23    A.   That's correct.
24    Q.   If the patient did not express
25 a suicidal tendency, you would not make a

Page 57

L. ALDANA-BERNIER
1
2 note of that?
3        MR. CALLAN:  Objection to form.
4        MR. SUCKLE:  I will rephrase it.
5     Q.   If the patient did not express
6 how they were going to perform some type
7 of homicidal act --
8        MR. SUCKLE:  I'm withdrawing
9     that question too.
10    Q.   When a patient expresses a
11 suicidal thought, do you write down the
12 details of that thought in --
13    A.   Yes.
14    Q.   Because good and accepted
15 medical practice requires you to do that,
16 correct?
17    A.   Yes.
18    Q.   And the absence of any note
19 regarding homicidal thought in your
20 records means the patient did not express
21 a homicidal thought, correct?
22    A.   It will say that the patient is
23 not homicidal or they will put a negative
24 sign, a circle.
25    Q.   I'm talking about you in your

15 (Pages 54 - 57)

Page 58

L. ALDANA-BERNIER

1   record.
3   A.   Uh-huh.
4   Q.   When a patient expresses how
5   they intend to commit a homicidal act, do
6   you write down the thought of the patient
7   how they were going to commit the
8   homicidal act?
9   A.   Yes.
10   Q.   When a patient expresses how
11   they are going to commit a suicidal act,
12   do you write down what the patient tells
13   you about how they were going to perform
14   a suicidal act?
15   A.   That's correct.
16   Q.   If there is no note regarding
17   how a patient is going to commit a
18   suicidal act, that means the patient
19   didn't express to you how they were going
20   to commit a suicidal act, correct?
21   A.   Correct.
22   Q.   If there is no note regarding
23   how a patient was planing to commit a
24   homicidal act, that means the patient
25   didn't express to you how they were going

Page 59

L. ALDANA-BERNIER

1   to commit a homicidal act, correct?
3   A.   That's correct.
4   Q.   You have to assess their
5   speech. How do you do that?
6   A.   Characterize the volume and the
7   pitch: Is it soft, is it normal.
8   Q.   And again, good and accepted
9   medical practice requires you as a
10   physician while performing this mental
11   status examination to make a note
12   regarding the assessment of speech,
13   correct?
14   A.   That's correct.
15   Q.   Did you have access to Mr.
16   Schoolcraft's entire chart when you first
17   saw him?
18       Did you understand the
19   question.
20   A.   Yes.
21   Q.   Physically, this chart we now
22   have as Exhibit 69 in some form was fully
23   accessible to you in the psychiatric
24   emergency room when you saw Mr.
25   Schoolcraft, correct?

Page 60

L. ALDANA-BERNIER

2       MR. CALLAN:  Objection to form.
3       MR. SMITH:  Objection to form.
4       There is a timing issue.
5   Q.   Was Mr. Schoolcraft's medical
6   chart as it existed at the time that you
7   saw him available to you at Jamaica
8   Hospital's emergency room?
9   A.   Yes.
10   Q.   Did you have physically Mr.
11   Schoolcraft's chart in your presence when
12   you evaluated him?
13       MR. CALLAN:  She already said
14   yes to that, Counsel.
15       MR. SMITH:  I don't think she
16   did.
17   Q.   Did you have it in your
18   presence when you evaluated him?
19   A.   I saw it before I saw him.
20   Q.   Where were the charts keep in
21   this psychiatric emergency room at least
22   as it was in November 2009?
23   A.   It's usually in the nursing
24   station.
25   Q.   Are you familiar with the

Page 61

L. ALDANA-BERNIER

2   policies and procedures for Jamaica
3   Hospital with regard to the use of
4   restraints as they existed in 2009?
5   A.   Yes.
6   Q.   What is your understanding of
7   that?
8   A.   A restraint a usually applied
9   on a patient who is a danger to himself
10   or a danger to the other patients or
11   someone is very agitated, aggressive, or
12   violent.
13       They usually come in soft
14   restraint, four-point restraints usually
15   applied for two hours, and then staff has
16   to go monitor those restraints every 15
17   minutes to make sure there is no
18   impairment of circulation.
19   Q.   You described a type of
20   restraint. I missed what you said.
21   A.   Soft restraint.
22   Q.   What is a soft restraint?
23   A.   They are not leather.  They
24   were like Velcro, like bandages, so that
25   they wouldn't be very constricting to the

16 (Pages 58 - 61)

Page 62

L. ALDANA-BERNIER

1       L. ALDANA-BERNIER
2  hand or the wrist of the patient.
3       Q.   Are those the only type of
4  restraints that Jamaica Hospital used in
5  2009?
6       A.   Yes.
7       Q.   And who makes the decision
8  regarding whether or not restraints are
9  to be applied to a patient?
10      A.   When the doctor is not present,
11 any nursing staff that's there can make a
12 decision if the patient should be
13 restrained.
14          What they do is call the doctor
15 and they will tell the doctor that a
16 patient is going to be restained, and in
17 30 minutes that doctor has to go and
18 check the patient.
19      Q.   When a patient was brought in
20 in handcuffs at Jamaica Hospital in 2009,
21 was there a procedure for assessment as
22 to whether or not that person should be
23 put into hospital restraints or not?
24      A.   Repeat that again.
25      Q.   Sure.

Page 63

L. ALDANA-BERNIER

1       L. ALDANA-BERNIER
2          When a patient was brought into
3  the hospital, Jamaica Hospital, in
4  handcuffs in 2009, was there a hospital
5  procedure for determining whether or not
6  that patient should be put in the soft
7  restraints that you described?
8       A.   Depends on the case.  If the
9  patient is in handcuffs taken to our
10 emergency room and the patient is
11 agitated or violent and a danger to that
12 community of the ER, then he will have to
13 be restained.  We usually restrain those
14 kind of patients, violent patients.
15      Q.   When a violent patient comes in
16 in handcuffs, they were then placed into
17 the soft restraints, correct?
18      A.   Yes.
19      Q.   Why is that?
20      A.   If they are violent, if we see
21 them as a potential danger, then we have
22 to restrain them.
23      Q.   Are the only appropriate
24 restraints to be used at Jamaica Hospital
25 in 2009 the soft restraints that you have

Page 64

L. ALDANA-BERNIER

1       L. ALDANA-BERNIER
2  been describing?
3          MR. RADOMISLI:  Objection to
4     form.
5          MR. CALLAN:  I join the
6     objection.
7       Q.   Does good and accepted medical
8  practice require when a patient was
9  brought in in handcuffs that the hospital
10 replace those handcuffs with soft
11 restraints in 2009?
12          MR. RADOMISLI:  Objection to
13    form.
14      A.   Not all handcuffs are soft
15 restraints.  I'm trying to say if we
16 think they were violent and a danger or
17 if they are going to be destructive, we
18 have to put them in restraints.
19      Q.   When you say not all handcuffed
20 people are put in restraints, are all
21 people that need to be restrained removed
22 from handcuffs and put into soft
23 restraints?
24      A.   If they were violent.
25      Q.   How soon after admission in

Page 65

L. ALDANA-BERNIER

1       L. ALDANA-BERNIER
2  handcuffs should the patient be put into
3  soft restraints?
4       A.   They go through triage.  If
5  triage assess the patient and they assess
6  that the patient needs to be on
7  restraints because they were violent, as
8  soon as they come into the emergency
9  room, we have to take off the handcuffs
10 and put them on four-point restraints.
11      Q.   Why is that?
12      A.   Because they are dangerous.
13 That's after the assessment.  If we know
14 they are dangerous, we have to put them
15 on restraints.
16      Q.   Am I correct once a patient is
17 brought into Jamaica Hospital in
18 handcuffs and they become a patient of
19 the hospital, physicians are going to
20 make decisions about restraints and the
21 type of restraints to be used, correct?
22      A.   Yes.
23      Q.   Not the police officers,
24 correct?
25      A.   No, they don't have a role.

17 (Pages 62 - 65)

Page 66

L. ALDANA-BERNIER
1
2    Q.    When you say "they don't have a
3 role," what do you mean?
4    A.    They don't have a role in
5 deciding if our patient should be
6 restrained or not.
7    Q.    If a patient is handcuff and
8 the hospital wants the handcuffs removed,
9 they should be removed, correct?
10       MR. RADOMISLI:  Objection to
11    form.
12       MR. CALLAN:  Objection to form.
13    A.    The handcuffs?
14    Q.    Yes.
15    A.    If we think they have to --
16 clarify that.  There are many, many -- go
17 ahead.  Can you clarify it?
18       MR. SUCKLE:  We will move onto
19    something else.
20    Q.    Did you have any role in
21 writing any written rules or regulations
22 with regards to restraints at Jamaica
23 Hospital?
24    A.    Do I have a role -- I may have
25 sit in in one of those sessions, yes.

Page 67

L. ALDANA-BERNIER
1
2    Q.    As a medical provider, your
3 concern is for the patient's health,
4 correct?
5    A.    Yes.
6    Q.    Did you in reviewing the chart
7 -- how many times did you actually speak
8 to Mr. Schoolcraft?
9    A.    I speak to him once when I came
10 in.
11       MR. SMITH:  I'm sorry, what?
12       THE WITNESS:  When I came in.
13    Q.    When you say when you came in,
14 when your shift started?
15    A.    Yes.
16    Q.    It's your understanding Mr.
17 Schoolcraft was already in the hospital
18 when your shift started?
19    A.    Yes.
20    Q.    Do you know how many other
21 patients were under your care when you
22 first started that shift at the
23 psychiatric emergency room besides Mr.
24 Schoolcraft?
25    A.    I do not know.  2009 we usually

Page 68

L. ALDANA-BERNIER
1
2 have a 13-bed capacity.  It's always full
3 so I wouldn't know how many patients were
4 there.
5       MR. SMITH:  Did she say 30 beds?
6       THE WITNESS:  Thirteen.
7    Q.    Am I correct that the first
8 time that you encountered Mr. Schoolcraft
9 he was in the psychiatric emergency room,
10 correct?
11    A.    That's correct.
12    Q.    I will show you what's been
13 marked Plaintiff's Exhibit 69 for today's
14 date.  I will ask you, can you turn to
15 the first entry that you made in this
16 chart.
17       [Witness complying.]
18    A.    [Indicating.]
19    Q.    And you pulled out a note, what
20 is the date of that note?
21    A.    That was on November 2nd, 2009,
22 three o'clock in the morning.
23    Q.    Do you know what your shift was
24 that day?
25    A.    My shift was from eight to

Page 69

L. ALDANA-BERNIER
1
2 four.
3    Q.    And are you familiar with the
4 any laws or rules regarding patients
5 being held in psychiatric emergency rooms
6 or hospital against their will?
7       MR. RADOMISLI:  Objection to
8    form.  Can I just see that?
9       MR. CALLAN:  [Handing.]
10    A.    Clarify that.
11       MR. SMITH:  Can I see that too?
12       MR. CALLAN:  Let's get the notes
13 straightened out.
14    Q.    Just as a clarification, you
15 said you made this note at three a.m.?
16    A.    That's p.m.
17    Q.    When did your shift start?
18    A.    From eight to four.
19       MR. SMITH:  A.m. or p.m.?
20    Q.    8 a.m. to 4 p.m.?
21    A.    Yes.
22    Q.    Are you familiar with any rules
23 in the Mental Hygiene Law for admitting
24 patients against their will?
25    A.    Yes, the involuntary admission.

18 (Pages 66 - 69)

Page 70

L. ALDANA-BERNIER

2 MR. SUCKLE: Let me put a thing
3 there so you don't lose it.
4 MR. LEE: I didn't hear anything
5 you just said.
6 MR. CALLAN: His said he's
7 putting a marker in the chart so she
8 doesn't lose her place.
9 Q. What do you know of that law?
10 A. That is where two doctors will
11 commit the patient, or we have the 9.39
12 which is the emergency admission.
13 Q. What was the first one?
14 A. Involuntary, that would be the
15 9.27, and emergency admission is the
16 9.39.
17 Q. What is 9.27, what does that
18 mean?
19 A. Involuntary admission.
20 Q. That's somebody going to be
21 involuntarily admitted for how long?
22 A. After 48 hours, that depends if
23 the patient is not better, they can be
24 kept until six months.
25 Q. So 9.39 of the Mental Hygiene

Page 71

L. ALDANA-BERNIER

2 Law, what is that?
3 A. Emergency admission to the
4 hospital which is also involuntary.
5 Q. In order for a patient to be
6 involuntarily admitted to a hospital, are
7 you familiar with the procedure that must
8 take place?
9 A. Yes.
10 Q. Did you learn about this in
11 your training at Jamaica Hospital?
12 A. At Metropolitan Hospital.
13 Q. And you have been familiar with
14 that since your training at Metropolitan
15 Hospital?
16 A. Yeah.
17 Q. Have you ever had to use that
18 involuntary -- that 9.39 of the Mental
19 Hygiene Law to admit a patient?
20 A. Yes.
21 Q. How many times have you done
22 that in your career?
23 A. Many times.
24 Q. When you say "many," give me an
25 idea how many is many?

Page 72

L. ALDANA-BERNIER

2 A. At that time I used to see
3 3,000 patients a year, most likely 2,000
4 patients. I'm giving you a....
5 MR. SMITH: Can you read that
6 back.
7 [The requested portion of the
8 record was read.]
9 A. An approximation.
10 Q. Is that 2,000 patient a year?
11 A. Two thousand patients a year.
12 Q. You used Section 9.39 of Mental
13 Hygiene Law to admit patients against
14 their will 2,000 times in the year 2009,
15 correct?
16 A. Most likely, yes.
17 Q. The 2,000 per year, has that
18 basically been about how many you have
19 admitted per year while you work at
20 Jamaica Hospital to date?
21 A. Cannot recall. It's hard to
22 say.
23 Q. This is a regular occurrence in
24 your practice?
25 MR. CALLAN: Objection to the

Page 73

L. ALDANA-BERNIER

2 form of the question.
3 Q. Do you understand my question?
4 A. [No response.]
5 Q. Do you understand my question?
6 A. Say it again.
7 Q. Sure.
8 Admitting a patient pursuant to
9 9.39 of the Mental Hygiene Law is a
10 regular part of your practice, correct?
11 A. Yes, when I was in the
12 emergency room.
13 Q. And does your understanding of
14 9.39 of the Mental Hygiene Law, does that
15 apply to any admission at Jamaica
16 Hospital or just the psychiatric
17 emergency room?
18 A. Just the psychiatric emergency
19 room.
20 Q. So a patient can be held
21 against their will in the
22 medical emergency --
23 MR. RADOMISLI: Objection to
24 form.
25 MR. LEE: Objection to form.

19 (Pages 70 - 73)

Page 74

L. ALDANA-BERNIER

1
2      MR. CALLAN:  I join in the
3  objection.
4      Q.   Without complying with 9.39 --
5      MR. CALLAN:  Objection.
6      Q.   Is that your understanding?
7      A.   I could admit them
8  involuntarily, yes.
9      Q.   So a patient can be admitted
10  pursuant to 9.39 of the Mental Hygiene
11  Law in the medical emergency room,
12  correct?
13      A.   In the medical emergency room?
14      MR. CALLAN:  Objection to the
15  form of the question.
16      Q.   Yes.
17      MR. CALLAN:  You can answer.
18      THE WITNESS:  I can answer?
19      MR. CALLAN:  Yes.
20      A.   If the patient is in the
21  medical ER and we know that the patient
22  needs to be transferred to the
23  psychiatric ER, then we have to move them
24  from the medical ER to the psychiatric
25  ER.

Page 75

L. ALDANA-BERNIER

1
2      Q.   If someone is in the medical
3  emergency room --
4      A.   Yes.
5      Q.   -- are they free to leave?
6      A.   From the medical ER?
7      Q.   Yeah.
8      A.   But that depends, yes.
9        If the medical doctor calls for
10  an evaluation or assessment for a
11  psychiatric patient, if the psychiatric
12  doctor deems the patient -- that the
13  patient needs to be transferred to the
14  psychiatric ER, they were not free to
15  leave.  They have to come to the
16  psychiatric ER.
17      Q.   So it's your understanding a
18  patient in the medical ER can be held
19  until transferred to the psych ER for the
20  purposes of then being evaluated at some
21  point in the psych ER under Section 9.39
22  of the Mental Hygiene Law; is that your
23  understanding?
24      MR. LEE:  Objection to form.
25      MR. RADOMISLI:  Objection.

Page 76

L. ALDANA-BERNIER

1
2      MR. CALLAN:  Same objection.
3      A.   A psychiatrist will go to the
4  medical ER, he will assess the patient.
5  He already assessed and evaluated.  The
6  psychiatrist will say once medically
7  cleared, transfer the patient to the
8  psych ER.  So then the patient will be in
9  the psych ER.
10      Q.   When a patient is in the
11  medical ER --
12      A.   Yes.
13      Q.   -- and they want to go home,
14  can they go home?
15      A.   It depends.  If a medical
16  issue, yes.  If medically cleared they
17  want to go home, they go home.
18        If a psychiatric issue and the
19  psychiatrist will say send to the psych
20  ER, then cannot go home.  They have to
21  come to the psych ER for further
22  stabilization or further assessment.
23      Q.   Under what standard or law,
24  rule or regulation can a person be held,
25  to your understanding, in the medical

Page 77

L. ALDANA-BERNIER

1
2  emergency room pending transfer to the
3  psych emergency room?
4      A.   If you are referring to that,
5  there is no 9.39 or 9.27 or 9.13.
6        If we know that the patient
7  needs to come to psychiatry, we have to
8  transfer the patient to psychiatry.
9      Q.   Am I correct that the only way
10  a hospital can hold a patient based upon
11  a psychiatric problem is under 9.39 if
12  that patient wants to go home?
13      MR. LEE:  Objection to form.
14      MR. CALLAN:  Objection to form.
15      MR. RADOMISLI:  Objection to
16  form.
17      A.   Rephrase your question.
18      Q.   Sure.  I will rephrase it.
19        You say when a person is in the
20  medical emergency room, they can be held.
21  What does that mean?
22      A.   If let's say the medical doctor
23  will ask for a consult, he needs a psych
24  consult because let's say that patient is
25  behaving bizarre or may be agitated in

20 (Pages 74 - 77)

Page 78

1        L. ALDANA-BERNIER
2  the ER or if they have a past history of
3  psychiatric illness, then that doctor
4  will call for a psychiatrist to come and
5  see the patient.
6        If the psychiatrist thinks that
7  the patient needs to be transferred to
8  the psychiatric department, then we can
9  hold the patient and transfer that
10 patient to the psychiatric unit.
11    Q.    Under what regulation, rule, or
12 standard can you hold the patient that
13 you're aware of that you just described?
14    A.    There is no 9.39, it's the
15 decision of the psychiatrist to transfer.
16 That's the medical ER.  Usually, in the
17 medical ER you cannot handle the patient
18 that has all of these symptoms that I was
19 talking about:  bizarre behavior,
20 violent, unpredictable, delusional.
21       They can't handled those types
22 of patients.  They tend to transfer that
23 patient to the psychiatric unit for
24 further stabilization of the psychiatric
25 problem.

Page 79

1        L. ALDANA-BERNIER
2    Q.    I'm going to ask my question
3  again.  Maybe I'm not being clear.
4        Under what rules, standard, or
5  law can a patient be held in a medical
6  emergency room pending transfer to the
7  psychiatric emergency room for evaluation
8  of the Mental Hygiene Law 9.39, if you
9  are aware of any?
10    A.    I'm not aware of any.
11    Q.    Am I correct that Section 9.39
12 of the Mental Hygiene Law as you
13 understand it must be complied with in
14 order to hold a patient for psychiatric
15 reasons against their will?
16       MR. LEE:  Objection to form.
17    A.    That is for when you admit the
18 patient?
19    Q.    Yes.
20    A.    9.39.
21    Q.    That's your understanding?
22    A.    Yes, that's against the rule,
23 yes.
24    Q.    What is required by Section
25 9.39 of the Mental Hygiene Law as you

Page 80

1        L. ALDANA-BERNIER
2  understand it in order to admit a patient
3  against their will under that section?
4    A.    If we know that the patient
5  need admission because they are a danger
6  to themselves or a danger to society; if
7  they are psychotic and not able to take
8  care of themselves; if they were
9  depressed; if they were suicidal, then we
10 make that decision that the patient needs
11 to be admitted even if it's against their
12 will.
13    Q.    This assessment that you just
14 said has to be made, is that the kind of
15 assessment we talked about earlier:  the
16 mental status examination?
17    A.    Yes.  Yes.
18    Q.    And when a person is depressed,
19 when you say they could be held, what do
20 you mean?
21    A.    They could be held?
22    Q.    Yeah, because they are
23 depressed?
24    A.    When they were depressed and
25 not able to take care of themselves, then

Page 81

1        L. ALDANA-BERNIER
2  that would be considered also a danger to
3  themselves because they were depressed.
4  They are not functioning, not eating.
5  They could be suicidal.  They were not
6  maybe functioning, to bare minimum.  They
7  are not sleeping, not eating.  This is
8  also considered a danger to themselves so
9  they have to be admitted.
10    Q.    Are there certain procedures
11 that must be followed in order to comply
12 with 9.39 as you understand it?
13    A.    Patient not able to take care
14 of themselves then we are supposed to
15 admit these patients.
16    Q.    As a physician are there
17 certain things that you are supposed to
18 do in order to comply with Section 9.39
19 of the Mental Hygiene Law as you
20 understand it?
21    A.    Yes, I have to admit this
22 patient.  They are depressed.
23    Q.    That's all you have to do is
24 admit them?
25    A.    I have to admit them, observe

21 (Pages 78 - 81)

Page 82

```
1        L. ALDANA-BERNIER
2  them, stabilize them, medicate them.
3     Q.   Anything else that you have to
4  do?
5     A.   Anything else.  I have to
6  stabilize, medicate.  I have to admit.  I
7  have to obtain information from previous
8  records.
9     Q.   What kind of previous records,
10 you mean the hospital records?
11    A.   Yes.  If they have a
12 psychiatrist, I have to call them.
13    Q.   If they have a psychiatrist,
14 you have to call them?
15    A.   If they have a psychiatrist,
16 yes.
17    Q.   What about any other doctor, do
18 you have to call those doctors?
19    A.   Only the psychiatrist.
20        If they say they want us to
21 call their medical doctor, yes, we call
22 their medical doctor.
23    Q.   Did you have to fill out any
24 form?
25    A.   Yes, release of information,
```

Page 83

```
1        L. ALDANA-BERNIER
2  yes.
3     Q.   In order to comply with Section
4  9.39 of the Mental Hygiene Law, you have
5  to fill out a release of information
6  form?
7     A.   I have to go back.  I'm sorry.
8        In the emergency room, we do
9  not get release of information, only in
10 the inpatient unit.
11    Q.   Did you ever fill out any form
12 in order to comply with Section 9.39 of
13 the Mental Hygiene Law, as you understand
14 it?
15    A.   Just those forms, the 9.39
16 form.
17    Q.   What are those forms for?
18    A.   Those are legal forms.
19    Q.   What is the purpose of those
20 legal forms, do you know, as you
21 understand it?
22    A.   The purpose of those legal
23 forms is just for the reason that you
24 think:  if the patient is a danger to
25 himself and that he needs to be
```

Page 84

```
1        L. ALDANA-BERNIER
2  stabilized in a hospital.
3     Q.   It's for your own benefit?
4     A.   No.
5        MR. CALLAN:  Objection to form.
6  You're recharacterizing her answers.
7        MR. SUCKLE:  I'm asking.
8     A.   It's not for my benefit.
9     Q.   Whose benefit is it for?
10    A.   For the benefit of the whole
11 society as well as the patient and whole
12 society.
13    Q.   Is it important to be accurate
14 in your recordkeeping in a hospital
15 chart?
16    A.   Repeat the question.
17    Q.   Is it important to be accurate
18 in your recordkeeping and note keeping in
19 a hospital chart?
20    A.   Yes.
21    Q.   As a physician?
22    A.   Yes.
23    Q.   Why?
24    A.   It's for the sake of patient.
25        MR. SUCKLE:  Do you need to take
```

Page 85

```
1        L. ALDANA-BERNIER
2  a break?
3        THE REPORTER:  No.
4        MR. SMITH:  Let's take a break.
5        We are going off the record at
6  11:51.
7        [Discussion held off the
8  record.]
9        [Whereupon, at 11:51 a.m., a
10 recess was taken.]
11        [Whereupon, at 12:13 p.m., the
12 testimony continued.]
13        MR. SMITH:  Back on the record
14 12:13.
15    Q.   Doctor, you had indicated to us
16 your first note in the chart was November
17 2nd, 2009, at 3:10 p.m.
18        And do you know whether or not
19 the patient had been evaluated from a
20 psychiatric prospective at any time prior
21 to your note?
22    A.   You're asking me if --
23    Q.   I'm asking do you know whether
24 or not the patient had to be evaluated
25 from a psychiatric prospective at any
```

22 (Pages 82 - 85)

Page 86

L. ALDANA-BERNIER

1
2 time prior to November 2, 2009, at any
3 time before you made your note?
4    A.   Yes.
5    Q.   Did you review the chart of Mr.
6 Schoolcraft prior to seeing him on
7 November 2nd, 2009, at 3:10 p.m.?
8    A.   Yes.
9    Q.   Why did you do that?
10   A.   To be able to know the patient
11 and see what's going on and get
12 information about the patient.
13   Q.   And when for the first time did
14 anybody do any kind of psychiatric
15 examination or assessment of Mr.
16 Schoolcraft in Jamaica Hospital that
17 you're aware of?
18   A.   That is when he was in the
19 medical ER.
20   Q.   And did you see a note of that
21 evaluation?
22   A.   Yes, it's here [indicating].
23   Q.   What is the date and time of
24 that note?
25   A.   It's 11/1/2009 at 6:30 in the

Page 87

L. ALDANA-BERNIER

1
2 morning.
3         MR. LEE:  At what time?
4         THE REPORTER:  6:30 in the
5 morning.
6         MR. SUCKLE:  Just give me a
7 second.
8         MR. SMITH:  Did you see 11/1?
9         THE WITNESS:  Yes, 11/1/2009 at
10 6:30 in the morning.
11   Q.   And this is a note by who?
12   A.   Dr. Lewin.
13   Q.   Spell that?
14   A.   L-E-W-I-N.
15   Q.   It says 1 of 3 on top, correct?
16   A.   Yes.
17   Q.   It's a three-page note,
18 correct?
19   A.   Yes.
20   Q.   And it ends and the three pages
21 end with a note on 11/1/09 at 6:30 a.m.,
22 correct?
23   A.   Yes.
24   Q.   This is called a "Consultation
25 Form."  What is that?

Page 88

L. ALDANA-BERNIER

1
2    A.   When the doctor calls for a
3 consult, this is the form that we use to
4 write our notes.
5    Q.   What was the purpose of having
6 Mr. Schoolcraft evaluated, if you recall,
7 from your review of the chart?
8    A.   Okay.  It said in here that a
9 psych consult was called and reported as
10 patient was acting bizarre.
11   Q.   Did you read this note prior to
12 your evaluation of the patient?
13   A.   Yes.
14   Q.   Is this one of notes that you
15 read prior to coming here to testify in
16 preparation for your testimony today?
17   A.   Yes.
18   Q.   And were you able to read the
19 note, the handwriting, when you read
20 it --
21   A.   Yes.
22   Q.   -- back in 2009?
23   A.   Yes.
24   Q.   Have you seen Dr. Lewin's
25 handwriting before?

Page 89

L. ALDANA-BERNIER

1
2    A.   Yes.
3    Q.   And you had become familiar
4 with it?
5    A.   Yes.
6    Q.   And if you go to the second
7 page of that note, did you see from that
8 note there had been no prior psychiatric
9 history?
10   A.   It says in here, "Denied past
11 psych hospitalization or treatment."
12   Q.   Or suicidal attempt?
13   A.   Yes.
14   Q.   And after this note was
15 written, was Mr. Schoolcraft free to go
16 home?
17   A.   After this note was written,
18 she had recommendations.
19   Q.   I know.  But my question was:
20 Was Mr. Schoolcraft free to go home after
21 that note was written?
22   A.   No.
23   Q.   When you say "no," why not?
24   A.   Because then that was her
25 recommendation he needed one-to-one

23 (Pages 86 - 89)

Page 90

1       L. ALDANA-BERNIER
2  observation for unpredictable behavior
3  and escape risk.
4       Q.   What was he escaping from, what
5  was the escape risk from?
6       A.   He might run out of the
7  emergency room because it's unlocked
8  door.
9       Q.   He needed to be held because he
10 was an escape risk?
11      A.   He needed to be observed more.
12      Q.   He needed to be observed more?
13      A.   One-to-one, yes.
14      Q.   Did you also read in the note
15 on the second page, the last line on the
16 second page where the note reads, "He
17 denies suicidal ideations." Do you see
18 that?
19      A.   Yes.
20      Q.   And "He denies homicidal
21 ideations."
22      A.   Yes.
23      Q.   Do you have any reason when you
24 read that note to believe that wasn't
25 true?

Page 91

1       L. ALDANA-BERNIER
2       MR. LEE:  Objection to form.
3       A.   But you are missing the point
4  in there when he is paranoid about his
5  supervisors.
6       Q.   I asked you whether you had any
7  reason to believe he was not suicidal and
8  not homicidal?
9       A.   I think I need to know further
10 if he was suicidal or homicidal.  At that
11 point in time, I need to assess suicidal
12 or homicidal.
13      Q.   You didn't have enough
14 information by just reading suicidal or
15 homicidal, correct, you needed more
16 information, correct?
17      A.   Yes, it's saying here he was
18 paranoid about his supervisors.
19      MR. CALLAN:  Objection to form.
20      Q.   So he was being held because he
21 was paranoid?
22      A.   Not only that.  He became
23 agitated, uncooperative, verbally abusive
24 while he was in the medical ER so we have
25 to find out why there is agitation, why

Page 92

1       L. ALDANA-BERNIER
2  is was behaving bizarre.
3       Q.   Just so I understand.  He is
4  been held because he is agitated?
5       A.   Yes.
6       MR. CALLAN:  Wait for the
7  question.
8       Q.   He was being held because you
9  want to know more about him, correct?
10      MR. CALLAN:  Objection to form
11 of the question.
12      Q.   Is that correct?
13      MR. CALLAN:  That question
14 doesn't make any sense.  You are
15 talking about --
16      MR. SUCKLE:  You have your
17 objection.
18      Q.   Is that your understanding of
19 the note?
20      A.   There was more to that.  The
21 patient was behaving bizarre.
22      Q.   What action was he taking that
23 was bizarre?
24      A.   According to the note, when
25 they went to his house, the patient

Page 93

1       L. ALDANA-BERNIER
2  barricaded himself and he will not open
3  the door so they had to break into his
4  apartment.
5       Q.   Is it your understanding under
6  9.39 of the Mental Hygiene Law, someone
7  can be held because they are acting
8  bizarre?
9       MR. CALLAN:  Objection to form.
10      MR. LEE:  Objection to form.
11      Q.   Is that your understanding?
12      A.   That's my -- he can be bizarre
13 and he can be psychotic.
14      Q.   The question was:  Is it your
15 understanding of 9.39 of the Mental
16 Hygiene Law that a patient could be held
17 because they're acting bizarre?
18      MR. LEE:  Objection to form.
19      A.   He can be a danger to himself.
20      Q.   You have to answer my question.
21      Can a patient be held under
22 Section 9.39 of the Mental Hygiene Law
23 because they are acting bizarre?
24      A.   Yes.
25      Q.   Can they be held under Mental

24 (Pages 90 - 93)

Page 94

1      L. ALDANA-BERNIER
2 Hygiene Law 9.39, as you understand it,
3 because they are agitated?
4    A.   Yes.
5    Q.   That's your understanding of
6 the law?
7      MR. CALLAN:  Objection to the
8    form of the question.
9    Q.   Correct?
10   A.   [No response.]
11   Q.   Am I correct that's your
12 understanding?
13   A.   My understanding, yes.
14   Q.   So a good and accepted medical
15 practice as you understand it allowed to
16 make a hospital to hold Mr. Schoolcraft
17 on November 1, 2009, 'cause he was acting
18 bizarre, correct?
19     MR. CALLAN:  Objection to form.
20     MR. LEE:  Objection to the form.
21   Q.   Correct?
22   A.   It's not only the behaving
23 bizarre. It's the whole picture that was
24 going on at the time. From the --
25   Q.   Did you see anything in this

Page 95

1      L. ALDANA-BERNIER
2 note that Mr. Schoolcraft was exhibiting
3 a threat to another person?
4    A.   Not a threat to another person.
5    Q.   Did you see anywhere in here
6 that he was suicidal?
7    A.   He is not suicidal.
8    Q.   Did you see anywhere in here
9 that he was going to harm himself in any
10 way?
11   A.   That I have to question if he
12 was going to hurt himself or if he was a
13 danger to himself because if I have
14 somebody in the emergency room, you have
15 a report that he was behaving bizarre or
16 he was agitated, and if I look at the
17 whole picture from the time that he was
18 taken away from his home where he was --
19 he barricaded himself, then I have to
20 consider him to be held against his will.
21   Q.   Did you see anything in this
22 record that Mr. Schoolcraft indicated to
23 the consulting physician that he was
24 going to harm himself?
25   A.   He said in here that he denied

Page 96

1      L. ALDANA-BERNIER
2 that he was going to hurt himself. There
3 is nothing that he was going to hurt
4 himself.
5    Q.   Or hurt anybody else, correct?
6    A.   Nope.
7    Q.   Do you know the physician, the
8 psychiatric resident, that signed that
9 note?
10   A.   That is Dr. Lewin.  The
11 resident was Dr. Lewin, and the attending
12 Dr. Patel.
13   Q.   On the last page of that note,
14 it's a three-page note, is there a stamp
15 there for the resident?
16   A.   Yes.
17   Q.   So Dr. Lewin was a resident?
18   A.   Yes.
19   Q.   And did Dr. Lewin provide any
20 notice to Mr. Schoolcraft under 9.39 of
21 the Mental Hygiene Law?
22     MR. RADOMISLI:  Objection.
23   A.   I would not remember that.
24   Q.   Did Dr. Lewin, from your review
25 of the records, produce any forms, signed

Page 97

1      L. ALDANA-BERNIER
2 any form, under 9.39 of the Mental
3 Hygiene Law in order to admit Mr.
4 Schoolcraft against his will?
5     MR. RADOMISLI:  Objection.
6    Q.   Did you see any form?
7     MR. RADOMISLI:  Objection.
8     MR. CALLAN:  Objection.
9    Q.   Did he fill out any such form?
10    MR. CALLAN:  She is supposed to
11   get into his mind and know what he
12   did?
13    MR. SUCKLE:  Forms, forms, did
14   you see any forms.
15    MR. CALLAN:  Did you see any
16   forms, that's fine.
17    Go right ahead.
18   A.   No.
19   Q.   Is there anything in the file
20 that suggests that Dr. Lewin actually
21 filled out any form with regard to 9.39
22 of the Mental Hygiene Law?
23    MR. RADOMISLI:  Objection.
24   Q.   Anything to suggest that?
25    MR. RADOMISLI:  Objection.

25 (Pages 94 - 97)

1    L. ALDANA-BERNIER
2    Q.   From your prospective?
3        MR. RADOMISLI:  Objection.
4        MR. SUCKLE:  I heard it.
5        MR. RADOMISLI:  I strenuously
6    object.
7        MR. SUCKLE:  I heard your
8    strenuous objection.
9        MR. CALLAN:  Do you want her to
10   look through the entire record?
11   A.   There are no forms.
12   Q.   Did Dr. Lewin, do you see
13   anything to suggest that Dr. Lewin then
14   ensured within 48 hours that another
15   physician evaluated Mr. Schoolcraft?
16       MR. RADOMISLI:  Objection.
17       MR. CALLAN:  Objection.
18   Q.   Does it say anything in there?
19   A.   She indicated in here he needs
20   to be transferred to the psych ER.
21   Q.   And after Dr. Lewin, there is
22   another signature.  Do you know who that
23   is?  Did I ask you that already?
24       In the note of November 1, that
25   Dr. Lewin wrote, underneath his signature

1    L. ALDANA-BERNIER
2    is another signature.  Do you know whose
3    signature that is?
4    A.   That is Dr. Patel.
5    Q.   Did Dr. Patel fill out any form
6    that you are aware of in order to comply
7    with 9.39 of the Mental Hygiene Law?
8        MR. LEE:  Objection to form.
9        MR. RADOMISLI:  Objection.
10       MR. CALLAN:  Same objection.
11   Q.   No?
12   A.   There is no form in here.
13   Q.   There is no form in the record,
14   correct?
15   A.   None.
16   Q.   Did you read Dr. Patel's note
17   at the end there where he signed?
18   A.   "I concur with above doctor's
19   treatment recommendations."
20   Q.   What is psychotic disorder,
21   what is that?
22   A.   Psychotic disorder is one of
23   the categories of diagnosis wherein
24   patient is not in touch with reality.
25       He can have the following

1    L. ALDANA-BERNIER
2    symptoms, like, agitation, aggressive
3    behavior, delusions, hallucinations,
4    impairment in reality testing.
5    Q.   That's a pretty broad category,
6    correct?
7    A.   Yes.
8    Q.   What does Axis I stand for?
9    A.   Those are our DSM categories
10   when we are diagnosing patients.
11       Axis I is for psychotic
12   disorders or mental health disorders.
13   Axis II would be our personality
14   disorder.  Axis III is the medical
15   disorder.  Axis IV is the social
16   stressor.  And Axis V is the global
17   functioning.
18   Q.   So when you read that note, you
19   learned that there was some social
20   stressors; being, a conflict at the
21   worksite for Mr. Schoolcraft, correct?
22   A.   That's correct.
23   Q.   Do you know what the nature of
24   a that conflict was?
25   A.   Something -- a conflict between

1    L. ALDANA-BERNIER
2    his supervisor and himself.
3    Q.   Am I correct that up until this
4    note that nobody at Jamaica Hospital had
5    attempted to admit Mr. Schoolcraft under
6    9.39 of the Mental Hygiene Law, correct?
7        MR. CALLAN:  Objection to the
8    form of the question.
9        MR. LEE:  Likewise.
10   A.   Can you say that again?
11   Q.   Prior to this note of November
12   1, 2009, at 6:30 a.m. and from your
13   review of the records, nobody at Jamaica
14   Hospital had attempted to admit Mr.
15   Schoolcraft under 9.39 of the Mental
16   Hygiene Law up to that point, correct?
17       MR. RADOMISLI:  Objection to
18   form.
19       MR. CALLAN:  Same objection.
20       MR. LEE:  Me too.
21       MR. RADOMISLI:  Can you rephrase
22   the question?
23       MR. SUCKLE:  I think it's
24   perfectly fine.
25       MR. RADOMISLI:  You can say

26 (Pages 98 - 101)

Page 102

1      L. ALDANA-BERNIER
2  prior to.
3      MR. SUCKLE:  I think I just did.
4      MR. RADOMISLI:  No.  You're
5  referring to your note.  You're
6  characterizing the note in a certain
7  way.
8      Q.   Prior to 6:30 on November 1,
9  2009, had anyone at Jamaica Hospital
10 attempted to admit Mr. Schoolcraft
11 pursuant to Section 9.39 of the Mental
12 Hygiene Law?
13     MR. CALLAN:  Objection.  How
14 would she know five years before it
15 happened?  Are you talking about the
16 records she has in front of her?
17     Q.   From your review of the
18 records?
19     MR. CALLAN:  Which record?
20     MR. SMITH:  The record should
21 reflect, the Witness has the entire --
22     MR. SUCKLE:  We've already done
23 this, Counsel.  It's on the record
24 she's reading from Exhibit 69.
25     MR. CALLAN:  You can specify

Page 103

1      L. ALDANA-BERNIER
2  that.
3      MR. SUCKLE:  We were talking
4  about it and she's testified to it.
5      MR. CALLAN:  Just because we
6  were talking about it does not mean
7  that is what a specific question is
8  referring to.
9      MR. SUCKLE:  Every question has
10 been asked about the record she has in
11 front of her.  If you think there is a
12 problem here, we will be asking it
13 that way every time.
14     MR. CALLAN:  There is a way to
15 correctly ask the question.  I'm just
16 asking that you answer it correctly.
17     You can answer if he is talking
18 about this record.
19     MR. SUCKLE:  Of course.
20     Q.   In your review of the record
21 that you have sitting in front of you,
22 has anybody at Jamaica Hospital ever
23 during this admission tried to admit Mr.
24 Schoolcraft pursuant to Section 9.39 of
25 the Mental Hygiene Law?

Page 104

1      L. ALDANA-BERNIER
2      A.   Referring to this admission?
3      Q.   Yes.
4      A.   She want the patient
5  transferred to the psych ER.  That is an
6  admission to the psych ER.
7      Q.   The question is:  Did anybody
8  try to admit Mr. Schoolcraft pursuant to
9  Section 9.39 of the Mental Hygiene Law
10 prior to 6:30 in the morning from your
11 review of Mr. Schoolcraft's chart?
12     A.   This alone is admission to the
13 psych ER, transfer to the psych ER after
14 medical clearance.  From there she
15 admitted the patient to the psych ER.
16     Q.   The question was "did they
17 invoke Section 9.39 of the Mental Hygiene
18 Law at any time prior to 6:30 in the
19 morning?
20     MR. CALLAN:  Objection to the
21 form of the question.
22     MR. RADOMISLI:  Objection to the
23 form.
24     Q.   Did anybody try to admit Mr.
25 Schoolcraft pursuant to 9.39 of the

Page 105

1      L. ALDANA-BERNIER
2  Mental Hygiene Law prior to 6:30 in the
3  morning at Jamaica Hospital based on your
4  view of the Jamaica Hospital chart you
5  have in front of you?
6      A.   Once they transferred to the
7  psych ER, that patient is admitted to the
8  psych emergency room.
9      Q.   Is every patient admitted to
10 the psych emergency room admitted
11 pursuant to Section 9.39?
12     A.   To the emergency room, yes.
13     Q.   So every patient that goes to
14 the psych emergency room is admitted from
15 your understanding pursuant to 9.39 of
16 the Mental Hygiene Law?
17     A.   I think you are using that 9.39
18 in the wrong way.  9.39 is when a patient
19 is admitted to inpatient unit.  When the
20 patient is a transferred to psych ER, we
21 don't use 9.39.
22     If the patient needs further
23 treatment in the psych ER, then we
24 transferred to the psych ER.
25     Q.   So the answer is no, no one

27 (Pages 102 - 105)

Page 106

L. ALDANA-BERNIER

1
2 tried to admit Mr. Schoolcraft pursuant
3 to 9.39 --
4    A.   But you're using it in the
5 wrong way.
6    Q.   I just want to know whether or
7 not anybody tried to admit --
8        MR. CALLAN:  She's answered the
9 question three times.
10       MR. SUCKLE:  No, she hasn't.
11       MR. CALLAN:  What do you think,
12 people get teleported?  They have to
13 be evaluated.
14       MR. SUCKLE:  Keep your
15 objections as to form as the rules
16 require.
17       MR. CALLAN:  You don't seem to
18 get it when an objection to form is
19 made.  She's answered it three times.
20       MR. SUCKLE:  She's not answered
21 it once.
22       THE WITNESS:  That's my answer.
23       MR. CALLAN:  Do you think they
24 teleport --
25       MR. SUCKLE:  No more speaking

Page 107

L. ALDANA-BERNIER

1
2 objections.  Should we just call
3 Justice Sweet?
4        MR. CALLAN:  -- inpatient
5 treatment or do they have to be
6 evaluated?
7        MR. SUCKLE:  You're speaking on
8 the record in violation of the rules.
9        MR. CALLAN:  Make the call.  Be
10 my guest.
11   Q.   Was Mr. Schoolcraft admitted
12 pursuant to 9.39 of the Mental Hygiene
13 Law at any time during his admission to
14 Jamaica Hospital?
15   A.   The patient was transferred to
16 the psych ER.
17   Q.   I know.
18        Was he ever admitted pursuant
19 to Section 9.39 of the Mental Hygiene Law
20 at any time during his admission in
21 October and November 2009 pursuant to
22 Section 9.39?
23   A.   I did it myself when he was in
24 the psych ER.  I made that decision he
25 was admitted.

Page 108

L. ALDANA-BERNIER

1
2    Q.   Are you the first physician
3 that made that decision?
4    A.   Yes, I was.
5    Q.   And is that the first time when
6 you made the decision that somebody
7 attempted to comply with Section 9.39 of
8 the Mental Hygiene Law in order to admit
9 Mr. Schoolcraft?
10       MR. RADOMISLI:  Objection to
11 form.
12   A.   Was it the first time?
13   Q.   Yes.
14        Was your conduct the first
15 effort on behalf of Jamaica Hospital to
16 admit him pursuant to Section 9.39 of
17 Mental Hygiene Law --
18       MR. CALLAN:  Objection to form.
19   Q.   -- per your evaluation?
20   A.   I was the one that did the
21 9.39.
22   Q.   Were there any other
23 evaluations of Mr. Schoolcraft from the
24 psychiatric perspective prior to your
25 note of November 2nd, 2009, at 3:10 p.m.

Page 109

L. ALDANA-BERNIER

1
2    A.   Yes, the notes of 11/1/09 at 12
3 p.m.
4    Q.   Did you review this November 1,
5 2009, 12 p.m. note prior to writing your
6 note on November 2nd, 2009, at 10 p.m. --
7    A.   Yes.
8        MR. CALLAN:  11/1/09 at 12 p.m.
9 is the note.
10   Q.   Did you review this note prior
11 to you writing your note of November 2nd?
12       MR. LEE:  Objection.
13        Off the record.
14        [Discussion held off the
15 record.]
16       MR. SMITH:  Let me shut this
17 off.
18        [Whereupon, at 12:42 p.m., a
19 recess was taken.]
20        [Whereupon, at 12:43 p.m., the
21 testimony continued.]
22       MR. CALLAN:  My client is
23 looking at a page that has at the top
24 11/1/09, time 12 p.m., Jamaica
25 Hospital Medical Center.  She's

28 (Pages 106 - 109)

L. ALDANA-BERNIER

1  L. ALDANA-BERNIER
2  looking at that at the top of the
3  page.
4      Take if from there, Counsel.
5  Q.   The note that counsel described
6  as the first page, do you know how many
7  pages that is in the record?
8  A.   Seven pages.
9  Q.   Is the last page of that note
10  the psychiatrist's name with a stamp Dr.
11  Tariq, is that the last page of that
12  note?
13  A.   Yes.
14  Q.   Who is Dr. Tariq, do you know?
15  A.   He was the resident.
16  Q.   Medical resident, psychiatric
17  resident?
18  A.   Psychiatric resident.
19  Q.   And just since you're on the
20  page, you wrote "disposition," what does
21  that mean?
22  A.   We have to decide whether we
23  hold and stabilize the patient or
24  discharge the patient.
25  Q.   Where was the patient

L. ALDANA-BERNIER

1  L. ALDANA-BERNIER
2  physically: Was he in the medical
3  emergency room?
4  A.   He is in the psych ER.
5  Q.   At this point he was in the
6  psych ER?
7  A.   Yes.
8  Q.   And at this point, what did Dr.
9  Tariq write with regard to disposition?
10  A.   Hold and stabilize.
11  Q.   What does hold mean?
12  A.   When we hold the patient and
13  stabilize the patient.
14  Q.   Was the patient free to leave?
15  A.   No.  It said hold and
16  stabilize.
17  Q.   Was he being held in
18  restraints?
19  A.   Are you asking if the hold is
20  in restraints or was the patient --
21  Q.   Was he physically being
22  restrained at that point?
23  A.   I don't know.
24  Q.   What was physically preventing
25  him from leaving?

L. ALDANA-BERNIER

1  L. ALDANA-BERNIER
2  A.   [No response.]
3  Q.   Were the doors locked?
4  A.   Yes.
5  Q.   So the doors were locked?
6  A.   In the emergency room.
7  Q.   So when you are in the psych
8  emergency room and someone says hold, the
9  doors are locked and you can't get out?
10  A.   It means to say being kept in
11  emergency room for further stabilization
12  and admission.
13  Q.   Had Mr. Schoolcraft desired to
14  leave, he wouldn't be able because the
15  doors are locked, correct?
16  A.   No one can run out of the
17  emergency room.  The doors are locked.
18  Q.   Any other way that Mr.
19  Schoolcraft was being held other than the
20  doors being locked?
21  A.   Hold, I don't know how you are
22  using hold.  Hold is just to keep
23  inpatients in the emergency room for
24  further admission and stabilization.
25  Q.   He wasn't free to go home,

L. ALDANA-BERNIER

1  L. ALDANA-BERNIER
2  correct?
3  A.   Yes.
4  Q.   He was not?
5  A.   He was not discharged.  That's
6  why it says hold and stabilize.
7  Q.   Am I correct Dr. Tariq on the
8  third written page on the second page of
9  the printed form, there is a place called
10  suicide attempts?  Do you see that, there
11  is a line that says, suicide attempts?
12  A.   Suicidal ideations?
13  Q.   Past psychiatric history, under
14  past psychiatric history.
15  A.   Okay.
16  Q.   The box no suicide attempts in
17  the past psychiatric history, correct?
18  A.   That's correct.
19  Q.   Under violence, no history of
20  violence, correct?
21  A.   That's correct.
22  Q.   And in the chart actually
23  immediately adjacent page actually the
24  back of one of the forms, Dr. Tariq has
25  written in the last paragraph, "Patient

29 (Pages 110 - 113)

Page 114

1     L. ALDANA-BERNIER
2 denies recent suicidal or homicidal
3 thoughts," correct?
4     A.   That's correct.
5     Q.   And then when we talk about
6 mental status exam -- part of this is a
7 mental status exam.  Do you see that part
8 of the printed form, that's page 4 of the
9 printed form?
10    A.   Uh-huh.
11    Q.   Yes?
12    A.   Yes.
13    Q.   Mental status, is that the
14 mental status examination that you and I
15 were talking about earlier today?
16    A.   Yes.
17    Q.   The same type of examination?
18    A.   Yes.
19    Q.   Here in response to questions,
20 Mr. Schoolcraft has given some answers,
21 correct?
22    A.   That's correct.
23    Q.   And those answers have been
24 written down?
25    A.   That's correct.

Page 115

1     L. ALDANA-BERNIER
2     Q.   And the doctor has had a chance
3 to assess the patient as the patient sits
4 in front of him?
5     A.   That's correct.
6     Q.   And the patient wrote down what
7 he saw, correct?
8     A.   Correct.
9     Q.   That was Dr. Tariq that wrote
10 that down, correct?
11    A.   Correct.
12    Q.   Under mental status, appearance
13 and attitude, "cooperative at this time."
14 Do you see that?
15    A.   Yes.
16    Q.   Do you have any reason to
17 believe as you read that in 2009 that Mr.
18 Schoolcraft was not being cooperative
19 when Dr. Tariq made that evaluation?
20    A.   He wrote cooperative.  He
21 should be cooperative then.
22    Q.   Going down further, suicidal
23 ideations, do you see that?
24    A.   Yes.
25    Q.   In response to Dr. Tariq's

Page 116

1     L. ALDANA-BERNIER
2 questioning of Mr. Schoolcraft during his
3 mental status exam, he expressed no
4 suicidal ideations, correct?
5     MR. LEE:  Objection to form.
6     A.   Correct.
7     Q.   No homicidal ideations,
8 correct?
9     A.   Correct.
10    Q.   And no hallucinations, correct?
11    A.   Correct.
12    Q.   On the next printed form page
13 5, what is that bar score?
14    A.   That is after.  I think that's
15 agitation rating score.
16    Q.   And 7 being highly agitated and
17 1 not being agitated at all?
18    A.   Yes.
19    Q.   And Dr. Tariq wrote 1, which
20 means not agitated at all, correct?
21    A.   Correct.  At that time, he was
22 not agitated at all.
23    Q.   At the time that Dr. Tariq
24 evaluated him, the patient was not
25 agitated at all; is that correct?

Page 117

1     L. ALDANA-BERNIER
2     A.   That's correct.
3     Q.   Going to the first page of Dr.
4 Tariq's note, from the second line up,
5 Dr. Tariq says he evaluates -- can you
6 read that, the second line up what it
7 says?
8     A.   As per ER consult?
9     Q.   The first page, second line up.
10    A.   As per ER consult?
11    Q.   Just before that.  Can you read
12 it, the beginning of that line?
13    A.   "He states that he was in bed
14 last night.  Landlord let NYPD officers
15 in, assaulted him including bending his
16 arm, stamping slightly on his face, and
17 causing many bruises.  Bruises are
18 visible on both arms."
19    Q.   So Dr. Tariq is reporting from
20 your understanding that Mr. Schoolcraft
21 has bruises on both arms?
22    A.   Yeah.  Yes.
23    Q.   Was there any other evaluation
24 of Mr. Schoolcraft from the perspective
25 of psychiatric examination prior to your

30 (Pages 114 - 117)

Page 118

```
 1        L. ALDANA-BERNIER
 2 note of November 2nd, 2009, 3:10?
 3    A.   There was an 11/2/2009 at 2:15.
 4    Q.   That's the note right above
 5 your note?
 6    A.   Yes.
 7    Q.   Who is that by?
 8    A.   A resident Dr. Slowik,
 9 S-L-O-W-I-K.
10    Q.   Are you able to read that note?
11    A.   "Patient seen and examined
12 today. Patient remains calm, withdrawn,
13 not violent or aggressive.
14        "Patient is guarded and not
15 cooperative. Patient keeps saying he
16 doesn't know why he came to this room and
17 forced him to go to the hospital.
18        "Patient doesn't know why he
19 cannot carry the guns, saying that they,
20 his supervisor -- he said I don't know.
21 Patient" --
22        MR. CALLAN:  Don't speak out
23    loud until you're ready because she
24    was taking down everything.  All
25    right?
```

Page 119

```
 1        L. ALDANA-BERNIER
 2        If you can't read it, you can't
 3    read it.
 4    A.   "Patient doesn't know why he
 5 cannot carry the guns, saying that they,
 6 his supervisor, did it to him, but he
 7 said I don't know."
 8        "He denies auditory or visual
 9 hallucinations. Assessment and plan is
10 admit."
11    Q.   Assess and admit, what does
12 that mean?
13    A.   An assessment to admit.
14    Q.   What does assessment mean?
15    A.   That is her assessment, what
16 her notes are and the plans is to admit.
17    Q.   Doctor, is a there an emergency
18 room record from the medical emergency
19 room that I'll show you, this is the
20 record we are looking for [indicating]?
21        MR. LEE:  Howard, can I see the
22    form?
23        MR. SUCKLE:  [Handing.]
24        MR. LEE:  Thank you.
25        THE WITNESS:  Can I have it?
```

Page 120

```
 1        L. ALDANA-BERNIER
 2        MR. CALLAN:  Why don't you put
 3    that in front of her so she can page
 4    through?
 5        MR. SUCKLE:  Yeah.
 6        It's dated 10/31/09.
 7        MR. SMITH:  Doctor, it's just
 8    prior to the chart, about that far
 9    into the chart [indicating].  Keep
10    going.  The other way.
11        MR. CALLAN:  Okay.  All right.
12    She's got it.
13    Q.   Did you review this record
14 prior --
15        MR. CALLAN:  Let's just identify
16    it.
17        MR. SUCKLE:  Sure.
18        MR. CALLAN:  Let the record
19    reflect, we're looking at medical
20    record 1298984, date 10/31/2009, and
21    it's a Jamaica Hospital Medical Center
22    Emergency Department record.  Okay.
23    Q.   Doctor, did you review this
24 record prior to making your note of
25 November 2nd, 2009?
```

Page 121

```
 1        L. ALDANA-BERNIER
 2    A.   No. This is a medical record,
 3 medical ER. This doesn't come to our ER.
 4    Q.   So the medical records aren't
 5 in your possession in the psych ER?
 6    A.   No.
 7    Q.   Turning to the nursing
 8 assessment in that form, the nurse's
 9 notes. And this is again, October 31,
10 2009, and there are nursing notes.
11        Do you see that?
12    A.   October 31?
13    Q.   Yes.
14        Looking at the nursing note the
15 entry of -- do you have that in front of
16 you.
17    A.   That's 11/1.
18    Q.   The top of the page says 10/31,
19 but I'm looking at the note November 1st,
20 2009, at 2 a.m.
21    A.   Yes.
22    Q.   Do you see that?
23    A.   [Indicating.]
24    Q.   There is a note November 1,
25 2009, 2 a.m., do you see that, correct,
```

Page 122

1       L. ALDANA-BERNIER
2 do you see that?
3    A.   Yes.
4    Q.   Doctor, when you wrote your
5 note of November 2nd, 2009, did you know
6 that a nurse noted "with redness on the
7 right wrist with the handcuff, police
8 officer made aware and requested to
9 loosen a little bit yet refused."
10      Did you know about that note
11 when you made your note of November 2nd,
12 2009?
13   A.   This is a medical ER note
14 [indicating].
15   Q.   So you did not know?
16   A.   I didn't have that note.
17   Q.   Just so I'm clear:  You did not
18 know that a nurse had asked a police
19 officer to loosen the handcuff, that the
20 police officer refused, you did not know
21 that?
22   A.   No, I did not know that.
23   Q.   Looking at that same note, the
24 nurse's assessment, November 1st, 2009,
25 5:54 a.m., do you see that note?

Page 123

1       L. ALDANA-BERNIER
2    A.   Yes.
3    Q.   Were you aware when you first
4 saw Mr. Schoolcraft that he had reported
5 to the nurse, "My wrist is numb, I don't
6 feel anything now," did you know that
7 when you wrote your note on November 2nd,
8 2009?
9    A.   No, because I don't have this
10 record.
11   Q.   Did you see that this note,
12 that same note starts, "Psych consult in
13 progress"?
14   A.   Yes.
15   Q.   Do you know whose psych consult
16 that was, was that Dr. Tariq?
17   A.   No, this was Dr. Lewin.
18   Q.   And do you know if Dr. Lewin
19 wrote or made a note that you saw
20 regarding Mr. Schoolcraft's wrist being
21 numb and he doesn't feel anything?
22   A.   She didn't write anything.
23   Q.   And Doctor, does good and
24 accepted medical practice require
25 loosening of a handcuff when it's causing

Page 124

1       L. ALDANA-BERNIER
2 redness to the wrist?
3       MR. RADOMISLI:  Objection.
4       MR. LEE:  Objection.
5       MR. RADOMISLI:  Also under
6 Karbala [phonetic].
7       MR. SUCKLE:  This is prior, not
8 subsequent.
9    Q.   Does good and accepted medical
10 practice require the loosening --
11      MR. CALLAN:  This is a nursing
12 question as well.
13   Q.   Does good and accepted medical
14 practice require loosening of a handcuff
15 causing redness to the wrist?
16      MR. LEE:  Objection.
17      MR. CALLAN:  Objection.
18      You can answer if you can,
19 Doctor.  I mean is there a course in
20 --
21      MR. RADOMISLI:  Objection.
22      MR. CALLAN:  Is there a course
23 in medical school about handcuffs?
24      MR. SMITH:  You cannot coach the
25 Witness.  Cut it out.

Page 125

1       L. ALDANA-BERNIER
2       MR. SUCKLE:  We will attach this
3 to our motion papers.
4       MR. CALLAN:  Bring that to Judge
5 Sweet.
6       MR. SUCKLE:  So you are
7 confident you can talk over us and
8 make speaking objections?  Is that
9 your position, Counsel?
10      MR. CALLAN:  No.  My position is
11 that you have --
12      MR. SUCKLE:  Is that the
13 disrespect that you have for the
14 Court?
15      MR. CALLAN:  Ask relevant
16 questions.  You have been doing this
17 long enough to know they do not teach
18 you about handcuffs in medical school.
19      MR. SMITH:  You cannot coach the
20 Witness.  It's totally improper.  It's
21 completely wrong.  You know it.
22      Should we call the Court and ask
23 them to tell you which you know you
24 are not entitled to do.  You are not a
25 law department kid that just got --

32 (Pages 122 - 125)

1        L. ALDANA-BERNIER
2        MR. SHAFFER:  Objection.
3        MR. SMITH:  Come on.
4        MR. CALLAN:  I think that's a
5    smear on the law department of State
6    of New York.
7    Q.   Does good and accepted medical
8    practice require that a handcuff be
9    loosened if it's causing redness to the
10   wrist?
11       MR. RADOMISLI:  Objection.
12       MR. LEE:  Objection.
13       MR. SUCKLE:  You can answer.
14       MR. CALLAN:  You can, Doctor, go
15   ahead.
16   A.   If the patient complains, yes,
17   you have to release the restraints.
18       MR. RADOMISLI:  Move to strike.
19   Q.   When you say that you have to
20   release the restraints, what do you mean?
21   A.   Loosen it.
22   Q.   Going back to your previous
23   conversation about soft restraints, how
24   long had Mr. Schoolcraft been in the
25   hospital, if you know, prior to this note

1        L. ALDANA-BERNIER
2    November 1st, 2009, at 13:51.  The last
3    entry is November 3rd, 2009, at 8:27.
4        Doctor, on November 1st, 2009,
5    at 15:38, did the nurse note that the
6    patient denied suicidal/homicidal
7    ideations?
8    A.   Yes.
9    Q.   Did you know when you wrote
10   your November 2nd, 2009 note?
11   A.   No.
12   Q.   On the same date November 1st,
13   2009, the nurse noted at 22:56, "Patient
14   denied suicidal/homicidal ideations."
15   A.   These are medical records.  I
16   wouldn't know.
17   Q.   So you didn't know that when
18   you wrote your November 2nd, note,
19   correct?
20   A.   That's correct.
21   Q.   And again, November 2nd, 2009,
22   6:25, the nurse noted, denies suicidal,
23   slash, homicidal ideations.  Did you know
24   about that note?
25   A.   No.

1        L. ALDANA-BERNIER
2    of 2 a.m. on November 1st, 2009?
3    A.   He was admitted, arrived at the
4    hospital 10/31/2009 at 23:03.
5    Q.   So at this point, it had been
6    more than two hours he had been in the
7    hospital by the time of that note of 2
8    a.m., correct?
9    A.   That's -- let me see, seven
10   hours.
11       MR. RADOMISLI:  Sorry.
12       THE REPORTER:  Seven hours.
13   Q.   Doctor, continuing on the
14   further nursing notes, here's the page I
15   am referring to.  Can you find that in
16   the hospital record?
17       MR. LEE:  What notes are we
18   talking about?
19       MR. SUCKLE:  November 1 through
20   November 3rd nursing notes.
21   Q.   Do you have it?
22   A.   Yes.
23   Q.   We are looking at a page in the
24   hospital chart.  At the top it's dated
25   11/1/2009.  And the first entry is

1        L. ALDANA-BERNIER
2    Q.   How about November 2nd, 2009,
3    at 10:47, did you know the nurse
4    reported, "The patient was calm and
5    cooperative, no signs of acute physical
6    distress."  Did you know about that note
7    when you wrote your note of November 2nd,
8    2009?
9    A.   No.
10   Q.   How about the note of November
11   2nd, 2009, at 10:06, "Patient denied
12   suicidal/homicidal ideations," did you
13   know about that note when you wrote your
14   note of November 2nd, 2009?
15   A.   No.
16   Q.   Do you know about it at any
17   time during Mr. Schoolcraft's
18   hospitalization?
19   A.   About all of these notes, no,
20   because they belong to the emergency
21   medical --
22   Q.   You never looked at any of
23   those nursing notes from November 2nd,
24   2009, at 13:51 through November 3rd,
25   2009, at 8:27 at any time --

33 (Pages 126 - 129)

Page 130

L. ALDANA-BERNIER

2  MR. CALLAN: Objection.
3  Q. -- during Mr. Schoolcraft's
4  hospitalization?
5      MR. CALLAN: How many times do
6  you have to go back to this, Counsel?
7  Q. Am I correct?
8  A. These record don't come to our
9  emergency room [indicating].
10  Q. Turning briefly forward in the
11  chart right where you are, there is a
12  section called "Diagnostics" in the
13  medical chart probably pages ahead.
14      It's a note November 1st, 2009.
15  It actually shows his diagnostics in the
16  printed form and the first entry is
17  November 1st, 2009, at 12:59, urinalysis.
18      What is urinalysis, do you
19  know?
20  A. Urinalysis is patient will give
21  urine, and they will test the urine for
22  any presence of like blood or any
23  infection.
24  Q. So the patient is required to
25  do what, urinate into something?

Page 131

L. ALDANA-BERNIER

2  A. Yes.
3  Q. Was he given an apparatus?
4  A. Either they will give him a
5  container, urinal, or he has to go to the
6  bathroom.
7  Q. There is also the test right
8  there at the same time, 12:59 urine tox,
9  what is that?
10  A. Toxicology, they test if they
11  are using drugs.
12  Q. So Mr. Schoolcraft was
13  subjected to a test so see if he was
14  using any drugs?
15      MR. RADOMISLI: Objection to
16  form.
17  Q. Correct?
18  A. Every patient that comes to the
19  emergency room, we request a urinalysis
20  and urine toxicology.
21  Q. Every patient that comes to the
22  medical emergency room?
23  A. Depending on what the situation
24  is.
25  Q. So not every patient has to do

Page 132

L. ALDANA-BERNIER

2  urine tox, correct?
3  A. Not every patient but depending
4  on what the situation is because they
5  would like in your toxicology you can
6  also determine what your diagnosis is,
7  what -- you can see if the bizarre
8  behavior or agitation is caused from
9  substances.
10  Q. Did Mr. Schoolcraft come to the
11  hospital for the purpose of having his
12  urine tested?
13  A. You want to rule out a
14  pathology secondary to substance abuse.
15  You have to get a urine toxicology.
16  Q. You have to do that?
17  A. Anyone come in agitated,
18  bizarre, didn't have a psych history,
19  then you have to get a urine.
20  Q. So Mr. Schoolcraft had to give
21  that urine sample, correct?
22  A. They requested it so he has to
23  give it.
24  Q. CBC, that's a blood test?
25  A. Blood count test.

Page 133

L. ALDANA-BERNIER

2  Q. So somebody stuck a needle in
3  his arm and drew blood?
4  A. Yes.
5  Q. The THC test, how is that done?
6  A. Through urine.
7  Q. A CAT scan of his head?
8  A. CAT scan of the head, yes.
9  Q. How is that done?
10  A. He has to go under a big
11  machine wherein they have to test his --
12  x-ray his brain to see if there is any
13  other causes, organic causes: trauma,
14  pathology, any mass, or any reason why
15  that patient came in.
16      It was his first episode of --
17  psychotic episode. You have to do a CAT
18  scan of the head especially if he was
19  aged 34 years old. First psych episode
20  at 34, we have to do a psych CT.
21  Q. And Mr. Schoolcraft had to go
22  through that test?
23  A. He has to go through that test,
24  yes.
25  Q. What is TSH?

34 (Pages 130 - 133)

Page 134

1      L. ALDANA-BERNIER
2      A.   That is thyroid stimulating
3  hormone, to test his thyroid function.
4      Q.   How?
5      A.   Through blood.
6      Q.   Is that a separate test than
7  the CBC test?
8      A.   It's a separate tube, yes.
9      Q.   With a needle aspirating blood
10  out?
11      A.   Yes.
12      Q.   RPR, what is that?
13      A.   That is to test for syphilis.
14      Q.   So Mr. Schoolcraft was
15  subjected to a syphilis test while he was
16  in the hospital?
17      MR. RADOMISLI:  Objection to
18  form.
19      A.   Just to make sure that's not
20  the reason why he was behaving bizarre.
21      Q.   Okay.  And he had to go through
22  that test, correct?
23      A.   Yes.
24      Q.   By the way, the CAT scan showed
25  he had a normal brain, correct?

Page 135

1      L. ALDANA-BERNIER
2      MR. SMITH:  What was the answer
3  to that?
4      MR. SUCKLE:  Nothing yet.
5      A.   Yes.
6      Q.   On that same page, there is a
7  diagnosis, correct?
8      A.   Yes.
9      Q.   What is that?
10      A.   Paranoid.
11      Q.   There a number next to that,
12  what is that?
13      A.   That's the code.
14      Q.   What does it relate to?
15      A.   That is the code they use for
16  billing.
17      Q.   That's for billing?
18      A.   Yes, diagnosis 2979.
19      Q.   Let's go with paranoid, what
20  does that mean?
21      A.   Like a false belief about what
22  is going on in your environment that is
23  not in agreement with the culture;
24  someone that will say they feel he is
25  being watched or followed or somebody

Page 136

1      L. ALDANA-BERNIER
2  saying there is a conspiracy against him
3  or if someone will say someone is talking
4  about him; there's some sort of paranoia,
5  jealousy.  There are different kinds of
6  persecution.  It's a delusion.
7      Q.   And this was all done by Dr.
8  Tariq, right?
9      A.   Yes.
10      Q.   That was Dr. Tariq's only sole
11  diagnosis on this form, correct?
12      A.   No, this was from the emergency
13  room, the medical ER.
14      Q.   Let's look at the bottom of the
15  form.  Doesn't it say Dr. Tariq?
16      A.   Yes.
17      Q.   So this was Dr. Tariq's
18  diagnosis, correct?
19      MR. RADOMISLI:  Objection.
20      A.   Yes.
21      Q.   And Dr. Tariq didn't make any
22  other diagnosis besides this diagnosis of
23  paranoia on this form, correct?
24      MR. RADOMISLI:  Objection.
25      Q.   On that form, did he make any

Page 137

1      L. ALDANA-BERNIER
2  other diagnosis?
3      A.   Paranoid.
4      Q.   That's the only diagnosis Dr.
5  Tariq made?
6      MR. LEE:  Objection.
7      MR. CALLAN:  Objection.
8      MR. RADOMISLI:  Objection.
9      Q.   On this form.
10      MR. LEE:  Think of things in
11  isolation.  There is another form that
12  has a diagnosis.
13      MR. SUCKLE:  All right, Counsel.
14      A.   I don't think this was him that
15  put that there, Dr. Tariq who put that
16  there.
17      Q.   Who put that there?
18      A.   In here it was just, they just
19  put his name [indicating].  This was the
20  emergency notes.  This was the emergency
21  notes.
22      Q.   So you don't know who made that
23  diagnosis?
24      A.   I don't know.
25      Q.   When you did your evaluation of

35 (Pages 134 - 137)

Page 138

1       L. ALDANA-BERNIER
2  Mr. Schoolcraft, did you know about the
3  result of the CAT scan?
4       A.   The blood work.  I will not
5  remember if I read the CAT scan at that
6  time.  I don't have a recollection.
7       The only time -- it's already
8  written down in our -- from the medical
9  doctor so if we go over to the notes, I
10  have read the CT is normal.
11      Q.   So you didn't make a note of
12  that, that you read it, you're relying on
13  the note in the chart?
14      A.   The notes, yes.
15      MR. RADOMISLI:  Off the record.
16      MR. SMITH:  Time is 1:23.  Going
17  off the record.
18      [Discussion held off the
19  record.]
20      [Whereupon, at 1:23 p.m., a
21  recess was taken.]
22      [Whereupon, at 2:30 p.m., the
23  testimony continued.]
24      MR. SMITH:  We are going back on
25  the record.  It's 2:30.

Page 139

1       L. ALDANA-BERNIER
2       Q.   Doctor, did you discuss your
3  testimony with anybody during the break?
4       A.   No.
5       Q.   Doctor, there is a nursing
6  assessment form from the hospital record
7  dated November 1, 2009, at 9:00 a.m.  Can
8  you turn to that?
9       [Witness complying.]
10      MR. CALLAN:  This is the one.
11  See if you can find it.
12      Is that the general medicine
13  department?
14      MR. SUCKLE:  Department of
15  psychiatry.
16      Q.   Doctor, I have asked you to
17  turn to the nursing assessment form dated
18  November 1, 2009, from the Department of
19  Psychiatry Emergency Division.
20      Doctor, do you have that in
21  front of you now?
22      A.   Yes.
23      Q.   It's dated 9 a.m.  What is
24  that, Doctor?
25      A.   This is a nursing assessment.

Page 140

1       L. ALDANA-BERNIER
2       Q.   What is a nursing assessment.
3       A.   This is patient - the nurse
4  --the second nurse.
5       THE REPORTER:  I'm sorry.
6       A.   This is the second nurse that
7  sees the patient when he comes to the
8  emergency room.
9       Q.   Is the patient retriaged in the
10  emergency room?
11      A.   Let me just see.  No, he come
12  directly.  He doesn't pass through the
13  triage department.
14      Q.   When you say "the second
15  nurse," who is the first nurse?
16      A.   His second nurse because he is
17  already this form [sic].  The first nurse
18  are usually the ones in triage.
19      Q.   Did Adrian Schoolcraft see a
20  nurse prior to the nurse who filled out
21  this nursing assessment form in the
22  psychiatric emergency room:  Was there a
23  triage nurse?
24      A.   I think there was a triage
25  nurse because he came directly from

Page 141

1       L. ALDANA-BERNIER
2  emergency, medical ER.
3       Q.   You think this was not -- it's
4  your testimony you believe there is not a
5  second triage in the psychiatric
6  emergency room; is that what you're
7  saying?
8       A.   That's what I'm saying.
9       Q.   So, Doctor, this would be the
10  first nurse assessment in the psychiatric
11  ER, correct?
12      A.   The first nurse, yes.
13      Q.   Look at that nursing assessment
14  form that we have pulled out, did you
15  review this form before you did your
16  evaluation of Mr. Schoolcraft?
17      A.   I will not remember if it was
18  in the chart.  I may have gone through
19  it.
20      Q.   When you say you may have gone
21  through, do you have a habit, a custom
22  and practice of reviewing prior notes
23  from the psychiatric emergency room when
24  you evaluate the patient?
25      A.   That depends on the case.

36 (Pages 138 - 141)

Page 142

L. ALDANA-BERNIER

1 There is times that the patient comes,
2 and the nurse hasn't seen the patient,
3 and it's an emergency, we have to go see
4 the patient.
5     Q.   My question is: Did you review
6 the records of psychiatric emergency room
7 that exist for a patient at the time that
8 you would examine the patient?
9     A.   I do review the records, yes.
10    Q.   So do you recall then that you
11 reviewed this nursing assessment?
12    A.   I do not recall that, but I
13 usually review the records.
14    Q.   So your habit and custom would
15 have been to review this form?
16    A.   Yes.
17    Q.   Doctor, on this form on the
18 first page it says, "circumstances
19 leading to admission." Do you see that
20 on the first page of that form,
21 circumstances leading to admission?
22    A.   Yes.
23    Q.   Actually, let's go up the line
24 before, "patient's chief complaint," do

Page 143

L. ALDANA-BERNIER

1 you see that?
2    A.   Yes.
3    Q.   What did the nurse write there?
4    A.   Denies.
5    Q.   What does that mean, Doctor?
6    A.   He didn't have any complaints
7 so he put denies.
8    Q.   He had no complaints to make to
9 the nurse?
10    A.   Yes.
11    Q.   That's how you understood it
12 when you read it?
13    A.   Yes.
14    Q.   Under that, circumstances
15 leading to admission, do you see that?
16    A.   Yes.
17    Q.   What is B-I-B?
18    A.   Brought in by.
19    Q.   What else did you read when you
20 read this form?
21    A.   "Brought in by NYPD after
22 client was deemed to be paranoid and
23 danger to himself by his police
24 sergeant."

Page 144

L. ALDANA-BERNIER

1    Q.   What does that mean, do you
2 know?
3    A.   Means there is a report that he
4 was paranoid and he is a danger to
5 himself, a report made by his police
6 sergeant.
7    Q.   So that record is indicating
8 that the police sergeant has reported
9 these things that you just read to
10 Jamaica Hospital, correct?
11        MR. KRETZ: Objection.
12    Q.   The police sergeant is
13 reporting that by the police sergeant's
14 assessment, Mr. Schoolcraft is paranoid,
15 correct?
16        MR. KRETZ: Objection.
17    A.   Yes.
18    Q.   And the police officer is
19 reporting that the police officer
20 believed that Mr. Schoolcraft was a
21 danger to himself, correct?
22        MR. KRETZ: Objection.
23    A.   Yes.
24    Q.   Did you in your evaluation of

Page 145

L. ALDANA-BERNIER

1 Mr. Schoolcraft rely on that note at all?
2    A.   Did I rely only on this note?
3    Q.   No, at all. Was it part of
4 your evaluation?
5    A.   Not only this note.
6    Q.   Was this note part of your
7 evaluation?
8    A.   I read it.
9    Q.   Did you use the information in
10 this note at all in your evaluation?
11    A.   I read it. I read the
12 complaint. I read this note of the
13 nurse.
14        If you are going to ask me if
15 this was part of my decision to admit
16 him, no, not that alone.
17    Q.   Was it part at all of your
18 decision?
19    A.   I'm saying it's not that alone.
20    Q.   I understand that. I'm asking
21 a very specific question.
22        Did it play a part at all in
23 your decision to admit Mr. Schoolcraft?
24    A.   If I read that kind of

Page 146

1        L. ALDANA-BERNIER
2   statement, I will have to see other
3   aspects that will make me decide for the
4   reason why I admitted the patient.
5        Q.   You have to make your own
6   evaluation?
7        A.   I have to see the patient,
8   access all of the notes of the resident,
9   and I have to see the patient and make my
10  assessment if the patient needs an
11  admission.
12       Q.   Regardless of what notes you do
13  or don't read, you make your only final
14  assessment of what your opinion is
15  regarding what the patient needs?
16       A.   It's not only me make that
17  decision, I will probably also will ask a
18  second opinion.
19       Q.   I understand that you may ask a
20  second opinion, but do you form your own
21  independent opinion regarding your
22  assessment of your own patients?
23            MR. CALLAN:  Objection.
24       Are you asking if she is not
25       considering all of the notes in the

Page 147

1        L. ALDANA-BERNIER
2            chart?
3            MR. SUCKLE:  No, I'm asking if
4       she makes her own independent
5       assessment of the patient regarding
6       this patient.
7        A.   The totality of the notes.
8        Q.   Is it solely based on the
9   notes?
10       A.   Plus my assessment.  Of course
11  I have to go see the patient.
12       Q.   It's your assessment and the
13  notes that you use to form your opinion
14  regarding your evaluation of a patient,
15  correct?
16       A.   Plus the second opinion, yes.
17       Q.   Plus a second opinion?
18       A.   Yes.
19       Q.   Do you not form an opinion
20  until you get a second opinion?
21       A.   That depends on the case.  If
22  it's a case that I think needs a second
23  opinion, then I have to ask for a second
24  opinion.
25       Q.   From your review of Mr.

Page 148

1        L. ALDANA-BERNIER
2   Schoolcraft's records, did you form an
3   opinion before you got a second opinion
4   with regard to Mr. Schoolcraft?
5        A.   No, I asked for a second
6   opinion.
7        Q.   So you did not form an opinion
8   prior to any second opinion?
9        A.   I have to ask the second
10  opinion at that time.
11       Q.   Why was that?
12       A.   Because he was a police
13  officer.
14       Q.   Because he was a police
15  officer, you were unable to come to your
16  own opinion without getting a second
17  opinion; is that correct?
18            MR. CALLAN:  Objection to form.
19            MR. RADOMISLI:  Objection to
20       form.
21       A.   No, but I think two heads are
22  better than one.
23       Q.   Did you have an opinion before
24  the second opinion was rendered regarding
25  Mr. Schoolcraft?

Page 149

1        L. ALDANA-BERNIER
2        A.   My opinion was I think I needed
3   a second opinion so I asked for a second
4   opinion.
5        Q.   Was that your only opinion
6   prior to the second opinion?
7        A.   I think his case was something
8   that needed to be determined by two
9   doctors to see if he needed admission.
10       Q.   So you agree that your opinion
11  alone you didn't think was sufficient for
12  admission of Mr. Schoolcraft to the
13  hospital?
14       A.   Well, my opinion was that I
15  know he needed admission.  I needed
16  someone to second my opinion.
17       Q.   What was your opinion based on
18  that he needed admission?
19       A.   In whole story about this case
20  when he had to barricade himself, he was
21  acting bizarre, that he was agitated in
22  the ER, and that because he was a police
23  officer and my fear if I discharged him
24  to society, that something -- if
25  something wrong might happen -- if I --

38 (Pages 146 - 149)

Page 150

1      L. ALDANA-BERNIER
2  at that time in 2009, let's say if I
3  forward that thinking, I was trying to
4  prevent another case of navy yard
5  disaster, that's how I always think; that
6  I do not want a disaster happening when
7  I'm thinking about admitting a patient.
8      He is a police officer. He may
9  have access to guns even if they took all
10 his guns already. I think it's easier
11 for police officer to get access to gun.
12     Q.   So the fact that he was a
13 police officer weighed heavily on your
14 decision to admit Mr. Schoolcraft?
15        MR. RADOMISLI: Objection.
16        MR. LEE: Objection.
17        MR. CALLAN: Objection to form
18 as well.
19     A.   The fact he was a police
20 officer, bizarre, agitated, delusional is
21 the reason why I admitted him.
22     Q.   You talked about having access
23 to guns.
24     A.   Yes.
25     Q.   How did that play into your

Page 151

1      L. ALDANA-BERNIER
2  decision making?
3     A.   He is a police officer.
4     Q.   We still haven't gotten my
5  basic question answered.
6        Did you have an opinion before
7  the second opinion about whether or not
8  Mr. Schoolcraft needed to be admitted?
9        MR. CALLAN: Objection to form
10 of the question.
11     A.   I did, yes.
12     Q.   What was that opinion?
13     A.   I was going to admit him, but I
14 had to get that second opinion to agree
15 to my decision.
16     Q.   Keep that page open. Go down
17 to where it talks about skin contusion,
18 slash, laceration. Do you see that?
19     A.   Yes.
20     Q.   Did you read that when you read
21 that form?
22     A.   Yes.
23     Q.   What did you read when you read
24 that form, what does it say?
25     A.   Purple and black and he circled

Page 152

1      L. ALDANA-BERNIER
2  the area.
3     Q.   Let's be clear, skin condition,
4  contusion, slash, laceration, and the box
5  yes is checked or X'd, correct?
6     A.   Yes.
7     Q.   So the nurse was observing
8  contusions on his body somewhere based on
9  that chart, correct?
10     A.   Yes.
11     Q.   Going down to the next line,
12 there is a description of those
13 contusions, correct?
14     A.   Yes.
15     Q.   And those contusions are purple
16 and black, correct?
17     A.   [Indicating.]
18     Q.   Correct?
19     A.   Yes.
20     Q.   And the nurse has now circled
21 both the front of both arms and the back
22 of both arms, correct?
23     A.   Yes.
24     Q.   So did you understand this to
25 mean that Mr. Schoolcraft had purple and

Page 153

1      L. ALDANA-BERNIER
2  black contusions on the front and back of
3  both of his arms?
4     A.   Yes.
5     Q.   Do you know what that was from?
6     A.   Possible from restraints, also
7  be possible from any fights he had.
8     Q.   And the only restraints that
9  you were aware of that he was in, at
10 least reflected in the hospital record,
11 are handcuffs, correct?
12     A.   That's correct.
13     Q.   Taking the next page, the
14 second page of the nurse's assessment
15 form, do you see homicidal and suicidal,
16 do you see that at the bottom of that
17 form?
18     A.   Yes.
19     Q.   Ideations for homicidal, no,
20 correct?
21     A.   That's correct.
22     Q.   That was the nurse's assessment
23 at that time?
24     A.   Yes.
25     Q.   So the patient is in front of

39 (Pages 150 - 153)

Page 154

L. ALDANA-BERNIER

1
2  nurse, the nurse is evaluating the
3  patient, and the nurse is making an
4  assessment, correct?
5      A.   That's correct.
6      Q.   Next to it, suicidal ideation,
7  no?
8          MR. LEE:  Objection to form.
9      A.   Correct.
10     Q.   Suicidal ideations.
11         Again, the patient was in front
12  of the nurse and she made this
13  assessment, correct?
14     A.   That's correct.
15     Q.   Doctor, looking at the third
16  page of this form, this clinical risk
17  assessment, behavioral dyscontrol,
18  correct, what does that mean?
19     A.   Out of control.
20     Q.   And he was not required for any
21  restraints or seclusion, correct?
22     A.   No.
23     Q.   So as of the November 1st, at 9
24  a.m., there was no reason to restrain
25  this man, correct?

Page 155

L. ALDANA-BERNIER

1
2      A.   Correct.
3      Q.   Looking at Jamaica Hospital
4  triage note from the nurse's note
5  10/31/09 at 23:03.
6      A.   What date was that?
7      Q.   October 31, 2009, Jamaica
8  Hospital triage, at 23:03 hours.
9      A.   I have 11/1, 11/3.
10         MR. SUCKLE:  May I help you?
11     Q.   Looking at now Jamaica Hospital
12  triage note, 10/31/09, 23:03, did you
13  review this prior to your assessment of
14  Mr. Schoolcraft?
15     A.   No, this is a medical chart.
16     Q.   Did you know that somebody
17  reported to the triage nurse that Mr.
18  Schoolcraft was in police custody when he
19  came in?
20     A.   Yes.
21     Q.   Where did you get that from?
22     A.   From the records.
23     Q.   Did you also know that the
24  triage nurse suicide risk assessment was
25  no risk identified?

Page 156

L. ALDANA-BERNIER

1
2      A.   This is a record of the medical
3  ER so I did not see this one.
4      Q.   You didn't know that?
5      A.   I did not see that.
6      Q.   What was Mr. Schoolcraft's
7  blood pressure when he came in to the
8  emergency room at October 31, 2009, at
9  23:03?
10     A.   It was 139 over 80.
11     Q.   Do you have an opinion with a
12  reasonable degree of medical certainty
13  what normal blood pressure is?
14     A.   Normal blood pressure is 120
15  over 80, that's the normal blood
16  pressure.
17     Q.   Was 139 over 80 within the
18  normal range?
19     A.   The diastolic which is the
20  upper level, was a little bit elevated.
21     Q.   Slightly elevated?
22     A.   Slightly elevated.
23     Q.   And the pulse was 115.  Is that
24  within the normal range?
25     A.   Yes, elevated.

Page 157

L. ALDANA-BERNIER

1
2      Q.   Slightly elevated, correct?
3      A.   Elevated.
4      Q.   There is a note on the chart
5  for pain scale.  What was the pain scale?
6      A.   Mild, 3 to 4.
7      Q.   Do you know what that relates
8  to?
9      A.   He came in with abdominal pain.
10  They must relate to abdominal pain.
11     Q.   Do you know what the category
12  of urgency was assigned to Mr.
13  Schoolcraft?
14     A.   The --
15     Q.   The category where he was
16  placed by the triage nurse with regard to
17  how quick or not quick he should be seen?
18     A.   Okay.  The category is urgent
19  [indicating].
20     Q.   What does that mean?
21     A.   Urgent that he needs immediate
22  attention.
23         MR. CALLAN:  Keep your voice up,
24      Doctor.  Everybody around the table
25      has to hear.

40 (Pages 154 - 157)

L. ALDANA-BERNIER

1
2     Q.   Doctor, just because we are
3  here, I don't want you to have to flip
4  through again, can you find where you
5  filled out the form for 9.39 of Mental
6  Hygiene Law.
7          You have turned to a page
8  called -- what is at the top of page,
9  "Emergency Admission Section 9.39"?
10    A.   Yes.
11    Q.   And you signed the bottom of
12 that form?
13    A.   Yes.
14    Q.   And you dated that form?
15    A.   Yes.
16    Q.   What did you date it?
17    A.   11/3/2009, 1:20 in the
18 afternoon.
19    Q.   That's the time that you made
20 your evaluation that Mr. Schoolcraft
21 needed to be admitted?
22    A.   Yes.
23    Q.   That's the date and time?
24    A.   Yes.
25    Q.   The reason I bring this to your

L. ALDANA-BERNIER

1
2  attention now, is there a place on that
3  form to indicate when the patient was
4  first admitted to the hospital?
5     A.   11/1, yes.
6     Q.   And is there a time on there?
7     A.   23:03.
8     Q.   In fact we have in front of us
9  the triage note for when the patient was
10 admitted, and in fact the time was 23:03,
11 correct?
12    A.   Yes.
13    Q.   But the date was actually
14 October 31st, 2009, correct?
15    A.   That's correct.
16    Q.   So your note regarding the date
17 of admission was incorrect, correct?
18    A.   That was the time that I was in
19 the emergency room, 11/1.
20    Q.   When you say "the emergency
21 room," what are you referring to?
22    A.   Our medical ER.
23    Q.   So he was in the medical ER
24 exactly at 23:03 as well as the triage
25 exactly 23:03, one day later?

L. ALDANA-BERNIER

1
2     A.   11/1/2009, that is when he was
3  in our medical ER.
4     Q.   Where did you get the time that
5  you put on the form we have in front of
6  us with regard to the Mental Hygiene Law,
7  the date of admission, where did you get
8  the time 23:03 from?
9     A.   It was -- it had said the time
10 of arrival at the hospital.
11    Q.   Isn't that the time that the
12 triage nurse first sees him?
13    A.   The time the triage nurse saw
14 the patient.
15    Q.   23:03?
16    A.   That was 10/31 though.
17    Q.   So your form is incorrect when
18 it says November 1.  It should have been
19 10/31, correct?
20    A.   The patient came to the ER 12
21 -- one -- 12 midnight 23:03 -- 12 noon
22 that was -- 23:03, yeah, this is.
23         MR. CALLAN:  Don't think out
24 loud, Doctor.
25         MR. SUCKLE:  Don't interrupt her

L. ALDANA-BERNIER

1
2  answer.
3          MR. CALLAN:  Sorry.
4     A.   11/1/2009 he was in the
5  emergency room.
6     Q.   When you say "in the emergency
7  room," what does that mean?
8     A.   When he arrived at the
9  emergency room, time of arrival to the
10 hospital.
11    Q.   Isn't the time of arrival 23:03
12 on 10/31/09?
13         MR. CALLAN:  Objection to the
14 form of the question.
15    A.   It said here in the notes
16 10/31; however, when he came to the ER,
17 it was 11/1.
18    Q.   What did the form ask you to
19 fill in there?
20    A.   It's saying time of arrival at
21 the hospital.
22    Q.   Were you trying to put in the
23 time of arrival at the hospital on that
24 form?
25    A.   It's the time of the arrival at

41 (Pages 158 - 161)

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2  the hospital.
3    Q.  Can we agree that you put the
4  wrong date?
5    A.  I probably put the wrong time
6  but 11/1 when he came to the emergency
7  room, the psych emergency room.
8    Q.  I'm just trying to be clear,
9  your intent was to put in November 1st,
10 correct?
11   A.  That's when he came to the
12 emergency room.
13   Q.  And you got the time 23:03 from
14 where?
15   A.  I do not remember if -- this
16 was a long time ago, 2009.  I don't have
17 any recollection.
18   Q.  You have in front of you the
19 triage notes which said he actually
20 arrived at the hospital at a time, 23:03,
21 correct?
22   A.  Yes.
23   Q.  So he was actually at the
24 hospital at the time that you wrote in
25 there, 23:03, correct?

L. ALDANA-BERNIER

2    A.  That's when he was in the
3  hospital, yes.
4    Q.  So you got the time right,
5  correct?
6    A.  The time is right in here, yes.
7    Q.  But you are not willing to say
8  that you simply made a mistake on the
9  date, correct?
10   MR. RADOMISLI:  Objection to
11 form.  You keep mixing up the hospital
12 from the psych emergency room.
13   MR. SUCKLE:  I'm not mixing up.
14   MR. CALLAN:  You are.  You
15 question doesn't clarify whether she
16 was intending to put arrival at the
17 psych ER or arrival at the hospital.
18   I don't know where you were
19 going with this question.  You are
20 going all over the place.
21   MR. SUCKLE:  I'm not.
22   MR. CALLAN:  You are.  I object
23 to the question.  I don't know what
24 you are asking her.
25   MR. SUCKLE:  I'm asking her

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2  anyway.
3    Could we have the question read
4  back.
5    MR. CALLAN:  Which one of the 20
6  questions you have asked?
7    MR. SUCKLE:  Counselor, would
8  you like to have your show now?  Go
9  ahead.
10   Can I have the question --
11   MR. CALLAN:  I will like to have
12 a clear record.
13   MR. SUCKLE:  I would too,
14 unfortunately, I have a witness that
15 doesn't want to seem to give me a
16 clear answer.
17   MR. CALLAN:  Well, it's hard
18 when you don't ask a question that's
19 clear.
20   MR. SUCKLE:  It's a tough job.
21 I'm learning as I'm going.
22   MR. SHAFFER:  So I'm not the
23 only inexperienced person in the room.
24   MR. SUCKLE:  You'll have to
25 excuse my inability to ask a question.

L. ALDANA-BERNIER

2    By next year maybe I'll be able
3  to.
4    Q.  Can you tell me where you got
5  the time 23:03 from that you wrote in
6  record?
7    MR. CALLAN:  That she wrote
8  where in the record, Counsel?
9    A.  I know I got the date from the
10 time that he was transferred to the
11 medical ER.
12   Q.  Where did you get the time that
13 you wrote on the same form?
14   A.  I have to go back to 2009.  I
15 cannot remember.
16   Q.  Why didn't you write the date
17 that he arrived at the hospital on the
18 form that you have in front of you which
19 is the Mental Hygiene Law 9.39 form, why
20 didn't you write the time that he arrived
21 at the hospital?
22   A.  Because there is a 9.39 in the
23 psych emergency room so I have to write
24 the time when he was in the psych
25 emergency room.

42 (Pages 162 - 165)

Page 166

L. ALDANA-BERNIER

1
2    Q.   Does the form ask you for the
3 date of arrival at the hospital?
4    A.   The date said in here time of
5 arrival at the hospital, but we do not
6 use this in the medical ER.  We use it in
7 the psych ER.  So that is time he came --
8 that is the date he came to the psych ER.
9    Q.   What time did he arrive at the
10 psych ER?
11    A.   He came to the psych ER 12
12 noon.
13    Q.   When you wrote that he arrived
14 at 23:03, that was incorrect?
15    A.   He came in at 12 noon.
16    Q.   So it was incorrect when you
17 wrote 23:03 as the time that he arrived?
18    A.   12 p.m.  I was checking -- on
19 the record over here it says 23:03 he
20 came so that's where I probably got my
21 time.  But then he came in on 11/1/2009.
22    Q.   What date did Mr. Schoolcraft
23 arrive at Jamaica Hospital?
24    A.   10/31.
25    Q.   You signed that form on

Page 168

L. ALDANA-BERNIER

1
2    Q.   And you agreed that he showed
3 no homicidal ideations, correct?
4    A.   That's correct.
5    Q.   And you agree that he showed
6 that he was calm?
7       MR. CALLAN:  We have already
8    been down this road before, Counsel.
9    We have gone through every single one
10    of these questions.
11       MR. SUCKLE:  No.
12       MR. CALLAN:  Asked and answered.
13       MR. SUCKLE:  She adopted those
14    as hers.  I'm asking.
15       MR. CALLAN:  No.  She hasn't
16    said anything different than she said
17    the last time.
18       MR. SUCKLE:  You know me, I'm --
19       MR. CALLAN:  I object to the
20    repetitions nature of the question.
21    Q.   You agreed when you evaluated
22 him he was calm?
23    A.   I agreed to the above notes.
24    Q.   Did you agree that he was not
25 agitated?

Page 167

L. ALDANA-BERNIER

1
2 November 3rd?
3    A.   November 1st -- I signed on
4 November 3rd, yes.
5    Q.   So you did your evaluation on
6 November 3rd; am I correct?
7    A.   That was when he was admitted,
8 November 3rd, so that's when he went
9 upstairs.
10    Q.   When did you do your
11 evaluation?
12    A.   That was on the 2nd.
13    Q.   Is there a note of your
14 evaluation?
15    A.   I have in here saying that I
16 have agreed with the above evaluation of
17 the resident.
18    Q.   When did you make that note?
19    A.   That was on the 2nd.
20    Q.   Which residents were you
21 agreeing with?
22    A.   Dr. Tariq and Dr. Slowik.
23    Q.   So you agreed that he showed no
24 suicidal ideations, correct?
25    A.   Yes.

Page 169

L. ALDANA-BERNIER

1
2    A.   I agreed he was calm.
3    Q.   And not agitated?
4    A.   That he was not agitated at the
5 time of the interview.
6    Q.   And you interviewed him when he
7 was in front of you?
8    A.   I saw him.
9    Q.   That's when you made your
10 assessment, correct, when he was in front
11 of you?
12    A.   Yes.
13       THE WITNESS:  Can I --
14       MR. CALLAN:  You can finish your
15    answer.
16       You're cutting her off, and she
17    can finish her answer.
18    Finish your answer, Doctor.
19       MR. SUCKLE:  Stop making
20    speeches.
21       MR. CALLAN:  You're the one
22    making speeches, cutting her off from
23    giving her answer.
24       MR. SUCKLE:  How am I cutting
25    anyone off?

43 (Pages 166 - 169)

Page 170

L. ALDANA-BERNIER

1
2     MR. CALLAN:  Did you finish your
3  answer, or do you have more to say?
4     THE WITNESS:  Yes.  I was trying
5  to say that I agreed that he was calm,
6  but it was not only the decision that
7  you have to make or the decision that
8  I made.  I was looking at all factors
9  that brought him to the hospital.
10    Q.   So you were told about what
11 happened in his apartment?
12    A.   Everything, yes.
13    Q.   And you were considering what
14 you were told by the police when they
15 arrived in the hospital, correct?
16    A.   That's correct.
17    Q.   And do you know who Sergeant
18 James is?
19    A.   No, I don't.
20    Q.   Did you ever speak to Sergeant
21 James?
22    A.   No, I don't -- I did not.
23    Q.   Did you ever see any reference
24 to Sergeant James providing any
25 information that was recorded in the

Page 172

L. ALDANA-BERNIER

1
2     A.   That's correct.
3     Q.   He was not trying to hurt
4  himself, correct?
5     A.   That's correct.
6     Q.   In front of you, he wasn't
7  acting bizarre, correct?
8     A.   That's correct but he was
9  paranoid.
10    Q.   And the paranoia was that the
11 sergeant told you they weren't trying to
12 get him as he was saying, correct?
13       MR. LEE:  Objection to form.
14    A.   That he was the one that said
15 that there was a possible conspiracy
16 against him, that the officers -- that
17 there is this problem between him and his
18 supervisor, okay, so....
19    Q.   So in front of you, that
20 paranoia is what he exhibited, correct?
21    A.   That's a form of psychosis,
22 yes, paranoia.
23    Q.   Any other psychiatric behavior
24 or psychosis that he exhibited in front
25 of you other than being paranoid?

Page 171

L. ALDANA-BERNIER

1
2  hospital record?
3     A.   It's in the record.
4     Q.   In that context you know of
5  Sergeant James because his name appears
6  in the record, correct?
7     A.   That's correct.
8     Q.   And you know some of the things
9  about the history about what took place
10 in the apartment came from Sergeant
11 James?
12    A.   That's what in the record.
13    Q.   When this patient was in front
14 of you, he was not in need of restraints,
15 correct?
16    A.   That's correct.
17    Q.   And when he was in front of
18 you, he was not exhibiting any of the
19 behaviors that would lead you to believe
20 he was homicidal?
21    A.   That's correct.
22    Q.   And he was leading you to --
23 not exhibiting any of the behaviors that
24 would lead you to believe he was
25 suicidal, correct?

Page 173

L. ALDANA-BERNIER

1
2     A.   At that point in time?
3     Q.   Yes.
4     A.   There was nothing else.
5     Q.   Let's look at your note of
6  November 2nd, 2009.  What did you write?
7     A.   He was still complaining of
8  pain in area of his right and left wrist.
9  "States it was numb for two hours
10 yesterday.  Bruise was noted in the left
11 inner aspect of arm and minimal area of
12 bruise inner aspect of the right arm."
13    Q.   Why did you write those things
14 down?
15    A.   Because then he showed it to me
16 so I have to write them.
17    Q.   Did you do a physical
18 examination of him?
19    A.   He showed it to me.  That's a
20 physical exam.
21    Q.   And you thought it was
22 important to write down whatever symptoms
23 or manifestations of some problems he was
24 having, you thought it was important to
25 write down, correct?

44 (Pages 170 - 173)

1        L. ALDANA-BERNIER
2    A.   Yes.
3    Q.   Did you write down all of the
4  things that he was exhibiting, physical
5  problems he was having in your presence?
6    A.   I wrote, but he said that this
7  is a setup; he would like a lawyer; and
8  that internal affairs would like to
9  interview him and he agreed.
10       He was made aware that he was
11 going upstairs and -- but he wanted to go
12 home; however, I wrote, "agreed with the
13 notes above of the resident."
14   Q.   So let's go back through this.
15       You said he wanted a lawyer.
16 He said that to you?
17   A.   Yes.
18   Q.   Did you do anything to help him
19 get a lawyer?
20   A.   The lawyers -- usually they get
21 the lawyer when they go upstairs in the
22 inpatient unit.
23   Q.   When you say "usually"?
24   A.   They were entitled to -- they
25 have legal representation when they go

1        L. ALDANA-BERNIER
2  upstairs in the inpatient unit.
3    Q.   How does a patient know they
4  were entitled to a lawyer when they go
5  upstairs?
6    A.   It's posted on the wall.
7    Q.   It's posted on the wall?
8    A.   Yes.
9    Q.   Is there anything else that the
10 hospital did to advise him of his right
11 to have a lawyer?
12       MR. RADOMISLI:  Objection to
13 form.
14       MR. CALLAN:  I join in the
15 objection, but you can answer.
16   A.   You are asking me if the
17 hospital has anything? It's posted on
18 the wall.  I think that's part of
19 hospital being able to make the patient
20 aware they have legal representation.
21   Q.   Did you give him any papers
22 that indicated that he can make a phone
23 call to somebody to get help?
24   A.   There are free phone calls.
25 Phones are on the walls.  They are free

1        L. ALDANA-BERNIER
2  to call if they want to call.
3    Q.   Did you give him any paperwork
4  there was a telephone number if he needed
5  help?
6    A.   We don't have papers.
7    Q.   So you didn't give him any
8  papers?
9    A.   Not in the emergency room, no.
10   Q.   You didn't hand him any papers,
11 did you?
12   A.   No, I didn't hand him anything.
13   Q.   You didn't ask him to sign any
14 papers, did you?
15   A.   No, I did not.
16       MR. SUCKLE:  Counsel, please
17 hold on.  Counsel, don't put papers in
18 front of the Witness while I'm asking
19 her questions.
20       MR. CALLAN:  You are having her
21 looking at the chart.
22       MR. RADOMISLI:  She is allowed
23 to go through the chart.
24       MR. SUCKLE:  I didn't stop her
25 from doing anything.

1        L. ALDANA-BERNIER
2        Please don't put papers in front
3  of the Witness so she can answer the
4  question the way you want her to.
5        MR. CALLAN:  You're referring to
6  a piece of paper that's in the chart?
7        Aren't you trying to find out
8  what happened, Counsel?
9        MR. SUCKLE:  Can you not put a
10 piece of paper in front of her again?
11       Did you do that?
12       MR. CALLAN:  Is it in the chart?
13       MR. SUCKLE:  Did you put a piece
14 of paper in front of her?
15       MR. CALLAN:  Yeah.
16       MR. SUCKLE:  Please don't do
17 that while I'm questioning.
18       MR. CALLAN:  Your cocounsel has
19 been handing her the same paper all
20 morning from the chart.
21       MR. SUCKLE:  You have a chance
22 to ask her whatever questions you
23 want.
24       MR. CALLAN:  You are being quite
25 disingenuous when you're questioning a

45 (Pages 174 - 177)

Page 178

L. ALDANA-BERNIER

1
2    Witness about a piece of paper you
3    know is in the chart regarding --
4         MR. SUCKLE:  Keep talking on the
5    record and the sanction motion will be
6    --
7         MR. CALLAN:  I can't wait to see
8    your sanction motion --
9         MR. SUCKLE:  Keep talking.
10        MR. CALLAN:  When the Court sees
11   another seven-hour deposition about
12   one chart entry.
13        MR. SUCKLE:  Keep going.
14        MR. CALLAN:  Which has been
15   basically the pattern in this case.
16        MR. SUCKLE:  You don't think
17   Judge Sweet cares what you're talking
18   about?
19        MR. SHAFFER:  Call him and find
20   out instead of arguing.
21        MR. CALLAN:  Unlike you, I don't
22   choose to look into Judge Sweet's mind
23   how he views this deposition.  I will
24   let the record speak for itself.
25        MR. SMITH:  The record should

Page 179

L. ALDANA-BERNIER

1
2    reflect you tried to show the Witness
3    a document which is the form she
4    filled out that contains, among other
5    things, a list of that you fully
6    know --
7         MR. CALLAN:  Let's identify the
8    record.
9         THE WITNESS:  I'm sorry.
10        MR. SMITH:  Let's mark the
11   document you tried to show the Witness
12   while she was in the middle of
13   answering the question.  Let's do that
14   okay.  Come on.
15        MR. CALLAN:  Counsel for the
16   hospital --
17        MR. SMITH:  I would like to have
18   the court reporter mark this document.
19        MR. RADOMISLI:  This is my copy.
20   There is one in the chart.
21        MR. SMITH:  Show me what it was
22   you were trying to show the Witness.
23        MR. RADOMISLI:  I didn't show
24   anything to the Witness.
25        MR. SMITH:  I'm talking to the

Page 180

L. ALDANA-BERNIER

1
2    Witness's lawyer.
3         I would like to see the document
4    is handed to the Witness while she was
5    answering a question.
6         Are you going to show me the
7    document or not or do I assume the
8    record speaks for itself?
9         MR. CALLAN:  Make a motion,
10   Counsel, all right?
11        MR. SMITH:  So the record is
12   clear that I'm asking for the piece of
13   paper, Counsel is not giving it to me.
14   I saw it.  I know exactly what it was.
15        MR. CALLAN:  I don't have the
16   piece of paper.  You can look through
17   the chart to see if there is a piece
18   of paper relating to Counsel and what
19   is routinely told concerning --
20   Q.   When a patient comes into the
21   hospital, was Mr. Schoolcraft required to
22   give his clothes up, to get out of his
23   clothes?
24   A.   Give his clothes?
25   Q.   Was he required to take off his

Page 181

L. ALDANA-BERNIER

1
2    clothes when he came into the hospital?
3    A.   Yes, he has to wear hospital
4    gown.
5    Q.   So Mr. Schoolcraft when he was
6    brought in in handcuffs, did he have to
7    remove his pants?
8    A.   Yes.
9    Q.   Did he have to remove his
10   shirt?
11   A.   Yes, has to be in a hospital
12   gown.
13   Q.   Did he have to remove his
14   socks?
15   A.   Yes.
16   Q.   Did he have to remove his
17   underwear?
18   A.   Yes.
19   Q.   Did he have to turn over his
20   money?
21   A.   Yes, they put in the safe.
22   Q.   Did he have to turn over his
23   cell phone?
24   A.   Yes.
25   Q.   Did he have to turn over all of

46 (Pages 178 - 181)

Page 182

L. ALDANA-BERNIER

1   his personal belonging to Jamaica
2   Hospital?
3       MR. RADOMISLI:  Objection to
4   form.
5       MR. CALLAN:  Objection to form
6   too.
7       Are you saying for safekeeping
8   or asking --
9       MR. SUCKLE:  I asked the
10  question, Counselor.  I think it's
11  pretty clear.
12  Q.   Did he have to turn over his
13  personal belongings on his body to
14  Jamaica Hospital?
15      MR. RADOMISLI:  Objection.
16      MR. CALLAN:  Objection.
17  A.   When they come into the
18  hospital, they usually tell them to
19  undress and then they put all of their
20  belonging to the safe and put a hospital
21  gown on.
22  Q.   When you say "they," what do
23  you mean?
24  A.   The nurses tell the patients.

Page 183

L. ALDANA-BERNIER

1       Q.   Who is they, when they have to
2   do something?
3       A.   They will, the nurses will ask
4   the patient to take off their clothes and
5   surrender their belonging to the nurse so
6   they can put their belongings to the
7   safe.
8       Q.   What is it Mr. Schoolcraft was
9   given to wear after he had to give his
10  clothes to Jamaica Hospital?
11      MR. RADOMISLI:  Objection to
12  form.
13      A.   Can you clarify?
14      Q.   What is it, if anything, he was
15  wearing after he gave his clothes to
16  Jamaica Hospital?
17      A.   This is asked of every patient
18  to give their belongs because then they
19  check them.
20      Q.   I understand.
21      What was Mr. Schoolcraft
22  wearing, if anything, after he gave his
23  clothes to Jamaica Hospital?
24      MR. RADOMISLI:  Objection to

Page 184

L. ALDANA-BERNIER

1   form.
2       A.   If anything, he would have been
3   searched in the medical ER.  Then they
4   have to put him in a hospital gown.
5       And these items would have been
6   transferred with the patient to the psych
7   ER so that they can go to the safe.
8       Q.   You talked about the search.
9   What is the search?
10      A.   They search every patient to
11  make sure no contraband.
12      Q.   When you say "search," did they
13  do a cavity search?
14      A.   No, just take off the clothes,
15  make sure they are not carrying anything
16  like weapons, knives, anything they are
17  hiding in their socks or on their bodies.
18      Q.   So they have to be completely
19  naked and observed to see they have no
20  weapons, to see they have to weapons,
21  correct?
22      A.   They have to take off
23  everything, yes.
24      Q.   Is this observation done by a

Page 185

L. ALDANA-BERNIER

1   doctor, a nurse, somebody else?
2       A.   Done by a nurse.
3       Q.   Was that process done by Mr.
4   Schoolcraft with a woman, a male, do you
5   know?
6       A.   This I wouldn't know.  I wasn't
7   there.
8       Q.   Was he handcuffed while that
9   was going on?
10      A.   That I don't know because I was
11  wasn't there.
12      Q.   Did they look in his mouth?
13      MR. CALLAN:  She said she wasn't
14  there.  Objection.
15      Are you asking about routine
16  searches or about this search?  She
17  wasn't there for this search, Counsel.
18      Q.   Does the search include looking
19  into Mr. Schoolcraft's mouth?
20      MR. CALLAN:  Objection to the
21  form of the question.
22      A.   I don't know because I wasn't
23  there.
24      Q.   Have you been present for these

47 (Pages 182 - 185)

**Page 186**

L. ALDANA-BERNIER

1 searches when they are done? Have you
2 ever been present for the search when
3 they were done?
4
5     A.   It's been done by a nurse and
6 the security officers of the hospital.
7     Q.   So the security officer and the
8 nurses do the search?
9     A.   Yes.
10    Q.   And the security officer, what
11 is the medical training, if any, of a
12 security officer?
13        MR. RADOMISLI: Objection.
14        MR. CALLAN:  I join in the
15    objection.
16    Q.   If you know?  Is it a
17 nonmedical person?
18    A.   He was part of team.  He is
19 nonmedical, but he is part of team.
20    Q.   So we have the nurse, the
21 security guard, Mr. Schoolcraft standing
22 naked and being examined --
23        MR. CALLAN: Objection.
24    Q.   -- is that the process?
25        MR. CALLAN: She said she wasn't

**Page 187**

L. ALDANA-BERNIER

1
2 there.
3        Is there a process?
4     Q.   Is that the process that Mr.
5 Schoolcraft went through?
6     A.   That I don't know.  I wasn't
7 there.
8        MR. RADOMISLI: Objection.
9     Q.   Do you understand that to be
10 the process whereby all patients are
11 asked to take their clothes off and they
12 are examined by a nurse and security
13 officer --
14        MR. RADOMISLI: Objection.
15    Q.   -- in the emergency room.  Is
16 that your understanding?
17    A.   Every patient goes through
18 this.
19    Q.   The answer is yes?  Is the
20 answer yes?
21    A.   Yes.
22    Q.   When you wrote your note on
23 November 2nd, 2009, Mr. Schoolcraft told
24 you he wanted to go home, correct?
25    A.   Yes.

**Page 188**

L. ALDANA-BERNIER

1
2     Q.   Was he free to go home?
3     A.   Not at the time.  I don't think
4 he was ready to go home.
5     Q.   How long had Mr. Schoolcraft
6 been in the hospital as of the time that
7 you wrote your note on November 2nd,
8 2009?
9        MR. RADOMISLI:  Objection to the
10    form.
11    Q.   Do you know how long he had
12 been at the hospital?
13        MR. RADOMISLI:  Objection to the
14    form.
15        MR. CALLAN:  I join in the
16    objection.
17        MR. LEE:  Read that back.
18        [The requested portion of the
19    record was read.]
20    A.   Are you asking for the total
21 number of days he was in Jamaica Hospital
22 or --
23    Q.   When you wrote your note on
24 November 2nd, 2009, he had already been
25 in the hospital for three days?

**Page 189**

L. ALDANA-BERNIER

1
2        MR. RADOMISLI:  Objection to
3    form.
4     Q.   He came in October 31st at
5 23:03, and now it's November 2nd at three
6 o'clock in the afternoon, 3:10, correct?
7     A.   Then he was admitted upstairs
8 to 11/6.
9     Q.   When you wrote your note, he
10 had already been there two days?
11        MR. RADOMISLI: Objection.
12        KRETZ: Objection.
13        MR. CALLAN:  You can answer,
14    Doctor, if you know.
15        MR. KRETZ:  Less than two days.
16    A.   November 2nd -- 31.  He was
17 there -- he came on the 1st.  I was
18 there, one, two days.
19    Q.   And Doctor, when did you write,
20 fill out of the form that you signed with
21 regard to the mental hygiene --
22        MR. CALLAN:  Asked and answered.
23    Q.   The next day?
24        MR. CALLAN:  She said November
25    3rd.  Asked and answered.

48 (Pages 186 - 189)

Page 190

1          L. ALDANA-BERNIER
2     A.   It was the next day, yes.
3     Q.   Why did you wait till the next
4  day to fill out that form?
5     A.   That's when he was going
6  upstairs to the inpatient unit.
7     Q.   Where was he from November 2nd,
8  at 3:10 until he went upstairs?
9     A.   He was in the psych ER.
10     Q.   Why did he stay in the psych ER
11  after you saw him on November 2nd, 2009?
12     A.   Why did he stay in the psych
13  ER?  I do not know what happened in 2009.
14  Maybe there were no beds available, I
15  have to let him wait in the emergency
16  room.
17     Q.   Did you do your mental status
18  examination of Mr. Schoolcraft on
19  November 2nd, 2009, November 3rd, 2009
20  2009, or some other date?
21     A.   It was on November 2nd.
22     Q.   When you did your mental status
23  examination of Mr. Schoolcraft, did you
24  make -- let's go back.
25          Did you take a history of Mr.

Page 191

1          L. ALDANA-BERNIER
2  Schoolcraft?
3     A.   I spoke to Mr. Schoolcraft, and
4  I did take a history on him.
5     Q.   Did you write that history
6  down?
7     A.   No, because I did agree with
8  the notes of the resident.
9     Q.   Did you make a note of what Mr.
10  Schoolcraft told you regarding his
11  history?
12     A.   It's -- all of the notes was in
13  the resident notes.
14     Q.   And did you do a mental status
15  examination of Mr. Schoolcraft in your
16  presence?
17     A.   I did a mental status exam, and
18  I agreed to the notes of the resident.
19     Q.   Am I correct other than the
20  November 2nd, 2009 note, and the November
21  3rd 2009 mental hygiene form that you
22  filled out, you make no other notes in
23  this chart?
24          MR. RADOMISLI:  Objection to
25     form.

Page 192

1          L. ALDANA-BERNIER
2     Q.   Am I correct?
3          MR. RADOMISLI:  Objection to
4     form.
5     A.   That's correct.
6     Q.   So the residents had evaluated
7  him and made notes, correct?
8     A.   Yes.
9     Q.   And you were the director of
10  the emergency room, correct?
11     A.   Correct.
12     Q.   And you had this patient in
13  front of you, correct?
14     A.   Yes.
15     Q.   And you had the wherewithal,
16  you had the chart in front of you,
17  correct, when you saw the patient?
18     A.   That's correct.
19     Q.   And you had the ability and did
20  in fact make notes in the chart, correct?
21     A.   That's correct.
22     Q.   Just so we are clear:  You did
23  not make any independent notes regarding
24  your own findings during your
25  examination, correct?

Page 193

1          L. ALDANA-BERNIER
2     A.   That's correct.  I agreed with
3  the notes of the resident.
4     Q.   Doctor, do you believe not
5  making any notes regarding your
6  examination and findings with regard to
7  Mr. Schoolcraft was in the bounds of good
8  and accepted medical practice?
9     A.   I have the residents that saw
10  that patient and I agreed with their
11  notes so that is my -- the agreement with
12  regards to the notes of the residents
13  since I agreed with the above, I
14  considered that as my notes.
15     Q.   I understand when you say you
16  considered it.
17          The question is:  Does good and
18  accepted medical practice require you to
19  make your own notes regarding your
20  examination and assessment of the
21  patient?
22          MR. CALLAN:  Objection to the
23     form of the question.
24          You can answer.
25     A.   If I'm agreeing with notes of

49 (Pages 190 - 193)

Page 194

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2 the resident, then I do not have to write
3 notes because I agree with the notes of
4 the both residents from the first day
5 that he came and the second note of Dr.
6 Slowik.
7    Q.   Was Mr. Schoolcraft oriented to
8 time?
9    A.   Yes.
10   Q.   Place?
11   A.   Yes.
12   Q.   He was oriented to time/space?
13   A.   Yes.
14   Q.   In your presence, correct?
15   A.   Yes.
16   Q.   His speech was normal, correct?
17   A.   That's correct.
18   Q.   He did not appear to be
19 suffering from delusions in your
20 presence, correct?
21   A.   He was paranoid.
22   Q.   But that's that delusions,
23 correct?
24   A.   Persecutory delusions.
25   Q.   He wasn't seeing things, was

Page 195

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2 he?
3   A.   That's hallucinations, no.
4   Q.   He wasn't hallucinating, was
5 he?
6   A.   No.
7   Q.   How about his cognitive
8 functioning, that was normal, correct?
9   A.   Yes.
10   MR. RADOMISLI:  Off the record.
11   [Discussion held off the
12 record.]
13   MR. SMITH:  It's 3:34.  Off the
14 record.
15   [Whereupon, at 3:34 p.m., a
16 recess was taken.]
17   [Whereupon, at 3:49 p.m., the
18 testimony continued.]
19   MR. SMITH:  Back on the record
20 3:49 p.m.
21   Q.   Doctor, the paranoia that you
22 diagnosed Mr. Schoolcraft with, how was
23 he manifesting that?
24   A.   By him saying that there was a
25 conspiracy against him.

Page 196

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2   Q.   Any other way that he was
3 manifesting besides that?
4   A.   He believed he was being
5 persecuted by his superiors, coworkers,
6 superiors, that's the main -- that's the
7 conspiracy.
8   MR. CALLAN:  You have to keep
9 your voice up.
10   Q.   So it was this conspiracy
11 theory in his head that you thought was
12 the --
13   MR. SUCKLE:  Withdrawn.
14   Q.   It was the conspiracy that was
15 the basis of your opinion that he was
16 paranoid, correct?
17   A.   Yes.
18   Q.   And how did that manifest
19 itself, if at all:  in a threat to his
20 own physical harm?
21   A.   If I look at him as being a
22 police officer talking about this
23 conspiracy theory and then I'm thinking
24 that he has access to weapons, then I
25 would think that I should think twice and

Page 197

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2 be cautious that he could be a danger to
3 himself or to others.
4   Q.   Is that the entirety of the
5 reason that you came to the opinion he
6 was a danger to himself and others?
7   MR. CALLAN:  Objection to form.
8   MR. LEE:  Objection to form.
9   A.   The fact that he had to be
10 brought in from his house where he
11 barricaded himself and he had to be taken
12 away and he was bizarre and agitated at
13 the time when he was brought in from his
14 home, I think those are all the factors
15 that you have to take in consideration
16 because then I am trying to -- the reason
17 why I kept him is because I'm trying to
18 prevent a disaster.
19   MR. SMITH:  I'm sorry what was
20 the last part?
21   [The requested portion of the
22 record was read.]
23   Q.   Prevent a disaster to whom?
24   A.   Obviously, if you hear all of
25 the stories about the Navy yard disaster,

50 (Pages 194 - 197)

Page 198

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2  the Range Rover disaster with cops.  If
3  you try to fast forward with an
4  individual.  I'm trying to prevent things
5  that will happened.
6        As an emergency room doctor,
7  you always have to think of all of the
8  factors that will make a person a danger
9  to others like presence of weapons, does
10  he have accessibility to weapons and he
11  was paranoid.
12        At the time I was thinking that
13  maybe he was really a danger to himself.
14    Q.   So a paranoid person,
15  accessible to weapons, made him a danger
16  to himself and others?
17    A.   Plus the other information that
18  we got when they went to his house:  They
19  have to take him out from his house; he
20  was barricaded in his house; and he was
21  agitated at the time when he was in the
22  emergency room.
23        You have to take all of those
24  into consideration and find out why did
25  he behaving this way.  You cannot see

Page 199

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2  that kind of behavior in just one day.
3  You have to observe the patient.
4    Q.   By the time that you wrote your
5  note on the 3rd, he had now been there
6  for two and a half, three days, correct?
7        MR. RADOMISLI:  Objection to the
8    form.
9        Been where?
10       MR. SUCKLE:  At Jamaica
11   Hospital.
12   A.   He was in the emergency room
13  then.  I made my decision at the time
14  that I saw him that he needed to be
15  admitted.
16   Q.   But he wasn't exhibiting
17  anything other than the paranoia when you
18  saw him, he didn't exhibit any of that,
19  correct:  The things you just described
20  as agitation or the barricading, that was
21  not in your presence, correct?
22   A.   No.  He was paranoid.  He said
23  all of the stories that maybe there was a
24  conspiracy against him.
25   Q.   But he wasn't agitated or

Page 200

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2  barricading himself in your presence,
3  right?
4    A.   At that moment but then you
5  have to consider -- at that moment when
6  you make your decision, you also have to
7  consider all of the other factors.
8    Q.   Why didn't you read the medical
9  record from the medical emergency room?
10   A.   Because the medical record
11  doesn't come to our psych ER.
12   Q.   Did you speak to any of the
13  police officers that brought him to the
14  hospital?
15   A.   I do not have any recollection.
16  I do not remember.
17   Q.   Did you speak to any police
18  officer at all at any time regarding Mr.
19  Schoolcraft?
20   A.   I do not remember.
21   Q.   Did you speak to Dr. Lamstein?
22       MR. SMITH:  L-A-M-S-T-E-I-N.
23   A.   No.
24   Q.   Did you tell Dr. Lamstein
25  that --

Page 201

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2        MR. CALLAN:  Didn't she just say
3    she didn't speak to Dr. Lamstein?
4    Objection.
5    Q.   Did you ever tell Dr. Lamstein
6  that Mr. Schoolcraft did not need
7  psychiatric care?
8        MR. CALLAN:  Are you asking if
9    she used telepathy since she didn't
10   speak to the doctor?
11   Q.   Did you say that to --
12   A.   I haven't spoken to Dr.
13  Lamstein.
14   Q.   So if Dr. Lamstein said that
15  you told her that Mr. Schoolcraft did not
16  need psychiatric care, she would not be
17  telling the truth; is that what you're
18  saying?
19       MR. CALLAN:  Objection to the
20   form of the question.
21   A.   You are asking me if Dr.
22  Lamstein tells me that he doesn't need
23  admission, am I going to change my mind?
24   Q.   No.  If Dr. Lamstein testified
25  that you told Dr. Lamstein that Mr.

51 (Pages 198 - 201)

Page 202

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2 Schoolcraft did not need psychiatric
3 admission, would she be lying?
4      MR. CALLAN:  Objection to the
5 form of the question.
6   A.   This is the first time I'm
7 hearing about Dr. Lamstein.
8   Q.   Did you ever hear the name Dr.
9 Lamstein before?
10   A.   No, the first time I'm hearing
11 about Lamstein.
12   Q.   Did you ever speak to anybody
13 from the internal affairs bureau of the
14 police department?
15   A.   Excuse me?
16   Q.   Did you ever speak to anybody
17 from the internal affairs bureau of the
18 police department?
19   A.   No.
20   Q.   Were you the admitting
21 physician for Mr. Schoolcraft to the
22 psych emergency room?
23   A.   In the emergency room, yes.
24   Q.   Do you know the name of the
25 person that brought Mr. Schoolcraft in?

Page 204

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2 therapeutic," what do you mean?
3   A.   If you are getting 0.5
4 milligrams twice a day, 1 milligram, yes.
5   Q.   How long does it take before it
6 becomes effective to become therapeutic?
7      MR. CALLAN: Objection.
8   Q.   At the dosage that you
9 prescribed at the weight that Mr.
10 Schoolcraft was?
11      MR. CALLAN:  Objection.
12   A.   Most likely a week.
13   Q.   And when people come in and are
14 dangerous, have you prescribed medication
15 that they have rejected and refused to
16 take?  Has that ever happened to you
17 where a patient refuses to take medicine
18 and you have decided the patient is a
19 danger to themselves or others?
20   A.   Before we start any medication,
21 you describe it with the patient which
22 you need informed consent and you talk
23 about the side effects, the consequences,
24 and the benefits of taking or not taking
25 medication.

Page 203

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2   A.   No, I don't.
3   Q.   Did you prescribe any
4 medication for Mr. Schoolcraft?
5   A.   Risperdal, 0.5 milligrams.
6 That was written by the resident, but I
7 agreed; Risperdal 0.5 milligrams twice a
8 day.
9   Q.   What is that?
10   A.   That's an antipsychotic.
11   Q.   Antipsychotic?
12   A.   Paranoia, psychosis.
13   Q.   What was the dosage?
14   A.   It's 0.5.
15   Q.   What was his weight?
16   A.   Weight, 109 kilograms.
17   Q.   And the dosage that you
18 prescribed, is that an introductory dose?
19      MR. LEE:  Objection to form.
20   A.   Yes.
21   Q.   So it's not really therapeutic
22 at that level, correct?
23   A.   It's twice a day.  It should be
24 therapeutic.
25   Q.   When you say "it should be

Page 205

L. ALDANA-BERNIER

1   L. ALDANA-BERNIER
2   Q.   Have you ever medicated a
3 patient against their will because they
4 were a danger to themselves or others?
5   A.   They are a danger to
6 themselves, if they are agitated, they
7 are violent, yes, I medicated someone
8 against their will.
9   Q.   How did you do that?
10   A.   If they are becoming -- if the
11 emergency room is being chaotic and the
12 patient -- first you speak with the
13 patient and you try to redirect the
14 patient, try to calm him down.  If he
15 doesn't agree or if he doesn't listen to
16 your redirection, then you start telling
17 him that you are going to medicate him.
18   Q.   And physically, how do you do
19 that, how do you medicate the person who
20 resists taking the medicine?
21   A.   We give them intramuscular.
22   Q.   Someone will restrain them and
23 give them a shot, correct?
24   A.   Yes.
25   Q.   You did not have the opinion

52 (Pages 202 - 205)

L. ALDANA-BERNIER

1
2 that Mr. Schoolcraft needed to go through
3 the process of being medicated against
4 his will, correct?
5    A.   At the time in the ER, at that
6 point in time when he was in the ER, he
7 was not given any intramuscular
8 injection.
9    Q.   Mr. Schoolcraft refused to take
10 the medication that you prescribed,
11 correct?
12    A.   Yes.
13    Q.   And you did not go through this
14 process where you went through having him
15 restrained and giving him the shot, you
16 didn't go through that process with him,
17 correct?
18    A.   No, I didn't.
19    Q.   Because you didn't deem it
20 necessary to do that to Mr. Schoolcraft,
21 correct?
22    A.   At the point he was in the ER,
23 he was not agitated so I did not have to
24 give him an injection.
25    Q.   He wasn't such a threat to

L. ALDANA-BERNIER

1
2 anybody that he was going to need that
3 type of restraint and then injection,
4 correct?
5    A.   He was not agitated at the time
6 so I didn't have to inject him.
7    Q.   You indicated that you wanted a
8 second opinion earlier, correct?
9    A.   Yes.
10    Q.   Did you write a request for a
11 second opinion or a consult?
12    A.   No, I just have to call my
13 associate chairman and present to him the
14 case, and I spoke with him and he agreed
15 with me.
16    Q.   Who is the doctor that you
17 called?
18    A.   Associate chairman.
19    Q.   Who is the associate chairman
20 that you spoke with?
21    A.   Dr. Dhar, D-H-A-R.
22    Q.   Dr. Dhar is a psychiatrist?
23    A.   Yes.
24    Q.   Dr. Dhar is his associate
25 chairman.  What is that?

L. ALDANA-BERNIER

1
2    A.   Next to the chairman.
3    Q.   Who is the chairman?
4    A.   Dr. Vivek.
5    Q.   Can you spell that?
6    A.   V-I-V-E-K.
7    Q.   When you say you spoke to him,
8 did you speak to him on the phone or you
9 don't recall?
10    A.   Call him downstairs and I
11 presented the case to him.
12    Q.   When you say "you presented the
13 case to him," did you tell him about the
14 history that you took?
15    A.   Yes.
16    Q.   Do you remember actually having
17 this conversation, or is that your
18 standard practice that you described?
19    A.   When it's a decision, like,
20 when a decision has to be made wherein --
21 I would say it's standard practice.
22    Q.   You don't recall actually
23 having the conversation?
24    A.   I recall that I spoke to him.
25    Q.   You recall in this case

L. ALDANA-BERNIER

1
2 speaking to him?
3    A.   Speaking to him.
4    Q.   What time of day did you speak
5 to him?
6    A.   That was the afternoon.
7    Q.   And is the associate chairman
8 the person that you generally call to get
9 a second opinion for admission under the
10 Mental Hygiene Law?
11    A.   Yes.
12    Q.   Why do you recall this
13 particular incident with regard to Mr.
14 Schoolcraft when you got the second
15 opinion:  Is there anything that brings
16 it to your mind?
17    A.   I recall that because every
18 police officer that comes to our
19 hospital, I try to get second opinion.
20    Q.   When you say "every police
21 officer," how often have you had police
22 officers brought to your hospital to the
23 emergency psych ward?
24    A.   I could not recall how many.
25    Q.   Hundreds?

53 (Pages 206 - 209)

Page 210

L. ALDANA-BERNIER
1
2    A.   No.
3    Q.   Dozens?
4    A.   No.  That's why it came back in
5  memory because it's not 100, but I cannot
6  recall how many.
7    Q.   More than ten?
8    A.   I don't remember.
9    Q.   Less than 50?
10    A.   I would not remember.
11    Q.   On each of these occasions,
12  were they brought in by other members of
13  the New York City Police Department?
14    A.   Yes.
15       MR. RADOMISLI:  What?
16       THE WITNESS:  Yes.
17    Q.   On each of those occasions, did
18  you admit those patients to the psych ER?
19    A.   To the psych ER, yes.
20    Q.   On each of those occasions, did
21  the associate chairman agree with your
22  opinion to admit these police officers
23  under the --
24       MR. CALLAN:  Objection to the
25    question.  I don't know that she said

Page 211

L. ALDANA-BERNIER
1
2    she consulted with the associate
3    chairman on every case.
4       MR. SUCKLE:  I will clarify.
5    Q.   For each of those police
6  officers that were admitted under the
7  Mental Hygiene Law, did you consult with
8  a second opinion?
9    A.   Yes.
10    Q.   In each of those police
11  officers, did the person, the doctor you
12  consulted with, agree with your opinion
13  to admit under the Mental Hygiene Law?
14    A.   Yes.
15    Q.   And these times when police
16  officers were admitted under the Mental
17  Hygiene Law, did some of them occur
18  before Mr. Schoolcraft's admission?  I
19  mean in the year or months beforehand.
20    A.   Yes.
21    Q.   And did the police officers
22  come from any particular precinct that
23  you were talking about:  Did they come
24  from the 81st Precinct, if you know?
25    A.   I would not know that.

Page 212

L. ALDANA-BERNIER
1
2    Q.   Do you know, did you get to see
3  any of the police officers on a recurring
4  basis that would bring these police
5  officer in; in other words, the police
6  officers that would bring the other
7  police officer in for evaluation, did you
8  see those police officers more than once?
9       MR. RADOMISLI:  Objection to
10    form.
11    A.   What do you mean more than
12  once?
13    Q.   Like in this case we know that
14  Sergeant James played some role in Mr.
15  Schoolcraft's history, correct?
16       MR. SHAFFER:  Objection.
17    A.   That's in the record.
18    Q.   Do you know if Sergeant James
19  was involved in any of the other police
20  officers who were admitted to Jamaica
21  Hospital who you admitted under the
22  Mental Hygiene Law?
23    A.   I don't know how Mr. James look
24  like.
25    Q.   Were there any police officers,

Page 213

L. ALDANA-BERNIER
1
2    sergeants, lieutenants who you can
3    identify who would bring police officers
4    to Jamaica Hospital on a recurring basis?
5       MR. RADOMISLI:  Objection to
6    form.
7       MR. SHAFFER:  Objection.
8    Q.   That you know either by sight
9  or name?
10    A.   No, I wouldn't.
11    Q.   When the police officers are
12  brought in by the other members of the
13  New York City Police Department, do you
14  always have the same concerns that you
15  describe for us about the police officer
16  having access to weapons?
17       MR. CALLAN:  Objection to the
18    form of the question.
19       She didn't say they were brought
20    in by other members of the New York
21    City Police Department.
22       MR. SUCKLE:  We've been told
23    that she did.
24    Q.   Does that concern that you
25  expressed about Mr. Schoolcraft and the

54 (Pages 210 - 213)

L. ALDANA-BERNIER

1
2  access to weapons, did it apply to those
3  other police officers that you admitted
4  under the Mental Hygiene Law?
5      A.   I think you have to look at the
6  case.  It depends.  Every case is
7  different.  You have to look at it
8  differently.
9      Q.   So some police officers have
10  access to weapons and some don't?
11     A.   That I wouldn't know.
12     Q.   You indicated one of your
13  concerns for Mr. Schoolcraft's safety was
14  that he had access to weapons.
15     A.   In the notes he mentioned why
16  he cannot have access to his guns.
17     Q.   So were other police officers
18  brought in who did have access to weapons
19  that you are aware of?
20     A.   I do not remember that.
21     Q.   Did other police officers ever
22  bring in another police officer to the
23  emergency room who you did not admit
24  under the Mental Hygiene Law?
25     A.   That would be hard to remember.

L. ALDANA-BERNIER

1
2      Q.   Was Mr. Schoolcraft the last
3  police officer that you admitted under
4  the Mental Hygiene Law?
5      A.   I do not know if he was the
6  last one.
7          MR. RADOMISLI:  Read that back.
8          [The requested portion of the
9      record was read.]
10     Q.   But none come to memory since
11  Mr. Schoolcraft, correct?
12     A.   I'm not sure.  I don't
13  remember.
14     Q.   And going to your November 3rd
15  note where you fill out the mental status
16  exam form, can we turn to that, please.
17         [Witness complying.]
18     Q.   Look first at --
19     A.   Yes.
20     Q.   -- that's stamped at the top
21  "Emergency Admission Section 9.39 Mental
22  Hygiene Law."  At the bottom is your
23  signature?
24     A.   Yes.
25     Q.   Is that what we are all talking

L. ALDANA-BERNIER

1
2      Q.   As you sit here today, you
3  don't recall any such situations; am I
4  correct?
5          MR. RADOMISLI:  Objection.
6          MR. CALLAN:  Objection to form.
7      What situation:  admitting or not?
8          MR. SUCKLE:  Not admitting.
9      Q.   As you sit here today, do you
10  recall any occurrence of a police officer
11  being brought in by other police officers
12  and you did not admit them under mental
13  hygiene?
14         MR. RADOMISLI:  Objection.
15     A.   It would be hard to remember.
16     Q.   So the answer is:  As you sit
17  here, no, you don't remember?
18         MR. RADOMISLI:  Objection to
19     form.
20     A.   I do not remember.
21     Q.   When is the last time you
22  admitted a police officer under the
23  Mental Hygiene Law into the psych
24  emergency room?
25     A.   Do not remember.

L. ALDANA-BERNIER

1
2  about, is that what you have in front of
3  you?
4      A.   Yes.
5      Q.   Is this all of your
6  handwriting?
7      A.   Yes.
8      Q.   And going to the part that
9  says, "record of admission," what did you
10  write there?
11     A.   "Patient is a danger to
12  himself.  Currently psychotic and
13  paranoid.  Would benefit from inpatient
14  stabilization."
15     Q.   I'm sorry.  I didn't get all of
16  that?
17     A.   Would benefit from inpatient
18  stabilization.
19     Q.   I didn't hear before will
20  benefit.
21         [The requested portion of the
22     record was read.]
23     Q.   When you say he would benefit
24  from it, what do you mean?
25     A.   Benefit from inpatient

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2  stabilization because when you go up to
3  the inpatient unit, you will have a
4  psychiatrist, a therapist, and a team
5  that will work with you. There are
6  groups in the inpatient unit and there
7  are other modalities of the kind of
8  treatment in the inpatient unit that will
9  be able to maybe find out why he was
10  behaving the way he was behaving or why
11  he was paranoid, and he will be able to
12  talk to a psychologist or the other
13  therapist.
14    Q.   The stabilization, was that a
15  stabilization of his affect, his
16  environment that was going to be
17  stabilized, what did you mean by that?
18      MR. CALLAN: Objection to form.
19    A.   Stabilization means
20  stabilization of his psychosis and
21  stabilization of if there was any
22  emotional crisis that was he going on
23  [sic] or going through with the conflict
24  that he was having with the supervisors.
25    Q.   So some type of resolution of

1    L. ALDANA-BERNIER
2  that conflict would be part of the
3  stabilization?
4    A.   Yes.
5    Q.   And that would have occurred
6  through the modalities that you just
7  described earlier?
8    A.   Yes.
9    Q.   And would the stabilization
10  also include limiting his access to
11  weapons?
12    A.   Stabilization, that will
13  include, yes, because they will have to
14  find out before he is discharged to
15  ascertain he doesn't have any access to
16  weapons or....
17    Q.   Is that stabilization something
18  that every police officer admitted under
19  the Mental Hygiene Law needs to go
20  through: making sure they don't have
21  access to weapons?
22      MR. RADOMISLI: Objection.
23      MR. CALLAN: I join in the
24  objection.
25    A.   It's not only police officers

1    L. ALDANA-BERNIER
2  but everyone that comes in who are a
3  danger that we know they have access to
4  weapons, then we try as much as possible.
5    I don't know if you know about
6  the New York SAFE Act wherein we have to
7  report everyone that has a weapon, we
8  have to make sure that they are
9  discharged before....
10    Q.   Usually you have to report
11  everyone that has a weapon, who do you
12  have to report that to?
13    A.   The Department of Health.
14    Q.   That's been the law for how
15  long?
16    A.   Maybe -- that's new, a new law.
17    Q.   Was that in effect in 2009?
18    A.   Not 2009. What I was trying to
19  say that anyone we know that is a danger
20  to themselves, we try to make sure they
21  don't have any access to weapons.
22    Q.   Looking at the date that you
23  wrote in there -- we have gone through
24  this. I don't want to spend too much
25  time on it; but did you actually cross

1    L. ALDANA-BERNIER
2  out the date of the admission and then
3  rewrite it?
4    A.   I tried to put 11/1/2009.
5    Q.   Did you check a.m. or p.m. on
6  this?
7    A.   No, I did not check it, but
8  23:03 is --
9    Q.   Military time?
10    A.   -- military time, yes.
11    Q.   From the time of your note on
12  the 2nd at 3:10 until this note on the
13  3rd at 1:20, was Mr. Schoolcraft free to
14  leave?
15    A.   No, he was not.
16    I made my decision on the day
17  that I saw him.
18    Q.   You made your decision on that
19  date and then turn to the Notice of
20  Status of Rights in Emergency Admission
21  which your counsel clearly decided to
22  throw in front of you before --
23      MR. CALLAN: Are we allowed to
24  look at it now because it's in the
25  record, Counsel?

56 (Pages 218 - 221)

L. ALDANA-BERNIER

1
2   Q.   Did you sign that form?
3   A.   Yes.
4   Q.   On the 3rd, correct?
5   A.   On the 3rd, yes.
6   Q.   Did you sign that at the same
7  time that you signed the Emergency
8  Admission Section 9.39 Mental Hygiene
9  Law, that form?
10   A.   Yes.
11   Q.   What did you do with this form
12  once you signed it?
13   A.   One copy goes to the patient.
14   Q.   So Mr. Schoolcraft was given
15  this on the 3rd of November, 2009?
16   A.   Yes.
17   Q.   Did he sign it?
18   A.   No.  I am the one that signs
19  it.
20   Q.   Did Mr. Schoolcraft ask you to
21  -- did you have any contact with Mr.
22  Schoolcraft's father?
23   A.   No, I did not.
24   Q.   Did Mr. Schoolcraft say, call
25  my father and tell him about this?

L. ALDANA-BERNIER

1
2   A.   No, he did not.  I don't know.
3  I don't have any notes about him allowing
4  me to speak to his father.
5   Q.   Do you know if you spoke to his
6  father while he was in the hospital?
7   A.   Regarding the notes if I spoke
8  to the father?
9   Q.   Did you write on here that his
10  father should be designated as the person
11  to be noticed of this admission?
12   A.   No, I didn't write anything
13  here.
14   Q.   Why not?
15   A.   Because this belongs to him.
16   Q.   When you say --
17   A.   This is the for the patient.
18   Q.   This is for the patient?
19   A.   Yes.
20   Q.   Do you know why there are these
21  lines indicating where copies should go?
22   A.   It says, above patient has been
23  given a copy of that notice.
24   Q.   Underneath that, what does it
25  say, it has your signature and underneath

L. ALDANA-BERNIER

1
2  that, what does it say?  Can you read
3  that into the record, please?
4   A.   "Copies to persons designed by
5  patient to be informed of admission."
6   Q.   Continue.  "If," there is a
7  parenthesis there.
8   A.   "If none type in none."
9   Q.   Did you type in none?
10   A.   No, I did not.
11   Q.   Did you write in none?
12   A.   No, I did not.
13   Q.   Did you write in anybody's
14  name?
15   A.   It's there, "Schoolcraft,
16  Adrian."
17   Q.   Did you write anybody's name to
18  be designated by the patient to be
19  informed of his admission, did you write
20  any names there?
21   A.   No, I didn't write any names.
22   Q.   Do you have a recollection as
23  you sit here today independent of the
24  record, do you recall actually giving
25  this to Mr. Schoolcraft?

L. ALDANA-BERNIER

1
2   A.   I do not have an independent
3  recollection.  The nurse could have given
4  it to him.
5   Q.   So the nurse may have given it
6  to him?
7   A.   Yes.
8   Q.   Is this something that you
9  assigned the nurses to do from time to
10  time?
11   A.   Either the nurse or I do.  I do
12  not have a recollection if I gave it to
13  him.  I will not know.
14   Q.   Who is the person who write
15  none on it for people to designated if
16  none is the appropriate answer:  you, the
17  nurse, something else?
18   A.   I would.
19   Q.   The second page of that
20  emergency admission form -- hold on one
21  second.  Go back to that notice for the
22  second.
23       At the top of the notice there
24  appears to be a date.  Can you tell me
25  the date that you wrote there?

Page 226

1        L. ALDANA-BERNIER
2   A.   11/1/09.
3   Q.   What does the form say in that
4   box, what is the date of --
5   A.   "Date of arrival at hospital."
6   Q.   Did you first write 11/3 and
7   then cross it out and make it 1?
8   A.   No, that's 11/1.
9   Q.   Did you cross out that middle
10  number at all, the date?
11  A.   No, I put 1.
12  Q.   So there is no cross out or
13  block out of that 1 where the 1 is now?
14  A.   I put a 1 in there.
15  Q.   Again, you put the 1 there
16  because that's the date that you
17  understand him to arrive at the psych ER,
18  right?
19  A.   Yes.
20  Q.   As opposed to generally him
21  arriving at the hospital, yes?
22  A.   Yes.
23  Q.   Is that something that you do
24  when you fill out these forms when part
25  of the form asked for date of arrival,

Page 227

1        L. ALDANA-BERNIER
2   did you put in the date they arrived at
3   the psych ER?
4   A.   Yes.
5   Q.   As opposed to the date they
6   actually arrive at the hospital itself?
7   A.   You're right.
8   Q.   Why do you do that?
9   A.   We usually put the date of the
10  arrival when they come to the emergency
11  room.
12  Q.   I understand that.
13       Why don't you put the date of
14  arrival at the hospital when that's what
15  the form asked for?
16  A.   We do not use this in the
17  medical ER.  We use this in the psych ER.
18  Q.   Did you have any hand in
19  creating this form as director?
20  A.   No.
21  Q.   This existed prior to you --
22  A.   Yes.
23  Q.   -- prior to you being director?
24  A.   Yes.
25  Q.   When did you stop being

Page 228

1        L. ALDANA-BERNIER
2   director?
3   A.   Yes.
4   Q.   When did you stop?
5   A.   October 2013.
6   Q.   Was there a reason that you
7   stopped being director?
8   A.   There was a change of
9   administration.
10  Q.   Has there been changes of
11  administration at any time in the ten
12  years that you were director?
13  A.   No.
14  Q.   Looking at the second page of
15  the emergency admission form, is any of
16  this your handwriting?
17  A.   That belong to Dr. Isakov.
18  Q.   Did Dr. Vivek make any notes in
19  the chart as to the associate chairman
20  that you spoke to?
21       MR. CALLAN:  Vivek is the
22  chairman.
23  Q.   I thought you said associate
24  chairman.
25  A.   Associate chairman is Dr. Dhar

Page 229

1        L. ALDANA-BERNIER
2   and chairman and Dr. Vivek.
3   Q.   You spoke to Dr. Dhar?
4   A.   Yes.
5   Q.   Did Dr. Dhar fill out any of
6   these forms with regard to the mental
7   hygiene admission?
8   A.   No.
9   Q.   So you just got a verbal on the
10  phone by Dr. Dhar; is that what you're
11  saying?
12       MR. RADOMISLI:  Objection.
13  Q.   Of your opinion?
14       MR. CALLAN:  Objection to the
15  form of the question.
16  Q.   Did you speak to Dr. Dhar on
17  the telephone?
18  A.   He came down.
19  Q.   He came down to the emergency
20  room?
21  A.   [Indicating.]
22  Q.   When Dr. Dhar came down to the
23  emergency room, you presented the case to
24  him, correct?
25  A.   Yes.

58 (Pages 226 - 229)

L. ALDANA-BERNIER

1
2    Q.   And then what happened?
3    A.   And he agreed to my decision of
4  admitting the patient.
5    Q.   Did he become the second
6  physician under Mental Hygiene Law for
7  admission?
8    A.   You only the need one in an
9  emergency admission.
10    Q.   But it needs to be confirmed
11  eventually, correct?
12    A.   That is after 48 hours.
13    Q.   So you called him down just
14  because you wanted a second opinion, not
15  to confirm for the purposes of 48-hour
16  requirement, correct?
17    A.   To discuss this case, yes.
18    Q.   Was there something you were
19  unsure of, is that why you wanted Dr.
20  Dhar's opinion or something else?
21      MR. CALLAN:  You went through
22  this whole thing.  Asked and answered,
23  objection.
24      MR. SUCKLE:  Then her answer
25  should be the same.

L. ALDANA-BERNIER

1
2    A.   I give you the same answer.
3    Q.   What is the same answer?
4    A.   I made the decision and I asked
5  for Dr. Dhar's opinion and Dr. Dhar
6  agreed.
7    Q.   Was there anything about Mr.
8  Schoolcraft's presentation to you that
9  made you unsure of your opinion?
10      MR. RADOMISLI:  Objection to
11  form; unsure.
12    A.   Once more I have to reiterate:
13  I was not only looking at that day when I
14  saw him, I was looking at the whole
15  picture; the whole picture from the time
16  that he came in to the time that I made
17  the decision that he needs to be
18  admitted.
19    Q.   Was there anything about that
20  whole picture as you say and the opinion
21  you formed as a result of that whole
22  picture of which you were unsure; that is
23  the question?
24    A.   That I was not, no.  I made a
25  decision so I had to admit him.

L. ALDANA-BERNIER

1
2    Q.   And the second form, did you
3  review this at any time while Mr.
4  Schoolcraft was in the hospital or were
5  you done with Mr. Schoolcraft's care and
6  treatment after that?
7    A.   I did not review that.  I do
8  not go to the inpatient.  I was not in
9  the inpatient.
10    Q.   So this form was completed in
11  part by you in the emergency room, and
12  the rest was completed for the inpatient
13  by the second confirming physician?
14    A.   Yes.
15      MR. SUCKLE:  Mark this as
16  Plaintiff's Exhibit 70.
17      [The document was hereby marked
18    as Plaintiff's Exhibit 70 for
19    identification, as of this date.]
20    Q.   I show you what's been marked
21  Exhibit 70 for today's date and ask you
22  what that is?
23      MR. RADOMISLI:  Do you have one
24    at least?
25      MR. SUCKLE:  You produced it.

L. ALDANA-BERNIER

1
2      MR. CALLAN:  What you are
3  showing is Emergency Admission Status.
4    Q.   Do you know what that is?
5      MR. CALLAN:  Do you have a copy
6  machine?
7      MR. SMITH:  I do.
8      MR. CALLAN:  Before the end of
9  day?
10      MR. SMITH:  For sure.
11      MR. CALLAN:  It's only three
12  pages.
13      MR. SMITH:  Everybody take a
14  break.  I'll make copies right now.
15      It's 4:34.  We are taking a
16  break.
17      [Discussion held off the
18    record.]
19      [Whereupon, at 4:34 p.m., a
20    recess was taken.]
21      [Whereupon, at 4:49 p.m., the
22    testimony continued.]
23      [The documents were hereby
24    marked as Plaintiff's Exhibits 71
25    through 75 for identification, as of

Page 234

L. ALDANA-BERNIER

1
2  this date.]
3    Q.   Doctor, you have in front of
4  you Exhibit 70 I believe.
5    A.   Yeah.
6    Q.   Do you know what that is?
7    A.   Yes.
8    Q.   What is it?
9    A.   It's a policy on Emergency
10  Admission Status.
11    Q.   Did you have any hand in
12  creating this document?
13    A.   I do not remember.  I just
14  probably would see it, but I don't
15  remember crafting it or making all of
16  those policies.
17    Q.   I realize it's long and I know
18  you're tired, I appreciate that, but you
19  have to keep your voice up if you can.
20        When you were the director of
21  the emergency room, did you have a
22  supervisor that you answered to?
23    A.   Yes.
24    Q.   Who was that?
25    A.   Dr. Dhar and Dr. Vivek.

Page 235

L. ALDANA-BERNIER

1
2    Q.   So the chairman and the
3  associate chairman?
4    A.   Yes.
5    Q.   Did they have a hand in
6  creating this form?
7    A.   Yes.
8    Q.   So who else was involved in the
9  creation of this form?  You said you sat
10  in maybe?
11    A.   Yes.  It's all the
12  administrative leaders of the department:
13  the unit chief, Dr. Dhar, Dr. Vivek, and
14  the director of the nursing department.
15    Q.   Have you ever from time to time
16  had to reference this document for your
17  own information?
18        MR. RADOMISLI:  Objection to
19  form.
20    A.   You mean go back and read?
21    Q.   Yes, that's another way of
22  asking it.
23    A.   I see it every now and then if
24  we have administrative meetings, we have
25  to see it once again so I more or less

Page 236

L. ALDANA-BERNIER

1
2  will listen to what is being changed or
3  being added.
4        MR. CALLAN:  Keep your voice up,
5  Doctor, louder.
6    Q.   Doctor, I know that the last
7  review was April of 2010.  Was anything
8  changed then?
9    A.   I would not remember.
10    Q.   It appears that the policy was
11  reviewed every April from 1999 through
12  2010.  What does the review entail, do
13  you know?
14    A.   Going back to all of this if
15  there is anything added that the
16  Department of Health would like to add.
17    Q.   What is on here, how would you
18  characterize that?
19    A.   Well, it's giving us all the
20  reasons about when we admit the patient.
21  It's the 9.39.
22    Q.   Do you know the vernacular,
23  CPEP, do you know what a CPEP is?
24    A.   Community --

Page 237

L. ALDANA-BERNIER

1
2    Q.   Community psyche emergency
3  protocol?
4    A.   Where are you?
5    Q.   It's not on here.
6        Do you know that vernacular, do
7  you know what that stands for, CPEP?
8        MR. RADOMISLI:  Did you say what
9  you thought it stood for on the
10  record?  I don't think you got it
11  right.
12    Q.   Do you know what CPEP stands
13  for?
14    A.   Referring to CPEP?
15    Q.   What is that?
16    A.   That is the holding a patient
17  in that department instead of sending the
18  patient to admission.
19    Q.   Holding them in that --
20    A.   It's a different department of
21  ER wherein you can hold a patient before
22  you could admit the patient to the
23  inpatient.
24    Q.   That's the psych ER, the
25  medical ER, or both?

60 (Pages 234 - 237)

Page 238

L. ALDANA-BERNIER

1
2   A.   The psych ER.
3   Q.   And that wasn't done with Mr.
4 Schoolcraft, correct?
5   A.   Because we did not have a CPEP
6 then.
7   Q.   What does that stand for?
8   A.   Community psychiatry emergency
9 -- I do not have the whole name, sorry.
10   Q.   But Jamaica Hospital has one
11 now?
12   A.   It has one, yes.
13   Q.   When looking at Exhibit 70, is
14 it your understanding this sets out what
15 is required under 9.39 of the mental
16 health law to admit someone under the
17 mental health law?
18   MR. CALLAN: Objection to form.
19   MR. LEE: Objection to the form.
20   A.   I want you to rephrase that
21 one.
22   Q.   Sure.
23   What is the standard set out in
24 this document, if you know?
25   MR. CALLAN: Do you want her to

Page 239

L. ALDANA-BERNIER

1
2 read the document, a summary?
3   MR. SUCKLE: I want to know her
4 understanding of it.
5   MR. CALLAN: I object. It's a
6 three-page piece of paper. It speaks
7 for itself.
8   Objection to the form of the
9 question.
10   Q.   Do you know what this is?
11   A.   Yes, it's a New York Mental
12 Hygiene Law, that's careful attention
13 with preservation of their legal rights
14 as well as their safety.
15   Q.   Is this the policy of Jamaica
16 Hospital?
17   A.   To do a 9.39?
18   Q.   Is this document a policy of
19 Jamaica Hospital?
20   A.   It's showing in here Jamaica
21 Hospital Department of Psychiatry Manual.
22   Q.   Is it a policy of Jamaica
23 Hospital, a written policy?
24   A.   A written policy, yes.
25   Q.   Do you endeavor to follow the

Page 240

L. ALDANA-BERNIER

1
2 policies of Jamaica Hospital, the written
3 ones?
4   A.   The written, yes.
5   Q.   In dealing with Mr.
6 Schoolcraft, did you endeavor to follow
7 the policy set forth here as Exhibit 70?
8   MR. CALLAN: Well, this says it
9 was revised 4/10.
10   MR. SUCKLE: I asked her if she
11 knew what --
12   MR. CALLAN: Well, we don't
13 know.
14   MR. SUCKLE: It doesn't say
15 revised. It says reviewed. Please
16 don't speak. I asked her about --
17   MR. CALLAN: Are you making a
18 representation this was the policy
19 that was in effect at the time that
20 Mr. Schoolcraft were seen?
21   MR. SUCKLE: I'm asking if she
22 followed this policy, endeavored to
23 follow this policy, whether it was in
24 effect or not she can tell me.
25   MR. LEE: Objection to form.

Page 241

L. ALDANA-BERNIER

1
2   A.   It's saying in here, "Patient
3 alleged to have a mental illness for
4 which immediate observation, care, and
5 treatment in a hospital is appropriate
6 and which is likely to result in serious
7 harm to himself or others may be admitted
8 under this provision for a period of 15
9 days."
10   Q.   The question is: Did you
11 endeavor to follow this policy in your
12 care and treatment of Mr. Schoolcraft?
13   A.   At that point in 2009, I
14 thought -- I believe that he may be a
15 danger to others or to himself because of
16 that point in time if you go back to the
17 story where he was brought to the
18 hospital because he was acting bizarre
19 and agitated and he was paranoid. I
20 think he was a danger to others or to
21 himself.
22   Q.   Is your answer, yes, you tried
23 to --
24   A.   That's what I'm saying, yes.
25   Q.   Under this policy, under number

61 (Pages 238 - 241)

Page 242

L. ALDANA-BERNIER

1 is "a substantial risk of physical harm
2 to himself as manifested by threats of or
3 attempts at suicide."
4 Did he manifest threats or
5 attempts at suicide?
6 Q. Did he manifest threats or
7 MR. SHAFFER: Objection.
8 MR. CALLAN: Objection.
9 Q. Did Mr. Schoolcraft manifest
10 threats or attempts at suicide?
11 A. You have to finish.
12 Q. We are going to break it down.
13 We are going to go one by one?
14 MR. CALLAN: Objection.
15 MR. SUCKLE: That's the
16 question.
17 MR. CALLAN: Objection to the
18 form of the question.
19 MR. SUCKLE: Noted. She can
20 answer.
21 MR. CALLAN: The doctor said you
22 left something out. You are reading
23 incomplete sentences from a three-page
24 document.
25 MR. SUCKLE: I'm asking

Page 243

L. ALDANA-BERNIER

1 questions. In my horrific stumbling
2 way, I'm asking a question.
3 Q. Doctor, did you admit Mr.
4 Schoolcraft because he was a substantial
5 risk of physical harm to himself as
6 manifested by a threat or attempt at
7 suicide?
8 A. Sir --
9 Q. Just yes or no.
10 A. Sir, you have to complete the
11 statement.
12 Q. I don't have to do anything.
13 You have to answer questions.
14 MR. SHAFFER: Objection.
15 A. "Or other conduct demonstrating
16 he is a danger to himself."
17 Q. We're going to get there. I
18 know that part. I'm asking you a
19 question.
20 A. That's what I based --
21 Q. We are going to get to what you
22 based your opinion on. I'm asking you:
23 Did you base it on that he was a
24 substantial risk of physical harm to

Page 244

L. ALDANA-BERNIER

1 himself as manifested by a threat of or
2 attempt at suicide?
3 MR. CALLAN: Objection, asked
4 and answered.
5 MR. SUCKLE: Not answered yet.
6 Q. Yes or no?
7 MR. CALLAN: Objection, asked
8 and answered.
9 Q. Can you answer, please?
10 A. A potential risk, yes.
11 Q. So you say he manifest by a
12 threat or attempt at suicide; it that
13 what you're saying?
14 A. A potential risk.
15 Q. Did he manifest by a threat of
16 suicide?
17 A. It's the behavior that he came
18 in with to the emergency room. I saw he
19 was a potential risk that he might hurt
20 himself or hurt others. That's a
21 potential risk.
22 Q. So potential risk was the
23 reason that you held him, correct?
24 A. That's the reason that I was

Page 245

L. ALDANA-BERNIER

1 thinking that he needs admission.
2 Q. And the potential of that risk
3 you've described to us already today?
4 A. I did, yes.
5 Q. And this potential of a risk,
6 did the doctor who saw him within the
7 48-hour period to confirm his admission
8 also tell you that he was concerned about
9 the potential risk?
10 MR. RADOMISLI: Objection.
11 MR. LEE: Objection to the form.
12 MR. CALLAN: I join in the
13 objection.
14 Q. Did he tell you he was
15 concerned about the potential risk that
16 you've just described?
17 MR. LEE: There's been no
18 testimony she ever talked to him.
19 MR. SUCKLE: She can say that if
20 that's the answer.
21 A. If you read the notes, I wasn't
22 there for him to tell me that. As I read
23 his notes, I can see he was a potential
24 risk.

62 (Pages 242 - 245)

Page 246

L. ALDANA-BERNIER

1
2    Q.   This potential risk that you're
3  talking about, did he have this potential
4  risk when you last saw him?
5    A.   I'm not basing it only to one
6  day.  I'm basing it from the beginning
7  that he came into the hospital.
8    Q.   And this potential risk, is
9  there any other risk besides that
10  potential risk that you just described as
11  the reason that you held him?
12    A.   What risk are you thinking of?
13    Q.   I'm not thinking of any.
14      MR. CALLAN:  Do you want her to
15  repeat herself again?
16      MR. SUCKLE:  No, I want to make
17  sure there are no other ones.
18    Q.   Is that potential risk that you
19  just described the only reason that you
20  held him?
21    A.   The same reason I think when I
22  see a patient, it is a potential risk and
23  danger to others, and I make the decision
24  I have to admit the patient.
25    Q.   And when you say "potential

Page 247

L. ALDANA-BERNIER

1
2  risk," can you quantify that for me at
3  all what you mean by potential?
4    A.   The patient comes in barricaded
5  himself, acting bizarre.  He was brought
6  in from his house.  It was a police
7  officer who may have access to weapons,
8  easy for him to have access to weapons.
9  He is paranoid.  I would think that maybe
10  it would be safe if the patient will be
11  admitted.
12    Q.   So your thought he might be
13  safe if he was admitted?
14    A.   If he was admitted.
15    Q.   That's what you were talking
16  about when you say potential risk,
17  correct?
18    A.   All of the above that I told
19  you.
20    Q.   Can you quantify what you mean
21  by potential risk as far as the
22  likelihood of risk?  This word
23  "potential" that you have been using, can
24  you quantify that for me?
25    A.   When you say "quantify," what

Page 248

L. ALDANA-BERNIER

1
2  do you mean?
3    Q.   Sure.
4      Well, you used the word
5  "potential."  I would like to know what
6  you mean by potential.
7    A.   If you think of the navy yard
8  disaster, was he an officer or army man?
9  He was so quite, no one ever found out
10  what was going on with him.  So what
11  happened then?
12      Or if you look at all of those
13  -- the Range Rover.  Who are all of these
14  people that caused that?  They are all
15  police officers.
16      So if I think then I have to
17  make sure that when I see a patient in
18  the ER, I have to think in the future
19  that there will be no disaster, there
20  will be no destruction, or no one will
21  get harmed when they were discharged from
22  the ER.
23    Q.   I was asking about what you
24  meant by potential.
25    A.   That's the potential.

Page 249

L. ALDANA-BERNIER

1
2    Q.   So if there is any potential at
3  all, you want to make sure that the
4  patient is safe, correct?
5    A.   Correct.
6    Q.   And if there is any potential
7  at all, you want to make sure the
8  community is safe, correct?
9    A.   That's correct.
10    Q.   And if there is any potential
11  at all, you were going to admit Mr.
12  Schoolcraft, correct?
13      MR. LEE:  Objection to form.
14    A.   With all of those reasons, yes,
15  I would have to admit him.
16    Q.   When you admitted him to the
17  emergency room, there were certain rules
18  and regulations --
19      MR. SUCKLE:  Withdrawn.
20    Q.   When he was admitted to the
21  psych floor, there were certain rules and
22  regulations in the psych ward, correct,
23  about clothes they wear, what hours
24  visitors can come, correct?
25    A.   Yes.

63 (Pages 246 - 249)

Page 250

```
1        L. ALDANA-BERNIER
2    Q.   It's not like they are free to
3  have anybody come and visit any time they
4  want, correct; is that true?
5    A.   That's correct.
6    Q.   I will show you what's been
7  marked as Exhibit 71.
8        Now, do you know what that is?
9    A.   [No response.]
10   Q.   Do you know what that is?
11   A.   It's the policy of visiting
12 hours.
13   Q.   Were those the policies in
14 effect when Mr. Schoolcraft was on the
15 psychiatric floor at Jamaica Hospital in
16 2009?
17   A.   Okay, this policy is for the
18 inpatient unit.
19   Q.   During the time that Mr.
20 Schoolcraft was at Jamaica Hospital, was
21 he in the inpatient unit?
22   A.   I did not work in the inpatient
23 unit.
24   Q.   I understand.
25        Was he in the inpatient unit?
```

Page 251

```
1        L. ALDANA-BERNIER
2    A.   Yeah, he was in the inpatient
3  unit.
4    Q.   Were these documents created by
5  Jamaica Hospital, the visiting hours, do
6  you know about that?
7    A.   It's in here [indicating].
8    Q.   Were you sitting in on the
9  committee that created that document too?
10   A.   I don't remember that.
11   Q.   Do you agree that Mr.
12 Schoolcraft could have visitors from 2
13 p.m. and 3 p.m. and 6:30 p.m. to 8 p.m.
14 only?
15       MR. RADOMISLI:  Objection.
16       MR. CALLAN:  Objection.
17   Q.   While he was on the floor, do
18 you agree with that?
19       MR. CALLAN:  You know, Counsel,
20  she said she is not involved with the
21  inpatient.
22       Maybe you can ask her about
23  painting the hospital.  Maybe she
24  might know something about that.
25       Maybe she looked at it from her car
```

Page 252

```
1        L. ALDANA-BERNIER
2  when she drove by.
3        MR. SUCKLE:  I'll ask her about
4  it next.
5        MR. SHAFFER:  I will be leaving
6  if that is a question that's asked.
7    A.   Can you ask the question again?
8    Q.   What were the visiting hours on
9  the floor?
10   A.   Two to three, 6:30 to eight.
11   Q.   So Mr. Schoolcraft if his
12 father wanted to visit him at nine
13 o'clock in the morning, would not be able
14 to do that, correct?
15       MR. CALLAN:  Objection.
16       MR. RADOMISLI:  Objection.
17       MR. LEE:  Objection to form.
18   A.   I would not know what the
19 policy at the inpatient unit would be.
20       MR. SUCKLE:  Counsel wants me to
21  ask about painting, but I'm not going
22  to do that.
23       MR. CALLAN:  That's a relief.
24   Q.   Let's look at Exhibit 72.
25       MR. SMITH:  Which is --
```

Page 253

```
1        L. ALDANA-BERNIER
2    Q.   Which is the restriction of
3  visiting and communication and
4  correspondence, do you know about that,
5  what that document is?
6    A.   This is also for the inpatient
7  unit.
8    Q.   So you don't know anything
9  about it?
10   A.   I can read it to you.
11   Q.   Do you know anything about it?
12   A.   No, it's for the inpatient
13 unit.
14   Q.   So you only know about the
15 emergency room?
16   A.   Emergency room.
17       MR. CALLAN:  Aren't you doing
18  Isakov tomorrow?  Isn't he in the
19  inpatient room?
20   Q.   I'm showing you what's been
21 marked Exhibit 74 today's date.  Do you
22 know what this is?
23   A.   It's the rules and regulations
24 the patients have to comply with.
25   Q.   At Jamaica Hospital in the
```

64 (Pages 250 - 253)

Page 254

1    L. ALDANA-BERNIER
2  psych unit?
3     A.   Psych Unit 3, yes.
4     Q.   What is Psych Unit 3?
5     A.   That's -- it's a unit which
6  patients are admitted; one is 2 and one
7  is 3.
8     Q.   What is the distinction, if
9  any, in treatment?
10    A.   None, it's the same.
11    Q.   Was Mr. Schoolcraft admitted to
12  Psych 3?
13    A.   Yes.
14    Q.   So these rules would apply to
15  him?
16    A.   Psych 3.
17       MR. RADOMISLI: Mr. Suckle, is
18  this something we produced to you?
19       MR. SUCKLE: I believe so. I
20  don't know.
21       MR. RADOMISLI: Do you know?
22       MR. SUCKLE: Off the top of my
23  head, I don't remember but -- I don't
24  remember.
25       MR. RADOMISLI: Would there be a

Page 255

1    L. ALDANA-BERNIER
2  way for you to get it in a fashion
3  other than if we produced it?
4       MR. SUCKLE: I didn't do
5  discovery in this case so you've got
6  the wrong guy.
7       MR. RADOMISLI: Do you know
8  whether this was produced to you by
9  us?
10       MR. SUCKLE: Off the top of my
11  head, I would assume it was. In fact,
12  I know it came out of, I hit print on
13  your document response to discovery
14  inspection and this came out. I can
15  tell you that.
16       MR. RADOMISLI: Fair enough.
17  Thank you.
18       MR. CALLAN: Or it could be
19  another hospital in Queens, who knows.
20    Q.   This document was created by
21  Jamaica Hospital, correct?
22       MR. CALLAN: Objection.
23    A.   Correct.
24    Q.   She already said yes.
25       MR. CALLAN: Do you know if that

Page 256

1    L. ALDANA-BERNIER
2  was created by Jamaica Hospital, do
3  you have personal knowledge of that?
4       THE WITNESS: It says Unit 3
5  so....
6       MR. CALLAN: I'm not asking you
7  what it says.
8       Do you have personal knowledge
9  as to whether that document was
10  created by Jamaica Hospital?
11       If you do, you can say yes, if
12  no, say no. Don't assume is all I'm
13  saying to you.
14       Do you know?
15       MR. SUCKLE: Stop badgering your
16  own witness.
17       THE WITNESS: I was just looking
18  at the top of it.
19    Q.   Do you recognize this document?
20    A.   Which one?
21    Q.   This one, have you seen it
22  before?
23    A.   I have to -- I don't think so
24  because it's inpatient unit.
25       MR. SMITH: You don't think so?

Page 257

1    L. ALDANA-BERNIER
2       THE WITNESS: It's in the
3  inpatient unit. I work in the ER.
4    Q.   You work in the ER; am I
5  correct?
6    A.   Yes.
7    Q.   You have been doing this for
8  how many years, how long have you been
9  working in the ER?
10    A.   Eighteen years.
11    Q.   For 18 years people come into
12  the psychiatric ER, right, you evaluate
13  them, correct?
14    A.   Yes.
15    Q.   And you sign them in under
16  Mental Hygiene Law, they go upstairs,
17  correct?
18    A.   Yes.
19    Q.   And you never see them again;
20  is that true?
21       MR. CALLAN: Objection.
22    Q.   While they were at the
23  hospital?
24       MR. CALLAN: Does that have to
25  do with the piece of paper?

65 (Pages 254 - 257)

Page 258

L. ALDANA-BERNIER

1
2    MR. SUCKLE: I'm asking
3  questions about the paper because you
4  didn't like the paper.
5    Q.   Is that true?  When they go
6  upstairs on the psychiatric ward, you
7  don't see them again, correct?
8    A.   That depends if you follow the
9  patient on the outside, then you see them
10  again.
11    Q.   When you say "follow the
12  patient on the outside," do you follow
13  patients on the outside?
14    A.   If they refer them to me, yes.
15    Q.   Who is they?
16    A.   The inpatient Unit 3.
17    Q.   So inpatient can refer a
18  patient to you for private care?
19    A.   Yes.
20    Q.   Do you do your own private
21  practice?
22    A.   Yes.
23    Q.   Do you have an office outside
24  of Jamaica Hospital?
25    A.   I do.

Page 259

L. ALDANA-BERNIER

1
2    Q.   In this private practice, you
3  practice psychiatry I assume, correct?
4    A.   What else would I practice?
5    Q.   I don't know.  I'm just making
6  sure.
7      How many days a week do you
8  work in that private practice?
9    A.   One.
10    Q.   How many days a week did you
11  work at Jamaica Hospital in 2009?
12    A.   Five.
13    Q.   And you also had private
14  practice back in 2009?
15    A.   That's -- yes, one, one day.
16    Q.   So just to be clear:  You were
17  working six days a week back in 2009,
18  correct, five at Jamaica, one on your
19  own?
20    A.   I work with somebody.
21    Q.   So you are working six days a
22  week, five at Jamaica Hospital and one in
23  private practice in 2009?
24    A.   Five days a week after I come
25  -- after five o'clock on Friday.

Page 260

L. ALDANA-BERNIER

1
2    Q.   So five o'clock on Fridays you
3  see private patients in your own
4  practice; is that what you're saying?
5    A.   Yes.
6    Q.   How many hours do you usually
7  do that?
8    A.   Four hours.
9    Q.   Could you get referrals from
10  time to time from patients up on the
11  psych 3 unit?
12    A.   Yes.
13    Q.   Who refers them to you:  the
14  physicians up there, the nurses, anybody
15  else?
16    A.   Social worker.
17    Q.   Social workers?
18    A.   Yes.
19    MR. CALLAN:  Counsel, does this
20  have anything remotely to do with Mr.
21  Schoolcraft?
22    MR. SUCKLE:  I don't know yet.
23    MR. CALLAN:  Has he told you he
24  was seeing Dr. Aldana-Bernier in her
25  office?

Page 261

L. ALDANA-BERNIER

1
2    MR. SUCKLE:  Are you saying her
3  resumé is not part of my questions?
4    MR. CALLAN:  I'm just asking.
5  You have been going for hours here and
6  now we have gone down this road to
7  nowhere.  I would kind of like to get
8  it back.
9      This all has to do with you
10  handing her a piece of paper if they
11  can smoke in the inpatient unit or not
12  which I will be willing to stipulate
13  by the way that no smoking is allowed.
14      I think it is Rule No. 1
15  assuming that's Psych Unit 3 is
16  Jamaica Hospital.
17    MR. SUCKLE:  Are you enjoying
18  extending our stay here?
19    Q.   So did you see Mr. Schoolcraft
20  in your private practice?
21    A.   No.
22    Q.   Did you see police officers in
23  your private practice?
24    A.   No.
25    Q.   Did a Captain Lauterborn tell

66 (Pages 258 - 261)

Page 262

L. ALDANA-BERNIER

1 you that from his observation of Mr.
2 Schoolcraft as he observed Mr.
3 Schoolcraft on October 31st, 2009, that
4 Mr. Schoolcraft was fit for duty?
5       MR. SHAFFER:  Objection.
6    Q.   Did he tell you that?
7    A.   I did not meet him.
8    Q.   So am I correct that you got
9 the history of Mr. Schoolcraft
10 barricading him [sic] from some police
11 officers, but you didn't get the
12 histories from other police officers like
13 Captain Lauterborn; am I correct?
14       MR. CALLAN:  Objection to form.
15       MR. LEE:  Objection to form.
16       MR. RADOMISLI:  Objection to
17 form.
18    A.   I don't know the officer.  I
19 haven't met him.
20    Q.   Well, it was Mr. Schoolcraft's
21 captain.  Are you aware that Captain
22 Lauterborn was his captain?
23       MR. SHAFFER:  Objection.
24    A.   No.

Page 263

L. ALDANA-BERNIER

1    Q.   So you were not aware when you
2 signed the form on November 3rd, to admit
3 Mr. Schoolcraft to the hospital that his
4 captain said he was fit for duty?
5       MR. CALLAN:  Objection.
6       MR. SHAFFER:  Objection.
7       MR. RADOMISLI:  Objection.
8    Q.   You did not know that?
9       MR. SHAFFER:  Objection.
10   A.   No, I didn't know that.
11   Q.   Would you like to have known
12 that information, would it have helped
13 you in your assessment of Mr.
14 Schoolcraft?
15       MR. SHAFFER:  Objection.
16       MR. CALLAN:  I join in the
17 objection.
18   Q.   Would you have liked to know,
19 would that have helped you in your
20 assessment of Mr. Schoolcraft?
21       MR. CALLAN:  If it's true.
22   A.   I didn't even know when he came
23 to the hospital, I didn't see any
24 officer.  I don't remember if I seen an

Page 264

L. ALDANA-BERNIER

1 officer at the time when I saw Mr.
2 Schoolcraft.
3       MR. CALLAN:  Doctor, he didn't
4 say he came to the hospital.  I know
5 it's getting late in the day.  He is
6 asking you to make an assumption about
7 something.  He asking you a question.
8 He didn't say this person came to the
9 hospital so just listen carefully to
10 the question.
11       Go ahead, Counsel.
12       MR. SUCKLE:  Read that back.
13       [The requested portion of the
14 record was read.]
15   Q.   My question is:  Would you have
16 liked to know, would it have helped you
17 in your assessment of Mr. Schoolcraft
18 that his captain said he was fit for duty
19 on October 31st, 2009?
20       MR. KRETZ:  Objection.
21       MR. CALLAN:  On October 31st?
22       MR. SUCKLE:  Yes.
23       MR. CALLAN:  Objection.
24   A.   Yes, I would.

Page 265

L. ALDANA-BERNIER

1    Q.   Would that have changed your
2 opinion regarding whether or not Mr.
3 Schoolcraft needed to be admitted to the
4 hospital if you had known that Captain
5 Lauterborn had said that Mr. Schoolcraft
6 was fit for duty on October 31st, 2009?
7       MR. RADOMISLI:  Can you just
8 define when he said that?
9       MR. SUCKLE:  On that day,
10 October 31st, 2009.
11       MR. RADOMISLI:  Before Mr.
12 Schoolcraft left?
13       MR. SUCKLE:  I just want to ask
14 the question.  You can narrow it down
15 anyway you want when your turn comes.
16       Let's have a question and an
17 answer.
18       MR. RADOMISLI:  I would like a
19 time frame.
20       MR. SUCKLE:  I know what you
21 want.  I asked a question.
22       MR. RADOMISLI:  Objection to
23 form.
24       MR. SHAFFER:  I join in the

Page 266

L. ALDANA-BERNIER
1
2    objection.
3    Q.   Would you have changed your
4    opinion had you known on October 31st,
5    2009, at 21:30 hours, Captain Lauterborn
6    said that Mr. Schoolcraft was fit for
7    duty, would that have changed your
8    opinion?
9         MR. KRETZ:  Objection.
10        MR. CALLAN:  Objection.
11        MR. SHAFFER:  Objection.
12   Q.   Would you have admitted him is
13   the question?
14   A.   Yes, I would have admitted him.
15   Q.   How would it have changed your
16   opinion.  You said it would change your
17   opinion?
18        MR. CALLAN:  You asked if she
19   would have liked to have known.
20        MR. SUCKLE:  I did ask her.
21   Q.   Would it change your opinion if
22   you knew that Captain Lauterborn on
23   October 31st, 2009, at 21:30 hours,
24   deemed Mr. Schoolcraft fit for duty?
25   A.   It would not change my opinion.

Page 267

L. ALDANA-BERNIER
1
2    I would talk to maybe the captain, and I
3    will tell him what is going on, and I
4    will make a decision together again with
5    the chairman if he should be admitted or
6    discharged.
7    Q.   And you would talk to the
8    captain because you want to verify that
9    information, correct?
10        MR. KRETZ:  Objection.
11        MR. CALLAN:  Same objection.
12   Q.   Is that why you would have
13   talked to the captain?
14        MR. CALLAN:  Verify what
15   information, what information,
16   Counsel?
17        MR. SUCKLE:  She said she would
18   talk to the captain.
19   Q.   Why would you have talked to
20   the captain?
21   A.   To verify that he said he was
22   fit for duty.
23   Q.   Did you speak to any officers
24   to verify that he had barricaded himself
25   in his house?

Page 268

L. ALDANA-BERNIER
1
2         MR. SHAFFER:  Objection.
3    A.   I get it from the information
4    in the report.
5    Q.   Did you speak to any police
6    officer to verify he was acting bizarre?
7         MR. SHAFFER:  Objection.
8         MR. CALLAN:  Asked and answered.
9    Q.   Did you speak to any officers?
10   A.   It's been reported and written
11   down in the document.
12        MR. KRETZ:  Read that back.
13        [The requested portion of the
14   record was read.]
15   Q.   Seroquel, do you know what that
16   is?
17   A.   Yes.
18   Q.   What is it?
19   A.   A second generation
20   antipsychotic.
21   Q.   Is that also used for sleep
22   disorders?
23   A.   Sleep, depression, bipolar,
24   used for psychosis.
25        MR. SMITH:  We are going to take

Page 269

L. ALDANA-BERNIER
1
2    a short break to see what we have
3    left.
4         It's 5:24.  We are going off the
5    record.
6         MR. CALLAN:  All right.
7         [Discussion held off the
8    record.]
9         [Whereupon, at 5:24 p.m., a
10   recess was taken.]
11        [Whereupon, at 5:38 p.m., the
12   testimony continued.]
13        MR. SMITH:  Back on the record.
14   It is 5:38 p.m.
15        MR. RADOMISLI:  Just before you
16   start asking questions, I sent an
17   email to my associate at the office
18   asking him to do a search in our
19   system to determine if we ever
20   provided with you document Psych 3
21   Unit Rules, according to his search,
22   there is nothing on our system
23   indicating we ever did.
24        I ask you send us by within a
25   week an explanation how you obtained

68 (Pages 266 - 269)

Page 270

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2  this document. I'm not saying we
3  didn't give it to you, all I'm saying
4  is according to my associate based on
5  his search, there is no indication we
6  did.
7       MR. SUCKLE: I will double-check
8  my records, but I'm fairly confident
9  that it came from you.
10      MR. CALLAN: It didn't come from
11 me. I can tell you that.
12      MR. SUCKLE: Maybe the house
13 painter gave it.
14   Q.   Doctor, I know it's late. We
15 are getting there.
16      Doctor, in your position as
17 employee of the hospital, do you get a
18 performance evaluation, do you get
19 evaluated in your performance?
20   A.   Yes.
21   Q.   Is that something done
22 annually, some other way?
23   A.   Annually.
24   Q.   Are they written evaluations?
25   A.   Are they written, yes.

Page 271

1    L. ALDANA-BERNIER
2    Q.   And in their evaluations,
3  without discussing at this point what the
4  evaluations were, can you tell me what
5  some of items that are considered in
6  your evaluation?
7    A.   I don't have a copy so it's
8  hard for me to say. We talk about
9  performance. We talk about ability to
10 relate with other staff. We talk about
11 clinical judgment. We talk about if we
12 have this sense of cooperativeness with
13 the department. We also talk about our
14 knowledge of medicine or psychiatry.
15 That's all I can remember.
16   Q.   In your evaluation has any of
17 your evaluations criticized your clinical
18 judgment?
19      MR. RADOMISLI: Objection based
20 on the --
21      MR. CALLAN: Yeah, objection.
22      MR. RADOMISLI: -- and based on
23 Education Law 6527.
24      MR. CALLAN: I join in the
25 objection, and you're directed not to

Page 272

1    L. ALDANA-BERNIER
2  answer that question.
3    Q.   When you talk about
4  performance, is there any relationship
5  between performance and the number of
6  patients seen in your evaluation?
7       MR. CALLAN: Objection to the
8  question.
9       MR. SUCKLE: Just generally not
10 only her.
11   Q.   Generally, is part of your
12 performance evaluation based on the
13 number of patients seen?
14      MR. RADOMISLI: Objection based
15 on privilege, but I can't direct her
16 not to answer.
17      MR. SUCKLE: I don't think
18 that's privileged. She just gave me
19 generally categories of evaluations.
20      MR. RADOMISLI: You're asking
21 her?
22      MR. SUCKLE: I'm asking
23 generally.
24      MR. LEE: Objection.
25   Q.   Generally, in the category of

Page 273

1    L. ALDANA-BERNIER
2  performance, does that include number of
3  patients seen?
4    A.   No.
5    Q.   Do you know how many patients
6  you saw last year at Jamaica Hospital?
7    A.   I would not remember that.
8    Q.   Is there a way that you can
9  ascertain that kind of information?
10   A.   I have to go to the financial
11 department and see how many patients I
12 have seen. I don't know.
13   Q.   That would be the same for
14 patients that you saw in 2009?
15      MR. CALLAN: You mean did she
16 see the exact number of patients?
17   Q.   In order to find out how many
18 you saw, you would have to go to the
19 financial department?
20   A.   Financial department because
21 they have to do the billing. I don't
22 bill.
23   Q.   So in order to find out how
24 many patients you saw if you wanted, you
25 would have to go to the billing or

69 (Pages 270 - 273)

Page 274

1      L. ALDANA-BERNIER
2  financial department, correct?
3         MR. CALLAN:  Do you know if they
4  can isolate it by doctor name or are
5  you assuming?
6         THE WITNESS:  I do not know how.
7         MR. CALLAN:  Just tell him that.
8         MR. SMITH:  Let her speak.
9  Don't interrupt.  Let her answer the
10  question for God's sake.
11        MR. CALLAN:  Do you know for a
12  fact if they have the software or
13  computer program to isolate it by
14  doctor per patient, do you know that?
15        THE WITNESS:  No, I don't.
16     Q.   Doctor, does Jamaica Hospital
17  have a billing department?
18     A.   They do.
19     Q.   When you see a patient, are you
20  required to fill out any paperwork so
21  that the patient's insurance company will
22  be billed if there is an insurance
23  company?
24     A.   I'm not the one that do the
25  billing.

Page 275

1      L. ALDANA-BERNIER
2     Q.   Do you fill out any forms or
3  documents that go to billing so they can
4  bill the patient for your services?
5     A.   Yes, I fill out a form.
6     Q.   What is the nature of that
7  form, what is it?
8     A.   It's a form that I sign that I
9  saw the patient.
10     Q.   Do patients who come in with
11  private insurance, do they get admitted,
12  do you need approval from time to time
13  from private insurance before they get
14  admitted; just generally we're talking
15  about?
16     A.   Let me see.
17     Q.   I'm talking generally.
18     A.   Yes.
19     Q.   Not Mr. Schoolcraft.
20     A.   Yes.
21     Q.   What about for Medicare, do
22  they need approval before a patient is
23  admitted?
24     A.   That depends if it's an HMO.
25     Q.   So some HMOs require approval

Page 276

1      L. ALDANA-BERNIER
2  and some aren't HMOs.
3         And does the federal government
4  require prior approval on their Medicare?
5     A.   If they are not HMOs, you don't
6  to ask for authorization.
7     Q.   How about Medicaid, is prior
8  approval required before admission?
9     A.   No.
10     Q.   Just as a housekeeping thing:
11  Are you paid for your overtime hours?
12     A.   No.
13     Q.   You have actually in front of
14  you, you know at some point IAB, internal
15  affairs from the New York City Police
16  Department did come to the hospital based
17  on the records in front of you, correct?
18        MR. CALLAN:  Is that a question,
19  does she know that?
20        MR. SUCKLE:  Yes.
21     Q.   Based on the record in front of
22  you?
23     A.   Yes, I know there is a note.
24     Q.   What is the date of that note?
25     A.   That's 11/2/2009, five o'clock

Page 277

1      L. ALDANA-BERNIER
2  in the afternoon.
3     Q.   So that note was in the chart
4  before you signed your November 3rd,
5  mental hygiene admission form, correct?
6     A.   That's correct.
7     Q.   So you know that internal
8  affairs had come to the hospital before
9  you decided to admit Mr. Schoolcraft to
10  the hospital?
11        MR. CALLAN:  Objection.  She
12     testified earlier she made the
13     decision to admit him on the 2nd not
14     on the 3rd.  She filled out the form
15     on the 3rd.  You're mischaracterizing
16     testimony.
17     Q.   Before you filled out the form
18  to admit Mr. Schoolcraft under the Mental
19  Hygiene Law, you knew that IAB had come
20  to the hospital, correct?
21        MR. SHAFFER:  Objection.
22     A.   The notes are here from 11/2.
23     Q.   So the answer is yes, you knew
24  that IAB had come to the hospital before
25  you signed the admission forms on 11/3,

70 (Pages 274 - 277)

Page 278

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2 correct?
3    A.   I must have read the notes.
4       MR. SMITH:  What was the answer?
5       THE WITNESS:  I must have read
6    the note.
7    Q.   Did you speak to the officer
8 from IAB and ask them whether or not Mr.
9 Schoolcraft had told them the story about
10 the problem with his supervisor that Mr.
11 Schoolcraft told to you?
12      MR. SHAFFER:  Objection.
13   A.   It was at five o'clock.  I was
14 not there.  It was at 9:30.  I'm not
15 there anymore [indicating].
16   Q.   In fact one of the officers
17 from IAB stapled -- gave his card and it
18 was taped to the chart, correct?
19      MR. CALLAN:  She said she wasn't
20   there when they were there.
21   Q.   The chart you have in front of
22 you, correct?
23   A.   Yes.
24   Q.   Yes.  And when you went to sign
25 your admission under the Mental Hygiene

Page 279

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2 Law on November 3rd, that card was in the
3 chart, correct?
4       MR. CALLAN:  How do we know when
5    the card was stapled in?
6       MR. SUCKLE:  Let her answer.  If
7    she doesn't know, she'll tell me.
8       MR. CALLAN:  You're making these
9    things up in your question.
10      MR. SUCKLE:  I'm making up
11   nothing.  I'm --
12      MR. CALLAN:  You are.  You said
13   the IAB officer stapled the card into
14   the card.
15      MR. SUCKLE:  I didn't say that.
16      MR. CALLAN:  Who stabled that
17   in?
18      MR. SUCKLE:  Nobody, it's taped.
19   Q.   Can we have an answer to the
20 question, please?
21   A.   I don't remember.  I do not
22 remember seeing this card.
23   Q.   If that card was in the chart,
24 would you have called that officer from
25 internal affairs to verify Mr.

Page 280

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2 Schoolcraft's story?
3       MR. CALLAN:  Objection.
4       MR. SHAFFER:  Objection.
5       MR. SMITH:  What was the answer?
6       THE REPORTER:  I didn't get an
7    answer yet.
8    Q.   What's your answer.
9    A.   I wouldn't know because I don't
10 know if I saw the card or not.
11   Q.   Had you seen the card before
12 you signed the mental hygiene admission
13 on the 3rd, would you have called
14 internal affairs?
15   A.   I did not see these cards
16 before so I don't know if I would have
17 called internal affairs.
18   Q.   So now you are saying you know
19 you did not see the cards?
20   A.   I do not know if I saw these
21 cards.  I don't remember seeing them.
22   Q.   And you don't remember if you
23 would have called internal affairs?
24   A.   I didn't see the card.
25   Q.   You know you did not see the

Page 281

L. ALDANA-BERNIER

1    L. ALDANA-BERNIER
2 cards?
3    A.   I do not know.  I do not
4 remember.  It was that 2009.
5    Q.   So the answer is, am I correct,
6 you don't know if you saw the cards and
7 you don't know what you would have done
8 if you did see the cards, am I correct,
9 is that the answer?
10      MR. CALLAN:  Objection.
11   Q.   You can answer.
12   A.   I do not know if I would have
13 called them.
14   Q.   Looking at the note of November
15 2nd, 2009, at 9:30, do you see that note?
16   A.   P.m.?
17   Q.   Yes.
18      Do you see that note?
19   A.   Yes.
20   Q.   And that is before your
21 November 3rd, 1:20 note where you signed
22 the form, the mental hygiene admission,
23 correct?
24   A.   Yes.
25   Q.   And did you read the chart

71 (Pages 278 - 281)

Page 282

L. ALDANA-BERNIER

1      L. ALDANA-BERNIER
2 where it says, "Patient has been seen and
3 interviewed by Detective Steven P. Wacter
4 [phonetic] and Sergeant Scott from
5 Internal Affairs Bureau"?
6   A.   Yes.
7   Q.   Would you want to know what
8 internal affairs had to see about Mr.
9 Schoolcraft in coming to your opinion
10 regarding whether or not he needed to be
11 admitted to the hospital?
12      MR. SHAFFER: Objection.
13   A.   I was wondering why the
14 attending put this note and did not write
15 any note about what interaction happened
16 with internal affairs.
17   Q.   When you say you were wondering
18 about it --
19   A.   There's nothing.
20   Q.   When were you wondering about
21 it?
22   A.   Now.
23   Q.   Why were you wondering about
24 it?
25   A.   Should have written a note.

Page 283

1      L. ALDANA-BERNIER
2   Q.   When you say "should have
3 written a note," what should he have
4 written about?
5   A.   His interaction with internal
6 affairs.
7   Q.   Would that have been helpful to
8 you in your care and treatment with Mr.
9 Schoolcraft?
10   A.   In deciding to admit him or
11 not?
12   Q.   Yes.
13   A.   I already made my decision
14 before that. On 11/1 I made the decision
15 of admission.
16   Q.   Was your decision irreversible
17 once you made it?
18   A.   I think that he would benefit
19 from inpatient admission.
20   Q.   When you say "he would
21 benefit," what do you mean?
22   A.   I thought at the time in 2009
23 that he would be a danger to himself or
24 others.
25   Q.   The question was: Would the

Page 284

1      L. ALDANA-BERNIER
2 notes that you think would have been
3 helpful in coming to your decision as to
4 whether or not Mr. Schoolcraft needed to
5 be admitted?
6      MR. RADOMISLI: Objection to
7 form.
8      MR. CALLAN: How would she know?
9      MR. SUCKLE: She was the one
10 that said something should have been
11 there.
12      MR. CALLAN: You are the one
13 talking about cards stapled into a
14 chart.
15      MR. SUCKLE: The record is what
16 the record is. You are just playing
17 games now.
18      MR. CALLAN: It's nonsense.
19      MR. SUCKLE: It's nonsense?
20      MR. CALLAN: Right.
21      MR. SUCKLE: A doctor has a note
22 in front of her and she signs a day
23 later, you think it's nonsense.
24      MR. CALLAN: It is.
25      MR. SUCKLE: Let's go.

Page 285

1      L. ALDANA-BERNIER
2      MR. SUCKLE: She's got one note
3 in the chart, it's only taken us six
4 hours to question her so....
5      MR. SUCKLE: Maybe we should
6 have taken six hours to evaluate the
7 patient.
8   Q.   The notes you said should have
9 been there, would that have been helpful
10 to you in your decision to admit Mr.
11 Schoolcraft?
12      MR. SHAFFER: Objection to form.
13      MR. CALLAN: Objection to form.
14      MR. SUCKLE: It hasn't been
15 answered.
16      MR. RADOMISLI: It has actually.
17      MR. CALLAN: Asked and answered,
18 Counsel.
19      There is nothing in the note
20 except that IAB was there.
21      MR. SUCKLE: The note she said
22 should have been there.
23      MR. CALLAN: She is supposed to
24 make up a note now and answer a
25 hypothetical?

72 (Pages 282 - 285)

Page 286

L. ALDANA-BERNIER

1
2      MR. SUCKLE: She said a note
3  should be there. I'm asking about the
4  note that should have been there.
5      A.   Not my note.
6      Q.   I understand.
7      The note that should have been
8  there, would they have mattered in your
9  decision to admit Mr. Schoolcraft?
10      MR. SHAFFER: Objection to form.
11      MR. RADOMISLI: Objection to
12  form, asked and answered.
13      MR. SUCKLE: I didn't get an
14  answer. I've asked it.
15      MR. SHAFFER: It's impossible to
16  answer the question. The information
17  doesn't exist. It's impossible to
18  answer.
19      Let's stop playing games and
20  move this along. You cannot answer a
21  question about something that does not
22  exist.
23      Q.   Please answer the question?
24      MR. CALLAN: Can you answer the
25  question, Doctor?

Page 287

L. ALDANA-BERNIER

1
2      A.   I already made my decision. I
3  cannot answer the question.
4      Q.   Once your made your decision?
5      A.   The patient needed admission.
6  I felt that at that point on 11/1 that
7  the patient needed inpatient
8  stabilization.
9      Q.   So just so we are clear here:
10  No information from IAB would have
11  changed your mind, correct, from internal
12  affairs?
13      MR. KRETZ: Objection.
14      MR. CALLAN: Same objection.
15      A.   Then I would have to make the
16  chairman make the decision.
17      Q.   So if IAB had information, you
18  would want the chairman to make the
19  decision?
20      MR. CALLAN: Objection. This is
21  ridiculous.
22      MR. SMITH: Would you stop.
23  Would you please stop. I'm sick and
24  tired of you interrupting this
25  examination. You've been doing this

Page 288

L. ALDANA-BERNIER

1
2  all day.
3      MR. CALLAN: Are you involved in
4  this?
5      MR. SMITH: Yes, heavily and
6  you're going to become more involved
7  in this with this kind of
8  irresponsible behavior.
9      MR. CALLAN: There is one
10  attorney designated to represent the
11  Plaintiff. It's not you today. You
12  are just running the home movie
13  camera.
14      MR. SMITH: Would you please
15  stop interfering?
16      MR. SUCKLE: Excuse me. No
17  matter how much you pontificate, we
18  are not going home until we are done.
19      I'm going to keep asking until I
20  get an answer. I'm going to keep
21  asking.
22      MR. CALLAN: Try to ask a
23  relevant question.
24      MR. SUCKLE: I haven't been able
25  to all day, that's why we're here.

Page 289

L. ALDANA-BERNIER

1
2  I'm trying.
3      MR. CALLAN: Work harder at it.
4      MR. SUCKLE: Maybe you'll teach
5  me one day.
6      A.   What do the think internal
7  affairs would tell me?
8      MR. CALLAN: Doctor, you have to
9  wait for the question.
10      Q.   There was nothing internal
11  affairs could have told you to change
12  your mind, you already made your decision
13  and whatever internal affairs had to say,
14  you were not going to change your mind,
15  correct?
16      A.   Is internal affairs reliable?
17      Q.   That's a good questions. Can
18  you answer my question?
19      A.   So I have to determine how
20  reliable internal affairs is.
21      Q.   How do you determine whether or
22  not internal affairs is reliable?
23      A.   Because I have to assess them
24  too.
25      Q.   In assessing them, how would

73 (Pages 286 - 289)

L. ALDANA-BERNIER

1
2 you do that?
3    A.   Collaborate what I have seen
4 and what they tell me.
5    Q.   So you would need to hear what
6 internal affairs has to say and evaluate
7 whether or not you can believe them or
8 not, correct?
9    A.   Yes.
10    Q.   Did you evaluate the police
11 officer who reported that Mr. Schoolcraft
12 had barricaded himself in his house, did
13 you evaluate that person?
14        MR. SHAFFER: Objection.
15    A.   He wasn't there. I didn't see
16 him.
17    Q.   So but you accepted his
18 information as part of the basis of your
19 diagnosis, correct?
20    A.   And the documentation.
21    Q.   Documentation somebody else
22 wrote in a chart, correct?
23    A.   That I saw Mr. Schoolcraft and
24 I agreed to whatever the documentation of
25 the resident was.

L. ALDANA-BERNIER

1
2    Q.   When you saw Mr. Schoolcraft,
3 you agreed he had barricaded himself in
4 his house?
5    A.   That is the information given.
6    Q.   Written in the chart?
7    A.   Information given in the chart.
8    Q.   By some police officer or
9 sergeant from the police department,
10 correct?
11    A.   Hold on. Also have the
12 documentation from the EMS.
13    Q.   Did you speak to EMS?
14    A.   Documentation is here.
15    Q.   Documentation meaning a note?
16    A.   Yes.
17    Q.   So EMS writes a note and you
18 accept what they say because it's written
19 in the chart, correct?
20    A.   They were there. They went to
21 pick up the patient.
22    Q.   But you are not sure if you
23 would trust internal affairs; am I
24 correct?
25    A.   That's a big question.

L. ALDANA-BERNIER

1
2    Q.   Do you have the duty as a
3 physician in accordance with good and
4 accepted medical practice to conduct your
5 own evaluation of a patient?
6    A.   I do.
7    Q.   Do you as a physician have in
8 accordance with good and accepted medical
9 practice have to do a complete evaluation
10 of your patients?
11    A.   I agree with the evaluation of
12 the resident. I saw the patient. I
13 agree whatever evaluation of resident was
14 and that's it. I have written in my
15 notes --
16    Q.   I understand.
17        My question is not quite that.
18        Do you have a duty, does good
19 and accepted medical practice require you
20 to do a complete evaluation of your
21 patients; that's the question?
22    A.   I'm in agreement with the
23 resident.
24    Q.   Yes or no, do you have a duty
25 within the bounds of good and accepted

L. ALDANA-BERNIER

1
2 medical practice to do a complete
3 evaluation of your patient?
4        MR. CALLAN: Objection to form.
5        MR. LEE: Objection.
6    Q.   Does good and accepted medical
7 practice require you to do a complete
8 evaluation of your patient?
9    A.   I did evaluation. I'm in
10 agreement with the resident.
11        MR. CALLAN: Objection.
12    Q.   You can't answer that question?
13    A.   I consider that in agreement
14 with my resident.
15    Q.   I'm not talking about conduct
16 here. I'm talking about a standard of
17 practice. The standard of practice is
18 what we are talking about now.
19        The question is: Does good and
20 accepted medical practice require you to
21 do a complete evaluation; that's the
22 question?
23        MR. KRETZ: Objection.
24    A.   I mention to you I did an
25 evaluation and I agree with whatever

74 (Pages 290 - 293)

Page 294

1    L. ALDANA-BERNIER
2 evaluation of the resident.
3    Q.   I understand what you think you
4 did in Mr. Schoolcraft's situation.
5       I'm asking as a standard as a
6 physician what the standards are.
7       My question is: Does good and
8 accepted medical practice require you to
9 do a complete evaluation of all of your
10 patients?
11    A.   Okay. If you are saying in
12 general if we agree with the evaluation
13 of the residents, we usually say I agree
14 with the above evaluation of the patient.
15    Yes, we evaluate the patient.
16 If we agree with the assessment whatever
17 the residents say, that's what we
18 document.
19    Q.   Do you not understand my
20 question?
21    A.   I understand your question.
22    Q.   But you are just refusing to
23 answer?
24       MR. CALLAN: Next question.
25    Move on.

Page 295

1       L. ALDANA-BERNIER
2    Q.   Doctor, does good and accepted
3 medical practice require you to do an
4 independent evaluation of your patient?
5       MR. CALLAN: We have been down
6    that road, Counsel. She did an
7    independent. She read --
8       MR. SUCKLE: I'm asking about
9    standard in the field. Maybe I
10   learned it, somewhere I must have
11   stumbled in somewhere about the
12   standard so I'm going to ask. I might
13   be right.
14    Q.   Doctor, does good and accepted
15 medical practice require you to do an
16 independent evaluation of all of your
17 patients?
18    A.   I already answered you. I said
19 I assessed the patient. And if the
20 resident assessed also the patient, I
21 will say that I agree with the assessment
22 of the patient.
23    Q.   Do you know what good and
24 accepted medical practice means?
25    A.   I said I did assess the

Page 296

1    L. ALDANA-BERNIER
2 patient.
3    Q.   Do you know what medical
4 standards are, standards of practice, do
5 you understand that?
6    A.   But you --
7    Q.   I'm talking about general
8 standards of practice. Do you
9 understand?
10    A.   Yes, I'm saying --
11    Q.   I'm not talking about what you
12 did with Mr. Schoolcraft.
13    A.   I'm not referring only to Mr.
14 Schoolcraft.
15    Q.   The question is: Do you have,
16 a simple yes or no, does good and
17 accepted medical practice require you to
18 do your own independent evaluation of an
19 a patient?
20       MR. CALLAN: Objection to the
21    form.
22    Q.   If it's no you can tell me no.
23       MR. CALLAN: What do you mean,
24    your own independent evaluation as
25    opposed to speaking to a resident, as

Page 297

1       L. ALDANA-BERNIER
2    opposed to calling people?
3       MR. SUCKLE: Yes.
4       MR. CALLAN: Then ask it that
5    way.
6       MR. SUCKLE: It's pretty clear.
7       MR. CALLAN: They way you're
8    asking it is totally unclear.
9       MR. SUCKLE: It's one of those
10   things I have to learn from you again.
11   Thanks for teaching me.
12    Q.   Can you please answer my
13 question, Doctor? We are going to be
14 here all night if you don't answer these
15 few questions.
16       MR. CALLAN: I can assure we are
17   not going to be here all night. We're
18   getting very close to you being
19   abusive.
20    Q.   I'm entitled to be here. We
21 will bring you back to answer this last
22 few series of questions which go to
23 standard of care.
24       MR. CALLAN: Sure you will.
25       MR. SUCKLE: I absolutely will

75 (Pages 294 - 297)

Page 298

L. ALDANA-BERNIER

1   bring her back if she can't answer
2   standard of care questions. I will.
3   You might want to ask her to answer
4   the questions. I will bring her back
5   if she doesn't answer standard of care
6   questions.
7   MR. RADOMISLI: Off the record.
8   MR. SMITH: Off the record at
9   6:05 p.m.
10  [Discussion held off the
11  record.]
12  [Whereupon, at 6:05 p.m., a
13  recess was taken.]
14  [Whereupon, at 6:06 p.m., the
15  testimony continued.]
16  [Discussion held off the
17  record.]
18  MR. SMITH: Back on the record
19  at 6:06.
20  Q.   Doctor, I'm not talking about
21  what you documented or didn't document.
22  I'm just talking about standard of care
23  as a physician.
24  The question is: Does good and
25

Page 299

L. ALDANA-BERNIER

1   accepted medical practice require you to
2   do your own independent evaluation
3   regardless of how you document that
4   evaluation?
5   MR. CALLAN: Objection to the
6   form of the question.
7   You can answer.
8   A.   When a resident sees the
9   patient, after the resident sees the
10  patient, I do go see the patient. If I
11  can agree with the documentation, then I
12  write I agree with the documentation.
13  Q.   I understand your procedure.
14  Thank for telling me your procedure.
15  Does good and accepted medical
16  practice require you, forget what you do,
17  does it require you to do your own
18  independent evaluation? That's a simple,
19  straightforward question, not about what
20  other people do, about what you do.
21  A.   I have to see every patient,
22  yes.
23  MR. SMITH: What was the answer.
24  [The requested portion of the
25

Page 300

L. ALDANA-BERNIER

1   record was read.]
2   Q.   And make your own independent
3   evaluation, correct?
4   A.   Yes.
5   MR. SHAFFER: Is that a yes?
6   MR. CALLAN: It's a yes.
7   Q.   Doctor, have you ever been
8   involved in any other lawsuits besides
9   this one?
10  A.   Yes.
11  Q.   The answer was yes?
12  A.   Yes.
13  Q.   When you say yes, how many?
14  A.   Two that I know of.
15  Q.   When you say that you know of,
16  why do you answer that way?
17  A.   That's what I know.
18  Q.   Do you keep open there is a
19  possibility that there are lawsuits that
20  you don't know about?
21  A.   That's what I know. You are
22  asking me.
23  Q.   Do you know the names of those
24  people that are suing you?
25

Page 301

L. ALDANA-BERNIER

1   MR. CALLAN: You can answer
2   that, Doctor, if you have a
3   recollection of names.
4   A.   One is McDougal [phonetic].
5   Q.   Was that in your capacity as an
6   employee at Jamaica Hospital, your
7   private practice, something else?
8   A.   Jamaica Hospital.
9   Q.   Do you know generally what the
10  claims against you were?
11  A.   It's about admitting the
12  patient.
13  Q.   An admission under 9.39 of
14  Mental Hygiene Law?
15  A.   Yes.
16  Q.   Is that matter still pending?
17  A.   No, it was cleared.
18  Q.   Who represented you in this
19  case?
20  A.   The office of Mr. Callan.
21  Q.   Did you testify at a deposition
22  in that case?
23  A.   Yes.
24  Q.   Did you testify at trial in
25

76 (Pages 298 - 301)

Page 302

1       L. ALDANA-BERNIER
2   that case?
3     A.   No.
4     Q.   You said there were two
5   matters.  What is the other matter?
6     A.   Ballek.
7     Q.   Spell that for me?
8     A.   B-A-L-L-E-K.
9     Q.   Again, was that in your
10  capacity as an employee of Jamaica
11  Hospital?
12    A.   Yes.
13    Q.   What were the claims against
14  you in that cares?
15    A.   I discharged the patient and
16  the patient after 30 days they found out
17  committed suicide.
18    Q.   When was that admission that
19  was the subject of that lawsuit?
20    A.   2008.
21    Q.   Do you know when in 2008 he
22  ended up committing suicide?
23    A.   I don't know.  I don't
24  remember.
25    Q.   Was that incident in your mind

Page 303

1       L. ALDANA-BERNIER
2   when you evaluated Mr. Schoolcraft?
3     A.   I learned from experience.
4     Q.   When you say you learned from
5   experience, the answer is yes, that
6   incident was in your mind when you
7   evaluated Mr. Schoolcraft?
8     A.    No, because this case, it
9   happened 2008 but the case was cleared in
10  2013.
11    Q.   I'm talking about the lawsuit.
12  I'm talking about the incident where the
13  man committed suicide.  Was that part of
14  your thought process when you admitted
15  Mr. Schoolcraft: having had the
16  experience of a patient committing
17  suicide after being released?
18    A.   Working in the emergency room,
19  you have to be cautious.  You have to
20  make very defensive decisions when you
21  discharge the patient.
22    Q.   When you say "cautious," what
23  do you mean?
24    A.   You are thinking right, proper,
25  you are either keeping or discharging the

Page 304

1       L. ALDANA-BERNIER
2   patient.
3     Q.   Were you more cautious after
4   that incident you are talking about when
5   this person killed himself in 2008?
6         MR. CALLAN:  Objection.
7     A.   It's the same.
8     Q.   Is that lawsuit still pending?
9     A.   No, cleared.
10    Q.   Who represented you in that
11  case?
12    A.   Mr. Callan.
13    Q.   And McDougal, do you know what
14  court that was in?
15    A.   Manhattan.
16    Q.   State court, federal court?
17    A.   I think state court.
18    Q.   What about Ballek?
19    A.   Federal.
20        MR. CALLAN:  Supreme Court,
21  Queens County, in any effort to be
22  cooperative.
23    Q.   Have you ever had any hospital
24  privileges revoked or suspended?
25    A.   No.

Page 305

1       L. ALDANA-BERNIER
2     Q.   Have your licenses ever been
3   revoked or suspended?
4     A.   Never.
5     Q.   Have you ever had any sanctions
6   at all with regard to your profession as
7   a physician?
8     A.   Never.
9     Q.   As part of your education or
10  are you required to do continuing
11  education?
12    A.   Yes.
13    Q.   As part of your formal
14  education or continuing education, did
15  you ever do any training in danger
16  assessment?
17    A.   Training in danger assessment.
18    Q.   The danger of a patient
19  injuring themselves or others?
20    A.   Risk management you mean?
21    Q.   I will rephrase it.
22        Did you have any training with
23  regard to assessing a patient with regard
24  to whether or not they were a danger to
25  themselves or to others?

77 (Pages 302 - 305)

Page 306

L. ALDANA-BERNIER

1
2  A.   If you are talking about CME
3  with regard to risk management, I think
4  that comes under that title, yes.
5  Q.   When it comes under risk
6  management, how does it come under risk
7  management, management of the risk of the
8  patient?
9  A.   Yes.
10  Q.   Earlier you talked about risk
11  management when you got the lawsuit, they
12  contacted you.
13  A.   Yes.
14  Q.   Different risk management?
15  A.   Yes.
16  Q.   So risk management of the
17  patient?
18  A.   Of the patient, yes.
19  Q.   Where and when did you have
20  this education regarding risk management?
21  A.   With Florida CME.
22  Q.   What is a CME?
23  A.   Medical education credit.
24  Q.   You say Florida, is that the
25  location where the course was given?

Page 307

L. ALDANA-BERNIER

1
2  A.   It's required by the State of
3  Florida.
4  Q.   Are you licensed in the state
5  of Florida?
6  A.   Yes.
7  Q.   Where else besides Florida and
8  New York are you licensed?
9  A.   West Virginia.
10  Q.   Did you ever practice in
11  Florida?
12  A.   No.
13  Q.   How about West Virginia?
14  A.   No.
15  Q.   Have you ever lived in Florida?
16  A.   No.
17  Q.   How about West Virginia?
18  A.   No.
19  Q.   Any particular reason you have
20  those licenses?
21  A.   Just in case.
22  Q.   When did you get those
23  licenses?
24      MR. CALLAN:  She's ready to go
25  now.

Page 308

L. ALDANA-BERNIER

1
2  A.   I'm not sure but maybe '95.
3  Q.   How about West Virginia?
4  A.   Very first one, maybe '93.
5  Q.   When did you get New York?
6  A.   '94.
7  Q.   Did you sit for any licensing
8  exams that you did not pass?
9  A.   Yes.
10  Q.   Where?
11  A.   That's my -- that's the --
12  what-do-you-call-it?  I'm blocking.
13      MR. CALLAN:  He is asking about
14  medical licenses, your MD exams, West
15  Virginia, Florida, New York?
16  A.   No.
17  Q.   Any other state that you did
18  not pass the MD license?
19      MR. CALLAN:  MD.
20  A.   That was the Flex.  Sorry, yes,
21  it was the Flex.
22  Q.   What is the Flex?
23  A.   That's our licensing.
24  Q.   And you did not pass that?
25  A.   No, I pass it now.

Page 309

L. ALDANA-BERNIER

1
2  Q.   When did you not pass it?
3  A.   There was one in -- before my
4  '93 licensure.
5  Q.   Do you know why Mr. Schoolcraft
6  was admitted to the medical emergency
7  part of the hospital as opposed to the
8  psych part of the hospital when he first
9  came to the hospital?
10  A.   He was complaining of abdominal
11  pain.
12  Q.   From your review of the
13  hospital record, did you see any
14  treatment for abdominal pain?
15  A.   Did I see any treatment?
16  Q.   At the hospital given to him
17  for abdominal pain?
18      MR. KRETZ:  Objection.
19  Q.   In the hospital?
20  A.   I have to go back through the
21  notes.
22  Q.   I'm also going to ask you about
23  blood pressure so while you are looking
24  at the medical records, I'm going to ask
25  any treatment for blood pressure too

78 (Pages 306 - 309)

1        L. ALDANA-BERNIER
2    while you're looking the medical records?
3      A.   He had a physical exam.
4      Q.   When you say "he had a physical
5    exam," how do you know that?
6      A.   It's written down here in the
7    MD notes.
8      Q.   When the doctor examined him,
9    the doctor made notes about that
10   examination?
11     A.   Yes.
12     Q.   Did the doctor also take a
13   history?
14     A.   Yes.
15     Q.   Doctor made notes of that
16   history?
17     A.   Yes, it's here.
18     Q.   Did the doctor come to any
19   evaluation or opinion or diagnosis?
20     A.   History of present illness, he
21   has a review of systems, past medical
22   history, social history, family history.
23     Q.   And he puts information in
24   those spots, right?
25     A.   Excuse me?

1        L. ALDANA-BERNIER
2      Q.   There's information, not just
3    printed form, there is a whole bunch of
4    information in all those categories,
5    correct?
6      A.   Yes.
7      Q.   So when the doctor evaluated
8    him, the doctor made notes of that
9    evaluation, correct?
10     A.   It's here, yes.
11     Q.   And the question is: Was this
12   patient ever treated for abdominal, given
13   any treatment for his abdominal pain or
14   high blood pressure?
15         MR. LEE: Objection to the form
16   of the question.
17         MR. RADOMISLI: Objection to the
18   form.
19         MR. SUCKLE: You want to do one
20   at a time: Was he ever treated for
21   abdominal?
22         MR. RADOMISLI: That's not the
23   basis for the objection.
24         MR. SUCKLE: What is the
25   objection?

1        L. ALDANA-BERNIER
2          MR. RADOMISLI: She didn't see
3    him in the medical ED, she didn't
4    review the medical ED chart before
5    coming here.
6          MR. SUCKLE: Your objection is
7    she might not know the answer?
8          MR. RADOMISLI: The objection is
9    you have no right to ask these
10   questions.
11         MR. SUCKLE: She is a treating
12   physician.
13         MR. CALLAN: She's a treating
14   psychiatrist.
15         MR. SUCKLE: When I get there.
16         MR. SHAFFER: Six hours to do
17   the deposition.
18         MR. RADOMISLI: Howard, you know
19   it's not separate.
20     Q.   The question is: Was he ever
21   treated for his abdominal pain?
22         MR. CALLAN: Is there a claim
23   for abdominal failure -- failure to
24   treat --
25         MR. SUCKLE: We're working on

1        L. ALDANA-BERNIER
2    it.
3      Q.   Was he treated for any
4    abdominal --
5      A.   I wasn't in the emergency room.
6    If you want me to, I have to read --
7      Q.   You agree sometimes patients
8    come from the medical floor to the psych
9    floor, correct?
10     A.   From the medical ER to the
11   psych ER, yes.
12     Q.   Sometimes they come with
13   medical problems to the psych ER,
14   correct?
15     A.   That's correct.
16     Q.   When a patient comes from the
17   medical ER to the psych ER, do you
18   concern yourself at all with the medical
19   issues that the patient may be coming to
20   the psych ER with?
21     A.   The patient was medically
22   cleared.
23     Q.   But at least it was important
24   for you to know that the patient was
25   medically cleared, right?

79 (Pages 310 - 313)

Page 314

1        L. ALDANA-BERNIER
2    A.    Right.
3    Q.    What was the evaluation of for
4 which he was cleared:  abdomen, blood
5 pressure, something else, nothing, you
6 tell me?
7    A.    Gastric pain.
8    Q.    Was there any treatment that
9 you are aware of he had while in the
10 medical emergency room for that problem?
11        MR. RADOMISLI:  Objection.
12    A.    I was not in the medical ER.
13 He came to the psych ER the next day.
14    Q.    The answer is you don't know;
15 am I correct?
16        MR. LEE:  Objection to form.
17        MR. RADOMISLI:  Objection to
18    form.
19    Q.    You don't know if he was
20 treated for any gastrointestinal
21 problems?
22        MR. RADOMISLI:  Objection.
23        MR. SUCKLE:  She just said she
24    doesn't know.  I'm asking her.
25        MR. RADOMISLI:  I'm objecting.

Page 315

1        L. ALDANA-BERNIER
2    A.    There is nothing written down
3 in here.  "Whole medications, none;
4 medication administered in emergency
5 department, none; medication prescription
6 provided on discharge, none."
7    Q.    No abdominal medication, no
8 blood pressure medication, correct?
9        MR. KRETZ:  Objection.
10    A.    It's here, none.
11    Q.    Did you have any discussions
12 regarding Mr. Schoolcraft with a Bruce
13 Flanz, F-L-A-N-Z?
14    A.    No, I don't know.
15    Q.    How about conversations
16 regarding Mr. Schoolcraft with David
17 Rosen?
18    A.    No, I don't.
19    Q.    How about Ollie Peterson, any
20 conversations with Ollie Peterson?
21    A.    I don't know.
22    Q.    Seth Vivek?
23    A.    Seth Vivek?
24    Q.    You answered that.  Did you
25 have any conversations with Seth Vivek

Page 316

1        L. ALDANA-BERNIER
2 regarding Adrian Schoolcraft?
3        MR. CALLAN:  She said no.
4    A.    At what point in time?
5    Q.    Any.
6    A.    I go to Dr. Dhar.
7    Q.    When you say "at what point in
8 time," you gave an indication that you
9 may have had a conversation.
10        Did you ever have a
11 conversation with Dr. Vivek regarding
12 Adrian --
13    A.    No, it's Dr. Dhar.
14    Q.    You told us about earlier?
15    A.    Excuse me?
16    Q.    You told us about that
17 conversation earlier, correct?
18    A.    Yes.
19        MR. SUCKLE:  I have nothing
20    further.
21        MR. SHAFFER:  I have a few
22    questions.  It's a few.
23 EXAMINATION MR. SHAFFER:
24    Q.    Doctor, did anybody from the
25 NYPD, any employee of New York City

Page 317

1        L. ALDANA-BERNIER
2 Police Department, ever tell you to keep
3 Adrian Schoolcraft at Jamaica Hospital
4 against his will?
5    A.    No.
6    Q.    At any time prior to Mr.
7 Schoolcraft being released from Jamica
8 Hospital --
9        MR. SHAFFER:  Let me rephrase.
10    Q.    Did you believe that Mr.
11 Schoolcraft should have been released
12 from Jamaica Hospital earlier than he
13 actually was?
14    A.    Earlier than when I decided he
15 needed admission?
16    Q.    No, no.  Did --
17        MR. RADOMISLI:  Objection to
18    form.  That's just improper because
19    you don't know if she knows what
20    happened after she saw him.
21    Q.    Do you know that Mr.
22 Schoolcraft was released from the
23 hospital at some point in time?
24    A.    Yes.
25    Q.    Do you know when Mr.

80 (Pages 314 - 317)

Page 318

L. ALDANA-BERNIER

1
2  Schoolcraft was released in the hospital?
3     A.   Looking at the note, 2/6/2009.
4     Q.   Say again?
5     A.   February 6, 2009.
6     Q.   You mean November 6th?
7     A.   November 6, yes.
8     Q.   At any point prior to November
9  6, 2009, did you believe that Mr.
10 Schoolcraft should have been released
11 from the hospital?
12        MR. RADOMISLI:  Objection.
13        MR. LEE:  Objection.
14    A.   Before 11/6?
15    Q.   Correct.
16        MR. RADOMISLI:  Objection.
17    A.   I already admitted him.  I
18 wouldn't know.  He went upstairs.  I
19 would not be able to make a decision to
20 be discharged then.
21    Q.   Doctor, what is adjustment
22 disorder?
23    A.   Adjustment disorder is -- it's
24 a psychiatric -- it's a diagnosis wherein
25 someone goes under stress and will react

Page 319

L. ALDANA-BERNIER

1
2  to that stress within a day to one month;
3  react in a sense that will affect his
4  functioning.  He could either be
5  depressed, either be agitated, or he
6  could also -- different kinds of
7  reactions could be manifested either
8  through violence or opposite of violence
9  which would be depression or could be
10 manifested with anxiety.
11        MR. SHAFFER:  Nothing further.
12        MR. RADOMISLI:  I just have a
13    few questions.
14 EXAMINATION BY MR. RADOMISLI:
15    Q.   Doctor, residents operate under
16 the supervision of attending physicians,
17 correct?
18    A.   That's correct.
19    Q.   Decisions by residents must be
20 approved by the attending, correct?
21    A.   That's correct.
22    Q.   Attendings can overrule
23 decisions made by residents if they
24 believe that the decisions were
25 incorrect; is that right?

Page 320

L. ALDANA-BERNIER

1
2     A.   That's correct.
3     Q.   And the attending physician has
4  ultimate responsibility for the patient,
5  correct?
6     A.   That's correct.
7     Q.   And you can direct nurses to do
8  things for the patient, correct?
9     A.   That's correct.
10    Q.   You didn't have any issues with
11 what any of the nurses did or did not do
12 for the patient, correct?
13    A.   That's correct.
14        MR. SMITH:  Objection.
15    Q.   You did not have any issues of
16 what the residents did or didn't do for
17 this patient, correct?
18    A.   That's correct.
19    Q.   You were the attending in
20 charge of the psychiatric ED when you
21 were there, correct?
22    A.   That's correct.
23    Q.   That means you would have
24 supervised the psychiatric residents in
25 the ED?

Page 321

L. ALDANA-BERNIER

1
2     A.   Psych emergency room, yes.
3     Q.   Would that include the
4  psychiatric residents who evaluated the
5  patient when he was in the medical
6  emergency room?
7     A.   In 2009, yes, it was us, the
8  doctors in the emergency room.
9     Q.   The doctors in the psychiatric
10 emergency room supervised the psychiatric
11 residents who evaluated patients in the
12 medical emergency room?
13    A.   Yes.
14    Q.   And the resident would not have
15 authority to discharge a patient on his
16 own, correct?
17    A.   Correct.
18    Q.   That decision would have to be
19 made by the attending, correct?
20    A.   Correct.
21    Q.   If a patient was going to be
22 discharged at some point from the
23 psychiatric emergency room, an attending
24 psychiatrist would have to make that
25 decision, correct?

81 (Pages 318 - 321)

Page 322

```
1          L. ALDANA-BERNIER
2     A.   That's correct.
3     Q.   And you were this patient's
4  attending psychiatrist, correct?
5          MR. LEE:  In the emergency room?
6          MR. RADOMISLI:  Yes.
7     A.   In the emergency room, depends
8  what the shift is.
9     Q.   During your shift?
10    A.   During my shift, yes.
11         MR. RADOMISLI:  No more
12  questions.
13         MR. SUCKLE:  I have a couple
14  questions.
15  FURTHER EXAMINATION BY MR. SUCKLE:
16    Q.   A resident, a resident can't
17  discharge a patient, correct?
18    A.   That's correct.
19    Q.   And a resident can't admit a
20  patient, correct?
21    A.   The attending has the final
22  decision.
23    Q.   So when a resident says that a
24  patient should be held, that has to be
25  confirmed by an attending, correct?
```

Page 323

```
1          L. ALDANA-BERNIER
2     A.   That's correct, yes.
3     Q.   So a resident can't hold a
4  patient on his own or her own order,
5  correct?
6     A.   Needs to be discussed with the
7  attending.
8     Q.   Am I correct, a patient cannot
9  be held on the order of a resident at
10  Jamaica Hospital in 2009, correct?
11         MR. CALLAN:  She just answered
12    the question.
13    A.   It has to be discussed with the
14  attending.  The attending has to make --
15  they discuss that and once it's
16  discussed, then the attending will make
17  the decision.
18    Q.   Attending has to make the order
19  for admission, correct?
20  [Continued on the following page to include
21  signature and jurat.]
22
23
24
25
```

Page 324

```
1          L. ALDANA-BERNIER
2     A.   Yes.
3     Q.   And for holding a patient,
4  attending has to make that order too,
5  correct?
6     A.   That's correct.
7          MR. SUCKLE:  Nothing further.
8          MR. SMITH:  It's 6:30.  We are
9  ending the deposition.
10         MR. SUCKLE:  For the record I
11  want to say the attorney for Jamaica
12  Hospital will be retaining the
13  original Exhibit No. 69 which is the
14  hospital chart.
15         [TIME NOTED:  6:31 p.m.]
16  _____
17         DR. LILIAN ALDANA-BERNIER
18
19  Subscribed and sworn to
      before me this _____
20  day of _____, 2014.
21  _____
      Notary Public
22
23
24
25
```

Page 325

```
1
2            I N D E X
3
   WITNESS   EXAMINATION BY     PAGE
4
5  L. Bernier  Mr. Suckle     7, 322
           Mr. Shaffer     316
6          Mr. Radomisli   319
7
8
9          E X H I B I T S
10  PLAINTIFF'S  DESCRIPTION        PAGE
11  Exhibit 69  Chart          37
12  Exhibit 70  Emergency Admission
              Status      232
13
   Exhibit 71  Visiting Hours     233/234
14
   Exhibit 72  Restriction of
15          Visitors     233/234
16  Exhibit 73  Use of Razors    233/234
17  Exhibit 74  Psych 3 Unit Rules   233/234
18  Exhibit 75  4/95 Document     233/234
19
   Attorneys have retained all exhibits.
20
21
22
23
24
25
```

82 (Pages 322 - 325)

Page 326

```
1
2       CERTIFICATION
3
4     I, MARGARET SCULLY-AYERS, a Notary
5  Public for and within the State of New
6  York, do hereby certify:
7     That the witness whose testimony as
8  herein set forth, was duly sworn by me;
9  and that the within transcript is a true
10 record of the testimony given by said
11 witness.
12    I further certify that I am not
13 related to any of the parties to this
14 action by blood or marriage, and that I
15 am in no way interested in the outcome of
16 this matter.
17    IN WITNESS WHEREOF, I have hereunto
18 set my hand this 27th day of February,
19 2014.
20
21    _____
22    MARGARET SCULLY-AYERS
23         *    *    *
24
25
```

Page 327

```
1
2      ERRATA SHEET
       VERITEXT/NEW YORK REPORTING, LLC
3
   CASE NAME: Adrian Schoolcraft -v- The
4  City of New York et al.
   DATE OF DEPOSITION: February 11, 2014
5  WITNESS' NAME: Dr. Lilian Aldana-Bernier
6  PAGE/LINE(S)/   CHANGE      REASON
      ___/____/___              /
7  ___/____/___              /
      ___/____/___              /
8  ___/____/___              /
      ___/____/___              /
9  ___/____/___              /
      ___/____/___              /
10 ___/____/___              /
      ___/____/___              /
11 ___/____/___              /
      ___/____/___              /
12 ___/____/___              /
      ___/____/___              /
13 ___/____/___              /
      ___/____/___              /
14 ___/____/___              /
      ___/____/___              /
15 ___/____/___              /
      ___/____/___              /
16 ___/____/___              /
      ___/____/___              /
17 ___/____/___              /
      ___/____/___              /
18 ___/____/___              /
      ___/____/___              /
19
20    _____
       DR. LILIAN ALDANA-BERNIER
21
   SUBSCRIBED AND SWORN TO
22 BEFORE THIS_____DAY
   OF_____, 2014.
23 _____
24 NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____
```

**[& - 3]**

| & |
| --- |
| **&**   4:3,10,16 5:4 |

| 0 |
| --- |
| **0.5**   203:5,7 204:3 |
| **0.5.**   203:14 |
| **07042**   7:25 |
| **090.155440**   5:7 |

| 1 |
| --- |

**1**   87:15 94:17 98:24
  101:12 102:8 109:4
  116:17,19 121:24
  127:19 139:7,18
  160:18 204:4 226:7
  226:11,13,13,14,15
  242:2 261:14
**1-50**   1:19,24
**10**   109:6
**10/31**   121:18 160:16
  160:19 161:16
  166:24
**10/31/09**   120:6
  155:5,12 161:12
**10/31/2009**   120:20
  127:4
**100**   3:17 210:5
**10001**   3:12
**10004**   5:6
**10006**   3:5
**10007**   3:18
**10017**   4:12
**10022**   4:6
**109**   203:16
**10:06**   129:11
**10:29**   7:3
**10:30**   2:8
**10:47**   129:3
**10civ**   1:7
**11**   2:8 327:4
**11/1**   87:8 121:17
  155:9 159:5,19
  161:17 162:6 226:8
  283:14 287:6

**11/1/09**   87:21 109:2
  109:8,24 226:2
**11/1/2009**   86:25
  87:9 127:25 160:2
  161:4 166:21 221:4
**11/2**   277:22
**11/2/2009**   118:3
  276:25
**11/3**   155:9 226:6
  277:25
**11/3/2009**   158:17
**11/6**   189:8 318:14
**11042**   4:19
**111**   2:6 3:4 7:10
**115**   156:23
**11:51**   85:6,9
**11th**   7:12
**12**   23:4 24:14,15
  109:2,5,8,24 160:20
  160:21,21 166:11
  166:15,18
**120**   156:14
**1200**   3:12
**1298984**   120:20
**12:13**   85:11,14
**12:42**   109:18
**12:43**   109:20
**12:59**   130:17 131:8
**13**   68:2
**139**   156:10,17
**13:51**   128:2 129:24
**13th**   4:12
**15**   61:16 241:8
**15:38**   128:5
**18**   257:11
**1973**   11:7,16
**1976**   11:23
**1981**   12:12
**1986**   12:12 13:12
**1993**   14:14,18
**1994**   14:18
**1995**   10:2 17:17,22
  18:13
**1999**   236:11

**1:20**   158:17 221:13
  281:21
**1:23**   138:16,20
**1st**   121:19 122:24
  127:2 128:2,4,12
  130:14,17 154:23
  162:9 167:3 189:17

| 2 |
| --- |

**2**   86:2 121:20,25
  127:2,7 251:12
  254:6
**2,000**   72:3,10,14,17
**2/6/2009**   318:3
**20**   164:5
**20002**   3:8
**2001**   4:18
**2008**   302:20,21
  303:9 304:5
**2009**   20:9,15 21:12
  22:4 24:4,24 25:5
  25:12 26:20 32:16
  33:2 46:2,3 60:22
  61:4 62:5,20 63:4
  63:25 64:11 67:25
  68:21 72:14 85:17
  86:2,7 88:22 94:17
  101:12 102:9
  107:21 108:25
  109:5,6 115:17
  118:2 120:25
  121:10,20,25 122:5
  122:12,24 123:8
  127:2 128:2,3,4,10
  128:13,21 129:2,8
  129:11,14,24,25
  130:14,17 139:7,18
  150:2 155:7 156:8
  159:14 162:16
  165:14 173:6
  187:23 188:8,24
  190:11,13,19,19,20
  191:20,21 220:17
  220:18 222:15
  241:13 250:16

**259**:11,14,17,23
  262:4 264:20 265:7
  265:11 266:5,23
  273:14 281:4,15
  283:22 318:5,9
  321:7 323:10
**2010**   236:7,12
**2010-033074**   3:19
**2012/2013**   22:3
**2013**   20:8 228:5
  303:10
**2014**   2:8 7:12
  324:20 326:19
  327:4,22
**21:30**   266:5,23
**220**   4:11
**224**   3:11
**22:56**   128:13
**232**   325:12
**233/234**   325:13,15
  325:16,17,18
**2483**   1:16
**2576**   1:15
**27th**   326:18
**2979**   135:18
**2:15**   118:3
**2:30**   138:22,25
**2nd**   68:21 85:17
  86:7 108:25 109:6
  109:11 118:2
  120:25 122:5,11
  123:7 128:10,18,21
  129:2,7,11,14,23
  167:12,19 173:6
  187:23 188:7,24
  189:5,16 190:7,11
  190:19,21 191:20
  221:12 277:13
  281:15

| 3 |
| --- |

**3**   87:15 157:6
  251:13 254:3,4,7,12
  254:16 256:4
  258:16 260:11

[3 - accurate]  Page 2

261:15 269:20
325:17
**3,000** 72:3
**30** 62:17 68:5
302:16
**3004** 1:19
**30th** 4:6
**31** 121:9,12 155:7
156:8 189:16
**316** 325:5
**319** 325:6
**31st** 159:14 189:4
262:4 264:20,22
265:7,11 266:4,23
**322** 325:5
**34** 133:19,20
**35th** 3:11
**37** 325:11
**3:10** 85:17 86:7
108:25 118:2 189:6
190:8 221:12
**3:34** 195:13,15
**3:49** 195:17,20
**3rd** 127:20 128:3
129:24 167:2,4,6,8
189:25 190:19
191:21 199:5
216:14 221:13
222:4,5,15 263:3
277:4,14,15 279:2
280:13 281:21

**4**

**4** 69:20 114:8 157:6
**4/10** 240:9
**4/95** 325:18
**42nd** 4:11
**444** 4:5
**48** 70:22 98:14
230:12,15 245:8
**4:34** 233:15,19
**4:49** 233:21

**5**

**5** 116:13
**50** 210:9
**5:24** 269:4,9
**5:38** 269:11,14
**5:54** 122:25

**6**

**6** 318:5,7,9
**6005** 1:7
**6527** 271:23
**667-82153** 4:14
**69** 37:2,4,8 59:22
68:13 102:24
324:13 325:11
**6:05** 298:10,13
**6:06** 298:15,20
**6:25** 128:22
**6:30** 86:25 87:4,10
87:21 101:12 102:8
104:10,18 105:2
251:13 252:10
324:8
**6:31** 324:15
**6th** 318:6

**7**

**7** 116:16 325:5
**70** 232:16,18,21
234:4 238:13 240:7
325:12
**71** 7:24 233:24
250:7 325:13
**72** 252:24 325:14
**73** 325:16
**74** 253:21 325:17
**75** 233:25 325:18
**78** 12:23
**79** 12:23

**8**

**8** 69:20 251:13
**80** 156:10,15,17
**81st** 211:24
**829** 3:8

**873220** 1:9
**885374** 1:18
**89** 13:21
**894025** 1:14
**895117** 1:12
**897840** 1:13
**8:27** 128:3 129:25

**9**

**9** 139:23 154:23
**9.13.** 77:5
**9.27** 70:15,17 77:5
**9.39** 70:11,25 71:18
72:12 73:9,14 74:4
74:10 75:21 77:5,11
78:14 79:8,11,25
81:12,18 83:4,12,15
93:6,15,22 94:2
96:20 97:2,21 99:7
101:6,15 102:11
103:24 104:9,17,25
105:11,15,17,18
106:3 107:12,19,22
108:7,16 158:5,9
165:19,22 216:21
222:8 238:15
239:17 301:14
**9.39.** 70:16 79:20
105:21 108:21
236:22
**912370** 1:11
**93** 13:21 308:4
309:4
**94** 308:6
**95** 17:23 308:2
**97** 11:23
**9:00** 139:7
**9:30** 278:14 281:15

**a**

**a.m.** 2:8 69:15,19,20
85:9 87:21 101:12
121:20,25 122:25
127:2,8 139:7,23
154:24 221:5

**abdomen** 314:4
**abdominal** 157:9,10
309:10,14,17
311:12,13,21
312:21,23 313:4
315:7
**abercrombie** 4:3
**ability** 192:19 271:9
**able** 47:13 80:7,25
81:13 86:10 88:18
112:14 118:10
165:2 175:19 218:9
218:11 252:13
288:24 318:19
**absence** 57:18
**absolutely** 297:25
**abstraction** 47:20
51:3,8
**abuse** 132:14
**abusive** 91:23
297:19
**accept** 291:18
**accepted** 41:25 42:6
49:14 50:19 51:6,20
53:4,25 54:24 55:18
55:23 56:5,17 57:14
59:8 64:7 94:14
123:24 124:9,13
126:7 193:8,18
290:17 292:4,8,19
292:25 293:6,20
294:8 295:2,14,24
296:17 299:2,16
**access** 33:3 38:12
59:15 146:8 150:9
150:11,22 196:24
213:16 214:2,10,14
214:16,18 219:10
219:15,21 220:3,21
247:7,8
**accessibility** 198:10
**accessible** 59:23
198:15
**accurate** 84:13,17

[act - aldana]                                                         Page 3

**act** 57:7 58:5,8,11
58:14,18,20,24 59:2
220:6
**acting** 18:23 19:3,9
19:13,19,22 88:10
93:7,17,23 94:17
149:21 172:7
241:18 247:5 268:6
**action** 2:12 92:22
326:14
**acute** 129:5
**add** 236:16
**added** 236:3,15
**addition** 8:16 23:13
24:2
**adjacent** 113:23
**adjustment** 318:21
318:23
**administered** 315:4
**administration**
228:9,11
**administrative**
20:18,19 21:12,19
23:6,8,14 235:12,24
**administrators** 21:8
**admission** 64:25
69:25 70:12,15,19
71:3 73:15 80:5
103:23 104:2,6,12
107:13,20 112:12
112:24 142:20,22
143:16 146:11
149:9,12,15,18
158:9 159:17 160:7
201:23 202:3 209:9
211:18 216:21
217:9 221:2,20
222:8 223:11 224:5
224:19 225:20
228:15 229:7 230:7
230:9 233:3 234:10
237:18 245:2,8
276:8 277:5,25
278:25 280:12
281:22 283:15,19

287:5 301:14
302:18 317:15
323:19 325:12
**admit** 71:19 72:13
74:7 79:17 80:2
81:15,21,24,25 82:6
97:3 101:5,14
102:10 103:23
104:8,24 106:2,7
108:8,16 119:10,11
119:13,16 145:16
145:24 150:14
151:13 210:18,22
211:13 214:23
215:12 231:25
236:21 237:22
238:16 243:4
246:24 249:11,15
263:3 277:9,13,18
283:10 285:10
286:9 322:19
**admitted** 39:17
70:21 71:6 72:19
74:9 80:11 81:9
104:15 105:7,9,10
105:14,19 107:11
107:18,25 127:3
146:4 150:21 151:8
158:21 159:4,10
167:7 189:7 199:15
211:6,16 212:20,21
214:3 215:22 216:3
219:18 231:18
241:7 247:11,13,14
249:16,20 254:6,11
265:4 266:12,14
267:5 275:11,14,23
282:11 284:5
303:14 309:6
318:17
**admitting** 69:23
73:8 150:7 202:20
215:7,8 230:4
301:12

**adopted** 168:13
**adrian** 1:5 29:12,20
37:11 140:19
224:16 316:2,12
317:3 327:3
**advise** 175:10
**affairs** 174:8 202:13
202:17 276:15
277:8 279:25
280:14,17,23 282:5
282:8,16 283:6
287:12 289:7,11,13
289:16,20,22 290:6
291:23
**affect** 218:15 319:3
**afternoon** 158:18
189:6 209:6 277:2
**aged** 133:19
**aggressive** 61:11
100:2 118:13
**agitated** 29:3 61:11
63:11 77:25 91:23
92:4 94:3 95:16
116:16,17,20,22,25
132:17 149:21
150:20 168:25
169:3,4 197:12
198:21 199:25
205:6 206:23 207:5
241:19 319:5
**agitation** 91:25
100:2 116:15 132:8
199:20
**ago** 162:16
**agree** 149:10 151:14
162:3 168:5,24
191:7 194:3 205:15
210:21 211:12
251:11,18 292:11
292:13 293:25
294:12,13,16
295:21 299:12,13
313:7
**agreed** 6:3,9,13
167:16,23 168:2,21

168:23 169:2 170:5
174:9,12 191:18
193:2,10,13 203:7
207:14 230:3 231:6
290:24 291:3
**agreeing** 167:21
193:25
**agreement** 52:11
135:23 193:11
292:22 293:10,13
**ahead** 21:22 66:17
97:17 126:15
130:13 164:9
264:12
**al** 327:4
**aldana** 1:23 2:11 5:5
7:5,7,20 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1

| | | | |
|---|---|---|---|
| 116:1 117:1 118:1 | 251:1 252:1 253:1 | 225:16 230:24 | **anyway**  164:2 |
| 119:1 120:1 121:1 | 254:1 255:1 256:1 | 231:2,3 241:22 | 265:16 |
| 122:1 123:1 124:1 | 257:1 258:1 259:1 | 242:20 243:14 | **apartment**  93:4 |
| 125:1 126:1 127:1 | 260:1,24 261:1 | 244:10 245:21 | 170:11 171:10 |
| 128:1 129:1 130:1 | 262:1 263:1 264:1 | 265:18 272:2,16 | **apparatus**  131:3 |
| 131:1 132:1 133:1 | 265:1 266:1 267:1 | 274:9 277:23 278:4 | **appear**  194:18 |
| 134:1 135:1 136:1 | 268:1 269:1 270:1 | 279:6,19 280:5,7,8 | **appearance**  48:2 |
| 137:1 138:1 139:1 | 271:1 272:1 273:1 | 281:5,9,11 285:24 | 115:12 |
| 140:1 141:1 142:1 | 274:1 275:1 276:1 | 286:14,16,18,20,23 | **appearances**  3:2,23 |
| 143:1 144:1 145:1 | 277:1 278:1 279:1 | 286:24 287:3 | 4:2,22 5:2 |
| 146:1 147:1 148:1 | 280:1 281:1 282:1 | 288:20 289:18 | **appears**  171:5 |
| 149:1 150:1 151:1 | 283:1 284:1 285:1 | 293:12 294:23 | 225:24 236:10 |
| 152:1 153:1 154:1 | 286:1 287:1 288:1 | 297:12,14,21 298:2 | **applied**  61:8,15 62:9 |
| 155:1 156:1 157:1 | 289:1 290:1 291:1 | 298:4,6 299:8,24 | **apply**  73:15 214:2 |
| 158:1 159:1 160:1 | 292:1 293:1 294:1 | 300:12,17 301:2 | 254:14 |
| 161:1 162:1 163:1 | 295:1 296:1 297:1 | 303:5 312:7 314:14 | **appreciate**  234:18 |
| 164:1 165:1 166:1 | 298:1 299:1 300:1 | **answered**  27:15 | **appropriate**  8:19 |
| 167:1 168:1 169:1 | 301:1 302:1 303:1 | 106:8,19,20 151:5 | 63:23 225:16 241:5 |
| 170:1 171:1 172:1 | 304:1 305:1 306:1 | 168:12 189:22,25 | **appropriately**  8:24 |
| 173:1 174:1 175:1 | 307:1 308:1 309:1 | 230:22 234:22 | **approval**  275:12,22 |
| 176:1 177:1 178:1 | 310:1 311:1 312:1 | 244:5,6,9 268:8 | 275:25 276:4,8 |
| 179:1 180:1 181:1 | 313:1 314:1 315:1 | 285:15,17 286:12 | **approved**  319:20 |
| 182:1 183:1 184:1 | 316:1 317:1 318:1 | 295:18 315:24 | **approximately**  19:9 |
| 185:1 186:1 187:1 | 319:1 320:1 321:1 | 323:11 | **approximation**  72:9 |
| 188:1 189:1 190:1 | 322:1 323:1 324:1 | **answering**  179:13 | **april**  236:7,11 |
| 191:1 192:1 193:1 | 324:16 327:5,20 | 180:5 | **area**  13:2 152:2 |
| 194:1 195:1 196:1 | **alleged**  241:3 | **answers**  46:21 47:6 | 173:8,11 |
| 197:1 198:1 199:1 | **allowed**  94:15 | 84:6 114:20,23 | **arguing**  178:20 |
| 200:1 201:1 202:1 | 176:22 221:23 | **anticipate**  9:7 | **arm**  117:16 133:3 |
| 203:1 204:1 205:1 | 261:13 | **anticipation**  32:19 | 173:11,12 |
| 206:1 207:1 208:1 | **allowing**  223:3 | 34:8 35:17 | **arms**  117:18,21 |
| 209:1 210:1 211:1 | **american**  11:20 | **antipsychotic** | 152:21,22 153:3 |
| 212:1 213:1 214:1 | **annually**  270:22,23 | 203:10,11 268:20 | **army**  248:8 |
| 215:1 216:1 217:1 | **answer**  8:13,19,19 | **anxiety**  319:10 | **arrest**  28:22,23,25 |
| 218:1 219:1 220:1 | 8:24 9:11 15:16,19 | **anybody**  28:8 35:23 | **arrival**  160:10 161:9 |
| 221:1 222:1 223:1 | 26:3 28:6 29:24 | 36:3,6,10,13,14,17 | 161:11,20,23,25 |
| 224:1 225:1 226:1 | 30:14 74:17,18 | 86:14 96:5 103:22 | 163:16,17 166:3,5 |
| 227:1 228:1 229:1 | 93:20 103:16,17 | 104:7,24 106:7 | 226:5,25 227:10,14 |
| 230:1 231:1 232:1 | 105:25 106:22 | 139:3 202:12,16 | **arrive**  166:9,23 |
| 233:1 234:1 235:1 | 124:18 126:13 | 207:2 250:3 260:14 | 226:17 227:6 |
| 236:1 237:1 238:1 | 135:2 161:2 164:16 | 316:24 | **arrived**  34:5 127:3 |
| 239:1 240:1 241:1 | 169:15,17,18,23 | **anybody's**  224:13 | 161:8 162:20 |
| 242:1 243:1 244:1 | 170:3 175:15 177:3 | 224:17 | 165:17,20 166:13 |
| 245:1 246:1 247:1 | 187:19,20 189:13 | **anymore**  278:15 | 166:17 170:15 |
| 248:1 249:1 250:1 | 193:24 215:16 | | 227:2 |

arriving  226:21
ascertain  41:4
  219:15 273:9
asked  33:15 48:20
  54:8,9,10,12 91:6
  103:10 122:18
  139:16 148:5 149:3
  164:6 168:12
  182:10 183:18
  187:11 189:22,25
  226:25 227:15
  230:22 231:4
  240:10,16 244:4,8
  252:6 265:22
  266:18 268:8
  285:17 286:12,14
asking  8:5 25:8
  46:13 47:5 49:11
  54:19 84:7 85:22,23
  103:12,16 111:19
  145:21 146:24
  147:3 163:24,25
  168:14 175:16
  176:18 180:12
  182:9 185:16
  188:20 201:8,21
  235:22 240:21
  242:25 243:3,19,23
  248:23 256:6 258:2
  261:4 264:7,8
  269:16,18 272:20
  272:22 286:3
  288:19,21 294:5
  295:8 297:8 300:23
  308:13 314:24
aspect  20:22 173:11
  173:12
aspects  146:3
aspirating  134:9
assaulted  117:15
assess  39:16 59:4
  65:5,5 76:4 91:11
  115:3 119:11
  289:23 295:25

assessed  42:18,21
  76:5 295:19,20
assessing  48:2,3
  289:25 305:23
assessment  47:25
  59:12 62:21 65:13
  75:10 76:22 80:13
  80:15 86:15 119:9
  119:13,14,15 121:8
  122:24 139:6,17,25
  140:2,21 141:10,13
  142:12 144:15
  146:10,14,22 147:5
  147:10,12 153:14
  153:22 154:4,13,17
  155:13,24 169:10
  193:20 263:14,21
  264:18 294:16
  295:21 305:16,17
assigned  157:12
  225:9
assistant  1:10
associate  207:13,18
  207:19,24 209:7
  210:21 211:2
  228:19,23,25 235:3
  269:17 270:4
association  24:10
assume  8:13 180:7
  255:11 256:12
  259:3
assuming  261:15
  274:5
assumption  264:7
assure  297:16
attach  125:2
attempt  89:12 243:7
  244:3,13
attempted  101:5,14
  102:10 108:7
attempts  113:10,11
  113:16 242:4,6,10
attend  20:19
attending  15:2,3
  16:17,23 17:6 18:6

18:10,11,14,17,25
  21:25 22:5 96:11
  282:14 319:16,20
  320:3,19 321:19,23
  322:4,21,25 323:7
  323:14,14,16,18
  324:4
attendings  25:21
  319:22
attention  157:22
  159:2 239:12
attitude  115:13
attorney  3:4,7 8:6
  288:10 324:11
attorneys  3:11,16
  4:4,10,17 5:4
  325:19
auditory  119:8
authority  321:15
authorization  276:6
available  60:7
  190:14
avenue  4:5,18 7:24
average  22:25
aware  24:12 25:14
  35:13 49:12 78:13
  79:9,10 86:17 99:6
  122:8 123:3 153:9
  174:10 175:20
  214:19 262:22
  263:2 314:9
axis  100:8,11,13,14
  100:15,16
ayers  2:14 326:4,22

**b**

b  7:15,22 143:18,18
  302:8 325:9
bachelor's  10:25
  11:4,9
back  26:20 44:2
  72:6 83:7 85:13
  88:22 113:24
  126:22 130:6
  138:24 152:21

153:2 164:4 165:14
  174:14 188:17
  190:24 195:19
  210:4 216:7 225:21
  235:20 236:14
  241:16 259:14,17
  261:8 264:13
  268:12 269:13
  297:21 298:2,5,19
  309:20
badgering  256:15
ballek  302:6 304:18
bandages  61:24
bar  116:13
bare  81:6
barricade  149:20
barricaded  93:2
  95:19 197:11
  198:20 247:4
  267:24 290:12
  291:3
barricading  199:20
  200:2 262:11
base  44:14 243:24
based  77:10 105:3
  147:8 149:17 152:8
  243:21,23 270:24
  271:19,22 272:12
  272:14 276:16,21
basic  8:7 151:5
basically  72:18
  178:15
basing  246:5,6
basis  196:15 212:4
  213:4 290:18
  311:23
bathroom  131:6
bauza  5:11
becoming  205:10
bed  68:2 117:13
beds  68:5 190:14
beginning  117:12
  246:6
behalf  108:15

behaving  77:25 92:2
  92:21 94:22 95:15
  134:20 198:25
  218:10,10
behavior  78:19 90:2
  100:3 132:8 172:23
  199:2 244:18 288:8
behavioral  154:17
behaviors  171:19,23
belief  52:9,10,18,19
  135:21
believe  90:24 91:7
  115:17 141:4
  171:19,24 193:4
  234:4 241:14
  254:19 290:7
  317:10 318:9
  319:24
believed  144:21
  196:4
bell  4:10
belong  129:20
  228:17
belonging  182:2,21
  183:6
belongings  182:14
  183:7
belongs  183:19
  223:15
bending  117:15
benefit  84:3,8,9,10
  217:13,17,20,23,25
  283:18,21
benefits  204:24
bernier  1:23 2:11
  5:5 7:6,7,20 8:1 9:1
  10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1

46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1

194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1,24 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
324:16 325:5 327:5

327:20
best  27:22
better  70:23 148:22
big  133:10 291:25
bill  10:10 273:22
  275:4
billed  274:22
billing  135:16,17
  273:21,25 274:17
  274:25 275:3
bipolar  268:23
bit  122:9 156:20
bizarre  77:25 78:19
  88:10 92:2,21,23
  93:8,12,17,23 94:18
  94:23 95:15 132:7
  132:18 134:20
  149:21 150:20
  172:7 197:12
  241:18 247:5 268:6
black  151:25 152:16
  153:2
block  226:13
blocking  308:12
blood  130:22 132:24
  132:25 133:3 134:5
  134:9 138:4 156:7
  156:13,14,15
  309:23,25 311:14
  314:4 315:8 326:14
bodies  184:18
body  152:8 182:14
born  10:21
borough  1:10
bottom  136:14
  153:16 158:11
  216:22
bounds  193:7
  292:25
box  113:16 152:4
  226:4
brady  5:4
brain  133:12 134:25
break  85:2,4 93:3
  139:3 233:14,16

242:12 269:2
**brennan**  5:4
**brian**  4:20
**briefly**  130:10
**bring**  28:12 29:2
  125:4 158:25 212:4
  212:6 213:3 214:22
  297:21 298:2,5
**bringing**  28:15
**brings**  28:18 209:15
**broad**  100:5
**broadway**  2:6 3:4
  7:10
**brooklyn**  1:10 15:9
**brought**  26:12,22
  27:6,13 28:4,9 29:5
  62:19 63:2 64:9
  65:17 143:19,22
  170:9 181:6 197:10
  197:13 200:13
  202:25 209:22
  210:12 213:12,19
  214:18 215:11
  241:17 247:5
**bruce**  315:12
**bruise**  173:10,12
**bruises**  117:17,17
  117:21
**bsn**  10:16
**bunch**  311:3
**bureau**  202:13,17
  282:5
**business**  37:21,24
  38:5

|  | c |  |
| --- | --- | --- |

**call**  29:4 62:14 78:4
  82:12,14,18,21,21
  107:2,9 125:22
  175:23 176:2,2
  178:19 207:12
  208:10 209:8
  222:24 308:12
**callan**  5:4,7 7:5 26:4
  29:22 30:12 35:3

37:6 41:23 50:22,25
54:17 57:3 60:2,13
64:5 66:12 69:9,12
70:6 72:25 74:2,5
74:14,17,19 76:2
77:14 84:5 91:19
92:6,10,13 93:9
94:7,19 97:8,10,15
98:9,17 99:10 101:7
101:19 102:13,19
102:25 103:5,14
104:20 106:8,11,17
106:23 107:4,9
108:18 109:8,22
118:22 120:2,11,15
120:18 124:11,17
124:22 125:4,10,15
126:4,14 130:2,5
137:7 139:10
146:23 148:18
150:17 151:9
157:23 160:23
161:3,13 163:14,22
164:5,11,17 165:7
168:7,12,15,19
169:14,21 170:2
175:14 176:20
177:5,12,15,18,24
178:7,10,14,21
179:7,15 180:9,15
182:6,17 185:14,21
186:14,23,25
188:15 189:13,22
189:24 193:22
196:8 197:7 201:2,8
201:19 202:4 204:7
204:11 210:24
213:17 215:6
218:18 219:23
221:23 228:21
229:14 230:21
233:2,5,8,11 236:4
238:18,25 239:5
240:8,12,17 242:8
242:14,17,21 244:4

244:8 245:13
246:14 251:16,19
252:15,23 253:17
255:18,22,25 256:6
257:21,24 260:19
260:23 261:4
262:15 263:6,17,22
264:4,22,24 266:10
266:18 267:11,14
268:8 269:6 270:10
271:21,24 272:7
273:15 274:3,7,11
276:18 277:11
278:19 279:4,8,12
279:16 280:3
281:10 284:8,12,18
284:20,24 285:2,13
285:17,23 286:24
287:14,20 288:3,9
288:22 289:3,8
293:4,11 294:24
295:5 296:20,23
297:4,7,16,24 299:6
300:7 301:2,21
304:6,12,20 307:24
308:13,19 312:13
312:22 316:3
323:11
**called**  87:24 88:9
  113:9 130:12 158:8
  207:17 230:13
  279:24 280:13,17
  280:23 281:13
**calling**  297:2
**calls**  75:9 88:2
  175:24
**calm**  118:12 129:4
  168:6,22 169:2
  170:5 205:14
**camera**  288:13
**capacity**  1:10,11,13
  1:14,15,16,17,18,20
  1:23,23 2:2 50:5
  68:2 301:6 302:10

**captain**  1:13 261:25
  262:14,22,22,23
  263:5 264:19 265:5
  266:5,22 267:2,8,13
  267:18,20
**car**  251:25
**card**  278:17 279:2,5
  279:13,14,22,23
  280:10,11,24
**cards**  280:15,19,21
  281:2,6,8 284:13
**care**  30:6,16 36:7,10
  36:15,19 38:24 39:2
  39:7 44:4 67:21
  80:8,25 81:13 201:7
  201:16 232:5 241:4
  241:12 258:18
  283:8 297:23 298:3
  298:6,23
**career**  11:10,22
  12:10 13:11,20
  14:16 26:21 27:5,11
  71:22
**careful**  239:12
**carefully**  264:10
**cares**  178:17 302:14
**carry**  118:19 119:5
**carrying**  184:16
**carter**  3:15
**case**  63:8 141:25
  147:21,22 149:7,19
  150:4 178:15
  207:14 208:11,13
  208:25 211:3
  212:13 214:6,6
  229:23 230:17
  255:5 301:20,23
  302:2 303:8,9
  304:11 307:21
  327:3
**cat**  133:7,8,17
  134:24 138:3,5
**categories**  99:23
  100:9 272:19 311:4

category  100:5
157:11,15,18
272:25
caughey  1:17
cause  94:17
caused  132:8 248:14
causes  133:13,13
causing  117:17
123:25 124:15
126:9
cautious  197:2
303:19,22 304:3
cavity  184:14
cbc  132:24 134:7
cell  181:23
center  1:22,24 4:11
109:25 120:21
certain  81:10,17
102:6 249:17,21
certainty  156:12
certification  6:6
326:2
certify  326:6,12
chairman  207:13,18
207:19,25 208:2,3
209:7 210:21 211:3
228:19,22,24,25
229:2 235:2,3 267:5
287:16,18
chance  38:17 115:2
177:21
change  201:23
228:8 266:16,21,25
289:11,14 327:6
changed  18:7,8
236:2,8 265:2 266:3
266:7,15 287:11
changes  228:10
chaotic  205:11
characterize  59:6
236:19
characterizing
102:6
charge  320:20

chart  29:18 30:8,18
31:8 32:17 33:4,14
34:10,12 35:13
37:10 38:7 44:4,19
54:18 59:16,21 60:6
60:11 67:6 68:16
70:7 84:15,19 85:16
86:5 88:7 104:11
105:4 113:22 120:8
120:9 127:24
130:11,13 138:13
141:18 147:2 152:9
155:15 157:4
176:21,23 177:6,12
177:20 178:3,12
179:20 180:17
191:23 192:16,20
228:19 277:3
278:18,21 279:3,23
281:25 284:14
285:3 290:22 291:6
291:7,19 312:4
324:14 325:11
charts  42:13 60:20
chasing  52:16
check  62:18 183:20
221:5,7 270:7
checked  152:5
checking  48:13
166:18
chief  1:8,10 142:25
235:13
choose  14:7 178:22
church  3:17
circle  57:24
circled  151:25
152:20
circulation  61:18
circumstances
142:19,22 143:15
citizen  12:17,19,22
city  1:8 3:17 15:8,11
15:22 16:4,6,11
17:2,4,7 36:18
210:13 213:13,21

276:15 316:25
327:4
civil  2:17
claim  312:22
claims  301:11
302:13
clarification  69:14
clarify  25:2 35:6
66:16,17 69:10
163:15 183:14
211:4
clear  8:9 79:3
122:17 152:3 162:8
164:12,16,19
180:12 182:12
192:22 259:16
287:9 297:6
clearance  104:14
cleared  76:7,16
301:18 303:9 304:9
313:22,25 314:4
clearly  221:21
clearwater  4:10
client  109:22 143:23
clinical  20:21 21:13
21:14,15,16,19,20
23:9,17,21 154:16
271:11,17
clinicals  20:21
close  297:18
clothes  180:22,23,24
181:2 183:5,11,16
183:24 184:15
187:11 249:23
cme  306:2,21,22
coach  124:24 125:19
cocounsel  177:18
code  135:13,15
cognitive  47:17
49:17,23 195:7
collaborate  290:3
collectively  1:21
college  10:16,24
combative  29:3

come  11:18 52:21
61:13 65:8 75:15
76:21 77:7 78:4
121:3 126:3 130:8
132:10,17 140:11
148:15 179:14
182:18 200:11
204:13 211:22,23
216:10 227:10
249:24 250:3
257:11 259:24
270:10 275:10
276:16 277:8,19,24
306:6 310:18 313:8
313:12
comes  30:17 47:12
52:15 55:7 63:15
131:18,21 140:7
142:2 180:20
209:18 220:2 247:4
265:16 306:4,5
313:16
coming  30:21 32:15
32:19 33:24 35:17
88:15 282:9 284:3
312:5 313:19
commission  327:25
commit  58:5,7,11,17
58:20,23 59:2 70:11
committed  302:17
303:13
committee  251:9
committing  302:22
303:16
communication
253:3
community  63:12
236:25 237:2 238:8
249:8
company  274:21,23
compared  23:17
complaining  173:7
309:10
complains  126:16

[complaint - correct] Page 9

complaint 33:20
142:25 145:13
complaints 143:7,9
complete 11:6 14:12
41:9,11 243:11
292:9,20 293:2,7,21
294:9
completed 11:8 12:7
232:10,12
completely 125:21
184:19
complied 79:13
comply 81:11,18
83:3,12 99:6 108:7
253:24
complying 68:17
74:4 139:9 216:17
computer 274:13
conative 47:18
48:11 49:5
concentrate 12:25
concern 67:3 213:24
313:18
concerned 245:9,16
concerning 180:19
concerns 213:14
214:13
concordia 10:15,23
concur 99:18
condition 152:3
conduct 108:14
243:16 292:4
293:15
coney 16:20 17:2,6
17:10,16,18 26:9
40:15
confident 125:7
270:8
confirm 230:15
245:8
confirmed 230:10
322:25
confirming 232:13
conflict 100:20,24
100:25 218:23

219:2
confusion 35:5
consent 204:22
consequences
204:23
consider 95:20
200:5,7 293:13
consideration
197:15 198:24
considered 81:2,8
193:14,16 271:5
considering 146:25
170:13
conspiracy 52:17
136:2 172:15
195:25 196:7,10,14
196:23 199:24
constricting 61:25
consult 31:17,19,20
31:24 32:2,2,6,7,8
34:22 77:23,24 88:3
88:9 117:8,10
123:12,15 207:11
211:7
consultation 87:24
consulted 211:2,12
consulting 95:23
contact 222:21
contacted 306:12
contained 30:8,18
container 131:5
contains 179:4
contemplating
53:23
content 47:22
context 171:4
continue 11:21
224:6
continued 1:25 3:23
4:2,22 5:2 85:12
109:21 138:23
195:18 233:22
269:12 298:16
323:20

continuing 127:13
305:10,14
contraband 184:12
control 154:19
contusion 151:17
152:4
contusions 152:8,13
152:15 153:2
conversation 8:17
52:24 53:6 126:23
208:17,23 316:9,11
316:17
conversations
315:15,20,25
cooperative 115:13
115:18,20,21
118:15 129:5
304:22
cooperativeness
271:12
copies 223:21 224:4
233:14
cops 198:2
copy 38:15,16
179:19 222:13
223:23 233:5 271:7
corporation 3:16
correct 10:5 16:12
30:5,19 33:24 34:6
37:22,23 38:5 40:16
41:18 43:8,12,15,19
43:20,23,24 44:5,6
44:9,10,13,16,17,20
44:23 48:9,21,24
49:17,18,20,21,24
49:25 50:17 52:2
53:6,9,12,15 56:9
56:10,15,16,19,20
56:22,23 57:16,21
58:15,20,21 59:2,3
59:13,14,25 63:17
65:16,21,24 66:9
67:4 68:7,10,11
72:15 73:10 74:12
77:9 79:11 87:15,18

87:22 91:15,16 92:9
92:12 94:9,11,18,21
96:5 99:14 100:6,21
100:22 101:3,6,16
112:15 113:2,7,17
113:18,20,21 114:3
114:4,21,22,25
115:5,7,8,10,11
116:4,6,8,9,10,11,20
116:21,25 117:2
121:25 127:8
128:19,20 130:7
131:17 132:2,21
134:22,25 135:7
136:11,18,23
141:11 144:11,16
144:22 147:15
148:17 152:5,9,13
152:16,18,22
153:11,12,20,21
154:4,5,9,13,14,18
154:21,25 155:2
157:2 159:11,14,15
159:17 160:19
162:10,21,25 163:5
163:9 167:6,24
168:3,4 169:10
170:15,16 171:6,7
171:15,16,21,25
172:2,4,5,7,8,12,20
173:25 184:22
187:24 189:6
191:19 192:2,5,7,10
192:11,13,17,18,20
192:21,25 193:2
194:14,16,17,20,23
195:8 196:16 199:6
199:19,21 203:22
205:23 206:4,11,17
206:21 207:4,8
212:15 215:4
216:11 222:4
229:24 230:11,16
238:4 244:24
247:17 249:4,5,8,9

249:12,22,24 250:4
250:5 252:14
255:21,23 257:5,13
257:17 258:7 259:3
259:18 262:9,14
267:9 274:2 276:17
277:5,6,20 278:2,18
278:22 279:3 281:5
281:8,23 287:11
289:15 290:8,19,22
291:10,19,24 300:4
311:5,9 313:9,14,15
314:15 315:8
316:17 318:15
319:17,18,20,21
320:2,5,6,8,9,12,13
320:17,18,21,22
321:16,17,19,20,25
322:2,4,17,18,20,25
323:2,5,8,10,19
324:5,6
**correctly** 103:15,16
**correspondence**
253:4
**counsel** 3:16 6:4
35:4,9 37:9 60:14
102:23 110:4,5
125:9 130:6 137:13
165:8 168:8 176:16
176:17 177:8
179:15 180:10,13
180:18 185:18
221:21,25 251:19
252:20 260:19
264:12 267:16
285:18 295:6
**counselor** 164:7
182:11
**count** 15:23 132:25
**county** 14:19 15:5,6
16:18 26:9 40:11
304:21
**couple** 322:13
**course** 8:17 38:5
103:19 124:19,22

147:10 306:25
**court** 1:2 6:17 8:20
8:21 125:14,22
178:10 179:18
304:14,16,16,17,20
**coworkers** 196:5
**cpep** 236:24,24
237:7,12,14 238:5
**crafting** 234:15
**create** 41:21
**created** 37:20 251:4
251:9 255:20 256:2
256:10
**creating** 21:4 40:21
40:25 43:22 227:19
234:12 235:6
**creation** 39:19
235:9
**credit** 306:23
**crisis** 218:22
**criticized** 271:17
**cross** 220:25 226:7,9
226:12
**ct** 133:20 138:10
**culture** 52:12
135:23
**currently** 217:12
**custody** 155:18
**custom** 141:21
142:15
**cut** 124:25
**cutting** 169:16,22,24

**d**

**d** 7:6,14,21 207:21
325:2
**danger** 61:9,10
63:11,21 64:16 80:5
80:6 81:2,8 83:24
93:19 95:13 143:24
144:5,22 197:2,6
198:8,13,15 204:19
205:4,5 217:11
220:3,19 241:15,20
243:17 246:23

283:23 305:15,17
305:18,24
**dangerous** 65:12,14
204:14
**date** 37:5 49:11
68:14,20 72:20
86:23 120:20
128:12 155:6
158:16,23 159:13
159:16 160:7 162:4
163:9 165:9,16
166:3,4,8,22 190:20
220:22 221:2,19
225:24,25 226:4,5
226:10,16,25 227:2
227:5,9,13 232:19
232:21 234:2
253:21 276:24
327:4
**dated** 120:6 127:24
139:7,17,23 158:14
**dates** 38:8
**david** 315:16
**day** 21:18 22:9,18
22:25 68:24 159:25
189:23 190:2,4
194:4 199:2 203:8
203:23 204:4 209:4
221:16 231:13
233:9 246:6 259:15
264:6 265:10
284:22 288:2,25
289:5 314:13 319:2
324:20 326:18
327:22
**days** 188:21,25
189:10,15,18 199:6
241:9 259:7,10,17
259:21,24 302:16
**dc** 3:8
**dealing** 240:5
**deceiving** 27:20
**decide** 110:22 146:3
**decided** 33:13
204:18 221:21

277:9 317:14
**deciding** 66:5
283:10
**decision** 39:16 50:5
62:7,12 78:15 80:10
107:24 108:3,6
145:16,19,24
146:17 150:14
151:2,15 170:6,7
199:13 200:6
208:19,20 221:16
221:18 230:3 231:4
231:17,25 246:23
267:4 277:13
283:13,14,16 284:3
285:10 286:9 287:2
287:4,16,19 289:12
318:19 321:18,25
322:22 323:17
**decisions** 65:20
303:20 319:19,23
319:24
**deem** 206:19
**deemed** 143:23
266:24
**deems** 75:12
**defendant** 3:16 4:4
4:10,17 5:4
**defendants** 1:21 2:4
2:11
**defensive** 303:20
**define** 265:9
**degree** 13:8 156:12
**delusion** 47:23
136:6
**delusional** 52:6,9,18
78:20 150:20
**delusions** 100:3
194:19,22,24
**demonstrating**
243:16
**denied** 89:10 95:25
128:6,14 129:11
**denies** 90:17,20
114:2 119:8 128:22

143:5,8
**department** 36:18
36:25 78:8 120:22
125:25 126:5
139:13,14,18
140:13 202:14,18
210:13 213:13,21
220:13 235:12,14
236:16 237:17,20
239:21 271:13
273:11,19,20 274:2
274:17 276:16
291:9 315:5 317:2
**depending** 29:4
131:23 132:3
**depends** 22:14 63:8
70:22 75:8 76:15
141:25 147:21
214:6 258:8 275:24
322:7
**deposition** 2:10 6:7
6:14 7:3,8 8:8
178:11,23 301:22
312:17 324:9 327:4
**depressed** 80:9,18
80:23,24 81:3,22
319:5
**depression** 268:23
319:9
**deputy** 1:8,11
**describe** 30:2
204:21 213:15
**described** 45:3
61:19 63:7 78:13
110:5 199:19
208:18 219:7 245:4
245:17 246:10,19
**describing** 64:2
**description** 152:12
325:10
**designated** 223:10
224:18 225:15
288:10
**designed** 224:4

**desired** 112:13
**destruction** 248:20
**destructive** 64:17
**detail** 53:8
**details** 10:4 41:18
57:12
**detective** 282:3
**determine** 45:7
132:6 269:19
289:19,21
**determined** 149:8
**determining** 63:5
**devine** 4:16
**devoted** 23:17
**dhar** 207:21,22,24
228:25 229:3,5,10
229:16,22 231:5
234:25 235:13
316:6,13
**dhar's** 230:20 231:5
**diagnosed** 195:22
**diagnosing** 100:10
**diagnosis** 99:23
132:6 135:7,18
136:11,18,22,22
137:2,4,12,23
290:19 310:19
318:24
**diagnostics** 130:12
130:15
**diastolic** 156:19
**difference** 19:18
**different** 47:16
136:5 168:16 214:7
237:20 306:14
319:6
**differently** 214:8
**direct** 272:15 320:7
**directed** 51:18
271:25
**directly** 140:12,25
**director** 18:18,20,23
18:24 19:3,11,12,14
19:14,19,20,23 20:5
20:10,13,17 21:2,12

23:19 192:9 227:19
227:23 228:2,7,12
234:20 235:14
**disaster** 150:5,6
197:18,23,25 198:2
248:8,19
**discharge** 41:15
110:24 303:21
315:6 321:15
322:17
**discharged** 113:5
149:23 219:14
220:9 248:21 267:6
302:15 318:20
321:22
**discharging** 303:25
**disciplines** 13:25
14:5
**discovery** 255:5,13
**discuss** 139:2
230:17 323:15
**discussed** 323:6,13
323:16
**discussing** 271:3
**discussion** 85:7
109:14 138:18
195:11 233:17
269:7 298:11,17
**discussions** 315:11
**disingenuous**
177:25
**disorder** 99:20,22
100:14,15 318:22
318:23
**disorders** 100:12,12
268:22
**disorganized** 51:19
**disposition** 110:20
111:9
**disrespect** 125:13
**distinction** 254:8
**distress** 129:6
**district** 1:2,3
**divided** 24:13

**division** 139:19
**doctor** 8:2 9:13,15
10:13 14:20,22
39:14 47:12 62:10
62:14,15,17 75:9,12
77:22 78:3 82:17,21
82:22 85:15 88:2
115:2 119:17 120:7
120:23 122:4
123:23 124:19
126:14 127:13
128:4 138:9 139:2,5
139:16,20,24 141:9
142:18 143:6
154:15 157:24
158:2 160:24
169:18 185:2
189:14,19 193:4
195:21 198:6
201:10 207:16
211:11 234:3 236:5
236:6 242:21 243:4
245:7 264:4 270:14
270:16 274:4,14,16
284:21 286:25
289:8 295:2,14
297:13 298:21
300:8 301:3 310:8,9
310:12,15,18 311:7
311:8 316:24
318:21 319:15
**doctor's** 99:18
**doctors** 24:10 70:10
82:18 149:9 321:8,9
**document** 37:3
179:3,11,18 180:3,7
232:17 234:12
235:16 238:24
239:2,18 242:24
251:9 253:5 255:13
255:20 256:9,19
268:11 269:20
270:2 294:18
298:22 299:4
325:18

documentation
  290:20,21,24
  291:12,14,15
  299:12,13
documented  298:22
documents  30:22
  32:21 35:17 233:23
  251:4 275:3
doe  1:19,20,24 2:2
doing  16:3 21:18
  23:17 42:19 125:16
  176:25 253:17
  257:7 287:25
dominican  12:13,15
  12:18
door  90:8 93:3
doors  112:3,5,9,15
  112:17,20
dosage  203:13,17
  204:8
dose  203:18
double  270:7
downstairs  208:10
dozens  210:3
dr  1:22,23 2:10 4:17
  7:4 87:12 88:24
  96:10,11,12,17,19
  96:24 97:20 98:12
  98:13,21,25 99:4,5
  99:16 110:10,14
  111:8 113:7,24
  115:9,19,25 116:19
  116:23 117:3,5,19
  118:8 123:16,17,18
  136:7,10,15,17,21
  137:4,15 167:22,22
  194:5 200:21,24
  201:3,5,12,14,21,24
  201:25 202:7,8
  207:21,22,24 208:4
  228:17,18,25 229:2
  229:3,5,10,16,22
  230:19 231:5,5
  234:25,25 235:13
  235:13 260:24

316:6,11,13 324:16
  327:5,20
drafting  21:4
dream  11:20
drew  133:3
drove  252:2
drugs  131:11,14
dsm  100:9
duly  7:16 326:8
duncan  1:16
duty  262:5 263:5
  264:19 265:7 266:7
  266:24 267:22
  292:2,18,24
dyscontrol  154:17

**e**

e  4:20 7:15,15,22,22
  87:14 200:22 208:6
  302:8 325:2,9
earlier  80:15 114:15
  207:8 219:7 277:12
  306:10 316:14,17
  317:12,14
early  15:13
easier  150:10
eastern  1:3 11:13
easy  247:8
eating  81:4,7
ed  312:3,4 320:20
  320:25
education  11:10,21
  11:24 12:5,8,10
  13:11,20 14:17
  271:23 305:9,11,14
  305:14 306:20,23
effect  6:16 220:17
  240:19,24 250:14
effective  204:6
effects  204:23
effort  108:15 304:21
eight  15:25 22:11,19
  23:21 24:15 25:8
  68:25 69:18 252:10

eighteen  257:10
either  34:8 42:24
  131:4 213:8 225:11
  303:25 319:4,5,7
elective  14:7
elevated  156:20,21
  156:22,25 157:2,3
elizabeth  13:13
else's  36:10,14
email  269:17
emergency  11:12
  16:21,23,25 18:5,18
  18:21 20:6,10,14,17
  20:25 21:3,5,21
  22:6 24:4,6,11 25:4
  25:15 26:13,23 27:7
  27:13 28:19 31:22
  39:5 59:24 60:8,21
  63:10 65:8 67:23
  68:9 69:5 70:12,15
  71:3 73:12,17,18,22
  74:11,13 75:3 77:2
  77:3,20 79:6,7 83:8
  90:7 95:14 105:8,10
  105:12,14 111:3
  112:6,8,11,17,23
  119:17,18 120:22
  129:20 130:9
  131:19,22 136:12
  137:20,20 139:19
  140:8,10,22 141:2,6
  141:23 142:4,7
  156:8 158:9 159:19
  159:20 161:5,6,9
  162:6,7,12 163:12
  165:23,25 176:9
  187:15 190:15
  192:10 198:6,22
  199:12 200:9
  202:22,23 205:11
  209:23 214:23
  215:24 216:21
  221:20 222:7
  225:20 227:10
  228:15 229:19,23

230:9 232:11 233:3
  234:9,21 237:2
  238:8 244:19
  249:17 253:15,16
  303:18 309:6 313:5
  314:10 315:4 321:2
  321:6,8,10,12,23
  322:5,7 325:12
emotional  218:22
employed  9:17,24
  15:4 17:24 24:3,17
  24:21 25:13
employee  15:10,21
  16:10,14 270:17
  301:7 302:10
  316:25
employees  1:24
employer  9:22
ems  291:12,13,17
encounter  26:11,14
  26:22
encountered  27:6
  27:12 28:15 68:8
endeavor  239:25
  240:6 241:11
endeavored  240:22
ended  302:22
endocrine  14:8,9,10
ends  87:20
enjoying  261:17
ensured  98:14
entail  236:12
entails  47:16
entire  30:6 31:7,9
  32:25 33:3 59:16
  98:10 102:21
entirety  197:4
entitled  2:12 125:24
  174:24 175:4
  297:20
entries  38:7
entry  68:15 121:15
  127:25 128:3
  130:16 178:12

environment 135:22
218:16
episode 133:16,17
133:19
er 32:3,7,9,11,12
34:23,24 35:10,14
45:21 63:12 74:21
74:23,24,25 75:6,14
75:16,18,19,21 76:4
76:8,9,11,20,21
78:2,16,17 86:19
91:24 98:20 104:5,6
104:13,13,15 105:7
105:20,23,24
107:16,24 111:4,6
117:8,10 121:3,3,5
122:13 136:13
141:2,11 149:22
156:3 159:22,23
160:3,20 161:16
163:17 165:11
166:6,7,8,10,11
184:4,8 190:9,10,13
200:11 206:5,6,22
210:18,19 226:17
227:3,17,17 237:21
237:24,25 238:2
248:18,22 257:3,4,9
257:12 313:10,11
313:13,17,17,20
314:12,13
errata 327:2
escape 90:3,5,10
escaping 90:4
especially 43:10
133:18
esq 3:3,7,13,15,19
4:7,13,20 5:7
esqs 4:4
estimate 27:17,23
28:2
et 327:4
evaluate 39:10,11
43:13,15 46:5
141:24 257:12

285:6 290:6,10,13
294:15
evaluated 42:21
44:24 60:12,18
75:20 76:5 85:19,24
88:6 98:15 106:13
107:6 116:24
168:21 192:6
270:19 303:2,7
311:7 321:4,11
evaluates 117:5
evaluating 154:2
evaluation 41:16,18
42:8,9,25 45:25
75:10 79:7 86:21
88:12 108:19
115:19 117:23
137:25 141:16
144:25 145:5,8,11
146:6 147:14
158:20 167:5,11,14
167:16 212:7
270:18 271:6,16
272:6,12 292:5,9,11
292:13,20 293:3,8,9
293:21,25 294:2,9
294:12,14 295:4,16
296:18,24 299:3,5
299:19 300:4
310:19 311:9 314:3
evaluations 43:3
44:9,15 108:23
270:24 271:2,4,17
272:19
eventually 230:11
everybody 157:24
233:13
exact 273:16
exactly 159:24,25
180:14
exam 46:8,10 47:3,5
47:14,15 48:5 114:6
114:7 116:3 173:20
191:17 216:16
310:3,5

examination 7:18
41:20 42:4 45:22,22
46:4 48:8,18 49:6
49:16,23 50:8,24
51:22,23 52:5 53:19
59:11 80:16 86:15
114:14,17 117:25
173:18 190:18,23
191:15 192:25
193:6,20 287:25
310:10 316:23
319:14 322:15
325:3
examinations 42:12
42:24 43:3 44:12,15
examine 45:20
142:9
examined 7:17
118:11 186:22
187:12 310:8
examines 42:3
exams 308:8,14
excuse 164:25
202:15 288:16
310:25 316:15
exhibit 37:4,8 59:22
68:13 102:24
199:18 232:16,18
232:21 234:4
238:13 240:7 250:7
252:24 253:21
324:13 325:11,12
325:13,14,16,17,18
exhibited 172:20,24
exhibiting 95:2
171:18,23 174:4
199:16
exhibits 233:24
325:19
exist 142:8 286:17
286:22
existed 60:6 61:4
227:21
experience 303:3,5
303:16

expires 327:25
explanation 269:25
express 56:24 57:5
57:20 58:19,25
expressed 116:3
213:25
expresses 57:10
58:4,10
extending 261:18
externship 13:12

**f**

f 315:13
face 117:16
facility 41:13
fact 34:4 40:20
43:25 150:12,19
159:8,10 192:20
197:9 255:11
274:12 278:16
factors 170:8 197:14
198:8 200:7
failure 312:23,23
fair 255:16
fairly 270:8
false 52:9,10,18
135:21
familiar 60:25 69:3
69:22 71:7,13 89:3
family 310:22
far 11:13 120:8
247:21
fashion 255:2
fast 198:3
father 222:22,25
223:4,6,8,10 252:12
fear 149:23
february 2:8 7:12
318:5 326:18 327:4
federal 2:16 276:3
304:16,19
feedback 21:10
feel 123:6,21 135:24
felt 287:6

| | | | |
|---|---|---|---|
| **fictitious** 1:20 2:2 | **fit** 262:5 263:5 | 130:16 131:16 | **forms** 83:15,17,18 |
| **field** 295:9 | 264:19 265:7 266:6 | 134:18 136:11,15 | 83:20,23 96:25 |
| **fights** 153:7 | 266:24 267:22 | 136:23,25 137:9,11 | 97:13,13,14,16 |
| **file** 3:19 4:14 5:7 | **five** 27:19 31:10,11 | 139:6,17 140:17,21 | 98:11 113:24 |
| 40:22,24 41:4 97:19 | 102:14 259:12,18 | 141:14,15 142:16 | 226:24 229:6 275:2 |
| **filing** 6:5 | 259:22,24,25 260:2 | 142:18,21 143:21 | 277:25 |
| **fill** 82:23 83:5,11 | 276:25 278:13 | 146:20 147:13,19 | **forth** 240:7 326:8 |
| 97:9 99:5 161:19 | **flanz** 315:13 | 148:2,7,18,20 | **forward** 130:10 |
| 189:20 190:4 | **flex** 308:20,21,22 | 150:17 151:9,21,24 | 150:3 198:3 |
| 216:15 226:24 | **flip** 158:3 | 153:15,17 154:8,16 | **found** 19:24 248:9 |
| 229:5 274:20 275:2 | **floor** 4:6,12 249:21 | 158:5,12,14 159:3 | 302:16 |
| 275:5 | 250:15 251:17 | 160:5,17 161:14,18 | **four** 16:16 22:19,21 |
| **filled** 97:21 140:20 | 252:9 313:8,9 | 161:24 163:11 | 24:14 25:9 61:14 |
| 158:5 179:4 191:22 | **florida** 306:21,24 | 165:13,18,19 166:2 | 65:10 69:2,18 260:8 |
| 277:14,17 | 307:3,5,7,11,15 | 166:25 172:13,21 | **frame** 265:20 |
| **final** 146:13 322:21 | 308:15 | 175:13 179:3 182:5 | **frederick** 1:15 |
| **financial** 273:10,19 | **follow** 239:25 240:6 | 182:6 183:13 184:2 | **free** 75:5,14 89:15 |
| 273:20 274:2 | 240:23 241:11 | 185:22 188:10,14 | 89:20 111:14 |
| **find** 19:21,23 22:23 | 258:8,11,12 | 189:3,20 190:4 | 112:25 175:24,25 |
| 91:25 127:15 | **followed** 81:11 | 191:21,25 192:4 | 188:2 221:13 250:2 |
| 139:11 158:4 177:7 | 135:25 240:22 | 193:23 197:7,8 | **friday** 259:25 |
| 178:19 198:24 | **following** 99:25 | 199:8 201:20 202:5 | **fridays** 260:2 |
| 218:9 219:14 | 323:20 | 203:19 212:10 | **front** 102:16 103:11 |
| 273:17,23 | **follows** 7:17 | 213:6,18 215:6,19 | 103:21 105:5 115:4 |
| **findings** 49:20 51:11 | **force** 6:16 | 216:16 218:18 | 120:3 121:15 |
| 52:2 192:24 193:6 | **forced** 118:17 | 222:2,9,11 225:20 | 139:21 152:21 |
| **fine** 97:16 101:24 | **forget** 299:17 | 226:3,25 227:15,19 | 153:2,25 154:11 |
| **finish** 9:9,9 15:15,18 | **form** 6:10 25:17 | 228:15 229:15 | 159:8 160:5 162:18 |
| 169:14,17,18 170:2 | 29:23 30:11 44:22 | 231:11 232:2,10 | 165:18 169:7,10 |
| 242:11 | 45:24 51:2 57:3 | 235:6,9,19 238:18 | 171:13,17 172:6,19 |
| **finished** 11:11 | 59:22 60:2,3 64:4 | 238:19 239:8 | 172:24 176:18 |
| **finishing** 22:14 | 64:13 66:11,12 69:8 | 240:25 242:18 | 177:2,10,14 192:13 |
| **first** 7:16 18:3 33:16 | 73:2,24,25 74:15 | 245:12 249:13 | 192:16 217:2 |
| 59:16 67:22 68:7,15 | 75:24 77:13,14,16 | 252:17 262:15,16 | 221:22 234:3 |
| 70:13 85:16 86:13 | 79:16 82:24 83:6,11 | 262:18 263:3 | 276:13,17,21 |
| 108:2,5,12,14 110:6 | 83:16 84:5 87:25 | 265:24 275:5,7,8 | 278:21 284:22 |
| 117:3,9 123:3 | 88:3 91:2,19 92:10 | 277:5,14,17 281:22 | **full** 68:2 |
| 127:25 130:16 | 93:9,10,18 94:8,19 | 284:7 285:12,13 | **fully** 59:22 179:5 |
| 133:16,19 140:15 | 94:20 97:2,6,9,21 | 286:10,12 293:4 | **function** 19:19 |
| 140:17 141:10,12 | 99:5,8,12,13 101:8 | 296:21 299:7 311:3 | 47:17,18 49:5 134:3 |
| 142:19,21 159:4 | 101:18 104:21,23 | 311:15,18 314:16 | **functioning** 48:12 |
| 160:12 194:4 202:6 | 106:15,18 108:11 | 314:18 317:18 | 49:17,23 81:4,6 |
| 202:10 205:12 | 108:18 113:9 114:8 | **formal** 305:13 | 100:17 195:8 319:4 |
| 216:18 226:6 308:4 | 114:9 116:5,12 | **formed** 231:21 | **functions** 20:16 |
| 309:8 | 119:22 121:8 | | 23:18 |

**further**  6:9,13 76:21
  76:22 78:24 91:9
  105:22 112:11,24
  115:22 127:14
  316:20 319:11
  322:15 324:7
  326:12
**future**  43:2 248:18

**g**

**games**  284:17
  286:19
**gastric**  314:7
**gastrointestinal**
  314:20
**general**  13:13
  139:12 294:12
  296:7
**generally**  38:23
  209:8 226:20 272:9
  272:11,19,23,25
  275:14,17 301:10
**generation**  268:19
**gentleman**  29:12
**gerald**  1:10
**getting**  47:6 148:16
  204:3 264:6 270:15
  297:18
**give**  19:8 21:9,17
  27:17,22 50:6 71:24
  87:6 130:20 131:4
  132:20,23 164:15
  175:21 176:3,7
  180:22,24 183:10
  183:19 205:21,23
  206:24 231:2 270:3
**given**  16:8 21:24
  114:20 131:3
  183:10 206:7
  222:14 223:23
  225:3,5 291:5,7
  306:25 309:16
  311:12 326:10
**giving**  50:5 72:4
  169:23 180:13

206:15 224:24
  236:20
**global**  100:16
**go**  10:14 21:22
  22:11 31:9 38:22
  39:6,9 45:10,18
  48:11 61:16 62:17
  65:4 66:16 76:3,13
  76:14,17,17,20
  77:12 83:7 89:6,15
  89:20 97:17 112:25
  118:17 126:14
  130:6 131:5 133:10
  133:21,23 134:21
  135:19 138:9 142:4
  142:24 147:11
  151:16 164:8
  165:14 174:11,14
  174:21,25 175:4
  176:23 184:8
  187:24 188:2,4
  190:24 206:2,13,16
  218:2 219:19
  223:21 225:21
  232:8 235:20
  241:16 242:13
  257:16 258:5
  264:12 273:10,18
  273:25 275:3
  284:25 297:22
  299:11 307:24
  309:20 316:6
**goal**  51:18
**god's**  274:10
**goes**  105:13 187:17
  222:13 318:25
**goff**  1:14
**going**  8:13 9:8 15:16
  31:13 51:19 56:13
  57:6 58:7,11,13,17
  58:19,25 62:16
  64:17 65:19 70:20
  79:2 85:5 86:11
  94:24 95:9,12,24
  96:2,3 115:22 117:3

120:10 126:22
  135:22 138:16,24
  145:15 151:13
  152:11 163:19,20
  164:21 174:11
  178:13 180:6
  185:10 190:5
  201:23 205:17
  207:2 216:14 217:8
  218:16,22,23
  236:14 242:12,13
  243:18,22 248:10
  249:11 252:21
  261:5 267:3 268:25
  269:4 288:6,18,19
  288:20 289:14
  295:12 297:13,17
  309:22,24 321:21
**good**  8:2 41:25 42:6
  49:14 50:19 51:6,20
  53:4,25 54:24 55:18
  55:23 56:5,17 57:14
  59:8 64:7 94:14
  123:23 124:9,13
  126:7 193:7,17
  289:17 292:3,8,18
  292:25 293:6,19
  294:7 295:2,14,23
  296:16 298:25
  299:16
**gotten**  46:12 151:4
**government**  276:3
**gown**  181:4,12
  182:22 184:5
**graduate**  13:5
**greg**  4:13
**groups**  218:6
**guard**  186:21
**guarded**  118:14
**guest**  107:10
**gun**  150:11
**guns**  118:19 119:5
  150:9,10,23 214:16
**guy**  255:6

**h**

**h**  207:21 325:9
**habit**  141:21 142:15
**half**  199:6
**hallucinating**  195:4
**hallucination**  47:23
**hallucinations**
  100:3 116:10 119:9
  195:3
**hand**  62:2 176:10,12
  227:18 234:11
  235:5 326:18
**handcuff**  66:7 122:7
  122:19 123:25
  124:14 126:8
**handcuffed**  64:19
  185:9
**handcuffs**  28:4,10
  28:13,16,20 29:6
  62:20 63:4,9,16
  64:9,10,14,22 65:2
  65:9,18 66:8,13
  124:23 125:18
  153:11 181:6
**handed**  180:4
**handing**  69:9
  119:23 177:19
  261:10
**handle**  78:17
**handled**  78:21
**handwriting**  34:13
  34:15,18 88:19,25
  217:6 228:16
**happen**  149:25
**happened**  43:19
  102:15 170:11
  177:8 190:13 198:5
  204:16 230:2
  248:11 282:15
  303:9 317:20
**happening**  150:6
**hard**  72:21 164:17
  214:25 215:15
  271:8

harder 289:3
harm 95:9,24
196:20 241:7 242:2
243:6,25
harmed 248:21
head 8:18 9:3 133:7
133:8,18 196:11
254:23 255:11
heads 148:21
health 67:3 100:12
220:13 236:16
238:16,17
hear 70:4 157:25
197:24 202:8
217:19 290:5
heard 98:4,7
hearing 202:7,10
heavily 150:13
288:5
held 2:12 69:5 73:20
75:18 76:24 77:20
79:5 80:19,21 85:7
90:9 91:20 92:4,8
93:7,16,21,25 95:20
109:14 111:17
112:19 138:18
195:11 233:17
244:24 246:11,20
269:7 298:11,17
322:24 323:9
help 155:10 174:18
175:23 176:5
helped 263:13,20
264:17
helpful 283:7 284:3
285:9
hereto 6:5
hereunto 326:17
hiding 184:18
high 311:14
highly 116:16
histories 262:13
history 28:17 46:6,7
46:9,10,12,16,21,24
46:25 47:2,3 78:2

89:9 113:13,14,17
113:19 132:18
171:9 190:25 191:4
191:5,11 208:14
212:15 262:10
310:13,16,20,22,22
310:22
hit 255:12
hitting 15:16
hmo 275:24
hmos 275:25 276:2
276:5
hold 29:14 77:10
78:9,12 79:14 94:16
110:23 111:10,11
111:12,15,19 112:8
112:21,22,22 113:6
176:17 225:20
237:21 291:11
323:3
holding 237:16,19
324:3
home 76:13,14,17
76:17,20 77:12
89:16,20 95:18
112:25 174:12
187:24 188:2,4
197:14 288:12,18
homicidal 47:24
55:5,21 56:3,7 57:7
57:19,21,23 58:5,8
58:24 59:2 90:20
91:8,10,12,15 114:2
116:7 128:6,14,23
129:12 153:15,19
168:3 171:20
homicide 56:14
hormone 134:3
hormones 14:11
horrific 243:2
hospital 1:22,24
4:11 9:20,22,25
10:7 13:13,23 14:19
15:5,6,7 16:5,6,18
17:2,3,4,6,10,16,18

17:20,21 18:4,9,15
18:17,25 20:7 21:5
23:3 24:22 25:14
26:9,10,11 28:16
30:8,9,18,19 31:4,8
33:3,12 35:24 36:4
36:7,14 37:9,10,11
37:19,21,25 38:4
39:20,23,25 40:5,9
40:12,16,18,21 41:2
42:13 43:10,22,23
61:3 62:4,20,23
63:3,3,4,24 64:9
65:17,19 66:8,23
67:17 69:6 71:4,6
71:11,12,15 72:20
73:16 77:10 82:10
84:2,14,19 86:16
94:16 101:4,14
102:9 103:22 105:3
105:4 107:14
108:15 109:25
118:17 120:21
126:25 127:4,7,16
127:24 132:11
134:16 139:6
144:11 149:13
153:10 155:3,8,11
159:4 160:10
161:10,21,23 162:2
162:20,24 163:3,11
163:17 165:17,21
166:3,5,23 170:9,15
171:2 175:10,17,19
179:16 180:21
181:2,3,11 182:3,15
182:19,21 183:11
183:17,24 184:5
186:6 188:6,12,21
188:25 199:11
200:14 209:19,22
212:21 213:4 223:6
226:5,21 227:6,14
232:4 238:10
239:16,19,21,23

240:2 241:5,18
246:7 250:15,20
251:5,23 253:25
255:19,21 256:2,10
257:23 258:24
259:11,22 261:16
263:4,24 264:5,10
265:5 270:17 273:6
274:16 276:16
277:8,10,20,24
282:11 301:7,9
302:11 304:23
309:7,8,9,13,16,19
317:3,8,12,23 318:2
318:11 323:10
324:12,14
hospital's 37:18
60:8
hospitalization
89:11 129:18 130:4
hospitals 26:16
hour 178:11 230:15
245:8
hours 23:4,21,21
61:15 70:22 98:14
127:6,10,12 155:8
173:9 230:12
249:23 250:12
251:5 252:8 260:6,8
261:5 266:5,23
276:11 285:4,6
312:16 325:13
house 92:25 197:10
198:18,19,20 247:6
267:25 270:12
290:12 291:4
housekeeping
276:10
howard 3:13 8:3
119:21 312:18
huh 58:3 114:10
hundred 27:19
hundreds 27:2,4
209:25

**hurt** 95:12 96:2,3,5
  172:3 244:20,21
**hurting** 55:8
**hygiene** 69:23 70:25
  71:19 72:13 73:9,14
  74:10 75:22 79:8,12
  79:25 81:19 83:4,13
  93:6,16,22 94:2
  96:21 97:3,22 99:7
  101:6,16 102:12
  103:25 104:9,17
  105:2,16 107:12,19
  108:8,17 158:6
  160:6 165:19
  189:21 191:21
  209:10 211:7,13,17
  212:22 214:4,24
  215:13,23 216:4,22
  219:19 222:8 229:7
  230:6 239:12
  257:16 277:5,19
  278:25 280:12
  281:22 301:15
**hyphen** 7:20,21
**hypothetical** 285:25

**i**

**iab** 276:14 277:19
  277:24 278:8,17
  279:13 285:20
  287:10,17
**idea** 19:8 21:17
  71:25
**ideation** 154:6
**ideations** 90:17,21
  113:12 115:23
  116:4,7 128:7,14,23
  129:12 153:19
  154:10 167:24
  168:3
**identification** 37:5
  232:19 233:25
**identified** 155:25
**identify** 120:15
  179:7 213:3

**ii** 100:13
**iii** 100:14
**illness** 46:6 47:2
  78:3 241:3 310:20
**immediate** 157:21
  241:4
**immediately** 113:23
**immigrated** 12:14
**impairment** 61:18
  100:4
**important** 42:23
  44:7 84:13,17
  173:22,24 313:23
**impossible** 286:15
  286:17
**improper** 125:20
  317:18
**inability** 164:25
**incident** 209:13
  302:25 303:6,12
  304:4
**include** 25:19
  185:19 219:10,13
  273:2 321:3 323:20
**included** 35:10
**includes** 47:24
**including** 117:15
**incomplete** 242:23
**incorrect** 159:17
  160:17 166:14,16
  319:25
**independent** 29:19
  146:21 147:4
  192:23 224:23
  225:2 295:4,7,16
  296:18,24 299:3,19
  300:3
**independently**
  10:11
**index** 1:7
**indicate** 159:3
**indicated** 50:2 85:15
  95:22 98:19 175:22
  207:7 214:12

**indicating** 30:25
  31:14 34:25 50:12
  68:18 86:22 119:20
  120:9 121:23
  122:14 130:9
  137:19 144:8
  152:17 157:19
  223:21 229:21
  251:7 269:23
  278:15
**indication** 270:5
  316:8
**individual** 198:4
**individually** 1:9,11
  1:12,13,14,15,17,18
  1:19,22,23,24
**inexperienced**
  164:23
**infection** 130:23
**information** 82:7,25
  83:5,9 86:12 91:14
  91:16 145:10
  170:25 198:17
  235:17 236:18
  263:13 267:9,15,15
  268:3 273:9 286:16
  287:10,17 290:18
  291:5,7 310:23
  311:2,4
**informed** 204:22
  224:5,19
**initial** 39:14
**inject** 207:6
**injection** 206:8,24
  207:3
**injuring** 305:19
**inner** 173:11,12
**inpatient** 14:19,21
  14:23,25 16:17
  83:10 105:19 107:4
  174:22 175:2 190:6
  217:13,17,25 218:3
  218:6,8 232:8,9,12
  237:23 250:18,21
  250:22,25 251:2,21

  252:19 253:6,12,19
  256:24 257:3
  258:16,17 261:11
  283:19 287:7
**inpatients** 112:23
**insight** 48:3
**inspection** 255:14
**inspector** 1:11
**insurance** 274:21,22
  275:11,13
**intellectual** 50:4
**intend** 58:5
**intending** 163:16
**intent** 162:9
**interaction** 46:17
  282:15 283:5
**interested** 326:15
**interfering** 288:15
**internal** 14:3 174:8
  202:13,17 276:14
  277:7 279:25
  280:14,17,23 282:5
  282:8,16 283:5
  287:11 289:6,10,13
  289:16,20,22 290:6
  291:23
**interrupt** 160:25
  274:9
**interrupting** 287:24
**interview** 169:5
  174:9
**interviewed** 169:6
  282:3
**intramuscular**
  205:21 206:7
**introductory** 203:18
**invoke** 104:17
**involuntarily** 70:21
  71:6 74:8
**involuntary** 69:25
  70:14,19 71:4,18
**involved** 21:12
  212:19 235:8
  251:20 288:3,6
  300:9

**irresponsible** 288:8
**irreversible** 283:16
**isak** 1:22 4:17
**isakov** 1:22 4:17
  228:17 253:18
**island** 16:20 17:2,6
  17:10,16,18 26:9
  40:15
**isolate** 274:4,13
**isolation** 137:11
**issue** 60:4 76:16,18
**issues** 313:19 320:10
  320:15
**items** 184:6 271:5
**iv** 100:15
**ivone** 4:16

**j**

**jamaica** 1:21,24
  4:11 9:19,22,25
  10:7 17:20,21 18:3
  18:9,15,17,25 20:6
  21:5 24:21 25:13
  26:11 30:9,19 33:3
  35:24 36:4,7,14
  37:9,11,18,19,21,24
  38:4 40:18 60:7
  61:2 62:4,20 63:3
  63:24 65:17 66:22
  71:11 72:20 73:15
  86:16 101:4,13
  102:9 103:22 105:3
  105:4 107:14
  108:15 109:24
  120:21 144:11
  155:3,7,11 166:23
  182:2,15 183:11,17
  183:24 188:21
  199:10 212:20
  213:4 238:10
  239:15,19,20,22
  240:2 250:15,20
  251:5 253:25
  255:21 256:2,10
  258:24 259:11,18

259:22 261:16
273:6 274:16 301:7
301:9 302:10 317:3
317:7,12 323:10
324:11
**james** 1:19 170:18
  170:21,24 171:5,11
  212:14,18,23
**jealousy** 136:5
**jensen** 4:16
**jersey** 7:25 13:16
**job** 17:11,12,13,14
  19:19 21:11 26:10
  164:20
**john** 1:19,20,24 2:2
  3:7
**join** 30:12 64:5 74:2
  175:14 186:14
  188:15 219:23
  245:13 263:17
  265:25 271:24
**joseph** 1:14
**jr** 4:7
**judge** 125:4 178:17
  178:22
**judgment** 48:3
  271:11,18
**jurat** 323:21
**justice** 107:3

**k**

**k** 118:9 208:6 302:8
**karbala** 124:6
**keep** 15:14 40:22
  60:20 106:14
  112:22 120:9
  151:16 157:23
  163:11 178:4,9,13
  196:8 234:19 236:4
  288:19,20 300:19
  317:2
**keeping** 84:18
  303:25
**keeps** 118:15

**kept** 38:3 70:24
  112:10 197:17
**kid** 125:25
**killed** 304:5
**kilograms** 203:16
**kind** 24:10 27:18
  63:14 80:14 82:9
  86:14 145:25 199:2
  218:7 261:7 273:9
  288:7
**kinds** 136:5 319:6
**kings** 14:19 15:4,6
  16:18 17:9 26:9
  40:11
**knew** 33:23 240:11
  266:22 277:19,23
**knives** 184:17
**know** 8:12 10:3
  22:20 37:14 40:20
  41:6,6 43:6,17 44:8
  44:11,14,18 45:12
  45:15,17 65:13
  67:20,25 68:3,23
  70:9 74:21 77:6
  80:4 83:20 85:18,23
  86:10 89:19 91:9
  92:9 96:7 97:11
  98:22 99:2 100:23
  102:14 106:6
  107:17 110:6,14
  111:23 112:21
  118:16,18,20 119:4
  119:7 122:5,10,15
  122:18,20,22 123:6
  123:15,18 125:17
  125:21,23 126:25
  128:9,16,17,23
  129:3,6,13,16
  130:19 137:22,24
  138:2 144:3 149:15
  153:5 155:16,23
  156:4 157:7,11
  163:18,23 165:9
  168:18 170:17
  171:4,8 175:3 178:3

179:6 180:14 185:6
185:7,11,23 186:16
187:6 188:11
189:14 190:13
202:24 210:25
211:24,25 212:2,13
212:18,23 213:8
214:11 216:5 220:3
220:5,5,19 223:2,5
223:20 225:13
233:4 234:6,17
236:6,13,23,24
237:6,7,12 238:24
239:3,10 240:13
243:19 248:5 250:8
250:10 251:6,19,24
252:18 253:4,8,11
253:14,22 254:20
254:21 255:7,12,25
256:14 259:5
260:22 262:19
263:9,11,19,23
264:5,17 265:21
268:15 270:14
273:5,12 274:3,6,11
274:14 276:14,19
276:23 277:7 279:4
279:7 280:9,10,16
280:18,20,25 281:3
281:6,7,12 282:7
284:8 295:23 296:3
300:15,16,18,21,22
300:24 301:10
302:21,23 304:13
309:5 310:5 312:7
312:18 313:24
314:14,19,24
315:14,21 317:19
317:21,25 318:18
**knowledge** 256:3,8
  271:14
**known** 263:12 265:5
  266:4,19
**knows** 255:19
  317:19

**[koster - lee]**                                                    Page 19

| | | | |
|---|---|---|---|
| **koster** 5:4 | 128:1 129:1 130:1 | 262:1 263:1 264:1 | 209:10 211:7,13,17 |
| **kretz** 4:3,7 144:12 | 131:1 132:1 133:1 | 265:1 266:1 267:1 | 212:22 214:4,24 |
| 144:17,23 189:12 | 134:1 135:1 136:1 | 268:1 269:1 270:1 | 215:23 216:4,22 |
| 189:15 264:21 | 137:1 138:1 139:1 | 271:1 272:1 273:1 | 219:19 220:14,16 |
| 266:9 267:10 | 140:1 141:1 142:1 | 274:1 275:1 276:1 | 222:9 230:6 238:16 |
| 268:12 287:13 | 143:1 144:1 145:1 | 277:1 278:1 279:1 | 238:17 239:12 |
| 293:23 309:18 | 146:1 147:1 148:1 | 280:1 281:1 282:1 | 257:16 271:23 |
| 315:9 | 149:1 150:1 151:1 | 283:1 284:1 285:1 | 277:19 279:2 |
| **kurt** 1:16 | 152:1 153:1 154:1 | 286:1 287:1 288:1 | 301:15 |
| **l** | 155:1 156:1 157:1 | 289:1 290:1 291:1 | **laws** 69:4 |
| **l** 7:6,14,14,14,21,21 | 158:1 159:1 160:1 | 292:1 293:1 294:1 | **lawsuit** 33:21 |
| 7:21 8:1 9:1 10:1 | 161:1 162:1 163:1 | 295:1 296:1 297:1 | 302:19 303:11 |
| 11:1 12:1 13:1 14:1 | 164:1 165:1 166:1 | 298:1 299:1 300:1 | 304:8 306:11 |
| 15:1 16:1 17:1 18:1 | 167:1 168:1 169:1 | 301:1 302:1,8,8 | **lawsuits** 300:9,20 |
| 19:1 20:1 21:1 22:1 | 170:1 171:1 172:1 | 303:1 304:1 305:1 | **lawyer** 174:7,15,19 |
| 23:1 24:1 25:1 26:1 | 173:1 174:1 175:1 | 306:1 307:1 308:1 | 174:21 175:4,11 |
| 27:1 28:1 29:1 30:1 | 176:1 177:1 178:1 | 309:1 310:1 311:1 | 180:2 |
| 31:1 32:1 33:1 34:1 | 179:1 180:1 181:1 | 312:1 313:1 314:1 | **lawyers** 174:20 |
| 35:1 36:1 37:1 38:1 | 182:1 183:1 184:1 | 315:1,13 316:1 | **lead** 171:19,24 |
| 39:1 40:1 41:1 42:1 | 185:1 186:1 187:1 | 317:1 318:1 319:1 | **leaders** 235:12 |
| 43:1 44:1 45:1 46:1 | 188:1 189:1 190:1 | 320:1 321:1 322:1 | **leading** 142:20,22 |
| 47:1 48:1 49:1 50:1 | 191:1 192:1 193:1 | 323:1 324:1 325:5 | 143:16 171:22 |
| 51:1 52:1 53:1 54:1 | 194:1 195:1 196:1 | **laceration** 151:18 | **learn** 39:19,22 40:4 |
| 55:1 56:1 57:1 58:1 | 197:1 198:1 199:1 | 152:4 | 40:9,12 71:10 |
| 59:1 60:1 61:1 62:1 | 200:1,22 201:1 | **lake** 4:19 | 297:10 |
| 63:1 64:1 65:1 66:1 | 202:1 203:1 204:1 | **lamstein** 200:21,24 | **learned** 100:19 |
| 67:1 68:1 69:1 70:1 | 205:1 206:1 207:1 | 201:3,5,13,14,22,24 | 295:10 303:3,4 |
| 71:1 72:1 73:1 74:1 | 208:1 209:1 210:1 | 201:25 202:7,9,11 | **learning** 164:21 |
| 75:1 76:1 77:1 78:1 | 211:1 212:1 213:1 | **landlord** 117:14 | **leather** 61:23 |
| 79:1 80:1 81:1 82:1 | 214:1 215:1 216:1 | **late** 264:6 270:14 | **leave** 17:11 75:5,15 |
| 83:1 84:1 85:1 86:1 | 217:1 218:1 219:1 | **lauterborn** 1:13 | 111:14 112:14 |
| 87:1,14 88:1 89:1 | 220:1 221:1 222:1 | 261:25 262:14,23 | 221:14 |
| 90:1 91:1 92:1 93:1 | 223:1 224:1 225:1 | 265:6 266:5,22 | **leaving** 111:25 |
| 94:1 95:1 96:1 97:1 | 226:1 227:1 228:1 | **law** 69:23 70:9 71:2 | 252:5 |
| 98:1 99:1 100:1 | 229:1 230:1 231:1 | 71:19 72:13 73:9,14 | **lee** 4:20 45:24 70:4 |
| 101:1 102:1 103:1 | 232:1 233:1 234:1 | 74:11 75:22 76:23 | 73:25 75:24 77:13 |
| 104:1 105:1 106:1 | 235:1 236:1 237:1 | 79:5,8,12,25 81:19 | 79:16 87:3 91:2 |
| 107:1 108:1 109:1 | 238:1 239:1 240:1 | 83:4,13 93:6,16,22 | 93:10,18 94:20 99:8 |
| 110:1 111:1 112:1 | 241:1 242:1 243:1 | 94:2,6 96:21 97:3 | 101:9,20 109:12 |
| 113:1 114:1 115:1 | 244:1 245:1 246:1 | 97:22 99:7 101:6,16 | 116:5 119:21,24 |
| 116:1 117:1 118:1,9 | 247:1 248:1 249:1 | 102:12 103:25 | 124:4,16 126:12 |
| 119:1 120:1 121:1 | 250:1 251:1 252:1 | 104:9,18 105:2,16 | 127:17 137:6,10 |
| 122:1 123:1 124:1 | 253:1 254:1 255:1 | 107:13,19 108:8,17 | 150:16 154:8 |
| 125:1 126:1 127:1 | 256:1 257:1 258:1 | 125:25 126:5 158:6 | 172:13 188:17 |
| | 259:1 260:1 261:1 | 160:6 165:19 | 197:8 203:19 |

238:19 240:25
245:12,18 249:13
252:17 262:16
272:24 293:5
311:15 314:16
318:13 322:5
**left** 17:13 39:7 173:8
173:10 242:22
265:13 269:3
**legal** 36:25 83:18,20
83:22 174:25
175:20 239:13
**lenoir** 3:7
**letting** 15:15
**level** 156:20 203:22
**lewin** 87:12 96:10
96:11,17,19,24
97:20 98:12,13,21
98:25 123:17,18
**lewin's** 88:24
**license** 308:18
**licensed** 307:4,8
**licenses** 305:2
307:20,23 308:14
**licensing** 308:7,23
**licensure** 309:4
**lieutenant** 1:14,17
**lieutenants** 213:2
**liked** 263:19 264:17
266:19
**likelihood** 247:22
**likewise** 101:9
**lilian** 1:23 2:10 5:5
7:4,20 324:16 327:5
327:20
**limiting** 219:10
**line** 90:15 113:11
117:4,6,9,12 142:24
152:11 327:6
**linear** 51:17
**lines** 223:21
**list** 179:5
**listed** 38:8
**listen** 205:15 236:2
264:10

**little** 122:9 156:20
**lived** 307:15
**living** 9:14
**llc** 327:2
**llp** 4:10,16 5:4
**location** 306:25
**locked** 112:3,5,9,15
112:17,20
**long** 9:24 11:14
13:17 15:21 16:14
17:5 19:5 23:2
70:21 125:17
126:24 162:16
188:5,11 204:5
220:15 234:17
257:8
**look** 31:11 32:21
33:14 54:17 95:16
98:10 136:14
141:13 173:5
178:22 180:16
185:13 196:21
212:23 214:5,7
216:18 221:24
248:12 252:24
**looked** 31:16 32:10
32:16 129:22
251:25
**looking** 47:25
109:23 110:2
119:20 120:19
121:14,19 122:23
127:23 154:15
155:3,11 170:8
176:21 185:19
220:22 228:14
231:13,14 238:13
256:17 281:14
309:23 310:2 318:3
**loose** 51:19
**loosen** 122:9,19
126:21
**loosened** 126:9
**loosening** 123:25
124:10,14

**lose** 70:3,8
**loud** 118:23 160:24
**louder** 236:5
**lying** 202:3

**m**

**m** 200:22
**machine** 133:11
233:6
**madison** 4:5
**magdalena** 5:10
**main** 196:6
**making** 50:6 120:24
151:2 154:3 169:19
169:22 193:5
219:20 234:15
240:17 259:5 279:8
279:10
**male** 185:5
**man** 25:24 154:25
248:8 303:13
**management** 33:12
33:15,18 36:23,24
305:20 306:3,6,7,7
306:11,14,16,20
**manhattan** 13:23
304:15
**manifest** 196:18
242:5,9 244:12,16
**manifestations**
173:23
**manifested** 242:3
243:7 244:2 319:7
319:10
**manifesting** 195:23
196:3
**manual** 239:21
**maplewood** 7:24
**march** 11:11,15
**marcus** 4:18
**margaret** 2:14 326:4
326:22
**marino** 1:9
**mark** 37:2 179:10
179:18 232:15

**marked** 37:3,7
68:13 232:17,20
233:24 250:7
253:21
**marker** 70:7
**marriage** 326:14
**martin** 4:10
**mass** 133:14
**master's** 11:24 12:2
12:8
**matter** 8:4 288:17
301:17 302:5
326:16
**mattered** 286:8
**matters** 302:5
**mauriello** 1:12 4:5
**mcdougal** 301:5
304:13
**md** 13:9 308:14,18
308:19 310:7
**mean** 14:22 28:25
37:18 49:10 53:21
66:3 70:18 77:21
80:20 82:10 103:6
110:21 111:11
119:12,14 124:19
126:20 135:20
143:6 144:2 152:25
154:18 157:20
161:7 182:24 204:2
211:19 212:11
217:24 218:17
235:20 247:3,20
248:2,6 273:15
283:21 296:23
303:23 305:20
318:6
**meaning** 291:15
**means** 57:20 58:18
58:24 112:10
116:20 144:4
218:19 295:24
320:23
**meant** 248:24

medicaid 276:7
medical 1:22,24
  4:11 9:15 12:11,24
  13:3 32:3,9 34:23
  40:25 41:3,8,9,11
  41:25 42:6 46:23
  47:2 49:14 50:20
  51:6,20 53:4 54:2
  54:24 55:18,23 56:5
  56:18 57:15 59:9
  60:5 64:7 67:2
  73:22 74:11,13,21
  74:24 75:2,6,9,18
  76:4,11,15,25 77:20
  77:22 78:16,17 79:5
  82:21,22 86:19
  91:24 94:14 100:14
  104:14 109:25
  110:16 111:2
  119:18 120:19,21
  121:2,3,4 122:13
  123:24 124:9,13,23
  125:18 126:7
  128:15 129:21
  130:13 131:22
  136:13 138:8 141:2
  155:15 156:2,12
  159:22,23 160:3
  165:11 166:6 184:4
  186:11 193:8,18
  200:8,9,10 227:17
  237:25 292:4,8,19
  293:2,6,20 294:8
  295:3,15,24 296:3
  296:17 299:2,16
  306:23 308:14
  309:6,24 310:2,21
  312:3,4 313:8,10,13
  313:17,18 314:10
  314:12 321:5,12
medically 76:6,16
  313:21,25
medicare 275:21
  276:4

medicate 82:2,6
  205:17,19
medicated 205:2,7
  206:3
medication 203:4
  204:14,20,25
  206:10 315:4,5,7,8
medications 315:3
medicine 13:2 14:3
  19:15 43:6 139:12
  204:17 205:20
  271:14
meet 262:8
meeting 20:19
meetings 235:24
members 21:7
  210:12 213:12,20
memory 29:13,15
  29:20 30:6,16 48:14
  48:21 49:8 54:19
  210:5 216:10
mental 46:8,10 47:3
  47:4,14,15 48:4,17
  49:6,16 50:8,24
  51:22 52:5 53:18
  59:10 69:23 70:25
  71:18 72:12 73:9,14
  74:10 75:22 79:8,12
  79:25 80:16 81:19
  83:4,13 93:6,15,22
  93:25 96:21 97:2,22
  99:7 100:12 101:6
  101:15 102:11
  103:25 104:9,17
  105:2,16 107:12,19
  108:8,17 114:6,7,13
  114:14 115:12
  116:3 158:5 160:6
  165:19 189:21
  190:17,22 191:14
  191:17,21 209:10
  211:7,13,16 212:22
  214:4,24 215:12,23
  216:4,15,21 219:19
  222:8 229:6 230:6

238:15,17 239:11
  241:3 257:16 277:5
  277:18 278:25
  280:12 281:22
  301:15
mention 293:24
mentioned 214:15
met 262:20
method 56:12
metropolitan 13:23
  16:4,15 26:8 71:12
  71:14
michael 1:9
middle 179:12 226:9
midnight 160:21
mild 157:6
military 221:9,10
milligram 204:4
milligrams 203:5,7
  204:4
mind 97:11 178:22
  201:23 209:16
  287:11 289:12,14
  302:25 303:6
minimal 173:11
minimum 81:6
minor 11:24
minutes 61:17 62:17
mischaracterizing
  277:15
missed 61:20
missing 91:3
mistake 163:8
mixing 163:11,13
modalities 218:7
  219:6
moment 200:4,5
money 16:8 181:20
monitor 61:16
month 319:2
months 16:2 17:8
  19:2,8 70:24 211:19
morning 8:2 68:22
  87:2,5,10 104:10,19
  105:3 177:20

252:13
motion 125:3 178:5
  178:8 180:9
mouth 185:13,20
move 66:18 74:23
  126:18 286:20
  294:25
movie 288:12

## n

n 7:6,14,14,15,21,21
  7:22 87:14 200:22
  315:13 325:2
n100 4:18
naked 184:20
  186:22
name 1:20 2:2 7:19
  8:2 110:10 137:19
  171:5 202:8,24
  213:9 224:14,17
  238:9 274:4 327:3,5
named 29:12
names 1:20 2:3 29:8
  224:20,21 300:24
  301:4
narrow 265:15
nathaniel 3:3 7:11
nature 29:4 31:15
  100:23 168:20
  275:6
navy 150:4 197:25
  248:7
ne 3:8
necessary 206:20
need 42:8 64:21
  80:5 84:25 91:9,11
  171:14 201:6,16,22
  202:2 204:22 207:2
  230:8 275:12,22
  290:5
needed 39:17 89:25
  90:9,11,12 91:15
  149:2,8,9,15,15,18
  151:8 158:21 176:4
  199:14 206:2 265:4

282:10 284:4 287:5
287:7 317:15
**needle** 133:2 134:9
**needs** 8:21 9:6 65:6
74:22 75:13 77:7,23
78:7 80:10 83:25
98:19 105:22
146:10,15 147:22
157:21 219:19
230:10 231:17
245:2 323:6
**negative** 57:23
**nelson** 1:10
**never** 34:9,12
129:22 257:19
305:4,8
**new** 1:3,8 2:7,7,16
3:5,5,12,12,17,18,18
4:6,6,12,12,19 5:6,6
7:25 11:25 13:16
15:8,11,22 16:11
17:7,12,13 21:24
36:18 126:6 210:13
213:13,20 220:6,16
220:16 239:11
276:15 307:8 308:5
308:15 316:25
326:5 327:2,4
**night** 117:14 297:14
297:17
**nine** 16:2 252:12
**nod** 8:18
**nonmedical** 186:17
186:19
**nonsense** 284:18,19
284:23
**noon** 160:21 166:12
166:15
**nope** 96:6
**normal** 59:7 134:25
138:10 156:13,14
156:15,18,24
194:16 195:8
**north** 1:10

**notary** 2:15 6:15
7:16 324:21 326:4
327:24
**note** 31:25 39:16
42:3,9,23 49:19,22
53:5 54:3,15,25
55:19,24 56:6,14,19
56:21 57:2,18 58:16
58:22 59:11 68:19
68:20 69:15 84:18
85:16,21 86:3,20,24
87:11,17,21 88:11
88:19 89:7,8,14,17
89:21 90:14,16,24
92:19,24 95:2 96:9
96:13,14 98:24
99:16 100:18 101:4
101:11 102:5,6
108:25 109:5,6,9,10
109:11 110:5,9,12
117:4 118:2,4,5,10
120:24 121:14,19
121:24 122:5,10,11
122:13,16,23,25
123:7,11,12,19
126:25 127:7 128:5
128:10,18,24 129:6
129:7,10,13,14
130:14 138:11,13
145:2,3,6,7,11,13
155:4,4,12 157:4
159:9,16 167:13,18
173:5 187:22 188:7
188:23 189:9 191:9
191:20 194:5 199:5
216:15 221:11,12
276:23,24 277:3
278:6 281:14,15,18
281:21 282:14,15
282:25 283:3
284:21 285:2,19,21
285:24 286:2,4,5,7
291:15,17 318:3
**noted** 122:6 128:13
128:22 173:10

242:19 324:15
**notes** 30:18 31:18,21
32:4,10,13,14,17,23
32:24 34:10,19,24
35:2,4,10,10,12
39:14 41:22 42:12
42:14,16 43:22 44:2
44:8 45:2,5,10,19
47:13 51:10,25
55:17 69:12 88:4,14
109:2 119:16 121:9
121:10 127:14,17
127:20 129:19,23
137:20,21 138:9,14
141:22 146:8,12,25
147:7,9,13 161:15
162:19 168:23
174:13 191:8,12,13
191:18,22 192:7,20
192:23 193:3,5,11
193:12,14,19,25
194:3,3 214:15
223:3,7 228:18
245:22,24 277:22
278:3 284:2 285:8
292:15 309:21
310:7,9,15 311:8
**notice** 96:20 221:19
223:23 225:21,23
**noticed** 223:11
**november** 11:15
46:3 60:22 68:21
85:16 86:2,7 94:17
98:24 101:11 102:8
107:21 108:25
109:4,6,11 118:2
120:25 121:19,24
122:5,11,24 123:7
127:2,19,20 128:2,3
128:4,10,12,18,21
129:2,7,10,14,23,24
130:14,17 139:7,18
154:23 160:18
162:9 167:2,3,4,6,8
173:6 187:23 188:7

188:24 189:5,16,24
190:7,11,19,19,21
191:20,20 216:14
222:15 263:3 277:4
279:2 281:14,21
318:6,7,8
**numb** 123:5,21
173:9
**number** 27:18,21
135:11 176:4
188:21 226:10
241:25 272:5,13
273:2,16
**nurse** 39:18,24
122:6,18 123:5
128:5,13,22 129:3
140:3,4,6,15,15,16
140:17,20,20,23,25
141:10,12 142:3
143:4,10 145:14
152:7,20 154:2,2,3
154:12 155:17,24
157:16 160:12,13
183:6 185:2,3 186:5
186:20 187:12
225:3,5,11,17
**nurse's** 121:8
122:24 153:14,22
155:4
**nurses** 182:25 183:4
186:8 225:9 260:14
320:7,11
**nursing** 11:2,5,9,24
12:3,8 23:23,25
60:23 62:11 121:7
121:10,14 124:11
127:14,20 129:23
139:5,17,25 140:2
140:21 141:13
142:12 235:14
**nypd** 1:21 117:14
143:22 316:25

**o**

o  118:9
o'clock  22:12,16,17
  22:21 68:22 189:6
  252:13 259:25
  260:2 276:25
  278:13
object  98:6 163:22
  168:19 239:5
objecting  314:25
objection  25:16
  29:22 30:10,13
  41:23 44:21 45:24
  50:22,23,25 57:3
  60:2,3 64:3,6,12
  66:10,12 69:7 72:25
  73:23,25 74:3,5,14
  75:24,25 76:2 77:13
  77:14,15 79:16 84:5
  91:2,19 92:10,17
  93:9,10,18 94:7,19
  94:20 96:22 97:5,7
  97:8,23,25 98:3,8
  98:16,17 99:8,9,10
  101:7,17,19 102:13
  104:20,22 106:18
  108:10,18 109:12
  116:5 124:3,4,16,17
  124:21 126:2,11,12
  130:2 131:15
  134:17 136:19,24
  137:6,7,8 144:12,17
  144:23 146:23
  148:18,19 150:15
  150:16,17 151:9
  154:8 161:13
  163:10 172:13
  175:12,15 182:4,6
  182:16,17 183:12
  183:25 185:15,21
  186:13,15,23 187:8
  187:14 188:9,13,16
  189:2,11,12 191:24
  192:3 193:22 197:7

  197:8 199:7 201:4
  201:19 202:4
  203:19 204:7,11
  210:24 212:9,16
  213:5,7,17 215:5,6
  215:14,18 218:18
  219:22,24 229:12
  229:14 230:23
  231:10 235:18
  238:18,19 239:8
  240:25 242:7,8,14
  242:17 243:15
  244:4,8 245:11,12
  245:14 249:13
  251:15,16 252:15
  252:16,17 255:22
  257:21 262:6,15,16
  262:17,24 263:6,7,8
  263:10,16,18
  264:21,24 265:23
  266:2,9,10,11
  267:10,11 268:2,7
  271:19,21,25 272:7
  272:14,24 277:11
  277:21 278:12
  280:3,4 281:10
  282:12 284:6
  285:12,13 286:10
  286:11 287:13,14
  287:20 290:14
  293:4,5,11,23
  296:20 299:6 304:6
  309:18 311:15,17
  311:23,25 312:6,8
  314:11,16,17,22
  315:9 317:17
  318:12,13,16
  320:14
objections  6:10
  106:15 107:2 125:8
observation  90:2
  184:25 241:4 262:2
observe  81:25 199:3
observed  90:11,12
  184:20 262:3

observing  152:7
obstruction  50:2,21
  51:4
obtain  82:7
obtained  269:25
obviously  197:24
occasions  210:11,17
  210:20
occur  211:17
occurred  219:5
occurrence  72:23
  215:10
october  20:8,9,14
  21:11 22:4 24:4,24
  25:4,12 26:20 32:16
  33:2 46:2 107:21
  121:9,12 155:7
  156:8 159:14 189:4
  228:5 262:4 264:20
  264:22 265:7,11
  266:4,23
office  7:11 258:23
  260:25 269:17
  301:21
officer  28:12,18
  122:8,19,20 144:19
  144:20 148:13,15
  149:23 150:8,11,13
  150:20 151:3 186:7
  186:10,12 187:13
  196:22 200:18
  209:18,21 212:5,7
  213:15 214:22
  215:10,22 216:3
  219:18 247:7 248:8
  262:19 263:25
  264:2 268:6 278:7
  279:13,24 290:11
  291:8
officers  26:12,24
  27:8,14 28:15 65:23
  117:14 172:16
  186:6 200:13
  209:22 210:22
  211:6,11,16,21

  212:3,6,8,20,25
  213:3,11 214:3,9,17
  214:21 215:11
  219:25 248:15
  261:22 262:12,13
  267:23 268:9
  278:16
official  1:9,11,12,14
  1:15,16,17,18,20,22
  1:23 2:2
okay  8:14,15 9:11
  15:14,19,20 28:5
  30:2 88:8 113:15
  120:11,22 134:21
  157:18 172:18
  179:14 250:17
  294:11
old  133:19
ollie  315:19,20
once  65:16 67:9 76:6
  105:6 106:21 212:8
  212:12 222:12
  231:12 235:25
  283:17 287:4
  323:15
one's  52:12
ones  140:18 240:3
  246:17
open  93:2 151:16
  300:19
operate  319:15
opinion  146:14,18
  146:20,21 147:13
  147:16,17,19,20,23
  147:24 148:3,3,6,7
  148:8,10,16,17,23
  148:24 149:2,3,4,5
  149:6,10,14,16,17
  151:6,7,12,14
  156:11 196:15
  197:5 205:25 207:8
  207:11 209:9,15,19
  210:22 211:8,12
  229:13 230:14,20
  231:5,9,20 243:23

[opinion - patient]

265:3 266:4,8,16,17
266:21,25 282:9
310:19
**opposed**  9:2 226:20
227:5 296:25 297:2
309:7
**opposite**  319:8
**order**  71:5 79:14
80:2 81:11,18 83:3
83:12 97:3 99:6
108:8 273:17,23
323:4,9,18 324:4
**organic**  133:13
**orientation**  48:13
49:7,9
**oriented**  194:7,12
**original**  38:18
324:13
**originally**  10:18
**outcome**  326:15
**outside**  20:3 258:9
258:12,13,23
**overrule**  319:22
**oversee**  20:23 23:7
**overseeing**  23:12,22
**overtime**  22:16
276:11

**p**

**p**  282:3
**p.m.**  69:16,19,20
85:11,17 86:7
108:25 109:3,5,6,8
109:18,20,24
138:20,22 166:18
195:15,17,20 221:5
233:19,21 251:13
251:13,13,13 269:9
269:11,14 281:16
298:10,13,15
324:15
**p.o.'s**  1:19
**page**  3:23 4:22
87:17 89:7 90:15,16
96:13,14 109:23

110:3,6,9,11,20
113:8,8,23 114:8
116:12 117:3,9
120:3 121:18
127:14,23 135:6
142:19,21 151:16
153:13,14 154:16
158:7,8 225:19
228:14 239:6
242:23 323:20
325:3,10 327:6
**pages**  31:10,11
87:20 110:7,8
130:13 233:12
**paid**  10:4 16:8,9
276:11
**pain**  157:5,5,9,10
173:8 309:11,14,17
311:13 312:21
314:7
**painter**  270:13
**painting**  251:23
252:21
**pants**  181:7
**paper**  177:6,10,14
177:19 178:2
180:13,16,18 239:6
257:25 258:3,4
261:10
**papers**  125:3 175:21
176:6,8,10,14,17
177:2
**paperwork**  176:3
274:20
**paragraph**  113:25
**paranoia**  136:4,23
172:10,20,22
195:21 199:17
203:12
**paranoid**  91:4,18,21
135:10,19 137:3
143:23 144:5,15
172:9,25 194:21
196:16 198:11,14
199:22 217:13

218:11 241:19
247:9
**parenthesis**  224:7
**parker**  7:24
**part**  23:7 37:20 38:4
50:7 51:15,22 52:5
53:18 73:10 114:6,7
145:4,7,16,18,23
175:18 186:18,19
197:20 217:8 219:2
226:24 232:11
243:19 261:3
272:11 290:18
303:13 305:9,13
309:7,8
**particular**  13:2
209:13 211:22
307:19
**parties**  6:5 326:13
**pass**  140:12 308:8
308:18,24,25 309:2
**patel**  96:12 99:4,5
**patel's**  99:16
**pathology**  132:14
133:14
**patient**  22:15 28:12
28:19 29:2 32:4
39:7,9,15 40:23
41:4,9,10,13,17,21
42:3,8,17,19,20,25
43:8,14,15 45:11,20
46:5,13,18,19,21
47:5 52:15,23 53:8
54:11 55:7 56:8,11
56:22,24 57:5,10,20
57:22 58:4,6,10,12
58:17,18,23,24 61:9
62:2,9,12,16,18,19
63:2,6,9,10,15 64:8
65:2,5,6,16,18 66:5
66:7 70:11,23 71:5
71:19 72:10 73:8,20
74:9,20,21 75:11,12
75:13,18 76:4,7,8
76:10 77:6,8,10,12

77:24 78:5,7,9,10
78:12,17,23 79:5,14
79:18 80:2,4,10
81:13,22 83:24
84:11,24 85:19,24
86:10,12 88:10,12
92:21,25 93:16,21
99:24 104:4,15
105:7,9,13,18,20,22
107:15 110:23,24
110:25 111:12,13
111:14,20 113:25
115:3,3,6 116:24
118:11,12,14,15,18
118:21 119:4
126:16 128:6,13
129:4,11 130:20,24
131:18,21,25 132:3
133:15 140:3,7,9
141:24 142:2,3,5,8
142:9 146:4,7,9,10
146:15 147:5,6,11
147:14 150:7
153:25 154:3,11
159:3,9 160:14,20
171:13 175:3,19
180:20 183:5,18
184:7,11 187:17
192:12,17 193:10
193:21 199:3
204:17,18,21 205:3
205:12,13,14
217:11 222:13
223:17,18,22 224:5
224:18 230:4
236:21 237:16,18
237:21,22 241:2
246:22,24 247:4,10
248:17 249:4 258:9
258:12,18 274:14
274:19 275:4,9,22
282:2 285:7 287:5,7
291:21 292:5,12
293:3,8 294:14,15
295:4,19,20,22

296:2,19 299:10,11
299:11,22 301:13
302:15,16 303:16
303:21 304:2
305:18,23 306:8,17
306:18 311:12
313:16,19,21,24
320:4,8,12,17 321:5
321:15,21 322:17
322:20,24 323:4,8
324:3
**patient's** 67:3
142:25 274:21
322:3
**patients** 10:10 20:22
26:12,22 27:6,12
28:3,15 29:9 42:12
48:6,22 49:2 50:11
50:16 53:11 61:10
63:14,14 67:21 68:3
69:4,24 72:3,4,11
72:13 78:22 81:15
100:10 146:22
182:25 187:10
210:18 253:24
254:6 258:13 260:3
260:10 272:6,13
273:3,5,11,14,16,24
275:10 292:10,21
294:10 295:17
313:7 321:11
**patrol** 1:10
**pattern** 178:15
**paul** 5:7
**pending** 77:2 79:6
301:17 304:8
**people** 24:18 27:2,3
28:9 64:20,21
106:12 204:13
225:15 248:14
257:11 297:2
299:21 300:25
**perfectly** 101:24
**perform** 49:15 50:7
50:20 51:7,21 52:13

52:20 56:13 57:6
58:13
**performance** 270:18
270:19 271:9 272:4
272:5,12 273:2
**performing** 59:10
**period** 19:15 241:8
245:8
**persecuted** 196:5
**persecution** 136:6
**persecutory** 194:24
**person** 62:22 76:24
77:19 80:18 95:3,4
164:23 186:17
198:8,14 202:25
205:19 209:8
211:11 223:10
225:14 264:9
290:13 304:5
**personal** 182:2,14
256:3,8
**personality** 100:13
**persons** 224:4
**perspective** 108:24
117:24
**peterson** 315:19,20
**philippines** 10:17,19
10:20
**phone** 175:22,24
181:23 208:8
229:10
**phones** 175:25
**phonetic** 124:6
282:4 301:5
**physical** 45:21
129:5 173:17,20
174:4 196:20 242:2
243:6,25 310:3,4
**physically** 30:3 41:7
59:21 60:10 111:2
111:21,24 205:18
**physician** 22:5 24:3
40:6 42:2,7 43:7
45:13 56:9 59:10
81:16 84:21 95:23

96:7 98:15 108:2
202:21 230:6
232:13 292:3,7
294:6 298:24 305:7
312:12 320:3
**physicians** 24:5
25:24 42:11 43:14
43:18 44:3,8 65:19
260:14 319:16
**pick** 291:21
**picture** 94:23 95:17
231:15,15,20,22
**piece** 177:6,10,13
178:2 180:12,16,17
239:6 257:25
261:10
**pitch** 59:7
**place** 2:13 41:5,7
43:4 45:7 70:8 71:8
113:9 159:2 163:20
171:9 194:10
**placed** 63:16 157:16
**plaintiff** 1:6 3:4,7,11
288:11
**plaintiff's** 37:4,7
68:13 232:16,18
233:24 325:10
**plan** 41:14,15 53:24
55:10,14 119:9
**planing** 58:23
**plans** 119:16
**play** 145:23 150:25
**played** 212:14
**playing** 284:16
286:19
**please** 8:12,25 9:9
176:16 177:2,16
216:16 224:3
240:15 244:10
279:20 286:23
287:23 288:14
297:12
**pllc** 3:10
**plot** 52:17

**plus** 147:10,16,17
198:17
**point** 11:22 12:14
13:3 16:11 33:13
61:14 65:10 75:21
91:3,11 101:16
111:5,8,22 127:5
173:2 206:6,22
241:13,16 271:3
276:14 287:6 316:4
316:7 317:23 318:8
321:22
**points** 35:9
**police** 26:12,24 27:7
27:13 36:18 65:23
122:7,18,20 143:24
144:6,9,13,14,19,20
148:12,14 149:22
150:8,11,13,19
151:3 155:18
170:14 196:22
200:13,17 202:14
202:18 209:18,20
209:21 210:13,22
211:5,10,15,21
212:3,4,5,7,8,19,25
213:3,11,13,15,21
214:3,9,17,21,22
215:10,11,22 216:3
219:18,25 247:6
248:15 261:22
262:11,13 268:5
276:15 290:10
291:8,9 317:2
**policies** 61:2 234:16
240:2 250:13
**policy** 234:9 236:10
239:15,18,22,23,24
240:7,18,22,23
241:11,25 250:11
250:17 252:19
**pontificate** 288:17
**portion** 26:6 72:7
188:18 197:21
216:8 217:21

264:14 268:13
299:25
**position** 18:4,7,8,13
125:9,10 270:16
**possession** 121:5
**possibility** 300:20
**possible** 153:6,7
172:15 220:4
**posted** 175:6,7,17
**potential** 63:21
244:11,15,20,22,23
245:3,6,10,16,24
246:2,3,8,10,18,22
246:25 247:3,16,21
247:23 248:5,6,24
248:25 249:2,6,10
**practice** 42:2,7 46:3
49:15 50:20 51:7,21
53:5 54:2,25 55:18
55:24 56:6,18 57:15
59:9 64:8 72:24
73:10 94:15 123:24
124:10,14 126:8
141:22 193:8,18
208:18,21 258:21
259:2,3,4,8,14,23
260:4 261:20,23
292:4,9,19 293:2,7
293:17,17,20 294:8
295:3,15,24 296:4,8
296:17 299:2,17
301:8 307:10
**practicing** 19:15
**precinct** 211:22,24
**preparation** 88:16
**preparing** 35:24
**prescribe** 203:3
**prescribed** 203:18
204:9,14 206:10
**prescription** 315:5
**presence** 60:11,18
130:22 174:5
191:16 194:14,20
198:9 199:21 200:2

**present** 5:10 10:2
46:6,25 62:10
185:25 186:3
207:13 310:20
**presentation** 231:8
**presented** 208:11,12
229:23
**presently** 1:21 2:3
9:14
**preservation** 239:13
**pressure** 156:7,13
156:14,16 309:23
309:25 311:14
314:5 315:8
**pretty** 100:5 182:12
297:6
**prevent** 150:4
197:18,23 198:4
**preventing** 111:24
**previous** 44:2 82:7,9
126:22
**previously** 45:7
**print** 255:12
**printed** 113:9 114:8
114:9 116:12
130:16 311:3
**prior** 30:21 32:15
34:13 35:21 38:12
38:19 85:20 86:2,6
88:11,15 89:8
101:11 102:2,8
104:10,18 105:2
108:24 109:5,10
117:25 120:8,14,24
124:7 126:25
140:20 141:22
148:8 149:6 155:13
227:21,23 276:4,7
317:6 318:8
**private** 258:18,20
259:2,8,13,23 260:3
261:20,23 275:11
275:13 301:8
**privilege** 272:15

**privileged** 272:18
**privileges** 24:5
304:24
**probably** 130:13
146:17 162:5
166:20 234:14
**problem** 77:11
78:25 103:12
172:17 278:10
314:10
**problems** 50:5
173:23 174:5
313:13 314:21
**procedure** 2:17
62:21 63:5 71:7
299:14,15
**procedures** 61:2
81:10
**process** 47:21 51:13
51:14,16 185:4
186:24 187:3,4,10
206:3,14,16 303:14
**produce** 96:25
**produced** 232:25
254:18 255:3,8
**profession** 305:6
**program** 274:13
**progress** 123:13
**proper** 303:24
**prospective** 85:20
85:25 98:2
**protocol** 237:3
**provide** 96:19
**provided** 37:10
269:20 315:6
**provider** 67:2
**providing** 170:24
**provision** 241:8
**psych** 32:5,7,11,12
35:10,14 75:19,21
76:8,9,19,21 77:3
77:23 88:9 89:11
98:20 104:5,6,13,13
104:15 105:7,8,10
105:14,20,23,24

107:16,24 111:4,6
112:7 121:5 123:12
123:15 132:18
133:19,20 162:7
163:12,17 165:23
165:24 166:7,8,10
166:11 184:7 190:9
190:10,12 200:11
202:22 209:23
210:18,19 215:23
226:17 227:3,17
237:24 238:2
249:21,22 254:2,3,4
254:12,16 260:11
261:15 269:20
309:8 313:8,11,13
313:17,20 314:13
321:2 325:17
**psyche** 237:2
**psychiatric** 16:24,25
20:6,10,14 22:5,6
24:3,6,11 26:13,23
27:7 32:8 34:23,24
45:21,22,25 46:4
48:5 59:23 60:21
67:23 68:9 69:5
73:16,18 74:23,24
75:11,11,14,16
76:18 77:11 78:3,8
78:10,23,24 79:7,14
85:20,25 86:14 89:8
96:8 108:24 110:16
110:18 113:13,14
113:17 117:25
140:22 141:5,10,23
142:7 172:23 201:7
201:16 202:2
250:15 257:12
258:6 318:24
320:20,24 321:4,9
321:10,23
**psychiatrist** 9:16
18:6 21:21 25:3,9
26:2 76:3,6,19 78:4
78:6,15 82:12,13,15

82:19 207:22 218:4
312:14 321:24
322:4
**psychiatrist's**
110:10
**psychiatrists** 24:20
25:6,13,19
**psychiatry** 13:14,22
14:2,24,25 77:7,8
139:15,19 238:8
239:21 259:3
271:14
**psychologist** 218:12
**psychosis** 172:21,24
203:12 218:20
268:24
**psychotic** 80:7
93:13 99:20,22
100:11 133:17
217:12
**public** 2:15 6:15
7:16 324:21 326:5
327:24
**pulled** 68:19 141:14
**pulse** 156:23
**purple** 151:25
152:15,25
**purpose** 11:18 40:21
40:25 41:3 83:19,22
88:5 132:11
**purposes** 75:20
230:15
**pursuant** 2:16 73:8
74:10 102:11
103:24 104:8,25
105:11,15 106:2
107:12,18,21
108:16
**put** 57:23 62:23
63:6 64:18,20,22
65:2,10,14 70:2
120:2 137:15,15,17
137:19 143:8 160:5
161:22 162:3,5,9
163:16 176:17

177:2,9,13 181:21
182:20,21 183:7
184:5 221:4 226:11
226:14,15 227:2,9
227:13 282:14
**puts** 310:23
**putting** 70:7

**q**

**quantify** 247:2,20
247:24,25
**queens** 255:19
304:21
**question** 6:11 8:11
8:14 9:8 27:9 29:23
46:20 51:2 55:20
57:9 59:19 73:2,3,5
74:15 77:17 79:2
84:16 89:19 92:7,11
92:13 93:14,20 94:8
95:11 101:8,22
103:7,9,15 104:7,16
104:21 106:9
124:12 142:6
145:22 151:5,10
161:14 163:15,19
163:23 164:3,10,18
164:25 168:20
177:4 179:13 180:5
182:11 185:22
193:17,23 201:20
202:5 210:25
213:18 229:15
231:23 239:9
241:10 242:16,18
243:3,20 252:6,7
264:8,11,16 265:15
265:17,22 266:13
272:2,8 274:10
276:18 279:9,20
283:25 285:4
286:16,21,23,25
287:3 288:23 289:9
289:18 291:25
292:17,21 293:12

293:19,22 294:7,20
294:21,24 296:15
297:13 298:25
299:7,20 311:11,16
312:20 323:12
**questioning** 116:2
177:17,25
**questions** 8:5 46:13
47:6,16 48:15,20
54:4,7 55:2 114:19
125:16 164:6
168:10 176:19
177:22 243:2,14
258:3 261:3 269:16
289:17 297:15,22
298:3,5,7 312:10
316:22 319:13
322:12,14
**quick** 157:17,17
**quite** 177:24 248:9
292:17

**r**

**r** 7:15,15,22,22
207:21
**radomisli** 4:13
25:16 30:10 37:13
44:21 50:23 64:3,12
66:10 69:7 73:23
75:25 77:15 96:22
97:5,7,23,25 98:3,5
98:16 99:9 101:17
101:21,25 102:4
104:22 108:10
124:3,5,21 126:11
126:18 127:11
131:15 134:17
136:19,24 137:8
138:15 148:19
150:15 163:10
175:12 176:22
179:19,23 182:4,16
183:12,25 186:13
187:8,14 188:9,13
189:2,11 191:24

192:3 195:10 199:7
210:15 212:9 213:5
215:5,14,18 216:7
219:22 229:12
231:10 232:23
235:18 237:8
245:11 251:15
252:16 254:17,21
254:25 255:7,16
262:17 263:8 265:8
265:12,19,23
269:15 271:19,22
272:14,20 284:6
285:16 286:11
298:8 311:17,22
312:2,8,18 314:11
314:17,22,25
317:17 318:12,16
319:12,14 322:6,11
325:6
**range** 156:18,24
198:2 248:13
**rating** 116:15
**ray** 133:12
**razors** 325:16
**react** 318:25 319:3
**reactions** 319:7
**read** 26:7 34:18,22
35:20 39:13 43:2
44:2,19 45:5,10,18
47:13 72:5,8 88:11
88:15,18,19 90:14
90:24 99:16 100:18
115:17 117:6,11
118:10 119:2,3
138:5,10,12 143:13
143:20,21 144:10
145:9,12,12,13,25
146:13 151:20,20
151:23,23 164:3
188:17,19 197:22
200:8 216:7,9
217:22 224:2
235:20 239:2
245:22,23 253:10

[read - remember]                                                                           Page 28

264:13,15 268:12
268:14 278:3,5
281:25 295:7 300:2
313:6
**reading**  29:17 91:14
102:24 242:22
**reads**  90:16
**ready**  118:23 188:4
307:24
**real**  19:23
**reality**  99:24 100:4
**realize**  234:17
**really**  198:13 203:21
**reason**  8:11 83:23
90:23 91:7 115:16
133:14 134:20
146:4 150:21
154:24 158:25
197:5,16 228:6
244:24,25 246:11
246:19,21 307:19
327:6
**reasonable**  156:12
**reasons**  43:21 79:15
236:21 249:14
**recall**  28:3 29:7,11
54:21,22 72:21 88:6
142:11,13 208:9,22
208:24,25 209:12
209:17,24 210:6
215:3,10 224:24
**received**  33:19
**recess**  85:10 109:19
138:21 195:16
233:20 269:10
298:14
**recharacterizing**
84:6
**recognize**  256:19
**recollection**  19:6
138:6 162:17
200:15 224:22
225:3,12 301:4
**recommendation**
89:25

**recommendations**
89:18 99:19
**record**  7:2 12:21
26:7 36:22 37:16,17
37:18,19,20,25 38:3
38:11,18,22,23
40:21 41:2,8,9,12
42:20 43:22 58:2
72:8 85:5,8,13
95:22 98:10 99:13
102:19,20,23
103:10,18,20 107:8
109:13,15 110:7
119:18,20 120:13
120:18,20,22,24
121:2 123:10
127:16 130:8
138:15,17,19,25
139:6 144:8 153:10
156:2 164:12 165:6
165:8 166:19 171:2
171:3,6,12 178:5,24
178:25 179:8 180:8
180:11 188:19
195:10,12,14,19
197:22 200:9,10
212:17 216:9 217:9
217:22 221:25
224:3,24 233:18
237:10 264:15
268:14 269:5,8,13
276:21 284:15,16
298:8,9,12,18,19
300:2 309:13
324:10 326:10
**recorded**  170:25
**recordkeeping**
84:14,18
**records**  29:19 30:25
31:2,3,4 39:20,23
39:25 40:5,9,13
41:17 42:24 45:6,13
45:16 47:11 57:20
82:8,9,10 96:25
101:13 102:16,18

121:4 128:15 142:7
142:10,14 148:2
155:22 270:8
276:17 309:24
310:2
**recurring**  212:3
213:4
**redirect**  205:13
**redirection**  205:16
**redness**  122:6 124:2
124:15 126:9
**refer**  258:14,17
**reference**  170:23
235:16
**referrals**  260:9
**referred**  1:21
**referring**  25:7 77:4
102:5 103:8 104:2
127:15 159:21
177:5 237:14
296:13
**refers**  260:13
**reflect**  102:21
120:19 179:2
**reflected**  153:10
**refused**  122:9,20
204:15 206:9
**refuses**  204:17
**refusing**  294:22
**regard**  12:9 13:11
13:20 14:16 38:24
49:5 61:3 97:21
111:9 148:4 157:16
160:6 189:21 193:6
209:13 229:6 305:6
305:23,23 306:3
**regarding**  33:20
35:24 36:19 41:22
55:3,21 56:2,3
57:19 58:16,22
59:12 62:8 69:4
123:20 146:15,21
147:5,14 148:24
159:16 178:3
191:10 192:23

193:5,19 200:18
223:7 265:3 282:10
306:20 315:12,16
316:2,11
**regardless**  146:12
299:4
**regards**  11:10 66:22
193:12
**regular**  38:4 72:23
73:10
**regulation**  76:24
78:11
**regulations**  21:5
66:21 249:18,22
253:23
**reiterate**  231:12
**rejected**  204:15
**relate**  135:14 157:10
271:10
**related**  326:13
**relates**  157:7
**relating**  180:18
**relationship**  272:4
**release**  82:25 83:5,9
126:17,20
**released**  303:17
317:7,11,22 318:2
318:10
**relevant**  125:15
288:23
**reliable**  289:16,20
289:22
**relied**  45:6
**relief**  252:23
**rely**  145:2,3
**relying**  138:12
**remains**  118:12
**remember**  18:23
25:25 26:5,25 27:16
28:8 33:17 55:16,22
96:23 138:5 141:17
162:15 165:15
200:16,20 208:16
210:8,10 214:20,25
215:15,17,20,25

216:13 234:13,15
236:9 251:10
254:23,24 263:25
271:15 273:7
279:21,22 280:21
280:22 281:4
302:24
**remotely** 260:20
**remove** 181:7,9,13
181:16
**removed** 64:21 66:8
66:9
**rendered** 30:7
148:24
**repeat** 27:9 62:24
84:16 246:15
**repetitions** 168:20
**rephrase** 51:4 57:4
77:17,18 101:21
238:20 305:21
317:9
**replace** 64:10
**report** 95:15 144:4,6
220:7,10,12 268:4
**reported** 88:9 123:4
129:4 144:9 155:17
268:10 290:11
**reporter** 2:15 8:20
8:21 9:5,10 53:2
85:3 87:4 127:12
140:5 179:18 280:6
**reporting** 117:19
144:14,20 327:2
**represent** 8:3
288:10
**representation**
56:12 174:25
175:20 240:18
**representations**
56:8
**represented** 301:19
304:10
**republic** 12:13,15
12:18

**request** 131:19
207:10
**requested** 26:6 72:7
122:8 132:22
188:18 197:21
216:8 217:21
264:14 268:13
299:25
**require** 42:2,7 50:20
51:7 54:2,25 55:19
55:24 56:18 64:8
106:16 123:24
124:10,14 126:8
193:18 275:25
276:4 292:19 293:7
293:20 294:8 295:3
295:15 296:17
299:2,17,18
**required** 41:17,21
79:24 130:24
154:20 180:21,25
238:15 274:20
276:8 305:10 307:2
**requirement** 230:16
**requires** 49:15
51:21 53:5 56:6
57:15 59:9
**reserved** 6:11
**reside** 7:23
**residence** 32:14
**residency** 13:22
14:13,15 16:4
**resident** 13:24 31:18
31:20,22 32:3,4,6
34:22,23 39:15 40:8
96:8,11,15,17
110:15,16,17,18
118:8 146:8 167:17
174:13 191:8,13,18
193:3 194:2 203:6
290:25 292:12,13
292:23 293:10,14
294:2 295:20
296:25 299:9,10
321:14 322:16,16

322:19,23 323:3,9
**resident's** 31:24
**residents** 20:24 23:7
25:6,19,20 31:21
45:2,5 167:20 192:6
193:9,12 194:4
294:13,17 319:15
319:19,23 320:16
320:24 321:4,11
**resists** 205:20
**resolution** 218:25
**respective** 6:4
**response** 56:3 73:4
94:10 112:2 114:19
115:25 250:9
255:13
**responses** 54:3,16
55:2,20
**responsibilities**
20:15 23:6,11,14
**responsibility** 20:18
23:8 39:6 320:4
**rest** 232:12
**restained** 62:16
63:13
**restrain** 63:13,22
154:24 205:22
**restrained** 62:13
64:21 66:6 111:22
206:15
**restraint** 61:8,14,20
61:21,22 207:3
**restraints** 61:4,14
61:16 62:4,8,23
63:7,17,24,25 64:11
64:15,18,20,23 65:3
65:7,10,15,20,21
66:22 111:18,20
126:17,20,23 153:6
153:8 154:21
171:14
**restriction** 253:2
325:14
**result** 138:3 231:21
241:6

**resumé** 261:3
**retained** 325:19
**retaining** 324:12
**retriaged** 140:9
**review** 30:22,24
31:7 33:9 35:16
38:12,18,22 43:18
86:5 88:7 96:24
101:13 102:17
103:20 104:11
109:4,10 120:13,23
141:15 142:6,10,14
142:16 147:25
155:13 232:3,7
236:7,12 309:12
310:21 312:4
**reviewed** 34:9,12
45:13,15 142:12
236:11 240:15
**reviewing** 67:6
141:22
**revised** 240:9,15
**revoked** 304:24
305:3
**rewrite** 221:3
**ridiculous** 287:21
**right** 27:21 34:2,11
38:2 43:5,9 48:18
49:12 97:17 118:4
118:25 120:11
122:7 130:11 131:7
136:8 137:13 163:4
163:6 173:8,12
175:10 180:10
200:3 226:18 227:7
233:14 237:11
257:12 269:6
284:20 295:13
303:24 310:24
312:9 313:25 314:2
319:25
**rights** 221:20
239:13
**risk** 33:12,14,18
36:23,24 90:3,5,10

154:16 155:24,25
242:2 243:6,25
244:11,15,20,22,23
245:3,6,10,16,25
246:2,4,8,9,10,12,18
246:22 247:2,16,21
247:22 305:20
306:3,5,6,7,10,14,16
306:20
**risperdal**  203:5,7
**road**  168:8 261:6
295:6
**role**  20:5 21:3 38:23
39:2,4 65:25 66:3,4
66:20,24 212:14
**room**  8:23 11:12
16:21,23,25 18:6,19
18:21 20:6,11,14,17
20:25 21:3,6,22
22:6 24:4,6,11 25:4
25:15 26:23 27:7,13
28:19 31:23 32:20
34:5 39:5 59:24
60:8,21 63:10 65:9
67:23 68:9 73:12,17
73:19 74:11,13 75:3
77:2,3,20 79:6,7
83:8 90:7 95:14
105:8,10,12,14
111:3 112:6,8,11,17
112:23 118:16
119:18,19 130:9
131:19,22 136:13
140:8,10,22 141:6
141:23 142:7 156:8
159:19,21 161:5,7,9
162:7,7,12 163:12
164:23 165:23,25
176:9 187:15
190:16 192:10
198:6,22 199:12
200:9 202:22,23
205:11 214:23
215:24 227:11
229:20,23 232:11

234:21 244:19
249:17 253:15,16
253:19 303:18
313:5 314:10 321:2
321:6,8,10,12,23
322:5,7
**rooms**  69:5
**rosen**  315:17
**rotate**  13:25
**rotated**  14:6
**routine**  185:16
**routinely**  180:19
**rover**  198:2 248:13
**rpr**  134:12
**rule**  76:24 78:11
79:22 132:13
261:14
**rules**  2:17 8:7 21:4
66:21 69:4,22 79:4
106:15 107:8
249:17,21 253:23
254:14 269:21
325:17
**run**  15:7 90:6
112:16
**running**  15:14 52:16
288:12
**rws**  1:7
**ryan**  3:19

---

**s**

**s**  118:9 200:22 325:9
327:6
**safe**  181:21 182:21
183:8 184:8 220:6
247:10,13 249:4,8
**safekeeping**  182:8
**safety**  214:13
239:14
**sake**  84:24 274:10
**salary**  10:4 16:9
**sample**  132:21
**sanction**  178:5,8
**sanctions**  305:5

**santiago**  12:13 13:6
**sat**  235:9
**saw**  34:17 39:15
59:17,24 60:7,19,19
115:7 123:4,19
160:13 169:8
180:14 190:11
192:17 193:9
199:14,18 221:17
231:14 244:19
245:7 246:4 264:2
273:6,14,18,24
275:9 280:10,20
281:6 290:23 291:2
292:12 317:20
**sawyer**  1:15
**saying**  25:5,18
29:14 45:9 91:17
118:15,19 119:5
136:2 141:7,8
145:20 161:20
167:15 172:12
182:8 195:24
201:18 229:11
241:2,24 244:14
256:13 260:4 261:2
270:2,3 280:18
294:11 296:10
**says**  53:9 87:15
89:10 112:8 113:6
113:11 117:5,7
121:18 142:19
160:18 166:19
217:9 223:22 240:8
240:15 256:4,7
282:2 322:23
**scale**  157:5,5
**scan**  133:7,8,18
134:24 138:3,5
**schedule**  22:8
**schlesinger**  3:10
**school**  10:14 12:12
12:25 13:4 124:23
125:18

**schoolcraft**  1:5 8:4
29:12,21 30:7,17
31:6 36:8,11,15,20
37:12 38:25 39:8
44:25 45:8,14 48:18
48:24 49:3 50:9,14
53:15 54:6,13 55:12
55:14 59:25 67:8,17
67:24 68:8 86:6,16
88:6 89:15,20 94:16
95:2,22 96:20 97:4
98:15 100:21 101:5
101:15 102:10
103:24 104:8,25
106:2 107:11 108:9
108:23 112:13,19
114:20 115:18
116:2 117:20,24
123:4 126:24
131:12 132:10,20
133:21 134:14
138:2 140:19
141:16 144:15,21
145:2,24 148:4,25
149:12 150:14
151:8 152:25
155:14,18 157:13
158:20 166:22
180:21 181:5 183:9
183:22 185:5
186:21 187:5,23
188:5 190:18,23
191:2,3,10,15 193:7
194:7 195:22
200:19 201:6,15
202:2,21,25 203:4
204:10 206:2,9,20
209:14 213:25
216:2,11 221:13
222:14,20,24
224:15,25 232:4
238:4 240:6,20
241:12 242:9 243:5
249:12 250:14,20
251:12 252:11

254:11 260:21
261:19 262:3,4,5,10
263:4,15,21 264:3
264:18 265:4,6,13
266:6,24 275:19
277:9,18 278:9,11
282:9 283:9 284:4
285:11 286:9
290:11,23 291:2
296:12,14 303:2,7
303:15 309:5
315:12,16 316:2
317:3,7,11,22 318:2
318:10 327:3
**schoolcraft's** 44:4
55:20 56:2 59:16
60:5,11 104:11
123:20 129:17
130:3 148:2 156:6
185:20 211:18
212:15 214:13
222:22 231:8 232:5
262:21 280:2 294:4
**science** 10:25
**scoppetta** 4:3
**score** 116:13,15
**scott** 282:4
**scully** 2:14 326:4,22
**sealing** 6:5
**search** 184:9,10,11
184:13,14 185:17
185:18,19 186:3,8
269:18,21 270:5
**searched** 184:4
**searches** 185:17
186:2
**seclusion** 154:21
**second** 34:4 87:7
89:6 90:15,16 113:8
117:4,6,9 140:4,6
140:14,16 141:5
146:18,20 147:16
147:17,20,22,23
148:3,5,8,9,16,24
149:3,3,6,16 151:7

151:14 153:14
194:5 207:8,11
209:9,14,19 211:8
225:19,21,22
228:14 230:5,14
232:2,13 268:19
**secondary** 132:14
**section** 72:12 75:21
79:11,24 80:3 81:18
83:3,12 93:22
102:11 103:24
104:9,17 105:11
107:19,22 108:7,16
130:12 158:9
216:21 222:8
**security** 186:6,7,10
186:12,21 187:12
**see** 10:9 20:22 39:6
39:10 43:7,14,15
44:19 45:11 63:20
69:8,11 72:2 78:5
86:11,20 87:8 89:7
90:17 94:25 95:5,8
95:21 97:6,14,15
98:12 113:10 114:7
115:14,23 119:21
121:11,22,25 122:2
122:25 123:11
127:9 131:13 132:7
133:12 139:11
140:11,19 142:4,20
143:2,16 146:2,7,9
147:11 149:9
151:18 153:15,16
156:3,5 170:23
178:7 180:3,17
184:20,21 198:25
212:2,8 234:14
235:23,25 245:24
246:22 248:17
257:19 258:7,9
260:3 261:19,22
263:24 269:2
273:11,16 274:19
275:16 280:15,19

280:24,25 281:8,15
281:18 282:8
290:15 299:11,22
309:13,15 312:2
**seeing** 86:6 194:25
260:24 279:22
280:21
**seen** 42:17 88:24
118:11 142:3
157:17 240:20
256:21 263:25
272:6,13 273:3,12
280:11 282:2 290:3
**sees** 140:7 160:12
178:10 299:9,10
**seiff** 4:3
**send** 76:19 269:24
**sending** 237:17
**sense** 92:14 271:12
319:3
**sent** 269:16
**sentences** 242:23
**separate** 134:6,8
312:19
**sergeant** 1:16,18
143:25 144:7,9,13
170:17,20,24 171:5
171:10 172:11
212:14,18 282:4
291:9
**sergeant's** 144:14
**sergeants** 213:2
**series** 297:22
**serious** 241:6
**seroquel** 268:15
**services** 275:4
**sessions** 66:25
**set** 22:8 238:23
240:7 326:8,18
**seth** 315:22,23,25
**sets** 238:14
**setting** 43:11
**setup** 174:7
**seven** 22:17 110:8
127:9,12 178:11

**shaffer** 3:19 126:2
164:22 178:19
212:16 213:7 242:7
243:15 252:5 262:6
262:24 263:7,10,16
265:25 266:11
268:2,7 277:21
278:12 280:4
282:12 285:12
286:10,15 290:14
300:6 312:16
316:21,23 317:9
319:11 325:5
**shake** 8:18
**shaking** 9:3
**shantel** 1:18
**she'll** 279:7
**sheet** 327:2
**shield** 1:15,16,19
**shift** 25:10,11 67:14
67:18,22 68:23,25
69:17 322:8,9,10
**shifts** 24:13,19
25:24
**shirt** 181:10
**short** 269:2
**shorthand** 2:14
**shot** 205:23 206:15
**show** 37:6 41:12
68:12 119:19 164:8
179:2,11,21,22,23
180:6 232:20 250:6
**showed** 33:7 134:24
167:23 168:2,5
173:15,19
**showing** 233:3
239:20 253:20
**shows** 130:15
**shut** 109:16
**sic** 50:3,21 51:19
140:17 218:23
262:11
**sick** 287:23
**side** 204:23

sight 213:8
sign 57:24 176:13
  222:2,6,17 257:15
  275:8 278:24
signature 98:22,25
  99:2,3 216:23
  223:25 323:21
signed 6:14,16 96:8
  96:25 99:17 158:11
  166:25 167:3
  189:20 222:7,12
  263:3 277:4,25
  280:12 281:21
signs 129:5 222:18
  284:22
simple 296:16
  299:19
simply 163:8
single 28:14 168:9
sir 243:9,11
sit 21:9 29:7,11
  66:25 215:2,9,16
  224:23 308:7
sits 115:3
sitting 103:21 251:8
situation 50:6
  131:23 132:4 215:7
  294:4
situations 215:3
six 19:7 22:16 70:24
  259:17,21 285:3,6
  312:16
skin 151:17 152:3
slash 128:23 151:18
  152:4
sleep 268:21,23
sleeping 81:7
slightly 117:16
  156:21,22 157:2
slow 53:2
slowik 118:8 167:22
  194:6
smear 126:5
smith 3:3 7:2,7,11
  11:3 26:3 51:3 60:3

60:15 67:11 68:5
  69:11,19 72:5 85:4
  85:13 87:8 102:20
  109:16 120:7
  124:24 125:19
  126:3 135:2 138:16
  138:24 178:25
  179:10,17,21,25
  180:11 195:13,19
  197:19 200:22
  233:7,10,13 252:25
  256:25 268:25
  269:13 274:8 278:4
  280:5 287:22 288:5
  288:14 298:9,19
  299:24 320:14
  324:8
smoke 261:11
smoking 261:13
social 100:15,19
  260:16,17 310:22
society 80:6 84:11
  84:12 149:24
socks 181:14 184:18
soft 59:7 61:13,21
  61:22 63:6,17,25
  64:10,14,22 65:3
  126:23
software 274:12
sole 136:10
solely 147:8
somebody 20:2,3
  47:11 52:15,16
  70:20 95:14 108:6
  133:2 135:25
  155:16 175:23
  185:2 259:20
  290:21
soon 39:4 64:25
  65:8
sorry 11:3 67:11
  83:7 127:11 140:5
  161:3 179:9 197:19
  217:15 238:9
  308:20

sort 136:4
space 194:12
speak 35:23 39:10
  44:25 45:4 67:7,9
  118:22 170:20
  178:24 200:12,17
  200:21 201:3,10
  202:12,16 205:12
  208:8 209:4 223:4
  229:16 240:16
  267:23 268:5,9
  274:8 278:7 291:13
speaking 106:25
  107:7 125:8 209:2,3
  296:25
speaks 180:8 239:6
specialty 9:16
specific 103:7
  145:22
specify 102:25
speech 48:2 59:5,12
  194:16
speeches 169:20,22
spell 87:13 208:5
  302:7
spend 23:20,21
  220:24
spent 21:18
spoke 36:23 191:3
  207:14,20 208:7,24
  223:5,7 228:20
  229:3
spoken 36:3,6,13,17
  201:12
spots 310:24
stabilization 76:22
  78:24 112:11,24
  217:14,18 218:2,14
  218:15,19,20,21
  219:3,9,12,17 287:8
stabilize 82:2,6
  110:23 111:10,13
  111:16 113:6
stabilized 84:2
  218:17

stabled 279:16
staff 20:24 23:12,23
  23:23,25 61:15
  62:11 271:10
stamp 96:14 110:10
stamped 216:20
stamping 117:16
stand 100:8 238:7
standard 22:18 46:3
  76:23 78:12 79:4
  208:18,21 238:23
  293:16,17 294:5
  295:9,12 297:23
  298:3,6,23
standards 294:6
  296:4,4,8
standing 186:21
stands 237:7,12
stapled 278:17
  279:5,13 284:13
start 15:16 17:11,13
  69:17 204:20
  205:16 269:16
started 67:14,18,22
starting 7:3
starts 123:12
state 2:15 126:5
  304:16,17 307:2,4
  308:17 326:5
statement 146:2
  243:12
states 1:2 11:16,18
  11:19 12:20 117:13
  173:9
station 60:24
status 46:8,10 47:3
  47:5,14,15 48:5,17
  49:6,16 50:8,24
  51:22 52:5 53:18
  59:11 80:16 114:6,7
  114:13,14 115:12
  116:3 190:17,22
  191:14,17 216:15
  221:20 233:3
  234:10 325:12

stay 22:15,21,21
  23:2 190:10,12
  261:18
steven 1:12 4:5
  282:3
stg 1:15
stimulating 134:2
stipend 16:8
stipulate 261:12
stipulated 6:3,9,13
stipulations 6:2
stood 237:9
stop 169:19 176:24
  227:25 228:4
  256:15 286:19
  287:22,23 288:15
stopped 33:10,11
  228:7
stories 197:25
  199:23
story 149:19 241:17
  278:9 280:2
straightened 69:13
straightforward
  299:20
street 3:8,11,17 4:11
  5:5
strenuous 98:8
strenuously 98:5
stress 318:25 319:2
stressor 100:16
stressors 100:20
strike 126:18
stuck 133:2
study 10:23
stumbled 295:11
stumbling 243:2
subject 302:19
subjected 131:13
  134:15
subscribed 324:19
  327:21
subsequent 124:8
substance 132:14

substances 132:9
substantial 242:2
  243:5,25
success 4:19
suckle 3:10,13 7:18
  8:3 35:6 36:5 37:2
  57:4,8 66:18 70:2
  84:7,25 87:6 92:16
  97:13 98:4,7 101:23
  102:3,22 103:3,9,19
  106:10,14,20,25
  107:7 119:23 120:5
  120:17 124:7 125:2
  125:6,12 126:13
  127:19 135:4
  137:13 139:14
  147:3 155:10
  160:25 163:13,21
  163:25 164:7,13,20
  164:24 168:11,13
  168:18 169:19,24
  176:16,24 177:9,13
  177:16,21 178:4,9
  178:13,16 182:10
  196:13 199:10
  211:4 213:22 215:8
  230:24 232:15,25
  239:3 240:10,14,21
  242:15,19,25 244:6
  245:20 246:16
  249:19 252:3,20
  254:17,19,22 255:4
  255:10 256:15
  258:2 260:22 261:2
  261:17 264:13,23
  265:10,14,21
  266:20 267:17
  270:7,12 272:9,17
  272:22 276:20
  279:6,10,15,18
  284:9,15,19,21,25
  285:5,14,21 286:2
  286:13 288:16,24
  289:4 295:8 297:3,6
  297:9,25 311:19,24

312:6,11,15,25
  314:23 316:19
  322:13,15 324:7,10
  325:5
suffering 194:19
sufficient 149:11
suggest 97:24 98:13
suggests 97:20
suicidal 47:24 53:17
  53:23 55:3 56:7,25
  57:11 58:11,14,18
  58:20 80:9 81:5
  89:12 90:17 91:7,10
  91:11,14 95:6,7
  113:12 114:2
  115:22 116:4 128:6
  128:14,22 129:12
  153:15 154:6,10
  167:24 171:25
suicide 56:13 113:10
  113:11,16 155:24
  242:4,6,10 243:8
  244:3,13,17 302:17
  302:22 303:13,17
suing 300:25
suite 3:12 4:18
summary 239:2
summons 33:20
superiors 196:5,6
supervised 320:24
  321:10
supervision 319:16
supervisor 101:2
  118:20 119:6
  172:18 234:22
  278:10
supervisors 91:5,18
  218:24
supposed 41:12
  42:18 81:14,17
  97:10 285:23
supreme 304:20
sure 8:6,8 15:25
  18:22 27:10 29:5
  42:17,20 45:18 54:9

61:17 62:25 73:7
  77:18 120:17
  134:19 184:12,16
  216:12 219:20
  220:8,20 233:10
  238:22 246:17
  248:3,17 249:3,7
  259:6 291:22
  297:24 308:2
surrender 183:6
surrounding 49:13
suspended 304:24
  305:3
swear 7:13
sweet 107:3 125:5
  178:17
sweet's 178:22
sworn 6:16 7:16
  324:19 326:8
  327:21
symptoms 78:18
  100:2 173:22
syphilis 134:13,15
system 269:19,22
systems 310:21

t

t 200:22 325:9
table 157:24
take 8:21 9:6,10
  15:24 20:2 65:9
  71:8 80:7,25 81:13
  84:25 85:4 110:4
  180:25 183:5
  184:15,23 187:11
  190:25 191:4
  197:15 198:19,23
  204:5,16,17 206:9
  233:13 268:25
  310:12
taken 2:13 45:7 63:9
  85:10 95:18 109:19
  138:21 195:16
  197:11 233:20
  269:10 285:3,6

298:14
**talk** 25:20 114:5
  125:7 204:22
  218:12 267:2,7,18
  271:8,9,10,11,13
  272:3
**talked** 23:5 52:4
  80:15 150:22 184:9
  245:19 267:13,19
  306:10
**talking** 24:7 27:18
  57:25 78:19 92:15
  102:15 103:3,6,17
  114:15 127:18
  136:3 178:4,9,17
  179:25 196:22
  211:23 216:25
  246:3 247:15
  275:14,17 284:13
  293:15,16,18 296:7
  296:11 298:21,23
  303:11,12 304:4
  306:2
**talks** 151:17
**taped** 278:18 279:18
**tariq** 110:11,14
  111:9 113:7,24
  115:9,19 116:19,23
  117:5,19 123:16
  136:8,15,21 137:5
  137:15 167:22
**tariq's** 115:25 117:4
  136:10,17
**tax** 1:9,11,12,13,14
  1:18
**teach** 125:17 289:4
**teaching** 23:10
  297:11
**team** 21:8 186:18,19
  218:4
**telepathy** 201:9
**telephone** 176:4
  229:17
**teleport** 106:24

**teleported** 106:12
**tell** 9:13 10:13 38:21
  52:21 55:7 62:15
  125:23 165:4
  182:19,25 200:24
  201:5 208:13
  222:25 225:24
  240:24 245:9,15,23
  255:15 261:25
  262:7 267:3 270:11
  271:4 274:7 279:7
  289:7 290:4 296:22
  314:6 317:2
**telling** 201:17
  205:16 299:15
**tells** 52:23 58:12
  201:22
**ten** 19:8,12 23:4,20
  27:19,24,25 28:9
  210:7 228:11
**tend** 78:22
**tendencies** 53:17
  55:3,5,21 56:3
**tendency** 56:25
**test** 50:4,21 51:8,11
  51:15 52:13,20 55:6
  55:11 130:21 131:7
  131:10,13 132:24
  132:25 133:5,11,22
  133:23 134:3,6,7,13
  134:15,22
**tested** 132:12
**testified** 7:17 43:25
  103:4 201:24
  277:12
**testify** 33:24 34:2,5
  35:18 88:15 301:22
  301:25
**testifying** 38:12,19
**testimony** 35:21,25
  85:12 88:16 109:21
  138:23 139:3 141:4
  195:18 233:22
  245:19 269:12
  277:16 298:16

326:7,10
**testing** 47:16,20,21
  47:21 48:11,13
  100:4
**thank** 35:7 119:24
  255:17 299:15
**thanks** 297:11
**the** 133:5
**theodore** 1:13
**theory** 196:11,23
**therapeutic** 203:21
  203:24 204:2,6
**therapist** 218:4,13
**thing** 23:2 46:24
  70:2 230:22 276:10
**things** 31:16 47:9
  49:4 81:17 137:10
  144:10 171:8
  173:13 174:4 179:5
  194:25 198:4
  199:19 279:9
  297:10 320:8
**think** 27:15 35:4
  60:15 64:16 66:15
  83:24 91:9 101:23
  102:3 103:11
  105:17 106:11,23
  116:14 126:4
  137:10,14 140:24
  141:3 147:22
  148:21 149:2,7,11
  150:5,10 160:23
  175:18 178:16
  182:11 188:3
  196:25,25 197:14
  198:7 214:5 237:10
  241:20 246:21
  247:9 248:7,16,18
  256:23,25 261:14
  272:17 283:18
  284:2,23 289:6
  294:3 304:17 306:3
**thinking** 51:17
  150:3,7 196:23
  198:12 245:2

246:12,13 303:24
**thinks** 78:6
**third** 3:8 113:8
  154:15
**thirteen** 68:6
**thought** 25:2 47:21
  47:22 51:13,14,16
  57:11,12,19,21 58:6
  173:21,24 196:11
  228:23 237:9
  241:14 247:12
  283:22 303:14
**thoughts** 55:8 114:3
**thousand** 72:11
**thousands** 27:2
**threat** 95:3,4 196:19
  206:25 243:7 244:2
  244:13,16
**threats** 242:3,5,10
**three** 17:8 68:22
  69:15 87:17,20
  96:14 106:9,19
  188:25 189:5 199:6
  233:11 239:6
  242:23 252:10
**throw** 221:22
**thyroid** 134:2,3
**till** 190:3
**time** 2:13 6:12 8:10
  15:11,24 17:8 19:16
  20:4,20,23 22:9
  23:16 25:7,8 28:11
  28:14 32:25 33:16
  34:4 60:6 68:8 72:2
  85:20 86:2,3,13,23
  87:3 91:11 94:24
  95:17 103:13
  104:18 107:13,20
  108:5,12 109:24
  115:13 116:21,23
  127:7 129:17,25
  131:8 138:6,7,16
  142:8 148:10 150:2
  153:23 158:19,23
  159:6,10,18 160:4,8

160:9,11,13 161:9
161:11,20,23,25
162:5,13,16,20,24
163:4,6 165:5,10,12
165:20,24 166:4,7,9
166:17,21 168:17
169:5 173:2 188:3,6
194:8,12 197:13
198:12,21 199:4,13
200:18 202:6,10
206:5,6 207:5 209:4
215:21 220:25
221:9,10,11 222:7
225:9,10 228:11
231:15,16 232:3
235:15,15 240:19
241:16 250:3,19
260:10,10 264:2
265:20 275:12,12
283:22 311:20
316:4,8 317:6,23
324:15
**times** 5:10 26:21
27:11,19,19,19,25
34:9 67:7 71:21,23
72:14 106:9,19
130:5 142:2 211:15
**timing** 60:4
**timothy** 1:17
**tired** 234:18 287:24
**title** 24:18 306:4
**today** 7:11 8:5 30:21
32:15,20,22 33:2,25
34:14 35:21,25
38:13,18 49:11
88:16 114:15
118:12 215:2,9
224:23 245:4
288:11
**today's** 68:13
232:21 253:21
**told** 27:21 33:25
34:21 170:10,14
172:11 180:19
187:23 191:10

201:15,25 213:22
247:18 260:23
278:9,11 289:11
316:14,16
**tomorrow** 253:18
**top** 87:15 109:23
110:2 121:18
127:24 158:8
216:20 225:23
254:22 255:10
256:18
**total** 188:20
**totality** 147:7
**totally** 125:20 297:8
**touch** 99:24
**tough** 164:20
**tox** 131:8 132:2
**toxicology** 131:10
131:20 132:5,15
**training** 39:18,23
40:5 71:11,14
186:11 305:15,17
305:22
**transcript** 326:9
**transcripts** 35:20
**transfer** 17:11 76:7
77:2,8 78:9,15,22
79:6 104:13
**transferred** 74:22
75:13,19 78:7 98:20
104:5 105:6,20,24
107:15 165:10
184:7
**trauma** 133:13
**treat** 312:24
**treated** 41:5 42:21
45:14 311:12,20
312:21 313:3
314:20
**treating** 312:11,13
**treatment** 30:6,17
36:8,11,15,19 38:25
41:13,14,14 44:5
89:11 99:19 105:23
107:5 218:8 232:6

241:5,12 254:9
283:8 309:14,15,25
311:13 314:8
**triage** 65:4,5 140:13
140:18,23,24 141:5
155:4,8,12,17,24
157:16 159:9,24
160:12,13 162:19
**trial** 6:12 301:25
**tried** 103:23 106:2,7
179:2,11 221:4
241:22
**true** 1:20 2:2 90:25
250:4 257:20 258:5
263:22 326:9
**trust** 291:23
**truth** 201:17
**try** 104:8,24 198:3
205:13,14 209:19
220:4,20 288:22
**trying** 19:21 22:23
50:4 64:15 150:3
161:22 162:8 170:4
172:3,11 177:7
179:22 197:16,17
198:4 220:18 289:2
**tsh** 133:25
**tube** 134:8
**turn** 68:14 139:8,17
181:19,22,25
182:13 216:16
221:19 265:16
**turned** 158:7
**turning** 121:7
130:10
**twice** 196:25 203:7
203:23 204:4
**two** 19:7 24:19 34:9
61:15 70:10 72:11
127:6 148:21 149:8
173:9 189:10,15,18
199:6 252:10
300:15 302:4
**type** 8:25 33:20 57:6
61:19 62:3 65:21

114:17 207:3
218:25 224:8,9
**types** 78:21

**u**

**uh** 58:3 114:10
**ultimate** 320:4
**unable** 148:15
**unclear** 297:8
**uncooperative**
91:23
**undergraduate**
10:14
**underneath** 98:25
223:24,25
**understand** 8:11
43:4 59:18 73:3,5
79:13 80:2 81:12,20
83:13,21 92:3 94:2
94:15 145:21
146:19 152:24
183:21 187:9
193:15 226:17
227:12 250:24
286:6 292:16 294:3
294:19,21 296:5,9
299:14
**understanding** 28:2
61:6 67:16 73:13
74:6 75:17,23 76:25
79:21 92:18 93:5,11
93:15 94:5,12,13
105:15 117:20
187:16 238:14
239:4
**understood** 8:14
33:4 143:12
**underwear** 181:17
**undress** 182:20
**unfortunately**
164:14
**unit** 14:23,25 26:13
32:5 78:10,23 83:10
105:19 174:22
175:2 190:6 218:3,6

218:8 235:13
250:18,21,23,25
251:3 252:19 253:7
253:13 254:2,3,4,5
256:4,24 257:3
258:16 260:11
261:11,15 269:21
325:17
united  1:2 11:16,17
11:19 12:20
university  11:13,25
12:12 13:6
unknown  1:21 2:3
unlocked  90:7
unpredictable  78:20
90:2
unsure  230:19 231:9
231:11,22
upper  156:20
upstairs  167:9
174:11,21 175:2,5
189:7 190:6,8
257:16 258:6
318:18
urgency  157:12
urgent  157:18,21
urinal  131:5
urinalysis  130:17,18
130:20 131:19
urinate  130:25
urine  130:21,21
131:8,20 132:2,12
132:15,19,21 133:6
urology  14:4
use  8:25 61:3 71:17
88:3 105:21 135:15
145:10 147:13
166:6,6 227:16,17
325:16
usually  28:20,21
49:7 52:14 60:23
61:8,13,14 63:13
67:25 78:16 140:18
142:14 174:20,23
182:19 220:10

227:9 260:6 294:13

v

v  100:16 208:6,6
327:3
various  5:10
vein  9:5
velcro  61:24
verbal  229:9
verbally  91:23
verify  267:8,14,21
267:24 268:6
279:25
veritext  327:2
vernacular  236:23
237:6
versus  21:13,19
videotaped  2:10 7:9
view  105:4
views  178:23
violation  107:8
violence  113:19,20
319:8,8
violent  29:3 61:12
63:11,14,15,20
64:16,24 65:7 78:20
118:13 205:7
virginia  307:9,13,17
308:3,15
visible  117:18
visit  250:3 252:12
visiting  250:11
251:5 252:8 253:3
325:13
visitors  249:24
251:12 325:15
visual  47:25 119:8
vivek  208:4 228:18
228:21 229:2
234:25 235:13
315:22,23,25
316:11
voice  157:23 196:9
234:19 236:4

volume  59:6
voluntarily  11:12

w

w  3:15 87:14 118:9
wacter  282:3
wait  92:6 178:7
190:3,15 289:9
waived  6:8
wall  175:6,7,18
walls  175:25
walter  4:7
want  10:3 22:20
28:5 31:17 33:14
43:18 76:13,17
82:20 92:9 98:9
104:4 106:6 132:13
150:6 158:3 164:15
176:2 177:4,23
220:24 238:20,25
239:3 246:14,16
249:3,7 250:4
265:14,16,22 267:8
282:7 287:18 298:4
311:19 313:6
324:11
wanted  174:11,15
187:24 207:7
230:14,19 252:12
273:24
wants  66:8 77:12
252:20
ward  209:23 249:22
258:6
washington  3:8
watched  135:25
way  44:18 46:15
77:9 95:10 102:7
103:13,14 105:18
106:5 112:18
120:10 134:24
177:4 196:2 198:25
218:10 235:21
243:3 255:2 261:13
270:22 273:8 297:5

297:7 300:17
326:15
we've  102:22 213:22
weapon  55:10,15
220:7,11
weapons  184:17,21
184:21 196:24
198:9,10,15 213:16
214:2,10,14,18
219:11,16,21 220:4
220:21 247:7,8
wear  181:3 183:10
249:23
wearing  183:16,23
week  21:18 204:12
259:7,10,17,22,24
269:25
weighed  150:13
weight  203:15,16
204:9
went  10:15 12:11,20
16:20 17:9,20,21
31:18 44:2,24 92:25
167:8 187:5 190:8
198:18 206:14
230:21 278:24
291:20 318:18
west  3:11 307:9,13
307:17 308:3,14
whatsoever  8:12
whereof  326:17
wherewithal  192:15
whitehall  5:5
willing  163:7 261:12
withdrawing  57:8
withdrawn  36:5
118:12 196:13
249:19
witness  7:13,15 11:5
67:12 68:6,17 74:18
87:9 102:21 106:22
119:25 124:25
125:20 139:9
164:14 169:13
170:4 176:18 177:3

178:2 179:2,9,11,22
179:24 180:4
210:16 216:17
256:4,16,17 257:2
274:6,15 278:5
325:3 326:7,11,17
327:5
**witness's** 180:2
**woman** 185:5
**wondering** 282:13
282:17,20,23
**word** 9:2 247:22
248:4
**words** 10:9 212:5
**work** 9:21 11:12
14:18 17:5 21:13,13
21:19,19 22:11,16
24:9,15 25:8 72:19
138:4 218:5 250:22
257:3,4 259:8,11,20
289:3
**worked** 17:16 22:10
24:19 26:17
**worker** 260:16
**workers** 260:17
**working** 9:19 18:5
25:4 26:8,10 31:22
257:9 259:17,21
303:18 312:25
**works** 24:14,16
**worksite** 100:21
**wrist** 62:2 122:7
123:5,20 124:2,15
126:10 173:8
**write** 47:9 54:22
57:11 58:6,12 88:4
111:9 123:22 143:4
165:16,20,23 173:6
173:13,16,22,25
174:3 189:19 191:5
194:2 207:10
217:10 223:9,12
224:11,13,17,19,21
225:14 226:6
282:14 299:13

**writes** 291:17
**writing** 47:6 66:21
109:5,11
**written** 44:20 45:2
66:21 89:15,17,21
113:8,25 114:24
138:8 203:6 239:23
239:24 240:2,4
268:10 270:24,25
282:25 283:3,4
291:6,18 292:14
310:6 315:2
**wrong** 105:18 106:5
125:21 149:25
162:4,5 255:6
**wrote** 98:25 110:20
115:6,9,20 116:19
122:4 123:7,19
128:9,18 129:7,13
162:24 165:5,7,13
166:13,17 174:6,12
187:22 188:7,23
189:9 199:4 220:23
225:25 290:22

---

**x**

**x** 2:5 133:12 325:2,9
**x'd** 152:5

---

**y**

**yard** 150:4 197:25
248:7
**yeah** 19:25 46:25
50:18 71:16 75:7
80:22 117:22 120:5
160:22 177:15
234:5 251:2 271:21
**year** 13:18 17:15
19:7,10 21:25 72:3
72:10,11,14,17,19
165:2 211:19 273:6
**years** 16:16 19:2,4,7
19:8,12 102:14
133:19 228:12
257:8,10,11

**yesterday** 173:10
**york** 1:3,8 2:7,7,16
3:5,5,12,12,17,18,18
4:6,6,12,12,19 5:6,6
11:25 15:8,11,22
16:11 17:7 36:18
126:6 210:13
213:13,20 220:6
239:11 276:15
307:8 308:5,15
316:25 326:6 327:2
327:4

---

**z**

**z** 315:13
**zachary** 3:15