1
2   UNITED STATES DISTRICT COURT
3   EASTERN DISTRICT OF NEW YORK
4   - - - - - - - - - - - - - - - - - - -
5   ADRIAN SCHOOLCRAFT,
6                        Plaintiff,
7          -against- Index No.
                     10CIV-6005 (RWS)
8
    THE CITY OF NEW YORK, DEPUTY CHIEF
9   MICHAEL MARINO, Tax Id. 873220,
    Individually and in his Official
10  Capacity, ASSISTANT CHIEF PATROL
    BOROUGH BROOKLYN NORTH GERALD NELSON,
11  Tax Id. 912370, Individually and in his
    Official Capacity, DEPUTY INSPECTOR
12  STEVEN MAURIELLO, Tax Id. 895117,
    Individually and in his Official
13  Capacity, CAPTAIN THEODORE LAUTERBORN,
    Tax Id. 897840, Individually and in his
14  Official Capacity, LIEUTENANT JOSEPH
    GOFF, Tax Id. 894025, Individually and
15  in his Official Capacity, stg. Frederick
    Sawyer, Shield No. 2576, Individually
16  and in his Official Capacity, SERGEANT
    KURT DUNCAN, Shield No. 2483,
17  Individually and in his Official
    Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18  Tax Id. 885374, Individually and in his
    Official Capacity, SERGEANT SHANTEL
19  JAMES, Shield No. 3004, and P.O.'s "JOHN
    DOE" 1-50, Individually and in their
20  Official Capacity (the name John Doe
    being fictitious, as the true names are
21  presently unknown)(collectively referred
    to as "NYPD defendants"), JAMAICA
22  HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
    Individually and in his Official
23  Capacity, DR. LILIAN ALDANA-BERNIER,
    Individually and in her Official Capacity
24  and JAMAICA HOSPITAL MEDICAL CENTER
    EMPLOYEES "JOHN DOE" # 1-50, Individually
25
    (Continued)

Page 2

1
2    and in their Official Capacity (the name
     John Doe being fictitious, as the true
3    names are presently unknown),
4
     Defendants.
5
          - - - - - - - - - - - - - - - - - - -x
6
                         111 Broadway
7                        New York, New York
8                        February 11, 2014
                         10:30 a.m.
9
10       VIDEOTAPED DEPOSITION of DR. LILIAN
11   ALDANA-BERNIER, one of the Defendants in
12   the above-entitled action, held at the
13   above time and place, taken before
14   Margaret Scully-Ayers, a Shorthand
15   Reporter and Notary Public of the State
16   of New York, pursuant to the Federal
17   Rules of Civil Procedure.
18
19                *        *        *
20
21
22
23
24
25

Page 3

1
2     APPEARANCES:
3
      NATHANIEL SMITH, ESQ.
4     Attorney for Plaintiff
          111 Broadway
5         New York, New York 10006
6
7     JOHN LENOIR, ESQ.
      Attorney for Plaintiff
8         829 Third Street NE
          Washington, DC 20002
9
10
      SUCKLE SCHLESINGER PLLC
11    Attorneys for Plaintiff
          224 West 35th Street
12        Suite 1200
          New York, New York 10001
13
      BY:  HOWARD SUCKLE, ESQ.
14
15
      ZACHARY W. CARTER, ESQ.
16    Corporation Counsel
      Attorneys for Defendant
17    THE CITY OF NEW YORK
          100 Church Street
18        New York, New York  10007
19    BY:  RYAN SHAFFER, ESQ.
      File # 2010-033074
20
21
22
23    (Appearances continued on next page.)
24
25

Page 4

1
2     APPEARANCES CONTINUED
3
      SCOPPETTA, SEIFF, KRETZ & ABERCROMBIE,
4     ESQS.
      Attorneys for Defendant
5     STEVEN MAURIELLO
          444 Madison Avenue
6         30th Floor
          New York, New York 10022
7
      BY:  WALTER A. KRETZ, JR., ESQ.
8
9
10    MARTIN, CLEARWATER & BELL, LLP
      Attorneys for Defendant
11    JAMAICA HOSPITAL MEDICAL CENTER
          220 42nd Street
12        13th Floor
          New York, New York  10017
13
      BY:  GREG RADOMISLI, ESQ.
14    File # 667-82153
15
16
      IVONE, DEVINE & JENSEN, LLP
17    Attorneys for Defendant
      DR. ISAK ISAKOV
18        2001 Marcus Avenue
          Suite N100
19        Lake Success, New York 11042
20    BY:  BRIAN E. LEE, ESQ.
21
22     (Appearances continued on next page.)
23
24
25

1
2  APPEARANCES CONTINUED
3
4  CALLAN, KOSTER, BRADY & BRENNAN, LLP
   Attorneys for Defendant
5  LILIAN ALDANA-BERNIER
      One Whitehall Street
6     New York, New York 10004
7  BY:  PAUL CALLAN, ESQ.
   File # 090.155440
8
9
10
   ALSO PRESENT AT VARIOUS TIMES:  MAGDALENA
11                                  BAUZA
12
13
14            *       *       *
15
16
17
18
19
20
21
22
23
24
25

Page 6

1

2              STIPULATIONS

3       IT IS HEREBY STIPULATED AND AGREED, by

4    and among counsel for the respective

5    parties hereto, that the filing, sealing

6    and certification of the within

7    deposition shall be and the same are

8    hereby waived;

9       IT IS FURTHER STIPULATED AND AGREED

10   that all objections, except as to form of

11   the question, shall be reserved to the

12   time of the trial;

13      IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be signed

15   before any Notary Public with the same

16   force and effect as if signed and sworn

17   to before the Court.

18

19              *       *       *

20

21

22

23

24

25

Page 7

1

2          MR. SMITH:  On the record at

3      10:29.  We are starting the deposition

4      of Dr. Lilian --

5          MR. CALLAN:  Aldana,

6      A-L-D-A-N-A, Bernier.

7          MR. SMITH:  Aldana-Bernier.

8          The deposition is being

9      videotaped.

10         We are at 111 Broadway, my

11     office, Nathaniel Smith, and today is

12     the 11th of February 2014.

13         You can swear the Witness in.

14  L I L I A N    A L D A N A -

15  B E R N I E R, the Witness herein, having

16  first been duly sworn by the Notary Public,

17  was examined and testified as follows:

18  EXAMINATION BY MR. SUCKLE:

19     Q.    What is your name?

20     A.    Lilian Aldana, hyphen, Bernier;

21  L-I-L-I-A-N, A-L-D-A-N-A, hyphen,

22  B-E-R-N-I-E-R.

23     Q.    Where do you reside?

24     A.    71 Parker Avenue, Maplewood,

25  New Jersey 07042.

1                L. ALDANA-BERNIER

2      Q.    Good morning, Doctor.  My name

3  is Howard Suckle.  I represent Mr.

4  Schoolcraft in this matter, and I'll be

5  asking you some questions today.

6           Although I'm sure your attorney

7  has gone over some basic rules of a

8  deposition, let me just make sure we are

9  all are clear on them.

10          If at any time you don't

11 understand my question for any reason

12 whatsoever, please let me know because if

13 you do answer we are going to assume that

14 you understood the question.  Okay?

15     A.    Okay.

16     Q.    In addition while sometimes

17 during the course of a conversation, a

18 shake of the head or a nod may be an

19 appropriate answer when the answer is yes

20 or no.  Here we have a court reporter and

21 the court reporter needs to take down

22 everything that you say, everything I

23 say, and anything else said in the room.

24          If the answer is appropriately

25 yes or no, can you please use some type

Page 9

1              L. ALDANA-BERNIER

2     of word, say yes or no, opposed to

3     shaking your head?

4          A.    Yes.

5          Q.    Also in that vein, the reporter

6     needs to take down everything that you

7     and I say.  Although you may anticipate

8     what my question is going to be before I

9     finish, please let me finish it so the

10    reporter can take that down and then

11    begin to answer.  Okay?

12         A.    Yes.

13         Q.    Doctor, can you tell me what

14    you presently do for a living?

15         A.    I am a medical doctor,

16    psychiatrist specialty.

17         Q.    Where are you employed, if at

18    all?

19         A.    I am.  I'm working for Jamaica

20    Hospital.

21         Q.    When you say you work for

22    Jamaica Hospital, is that your employer?

23         A.    Yes.

24         Q.    How long have you been employed

25    by Jamaica Hospital?

L. ALDANA-BERNIER

A.    From 1995 to the present.

Q.    I don't want to know the details, but you are paid a salary, correct?

A.    Yes.

Q.    By Jamaica Hospital?

A.    Yes.

Q.    In other words when you see patients, you don't bill them independently, do you?

A.    No, I don't.

Q.    Doctor, can you tell me where did you go to undergraduate school?

A.    I went to the Concordia College. That is for my BSN in the Philippines.

Q.    Are you originally from the Philippines?

A.    I am from the Philippines, yes.

Q.    That's where you were born?

A.    Yes.

Q.    What did you study at Concordia College?

A.    That's bachelor's of science in

1              L. ALDANA-BERNIER

2   nursing.

3              MR. SMITH:  Sorry.  What was

4       that bachelor's in?

5              THE WITNESS:  In nursing.

6       Q.     When did you complete that?

7       A.     This was in 1973.

8       Q.     After you completed your

9   bachelor's in nursing, what did you do

10  with regards to your career or education?

11      A.     When I finished in March, I

12  work in the emergency room voluntarily

13  for the Far Eastern University.

14      Q.     How long did you do that?

15      A.     From March to November when I

16  came to the United States in 1973.

17      Q.     When you came to the United

18  States, for what purpose did you come to

19  the United States?

20      A.     The American dream.

21      Q.     Did you continue your education

22  or your career at that point?

23      A.     Yes, 1976 to '97 I took my

24  master's in nursing, minor in education

25  at the New York University.

1              L. ALDANA-BERNIER

2       Q.    So you have a master's in

3   nursing?

4       A.    Yes.

5       Q.    And education?

6       A.    Yes.

7       Q.    After you completed your

8   master's in nursing and in education,

9   what did you do next with regard to your

10  career and education?

11      A.    After that I went to medical

12  school from 1981 to 1986, University of

13  Santiago, Dominican Republic.

14      Q.    At some point you immigrated to

15  the Dominican Republic?

16      A.    Yes.

17      Q.    Did you become a citizen of the

18  Dominican Republic?

19      A.    No, I was a citizen of the

20  United States before I went there.

21      Q.    Just for the record, when did

22  you become a citizen?

23      A.    That was between '78 and '79.

24      Q.    While you were in medical

25  school, did you concentrate on any

1                L. ALDANA-BERNIER

2    particular area of medicine?

3         A.    At that point in medical

4    school, no.

5         Q.    Did you graduate from the

6    University of Santiago?

7         A.    Yes.

8         Q.    What was your degree?

9         A.    MD.

10        Q.    What did you do next after that

11   with regard to your career or education?

12        A.    In 1986 I had my externship at

13   the Elizabeth General Hospital in

14   psychiatry.

15        Q.    Where is that?

16        A.    In New Jersey.

17        Q.    How long did you do that?

18        A.    For a year.

19        Q.    After that what did you do next

20   with regard to your career or education?

21        A.    From '89 to '93, I had my

22   residency in psychiatry at the

23   Metropolitan Hospital here in Manhattan.

24        Q.    As a resident did you have to

25   rotate through other disciplines as well

Page 14

1              L. ALDANA-BERNIER
2   as psychiatry?
3        A.     Yes, we did internal medicine,
4   urology.
5        Q.     Any other disciplines you
6   rotated through?
7        A.     I choose my elective in
8   endocrine.
9        Q.     What is endocrine?
10       A.     Endocrine has to do with your
11   hormones.
12       Q.     Did you complete that
13   residency?
14       A.     I did in 1993.
15       Q.     After your residency what did
16   you do next with regard to your career or
17   education?
18       A.     After 1993 I had -- 1994 I work
19   at Kings County Hospital as an inpatient
20   doctor.
21       Q.     When you say "inpatient
22   doctor," what do you mean?
23       A.     Inpatient unit.
24       Q.     In psychiatry?
25       A.     Psychiatry inpatient unit.

Page 15

1           L. ALDANA-BERNIER

2      Q.     As an attending?

3      A.     Attending.

4      Q.     You were employed by Kings

5  County Hospital?

6      A.     Kings County Hospital.

7      Q.     That's a hospital run by the

8  City of New York?

9      A.     Yes, Brooklyn.

10      Q.     You were an employee of the

11  City of New York at that time?

12      A.     Yes.

13      Q.     We're early on now, and it's

14  okay, but if we keep running over each

15  and you're not letting me finish before

16  you answer, she is going to start hitting

17  me.

18           You have to let me finish

19  before you answer.  Okay?

20      A.     Okay.

21      Q.     How long were you an employee

22  of the City of New York?

23      A.     Can I count?

24      Q.     Take your time.

25      A.     I'm not sure.  Between eight to

Page 16

1              L. ALDANA-BERNIER

2    nine months.

3        Q.    While you were doing your

4    residency at Metropolitan, is that a City

5    hospital?

6        A.    It's a City hospital.

7        Q.    While you were there, were you

8    paid any money or given any stipend?

9        A.    Paid a salary.

10       Q.    So you were an employee at that

11   point too of the City of New York,

12   correct?

13       A.    Yes.

14       Q.    How long were you an employee

15   of Metropolitan?

16       A.    Four years.

17       Q.    After the inpatient attending

18   at Kings County Hospital, what did you do

19   next?

20       A.    I went to Coney Island

21   emergency room.

22       Q.    What did you do there?

23       A.    Emergency room attending.

24       Q.    Psychiatric?

25       A.    Psychiatric emergency room.

Page 17

1              L. ALDANA-BERNIER

2        Q.    Is Coney Island Hospital a City

3    hospital?

4        A.    City hospital.

5        Q.    How long did you work as an

6    attending at the Coney Island Hospital

7    for the City of New York?

8        A.    At the time maybe three months.

9        Q.    When you went from Kings to

10   Coney Island Hospital, was this a

11   transfer; did you leave one job and start

12   a new job?

13       A.    I left one job to start a new

14   job.

15       Q.    After what year was it that you

16   worked at Coney Island Hospital?

17       A.    That was 1995.

18       Q.    After Coney Island Hospital,

19   what did you do next?

20       A.    I went to Jamaica Hospital.

21       Q.    So you went to Jamaica Hospital

22   in 1995?

23       A.    '95.

24       Q.    And you have been employed

25   there ever since?

Page 18

                    L. ALDANA-BERNIER

1

2       A.     Yes.

3       Q.     When you first got to Jamaica

4   Hospital, what was your position?

5       A.     I was working in the emergency

6   room as an attending psychiatrist.

7       Q.     And has that position changed

8   at all, have you changed your position at

9   Jamaica Hospital?

10      A.     As an attending?  I'm still an

11  attending.

12      Q.     You are still in the same

13  position as in 1995?

14      A.     I'm an attending still in

15  Jamaica Hospital.

16      Q.     Were you anything other than an

17  attending at Jamaica Hospital?

18      A.     I was director of the emergency

19  room.

20      Q.     When were you the director of

21  the emergency room?

22      A.     I am not sure.  I don't

23  remember when, but I was acting director

24  and became the director.  Then I was

25  still an attending at Jamaica Hospital.

Page 19

1                    L. ALDANA-BERNIER

2          Q.      How many months or years were

3     you the acting director?

4          A.      How many years?

5          Q.      How long?

6          A.      Like -- I have no recollection.

7          Q.      Was it a year, two years, six

8     months, ten years?  Give me an idea.

9          A.      As acting, approximately one

10    year.

11         Q.      How about as director?

12         A.      Director, maybe ten years.

13         Q.      While you were the acting

14    director and director, were you actually

15    practicing medicine during that period of

16    time?

17         A.      Yes.

18         Q.      Well, was there any difference

19    in the job function as acting director or

20    director?

21         A.      No.  They were trying to find

22    something so you are just the acting

23    until they find a real director.

24         Q.      And they found you?

25         A.      Yeah, I have been there.  They

Page 20

1                    L. ALDANA-BERNIER

2      rather have somebody in there than take

3      somebody from outside.

4          Q.    When was the last time you were

5      in the role of director of the

6      psychiatric emergency room at Jamaica

7      Hospital?

8          A.    That was October 2013.

9          Q.    So in October 2009, you were

10     the director of the psychiatric emergency

11     room?

12         A.    Yes.

13         Q.    As a director of the

14     psychiatric emergency room in October

15     2009, what were your responsibilities and

16     functions?

17         A.    Director of emergency room, you

18     do have administrative responsibility.

19     You attend administrative meeting.  At

20     the same time, you were still do

21     clinicals, you still have the clinical

22     aspect.  You have to see the patients.

23     At the same time, you have to oversee the

24     residents and the other staff of the

25     emergency room.

1          L. ALDANA-BERNIER

2     Q.     As the director of the

3  emergency room, did you have any role in

4  creating or drafting any of the rules or

5  regulations of Jamaica Hospital emergency

6  room?

7     A.     Together with the other members

8  of the team or other administrators, yes,

9  I sit down with them and give my

10  feedback.

11     Q.     How much of your job in October

12  2009 as director involved administrative

13  work versus clinical work?

14     A.     I do more clinical.

15     Q.     You say more clinical?

16     A.     More clinical, yes.

17     Q.     Give me an idea how much of

18  your day or week was spent doing

19  administrative work versus clinical work?

20     A.     I do more clinical, but I was

21  the only psychiatrist in the emergency

22  room until -- go ahead?

23     Q.     Until when?

24     A.     Until they had given me a new

25  attending which was for only one year.

Page 22

1                  L. ALDANA-BERNIER

2        Q.     When was that?

3        A.     In 2012/2013.

4        Q.     So October 2009 you were the

5    only attending psychiatric physician in

6    the psychiatric emergency room?

7        A.     Yes.

8        Q.     And did you have a set schedule

9    at the time during the day that you

10   worked?

11       A.     I go to work from eight

12   o'clock.

13       Q.     Until when?

14       A.     That depends, until finishing

15   my patient.  I cannot stay because

16   sometimes you work overtime, six o'clock,

17   seven o'clock.

18       Q.     What is the standard day?

19       A.     Eight to four.

20              I want you to know, I don't

21   stay until four o'clock.  I stay more

22   than that.

23       Q.     That's what I'm trying to find

24   out.

25              On an average day, if there is

Page 23

1          L. ALDANA-BERNIER
2    such a thing, how long do you stay at the
3    hospital?
4          A.     Maybe ten, 12 hours.
5          Q.     When I talked about
6    administrative responsibilities, to
7    oversee the residents, was that part of
8    that administrative responsibility, is
9    that clinical, or something else?
10         A.     That's more of your teaching
11   responsibilities.
12         Q.     How about overseeing the staff,
13   is that in addition to your
14   administrative responsibilities?
15         A.     Yes.
16         Q.     How much of your time was
17   devoted to doing clinical compared to all
18   of these other functions that you had as
19   director?
20         A.     I spend maybe out of the ten
21   hours, I spend eight hours clinical.
22         Q.     When you say "overseeing
23   staff," is that the nursing staff or
24   something else?
25         A.     Yes, nursing staff.

L. ALDANA-BERNIER

Q.     In addition to having been the only psychiatric physician employed at the emergency room in October 2009, were there other physicians who had privileges in the emergency room; psychiatric I'm talking about?

A.     Yes.

Q.     And how did that work, what kind of association did other doctors have with the psychiatric emergency room that you are aware of?

A.     We divided in shifts.  One you have that works from four to 12 and one that work from 12 to eight.

Q.     When you say "one that works," since you were the only one employed, what was the title of the people that worked for the other two shifts?

A.     Also psychiatrists.

Q.     Were they employed by Jamaica Hospital?

A.     Yes.

Q.     And that was in October 2009?

A.     Yes.

```
 1              L.  ALDANA-BERNIER
 2         Q.    Let me just clarify:  I thought
 3    you said you were the only psychiatrist
 4    working in the emergency room in October
 5    2009.  Are you saying these other
 6    psychiatrists were residents?
 7         A.    I'm referring to the time you
 8    were asking.  The time I work from eight
 9    to four, I am the only psychiatrist.
10         Q.    So during your shift?
11         A.    During my shift.
12         Q.    In October 2009 who were the
13    other psychiatrists employed by Jamaica
14    Hospital that you are aware of in the
15    emergency room?
16              MR. RADOMISLI:  Objection to
17         form.
18         A.    When you saying other
19    psychiatrists, include the residents?
20         Q.    Let's not talk about residents
21    yet.  The other attendings.
22         A.    Who are the other?
23         Q.    Yes, who are the other
24    physicians that man those other shifts?
25         A.    I will not remember who those
```

Page 26

1          L. ALDANA-BERNIER

2    psychiatrist were.

3              MR. SMITH:  What was the answer?

4              MR. CALLAN:  She doesn't

5        remember.

6              [The requested portion of the

7        record was read.]

8        Q.    And working at Metropolitan,

9    Kings County Hospital, Coney Island

10   Hospital up until your job working with

11   Jamaica Hospital, did you ever encounter

12   patients brought in by police officers to

13   the emergency psychiatric unit?

14       A.    Did I ever encounter?

15       Q.    Yes.

16       A.    In all of the hospitals that I

17   worked?

18       Q.    Yes.

19       A.    Yes.

20       Q.    From October 2009 back into

21   your career, how many times did you

22   encounter patients who had been brought

23   to the psychiatric emergency room by

24   police officers?

25       A.    I will not remember.

Page 27

1              L. ALDANA-BERNIER

2        Q.     Hundreds of people, thousands

3   of people?

4        A.     Not hundreds.

5        Q.     How often in your career have

6   you encountered patients brought to the

7   psychiatric emergency room by police

8   officers?

9        A.     Repeat that question.

10        Q.     Sure.

11              In your career how many times

12   have you encountered patients being

13   brought to the emergency room by police

14   officers?

15        A.     I think I answered you.  I will

16   say I cannot remember.

17        Q.     Can you give me an estimate

18   what kind of number we are talking about:

19   ten times, five times, a hundred times?

20        A.     Well, I will be deceiving you

21   if I told you a number, right?

22        Q.     Can you give your best

23   estimate?

24        A.     Maybe ten.

25        Q.     In those ten or so times,

Page 28

1          L. ALDANA-BERNIER
2    understanding it's an estimate, do you
3    recall any of those patients being
4    brought in in handcuffs?
5        A.    Okay.  How do you want me to
6    answer that?
7        Q.    Yes or no.
8              Do you remember anybody, any of
9    those ten or so people, being brought in
10   in handcuffs?
11       A.    They were -- any time an
12   officer bring a patient, they are in
13   handcuffs.
14       Q.    Every single time that you
15   encountered officers bringing patients to
16   the hospital, they are in handcuffs in
17   your history?
18       A.    When an officer brings a
19   patient to the emergency room, they
20   usually are in handcuffs.
21       Q.    And they are usually under
22   arrest?
23       A.    Not all are under arrest.
24       Q.    When you say "they are not all
25   under arrest," what do you mean?

Page 29

1              L. ALDANA-BERNIER

2      A.    When they bring in a patient

3  very agitated, combative, violent,

4  depending on the nature of their call,

5  I'm sure they were being brought by

6  handcuffs.

7      Q.    And do you recall as you sit

8  here any of names of any of those

9  patients?

10     A.    No.

11     Q.    And do you recall as you sit

12  here a gentleman named Adrian Schoolcraft

13  from only your memory?

14     A.    Hold on.   You're saying from my

15  memory?

16     Q.    Yes.

17     A.    Because I have been reading the

18  chart.

19     Q.    Independent of the records, do

20  you have any memory of Adrian

21  Schoolcraft?

22          MR. CALLAN:  Objection to the

23      form of the question.

24          You can answer.

25     A.    No, I don't.

Page 30

1                    L. ALDANA-BERNIER

2        Q.     Okay.   Can't describe him

3    physically, can you?

4        A.     No.

5        Q.     So am I correct that your

6    entire memory of any care or treatment

7    you may have rendered to Mr. Schoolcraft

8    is contained in the hospital chart of

9    Jamaica Hospital?

10              MR. RADOMISLI:   Objection to

11         form.

12              MR. CALLAN:   I join in the

13         objection.

14              You can answer.

15       A.     From it, yes.

16       Q.     So your memory of care and

17   treatment of Mr. Schoolcraft comes from

18   the notes contained in the hospital chart

19   of Jamaica Hospital, correct?

20       A.     Yes.

21       Q.     And prior to coming here today,

22   did you review any documents?

23       A.     The same, yes.

24       Q.     What did you review?

25       A.     The records [indicating].

Page 31

1                L. ALDANA-BERNIER

2        Q.    When you say "the records,"

3   what records?

4        A.    The hospital records.

5        Q.    Of who?

6        A.    Of Mr. Schoolcraft.

7        Q.    Did you review the entire

8   hospital chart?

9        A.    Not the entire, just go through

10  maybe five pages.

11       Q.    What five pages did you look

12  at?

13       A.    Just going through

14  [indicating].

15       Q.    What was the nature of the

16  things you looked at?

17       A.    I want to the consult, and I

18  went through the notes of the resident.

19       Q.    Your consult and the --

20       A.    The consult of the resident and

21  the notes of the residents when the

22  resident was working in the emergency

23  room.

24       Q.    Your consult and the resident's

25  note in your --

1                    L. ALDANA-BERNIER

2          A.    Not my consult, a consult done

3     by the resident in the medical ER and the

4     notes of the resident when the patient

5     was in our psych unit.

6          Q.    The consult of the resident,

7     was that a psych ER consult?

8          A.    It was a psychiatric consult in

9     the medical ER.

10         Q.    And then you looked at notes

11    from the psych ER?

12         A.    From the psych ER.

13         Q.    Were any of those your notes?

14         A.    The notes of the residence.

15         Q.    Prior to coming here today and

16    since October 2009, have you ever looked

17    at any notes that you made in the chart?

18         A.    No.

19         Q.    So in anticipation of coming

20    here today before you came to this room,

21    did you look at any documents before

22    today?

23         A.    Yes, same notes.

24         Q.    Same notes.

25               In that entire time from

Page 33

1                  L. ALDANA-BERNIER

2     October 2009 up until today, did you have

3     access to the entire Jamaica Hospital

4     chart, at least as you understood it to

5     be?

6          A.    No.

7          Q.    No one showed it to you?

8          A.    No.

9          Q.    Did you ask to review it?

10         A.    Before, but I was stopped.

11         Q.    Who stopped you?

12         A.    The hospital risk management.

13         Q.    So you at some point decided

14    you want to look at the chart, and risk

15    management asked you not to do that?

16         A.    The very, very first time, yes.

17    I don't remember when was that but was

18    risk management.

19         Q.    Was that when you received some

20    type of summons and complaint regarding

21    this lawsuit?

22         A.    Yes.

23         Q.    After that you knew you were

24    coming here to testify, correct,

25    somewhere before today someone told you

Page 34

```
 1              L. ALDANA-BERNIER
 2   have to testify, right?
 3       A.    Yes.
 4       Q.    In fact this is the second time
 5   that you arrived in this room to testify,
 6   correct?
 7       A.    Yes.
 8       Q.    In anticipation of either of
 9   those two times, you never reviewed the
10   chart other than the notes you --
11       A.    You're right.
12       Q.    You never reviewed any chart
13   with your handwriting on it prior to
14   today?
15       A.    My handwriting?
16       Q.    Yes.
17       A.    I saw it.
18       Q.    So you read your handwriting or
19   your notes?
20       A.    Yes.
21       Q.    So now you have told me you
22   have read the consult of a resident,
23   psychiatric resident, in the medical ER
24   and the notes in the psychiatric ER?
25       A.    [Indicating.]
```

Page 35

1           L. ALDANA-BERNIER

2      Q.    And your notes?

3           MR. CALLAN:   Those were her

4      notes, Counsel.   I think that's the

5      confusion.

6           MR. SUCKLE:   I'll clarify.

7      Thank you.

8      A.    Yes.

9      Q.    As your counsel points out, the

10   psych ER notes included your notes?

11     A.    Yes.

12     Q.    Did you make any notes in the

13   chart that you were aware of that were

14   not done in the psych ER?

15     A.    No.

16     Q.    And did you review any other

17   documents in anticipation of coming here

18   to testify?

19     A.    No.

20     Q.    Did you read any transcripts of

21   any testimony prior to today?

22     A.    No.

23     Q.    Did you speak to anybody at

24   Jamaica Hospital regarding preparing for

25   testimony here today?

1            L. ALDANA-BERNIER

2      A.    No.

3      Q.    Have you spoken to anybody at

4  Jamaica Hospital --

5            MR. SUCKLE:  Withdrawn.

6      Q.    Have you spoken to anybody at

7  Jamaica Hospital about your care and

8  treatment of Mr. Schoolcraft?

9      A.    No.

10     Q.    How about anybody else's care

11 and treatment of Mr. Schoolcraft?

12     A.    Who?

13     Q.    Have you ever spoken to anybody

14 at Jamaica Hospital about anybody else's

15 care and treatment of Mr. Schoolcraft?

16     A.    No.

17     Q.    Have you spoken to anybody from

18 the New York City Police Department

19 regarding your care and treatment of Mr.

20 Schoolcraft?

21     A.    No.

22     Q.    And just for the record, what

23 is risk management?  You said you spoke

24 to risk management.  What is that?

25     A.    They are the legal department.

Page 37

1                L. ALDANA-BERNIER

2             MR. SUCKLE:   Mark this 69.

3             [The document was hereby marked

4          as Plaintiff's Exhibit 69 for

5          identification, as of this date.]

6             MR. CALLAN:   I'll show you

7          what's been marked as Plaintiff's

8          Exhibit 69.

9             Counsel from Jamaica Hospital,

10         is that the hospital chart provided to

11         you by Jamaica Hospital for Adrian

12         Schoolcraft?

13            MR. RADOMISLI:   Yes.

14         Q.   I will ask you, do you know

15     what this is?

16         A.   That's our record.

17         Q.   When you say "our record," you

18     mean Jamaica Hospital's record?

19         A.   Jamaica Hospital record.

20         Q.   That record is created as part

21     of the business of Jamaica Hospital,

22     correct?

23         A.   Correct.

24         Q.   It's the business of Jamaica

25     Hospital to make that record?

Page 38

1              L.  ALDANA-BERNIER

2        A.    You're right.

3        Q.    And that record is kept at

4    Jamaica Hospital as part of its regular

5    course of business, correct?

6        A.    Yes.

7        Q.    And entries in this chart were

8    made on or about the dates listed in

9    here?

10       A.    Yes.

11       Q.    Is this the record that you had

12   access to review prior to testifying here

13   today?

14       A.    Yes.

15       Q.    Or a copy of it?

16       A.    Or the copy, yes.

17       Q.    But you did have a chance to

18   review this original record here today

19   prior to testifying?

20       A.    Yes, when I came in here.

21       Q.    Can you tell me from your

22   review of the record before we go through

23   the record, generally what was your role,

24   if at all, was with regard to the care

25   and treatment of Mr. Schoolcraft?

Page 39

1          L. ALDANA-BERNIER

2     A.    What was my role in the care?

3     Q.    Yes.

4     A.    My role was I as soon as I came

5  to the emergency room, I had the

6  responsibility to go and see every

7  patient that was left over under my care

8  and Mr. Schoolcraft was one of them so I

9  had to, like, every other patient go and

10  see him, speak to him, evaluate him.

11     Q.    Evaluate him?

12     A.    Yes.

13          And then I have to read the

14  notes of the initial doctor who was the

15  resident that saw the patient.  I have to

16  assess that note, and make my decision if

17  needed to be admitted.

18     Q.    In your training as a nurse,

19  did you learn about the creation of

20  hospital records?

21     A.    Did I what?

22     Q.    Did you learn about how to make

23  hospital records in your training as a

24  nurse?

25     A.    How to make hospital records?

Page 40

1          L. ALDANA-BERNIER

2      Q.     Yes.

3      A.     Yes.

4      Q.     Did you also learn how to make

5  hospital records during your training as

6  a physician?

7      A.     Yes.

8      Q.     And as a resident, did you

9  learn about how to make hospital records?

10     A.     Yes.

11     Q.     How about Kings County, did you

12  learn there about how to make hospital

13  records?

14     A.     Yes.

15     Q.     And the same for Coney Island

16  Hospital, correct?

17     A.     Yes.

18     Q.     And Jamaica Hospital as well?

19     A.     Yes.

20     Q.     In fact do you know what the

21  purpose of creating a hospital record is?

22     A.     That's to keep a file on the

23  patient.

24     Q.     Is that just to have a file, or

25  is there a medical purpose for creating a

Page 41

1              L. ALDANA-BERNIER
2    hospital record?
3        A.    Yes, a medical purpose for the
4    file to ascertain that the patient was in
5    that place when he was treated.
6        Q.    Just to know whether or know he
7    was physically in the place?
8        A.    It's a medical record of the
9    patient, complete medical record of the
10   patient.
11       Q.    When you say "complete medical
12   record," it's supposed to show the
13   treatment of a patient at a facility?
14       A.    Treatment, treatment plan, and
15   discharge plan.
16       Q.    If there is an evaluation of
17   the patient, the records are required to
18   have details of that evaluation, correct?
19       A.    Yes.
20       Q.    If there is an examination of
21   the patient, it's required to create
22   notes regarding that --
23              MR. CALLAN:   Objection.
24       A.    Yes.
25       Q.    Does good and accepted medical

Page 42

1              L. ALDANA-BERNIER
2    practice require when a physician
3    examines a patient they make a note of
4    that examination?
5         A.    Yes.
6         Q.    Does good and accepted medical
7    practice require when a physician makes
8    an evaluation of the patient, they need
9    to make a note of that evaluation?
10        A.    Yes.
11        Q.    And why do physicians make
12   notes of their examinations of patients
13   in hospital charts?
14        A.    Why do we make notes?
15        Q.    Yes.
16        A.    We have to make notes to make
17   sure that we have seen the patient, that
18   we have assessed what we are supposed to
19   be doing for the patient, and to make
20   sure there is a record that the patient
21   was assessed and evaluated and treated;
22   that's why we do it.
23        Q.    Isn't it also important to note
24   in the records either your examinations
25   or evaluation of a patient so that in the

Page 43

1                L. ALDANA-BERNIER
2    future someone else can read those
3    evaluations and examinations and
4    understand what took place?
5         A.    You're right.
6         Q.    You know in medicine sometimes
7    you are not the last physician to see a
8    patient, correct?
9         A.    That's right.
10        Q.    Especially in a hospital
11   setting?
12        A.    That's correct.
13        Q.    Sometimes you will evaluate or
14   see a patient and other physicians will
15   see a patient and evaluate them, correct?
16        A.    Yes.
17        Q.    And you know that other
18   physicians may want to review what
19   happened in the past, correct?
20        A.    That's correct.
21        Q.    That's one of the reasons for
22   creating a hospital record and notes in
23   the hospital, correct?
24        A.    That's correct.
25        Q.    In fact you testified that you

Page 44

1              L. ALDANA-BERNIER

2     went back and read some previous notes

3     that other physicians made in Mr.

4     Schoolcraft's chart during your care and

5     treatment of him, correct?

6          A.    That's correct.

7          Q.    It's important for you to have

8     notes from other physicians so you know

9     what their evaluations were, correct?

10         A.    That's correct.

11         Q.    Also to know what their

12    examinations were?

13         A.    That's correct.

14         Q.    And to know what they base

15    their examinations and evaluations on,

16    correct?

17         A.    That's correct.

18         Q.    The only way to know that would

19    be to read the chart and see what is

20    written down, correct?

21              MR. RADOMISLI:   Objection to

22         form.

23         A.    That's correct.

24         Q.    When you went and evaluated Mr.

25    Schoolcraft, did you actually speak to

1          L.  ALDANA-BERNIER

2    the residents that had written the notes

3    that you just described?

4        A.    I did not speak to the

5    residents.  I read his notes.

6        Q.    You relied on the records to

7    determine what previously had taken place

8    with Mr. Schoolcraft; is that what you're

9    saying?

10        A.    I read his notes.  I had to go

11    see the patient.

12        Q.    Do you know whether or not any

13    physician reviewed any of your records

14    after you treated Mr. Schoolcraft?

15        A.    I do not know if they reviewed

16    my records.

17        Q.    Do you know if they did?

18        A.    I'm sure they go and read the

19    notes.

20        Q.    When you examine a patient in

21    the psychiatric ER, is that a physical

22    examination, psychiatric examination, or

23    something else?

24            MR. LEE:  Objection to form.

25        A.    Psychiatric evaluation.

Page 46

1          L. ALDANA-BERNIER

2      Q.     Did you in October 2009 or

3   November 2009 have a standard practice

4   how you did a psychiatric examination?

5      A.     Yes, yes.  Evaluate the patient

6   and get the history of present illness

7   and the past history and then you do a

8   mental status exam.

9      Q.     So you do history, past

10  history, and mental status exam?

11     A.     Yes.

12     Q.     And the history is gotten by

13  asking the patient questions?

14     A.     Yes.

15     Q.     And any other way that you get

16  the history?

17     A.     It's just through interaction.

18     Q.     With the patient?

19     A.     With the patient, yes.

20     Q.     So you ask a question, the

21  patient answers, so you get the history?

22     A.     Yes.

23     Q.     How about the past medical

24  history, same thing?

25     A.     Yeah, it's history, present

Page 47

1              L. ALDANA-BERNIER

2      illness, past history, past medical

3      history, and the mental status exam.

4          Q.     Everything but the mental

5      status exam is done by asking the patient

6      questions, getting answers, and writing

7      it down?

8          A.     Yes.

9          Q.     Why did you write those things

10     down?

11         A.     For records so that somebody

12     else when the next doctor comes will be

13     able to read the notes.

14         Q.     What is a mental status exam?

15         A.     A mental status exam is --

16     entails different questions like testing

17     cognitive function.

18         Q.     Conative function?

19         A.     Yes.

20                Testing his abstraction,

21     testing his thought process, testing the

22     thought content whether there is a

23     delusion, there is a hallucination, if he

24     was suicidal or homicidal; also includes

25     visual assessment which is looking at his

1              L. ALDANA-BERNIER
2   appearance and also assessing his speech
3   and assessing his insight and judgment.
4       Q.    This is how you do your mental
5   status exam on all the psychiatric
6   patients --
7       A.    Yes.
8       Q.    You do your own examination,
9   correct?
10      A.    Yes.
11      Q.    Let's go to testing conative
12  functioning, how do you do that?
13      A.    Testing orientation, checking
14  his memory.
15      Q.    And you ask him questions?
16      A.    Yes.
17      Q.    You did a mental status
18  examination on Mr. Schoolcraft, right?
19      A.    Yes.
20      Q.    You asked him questions about
21  his memory, correct?
22      A.    We do that on all our patients.
23      Q.    You did that on Mr.
24  Schoolcraft, correct?
25      A.    We do it on all of our

1              L. ALDANA-BERNIER

2    patients.  I may have done on Mr.

3    Schoolcraft.

4         Q.    Any other things that you do

5    with regard to conative function in your

6    mental status examination?

7         A.    Usually the orientation and the

8    memory.

9         Q.    When you say "orientation,"

10   what do you mean?

11        A.    Asking what date is it today,

12   where are you right now, if he is aware

13   of his surrounding, where he was.

14        Q.    And good and accepted medical

15   practice requires you to perform this

16   mental status examination of his

17   cognitive functioning, correct?

18        A.    That's correct.

19        Q.    And to make a note of your

20   findings, correct?

21        A.    Correct.

22        Q.    And make a note of your

23   examination of his cognitive functioning,

24   correct?

25        A.    That's correct.

1              L. ALDANA-BERNIER

2       Q.    You indicated obstruction

3  [sic], what is that?

4       A.    Trying to test the intellectual

5  capacity by giving problems or decision

6  making if you give a situation.

7       Q.    Did you perform this part of

8  the mental status examination on Mr.

9  Schoolcraft?

10      A.    We do that in all of our

11  patients.  I may have done it

12  [indicating].

13      Q.    So you did it with Mr.

14  Schoolcraft?

15      A.    Yes.

16      Q.    He is one of your patients,

17  correct?

18      A.    Yeah.

19      Q.    And does good and accepted

20  medical practice require you perform this

21  obstruction [sic] test --

22            MR. CALLAN:  Objection.

23            MR. RADOMISLI:  Objection.

24      Q.    -- mental status examination?

25            MR. CALLAN:  Objection to the

Page 51

1              L. ALDANA-BERNIER

2         form of the question.

3              MR. SMITH:  It's abstraction.

4         You said obstruction.  Let's rephrase

5         that.

6         Q.    Does good and accepted medical

7    practice require you to perform this

8    abstraction test?

9         A.    Yes.

10        Q.    And to make notes of your

11   findings during that test?

12        A.    Yes.

13        Q.    Thought process, what is that?

14        A.    Thought process.

15        Q.    You said part of the test was

16   thought process?

17        A.    If he was thinking linear, is

18   he goal directed or is he was over --

19   going [sic] disorganized or loose.

20        Q.    Good and accepted medical

21   practice requires you to perform that

22   examination as part of your mental status

23   examination?

24        A.    Yes.

25        Q.    And you make notes of your

Page 52

1              L. ALDANA-BERNIER

2    findings, correct?

3        A.    Yes.

4        Q.    You talked about whether or not

5    part of the mental status examination is

6    whether or not someone is delusional?

7        A.    Yes.

8        Q.    How do you that?

9        A.    Delusional is false belief.

10       Q.    False belief?

11       A.    That's not in agreement with

12   one's culture.

13       Q.    How do you perform that test?

14       A.    You usually ask them or when

15   the patient comes and say somebody

16   running after me, somebody is chasing me,

17   or there is a conspiracy or plot against

18   me; that is a delusional belief, a false

19   belief.

20       Q.    How do you perform that test?

21       A.    They come and tell you.

22       Q.    You ask them?

23       A.    The patient tells you.

24       Q.    Have a conversation?

25       A.    Yes.

```
 1              L. ALDANA-BERNIER
 2              THE REPORTER:  You have to slow
 3      down.
 4      Q.    And good and accepted medical
 5  practice requires you to make a note of
 6  that conversation, correct?
 7      A.    Yes.
 8      Q.    And to detail what the patient
 9  says, correct?
10      A.    Yes.
11      Q.    For each of your patients,
12  correct?
13      A.    Yes.
14      Q.    And you did that with Mr.
15  Schoolcraft, correct?
16      A.    Yes.
17      Q.    Suicidal tendencies, you said
18  that was part of your mental status
19  examination --
20      A.    Yes.
21      Q.    -- what did you mean?
22      A.    We have to ask them if they
23  were suicidal, contemplating, if they are
24  -- if they have a plan.
25      Q.    And does good and accepted
```

1          L. ALDANA-BERNIER

2    medical practice require you to make a

3    note of their responses to those

4    questions?

5        A.    Yes.

6        Q.    Did you ask Mr. Schoolcraft

7    those questions?

8        A.    Should have been asked.  I'm

9    sure asked.

10        Q.    Should have been asked?

11        A.    We ask for every patient.

12        Q.    So you asked it of Mr.

13    Schoolcraft?

14        A.    Yes.

15        Q.    Did you make a note of his

16    responses?

17            MR. CALLAN:  You can look at the

18        chart.

19            Are you asking from her memory

20        or --

21        Q.    If you recall?

22        A.    I do not recall if I did write

23    it.

24        Q.    But good and accepted medical

25    practice would require you to make a note

Page 55

1                    L. ALDANA-BERNIER

2    of his responses to your questions

3    regarding suicidal tendencies?

4         A.    Yes.

5         Q.    How about homicidal tendencies,

6    how do you test for that?

7         A.    When a patient comes and tell

8    you he's has thoughts of hurting anyone,

9    and then you will ask him if he has a

10   plan, if he has a weapon.

11        Q.    Did you do this test on Mr.

12   Schoolcraft?

13        A.    Yes.

14        Q.    Did Mr. Schoolcraft have a plan

15   or a weapon?

16        A.    I will not remember.

17        Q.    Did you make any notes?  Does

18   good and accepted medical practice

19   require you to make a note of Mr.

20   Schoolcraft's responses to your question

21   regarding homicidal tendencies?

22        A.    I will not remember.

23        Q.    Does good and accepted medical

24   practice require you to make that note --

25        A.    Yes.

1              L. ALDANA-BERNIER

2       Q.     -- regarding Mr. Schoolcraft's

3    response regarding homicidal tendencies?

4       A.     Yes.

5       Q.     And good and accepted medical

6    practice requires you to make a note of

7    both suicidal or homicidal

8    representations that the patient makes to

9    you as a physician, correct?

10      A.     Correct.

11      Q.     For every patient that makes

12   representation about a method by which

13   they were going to perform a suicide or a

14   homicide, you would make a note of that,

15   correct?

16      A.     Correct.

17      Q.     Because good and accepted

18   medical practice would require you to

19   make that note, correct?

20      A.     That's correct.

21      Q.     If there is no such note, the

22   patient didn't say it, correct?

23      A.     That's correct.

24      Q.     If the patient did not express

25   a suicidal tendency, you would not make a

Page 57

```
 1            L. ALDANA-BERNIER
 2  note of that?
 3            MR. CALLAN:  Objection to form.
 4            MR. SUCKLE:  I will rephrase it.
 5       Q.    If the patient did not express
 6  how they were going to perform some type
 7  of homicidal act --
 8            MR. SUCKLE:  I'm withdrawing
 9       that question too.
10       Q.    When a patient expresses a
11  suicidal thought, do you write down the
12  details of that thought in --
13       A.    Yes.
14       Q.    Because good and accepted
15  medical practice requires you to do that,
16  correct?
17       A.    Yes.
18       Q.    And the absence of any note
19  regarding homicidal thought in your
20  records means the patient did not express
21  a homicidal thought, correct?
22       A.    It will say that the patient is
23  not homicidal or they will put a negative
24  sign, a circle.
25       Q.    I'm talking about you in your
```

Page 58

1                    L. ALDANA-BERNIER

2    record.

3         A.      Uh-huh.

4         Q.      When a patient expresses how

5    they intend to commit a homicidal act, do

6    you write down the thought of the patient

7    how they were going to commit the

8    homicidal act?

9         A.      Yes.

10        Q.      When a patient expresses how

11   they are going to commit a suicidal act,

12   do you write down what the patient tells

13   you about how they were going to perform

14   a suicidal act?

15        A.      That's correct.

16        Q.      If there is no note regarding

17   how a patient is going to commit a

18   suicidal act, that means the patient

19   didn't express to you how they were going

20   to commit a suicidal act, correct?

21        A.      Correct.

22        Q.      If there is no note regarding

23   how a patient was planing to commit a

24   homicidal act, that means the patient

25   didn't express to you how they were going

Page 59

1                    L. ALDANA-BERNIER

2    to commit a homicidal act, correct?

3         A.     That's correct.

4         Q.     You have to assess their

5    speech.   How do you do that?

6         A.     Characterize the volume and the

7    pitch:   Is it soft, is it normal.

8         Q.     And again, good and accepted

9    medical practice requires you as a

10   physician while performing this mental

11   status examination to make a note

12   regarding the assessment of speech,

13   correct?

14        A.     That's correct.

15        Q.     Did you have access to Mr.

16   Schoolcraft's entire chart when you first

17   saw him?

18               Did you understand the

19   question.

20        A.     Yes.

21        Q.     Physically, this chart we now

22   have as Exhibit 69 in some form was fully

23   accessible to you in the psychiatric

24   emergency room when you saw Mr.

25   Schoolcraft, correct?

Page 60

1              L. ALDANA-BERNIER

2              MR. CALLAN:  Objection to form.

3              MR. SMITH:  Objection to form.

4              There is a timing issue.

5      Q.    Was Mr. Schoolcraft's medical

6   chart as it existed at the time that you

7   saw him available to you at Jamaica

8   Hospital's emergency room?

9      A.    Yes.

10     Q.    Did you have physically Mr.

11  Schoolcraft's chart in your presence when

12  you evaluated him?

13             MR. CALLAN:  She already said

14      yes to that, Counsel.

15             MR. SMITH:  I don't think she

16      did.

17     Q.    Did you have it in your

18  presence when you evaluated him?

19     A.    I saw it before I saw him.

20     Q.    Where were the charts keep in

21  this psychiatric emergency room at least

22  as it was in November 2009?

23     A.    It's usually in the nursing

24  station.

25     Q.    Are you familiar with the

Page 61

1                    L. ALDANA-BERNIER
2       policies and procedures for Jamaica
3       Hospital with regard to the use of
4       restraints as they existed in 2009?
5            A.    Yes.
6            Q.    What is your understanding of
7       that?
8            A.    A restraint a usually applied
9       on a patient who is a danger to himself
10      or a danger to the other patients or
11      someone is very agitated, aggressive, or
12      violent.
13                 They usually come in soft
14      restraint, four-point restraints usually
15      applied for two hours, and then staff has
16      to go monitor those restraints every 15
17      minutes to make sure there is no
18      impairment of circulation.
19           Q.    You described a type of
20      restraint.  I missed what you said.
21           A.    Soft restraint.
22           Q.    What is a soft restraint?
23           A.    They are not leather.  They
24      were like Velcro, like bandages, so that
25      they wouldn't be very constricting to the

Page 62

1                L. ALDANA-BERNIER

2    hand or the wrist of the patient.

3        Q.    Are those the only type of

4    restraints that Jamaica Hospital used in

5    2009?

6        A.    Yes.

7        Q.    And who makes the decision

8    regarding whether or not restraints are

9    to be applied to a patient?

10       A.    When the doctor is not present,

11   any nursing staff that's there can make a

12   decision if the patient should be

13   restrained.

14            What they do is call the doctor

15   and they will tell the doctor that a

16   patient is going to be restained, and in

17   30 minutes that doctor has to go and

18   check the patient.

19       Q.    When a patient was brought in

20   in handcuffs at Jamaica Hospital in 2009,

21   was there a procedure for assessment as

22   to whether or not that person should be

23   put into hospital restraints or not?

24       A.    Repeat that again.

25       Q.    Sure.

Page 63

1              L. ALDANA-BERNIER

2              When a patient was brought into

3      the hospital, Jamaica Hospital, in

4      handcuffs in 2009, was there a hospital

5      procedure for determining whether or not

6      that patient should be put in the soft

7      restraints that you described?

8         A.    Depends on the case.  If the

9      patient is in handcuffs taken to our

10     emergency room and the patient is

11     agitated or violent and a danger to that

12     community of the ER, then he will have to

13     be restained.  We usually restrain those

14     kind of patients, violent patients.

15        Q.    When a violent patient comes in

16     in handcuffs, they were then placed into

17     the soft restraints, correct?

18        A.    Yes.

19        Q.    Why is that?

20        A.    If they are violent, if we see

21     them as a potential danger, then we have

22     to restrain them.

23        Q.    Are the only appropriate

24     restraints to be used at Jamaica Hospital

25     in 2009 the soft restraints that you have

1           L. ALDANA-BERNIER
2   been describing?
3           MR. RADOMISLI:  Objection to
4       form.
5           MR. CALLAN:  I join the
6       objection.
7       Q.    Does good and accepted medical
8   practice require when a patient was
9   brought in in handcuffs that the hospital
10  replace those handcuffs with soft
11  restraints in 2009?
12          MR. RADOMISLI:  Objection to
13      form.
14      A.    Not all handcuffs are soft
15  restraints.  I'm trying to say if we
16  think they were violent and a danger or
17  if they are going to be destructive, we
18  have to put them in restraints.
19      Q.    When you say not all handcuffed
20  people are put in restraints, are all
21  people that need to be restrained removed
22  from handcuffs and put into soft
23  restraints?
24      A.    If they were violent.
25      Q.    How soon after admission in

Page 65

1           L. ALDANA-BERNIER

2   handcuffs should the patient be put into

3   soft restraints?

4       A.     They go through triage.   If

5   triage assess the patient and they assess

6   that the patient needs to be on

7   restraints because they were violent, as

8   soon as they come into the emergency

9   room, we have to take off the handcuffs

10  and put them on four-point restraints.

11      Q.     Why is that?

12      A.     Because they are dangerous.

13  That's after the assessment.   If we know

14  they are dangerous, we have to put them

15  on restraints.

16      Q.     Am I correct once a patient is

17  brought into Jamaica Hospital in

18  handcuffs and they become a patient of

19  the hospital, physicians are going to

20  make decisions about restraints and the

21  type of restraints to be used, correct?

22      A.     Yes.

23      Q.     Not the police officers,

24  correct?

25      A.     No, they don't have a role.

Page 66

1           L.  ALDANA-BERNIER

2       Q.    When you say "they don't have a

3   role," what do you mean?

4       A.    They don't have a role in

5   deciding if our patient should be

6   restrained or not.

7       Q.    If a patient is handcuff and

8   the hospital wants the handcuffs removed,

9   they should be removed, correct?

10          MR. RADOMISLI:  Objection to

11      form.

12          MR. CALLAN:  Objection to form.

13      A.    The handcuffs?

14      Q.    Yes.

15      A.    If we think they have to --

16  clarify that.  There are many, many -- go

17  ahead.  Can you clarify it?

18          MR. SUCKLE:  We will move onto

19      something else.

20      Q.    Did you have any role in

21  writing any written rules or regulations

22  with regards to restraints at Jamaica

23  Hospital?

24      A.    Do I have a role -- I may have

25  sit in in one of those sessions, yes.

1               L. ALDANA-BERNIER

2        Q.     As a medical provider, your

3    concern is for the patient's health,

4    correct?

5        A.     Yes.

6        Q.     Did you in reviewing the chart

7    -- how many times did you actually speak

8    to Mr. Schoolcraft?

9        A.     I speak to him once when I came

10   in.

11              MR. SMITH:   I'm sorry, what?

12              THE WITNESS:   When I came in.

13       Q.     When you say when you came in,

14   when your shift started?

15       A.     Yes.

16       Q.     It's your understanding Mr.

17   Schoolcraft was already in the hospital

18   when your shift started?

19       A.     Yes.

20       Q.     Do you know how many other

21   patients were under your care when you

22   first started that shift at the

23   psychiatric emergency room besides Mr.

24   Schoolcraft?

25       A.     I do not know.   2009 we usually

Page 68

1          L. ALDANA-BERNIER

2    have a 13-bed capacity.  It's always full

3    so I wouldn't know how many patients were

4    there.

5              MR. SMITH:  Did she say 30 beds?

6              THE WITNESS:  Thirteen.

7        Q.    Am I correct that the first

8    time that you encountered Mr. Schoolcraft

9    he was in the psychiatric emergency room,

10   correct?

11       A.    That's correct.

12       Q.    I will show you what's been

13   marked Plaintiff's Exhibit 69 for today's

14   date.  I will ask you, can you turn to

15   the first entry that you made in this

16   chart.

17             [Witness complying.]

18       A.    [Indicating.]

19       Q.    And you pulled out a note, what

20   is the date of that note?

21       A.    That was on November 2nd, 2009,

22   three o'clock in the morning.

23       Q.    Do you know what your shift was

24   that day?

25       A.    My shift was from eight to

Page 69

```
 1           L. ALDANA-BERNIER
 2   four.
 3       Q.    And are you familiar with the
 4   any laws or rules regarding patients
 5   being held in psychiatric emergency rooms
 6   or hospital against their will?
 7           MR. RADOMISLI:  Objection to
 8       form.  Can I just see that?
 9           MR. CALLAN:  [Handing.]
10       A.    Clarify that.
11           MR. SMITH:  Can I see that too?
12           MR. CALLAN:  Let's get the notes
13       straightened out.
14       Q.    Just as a clarification, you
15   said you made this note at three a.m.?
16       A.    That's p.m.
17       Q.    When did your shift start?
18       A.    From eight to four.
19           MR. SMITH:  A.m. or p.m.?
20       Q.    8 a.m. to 4 p.m.?
21       A.    Yes.
22       Q.    Are you familiar with any rules
23   in the Mental Hygiene Law for admitting
24   patients against their will?
25       A.    Yes, the involuntary admission.
```

Page 70

1          L. ALDANA-BERNIER
2              MR. SUCKLE:  Let me put a thing
3      there so you don't lose it.
4              MR. LEE:  I didn't hear anything
5      you just said.
6              MR. CALLAN:  His said he's
7      putting a marker in the chart so she
8      doesn't lose her place.
9      Q.     What do you know of that law?
10     A.      That is where two doctors will
11  commit the patient, or we have the 9.39
12  which is the emergency admission.
13     Q.     What was the first one?
14     A.      Involuntary, that would be the
15  9.27, and emergency admission is the
16  9.39.
17     Q.     What is 9.27, what does that
18  mean?
19     A.      Involuntary admission.
20     Q.     That's somebody going to be
21  involuntarily admitted for how long?
22     A.      After 48 hours, that depends if
23  the patient is not better, they can be
24  kept until six months.
25     Q.     So 9.39 of the Mental Hygiene

Page 71

1                L. ALDANA-BERNIER

2    Law, what is that?

3         A.    Emergency admission to the

4    hospital which is also involuntary.

5         Q.    In order for a patient to be

6    involuntarily admitted to a hospital, are

7    you familiar with the procedure that must

8    take place?

9         A.    Yes.

10        Q.    Did you learn about this in

11   your training at Jamaica Hospital?

12        A.    At Metropolitan Hospital.

13        Q.    And you have been familiar with

14   that since your training at Metropolitan

15   Hospital?

16        A.    Yeah.

17        Q.    Have you ever had to use that

18   involuntary -- that 9.39 of the Mental

19   Hygiene Law to admit a patient?

20        A.    Yes.

21        Q.    How many times have you done

22   that in your career?

23        A.    Many times.

24        Q.    When you say "many," give me an

25   idea how many is many?

1                L. ALDANA-BERNIER

2       A.     At that time I used to see

3  3,000 patients a year, most likely 2,000

4  patients.  I'm giving you a....

5                MR. SMITH:  Can you read that

6       back.

7                [The requested portion of the

8       record was read.]

9       A.     An approximation.

10      Q.     Is that 2,000 patient a year?

11      A.     Two thousand patients a year.

12      Q.     You used Section 9.39 of Mental

13  Hygiene Law to admit patients against

14  their will 2,000 times in the year 2009,

15  correct?

16      A.     Most likely, yes.

17      Q.     The 2,000 per year, has that

18  basically been about how many you have

19  admitted per year while you work at

20  Jamaica Hospital to date?

21      A.     Cannot recall.  It's hard to

22  say.

23      Q.     This is a regular occurrence in

24  your practice?

25                MR. CALLAN:  Objection to the

Page 73

1                    L. ALDANA-BERNIER

2        form of the question.

3        Q.    Do you understand my question?

4        A.    [No response.]

5        Q.    Do you understand my question?

6        A.    Say it again.

7        Q.    Sure.

8              Admitting a patient pursuant to

9    9.39 of the Mental Hygiene Law is a

10   regular part of your practice, correct?

11       A.    Yes, when I was in the

12   emergency room.

13       Q.    And does your understanding of

14   9.39 of the Mental Hygiene Law, does that

15   apply to any admission at Jamaica

16   Hospital or just the psychiatric

17   emergency room?

18       A.    Just the psychiatric emergency

19   room.

20       Q.    So a patient can be held

21   against their will in the

22   medical emergency --

23             MR. RADOMISLI:  Objection to

24       form.

25             MR. LEE:  Objection to form.

Page 74

1          L. ALDANA-BERNIER

2              MR. CALLAN:   I join in the

3      objection.

4      Q.    Without complying with 9.39 --

5              MR. CALLAN:   Objection.

6      Q.    Is that your understanding?

7      A.    I could admit them

8  involuntarily, yes.

9      Q.    So a patient can be admitted

10  pursuant to 9.39 of the Mental Hygiene

11  Law in the medical emergency room,

12  correct?

13      A.    In the medical emergency room?

14              MR. CALLAN:   Objection to the

15      form of the question.

16      Q.    Yes.

17              MR. CALLAN:   You can answer.

18              THE WITNESS:   I can answer?

19              MR. CALLAN:   Yes.

20      A.    If the patient is in the

21  medical ER and we know that the patient

22  needs to be transferred to the

23  psychiatric ER, then we have to move them

24  from the medical ER to the psychiatric

25  ER.

Page 75

1                L. ALDANA-BERNIER

2       Q.      If someone is in the medical

3    emergency room --

4       A.      Yes.

5       Q.      -- are they free to leave?

6       A.      From the medical ER?

7       Q.      Yeah.

8       A.      But that depends, yes.

9               If the medical doctor calls for

10   an evaluation or assessment for a

11   psychiatric patient, if the psychiatric

12   doctor deems the patient -- that the

13   patient needs to be transferred to the

14   psychiatric ER, they were not free to

15   leave.  They have to come to the

16   psychiatric ER.

17      Q.      So it's your understanding a

18   patient in the medical ER can be held

19   until transferred to the psych ER for the

20   purposes of then being evaluated at some

21   point in the psych ER under Section 9.39

22   of the Mental Hygiene Law; is that your

23   understanding?

24              MR. LEE:   Objection to form.

25              MR. RADOMISLI:   Objection.

Page 76

1              L. ALDANA-BERNIER

2                   MR. CALLAN:   Same objection.

3        A.      A psychiatrist will go to the

4    medical ER, he will assess the patient.

5    He already assessed and evaluated.   The

6    psychiatrist will say once medically

7    cleared, transfer the patient to the

8    psych ER.  So then the patient will be in

9    the psych ER.

10       Q.      When a patient is in the

11   medical ER --

12       A.      Yes.

13       Q.      -- and they want to go home,

14   can they go home?

15       A.      It depends.  If a medical

16   issue, yes.  If medically cleared they

17   want to go home, they go home.

18               If a psychiatric issue and the

19   psychiatrist will say send to the psych

20   ER, then cannot go home.  They have to

21   come to the psych ER for further

22   stabilization or further assessment.

23       Q.      Under what standard or law,

24   rule or regulation can a person be held,

25   to your understanding, in the medical

Page 77

1           L. ALDANA-BERNIER

2    emergency room pending transfer to the

3    psych emergency room?

4        A.    If you are referring to that,

5    there is no 9.39 or 9.27 or 9.13.

6              If we know that the patient

7    needs to come to psychiatry, we have to

8    transfer the patient to psychiatry.

9        Q.    Am I correct that the only way

10   a hospital can hold a patient based upon

11   a psychiatric problem is under 9.39 if

12   that patient wants to go home?

13             MR. LEE:  Objection to form.

14             MR. CALLAN:  Objection to form.

15             MR. RADOMISLI:  Objection to

16       form.

17       A.    Rephrase your question.

18       Q.    Sure.  I will rephrase it.

19             You say when a person is in the

20   medical emergency room, they can be held.

21   What does that mean?

22       A.    If let's say the medical doctor

23   will ask for a consult, he needs a psych

24   consult because let's say that patient is

25   behaving bizarre or may be agitated in

Page 78

1              L. ALDANA-BERNIER

2    the ER or if they have a past history of

3    psychiatric illness, then that doctor

4    will call for a psychiatrist to come and

5    see the patient.

6              If the psychiatrist thinks that

7    the patient needs to be transferred to

8    the psychiatric department, then we can

9    hold the patient and transfer that

10   patient to the psychiatric unit.

11        Q.   Under what regulation, rule, or

12   standard can you hold the patient that

13   you're aware of that you just described?

14        A.   There is no 9.39, it's the

15   decision of the psychiatrist to transfer.

16   That's the medical ER.  Usually, in the

17   medical ER you cannot handle the patient

18   that has all of these symptoms that I was

19   talking about:  bizarre behavior,

20   violent, unpredictable, delusional.

21             They can't handled those types

22   of patients.  They tend to transfer that

23   patient to the psychiatric unit for

24   further stabilization of the psychiatric

25   problem.

Page 79

1                    L. ALDANA-BERNIER

2          Q.    I'm going to ask my question

3     again.  Maybe I'm not being clear.

4                 Under what rules, standard, or

5     law can a patient be held in a medical

6     emergency room pending transfer to the

7     psychiatric emergency room for evaluation

8     of the Mental Hygiene Law 9.39, if you

9     are aware of any?

10         A.    I'm not aware of any.

11         Q.    Am I correct that Section 9.39

12    of the Mental Hygiene Law as you

13    understand it must be complied with in

14    order to hold a patient for psychiatric

15    reasons against their will?

16                MR. LEE:  Objection to form.

17         A.    That is for when you admit the

18    patient?

19         Q.    Yes.

20         A.    9.39.

21         Q.    That's your understanding?

22         A.    Yes, that's against the rule,

23    yes.

24         Q.    What is required by Section

25    9.39 of the Mental Hygiene Law as you

1          L. ALDANA-BERNIER

2    understand it in order to admit a patient

3    against their will under that section?

4          A.    If we know that the patient

5    need admission because they are a danger

6    to themselves or a danger to society; if

7    they are psychotic and not able to take

8    care of themselves; if they were

9    depressed; if they were suicidal, then we

10   make that decision that the patient needs

11   to be admitted even if it's against their

12   will.

13         Q.    This assessment that you just

14   said has to be made, is that the kind of

15   assessment we talked about earlier:   the

16   mental status examination?

17         A.    Yes.   Yes.

18         Q.    And when a person is depressed,

19   when you say they could be held, what do

20   you mean?

21         A.    They could be held?

22         Q.    Yeah, because they are

23   depressed?

24         A.    When they were depressed and

25   not able to take care of themselves, then

1              L. ALDANA-BERNIER

2    that would be considered also a danger to

3    themselves because they were depressed.

4    They are not functioning, not eating.

5    They could be suicidal.  They were not

6    maybe functioning, to bare minimum.  They

7    are not sleeping, not eating.  This is

8    also considered a danger to themselves so

9    they have to be admitted.

10        Q.    Are there certain procedures

11   that must be followed in order to comply

12   with 9.39 as you understand it?

13        A.    Patient not able to take care

14   of themselves then we are supposed to

15   admit these patients.

16        Q.    As a physician are there

17   certain things that you are supposed to

18   do in order to comply with Section 9.39

19   of the Mental Hygiene Law as you

20   understand it?

21        A.    Yes, I have to admit this

22   patient.  They are depressed.

23        Q.    That's all you have to do is

24   admit them?

25        A.    I have to admit them, observe

Page 82

1              L. ALDANA-BERNIER

2    them, stabilize them, medicate them.

3         Q.    Anything else that you have to

4    do?

5         A.    Anything else.  I have to

6    stabilize, medicate.  I have to admit.  I

7    have to obtain information from previous

8    records.

9         Q.    What kind of previous records,

10   you mean the hospital records?

11        A.    Yes.  If they have a

12   psychiatrist, I have to call them.

13        Q.    If they have a psychiatrist,

14   you have to call them?

15        A.    If they have a psychiatrist,

16   yes.

17        Q.    What about any other doctor, do

18   you have to call those doctors?

19        A.    Only the psychiatrist.

20              If they say they want us to

21   call their medical doctor, yes, we call

22   their medical doctor.

23        Q.    Did you have to fill out any

24   form?

25        A.    Yes, release of information,

Page 83

1          L. ALDANA-BERNIER

2    yes.

3       Q.    In order to comply with Section

4    9.39 of the Mental Hygiene Law, you have

5    to fill out a release of information

6    form?

7       A.    I have to go back.  I'm sorry.

8             In the emergency room, we do

9    not get release of information, only in

10   the inpatient unit.

11      Q.    Did you ever fill out any form

12   in order to comply with Section 9.39 of

13   the Mental Hygiene Law, as you understand

14   it?

15      A.    Just those forms, the 9.39

16   form.

17      Q.    What are those forms for?

18      A.    Those are legal forms.

19      Q.    What is the purpose of those

20   legal forms, do you know, as you

21   understand it?

22      A.    The purpose of those legal

23   forms is just for the reason that you

24   think:  if the patient is a danger to

25   himself and that he needs to be

1              L. ALDANA-BERNIER

2    stabilized in a hospital.

3        Q.    It's for your own benefit?

4        A.    No.

5              MR. CALLAN:  Objection to form.

6        You're recharacterizing her answers.

7              MR. SUCKLE:  I'm asking.

8        A.    It's not for my benefit.

9        Q.    Whose benefit is it for?

10       A.    For the benefit of the whole

11   society as well as the patient and whole

12   society.

13       Q.    Is it important to be accurate

14   in your recordkeeping in a hospital

15   chart?

16       A.    Repeat the question.

17       Q.    Is it important to be accurate

18   in your recordkeeping and note keeping in

19   a hospital chart?

20       A.    Yes.

21       Q.    As a physician?

22       A.    Yes.

23       Q.    Why?

24       A.    It's for the sake of patient.

25             MR. SUCKLE:  Do you need to take

Page 85

1           L.  ALDANA-BERNIER

2      a break?

3             THE  REPORTER:   No.

4             MR.  SMITH:   Let's take a break.

5             We are going off the record at

6      11:51.

7             [Discussion held off the

8      record.]

9             [Whereupon, at 11:51 a.m., a

10     recess was taken.]

11            [Whereupon, at 12:13 p.m., the

12     testimony continued.]

13            MR.  SMITH:   Back on the record

14     12:13.

15     Q.    Doctor, you had indicated to us

16 your first note in the chart was November

17 2nd, 2009, at 3:10 p.m.

18            And do you know whether or not

19 the patient had been evaluated from a

20 psychiatric prospective at any time prior

21 to your note?

22     A.    You're asking me if --

23     Q.    I'm asking do you know whether

24 or not the patient had to be evaluated

25 from a psychiatric prospective at any

1          L. ALDANA-BERNIER

2     time prior to November 2, 2009, at any

3     time before you made your note?

4          A.     Yes.

5          Q.     Did you review the chart of Mr.

6     Schoolcraft prior to seeing him on

7     November 2nd, 2009, at 3:10 p.m.?

8          A.     Yes.

9          Q.     Why did you do that?

10         A.     To be able to know the patient

11    and see what's going on and get

12    information about the patient.

13         Q.     And when for the first time did

14    anybody do any kind of psychiatric

15    examination or assessment of Mr.

16    Schoolcraft in Jamaica Hospital that

17    you're aware of?

18         A.     That is when he was in the

19    medical ER.

20         Q.     And did you see a note of that

21    evaluation?

22         A.     Yes, it's here [indicating].

23         Q.     What is the date and time of

24    that note?

25         A.     It's 11/1/2009 at 6:30 in the

1              L. ALDANA-BERNIER

2    morning.

3              MR. LEE:  At what time?

4              THE REPORTER:  6:30 in the

5         morning.

6              MR. SUCKLE:  Just give me a

7         second.

8              MR. SMITH:  Did you see 11/1?

9              THE WITNESS:  Yes, 11/1/2009 at

10        6:30 in the morning.

11        Q.    And this is a note by who?

12        A.    Dr. Lewin.

13        Q.    Spell that?

14        A.    L-E-W-I-N.

15        Q.    It says 1 of 3 on top, correct?

16        A.    Yes.

17        Q.    It's a three-page note,

18   correct?

19        A.    Yes.

20        Q.    And it ends and the three pages

21   end with a note on 11/1/09 at 6:30 a.m.,

22   correct?

23        A.    Yes.

24        Q.    This is called a "Consultation

25   Form."  What is that?

Page 88

1              L. ALDANA-BERNIER

2      A.     When the doctor calls for a

3   consult, this is the form that we use to

4   write our notes.

5      Q.     What was the purpose of having

6   Mr. Schoolcraft evaluated, if you recall,

7   from your review of the chart?

8      A.     Okay.  It said in here that a

9   psych consult was called and reported as

10  patient was acting bizarre.

11     Q.     Did you read this note prior to

12  your evaluation of the patient?

13     A.     Yes.

14     Q.     Is this one of notes that you

15  read prior to coming here to testify in

16  preparation for your testimony today?

17     A.     Yes.

18     Q.     And were you able to read the

19  note, the handwriting, when you read

20  it --

21     A.     Yes.

22     Q.     -- back in 2009?

23     A.     Yes.

24     Q.     Have you seen Dr. Lewin's

25  handwriting before?

Page 89

1              L. ALDANA-BERNIER

2       A.    Yes.

3       Q.    And you had become familiar

4   with it?

5       A.    Yes.

6       Q.    And if you go to the second

7   page of that note, did you see from that

8   note there had been no prior psychiatric

9   history?

10      A.    It says in here, "Denied past

11  psych hospitalization or treatment."

12      Q.    Or suicidal attempt?

13      A.    Yes.

14      Q.    And after this note was

15  written, was Mr. Schoolcraft free to go

16  home?

17      A.    After this note was written,

18  she had recommendations.

19      Q.    I know.  But my question was:

20  Was Mr. Schoolcraft free to go home after

21  that note was written?

22      A.    No.

23      Q.    When you say "no," why not?

24      A.    Because then that was her

25  recommendation he needed one-to-one

Page 90

1              L. ALDANA-BERNIER

2    observation for unpredictable behavior

3    and escape risk.

4         Q.    What was he escaping from, what

5    was the escape risk from?

6         A.    He might run out of the

7    emergency room because it's unlocked

8    door.

9         Q.    He needed to be held because he

10   was an escape risk?

11        A.    He needed to be observed more.

12        Q.    He needed to be observed more?

13        A.    One-to-one, yes.

14        Q.    Did you also read in the note

15   on the second page, the last line on the

16   second page where the note reads, "He

17   denies suicidal ideations."  Do you see

18   that?

19        A.    Yes.

20        Q.    And "He denies homicidal

21   ideations."

22        A.    Yes.

23        Q.    Do you have any reason when you

24   read that note to believe that wasn't

25   true?

1      L. ALDANA-BERNIER

2          MR. LEE:  Objection to form.

3      A.    But you are missing the point

4   in there when he is paranoid about his

5   supervisors.

6      Q.    I asked you whether you had any

7   reason to believe he was not suicidal and

8   not homicidal?

9      A.    I think I need to know further

10  if he was suicidal or homicidal.  At that

11  point in time, I need to assess suicidal

12  or homicidal.

13     Q.    You didn't have enough

14  information by just reading suicidal or

15  homicidal, correct, you needed more

16  information, correct?

17     A.    Yes, it's saying here he was

18  paranoid about his supervisors.

19         MR. CALLAN:  Objection to form.

20     Q.    So he was being held because he

21  was paranoid?

22     A.    Not only that.  He became

23  agitated, uncooperative, verbally abusive

24  while he was in the medical ER so we have

25  to find out why there is agitation, why

1          L. ALDANA-BERNIER

2   is was behaving bizarre.

3      Q.    Just so I understand.  He is

4   been held because he is agitated?

5      A.    Yes.

6          MR. CALLAN:  Wait for the

7      question.

8      Q.    He was being held because you

9   want to know more about him, correct?

10         MR. CALLAN:  Objection to form

11     of the question.

12     Q.    Is that correct?

13         MR. CALLAN:  That question

14     doesn't make any sense.  You are

15     talking about --

16         MR. SUCKLE:  You have your

17     objection.

18     Q.    Is that your understanding of

19  the note?

20     A.    There was more to that.  The

21  patient was behaving bizarre.

22     Q.    What action was he taking that

23  was bizarre?

24     A.    According to the note, when

25  they went to his house, the patient

Page 93

```
 1              L. ALDANA-BERNIER
 2   barricaded himself and he will not open
 3   the door so they had to break into his
 4   apartment.
 5        Q.    Is it your understanding under
 6   9.39 of the Mental Hygiene Law, someone
 7   can be held because they are acting
 8   bizarre?
 9              MR. CALLAN:  Objection to form.
10              MR. LEE:  Objection to form.
11        Q.    Is that your understanding?
12        A.    That's my -- he can be bizarre
13   and he can be psychotic.
14        Q.    The question was:  Is it your
15   understanding of 9.39 of the Mental
16   Hygiene Law that a patient could be held
17   because they're acting bizarre?
18              MR. LEE:  Objection to form.
19        A.    He can be a danger to himself.
20        Q.    You have to answer my question.
21              Can a patient be held under
22   Section 9.39 of the Mental Hygiene Law
23   because they are acting bizarre?
24        A.    Yes.
25        Q.    Can they be held under Mental
```

Page 94

1              L. ALDANA-BERNIER

2     Hygiene Law 9.39, as you understand it,

3     because they are agitated?

4          A.    Yes.

5          Q.    That's your understanding of

6     the law?

7                MR. CALLAN:   Objection to the

8          form of the question.

9          Q.    Correct?

10         A.    [No response.]

11         Q.    Am I correct that's your

12    understanding?

13         A.    My understanding, yes.

14         Q.    So a good and accepted medical

15    practice as you understand it allowed to

16    make a hospital to hold Mr. Schoolcraft

17    on November 1, 2009, 'cause he was acting

18    bizarre, correct?

19                MR. CALLAN:   Objection to form.

20                MR. LEE:   Objection to the form.

21         Q.    Correct?

22         A.    It's not only the behaving

23    bizarre.   It's the whole picture that was

24    going on at the time.   From the --

25         Q.    Did you see anything in this

Page 95

1              L. ALDANA-BERNIER

2    note that Mr. Schoolcraft was exhibiting

3    a threat to another person?

4         A.    Not a threat to another person.

5         Q.    Did you see anywhere in here

6    that he was suicidal?

7         A.    He is not suicidal.

8         Q.    Did you see anywhere in here

9    that he was going to harm himself in any

10   way?

11        A.    That I have to question if he

12   was going to hurt himself or if he was a

13   danger to himself because if I have

14   somebody in the emergency room, you have

15   a report that he was behaving bizarre or

16   he was agitated, and if I look at the

17   whole picture from the time that he was

18   taken away from his home where he was --

19   he barricaded himself, then I have to

20   consider him to be held against his will.

21        Q.    Did you see anything in this

22   record that Mr. Schoolcraft indicated to

23   the consulting physician that he was

24   going to harm himself?

25        A.    He said in here that he denied

Page 96

1                    L. ALDANA-BERNIER

2      that he was going to hurt himself.  There

3      is nothing that he was going to hurt

4      himself.

5           Q.    Or hurt anybody else, correct?

6           A.    Nope.

7           Q.    Do you know the physician, the

8      psychiatric resident, that signed that

9      note?

10          A.    That is Dr. Lewin.  The

11     resident was Dr. Lewin, and the attending

12     Dr. Patel.

13          Q.    On the last page of that note,

14     it's a three-page note, is there a stamp

15     there for the resident?

16          A.    Yes.

17          Q.    So Dr. Lewin was a resident?

18          A.    Yes.

19          Q.    And did Dr. Lewin provide any

20     notice to Mr. Schoolcraft under 9.39 of

21     the Mental Hygiene Law?

22                MR. RADOMISLI:  Objection.

23          A.    I would not remember that.

24          Q.    Did Dr. Lewin, from your review

25     of the records, produce any forms, signed

1            L. ALDANA-BERNIER

2   any form, under 9.39 of the Mental

3   Hygiene Law in order to admit Mr.

4   Schoolcraft against his will?

5            MR. RADOMISLI:  Objection.

6      Q.    Did you see any form?

7            MR. RADOMISLI:  Objection.

8            MR. CALLAN:  Objection.

9      Q.    Did he fill out any such form?

10           MR. CALLAN:  She is supposed to

11      get into his mind and know what he

12      did?

13           MR. SUCKLE:  Forms, forms, did

14      you see any forms.

15           MR. CALLAN:  Did you see any

16      forms, that's fine.

17           Go right ahead.

18      A.    No.

19      Q.    Is there anything in the file

20   that suggests that Dr. Lewin actually

21   filled out any form with regard to 9.39

22   of the Mental Hygiene Law?

23           MR. RADOMISLI:  Objection.

24      Q.    Anything to suggest that?

25           MR. RADOMISLI:  Objection.

Page 98

```
 1            L. ALDANA-BERNIER
 2      Q.     From your prospective?
 3            MR. RADOMISLI:  Objection.
 4            MR. SUCKLE:  I heard it.
 5            MR. RADOMISLI:  I strenuously
 6      object.
 7            MR. SUCKLE:  I heard your
 8      strenuous objection.
 9            MR. CALLAN:  Do you want her to
10      look through the entire record?
11      A.     There are no forms.
12      Q.     Did Dr. Lewin, do you see
13   anything to suggest that Dr. Lewin then
14   ensured within 48 hours that another
15   physician evaluated Mr. Schoolcraft?
16            MR. RADOMISLI:  Objection.
17            MR. CALLAN:  Objection.
18      Q.     Does it say anything in there?
19      A.     She indicated in here he needs
20   to be transferred to the psych ER.
21      Q.     And after Dr. Lewin, there is
22   another signature.  Do you know who that
23   is?  Did I ask you that already?
24            In the note of November 1, that
25   Dr. Lewin wrote, underneath his signature
```

Page 99

```
 1              L. ALDANA-BERNIER
 2   is another signature.  Do you know whose
 3   signature that is?
 4        A.     That is Dr. Patel.
 5        Q.     Did Dr. Patel fill out any form
 6   that you are aware of in order to comply
 7   with 9.39 of the Mental Hygiene Law?
 8              MR. LEE:  Objection to form.
 9              MR. RADOMISLI:  Objection.
10              MR. CALLAN:  Same objection.
11        Q.     No?
12        A.     There is no form in here.
13        Q.     There is no form in the record,
14   correct?
15        A.     None.
16        Q.     Did you read Dr. Patel's note
17   at the end there where he signed?
18        A.     "I concur with above doctor's
19   treatment recommendations."
20        Q.     What is psychotic disorder,
21   what is that?
22        A.     Psychotic disorder is one of
23   the categories of diagnosis wherein
24   patient is not in touch with reality.
25              He can have the following
```

1              L. ALDANA-BERNIER

2   symptoms, like, agitation, aggressive

3   behavior, delusions, hallucinations,

4   impairment in reality testing.

5       Q.    That's a pretty broad category,

6   correct?

7       A.    Yes.

8       Q.    What does Axis I stand for?

9       A.    Those are our DSM categories

10  when we are diagnosing patients.

11            Axis I is for psychotic

12  disorders or mental health disorders.

13  Axis II would be our personality

14  disorder.  Axis III is the medical

15  disorder.  Axis IV is the social

16  stressor.  And Axis V is the global

17  functioning.

18      Q.    So when you read that note, you

19  learned that there was some social

20  stressors; being, a conflict at the

21  worksite for Mr. Schoolcraft, correct?

22      A.    That's correct.

23      Q.    Do you know what the nature of

24  a that conflict was?

25      A.    Something -- a conflict between