1           L. ALDANA-BERNIER

2    his supervisor and himself.

3        Q.    Am I correct that up until this

4    note that nobody at Jamaica Hospital had

5    attempted to admit Mr. Schoolcraft under

6    9.39 of the Mental Hygiene Law, correct?

7              MR. CALLAN:  Objection to the

8         form of the question.

9              MR. LEE:  Likewise.

10       A.    Can you say that again?

11       Q.    Prior to this note of November

12   1, 2009, at 6:30 a.m. and from your

13   review of the records, nobody at Jamaica

14   Hospital had attempted to admit Mr.

15   Schoolcraft under 9.39 of the Mental

16   Hygiene Law up to that point, correct?

17             MR. RADOMISLI:  Objection to

18        form.

19             MR. CALLAN:  Same objection.

20             MR. LEE:  Me too.

21             MR. RADOMISLI:  Can you rephrase

22        the question?

23             MR. SUCKLE:  I think it's

24        perfectly fine.

25             MR. RADOMISLI:  You can say

Page 102

1                L. ALDANA-BERNIER
2       prior to.
3                MR. SUCKLE:  I think I just did.
4                MR. RADOMISLI:  No.  You're
5       referring to your note.  You're
6       characterizing the note in a certain
7       way.
8       Q.    Prior to 6:30 on November 1,
9    2009, had anyone at Jamaica Hospital
10   attempted to admit Mr. Schoolcraft
11   pursuant to Section 9.39 of the Mental
12   Hygiene Law?
13               MR. CALLAN:  Objection.  How
14      would she know five years before it
15      happened?  Are you talking about the
16      records she has in front of her?
17      Q.    From your review of the
18   records?
19               MR. CALLAN:  Which record?
20               MR. SMITH:  The record should
21      reflect, the Witness has the entire --
22               MR. SUCKLE:  We've already done
23      this, Counsel.  It's on the record
24      she's reading from Exhibit 69.
25               MR. CALLAN:  You can specify

Page 103

1         L. ALDANA-BERNIER

2      that.

3            MR. SUCKLE:  We were talking

4      about it and she's testified to it.

5            MR. CALLAN:  Just because we

6      were talking about it does not mean

7      that is what a specific question is

8      referring to.

9            MR. SUCKLE:  Every question has

10     been asked about the record she has in

11     front of her.  If you think there is a

12     problem here, we will be asking it

13     that way every time.

14           MR. CALLAN:  There is a way to

15     correctly ask the question.  I'm just

16     asking that you answer it correctly.

17           You can answer if he is talking

18     about this record.

19           MR. SUCKLE:  Of course.

20     Q.    In your review of the record

21     that you have sitting in front of you,

22     has anybody at Jamaica Hospital ever

23     during this admission tried to admit Mr.

24     Schoolcraft pursuant to Section 9.39 of

25     the Mental Hygiene Law?

Page 104

1                L. ALDANA-BERNIER

2        A.      Referring to this admission?

3        Q.      Yes.

4        A.      She want the patient

5    transferred to the psych ER.  That is an

6    admission to the psych ER.

7        Q.      The question is:  Did anybody

8    try to admit Mr. Schoolcraft pursuant to

9    Section 9.39 of the Mental Hygiene Law

10   prior to 6:30 in the morning from your

11   review of Mr. Schoolcraft's chart?

12       A.      This alone is admission to the

13   psych ER, transfer to the psych ER after

14   medical clearance.  From there she

15   admitted the patient to the psych ER.

16       Q.      The question was "did they

17   invoke Section 9.39 of the Mental Hygiene

18   Law at any time prior to 6:30 in the

19   morning?

20           MR. CALLAN:  Objection to the

21       form of the question.

22           MR. RADOMISLI:  Objection to the

23       form.

24       Q.      Did anybody try to admit Mr.

25   Schoolcraft pursuant to 9.39 of the

Page 105

1                    L. ALDANA-BERNIER
2    Mental Hygiene Law prior to 6:30 in the
3    morning at Jamaica Hospital based on your
4    view of the Jamaica Hospital chart you
5    have in front of you?
6         A.    Once they transferred to the
7    psych ER, that patient is admitted to the
8    psych emergency room.
9         Q.    Is every patient admitted to
10   the psych emergency room admitted
11   pursuant to Section 9.39?
12        A.    To the emergency room, yes.
13        Q.    So every patient that goes to
14   the psych emergency room is admitted from
15   your understanding pursuant to 9.39 of
16   the Mental Hygiene Law?
17        A.    I think you are using that 9.39
18   in the wrong way.  9.39 is when a patient
19   is admitted to inpatient unit.  When the
20   patient is a transferred to psych ER, we
21   don't use 9.39.
22             If the patient needs further
23   treatment in the psych ER, then we
24   transferred to the psych ER.
25        Q.    So the answer is no, no one

Page 106

1              L. ALDANA-BERNIER
2     tried to admit Mr. Schoolcraft pursuant
3     to 9.39 --
4         A.    But you're using it in the
5     wrong way.
6         Q.    I just want to know whether or
7     not anybody tried to admit --
8              MR. CALLAN:  She's answered the
9         question three times.
10             MR. SUCKLE:  No, she hasn't.
11             MR. CALLAN:  What do you think,
12        people get teleported?  They have to
13        be evaluated.
14             MR. SUCKLE:  Keep your
15        objections as to form as the rules
16        require.
17             MR. CALLAN:  You don't seem to
18        get it when an objection to form is
19        made.  She's answered it three times.
20             MR. SUCKLE:  She's not answered
21        it once.
22             THE WITNESS:  That's my answer.
23             MR. CALLAN:  Do you think they
24        teleport --
25             MR. SUCKLE:  No more speaking

Page 107

1              L. ALDANA-BERNIER
2       objections.  Should we just call
3       Justice Sweet?
4              MR. CALLAN:  -- inpatient
5       treatment or do they have to be
6       evaluated?
7              MR. SUCKLE:  You're speaking on
8       the record in violation of the rules.
9              MR. CALLAN:  Make the call.  Be
10      my guest.
11      Q.    Was Mr. Schoolcraft admitted
12  pursuant to 9.39 of the Mental Hygiene
13  Law at any time during his admission to
14  Jamaica Hospital?
15      A.    The patient was transferred to
16  the psych ER.
17      Q.    I know.
18            Was he ever admitted pursuant
19  to Section 9.39 of the Mental Hygiene Law
20  at any time during his admission in
21  October and November 2009 pursuant to
22  Section 9.39?
23      A.    I did it myself when he was in
24  the psych ER.  I made that decision he
25  was admitted.

Page 108

1          L. ALDANA-BERNIER

2      Q.    Are you the first physician

3  that made that decision?

4      A.    Yes, I was.

5      Q.    And is that the first time when

6  you made the decision that somebody

7  attempted to comply with Section 9.39 of

8  the Mental Hygiene Law in order to admit

9  Mr. Schoolcraft?

10            MR. RADOMISLI:   Objection to

11      form.

12      A.    Was it the first time?

13      Q.    Yes.

14            Was your conduct the first

15  effort on behalf of Jamaica Hospital to

16  admit him pursuant to Section 9.39 of

17  Mental Hygiene Law --

18            MR. CALLAN:   Objection to form.

19      Q.    -- per your evaluation?

20      A.    I was the one that did the

21  9.39.

22      Q.    Were there any other

23  evaluations of Mr. Schoolcraft from the

24  psychiatric perspective prior to your

25  note of November 2nd, 2009, at 3:10 p.m.

1          L. ALDANA-BERNIER

2      A.    Yes, the notes of 11/1/09 at 12

3   p.m.

4      Q.    Did you review this November 1,

5   2009, 12 p.m. note prior to writing your

6   note on November 2nd, 2009, at 10 p.m. --

7      A.    Yes.

8          MR. CALLAN:  11/1/09 at 12 p.m.

9      is the note.

10     Q.    Did you review this note prior

11  to you writing your note of November 2nd?

12         MR. LEE:  Objection.

13         Off the record.

14         [Discussion held off the

15     record.]

16         MR. SMITH:  Let me shut this

17     off.

18         [Whereupon, at 12:42 p.m., a

19     recess was taken.]

20         [Whereupon, at 12:43 p.m., the

21     testimony continued.]

22         MR. CALLAN:  My client is

23     looking at a page that has at the top

24     11/1/09, time 12 p.m., Jamaica

25     Hospital Medical Center.  She's

1              L. ALDANA-BERNIER

2        looking at that at the top of the

3        page.

4              Take if from there, Counsel.

5        Q.    The note that counsel described

6    as the first page, do you know how many

7    pages that is in the record?

8        A.    Seven pages.

9        Q.    Is the last page of that note

10   the psychiatrist's name with a stamp Dr.

11   Tariq, is that the last page of that

12   note?

13       A.    Yes.

14       Q.    Who is Dr. Tariq, do you know?

15       A.    He was the resident.

16       Q.    Medical resident, psychiatric

17   resident?

18       A.    Psychiatric resident.

19       Q.    And just since you're on the

20   page, you wrote "disposition," what does

21   that mean?

22       A.    We have to decide whether we

23   hold and stabilize the patient or

24   discharge the patient.

25       Q.    Where was the patient

Page 111

1              L. ALDANA-BERNIER

2    physically:  Was he in the medical

3    emergency room?

4         A.    He is in the psych ER.

5         Q.    At this point he was in the

6    psych ER?

7         A.    Yes.

8         Q.    And at this point, what did Dr.

9    Tariq write with regard to disposition?

10        A.    Hold and stabilize.

11        Q.    What does hold mean?

12        A.    When we hold the patient and

13   stabilize the patient.

14        Q.    Was the patient free to leave?

15        A.    No.  It said hold and

16   stabilize.

17        Q.    Was he being held in

18   restraints?

19        A.    Are you asking if the hold is

20   in restraints or was the patient --

21        Q.    Was he physically being

22   restrained at that point?

23        A.    I don't know.

24        Q.    What was physically preventing

25   him from leaving?

Page 112

1              L. ALDANA-BERNIER

2        A.    [No response.]

3        Q.    Were the doors locked?

4        A.    Yes.

5        Q.    So the doors were locked?

6        A.    In the emergency room.

7        Q.    So when you are in the psych

8    emergency room and someone says hold, the

9    doors are locked and you can't get out?

10       A.    It means to say being kept in

11   emergency room for further stabilization

12   and admission.

13       Q.    Had Mr. Schoolcraft desired to

14   leave, he wouldn't be able because the

15   doors are locked, correct?

16       A.    No one can run out of the

17   emergency room.  The doors are locked.

18       Q.    Any other way that Mr.

19   Schoolcraft was being held other than the

20   doors being locked?

21       A.    Hold, I don't know how you are

22   using hold.  Hold is just to keep

23   inpatients in the emergency room for

24   further admission and stabilization.

25       Q.    He wasn't free to go home,

Page 113

1              L. ALDANA-BERNIER
2     correct?
3          A.    Yes.
4          Q.    He was not?
5          A.    He was not discharged.  That's
6     why it says hold and stabilize.
7          Q.    Am I correct Dr. Tariq on the
8     third written page on the second page of
9     the printed form, there is a place called
10    suicide attempts?  Do you see that, there
11    is a line that says, suicide attempts?
12         A.    Suicidal ideations?
13         Q.    Past psychiatric history, under
14    past psychiatric history.
15         A.    Okay.
16         Q.    The box no suicide attempts in
17    the past psychiatric history, correct?
18         A.    That's correct.
19         Q.    Under violence, no history of
20    violence, correct?
21         A.    That's correct.
22         Q.    And in the chart actually
23    immediately adjacent page actually the
24    back of one of the forms, Dr. Tariq has
25    written in the last paragraph, "Patient

1              L. ALDANA-BERNIER

2    denies recent suicidal or homicidal

3    thoughts," correct?

4         A.    That's correct.

5         Q.    And then when we talk about

6    mental status exam -- part of this is a

7    mental status exam.  Do you see that part

8    of the printed form, that's page 4 of the

9    printed form?

10        A.    Uh-huh.

11        Q.    Yes?

12        A.    Yes.

13        Q.    Mental status, is that the

14   mental status examination that you and I

15   were talking about earlier today?

16        A.    Yes.

17        Q.    The same type of examination?

18        A.    Yes.

19        Q.    Here in response to questions,

20   Mr. Schoolcraft has given some answers,

21   correct?

22        A.    That's correct.

23        Q.    And those answers have been

24   written down?

25        A.    That's correct.

1                L. ALDANA-BERNIER

2        Q.    And the doctor has had a chance

3    to assess the patient as the patient sits

4    in front of him?

5        A.    That's correct.

6        Q.    And the patient wrote down what

7    he saw, correct?

8        A.    Correct.

9        Q.    That was Dr. Tariq that wrote

10   that down, correct?

11       A.    Correct.

12       Q.    Under mental status, appearance

13   and attitude, "cooperative at this time."

14   Do you see that?

15       A.    Yes.

16       Q.    Do you have any reason to

17   believe as you read that in 2009 that Mr.

18   Schoolcraft was not being cooperative

19   when Dr. Tariq made that evaluation?

20       A.    He wrote cooperative.  He

21   should be cooperative then.

22       Q.    Going down further, suicidal

23   ideations, do you see that?

24       A.    Yes.

25       Q.    In response to Dr. Tariq's

1              L. ALDANA-BERNIER

2    questioning of Mr. Schoolcraft during his

3    mental status exam, he expressed no

4    suicidal ideations, correct?

5              MR. LEE:  Objection to form.

6        A.    Correct.

7        Q.    No homicidal ideations,

8    correct?

9        A.    Correct.

10       Q.    And no hallucinations, correct?

11       A.    Correct.

12       Q.    On the next printed form page

13   5, what is that bar score?

14       A.    That is after.  I think that's

15   agitation rating score.

16       Q.    And 7 being highly agitated and

17   1 not being agitated at all?

18       A.    Yes.

19       Q.    And Dr. Tariq wrote 1, which

20   means not agitated at all, correct?

21       A.    Correct.  At that time, he was

22   not agitated at all.

23       Q.    At the time that Dr. Tariq

24   evaluated him, the patient was not

25   agitated at all; is that correct?

Page 117

1                L. ALDANA-BERNIER

2        A.     That's correct.

3        Q.     Going to the first page of Dr.

4   Tariq's note, from the second line up,

5   Dr. Tariq says he evaluates -- can you

6   read that, the second line up what it

7   says?

8        A.     As per ER consult?

9        Q.     The first page, second line up.

10       A.     As per ER consult?

11       Q.     Just before that.  Can you read

12   it, the beginning of that line?

13       A.     "He states that he was in bed

14   last night.  Landlord let NYPD officers

15   in, assaulted him including bending his

16   arm, stamping slightly on his face, and

17   causing many bruises.  Bruises are

18   visible on both arms."

19       Q.     So Dr. Tariq is reporting from

20   your understanding that Mr. Schoolcraft

21   has bruises on both arms?

22       A.     Yeah.  Yes.

23       Q.     Was there any other evaluation

24   of Mr. Schoolcraft from the perspective

25   of psychiatric examination prior to your

Page 118

1              L. ALDANA-BERNIER

2      note of November 2nd, 2009, 3:10?

3           A.    There was an 11/2/2009 at 2:15.

4           Q.    That's the note right above

5      your note?

6           A.    Yes.

7           Q.    Who is that by?

8           A.    A resident Dr. Slowik,

9      S-L-O-W-I-K.

10          Q.    Are you able to read that note?

11          A.    "Patient seen and examined

12     today.  Patient remains calm, withdrawn,

13     not violent or aggressive.

14                "Patient is guarded and not

15     cooperative.  Patient keeps saying he

16     doesn't know why he came to this room and

17     forced him to go to the hospital.

18                "Patient doesn't know why he

19     cannot carry the guns, saying that they,

20     his supervisor -- he said I don't know.

21     Patient" --

22                MR. CALLAN:  Don't speak out

23          loud until you're ready because she

24          was taking down everything.  All

25          right?

Page 119

1            L. ALDANA-BERNIER

2              If you can't read it, you can't

3      read it.

4      A.    "Patient doesn't know why he

5  cannot carry the guns, saying that they,

6  his supervisor, did it to him, but he

7  said I don't know."

8              "He denies auditory or visual

9  hallucinations.  Assessment and plan is

10 admit."

11     Q.    Assess and admit, what does

12 that mean?

13     A.    An assessment to admit.

14     Q.    What does assessment mean?

15     A.    That is her assessment, what

16 her notes are and the plans is to admit.

17     Q.    Doctor, is a there an emergency

18 room record from the medical emergency

19 room that I'll show you, this is the

20 record we are looking for [indicating]?

21             MR. LEE:  Howard, can I see the

22     form?

23             MR. SUCKLE:   [Handing.]

24             MR. LEE:  Thank you.

25             THE WITNESS:  Can I have it?

Page 120

1              L. ALDANA-BERNIER

2              MR. CALLAN:  Why don't you put

3        that in front of her so she can page

4        through?

5              MR. SUCKLE:  Yeah.

6              It's dated 10/31/09.

7              MR. SMITH:  Doctor, it's just

8        prior to the chart, about that far

9        into the chart [indicating].  Keep

10       going.  The other way.

11             MR. CALLAN:  Okay.  All right.

12       She's got it.

13       Q.    Did you review this record

14   prior --

15             MR. CALLAN:  Let's just identify

16       it.

17             MR. SUCKLE:  Sure.

18             MR. CALLAN:  Let the record

19       reflect, we're looking at medical

20       record 1298984, date 10/31/2009, and

21       it's a Jamaica Hospital Medical Center

22       Emergency Department record.  Okay.

23       Q.    Doctor, did you review this

24   record prior to making your note of

25   November 2nd, 2009?

Page 121

1            L. ALDANA-BERNIER

2      A.     No.   This is a medical record,

3  medical ER.   This doesn't come to our ER.

4      Q.     So the medical records aren't

5  in your possession in the psych ER?

6      A.     No.

7      Q.     Turning to the nursing

8  assessment in that form, the nurse's

9  notes.  And this is again, October 31,

10  2009, and there are nursing notes.

11            Do you see that?

12      A.     October 31?

13      Q.     Yes.

14            Looking at the nursing note the

15  entry of -- do you have that in front of

16  you.

17      A.     That's 11/1.

18      Q.     The top of the page says 10/31,

19  but I'm looking at the note November 1st,

20  2009, at 2 a.m.

21      A.     Yes.

22      Q.     Do you see that?

23      A.     [Indicating.]

24      Q.     There is a note November 1,

25  2009, 2 a.m., do you see that, correct,

Page 122

1          L. ALDANA-BERNIER

2    do you see that?

3         A.    Yes.

4         Q.    Doctor, when you wrote your

5    note of November 2nd, 2009, did you know

6    that a nurse noted "with redness on the

7    right wrist with the handcuff, police

8    officer made aware and requested to

9    loosen a little bit yet refused."

10             Did you know about that note

11   when you made your note of November 2nd,

12   2009?

13        A.    This is a medical ER note

14   [indicating].

15        Q.    So you did not know?

16        A.    I didn't have that note.

17        Q.    Just so I'm clear:  You did not

18   know that a nurse had asked a police

19   officer to loosen the handcuff, that the

20   police officer refused, you did not know

21   that?

22        A.    No, I did not know that.

23        Q.    Looking at that same note, the

24   nurse's assessment, November 1st, 2009,

25   5:54 a.m., do you see that note?

Page 123

1           L. ALDANA-BERNIER
2        A.     Yes.
3        Q.     Were you aware when you first
4    saw Mr. Schoolcraft that he had reported
5    to the nurse, "My wrist is numb, I don't
6    feel anything now," did you know that
7    when you wrote your note on November 2nd,
8    2009?
9        A.     No, because I don't have this
10   record.
11       Q.     Did you see that this note,
12   that same note starts, "Psych consult in
13   progress"?
14       A.     Yes.
15       Q.     Do you know whose psych consult
16   that was, was that Dr. Tariq?
17       A.     No, this was Dr. Lewin.
18       Q.     And do you know if Dr. Lewin
19   wrote or made a note that you saw
20   regarding Mr. Schoolcraft's wrist being
21   numb and he doesn't feel anything?
22       A.     She didn't write anything.
23       Q.     And Doctor, does good and
24   accepted medical practice require
25   loosening of a handcuff when it's causing

Page 124

```
 1            L. ALDANA-BERNIER
 2   redness to the wrist?
 3            MR. RADOMISLI:  Objection.
 4            MR. LEE:  Objection.
 5            MR. RADOMISLI:  Also under
 6       Karbala [phonetic].
 7            MR. SUCKLE:  This is prior, not
 8       subsequent.
 9       Q.   Does good and accepted medical
10   practice require the loosening --
11            MR. CALLAN:  This is a nursing
12       question as well.
13       Q.   Does good and accepted medical
14   practice require loosening of a handcuff
15   causing redness to the wrist?
16            MR. LEE:  Objection.
17            MR. CALLAN:  Objection.
18            You can answer if you can,
19       Doctor.  I mean is there a course in
20       --
21            MR. RADOMISLI:  Objection.
22            MR. CALLAN:  Is there a course
23       in medical school about handcuffs?
24            MR. SMITH:  You cannot coach the
25       Witness.  Cut it out.
```

Page 125

1          L. ALDANA-BERNIER
2              MR. SUCKLE:  We will attach this
3      to our motion papers.
4              MR. CALLAN:  Bring that to Judge
5      Sweet.
6              MR. SUCKLE:  So you are
7      confident you can talk over us and
8      make speaking objections?  Is that
9      your position, Counsel?
10             MR. CALLAN:  No.  My position is
11     that you have --
12             MR. SUCKLE:  Is that the
13     disrespect that you have for the
14     Court?
15             MR. CALLAN:  Ask relevant
16     questions.  You have been doing this
17     long enough to know they do not teach
18     you about handcuffs in medical school.
19             MR. SMITH:  You cannot coach the
20     Witness.  It's totally improper.  It's
21     completely wrong.  You know it.
22             Should we call the Court and ask
23     them to tell you which you know you
24     are not entitled to do.  You are not a
25     law department kid that just got --

```
 1              L. ALDANA-BERNIER
 2              MR. SHAFFER:  Objection.
 3              MR. SMITH:  Come on.
 4              MR. CALLAN:  I think that's a
 5        smear on the law department of State
 6        of New York.
 7        Q.    Does good and accepted medical
 8   practice require that a handcuff be
 9   loosened if it's causing redness to the
10   wrist?
11              MR. RADOMISLI:  Objection.
12              MR. LEE:  Objection.
13              MR. SUCKLE:  You can answer.
14              MR. CALLAN:  You can, Doctor, go
15        ahead.
16        A.    If the patient complains, yes,
17   you have to release the restraints.
18              MR. RADOMISLI:  Move to strike.
19        Q.    When you say that you have to
20   release the restraints, what do you mean?
21        A.    Loosen it.
22        Q.    Going back to your previous
23   conversation about soft restraints, how
24   long had Mr. Schoolcraft been in the
25   hospital, if you know, prior to this note
```

Page 127

1            L. ALDANA-BERNIER

2    of 2 a.m. on November 1st, 2009?

3        A.    He was admitted, arrived at the

4    hospital 10/31/2009 at 23:03.

5        Q.    So at this point, it had been

6    more than two hours he had been in the

7    hospital by the time of that note of 2

8    a.m., correct?

9        A.    That's -- let me see, seven

10   hours.

11            MR. RADOMISLI:   Sorry.

12            THE REPORTER:   Seven hours.

13       Q.    Doctor, continuing on the

14   further nursing notes, here's the page I

15   am referring to.   Can you find that in

16   the hospital record?

17            MR. LEE:   What notes are we

18       talking about?

19            MR. SUCKLE:   November 1 through

20       November 3rd nursing notes.

21       Q.    Do you have it?

22       A.    Yes.

23       Q.    We are looking at a page in the

24   hospital chart.   At the top it's dated

25   11/1/2009.   And the first entry is

Page 128

1              L. ALDANA-BERNIER

2    November 1st, 2009, at 13:51.  The last

3    entry is November 3rd, 2009, at 8:27.

4              Doctor, on November 1st, 2009,

5    at 15:38, did the nurse note that the

6    patient denied suicidal/homicidal

7    ideations?

8         A.    Yes.

9         Q.    Did you know when you wrote

10   your November 2nd, 2009 note?

11        A.    No.

12        Q.    On the same date November 1st,

13   2009, the nurse noted at 22:56, "Patient

14   denied suicidal/homicidal ideations."

15        A.    These are medical records.  I

16   wouldn't know.

17        Q.    So you didn't know that when

18   you wrote your November 2nd, note,

19   correct?

20        A.    That's correct.

21        Q.    And again, November 2nd, 2009,

22   6:25, the nurse noted, denies suicidal,

23   slash, homicidal ideations.  Did you know

24   about that note?

25        A.    No.

1                 L. ALDANA-BERNIER

2          Q.    How about November 2nd, 2009,

3    at 10:47, did you know the nurse

4    reported, "The patient was calm and

5    cooperative, no signs of acute physical

6    distress." Did you know about that note

7    when you wrote your note of November 2nd,

8    2009?

9          A.    No.

10         Q.    How about the note of November

11   2nd, 2009, at 10:06, "Patient denied

12   suicidal/homicidal ideations," did you

13   know about that note when you wrote your

14   note of November 2nd, 2009?

15         A.    No.

16         Q.    Do you know about it at any

17   time during Mr. Schoolcraft's

18   hospitalization?

19         A.    About all of these notes, no,

20   because they belong to the emergency

21   medical --

22         Q.    You never looked at any of

23   those nursing notes from November 2nd,

24   2009, at 13:51 through November 3rd,

25   2009, at 8:27 at any time --

Page 130

1           L. ALDANA-BERNIER

2           MR. CALLAN:  Objection.

3       Q.    -- during Mr. Schoolcraft's

4   hospitalization?

5           MR. CALLAN:  How many times do

6       you have to go back to this, Counsel?

7       Q.    Am I correct?

8       A.    These record don't come to our

9   emergency room [indicating].

10      Q.    Turning briefly forward in the

11  chart right where you are, there is a

12  section called "Diagnostics" in the

13  medical chart probably pages ahead.

14           It's a note November 1st, 2009.

15  It actually shows his diagnostics in the

16  printed form and the first entry is

17  November 1st, 2009, at 12:59, urinalysis.

18           What is urinalysis, do you

19  know?

20      A.    Urinalysis is patient will give

21  urine, and they will test the urine for

22  any presence of like blood or any

23  infection.

24      Q.    So the patient is required to

25  do what, urinate into something?

Page 131

1                    L. ALDANA-BERNIER

2          A.    Yes.

3          Q.    Was he given an apparatus?

4          A.    Either they will give him a

5     container, urinal, or he has to go to the

6     bathroom.

7          Q.    There is also the test right

8     there at the same time, 12:59 urine tox,

9     what is that?

10         A.    Toxicology, they test if they

11    are using drugs.

12         Q.    So Mr. Schoolcraft was

13    subjected to a test so see if he was

14    using any drugs?

15              MR. RADOMISLI:  Objection to

16         form.

17         Q.    Correct?

18         A.    Every patient that comes to the

19    emergency room, we request a urinalysis

20    and urine toxicology.

21         Q.    Every patient that comes to the

22    medical emergency room?

23         A.    Depending on what the situation

24    is.

25         Q.    So not every patient has to do

Page 132

1              L. ALDANA-BERNIER

2   urine tox, correct?

3        A.    Not every patient but depending

4   on what the situation is because they

5   would like in your toxicology you can

6   also determine what your diagnosis is,

7   what -- you can see if the bizarre

8   behavior or agitation is caused from

9   substances.

10       Q.    Did Mr. Schoolcraft come to the

11  hospital for the purpose of having his

12  urine tested?

13       A.    You want to rule out a

14  pathology secondary to substance abuse.

15  You have to get a urine toxicology.

16       Q.    You have to do that?

17       A.    Anyone come in agitated,

18  bizarre, didn't have a psych history,

19  then you have to get a urine.

20       Q.    So Mr. Schoolcraft had to give

21  that urine sample, correct?

22       A.    They requested it so he has to

23  give it.

24       Q.    CBC, that's a blood test?

25       A.    Blood count test.

1              L. ALDANA-BERNIER

2         Q.    So somebody stuck a needle in

3    his arm and drew blood?

4         A.    Yes.

5         Q.    The THC test, how is that done?

6         A.    Through urine.

7         Q.    A CAT scan of his head?

8         A.    CAT scan of the head, yes.

9         Q.    How is that done?

10        A.    He has to go under a big

11   machine wherein they have to test his --

12   x-ray his brain to see if there is any

13   other causes, organic causes:  trauma,

14   pathology, any mass, or any reason why

15   that patient came in.

16              It was his first episode of --

17   psychotic episode.  You have to do a CAT

18   scan of the head especially if he was

19   aged 34 years old.  First psych episode

20   at 34, we have to do a psych CT.

21        Q.    And Mr. Schoolcraft had to go

22   through that test?

23        A.    He has to go through that test,

24   yes.

25        Q.    What is TSH?

Page 134

1                   L. ALDANA-BERNIER

2        A.    That is thyroid stimulating

3   hormone, to test his thyroid function.

4        Q.    How?

5        A.    Through blood.

6        Q.    Is that a separate test than

7   the CBC test?

8        A.    It's a separate tube, yes.

9        Q.    With a needle aspirating blood

10  out?

11       A.    Yes.

12       Q.    RPR, what is that?

13       A.    That is to test for syphilis.

14       Q.    So Mr. Schoolcraft was

15  subjected to a syphilis test while he was

16  in the hospital?

17            MR. RADOMISLI:  Objection to

18       form.

19       A.    Just to make sure that's not

20  the reason why he was behaving bizarre.

21       Q.    Okay.  And he had to go through

22  that test, correct?

23       A.    Yes.

24       Q.    By the way, the CAT scan showed

25  he had a normal brain, correct?

Page 135

1                L. ALDANA-BERNIER

2              MR. SMITH:  What was the answer

3        to that?

4              MR. SUCKLE:  Nothing yet.

5        A.    Yes.

6        Q.    On that same page, there is a

7    diagnosis, correct?

8        A.    Yes.

9        Q.    What is that?

10       A.    Paranoid.

11       Q.    There a number next to that,

12   what is that?

13       A.    That's the code.

14       Q.    What does it relate to?

15       A.    That is the code they use for

16   billing.

17       Q.    That's for billing?

18       A.    Yes, diagnosis 2979.

19       Q.    Let's go with paranoid, what

20   does that mean?

21       A.    Like a false belief about what

22   is going on in your environment that is

23   not in agreement with the culture;

24   someone that will say they feel he is

25   being watched or followed or somebody

Page 136

1               L. ALDANA-BERNIER

2    saying there is a conspiracy against him

3    or if someone will say someone is talking

4    about him; there's some sort of paranoia,

5    jealousy.  There are different kinds of

6    persecution.  It's a delusion.

7         Q.    And this was all done by Dr.

8    Tariq, right?

9         A.    Yes.

10        Q.    That was Dr. Tariq's only sole

11   diagnosis on this form, correct?

12        A.    No, this was from the emergency

13   room, the medical ER.

14        Q.    Let's look at the bottom of the

15   form.  Doesn't it say Dr. Tariq?

16        A.    Yes.

17        Q.    So this was Dr. Tariq's

18   diagnosis, correct?

19             MR. RADOMISLI:  Objection.

20        A.    Yes.

21        Q.    And Dr. Tariq didn't make any

22   other diagnosis besides this diagnosis of

23   paranoia on this form, correct?

24             MR. RADOMISLI:  Objection.

25        Q.    On that form, did he make any

Page 137

1              L. ALDANA-BERNIER
2    other diagnosis?
3        A.      Paranoid.
4        Q.      That's the only diagnosis Dr.
5    Tariq made?
6                MR. LEE:   Objection.
7                MR. CALLAN:   Objection.
8                MR. RADOMISLI:   Objection.
9        Q.    On this form.
10               MR. LEE:   Think of things in
11       isolation.   There is another form that
12       has a diagnosis.
13               MR. SUCKLE:   All right, Counsel.
14       A.    I don't think this was him that
15   put that there, Dr. Tariq who put that
16   there.
17       Q.    Who put that there?
18       A.    In here it was just, they just
19   put his name [indicating].   This was the
20   emergency notes.   This was the emergency
21   notes.
22       Q.    So you don't know who made that
23   diagnosis?
24       A.    I don't know.
25       Q.    When you did your evaluation of

1              L.  ALDANA-BERNIER

2    Mr. Schoolcraft, did you know about the

3    result of the CAT scan?

4        A.     The blood work.  I will not

5    remember if I read the CAT scan at that

6    time.  I don't have a recollection.

7              The only time -- it's already

8    written down in our -- from the medical

9    doctor so if we go over to the notes, I

10   have read the CT is normal.

11       Q.     So you didn't make a note of

12   that, that you read it, you're relying on

13   the note in the chart?

14       A.     The notes, yes.

15            MR. RADOMISLI:  Off the record.

16            MR. SMITH:  Time is 1:23.  Going

17       off the record.

18            [Discussion held off the

19       record.]

20            [Whereupon, at 1:23 p.m., a

21       recess was taken.]

22            [Whereupon, at 2:30 p.m., the

23       testimony continued.]

24            MR. SMITH:  We are going back on

25       the record.  It's 2:30.

Page 139

1              L. ALDANA-BERNIER

2     Q.     Doctor, did you discuss your

3  testimony with anybody during the break?

4     A.     No.

5     Q.     Doctor, there is a nursing

6  assessment form from the hospital record

7  dated November 1, 2009, at 9:00 a.m.  Can

8  you turn to that?

9             [Witness complying.]

10            MR. CALLAN:  This is the one.

11     See if you can find it.

12             Is that the general medicine

13     department?

14            MR. SUCKLE:  Department of

15     psychiatry.

16     Q.     Doctor, I have asked you to

17  turn to the nursing assessment form dated

18  November 1, 2009, from the Department of

19  Psychiatry Emergency Division.

20             Doctor, do you have that in

21  front of you now?

22     A.     Yes.

23     Q.     It's dated 9 a.m.  What is

24  that, Doctor?

25     A.     This is a nursing assessment.

Page 140

1              L. ALDANA-BERNIER

2      Q.     What is a nursing assessment.

3      A.     This is patient - the nurse

4  --the second nurse.

5             THE REPORTER:  I'm sorry.

6      A.     This is the second nurse that

7  sees the patient when he comes to the

8  emergency room.

9      Q.     Is the patient retriaged in the

10  emergency room?

11     A.     Let me just see.  No, he come

12  directly.  He doesn't pass through the

13  triage department.

14     Q.     When you say "the second

15  nurse," who is the first nurse?

16     A.     His second nurse because he is

17  already this form [sic].  The first nurse

18  are usually the ones in triage.

19     Q.     Did Adrian Schoolcraft see a

20  nurse prior to the nurse who filled out

21  this nursing assessment form in the

22  psychiatric emergency room:  Was there a

23  triage nurse?

24     A.     I think there was a triage

25  nurse because he came directly from

Page 141

1                    L. ALDANA-BERNIER

2    emergency, medical ER.

3         Q.    You think this was not -- it's

4    your testimony you believe there is not a

5    second triage in the psychiatric

6    emergency room; is that what you're

7    saying?

8         A.    That's what I'm saying.

9         Q.    So, Doctor, this would be the

10   first nurse assessment in the psychiatric

11   ER, correct?

12        A.    The first nurse, yes.

13        Q.    Look at that nursing assessment

14   form that we have pulled out, did you

15   review this form before you did your

16   evaluation of Mr. Schoolcraft?

17        A.    I will not remember if it was

18   in the chart.  I may have gone through

19   it.

20        Q.    When you say you may have gone

21   through, do you have a habit, a custom

22   and practice of reviewing prior notes

23   from the psychiatric emergency room when

24   you evaluate the patient?

25        A.    That depends on the case.

Page 142

1           L. ALDANA-BERNIER

2  There is times that the patient comes,

3  and the nurse hasn't seen the patient,

4  and it's an emergency, we have to go see

5  the patient.

6       Q.    My question is:  Did you review

7  the records of psychiatric emergency room

8  that exist for a patient at the time that

9  you would examine the patient?

10      A.    I do review the records, yes.

11      Q.    So do you recall then that you

12 reviewed this nursing assessment?

13      A.    I do not recall that, but I

14 usually review the records.

15      Q.    So your habit and custom would

16 have been to review this form?

17      A.    Yes.

18      Q.    Doctor, on this form on the

19 first page it says, "circumstances

20 leading to admission."  Do you see that

21 on the first page of that form,

22 circumstances leading to admission?

23      A.    Yes.

24      Q.    Actually, let's go up the line

25 before, "patient's chief complaint," do

Page 143

1                L. ALDANA-BERNIER

2    you see that?

3        A.      Yes.

4        Q.      What did the nurse write there?

5        A.      Denies.

6        Q.      What does that mean, Doctor?

7        A.      He didn't have any complaints

8    so he put denies.

9        Q.      He had no complaints to make to

10   the nurse?

11       A.      Yes.

12       Q.      That's how you understood it

13   when you read it?

14       A.      Yes.

15       Q.      Under that, circumstances

16   leading to admission, do you see that?

17       A.      Yes.

18       Q.      What is B-I-B?

19       A.      Brought in by.

20       Q.      What else did you read when you

21   read this form?

22       A.      "Brought in by NYPD after

23   client was deemed to be paranoid and

24   danger to himself by his police

25   sergeant."

Page 144

1          L. ALDANA-BERNIER

2      Q.     What does that mean, do you

3  know?

4      A.     Means there is a report that he

5  was paranoid and he is a danger to

6  himself, a report made by his police

7  sergeant.

8      Q.     So that record is indicating

9  that the police sergeant has reported

10 these things that you just read to

11 Jamaica Hospital, correct?

12          MR. KRETZ:   Objection.

13     Q.     The police sergeant is

14 reporting that by the police sergeant's

15 assessment, Mr. Schoolcraft is paranoid,

16 correct?

17          MR. KRETZ:   Objection.

18     A.     Yes.

19     Q.     And the police officer is

20 reporting that the police officer

21 believed that Mr. Schoolcraft was a

22 danger to himself, correct?

23          MR. KRETZ:   Objection.

24     A.     Yes.

25     Q.     Did you in your evaluation of

1                    L. ALDANA-BERNIER
2    Mr. Schoolcraft rely on that note at all?
3         A.    Did I rely only on this note?
4         Q.    No, at all.  Was it part of
5    your evaluation?
6         A.    Not only this note.
7         Q.    Was this note part of your
8    evaluation?
9         A.    I read it.
10        Q.    Did you use the information in
11   this note at all in your evaluation?
12        A.    I read it.  I read the
13   complaint.  I read this note of the
14   nurse.
15              If you are going to ask me if
16   this was part of my decision to admit
17   him, no, not that alone.
18        Q.    Was it part at all of your
19   decision?
20        A.    I'm saying it's not that alone.
21        Q.    I understand that.  I'm asking
22   a very specific question.
23              Did it play a part at all in
24   your decision to admit Mr. Schoolcraft?
25        A.    If I read that kind of

Page 146

1              L. ALDANA-BERNIER

2    statement, I will have to see other

3    aspects that will make me decide for the

4    reason why I admitted the patient.

5        Q.    You have to make your own

6    evaluation?

7        A.    I have to see the patient,

8    access all of the notes of the resident,

9    and I have to see the patient and make my

10   assessment if the patient needs an

11   admission.

12       Q.    Regardless of what notes you do

13   or don't read, you make your only final

14   assessment of what your opinion is

15   regarding what the patient needs?

16       A.    It's not only me make that

17   decision, I will probably also will ask a

18   second opinion.

19       Q.    I understand that you may ask a

20   second opinion, but do you form your own

21   independent opinion regarding your

22   assessment of your own patients?

23            MR. CALLAN:  Objection.

24            Are you asking if she is not

25        considering all of the notes in the

Page 147

1           L. ALDANA-BERNIER
2       chart?
3           MR. SUCKLE:  No, I'm asking if
4       she makes her own independent
5       assessment of the patient regarding
6       this patient.
7       A.    The totality of the notes.
8       Q.    Is it solely based on the
9   notes?
10      A.    Plus my assessment.  Of course
11  I have to go see the patient.
12      Q.    It's your assessment and the
13  notes that you use to form your opinion
14  regarding your evaluation of a patient,
15  correct?
16      A.    Plus the second opinion, yes.
17      Q.    Plus a second opinion?
18      A.    Yes.
19      Q.    Do you not form an opinion
20  until you get a second opinion?
21      A.    That depends on the case.  If
22  it's a case that I think needs a second
23  opinion, then I have to ask for a second
24  opinion.
25      Q.    From your review of Mr.

Page 148

1              L. ALDANA-BERNIER
2    Schoolcraft's records, did you form an
3    opinion before you got a second opinion
4    with regard to Mr. Schoolcraft?
5         A.    No, I asked for a second
6    opinion.
7         Q.    So you did not form an opinion
8    prior to any second opinion?
9         A.    I have to ask the second
10   opinion at that time.
11        Q.    Why was that?
12        A.    Because he was a police
13   officer.
14        Q.    Because he was a police
15   officer, you were unable to come to your
16   own opinion without getting a second
17   opinion; is that correct?
18             MR. CALLAN:  Objection to form.
19             MR. RADOMISLI:  Objection to
20        form.
21        A.    No, but I think two heads are
22   better than one.
23        Q.    Did you have an opinion before
24   the second opinion was rendered regarding
25   Mr. Schoolcraft?

Page 149

1                L. ALDANA-BERNIER

2      A.    My opinion was I think I needed

3   a second opinion so I asked for a second

4   opinion.

5      Q.    Was that your only opinion

6   prior to the second opinion?

7      A.    I think his case was something

8   that needed to be determined by two

9   doctors to see if he needed admission.

10     Q.    So you agree that your opinion

11  alone you didn't think was sufficient for

12  admission of Mr. Schoolcraft to the

13  hospital?

14     A.    Well, my opinion was that I

15  know he needed admission.  I needed

16  someone to second my opinion.

17     Q.    What was your opinion based on

18  that he needed admission?

19     A.    In whole story about this case

20  when he had to barricade himself, he was

21  acting bizarre, that he was agitated in

22  the ER, and that because he was a police

23  officer and my fear if I discharged him

24  to society, that something -- if

25  something wrong might happen -- if I --

Page 150

```
 1              L. ALDANA-BERNIER
 2   at that time in 2009, let's say if I
 3   forward that thinking, I was trying to
 4   prevent another case of navy yard
 5   disaster, that's how I always think; that
 6   I do not want a disaster happening when
 7   I'm thinking about admitting a patient.
 8              He is a police officer.  He may
 9   have access to guns even if they took all
10   his guns already.  I think it's easier
11   for police officer to get access to gun.
12      Q.    So the fact that he was a
13   police officer weighed heavily on your
14   decision to admit Mr. Schoolcraft?
15              MR. RADOMISLI:  Objection.
16              MR. LEE:  Objection.
17              MR. CALLAN:  Objection to form
18      as well.
19      A.    The fact he was a police
20   officer, bizarre, agitated, delusional is
21   the reason why I admitted him.
22      Q.    You talked about having access
23   to guns.
24      A.    Yes.
25      Q.    How did that play into your
```

Page 151

1          L. ALDANA-BERNIER

2    decision making?

3          A.    He is a police officer.

4          Q.    We still haven't gotten my

5    basic question answered.

6                Did you have an opinion before

7    the second opinion about whether or not

8    Mr. Schoolcraft needed to be admitted?

9                MR. CALLAN:   Objection to form

10         of the question.

11         A.    I did, yes.

12         Q.    What was that opinion?

13         A.    I was going to admit him, but I

14   had to get that second opinion to agree

15   to my decision.

16         Q.    Keep that page open.  Go down

17   to where it talks about skin contusion,

18   slash, laceration.  Do you see that?

19         A.    Yes.

20         Q.    Did you read that when you read

21   that form?

22         A.    Yes.

23         Q.    What did you read when you read

24   that form, what does it say?

25         A.    Purple and black and he circled

Page 152

1                    L. ALDANA-BERNIER
2      the area.
3          Q.    Let's be clear, skin condition,
4      contusion, slash, laceration, and the box
5      yes is checked or X'd, correct?
6          A.    Yes.
7          Q.    So the nurse was observing
8      contusions on his body somewhere based on
9      that chart, correct?
10         A.    Yes.
11         Q.    Going down to the next line,
12     there is a description of those
13     contusions, correct?
14         A.    Yes.
15         Q.    And those contusions are purple
16     and black, correct?
17         A.    [Indicating.]
18         Q.    Correct?
19         A.    Yes.
20         Q.    And the nurse has now circled
21     both the front of both arms and the back
22     of both arms, correct?
23         A.    Yes.
24         Q.    So did you understand this to
25     mean that Mr. Schoolcraft had purple and

Page 153

1              L.  ALDANA-BERNIER

2    black contusions on the front and back of

3    both of his arms?

4         A.    Yes.

5         Q.    Do you know what that was from?

6         A.    Possible from restraints, also

7    be possible from any fights he had.

8         Q.    And the only restraints that

9    you were aware of that he was in, at

10   least reflected in the hospital record,

11   are handcuffs, correct?

12        A.    That's correct.

13        Q.    Taking the next page, the

14   second page of the nurse's assessment

15   form, do you see homicidal and suicidal,

16   do you see that at the bottom of that

17   form?

18        A.    Yes.

19        Q.    Ideations for homicidal, no,

20   correct?

21        A.    That's correct.

22        Q.    That was the nurse's assessment

23   at that time?

24        A.    Yes.

25        Q.    So the patient is in front of

Page 154

1           L. ALDANA-BERNIER
2    nurse, the nurse is evaluating the
3    patient, and the nurse is making an
4    assessment, correct?
5         A.    That's correct.
6         Q.    Next to it, suicidal ideation,
7    no?
8              MR. LEE:  Objection to form.
9         A.    Correct.
10        Q.    Suicidal ideations.
11             Again, the patient was in front
12   of the nurse and she made this
13   assessment, correct?
14        A.    That's correct.
15        Q.    Doctor, looking at the third
16   page of this form, this clinical risk
17   assessment, behavioral dyscontrol,
18   correct, what does that mean?
19        A.    Out of control.
20        Q.    And he was not required for any
21   restraints or seclusion, correct?
22        A.    No.
23        Q.    So as of the November 1st, at 9
24   a.m., there was no reason to restrain
25   this man, correct?

Page 155

1           L. ALDANA-BERNIER

2       A.      Correct.

3       Q.      Looking at Jamaica Hospital

4   triage note from the nurse's note

5   10/31/09 at 23:03.

6       A.      What date was that?

7       Q.      October 31, 2009, Jamaica

8   Hospital triage, at 23:03 hours.

9       A.      I have 11/1, 11/3.

10              MR. SUCKLE:  May I help you?

11      Q.      Looking at now Jamaica Hospital

12  triage note, 10/31/09, 23:03, did you

13  review this prior to your assessment of

14  Mr. Schoolcraft?

15      A.      No, this is a medical chart.

16      Q.      Did you know that somebody

17  reported to the triage nurse that Mr.

18  Schoolcraft was in police custody when he

19  came in?

20      A.      Yes.

21      Q.      Where did you get that from?

22      A.      From the records.

23      Q.      Did you also know that the

24  triage nurse suicide risk assessment was

25  no risk identified?

Page 156

1           L. ALDANA-BERNIER

2        A.     This is a record of the medical

3    ER so I did not see this one.

4        Q.     You didn't know that?

5        A.     I did not see that.

6        Q.     What was Mr. Schoolcraft's

7    blood pressure when he came in to the

8    emergency room at October 31, 2009, at

9    23:03?

10       A.     It was 139 over 80.

11       Q.     Do you have an opinion with a

12   reasonable degree of medical certainty

13   what normal blood pressure is?

14       A.     Normal blood pressure is 120

15   over 80, that's the normal blood

16   pressure.

17       Q.     Was 139 over 80 within the

18   normal range?

19       A.     The diastolic which is the

20   upper level, was a little bit elevated.

21       Q.     Slightly elevated?

22       A.     Slightly elevated.

23       Q.     And the pulse was 115.  Is that

24   within the normal range?

25       A.     Yes, elevated.

Page 157

1              L. ALDANA-BERNIER

2      Q.    Slightly elevated, correct?

3      A.    Elevated.

4      Q.    There is a note on the chart

5  for pain scale.  What was the pain scale?

6      A.    Mild, 3 to 4.

7      Q.    Do you know what that relates

8  to?

9      A.    He came in with abdominal pain.

10  They must relate to abdominal pain.

11      Q.    Do you know what the category

12  of urgency was assigned to Mr.

13  Schoolcraft?

14      A.    The --

15      Q.    The category where he was

16  placed by the triage nurse with regard to

17  how quick or not quick he should be seen?

18      A.    Okay.  The category is urgent

19  [indicating].

20      Q.    What does that mean?

21      A.    Urgent that he needs immediate

22  attention.

23              MR. CALLAN:  Keep your voice up,

24      Doctor.  Everybody around the table

25      has to hear.

Page 158

1              L. ALDANA-BERNIER

2       Q.    Doctor, just because we are

3   here, I don't want you to have to flip

4   through again, can you find where you

5   filled out the form for 9.39 of Mental

6   Hygiene Law.

7              You have turned to a page

8   called -- what is at the top of page,

9   "Emergency Admission Section 9.39"?

10      A.    Yes.

11      Q.    And you signed the bottom of

12  that form?

13      A.    Yes.

14      Q.    And you dated that form?

15      A.    Yes.

16      Q.    What did you date it?

17      A.    11/3/2009, 1:20 in the

18  afternoon.

19      Q.    That's the time that you made

20  your evaluation that Mr. Schoolcraft

21  needed to be admitted?

22      A.    Yes.

23      Q.    That's the date and time?

24      A.    Yes.

25      Q.    The reason I bring this to your

Page 159

1                    L. ALDANA-BERNIER
2    attention now, is there a place on that
3    form to indicate when the patient was
4    first admitted to the hospital?
5         A.    11/1, yes.
6         Q.    And is there a time on there?
7         A.    23:03.
8         Q.    In fact we have in front of us
9    the triage note for when the patient was
10   admitted, and in fact the time was 23:03,
11   correct?
12        A.    Yes.
13        Q.    But the date was actually
14   October 31st, 2009, correct?
15        A.    That's correct.
16        Q.    So your note regarding the date
17   of admission was incorrect, correct?
18        A.    That was the time that I was in
19   the emergency room, 11/1.
20        Q.    When you say "the emergency
21   room," what are you referring to?
22        A.    Our medical ER.
23        Q.    So he was in the medical ER
24   exactly at 23:03 as well as the triage
25   exactly 23:03, one day later?

Page 160

1                    L. ALDANA-BERNIER

2        A.    11/1/2009, that is when he was

3    in our medical ER.

4        Q.    Where did you get the time that

5    you put on the form we have in front of

6    us with regard to the Mental Hygiene Law,

7    the date of admission, where did you get

8    the time 23:03 from?

9        A.    It was -- it had said the time

10   of arrival at the hospital.

11       Q.    Isn't that the time that the

12   triage nurse first sees him?

13       A.    The time the triage nurse saw

14   the patient.

15       Q.    23:03?

16       A.    That was 10/31 though.

17       Q.    So your form is incorrect when

18   it says November 1.  It should have been

19   10/31, correct?

20       A.    The patient came to the ER 12

21   -- one -- 12 midnight 23:03 -- 12 noon

22   that was -- 23:03, yeah, this is.

23            MR. CALLAN:  Don't think out

24        loud, Doctor.

25            MR. SUCKLE:  Don't interrupt her

Page 161

1          L. ALDANA-BERNIER

2      answer.

3          MR. CALLAN:  Sorry.

4      A.    11/1/2009 he was in the

5  emergency room.

6      Q.    When you say "in the emergency

7  room," what does that mean?

8      A.    When he arrived at the

9  emergency room, time of arrival to the

10  hospital.

11      Q.    Isn't the time of arrival 23:03

12  on 10/31/09?

13          MR. CALLAN:  Objection to the

14      form of the question.

15      A.    It said here in the notes

16  10/31; however, when he came to the ER,

17  it was 11/1.

18      Q.    What did the form ask you to

19  fill in there?

20      A.    It's saying time of arrival at

21  the hospital.

22      Q.    Were you trying to put in the

23  time of arrival at the hospital on that

24  form?

25      A.    It's the time of the arrival at

Page 162

1              L. ALDANA-BERNIER

2   the hospital.

3      Q.    Can we agree that you put the

4   wrong date?

5      A.    I probably put the wrong time

6   but 11/1 when he came to the emergency

7   room, the psych emergency room.

8      Q.    I'm just trying to be clear,

9   your intent was to put in November 1st,

10  correct?

11     A.    That's when he came to the

12  emergency room.

13     Q.    And you got the time 23:03 from

14  where?

15     A.    I do not remember if -- this

16  was a long time ago, 2009.  I don't have

17  any recollection.

18     Q.    You have in front of you the

19  triage notes which said he actually

20  arrived at the hospital at a time, 23:03,

21  correct?

22     A.    Yes.

23     Q.    So he was actually at the

24  hospital at the time that you wrote in

25  there, 23:03, correct?

Page 163

1                    L. ALDANA-BERNIER

2        A.     That's when he was in the

3    hospital, yes.

4        Q.     So you got the time right,

5    correct?

6        A.     The time is right in here, yes.

7        Q.     But you are not willing to say

8    that you simply made a mistake on the

9    date, correct?

10            MR. RADOMISLI:   Objection to

11       form.  You keep mixing up the hospital

12       from the psych emergency room.

13            MR. SUCKLE:   I'm not mixing up.

14            MR. CALLAN:   You are.  You

15       question doesn't clarify whether she

16       was intending to put arrival at the

17       psych ER or arrival at the hospital.

18            I don't know where you were

19       going with this question.  You are

20       going all over the place.

21            MR. SUCKLE:   I'm not.

22            MR. CALLAN:   You are.  I object

23       to the question.  I don't know what

24       you are asking her.

25            MR. SUCKLE:   I'm asking her

Page 164

1              L. ALDANA-BERNIER

2        anyway.

3              Could we have the question read

4        back.

5              MR. CALLAN:  Which one of the 20

6        questions you have asked?

7              MR. SUCKLE:  Counselor, would

8        you like to have your show now?  Go

9        ahead.

10             Can I have the question --

11             MR. CALLAN:  I will like to have

12        a clear record.

13             MR. SUCKLE:  I would too,

14        unfortunately, I have a witness that

15        doesn't want to seem to give me a

16        clear answer.

17             MR. CALLAN:  Well, it's hard

18        when you don't ask a question that's

19        clear.

20             MR. SUCKLE:  It's a tough job.

21        I'm learning as I'm going.

22             MR. SHAFFER:  So I'm not the

23        only inexperienced person in the room.

24             MR. SUCKLE:  You'll have to

25        excuse my inability to ask a question.

Page 165

1           L. ALDANA-BERNIER

2              By next year maybe I'll be able

3       to.

4       Q.    Can you tell me where you got

5   the time 23:03 from that you wrote in the

6   record?

7              MR. CALLAN:   That she wrote

8       where in the record, Counsel?

9       A.    I know I got the date from the

10  time that he was transferred to the

11  medical ER.

12      Q.    Where did you get the time that

13  you wrote on the same form?

14      A.    I have to go back to 2009.  I

15  cannot remember.

16      Q.    Why didn't you write the date

17  that he arrived at the hospital on the

18  form that you have in front of you which

19  is the Mental Hygiene Law 9.39 form, why

20  didn't you write the time that he arrived

21  at the hospital?

22      A.    Because there is a 9.39 in the

23  psych emergency room so I have to write

24  the time when he was in the psych

25  emergency room.

Page 166

1              L. ALDANA-BERNIER
2         Q.    Does the form ask you for the
3    date of arrival at the hospital?
4         A.    The date said in here time of
5    arrival at the hospital, but we do not
6    use this in the medical ER.  We use it in
7    the psych ER.  So that is time he came --
8    that is the date he came to the psych ER.
9         Q.    What time did he arrive at the
10   psych ER?
11        A.    He came to the psych ER 12
12   noon.
13        Q.    When you wrote that he arrived
14   at 23:03, that was incorrect?
15        A.    He came in at 12 noon.
16        Q.    So it was incorrect when you
17   wrote 23:03 as the time that he arrived?
18        A.    12 p.m.  I was checking -- on
19   the record over here it says 23:03 he
20   came so that's where I probably got my
21   time.  But then he came in on 11/1/2009.
22        Q.    What date did Mr. Schoolcraft
23   arrive at Jamaica Hospital?
24        A.    10/31.
25        Q.    You signed that form on

Page 167

1              L. ALDANA-BERNIER
2    November 3rd?
3         A.    November 1st -- I signed on
4    November 3rd, yes.
5         Q.    So you did your evaluation on
6    November 3rd; am I correct?
7         A.    That was when he was admitted,
8    November 3rd, so that's when he went
9    upstairs.
10        Q.    When did you do your
11   evaluation?
12        A.    That was on the 2nd.
13        Q.    Is there a note of your
14   evaluation?
15        A.    I have in here saying that I
16   have agreed with the above evaluation of
17   the resident.
18        Q.    When did you make that note?
19        A.    That was on the 2nd.
20        Q.    Which residents were you
21   agreeing with?
22        A.    Dr. Tariq and Dr. Slowik.
23        Q.    So you agreed that he showed no
24   suicidal ideations, correct?
25        A.    Yes.

Page 168

```
 1            L. ALDANA-BERNIER
 2      Q.    And you agreed that he showed
 3  no homicidal ideations, correct?
 4      A.    That's correct.
 5      Q.    And you agree that he showed
 6  that he was calm?
 7            MR. CALLAN:  We have already
 8      been down this road before, Counsel.
 9      We have gone through every single one
10      of these questions.
11            MR. SUCKLE:  No.
12            MR. CALLAN:  Asked and answered.
13            MR. SUCKLE:  She adopted those
14      as hers.  I'm asking.
15            MR. CALLAN:  No.  She hasn't
16      said anything different than she said
17      the last time.
18            MR. SUCKLE:  You know me, I'm --
19            MR. CALLAN:  I object to the
20      repetitions nature of the question.
21      Q.    You agreed when you evaluated
22  him he was calm?
23      A.    I agreed to the above notes.
24      Q.    Did you agree that he was not
25  agitated?
```

Page 169

1              L. ALDANA-BERNIER

2        A.     I agreed he was calm.

3        Q.     And not agitated?

4        A.     That he was not agitated at the

5    time of the interview.

6        Q.     And you interviewed him when he

7    was in front of you?

8        A.     I saw him.

9        Q.     That's when you made your

10   assessment, correct, when he was in front

11   of you?

12       A.     Yes.

13              THE WITNESS:  Can I --

14              MR. CALLAN:  You can finish your

15       answer.

16              You're cutting her off, and she

17       can finish her answer.

18              Finish your answer, Doctor.

19              MR. SUCKLE:  Stop making

20       speeches.

21              MR. CALLAN:  You're the one

22       making speeches, cutting her off from

23       giving her answer.

24              MR. SUCKLE:  How am I cutting

25       anyone off?

Page 170

1          L. ALDANA-BERNIER
2              MR. CALLAN:  Did you finish your
3         answer, or do you have more to say?
4              THE WITNESS:  Yes.  I was trying
5         to say that I agreed that he was calm,
6         but it was not only the decision that
7         you have to make or the decision that
8         I made.  I was looking at all factors
9         that brought him to the hospital.
10        Q.    So you were told about what
11   happened in his apartment?
12        A.    Everything, yes.
13        Q.    And you were considering what
14   you were told by the police when they
15   arrived in the hospital, correct?
16        A.    That's correct.
17        Q.    And do you know who Sergeant
18   James is?
19        A.    No, I don't.
20        Q.    Did you ever speak to Sergeant
21   James?
22        A.    No, I don't -- I did not.
23        Q.    Did you ever see any reference
24   to Sergeant James providing any
25   information that was recorded in the

Page 171

1              L. ALDANA-BERNIER

2    hospital record?

3         A.    It's in the record.

4         Q.    In that context you know of

5    Sergeant James because his name appears

6    in the record, correct?

7         A.    That's correct.

8         Q.    And you know some of the things

9    about the history about what took place

10   in the apartment came from Sergeant

11   James?

12        A.    That's what in the record.

13        Q.    When this patient was in front

14   of you, he was not in need of restraints,

15   correct?

16        A.    That's correct.

17        Q.    And when he was in front of

18   you, he was not exhibiting any of the

19   behaviors that would lead you to believe

20   he was homicidal?

21        A.    That's correct.

22        Q.    And he was leading you to --

23   not exhibiting any of the behaviors that

24   would lead you to believe he was

25   suicidal, correct?

Page 172

1                  L. ALDANA-BERNIER

2       A.     That's correct.

3       Q.     He was not trying to hurt

4   himself, correct?

5       A.     That's correct.

6       Q.     In front of you, he wasn't

7   acting bizarre, correct?

8       A.     That's correct but he was

9   paranoid.

10      Q.     And the paranoia was that the

11  sergeant told you they weren't trying to

12  get him as he was saying, correct?

13             MR. LEE:   Objection to form.

14      A.     That he was the one that said

15  that there was a possible conspiracy

16  against him, that the officers -- that

17  there is this problem between him and his

18  supervisor, okay, so....

19      Q.     So in front of you, that

20  paranoia is what he exhibited, correct?

21      A.     That's a form of psychosis,

22  yes, paranoia.

23      Q.     Any other psychiatric behavior

24  or psychosis that he exhibited in front

25  of you other than being paranoid?

Page 173

1              L. ALDANA-BERNIER

2      A.      At that point in time?

3      Q.      Yes.

4      A.      There was nothing else.

5      Q.      Let's look at your note of

6    November 2nd, 2009.  What did you write?

7      A.      He was still complaining of

8    pain in area of his right and left wrist.

9    "States it was numb for two hours

10   yesterday.  Bruise was noted in the left

11   inner aspect of arm and minimal area of

12   bruise inner aspect of the right arm."

13     Q.      Why did you write those things

14   down?

15     A.      Because then he showed it to me

16   so I have to write them.

17     Q.      Did you do a physical

18   examination of him?

19     A.      He showed it to me.  That's a

20   physical exam.

21     Q.      And you thought it was

22   important to write down whatever symptoms

23   or manifestations of some problems he was

24   having, you thought it was important to

25   write down, correct?

Page 174

1                L. ALDANA-BERNIER

2        A.    Yes.

3        Q.    Did you write down all of the

4   things that he was exhibiting, physical

5   problems he was having in your presence?

6        A.    I wrote, but he said that this

7   is a setup; he would like a lawyer; and

8   that internal affairs would like to

9   interview him and he agreed.

10            He was made aware that he was

11  going upstairs and -- but he wanted to go

12  home; however, I wrote, "agreed with the

13  notes above of the resident."

14       Q.    So let's go back through this.

15            You said he wanted a lawyer.

16  He said that to you?

17       A.    Yes.

18       Q.    Did you do anything to help him

19  get a lawyer?

20       A.    The lawyers -- usually they get

21  the lawyer when they go upstairs in the

22  inpatient unit.

23       Q.    When you say "usually"?

24       A.    They were entitled to -- they

25  have legal representation when they go

Page 175

1              L. ALDANA-BERNIER

2    upstairs in the inpatient unit.

3        Q.     How does a patient know they

4    were entitled to a lawyer when they go

5    upstairs?

6        A.     It's posted on the wall.

7        Q.     It's posted on the wall?

8        A.     Yes.

9        Q.     Is there anything else that the

10   hospital did to advise him of his right

11   to have a lawyer?

12              MR. RADOMISLI:  Objection to

13       form.

14              MR. CALLAN:  I join in the

15       objection, but you can answer.

16       A.     You are asking me if the

17   hospital has anything?  It's posted on

18   the wall.  I think that's part of

19   hospital being able to make the patient

20   aware they have legal representation.

21       Q.     Did you give him any papers

22   that indicated that he can make a phone

23   call to somebody to get help?

24       A.     There are free phone calls.

25   Phones are on the walls.  They are free

Page 176

```
 1              L. ALDANA-BERNIER
 2   to call if they want to call.
 3        Q.    Did you give him any paperwork
 4   there was a telephone number if he needed
 5   help?
 6        A.    We don't have papers.
 7        Q.    So you didn't give him any
 8   papers?
 9        A.    Not in the emergency room, no.
10        Q.    You didn't hand him any papers,
11   did you?
12        A.    No, I didn't hand him anything.
13        Q.    You didn't ask him to sign any
14   papers, did you?
15        A.    No, I did not.
16             MR. SUCKLE:  Counsel, please
17        hold on.  Counsel, don't put papers in
18        front of the Witness while I'm asking
19        her questions.
20             MR. CALLAN:  You are having her
21        looking at the chart.
22             MR. RADOMISLI:  She is allowed
23        to go through the chart.
24             MR. SUCKLE:  I didn't stop her
25        from doing anything.
```

1           L. ALDANA-BERNIER

2              Please don't put papers in front

3       of the Witness so she can answer the

4       question the way you want her to.

5              MR. CALLAN:  You're referring to

6       a piece of paper that's in the chart?

7              Aren't you trying to find out

8       what happened, Counsel?

9              MR. SUCKLE:  Can you not put a

10      piece of paper in front of her again?

11             Did you do that?

12             MR. CALLAN:  Is it in the chart?

13             MR. SUCKLE:  Did you put a piece

14      of paper in front of her?

15             MR. CALLAN:  Yeah.

16             MR. SUCKLE:  Please don't do

17      that while I'm questioning.

18             MR. CALLAN:  Your cocounsel has

19      been handing her the same paper all

20      morning from the chart.

21             MR. SUCKLE:  You have a chance

22      to ask her whatever questions you

23      want.

24             MR. CALLAN:  You are being quite

25      disingenuous when you're questioning a

Page 178

1          L. ALDANA-BERNIER

2     Witness about a piece of paper you

3     know is in the chart regarding --

4          MR. SUCKLE:  Keep talking on the

5     record and the sanction motion will be

6     --

7          MR. CALLAN:  I can't wait to see

8     your sanction motion --

9          MR. SUCKLE:  Keep talking.

10         MR. CALLAN:  When the Court sees

11    another seven-hour deposition about

12    one chart entry.

13         MR. SUCKLE:  Keep going.

14         MR. CALLAN:  Which has been

15    basically the pattern in this case.

16         MR. SUCKLE:  You don't think

17    Judge Sweet cares what you're talking

18    about?

19         MR. SHAFFER:  Call him and find

20    out instead of arguing.

21         MR. CALLAN:  Unlike you, I don't

22    choose to look into Judge Sweet's mind

23    how he views this deposition.  I will

24    let the record speak for itself.

25         MR. SMITH:  The record should

Page 179

1              L. ALDANA-BERNIER
2       reflect you tried to show the Witness
3       a document which is the form she
4       filled out that contains, among other
5       things, a list of that you fully
6       know --
7              MR. CALLAN:  Let's identify the
8       record.
9              THE WITNESS:  I'm sorry.
10             MR. SMITH:  Let's mark the
11      document you tried to show the Witness
12      while she was in the middle of
13      answering the question.  Let's do that
14      okay.  Come on.
15             MR. CALLAN:  Counsel for the
16      hospital --
17             MR. SMITH:  I would like to have
18      the court reporter mark this document.
19             MR. RADOMISLI:  This is my copy.
20      There is one in the chart.
21             MR. SMITH:  Show me what it was
22      you were trying to show the Witness.
23             MR. RADOMISLI:  I didn't show
24      anything to the Witness.
25             MR. SMITH:  I'm talking to the

Page 180

1          L. ALDANA-BERNIER

2     Witness's lawyer.

3          I would like to see the document

4     is handed to the Witness while she was

5     answering a question.

6          Are you going to show me the

7     document or not or do I assume the

8     record speaks for itself?

9          MR. CALLAN:  Make a motion,

10    Counsel, all right?

11         MR. SMITH:  So the record is

12    clear that I'm asking for the piece of

13    paper, Counsel is not giving it to me.

14    I saw it.  I know exactly what it was.

15         MR. CALLAN:  I don't have the

16    piece of paper.  You can look through

17    the chart to see if there is a piece

18    of paper relating to Counsel and what

19    is routinely told concerning --

20    Q.    When a patient comes into the

21    hospital, was Mr. Schoolcraft required to

22    give his clothes up, to get out of his

23    clothes?

24    A.    Give his clothes?

25    Q.    Was he required to take off his

Page 181

1              L. ALDANA-BERNIER

2    clothes when he came into the hospital?

3        A.    Yes, he has to wear hospital

4    gown.

5        Q.    So Mr. Schoolcraft when he was

6    brought in in handcuffs, did he have to

7    remove his pants?

8        A.    Yes.

9        Q.    Did he have to remove his

10   shirt?

11       A.    Yes, has to be in a hospital

12   gown.

13       Q.    Did he have to remove his

14   socks?

15       A.    Yes.

16       Q.    Did he have to remove his

17   underwear?

18       A.    Yes.

19       Q.    Did he have to turn over his

20   money?

21       A.    Yes, they put in the safe.

22       Q.    Did he have to turn over his

23   cell phone?

24       A.    Yes.

25       Q.    Did he have to turn over all of

Page 182

1              L. ALDANA-BERNIER

2    his personal belonging to Jamaica

3    Hospital?

4              MR. RADOMISLI:  Objection to

5         form.

6              MR. CALLAN:  Objection to form

7         too.

8              Are you saying for safekeeping

9         or asking --

10             MR. SUCKLE:  I asked the

11        question, Counselor.  I think it's

12        pretty clear.

13        Q.    Did he have to turn over his

14   personal belongings on his body to

15   Jamaica Hospital?

16             MR. RADOMISLI:  Objection.

17             MR. CALLAN:  Objection.

18        A.    When they come into the

19   hospital, they usually tell them to

20   undress and then they put all of their

21   belonging to the safe and put a hospital

22   gown on.

23        Q.    When you say "they," what do

24   you mean?

25        A.    The nurses tell the patients.

Page 183

1              L. ALDANA-BERNIER

2      Q.    Who is they, when they have to

3  do something?

4      A.    They will, the nurses will ask

5  the patient to take off their clothes and

6  surrender their belonging to the nurse so

7  they can put their belongings to the

8  safe.

9      Q.    What is it Mr. Schoolcraft was

10  given to wear after he had to give his

11  clothes to Jamaica Hospital?

12          MR. RADOMISLI:  Objection to

13      form.

14      A.    Can you clarify?

15      Q.    What is it, if anything, he was

16  wearing after he gave his clothes to

17  Jamaica Hospital?

18      A.    This is asked of every patient

19  to give their belongs because then they

20  check them.

21      Q.    I understand.

22          What was Mr. Schoolcraft

23  wearing, if anything, after he gave his

24  clothes to Jamaica Hospital?

25          MR. RADOMISLI:  Objection to

Page 184

1          L. ALDANA-BERNIER

2      form.

3      A.     If anything, he would have been

4  searched in the medical ER.  Then they

5  have to put him in a hospital gown.

6          And these items would have been

7  transferred with the patient to the psych

8  ER so that they can go to the safe.

9      Q.     You talked about the search.

10  What is the search?

11     A.     They search every patient to

12  make sure no contraband.

13     Q.     When you say "search," did they

14  do a cavity search?

15     A.     No, just take off the clothes,

16  make sure they are not carrying anything

17  like weapons, knives, anything they are

18  hiding in their socks or on their bodies.

19     Q.     So they have to be completely

20  naked and observed to see they have no

21  weapons, to see they have to weapons,

22  correct?

23     A.     They have to take off

24  everything, yes.

25     Q.     Is this observation done by a

Page 185

1          L. ALDANA-BERNIER

2   doctor, a nurse, somebody else?

3        A.     Done by a nurse.

4        Q.     Was that process done by Mr.

5   Schoolcraft with a woman, a male, do you

6   know?

7        A.     This I wouldn't know.  I wasn't

8   there.

9        Q.     Was he handcuffed while that

10  was going on?

11       A.     That I don't know because I was

12  wasn't there.

13       Q.     Did they look in his mouth?

14              MR. CALLAN:  She said she wasn't

15       there.  Objection.

16              Are you asking about routine

17       searches or about this search?  She

18       wasn't there for this search, Counsel.

19       Q.     Does the search include looking

20  into Mr. Schoolcraft's mouth?

21              MR. CALLAN:  Objection to the

22       form of the question.

23       A.     I don't know because I wasn't

24  there.

25       Q.     Have you been present for these

1               L. ALDANA-BERNIER

2  searches when they are done?  Have you

3  ever been present for the search when

4  they were done?

5       A.    It's been done by a nurse and

6  the security officers of the hospital.

7       Q.    So the security officer and the

8  nurses do the search?

9       A.    Yes.

10      Q.    And the security officer, what

11 is the medical training, if any, of a

12 security officer?

13           MR. RADOMISLI:  Objection.

14           MR. CALLAN:  I join in the

15      objection.

16      Q.    If you know?  Is it a

17 nonmedical person?

18      A.    He was part of team.  He is

19 nonmedical, but he is part of team.

20      Q.    So we have the nurse, the

21 security guard, Mr. Schoolcraft standing

22 naked and being examined --

23           MR. CALLAN:  Objection.

24      Q.    -- is that the process?

25           MR. CALLAN:  She said she wasn't

Page 187

1              L. ALDANA-BERNIER
2        there.
3               Is there a process?
4        Q.    Is that the process that Mr.
5    Schoolcraft went through?
6        A.    That I don't know.  I wasn't
7    there.
8               MR. RADOMISLI:  Objection.
9        Q.    Do you understand that to be
10   the process whereby all patients are
11   asked to take their clothes off and they
12   are examined by a nurse and security
13   officer --
14              MR. RADOMISLI:  Objection.
15       Q.    -- in the emergency room.  Is
16   that your understanding?
17       A.    Every patient goes through
18   this.
19       Q.    The answer is yes?  Is the
20   answer yes?
21       A.    Yes.
22       Q.    When you wrote your note on
23   November 2nd, 2009, Mr. Schoolcraft told
24   you he wanted to go home, correct?
25       A.    Yes.

Page 188

1              L. ALDANA-BERNIER

2        Q.    Was he free to go home?

3        A.    Not at the time.  I don't think

4   he was ready to go home.

5        Q.    How long had Mr. Schoolcraft

6   been in the hospital as of the time that

7   you wrote your note on November 2nd,

8   2009?

9              MR. RADOMISLI:  Objection to the

10        form.

11        Q.    Do you know how long he had

12   been at the hospital?

13              MR. RADOMISLI:  Objection to the

14        form.

15              MR. CALLAN:  I join in the

16        objection.

17              MR. LEE:  Read that back.

18              [The requested portion of the

19        record was read.]

20        A.    Are you asking for the total

21   number of days he was in Jamaica Hospital

22   or --

23        Q.    When you wrote your note on

24   November 2nd, 2009, he had already been

25   in the hospital for three days?

Page 189

1              L. ALDANA-BERNIER
2              MR. RADOMISLI:  Objection to
3      form.
4      Q.    He came in October 31st at
5  23:03, and now it's November 2nd at three
6  o'clock in the afternoon, 3:10, correct?
7      A.    Then he was admitted upstairs
8  to 11/6.
9      Q.    When you wrote your note, he
10 had already been there two days?
11             MR. RADOMISLI:  Objection.
12             KRETZ:  Objection.
13             MR. CALLAN:  You can answer,
14     Doctor, if you know.
15             MR. KRETZ:  Less than two days.
16     A.    November 2nd -- 31.  He was
17 there -- he came on the 1st.  I was
18 there, one, two days.
19     Q.    And Doctor, when did you write,
20 fill out of the form that you signed with
21 regard to the mental hygiene --
22             MR. CALLAN:  Asked and answered.
23     Q.    The next day?
24             MR. CALLAN:  She said November
25     3rd.  Asked and answered.

Page 190

1              L. ALDANA-BERNIER

2        A.     It was the next day, yes.

3        Q.     Why did you wait till the next

4    day to fill out that form?

5        A.     That's when he was going

6    upstairs to the inpatient unit.

7        Q.     Where was he from November 2nd,

8    at 3:10 until he went upstairs?

9        A.     He was in the psych ER.

10       Q.     Why did he stay in the psych ER

11   after you saw him on November 2nd, 2009?

12       A.     Why did he stay in the psych

13   ER?  I do not know what happened in 2009.

14   Maybe there were no beds available, I

15   have to let him wait in the emergency

16   room.

17       Q.     Did you do your mental status

18   examination of Mr. Schoolcraft on

19   November 2nd, 2009, November 3rd, 2009

20   2009, or some other date?

21       A.     It was on November 2nd.

22       Q.     When you did your mental status

23   examination of Mr. Schoolcraft, did you

24   make -- let's go back.

25              Did you take a history of Mr.

Page 191

1              L. ALDANA-BERNIER
2    Schoolcraft?
3        A.    I spoke to Mr. Schoolcraft, and
4    I did take a history on him.
5        Q.    Did you write that history
6    down?
7        A.    No, because I did agree with
8    the notes of the resident.
9        Q.    Did you make a note of what Mr.
10   Schoolcraft told you regarding his
11   history?
12       A.    It's -- all of the notes was in
13   the resident notes.
14       Q.    And did you do a mental status
15   examination of Mr. Schoolcraft in your
16   presence?
17       A.    I did a mental status exam, and
18   I agreed to the notes of the resident.
19       Q.    Am I correct other than the
20   November 2nd, 2009 note, and the November
21   3rd 2009 mental hygiene form that you
22   filled out, you make no other notes in
23   this chart?
24            MR. RADOMISLI:   Objection to
25        form.

Page 192

1                L. ALDANA-BERNIER

2         Q.    Am I correct?

3               MR. RADOMISLI:   Objection to

4         form.

5         A.    That's correct.

6         Q.    So the residents had evaluated

7    him and made notes, correct?

8         A.    Yes.

9         Q.    And you were the director of

10   the emergency room, correct?

11        A.    Correct.

12        Q.    And you had this patient in

13   front of you, correct?

14        A.    Yes.

15        Q.    And you had the wherewithal,

16   you had the chart in front of you,

17   correct, when you saw the patient?

18        A.    That's correct.

19        Q.    And you had the ability and did

20   in fact make notes in the chart, correct?

21        A.    That's correct.

22        Q.    Just so we are clear:  You did

23   not make any independent notes regarding

24   your own findings during your

25   examination, correct?

Page 193

1              L. ALDANA-BERNIER

2      A.    That's correct.  I agreed with

3  the notes of the resident.

4      Q.     Doctor, do you believe not

5  making any notes regarding your

6  examination and findings with regard to

7  Mr. Schoolcraft was in the bounds of good

8  and accepted medical practice?

9      A.     I have the residents that saw

10  that patient and I agreed with their

11  notes so that is my -- the agreement with

12  regards to the notes of the residents

13  since I agreed with the above, I

14  considered that as my notes.

15      Q.    I understand when you say you

16  considered it.

17            The question is:  Does good and

18  accepted medical practice require you to

19  make your own notes regarding your

20  examination and assessment of the

21  patient?

22            MR. CALLAN:  Objection to the

23      form of the question.

24            You can answer.

25      A.    If I'm agreeing with notes of

```
 1              L. ALDANA-BERNIER
 2    the resident, then I do not have to write
 3    notes because I agree with the notes of
 4    the both residents from the first day
 5    that he came and the second note of Dr.
 6    Slowik.
 7         Q.    Was Mr. Schoolcraft oriented to
 8    time?
 9         A.    Yes.
10         Q.    Place?
11         A.    Yes.
12         Q.    He was oriented to time/space?
13         A.    Yes.
14         Q.    In your presence, correct?
15         A.    Yes.
16         Q.    His speech was normal, correct?
17         A.    That's correct.
18         Q.    He did not appear to be
19    suffering from delusions in your
20    presence, correct?
21         A.    He was paranoid.
22         Q.    But that's that delusions,
23    correct?
24         A.    Persecutory delusions.
25         Q.    He wasn't seeing things, was
```

Page 195

1              L. ALDANA-BERNIER

2    he?

3         A.    That's hallucinations, no.

4         Q.    He wasn't hallucinating, was

5    he?

6         A.    No.

7         Q.    How about his cognitive

8    functioning, that was normal, correct?

9         A.    Yes.

10             MR. RADOMISLI:  Off the record.

11             [Discussion held off the

12        record.]

13             MR. SMITH:  It's 3:34.  Off the

14        record.

15             [Whereupon, at 3:34 p.m., a

16        recess was taken.]

17             [Whereupon, at 3:49 p.m., the

18        testimony continued.]

19             MR. SMITH:  Back on the record

20        3:49 p.m.

21        Q.    Doctor, the paranoia that you

22    diagnosed Mr. Schoolcraft with, how was

23    he manifesting that?

24        A.    By him saying that there was a

25    conspiracy against him.

Page 196

1              L. ALDANA-BERNIER

2        Q.     Any other way that he was

3   manifesting besides that?

4        A.     He believed he was being

5   persecuted by his superiors, coworkers,

6   superiors, that's the main -- that's the

7   conspiracy.

8              MR. CALLAN:   You have to keep

9        your voice up.

10       Q.     So it was this conspiracy

11  theory in his head that you thought was

12  the --

13             MR. SUCKLE:   Withdrawn.

14       Q.     It was the conspiracy that was

15  the basis of your opinion that he was

16  paranoid, correct?

17       A.     Yes.

18       Q.     And how did that manifest

19  itself, if at all:   in a threat to his

20  own physical harm?

21       A.     If I look at him as being a

22  police officer talking about this

23  conspiracy theory and then I'm thinking

24  that he has access to weapons, then I

25  would think that I should think twice and

1              L. ALDANA-BERNIER

2    be cautious that he could be a danger to

3    himself or to others.

4         Q.    Is that the entirety of the

5    reason that you came to the opinion he

6    was a danger to himself and others?

7              MR. CALLAN:  Objection to form.

8              MR. LEE:  Objection to form.

9         A.    The fact that he had to be

10   brought in from his house where he

11   barricaded himself and he had to be taken

12   away and he was bizarre and agitated at

13   the time when he was brought in from his

14   home, I think those are all the factors

15   that you have to take in consideration

16   because then I am trying to -- the reason

17   why I kept him is because I'm trying to

18   prevent a disaster.

19              MR. SMITH:  I'm sorry what was

20        the last part?

21              [The requested portion of the

22        record was read.]

23        Q.    Prevent a disaster to whom?

24        A.    Obviously, if you hear all of

25   the stories about the Navy yard disaster,

1              L. ALDANA-BERNIER

2    the Range Rover disaster with cops.  If

3    you try to fast forward with an

4    individual.  I'm trying to prevent things

5    that will happened.

6              As an emergency room doctor,

7    you always have to think of all of the

8    factors that will make a person a danger

9    to others like presence of weapons, does

10   he have accessibility to weapons and he

11   was paranoid.

12             At the time I was thinking that

13   maybe he was really a danger to himself.

14        Q.   So a paranoid person,

15   accessible to weapons, made him a danger

16   to himself and others?

17        A.   Plus the other information that

18   we got when they went to his house:  They

19   have to take him out from his house; he

20   was barricaded in his house; and he was

21   agitated at the time when he was in the

22   emergency room.

23             You have to take all of those

24   into consideration and find out why was

25   he behaving this way.  You cannot see

1            L. ALDANA-BERNIER

2    that kind of behavior in just one day.

3    You have to observe the patient.

4        Q.    By the time that you wrote your

5    note on the 3rd, he had now been there

6    for two and a half, three days, correct?

7            MR. RADOMISLI:   Objection to the

8        form.

9            Been where?

10            MR. SUCKLE:   At Jamaica

11        Hospital.

12        A.    He was in the emergency room

13    then.   I made my decision at the time

14    that I saw him that he needed to be

15    admitted.

16        Q.    But he wasn't exhibiting

17    anything other than the paranoia when you

18    saw him, he didn't exhibit any of that,

19    correct:   The things you just described

20    as agitation or the barricading, that was

21    not in your presence, correct?

22        A.    No.   He was paranoid.   He said

23    all of the stories that maybe there was a

24    conspiracy against him.

25        Q.    But he wasn't agitated or

Page 200

1                L. ALDANA-BERNIER
2    barricading himself in your presence,
3    right?
4        A.    At that moment but then you
5    have to consider -- at that moment when
6    you make your decision, you also have to
7    consider all of the other factors.
8        Q.    Why didn't you read the medical
9    record from the medical emergency room?
10       A.    Because the medical record
11   doesn't come to our psych ER.
12       Q.    Did you speak to any of the
13   police officers that brought him to the
14   hospital?
15       A.    I do not have any recollection.
16   I do not remember.
17       Q.    Did you speak to any police
18   officer at all at any time regarding Mr.
19   Schoolcraft?
20       A.    I do not remember.
21       Q.    Did you speak to Dr. Lamstein?
22             MR. SMITH:   L-A-M-S-T-E-I-N.
23       A.    No.
24       Q.    Did you tell Dr. Lamstein
25   that --