Page 201

1              L. ALDANA-BERNIER

2              MR. CALLAN:  Didn't she just say

3        she didn't speak to Dr. Lamstein?

4        Objection.

5        Q.    Did you ever tell Dr. Lamstein

6    that Mr. Schoolcraft did not need

7    psychiatric care?

8              MR. CALLAN:  Are you asking if

9        she used telepathy since she didn't

10       speak to the doctor?

11       Q.    Did you say that to --

12       A.    I haven't spoken to Dr.

13   Lamstein.

14       Q.    So if Dr. Lamstein said that

15   you told her that Mr. Schoolcraft did not

16   need psychiatric care, she would not be

17   telling the truth; is that what you're

18   saying?

19             MR. CALLAN:  Objection to the

20       form of the question.

21       A.    You are asking me if Dr.

22   Lamstein tells me that he doesn't need

23   admission, am I going to change my mind?

24       Q.    No.  If Dr. Lamstein testified

25   that you told Dr. Lamstein that Mr.

1                L. ALDANA-BERNIER

2   Schoolcraft did not need psychiatric

3   admission, would she be lying?

4           MR. CALLAN:   Objection to the

5       form of the question.

6       A.     This is the first time I'm

7   hearing about Dr. Lamstein.

8       Q.     Did you ever hear the name Dr.

9   Lamstein before?

10      A.     No, the first time I'm hearing

11  about Lamstein.

12      Q.     Did you ever speak to anybody

13  from the internal affairs bureau of the

14  police department?

15      A.     Excuse me?

16      Q.     Did you ever speak to anybody

17  from the internal affairs bureau of the

18  police department?

19      A.     No.

20      Q.     Were you the admitting

21  physician for Mr. Schoolcraft to the

22  psych emergency room?

23      A.     In the emergency room, yes.

24      Q.     Do you know the name of the

25  person that brought Mr. Schoolcraft in?

1                L. ALDANA-BERNIER

2        A.     No, I don't.

3        Q.     Did you prescribe any

4   medication for Mr. Schoolcraft?

5        A.     Risperdal, 0.5 milligrams.

6   That was written by the resident, but I

7   agreed; Risperdal 0.5 milligrams twice a

8   day.

9        Q.     What is that?

10       A.     That's an antipsychotic.

11       Q.     Antipsychotic?

12       A.     Paranoia, psychosis.

13       Q.     What was the dosage?

14       A.     It's 0.5.

15       Q.     What was his weight?

16       A.     Weight, 109 kilograms.

17       Q.     And the dosage that you

18   prescribed, is that an introductory dose?

19            MR. LEE:   Objection to form.

20       A.     Yes.

21       Q.     So it's not really therapeutic

22   at that level, correct?

23       A.     It's twice a day.  It should be

24   therapeutic.

25       Q.     When you say "it should be

Page 204

1           L. ALDANA-BERNIER

2    therapeutic," what do you mean?

3        A.     If you are getting 0.5

4    milligrams twice a day, 1 milligram, yes.

5        Q.     How long does it take before it

6    becomes effective to become therapeutic?

7             MR. CALLAN:  Objection.

8        Q.     At the dosage that you

9    prescribed at the weight that Mr.

10   Schoolcraft was?

11            MR. CALLAN:  Objection.

12       A.     Most likely a week.

13       Q.     And when people come in and are

14   dangerous, have you prescribed medication

15   that they have rejected and refused to

16   take?  Has that ever happened to you

17   where a patient refuses to take medicine

18   and you have decided the patient is a

19   danger to themselves or others?

20       A.     Before we start any medication,

21   you describe it with the patient which

22   you need informed consent and you talk

23   about the side effects, the consequences,

24   and the benefits of taking or not taking

25   medication.

Page 205

1          L. ALDANA-BERNIER

2     Q.     Have you ever medicated a

3  patient against their will because they

4  were a danger to themselves or others?

5     A.     They are a danger to

6  themselves, if they are agitated, they

7  are violent, yes, I medicated someone

8  against their will.

9     Q.     How did you do that?

10    A.     If they are becoming -- if the

11 emergency room is being chaotic and the

12 patient -- first you speak with the

13 patient and you try to redirect the

14 patient, try to calm him down.  If he

15 doesn't agree or if he doesn't listen to

16 your redirection, then you start telling

17 him that you are going to medicate him.

18    Q.     And physically, how do you do

19 that, how do you medicate the person who

20 resists taking the medicine?

21    A.     We give them intramuscular.

22    Q.     Someone will restrain them and

23 give them a shot, correct?

24    A.     Yes.

25    Q.     You did not have the opinion

Page 206

1                    L. ALDANA-BERNIER

2      that Mr. Schoolcraft needed to go through

3      the process of being medicated against

4      his will, correct?

5           A.    At the time in the ER, at that

6      point in time when he was in the ER, he

7      was not given any intramuscular

8      injection.

9           Q.    Mr. Schoolcraft refused to take

10     the medication that you prescribed,

11     correct?

12          A.    Yes.

13          Q.    And you did not go through this

14     process where you went through having him

15     restrained and giving him the shot, you

16     didn't go through that process with him,

17     correct?

18          A.    No, I didn't.

19          Q.    Because you didn't deem it

20     necessary to do that to Mr. Schoolcraft,

21     correct?

22          A.    At the point he was in the ER,

23     he was not agitated so I did not have to

24     give him an injection.

25          Q.    He wasn't such a threat to

Page 207

L. ALDANA-BERNIER

1
2  anybody that he was going to need that
3  type of restraint and then injection,
4  correct?
5      A.    He was not agitated at the time
6  so I didn't have to inject him.
7      Q.    You indicated that you wanted a
8  second opinion earlier, correct?
9      A.    Yes.
10     Q.    Did you write a request for a
11 second opinion or a consult?
12     A.    No, I just have to call my
13 associate chairman and present to him the
14 case, and I spoke with him and he agreed
15 with me.
16     Q.    Who is the doctor that you
17 called?
18     A.    Associate chairman.
19     Q.    Who is the associate chairman
20 that you spoke with?
21     A.    Dr. Dhar, D-H-A-R.
22     Q.    Dr. Dhar is a psychiatrist?
23     A.    Yes.
24     Q.    Dr. Dhar is his associate
25 chairman.  What is that?

1                    L. ALDANA-BERNIER

2        A.     Next to the chairman.

3        Q.     Who is the chairman?

4        A.     Dr. Vivek.

5        Q.     Can you spell that?

6        A.     V-I-V-E-K.

7        Q.     When you say you spoke to him,

8    did you speak to him on the phone or you

9    don't recall?

10       A.     Call him downstairs and I

11   presented the case to him.

12       Q.     When you say "you presented the

13   case to him," did you tell him about the

14   history that you took?

15       A.     Yes.

16       Q.     Do you remember actually having

17   this conversation, or is that your

18   standard practice that you described?

19       A.     When it's a decision, like,

20   when a decision has to be made wherein --

21   I would say it's standard practice.

22       Q.     You don't recall actually

23   having the conversation?

24       A.     I recall that I spoke to him.

25       Q.     You recall in this case

Page 209

1            L. ALDANA-BERNIER

2   speaking to him?

3       A.      Speaking to him.

4       Q.      What time of day did you speak

5   to him?

6       A.      That was the afternoon.

7       Q.      And is the associate chairman

8   the person that you generally call to get

9   a second opinion for admission under the

10  Mental Hygiene Law?

11      A.      Yes.

12      Q.      Why do you recall this

13  particular incident with regard to Mr.

14  Schoolcraft when you got the second

15  opinion:  Is there anything that brings

16  it to your mind?

17      A.      I recall that because every

18  police officer that comes to our

19  hospital, I try to get second opinion.

20      Q.      When you say "every police

21  officer," how often have you had police

22  officers brought to your hospital to the

23  emergency psych ward?

24      A.      I could not recall how many.

25      Q.      Hundreds?

Page 210

1                    L. ALDANA-BERNIER

2        A.    No.

3        Q.    Dozens?

4        A.    No.   That's why it came back in

5    memory because it's not 100, but I cannot

6    recall how many.

7        Q.    More than ten?

8        A.    I don't remember.

9        Q.    Less than 50?

10       A.    I would not remember.

11       Q.    On each of these occasions,

12   were they brought in by other members of

13   the New York City Police Department?

14       A.    Yes.

15             MR. RADOMISLI:   What?

16             THE WITNESS:   Yes.

17       Q.    On each of those occasions, did

18   you admit those patients to the psych ER?

19       A.    To the psych ER, yes.

20       Q.    On each of those occasions, did

21   the associate chairman agree with your

22   opinion to admit these police officers

23   under the --

24             MR. CALLAN:   Objection to the

25        question.   I don't know that she said

Page 211

1             L. ALDANA-BERNIER

2         she consulted with the associate

3         chairman on every case.

4             MR. SUCKLE:  I will clarify.

5         Q.    For each of those police

6    officers that were admitted under the

7    Mental Hygiene Law, did you consult with

8    a second opinion?

9         A.    Yes.

10        Q.    In each of those police

11   officers, did the person, the doctor you

12   consulted with, agree with your opinion

13   to admit under the Mental Hygiene Law?

14        A.    Yes.

15        Q.    And these times when police

16   officers were admitted under the Mental

17   Hygiene Law, did some of them occur

18   before Mr. Schoolcraft's admission?  I

19   mean in the year or months beforehand.

20        A.    Yes.

21        Q.    And did the police officers

22   come from any particular precinct that

23   you were talking about:  Did they come

24   from the 81st Precinct, if you know?

25        A.    I would not know that.

Page 212

1           L. ALDANA-BERNIER

2      Q.    Do you know, did you get to see

3  any of the police officers on a recurring

4  basis that would bring these police

5  officer in; in other words, the police

6  officers that would bring the other

7  police officer in for evaluation, did you

8  see those police officers more than once?

9           MR. RADOMISLI:   Objection to

10      form.

11      A.    What do you mean more than

12  once?

13      Q.    Like in this case we know that

14  Sergeant James played some role in Mr.

15  Schoolcraft's history, correct?

16           MR. SHAFFER:   Objection.

17      A.    That's in the record.

18      Q.    Do you know if Sergeant James

19  was involved in any of the other police

20  officers who were admitted to Jamaica

21  Hospital who you admitted under the

22  Mental Hygiene Law?

23      A.    I don't know how Mr. James look

24  like.

25      Q.    Were there any police officers,

Page 213

1          L. ALDANA-BERNIER

2     sergeants, lieutenants who you can

3     identify who would bring police officers

4     to Jamaica Hospital on a recurring basis?

5               MR. RADOMISLI:  Objection to

6          form.

7               MR. SHAFFER:  Objection.

8          Q.    That you know either by sight

9     or name?

10         A.    No, I wouldn't.

11         Q.    When the police officers are

12    brought in by the other members of the

13    New York City Police Department, do you

14    always have the same concerns that you

15    describe for us about the police officer

16    having access to weapons?

17              MR. CALLAN:  Objection to the

18         form of the question.

19              She didn't say they were brought

20         in by other members of the New York

21         City Police Department.

22              MR. SUCKLE:  We've been told

23         that she did.

24         Q.    Does that concern that you

25    expressed about Mr. Schoolcraft and the

Page 214

1           L. ALDANA-BERNIER

2    access to weapons, did it apply to those

3    other police officers that you admitted

4    under the Mental Hygiene Law?

5        A.     I think you have to look at the

6    case.  It depends.  Every case is

7    different.  You have to look at it

8    differently.

9        Q.     So some police officers have

10   access to weapons and some don't?

11       A.     That I wouldn't know.

12       Q.     You indicated one of your

13   concerns for Mr. Schoolcraft's safety was

14   that he had access to weapons.

15       A.     In the notes he mentioned why

16   he cannot have access to his guns.

17       Q.     So were other police officers

18   brought in who did have access to weapons

19   that you are aware of?

20       A.     I do not remember that.

21       Q.     Did other police officers ever

22   bring in another police officer to the

23   emergency room who you did not admit

24   under the Mental Hygiene Law?

25       A.     That would be hard to remember.

Page 215

1          L. ALDANA-BERNIER

2     Q.    As you sit here today, you

3  don't recall any such situations; am I

4  correct?

5          MR. RADOMISLI:  Objection.

6          MR. CALLAN:  Objection to form.

7     What situation:  admitting or not?

8          MR. SUCKLE:  Not admitting.

9     Q.    As you sit here today, do you

10 recall any occurrence of a police officer

11 being brought in by other police officers

12 and you did not admit them under mental

13 hygiene?

14         MR. RADOMISLI:  Objection.

15    A.    It would be hard to remember.

16    Q.    So the answer is:  As you sit

17 here, no, you don't remember?

18         MR. RADOMISLI:  Objection to

19    form.

20    A.    I do not remember.

21    Q.    When is the last time you

22 admitted a police officer under the

23 Mental Hygiene Law into the psych

24 emergency room?

25    A.    Do not remember.

Page 216

1          L. ALDANA-BERNIER

2      Q.    Was Mr. Schoolcraft the last

3  police officer that you admitted under

4  the Mental Hygiene Law?

5      A.    I do not know if he was the

6  last one.

7          MR. RADOMISLI:  Read that back.

8          [The requested portion of the

9      record was read.]

10     Q.    But none come to memory since

11  Mr. Schoolcraft, correct?

12     A.    I'm not sure.  I don't

13  remember.

14     Q.    And going to your November 3rd

15  note where you fill out the mental status

16  exam form, can we turn to that, please.

17          [Witness complying.]

18     Q.    Look first at --

19     A.    Yes.

20     Q.    -- that's stamped at the top

21  "Emergency Admission Section 9.39 Mental

22  Hygiene Law."  At the bottom is your

23  signature?

24     A.    Yes.

25     Q.    Is that what we are all talking

Page 217

1                L. ALDANA-BERNIER

2    about, is that what you have in front of

3    you?

4        A.    Yes.

5        Q.    Is this all of your

6    handwriting?

7        A.    Yes.

8        Q.    And going to the part that

9    says, "record of admission," what did you

10   write there?

11       A.    "Patient is a danger to

12   himself.  Currently psychotic and

13   paranoid.  Would benefit from inpatient

14   stabilization."

15       Q.    I'm sorry.  I didn't get all of

16   that?

17       A.    Would benefit from inpatient

18   stabilization.

19       Q.    I didn't hear before will

20   benefit.

21             [The requested portion of the

22        record was read.]

23       Q.    When you say he would benefit

24   from it, what do you mean?

25       A.    Benefit from inpatient

Page 218

1          L. ALDANA-BERNIER

2    stabilization because when you go up to

3    the inpatient unit, you will have a

4    psychiatrist, a therapist, and a team

5    that will work with you.  There are

6    groups in the inpatient unit and there

7    are other modalities of the kind of

8    treatment in the inpatient unit that will

9    be able to maybe find out why he was

10   behaving the way he was behaving or why

11   he was paranoid, and he will be able to

12   talk to a psychologist or the other

13   therapist.

14       Q.    The stabilization, was that a

15   stabilization of his affect, his

16   environment that was going to be

17   stabilized, what did you mean by that?

18            MR. CALLAN:  Objection to form.

19       A.    Stabilization means

20   stabilization of his psychosis and

21   stabilization of if there was any

22   emotional crisis that was he going on

23   [sic] or going through with the conflict

24   that he was having with the supervisors.

25       Q.    So some type of resolution of

Page 219

L. ALDANA-BERNIER

1
2      that conflict would be part of the
3      stabilization?
4          A.    Yes.
5          Q.    And that would have occurred
6      through the modalities that you just
7      described earlier?
8          A.    Yes.
9          Q.    And would the stabilization
10     also include limiting his access to
11     weapons?
12         A.    Stabilization, that will
13     include, yes, because they will have to
14     find out before he is discharged to
15     ascertain he doesn't have any access to
16     weapons or....
17         Q.    Is that stabilization something
18     that every police officer admitted under
19     the Mental Hygiene Law needs to go
20     through:  making sure they don't have
21     access to weapons?
22             MR. RADOMISLI:  Objection.
23             MR. CALLAN:  I join in the
24         objection.
25         A.    It's not only police officers

Page 220

1              L. ALDANA-BERNIER
2      but everyone that comes in who are a
3      danger that we know they have access to
4      weapons, then we try as much as possible.
5              I don't know if you know about
6      the New York SAFE Act wherein we have to
7      report everyone that has a weapon, we
8      have to make sure that they are
9      discharged before....
10         Q.    Usually you have to report
11     everyone that has a weapon, who do you
12     have to report that to?
13         A.    The Department of Health.
14         Q.    That's been the law for how
15     long?
16         A.    Maybe -- that's new, a new law.
17         Q.    Was that in effect in 2009?
18         A.    Not 2009.  What I was trying to
19     say that anyone we know that is a danger
20     to themselves, we try to make sure they
21     don't have any access to weapons.
22         Q.    Looking at the date that you
23     wrote in there -- we have gone through
24     this.  I don't want to spend too much
25     time on it; but did you actually cross

Page 221

1              L. ALDANA-BERNIER

2    out the date of the admission and then

3    rewrite it?

4        A.    I tried to put 11/1/2009.

5        Q.    Did you check a.m. or p.m. on

6    this?

7        A.    No, I did not check it, but

8    23:03 is --

9        Q.    Military time?

10       A.    -- military time, yes.

11       Q.    From the time of your note on

12   the 2nd at 3:10 until this note on the

13   3rd at 1:20, was Mr. Schoolcraft free to

14   leave?

15       A.    No, he was not.

16             I made my decision on the day

17   that I saw him.

18       Q.    You made your decision on that

19   date and then turn to the Notice of

20   Status of Rights in Emergency Admission

21   which your counsel clearly decided to

22   throw in front of you before --

23             MR. CALLAN:  Are we allowed to

24         look at it now because it's in the

25         record, Counsel?

Page 222

1              L. ALDANA-BERNIER

2       Q.    Did you sign that form?

3       A.    Yes.

4       Q.    On the 3rd, correct?

5       A.    On the 3rd, yes.

6       Q.    Did you sign that at the same

7    time that you signed the Emergency

8    Admission Section 9.39 Mental Hygiene

9    Law, that form?

10      A.    Yes.

11      Q.    What did you do with this form

12   once you signed it?

13      A.    One copy goes to the patient.

14      Q.    So Mr. Schoolcraft was given

15   this on the 3rd of November, 2009?

16      A.    Yes.

17      Q.    Did he sign it?

18      A.    No.  I am the one that signs

19   it.

20      Q.    Did Mr. Schoolcraft ask you to

21   -- did you have any contact with Mr.

22   Schoolcraft's father?

23      A.    No, I did not.

24      Q.    Did Mr. Schoolcraft say, call

25   my father and tell him about this?

Page 223

1          L. ALDANA-BERNIER

2      A.    No, he did not.  I don't know.

3  I don't have any notes about him allowing

4  me to speak to his father.

5      Q.    Do you know if you spoke to his

6  father while he was in the hospital?

7      A.    Regarding the notes if I spoke

8  to the father?

9      Q.    Did you write on here that his

10  father should be designated as the person

11  to be noticed of this admission?

12      A.    No, I didn't write anything

13  here.

14      Q.    Why not?

15      A.    Because this belongs to him.

16      Q.    When you say --

17      A.    This is the for the patient.

18      Q.    This is for the patient?

19      A.    Yes.

20      Q.    Do you know why there are these

21  lines indicating where copies should go?

22      A.    It says, above patient has been

23  given a copy of that notice.

24      Q.    Underneath that, what does it

25  say, it has your signature and underneath

Page 224

1              L. ALDANA-BERNIER

2    that, what does it say?  Can you read

3    that into the record, please?

4         A.     "Copies to persons designed by

5    patient to be informed of admission."

6         Q.     Continue.  "If," there is a

7    parenthesis there.

8         A.     "If none type in none."

9         Q.     Did you type in none?

10        A.     No, I did not.

11        Q.     Did you write in none?

12        A.     No, I did not.

13        Q.     Did you write in anybody's

14   name?

15        A.     It's there, "Schoolcraft,

16   Adrian."

17        Q.     Did you write anybody's name to

18   be designated by the patient to be

19   informed of his admission, did you write

20   any names there?

21        A.     No, I didn't write any names.

22        Q.     Do you have a recollection as

23   you sit here today independent of the

24   record, do you recall actually giving

25   this to Mr. Schoolcraft?

1              L. ALDANA-BERNIER

2       A.    I do not have an independent

3    recollection.  The nurse could have given

4    it to him.

5       Q.    So the nurse may have given it

6    to him?

7       A.    Yes.

8       Q.    Is this something that you

9    assigned the nurses to do from time to

10   time?

11      A.    Either the nurse or I do.  I do

12   not have a recollection if I gave it to

13   him.  I will not know.

14      Q.    Who is the person who write

15   none on it for people to designated if

16   none is the appropriate answer:  you, the

17   nurse, something else?

18      A.    I would.

19      Q.    The second page of that

20   emergency admission form -- hold on one

21   second.  Go back to that notice for the

22   second.

23            At the top of the notice there

24   appears to be a date.  Can you tell me

25   the date that you wrote there?

1          L. ALDANA-BERNIER

2      A.    11/1/09.

3      Q.    What does the form say in that

4  box, what is the date of --

5      A.    "Date of arrival at hospital."

6      Q.    Did you first write 11/3 and

7  then cross it out and make it 1?

8      A.    No, that's 11/1.

9      Q.    Did you cross out that middle

10  number at all, the date?

11      A.    No, I put 1.

12      Q.    So there is no cross out or

13  block out of that 1 where the 1 is now?

14      A.    I put a 1 in there.

15      Q.    Again, you put the 1 there

16  because that's the date that you

17  understand him to arrive at the psych ER,

18  right?

19      A.    Yes.

20      Q.    As opposed to generally him

21  arriving at the hospital, yes?

22      A.    Yes.

23      Q.    Is that something that you do

24  when you fill out these forms when part

25  of the form asked for date of arrival,

1              L. ALDANA-BERNIER

2    did you put in the date they arrived at

3    the psych ER?

4         A.    Yes.

5         Q.    As opposed to the date they

6    actually arrive at the hospital itself?

7         A.    You're right.

8         Q.    Why do you do that?

9         A.    We usually put the date of the

10   arrival when they come to the emergency

11   room.

12        Q.    I understand that.

13              Why don't you put the date of

14   arrival at the hospital when that's what

15   the form asked for?

16        A.    We do not use this in the

17   medical ER.  We use this in the psych ER.

18        Q.    Did you have any hand in

19   creating this form as director?

20        A.    No.

21        Q.    This existed prior to you --

22        A.    Yes.

23        Q.    -- prior to you being director?

24        A.    Yes.

25        Q.    When did you stop being

Page 228

1              L. ALDANA-BERNIER

2      director?

3          A.    Yes.

4          Q.    When did you stop?

5          A.    October 2013.

6          Q.    Was there a reason that you

7      stopped being director?

8          A.    There was a change of

9      administration.

10         Q.    Has there been changes of

11     administration at any time in the ten

12     years that you were director?

13         A.    No.

14         Q.    Looking at the second page of

15     the emergency admission form, is any of

16     this your handwriting?

17         A.    That belong to Dr. Isakov.

18         Q.    Did Dr. Vivek make any notes in

19     the chart as to the associate chairman

20     that you spoke to?

21              MR. CALLAN:  Vivek is the

22         chairman.

23         Q.    I thought you said associate

24     chairman.

25         A.    Associate chairman is Dr. Dhar

Page 229

1              L. ALDANA-BERNIER

2    and chairman and Dr. Vivek.

3        Q.    You spoke to Dr. Dhar?

4        A.    Yes.

5        Q.    Did Dr. Dhar fill out any of

6    these forms with regard to the mental

7    hygiene admission?

8        A.    No.

9        Q.    So you just got a verbal on the

10   phone by Dr. Dhar; is that what you're

11   saying?

12             MR. RADOMISLI:  Objection.

13       Q.    Of your opinion?

14             MR. CALLAN:  Objection to the

15       form of the question.

16       Q.    Did you speak to Dr. Dhar on

17   the telephone?

18       A.    He came down.

19       Q.    He came down to the emergency

20   room?

21       A.    [Indicating.]

22       Q.    When Dr. Dhar came down to the

23   emergency room, you presented the case to

24   him, correct?

25       A.    Yes.

Page 230

1              L. ALDANA-BERNIER

2      Q.    And then what happened?

3      A.    And he agreed to my decision of

4    admitting the patient.

5      Q.    Did he become the second

6    physician under Mental Hygiene Law for

7    admission?

8      A.    You only the need one in an

9    emergency admission.

10     Q.    But it needs to be confirmed

11   eventually, correct?

12     A.    That is after 48 hours.

13     Q.    So you called him down just

14   because you wanted a second opinion, not

15   to confirm for the purposes of 48-hour

16   requirement, correct?

17     A.    To discuss this case, yes.

18     Q.    Was there something you were

19   unsure of, is that why you wanted Dr.

20   Dhar's opinion or something else?

21          MR. CALLAN:   You went through

22       this whole thing.  Asked and answered,

23       objection.

24          MR. SUCKLE:   Then her answer

25       should be the same.

Page 231

1                L. ALDANA-BERNIER

2        A.    I give you the same answer.

3        Q.    What is the same answer?

4        A.    I made the decision and I asked

5     for Dr. Dhar's opinion and Dr. Dhar

6     agreed.

7        Q.    Was there anything about Mr.

8     Schoolcraft's presentation to you that

9     made you unsure of your opinion?

10             MR. RADOMISLI:  Objection to

11          form; unsure.

12       A.    Once more I have to reiterate:

13    I was not only looking at that day when I

14    saw him, I was looking at the whole

15    picture; the whole picture from the time

16    that he came in to the time that I made

17    the decision that he needs to be

18    admitted.

19       Q.    Was there anything about that

20    whole picture as you say and the opinion

21    you formed as a result of that whole

22    picture of which you were unsure; that is

23    the question?

24       A.    That I was not, no.  I made a

25    decision so I had to admit him.

Page 232

1              L. ALDANA-BERNIER

2        Q.     And the second form, did you

3    review this at any time while Mr.

4    Schoolcraft was in the hospital or were

5    you done with Mr. Schoolcraft's care and

6    treatment after that?

7        A.     I did not review that.  I do

8    not go to the inpatient.  I was not in

9    the inpatient.

10       Q.     So this form was completed in

11   part by you in the emergency room, and

12   the rest was completed for the inpatient

13   by the second confirming physician?

14       A.     Yes.

15             MR. SUCKLE:  Mark this as

16        Plaintiff's Exhibit 70.

17             [The document was hereby marked

18        as Plaintiff's Exhibit 70 for

19        identification, as of this date.]

20       Q.     I show you what's been marked

21   Exhibit 70 for today's date and ask you

22   what that is?

23             MR. RADOMISLI:  Do you have one

24        at least?

25             MR. SUCKLE:  You produced it.

Page 233

```
1              L. ALDANA-BERNIER
2              MR. CALLAN:  What you are
3    showing is Emergency Admission Status.
4    Q.    Do you know what that is?
5              MR. CALLAN:  Do you have a copy
6    machine?
7              MR. SMITH:  I do.
8              MR. CALLAN:  Before the end of
9    day?
10             MR. SMITH:  For sure.
11             MR. CALLAN:  It's only three
12   pages.
13             MR. SMITH:  Everybody take a
14   break.  I'll make copies right now.
15             It's 4:34.  We are taking a
16   break.
17             [Discussion held off the
18   record.]
19             [Whereupon, at 4:34 p.m., a
20   recess was taken.]
21             [Whereupon, at 4:49 p.m., the
22   testimony continued.]
23             [The documents were hereby
24   marked as Plaintiff's Exhibits 71
25   through 75 for identification, as of
```

Page 234

1              L. ALDANA-BERNIER

2         this date.]

3         Q.    Doctor, you have in front of

4    you Exhibit 70 I believe.

5         A.    Yeah.

6         Q.    Do you know what that is?

7         A.    Yes.

8         Q.    What is it?

9         A.    It's a policy on Emergency

10   Admission Status.

11        Q.    Did you have any hand in

12   creating this document?

13        A.    I do not remember.  I just

14   probably would see it, but I don't

15   remember crafting it or making all of

16   those policies.

17        Q.    I realize it's long and I know

18   you're tired, I appreciate that, but you

19   have to keep your voice up if you can.

20              When you were the director of

21   the emergency room, did you have a

22   supervisor that you answered to?

23        A.    Yes.

24        Q.    Who was that?

25        A.    Dr. Dhar and Dr. Vivek.

Page 235

                    L. ALDANA-BERNIER

1

2        Q.    So the chairman and the

3    associate chairman?

4        A.    Yes.

5        Q.    Did they have a hand in

6    creating this form?

7        A.    Yes.

8        Q.    So who else was involved in the

9    creation of this form?  You said you sat

10   in maybe?

11       A.    Yes.  It's all the

12   administrative leaders of the department:

13   the unit chief, Dr. Dhar, Dr. Vivek, and

14   the director of the nursing department.

15       Q.    Have you ever from time to time

16   had to reference this document for your

17   own information?

18            MR. RADOMISLI:  Objection to

19       form.

20       A.    You mean go back and read?

21       Q.    Yes, that's another way of

22   asking it.

23       A.    I see it every now and then if

24   we have administrative meetings, we have

25   to see it once again so I more or less

Page 236

1            L. ALDANA-BERNIER

2    will listen to what is being changed or

3    being added.

4            MR. CALLAN:  Keep your voice up,

5        Doctor, louder.

6        Q.    Doctor, I know that the last

7    review was April of 2010.  Was anything

8    changed then?

9        A.    I would not remember.

10       Q.    It appears that the policy was

11   reviewed every April from 1999 through

12   2010.  What does the review entail, do

13   you know?

14       A.    Going back to all of this if

15   there is anything added that the

16   Department of Health would like to add.

17       Q.    What is on here, what is the

18   information on here, how would you

19   characterize that?

20       A.    Well, it's giving us all the

21   reasons about when we admit the patient.

22   It's the 9.39.

23       Q.    Do you know the vernacular,

24   CPEP, do you know what a CPEP is?

25       A.    Community --

Page 237

1              L.  ALDANA-BERNIER

2      Q.     Community psyche emergency

3  protocol?

4      A.     Where are you?

5      Q.     It's not on here.

6              Do you know that vernacular, do

7  you know what that stands for, CPEP?

8              MR. RADOMISLI:  Did you say what

9      you thought it stood for on the

10     record?  I don't think you got it

11     right.

12     Q.     Do you know what CPEP stands

13  for?

14     A.     Referring to CPEP?

15     Q.     What is that?

16     A.     That is the holding a patient

17  in that department instead of sending the

18  patient to admission.

19     Q.     Holding them in that --

20     A.     It's a different department of

21  ER wherein you can hold a patient before

22  you could admit the patient to the

23  inpatient.

24     Q.     That's the psych ER, the

25  medical ER, or both?

Page 238

1                L.  ALDANA-BERNIER

2        A.     The psych ER.

3        Q.     And that wasn't done with Mr.

4   Schoolcraft, correct?

5        A.     Because we did not have a CPEP

6   then.

7        Q.     What does that stand for?

8        A.     Community psychiatry emergency

9   -- I do not have the whole name, sorry.

10       Q.     But Jamaica Hospital has one

11  now?

12       A.     It has one, yes.

13       Q.     When looking at Exhibit 70, is

14  it your understanding this sets out what

15  is required under 9.39 of the mental

16  health law to admit someone under the

17  mental health law?

18              MR. CALLAN:  Objection to form.

19              MR. LEE:  Objection to the form.

20       A.     I want you to rephrase that

21  one.

22       Q.     Sure.

23              What is the standard set out in

24  this document, if you know?

25              MR. CALLAN:  Do you want her to

Page 239

1              L. ALDANA-BERNIER

2          read the document, a summary?

3              MR. SUCKLE:  I want to know her

4          understanding of it.

5              MR. CALLAN:  I object.  It's a

6          three-page piece of paper.  It speaks

7          for itself.

8              Objection to the form of the

9          question.

10     Q.    Do you know what this is?

11     A.    Yes, it's a New York Mental

12   Hygiene Law, that's careful attention

13   with preservation of their legal rights

14   as well as their safety.

15     Q.    Is this the policy of Jamaica

16   Hospital?

17     A.    To do a 9.39?

18     Q.    Is this document a policy of

19   Jamaica Hospital?

20     A.    It's showing in here Jamaica

21   Hospital Department of Psychiatry Manual.

22     Q.    Is it a policy of Jamaica

23   Hospital, a written policy?

24     A.    A written policy, yes.

25     Q.    Do you endeavor to follow the

Page 240

1              L. ALDANA-BERNIER

2    policies of Jamaica Hospital, the written

3    ones?

4         A.    The written, yes.

5         Q.    In dealing with Mr.

6    Schoolcraft, did you endeavor to follow

7    the policy set forth here as Exhibit 70?

8              MR. CALLAN:  Well, this says it

9         was revised 4/10.

10             MR. SUCKLE:  I asked her if she

11        knew what --

12             MR. CALLAN:  Well, we don't

13        know.

14             MR. SUCKLE:  It doesn't say

15        revised.  It says reviewed.  Please

16        don't speak.  I asked her about --

17             MR. CALLAN:  Are you making a

18        representation this was the policy

19        that was in effect at the time that

20        Mr. Schoolcraft were seen?

21             MR. SUCKLE:  I'm asking if she

22        followed this policy, endeavored to

23        follow this policy, whether it was in

24        effect or not she can tell me.

25             MR. LEE:  Objection to form.

Page 241

1            L. ALDANA-BERNIER

2       A.    It's saying in here, "Patient

3   alleged to have a mental illness for

4   which immediate observation, care, and

5   treatment in a hospital is appropriate

6   and which is likely to result in serious

7   harm to himself or others may be admitted

8   under this provision for a period of 15

9   days."

10      Q.    The question is:  Did you

11  endeavor to follow this policy in your

12  care and treatment of Mr. Schoolcraft?

13      A.    At that point in 2009, I

14  thought -- I believe that he may be a

15  danger to others or to himself because of

16  that point in time if you go back to the

17  story where he was brought to the

18  hospital because he was acting bizarre

19  and agitated and he was paranoid.  I

20  think he was a danger to others or to

21  himself.

22      Q.    Is your answer, yes, you tried

23  to --

24      A.    That's what I'm saying, yes.

25      Q.    Under this policy, under number

1                L. ALDANA-BERNIER
2    1 is "a substantial risk of physical harm
3    to himself as manifested by threats of or
4    attempts at suicide."
5                Did he manifest threats or
6    attempts at suicide?
7                MR. SHAFFER:  Objection.
8                MR. CALLAN:  Objection.
9         Q.   Did Mr. Schoolcraft manifest
10   threats or attempts at suicide?
11        A.   You have to finish.
12        Q.   We are going to break it down.
13   We are going to go one by one?
14                MR. CALLAN:  Objection.
15                MR. SUCKLE:  That's the
16        question.
17                MR. CALLAN:  Objection to the
18        form of the question.
19                MR. SUCKLE:  Noted.  She can
20        answer.
21                MR. CALLAN:  The doctor said you
22        left something out.  You are reading
23        incomplete sentences from a three-page
24        document.
25                MR. SUCKLE:  I'm asking

Page 243

1                    L. ALDANA-BERNIER

2          questions.   In my horrific stumbling

3          way, I'm asking a question.

4          Q.    Doctor, did you admit Mr.

5     Schoolcraft because he was a substantial

6     risk of physical harm to himself as

7     manifested by a threat or attempt at

8     suicide?

9          A.    Sir --

10         Q.    Just yes or no.

11         A.    Sir, you have to complete the

12    statement.

13         Q.    I don't have to do anything.

14    You have to answer questions.

15              MR. SHAFFER:   Objection.

16         A.    "Or other conduct demonstrating

17    he is a danger to himself."

18         Q.    We're going to get there.   I

19    know that part.   I'm asking you a

20    question.

21         A.    That's what I based --

22         Q.    We are going to get to what you

23    based your opinion on.   I'm asking you:

24    Did you base it on that he was a

25    substantial risk of physical harm to

Page 244

```
 1              L. ALDANA-BERNIER
 2    himself as manifested by a threat of or
 3    attempt at suicide?
 4              MR. CALLAN:  Objection, asked
 5         and answered.
 6              MR. SUCKLE:  Not answered yet.
 7         Q.   Yes or no?
 8              MR. CALLAN:  Objection, asked
 9         and answered.
10         Q.   Can you answer, please?
11         A.   A potential risk, yes.
12         Q.   So you say he manifest by a
13    threat or attempt at suicide; it that
14    what you're saying?
15         A.   A potential risk.
16         Q.   Did he manifest by a threat of
17    suicide?
18         A.   It's the behavior that he came
19    in with to the emergency room.  I saw he
20    was a potential risk that he might hurt
21    himself or hurt others.  That's a
22    potential risk.
23         Q.   So potential risk was the
24    reason that you held him, correct?
25         A.   That's the reason that I was
```

1              L. ALDANA-BERNIER
2   thinking that he needs admission.
3        Q.    And the potential of that risk
4   you've described to us already today?
5        A.    I did, yes.
6        Q.    And this potential of a risk,
7   did the doctor who saw him within the
8   48-hour period to confirm his admission
9   also tell you that he was concerned about
10  the potential risk?
11              MR. RADOMISLI:  Objection.
12              MR. LEE:  Objection to the form.
13              MR. CALLAN:  I join in the
14        objection.
15        Q.    Did he tell you he was
16  concerned about the potential risk that
17  you've just described?
18              MR. LEE:  There's been no
19        testimony she ever talked to him.
20              MR. SUCKLE:  She can say that if
21        that's the answer.
22        A.    If you read the notes, I wasn't
23  there for him to tell me that.  As I read
24  his notes, I can see he was a potential
25  risk.

1              L. ALDANA-BERNIER

2        Q.     This potential risk that you're

3    talking about, did he have this potential

4    risk when you last saw him?

5        A.     I'm not basing it only to one

6    day.  I'm basing it from the beginning

7    that he came into the hospital.

8        Q.     And this potential risk, is

9    there any other risk besides that

10   potential risk that you just described as

11   the reason that you held him?

12       A.     What risk are you thinking of?

13       Q.     I'm not thinking of any.

14              MR. CALLAN:  Do you want her to

15        repeat herself again?

16              MR. SUCKLE:  No, I want to make

17        sure there are no other ones.

18       Q.     Is that potential risk that you

19   just described the only reason that you

20   held him?

21       A.     The same reason I think when I

22   see a patient, it is a potential risk and

23   danger to others, and I make the decision

24   I have to admit the patient.

25       Q.     And when you say "potential

Page 247

1        L. ALDANA-BERNIER

2    risk," can you quantify that for me at

3    all what you mean by potential?

4        A.    The patient comes in barricaded

5    himself, acting bizarre.  He was brought

6    in from his house.  It was a police

7    officer who may have access to weapons,

8    easy for him to have access to weapons.

9    He is paranoid.  I would think that maybe

10   it would be safe if the patient will be

11   admitted.

12       Q.    So your thought he might be

13   safe if he was admitted?

14       A.    If he was admitted.

15       Q.    That's what you were talking

16   about when you say potential risk,

17   correct?

18       A.    All of the above that I told

19   you.

20       Q.    Can you quantify what you mean

21   by potential risk as far as the

22   likelihood of risk?  This word

23   "potential" that you have been using, can

24   you quantify that for me?

25       A.    When you say "quantify," what

Page 248

1                    L. ALDANA-BERNIER

2      do you mean?

3          Q.    Sure.

4                Well, you used the word

5      "potential."  I would like to know what

6      you mean by potential.

7          A.    If you think of the navy yard

8      disaster, was he an officer or army man?

9      He was so quite, no one ever found out

10     what was going on with him.  So what

11     happened then?

12               Or if you look at all of those

13     -- the Range Rover.  Who are all of these

14     people that caused that?  They are all

15     police officers.

16               So if I think then I have to

17     make sure that when I see a patient in

18     the ER, I have to think in the future

19     that there will be no disaster, there

20     will be no destruction, or no one will

21     get harmed when they were discharged from

22     the ER.

23         Q.    I was asking about what you

24     meant by potential.

25         A.    That's the potential.

Page 249

1                  L. ALDANA-BERNIER

2        Q.     So if there is any potential at

3    all, you want to make sure that the

4    patient is safe, correct?

5        A.      Correct.

6        Q.      And if there is any potential

7    at all, you want to make sure the

8    community is safe, correct?

9        A.      That's correct.

10       Q.      And if there is any potential

11   at all, you were going to admit Mr.

12   Schoolcraft, correct?

13              MR. LEE:   Objection to form.

14       A.      With all of those reasons, yes,

15   I would have to admit him.

16       Q.     When you admitted him to the

17   emergency room, there were certain rules

18   and regulations --

19              MR. SUCKLE:   Withdrawn.

20       Q.     When he was admitted to the

21   psych floor, there were certain rules and

22   regulations in the psych ward, correct,

23   about clothes they wear, what hours

24   visitors can come, correct?

25       A.     Yes.

1              L. ALDANA-BERNIER

2      Q.    It's not like they are free to

3  have anybody come and visit any time they

4  want, correct; is that true?

5      A.    That's correct.

6      Q.    I will show you what's been

7  marked as Exhibit 71.

8            Now, do you know what that is?

9      A.    [No response.]

10     Q.    Do you know what that is?

11     A.    It's the policy of visiting

12  hours.

13     Q.    Were those the policies in

14  effect when Mr. Schoolcraft was on the

15  psychiatric floor at Jamaica Hospital in

16  2009?

17     A.    Okay, this policy is for the

18  inpatient unit.

19     Q.    During the time that Mr.

20  Schoolcraft was at Jamaica Hospital, was

21  he in the inpatient unit?

22     A.    I did not work in the inpatient

23  unit.

24     Q.    I understand.

25            Was he in the inpatient unit?

Page 251

1           L. ALDANA-BERNIER

2      A.     Yeah, he was in the inpatient

3  unit.

4      Q.     Were these documents created by

5  Jamaica Hospital, the visiting hours, do

6  you know about that?

7      A.     It's in here [indicating].

8      Q.     Were you sitting in on the

9  committee that created that document too?

10     A.     I don't remember that.

11     Q.     Do you agree that Mr.

12 Schoolcraft could have visitors from 2

13 p.m. and 3 p.m. and 6:30 p.m. to 8 p.m.

14 only?

15           MR. RADOMISLI:  Objection.

16           MR. CALLAN:  Objection.

17     Q.     While he was on the floor, do

18 you agree with that?

19           MR. CALLAN:  You know, Counsel,

20      she said she is not involved with the

21      inpatient.

22           Maybe you can ask her about

23      painting the hospital.  Maybe she

24      might know something about that.

25      Maybe she looked at it from her car

Page 252

```
 1              L. ALDANA-BERNIER
 2        when she drove by.
 3              MR. SUCKLE:  I'll ask her about
 4        it next.
 5              MR. SHAFFER:  I will be leaving
 6        if that is a question that's asked.
 7        A.    Can you ask the question again?
 8        Q.    What were the visiting hours on
 9   the floor?
10        A.    Two to three, 6:30 to eight.
11        Q.    So Mr. Schoolcraft if his
12   father wanted to visit him at nine
13   o'clock in the morning, would not be able
14   to do that, correct?
15              MR. CALLAN:  Objection.
16              MR. RADOMISLI:  Objection.
17              MR. LEE:  Objection to form.
18        A.    I would not know what the
19   policy at the inpatient unit would be.
20              MR. SUCKLE:  Counsel wants me to
21        ask about painting, but I'm not going
22        to do that.
23              MR. CALLAN:  That's a relief.
24        Q.    Let's look at Exhibit 72.
25              MR. SMITH:  Which is --
```

```
 1              L. ALDANA-BERNIER
 2       Q.    Which is the restriction of
 3   visiting and communication and
 4   correspondence, do you know about that,
 5   what that document is?
 6       A.    This is also for the inpatient
 7   unit.
 8       Q.    So you don't know anything
 9   about it?
10       A.    I can read it to you.
11       Q.    Do you know anything about it?
12       A.    No, it's for the inpatient
13   unit.
14       Q.    So you only know about the
15   emergency room?
16       A.    Emergency room.
17             MR. CALLAN:  Aren't you doing
18       Isakov tomorrow?  Isn't he in the
19       inpatient room?
20       Q.    I'm showing you what's been
21   marked Exhibit 74 today's date.  Do you
22   know what this is?
23       A.    It's the rules and regulations
24   the patients have to comply with.
25       Q.    At Jamaica Hospital in the
```

Page 254

1              L. ALDANA-BERNIER

2   psych unit?

3       A.    Psych Unit 3, yes.

4       Q.    What is Psych Unit 3?

5       A.    That's -- it's a unit which

6   patients are admitted; one is 2 and one

7   is 3.

8       Q.    What is the distinction, if

9   any, in treatment?

10      A.    None, it's the same.

11      Q.    Was Mr. Schoolcraft admitted to

12  Psych 3?

13      A.    Yes.

14      Q.    So these rules would apply to

15  him?

16      A.    Psych 3.

17          MR. RADOMISLI:  Mr. Suckle, is

18      this something we produced to you?

19          MR. SUCKLE:  I believe so.  I

20      don't know.

21          MR. RADOMISLI:  Do you know?

22          MR. SUCKLE:  Off the top of my

23      head, I don't remember but -- I don't

24      remember.

25          MR. RADOMISLI:  Would there be a

Page 255

```
 1          L. ALDANA-BERNIER
 2     way for you to get it in a fashion
 3     other than if we produced it?
 4          MR. SUCKLE:  I didn't do
 5     discovery in this case so you've got
 6     the wrong guy.
 7          MR. RADOMISLI:  Do you know
 8     whether this was produced to you by
 9     us?
10          MR. SUCKLE:  Off the top of my
11     head, I would assume it was.  In fact,
12     I know it came out of, I hit print on
13     your document response to discovery
14     inspection and this came out.  I can
15     tell you that.
16          MR. RADOMISLI:  Fair enough.
17     Thank you.
18          MR. CALLAN:  Or it could be
19     another hospital in Queens, who knows.
20     Q.    This document was created by
21  Jamaica Hospital, correct?
22          MR. CALLAN:  Objection.
23     A.    Correct.
24     Q.    She already said yes.
25          MR. CALLAN:  Do you know if that
```

1           L. ALDANA-BERNIER

2       was created by Jamaica Hospital, do

3       you have personal knowledge of that?

4           THE WITNESS:  It says Unit 3

5       so....

6           MR. CALLAN:  I'm not asking you

7       what it says.

8           Do you have personal knowledge

9       as to whether that document was

10      created by Jamaica Hospital?

11          If you do, you can say yes, if

12      no, say no.  Don't assume is all I'm

13      saying to you.

14          Do you know?

15          MR. SUCKLE:  Stop badgering your

16      own witness.

17          THE WITNESS:  I was just looking

18      at the top of it.

19      Q.    Do you recognize this document?

20      A.    Which one?

21      Q.    This one, have you seen it

22  before?

23      A.    I have to -- I don't think so

24  because it's inpatient unit.

25          MR. SMITH:  You don't think so?

Page 257

1                L. ALDANA-BERNIER

2             THE WITNESS:  It's in the

3       inpatient unit.  I work in the ER.

4       Q.    You work in the ER; am I

5   correct?

6       A.    Yes.

7       Q.    You have been doing this for

8   how many years, how long have you been

9   working in the ER?

10      A.    Eighteen years.

11      Q.    For 18 years people come into

12  the psychiatric ER, right, you evaluate

13  them, correct?

14      A.    Yes.

15      Q.    And you sign them in under

16  Mental Hygiene Law, they go upstairs,

17  correct?

18      A.    Yes.

19      Q.    And you never see them again;

20  is that true?

21             MR. CALLAN:  Objection.

22      Q.    While they were at the

23  hospital?

24             MR. CALLAN:  Does that have to

25      do with the piece of paper?

1           L. ALDANA-BERNIER

2               MR. SUCKLE:  I'm asking

3       questions about the paper because you

4       didn't like the paper.

5       Q.    Is that true?  When they go

6   upstairs on the psychiatric ward, you

7   don't see them again, correct?

8       A.    That depends if you follow the

9   patient on the outside, then you see them

10  again.

11      Q.    When you say "follow the

12  patient on the outside," do you follow

13  patients on the outside?

14      A.    If they refer them to me, yes.

15      Q.    Who is they?

16      A.    The inpatient Unit 3.

17      Q.    So inpatient can refer a

18  patient to you for private care?

19      A.    Yes.

20      Q.    Do you do your own private

21  practice?

22      A.    Yes.

23      Q.    Do you have an office outside

24  of Jamaica Hospital?

25      A.    I do.

Page 259

1          L. ALDANA-BERNIER
2      Q.    In this private practice, you
3  practice psychiatry I assume, correct?
4      A.    What else would I practice?
5      Q.    I don't know.  I'm just making
6  sure.
7            How many days a week do you
8  work in that private practice?
9      A.    One.
10     Q.    How many days a week did you
11  work at Jamaica Hospital in 2009?
12     A.    Five.
13     Q.    And you also had private
14  practice back in 2009?
15     A.    That's -- yes, one, one day.
16     Q.    So just to be clear:  You were
17  working six days a week back in 2009,
18  correct, five at Jamaica, one on your
19  own?
20     A.    I work with somebody.
21     Q.    So you are working six days a
22  week, five at Jamaica Hospital and one in
23  private practice in 2009?
24     A.    Five days a week after I come
25  -- after five o'clock on Friday.

Page 260

1              L. ALDANA-BERNIER

2      Q.    So five o'clock on Fridays you

3   see private patients in your own

4   practice; is that what you're saying?

5      A.    Yes.

6      Q.    How many hours do you usually

7   do that?

8      A.    Four hours.

9      Q.    Could you get referrals from

10  time to time from patients up on the

11  psych 3 unit?

12     A.    Yes.

13     Q.    Who refers them to you:  the

14  physicians up there, the nurses, anybody

15  else?

16     A.    Social worker.

17     Q.    Social workers?

18     A.    Yes.

19         MR. CALLAN:  Counsel, does this

20      have anything remotely to do with Mr.

21      Schoolcraft?

22         MR. SUCKLE:  I don't know yet.

23         MR. CALLAN:  Has he told you he

24      was seeing Dr. Aldana-Bernier in her

25      office?

Page 261

1          L. ALDANA-BERNIER

2              MR. SUCKLE:  Are you saying her

3      resumé is not part of my questions?

4              MR. CALLAN:  I'm just asking.

5      You have been going for hours here and

6      now we have gone down this road to

7      nowhere.  I would kind of like to get

8      it back.

9              This all has to do with you

10     handing her a piece of paper if they

11     can smoke in the inpatient unit or not

12     which I will be willing to stipulate

13     by the way that no smoking is allowed.

14             I think it is Rule No. 1

15     assuming that's Psych Unit 3 is

16     Jamaica Hospital.

17             MR. SUCKLE:  Are you enjoying

18     extending our stay here?

19     Q.      So did you see Mr. Schoolcraft

20  in your private practice?

21     A.      No.

22     Q.      Did you see police officers in

23  your private practice?

24     A.      No.

25     Q.      Did a Captain Lauterborn tell

Page 262

1                L. ALDANA-BERNIER

2    you that from his observation of Mr.

3    Schoolcraft as he observed Mr.

4    Schoolcraft on October 31st, 2009, that

5    Mr. Schoolcraft was fit for duty?

6            MR. SHAFFER:  Objection.

7        Q.    Did he tell you that?

8        A.    I did not meet him.

9        Q.    So am I correct that you got

10   the history of Mr. Schoolcraft

11   barricading him [sic] from some police

12   officers, but you didn't get the

13   histories from other police officers like

14   Captain Lauterborn; am I correct?

15           MR. CALLAN:  Objection to form.

16           MR. LEE:  Objection to form.

17           MR. RADOMISLI:  Objection to

18       form.

19       A.    I don't know the officer.  I

20   haven't met him.

21       Q.    Well, it was Mr. Schoolcraft's

22   captain.  Are you aware that Captain

23   Lauterborn was his captain?

24           MR. SHAFFER:  Objection.

25       A.    No.

Page 263

1              L. ALDANA-BERNIER

2        Q.      So you were not aware when you

3    signed the form on November 3rd, to admit

4    Mr. Schoolcraft to the hospital that his

5    captain said that he was fit for duty?

6              MR. CALLAN:  Objection.

7              MR. SHAFFER:  Objection.

8              MR. RADOMISLI:  Objection.

9        Q.      You did not know that?

10             MR. SHAFFER:  Objection.

11       A.      No, I didn't know that.

12       Q.      Would you like to have known

13   that information, would it have helped

14   you in your assessment of Mr.

15   Schoolcraft?

16             MR. SHAFFER:  Objection.

17             MR. CALLAN:  I join in the

18       objection.

19       Q.      Would you have liked to know,

20   would that have helped you in your

21   assessment of Mr. Schoolcraft?

22             MR. CALLAN:  If it's true.

23       A.      I didn't even know when he came

24   to the hospital, I didn't see any

25   officer.  I don't remember if I seen an

Page 264

1              L. ALDANA-BERNIER

2     officer at the time when I saw Mr.

3     Schoolcraft.

4              MR. CALLAN:  Doctor, he didn't

5         say he came to the hospital.  I know

6         it's getting late in the day.  He is

7         asking you to make an assumption about

8         something.  He asking you a question.

9         He didn't say this person came to the

10        hospital so just listen carefully to

11        the question.

12             Go ahead, Counsel.

13             MR. SUCKLE:  Read that back.

14             [The requested portion of the

15        record was read.]

16        Q.   My question is:  Would you have

17    liked to know, would it have helped you

18    in your assessment of Mr. Schoolcraft

19    that his captain said he was fit for duty

20    on October 31st, 2009?

21             MR. KRETZ:  Objection.

22             MR. CALLAN:  On October 31st?

23             MR. SUCKLE:  Yes.

24             MR. CALLAN:  Objection.

25        A.   Yes, I would.

1              L. ALDANA-BERNIER
2       Q.     Would that have changed your
3  opinion regarding whether or not Mr.
4  Schoolcraft needed to be admitted to the
5  hospital if you had known that Captain
6  Lauterborn had said that Mr. Schoolcraft
7  was fit for duty on October 31st, 2009?
8              MR. RADOMISLI:  Can you just
9         define when he said that?
10             MR. SUCKLE:  On that day,
11        October 31st, 2009.
12             MR. RADOMISLI:  Before Mr.
13        Schoolcraft left?
14             MR. SUCKLE:  I just want to ask
15        the question.  You can narrow it down
16        anyway you want when your turn comes.
17             Let's have a question and an
18        answer.
19             MR. RADOMISLI:  I would like a
20        time frame.
21             MR. SUCKLE:  I know what you
22        want.  I asked a question.
23             MR. RADOMISLI:  Objection to
24        form.
25             MR. SHAFFER:  I join in the

Page 266

1               L. ALDANA-BERNIER

2         objection.

3         Q.    Would you have changed your

4    opinion had you known on October 31st,

5    2009, at 21:30 hours, Captain Lauterborn

6    said that Mr. Schoolcraft was fit for

7    duty, would that have changed your

8    opinion?

9               MR. KRETZ:   Objection.

10              MR. CALLAN:   Objection.

11              MR. SHAFFER:   Objection.

12        Q.    Would you have admitted him is

13   the question?

14        A.    Yes, I would have admitted him.

15        Q.    How would it have changed your

16   opinion.   You said it would change your

17   opinion?

18              MR. CALLAN:   You asked if she

19        would have liked to have known.

20              MR. SUCKLE:   I did ask her.

21        Q.    Would it change your opinion if

22   you knew that Captain Lauterborn on

23   October 31st, 2009, at 21:30 hours,

24   deemed Mr. Schoolcraft fit for duty?

25        A.    It would not change my opinion.

Page 267

1              L. ALDANA-BERNIER
2     I would talk to maybe the captain, and I
3     will tell him what is going on, and I
4     will make a decision together again with
5     the chairman if he should be admitted or
6     discharged.
7          Q.    And you would talk to the
8     captain because you want to verify that
9     information, correct?
10              MR. KRETZ:  Objection.
11              MR. CALLAN:  Same objection.
12          Q.    Is that why you would have
13     talked to the captain?
14              MR. CALLAN:  Verify what
15          information, what information,
16          Counsel?
17              MR. SUCKLE:  She said she would
18          talk to the captain.
19          Q.    Why would you have talked to
20     the captain?
21          A.    To verify that he said he was
22     fit for duty.
23          Q.    Did you speak to any officers
24     to verify that he had barricaded himself
25     in his house?

Page 268

```
 1              L. ALDANA-BERNIER
 2              MR. SHAFFER:  Objection.
 3      A.    I get it from the information
 4  in the report.
 5      Q.    Did you speak to any police
 6  officer to verify he was acting bizarre?
 7              MR. SHAFFER:  Objection.
 8              MR. CALLAN:  Asked and answered.
 9      Q.    Did you speak to any officers?
10      A.    It's been reported and written
11  down in the document.
12              MR. KRETZ:  Read that back.
13              [The requested portion of the
14      record was read.]
15      Q.    Seroquel, do you know what that
16  is?
17      A.    Yes.
18      Q.    What is it?
19      A.    A second generation
20  antipsychotic.
21      Q.    Is that also used for sleep
22  disorders?
23      A.    Sleep, depression, bipolar,
24  used for psychosis.
25              MR. SMITH:  We are going to take
```

Page 269

```
 1            L. ALDANA-BERNIER
 2      a short break to see what we have
 3      left.
 4            It's 5:24.  We are going off the
 5      record.
 6            MR. CALLAN:  All right.
 7            [Discussion held off the
 8      record.]
 9            [Whereupon, at 5:24 p.m., a
10      recess was taken.]
11            [Whereupon, at 5:38 p.m., the
12      testimony continued.]
13            MR. SMITH:  Back on the record.
14      It is 5:38 p.m.
15            MR. RADOMISLI:  Just before you
16      start asking questions, I sent an
17      email to my associate at the office
18      asking him to do a search in our
19      system to determine if we ever
20      provided with you document Psych 3
21      Unit Rules, according to his search,
22      there is nothing on our system
23      indicating we ever did.
24            I ask you send us by within a
25      week an explanation how you obtained
```

Page 270

1              L. ALDANA-BERNIER
2        this document.  I'm not saying we
3        didn't give it to you, all I'm saying
4        is according to my associate based on
5        his search, there is no indication we
6        did.
7              MR. SUCKLE:  I will double-check
8        my records, but I'm fairly confident
9        that it came from you.
10             MR. CALLAN:  It didn't come from
11       me.  I can tell you that.
12             MR. SUCKLE:  Maybe the house
13       painter gave it.
14       Q.    Doctor, I know it's late.  We
15   are getting there.
16             Doctor, in your position as
17   employee of the hospital, do you get a
18   performance evaluation, do you get
19   evaluated in your performance?
20       A.    Yes.
21       Q.    Is that something done
22   annually, some other way?
23       A.    Annually.
24       Q.    Are they written evaluations?
25       A.    Are they written, yes.

Page 271

1          L. ALDANA-BERNIER

2      Q.    And in their evaluations,

3   without discussing at this point what the

4   evaluations were, can you tell me what

5   some of items are that are considered in

6   your evaluation?

7      A.    I don't have a copy so it's

8   hard for me to say.  We talk about

9   performance.  We talk about ability to

10   relate with other staff.  We talk about

11   clinical judgment.  We talk about if we

12   have this sense of cooperativeness with

13   the department.  We also talk about our

14   knowledge of medicine or psychiatry.

15   That's all I can remember.

16      Q.    In your evaluation has any of

17   your evaluations criticized your clinical

18   judgment?

19          MR. RADOMISLI:  Objection based

20      on the --

21          MR. CALLAN:  Yeah, objection.

22          MR. RADOMISLI:  -- and based on

23      Education Law 6527.

24          MR. CALLAN:  I join in the

25      objection, and you're directed not to

Page 272

1           L. ALDANA-BERNIER

2      answer that question.

3      Q.      When you talk about

4  performance, is there any relationship

5  between performance and the number of

6  patients seen in your evaluation?

7           MR. CALLAN:  Objection to the

8      question.

9           MR. SUCKLE:  Just generally not

10      only her.

11      Q.      Generally, is part of your

12  performance evaluation based on the

13  number of patients seen?

14           MR. RADOMISLI:  Objection based

15      on privilege, but I can't direct her

16      not to answer.

17           MR. SUCKLE:  I don't think

18      that's privileged.  She just gave me

19      generally categories of evaluations.

20           MR. RADOMISLI:  You're asking

21      her?

22           MR. SUCKLE:  I'm asking

23      generally.

24           MR. LEE:  Objection.

25      Q.      Generally, in the category of

Page 273

1                L. ALDANA-BERNIER

2    performance, does that include number of

3    patients seen?

4        A.    No.

5        Q.    Do you know how many patients

6    you saw last year at Jamaica Hospital?

7        A.    I would not remember that.

8        Q.    Is there a way that you can

9    ascertain that kind of information?

10       A.    I have to go to the financial

11   department and see how many patients I

12   have seen.  I don't know.

13       Q.    That would be the same for

14   patients that you saw in 2009?

15            MR. CALLAN:  You mean did she

16       see the exact number of patients?

17       Q.    In order to find out how many

18   you saw, you would have to go to the

19   financial department?

20       A.    Financial department because

21   they have to do the billing.  I don't

22   bill.

23       Q.    So in order to find out how

24   many patients you saw if you wanted, you

25   would have to go to the billing or

Page 274

1          L. ALDANA-BERNIER

2    financial department, correct?

3              MR. CALLAN:  Do you know if they

4         can isolate it by doctor name or are

5         you assuming?

6              THE WITNESS:  I do not know how.

7              MR. CALLAN:  Just tell him that.

8              MR. SMITH:  Let her speak.

9         Don't interrupt.  Let her answer the

10        question for God's sake.

11             MR. CALLAN:  Do you know for a

12        fact if they have the software or

13        computer program to isolate it by

14        doctor per patient, do you know that?

15             THE WITNESS:  No, I don't.

16   Q.    Doctor, does Jamaica Hospital

17   have a billing department?

18   A.    They do.

19   Q.    When you see a patient, are you

20   required to fill out any paperwork so

21   that the patient's insurance company will

22   be billed if there is an insurance

23   company?

24   A.    I'm not the one that do the

25   billing.

Page 275

1              L. ALDANA-BERNIER

2       Q.    Do you fill out any forms or

3  documents that go to billing so they can

4  bill the patient for your services?

5       A.    Yes, I fill out a form.

6       Q.    What is the nature of that

7  form, what is it?

8       A.    It's a form that I sign that I

9  saw the patient.

10      Q.    Do patients who come in with

11 private insurance, do they get admitted,

12 do you need approval from time to time

13 from private insurance before they get

14 admitted; just generally we're talking

15 about?

16      A.    Let me see.

17      Q.    I'm talking generally.

18      A.    Yes.

19      Q.    Not Mr. Schoolcraft.

20      A.    Yes.

21      Q.    What about for Medicare, do

22 they need approval before a patient is

23 admitted?

24      A.    That depends if it's an HMO.

25      Q.    So some HMOs require approval

Page 276

1               L. ALDANA-BERNIER
2    and some aren't HMOs.
3               And does the federal government
4    require prior approval on their Medicare?
5       A.      If they are not HMOs, you don't
6    to ask for authorization.
7       Q.      How about Medicaid, is prior
8    approval required before admission?
9       A.      No.
10      Q.      Just as a housekeeping thing:
11   Are you paid for your overtime hours?
12      A.      No.
13      Q.      You have actually in front of
14   you, you know at some point IAB, internal
15   affairs from the New York City Police
16   Department did come to the hospital based
17   on the records in front of you, correct?
18              MR. CALLAN:  Is that a question,
19      does she know that?
20              MR. SUCKLE:  Yes.
21      Q.      Based on the record in front of
22   you?
23      A.      Yes, I know there is a note.
24      Q.      What is the date of that note?
25      A.      That's 11/2/2009, five o'clock

Page 277

1            L. ALDANA-BERNIER

2    in the afternoon.

3        Q.    So that note was in the chart

4    before you signed your November 3rd,

5    mental hygiene admission form, correct?

6        A.    That's correct.

7        Q.    So you know that internal

8    affairs had come to the hospital before

9    you decided to admit Mr. Schoolcraft to

10   the hospital?

11            MR. CALLAN:  Objection.  She

12        testified earlier she made the

13        decision to admit him on the 2nd not

14        on the 3rd.  She filled out the form

15        on the 3rd.  You're mischaracterizing

16        testimony.

17       Q.    Before you filled out the form

18   to admit Mr. Schoolcraft under the Mental

19   Hygiene Law, you knew that IAB had come

20   to the hospital, correct?

21            MR. SHAFFER:  Objection.

22       A.    The notes are here from 11/2.

23       Q.    So the answer is yes, you knew

24   that IAB had come to the hospital before

25   you signed the admission forms on 11/3,

Page 278

1              L. ALDANA-BERNIER

2   correct?

3       A.    I must have read the notes.

4            MR. SMITH:  What was the answer?

5            THE WITNESS:  I must have read

6       the note.

7       Q.    Did you speak to the officer

8   from IAB and ask them whether or not Mr.

9   Schoolcraft had told them the story about

10  the problem with his supervisor that Mr.

11  Schoolcraft told to you?

12           MR. SHAFFER:  Objection.

13      A.    It was at five o'clock.  I was

14  not there.  It was at 9:30.  I'm not

15  there anymore [indicating].

16      Q.    In fact one of the officers

17  from IAB stapled -- gave his card and it

18  was taped to the chart, correct?

19           MR. CALLAN:  She said she wasn't

20      there when they were there.

21      Q.    The chart you have in front of

22  you, correct?

23      A.    Yes.

24      Q.    Yes.  And when you went to sign

25  your admission under the Mental Hygiene

Page 279

1             L. ALDANA-BERNIER
2    Law on November 3rd, that card was in the
3    chart, correct?
4             MR. CALLAN:  How do we know when
5       the card was stapled in?
6             MR. SUCKLE:  Let her answer.  If
7       she doesn't know, she'll tell me.
8             MR. CALLAN:  You're making these
9       things up in your question.
10            MR. SUCKLE:  I'm making up
11       nothing.  I'm --
12            MR. CALLAN:  You are.  You said
13       the IAB officer stapled the card into
14       the card.
15            MR. SUCKLE:  I didn't say that.
16            MR. CALLAN:  Who stabled that
17       in?
18            MR. SUCKLE:  Nobody, it's taped.
19       Q.   Can we have an answer to the
20    question, please?
21       A.   I don't remember.  I do not
22    remember seeing this card.
23       Q.   If that card was in the chart,
24    would you have called that officer from
25    internal affairs to verify Mr.

Page 280

1          L.  ALDANA-BERNIER
2   Schoolcraft's story?
3             MR.  CALLAN:   Objection.
4             MR.  SHAFFER:   Objection.
5             MR.  SMITH:   What was the answer?
6             THE REPORTER:   I didn't get an
7       answer yet.
8       Q.    What's your answer.
9       A.    I wouldn't know because I don't
10   know if I saw the card or not.
11      Q.    Had you seen the card before
12   you signed the mental hygiene admission
13   on the 3rd, would you have called
14   internal affairs?
15      A.    I did not see these cards
16   before so I don't know if I would have
17   called internal affairs.
18      Q.    So now you are saying you know
19   you did not see the cards?
20      A.    I do not know if I saw these
21   cards.  I don't remember seeing them.
22      Q.    And you don't remember if you
23   would have called internal affairs?
24      A.    I didn't see the card.
25      Q.    You know you did not see the

Page 281

1              L. ALDANA-BERNIER

2    cards?

3        A.    I do not know.  I do not

4    remember.  It was that 2009.

5        Q.    So the answer is, am I correct,

6    you don't know if you saw the cards and

7    you don't know what you would have done

8    if you did see the cards, am I correct,

9    is that the answer?

10             MR. CALLAN:   Objection.

11       Q.    You can answer.

12       A.    I do not know if I would have

13   called them.

14       Q.    Looking at the note of November

15   2nd, 2009, at 9:30, do you see that note?

16       A.    P.m.?

17       Q.    Yes.

18             Do you see that note?

19       A.    Yes.

20       Q.    And that is before your

21   November 3rd, 1:20 note where you signed

22   the form, the mental hygiene admission,

23   correct?

24       A.    Yes.

25       Q.    And did you read the chart

Page 282

```
 1              L. ALDANA-BERNIER
 2   where it says, "Patient has been seen and
 3   interviewed by Detective Steven P. Wacter
 4   [phonetic] and Sergeant Scott from
 5   Internal Affairs Bureau"?
 6        A.   Yes.
 7        Q.   Would you want to know what
 8   internal affairs had to see about Mr.
 9   Schoolcraft in coming to your opinion
10   regarding whether or not he needed to be
11   admitted to the hospital?
12              MR. SHAFFER:  Objection.
13        A.   I was wondering why the
14   attending put this note and did not write
15   any note about what interaction happened
16   with internal affairs.
17        Q.   When you say you were wondering
18   about it --
19        A.   There's nothing.
20        Q.   When were you wondering about
21   it?
22        A.   Now.
23        Q.   Why were you wondering about
24   it?
25        A.   Should have written a note.
```

Page 283

1              L. ALDANA-BERNIER
2      Q.    When you say "should have
3   written a note," what should he have
4   written about?
5      A.    His interaction with internal
6   affairs.
7      Q.    Would that have been helpful to
8   you in your care and treatment with Mr.
9   Schoolcraft?
10     A.    In deciding to admit him or
11  not?
12     Q.    Yes.
13     A.    I already made my decision
14  before that.  On 11/1 I made the decision
15  of admission.
16     Q.    Was your decision irreversible
17  once you made it?
18     A.    I think that he would benefit
19  from inpatient admission.
20     Q.    When you say "he would
21  benefit," what do you mean?
22     A.    I thought at the time in 2009
23  that he would be a danger to himself or
24  others.
25     Q.    The question was:  Would the

1            L. ALDANA-BERNIER
2    notes that you think would have been
3    helpful in coming to your decision as to
4    whether or not Mr. Schoolcraft needed to
5    be admitted?
6            MR. RADOMISLI:  Objection to
7        form.
8            MR. CALLAN:  How would she know?
9            MR. SUCKLE:  She was the one
10       that said something should have been
11       there.
12           MR. CALLAN:  You are the one
13       talking about cards stapled into a
14       chart.
15           MR. SUCKLE:  The record is what
16       the record is.  You are just playing
17       games now.
18           MR. CALLAN:  It's nonsense.
19           MR. SUCKLE:  It's nonsense?
20           MR. CALLAN:  Right.
21           MR. SUCKLE:  A doctor has a note
22       in front of her and she signs a day
23       later, you think it's nonsense.
24           MR. CALLAN:  It is.
25           MR. SUCKLE:  Let's go.

Page 285

1              L. ALDANA-BERNIER

2          MR. CALLAN:  She's got one note

3      in the chart, it's only taken us six

4      hours to question her so....

5          MR. SUCKLE:  Maybe we should

6      have taken six hours to evaluate the

7      patient.

8      Q.    The notes you said should have

9  been there, would that have been helpful

10  to you in your decision to admit Mr.

11  Schoolcraft?

12          MR. SHAFFER:  Objection to form.

13          MR. CALLAN:  Objection to form.

14          MR. SUCKLE:  It hasn't been

15      answered.

16          MR. RADOMISLI:  It has actually.

17          MR. CALLAN:  Asked and answered,

18      Counsel.

19          There is nothing in the note

20      except that IAB was there.

21          MR. SUCKLE:  The note she said

22      should have been there.

23          MR. CALLAN:  She is supposed to

24      make up a note now and answer a

25      hypothetical?

Page 286

1          L. ALDANA-BERNIER
2          MR. SUCKLE:  She said a note
3      should be there.  I'm asking about the
4      note that should have been there.
5      A.    Not my note.
6      Q.    I understand.
7          The note that should have been
8  there, would they have mattered in your
9  decision to admit Mr. Schoolcraft?
10         MR. SHAFFER:  Objection to form.
11         MR. RADOMISLI:  Objection to
12     form, asked and answered.
13         MR. SUCKLE:  I didn't get an
14     answer.  I've asked it.
15         MR. SHAFFER:  It's impossible to
16     answer the question.  The information
17     doesn't exist.  It's impossible to
18     answer.
19         Let's stop playing games and
20     move this along.  You cannot answer a
21     question about something that does not
22     exist.
23     Q.    Please answer the question?
24         MR. CALLAN:  Can you answer the
25     question, Doctor?

Page 287

1                L. ALDANA-BERNIER
2       A.     I already made my decision.   I
3   cannot answer the question.
4       Q.     Once your made your decision?
5       A.     The patient needed admission.
6   I felt that at that point on 11/1 that
7   the patient needed inpatient
8   stabilization.
9       Q.     So just so we are clear here:
10  No information from IAB would have
11  changed your mind, correct, from internal
12  affairs?
13              MR. KRETZ:   Objection.
14              MR. CALLAN:   Same objection.
15      A.     Then I would have to make the
16  chairman make the decision.
17      Q.     So if IAB had information, you
18  would want the chairman to make the
19  decision?
20              MR. CALLAN:   Objection.   This is
21      ridiculous.
22              MR. SMITH:   Would you stop.
23      Would you please stop.   I'm sick and
24      tired of you interrupting this
25      examination.   You've been doing this

Page 288

1           L. ALDANA-BERNIER

2      all day.

3           MR. CALLAN:  Are you involved in

4      this?

5           MR. SMITH:  Yes, heavily and

6      you're going to become more involved

7      in this with this kind of

8      irresponsible behavior.

9           MR. CALLAN:  There is one

10     attorney designated to represent the

11     Plaintiff.  It's not you today.  You

12     are just running the home movie

13     camera.

14          MR. SMITH:  Would you please

15     stop interfering?

16          MR. SUCKLE:  Excuse me.  No

17     matter how much you pontificate, we

18     are not going home until we are done.

19          I'm going to keep asking until I

20     get an answer.  I'm going to keep

21     asking.

22          MR. CALLAN:  Try to ask a

23     relevant question.

24          MR. SUCKLE:  I haven't been able

25     to all day, that's why we're here.

1              L. ALDANA-BERNIER
2         I'm trying.
3              MR. CALLAN:  Work harder at it.
4              MR. SUCKLE:  Maybe you'll teach
5         me one day.
6         A.    What do the think internal
7    affairs would tell me?
8              MR. CALLAN:  Doctor, you have to
9         wait for the question.
10        Q.    There was nothing internal
11   affairs could have told you to change
12   your mind, you already made your decision
13   and whatever internal affairs had to say,
14   you were not going to change your mind,
15   correct?
16        A.    Is internal affairs reliable?
17        Q.    That's a good questions.  Can
18   you answer my question?
19        A.    So I have to determine how
20   reliable internal affairs is.
21        Q.    How do you determine whether or
22   not internal affairs is reliable?
23        A.    Because I have to assess them
24   too.
25        Q.    In assessing them, how would

Page 290

1              L. ALDANA-BERNIER

2    you do that?

3         A.    Collaborate what I have seen

4    and what they tell me.

5         Q.    So you would need to hear what

6    internal affairs has to say and evaluate

7    whether or not you can believe them or

8    not, correct?

9         A.    Yes.

10        Q.    Did you evaluate the police

11   officer who reported that Mr. Schoolcraft

12   had barricaded himself in his house, did

13   you evaluate that person?

14             MR. SHAFFER:  Objection.

15        A.    He wasn't there.  I didn't see

16   him.

17        Q.    So but you accepted his

18   information as part of the basis of your

19   diagnosis, correct?

20        A.    And the documentation.

21        Q.    Documentation somebody else

22   wrote in a chart, correct?

23        A.    That I saw Mr. Schoolcraft and

24   I agreed to whatever the documentation of

25   the resident was.

1              L. ALDANA-BERNIER

2      Q.    When you saw Mr. Schoolcraft,

3    you agreed he had barricaded himself in

4    his house?

5      A.    That is the information given.

6      Q.    Written in the chart?

7      A.    Information given in the chart.

8      Q.    By some police officer or

9    sergeant from the police department,

10   correct?

11     A.    Hold on.  Also have the

12   documentation from the EMS.

13     Q.    Did you speak to EMS?

14     A.    Documentation is here.

15     Q.    Documentation meaning a note?

16     A.    Yes.

17     Q.    So EMS writes a note and you

18   accept what they say because it's written

19   in the chart, correct?

20     A.    They were there.  They went to

21   pick up the patient.

22     Q.    But you are not sure if you

23   would trust internal affairs; am I

24   correct?

25     A.    That's a big question.

1            L. ALDANA-BERNIER

2       Q.    Do you have the duty as a

3    physician in accordance with good and

4    accepted medical practice to conduct your

5    own evaluation of a patient?

6       A.    I do.

7       Q.    Do you as a physician have in

8    accordance with good and accepted medical

9    practice have to do a complete evaluation

10   of your patients?

11      A.    I agree with the evaluation of

12   the resident.  I saw the patient.  I

13   agree whatever evaluation of resident was

14   and that's it.  I have written in my

15   notes --

16      Q.    I understand.

17            My question is not quite that.

18            Do you have a duty, does good

19   and accepted medical practice require you

20   to do a complete evaluation of your

21   patients; that's the question?

22      A.    I'm in agreement with the

23   resident.

24      Q.    Yes or no, do you have a duty

25   within the bounds of good and accepted

Page 293

```
 1              L. ALDANA-BERNIER
 2    medical practice to do a complete
 3    evaluation of your patient?
 4              MR. CALLAN:  Objection to form.
 5              MR. LEE:  Objection.
 6        Q.    Does good and accepted medical
 7    practice require you to do a complete
 8    evaluation of your patient?
 9        A.    I did evaluation.  I'm in
10    agreement with the resident.
11              MR. CALLAN:  Objection.
12        Q.    You can't answer that question?
13        A.    I consider that in agreement
14    with my resident.
15        Q.    I'm not talking about conduct
16    here.  I'm talking about a standard of
17    practice.  The standard of practice is
18    what we are talking about now.
19              The question is:  Does good and
20    accepted medical practice require you to
21    do a complete evaluation; that's the
22    question?
23              MR. KRETZ:  Objection.
24        A.    I mention to you I did an
25    evaluation and I agree with whatever
```

1          L. ALDANA-BERNIER

2    evaluation of the resident.

3        Q.    I understand what you think you

4    did in Mr. Schoolcraft's situation.

5              I'm asking as a standard as a

6    physician what the standards are.

7              My question is:  Does good and

8    accepted medical practice require you to

9    do a complete evaluation of all of your

10   patients?

11       A.    Okay.  If you are saying in

12   general if we agree with the evaluation

13   of the residents, we usually say I agree

14   with the above evaluation of the patient.

15             Yes, we evaluate the patient.

16   If we agree with the assessment whatever

17   the residents say, that's what we

18   document.

19       Q.    Do you not understand my

20   question?

21       A.    I understand your question.

22       Q.    But you are just refusing to

23   answer?

24             MR. CALLAN:  Next question.

25       Move on.

Page 295

1          L. ALDANA-BERNIER

2      Q.    Doctor, does good and accepted

3  medical practice require you to do an

4  independent evaluation of your patient?

5          MR. CALLAN:  We have been down

6      that road, Counsel.  She did an

7      independent.  She read --

8          MR. SUCKLE:  I'm asking about

9      standard in the field.  Maybe I

10      learned it, somewhere I must have

11      stumbled in somewhere about the

12      standard so I'm going to ask.  I might

13      be right.

14      Q.    Doctor, does good and accepted

15  medical practice require you to do an

16  independent evaluation of all of your

17  patients?

18      A.    I already answered you.  I said

19  I assessed the patient.  And if the

20  resident assessed also the patient, I

21  will say that I agree with the assessment

22  of the patient.

23      Q.    Do you know what good and

24  accepted medical practice means?

25      A.    I said I did assess the

Page 296

1                L. ALDANA-BERNIER

2    patient.

3        Q.     Do you know what medical

4    standards are, standards of practice, do

5    you understand that?

6        A.     But you --

7        Q.     I'm talking about general

8    standards of practice.  Do you

9    understand?

10       A.     Yes, I'm saying --

11       Q.     I'm not talking about what you

12   did with Mr. Schoolcraft.

13       A.     I'm not referring only to Mr.

14   Schoolcraft.

15       Q.     The question is:  Do you have,

16   a simple yes or no, does good and

17   accepted medical practice require you to

18   do your own independent evaluation of an

19   a patient?

20            MR. CALLAN:  Objection to the

21       form.

22       Q.     If it's no you can tell me no.

23            MR. CALLAN:  What do you mean,

24       your own independent evaluation as

25       opposed to speaking to a resident, as

Page 297

```
1              L. ALDANA-BERNIER
2        opposed to calling people?
3              MR. SUCKLE:  Yes.
4              MR. CALLAN:  Then ask it that
5        way.
6              MR. SUCKLE:  It's pretty clear.
7              MR. CALLAN:  They way you're
8        asking it is totally unclear.
9              MR. SUCKLE:  It's one of those
10       things I have to learn from you again.
11       Thanks for teaching me.
12       Q.    Can you please answer my
13   question, Doctor?  We are going to be
14   here all night if you don't answer these
15   few questions.
16             MR. CALLAN:  I can assure we are
17       not going to be here all night.  We're
18       getting very close to you being
19       abusive.
20       Q.    I'm entitled to be here.  We
21   will bring you back to answer this last
22   few series of questions which go to
23   standard of care.
24             MR. CALLAN:  Sure you will.
25             MR. SUCKLE:  I absolutely will
```

Page 298

1          L. ALDANA-BERNIER

2      bring her back if she can't answer

3      standard of care questions.  I will.

4      You might want to ask her to answer

5      the questions.  I will bring her back

6      if she doesn't answer standard of care

7      questions.

8               MR. RADOMISLI:  Off the record.

9               MR. SMITH:  Off the record at

10      6:05 p.m.

11               [Discussion held off the

12      record.]

13               [Whereupon, at 6:05 p.m., a

14      recess was taken.]

15               [Whereupon, at 6:06 p.m., the

16      testimony continued.]

17               [Discussion held off the

18      record.]

19               MR. SMITH:  Back on the record

20      at 6:06.

21      Q.      Doctor, I'm not talking about

22   what you documented or didn't document.

23   I'm just talking about standard of care

24   as a physician.

25               The question is:  Does good and

Page 299

1          L. ALDANA-BERNIER

2    accepted medical practice require you to

3    do your own independent evaluation

4    regardless of how you document that

5    evaluation?

6          MR. CALLAN:  Objection to the

7       form of the question.

8          You can answer.

9    A.    When a resident sees the

10   patient, after the resident sees the

11   patient, I do go see the patient.  If I

12   can agree with the documentation, then I

13   write I agree with the documentation.

14   Q.    I understand your procedure.

15   Thank for telling me your procedure.

16         Does good and accepted medical

17   practice require you, forget what you do,

18   does it require you to do your own

19   independent evaluation?  That's a simple,

20   straightforward question, not about what

21   other people do, about what you do.

22   A.    I have to see every patient,

23   yes.

24         MR. SMITH:  What was the answer.

25         [The requested portion of the

Page 300

```
 1            L. ALDANA-BERNIER
 2       record was read.]
 3       Q.    And make your own independent
 4   evaluation, correct?
 5       A.    Yes.
 6            MR. SHAFFER:  Is that a yes?
 7            MR. CALLAN:   It's a yes.
 8       Q.    Doctor, have you ever been
 9   involved in any other lawsuits besides
10   this one?
11       A.    Yes.
12       Q.    The answer was yes?
13       A.    Yes.
14       Q.    When you say yes, how many?
15       A.    Two that I know of.
16       Q.    When you say that you know of,
17   why do you answer that way?
18       A.    That's what I know.
19       Q.    Do you keep open there is a
20   possibility that there are lawsuits that
21   you don't know about?
22       A.    That's what I know.  You are
23   asking me.
24       Q.    Do you know the names of those
25   people that are suing you?
```