OUR FILE NO.: 090.155440

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                     Plaintiff,

    - against -

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO, Tax Id. 873220, Individually and in his Official Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH GERALD NELSON, Tax Id. 912370, Individually and in his Official Capacity, DEPUTY INSPECTOR STEVEN MAURIELLO, Tax Id. 895117, Individually and in his Official Capacity, CAPTAIN THEODORE LAUTERBORN, Tax Id. 897840, Individually and in his Official Capacity, LIEUTENANT JOSEPH GOFF, Tax Id. 894025, Individually and in his Official Capacity, STG. FREDERICK SAWYER, Shield No. 2576, Individually and in his Official Capacity, SERGEANT KURT DUNCAN, Shield No. 2483, Individually and in his Official Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id. 915354, Individually and in his Official Capacity, LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374, Individually and in his Official Capacity, SERGEANT SHANTEL JAMES, Shield No. 3004, and P.O.'s "JOHN DOE" #1-50, Individually and in their Official Capacity (the name John Doe being fictitious, as the true names are presently unknown) (collectively referred to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV, Individually and in his Official Capacity, DR. LILIAN ALDANA-BERNIER, Individually and in her Official Capacity and JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN DOE" # 1-50, Individually and in their Official Capacity (the name John Doe being fictitious, as the true names are presently unknown),

                     Defendants.
-------------------------------------------------------------------X

10CV6005 (RWS)

**AFFIDAVIT OF DR. LAURENCE TANCREDI**

CALLAN, KOSTER,
BRADY & BRENNAN, LLP
COUNSELORS AND
ATTORNEYS AT LAW
One Whitehall Street
New York, New York 10004
212-248-8800

STATE OF NEW YORK   )
                                    ) ss.:-
COUNTY OF NEW YORK)

LAURENCE TANCREDI, M.D., being duly sworn states the following to be true under the penalties of perjury.

1. I am a physician duly licensed to practice medicine in the State of New York. I am not a party to this litigation.

2. I am board certified in the field of psychiatry. I am currently a professor of clinical psychiatry at New York University Medical School. I also maintain a private psychiatric practice and consultation.

3. I have reviewed the portions of the Jamaica Hospital records available to Dr. Aldana-Bernier at the time she evaluated plaintiff and made her decision to commit plaintiff pursuant to New York State Mental Hygiene Law §9.39. I have also reviewed relevant portions of her deposition transcript and the report of plaintiff's expert, Dr. Roy Lubit, M.D., Ph.D.

4. Dr. Aldana-Bernier evaluated the plaintiff at the Jamaica Hospital on November 1, 2009, and on the basis of her review of the following she concluded that he should be admitted to the hospital:

> A. Review of EMS records, medical emergency room records and records created by the previous psychiatrists who examined Adrian Schoolcraft. These records demonstrate that Mr. Schoolcraft was brought into the Medical ER of Jamaica Hospital on October 31, 2009. Earlier that day, he had an altercation with an officer, felt threatened, and claiming he was not feeling well with abdominal pain and discomfort, left his job prior to completing his shift. Members of the NYPD went to his home, where they found he had barricaded himself in his room. The policemen were able to gain entrance into his room. One version is that they broke down the door; a second version states the police got the landlord to open the door. In any case, he was requested to accompany them to the precinct. He refused, whereupon the police put him in handcuffs and involuntarily had him taken to the

2

emergency room of Jamaica Hospital for evaluation.

The records revealed that he was bizarre in his behavior, uncooperative, suspicious, guarded and agitated before he arrived at the hospital, when he entered the hospital and during the medical evaluation. Furthermore, he manifested paranoid thinking. After medical clearance, a psychiatrist evaluated him and transferred him to the Psychiatric Emergency Room with a tentative diagnosis of psychosis NOS.

    B. Dr. Aldana-Bernier, who was the Director of the Psychiatric ER, also read the psychiatric evaluation of the resident, and evaluated Mr. Schoolcraft herself noting his paranoid and persecutory thinking about police conspiracies, cover-ups, and claims that the police were "after him." Her concerns were further augmented by information that six months or more previously he was evaluated by a psychiatrist in the police department and found to be emotionally unstable. As a result, his gun was taken away from him at that time.

5. Dr. Aldana-Bernier took all these factors into consideration, including the realization that as a policeman, plaintiff would likely have access to weapons, even though his gun had been removed; that he was living alone with few friends or available collaterals; and no doubt further appreciated that plaintiff was a big man, estimated 250 lbs, and could be bodily injurious to others, particularly given his compromised mental state as well as his manifested lack of judgment.

6. On the basis of these facts, she concluded he was a foreseeable danger to himself or others and needed additional time in the hospital for medical stabilization. She committed him under the Mental Hygiene Law Section 9.39, which provides for Emergency Admission when a person is deemed to have a "mental illness for which immediate observation, care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others." The phrase "substantial risk of physical harm" is included in the language of the relevant statute. Underlying these concepts is a notion of "foreseeability".

3

7. This law, Section 9.39, allows for 48 hours observation during which time the patient is further evaluated by others with more time available and a detailed analysis is conducted to determine whether the more "freedom restricting" confinement-- that of 15 days following the assessment of a second physician, should be employed.

8. The Emergency Admission (or commitment) is often done quickly in an emergency room with frequently incomplete information available; it is a judgment call as is the case with any "risk" analysis.  There is inevitably uncertainty inherent in risk assessment. (See: Buchanan A.; R. Binder; M. Norko et al:  Psychiatric Violence Risk Assessment; Am J Psychiatry 2012, 169: 340 ff. for a detailed discussion of the conceptual problems of risk assessment).

9. On the other hand, where factors, such as those in this case, lead to a reasonable conclusion by the clinician that there is foreseeable "substantial" risk of harm to self or others, it is essential to minimize serious adverse outcomes and, therefore, commit the individual.

10. Dr. Aldana-Bernier's deposition reveals a general knowledge about Section 9.39 of The Mental Hygiene Law.  She demonstrated the appropriate understanding of the limited applicability of that law, the importance of "dangerousness" to self and others, and her understanding that she must do what is best for the patient and for society at large at that specific moment of decision-making.

11. Dr. Aldana-Bernier made a judgment call that the plaintiff was potentially (foreseeably) dangerous.  And at the time when she made this judgment, she had to rely on the information that was readily available.  The very recent history of bizarre behavior, uncooperativeness, paranoid ideation, agitation, general aggressiveness, and

verbal confrontation (altercation with the officer earlier on 10/31/09, and cursing in the Medical ER), along with an evaluation of emotional instability resulting in removal of his gun months earlier formed the basis for her triggering Section 9.39 of the Mental Hygiene Law.

12. She demonstrated in this judgment not only an adequate understanding of the law, but also a reasonable "judicious" application of the Emergency Admissions standard. Additionally, Dr. Aldana- Bernier demonstrated her professionalism by presenting the case to the Associate Chairman of the Psychiatry Department, Dr. Dhar, who concurred with her analysis and decision for Emergency Admission. It was reasonable for her to get a second opinion to obtain the perspective of someone taking a fresh look at the data. In this case he obtained input from a top administrator in the department who has likely provided oversight for similar situations.

13. Plaintiff was given an initial diagnosis of "Psychosis NOS", by the first psychiatrist who examined him in the emergency room at Jamaica Hospital. This was subsequently used by Dr. Aldana-Bernier during the period of emergency admission until a final diagnosis of "Adjustment disorder with Anxious Mood" was made. The diagnosis of "Psychosis NOS" was essentially a working diagnosis. This diagnosis is defined in DSM-IV-TR, which was the operating handbook for mental disorders in 2009. The criteria for Psychotic Disorder Not Otherwise Specified (NOS) (DSM-IV-TR # 298.9) states in its general description the following: "This category includes psychotic symptomatology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders

5

with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder".

14. Note that not all of the symptoms must be present; in fact one of these, such as delusions, would fit. For example, the description gives the following three illustrations (among others) which in part fit patterns in this case:

    i. Psychotic symptoms that have lasted for less than 1 month but that have not yet remitted, so that the criteria for Brief Psychotic Disorder are not met;

    ii. Persistent non-bizarre delusions with periods of overlapping mood episodes that have been present for a substantial portion of the delusional disturbance; and

    iii. Situations in which the clinician has concluded that a Psychotic disorder is present, but is unable to determine whether it is primary, due to a general medical condition, or substance induced.

15. The presence, therefore, of paranoia (persecutory ideation and delusions), in addition to bizarre behavior, suspiciousness and guarded responses, agitation, and aggressive verbal confrontation (the bizarre behavior, agitation etc. may suggest a mood disorder) fit under the criteria of Psychotic Disorder-NOS.

16. With regards to paranoid thinking and delusions there is no necessity that the objects of the paranoia be extra-terrestrial beings, aliens etc. In fact, paranoid delusions most often involve abnormal configuring of the usual objects and images of everyday life into unrealistic systems. Paranoia often involves people in the very existence of an afflicted person's-- for example, a boss, a lover, a parent or sibling. The person suffering from paranoia will place these usual objects into bizarre, and

threatening situations and relate the potential danger wholly to themselves. The paranoia expressed by Mr. Schoolcraft--conspiracy of the police, the perception that they are out "to get him"-- is in fact a usual form of paranoid delusion.

17. Dr. Aldana-Bernier's assessment of Mr. Schoolcraft was consistent with a good standard of psychiatric care, including her reliance on the reports of others working in the emergency room and those providing supplementary information, such as the police. As an emergency room psychiatrist she is limited in her time for conducting a full investigation of the circumstances surrounding a patient's thinking and behavior. She has a short time to quickly assess the mental status of a patient, and, in particular, to determine if he or she is a danger to themselves or others. This is not an exact analysis by any means. But given the factors that she examined as they combined to form a profile of a disturbed person, she used good judgment admitting the patient for 48 hours to allow for a more extensive gathering of the facts and a period of stabilization for a better opportunity to assess the patient's psychiatric condition.

18. The symptoms displayed by Mr. Schoolcraft, and testified to by Dr. Aldana-Bernier were sufficient to satisfy the substantial risk requirement for committal under New York Hygiene Law §9.39.

19. Based on the medical records and Dr. Aldana-Bernier's deposition testimony, Dr. Aldana-Bernier did not base her determination pursuant to New York Mental Hygiene Law §9.39 using a potential risk standard in place of a substantial risk standard.

20. Dr. Aldana-Bernier's deposition testimony and medical records demonstrate Dr. Aldana-Bernier considered Mr. Schoolcraft a substantial risk pursuant to Mental Hygiene Law §9.39.

21.   Her testimony indicates that she believed use of the phrase "potential risk" was made in relation to a substantial risk; that plaintiff demonstrated the potential for substantial risk of harm to himself or others.

22.   Dr. Aldana-Bernier's examination of plaintiff comported with the requirements of Mental Hygiene Law §9.39 and therefore she did not depart from accepted psychiatric standards in hospitalizing the plaintiff for 48 hours observation.

Dated: New York, New York
       February 11, 2015

_____
LAURANCE TANCREDI, MD

Sworn to before me this
11 day of February, 2015

_____
Notary Public

WARREN S. KOSTER
Notary Public, State of New York
No. 4749783
Qualified in Nassau County
Commission Expires April 30, 2015