UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                          Plaintiff,       10-CV-6005 (RWS)

           -against-           **RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT AND STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

THE CITY OF NEW YORK, *et al.*,

                   Defendants.

-------------------------------------------------------------X

Pursuant to Local Rule 56.1 for the Southern District of New York, Defendant Lilian Aldana-Bernier ("Dr. Aldana-Bernier" submits this Statement of Disputed Material Facts in Opposition to Plaintiff's Local Rule 56. 1 Statement of Undisputed Material Facts.

## GENERAL OBJECTIONS AND DENIALS

Dr. Aldana-Bernier objects to and denies each and every allegations in Plaintiff's Rule 56.1 Statement to the extent that such allegation does not have a citation to any evidence of record.

Dr. Aldana-Bernier objects to and denies each and every allegation in Plaintiff's Rule 56.1 Statement to the extent such allegation is based on hearsay, is based on a statement by an individual without personal knowledge of the facts being averred, or is not supported by Plaintiff's citation.

To the extent that any relationship between disparate factual allegations is attempted, Dr. Aldana-Bernier objects to each and every paragraph that contains more than one factual allegations. These objections and denials are hereby incorporated into

CALLAN, KOSTER, BRADY & NAGLER, LLP COUNSELORS And ATTORNEYS At Law One Whitehall Street New York, New York 10004 212-248-8800

all of the responses hereunder, even if Dr. Aldana-Bernier's response hereunder states "no response."

Dr. Aldana-Bernier reserves the right to amend or supplement this response to Plaintiff's Rule 56.1 Statement.

## RESPONSES TO PLAINTIFF'S 56.1 STATEMENT

1. On July 1, 2002, Officer Schoolcraft joined the New York City Police Department ("NYPD"), and for most of his career, he was assigned as a Patrol Officer in the 81st Precinct, which is located in the Bedford Stuyvesant neighborhood of Brooklyn.[1]

**Response to Plaintiff's Statement No. 1**

Not contested for the purposes of this motion only.

2. The 81st Precinct is one of ten Precincts that are located in the geographical area known as "Patrol Borough Brooklyn North."   As a Patrol Officer, Officer Schoolcraft was a fine officer who ably and satisfactorily performed his duties and received satisfactory or better performance reviews for most of his career.[2]

**Response to Plaintiff's Statement No. 2**

Not contested for the purposes of this motion only.

---

[1] Plaintiff's Motion Exhibit 1 (hereinafter "PMX") at NYC 0001 (oath of office, dated 7-1-02).
[2] PMX 1:  NYC 005-007 (fine officer with great potential); 043-44 ("extremely competent" and an "asset for the department"); 045-46 ("highly competent"); 087-91 ("fine officer with great potential"); 176-81 ("well-rounded officer" and a "steady and reliable performer").  For the years 2003, 2004, 2005 and 2006, Officer Schoolcraft received yearly performance evaluations of 3.5, 4.0, 3.5 and 3.5, respectively.  (NYC 398-400, 171-72; 176-78 & 179-81.)   It was only in 2007, after Defendant Mauriello became the Executive Officer and then the Commanding Officer of the 81st Precinct in 2007 and 2008 that Officer Schoolcraft's yearly performance ratings dropped to 3.0 in 2007 and 2.5 in 2008.  (NYC 186-88 & 173-75.)

3.  In October of 2006, the NYPD assigned Defendant Steven Mauriello to be the Executive Officer of the 81st Precinct.[3]  As the Executive Officer, Mauriello was the second in command at the 81st Precinct.  According to Mauriello, he requested that transfer because it was his stated desire to become a commanding officer of an NYPD Precinct.[4]

**Response to Plaintiff's Statement No. 3**

Not contested for the purposes of this motion only.

4.  After Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft and other officers at the 81st Precinct began getting increasingly greater pressure at roll calls to achieve quotas on their number of arrests, summons and stops and to falsify documentation about the receipt of training during roll calls.[5]

**Response to Plaintiff's Statement No. 4**

Not contested for the purposes of this motion only.

5.  Because Officer Schoolcraft had concerns about the lawfulness of these directions, he eventually began tape recording roll calls at the 81st Precinct.[6]

**Response to Plaintiff's Statement No. 5**

Not contested for the purposes of this motion only.

6.  Coincident with Defendant Mauriello's arrival at the 81st Precinct, Officer

---

[3] PMX 2:  SM 340-43.
[4] PMX 34:  Mauriello Tr. 48:15 ("I wanted to go back to be an XO and earn my way back up again.")
[5] PMX 4:  Schoolcraft Tr.  29:13-30:12 & 32:24-33:5.
[6] *Id.*

Schoolcraft's performance evaluations began to decline.[7]  For 2007, Officer Schoolcraft received a 3.0 rating, which was the equivalent of a marginally satisfactory rating.[8]

**Response to Plaintiff's Statement No. 6**

Not contested for the purposes of this motion only.

7.  In that evaluation, Officer Schoolcraft was criticized for not achieving "activity goals" and "performance goals," which are coded phrases that refer to numerical quotas imposed on Patrol Officers.[9]

**Response to Plaintiff's Statement No. 7**

Not contested for the purposes of this motion only.

8.  After being the Executive Officer at the 81st Precinct for one year, "One Police Plaza" made the decision on December 1, 2007 to promote DI Mauriello to the position as Commanding Officer of the 81st Precinct, and later he received a promotion to the title of Deputy Inspector ("DI").[10]

**Response to Plaintiff's Statement No. 8**

Not contested for the purposes of this motion only.

9.  Under the command of DI Mauriello, the pressure to maintain numbers

---

[7] See n. 2 supra.
[8] PMX 1: NYC 065-69.
[9] See generally Floyd v City of New York, 959 F. Supp. 2d 540, 590, 596, 599 & n. 264 (S.D.N.Y. 2013) (increase in stops achieved by pressure on commanders at CompStat meetings to increase numbers and commanders in turn pressures mid-level mangers and line officers to generate numbers; abundant evidence that supervisors directed officers to meet numerical goals for stops, arrests and other enforcement activity as well as threating officers with negative consequences if they did not achieve those goals; "supervisors must evaluate officers based on their activity numbers, with particular emphasis on summons, stops, and arrests, [and] officers whose numbers are too low should be subject to increasingly serious discipline if their low numbers persist")
[10] PMX 3: Mauriello Tr. 51:12-25.

increased and Officer Schoolcraft's performance evaluations came under even greater scrutiny.

## Response to Plaintiff's Statement No. 9

Not contested for the purposes of this motion only.

10. During the course of second, third and fourth quarters of 2008, Officer Schoolcraft's supervisors persistently criticized him for his low "activity" and his failure to meet activity standards.[11]

## Response to Plaintiff's Statement No. 10

Not contested for the purposes of this motion only.

11. Based on these criticisms, in January of 2009, DI Mauriello gave Officer Schoolcraft a failing evaluation of 2.5.[12]

## Response to Plaintiff's Statement No. 11

Not contested for the purposes of this motion only.

12. Tracking the negative comments during the course of the year, DI Mauriello's 2008 performance evaluation recommended that Officer Schoolcraft be transferred because of his "poor activity," for his "approach to meeting the performance standards" and for his disregard of the "activity standards" of an NYPD Police Officer.[13]

## Response to Plaintiff's Statement No. 12

---

[11] PMX (PX 21): NYC 106 (as of May 2, 2008, "needs improvement in area of activity"); NYC 110 (as of July 4, 2008, "activity is still substandard and is unacceptable" and was instructed "on productivity expectations'); NYC 116 (as of October 1, 2009, "does not meet activity standards" and has been told about his "low activity"); NYC 122 (as of January 1, 2009, Officer Schoolcraft has been counseled on "his poor activity which is unacceptable").

[12] PMX 5 (PX 51); PMX 3: Mauriello Tr. 190:23-196:25.

[13] PMX 5 (PX 51) at NYC 071)

Not contested for the purposes of this motion only.

13. Officer Schoolcraft objected to this evaluation and informed his superiors that he wanted to appeal the failing evaluation.[14]

**Response to Plaintiff's Statement No. 13**

Not contested for the purposes of this motion only.

14. The appeal process involved the transmission of paperwork to the next level of the command structure, which was the Brooklyn North Patrol Borough, headed by Defendant Chief Gerald Nelson and Defendant Deputy Chief Michael Marino.[15]

**Response to Plaintiff's Statement No. 14**

Not contested for the purposes of this motion only.

15. At around this time, a poster appeared on Officer Schoolcraft's locker containing the words: "IF YOU DON'T LIKE YOUR JOB, THEN MAYBE YOU SHOULD GET ANOTHER JOB."[16]

**Response to Plaintiff's Statement No. 15**

Not contested for the purposes of this motion only.

16. Another handwritten note that later appeared on his locker stated: "shut up, you idiot."[17]

**Response to Plaintiff's Statement No. 16**

Not contested for the purposes of this motion only.

---

[14] PMX 3: Mauriello Tr. 190:18.
[15] PMX 3: Mauriello Tr. 192:4 ("Chief Marino has an appeal board with borough inspectors").
[16] PMX 1: NYC 12003.
[17] PMX 1: NYC 12005.

17. On February 25, 2009, Officer Schoolcraft met with several supervisors at the 81st Precinct, including DI Mauriello, and his new Executive Officer, Defendant Captain Theodore Lauterborn.[18]

**Response to Plaintiff's Statement No. 17**

Not contested for the purposes of this motion only.

18. During the meeting, Officer Schoolcraft confirmed his intent to appeal the failing 2008 performance evaluation and repeatedly asked for information about what numbers are required of him.[19]

**Response to Plaintiff's Statement No. 18**

Not contested for the purposes of this motion only.

19. At the end of the meeting, another of the 81st Precinct supervisors, Defendant Steven Weiss specifically asked Officer Schoolcraft if he was recording the meeting.[20]

**Response to Plaintiff's Statement No. 19**

Not contested for the purposes of this motion only.

20. In either late February or March of 2009, Mauriello went to the main office for Patrol Borough Brooklyn North with Sergeant Weiss from the 81st Precinct and met with Deputy Chief Marino about Officer Schoolcraft's appeal of his failing 2008 evaluation and about Mauriello's

---

[18] PMX 1: NYC 191.

[19] PMX 3: Mauriello Tr. 190:18.

[20] PMX 3: Mauriello Tr. 326; PMX 6: Weiss Tr. 111:7-114;12 (recalls believing that Schoolcraft was recording and recalled asking Schoolcraft if he was recording the meeting in February 2009 about the appeal but denies ever discussing that belief with Mauriello or Executive Officer Lauterborn or Lieutenant Caughey).

wish to transfer Schoolcraft out of the Precinct.[21]

**Response to Plaintiff's Statement No. 20**

Not contested for the purposes of this motion only.

21. DI Mauriello requested that Officer Schoolcraft be transferred, and Deputy Chief Marino denied that request at that time for lack of paperwork.[22]

**Response to Plaintiff's Statement No. 21**

Not contested for the purposes of this motion only.

22. On March 11, 2009, a labor attorney for Officer Schoolcraft, James A. Brown, Esq., wrote DI Mauriello a letter about Officer Schoolcraft's appeal of his failing evaluation.[23] Among other things, the letter documented previously-raised concerns about "numerical goals" being used improperly in performance evaluations: "We are concerned that our client's negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of arrests and summons issued.[24]

**Response to Plaintiff's Statement No. 22**

Not contested for the purposes of this motion only.

23. After receiving the letter, DI Mauriello told Chief Nelson about it and forwarded it to Patrol Borough Brooklyn North as part of the appeal

---

[21] PMX 6: Weiss Tr. 178:12-181:4; PMX 7: Marino Tr. 196:13-200:6; PMX 3: Mauriello Tr. 276:15-277:15.
[22] *Id.*
[23] PMX 8 (PX 57 & 22).
[24] PMX 8: *Id.* at p. 2.

process.[25]

**Response to Plaintiff's Statement No. 23**

Not contested for the purposes of this motion only.

24. A few days later, on about March 15, 2009, while Officer Schoolcraft was on patrol, Defendant Weiss issued to Officer Schoolcraft a command discipline for being "off post" and having "unnecessary conversation" with another patrol officer.[26]

**Response to Plaintiff's Statement No. 24**

Not contested for the purposes of this motion only.

25. Officer Schoolcraft believed that he was being punished for the letter from his lawyer and for appealing his evaluation, and as a result, made a formal request on his radio that the Duty Captain for Patrol Borough Brooklyn North respond to the scene.[27]

**Response to Plaintiff's Statement No. 25**

Not contested for the purposes of this motion only.

26. In response, Defendant Lauterborn, who claimed to have been the Duty Captain at the time, had Officer Schoolcraft brought back to the 81st Precinct.  According to Officer Schoolcraft's recording of the meeting with Captain Lauterborn, Lauterborn told Officer Schoolcraft that after the February meeting at the 81st Precinct to discuss his appeal, he should not be surprised by the fact that he was going to get a lot more

---

[25] PMX 3:  Mauriello Tr. 247:11-254:16.
[26] PMX 9 at NYC 00081 (PX 168 ).
[27] PMX 6:  Weiss Tr. 98:2-19; PMX 10:  Lauterborn Tr. 177:12-21 & 183:19-186:12

"supervision" by the 81st Precinct supervisors and that the 81st Precinct supervisors were now paying "closer attention" to him.[28]

**Response to Plaintiff's Statement No. 26**

Not contested for the purposes of this motion only.

27. Captain Lauterborn also told Officer Schoolcraft that "this is gonna go on;" that he has "a long road ahead" of him; that going forward, he needs to "cross your t's and dot your i's;" and that the "supervision" was "coming down hard" on him not just in the past two nights but since the day he walked out of the appeal meeting in February of 2009.[29]

**Response to Plaintiff's Statement No. 27**

Not contested for the purposes of this motion only.

28. The same day that Officer Schoolcraft spoke to Captain Lauterborn, Sergeant Weiss began reviewing police procedures on how to have Officer Schoolcraft psychologically evaluated.[30]

**Response to Plaintiff's Statement No.28**

Not contested for the purposes of this motion only.

29. Shortly after that, Sergeant Weiss contacted the NYPD's Early Intervention Unit and reported that he was "concerned" about the level of Office Schoolcraft's "mental distress."[31]

**Response to Plaintiff's Statement No.29**

[28] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45__28:50-31:30. The recording is attached at part of a compact disk accompanying this motion together with other records relevant to the motion.
[29] PMX  11:  Id. at 30:00-31:30.
[30] PMX  6:  Weiss Tr. 120:6-121:2.
[31] PMX  6:  Weiss Tr. 99:14-101:4.

Not contested for the purposes of this motion only.

> 30. Sergeant Weiss also did Internet research on Officer Schoolcraft and found a news article in a local upstate newspaper about a burglary at his father's home and forwarded that article to the Early Intervention Unit.[32]

**Response to Plaintiff's Statement No.30**

Not contested for the purposes of this motion only.

> 31. Within a week or two of Sergeant Weiss' contacting the Early Intervention Unit, Officer Schoolcraft was placed on modified or restricted duty without any law enforcement or patrol duties and his gun and shield were removed.[33]

**Response to Plaintiff's Statement No.31**

Not contested for the purposes of this motion only.

> 32. According to the NYPD psychologist who testified that she was directly involved in the decision to place Officer Schoolcraft on limited duty, Officer Schoolcraft was suffering from the physical manifestations of stress.[34]  Based on that opinion, she recommended cognitive behavioral therapy or stress management training to improve coping skills and to reduce the physical symptoms of stress.[35]

**Response to Plaintiff's Statement No.32**

Dr. Catherine Lamstein-Reiss, the NYPD psychologist referenced in Plaintiff's

---

[32] PMX 6:  Weiss Tr. 103:6-109:3
[33] PMX 6:  Weiss Tr. 101:24-102:10.
[34] PMX 12:  Lamstein Tr. 172:21-174:20
[35] PMX 12:  Lamstein Tr. 105:22-107:4.

Statement No. 32, testified she did only recommended treatment as an NYPD psychologist does not mandate treatment. (Dr. Catherine Lamstein-Reiss' Deposition Transcript is annexed to the Declaration of Matthew J. Koster (hereinafter "Koster Decl.) as Exhibit C at pg 107 lns 5-13). No response to the remainder of the statement.

33. The NYPD psychologist did not recommend any medication, did not believe that Officer Schoolcraft was psychotic, and did not believe that Officer Schoolcraft was dangerous to himself or others.[36]

**Response to Plaintiff's Statement No.33**

Dr. Lamstein-Reiss did not state she did not believe plaintiff was psychotic. Rather, she testified she did not observe any psychotic symptoms, but "Later on in the case I began to wonder if that was the case and I was not sure." (Exhibit C at pg 153 lns 9-23). Further, Dr. Lamstein-Reiss also testified that as time passed from her evaluation of plaintiff, she began to question her initial diagnosis as she received more information from plaintiff and other sources. (Exhibit C at pg 153 ln 24-pg 161 ln 5).

34. As a result of being placed on limited duty, Officer Schoolcraft was assigned to work at the 81st Precinct as the Telephone Switchboard operator, essentially taking calls to the Precinct and handling walk-ins by members of the public.[37]

**Response to Plaintiff's Statement No.34**

In addition to the results plaintiff lists in Statement No. 34, plaintiff also had his

---

[36] PMX 12: Lamstein Tr. 113:15-115:2, 153:10-17, & 285:3-23.
[37] PMX 13: Huffman Tr. 46:10-25.

firearms, ID and shield removed and vouchered at the medical division.  (Exhibit C at pg 205 lns 10-23).

   35. He held that position from April 2009 through the end of October 2009.

**Response to Plaintiff's Statement No.35**

Not contested for the purposes of this motion only.

   36. While on limited duty, Officer Schoolcraft continued his attempts to challenge his failing 2008 performance evaluation.[38]

**Response to Plaintiff's Statement No.36**

Not contested for the purposes of this motion only.

   37. He also started reporting misconduct by his supervisors at the 81st Precinct.

**Response to Plaintiff's Statement No.37**

Plaintiff does not cite to any evidence to support this claim.

   38. On August 20, 2009, Officer Schoolcraft reported to the Internal Affairs Bureau ("IAB") on "corruption involving the integrity control program" at the 81st Precinct by the Integrity Control Officer, Defendant Lieutenant Caughey and Assistant Integrity Control Officer, Defendant Weiss.[39]

**Response to Plaintiff's Statement No.38**

Not contested for the purposes of this motion only.

   39. In addition, on August 31, 2009, a former member of the service, David

---

[38] On September 2, 20109, Officer Schoolcraft wrote a memorandum to DI Mauriello requesting (again) that his appeal be processed and Mauriello testified that he received the memorandum and forwarded it to the Sergeant at Patrol Borough Brooklyn North who handled the paperwork for appeals. (PMX 14: (PX 58) & PMX 3: Mauriello Tr. 269:4-274:14).
[39] PMX 15:  Schoolcraft Report (PX 40).

Dirk, reported that Officer Schoolcraft was the victim of retaliation by his supervisors.[40]

### Response to Plaintiff's Statement No.39

Not contested for the purposes of this motion only.

40. On September 2, 2009, Officer Schoolcraft spoke with IAB and reported that DI Mauriello was pressuring his staff to downgrade or suppress crime reporting and that under the direction of DI Mauriello police officers were being directed to make arrests and issue summonses "in violation of people's civil rights."[41]

### Response to Plaintiff's Statement No.40

Not contested for the purposes of this motion only.

41. According to the IAB report, Officer Schoolcraft also stated that he received his failing evaluation "because he doesn't believe in summons and arrest quotas" and that police officers "are being forced to sign the training log even though they don't get the necessary training."[42]

### Response to Plaintiff's Statement No.41

Not contested for the purposes of this motion only.

42. On October 7, 2009, Officer Schoolcraft met with investigators from the NYPD's Quality Assurance Division ("QAD").[43]  At the meeting, Officer Schoolcraft reported in greater detail about the nature of the

---

[40] PMX 15 (NYC 4785-86) (Attorneys' Eyes Only ("AEO") designation, filed under seal).
[41] PMX 16 (NYC 4316-18) (Confidential designation, filed under seal).
[42] *Id.*
[43] PMX 16 at NYC 5158 (PX 169; NYC 5153-5248).

downgrading and suppression of major crime reporting at the 81st Precinct.[44]

## Response to Plaintiff's Statement No. 42

Not contested for the purposes of this motion only.

43. While QAD undertook to conduct an investigation into those allegations, it also referred Officer Schoolcraft's other misconduct allegations to IAB.[45]

## Response to Plaintiff's Statement No.43

Not contested for the purposes of this motion only.

44. By the end of October of 2009, it was common knowledge with the 81st Precinct that the Precinct was under investigation and that Officer Schoolcraft was involved in reporting the misconduct that led to that investigation.

## Response to Plaintiff's Statement No.44

Not contested for the purposes of this motion only.

45. Sometime earlier that year, Captain Lauterborn learned from DI Mauriello of a QAD investigation of the 81st Precinct.[46]

## Response to Plaintiff's Statement No.45

Not contested for the purposes of this motion only.

46. In addition, towards the end of October, an 81st Precinct Sergeant told DI Mauriello that QAD was calling down officers and based on that tip,

---

[44] *Id.* at 5158-60.
[45] *Id.* at 5159 & 5220.
[46] PMX 10: Lauterborn Tr. 278:17-280:19

DI Mauriello called up an Inspector from QAD, who confirmed that there was an investigation.[47]

## Response to Plaintiff's Statement No.46

Not contested for the purposes of this motion only.

47. Earlier in the year, there was persistent speculation at the 81st Precinct that Officer Schoolcraft was tape recording at the Precinct.[48]

## Response to Plaintiff's Statement No.47

Not contested for the purposes of this motion only.

48. In addition, Captain Lauterborn testified that as the QAD investigation was heating up, he allegedly received complaints from other officers interviewed by QAD that Officer Schoolcraft was asking them questions about their QAD interviews and informed DI Mauriello about Officer Schoolcraft's alleged conduct.[49]

## Response to Plaintiff's Statement No.48

Not contested for the purposes of this motion only.

49. Moreover, supervisors at the 81st Precinct knew from their practice of inspecting or "scratching" memo books that Officer Schoolcraft's memo book contained the name of an IAB officer.[50] Finally, on October 19th Lieutenant Caughey issued a written order to all officers in the command

---

[47] PMX 3: Mauriello Tr. 330:15-332:23 & 450:22-452:18.
[48] PMX 10: Lauterborn Tr. 278:17-280:19.
[49] PMX 10: Lauterborn Tr. 86:22-95:2. While Officer Schoolcraft denies doing this, the fact that it was stated by Defendant Lauterborn goes to his state of mind and beliefs about Officer Schoolcraft.
[50] PMX 10: Lauterborn Tr. 86:22-99:20 & 114:14-118:16

that all inquiries from IAB must be reported directly to him.[51]

**Response to Plaintiff's Statement No.49**

Not contested for the purposes of this motion only.

    50. On October 31, 2009 – the last day that Officer Schoolcraft reported to the 81st Precinct – he worked the day tour and conducted his regular duties at the Telephone Switchboard desk.

**Response to Plaintiff's Statement No.50**

Not contested for the purposes of this motion only.

    51. During the course of that morning, Lieutenant Caughey took Officer Schoolcraft's memo book to "scratch it" and instead, kept it for several hours.[52]

**Response to Plaintiff's Statement No.51**

Not contested for the purposes of this motion only.

    52. While in his office, Lieutenant Caughey made two photocopies of the *entire* memo book because he saw "unusual" entries in it.[53] Lieutenant Caughey kept one copy for himself and put the other copy in DI Inspector Mauriello's office desk.[54]

**Response to Plaintiff's Statement No.52**

Not contested for the purposes of this motion only.

    53. When he returned the memo book to Officer Schoolcraft later that day,

---

[51] PMX 17 (Caughey Memo).
[52] PMX 4: Schoolcraft Tr. 202:22-203:20; PMX 18: Caughey Tr. 120:18-121:19.
[53] PMX 18: Caughey Tr. 122:11-20.
[54] PMX 18: Caughey Tr. 127:24-128:15.

Officer Schoolcraft noticed (and became alarmed) that several pages of the memo book containing his entries about corruption or misconduct were earmarked or folded down.[55]

**Response to Plaintiff's Statement No.53**

Not contested for the purposes of this motion only.

54. Officer Schoolcraft grew more alarmed during the course of the day when Lieutenant Caughey started acting toward Officer Schoolcraft in a menacing manner.[56]

**Response to Plaintiff's Statement No.54**

Not contested for the purposes of this motion only.

55. One of the civilian workers at the Precinct, Police Administrative Aide ("PAA") Curtis Boston, saw Lieutenant Caughey walk by Officer Schoolcraft that day in an unusual manner and twice during the course of that morning PAA Boston and Officer Schoolcraft discussed Lieutenant Caughey's unusual behavior toward Officer Schoolcraft.[57]

**Response to Plaintiff's Statement No.55**

Not contested for the purposes of this motion only.

56. PAA Boston specifically recalled that Officer Schoolcraft told her that he felt uncomfortable about Lieutenant Caughey's behavior and that Officer Schoolcraft asked her to document her reasons for why she believed

---

[55] PMX 4:  Schoolcraft Tr. 202:22-203-11.
[56] PMX 4: Schoolcraft Tr. 118:3-25-120:10;
[57] PMX 19: Boston Tr. 64:17-65:5 & 77:15-86:13.

Lieutenant Caughey was acting in a suspicious manner.[58]

**Response to Plaintiff's Statement No.56**

Not contested for the purposes of this motion only.

57. About one hour before the end of his scheduled day, Officer Schoolcraft told his supervisor, Sergeant Huffman that he was not feeling well and was going home.[59]   At the time, Sergeant Huffman told Officer Schoolcraft that that was "okay."[60]

**Response to Plaintiff's Statement No.57**

Not contested for the purposes of this motion only.

58. Officer Schoolcraft also submitted to Sergeant Huffman a sick report, which could have been a basis for authorizing him to take "administrative sick" for the day.[61]

**Response to Plaintiff's Statement No.58**

Not contested for the purposes of this motion only.

59. As Officer Schoolcraft was leaving the precinct, however, Sergeant Huffman told Officer Schoolcraft that he could take "lost time"[62] and Officer Schoolcraft told her that that would be fine, although he would have preferred sick time.[63]

**Response to Plaintiff's Statement No.59**

---

[58] PMX 19: Boston Tr. 77:15-86:13 & 109:16-112:5.
[59] PMX 13: Huffman Tr. 66:20-67:2 & 71:3-75:9.
[60] PMX 13: Huffman Tr. 74:11-19.
[61] PMX 13: Huffman Tr. 68:6-15 (administrative sick can be approved by the desk sergeant); PMX 20: Valenti Tr. 14:20-16:13 (same).
[62] PMX 13:  Huffman Tr. 80:12-20.
[63] PMX 4:  Schoolcraft Tr. 123:23-124:14

Not contested for the purposes of this motion only.

> 60. At about 3:30 pm, Officer Schoolcraft got home, which was located at 82-60 Eighty-Eighth Place, Queens, New York, and telephonically notified IAB of Lieutenant's Caughey's menacing behavior.[64]

**Response to Plaintiff's Statement No.60**

Not contested for the purposes of this motion only.

> 61. Officer Schoolcraft specifically informed IAB that he felt threatened, retaliated against, and in danger as a result of Lieutenant Caughey's menacing behavior.[65]

**Response to Plaintiff's Statement No.61**

Not contested for the purposes of this motion only.

> 62. About one hour later, at about 4:20 pm, a Sergeant Krohley, from the 104th Precinct, went to Officer Schoolcraft's home with his driver. Sergeant Krohley rang the bell for Officer Schoolcraft's apartment, which was on the second floor of a three-family house, and when there was no answer, he spoke to the landlady, Carol Stretmoyer, who told him that she believed that Officer Schoolcraft had left about thirty minutes ago.[66]

**Response to Plaintiff's Statement No.62**

Not contested for the purposes of this motion only.

---

[64] PMX 4: Schoolcraft Tr. 126:3-127:18.  The call to IAB is also recorded and identified as DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma; PMX 11.
[65] *Id.* at 19:40-26:10.
[66] PMX 16 (NYC 4643) (AEO designation).

63. Stretmoyer also informed Sergeant Krohley that Officer Schoolcraft has a car, which was parked on the street. Sergeant Krohley determined that the car was registered in the name of Officer Schoolcraft's father.[67]

**Response to Plaintiff's Statement No.63**

Not contested for the purposes of this motion only.

64. At about 5:00 pm, Lieutenant Broschart from the 81st Precinct arrived at the scene, and Sergeant Krohley briefed Lieutenant Broschart on the facts he had determined since arriving at the scene.[68]

**Response to Plaintiff's Statement No.64**

Not contested for the purposes of this motion only.

65. Lieutenant Broschart was under orders from DI Mauriello and Captain Lauterborn to go to Officer Schoolcraft's home and bring him back to the Precinct.[69]

**Response to Plaintiff's Statement No.65**

Not contested for the purposes of this motion only.

66. After arriving at the scene, Lieutenant Broschart also knocked on the door, and when there was no answer, he updated Captain Lauterborn by telephone that Officer Schoolcraft was not home and that the

---

[67] *Id.*

[68] PMX 16: (NYC 4643) (AEO designation); *see also* PMX 11: DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma at 40:52 (noting that at 4:18 pm a black Impala in front of Officer Schoolcraft's house and his door bell being rung).

[69] PMX 20: Broschart Tr. 87:17-88:20.

landlady had told him that he might have left.[70]

## Response to Plaintiff's Statement No.66

Not contested for the purposes of this motion only.

67. Captain Lauterborn told Lieutenant Broschart to stand by and wait to see if Officer Schoolcraft returned.[71]

## Response to Plaintiff's Statement No.67

Not contested for the purposes of this motion only.

68. Later that evening, Captain Lauterborn spoke with NYPD Psychologist Lamstein. According to Psychologist Lamstein's notes of the call, Captain Lauterborn told her that Officer Schoolcraft left early that day and the "underlying issue" was that Officer Schoolcraft "has made allegations against others" and the "dept's investigation of those allegations picked up this week & it snowballed from there."[72]

## Response to Plaintiff's Statement No.68

Not contested for the purposes of this motion only.

69. Psychologist Lamstein told Captain Lauterborn that she had seen Officer Schoolcraft just a few days ago and that she "had no reason to think [Officer Schoolcraft] was a danger to himself or others."[73]

## Response to Plaintiff's Statement No.69

---

[70] PMX 20: Broschart Tr. 100:25-104:20.
[71] *Id.*
[72] PMX 22 at NYC 282(PX 29); PMX 12: Lamstein Tr. 327:13-328:4.
[73] PMX 12: Lamstein Tr. 319:24-25; *see also* PMX 23 Lauterborn Report (PX 16), 10-31-09 at p. NYC 00095 ("She stated that although she did not believe he was an immediate threat to himself or others his firearms were removed because of emotional distress caused by issues of anger and resentment against the Department.").

Not contested for the purposes of this motion only.

> 70. At about 7:40 pm that night, after speaking with Psychologist Lamstein, Captain Lauterborn also called Officer Schoolcraft's father and told the father that Officer Schoolcraft left without permission and had to return to the 81st Precinct that night.[74]

## Response to Plaintiff's Statement No.70

Not contested for the purposes of this motion only.

> 71. The father told Captain Lauterborn that he spoke to his son earlier that day, that his son told him he felt sick in his stomach with a tummy ache and was going home and would call him when he woke up.[75]

## Response to Plaintiff's Statement No.71

Not contested for the purposes of this motion only.

> 72. Lauterborn told the father that he needs to "physically talk to" Officer Schoolcraft and "resolve things" and the situation is not going to "wait until the morning."[76]   Lauterborn insisted that he had to talk to Officer Schoolcraft "in person" and not "over the phone."[77]   He also stated that the "situation was going to escalate as the night goes on " and that "no one is going in or out of that house he lives in because there are police all over it."[78]   If Officer Schoolcraft was there, Captain Lauterborn said

---

[74] PMX 11: WS.331M_31October2009_LCS_ReturnPhoneCall to Capt. Lauterborn at 3:38-5:15.
[75] *Id.*
[76] *Id.* at 6:20-37.
[77] *Id.* at 8:00-05.
[78] *Id. 9:55-10:06*

that "eventually we are going to make our way in."[79]

**Response to Plaintiff's Statement No.72**

Not contested for the purposes of this motion only.

73. Although the father assured Captain Lauterborn that his son was fine and was probably sleeping, Captain Lauterborn insisted that it was not going to "end here" and that Officer Schoolcraft should report to the Lieutenant on the scene outside his home.[80]

**Response to Plaintiff's Statement No.73**

Not contested for the purposes of this motion only.

74. At 9:45 pm that night, after waiting five hours outside Officer Schoolcraft's home, the NYPD took a key from the landlord and entered his home.[81]

**Response to Plaintiff's Statement No.74**

Not contested for the purposes of this motion only.

75. That entry, which was made without a warrant, was made by at least ten supervisory NYPD officers.

**Response to Plaintiff's Statement No.75**

Not contested for the purposes of this motion only.

76. The entry team was led by three Emergency Services Unit officers, who were followed by Deputy Chief Marino, DI Mauriello, Captain Lauterborn, Lieutenant Broschart, and three members of the Brooklyn

---

[79] *Id.* at 10:10-20.
[80] *Id.* at 10:55-11:00.
[81] PMX 16 at NYC 00432 (2145 entry made into apartment).

North Investigation Unit (Lieutenant William Gough, Sergeant Kurt Dunkin, and Sergeant Raymond Hawkins).[82]

**Response to Plaintiff's Statement No.76**

Not contested for the purposes of this motion only.

77. At the time of their entry, the house was also surrounded by numerous other members of the NYPD, including DI Keith Green, the commanding officer of the 104th Precinct, Lieutenant Thomas Crawford (81st Precinct); Sergeant Kevin Scanlon (104th Precinct); and several Police Officers who were acting either as drivers for the supervisors at the scene or had set up a barricade to block off street traffic.[83]

**Response to Plaintiff's Statement No.77**

Not contested for the purposes of this motion only.

78. Also responding to the scene was FDNY Lieutenant Hanlon and two Jamaica Hospital Emergency Medical Technicians ("EMT").[84]

**Response to Plaintiff's Statement No.78**

Not contested for the purposes of this motion only.

79. According to Deputy Chief Marino and DI Mauriello, the warrantless entry into Officer Schoolcraft's home was justified by their concerns for his "well-being."[85]

---

[82] PMX 3: Mauriello Tr. 349:13-350:21.
[83] *Id.* at NYC 000429.
[84] PMX 16 at NYC 431.
[85] PMX 7: Marino Tr. 255:15 ("I was thinking about Schoolcraft's safety") & 256:9-18 (believed there was "a possibility of" him being an emotionally disturbed person); *but see id.* at 258:5-16 (no information that Officer Schoolcraft had threatened to hurt himself or others). PMX 3: Mauriello Tr. 357:24-358:22 (entry made out of concern for his well-being and safety).

25

**Response to Plaintiff's Statement No.79**

Not contested for the purposes of this motion only.

80. Deputy Chief Marino admitted that he had no information that Officer Schoolcraft had threatened to hurt himself or others,[86]

**Response to Plaintiff's Statement No.80**

Not contested for the purposes of this motion only.

81. Psychologist Lamstein had told Captain Lauterborn that evening that to her knowledge he was not a threat to himself or others, they allegedly believed that he was "possibly" an emotionally disturbed person because he had been sent (by them) to psychological services earlier that year, had been put on restricted duty without a gun and had left work early, allegedly against orders.[87]

**Response to Plaintiff's Statement No.81**

Plaintiff cites to hearsay and this statement must be denied.   Plaintiff took Dr. Lamstein's deposition, cites other portions of Dr. Lamstein's transcript in this 56.1 statement yet fails to cite to Dr. Lamstein's testimony in support of this claim.  (Exhibit C)

82. Upon entry, the Emergency Services Unit officers moved into Officer Schoolcraft's' bedroom with their guns drawn, wearing bulletproof vests and helmets and carrying tactical shields.[88]

**Response to Plaintiff's Statement No.82**

---

[86] PMX 7: Marino Tr. at 258:5-16.
[87] PMX 3: Mauriello Tr.  357:24-358:22.
[88] PMX 24: Duncan Tr.  119:4-120:19; PMX 25: Gough Tr. 141:4-25.

Not contested for the purposes of this motion only.

83. Officer Schoolcraft was lying on his bed and it appeared that he was either watching TV or had just woke up.[89]

**Response to Plaintiff's Statement No.83**

Not contested for the purposes of this motion only.

84. As reflected by the first moments of a recording captured by Officer Schoolcraft's voice-activated digital recorder, one of the Emergency Service Unit officers asked Officer Schoolcraft, "You okay?" to which Officer Schoolcraft replied, "Yeah, I think so."

**Response to Plaintiff's Statement No.84**

Not contested for the purposes of this motion only.

85. Once DI Mauriello entered his bedroom, he ordered Officer Schoolcraft to return to the 81st Precinct.[90]

**Response to Plaintiff's Statement No.85**

Not contested for the purposes of this motion only.

86. As reflected by the recording, Officer Schoolcraft refused to return to the Precinct, notwithstanding numerous threats and orders. Eventually, however, Officer Schoolcraft succumbed to threats by Captain Lauterborn and Lieutenant Gough, and said he would go under

---

[89] PMX 24:  Duncan Tr. 127:11-20 (laying there on his bed watching TV); PMX 3:  Mauriello Tr. 359:2-5 (the TV was on).
[90] PMX 3:  Mauriello Tr. 356:11-357:15; PMX 11:  (DS.50_31October 2009_HomeInvasion.wma at 2:48).

protest.[91]

**Response to Plaintiff's Statement No.86**

Not contested for the purposes of this motion only.

87. Then a few moments later, Officer Schoolcraft stated that he had to sit down because he was not feeling well and agreed to receive medical attention.[92]

**Response to Plaintiff's Statement No.87**

Not contested for the purposes of this motion only.

88. While Officer Schoolcraft was being examined by Jamaica Hospital EMT Salvatore Sangeniti, who had previously responded to the scene with an FDNY EMT supervisor, Deputy Chief Marino returned to Officer Schoolcraft's bedroom and berated Officer Schoolcraft about feeling sick.[93]

**Response to Plaintiff's Statement No.88**

Not contested for the purposes of this motion only.

89. And at the very moment when EMT Sangeniti started taking Officer Schoolcraft's blood pressure, Deputy Chief Marino, in a loud and angry tone of voice, suspended Officer Schoolcraft.[94]

**Response to Plaintiff's Statement No.89**

---

[91] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40
[92] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40.
[93] PMX 11:DS.50_31October 2009_HomeInvasion.wma at 9:07-12:12.
[94] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 11:00-12:12; PMX 26: Sangeniti Tr. 144:16-148:3 (Sangeniti confirming that at the point when Deputy Chief Marino suspends Officer Schoolcraft he was taking his blood pressure; testimony based on the sounds made when taking blood pressure).

Not contested for the purposes of this motion only.

90. Based on the circumstances confronting Officer Schoolcraft, he agreed to go to the hospital associated with his primary care physician, which was Forest Hills Hospital, to have his blood pressure checked out.[95]

**Response to Plaintiff's Statement No.90**

Not contested for the purposes of this motion only.

91. When it became clear to Officer Schoolcraft, however, that the NYPD was going to take him to Jamaica Hospital (which has a psychiatric ward), Office Schoolcraft refused further medical attention and went back to his apartment.[96]

**Response to Plaintiff's Statement No.91**

Not contested for the purposes of this motion only.

92. As reflected in the second part of the recording of the events in his home that time, Officer Schoolcraft returned to his apartment, laid back down in his bed and refused further orders first by Captain Lauterborn and then by Deputy Chief Marino who returned again to his home and entered without permission.[97]

**Response to Plaintiff's Statement No.92**

Not contested for the purposes of this motion only.

---

[95] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 13:00-14:10.

[96] PMX 4: Schoolcraft Tr. 149:7-151:2.

[97] PMX 4: Schoolcraft Tr. 1:4-155:8 (Lauterborn pursued Schoolcraft back into his apartment and physically prevented him from shutting the doors behind him as he returned); PMX 11: DS.50_31October 2009_HomeInvasion.wma at 17:50-22:00.

93. Deputy Chief Marino declared Officer Schoolcraft an "emotionally disturbed person" (also known as an "EDP") and Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough and Sergeant Duncan grabbed Officer Schoolcraft from his bed, threw him on the floor of his bedroom and cuffed him with his hands behind his back.[98]

**Response to Plaintiff's Statement No.93**

Not contested for the purposes of this motion only.

94. While Officer Schoolcraft was prone on the floor and Gough and Duncan were forcing his wrists into handcuffs, Broschart stepped on the backs of his legs, Lauterborn held him down with his hands, and Deputy Chief Marino put his boot on Officer Schoolcraft's face as he tried to turn his neck around to see what was being done to his body.[99]

**Response to Plaintiff's Statement No.94**

Not contested for the purposes of this motion only.

95. After the handcuffs were secured, Officer Schoolcraft was then forced into an ESU chair, taken to the ambulance, placed on a stretcher with his hands cuffed behind his back, and driven to Jamaica Hospital by the two Jamaica Hospital EMTs.

**Response to Plaintiff's Statement No.95**

Not contested for the purposes of this motion only.

96. Lieutenant Broschart rode in the back of the ambulance to maintain

---

[98] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 21:30 -23:51.
[99] PMX 4: Schoolcraft Tr. 166:21-168:19; PMX 21: Broschart Tr. 167:16-169:17; PMX 10: Lauterborn Tr. 322:23-323:9.

custody of Officer Schoolcraft.[100]

## Response to Plaintiff's Statement No.96

Not contested for the purposes of this motion only.

97. While the NYPD officers were in his apartment, they searched his person and his apartment and seized a voice-activated digital recorder taken from his pocket as well as several files belonging to Officer Schoolcraft, including copies of crime reports reflecting the downgrading of crimes he reported to IAB and notes in a folder marked "Report to the Commissioner.[101]

## Response to Plaintiff's Statement No.97

Not contested for the purposes of this motion only.

98. Officer Schoolcraft arrived at Jamaica Hospital's Emergency Room later that night and spent the night handcuffed to a gurney in the Emergency Room.

## Response to Plaintiff's Statement No.98

Not contested for the purposes of this motion only.

99. Hospital medical records or the "chart" reflect that he was in custody of the NYPD the entire time.[102]

## Response to Plaintiff's Statement No.99

Plaintiff fails to indicate the time span of the entire time.  He also fails to identify if he

---

[100] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 22:00-28:27; .
[101] PMX  4:  Schoolcraft Tr. 173:12-177:17.
[102] PMX 27:  Jamaica Hospital Chart (PX 69 at JHMC  58) (Emergency Department Nursing Notes). Plaintiff's counsel has paginated the chart as "JHMC _."

means the medical emergency room or the medical emergency room and the psychiatric emergency room.

> 100.    Officer Schoolcraft was cuffed and under the custody of Lieutenant Broschart until the Lieutenant was relieved at about midnight by Defendant, Sergeant James, who was also from the 81st Precinct, and Sergeant James remained there until the morning.[103]

**Response to Plaintiff's Statement No.100**

Not contested for the purposes of this motion only.

> 101.    On November 1, 2009, Defendant, Sergeant Frederick Sawyer, another supervisor from the 81st Precinct, was sent to Jamaica Hospital to relieve Sergeant James.  When Sawyer got to the hospital, he saw Officer Schoolcraft on the telephone and, according to Sawyer, he ordered him to get off the telephone.[104]

**Response to Plaintiff's Statement No.101**

Not contested for the purposes of this motion only.

> 102.    When Officer Schoolcraft did not comply with that order, Sergeant Sawyer, Sergeant James, and their two drivers physically forced Officer Schoolcraft onto the gurney and handcuffed his other hand to the gurney, leaving him in a fully shackled position on the gurney.[105]

**Response to Plaintiff's Statement No.102**

Not contested for the purposes of this motion only.

---

[103] PMX  28:  James Tr. 53:18-20, 59:17-60:16 & 67:14-71:16 .
[104] PMX  29:  Sawyer Tr. 139:25-146:15.
[105] PMX  29:  Sawyer Tr. 139:25-146:15 & 153:14-156:16.

103.  When Sawyer applied the cuffs to Officer Schoolcraft, he used both hands to squeeze the cuffs tighter and said "this is what happens to rats."[106]

**Response to Plaintiff's Statement No.103**

Not contested for the purposes of this motion only.

104.  Later that morning, the two sets of handcuffs were removed and Officer Schoolcraft was wheeled into the Jamaica Hospital Psychiatric Emergency Room to be held against his will for further "observation."[107]

**Response to Plaintiff's Statement No.104**

Not contested for the purposes of this motion only.

105.  On November 3, 2009, Doctor Bernier ordered Officer Schoolcraft's involuntary hospitalization.

**Response to Plaintiff's Statement No.105**

This statement is denied as plaintiff fails to cite to any evidence to support this statement.

106.  Dr. Bernier's decision was made even though there was nothing in the chart that suggested that Officer Schoolcraft was dangerous.

**Response to Plaintiff's Statement No.106**

This statement is denied as plaintiff fails to cite to any evidence to support this statement.

107.  After the paperwork was filled out, Officer Schoolcraft was taken

---

[106] PMX  4:   Schoolcraft Tr. 186:11-22..
[107] PMX 27:   Medical Chart (PX 69) at JHMC 45.

from the Psychiatric Emergency Room to a psychiatric ward in the hospital.[108]

### Response to Plaintiff's Statement No.107

This statement is denied as the cited page was not attached by plaintiff's counsel as part of his exhibits through a hard copy, electronic filing or email.

108.  On November 4, 2009, Doctor Isakov, who was an attending doctor on the psychiatric ward, confirmed Dr. Bernier's decision to involuntarily hospitalize Officer Schoolcraft.[109]

### Response to Plaintiff's Statement No.108

Not contested for the purposes of this motion only.

109.  That decision was reached even though there was nothing in the chart that suggested that Officer Schoolcraft was dangerous to himself or others.[110]

### Response to Plaintiff's Statement No.109

This statement is denied as the cited "evidence", Plaintiff's Motion Exhibit 30 at pgs 13-14, does not support this proposition.  The cited portion of Dr. Lubit's report concerns alleged failures to collect information from collateral sources.  Further, Dr. Lubit's report is not part of an affidavit, affirmation or other sworn statement and therefore is not sufficient evidence to support a motion for summary judgment.  This statement is also denied as plaintiff does not cite to the chart to support this contention.  This statement is denied as the chart does provide ample evidence to

---

[108] *Id.* at 91.

[109] PMX 27 (PX 69) at p. 46.

[110] *See* PMX 30:  Report of Dr. Roy Lubit at p. 13-14.

support a determination plaintiff was a substantial risk to himself or others.  (A copy of the Jamaica Hospital chart is attached to Koster Decl. as Exhibit D).

> 110.  Doctor Bernier and Doctor Isakov testified at their depositions that they admitted Officer Schoolcraft on the ground that any possible or potential risk of dangerousness was a sufficient basis for their commitment decision.[111]

**Response to Plaintiff's Statement No.110**

This statement is denied as Dr. Aldana-Bernier's deposition testimony does not support the "fact" that she admitted plaintiff on the grounds that any possible or potential risk of dangerousness was a sufficient basis for their commitment decision.

> 111.  Dr. Dhar, who was the Jamaica Hospital witness in this action, also testified that it was the policy and practice of the hospital to involuntarily commit a patient based on any possibility that the person was dangerous.[112]

**Response to Plaintiff's Statement No.111**

This statement is denied as the cited testimony does not stand for the proposition cited.  Further, the statement is also denied as Dr. Dhar's cited testimony does not state or indicate Dr. Aldana-Bernier followed the policy and practice plaintiff claims Dr. Dhar's testimony stands for.

> 112.  On November 6, 2009, after a forced stay lasting six days, Jamaica Hospital released Officer Schoolcraft from its custody, the same day

---

[111] PMX  31:  Bernier Tr. 248-49; PMX 32:  Isakov Tr. 94-98
[112] PMX  33:  Dhar Tr. 132-35.

that insurance coverage for his forced stay expired.[113]

## Response to Plaintiff's Statement No.112

Dr. Aldana-Bernier admits plaintiff was discharged on November 6, 2009, and the remainder is not contested for the purposes this motion only.

113.  After Officer Schoolcraft was released from Jamaica Hospital, he moved to Johnstown, New York and for the next six months was relentlessly harassed by the NYPD, which sent NYPD and local police officers on at least twelve separate occasions to bang on his door, spy on him, and videotape him or his father.

## Response to Plaintiff's Statement No.113

Not contested for the purposes of this motion only.

114.  In January 2010 and in February 2010, Lieutenant Gough and Sergeant Duncan traveled with others north over 200 miles to his home to deliver papers to him that could have just as easily been sent to him by certified mail.[114]

## Response to Plaintiff's Statement No.114

Not contested for the purposes of this motion only.

115.  DI Mauriello was a witnesses in the stop and frisk case recently tried in this Courthouse before District Court Judge Shira A. Scheindlin, *Floyd v. City of New York*, 08-cv-1034 (SAS) (Dkt. # 298). In that testimony, DI Mauriello stated that *after* the quota allegations were

---

[113] PMX 27 (Medical Chart) at JHMC 128 ("The case is certified from 11/3/09 through 11/6/09. Next review will be with Dan of Aetna….").
[114] PMX 16 at 3876.

made against him as the commanding officer of the 81st Precinct, he was transferred on July 3, 2010 to become the Executive Officer of Transit Borough Brooklyn and Queens. According to DI Mauriello's testimony before Judge Scheindlin, at the time of the transfer, the Chief of Patrol for the entire NYPD told DI Mauriello that he was doing a "really good job at the 81st Precinct" and that he wanted to reward him with the new position.[115]

**Response to Plaintiff's Statement No.115**

Not contested for the purposes of this motion only.

116. While Mauriello did not claim then that the transfer was a promotion, he did considered it a transfer to a position as "second commander to more officers."[116]

**Response to Plaintiff's Statement No.116**

Not contested for the purposes of this motion only.

117. While technically not a "promotion," it was "a reward for the job [he] did at the 81st Precinct."[117]

**Response to Plaintiff's Statement No.117**

Not contested for the purposes of this motion only.

118. Mauriello has not suffered any damage to his status at the NYPD.

**Response to Plaintiff's Statement No.118**

Not contested for the purposes of this motion only.

---

[115] PMX 35: Mauriello *Floyd* Testimony (PX 48) at 1829:25-1831:11.
[116] *Id.* at 1831:17.
[117] *Id.* at 1836:25.

119.   In his deposition in this case, DI Mauriello testified that soon after the news broke in a February 2010 *Daily News* article about the investigation into downgrading major crimes at the 81st Precinct, he attended a Patrol Borough Brooklyn North supervisors meeting. At the meeting his direct supervisor, Deputy Chief Marino, told DI Mauriello not to worry about the negative press because he did not believe it.[118]

## Response to Plaintiff's Statement No.119

Not contested for the purposes of this motion only.

120.   In addition, according to Mauriello, Deputy Chief Marino and the thirty-five other supervisors in the room told DI Mauriello that they supported him.[119]

## Response to Plaintiff's Statement No.120

Not contested for the purposes of this motion only.

121.   Mauriello does not claim that he was denied some specific position or promotion.  At his deposition, DI Mauriello testified that he has not made *any* efforts to change his position at the NYPD since October 2009 and that he has not made any requests for any changes in his position since October 2009.[120]

## Response to Plaintiff's Statement No.121

Not contested for the purposes of this motion only.

122.   The only information that Mauriello could provide at his deposition

---

[118] PMX  3:  Mauriello Tr. 98:12-103:25.
[119] *Id.* at 103:16-25
[120] *Id.* at 419:4-420:10.

was that he had discussions in the summer of 2011 with his now-retired supervisor, Transit Bureau Chief Diaz, and his successor, Joseph Fox, who told him that any transfers or promotions would likely have to wait until the case is over and that until then they could not "push for him."[121]

**Response to Plaintiff's Statement No.122**

Not contested for the purposes of this motion only.

123.   Mauriello has no evidence that Officer Schoolcraft's statements to QAD or IAB were made for the *sole purpose* of intentionally inflicting harm on Mauriello or that Officer Schoolcraft used wrongful means to inflict that harm.

**Response to Plaintiff's Statement No.123**

Not contested for the purposes of this motion only.

124.   Mauriello's Counterclaims say that Officer Schoolcraft was motivated by a lawsuit.

**Response to Plaintiff's Statement No.124**

Not contested for the purposes of this motion only.

125.   Official findings by two NYPD investigative agencies – IAB and QAD – show that DI Mauriello personally committed misconduct and improperly permitted rampant downgrading and suppression of crime reporting at the 81st Precinct while under his command.

**Response to Plaintiff's Statement No.125**

---

[121] *Id.* at 466:11-470:9.

Not contested for the purposes of this motion only.

126. After October 31, 2009, IAB began an investigation into whether DI Mauriello knew about or suspected at the time of his entry into Officer Schoolcraft's home that IAB or QAD was investigating the 81st Precinct. IAB also made investigation into whether Mauriello knew about the contents of Officer Schoolcraft's memo book at the time he forced his way into his apartment.

**Response to Plaintiff's Statement No.126**

Not contested for the purposes of this motion only.

127. During the course of those investigations, DI Mauriello was required to be interviewed under oath by IAB, and at his interview DI Mauriello made materially false statements about his knowledge about the existence of an investigation into his Precinct and Officer Schoolcraft's memo book.[122]

**Response to Plaintiff's Statement No.127**

Not contested for the purposes of this motion only.

128. IAB has recommended that formal charges against Mauriello be filed, and those charges are still pending.

**Response to Plaintiff's Statement No.128**

Not contested for the purposes of this motion only.

129. In 2010, QAD issued a report on its investigation, stating: "In summary, although some upgrades were made during the course of

---

[122] PMX 15 (PX 144) (confidential designation)

2008 and 2009, the findings illustrate severe deficiencies in the overall crime reporting process as a whole beginning with the initial interaction of complainants attempting to file reports, the supervisor's review and finalization of the reports submitted and continuing with inordinate delay in changing, improper classifications. These conclusions, coupled with the significant amount of reports found not to have been entered into the Omni-System is disturbing."[123]

**Response to Plaintiff's Statement No.130**

Not contested for the purposes of this motion only.

## ADDITIONAL UNDISPUTED CLAIMS

**Deposition Testimony of Dr. Aldana-Bernier**

1. Dr. Aldana-Bernier is familiar with the Mental Hygiene Laws for involuntarily admitting patients; Mental Hygiene Law §9.39 concerns emergency involuntary admissions.   (Dr. Aldana-Bernier's Transcript is annexed to Koster Decl. as Exhibit A) (Exhibit A at pg 69 ln 22-pg 71 ln 4).

2. Dr. Aldana-Bernier is familiar with the procedures for involuntarily admitting a patient to a hospital.  (Exhibit A at pg 71 lns 5-16).

3. Dr. Aldana-Bernier has committed numerous individuals pursuant to Mental Hygiene Law §9.39.  (Exhibit A at pg 71 ln 17-pg 72 ln 22).

4. Dr. Aldana-Bernier understands that procedures of Mental Hygiene Law §9.39 must be complied with to involuntarily commit someone, including plaintiff. (Exhibit A at pg 79 lns 11-23).

---

[123] PMX 16 (PX 169) at NYC 5205 (AEO designation; filed under seal) (redacted ECF version).

5. Dr. Aldana-Bernier's understanding of Mental Hygiene Law §9.39 is that a patient can be admitted if they are a danger to themselves; a danger to society; they are psychotic; not able to take care of themselves; if they are depressed and not able to take care of themselves, and/or if they are suicidal. (Exhibit A at pg 79 ln 24-pg 80 ln 12).

6. A mental status examination is part of the procedure for admitting a patient pursuant to Mental Hygiene Law §9.39. (Exhibit A at pg 80 lns 13-17).

7. A person can be held if they are depressed and not able to take care of themselves, such as not eating, sleeping, or functioning. This patient could be suicidal and a danger to themselves. (Exhibit A at pg 80 ln 18-pg 81 ln 9).

8. To admit someone under Mental Hygiene Law §9.39, Dr. Aldana-Bernier has to take a number of steps, including, review previous hospital records; contact a psychiatrist if the person is seeing one; contact a medical doctor only if the patient says they want their medical doctor to be contacted. (Exhibit A at pg 81 ln 23-pg 82 ln 22).

9. Dr. Aldana-Bernier also has to fill out the Mental Hygiene Law §9.39 form. (Exhibit A at pg 83 lns 11-18).

10. This form is not for Dr. Aldana-Bernier's benefit; rather it is for the benefit of the patient and society as a whole. (Exhibit A at pg 84 lns 9-12.

11. Dr. Aldana-Bernier reviewed Dr. Lwin's note. Dr. Lwin determined plaintiff was paranoid about his supervisors and was agitated, uncooperative, verbally abusive in the medical emergency room. They needed to determine why he was so agitated and acting in a bizarre manner. The bizarre behavior included

plaintiff barricading himself in his home, not opening the door and having to have his apartment broken into.    Dr. Lwin determined plaintiff needed further evaluation. (Exhibit A at pg 87 ln 11-pg 93 ln 4).

12. A patient can be held pursuant to Mental Hygiene Law §9.39 if they are behaving bizarrely and are potentially psychotic; such behavior can make a patient dangerous to themselves or others. (Exhibit A at pg 93 ln 5-pg 94 ln 13).

13. Dr. Aldana-Bernier explicitly denied that plaintiff was committed under Mental Hygiene Law §9.39 solely because he was acting bizarrely.  Plaintiff's bizarre behavior was simply one component of his general mental state. (Exhibit A at pg 94 lns 14-24).

14. In reviewing Dr. Lwin's note, Dr. Aldana-Bernier believed there was a question of whether plaintiff was going to hurt himself or if he was a danger to himself because he was agitated, exhibited bizarre behavior and barricaded himself in his apartment. (Exhibit A at pg 94 ln 25-pg 95 ln 20).

15. Dr. Aldana-Bernier was examining plaintiff's behavior not just at that particular moment, but also his prior behavior, including his barricading himself in his apartment. (Exhibit A at pg 95 lns 8-20).

16. Dr. Patel signed Dr. Lwin's note "I concur with the above doctor's treatment recommendations." (Exhibit A at pg 99 lns 16-19).

17. A psychiatric disorder is one of the categories of diagnosis wherein a patient is not in touch with reality.  This can manifest as symptoms such as agitation, aggressive behavior, delusions, hallucinations and impairment of reality testing. (Exhibit A at pg 99 ln 20-pg 100 ln 4).

18. It was indicated plaintiff had a conflict with his supervisor.  (Exhibit A at pg 100 ln 18-pg 101 ln 2).

19. Dr. Slowick's note indicated plaintiff was guarded and not cooperative; did not know why he could not carry a gun; and that his supervisors did something to him.  (Exhibit A at pg 117 ln 23-pg 119 ln 7).

20. Being paranoid means the person had a false belief about what is occurring in their environment that is not in agreement with the culture; someone will say they feel they are being watched or followed; somebody saying there is a conspiracy against them; if someone will say someone is talking about them.  These are various forms of paranoia, jealousy and delusions.  (Exhibit A at pg 135 ln 19-pg 136 ln 6).

21. Dr. Tariq diagnosed plaintiff as paranoid.  (Exhibit A at pg 136 lns 7-20).

22. The nursing assessment indicated plaintiff was brought in by the NYPD after he was deemed paranoid and a danger to himself by his police sergeant.  (Exhibit A at pg 143 lns 4-25).

23. Dr. Aldana-Bernier reviewed this nursing assessment and it was something she considered in making her determination regarding plaintiff.  (Exhibit A at pg 144 ln 25-pg 146 ln 4).

24. Pursuant to Mental Hygiene Law §9.39, Dr. Aldana-Bernier had to make her own evaluation of plaintiff.  (Exhibit A at pg 146 lns 5-11).

25. Her assessment of plaintiff was based on the totality of the notes as well as her own assessment of plaintiff.  (Exhibit A at pg 146 ln 19-pg 147 ln 11).

26. Dr. Aldana-Bernier sought a second opinion of her assessment of plaintiff. (Exhibit A at pg 147 ln 25-pg 149 ln 16).

27. Dr. Aldana-Bernier's opinion that plaintiff could be admitted pursuant to Mental Hygiene Law §9.39 was based on the events at his apartment, including barricading himself in his apartment; acting bizarrely; displaying agitation in the emergency room; plaintiff's occupation as a police officer; his access to guns even though his gun had been taken away; his delusions; and the increased chance of damage plaintiff could cause based on his training and occupation as a police officer. (Exhibit A at pg 149 ln 17-pg 151 ln 3).

28. When she personally evaluated plaintiff, he displayed paranoia by claiming he was being set up by a various police officers who were conspiring against him; paranoia is a form of psychosis; he also displayed persecutory delusions. (Exhibit A at pg 172 lns 6-22; pg 194 lns 18-24).

29. Plaintiff's paranoia was manifested by his claims that there was a conspiracy against him. He also believed he was being persecuted by his superiors and his co-workers. (Exhibit A at pg 195 ln 21-pg 196 ln 17).

30. Plaintiff was a threat to cause physical harm to himself or others because he was a police officer talking about conspiracies, had access to weapons, had to be brought from the apartment where he barricaded himself in, acting bizarre and agitated at this home and in then in the emergency room. (Exhibit A at pg 196 ln 18-pg 197 ln 18; pg 197 ln 23-pg 199 ln 3).

31. Dr. Aldana-Bernier stated all relevant information has to be taken into account and the decision to commit pursuant to Mental Hygiene Law §9.39 is not just

based on a single isolated second at the exact time the decision is made. (Exhibit A at pg 198 ln 14-pg 199 ln 3).

32. Plaintiff consistently displayed paranoia that there was a conspiracy against him by numerous police officers. (Exhibit A at pg 199 lns 16-24).

33. In the "Emergency Admission Section 9.39 Mental Hygiene Law", in the section record of admission, Dr. Aldana-Bernier wrote "Patient is a danger to himself. Currently psychotic and paranoid. Would benefit from inpatient stabilization." (Exhibit A at pg 216 ln 14-pg 217 ln 14; Exhibit D at pg 57).

34. In formulating her decision concerning plaintiff pursuant to Mental Hygiene Law §9.39, Dr. Aldana-Bernier was not basing her decision just on how plaintiff presented to her during her face-to-face examination of him, but also all the prior events and determinations. (Exhibit A at pg 231 lns 7-18).

35. Dr. Aldana-Bernier based her opinion on her determination that plaintiff was a substantial risk to physically harm himself or others. Specifically, she was asked:

Q. We are going to get to what you based your opinion on. I'm asking you: Did you base it on that he was a substantial risk of physical harm to himself as manifested by a threat of or attempt at suicide?
        MR. CALLAN: Objection, asked and answered.
        MR. SUCKLE: Not answered yet.
Q. Yes or no?
        MR. CALLAN: Objection, asked an answered.
Q. Can you answer, please?
A. A potential risk, yes.
Aldana-Bernier Transcript pg 243 ln 4-pg 244 ln 11.

36. Plaintiff was a potential risk to harm himself or someone else because he was acting bizarre, barricaded himself in his apartment, was brought in from his home, was a police officer who may have access to weapons, and is paranoid. (Exhibit A at pg 246 ln 25-pg 247 ln 11).

37. The only testimony cited by plaintiff in support of his motion for summary

judgment is as follows:

do you mean?

Q. Sure. Well, you used the word "potential." I would like to know what you mean by potential.

A. If you think of the navy yard disaster, was he an officer or an army man? He was so quite, no one ever found out what was going on with him. So what happened then? Or if you look at all of those - - the Range Rover. Who are all of these people that caused that? They are all police officers.

So if I think then I have to make sure that when I see a patient in the ER, I have to think in the future that there will be no disaster, there will be no destruction, or no one will get harmed when they were discharged from the ER.

Q. I was asking about what you meant by potential.

A. That's the potential.

Q. So if there is any potential at all, you want to make sure that the patient is safe, correct?

A. Correct.

Q. And if there is any potential at all, you want to make sure the community is safe, correct?

A. That's correct.

Q. And if there is any potential at all, you were going to admit Mr. Schoolcraft, correct?

MR. LEE: Objection to form.

A. With all of those reasons, yes, I would have to admit him.

Q. When you admitted him to the emergency room, there were certain rules and regulations - -

MR. SUCKLE: Withdrawn.

Q. When he was admitted to the psych floor, there were certain rules and regulations in the psych war, correct, about clothes they wear, what hours visitors can come, correct?

A. Yes.

(Exhibit A at pg 248 ln 2-pg 249 ln 25).

38. Adjustment disorder is a psychiatric diagnosis for where someone goes under

stress and will react to that stress within a period of time; this reaction will affect

his functioning. The person could be depressed, agitated, manifest itself through

violence, depression or anxiety. (Exhibit A at pg 318 ln 21-pg 319 ln 10).

39. There is no evidence Dr. Aldana-Bernier based her determinations pursuant to

New York Mental Hygiene Law §9.39 whether there was a potential risk plaintiff

would psychically harm himself others as opposed to basing it on whether there was a substantial risk plaintiff would physically harm himself or others. (Exhibit A; A copy of Dr. Tancredi's Affidavit is attached to Koster Decl. as Exhibit B; and Exhibit D)

40. There is no evidence Dr. Aldana-Bernier based her determinations pursuant to New York Mental Hygiene Law §9.39 using a potential risk standard in place of a substantial risk standard. (Exhibit A; Exhibit B; and Exhibit D)

**Affidavit of Dr. Laurence Tancredi**

41. Dr. Aldana-Bernier evaluated the plaintiff at the Jamaica Hospital on November 1, 2009, and on the basis of her review of the records and her evaluation of plaintiff concluded that he should be admitted to the hospital. (Exhibit B at ¶ 4).

42. Dr. Aldana-Bernier took all these factors into consideration, including the realization that as a policeman, plaintiff would likely have access to weapons, even though his gun had been removed; that he was living alone with few friends or available collaterals; and no doubt further appreciated that plaintiff was a big man, estimated 250 lbs, and could be bodily injurious to others, particularly given his compromised mental state as well as his manifested lack of judgment. (Exhibit B at ¶ 5).

43. On the basis of these facts, she concluded he was a foreseeable danger to himself or others and needed additional time in the hospital for medical stabilization. She committed him under the Mental Hygiene Law Section 9.39, which provides for Emergency Admission when a person is deemed to have a "mental illness for which immediate observation, care and treatment in a hospital

is appropriate and which is likely to result in serious harm to himself or herself or others." The phrase "substantial risk of physical harm" is included in the language of the relevant statute. Underlying these concepts is a notion of "foreseeability". (Exhibit B at ¶ 6).

44. This law, Section 9.39, allows for 48 hours observation during which time the patient is further evaluated by others with more time available and a detailed analysis is conducted to determine whether the more "freedom restricting" confinement--that of 15 days following the assessment of a second physician, should be employed. (Exhibit B at ¶ 7).

45. The Emergency Admission (or commitment) is often done quickly in an emergency room with frequently incomplete information available; it is a judgment call as is the case with any "risk" analysis. There is inevitably uncertainty inherent in risk assessment. (See: Buchanan A.; R. Binder; M. Norko et al: Psychiatric Violence Risk Assessment; Am J Psychiatry 2012, 169: 340 ff. for a detailed discussion of the conceptual problems of risk assessment). (Exhibit B at ¶ 8).

46. On the other hand, where factors, such as those in this case, lead to a reasonable conclusion by the clinician that there is foreseeable "substantial" risk of harm to self or others, it is essential to minimize serious adverse outcomes and, therefore, commit the individual. (Exhibit B at ¶ 9).

47. Dr. Aldana-Bernier's deposition reveals a general knowledge about Section 9.39 of The Mental Hygiene Law. She demonstrated the appropriate understanding of the limited applicability of that law, the importance of "dangerousness" to self and

others, and her understanding that she must do what is best for the patient and for society at large at that specific moment of decision-making.  (Exhibit B at ¶ 10).

48. Dr. Aldana-Bernier made a judgment call that the plaintiff was potentially (foreseeably) dangerous.  And at the time when she made this judgment, she had to rely on the information that was readily available.  The very recent history of bizarre behavior, uncooperativeness, paranoid ideation, agitation, general aggressiveness, and verbal confrontation (altercation with the officer earlier on 10/31/09, and cursing in the Medical ER),  along with an evaluation of emotional instability resulting in removal of his gun months earlier formed the basis for her triggering Section 9.39 of the Mental Hygiene Law.  (Exhibit B at ¶ 11).

49. She demonstrated in this judgment not only an adequate understanding of the law, but also a reasonable "judicious" application of the Emergency Admissions standard.  Additionally, Dr. Aldana- Bernier demonstrated her professionalism by presenting the case to the Associate Chairman of the Psychiatry Department, Dr. Dhar, who concurred with her analysis and decision for Emergency Admission.  It was reasonable for her to get a second opinion to obtain the perspective of someone taking a fresh look at the data.  In this case she obtained input from a top administrator in the department who has likely provided oversight for similar situations.  (Exhibit B at ¶ 12).

50. Plaintiff was given an initial diagnosis of "Psychosis NOS", by the first psychiatrist who examined him in the emergency room at Jamaica Hospital.  This was subsequently used by Dr. Aldana-Bernier during the period of emergency

admission until a final diagnosis of "Adjustment disorder with Anxious Mood" was made. The diagnosis of "Psychosis NOS" was essentially a working diagnosis. This diagnosis is defined in DSM-IV-TR, which was the operating handbook for mental disorders in 2009. The criteria for Psychotic Disorder Not Otherwise Specified (NOS) (DSM-IV-TR # 298.9) states in its general description the following: "This category includes psychotic symptomatology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder". (Exhibit B at ¶ 13).

51. Note that not all of the symptoms must be present; in fact one of these, such as delusions, would fit. For example, the description gives the following three illustrations (among others) which in part fit patterns in this case:

   i. Psychotic symptoms that have lasted for less than 1 month but that have not yet remitted, so that the criteria for Brief Psychotic Disorder are not met;

   ii. Persistent non-bizarre delusions with periods of overlapping mood episodes that have been present for a substantial portion of the delusional disturbance; and

   iii. Situations in which the clinician has concluded that a Psychotic disorder is present, but is unable to determine whether it is primary, due to a general medical condition, or substance induced. (Exhibit B at ¶ 14).

52. The presence, therefore, of paranoia (persecutory ideation and delusions), in

addition to bizarre behavior, suspiciousness and guarded responses, agitation, and aggressive verbal confrontation (the bizarre behavior, agitation etc. may suggest a mood disorder) fit under the criteria of Psychotic Disorder-NOS. (Exhibit B at ¶ 15).

53. With regards to paranoid thinking and delusions there is no necessity that the objects of the paranoia be extra-terrestrial beings, aliens etc.  In fact, paranoid delusions most often involve abnormal configuring of the usual objects and images of everyday life into unrealistic systems.  Paranoia often involves people in the very existence of an afflicted person's--for example, a boss, a lover, a parent or sibling.  The person suffering from paranoia will place these usual objects into bizarre, and threatening situations and relate the potential danger wholly to themselves.  The paranoia expressed by Mr. Schoolcraft--conspiracy of the police, the perception that they are out "to get him"-- is in fact a usual form of paranoid delusion.  (Exhibit B at ¶ 16).

54. Dr. Aldana-Bernier's assessment of Mr. Schoolcraft was consistent with a good standard of psychiatric care, including her reliance on the reports of others working in the emergency room and those providing supplementary information, such as the police.  As an emergency room psychiatrist she is limited in her time for conducting a full investigation of the circumstances surrounding a patient's thinking and behavior.  She has a short time to quickly assess the mental status of a patient, and, in particular, to determine if he or she is a danger to themselves or others.  This is not an exact analysis by any means.  But given the factors that she examined as they combined to form a profile of a disturbed person, she used

good judgment admitting the patient for 48 hours to allow for a more extensive gathering of the facts and a period of stabilization for a better opportunity to assess the patient's psychiatric condition.  (Exhibit B at ¶ 17).

55. The symptoms displayed by Mr. Schoolcraft, and testified to by Dr. Aldana-Bernier were sufficient to satisfy the substantial risk requirement for committal under New York Hygiene Law §9.39.  (Exhibit B at ¶ 18).

56. Based on the medical records and Dr. Aldana-Bernier's deposition testimony, Dr. Aldana-Bernier did not base her determination pursuant to New York Mental Hygiene Law §9.39 using a potential risk standard in place of a substantial risk standard.  (Exhibit B at ¶ 19).

57. Dr. Aldana-Bernier's deposition testimony and medical records demonstrate Dr. Aldana-Bernier considered Mr. Schoolcraft a substantial risk pursuant to Mental Hygiene Law §9.39.  (Exhibit B at ¶ 20).

58. Her testimony indicates that she believed use of the phrase "potential risk" was made in relation to a substantial risk; that plaintiff demonstrated the potential for substantial risk of harm to himself or others.  (Exhibit B at ¶ 21).

59. Dr. Aldana-Bernier's examination of plaintiff comported with the requirements of Mental Hygiene Law §9.39 and therefore she did not depart from accepted psychiatric standards in hospitalizing the plaintiff for 48 hours observation. (Exhibit B at ¶ 22).

Dated: February 11, 2015

Respectfully Submitted,

CALLAN, KOSTER, BRADY, & NAGLER, LLP

Matthew J. Koster
By: MATTHEW J. KOSTER, ESQ. (3080)
Attorneys for Defendant
DR. LILIAN ALDANA-BERNIER
One Whitehall Street, 10th Floor
New York, New York 10004
(212) 248-8800
mkoster@ckbblaw.com

TO:     NATHANIEL SMITH, ESQ.
        111 Broadway, Suite 1305
        New York, New York 10006
        (212) 227-7062
        natbsmith@gmail.com

        Walter A. Kretz, Jr., Esq. (WK-4645)
        SCOPPETTA SEIFF KRETZ & ABERCROMBIE
        Attorneys for Defendant
        DEPUTY INSPECTOR STEVEN MAURIELLO
        444 Madison Avenue, 30th Floor
        New York, New York 10022
        (212) 371-4500
        wakretz@seiffkretz.com

        Gregory J. Radomisli, Esq. (GJR2670)
        MARTIN, CLEARWATER & BELL, LLP
        Attorneys for Defendant
        JAMAICA HOSPITAL MEDICAL CENTER
        220 East 42nd Street
        New York, New York 10017-5842
        (212) 697-3122
        radomg@mcblaw.com

        Brian E. Lee, Esq. (BL9495)
        IVONE, DEVINE & JENSEN, LLP
        Attorneys for Defendant
        ISAK ISAKOV
        2001 Marcus Avenue, Suite N100
        Lake Success, New York 11042

(516) 326-2400
brianelee@idjlaw.com

Ryan Shaffer
Senior Assistant Corporation Counsel
ZACHARY W. CARTER, ESQ.
CORPORATION COUNSEL OF THE CITY OF NEW YORK
Attorneys for CITY Defendants
NEW YORK CITY POLICE DEPARTMENT
Special Federal Litigation Division
New York City Law Department
100 Church Street, Room 2-124
New York, New York 10007
(212) 788-8703
rshaffer@law.nyc.gov