UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                              Plaintiff,              10-cv-6005 (RWS)

          -against-

THE CITY OF NEW YORK, et al,

                              Defendants.
--------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S SUMMARY JUDGMENT MOTION**


                              LAW OFFICE OF
                              NATHANIEL B. SMITH
                              111 Broadway – Suite 1305
                              New York, New York 10006
                              (212) 227-7062 (tel)
                              (212)-346-4665 (fax)
                              natbsmith@gmail.com
                              *Attorney for Plaintiff*

                              *Of Counsel:*
                              *John Lenoir*


Dated: February 11, 2015

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ..................................................... 1

**THE CITY DEFENDANTS' MOTION** .......................................... 2

I.A.  The City Defendants claim initial entry and search of the apartment was lawful based on exigent circumstances ........................................... 2

I.B.   The City Defendants claim there are no claims of unlawful search or seizure against Wilson, Wall, O'Hare, Trainor, Hanley, Nelson, Caughey, Sawyer and James ........................................................... 9

II.  The City Defendants argue that the false arrest and false imprisonment claims should be dismissed because it was reasonable for them to believe that Officer Schoolcraft was emotionally disturbed and because there was arguable probable cause to reach that conclusion . ......................................... 13

III. The City Defendants claim that the First Amendment claims should be dismissed because Officer Schoolcraft was "speaking" as a police officer, not a citizen; because they deny having a retaliatory motive; and because they claim that their conduct did not "chill" his speech .................................. 19

IV. The Section 1983 substantive rights............................................ 30

V. The City Defendants argue that the claims against several of the individual defendants fail for lack of personal involvement................................. 31

VI. The City Defendants argue that intra-corporate conspiracy doctrine precludes Officer Schoolcraft's Section 1983 conspiracy claim as a matter of law for the claims among the NYPD defendants and there is no evidence that the NYPD defendants conspired with the FDNY or the Jamaica employees ... 38

A.  The Intra-Corporate Conspiracy Doctrine .................................... 38

B.  The Conspiracy Among the NYPD Defendants, the FDNY
Lieutenant and Jamaica Hospital......................................... 42

VI. The City Defendants argue that the intentional infliction of emotional
distress claim fails because the conduct was not sufficiently outrageous to fall
within the scope of the tort ................................................................. 62

VII.  The negligence claim against the City allegedly fails because the
individual defendants were acting within the scope of their employment....... 66

VIII. The City Defendants' argue that the claim for negligence for disclosure
of the IAB complaints fails because of public policy; because the claims for
negligent investigation are duplicative of intentional torts;
because the Internal Affairs Bureau did not owe Officer Schoolcraft
a duty; and because the information was disclosed to individuals with
a right to find out about the complaint.................................................. 66

A.  Overlaping Claims........................................................ 66

B.  No Duty ..................................................................... 68

IX. The malicious abuse of process claim allegedly fails because no criminal
process was issued ........................................................................... 70

X. The claims against the City under Section 1983 allegedly fail because there
is no evidence of a policy or practice that caused any constitutional injury
to Officer Schoolcraft ....................................................................... 72

The Wide-Spread Practice Method ..................................... 73

Deliberate Indifference Method........................................... 81

**DI MAURIELLO'S MOTION** ........................................................ 84

I. Officer Schoolcraft's First Amendment protection attached not
at the point he was suspended from the NYPD (as this Court has held)
but when he moved out of New York City, and the prior restraint
claims against Mauriello fail because Mauriello did not personally
participate in the alleged wrongful conduct after October 31, 2009 ................ 84

II. Defendant Mauriello is not responsible for any of the claims of forcible
seizure and imprisonment because he was not physically present and did
not directly participate in the specified acts ........................................................ 87

III. The conspiracy claims against Defendant Mauriello allegedly fail as a matter
of law because he is shielded by the intra-corporate conspiracy doctrine,
and there was no conspiracy to cause a violation of Officer Schoolcraft's
constitutional rights ............................................................................. 97

**THE HOSPITAL'S MOTION** ...................................................... 99

1. Jamaica Hospital is a person under Section 1983 .................................. 99
2. State action exists in this case ............................................................. 101
3. Jamaica Hospital is liable for its actual policy ..................................... 110
4. The conspiracy claim includes Jamaica Hospital .................................. 111
5. Jamaica Hospital is liable for Dr. Bernier and Dr. Isakov's conduct ... 112
6. Jamaica Hospital is liable for all of its staff's conduct ......................... 115
7. "Substantially below" standards is not the test
   for medical malpractice ..................................................................... 116
8. Jamaica Hospital's conduct did fall substantially below
   established standards ......................................................................... 117
9. EMTALA is not a defense, substantively or procedurally ................... 119
10. The claim for negligent hiring, training or supervision does not fail
    because there is evidence that the employees had a propensity to
    improperly commit patients ................................................................ 122
11. The intentional infliction of emotional distress claim fails because
    the alleged conduct was not sufficiently outrageous ........................... 123

**BERNIER AND ISAKOV'S MOTION** ........................................................ 123

1. The Section 1983 claims fail because they are not state actors ............... 123
2. The intentional infliction of emotional distress claim fails because
   the conduct is not sufficiently outrageous ................................................ 127
3. The remaining claims should be remanded to state court ........................ 128
4. The declaratory judgment claim ................................................................ 129

**CONCLUSION** ............................................................................................ 130

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ADRIAN SCHOOLCRAFT,

                                   10–cv-6005 (RWS)

                     Plaintiff,

   -against-                  *PLAINTIFF'S OPPOSITION*
                                  *TO DEFENDANTS'MOTIONS*
                                  *FOR SUMMARY JUDGMENT*

THE CITY OF NEW YORK, *et al.*,
                         Defendants.
-------------------------------------------------------------x

## *PRELIMINARY STATEMENT*

      Plaintiff, Police Officer Adrian Schoolcraft ("Officer Schoolcraft"), submits

this memorandum of law in opposition to the motions for summary judgment filed

by the defendants.  The facts relevant to these motions are set forth in the

accompanying Plaintiff's Rule 56.1 Response Statement of Facts as well as the Rule

56.1 Statement submitted by Officer Schoolcraft in support of his motion for

summary judgment.    In this memorandum we address first the motions by the City

Defendants and DI Mauriello, who is separately represented, and then we will

address the motions by the Medical Defendants, Jamaica Hospital, Dr. Bernier and

Dr. Isakov.  Previously, the Court authorized the filing of oversized briefs of 50

pages each and several defendants have filed their motions with oversized briefs.  In

an effort to avoid repetition and for the convenience of the Court we have

consolidated our opposition into a single brief that collectively remains within the

50-page limitation per brief set by the Court.

## THE CITY DEFENDANTS' MOTION

The City Defendants have moved for partial summary judgment on multiple grounds, and we address those points in the order presented by the City Defendants.

*I. A. The initial entry and search of the apartment was lawful based on exigent circumstances.*

The City argues that the entry into Officer Schoolcraft's home on October 31, 2009 was properly based on a concern for Officer Schoolcraft's safety and well-being. (City Mem. at 3.) They claim that leaving work early and reportedly being sick constituted an "emergency" because NYPD Psychologist Catherine Lamstein is alleged to have told Captain Lauterborn that night that they "absolutely need" to find him. (*Id.)*

The City Defendants badly misstate the record on this key issue of what Lamstein told Lauterborn. In her deposition, Lamstein did not state that she told Lauterborn that he had to find Officer Schoolcraft and the allegation is a blatant fabrication by the City Defendants to manufacture the appearance of an emergency where none existed.  In her deposition, Lamstein was asked to describe her conversation with Lauterborn. After providing a detailed response to what she actually told him (*i.e.*, that as of the last time she saw him he was fine and was not

dangerous to himself or others), she then volunteered the statement: "And so I thought he absolutely did need to find him and make sure that he was okay.").[1] Thus, the record only supports the suggestion that -- four years after the fact -- Lamstein mentioned at her deposition her irrelevant and previously unexpressed state of mind that Lauterborn needed to find him.

---

[1] The relevant testimony is as follows:

"Q. So Captain Lauterborn called the sick desk and he was looking for somebody from the psychological evaluation services?
MS. PUBLICKER METTHAM: Objection.
A. Psychological evaluation section. Although, the psychological services section, which does pre-employment screening, they also do pager duty. He was looking for a department psychologist to give him a call to consult about the situation.
Q. Did you tell Captain Lauterborn you had evaluated and met with Schoolcraft?
A. Yes.
Q. And told him that during the conversation that you had with him on October 31st?
A. Yes.
Q. What else did you tell Captain Lauterborn?
A. He was asking me if there was any reason to be concerned about the fact that he went AWOL and that he seemed to be upset and said he had stomach pains and should they be concerned, do they need to go look for him, make sure he's okay. Typically, in that situation they do. He said he wasn't sure they wanted to suspend him, because they thought this was more of a psychological problem as opposed to a disciplinary one and so he wanted to consult with me. *I told him that as of the last time I saw him, which was a few days earlier, I had no reason to think he was a danger to himself or others*. Never expressed thoughts of suicide. It didn't seem to be anything that serious that would lead me to be concerned. However, he had also never acted like that before. He never went AWOL, leaving even though he was told to stay and was now saying he had stomach pains, while being visibly upset. So I did not know if that meant something new happened that led him to be so upset that he was acting in a different manner going AWOL and that kind of stuff and led to a reoccurrence of stomach pains badly enough that he did that or maybe the stomach pains never went away to begin with and I wasn't sure and that my evaluation is -- even though, I was not saying this person is suicidal, he's had these thoughts, you must -- it was nothing like that. I had no reason to think he was, except my evaluation was only as good as the last time I saw them. So if something happened since then or they're acting different since then, that may be different. *And so I thought he absolutely did need to find him and make sure that he was okay*." (Plaintiff's Opposition Exhibit ("POX") 1:  Lamstein Tr. at 318:13-321:3) (emphasis added).

Indeed, the documents and the testimony by Lauterborn confirm that Lamstein did not tell Lauterborn that night that Lauterborn "absolutely needed" to find Officer Schoolcraft. Lamstein took detailed handwritten notes of her conversation with Lauterborn and she read those notes into the record at her deposition.[2] Those notes do not contain any reference to her telling him that he had to find Officer Schoolcraft. In fact, the notes reflect that Lauterborn had concerns about an illegal entry: the notes reflect that Lauterborn told Lamstein that he had a key to the apartment "but [there were] legal issues with using it. Have to have cause."[3]

Nor did Lauterborn mention any such statements by Lamstein at his day-long deposition. Indeed, at his deposition, Lauterborn testified that when he was first questioned by IAB on August 11, 2010 about the events of October 31, 2009 he *forgot* that he even had a conversation with Lamstein.[4] And when specifically asked by IAB why he though Officer Schoolcraft was dangerous, he did not mention any contacts with Lamstein or anyone else.[5]

---

[2] POX 1: Lamstein Tr. 327:13-330:14) (Lamstein reading into the record her notes on her discussions with Lauterborn); POX 2: Plaintiff's Deposition Exhibit 29.

[3] POX 1: Lamstein Tr. 330:12-13.

[4] POX 3: Lauterborn Tr. 103:18-106:19 (acknowledging at deposition that he told IAB he forgot about his discussion with Lamstein); POX 4: Plaintiff's Deposition Exhibit 18 at NYC 5084 (transcript of IAB interview of Lauterborn); POX 5: NYC 10104 (CD # 108) at 19:54-20:45 (recording of IAB interview of Lauterborn).

[5] The transcript of IAB's official interview of Lauterborn provides: MALE VOICE 1: I'm sorry,

Finally and perhaps most importantly, after the events of October 31, 2009, Lauterborn went back to the 81st Precinct with Chief Marino, DI Mauriello, and the three Brooklyn North Investigations Unit officers (Lieutenant Gough, Sergeant Duncan and Sergeant Hawkins) and collectively they put together a detailed Unusual Incident Report about the events that night.[6]  The Report was signed by Lauterborn and was circulated up the NYPD chain of command.[7]   Although the Report does state that Lamstein told Lauterborn that Officer Schoolcraft was not dangerous to himself or others, there is not a single word or phrase that at all suggests that the entry was justified or based on any statement by Lamstein that the NYPD had to find Officer Schoolcraft or that anything that Lamstein said justified the entry.

Indeed, neither Chief Marino nor DI Mauriello testified that their decision to

---

why did you feel that he might hurt himself? Because? CPT. LAUTERBORN: Like I said in my mind, I was feeling that, you know, past things that were going on, that, you know, I'm now thinking that-- the whole--this was the following- - and he just abruptly leaves and I'm thinking now, you know, with all that's going on, uh, that it might have built up enough to where he wasn't thinking about himself, that's, you know, I mean--[Crosstalk] MALE VOICE 1: [Interposing] Let's say at this point in your mind you're developing--.  CPT. LAVTERBORN: Yeah he's – he's acting irrational what's going on is he's virtually not stable. You know, it was then, 'cause yeah that's –the other – it's -- you call back, you know, you got a message, you know, this is your employer. You know, you--you work-- here and you rely on a paycheck, you're going to call back. That's just irrational way of thinking. And this is what happened. And I don't know what was going on behind that door because even if you fall into a coma in two hours, you know. So, you know, there's something behind the door that's not right.  POX 4: Lauterborn PG Tr. at NYC 5079-80 (Plaintiff's Deposition Exhibit 18).

[6] PMX 23:  Lauterborn Report at D00098 (distribution list).
[7] *Id.*

enter was based on a direction or suggestion by any doctor to find him.   Thus, the claim that Lamstein told Lauterborn he had to find Officer Schoolcraft is utterly unsupported by any evidence.

The City Defendants alternatively argue that their subjective motivations about the entry "do not matter" because, according to them, their beliefs about Officer Schoolcraft's well-being were objectively reasonable.  (City Mem. at 4.) Thus, the City Defendants suggest that all the evidence we set forth in our motion for summary judgment (showing that all the relevant NYPD supervisors knew that Officer Schoolcraft was a "rat" who had challenged a quota-driven evaluation and had reported downgrading and other misconduct to QAD and IAB) is irrelevant and that they are entitled to summary judgment that the entry was lawful because they were concerned about his "well-being."

It is axiomatic that issues of credibility and choices between conflicting versions of factual events are issues of fact for a jury to decide, not issues of law that can be determined by the Court on a motion for summary judgment.[8]  Since the City Defendants have asserted that their actions were allegedly motivated by

---

[8] *Coleman v. City of New York,* 585 Fed Appx. 787, 2014 U. S. App. Lexis 18412 at *3 (2d Cir. 2014) (summary judgment on probable cause determination reversed; where question of whether probable cause existed is predominantly factual in nature, then "assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment"); *Donnelly v. Greenburgh Cent. Sch. Dist.*, 691 F. 3d 134, 146 (2d Cir. 2012) (credibility determinations must be made by the jury).

concerns for Officer Schoolcraft's well-being, they have -- at best -- raised issues of fact about their credibility and about the actual events confronting them.   These issues cannot be resolved in favor of the City Defendants as a matter of law.

While it may be correct that in assessing the reasonableness of their entry, the police officer's subjective intent is not the central question, that rule of law is neither a sword nor a shield but an attempt to focus the inquiry on whether police actions were objectively reasonable under the Fourth Amendment.   Thus, the law will not permit the police to barge into someone's home in the middle of the night merely because they had some subjective belief about a dangerous condition inside.  A "mere possibility of danger does not make it objectively reasonable to believe that the circumstances were exigent."[9]

Instead, the burden is on the police to point to objective facts – "specific and articulable facts which taken together with rational inferences from these facts, reasonably warrant that intrusion."[10]   Blind adherence to only those "facts" suggested by the police to justify they entry would simply give the police an unreviewable license to violate with impunity the sanctity of the home based on self-serving and subjective claims of concerns for a person's "well-being."  For

---

[9] *Rivera v. Leto,* 2008 *U.S.* Dist. Lexis 96680 at *13 (S.D.N.Y. Nov. 25, 2008) (quoting *Hurlman v. Rice,* 927 F. 2d 74, 81 (2d Cir. 1990) and citing *Caruso v. Forsland*, 47 F. 3d 27, 33 (2d Cir. 1995).

[10] *United States v. Sikat,* 488 F. Supp. 2d 291, 306 (W.D.N.Y. 2007).

good reason, then, mere surmise is not, as a matter of law, objectively reasonable.[11]

The City Defendants also claim in the alternative that they are entitled to summary judgment on qualified immunity grounds.  (City Mem. at 4.)   They argue that the City Defendants "had a reasonable belief that Plaintiff might cause harm to himself or others and in fact were told that they must locate him and ensure his wellbeing." (*Id.* at 5.)   Yet as noted on our motion, there were *no* facts to suggest that Officer Schoolcraft was dangerous to himself or others.[12]  And, as noted above, the City Defendants were not told that they "must locate him."

Based on this record, the City Defendants are not entitled to summary judgment on qualified immunity grounds because there are hotly disputed questions of fact surrounding the decision to enter Officer Schoolcraft's home. [13] "Though immunity ordinarily should be decided by the court.... that is true only in those cases where the facts concerning the availability of the defense are

---

[11] *Rivera v. Leto,* 2008 *U.S.* Dist. Lexis 96680 at *13 (S.D.N.Y. Nov. 25, 2008) ("A warrantless entry is not objectively reasonable where is it based on mere surmise [as opposed to]objective facts reasonably suggesting that an actual emergency involving human safety then existed.").
[12] Plaintiff's Rule 56.1 Statement at ¶¶ 67-81.
[13] *Mangino v. Inc. Vill. of Patchogue,* 814 F.Supp.2d 242, 261 (E.D.N.Y.2011) ("Given the disputed facts regarding whether [defendant] fabricated the exigency so that he and the Fire Department could conduct an unconstitutional search, summary judgment on qualified immunity grounds on this claim is unwarranted....")

undisputed; otherwise, jury consideration is normally required."[14]  Indeed,

qualified immunity does not protect "those who knowingly violate the law."[15]

Summary judgment is simply not appropriate "when there are facts in dispute that

are material to a determination of reasonableness."[16]

The City Defendants do not move for summary judgment on the issue of

whether they properly remained in the apartment or searched it.   As noted in our

motion for summary judgment, we contend that the entry was unlawful because

there was no emergency at all and that once the NYPD entered and saw that

Officer Schoolcraft was in bed watching TV they were required to leave the

premises.  Thus, our motion for summary judgment should be granted.

B.  *There are no claims of unlawful search or seizure against Wilson, Wall, O'Hare, Trainor, Hanley, Nelson, Caughey, Sawyer and James.*

The City argues that there are no claims for search and seizure against these

individual defendants.  We have already agreed to drop all claims against Wilson,

Wall, O'Hare, and Hanley, and the Court in its January 16, 2015 Decision

dismissed them from the case.[17]  Thus, we address the claims against the remaining

---

[14] *Kerman v. City of New York*, 374 F 3d 93, 109 (2d Cir. 2004).

[15] *Weyant v. Okst*, 101 F. 3d 845, 857 (2d Cir. 1996).

[16] *Rivera v. Leto*, 2008 U.S. Dist. Lexis 96680 (S.D.N.Y. Nov. 25, 2008) (summary judgment on qualified immunity grounds denied where questions of fact existed about whether the police's warrantless entry was justified by a claim of emergency need to come to the aid of another) (quoting *Kerman*, 261 F. 3d at 240).

[17] Opinion and Decision, dated January 16, 2015 at p. 5

individual defendants.

*Captain Trainor*.  The claims against Captain Trainor relate to the First Amendment claims for the harassment upstate.  As such, there are no claims against Trainor for unlawful search or seizure of Officer Schoolcraft.

*Sergeants Sawyer and James*.  The claims against Sergeants Sawyer and James are related to their unlawful seizure and abuse of Officer Schoolcraft while he was at Jamaica Hospital.  More specifically, they were directly involved in the handcuffing of Officer Schoolcraft to his hospital gurney.  Sergeant James was the supervising officer at the hospital and was responsible for Officer Schoolcraft being handcuffed to a hospital gurney throughout the night and early morning of November 1, 2009, and Sergeant Sawyer and Sergeant James were responsible for double cuffing both of Officer Schoolcraft's hands to the hospital gurney later that morning to prevent Officer Schoolcraft from speaking on the telephone in the Emergency Room.  As such, Sergeants James and Sawyer are liable for that unlawful seizure; and based on that same conduct, they are also liable for assault, battery, excessive force and unlawful imprisonment.

*Chief Nelson*.  The claim against Chief Nelson is based on his personal involvement in the events of October 31, 2009.[18]  During the course of the evening,

---

[18] "Personal involvement [of a defendant] can be shown by evidence that: (1) the defendant

Chief Nelson spoke several times with DI Mauriello, and the record evidence suggests that Chief Nelson authorized the conduct against Officer Schoolcraft. Although Mauriello testified that he only "updated" Chief Nelson and that Chief Nelson merely told him to follow procedure, a jury could rationally find that Chief Nelson, as the commanding officer, was personally involved in the decisions made that night.

Chief Nelson admitted at his departmental testimony that Mauriello had told him before the October 31st attack that Mauriello was having "problems" with Officer Schoolcraft and that he received updates throughout the night from Mauriello.[19]  In addition, Sergeant Duncan, who was one of the Brooklyn North Investigation Unit officers at the scene, reported that Officer Schoolcraft was going to be suspended when they found him "under the authority of Chief Nelson."[20] And Chief Marino testified that the Brooklyn North Investigations Unit "works

---

participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation . . . failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

[19] Chief Nelson also undercut Mauriello's claim that they entered Officer Schoolcraft's home out of concern for his well-being.  At his departmental testimony, Chief Nelson stated that he thought the October 31, 2009 incident was a "routine AWOL" and that Mauriello did *not* tell him that he was concerned about Officer Schoolcraft's mental well being. (POX 6: NYC 5790-91; *see also* POX 5: CD# 28 at 12:00-21.
[20] POX 7:  NYC 3832.

directly for the commanding officer of the borough" who was Nelson at the time.[21]

Since Nelson was the borough commander at the time, this fact shows that

Lieutenant Gough, Sergeant Hawkins and Sergeant Duncan went to Officer

Schoolcraft's home under the command and direction of their commanding officer,

Chief Nelson.

Finally, Chief Nelson signed off on Charges and Specifications against

Officer Schoolcraft.[22]  Those Charges and Specifications were for alleged

misconduct by Officer Schoolcraft by, among other things, refusing an "order"

given to him at his apartment that night to return immediately to the 81st Precinct.[23]

*Lieutenant Caughey*.  The claims against Lieutenant Caughey are based on

the fact that he menaced Officer Schoolcraft on the morning of October 31, 2009,

conduct that constitutes an assault under New York law, and that he made two

copies of Officer Schoolcraft's entire memo book, which contained entries relevant

to the IAB and QAD investigations, and supplied that information to Mauriello and

Lauterborn, thereby joining in, and aiding and abetting the scheme to punish

Officer Schoolcraft for reporting misconduct.   Lieutenant Caughey also furthered

the purpose of the conspiracy to punish Officer Schoolcraft by falsely testifying at

---

[21] POX 8:  Marino Tr. 226:4-16.
[22] POX 9:  NYC 3934.
[23] *Id.*

his deposition that he did not share the information about Officer Schoolcraft's

memo book with DI Mauriello until after the events of October 31, 2009, thereby

attempting to protect his commanding officer by falsely testifying that DI

Mauriello did not know about the contents of Officer Schoolcraft's memo book as

of the time when DI Mauriello entered Officer Schoolcraft's home and ordered

him to return that night to the 81st Precinct.   Finally, Lieutenant Caughey is sued

for his role in the retaliation against Officer Schoolcraft in the nine-month period

prior to October 31, 2009.  The evidence relating to those claims are set forth *infra*

at pp. 31-38.

*II.  The City Defendants argue that the false arrest and false imprisonment claims should be dismissed because it was reasonable for them to believe that Officer Schoolcraft was emotionally disturbed and because there was arguable probable cause to reach that conclusion.*

In Officer Schoolcraft's motion for summary judgment, we argued that the

undisputed facts, particularly the tape recording of the events of October 31, 2009,

constitute overwhelming evidence that Officer Schoolcraft was not an emotionally

disturbed person and that Officer Schoolcraft is entitled to summary judgment on

the issue in his favor precisely because no rational jury could find that he was an

emotionally disturbed person based on the undisputed evidence.   Based on those

same facts, it is just as clear that the City Defendants are not entitled to summary

judgment.

Indeed, the cases cited by the City Defendants make clear that the City Defendants are not entitled to summary judgment. *Weyant v. Okst,*[24] reversed summary judgment in a false arrest case. The Second Circuit in *Weyant* noted that "the question of whether or not probable cause existed can only be determined as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers."[25] In *Weyant,* since there was a dispute as to the nature of the plaintiff's conduct -- as there is in this case -- the lower court could not properly grant summary judgment because the weighing of the evidence and the determination as to which version of the events to accept was a matter for the jury.[26]

For the same reasons, the *Weyant* court also held that the police officers were not entitled to qualified immunity. "The matter of whether it was reasonable for the officers to believe their actions met the standards set by those principles depends on whether one believed their version of the facts. That version is sharply disputed, and the matter of the officers' qualified immunity therefore cannot be resolved as a matter of law."[27]

Similarly, the other relevant Second Circuit decision cited by the City

---

[24] 101 F. 3d 845 (2d Cir. 1996).
[25] *Id.* at 852.
[26] *Id.* at 855.
[27] *Id.* at 858.

Defendants, *Kerman v City of New York*,[28] also holds that summary judgment cannot be granted where the essential facts about a police officer's decision to place an individual in custody under Section 9.41 of the Mental Hygiene Law are disputed.   "At this stage [summary judgment] we must credit [plaintiff's] version of the facts.  In that light, a fact-finder could well find the police acted outside the bounds of both the Fourth Amendment and qualified immunity standards of objective reasonableness in placing [plaintiff] in restraints for his eventual transport to Bellevue."[29]  Indeed, the Second Circuit in *Kerman* pointed out that the police had the opportunity to obtain medical information and deliberately refused to take advantage of that opportunity, noting that "a officer contemplating an arrest is not free to disregard plainly exculpatory evidence."[30]  That holding applies with particular force here.

The City Defendants play fast and loose with the facts in their attempt to justify placing Officer Schoolcraft in custody as an "EDP" under Section 9.41 of the Mental Hygiene Law.  First, the City Defendants say (City Mem. at 8) that Officer Schoolcraft "had his gun and shield removed" but glide over the fact that it was *his* supervisors at the 81st Precinct who were directly involved in having

---

[28] 261 F. 3d 229 (2d Cir. 2001).
[29] *Id.* at 241.
[30] *Id.* at 241 (quoting *Kuehl v Burtis*, 173 F. 3d 646, 650 (8th Cir. 1999).

Officer Schoolcraft referred to the Early Intervention Unit.[31]

Second, the City Defendants say that "upon their arrival" at the apartment "they were informed that Plaintiff was suffering from abdominal pain, nausea, dizziness, and chest pains" (City Mem. at 9, citing City 56.1 at ¶ 44), but the document supporting that claim is the Patient Care Report that was filled out by one of the Jamaica Hospital EMTs *after* he was assaulted by his supervisors.[32] Indeed, the chest pains that the City Defendants are referring to are chest pains *caused by* Marino, Lauterborn, Broschart, Gough and Duncan when they attacked Officer Schoolcraft, threw him on the floor and stepped on his legs, back and head while handcuffing him from the rear, as dramatically captured on the tape recording of the home invasion.[33]

Third, the City Defendants say that Officer Schoolcraft's blood pressure was "so high" that the Jamaica Hospital EMTs "considered the situation to be an emergency." (City Mem. at 9.)  Yet in making this assertion, the City Defendants ignore the patently obvious fact that the high blood pressure reading (which was taken during the first entry, not the second entry) occurred minutes after ten armed police officers forcibly entered Officer Schoolcraft's apartment, and his

---

[31] Plaintiff's Rule 56.1 Statement at ¶¶ 25-34.
[32] PMX 27 at JHMC 42.
[33] PMX 11 (CD):  Home Invasion Recording at 22:00-23:00 ("my chest, my chest").

supervisors proceeded to yell at him and to give him orders in a threatening manner to return with them to the Precinct, where he was earlier that day menaced with a gun.  Moreover, the high blood pressure reading was taken at the very moment when Chief Marino declared loudly and angrily to Officer Schoolcraft, "You're suspended!"[34]  Even the Jamaica Hospital EMT who took the blood pressure reading had to admit at his deposition that the circumstances of the moment could explain the high blood pressure reading.[35]  And Officer Schoolcraft's medical expert, Dr. Halpren-Ruder, also submitted a report confirming the patently obvious connection between stress and blood pressure, writing that the vital signs taken by the EMT in Officer Schoolcraft's bedroom were "lacking in meaningful medical significance.4[36]

Under these circumstances, the police in this case, just like the police in *Kerman,* should not be free to justify their conduct by disregarding or ignoring facts.[37] And the circumstances here support a reasonable inference that Officer Schoolcraft's blood pressure reading was not indicative of a medical emergency and that it was used as pretext to get him involuntarily committed to the psychiatric

---

[34] Plaintiff's Rule 56.1 Statement at ¶¶ 82-89.
[35] POX 10: Sangeniti Tr. 99:10-103:3.
[36] PMX 36: Dr. Halpren-Ruder Report at p. 1.
[37] *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (duty to make further inquiry); *Russo v. City of Bridgeport*, 479 F. 3d 196, 209 (2d Cir. 2007) (duty to investigate); *Olivera v. Mayer*, 23 F. 3d 642, 647 (2d Cir. 1994) (uncorroborated complaint not sufficient for probable cause).

ward as a mentally ill and dangerous person.  In fact, it is undisputed that Officer Schoolcraft was taken to Jamaica Hospital on a *non*-emergency basis *without* flashing lights or ambulance sirens because he was in a stable condition and transportation rules prohibited the use of ambulance lights and sirens unless there was an actual emergency.[38]

Yet even the "facts" that the City Defendants claim justified their decision to put Officer Schoolcraft in custody are insufficient.  In *Tsesarskaya v. City of New York*,[39] the NYPD placed the plaintiff in custody as an emotionally disturbed person pursuant to Mental Hygiene Laws § 9.41.  The grounds asserted by the police in their summary judgment motion were the existence of statements by witnesses that the plaintiff was acting crazy, that the plaintiff refused to open her door when the police arrived at the scene, and that the plaintiff engaged in "erratic and inconsistent" behavior.   Since the Mental Hygiene Law requires that the likelihood of serious harm be *manifested* by threats or attempts of suicide or homicide or other violent behavior, those facts were held insufficient to justify summary judgment.[40]  Whether the plaintiff was "sufficiently erratic" or "just foolishly stubborn" was a question of fact for the jury.[41]  Similarly, whether the

---

[38] POX 10: Sangeniti Tr. 131:14-135:23.
[39] 843 F. Supp. 2d 446 (S.D.N.Y. 2012).
[40] *Id.* at 456.
[41] *Id.*

police in this case are entitled to qualified immunity is also a question of fact that

cannot be determined as a matter of law on a summary judgment motion.[42]

Finally, we note that Office Schoolcraft has supplied expert testimony from

a police practices expert, Professor and retired NYPD Captain John Eterno, who

opined in his report and at his deposition that there was simply no proper basis for

declaring Officer Schoolcraft an EDP.[43]   The City Defendants, on the other hand,

have failed to provide any expert testimony to support their claims that a

reasonable police officer could have considered Officer Schoolcraft an emotional

disturbed person.  Instead, the City Defendants rely upon hotly contested factual

matters in support of their motion for summary judgment.

*III.  The City Defendants claim that the First Amendment claims should be
dismissed because Officer Schoolcraft was "speaking" as a police officer, not a
citizen; because they deny having a retaliatory motive; and because they claim that
their conduct did not "chill" his speech.*

None of these arguments has any merit.  First, the City Defendants fail to

address the Court's prior ruling on the First Amendment claims.  In 2012, the

Court held that Officer Schoolcraft had cognizable First Amendment rights after he

---

[42] *Id.* at 459 ("If officers of reasonable competency would have to agree that the information
possessed by the officer at the time of the arrest did not add up to probable cause, the fact that it
came close does not immunize the officer.") (quoting *Jenkins v. City of New York*, 478 F. 3d 76,
87 (2d Cir. 2007) .

[43]  POX 11 & 12:  Eterno & Silverman Report at p. 9-10; Eterno Tr. at 31-33 (discussing
experience as a Captain at the NYPD, including providing training at the Police Academy on the
determination of a person as emotionally disturbed) & 178-191 (discussing lack of a basis for the
determination).

was suspended from the NYPD on October 31, 2009.[44]   In its decision, the Court carefully reviewed the competing considerations raised by a police officer who witnesses misconduct on the job.  On the one hand, the Court rejected on *Garcetti* grounds a First Amendment claim based on pre-suspension retaliation against Officer Schoolcraft for objecting to a quota system for summons, stops and arrests. On the other hand, the Court permitted a First Amendment claim for prior restraint based on the NYPD defendants' conduct toward Officer Schoolcraft after he was suspended from his position.[45]

Without even acknowledging this holding, the City Defendants argue (City Mem. at 11) that Officer Schoolcraft "does not have an interest protected by the First Amendment."   The City Defendants, however, offer no reason why the Court's 2012 decision ought to be changed, and they point to no new law or new fact to justify reconsideration or modification of the prior decision.[46]  Thus, the Court should reject the implicit argument that its prior decision should be modified to restrict the First Amendment claim.

To the contrary, the law has developed since the Court's 2012 ruling by limiting the scope of *Garcetti* and expanding First Amendment protection.  In *Lane*

---

[44] *Schoolcraft v. City of New York,* 2012 U.S. Dist. Lexis 128557 (S.D.N.Y. Sept. 7, 2012).
[45] *Id.*
[46] *Schoolcraft v. City of New York*, 2012 U.S. Dist. Lexis 101317 at *5 (S.D.N.Y. July 18, 2012) (party seeking re-argument needs to show intervening change on controlling law, new evidence, a need to correct a clear error or to prevent manifest injustice).

*v. Franks*,[47] the Supreme Court in a unanimous ruling held that the zone of First Amendment protection for public employees must focus on whether the speech was part of the employee's *ordinary* job duties.  "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it concerns those duties."[48]

Since the focus is now on whether a public employee spoke as part of his or her ordinary job functions, courts are denying motions for summary judgment when there are questions of fact about whether the reporting of misconduct was part of the employee's ordinary job functions.[49]  Indeed, based on this change in the law, the Court should now hold that Officer Schoolcraft's speech before his suspension was protected by the First Amendment because reporting misconduct is not an ordinary function of the position as a Police Officer, as reflected by the annual and monthly performance evaluations of Officer Schoolcraft.[50] Those evaluations set forth the ordinary functions of a Police Officer and do not at all

---

[47] 134 S. Ct. 2369 (2014).

[48] *Id.*  at 2373.

[49] *See, e.g.*, *Hagan v. City of New York*, 2014 U. S. Dist. Lexis 113847 (S.D.N.Y. Aug. 15, 2014) ("After *Lane*, the focus is on her 'ordinary' job responsibilities, and there is simply no indication from the allegations – nor any reason to think -- that [plaintiff/employee] would *ordinarily* go outside of the chain-of-command, to a different agency, to report a systemic policy of improper conduct on the part of her supervisor and other officials.")

[50] *Griffin v City of New York*, 880 F. Supp. 2d 384 (E.D.N.Y. 2012) (finding that NYPD officer's reporting of another police officer's misconduct was not "part-and-parcel" of the plaintiff's job function, and that "[w]hile reporting to IU may be considered synonymous with internally reporting to superiors, reporting to IAB is an entirely different story: plaintiff's complaint to IAB cannot be considered as part of "the chain of command" at the NYPD.")

mention reporting misconduct or corruption as a typical or ordinary function.[51]

As a secondary argument, the City Defendants claim they are entitled to summary judgment on the First Amendment claim on the ground that their "actions were not motivated by plaintiff's speech." (City Mem. at 11.)   The Court should reject the City Defendants' arguments about the absence of any alleged "motivation" on their part because motive is an issue of fact and there is abundant evidence in the record from which a jury could easily find that the City Defendants' conduct was motivated by an intent to silence, discredit and inhibit Officer Schoolcraft's speech.  Indeed, the Court in its prior ruling outlined the facts in this case (confirmed now in discovery) that were sufficient at the pleading stage to infer the City Defendants' intent to restrain Officer Schoolcraft's speech:

> Here, the proposed SAC alleges that Plaintiff's refusal to comply with the NYPD's summons policy resulted in increased pressure and scrutiny from his supervisors, that he received a poor evaluation based on his low summons activity and that when he challenged his low work evaluation, Plaintiff was subjected to intensified scrutiny and pressure to drop his objections. The proposed SAC includes allegations that Plaintiff was subjected to threats, intimidation and harassment because of his refusal to drop his appeal of his low performance evaluation. The proposed SAC further alleges that when Plaintiff raised his appeal to the NYPD summons policy to a Deputy Inspector in the department, he was harassed and intimidated by his superiors and reassigned to the telephone switchboard to isolate and degrade Plaintiff. According to the proposed SAC, after Plaintiff reported the quota policy to internal affairs and the Quality Assurance

---

[51] PMX 1 (annual performance evaluations)  & PMX 5 (monthly performance report a police officer's typical duties).

Division, Defendants menaced Plaintiff, ultimately entering his home on October 31, seizing him and confining him to Jamaica Hospital, where he was held for six days. As noted above, Defendants' harassment of Plaintiff allegedly continued when Plaintiff relocated to a new home in upstate New York. These allegations, which are accepted as true at this stage of the litigation, provide sufficient facts upon which Defendants' intent to restrain Plaintiff's speech can be inferred.

The proposed SAC alleges facts that Plaintiff intended to speak, following his suspension from the NYPD, to the media and public at large about the NYPD's summons policy. This intended speech addressed a matter of public concern, and, because Plaintiff intended to speak to the media and public following his suspension, Plaintiff's speech was outside the scope of his official duties. Accordingly, the speech was protected by the First Amendment. The proposed SAC further alleges that Defendants seized Plaintiff from his home following his suspension, held him at Jamaica Hospital and continued to harass him at his new home in upstate New York, thereby presenting sufficient facts upon which Defendants' intent to restrain Plaintiff's speech can be inferred. Accordingly, Plaintiff's motion to amend to include a prior restraint First Amendment claim is granted.[52]

These factual allegations identified by the Court as sufficient at the pleading stage are now amply supported by evidence in the discovery record in this case, which we set forth in detail in Officer Schoolcraft's motion for summary judgment.[53]  Thus, there is evidence that Officer Schoolcraft was criticized for his low activity and in early 2009 received a failing performance evaluation for the 2008 period;[54] that Officer Schoolcraft sought to appeal that evaluation and

---

[52] *Id.* at *22-23
[53] *See generally* Plaintiff's Rule 56.1 Statement ("Plaintiff's 56.1") at ¶¶ 10-114.
[54] Plaintiff's 56.1 ¶¶ 10-11.

challenged the evaluation on the ground that it was quota-driven;[55] that his

superiors at the 81st Precinct tried to transfer him;[56] that his supervisors put him on

an increased level of scrutiny after meeting with them to challenge the failing

evaluation;[57] that Officer Schoolcraft was subjected to harassment by having

posters and comments pasted on his locker, suggesting that he should get another

job and that he should "shut up;"[58] that his supervisors contacted the Early

Intervention Unit to get him placed on restricted duty for "mental issues" and as a

result his gun and badge were removed and he was assigned to work at the 81st

Precinct switchboard;[59] that while working the switchboard Lieutenant Caughey

menaced him with his gun after Lieutenant Caughey found confirmation in Officer

Schoolcraft's memo book that he had reported misconduct to IAB and QAD;[60] that

the NYPD, FDNY and Jamaica Hospital EMTs illegally and without a warrant,

exigent circumstances, or any bona fide "emergency" entered his home and took

him to Jamaica Hospital, where he was involuntarily committed for six days;[61] that

while in custody at Jamaica Hospital, Officer Schoolcraft was double handcuffed

to a gurney when he refused an "order" by NYPD Sergeant Sawyer to get off the

---

[55] Plaintiff's 56.1 ¶¶ 13, 18 & 22-23
[56] Plaintiff's 56.1 ¶¶12 & 20-21.
[57] Plaintiff's 56.1 ¶¶ 24-27.
[58] Plaintiff's 56.1 ¶¶ 15-16.
[59] Plaintiff's 56.1 ¶¶ 28-34.
[60] Plaintiff's 56.1 ¶¶ 51-56.
[61] Plaintiff's 56.1 ¶¶ 76, 82, 88

telephone; that Sergeant Sawyer told him as he squeezed the cuffs tight "this is what happened to rats;"[62] that after he was released from Jamaica Hospital he was harassed for the next six months by the NYPD, which sent NYPD and local police officers to his home on at least twelve occasions to bang in his door, spy on him or videotape him;[63] and that Office Schoolcraft formed the intent to go public and outside the NYPD after and as a result of the NYPD's invasion of his home on October 31, 2009.[64]

        As noted above, in the Court's prior rulings on the First Amendment claims, the Court rejected Officer Schoolcraft's First Amendment retaliation claim on the ground that any speech made by Officer Schoolcraft before his suspension was not protected because he was under an obligation to report misconduct or corruption.[65] On the other hand, the Court sustained Officer Schoolcraft's prior restraint claim, specifically stating the "First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech."[66] "Accordingly, the First Amendment prohibits government officials from encouraging the suppression of speech in a manner which can reasonably be interpreted as intimating that some form of punishment or adverse regulatory

---

[62] Plaintiff's 56.1 ¶¶ 101-03.
[63] Plaintiff's 56.1 ¶ 113.
[64] POX 13:  Schoolcraft Tr. 265.
[65] 2012 U. S. Dist. Lexis 128557 at *24-28 (S.D.N.Y. Sept. 10, 2012). *Cf. Griffin*, *supra*.
[66] *Id.* at *13 (citing and quoting *Zieper v. Metzinger*, 474 F. 3d 60, 65 (2d Cir. 2007)

action will follow the failure to accede to the official's request."[67]

Although the Court issued a clear ruling that Officer Schoolcraft was entitled to First Amendment protection upon his October 31, 2009 suspension, the City Defendants argue that that protection should not apply until February 1, 2010. The City Defendants do not provide any legal or factual basis for simply ignoring the Court's prior ruling, and on that basis alone the argument should be rejected. Moreover, the City Defendants fail to provide any reason based in logic, law or fact for selecting February 1, 2010.  It appears that the City Defendants selected the date merely because by that time most of the harassing upstate visits had already been conducted and by early February 2010 the first of several media stories was published.  (City Mem. at 12.)

Whatever the merit of this position, the "reason" offered by the City Defendants for this date makes no sense.  The City Defendants argue: "it is illogical to conclude that any defendant could have harbored an intent to prevent Plaintiff from going to the media with his allegations before his allegations became public." (City Mem. at 12.)  Given the facts set forth above, we disagree with the City Defendants' assertions about what is a "logical conclusion" but in the context of this motion, the Court must reject the City Defendants' "logic" because

---

[67] *Id.*

questions about reasonable inference to be drawn from the facts are jury questions and issues of intent and motive are particularly appropriate issues for a jury.

Finally, the City Defendants argue that nothing that they did to Officer Schoolcraft actually prevented him ultimately from going to the media and as a result they get a free pass on all their harassment, abuse, and assault on him. (City Mem. at 13-14.) That is not, has not and never will be the law.

In *Kerman v. City of New York*, the NYPD illegally entered the plaintiff's home based on an anonymous 911 report about a person with a gun. When the plaintiff referred to the NYPD officers as "goons," they handcuffed him and took him to a psychiatric ward where he was held against his will. The Second Circuit held that the plaintiff's speech was protected and that summary judgment should not have been granted, holding "an involuntary overnight trip to Bellevue has an obvious chilling effect."[68] Simply put, an attempt to coerce an individual into silence is an actionable violation of the First Amendment.[69]

Indeed, the City Defendants' argument is offensive to basis notions of law: a governmental actor who causes physical and emotional trauma to a person in an

---

[68] *Kerman v. City of New York*, 261 F. 3d 229, 242 (2d Cir. 2001).
[69] *Zieper v. Metzinger*, 474 F. 3d 60, 67 (2d Cir. 2007) ("we hold that a rational juror could conclude that the officers' actions and comments could reasonably be interpreted as an attempt to coerce Zieper into removing his film from the internet, and we believe that the district court erred in holding to the contrary.")

attempt to prevent that person from exercising a right to free speech and expression ought not to be able to escape liability for that trauma merely because the victim of his attack was able to overcome fear caused by the attack and speak out.

In its closing point on the First Amendment claims, the City Defendants ask for dismissal of the claims against the four individual defendants who already have been dismissed (Wilson, Wall, O'Hare and Hanley) and their supervisor at Brooklyn North Investigations Unit, Captain Timothy Trainor.  (City Mem. at 14.) We have already agreed to dismiss the four individual defendants but object to dismissal of the claims against Captain Trainor because he was the supervisor in charge of the campaign to harass Office Schoolcraft upstate.

"Personal involvement [of a defendant] can be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation . . . failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."[70]

---

[70]*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Here, Captain Trainor supervised the group of Brooklyn North

Investigations Unit officers who he sent up to Officer Schoolcraft's home 200

miles north of the City on eight separate occasions, ostensibly to deliver a letter

personally to Officer Schoolcraft.[71]  He also arranged for the local police on four

occasions to "visit" Officer Schoolcraft's upstate home.[72]

During these visits, Trainor's subordinates banged on Officer Schoolcraft's

door, spied on him through a bedroom window, videotaped him, and on one

occasion, an officer put his hand on the officer's holstered gun when Officer

Schoolcraft opened the door.  This conduct had a powerful effect on Officer

Schoolcraft, who believed that they were there to harass and intimidate him and

that they might *again* try to force themselves into his home, as was done on

October 31, 2009.[73]

In total, Captain Trainor directed about 264 hours of police time to be

devoted to the visits upstate[74] to deliver correspondence to Officer Schoolcraft that

could have been sent by certified mail.[75]  While Captain Trainor claimed at his

deposition that the officers were sent there to deliver paperwork to restore Officer

---

[71] POX 14: Trainor Tr. at 53-55 & 98-101 & 103-105; POX 15: Plaintiff's Deposition Exhibit 82.
[72] POX 15: Plaintiff's Deposition Exhibit 82.
[73] POX 13: Schoolcraft 10-11-12 Tr. 220:23-223:6 & 228:14-229:9; Schoolcraft 9-26-13 Tr. 199:9-219:17.
[74] POX 14: Trainor Tr. 118.
[75] POX 14: Trainor Tr. 152-54; POX 16: Plaintiff's Deposition Exhibit 92.

Schoolcraft to duty, one of the officers who he sent there, Defendant Duncan, testified that the real reason they were sent to Officer Schoolcraft's upstate home was to get him to resign.[76]

As if to drive home the intimidation effect, Captain Trainor personally ordered Defendants Gough and Duncan and Sergeant Hawkins to personally make at least two trips to Officer Schoolcraft's home, knowing that they were three of the officers who were at Officer Schoolcraft's home on October 31, 2009 and were personally involved in the assault and handcuffing of Officer Schoolcraft.[77]  And he did so despite Lieutenant Gough and Sergeant Duncan both informing him that they felt it was inappropriate for them to be again visiting Officer Schoolcraft's home. [78]

Under these circumstances, Captain Trainor is properly named as a defendant in this action because of his personal involvement in conduct that was designed to harass and intimidate Officer Schoolcraft.   A jury could easily find from these facts that Captain Trainor knew that his conduct was harassing and that it was designed to scare Officer Schoolcraft into silence.

*IV.  Section 1983 Substantive Rights*.  In Point IV of their memorandum, the

---

[76] POX 17: Duncan Tr. 245:6-22 (discontinuation of service form).
[77] POX 14: Trainor Tr. 163-64 & 182-189.
[78] POX 18: Gough Tr. 63:5-64:23; POX 17: Duncan Tr. 252:11-254:25.

City Defendants argue that Section 1983 does not have any substantive rights and that the separate claim for relief should be dismissed. We have agreed, and the Court has already directed the filing of the Third Amended Complaint, dropping the claim.

V. *The claims against several of the individual defendants fail for lack of personal involvement.*[79]

*Captain Lauterborn.* The City Defendants argue that the claims for excessive force against Lauterborn should be dismissed because he allegedly was not involved in the assault and battery of Officer Schoolcraft. (City Mem. at 16.) That is factually wrong. Lauterborn admitted during his deposition that he was personally involved in the attack on Officer Schoolcraft in his apartment on October 31, 2009 and the home invasion recording shows that he was personally involved in threatening and menacing behavior directed at Officer Schoolcraft.[80]

*Captain Trainor.* As noted above in the discussion of the City Defendants' liability under the First Amendment, there are material issues of fact showing that Captain Trainor personally directed the harassment campaign upstate against Officer Schoolcraft and therefore summary judgment in his favor should be denied.

*Chief Nelson.* As noted above in the discussion about the illegal entry,

---

[79] As noted above, we have dropped all claims against Wilson, Wall, O'Hare, and Hanley and will not address the City Defendants' arguments about those former defendants.
[80] POX 3: Lauterborn Tr. 109 (held down his legs until Officer Schoolcraft was rear cuffed on the floor in his bedroom); PMX 11: Home Invasion Recording.

search and seizure, Chief Nelson was directly involved in those events as a supervisor.  Accordingly, summary judgment on this behalf should be denied.

*Lieutenant Caughey*.   Lieutenant Caughey was not at Officer Schoolcraft's apartment on the night of October 31, 2009.  However, he was directly involved in the retaliatory conduct directed against Officer Schoolcraft through the events of that year, including issuing him retaliatory command disciplines,[81] referring him to the Early Intervention Unit, and menacing Office Schoolcraft with his gun at the 81st Precinct during the day of October 31, 2009.[82]

Lieutenant Caughey, who held the title of 81st Precinct Integrity Control Officer, was one of the supervisors at the February 25, 2009 meeting at the 81st Precinct where Officer Schoolcraft stated his intent to appeal his failing evaluation and the supervisors first began suspecting that Office Schoolcraft was tape recording his interactions at the Precinct.[83]

A few weeks later, Caughey's direct report, Sergeant Weiss, who was the Assistant Integrity Control Officer, issued to Officer Schoolcraft a command discipline for being "off post" when he was inside a building on his post, and for

[81] PMX 9 at D00083 & NYC 2855 (January 3, 2009 and October 28, 2009 command discplines issued to Officer Schoolcraft by Caughey).
[82] *Plaintiff's* 56.1 ¶¶ 24-31, 51-61; POX 21: Caughey Tr. 107-108: *see* n. 86 *supra.*
[83] Plaintiff's 56.1 ¶¶ 17-19; PMX 1 at NYC 191 (listing attendees, including Lt. "Coy," the phonetic spelling of "Caughey").

having "unnecessary conversation" with another Police Officer.[84]  The building at

Officer Schoolcraft's assigned foot post, 120 Chauncey Street, was well known

within the Precinct as a particular dangerous building.[85] His supervisors, however,

seemed more interested in harassing him than protecting and supporting him.

When Officer Schoolcraft made an entry in his memo book documenting the

circumstances of this command discipline, which he believed was retaliation for

the letter his lawyer recently wrote to DI Mauriello specifying that his failing

evaluation was improperly based on not meeting quotas, Lieutenant Caughey came

to the scene, confiscated Officer Schoolcraft's memo book, and took it back to the

Precinct to make copies of the memo book entry.[86]  While Lieutenant Caughey was

on his way back to the Precinct with the memo book, Officer Schoolcraft requested

that the Duty Captain respond to his post.[87]   After discussing the situation with

Lieutenant Caughey and Sergeant Weiss,[88] Captain Lauterborn had Officer

Schoolcraft brought back to the Precinct where Captain Lauterborn told Officer

Schoolcraft that as a result of his decision to appeal his failing evaluation, he

should expect a lot more "supervision," that the supervisors were going to be

---

[84] PMX 9 at DOOO81.
[85] POX 20:  Mauriello Tr. 677:3-21.
[86] POX 21: Caughey Vol. II Tr. 100:7- 105:25; POX 22:  Plaintiff's Deposition Exhibit 45.
[87] Plaintiff's 56.1 ¶¶ 25-27; POX 21: Caughey Vol. II Tr. 107:6-17 (Caughey heard the request
for the duty captain in the police radio while driving back to the precinct).
[88] POX 21: Caughey Vol. II 107:6-108:9.

"coming down hard" on him and "this is gonna go on."[89]

Directly after Officer Schoolcraft's meeting with Captain Lauterborn, Sergeant Weiss began doing research on Officer Schoolcraft's personal and family history and contacted the Early Intervention Unit to have him evaluated psychologically.[90]  Lieutenant Caughey also contacted the Early Intervention Unit regarding Officer Schoolcraft, after speaking with Sergeant Weiss about having Officer Schoolcraft evaluated psychologically.[91]  Since Weiss reported directly to Caughey at the time, it is reasonable to infer under these circumstances that Weiss was acting at the direction of Caughey when he contacted the Early Intervention Unit.

Later that year, on August 20, 2009, Officer Schoolcraft formally reported to IAB that Lieutenant Caughey and Sergeant Weiss had improperly removed from a locked NYPD file documents pertaining to civilian complaints against Weiss.[92]  By this time of the year, there was persistent speculation at the 81st Precinct that Officer Schoolcraft was tape recording at the Precinct.[93]  And by October 2009, the

---

[89] Plaintiff's 56.1 ¶¶ 26-27.
[90] Plaintiff's 56.1 ¶¶29-30.
[91] POX 21: Caughey Vol. II Tr. 58:19-69:23; POX 23:  Plaintiff's Deposition Exhibit 33 (Caughey PG transcript) at 72:1-73:11; POX 24: Weiss Tr. 107:20-108:20 & 128:16-13-134:16 (Weiss discussed referring Officer Schoolcraft to the Early Intervention Unit with Caughey and Lauterborn as a result of Officer Schoolcraft's request to speak to the duty captain.).
[92] PMX 15
[93] Plaintiff's 56.1 ¶ 47.

IAB and QAD investigations into the 81st Precinct were common knowledge.[94]

Indeed, on October 19, 2009, Lieutenant Caughey issued a directive within the 81st

Precinct that all future inquiries from IAB about any members of the service

working at the 81st Precinct must be directed to him personally.[95]  According to

Lieutenant Caughey, as the Integrity Control Officer, it was his job to work

directly with IAB when they were conducting investigations.

Later that month, on October 28, 2009, Lieutenant Caughey issued to

Officer Schoolcraft another command discipline for being "observed off post"

when he went to the headquarters of Patrol Borough Brooklyn North.[96]  According

to Caughey, he was told by DI Mauriello to issue the command discipline because

DI Mauriello saw Officer Schoolcraft off his "post" outside the offices of Patrol

Borough Brooklyn North several hours after Officer Schoolcraft met with the

personnel sergeant of Patrol Borough Brooklyn North.[97]

Three days later, during the course of the morning of Saturday, October 31,

2009, Lieutenant Caughey told Officer Schoolcraft, who was working at the 81st

Precinct switchboard, to turn over his memo book.  Officer Schoolcraft complied

and gave Lieutenant Caughey his memo book, but Lieutenant Caughey did not

---

[94] Plaintiff's 56.1 ¶¶ 39-49.
[95] PMX 17.
[96] PMX 9 at NYC 2855.
[97] POX 21:  Caughey Vol. II at 86:13-92:10.

examine the book and return it, in accordance with normal procedure.  Instead, he

took the memo book to his office, kept it for several hours, made two copies of the

entire memo book because he noticed unusual entries in it, and put one copy in DI

Mauriello's desk.[98]  And when he ultimately did return the memo book to Officer

Schoolcraft, Officer Schoolcraft became further alarmed when he noticed that

several pages of his memo book with entries about corruption or misconduct were

earmarked or folded down.[99]  Thus, Officer Schoolcraft had reason to believe that

Lieutenant Caughey had confirmatory evidence that he was the one reporting

misconduct and that by returning the memo book with those pages folded down

Lieutenant Caughey was *purposefully communicating* to Officer Schoolcraft that

Lieutenant Caughey knew definitively that he was the "rat."

The events of the day became even more alarming to Officer Schoolcraft

later that morning when Lieutenant Caughey started to act in a menacing manner

toward Officer Schoolcraft by repeatedly walking by his switchboard, by putting

his hand on his gun, carrying his gun in an improper manner, and by acting in an

unusual or suspicious manner towards Officer Schoolcraft.[100]  Officer Schoolcraft

---

[98] Plaintiff's 56.1 ¶¶ 50-52.
[99] Plaintiff's 56.1 ¶ 53.
[100] Plaintiff's 56.1 ¶¶ 54-56; POX 96: Caughey Vol. II Tr. 118:5-119:16 & 174:15-175:2 (had his handgun with him that day and did walk near Officer Schoolcraft that day, but denies menacing or brandishing his weapon); POX 13:  Schoolcraft Tr. 126:19-24 (Caughey was "pacing around me, carrying his firearm in an improper manner)

decided to go home an hour early that day to avoid any dangerous consequences of Lieutenant Caughey's menacing.  When Officer Schoolcraft reached his home, he telephoned IAB to report Lieutenant Caughey's threatening conduct.[101]

These facts show Lieutenant Caughey's direct and personal involvement in the retaliation and assault against Officer Schoolcraft.[102]  There is also evidence that Caughey attempted to cover up his role and DI Mauriello's role in the retaliation against Officer Schoolcraft by falsely claiming that he and DI Mauriello only discussed the IAB entries in Officer Schoolcraft's memo book days *after* DI Mauriello went to Officer Schoolcraft's home that night.  At his deposition and during the IAB investigation, Lieutenant Caughey falsely claimed that he did not inform DI Mauriello about the contents of Officer Schoolcraft's memo book on the day that he made two copies of the memo book and put one copy in DI Mauriello's desk.  Instead, Lieutenant Caughey claimed that he and DI Mauriello discussed the memo book several days after the events of October 31, 2009.[103]  DI Mauriello also falsely claimed during his deposition that he did not discuss Officer Schoolcraft's memo book with Caughey until several days later.  He also testified

---

[101] Plaintiff's 56.1 ¶¶ 57-61; POX 13: Schoolcraft Tr. 121:22-122:12 (left work early because of a fear for his physical safety).
[102] An assault under New York law is the "intentional placing of another person in fear of imminent harm or offensive contact."  *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 398  (S.D.N.Y. 2013).
[103] POX 21: Caughey Vol. II 128:5-130:11; POX 23: Plaintiff's Deposition Exhibit 33 at 24:19-31:8.

that he told IAB that he and Caughey discussed the memo book that night but that

that was a mistake he made when being questioned by IAB.[104]

These facts suggest that Caughey and Mauriello agreed to attempt to hide

the fact that they discussed the memo book contents during the course of October

31, 2009, before Mauriello entered Officer Schoolcraft's home that night.  And

those facts suggest that they both joined in a conspiratorial agreement to retaliate

against Officer Schoolcraft.   The scope and legal status of that conspiracy is

addressed in the next point set forth below.

VI. *The City Defendants argue that intra-corporate conspiracy doctrine
precludes Officer Schoolcraft's Section 1983 conspiracy claim as a matter of law
for the claims among the NYPD defendants, and that there is no evidence that the
NYPD defendants conspired with the FDNY or the Jamaica Hospital employees.*

A. *The Intra-Corporate Conspiracy Doctrine*.   The City Defendants argue

that the conspiracy claim fails under the intra-corporate conspiracy doctrine.  (City

Mem. at 19.)    The City Defendants are wrong for several reasons.

First, the doctrine does not apply to the facts of this case because Officer

Schoolcraft's conspiracy claim does not arise from a single decision or action by

agents of a single department or entity acting within the scope of their

employment.   The cases cited by the City Defendants prove the point.

---

[104] POX 20:  Mauriello Vol. I Tr. 383:12-390:3; *cf.* POX 25: Plaintiff's Deposition Exhibit 47 at
NYC 4937-38 (Mauriello tells IAB that Caughey called him that night and told him he looked at
his memo book).

Both *Hoffman* and *Danielak* involve a claim that a group of police officers working in a local police department engaged in a conspiracy when they took the limited action of arresting the plaintiff as part of a single, isolated incident with the plaintiff.  In addition, the Second Circuit case, *Girard v. 94th Street & Fifth Avenue Corp.*,[105] applied the doctrine where members of a board of directors of a cooperative corporation made a single decision not to approve a transfer of shares in the corporation to the plaintiff.   Importantly, the Second Circuit distinguished the situation more closely resembling this case, where several different departments within an organization made separate decisions that "were clearly not actions of only one policymaking body but of several bodies."[106]

As set forth in detail above and below, the scope of the conspiracy in this case is far more complex and far reaching than the narrow circumstances where the intra-corporate conspiracy doctrine had been applied.

Second, the personal-interest exception to the intra-corporate doctrine, which the City Defendants fail to address, also demonstrates that the doctrine does not apply in this case.  Under that exception, when conspirators are motivated by an independent personal stake in their actions beyond the entity's objectives, the

---

[105] 530 F. 2d 66, 71 (2d Cir. 1976).
[106] *Id.* at 71 (citing and distinguishing *Rackin v. University of Pennsylvania*, 386 F. Supp. 992 (E.D. Va. 1974)).

intra-corporate conspiracy doctrine does not apply.[107]  Thus, in *Hill v. City of New York*,[108] the District Court found the intra-corporate conspiracy doctrine inapplicable and denied summary judgment on plaintiff's conspiracy claim, finding that the plaintiff sufficiently alleged that the defendant, an NYPD officer, acted in his own personal interest, not in the interest of the NYPD or the City when he conspired with others to cover-up his alleged use of excessive force.  To the same effect is *Yeadon v. New York City Transit Authority*,[109] where police officers who engaged in race-based false arrests in order to "improve their arrest records in order to secure promotions and other benefits" had "independent, conspiratorial purpose."[110]

      Here, there is ample evidence that the NYPD defendants who joined into the

---

[107] *Reich v. Lopez,* 2014 WL 4067179, at *20 (S.D.N.Y. 2014) (finding defendants involvement in conspiracy was plausibly based on personal interests and not barred by the intra-corporate conspiracy doctrine because of defendant's "attempt to harm Plaintiffs in order to, in part, protect himself from the surfacing of the bribery activity. Self-protection is separate and apart from the concerns of the company.");  *Hill v. City of New York,* 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) ("conspiring with others to cover-up" illegal activity deemed a personal interest); *Roniger v. McCall,* 22 F. Supp. 2d 156, 168-69 (S.D.N.Y.2000) (defendant had " 'personal stake' in being reelected [to political office], and in downplaying his compromised political independence"); *Rini v. Zwirn,* 886 F. Supp. 270, 293 (E.D.N.Y.1995) (where "[n]one of the allegations regarding [a town employee] pertain[ed] to his duties as an employee of the Town," that town employee acted as an individual in conspiring with other town employees); *Yeadon v. New York City Transit Auth.,* 719 F. Supp. 204, 207, 212 (S.D.N.Y.1989) (police officers who engaged in race-based false arrests in order to "improve their arrest records in order to secure promotions and other benefits" had "independent, personal conspiratorial purpose").
[108] 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005).
[109] 719 F. Supp. 204, 207, 212 (S.D.N.Y. 1989).
[110] *Id.*

conspiracy to punish Officer Schoolcraft and to violate his constitutional rights were interested in protecting their own careers and punishing and intimidating Officer Schoolcraft for reporting to IAB and QAD their own misconduct, including illegal quotas, downgrading and other misconduct.  And, as noted above, they had a personal stake in preventing and discouraging Officer Schoolcraft from taking his complaints beyond IAB and QAD to the media or other governmental organizations.

Third, as demonstrated in greater detail below, the conspiracy in this case is not limited to only members of the NYPD.  The conspiracy includes individuals working for Jamaica Hospital, the FDNY, and the NYPD who, individually and collectively, fabricated evidence and unreasonably withheld and ignored exculpatory facts to manufacture a pretext for seizing Officer Schoolcraft at his home and prolonging his illegal detention as an "emotionally disturbed person" at Jamaica Hospital.   Thus, it is undisputed that two Jamaica Hospital EMTs, Sal Sangeniti and Jessica Marquez, and FDNY Lieutenant Hanlon were among the numerous personnel who illegally entered Officer Schoolcraft's apartment on October 31, 2009 and, as demonstrated below, participated in and aided in the seizure of Officer Schoolcraft.[111]   The fact that these entities were part of the

---

[111] Plaintiff's 56.1 ¶¶ 88-91.

conspiracy demonstrates that the intra-corporate conspiracy doctrine does not apply in this case because there were three separate organizational units that joined in the conspiracy.

### B. *The Conspiracy Among the NYPD Defendants, the FDNY Lieutenant and Jamaica Hospital.*

As a secondary argument, the City Defendants argue that there is "no evidence" to suggest a conspiracy or agreement between the City Defendants and individuals outside of the NYPD (*i.e.*, the FDNY and Jamaica Hospital) to act in concert to inflict an unconstitutional injury on Officer Schoolcraft. (City Mem. 19.) Once again, the City Defendants ignore the abundant evidence in the record of their joint activity.

A Section 1983 conspiracy claim requires proof of "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."[112]  In determining whether a claim of conspiracy is sufficient, courts regularly note that "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather

---

[112] *Deskovic v. City of Peekskill*, 894 F.Supp.2d 443, 465 (S.D.N.Y. 2012) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999)).

than direct, evidence."[113]

The facts and the reasonable inferences to be drawn from those facts -- inferences which must on a motion for summary judgment be drawn in favor of Officer Schoolcraft[114] -- show the existence of a conspiracy.   These facts are also relevant to the defense raised by the medical defendants that they were not state actors and did not engage in joint or collective activity with the NYPD.  (*See infra* at pp. 101-110.)  Accordingly, we set forth here in detail the facts relevant to both the conspiracy and the state action issues.

Context matters.  The events leading up to October 31, 2009, which are detailed in our motion for summary judgment, show a mounting level of retaliation against Officer Schoolcraft by supervisors at the 81st Precinct for speaking out and objecting to their mistreatment of him.  Officer Schoolcraft's actions during the course of the year and his supervisor's adverse reactions to him illustrate the escalation of their retaliatory efforts:  from DI Mauriello's failing 2008 performance evaluation of Officer Schoolcraft to Officer Schoolcraft's decision to appeal that evaluation to the Patrol Borough level (Chief Nelson and Chief Marino) level; from Officer Schoolcraft's questioning the quota-driven and numbers-driven game to a poster being place on his locker, suggesting that if he

---

[113] *Id*. (quoting *Pangburn*, 200 F.3d at 72).
[114] *Kirkland v. Cablevision Sys.*, 760 F. 3d 223, 224 (2d Cir. 2014).

does not like his job, then maybe he should  get another job; from the increased

level of "supervision" and the "long road ahead of him" avowed by Captain

Lauterborn in answer to Officer Schoolcraft's call for help from a Duty Captain,

outside the chain of command for a Duty Captain because of the retaliation and

harassment; from the 81st Precinct supervisors' contacts with the Early Intervention

Unit for a "psych" evaluation to Officer Schoolcraft being medically placed on

restricted duty and isolated at the Precinct on the switchboard; from Office

Schoolcraft's direct contacts with IAB and QAD about misconduct to the

widespread disclosure at the Precinct about the investigations and his role it them

as a "rat;"  from Officer Schoolcraft making entries in his memo book about

specific instances of misconduct to the menacing behavior of Lieutenant Caughey

on the day of October 31, 2009.

These facts provide an important contextual backdrop for explaining and

understanding the events of October 31, 2009 and thereafter.  When Officer

Schoolcraft left work one hour early during the afternoon of October 31, 2009, DI

Mauriello and Captain Lauterborn, knowing that Officer Schoolcraft had already

reported misconduct to IAB and QAD, made a plan to punish, silence, and

discredit Officer Schoolcraft with department charges of disregarding a "direct

order" and being "absent without leave."

First, they ordered Lieutenant Broschart to go to Officer Schoolcraft's home in Queens and bring him back to the 81st Precinct.[115]  Second, they ordered Sergeant Huffman and Police Officer Rodriguez to stand by at the Precinct past the end of their regular tour at the Precinct because they were going to conduct an "official investigation" of Officer Schoolcraft's conduct in leaving early and "disregarding orders.[116]  Third, DI Mauriello informed Chief Nelson of the events, and Brooklyn North Investigations Unit members, Lieutenant Gough and Sergeants Duncan and Hawkins, who worked for Chief Nelson and reported directly to Captain Trainor, were called at their homes on their day off and told to report to the 81st Precinct to conduct their part of the "investigation."[117]  Finally, Sergeant Duncan informed IAB that the Brooklyn North Investigations Unit was conducting an investigation of Officer Schoolcraft and that when they found him he was going to be suspended under the authority of Chief Nelson.[118]

Yet the plan to force Officer Schoolcraft back to the Precinct and to discredit him with charges and a suspension at an "official investigation" run by DI Mauriello and Brooklyn North Investigations was stymied when Lieutenant Broschart, who arrived at Officer Schoolcraft's Queens home at about 4:30 pm,

---

[115] POX 26: Broschart Tr. 87:6-88:12.
[116] POX 27: Huffman IAB Interview Memo.
[117] *See* n. 17-22 *supra*.
[118] POX 7: Duncan Report to IAB.

could not locate him for hours.[119]  Thus, Captain Lauterborn told Lieutenant

Broschart to stand by outside the house and wait, which he did for the next *five*

hours.[120]

After not being able to locate Officer Schoolcraft for several hours, Captain

Lauterborn spoke to his father, Larry Schoolcraft, and separately with Dr.

Lamstein, the NYPD psychologist who placed Officer Schoolcraft on restricted

duty in April of 2009.  The father told Lauterborn that his son was fine and

probably home in bed with a tummy ache, and Lamstein told Lauterborn that

Officer Schoolcraft was not dangerous to himself or others.[121]  Importantly,

Lauterborn told Lamstein that they had obtained a key from the landlord but that

there were legal issues about using it because they needed cause to do so.[122]

Unwilling to be delayed further in their plan to bring Officer Schoolcraft

back to the 81st Precinct that night, the NYPD Defendants, Chief Marino, DI

Mauriello, and Captain Lauterborn all went to his home and decided to enter the

apartment with a tactical entry by members of an Emergency Services Unit.   To

put this plan into action, at 8:57 pm Captain Lauterborn notified NYPD

---

[119] Plaintiff's 56.1 ¶ 64-67.
[120] *Id.*
[121] *Id.* ¶¶ 69-70.
[122] POX 2 at D00283.

Operations, providing system-wide notice of the status.[123]   At the same time, a 911 operator directed an ambulance to the scene, and a Jamaica Hospital ambulance arrived at 9:15 pm.[124]  In addition, at 9:15, the Emergency Services Unit ("ESU") darrived at the scene and arrived at about 9:30.[125]  Finally, FDNY Lieutenant Hanlon arrived at the scene at 9:28 pm.[126] Although the 911 operator dispatched the EMTs for an "unknown condition,"[127] Lieutenant Hanlon was notified to report to the scene for a "barricaded EDP" situation[128]

Thus, by 9:30 pm that evening numerous NYPD personnel were at the scene on the street in front of, and around, Officer Schoolcraft's home.  The group included Chief Marino, DI Mauriello, Captain Lauterborn, Lieutenant Gough, Sergeant Duncan, and Sergeant Hawkins as well as two Jamaica Hospital EMTs (Sangeniti and Marquez) and FDNY Lieutenant Hanlon.[129] While on the street outside the house, the NYPD officers formed a "huddle" and form a plan for

---

[123] POX 27:  Plaintiff's Deposition Exhibit 27 at NYC 3578.
[124] POX 28:  Plaintiff's Deposition Exhibit 66 at NYC 3552 ("50E3" refers to the Jamaica ambulance). POX 29: Hanlon Tr. 180:10-19 (code C513 refers to Hanlon and 50E3 refers to the Jamaica EMTs).
[125] POX 30:  Emergency Services Report (NYC 3535); *see also* attached IAB Interview Memorandum of ESU Detective Barbara (NYC 5848-49).
[126] POX 28:  Plaintiff's Deposition Exhibit 66 at NYC 3552 ("C513" refers to FDNY Lieutenant Hanlon).
[127] POX 10: Sangeniti Tr. 40:21-25; POX 28: (Plaintiff's Deposition Exhibit 66).
[128] POX 29: Hanlon Tr. 91, 180:10-19 (code C513 refers to Hanlon and 50E3 refers to the Jamaica EMTs).
[129] POX 28: (Plaintiff's Deposition Exhibit 66);

entering the apartment and dealing with Officer Schoolcraft.[130]  According to DI
Mauriello, Chief Marino directed the ESU to enter the apartment first and if
Officer Schoolcraft was fine, then they were going to take him back to the
Precinct.[131]

And that is what they did.  ESU made a tactical entry into the apartment with
the landlord's key, observed Officer Schoolcraft "lying on his bed face up
watching television" and "swept the apartment to ascertain if anyone else was there
before they rendered the apartment safe."[132]  As captured clearly in the home
invasion recording, first Mauriello, then Lauterborn, and finally Lieutenant Gough
each forcefully order Officer Schoolcraft back to the 81st Precinct.[133]  Under the
stress of the duress they caused and their implicit threats of violence, Officer
Schoolcraft eventually informed them that he would go "against his will" but then
moments later stated that he had to sit down because he was not feeling well.[134]

Purporting now to respond to a medical condition, the two EMTs from
Jamaica Hospital, Sangeniti and Marquez, and FDNY Lieutenant Hanlon, entered
the apartment, and EMT Sangeniti began a medical examination of Officer

---

[130] POX 20: Mauriello Tr. 341:2-10.
[131] POX 20: Mauriello Vol. I at 343:3-18 & 366:2-371:9.
[132] POX 30: Emergency Services Report (NYC 3535); *see also* IAB Interview Memorandum of
ESU Detective Barbara (NYC 5848-49).
[133] PMX 11: Home Invasion Recording
[134] PMX 11:  Home Invasion Recording at 6:00-6:45.

Schoolcraft.   While EMT Sangeniti was preparing to take Officer Schoolcraft's blood pressure, Chief Marino stormed back into his bedroom, berated Officer Schoolcraft for feeling sick, and on the spot suspended him at the very moment that EMT Sangeniti reports that his blood pressure is 160/120 and his pulse is 115.[135]

At the same time, Lieutenant Hanlon was having discussions with the NYPD officers in the apartment, and as a result of those discussions, Lieutenant Hanlon conveyed to EMT Sangeniti, who she had known on the job for twenty years,[136] that Officer Schoolcraft was an "EDP."[137]  After EMT Sangeniti urged Officer Schoolcraft to go to a hospital to have his "sky high" blood pressure checked out, Officer Schoolcraft agreed, stating again that he wanted to go to Forest Hills Hospital, which is where his own doctor was affiliated.[138]

Since Forest Hills did not have a psychiatric ward and Jamaica Hospital did, Sangeniti and Hanlon steered him to Jamaica Hospital in accordance with their hidden agenda with the NYPD to have him deemed an EDP and committed to the Jamaica Hospital psychiatric ward.   Although the stated medical issue was high

---

[135] *Id.*
[136] POX 29: Hanlon Tr. 236:24-237:7.
[137] POX 10: Sangeniti Tr. 54:9-67:10 (Hanlon conveys to Sangeniti that he is an EDP after talking with police in the room); & 149:5-10 (Hanlon was calling out Sangeniti's name to get his attention after she was speaking to the officers in the room); PMX 11:  Home Invasion Recording at 12:00-12:15 (Hanlon calling out to Sangeniti "Sal, Sal");
[138] PMX 11:  Home Invasion Recording at 12:40.

blood pressure and although Officer Schoolcraft made his preference for Forest

Hills Hospital crystal clear, Sangeniti told his colleagues in the apartment that they

will take him to "34," which is a coded number for Jamaica Hospital.[139]  And when

Officer Schoolcraft persisted in stating that he wanted to go to Forest Hills – as is

his right[140] --  Sangeniti and Hanlon both told Officer Schoolcraft that he had to go

to Jamaica Hospital because it was the closest hospital and a "better" choice.[141]

These are bogus and pretextual reasons being used in service of the overall

plan formed by the NYPD, the FDNY Lieutenant and the Jamaica EMTs to take

Officer Schoolcraft, one way or the other, to Jamaica Hospital as an emotionally

disturbed person.  At her deposition, Hanlon admitted that Jamaica was the

"better" choice because it had, among other things, a psychiatric ward.[142]  In

addition, the EMT's blatant departure from the medical standard of care[143] -- blood

---

[139] PMX 11 :  Home Invasion Recording at 12:55 (Sangeniti: we'll take him to 34"); POX 29: Hanlon Tr. 243-48 ("Sal, Sal" is Hanlon's voice and the reference to "34" is a reference to Jamaica Hospital)

[140] *See Stein v County of Nassau*, 642 F Supp. 2d 135, 138-39 (E.D.N.Y. 2009), *aff'd in part, vacated in part sub nom*., *Stein ex rel*. *Stein v Barthelson*, 419 Fed. Appx. 67 (2d Cir 2011) ("It is apparently uncontested that, if [plaintiff] had the capacity to express a hospital preference himself, the Defendants would have had to comply with that request unless "contraindicated by state, regional or system/service protocol or the assessment by a certified EMS provider shows that complying with [plaintiff's] request would be injurious or cause further harm to [him]." New York State, Department of Health, Bureau of Emergency Medical Services, Policy Statement No. 98–15 ("Policy Statement 98–15"). In such cases, the EMT must "fully document" the request, and the reasons for not complying with it")

[141] PMX 11: Home Invasion Recording at 12:50-15:39.

[142] POX 29: Hanlon Tr. 250:19-252:25.

[143] PMX 36: Report by Dr. Halpren-Ruder at p.1.

pressure readings be repeated with some frequency, often 10 to 15 minutes -- is further evidence that the EMTs were acting knowingly as aiders and abettors in the scheme to involuntarily commit Officer Schoolcraft as a psychiatric patient. Importantly, as of this time in the apartment, Lieutenant Hanlon admitted that Officer Schoolcraft was not acting like an EDP, and EMT Sangeniti admitted that he did not believe Officer Schoolcraft was a danger to himself at any point in time.[144]

The "closest" hospital claim is also a bogus pretext for two reasons.  First, Hanlon admitted that the hospitals were about the same distance from the scene.[145] In fact, the Court can take judicial notice of the fact that the two hospitals are of equivalent distances from the residence, as reflected by Google Maps or any other available navigation software.[146]

Second, the reason for needing to go to the "closest" hospital is to arrive at the destination as quickly as possible in an *emergency* situation.  Yet here, there was no "emergency" as demonstrated by the fact that Sangeniti drove Officer

---

[144] POX 29: Hanlon Tr. 230:5-233:24 (no concerns about him being an EDP or having medical issues as of 5 minutes and twenty-eight seconds into the Home Invasion Recording).  *See also* POX 10:  Sangeniti Tr. 167:15-20 (did not believe that Officer Schoolcraft was a danger to himself at any point).

[145] POX 29:  Hanlon Tr. 124:3-127:22.

[146] POX 31:  Google Map screen shots for the distances from the residence to Jamaica Hospital and Forest Hills show that the suggested routes to Jamaica are 2.5, 2.8 and 2.9 miles and the suggested routes to Forest Hills are 2.4, 2.5 and 2.8 miles.

Schoolcraft to Jamaica Hospital on a non-emergency basis *without* the use of flashing lights or ambulance sirens.[147]   Since there was no emergency, the need to take Officer Schoolcraft to the "closest" hospital is plainly a pretext reflecting an illicit scheme.

      After Officer Schoolcraft and the others in the apartment walked to the street, Officer Schoolcraft again repeated his request to go to Forest Hills Hospital.[148]   However, when he was finally told on the street as he was approaching the ambulance that he would be taken to Jamaica Hospital, Officer Schoolcraft informed the EMTs that he was refusing medical treatment and proceeded back to his apartment. DI Mauriello called out to Captain Lauterborn, "Teddy, Stop him!" and Captain Lauterborn ran behind Officer Schoolcraft and blocked the apartment door from closing with his foot allowing himself other NYPD officials to re-enter Officer Schoolcraft's bedroom. [149]

      After backing Officer Schoolcraft into a corner on his bed, Chief Marino declared him an EDP and his subordinate officers (Lauterborn, Broschart, Gough

---

[147] POX 10: Sangeniti Tr. 131:3-136:10 (lights and sirens were not used for trip to Jamaica Hospital because the patient was in stable condition and transportation regulations limit the use of lights and sirens to emergency situations); POX 29: Hanlon Tr. 138:21-139:6 (lights and sirens not used for transport to hospital) & 216:21-217:13 (not taken to hospital under life-threatening conditions because the patient was stable).
[148] PMX 11: Home Invasion Recording at 14:00-15:39.
[149] POX10: Sangeniti Tr.  107:2-118:2 (Schoolcraft was only briefly at the ambulance when he was told that he was being taken to Jamaica and at that point he refused to go and walked briskly back to his apartment); Plaintiff's 56.1 ¶¶ 91-92.

and Duncan) dragged him off the bed, handcuffed him and forced him onto a transport chair and into the Jamaica Hospital ambulance waiting on the street. Jamaica Hospital EMTs Sangeniti and Marquez drove Officer Schoolcraft, who was now in the custody of Lieutenant Broschart, to Jamaica Hospital.[150]

The decision at the apartment to take Officer Schoolcraft to the hospital against his will was a joint decision by the NYPD, the Jamaica Hospital EMTs and FDNY Hanlon.  While each of these groups of defendants tried to point the finger at each other at their depositions, several of the defendants acknowledged that the decision was a joint or collective decision.  Thus, Captain Lauterborn testified: "The Chief, along with the Emergency Medical Services, made the decision that he has to go to the hospital"[151] In addition, Lieutenant Broschart testified that he informed the Jamaica Hospital Emergency Room doctor that the Jamaica Hospital EMTs were the ones who decided that Officer Schoolcraft had to go to the hospital.[152]  Lieutenant Hanlon also testified that the EMT crew on the scene made the decision to take him to Jamaica Hospital.[153]

On the other hand, Chief Marino testified that, although he was the one who declared Officer Schoolcraft an "EDP," he also claimed that the determination was

---

[150] Plaintiff's 56.1 ¶¶ 95-98.
[151] POX 19: Lauterborn Tr. 82:24-83:4.
[152] POX 26:  Broschart Tr. 49-54.
[153] POX 29: Hanlon 132:3-11.

based on a statement by Hanlon that he "had to go."[154]  And yet Hanlon contradicted Chief Marino's claim at her deposition, testifying that she did not classify him as an EDP, that she did not tell anyone at the scene that he should be treated as an EDP, and that the only way that she *could* force a patient to go to the hospital was to first try to contact an FDNY doctor by telephone and have the doctor explain to the patient the reasons why going to the hospital was medically required or suggested.[155]

These facts create a reasonable inference that an agreement and joint decision was made by the NYPD officials, the FDNY Lieutenant, and the two Jamaica Hospital EMTs at Officer Schoolcraft's apartment to take Officer Schoolcraft to Jamaica Hospital as an EDP, and that the agreement was made and decision was reached when those individuals entered Officer Schoolcraft's home on the first occasion, when he resisted orders to return to the 81st Precinct and told the individuals in his apartment that he was not feeling well.  The FDNY

---

[154] POX 8: Marino Tr. 331:24-332:22 ("The paramedic lieutenant, female paramedic lieutenant [Hanlon] told me that he had to go to the hospital. It was dangerous if he didn't, and that if he refused to go he was making improper decisions and she would treat him as an emotionally disturbed person.")

[155] POX 29: Hanlon Tr. 77:3-16 (telemetry protocol) & 221:12-222:3 ("Q. On the next page in the third full paragraph down from the top it says: "Lieutenant Hanlon repeatedly explained that she did not classify Schoolcraft as an emotionally disturbed person to any police personnel." Do you see that reference? A. Okay. Yes. Q. Is that a correct statement? A. As far as I recall, yes. Q. So you didn't make the call that he was an EDP? A. No. Q. Did you tell anybody at the scene that you thought he should be treated as an EDP? A. No.")

Lieutenant and the Jamaica Hospital EMTs clearly joined in that agreement as evidenced by the fact that they required him to go to Jamaica Hospital because it had a psychiatric ward.

The FDNY Lieutenant's and the Jamaica EMTs' participation in the conspiracy is also evidenced by the fact that they repeatedly and pretextually told Officer Schoolcraft that his blood pressure was so high that he had to go to "the" hospital.  As noted already, the blood pressure reading was taken under circumstances of extreme stress and it is beyond dispute that stress can lead to elevated blood pressure readings.[156]  Indeed, the Jamaica EMT who took the blood pressure reading testified to the obvious fact that the tense circumstances in the apartment could cause anybody's blood pressure to rise.[157]  Moreover, the FDNY Lieutenant also admitted at her deposition that the stress of the situation could have caused the elevated reading.[158]  Finally, Officer Schoolcraft's expert report by Dr. Halpren-Ruder, an emergency room doctor with thirty years' experience, provides un-rebutted medical evidence that the blood pressure reading taken from Officer Schoolcraft did not provide any medically meaningful information precisely

---

[156] PMX 36 (Report by Dr. Halpren-Ruder) at p. 1 ("the recorded vital signs lack[ed] meaningful medical significance as it is well established that acute psychological and/or physical stress can raise blood pressure significantly.")
[157] PMX 26:  Sangeniti Tr. 93:22-100:25 (160/120 reading was a high blood pressure reading that could be explained by the stressful circumstances under which it was taken).
[158] POX 29:  Hanlon Tr. 166:15-167:25.

because of the well-known fact that stressful events will alter a person's blood pressure.[159]

The other Jamaica EMT, who was also present in the apartment, also knowingly joined in the conspiracy by fabricating evidence that a second, elevated blood pressure reading was taken.  According to the Patient Care Report, which was filled out by Jamaica EMT Marquez, a second blood pressure reading was taken ten minutes after the first reading, at 9:55 pm, reflecting a 160/120 reading with a pulse of 118.[160]  EMT Marquez claimed (falsely) that she took that blood pressure reading on the first occasion when Officer Schoolcraft voluntarily went to the ambulance.[161]

Marquez's claim about the second blood pressure reading does not square with the testimony of her own partner at the scene, EMT Sangeniti, who testified that when Office Schoolcraft went to the ambulance on the first occasion there was no opportunity to take his blood pressure.[162]  He also testified that he did not see EMT Marquez take the alleged second reading.[163]  Thus, according to EMT Sangeniti, EMT Marquez did not and could not have taken Officer Schoolcraft's second blood pressure reading in the ambulance, as she claimed – a fact showing

---

[159] PMX 36 (Report by Dr. Halpren-Ruder) at p. 1.
[160] PMX 27 at JHMC 42; POX 32: Marquez Tr. 56:24-61:17 (Marquez filled out the PCR).
[161] POX 32: Marquez Tr. 113:11-114:12
[162] POX 10: Sangeniti Tr. 117:12-118:3
[163] *Id.* at 121:15-20.

that the existence of the second reading was a fabrication.

Indeed, EMT Marquez's claim that she took Officer Schoolcraft's blood pressure in the ambulance is even contradicted by her own report of the incident. In the Patient Care Report (or "PCR"), which she filled out in her handwriting, EMT Marquez stated that Officer Schoolcraft walked toward the ambulance and then turned around and left, suggesting that she did not have time to take the blood pressure reading. Yet at her deposition five years later, Marquez claimed that her Patient Care Report was in "error" and that Officer Schoolcraft actually got in the ambulance and she then took his blood pressure at that time.[164]

There was no other possible time when EMT Marquez could have later taken the bogus blood pressure reading set forth in her Patient Care Report. EMT Marquez admitted that she did *not* take Officer Schoolcraft's blood pressure reading on the second occasion when he was in the ambulance because he was on the stretcher and handcuffed, making the taking of a reading impossible under the circumstances.[165]

These facts suggest that the second blood pressure reading was fabricated for the purpose of "confirming" that the first reading was valid and not aberrational or caused by stress. The second reading was also fabricated because standard

---

[164] POX 32: Marquez Tr. 81:20-84:2.
[165] POX 32: Marquez Tr. 121:3-23.

protocols for taking blood pressure readings required a second reading to confirm the validity of the first reading.[166]  And facts tending to show that fabrication are highly probative of an illicit scheme with a improper purpose – the involuntary psychiatric commitment of Officer Schoolcraft.

*                    *                    *

While Officer Schoolcraft was being taken to Jamaica Hospital by EMTs Sangeniti and Marquez under the custody of Lieutenant Broschart, Chief Marino, DI Mauriello, Captain Lauterborn, and all three officers from Brooklyn North Investigations went back to the 81st Precinct.[167]  At the 81st Precinct at about 11:05 pm, they conducted "official interviews" of Sergeant Huffman and Police Officer Rodriguez, who were still standing by at the precinct,[168] and prepared an Unusual Incident Report.[169]

Meanwhile, Officer Schoolcraft was delivered to Jamaica Hospital, and the NYPD and the Jamaica Hospital personnel continued to work together in furtherance of the scheme to have him involuntarily committed.   EMT Marquez told the triage nurse that Officer Schoolcraft was "agitated" at the apartment and

---

[166] POX 29: Hanlon Tr. 171:2-173:23; POX 10: Sangeniti Tr. 104:10-107:8.
[167] POX 20: Mauriello Tr. Vol. I at 381:10-382:14.
[168] PMX 25 at D00095-96 (noting interviews of Huffman and Rodriguez, who both were on a scheduled tour ending 3:52 pm); POX 33: Scott Memorandum, dated 11-3-09 regarding review of Huffman interview (NYC 5454-55).
[169] PMX 23.

Lieutenant Broschart also spoke with the triage nurse, and according to EMT Marquez, he "filled in the blanks" on the events of that night and told the triage nurse that the NYPD wanted Officer Schoolcraft evaluated psychologically.[170] And according to the hospital chart, Officer Schoolcraft "was deemed to be paranoid & a danger to himself by his Police Sergeant."[171]    Finally, according to a consultation report prepared by Dr. Lwin, Sergeant James of the 81st Precinct told her the next morning that Officer Schoolcraft "left his work early after getting agitated and cursing his supervisor" and they "followed him home and he had barricaded himself and the door had to be broken to get to him" and that "he ran and had to be chased and brought to the medical ER in handcuffs."[172]  The report also states that Sergeant James told Dr. Lwin that Officer Schoolcraft "was evaluated by NYPD psychiatrist and cannot carry a gun or a badge for a year."[173]

Based on this information, Jamaica Hospital held Officer Schoolcraft against his will until his release on November 6, 2009.  Indeed, the hospital records and deposition testimony from the doctors shows that all of the decisions made by the medical staff to detain Officer Schoolcraft were based upon the information provided to the hospital staff about him being an "EDP" who was "deemed

---

[170] POX 32: Marquez 86:17-90:7
[171] PMX 27 at JHMC 101.
[172] PMX 27 at JHMC 44.
[173] *Id.*

paranoid and dangerous." As demonstrated by the extensive report of Plaintiff's

psychiatric expert, Dr. Lubit, none of the Jamaica Hospital staff made even the

most basic inquiry to confirm the NYPD's statements that Officer Schoolcraft was

dangerous and thus simply "rubber stamped" the requests, encouragements and

"determinations" by the police and the Jamaica EMTs.[174]

\*                           \*                           \*

These facts established a material issue of fact on the question of whether

there was a conspiracy between the NYPD, the FDNY and Jamaica Hospital to

involuntary commit Officer Schoolcraft in violation of his rights to liberty and due

process.   While every conspiracy case must be examined based on its own facts,

courts have regularly found that a conspiracy claim can be stated based on these

types of circumstances, where various parties work together to achieve a common

end.[175]

---

[174] PMX 30 at pp. 10-21 (discussing the numerous glaring failures in the admission and retention decision)

[175] *See, e.g., Deskovic v. City of Peekskill,* 894 F.Supp.2d 443, 448 (S.D.N.Y. 2012) (denying summary judgment on plaintiff's § 1983 conspiracy claim where "a reasonable jury could find both an agreement and an overt act" where Peekskill police officers sought out investigator with the Putnam County Sheriff's Department knowing he would conduct an unreliable polygraph that would elicit a false confession from Plaintiff); *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 131 (2d Cir.1997) (denying summary judgment based on circumstantial evidence supporting claim that defendant officers engaged in conspiracy to maliciously prosecute plaintiffs); *Lynch v. Southampton Animal Shelter Foundation Inc.,* 971 F.Supp.2d 340, 355 (E.D.N.Y. 2013) (declining summary judgment in favor of the defendant with respect to the plaintiff's § 1983 conspiracy claim because genuine issues of material fact existed that defendants conspired against plaintiff in retaliation for exercising her First Amendment rights).

For example, in *Ruhlmann v. Ulster County Dept. of Social Services,*[176] several state officials contacted doctors at a private hospital in order to encourage them to admit on an involuntary basis the plaintiff who worked at the same agency where the state officials worked.   The state officials were also directly involved in the decision to have the local police pick up the plaintiff as an emotional disturbed person.  Denying a motion for summary judgment on the conspiracy claim between the state actors and the private actors, the court held that "the actions of the defendants, as a whole and individually, raise factual questions as to whether the private defendants conspired with the state employees in order to violate § 1983."[177]

In another case, *Deskovic v. City of Peekskill*, the court found that one party's fabrication of facts could show the illicit agreement required of a conspiracy claim:

> The Peekskill officers sought out Stephens for his knack for eliciting confessions; Stephens conducted what he knew was an unreliable polygraph examination while the Peekskill officers were listening; Stephens told Deskovic that the polygraph showed that he was guilty; Stephens then turned Deskovic over to McIntyre and listened while McIntyre coerced a confession from Deskovic; and Stephens fabricated the ejaculation statement, and then later reported it to Bolen. From this, a reasonable jury could find both an agreement and an overt act, namely Stephens' deliberate use of unreliable methods

---

[176] 234 F. Supp. 2d 140 (N.D.N.Y. 2002).
[177] *Id.* at 167.

and techniques designed to elicit a confession during the polygraph examination.[178]

Based upon all the circumstances of this case, we submit that there are genuine issues of material fact on the question of whether the various agents and employees of the NYPD, FDNY and Jamaica Hospital entered into an agreement to violate Officer Schoolcraft's rights.   The City Defendants' arguments (City Mem. at 20) that the conspiracy claims are conclusory and vague are, in the light of the above, without merit.

VI.  *The intentional infliction of emotional distress claim fails because the conduct was not sufficiently outrageous to fall within the scope of the tort.*

The City Defendants and the other defendants argue that their conduct is not sufficiently outrageous so as to fall within the scope of the common law tort of intentional infliction of emotional distress.  Taken as a whole, however, their conduct is outrageous:  a police officer reporting misconduct is pulled out of his bed in the middle of the night by his superiors for reporting their misconduct; he is physically assaulted, thrown on the floor, stepped on and handcuffed; his home is searched and evidence is destroyed; he is removed from his home handcuffed to a chair in the view of all his neighbors and taken to a psychiatric facility, where he is physically abused and incarcerated without any medical or legal basis as a

---

[178] *Deskovic v. City of Peekskill,* 894 F.Supp.2d 443, 448 (S.D.N.Y. 2012).

"dangerous and mentally ill" person and released a week later, to be pursued

relentlessly for the next six months at his family residence in upstate New York,

his career in shambles.  If that is not outrageous, then it is difficult to rationally

conceptualize what kinds of events ought to be considered sufficiently more

egregious so as to be held sufficiently "outrageous" for a jury to consider.

Where, as here, the police have engaged in a sustained, retaliatory campaign

against an individual, courts in this Circuit have sustained a claim for intentional

infliction of emotion distress, finding that the question of whether the facts were

outrageous should be decided by a jury at trial.  For example, in *Gonzalez v.

Bratton*,[179] the plaintiff was a police officer who was the victim of a campaign of

harassment by her superiors at the NYPD for reporting sexual harassment by

another member of the NYPD.  The plaintiff was subject to excessive scrutiny,

shift changes, referred for a psychological examination, visited at her home by

investigators, escorted to a medical faculty for a drug test, arrested for an alleged

traffic violation and subjected to a strip search. Based on these claims, the court

held that the issue was properly submitted to the jury, citing several relevant cases

against the police:

"[I]n the Second Circuit's assessment of New York law, conduct that

---

[179] 147 F. Supp. 2d 180 (S.D.N.Y. 2001), *aff'd*, 48 Fed. Appx. 363, 2002 U.S. Dist. Lexis 21521 (2d Cir. Oct. 12, 2002)

included acts such as those Gonzalez asserted here might well be considered sufficiently outrageous to satisfy the conduct element of the emotional distress tort. *See Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996) (fact that police officer struck plaintiff and then filed false charge that plaintiff assaulted him, resulting in 24 hours of imprisonment without reasonable cause, held sufficiently outrageous to satisfy the conduct element of the emotional distress tort); *Hughes v. Patrolmen's Benevolent Ass'n of City of New York*, 850 F.2d 876, 883 (2d Cir. 1988) (campaign of police harassment held sufficient to constitute intentional infliction of emotional distress); *Mejia v. City of New York,* 119 F. Supp. 2d 232, 285 (E.D.N.Y. 2000)(evidence that a police officer was involved in a scheme to fabricate charges against plaintiffs and ordered one of them to be strip-searched, held sufficient to defeat summary judgment on claim of intentional infliction of emotional distress); *Levine v. Gurney*, 149 A.D.2d 473, 539 N.Y.S.2d 967, 968 (N.Y. App. Div. 2d Dep't 1989) (false charges filed by police officer against plaintiff where the officer may have had personal motives for making the charges held sufficient to withstand summary judgment on a claim of intentional infliction of emotional distress).[180]

The City Defendants also argue that the intentional infliction claim is duplicative of the assault and excessive force claims and that where the more narrow torts applies, the intentional infliction claim should be dismissed.  (City Mem. at 21.)  Yet the assault and excessive force claims only focus on the more narrow or limited aspects of the defendants' conduct at a particular moment, whereas the intentional infliction of emotional distress claim more properly examines the full scope of all of the defendants' conduct over a substantial period of time.  Thus, the intentional infliction claim has a broader scope, beginning with

---

[180] *Id*. at 194.  On this issue, the Second Circuit specifically affirmed the District Court. 48 Fed. Appx. at 365, 2002 U.S. App.. Lexis 21521 at **5 ("we affirm the district court's ruling with respect to this claim substantially for the reasons provided in the district court's through opinion").

the harassment and retaliation at the 81st Precinct over the course of 2009, then leading to the events during the day and the night of October 31, 2009, then leading to the events at the hospital, and finally leading to the several months of harassment upstate after Officer Schoolcraft was released from the hospital.  In other words, where a intentional infliction claim and an excessive force claim arise from a single incident, then the claims do overlap and the argument has more force, but here the claims do not overlap because the intentional infliction claim arises not just from a single act but a series of acts over a sustained period of time. Under these circumstances, the intentional infliction of emotional distress claim is not duplicative of the other claims and the Court should reject this argument.[181]

---

[181] *See, e.g. Gonzalez v. Bratton*, 48 Fed. Appx. 363, 2002 U. S. Dist. Lexis 21521 at **6 (2d Cir. Oct. 15, 2002) ("plaintiff's intentional infliction of emotional distress claim is, quite simply, not duplicative of her false imprisonment claim and her claim is therefore not barred"); *See Alexander v Unification Church of Am.,* 634 F. 2d 673, 679 (2d Cir 1980) (finding conduct "relating to constant surveillance of the plaintiffs," and "having agents patrol the home of plaintiffs"... "distinct [from conduct which constitutes abuse of process claim] and stand on their own" as sufficient to state a claim); *see Sylvester v City of New York*, 385 F. Supp. 2d 431, 444 (S.D.N.Y. 2005) (denying defendants' motion for summary judgment dismissing IIED claim "although there undoubtfully is overlap between [plaintiffs] IIED claims and their false imprisonment claims, the IIED claims are not duplicative because enough elements of the IIED claims do not fall under any of the plaintiffs' other tort causes of action"); *see also Wahhab v. City of New York,* 386 F.Supp.2d 277, 292-93, 2005 WL 323716, at *14 (S.D.N.Y.2005) (denying the defendants' motion for summary judgment on the plaintiffs' IIED cause of action because the claim was not wholly duplicative of claims for assault and battery); *Levine v. Gurney,* 149 A.D.2d 473, 539 N.Y.S.2d 967 (2d Dep't 1989), (claims for emotional distress and malicious prosecution); *Murphy v. Murphy*, 109 A.D.2d 965, 966, 486 N.Y.S.2d 457 (3d Dep't 1985) ("breaking of screens and smashing of windows to force entry into house,... threats, use of force, ... wanton destruction of plaintiff's belongings" actionable as a emotional distress claim while encompassing conduct constituting assault and battery).

VII.  *The negligence claim against the City fails because the individual defendants were acting within the scope of their employment.*

The City Defendants argue that the negligence claim against the City of New York must fail because the individual defendants all acted within the scope of their employment. (City Mem. at 22.)   Since this a question of fact, the jury must make that determination as to each of the individual defendants, after assessing all the relevant evidence.  The fact that the Third Amended Complaint *alleges* that the individual defendants were acting within the scope of their employment does not change this analysis because the pleading rules permit the pleading of inconsistent legal claims.[182]

VIII.  *The City Defendants' argue that the claim for negligence for disclosure of the IAB complaints fails because of public policy bars claims for negligent investigation that are  duplicative of intentional torts; because the Internal Affairs Bureau did not owe Officer Schoolcraft a duty; and because the information was disclosed to individuals with a right to find out about the complaint.*

A.  *Overlapping Claims.*  The City Defendants argue that, as a matter of public policy, there is no claim under New York law for negligence where an internal affairs investigator carelessly, recklessly or maliciously leaks information about the identity of a confidential source who has reported misconduct.  (City Mem. at 24.)   The City Defendants are wrong, and none of the cases cited by them

---

[182] *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 398 n. 25 (S.D.N.Y. 2013).

are relevant or controlling.

Where a plaintiff is arrested and charged with a crime but is later exonerated, the plaintiff may or may not have a claim for false arrest or malicious prosecution. Several cases stand for the proposition that such a false arrest or malicious prosecution claim cannot be re-cast as a "negligent investigation" claim against the same arresting authorities to revive an otherwise duplicative or insufficient claim.[183]  For the same reasons, a single act of assault cannot be simply recast or "transmogrified" into another claim against the same actor for the same conduct.[184]

But here, the claim is that Officer Schoolcraft reported misconduct to IAB and QAD and that investigators leaked that fact to DI Mauriello and Lieutenant Caughey, thereby confirming their knowledge and beliefs about him being the "rat."  In addition, after Lieutenant Caughey menaced Officer Schoolcraft with his gun on the 31st of October, Officer Schoolcraft left work early out of fear of reprisal and immediately contacted IAB, informing them that he felt threatened.[185]

None of the cases cited by the City Defendants address this kind of situation and the limitations on re-casting claims do not apply.  Indeed, the *Jenkins* decision

---

[183] *See, e.g., Jenkins v City of New York,* 1992 U.S. Dist. Lexis 8279 (S.D.N.Y. June 15, 1992).
[184] *See, e.g. Schmidt v. Bishop,* 779 F. Supp. 321, 324 (S.D.N.Y. 1991).
[185] Plaintiff's 56.1 ¶¶ 60-61 (citing recorded message to IAB).

cited by the City Defendants proved the very point:  there, the court dismissed the negligence claim because  "plaintiffs' claims for negligence arise out of the same set of facts as their claims for false arrest and malicious prosecution. They simply allege that Jenkins would not have been arrested or prosecuted if defendants had been more careful."[186]  Here, the negligence claim does not arise from the same facts as the claims for false arrest, excessive force or false imprisonment.

    *B.  No Duty.*  The City Defendants also argue that they did not owe Officer Schoolcraft a duty of care, leaving them free to disclose to his superiors that he had reported their misconduct and to ignore his requests for protection.   A special duty, often referred to as a special relationship, can arise when a municipality: (1) "violates a statutory duty enacted for the benefit of a particular class of persons"; (2) "voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty"; or (3) "assumes positive direction and control in the face of a known, blatant and dangerous safety violation."[187]  The second factor is relevant in this case.

    In order for a municipality to assume a special duty under the second factor, the following must be present:  (1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2)

---

[186] *Id.* at *23.
[187] *Pelaez v. Seide*, 2 N.Y.3d 186, 199-200 (2004).

knowledge on the part of a municipality's agents that inaction could lead to harm;

(3) some form of direct contact between the municipality's agents and the injured

party; and (4) that party's justifiable reliance on the municipality's affirmative

undertaking.[188]

Here, the record shows that IAB did undertake a special duty to protect

Officer Schoolcraft.  The NYPD Patrol Guide states that the City encourages

employees to report misconduct and that City law "protects City employees who

report such wrongdoing from any form of retaliation."[189]  In addition, the NYPD's

Rule 30(b)(6) witness on IAB investigations testified that IAB undertakes to

protect members of the service who come forward with information about

misconduct and corruption by maintaining limited access to files and keeping

confidential the names of complainants.[190]  Indeed, the NYPD witness agreed that

IAB's misconduct in this case, calling the complainant's command where a

complainant works,[191] is precisely the type of conduct that would expose the

complainant to retaliation, that it should not be done, and that protecting a victim

---

[188] *Id.* at 202.
[189] POX 34:  PG 205-38 at p. 1 (Plaintiff's Deposition Exhibit 163).
[190] POX 35:  Cooper Tr. 18:18-20:20 (scope of witness's designation) & 44:20-45:16 (protection of member of the service) & 64:9-70:6.
[191] PMX 11:  DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma at 27:39-27:58 & 39:30 (IAB Sergeant Scott purposefully leaving messages at the command for Officer Schoolcraft to return calls from IAB).

of retaliation is the top priority of IAB in conducting an investigation.[192]

Finally, IAB specifically undertook a duty to Officer Schoolcraft in this case when he telephoned IAB on October 31, 2009 to report that he had been threatened by Lieutenant Caughey.  The IAB representative took down his report, and told him that an "investigation unit will investigate what was going on."[193] Since nobody from IAB interceded on Officer Schoolcraft's behalf, this conduct is plainly negligent.

The argument that Officer Schoolcraft somehow "waived" his right to be protected by IAB from retaliation should be rejected.  When Officer Schoolcraft told QAD that he did not want to file his report anonymously, he was merely stating that he was willing to provide his name *to* QAD, not that he was agreeing with the notion that QAD could inform his supervisors that he was reporting their misconduct.

Similarly, the argument that Lieutenant Caughey and Captain Mauriello had a right to know who the "rat" was is silly.  Obviously, at some later date, the name of a confidential informant might have to be revealed at a trial or hearing, but that is no license for actions needlessly putting the informant in harm's way.

*IX.  The malicious abuse of process claim fails because no legal process was*

---

[192] POX 35:  Cooper Tr. 64:9-70:6 & 146:2-149:8.
[193] PMX 11: DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma at 37:30-39:50.

*issued.*

The City Defendants argue that the malicious abuse of process claim is insufficient as a matter of law because that claim is limited only to criminal process and that the process used in this case should be characterized as merely "civil" process for which there is no constitutional protection.  The seminal Second Circuit case on malicious abuse of process, *Cook v. Sheldon*,[194] demonstrates that the City Defendants' simplistic "civil" versus "criminal" distinction fails because the underlying constitution interest at stake – liberty – was implicated by the arrest and incarceration of Officer Schoolcraft for six days at Jamaica Hospital.

In *Cook*, the plaintiff was arrested in retaliation for telling a friend who was being arrested to assert his right to have a lawyer.  The Second Circuit held that a claim for malicious abuse of criminal process was sufficient under Section 1983 because a criminal prosecution "implicates a constitutional right not to be deprived of *liberty*" and the "same is not *automatically* true for malicious civil prosecution."[195]  Thus, the underlying constitutional consideration is whether the process – civil or criminal  – threatens a *liberty* interest.

Here, that consideration is unquestionably satisfied.[196]  Pursuant to Mental

---

[194] 41 F. 3d 73 (2d Cir. 1994).

[195] *Id.* at 80 (emphasis added) (citing *Easton v. Sundram*, 947 F. 2d 1011, 1018 (2d Cir. 1991)).

[196] *See McArdle v. Tronetti*, 961 F. 2d 1083, 1088 (3d Cir 1992)"[plaintiff's] claim with respect to the petition for involuntary commitment amounts to a claim of malicious use of civil process

Hygiene Law § 9.41, the NYPD took Officer Schoolcraft into custody and transported him to Jamaica Hospital where he remained handcuffed until he was formally committed against his will to the Jamaica Hospital psychiatric emergency room and then to its psychiatric ward pursuant to Mental Hygiene Law §9.39. Whether the "process" fell under the Mental Hygiene Law or the Criminal Procedure Law ought to be irrelevant to the Constitution because the plaintiff's liberty interest was implicated.

X. *The claims against the City under Section 1983 fail because there is no evidence of a policy or practice that caused any constitutional injury to Officer Schoolcraft.*

The City Defendants' convoluted arguments about *Monell* liability fail to address the abundant evidence in this case that the New York City's quota and downgrading policy and the pervasive and well-documented practice of retaliation at the NYPD, known as the "blue wall of silence" or the "code of silence,"  provide the context, precedent and reason for the retaliation against Officer Schoolcraft. Direct, historical and expert evidence establishes that the City is liable for the violation of Officer Schoolcraft's rights.

To establish the existence of a municipal policy or custom, the plaintiff must show a material issue of fact on one of four well-established methods:

---

by state actors in violation of his Fourteenth Amendment rights")

(1) the existence of a formal policy which is officially endorsed by the municipality;[197]

(2) actions taken or decisions made by municipal policymaking officials *(i.e.*, officials with final decision making authority) which caused the alleged violation of plaintiff's civil rights;[198]

 (3) a practice "so persistent and widespread as to practically have the force of law,"[199] , or that "was so manifest as to imply the constructive acquiescence of senior policy-making officials:"[200] or

(4) that a policymaking official exhibited deliberate indifference to constitutional deprivations caused by subordinates."[201]

Here, Officer Schoolcraft has ample evidence to raise a material question of fact as to the third and the fourth methods.

*The Widespread Practice Method*

First, the unrebutted expert report of Professors Eterno and Silverman,[202] and

---

[197] *Connick v. Thompson*, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011)
[198] *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *Jeffers v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000)
[199] *Connick*, 131 S. Ct. at 1359; *see also Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006)
[200] *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (quotations and citations omitted)
[201] *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)(quotations and citations omitted); *see also Okin v. Village of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 439 (2d Cir. 2009)
[202] POX 11:  Report of Professors Silverman and Eterno.

the deposition testimony of Professor Eterno, who is also a retired NYPD Captain,

provide expert evidence about the pervasiveness of the blue wall of silence within

the NYPD, its documented history with the Knapp Commission and Mollen

Commission Reports, the established academic literature on the subject and its role

in this case.[203]  In addition, the Mollen Commission Report from 1994 documents

the fact that the blue wall of silence has been an established part of police culture

for decades.[204]  Indeed, Commissioner Kelly, in his testimony before the Mollen

Commission, admitted that the blue wall of silence exists within the NYPD.[205]

Finally, IAB conducted its own investigation into police corruption and culture at

the direction of Commissioner Kelly and as a result of its study determined that

police officers "evince great reluctance to report acts of misconduct or corruption

among their peers" and those that do so, risk ostracism from their peers and a

reputation as a 'rat.'"[206]  The study also found that:  "fear of being labeled a 'rat'

and the subsequent divorce from the police culture has a seemingly powerful,

negative impact upon reporting corruption" and that "physical fear surfaced several

times during the discussion about reporting corruption."[207]

  Although the City Defendants argue that there is no specific evidence of

---

[203] POX 12: Eterno Tr. 141:11-153:3.
[204] POX 36:  Mollen Commission Report (excerpts) at pp. 51-63.
[205] POX 37:  Kelly Testimony at 210-212.
[206] POX 38:  Police Corruption and Culture at pp. 8-9.
[207] *Id*. at p. 44

police officers who have been retaliated against for speaking out against the NYPD's quota system, they are simply wrong.  There are numerous examples in the record of how police officers suffered retaliation because of the blue wall of silence.

*Lieutenant Joseph Ferrara.*  Lieutenant Ferrara was a supervisor at the 81st Precinct in from April of 2009 through 2010,[208] and during that period he witnessed first-hand the quota and downgrading system run by DI Mauriello and the system of retaliation that supported the quota system.  The blue wall is defined simply:  "cops don't talk about what other cops do.  If something is done wrong, cops don't talk about it."[209] And if a cop does talk, "they get labeled a rat and then their lives are made difficult."[210]

Lieutenant Ferrara testified at his deposition that it was common practice within the NYPD for commanding officers to downgrade crime reports because of Compstat and that DI Mauriello and other commanding officers gave orders to downgrade crime reports.[211]  DI Mauriello personally set the arrest quota at one arrest for each reporting period.[212]  Although he believed that this was misconduct, Lieutenant Ferrara did not ever report it out of concern about retaliation:  "there's a

[208] POX 39:  Ferrara Tr. 49-51 & 196:23.
[209] *Id.* at 235:7.
[210] *Id.* at 235.
[211] POX 39:  Ferrara Tr. 73:21-75:20 & 77:20-79:15.
[212] *Id.* at 86:1-87:18.

perception in the NYPD to punish people who try to do good stuff."[213]

Lieutenant Ferrara also testified specifically about the retaliation against Officer Schoolcraft in this case.  First, he testified that at a supervisor's meeting sometime after October 31, 2009 and before February 18, 2010, DI Mauriello stated that he got a "heads up" about Officer Schoolcraft, which Lieutenant Ferrara understood to mean that somebody from IAB or QAD told DI Mauriello that they were investigating his command.[214]  Second, he testified that IAB leaked Officer Schoolcraft's involvement in reporting misconduct when it called the command and left a message for Officer Schoolcraft to return a call from IAB.[215]  In fact, Lieutenant Ferrara, who had previously works for several years at IAB, testified that there was a *practice* of leaking information to commanding officers about investigations:  "They let people know when they want to let people know to protect those people, hey listen, just to let you know. . . ."[216] Finally, he testified that on several occasions at supervisor's meetings at the 81st Precinct, DI Mauriello specifically referred to Officer Schoolcraft as a "rat" and that he started tape recording meetings because he felt that DI Mauriello's conduct was inappropriate,

---

[213] *Id.* at 79:5.
[214] *Id.* at 219:9-222:4.
[215] *Id.* at 192:8-195:3.
[216] *Id.* at 225:3-226:12.

especially for a commanding officer.[217]  For a commanding officer to label

someone a "rat" is inappropriate because "it causes other supervisors to look at that

officer based on that perception."[218]

   *Adhyl Polanco.*  Police Officer Adhyl Polanco joined the NYPD in 2005 and

was assigned to the 41st Precinct in the Bronx as a patrol officer from 2006 through

the end of 2009.[219]  Officer Polanco, like Officer Schoolcraft, was confronted with

consistent pressure to generate numbers for arrests, summons and stops and was

told that *at his Precinct* police officers had to have "20 summons and one arrest per

month per officer, at least" and that "it was non-negotiable, or you're going to

become a Pizza Hut deliver man."[220]  He was also subject to pressure to manipulate

crime reports, stating that at times "a robbery would come in and we would be told

not to take it for robbery because the numbers for the week will be too high in

order to keep crime as low as they say it is."[221]  In reviewing his monthly

performance reports with his supervisors, all they "care for" was "one thing:" "It's

how many arrest you had, how many summons you wrote and how many 250s you

have for that night."[222]  By 2009, his supervisors "came very hard with the quotas"

---

[217] *Id.* at 55:12-58:24.
[218] *Id.* at 192:8-195:3.
[219] POX 40:  Polanco Testimony in *Floyd v. City of New York*, 08-cv-1034, at Tr. 410-11.
[220] *Id.* at 425:6-12.
[221] *Id.* at 449:25-450:4.
[222] *Id*. at 420:14-17

which "[t]hey called productivity."[223]  While his supervisors were relentlessly

focusing on numbers, "[t]hey will never question the quality.  They will question

the quantity."[224]

By the middle of 2009, Officer Polanco, like Officer Schoolcraft, started

tape recording roll calls "because I couldn't believe what I was hearing, and I

thought nobody will believe me unless I record it."[225]  And by September of 2009,

Officer Polanco decided to report the widespread misconduct at his Precinct to

IAB.  Like others at the NYPD, Officer Polanco hesitated to go to IAB with his

allegations because of fear of retaliation:  "every time a cop steps out of the blue

wall, as they call it, we are considered rats."[226] After making that IAB report,

which he believed was anonymous, the word "rat" was written on a Precinct roster

next to his name, and one of his Sergeants told him that "they know that I reported

it, that I went to IAB."[227]

A month later, on December 12, 2009, Officer Polanco was suspended by

one of his supervisors at the 42nd Precinct.  Indeed, just like in this case, his

supervisor had him declared an emotionally disturbed person at the scene of his

---

[223] *Id.* at 421:11
[224] *Id.* at 423:5. *See also* POX 56: Finnegan Tr. 54-57 (performance evaluations do not take into consideration whether arrests or summons actually yield convictions).
[225] *Id.* at 423:22-424:2.
[226] *Id. at 577:8-10.*
[227] *Id.* at 474:6-12 & 498:8-23.

suspension and his gun and badge were removed at the direction of the supervisor.[228]

*Officer Pedro Serrano*.   Officer Serrano has been a NYPD Police Officer in the 40th Precinct in the Bronx since 2004.[229]  Like Officers Polanco and Schoolcraft, Officer Serrano's supervisors imposed a quota on him as a patrol officer and conveyed the quotas at roll calls and through direct comments by supervisors.[230]  After a period of time, Officer Serrano also started tape recording events at his Precinct.[231]

In about 2007 or 2008, after several years on the job, Officer Serrano started speaking out against the quotas to his supervisor and as a result was subject to retaliation.[232]  His locker was vandalized and stickers of a rat were place on his locker.[233]  Simply put:  "Usually if you call IAB in reference to another police officer, you're called a rat."[234]

*Police Officer Craig Matthews*.   Officer Matthews was a police officer assigned to the 42nd Precinct in the Bronx since 1999, and since at least 2008, he

---

[228] *Id.* at 512:23-514:22.
[229] POX 41:  Serrano Tr. at 636:11-24.
[230] *Id.*  at 653:18-654:4.
[231] *Id.* at 657:21.
[232] *Id* at 658:23-659:21.
[233] *Id.*
[234] *Id.* at 659:19.

was also subjected to the same quota system.[235]  He, too, was retaliated against

when he spoke out against the quotas.[236]  And, like the retaliation in this case,

Officer Matthews received from his supervisors a 2.5 performance evaluation for

2011, which put him at risk of being fired.[237]

*   *   *

Based on this record, there is a question of fact as to whether the blue wall of

silence constitutes a well-established custom or practice that caused the retaliation

against Officer Schoolcraft.  In this Circuit there are *numerous* decision holding

that the blue wall of silence is a proper basis for holding a municipality liable

under *Monell.*  For example, in *Barry v. New York City Police Department,*[238] the

plaintiff was an NYPD sergeant who reported that police officers on a truancy

detail were yielding to pressure to generate a fixed number of reports by filing

false reports about their activity.[239]  As a result, the plaintiff was subject to

retaliation for violating the NYPD's blue wall of silence, and the court held that the

testimony by the plaintiff and two other officers about the code of silence was

sufficient to raise an issue of fact on the City's liability under *Monell* for a practice

---

[235] POX 42: *Matthews v. City of New York*, 12-cv-1354 (S.D.N.Y.), Matthews Affidavit ¶¶5-6; Matthews Complaint ¶¶ 2-3 & 18.
[236] POX 42:  Matthews Complaint ¶¶3-4.
[237] *Id.* at ¶ 38.
[238] 2004 U.S.Dist. Lexis 5951 (S.D.N.Y. April 7, 2004).
[239] *Id.* at *5.

of punishing officers who report misconduct.[240]  Numerous other similar cases

have also held that retaliation against police officers for breaking the code of

silence establish a basis for *Monell* liability.[241]

    *Deliberate Indifference Method.*

    The other relevant method of establishing *Monell* liability is based on the

City of New York's deliberate indifference to the constitutional violations by

subordinates.  Under this theory, a plaintiff must offer evidence to satisfy three

requirements:  (1) the policy-makers know to a moral certainty that the employees

will confront a given situation; (2) that the situation presents itself with a difficult

choice of the sort that training or supervision will make less difficult or there is a

history of employees mishandling the situation; and (3) the wrong choice will

---

[240] *Id.* at * 34-42.

[241] *White-Ruiz v. City of New York,* 1996 U.S. Dist. Lexis 15571 (S.D.N.Y. Oct. 21, 1996) (based on expert testimony, evidence of other officers, and Mollen Commission Report on the pervasiveness of the blue wall of silence, summary judgment on Monell liability denied*);Valentin v. New York City,* 1997 U.S. Dist. Lexis 24059 (E.D.N.Y. Sept. 9, 1997*)* (summary judgment motion denied; expert testimony on the blue wall relevant to the issue of whether the adverse action was caused by the plaintiff's conduct in reporting sexual harassment); *Ariza v. City of New York,* 1996 U.S.Dist. Lexis 20250 (E.D.N.Y. 1996) (plaintiff/police officer label a "rat" for reporting misconduct could establish municipal liability for a widespread practice of retaliation against offices for breaking the code of silence); *Venture v. Town of Manchester,* 2008 U.S. Dist. Lexis 66957 at * 58 (D. Conn. Sept. 2, 2008) ("a reasonable jury could conclude that 'there existed a custom or practice with the [police department] of retaliating against officers who cross the thin blue line."). *Cf. Katt v. City of New York,* 151 F. Supp. 2d 313 (S.D.D.Y. 2001) (sexual harassment case where evidence of the blue wall was properly admitted at trial), *aff'd,* 60 Fed. Appx. 357 (2d Cir. 2003)  See also *Jackler v Byrne*, 658 F. 3d 225 (2d Cir. 2010) (County Sheriff as policy maker for municipality authorized a policy of punishing correction officers who violate the blue wall of silence).

frequently cause a deprivation of constitutional rights.[242]

All three criteria are satisfied here. First, the nature and history of the NYPD, as reflected by the expert report by Drs. Eterno and Silverman, the Mollen Commission Report, and the IAB Report, shows that police officers will, as an inherent part of their jobs, be confronted with numerous situations where the need to report misconduct or corruption is inevitable. Second, the question confronted by a police officer – whether to look the other way or to risk the "rat" label – is an exceedingly difficult decision of a sort that training and supervision can make less difficult. Third, there is an ample record showing a history of NYPD officers mishandling the situation, as noted above, and "a jury could reasonably conclude that the plaintiff's fellow officers and supervisors, if thoroughly trained to root out corruption and not to tolerate those who conceal it, would probably have acted differently to plaintiff."[243] Finally, the wrong choice – retaliation against the "rat" – frequently leads to the deprivation of constitutional rights.[244]

The deposition testimony of DI Mauriello about the blue wall of silence proves that the NYPD's failed to train and supervise DI Mauriello. Although there is, as noted above, a wide-spread custom or practice in the NYPD known as the

---

[242] *Valentin v. New York City,* 1997 U.S. Dist. Lexis 24059 (E.D.N.Y. Sept. 9, 1997) (citing *Walker v City of New York,* 974 F. 2d 293, 297 (2d Cir. 1992), *cert. denied*, 507 U.S. 961 (1993)); *White-Ruiz v. City of New York,* 1996 U.S. Dist. Lexis 15571 (S.D.N.Y. Oct. 21, 1996).
[243] *White-Ruiz, supra,* at *29-31.
[244] *See, e.g., Valentin*, *supra,* at *48-49; *White-Ruiz, supra,* at *29-31.

blue wall of silence, DI Mauriello testified at his deposition that he *did not know* whether there was an attitude on the job about how officers should not rat out other officers.[245]  He also testified that *he did not believe* that there were pressures in the job that inhibit officers from reporting misconduct.[246]  This testimony, if credited, shows that the NYPD has clearly failed to provide any kind of training or supervision of DI Mauriello about the existence of the blue wall and that he has little, if any, understanding about the impact of the blue wall on police officers. Indeed, other evidence in the record demonstrates that the NYPD has not trained or supervised DI Mauriello about how to respond to information about a subordinate officer reporting misconduct.  As noted above, one of DI Mauriello's subordinate officers at the 81st Precinct, Lieutenant Ferrara, testified that at a supervisor's meeting at the 81st Precinct DI Mauriello referred to Officer Schoolcraft as a "rat."[247]

* * *

Thus, summary judgment in favor of the City of New York should be denied based on questions of material fact under the third and the fourth methods of establishing *Monell* liability.

---

[245] POX 20: Mauriello Tr. II 245:3-247:5.
[246] POX 20:  Mauriello Trr. II 246:16-247:5.
[247] POX 39: Ferrara Tr. 234:25-235:20.

# DI MAURELLO'S MOTION

DI Mauriello claims that he is entitled to summary judgment as to all claims against him. Each of DI Mauriello's arguments fails utterly to establish the legal basis for summary judgment.  We list and respond to his specific points as follows.

    *I. Officer Schoolcraft's First Amendment protection attached not at the point he was suspended from the NYPD (*as this Court has held*) but when he moved out of New York City, and the prior restraint claims against Mauriello fail because Mauriello did not personally participate in the alleged wrongful conduct after October 31, 2009.*

Like the City Defendants, DI Mauriello argues that the Court should reverse its holding as to when Officer Schoolcraft's First Amendment protection attached to a later time when DI Mauriello was no longer directly involved with wrongful activities against Officer Schoolcraft. This argument is without merit.

In its Opinion dated September 7, 2012, this Court considered the issue of when First Amendment protection of speech attached, and held that Officer Schoolcraft had cognizable First Amendment rights after he was suspended from the NYPD in his bedroom on October 31, 2009.[248]  DI Mauriello, without citing change in controlling law, new evidence, a need to correct a clear error or to prevent manifest injustice, now asserts that the Court should reverse its ruling and find that First Amendment rights attached only after Officer Schoolcraft moved to

---

[248] *Schoolcraft v. City of New York,* 2012 U.S. Dist. Lexis 128557 (S.D.N.Y. Sept. 7, 2012).

upstate New York seeking to avoid further harassment by NYPD.

As we point out above in response to City Defendants' claim that Officer Schoolcraft's "speech" was part of his official responsibility as a police officer and thus not subject to First Amendment protection, there *is* a change in the law that formed the basis of the Court's September 7, 2012 Opinion.  The Supreme Court's decision in *Lane* should lead the Court to reconsider and now hold that Officer Schoolcraft's speech *before* his October 31, 2009 suspension was protected by the First Amendment because reporting official misconduct is not an ordinary function of a Police Officer, as reflected by the annual and monthly performance evaluations of Officer Schoolcraft.  Those evaluations set forth the ordinary functions of a Police Officer and reporting misconduct or corruption is not included at all as a typical or ordinary function.[249]

DI Mauriello, like the City Defendants, ignores these developments in the law and simply repeats the same argument that the Court rejected in its September 7, 2012 Opinion, *i.e.*, that Officer Schoolcraft, even though suspended, still had an official responsibility to report wrongdoing within the NYPD.  There is no basis for the Court to change its reasoning and holding that upon his suspension Officer

---

[249] PMX 1 (annual performance evaluations) & PMX 5 (monthly performance report a police officer's typical duties).  *Accord Griffin v. City of New York*, 880 F. Supp. 2d 384, 400 (E.D.N.Y. 2012).

Schoolcraft was entitled to protection under the First Amendment.

Nothing pointed to by DI Mauriello justifies or supports his arguments about further contraction of Office Schoolcraft's First Amendment rights.  DI Mauriello states that Officer Schoolcraft was "reaching out" to IAB while incarcerated at Jamaica Hospital to support the suggestion that he was exercising his obligation as a police officer to report wrongdoing.  The IAB visit to Jamaica Hospital on November 2, 2009 was hardly an "outreach" by Officer Schoolcraft.

An IAB investigator came to interview him in connection with the allegation in Captain Lauterborn's Report that Officer Schoolcraft had violated a direct order to return to the 81st Precinct given to him at his apartment the evening of October 31, 2009.[250]  The second IAB visit to Jamaica Hospital was on November 4, 2009 at the request of Officer Schoolcraft's father in an unsuccessful attempt to convince the psychiatric physician responsible for continuing to hold his son involuntarily, Dr. Isakov, that Officer Schoolcraft was not delusional in his accounts of reporting wrongdoing of, and retaliation by his police supervisors.[251]

DI Mauriello also points to an IAB investigator's meeting with Officer Schoolcraft shortly after his release from Jamaica Hospital as further examples of Officer Schoolcraft exercising his official responsibility to report official

---

[250] Scott IAB Report (Mauriello's Exhibit AO).
[251] Chu IAB Report (Mauriello Exhibit AP).

wrongdoing while on suspended status. IAB used these visits, however, for the purpose of photographing his apartment, collecting the second digital recording device that had not been discovered and destroyed by the NYPD home invasion team, and the rifle that was discussed on the recorded telephone conversation between Officer Schoolcraft and his father prior to the police invasion on October 31, 2009.  The IAB follow-up visits with Officer Schoolcraft were essentially to build the case for suspension for his failure to obey the command to return to the 81st Precinct, and an extension of the NYPD's pattern of intimidation and harassment.  IAB cited the presence of the rifle in the apartment while Officer Schoolcraft was on restricted duty status as an additional departmental charge levied against Officer Schoolcraft.[252]

DI Mauriello argues further that the prior restraint claims against him fail because he did not personally participate in the alleged wrongful conduct after October 31, 2009.  We address below his specious reasoning that he can avoid responsibility for actions he initiated and directed by not being physically present and directly participating in carrying them out.

*II. Defendant Mauriello is not responsible for any of the claims of forcible seizure and imprisonment because he was not physically present and did not directly participate in the specified acts.*

---

[252] POX 43: Charges and Specifications (NYC 3876-78).

DI Mauriello seeks to avoid responsibility for actions and consequences he initiated by claiming he was not physically present and directly participating in the actions. Neither law nor common sense supports this argument.

In *Gonzalez v. Bratton*,[253] a similar case involving retaliatory animus on the part of an NYPD precinct commander against a police officer, the court derided the commander's argument that he had no personal involvement in the unlawful act of a strip search, and that liability lay only against the subordinate officer who actually carried out the search.  Judge Marrero characterized this as "officialdom's was of saying 'The Butler did it.'"[254]

Noting that generally a defendant's personal involvement in a claimed deprivation of rights must be established, the court in *Gonzalez* held that a defendant's liability is established "where the unlawful conduct was carried out by a subordinate acting under direct instructions of a principal violator who possessed the wrongful intent to cause the denial of the complainant's civil rights.[255]

---

[253] 147 F. Supp. 2d 180 (S.D.N.Y. 2001), *aff'd*, 48 Fed. Appx. 363, 2002 U.S. Dist. Lexis 21521 (2d Cir. Oct. 12, 2002)

[254] *Id*. at 202

[255] *Id*. at 203 (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (A supervisor may be liable if he or she "directly participate in the infraction" or "created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.); *Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir. 1986); *cf. Varrone v. Bilotti*, 123 F.3d 75 (2d. Cir. 1997); see also *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988) (the requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should have known would cause others to deprive the plaintiff of her constitutional rights."); *Specht v. Jensen*, 832 F. 2d 1516, 1524 (10th Cir. 1987)).

Here, DI Mauriello set in motion the series of events at the 81st Precinct designed to prevent Officer Schoolcraft from speaking publically about illegal quotas and downgrading of major crimes, and to discredit Officer Schoolcraft's speech on the matter.

The broader policy context for Mauriello's aggressive use of disciplinary charges and poor evaluations to intimidate officers to meet quotas was displayed at a September 20, 2007 meeting of CompStat at NYPD Headquarters for executives of Patrol Borough Brooklyn North.  At that meeting, Chief Nelson, responded to questions about low arrests, summons and stops and frisk reports ("250s") by telling NYPD Chief Esposito that he has "problematic squads" in the Borough precincts.  When Chief Esposito asked Chief Nelson what he was going to do about the "problem," Nelson replied that Chief Marino had taken a personal interest in the matter, and that we will tell them that their low activity will affect their evaluations.  At that same CompStat session, DI Mauriello described from the podium that he will "micro manage" and review the activity of all squads at the end of each tour and described denying overtime for at least a month for a sergeant whose squad produced "minimal 250's and no C's."[256]

---

[256] POX 44: Compstat Video, 9/20/07 at 58:00-120:00.

After DI Mauriello's arrival at the 81st Precinct as commanding officer,
Officer Schoolcraft and other officers at the 81st Precinct began getting increasingly
greater pressure at roll calls to achieve quotas on their number of arrests, summons
and stops and to falsify documentation about the receipt of training during roll
calls.[257]  Coincident with DI Mauriello's assuming command at the 81st Precinct,
Officer Schoolcraft's performance evaluations began to decline.[258]

DI Mauriello gave Officer Schoolcraft a failing evaluation score for the
year 2008, and in February 2009, convened a meeting of all of Officer
Schoolcraft's supervisors after Officer Schoolcraft indicated that he intended to
appeal  the low evaluation on the grounds that it was based solely on the
number of arrests, summonses and 250s—in effect punishing him for not
meeting the expected quotas for these activities.  Officer Schoolcraft engaged a
labor attorney who sent a letter to DI Mauriello documenting Officer
Schoolcraft's concerns about "numerical goals" being used improperly in
performance evaluations.[259]

Immediately after DI Mauriello received the letter documenting Officer
Schoolcraft's complaint about being evaluated solely and improperly on not

---

[257] PMX 4:  Schoolcraft Tr.  29:13-30:12 & 32:24-33:5.
[258] Plaintiff's 56.1 ¶¶ 3-4.
[259] PMX 8:  *Id.* at p. 2.

making arrest, summons and 250 quotas, 81st Precinct supervisors began a regimen of "coming down hard" on Officer Schoolcraft.[260]  Supervisors began issuing Officer Schoolcraft command discipline citations for minor infractions such as "off post" and having "unnecessary conversation" with another patrol officer.[261]  When Officer Schoolcraft complained of the retaliatory nature of the "enhanced" supervision, DI Mauriello's deputy, the 81st Precinct Executive Officer, Captain Lauterborn, explained to Officer Schoolcraft that "this is gonna go on" and that Schoolcraft has "a long road ahead."[262]

The next turn for Officer Schoolcraft on his "long road ahead" was for him to be "psyched" after DI Mauriello became "concerned" for his mental condition in March 2009.[263] The 81st Precinct's Assistant Integrity Control Officer, Sergeant Weiss, began reviewing police procedures on how to have Officer Schoolcraft psychologically evaluated.[264]  Shortly after that, Sergeant Weiss referred Officer Schoolcraft to the NYPD's Early Intervention Unit because he

---

[260] PMX 11:  Id. at 30:00-31:30.
[261] PMX 9 at NYC 00081 (PX 168).
[262] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45, & 28:50-31:30. The recording is attached at part of a compact disk accompanying this motion together with other records relevant to the motion.
[263] POX 25: Mauriello IAB PG, August 11, 2010 at p. 16 (NYC 4903) (Officer Schoolcraft was referred to the Medical Unit that night after the meeting with Capt. Lauterborn).
[264] PMX 6:  Weiss Tr. 120:6-121:2.

was "concerned" about Officer Schoolcraft's "mental distress."[265] Sergeant Weiss conducted background research on Officer Schoolcraft and his family and forwarded information from a local upstate newspaper about the Schoolcraft family to the Early Intervention Unit.[266]

Within a week or two of Sergeant Weiss' contacting the Early Intervention Unit, Officer Schoolcraft was placed on restricted duty. This meant that his gun, shield and identification credentials were removed; he was assigned to the switchboard at the 81st Precinct and required to wear a police uniform without a badge or firearm.[267] His locker in the precinct stationhouse was defaced with a note saying "shut up you idiot," and with a poster saying "if you don't like your job, get another."  He was mocked by other officers as a "house mouse."[268]

During this same period of time, DI Mauriello learned that his command was under investigation by QAD and IAB.[269] On the morning of October 31, 2009, DIMauriello's Integrity Control Officer, Defendant Lieutenant Caughey, took Officer Schoolcraft's memo book, which contained confirmation of the suspicion in the 81st Precinct that Officer Schoolcraft was the source of information that led to the investigations.  Lieutenant Caughey placed a copy of

---

[265] PMX 6:  Weiss Tr. 99:14-101:4.
[266] PMX 6:  Weiss Tr. 103:6-109:3.
[267] PMX 6:  Weiss Tr. 101:24-102:10.
[268] POX 13: Schoolcraft Tr. II at 24-25.
[269] Plaintiff's 56.1 ¶ 44-49.

Officer Schoolcraft's memo book containing incriminating IAB contact information and other notations relating to downgrading major crimes and falsified training records in DI Maureillo's desk.

Later that day, October 31, 2009, when Mauriello discovered that Officer Schoolcraft had left the precinct switchboard an hour early, after submitting a sick leave slip to the desk officer, DI Mauriello ordered a senior supervisor, Lieutenant Brochardt, to go to Officer Schoolcraft's home in Queens to locate him and return him to the precinct.[270]  DI Mauriello also ordered the desk officer and another officer who saw Officer Schoolcraft leave to remain at the Precinct to participate as witnesses in a hearing to suspend Officer Schoolcraft for being AWOL.[271]

When supervisors from the 81st and the Queens Precinct could not locate Officer Schoolcraft at his residence, DI Mauriello launched a massive operation involving the top two executives of the Brooklyn North Patrol Borough, a three-man team from the Borough Investigations Unit called in from their homes on their day off, the command staff of the 81st Precinct, at least one NYPD Emergency Services unit, an FDNY Paramedic Lieutenant and two Jamaica Hospital EMTs, the commander of the 104 Precinct in Queens and numerous

---

[270] Plaintiff's 56.1 ¶ 65.
[271] *Id.*

officers from both the 81st and 104th Precincts – all assembled at Officer

Schoolcraft's apartment in order to bring him back to the 81st Precinct to take sick

leave "the right way."[272]  DI Mauriello diverted these public safety resources to

bring Officer Schoolcraft forthwith to the precinct for his "hearing" on one of the

most violent nights of the year for the City -- Halloween.[273]

At 9:45 pm that night, Defendant Mauriello and at least six other NYPD

officials entered Officer Schoolcraft's apartment behind an Emergency Services

Team on the pretext of exigent circumstances.  DI Mauriello confronted Officer

Schoolcraft and ordered him to return to the 81st Precinct.[274]  Officer Schoolcraft

responded by saying that he would only return to the 81st Precinct if forced to, and

that it would be against his will.[275]

At this point, after Officer Schoolcraft refused to be taken voluntarily, DI

Mauriello ordered his second-in-command, Captain Lauterborn, to "handle this."

In other words, get Schoolcraft into their custody and control one way or another.

Importantly, it was during this first entry into Officer Schoolcraft's home that DI

Marino declared that Officer Schoolcraft was suspended for disobeying a direct

---

[272] PMX 11: Home Invasion Recording (Lauterborn to Schoolcraft).
[273] POX 45: Crime Report Numbers for 10/31/09; POX 20: Mauriello Tr. 144-148 (Halloween is a very busy night).
[274] PMX 3:  Mauriello Tr. 356:11-357:15; PMX 11:  (DS.50_31October 2009_HomeInvasion.wma at 2:48).
[275] *Id.*

order to return immediately to the 81st Precinct.[276]

According to DI Mauriello's version of the events, he was standing outside Officer Schoolcraft's apartment house when Captain Lauterborn and others pressured Officer Schoolcraft to go in an ambulance for medical attention for his purported high blood pressure.  Officer Schoolcraft walked out of his apartment accompanied by Captain Lauterborn and the other officers who were in his apartment.  When Officer Schoolcraft reached the ambulance and learned that the EMTs would be taking him to Jamaica Hospital instead of honoring his request to be taken to Forest Hills Hospital, he refused to enter the ambulance and abruptly walked quickly back to his apartment.  At that point, DI Mauriello yelled to Captain Lauterborn, "Teddy, stop him!"[277]  Responding to DI Mauriello's order, Captain Lauterborn ran up the stairs and blocked open Officer Schoolcraft's apartment door with his foot, allowing Chief Marino, himself and other officers back into Officer Schoolcraft's bedroom.[278]

During this second unlawful entry into Officer Schoolcraft's residence, Captain Lauterborn, Chief Marino and at least four other officers forcibly took the already suspended Officer Schoolcraft into custody as an emotionally disturbed

---

[276] *Id.*
[277] POX 3: Lauterborn Tr. 318-320.
[278] *Id.*

person ("EDP"), searched his person and apartment and seized property from his person and from his residence.[279]

While Officer Schoolcraft was being transported to Jamaica Hospital under the custody of Lieutenant Broschart, DI Mauriello returned to the 81st Precinct to conduct the "hearing" on Officer Schoolcraft's leaving the precinct early on sick status. DI Mauriello also directed Captain Lauterborn to meet at the 81st Precinct that night with the NYPD officials involved in the home invasion and arrest of Officer Schoolcraft.  Captain Lauterborn prepared a Report that night describing the actions taken that resulted in Officer Schoolcraft's arrest and referral to Jamaica Hospital for psychiatric commitment.[280]

DI Mauriello then committed the resources of a Lieutenant and two Sergeants of the 81st Precinct, along with their drivers, to guard and insure that Officer Schoolcraft remain detained at Jamaica Hospital on Halloween night. Later that morning, DI Mauriello personally directed one of the Sergeants assigned to watch Officer Schoolcraft to call him to confirm that Officer Schoolcraft had been successfully committed as a psychiatric patient.[281]

These facts could rationally lead a jury to find that DI Mauriello set in

---

[279] PMX 4:  Schoolcraft Tr. 1:4-155:8 (Lauterborn pursued Schoolcraft back into his apartment and physically prevented him from shutting  the doors behind him as he returned); PMX 11: DS.50_31October 2009_HomeInvasion.wma at 17:50-22:00.
[280] PMX 23.
[281] POX 46: Sawyer Tr. 111:7-113:25.

motion a decision to punish Officer Schoolcraft for not meeting his quota of stops and summonses and reporting misconduct, in violation of the code of silence. The "coming down hard" disciplinary directive against Officer Schoolcraft became an all-out regimen of retaliation and frantic efforts to silence and discredit him when DI Mauriello learned that Officer Schoolcraft was providing information to IAB and QAD concerning the quota demands and manipulation of crime statistics in the 81st Precinct.   DI Mauriello orchestrated the series of activities, by him personally and by others under his direct command, that resulted ultimately in the forcible seizure and unlawful imprisonment of Officer Schoolcraft.

The "butler did it" defense does not work to let DI Mauriello avoid responsibility for unlawful conduct he caused and directed others to carry out.

*III.  The conspiracy claims against Defendant Mauriello fail as a matter of law because he is shielded by the intracorporate conspiracy doctrine, and there was no conspiracy to cause a violation of plaintiff's constitutional rights.*

DI Mauriello asserts the same arguments about the conspiracy claim as the City Defendants.  He argues that the forced entry on Halloween night into Officer Schoolcraft's apartment was an appropriate response to exigent circumstances; that the intra-corporate conspiracy doctrine shields DI Mauriello from the conspiracy claim; and that there is no evidence that DI Mauriello conspired with others to violate Officer Schoolcraft's constitutional rights.  With regard to DI Mauriello's

"exigent circumstances" argument justifying the forced entry into Officer Schoolcraft's apartment, and the claim that the intra-corporate conspiracy doctrine shields him from liability here, we refer to our response above to the same arguments proffered by City Defendants.

The ample evidence that DI Mauriello conspired with other defendants in furtherance of the unlawful goal of silencing Officer Schoolcraft, however, warrants additional mention. The NYPD conducted its own investigation into DI Mauriello's actions and found that his conduct was unbecoming an Executive Police Supervisor. As we argued in our motion for summary judgment against DI Mauriello's counterclaims, the official findings by two NYPD investigative agencies – IAB and QAD – show that DI Mauriello personally committed misconduct and improperly permitted rampant downgrading and suppression of crime reporting at the 81st Precinct while under his command.[282]

After Officer Schoolcraft was assaulted on October 31, 2009, IAB began an investigation into whether DI Mauriello knew about or suspected at the time of his entry into Officer Schoolcraft's home that IAB or QAD was investigating the 81st Precinct. IAB also investigated whether DI Mauriello knew about the contents of Officer Schoolcraft's memo book at the time he forced his way into his apartment.

---

[282] Plaintiff's 56.1 Statement ¶¶ 126-129.

During the course of those investigations, DI Mauriello was interviewed under oath by IAB, and at his interview DI Mauriello made materially false statements about his knowledge about the existence of an investigation into his Precinct and Officer Schoolcraft's memo book.[283]   Based on these findings, IAB recommended that formal charges against Mauriello be filed—this matter remains an open case with NYPD.[284]

The findings that DI Mauriello lied in a formal NYPD investigation about his knowledge of Officer Schoolcraft's memo book and his contacts with IAB and QAD show DI Mauriello's true intent and knowledge in setting in motion the series of events of October 31, 2009 that led to the acts that deprived Officer Schoolcraft of his constitutional rights.

*      *      *

Defendant Mauriello's motion for summary judgment should be denied in its entirety.

## THE HOSPITAL'S MOTION

1.  *Jamaica Hospital is a person under Section 1983.*

Jamaica Hospital argues that it is not a "person" within the meaning of Section 1983, relying on inapplicable *dicta* from two decisions dismissing *pro se*

---

[283] PMX 15 (PX 144) (confidential designation).
[284] PMX 3:  Mauriello Tr.  635:3-651:6.

complaints that failed to name a legally cognizable entity as a proper party in those

actions.  Those decisions and the cases cited by those decisions make clear that a

non-jural entity cannot be sued.

Here, however, there is no question but that Jamaica Hospital is a not-for-

profit corporation existing and formed under New York law.[285]  Accordingly, its

claim that is not a "person" should be rejected as meritless, particular in light of the

countless decisions under Section 1983 that hold that private entities are proper

defendants under the statute.[286]  Significantly, Jamaica Hospital does not even

bother to make this "non-person" claim with respect to the state law claims being

asserted against it.

To the extent that Jamaica Hospital is making a claims that it is not a

"person" because it has listed itself under the name "The Jamaica Hospital Medical

Center Diagnostic and Treatment Center Corporation" that argument has been long

ago waived.  In its Answer to the Second Amended Complaint it appeared as

"Jamaica Hospital Medical Center," asserted that it was a private hospital duly

licensed to operate under the laws of the State," and never raised any issue or claim

in its pleadings (or thereafter) that it's name was different than that which is set

---

[285] POX 47: NYS Secretary of State Information Sheet; NYS Department of Law, Charities Bureau Filing.
[286] *See, e.g. Will v. Mich. Dept. of State* Police, 491 U.S. 58, 69 (1989); Adickes *v. Kress & Co.*, 398 U. S. 144 (1970) (private restaurant liable under Section 1983).

forth in the Complaint.[287]   Accordingly, it has waived any claim that it was not properly named as a proper party in the pleadings, and the Court should reject any such argument and permit an amendment to correct any defect in the pleading.

2.  *State action exists in this case.*

Jamaica Hospital argues more substantively that it is not liable under Section 1983 because it is a private entity and it is not a state actor under the various state action tests. (JHMC Mem. at 14.)   Yet in making this argument, Jamaica Hospital does not address the evidence in the record.  Indeed, not once in its papers does it even acknowledge that it was *its* Emergency Medical Technicians (EMTs) who made the *joint decision* with the NYPD and the FDNY to declare Officer Schoolcraft an "EDP" and take him to the hospital against his will to be psychiatrically evaluated.

Nor does Jamaica Hospital address (or mention) the Court's prior, cogent statements on the state action issue.  In an earlier ruling in this action, the Court outlined the grounds upon which Jamaica Hospital could be held liable as a state actor:

> As noted above, Defendants contend that JHMC is not a state actor and that Plaintiff fails to sufficiently allege conspiracy under § *1983*. Because Plaintiff's claims against JHMC fail even if JHMC is a state actor or conspired with the NYPD, the Court does not need to decide this issue. That

---

[287] Dkt. 106; Answer ¶¶ 7 & 8.

having been stated, it does appear that JHMC is a state actor based on Plaintiff's allegations that the hospital's employees acted under the compulsion of, and in concert with, the NYPD. *Sybalski v. Independent Group Home Living Program, Inc., 546 F.3d 255, 258 (2d Cir. 2008).* Furthermore, because Plaintiff contends that JHMC was used as a detention facility, JHMC can be seen as a state actor through its assumption of a traditional government function. *Id.* Plaintiff also appears to sufficiently plead a *§ 1983* conspiracy by alleging that JHMC's employees formed an agreement with NYPD officers to collaborate in depriving Plaintiff of his constitutional rights and acted pursuant to that agreement. *See Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).*[288]

Rather than addressing the extensive factual record, the Court's prior statements or even its well-established burden of proof on a summary judgment motion, Jamaica Hospital falls back on the conclusory assertion that there is "no evidence that would allow the conduct of private actors to be attributable to the state for § 1983 purposes under the various tests." (JHMC Mem. at 16.)  Since it fails to demonstrate that there are no issues of material fact on the issue, summary judgment should be denied.  The burden was on Jamaica Hospital, as the summary judgment movant, to demonstrate the absence of any material issue of fact and it does not even attempt to satisfy that burden.[289]

Nor could it.  The evidence in this record, set forth in detail above, shows

---

[288] *Schoolcraft v. City of New York*, 2011 U. S. Dist. Lexis at *7-8 n. 2 (S.D.N.Y. May 6, 2011).
[289] *Adickes v. Kress & Co.*, 398 U. S. 144 (1970) (summary judgment improperly granted because movant did not foreclose the possibility of liability in its motion and the burden was on the moving party to show the absence of a genuine issue of fact); *accord Apex Oil Co. v. DiMauro,* 822 F. 2d 246, 252 (2d Cir. 1987).

the collaboration between the Jamaica Hospital EMTs, the FDNY Lieutenant and the NYPD in their *joint* decision and scheme to declare Officer Schoolcraft an "EDP" and hospitalize him at the psychiatric ward at Jamaica Hospital.   Those facts demonstrate that there are several issues of fact on the question of whether Jamaica Hospital was a state actor or collaborated with a state actor for purposes of Section 1983 liability.

The evidence shows that a joint decision was made in the apartment by employees of Jamaica Hospital (EMTs Sangeniti and Marquez), the FDNY Lieutenant (Hanlon) and the NYPD (Marino, Mauriello, Lauterborn and others) to force Officer Schoolcraft to the hospital against his will as an "emotionally disturbed person."   The evidence shows that they all acted together to steer Officer Schoolcraft to Jamaica Hospital because it has a psychiatric facility.  The evidence shows that once they got to the hospital both the NYPD and the EMTs used their influence with the hospital staff to assure that Officer Schoolcraft would be involuntarily committed.  The evidence shows that Officer Schoolcraft was not released until the NYPD approved that decision.[290]

Under these circumstances, the Court should hold that there is a fact question on whether Jamaica Hospital can be held liable under Section 1983.  "A

---

[290] POX 13: Schoolcraft Tr. 189-191, 436, 443; POX 55: Larry Schoolcraft Tr. 249-250.

private individual may be subject to liability under this section if he or she willfully collaborated with an official state actor in the depravation of the federal right."[291]   More generally, actions of a private entity can be attributable to the state "where the state provides significant encouragement to the entity, the entity is a willing participant in joint activity with the state or the entity's functions are entwined with state policies."[292]

In a leading Supreme Court decision, *Adickes v. Kress & Co.,*[293] the Supreme Court stated the governing rule:  "Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willing participant in the joint activity with the State or its agents."[294]

Jamaica Hospital and its staff, including Dr. Bernier and Dr. Isakov, are state actors because of the joint action taken in Officer Schoolcraft's apartment and

---

[291] *Dwares v. City of New York*, 985 F. 2d 94, 98 (2d Cir. 1993). *Accord Alexanian v. New York State Urban Dev. Corp.,* 554 F. 2d 15, 17 (2d Cir. 1977) (private party who collaborated with a police officer acting under color of law can be liable under Section 1983); *Adickes v. Kress & Co*., 398 U. S. 144 (1970) (summary judgment denied where there was evidence that a private restaurant entered into agreement with a police officer to arrest the plaintiff and deprive plaintiff of her constitutional rights, arising from her efforts to eat lunch at the restaurant in the company of six black children).
[292] *Sybalski v. Independent Group Home Living Program, Inc.,* 546 F. 3d 255, 257 (2d Cir. 2008).
[293] 398 U.S. 144 (1970).
[294] *Id*. at 152.

because of the significant encouragement by the NYPD and the EMTs to Jamaica Hospital's other staff to involuntarily commit him.  On point is *Ruhlmann v. Smith*,[295] where the plaintiff was an employee of the state and his superiors, who were also state employees, used their influence and connections with a private hospital and its private staff to involuntarily commit the plaintiff under Section 9.39 of the Mental Hygiene Law.[296]  Rejecting the state action defense, the court held:  "A reasonable jury could find that the [state agencies'] influence was felt every step of the process and their concerns and arguments were considered and acted upon by the private defendants."[297]   Summary judgment by the hospital defendants was therefore denied:  "A private party may be transformed into a state actor by virtue of willful participation in joint action with the state or its agents."[298]

Also on point is *Tewksburg v. Dowling*,[299] where a doctor for a public facility contacted a doctor at a private facility and accepted the patient as an involuntary commitment based on that contact.  Although the private doctor claimed that he made an "independent" decision, summary judgment was denied

---

[295] 234 F. Supp. 2d 140  (N.D.N.Y. 2002).
[296] *Compare Jensen v. Lane County*, 222 F. 3d 570, 575 (9th Cir. 2000) (summary judgment for doctor on state action issue reversed where state and private parties engaged in a complex and deeply intertwined process for evaluating and detaining individuals who are believe to be dangerous).
[297] *Id.* at 163.
[298] *Id.* at 167 (citing *Dennis v Sparks*, 449 U.S. 24 (1980)).
[299] 169 F. Supp. 2d 103 (E.D.N.Y. 2001).

on the state action defense because the evidence suggested that there was joint action based on the direct contact by a state actor with the private hospital and the decision to retain the patient based on that contact, even before the first psychiatric evaluation was conducted.[300]  That is precisely was happened here because the hospital EMTs made a joint decision at the apartment to deem Officer Schoolcraft an EDP and they then forced him to the hospital where he was kept against his for evaluation based on their joint decision.

All the medical defendants in this case rely extensively on this Court's decision in *Doe v. Rosenberg*.[301]  But that case is distinguishable from this one.

In *Doe*, the plaintiff met with *private* doctors and began having a paranoid psychotic episode and as a result, a *private* doctor arranged for security to escort the plaintiff to a *private* hospital where she was admitted as an involuntary patient. As noted by the Court, none of the doctors were state employees and the hospital was a private entity.  Based on these facts, the Court held that there was no state

---

[300] *Id.* at 110 ("A Stony Brook employee then telephoned Defendant Dowling who accepted Tewksbury for hospitalization at St. John's Hospital. Tewksbury was then transferred to St. John's and admitted without any further examination. Defendant Dowling did not meet Tewksbury until the following day. Defendant Aronson did not met with Tewksbury until two days later, when he authorized her continued confinement. Further, Defendant Dowling admits in his deposition that when he did perform his psychiatric evaluation on the following day, he relied on information he obtained from a social worker at Stony Brook. Therefore, like *Jensen v. Lane Co.,* 222 F. 3d 570 (9th Cir. 2000)], county employees initiated the evaluation process and there was consultation among the County health professionals and the private psychiatrists.")

[301] 996 F. Supp. 343 (S.D.N.Y. 1998), *aff'd,* 166 F. 3d 508 (2d Cir. 1999).

action because the was no state actor involved in the admission process and the mere fact that the process was regulated by the State was insufficient.[302]

While *Doe* does not apply here because of the direct involvement and encouragement of the NYPD, the EMTs, and the FDNY, the decision is relevant because of its analysis of the public function test, which the Court has already indicated ought to have application here.  In *Doe* the Court held that the care of the mentally ill was not exclusively a public function because of the historical role that private hospitals had in the care of the mentally ill.[303]  The Court also noted, however, that police protection and the protection of the public generally from the violent and dangerously insane was a state function.  That analysis applies with equal force here.

When Officer Schoolcraft was first brought to Jamaica Hospital he was handcuffed to a hospital gurney with Lieutenant Broschart's police handcuffs and detained in that fashion the entire night in the emergency room.[304]  During the course of the night, his hand became numb and his wrist turned red because the handcuffs was too tight and yet when the nurse asked the police officer to loosen the cuffs, the request was denied.[305]  Incredibly, the hospital chart reflects that

---

[302] *Id.* at 348-52.
[303] *Id.*
[304] PMX 27: Chart at JHMC 58.
[305] *Id*.

*while* a psychiatric examination was being conducted, Officer Schoolcraft stated: "My wrist is numb. I don't feel anything right now."[306]

Although Jamaica Hospital policy documents forbid the use of handcuffs and require – only when appropriate – the use of *soft* restraints,[307] these facts show that the NYPD was controlling decisions about Officer Schoolcraft, including decisions about the use of metal restraints that violated hospital policy and medical creed to cause a patient no needless harm.  Indeed, the NYPD asserted further control over Officer Schoolcraft later that morning when Sergeants Sawyer and James ordered him to get off the telephone, cuffed *both* of Officer Schoolcraft's hands to the gurney, and, squeezing the cuffs even tighter, Sawyer said "this is what happens to rats."[308]

The medical defendants also rely on *McGugan v. Aldana-Bernier,*[309] when they argue that none of them were state actors.  But that case is easily distinguishable.  *McGugan* specifically noted that there was no evidence that any state actor requested the involuntary hospitalization of the plaintiff,[310] whereas here there is evidence of a joint decision and direct influence by the NYPD, the FDNY and the EMTs to have Officer Schoolcraft hospitalized.

[306] *Id.*
[307] POX 48: Bernier Tr. 60:25-66:6, 122-27; POX 49:  JHMC Policy on Use of Restraints.
[308] Plaintiff's 56.1 ¶¶ 101-104.
[309] 752 F. 3d 224 (2d Cir. 2014).
[310] 752 F. 3d at 230.

Other factors in this case also support the conclusion that there is a jury question on the state action issue.  Thus, there is evidence, noted above, that the hospital was used as a detention facility.  Since that is traditionally a public function, as already noted by the Court, these facts create another basis for a reasonable conclusion that Jamaica Hospital became a state actor in this case.

Finally, there is another important factor showing that Jamaica Hospital assumed the role of a state actor in this case.  During her deposition, Dr. Bernier testified that she made the decision to involuntarily commit Officer Schoolcraft based on a mere possibility that he could be dangerous.[311]  She also explained that the reason she has such a low (or non-existent) threshold for dangerousness is because she sees herself as being in a role to protect the public in general by "trying to prevent a disaster."[312]  Thus, the possibility that a patient may commit mass murder as in the "Navy Yard" case or other examples of psychotic violence is a consideration used by Dr. Bernier.[313]  In other words, when making her decision, she is not simply guided by whether her patient presents as a danger to self or some other person but whether "in the future there will be no disaster"[314] because the purpose of the process is "for the benefit of the whole society as well as the

---

[311] Plaintiff's 56.1 ¶¶ 105-110.
[312] POX 48: Bernier Tr. 197:4-198:13.
[313] POX 48: Bernier Tr. 197:4-198:13 & 248:3-249:15.
[314] *Id.* at Tr. 248:18-19.

patient."[315]  Similarly, one of the hospital's Rule 30(b)(6) witnesses, Anthony

Maffia, agreed that hospital policy required the doctors to protect the

community.[316]  Since a non-specific or generalized function to protect the public

from danger is traditionally a governmental function, these facts also provide

further support for the conclusion that Jamaica Hospital was a state actor in this

case.

### 3.  *Jamaica Hospital is liable for its actual policy.*

Jamaica Hospital argues that as a matter of law it cannot have any *Monell*

liability as a private entity.  More specifically, it argues that its written policy on its

standard for admitting patients involuntarily conforms to the standard set forth in

the Mental Hygiene Law (JHMC Mem. at 16).  Jamaica Hospital also argues that

the binding admissions by Dr. Dhar, its Rule 30(b)(6) witness – who testified that

the actual policy, practice, and standards at the hospital – should be ignored

because Dr. Dhar was "only" the Assistant Chair of the Psychiatric Department

and he did not create its written policy on involuntary admissions. (JHMC Mem. at

18.)

Jamaica Hospital cannot run away from its own policy witnesses'

---

[315] *Id.* Tr. 83:20-84:10.
[316] POX 50: Maffia Tr. 101:9-15.

statements, which are binding admissions against the hospital.[317]  Dr. Dhar was the

hospital's Rule 30(b)(6) witness.[318] He started working at the hospital in 1996 and

since 2007 has held the position as the Assistant Chairman of the psychiatric

department.[319]  As Assistant Chairman, he participated in the annual review of the

Department's policies[320] but did not have a role in creating the hospital's

involuntary admission policy, which was issued in 1995, the year *before* he joined

the hospital.[321]

There is simply no basis for suggesting that Jamaica Hospital is not bound

by the statements made by its Rule 30(b)(6) witness. More important, it boarders

on being patiently meritless to suggest that a corporate entity is entitled to

summary judgment based on the conclusory assertion that its own corporate

witness lacked authority to speak on behalf of the corporation.

4. *The conspiracy claim includes Jamaica Hospital.*

As demonstrated above, they are substantial facts supporting the conspiracy

claim against all defendants, including Jamaica Hospital.  Although Jamaica

Hospital claims that it is "not entirely clear" whether the conspiracy claim is

asserted against it (JHMC Mem. at 20), the Third Amended Complaint specifically

---

[317] *Spanski Enters. v. Polska*, 2013 U.S. Dist. Lexis 2853 at * 20 (S.D.N.Y. Jan 8, 2013).
[318] POX 51: Dhar Tr. 14, 86 & 134.
[319] *Id*. at 8-9.
[320] *Id*. at 26.
[321] *Id*. at 44-45.

claims that the "defendant officers [of the NYPD] conspired with Jamaica Hospital Medical Center personnel to have him involuntarily committed."[322]  Thus, that argument must be rejected.

5. *Jamaica Hospital is liable for Dr. Bernier and Dr. Isakov's conduct.*

Jamaica Hospital indirectly argues that it is not liable for medical malpractice arising "independent from the patient's attending physicians."  (JHMC Mem. at 21.)  Without presenting any evidence of the legal relationship between Dr. Bernier or Dr. Isakov, and thereby failing (again) to satisfy its burden on a motion for summary judgment, the hospital claims that as "attending" doctors, the hospital is not liable for their malpractice.   The argument should be rejected because there is no evidence to support it; because Officer Schoolcraft did not have a direct or personal relationship with any of the doctors at the hospital; and because the hospital is liable as a matter of law where the doctors who examined him had apparent authority.

When a defendant hospital moves for summary judgment in a malpractice action, it is not enough for the hospital to produce evidence that the physician who allegedly rendered negligent care within the hospital was not its employee.  Rather,

---

[322] Third Amended Complaint ¶ 2; Dkt. # 341. *See also id.* ¶ 214 ("defendant JHMC, in furtherance of its agreement and conspiracy with NYPD officials, explicitly and/or tacitly formed an agreement to involuntarily confine plaintiff").

the hospital must also submit evidence demonstrating that the physician was not its actual or ostensible agent.[323]   Indeed, on a motion for summary judgment, the moving hospital bears the initial burden of establishing that the plaintiff sought care from a *specific* physician rather than from defendant generally.[324]   Jamaica Hospital fails to present any evidence on these issues and thus its motion should be denied on this basis alone.

Indeed, it cannot hope to show any facts in this case to support these arguments.  Officer Schoolcraft was brought to the hospital against his will and he never established his own personal relationship with any of the numerous doctors he was forced to see.  Any relationship was forced upon him because he was kept against his will.  It is particularly perverse for the hospital to argue that it is not responsible for the malpractice of the doctors who *it* forced *upon* Officer Schoolcraft.

Even where a patient *voluntarily* comes to the emergency room seeking

---

[323] *Contreras v. Adeyemi*, 102 A.D.3d 720, 722 (2d Dept. 2013); *Schacherbauer v. Univ. Assoc. in Obstetrics & Gynecology, P.C.,* 56 A.D. 3d 751 (2d Dept. 2008).
[324] *Friedland v. Vassar Bros. Med. Ctr.,* 119 A.D.3d 1183 (3d Dept. 2014) (finding defendant failed in its initial burden of establishing that plaintiff sought care from a specific physician rather than from defendant generally, record as a whole establishes that treating physicians role in plaintiff's course of treatment was limited, nothing in the record indicated that treating physician ordered or performed tests during decedent's hospitalization or otherwise assumed responsibility for his care); *St. Andrews v. Scalia,* 51 A.D. 3d 1260, 1262 (3d Dept 2008)(denying motion for summary judgment brought by the hospital with respect to the plaintiff's claim that the hospital was vicariously liable for malpractice in the emergency room).

treatment from the hospital (and not from a particular physician of the patient's choosing) there is still an apparent agency relationship."   Thus, the argument about not being responsible for "attending doctors" is meritless.

Moreover, *even if* Officer Schoolcraft had a relationship with one of the doctors and *even if* he came to the hospital of his own free will, the hospital would *still* not be entitled to summary judgment.  Notwithstanding any contractual terms of employment, if an employer retains the right to control the manner in which the work is done by the "independent contractor," who exercises more than mere supervisory powers, the independent contractor will be considered an employee and the employer will be subject to the principle of *respondeat superior,* regardless of the nomenclature used by the parties.[325]   Here, there is evidence that Dr. Dhar supervised and consulted generally about involuntary admissions and that Dr.

---

[325] *See Melbourne v. New York Life Ins., Co.,* 271 A.D.2d 296, 297, 707 N.Y.S.2d 64 (1st Dept.2000); *Mduba,* 52 A.D.2d at 452-53, 384 N.Y.S.2d 527 (holding that that since the defendant hospital maintained control over the manner in which the physician operated the emergency room, the physician was an employee of the hospital and not an independent contractor, although described as such in his contract with the hospital); *Gizzo v. Ben-Habib*, No. 13-CV-2139 KMK, 2014 WL 4387229, at *17 (S.D.N.Y. Sept. 5, 2014); *Mendez v White*, 40 A.D. 3d 1057, 1057-58 (2d Dept. 2007) (holding hospital failed, "to tender competent evidence establishing that [attending doctor] did not act as its agent, or that the Hospital exercised no control over him."); *Tesillo v Emergency Physician Assoc., Inc.,* 376 F. Supp. 2d 327, 331-32 (W.D.N.Y. 2005) (finding issues of fact existed as to extent of hospital control over physician such as fact that the physician was guaranteed a specific annual compensation, received clerical assistance from the hospital in billing patients, and charged patients at rates set by the hospital precluding summary judgment in favor of corporation on claim that it was liable as employer under *respondeat superior*).

Bernier specifically consulted Dr. Dhar on the decision to commit Officer

Schoolcraft.[326]  There is also evidence that Jamaica Hospital regularly reviews the

performance of the doctors who work in the Psychiatric Department.[327]

      6.  *Jamaica Hospital is liable for all of its staff's conduct*.

      The hospital also argues that it is not responsible for the conduct of its staff

because Officer Schoolcraft's experts did not identify any malpractice by "any

specific members of the JHMC staff."  (JHMC Mem. at 22.)  The hospital is

simply wrong, as a reading of the Expert Reports and their depositions

demonstrate.

      Dr. Lubit's Report (PMX 30) specifically identified Dr. Lwin and Dr. Patel

in his Report, stating that they both violated the hospital's written policy in

involuntary commitments.[328]  The Report also specifically references Dr. Lwin's

---

[326] POX 48: Bernier Tr. 207:7-209:11.

[327] POX 50: Maffia Tr. 31-33 & 108-110

[328] PMX 30 at p. 21 ("Dr. Isakov and Dr. Bernier, as well as Dr. Patel and Dr. Lwin violated the policies of Jamaica Hospital Department of Psychiatry. The policy says that to commit someone there must be a substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself; or a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm. Mr. Schoolcraft did not engage in any acts of self harm and he did not manifest or engage in any homicidal or other violent behavior which placed others in reasonable fear of serious bodily harm. Also deeply concerning, Dr. Dhar, vice chairman of the department of psychiatry, equated substantial risk of harm with any risk of harm. Plaintiff was handcuffed to a gurney for more than nine hours, during which time he was denied the free use of phone, or reasonable access to water, food or bathroom facilities. Plaintiff repeatedly requested an opportunity to speak with internal affairs, *and to have photographs taken of his multiple bruises*, but these requests were

Consultation Report,[329] which was handwritten by Dr. Lwin and approved by Dr.

Patel.[330]  The fact that the Report does not repeatedly refer to the specific author of

the consolation report is semantics, not substance.  Finally, Dr. Lubit confirmed his

opinion about Dr. Lwin and Dr. Patel in his deposition. (JHMC Mem. at 23.)

Similarly, Dr. Halpren-Ruder's Report specifically mentioned the Jamaica

EMTs' conduct in the apartment (Part One) and the Jamaica Hospital emergency

room doctor's conduct in the emergency room (Part Two).[331]  The fact that Dr.

Halpren-Ruder does not refer to the EMTs or the ER attending by proper name is

also semantics.

That a state statute provides EMTs with a limited and qualified immunity

from suit is also irrelevant to this case.  The EMTs are not named defendants and

under well-establish rules governing vicarious liability, an employer is liable for

the negligence of its employees.  Importantly, Jamaica Hospital cites no authority

for the proposition that the limited qualified immunity provide to EMTs is a

defense that *it* has in this case.

7.  *"Substantially below" standards is not the test for medical malpractice.*

Jamaica Hospital argues that its expert's Report provides evidence that it did

---

steadfastly ignored by doctors and hospital staff.")
[329] PMX 27:  Hospital Chart at JHMC 67-69.
[330] *See, e.g., id.* at 13 ("report that Schoolcraft barricaded himself) & 15 ("?paranoid ideation").
[331] PMX 36:  Report at p. 1 & p. 2-3.

not depart from accepted practices in its care of Officer Schoolcraft.  (JHMC Mem. at p. 24.)  But the fact that it offers a competing expert opinion does not entitled it to summary judgment; at best, that opinion raises a question of fact that must be resolved by a jury.[332]

8. *Jamaica Hospital's conduct did fall substantially below established standards.*

The hospital again argues semantics when it claims that it is entitled to summary judgment because the experts did not use the words "substantial" in describing their departure from the standard of care. (JHMC Mem. at 26.)  Again, the argument should be rejected.

It is well settled under New York law that "[t]he requisite elements of proof in a medical malpractice case are (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage."[333]   New York law does not require that an expert use any particular phrases or magic words contained within an expert opinion. The courts have made clear their intention to focus on the probative force of opinion evidence, rather than a particular combination of words and phrases used to express the opinion. This

---

[332] *Rodriguez v. City of New York*, 72 F. 3d 1051, 1063-64 (2d Cir. 1995) (summary judgment for defendant reversed there was a factual dispute over the scope and degree of departure from the applicable standard of care).
[333] *Berk v. St. Vincent's Hosp. and Med. Ctr.,* 380 F. Supp. 2d 334 (S.D.N.Y. 2005).

guards against the defeat of expert opinion "by semantics if it is reasonably apparent that the [expert] intends to signify a probability supported by some rational basis."[334]

The Court should not, therefore, reject opinion evidence merely because a non-lawyer witness did not use the words and phrases used by lawyers and judges. Instead, the Court should determine whether the whole record shows evidence that there was a departure from the requisite standard of care.[335]

JHMC relies on *Bender v. Lowe*,[336] to support its argument that Dr. Lubit's opinion is insufficient to defeat its summary judgment motion.  *Bender* does not support that conclusion for several reasons.

First, *Bender* is addressing a due process claim when using the language "substantially below medical standards," not a medical malpractice claim.  Second, *Bender* is distinguishable because the court found the expert report was properly excluded from consideration because the *pro se* plaintiff failed to comply with her

---

[334] *Miller v. Natl. Cabinet Co.,* 8 N.Y. 2d 277, 283 (1960); *see also Matott v. Ward,* 48 N.Y. 2d 455, 460 (1979); *Knutson v. Sand,* 725 N.Y.S.2d 350, 354–55 (2d Dep't 2001).

[335] *Ernest v Boggs Lake Estates, Inc.,* 12 N.Y.2d 414, 416 (1963); *Zeak v United States,* 2014 WL 5324319, at *9 (S.D.N.Y. Oct. 20, 2014) (finding plaintiff's expert was not required to use specific terms of art in his expert report or deposition testimony, only that, taken as a whole, the record contains evidence that there was a departure from the relevant standard of care); *Koller v Manhattan Eye, Ear & Throat Hosp.,* 168 AD2d 671 (2d Dept 1990) (finding the medical testimony "with a reasonable degree of medical certainty" and "under the prevailing standards and practices existing at the time for this operation" satisfied the first statutory element it was not necessary that the plaintiff's expert specifically enunciate the code words "reasonable medical practitioner" within the meaning of Public Health Law § 2805-d (1)).

[336] 2011 U.S. Dist. Lexis 99053 (S.D.N.Y. Aug. 31, 2011).

obligations.  Third, the report mainly addressed irrelevant matters and was

otherwise insufficient because it did not address (or even mention) the language or

requirements of Section 9.39 of the Mental Hygiene Law.[337]  Indeed, the report

"lack[ed] any discussion of the basic treatment procedures for psychiatric patients

in determining whether a patient presents a danger to herself or others for the

purpose of assessing whether an emergency involuntary commitment was

warranted."[338]

Here, Dr. Lubit's Report sets forth the governing standards, sets forth

established procedures for examining patients, and explains in detail the reason

why the examinations of Officer Schoolcraft grossly departed from the standard of

care.[339]

9. *EMTALA is not a defense, substantively or procedurally.*

As a last ditch effort, Jamaica Hospital claims that a federal statute, the

Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd,

constitutes the privilege that is required in order to defeat the false imprisonment

claim. (JHMC Mem. at 39.)  Procedurally the issue was waived long ago and

substantively the argument is meritless.

---

[337] *Id.* at *25.
[338] *Id.*
[339] PMX 30: Report at 10-21.

To the extent that EMTALA is somehow a "privilege" to hold a person against their will, it is in the nature of an avoidance or affirmative defense within the meaning of Rule 8 of the Federal Rules of Civil Procedure.  As such, the "privilege" should have been raised as an affirmative defense in its Answer, but was not and thus was waived.  In this regard, the Court should note that Jamaica Hospital did raise Section 9.39 as a privilege and as an affirmative defense in its Answer but did not raise EMTALA as a defense in its Answer.[340]

Substantively, EMTALA is simply not a defense because this federal statute was designed to impose a burden on hospitals to treat patients with emergency medical conditions by requiring hospitals to provide all patients with a basic evaluation to determine whether the patient has a serious or life threatening condition.[341]  Section 1395dd(b)(1) of the statute states that this stabilization requirement exists if "any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition."[342]  In

---

[340] Dkt. # 106:  JHMC Answer at pp. 13-15.

[341] *Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789, 795 (2d Cir.1999) ("The core purpose of EMTALA ... is to prevent hospitals from failing to examine and stabilize uninsured patients who seek emergency treatment."); *Reynolds v. Maine General Health,* 218 F.3d 78, 83 (1st Cir 2000]) (A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting *symptomatic* patients and provides that level of screening uniformly to all those who present substantially similar complaints).

[342] *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 883 (4th Cir 1992); *See also Gatewood,* 933 F.2d at 1041 (stabilization and transfer provisions "are triggered only after a hospital determines that an individual has an emergency medical condition"); *Cleland,* 917 F.2d at 271 ("[i]f the

addition, Section 1395dd(a) provides that "if any individual ... comes to the

emergency department ... the hospital must provide for an appropriate medical

screening examination within the capability of the hospital's emergency

department." Thus, the hospital's duty to provide an appropriate medical screening

arises only if the patient seeks treatment from the emergency department.[343]

The statute on its face does not apply to this case because Officer

Schoolcraft was forced to the hospital against his will, despite his repeated requests

to be released.  The statute provides:

> A hospital is deemed to meet the requirement of paragraph (1)(A) with
> respect to an individual if the hospital offers the individual the further
> medical examination and treatment described in that paragraph and informs
> the individual (or a person acting on the individual's behalf) of the risks and
> benefits to the individual of such examination and treatment, but the
> individual (or a person acting on the individual's behalf) refuses to consent
> to the examination and treatment. The hospital shall take all reasonable steps
> to secure the individual's (or person's) written informed consent to refuse
> such examination and treatment.[344]

Thus, under the express statutory scheme, a patient retains the well-

established right to refuse medical treatment and nothing in the statute, logic or

common sense suggests that a statutory provision designed to protect patients can

be used as a legal basis for keeping a person in a hospital against the patient's will.

---

emergency nature of the condition is not detected, the hospital cannot be charged with failure to
stabilize a known emergency condition").
[343] *Baber v. Hosp. Corp. of Am.,* 977 F. 2d 872, 884 (4th Cir 1992).
[344] 42 U.S.C. § 1395dd(b)(2).

Indeed, the statutory scheme expressly provides that it does not preempt state law, *except* to the extent that state law directly conflicts with the federal statute.[345]

It is firmly established under New York law that competent adult has the right to refuse medical treatment.[346]   Thus, there is no basis to argue that EMTALA overrides or preempts state law.  A state statute "directly conflicts" with federal law only when: (1) compliance with both federal and state regulations is a "physical impossibility," or (2) the state law "stands as an obstacle" to the "execution of the full purposes and objectives of Congress."[347]

10.   *The claim for negligent hiring, training or supervision does not fail because there is evidence that the employees had a propensity to improperly commit patients.*

Jamaica Hospital argues that the negligence claim against it fails because of a lack of evidence that its employees or agents had a propensity to improperly commit patients. (JHMC Mem. at 41.)  Yet this argument is easily disposed of.

As demonstrated above, in the recent motion to amend, and in Officer Schoolcraft's motion for summary judgment against the hospital for negligence *per se*, Dr. Bernier, Dr. Isakov, and Dr. Dhar all testified that the practice at Jamaica Hospital was to involuntarily commit a patient based on any possible or potential

---

[345] 42 U.S.C. § 1395dd(f).
[346] *Rivers v. Katz*, 67 N.Y. 2d 485, 492 (1980).
[347] *Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789, 795 (2d Cir 1999).

risk, not the substantial risk required by law and the applicable standard of care. Thus, Jamaica Hospital is not entitled to summary judgment on the issue; instead, summary judgment should be entered against it.

11. *The intentional infliction of emotional distress claim fails because the alleged conduct was not sufficiently outrageous.*

Jamaica Hospital argues that the intentional infliction claim is insufficient as a matter of law because its conduct is not "sufficiently outrageous" to state a claim or is "duplicative of other claims. (JHMC Mem. at 45-46.)  For the reasons already stated above, the Court should reject those arguments.

## BERNIER AND ISAKOV'S MOTION

1. *The Section 1983 claims fail because they are not state actors.*

Both Drs. Bernier and Isakov argue that they are not state actors and that the Section 1983 claims against them should be dismissed.  (Bernier Mem. at 6; Isakov Mem. at 7.)  For the reasons already set forth above, these arguments should be rejected.

There are, however, certain points raised by Dr. Bernier and Dr. Isakov that require this more specific response on the issue of whether they were willful participants in joint activity with state actors.[348]

---

[348] *Addickes*, *supra,* 398 U. S. 144, 152 (1970)(to act under color of law does not require that the accused be an officer of the state; it is enough that he is a willful participant in joint activity with

Dr. Bernier repeatedly argues that she was not influenced "directly" by anything that the NYPD said or did, claiming that she never spoke to anyone from the NYPD about Officer Schoolcraft.  (Bernier Mem. at 19.)   Yet in her deposition, Dr. Bernier admitted that she read the notes in the file about what the NYPD said before making her decision;[349] that she read and considered the information about what Sergeant James said happened before making her decision;[350] that at the time of her evaluation of Officer Schoolcraft, she knew that his Sergeant reported to the hospital that Officer Schoolcraft was paranoid and a danger to himself, and that this information was part of the information that she relied on.[351]  Dr. Bernier also testified that she also relied on the documentation provided by the EMTs.[352]

Dr. Bernier's after-the-fact claims that she was entitled under good and accepted practices to blindly accept the uncorroborated statements by Sergeant James in the file about Officer Schoolcraft raise questions of fact about her credibility and medical practices.  In her deposition, Dr. Bernier admitted that IAB had come to the hospital the day before she signed the form involuntarily

---

the state's agents).
[349] POX 48: Bernier Tr. 88:11-13.
[350] *Id.* at 170:10-171:12.
[351] *Id.* at 142:6.
[352] *Id.* at 291:8-21.

hospitalizing Officer Schoolcraft.[353]  Yet when asked whether she would have spoken to IAB to determine whether there was any corroboration of Officer Schoolcraft's claims that he had been reporting misconduct, Dr. Bernier testified that she *was not sure* if IAB was reliable ("is internal affairs reliable?") and *was not sure* she could trust what IAB had to say ("that's a big question") and that she would have to "assess them too."[354] On the other hand, Dr. Bernier claimed that it was entirely permissible under the standard of care for her to blindly accept what Sergeant James had to say about Officer Schoolcraft merely because that information was already written in the chart.[355]

This nonsensical, after-the-fact claim is made all the more staggering in the light of what Sergeant James actually said at her deposition, which was that she did *not* know anything about Officer Schoolcraft or what happened to him, and that she made *none* of the statements that Dr. Bernier testified was the basis for her commitment decision.[356]  Indeed, in the light of this testimony, the information in the hospital chart about what Sergeant James allegedly said cannot be offered into evidence by the medical defendants for the truth of those statements because the

---

[353] *Id.* at 276:13-291:25.
[354] *Id.*
[355] *Id.*
[356] POX 52: James Tr. 129:5-133:18.

information is hearsay.[357]   More important, based on this record and the

conflicting testimony, there are several issues of material fact about the NYPD's

role in the commitment decision, issues that must be resolved by a jury based on

admissible evidence.

Dr. Isakov repeats the same arguments about state action made by Jamaica

Hospital and Dr. Bernier.  Accordingly, we confine ourselves here to other issues

and facts necessary to a determination of Dr. Isakov's arguments about state action

and his role in the ongoing detainment of Officer Schoolcraft.

Dr. Isakov testified that when Officer Schoolcraft came to him he *was not

sure* whether Officer Schoolcraft was paranoid and admitted that he needed further

information.[358]   Nevertheless, Dr. Isakov re-confirmed Dr. Bernier's decision by

co-signing the Section 9.39 form, as required by the Mental Hygiene Law.[359]  And

he did so even though he also certified on that same document that Officer

Schoolcraft was *not* showing a tendency to cause serious harm to himself or

others.[360]  Thus, Dr. Isakov has admitted that he authorized Officer Schoolcraft's

detention, even though he was *not* dangerous and even though he only had a

---

[357] *See Romano v. Howarth*, 998 F. 2d 101, 107-08 (2d Cir. 1993) (nurses' notes of what correction officer told her may not be admissible at trial because of questions about the motives of the correction officer and hearsay issues contained within the notes).
[358] POX 53: Isakov Tr. 146:12-164:2  & 169:8-170:5.
[359] POX 53: Isakov Tr. 164:16-165:11.
[360] POX 53: Isakov Tr. 171:4-17; POX 54: Form 9.39 (Plaintiff's Deposition Exhibit 171).

*questionable* diagnosis of a mental illness.

Indeed, Dr. Isakov was asked in the hospital the next day by Officer

Schoolcraft and his father *why* he was being held against his will, and Dr. Isakov

told them that Officer Schoolcraft was being held because they were waiting to

hear back from the NYPD to get approval for his release,[361] thereby confirming his

role as a state actor.[362]  Thus, the evidence in the record shows that the NYPD was

involved with Jamaica Hospital personnel *throughout* the entire hospitalization

process, beginning with the joint EDP decision at the apartment, to the initial

determinations at the hospital, and ending with the need to obtain clearance from

the NYPD for his release.  These facts, quite plainly raise questions of fact on the

state action, collaboration and conspiracy claims.[363]

*2.  The intentional infliction of emotional distress claim fails because the conduct is not sufficiently outrageous.*

Drs. Bernier and Isakov also argues that the intentional infliction claim is

insufficient as a matter of law because their conduct is not "sufficiently

---

[361] POX 13: Schoolcraft Tr. I 189:8:21-191:22, 436:10-15, & 443:13-444:2; POX 55: Larry Schoolcraft Tr. 249:20-250:3.

[362] *See Kia P. v. McIntye*, 235 F. 3d 749 (2d Cir. 2000) (hospital decision to hold child after medical reasons no longer applies due to its obligation to state authorities about possible child abuse transformed private conduct into state action because the hold was conducted on behalf of the state authority).

[363] *Ruhlmann v. Ulster County Dept. of Social Services*, 234 F. Supp. 2d 140, 163-167 (W.D.N.Y. 2002) (summary judgment denied because a jury could find that the state officials influenced the hospitalization process and because there was evidence of joint action and because the actions of the defendants, as a whole and individually raised factual questions as to whether the private defendants conspired with the state employees in violation of Section 1983).

outrageous" to state a claim or is "duplicative of other claims. (Bernier Mem. at 21; Isakov Mem at 18.) For the reasons already stated above, the Court should reject those arguments.

   3.  *The remaining claims should be remanded to state court.*

   Drs. Bernier and Isakov argue that the remaining claims should be remanded to state court. (Bernier Mem. at 22; Isakov Mem. at 18). The Court should reject this argument because there is no question that the trial scheduled for April 6, 2015 will go forward and it makes no sense to have two separate trials in this case.

   The City Defendants have only moved for *partial* summary judgment. Accordingly, there is no question but that there are issues of fact that will be going to trial. Under these circumstances, it would be a waste of time and recourses for the Court to remand to state court a part of this case for a second trial.

   Indeed, several years ago, in 2011, the Court dismissed the now-reinstated federal claims against Jamaica Hospital but nevertheless denied Jamaica Hospital's request to remand the state law claims to state court because the federal claims and the state claims arise from a common nucleus of overlapping facts and because considerations of judicial economy warranted exercising supplemental jurisdiction over the state claims.[364] Those considerations apply with even great force at this

---

[364] *Schoolcraft v. City of New York*, 2011 U.S.Dist. Lexis 48996 at * 14-15 (S.D.N.Y. May 6,

point in the action, now that discovery has been completed and the parties are preparing for a trial to commence in two months.

4. *The declaratory judgment claim*.

Drs. Bernier and Isakov argue that the declaratory judgment claims should be dismissed against them on the ground that the Court did not authorize these claims. They are wrong. In our motion to amend the Second Amended Complaint, we specifically marked all the proposed changes, including the declaratory judgment sections, to show changes in the proposed amended complaint.[365] Neither Dr. Bernier nor Dr. Isakov filed any opposition to the motion, and on January 16, 2015, the Court issued its ruling on the motion to amend, specifically authorizing the filing of the proposed amendment with all the proposed changes, other than the addition of two proposed defendants, Weiss and Mascol.[366]

Since the amendments were authorized and since neither Dr. Bernier nor Dr. Isakov raised any issue or objection to the proposed amendments, there arguments should be rejected.

---

2011).
[365] Dkt. 291.3; Exhibit 3 to Memorandum of Law, dated 12-4-14.
[366] Opinion at p. 17; Dkt. # 340.

**CONCLUSION**

For all these reasons, the defendants' motions for summary judgment should

be denied.

Dated:  February 11, 2015

*s/NBS*

_____

Nathaniel B. Smith

*s/JL*

_____

John Lenoir
