UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                          Plaintiff,                    10-cv-6005 (RWS)


           -against-


THE CITY OF NEW YORK, et al,

                          Defendants.
----------------------------------------------------------X


## PLAINTIFF'S RULE 56.1 RESPONSIVE STATEMENT


LAW OFFICE OF
NATHANIEL B. SMITH
111 Broadway – Suite 1305
New York, New York 10006
(212) 227-7062 (tel)
(212)-346-4665 (fax)
natbsmith@gmail.com
*Attorney for Plaintiff*

*Of Counsel,*
*John Lenoir*


Dated: February 11, 2015

# Table of Contents

The City Defendants' Rule 56.1 Statement ................................................................. 3

Defendant Mauriello's Statement of Material Facts ................................................ 24

Jamaica Hospital Medical Center Statement of Material Facts ............................. 72

Bernier Statement of Material Facts ......................................................................... 90

Isakov Statement of Material Facts .......................................................................... 90

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X        10 Civ. 6005 (RWS)

ADRIAN SCHOOLCRAFT,

                                        Plaintiff,                    **PLAINTIFF'S RULE
                                                                      56.1 RESPONSIVE
                                                                      STATEMENT**

                  -against-

THE CITY OF NEW YORK, et al.

                                        Defendants.
-------------------------------------------------------------X

        Pursuant to Rule 56.1 of the Court's Civil Rules, Plaintiff submits this Response to the Rule

56.1 Statements submitted by the Defendants in support of their motions for summary judgment.

Plaintiff objects to Defendants' Statement of Material Facts pursuant to Local Rule 56.1 to the

extent that they incorporate improper legal characterizations and conclusions, neither of which

belongs in a 56.1 Statement. "[L]egal arguments . . . belong in briefs, not Rule 56.1 statements, and

so are disregarded in determining whether there are genuine issues of material fact." *Alliance Sec.*

*Prods., Inc. v. Fleming Co*., 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007).

**THE CITY DEFENDANTS' RULE 56.1 STATEMENT**

        *PLAINTIFF'S BACKGROUND AT THE NYPD*

        1.      Plaintiff, Adrian Schoolcraft joined the New York City Police Department

(hereinafter "NYPD") in 2002. (Plaintiff's Second Amended Complaint, annexed as Exhibit A to

the December 22, 2014 Declaration of Suzanna P. Mettham (hereinafter "Mettham Decl.") at

¶30).  Response:  Admitted.

2.     Shortly after becoming a Police Officer Plaintiff was assigned to work at the 81st Police Precinct. (Exhibit A at ¶ 31).  Response:  Admitted.

3.     No NYPD Police Officer in the 81st Precinct lost overtime for not meeting an alleged quota. (Deposition of Adrian Schoolcraft dated October 11, 2012, annexed as Exhibit B to Mettham Decl. at 61:10-12).  Response:  Denied.  *See* POX 44. At the September 20, 2007 CompStat session and NYPD Headquarters, when then Captain Mauriello was questioned about examples of how he dealt with low activity by officers, he reported that he denied a sergeant overtime for at least a month as a result of his not living up to the activity standards Mauriello had set for the unit.[1]

4.     No NYPD Police Officer in the 81st Precinct lost the ability to request overtime for not meeting an alleged quota. (Exhibit B at 62:4-63:10).  Response: Denied. *See* response to ¶ 3 above.

5.     No NYPD Police Officer had to issue certain number of summonses to return to their chosen tour in the 81st Precinct. (Exhibit B at 64:17-65:5).  Response:  Denied.  See *Floyd v City of New York*, 959 F. Supp. 540, 595-602 (S.D.N.Y. 2013) (findings of fact after trial); POX 58: Roll Call Transcripts (Plaintiff's Deposition Exhibit 50).

6.     No NYPD Police Officer in the 81st Precinct was denied a day off for failing to meet an alleged quota policy. (Exhibit B at 66:2-5).  *Response:* Denied.  See response to

---

[1] Deputy Commissioner for Operations Pulaski: Thirty-one officers and 4 sergeants produce 31 C's
Mauriello: That's horrible!
Commissioner: What are you doing about it – and how are you following up?
Mauriello: I talk to all the bosses before they turn out and tell 'em I want quality, not quantity. I micro manage and talk to each boss during the tour.  At the end of the tour I review the activity and ask how can there be an arrest without a 250.  I tell the bosses that can't be—go back and talk to the cops to do it right.
Commissioner: Give me an example of how you have followed up on a performance problem.
Mauriello: For example we had a module that goes out and produces minimal 250's and no C's, I talked to the boss, Chief Marino and the CO—that supervisor does not get Impact overtime for at least a month because they did not live up to the standards I set for him.

¶¶ 3-6 above.

7.    Plaintiff does not know the specific number of summonses that officers at the 81st Precinct were required to issue pursuant to an alleged quota policy. (Exhibit B at 49:11-22). Response:  Agreed that Plaintiff was never provided with a specific number by defendants; however, the understanding among police officers from statements by supervisors at 81st Precinct Roll Calls that officers were expected to produce "a book."  POX 13:  Schoolcraft Tr. 38:14-21.

8.    Plaintiff is not aware of single incident where a supervisor ordered him to issue a specific number of summonses. (Exhibit B at 50:14-51:7).  Response: Denied.  The record does not support the assertion.

9.    In 2008, while Plaintiff was assigned to the 81st Precinct, he received a performance evaluation that he did not accept. (Exhibit B at 42:23-43:2)  Response: Agreed.

10.    In early 2009, Plaintiff appealed his 2008 performance evaluation. (Exhibit B at 97:4-6).  Response: Agreed.

11.    Plaintiff believes that he was isolated from his fellow officers in the 81st Precinct. (Exhibit B at 99:10-100:25).  Response:  Agreed.

12.    Plaintiff believes that he was the victim of a conspiracy to falsely portray him as psychologically unbalanced. Schoolcraft (Exhibit B at 101:01-102:12).  *Response:* Agreed

13.    Plaintiff visited his personal physician, Dr. Hertzel K. Sure, M.D., on April 6, 2009. (Relevant Portions of Dr. Sure Medical Records, annexed as Exhibit C to the Mettham Decl.).  Response: Agreed.

14.    Dr. Sure prescribed Plaintiff Seroquel, an anti-psychotic medication (Timeline of Plaintiff's Contacts with the Psychological Evaluation Section, annexed as Exhibit D to the Mettham Decl.; Relevant Portions of Deposition of Dr. Lamstein-Reiss dated January 30, 2014, annexed as Exhibit E to the Mettham Decl. at 113:5-14, 149:21-23).  Response:  The record does not

support the assertion and the cited witness lacks a foundation.  The medication provided to Officer

Schoolcraft, Seroquel, is commonly prescribed for sleep disorders and stress related anxiety.  POX

1: Lamstein Tr. 214-220.   There was no diagnosis that Officer Schoolcraft had a psychotic

condition, and there is no relevance to what medication was prescribed to Officer Schoolcraft by his

personal physician.  Plaintiff's 56.1 ¶ 33.

   15. On April 6, 2009, Dr. Sure wrote a letter to the NYPD excusing Plaintiff from

work for eight days. (Exhibit C).  Response:  Agreed

   16. Following Plaintiff's visit with Dr. Sure, Plaintiff was referred to the New York

City Police Department's Psychological Evaluation Section. (Exhibit E at 84:10-95:16).  Response:

This misrepresents the chain of events. NYPD requires that when a police officer is excused from

duty by a private physician for a certain period, the officer must be seen by an NYPD doctor before

returning to work.  (NYPD Patrol Guide 205-01, Reporting Sick.) Plaintiff was seen by an NYPD

physician who referred Officer Schoolcraft for psychological evaluation. (Consultation Referral by

NYPD Medical Division.)  Officer Schoolcraft was also referred to Early Intervention by his

supervisors. Plaintiff's 56.1 Statement ¶¶ 28-31.

   17. Plaintiff was referred to Dr. Catherine Lamstein-Reiss, an NYPD psychologist.

(Exhibit E at 84:10-95:16).  Response:  Denied.  *See* No. 16 above.

   18. On April 13, 2009, Plaintiff consulted with Dr. Catherine Lamstein-Reiss.

(Exhibit B at 105:7-15; Exhibit D).  Response:  Agreed, except state that he was sent to her by the

job and did not "consult" in that sense of the term.

   19. Dr. Catherine Lamstein-Reiss placed Plaintiff on restricted duty due to his

anxiety. (Exhibit B at 106:7-16; Exhibit D; Exhibit E at 203:5-13).  *Response:* Denied.  Plaintiff's

56.1 ¶32-33.

   20. Following the consultation with Dr. Lamstein-Reiss, Plaintiff's gun and shield

were removed from him on April 13, 2009. (Exhibit B at 106:7-16; Exhibit D; Exhibit E at 203:5-13).  Response: Agreed.

21.   None of the defendants consulted with Dr. Lamstein-Reiss prior to Plaintiff's gun and shield being removed. (Exhibit B at 108:9-14).  *Response:* Denied.  See No. 16 above. Unknown to Plaintiff what communication, directly or indirectly, occurred between defendants and the NYPD psychologist, or between defendants and the NYPD physician who referred Officer Schoolcraft to NYPD Psychological Services.

22.   Plaintiff remained on restricted duty up to and including October 31, 2009. (Exhibit D).  Response: Agreed.

23.   On October 31, 2009 Plaintiff abruptly left work, reporting that he was sick. (Relevant Portions of Deposition of Captain Theodore Lauterborn dated November 7, 2013, annexed as Exhibit F to the Mettham Decl. at 281:22-25).  *Response:* Denied.  Plaintiff's 56.1 ¶¶ 50-61.

24.   Plaintiff left work without permission. (Exhibit F at 235:23-236:4). Response: Denied. Plaintiff's 56.1 ¶¶ 50-61.  A desk officer cannot refuse an officer's request to go sick; the desk officer has the discretion to designate the time off as Regular Sick or Administrative Sick. [2]  Officer Schoolcraft submitted to Sergeant Huffman a sick report, which could have been a basis for authorizing him to take "administrative sick" for the day. At the time, Sergeant Huffman told Officer Schoolcraft that that was "okay."[3] As Officer Schoolcraft was leaving the precinct, however, Sergeant Huffman told Officer Schoolcraft that he could take "lost

---

[2] PMX 13:  Huffman Tr. 68:6-17 (PMX 20:  Valenti Tr. 14:20-16:13 (You can't deny someone to go sick. The desk officer has the ability to decide whether or not you would be granted administrative sick or regular sick. Administrative sick is a one-day sick event, and you're not required to see a doctor, you don't have to provide any records. And regular sick you're required to see our police department surgeon. The desk officer has the ability to make a determination which one of those you would be granted. )

[3] PMX 13:  Huffman Tr. 74:11-19.

time"[4] and Officer Schoolcraft told her that that would be fine, although he would have preferred

sick time.[5]

      25.    Plaintiff left work without following the NYPD's proper procedure. (Exhibit F at

235:23-236:4).  Response:  Denied, see response to ¶ 24 above.

      26.    Following Plaintiff's abrupt departure, Captain Lauterborn contacted the NYPD

sick desk supervisor. (Exhibit D; Exhibit E at 317:17-24).  Response:  Denied as to "abrupt" and

agreed as to contact.

      27.    The NYPD sick desk supervisor informed Dr. Lamstein-Reiss to contact

Captain Lauterborn because Dr. Lamstein-Reiss was the psychologist on duty on October 31,

2009. *(Exhibit D; Exhibit E 317:17-24).  Response:* Denied.  The cited record does not support the

assertion and contains hearsay.

      28.    Captain Lauterborn reached out to the NYPD sick desk supervisor because he was

concerned about Plaintiff's wellbeing. *(Exhibit E 319:8-321:3).  Response:*  Denied. Captain

Lauterborn contacted psychological services because he needed a legal pretext to enter Officer

Schoolcraft's apartment without a warrant and force him back to the command in retaliation.

Plaintiff's Rule 56.1 ¶¶ 10-95.

      29.    Dr. Lamstein-Reiss told Captain Lauterborn that she had

evaluated Plaintiff's mental health prior to October 31, 2009. (Exhibit E at 318:25-319:3).

Response: Dr. Lamstein informed Captain Lauterborn that she had seen Officer Schoolcraft very

recently and that he did not appear to at risk of danger to himself or others.  Plaintiff's 56.1 ¶¶68-69.

      30.    Dr. Lamstein-Reiss told Captain Lauterborn that he "absolutely needed" to

find Plaintiff and "make sure that he was ok". (Exhibit E at 319:8-321:3).  Response: Denied. In

her deposition, Lamstein did *not* state that she told Lauterborn that he had to find Officer

---

[4] PMX 13:  Huffman Tr. 80:12-20.
[5] PMX 4:  Schoolcraft Tr. 123:23-124:14

Schoolcraft and the allegation is a blatant fabrication by the City Defendants to manufacture the appearance of an emergency where none existed.   (*See* Plaintiff's Memorandum in Response to Defendant's Motions for Summary Judgment at pp_2-9.)

31.   On October 31, 2009, Lieutenant Christopher Broschart, Captain Theodore Lauterborn, a patrol sergeant, and police officer from the 104th Police Precinct went to 82-60 80th Place, Glendale, New York, Plaintiff's home, out of concern for his safety. (Exhibit B at 132:24-133:25; Exhibit F at 340: 9-20; Relevant Portions of Deposition of Deputy Chief Michael  Marino dated  October 8, 2013 at 228:20-231:12 annexed  to  the  Mettham  Decl.  as Exhibit G). *Response:* Denied. These supervisors were sent by Defendant Mauriello to find Officer Schoolcraft and bring him back to the 81st Precinct for a hearing to suspend him for leaving on sick leave without permission in retaliation for reporting misconduct.  Plaintiff's 56.1 ¶¶10-95.

32.   When Lieutenant Broschart and Captain Lauterborn arrived at Plaintiff's home, they knocked on the door from the early afternoon until it was dark out. *(Exhibit B at 132:24-133:25, 137:15-24; Exhibit F 290:10-291:5, 298:10-17).  Response:* This statement mischaracterizes the effort to locate Officer Schoolcraft by suggesting that there was constant knocking on Officer Schoolcraft's apartment door, a claim that it not supported by the cited record.

33.    Plaintiff did not answer the door. (Exhibit B at 132:24-133:25, 137:15-24). Response: Agreed.

34.   On October 31, 2009, Dr. Lamstein-Reiss attempted to contact Plaintiff by calling him on his cell phone. (Exhibit B at 135:14-25, Exhibit D; Exhibit E 325:8-331:15).  Response: Agreed.

35.   Plaintiff did  not  answer Dr. Lamstein-Reiss's phone call. (Exhibit B at 135:14-25, Exhibit D, Exhibit E 325:8-331:15).   Response: Agreed

36.   Plaintiff's landlord initially heard Plaintiff moving around inside of his upstairs

apartment, but then heard no movement. (Exhibit G at 248:3-24).  Response:  Denied.  The record does not support the assertion and is based on hearsay. The statement also mischaracterizes the facts.

37.    Lieutenant Broschart remained outside of Plaintiff's apartment for approximately four hours, and never saw or heard Plaintiff. (Relevant Portions of Deposition of Lieutenant Christopher Broschart dated June 18, 2014 at 104:4-20, annexed as Exhibit H to the Mettham Decl.). Response:  Agreed

38.    Chief Marino believed that Plaintiff was still in his apartment. (Exhibit G at 248:3-24, 259:12-17).  Response:  Defendant Marino and the other NYPD entry team officers illegally entered Officer Schoolcraft's apartment to return him to the 81st Precinct on the apparent assumption that Officer Schoolcraft was home.   Plaintiff's Rule 56.1 ¶¶10-95.

39.    Defendants Broschart, Lauterborn, and Mauriello were aware on October 31, 2009 that Plaintiff's gun and shield had previously been removed from him. (Exhibit H at 106:5-9; Relevant Portions of Deposition of Deputy Inspector Steven Mauriello dated December 20, 2013, annexed as Exhibit I to the Mettham Decl. at 334:6-21).  Response: Agreed. Plaintiff contends, as noted above,  that Defendant Mauriello initiated the series of disciplinary actions and medical and employee assistance program referrals that were designed to have Officer Schoolcraft "psyched."

40.    Captain Lauterborn obtained a key to Plaintiff's apartment from his landlord. (Exhibit F at 299:20-300:3).  *Response:* Agreed.

41.    The NYPD Emergency Services Unit used a key to enter Plaintiff's apartment on October 31, 2009. (Exhibit F at 307:12-21).  *Response:*  Agreed.

42.    The Emergency Services  Unit was  concerned for Plaintiff's safety. (Exhibit B at 137:10-17, Exhibit F 340:9-20; Exhibit G at 228:20-231:12).  Response:  Denied.  The record does not support the assertion of what ESU believed and is based on hearsay. In addition, the ESU officers entered Officer Schoolcraft's apartment as directed by Defendants Marino and Mauriello

with helmets, guns and shields.  Among the first words spoken to Officer Schoolcraft was a shout from one of the ESU officers: "Let me see your hands!"  The entry is more consistent with an entry to control and arrest Officer Schoolcraft than with a concern for his safety. Plaintiff's 56.1 ¶¶ 75-76 & 82-84.

43.    At 9:06 p.m., Emergency Medical Technicians arrived at Plaintiff's apartment. (Relevant Portions of Deposition of Sal Sangeniti, dated May 15, 2014, annexed as Exhibit J to Mettham Decl. at 45:24-46:8).  Response:  Denied. POX 28:  Plaintiff's Deposition Exhibit 66 at NYC 3552 ("50E3" refers to the Jamaica ambulance). POX 29: Hanlon Tr. 180:10-19 (code C513 refers to Hanlon and 50E3 refers to the Jamaica EMTs).

44.    Once inside of Plaintiff's apartment, Emergency Medical Technicians were informed by Plaintiff that he was suffering from abdominal pain, nausea, dizziness, and chest pains. (Patient Care Report, annexed to the Mettham Decl. as Exhibit K).  Response: Denied. The cited record does not support the assertion.  The complete conversation between Officer Schoolcraft and the EMT in his apartment was recorded. (PMX 11: Home Invasion Transcript.)  City Defendants' statement that Officer Schoolcraft told EMTs that he was suffering from abdominal pain, nausea, dizziness, and chest pains is simply wrong.  *See also* PMX 27 at JHMC 42 for the PCR.

45.    Plaintiff's pulse and blood pressure was taken by EMT Sal Sangeniti. (Exhibit J at 93:22-24, 94:11-15).  Response: The EMT took the blood pressure reading when Officer Schoolcraft was "under significant duress, thereby rendering the recorded vital signs lacking in meaningful medical significance…" (PMX 36:  Expert Report of Dr. Halpren-Ruder, p. 1).

46.    Sal Sangeniti has been a trained EMT since 1980. (Exhibit J at 19:25-20:8). *Response:* Agreed.

47.    Plaintiff's pulse was 120 beats per minute. (Exhibit J at 94:18-23).  Response: Officer Schoolcraft was "under significant duress, thereby rendering the recorded vital signs lacking

in meaningful medical significance…" (PMX 36:Expert Report of Dr. Halpren-Ruder, p. 1).

48.   Plaintiff's blood pressure was 160 over 120. (Exhibit J at 96:6-24). *Response:* Officer Schoolcraft was "under significant duress, thereby rendering the recorded vital signs lacking in meaningful medical significance…" (PMX 36: Expert Report of Dr. Halpren-Ruder, p. 1). Plaintiff also contends that the reading were prextually used. Plaintiff's Mem. in Opp. at 44-48.

49.   A blood pressure reading of 160 over 120 is an emergency situation that requires treatment at a hospital. (Exhibit J at 96:6-24).  Response: Denied. Officer Schoolcraft was "under significant duress, thereby rendering the recorded vital signs lacking in meaningful medical significance…"  Further there was no imminent danger to Officer Schoolcraft's life indicated through these vital signs. (Expert Report of Dr. Halpren-Ruder, p. 1).  In addition, there was not an "emergency" as evidenced by the way he was taken to the hospital. Plaintiff's Mem. at 49-52.

50.   EMT Sangeniti told Lieutenant Elise Hanlon that Plaintiff's medical condition required medical attention at a hospital. (Exhibit J at 159:7-21).  Response: The cited record does not support the assertion, and if he did so, he was incorrect and acting based on a pretextual plan, noted above.   Also, Officer Schoolcraft was "under significant duress, thereby rendering the recorded vital signs lacking in meaningful medical significance…"  Further there was no imminent danger to Officer Schoolcraft's life indicated through these vital signs. (Expert Report of Dr. Halpren-Ruder, p. 1)

51.   Plaintiff was held at Jamaica Hospital Medical Center pursuant to New York State Mental Hygiene Law Section 9.39 until November 6, 2009. (Relevant Pages from Plaintiff's Jamaica Hospital Medical Center File, annexed as Exhibit RR to Mettham Decl.).  Response: Officer Schoolcraft was held illegally under the pretext of Section 9.39. (See Psychiatric Expert report of Dr. Lubit.)

52.   Plaintiff believes that there is a "strong possibility" that Lieutenant Timothy

Caughey and Sergeant Shantel James conspired to have him "locked away" at Jamaica Hospital

Medical Center, but does not know when or where any agreement to hold Plaintiff at Jamaica

Hospital Medical Center against his will was made, the nature of such an agreement, or the specific

acts performed in furtherance of this alleged agreement. (Exhibit A; Exhibit B at 287:1-14).

Response: This is conclusory and argument. It is also disputed in Plaintiff's Opposition

Memorandum of Law.

53.    Lieutenant Caughey and Sergeant James did not have any discussions about

Adrian Schoolcraft on October 31, 2009. (Relevant Portions of Deposition of Sergeant Shantel

James, dated May 12, 2014, annexed as Exhibit R to Mettham Decl. at 46:3-6).  Response: Plaintiff

does not allege specific record support for communications between Defendants James and

Caughey.

54.    *Sergeant James does not know Lieutenant Caughey. (Exhibit R at 46:13-14).*

*Response:* Not known to Plaintiff the nature of the relationship between Defendants James and

Caughey.

55.     Plaintiff only alleges that Lieutenant Christopher Broschart, Deputy Chief

Michael Marino, Lieutenant William Gough, and Sergeant Kurt Duncan used excessive force used

against him inside his apartment. (Exhibit B at 166:22-24).  *Response:*  Denied.  Plaintiff's 56.1 ¶¶

93-95.  In addition, the complaint alleges a conspiracy to deprive Officer Schoolcraft of

constitutional rights.  See Plaintiff's Opp. Mem. Point IV.

56.    Plaintiff only alleges that Sergeant Frederick Sawyer and Sergeant Shantel James

used excessive force against him inside the Jamaica Hospital Medical Center. (Exhibit B at

184:19-186:10).  *Response:* The complaint alleges a conspiracy to deprive Officer Schoolcraft of

constitutional rights and the record shows that their assistants also used force against him.  Plaintiff's

56.1 ¶102.

13

57.    Plaintiff's only claims against Assistant Chief Gerald Nelson are that "[a]t all relevant times on October 31, 2009, defendant CHIEF GERALD NELSON was aware of defendant MARINO's actions and in fact, expressly authorized defendant MARINO to unlawfully enter Plaintiff's residence, remove Plaintiff against his will, and involuntarily confine Plaintiff in a psychiatric ward." *(Exhibit A at ¶163; Exhibit B at 88:17-24, 179:8-180:16).  Response:* See Plaintiff's Mem. at 10-13.  The complaint also alleges a conspiracy to deprive Officer Schoolcraft of constitutional rights.

58.    Plaintiff only believes that Assistant Chief Gerald Nelson was aware of, or authorized, Deputy Chief Marino's actions on October 31, 2009 because Assistant Chief Nelson is Deputy Chief Marino's immediate boss. (Exhibit B at 179:8-180:16).  *Response:* Denied. See No. 57 above.  The PBBN Investigations Unit, which reports directly to Defendant Nelson, was summoned to Officer Schoolcraft's apartment from their homes while off duty in order to return Officer Schoolcraft to the 81st Precinct to face allegations of leaving his post.[6]  Defendant Nelson was kept informed of the incident throughout the evening by Defendant Mauriello and understood that it was simply an AWOL officer.  Plaintiff's Mem. at 10-13.

59.    Plaintiff's claims against Lieutenant Caughey are "the fear and intimidation he created, from his behavior," in reference to actions inside the 81st  Precinct stationhouse on October 31, 2009, not any actions that occurred at Plaintiff's residence. (Exhibit B at 286:23-25).  Response: The complaint alleges a conspiracy that included Defendant Caughey to deprive Officer Schoolcraft of constitutional rights.

60.    Plaintiff believes that Lieutenant Caughey's behavior inside the 81st Precinct on October 31, 2009 was "menacing, and intimidating and threatening." (Exhibit B at 120:3-10). Response:  Agreed.

---

[6] POX 18: Gough Tr. 79-80.

61.   Plaintiff believes that he was "menaced" by Lieutenant Caughey with an intent to silence him. (Exhibit B at 119:14-122:12; 227:12-228:4).  Response: Agreed. The complaint alleges a conspiracy that included Defendant Caughey to deprive Officer Schoolcraft of constitutional rights.

62.   Lieutenant Caughey never used any force against Plaintiff. (Exhibit B at 287:15-16).  Response: The complaint alleges a conspiracy that included Defendant Caughey to deprive Officer Schoolcraft of constitutional rights as well as an assault as defined by the common law (menacing).   Plaintiff's Rule 56.1 Statement ¶¶ 50-61.

63.   Officers visited Plaintiff's home in upstate New York about six times from December 2009 through 2010, but not thereafter. (Relevant Portions of Deposition of Adrian Schoolcraft dated September 26, 2013, annexed as Exhibit L to Mettham Decl. at 205:6-25). *Response:*  Brooklyn North Investigations Unit officers were sent to Officer Schoolcraft's upstate New York home on eight separate occasions ostensibly to deliver a letter personally to Officer Schoolcraft.[7]  Defendant Trainor also arranged for the local police on four occasions to "visit" Officer Schoolcraft's upstate home.[8]

64.   Plaintiff does not know specifically who visited his home from December 2009 through 2010 and what they said to constitute an alleged attempt to deprive him of his First Amendment rights. (Exhibit L at 212:10-215:8; 223:9-229:17; 234:10-20).  Response: During the visits to Officer Schoolcraft's home in upstate New York, Defendant Trainor's subordinates banged on Officer Schoolcraft's door, spied on him through a bedroom window, videotaped him, and on one occasion an officer put his hand on the officer's holstered gun when Officer Schoolcraft opened the door.  The effect of this conduct was to harass and intimidate Officer Schoolcraft and give him the impression that they might again try to force themselves into his home, as was done on October 31,

---

[7] POX 14: Trainor Tr. at 53-55 & 98-101 & 103-105; POX 15: Plaintiff's Deposition Exhibit 82.
[8] POX 15: Plaintiff's Deposition Exhibit 82.

2009.[9]

65.    Plaintiff opened the door only once to accept an NYPD delivery. (Exhibit B at 220:23-221:19; Exhibit L at 201:22-203:10).  Response: Agreed.

66.    Plaintiff never communicated with the officers who visited him in Johnstown, New York. (Exhibit B at 221:20-222:1).   Response: Denied.  The cited record does not support the assertion.

67.    The motivation for the visitations by the NYPD to Plaintiff's residence in Johnstown, New York was to serve Plaintiff with charges and specifications and a notification to appear, wherein if he returned to work, he would be placed back on the payroll. (Exhibit B at 220:23-221:15; Relevant Portions of Deposition of Lieutenant William Gough, dated April 11, 2014, annexed as Exhibit N to Mettham Decl. at 54:18-55:6; 56:2-19; Letter titled "Suspension from Duty and Notification to Appear while on Suspension" dated December 9, 2010, annexed as Exhibit V to Mettham Decl.; Letter titled "Notification to Appear for Restoration to Duty" dated January 19, 2010, annexed as Exhibit W to Mettham Decl.; Letter titled "Notification to Appear for Restoration to Duty" dated January 11, 2010, annexed as Exhibit X to Mettham Decl.; Email from Captain Timothy Trainor to Louis Luciani, Liju Thotam, and Mark Berger dated January 12, 2010, annexed as Exhibit Y to Mettham Decl.; Email from Captain Timothy Trainor to Louis Luciani, Liju Thotam, and Mark Berger dated January 18, 2010, annexed as Exhibit Z to Mettham Decl.; Letter "Notification to Appear for Restoration to Duty" dated January 20, 2010, titled annexed as Exhibit AA to Mettham Decl.; Email from Captain Timothy Trainor to Louis Luciani, Liju Thotam, and Mark Berger dated January 20, 2010, annexed as Exhibit BB to Mettham Decl.; Letter titled "Notification to Appear for Restoration to Duty" dated January 31, 2010, annexed as Exhibit CC to Mettham Decl.; Email from Captain Timothy Trainor to Louis

_____

[9] POX 13: Schoolcraft 10-11-12 Tr. 220:23-223:6 & 228:14-229:9; Schoolcraft 9-26-13 Tr. 199:9-219:17

Luciani, Liju Thotam, and Mark Berger dated February 1, 2010, annexed as Exhibit DD to

Mettham Decl.; Letter titled "Notification to Appear for Restoration to Duty" dated February 3,

2010, annexed as Exhibit EE to Mettham Decl.).  Response: Denied. Plaintiff's 56.1 ¶¶ 113-14.

Personal service was not required.  There was no legitimate purpose in dispatching teams of officers,

including supervisors and a NYPD physician to drive over 200 miles each way on multiple

occasions to bang on Officer Schoolcraft's apartment door and conduct surveillance on him.   The

effect of this conduct was to harass and intimidate Officer Schoolcraft and give him the impression

that the PBBN Investigations Unit might again try to force themselves into his home, as was done on

October 31, 2009.[10]  Duncan also testified that the reason they when to his home was to have him

sign resignation papers. POX 17:  Duncan Tr. 6-23-14 at 245:6-14.

> 68.   No defendant ever told Plaintiff not to speak to the media or said anything that
indicated to Plaintiff that they were trying to silence him. (Exhibit B at 203:21-204:13; Exhibit L at
204:1-11; 234:10-20).  Response:  Denied.  The entire theory of the case in based in part on the
claim that the defendants' conduct was deigned to silence him.  Plaintiff's Opp. Mem. Point III.

> 69.   Plaintiff believes that City Defendants' intent to silence him was an attempt to
prevent him  from  pursuing his internal complaints.  (Exhibit B at 195:13-196:3; Exhibit L at
186:10-190:7).  Response:  Agreed, among other reasons.

> 70.   Plaintiff was suspended on October 31, 2009 for refusing to return to the 81st
Precinct after being accused of leaving without authorization. (Charges and Specifications Issued
against Adrian Schoolcraft, annexed as Exhibit QQ to Mettham Decl.).  Response:  Denied.  The
home invasion tape captures Chief Marino's suspension of Officer Schoolcraft for not complying
with his demands to go to Jamaica Hospital.  PMX 11:  Home Invasion Recording.

> 71.   Plaintiff was  re-suspended  for  refusing  to  return  to  work  after  he  was

---

[10] POX 13: Schoolcraft 10-11-12 Tr. 220:23-223:6 & 228:14229:9; Schoolcraft 9-26-13 Tr. 199:9-219:17

released from JHMC on November 6, 2009. (Exhibit QQ).  Response:  Admitted.

72.    Plaintiff's allegations first became public in The Daily News on February 1, 2010. (Rocco Parascandola, Brooklyn's 81st Precinct probed by NYPD for fudging stats; felonies allegedly marked as misdemeanors, N.Y. Daily News, Feb. 1, 2010, annexed as Exhibit M to Mettham Decl.).  Response:  Denied.  The cited record does not support the assertion.

73.    Plaintiff decided after his October 31, 2009 involuntary commitment to go to the media. (Exhibit B at 206:11-24; 267:20-25).  Response:  Admitted.

74.    Prior to November 1, 2009, no one assigned to the 81st Precinct was aware that Plaintiff was recording his fellow police officers. (Exhibit L at 130:11-131:2).  Response:  Denied. Plaintiff's 56.1 ¶19.

75.    Prior to November 1, 2009, Plaintiff never intended to go public with his allegations of misconduct. (Exhibit B at 264:24-266:1).  Response:  Denied.  The record does not support the assertion.

76.    A Daily News reporter contacted Plaintiff within a month after Plaintiff's suspension. (Deposition of Adrian Schoolcraft dated September 27, 2013, annexed as Exhibit O to Mettham Decl., at 292:17-293:25).  Response:  Denied.  The record does not support the assertion.

77.    Plaintiff corresponded with reporters and attorneys via e-mail for "a couple years" beginning in 2010. (Exhibit O at 315:2-317:24).  Response: Admitted.

78.    Plaintiff spoke numerous times with The Daily News, This American Life and The Village Voice in late 2009 and/or early 2010 through 2012. (Exhibit B at 267:13-269:23). Response: Admitted.

79.    Plaintiff wrote a summary of his Jamaica Hospital Medical Center confinement and provided that summary to The Village Voice, The Daily News, and his various attorneys. (Exhibit O at 321:23-332:24).  Response:  Admitted.

80.     Plaintiff began communicating with and providing his audio recordings of police officers within the 81st Precinct to Village Voice reporter Graham Rayman in early 2010 and continued to communicate with him through the summer of 2012. (Exhibit L at 150:20-24; Exhibit O at 290:25-291:4).  Response:  Denied on the ground that the record does not support the assertion.

81.     Plaintiff gave copies of recordings of individuals within his command to Graham Rayman and Plaintiff's attorneys. (Exhibit O at 311:9-312:17).  Response:  Admitted.

82.     Plaintiff gave all of his recordings of individuals in his command to his attorneys. (Exhibit B at 31:4-6).  Response:  Objection on the ground of attorney-client and work product privileges.

83.     Plaintiff spoke with Graham Rayman "a couple dozen times" from early 2010 through 2012. (Exhibit L at 132:10-133:1).  Response:  Admitted.

84.     As of October 2012, Plaintiff had given six or seven interviews to the media. (Exhibit B at 271:19-23).  Response:  Denied. The cited record does not support the assertion.

85.     Plaintiff contacted State Senator Hugh T. Farley in 2010. (Exhibit B at 278:1-5; 279:19-280:4).  Response:  Admitted

86.     Plaintiff contacted New York City Councilman Albert Vann in 2010. (Exhibit B at 280:19-281:10).  Response:  Admitted.

87.     Plaintiff contacted New York City Councilman Peter Vallone in 2010. (Exhibit B at 281:11-25).  Response:  Admitted.

88.     Plaintiff contacted the Queens District Attorney in late 2009 or early 2010. (Exhibit B at 278:16-279:15).  Response: Admitterd

89.     Plaintiff contacted the United States Department of Justice. (Exhibit B at 279:16-18).  Response:  Admitted.

90.     Plaintiff contacted Plaintiffs' counsel in the matter of Floyd v. City of New

York,  08 CV 1034 (SAS), and provided supporting affidavits. (Exhibit B at 282:1-284:2).

Response: Admitted.

91.   Plaintiff was never dissuaded from speaking to the media. (Exhibit B at 271:24-272:12).  Response: Denied.   The cited record does not support the assertion.

92.   The defendants actually "encouraged" Plaintiff to speak to the media. (Exhibit B at 271:24-272:12).  Response:  Denied.  The cited evidence does not support the assertion.

93.   During his recorded interviews with internal investigators at the NYPD, Plaintiff told NYPD investigators that he did not want to be anonymous and that he was not concerned with confidentiality. (Recording of Interview of Plaintiff by Quality Assurance Division,  annexed  as Exhibit OO to Mettham Decl.; Transcript of Exhibit OO, annexed as Exhibit PP to Mettham Decl. at 3:15-22).  Response:  Denied.  The cited evidence does not support the assertion.

94.   The complaint specifically identifies Lieutenant Timothy Caughey as the individual that Internal Affairs Bureau contacted and he is the only person with whom IAB is accused of trying to discuss the merits of Plaintiff's accusations.

(Exhibit A at ¶ 135).   Response:  Denied.  The statement is not a fact and the "evidence" does not support the assertion.  The statement also is vague.

95.   No employee of the  NYPD  intentionally  leaked  information about Plaintiff's IAB complaint. (Exhibit B at 264:2-5).  Response:  Denied. Plaintiff specifically told IAB that Investigator Scott left messages and Lieutenant Ferrara testified about the leaks to the 81st Precinct. POX 39: Ferrara Tr.; PMX 11: DS.50_31October2009_Notify_IAB_ Lt.Cauhey_Menacing.wma at 27:39-27:58 & 39:30 (IAB Sergeant Scott purposefully leaving messages at the command for Officer Schoolcraft to return calls from IAB).

96.   Deputy Inspector Steven Mauriello was brought up on charges and specifications

based on allegations of crime complaint manipulation that were made against him by Plaintiff. (Charges and Specifications Issued against Steven Mauriello, annexed as Exhibit NN to Mettham Decl.).  Response:  Denied.  PMX 16 at D00442.

97.   There have been no substantiated incidents involving any allegation that any physical force whatsoever was used by Deputy Chief Michael Marino in any incident. (Civilian Complaint Review Board history for Deputy Chief Michael Marino, annexed as Exhibit FF to Mettham Decl.; Central Personnel Index for Deputy Chief Michael Marino, annexed as Exhibit GG to Mettham Decl.; Internal Affairs Bureau Officer Resume for Deputy Chief Michael Marino, annexed as Exhibit HH to Mettham Decl.).  Response: Objection on the grounds that the City Defendants successfully precluded inquiry on this subject in discovery and should not be permitted to assert this claim.

98.   There are no substantiated allegations of unlawful search or seizure, conspiracy, or retaliation against Deputy Chief Michael Marino, Deputy Inspector Steven Mauriello, or Assistant Chief Gerald Nelson. (Exhibit FF; Exhibit GG; Exhibit HH; Civilian Complaint Review Board history for Deputy Inspector Steven Mauriello, annexed as Exhibit II to Mettham Decl.; Central Personnel Index for Deputy Inspector Steven Mauriello, annexed as Exhibit JJ to Mettham Decl.; Internal Affairs Bureau Officer Resume for Deputy Inspector Steven Mauriello, annexed as Exhibit KK to Mettham Decl.; Central Personnel Index for Assistant Chief Gerald Nelson, annexed as Exhibit LL to Mettham Decl.; Internal Affairs Bureau Officer Resume for Assistant Chief Gerald Nelson, annexed as Exhibit MM to Mettham Decl.).  Response:  Denied.  The defendants refused to produce records and refused to permit examination on these issues and the cited evidence does not support the assertion.

99.   Plaintiff only alleges that three other officers, Adhyl Polanco, (Exhibit A at ¶ 323) Frank Pallestro, (Exhibit A at ¶ 323) and Joseph Ferrara (Relevant Portions of Deposition of

Joseph Ferrara, dated June 5, 2014, annexed as Exhibit S to Mettham Decl. at 150:11-13; 152:4-17; 165:17-166:24) were treated similarly to him and were retaliated against for claimed whistleblowing.  Response:  Denied.  *See* Plaintiff's Opp. Mem. Point VI .

100.    Plaintiff's belief that Frank Pallestro was retaliated against due to a quota policy is based only on news reports. (Exhibit A at ¶ 323).  Response: Denied. *Id.*  (citing his *Floyd* testimony).

101.    Plaintiff did not attend any disciplinary hearing for disclosing or attempting to disclose NYPD corruption and police misconduct. (Exhibit A).  Response:  Admitted.

102.    Plaintiff only alleges that Adhyl Polanco and Frank Pallestro intentionally leaked IAB complaints. (Exhibit A at ¶¶ 387-388).  Response:  Denied. *Id.*

103.    Frank Pallestro alleges that retaliation against him began in September 2009. (Exhibit A at ¶387).   Response:  Denied. The cited "evidence" does not support the assertion.

104.    Adhyl Polanco alleges that retaliation against him occurred in September to December 2009. (Relevant Portions of Deposition of Adhyl Polanco, annexed as Exhibit T to Mettham Decl. at 15:10-16:9; 41:15-42:20.  Response:  Denied.  *Id.*

105.    The New York City Police Department is a model police department and its practices are within the standards of police departments throughout the United States, and certainly New York State. (Relevant Portions of Deposition of John Eterno, dated October 17, 2014, annexed as Exhibit T to Mettham Decl. at 63:8-13).   Response:  Denied.  The cited evidence does not support the assertion.

106.    Plaintiff moved this Court on December 4, 2014 to permit a Third Amended Complaint to be filed, removing Sergeant Richard Wall, Sergeant Robert W. O'Hare, Sergeant Sondra Wilson, Lieutenant Thomas Hanley as defendants. (Plaintiff's Memorandum of Law to Amend the Complaint a Third Time, dated December 4, 2014, annexed as Exhibit P to Mettham Decl. at 1-5).

Response:  Admitted.

107.    Plaintiff has not filed a Stipulation of Withdrawal with the Court agreeing to dismiss Sergeant Richard Wall, Sergeant Robert W. O'Hare, Sergeant Sondra Wilson, Lieutenant Thomas Hanley as defendants with prejudice. (Civil Docket Sheet for 10-CV-6005 (RWS), annexed as Exhibit Q to Mettham Decl.).  Response: Admitted.

108.    Plaintiff moved this Court on December 4, 2014 to permit a Third Amended Complaint to be filed removing his claim for "deprivation of federal rights under 42 U.S.C. § 1983." (Exhibit P at 1, 5). Response:  Admitted.

109.    Plaintiff has not filed a Stipulation of Withdrawal with the Court, agreeing to dismiss this claim with prejudice. (Exhibit Q).  Response:  Admitted.

**DEFENDANT MAURIELLO'S STATEMENT OF MATERIAL FACTS**

1. On February 25, 2009, a meeting was held at the 81st Precinct regarding plaintiff's poor performance evaluation for 2008 (appeal meeting). (SAC ¶ 68; AS2 pp 45-46; SM Exhibit C, Mauriello Dep. pp.131-132; SM Exhibit A, Plaintiff's Evaluation for 2008.) Response: Agreed.

2. Plaintiff secretly recorded the appeal writing, which was attended by all of his supervisors as well as by Deputy Inspector Steven Mauriello, the Commanding Officer of the 81st Precinct. (SAC ¶ 69; SM Exhibit D is a disk with a copy of the recording, which is approximately sixty-one minutes long. The recording will not be submitted electronically. This disk and all other disks used as exhibits in support of this motion will be submitted with the courtesy copy of the motion papers delivered to the Court.) Response: Denied. Defendant Mauriello had the ultimate authority over Officer Schoolcraft's annual evaluation, and organized the meeting of all of Officer Schoolcraft's chain of command supervisors and included a PBA union delegate without knowledge and consent of Officer Schoolcraft. *Id.* On February 25, 2009, Officer Schoolcraft met with several supervisors at the 81st Precinct, including DI Mauriello, and his new Executive Officer, Defendant Captain Theodore Lauterborn.[11] During the meeting, Officer Schoolcraft confirmed his intent to appeal the failing 2008 performance evaluation and repeatedly asked for information about what activity numbers are required of him.[12] At the end of the meeting, another of the 81st Precinct supervisors, Defendant Steven Weiss, specifically asked Officer Schoolcraft if he was recording the

---

[11] PMX 1: NYC 191 (Schoolcraft memo book entry).
[12] PMX 3: Mauriello Tr. 190:18.

meeting.[13]  There was persistent speculation at the 81st Precinct that Officer Schoolcraft was tape recording at the Precinct.[14]

        3.    Plaintiff was told his performance would be more closely monitored due to his poor evaluation.  (SM Exhibit D at 55:00-58:00, appeal meeting recording; AS1 p. 44; SM Exhibit E, plaintiff's recording of conversation with Lauterborn; Mauriello Affidavit ¶ 5.)  Resonse. Denied.  Mauriello's enhanced monitoring of Officer Schoolcraft was based solely on his low "activity" and "productivity."  Officer Schoolcraft was criticized for not achieving "activity goals" and "performance goals," which are coded phrases that refer to numerical quotas for arrests, summonses and 250s imposed on Patrol Officers.[15] As a Patrol Officer, Officer Schoolcraft was a fine officer who ably and satisfactorily performed his duties and received satisfactory or better performance reviews for most of his career.[16] After Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft and other officers at the 81st Precinct began getting increasingly greater pressure

---

[13]  PMX 3:  Mauriello Tr. 326; PMX 6:  Weiss Tr. 111:7-114;12 (recalls believing that Schoolcraft was recording and recalled asking Schoolcraft if he was recording the meeting in February 2009 about the appeal but denies ever discussing that belief with Mauriello or Executive Officer Lauterborn or Lieutenant Caughey).

[14] PMX 10:  Lauterborn Tr. 278:17-280:19.

[15] *See generally Floyd v City of New York*, 959 F. Supp. 2d 540, 590, 596, 599 & n. 264 (S.D.N.Y. 2013) (the increase in the number of stops was achieved by pressure on commanders at CompStat meetings to increase numbers and commanders in turn pressured mid-level mangers and line officers to generate numbers; abundant evidence that supervisors directed officers to meet numerical goals for stops, arrests and other enforcement activity as well as threating officers with negative consequences if they did not achieve those goals; "supervisors must evaluate officers based on their activity numbers, with particular emphasis on summons, stops, and arrests, [and] officers whose numbers are too low should be subject to increasingly serious discipline if their low numbers persist")

[16] PMX 1:  NYC 005-007 (fine officer with great potential); 043-44 ("extremely competent" and an "asset for the department); 045-46 ("highly competent"); 087-91 ("fine officer with great potential"); 176-81 ("well-rounded officer" and a "steady and reliable performer").  For the years 2003, 2004, 2005 and 2006, Officer Schoolcraft received yearly performance evaluations of 3.5, 4.0, 3.5 and 3.5, respectively.  (PMX 1:  NYC 398-400, 171-72; 176-78 & 179-81.)   It was only in 2007, after Defendant Mauriello became the Executive Officer and then the Commanding Officer of the 81st Precinct in 2007 and 2008 that Officer Schoolcraft's yearly performance ratings dropped to 3.0 in 2007 and 2.5 in 2008.  (PMX 1:  NYC 186-88 & 173-75.)

at roll calls to achieve quotas on their number of arrests, summons and stops and to falsify documentation about the receipt of training during roll calls.[17]  Coincident with Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft's performance evaluations began to decline.[18] Because Officer Schoolcraft had concerns about the lawfulness of these directions, he eventually began tape recording roll calls at the 81st Precinct.[19]  Defendants Mauriello and Marino both took aggressive measures using evaluations and denial of overtime to enforce the activity quota expectations.  At a September 20, 2007 meeting of CompStat at NYPD Headquarters for executives of PBBN, the Borough Chief, AC Gerald Nelson responded to questions about low arrest, summons and stop and frisk reports ("250s") by telling NYPD Chief Esposito that he has "problematic squads" in the Borough precincts.  When Chief Esposito asked AC Nelson what he was going to do about the "problem," Nelson replied that AC Marino had taken a personal interest in the matter, and that we will tell them that their low activity will affect their evaluations. POX 44:  At the same CompStat session in September 2007, Defendant Marino who was the second in command of PBBN told Chief Esposito (and the entire audience of NYPD executives), "I am personally contacting the sergeants and lieutenants and told them I will be making some modifications on their careers. … I spoke to them about interim evaluations being done by myself." *Id.*  Also at the September 20, 2007 CompStat session, when then Captain Mauriello was questioned about examples of how he dealt with low activity by officers, he reported that he denied a sergeant overtime for at least a month as a result of his not living up to the activity standards Mauriello had set for the unit.[20]  (This directly contradicts Mauriello's statement to IAB

---

[17] PMX 4:  Schoolcraft Tr.  29:13-30:12 & 32:24-33:5.
[18] *See* n. 2 *supra*.
[19] *Id.*
[20] Commissioner Pulaski: Thirty-one officers and 4 sergeants produce 31 C's and 66 250's for a week—how do you explain that?
Mauriello: That's horrible!
Commissioner: What are you doing about it – and how are you following up?

investigators on August 11, 2010 investigating the reprisal allegations of Officer Schoolcraft that

he, Mauriello, never pressured anyone to meet arrest, summons and 250 activity expectations, nor

did he ever punish anyone by withholding overtime for failure to meet activity goals.)[21]

        4.   Throughout the appeal meeting, plaintiff did not express any concern

regarding the alleged wrongdoing about which he now complains – illegal quotas and crime

misclassification.  Instead, he spoke about not knowing how much activity is needed and that the

numbers on his evaluation were not adding up correctly.  (SM Exhibit D.)  Response:  Denied.  *Id*.

Officer Schoolcraft expressed deep concern that his poor evaluation was based solely on the

number of arrests, summonses and 250s—in effect punishing him for not meeting the expected

quotas for these activities.  Less than two weeks after the meeting, March 11, 2009, a labor attorney

engaged by Officer Schoolcraft wrote DI Mauriello a letter specifying Officer Schoolcraft's basis for

---

Mauriello: I talk to all the bosses before they turn out and tell 'em I want quality, not quantity. I micro manage and talk to each boss during the tour.  At the end of the tour I review the activity and ask how can there be an arrest without a 250.  I tell the bosses that can't be—go back and talk to the cops to do it right.
Commissioner: Give me an example of how you have followed up on a performance problem.
Mauriello: For example we had a module that goes out and produces minimal 250's and no C's, I talked to the boss, Chief Marino and the CO—that supervisor does not get Impact overtime for at least a month because they did not live up to the standards I set for him.

[21] INTERVIEWER: Was [Officer Schoolcraft's 2008 low performance evaluation] considered--an evaluation considered a punishment or consequence, or was it documentation?
DI MAURIELLO: It was documentation. - - that he was the only one that got a 2.5 that year. --got a 2.5. And Officer-- accepted his 2.5 for reason--he was chronic, a lot of sickness on top of his activity- - how many days working and his attitude, and he turned it around and he never was a problem afterwards.
INTERVIEWER: So you stated you had productivity standard. Were they set numbers with regard to those standards?
Dl MAURIELLO: Never set numbers.
INTERVIEWER: Was anybody ever denied overtime, days off, tour changes, assignment changes for not meeting the productivity standards?
Dl MAURIELLO: No
INTERVIEWER: Did you personally ever threaten or pressure anyone regarding their activity?
Dl MAURIELLO: No.

appeal of his failing evaluation.[22]   Among other things, the letter documented previously-raised concerns about "numerical goals" being used improperly in performance evaluations:  "We are concerned that our client's negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of arrests and summons issued.[23]   After receiving the letter, DI Mauriello told Chief Nelson about it and forwarded it to Patrol Borough Brooklyn North as part of the appeal process.[24]

     5.     On March 16, 2009, plaintiff spoke with Captain Theodore Lauterborn, the Executive Officer of the 81st Precinct, who was serving that day as the Duty Captain for Patrol Borough Brooklyn North (PBBN).  (SAC ¶ 94; Mauriello Affidavit ¶ 7.)  Plaintiff secretly recorded the conversation, in which they discussed, among other things, the heightened monitoring of plaintiff and his displeasure with it.  (A copy of the recording of the conversation, which is approximately thirty-five minutes long, is submitted as SM Exhibit E.)  Response: Denied.  *Id.*  On about March 15, 2009, four days after Officer Schoolcraft's attorney sent the letter to Defendant Mauriello detailing his complaints about being evaluated solely on not making arrest, summons and 250 quotas, Sergeant Weiss confronted Officer Schoolcraft who was on foot patrol and issued Officer Schoolcraft a command discipline for being "off post" and having "unnecessary conversation" with another patrol officer.[25]   Officer Schoolcraft believing that he was being punished by the 81st Precinct command for appealing his negative evaluation, made a call on his radio for the Duty Captain for Patrol Borough Brooklyn North to respond to the scene.[26]  Defendant Lauterborn heard the radio call and ordered that Officer Schoolcraft be brought back to the 81st Precinct.  According to Officer Schoolcraft's recording of the meeting with Captain Lauterborn, Lauterborn told Officer

---

[22] PMX 8 (PX 57 & 22).
[23] PMX 8:  *Id.* at p. 2.
[24] PMX 3:  Mauriello Tr. 247:11-254:16.
[25] PMX 9 at NYC 00081 (PX 168).
[26] PMX 6:  Weiss Tr. 98:2-19; PMX 10:  Lauterborn Tr. 177:12-21 & 183:19-186:12

Schoolcraft that after the February meeting at Defendant Mauriello's office regarding his appeal, he should not be surprised that he was going to get a lot more "supervision" by the 81st Precinct supervisors and that the Precinct supervisors were now paying "closer attention" to him.[27]   Captain Lauterborn also told Officer Schoolcraft that "this is gonna go on;" that he has "a long road ahead" of him; that going forward, he needs to "cross your t's and dot your i's;" and that the "supervision" was "coming down hard" on him not just in the past two nights but since the day he walked out of the appeal meeting in February of 2009.[28]

6.     In the March 16, 2009, conversation with Captain Lauterborn, plaintiff explained his feelings as follows:  "I just feel my safety and the public's safety is [sic] being compromised because of the acts of retaliation . . . because of [the] appeal." (SM Exhibit E at 0:08-0:25 and 4:10-4:20; SAC ¶ 91.)  Response:  Denied. *Id.*

7.     In the March 16, 2009, conversation with Captain Lauterborn, plaintiff expressed no objection and made no mention of illegal quotas or improper crime reporting.  (SM Exhibit E at 21:00-23:00.)  Response: Denied.  The issue pervaded his discussions with the supervisors about his "performance."

8.     On April 3, 2009, plaintiff independently went to a hospital emergency room because of symptoms of stress and anxiety and received an injection of medication commonly used to treat anxiety. The hospital also gave plaintiff a prescription for anti-anxiety medication, which he took on each of the next two nights.  (SM Exhibit F, Lamstein Dep. pp. 181, l. 8-24 and 249-250.) Response: Denied. The cited evidence does not support the assertion and is based on hearsay. In addition, the 81st Precinct supervisors intentionally enhanced Officer Schoolcraft's work related

---

[27] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45, & 28:50-31:30. The recording is attached at part of a compact disk accompanying this motion together with other records relevant to the motion.
[28] PMX 11:  Id. at 30:00-31:30.

stress. Defendant Mauriello told IAB investigators that he became concerned with Officer

Schoolcraft's mental condition on March 15, 2009, when Officer Schoolcraft sought intervention

from the PBBN Duty Captain for protection against the harassment by the 81st Precinct supervisors.

Defendant Mauriello stated to IAB investigators on August 11, 2010 that Officer Schoolcraft was

referred to the Medical Unit that night after the meeting with Defendant Lauterborn.  POX 25:

Transcript of Interview at NYC 4903:13 (Plaintiff's Deposition Exhibit 47).   That day, when Officer

Schoolcraft called for a Duty Captain to complain of Sergeant Weiss' harassment, Sergeant Weiss

began reviewing police procedures on how to have Officer Schoolcraft psychologically evaluated.[29]

Shortly after that, Sergeant Weiss contacted the NYPD's Early Intervention Unit and reported that he

was "concerned" about the level of Officer Schoolcraft's "mental distress."[30] Sergeant Weiss also

began a background investigation into Officer Schoolcraft's personal and family affairs and

discovered a news article in a local upstate newspaper about a burglary at his father's home and

forwarded that article to the Early Intervention Unit.[31]

> 9.    On April 6, 2009, plaintiff went to see his private physician, Dr. Sure, who
indicated plaintiff should not return to work until April 14, 2009. (SM Exhibit G, Dr. Sure written
excuse from work.)   Response: Agreed.

> 10.    As required by NYPD procedures, after being out sick on the advice of Dr. Sure,
plaintiff then had to be seen by an NYPD doctor before returning to work.  (SM Exhibit H, NYPD
Patrol Guide 205-01, Reporting Sick.)  Response: Agreed that there is a standard procedure that
was manipulated in this case.

---

[29] PMX 6:  Weiss Tr. 120:6-121:2.
[30] PMX 6:  Weiss Tr. 99:14-101:4.
[31] PMX 6:  Weiss Tr. 103:6-109:3

11.    Plaintiff was seen by Dr. Ciuffo of the NYPD on April 13, 2009. (SM Exhibit I, Consultation Referral by NYPD Medical Division.)  Response: Agreed.

12.    After plaintiff reported to the medical division he was suffering from stress on the job, Dr. Ciuffo referred plaintiff to Dr. Lamstein of the NYPD Psychological Evaluation Services Unit for a psychological examination.  (SM Exhibit I; SM Exhibit F, Lamstein Dep. p. 56, ll. 14-21.)  Response:  The cited evidence does not support the assertion and is based on hearsay.

13.    Plaintiff went directly to Dr. Lamstein on April 13, 2009. (SM Exhibit I; SM Exhibit J, Lamstein notes; Lamstein Dep. pp.177-179, ll.23-25.)

Response: Agreed.

14.    On April 13, 2009, Dr. Lamstein indicated in her Consultation Report a diagnosis of "stress/anxiety" and recommended "psychotherapy", specifically cognitive behavioral therapy "to improve coping skills [and] reduce physical symptoms of stress."  Dr. Lamstein indicated that she was concerned that Schoolcraft's primary care physician had recently prescribed a medication known for being anti-psychotic, but still noted his prognosis was "good, with treatment."  (SM Exhibit I, "Consultation Report" by Dr. Lamstein; SM Exhibit J, Lamstein notes; SM Exhibit F, Lamstein Dep. p. 149, ll.4-16.)  Response:  Denied.  *See* Response to City Defendants, *supra*, No. 14.  The NYPD psychologist directly involved in the decision to place Officer Schoolcraft on limited duty stated that he was suffering from the physical manifestations of stress.[32]  Based on that opinion, she recommended cognitive behavioral therapy or stress management training to improve coping skills and to reduce the physical symptoms of stress.[33]  The NYPD

---

[32] PMX 12:  Lamstein Tr. 172:21-174:20.
[33] PMX 12:  Lamstein Tr. 105:22-107:4.

psychologist did not recommend any medication, did not believe that Officer Schoolcraft was psychotic, and did not believe that Officer Schoolcraft was dangerous to himself or others.[34]

15.    Based on the information available, Dr. Lamstein placed Schoolcraft on restricted duty which included an automatic placement in a "NO FIREARMS STATUS."  Dr. Lamstein sent a restricted duty memo to the NYPD Medical Division, indicating she was requiring removal of plaintiff's firearms, shield, and active duty identification card as of April 13, 2009.  (SM Exhibit K, Restricted Duty Memo; SM Exhibit F, Lamstein Dep. pp. 56, ll.14-23 and 280, ll.20-23; and SM Exhibit B, AS1 p. 106, ll.11-16.)  Response: Denied. As noted above, Defendant Mauriello and his command staff at the 81st Precinct began taking steps to "psych" Officer Schoolcraft the day that he called for the PBBN Duty Captain to intervene in Sgt. Weiss' harassment of him while on foot post.  The information available would have included the personal and family history researched by Sgt. Weiss and his referral of Officer Schoolcraft to NYPD's Employee Assistance Program.

16.    Dr. Lamstein also indicated in her notes that she "urge[d]" Schoolcraft to see a psychologist.  (SM Exhibit J; SM Exhibit F, Lamstein Dep. p.  147, l.2-8; SM Exhibit L, Lamstein timeline created for Psychological Services Unit; SM Exhibit M, IAB report summarizing interview of Dr. Lamstein.) Response: Denied.  Lamstein suggested books on the topic of stress management, and therapies such as yoga. *Id.*

17.    Plaintiff returned to see Dr. Lamstein on July 27, 2009. (SM Exhibits J, Dr. Lamstein notes; See SM Exhibit M, plaintiff's recording of visit with Dr. Lamstein; SM Exhibit L, Lamstein timeline.)  Response:  Agreed.

---

[34] PMX 12:  Lamstein Tr. 113:15-115:2, 153:10-17, & 285:3-23.

18.    Plaintiff returned again to see Dr. Lamstein on October 27, 2009.  (SM Exhibit J, Lamstein notes; SM Exhibit N, plaintiff recording of visit with Dr. Lamstein; SM Exhibit L, Lamstein timeline.)  Response:  Agreed.

19.    Dr. Lamstein concluded on July 27, 2009, and on October 27, 2009, that plaintiff should continue on restricted duty.  (SM Exhibits M and N; SM Exhibit F, Lamstein Dep. pp. 306-307; SM Exhibits L, Lamstein timeline, and J, Lamstein notes.)  Response: Agreed.

20.    On each occasion, Dr. Lamstein repeated her recommendation that Adrian Schoolcraft see a psychologist.  (SM Exhibits J, Lamstein notes, and L, Lamstein timeline, and SM Exhibit F, Lamstein Dep. at pp. 304-305.)  Response: Denied.  The cited evidence does not support the assertion.   In addition the NYPD psychologist recommended books and stress management practices such as yoga therapy as well as psychological counseling.

21.    Plaintiff never went to see a psychologist.  (See SM Exhibit B, AS1 p 110, l.7-18.)  Response. Denied.  The record does not support the assertion. Plaintiff did not read the books recommended or attend therapy or counseling.

22.    According the Dr. Lamstein, plaintiff complained on April 13, 2009, that he had recently received a poor performance evaluation and that his superiors had met with him in an effort to have plaintiff be a more active police officer.  (SM Exhibit J, and SM Exhibit F, Lamstein Dep. pp. 257-258.)   Response: Agreed.

23.    Plaintiff never made any mention to Dr. Lamstein about illegal quotas or crime misclassification in any of their meetings, though he complained about pressure to improve his performance and increase his activity.  (SM Exhibit F, Lamstein Dep. pp. 241-242; and SM Exhibit

J, Lamstein's notes.)  Response:  Denied.  POX 2:  Lamstein Notes (Plaintiff's Deposition Exhibit

68 at NYC 2895 (complaints about quotas at 4-13-09 meeting)

24.    Neither plaintiff nor anyone on his behalf ever made known to anyone at

NYPD any objection or complaint he might have had about illegal quotas or crime misclassification

until David Durk did so on August 31, 2009. (SM Exhibit B, AS1 47, l. 9-24; SM Exhibit O, IAB

memo re: Durk call to Del Pozo; SM Exhibit J, Lamstein notes; SM Exhibit M, recording of

Lamstein meeting; SM Exhibit E, recording of Lauterborn conversation; Mauriello Affidavit  ¶¶

4,5.)  Response: Denied.  Officer Schoolcraft objected to his negative annual evaluation for 2008 at

the February 25, 2009 meeting of Schoolcraft's supervisors on the grounds that the failing grade of

2.5 was based solely his not having sufficient numbers of arrests, summonses and 250s. While not

using the explicit term "illegal quota," Officer Schoolcraft was clear and explicit in his verbal

presentation and the follow up letter to Defendant Mauriello from his attorney: "We are concerned

that our client's negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but

rather on his alleged lack of 'activity' related to his number of arrests and summons issued.[35]

25.    There is not a single document, nor a single recording in which plaintiff

expresses any such objection about illegal quotas or crime misclassification before August 31,

2009.  (Mauriello Affidavit ¶ 4.)  Response: Denied.  See, e.g. PMX 8 (Brown Letter to Mauriello).

Also, Officer Schoolcraft's concerns about quotas and misclassification of crimes led him to begin

recording Roll Calls at the 81st Precinct.[36]

---

[35] PMX 8:  *Id.* at p. 2.
[36] PMX 4; Schoolcraft Tr. 29:13-30; 12 & 32: 24-33:5. Officer Schoolcraft's recordings of 81st
Precinct Roll Calls provided significant evidence for the Court in *Floyd v City of New York*, *supra,*
to find unlawful practices in evaluating and disciplining officers on the numbers of arrests,
summonses and stops.

26.   Any adverse treatment plaintiff allegedly suffered on the job prior to August 31, 2009, was performance related and could not have been in response to any objection plaintiff expressed about illegal quotas or crime misclassification because plaintiff had not expressed any such objection.  (SM Exhibit B, AS1 47, l. 9-24; SM Exhibit J; Lamstein notes; SM Exhibits M and E; Mauriello Affidavit ¶ 5.)  Response:  Denied.  *Id.*   In addition, at the February 25, 2009 meeting convened by Defendant Mauriello to discuss Officer Schoolcraft's annual evaluation with his supervisors, Officer Schoolcraft made it clear he was objecting to the evaluation being based on his failure to make a sufficient number of arrests, summonses and 250s.  His attorney spelled out Officer Schoolcraft's grievance in a letter to Defendant Mauriello days after the meeting in which it was clear that he felt that the "negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of arrests and summons issued."[37]   One does not have to use the phrase "illegal quotas" to effectively object to being unlawfully evaluated adversely on not meeting "activity standards" or "productivity expectations."  Defendant Mauriello notified PBBN Chief, Defendant Nelson of his problem officer and forwarded Schoolcraft's attorney's letter to Patrol Borough Brooklyn North.[38]  The harassment of Officer Schoolcraft through enhanced supervision started the day he walked out of the February 25, 2009 appeal meeting according to Defendant Capt. Lauterborn.  He told Officer Schoolcraft that he should not be surprised that he was going to get a lot more "supervision" by the 81st Precinct supervisors and that the Precinct supervisors were now paying "closer attention" to him.[39]   Captain Lauterborn also told Officer Schoolcraft that "this is gonna go on;" that he has "a long road ahead" of

---

[37] PMX 8:  *Id.* at p. 2.
[38] PMX 3:  Mauriello Tr. 247:11-254:16; Nelson IAB PG
[39] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45, & 28:50-31:30. The recording is attached at part of a compact disk accompanying this motion together with other records relevant to the motion.

him; that going forward, he needs to "cross your t's and dot your i's;" and that the "supervision" was "coming down hard" on him ....[40]

27.     Schoolcraft told IAB on September 2, 2009, that, according to IAB, "he doesn't feel he is being retaliated against from the Members of his Command and has no problems with his supervisors and peers."  (SM Exhibit BG.)

Response:  Denied.  The cited evidence does not support the assertion.

28.     Prior to August 31, 2009, no conspiracy could have been hatched to violate plaintiff's constitutional rights as allegedly occurred on October 31, 2009, due to objections plaintiff might have had to illegal quotas or crime misclassification because plaintiff had not expressed any such objections. (See SM Exhibits J, M and E; Mauriello Affidavit ¶¶ 4, 5.)

Response:  Denied.  Not a fact, but a conclusory argument that is not supported by the record.  On February 25, 2009, Officer Schoolcraft told Defendant Mauriello and his entire chain of command at the 81st Precinct that he objected to being evaluated inappropriately solely on his activity numbers in arrests and summonses.  Officer Schoolcraft engaged an attorney to formalize in a letter to Defendant Mauriello his objection to being evaluated improperly.  After the February 25, 2009 meeting convened by Defendant Mauriello to discuss Officer Schoolcraft's annual evaluation with his supervisors, the supervisors of the 81st Precinct started "coming down hard" on him, as Defendant Lauterborn phrased it.  Who could have anticipated how prophetic Defendant Lauterborn was when he told Officer Schoolcraft on March 15, 2009, "you have a long road ahead" of you.[41]

29.     On August 31, 2009, David Durk (now deceased), a former employee of the NYPD, after receiving a call from Adrian Schoolcraft's father, Larry Schoolcraft (SAC ¶ 120)

---

[40] PMX 11:  Id. at 30:00-31:30.
[41] PMX 11:  Id. at 30:00-31:30.

called Brandon Del Pozo an employee of the NYPD assigned at the time to the Internal Affairs

Bureau (IAB). **(**SM Exhibit B AS2 pp. 10-12; SM Exhibit O, IAS memo re: Durk call to Del Pozo.)

Response: Objection to the hearsay.

      30.    Durk told Del Pozo that Schoolcraft felt he was being retaliated against

concerning his vacation and productivity, and believed he received a poor evaluation "because he

doesn't believe in summons and arrest quotas." (SM Exhibit O, IAB memo of September 7, 2009.)

Response:  Objection to the hearsay.

      31.    Durk's conversation with Del Pozo was the first time plaintiff's alleged

objections about illegal quotas and crime misclassification were made known to anyone at NYPD.

Response: Denied.  *See* above.

      32.    For the period from August 31, 2009, through October 30, 2009 --

notwithstanding Durk's disclosure to Del Pozo, and any other alleged disclosures made to any of

the defendants about plaintiff's objections to illegal quotas and crime misclassification, including

any disclosures that might have been made to the defendants regarding plaintiff communicating to

QAD and IAB about his objections to illegal quotas and crime misclassification, all of which we do

not challenge for purposes of this motion -- nothing was done to Adrian Schoolcraft by anyone at

NYPD that was in furtherance of the alleged conspiracy to violate his constitutional rights as

allegedly occurred on October 31, 2009. (SAC ¶¶ 125-38; SM Exhibit B, AS2 pp. 166-77.)

Response:  Denied.  The defendants successfully had the plaintiff "psyched" by NYPD Medical

Division through October 31, 2009, his gun, shield and identification credentials were removed; he

was assigned to the switchboard at the 81st Precinct and required to wear a police uniform without a

badge or firearm; his locker in the precinct stationhouse was defaced with threatening graffiti, and

the words "shut up you idiot," and "if you don't like your job, get another." He was derided by other officers as a "House Mouse," and a "Zero." Plaintiff's 56.1 ¶¶ 10-85.

33.   On October 31, 2009, Schoolcraft was a New York City police officer assigned to the 81st Precinct in Bedford-Stuyvesant, Brooklyn, and was serving on restricted duty, without authority to possess a gun or a shield (Mauriello Affidavit ¶ 3.) Response: Agreed.

34.   While on restricted duty, Schoolcraft was assigned to work as a telephone switchboard operator at the 81st Precinct, which included responsibility for answering phones and retrieving vouchered property. (SM Exhibit B, AS1 p. 114, ll.11-22; SM Exhibit P, Huffman Dep. pp. 46-47, l.15-24.) Response: Agreed.

35.   Schoolcraft secretly recorded his entire tour of duty on October 31, 2009. (SM Exhibit Q.) Response: Admit to the recording but deny that individuals did not know he was recording. See, e.g., Plaintiff's 56.1 ¶ 19.

36.   After leaving work on October 31, 2009, at approximately 2:30 p.m., Schoolcraft recorded conversations and events in his apartment throughout the rest of that day until the first entry was made by NYPD into his apartment at approximately 9:40 p.m. (SM Exhibit R.) Schoolcraft then separately recorded everything audible in his bedroom throughout the two entries into his apartment. (SM Exhibit S.) Response: Denied in part. Officer Schoolcraft had two small voice-activated recording devices in his possession at his apartment the evening of October 31, 2009 that captured part of the events of that day. The Defendants who entered Officer Schoolcraft's apartment the second time that night and threw him to the ground to arrest and handcuff him discovered and seized this recorder, that was on and recording. Deputy Chief Marino took possession of that device later in the evening and since then that recorder has disappeared and the last Officer Schoolcraft saw of it was when Deputy Chief Marino put it in his pocket. PMX 4:

Schoolcraft Tr. 194:14-21.  There is no reference to the recorder discovered and seized by

defendants in the after action report prepared later that evening at the 81st Precinct.  The second

device was on a shelf in Officer Schoolcraft's bedroom, and was not discovered by the Defendants.

The events that evening that occurred outside his home were not captured by the recorder that was

on the shelf in his bedroom.  Officer Schoolcraft returned to his apartment with IAB officers after

his release from Jamaica Hospital's psychiatric ward and turned the recorder from the bedroom

shelf over to IAB investigators, at their demand.

     37.    On October 31, 2009, at approximately 2:00 p.m., Schoolcraft told the desk

officer on duty he did not feel well and was leaving work an hour early.  (SM Exhibit Q at 7:19.00-

7:28.00, Schoolcraft's Day Tour; SM Exhibit B, AS1 123:22-124:4; SM Exhibit T, recording of

interview of Desk Sergeant Rasheena Huffman on 10/31/09, at 2:00-3:00 and 6:45-7:20; SM

Exhibit U, recording of Police Officer Rodriguez interview on 10/31/09 at 10:00-11:00.)

Response: Agreed.

     38.    For purposes of this motion, we do not dispute that Schoolcraft would later claim

he left work early because he felt menaced by Lieutenant Timothy Caughey, the Integrity Control

Officer of the 81st Precinct, believing Lieutenant Caughey would want to cause him harm (though

plaintiff has provided vastly different explanations of the cause for his concern).  (SAC ¶¶ 139-42;

SM Exhibit B, AS1 122:1-8; SM Exhibit V, Larry Schoolcraft secret recording of 10/31/09

conversation with Lauterborn; SM Exhibit W, Lubit (plaintiff's psychiatric expert) (to be

submitted.)  Lieutenant Caughey left work at approximately noon on October 31, 2009, two and a

half hours before Adrian Schoolcraft decided to leave.  (SM Exhibit X, IAB Interview of Caughey,

p. 21, ll.13-17.)  Response: Denied.  Plaintiff's 56.1 ¶¶ 50-61.

39.      For purposes of this motion, we do not dispute that Schoolcraft may have believed Lieutenant Caughey would want to harm him because Caughey would have seen references in Schoolcraft's memo book to alleged "specific instances of the corruption and illegal activity plaintiff had documented in preparation for his report to Commissioner Kelly." (SAC ¶ 140; SM Exhibit B, AS1 112:13-19 and AS1 203:14-20.)  The truth is that there are no explicit references in plaintiff's memo book to any alleged "specific instance[s] of . . . corruption and illegal activity."  There are references to only three incidents that might be an indication of impropriety.  One is on September 14, 2009, where Schoolcraft indicates "Training:  None, P.O. Hurley present "Sign the Training Log."  Another is a note indicating a charge of Assault in the Second Degree was changed to Assault in the Third Degree, but no further information is provided.  Finally, there is a note indicating that a Sergeant Gallina said on October 5, 2009, "All I want is one collar a month." (SM Exhibit BI, Schoolcraft Activity Log.)   Response: Denied. The cited evidence does not support the assertion and the "statement" is not of fact but argument.

40.      Schoolcraft's recording of his entire day tour does not reveal anything said to Schoolcraft by Lieutenant Caughey other than an almost inaudible request to see his memo book so Caughey could "scratch" it. (SM Exhibit Q at 1:06.00-1:11.00.)  Reponses:  The recording is the best evidence.

41      As Schoolcraft walked out of the precinct, Steven Mauriello was walking in and said hello to Adrian Schoolcraft.  (SM Exhibit Q at 7:20.30-7:20.40) (Day Tour Recording; SM Exhibit C, SM Exhibit C, Mauriello Dep. p. 305, l.13-17; Mauriello Affidavit ¶ 6.)  Response: Agreed

42.      Schoolcraft did not get authorization to leave work early.  (SM Exhibit S at 3:00-4:30; SM Exhibit P,  Huffman Dep. pp. 67-70; SM Exhibit Y, Lauterborn Dep. at 238, ll.6-13; SM

Exhibits Q, Day Tour Recording, SM Exhibit T, Huffman interview, and SM Exhibit U, Rodriguez interview.)  Response:  Denied.  About one hour before the end of his scheduled day, Officer Schoolcraft told the Desk Sergeant, his supervisor Sergeant Huffman, that he was not feeling well and was going home.[42]  A desk officer cannot refuse an officer's request to go sick; the desk officer has the discretion to designate the time off as Regular Sick or Administrative Sick. [43]  Officer Schoolcraft submitted to Sergeant Huffman a sick report, which could have been a basis for authorizing him to take "administrative sick" for the day. At the time, Sergeant Huffman told Officer Schoolcraft that that was "okay."[44] As Officer Schoolcraft was leaving the precinct, however, Sergeant Huffman told Officer Schoolcraft that he could take "lost time"[45] and Officer Schoolcraft told her that that would be fine, although he would have preferred sick time.[46]

43.    According to the desk sergeant, Rasheena Huffman, Schoolcraft left work early despite being told by her that he did not have authority to do so.  (SM Exhibit T at 3:00-4:30; SM Exhibit Q at 7:26.20-7:27.20 and 7:30.15-7:40.00.)

Response:  Denied.    Sergeant Huffman did not have the authority to refuse Officer Schoolcraft's to take sick leave.[47]

44.    The desk sergeant called the NYPD centralized Sick Desk to inquire whether Adrian Schoolcraft had called for permission to leave work early, and was told he had not done so. (SM Exhibit T at 6:00-7:00; SM Exhibit P, Huffman Dep. pp. 76-77 and 86, ll.1-14; SM Exhibit Y,

---

[42] PMX 13:  Huffman Tr. 66:20-67:2 & 71:3-75:9.
[43] PMX 13:  Huffman Tr. 68:6-17 ( PMX 20:  Valenti Tr. 14:20-16:13 (You can't deny someone to go sick. The desk officer has the ability to decide whether or not you would be granted administrative sick or regular sick. Administrative sick is a one-day sick event, and you're not required to see a doctor, you don't have to provide any records. And regular sick you're required to see our police department surgeon. The desk officer has the ability to make a determination which one of those you would be granted. )

[44] PMX 13:  Huffman Tr. 74:11-19.
[45] PMX 13:  Huffman Tr. 80:12-20.
[46] PMX 4:  Schoolcraft Tr. 123:23-124:14
[47] POX 59: Valenti Tr. 14:20-16:13

Lauterborn Dep. p. 241, ll. 3-7.)  Response:  Agreed; except to state that Officer Schoolcraft was not required to call the centralized Sick Desk to request permission to take sick leave.[48]

45.   Shortly after Schoolcraft left the precinct, the desk officer called Schoolcraft's cell phone, but the calls were not answered.  (SM Exhibit P, Huffman Dep. p. 87, ll.6-14; SM Exhibit Y, Lauterborn Dep. p. 288, ll. 2-13; SM Exhibit C, Mauriello Dep. p. 311, ll. 3-4.) Response: Agreed. Sergeant Huffman was instructed to call Officer Schoolcraft by Mauriello.

46.   Lieutenant Broschart of the 81st Precinct arrived at the 81st Precinct to work the 4:00 to 12:00 shift.  He was instructed by Captain Lauterborn to go with his driver to Schoolcraft's apartment which was in the 104th Precinct in Queens and check to see if Schoolcraft had returned home.  (SM Exhibit Y, Lauterborn  Dep. pp. 289-290; SM Exhibit Z, Broschart Dep. p. 87, ll.16-19.) Response: Agreed.

47.   The 104th Precinct was notified about Schoolcraft's status, and was asked to send an officer to his home.  (SM Exhibit C, Mauriello Dep. p. 308, ll.13-22).  Response:  Agreed.

48.   When Lieutenant Broschart and his driver arrived at Schoolcraft's residence at approximately 4:45 p.m., an officer from the 104th Precinct had already arrived.  (SM Exhibit Z, Broschart Dep. p. 29, l. 24-30; SM Exhibit AA, IAB memo.)  Response: Agreed.

49.   Over a period of approximately four hours, Lieutenant Broschart knocked several times on the door to Schoolcraft's apartment, but there was no response.  (SM Exhibit Z, Broschart Dep. p. 104, ll. 4-16)  Response: Agreed, except to state is was four and a half to five hours.  Plaintiff's 56.1

50.   On October 31, 2009, Captain Theodore Lauterborn was the Executive Officer of the 81st Precinct (the position below Commanding Officer in the chain of authority in a precinct).

---

[48] POX 59: Valenti Tr. 15-16

(Mauriello Affidavit ¶ 7; SM Exhibit AB; SM Exhibit Y, Lauterborn Dep. pp. 13-15.) Response: Agreed.

51.   On October 31, 2009, Captain Lauterborn also was assigned for the day to be the PBBN Duty Captain, for the entire Brooklyn North area (SM Exhibit AB, Brooklyn North Duty Sheet. (Mauriello Affidavit ¶ 7.)   Response:  Denied.  Records produced by the City Defendants suggest that he was not the duty captain.

52.   In his capacity as Duty Captain, Captain Lauterborn contacted the PBBN Special Investigations Unit (SIU) and asked that a crew report to the 81st Precinct to then respond to the scene of Schoolcraft's apartment.  (SM Exhibit AC, Gough Dep. p. 93, ll.12-21.)  Response:  The record does not support the assertion and is based on hearsay.

53.   At all relevant times, defendant Michael Marino (now retired) was the PBBN Assistant Chief, or second in command, with supervisory authority over all of the precincts in PBBN, including the 81st Precinct.  (SM Exhibit AD, Marino Dep. p. 219, ll. 4-11.)  Response: Agreed.

54.   On October 31, 2009, Chief Marino met Captain Lauterborn and the SIU officers, Lieutenant William Gough and Sergeant Kurt Duncan, who had gathered at the 81st Precinct, in the precinct parking lot, as they prepared to go to Schoolcraft's apartment.  (SM Exhibit AD, Marino Dep. pp. 223-31; SM Exhibit AC, Gough Dep. pp. 113-114.)   Response: Agreed.

55.   Chief Marino directed that the NYPD Operations division be notified and that arrangements be made to have an Emergency Services Unit (ESU) also respond to Schoolcraft's residence.  (SM Exhibit AD, Marino Dep. p. 230, ll. 4-11;  SM Exhibit AC, Gough Dep. pp. 113-114; SM Exhibit AE, Duncan Dep. p. 87, ll.12-13.]  Response: Denied. Notifications were not made until about 9:00 PM.  POX 27:  Plaintiff's Deposition Exhibit 27 at NYC 3578.

56. The role of ESU is to provide specialized assistance to other units of the NYPD. Response Agreed and state their role includes "tactical" entry into homes.

57. Chief Marino went inside the 81st Precinct stationhouse at approximately 8:35 p.m. (SM Exhibit AF, 81st Precinct Command Log; SM Exhibit AK, IAB memo re copy of Command Log) and told Mauriello, who was subordinate to Chief Marino, that he should follow Chief Marino to the scene of Schoolcraft's residence.  (SM Exhibit C, Mauriello Dep. p. 336, ll. 16-23; Mauriello Affidavit ¶ 8.)  Response: Agreed as to Log entry and objection to the hearsay and state that the cited evidence does not support the assertion.

58. At approximately 8:30 p.m., Captain Lauterborn and the SIU crew, comprised of Lieutenant William Gough, Sergeant Kurt Duncan and Sergeant Hawkins, arrived at the scene of Schoolcraft's residence. (SM Exhibit AG, Gough IAB interview.)  Response: Agreed.

59. Before Captain Lauterborn arrived at the scene, he was informed by Lieutenant Broschart the landlord had heard creaking sounds from Schoolcraft's apartment on the second floor of a three-family house, which was the first indication of any activity in the apartment.  (SM Exhibit Z, Broschart Dep. pp. 104-105; SM Exhibit Y, Lauterborn Dep. p. 210, ll. 10-19.)  Response:  Deny that that was the "first" indication but agreed that that is what he claims was said to him.

60. In response, Captain Lauterborn ordered Lieutenant Broschart to ask the landlord of plaintiff's apartment if the landlord could provide NYPD with a key for plaintiff's apartment. (SM Exhibit Z, Broschart Dep. p. 110, ll. 10-14.)  Response: Agreed that that is what he said was said to him.

61. Emergency Medical Services (EMS) (i.e., an ambulance) also responded to Schoolcraft's residence.  Response: Agreed.

62.    An EMS crew from Jamaica Hospital arrived at the location of Adrian Schoolcraft's apartment at approximately 9:15 p.m. (SM Exhibit AH, Hanlon Dep. p. 105, l. 6-9; SM Exhibit AI, IAB memo re: 911 Calls for Service.)  Response: Agreed.

63.    An NYPD ESU crew was requested at the scene at 9:09 p.m. (SM Exhibit AI, IAB memo re: 911 Calls for Service.)  Response: Agreed.

64.    Chief Marino, driving his own car, and Deputy Inspector Mauriello, driven by Lieutenant Crawford, arrived at the scene at approximately 9:30 p.m.  At the time Chief Marino arrived, ESU had already arrived at Schoolcraft's apartment.  (SM Exhibit AJ, IAB Interim report pp. 26-27; SM Exhibit AD, Marino Dep. pp. 237-241; SM Exhibit C, Mauriello Dep. pp. 339-340; Mauriello Affidavit ¶ 9.) Response: The cited record does not support the assertion.

65.    By the time Chief Marino and Deputy Inspector Mauriello arrived, the landlord had provided Captain Lauterborn and Lieutenant Broschart with a key to Adrian Schoolcraft's apartment. (SM Exhibit Z, Broschart Dep. p. 111, ll. 4-24; SM Exhibit C, Mauriello Dep. p. 341, ll. 2-12.)  Response: Agreed.

66.    Chief Marino decided at the scene that a "soft entry" should be made into Adrian Schoolcraft's apartment, apparently meaning that if Adrian Schoolcraft again did not respond to the knocks on his apartment door, they would enter without having ESU don helmets or any kind of body armor.  (SM Exhibit AD, Marino Dep. pp. 250-251; SM Exhibit C, Mauriello Dep. p. 343.) Response: Denied. The ESU team entered Officer Schoolcraft's residence in full gear: helmets, shields and guns.[49]

67.    During the nearly seven-hour period after Adrian Schoolcraft left work and before entry was made into his apartment, Adrian Schoolcraft was awake, fully aware of NYPD's

---

[49] Plaintiff's 56.1 ¶ 82.

efforts to reach him, and fully aware of the gathering presence of NYPD, FDNY and EMS

personnel outside his apartment building.  (SM Exhibit R, Schoolcraft recordings in apartment.)

Response: Denied.Officer Schoolcraft testified that he had taken Nyquil and slept for a period.[50]

68.   While alone in his second-floor apartment with NYPD personnel gathered

outside on the street, plaintiff spoke several times over the telephone with his father, who was

upstate. (SM Exhibit R, Schoolcraft recordings in apartment.)

Response: Agreed.

69.   Captain Lauterborn also spoke with plaintiff's father while Captain Lauterborn

was trying to make contact with plaintiff.  (SM Exhibit V, Larry Schoolcraft recording of

conversation with Lauterborn; SM Exhibit AJ, IAB Interim Report at 11, section f; SM Exhibit Y,

Lauterborn Dep. pp. 67-70.)  Response: Agreed.

70.    Captain Lauterborn spoke with Dr. Lamstein during the hours he was trying to

make contact with plaintiff, and asked Dr. Lamstein to see if she could try to reach plaintiff over

the telephone. (SM Exhibit L, Lamstein Timeline; SM Exhibit Y, Lauterborn Dep. pp. 105-106, ll.

6-19.)  Response: Agreed.

71.   Despite his awareness of the efforts to reach him during that seven-hour period,

Adrian Schoolcraft did not respond to any one of the many telephone calls or to any one of the

many knocks on his apartment door.  (SM Exhibit R, Schoolcraft recording in apartment, including

Lamstein phone message to Schoolcraft.)  Response: Agreed.

72.   One of the telephone messages received by Adrian Schoolcraft was from Dr.

Lamstein, the NYPD psychologist who had placed Adrian Schoolcraft on restricted duty more than

---

[50] PMX 11: Home Invasion Recording at 1:00-4:50.

six months earlier. (SM Exhibit R, Schoolcraft recordings in apartment, including Lamstein voicemail; SM Exhibit J, Lamstein notes.)  Response: Agreed.

73.   Dr. Lamstein just four days earlier, on October 27, 2009, had met with Schoolcraft and continued him on restricted duty.  (SM Exhibit J, Lamstein notes.)  Response: Agreed and state that Dr. Lamstein also did not find Officer Schoolcraft to be a danger to himself or to others, and on October 31, 2009, informed Captain Lauterborn of her finding that Officer Schoolcraft did not present indications  of danger to self or others.[51]

74.   Adrian Schoolcraft listened to Dr. Lamstein's message, then played it back to record it on one of his recorders.  (SM Exhibit R.)   Response:  Denied.  The cited evidence does not support the assertion that he listened to it.

75.   The message left by Dr. Lamstein was as follows:

Hi Officer Schoolcraft, Dr. Lamstein. I am the pager duty psychologist today and I got a call from Captain Lauterborn. I know I'm not the first call you're receiving so I'm sure you're aware that they're all looking for you and very concerned because you ran off without doing proper procedure and they're not sure if you're OK. So right now they are trying to figure out if they supposed to do a whole city-wide high-level mobilization to find you or if you're OK and they're not sure if they are supposed to be doing that. So there are other people who left you a message asking you to return to the 8-1. I asked if it would also be OK if you just returned to your home and to send a Lt. there hoping to find you. So I don't know what to tell them because as long as I've known you, I've had no concerns about you having thoughts about hurting yourself, I really really want to urge you to return to your home or call your Capitan or you can call me. Whatever this is, if you just return to your home and just resolve whatever this is quickly and easily otherwise it's just going to blow up to a bigger mess than you would want and I would really really hate to see that happen. I would much rather this, whatever this is, get reconciled very quickly and easily without a whole big city wide mobilization and suspensions and whatever else is being considered because this is not necessary, it can be resolved in two minutes. [Gives phone numbers]. You can also just return home and resolve it with you there instead of at the precinct because I suggested that might be embarrassing for you. So hope everything is OK and please give me a call.

---

[51] Plaintiff's 56.1 ¶ 69.

(SM Exhibit R, Schoolcraft recordings in apartment, including Lamstein voicemail recording.)

Response:  The recording speaks for itself.

76.    Adrian Schoolcraft did not call Dr. Lamstein or Captain Lauterborn, despite their requests that he do so.  Response: Agreed.

77.    At approximately 9:45 p.m., the following people climbed the interior stairs to gain entry with a key into Schoolcraft's second-floor apartment (the first entry): two officers from ESU, Chief Marino, Deputy Inspector Mauriello, Captain Lauterborn, the three officers from PBBN SIU (Gough, Hawkins and Duncan), followed by FDNY EMS Lieutenant Elise Hanlon, and then by two EMT's from Jamaica Hospital.  (SM Exhibit B, AS1 pp. 139-140; SM Exhibit C, Mauriello Dep. pp. 345-346; SM Exhibit AC, Gough Dep. p. 140, ll.10-21; Mauriello Affidavit ¶ 12.)   Response: Agreed.

78.    On October 31, 2009, Schoolcraft had set up a hidden recorder in his bedroom to record every sound that could be heard in his bedroom, including any sound heard in his bedroom in the event anyone entered his apartment.  (SM Exhibit R, Schoolcraft recordings in apartment, including telephone conversation with father.)

Response:  The recorders were voice-activated.

79.    The hidden recorder did record every sound heard in Schoolcraft's bedroom from the moment ESU knocked on the apartment door, opened it with the key and entered for the first time, until the last person left the apartment for the final time on October 31, 2009.  (SM Exhibit S, Schoolcraft recording of two NYPD entries into apartment.)  Response: The recorders were voice-activated. Also, the sequence of events that evening outside his home were not captured by the recorder that was in his bedroom.  Although Officer Schoolcraft also had a voice-activated digital recorder in his pocket that evening, Deputy Chief Marino took possession of that device

later in the evening and since then that recorder has disappeared and the last Officer Schoolcraft

saw of it was when Deputy Chief Marion put it in his pocket.[52]

       80.   ESU is heard knocking on the apartment door and calling out "Adrian".  As the

door apparently opens, a comment is made by one of the officers in a low voice, saying "He's on

the bed."  In response, another officer asks "Is he alright?"  (SM Exhibit S at 0:45-1:00.)

Response:  The recording is the best evidence.

       81.   The ESU officers then address Adrian Schoolcraft directly, asking him to show

his hands and asking him to assure them he is OK.  There is no indication of any aggressive

conduct or the exertion of any physical force of any kind.  (SM Exhibit S at 1:00-1:10.)  Response:

Agreed; there is no indication of aggressive conduct or physical force by Officer Schoolcraft but

ESU came into the apartment without permission and in full tactical gear and secured and searched

the apartment.  Plaintiff's 56.1 ¶¶ 82-84.

       82.   As the ESU officers and Schoolcraft are speaking, Chief Marino, apparently

steps into the bedroom and speaks to Schoolcraft.  The exchange between them was as follows:

> Marino: Adrian, you didn't hear us knocking on this door for a couple hours?
> Schoolcraft: I drank some Nyquil.
> Unidentified male voice: Adrian, sit up.
> Marino: Adrian, you didn't hear us knocking on that door… for the last couple hours?
> Schoolcraft: No, why would I be expecting anyone knocking at my door Chief?
> Marino: I don't know Adrian, but normally if you hear someone knocking you get up and answer it. They were kicking on that door loud and yelling.
> Schoolcraft: I wasn't feeling well.
> Marino: You got a million people downstairs worried about your welfare, spending hours out here, worried about you. We've talked to your father, we've called your phone.
> Schoolcraft: What did my father say?
> Marino: I don't know Adrian, I didn't talk to him personally. Alright, sit down.
> (SM Exhibit S at 1:20-1:50.)

Response: Agreed.

---

[52] PMX 4:  Schoolcraft Tr. 194:14-21.

83. Chief Marino was in charge at the scene as the highest ranking NYPD officer present. (SM Exhibit AL, 216-05 of NYPD Patrol Guide Procedure for Emotionally Disturbed Persons; SM Exhibit C, Mauriello Dep. pp. 341, ll. 16-22, 343 and 361-362; Mauriello Affidavit ¶ 9.) Response:  Denied.  According to AC Nelson, the Commanding Officer of PBBN and the superior officer to both AC Marino and DI Mauriello, DI Mauriello was in command of the situation until AC Marino declared Officer Schoolcraft an EDP.[53]

84. After speaking with Schoolcraft for less than a minute, Chief Marino said "Steve", indicating to Mauriello that Chief Marino wanted him to step into the bedroom and deal with the situation.  (SM Exhibit S at 1:20-1:55.)  Response: Agreed; and consistent with the statement of AC Nelson that the precinct CO, DI Mauriello was in charge of the event at that point.[54]

85. After a few moments, Mauriello steps into the bedroom and speaks to Schoolcraft.  The entire conversation between them lasted approximately forty-five seconds, as follows:

> Mauriello: Adrian, what happened today?
> Adrian: I wasn't feeling well, I left.
> Mauriello: That's it? You weren't feeling well. Your sergeant told you to stay, right?
> Schoolcraft: No, she didn't say anything. She was talking on her cell phone.
> Mauriello: You got everybody worried, we are worried about your safety.
> Schoolcraft: Worried about what?
> Mauriello: What do you mean, worried about what? They tried calling you, everybody(s) been calling you. Captain Lauterborn's been calling, everyone has been calling you, your father has been calling you. You're not answering. We were worried about anything that happens. That's what we are worried about. God forbid. You just walk out of the precinct. I say hello to you today that was the last I saw you. You know, that's what we are worried about, your safety, your well-being.
> Schoolcraft: Alright, I'm fine.
> Mauriello: Well, you are going to come back to the precinct with us.
> Schoolcraft: Well…if I'm forced to. It's against my will.

---

[53] POX 6: Nelson Interview.
[54] Id.

> Mauriello: Against your will? OK Teddy [referring to Captain Lauterborn], you
> handle this.

(SM Exhibit S at 2:15-3:00.]  Response:  The recording is the best evidence.

86.   It appeared to Mauriello that Schoolcraft was agitated speaking to him, which is why Mauriello said "alright, Teddy you handle this." (SM Exhibit C, Mauriello Dep. pp. 352-353; Mauriello Affidavit ¶ 14.)  Response: Denied.  The recording is clear that Officer Schoolcraft was not aggressive or threatening to DI Mauriello. PMX 11:  Home Invasion Recording. The recorded interaction shows that DI Mauriello told his second-in-command, Captain Lauterborn, to "handle this" after DI Mauriello was frustrated by Officer Schoolcraft's statement that he will return to the 81st Precinct if forced to and that it would be against his will. *Id.*

87. Mauriello then immediately walked out of the bedroom, out of the apartment, down the stairs and out of the house on to the street, never to enter the building or the apartment again, never to speak or interact in any way with Schoolcraft again, and never to exercise any authority at the scene with respect to anything to do with Schoolcraft.  (SM Exhibit C, Mauriello Dep. pp. 361-362, 370-375, 379, ll. 4-13 and 609; Mauriello Affidavit ¶ 14.)  Response: Denied.  DI Mauriello was standing outside Officer Schoolcraft's apartment house when Officer Schoolcraft walked out of his apartment but refused to enter the ambulance when  he learned that he would be taken to Jamaica Hospital instead of his request to be taken to Forest Hills.  When Officer Schoolcraft began walking quickly back to his apartment, DI Mauriello yelled to Captain Lauterborn, "Teddy, stop him!"[55] Responding to DI Mauriello's order, Captain Lauterborn ran up the stairs and blocked open Officer Schoolcraft's apartment door with his foot, allowing AC Marino, himself and other officers back into Officer Schoolcraft's bedroom.[56]

---

[55] POX 3: Lauterborn Tr. 82-83 & 103-106.

[56] *Id.*

88.    Steven Mauriello did not have any physical contact with plaintiff and did not threaten him in any way. (SM Exhibit S, recording of two NYPD entries into apartment; SM Exhibit C, Mauriello Dep. p. 353, ll.9-23; Mauriello Affidavit ¶ 14.)  Response: Denied.  DI Mauriello, after forcing himself and other armed, uniformed officers into Officer Schoolcraft's bedroom, ordered him to return with them to the 81st precinct. The threat was that Officer Schoolcraft did not have an option: he would return to the precinct voluntarily or be taken by force by Captain Lauterborn and the three-man team from PBBN Investigations he had ordered to the scene.[57]

> Mauriello: Well, you are going to come back to the precinct with us.
> Schoolcraft: Well…if I'm forced to. It's against my will.
> Mauriello: Against your will? OK Teddy [referring to Captain Lauterborn], you handle this.

89.    Captain Lauterborn then spoke with plaintiff over the course of the next several minutes.  Their dialogue included the following exchange:

> Lauterborn: Get your stuff on, we are going back to the precinct.
> Schoolcraft: I'm not going back to the precinct.
> Lauterborn: Adrian, we are going to go back to the precinct.
> Schoolcraft: For…?
> Lauterborn: Because we are going to do it the right way. You can't just walk out of the command.
> Schoolcraft: And do what?
> Lauterborn: You can't just walk out of the command.
> Schoolcraft: What's going to be done if I go back to the 8-1?
> Lauterborn: What's gonna be done? We are going to investigate why you left.
> Schoolcraft: I'm telling you why I left, I was feeling sick.
> Lauterborn: Adrian, that's not the reason why you leave. Alright, you know that. You just don't put a thing on a desk, you ask for permission.
> Schoolcraft: I did ask permission.
> Lauterborn: No you didn't.
> Schoolcraft: She denied it.
> Lauterborn: Alright, so you can't leave. You weren't given permission.
> Schoolcraft: Well…I wasn't feeling well.
> Lauterborn: She denied it, that's it. You have to sit there and wait until your permission is granted. Alright, if it's that bad then you're gonna go to the hospital

---

[57] PMX 11: Home Invasion Recording.

from the precinct. You know better than to just slap a sick report on a desk and walk out.
Schoolcraft: I didn't do that. She embellished that I… she was on the cell phone.
Lauterborn: Alright, so then what did you do? Set it down? She told you [that] you can't leave and you left anyway, right?
Schoolcraft: I was going sick.
Lauterborn: And you left anyway? She told you [that] you can't leave? Right. You can't leave. That's the way it rolls. You can't go. Alright? So we
have to go back. So get your clothes on, whatever you have to do. People have been calling you all day, I talked to your father. Alright?

(SM Exhibit S at 3:00-4:30.)  Response:  The recording is the best evidence.  Agreed as to the transcription of the conversation. However, DI Mauriello and Captain Lauterborn were in violation of NYPD procedures by attempting to force an officer into an immediate hearing for possible suspension related to an allegation of misconduct such as going sick without formal permission. First, the desk sergeant could not deny an officer's request to go sick.[58]  Second, the NYPD Patrol Guide requires that an accused officer be accorded due process in interrogations into allegations of wrongdoing. The City Defendants' 30(b)(6) witness testified that Patrol Guide section 206-13 sets forth the requirements for due process in interrogations into allegations of wrong doing which DI Mauriello and Captain Lauterborn completely disregarded:  "All members of the service who are the subject of an official investigation or are a witness in the official investigation shall be given a reasonable period of time to obtain and confer with counsel prior to questioning. Interrogations of members in routine noncritical matters should be scheduled during business hours on a day when the member is scheduled to work.[59]

90.        Defendants made the first entry into the apartment to establish contact with plaintiff and determine his condition.  (SM Exhibit S at 0:40-2:00; SM Exhibit AD, Marino Dep. pp. 250-251; SM Exhibit C, Mauriello Dep. p. 343, ll. 4-12.)  Response Denied.  See Plaintiff's Memorandum on Support and in Opposition to Summary Judgment (theory of the case).  As set

---

[58] POX 59: Valenti Tr. 14:20-16:13
[59] POX 59: Valenti Tr.  24-25.

forth therein, the concern over Officer Schoolcraft's condition was pretext of "exigent circumstances" to fabricate a legal basis to enter into Officer Schoolcraft's apartment and force him back to the 81st Precinct for a "hearing" on the allegation that he left early on sick leave without proper permission from the desk sergeant.  The PBBN Investigations Unit was summoned to Officer Schoolcraft's apartment from their homes while off duty in order to return Officer Schoolcraft to the 81st Precinct to face allegations of leaving his post; PBBN CO AC Nelson was kept informed of the incident throughout the evening by DI Mauriello and understood that it was simply an AWOL officer; Captain Lauterborn telephoned the NYPD psychologist and explained to her that there were "legal issues" involved in their desire to enter Officer Schoolcraft's residence. *See supra*.

91.   Once entry was made into the apartment and plaintiff appeared to be in reasonably good condition, Chief Marino, then Deputy Inspector Mauriello, and then Captain Lauterborn explained to him that he was being directed to return to the precinct. (SM Exhibit S, 0:40-4:30; SM Exhibit AD,  Marino Dep. pp. 271-273; SM Exhibit C, Mauriello Dep. pp. 356-358.)  Response: Agreed; *but see* response to 89 above.

92.   Plaintiff was directed to return to the precinct for questioning, along with two officers – Huffman and Rodriguez – who had witnessed his early departure from work and were being detained at the precinct.  (SM Exhibits T and U, recordings of Huffman and Rodriguez interviews at 81st Precinct.)   Response: Agreed; but as detailed in response to 89, this order was in contradiction of NYPD requirements of due process for officers accused of wrongdoing.

93.   Schoolcraft initially objected and refused orders from his superior officers to come back to the precinct for an investigation as to why he left the 81st precinct before the end of his tour after being denied permission to leave.  (SM Exhibit S at 2:40-4:30.)  Response:  The

recording is the best evidence and agreed to the extent that Officer Schoolcraft initially objected to DI Mauriello's and Captain Lauterborn's orders to return immediately to the 81st Precinct.  Denied that he was denied permission to leave.

94.   The two officers who were witnesses were questioned at the precinct shortly before midnight of October 31, 2009 as part of an investigation into the incident.  (SM Exhibit C, Mauriello Dep. p.382, ll.5-10; SM Exhibits T and U, Huffman and Rodriguez interview recordings.)  Response: Agreed.

95.   Such questioning after an unusual incident involving an NYPD officer is an established, common and accepted procedure of the NYPD. (SM Exhibit AD, Marino Dep. p. 272, ll.5-10; SM Exhibit C, Mauriello Dep. pp. 360-363; SM Exhibit BF, Patrol Guide Procedure 206-13.)  Response: Denied.  The NYPD Patrol Guide requires that an accused officer be accorded due process in interrogations into allegations of wrongdoing. The City Defendants' 30(b)(6) witness testified that Patrol Guide section 206-13 sets forth the requirements for due process in interrogations into allegations of wrong doing which DI Mauriello and Captain Lauterborn completely disregarded: "All members of the service who are the subject of an official investigation or are a witness in the official investigation shall be given a reasonable period of time to obtain and confer with  counsel prior to questioning. Interrogations of members in routine noncritical matters should be scheduled during business hours on a day when the member is scheduled to work.[60]

96.   Mauriello was not in Schoolcraft's apartment when all of the events allegedly occurred that form the basis for plaintiff's claims, whether for the remainder of the first entry or during the second entry.  (Mauriello Affidavit ¶¶ 14-21.)  Response: Agreed that DI Mauriello was

---

[60] POX 59: Valenti Tr. 24-25.

not physically present; his presence was not necessary as he directed his second-in-command, Captain Lauterborn, "Teddy," to "handle this," as noted above.

97.     After a discussion with Lieutenant Gough of PBBN SIU, plaintiff agreed to go back to the 81st Precinct as directed. (SM Exhibit S at 4:30-5:40.)  Response: Denied.  As reflected by the recording, Officer Schoolcraft was given no choice but to return immediately to the 81st Precinct under implicit threats of harm.

98.     After agreeing to return the 81st Precinct, plaintiff spoke on the phone with his father, Larry Schoolcraft, then indicated he did not feel well. (SM Exhibit S at 6:20-8:30.) Response:  The cited evidence does not support the assertion.

99.     Upon hearing that plaintiff was not feeling well, NYPD officers asked plaintiff if he needed medical aid. When plaintiff indicated he needed aid, officers said "OK" and "we have an ambulance right outside." (SM Exhibit S at 8:30-8:40.)  Response:  The recording is the best evidence.

100.     An EMT present at the scene determined plaintiff's pulse and blood pressure were elevated ("sky high)."  (SM Exhibit S at 11:40-12:40.)  Response: Agreed; insofar as an elevated blood pressure was not unusual under the conditions in which the Jamaica Hospital EMT took Officer Schoolcraft's blood pressure.[61]  See also supra (discussing the City Defendants claims in this regard).

101.     The EMT, Sal Sangianetti, encouraged Schoolcraft to go directly to the hospital in the ambulance for an immediate medical exam.  (SM Exhibit S at 11:40-13:00.)

---

[61] PMX 36 (Report by Dr. Halpren-Ruder) at p. 1 ("the recorded vital signs lack[ed] meaningful medical significance as it is well established that acute psychological and/or physical stress can raise blood pressure significantly.")

Response: Agreed, except state, as noted above, that it was a pretext for getting him declared mentally ill and involuntarily hospitalized at JHMC.

102.     Schoolcraft agreed to go to the hospital in the waiting ambulance. (SM Exhibit S at 12:50-13:00.)  Response: Agreed to the extent that Officer Schoolcraft said (under duress) that he wanted to be taken to the hospital of his choice, Forest Hills, where his primary care physician practiced.[62]

103.     Plaintiff walked out of the apartment on his own, along with anyone else who had been in the apartment with him, and approached the ambulance. (SM Exhibit B, AS2 p. 244, ll. 7-10; SM Exhibit AD, Marino Dep. p. 280, ll. 15-18; SM Exhibit C, Mauriello Dep. p. 377, ll. 2-9; Mauriello Affidavit ¶ 17; SM Exhibit Z, Broschart Dep. pp. 136-137.)  Response: Agreed.

104.     A total of sixteen minutes had elapsed from the time ESU first opened the door to the apartment until the remaining officers and EMTs left the apartment with the expectation the ambulance would take plaintiff to the hospital for a medical exam.  (SM Exhibit S.)  Response: Agreed to the extent that Officer Schoolcraft left his apartment on the understanding that he would be taken to Forest Hills Hospital, not Jamaica Hospital.[63]

105.     While approaching the ambulance, plaintiff was talking on the cell phone with his father, then, without saying anything, suddenly turned around and went back to his apartment. (SM Exhibit B, AS1 p. 149, ll.15-24; SM Exhibit AD, Marino Dep. pp. 286-287; Mauriello Affidavit ¶ 17; SM Exhibit AE, Duncan Dep. p. 156, ll. 21-23; SM Exhibit AM, Marquez Dep. p. 167, ll.8-17.)  Response:  Denied.  The evidence does not support the assertion.

106.     Plaintiff did not suffer any physical harm during the brief period Mauriello was in the apartment during the first entry, and Mauriello is unaware of any such harm being

---

[62] PMX 11: Home Invasion Recording.
[63] Id.

suffered by Schoolcraft any time during the remainder of the first entry.  (Mauriello Affidavit ¶ 15.)

Response: Agreed that he was not physically attacked in the apartment on the occasion of the first

entry.

107.    No removal of property or evidence occurred during the brief period Mauriello

was in the apartment during the first entry (and Mauriello is unaware of any such removal during

the remainder of the first entry or during the second entry).  (Mauriello Affidavit ¶ 16.)  Reponses:

Denied.  The evidence cited does not support the assertion and the witness claims to have a lack of

personal knowledge and thus is testifying based on hearsay.

108.    From a distance out on the street, Mauriello saw plaintiff walk out of the house

and toward the ambulance.  (SM Exhibit C, Mauriello Dep. pp. 576-79; Mauriello Affidavit ¶ 17.)

Response: Agreed.

109.    As plaintiff approached the ambulance, there was no reason to expect plaintiff

would return to the apartment and no reason to expect there to be a need for a second entry. (SM

Exhibit S; Mauriello Affidavit ¶ 17.)    Response: Denied.  There was plenty of reason to believe

that Officer Schoolcraft did not want to go and might change his mind. PMX 11:  Home Invasion

Recording.

110.    Defendants did not use any force against plaintiff prior to the second entry

because they had not gone to plaintiff's residence to cause plaintiff harm.  (SM Exhibit S.)

Response: Agreed that Officer Schoolcraft was not physically harmed during the first entry into his

bedroom, but he was effectively being arrested and forced to return to the 81st Precinct, and the

three officers from the PBBN Investigations Unit were there to return Officer Schoolcraft to return

to the precinct by force if necessary.  Deny that the defendants did not go to the apartment to cause

him harm and state that they agreed before the entry to take him back to the 81st Precinct. Plaintiff's

Opp. Mem. Point VI .

111.    Mauriello did not say anything to plaintiff or anyone else as plaintiff turned

around and then headed back to his apartment. (Mauriello Affidavit ¶ 18.)  Response: Denied.

When it became clear to Officer Schoolcraft that the NYPD and Jamaica Hospital EMTs were

going to take him to Jamaica Hospital (which has a psychiatric ward), Officer Schoolcraft refused

further medical attention and went back to his apartment.[64] DI Mauriello, who was standing outside

Officer Schoolcraft's apartment, yelled to Captain Lauterborn, "Teddy, stop him!" when Officer

Schoolcraft started walking quickly back to his apartment. Captain Lauterborn ran up the stairs and

blocked open Officer Schoolcraft's apartment door with his foot, allowing AC Marino, himself and

other officers back into Officer Schoolcraft's bedroom.  Plaintiff's Opp. Mem. at pp. 81-95.

112.    When Mauriello saw plaintiff go back inside, he saw Chief Marino, Captain

Lauterborn and the SIU crew (Duncan, Hawkins and Gough), follow plaintiff back inside the house

and upstairs to Schoolcraft's apartment.  (SM Exhibit S, recording of first and second entries; SM

Exhibit C, Mauriello Dep. pp. 376-79; Mauriello Affidavit ¶ 17.)   Response: Agreed; because DI

Mauriello directed his Executive Officer, Captain Lauterborn, to "stop him."[65]

113.    Mauriello did not direct anyone to follow Adrian Schoolcraft or to do anything

about the fact that Adrian Schoolcraft was heading back to his apartment.  (SM Exhibit C,

Mauriello Dep. pp. 376-79; Mauriello Affidavit ¶ 18.) Response: Denied. See Response to No. 111.

114.    Mauriello did not follow plaintiff back to the apartment or take any other

action when plaintiff headed back to the apartment, other than to wait outside on the street pending

---

[64] PMX 4:  Schoolcraft Tr.  149:7-151:2.  This part of the sequence of events that evening outside
his home were not captured by the recorder that was in his bedroom.  Although Officer Schoolcraft
also had a voice-activated digital recorder in his pocket that evening, Deputy Chief Marino took
possession of that device later in the evening and since then that recorder has disappeared and the
last Officer Schoolcraft saw of it was when Deputy Chief Marion put it in his pocket.  PMX 4:
Schoolcraft Tr. 194:14-21.
[65] Id.

further developments.  (SM Exhibit C, Mauriello Dep. p. 379; SM Exhibit S, recording of first and second entries; Mauriello Affidavit ¶ 18.)

Response:  Denied.  See Response to No. 111 ("stop him").

115.    Mauriello did not ever re-enter the apartment. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 378-79; Mauriello Affidavit ¶ 18.)
Response: Agreed.

116.    On October 31, 2009, Mauriello was not consulted and did not express an opinion on whether plaintiff should be suspended. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.)  Response: Denied. It was DI Mauriello who ordered that Officer Schoolcraft be located and brought immediately back to the 81st Precinct for a hearing that would likely result in his suspension and BNIU was sent out to find him to be suspended.  DI Mauriello thus initiated the series of actions by the NYPD, FDNY and Jamaica Hospital that culminated in the unlawful entry, detention and hospitalization.

117.    Mauriello was not present when plaintiff was suspended. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.) Response: Agreed.

118.    Mauriello was not consulted about and did not express an opinion on whether plaintiff should be declared an emotionally disturbed person (EDP).  (SM Exhibit S, recording of first and second entries; SM Exhibit C, pp. 376-81; Mauriello Affidavit ¶ 19.).  Response: Denied. The theory of the case is that he and others retaliated against Officer Schoolcraft and took actions against him in retaliation.

119.    Mauriello was not present when plaintiff was declared an EDP.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.)  Response: Agreed that DI Mauriello was not physically present in Officer Schoolcraft's bedroom when AC Marino declared him an EDP.

120.    Mauriello did not arrest Adrian Schoolcraft, never directed anyone to arrest him, and was not present when, if ever, he was placed under arrest.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.) Response: Denied. DI Mauriello ordered his Executive Officer, Captain Lauterborn, to "take care of this" when Officer Schoolcraft refused to voluntarily return to the 81st Precinct immediately. This order was, in effect, an order to bring Officer Schoolcraft back to the precinct involuntarily. DI Mauriello had notified the PBBN chief, AC Nelson, of the operation to locate an AWOL officer, and had a three-man team from the PBBN Investigations Unit in Officer Schoolcraft's bedroom (having been called out from their day off) to assist in bringing Officer Schoolcraft to the "hearing" that evening at the 81st Precinct.

121.    Mauriello was not present when plaintiff was handcuffed, and he had not directed anyone to apply handcuffs.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 19.) Response: Agreed that DI Mauriello was not physically present in Officer Schoolcraft's bedroom when he was removed from his bed and handcuffed by the officers who were present in Officer Schoolcraft's bedroom on his orders.[66]

122.    Mauriello was not present for or aware of the removal of any of plaintiff's personal property, including any alleged removal of evidence plaintiff claims to have gathered of NYPD corruption.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello

---

[66] Id.

Dep. pp. 376-81; Mauriello Affidavit ¶ 16.) Denied.  *See, e.g.* PMX 23 (report of incident showing Mauriello pointed out to Lauterborn name of known person on paper in apartment and noting the presence of crime reports in the apartment).

       123.    Mauriello did not direct anyone to remove any property and did not direct or participate in the alleged forcible removal of plaintiff from his apartment during the second entry. (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 16.)  Response: Denied.  *See* Response to No. 122.

       124.    Mauriello waited outside of the house until he saw everyone exit the house with Adrian Schoolcraft being carried in a chair to the ambulance.  (SM Exhibit S, SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 20.)
Response: Agreed.

       125.    The entire time that elapsed from the time plaintiff went back into his apartment until everyone left the apartment was approximately fifteen minutes.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. p. 379.)  Response:  The recording is the best evidence.

       126.    Steve Mauriello did not know what had happened in the apartment during the second entry, and he did not ever again speak to or interact with Adrian Schoolcraft.  (SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 14.)  Agreed that DI Mauriello did not visit Officer Schoolcraft in the hospital or express any concern or make inquiry relating to Officer Schoolcraft's purported medical condition of dangerously high blood pressure.  DI Mauriello did convene a meeting at the 81st Precinct that night of the NYPD officials who entered Officer Schoolcraft's apartment, searched it, removed property and arrested him.  In that meeting, they

prepared a memo of the actions taken that resulted in Officer Schoolcraft's arrest and psychiatric commitment.[67]

127.   On October 31, 2009, Mauriello never touched Adrian Schoolcraft, never directed anyone to do so and never saw anyone do so.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶¶ 14,15.)  Response: Denied.  As noted above, DI Mauriello ordered his Executive Officer, Captain Lauterborn to "take care of this" when Officer Schoolcraft refused to return immediately to the 81st Precinct voluntarily, and later ordered Captain Lauterborn to "Stop Him" when Officer Schoolcraft tried to return to his apartment after refusing to be taken to Jamaica Hospital instead of his requested hospital, Forest Hills.

128.   On October 31, 2009, Mauriello never threatened Adrian Schoolcraft, never directed anyone to do so, and never saw anyone do so.  (SM Exhibit S, recording of first and second entries; SM Exhibit C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶¶ 14,15.)Denied. See response to 127.

129.   As plaintiff's secret recording of the events in his apartment during the two entries by NYPD reveals, defendants did not ever, directly or indirectly, indicate any sentiment about causing plaintiff harm.  (SM Exhibit S, recording of first and second entries.)  Response: Denied. The home invasion recording shows that Officer Schoolcraft had no choice but to comply with DI Mauriello's order for him to return immediately to the 81st Precinct, and later forced to comply with Chief Marino's order to take him to Jamaica Hospital. The three officers from PBBN Investigations Unit were present to enforce these orders by force if necessary.

130.   The NYPD officers who took the allegedly wrongful actions during the second entry, did so only when plaintiff suddenly and unexpectedly decided to go back inside.  (SM

---

[67] PMX 23.

Exhibit S, recording of first and second entries.)   Response: Denied. Officer Schoolcraft had an

absolute right to refuse medical attention.  DI Mauriello initiated the wrongful reentry and

subsequent seizure of Officer Schoolcraft by yelling to Captain Lauterborn, "Teddy, Stop him."

131.    Mauriello did not have an opportunity to speak with any of the other

defendants once plaintiff started to go back inside.  (SM Exhibit S; Mauriello Affidavit ¶ 18.)

Response: Denied.  As noted above, DI Mauriello, who was standing outside Officer Schoolcraft's

apartment house when Officer Schoolcraft refused to enter the ambulance, yelled to Captain

Lauterborn, "Teddy, stop him!" when Officer Schoolcraft was walking quickly back to his

apartment. Captain Lauterborn ran up the stairs and blocked open Officer Schoolcraft's apartment

door with his foot, allowing AC Marino, himself and other officers back into Officer Schoolcraft's

bedroom.

132.    If there were a conspiracy by the defendants to do what they did to plaintiff

during the second entry, which is the only time plaintiff allegedly was harmed, it would have to

have been hatched in the moments they began following plaintiff as he suddenly started to go back

into the apartment, or some time after the officers re-entered.  There is no indication that either

occurred or could have occurred. Response: Denied.  Objection to the argument.  State that after

Officer Schoolcraft left the 81st Precinct on Sick Leave the afternoon of October 31, 2009, DI

Mauriello ordered that Officer Schoolcraft be located and brought immediately back to the 81st

Precinct for a hearing that would likely result in his suspension.  DI Mauriello thus initiated the

series of actions by the NYPD, FDNY and Jamaica Hospital that culminated in the unlawful entry,

detention and hospitalization.   As the events unfolded in Officer Schoolcraft's apartment and

bedroom, DI Mauriello's plans changed when Officer Schoolcraft did not comply with his orders as

expected.  DI Mauriello ordered his Executive Officer, Captain Lauterborn, to "take care of this"

when Officer Schoolcraft refused to voluntarily return to the 81st Precinct immediately. This order

was, in effect, to bring Officer Schoolcraft back to the precinct, period.  DI Mauriello had elements in place for contingencies in bringing Officer Schoolcraft to the suspension "hearing" that DI Mauriello had arranged for that evening at the 81st Precinct. DI Mauriello had notified the PBBN chief, AC Nelson, of the operation to locate an AWOL officer, and had a three-man team from the PBBN Investigations Unit respond to Officer Schoolcraft's bedroom (having been called out from their day off) to bring in Officer Schoolcraft.[68] The deputy chief of PBBN, AC Marino, arrived at the 81st Precinct and the call went out for ESU and Jamaica Hospital and FDNY EMT units to respond to Officer Schoolcraft's apartment.

133.    Once plaintiff was in the ambulance, he was taken to Jamaica Hospital, accompanied by Lieutenant Broschart.  (SM Exhibit Z, Broschart Dep. pp. 182-85; SM Exhibit C, Mauriello Dep. pp. 380-81.)  Response: Agreed.

134.    Mauriello did not go to Jamaica Hospital, did not communicate with anyone at Jamaica Hospital, did not direct any officer to do so, and he played no role with respect to anything that transpired at Jamaica Hospital.   (Mauriello Affidavit ¶ 21.)  Response: Denied. A Lieutenant and two sergeants of the 81st Precinct, along with their drivers, were assigned to watch Officer Schoolcraft in Jamaica Hospital on Halloween night. Lt. Brochardt took the handcuffed Officer Schoolcraft to Jamaica Hospital in the Jamaica Hospital ambulance, and according to Jamaica Hospital EMT Marquez, Lt. Brochardt "filled in the blanks" about Officer Schoolcraft for the Jamaica Hospital Emergency Room nurse. Sergeant James, who was scheduled to be the night shift supervisor for the 81st Precinct, was assigned, along with her driver, to "sit" on Officer Schoolcraft at Jamaica Hospital. Her instructions were to not speak with Officer Schoolcraft. Sergeant James telephoned the 81st Precinct command for instructions when Officer Schoolcraft refused to stop speaking on a hospital telephone. Sergeant James and her driver were, in turn, relieved at about

---

[68] POX 18: Gough Tr. 241-242

6:00 am by Sergeant Sawyer and his driver.   The four of them shackled Officer Schoolcraft to his gurney with two sets of handcuffs to prevent him from using the telephone.  Later that morning DI Mauriello summoned Sawyer by police radio with the instruction to call DI Mauriello on his cell phone.  Sgt. Sawyer stepped out of his patrol car to make the call to DI Mauriello out of earshot of his driver. According to Sgt. Sawyer, DI Mauriello wanted to know if Officer Schoolcraft had been successfully admitted to the psychiatric ward.  Plaintiff's Opp. Mem. Point VI .

135.    A suspended officer such as Schoolcraft continues to be a member of the service and suspension does not relieve an officer of the obligation to report wrongdoing to the department.  *See* SM Exhibit AN,  NYPD Patrol Guide § 207-21, in effect at the time, which provides "[a]ll members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware.")  Response: Objection; this is argument and conclusion and not a statement of material fact.

136.    Schoolcraft reached out to IAB while in Jamaica Hospital and arranged to meet twice with NYPD representatives before he left the hospital.  (SM Exhibits AO and AP.) Response:  Denied.  The IAB report cited as Exhibit AO is the report of Sgt. Scott of IAB on his visit to Jamaica Hospital on November 2, 2009, to interview Officer Schoolcraft at 9:30 pm in regards to the allegation that Officer Schoolcraft had violated a direct order to return to the 81st Precinct given to him by a senior officer at Schoolcraft's apartment the evening of October 31, 2009.  Exhibit AP is the report of Sgt. Chu of IAB who went to Jamaica Hospital on November 4, 2009 apparently at the request of Officer Schoolcraft's father for the purpose of meeting with the psychiatric physician and a psychiatric social worker to confirm that Officer Schoolcraft had made legitimate complaints through proper channels concerning misconduct.  This effort was to demonstrate to the psychiatric staff responsible for detaining Officer Schoolcraft that his statements concerning retaliation by NYPD officials were not delusional, and to obtain the release of his son

from further psychiatric incarceration. . *See also* POX 57 at NYC 4878 (IAB speaks with Lauterborn that night after Officer Schoolcraft is taken to the hospital and notes his request that IAB conduct an investigation into allegations against Office Schoolcraft).

137.    After Schoolcraft's release from the hospital on November 6, 2009, he arranged to meet again with NYPD representatives from IAB in his Queens apartment. (SM Exhibits AQ and AR, IAB Memos.)   Response:  Agreed that IAB investigators met with Officer Schoolcraft on November 6, 2009 and deny that  Officer Schoolcraft "arranged" the meeting, an assertion not supported by the record cites.

138.    At the meeting in his Queens apartment on November 6, 2009, plaintiff demonstrated what had happened on October 31, 2009. (SM Exhibits AQ and AR.)  Response: Agreed that Officer Schoolcraft provided IAB investigators the digital recording device that had not been discovered and seized by the NYPD home invasion team on October 31, 2009.

139.    At the meeting in his Queens apartment, plaintiff provided the NYPD representatives with copies of the recordings he had made of the events in his apartment on October 31, 2009. (SM Exhibits AQ and AR.)   Response: Officer Schoolcraft provided IAB investigators the actual digital recording device that had not been discovered and seized by the NYPD home invasion team on October 31, 2009.

140.    Following the meeting in his Queens apartment, plaintiff was contacted by IAB and told IAB wanted to re-visit this apartment.  They met again at the premises on November 9, 2009, along with plaintiff's father.  (SM Exhibits AS and AT.)  Response: Agreed.

141.    After denying there were any weapons on the premises, plaintiff ultimately acknowledged he had a high-powered shotgun.  IAB had learned of the shotgun from the recording of the two NYPD entries on October 31, 2009, in which plaintiff discusses the shotgun with his

father and they agree he should hide it under his mattress before the NYPD makes its first entry. (SM Exhibits AS and AT; SM Exhibit S.)  Response:  The cited record does not support the assertions and the evidence is inadmissible as an illegal search and is based on hearsay.

142.    Plaintiff turned the shotgun over to IAB because he was on restricted duty and not permitted to have possession of any firearms.  (SM Exhibit AS and AT.)  Response:  The cited record does not support the assertions and the evidence is inadmissible as an illegal search and is based on hearsay.

143.    Some time shortly after plaintiff last met with NYPD representatives in his Queens apartment, he moved upstate (SAC ¶ 215).

Response: Agreed.

144.    In December 2009, the NYPD BNIU made its first attempt to contact plaintiff upstate (SAC ¶ 216), and continued to do so thereafter.  (SM Exhibits AU – BB.)   Response: Agreed.

145.    The purposes of the upstate visits were to personally serve plaintiff with department orders for plaintiff to report for duty, to renew his suspension, and to deliver his administrative charges.  (SM Exhibits AU – BB.)  Response: Denied.

Personal service was not required.  There was no legitimate purpose in dispatching teams of officers, including supervisors and a NYPD physician to drive over 200 miles each way on multiple occasions to bang on Officer Schoolcraft's apartment door and conduct surveillance on him.  The "purpose" was to silence him and get him to resign.  *See supra.*

146.    Plaintiff chose not to comply with the orders or appear as directed and, after some initial conversations, chose not to speak with the visiting NYPD personnel.  It thus became clear he had no interest in communicating further with the NYPD.  (SM Exhibits AU – BB.)

Response: Agreed that Officer Schoolcraft did not appear at an NYPD precinct as directed, and did

not speak with the NYPD officials and the local police officers dispatched by NYPD to pound on and kick his door.

147.    At no time did BNIU or IAB inform Mauriello of their actions or seek to consult with him in any way about their efforts to contact Schoolcraft.  (Mauriello Affidavit ¶ 22.) Response:  Objection to hearsay and the self-serving denials of knowledge.  Plaintiff states that it is unknown to Plaintiff what communication there may have been between DI Mauriello and BNIU or IAB regarding actions against Officer Schoolcraft after October 31, 2009.

148.    Plaintiff never indicated to anyone at the NYPD any intention to go to the media until there was a report in the media in February 2010 indicating he had done so.  (SM Exhibits BC, BD, BE, IAB Memos re media reports.)  Response:  Denied.  The cited "evidence" does not support the assertion.

149.    Plaintiff began speaking and meeting with the media without anyone's knowledge or interference.  Response: Objection to the vagueness and the argument and state that Officer Schoolcraft did not seek NYPD Departmental permission to speak to public media representatives.

150.    Plaintiff's speech was not at all chilled, as he had numerous contacts with the media throughout the period from December 2009 and June 2010, when defendants allegedly were subjecting him to prior restraint.  (SM Exhibits AU – BB and BC – BE.)  Response: Denied. Objection to this as conclusion and argument, not a statement of material fact.

151.    Throughout the events of October 31, 2009, Steven Mauriello and all other NYPD defendants were acting at all times in the normal course of their duties and in furtherance of the NYPD's interests, as plaintiff concedes in the SAC (SAC ¶¶ 2, 10, 11, 12, 51, 256-60 and 321-31).  Response:  Denied.  See Plaintiff's Memorandum of Law in Support of Summary Judgment

(statement of facts) ; Plaintiff's Memorandum in Opposition to Summary Judgment, Point VI .

Objection on the ground that this is argument, not a statement of material fact.

## JAMAICA HOSPITAL MEDICAL CENTER

## STATEMENT OF MATERIAL FACTS

1.      On October 31, 2009, the plaintiff was employed as a police officer in the New York Police Department ("NYPD") (Exhibit K, p. 23).  *Response:*  Admitted.

2.      Defendant Jamaica Hospital is a not-for-profit hospital (Exhibit FF, p. 40). (Exhibit LL, ¶17) *Response:* Admitted.

3.      In 2009, defendant Jamaica Hospital had a mental health clinic, a psychiatric emergency department, and two psychiatric inpatient units (Exhibit FF, p 14). *Response:* Admitted.

4.      In October 2009, codefendant Dr. Lilian Aldana-Bernier was an attending physician at Jamaica Hospital (Exhibit W, p. 18), and was the director of the psychiatric emergency room at Jamaica Hospital (Exhibit W, p. 20).  *Response:*  Admitted.

5.      In October 2009, codefendant Dr. Isak Isakov was an attending physician at Jamaica Hospital (Exhibit X, p. 23).  *Response:* Admitted.

6.      In October and November 2009, non-party Dr. Khin Mar Lwin was a physician in the first year of her residency at Jamaica Hospital (Exhibit V, pp. 8-9).  *Response:* Admitted.

7.      In April 2009, the plaintiff was referred to Dr. Catherine Lamstein, a psychologist who worked at the New York City Police Department, because he was suffering from "psychological issues" (Exhibit M, pp. 84 and 102).  *Response:*  Denied.  Officer Schoolcraft was steered to the meeting by the City Defendants, as noted above in connection with the City Defendants' and Mauriello's Statement of Facts (respectively ¶¶16-18 & ¶¶8-16.

8.      Those issues stemmed from the plaintiff's "anxiety secondary to the stress on the job" (*Id.,* p. 87).  *Response:* Denied.  *See* No. 7 above.

9.    Dr. Lamstein evaluated the plaintiff and recommended cognitive behavioral therapy (*Id*., p. 106). *Response:* Denied. *See* No. 7 above.

10.    Dr. Lamstein also recommended that the plaintiff see a psychiatrist for an evaluation because two previous doctors had prescribed him psychiatric medication, one of which was an antipsychotic. (*Id*., pp. 113, 149). *Response:* Denied. *See* No. 7 above.

11.    The plaintiff was placed on restricted duty, and he was compelled to surrender his firearms (*Id*., pp. 208, 289). *Response:* Admitted.

12.    On October 31, 2009, the plaintiff was working at the 81st Precinct, and was assigned to work as the telephone switchboard operator (Exhibit K, p. 112). *Response:* Admitted.

13.    The plaintiff left work early on October 31, 2009, but he failed to obtain the requisite permission necessary to leave work early, thereby failing to follow required police procedure (Exhibit O, pp. 235-236) (Exhibit K, p. 121) (Exhibit N, pp. 68, 73). *Response:* Denied. See above ¶42.

14.    The plaintiff dropped a sick report on the lap of the precinct's Desk Sergeant, Sergeant Rasheena Huffman, walked away, and left the precinct (*Id.,* p. 73). *Response:* Denied. *See id.*

15.    Upon leaving work early on October 31, 2009, plaintiff went to his apartment (Exhibit K, p. 126), which was on the second floor of his apartment building (Exhibit K, p. 28). *Response:* Admitted.

16.    A number of his fellow officers began an investigation into his absence and arrived at his residence (Exhibit O, pp. 237 and 289-290) (Exhibit K, p. 132) (Exhibit P, p. 238). *Response:* Admitted, except state the "investigation" was a pretext. Plaintiff's Opp. Mem. Point VI .

17.   Upon arriving at the plaintiff's apartment, the police officers knocked on the plaintiff's door, but the plaintiff did not answer (Exhibit Q, p. 101). *Response:* Admitted.

18.   The officers became worried about the plaintiffs well-being (*Id.*, pp. 111-112). *Response:* Denied.   The "investigation" was a pretext. Plaintiff's Opp. Mem. Point VI .

19.   The plaintiff's fellow officers had tried calling his cellular telephone throughout the day but the plaintiff never answered the phone calls (Exhibit O, p. 288).  Response*:* Admitted.

20.   The officers ultimately remained at the plaintiff's residence for approximately four hours (Exhibit Q, p. 104). *Response:* Admitted.

21.   They would occasionally knock on his door, but the plaintiff continued to not answer (*Id.* p. 104) (Exhibit O, p. 290). *Response:* Admitted.

22.   At one point, the plaintiff's landlord told the officers that he believed the plaintiff was inside his apartment because he could hear him moving (Exhibit Q, p. 104). *Response:* Objection to the hearsay.

23.   The officers also noticed that the plaintiff's television set was on *(Id.,* p. 105). *Response:* Admit that upon the illegal entry they saw the television was on.

24.   An ambulance was called to the scene (*Id.*, p. 119) *Response:*   Admitted and state it was a JHMC ambulance with JHMC employees operating it.

25.   The officers entered his apartment, where they found the plaintiff lying on his bed (Exhibit R, pp. 142-143). *Response:* Admitted

26.   The plaintiff complained he was sick and that his stomach hurt (Exhibit P, p. 262) (Exhibit S, pp. 110-111). *Response:* Denied.  See PMX11: Home Invasion Recording (not feeling well).

27.   He was examined by an Emergency Medical Service Crew member (Exhibit

S, p. 109), and it was recommended that he go to the hospital (Exhibit S, p. 114) (Exhibit Q, p. 164) (Exhibit R, p. 166) because he had high blood pressure (Exhibit R, p. 166) (Exhibit S, pp. 95 and 113) (Exhibit T, p. 96). *Response:* Admit the evaluation but state that the blood pressure was a pretext by the EMTs. Plaintiff's Opp. Mem. Point VI .

28.   The plaintiff agreed to go to the hospital and voluntarily walked to the ambulance, which was located on the street outside his apartment (Exhibit R, p. 166) (Exhibit S, p. 161). Upon reaching the ambulance, the plaintiff turned around and returned to his second floor apartment (Exhibit S, p. 130) (Exhibit R, p. 177). *Response:* Admitted, except state that the "agreement" to go was under duress.

29.   A number of officers, including Chief Marino, followed the plaintiff back into his apartment (Exhibit P, pp. 287-288) (Exhibit K, p. 155). *Response:* Admitted.

30.   The EMS personnel remained by the ambulance, and did not enter the plaintiff's apartment again (Exhibit S, p. 193) (Exhibit T, pp. 114 and 118-119). *Response:* Denied. The evidence does not support the assertion.

31.   The plaintiff refused medical attention (Exhibit K, p. 149) (Exhibit R, p. 177). *Response:* Admitted.

32.   Chief Marino then ordered the plaintiff to be handcuffed and transported to the hospital because he believed the plaintiff was an emotionally disturbed person (Exhibit P, p. 301) (Exhibit K, p. 155) (Exhibit R, pp. 186-187). *Response:* Admit the order but deny that Chief Marino believed Officer Schoolcraft was an EDP. PMX 11: Home Invasion Recording; Plaintiff's Opp. Mem. Point VI .

33.   The plaintiff was handcuffed and transported to the ambulance on a medical chair, where he was then placed on a stretcher in the ambulance (Exhibit K, p. 164) (Exhibit S, p. 196). *Response:* Admitted.

34.    The plaintiff was transported by ambulance to Jamaica Hospital (Exhibit Q, p. 185) (Exhibit K, pp. 180-181) (Exhibit L, p. 335). *Response:* Admitted.

35.    The plaintiff remained in handcuffs and was accompanied by NYPD Lieutenant Christopher Broschart (Exhibit L, pp. 335-336 and 341) *Response:* Admitted.

36.    The plaintiff arrived at Jamaica Hospital Medical Emergency Department, and was triaged at approximately 11:03 p.m. on October 31, 2009 (Exhibit U, p. 17). *Response:* Admitted.

37.    The records state that "EMS said the patient was behaving irrationally" (Exhibit U, p. 13). *Response:* Admitted.

38.    Plaintiff remained handcuffed upon his arrival at Jamaica Hospital (Exhibit L, p. 337). *Response:* Admitted.

39.    The plaintiff was examined and laboratory tests were taken (Exhibit U, pp. 13-14). Response: In addition, a CT Scan was ordered (Exhibit U, p. 115). *Response:* Admitted, except state that a urine test was cancelled. (*Id.*)

40.    No physical problems were found, other than erythematous impressions on both wrists (Exhibit U, p. 13). *Response:* Admitted.

41.    At 12:03 a.m. on November 1, Dr. Silas Nwaishieny examined the plaintiff and requested a psychiatric consultation (Exhibit U, pp. 13-14). *Response:* Objection to the hearsay.

42.    Dr. Khin Mar Lwin, a psychiatric resident, performed the psychiatric consultation, which had been requested because the plaintiff had been acting "bizarre" (Exhibit U, pp. 4-6). *Response:* Denied. The cited evidence does not support the assertion and it based on hearsay.

43.    According to the note, the plaintiff told Dr. Lwin that he was "worried about the situation" (Exhibit U, pp. 4-6). He told her that "this is happening" because he had been discussing

the internal affairs of the police department with his superiors and the Police· Commissioner, that his supervisors were hiding information about robbery and assault cases to improve their statistics for their own advancement, that he has "documentation" about "this crime," and that he has been reporting his supervisors' actions for the past year *(Id.)*.  *Response:*  Admit that the record reflects that.

44.   The NYPD officers who remained with the plaintiff at that time informed Dr. Lwin of the plaintiffs history and the events that occurred throughout the day, and said that that the plaintiff had left work early "after getting agitated and cursing [his] supervisor" (Exhibit U, pp. 4-6).  *Response:*   Objection to the hearsay.

45.   Dr. Lwin was also told that the plaintiff had "barricaded himself" in his apartment, which required the NYPD to break the door down, and that the plaintiff had initially agreed to go to the Hospital for evaluation, but that once he was outside his house, he began to run, after which a chase ensued, and he was brought to the ED in handcuffs (Exhibit U, pp. 4-6) (Exhibit V, p. 45).  *Response:*  Objection to the hearsay.

46.   Dr. Lwin was also advised that the plaintiff had previously been evaluated by an NYPD psychologist and that as a result, the plaintiff has not carried a gun or a badge for almost a year (Exhibit U, pp. 4-6).  *Response:*  Objection to the hearsay.

47.   Dr. Lwin noted that while the plaintiff was in the ED before Dr. Lwin saw him, the plaintiff had become agitated, uncooperative and verbally abusive due to a discussion about using the telephone, and that he had told his treating physician that "they are all against me" (Exhibit U, pp. 4-6).  *Response:*  Objection to the hearsay.

48.   Dr. Lwin performed a mental status examination and determined that the plaintiff was coherent and relevant, with goal-directed speech (Exhibit U, p. 5).  He was irritable with appropriate affect *(ld.)*.  *Response:*  Admitted.

49.    Dr. Lwin noted that the plaintiff denied suicidal and homicidal ideation, but that he was "? paranoid about his supervisors" (Exhibit U, pp. 4-6).  *Response:*  Admitted.

50.    Dr. Lwin determined that the plaintiff's memory and concentration were intact, that he was alert and oriented, but that his insight and judgment were impaired (Exhibit U, p. 6). *Response:*  Admit that is what the record states and deny that his insight or judgment were impaired.  PMX 30 (Dr. Lubit Report that judgment was sound).

51.    Dr. Lwin diagnosed the plaintiff with a Psychotic Disorder, Not Otherwise Specified ("NOS") (Exhibit U, p. 6).  *Response:  Response:*  Admit that is what the record states and deny that the conclusion was proper.  PMX 30 (Dr. Lubit Report that judgment was sound).

52.    Dr. Lwin recommended continued one-to-one observation due to the plaintiff's unpredictable behavior and escape risk (Exhibit U, p. 6.).  *Response:*  Admit that that is what the record states and deny any need for his being detained.  (PMX 30.)

53.    Dr. Lwin also recommended that the plaintiff be transferred to the Psychiatric Emergency Room for further observation after he was medically cleared (Exhibit U, p. 6.) (Exhibit V, p. 47).  *Response:  Response:*  Admit that that is what the record states and deny any need for his being detained.  (PMX 30.)

54.    Dr. Indira Patel, a psychiatric attending physician, confirmed Dr. Lwin's diagnosis and treatment recommendations (Exhibit V, p. 47).  A 6:30 a.m. note indicates that Dr. Lwin discussed the case with the attending physician, and that he concurred with the diagnosis and treatment recommendations *(Id)* (Exhibit U, pp. 4-6) (Exhibit BB, p. 37). *Response:  Response:*  Admit that that is what the record states and deny any need for his being detained.  (PMX 30.)

55.    The plaintiff himself expressed that he had no complaints with regard to

the care and treatment rendered by Dr. Lwin (Exhibit L, p. 497). *Response:* Denied. The cited evidence does not support the assertion.

56. As the attending physician in charge of the plaintiff at this time, Dr. Patel had the ultimate responsibility and was the decision-maker with regard to the plaintiff's care (Exhibit V, pp. 39-41 and 47) (Exhibit W, pp. 320-321). Dr. Lwin, as the resident, could not make a decision with regards to the plaintiff's care without the approval of the attending physician (Exhibit V, pp. 39-41 and 476) (Exhibit W, pp. 320-321). *Response:* Objection to the argument and conclusion and state that the record does not support the assertion.

57. At 6:56 a.m., Dr. Nwaishienyi indicated that the plaintiff would be transferred to the Psychiatric Emergency Department (Exhibit U, p. 14). *Response:* Denied. The record does not support the assertion.

58. Plaintiff's chart from the Medical Emergency Department indicates that the physicians thought that the plaintiff had been arrested (Exhibit U, pp. 4 and 13) (Exhibit V, p. 43). *Response:* Denied. The statement is not a fact, it is a conclusion about a state of mind that it not supported by the evidence so cited.

59. Sgt. Shantell James was afraid of the plaintiff while he was in the Medical Emergency Department (Exhibit GG, p. 77-78). *Response:* Denied. The plaintiff was handcuffed to his gurney and did not do anything to scare her. POX 13: Schoolcraft Tr. 184-186.

60. The plaintiff testified that he believed he had been arrested (Exhibit L, pp. 453-454). *Response:* Admitted.

61. On November 1, 2009 at 6:58 a.m., the Psychiatric Emergency Department was made aware that the plaintiff would be transferred from the Medical Emergency Department (Exhibit U, p. 16). *Response:* Objection to the hearsay.

62.    The Jamaica Hospital chart indicates that the plaintiff was admitted to the Psychiatric Emergency Department under Dr. Aldana-Bernier's service on November 1, 2009, at 8:54 a.m. (Exhibit U, pp. 59-63). *Response:* Objection to the hearsay and to the vague term "admitted."

63.    The plaintiff testified that he was transferred to the Psychiatric Emergency Department on November 1, 2009, early Sunday morning (Exhibit L, p. 345). *Response:* Admitted.

64.    The plaintiff testified that his handcuffs were removed when he was transferred to the Psychiatric Emergency Department (Exhibit L, p. 345). *Response:* Admitted.

65.    A Psychiatric Nursing Assessment Form was completed in the Psychiatric Emergency Department on November 1, 2009 at 9:00 a.m. (Exhibit U, pp. 61-63). *Response:* Admitted.

66.    Dr. Khwaja Khusro Tariq, a resident physician, performed a psychiatric consultation in the Psychiatric Emergency Department at 12:00 p.m. (Exhibit U, pp. 74-79). *Response:* Denied. The record does not support the assertion.

67.    It is documented that the plaintiff had been brought to the ED because he had been "deemed to be paranoid and a danger to himself by his police sergeant" (Exhibit U, pp. 74-79). Contusions were noted on the plaintiff's arms, but he was cooperative, with clear, spontaneous and relevant speech (Exhibit U, pp. 74-79). *Response:* Admit that that is what appears in the record.

68.    The plaintiff also expressed paranoid/persecutory delusions and paranoid thoughts (Exhibit U, pp. 74-79). *Response:* Denied. PMX 30 Dr. Lubit Report).

69.    The plaintiff told Dr. Tariq the he has been reporting irregularities at work to Internal Affairs for over a year, that his supervisors had been under-reporting crime statistics to advance their careers, that he had documentary proof thereof, and that, as a result, he was being

"persecuted" (Exhibit U, pp. 74-79).  *Response:*   Denied.  The record does not support the

assertion that that is what plaintiff said.

70.    The NYPD officer who remained with the plaintiff told Dr. Tariq that the

plaintiff had been acting bizarre (Exhibit U, pp. 74-79).  *Response:*  Objection to the hearsay.

Also, Sergeant James denied making the statement.  POX 52: James Tr. 129-133.

71.    Dr. Tariq stated that the plaintiff was cooperative, but that he was angry, with

constricted affect (Exhibit U, pp. 74-79).  *Response:*  Objection to the hearsay.

72.    Dr. Tariq noted that the plaintiff had paranoid and persecutory delusions

because he believed that he was being persecuted for having reported his supervisors'

irregularities and corruptive behavior (Exhibit U, pp. 74-79).  *Response:*   Objection to the

hearsay and deny the conclusions. PMX 30 :Dr. Lubit Report).

73.    Dr. Tariq also determined that the plaintiff had poor insight and judgment

(Exhibit U, pp. 74-79).  *Response:* Objection to the hearsay and deny the conclusions. PMX 30

Dr. Lubit Report).

74.    Dr. Tariq diagnosed the plaintiff as suffering from Psychosis, NOS, Rule Out

Schizophrenia, Paranoid Type (Exhibit U, pp. 74-79).  *Response:  :*   Objection to the hearsay

and deny the conclusions. PMX 30:Dr. Lubit Report).

75.    At 1:40 p.m., Dr. Tariq wrote an Order for a head CT to be performed (Exhibit

U, p. 82)  *Response:*  Admitted.

76.    At 15:38 and at 5:54, it was noted that the plaintiff had spoken with his

father on the telephone (Exhibit U, p. 82).  *Response:  :*   Objection to the hearsay and deny the

conclusions. PMX 30: Dr. Lubit Report).

77.    On November 2, 2009, the plaintiff was examined by Dr. Heron, who noted

that the plaintiff had been taken to the Hospital because the NYPD thought he was paranoid

and was a danger to himself (Exhibit U, pp. 64-67).  *Response:*  The cited evidence does not support the assertion.

78.   The plaintiff's head CT was read as normal, per the 11/2/0910:45 a.m. CT report (Exhibit U, p. 115).  *Response:* Admitted.

79.   After the plaintiff was transferred to the Psychiatric ED, codefendant Dr. Lilian Aldana-Bernier took over his care as the attending psychiatrist while he was in the Psychiatric ED prior to his admission to the psychiatric unit (Exhibit W, p. 322).  *Response:*  Deny that she "took over" any care of him because she did not conduct an independent or complete examination of him.

80.   As the plaintiffs attending, Dr. Aldana-Bernier supervised the residents who evaluated the plaintiff in the Emergency Room prior to admission, as she had the ultimate responsibility to care for the plaintiff during her shift (Exhibit W, pp. 320-321).  *Response:* Denied. Also, state that the record does not support the assertion.

81.   Dr. Aldana-Bernier determined that the plaintiff was a danger to himself because he was psychotic and paranoid, and would benefit from in-patient stabilization (Exhibit U, pp. 57-58) (Exhibit W, pp. 198 and 217).  *Response:*  Denied. The chart does not reflect that she conducted any kind of evaluation and deny that she made any kind of bona fide determination.

82.   Dr. Aldana-Bernier indicated that she agreed with the previous evaluation by resident Dr. Tariq (Exhibit U, pp. 57-58) (Exhibit W, pp. 167 and 193).  *Response:*   Objection to the hearsay.

83.   On November 3, 2009 at 1:20 p.m., codefendant Dr. Lilian Aldana-Bernier completed the Emergency Admission Form pursuant to Mental Hygiene Law §9.39 (Exhibit U, pp. 57-58).  *Response:* Admitted, except state that in filling out the form she failed to do a

complete job as required by the Mental Hygiene Law.

84.   Dr. Aldana-Bernier made the decision to admit the patient to the psychiatric unit of Jamaica Hospital (Exhibit U, pp. 57-58) (Exhibit W, p. 107) (Exhibit X, pp. 222-223). *Response:*   Admitted.

85.   Dr. Aldana-Bernier provided the plaintiff with written notice of his notice of his status and rights as an admitted patient on November 3, 2009 (Exhibit U, p. 55) (Exhibit W, p. 222). *Response:*   Admitted.

86.   On November 4, 2009, codefendant Dr. Isak lsakov co-signed the Emergency Admission Form that was previously completed by Dr. Aldana-Bernier (Exhibit U, p. 58). *Response:* Admitted.

87.   Also on November 4, 2009, Dr. Isakov wrote the psychiatric admission note (Exhibit U, pp. 94-95).  *Response:*   Admitted.

88.   To obtain the information for the basis of his note, Dr. Isakov spoke to a social worker who previously evaluated the plaintiff, spoke to the plaintiff's father, and evaluated the plaintiff himself (Exhibit X, pp. 144-145).  *Response:* Denied.  The record does not support the assertion.

89.   Dr. Isakov noted that the plaintiff told him that he had not been happy with how the police department was being run since his career started, that he had made multiple complaints which had not been addressed, and that, instead, he was "declared" emotionally "unstable" (Exhibit U, p. 94).  *Response:*   Admitted.

90.   The plaintiff told Dr. Isakov that his gun had been taken away from him after a psychiatric evaluation was performed by an NYPD psychologist, and that, since then, he has started to collect the "evidence" to "prove his point," but then he became suspicious that "they are after him" (Exhibit U, p. 94).  *Response:*   Denied.  The record and the chart do not support

the assertion.

91.    Dr. Isakov found the plaintiff to be suspicious, guarded, restless, and demanding to be discharged (Exhibit U, p. 95). *Response:* Denied on the ground that Dr. Isakov did not genuinely believe that the plaintiff was in need of any further treatment or suffering from any kind of mental illness. (PMX 30: Dr. Lubit Report at 18-20.)

92.    The plaintiff denied suicidal and homicidal ideation, but Dr. Isakov noted that the plaintiff expressed questionably paranoid ideas about conspiracies and cover-ups in his precinct (Exhibit U, p. 95). *Response:* Denied on the ground that Dr. Isakov did not genuinely believe that the plaintiff was in need of any further treatment or suffering from any kind of mental illness. (PMX 30: Dr. Lubit Report at 18-20.)

93.    Dr. Isakov noted that the plaintiff's cognition and memory were intact, but that his judgment and insight were limited (Exhibit U, p. 95). *Response:* Denied on the ground that Dr. Isakov did not genuinely believe that the plaintiff was in need of any further treatment or suffering from any kind of mental illness. (PMX 30: Dr. Lubit Report at 18-20.)

94.    Dr. Isakov's diagnosis was Psychosis NOS, Rule Out Adjustment Disorder with Anxiety (Exhibit U, p. 95). *Response:* Denied on the ground that Dr. Isakov did not genuinely believe that the plaintiff was in need of any further treatment or suffering from any kind of mental illness. (PMX 30: Dr. Lubit Report at 18-20.)

95.    On November 5, 2009, Dr. Isakov performed an evaluation of the plaintiff (Exhibit U, pp. 97-98). *Response:* Denied on the ground that Dr. Isakov did not conduct a proper examination and did not believe that the plaintiff was in need of any further treatment or suffering from any kind of mental illness. (PMX 30: Dr. Lubit Report at 18-20.)

96.    Dr. Isakov noted that although the plaintiff "reiterated his story" and still wanted "to take steps/action against his precinct," he did not express any physical threats to

anyone (Exhibit U, pp. 97-98). *Response:* Denied on the ground that the cited evidence does not support the assertion.

97. The plaintiff refused to give permission for anyone at Jamaica Hospital to speak with the police psychiatrist who had previously evaluated him, but agreed to see a psychotherapist after he was discharged (Exhibit U, pp. 97-98). *Response:* Denied. The cited evidence does not support the assertion.

98. On November 6, 2009, Dr. Isakov performed an evaluation of the plaintiff (Exhibit U, p. 99). *Response:* Denied on the ground that Dr. Isakov did not conduct a proper examination and did not believe that the plaintiff was in need of any further treatment or suffering from any kind of mental illness. (PMX 30: Dr. Lubit Report at 18-20.)

99. Dr. Isakov noted that the plaintiff was compliant, was not in emotional distress, and was not expressing any paranoid ideation or making any threats (Exhibit U, p. 99). *Response:* Admitted.

100. Dr. Isakov indicated that the plaintiff would be discharged after an appointment was made with an outside psychiatrist (Exhibit U, p. 99). *Response:* Admitted.

101. Dr. Isakov composed the plaintiff's Discharge Summary (Exhibit U, pp. 41-42). *Response:* Admitted.

102. Dr. Isakov discharged the plaintiff with a recommendation to follow up with a psychotherapist and, if he became symptomatic, to see a psychiatrist for medication (Exhibit U, pp. 41-42). *Response:* Denied. The record does not support the assertion and Dr. Isakov illegally conditioned release on the plaintiff making an appointment.

103. Dr. Isakov's discharge diagnosis was Adjustment Disorder with Anxious Mood (Exhibit U, pp. 41-42). *Response:* Denied on the ground that the record does not support the assertion and is in error. (PMX 30 at 18-20.)

104.    The plaintiff verbalized an understanding of the recommendation and was discharged on his own on November 6, 2009 (Exhibit U, p. 43).  *Response:*  Denied on the ground that the record does not support the assertion.

105.    After his discharge from Jamaica Hospital on November 6, the plaintiff treated on only one occasion with private physician Dr. Steven Luell (Exhibit L, p. 417) (Exhibit U, p. 46) (Exhibit Y, p. 1).  *Response:*  Denied on the ground that the record cited does not support the assertion and is vague.

106.    According to Dr. Luell's report, the plaintiff complained of stomach distress, anxiety, difficulty relaxing and insomnia, and his mood was depressed (Exhibit Y, p. 1). *Response:*   Objection to the hearsay and lack of foundation for the assertion .

107.    Dr. Luell diagnosed the plaintiff with Adjustment Disorder with Mixed Emotional Features, Rule Out Obsessive Compulsive Personality Disorder, and recommended that the plaintiff undergo a comprehensive psychiatric evaluation and counseling (Exhibit Y, pp. 1-2). *Response:*  Objection to the hearsay and the lack of foundation.

108.    The plaintiff did not follow those recommendations (Exhibit L, p. 417). *Response:*  Admitted.

109.    The Policies and Procedures regarding restraints are from the Policy and Procedure Manual from the Psychiatric Emergency Department of Jamaica Hospital (Exhibit HH, p.1). *Response:*   The document speaks for itself.

110.    A physician in the Medical Emergency Department has authority to keep a patient under observation (Exhibit II, p. 153).  *Response:*   Denied as an assertion of law and state that the assertion is a legal conclusion that does not require a response and is an incorrect statement of law.

111.    The written policy of Jamaica Hospital Medical Center contains language regarding the criteria for involuntary hospitalization that is identical to the language in the Mental Hygiene Law (Exhibits NN and II).  *Response:*   Denied.  Compare the statute with the policy.

112.    Deputy Chief Michael Marino never spoke to any personnel from Jamaica Hospital, including anyone who treated the plaintiff (Exhibit P, pp. 410-411).  *Response:* Denied. The home invasion tape shows communication between the Jamaica EMTs and the others in the apartment.  In addition, there is evidence of conspiracy and collaboration among all the defendants. Plaintiff's Opp. Mem Point VI .

113.    Capt. Theodore Lauterbom never spoke to any personnel from Jamaica Hospital, including doctors and nurses (Exhibit O, pp. 335-336).  *Response:* Denied.  The home invasion tape shows communication between the Jamaica EMTs and the others in the apartment.  In addition, there is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .

114.    Lt. Timothy Caughey never spoke to any personnel from Jamaica Hospital, about the plaintiff (Exhibit MM, p. 4).  Response*:* Denied. There is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .

115.    Deputy Inspector Steven Mauriello did not have any contact with or speak to anyone, including doctors and nurses, at Jamaica Hospital (Exhibit MM, pp. 4-5).  *Response:* Denied.  The home invasion tape shows communication between the Jamaica EMTs and the others in the apartment.  In addition, there is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .    He also spoke to Sergeant Sawyer about his time at the hospital. POX 46: Sawyer Tr. 111-113.  See Responses to Defendant Mauriello ¶ 134 & defendant's opposition Memo Point VI .

116.    Sgt. Rasheena Huffman never spoke to anyone at Jamaica Hospital regarding the plaintiff (Exhibit N, pp. 174-175).  *Response:* Denied. There is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .

117.    Lt. Elise Hanlon never spoke with or had contact with any doctors, nurses or anyone else at Jamaica Hospital (Exhibit S, pp. 270-271).  *Response:* Denied.  The home invasion tape shows communication between the Jamaica EMTs and the others in the apartment.  In addition, there is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .  In addition, her husband worked for the hospital and she has worked with numerous individuals from JHMC, as admitted in her deposition.  POX 29: Hanlon Tr. p. 89, 237.

118.    Capt. Timothy Trainor never spoke to anyone at Jamaica Hospital about the plaintiff (Exhibit MM, p. 6).  *Response:* Denied. There is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .

119.    Lt. William Gough never spoke with anyone at Jamaica Hospital regarding the plaintiff (Exhibit R, pp. 65-74).  *Response:* Denied.  The home invasion tape shows communication between the Jamaica EMTs and the others in the apartment.  In addition, there is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .

120.    Lt. Steven Weiss never went to Jamaica Hospital and never directed anyone to say anything to anyone at Jamaica Hospital (Exhibit MM, pp. 8-9).  *Response:*  Admitted.

121.    Sgt. Kurt Duncan never had any contact with anyone at Jamaica Hospital (Exhibit MM, p. 9).  *Response:*  Denied.  The home invasion tape shows communication between the Jamaica EMTs and the others in the apartment.  In addition, there is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem Point VI .

122.    Lt. Christopher Broschart did not give instructions to anyone at Jamaica Hospital as to what to do with plaintiff (Exhibit Q, pp. 260-261).  *Response:*  Denied.  The home

invasion tape shows communication between the Jamaica EMTs and the others in the apartment.  In addition, there is evidence of conspiracy and collaboration among all the defendants.  Plaintiff's Opp. Mem at pp. 42-62  (Marquez and Broschart discussions with triage nurse).

123.    Lt. Broschart testified that until a physician evaluated the plaintiff, he was in police custody (Exhibit Q, p. 192).  *Response:*  Admit that that is what he claimed at his deposition.

124.    Sgt. Shantel James denied having any contact with anyone at Jamaica Hospital. (Exhibit MM, pp. 10-11).  *Response:*   Admit that the witness made in substance that statement at her deposition and refer the Court to the testimony for its content.

## BERNIER STATEMENT OF MATERIAL FACTS

1.      Plaintiff, Adrian Schoolcraft, filed his Second Amended Complaint, on September 25, 2012.  (Plaintiff's Second Amended Complaint is annexed to Declaration of Paul Callan (hereinafter "Callan Decl.) at Exhibit A).  *Response:*  Admitted.

2.      Dr. Aldana-Bernier served a timely partial motion for summary judgment to dismiss some of plaintiff's causes of action.  *Response:*  Denied as not a fact that requires a response.

3.      After Dr. Aldana-Bernier served her partial motion for summary judgment, Judge Sweet partially granted plaintiff's motion to amend his complaint for a third time on January 16, 2015.  (Judge Sweet's Opinion and Order dated January 16, 2015, is annexed to Callan Decl. as Exhibit F).  *Response:*  Denied as not a fact that requires a response.

4.      Plaintiff filed his Third Amended Complaint on January 22, 2014. (Plaintiff's Third Amended Complaint is annexed to Callan Decl. as Exhibit G).  *Response:*   Denied as not a fact that requires a response.

5.       In his Third Amended Complaint, plaintiff alleges he was a New York City Police officer assigned to the 81st precinct in October 2009.   (Plaintiff's Second Amended Complaint is annexed to Declaration of Paul Callan (hereinafter "Callan Decl.) at Exhibit A at ¶¶30-32).  *Response:*  Denied as not a fact that requires a response.

6.      Plaintiff alleges Dr. Aldana-Bernier violated Mental Hygiene Law § 9.39(a) by failing to perform the necessary test and examinations to determine whether plaintiff was either "1) a 'substantial risk of physical harm to himself as manifested by threats or attempts at suicide or other conduct demonstrating that he his dangerous to himself' or 2) 'a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which

others are placed in reasonable fear of serious physical harm." (Exhibit G at ¶204.)  *Response:*
Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his
Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

       7.    Plaintiff also alleges Dr. Aldana-Bernier "falsified hospital reports in
order  to secure plaintiffs continued confinement in the psychiatric ward when she noted
"PATIENT IS A DANGER TO HIMSELF," without performing any medical test to substantiate
this." (Exhibit G at ¶205).  *Response:* Denied as not a fact that requires a response. Denies the
limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff
alleges is not a "fact" but a contention.

       8.    Plaintiff further alleges that the NYPD defendants conspired to, and
intentionally falsified evidence and submitted it to the Jamaica Hospital staff for the sole purpose
of having plaintiff committed to its psychiatric ward.  (Exhibit G at ¶210).  *Response:*  Denied as
not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third
Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

       9.    In addition, plaintiff alleges Dr. Aldana-Bernier's actions were "taken under the
assumed governmental authority and responsibility to protect the public, in violation of accepted
medical standards and New York Mental Hygiene Law §9.39." (Exhibit G at §243).  *Response:*
Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his
Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

       10.    In attempting to determine the causes of action actually plead against Dr.
Aldana-Bernier, is appears plaintiff asserts his Seventh, Eighth and Ninth claims under §1983
against Dr. Aldana-Bernier as well as his Fourth, Fifth and Seventh claims under New York State
Law.  (Exhibit G at ¶¶ 245-373).  *Response:*  Denied as not a fact that requires a response.  Also,
the statement is unclear as to what appears to be in the mind of defendant's counsel.

11.   Plaintiff's Seventh Claim for Relief is for Involuntary Confinement under 42 U.S.C. §1983.  (Exhibit G at ¶¶ 282-287).  *Response:*  Denied as not a fact that requires a response.

12.   Plaintiff claims Dr. Aldana-Bernier "unlawfully and involuntarily confined plaintiff to JHMC for six (6) days without plaintiff's permission, consent or any lawful basis for doing so, in violation of his constitutional rights as set forth in the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States."  (Exhibit G at ¶283).  *Response:*  Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

13.   It is also alleged that Dr. Aldana-Bernier violated plaintiff's rights under the New York State Mental Hygiene Law §9.39(a) when she failed to perform the proper tests pursuant to the aforementioned section.  (Exhibit G at ¶ 284).  *Response:* Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

14.   Plaintiff's Eighth Claim for Relief is Conspiracy to Violate Plaintiff's Civil Rights under 42 U.S.C. § 1983.  It is alleged that Dr. Aldana-Bernier conspired and acted in concert to do whatever was necessary, lawful of not, to arrest, imprison and involuntarily confine plaintiff.  (Exhibit G at ¶¶ 288-292).  *Response:* Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

15.   This included manufacturing false evidence; destroying evidence; unlawfully entering plaintiff's home; illegally seizing plaintiff's property; verbally and physically threatened plaintiff in an attempt to silence him; stalked and menaced plaintiff at his home; and pressured, bribed, coerced and induced individuals to have plaintiff involuntarily confined to hospital treatment without his consent or any other lawful basis for doing so.  (Exhibit G at ¶291).

*Response:*  Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

16.    Plaintiff's Ninth Claim for Relief is Violation of Substantive and Procedural Due Process under 42 U.S.C. §1983.  (Exhibit G at ¶¶ 293-300).  *Response:*  Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

17.    The claims are Dr. Aldana-Bernier had no objective information to believe plaintiff was a danger to himself or others and was involuntarily hospitalized for six (6) days; never made a determination plaintiff was a danger to himself or others; unlawfully and involuntarily confined plaintiff to Jamaica Hospital for six (6) days without plaintiff's permission; forcibly restrained plaintiff; permitted forcible restraints without considering less restrictive alternatives; and deprived him of his substantive and procedural due process rights. (Exhibit G at ¶¶ 294-300).  *Response:* Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

18.    There is no allegation that Dr. Aldana-Bernier is or was an employee of any federal, state or local government entity.  (Exhibit G).  *Response:* Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what plaintiff alleges is not a "fact" but a contention.

19.    Dr. Aldana-Bernier interposed an Answer to the Second Amended Complaint on October 22, 2012.  (A copy of Dr. Aldana-Bernier's Answer to the Second Amended Complaint is attached to Callan Decl. as Exhibit B).  *Response:* Denied as not a fact that requires a response. Denies the limitations on plaintiff's allegations in his Third Amended Complaint and state that what

plaintiff alleges is not a "fact" but a contention.

20.     Dr. Aldana-Bernier is a physician duly licensed to practice medicine in the State of New York.  (A copy of Dr. Aldana-Bernier's Affidavit dated December 19, 2014 is attached to Callan Decl. as Exhibit C) (Exhibit C at ¶1).  *Response:*   Admitted.

21.     In November 2009, at all times, she was an attending psychiatrist at Jamaica Hospital and director of the psychiatric emergency room.  (Exhibit C at ¶2).  *Response:* Admitted.

22.     She was privately employed at all relevant times to the instant lawsuit. (Exhibit C at ¶2).  *Response:*  Admitted.

23.     Plaintiff, Adrian Schoolcraft, first underwent a psychiatric examination/assessment at Jamaica Hospital at approximately 6:30 a.m. on November 1, 2009. He was examined by Dr. Khin Mar Lwin in the medical emergency room. (Exhibit C at ¶3); (A copy of Jamaica Hospital Medical Records is attached to Callan Decl. as Exhibit D) (Exhibit D at pg 4-6).  *Response:*  Admitted.

24.     Dr. Lwin's note indicated that as per a Sergeant James of the 81st Precinct, plaintiff complained about not feeling well the prior afternoon and left work early after becoming agitated and cursing a supervisor.  The police followed plaintiff to his home.  Plaintiff barricaded himself in his apartment and the door had to be broken down to get him.  Plaintiff initially agreed to go with them for evaluation, but once outside, he ran and had to be chased and brought to the medical emergency room.  (Exhibit C at ¶4; Exhibit D at pgs 4-6).  Response: Objection to the hearsay.

25.     Dr. Lwin's note also indicated, again listing Sergeant James as the source, that plaintiff was evaluated by a New York City Police Department psychiatrist and had not been able to carry a gun or a badge for nearly a year.  (Exhibit C at ¶5; Exhibit D at pgs 4-6).

*Response:*  Objection to the hearsay.

26.     Dr. Indira Patel, a psychiatrist at Jamaica Hospital, subsequently reviewed Dr. Lwin's note and concurred with Dr. Lwin's findings.  (Exhibit C at ¶6; Exhibit D at pgs 4-6).  *Response:*  Admitted.

27.     Later that day, plaintiff was transferred to the psychiatric emergency room  at Jamaica Hospital.  (Exhibit C at ¶7).  *Response:*  Admitted.

28.     Dr. Tariq, a psychiatrist at Jamaica Hospital, performed a psychiatric examination of plaintiff at approximately 12 p.m. on November 1, 2009.  In the section marked chief complaints, Dr. Tariq writes "they just came to my place and handcuffed me" and that according to the accompanying New York City Police Department officer (Sergeant James as per the ER consult note), plaintiff had been acting bizarre.  (Exhibit C at ¶8; Exhibit D at pgs 74-79).  *Response:*  Denied.  The record does not support the assertion.

29.     Plaintiff was next psychiatrically examined by Dr. Slowik on November 2, 2009, at 2:15 p.m.  (Exhibit C at ¶9; Exhibit D at pg 87*)*.  Response*:*  Denied.  The record does not support the assertion.

30.     Dr. Aldana-Bernier examined plaintiff, Adrian Schoolcraft, at Jamaica Hospital on November 2, 2009, at approximately 3:10 pm.  (Exhibit C at ¶10).  *Response:*  Denied.  There is no evidence in the chart that she examined him and Officer Schoolcraft testified that she was in the same area of the hospital as him for a few minutes.   POX 13: Schoolcraft Tr. 355:17-19.

31.     Prior to examining plaintiff, she reviewed the notes created by prior treating physicians and nurses, including, but not limited to, Dr. Lwin, Dr. Patel, Dr. Tariq and Dr. Slowick. (Exhibit C at ¶11).  *Response:*  Denied.  The cited evidence does not support the assertion and she testified at her deposition that she reviewed the file

32.     Dr. Aldana-Bernier made her medical decision regarding plaintiff based on

the notes made by prior physicians and nurses as well as her own evaluation of plaintiff. (Exhibit C at ¶12).  *Response:*  Denied.  She did not conduct an independent examination of plaintiff. POX 48: Bernier Tr. 29 (no memory of any examination) & 192-93 (no notes of her own examination).

33.     Dr. Aldana-Bernier also sought a second opinion from Dr. Dhar concerning plaintiff.  (Exhibit C at ¶13).  *Response:*  Admitted.

34.     Dr. Aldana-Bernier was never told by anyone from the New York City Police Department, or anyone acting on their behalf, to keep plaintiff at Jamaica Hospital against his will.  (Exhibit C at ¶14).  *Response:*  Denied.  She claimed to have reviewed the notes in the chart, including the statements allegedly made by Sergeant James. *See* Plaintiff's Opp. Mem. at pp. 121-127.

35.     She never spoke with the Sergeant James, or any other officer, who is identified in the notes of prior treating physicians.  (Exhibit C at ¶15).  *Response:*  Admitted.

36.     Dr. Aldana-Bernier never spoke with any police officer concerning plaintiff. (Exhibit C at ¶16).  *Response:*  Admitted.

37.     She never spoke with Dr. Catherine Lamstein, who she is advised is a psychiatrist attached to the New York City Police Department, concerning plaintiff. (Exhibit C at ¶17).  *Response:*  Admitted.

38.     Dr. Aldana-Bernier was not, and is not, a participant in any conspiracy to keep plaintiff at Jamaica Hospital against his will.  (Exhibit C at ¶18).  *Response:*  Denied.  See Plaintiff's Opp. Mem. at Point VI  and pp. 121-127.

39.     Dr. Aldana-Bernier's medical decisions concerning plaintiff were entirely based on her sound medical judgment.  They were not influenced by her contact with anyone from the New York City Police Department or any other state actor.  (Exhibit C at ¶19).  *Response:*

Denied.  See Plaintiff's Opp. Mem. at Point VI  and pp. 121-127.

40.     Dr. Aldana-Bernier was not pressured, encouraged or compelled by anyone from the New York City Police Department to keep plaintiff against his will.  (Exhibit C at ¶19).  *Response:*  Denied.  *Id.*

41.     Dr. Aldana-Bernier was not pressured, encouraged or compelled by anyone from Jamaica Hospital to keep plaintiff there against his will.  (Exhibit C at ¶20).  *Response:*  Denied.  *Id.*

42.     Dr. Aldana-Bernier never falsified any medical records concerning plaintiff. (Exhibit C at ¶21).  *Response:*  Objection to the term "falsified" as vague.

43.     Dr. Roy Lubit has been retained by plaintiff as a psychiatric expert. Pursuant to his retention, Dr. Lubit issued an expert report.  (A copy of Dr. Lubit's report is attached to Callan Decl. as Exhibit E.)  *Response:*  Admitted.

44.     In his report, Dr. Lubit claims Dr. Aldana-Bernier committed malpractice, in part, due to her failure to failure to gather information about Mr. Schoolcraft, including speaking with IAB and other key collaterals such as the police.  (Exhibit E at pgs 11-13).  *Response:*  The Report speaks for itself.

**ISAKOV STATEMENT OF MATERIAL FACTS**

1.     Following a lengthy interaction with members of the New York City Police Department ("NYPD"), Adrian Schoolcraft (hereafter "Schoolcraft") was brought to the Jamaica Hospital Medical Center (hereafter ("JHMC") medical emergency room by EMS personnel on October 31, 2009 (Exhibit C, JHMC Chart, pages 1, 2, 3, 4, and numerous other places in the chart).  *Response:*  Admitted.

2.     Schoolcraft was transferred from the medical emergency room to the psychiatric emergency room on November 1, 2009 (Exhibit C, JHMC Chart).  *Response:*  Admitted.

3.     On November 3, 2009, Dr. Aldana-Bernier signed part 1 of the involuntary admission papers for 9.39 admission under the New York State Mental Hygiene Law, thus involuntarily confining Schoolcraft (Exhibit C, JHMC Chart, page 57).  Schoolcraft was then transferred to the psychiatric ward on the third floor of JHMC.  *Response:*  Admitted.

4.     On November 4, 2009, Dr. Isak Isakov signed part 2 of the involuntary admission papers for 9.39 admission under the New York State Mental Hygiene Law, thus confirming the involuntary confinement of Schoolcraft (Exhibit C, JHMC Chart, page 58, affidavit of Isak Isakov, M.D., page 8).  *Response:*  Admitted.

5.     Dr. Isakov carefully evaluated the patient, his claims, his need for hospitalization, and did so free from constraint or undue influence.  (Affidavit of Dr. Isakov, pages 6-12).  *Response:*  Denied.  See PMX 30 (Dr. Lubit Report at pp. 18-20.)

6.     Dr. Isakov had no contact with any New York City employees, including Police Department, Fire Department, EMS, or any other NYC employee, with the exception of an officer from the Internal Affairs Bureau (hereafter "IAB") (Affidavit of Isak Isakov, M.D., pages 2, 10-12; declaration of Brian E. Lee including quotation of testimony at depositions of numerous NYC employees attesting to no such contact).  *Response:*  Denied.  See Plaintiff's Opp. Mem. Point VI .

*See also id* at pp. 121-127 (discussing his need to get approval from the NYPD before releasing the plaintiff).

7.      Dr. Isakov was at a family meeting with Schoolcraft and his father, Larry Schoolcraft, which included, at the request of the Schoolcrafts, the officer from the IAB, Licensed Mental Social Worker Colleen McMahon and Dr. Isakov (Affidavit of Isak Isakov, M.D., pages 2, 10-12). *Response:*  Admitted.

8.      The meeting was tape recorded (Source: Affidavit of Isak Isakov, M.D., page 11). The IAB officer did not request, pressure or in any way influence the independent medical judgment concerning Schoolcraft made by Dr. Isakov (Affidavit of Isak Isakov, M.D., pages 2, 10-12). *Response:*  Admit that IAB recorded the meeting and refer the Court to its contents.

9.      Dr. Isakov requested permission from Schoolcraft to obtain a copy of his prior records from the police psychologist who had ordered taking his gun away (Source: Affidavit of Isak Isakov, M.D., page 12). That request was denied by Adrian Schoolcraft (Exhibit D, deposition of Adrian Schoolcraft, page 436-437). *Response:*  Denied on the ground that the cited evidence does not support the assertion.

10.    All of the decisions made by Dr. Isakov were the result of the exercise of his independent professional medical judgment (Affidavit of Isak Isakov, M.D., pages 2, 4, 10).

*Response:*   Denied.  POX 55 and POX 13 at pp. 183-186.  See Plaintiff's Opp. Mem. Point VI .

*See also id* at pp. 121-127 (discussing his need to get approval from the NYPD before releasing the plaintiff).   See also PMX 30 (Dr. Lubit Report at pp. 18-20.)

 Dated: February 11, 2015

*s/NBS*

_____

Nathaniel B. Smith

*s/JL*

_____

John Lenoir
