UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                           Plaintiff,              10-CV-6005 (RWS)

              -against-


THE CITY OF NEW YORK, *et al*.,

                           Defendants.

----------------------------------------------------------X

DEFENDANT STEVEN MAURIELLO'S RULE 56.1(b) STATEMENT
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
SEEKING DISMISSAL OF MAURIELLO'S COUNTERCLAIMS

Pursuant to Rule 56.1(b) of the Local Civil Rules of the Southern and Eastern

Districts of New York, defendant Steven Mauriello responds as follows to the numbered

paragraphs re-stated below of the Rule 56.1 Statement submitted in support of plaintiff's motion

for summary judgment seeking dismissal of Mauriello's counterclaims.  Defendant Mauriello

then sets forth additional paragraphs containing separate, short and concise statements of

additional material facts as to which it is contended there exists a genuine issue to be tried.

Plaintiff's motion for summary judgment with respect to Mauriello's

counterclaims therefore must be denied.

1.      On July 1, 2002, Officer Schoolcraft joined the New York City Police
Department ("NYPD"), and for most of his career, he was assigned as a Patrol Officer in the 81st
Precinct, which is located in the Bedford Stuyvesant neighborhood of Brooklyn.[1]

Response:      Not disputed.

2.      The 81st Precinct is one of ten Precincts that are located in the geographical
area known as "Patrol Borough Brooklyn North."   As a Patrol Officer, Officer Schoolcraft was a

---

[1] Plaintiff's Motion Exhibit 1 (hereinafter "PMX") at NYC 0001 (oath of office, dated 7-1-02).

fine officer who ably and satisfactorily performed his duties and received satisfactory or better performance reviews for most of his career.[2]

        Response:      Not disputed except with respect to the assertion that "[a]s a Patrol Officer, Officer Schoolcraft was a fine officer who ably and satisfactorily performed his duties." From 2006 through 2008 and continuing into 2009, Adrian Schoolcraft converted from being an officer performing at or above acceptable performance standards to a disaffected and ultimately malingering officer who failed and refused to satisfy his basic duties and responsibilities.  (See PMX 1.)

        The evidence indicates Schoolcraft's transformation evolved in part as follows:   He took an extended leave of absence in the latter half of 2005 to attend to his father in upstate New York, who was sick at the time. (See SM Exhibit BJ.)  In 2006, Schoolcraft fell below an earlier rating of 4.0, but continued to perform reasonably well, and achieved a 3.5 rating (with 5 being the highest possible rating, and below 3 being unsatisfactory.) (See PMX 1.) He showed signs in 2006, however, of anger and resentment toward the job, as displayed by his submission of a complaint against the Commanding Officer of the 81st Precinct, Robert Brower, regarding "forced overtime," claiming it was a "chronic safety issue." (See SM Ex. BK, Schoolcraft Report to Brower, April 10, 2006.)  In June 2007, Schoolcraft again became upset with the job, and wrote to Robert Brower as the Commanding Officer of the 81st Precinct to complain about how he had been treated by a Lieutenant Jones when Schoolcraft sought additional time off to pick up his father after another hospital stay.  (SM Ex. BL, Schoolcraft Report to Brower, June 11, 2007.)

---

[2] PMX  1:  NYC 005-007 (fine officer with great potential); 043-44 ("extremely competent" and an "asset for the department); 045-46 ("highly competent"); 087-91 ("fine officer with great potential"); 176-81 ("well-rounded officer" and a "steady and reliable performer").  For the years 2003, 2004, 2005 and 2006, Officer Schoolcraft received yearly performance evaluations of 3.5, 4.0, 3.5 and 3.5, respectively.  (NYC 398-400, 171-72, 176-78 and 179-81.)   It was only in 2007, after Defendant Mauriello became the Executive Officer and then the Commanding Officer of the 81st Precinct in 2007 and 2008 that Officer Schoolcraft's yearly performance ratings dropped to 3.0 in 2007 and 2.5 in 2008.  (NYC 186-88 and 173-75.)

Around the same time, in March of 2007, Schoolcraft's father was hospitalized after being picked up in a public place by the local police in his upstate town on suspicion of intoxication, which the father later claimed was an adverse reaction to his medication. The father claimed to have been left out in the cold on his porch by local law enforcement and to have remained there for perhaps two days, suffering permanent injuries. (SM Ex.. BM, May 7, 2008 article from The Leader Herald.) Schoolcraft assisted his father in his recuperation after his release from the hospital. The father then came to live with Schoolcraft in Queens, where the father remained until some time in early 2008. (SM Exhibit BM, Leader Herald; SM Exhibit BN, AS2 p. 88 ll. 6-25.) While the father was living with Schoolcraft, his upstate house was burglarized and, among other things, the ashes of Schoolcraft's deceased mother were stolen. According to an article published by local media, Schoolcraft said the burglary of his mother's ashes "affects me every day" and "it's the last thing I think about before I go to sleep at night." (SM Exhibit BM, May 7, 2008 article from the Leader-Herald.) Schoolcraft was not pleased with the way the police and investigators handled the situation. (SM Exhibit BN, AS2 p. 88 ll. 20-25.)

Whether it was those troubles or other issues in Schoolcraft's life, it is clear that by early 2008 Schoolcraft had become a disaffected, under-performing cop. (See PMX 1.) As his supervisors described at the February 25, 2009, appeal meeting, Schoolcraft repeatedly was accompanied on tour with one of his supervisors and in each instance demonstrated he knew how to do the police work required of him. (SM Exhibit D at 22:30-23:15). Then, he would go back on patrol with another officer and not engage in any of the police enforcement work expected of him. Apparently Schoolcraft had a significant number of CCRB complaints against him in earlier years, and at the appeal meeting he alluded to them and to civil rights complaints against him, as well as an FBI investigation, as possible explanations for his failure to be engaged in his work. He

indicated that his experience had caused him to become "more cautious." (SM Ex. D at 23:40-24:10; SM Ex. BO.)

One particularly good illustration of just how disaffected Schoolcraft had become about the job occurred in February, 2009.  He appeared in court to testify, but was over an hour late and showed up wearing jeans and sneakers. (SM Ex. BP, Command Discipline).  All indications were he just was not engaged in doing police work anymore.

Other examples of troubles in Schoolcraft's life that might help explain his failure to perform include the following:  i) according to his father, Schoolcraft was always very "different" and "he just does not talk about anything" (SM Ex. BQ, L; Schoolcraft Dep. p. 142-143 ll. 13-11); ii) as Schoolcraft told his father in a recorded conversation in October 2009, he had no friends in the NYPD (SM Ex. BR at 15:00-15:20); in fact, at the appeal meeting in February 2009, he was unable to identify any officer he would like to partner with so that he might be more engaged in the job (SM Exhibit D at 51:00-52:00); iii) in his earlier years in the 81st Precinct, Schoolcraft apparently lived for a time in the basement of the precinct (SM Ex. BS at 2:00-2:30, IAB Interview with PBA delegate Richard Braun); iv) Schoolcraft's mother died at the end of 2003 causing Schoolcraft to take nearly a month off from work; then, when his father was ill in 2005, he took at least three months off; in 2007, he also took time off from work to tend to his father; as Sergeant Weiss observed in the February 2009 appeal meeting, Schoolcraft simply was not the same after that (SM Ex. D at 43:00-44:00);  v) Schoolcraft had been placed on force monitoring for nearly a year in 2004 and 2005 for his conduct on the job (SM Ex. BO, Schoolcraft Employment Record); he was the subject of CCRB and civil rights complaints by the public with whom he interacted on the job, as he explained at the appeal meeting in February 2009 (SM Ex. D at 23:30-24:30; SM Ex. BO, Schoolcraft Employment History); vi) the public's complaints about him apparently were so troubling to Schoolcraft that he began to secretly record his time on the job,

possibly starting in 2006 (SM Ex. BN, AS1 Dep. pp. 29-30 ll. 15-24); vii) the evidence, principally

plaintiff's recordings, indicates his father, who had himself been involved in lawsuits against

police departments for which he had worked, as well as a lawsuit against the local police in upstate

New York for leaving him out in the cold (SM Ex. BQ, L. Schoolcraft Dep. pp. 10-18 ll. 20-9), at

times appears to have aggressively attempted to influence Schoolcraft's conduct, including

directing his actions as they attempted to orchestrate the events of September and October of 2009

(SM Exs. Q at 3:02.00-3:08.00, 5:24.00, 6:49.00-7:02.00; SM Exhibit R; and SM Exhibit BR at

0:00-15:00); and viii) Schoolcraft's family history indicates the family may have been very

troubled, as revealed by his estranged sister to the NYPD during an Internal Affairs Interview.

Schoolcraft's sister describes Larry Schoolcraft as a "leach" whose modus operandi was to create

controversy where none existed to reap a monetary reward. Much to her dismay, Schoolcraft was

once a "good kid" who had unfortunately, in her opinion, fallen under his father's influence.  (SM

Ex. BT at 2:00-8:00, IAB Interview with Misty Schoolcraft.)

   It is hard to know to what extent any or all of these conditions came to influence

Schoolcraft's attitude and emotional state, but, despite all of the instruction and encouragement he

received from his supervisors in 2007 and throughout 2008, Schoolcraft simply failed to make a

commitment to perform effectively on the job and refused to become engaged in his work.  He

never revealed any of his personal struggles, and he never offered them as an excuse for any of his

behavior other than at the appeal meeting on February 25, 2009, when he briefly alluded to

complaints made against him and investigations conducted into his conduct as a possible cause for

him becoming "more cautious."   Soon after the appeal meeting, as a result of ensuing events and

Schoolcraft's distressed reaction to them (if even that can be believed), Schoolcraft was placed on

restricted duty (SM Ex. K, Restricted Duty Memo), and never served as a patrol officer again.

Some time after Mauriello's approval of Schoolcraft's final evaluation for 2008 (SM Exhibit A, Schoolcraft 2008 Evaluation), Schoolcraft began to devote himself to getting revenge against Mauriello by false pretenses (that he no doubt also hoped might one day reap him an undeserved monetary recovery based upon those same false pretenses.)  It may be that Schoolcraft did not fully commit to getting revenge until after he started to get more closely monitored in March 2009, or after he was placed on restricted duty in April 2009, or possibly not until his restricted duty was extended in July 2009, but there is no doubt that revenge became the ultimate goal of his efforts.

Schoolcraft thus had gone from being a decent cop to being a malingering, disaffected cop, determined to get revenge. In his own words, spoken to his father on October 7, 2009, he stated "but you're right…this is the way to fuck him over" (SM Ex. BR at 7:10-7:40, Schoolcraft telephone conversation with father, who is mostly not heard, before Schoolcraft's October 7, 2009, QAD meeting.) Also in his own words, uttered to another officer on the morning of October 31, 2009, "that fat miserable fuck… If I could get [Mauriello]…if I could get him…I would sell him out faster than anything."  (SM Ex. Q at 46:00-47:30). Most notably, as Schoolcraft was about to enter his meeting with QAD, he was advised by his father to "never, ever tell them this is about revenge", revealing that Schoolcraft's motivation was, in fact, about getting revenge. (SM Exhibit BR at 2:30-2:45, Schoolcraft conversation with father before QAD meeting.)

3.      In October of 2006, the NYPD assigned Defendant Steven Mauriello to be the Executive Officer of the 81st Precinct.[3]  As the Executive Officer, Mauriello was the second in command at the 81st Precinct.  According to Mauriello, he requested that transfer because it was his stated desire to become a commanding officer of an NYPD Precinct.[4]

---

[3] PMX 2:  SM 340-43.
[4] PMX 34:  Mauriello Tr. 48:15 ("I wanted to go back to be an XO and earn my way back up again.")

Response:        Not disputed, except to the extent it asserts Mauriello requested a

transfer to the 81st Precinct.  Mauriello requested a transfer from his position as the Commanding

Officer of the Brooklyn North Anti-Crime Unit to a position in a precinct that would enable him to

earn an appointment as a Commanding Officer as well as a promotion to Inspector and perhaps

Assistant Chief. (See SM Aff. in Opp. ¶ 2.)

4.       After Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft
and other officers at the 81st Precinct began getting increasingly greater pressure at roll calls to
achieve quotas on their number of arrests, summons and stops and to falsify documentation about
the receipt of training during roll calls.[5]

Response:        Disputed.  First, Mauriello rarely addressed roll calls at the 81st

Precinct as the Executive Officer (SM Aff. in Opp. ¶ 3).  Second, Deputy Inspector Brower was the

Commanding Officer of the 81st Precinct in 2006 and 2007 and regularly addressed roll calls (SM.

Aff. In Opp. ¶ 3).  Third, quotas were not prohibited in any event, except for traffic violations (see

VTL section?)  In addition, Schoolcraft is the only person assigned to the 81st Precinct during the

tenures of Mauriello and his predecessor Brower, as the Commanding Officers of the 81st Precinct,

who has made this assertion (note that it is only Schoolcraft's testimony that is cited.)  In fact,

Police Officer Joseph Ferrara was assigned to the 81st Precinct in April 2009 and continued there

through 2010.  He was deposed at plaintiff's request because he had expressed a complaint to

Schoolcraft's previous attorney that Mauriello had referred to Schoolcraft as a rat when  the news

reports first began to be published about Schoolcraft's allegations.  Ferrara explained that he

thought such talk was inappropriate by a Commanding Officer.  He went on to say he did not

know of any other wrongdoing in the 81st Precinct – no quotas, no pressure to misclassify crime,

no inappropriate punishment of officers for failing to do their job effectively.  He also expressed

high praise for Mauriello as a Commanding Officer.  (See SM Ex. DE, Ferrara Dep. pp. 56, 81—

---

[5] PMX 4:  Schoolcraft Tr.  29:13-30:12 & 32:24-33:5.

82, 188-89 and 209-13.)   Despite more than 18 months of secretly recording conversations at the 81st Precinct, plaintiff has been able to identify only a de minimus number of instances where any discussion of numbers of arrests, summonses and stops took place involving supervisors, and even more rarely involving Mauriello, and in each of those instances there is no indication anyone suffered any adverse consequences on the job for failing to achieve the numbers mentioned.  The numbers mentioned simply were not being imposed as quotas.

There also is only de minimus evidence in Schoolcraft's 18 months of recording roll calls of the training sergeant asking officers to sign the training log at roll call when the recording did not capture any training taking place during the roll call, which is when training often would be provided.  One explanation is that training often would take place before roll call and at times after.  There certainly is no indication of Mauriello being aware of any instance where the training log was signed without training taking place, and there is no evidence of anyone benefitting from falsely reporting that training had been provided.  Finally, the point Schoolcraft ultimately decides to make about the importance of the training log being signed if no training was provided was expressed by him at his only meeting with QAD on October 7, 2009, essentially as follows:  without training, the patrol officers did not know the elements of a crime and thus did not know how to challenge supervisors who allegedly told them to downgrade crimes on complaint reports (SM Exhibit BR at 56:30-57:00 and 1:19.10-1:19.30, Schoolcraft QAD meeting recording.) There is no evidence, and remarkably no recording, of anyone being told to downgrade a crime and no evidence of any officer not knowing the elements of a crime.

5.     Because Officer Schoolcraft had concerns about the lawfulness of these directions, he eventually began tape recording roll calls at the 81st Precinct.[6]

---

[6] *Id.*

Response:        Disputed.  Schoolcraft has acknowledged he began recording on the job as early as 2006 (SM Ex. BN, AS1 29:15-17) because he was regularly the subject of CCRB and civil rights complaints by members of the public with whom he interacted as an officer (SM Exhibit D at 23:40-24:10) – so much so that he was placed on force monitoring in 2004 for a full year (SM Ex. BO, Schoolcraft Employment History.)  Yet, Schoolcraft did not produce any recordings from 2006 or 2007.  His earliest produced recording is from April 2008, and the only portions of his tours of duty which have been produced -- with very few exceptions, when it apparently suited Schoolcraft -- are the roll calls.  Based upon the foregoing as well other evidence, including the data relating to the recordings as revealed by the digital files produced by Schoolcraft, Schoolcraft apparently has withheld not only the earlier recordings, but also recordings of the portions of his tours of duty other than the roll calls, as well as a number of roll call recordings during the period for which recordings were produced.  (See SM Ex. CY, a disk of the roll call recordings produced by Schoolcraft.)

One striking example of a recording being withheld is as follows:  Schoolcraft produced in discovery the recording he secretly made of his meeting with QAD on October 7, 2009, but deleted from the recording was the conversation he had with his father on his way to the meeting, which was part of one uninterrupted recording that continues through the end of the QAD meeting.  That deleted portion of the recording, which was independently retrieved and preserved by IAB, sheds a bright light on Schoolcraft's true feelings of revenge against Mauriello and disdain for the community and his fellow officers. (SM Ex. BR at 2:30-2:45, 3:45-4:15, 7:10-7:40, and 14:55-15:20; see paragraph 42 below.)

6.        Coincident with Defendant Mauriello's arrival at the 81st Precinct, Officer Schoolcraft's performance evaluations began to decline.[7]  For 2007, Officer Schoolcraft received a 3.0 rating, which was the equivalent of a marginally satisfactory rating.[8]

---

[7] See n. 2 supra.

Response:      Disputed.  See response to paragraph 2.  There is no correlation

between Schoolcraft's performance evaluations in 2006 through 2008, and Steve Mauriello's

appointment as Executive Officer of the 81st Precinct in October 2006. First, Schoolcraft received

a 3.5 rating in 2006 even though Mauriello had by then been in the 81st Precinct for three months

(see PMX 1.)  Second, as the Executive Officer, Mauriello was subordinate to Inspector Brower,

the Commanding Officer and the person with overall responsibility for the operations of the

precinct.  As Executive Officer, Mauriello played no role in Schoolcraft's evaluation for 2006 or

2007 -- as a direct supervisor or as one of the raters or the reviewer (see PMX 1), and he only

occasionally addressed roll calls (SM Aff. in Opp. ¶ 3).  He also did not set the tone for the law

enforcement conducted in the 81st Precinct.  As the Commanding Officer throughout 2008,

Mauriello's only role in evaluating Schoolcraft was as the person designated by the Patrol Guide to

serve as the reviewer of the evaluation provided by Schoolcraft's supervisors because he received

an unsatisfactory rating.  (See SM Ex. BU, Patrol Guide section 205-58, Appeal of Evaluation-

Uniformed Member of Service; SM Ex. BV, Mauriello Dep. p. 172 ll. 4-7.)

7.      In that evaluation, Officer Schoolcraft was criticized for not achieving
"activity goals" and "performance goals," which are coded phrases that refer to numerical quotas
imposed on Patrol Officers.[9]

Response:      Disputed.  A quota is understood to be a specified number that an

officer is required to meet or suffer adverse consequences on the job (see SM Ex. BW), and there is

---

[8] PMX 1:  NYC 065-69.
[9] *See generally Floyd v City of New York*, 959 F. Supp. 2d 540, 590, 596, 599 & n. 264 (S.D.N.Y. 2013) (increase in stops achieved by pressure on commanders at CompStat meetings to increase numbers and commanders in turn pressures mid-level mangers and line officers to generate numbers; abundant evidence that supervisors directed officers to meet numerical goals for stops, arrests and other enforcement activity as well as threating officers with negative consequences if they did not achieve those goals; "supervisors must evaluate officers based on their activity numbers, with particular emphasis on summons, stops, and arrests, [and] officers whose numbers are too low should be subject to increasingly serious discipline if their low numbers persist")

no evidence of such adverse consequences being suffered in the 81st Precinct, and even if there

were, New York law only prohibited quotas for traffic violations.  (See SM Ex. BW.)  It was not

until 2010 that stops, summonses and arrests also could not be covered by quotas.  (See SM Ex.

BW.)  Still, in 2008 and 2009, there was no punishment of officers for failing to achieve a stated

number of stops, summonses and arrests.  (See SM Ex. BX. IAB Interviews of officers, and SM

Ex. DE, Ferrara Dep. pp. 82 and 188-89.)

In 2007, Schoolcraft exhibited modest commitment to his duties and

responsibilities, and was minimally engaged in trying to satisfy those responsibilities (see PMX 2).

He was not penalized, however, and instead, he received an appropriate rating and tremendous

encouragement and support from his supervisors throughout 2008.  As became clear in 2008 and in

the beginning of 2009, including at the appeal meeting in February 2009, Schoolcraft had no

intention or interest in responding positively to the encouragement and support.  He alluded to

problems he had experienced with the public on the job, but otherwise took no responsibility for

his poor performance and showed no signs of a desire to improve. (SM Exhibit D at **2**3:40-24:10.)

8.     After being the Executive Officer at the 81st Precinct for one year, "One
Police Plaza" made the decision on December 1, 2007 to promote DI Mauriello to the position as
Commanding Officer of the 81st Precinct, and later he received a promotion to the title of Deputy
Inspector ("DI").[10]

Response:     Not disputed.

9.     Under the command of DI Mauriello, the pressure to maintain numbers
increased and Officer Schoolcraft's performance evaluations came under even greater scrutiny.

Response:     Disputed, and plaintiff cites no support for the statement.  Plaintiff is

the only person assigned to the 81st Precinct during the tenures of Steven Mauriello and his

predecessor Robert Brower, as the Commanding Officers of the 81st Precinct, to make this

assertion.  In fact, 81st Precinct police officers interviewed by the NYPD Internal Affairs Bureau

---

[10] PMX  3:  Mauriello Tr. 51:12-25.

summarily denied that there was increased pressure from Steven Mauriello or other supervisors
that went beyond a desire to maintain an active enforcement presence in the precinct. (See SM
Exhibit BX, IAB Interviews of 81st precinct police officers.) There is no evidence of increased
pressure being applied to Schoolcraft or any other officer to do anything other than the job they
were employed to do, and there is no evidence Schoolcraft's performance evaluations came under
even greater scrutiny, except to the extent Schoolcraft was less and less engaged in his work.
Another officer received a 2.5 rating for 2008, and he took it as motivation to improve his
performance, which he did. (See SM Aff. in Opp. ¶ 4.)

Schoolcraft's performance simply was unsatisfactory throughout most of 2008,
despite receiving encouragement and support from all of his supervisors, not only throughout that
year, but also into the beginning of 2009. (SM Exhibit D at 13:00-17:00.) He failed and refused to
improve. As required by the NYPD Patrol Guide, a meeting was held, conducted by Steven
Mauriello, as the Commanding Officer, in February 2009 to discuss Schoolcraft's evaluation
before he had to decide whether to proceed with the appeal. (SM Exhibit BU, Patrol Guide section
205-58; SM Exhibit D.)

10.    During the course of second, third and fourth quarters of 2008, Officer
Schoolcraft's supervisors persistently criticized him for his low "activity" and his failure to meet
activity standards.[11]

Response:    Disputed to the extent it suggests the supervisors personally or
openly criticized Schoolcraft or criticized Schoolcraft's numbers simply for numbers sake. Not
surprisingly, despite secretly recording on the job throughout at least most of 2008, there is not a
single recording of any supervisor criticizing Schoolcraft. The supervisors did make critical

[11] PMX (PX 21): NYC 106 (as of May 2, 2008, "needs improvement in area of activity"); NYC
110 (as of July 4, 2008, "activity is still substandard and is unacceptable" and was instructed "on
productivity expectations'); NYC 116 (as of October 1, 2009, "does not meet activity standards"
and has been told about his "low activity"); NYC 122 (as of January 1, 2009, Officer Schoolcraft
has been counseled on "his poor activity which is unacceptable").

12

comments about Schoolcraft's performance in their monthly performance reports and quarterly

ratings, which are essentially confidential communications. (See PX 5.)  As Plaintiff's own

statement admits, Schoolcraft's supervisors were well aware of Schoolcraft's barely satisfactory

performance during 2007 and his diminishing performance throughout 2008 and made repeated

efforts to instruct, motivate, encourage and support him to become engaged in satisfying his duties

and responsibilities.  (SM Ex. D; see plaintiff's footnote 11.)  Despite all of their efforts,

Schoolcraft failed and refused to become engaged in the fundamental work of a law enforcement

officer or to improve his performance to at least a minimally satisfactory level. (See PMX 5.)

        11.     Based on these criticisms, in January of 2009, DI Mauriello gave Officer
Schoolcraft a failing evaluation of 2.5.[12]

        Response:     Disputed.  Steven Mauriello reviewed the monthly, quarterly and

final evaluations by Schoolcraft's supervisors of Schoolcraft's performance throughout 2008.  (See

SM Ex. BV, Mauriello Dep. p.174 ll.15-20.)  Then, after learning of the efforts of the supervisors

to encourage Schoolcraft's improvement and to support any effort he made to do his job, as well as

hearing Schoolcraft's response at the appeal meeting, Mauriello decided to approve the final

evaluation, which contained the unsatisfactory rating.  (PMX 2; SM Ex. D at 32:20-33:30, 57:00-

1:00.00; SM Ex. BV,  Mauriello Dep. p. 193 ll. 2-21)  As Mauriello wrote when finalizing the

evaluation:  "Police Officer Schoolcraft has been counseled by both his Squad Supervisor and his

Platoon Commander about his lack of drive.  He has yet to show any improvement.  I concur with

the above evaluation." (SM Exhibit A, Plaintiff's Evaluation for 2008.)

        12.     Tracking the negative comments during the course of the year, DI
Mauriello's 2008 performance evaluation recommended that Officer Schoolcraft be transferred
because of his "poor activity," for his "approach to meeting the performance standards" and for his
disregard of the "activity standards" of an NYPD Police Officer. [13]

---

[12] PMX 5 (PX 51); PMX 3: Mauriello Tr. 190:23-196:25.
[13] PMX 5 (PX 51) at NYC 071)

Response:     Disputed to the extent it indicates Steve Mauriello simply tracked or repeated negative comments made by Schoolcraft's supervisors throughout the year in their quarterly evaluations, and to the extent it suggests that the recommendation of a transfer of Schoolcraft was intended as punishment or criticism or was a sign of some personal or professional animus.  Steve Mauriello took into consideration the entire performance record of Schoolcraft, as well as the description by his supervisors of their efforts to help him improve, along with Schoolcraft's apparent unwillingness to take responsibility for his poor performance or to indicate a desire to improve. (SM Ex. BV, Mauriello Dep. pp. 199-206 ll.20-24.)  As reiterated in a subsequent conversation with Chief Marino, a transfer was recommended in the hope a change of circumstances might be more suitable for Schoolcraft or might help motivate him to do better. (SM Exhibit BV, Mauriello Dep. p. 277 ll. 2-15).

13.     Officer Schoolcraft objected to this evaluation and informed his superiors that he wanted to appeal the failing evaluation. [14]

Response:     Not disputed.  At the appeal meeting, after an extended discussion, Schoolcraft indicated he had already retained an attorney and would be appealing his evaluation (SM Exhibit D at 58:00-60:00).

14.     The appeal process involved the transmission of paperwork to the next level of the command structure, which was the Brooklyn North Patrol Borough, headed by Defendant Chief Gerald Nelson and Defendant Deputy Chief Michael Marino.[15]

Response:  Not disputed.  It was explained to Schoolcraft at the meeting that he had to submit his appeal, in accordance with the Patrol Guide procedures, in writing directly to Patrol Borough Brooklyn North. (SM Ex. D at 59:00-60:00); SM Ex. BY, Schoolcraft memo book entry noting he was informed of the appeal procedures.)

---

[14] PMX  3:  Mauriello Tr. 190:18.
[15] PMX  3:  Mauriello Tr. 192:4 ("Chief Marino has an appeal board with borough inspectors").

15.     At around this time, a poster appeared on Officer Schoolcraft's locker containing the words:  "IF YOU DON'T LIKE YOUR JOB, THEN MAYBE YOU SHOULD GET ANOTHER JOB."[16]

Response:     Disputed to the extent this is intended to refer to an advertising poster for CareerBuilder.com with the tagline "If you don't like your job then maybe you should get another job. Start Building," or to suggest that the poster was placed on a locker used by Schoolcraft in response to him informing 81st Precincts supervisors that he wanted to appeal.  First, Schoolcraft's own recording indicates that 81st Precinct supervisors remained positive about their ability to motivate Schoolcraft and assist him through any difficulties he was having (SM Exhibit D at 28:00-28:30, 43:00-45:30, and 50:00-52:00).  Second, nothing in the record indicates that Schoolcraft ever complained or expressed concern that he was being harassed or intimidated by anyone, including by the placement of this sign, because of his intention to appeal or otherwise. In fact, Schoolcraft's deposition testimony and his statements to QAD in October 2009 indicate he did not believe his supervisors or fellow officers were retaliating against him either at his appeal meeting or thereafter. (See SM Ex. BN, AS1 262:19-24 and AS2 55:13-20; SM Exhibit BR at 27:45-27:55. ) Third, the earliest photograph taken of Schoolcraft's locker with the sign taped to his locker, apparently was taken by Schoolcraft on January 31, 2009 (SM Ex. BZ, IAB Locker/NYC ).  Remarkably, though the picture easily could be removed, it remained taped to his locker until it was photographed by IAB some time in 2010, suggesting may have put it there in the first place. (SM Exhibit CA, NYC 12004.)

16.     Another handwritten note that later appeared on his locker stated:  "shut up, you idiot."[17]

Response:     Disputed to the extent the statement is intended to suggest the note was directed at Schoolcraft.  The photograph cited depicts a sticker on what was once Schoolcraft's

---

[16] PMX 1:  NYC 12003.
[17] PMX  1:  NYC 12005.

locker.  The sticker is the same sticker depicted in earlier photos taken in January 2009 through

January 2010.  The cited photo was taken as recently as 2013 and for the first time depicts the

sticker with the scribbled note "shut up, you idiot."  By that time, Schoolcraft had not been back to

work for three years or so and the locker had been reassigned multiple times to several different

officers (SM Ex. CB NYC 11909-12002).  The note appears to simply be recent graffiti. The

suggestion that this note was written on Schoolcraft's locker with the purpose of harassing him or

attempting to silence him is simply wrong. (SM Exhibit CC, NYC 12005).

    17.    On February 25, 2009, Officer Schoolcraft met with several supervisors at
the 81st Precinct, including DI Mauriello, and his new Executive Officer, Defendant Captain
Theodore Lauterborn. [18]

    Response:    Not disputed.  We have referred to this as the "appeal meeting."

Also in attendance were Lieutenant DelaFuente, Lieutenant Mascol, Lieutenant Caughey, Sergeant

Weiss, Sergeant Stukes and Schoolcraft's union delegate (SM Exhibit D).


    18.    During the meeting, Officer Schoolcraft confirmed his intent to appeal the
failing 2008 performance evaluation and repeatedly asked for information about what numbers are
required of him. [19]

    Response:    Not disputed except Schoolcraft did not confirm his intent to appeal

until the last minute of a one-hour meeting at which supervisors repeatedly offered Schoolcraft

multiple forms of assistance to help improve his performance. (SM Exhibit D at 59:40-61:00.)

Also, as the appeal meeting recording indicates, Schoolcraft actually asked two or three times in

the first few minutes of the meeting "what is the standard?" (SM Ex. D at 17:20-18:30).  In

response, Mauriello responds "there is no standard" and "there is no line where I judge good

activity and bad activity, I highlight everything…you've got to do something out there." (SM

Exhibit D at 17:20-19:40.)  Schoolcraft's claim that his evaluation was based on numbers indicates

---

[18] PMX 1:  NYC 191.
[19] PMX  3:  Mauriello Tr. 190:18.

he never took responsibility for his poor performance and instead is looking to blame Mauriello for

demanding that Schoolcraft do his job.  It also shows Schoolcraft refused to understand he had an

obligation to become engaged in doing his job not just get numbers for the sake of satisfying a

standard.  It is important to note that Schoolcraft is complaining he was penalized for not achieving

a certain number, but he does not know the number or whether there even is one, and he does not

indicate what the number relates to – summonses, arrests, stops, verticals, radio runs, community

visits, domestic violence runs, or anything else.

19.     At the end of the meeting, another of the 81st Precinct supervisors,
Defendant Steven Weiss specifically asked Officer Schoolcraft if he was recording the meeting.[20]

Response:     Not disputed, but in response Schoolcraft lied that he was not

recording the meeting.  He said his radio was off, which was a way of dissuading Weiss from any

suspicion that Schoolcraft might have been recording the meeting or had any idea how to go about

recording such a meeting.  In fact, Schoolcraft by then had become quite skilled in using recorders

as he had been secretly recording events in the precinct for nearly a year, and perhaps for as long as

three years.  (SM Exhibit D at 1:01.20-1:01.30.)

20.     In either late February or March of 2009, Mauriello went to the main office
for Patrol Borough Brooklyn North with Sergeant Weiss from the 81st Precinct and met with
Deputy Chief Marino about Officer Schoolcraft's appeal of his failing 2008 evaluation and about
Mauriello's wish to transfer Schoolcraft out of the Precinct. [21]

Response:     Not disputed except to the extent the statement suggests the meeting

was set up just to discuss Schoolcraft, and to the extent it suggests any impropriety in

recommending that Schoolcraft be transferred.  The meeting was called because Chief Marino

---

[20] PMX  3:  Mauriello Tr. 326; PMX 6:  Weiss Tr. 111:7-114;12 (recalls believing that
Schoolcraft was recording and recalled asking Schoolcraft if he was recording the meeting in
February 2009 about the appeal but denies ever discussing that belief with Mauriello or
Executive Officer Lauterborn or Lieutenant Caughey).
[21] PMX  6:  Weiss Tr. 178:12-181:4; PMX 7:  Marino Tr. 196:13-200:6; PMX 3:  Mauriello Tr.
276:15-277:15.

typically would discuss the evaluations of any officers in the precinct receiving a 3.0 or lower on

their evaluations, which would have included Schoolcraft and another officer who received a 2.5

(SM Ex. BV, Mauriello Dep. p. 511 ll. 9-17).  With respect to the recommendation that Schoolcraft

be transferred, Mauriello believed a change might do Schoolcraft some good, and he thought

Schoolcraft might be better suited to work in a slower precinct with a lower incidence of crime.

(SM Ex. BV, SM Dep. p. 277:2-15).

       21.    DI Mauriello requested that Officer Schoolcraft be transferred, and Deputy Chief Marino denied that request at that time for lack of paperwork. [22]

       Response:    Not disputed.  Mauriello recalls being told by Chief Marino that an

officer could not be transferred at the time of his year-end evaluation unless the request had been

initiated earlier in the year.  (SM Aff. in Opp. ¶ 5.)

       22.    On March 11, 2009, a labor attorney for Officer Schoolcraft, James A. Brown, Esq., wrote DI Mauriello a letter about Officer Schoolcraft's appeal of his failing evaluation.[23]   Among other things, the letter documented previously-raised concerns about "numerical goals" being used improperly in performance evaluations:  "We are concerned that our client's negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of arrests and summons issued.[24]

       Response:    Not disputed that the letter was received, but dispute the statement

in the letter that a concern had previously been raised about numerical goals being used improperly

in performance evaluations.  Also the letter states the attorney's "understanding that a final

decision from Command [i.e., the 81st Precinct] has not yet been rendered," thus indicating

Schoolcraft had not told his attorney Mauriello made it quite clear at the end of the February 25,

2009, meeting – which Schoolcraft recorded – that he would not change Schoolcraft's evaluation

(SM Ex. D at 57:45-60:00), and did not tell his attorney he was advised at the meeting that he had

to submit his appeal to the Patrol Borough Brooklyn North office, as the Patrol Guide indicates.

---

[22] *Id.*
[23] PMX 8 (PX 57 & 22).
[24] PMX  8:  *Id.* at p. 2.

(SM Ex.BU Patrol Guide 205-58; SM Ex. BY (Schoolcraft's Memo Book); and SM Ex. D at 59:00-60:00.)

The attorney's letter further states that "[w]e urge you to weigh the above considerations before issuing a decision related to our client's evaluation."  Again, apparently the attorney was not told Mauriello had made his decision at the meeting, or that any further decision would have to be made not by Mauriello but by the Brooklyn North borough commanders. (SM Exhibit D at 57:15-58:00.) Mauriello forwarded the attorney's letter to the Brooklyn North office (SM Ex. BV, Mauriello Dep. p. 248 ll. 8-16.), and had no further role with respect to an appeal of Schoolcraft's evaluation.

Schoolcraft had prepared a draft of his appeal on February 27, 2009, but never submitted it (SM Exhibit CD, Rough Copy of Appeal), pretending ever since that he had done so while faulting others for the "appeal" being ignored.  In fact, when Schoolcraft's evaluation was re-signed in April 2009, Schoolcraft thereafter spoke of it as being a finalizing or dismissal of his appeal, when the truth was and is that he never submitted an appeal, so the appeal never was dismissed, and the only thing that was finalized had been the evaluation itself.  (SM Ex. M at 2:20-3:00 (Schoolcraft recorded conversation with Dr. Lamstein on July 27, 2009; SM Ex. BR.) When Schoolcraft was called to a meeting with Sergeant Devino, the personnel officer for Brooklyn North, on October 29, 2009, she told him the 81st Precinct and Mauriello had done everything they were supposed to do, but Schoolcraft had never submitted an appeal of his evaluation.  She also said he still could do so but he never did. (SM Exhibit CE at 5:25-8:15, Schoolcraft recording of 10/28/09 meeting with PBBN re: appeal )

23.     After receiving the letter, DI Mauriello told Chief Nelson about it and forwarded it to Patrol Borough Brooklyn North as part of the appeal process.[25]

---

[25] PMX  3:  Mauriello Tr. 247:11-254:16.

Response:        Not disputed, though such a letter was not an actual required part of the appeal process.  Still, Chief Nelson informed Mauriello that he would send any received documents related to Schoolcraft's performance evaluation to the personnel department at Patrol Borough Brooklyn North. (SM Exhibit BV, Mauriello Dep. p. 248 ll. 8-16.)

24.      A few days later, on about March 15, 2009, while Officer Schoolcraft was on patrol, Defendant Weiss issued to Officer Schoolcraft a command discipline for being "off post" and having "unnecessary conversation" with another patrol officer. [26]

Response:        Not disputed.

25.      Officer Schoolcraft believed that he was being punished for the letter from his lawyer and for appealing his evaluation, and as a result, made a formal request on his radio that the Duty Captain for Patrol Borough Brooklyn North respond to the scene.[27]

Response:        Disputed, to the extent it purports to assert Schoolcraft's belief, and to the extent it suggests there was a basis for Schoolcraft to believe he suffered retaliation for commencing pursuit of his appeal.  As to Schoolcraft's stated belief, there is substantial evidence Schoolcraft was orchestrating events -- such as pretending to pursue an appeal of his evaluation (see responses to paragraphs 22 and 36), but not actually doing so, and perhaps even pretending to suffer stress and anxiety on the job, when not actually suffering at all (see responses to paragraphs 29 through 33) -- in an effort to either trigger or create the appearance of retaliation.  In any event, in this instance his purported belief was unfounded.  Among other things, defendants would have had no incentive to punish Schoolcraft for his appeal.  His poor performance was well documented (see PMX 1), and all of his supervisors had made a substantial effort to get him to improve.  In addition, Schoolcraft's poor performance, whether he appealed his evaluation or not, would already have been known by the borough commanders – Deputy Chief Nelson and Assistant Chief Marino, so there was no concern about them finding out about it (SM Exhibit BV, Mauriello Dep.

---

[26] PMX 9 at NYC 00081 (PX 168 ).
[27] PMX 6:  Weiss Tr. 98:2-19; PMX 10:  Lauterborn Tr. 177:12-21 & 183:19-186:12

155:13-23, 511:9-17).  Also, as plaintiff concedes, once Mauriello received the attorney's letter he passed it on to the Brooklyn North borough office (see response to paragraph 23 above).

Schoolcraft did allude at the time to the belief that he was being punished for appealing his evaluation and for the letter from his lawyer, but the evidence indicates the far greater likelihood is he did not believe that at all.  Instead, he simply performed poorly, became angry when he received a poor evaluation and then pretended to appeal, though not actually doing so, no doubt aware it never would succeed.  He thus tried to create the appearance of retaliation – in the way he was being treated and in the fact his "appeal" was ignored, but instead, he simply was being more closely supervised due to his unsatisfactory evaluation and his apparent unwillingness to take responsibility for his poor performance.  His appeal was not considered because he never filed it, not because anyone was upset with him or retaliating against him.  (SM Exhibit E at 0:45-1:00, 31:00-31:30, recorded conversation with Lauterborn on 3/16/09; see response to paragraph 36.)

In any event, the lawyer's letter was addressed to Mauriello, and Mauriello was not on duty that week, so no one would have been aware yet of the letter's content. (SM Exhibit E at 1:08-1:20.)  Even if the content of the letter were known, it would not have provided any motivation to Schoolcraft's supervisors to penalize him.  His performance was so poor that no appeal had any likelihood of success.  It simply is not credible that Schoolcraft believed he was being punished for it.

Finally, a patrol officer calling over the borough-wide radio for the duty captain of the borough to come to a scene because the officer objects to action taken by a platoon sergeant was unprecedented.  (See SM Ex. CF, Weiss Dep. Tr. 128:4-129:23.)  It not only was an indication of Schoolcraft's unwillingness to take any responsibility for his poor performance while attributing wrongdoing to others, but also, in hindsight, a bold effort by Schoolcraft to create the appearance

of retaliation.  Perhaps most telling about Schoolcraft's assertion that he was being punished for

appealing his evaluation and for hiring a lawyer to help him, is what Schoolcraft does not say –

that he believed he was being punished for complaining about illegal quotas or downgrading of

crime.  The reason is clear – plaintiff never expressed any complaints about such things until many

months later. (SM Exhibit BN, AS1 95:12-16.) Thus, none of these earlier events have any bearing

on the outcome of any of plaintiff's claims, all of which are tied to his supposed objection to illegal

quotas and downgrading of crime.  On the other hand, all of the events since the date of the appeal

meeting show just how far Schoolcraft was willing to go to get revenge against Mauriello by

attributing fault to him where there was none.

      26.    In response, Defendant Lauterborn, who claimed to have been the Duty
Captain at the time, had Officer Schoolcraft brought back to the 81st Precinct.  According to
Officer Schoolcraft's recording of the meeting with Captain Lauterborn, Lauterborn told Officer
Schoolcraft that after the February meeting at the 81st Precinct to discuss his appeal, he should not
be surprised by the fact that he was going to get a lot more "supervision" by the 81st Precinct
supervisors and that the 81st Precinct supervisors were now paying "closer attention" to him.[28]

      Response:    Not disputed except to the extent plaintiff intends to suggest that

giving plaintiff more supervision and paying closer attention to him was in any way inappropriate

or somehow constituted punishment.  Instead, such closer monitoring was required due to

Schoolcraft's poor performance and his unwillingness to take any responsibility for it or make any

effort to improve.  (SM Exhibit E at 6:00-7:30, 15:00-16:30). The other officer who received a 2.5

rating in his year-end evaluation for 2008 also was more closely monitored.  (See SM Aff. in Opp.

¶ 4.)

      27.    Captain Lauterborn also told Officer Schoolcraft that "this is gonna go on;"
that he has "a long road ahead" of him; that going forward, he needs to "cross your t's and dot your

---

[28] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45__28:50-31:30.
The recording is attached at part of a compact disk accompanying this motion together with other
records relevant to the motion.

i's;" and that the "supervision" was "coming down hard" on him not just in the past two nights but since the day he walked out of the appeal meeting in February of 2009.[29]

> Response:    Not disputed except to the extent plaintiff intends to suggest that

Captain Lauterborn was describing scrutiny of Schoolcraft that was in some way inappropriate or

somehow constituted punishment.  Instead, such scrutiny was required due to Schoolcraft's poor

performance and his unwillingness to take any responsibility for it or make any effort to improve.

(SM Exhibit E at 2:35-2:50).

> 28.    The same day that Officer Schoolcraft spoke to Captain Lauterborn, Sergeant Weiss began reviewing police procedures on how to have Officer Schoolcraft psychologically evaluated.[30]

> Response:    Not disputed except to the extent it suggests Sergeant Weiss

reviewed police procedures regarding referring a fellow member of the service to the

Psychological Evaluation Unit as a result of the conversation between Captain Lauterborn and

Schoolcraft. Sergeant Weiss testified that a series of unusual and bizarre actions, culminating in

Schoolcraft engaging in the highly unusual act of calling for a duty captain, led him to become

concerned for Schoolcraft's well-being. (SM Exhibit CF, Weiss Dep. Tr. 128:4-129:23.)

> 29.    Shortly after that, Sergeant Weiss contacted the NYPD's Early Intervention Unit and reported that he was "concerned" about the level of Office Schoolcraft's "mental distress."[31]

> Response:    Not disputed, although Sergeant Weiss contacted the early

Intervention Unit not only after Schoolcraft called for a duty captain, but also because Schoolcraft

took time off from work following that incident. Schoolcraft was out sick, having first visited a

hospital emergency room and receiving medication, and then visiting his primary physician,

allegedly due to continuing anxiety and stress.  In fact, during that time period, Schoolcraft's father

---

[29] PMX  11:  Id. at 30:00-31:30.
[30] PMX  6:  Weiss Tr. 120:6-121:2.
[31] PMX  6:  Weiss Tr. 99:14-101:4.

had reached out to NYPD because he could not reach Schoolcraft and was concerned about his

well-being (SM Ex. CG at 11:00-11:40, Larry Schoolcraft recorded conversation with Captain

Lauterborn.) The 81st Precinct was not provided an explanation of what happened, but Schoolcraft

returned to work soon thereafter.  Sergeant Weiss perceived that Schoolcraft was suffering from

some distress and was in need of intervention. (SM Exhibit CF, Weiss Dep. Tr. 101:14-102:10;

SM Exhibit G, Dr. Sure record: plaintiff taking off from work; SM Exhibit I; SM Exhibit CI,

Lamstein Dep. p. 56, ll. 14-21).  The date Weiss called EIU is not documented, but we do know

Schoolcraft was not interviewed by EIU until April 30, 2009, more than two weeks after he was

placed on restricted duty by Dr. Lamstein, who worked in the Medical Division at Lefrak.  EIU

is a unit unto itself in One Police Plaza.  (SM Exhibit CH, NYC 13444.)

   30. Sergeant Weiss also did Internet research on Officer Schoolcraft and found
a news article in a local upstate newspaper about a burglary at his father's home and forwarded that
article to the Early Intervention Unit.[32]

   Response: Not disputed. Concerned about Schoolcraft's well-being, Sergeant

Weiss found an article on-line in which Schoolcraft said the burglary of his mother's ashes "affects

me every day" and "it's the last thing I think about before I go to sleep at night." (SM Exhibit BM,

May 7, 2008 article from the Leader-Herald; SM Exhibit CF, Weiss Dep. Tr. 100:11-101:4.)

   31. Within a week or two of Sergeant Weiss' contacting the Early Intervention
Unit, Officer Schoolcraft was placed on modified or restricted duty without any law enforcement
or patrol duties and his gun and shield were removed.[33]

   Response: Disputed to the extent it attempts to suggest that Schoolcraft was

placed on restricted duty by the NYPD psychologist, Dr. Lamstein, because Sergeant Weiss had

contacted the Early Intervention Unit (EIU).  There is no evidence at all that those two events were

at all related.  The sequence of events resulting in Schoolcraft being placed on restricted duty is

---

[32] PMX  6:  Weiss Tr. 103:6-109:3
[33] PMX  6:  Weiss Tr. 101:24-102:10.

recited in paragraphs 8 through 15 of Defendant Mauriello's Statement of Material Facts in support

of his motion for summary judgment seeking dismissal of Schoolcraft's claims, and those events

have nothing to do with Sergeant Weiss contacting the EIU.   (Those facts also are recited in

paragraphs 13 through 22 of the City Defendants' Statement of Material Facts in support of the

City Defendants' motion for partial summary judgment.)  Schoolcraft was not interviewed by EIU

until nearly three weeks after he had been placed on restricted duty by Dr. Lamstein. It appears he

was advised by EIU to see a psychologist (just as he earlier had been advised by his personal

physician and by Dr. Lamstein).  (SM Exs. L, K and CH.) Yet, he never arranged to see a

psychologist.

32.     According to the NYPD psychologist who testified that she was directly

involved in the decision to place Officer Schoolcraft on limited duty, Officer Schoolcraft was

suffering from the physical manifestations of stress.[34]  Based on that opinion, she recommended

cognitive behavioral therapy or stress management training to improve coping skills and to reduce

the physical symptoms of stress.[35]

Response:     Not disputed, except at his first meeting with the NYPD

psychologist, Dr. Lamstein, on April 13, 2009, Schoolcraft was placed on restricted (not limited)

duty, requiring that his gun and shield be taken.  He also was advised to see a psychologist for the

needed therapy, as his personal physician had recommended less than two weeks earlier. (SM

Exhibit K; SM Exhibit L.)

33.     The NYPD psychologist did not recommend any medication, did not
believe that Officer Schoolcraft was psychotic, and did not believe that Officer Schoolcraft was
dangerous to himself or others.[36]

---

[34] PMX  12:  Lamstein Tr. 172:21-174:20
[35] PMX  12:  Lamstein Tr. 105:22-107:4.
[36] PMX  12:  Lamstein Tr. 113:15-115:2, 153:10-17, & 285:3-23.

Response:       Not disputed, although the NYPD psychologist was not authorized

to prescribe any medication for a member of the service such as Schoolcraft, who was not her

patient (SM Ex. N at 7:00-7:20, Schoolcraft recording of meeting with Dr. Lamstein, October 27,

2009; SM Exhibit CI, Lamstein Dep. p. 143 l. 19-25). When she first saw Schoolcraft in April

2009, she did recommend that he consult with a psychologist, which Schoolcraft's personal

physician also had recommended just two weeks earlier (SM Exhibit CI, Lamstein Dep. p. 127 ll.7-

20, 147-149).  Schoolcraft's personal physician also had prescribed medication for Schoolcraft's

stress, which was shortly after Schoolcraft had received a shot in a hospital emergency room to

treat his stress. (SM Exhibit J, Lamstein notes; SM Exhibit CI, Lamstein Dep. pp. 149-150, ll.4-

16).  The psychologist Schoolcraft was urged to see would have determined whether to renew

Schoolcraft's prescription or prescribe additional medication.  Schoolcraft, however, never made

any arrangement to ever see a psychologist – not even after the NYPD psychologist repeated her

recommendation when she saw Schoolcraft on two more occasions over the next six months (SM

Exs. M and N; See SM Exhibit BN AS1 p 110, l.7-18). Finally, though the NYPD psychologist

did not draw the conclusion Schoolcraft was a danger to himself on the three occasions she saw

him, on the night of October 31, 2009, she was unable to say on that night whether he was a danger

to himself.  She urged him to call her, but he chose not to do so. (see Mauriello SOF paragraph 75.)

34.     As a result of being placed on limited duty, Officer Schoolcraft was
assigned to work at the 81st Precinct as the Telephone Switchboard operator, essentially taking
calls to the Precinct and handling walk-ins by members of the public.[37]

Response:       Not disputed, although Schoolcraft was placed on restricted duty,

not limited duty, with the principal difference being that restricted duty requires that the officer's

gun and shield be removed.

35.     He held that position from April 2009 through the end of October 2009.

---

[37] PMX  13:  Huffman Tr. 46:10-25.

Response:        Not disputed.

36.        While on limited duty, Officer Schoolcraft continued his attempts to challenge his failing 2008 performance evaluation.[38]

Response:        Disputed.  This is a remarkably deceitful assertion, and deconstructing it helps reveal that Schoolcraft was trying to orchestrate events to get revenge against Mauriello for signing off on the 2008 evaluation and for having Schoolcraft placed on restricted duty, while trying to make it appear he was being retaliated against and his appeal was being ignored.  Under NYPD Patrol Guide provisions, Schoolcraft had an affirmative duty to submit a report on typed letterhead stating that he wished to appeal his evaluation and giving the reasons for the appeal. (SM Exhibit BU, NYPD Patrol Guide 205-58(4), "Appeal of Evaluation-Uniformed Members of the Service"). Schoolcraft was made aware of this duty by Sergeant Weiss at his performance evaluation hearing conducted on February 25, 2009. (SM Exhibit D at 59:30-60:30; SM Ex. BY.)  Schoolcraft also was represented by a union delegate at the meeting who would have been available to assist him with any questions he might have had about the appeal process.   In response, Schoolcraft apparently prepared a "rough" copy of his appeal the following day (SM Exhibit CD, Schoolcraft "Rough Copy of Appeal), but did nothing with it.  On August 17, 2009, Schoolcraft was informed by PBA counsel David Morris that his appeal could not be resolved until he submitted this formal, typed report to the personnel department at Patrol Borough Brooklyn North. (SM Exhibit CJ, Letter from PBA to Schoolcraft re: appeal). Despite having any information he might need, however, and despite hiring an attorney to represent him, Schoolcraft failed to take the necessary steps to pursue the appeal. In fact, Schoolcraft's own recording of his meeting with a Sergeant at Patrol Borough Brooklyn North – eight months later -- confirms he was

---

[38] On September 2, 20109, Officer Schoolcraft wrote a memorandum to DI Mauriello requesting (again) that his appeal be processed and Mauriello testified that he received the memorandum and forwarded it to the Sergeant at Patrol Borough Brooklyn North who handled the paperwork for appeals.  (PMX 14: (PX 58) & PMX  3:  Mauriello Tr. 269:4-274:14).

aware the he had not completed the steps necessary to formally appeal his performance evaluation. (SM Exhibit D at 5:00-5:30.)  Yet, all indications are Schoolcraft tried to create the false appearance he was doing what he needed to do to pursue his appeal, but purposefully did not do so, with the intention of later claiming the NYPD intentionally ignored his appeal and somehow refused to address it.  Schoolcraft so ineptly failed to follow the basic steps to have his appeal heard, that the conclusion is unavoidable, as the evidence fully suggests, that the failure was purposeful.  In any event, Schoolcraft has only himself to blame for failing to get his appeal considered.

37.     He also started reporting misconduct by his supervisors at the 81st Precinct.

Response:        Disputed.  For all of his purported, though unexpressed, concern about illegal quotas and the misclassifying of crime, the first and only written complaint Schoolcraft made to the NYPD was made on August 20, 2009, and asserted that Lieutenant Caughey and Sergeant Weiss improperly gained access to the unofficial hard copy of Weiss' personnel file to the extent it was maintained in the 81st Precinct.  Schoolcraft indicated in the complaint that Weiss may have destroyed records that would have prevented him from being promoted to lieutenant.  First, it was determined by IAB that no documents had been removed from the file, and the file would not have been reviewed by those deciding whether to promote Weiss; instead they would have reviewed the computerized official NYPD records relating to Weiss.  More importantly, Schoolcraft's decision to file that complaint, rather than a written complaint about allegedly illegal quotas and misclassification of crime, provides some indication of just how unconcerned he was about those issues. (SM Exhibit BN, AS2 pp. 162-164.)

38.     On August 20, 2009, Officer Schoolcraft reported to the Internal Affairs Bureau ("IAB") on "corruption involving the integrity control program" at the 81st Precinct by the

Integrity Control Officer, Defendant Lieutenant Caughey and Assistant Integrity Control Officer, Defendant Weiss.[39]

> Response:     Not disputed.  See Response to paragraph 37 above.

39.     In addition, on August 31, 2009, a former member of the service, David Dirk, reported that Officer Schoolcraft was the victim of retaliation by his supervisors.[40]

> Response:     Not disputed, though it appears this may have been done by Durk (who is now deceased) at the urging of Schoolcraft's father, not Schoolcraft. (TAC ¶ 120.) It appears the father was trying to help Schoolcraft create the appearance of retaliation against him for complaining about quotas and downgrading of crime – except Schoolcraft had not yet made any complaint about such things.

40.     On September 2, 2009, Officer Schoolcraft spoke with IAB and reported that DI Mauriello was pressuring his staff to downgrade or suppress crime reporting and that under the direction of DI Mauriello police officers were being directed to make arrests and issue summonses "in violation of people's civil rights."[41]

> Response:     Not disputed that Schoolcraft expressed these objections, but this is the first time Schoolcraft expressed these objections to anyone in the NYPD.  It is not a coincidence that on the same date Schoolcraft wrote to Mauriello requesting that his appeal be processed. (See PX 14). In its own ways, each communication was a deceitful act in furtherance of Schoolcraft's revenge against Mauriello.  (See responses to paragraphs 22 and 36.)

41.     According to the IAB report, Officer Schoolcraft also stated that he received his failing evaluation "because he doesn't believe in summons and arrest quotas" and that police officers "are being forced to sign the training log even though they don't get the necessary training."[42]

---

[39] PMX 15:  Schoolcraft Report (PX 40).
[40] PMX 15 (NYC 4785-86) (Attorneys' Eyes Only ("AEO") designation, filed under seal).
[41] PMX 16 (NYC 4316-18) (Confidential designation, filed under seal).
[42] *Id.*

Response:      Not disputed that Schoolcraft made the recorded statement.  Again, this is the first time Schoolcraft expressed these objections to anyone in the NYPD – more than six months after the appeal meeting.

42.     On October 7, 2009, Officer Schoolcraft met with investigators from the NYPD's Quality Assurance Division ("QAD").[43]  At the meeting, Officer Schoolcraft reported in greater detail about the nature of the downgrading and suppression of major crime reporting at the 81st Precinct.[44]

Response:      Not disputed except to the extent it suggests there was a practice of downgrading and suppressing major crime in the 81st Precinct, and to the extent it suggests Schoolcraft spoke truthfully to QAD on that subject.  It also is disputed to the extent it says that at the meeting Schoolcraft reported downgrading and suppression of crime to QAD "in greater detail," thus suggesting he had previously reported to QAD about downgrading or suppression of crime.  This simply was not so.  It is in the conversation he recorded with his father on the way to this meeting with QAD when Schoolcraft and his father spoke, among other things, about:  i) not letting QAD know Schoolcraft was there to get revenge against Mauriello (for Schoolcraft's poor performance evaluation and for placing Schoolcraft on restricted duty) (SM Exhibit BR at 2:30-2:45); ii) making misrepresentations to QAD in order to "fuck [Mauriello] over;" (SM Exhibit BR at 7:10-7:45) and iii) telling QAD at the meeting – the only time Schoolcraft met with QAD – that Schoolcraft was providing only a small sample of the downgraded crimes he had identified, indicating downgrading of crime was a common occurrence and he had many more examples of its occurrence to share with QAD, none of which was true. (SM Exhibit BR at 4:30-5:10 and 43:45-43:55.)  Further, Schoolcraft told QAD investigators that he became concerned with downgrading of crime after his father's home was burglarized in 2007, and investigators failed to list certain stolen property in the incident report. At that point, he finally realized how harmful the practice of

[43] PMX 16 at NYC 5158 (PX 169; NYC 5153-5248).
[44] *Id.* at 5158-60.

downgrading was because he "felt it." (SM Exhibit BR at 45:00-46:00.)  Despite his concern that

members of the public were being harmed by this practice as early as January, 2008, Schoolcraft

did not complain about this alleged conduct to anyone in the NYPD until 19 months later, and it

wasn't even his central complaint. Moreover, despite being aware of this practice for years,

Schoolcraft was able to produce only a total of no more than 13 complaint reports to investigators,

not all of which posed any concern. (See SM Exhibit CK.)

        43.     While QAD undertook to conduct an investigation into those allegations, it also referred Officer Schoolcraft's other misconduct allegations to IAB.[45]

        Response:     Not disputed to the extent it states QAD indicated it would conduct

an investigation only into the allegations of downgrading complaint reports.

        44.     By the end of October of 2009, it was common knowledge with the 81st Precinct that the Precinct was under investigation and that Officer Schoolcraft was involved in reporting the misconduct that led to that investigation.

        Response:     Disputed, and plaintiff cites no evidentiary support for the statement.

QAD conducted semi-annual audits of the complaint reports of all precincts, including the 81st

Precinct (SM Ex. CK, QAD semi-annual findings).  Anyone who might have later thought the

semi-annual audit of the 81st Precinct in the summer of 2009 was related to the full-blown

investigation later conducted by QAD in response to Schoolcraft's allegations would have been

mistaken.  (See SM Ex. CL, Lauterborn Dep. pp. 278-79.)

        It was not known by anyone by the end of October 2009 that the 81st Precinct was

under investigation by QAD.  It was known by some that in the last week of October 2009 two

officers had been called down to QAD for interviews, but it was not known by anyone in the 81st

Precinct (apparently not even by Schoolcraft (SM Ex. BN, AS2 168-170)) why those two officers

had been interviewed.  Captain Lauterborn has said that he was told by the two officers or by their

---

[45] *Id.* at 5159 & 5220.

supervisor that Schoolcraft had approached the two officers to find out why they had been called

down (SM. Ex. CL, Lauterborn Dep. pp. 226, 3-20), but Schoolcraft denies doing so (SM Ex. BN,

AS2 168-170).  When Steven Mauriello learned the two officers had been notified to report to

QAD for interviews, he did not speak with them, but he did call Chief Mary Cronin, an Inspector at

QAD, and asked if there was any problem he should be aware of.  Chief Cronin said "No," and

briefly explained only that they had received an anonymous call and were simply following it up

(SM Ex. BV, Mauriello Dep. p. 331 ll. 9-12-17**).**

        In addition, on the morning of October 31, 2009, after Schoolcraft was formally

placed on performance monitoring by NYPD headquarters 17 days earlier due to his unsatisfactory

evaluation (apparently having been mistakenly placed on force monitoring several months earlier

(SM Ex. CE at 3:30-4:00, Schoolcraft/Devino), Lieutenant Caughey "scratched" Schoolcraft's

memo book, which contained an entry on the upper sheet for that day indicating police officer

Fadil Astor had called him and including Astor's tax and shield numbers.  Astor had once been

Schoolcraft's partner and was then assigned to IAB (SM Ex. BI).  Caughey copied the memo book

and left a copy for Mauriello in an envelope he placed in Mauriello's desk drawer, since Mauriello

was not then on duty (SM Ex. CM, Caughey Dep. p. 128 ll. 5-15).  Caughey left work at 12:00

noon on October 31, 2009 (SM Exhibit X, IAB Interview of Caughey, at 18:55-19:45), and did

not bring the memo book to Mauriello's attention or discuss any of its content with him until the

next time they were both on duty, November 2, 2009 (SM Ex. CM, Caughey Dep. p. 129 ll. 3-8;

SM Ex. BV, Mauriello Dep. pp. 385-386).

        It was not until after October 31, 2009, November that QAD began to call down

many more officers for interviews (SM Ex. CK), and also not until November or December, or

possibly even January, when QAD sought to review all of the complaint reports from the 81st

Precinct for 2009 (SM Ex. CK).  By then, it was apparent QAD was conducting an investigation,

but even then, it was not known the investigation was triggered by communications Schoolcraft

may have had with QAD.  After October 31, 2009, Schoolcraft had not been heard from and had

not been the subject of any news reports or publicity, which did not start until February 2010 (see

SM Ex.DC).

45.     Sometime earlier that year, Captain Lauterborn learned from DI Mauriello
of a QAD investigation of the 81st Precinct.[46]

Response:     Disputed.  See Response to paragraph 44.  Mauriello does not recall,

but it may be that he discussed with Lauterborn in the summer of 2009 that QAD was doing its

semi-annual audit.  (See SM Ex. CL, Lauterborn Dep. pp. 278-79.)  Otherwise, Mauriello believes

it was the 81st Precinct crime analysis Sergeant Seymour who told him that two officers were

called down to QAD for interviews in the last week of October 2009 (SM Ex. BV, Mauriello Dep.

p. 330 ll. 15-25), and, in any event, those two interviews and Mauriello's brief conversation with

Chief Cronin was the full extent of Mauriello's awareness of any QAD activity prior to October

31, 2009.

46.     In addition, towards the end of October, an 81st Precinct Sergeant told DI
Mauriello that QAD was calling down officers and based on that tip, DI Mauriello called up an
Inspector from QAD, who confirmed that there was an investigation.[47]

Response:     See responses to paragraphs 44 and 45.  Disputed to the extent it

refers to Mauriello receiving a "tip", as if there was something sinister in Mauriello being advised

two of his officers were directed to appear at QAD.  Also disputed to the extent it suggests the

interview of two officers in the last week of October was known by anyone at the time to be the

beginning of the investigation into the handling of complaint reports, which everyone later learned

was taking place after October 31, 2009.

---

[46] PMX  10:  Lauterborn Tr. 278:17-280:19
[47] PMX  3:  Mauriello Tr. 330:15-332:23 & 450:22-452:18.

47.     Earlier in the year, there was persistent speculation at the 81st Precinct that Officer Schoolcraft was tape recording at the Precinct.[48]

Response:     Disputed to the extent it suggests everyone in the 81st Precinct participated in such speculation.  If some officers engaged in such speculation, Mauriello was not one of them. (SM Exhibit BV, Mauriello Dep. p. 329.) There simply is no evidence anyone at the 81st Precinct ever <u>knew</u> Schoolcraft recorded even a single conversation in the 81st Precinct until the recordings were reported in the Village Voice in the second half of 2010.

48.     In addition, Captain Lauterborn testified that as the QAD investigation was heating up, he allegedly received complaints from other officers interviewed by QAD that Officer Schoolcraft was asking them questions about their QAD interviews and informed DI Mauriello about Officer Schoolcraft's alleged conduct.[49]

Response:     Disputed.  See responses to paragraphs 44 through 47.  At no time prior to October 31, 2009, was it known by Mauriello, or anyone else as far as he knew, that the QAD investigation, which everyone later learned about, was already ongoing, or that any such investigation was "heating up."  Only two officers were interviewed (SM Ex. BV, Mauriello Dep. p. 330 ll. 15-25); there is some evidence Schoolcraft approached them to ask them what the interviews were about, though he has denied doing so  (see footnote 49 to plaintiff's statement 48); and Chief Cronin deflected Mauriello's inquiry by saying there was no problem he needed to be aware of, briefly explaining they interviewed the two officers as a follow-up to an anonymous call (SM Exhibit BV, Mauriello Dep. 331:9-12-17).

49.     Moreover, supervisors at the 81st Precinct knew from their practice of inspecting or "scratching" memo books that Officer Schoolcraft's memo book contained the name of an IAB officer.[50]  Finally, on October 19th Lieutenant Caughey issued a written order to all officers in the command that all inquiries from IAB must be reported directly to him.[51]

---

[48] PMX  10:  Lauterborn Tr. 278:17-280:19.
[49] PMX  10:  Lauterborn Tr. 86:22-95:2.  While Officer Schoolcraft denies doing this, the fact that it was stated by Defendant Lauterborn goes to his state of mind and beliefs about Officer Schoolcraft.
[50] PMX  10:  Lauterborn Tr. 86:22-99:20 & 114:14-118:16
[51] PMX 17  (Caughey Memo).

Response:      See responses to paragraphs 44 through 47.  The citations do not provide any support for, or even relate to, the subject of this statement.  The statement is disputed to the extent it intends to convey by innuendo that the matters described are somehow related or are an indication of wrongdoing by Lieutenant Caughey.  Lieutenant Caughey is the only person who had scratched Schoolcraft's memo book in use on October 31, 2009, and he did so that morning. He thus was the only one to see the reference in the memo book to Schoolcraft apparently speaking with an officer formerly assigned to the 81st Precinct who had been a partner of Schoolcraft but who was then assigned to IAB (SM Ex. BI).  Caughey did not know what to make of the entry and brought it to Mauriello's attention when they were both next on duty on November 2, 2009 (SM Ex. CM, Caughey Dep. p. 128 ll. 5-15; SM Exhibit BV, Mauriello Dep. 385-386).

With respect to IAB inquiries, Lieutenant Caughey was the Integrity Control Officer for the 81st Precinct, and his duties included approving requests for records or for officers to appear in court or elsewhere, including IAB (SM Ex. CN, NYPD Patrol Guide 202-15-"Command Integrity Control Officer").  There was nothing inappropriate about his instruction on October 19, 2009, which essentially was a reminder, that IAB inquiries should be directed to him. Certainly, if IAB did not think Caughey should be made aware of an inquiry, IAB would figure out how to reach the person they wanted to reach without Caughey knowing about it.

50.    On October 31, 2009 – the last day that Officer Schoolcraft reported to the 81st Precinct – he worked the day tour and conducted his regular duties at the Telephone Switchboard desk.

Response:      Disputed.  Schoolcraft was assigned to work the day tour on October 31, 2009, but left work -- without permission after being directed not to leave -- more than an hour before his tour ended (SM Exhibit Q at 7:30.25-7:30.45; SM Exhibit CO, Huffman Dep. Tr. 70:7-

25). He then did not respond to any efforts to reach him during the balance of his tour and for several more hours thereafter.

     51.     During the course of that morning, Lieutenant Caughey took Officer Schoolcraft's memo book to "scratch it" and instead, kept it for several hours.[52]

     Response:     Not disputed.

     52.     While in his office, Lieutenant Caughey made two photocopies of the *entire* memo book because he saw "unusual" entries in it.[53] Lieutenant Caughey kept one copy for himself and put the other copy in DI Inspector Mauriello's office desk.[54]

     Response:     Not disputed, but with the added explanation that there were only 20 pages to copy, some two-sided, and Caughey put the copy for Mauriello in an envelope and then put the envelope in Mauriello's desk drawer (SM Ex. CM, Caughey Dep. p. 128 ll. 5-15.)

     53.     When he returned the memo book to Officer Schoolcraft later that day, Officer Schoolcraft noticed (and became alarmed) that several pages of the memo book containing his entries about corruption or misconduct were earmarked or folded down.[55]

     Response:     Disputed.  Caughey does not recall doing so (SM Ex. CM, Caughey Dep. p. 174:2-6), and there are no entries that can properly described as referring to corruption or misconduct (see SM Ex. CZ).

     54.     Officer Schoolcraft grew more alarmed during the course of the day when Lieutenant Caughey started acting toward Officer Schoolcraft in a menacing manner.[56]

     Response:     Disputed.  All of the evidence, especially the recordings secretly made by Schoolcraft throughout the day and evening of October 31, 2009, reveals that Schoolcraft was not alarmed by anything that happened on that date, and Caughey is never heard on the recording saying anything to Schoolcraft, much less saying anything menacing.  In fact, Caughey left work at noon, more than two and a half hours before Schoolcraft (SM Exhibit X, IAB

---

[52] PMX  4:  Schoolcraft Tr.  202:22-203:20; PMX 18:  Caughey Tr. 120:18-121:19.
[53] PMX  18:  Caughey Tr. 122:11-20.
[54] PMX  18:  Caughey Tr. 127:24-128:15.
[55] PMX  4:   Schoolcrfaft Tr. 202:22-203-11.
[56] PMX  4:  Schoolcraft Tr. 118:3-25-120:10;

Interview of Caughey, at 18:55-19:45). The reality is that Schoolcraft, with the urging of his father, decided to seize the opportunity to put their apparent plan into action to bait the NYPD to take action against him that he could mischaracterize as retaliation for supposedly revealing wrongdoing. Schoolcraft's allegations of wrongdoing -- illegal quotas and rampant downgrading of crime -- were misrepresentations designed to cause harm to Mauriello, and perhaps others, in revenge for giving Schoolcraft a failing evaluation and for putting him on restricted duty.

55.     One of the civilian workers at the Precinct, Police Administrative Aide ("PAA") Curtis Boston, saw Lieutenant Caughey walk by Officer Schoolcraft that day in an unusual manner and twice during the course of that morning PAA Boston and Officer Schoolcraft discussed Lieutenant Caughey's unusual behavior toward Officer Schoolcraft.[57]

Response:     Disputed.  Boston testified that part of Lieutenant Caughey's duties as 81st Precinct Integrity Control Officer is to ensure that both the precinct desk and telephone switchboard are functioning properly. As part of that duty, Lieutenant Caughey regularly walks around and observes both areas. (SM Exhibit CP, Boston Dep. Tr. 67 4:18, 78:6-79:20). In fact, when questioned about the incident, Boston was unable to describe anything unusual about Caughey's behavior or "manner" specifically <u>toward</u> Schoolcraft. (SM Exhibit CP, Boston Dep. Tr. 68-70). The only thing Boston cited as unusual was that Schoolcraft brought to her attention Caughey walking by the precinct desk two or three times that morning. In retrospect, Boston was unable to say that this behavior was, in fact, unusual because she never noticed how many times Caughey usually walked by to make observations. (SM Exhibit CQ at 11:40-12:40, PAA Boston IAB Interview). Despite Schoolcraft's attempt to portray Boston as being concerned that Schoolcraft's "safety may be in jeopardy" because of Caughey's "threatening behavior" (TAC ¶ 143-144), all indications are that Schoolcraft initiated conversation with Boston to create the appearance that Caughey was being a "menace."

---

[57] PMX  19:  Boston Tr. 64:17-65:5 & 77:15-86:13.

56.    PAA Boston specifically recalled that Officer Schoolcraft told her that he felt uncomfortable about Lieutenant Caughey's behavior and that Officer Schoolcraft asked her to document her reasons for why she believed Lieutenant Caughey was acting in a suspicious manner.[58]

Response:    Disputed to the extent it suggests that Boston believed Caughey was acting in a suspicious manner toward Schoolcraft. While Schoolcraft encouraged Boston to "write down what you find suspicious; just write it down for your own notes" (SM Exhibit Q at 6:25.10-6:25.30), Boston never wrote any notes in regards to the incident. In regard to Caughey acting in a suspicious manner toward Schoolcraft, it seems that Schoolcraft was the only member of service who believed an 81st Precinct Officer inspecting an area under his control was suspicious; see response to Paragraph 55. Further, despite numerous statements that he believed Caughey was going to kill him and that "I would like to have at least a fucking chance to go in a gun battle with him" and "I think I am going to get whacked" (SM Exhibit Q at 5:24.00, lunch time call to Larry Schoolcraft), nothing in the recording suggests that Caughey was, in any way, posing a threat to Schoolcraft. Schoolcraft's deposition testimony supports the fact that he cannot point to a single specific incident where Caughey's words or actions made him afraid for his own safety. (SM Exhibit BN, AS1 118-120).

57.    About one hour before the end of his scheduled day, Officer Schoolcraft told his supervisor, Sergeant Huffman that he was not feeling well and was going home.[59]   At the time, Sergeant Huffman told Officer Schoolcraft that that was "okay."[60]

Response:    Disputed. Sergeant Huffman responded "oh okay" as Schoolcraft dropped a sick report on her desk while walking away. Notwithstanding Schoolcraft's attempt to now show that this informal, surprised response by Huffman was an authorization to leave early, he understood fully he did not have permission to leave work early. First, Police Officer Rudy

---

[58] PMX  19:  Boston Tr. 77:15-86:13 & 109:16-112:5.
[59] PMX  13:  Huffman Tr. 66:20-67:2 & 71:3-75:9.
[60] PMX  13:  Huffman Tr. 74:11-19.

came down to the locker room and informed him that he would need to call the NYPD's

centralized sick desk and get permission to leave before getting dressed. Schoolcraft refused to do

so. (SM Exhibit Q at 7:25.40-7:26.00). Schoolcraft refused to even consider any attempt by

Huffman to follow formal sick procedure. (SM Exhibit Q at 7:26.00-7:27.10). When Schoolcraft

entered his vehicle to leave the precinct, he admits on the recording that he did not sign out sick but

rather "I gave a sick slip to Sergeant Huffman at the desk, she said I had to wait and had to get

authorization from a lieutenant or something. I just said I felt sick and needed to go." (SM Exhibit

Q at 7:30.25-7:30.45.)  Further, Schoolcraft later admitted to Captain Lauterborn that he left the

81st Precinct improperly by not waiting for permission from a supervisor. (SM Exhibit S at 3:00-

4:30.)

>        58.        Officer Schoolcraft also submitted to Sergeant Huffman a sick report, which
could have been a basis for authorizing him to take "administrative sick" for the day.[61]

>        Response:        Disputed to the extent it suggests it would have been fine for

Schoolcraft to walk out of the precinct if he simply said to Huffman he was taking "administrative

sick" while placing a sick report on her desk. In that case, Schoolcraft still would have to wait for

formal permission from either Sergeant Huffman or another supervisor.  (SM Exhibit CO,

Huffman Dep. Tr. 70:7-25.)

>        59.        As Officer Schoolcraft was leaving the precinct, however, Sergeant
Huffman told Officer Schoolcraft that he could take "lost time"[62] and Officer Schoolcraft told her
that that would be fine, although he would have preferred sick time.[63]

>        Response:        Disputed to the extent plaintiff purports to recite in paragraphs 57

through 59 the essence or the entirety of his exchange with Sergeant Huffman or the events

surrounding his early departure, which Schoolcraft himself substantially recorded.  Schoolcraft

---

[61] PMX  13:  Huffman Tr. 68:6-15 (administrative sick can be approved by the desk sergeant);
PMX 20:  Valenti Tr. 14:20-16:13 (same).
[62] PMX  13:  Huffman Tr. 80:12-20.
[63] PMX  4:  Schoolcraft Tr. 123:23-124:14

could have been approved for lost time had he requested it in writing and been approved by

Sergeant Huffman. (SM Exhibit CO, Huffman Dep. Tr. 80-82).  As recited in response to

paragraphs 57 through 59, Schoolcraft was well aware that the NYPD has established procedures

for leaving before the end of a tour, and he failed to follow any proper procedure every step of the

way.

> 60.    At about 3:30 pm,  Officer Schoolcraft got home, which was located at 82-
60 Eighty-Eighth Place, Queens, New York, and telephonically notified IAB of Lieutenant's
Caughey's menacing behavior[64].

> Response:    Disputed to the extent it alleges that Caughey was engaged in

behavior that was menacing or threatening toward Schoolcraft. See responses to paragraphs 54-56.

> 61.    Officer Schoolcraft specifically informed IAB that he felt threatened,
retaliated against, and in danger as a result of Lieutenant Caughey's menacing behavior.[65]

> Response:    Disputed. See response to paragraphs 54-56

> 62.    About one hour later, at about 4:20 pm, a Sergeant Krohley, from the 104th
Precinct, went to Officer Schoolcraft's home with his driver.  Sergeant Krohley rang the bell for
Officer Schoolcraft's apartment, which was on the second floor of a three-family house, and
when there was no answer, he spoke to the landlady, Carol Stretmoyer, who told him that she
believed that Officer Schoolcraft had left about thirty minutes ago.[66]

> Response:    Not disputed.

> 63.    Stretmoyer also informed Sergeant Krohley that Officer Schoolcraft has a
car, which was parked on the street.  Sergeant Krohley determined that the car was registered in
the name of Officer Schoolcraft's father.[67]

> Response:    Not disputed.

> 64.    At about 5:00 pm, Lieutenant Broschart from the 81st Precinct arrived at
the scene, and Sergeant Krohley briefed Lieutenant Broschart on the facts he had determined
since arriving at the scene.[68]

---

[64] PMX  4:  Schoolcraft Tr. 126:3-127:18.   The call to IAB is also recorded and identified as
DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma; PMX  11.
[65] *Id.* at 19:40-26:10.
[66] PMX 16 (NYC 4643) (AEO designation).
[67] *Id.*

Response:      Not disputed.

65.      Lieutenant Broschart was under orders from DI Mauriello and Captain Lauterborn to go to Officer Schoolcraft's home and bring him back to the Precinct.[69]

Response:      Disputed to the extent it is intended to suggest Broschart was told, without regard for the circumstances existing at Schoolcraft's home when he arrived, to force his way into Schoolcraft's apartment and forcefully take him from his apartment, put him in Broschart's car and bring him back to the precinct.  Instead, Broschart was instructed to go to Schoolcraft's home and, if he was able to communicate with Schoolcraft, tell Schoolcraft he should return to the precinct.  At the time, there was no expectation Schoolcraft would disregard such an instruction.  (SM Ex. CL, Lauterborn Dep. pp. 289-290 ll. 18-20.)

66.      After arriving at the scene, Lieutenant Broschart also knocked on the door, and when there was no answer, he updated Captain Lauterborn by telephone that Officer Schoolcraft was not home and that the landlady had told him that he might have left.[70]

Response:      Not disputed.

67.      Captain Lauterborn told Lieutenant Broschart to stand by and wait to see if Officer Schoolcraft returned.[71]

Response:      Not disputed.

68.      Later that evening, Captain Lauterborn spoke with NYPD Psychologist Lamstein.  According to Psychologist Lamstein's notes of the call, Captain Lauterborn told her that Officer Schoolcraft left early that day and the "underlying issue" was that Officer Schoolcraft "has made allegations against others" and the "dept's investigation of those allegations picked up this week & it snowballed from there."[72]

---

[68] PMX 16:  (NYC 4643) (AEO designation); *see also* PMX 11:
DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma at 40:52 (noting that at 4:18 pm a black Impala in front of Officer Schoolcraft's house and his door bell being rung).
[69] PMX  20:  Broschart Tr. 87:17-88:20.
[70] PMX  20:  Broschart Tr. 100:25-104:20.
[71] *Id.*
[72] PMX 22 at NYC 282(PX 29); PMX 12:  Lamstein Tr. 327:13-328:4.

Response:        Not disputed that Dr. Lamstein's notes contain those entries, which appear to refer not only to the fact that two officers had been called down to QAD for interviews (see responses above to statements/paragraphs 44-46, 48 and 49), but also to the fact that others, including two civilians employed at the 81st Precinct (SM Ex. CR), had been called down to IAB (SM Ex. J, Dr. Lamstein notes).  Just as it was not known why the two officers were being interviewed by QAD, there is no evidence anyone knew why the others were being interviewed by IAB.  (We now know it was about Schoolcraft's complaint that Caughey and Weiss had allegedly improperly accessed Weiss' personnel folder and removed documents, which IAB determined to be unfounded (SM Ex. CR, IAB Report on Personnel Room Incident).)  There is no evidence anyone even knew of that complaint, but Lauterborn no doubt had seen that the civilian employees and possibly officers had been noticed to go to IAB.  Lauterborn, having been alerted about Schoolcraft approaching the two officers who had been called down to QAD, and knowing others had been called down to IAB, apparently surmised, when speaking to Dr. Lamstein on the evening of October 31, 2009, when Schoolcraft could not be located, that Schoolcraft was feeling some anxiety about the QAD interviews and apparently about the IAB interviews as well.  (See PMX 22.)

            69.     Psychologist Lamstein told Captain Lauterborn that she had seen Officer Schoolcraft just a few days ago and that she "had no reason to think [Officer Schoolcraft] was a danger to himself or others."[73]

            Response:        Disputed to the extent it is intended to suggest Dr. Lamstein expressed the opinion that on the evening of October 31, 2009, there was no reason to believe Schoolcraft might be a danger to himself or others.  Instead, Dr. Lamstein indicated that had

---

[73] PMX 12:  Lamstein Tr. 319:24-25; *see also* PMX 23 Lauterborn Report (PX 16), 10-31-09 at p. NYC 00095 ("She stated that although she did not believe he was an immediate threat to himself or others his firearms were removed because of emotional distress caused by issues of anger and resentment against the Department.").

been her belief when she last saw Schoolcraft four days earlier, but she could not say so "with

any reasonable amount of certainty" on October 31, 2009.  As Dr. Lamstein explained to Captain

Lauterborn and later recorded in her notes, '[a]t no time had he ever expressed thoughts of

suicide, but he also never was AWOL before and acted the way he was acting on 10/31/09.  My

assessment of his suicide risk is only as good as the last time I saw him.  If something happened

after that and led him to be so upset that he left work without permission an hour before the end

of his tour, said to have stomach pains, etc., then I am unable to say with any reasonable amount

of certainty that he is not at risk of S/I [suicidal ideation] under present circumstances."  (SM Ex.

J, Lamstein note (D000284); SM Ex. CI, Lamstein Dep. p. 340.)

> 70.    At about 7:40 pm that night, after speaking with Psychologist Lamstein,
> Captain Lauterborn also called Officer Schoolcraft's father and told the father that Officer
> Schoolcraft left without permission and had to return to the 81st Precinct that night.[74]

> Response:    Not disputed, although Lauterborn also told Schoolcraft's father that

they needed to see Schoolcraft in person and check his condition because he was on restricted duty

for unknown reasons. (SM Exhibit CG, 8:45-10:00.)

> 71.    The father told Captain Lauterborn that he spoke to his son earlier that
> day, that his son told him he felt sick in his stomach with a tummy ache and was going home and
> would call him when he woke up.[75]

> Response:    It is not disputed Schoolcraft's father said such things to Captain

Lauterborn.  Captain Lauterborn wisely did not rely on the father's representations as Schoolcraft's

recordings reveal that the things Schoolcraft's father said to Captain Lauterborn were not true, and

that the father knew them to be not true.  (SM Ex. R, at 6:00-6:25.)

> 72.    Lauterborn told the father that he needs to "physically talk to" Officer
> Schoolcraft and "resolve things" and the situation is not going to "wait until the morning."[76]
> Lauterborn insisted that he had to talk to Officer Schoolcraft "in person" and not "over the

---

[74] PMX 11:  WS.331M_31October2009_LCS_ReturnPhoneCall to Capt. Lauterborn at 3:38-5:15.
[75] Id.
[76] Id. at 6:20-37.

phone." [77] He also stated that the "situation was going to escalate as the night goes on " and that "no one is going in or out of that house he lives in because there are police all over it."[78]  If Officer Schoolcraft was there, Captain Lauterborn said that "eventually we are going to make our way in."[79]

Response:      Not disputed.  Captain Lauterborn had been told by Dr. Lamstein that they had to find Schoolcraft (SM Ex. CI, Lamstein Dep. pp. 319:10-321:3).

73.     Although the father assured Captain Lauterborn that his son was fine and was probably sleeping, Captain Lauterborn insisted that it was not going to "end here" and that Officer Schoolcraft should report to the Lieutenant on the scene outside his home.[80]

Response:      Not disputed that Schoolcraft's father said such things to Captain Lauterborn, but Captain Lauterborn wisely did not rely on the father's representations, as Schoolcraft's recordings reveal that the things Schoolcraft's father said to Captain Lauterborn were not true, and that the father knew them to be not true.  (SM Exhibit R, 0:00-8:00.)

74.     At 9:45 pm that night, after waiting five hours outside Officer Schoolcraft's home, the NYPD took a key from the landlord and entered his home.[81]

Response:      Not disputed, except to the extent it suggests the NYPD forcefully took the key from the landlord.  The NYPD asked if the landlord had a key and the landlord said yes and voluntarily gave it to them. (SM Exhibit CL, Lauterborn Dep. pp. 300-301 ll. 1-4, SM Exhibit CS, Broschart Dep. p. 112 ll. 6-14).

75.     That entry, which was made without a warrant, was made by at least ten supervisory NYPD officers.

Response:       Disputed.  Actual entry to Schoolcraft's apartment was made by a team of two to three ESU officers. Over a period of time there were seven officers of authority who, over time, entered and left Schoolcraft's apartment: Chief Marino, Deputy Inspector

---

[77] *Id.* at 8:00-05.
[78] *Id. 9:55-10:06*
[79] *Id*. at 10:10-20.
[80] *Id.* at 10:55-11:00.
[81] PMX 16 at  NYC 00432 (2145 entry made into apartment).

Mauriello, Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough, Sergeant Duncan, and

Sergeant Hawkins. (SM Exhibit CT, Gough Dep. pp. 138-141).

      76.    The entry team was led by three Emergency Services Unit officers, who were followed by Deputy Chief Marino, DI Mauriello, Captain Lauterborn, Lieutenant Broschart, and three members of the Brooklyn North Investigation Unit (Lieutenant William Gough, Sergeant Kurt Duncan, and Sergeant Raymond Hawkins).[82]

      Response:    Disputed, to the extent this suggests <u>entry</u> was made by all listed

Officers at once (see response to paragraph 75).

      77.    At the time of their entry, the house was also surrounded by numerous other members of the NYPD, including DI Keith Green, the commanding officer of the 104th Precinct, Lieutenant Thomas Crawford (81st Precinct); Sergeant Kevin Scanlon (104th Precinct); and several Police Officers who were acting either as drivers for the supervisors at the scene or had set up a barricade to block off street traffic.[83]

      Response:    Not disputed, except there never was a barricade set up to block

street traffic and the other officers did not "surround" the house (despite Lauterborn saying "the

police are all over it").  (SM Exhibit CU, Marino Dep. p. 243 ll. 7-12.) They simply were waiting

outside pending a resolution of the situation inside Schoolcraft's apartment.  Crawford was

Mauriello's driver, and DI Green and Sergeant Scanlon were there because Schoolcraft's house

was in their precinct area.

      78.    Also responding to the scene was FDNY Lieutenant Hanlon and two Jamaica Hospital Emergency Medical Technicians ("EMT").[84]

      Response:  Not disputed.

      79.    According to Deputy Chief Marino and DI Mauriello, the warrantless entry into Officer Schoolcraft's home was justified by their concerns for his "well-being."[85]

---

[82] PMX  3:  Mauriello Tr. 349:13-350:21.
[83] *Id.* at NYC 000429.
[84] PMX  16 at NYC 431.
[85] PMX  7:  Marino Tr. 255:15 ("I was thinking about Schoolcraft's safety") & 256:9-18 (believed there was "a possibility of" him being an emotionally disturbed person); *but see id.* at 258:5-16 (no information that Officer Schoolcraft had threatened to hurt himself or others). PMX 3:  Mauriello Tr.  357:24-358:22 (entry made out of concern for his well-being and safety).

Response:      Not disputed.

80.      Deputy Chief Marino admitted that he had no information that Officer Schoolcraft had threatened to hurt himself or others.[86]

Response:      Not disputed, although Marino said he had no "specific" information of such a threat.  Clearly, however, he knew the circumstances and what had transpired earlier in the day.  (See SM Ex. CU, Marino Dep. p. 257 ll. 8-23).

81.      Psychologist Lamstein had told Captain Lauterborn that evening that to her knowledge he was not a threat to himself or others, they allegedly believed that he was "possibly" an emotionally disturbed person because he had been sent (by them) to psychological services earlier that year, had been put on restricted duty without a gun and had left work early, allegedly against orders.[87]

Response:      Disputed.  See response to statement 69 above.  With respect to Dr. Lamstein, she did not express the opinion that on the evening of October 31, 2009, there was no reason to believe Schoolcraft might be a danger to himself or others.  Instead, Dr. Lamstein indicated it had been her belief when she last saw Schoolcraft four days earlier, but she could not say so with any reasonable amount of certainty on October 31, 2009, because of what she had learned Schoolcraft had done that afternoon and evening (SM Ex. CI, Lamstein Dep. p. 340).  With respect to what "they allegedly believed," if it is intended to refer to what Captain Lauterborn said about what he and others believed about Schoolcraft at that point in time on the evening of October 31, 2009, it is undisputed Lauterborn expressed the view Schoolcraft might be emotionally disturbed, but he did not say and certainly should not have said anyone from the 81st Precinct sent Schoolcraft to psychological services because that absolutely was not true (see Mauriello Statement of Material Facts ¶¶ 8-16 and responses to paragraphs 28-33).  Everyone involved was aware Schoolcraft was on restricted duty and had left work early, against orders.

---

[86] PMX  7:  Marino Tr. at 258:5-16.
[87] PMX  3:  Mauriello Tr.  357:24-358:22.

82.    Upon entry, the Emergency Services Unit officers moved into Officer Schoolcraft's' bedroom with their guns drawn, wearing bulletproof vests and helmets and carrying tactical shields.[88]

Response:    Disputed.  While there is differing testimony as to what gear ESU was wearing, they did not have guns drawn.    (SM Ex. BV, Mauriello Dep. p. 352 ll. 10-16; SM Ex. CL, Lauterborn  Dep. pp. 307-308 ll 22-10).

83.    Officer Schoolcraft was lying on his bed and it appeared that he was either watching TV or had just woken up.[89]

Response:    Disputed.  Schoolcraft was lying on his bed, but he had not just woken up.  He had been awake in the dark for hours, as revealed by all of the conversations he recorded during that time (SM Ex. R, Schoolcraft Conversation with Larry Schoolcraft, SM Exhibit S.)  Also, the television was turned on for at least a portion of the time.

84.    As reflected by the first moments of a recording captured by Officer Schoolcraft's voice-activated digital recorder, one of the Emergency Service Unit officers asked Officer Schoolcraft, "You okay?" to which Officer Schoolcraft replied, "Yeah, I think so."

Response:    Disputed.  The first moments of the recording after ESU banged on the door to the apartment, while calling out "Adrian", and then opening the door to the apartment, are of statements uttered in whispers by the ESU officers, as follows:  One officer says "He's on the bed."  The other officer responds, "Is he alright?"   (SM Exhibit S at 0:45-1:00.)

85.    Once DI Mauriello entered his bedroom, he ordered Officer Schoolcraft to return to the 81st Precinct.[90]

Response:    Disputed.  The dialogue with Schoolcraft after ESU had conducted the initial exchange with Schoolcraft, was as follows:

---

[88] PMX  24:  Duncan Tr.  119:4-120:19; PMX 25:  Gough Tr. 141:4-25.
[89] PMX  24:   Duncan Tr. 127:11-20 (laying there on his bed watching TV); PMX 3:  Mauriello Tr. 359:2-5 (the TV was on).
[90] PMX  3:  Mauriello Tr. 356:11-357:15;  PMX 11:  (DS.50_31October 2009_HomeInvasion.wma at 2:48).

As the ESU officers and Schoolcraft are speaking, Chief Marino apparently steps

into the bedroom and speaks with Schoolcraft:

> Marino: Adrian, you didn't hear us knocking on this door for a couple hours?
> Schoolcraft: I drank some Nyquil.
> Unidentified male voice: Adrian, sit up.
> Marino: Adrian, you didn't hear us knocking on that door… for the last couple
hours?
> Schoolcraft: No, why would I be expecting anyone knocking at my door Chief?
> Marino: I don't know Adrian, but normally if you hear someone knocking you get
up and answer it. They were kicking on that door loud and yelling.
> Schoolcraft: I wasn't feeling well.
> Marino: You got a million people downstairs worried about your welfare,
spending hours out here, worried about you. We've talked to your father, we've called your
phone.
> Schoolcraft: What did my father say?
> Marino: I don't know Adrian, I didn't talk to him personally. Alright, sit down.

(SM Exhibit S at 1:20-1:50.)

After speaking with Schoolcraft for less than a minute, Chief Marino then said

"Steve", indicating to Mauriello that Chief Marino wanted him to step into the bedroom and deal

with the situation.  (SM Exhibit S at 1:20-1:55.)

After a few moments, Mauriello steps into the bedroom and speaks to Schoolcraft.

The entire conversation between them lasted approximately forty-five seconds, as follows:

> Mauriello: Adrian, what happened today?
> Adrian: I wasn't feeling well, I left.
> Mauriello: That's it? You weren't feeling well. Your sergeant told you to stay,
right?
> Schoolcraft: No, she didn't say anything. She was talking on her cell phone.
> Mauriello: You got everybody worried, we are worried about your safety.
> Schoolcraft: Worried about what?
> Mauriello: What do you mean, worried about what? They tried calling you,
everybody(s) been calling you. Captain Lauterborn's been calling, everyone has been calling
you, your father has been calling you. You're not answering. We were worried about anything
that happens. That's what we are worried about. God forbid. You just walk out of the precinct. I
say hello to you today that was the last I saw you. You know, that's what we are worried about,
your safety, your well-being.
> Schoolcraft: Alright, I'm fine.
> Mauriello: Well, you are going to come back to the precinct with us.
> Schoolcraft: Well…if I'm forced to. It's against my will.

48

Mauriello: Against your will? OK Teddy [referring to Captain Lauterborn], you handle this.

(SM Exhibit S at 2:15-3:00.)

86.     As reflected by the recording, Officer Schoolcraft refused to return to the Precinct, notwithstanding numerous threats and orders.  Eventually, however, Officer Schoolcraft succumbed to threats by Captain Lauterborn and Lieutenant Gough, and said he would go under protest.[91]

Response:     Disputed.  While officers were giving orders to a subordinate, there were no threats made to Schoolcraft before he agreed to return to the precinct, though he said "it's against my will."  (SM Ex. S at 2:45-3:00.) While preparing to leave, and while speaking on his cell phone with his father, Schoolcraft then claimed not to feel well.  He sat back down and was offered, and he accepted, medical attention from EMS (SM Ex. S at 6:20-8:40.)

87.     Then a few moments later, Officer Schoolcraft stated that he had to sit down because he was not feeling well and agreed to receive medical attention.[92]

Response:     Not disputed, but Schoolcraft announced he was not feeling well only while speaking on his cell phone with his father, who apparently told him to say so (SM Exhibit S at 6:20-8:30).  In an earlier conversation, before anyone entered the apartment, Schoolcraft and his father had discussed what illness Schoolcraft should pretend to have.  Schoolcraft suggested cancer, but his father said "no, don't say anything like that (inaudible) cause it's a big deal in a lawsuit. It will come out and you will have to say you lied." The father recommended diarrhea because "that's always a good one."  (SM Ex. R, at 6:00-6:25.)   In any event, Schoolcraft was offered medical attention and he accepted.  He then was examined by the EMTs.  (SM Ex. S at 8:30-9:00).

88.     While Officer Schoolcraft was being examined by Jamaica Hospital EMT Salvatore Sangeniti, who had previously responded to the scene with an FDNY EMT supervisor,

[91] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40
[92] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40.

Deputy Chief Marino returned to Officer Schoolcraft's bedroom and berated Officer Schoolcraft about feeling sick.[93]

        Response:     Disputed.  First, the EMTs did not arrive at the scene with the

FDNT supervisor.  Second, the suggestion that Chief Marino scolded or yelled at Schoolcraft is

simply not supported by Schoolcraft's own recording of the events. The dialogue was as follows

and recounts the events of the day and Chief Marino's decision to suspend Schoolcraft based on

those events:

        Marino: I thought you did go sick today?
        Schoolcraft: I did go sick.
        Marino: Alright, then the Sergeant asked you to stay for a minute, right? That she needed to speak with you first. So you disobeyed an order, and now you have…
        Schoolcraft: She was on the phone.
        Marino: Listen to me. I'm a chief in the New York City Police Department and you're a police officer. And then your have umpteen people out here standing in the rain. And don't tell me you didn't hear them knocking on your door. OK and when they call your cell phone and you hang up. So this is what's gonna happen my friend. You disobeyed an order and the way you are acting is not right at the very least.
        Schoolcraft: Chief, if you were woken up in your house.
        Marino: Stop right there, son. Son, I'm doing the talking right now, not you.
        Schoolcraft: In my apartment.
        Marino: In your apartment.
        Schoolcraft: What is this Russia?
        Marino: You are going to be suspended, alright. That's what's gonna happen. You can go see the surgeon if you are sick. We will get you all the medical attention that you need. At the end of it, you are suspended son.

        Notably, while no one was denying Schoolcraft the medical

attention he requested, Chief Marino, quite correctly, believed Schoolcraft was not being

truthful. (SM Exhibit S at 10:45-11:45.)

        89.    And at the very moment when EMT Sangeniti started taking Officer Schoolcraft's blood pressure, Deputy Chief Marino, in a loud and angry tone of voice, suspended Officer Schoolcraft.[94]

---

[93] PMX 11:DS.50_31October 2009_HomeInvasion.wma at 9:07-12:12.
[94] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 11:00-12:12; PMX 26:  Sangeniti Tr. 144:16-148:3 (Sangeniti confirming that at the point when Deputy Chief Marino suspends Officer Schoolcraft he was taking his blood pressure; testimony based on the sounds made when taking blood pressure).

Response:     Disputed, to the extent that this suggests that Chief Marino yelled at Schoolcraft or acted in any manner that was inappropriate. (see response to paragraph 89.) Further, the suggestion that Chief Marino contributed to Schoolcraft's ill-health or high blood pressure is belied by the fact that Schoolcraft himself asked for medical assistance, and acknowledged to EMTs that he already suffered from high blood pressure. (SM Exhibit S at 13:30-14:00.)

90.     Based on the circumstances confronting Officer Schoolcraft, he agreed to go to the hospital associated with his primary care physician, which was Forest Hills Hospital, to have his blood pressure checked out.[95]

Response:     Not disputed that Schoolcraft agreed to go to the hospital to be medically examined, but the hospital to which Schoolcraft was to be taken was discussed with him and he was told it would be Jamaica Hospital, which was closer than Forest Hills and was the hospital where the ambulance had originated and where the EMT's worked (SM Ex. S at 13:20-14:05.)

91.     When it became clear to Officer Schoolcraft, however, that the NYPD was going to take him to Jamaica Hospital (which has a psychiatric ward), Office Schoolcraft refused further medical attention and went back to his apartment.[96]

Response:     Disputed.  During the first entry into Schoolcraft's apartment it was agreed he needed medical attention, and he was told he would be taken to Jamaica Hospital.  He had not been declared an EDP, and there was no concern or discussion about which hospital had a psychiatric ward.  Schoolcraft turned around and went back inside his apartment not because he suddenly discovered he was going to be taken to Jamaica Hospital, but because he was again talking on his cell phone with his father and no doubt was told not to cooperate.  At the time, he

---

[95] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 13:00-14:10.
[96] PMX 4:  Schoolcraft Tr.  149:7-151:2.

did not offer any explanation for his decision to go back inside or any explanation for his supposed

objection to Jamaica Hospital. (SM Ex. S at 18:00-20:00.)

92.     As reflected in the second part of the recording of the events in his home that time, Officer Schoolcraft returned to his apartment, laid back down in his bed and refused further orders first by Captain Lauterborn and then by Deputy Chief Marino who returned again to his home and entered without permission.[97]

Response:     Not disputed by Steven Mauriello as he was not present and this

paragraph does not relate to the claims against him or his counterclaims.

93.     Deputy Chief Marino declared Officer Schoolcraft an "emotionally disturbed person" (also known as an "EDP") and Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough and Sergeant Duncan grabbed Officer Schoolcraft from his bed, threw him on the floor of his bedroom and cuffed him with his hands behind his back.[98]

Response:     Not disputed by Steven Mauriello as he was not present and this

paragraph does not relate to the claims against him or his counterclaims.

94.     While Officer Schoolcraft was prone on the floor and Gough and Duncan were forcing his wrists into handcuffs, Broschart stepped on the backs of his legs, Lauterborn held him down with his hands, and Deputy Chief Marino put his boot on Officer Schoolcraft's face as he tried to turn his neck around to see what was being done to his body.[99]

Response:     Not disputed by Steven Mauriello as he was not present and this

paragraph does not relate to the claims against him or his counterclaims.

95.     After the handcuffs were secured, Officer Schoolcraft was then forced into an ESU chair, taken to the ambulance, placed on a stretcher with his hands cuffed behind his back, and driven to Jamaica Hospital by the two Jamaica Hospital EMTs.

Response:     Not disputed by Steven Mauriello as he was not present for much

of what is described and this paragraph does not relate to the claims against him or his

counterclaims.

---

[97] PMX 4:  Schoolcraft Tr. 1:4-155:8 (Lauterborn pursued Schoolcraft back into his apartment and physically prevented him from shutting  the doors behind him as he returned); PMX 11: DS.50_31October 2009_HomeInvasion.wma at 17:50-22:00.
[98] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 21:30 -23:51.
[99] PMX 4:  Schoolcraft Tr. 166:21-168:19; PMX 21:  Broschart Tr. 167:16-169:17; PMX 10: Lauterborn Tr. 322:23-323:9.

96.     Lieutenant Broschart rode in the back of the ambulance to maintain custody of Officer Schoolcraft.[100]

Response:     Disputed.  Lieutenant Broschart rode in the back of the ambulance to accompany Schoolcraft pending a further evaluation of Schoolcraft's condition as per NYPD Patrol Guide guidelines. (SM Exhibit CV, NYPD Patrol Guide 216-05(27).)

97.     While the NYPD officers were in his apartment, they searched his person and his apartment and seized a voice-activated digital recorder taken from his pocket as well as several files belonging to Officer Schoolcraft, including copies of crime reports reflecting the downgrading of crimes he reported to IAB and notes in a folder marked "Report to the Commissioner.[101]

Response:     Disputed.  During the three minutes or so Mauriello was present in Schoolcraft's apartment during the initial portion of the first entry into the apartment, neither Schoolcraft nor his apartment was searched and no property was seized.  There also is no evidence that any paper or property of Schoolcraft's was seized during the remainder of the first entry or during the second entry, and there is no evidence the so-called "Report to the Commissioner" ever existed. (SM Exhibit BV, Mauriello Dep. pp. 376-81.)

98.      Officer Schoolcraft arrived at Jamaica Hospital's Emergency Room later that night and spent the night handcuffed to a gurney in the Emergency Room.

Response:     Not disputed by Steven Mauriello as he was not present and this paragraph does not relate to the claims against him or his counterclaims.

99.     Hospital medical records or the "chart" reflect that he was in custody of the NYPD the entire time.[102]

Response:     Not disputed.

100.    Officer Schoolcraft was cuffed and under the custody of Lieutenant Broschart until the Lieutenant was relieved at about midnight by Defendant, Sergeant James, who was also from the 81st Precinct, and Sergeant James remained there until the morning.[103]

---

[100] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 22:00-28:27; .
[101] PMX  4:  Schoolcraft Tr. 173:12-177:17.
[102] PMX 27:  Jamaica Hospital Chart (PX 69 at JHMC  58) (Emergency Department Nursing Notes). Plaintiff's counsel has paginated the chart as "JHMC _."

Response:        Not disputed.

101.    On November 1, 2009, Defendant, Sergeant Frederick Sawyer, another supervisor from the 81st Precinct, was sent to Jamaica Hospital to relieve Sergeant James.  When Sawyer got to the hospital, he saw Officer Schoolcraft on the telephone and, according to Sawyer, he ordered him to get off the telephone.[104]

Response:        Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against Mauriello or his counterclaims.

102.    When Officer Schoolcraft did not comply with that order, Sergeant Sawyer, Sergeant James, and their two drivers physically forced Officer Schoolcraft onto the gurney and handcuffed his other hand to the gurney, leaving him in a fully shackled position on the gurney.[105]

Response:        Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

103.    When Sawyer applied the cuffs to Officer Schoolcraft, he used both hands to squeeze the cuffs tighter and said "this is what happens to rats."[106]

Response:        Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

104.    Later that morning, the two sets of handcuffs were removed and Officer Schoolcraft was wheeled into the Jamaica Hospital Psychiatric Emergency Room to be held against his will for further "observation."[107]

Response:        Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

105.    On November 3, 2009, Doctor Bernier ordered Officer Schoolcraft's involuntary hospitalization.

---

[103] PMX  28:  James Tr. 53:18-20, 59:17-60:16 & 67:14-71:16 .
[104] PMX  29:  Sawyer Tr. 139:25-146:15.
[105] PMX  29:  Sawyer Tr. 139:25-146:15 & 153:14-156:16.
[106] PMX  4:   Schoolcraft Tr. 186:11-22..
[107] PMX 27:   Medical Chart (PX 69) at JHMC 45.

Response:       Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

106.    Dr. Bernier's decision was made even though there was nothing in the chart that suggested that Officer Schoolcraft was dangerous.

Response:       Not disputed by Steven Mauriello as this paragraph does not relate to the claims against him or his counterclaims.

107.    After the paperwork was filled out, Officer Schoolcraft was taken from the Psychiatric Emergency Room to a psychiatric ward in the hospital.[108]

Response:       Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

108.    On November 4, 2009, Doctor Isakov, who was an attending doctor on the psychiatric ward, confirmed Dr. Bernier's decision to involuntarily hospitalize Officer Schoolcraft.[109]

Response:       Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

109.    That decision was reached even though there was nothing in the chart that suggested that Officer Schoolcraft was dangerous to himself or others.[110]

Response:       Not disputed by Steven Mauriello as this paragraph does not relate to the claims against him or his counterclaims.

110.    Doctor Bernier and Doctor Isakov testified at their depositions that they admitted Officer Schoolcraft on the ground that any possible or potential risk of dangerousness was a sufficient basis for their commitment decision.[111]

Response:       Not disputed by Steven Mauriello as this paragraph does not relate to the claims against him or his counterclaims.

---

[108] *Id.* at 91.
[109] PMX 27 (PX 69) at p. 46.
[110] *See* PMX 30:   Report of Dr. Roy Lubit at p. 13-14.
[111] PMX  31:  Bernier Tr. 248-49; PMX 32:  Isakov Tr. 94-98

111.    Dr. Dhar, who was the Jamaica Hospital witness in this action, also testified that it was the policy and practice of the hospital to involuntarily commit a patient based on any possibility that the person was dangerous.[112]

Response:    Not disputed by Steven Mauriello as this paragraph does not relate to the claims against him or his counterclaims.

112.    On November 6, 2009, after a forced stay lasting six days, Jamaica Hospital released Officer Schoolcraft from its custody, the same day that insurance coverage for his forced stay expired.[113]

Response:    Not disputed by Steven Mauriello as he was not present for or involved in what is described and this paragraph does not relate to the claims against him or his counterclaims.

113.    After Officer Schoolcraft was released from Jamaica Hospital, he moved to Johnstown, New York and for the next six months was relentlessly harassed by the NYPD, which sent NYPD and local police officers on at least twelve separate occasions to bang on his door, spy on him, and videotape him or his father.

Response:    Not disputed by Steven Mauriello as he was not present for or involved in what is described and this paragraph does not relate to the claims against him or his counterclaims.

114.    In January 2010 and in February 2010, Lieutenant Gough and Sergeant Duncan traveled with others north over 200 miles to his home to deliver papers to him that could have just as easily been sent to him by certified mail.[114]

Response:    Not disputed by Steven Mauriello as he was not present for or involved in what is described and this paragraph does not relate to the claims against him or his counterclaims.

115.    DI Mauriello was a witnesses in the stop and frisk case recently tried in this Courthouse before District Court Judge Shira A. Scheindlin, *Floyd v. City of New York*, 08-cv-1034 (SAS) (Dkt. # 298).  In that testimony, DI Mauriello stated that *after* the quota

---

[112] PMX  33:  Dhar Tr. 132-35.
[113] PMX  27 (Medical Chart) at JHMC 128 ("The case is certified from 11/3/09 through 11/6/09. Next review will be with Dan of Aetna….").
[114] PMX 16 at 3876.

allegations were made against him as the commanding officer of the 81st Precinct, he was transferred on July 3, 2010 to become the Executive Officer of Transit Borough Brooklyn and Queens.  According to DI Mauriello's testimony before Judge Scheindlin, at the time of the transfer, the Chief of Patrol for the entire NYPD told DI Mauriello that he was doing a "really good job at the 81st Precinct" and that he wanted to reward him with the new position.[115]

Response:       Disputed to the extent it misstates Mauriello's testimony at the

Floyd trial and ignores more recent testimony in this case on that same subject.  Mauriello testified

at the Floyd trial in May 2013 that he was transferred to his current position in July 2010, and at

the time he considered it to be just a transfer, not a step up or a promotion or an appointment to a

more important position, just a lateral transfer (PMX 35 at 1829-1831).  In this case, Mauriello

testified on July 1, 2014 as follows:

Q: Did Hall tell you as a reward for doing a good job at the 81 that you were getting

this transfer?

A: He didn't say it was a reward. He said I did a very good job at the 81. I guess he

was trying to soften the blow. You could tell by my voice I was disappointed. Had a lot going on in

my life at the moment and probably was the last thing I wanted to hear.

Q: It was a blow?

A: It was a big, big blow.

(SM Exhibit BV, Mauriello Dep. pp. 480-481 ll. 20-7)

Further, Mauriello has learned his transfer to the Transit Division had nothing to do

with his ability or his reputation, but was a reaction to the adverse publicity generated by

Schoolcraft's efforts to get revenge against Mauriello by his lies to QAD and IAB and his selective

release of his recordings. (SM Exhibit BV, Mauriello Dep. 458-460.)

116.    While Mauriello did not claim then that the transfer was a promotion, he did considered it a transfer to a position as "second commander to more officers."[116]

---

[115] PMX 35:  Mauriello *Floyd* Testimony (PX 48) at 1829:25-1831:11.
[116] *Id.* at 1831:17.

Response:      Disputed.  Mauriello testified he did not consider it a promotion to a more important position.  He said, instead, it was just a transfer to a position as "second commander to more officers" (PMX 35 at 1829-1831) as further explained in the response to paragraph 115 above.

117.   While technically not a "promotion," it was "a reward for the job [he] did at the 81[st] Precinct."[117]

Response:      Disputed.  See response to paragraph 115.  Chief Hall indicated Mauriello did a good job at the 81st Precinct.

118.   Mauriello has not suffered any damage to his status at the NYPD.

Response:      Disputed.  As Mauriello explained at his deposition, based on his career path he should have been promoted to inspector with a corresponding increase in salary of $9,000 per year plus additional retirement and pension benefits. Further, in 2009, Mauriello had been selected to attend special training at the Police Management Institute (PMI) at Columbia University. Every other Deputy Inspector and Captain who attended PMI with Mauriello has since received at least one promotion and the corresponding pay increase.  (SM Exhibit BV, Mauriello Dep. 578-588 ll. 24-18; see SM Aff. in Opp. ¶ 6.)

119.   In his deposition in this case, DI Mauriello testified that soon after the news broke in a February 2010 *Daily News* article about the investigation into downgrading major crimes at the 81st Precinct, he attended a Patrol Borough Brooklyn North supervisors meeting.  At the meeting his direct supervisor, Deputy Chief Marino, told DI Mauriello not to worry about the negative press because he did not believe it.[118]

Response:      Not disputed.

120.   In addition, according to Mauriello, Deputy Chief Marino and the thirty-five other supervisors in the room told DI Mauriello that they supported him.[119]

---

[117] *Id.*  at 1836:25.
[118] PMX  3:  Mauriello Tr. 98:12-103:25.
[119] *Id.* at 103:16-25

Response:        Not disputed.

121.    Mauriello does not claim that he was denied some specific position or promotion.  At his deposition, DI Mauriello testified that he has not made *any* efforts to change his position at the NYPD since October 2009 and that he has not made any requests for any changes in his position since October 2009.[120]

Response:        Disputed.  Mauriello's deposition testimony explained that there is

no formalized process for an officer above captain to request a promotion. (SM Exhibit BV,

Mauriello Dep. p. 419 ll. 18-25.) Nonetheless, Mauriello repeatedly said in his deposition that he

approached his supervisors at the Transit Department, Chief Diaz and Chief Fox, on at least two

occasions about a promotion and transfer. (SM Exhibit BV, Mauriello Dep. pp. 471-474 ll. 14-

12.) Both supervisors indicated that the NYPD would not even consider any promotion for

Mauriello as his career "was on hold" while Schoolcraft's lawsuit was proceeding. (SM Exhibit

BV, Mauriello Dep. pp. 467-486 ll.15-8, 469-470 ll. 1-14.)  In addition, Mauriello has repeatedly

discussed the subjects of promotion and transfer with the president of his union.  (SM Aff. In

Opp. ¶ 7.)

122.    The only information that Mauriello could provide at his deposition was that he had discussions in the summer of 2011 with his now-retired supervisor, Transit Bureau Chief Diaz, and his successor, Joseph Fox, who told him that any transfers or promotions would likely have to wait until the case is over and that until then they could not "push for him."[121]

Response:        Disputed to the extent the statement includes the phrase "[t]he only

information that Mauriello could provide at his deposition" the meaning of which is unclear.

123.    Mauriello has no evidence that Officer Schoolcraft's statements to QAD or IAB were made for the *sole purpose* of intentionally inflicting harm on Mauriello or that Officer Schoolcraft used wrongful means to inflict that harm.

Response:        Disputed.  Schoolcraft's own recordings indicate that he and his

---

[120] *Id.* at 419:4-420:10.
[121] *Id.* at 466:11-470:9.

father were motivated to intentionally inflict harm on Mauriello as revenge for signing off on

Schoolcraft's 2008 evaluation and for arranging to have Schoolcraft placed on restricted duty.

Schoolcraft got his misguided revenge by telling the lies he and his father prepared to have him

tell QAD, as well as IAB. Schoolcraft's recording of a conversation with his father prior to the

QAD meeting (which was withheld in discovery, but had been retrieved by IAB) indicates an

insidious and continuing plan to cause career and reputational harm to Mauriello. The fact that

Schoolcraft told his father that "this is the way we are going to fuck him over" suggests that

Schoolcraft and his father had finally, after earlier failed attempts, found the way to inflict harm

on Mauriello. (SM Ex. BR at 7:10-7:40.)  In just about every aspect of Schoolcraft's involvement

with the NYPD, he was engaged in deceit with the ultimate purpose of hurting Mauriello, while

creating a false basis for an undeserved recovery in a lawsuit – whether it was about his

performance in 2008, his desire to appeal his evaluation, his feelings of stress and anxiety, his

purported ignorance of the reasons he was placed on restricted duty, his purported desire to be

restored to full duty, his purported concern for the people of the community served by the 81st

precinct, his purported concern for his fellow officers, his recording of his time on duty, his

selective production of his recordings, and so on.   The evidence of his desire to get revenge

against Mauriello pervades everything he has said and done.

       124.    Mauriello's Counterclaims say that Officer Schoolcraft was motivated by
a lawsuit.

       Response:    Disputed.  What the counterclaims allege is as follows, in paragraph

7: "Thus, plaintiff held himself out to QAD and all others, including the NYPD Internal Affairs

Bureau (IAB), members of the press, and the public generally, under extremely false pretenses

for the purpose not of protecting his fellow officers or the rights of the residents of the Bedford

Stuyvesant community, but for the purpose of getting revenge against Steven Mauriello --

60

interfering in his employment relationship with the NYPD, and otherwise trying to destroy his

career and reputation – while also creating false support for plaintiff's lawsuit against the

NYPD."  (SM Ex. BR at 0-2.00) (Larry Schoolcraft speaking to Adrian on October 7, 2009,

alludes to addressing the "ladies and gentlemen" of a jury in a future lawsuit); (SM Ex. R) (Larry

Schoolcraft speaking to Adrian on October 31, 2009, again refers to a future lawsuit they clearly

were contemplating).

        125.    Official findings by two NYPD investigative agencies – IAB and QAD –
show that DI Mauriello personally committed misconduct and improperly permitted rampant
downgrading and suppression of crime reporting at the 81st Precinct while under his command.

        Response:     Disputed.  First, the former NYPD attorney responsible for

overseeing the investigations and deciding what charges, if any, should be brought, said at a

meeting of those involved in the investigations, after being told there was no basis for bringing

charges against Mauriello, that she wanted them to bring her something, anything, that could be

used against Mauriello, and that is what lead to the charges.  (SM Ex. BV, Mauriello Dep. pp.

444-448 ll. 10-7.)  The charges have not yet been heard.  When they are heard, Mauriello will urge

their dismissal and expects to prevail.

        126.    After October 31, 2009, IAB began an investigation into whether DI
Mauriello knew about or suspected at the time of his entry into Officer Schoolcraft's home that
IAB or QAD was investigating the 81st Precinct.  IAB also made investigation into whether
Mauriello knew about the contents of Officer Schoolcraft's memo book at the time he forced his
way into his apartment.

        Response:     Disputed that Mauriello forced his way into Schoolcraft's

apartment.  Not disputed that IAB considered a number of questions when investigating

Schoolcraft's allegations, but it did not address whether Mauriello knew about IAB's

investigation, only whether he knew about QAD's investigation.  In that regard, Mauriello was

charged as follows:  "On August 11, 2010, in an IAB interview relating to 'retaliation, whistle

blower,' Mauriello 'stated he was not aware that the Quality Assurance Division was conducting

an investigation into the 81st Precinct's handling of Complaint Reports until either sometime in

February 2010, or when he was interviewed by QAD on April 30, 2010, when in fact, the

investigation disclosed that he was aware prior to the aforementioned dates.'  This conduct was

"prejudicial to the good order, efficiency or discipline of the Department [as it] impede[d] an

official Department investigation."  This charge is unfounded and we expect it to be summarily

dismissed at the administrative hearing.

127.    During the course of those investigations, DI Mauriello was required to be
interviewed under oath by IAB, and at his interview DI Mauriello made materially false
statements about his knowledge about the existence of an investigation into his Precinct and
Officer Schoolcraft's memo book.[122]

Response:    Disputed.  Mauriello did not make any materially false statements

and has not been charged with making any materially false statements.  See response to

paragraph 126.

128.    IAB has recommended that formal charges against Mauriello be filed, and
those charges are still pending.

Response:    Not disputed.  See responses to paragraphs 125 through 127.  The

charges have not yet been heard.  When they are heard, Mauriello will urge their dismissal and

expects to prevail.

129.    In 2010, QAD issued a report on its investigation, stating: "In summary,
although some upgrades were made during the course of 2008 and 2009, the findings illustrate
severe deficiencies in the overall crime reporting process as a whole beginning with the initial
interaction of complainants attempting to file reports, the supervisor's review and finalization of
the reports submitted and continuing with inordinate delay in changing, improper classifications.
These conclusions, coupled with the significant amount of reports found not to have been entered
into the Omni-System is disturbing."[123]

Response:    Not disputed that the quoted statement appears in the QAD report,

and identifies administrative deficiencies that needed to be addressed in the 81st Precinct, for

---

[122] PMX 15 (PX 144) (confidential designation)
[123] PMX 16 (PX 169) at NYC 5205 (AEO designation; filed under seal) (redacted ECF version).

which Mauriello was responsible as the Commanding Officer.  The administrative deficiencies,

however, had been identified by QAD in 2008 and 2009, as the quoted statement indicates, and

the analysis of the data reviewed in the 2010 investigation revealed a degree of crime

misclassification that was the same or better than what QAD had found in the semi-annual audit

covering six months of the ten-month period reviewed by QAD in its investigation.


ADDITIONAL MATERIAL FACTS AS TO WHICH
MAURIELLO CONTENDS THERE EXIST
GENUINE ISSUES TO BE TRIED,
THUS REQUIRING DENIAL OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

Mauriello's Counterclaims

1.      On October 7, 2009, in a recorded conversation with his father on his way

to his first and only meeting with QAD – a recording Schoolcraft or his previous counsel deleted

from the recordings Schoolcraft produced in discovery (SM Ex. CV) -- Schoolcraft expressed his

desire and intent to "fuck [Mauriello] over" by providing QAD false information.  More

specifically, Schoolcraft told his father that "you're right, this is the way to fuck [Mauriello]

over", suggesting that in Schoolcraft's mind they had finally come upon a way to hurt Mauriello.

(SM Ex. BR at 7:10-7:40.)

2.      In the October 7, 2009, conversation with his father, Schoolcraft and his

father discussed that Schoolcraft should provide QAD with false information without letting on

in any way that Schoolcraft was seeking to get "revenge" against Mauriello (SM Ex. 2:30-2:45).

Following his father's advice, Schoolcraft made one of his initial points to the QAD investigator

that he was not looking to "burn anyone" or "for vengeance", and was not seeking a "retaliation

claim." (SM Exhibit BR at 27:45-27:55.) In a particularly telling moment, Schoolcraft tells a

QAD investigator "I kinda want to present… I don't wanna come in here as just some

disgruntled employee that wants to burn somebody or something. I wanna present it as…let's fix the problem." (SM Exhibit BR at 43:45-44:15.) Schoolcraft's repetitive framing of this issue, which he had rehearsed with his father, and the fact that he felt the need to express concern for the integrity of the department to the QAD investigators, suggests that his real interests were quite different, as we now know.  Schoolcraft further attempted to mask his true intentions at the end of the interview by saying to the investigators "this isn't because I don't like Inspector Mauriello, he is a jovial guy." (SM Exhibit BR at 2:57.45-2:57.55.)

    3. On the morning of October 31, 2009, while in conversation with other officers in the 81st Precinct that he secretly recorded, Schoolcraft complained "look at what they did to me… they fucked me over on my evaluation." Claiming that he asked supervisors to put it in writing but they said "no, go fuck yourself. That's your buddy Mauriello." Schoolcraft then said "That's your buddy Mauriello, that fat miserable fuck.  If I could get him…If I could get him, I would fucking sell him out faster than anything, for free.  I would give him away for free." (SM Exhibit Q at 44:15 – 45:10.)

    4. In that conversation, the officer to whom Schoolcraft was speaking responded "It's been like forever already. Can't get over that shit yet?"  Schoolcraft responded as if the officer had asked whether Mauriello had gotten over Schoolcraft's evaluation and appeal, which seemingly was not what the officer asked, as there was nothing for Mauriello to get over. Schoolcraft, on the other hand, not only had not gotten over it, but he was in the process of getting revenge.  (SM Exhibit Q at 45:15-45:25.)

    5. After speaking with his father on October 7, 2009, Schoolcraft then met with QAD and lied to QAD that he was providing QAD only a sample of the misclassified complaint reports he had gathered (SM Exhibit BR at 43:45-43:55.)

6.      Schoolcraft also lied to QAD that he had many more misclassified complaint reports to provide to QAD as the problem was "chronic" and "systemic"  (SM Exhibit BR at 4:30-5:30.)  He had nothing more and never provided anything more to QAD.

7.      Schoolcraft lied to QAD that the downgrading of complaints was a rampant practice in the 81st Precinct, referring to it as "chronic" and "systemic."  SM Ex. BR at 27:20-27:35.)

8.      The incidence of the misclassification or downgrading of crime in the 81st Precinct as determined by QAD after conducting a complete review of the complaint reports for a ten-month period ending September 30, 2009, triggered by Schoolcraft's allegations, was consistent with the City-wide average of errors in crime classification among all precincts (SM Ex. DC), and consistent with the results found by QAD in its earlier semi-annual audit of the 81st Precinct covering six out of the same ten months.  (See SM Ex. CK.)

9.      In Schoolcraft's October 7, 2009, conversation with his father, they discussed that Schoolcraft should lie to QAD and say he was speaking up because of his concern about the safety of his fellow officers (SM Ex. BR at 13:00-14:30.)

10.      In that same conversation, Schoolcraft told his father he had no friends in the NYPD and did not care if any of his fellow officers were harmed by what he was about to tell QAD (SM Ex. BR at 15:00-15:20.)

11.      Schoolcraft and his father also discussed that Schoolcraft should lie to QAD and say he was speaking up because of his concern about the rights of the people of the largely minority Bedford Stuyvesant community (SM Ex. BR at 13:45-14:30.)

12.      In fact, Schoolcraft had little or no regard for the people of the community, as exhibited by the following paragraphs (13-15).

13.     In that same conversation with his father, Schoolcraft said he and a former partner of his in the 81st Precinct only worked together because "we just worked together so we didn't have to work with any n_____ [African Americans]."  (SM Exhibit BR at 15:10-15:30.)

14.     Schoolcraft has acknowledged that it was on account of the many CCRB and civil rights complaints made against him by people in the community – for which he was placed on force monitoring for one year, from 2004 to 2005 -- that he started recording his time on the job as early as 2006 (SM Ex. BN, AS1 29:15-17.)

15.     Schoolcraft is heard in the recordings he made on the job repeatedly making disparaging remarks about minorities, including the following:   i) on October 31, 2009, Schoolcraft observed an Asian officer outside his home and recorded himself  twice referring to that officer as a "chinc" (SM Ex. R at 17:30-18:00); ii) he is heard on his recording from earlier in the day on October 31, 2009, referring to an African American female officer as one who only could have advanced in the NYPD the way she did by performing sexual favors for her male supervisors (SM Ex. Q at 6:00-6:45); iii) in the same day tour recording, mocking another police officer's ethnic accent (SM Exhibit Q at 29:00-29:10; iv) also in the same day tour recording, referring to member of the community who had come into the precinct asking to use the bathroom as a "fucking retard" (SM Ex. Q at 5:02.45-5:03.00); v) he is heard on another recordings saying to another officer, when hearing music being played by someone in the community, that the person was stealing the air of the officer's kids; and vi) he is heard on one of his recordings, from October 29, 2009, saying to the Borough Personnel Sergeant, who had called Schoolcraft to her office to discuss his appeal, that it was not easy for him, as a white cop, to be working in a predominantly African American community because as a "white male in a black neighborhood, it was a fight every time." (SM Ex. CE at 23:00-23:19.)

16.     Schoolcraft's sole purpose for falsely reporting to QAD was to inflict harm on Mauriello by causing an inevitable impact on his career and employment with the NYPD as revenge for Mauriello's approval of Schoolcraft's unsatisfactory evaluation for 2008 and for somehow having Schoolcraft placed on restricted duty.  Unable to control his hostility for Mauriello, Schoolcraft also has blamed Mauriello for ignoring his appeal. (SM Exhibit Q at 44:35 – 47:30) though Schoolcraft never submitted an appeal.  In each instance, Schoolcraft has only himself to blame, but nonetheless seeks revenge against Mauriello.

17.     Even if Schoolcraft believed his lies to QAD could be justified by the fact that complaint reports occasionally were misclassified, which QAD already was well aware of, he lied about the extent of the misclassification, and he lied about the circumstances involved in certain instances, to make it sound like an extraordinary problem in the 81st Precinct.  (See paragraph 8 above.)

18.     To make the incidence of crime report misclassification seem like a serious problem, at least in the 81st Precinct, Schoolcraft himself purposefully downgraded complaint reports as a means to cause unjustified harm to Mauriello's employment and career. (See SM Ex. DD.)

19.     Not satisfied that he had caused Mauriello enough harm, Schoolcraft selectively released his recordings of roll calls at the 81st Precinct more than six months after the events of October 31, 2009, for the sole purpose of inflicting additional harm on Mauriello by further damaging his employment and career with the NYPD -- again as revenge for Mauriello's approval of Schoolcraft's unsatisfactory evaluation for 2008 and for Schoolcraft being placed on restricted duty.  (See SM Ex. DC.)

20.     Even if there were some innocent justification for Schoolcraft's release of his roll call recordings, he intentionally promoted a misunderstanding of what was said in the

recordings so that Mauriello would be subjected to unjustified ridicule and scorn and ultimately suffer further damage to his employment relationship and career with NYPD.   For example, Mauriello is heard in one of the recordings on Halloween night saying that the officers in his command, unlike under normal circumstances, had zero discretion because of word from the community leaders and the gang detectives that there would be gang initiation that night. Mauriello had foot posts at one of the particularly crime-ridden buildings that suffered from criminal gang activity, and told the officers "I want you stopping everybody coming out of that building, and I mean everybody."   There were over 1000 people living in the building, and Mauriello did not mean, and his officers knew he did not mean, they should stop everyone coming out of the building, which would have been an impossible task.   Instead they were to stop only those they had a reasonable basis to stop.   Schoolcraft, however, knew Mauriello's statement would be taken literally and thus misconstrued by the general public when presented in a sensational way by the media, thus causing embarrassing publicity for the NYPD.   That is, in fact, what happened, which inevitably contributed to the damage caused to Mauriello's employment and career with the NYPD.

21.      Mauriello has performed in exemplary fashion since being transferred to the Queens and Bronx Transit Division in July 2010, and has received the highest performance scores possible during that time (SM Ex. DA).

22.      In March 2009, Mauriello was selected by the NYPD to attend the prestigious Police Management Institute (PMI) at Columbia University.   At the time, he was a Deputy Inspector.   All or substantially all of the other Deputy Inspectors, as well as every Captain (a rank below), who participated in Mauriello's PMI class has since been promoted to Inspector or above.   (See SM Aff. in Opp. ¶ 6.)

23.     The person who succeeded Mauriello as Commanding Officer of the 81st Precinct was promoted to Deputy Inspector after Mauriello, but has since been promoted to Inspector and then to Assistant Chief.  (See SM Aff. in Opp. ¶ 6.)

24.     In the ordinary course, had Schoolcraft not lied to QAD and the media about Mauriello and the 81st Precinct, Mauriello would not have been transferred to the Queens and Bronx Transit Division, and, even if he had, he long ago would have been promoted to Inspector and perhaps to Assistant Chief, and would have received a new assignment. (See SM Aff. in Opp. ¶ 7.)

25.     Had Mauriello been promoted to Inspector in the ordinary course, he would have received an additional $9,000 to $10,000 in annual compensation.  (SM Exhibit BV, Mauriello Dep. 578-588 ll. 24-18.)

26.     All or substantially all of those who were Deputy Inspectors in 2008, when Mauriello was promoted, and are still employed with the NYPD, have been appointed Inspector or Assistant Chief.  Due to the extent of Schoolcraft's lies, and the effort he made to have them sensationalized in the media, Mauriello's employment relationship and career with the NYPD have been damaged, resulting in him not being promoted since 2008.  (See SM Aff. in Opp. ¶ 7.)

27.     An officer at the rank of Captain or above does not apply for a promotion in the NYPD.  The presumption, and the universal truth, is that anyone who is a Deputy Inspector is trying to earn a promotion to Inspector and then to Assistant Chief.  They are promotions one earns, and Mauriello has done everything he can possibly do to earn such a promotion for himself.  Because of Schoolcraft's interference, Mauriello has not been promoted in over six years despite a record that should have earned him at least one, if not two promotions

during that time.  (See SM Aff. in Opp. ¶¶ 6-7; SM Exhibit BV, Mauriello Dep. p. 419 ll. 18-25; SM Ex. DA.)

   28. Brandon Del Pozo, who in 2010 was a Captain in the NYPD assigned to the 50th Precinct, had been assigned to IAB in 2009.  He was contacted by David Durk in 2009 at the behest of Larry Schoolcraft, with whom Durk was acquainted.  In 2010, DelPozo was asked by the NYPD legal bureau to facilitate communications with Schoolcraft's attorney, and in that context was quoted in the media as saying Mauriello was in a "dead-end job" after being transferred to the NYPD Transit Division (SM Ex. BV, Mauriello Dep. 458-461.)

   29. As one final example of the orchestration and deceit by Schoolcraft, with the "guidance" of his father, the recording of their conversation on October 31, 2009, while Schoolcraft was in his apartment, reveals that Larry Schoolcraft called someone he refers to as Shakey or Shady.  He talks about how he told this person something that he thought would influence him to tell others, which he would have expected to trigger a response from the NYPD that was different from what was occurring.  They seem to be aware that their conversation is being recorded, and their expressed reasoning does not make much sense, but it certainly appears that they were involved in an effort to somehow entice NYPD into taking action.  Their plan seemed to have failed, so they were discussing what ought be done next.  (SM Ex. R.)

   30. In that same conversation, Schoolcraft tells his father over the telephone while in his apartment watching police personnel gather outside his house – "I feel stupid" and "this is ridiculous," as his father coaches him to say he has diarrhea if the police enter his apartment and want to take him back to the precinct or the hospital.   (SM Ex. R.)

Plaintiff's Motion for Partial Summary Judgment
<u>Imposing Fourth Amendment Liability for Unlawful Entry</u>

      Steven Mauriello has moved for summary judgment seeking dismissal of plaintiff's claim of a Fourth Amendment violation relating to the entry into plaintiff's apartment. In particular, Mauriello only entered the apartment for a brief portion of the initial entry, and did not participate in the second entry.  We have set forth the material facts that are not genuinely in dispute relating to the Fourth Amendment claim as it relates to Mauriello in our Rule 56.1 Statement and respectfully request that the claim as it relates to Mauriello be dismissed.

Dated:  New York, New York
      February 11, 2015

                     SCOPPETTA SEIFF KRETZ & ABERCROMBIE
                     Attorneys for Defendant STEVEN MAURIELLO

                     By: _____
                         Walter A. Kretz, Jr., (WK-4645)
                     444 Madison Avenue, 30th Floor
                     New York, NY  10022
                     wakretz@seiffkretz.com
                     212-371-4500