SM Exhibit BN

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------------X
      ADRIAN SCHOOLCRAFT,
 3
                                       PLAINTIFF,
 4              -against-              Case No:
                                      10 Civ. 6005
 5                        (RWS)

 6    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
      Tax Id. 873220, Individually and in his Official
 7    Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
      NORTH GERALD NELSON, Tax Id. 912370, Individually
 8    And in his Official Capacity, DEPUTY INSPECTOR
      STEVEN MAURIELLO, Tax Id. 895117, Individually and
 9    In his Official Capacity, CAPTAIN THEODORE
      LAUTERBORN, Tax Id. 897840, Individually and in his
10    Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
      919124, Individually and in his Official Capacity,
11    SGT. FREDERICK SAWYER, Shield No. 2576, Individually
      and in his Official Capacity, SERGEANT KURT DUNCAN,
12    Shield No. 2483, Individually and in his Official
      Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
13    915354, Individually and in his Official Capacity,
      LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
14    Individually and in his Official Capacity, SERGEANT
      SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
15    #1-50, Individually and in their Official Capacity
      (the name John Doe being fictitious, as the true
16    names are presently unknown) (collectively referred
      to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
17    CENTER, DR. ISAK ISAKOV, Individually and in his
      Official Capacity, DR. LILIAN ALDANA-BERNIER,
18    Individually and in her Official Capacity and
      JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
19    DOE" # 1-50, Individually and in their Official
      Capacity (the name John Doe being fictitious, as
20    The true names are presently unknown),

21                                       DEFENDANTS.
      ------------------------------------------------X
22

23                        DATE: October 11, 2012

24                        TIME: 10:20 A.M.

25    (Continued  ...)
```

1

2                                    DATE: October 11, 2012

3                                    TIME: 10:20 A.M.

4

5

6                        VIDEOTAPED DEPOSITION of the

7      Plaintiff, ADRIAN SCHOOLCRAFT, taken by the

8      Respective Parties, pursuant to a Notice and

9      to the Federal Rules of Civil Procedure, held at

10     the offices of the New York City Law Department,

11     100 Church Street, New York, New York 10007, before

12     Nathan MacCormack, a Notary Public of the State of

13     New York.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2    JON L. NORINSBERG, ESQ.
             Attorney for Plaintiff
 3           ADRIAN SCHOOLCRAFT
             225 Broadway, Suite 2700
 4           New York, New York  10007
             BY: JON L. NORINSBERG, ESQ.
 5
      COHEN & FITCH, LLP
 6           Attorneys for Plaintiff
             ADRIAN SCHOOLCRAFT
 7           233 Broadway, Suite 1800
             New York, New York 10279
 8           BY: GERALD COHEN, ESQ.
                  - and -
 9                JOHN MEEHAN, ESQ.

10    MICHAEL A. CARDOZO, ESQ.
      CORPORATION COUNSEL
11    NEW YORK CITY LAW DEPARTMENT
             Attorneys for the Defendants
12           THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
             Tax Id. 873220, Individually and in his Official
13           Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
             NORTH GERALD NELSON, Tax Id. 912370, Individually
14           and in his Official Capacity, CAPTAIN THEODORE
             LAUTERBORN, Tax Id. 897840, Individually and in his
15           Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
             919124, Individually and in his Official Capacity,
16           SGT. FREDERICK SAWYER, Shield No. 2576, Individually
             and in his Official Capacity, SERGEANT KURT DUNCAN,
17           Shield No. 2483, Individually and in his Official
             Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
18           915354, Individually and in his Official Capacity,
             LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
19           Individually and in his Official Capacity, SERGEANT
             SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
20           #1-50, Individually and in their Official Capacity
             (the name John Doe being fictitious, as the true
21           names are presently unknown) (collectively referred
             to as "NYPD defendants")
22           100 Church Street
             New York, New York 10007
23           BY: SUZANNA PUBLICKER, ESQ.,
                 ASSISTANT CORPORATION COUNSEL and
24               QIANA SMITH, ESQ., SENIOR CORPORATION COUNSEL
                 File #: 2010-033074
25               Control #: HHH05718
      (Continued  ...)
```

A. SCHOOLCRAFT

1      A.      To the best of my memory, it was it was a short

2  time after that.  I think it was Summer, 2010.

3      Q.      Do you owe your landlord any money for that

4  address?

5              MR. NORINSBERG:  Objection.

6      A.      Yes.

7      Q.      How much do you owe the landlord?

8      A.      I -- I imagine thousands, a few thousand dollars.

9      Q.      When did you begin surreptitiously recording your

10  coworkers?

11             MR. NORINSBERG:  Objection.

12     A.      What does "surreptitiously" mean, what is that?

13     Q.      When did you begin recording your coworkers

14  without their knowledge?

15             MR. NORINSBERG:  Objection.  You can answer.

16     A.      I don't recall any date when I started.  In 2006,

17  2007 or 2008, some time around that period.

18     Q.      Why did you begin recording your coworkers

19  without their knowledge?

20             MR. NORINSBERG:  Objection.

21     A.      There wasn't any one specific reason.  I was

22  documenting the roll calls, where officers receive orders

23  pertaining to their duties throughout the day.  I was

24  particularly concerned about how they reference training

25  and sign the training log, and -- they wanted officers to

A. SCHOOLCRAFT

1    just sign the training log.  And most of the time, we

2    didn't receive any training that I became aware of, was

3    mandated by police headquarters.

4        And I heard other officers talk about how

5    recorders can back you up from accusations made by people

6    on the street, and stuff like that.  It wasn't any one

7    particular reason.  It was -- it was to document the roll

8    calls and the falsifying the training log, and those -- I

9    don't recall any other particular issue or specific issue.

10   Q.   Did you think at the time you made these

11   recordings, that you would be suing the City at some later

12   date?

13   A.   No.

14   Q.   Did anyone suggest to you that you record your

15   coworkers without their knowledge?

16   A.   I don't recall any suggestion.

17   Q.   Did your father ever suggest to you that you

18   record your coworkers without their knowledge?

19   A.   No.

20   Q.   Do you know if your father has ever recorded his

21   coworkers without their knowledge?

22   A.   I don't believe so, no.

23   Q.   How many recordings have you made that are

24   related to your claims in this lawsuit?

25       MR. NORINSBERG:  Objection.  You can answer.

A. SCHOOLCRAFT

1      A.      The -- I don't know the specific number, but I

2   believe my attorneys have all the recordings.  If --

3   perhaps they could be added up; I never added them up.

4      Q.      Did you give your attorneys all recordings that

5   were relevant to this matter?

6      A.      I believe they have all the recordings, yes.

7              MS. PUBLICKER:  To the extent not already

8              produced, I would request production of all

9              recordings in this matter.

10     Q.      Did you record every single one of your tours on

11   command?

12     A.      I don't believe so, no.

13     Q.      How did you choose what to record?

14     A.      I didn't -- it wasn't always my choice.  It was a

15   technology new to me.  I don't believe -- like, you asked

16   me if my father ever recorded -- I don't believe the

17   technology was there.  These devices require power,

18   batteries, the batteries go dead.

19              This is stuff that I didn't know.  And there were

20   times where I had the recorder, but there were no

21   recordings.  What was the question -- did I answer the

22   question?

23     Q.      Did you attempt to record every one of your tours

24   on command?

25     A.      I don't recall any attempt to -- to record

A. SCHOOLCRAFT

1    anything, exactly.  There was no way to know when something

2    would happen.

3        Q.    Did you record just the roll calls, or did you

4    record as well, other portions of your tour?

5        A.    There were times where I think there are -- there

6    are -- where I didn't go back to my locker and put the

7    recorder back, and the recorder would go on until I did

8    that.  It would be after roll call.  There may have been

9    times like that.

10           But I don't recall recording the entire day or --

11   you know, I don't remember how long or when exactly I would

12   have the recorder.

13       Q.    So it was not your intention, though, to record

14   your actual tours on command?

15           MR. NORINSBERG:  Objection.

16       A.    You mean including the roll call?

17       Q.    Excluding the roll call.

18       A.    I don't believe I ever intended to record the

19   entire tour.  I didn't know if I had the technology; I

20   didn't know if it would run that long.  My intent was to

21   catch -- to document the roll calls, the official, "This is

22   your duty today, this is what we want you to do, and sign

23   the training log."

24       Q.    Why did you feel you had to record those roll

25   calls?

A. SCHOOLCRAFT

1    A.    Again, the falsifying the training we were

2  receiving, numerous times, instructions on how to increase

3  our activity.  What I was hearing was, "Arrest people or

4  summons people without probable cause."  And I had a -- I

5  had concerns about those orders.

6    Q.    What did you intend to do with those recordings?

7    A.    What did I intend to do?

8    Q.    Yes.

9    A.    I had no -- I was just documenting -- I was just

10 documenting and somewhat corroborating to myself what was

11 being said.  I had no -- I didn't start any investigation

12 at that time.  I was just -- again, learning the

13 technology, and hearing what was said.

14   Q.    So when you first started recording, you had no

15 intention of sharing these recordings with anyone?

16   A.    No.  I didn't think of anyone who would be

17 concerned.  I never -- I didn't think about it.  What I was

18 documenting was a pattern, not any specific one recording.

19 But a pattern over a period of time of this -- of what

20 supervisors were telling patrolmen.

21   Q.    Did you save every recording that you made?

22   A.    I don't believe so.

23   Q.    Did you delete recordings?

24   A.    Not intentionally.  Again, there were times where

25 the battery would go dead transferring the recording to the

A. SCHOOLCRAFT

1    computer.  Not having the right software, I believe there

2    were a loft last.

3        Q.    When you say "a lot," what do you mean?

4        A.    It seems like I had more.  But again, my

5    attorneys have all the recordings that I am aware of, at

6    this time.  The technology -- it's hard to explain.  I had

7    recorders, one was a watch that was difficult, it was

8    touchy.  The technology was touchy.

9        Q.    How many recordings would you say were

10    accidentally deleted?

11        A.    There is no way for me to know.  I couldn't even

12    approximate how many.

13        Q.    More than 50?

14        A.    There would be no way for me to know if I -- if I

15    didn't know if they were deleted.

16        Q.    You wouldn't realize it when you were trying to

17    transfer it to your computer?

18             MR. NORINSBERG:  Objection.

19        A.    I would have to specifically make a note that I

20    transferred that -- that recording or data, and then know

21    that it was gone later.  There's just no way.  I believe

22    there was more, it just seems like there was more.  And --

23    it was -- I can only blame it on the technology.  It was

24    touchy, the software.

25        Q.    What technology did you use?

A. SCHOOLCRAFT

1      A.      I don't believe so, no.

2      Q.      Prior to October 31, 2009, had you ever made any

3  misconduct allegations against Defendant Marino?

4      A.      If I did, I don't remember.

5      Q.      Your Complaint states that on March 16, 2009,

6  Defendant Caughey issued you a written reprimand for not

7  documenting in your memo book that you had used the

8  bathroom facility on our assigned post; is that correct?

9      A.      To the best of my memory.

10     Q.      Do you have a copy of that written reprimand?

11     A.      I don't believe so, no.

12     Q.      Why not?

13             MR. NORINSBERG:  Objection.

14     A.      I don't know if I ever received one, or if I have

15  it.  I am not aware of it.

16     Q.      Did you ever receive a written reprimand?

17     A.      I am not of aware of what a written reprimand --

18  it would be -- no.  I don't recall ever seeing it.  But if

19  I did, it's possible.

20     Q.      What does it mean to be "off post"?

21     A.      You are assigned a specific area, and to be off

22  post would be out of that area.

23     Q.      Are you supposed to document when you are off

24  post during your tour?

25     A.      I believe so, yes.

A. SCHOOLCRAFT

1    Q.    Did she tell you to go speak to someone about

2    your issues?

3    A.    It's possible, but it wasn't -- I don't think I

4    understood exactly who I was supposed to go see.

5    Q.    Did she ever make any recommendations of somebody

6    to go see?

7    A.    It's possible.  I believe in October, 2009, I

8    finally expressed that I was -- that I wanted to know why I

9    was on modification -- or modified, restricted.

10          And -- and I believe, I recall her -- or she said

11   she was going to send me a list of names, or she gave me a

12   list of names.

13   Q.    Did you go see someone?

14   A.    I don't -- I don't believe so, no.

15   Q.    Why not?

16   A.    I didn't -- again, until she -- if she ever gave

17   me the list, I wasn't aware of who I was supposed to go see

18   or what the -- what they wanted to do.

19   Q.    Did you want to get your guns back?

20   A.    I wanted to go back to the normal duty.  I wasn't

21   concerned about the gun.  I was concerned about being a

22   patrolman again, and --

23   Q.    Could you work as a police officer without a gun?

24   A.    I don't -- in -- police officers are faced with

25   dangerous situations, sometimes.  And in order to defend

A. SCHOOLCRAFT

1      A.      I don't recall if I had lunch with anyone or

2  where we went.

3      Q.      Your Complaint states that Lieutenant Caughey was

4  menacing and threatening to you, by keeping his hand on his

5  gun on October 31, 2009; is that correct?

6      A.      Correct.

7      Q.      Did you believe he was going to shoot you?

8      A.      At the time, I believed his behavior was

9  inappropriate.  And I -- I felt anything was possible.

10     Q.      Did you believe that anyone from the N.Y.P.D. was

11  going to use their firearm against you on October 31, 2009?

12     A.      I don't recall specifically thinking that, no.

13     Q.      Had anyone from the N.Y.P.D. ever threatened you

14  with a firearm prior to October 31, 2009?

15     A.      I don't believe so, no.

16     Q.      You allege that P.A.A. Boston told you that she

17  also believed Defendant Caughey was menacing that day; is

18  that correct?

19     A.      Yes.

20     Q.      Did you record that statement by her?

21     A.      I don't know if -- I don't know -- I haven't

22  heard that recording; it's possible.

23     Q.      Did she tell you why she thought Lieutenant

24  Caughey was menacing?

25     A.      I don't remember if she did or not.

A. SCHOOLCRAFT

1     Q.     On October 31, 2009, did you state in reference

2  to Defendant Mauriello, "I would like to at least have a

3  fucking chance to go in a gun battle with him"?

4     A.     What was that again?

5     Q.     Did you state on October 31, 2009, in reference

6  to Defendant Mauriello, "I would like to have at least a

7  fucking chance to go in a gun battle with him"?

8     A.     I don't recall making -- ever making a statement

9  like that.

10     Q.     Do you recall making that statement about anyone,

11  not including Defendant Mauriello?

12     A.     I don't recall ever making that statement about

13  anyone, no.

14     Q.     On October 31, 2009, do you recall stating in

15  reference to a recording device, "How long do you think

16  that'll fucking stay on me, after they fucking kill me?"

17     A.     Again, I don't recall making that statement, but

18  it's possible.

19     Q.     Who did you make that statement to?

20     A.     I would have to hear the recording.

21     Q.     But sitting here right now, you don't recall who

22  you made that statement to?

23     A.     No.

24     Q.     Had anyone at the N.Y.P.D. threatened to kill you

25  prior to you making this statement?

A. SCHOOLCRAFT

1          MR. NORINSBERG:  Objection.

2     A.    I didn't receive any explicit threat, no.

3     Q.    Did you receive any implicit threat?

4     A.    I felt Caughey's behavior that day was menacing

5     and threatening.

6     Q.    And you believed that he was threatening to kill

7     you?

8          MR. NORINSBERG:  Objection.

9     A.    I believe his behavior was menacing, and

10    intimidating and threatening.

11    Q.    Besides Lieutenant Caughey, were you in fear from

12    any other member of the N.Y.P.D.?

13    A.    I don't recall any exact -- I was concerned; I

14    don't know if I would define it at fear.  Maybe at certain

15    times, I was more concerned towards the end of the day.

16    Q.    Who were you concerned about at the end of the

17    day?

18    A.    Mostly, Lieutenant Caughey.

19    Q.    Did you tell anyone on October 31, 2009, that

20    "Mom is speaking to me"?

21    A.    I don't recall ever making that statement, no.

22    Q.    Do you recall making a statement on October 31,

23    2009, "I have heard guys say that I am six-foot four and

24    that I lift motorcycles over my head"?

25    A.    I don't recall ever making that statement.

A. SCHOOLCRAFT

1      A.      What was that again?

2      Q.      Was the basis of the evidence you were presenting

3   to I.A.B. and Q.A.D., audio recordings that you had made?

4              MR. NORINSBERG:  Objection.

5      A.      No, I don't believe so.

6      Q.      You had no intention of providing I.A.B. or

7   Q.A.D. the audio recordings you had made?

8              MR. NORINSBERG:  Objection.

9      A.      To the best of my memory, the recordings -- I

10  wasn't -- no, not at that time, or any time.  I don't

11  recall thinking about giving the recordings to anyone.

12     Q.      Did your I.A.B. Complaint, prior to October 31,

13  2009, allege retaliation against you?

14     A.      The date again, or just the whole question,

15  please.

16     Q.      Did your I.A.B. Complaint, prior to October 31,

17  2009, allege retaliation against you?

18     A.      Can you be more specific on what Complaint.

19     Q.      Did you make any Complaints to I.A.B. that anyone

20  had retaliated against you?

21     A.      I believe so.  Off the top of my head, what was

22  the -- it wouldn't be -- I believe they were asking me

23  about my 2008 evaluation appeal.  But I didn't feel I had a

24  case of retaliation yet.

25              I was -- I was waiting for the appeal to be

**ORIGINAL**

1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------------------X
    ADRIAN SCHOOLCRAFT,
3                                      PLAINTIFF,

4            -against-        Case No.:
                             10 CV 6005
5
    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
6   MARINO, Tax ID. 873220, Individually and
    in his Official Capacity, ASSISTANT CHIEF
7   PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
    Tax Id. 912370, Individually and
8   in his Official Capacity, DEPUTY INSPECTOR
    STEVEN MAURIELLO, Tax Id. 895117, Individually
9   and in his Official Capacity, CAPTAIN THEODORE
    LAUTERBORN, Tax Id. 897840, Individually and
10  in his Official Capacity, LIEUTENANT WILLIAM
    GOUGH, Tax Id. 919124, Individually and
11  in his Official Capacity, SGT. FREDERICK SAWYER,
    Shield No. 2567, Individually and
12  in his Official Capacity, SERGEANT KURT DUNCAN,
    Shield No. 2483, Individually and
13  in his Official Capacity, LIEUTENANT CHRISTOPHER
    BROSCHART, Tax Id. 915354, Individually and
14  in his Official Capacity, LIEUTENANT TIMOTHY
    CAUGHEY, Tax Id. 885374, Individually and
15  in his Official Capacity, SERGEANT SHANTEL JAMES,
    Shield No. 3004, Individually and
16  in his Official Capacity, and P.O.'s "JOHN DOE"
    #1-50, Individually and in their Official Capacity,
17  (the name John Doe being fictitious, as the true
    names are presently unknown)(collectively
18  referred to as "NYPD Defendants"), JAMAICA
    HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
19  Individually and in his Official Capacity,
    DR. LILLIAN ALDANA-BERNIER, Individually and
20  in her Official Capacity, and JAMAICA HOSPITAL
    MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
21  Individually and in their Official Capacity,
    (the name John Doe being fictitious, as the
22  true names are presently unknown),

23                                    DEFENDANT.
    ----------------------------------------X
24

25  (Continued... )
```

1                    DATE: SEPTEMBER 26, 2013

2                    TIME: 10:10 A.M

3

4           VIDEO DEPOSITION of the Plaintiff, ADRIAN

5    SCHOOLCRAFT, taken by the respective parties, pursuant to a

6    Court Order and to the Federal Rules of Civil Procedure,

7    held at the offices of Scoppetta, Seiff, Kretz &

8    Abercrombie, Esqs, 444 Madison Avenue, New York New York,

9    10022 before Elizabeth Forero, a Notary Public of the State

10   of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S :

 2    LAW OFFICE OF NATHANIEL B. SMITH
              Attorneys for the Plaintiff
 3            ADRIAN SCHOOLCRAFT
              111 Broadway
 4            New York, New York 10006
              BY: NATHANIEL B. SMITH, ESQ.
 5                   -AND-
              JOHN LENIOR, ESQ.
 6
      MICHAEL CARDOZO, ESQ.
 7            CORPORATION COUNSEL
              NEW YORK CITY LAW DEPARTMENT
 8            Attorneys for Defendants
              THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
 9            MARINO, Tax ID. 873220, Individually and
              in his Official Capacity, ASSISTANT CHIEF
10            PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
              Tax Id. 912370, Individually and
11            in his Official Capacity, DEPUTY INSPECTOR
              STEVEN MAURIELLO, Tax Id. 895117, Individually
12            and in his Official Capacity, CAPTAIN THEODORE
              LAUTERBORN, Tax Id. 897840, Individually and
13            in his Official Capacity, LIEUTENANT WILLIAM
              GOUGH, Tax Id. 919124, Individually and
14            in his Official Capacity, SGT. FREDERICK SAWYER,
              Shield No. 2567, Individually and
15            in his Official Capacity, SERGEANT KURT DUNCAN,
              Shield No. 2483, Individually and
16            in his Official Capacity, LIEUTENANT CHRISTOPHER
              BROSCHART, Tax Id. 915354, Individually and
17            in his Official Capacity, LIEUTENANT TIMOTHY
              CAUGHEY, Tax Id. 885374, Individually and
18            in his Official Capacity, SERGEANT SHANTEL JAMES,
              Shield No. 3004, Individually and
19            in his Official Capacity, and P.O.'s "JOHN DOE"
              #1-50, Individually and in their Official Capacity,
20            (the name John Doe being fictitious, as the true
              names are presently unknown)(collectively
21            referred to as "NYPD Defendants")
              100 Church Street
22            New York, New York 10007
              BY: SUZANNA METTHAM, ESQ.
23                   -AND-
              RYAN SHAFFER, ESQ.
24            File #: 2010-033074
              Control #: SSS08994
25    (Continued...)
```

A. SCHOOLCRAFT

1    Q.    Well, I just wanted -- we were talking about

2    retaliation.  I wanted to see what the retaliation was at

3    that point in time and you said it was because of your

4    performance.

5    A.    I don't think it says in those summaries

6    because -- well, I think it does explicit say, it refers to

7    activity.  But there are other comments in that report that

8    are critical of my performance.  And I wanted to contest

9    the entire evaluation, not just the areas of activity,

10   which they were saying you can't contest it based on that.

11   How I was contesting it was I was saying that evaluation

12   was based on activity.

13   Q.    At the meeting in February of 2009, where you met

14   with supervising officers and discussed your evaluation and

15   your appeal, did anyone say anything at that meeting to you

16   that indicated to you they were retaliating against you?

17   A.    Off the top of my head, I don't recall.

18   Q.    Do you recall anything inappropriate being said

19   to you at that meeting by any of the people present?

20   A.    Inappropriate, I don't think so.  I don't recall.

21   Q.    At the end of that meeting you were still

22   committed to going ahead and appealing your evaluation?

23   A.    I believe it was determined at the end of the

24   meeting Mauriello said, that's it.  It stays at two point

25   five.  And based on that, I was still committed to the

A. SCHOOLCRAFT

1    referred to on the recording that is Defendants' Exhibit E

2    for identification, there was mention by you in that

3    recording of troopers and sheriffs that didn't do anything

4    to aid your father whose house was burglarized.

5        A.    Correct.

6        Q.    When did that happen, your father's house was

7    burglarized?

8        A.    It would have happened while he was living with

9    me.  I believe it was 2007.

10       Q.    It was your house as well?

11       A.    I don't know if my name was on it, but it was

12   definitely my father's.

13       Q.    In other words, it was where you lived as well at

14   the time the place that got burglarized?

15       A.    No, I believe it was house in Fonda, New York.

16       Q.    And your father was not living there at the time?

17       A.    No, he was either in the hospital or with me.

18       Q.    Was anyone living there?

19       A.    No.

20       Q.    So in 2007 it was burglarized and you felt the

21   troopers and the sheriffs were unhelpful?

22       A.    Well, I think I stated they didn't document

23   everything that was taken, that we had told them was taken.

24       Q.    You were not pleased with their actions?

25       A.    Yes.

A. SCHOOLCRAFT

1   understand he was writing a book?

2        A.    I don't recall when I learned that he was going

3   to do a book or if he was going to do a book.

4        Q.    Did you ever discuss that with him?

5        A.    I believe there were discussions, but I don't

6   recall when they were.

7        Q.    You had no interest in raising with him any kind

8   of compensation or remuneration you would receive as a

9   result of him writing a book about you?

10             MR. SMITH:  Wait.  That is a different

11             question.

12       Q.    Did you have any interest in receiving any

13  compensation or remuneration from the book?

14             MR. SMITH:  Objection to form.

15       A.    No.

16       Q.    No interest at all even thought it was all about

17  you?

18       A.    I am not aware that it is all about me.

19             MR. SMITH:  He said he didn't read it.

20       Q.    It's all about your tapes.  You said you didn't

21  read it?

22       A.    No.  I have received no compensation.  I never

23  asked for compensation.

24       Q.    And you have no expectation of ever receiving any

25  compensation?

163

A. SCHOOLCRAFT

1          MR. SMITH:  From Graham Raymond?

2          MR. KRETZ:  From Graham Raymond.

3          MR. SMITH:  Just to be clear.

4     Q.    How about the publisher?

5     A.    No one in any relation to that book has ever paid

6     me nor do I expect to be paid for the shows or other

7     articles or that book.

8     Q.    Anyone else you expect to get paid for aside from

9     Mr. Raymond?

10    A.    My employer after this is resolved.

11    Q.    I mean anyone you expect to be paid for the book

12    other than Raymond, in other words, anyone else receiving

13    benefits from the publication of the book, you know of?

14    A.    No.

15    Q.    So you provided him with all your recordings no

16    strings attached?

17          MR. SMITH:  No financial strings, is that

18          what you are saying?

19    Q.    Were there any other strings?

20    A.    I don't know if I gave him all the recordings.

21    But there was no -- there was no -- I don't recall ever

22    receiving anything from -- I think he bought me lunch a

23    couple of times.

24    Q.    Before you first contacted IAB regarding the

25    lieutenant providing the sergeant with access to your

A. SCHOOLCRAFT

1    personnel folder, did you tell anybody you were contacting

2    IAB?

3        A.      That may have been one of the things I shared

4    with Durk either right before or after I made the report.

5        Q.      Did your tell your father as well?

6        A.      My father was aware, yes.

7        Q.      Anyone else?

8        A.      Other than Carter, the one who told me.

9        Q.      You told Carter you were reporting to IAB?

10       A.      No, she told me what had happened.  I didn't tell

11   her I was going to do a report.

12       Q.      After you sent the report to IAB, the 49 it was,

13   is that a 49 you prepared?

14       A.      I believe it was at least close to a 49.  There

15   may be some spaces wrong but it was.

16       Q.      After you sent that to IAB, did you tell anyone

17   you had done so?

18       A.      I think I might have talked to Durk again after

19   that and made him aware of that.  But I don't remember

20   everything I told him.

21       Q.      So aside from Durk and your father, do you recall

22   ever telling anyone you submitted a report regarding that

23   personnel file?

24       A.      I don't believe so.

25       Q.      Do you believe anyone in the 81 learned that you

A. SCHOOLCRAFT

1    or something else?

2        A.    Correct.  I am not sure.

3        Q.    She asked you before she went to QUAD, what it

4    was and where it was, and all these kinds of things.  Did

5    you speak with her after she returned from Quad?

6        A.    I don't believe so.

7        Q.    Did you speak with Officer Deck when he returned

8    from QUAD?

9        A.    I don't recall any conversation with him about

10   QUAD.

11       Q.    Were you aware he went down to QUAD?

12       A.    I believe Santana told me they were both notified

13   to go at the same time and neither of them were sure where

14   to go.

15       Q.    You didn't speak to Deck or Santana after they

16   went down to QUAD?

17       A.    I don't recall any conversation with them.

18       Q.    Did you speak to anyone about your visit to QUAD,

19   your interview with QUAD?

20       A.    I don't believe so, no.

21       Q.    Did you speak to anyone about the fact Deck and

22   Santana went down to QUAD?

23       A.    No, I don't believe so.

24       Q.    Did you tell anybody you though they went down

25   because of what you told QUAD?

A. SCHOOLCRAFT

1    A.    To the best of my memory, I didn't tell anyone

2    about, I followed the investigator's instructions.

3    Q.    Did Captain Lauterborn ever talk to you about

4    approaching Deck and Santana after they had gone down to

5    QUAD?

6    A.    No.

7    Q.    So Deck and Santana were called down to QUAD.

8    Did they know you were called down to QUAD?  Did you tell

9    them that?

10   A.    After she approached me, I may have stated that I

11   was just there, and I know where it is.  I believe it was

12   across the street from the 77th Precinct.

13   Q.    Did you tell her anything else?

14   A.    No.  I don't recall sharing anything with her.

15   Q.    Did you speak with anyone else about the fact you

16   had gone to QUAD or Santana had gone to QUAD, or Deck had

17   gone to QUAD at any time prior to October 31st?

18   A.    My father knew I was going.  I may brought it up

19   with Durk and the IAB investigator I was talking to.  But

20   no one was assigned to the 81st Precinct, I don't believe I

21   told anyone.

22   Q.    Do you believe anybody found out you had been

23   down to QUAD?

24        MR. SMITH:  Asked and answered.

25   A.    I believe that is possible.

A. SCHOOLCRAFT

1      Q.      I asked before about IAB.  And we talked about

2  Coy.  Now I am asking about QUAD.

3                      MR. SMITH:  Bearing that distinction in mind

4              if there is one.

5      Q.      Do you have any recollection of anybody finding

6  out you had been down to QUAD?

7      A.      No.

8      Q.      Did anybody ever indicate to you they knew Deck

9  and Santana went down to QUAD?

10     A.      I believe Santana told me she was going.

11     Q.      Did anybody else aside from Deck and Santana tell

12 you they understood Deck and Santana went down?  Like come

13 to you and ask, do you know why they went down or what's

14 going on?

15     A.      No, I don't recall any conversation like that.

16     Q.      Do you recall any conversation by anyone relating

17 to QUAD and any complaint you might have made to QUAD or

18 the fact you got called down to QUAD at any time prior to

19 October 31st?

20     A.      Only Santana asked me directions, and I believe

21 she asked me what QUAD was.

22     Q.      You told me that.  So you do have some reason in

23 your mind to believe Coy knew you had been in touch with

24 IAB.  But you don't have any reason to indicate that

25 anybody knew you had been in touch with QUAD or complained