SM Exhibit BV

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    EASTERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - - -
 5    ADRIAN SCHOOLCRAFT,
 6                          Plaintiff,
 7            -against- Index No.
                          10CIV-6005 (RWS)
 8
      THE CITY OF NEW YORK, DEPUTY CHIEF
 9    MICHAEL MARINO, Tax Id. 873220,
      Individually and in his Official
10    Capacity, ASSISTANT CHIEF PATROL
      BOROUGH BROOKLYN NORTH GERALD NELSON,
11    Tax Id. 912370, Individually and in his
      Official Capacity, DEPUTY INSPECTOR
12    STEVEN MAURIELLO, Tax Id. 895117,
      Individually and in his Official
13    Capacity, CAPTAIN THEODORE LAUTERBORN,
      Tax Id. 897840, Individually and in his
14    Official Capacity, LIEUTENANT JOSEPH
      GOFF, Tax Id. 894025, Individually and
15    in his Official Capacity, stg. Frederick
      Sawyer, Shield No. 2576, Individually
16    and in his Official Capacity, SERGEANT
      KURT DUNCAN, Shield No. 2483,
17    Individually and in his Official
      Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18    Tax Id. 885374, Individually and in his
      Official Capacity, SERGEANT SHANTEL
19    JAMES, Shield No. 3004, and P.O.'s "JOHN
      DOE" 1-50, Individually and in their
20    Official Capacity (the name John Doe
      being fictitious, as the true names are
21    presently unknown)(collectively referred
      to as "NYPD defendants"), JAMAICA
22    HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
      Individually and in his Official
23    Capacity, DR. LILIAN ALDANA-BERNIER,
      Individually and in her Official Capacity
24    and JAMAICA HOSPITAL MEDICAL CENTER
      EMPLOYEES "JOHN DOE" # 1-50, Individually
25
      (Continued)
```

Page 2

1

2    and in their Official Capacity (the name

     John Doe being fictitious, as the true

3    names are presently unknown),

4

     Defendants.

5

     - - - - - - - - - - - - - - - - - - - - -x

6

                          444 Madison Avenue

7                         New York, New York

8                         December 20, 2013

                          10:16 a.m.

9

10       VIDEOTAPED DEPOSITION of DEPUTY

11   INSPECTOR STEVEN MAURIELLO, one of the

12   Defendants in the above-entitled action,

13   held at the above time and place, taken

14   before Margaret Scully-Ayers, a Shorthand

15   Reporter and Notary Public of the State

16   of New York, pursuant to the Federal

17   Rules of Civil Procedure.

18

19              *       *       *

20

21

22

23

24

25

1           S. MAURIELLO

2  That's when I'm saying that, that has the

3  retribute [sic] going back.  There was

4  more to this roll call....

5      Q.    The reference to the wolves is

6  investigations?

7      A.      Investigations.  That instance

8  where cops should have been doing things

9  by the book and they didn't.

10      Q.    What is the reference to Chief

11  Marino pulling activity reports, what are

12  you referring to there?

13      A.      The end of the year he does a

14  review of everybody's evaluation.  He

15  wants to make sure not only is the CO

16  looking at it, he wants to make sure the

17  supervisors are properly looking at the

18  officers and the same thing, wants to

19  make sure the lieutenants properly

20  looking at the sergeants with their

21  evaluations.  And I want to make sure I'm

22  looking at the lieutenants, my captain is

23  looking at them.

24           I'm trying to give them

25  motivation.  It's the end of the year,

```
 1                S. MAURIELLO
 2      Q.    I'm going to show you Exhibit
 3 51.  It's a performance evaluation of
 4 Officer Schoolcraft.
 5           MR. SMITH:  For the record, this
 6      is Bates-stamped D70 through 72.
 7           MS. PUBLICKER METTHAM:  I will
 8      note, I believe that was produced
 9      confidentially, but it's plaintiff's
10      own performance evaluation so if you
11      have no objection to the
12      confidentiality designation being
13      removed, neither do City defendants.
14           MR. KRETZ:  Nor do we.
15           MR. SMITH:  I don't have any
16      objection.
17      Q.    Have you seen this document
18 before, Inspector?
19      A.    Yes.
20      Q.    Did you review this document at
21 the time of your conversation with
22 Sergeant Stukes about Officer
23 Schoolcraft's 2008 performance?
24      A.    Yes, but I believe I didn't
25 review it already.  They did it, and they
```

Page 172

```
 1                S. MAURIELLO
 2   had to do it over again where I'm the
 3   reviewer.
 4        Q.    Can you explain that to me
 5   slowly?
 6        A.    I'm reviewing it when it's 2.5.
 7   That's the get-go.  He's telling me 2.5.
 8   I may have to go on the bottom.  Now we
 9   were going to do an appeal.
10             When they were doing their
11   evaluations at the end of December,
12   Lieutenant Delafuente has been the
13   reviewing officer all year.  He's platoon
14   commander.  So I have no input on any of
15   the evaluations all year.  Now at the end
16   of year, it's becoming 2.5.  Now I'm
17   become the reviewer.
18             MR. KRETZ:  Off the record.
19             [Discussion held off the
20        record.]
21        Q.    I'm going to show you what was
22   previously marked as Plaintiff's Exhibit
23   21.  This is a collection of monthly
24   performance reports by Officer
25   Schoolcraft with comments by his
```

1              S. MAURIELLO

2    supervisors at the eight one.

3              MS. PUBLICKER METTHAM:  This was

4        produced confidentially.  As it's

5        plaintiff's own performance

6        evaluation, if you like it to be

7        designated nonconfidential, I have no

8        objection to that.

9              MR. SMITH:  I don't see any

10       reason to designate this section of

11       the transcript as confidential.

12             MS. PUBLICKER METTHAM:  The

13       exhibit is confidential.  If you like

14       to designate the exhibit as

15       nonconfidential, the City defendants

16       have no objection.

17             MR. SMITH:  That's fine with me.

18       Q.    Are you familiar with the

19   monthly reports that are part of Exhibit

20   21, Inspector?

21       A.    Yes.

22       Q.    When Officer Schoolcraft's

23   performance was first hitting your radar,

24   were any of these documents the documents

25   that you were looking at?

1              S. MAURIELLO

2        A.     Yes.

3        Q.     Are these in fact the regular

4    quarterly reviews that we were talking

5    about on Officer Schoolcraft that you had

6    previously identified and mentioned in

7    your testimony?

8        A.     Yes.

9        Q.     Did you have any role in

10   preparing any of these monthly reports?

11       A.     No.

12       Q.     Did you have any role in

13   reviewing them as they were being

14   created?

15       A.     I might have on a monthly --

16   they would have the quarterlies.  They

17   would have the names of people by squad,

18   the whole precinct, but I never had

19   anything to do with them, with the

20   quarterly, looking at it and review it.

21             There is a recap sheet that the

22   sergeant does, crime analysis sergeant,

23   does every month.

24             MR. SMITH:  I'm not sure if

25        that's been produced.  I don't think

Page 192

1              S. MAURIELLO

2    They have an appeal board like I went the

3    year before with people that get 2.5.

4              Chief Marino has an appeal

5    board with borough inspectors and they

6    bring in ICO and the CO.  I guess that

7    was the recommendation when they went in

8    to transfer him.

9         Q.    I'm not sure I understand.  I

10   will try to ask a more clear question.

11             Is that your signature on the

12   last page of that document?

13        A.    Yes.

14        Q.    Did you sign this document on

15   April 27th, 2009?

16        A.    Yes.  I believe I signed the

17   document the day he appealed it, you

18   know, we all signed it that February.

19        Q.    So why is it -- is that your

20   handwriting --

21        A.    Yes.

22        Q.    -- next to your signature where

23   it gives the date 4/27/09?

24        A.    Yes.

25        Q.    Why did you date it 4/27/09?

```
 1              S. MAURIELLO
 2      A.      It was dated I believe back in
 3  February.  When you appeal you send the
 4  evaluation over to the borough 'cause the
 5  higher borough has to do it.  It was sent
 6  over to the borough.  I don't know the
 7  reason why another one had to be done.
 8              We also give Officer
 9  Schoolcraft the information to do what he
10  had to do to write a letter.  The first
11  time he wrote a letter was September.  I
12  don't know why.  This is dated April.  I
13  don't know if they lost the letter,
14  didn't want to do it over again, whether
15  it was dated.  He signed it in the
16  office.  Everybody signed it.  He's
17  appealing it.  It was well known he was
18  going to appeal it.  And we sent to the
19  borough.  It's out of my hands now.
20      Q.      As of February 2009, the
21  paperwork was sent to the borough?
22      A.      Yes.
23      Q.      As of February 2009, you were
24  recommending to the borough that
25  Schoolcraft be transferred; is that
```

```
1                    S. MAURIELLO
2    correct?
3         A.    As a reviewer, yes.
4         Q.    You signed off on the request
5    that Schoolcraft be transferred, right?
6         A.    Yes.
7         Q.    And that was initially a
8    reference or a suggestion by Stukes that
9    you agreed with?
10        A.    And Delafuente.
11        Q.    So both you, Stukes, and
12   Delafuente believed that Schoolcraft
13   should be transferred as of February
14   2009; is that correct?
15        A.    Yes.
16        Q.    Why didn't that happen?
17        A.    I don't know.  I got a lot of
18   other people who were transferred into me
19   for the same evaluation so....
20        Q.    You see the number 2.5 in the
21   lower left-hand corner for overall
22   evaluation?
23        A.    Down here?
24        Q.    You see that 2.5?
25        A.    Yes, sir.
```

1                S. MAURIELLO

2    conditions team.  I didn't know that the

3    FBI came calling on him and civil rights

4    kept calling.  This is everything he

5    provided and was provided at the meeting.

6                The delegate was even saying to

7    him, "They want you to work.  We're all

8    here to help you."  Even he said, "If I

9    got an evaluation just barely above him,

10   I would be upset.

11               If everybody in your platoon

12   and Sergeant Stukes and Lieutenant

13   Delafuente, three platoons 30 cops, all

14   on the same foot post as Officer

15   Schoolcraft, they all have the same

16   number of car tours as Officer

17   Schoolcraft.  They are responding to

18   domestic radio runs as Officer

19   Schoolcraft and verticals, and you know

20   what, they are doing a job.  They are

21   seeing it.

22               We only put him where crime

23   conditions or the quality of life

24   conditions exist where the community asks

25   for help; that's where the cops are put.

1           S. MAURIELLO

2           If you don't want to help the

3   community and do your job, what can I

4   tell you.

5       Q.    Do I understand you that you're

6   saying at the time of this assessment of

7   Schoolcraft's performance was being made

8   by you, Stukes, and Delafuente, there

9   were 30 other officers in the platoon

10  doing the same or similar types of work

11  as Officer Schoolcraft?

12          MR. KRETZ:   Objection.

13          You can answer.

14      A.    No.   When I say -- it was said

15  on the tape as you hear Lieutenant Mascol

16  says we looked at everybody in your squad

17  that works the same tour as you.

18      Q.    Right.

19      A.    They are observing stuff and

20  correcting conditions.   They are

21  arresting domestic violence crimes.   They

22  are going into a building and making an

23  arrest of five people trespassing or

24  smoking marijuana or summonsing somebody.

25  They're doing reports.

Page 201

1              S. MAURIELLO

2      Q.      What you're telling me if I

3  pull out the monthlies and the

4  quarterlies and the annuals for those

5  other officers, we'll see that

6  Schoolcraft has much lower numbers than

7  these other officers; is that what you

8  are telling me?

9      A.      Yes.

10      Q.      Who were those other officers?

11      A.      I have 30 cops in my platoon.

12  I can't tell you their names off the top

13  of my head.

14      Q.      How would you go about

15  identifying them if you had to?

16      A.      Whoever was in Sergeant Stukes

17  squad at the same time as Officer

18  Schoolcraft or other squads in that

19  platoon like Delafuente.

20      Q.      And you're saying 30 police

21  officers, roughly?

22      A.      Could be a little more.

23  Sometimes we had more cops, a bunch a

24  cops that came from impact [phonetic].

25  It could be more.  It could be less.

Page 202

1                    S. MAURIELLO

2          Q.     It's your understanding that

3    Lieutenant Mascol actually looked and was

4    familiar with all of the numbers of all

5    of the officers in Stukes's squad and

6    Schoolcraft was way at the bottom?

7          A.     You heard the tape.  That's

8    what is on the tape.

9          Q.     I'm just asking.  You're the

10   Witness.

11         A.     Yes.

12         Q.     I get to ask the questions and

13   you answer them.  Maybe one day it will

14   change.  Right now that's the way it

15   goes.

16         A.     Yes.

17         Q.     The answer is yeah.

18            MR. SMITH:  I'm going to request

19        the production of the monthly reports

20        for those officers in an equivalent

21        form to 21 and 51.

22            MS. PUBLICKER METTHAM:  Put that

23        request in writing.  Currently stated,

24        I would say that's objectionable.  I'm

25        not totally clear for what period of

Page 203

```
1              S. MAURIELLO
2    time or which officer.
3          MR. SMITH:  The Witness just
4    said --
5          MS. PUBLICKER METTHAM:  For what
6    period of time?
7          MR. SMITH:  The Witness just
8    said that Lieutenant Mascol who is an
9    admin lieutenant for the eight one had
10   in his skull the performance of
11   approximately 30-odd other officers in
12   Stukes's squad and that Schoolcraft
13   was way at the bottom of those numbers
14   and the other guys were somewhere
15   north of that.  Those are the
16   documents that I'm referring to and
17   the forms are 21 and 51, the annual
18   and monthlies.
19         MS. PUBLICKER METTHAM:  It's
20   still not a date range, but put it in
21   writing.  We'll take it under
22   advisement.
23         MR. SMITH:  Well, it is a date
24   range, it is the year.  It's the
25   performance evaluation documents
```

Page 204

1             S. MAURIELLO
2    relevant to the Witness's statement
3    about who was Schoolcraft being
4    compared to.  I'm assuming they would
5    be compared to the same year;
6    otherwise, it would be odd.
7             I don't want to belabor the
8    record and waste all of our time with
9    this.
10   Q.    At the bottom of page 71 --
11            MR. SMITH:  Why don't we take a
12   very short break.  It's 3:17.  I see
13   the court reporter shaking her hands,
14   why don't we take a very short break.
15            It's 3:17 and we are going off
16   the record.
17            [Whereupon, at 3:17 p.m., a
18   recess was taken.]
19            [Whereupon, at 3:40 p.m., the
20   testimony continued.]
21            MR. SMITH:  Back on the record.
22   It's 3:40.
23   Q.    And the last question that I
24   think we were at before I made a request
25   for documents was at the bottom of page

1                    S. MAURIELLO

2    71 of Exhibit 51, there is a statement by

3    the overall reviewer comments, quote,

4    Police Officer Schoolcraft has been

5    counseled by both his squad supervisor

6    and his platoon commander about his lack

7    of drive.  He has yet to show any

8    improvement.  I confer with the above

9    valuation.

10           Do you see that reference,

11   Inspector?

12       A.    Yes.

13       Q.    Are those your words?

14       A.    Yes.

15       Q.    Do they accurately convey what

16   you intended them to convey?

17           MS.  PUBLICKER METTHAM:

18       Objection.

19           MR.  KRETZ:   Objection.

20       A.    Yes.

21       Q.    Before the break we were

22   talking about activity standards and

23   productivity standards and performance

24   standards.  Can you just clarify one

25   thing for me, Inspector, do I understand

1                    S. MAURIELLO

2   you to be telling me that performance

3   standards are based on factors other than

4   just numbers?

5       A.    Clarify again.

6       Q.    I'll try my best.

7             You talked a lot activity,

8   productivity, expectations.  What I want

9   to know is does your idea of a

10  performance standard embody more than

11  just the number of arrests, summonses,

12  and 250s that appear on a piece of paper?

13      A.    Yes.

14      Q.    Other than the number of

15  arrests and number of summonses and

16  number of 250s that appear on a piece of

17  paper like a monthly performance report,

18  what are the other factors that go into

19  the assessment of a patrol officer's

20  performance?

21      A.    Sick records, discipline

22  history, CCRB history, are you willing to

23  work with supervisor, their attitude,

24  overall attitude.

25            [The document was hereby marked

Page 248

1                    S. MAURIELLO

2        Q.      Did you review it when you

3   received it?

4        A.      Yes.

5        Q.      Did you forward it to anybody?

6        A.      Yes.

7        Q.      Who did you forward it to?

8        A.      I called up Chief Nelson,

9   two-star chief of the borough.  I told

10  him I got a letter from an attorney from

11  an officer who is appealing his

12  evaluation.  He said send it to up to the

13  borough, let it follow up the

14  evaluation,, and it will go to proper

15  channels to him, and he will give it to

16  his review board.

17       Q.      How did you send this to Chief

18  Nelson?

19               MR. KRETZ:  Objection.

20               MS. PUBLICKER METTHAM:

21       Objection.

22       A.      I had someone hand-deliver it

23  to his officer in an envelope.

24               MR. SMITH:  I'm going to call

25       for the production of the copy or the

1              S. MAURIELLO
2  evaluation part of the 2.5.  I said, "We
3  think he might need a change of scenery
4  to benefit him.  He seems not to be happy
5  in the 81st Precinct.  He doesn't take
6  well to his supervision.  We think maybe
7  he can go to Greenpoint, nine four
8  precinct, may be better for him, maybe he
9  will like the work over there better."
10      Q.     What did Chief Marino did?
11      A.     He will look into it.
12      Q.     Did you have any other
13  discussions with Chief Marino about the
14  appeal?
15      A.     No.
16      Q.     Do you recall any discussions
17  that you ever had with Chief Marino about
18  Officer Schoolcraft other than that one?
19      A.     No.  The night of.
20      Q.     The Halloween night?
21      A.     Halloween night.
22      Q.     Other than this discussion
23  about the appeal and other than Halloween
24  night discussions, you never had any
25  other discussions with Chief Marino about

```
1                  S. MAURIELLO
2        Q.     At that PG or meeting, Chief
3   Marino and Brooklyn North investigations
4   personnel were there, right?
5        A.     Captain Lauterborn, yes.
6        Q.     Captain Lauterborn, you, and
7   other people, correct?
8        A.     That was about it.
9        Q.     That was in the context of that
10  meeting that the subject of Officer
11  Schoolcraft having a tape recorder came
12  up?
13       A.     Yes, along with complaint
14  reports and calling a criminal.
15       Q.     Inspector, when was the first
16  time that you became aware that QAD was
17  doing any kind of investigation of the
18  eight one?
19       A.     I believe there was a telephone
20  message near the end of October calling
21  down two cops to QAD.
22       Q.     How did you become aware of
23  that telephone message?
24       A.     I believe my crime analysis
25  sergeant asked me what this is about.
```

Page 331

1              S. MAURIELLO

2       Q.      Who is your crime analysis

3   sergeant?

4       A.      Sergeant Seymour [phonetic].

5       Q.      What did you tell Sergeant

6   Seymour?

7       A.      I said, "Let me make a phone

8   call over there."

9       Q.      Who did you call?

10      A.      I spoke to Inspector Cronin,

11  who is now Chief Cronin.

12      Q.      What did Cronin tell you?

13      A.      I just asked her, "There is a

14  telephone message here.  Anything I

15  should worry about?"  She said,

16  "Anonymous letter.  They're going to

17  investigate.  No big deal."

18      Q.      She didn't tell you what the

19  investigation was about?

20      A.      Nope.

21      Q.      Did she tell you anything about

22  the investigation?

23      A.      No, she didn't.

24      Q.      Was there a time before that

25  conversation that you had with somebody

Page 332

1          S. MAURIELLO

2  at QAD where you suspected that maybe QAD

3  was with doing an investigation into the

4  eight one?

5       A.    No.

6       Q.    So the first hint that you had

7  of any kind of QAD investigation at the

8  eight one was sometime near the end of

9  October when a crime analysis sergeant

10  brought to your attention the fact there

11  were these phone messages, right?

12       A.    Yeah, telephone messages.

13  That's the first.

14       Q.    Do you know what day that was,

15  whenever that came down?

16       A.    It had to be whenever it came

17  down.  Whenever I was working.  I don't

18  know if I was at PMI or whenever I first

19  went back.

20       Q.    Who were the officers being

21  called down?

22       A.    I think Deck [phonetic] and

23  maybe Santana.

24       Q.    When were you at PMI that

25  month?

1                   S. MAURIELLO

2    you have a problem going on at the

3    precinct, a shooting or a cop -- a

4    community arrest, he was going to get the

5    phone call right away from the PC so I

6    deal with the chief.

7         Q.    And Marino reports directly to

8    the chief, right?

9         A.    Yes.

10        Q.    So did you believe that the

11   reason why Marino was at the eight one

12   was because Nelson sent him there?

13             MS. PUBLICKER METTHAM:

14        Objection.

15        A.    I said I don't know.

16        Q.    I know you didn't know.  Do you

17   believe that was the reason?

18             MS. PUBLICKER METTHAM:

19        Objection.

20             THE WITNESS:  Isn't I don't know

21        an answer?

22             MR. KRETZ:  Did you have that

23        belief when he walked into your

24        office, he was sent there by Nelson?

25             THE WITNESS:  I didn't know.

1            S. MAURIELLO
2       Maybe yes, maybe no.   I don't know.
3       Q.      Did you discuss anything else
4  with Marino?
5       A.      No.   I said, "Let's go."
6       Q.      What did you do next?
7       A.      Went outside, I saw Lieutenant
8  Crawford.   I don't know where the 104 is.
9  I never worked in Queens.   He used to be
10  a sergeant there.   Lieutenant Crawford
11  drove me in my car.
12       Q.      What kind of car is that?
13       A.      I believe a gray truck.
14       Q.      Is that a department car?
15       A.      Yes, sir.
16       Q.      A gray truck?
17       A.      Yes, a truck like I forget.   I
18  had a couple of cars.   I forget.
19       Q.      How long did it take you to get
20  to Officer Schoolcraft's apartment?
21       A.      About 15 minutes.
22       Q.      And Crawford drove you?
23       A.      Yes, sir.
24       Q.      When you got there, did you get
25  out of the car?

Page 340

1                    S. MAURIELLO

2      A.      Yes, sir.

3      Q.      Did Crawford also get out of

4  the car?

5      A.      Yes.

6      Q.      Who was at the scene when you

7  got there?

8      A.      When I got there, Chief Marino

9  was following us in his car.  We walked

10  up, it was Captain Lauterborn was on the

11  sidewalk with Brooklyn North

12  investigations, ESU, EMS personnel were

13  there, Lieutenant Brosschart was there,

14  sergeant from the 104 was there with a

15  couple of cops and the CO of 104 was

16  there, Deputy Inspector Green.

17      Q.      Who from Brooklyn North was

18  there?

19      A.      I think Hawkins [phonetic],

20  Gough, and I forget the other one there.

21          MS. PUBLICKER METTHAM:

22      G-O-U-G-H.

23      Q.      Did you know the Brooklyn North

24  investigations officers who were there?

25      A.      Yes.

1              S. MAURIELLO
2     Q.     What happened next?
3     A.     We were outside Chief Marino
4 comes up, huddles everybody up, gets an
5 update.  At the time the landlord the
6 husband and wife were there talking.
7 They gave a key I think to Captain
8 Lauterborn and discussing what was going
9 on.  They were pretty adamant that
10 Officer Schoolcraft was home.
11     Q.     Who was adamant?
12     A.     The landlord.
13     Q.     Did you have any discussions
14 with either the landlord or the landlady?
15     A.     No.
16     Q.     Were you present when anybody
17 else had any discussions with either the
18 landlord or the landlady?
19     A.     After they gave the key to
20 Captain Lauterborn, they stepped back.
21 Chief Marino was handling the scene.  He
22 was the highest ranking.
23     Q.     Were you present when
24 Lauterborn was discussing getting the key
25 from the landlord?

1                S. MAURIELLO

2            MS. PUBLICKER METTHAM:

3       Objection.

4            MR. KRETZ:   Objection.

5       A.    I believe we were walking up,

6   we were walking up out of the car, they

7   were talking.

8       Q.    So when you got to the scene,

9   you saw Lauterborn discussing or talking

10  with the landlord and the landlady?

11      A.    The husband and the wife.

12      Q.    Let's call them the husband and

13  wife.  Did you see them hand the key to

14  him?

15      A.    No.

16      Q.    Did he already have the key by

17  then?

18      A.    They probably already gave him

19  the key, yes.

20      Q.    Did either the husband or the

21  wife, the landlady and the landlord, say

22  anything to you?

23      A.    No.

24      Q.    Did they say anything in your

25  presence that you heard?

1              S. MAURIELLO

2    might have hurt himself.  Nobody was

3    going in there defensive, he was going to

4    hurt us.  We were there to help him.

5         Q.    I understand what you were

6    thinking --

7              MR. KRETZ:  Let him continue,

8         please.

9              MR. SMITH:  Yes.

10        A.    Were in there to help him and

11   not hurt him.  At no time did anybody

12   have his gun out.  At no time were we

13   going in there and roust him off his bed.

14   I was in there.  You can hear the tape.

15   I come off concerned.  I was.  We all

16   were.

17        Q.    Inspector, you said he came at

18   you twice, right?

19        A.    He walked toward me twice.

20        Q.    He came up to your face twice,

21   right?

22        A.    Yes, sir.

23        Q.    Did you feel at all concerned

24   on either occasion that Officer

25   Schoolcraft was going to strike you?

1               S. MAURIELLO

2        A.     I don't think he was in uniform

3   that night.

4        Q.     How was he dressed?

5        A.     Gray jacket on, shield,

6   covering anticrime that night.

7        Q.     You were wearing a white shirt

8   that night?

9        A.     Yes, sir.

10       Q.     And Marino was wearing a white

11  shirt?

12       A.     Yes, sir.

13       Q.     And Captain Lauterborn was

14  wearing a white shirt?

15       A.     Yes.

16       Q.     How was the Brooklyn North's

17  investigations personnel dressed?

18       A.     I don't remember.

19  Plainclothes.  That's all I remember.

20       Q.     What about Brosschart, how was

21  he dressed?

22       A.     Uniform.

23       Q.     White shirt?

24       A.     I think so.

25       Q.     What happened next?

1                      S. MAURIELLO

2      A.        Standing out there ten to 15

3  minutes later, Officer Schoolcraft, I

4  should say, Adrian Schoolcraft, is

5  walking down the stairs.  He was on the

6  phone.  He walked down.  He made a left.

7  He went towards the EMS truck.  Everybody

8  else was coming out the apartment down

9  the stairs behind him.

10          He got by the truck and all of

11  a sudden made a U-turn, and he started

12  running fast and he ran into the

13  building.

14     Q.     Did you see him make this

15  U-turn?

16     A.     I was watching him, I seen him

17  go down to the EMS truck.  All of a

18  sudden, I see him make a U-turn, he

19  turned.  The next thing I know he was

20  running up the stairs.

21     Q.     Did you overhear anyone say

22  anything either while he was walking

23  towards the truck or when he made the

24  U-turn?

25     A.     No.

Page 378

1                   S. MAURIELLO
2        Q.      Did you hear anybody say
3    anything as he started heading back
4    towards the apartment?
5        A.      I don't think so.
6        Q.      Did you tell Lauterborn words
7    to the effect, Teddy, go get him?
8        A.      Absolutely not.
9        Q.      You believed that he actually
10   ran back to the --
11       A.      Walking fast and started
12   running up the stairs.
13       Q.      So he walked fast --
14       A.      First he --
15            THE REPORTER:  You're
16       interrupting him before he finishes.
17       Q.      Did he start walking quickly to
18   his apartment; is that what you are
19   saying?
20       A.      He U-turned, started walking,
21   then he put a quick pace, like a jog.
22       Q.      Up the steps?
23       A.      Like 10 feet before coming up
24   the steps.  He went up the steps fast.
25       Q.      Then what happened?

Page 379

1              S. MAURIELLO

2      A.    Saw everybody followed him up

3  in the building.  Everybody disappeared.

4      Q.    Who followed him in the

5  building first?

6      A.    Brooklyn North investigation

7  maybe and Captain Lauterborn and Chief

8  Marino.

9      Q.    Why didn't you go upstairs?

10      A.    First time I was involved in a

11  situation, get out of my face, agitated

12  the situation.  I'm not going to get back

13  involved again.

14      Q.    Did anybody tell you to stay

15  out on the street?

16      A.    No.

17      Q.    You made that decision on your

18  own?

19      A.    Yes, I did.

20      Q.    What happened next?

21      A.    Fifteen, 20 minutes later I see

22  EMS coming down the stairs, Schoolcraft

23  is sitting down on a chair, like,

24  restrained in an orange chair looking

25  around staring around at everybody.

Page 380

```
 1              S. MAURIELLO
 2      Q.    Who else was on the street at
 3  the time?
 4      A.    I believe Lieutenant Crawford
 5  was there with me.
 6      Q.    Were there any civilians on the
 7  street?
 8      A.    There was a bunch of people in
 9  the houses on the street.  There was
10  people on the street.
11      Q.    When you say "a bunch of
12  people," how many?
13      A.    People living next door, the
14  landlady, the super on the street away
15  from everything, the people next door
16  were there, some cops.
17      Q.    Is it fair to say there were
18  probably five to ten, maybe more,
19  civilians on the street looking at the
20  scene?
21      A.    Yeah, away from it, but they
22  are still in the street.
23      Q.    What happened next?
24      A.    What happened next, EMS took
25  him to the ambulance.  Captain Lauterborn
```

Page 381

1               S. MAURIELLO

2   told Lieutenant Brosschart to go with him

3   in the ambulance.

4       Q.     Did Officer Schoolcraft say

5   anything that you heard?

6       A.     No.

7       Q.     Did anybody say anything to

8   him?

9       A.     Not that I know of.

10      Q.     What happened next?

11      A.     Everybody came out.  We got in

12  the car, went back to the precinct to

13  start the investigation.

14      Q.     Am I correct that it was back

15  at the precinct, it was Brooklyn North

16  investigations, those three officers; is

17  that correct?

18      A.     Yes.

19      Q.     And Chief Marino?

20      A.     Yes.

21      Q.     And Captain [sic] Brosschart?

22      A.     No.  Captain Lauterborn.

23      Q.     Captain Lauterborn was there?

24      A.     Yes.

25      Q.     Is that correct?

Page 385

1                  S. MAURIELLO

2        Q.     Did Caughey say anything else

3   to you?

4        A.     He said -- with that he said,

5   "I wondered because I scratched him.  Did

6   that have an effect why he left the

7   precinct?"

8              I said, "No, he left because he

9   said he was sick."  That was it.

10       Q.     What did you understand Caughey

11  to be saying when he said did the

12  scratching have an effect on why Officer

13  Schoolcraft left the precinct?

14       A.     I don't understand.  I said,

15  "He went sick.  It was a bizarre night."

16  And that was it.  He hung up.

17       Q.     Did Caughey tell you that he

18  thought that maybe he intimidated

19  Schoolcraft?

20       A.     No, he did not say that.

21       Q.     Did he suggest that to you?

22              MS. PUBLICKER METTHAM:

23       Objection.

24       A.     No.

25       Q.     Did Caughey tell you that he

Page 386

```
1                S. MAURIELLO
2    threatened Schoolcraft?
3         A.     No, he did not.
4         Q.     Did Caughey tell you that he
5    made a copy of Schoolcraft's memo book?
6         A.     Not that night.  He didn't tell
7    me that night.
8         Q.     Did he tell you that night that
9    he made a photocopy of Officer
10   Schoolcraft's memo book and put it your
11   desk drawer?
12        A.     Not that night.  When I came
13   into work that Monday.
14        Q.     How did you communicate with
15   Caughey on Sunday afternoon?
16        A.     He called me.
17        Q.     On your cell phone?
18        A.     I believe job phone.
19        Q.     Job cell phone?
20        A.     I believe.
21        Q.     What is the phone number
22   associated with that phone number?
23        A.     I don't know.  His cell number
24   or his home number.  I don't even know.
25        Q.     But you got it on your
```

# CERTIFIED TRANSCRIPT

Page 402

1   UNITED STATES DISTRICT COURT.

    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------------------------X

3   ADRIAN SCHOOLCRAFT,

4                         Plaintiff,

5

                                        Case No:

6          - against -            10 CV 06005

7

    THE CITY OF NEW YORK, ET AL.,

8

9                         Defendants.

10  ------------------------------------------------X

11            444 Madison Avenue

              New York, New York

12

              July 1, 2014

13            10:24 a.m.

14

15

16

17

18

19  CONTINUED DEPOSITION OF STEVEN MAURIELLO,

20

21  pursuant to Notice, taken at the above place,

22

23  date and time, before DENISE ZIVKU, a Notary

24

25  Public within and for the State of New York.

Page 403

1    A P P E A R A N C E S:

2

3        NATHANIEL B. SMITH, ESQ.
              Attorneys for Plaintiff
              111 Broadway

4             New York, New York 10006

5

6        JOHN LENOIR, ESQ.
         Attorneys for Plaintiff

7             829 Third Street NE
              Washington, D.C. 20002

8

9

10       NEW YORK CITY LAW DEPARTMENT
         OFFICE OF CORPORATION COUNSEL
         Attorneys for Defendant

11       THE CITY OF NEW YORK
              100 Church Street

12            New York, New York 10007
         BY:  SUZANNA PUBLICKER METTHAM, ESQ.

13

14       SCOPPETTA SEIFF KRETZ & ABERCROMBIE

15       Attorneys for Defendant
         STEVEN MAURIELLO

16            444 Madison Avenue
              New York, New York 10022

17       BY:  WALTER A. KRETZ, JR., ESQ.

18

19   IVONE, DEVINE & JENSEN, LLP
         Attorneys for Defendant

20       DR. ISAK ISAKOV
              2001 Marcus Avenue

21            Lake Success, New York 11042

22       BY:  BRIAN LEE, ESQ.

23

24

25       (Continued.)

1          CONTINUED- STEVEN MAURIELLO

2    one you had?

3          A.      Yes.  Yes.

4          Q.      Can you please turn to page 37

5    of Exhibit 139.  On the top of that page

6    there is a request for any documents

7    relating to any searches for employment that

8    you have undertaken since October of 2009.

9    Do you see that, sir?

10         A.      Yes.

11         Q.      The response here is "not

12   applicable."  Do you see that?

13         A.      Yes, sir.

14         Q.      Does this mean that since

15   October of 2009, you have not made any

16   efforts to seek any form of employment?

17         A.      Yes.

18         Q.      Since October of 2009, have you

19   sought to change your position, either as

20   the commanding officer of the 81st Precinct

21   or the executive officer of Transit?

22         A.      When you make captain or above

23   and you get a command, there's no way really

24   you could put in for another command.  It's

25   all done by the police commissioner.  I

1  CONTINUED- STEVEN MAURIELLO

2  by her.  I think she knows a little more

3  than is being said.

4      Q.      Tell me what it is that you

5  believe that she knows?

6      A.      I could say something about her,

7  but I'd like to go to this person before her

8  to tie her into it.

9      Q.      All right, go right ahead.

10     A.      Thomas Korakis, down there,

11  Thomas Korakis, he's a former lieutenant

12  NYPD.

13     Q.      What about him?

14     A.      He retired, I believe, a year

15  ago.  He used to work in the advocate's

16  office.  I met him one time before that.  He

17  was, guess a lieutenant in the Brooklyn

18  North Gang that turned out of the 81.  He

19  happened to give me information and the

20  information he gave me, he said that a

21  former lawyer of the advocate's office,

22  Captain O'Connor, was no longer in the

23  advocate's office anymore, told him, she

24  vented to him that she was handed my case

25  before it officially became a case and she

1    CONTINUED- STEVEN MAURIELLO

2   thought I was getting a raw deal, I was

3   being treated unfairly.  She said

4   Commissioner Schwartz had a meeting and in

5   the meeting Schwartz said we have to get

6   Mauriello on anything, something and this is

7   what Lieutenant Korakis told me and what was

8   stated by Chief Cronin, if there's smoke,

9   but there's no fire connecting him.  And she

10   said I don't care, we have to get him on

11   anything, something.

12       Q.    Who is Chief Cronin?

13       A.    She's the chief of QAD.  At the

14   time she was the inspector of QAD, so she

15   said in a meeting.

16       Q.    So what you're telling me is

17   that Korakis told you that he was a

18   participant at a meeting --

19       A.    No.

20       Q.    -- where Cronin and Schwartz

21   were attending; is that correct?

22       A.    Korakis told me that Kathleen

23   O'Connor, who is a lawyer, was a participant

24   in a meeting with other people and she came

25   out and vented for a while about

Page 446

CONTINUED- STEVEN MAURIELLO

Commissioner Schwartz and she vented about the case and she told him this stuff.

Q.     I think I've got it.  I just want to make sure I've got it straight in my head.  So Korakis, K-o-r-a-k-i-s, told you that Kathleen O'Connor provided information to him about Korakis; is that correct?

A.     Yes, sir.

Q.     The information that was provided by O'Connor to Korakis was that O'Connor was at a meeting and in attendance at that meeting was Cronin, Schwartz and perhaps others; is that correct?

A.     Yes.

Q.     And in that meeting, Schwartz or Commissioner Julie Schwartz said that in sum and substance they have to find something to go after you with; is that right?

A.     Anything.  It was kind of relayed back there was really nothing there and she made that statement, Chief Cronin made the statement, you know, there's smoke, but there's no fire connected to anything to him.

Page 447

1        CONTINUED- STEVEN MAURIELLO

2        Q.      Did Korakis provide you with any

3   other information?

4        A.      I got a raw deal.  He said, you

5   know, that's what he said I got a raw deal.

6   It's known down there that I got a raw deal.

7   He said something, you know.

8            MR. KRETZ:  Did he say anything

9       else?

10           THE WITNESS:  No, raw deal.

11       Q.      I am going to ask the same

12  question your lawyer just asked you, just

13  because it's important to provide all the

14  information that you have.  So I am going to

15  ask you again.  Did Korakis provide you with

16  any other information about what was going

17  on with respect to your charges and specs?

18       A.      Well, he said there was daily

19  meetings every day down there with Chief

20  Schwartz, I guess -- Commissioner Schwartz

21  about what they're going to do with me and

22  see people coming in and out of it, he knows

23  about it and that Kathleen O'Connor was fed

24  up with Julie Schwartz.  Korakis said, if I

25  could say it, that Julie Schwartz was very

CONTINUED- STEVEN MAURIELLO

1
2   unethical and that's about it.
3       Q.      Did he say what was unethical
4   about what she was saying or doing?
5       A.      The statement when he said
6   unethical is the way she handles down there
7   is very unethical.
8       Q.      When was the conversation that
9   you had with Korakis that you -- where you
10  got all this information that you just
11  provided to me?
12      A.      He told me -- this at a
13  retirement seminar going back like seven
14  months, eight months ago, but --
15      Q.      Was this in person, this
16  communication you had with Korakis?
17      A.      Yes.  Yes.
18      Q.      And was there anybody else
19  present?
20      A.      No.
21      Q.      Have you ever had any other
22  conversations with Korakis about, either
23  your case, your counterclaims or the charges
24  that were brought against you?
25      A.      I just -- I called him up two

1              CONTINUED- STEVEN MAURIELLO

2   the 81st Precinct?

3              MR. KRETZ:   Objection.

4       A.      Again, I didn't know what it

5   was.  Got a telephone message, sometimes

6   people feel it's a telephone, sometimes they

7   feel -- I didn't know what it was.  I didn't

8   know what was going on.

9       Q.      No, I understand --

10      A.      I didn't think it was

11  inappropriate, no.

12      Q.      Did Cronin tell you it was

13  appropriate or inappropriate for you to be

14  contacting QAD about the nature of any

15  investigation that was conducted?

16      A.      No.

17      Q.      Am I correct that she didn't

18  object to you contacting her; is that right?

19      A.      No.

20      Q.      Has anybody, on your behalf,

21  contacted Cronin about your claims?

22      A.      No.

23      Q.      Is she currently still the head

24  of QAD?

25      A.      I don't know.

1          CONTINUED- STEVEN MAURIELLO

2          Q.      The next person is Brandon Del

3   Pozo D-e-l P-o-z-o.   Who is that?

4          A.      I believe the deputy inspector

5   of NYPD.

6          Q.      Where?

7          A.      Somewhere in One PP.

8          Q.      What information does he have

9   about the, your claims?

10          A.      Well, I didn't -- Brandon Del

11   Pozo was quoted in a Lenny Levitt article.

12   I guess it was all E-mailed to lawyer,

13   Norinsberg, about -- on behalf of

14   Commissioner Schwartz and he was asking

15   Norinsberg to give him a call.  Gave him an

16   update with the case and when he was pushed

17   in the article, he said he had the

18   permission of Commissioner Schwartz and the

19   people of Commissioner Farrell's office to

20   be an intermediate who talked to

21   Norinsberg --

22              (Whereupon, Mr. Callan entered

23      the deposition room.)

24              MR. KRETZ:  Could you read back

25      his answer so far as he can continue

Page 460

1          CONTINUED- STEVEN MAURIELLO

2          it.  And you might as well note Paul

3          Callan is in the house.

4                    (Record read.)

5          A.        -- and then I guess he had

6     numerous conversations with Counsel

7     Norinsberg and he kind of said in the

8     article it was quoted Mauriello --

9     Mauriello's career is over.  He's in a

10    dead-end spot.  And I just thought it was

11    very funny how a captain in the NYPD would

12    be able to say that to a newspaper guy or to

13    a lawyer, when as far as I know, he had

14    nothing to do with my case.  You know, and

15    now, you know, he said he's speaking on

16    permission of Commissioner Schwartz and I

17    hear stuff now about what Schwartz said

18    about me and I would like to know more.

19          Q.        Farrell, who is Farrell?

20          A.        I guess he was the commissioner

21    of office -- OMAP, Office Management and

22    Planning.

23          Q.        Does Del Pozo have any other

24    information about your case or your claims

25    for damages?

1          CONTINUED- STEVEN MAURIELLO

2    anywhere beginning 2011.  A year from I was

3    there.

4          Q.     Well, what date were you

5    transferred to Transit?

6          A.     Now I'm getting mixed up here.

7    2010, July 3rd I think it came down, but I

8    think July 7th was the official date.

9          Q.     Did you know it was coming

10   before it hit the tape?

11         A.     What was coming?

12         Q.     The transfer.

13         A.     No.  I was surprised.

14         Q.     How many days or weeks or months

15   after your transfer to Transit did you have

16   the conversation with Diaz about another

17   position or promotion?

18         A.     About a year.

19         Q.     So it's fair to say the

20   conversation with Diaz took place sometime

21   in the summer 2011?

22         A.     Yes.  Just, I guess, they had

23   annual meetings or every six months they

24   would meet, the bureau chiefs would meet

25   with Commissioner Kelly and go over every

Page 468

CONTINUED- STEVEN MAURIELLO

1
2  personnel under his jurisdiction --
3  underneath him, all the executives.  And he
4  said, you know, I said good things to
5  Commissioner Kelly on your behalf.  I said
6  any way I'm moving up, moving to some other
7  position.  He said too soon.  Not until this
8  whole thing is over with.
9      Q.      When he said not until this
10  whole thing is over with, what was your
11  understanding of what he was referring to?
12      A.      I guess not until these articles
13  in the newspaper are over with, not until
14  this lawsuit is over with.
15      Q.      What did he tell Commissioner
16  Kelly about you?
17      A.      I don't know.
18      Q.      Where is Diaz today?
19      A.      He's retired.  I think he's --
20  maybe head of security of MTA.
21      Q.      Do you know where he lives?
22      A.      No.
23      Q.      Purely a professional
24  relationship with him?
25      A.      Professional, yes.

1    CONTINUED- STEVEN MAURIELLO

2        Q.      What information does Diaz have

3    about your claims, other than what you've

4    already provided me with?

5        A.      Just that my career is on hold

6    until, I guess, or the lawsuit is over and

7    all the public sensationalism.

8        Q.      Did he lead you to believe that

9    once the lawsuit is over with that your

10   career would be, get back on track?

11       A.      He led me to believe that he'd

12   push for me, yes.

13       Q.      Do you believe that once the

14   lawsuit's over, that your career will be

15   back on track?

16       A.      Four years ago I thought so.

17   Right now, I don't know.  I really don't.

18       Q.      Next person is Bureau Chief

19   Joseph Fox.

20       A.      Yes.

21       Q.      Who is that?

22       A.      He's the Chief of Transit.

23       Q.      Is he in the chain of command

24   higher than Diaz or lower than or on the

25   same level as Diaz?

Page 470

1          CONTINUED- STEVEN MAURIELLO

2       A.      Same level.

3       Q.      What does Fox know about your

4    claim and damages?

5       A.      Just that, the same thing, that

6    I went to him and he said the same thing.

7    When this is all over and the lawsuit's all

8    over and everything's all over, then he'll

9    go to push for me.  Right now he can't.

10      Q.      When did you have this

11   conversation with Fox?

12      A.      I'm going to say I had it -- I

13   had it twice, twice.

14      Q.      When did you have these two

15   conversations with Fox?

16      A.      I would say one when

17   Commissioner Kelly was still here.  One

18   right around when they named Commissioner

19   Bratton was coming.

20      Q.      Bratton?

21      A.      Bratton.

22      Q.      Can you provide me with any

23   greater level of specificity about when you

24   had a conversation with Fox?

25      A.      I believe the second one around

1          CONTINUED- STEVEN MAURIELLO
2    December and one before that had to be in, I
3    guess, that's December 2013 -- I would say
4    beginning of 2013.
5          Q.      Did the conversation you had
6    with Fox take place at the same time as the
7    conversation with Diaz?
8          A.      Chief Diaz was the Bureau Chief
9    of Transit.  He retired and then Chief Fox
10   took over.
11         Q.      Okay.  So when did Fox become
12   the successor to Diaz?
13         A.      I don't recall.
14         Q.      Am I correct that in
15   approximately the summer of 2011, you went
16   to Diaz, who was your direct supervisor at
17   Transit and said any chance for a promotion
18   here, in sum and substance?
19         A.      Any chance of moving up or, you
20   know, being transferred somewhere else, yes.
21         Q.      And he told you that you got to
22   wait a while, right?
23         A.      Yes.
24         Q.      Am I correct that after Diaz
25   left and Fox became his replacement that you

1           CONTINUED- STEVEN MAURIELLO

2   made an approach to Fox again to see if

3   there was any chance for a promotion; is

4   that right?

5           A.      Yes or a transfer.

6           Q.      When you went to Diaz and you

7   were trying to get a transfer, where were

8   you trying to get a transfer to?

9           A.      Anywhere, commanding officer's

10  spot, second in command.

11          Q.      So you wanted a commanding

12  officer's position?  You didn't want to be

13  an executive officer; is that correct?

14          A.      Correct.

15          Q.      When you went to Fox.  Did you

16  have any particular transfers in mind?

17          A.      No.  To move up inside Transit

18  maybe, if something opened up or outside of

19  Transit.

20          Q.      If you had obtained this

21  transfer or promotion or move from either

22  Diaz or as a result of your conversations

23  Diaz or Fox, would your title at NYPD

24  change?

25          MR. KRETZ:  Objection.

Page 473

1          CONTINUED- STEVEN MAURIELLO

2          A.         It depends what they transfer me

3     to.

4          Q.         As of right now, your title is

5     deputy inspector; is that right?

6          A.         Executive officer, yes.  Would

7     be deputy inspector still.

8          Q.         When you had these conversations

9     with Diaz and Fox, you weren't trying to get

10    promoted to inspector; is that right?

11         A.         I was trying to get to a

12    position where I could get promoted again.

13    With all these lies, I've been sidetracked

14    for over four years now.

15         Q.         And do I understand you to be

16    saying that a commanding officer position,

17    was the position that would enable you to

18    get another promotion; is that what you're

19    telling me?

20         A.         Yes.

21         Q.         And if you were successful at

22    getting the commanding officer position, you

23    would then seek a promotion to what?

24         A.         Well, I wouldn't seek a

25    promotion, it would be to inspector.  It

1        CONTINUED- STEVEN MAURIELLO

2    would be -- it depends if they want to

3    promote you, they would promote you to

4    inspector.

5        Q.      And what are the advantages to

6    being promoted to inspector?

7        A.          Financially.   Financially.

8    Talking about $9,000 more a year, you know,

9    back to being a commanding officer.   I

10   thought I did a very good job as commanding

11   officer.   I liked being commanding officer.

12   I loved working at the 81st Precinct.

13       Q.      You were a commanding officer at

14   the 81st Precinct with the title deputy

15   inspector?

16       A.      I was captain.   Then I became

17   deputy inspector.

18       Q.      So am I correct that the only

19   advantage to being appointed inspector from

20   the position of deputy inspector is this

21   $9,000 a year?

22              MR. KRETZ:   Objection.

23       A.      No.   I've been ridiculed, public

24   humiliation for over four years.   Lies, the

25   damage to my reputation, to my job.   Putting

Page 475

1          CONTINUED- STEVEN MAURIELLO

2    me in the commanding officer's position to

3    myself is a step going towards healing,

4    closure, to the right direction.   Not being

5    stuck as an XO and there is room for

6    improvement.

7          Q.     Do you agree that the position

8    as an XO at Transit is a dead-end job?

9          A.     There's no room for improve --

10   there's no room for promotion.

11         Q.     You agree with me it's a

12   dead-end job, right?

13         A.     Yes.

14         Q.     I understand that there were

15   noneconomic advantages to a promotion to

16   inspector, but just focusing on the economic

17   advantages of being inspector.   What else is

18   there, other than the approximately $9,000 a

19   year raise that you would get economically

20   or financially from receiving a promotion of

21   deputy inspector to inspector?

22              MR. KRETZ:   Just economically

23         and financially, you're saying?

24              MR. SMITH:   Yes.

25         A.     Economical advantage.   $9,000,

1          CONTINUED- STEVEN MAURIELLO

2     it helps you towards your retirement, your

3     pension.

4          Q.     Okay.  But that's it, it's just

5     9,000, plus as you retire the higher your

6     salary at the time of retirement, the larger

7     your retirement; is that correct?

8          A.     Yes.

9          Q.     The next individual that you've

10    identified in the list, Robert Gianelli, and

11    we've already discussed him.  Is there

12    anything else that he has, any information

13    about, other than what you already provided

14    to me?

15         A.     Just that he knows my character,

16    my ethics, highly ethical -- I believe he

17    knew I was one of the best commanding

18    officers in the city and I believe he'll

19    testify to that.

20         Q.     How would you measure up who the

21    best commanding officers are in the city?

22              MS. PUBLICKER METTHAM:

23         Objection.

24         A.     He'll know I had a very good

25    relationship with the community as -- look

Page 477

CONTINUED- STEVEN MAURIELLO

1
2   at the disks you could see numerous awards
3   from the community.  He knows the way I ran
4   the precinct, all the administrative wise,
5   the self inspections passed, the morale of
6   the men and women and he knows that I am
7   very sharp when it comes to identifying
8   crime trends presented at CompStat, but also
9   knowing everything about the community.  I
10  know politicians, I know clergy, but I also
11  know when there's crime, who's doing the
12  crime.  I put my resources in the right
13  location and he thinks I'm very highly
14  motivated and a highly integrity person.
15      Q.    How would the chief of patrol
16  measure your performance as a commanding
17  officer of the 81 for example, with the
18  performance of other commanding officers of
19  the other precincts of the New York Police
20  Department?
21      A.    I was put up for -- the precinct
22  got unit citation for great police work and
23  community relationship.  I was sent to
24  police -- PMI, Police Management Institute,
25  that's represented by Columbia University.

1         CONTINUED- STEVEN MAURIELLO

2    Our presentation to the commissioner was

3    video interrogation of criminals and that's

4    been put into NYPD.  He looks at that and he

5    also looks at the reputation of bureau

6    chiefs who are over me, other chiefs and how

7    I present myself and how the community

8    appreciates me.

9         Q.      Are there any statistics or

10   numbers that you're aware of that are used

11   to compare the performance of COs of the 81

12   as opposed to COs of any other countless

13   precincts within the NYPD?

14        A.      Not that I know of, no.

15        Q.      Anything else about Gianelli

16   that you think he has any information about

17   your case or your claimed damages?

18        A.      No.

19        Q.      Next individual on the list is

20   Chief James Hall.

21        A.      Yes.

22        Q.      Who is he?

23        A.      He replaced Chief Gianelli.

24   Chief of Patrol.

25        Q.      Have you ever spoken with him

1          CONTINUED- STEVEN MAURIELLO

2   about your claims or counterclaims?

3          A.     No.

4          Q.     What information do you believe

5   that James Hall has about your case?

6          A.     He called up after I got

7   released from the hospital.  I think it was

8   three days later, right before July 4th he

9   called me up.  I was taking my kids up to

10  Jersey and he broke the bad news that the

11  command's being taken from me and I was

12  being transferred.

13         Q.     When did he make this phone call

14  to you?

15         A.     Had to be before July 4th.  I

16  think it was July 3rd.

17         Q.     So when you told me earlier that

18  you got notice that you were going to be

19  transferred on July 3rd, that's the way you

20  got the notice?

21         A.     Yes.

22         Q.     That was the first piece of

23  information that you got that you were going

24  to be transferred?

25         A.     Yes, sir.

Page 480

CONTINUED- STEVEN MAURIELLO

1

2      Q.      What did he tell you the reason

3  for you being transferred was?

4      A.      He didn't tell me.

5      Q.      What did you believe the reason

6  for the transfer was?

7          MS. PUBLICKER METTHAM:

8      Objection.

9      A.      At the time, he said I did a

10  good job.  That I was going to go to Transit

11  in second command.  I thought it was a

12  lateral move at the time, but the reason

13  why, I know was it was a lot of

14  sensationalism in the newspaper, Village

15  Voice.  Again, a lot of it was slanderous

16  and really not accurate.  I think it was a

17  lot of pressure on the New York City Police

18  Department and I understood they probably --

19  the best interest had to move me somewhere.

20      Q.      Did Hall tell you as a reward

21  for doing a good job at the 81 you were

22  getting this transfer?

23      A.      He didn't say it was a reward.

24  He said I did a very good job at the 81.  I

25  guess he was trying to soften the blow.  You

Page 481

CONTINUED- STEVEN MAURIELLO

1
2  could tell by my voice I was disappointed.
3  Had a lot going on in my life at that moment
4  and probably was the last thing I wanted to
5  hear.
6      Q.      It was a blow?
7      A.      Big blow, big blow.
8      Q.      Getting transferred to Transit
9  was a blow for you, right?
10     A.      Leading up to it was a big blow,
11 being publicly humiliated on lies in the
12 newspaper.  You know, they were saying that
13 Officer Schoolcraft did this, because he
14 cared about the community and the cops.  The
15 first paragraph, Graham Rayman's whole
16 thing.
17              Then we have tape recording
18 where he's saying he don't give a damn about
19 the cops and he's saying racial comments
20 about the community.  So to me it was all a
21 bunch of lies.  At the time I didn't know
22 that, but now I do.  So I mean, at time it
23 was a big, big blow, because I loved what I
24 did.  I loved working in the 81st.  I loved
25 the men and women I worked for.  I loved the

1        CONTINUED- STEVEN MAURIELLO

2   community.  Had a very good relationship

3   with the community.  You know, it was a

4   tough blow, you know, not to know and to

5   tell you you're being moved, you know, it's

6   not an easy thing to deal with.

7        Q.      What other information does

8   James Hall have about your damages in the

9   case?

10       A.      I don't know.  I would like to

11  know.

12       Q.      How many times have you ever

13  spoken to -- with Hall?

14       A.      I think it was the only time.

15       Q.      That was the only time?

16       A.      Yeah.  Yeah.

17       Q.      Do you know where he is today?

18       A.      Just retired.  That's all I

19  know.

20       Q.      Do you know where he lives?

21       A.      I don't know.

22       Q.      He called you on your cell

23  phone?

24       A.      He called on the job phone and

25  they said hold on for chief of patrol.  I

Page 483

1          CONTINUED- STEVEN MAURIELLO

2   don't know what this was about.  I didn't

3   think I'm getting booted, but that's what it

4   was.

5          Q.     You were at your desk at the 81?

6          A.     No, I was off.  Just got out of

7   the hospital.  I was out.  I was taking my

8   kids up to Jersey, driving on the Cross

9   Island Parkway with the dog and my two kids

10  and I get the phone call.

11         Q.     But you got the phone call on

12  your cell phone?

13         A.     The job cell phone, yes.

14         Q.     Okay.  That's what I

15  misunderstood.  I thought you said the

16  office.  So the job cell phone you got the

17  call?

18         A.     Yes, sir.  Yes, sir.

19         Q.     Next person Deputy Inspector

20  Scott Henderson, see that?

21         A.     Yes.

22         Q.     What information does Scott

23  Henderson have about your claim, your claims

24  and damages?

25         A.     Scott was my first XO of the

Page 484

1           CONTINUED- STEVEN MAURIELLO
2     81st Precinct when I first received -- was
3     awarded the command.  He is now the current
4     commanding officer of the 81st Precinct.  I
5     knew Scott when I was a sergeant in the 79.
6     I was a cop in the 79.  He knows my
7     integrity.  He knows my work ethic.  He
8     knows how I am loved by the men and women at
9     the 81 to this day still.  He knows the
10    community.  They still love me there and I
11    believe he would come in and say that
12    because of the lies of certain people in
13    this room that my career was put on hold and
14    I'm still suffering from it.
15         Q.      Have you ever spoken with him
16    about your claims?
17         A.      Never.
18         Q.      When was the last time you spoke
19    with Henderson about any subject?
20         A.      I was invited back about three
21    weeks ago to the community council.  First
22    time been back there four years in the 81st
23    Precinct.  Cathy Arline, the community
24    council president was retiring.  September
25    will be her last official month there as

CONTINUED- STEVEN MAURIELLO

1
2   president and I was invited back.  I went
3   back there and I was there.  Chief of
4   department Phil Banks was there.  Chief of
5   Brooklyn North Gerald Nelson was there and
6   he's the current CO and I'm the only former
7   commanding officer that showed up to pay
8   respects.
9        Q.     You didn't talk about this
10  counterclaim of yours?
11       A.     Counterclaim, no.  He asked me
12  how I'm doing in the job.  I said all right.
13  He said I saw about it in the paper again.
14  He said don't worry about it, everybody
15  knows your true character and then it was
16  all about -- I was there for the honor of
17  Ms. Arline.  I was the third person actually
18  to get called up to talk, give a
19  testimonial.  It was, Chief Banks was first,
20  Chief Nelson was second.  They sat and I got
21  called up third to give a testimonial about
22  Cathy Arline's great work in the Bedford
23  Stuyvesant community.
24       Q.     Cathy who?
25       A.     Arline.

Page 486

CONTINUED- STEVEN MAURIELLO

1
2          Q.      And who is she?

3          A.      Community Council President of

4     the 81st Precinct.

5          Q.      You said that everybody knows

6     your true character; what are you referring

7     to?

8          A.      They -- listen, when people

9     write articles on you, it's only slanted one

10    way.  There's no response from me, not even

11    NYPD.  It's written to be factual, which

12    it's not.  So when you're in the paper for

13    four years, God knows how many articles are

14    written about me.  I mean, really, and they

15    read the same thing, regurgitate over and

16    over and you know, I'm this, I'm that.  They

17    know my true character.  The community knew.

18    I was welcomed back with open arms.  It

19    touched me.  I mean, I was four years away

20    from there and I was very happy.

21         Q.      You're telling me that the

22    supervisors that you know in the NYPD, who

23    are familiar with the newspaper articles, do

24    not believe that the things that you're

25    accused of are true; is that correct?

Page 511

1          CONTINUED- STEVEN MAURIELLO

2   conversations you ever had with Weiss or

3   where Weiss was involved in conversations

4   about Schoolcraft?

5          A.      No, not that I recall.

6          Q.      Do you remember going to the

7   borough and talking with Marino, with Weiss?

8          A.      Yes.  Yes.

9          Q.      What do you recall about that?

10         A.      It was -- the COs get called

11  down, the ICO usually gets called down with

12  the CO to go over whoever got 3.0 and I

13  believe I testified that when I first got

14  the command, I went down there about two

15  other officers and this time I went down

16  there about Officer Schoolcraft and Officer

17  Scandola.

18         Q.      Do you remember having a

19  conversation with Weiss after Weiss went to

20  Jamaica Hospital?

21         A.      What Jamaica Hospital?

22         Q.      Do you remember that School --

23  you know that Schoolcraft was taken to

24  Jamaica Hospital --

25         A.      Okay.

Page 578

1          CONTINUED- STEVEN MAURIELLO

2      Q.      Kind of sort of?

3      A.      Yeah, friends going out.  I

4  wasn't really ready to date anybody.

5      Q.      She doesn't work for the police

6  department?

7      A.      No.  No.

8      Q.      She's a nurse in a private

9  hospital or state or city hospital?

10     A.      No, she's like a nurse that

11  works for a company.  She goes to peoples'

12  houses.  She's a nurse that -- RN.

13     Q.      You don't know the name of the

14  company she works for?

15     A.      No.

16     Q.      The next paragraph you say --

17  you're identifying your damages --

18             MR. SMITH:  Let's take a short

19      break.  It's 15:06.  Just going off the

20      record.

21             (Whereupon, a recess was taken.)

22             MR. SMITH:  Going back on the

23      record.  It's 15:26.

24     Q.      The next paragraph refers to

25  damages and there's a statement here that

CONTINUED- STEVEN MAURIELLO

1
2  the total amount of damages are "lost wages
3  of 8,000 to 9,000 per year, emotional
4  distress damages and reputational harm, an
5  unspecified amount not to exceed $2
6  million."   You see those references, sir?
7       A.     Yes, sir.
8       Q.       Those are your claimed damages
9  in your counterclaim?
10      A.     Yes, sir.
11      Q.       The loss of wages of $8,000 to
12 $9,000 a year, what's that based on?
13      A.       Inspector -- I think the
14 difference between inspector and deputy
15 inspector.
16      Q.       Do you believe that you would
17 have been promoted to inspector, but for the
18 media coverage about your career?
19      A.     Yes, sir.
20      Q.       Did anybody at the NYPD tell you
21 that you were being considered for promotion
22 to inspector?
23      A.     No.
24      Q.       Is the promotion to the position
25 of inspector a promotion that automatically

1         CONTINUED- STEVEN MAURIELLO

2   follows from being deputy inspector?

3              MR. KRETZ:   Objection to the

4        form.

5        A.      Yes.

6        Q.      How many deputy inspectors are

7   there in the NYPD?

8        A.      I don't know.

9        Q.      How many inspectors are there in

10  the NYPD?

11       A.      I don't know.

12       Q.      How does one receive the

13  promotion from deputy inspector to

14  inspector?

15       A.      Sometimes it's by longevity.

16  I've been a deputy inspector for six years

17  now.  Sometimes it's how long you have been

18  in the command to get another promotion.

19  Sometimes they move you to another command

20  or they move you to another spot that's

21  promotional when you have too much time as

22  deputy inspector.

23       Q.      Can you explain that answer to

24  me, please?

25       A.      Yes.  When you're deputy

1        CONTINUED- STEVEN MAURIELLO

2   inspector and run the command, there's a

3   chance you can make full inspector in the

4   same command by longevity.  If you're still

5   there for a couple more years, you could be

6   full inspector if they deem to promote you.

7   If they move you to another unit, say

8   narcotics or another precinct, district,

9   housing, they could promote you again.  They

10  usually try to move people, deputy inspector

11  to an inspector spot.

12       Q.      How many inspector spots are

13  there in the NYPD?

14       A.      I don't know.

15       Q.      Who makes the decision to

16  promote deputy inspectors to inspectors?

17       A.      Police commissioner.

18       Q.      Does the police commissioner get

19  any information from anybody else?

20       A.      I don't know.

21       Q.      Do you have any sense of how

22  long it takes for somebody who is a deputy

23  inspector to be promoted to an inspector

24  position?

25       A.      No, but I know for quite a few

Page 582

CONTINUED- STEVEN MAURIELLO

1

2  people that were captains when I was deputy

3  inspector, now they're inspectors.

4       Q.       Who were those people?

5       A.       The list -- I'll recall.  I have

6  to remember.  There is a bunch of them.  I

7  look on the sheet all the time.

8       Q.       Do you know any deputy

9  inspectors who became inspectors when you

10  were deputy inspector and still are?

11       A.       And still are?

12       Q.       Let me rephrase that question.

13  You're telling me that there are some

14  captains that you know of who have, since

15  you became deputy inspector, they have

16  achieved title of inspector; is that

17  correct?

18       A.       Yes, sir.

19       Q.       If I leave a space in the

20  transcript, would you provide me with the

21  names of those?

22       A.       Yeah, think about it.  Yes.

23  Insert:  _____

24

25       Q.       Can you tell me of any other

1          CONTINUED- STEVEN MAURIELLO

2    deputy inspectors who became inspectors

3    while you have been just a deputy inspector

4    during that period of time?

5               MR. KRETZ:  The people who were

6          deputy inspectors when he was the

7          deputy inspector since becoming

8          inspector?

9               MR. SMITH:  Yes, thank you.

10         That's a better --

11         A.     I could tell you right now from

12    my PMI class, Promotional -- Police

13    Management Institute, Steve Cirabisi is a

14    full inspector, Joseph Dowling is a full

15    inspector, Ellen Chang is a full inspector.

16    You have that picture.  One of the evidence

17    is the picture of my PMI.  I could go down

18    it right now to give you the names.  I think

19    it's in your pictures.

20         Q.     These are the plaques, right?

21         A.     Yeah, yeah.  What's this?

22    Police Management Institute.  Right there.

23         Q.     Showing you what's been

24    marked -- well, it's a page with the marking

25    on this page has been cut off.  This appears

1          CONTINUED- STEVEN MAURIELLO

2     to be SM352.  It's a photocopy of a plaque

3     there saying Police Management Institute.

4               MS. PUBLICKER METTHAM:  Could we

5          mark that for the witness, referring it

6          to the witness to refresh his

7          recollection.

8               MR. SMITH:  All right.  That's a

9          good idea.  I am going to mark this as

10         Exhibit 140.

11              Walter, at a break would you

12         mind making photocopies of this for

13         everybody?

14              MR. KRETZ:  No.

15              (Plaintiff's Exhibit 140,

16         document, was marked for identification

17         as of this date.)

18         Q.    Can you, slowly for the court

19    reporter, please identify the names of the

20    individuals?

21              MR. KRETZ:  The names of the

22         individuals listed here.  Who were

23         deputy inspectors when he was a deputy

24         inspector who are now inspectors?

25              MR. SMITH:  Correct.

1      CONTINUED- STEVEN MAURIELLO

2      A.      Ted Berntsen, B-e-r-n-t-s-e-n,

3  Ellen Chang, Steve Cirabisi.

4      Q.      Can you spell that, please?

5      A.      C-i-r-a --

6      Q.      She's got it.  She's reading it

7  too.

8      A.      Joseph Dowling, Brian Maguire.

9  Then we have a bunch of them that went from

10 captain to DI too on this list during the

11 time.

12     Q.      All right.  While you have it in

13 front of you, sort of identify those?

14     A.      Tell you right now Steve

15 D'Ulisse, Michael Nemoyten, Kevin Nicholson,

16 Anthony Tasso.  That's about it.

17     Q.      Did all of these individuals who

18 were deputy inspectors receive an $8,000 to

19 $9,000 a year raise as a result of being

20 made inspector?

21     A.      Only a couple and there's a

22 reason why.

23     Q.      Why?

24     A.      Alan Abel, I think he got

25 three-quarters, he was in a bad accident.  I

1        CONTINUED- STEVEN MAURIELLO

2    just need to look again.  Alan Abel is one.

3    Corey Pegues got three-quarters.  So both

4    guys got three-quarters injury and the last

5    one was John Argenziano, he retired deputy

6    inspector.

7        Q.      My question is that the

8    individuals that you just identified were

9    deputy inspectors and then made inspector;

10   did they all receive the $8,000, $9,000 a

11   year increase in salary?

12       A.      Yes, sir.

13       Q.      How do you know that?

14       A.      That's automatic.

15       Q.      Is that a collective bargaining,

16   collective agreement that governs their

17   salaries?

18       A.      I think so, yes.

19       Q.      Are inspectors part of the same

20   union you're part of now?

21       A.      Yes, sir.

22       Q.      Alan Abel, he's still a deputy

23   inspector?

24       A.      He got a three-quarter's injury.

25   He hurt his neck.  He's out.  He retired as

1              CONTINUED- STEVEN MAURIELLO

2    deputy inspector, but three-quarter's

3    salary.

4         Q.       And John Argenziano?

5         A.       He retired.

6         Q.       As a deputy inspector?

7         A.       Yeah, but he retired a while

8    ago.

9         Q.       And William Castillo retired?

10        A.       He's a civilian, so he doesn't

11   count.

12        Q.       What's his title?

13        A.       I forget.  He's a civilian

14   member of the service.

15        Q.       And Stephen Cirabisi,

16   C-i-r-a-b-i-s-i?

17        A.       He's an inspector.

18        Q.       Where?

19        A.       One Police Plaza.

20        Q.       Dennis Clary?

21        A.       Retired inspector.

22        Q.       And Steven D'Ulisse?

23        A.       He was a captain deputy

24   inspector.

25        Q.       He's a deputy inspector now?

Page 588

1                CONTINUED- STEVEN MAURIELLO

2          A.      Yes.

3          Q.      Brian Maguire?

4          A.      Full inspector now.

5          Q.      Michael Nemoyten?

6          A.      He went from captain, deputy

7    inspector.

8          Q.      Kevin Nicholson?

9          A.      Captain, deputy inspector.

10         Q.      Corey Pegues.

11         A.      He retired three-quarters,

12   deputy inspector, but he was in a command

13   where he would have been inspector.

14         Q.      And Anthony Tasso?

15         A.      Captain, deputy inspector.

16         Q.      This list that we have just been

17   talking about, this is the PMI class that

18   you took in 2009?

19         A.      Yes, sir.

20         Q.      When did you take this class?

21         A.      I guess beginning of 2009 to end

22   of 2009.

23         Q.      What's your date of birth?

24         A.      9/13/67.

25         Q.      Do you have an expected

```
 1            CONTINUED- STEVEN MAURIELLO
 2   retirement date?
 3        A.      No.
 4        Q.      Do you expect to retire at any
 5   time?
 6        A.      Eventually, yes, it would be
 7   nice.
 8        Q.      Do you have in mind today a
 9   targeted date for when you would like to
10   retire?
11        A.      No.
12        Q.      Do you have a targeted rank that
13   you would like to achieve before retiring?
14        A.      No.
15        Q.      In the damages section of your
16   interrogatories, it says that you're seeking
17   emotional distress damages and reputational
18   damages in an amount not to exceed $2
19   million.  Can you tell me the basis for your
20   request for at least $2 million in damages?
21        A.      For the amount of damage in
22   interpretation to my career and public
23   humiliation, to the damage to my family, to
24   the ex-wife, to my mother, to my friends,
25   co-workers that I suffered public
```