SM Exhibit CI

Page 1

1    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------------------------X

3    ADRIAN SCHOOLCRAFT,

4                         Plaintiff,

5
                                          Case No:

6            - against -              10 CV 06005

7
     THE CITY OF NEW YORK, ET AL.,

8

9                         Defendants.

10   ------------------------------------------------X

11                    100 Church Street

                      New York, New York

12
                      January 30, 2014

13                    10:22 a.m.

14

15

16

17   DEPOSITION OF CATHERINE LAMSTEIN-REISS, M.D.,

18   pursuant to Subpoena, taken at the above

19   place, date and time, before DENISE ZIVKU, a

20   Notary Public within and for the State of

21   New York.

22

23

24

25

Page 2

```
 1      A P P E A R A N C E S:
 2
 3         NATHANIEL B. SMITH, ESQ.
               Attorneys for Plaintiff
 4             111 Broadway
               New York, New York 10006
 5
 6
           JOHN LENOIR, ESQ.
 7         Attorneys for Plaintiff
               829 Third Street NE
 8             Washington, D.C. 20002
 9
10         NEW YORK CITY LAW DEPARTMENT
           OFFICE OF CORPORATION COUNSEL
11         Attorneys for Defendant
           THE CITY OF NEW YORK
12             100 Church Street
               New York, New York 10007
13         BY:  SUZANNA PUBLICKER METTHAM, ESQ.
14
15         SCOPPETTA SEIFF KRETZ & ABERCROMBIE
           Attorneys for Defendant
16         STEVEN MAURIELLO
               444 Madison Avenue
17             New York, New York 10022
           BY:  WALTER A. KRETZ, JR., ESQ.
18
19
           IVONE, DEVINE & JENSEN, LLP
20         Attorneys for Defendant
           DR. ISAK ISAKOV
21             2001 Marcus Avenue
               Lake Success, New York 11042
22         BY:  WILLIAM ROBERT DEVINE, ESQ.
23
                   (Continued.)
24
25
```

Page 127

C. LAMSTEIN-REISS, M.D.

1

2    A.        That I gave that feedback to Dr.

3    Ciuffo, not necessarily.  That if something

4    that was part of our evaluation that I gave

5    feedback to the officer, yes, that's

6    documented.

7    Q.        I'm not asking about your

8    feedback with the officer.  I am asking

9    about your feedback to the physician who

10   referred the patient or the person to you.

11   That's all I am focusing on.  Can we stay

12   focused on that?

13   A.        Yes.  This says treatment

14   recommended.  I recommended a treatment with

15   a psychologist and medication evaluation

16   with a psychiatrist.

17   Q.        I understand that.  I can read

18   that just as clearly as you can --

19   A.        I'm not clear --

20   Q.        But the problem is that you came

21   back after the break and you told me that

22   you not only recommended this, but you

23   recommended some other things, long-term

24   therapy and a psychiatrist and I'm trying to

25   clarify in my mind, whether or not there's

Page 143

```
 1              C. LAMSTEIN-REISS, M.D.
 2   him, right?
 3              MS. PUBLICKER METTHAM:
 4       Objection.
 5       Q.    Am I correct about that, you
 6   weren't recommending it?
 7              MS. PUBLICKER METTHAM:
 8       Objection.
 9       A.    I recommended that to deal with
10   issues other than the physical symptoms of
11   stress.
12       Q.    Were you recommending on April
13   15, 2009 long-term therapy for Schoolcraft,
14   yes or no?
15       A.    Yes.
16       Q.    Were you recommending --
17       A.    That was one of my two
18   recommendations -- three recommendations.
19       Q.    Were you recommending -- were
20   you recommending that Schoolcraft take any
21   kind of medication as of April 15, 2009?
22              MS. PUBLICKER METTHAM:
23       Objection.
24       A.    I never make such
25   recommendations.
```

Page 144

1                    C. LAMSTEIN-REISS, M.D.

2          Q.       So the answer to my question is,

3    no, you didn't make a recommendation?

4          A.       Correct, because it's outside my

5    scope of practice.

6          Q.       Well, whether it's inside or

7    outside your scope of practice, you

8    understand that it's a possibility that

9    somebody could do something even though it's

10   outside of the scope of their practice.

11   That's a possibility; isn't it?

12                    MS. PUBLICKER METTHAM:

13         Objection.

14         A.       Could somebody do something

15   outside their scope of practice, sure --

16         Q.       All right, okay, did you

17   recommend --

18         A.       I can give you plumbing advice,

19   I'm not a plumber.  You could listen to it

20   or not listen to it.

21         Q.       All right, well, did you

22   recommend that Schoolcraft take antianxiety

23   medication at any time on or before

24   April 15, 2009?

25                    MS. PUBLICKER METTHAM:

Page 145

1          C. LAMSTEIN-REISS, M.D.

2      Objection.

3      A.      I did not because it would be

4   outside of my scope of practice to do so.

5      Q.      Where in your notes is the

6   reference to you recommending that

7   Schoolcraft go see a psychiatrist?

8      A.      I would have to refer to my

9   notes.

10     Q.      And if you could use the

11  exhibit, that will be more helpful.

12     A.      I'll find it -- it would be

13  easier for me to find it here.  Then I will

14  find the exact page through here.  The same

15  page number that included that telephone

16  contact with Dr. Ciuffo.

17          MS. PUBLICKER METTHAM:  So that

18      is NYC2997.

19     A.      Correct.

20     Q.      Where on that page?

21     A.      Under where it says feedback

22  given to MOS.

23     Q.      The middle of the page, the top

24  of the page, the bottom of the page?

25     A.      About a quarter of the way down.

1           C. LAMSTEIN-REISS, M.D.

2   Provided MOS with psycho education.  In that

3   paragraph.

4               MS. PUBLICKER METTHAM:  I will

5        just note for the record it's also

6        found on the document bearing Bates

7        Number D306.

8        A.      It may be also in here too, but

9   that's --

10       Q.      What's the date of this entry?

11       A.      April 13, 2009.

12       Q.      Where did you see that date?  Is

13  that on the prior page?

14       A.      Yes.

15       Q.      At the top where the f-i-f-t

16  something O Adrian Schoolcraft?

17       A.      Say cont for c-o-n-t, like

18  continuation of F/F meaning face-to-face

19  with DO Adrian Schoolcraft on 4/13/09.

20              MS. PUBLICKER METTHAM:  And

21       again, this page is NYC2996 and NYC --

22       or I'm sorry D305.

23       Q.      Can you read the entry that

24  you're referring to feedback given to MOS,

25  after that what does the entry say?

Page 147

C. LAMSTEIN-REISS, M.D.

1

2    A.       Sure.  Provided MOS with psycho

3  education on mind body connection and urged

4  him to see a psychologist who specializes in

5  that.  He agreed.  Also, recommended a

6  medication evaluation with a psychiatrist

7  instead of his primary care physician, but

8  he declined, preferring to avoid meds if

9  possible.

10              MR. CALLAN:  Off the record.

11              (Discussion off the record.)

12    Q.       Is there a reference in your

13  notes to you recommending that he do

14  long-term therapy?

15    A.       I believe there is.  Let me find

16  it.  I don't see it my notes.  However, it's

17  very clear in my mind.  The initial

18  interview and I may have -- if I did mention

19  it in the subsequent interviews, it will be

20  on the recordings.

21    Q.       So you don't see a reference in

22  your file recommending long-term therapy; is

23  that right?

24    A.       I don't, because that was not

25  what was most important for the fitness for

Page 148

```
 1              C. LAMSTEIN-REISS, M.D.
 2    duty evaluation.  It was for his own
 3    personal benefit.
 4         Q.     So, it wasn't that important; is
 5    that what you're saying to me?
 6              MS. PUBLICKER METTHAM:
 7         Objection.
 8         A.     To the decision about at what
 9    point we would return him to full duty work
10    whether or not he dealt with those issues
11    would not have been an issue, as far as
12    fitness for police duty.  For his own
13    personal life satisfaction, it would have
14    been helpful.
15         Q.     What did Schoolcraft have to do
16    in order to return to full duty?
17              MS. PUBLICKER METTHAM:
18         Objection.
19         A.     He would have, you know, he
20    would have needed to have been assessed as
21    being psychologically fit for full duty.  My
22    biggest concerns would be that he was
23    asymptomatic for a period of time.  I would
24    have felt much better about returning him
25    had he done the stress management training
```

Page 149

           C. LAMSTEIN-REISS, M.D.

1
2   to know that should stressful -- when
3   stressful things happen with his life again
4   that these symptoms would not reoccur.  We
5   need a significant period of time to know
6   that things really are calm and it's
7   possible.  It's not something that I had
8   discussed with supervisors at that point,
9   but it's possible that we might have been
10  able to return him to full duty without
11  being able to speak to the doctor who
12  prescribed the Seroquel.  Some doctor
13  thought he needed an antipsychotic and it
14  would not be prudent of us to give someone
15  back their gun in position of police
16  authority without knowing why that was.
17        Q.     Well, did you ever find out why
18  some physician prescribed Seroquel?
19        A.     The officer refused to allow me
20  to obtain that information.
21        Q.     Who was it that prescribed
22  Seroquel?
23        A.     Dr. Sure.
24        Q.     How do you know that Dr. Sure
25  prescribed Seroquel?

1              C. LAMSTEIN-REISS, M.D.

2      A.      Because Officer Schoolcraft told

3   me that he did and that Officer Schoolcraft

4   told me he was not sure why it was

5   prescribed.

6      Q.      Don't you, as a doctor reviewing

7   the fitness for duty of a police officer,

8   have a right to gain access to his medical

9   file?

10     A.      No.  We do not have a right to

11  do that without his written permission.  We

12  do have a right to say that the person

13  cannot be cleared to go back to full duty if

14  we don't have it.  But he is not required to

15  release his personal medical information if

16  he does not want to.

17     Q.      So am I correct that you would

18  not have returned Schoolcraft to full duty

19  without getting a release from him to talk

20  to Dr. Sure about why Sure prescribed

21  Seroquel?

22            MS. PUBLICKER METTHAM:

23      Objection.

24      A.      I don't know because I do not

25  make those decisions by myself and I had not

1          C. LAMSTEIN-REISS, M.D.

2    you were the psychologist that had seen

3    Schoolcraft when he called?

4               MS. PUBLICKER METTHAM:

5         Objection.

6         A.      I don't believe he did.  What

7    happens is they call the sick desk

8    supervisor, who looks up and sees who is on

9    duty and they call whoever is on duty.

10        Q.      So on October 31, 2009, you

11   happened to be on pager duty?

12        A.      Correct.

13        Q.      So Captain Lauterborn called the

14   sick desk and he was looking for somebody

15   from the psychological evaluation services?

16              MS. PUBLICKER METTHAM:

17        Objection.

18        A.      Psychological evaluation

19   section.  Although, the psychological

20   services section, which does pre-employment

21   screening, they also do pager duty.  He was

22   looking for a department psychologist to

23   give him a call to consult about the

24   situation.

25        Q.      Did you tell Captain Lauterborn

Page 319

1            C. LAMSTEIN-REISS, M.D.

2   you had evaluated and met with Schoolcraft?

3        A.    Yes.

4        Q.    And told him that during the

5   conversation that you had with him on

6   October 31st?

7        A.    Yes.

8        Q.    What else did you tell Captain

9   Lauterborn?

10       A.    He was asking me if there was

11  any reason to be concerned about the fact

12  that he went AWOL and that he seemed to be

13  upset and said he had stomach pains and

14  should they be concerned, do they need to go

15  look for him, make sure he's okay.

16  Typically, in that situation they do.  He

17  said he wasn't sure they wanted to suspend

18  him, because they thought this was more of a

19  psychological problem as opposed to a

20  disciplinary one and so he wanted to consult

21  with me.

22            I told him that as of the last

23  time I saw him, which was a few days

24  earlier, I had no reason to think he was a

25  danger to himself or others.  Never

Page 320

1          C. LAMSTEIN-REISS, M.D.

2    expressed thoughts of suicide.  It didn't

3    seem to be anything that serious that would

4    lead me to be concerned.  However, he had

5    also never acted like that before.  He never

6    went AWOL, leaving even though he was told

7    to stay and was now saying he had stomach

8    pains, while being visibly upset.  So I did

9    not know if that meant something new

10   happened that led him to be so upset that he

11   was acting in a different manner going AWOL

12   and that kind of stuff and led to a

13   reoccurrence of stomach pains badly enough

14   that he did that or maybe the stomach pains

15   never went away to begin with and I wasn't

16   sure and that my evaluation is -- even

17   though, I was not saying this person is

18   suicidal, he's had these thoughts, you must

19   -- it was nothing like that.  I had no

20   reason to think he was, except my evaluation

21   was only as good as the last time I saw

22   them.

23          So if something happened since

24   then or they're acting different since then,

25   that may be different.  And so I thought he

Page 321

1           C. LAMSTEIN-REISS, M.D.

2   absolutely did need to find him and make

3   sure that he was okay.

4       Q.      Was your sharing of information

5   about Schoolcraft with Lauterborn a

6   violation of Schoolcraft's privacy?

7           MS. PUBLICKER METTHAM:

8       Objection.

9       A.      No.  This is -- they're not

10  treatment records.  Whenever they come to

11  our office before they -- before I allow

12  them to open their mouth on all, I make sure

13  that they know that the interview is on the

14  record only within the department and only

15  on a need to know basis, so within that it

16  is on the record.

17          So in this case, someone is AWOL

18  and they're upset and they leave and they

19  say their stomach hurts and they're acting

20  in that manner, I deemed there was a need to

21  know, for him to know some basic information

22  about why he was on restricted duty.  Not

23  information like, you know, whether or not

24  his father used -- had any kind of drug

25  problem, whether or not he's had sex in the

Page 322

```
 1              C. LAMSTEIN-REISS, M.D.
 2    last few years.  I mean, like that's not his
 3    business.  He doesn't need to know that.
 4    That does not relate to the situation at
 5    hand.
 6              What did relate was issues of do
 7    we need to be concerned about this guy and
 8    so I released information that I deemed
 9    pertinent to that, while keeping everything
10    else as confidential.  Like I said, even
11    though it's on the record within the
12    department, it's an NYPD evaluation.  It's
13    not private treatment records.  Not
14    everything needs to be known -- to be given
15    out rather.
16         Q.     The entry here says that Captain
17    Lauterborn kept you informed throughout the
18    night; is that right, he did that?
19         A.     Correct.
20         Q.     Did he tell you that he spoke
21    with Schoolcraft's father?
22         A.     I would have to reference my
23    notes, but I believe he did.  Yes, he
24    definitely did.
25         Q.     Did he tell you that
```

Page 338

1          C. LAMSTEIN-REISS, M.D.

2   about discussing this delayed entry with

3   anybody?

4               MS. PUBLICKER METTHAM:

5        Objection.

6               MR. KRETZ:   She's answered that.

7               MR. SMITH:   I think she has --

8        A.     I only recall at some point --

9   at some point I reviewed all my notes with

10  IAB --

11       Q.     But you don't have a

12  recollection sitting here today --

13       A.     No.

14       Q.     -- of discussing?

15       A.     I don't recall if that was

16  before or after I made that entry.

17       Q.     Do you have a recollection

18  sitting here of discussing the delayed entry

19  with IAB?

20              MS. PUBLICKER METTHAM:

21       Objection.

22       A.     No.   I recall discussing the

23  full case and that would have been part of

24  it if that conversation was after that date.

25       Q.     All right, thank you.   I think I

Page 339

C. LAMSTEIN-REISS, M.D.

1
2    understand what you're telling me.  Did you
3    ever speak with anybody from the media about
4    Schoolcraft?
5         A.      No.  We never speak to the
6    media.
7         Q.      Okay.  So you never spoke to
8    anybody from the media about Schoolcraft,
9    right?
10        A.      Correct.
11        Q.      Continue reading the delayed
12   entry.
13              THE WITNESS:  Do you have where
14        I left off?
15        Q.      The first sentence ends with in
16   writer's memory.
17        A.      Undersigned.
18        Q.      Undersigned's memory, right.
19   Can you go on from there?
20        A.      From there, Captain Lauterborn
21   asked if MOS was suicidal or depressed
22   because he needed to know how concerned they
23   should be about MOS's safety given his going
24   AWOL, not answering phone calls, not
25   answering door of home, but his car was

Page 340

C. LAMSTEIN-REISS, M.D.

1
2  there, et cetera.  I informed captain that I
3  last saw MOS at PES on 10/27/09 and at that
4  time he looked okay and reported being
5  asymptomatic.  At no time had he ever
6  expressed thoughts of suicide, but he also
7  never went AWOL before and acted the way he
8  was acting on 10/31/09.  My assessment of
9  his suicide risk is only as good as the last
10 time I saw him.  If something happened after
11 and led him to be so upset that he left work
12 without permission an hour before the end of
13 his tour, said he had stomach pains, et
14 cetera.  Then I am unable to say with any
15 reasonable amount of certainty that he is
16 not at risk for suicidal ideation under
17 present circumstances.
18              I provided captain with basic
19 information about reason MOS was on
20 restricted duty.  That he had significant
21 physical symptoms of stress insomnia, GI
22 symptoms, cardiac symptoms, et cetera.
23 Unclear if MOS was reporting openly on
24 10/27/09 when he said all of his symptoms
25 went away without treatment.  Motivation to

1                C. LAMSTEIN-REISS, M.D.

2     minimize is that he did not want to be

3     psychological restricted duty.  He was open

4     during initial evaluation, but denied any

5     and all symptoms in subsequent monitoring

6     sessions.  When also expressed being upset

7     about being on psychological restricted

8     duty.  His reporting on 10/31/09 that he had

9     stomach pains severe enough to warrant

10    leaving work before end of tour without

11    permission suggests either the symptoms

12    never did go away or they reoccurred on

13    10/31/09 due to his being really upset about

14    something.  It is also possible that there

15    was medical cause for the stomach pain, but

16    the angry manner in which he left work

17    suggests a psychological cause and I signed

18    my name.

19              MS. PUBLICKER METTHAM:  D284

20        and --

21              MR. OSTERMAN:  2890.

22        Q.     Had you, when you prepared this

23    note, any thoughts that there was going to

24    be litigation about what happened to

25    Schoolcraft on October 31, 2009?

Page 342

1          C. LAMSTEIN-REISS, M.D.

2          MS. PUBLICKER METTHAM:

3     Objection.

4     A.     I don't remember.  I would have

5  to refer to my full notes, including

6  redacted information.

7     Q.     When did it first occur --

8     A.     I don't recall.

9     Q.     You don't recall?

10    A.     I don't recall.

11    Q.     Had you been named as a

12  defendant in those two lawsuits Howard and

13  Nelson as of the time of this delayed entry?

14         MS. PUBLICKER METTHAM:

15    Objection.

16    A.     Howard -- this more recent than

17  that.  Actually, I am really not sure.  I

18  think -- I don't remember the dates of those

19  when they first started.

20    Q.     Have you ever made a delayed

21  entry like this in a patient's file or file

22  like this?

23         MS. PUBLICKER METTHAM:

24    Objection.

25    A.     Yes.