UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

                                    Plaintiff,

                -against-

                                                                10-CV-06005 (RWS)

THE CITY OF NEW YORK, et al.,

                                    Defendants.

----------------------------------------------------------------X

DEPUTY INSPECTOR STEVEN MAURIELLO'S MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
SEEKING DISMISSAL OF MAURIELLO'S COUNTERCLAIMS

Preliminary Statement

        Defendant Steven Mauriello submits this memorandum in

opposition to plaintiff's motion for summary judgment, which seeks dismissal of

Mauriello's counterclaims and "a judicial determination as a matter of law that the

NYPD defendants' warrantless entr[ies] into . . . Schoolcraft's home violated the

Fourth Amendment" and were otherwise unjustified (Memorandum in Support of

Plaintiff's Summary Judgment Motion, page1).  (The other relief sought by

plaintiff's motion does not relate to Mauriello.)  We address in this memorandum

plaintiff's attempt to have the counterclaims dismissed.[1]  See Point I, infra.

        We have responded at length and in great detail to Schoolcraft's

Statement of Material Facts in support of his motion to dismiss the counterclaims,

and respectfully refer the Court to those responses for a more thorough

---

[1]  With respect to the two entries into plaintiff's apartment, Mauriello only was in the apartment for
the first three minutes of the first entry, and has moved for summary judgment seeking dismissal
of the Fourth Amendment claim as it relates to him.  On that issue, we rely on the discussion in
our papers submitted in support of Mauriello's motion.  See Point II, infra.

understanding of the underlying facts genuinely in dispute.  We discuss below some of the facts more directly pertinent to the issues raised in Schoolcraft's motion, which should be denied in its entirety as it relates to Mauriello.

MAURIELLO'S COUNTERCLAIMS

The counterclaims seek recovery from Schoolcraft for the damage suffered by Mauriello as a result of Schoolcraft's tortious interference with Mauriello's employment relationship with the NYPD, and as a result of Schoolcraft's prima facie tort, willfully and maliciously engaging in conduct whose sole purpose was to damage Mauriello's career and reputation.  (See Counterclaims in Mauriello's Answer to Plaintiff's Second Amended Complaint Docket Entry 231.))  In particular, as a result of Schoolcraft's wrongful conduct, in July 2010, Mauriello was transferred out of the 81st Precinct, where he had been the Commanding Officer in the rank of Deputy Inspector, and was assigned to the Bronx and Queens Transit Division as the Executive Officer.  Not long after, a Captain working with the NYPD Advocate's Office in its effort to address Schoolcraft's status with the Department, publicly referred to Mauriello's new assignment as "a dead-end job."  (See SM Response to paragraph 125 of Plaintiff's Statement of Material Facts in support of his motion (PSMF) and ¶ 28 of Defendant Mauriello's Additional Material Facts in Opposition to Plaintiff's motion (Mauriello AMF.))

Mauriello has remained in that position for nearly five years without promotion or even consideration for promotion above the rank of Deputy Inspector, and without the salary increase that would accompany such a

promotion, thus depriving him of recognition for his performance on the job and the attendant salary increase (see SM Response 118 to PSMF).

Thus, while Schoolcraft failed to get Mauriello fired, as he had hoped (see SM Responses 2, 4, 36-42, 54, 121-125 to PSMF and Mauriello AMF ¶ 1-7, 16, 19), he managed to derail Mauriello's career and to have him publicly maligned in the process (see SM Responses 115, 118, 121, 123, 125 to PSMF and Mauriello AMF ¶ 19).  We believe that by his deceitful acts Schoolcraft also was hoping to lay a foundation for frivolous claims that might reap him an undeserved recovery (see SM Responses 2, 5, 18, 22, 25, 36, 37, 39, 42, 54-60, 73, 87 to PSMF and  Mauriello AMF ¶ 1-9 and 16-20).  That he would pursue such frivolous claims based upon the same deceit by which he sought to harm Mauriello does not serve as a basis for dismissing Mauriello's counterclaims, as we discuss below.  Instead, it demonstrates the outrageous conduct in which Schoolcraft was willing to engage, with his father's urging, to achieve unjust results.  (See Point I, infra.)

Schoolcraft's Recordings Reveal His
Intent To Get Revenge Against Mauriello

This is a rare case in which we have direct evidence of a plaintiff's explicit desire and intent to tell lies for the specific purpose of causing the defendant harm in his employment (see SM Responses 2, 42, 123 to PSMF and Mauriello AMF ¶ 1-3).  For example, Schoolcraft's recording of his October 7, 2009, telephone conversation with his father, Larry Schoolcraft, while Schoolcraft was on his way to his first and only meeting with members of the NYPD Quality Assurance Division (QAD), reveals their plan to have Schoolcraft falsely complain to QAD of  "chronic and systemic" downgrading of crime at the 81st

Precinct and to do so for the sake of getting revenge against Mauriello – the expressed goal being to "fuck [Mauriello] over." (See SM Responses 2 and 42 to PSMF and Mauriello AMF ¶ 1-7.) This sentiment was repeated by Schoolcraft on the morning of October 31, 2009, when he said to another officer that "that's your buddy Mauriello. That fat miserable fuck. If I could get him… if I could get him. I would sell him out faster than anything, for free. I would give him away for free." (See Mauriello AMF ¶ 3.)

Another example of Schoolcraft dishonestly orchestrating events to cause Mauriello harm is one of the telephone conversations Schoolcraft had with his father from his apartment on the afternoon of October 31, 2009. They are heard talking about how Larry Schoolcraft told something to someone he refers to as Shakey of Shady, which he had expected to provoke an unspecified reaction by the NYPD (see Mauriello AMF ¶ 29). Apparently, if anything Schoolcraft and his father are heard to say can possibly be believed, and, in this case, understood, the thought was that the person Larry Schoolcraft spoke to would have told others and by 4:40 in the afternoon that would have triggered some unspecified action by the NYPD. (See Mauriello AMF ¶ 29.)

The plan apparently failed and Schoolcraft and his father were discussing other ways to initiate engagement with the NYPD personnel waiting outside Schoolcraft's home. (See Mauriello AMF ¶ 29.) As IAB later concluded, Schoolcraft and his father were orchestrating the events of October 31, 2009, and, as the recordings have since revealed, the goal was to get revenge against Mauriello. (See SM Exhibit C; SM responses to 54-60, 71-73, 83, 87, 91; Mauriello AMF ¶ 29-30.)

Part of Schoolcraft's deceitful presentation to QAD on October 7, 2009, which was preserved on his recording (SM Ex. BR), was not revealing he had intentionally contributed to the incidence of improper crime reporting to try to make it appear to QAD there was rampant, purposeful wrongdoing at the 81st Precinct.  (See SM Responses 125 to PSMF and Mauriello's AMF ¶ 18.) Schoolcraft played a direct role in causing at least three incidents of grand larceny and burglary, reported directly to him, to be recorded instead as lost property, and in causing at least three other incidents of crime not to be recorded at all.  (See SM Exhibit DD.)  In other words, Schoolcraft reported thirteen incidents of improper crime reporting for the entire precinct over a period of a year or more, while he alone was responsible for six such incidents over a similar period.  A subsequent investigation by QAD revealed that many of these incidents reported by Schoolcraft were not the result of improper crime reporting at the 81st Precinct. (See SM Exhibit CK.)

Plaintiff dishonestly reported to QAD that the eleven instances he identified where a crime report was improperly downgraded, several of which he had a direct hand in, plus two additional incidents reported in the press and attributed to plaintiff, were only a small sample of such downgrading in the 81st Precinct, when, in fact, Schoolcraft did not know of any other instances, and actually knew or should have known that incorrect crime reporting only rarely occurred in the 81st Precinct.  (See SM Responses 42 and 129 to PSMF.) Indeed, it was later independently determined, after a thorough scrutiny of the 81st Precinct's records triggered by Schoolcraft's allegations, that of more than 1100 crime reports prepared in the 81st Precinct over a period of approximately

5

ten months, only approximately two percent had been incorrectly classified – a total of 23, which was consistent with the City-wide average, and thus far better than several other precincts throughout the City.  (See SM Response 129 to PSMF.) When you eliminate the misclassified complaints for which Schoolcraft was responsible, the error rate is reduced to 1.4% -- a better performance than found by QAD in its routine semi-annual audit of 81st Precinct complaint reports completed in the summer of 2009.  (See SM Response 129 to PSMF.)

In furtherance of his deceit of QAD, Schoolcraft also did not reveal that he had recorded countless hours of conversation at the 81st Precinct for a period of at least 18 months and possibly as long as three years or more, and that the recordings did not provide any support for plaintiff's accusations of improper crime reporting.  There is nothing to suggest a "chronic" or "systemic" or "rampant" practice to misclassify crime or to pressure officers to downgrade crime, as Schoolcraft alleged.  In fact, despite the several instances of misclassifying crime in which Schoolcraft was involved, and the many conversations he supposedly had about those complaints and the complaints involving other officers, there are no related recordings, and he cites none.  (See SM Responses 42 to PSMF and Mauriello AMF ¶ 6.)

To enhance Schoolcraft's presentation to QAD, Schoolcraft and his father also discussed that Schoolcraft should, and he ultimately did, deceive QAD about his motives by falsely explaining to QAD he had taken it upon himself to gather information about purported wrongdoing in the NYPD because he was concerned about the safety of the people in the community as well as the safety

of police officers.  Emphasized in their conversation was that Schoolcraft should

not let QAD know he was out to get "revenge".  (See SM Response 42 to PSMF.)

In fact, Schoolcraft was out to get revenge, and he had no concern

for his fellow officers or the people of the community.  (See SM Responses 2 to

PSMF and Mauriello AMF ¶ 1-16.)  Schoolcraft reveals while speaking to his

father that "ain't nobody my friend" in the NYPD, and if any fellow officers in the

NYPD were to suffer any consequences as a result of what he intended to report

to QAD, "they asked for it" because "none of these guys came to my aid when

[the NYPD was] coming at me."  (See SM Response 2 to PSMF and Mauriello

AMF ¶ 10.)

Schoolcraft also expressed to his father an even more stark

contradiction of the sentiments he planned to express and did falsely express to

QAD about his purported concern for the predominantly minority community

served by the 81st precinct.  In response to an inaudible question from his father,

apparently about whether one or more officers with whom Schoolcraft had

worked would be supportive of him, Schoolcraft told his father the other officers

and he "just worked together so we wouldn't have to work with any n_____

[African Americans]."  ( Mauriello AMF ¶ 13.)  Similar sentiments regarding many

different types of people are regularly expressed by Schoolcraft throughout his

recordings.  (See Mauriello AMF ¶¶ 11, 14 and 15.)

Thus, Schoolcraft held himself out to QAD and all others, including

IAB, members of the press, and the public generally, under extremely false

pretenses for the purpose not of protecting his fellow officers or the rights of the

residents of the Bedford Stuyvesant community, and his recordings help clearly

demonstrate his true sentiments.  His purpose was to get "revenge" against Mauriello for his poor evaluation and for having him placed and kept on restricted duty.  With the apparent guidance of his father, Schoolcraft opted to interfere in Mauriello's employment relationship with the NYPD, and to otherwise try to destroy Mauriello's career and reputation – while also creating false support for a lawsuit he planned to bring against the NYPD. (See SM Response 2 and 123 to PSMF and Mauriello  AMF ¶ 2.)

With respect to Schoolcraft's false accusations that illegal quotas were imposed by Mauriello and that Schoolcraft's failure to comply with them was the basis for his sub-standard evaluation, Schoolcraft, again, had surreptitiously recorded roll calls and other conversations in the 81st Precinct for perhaps three years or longer.  He also secretly recorded the meetings he requested with his union delegate and his supervising officers from the 81st Precinct with respect to his appeal of his 2008 evaluation. Yet, there is no evidence that unlawful quotas actually were imposed on Schoolcraft or anyone else or played any part in Schoolcraft's evaluation.  (See SM Responses 4, 8, 10 and Mauriello AMF ¶ 19.) The accusations are false and were maliciously made by Schoolcraft, and continue to be made by him, to cause Mauriello undeserved harm and to again provide Schoolcraft with false support for his unfounded claims.  (See Mauriello Counterclaim ¶ 8.)

Despite the performance of the 81st Precinct with respect to the classification of crimes, the precinct and especially Mauriello were singled out for ridicule in some media due to Schoolcraft's unfounded and exaggerated criticism, his manipulation of the records, the bizarre events of October 31, 2009, and the

sensationalized and apparently selective release of Schoolcraft's roll call recordings. (See SM Exhibit DC.)  In the end, Mauriello suffered the consequence of a transfer out of the 81st Precinct, and the loss of any consideration for promotion or transfer.  (See SM Responses 115-122 to PSMF.)

Mauriello's Brief Entry Into Schoolcraft's Apartment

Steven Mauriello had de minimus involvement in the events of October 31, 2009, which are the principal subject of Schoolcraft's complaint, and did not engage in any of the alleged wrongdoing in Schoolcraft's apartment, having been present only briefly.  (See paragraphs 45-96 of Mauriello's Statement of Material Facts in support of his motion for summary judgment.) Yet, Schoolcraft has named Mauriello as a defendant in furtherance of Schoolcraft's revenge against Mauriello.  In doing so, Schoolcraft also is trying to taint the NYPD's actions on October 31, 2009, as being motivated by Mauriello's purported desire to retaliate against Schoolcraft for communicating with QAD and IAB.  (See SM Responses 37-49 to PSMF.)  It is a hollow charge, and at best, the material facts are genuinely in dispute.

As we discuss at length in our memorandum in support of Mauriello's motion for summary judgment, there is no evidence anyone acted out of a desire to retaliate against Schoolcraft on October 31, 2009.  Instead, they acted out of a desire to prevent Schoolcraft from doing harm to himself and others (see SM responses 69, 70, 72, 79-80 to PSMF.)  The evidence shows that Schoolcraft's conduct on October 31, 2009, much of it revealed by his surreptitious recordings, was designed to provoke a response by the NYPD that Schoolcraft hoped to be able to point to as an act of retaliation by Mauriello that

would cost him his job, while also providing Schoolcraft support in the frivolous

lawsuit he had already planned to bring against the NYPD.  (See SM Responses

2, 87, 123 and Mauriello AMF ¶ 29.)  It was a sinister, cynical and malicious effort

by Schoolcraft for which he should be held accountable and not be rewarded.

Mauriello's Harm Caused By Schoolcraft

         More importantly, for purposes of this discussion, as a result of

Schoolcraft's wrongful conduct, Mauriello has suffered damage to his career and

reputation; his employment relationship with the NYPD has suffered; he has not

even been considered for a promotion for more than six years; he will continue to

suffer loss of income and other financial losses in the future; he has

undeservedly suffered public humiliation and scorn; and he has been caused to

suffer a prolonged period of emotional distress.  (See Mauriello's AMF ¶¶ 19 and

23-28, and Mauriello Affidavit in Opposition ¶ 8.)  Schoolcraft's deceitful conduct

– toward QAD, IAB, his fellow officers, his supervisors, his Commanding Officer,

and the borough commanders and their staff -- represents such a high degree of

immorality and such wanton dishonesty as to imply a criminal indifference by him

to his civil obligations.

         In addition, when the NYPD, FDNY and EMT personnel who

responded to Schoolcraft's apartment should have been attending to their law

enforcement and emergency service obligations to the public, they instead were

being drawn into Schoolcraft's selfish, deceitful scheme by their fear Schoolcraft

might be at risk of hurting himself, which also could have resulted in harm to

others.  Schoolcraft was acting with the intent to do harm to Mauriello, and in

doing so demonstrated a conscious indifference and utter disregard not only for

Mauriello, but also those who came to Schoolcraft's aid and the public generally.

<u>Material Facts Genuinely In Dispute</u>

Thus, the most significant material facts genuinely in dispute for

purposes of Schoolcraft's motion for summary judgment seeking dismissal of

Mauriello's counterclaims include:  1) Did Schoolcraft use wrongful means

sufficient to constitute tortious interference with Mauriello's employment

relationship with the NYPD?  2) Alternatively, was the sole purpose of

Schoolcraft's communications with QAD, IAB and later the media (in connection

with the release of his recordings), to cause harm to Mauriello's relationship with

the NYPD?  And, 3) Has Mauriello's employment relationship with the NYPD

been damaged as a result of Schoolcraft's conduct?

<u>Summary of Argument</u>

At a minimum, there is a question of fact as to 1) whether

Schoolcraft engaged in wrongful means to harm Mauriello that constituted

tortious interference with Mauriello's employment relationship with the NYPD; 2)

whether, in the alternative, Schoolcraft's sole purpose was to harm Mauriello's

relationship with the NYPD; and 3) whether Mauriello has suffered harm in his

relationship with the NYPD caused by Schoolcraft's conduct.

ARGUMENT

POINT I
SUMMARY JUDGMENT DISMISSING MAURIELLO'S
COUNTERCLAIMS IS NOT WARRANTED

A.      Mauriello's Claim For Tortious Interference
        With His Employment Relationship With
        The NYPD Can Only Be Resolved At Trial

1.      The Elements of a Tortious Interference Claim

Plaintiff has correctly recited the elements of a tortious interference claim, as set forth by the New York State Court of Appeals in Posner v. Lewis, 18 N.Y.3d 566, 570 n.2 (2012) (quoting Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004)) – an employment relationship between Mauriello and the NYPD, interference by Schoolcraft with that relationship, and either interference for the sole purpose of damaging that relationship or the use of "wrongful means" to interfere with the relationship, even if it was not the sole purpose to do so.  These elements are readily satisfied by the evidence, and certainly, at a minimum, there are genuine issues of material fact that bear on whether the claim ultimately should be sustained.

Schoolcraft would have this Court conclude it is beyond dispute i) he did not interfere in Mauriello's employment relationship with the NYPD because the interference was not "direct" and did not affect any "specific" employment opportunity; ii) he did not interfere for the sole purpose of causing Mauriello harm; and iii) even if one of Schoolcraft's purposes was to cause Mauriello harm, he did not engage in wrongful means to do so.

We do not understand what could be more "direct" than making falsified claims of wrongdoing to QAD and IAB, while misclassifying crimes on

complaint reports to buttress those claims; in any event, the reference to direct interference is from opinions relating to competition in the marketplace and thus has no bearing here.  See Carvel, 3 N.Y.3d at 197 n.3.  We also do not understand Schoolcraft's claim that no "specific" employment opportunity has been identified.  Quite simply, Steven Mauriello was a Deputy Inspector when Schoolcraft engaged in his wrongful conduct, and Mauriello remains a Deputy Inspector more than five years later.  We will demonstrate at trial that Mauriello would have been considered for promotion, and no doubt would have been promoted, to Inspector, with the corresponding salary increase, had Schoolcraft not interfered for the sake of getting revenge.  (See Mauriello AMF ¶ 23-28.)  Frankly, we believe nothing more need be said on these subjects in opposing plaintiff's motion to have the counterclaims dismissed.

We do discuss at greater length Schoolcraft's interference by wrongful means and the fact that his sole purpose in interfering was to get revenge against Mauriello.

a.      Schoolcraft's Interference by Wrongful Means

Schoolcraft first complained – falsely -- about illegal quotas and crime misclassification in early September 2009 in a telephone call to IAB.  That led to his interview by QAD on October 7, 2009.  QAD openly recorded the interview, while it also was being secretly recorded by Schoolcraft.  As we have reported to the Court, Schoolcraft also recorded a lengthy telephone conversation he had with his father as he was on his way to the meeting with QAD.  IAB retrieved a copy of the October 7, 2009, recording, including the portion with the conversation between Schoolcraft and his father, when IAB met

Schoolcraft at his apartment after his release from Jamaica Hospital on November 6, 2009.  (See SM Statement of Material Facts ¶ 137-138.)[2] As alleged in Mauriello's counterclaims, in the October 7, 2009, conversation between Schoolcraft and his father, in the following QAD meeting, and in subsequent recordings by Schoolcraft, we learn all that we have recited above regarding Schoolcraft's intent to get revenge against Mauriello.

      In addition, as we have detailed in our response to Plaintiff's Statement of Material Facts (PSMF), prior to Schoolcraft's call to IAB in early September to complain for the first time about illegal quotas and misclassification of crime, Schoolcraft's father had contacted David Durk, a family friend who Schoolcraft thought of as an uncle.  Durk, now deceased, was once with the NYPD, and apparently is best known for his relationship with Frank Serpico. Durk contacted Captain Brandon DelPozo, with whom he was acquainted, at IAB on Schoolcraft's behalf.  Schoolcraft himself then filed a false claim with IAB regarding the Integrity Control Officer (ICO) and Assistant ICO of the 81st Precinct, which we now believe was a purposefully indirect criticism of Mauriello and his administration of the precinct.  That complaint and Durk's call to IAB soon were followed by the telephone call from Schoolcraft to IAB to falsely accuse Mauriello not only of imposing quotas on the officers of the 81st Precinct, but also of engaging in rampant downgrading or misclassification of crime.  (See SM Ex. CR.)

---

[2] In discovery in this case, Schoolcraft's prior attorneys produced a recording labeled the same as the October 7, 2009, recording retrieved by IAB, but deleted the portion of the recording containing the conversation between Schoolcraft and his father, which we discuss above.  It is apparent why they did so.  (Compare SM Exhibit CX (edited by Plaintiff) with SM Exhibit BR (recovered by IAB investigators.))

Schoolcraft never appeared for an interview with IAB, but IAB investigated the complaint against the ICO and the Assistant ICO and found the complaint unfounded.  IAB also investigated the complaint about illegal quotas being imposed on the officers of the 81st Precinct.  (The only quotas that actually were illegal at the time were quotas for traffic violations.)  IAB found there were no quotas of any kind as there was no evidence that a specific amount of any kind of police action was required, and there was no evidence of any adverse consequences suffered by any officer for failing to perform a certain amount of any kind of police action.  (See SM Ex. CR.)

   b.   <u>Schoolcraft's Motive for Interfering -- Revenge</u>

Schoolcraft held himself out to QAD and all others, including IAB, members of the press, and the public generally, under extremely false pretenses. The purpose of his actions was not to protect his fellow officers or the rights of the residents of the Bedford Stuyvesant community.  It was to get revenge against Mauriello.

Schoolcraft's desire for revenge is tied to events for which he alone, and certainly not Mauriello, is responsible.  Before focusing on those events, it is important to recognize the nature of the evidence we are evaluating to discern Schoolcraft's true intentions.  We typically are dealing with circumstantial evidence occasionally illuminated by statements preserved on Schoolcraft's recordings.  Of course, since Schoolcraft was the one who knew the events were being recorded, we often cannot trust what is "revealed."  At times, Schoolcraft clearly appears to be playing to his ultimate audience, such as when he is trying to pretend he was menaced by Lieutenant Caughey on the morning of October

31, 2009, and trying to get another precinct employee to agree with something he says about Caughey's purported menacing.

At other times, Schoolcraft seems to have forgotten he was recording himself and lets us get a real sense of what actually is happening, such as when he tells his father over the telephone while in his apartment watching police personnel gather outside his house – "I feel stupid" and "this is ridiculous," as his father coaches him to say he has diarrhea if the police enter his apartment and want to take him back to the precinct or the hospital.  (See Mauriello's AMF ¶ 30.)  Chances are, Schoolcraft never expected some of the recordings to be disclosed, especially the recordings created in the days and weeks before IAB retrieved them from his apartment on November 6, 2009.  His expectation, no doubt, was that he would have had an opportunity to weed out, or delete, those recordings or portions of recordings that were not favorable to him in one way or another, as he appears to have done with many of the earlier recordings.

For example, how is it that Schoolcraft preserved the entire recording of his day tour from October 31, 2009, but nothing close to the entirety of any other day tour over a period of 18 months?  Is it that he simply never had a chance to destroy or at least edit that recording?  Or could it be that the recording of his October 31, 2009, day tour actually is the only fully recorded day tour because that is the day Schoolcraft and his father selected to bring their plan to fruition?  What ever the case may be, that recording as well as other recordings on that same date when Schoolcraft was in his apartment, including the recordings of the two entries into his apartment, are very revealing.

With that in mind, the first event that appears to have triggered Schoolcraft's desire for revenge, though being entirely of his own doing, is his poor evaluation (see SM responses 2, 22, 36 to PSMF).  Schoolcraft simply did not do his job, despite ample guidance and encouragement from his supervisors. His evaluation for 2008 accurately reflected his poor performance – and it was not based upon Mauriello's observations, but on the observations of Schoolcraft's supervisors.   Mauriello's role was that of the reviewer, after the year-end evaluation was completed.  He held the required appeal meeting with Schoolcraft and his supervisors and decided to adopt the supervisors' rating of Schoolcraft. Little did Mauriello know what Schoolcraft would do to get revenge.

The second event that (ostensibly) triggered Schoolcraft's desire to get revenge against Mauriello was Dr. Lamstein's decision to place Schoolcraft on restricted duty.  There is no legitimate basis to doubt that Mauriello had absolutely nothing to do with this.  There also is no doubt that Schoolcraft brought it upon himself.  Still, Schoolcraft blames Mauriello.  One could ask, did he bring it upon himself by orchestrating events to get himself placed on restricted duty, thus enabling him to complain he was being retaliated against? Or, was he genuinely suffering anxiety, with anger and resentment toward the job, which caused him to seek out the medical care that ultimately landed him on restricted duty?

We think it was the latter.  And we think he suffered anxiety, with anger and resentment toward the job, not because of concern for illegal quotas or misclassification of crime – those were causes he later adopted as a means of getting revenge.  We think he started to develop anxiety, anger and resentment

from the time he received his poor evaluation for 2008 continuing through the time he was placed on restricted duty, and that he then adopted illegal quotas and misclassification of crime as a means to get revenge.  We believe the reason for the anxiety, anger and resentment was he performed poorly throughout 2008 either purposefully or for a number of personal reasons that simply made him not care (see SM Response 2 to PSMF).[3]  In any case, when he got his failing evaluation, his desire for revenge began to emerge.

In the days that followed the appeal meeting of February 25, 2009, Schoolcraft was more closely monitored,[4] and began to seek medical attention for anxiety, which ultimately lead to him being placed on restricted duty.  (See Mauriello Statement of Material Facts in Support of his Motion for Summary Judgment ¶¶ 8 -15.)  By the time he was placed on restricted duty, he was on the path to getting revenge.  This, in part, is indicated by the fact that he repeatedly did things to create the appearance he was pursuing his appeal, when the truth was he never actually submitted it.  He was fully aware he never had submitted it because he had drafted it, but never finalized it.  Still, he repeatedly told people it was being ignored.  (See SM Responses 22, 36 to PSMF and Mauriello AMF ¶ 3.)

---

[3]  Listening to the recorded conversations of Schoolcraft and his father, you get a glimpse of how their machinations know no bounds.  We allow for the possibility that they hatched a plan in late 2007 and early 2008, when the father was recuperating in Schoolcraft's apartment, to have Schoolcraft do as little work as possible to bait Mauriello and his staff to take disciplinary action against him which Schoolcraft then would challenge in some fashion.  All things considered, however, we believe Schoolcraft performed poorly in 2008 for personal reasons, and then developed anxiety, anger and resentment when he received his poor evaluation.

[4]  Schoolcraft should have been formally placed on performance monitoring by the Employee Management Division once he received a 2.5 rating. Instead, he mistakenly was placed on force monitoring, though he still was properly being more closely monitored by his supervisors in the 81st Precinct. (See SM Exhibit CE at 3:10-4:00.)

Remarkably, Schoolcraft was called down to the Brooklyn North personnel office in late October because it was receiving calls from a union attorney for Schoolcraft asking about the status of the appeal.  (See SM Responses 22 and 36 to PSMF.)  Schoolcraft was told the appeal was not addressed because he had never submitted it, and he acknowledged in that meeting that he had prepared a "rough" draft -- eight months earlier (see SM Responses 22 and 36 to PSMF) -- but never finalized it and never submitted it. He was assured by the personnel sergeant he still could submit the appeal if he wanted it to be addressed (see SM Responses 22 and 36 to PSMF).  He did not do so, and clearly could not have had any real interest in doing so because he had performed so poorly.  His purpose in pretending to be pursuing the appeal, we believe, and the evidence shows, was that he wanted to be able to continue to complain that the appeal was being ignored because that would help him get revenge against Mauriello, as if it were his doing.

Schoolcraft's desire for revenge also is indicated by his purported desire to be restored to full duty while failing over a period of six months to follow the advice of every professional he encountered to see a psychologist.  (See SM Responses 32 and 33 to PSMF.)  He was advised by his personal physician on April 6, 2009, to see a psychologist, but never did so.  He then was advised by Dr. Lamstein on April 14, 2009, to see a psychologist, but never did so.  He was advised by Dr. Lamstein again on July 27, 2009, and then again on October 27, 2009, to see a psychologist, but never did so.  He then was advised by Jamaica Hospital to see a psychologist, as a condition for his release from the hospital, and he did so once, but never again.  He has not even bothered, for purposes of

his claims in this case, to see a therapist regularly who might opine with some degree of validity about the state of his mental health.  (Even the two mental health experts he has retained to testify on his behalf in this case each only interviewed him once.)

All indications are Schoolcraft wants to create the appearance Mauriello arranged to have him placed on restricted duty and somehow arranged to have Schoolcraft kept on restricted duty.  He would have it appear that on the one hand there never has been a basis to question the state of his mental health – not when he went to a hospital emergency room on his own, not when he went to see his personal physician, not when he was placed on restricted duty by Dr. Lamstein, not when he was seen again by Dr. Lamstein in July and October and was continued on restricted duty, not on the night of October 31, 2009, when he was EDP'd by Chief Marino, and not during his stay at Jamaica Hospital.  On the other hand, he made no effort to be restored to full duty, though pretending that is what he wanted (just as he never actually appealed his evaluation, though pretending to pursue it and blaming Mauriello for arranging to have it ignored).

What Schoolcraft eventually does instead is have his father speak to David Durk in August 2009, and have his father place calls to the Mayor's Office in October 2009, claiming among other things Schoolcraft has no idea why he is on restricted duty.  When Schoolcraft was then called by Dr. Lamstein to meet with her on October 27, 2009, Dr. Lamstein challenged him on the claim he was not told why he was on restricted duty and reminded him of the reasons. Schoolcraft, who recorded the session, expressed no objection and indicated agreement.  Yet, to this day, he has not abandoned the claim.

2.      Mauriello's Tortious Interference Claim
        Should Be Tried Before A Jury

        a.  Tortious Interference by Wrongful Means

        In Brandt v. Winchell, 3 N.Y.2d 628 (1958), the New York State

Court of Appeals addressed a claim of prima facie tort based upon the acts of the

principal of one charitable fund-raising organization to destroy the reputation of

the principal of a competing organization.  The methods used were to 1) prevail

on government officials to investigate the plaintiff, 2) instigate a prosecution of

the plaintiff, which resulted in an acquittal, 3) prevail upon the police department

to cancel the plaintiff's pistol license, and 4) utter and have published in the

media "false accusations against plaintiff attacking his business and professional

integrity."  Id. at 632.   The Court, choosing to "assume that [the] actions [taken]

by the [public] officials [against the plaintiff] were taken for good cause shown"

concluded that "that being so, plaintiff has no cause of action against defendants

in prima facie tort regardless of plaintiff's motives."  Id. at 636.

        In Posner v. Lewis, supra, relied upon by plaintiff, the New York

State Court of Appeals was confronted with claims of prima facie tort and tortious

interference with prospective contract rights by a public school teacher who had

been denied tenure.  He was involved in an extra-marital affair with a student's

parent, whom he also had recommended to serve as a substitute teacher in his

class.  This information was brought to the attention of the school board by the

defendants, the father and brother of the plaintiff's wife.  Defendants argued "that

their disclosure of [the plaintiff's] affair to school officials was a matter of public

interest and that they were immune from liability similar to the defendants in

Brandt." Posner, 18 N.Y.3d at 570. The Court disagreed and allowed the case to proceed.

The Posner Court, after noting the similarities between Brandt and the case before it, nonetheless found that "there is a critical distinction between the two cases." Id. at 571. In Posner, the "defendants . . . did more than instigate an inquiry or investigation." Id. The defendants "attempted to coerce [plaintiff] into relinquishing his parental rights by offering him money and threatening to reveal certain information to school authorities to ensure that he was denied tenure. And when [plaintiff] refused to accede to this demand, defendants made good on the threat." Id. The Posner Court concluded that 'the absolute privilege articulated in Brandt should not be extended to protect the course of conduct alleged in this case" because the defendants' "complaints to school officials cannot be isolated from th[eir] coercive scheme, which 'constituted a single and integrated course of conduct'." Id., quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949). So, too, here.

While Schoolcraft did not engage in coercion, he did engage in a broad pattern of deceit, the falsification of documents, the telling of extensive lies to QAD, IAB, and others, and the manipulation of circumstances and the orchestration of events. Even if his complaints about quotas and the misclassification of crime had some validity, they cannot be isolated from the wrongdoing he engaged in to create the unjustified appearance Mauriello's

relationship with the NYPD should be damaged.  As in <u>Posner</u>, Schoolcraft's

behavior constituted a single and integrated course of conduct.[5]

        In <u>Carvel</u>, <u>supra</u>, relied upon by the <u>Posner</u> Court for the elements

of a claim for tortious interference with prospective contract rights, 18 N.Y.3d at

570 n.2, the New York State Court of Appeals quoted from an earlier opinion in

<u>NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.</u>, 87 N.Y.2d 614, 621 (1996), in

pertinent part as follows:

> 'where there is an existing enforceable contract and a
> defendant's deliberate interference results in a breach
> of that contract, a plaintiff may recover damages for
> tortious interference with contractual relations even if
> the defendant was engaged in lawful behavior.  Where
> there has been no breach of an existing contract, but only
> interference with prospective contract rights, however,
> plaintiff must show more culpable conduct on the part of
> the defendant.'

<u>Carvel</u>, 3 N.Y.3d at 189-90.  The Court then addressed the meaning of interfering

conduct "more culpable" than interfering behavior that is lawful.  The Court,

quoting its earlier opinion in <u>Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.</u>,

50 N.Y.2d 183, 191 (1980), indicated that section 768 of the Restatement

[Second] of Torts was to be relied upon for its explanation of the "wrongful

means" needed to sustain a claim for tortious interference with prospective

contract rights.  <u>Id</u>. at 191.  See <u>Scutti Enterprises, LLC v. Park Place</u>

<u>Entertainment Corp.</u>, 333 F.3d 211, 216 (2d Cir. 2003)( "wrongful means" to

sustain a tortious interference with business relations claim does not require

---

[5] Unlike in <u>Brandt</u>, where the Court assumed the action of the authorities was taken in good faith because they were not subjected to deceit by the defendant, and unlike in <u>Posner</u>, where the employer was provided with concededly accurate information of wrongdoing while the employee was being coerced, here we have deceit purposefully directed at the employer for the sake of causing harm to the employee (Mauriello).  The NYPD was victimized by Schoolcraft in furtherance of his effort to cause Mauriello harm, a plan which has succeeded to date in its impact on Mauriello.

criminal or fraudulent conduct, just the conduct described in section 768 of the Restatement, citing <u>NBT</u> and <u>Guard-Life</u>).  <u>See</u> <u>also</u> <u>Hannex Corp. v. GMI, Inc.</u>, 140 F.3d 194, 206 (2d Cir. 1998).

   According to the opinion in <u>Guard-Life</u>, section 768 of the Restatement [Second] of Torts defines "wrongful means" as including "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract."  <u>Id</u>. Here, Schoolcraft has engaged in actions, each of which alone could constitute wrongful means and all of which together certainly do constitute wrongful means sufficient to sustain his claim for tortious interference even if the sole purpose of Schoolcraft's conduct was not to do Mauriello harm.  <u>See</u> <u>also</u> <u>Hannex Corp.</u>, 140 F.3d at 206 (participating in a breach of fiduciary duty could constitute wrongful means and should be decided by a jury); <u>and</u> <u>Pagliaccio v. Holborn Corp.</u>, 734 N.Y.S.2d 148, 148-49 (First Dept. 2001) (whether defendant's threat to sue plaintiff's employer if the employment was not curtailed or terminated constituted wrongful means is a triable issue of fact).

   Schoolcraft's wrongful means engaged in to get revenge against Mauriello by damaging his employment relationship with the NYPD include: 1) his personal downgrading of complaint reports, 2) his orchestration of events on October 31, 2009, to trigger a reaction from the NYPD, 3) his misrepresentations about his appeal being ignored when he knew he had never filed an appeal, 4) his misrepresentations that he did not know why he was placed on restricted duty despite having the reasons clearly explained to him by Dr. Lamstein, 5) his

accusations that Mauriello arranged to have him placed on restricted duty when there is no evidence of any Mauriello involvement, and every indication that Schoolcraft was seeking medical attention for the stress and anxiety that was the basis for Dr. Lamstein placing him on restricted duty, 6) his reaching out to the media to help him secure his revenge against Mauriello while promoting his pursuit of an undeserved recovery (see SM Exhibit DC) and 7) his lies to QAD and IAB for the explicit purpose of getting "revenge," such as (i) his false claim that he was concerned for the members of the predominantly minority community served by the 81st Precinct, (ii) his false claim that he was concerned for his fellow officers, (iii) his misrepresentation that the eleven complaint reports he provided to QAD were just a small sample of the downgraded complaints which he had accumulated and (iv) his misrepresentation that downgrading was "chronic" and "systemic".

Surely, in accordance with the opinions cited above, whether such conduct constitutes wrongful means sufficient to sustain Mauriello's claim for tortious interference with his NYPD employment presents triable issues of fact for a jury to resolve.

      b.    Alternatively, Tortious Interference was the
            Sole Purpose Of Schoolcraft's Actions_____

As the New York State Court of Appeals affirmed in <u>Posner</u>, quoting its earlier opinion in <u>Carvel</u>,

> To state a cause of action for tortious interference
> with prospective contractual relations, a plaintiff must
> plead that defendant directly interfered with a third party
> and that the defendant either employed wrongful means
> or acted 'for the sole purpose of inflicting intentional
> harm on plaintiff[ ].'

Posner, 18 N.Y.3d at 570, quoting Carvel, 3 N.Y.3d at 190.  Here, there is compelling evidence Schoolcraft "acted for the sole purpose of inflicting intentional harm on [Mauriello]."  It bears repeating in this context that the recorded October 7, 2009, conversation between Schoolcraft and his father, which was deleted from the recording produced by Schoolcraft in discovery, contains statements that reveal their true intention – to get revenge against Mauriello, not to do anything for the sake of benefitting the community or his fellow officers.  (See Mauriello AMF ¶ 1, 2, 9-13.)

In the October 7, 2009, recording, Schoolcraft and his father rehearse what Schoolcraft will say to QAD and the father reminds Schoolcraft not to let QAD realize Schoolcraft is out for "revenge".  (See Mauriello AMF ¶ 1.) They discuss how Schoolcraft should pretend that he is providing only a small sample of the complaint reports he had gathered, when in fact he had only known of the eleven (or perhaps thirteen) he had gathered, several of which he had initiated.  School excitedly proclaims this is the way they are going to "fuck [Mauriello] over."  (See Mauriello AMF ¶ 1.)  In addition. from Schoolcraft's eight-hour recording of his entire day tour on October 31, 2009, we have the conversation between Schoolcraft and another officer in which Schoolcraft says "if I could get him [Mauriello]…if I could get him. I would sell him out faster than anything. I would fucking sell him out faster than anything."  (See SM Response 3 to PSMF.)

These candid quotes, recorded by Schoolcraft himself, provide compelling evidence that his sole purpose in falsely reporting wrongdoing to QAD and IAB was to harm Mauriello in his relationship with the NYPD in revenge for

signing off on Schoolcraft's appeal and for somehow arranging to have Schoolcraft placed on restricted duty.  Surely, there are genuine disputes about the material facts relating to Mauriello's tortious interference claim to require that it be resolved by a jury.

      B.     Mauriello's Claim For Prima Facie Tort
                <ins>Can Only Be Resolved At Trial</ins>

      Based upon the same evidence that supports Mauriello's counterclaim for tortious interference with his relationship with the NYPD, Mauriello's counterclaim for prima facie tort also should be left to the jury to decide.  The New York State Court of Appeals in <u>Posner</u> recited the elements of a prima facie tort claim, as follows:

> To State a legally cognizable claim for prima facie tort, a plaintiff must allege '(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful.'

18 N.Y.3d at 570 n.1, <u>quoting</u> <u>Freihofer v. Hearst Corp.</u>, 65 N.Y.2d 135, 142-43 (1985).  As discussed above, there are, at a minimum, genuine disputes about the material facts relating to this counterclaim.  It, too, should be tried by a jury.

<u>POINT II</u>

PLAINTIFF'S   FOURTH AMENDMENT CLAIM FOR UNLAWFUL
ENTRY SHOULD BE DISMISSED AS IT RELATES TO MAURIELLO

      In opposition to Schoolcraft's motion to have the Court make "a judicial determination as a matter of law that the NYPD defendants' warrantless entr[ies] into . . . Schoolcraft's home violated the Fourth Amendment" and were otherwise unjustified (Memorandum in Support of Plaintiff's Summary Judgment Motion, page1), we rely upon our discussion of the Fourth Amendment claim as it

relates to Mauriello set forth in our motion for summary judgment seeking dismissal of that claim.  (See Mauriello's Corrected Memorandum in Support of His Motion for Summary Judgment Points II A, II A.v, and II A.v.b.)

Conclusion

Based upon the foregoing, plaintiff's motion for summary judgment seeking dismissal of the counterclaims asserted by Steven Mauriello should be denied in its entirety.   With respect to plaintiff's motion for "a judicial determination . . . that the NYPD defendants' warrantless entr[ies] into . . . Schoolcraft's home violated the Fourth Amendment" and were otherwise unjustified, that relief also should be denied to the extent it is asserted against Mauriello for his entry into the apartment for three minutes during the first entry. As to that claim against Mauriello, we respectfully request that Mauriello's motion for summary judgment seeking dismissal of that claim be granted in its entirety, together with such other relief as the Court deems just.

Dated:  New York, New York
          February 11, 2015

SCOPPETTA SEIFF KRETZ & ABERCROMBIE
Attorneys for Defendant STEVEN MAURIELLO

By: _____
          Walter A. Kretz, Jr., (WK-4645)
444 Madison Avenue, 30th Floor
New York, NY  10022
wakretz@seiffkretz.com
212-371-4500