SM EXHIBIT DE

JOSEPH FERRARA

1    THE VIDEOGRAPHER:  We are now -- excuse me.
2    We are now off the record at 11:23 am.
3        (Whereupon, a short recess was taken.)
4    THE VIDEOGRAPHER:  This is tape two of the
5    deposition of Joseph Ferrera.  We are now on the
6    record at 11:40 a.m.
7    Q.    Okay.  So, before we took the break you stated
8    that you started recording because you didn't like the way
9    that Schoolcraft was -- was treated by Mauriello in the
10   precinct; is that correct?
11   A.    The way Mauriello --
12        MR. KRETZ:  Objection.  Sorry.
13   A.    The way Mauriello was referring to Schoolcraft in
14   the precinct.
15   Q.    And how was Inspector Mauriello referring to
16   Schoolcraft in the precinct?
17   A.    That he was a rat.
18   Q.    Did you think at the time you started making
19   these recordings that you would be suing the City at some
20   point?
21
22        MR. SMITH:  I'm sorry, the who?
23        MS. PUBLICKER METTHAM:  City.
24        THE COURT REPORTER:  At the time you were
25   making these recordings --
        MR. SMITH:  Did you think that you --

JOSEPH FERRARA

1  They even had started in the 81 which I had never seen
2  before, they would make the supervisors on patrol document
3  as the patrol officers came in at the end of their tour
4  what did you write today, day by day, how many did you
5  write, what did you write.
6      Q.   And that was in reference to these seat belts and
7  cell phones?
8      A.   Yes.
9      Q.   Do you believe there was a quota policy in the
10 81st Precinct?
11     A.   No, I don't believe there was a quota, because
12 there was never a number set in stone, but there was
13 tremendous pressure put on officers to answer the radios,
14 write complaints, take care of people who needed, you know,
15 aid with hospitals and stuff, help with lost kids, help
16 finding people.  But then they also had pressure to write
17 summonses throughout their day.  They wanted to see those
18 numbers from those officers.  And they didn't care if the
19 officer answered 15 different jobs that day and didn't get
20 a meal, how many summonses did you write that day.
21     Q.   Did you believe there was a quota policy in the
22 81st Precinct requiring officers to issue a certain number
23 of UF-250s?
24          MR. SMITH:  Objection to form.
25     A.   There was never a set number, but there was

JOSEPH FERRARA

1  tremendous pressure for that, also, because that ended up
2  being statistic at ComStat number of 250s that were done.
3      Q.   But there was never a number of UF-250s that
4  officers in the 81st Precinct were required to issue?
5      A.   No.  Not a set number, no.
6      Q.   Have you ever issued a UF-250 without reasonable
7  suspicion?
8      A.   No.
9      Q.   Did any supervisor ever tell you to stop someone
10 even if you did not have reasonable suspicion?
11     A.   No.
12     Q.   Have you personally observed another officer stop
13 someone without reasonable suspicion?
14     A.   No.
15     Q.   Did you ever lose overtime for failing to issue a
16 certain number of UF-250s?
17     A.   No.
18     Q.   Did you ever suffer a change of tours as a result
19 of failing to issue a certain number of UF-250s?
20     A.   No.
21     Q.   Were you ever denied vacation days as a result
22 failing to issue a certain number of UF-250s?
23     A.   No.
24     Q.   Was there a quota policy regarding the number of
25 summonses officers in the 81st Precinct were required to

JOSEPH FERRARA

1  identities of the anonymous complainants?
2      A.    No, I don't think so.
3      Q.    So, IAB kept those anonymous complainants
4  identities confidential?
5          MR. SMITH:  Objection.
6      A.    I believe so.
7          MR. SMITH:  You mean they didn't tell him?
8          MS. PUBLICKER METTHAM:  They kept it
9  confidential was my question, Mr. Smith.
10     Q.    You produced two recordings in response to the
11 subpoena, correct?
12     A.    Yes.
13     Q.    What misconduct, if any, do you believe you
14 captured on those recordings?
15         MR. SMITH:  Objection.
16     A.    Captain Perez with the -- with the numbers that
17 he wanted and the statement by Mauriello in regards to
18 Schoolcraft and how he referred to Schoolcraft.
19     Q.    And what about how he referred to Schoolcraft
20 made you believe he was committing misconduct?
21     A.    Well, just from a CO turning around and saying
22 that a subordinate is a rat, you know, that's -- that's not
23 something that should be conveyed to the other supervisors
24 of the command about one person.  If the officer wants to
25 report corruption or misconduct in regards to something, he

JOSEPH FERRARA

shouldn't have his name blasted out like that to other supervisors, that tells me is that Mauriello wanted to use the other supervisors to maybe pay more attention to Schoolcraft which, for what reason, because he made a complaint or he made an allegation about whatever his allegation was, I don't believe that's fair.

Q. Where either of these recordings made after Schoolcraft's allegations became public in the -- in the media?

    MR. SMITH: Objection to form.

A. I don't know.

Q. Was there any other misconduct that you believe can be heard on those two recordings?

A. Not that I recall.

Q. Did you alter those recordings in any way?

A. No.

Q. Do you know why those recordings skip at times?

    MR. SMITH: Objection to form.

A. I have no idea.

Q. Did you hear Inspector Mauriello in those recordings state that the punishment for fudging crimes or downgrading crimes was much more stiff than for allowing crime to increase in a precinct?

A. I don't recall.

Q. Did you hear supervisors during those recordings

JOSEPH FERRARA

1         MR. SMITH:  Objection.
2    A.    Yes, and more so.
3    Q.    You told us today more so?
4    A.    More so, yeah.
5    Q.    That's because Suzanna was asking you those
6 questions?
7    A.    Yes.
8    Q.    We count on her for that.
9         You refer on page 12145 to Mauriello -- in the
10 middle of the page, Mauriello was a typical commanding
11 officer reduce crime/get numbers.  Is that how you viewed
12 him based upon your experience in the 81?
13   A.    Yes.
14   Q.    What is your opinion of Mauriello as we sit here
15 today based upon what you know of him from your experience?
16   A.    I think Mauriello was an excellent commanding
17 officer when it came down to the police duties.  He knew
18 everybody that was a player in the command.  He knew who
19 was doing what before it even happened.  I was impressed
20 with Mauriello when he spoke at the COs' meetings.  He knew
21 his stuff.  He knew who was doing what to who, who was
22 going to go after who.  He knew what he was doing
23 policewise.  He knew what he was doing tacticwise.  He was
24 a good commanding officer.
25        You know, I listened to him when he spoke because

JOSEPH FERRARA

1  you could never not learn something especially from a guy
2  like that.  He knew -- you know, he knew -- he knew how to
3  police, you know and he knew his command which, you know,
4  my history of dealing with some COs, some COs know what's
5  going on, some COs don't know what's going on.  Mauriello
6  knew what was going on in his command and that was
7  impressive.
8      Q.    So, the thing you fault him for is the way he
9  spoke about Schoolcraft in February and April of 2010?
10     A.    Yeah, I don't like that whole rat thing, you
11  can't as a CO portray to other supervisors this guy is a
12  rat, because, listen, there's going to be one or two
13  supervisors who are going to take that and be like, screw
14  Schoolcraft, you know, he's a rat, you know, let's make his
15  life hard because it's been done.
16     Q.    Yeah.
17     A.    You know, and I -- you know, if you hear the CO
18  saying that, you know, if the CO is kind of oh, it's okay,
19  he's rat to talk like that, then other people are going to
20  think it's okay to do that and I don't think that's right,
21  you know, it's -- that's not right.
22     Q.    Do you recall that at the time that the -- you
23  heard him say those things about Schoolcraft in February of
24  2010 there had been the first report released in the media
25  about Schoolcraft and his recordings and his supposedly

JOSEPH FERRARA

1    cooperation with Quad and IAB?
2            MR. SMITH: Objection to form.
3    A.    I don't know. I don't know. Was it? I really
4    don't know. I don't recall.
5    Q.    I'm just asking what your recollection is.
6    A.    Yeah, I don't recall.
7    Q.    Do you recall that in February of 2010
8    Schoolcraft wasn't on the job?
9    A.    Yeah, okay.
10   Q.    Do you recall that now?
11   A.    Yeah, I don't think he came back to the job
12   after.
13   Q.    Has still not come back to the job.
14   A.    Okay.
15   Q.    Okay. So, the events at issue here principally
16   involve October 31st of '09 --
17   A.    Right, okay.
18   Q.    -- and then he never returned to the job.
19           MR. SMITH: Do you have a question in this
20           statement someplace?
21           MR. KRETZ: I'm just asking if that
22           refreshes his recollection about whether he was
23           on the job or not.
24           MR. SMITH: Do you understand what he means
25           by refreshing your recollection or about his

JOSEPH FERRARA

1           testimony?
2      A.    Yes, yeah, he never came back.
3      Q.    Okay.  No, I ask because your previous answer
4  suggested he was, you know, about to show up for a roll
5  call and he didn't want anybody picking on him because
6  Mauriello called him a rat, he wasn't on the job at the
7  time, that's all, I just wanted to make sure you recall
8  that correctly.
9      A.    Okay.
10     Q.    On page 12149 you write to Mr. Norinsberg on
11 September 7, 2010 indicating -- asking him did he know that
12 del Pozo was -- was in IAB before going to the 50 Precinct.
13 What's your recollection as to why you were telling
14 Norinsberg that?
15     A.    Okay, hang on, let me just read it.
16           MR. LEE:  What page is that on?
17           MR. KRETZ:  12149.
18     A.    I believe Jon brought up the name del Pozo I
19 believe during a conversation and I knew a del Pozo in IAB,
20 so I just said, you know, do you know that he worked in IAB
21 before.  Something -- something came up with del Pozo and
22 maybe Schoolcraft's father or something, but the name del
23 Pozo is an unique name, so when that came up, I was like
24 oh, you know, he was in IAB, you know, and then he went to
25 wherever he went, the 50 Precinct.

JOSEPH FERRARA

Q. The following line is in your message, since he worked for Chief Campisi I would not trust him.

A. Right, okay.

Q. Did you have any personal experience with him so as not to trust him or is it just he's not trustworthy by association with Chief Campisi?

A. By association with Chief Campisi.

Q. So, you knew nothing else about him?

A. No.

Q. Directing your attention to page 12152 of Exhibit A. It appears to be an e-mail message from Mr. Norinsberg to you on September 19, 2010. It's addressed to you, Joe, I assume that's you?

A. Yes.

Q. And it says, I am sure you already saw this but here was Browne's reaction to the very damning quota tapes you provided. Do you know what he's referring to there, what are the quota tapes?

A. Yeah, that was, um, the February 2010 recording.

Q. With Perez?

A. Perez about the numbers and how he's going to mess people up.

Q. So, although he refers to them as quota tapes, you believe it's only that first one that --

A. Yeah, I don't believe anything was on the second