1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------------

5  ADRIAN SCHOOLCRAFT,

6                                      Plaintiff,

7          -against-

8

9  THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL

10 MARINO, Tax ID. 873220, Individually and in

11 his Official Capacity, ASSISTANT CHIEF

12 PATROL BOROUGH BROOKLYN NORTH GERALD

13 NELSON, Tax Id. 912370, Individually and in

14 his Official Capacity, DEPUTY INSPECTOR

15 STEVEN MAURIELLO, Tax Id. 895117,

16 Individually and in his Official Capacity,

17 CAPTAIN THEODORE LAUTERBORN, Tax Id.

18 897840, Individually and in his Official

19 Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.

20 919124, Individually and in his Official

21 Capacity, ST. FREDERICK SAWYER, Shield No.

22 2567, Individually and in his Official

23 Capacity, SERGEANT KURT DUNCAN Shield No.

24 2583, Individually and in his Official

25 Capacity, LIEUTENANT CHRISTOPHER BROSCHART,

```
 1
 2   Tax Id. 915354, Individually and in his
 3   Official Capacity, LIEUTENANT TIMOTHY
 4   CAUGHEY, Tax Id. 885374, Individually and
 5   in his Official Capacity, SERGEANT SHANTEL
 6   JAMES, Shield No. 3004, Individually and in
 7   his Official Capacity, and P.O.'s"JOHN DOE"
 8   #1-50, Individually and in their Official
 9   Capacity, (the name John Doe being
10   fictitious, as the true names are presently
11   unknown) (collectively referred to as "NYPD
12   Defendants"), JAMAICA HOSPITAL MEDICAL
13   CENTER, DR. ISAK ISAKOV, Individually and
14   in his Official Capacity, DR. LILLIAN
15   ALDANA-BERNIER, Individually and in her
16   Official Capacity, and JAMAICA HOSPITAL
17   MEDICAL CENTER EMPLOYEE'S"JOHN DOE" #1-50,
18   Individually and in their Official
19   Capacity, (the name John Doe being
20   fictitious, as the true names are presently
21   unknown),
22                                    Defendants.
23   ------------------------------------------
24             111 Broadway
25             New York, New York
```

LAUTERBORN

Page 3

1
2             November 7, 2013
3              10:10 A.M.
4
5     VIDEO DEPOSITION of THEODORE
6  LAUTERBORN, the Defendant in the
7  above-entitled action, held at the above
8  time and place, taken before Dawn Miller, a
9  Notary Public of the State of New York,
10 pursuant to court order and stipulations
11 between Counsel.
12                *    *    *
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2      Q.      Do you remember Schoolcraft
3  requesting a preference as to what hospital
4  he wanted to go to?
5      A.      Again, I don't know if he was
6  asking, I know there was a discussion over
7  a hospital, and, like I said, I may not
8  have been paying close attention to that
9  because I would have no say in that matter.
10     Q.      There came a time when
11 Schoolcraft agreed to go to the hospital,
12 right?
13     A.      Yes.
14     Q.      Everybody left the apartment,
15 right?
16     A.      Yes.
17     Q.      He went down the street to the
18 ambulance, right?
19     A.      From my point of view, he was
20 heading towards the ambulance on his own.
21     Q.      Then what happened?
22     A.      And then I heard somebody yell
23 out my name, who I believe to be Inspector
24 Mauriello, and I see Schoolcraft walking
25 towards me.

1
2    Q.    And what Mauriello said to you
3  was, "Teddy, stop him," right?
4             MR. KRETZ: Objection.
5    A.    Basically.
6    Q.    Did you stop him?
7    A.    Not initially at that moment.
8    Q.    What happened?
9    A.    I don't know how it went down.
10  He was coming towards me. Whether I said,
11  "Adrian, where you going?" or he just went
12  walking quickly past me and, you know, I
13  don't know what the exchange was as we were
14  going up the stairs back to his apartment
15  but he was trying to get back in, he went
16  to close the door and I put my foot in it
17  to keep him from closing it.
18    Q.    Is it fair to say, he went back
19  upstairs, you followed him, he tried to
20  close the door and you put your foot in as
21  a stopper from closing the door?
22    A.    Yeah, basically.
23    Q.    He went into his apartment and
24  you entered the apartment again; is that
25  right?

1
2      A.    That's right.
3      Q.    And you were followed by Chief
4  Marino; is that right?
5      A.    Again, I couldn't tell you the
6  order of how people came in.
7      Q.    You don't have to worry about the
8  order.  Eventually, in the apartment was
9  Chief Marino, three guys from Brooklyn --
10     A.    North --
11     Q.    Investigation and who else?
12     A.    I couldn't tell you after that
13 who followed in.
14     Q.    Schoolcraft went into his
15 bedroom, right?
16     A.    Yes.
17     Q.    All of those individuals went
18 into his bedroom as well; is that right?
19     A.    At that point, I don't think all
20 of us were in his bedroom.  Some might have
21 been out in the living room area.
22     Q.    Was Lieutenant Hanlon in the
23 apartment the second time?
24     A.    Yeah, all three of the
25 technicians came up again.

Page 321

1
2      Q.     It was this second occasion that
3  Hanlon says he had to go to the hospital?
4             MS. METTHAM: Objection. Asked
5     and answered.
6      A.     No, it was stated that he has to
7  go the first time around.
8      Q.     Did you overhear any of the
9  exchanges between Schoolcraft and anybody
10 else while he was approaching the bus on
11 the street?
12     A.     No, I didn't.
13     Q.     Did you see any of the exchanges
14 between Schoolcraft and any of the
15 individuals as he was approaching the bus?
16     A.     I mean I could see him walking
17 towards the ambulance but I don't know what
18 he -- if he -- what or if he was saying to
19 anybody.
20            MR. SMITH: Going off the
21    record 6:35 for a paper change.
22            Going back on record it's 6:46.
23     Q.     We were at the scene of
24 Schoolcraft's residence. We were talking
25 being about the second, what I call, "The