Page 1

1    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

2    ---------------------------------------------X

3    ADRIAN SCHOOLCRAFT,

4                         Plaintiff,

5

                                     Case No:

6         - against -              10 CV 06005

7

     THE CITY OF NEW YORK, ET AL.,

8

9                    Defendants.

10   ---------------------------------------------X

11                    111 Broadway

                      New York, New York

12

                      May 15, 2014

13                    10:28 a.m.

14

15

16   DEPOSITION OF SALVATORE SANGENITI, pursuant to

17   Notice, taken at the above place, date and

18   time, before DENISE ZIVKU, a Notary Public

19   within and for the State of New York.

20

21

22

23

24

25

Page 40

1                    S.  SANGENITI

2   respond to your corner location.

3        Q.    What was your corner location?

4        A.    127th Street and 95th Avenue.

5        Q.    And you would just wait there

6   until you got a call?

7        A.    Correct.

8        Q.    Do you recall getting the call

9   to respond to the Schoolcraft --

10       A.    No, I don't.

11       Q.    -- residence?

12       A.    Sorry, I don't.

13       Q.    What do you recall about that

14  call or that job or that assignment?

15             MR. RADOMISLI:  You're going to

16        have to narrow it down.

17       Q.    Do you recall going to

18  Schoolcraft's residence?

19       A.    I remember going to the

20  assignment.

21       Q.    When you went to the assignment,

22  what was your understanding about what the

23  assignment was about?

24       A.    Just that it was an unknown

25  condition.

Page 54

1                           S. SANGENITI

2           Q.      Did you ever have any

3     discussions with anybody at the scene about

4     Officer Schoolcraft carrying or not carrying

5     any weapons?

6                       MS. PUBLICKER METTHAM:

7           Objection.

8           A.      No.

9           Q.      Did you ever have any

10    discussions with anybody at the scene about

11    Officer Schoolcraft being an emotionally

12    disturbed person?

13          A.      I'm sorry, can you just rephrase

14    that?

15          Q.      Did you ever have any

16    discussions with anybody at the scene about

17    Officer Schoolcraft being an EDP or an

18    emotionally disturbed person?

19          A.      I don't -- I don't designate who

20    is an emotionally disturbed person.

21          Q.      I understand that, but I'm not

22    asking you that question.  I'm asking you a

23    slightly different question which I will try

24    to restate it just so it's clear.

25                      Did you have any conversations

1                    S. SANGENITI

2    with anybody at any time during this scene

3    or while you were at the scene of

4    Schoolcraft's residence, either on the

5    street or in his house, where somebody told

6    you that Officer Schoolcraft was an

7    emotionally disturbed person or an EDP?

8         A.    Yes.

9         Q.    Who told you?

10        A.    Lieutenant Hanlon.

11        Q.    Lieutenant Hanlon told you that.

12   When did Lieutenant Hanlon tell you that

13   Officer Schoolcraft was an EDP?

14        A.    It was after the conversation

15   she had with the officers.

16        Q.    After what conversation she had

17   with the officers?

18        A.    At the scene of the assignment

19   when an EMS officer is there, they are the

20   go between for police department and the

21   fire department.

22        Q.    My question is when did Hanlon

23   tell you that Schoolcraft was an EDP?

24        A.    At the scene of the assignment.

25        Q.    When at the time of the scene of

Page 56

1                        S. SANGENITI

2      the assignment?

3             A.    I would say maybe 21 -- 21 --

4      maybe 2200.

5             Q.    What were the circumstances or

6      what was the situation at the time that

7      Lieutenant Hanlon told you that Officer

8      Schoolcraft was an EDP?

9                   MR. RADOMISLI:  Objection to

10            form.  You could answer.

11            A.    Just that he was acting

12     irrational and based on their evaluation,

13     that being Lieutenant Hanlon and the

14     officers on the scene of the assignment that

15     he is an emotionally disturbed person.

16            Q.    Did she make this statement to

17     you that Officer Schoolcraft was an EDP to

18     you directly?

19            A.    She would have to.

20            Q.    No, no.  I'm not asking you what

21     could have happened or should have happened

22     or what likely has happened.  I am asking

23     you do you have a recollection of Hanlon

24     telling you that Schoolcraft was an EDP?

25            A.    No.

Page 57

1                    S. SANGENITI

2         Q.        So when you told me a little

3    while ago that she did tell you that Officer

4    Schoolcraft was an EDP, you were testifying

5    about what you believe, but you didn't have

6    any specific recollection of her telling you

7    that; is that correct?

8                   MR. RADOMISLI:  Objection to

9         form.

10        A.        Correct.

11        Q.        So I will come back to the

12   question that originally got us down this

13   path.  Do you recall anyone at the scene,

14   either on the street or in the apartment or

15   in the bus or on the way to the hospital,

16   telling you that Officer Schoolcraft was an

17   EDP or emotionally disturbed person?

18        A.        Yes.

19        Q.        Who?

20        A.        Lieutenant Hanlon.

21        Q.        When did she tell you that?

22                  MR. RADOMISLI:  Asked and

23        answered.  You can answer again.

24                  THE WITNESS:  I'm sorry?

25                  MR. RADOMISLI:  Asked and

Page 58

```
 1                      S. SANGENITI
 2        answered, but you can answer again.
 3        A.      22:00 hours approximately.
 4        Q.      When she said that to you, where
 5   were you standing?
 6        A.      In the apartment.
 7        Q.      And where was she standing?
 8        A.      In the apartment.
 9        Q.      Were you in the same room?
10        A.      There is only one room there.
11   We were all there.
12        Q.      So Hanlon told you while you and
13   she were standing in the room that Officer
14   Schoolcraft was EDP?
15        A.      Yes.
16        Q.      Is there something in the PCR,
17   which you were just looking at, which is
18   relative to the inquiry I'm making to you
19   about Hanlon telling you that Schoolcraft
20   was an EDP?
21             MR. RADOMISLI:  Objection to
22        form.
23        A.      Just trying refresh my memory.
24   As you know, it was quite a while ago.
25             MR. SMITH:  For the record the
```

Page 59

```
 1                    S. SANGENITI
 2        witness was just perusing the PCR
 3        report.
 4             MR. RADOMISLI:  Why?
 5             MR. SMITH:  Why should it
 6        reflect that, because that's a fact.  I
 7        can go beyond that, but I am not
 8        choosing not to at this point.
 9        Q.     Why do you believe that Hanlon
10   told you this at 2200?
11        A.     'Cause we were getting ready to
12   transport the patient.
13        Q.     How many times were you in
14   Schoolcraft's apartment?
15        A.     Just once.
16        Q.     How many times was Hanlon in
17   Schoolcraft's apartment?
18             MS. PUBLICKER METTHAM:
19        Objection.
20        A.     Once.
21        Q.     Other than Hanlon telling you
22   that Schoolcraft was an EDP in the
23   apartment, did anybody else at the scene or
24   thereafter tell you that Schoolcraft was an
25   EDP?
```

Page 60

S. SANGENITI

1
2          A.      Just the officer told Lieutenant
3     Hanlon and Lieutenant Hanlon discussed it
4     with me.
5          Q.      What officer told Lieutenant
6     Hanlon?
7          A.      Blue shirt.
8          Q.      Are you telling me that an
9     officer, a blue shirt in the apartment, told
10    Hanlon Schoolcraft is an EDP and then Hanlon
11    told you he was an EDP?
12                 MS. PUBLICKER METTHAM:
13          Objection.
14          A.      I don't know what conversation
15    they would have.  I don't have privy to
16    their conversation.
17          Q.      You just told me that an officer
18    told Hanlon that Schoolcraft was an EDP,
19    right?  Did you just tell me that?
20          A.      I told you the conversation the
21    officer had with Lieutenant Hanlon and then
22    it was conveyed to me.
23          Q.      Did you just tell me that an
24    officer in a blue shirt told Hanlon that
25    Schoolcraft was an EDP, you just told me

Page 61

1                    S. SANGENITI
2    that, right?
3        A.    Yes.
4        Q.    And that's the truth, right?
5        A.    It is.
6        Q.    Were you in the room when the
7    officer told Hanlon that Schoolcraft was an
8    EDP?
9        A.    Yes.
10       Q.    What did this officer look like?
11       A.    I don't remember.
12       Q.    It was a male?
13       A.    Yes.
14       Q.    Can you describe his ethnic
15   background or his build or anything else
16   about him?
17       A.    No, I can't, I'm sorry.
18       Q.    Can you describe the uniform
19   that the officer was wearing?
20       A.    Police department issued
21   uniform, blue shirt.
22       Q.    Did the officer have any facial
23   hair?
24       A.    I don't remember.
25       Q.    Did the officer say anything

Page 62

```
 1                    S. SANGENITI
 2   else to Hanlon, other than that Officer
 3   Schoolcraft was an EDP?
 4              MS. PUBLICKER METTHAM:
 5        Objection.
 6              MR. RADOMISLI:  That he was
 7        able to hear?
 8              MR. SMITH:  Yes.
 9        A.    No, I wasn't privy to that.
10        Q.    How much time elapsed between
11   the time that this blue shirt officer told
12   Hanlon that Officer Schoolcraft was an EDP
13   and Hanlon telling you that Officer
14   Schoolcraft was an EDP?
15        A.    I really can't tell you.
16        Q.    But you were in the same room
17   when the officer had this conversation with
18   Hanlon?
19        A.    I was in the room, yes.
20        Q.    You heard the officer's words
21   spoken to Hanlon; is that correct?
22        A.    No, I didn't.
23        Q.    How do you know that the officer
24   told Hanlon that Schoolcraft was an EDP?
25        A.    'Cause she couldn't make that
```

Page 63

1                        S. SANGENITI

2      decision by herself.

3           Q.      All right.  Did you see an

4      officer speaking to Hanlon about

5      Schoolcraft?

6           A.      No.

7           Q.      So when you told me that an

8      officer in a blue shirt told Hanlon that

9      Schoolcraft was an EDP, you didn't actually

10     witness those statements?

11          A.      Correct.

12          Q.      You just drew a conclusion; is

13     that correct?

14          A.      Based on Lieutenant Hanlon's

15     statement to myself, yes.

16          Q.      What was Lieutenant Hanlon's

17     statement to you, which led you to the

18     conclusion that it was an officer wearing a

19     blue shirt who told her that Schoolcraft was

20     an EDP?

21          A.      Based on her conversation with

22     the officer.

23          Q.      So Hanlon told you that

24     Schoolcraft is an EDP based on what the

25     police officer told her; is that correct?

Page 64

```
 1                    S. SANGENITI
 2              MS. PUBLICKER METTHAM:
 3        Objection.
 4                MR. RADOMISLI:   Objection to
 5        form.
 6        A.     Based on Lieutenant Hanlon's
 7   conversation with the officer, Officer
 8   Schoolcraft was treated as such.
 9        Q.     Can you tell me what her words
10   were to you?
11        A.     No, I couldn't.
12        Q.     Is it fair to say that the sum
13   and substance of what she told you was that
14   he is an EDP because the cop said so?
15              MS. PUBLICKER METTHAM:
16        Objection.
17        A.     I can't speculate as to what was
18   said.  All I can tell you that what was
19   conveyed to me.
20        Q.     That's what I'm trying to get at
21   is what was conveyed to you?
22        A.     That he was an EDP, but he
23   wasn't treated like that.  He was treated as
24   a medical patient.
25        Q.     I am respectfully very, very
```

Page 65

1                    S. SANGENITI
2    confused about what you're telling me.
3    Hanlon told you that Schoolcraft was an EDP,
4    right?
5         A.     Correct.
6         Q.     She told you that while you were
7    standing in Officer Schoolcraft's bedroom;
8    is that correct?
9         A.     Correct.
10        Q.     And she told you that that
11   decision was based on her discussions with a
12   member of the police department; is that
13   correct?
14        A.     Correct.
15        Q.     And although you didn't hear the
16   conversation between Hanlon and the police
17   department, you saw her having conversations
18   with members of the police department; is
19   that correct?
20        A.     I was in the same room, yes.
21        Q.     And you saw Hanlon having
22   conversations with members of the police
23   department?
24        A.     Yes.
25        Q.     And was based on the fact that

Page 66

1                      S.  SANGENITI

2    she was having conversations with members of

3    the police department and that thereafter

4    she told you that he was an EDP that you

5    drew the conclusion that it was the officer

6    who made the decision that he was an EDP; is

7    that correct?

8                MR. RADOMISLI:  Read it back.

9                MR. SMITH:  You lawyer's asked

10        the court reporter to read back the

11        question just so you have it in mind.

12               (Record read.)

13        A.     Yes.

14        Q.     Other than Hanlon telling you

15   that Officer Schoolcraft was an EDP, did

16   anybody else in the world ever tell you at

17   any time that Officer Schoolcraft was an

18   EDP?

19               MR. RADOMISLI:  Objection to

20        form.

21               MS. PUBLICKER METTHAM:

22        Objection.

23        A.     My interactions with Lieutenant

24   Hanlon, she was the only EMS officer on the

25   scene.

Page 67

1                        S. SANGENITI
2                    MR. SMITH:  I will rephrase the
3           question.
4           Q.      Other than Hanlon, anybody else
5    tell you Schoolcraft was an EDP?
6           A.      No.
7           Q.      Did you ever have any
8    discussions with anybody at the scene about
9    whether or not Schoolcraft was an EDP?
10          A.      No.
11                   MR. SMITH:  All right, take a
12          short break.  It's 11:39, going off the
13          record.  Just five minutes; okay.
14                   (Whereupon, a recess was taken.)
15                   MR. SMITH:  Going back on the
16          record, it's 11:51.
17          Q.      We were talking about the
18   conversation you had with Hanlon about
19   Schoolcraft being an EDP.  Can you tell me
20   what the -- let me rephrase that.
21                   When Hanlon told you that, was
22   Schoolcraft in the bedroom?
23          A.      Yes.
24          Q.      Was he sitting on the bed?
25          A.      Yes.

1                    S. SANGENITI

2   officer tell you that you're suspended,

3   would that be the kind of thing that would

4   elevate somebody's blood pressure?

5                MR. RADOMISLI:  Objection.

6                MS. PUBLICKER METTHAM:

7        Objection.

8        A.     I can't speculate on it.  I'm

9   not that person.

10       Q.     No, I understand that you're not

11   that person, but you have an enormous amount

12   of experience taking blood pressure

13   readings, don't you?

14       A.     Yes.

15       Q.     As an EMT you have probably

16   taken tens of thousands of blood pressure

17   readings over the past 25 years, right?

18       A.     Correct.

19       Q.     Given that background, can you

20   tell me whether or not a person being told

21   by their superior officer that they're

22   suspended is the kind of circumstance that

23   would lead to or could lead to an elevated

24   blood pressure reading?

25                MS. PUBLICKER METTHAM:

```
1                    S. SANGENITI
2        Objection.
3              MR. RADOMISLI:  Objection.
4        A.      It could, but what happened is
5    that the officer told me that was his normal
6    blood pressure.
7        Q.      I'm not trying argue with you.
8        A.      Nope, not at all.
9        Q.      I just want you to answer my
10   question.
11       A.      Okay.
12       Q.      All right.  I will restate my
13   question just so it's clear.  It's my
14   understanding that you just told me that
15   based on your experience, if somebody is
16   told by his superior officer that they're
17   being suspended that those are the kind of
18   facts that could lead to an elevated blood
19   pressure; is that correct?
20             MS. PUBLICKER METTHAM:
21       Objection.
22             MR. RADOMISLI:  Objection.
23       Substance.
24       Q.      Is that correct?
25       A.      Yes.
```

Page 101

1                      S. SANGENITI

2        Q.       Is that correct because a

3   person's emotional state is connected with

4   their blood pressure readings?

5        A.       It's one of the factors, yes.

6        Q.       What are the other factors?

7        A.       History, any medication that the

8   individual is on, that's pretty much.

9        Q.       Does the respiration rate of 20

10  appear to be normal?

11       A.       Yes.  16 to 20 would be a fair

12  number.

13       Q.       What about the pulse of 120, the

14  first entry, that appear to be normal?

15       A.       No.

16       Q.       How does that appear to you?

17       A.       Little high.

18       Q.       What's a normal range?

19       A.       80 to probably -- 80 to 90,

20  preferably below 80.

21       Q.       After taking the initial or

22  primary blood pressure reading from

23  Schoolcraft, what did you do?

24       A.       Discussed with him that it would

25  be in his best interest to go to the

Page 102

```
 1                   S. SANGENITI
 2    hospital.  He was pretty adamant as to not
 3    go to the hospital.  I stated to him that
 4    with a pressure that high, you know, you're
 5    jeopardizing his own health and it would be
 6    in his best interest and he agreed.
 7         Q.     Did he have a right to refuse
 8    medical attention?
 9         A.     Sure.  As long as he had
10    decisional capacity.
11         Q.     And he did have decisional
12    capacity?
13         A.     Yes, but you try to discuss with
14    the individual that based on his medical
15    condition it would be prudent to get it seen
16    and take care of.
17         Q.     And your advice to him was that
18    he have his medical condition checked out,
19    right?
20         A.     Correct.
21         Q.     In what way did you believe that
22    he should be checked out medically?
23               MR. RADOMISLI:  Objection.
24         A.     Based on his blood pressure and
25    other conditions, his underlying condition,
```

Page 103

                    S. SANGENITI

1

2    it would be prudent to go to the emergency

3    room.

4         Q.      What would you expect the

5    emergency room to do?

6                 MR. RADOMISLI:  Objection.

7         A.      I can't -- they're going to

8    treat his blood pressure.

9         Q.      How are they going to treat it?

10                MR. RADOMISLI:  Objection.

11        A.      They can give him Lasix, they

12   are going to give him other drugs that can

13   assist in lowering his pressure.

14        Q.      Was Schoolcraft at risk of a

15   heart attack at this point?

16                MR. RADOMISLI:  Objection.

17        A.      Could he have a heart attack,

18   yes.

19        Q.      Anything's possible.  What I

20   want to know is given your experience, was

21   Schoolcraft at risk of a heart attack at the

22   time you took this first blood pressure

23   reading?

24                MR. RADOMISLI:  Objection.

25        A.      Sure.

Page 104

1                         S. SANGENITI

2        Q.       Why do you say that?

3        A.       A pulse rate of 120 he would go

4    into V-fib.

5        Q.       What is that?

6        A.       Where the heart actually pumps

7    so fast to where it -- you have an

8    irregularity and he could -- his heart could

9    stop.

10       Q.       Is there a protocol that you're

11   aware of that when you take a blood pressure

12   reading and a pulse reading that gives you

13   numbers like these?

14                MR. RADOMISLI:  Objection to

15       form.  I don't understand the question.

16       A.       It there a pulse?

17       Q.       Is there a protocol, I mean, is

18   there a standard procedure that --

19       A.       No.

20       Q.       -- you normally follow in

21   circumstances like this?

22       A.       No.

23       Q.       Isn't it advisable to tell the

24   patient to sit down or lie down and take the

25   blood pressure reading again?

Page 105

```
 1                    S. SANGENITI
 2              MR. RADOMISLI:  Objection.
 3      A.      Well, he was sitting down.
 4      Q.      You're not answering my
 5   question.  Isn't it standard procedure to
 6   ask a patient who gives you a blood pressure
 7   reading that you consider to be elevated to
 8   tell the person sit or lie down, relax and
 9   take the reading again in a few minutes?
10              MR. RADOMISLI:  Objection.
11      Q.      Isn't that standard procedure?
12              MR. RADOMISLI:  Objection.
13      A.      Yes.
14      Q.      Why didn't you do that in this
15   case?
16              MS. PUBLICKER METTHAM:
17      Objection.
18      A.      Probably because we were -- I
19   wanted -- I talked the individual to now go
20   to the hospital and I didn't want to stray
21   from getting him to the hospital.  So I
22   moved it along.
23      Q.      Why did you move it along?
24      A.      I wouldn't want the individual
25   to not get care based on the situation.
```

Page 106

```
 1                    S. SANGENITI
 2        Q.       Wasn't it possible that your
 3    blood pressure reading and your pulse
 4    reading and your respiration readings were
 5    incorrect?
 6                    MR. RADOMISLI:  Anything's
 7          possible.
 8        A.       And not that -- he told me that
 9    it's normal for him.  That's his normal
10    blood pressure.  'Cause when I told him --
11    I'm sorry, I didn't mean to interrupt you.
12        Q.       No, that's okay.  He told you
13    that his blood pressure was normally that
14    high?
15        A.       Yes.
16        Q.       And did that suggest to you that
17    this was not an emergency situation?
18        A.       Just because an individual says
19    that that's their normal blood pressure
20    doesn't not mean that other things are not
21    going on.  I'm not a doctor.  I'm just there
22    to evaluate and treat.
23        Q.       Did you offer him any
24    medication?
25        A.       We don't carry any medication.
```

Page 107

S. SANGENITI

1

2      Q.       After you took the blood

3  pressure reading what happened next, to your

4  recollection?

5      A.       Had a conversation with him

6  discussing the importance of going to the

7  emergency room and after back and forth

8  conversations he had decided to go.

9      Q.       Then what happened?

10      A.       We exited the apartment.  We

11  walked down to the vehicle.  He went into

12  the back of the vehicle and when he found

13  out that he wasn't going to North Shore

14  Forest Hills, he ran out of the vehicle and

15  went back into the apartment.

16      Q.       How did he find out that he

17  wasn't going to North Shore Forest Hills?

18      A.       I probably discussed it with

19  him.  I told him we needed to go to the

20  closest 911 receiving hospital.

21      Q.       Which hospital was that?

22      A.       Jamaica Hospital.

23      Q.       How far was Forest Hills?

24      A.       I don't really know exactly, but

25  it was further.

Page 108

```
 1                    S. SANGENITI
 2        Q.        You have no idea how much
 3   further?
 4        A.        No.  Again, we -- when we get an
 5   assignment and hospital designation from
 6   911, it comes up with a mask.  That mask
 7   tells you the closest hospitals, closest
 8   speciality hospital, the closest whatever
 9   that's designed and through the 911 system.
10   It comes out through them.
11        Q.        When you mean the speciality
12   hospital, what do you mean?
13        A.        Replant center, burn center, a
14   psychiatric hospital.
15        Q.        Forest Hills has a psychiatric
16   unit?
17        A.        No.
18        Q.        Jamaica does?
19        A.        Yes.
20        Q.        So if the 911 system says send
21   us to the closest hospital that has a
22   psychiatric unit, Forest Hills at that
23   location would be the closest hospital; is
24   that correct?
25                   MR. RADOMISLI:  Objection.
```

Page 109

1                    S. SANGENITI

2        A.       No, Forest Hills doesn't.

3        Q.       I'm sorry, I misspoke.  So if

4    the 911 system protocol says you're looking

5    for a hospital that has psych services, the

6    closest hospital from the location that you

7    were at Schoolcraft's residence was Jamaica

8    Hospital; is that correct?

9                 MR. RADOMISLI:  Objection.

10       A.       Correct.

11       Q.       Putting aside the nature of the

12   services, am I correct that Forest Hills and

13   Jamaica were 911 receiving hospitals?

14       A.       Yes.

15       Q.       Am I correct that they were

16   roughly the same distance from each other?

17                MR. RADOMISLI:  Objection.

18       A.       Probably not.

19       Q.       Which one is closer?

20       A.       Jamaica.

21       Q.       By how much?

22       A.       Approximately two miles.

23       Q.       How did you measure the

24   distance, is that by GPS, by driving mileage

25   or how the crow flies or some other

Page 110

```
 1                    S. SANGENITI
 2    measurement?
 3         A.      How it's measured?
 4         Q.      Yeah.  Do you know how it's
 5    measured, driving distance?
 6         A.      I would assume by blocks and
 7    mileage.
 8         Q.      You're familiar with the
 9    location where you were at, right?
10         A.      Yes.
11         Q.      You're familiar with where
12    Jamaica Hospital is at, right?
13         A.      Yes.
14         Q.      You're familiar with where
15    Forest Hills is at?
16         A.      I am.
17         Q.      Fair to say you've been to both
18    locations many times?
19         A.      I would say, yes.
20         Q.      According to the PCR, you were
21    at 82-60 88 Place and that drive to Jamaica
22    Hospital was four miles.  Do you see that on
23    this PCR?
24         A.      Yes.
25         Q.      Are you telling me that the
```

Page 111

```
 1                    S. SANGENITI
 2    drive from 82-60 88th Place to Forest Hills
 3    was six miles in your estimation?
 4                MR. RADOMISLI:  Objection.
 5         A.      Four miles.
 6         Q.      And how long was the drive to
 7    Forest Hills?
 8                MR. RADOMISLI:  Objection.
 9         A.      Approximately seven miles.
10         Q.      You're sure about that?
11                MR. RADOMISLI:  Objection.
12         A.      No, I am not.  It's all an
13    estimation.
14         Q.      Did anybody else say anything to
15    Schoolcraft when he got into the ambulance?
16         A.      The first time or the second
17    time?
18         Q.      The first time.
19         A.      No.  At that time we were just
20    sitting him on the stretcher and...
21         Q.      And you told him that he was
22    going to go to Jamaica, right?
23         A.      I said we're going to take you
24    to the closest 911, which is Jamaica.
25         Q.      And he said he wanted to go to
```

Page 112

1                          S. SANGENITI
2     Forest Hills, right?
3          A.        He goes I'm not going, I'm out
4     of here and he got up, bolted and ran into
5     the apartment.
6          Q.        Did you say he bolted and ran
7     into the apartment?
8          A.        He left.  He left the vehicle
9     and proceeded to go back into the apartment.
10         Q.        There is big difference in my
11    mind between leaving the vehicle and
12    proceeding back to the apartment and bolting
13    and running back to the apartment.  Do you
14    recognize there's a difference --
15         A.        I do.
16         Q.        -- between those two things?
17         A.        Bad choice of words.
18         Q.        Sorry.
19         A.        Bad choice of words.
20         Q.        Well, which was the bad choice
21    of words --
22         A.        The bolted.
23         Q.        So he didn't bolt out of the
24    ambulance, right?
25         A.        No.  He left -- he exited the

1                        S. SANGENITI

2    vehicle.

3         Q.      He left the vehicle.  Did he run

4    to his apartment or did he walk to his

5    apartment?

6         A.      He walked fast.

7                 MR. LEE:  Or something else?

8                 MR. SMITH:  I'm sorry, what did

9         you say?

10                MR. LEE:  I said or something

11        else.

12        Q.      He didn't fly, did he?

13        A.      No.

14        Q.      Did he take a motorcycle?

15        A.      No.

16        Q.      He used his feet, right?

17        A.      Yes.

18                MR. RADOMISLI:  There's skipping

19        and hopping.

20                MR. SMITH:  Fine.  Fair enough.

21        Q.      He didn't skip or hop or gallop,

22    did he?

23        A.      No.

24        Q.      So he walked quickly, is that

25    what you said?  Quick, fast?

Page 114

1                    S. SANGENITI

2        A.        Brisk.

3        Q.        Thank you.  All right, so he

4    briskly walked back to his apartment and you

5    saw him briskly walking back to his

6    apartment; is that right?

7        A.        Correct.

8        Q.        Did you see anybody briskly

9    walking behind him?

10       A.        The officers were following him.

11       Q.        Okay, so you saw officers

12   following Schoolcraft into the apartment?

13       A.        Because at that point he was --

14   officers were with us in the back of the

15   vehicle.

16       Q.        Who was in the vehicle with you?

17       A.        It was Jessica Marquez, you

18   know, Officer Schoolcraft and an officer who

19   was waiting outside till once we secured the

20   patient, that's when the officer would come

21   with us.

22       Q.        Was it normal procedure for an

23   officer to go to the hospital under these

24   circumstances?

25       A.        They will when they're

Page 115

1                    S. SANGENITI

2   designated as an EDP.

3        Q.      Well, had Schoolcraft been

4   designated as an EDP at that time?

5        A.      Sure.

6        Q.      By whom?

7        A.      The officers.

8        Q.      So a police officer was getting

9   into the ambulance on that first occasion

10  when Schoolcraft was getting into the

11  ambulance; is that right?

12       A.      Well, the officer was outside

13  and we were waiting to put him in the

14  stretcher and you know, get him situated.

15       Q.      And it was while you were

16  getting him situated that he got up and

17  left, right?

18       A.      Correct.

19       Q.      How long was Schoolcraft in the

20  ambulance on that first occasion?

21       A.      Not long.  Approximately --

22       Q.      Five seconds, ten seconds?

23       A.      Five minutes, if that.

24       Q.      What happened inside the

25  ambulance, other than what you told me,

Page 116

                         S. SANGENITI
1
2    which is that you told him you were going to
3    take him to the nearest 911 receiving
4    hospital Jamaica and he said I'm out of
5    here.  What else happened?
6         A.    I'm not going to Jamaica.  I'm
7    going back in the house.  I'm going.  I
8    don't need your help and he just left.
9         Q.    Did he say I'm refusing medical
10   attention?
11        A.    He said he's refusing to go to
12   the hospital.
13        Q.    Did you do anything to
14   Schoolcraft while he was in the ambulance?
15        A.    No.
16        Q.    Did Marquez do anything while he
17   was in the ambulance?
18        A.    Just try to sit him on the
19   stretcher.
20        Q.    Did you try and force him onto
21   the stretcher?
22              MR. RADOMISLI:  Objection.
23        A.    No.
24        Q.    Was he bound or handcuffed in
25   any way?

Page 117

1                    S. SANGENITI

2          A.      No.

3          Q.      Was he restrained in any way?

4          A.      No.

5          Q.      Was anybody holding his arm when

6    he was brought into the ambulance?

7          A.      Just the step up.

8          Q.      Just to help him to get up?

9          A.      Yes.

10         Q.      Who did that?

11         A.      Myself.

12         Q.      Did anybody take his blood

13   pressure while he was in the ambulance?

14         A.      The first time or second time?

15         Q.      No, no.  The first time.  I'm

16   only talking about the first when he was

17   walking into the ambulance of his own free

18   will?

19         A.      No.

20         Q.      Did anybody do anything else to

21   assess him medically while he was in the

22   ambulance?

23         A.      No.  It was too short of a time.

24         Q.      So is there anything else that

25   happened in the ambulance on that first

Page 118

```
 1                    S. SANGENITI
 2   occasion?
 3        A.     No.
 4        Q.     Do you recall Lieutenant Hanlon
 5   being at the scene at the time that
 6   Schoolcraft went into the ambulance?
 7        A.     Yes.
 8        Q.     Do you recall her saying
 9   anything?
10        A.     I'm sorry, I don't know exactly
11   what you're trying to --
12        Q.     I'm really just asking do you
13   recall her saying or doing anything?
14               MR. RADOMISLI:  At the
15        ambulance?
16               MR. SMITH:  Yeah.
17        A.     No.
18        Q.     After Schoolcraft left the
19   ambulance, did you see Hanlon do anything?
20        A.     She said stay here and you know,
21   let PD handle it.
22        Q.     Then what did she do?
23        A.     What did I do?
24        Q.     No, no.  What did Hanlon do?
25        A.     She stood there with me.  She
```

Page 119

1                    S.  SANGENITI

2    wasn't go into the scene either.

3          Q.      Into what scene?

4          A.      Where they went back into the

5    apartment.

6          Q.      You stayed on the street, right?

7          A.      Correct.

8          Q.      And Marquez stayed on the

9    street; is that right?

10         A.      Correct.

11         Q.      And Hanlon stayed on the street,

12   right?

13         A.      Correct.

14         Q.      And a whole bunch of the

15   officers went back into the apartment?

16         A.      They asked for the chair.  We

17   gave them the stair chair.  Timeframe I

18   couldn't tell you.  It was approximately

19   five, ten minutes later Officer Schoolcraft

20   was in the chair, handcuffed and he was now,

21   you know, getting ready to be put in my

22   vehicle.

23         Q.      And he was then put in the

24   vehicle?

25         A.      Yes.

Page 120

```
 1                    S. SANGENITI
 2        Q.      And was he then handcuffed to
 3   the stretcher?
 4        A.      He was.
 5        Q.      Was his blood pressure taken
 6   then?
 7        A.      Let's see --
 8        Q.      We can read all the documents --
 9        A.      Yeah, it was.
10        Q.      -- till we're blue in the face.
11   I want to know whether or not you remember
12   his blood pressure being taken when he was
13   put in the ambulance on the second occasion?
14              MR. RADOMISLI:  That wasn't what
15        your question was.  The question was
16        what was done, so he's referring to the
17        records.
18              MR. SMITH:  Fair enough.
19              MR. RADOMISLI:  If you're asking
20        him what you recall --
21              MR. SMITH:  Yeah, all right.  I
22        will ask him a different question.
23        Q.      I know what the document says
24   and so do you.  What I want to know, like I
25   said before, is what do you remember about
```

Page 121

                        S. SANGENITI

1

2    him having his blood pressure taken on that

3    second time he was in the ambulance, this

4    time handcuffed to the gurney?

5             MR. RADOMISLI:   Objection to

6         form.

7        A.      And again, I wouldn't be in the

8    rear of the vehicle.  At that point I would

9    shut the vehicle doors and take the person

10   to the hospital.

11       Q.      So you didn't see him when he

12   was put in the vehicle, right?

13       A.      I was there when we -- he was

14   put in the vehicle, sure.

15       Q.      You didn't see Marquez take a

16   blood pressure reading for a second time?

17       A.      Not for the second time, no.

18       Q.      Did you ever at any time see her

19   take a second reading?

20       A.      No.

21       Q.      When you saw Schoolcraft coming

22   out of the apartment in the stair chair,

23   what was his demeanor?

24       A.      Agitated, yelling.

25       Q.      Anything else?

Page 131

```
 1                    S. SANGENITI
 2   don't remove the handcuffs.
 3        Q.     After he was cuffed to the
 4   stretcher or the gurney, what happened next?
 5        A.     We closed the door and proceeded
 6   to go take him to the hospital.
 7        Q.     Who was in the ambulance?
 8        A.     It would have to be -- I can't
 9   speculate -- I don't remember.  I know that
10   it was an officer and Jessica Marquez.
11        Q.     So they were in the back of the
12   bus and you were driving; is that right?
13        A.     Yes.
14        Q.     Did you go with lights flashing
15   and sirens blaring?
16        A.     No.
17        Q.     Why not?
18        A.     New York State Department of
19   Health does not let you -- DMV actually does
20   not let you.
21        Q.     I thought you had a potential
22   emergency situation.  So can you explain to
23   me why you wouldn't be going back to the
24   hospital under those circumstances?
25        A.     Based on his blood pressure and
```

CRITICAL

Page 132

1                    S. SANGENITI

2    his statement that that was his normal blood

3    pressure, he's considered a stable patient

4    at that point.

5         Q.     I see.  So the regulations that

6    you were just referring to state that if

7    somebody is considered a stable patient you

8    can't use lights and sirens?

9         A.     Correct.

10        Q.     So when Schoolcraft was put in

11   the ambulance he was considered a stable

12   patient?

13        A.     Yes.

14        Q.     And he was considered a stable

15   patient by you?

16        A.     Yes.

17        Q.     Was there somebody who was

18   responsible for making the determination

19   whether or not the patient is stable or not

20   stable?

21        A.     It would be the highest medical

22   authority on the scene.

23        Q.     And who was that?

24        A.     It would be Lieutenant Hanlon.

25   She's a paramedic.

Page 133

1                    S. SANGENITI
2        Q.        Is there something on the PCR
3    that reflects that he was in stable
4    condition at the time he was put in the
5    ambulance?
6                  MR. RADOMISLI:  Other than what
7            he already testified to?
8                  MR. SMITH:  Yeah, other than
9            whatever else is in the PCR, but I am
10           not sure that's clear.  So maybe you
11           want to do that.  Let me rephrase the
12           question.
13       Q.        Is there anything in the PCR
14   that suggests to you that Schoolcraft was
15   classified as a stable patient at the time
16   he was being taken to Jamaica Hospital?
17                 MR. RADOMISLI:  Objection to
18           form.
19       A.        Based on EMT Marquez' narrative
20   on his condition, it would warrant it being
21   considered a stable patient.
22       Q.        What is it about her narrative
23   that --
24       A.        Alert and oriented times three
25   -- I'm sorry, not times three.  Alert and

Page 134

1                           S. SANGENITI

2      oriented.  He denied taking any medicines,

3      his vitals again, were his normal, he denied

4      any negative chest pain, he had good pulse,

5      motor sensory.  That would be considered a

6      stable patient.

7             Q.      Where does it say the vitals

8      were normal?

9             A.      Vitals weren't normal.

10            Q.      Oh, I thought you said --

11            A.      No, his vitals were normal for

12     him.  That was his statement.

13            Q.      Does it make a reference to his

14     statement that his vitals were normal for

15     him?

16            A.      No. Doesn't state it in the PCR.

17            Q.      Other than the narrative, is

18     there some other indication or box or check

19     or a mark that suggests that Schoolcraft was

20     deemed to be in stable condition when he was

21     being taken to Jamaica?

22                    MR. RADOMISLI:  Objection to

23            form.

24            A.      Well, patent airway, his

25     breathing was normal, lung sounds were

Page 135

                    S. SANGENITI
1
2     clear.  These vitals were posed to me they
3     would be considered normal.
4          Q.     So all of the indications on
5     page 1 of the PCR relating to airway,
6     breathing, circulation, pupils and the
7     Glasgow.  Those are all indications that
8     he's in stable condition, right?
9          A.     Yes.
10         Q.     Is there anything on the first
11    page that indicates that he is in anything
12    but a stable condition?
13         A.     No.
14         Q.     What do the transportation
15    regulations that you were referring to
16    earlier about when you're allowed and not
17    allowed to use the lights and sirens to
18    return a patient to a hospital?
19         A.     They -- New York State --
20    actually New York City Fire Department has a
21    procedure out for patients that are in
22    stable condition as to use of lights and
23    sirens.
24         Q.     What is that regulation called?
25         A.     It's the use of lights and

Page 136

```
 1                    S. SANGENITI
 2    sirens in an emergency mode.
 3        Q.      And those regulations govern
 4    your operation of the Jamaica bus?
 5                    MR. RADOMISLI:  Objection to
 6        form.
 7        A.      Of all ambulances within, you
 8    know, within New York City.
 9        Q.      Including Jamaica ambulances?
10        A.      Everyone.
11        Q.      Are there other fire department
12    regulations that govern the way a Jamaica
13    EMT conducts his or her duties as an EMT?
14                    MR. RADOMISLI:  Objection.
15        A.      They have the rules and
16    regulations that every voluntary hospital
17    that needs to abide by.
18        Q.      And if I want to get my hands on
19    those rules and regulations, where would I
20    go?
21        A.      You would probably have to have
22    to go through the City Law Department.
23        Q.      Did you hear any of the
24    conversation, if any, that was had in the
25    ambulance between or among anybody in the
```

Page 137

1                    S. SANGENITI

2    ambulance during the ride to the hospital?

3         A.      No, I wouldn't be able to hear

4    anything.

5         Q.      You couldn't?

6         A.      Couldn't.  There's a partition.

7         Q.      When you got to the destination,

8    did you hear any conversation that anybody

9    had pertaining to Schoolcraft?

10        A.      No.

11        Q.      So after you got to the

12   destination what did you do?

13        A.      Backed into the ER bay, opened

14   the back and moved Officer Schoolcraft, took

15   him over to the ER triage.  Had him

16   evaluated.  I took the stretcher back, put

17   it into the ambulance and prepared myself to

18   go home.

19        Q.      Was Schoolcraft in custody when

20   he was brought to the hospital?

21             MR. RADOMISLI:  Objection.

22        A.      He was.

23        Q.      And was he left in custody by

24   the police department when you left?

25             MR. RADOMISLI:  Objection.

```
 1                    S. SANGENITI
 2    attention from the other room while you were
 3    inside the bedroom?
 4         A.    Yes.
 5         Q.    Had she been speaking with other
 6    officers who were in that other room just
 7    before she called out your name Sal, Sal?
 8                    MR. KRETZ:  Objection.
 9                    MR. RADOMISLI objection.
10         A.    Yes.
11         Q.    What's your understanding of
12    why she was trying to get your attention at
13    that moment when you were taking or had just
14    taken his blood pressure?
15                    MR. RADOMISLI:  Objection.
16                    MS. PUBLICKER METTHAM:
17    Objection.
18         A.    I don't know.  I wasn't privy to
19    that.
20         Q.    Well, you responded to that --
21         A.    Well, I have because she was
22    my...
23         Q.    I know.  What I want to know is
24    I want to understand what is it that you
25    were conveying back to her when you said
```

Page 167

1                    S. SANGENITI
2          A.      Not really.  Whatever was said
3    on the tape that he had a headache and he
4    was wasn't feeling well.
5          Q.      Did he tell you whether he had
6    taken any medication for his headaches?
7          A.      Just the Nyquil.
8          Q.      Did plaintiff ever tell you that
9    he had chest pains?
10         A.      No.
11         Q.      Did anyone from the NYPD ever
12   tell you that plaintiff complained of chest
13   pains?
14         A.      No.
15         Q.      Did plaintiff complain about any
16   sinus problems?
17         A.      No.
18         Q.      Did you believe plaintiff to be
19   a danger to himself at any point?
20         A.      No.
21         Q.      Did you personally fill out any
22   paperwork as a result of this call?
23         A.      No.
24         Q.      Did you review any documents
25   prior to going to plaintiff's apartment on