1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------X
    ADRIAN SCHOOLCRAFT,
3
                                        PLAINTIFF,
4
                    -against-          Case No:
5                                      10 Civ. 6005
                                       (RWS)
6
    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
7   Tax Id. 873220, Individually and in his Official
    Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
8   NORTH GERALD NELSON, Tax Id. 912370, Individually
    and in his Official Capacity, DEPUTY INSPECTOR
9   STEVEN MAURIELLO, Tax Id. 895117, Individually and
    in his Official Capacity, CAPTAIN THEODORE
10  LAUTERBORN, Tax Id. 897840, Individually and in his
    Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
11  919124, Individually and in his Official Capacity,
    SGT. FREDERICK SAWYER, Shield No. 2576, Individually
12  and in his Official Capacity, SERGEANT KURT DUNCAN,
    Shield No. 2483, Individually and in his Official
13  Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
    915354, Individually and in his Official Capacity,
14  LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
    Individually and in his Official Capacity, SERGEANT
15  SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
    #1-50, Individually and in their Official Capacity
16  (the name John Doe being fictitious, as the true
    names are presently unknown) (collectively referred
17  to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
    CENTER, DR. ISAK ISAKOV, Individually and in his
18  Official Capacity, DR. LILIAN ALDANA-BERNIER,
    Individually and in her Official Capacity and
19  JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEES "JOHN
    DOE" #1-50, Individually and in their Official
20  Capacity (the name John Doe being fictitious, as
    the true names are presently unknown),
21
                                       DEFENDANTS.
22  ------------------------------------------------X
                    DATE:   October 17, 2014
23                  TIME:   10:20 A.M.

24
            (Deposition of JOHN ETERNO, PhD)
25

1

2                          DATE:   October 17, 2014

3                          TIME:   10:20 A.M.

4

5

6

7           DEPOSITION of an Expert Witness,

8     JOHN ETERNO, PhD, taken by the Respective Parties,

9     Pursuant to a Notice and to the Federal Rules of

10    Civil Procedure, held at the offices of the New

11    York City Law Department, 100 Church Street,

12    New York, New York 10007, before Nathan MacCormack,

13    a Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

J. ETERNO

1          Would we would bring them up in lecture and in

2     class discussion.   Students often might do papers on this,

3     as well.

4          Q.    Have you ever taught a course dealing with the

5     topic of emotionally disturbed persons?

6          A.    Not specifically.

7          Q.    Has it ever come up in any of your courses?

8          A.    Again, possibly.

9          Q.    But you don't have a specific recollection?

10         A.    No.

11         Q.    Do you hold any expert or professional

12    certifications?

13         A.    Yes.

14         Q.    What certification or titles are those?

15         A.    I am CITI-certificated, in terms of social

16    behavioral research, that's C-I-T-I, which means

17    Collaborative Institutional Training Initiative; I am

18    certificated as a physical fitness instructor for law

19    enforcement; I was certified by the New York City Police

20    Academy to be a Police Academy instructor, where I taught

21    police science, where I taught Emotionally Disturbed

22    People; I am also a verbal judo instructor, and

23    certificated by the New York City Police Department there.

24         Q.    Can you repeat which courses you have taught on

25    emotionally disturbed persons?

J. ETERNO

1    A.    That would be in police science.

2    Q.    So, when I asked earlier if you had ever taught

3    any course dealing with emotionally disturbed persons you

4    would add that to the list?

5    A.    I would.

6    Q.    When did you teach that course?

7    A.    This was 1987 through '88.

8    Q.    In what context did you teach that course?

9    A.    I taught recruits at the academy.

10   Q.    Was the course solely on emotionally disturbed

11   persons?

12   A.    No.

13   Q.    What was the context of the course?

14   A.    Police science.

15   Q.    How long was the section on emotionally disturbed

16   persons?

17   A.    I don't recall.

18   Q.    How long was the training that you gave to these

19   new recruits?

20   A.    Approximately six months.

21   Q.    What kind of training did you give with regard to

22   emotionally disturbed persons?

23   A.    There were very strict lectures that we do and

24   cover on emotionally disturbed people.  We sometimes do

25   role play, other types of activities for the recruits.

33

J. ETERNO

1     Q.     Do you personally have any experience with

2     emotionally disturbed persons?

3     A.     Yes.

4     Q.     What is that experience?

5     A.     As a police officer, police sergeant, police

6     lieutenant and a police captain.

7     Q.     And what were your experiences in those different

8     capacities?

9     A.     We handle emotionally disturbed people on a

10    regular basis.

11    Q.     In your capacity as an employee of the N.Y.P.D.,

12    did you ever have occasion to declare someone as an E.D.P.?

13    A.     Yes.

14    Q.     And when I say "E.D.P.," you understand that I

15    mean an emotionally disturbed person?

16    A.     I do.

17    Q.     How many times did you declare someone an E.D.P.?

18    A.     I don't recall.

19    Q.     How did you decide whether or not somebody was an

20    E.D.P.?

21            MR. SMITH:  Objection to the form.

22    A.     Using the patrol guide standard:  Mentally ill

23    and dangerous to himself or others.

24    Q.     And how would you determine if someone was

25    mentally ill?

J. ETERNO

1     individuals were disciplined as a result of having that

2     Q.A.D. report?

3          A.     No, they haven't.

4          Q.     You drafted the patrol guide section on

5     complaints when you were employed by the N.Y.P.D.; is that

6     correct?

7          A.     I helped draft it, yes.

8          Q.     Do you know if that section, as written by you,

9     is still in place?

10         A.     No, I don't.

11         Q.     The next section, starting on page 8 of your

12    report, is the Blue Wall of Silence.

13               MR. SMITH:  Why don't we take a lunch break?

14               MS. PUBLICKER METTHAM:  If you let me finish

15               the question, Mr. Smith.  As you know, you cannot

16               take a break while a question is pending.  We can

17               take a break after that.

18               MR. SMITH:  I was suggesting that we take a

19               break before you asked the question.

20               MS. PUBLICKER METTHAM:  Well, I am going to

21               ask the question, then we can take the break.

22         Q.     Your section indicates that the blue --

23         A.     Where are we now?

24               MS. PUBLICKER METTHAM:  On page --

25               MR. SMITH:  She is asking one more question,

J. ETERNO

1           then we are taking a break.

2               MS. PUBLICKER METTHAM:  Mr. Smith, if you

3               are going to continue to interrupt

4               inappropriately I am going to make an application

5               to the court based on your continued malfeasance.

6      Q.   Professor Eterno, your section entitled Blue Wall

7    of Silence indicates that the code of silence has been

8    observed and studied in reports of many police departments

9    throughout the world, right?

10     A.   Yes.

11     Q.   So, do you believe that every police department

12   in the world has a blue wall of silence?

13     A.   I believe that the informal code is something

14   that exists and is well researched.  There are numerous

15   studies that have shown the police culture is pervasive in

16   policing.

17          So, when you say "every police department," I

18   would have to say that it is pervasive, it might not be

19   somewhere.  But there is an informal code, that is well

20   documented.

21               MS. PUBLICKER METTHAM:  We can take a break

22               at this time for lunch.  The time is 1:18 p.m.

23               (Whereupon, a luncheon recess was taken at

24               this time.)

25               MS. PUBLICKER METTHAM:  So, we are going

143

J. ETERNO

1          back on the record.  It is 2:12 p.m.

2     Q.     Dr. Eterno, when we left off we were talking

3     about the blue wall of silence.

4     A.     Yes.

5     Q.     How do you determine whether a police department

6     has a blue wall of silence?

7     A.     There is a huge amount of research that indicates

8     that a blue wall of silence is nearly ubiquitous in police

9     departments.  This research is well documented.

10    Q.     How does the research determine whether a

11    department has a blue wall of silence?

12    A.     They use typical social science methods, might

13    include surveys or qualitative research, where they would

14    actually visit the department and watch what's going on.

15    Q.     And what kind of information that would be

16    derived from a survey or research, qualitative research,

17    would indicate that a blue wall of silence was in place?

18    A.     Well, the blue wall of silence is really part of

19    the informal code, which is part of police culture.  And

20    the police culture is something that's in -- it's in every

21    department.  But instead of a formal code, it's an informal

22    code.

23          It's just what's going on.  So, the nature of the

24    blue wall of silence may be very different depending on the

25    department.

J. ETERNO

1    Q.    So, when you use the term "blue wall of silence,"
2    what do you mean?
3    A.    Well, again, it's a euphemism for police culture,
4    and it is a way that officers informally deal with what's
5    going on in the dangerousness of the work environment and
6    the loyalty to one another.
7          Because of that danger, they kind of stick
8    together.  And because of that, they will develop a blue
9    wall of silence where they won't talk about things.
10   Because they need to stick together, they need to be loyal
11   to one another.  And again, we have seen this in the Mollen
12   Commission, the Knapp Commission, we have seen this
13   numerous places.
14   Q.    Is the blue wall of silence necessarily
15   pejorative?
16   A.    I think most people do take it that way, as a
17   pejorative term.  But I would say in some cases it's not
18   necessarily a bad thing.
19         It could be at times something healthy, where
20   officers want to keep things to themselves.  But generally,
21   it is used as a negative term.
22   Q.    Do you believe it's a pejorative term?
23   A.    I think in general it is, yes.
24   Q.    You said that it can manifest in different ways
25   and different agencies; is that correct?

J. ETERNO

1       A.      Yes.

2       Q.      And how could it manifest differently in

3    different agencies?

4       A.      In some agencies it may not be as necessary.

5    There may not be as much danger, there may not be as much

6    need for that protection.  In other agencies there may be a

7    very strong need for that protection.  It might be in an

8    agency that perhaps is doing things that might be illegal.

9    And officers are aware of that, that you need to make sure

10   that you don't rat out the other guy.

11              Or it may just be that they are doing things that

12   may be questionable in the eyes of people who are not

13   initiated into the world of policing.  And to that extent,

14   at times the officers need to stick together to defend

15   themselves from what they perceive at times to be unneeded

16   circumspection of what they are doing.

17      Q.      In your answer you mentioned danger and

18   protection.  Can you be more specific about what kind of

19   danger and protection you believe are related to this blue

20   wall of silence?

21      A.      Yes.  The danger of the work environment.  We are

22   talking about perpetrators and others who may be fighting

23   police officers, or just could be animosity against police

24   officers.  It could be a community that may be negative to

25   the police officers.

J. ETERNO

1           But the danger is generally thought to be, at

2    least in most of the literature, it's generally seen to be

3    the work environment itself and from the perpetrators.

4       Q.    And when you refer to protection, what are you

5    referring to?

6       A.    Well, protection from various different things

7    from the outside, community pressures, media pressures.  It

8    could be legal pressures, it could be C.C.R.B, or it could

9    be from the bosses.

10          There is a literature on the New York City Police

11   Department written by Elizabeth Reuss-Ianni, had a very

12   interesting study that compares two cultures of policing.

13   They call them management culture and the street cop

14   culture.  She points out that there is some animosity

15   between those two, so it could even be protection from

16   management.

17      Q.    Can you spell Reuss-Ianni?

18      A.    R-E-U-S-S dash I-A-N-N-I.  The name of the book

19   is Two Cultures of Policing, one of many of her writings.

20      Q.    And earlier you mentioned that there were

21   surveys, qualitative research and studies into police

22   culture and the blue wall of silence that you believe are

23   authoritative; is that correct?

24      A.    Very authoritative, yes.

25      Q.    What are those?

J. ETERNO

1      A.      Stoddard, Wesley, Fielding, Manning, Crank, just

2   to name a few off the top of my head that show that.  There

3   is also research on an attitude effect, Oneman, Wardman and

4   Shepherd, just a few of the names that come to mind.

5      Q.      What do you mean by attitude effect?

6      A.      The attitude effect is where officers respond

7   to -- again, this is part of the police culture, just like

8   the blue wall of silence, that officers respond to the

9   attitude of suspect as to opposed to the legality of what

10   the suspect is doing.

11      Q.      And do you believe that attitude effect is

12   reflected in your expert report in any way?

13      A.      It's possible.  It could be there somewhere.  I

14   didn't specifically mention it, but it might be there.

15      Q.      Have you formed opinions in this case about the

16   attitude effect?

17      A.      Not specifically.  But there might be

18   circumstances that come up when we are talking that it may

19   come up.

20      Q.      But in your expert report, have you come to a

21   conclusion or opinion about the attitude effect as it

22   relates to Adrian Schoolcraft?

23                  MR. SMITH:  Objection to the form.

24      A.      No.

25      Q.      In your expert report you mention that the issue

148

J. ETERNO

1    of the blue wall of silence has repeatedly come up in the

2    history of New York City; is that correct?

3        A.    Yes.

4        Q.    And in doing so, you cite to the 1972 Knapp

5    Commission and the 1994 Mollen Commission; is that correct?

6        A.    Yes.

7        Q.    Are you aware of any other commissions or studies

8    on New York's blue wall of silence in the last 20 years?

9        A.    No.  Those are the two main commissions.  There

10   haven't been any commissions since Mollen regarding -- at

11   least at that level.  There was the Committee to Combat

12   Corruption, Mark Pomerantz, which I do talk about in my

13   expert report.

14            But that was basically cut off and not allowed to

15   do -- Mark Pomerantz eventually quit when he wasn't allowed

16   to rebuke.

17       Q.    Was the subject of the Committee to Combat

18   Corruption the blue wall of silence?

19       A.    No.  That was complaint reports at the time and

20   the gaming of complaint reports.

21       Q.    Are you aware of any studies outside of the

22   commissions' on the blue wall of silence's prevalence in

23   New York City in the last 20 years?

24       A.    No.  I did mention it in my book, Policing Within

25   the Law:  A Case Study of the New York Police Department.

J. ETERNO

1    Q.    When was that book published?

2    A.    2003.

3    Q.    Have you done any research, qualitative research,

4    on the blue wall of silence yourself?

5    A.    Not qualitative, no.

6    Q.    Have you done any quantitative research on the

7    blue wall of silence?

8    A.    Yes.  As I said, it's in my book, Police Culture,

9    Policing Within the Law, where there is quantitative work

10   on the police culture.

11   Q.    And what is that quantitative work?

12   A.    It was a survey that I sent out as part of my

13   dissertation.

14   Q.    What was that survey?

15   A.    It was a survey on whether officers would follow

16   the law in various situations.  I put them in various

17   hypothetical situations and asked them what they would do

18   in that situation.

19   Q.    How does that relate to the blue wall of silence?

20   A.    One of the variables was police culture, where I

21   mention the loyalty to one another, which is part of the

22   blue wall of silence.  We also talk about the language, and

23   I also did measure the attitude effect.

24          Also, one of the variables that was in the

25   instrument that I used included a measure of police

J. ETERNO

1    culture.

2        Q.    What was that measure of police culture?

3        A.    Again, it was a survey question, and they were

4    put into hypothetical situations which included the police

5    culture.

6        Q.    When you say "which included police culture,"

7    what do you mean, what was the survey question?

8        A.    Well, it -- it's hard to explain.  It was a

9    factorial survey method, which means that when it came to

10   police culture, and putting them in various hypothetical

11   situations, when I put them in those situations I used

12   specific language that measures the extent to which the

13   police culture has an effect on them.

14       Q.    What questions did you ask that got to the issue

15   of the blue wall of silence?

16       A.    The police culture was measured in every

17   question, so the police culture including loyalty.  Things

18   like that were in various questions, depending on the type

19   of questioning.  Since it's something called the factorial

20   survey method, which means they don't get -- every officer

21   doesn't get the same exact method.  It's randomly -- the

22   question they get is randomly selected.

23             And then, looking at the differences in the

24   officers' responses, we can determine how much influence

25   the police culture has.

J. ETERNO

1    Q.    What was the result of that survey as it related
2    to the blue wall of silence?

3    A.    The police culture did have an effect on some
4    officers at certain times.

5    Q.    On how many officers?

6    A.    Well, I don't have that in front of me.  I would
7    have to take a look at the -- look it over again.

8    Q.    Do you recall approximately what the percentage
9    of officers was?

10    A.    I don't recall right now, but it depended on the
11    situation.  The police culture had more of an effect, and I
12    compared it, certain situations and stop situations.  And
13    in the stop situations, the police culture had more of an
14    effect in the stop as opposed to the search.

15    Q.    Can you explain that further?

16    A.    Okay.  There are a number of different types of
17    scenarios that I put them in legally; some were search
18    situations, some were stop situations.

19         When I compared the differences between the stop
20    and the search situations, I found that in the stop
21    situations the officers did react more to loyalty and other
22    police culture factors that would be involved in the blue
23    wall of silence.

24    Q..    And that's what you meant when you said that this
25    has a greater effect on some officers at some times?

J. ETERNO

1      A.      Yes.

2      Q.      Did you find that any officers were more or less

3   immune to this blue wall of silence?

4      A.      From -- again, from my recollection, just off the

5   top of my head, but from my recollection of my research,

6   there were officers that were more prone than others.

7      Q.      Would you say that this research that you

8   conducted is some of the facts and data on which you relied

9   in creating your expert report?

10     A.      Not really.  It's just basic knowledge.  I didn't

11   rely on that for this report, no.

12     Q.      So, at trial, you would not rely on that research

13   in defending your report?

14             MR. SMITH:  Objection to the form.

15     A.      No.  However, I would rely on general knowledge

16   that I have on the police culture and the blue wall of

17   silence.  That, I would rely on.

18     Q.      The next section on the next page, page 9, is

19   titled "The Blue Wall and Forceable Hospitalization of

20   Officer Schoolcraft."

21             You claim that the blue wall of silence likely

22   contributed to Officer Schoolcraft?

23     A.      Yes.

24     Q.      What do you mean by "likely contributed"?

25     A.      "Likely" means that it appears to have.

J. ETERNO

1      Q.      Is that to a reasonable degree of scientific

2   certainty?

3      A.      Yes.

4      Q.      And on what do you base that opinion?

5      A.      On what's in appendix B, and all the other

6   materials, my knowledge and expertise.

7      Q.      Did you read the depositions of any officers

8   involved in this case?

9      A.      Not in their entirety.

10      Q.      Did you read any in part?

11      A.      There was, I think, an Officer Duncan that I

12   looked at.

13      Q.      And earlier today, when I asked you about

14   documents, you did not mention Officer Duncan?

15      A.      Isn't that in appendix B?

16      Q.      I am sorry, that one is in appendix B.

17              MR. SMITH:  As is Finnegan.

18      Q.      So, the only depositions you reviewed would be

19   Finnegan and Duncan?

20      A.      Yes.

21              MR. SMITH:  But he did mention that there

22              were subsequent reports.

23              THE WITNESS:  Yes, the lieutenant's special

24              assignment from the medical division.

25      Q.      So, you did not review the complete deposition of

J. ETERNO

1    still doesn't make her statement meaningless.

2           A department psychologist's opinion is very

3    important.  Regardless of the circumstances, I would take

4    what she has to say about him very seriously.

5    Q.    So, you would take very seriously, the fact that

6    she removed his guns based on anger issues very seriously?

7           MR. SMITH:  Objection to the form.

8    A.    Yes.

9    Q.    Is it your understanding --

10   A.    Let me clarify that.  I would also take seriously

11   the fact that she said he is not a danger to himself or

12   others.  Both statements are important.

13   Q.    Do you believe that she saw Adrian Schoolcraft on

14   October 31, 2009?

15          MR. SMITH:  Objection to the form.

16   A.    I don't know when she saw him.

17   Q.    So, on page 10, the next real sentence starting

18   with "we note."  I would like you to read that page for me.

19   You can read it into the record if you like, or if you

20   like, you can read it to yourself.

21   A.    We are talking about two issues?

22   Q.    Yes.

23   A.    I guess we should read this in.  "Two issues with

24   this are, one, the EMT only states he is potentially

25   emotionally disturbed, which is not emotionally disturbed.

J. ETERNO

1    And two, according to police procedure, a police officer,

2    not an EMT, must reasonably believe that the person being

3    taken into forcible custody is mentally ill or temporarily

4    deranged and his behavior is likely to cause serious injury

5    to himself other others."

6        Q.    Great.  I will move on.

7            To what police procedure are you referring to?

8        A.    This is the patrol guide procedure on emotionally

9    disturbed persons.

10       Q.    Is that cited in your appendix?  It's the last

11   page of your report.

12       A.    It's not in the appendix, but it's in the

13   references section, page 28 at the bottom.

14       Q.    This just states the "N.Y.P.D. patrol guide,

15   unpublished," correct?

16       A.    Yeah, unpublished.

17       Q.    So, I am asking which patrol guide procedure,

18   specifically, you are referring to?

19       A.    Emotionally disturbed persons.

20       Q.    You don't know the number?

21       A.    Not off the top of my head.

22       Q.    How did you receive that document?

23       A.    Again, I have the patrol guide on my computer at

24   work.

25                    MS. PUBLICKER METTHAM:  I am going to ask

J. ETERNO

1           for production of the E.D.P. procedure in which

2           the expert relied in creating his report.

3      Q.    In that police procedure, does it state what

4   information has to be captured on an unusual incident

5   report?

6      A.    Do you have a copy of the procedure?

7      Q.    I don't.

8      A.    Okay, I am not sure.

9      Q.    When you wrote this report, did you believe that

10  to be the case?

11           MR. SMITH:  Objection to the form.

12     A.    Believe what to be the case?

13     Q.    Did you believe that the police procedure

14  required information to be included in the unusual incident

15  report?

16     A.    An unusual incident report is a separate

17  procedure in the patrol guide.  And anything that the chief

18  of patrol needs to know should be included in the unusual

19  report.

20           I think it would be critical for the chief patrol

21  to know why a member of the service -- a uniformed member

22  of the service is being forcibly placed into a mental

23  hospital.  So yes, I believe that should be in the unusual

24  report.

25     Q.    And you believe it's not contained in the unusual

J. ETERNO

1    incident report drafted by Captain Lauterborn?

2        A.    From my recollection, because I don't have the

3    memo.  But from my recollection of the memo, there was no

4    indication specifically delineating how Officer Schoolcraft

5    was found to be mentally ill and dangerous.

6        Q.    Is it possible that by writing "potentially

7    emotionally disturbed" Captain Lauterborn was indicating

8    that he reasonably believed plaintiff was emotionally

9    disturbed?

10            MR. SMITH:  Objection to form.

11       A.    The issue with that, if that's what the EMT said,

12   "He is a potential emotionally disturbed person," this to

13   me does not indicate that he is emotionally disturbed.  And

14   as I say in my expert opinion, the situation that led to

15   this was actually created, in my view, by the police

16   department.

17       Q.    Did you read the deposition of Lieutenant Hamlon

18   of the F.D.N.Y.?

19       A.    I did not.

20       Q.    So, do you know whether by stating "potentially

21   emotionally disturbed" she believed that he was emotionally

22   disturbed?

23       A.    "Potentially" means potentially.  I take that for

24   what it says.  So, if she has some other meaning or somehow

25   communicated something else, it's not in the written

J. ETERNO

1    record.

2        Q.    Is it appropriate to make a determination about

3    someone's mental illness, to make a diagnosis on the scene

4    of an incident?

5              MR. SMITH:  Objection to the form.

6        A.    You are not making a diagnosis.  That's going to

7    be made at the hospital.

8        Q.    So, you can't make a diagnosis about whether

9    someone is mentally ill while at the scene of the accident;

10   is that correct?

11             MR. SMITH:  Objection to the form.

12       A.    Correct, you don't make a diagnosis.

13       Q.    Because police officers don't make diagnoses,

14   correct?

15       A.    Correct.

16       Q.    So, they have to reasonably believe that an

17   individual is emotionally disturbed?

18             MR. SMITH:  Objection to the form.

19       A.    That is correct.

20       Q.    And you don't believe that by writing

21   "potentially" someone could mean "reasonably believing"?

22             MR. SMITH:  Objection to the form.

23       A.    I think that it's showing what an EMT thought.

24   It is not showing what any of the officers thought at the

25   scene.

J. ETERNO

1    Q.    Your report mentioned that the duty captain

2    referred complaint reports to Internal Affairs for

3    followup; is that right?

4    A.    Again, you are referring to the Lauterborn memo?

5    Q.    No.  I am just referring to your report.  On page

6    10, "Additionally, the duty captain refers the complaint

7    reports to Internal Affairs for followup, which is referred

8    to Quality Assurance, which, in turn, confirms Officer

9    Schoolcraft's allegations about the corrupt activity in the

10   precinct."

11          So, this does seem to be you paraphrasing from

12   the unusual incident report?

13   A.    Yes.

14   Q.    So, based on this, the duty captain did not try

15   to cover up the complaint report he found in Schoolcraft's

16   apartment?

17          MR. SMITH:  Objection to the form.

18   A.    No.

19   Q.    Does that fit within your concept of the blue

20   wall of silence?

21   A.    Well, the tape recorder not being put in

22   certainly is something that bothers me.  When he put this

23   in -- excuse me, when he put this in, and not the tape

24   recorder, that seems a little conflicting to me.

25   Q.    But does the fact that he -- on its own, the fact

184

J. ETERNO

1    that the duty captain reported the complaint reports he

2    found to Internal Affairs fit within your concept of the

3    blue wall of silence?

4        A.    How do you mean?  What do you mean, fitting

5    within my concept of the blue wall -- who is being silent?

6    What are you driving at?

7        Q.    Well, the duty captain didn't try to cover up

8    these complaint reports, did he?

9        A.    Yeah, the duty captain is a supervisory officer

10   involved with this.  The blue wall of silence really has to

11   do with officers, you know, police officers' rank.

12              The supervisor has a completely different set of

13   responsibilities and duties that he or she would have to

14   do.  So, I am not quite sure what you mean by "fitting

15   within the blue wall of silence" in this context.

16       Q.    Well, thank you for that clarification, I don't

17   think we had that before.

18              So, for you, the blue wall of silence relates

19   only to other officers, of the rank of officer?

20              MR. SMITH:  Objection to the form.

21       A.    Sorry, not totally.  But in this case, they

22   clearly have been brought in as a supervisory type of

23   thing, they are now working under formal guidelines.

24              The blue wall is an informal thing, it's not

25   something that is written down.  They weren't operating

J. ETERNO

1    under patrol guide procedures now.  There are very specific

2    things that they need to do.  So, this would not fall in

3    with that thesis.

4        Q.    So, if a supervisor, for example, were within the

5    blue wall of silence, trying to protect someone else, you

6    don't believe they could have covered up those complaint

7    reports found in his room?

8        A.    I see what you are saying.  Yes, that's very

9    possible, if they were trying to cover up for him.  But I

10   don't think in this case the supervisors were trying to

11   cover up for him.  I don't think that was an issue.  I

12   don't think that was ever an issue.

13       Q.    You don't believe they were trying to cover up

14   for themselves?

15       A.    That's a separate issue.  I don't know.

16       Q.    You claim that plaintiff was found in good

17   condition in his apartment; is that right?

18       A.    Based on the Lauterborn memo, yes, and the tape

19   recordings.

20       Q.    Are you aware of his elevated heart rate?

21       A.    I am aware of that, yes.

22       Q.    And you are aware of his elevated blood pressure?

23       A.    Yes.

24       Q.    And you believe that, given the elevated heart

25   rate and elevated blood pressure, he was in good condition?

J. ETERNO

1      A.      I think anyone would have an elevated heart rate

2   having a team of armed officers in your living room

3   refusing to leave.

4      Q.      But you didn't answer the question, which is, do

5   you consider having elevated heart rate and elevated blood

6   pressure to be a good condition?

7      A.      Depends on the situation.

8      Q.      You believe in this situation his elevated heart

9   rate and elevated blood pressure was a good condition?

10     A.      I think it was completely normal given the

11  situation.

12     Q.      Were you there that night?

13     A.      No.

14     Q.      Have you seen any video of that evening?

15     A.      No.

16     Q.      You haven't read the officers' depositions who

17  were there that day, other than Officer Duncan?

18     A.      Right, yes.

19     Q.      So, you don't know whether they perceived him to

20  be in good condition or not; is that correct?

21              MR. SMITH:   Objection to the form.

22     A.      Correct.

23     Q.      As you just mentioned, you believe that if he

24  appeared emotionally disturbed, it was only the direct

25  result of the actions of the N.Y.P.D., correct?

J. ETERNO

1      A.    I didn't say "only," but I do feel that that was

2   certainly a contributing factor.

3      Q.    I believe you do say it's a direct result.  On

4   page 11, "If any actions appeared emotionally disturbed

5   they occurred after they entered the apartment.  In fact,

6   if they occurred, they apparently were the direct result of

7   the actions of the N.Y.P.D."

8      A.    Apparently.

9      Q.    So, what do you mean by apparently, then?

10     A.    It appears that that was the direct reaction of

11  them staying in his living room, or bedroom, not sure

12  which.  But they stayed there against his wishes.  That

13  would drive anyone's blood pressure, I think, higher.

14     Q.    Do you have any medical background or training?

15     A.    Just what I had with the Police Academy.

16     Q.    So, are you qualified to make a determination

17  about the impact of others on an individual's mental or

18  physical health?

19     A.    I am a physical fitness instructor for law

20  enforcement, but I am not a qualified doctor of medicine.

21     Q.    And have you ever done any studies on the impact

22  of others on someone's physical and mental health?

23     A.    I actually did a study for the police department

24  on physical fitness standards and their effect on arrests

25  that went on to win an award.  It won a police foundation

J. ETERNO

1    Hemmerdinger award, which did indicate that those who are

2    able to have higher cardiovascular endurance made more

3    arrests, things like that.

4        Q.    I'm sorry, but that didn't answer the question,

5    which was, have you done any research on the impact of

6    others on someone's mental or physical health?

7        A.    Again, it's a physical fitness study on policing

8    and it's effect on police.  And I think that would qualify

9    as a study on somebody's health, on fitness and how they

10   react.

11       Q.    On causation of outside forces, on someone's

12   physical or mental health, you believe your research does

13   that?

14               MR. SMITH:  Objection to the form.

15       A.    Can you rephrase?

16       Q.    You believe that your research on officer's

17   physical fitness actually relates to the causation of an

18   outside force on an individual's physical and mental

19   health?

20       A.    What do you mean by causation --  I am not clear

21   on the question.

22       Q.    My question to you is, is the impact of other

23   individuals on someone's physical or mental health, that's

24   a causation?

25       A.    I understand what you are saying.  No, that would

J. ETERNO

1    not be it.

2         Q.    Your report indicates that it would have been

3    exceedingly prudent to contact the legal bureau for advice,

4    as well as notify them directly; is that correct?

5         A.    Yes.

6         Q.    Is it required that officers contact the legal

7    bureau before declaring someone an E.D.P.?

8         A.    It's not required to declare someone an E.D.P.

9    But this is an extremely unusual situation, where a

10   uniformed member of the service is being declared

11   emotionally disturbed.   It would have been extremely

12   prudent to contact the legal bureau on this.

13        Q.    But is it required?

14        A.    No.

15        Q.    Moving on to the next section, which is also on

16   page 11.   That's your section on hospital data; is that

17   right?

18        A.    Yes.

19        Q.    Mr. Smith has represented that the Health and

20   Hospital Corporation data is no longer available on the

21   website and no copy has been maintained by the expert; is

22   that accurate?

23        A.    Yes.

24        Q.    So, there is nothing --

25                    MR. SMITH:   Just correct one thing.   I

190
J. ETERNO

1        didn't do the independent determination of

2        whether or not this data was available on the

3        website.  That was done by, I believe, the

4        witness.  So, I would be passing on information

5        about the existence of the data, I wasn't --

6            MS. PUBLICKER METTHAM:  It was your

7        representation to the rest of the codefendants.

8            MR. SMITH:  To the extent that was the

9        representation, I would like to clarify.  I did

10       not go to the hospital's website.  I spoke to the

11       witness about his ability to do so.  And I think

12       we will get to the information of what he did to

13       try to get information.

14            But to the extent that someone was

15       suggesting that I did it, I want to make a

16       correction.

17   Q.   So, was that statement I read accurate, that the

18   Health and Hospital data is no longer on its website and no

19   hardcopy has been maintained by the expert?

20   A.   Yes.

21   Q.   So, for us to review or check your data here,

22   there is no way you can think of for us to do that?

23   A.   Contact Health and Hospital.

24   Q.   What data would we ask for?

25   A.   You would ask for the datas from the hospital

J. ETERNO

1    which is collected by them from 1999 through 2006.

2        Q.    Was there a title to this particular section,

3    just "hospital data," generally?

4        A.    It's -- actually, emergency room visits.

5        Q.    Have you made any efforts to locate this data?

6        A.    Yes.

7        Q.    What efforts have you made?

8        A.    Searching through the materials on my study,

9    getting on the website.

10        Q.    So, how did you write the section without access

11    to those materials?

12        A.    I did have access at one time.  And it's in our

13    book, so I know it's true.

14        Q.    So, you haven't actually looked at any of this

15    data since before writing your report in this case?

16        A.    The data itself?

17        Q.    Yes.

18        A.    No.

19        Q.    So, you are relying on data you have used in

20    other books?

21        A.    In the book that I cited in the references

22    section, yes.

23        Q.    When was the last time you looked at that

24    research?

25        A.    Just before we wrote the book.