```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -------------------------------------------------X
      ADRIAN SCHOOLCRAFT,
 3
                                         PLAINTIFF,
 4                  -against-            Case No:
                                         10 Civ. 6005
 5                           (RWS)

 6    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
      Tax Id. 873220, Individually and in his Official
 7    Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
      NORTH GERALD NELSON, Tax Id. 912370, Individually
 8    And in his Official Capacity, DEPUTY INSPECTOR
      STEVEN MAURIELLO, Tax Id. 895117, Individually and
 9    In his Official Capacity, CAPTAIN THEODORE
      LAUTERBORN, Tax Id. 897840, Individually and in his
10    Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
      919124, Individually and in his Official Capacity,
11    SGT. FREDERICK SAWYER, Shield No. 2576, Individually
      and in his Official Capacity, SERGEANT KURT DUNCAN,
12    Shield No. 2483, Individually and in his Official
      Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
13    915354, Individually and in his Official Capacity,
      LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
14    Individually and in his Official Capacity, SERGEANT
      SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
15    #1-50, Individually and in their Official Capacity
      (the name John Doe being fictitious, as the true
16    names are presently unknown) (collectively referred
      to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
17    CENTER, DR. ISAK ISAKOV, Individually and in his
      Official Capacity, DR. LILIAN ALDANA-BERNIER,
18    Individually and in her Official Capacity and
      JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
19    DOE" # 1-50, Individually and in their Official
      Capacity (the name John Doe being fictitious, as
20    The true names are presently unknown),

21                                         DEFENDANTS.
      -------------------------------------------------X
22

23                    DATE: October 11, 2012

24                    TIME: 10:20 A.M.

25    (Continued  ...)
```



1

2                          DATE: October 11, 2012

3                          TIME: 10:20 A.M.

4

5

6                     VIDEOTAPED DEPOSITION of the

7     Plaintiff, ADRIAN SCHOOLCRAFT, taken by the

8     Respective Parties, pursuant to a Notice and

9     to the Federal Rules of Civil Procedure, held at

10    the offices of the New York City Law Department,

11    100 Church Street, New York, New York 10007, before

12    Nathan MacCormack, a Notary Public of the State of

13    New York.

14

15

16

17

18

19

20

21

22

23

24

25

A. SCHOOLCRAFT

1    Q.    On October 31, 2009, do you recall telling

2    anyone, "Mentally, I am not that stable"?

3    A.    I don't recall ever saying -- ever making that

4    statement.  But if you have the recordings to these, I

5    would be happy to listen to them and verify them.

6    Q.    I am just asking if you recall ever making these

7    statements?

8    A.    I don't recall ever making these statements.  But

9    if you have a recording of these exact statements, as you

10   are telling me, I would be happy to verify it through the

11   recording.

12   Q.    Did there come a time when you left work on

13   October 31, 2009?

14   A.    Yes.

15   Q.    When did you first decide to leave work that day?

16   A.    I don't remember the approximate time.  It was

17   some time between 2:30 and 3:30 or 2:00 and 3:30, probably.

18   Q.    When were you supposed to leave work that day?

19   A.    I believe the end of shift is 15:30.

20   Q.    So 3:30?

21   A.    15:00 -- yeah, 3:00 or 3:30.

22   Q.    Why did you want to leave early that day?

23   A.    I was feeling under the weather.  But primarily,

24   I was concerned about Lieutenant Caughey's behavior.

25   Q.    What were you concerned about?

A. SCHOOLCRAFT

1      A.      I was concerned that my safety and well-being was

2    -- I was concerned with my safety and well-being, the way

3    that he was behaving.

4      Q.      What, specifically, about your safety were you

5    concerned about?

6      A.      Specifically, my safety and well-being, my person

7    being harmed.

8      Q.      Were you afraid that he was going to injure you?

9      A.      I don't recall any specific -- any specific thing

10   that I thought he would do to me.  I was just concerned,

11   and I felt it was appropriate to remove myself from that

12   situation.

13     Q.      Is there a procedure for leaving work early?

14     A.      Other than notifying your supervisor, I am not

15   aware of -- I guess it depends on what -- why you are

16   leaving.

17     Q.      Have you ever been disciplined for not following

18   sick leave procedures before?

19     A.      I don't believe so.  It's possible, probably;

20   it's a complicated procedure.

21     Q.      How is it complicated?

22     A.      There's -- it's like six pages.  But as far as

23   being at work and notifying anyone else, other than your

24   immediate supervisor, regarding that situation, I am not

25   aware of any other steps.

A. SCHOOLCRAFT

1    Q.    Did you follow the procedure for leaving work

2    early on October 31, 2009?

3    A.    I believe so, yes.

4    Q.    Whom did you ask to leave early?

5    A.    I believe her name was Sergeant Huffman,

6    something like that.

7    Q.    How did you ask her to leave early?

8    A.    I informed her -- I believe I told her I had an

9    upset stomach, and I gave her a -- a slip with my -- with

10   all my information on it; my name, my address where I would

11   be.  And I told her "I don't feel well."  And I turned in

12   all the paperwork I was involved with.  And that was it.

13   Q.    What paperwork did you give her?

14   A.    Referring to what I was working on, or the slip?

15   Q.    What did you give her?

16   A.    I gave her -- it's referred to as a sick slip.  I

17   am not sure the exact form number, but the slip is what

18   officers fill out when they go sick.

19   Q.    Did you give her other documents at the same time

20   you gave the sick slip?

21   A.    I don't recall giving her any specific other

22   documents that I gave her at that time, no.

23   Q.    Did Sergeant Huffman tell you that you cannot

24   leave unless you wanted lost time?

25   A.    I believe she said something to that effect.  And

A. SCHOOLCRAFT

1    I said "lost time is fine," to the best of my memory, "lost

2    time is fine."  But then I think she said the lost time had

3    to be authorized.

4         And I didn't feel the lost time would have been

5    authorized.  I preferred -- I was feeling under the

6    weather, and I preferred to go regular sick.

7    Q.   But you recall agreeing to lost time?

8    A.   I don't recall agreeing to lost time.  It's

9    possible, if that was -- if she would have allowed it, then

10   I would have agreed to it.  But I didn't feel lost time

11   would have been granted.

12   Q.   So when she said you can take lost time, what did

13   you say to her?

14   A.   It would be something to the effect, "That's

15   fine."

16   Q.   Did you speak with Police Officer Yadira

17   Rodriguez, after you asked to leave work early?

18   A.   I don't recall speaking to Yadira Rodriguez, no.

19   Q.   Do you recall speaking with Police Officer Craig

20   Rudy after you asked to leave work early?

21   A.   I don't recall any specific conversation with any

22   officers.

23   Q.   Did you believe that you were leaving work early

24   against the orders of Sergeant Huffman?

25   A.   No.  I didn't believe that, no.

A. SCHOOLCRAFT

1    Q.    Did you believe that Sergeant Huffman had

2  authorized your leaving work early on October 31, 2009?

3    A.    I believed it was fine.  Whether or not she was

4  going to do it as regular sick or lost time, it really

5  didn't concern me, as long as I was able to get out of

6  there.

7    Q.    When did you first see Defendant Mauriello on

8  October 31, 2009?

9    A.    I believe I saw him walk in as I was walking out.

10    Q.    Did you see Sergeant Huffman speak to Defendant

11  Mauriello on October 31, 2009?

12    A.    I don't recall seeing them speak to each other,

13  no.

14    Q.    Did you see Defendant Mauriello speak to

15  Defendant Caughey on October 31, 2009?

16    A.    I don't recall seeing him speak to anyone.

17    Q.    Did you see Lieutenant Caughey speak to Sergeant

18  Huffman on October 31, 2009?

19    A.    Yes.

20    Q.    When did you see them speak?

21    A.    I don't recall the specific time.  It was some

22  time -- it was around noon.

23    Q.    Did you hear what they were speaking about?

24    A.    I could not hear what they were speaking about.

25    Q.    Did you speak to Defendant Mauriello as you were

A. SCHOOLCRAFT

1    leaving the precinct on October 31, 2009?

2        A.      I don't recall speaking to him, no.

3        Q.      What happened, after you left the precinct?

4        A.      To the best of my memory, I drove home.  I got

5    home, I notified I.A.B. of -- by phone, I notified I.A.B.

6    of Caughey's behavior.  I addressed my upset stomach or --

7    they were flu symptoms, with NyQuil.

8                And I -- I recall talking to my father.  And

9    then -- then I laid down to go to sleep.  And then the

10   details after that, are in the recording.

11       Q.      Why did you notify I.A.B. of Caughey's behavior?

12       A.      I felt his behavior should have been

13   investigated.

14       Q.      How so?

15       A.      How would they investigate it?

16       Q.      I am sorry, that was an unclear question.  Why

17   did you believe that Caughey's behavior needed to be

18   addressed by the I.A.B.?

19       A.      He was acting in an -- in a bizarre, unusual

20   manner; pacing around me, carrying his firearm in an

21   improper fashion.  Ms. Boston called me on the phone and

22   told me he was pacing around me and staring at me.  And I

23   just had a general concern about what his problem was with

24   me.

25       Q.      So what did you want I.A.B. to do?

A. SCHOOLCRAFT

1     A.     That's -- I couldn't think of any other reason a

2     nurse or a doctor would ignore me in some simple human

3     requests.

4     Q.     Were you permitted to use the phone while you

5     were at Jamaica Hospital?

6     A.     At a -- there was a point in time, they wheeled

7     me over to the phone.  My father was calling -- he had

8     finally found me.  And he was calling so often that they --

9     that they let me talk to him.

10    Q.     When you say "they wheeled me over to a phone,"

11    who is "they"?

12    A.     It was -- I believe she was a nurse.

13    Q.     Did the N.Y.P.D. obstruct them from wheeling you

14    to a phone?

15    A.     Not that first one, no.

16    Q.     How long were you on the phone with your father

17    at that time?

18    A.     At that time, I don't remember.

19    Q.     More than half an hour?

20    A.     I don't think so.

21    Q.     Did you make any other phone calls from the

22    hospital?

23    A.     Yes.

24    Q.     Whom did you call?

25    A.     It would have been my father.

A. SCHOOLCRAFT

1   Q.   You called your father more than once from the

2   hospital?

3   A.   Yes.

4   Q.   How many times did you call your father on

5   October 31, 2009?

6   A.   To the best of my memory, two, three times,

7   approximately.

8   Q.   Did you see any nurses or doctors during the

9   first nine hours that you have alleged you were denied food

10  and water?

11  A.   Yes.

12  Q.   How many nurses and doctors did you see in that

13  first nine hours?

14  A.   Approximately, maybe two nurses and at least two

15  doctors.

16  Q.   Do you know the names of those nurses and

17  doctors?

18  A.   No.

19  Q.   You claim that Sergeant Sawyer assaulted you in

20  Jamaica Hospital; is that correct?

21  A.   Yes, correct.

22  Q.   How did he assault you?

23  A.   He -- well, him and at least four other officers

24  -- there came a point where they stopped bringing me the

25  phone.  At one point, I got out of gurney, and I had to

A. SCHOOLCRAFT

1    drag the gurney with me to the phone, because I became

2    aware that my father was trying to get ahold of me.  And I

3    contacted him from a phone.

4           Sergeant Sawyer arrived some time the next

5    morning, and he saw me on the phone.  He approached the

6    midnight sergeant, the Black female, and he said to her, "I

7    thought perps weren't supposed to get phone calls."  And he

8    walked over to the phone and hung up the phone and it

9    stopped my call.

10          And then that's when he -- it sounded like he

11   said "okay, now," or something to that effect.  And then

12   Officer Miller was on the other side of the gurney.  He

13   grabbed my arm, and two more officers in uniform grabbed my

14   legs and body, and Sawyer grabbed my head and my hair.

15          And then they put me back onto the gurney,

16   slammed me onto the gurney and my left hand was then

17   handcuffed.  And I was double-handcuffed to a gurney.

18   Q.     So Sergeant Sawyer, you stated, was holding your

19   head and your hair at that time?

20   A.     Correct, more pulling my hair.

21   Q.     Who was holding your right hand?

22   A.     The right hand was secured to the gurney, it was

23   -- the left hand, Officer Miller grabbed that arm.  And I

24   think Sergeant James was also holding that arm.  And that's

25   when they cuffed it.

A. SCHOOLCRAFT

1    Q.    With how much force were you thrown on the
2    gurney?

3    A.    It was a little softer than the floor before,
4    because there was padding on the gurney.  But it was -- I
5    was grabbed and pulled, and no one was standing on my legs.
6    It was not as painful as in my home.  But it was -- having
7    my hair pulled was probably the most painful.

8    Q.    Did Sergeant James injure you in any way?

9    A.    I don't recall if her grabbing me -- if I
10   sustained any injuries from her.

11   Q.    What injuries did you sustain from having
12   Sergeant Sawyer pull your hair?

13   A.    It wasn't that -- after Officer Miller applied
14   the cuffs, they were a little too tight.  Sawyer said
15   something to the effect, "Can you believe this fucking
16   guy?"  And then he walked over to me, leaned over and said,
17   "This is what happens" -- in sum and substance, to the best
18   of my memory, he said, "This is -- this is what happens to
19   fucking rats."

20         And then he put both his hands around my wrists,
21   pressing the cuffs together until they wouldn't -- until
22   they wouldn't go any further.

23   Q.    Could you explain what you mean by he was
24   pressing your wrists together.

25   A.    How handcuffs work, they are one-sided, you close

A. SCHOOLCRAFT

1   them by pressing one side.  He secured his hand around both

2   sides of my wrists that the cuffs were on, and pressed the

3   cuffs together until they wouldn't close anymore.

4        Q.     So are you stating that he stood over you and had

5   one of his hands on each of your wrists and closed the

6   handcuffs as tightly as possible?

7               MR. NORINSBERG:  Objection.

8        A.     No.  Just the left wrist.

9        Q.     Just the left wrist?

10       A.     Correct.

11       Q.     So it wasn't both your wrists; just one?

12       A.     Correct.

13       Q.     Before the officers allegedly pushed you back on

14   to the gurney, had they asked you to sit down on the

15   gurney?

16       A.     That's when I sat down on the gurney.  After he

17   hung up the phone, it was either Miller or Sawyer, one of

18   them said "Get back on the gurney."  And that's when --

19   that's when I sat up on the gurney.  And I was grabbed from

20   multiple angles.

21       Q.     During the six days you were at the hospital, did

22   you ever see any N.Y.P.D. officers talking to any

23   physicians?

24       A.     Yes.  I saw Shantel James talking to the psyche

25   intern.  And then -- I am aware there was another period of

A. SCHOOLCRAFT

1    A.    I believe it was before.

2    Q.    Before.  So you spoke to the psyche intern, and

3  then later saw the psyche intern speaking to Sergeant

4  James?

5                MR. RADOMISLI:  Objection to form.

6    A.    Correct.

7    Q.    What was the content of your conversation with

8  the psyche intern?

9                MR. RADOMISLI:  I will stop objecting to

10               form if you refer to her as "the Asian woman."

11               MS. PUBLICKER:  I don't like that.  The

12               apparent psyche intern with long, black hair?

13               MR. RADOMISLI:  Well, you can say "apparent

14               psyche intern," but don't be offended if I object

15               to the form.

16               MS. PUBLICKER:  Okay.

17   Q.    Did you hear the conversation the apparent psyche

18  intern with long, black hair had with Sergeant James?

19               MR. RADOMISLI:  Objection to the form.

20   A.    No.

21   Q.    Your Complaint states that the N.Y.P.D.

22  maintained contact with Jamaica Hospital Medical Center for

23  the six days you were in there, to ensure that you remained

24  at the hospital; is that correct?

25   A.    Correct.

A. SCHOOLCRAFT

1    Q.    Which N.Y.P.D. defendants do you believe

2    maintained contact with Jamaica Hospital Medical Center

3    staff?

4    A.    Specifically, I don't know.  But I do recall in a

5    meeting with Dr. Isakov, my father had arrived with my --

6    as my health care proxy and power of attorney.

7          He had asked Dr. Isakov, "Why are you holding my

8    son against his will?"  And Dr. Isakov responded, "We are

9    not holding your son against his will.  We are -- I am

10   waiting to hear from the police department."

11   Q.    Did Dr. Isakov tell you who from the N.Y.P.D. he

12   was waiting to hear from?

13   A.    I don't recall him saying anyone specific, no.

14   Q.    Aside from that instance, are you aware of any

15   N.Y.P.D. defendants speaking with Jamaica Hospital Medical

16   Center staff?

17   A.    I am aware that there were Internal Affairs

18   investigators there.

19   Q.    And are you aware of whether or not they spoke to

20   Jamaica Hospital Medical Center staff?

21   A.    I did see them speaking to staff as they were

22   coming in, yes.

23   Q.    Who did you see them speaking to?

24   A.    I don't recall the names of the specific nurses

25   or doctors.

A. SCHOOLCRAFT

1    Q.    Can you describe those nurses and doctors.

2    A.    Off the top of my head, I don't recall,

3    specifically.

4    Q.    You allege that the N.Y.P.D. defendants falsified

5    evidence and gave that evidence to Jamaica Hospital staff;

6    is that correct?

7    A.    Correct.

8    Q.    What evidence do you believe the N.Y.P.D.

9    defendants falsified and submitted to Jamaica Hospital

10   Medical Center staff?

11   A.    To the best of my recollection, after reviewing

12   the hospital notes, it was statements made to the hospital

13   by supervisors of the 81st Precinct.

14   Q.    Which supervisors?

15   A.    I believe it was Sergeant James; if I have her

16   name correct.

17   Q.    What statements did she give, that you believe

18   were false?

19   A.    I may not remember all of them, but I believe she

20   stated I was acting in a bizarre manner, that I ran from

21   the police, that I was cursing and swearing at supervisors,

22   and that I barricaded myself.  And there is probably more.

23   Q.    Did you call a lawyer while you were in the

24   hospital?

25   A.    I believe there was an attorney -- I believe I

A. SCHOOLCRAFT

1    an officer they reviewed had appealed the review?

2              MR. NORINSBERG:   Objection.

3    A.     I am not aware if they would be punished just by

4    an officer appealing an evaluation.  I don't feel it would

5    be punishment, having to explain something you documented

6    and signed.

7    Q.     Aside from the recordings that you have provided

8    to your attorneys and the crime complaints that you

9    mentioned prior, is there any other evidence of N.Y.P.D.

10   misconduct and corruption that you had in your possession

11   on October 31, 2009?

12   A.     I believe my attorneys have everything, to the

13   best of my knowledge.

14   Q.     Do you know what "charges and specifications"

15   are?

16   A.     Yes.

17   Q.     What are "charges and specifications"?

18   A.     I believe that's the term used for charges

19   brought against an officer in the police department and the

20   specific -- the specifics of that charge.  I believe it's

21   just a list of the charges, and the specifics of those

22   charges.

23   Q.     Did the N.Y.P.D. officers that visited your home

24   in Johnstown ever tell you why they were there?

25   A.     I only recall answering the door once.  And I

A. SCHOOLCRAFT

1   can't remember what she handed me, if it was a copy of

2   charges and specifications, or something else.  I don't

3   recall what it was.  But in words, it wasn't explained to

4   me, no.

5        Q.    Did you ever ask the individuals who visited your

6   home in Johnstown what they were doing there?

7        A.    Before I could ask -- when I did answer that

8   door, I didn't know she was a New York City Police Officer.

9   She was dressed in plainclothes.

10            And as soon as I opened the door, I saw the video

11   camera and who I believe is Sergeant O'Hare, standing on

12   the stairway, with his hand on his gun, when I opened the

13   door.  So she handed me the envelope, I closed door.  I may

14   have said -- shake my hand, "Yes, I understand."  But I

15   abruptly closed the door.

16        Q.    All the other occasions, when officers visited

17   your home in Johnstown and knocked on your door, did you

18   ever speak to those officers?

19        A.    No.  And they were banging on the door.

20        Q.    So when they were banging on the door, did you

21   ever ask them what they were doing there?

22        A.    I don't recall communicating with any of them.

23        Q.    Why didn't you?

24        A.    It was -- I believe their behavior was

25   threatening and intimidating.  I really felt that it was

A. SCHOOLCRAFT

1      going to happen again, there.

2      Q.      Were you trying to avoid being served with

3      charges and specifications?

4      A.      No.   I have -- I made aware my union attorney, of

5      what happened.   And I -- I seem to recall telling a police

6      supervisor, either a Captain Perez or a deputy inspector --

7      I may have his rank wrong, Luciano.

8              I expressed to them, I wanted all communications

9      to be handled through my attorney.   And they ignored that,

10     because they wanted to intimidate and threaten me.

11     Q.      Why did you feel threatened?

12     A.      The banging on the door.   My neighbors were

13     concerned, they said the pictures on their walls falling

14     off the walls, they were kicking and banging the door so

15     hard.

16             There were times where they got the local police

17     involved, and then they started banging on my door and

18     kicking the door.   It was frightening, for my father and

19     me, especially.

20     Q.      So it was just the manner in which they knocked

21     on your door that made you feel threatened?

22             MR. NORINSBERG:   Objection.

23     A.      To the best of my memory, yeah.   It was that, and

24     them stationing themselves outside the door to my apartment

25     for hours.

A. SCHOOLCRAFT

1    Q.    Did any of the officers who came to your home

2    threaten you, explicitly?

3    A.    I don't recall any words being exchanged.  But

4    the banging on the door, and the cameras and the hands on

5    the gun, hands on their guns, and stationing or posting

6    themselves outside the apartment.

7    Q.    Did you ever tell anyone at the N.Y.P.D. that you

8    can't return to work, because you were too sick to travel?

9    A.    At the end of the suspension, I believe they

10   were -- they wanted me to return back to the 81st Precinct.

11   And -- and I still had -- I definitely -- I was under the

12   weather, and out of fear, also.  I wasn't -- I wasn't going

13   to return back there.

14         And again, I tried communicating this with my

15   union attorney, and how he was going to be involved.  And

16   pretty soon after that, he made it explicitly clear that

17   until I came back, that they weren't going to do anything.

18   Even though they were coming up to me, I had no advocate.

19   Q.    Were you too ill to travel back to the N.Y.P.D.?

20         MR. NORINSBERG:  Objection.

21   A.    Too -- I felt -- I felt at that time, I didn't

22   feel good.  It was a flu or something.  I believe I got it

23   out of the hospital.  It was a filthy place.  People

24   bleeding and peeing and defecating out in the open,

25   vomiting.

A. SCHOOLCRAFT

1        I was sick for a while.  And another reason why I
2    didn't return, was out of fear of -- of Halloween night
3    happening again.
4    Q.    Were you informed that the N.Y.P.D. would send a
5    district surgeon to see you, since you told them you were
6    too ill to travel?
7    A.    I don't recall that conversation.  But if there's
8    a recording, I will verify it.
9    Q.    But you don't recall hearing that?
10   A.    I don't recall any specific conversation, other
11   than they were sending the local police up there to verify
12   where I was.
13   Q.    Are you aware that N.Y.P.D. doctors came to visit
14   you in Johnstown?
15   A.    I am not aware of that, no.  Or if I was, I don't
16   recall a doctor coming.
17   Q.    Did you answer the door for any doctors who came
18   to visit you --
19            MR. NORINSBERG:  Objection.
20   Q.      -- from the N.Y.P.D.?
21            MR. NORINSBERG:  Objection.
22   A.    I don't recall answering the door to a doctor
23   from the N.Y.P.D.
24   Q.    Before October 31, 2009, what knowledge did you
25   have of quota policies in any other N.Y.P.D. precinct but

A. SCHOOLCRAFT

1    the 81st Precinct?

2              MR. NORINSBERG:  Objection.

3    A.       To the best of my memory, I would have to refer

4    to the recordings, where there are supervisors quoting

5    other officers as high as in the rank of chief, asking "How

6    many summonses does this squad have?  What's their

7    activity?  How low is their activity?  How many summonses

8    do they have?"

9    Q.       What chiefs did you hear say that?

10   A.       Without listening to the recording, I can't -- I

11   don't recall the name of who was being quoted.  But I

12   believe it's in the Complaint, or on the recording.

13   Q.       Since October 2009, have you learned of quota

14   policies in other N.Y.P.D. precincts?

15   A.       Since when?

16   Q.       Since October , 2009.

17   A.       I believe my attorneys have received phone calls

18   and information from other police officers regarding

19   quotas.

20   Q.       How many officers were you aware of that were

21   intimidated or threatened with retaliation when they

22   challenged an allegedly unlawful quota policy?

23             MR. NORINSBERG:  Objection.

24   A.       Off the top of my head, everyone had to.

25   Everyone that I had worked with in patrol, the pressure was

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

A. SCHOOLCRAFT

1    there.  Was that the question?

2        Q.    I am asking about officers who were intimidated

3    when they challenged a quota policy.

4                MR. NORINSBERG:  Objection.

5        A.    I don't recall any other officer, specifically.

6    If there was, I am not aware of it in the 81st Precinct

7    that that was -- that was challenging.  I wouldn't even

8    consider myself challenging the quota policy.

9                I felt it was wrong.  But a lot of officers felt

10   it was wrong.  And the atmosphere, the hostility from

11   supervisors towards patrolmen, was certainly there.

12       Q.    Do you know of any other officers that were

13   intimidated or threatened with retaliation when they

14   attempted to disclose instances of N.Y.P.D. corruption or

15   misconduct?

16               MR. NORINSBERG:  Objection.

17       A.    Am I aware of any?

18       Q.    Yes.

19       A.    Is there a specific time or --

20       Q.    Ever.

21       A.    I am trying to think of -- off the top of my

22   head, I don't recall any specific officer.

23       Q.    Are you aware of any other police officers who

24   have spoken out publicly against the alleged quota policy?

25       A.    I believe there have been.

A. SCHOOLCRAFT

1    Q.    Who do you believe has spoken out against the

2    alleged N.Y.P.D. quota policy?

3    A.    Off the top of my head, I can't recall an exact

4    name, but -- I believe one of them is, Adhyl Polanco.  I

5    think the other one's first name is Frank -- Frank

6    Palestro.  I may be saying the name wrong; Palestro or

7    Palestri.

8           There is a -- I believe his name is Valez; is --

9    or was in the 75th Precinct at one time.  That was a while

10   back.  I can't recall, but I do believe there is more.  But

11   I don't recall at this time, who exactly.

12   Q.    Do you claim that the defendants wanted to

13   prevent you from speaking about certain issues?

14                MR. NORINSBERG:  Objection.

15   A.    Yes.

16   Q.    What issues do you believe they wanted to keep

17   you from speaking about?

18   A.    Corruption and misconduct in the 81st Precinct,

19   the illegal quota policy, the tampering with evidence of

20   crimes, manipulating the crime reports, the actual

21   documents themselves, falsifying training logs, supervisors

22   sanitizing the personnel files to help their advancement.

23   Q.    Which defendant, specifically, do you believe

24   wanted to prevent you from speaking about those issues?

25   A.    I believe they all wanted -- benefited, if I had

A. SCHOOLCRAFT

1    stopped pushing the issue.

2        Q.    Every single named defendant from the N.Y.P.D.,

3    you believe, would have benefited, if you did not speak out

4    against the issues you just mentioned?

5                MR. NORINSBERG:  Objection.

6        A.    In some way or another, yes.

7        Q.    How did you intend to speak out about the issues

8    you just described?

9        A.    Well at first, I felt it could be resolved within

10   the department, with the investigations.  But after

11   Halloween night, I became aware that they weren't -- it

12   would -- I think that's what convinced me that the public

13   had to be made aware, directly.

14       Q.    Since you decided that the public needed to be

15   made aware directly, have any defendants taken any steps to

16   prevent you from speaking out?

17               MR. NORINSBERG:  Objection.

18       A.    I believe so, yes.

19       Q.    What steps have they taken?

20               MR. NORINSBERG:  Objection.

21       A.    The driving some 300 miles to bang on my door,

22   and stand outside or park outside my apartment and prevent

23   me from going anywhere, creating that fear that they were

24   going to come in.

25       Q.    Did you eventually speak out against the issues

A. SCHOOLCRAFT

1    you just mentioned?

2    A.    I believe I have a couple of times.  It's been

3    out there.

4    Q.    Since that time, have the defendants continued to

5    attempt to prevent you from speaking out?

6    A.    Again -- it went on for a few months.  Yeah, yes.

7    Q.    How?

8    A.    Again, banging on my door for months, parking

9    outside my apartment, waiting for something.

10    Q.    But they never once mentioned the media during

11    these visits?

12            MR. NORINSBERG:  Objection.

13    A.    I don't recall any mention of the media.

14    Q.    Did you have medical insurance on October 31,

15    2009?

16    A.    I didn't believe so.  On -- the day after I was

17    suspended, I assume that I didn't.

18    Q.    Why did you assume that?

19    A.    Because when officers were suspended, so are

20    their benefits.

21    Q.    How did you learn that?

22    A.    I believe, that's what I understood.  And I

23    believe on one of the recordings, a supervisor reiterates

24    that.

25    Q.    Did you try to seek reimbursement from your

A. SCHOOLCRAFT

1    believe so.

2        Q.    Who did you believe leaked information on I.A.B.

3    Complaints to the defendant?

4        A.    I don't think we know yet.  I don't believe we

5    know yet.

6        Q.    Why do you believe they leaked the information?

7        A.    Lieutenant Caughey's behavior October 31, 2009.

8    I believe he was aware in some form or another that there

9    was a -- maybe not the Complaint against him, but it was

10   certainly timely.  I believe he was at least aware that

11   there were Complaints against the precinct, made by me.

12       Q.    Do you believe he could have learned this

13   information from your memo book?

14       A.    On the 31st of October , 2009?

15       Q.    Yes.

16       A.    I would have to review the notes again.  But

17   again, how would he know to review the memo book?

18       Q.    Do you believe that if I.A.B. had not leaked

19   information on you to the defendants, that the October 31,

20   2009, incident would not have happened?

21            MR. NORINSBERG:  Objection.

22       A.    I believe it's possible that it would not have

23   happened.

24       Q.    In 2008, did you intend to go public with your

25   knowledge with N.Y.P.D. corruption and police misconduct?

A. SCHOOLCRAFT

1      A.      When?

2      Q.      In 2008?

3      A.      I don't believe I ever intended before

4   October 31, 2009.  I don't believe it ever crossed my mind,

5   going outside the department.  I -- to the best of my

6   memory, I still believed that there were -- that there were

7   certain parts of -- that once -- once I brought the

8   evidence forward, that the department would have to resolve

9   the issues of misconduct in the 81st Precinct.  And it

10  would be handled inside -- inside the department.

11     Q.      So in February of 2009, you did not intend to go

12  public with your knowledge of N.Y.P.D. corruption and

13  misconduct; is that correct?

14     A.      On what date?

15     Q.      In February of 2009?

16     A.      In February of 2009, to the best of my memory, I

17  don't recall ever thinking about going to the public or to

18  any media source.

19     Q.      When did you believe -- sorry, strike that.

20             When do you believe that members the N.Y.P.D.

21  first learned about your intention to disclose N.Y.P.D.

22  police misconduct, publicly?

23             MR. NORINSBERG:  Objection.

24     A.      I don't know if they -- I don't what they

25  believed or when they believed it.  They may have just

1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------X
      ADRIAN SCHOOLCRAFT,
 3                                       PLAINTIFF,

 4             -against-        Case No.:
                                10 CV 6005
 5
      THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
 6    MARINO, Tax ID. 873220, Individually and
      in his Official Capacity, ASSISTANT CHIEF
 7    PATROL BOROUGH BROOKLYN NORTH GERALD NELSON,
      Tax Id. 912370, Individually and
 8    in his Official Capacity, DEPUTY INSPECTOR
      STEVEN MAURIELLO, Tax Id. 895117, Individually
 9    and in his Official Capacity, CAPTAIN THEODORE
      LAUTERBORN, Tax Id. 897840, Individually and
10    in his Official Capacity, LIEUTENANT WILLIAM
      GOUGH, Tax Id. 919124, Individually and
11    in his Official Capacity, SGT. FREDERICK SAWYER,
      Shield No. 2567, Individually and
12    in his Official Capacity, SERGEANT KURT DUNCAN,
      Shield No. 2483, Individually and
13    in his Official Capacity, LIEUTENANT CHRISTOPHER
      BROSCHART, Tax Id. 915354, Individually and
14    in his Official Capacity, LIEUTENANT TIMOTHY
      CAUGHEY, Tax Id. 885374, Individually and
15    in his Official Capacity, SERGEANT SHANTEL JAMES,
      Shield No. 3004, Individually and
16    in his Official Capacity, and P.O.'s "JOHN DOE"
      #1-50, Individually and in their Official Capacity,
17    (the name John Doe being fictitious, as the true
      names are presently unknown)(collectively
18    referred to as "NYPD Defendants"), JAMAICA
      HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
19    Individually and in his Official Capacity,
      DR. LILLIAN ALDANA-BERNIER, Individually and
20    in her Official Capacity, and JAMAICA HOSPITAL
      MEDICAL CENTER EMPLOYEE'S "JOHN DOE" #1-50,
21    Individually and in their Official Capacity,
      (the name John Doe being fictitious, as the
22    true names are presently unknown),

23                                       DEFENDANT.
      ------------------------------------------X
24

25    (Continued... )
```

2

1                    DATE: SEPTEMBER 26, 2013

2                    TIME: 10:10 A.M

3

4             VIDEO DEPOSITION of the Plaintiff, ADRIAN

5    SCHOOLCRAFT, taken by the respective parties, pursuant to a

6    Court Order and to the Federal Rules of Civil Procedure,

7    held at the offices of Scoppetta, Seiff, Kretz &

8    Abercrombie, Esqs, 444 Madison Avenue, New York New York,

9    10022 before Elizabeth Forero, a Notary Public of the State

10   of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A. SCHOOLCRAFT

1    two minutes forty-five seconds -- you should express that

2    your concern is about safety and not about getting revenge?

3                 MR. SMITH: Objection to form.

4    A.      I believe that is what he said, yes.

5                 MR. KRETZ: I stopped it at three minutes and

6                 five seconds.

7    Q.      Did you and your father agree that Mauriello was

8    a worthless mother fucker?  Is that what your father said?

9                 MR. SMITH:  You have two questions in there.

10                Objection to form.

11   Q.      Did your father just say Mauriello was a

12   worthless mother fucker?

13   A.      I believe that is what he said, yes.

14   Q.      Did you agree with that?

15   A.      Yes.

16                MR. KRETZ: I will continue with three

17                minutes five seconds. I stopped at three minutes

18                fifty-nine seconds.

19   Q.      Do you know who your father is referring to in

20   that segment of the recording?

21                MR. SMITH: Objection to form.

22   A.      Officer Horun, H-O-R-U-N.

23   Q.      What role has that officer played at this point

24   in time?

25   A.      He just referred to me as a house mouse

A. SCHOOLCRAFT

1    Q.    He referred to you as a house mouse?

2    A.    Correct.

3    Q.    Is that a he or a she?

4    A.    He.

5    Q.    When did he do that?

6    A.    I don't know the exact date, but it was sometime

7    after being put on desk duty which would have been April or

8    March 2009 to this day October 7th.  It may have been

9    fairly recent.

10   Q.    It was a comment he made in passing in the

11   precinct?

12   A.    Yes, he made some comment.  I don't remember the

13   exact statement but he referred to me as a house mouse.

14   Q.    What do you think prompted him to say that?

15   A.    I don't know.  Well, other than being a house

16   mouse at that time.

17   Q.    Meaning being a telephone switchboard operator?

18   A.    Any officer who isn't on patrol and basically

19   working inside the precinct they are refer to as a house

20   mouse.

21   Q.    Your father referred to you being without a gun

22   and shield.  Was that one of your goals in meeting with

23   QUAD to get your gun and shield back?

24         MR. SMITH: Objection to form.

25   A.    I don't see how a meeting with QUAD would have --

A. SCHOOLCRAFT

1      Q.     Well, who might you give a recording device to?

2             MR. SMITH:  Objection to form.

3      A.     No one other than my father.

4      Q.     Other than your father you can't think of anyone

5      to whom you might have gifted this recording device?

6      A.     Correct.

7      Q.     Or sold?

8      A.     Correct.

9      Q.     Now, in your Second Amended Complaint are you

10     aware you added claims relating to NYPD visits to your home

11     in John's Town, New York?

12     A.     I believe so.

13     Q.     What is your understanding why NYPD officers

14     visited your home in John's Town, New York in December

15     2009?

16     A.     To intimidate and harass me.

17     Q.     Why do you believe that?

18     A.     Because of their actions on Halloween, on October

19     31st, 2009 and the misconduct and criminal allegations I

20     made against various supervisors of the New York City

21     Police Department.

22     Q.     Were all of the NYPD officers who visited your

23     home in John's Town, New York the same who were in your

24     apartment on October 31st, 2009?

25            MR. SMITH:  Objection to form.

A. SCHOOLCRAFT

1    A.    I don't know.

2    Q.    What specifically did the NYPD officers who

3    visited your home in John's Town, New York do that made you

4    believe you they were intimidating and harassing you?

5            MR. SMITH:  Objection to form.

6    A.    Banging on my door, posting themselves outside my

7    apartment, intimidating me, preventing me from leaving.

8    Q.    How were they intimidating you?

9    A.    They were armed and standing by either my

10    apartment door or right outside my apartment complex,

11    building or parked at the entrance exit to the apartment

12    complex.

13    Q.    Aside from officers who are on modified

14    restricted duty, do most police officers carry a weapon?

15    A.    I believe so.

16    Q.    So why did you believe it was strange these

17    officers were armed?

18    A.    I never said it was strange they were armed.

19    Q.    You but believe it was a fact that contributed to

20    your belief they intimidated you; is that correct?

21    A.    That's correct.

22    Q.    Why did the fact officers who generally carry

23    guns, who were carrying guns on this day, indicate to you

24    they were intimidating you?

25    A.    Because they had guns, and at one time, when I

A. SCHOOLCRAFT

1    did answer the door the officer, he may have been a

2    sergeant, had his hand on his gun.

3        Q.    You carried a gun for years; is that correct?

4        A.    Correct.

5        Q.    In a resting position, did you ever leave your

6    hand on your service weapon?

7        A.    What was that?  Leave my hand where?

8        Q.    Did you ever place your hand on your service

9    weapon while in a resting position?

10       A.    I believe so.

11       Q.    Now, you said you answered the door -

12       A.    Did you say arresting or resting?

13       Q.    Resting.

14       A.    No.

15       Q.    You never in a resting position just placed your

16   hand on your gun?

17       A.    I don't believe so, no.  Again, I want to point

18   out that officer was in plain clothes.

19       Q.    Do police officers who are on duty in plain

20   clothes typically carry weapons?

21       A.    I believe so.

22       Q.    You said you answered the door once; is that

23   correct?

24       A.    To the best of my memory, it was one time, and a

25   black female was knocking and pounding on the door.  My

A. SCHOOLCRAFT

1    father answered it.  She convinced him to convince me to.

2    I believe, they gave me a letter.

3         Q.    So she is the individual who you referred to as

4    having her hand on her service weapon?

5         A.    No, it was a male standing on the stairs out of

6    the view of the camera.

7         Q.    Can you describe that male?

8         A.    Approximately, well, he was standing on a step.

9    I would say he was about five ten.  He was the same male

10   sitting with Lieutenant Gough as they were posted outside

11   in my apartment complex.  He had a mustache, and I believe

12   gray and white colored hair, mustache and hair. But that

13   wasn't Gough that had his hand on his gun.

14        Q.    What ethnicity was this individual, to the best

15   of your ability?

16        A.    Which one?

17        Q.    The male?

18        A.    The one with his hand on his gun?

19        Q.    Yes.

20        A.    White male.

21        Q.    About how old?

22        A.    Approximately thirty-five to forty-five years

23   old.

24        Q.    On what date did this occur where you opened the

25   door for the officers?

A. SCHOOLCRAFT

1    A.    I don't recall the specific date.

2    Q.    Can you give me a month and a year?

3    A.    I am sure we can.

4    Q.    Sitting here today, can you?

5    A.    Not off the top of my head, no.

6    Q.    Do you recall if it was in 2009?

7    A.    It may have been.

8    Q.    It is your belief today that you only opened the

9    door on one occasion; is that correct?

10   A.    I believe so.

11   Q.    Do you believe the officers who visited your home

12   in John's Town were doing so in order to silence you?

13   A.    To intimidate me.

14   Q.    But not to silence you?

15   A.    That would fall under intimidation, yes, silence

16   me, I would agree with that.

17   Q.    What they do that communicated to you they wanted

18   to silence you?

19              MR. SMITH:   Other than want he already

20              testified about?

21   A.    Their behavior, standing outside my apartment,

22   banging on the doors, disturbing the neighbors, calling the

23   local police getting them involved, posting themselves at

24   my apartment door, outside my apartment building at the

25   entrance and exit of my apartment complex.

A. SCHOOLCRAFT

```
 1      Q.    Did the officers ever say anything specifically
 2    to you that indicated to you they were trying to silence
 3    you?
 4      A.    I don't recall any specific comment.
 5      Q.    Would anything refresh your recollection about
 6    whether they said anything to you?
 7      A.    It is possible.
 8      Q.    What?
 9      A.    I don't know.
10      Q.    There is nothing you can think of today?
11      A.    Not that I am aware of today.
12      Q.    Did any officers threaten you since October 31st,
13    2009.
14      A.    That officer with his hand on his gun and the
15    other one banging on the door.
16      Q.    They threatened you by knocking on the door?
17      A.    Banging on the door, kicking the door.
18      Q.    How do you know they were kicking the door?
19      A.    They left scuff marks on the bottom of the door.
20      Q.    You checked the door before and after they
21    arrived?
22      A.    Correct.
23      Q.    How many times did they kick your door?
24      A.    At least once, at least one occasion where they
25    were kicking the door and there were scuff marks.
```

A. SCHOOLCRAFT

1    Q.    Did they say anything to threaten you?

2    A.    I don't recall any specific comments.

3    Q.    Did they say anything to threaten your father?

4    A.    I don't recall any specific comments made towards

5  him.

6    Q.    When was last the time NYPD officers visited you

7  in upstate New York?

8    A.    I don't know.

9    Q.    You don't know?

10    A.    Correct.

11    Q.    When was the last time you know of officers

12  visiting you in upstate New York?

13    A.    I don't recall any specific date or time but I

14  believe it went on through late 2010, to the best of my

15  memory.

16    Q.    Do you believe the officers visited you in 2011?

17    A.    I am not aware of it, no.

18    Q.    What about 2012?

19    A.    Not that I am aware of.

20    Q.    How many times did NYPD officers visit you in

21  upstate New York?

22    A.    Off the top of my head, sitting here right now, I

23  don't recall.

24    Q.    Can you give me an approximation?

25    A.    Six times approximately.

A. SCHOOLCRAFT

1     Q.    When did they start visiting you in upstate New

2     York?

3     A.    I think December 2009.

4     Q.    Your Second Amended Complaint states that a

5     defendant yelled, NYPD, we know you are in there in open

6     up.  In December 2009, do you know which defendant officer

7     allegedly yelled that?

8     A.    No.

9     Q.    How many times did an officer yell NYPD we know

10    you're in there open up?

11    A.    At least once.

12    Q.    Was it a male voice or a female voice?

13    A.    I believe it was male.

14    Q.    Did you look through your peephole when you heard

15    that?

16    A.    I may have, but they were, it was covered with

17    something.

18    Q.    You can't describe that officer?

19    A.    No.

20    Q.    Did you say anything in response to the officer

21    stating NYPD we know you're in there open up?

22    A.    I don't recall making any response.

23    Q.    Why not?

24    A.    If they knew I was in there, were they going to

25    kick the door in again?  I don't know.  I had no response

A. SCHOOLCRAFT

1    to give them.

2        Q.    Do you know why the officers were at your

3    apartment?

4                  MR. SMITH:   Objection to form.

5        A.    To intimidate and harass me.

6        Q.    At the time is that what you believed?

7        A.    I believe that now.

8        Q.    Do you believe that is the only reason officers

9    visited your home in John's Town, New York?

10       A.    Yes.

11       Q.    Which officer allegedly spied through your

12   bedroom window?

13       A.    I don't know.

14       Q.    Could you describe that officer?

15       A.    He was wearing a puffy jacket, short, buzz cut,

16   his skin was darker than white, approximately thirty to

17   thirty-five years old, wearing jeans.

18       Q.    So this is a male?

19       A.    Correct.

20       Q.    Any other identifying characteristics of this

21   individual?

22       A.    His hair, if it wasn't buzzed, it was short

23   cropped, neat, dark-colored hair.

24       Q.    Had you seen this individual on any other

25   occasions?

A. SCHOOLCRAFT

1     A.      I don't know.  I remember him from that time, but
2     I didn't know who it was.

3     Q.      Do you know who he is sitting here today?

4     A.      I don't know.

5     Q.      How close to your bedroom window was he?

6     A.      I didn't see him next to my bedroom window.  What
7     I heard was the tree next to my window beating against the
8     window, when I got up and looked out, he was just landing
9     on the ground as if he jumped out of the tree.  That's what
10    happened.

11    Q.      What floor was your bedroom on?

12    A.      I believe it was the second floor and there was a
13    basement with another apartment and a laundry room.  So the
14    second floor from the street level.

15    Q.      So you could not look into your bedroom window
16    without being elevated by some means; is that accurate?

17    A.      Correct.

18    Q.      But you did not see an officer looking through
19    your window; is that correct?

20    A.      Correct.

21    Q.      Was your window open or closed?

22    A.      I believe it was closed.  I believe it was cold
23    outside at that time.

24    Q.      Did you say anything to the officer after you
25    noticed him by your window?

A. SCHOOLCRAFT

1    A.    I don't recall making any statements to him, no.

2    Q.    Did that happen more than once?

3    A.    I don't believe so, no.

4    Q.    Could you please physically describe defendant,

5  Thomas Hanley?

6    A.    No.

7    Q.    Who is defendant, Thomas Hanley, to you?

8    A.    One of the officers that drove up to John's Town,

9  New York.

10   Q.    You don't know what he looks like?

11   A.    I don't believe so.

12   Q.    Why are you suing him?

13   A.    I believe my attorneys learned he was one of the

14  officers that came up there and intimidated and harassed

15  me.

16   Q.    But you don't have any independent recollection

17  of defendant, Hanley, yourself?

18   A.    If I saw him I don't know what his name would be.

19   Q.    Do you claim defendant, Hanley, used any force

20  against you?

21   A.    No. I don't think so.  I don't know if he was

22  there.  I didn't recognize any one other than Gough and

23  Duncan from Halloween night.

24   Q.    Did anyone use force against you in John's Town,

25  New York?

A. SCHOOLCRAFT

1    A.    Not physically on me, no.

2    Q.    Against your father?

3    A.    No.

4    Q.    Are you claiming defendant, Hanley, could have

5    stopped any other officers from using force against you?

6              MR. SMITH:  He just said nobody used any

7              physical force against him.

8              MS. METTHAM:  At any time.  The Complaint

9              states defendant, Hanley, is an individual who

10             failed to intercede.

11   Q.    I am asking are you claiming that Hanley could

12   have done anything to stop an officer from using force

13   against you on October 31st, 2009?

14             MR. SMITH:  I will object to the form of the

15             question.

16   A.    I assuming since he was a lieutenant if there

17   were subordinate officers, whatever his order would been.

18   Q.    Do you believe he was present on October 31st,

19   2009?

20   A.    I don't know.

21   Q.    Do you have any reason to believe defendant,

22   Hanley, had anything to do with your false arrest on

23   October 31st, 2009?

24   A.    I don't have anything, no.

25   Q.    Did defendant, Hanley, enter or search any of

A. SCHOOLCRAFT

1    your residences at any time?

2       A.    I don't know.  Not that I am aware of.

3       Q.    Do you believe he may have?

4       A.    I believe it is possible.

5       Q.    On what do you base that belief?

6       A.    I did not see everyone who was in my home on

7    October 31st, 2009.

8       Q.    Do you belive defendant, Hanley, seized any of

9    your property at any time?

10      A.    It is possible.  I don't know.  I am not aware of

11   it.

12      Q.    Do you have any documents or information to back

13   up that belief he may have seized your property?

14      A.    Not that I am aware of.

15      Q.    Do you believe that defendant, Hanley, had

16   anything to do with your confinement at Jamaica Hospital

17   Medical Center?

18      A.    I don't know.

19      Q.    During your confinement at Jamaica Hospital, did

20   you ever see defendant, Hanley?

21      A.    I don't believe so.

22      Q.    Do you believe that defendant, Hanley, falsely

23   manufactured any evidence against you?

24      A.    I don't know?

25      Q.    But the complaint does allege defendant, Thomas

A. SCHOOLCRAFT

1    Hanley, attempted to silence, harass or otherwise harm you;

2    is that correct?

3                    MR. SMITH:  Do you want to show him the

4                    Complaint?  It is a ninety-five page document so

5                    you are asking him does he have a recollection of

6                    that allegation in the Second Amendment

7                    Complaint?

8                    MS. METTHAM:  No, I am wondering if that is

9                    an allegation of his.

10   Q.    Do you believe defendant, Hanley, attempted to

11   silence, harass or otherwise harm you?

12   A.    Yes.

13   Q.    How did he attempt to harm you?

14   A.    If he was one of the officers there.

15   Q.    When you say there on October 31st, 2009?

16   A.    That and post October 31st, 2009 upstate.

17   Q.    What officers tried to harm up in upstate New

18   York following October 31st, 2009?

19   A.    I believe any officer, especially the ones

20   banking on the door.  I don't know what their intent was.

21   I believe their intent was to harm me.

22   Q.    Do you have any statements they gave you to

23   support that belief?

24   A.    Off the top of my head right now, I don't recall

25   any statements.

A. SCHOOLCRAFT

1    Q.    Do you have any recording that with substantiate

2    your claim that officers tried to harm you in upstate New

3    York?

4    A.    I don't recall hearing any recordings.

5    Q.    When was the last time you saw defendant, Hanley?

6    A.    I don't know what he looks like.  I don't know

7    who he is.

8    Q.    Have you ever interacted with defendant, Hanley,

9    before October 31st, 2009?

10    A.    Who.

11    Q.    Defendant, Hanley?

12    A.    I am not aware if I did.

13    Q.    Do you have any reason to believe defendant,

14    Hanley, was aware of your recordings at the 81st Precinct

15    before the "Village Voice" article was published?

16    A.    I don't know.

17    Q.    Is there anything that would refresh your

18    recollection about that?

19    A.    About?

20    Q.    Whether or not you believe he was aware of the

21    recordings before the "Village Voice" article?

22    A.    It is possible.

23    Q.    It is possible you would have a document that

24    would refresh your recollection?

25    A.    Not that I have.  I haven't seen anything that

A. SCHOOLCRAFT

1    indicates he knew, whoever he was, knew anything.

2        Q.    Did defendant, Hanley, ever work at any precincts

3    at the same time you were assigned there?

4        A.    His name does not sound familiar.

5        Q.    Prior to October 31st, 2009 had you any made any

6    IAB complaints against defendant, Hanley?

7        A.    I don't believe so.

8        Q.    Are you alleging defendant, Hanley, conspired

9    against you with any other defendants in this matter?

10       A.    I believe that is alleged in the complaint.

11       Q.    How do you believe he conspired with other

12   defendants?

13       A.    If he was one of the officers that showed up

14   Halloween night and post October 31st, 2009 upstate in

15   John's Town at my home or my apartment at that time.

16       Q.    If defendant, Hanley, was not present at your

17   apartment on October 31st, 2009, how do you believe he

18   conspired with other defendants in this matter?

19            MR. SMITH:  Objection to form.

20       A.    I am not aware of him having any other

21   involvement or any involvement at all.

22       Q.    Can you please physically describe defendant,

23   Robert O'Hare?

24       A.    I don't believe I know who that is.

25       Q.    Why are you suing him?

A. SCHOOLCRAFT

1     A.     I believe my attorneys found out who was driving

2     up to my apartment in John's Town, New York.

3     Q.     You believe he is an individual who drove up to

4     your apartment in John's Town, New York?

5     A.     That's what my attorneys believe so.

6     Q.     Do you have any reason to believe that personally

7     aside from what your attorneys have told you?

8     A.     No.

9            MR. SMITH:   I just want to caution you Mr.

10           Schoolcraft.

11           MS. METTHAM:   I said aside from what your

12           attorneys told you.

13           MR. SMITH:   Stop interrupting me.   Your

14           persistent interrupting is very unprofessional.

15           Officer Schoolcraft, I want to remind you if you

16           are asked a question, if you have any knowledge

17           or aware of, on its face could you call for

18           information about discussions you may have had

19           with your counsel, I just want to remind you, you

20           are not to reveal any privileged communications.

21     Q.     When you did not answer the door to officers when

22     living in John's Town, New York, was that because you knew

23     the officers were trying to serve you with papers?

24     A.     If they were trying to serve me with papers, I

25     instructed my PBA attorney, Stuart London, well, I asked

A. SCHOOLCRAFT

1    why he wasn't able to accept service.  I made him aware I

2    was threatened by them coming after me up there.  And, no,

3    I believe their intent was to intimidate and harass.

4        Q.    Are you aware the NYPD sent a NYPD district

5    surgeon to your house in John's Town, New York?

6        A.    I don't recall who was sent.

7        Q.    Were you ever told that the NYPD was sending a

8    district surgeon to visit you in John's Town, New York?

9              MR. SMITH:  Do you have information provided

10             to by your attorneys --

11       Q.    I am asking about his recollection.

12             MR. SMITH:  Let's read the question.

13       Q.    Beside being told by any attorneys, are you aware

14   that NYPD was sending a physician to visit you in John's

15   Town, New York?

16       A.    In a conversation I had with Deputy Inspector

17   Luciana, he stated in a threatening manner I am going to

18   send a doctor up to you, but he refused to make an

19   appointment or give a specific time or date.  So I don't

20   know when that was.  And then I contacted my PBA attorney.

21   He refused to make that appointment with -- to the best of

22   my memory, Stuart London was not going to get involved.  He

23   stated they are going to do whatever they want.

24             MR. SMITH:  This is a conversation between

25             you and your PBA attorney, please don't reveal

A. SCHOOLCRAFT

1              it.   There is no intent here to waive any

2              attorney/client communication.   The witness is

3              doing this best to answer your question.   It is

4              now five forty-eight.

5        Q.    Mr. Schoolcraft, do you believe it was

6    threatening for the NYPD to tell you they were sending a

7    doctor to visit you; is that correct?

8        A.    Yes, again, and the conversation I had with my

9    attorney, that I am not going to disclose, what is the word

10   I am thinking of, strengthened my theory.

11       Q.    So something Stuart London said made you believe

12   even further the officers were sending a doctor to threaten

13   you; is that correct?

14       A.    That their behavior, what Luciana stated, he was

15   going to do, that wasn't the intent.

16       Q.    I don't understand.

17       A.    I don't know how to explain it without giving up

18   what Mr. London said.

19       Q.    We can move on for now.   Do you claim defendant,

20   Robert O'Hare, used any force against you?

21       A.    I don't recall any force being used on me by an

22   individual that I am not aware of at this point.

23       Q.    Do you believe defendant, O'Hare, had anything to

24   do with your alleged false arrest on October 31st, 2009?

25       A.    I am not aware.

A. SCHOOLCRAFT

1    Q.    Do you believe defendant, O'Hare, entered or

2    searched any of your residences at any time?

3    A.    I not aware of that.

4    Q.    Do you believe that defendant, O'Hare, seized any

5    of your property at any time?

6    A.    Not that I am aware of.

7    Q.    Do you believe that defendant, O'Hare, had

8    anything to do with your confinement at Jamaica Hospital

9    Medical Center?

10   A.    Not that I am aware of.

11   Q.    During your confinement at Jamaica Hospital

12   Medical Center, did you ever see defendant, O'Hare.

13   A.    I recall every one I met giving me their names.

14   That name does not sound familiar nor does Hanley.

15   Q.    Do you believe defendant, O'Hare, falsely

16   manufactured any evidence against you?

17   A.    I am not aware of that.

18   Q.    Do you believe that defendant, O'Hare, has

19   attempted to silence, harass and/or otherwise harm you?

20   A.    If he was one of the officers responding to

21   John's Town, New York where I was residing at the time,

22   then, yes.

23   Q.    On all of those six occasions you mentioned, you

24   believe that the officers on every occasion were trying to

25   silence, harass and/are otherwise harm you; is that

219

A. SCHOOLCRAFT

1    correct?

2        A.      Yes.  The individual holding his hand on his gun

3    could have been Hanley or O'Hare.  I don't know.  I don't

4    have any pictures.

5        Q.      Did you take any pictures of the officers who

6    came to your home in John's Town, New York?

7        A.      I believe I did at one time.

8        Q.      You don't know all of the officers in those

9    pictures?

10       A.      I don't recall the pictures even, but I think, I

11   recall taking pictures of a gentleman standing outside my

12   window in plain clothes, and then a female officer sitting

13   in a car with a video camera.

14       Q.      Did you take pictures of any other officers that

15   visited you in John's Town, New York?

16       A.      To the best of my memory, that is the only one.

17       Q.      Had you ever interacted with defendant, O'Hare,

18   before October 31st, 2009?

19       A.      Not that I am aware of or that I remember.

20       Q.      Have you interacted with him since?

21       A.      Not that I am aware of.

22       Q.      Do you have any reason to believe defendant,

23   O'Hare, was aware of your alleged whistle blowing before

24   the "Village Voice" article was published?

25               MR. SMITH:  Objection to form.

```
1                    A. SCHOOLCRAFT

2      had already had a conversation or

3      discussion with someone you understood to

4      be a psych intern?

5           A.    Yes.

6           Q.    When did that take place?

7           A.    Again, it's hard to tell the

8      time.

9           Q.    Just approximately.

10          A.    I didn't have a window or --

11     I'm going to say after midnight.  I believe

12     she was communicating with me when Sergeant

13     James was there.

14          Q.    So, it was during the night,

15     your first night there?

16          A.    Yes.

17          Q.    How long did your interaction

18     with that person last?

19          A.    Approximately 15, 20 minutes.

20          Q.    While you were talking to the

21     "second female physician," did she appear

22     to have any difficulty understanding you

23     from your observation?

24          A.    She had absolutely zero

25     expression on her face.  I couldn't read
```

356

```
1                    A. SCHOOLCRAFT

2    her at all.  If she did understand or

3    didn't understand, I could not tell.

4        Q.    You couldn't get a read?

5        A.    No, not at all.

6        Q.    Up until the time that you had

7    the conversation with the second female

8    physician, had you been medicated at all at

9    Jamaica?

10       A.    No.

11       Q.    During the course of your

12   admission there, did you receive any

13   medication?

14       A.    No.

15            MR. SMITH:  Wait.  Received,

16        you mean like swallowed or offered?

17       Q.    Was any medication actually

18   administered to you?

19       A.    No, I don't -- no.

20       Q.    Were you offered any

21   medication?

22       A.    I don't know about offered.  I

23   was approached by a nurse after -- there

24   was this -- this, not a bell, but a sound

25   would go off and everyone would go into a
```

```
 1                    A. SCHOOLCRAFT
 2   and -- was it one person from IAB?
 3          A.    Yes.
 4          Q.    What took place in that
 5   meeting?
 6          A.    My father confronted Dr. Isakov
 7   in trying to get a reason for being -- for
 8   me being involuntarily committed to the
 9   hospital.
10          Q.    Did Dr. Isakov respond to that?
11          A.    His response was, some -- to
12   the best of my memory, nobody's here
13   against their will.  We are just waiting
14   for word from his employer, or I think he
15   said NYPD.
16          Q.    He said he was waiting for word
17   from your employer?
18          A.    Correct.
19          Q.    Did he ask you for permission
20   to speak to Dr. Lamstein?
21          A.    He did not personally, no.
22          Q.    Did somebody tell you that he
23   wanted permission to speak to Dr. Lamstein?
24          A.    No.
25          Q.    Did you ever refuse him the
```

```
 1                  A. SCHOOLCRAFT
 2          Q.    Was the IAB person in this
 3    meeting one of those four people?
 4          A.    No.
 5          Q.    It was somebody different?
 6          A.    Correct.
 7          Q.    When your father was speaking
 8    to the IAB person, did Dr. Isakov and the
 9    social worker leave for a period of time?
10          A.    I don't remember if they were
11    there, then left.  I just remember them
12    arriving.
13          Q.    Now, what did Dr. Isakov say
14    about needing a word from your employer?
15          A.    To the best of my memory, in
16    response to my father asking why I was
17    being held against my will or involuntarily
18    committed, he was demanding the records
19    that were keeping me locked up and Dr.
20    Isakov responded that, he said, I remember
21    him saying, nobody is being held against
22    their will.  We're just waiting to hear
23    from, then he kind of shuffled towards the
24    sergeants, the IAB investigator sitting in
25    the chair, we're just waiting to hear from
```

```
 1                    A. SCHOOLCRAFT
 2    the NYPD.
 3         Q.    In fact, didn't Isakov tell you
 4    that he wanted a plan for you to see
 5    somebody after your discharge during that
 6    meeting?  In other words, he wanted you to
 7    see a psychiatrist or a psychologist?
 8                MR. SMITH:  Objection to form.
 9         A.    Before being discharged?
10         Q.    That you had that appointment
11    already made before discharge.
12         A.    Correct.  The way I understood
13    it, it was a condition but not from that
14    meeting.  It was -- I did not know that
15    until, I want to say Friday.
16                MR. SMITH:  Could you read that
17          back.
18                (Record read.)
19         Q.    Are you aware that your father
20    spent a lot of Thursday speaking with your
21    private doctor, trying to set up an
22    appointment for a psychiatrist for you to
23    see?
24         A.    That sounds right.
25         Q.    Were you aware of that at that
```