Page 1

1
2    UNITED STATES DISTRICT COURT
3    EASTERN DISTRICT OF NEW YORK
4    - - - - - - - - - - - - - - - - - - -
5    ADRIAN SCHOOLCRAFT,
6                        Plaintiff,
7         -against- Index No.
                    10CIV-6005 (RWS)
8
     THE CITY OF NEW YORK, DEPUTY CHIEF
9    MICHAEL MARINO, Tax Id. 873220,
     Individually and in his Official
10   Capacity, ASSISTANT CHIEF PATROL
     BOROUGH BROOKLYN NORTH GERALD NELSON,
11   Tax Id. 912370, Individually and in his
     Official Capacity, DEPUTY INSPECTOR
12   STEVEN MAURIELLO, Tax Id. 895117,
     Individually and in his Official
13   Capacity, CAPTAIN THEODORE LAUTERBORN,
     Tax Id. 897840, Individually and in his
14   Official Capacity, LIEUTENANT JOSEPH
     GOFF, Tax Id. 894025, Individually and
15   in his Official Capacity, stg. Frederick
     Sawyer, Shield No. 2576, Individually
16   and in his Official Capacity, SERGEANT
     KURT DUNCAN, Shield No. 2483,
17   Individually and in his Official
     Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18   Tax Id. 885374, Individually and in his
     Official Capacity, SERGEANT SHANTEL
19   JAMES, Shield No. 3004, and P.O.'s "JOHN
     DOE" 1-50, Individually and in their
20   Official Capacity (the name John Doe
     being fictitious, as the true names are
21   presently unknown)(collectively referred
     to as "NYPD defendants"), JAMAICA
22   HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
     Individually and in his Official
23   Capacity, DR. LILIAN ALDANA-BERNIER,
     Individually and in her Official Capacity
24   and JAMAICA HOSPITAL MEDICAL CENTER
     EMPLOYEES "JOHN DOE" # 1-50, Individually
25
     (Continued)

Page 144

                    S. MAURIELLO

1
2      A.     Yes, you hear that on the tape.
3      Q.     You understand that to mean
4    that there was a time that Schoolcraft
5    was performing well and now he is not
6    performing; is that right?
7      A.     Yes.
8      Q.     I want to show you what's been
9    marked as the next exhibit.  It's a
10   series of roll call transcripts.
11            MR. SMITH:  For the record this
12        is Bates NYC 10357 through -- it's not
13        through 359 and then 10366, 10365, and
14        10350.
15            [The document was hereby marked
16        as Plaintiff's Exhibit 50 for
17        identification, as of this date.]
18      Q.     So, Inspector, these are
19   transcripts of various recordings.  I
20   think mostly of roll call.  I believe you
21   mentioned some of these before as being
22   transcripts that you heard playing at the
23   Floyd case or during the Floyd case.
24            The first one is dated October
25   31, 2008, and there is a reference there

Page 145

S. MAURIELLO

1
2     attributable to you to how you except any
3     groups to be brought in that you want
4     them cuffed, this is at the top of page,
5     and that you have overtime; and, quote, I
6     want them herded in here like New Year's
7     Eve.  And that's on line 18 and 19.
8              Do you see that reference, sir,
9     on the first page?
10        A.    Yes, I do.
11        Q.    Is that a statement that you
12    made during a roll call about wanting
13    individuals brought in like New Year's
14    Eve?
15        A.    Yes, I did.
16        Q.    What did you mean when you were
17    saying "like New Year's Eve," can you
18    explain that to me?
19        A.    Certain days of the year are
20    very radio backlogged.  A good thing to
21    say, Halloween, Fourth of July, New
22    Year's Eve.  I have to slow down when I'm
23    talking.
24              What happened is there is a
25    parade going on in Manhattan.  A lot of

Page 146

```
 1                    S. MAURIELLO
 2     times they can't go up to the do the
 3     warrant checks so it's hard to do it over
 4     the radio so they have to bring the
 5     people in to do the warrant checks.
 6               New Year's Eve again is a very
 7     violent night as is Halloween.
 8               I got to go into this, the
 9     whole thing.
10               We got a lot of intelligence
11     talking about Halloween.  Here I got
12     intelligence from the gang division came
13     down and talked to the officers about
14     initiations they're hearing.
15               Most of these officers probably
16     I would say probably all have experience
17     on Halloween at the 81st Precinct.
18               Gang initiation going to cut
19     people in the face to get into the Bloods
20     and Crips.
21               You're hearing about knock out
22     punch.  Back then it was a group doing
23     the knock out punch.  Now it's one person
24     walking up to somebody and punching them
25     in the face.  Back then it was groups
```

Page 147

1                S. MAURIELLO
2    jumping one person, beat them up, and go
3    over to the next victim.  That's what
4    gang heard.
5                With that community board
6    president called me up, community,
7    counsel president called me up.  They
8    were all worried.  The politicians, all
9    worried, Halloween, how where they were
10   getting feedback from the people in the
11   community.
12               It's a very violent night.
13   They were worried about the safe -- if
14   it's a weekday, kids coming home school
15   zones to you have to put cops out there
16   making sure they're all right coming to
17   and from.  Cops out there for people
18   coming home from work the subway.
19   Transit beefs it up.  Housing beefs it
20   up.  This is all related.
21               When I meant herd it, if I have
22   a group if there is an arrestable
23   situation or summonsable situation, you
24   can't go up citywide go over the radio,
25   bring them in the house and do the

1                    S. MAURIELLO
2    investigation in the house and run them
3    for warrants in there if they have ID.
4    If they don't have ID, you have to wait
5    for someone to come in the house to say
6    they are who they say they are and go
7    back out on the street.
8         Q.    Is the reason why you can't do
9    the warrants more quickly in the ordinary
10   course is because this is a particularly
11   busy night?
12        A.    Two prong, busy night and the
13   frequency they go up to is being used for
14   the Halloween parade, New Year's Eve
15   detail in Manhattan, and the Fourth of
16   July in Manhattan.  They take the
17   frequency over.
18             At one time you can go up to
19   the radio and say, central, I want to do
20   a warrant check.  What is your location?
21   And they will tell you 1018 or 1019.  Now
22   they can't do it.  They were backlogged
23   with written 911 radio runs so they bring
24   them in the house on the computer and do
25   it there.

Page 245

                    S. MAURIELLO
1
2        A.    No.
3        Q.    Are you familiar with the term
4    "blue wall of silence"?
5        A.    Yes.
6        Q.    What is it?
7             MR. KRETZ:  Objection.
8             You may answer.
9        A.    I guess a book or was in the
10   paper that cops don't rat on other cops
11   which is a lie.
12       Q.    What is the term blue wall of
13   silence or code of silence, what is that
14   a reference to?  I want to know what your
15   understanding is; whether or not you
16   think it's a fair or accurate
17   representation?
18       A.    I don't believe in the blue
19   wall of silence.  If someone does
20   something wrong, you report it, that's
21   it.
22       Q.    What is the blue wall of
23   silence?
24       A.    Just what it says, that
25   officers won't rat out another officer or

Page 246

1                    S. MAURIELLO

2    won't retaliate against another officer;

3    just protect the other officer which I

4    don't agree with.

5         Q.     Do you agree there is an

6    attitude within some members of the

7    service that officers shouldn't rat out

8    other officers?

9         A.     I don't know.

10        Q.     You don't know?

11        A.     You are asking me to think

12   there is a population on this job that no

13   matter what happened, they are not going

14   to rat out another officer, I don't

15   believe that.

16        Q.     I think you are characterizing

17   my question in a way that suggests it

18   unfairly so I'll rephrase the question.

19              Do you believe there are

20   pressures in the job that are systemic or

21   institutionally part of the job that

22   inhibit officers from reporting

23   misconduct that they otherwise might be

24   required to report?

25              MS. PUBLICKER METTHAM:

Page 247

1                 S. MAURIELLO

2        Objection.

3             MR. KRETZ:   Objection.

4             You may answer.

5        A.    No.

6        Q.    I'm going to show you what's

7    being marked as the next exhibit, 57.

8             MR. SMITH:   This was actually

9        previously marked as 22, I don't have

10        a 22.  Let's mark this as 57 as well.

11             [The document was hereby marked

12        as Plaintiff's Exhibit 57 for

13        identification, as of this date.]

14             This is a two-page document NYC

15        2846 to 47.  It's a letter from James

16        Brown to Steven Mauriello, dated March

17        11th, 2009.

18        Q.    Have you ever seen this

19    document before?

20        A.    Yes.

21        Q.    When did you see it for the

22    first time?

23        A.    I guess sometime in March.

24        Q.    Of 2009?

25        A.    Of 2009.

Page 341

1              S. MAURIELLO

2       Q.     What happened next?

3       A.     We were outside Chief Marino

4    comes up, huddles everybody up, gets an

5    update.  At the time the landlord the

6    husband and wife were there talking.

7    They gave a key I think to Captain

8    Lauterborn and discussing what was going

9    on.  They were pretty adamant that

10   Officer Schoolcraft was home.

11      Q.     Who was adamant?

12      A.     The landlord.

13      Q.     Did you have any discussions

14   with either the landlord or the landlady?

15      A.     No.

16      Q.     Were you present when anybody

17   else had any discussions with either the

18   landlord or the landlady?

19      A.     After they gave the key to

20   Captain Lauterborn, they stepped back.

21   Chief Marino was handling the scene.  He

22   was the highest ranking.

23      Q.     Were you present when

24   Lauterborn was discussing getting the key

25   from the landlord?

Page 366

1                      S. MAURIELLO
2           Q.     When you went into the
3     apartment, you saw he was laying on his
4     bed and he hadn't hurt himself, right?
5                      MS. PUBLICKER METTHAM:
6           Objection.
7           A.     We still have to do an
8     investigation why he left, yes.
9           Q.     Going to that, what authority
10    can you point me to that authorizes you
11    or anybody else in the apartment to
12    direct him to go back to the precinct to
13    conduct some sort of investigation?
14          A.     That's what was said.  Chief
15    Marino said we were going to conduct an
16    investigation and bring him back to the
17    precinct so....
18          Q.     So Chief Marino told you that's
19    what you guys were going to do?
20          A.     That's what he said when they
21    huddled up.  If he's not safe, God forbid
22    if he is not hurt, if he is not coming
23    because he wanted to leave work, we were
24    going to bring him back for an
25    investigation.

Page 367

1                      S. MAURIELLO
2        Q.    What is the authority for that
3    course of conduct?
4        A.    I don't know the authority.
5        Q.    What is the authority, the
6    patrol guide procedure, administrative
7    procedure, something else that authorizes
8    commanding officers to go into somebody's
9    house and take them back for an
10   investigation into their precinct?
11       A.    We went there because we
12   thought he hurt himself.
13       Q.    You're not answering my
14   question, Inspector.
15             I want know what authority you
16   believed exists which authorized you,
17   Marino, or anybody else to go into
18   Schoolcraft's apartment and order him to
19   return to the precinct for an
20   investigation?
21       A.    Officially, he's still on duty.
22   He left work.  He's still an on-duty MOS.
23   He's not off duty.  He's on duty.  He
24   left without permission.  He's an on-duty
25   MOS.  There is an investigation to be

Page 368

1                    S. MAURIELLO

2    done.

3        Q.     Right.

4        A.     It's not like he stayed home

5    and never showed up to work and he was

6    off duty and never came to work.  He

7    left.  He was suppose to be on duty, just

8    walked out.

9        Q.     Do you have a right to arrest

10   somebody for going off duty?

11              MR. KRETZ:  Objection.

12       A.     First of all, I don't know what

13   you're saying about arresting.  There was

14   no arrest there.  Second of all, it was

15   at his apartment.  Third of all, we went

16   there because we thought he hurt himself.

17   You know that, I know that.  You heard

18   his tapes how he set it up.  All right.

19   You want to come over here and slant to

20   that, it's the farthest thing from the

21   truth.

22       Q.     I don't want to argue with you,

23   Inspector, I would like to get some

24   answers to some of my questions.

25              The question I had on the table

Page 369

S. MAURIELLO

1

2    that I don't think you answered:  Can you

3    identify any authority in the patrol

4    guide, administrative guide, or any place

5    else that authorizes you to or Chief

6    Marino or anybody else at the scene to

7    remove or order Officer Schoolcraft to

8    return to the precinct against his will?

9         A.    He is still an on-duty member

10   of service.

11        Q.    I'm sorry?

12        A.    He's an on-duty member of

13   service.  He's still on duty.

14        Q.    That's your answer to the

15   question?

16        A.    We went there 'cause we thought

17   he hurt himself.  That's it.  I don't

18   know off the top of my head what rule or

19   procedure.  We went there because we

20   thought he hurt himself.

21        Q.    Is that your answer to my

22   question?

23        A.    Yes.

24        Q.    During the huddle before the

25   entry, am I correct there was a

Page 370

1                    S. MAURIELLO

2    discussion about what you are going to do

3    as a group if Officer Schoolcraft was

4    inside the apartment and he was

5    physically seeming fine, right?

6         A.    Yes.

7         Q.    Who said what about that?

8         A.    Chief Marino.

9         Q.    What did Chief Marino say?

10        A.    We were here to make sure he

11   didn't hurt himself, God forbid he hurt

12   himself.  If we go in there and we

13   realize he didn't hurt himself, he was

14   playing a game, he left work, then he has

15   to go back to the precinct and conduct an

16   investigation with GOs.

17        Q.    What did you mean by GOs?

18        A.    Getting interviewed on the tape

19   under oath.  They get the department

20   lawyer to come and sit there with you.

21   They interview you:  Why did you leave?

22   Why this?  It's an investigation.

23        Q.    Is it your understanding that

24   the police department has the authority

25   to compel an officer to go forward with

```
 1                S. MAURIELLO
 2  that type of investigation on the spot
 3  against that person's will?
 4           MS. PUBLICKER METTHAM:
 5      Objection.
 6      A.    I wasn't in the apartment.  I
 7  don't know happened afterward.  I'm
 8  telling you we went there to make sure he
 9  was all right.
10      Q.    Had you ever before directed an
11  officer to return to the precinct or the
12  command for an investigation?
13      A.    Yes.
14      Q.    How many times did that happen?
15      A.    Numerous times:  Off-duty
16  incidents, an allegation a wife said
17  something MOS did, the husband.  You
18  bring both parties in and you find out,
19  especially, when there is a weapon
20  related to it.
21      Q.    On any of those occasions, did
22  any of members of service refuse to go?
23      A.    No.
24      Q.    Am I correct this is the first
25  time that an officer was ordered to go
```

Page 381

1                    S. MAURIELLO

2    told Lieutenant Brosschart to go with him

3    in the ambulance.

4         Q.    Did Officer Schoolcraft say

5    anything that you heard?

6         A.    No.

7         Q.    Did anybody say anything to

8    him?

9         A.    Not that I know of.

10        Q.    What happened next?

11        A.    Everybody came out.  We got in

12   the car, went back to the precinct to

13   start the investigation.

14        Q.    Am I correct that it was back

15   at the precinct, it was Brooklyn North

16   investigations, those three officers; is

17   that correct?

18        A.    Yes.

19        Q.    And Chief Marino?

20        A.    Yes.

21        Q.    And Captain [sic] Brosschart?

22        A.    No.  Captain Lauterborn.

23        Q.    Captain Lauterborn was there?

24        A.    Yes.

25        Q.    Is that correct?

Page 382

```
 1                   S. MAURIELLO
 2        A.     Yes.
 3        Q.     And who else?
 4        A.     Myself.
 5        Q.     And was Crawford also at the GO
 6   or the PG afterwards?
 7        A.     No.
 8        Q.     Who else was at the
 9   investigation at the precinct?
10        A.     I think they interviewed two
11   people:  Sergeant Hoffman or Officer
12   Rodriguez or Reyes.
13        Q.     Was anybody else interviewed?
14        A.     Not that I know of.
15        Q.     It was at that meeting there
16   was a discussion about the fact that
17   Officer Schoolcraft had a tape recorder;
18   is that correct?
19        A.     Yes.
20        Q.     Who mentioned that?
21        A.     Brooklyn investigations might
22   have mentioned it.
23        Q.     That was the first time that
24   you heard anybody discuss the fact that
25   Officer Schoolcraft had a tape recorder?
```

Page 383

1                    S. MAURIELLO

2        A.    Yes.

3        Q.    How long did this PG or GO

4    last?

5        A.    I don't recall, not too long.

6    They have to wait for union

7    representation and lawyers to show up.

8    Once the interviews were over, I left.

9        Q.    And these are lawyers for the

10   people being interviewed?

11       A.    Yes.

12       Q.    Did you have any discussions

13   either during that day or that night with

14   Lieutenant Caughey?

15       A.    I believe Lieutenant Caughey

16   calls me up on Sunday afternoon when I

17   was off.

18       Q.    The next morning?

19       A.    Afternoon.

20       Q.    The next afternoon?

21       A.    Or night, yeah.

22       Q.    But that day you did not speak

23   to him?

24       A.    No.

25       Q.    Did you speak to anybody at IAB

Page 384

1              S. MAURIELLO
2    that day, October 31, 2009.
3        A.    No.
4        Q.    You didn't speak to Astor?
5        A.    No.
6        Q.    Did you ask anybody to speak to
7    Astor on your behalf?
8        A.    No.  I have no relation with
9    Astor.
10        Q.    What did you discuss with
11    Caughey Sunday afternoon?
12        A.    He called up.  He said he heard
13    what happened.  I said, "Officer
14    Schoolcraft left work.  He didn't feel
15    well.  He just left without permission.
16    He went back to his house.  He was AWOL.
17    He was physically restrained by
18    investigations, and he went to the
19    hospital."
20        Q.    That's what you told Caughey?
21        A.    Yeah.
22        Q.    What did Caughey tell you?
23        A.    He said that day he scratched
24    him and took his memo book, scratched him
25    and handed it back to him later on.

Page 385

1                    S. MAURIELLO
2       Q.    Did Caughey say anything else
3   to you?
4       A.    He said -- with that he said,
5   "I wondered because I scratched him.   Did
6   that have an effect why he left the
7   precinct?"
8             I said, "No, he left because he
9   said he was sick."   That was it.
10      Q.    What did you understand Caughey
11  to be saying when he said did the
12  scratching have an effect on why Officer
13  Schoolcraft left the precinct?
14      A.    I don't understand.   I said,
15  "He went sick.   It was a bizarre night."
16  And that was it.   He hung up.
17      Q.    Did Caughey tell you that he
18  thought that maybe he intimidated
19  Schoolcraft?
20      A.    No, he did not say that.
21      Q.    Did he suggest that to you?
22            MS. PUBLICKER METTHAM:
23      Objection.
24      A.    No.
25      Q.    Did Caughey tell you that he

Page 386

```
 1              S. MAURIELLO
 2   threatened Schoolcraft?
 3        A.    No, he did not.
 4        Q.    Did Caughey tell you that he
 5   made a copy of Schoolcraft's memo book?
 6        A.    Not that night.  He didn't tell
 7   me that night.
 8        Q.    Did he tell you that night that
 9   he made a photocopy of Officer
10   Schoolcraft's memo book and put it your
11   desk drawer?
12        A.    Not that night.  When I came
13   into work that Monday.
14        Q.    How did you communicate with
15   Caughey on Sunday afternoon?
16        A.    He called me.
17        Q.    On your cell phone?
18        A.    I believe job phone.
19        Q.    Job cell phone?
20        A.    I believe.
21        Q.    What is the phone number
22   associated with that phone number?
23        A.    I don't know.  His cell number
24   or his home number.  I don't even know.
25        Q.    But you got it on your
```

Page 387

1              S. MAURIELLO

2    department-issued BlackBerry, right?

3         A.    Should be.

4              MR. SMITH:  I going to call for

5         the production of the records

6         pertaining to calls, texts, emails,

7         received or sent from Inspector

8         Mauriello's cell phone or BlackBerry

9         for the days October 31, November 1,

10        November 2, November 3, and November

11        4, 2009.

12             MR. KRETZ:  Usual instructions,

13        put it in written, please; and we will

14        take it under advisement.

15        Q.    So am I correct as of the time

16   that you went into Officer Schoolcraft's

17   apartment on October 31, you were unaware

18   that Officer Schoolcraft had made any

19   reports of misconduct at the eight one to

20   IAB?

21        A.    That's correct.

22        Q.    In your statements to IAB,

23   Exhibit 47, at page 4938 --

24             MS. PUBLICKER METTHAM:  Again,

25        we going into a confidential portion

Page 388

```
1                 S. MAURIELLO
2        in the transcript.
3             MR. SMITH:  Let's label that
4        part confidential.
5             MR. KOSTER:  What time is it?
6             MR. KRETZ:  We are at seven
7        hours.  We can finish this line of
8        questions, but I was just making the
9        observation if less time was spent on
10       the color of people's jackets and
11       shirts and more on matters of
12       substance.  I have done my absolute
13       utmost not to intrude on your
14       examination.  And so seven hours it is
15       plus a few minutes to finish this line
16       of questions.
17            MR. SMITH:  I'm not sure I agree
18       with the seven hours.  I certainly
19       don't agree with the characterization
20       with less time or more time spent on
21       other matters, but rather than wasting
22       more time debating that, I will finish
23       this line of questioning, and we will
24       discuss how we want to proceed if we
25       can reach an understanding.
```

```
 1              S. MAURIELLO
 2              [Whereupon, the following is
 3        deemed confidential:]
 4        Q.    I direct your attention to page
 5   4938 of your PG it's also page 51.  On
 6   line 9 --
 7              MS. PUBLICKER METTHAM:  This
 8        portion should be confidential.
 9              MR. SMITH:  Yes.
10        Q.    On line 9, aren't you saying
11   here that Caughey called you that night?
12        A.    I got confused.  It was the
13   next night.
14        Q.    So what you told IAB is
15   incorrect, but what you told me is
16   correct?
17        A.    Yes, IAB knows that.
18        Q.    How do you know that?
19        A.    They know it.  They interviewed
20   other people probably too.
21        Q.    Did you correct that statement?
22        A.    It happen the next day.  He
23   called me.
24        Q.    You're not answering my
25   question.  Did you correct the statement?
```

Page 390

1                    S. MAURIELLO

2        A.      I didn't get a chance to

3    correct the statement.

4                 [Whereupon, the following is

5        deemed not confidential:]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 677

1              CONTINUED- STEVEN MAURIELLO
2    feeling upset stomach or what.
3         Q.     Are you familiar the building
4    120 Chauncey Street?
5         A.     Yes, I am.
6         Q.     Is that a dangerous building?
7         A.     Yes.
8         Q.     While you were at the command at
9    the 81, there had been shots fired at that
10   building, right?
11        A.     Been shots fired, numerous
12   people shot, people scared.  There was a cop
13   shot at.
14        Q.     When when was a cop shot at?
15        A.     It was in the summer.  I forget
16   the date, but --
17        Q.     Summer of what?
18        A.     '08 or '09.  I don't recall.
19        Q.     Who was the cop?
20        A.     Officer Freanelli.
21        Q.     What's an I09?
22        A.     Interim order nine, I think it
23   is.
24        Q.     What's is it referring to?
25        A.     Something with the -- I don't