Page 1

1   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

2   ----------------------------------------------X

3   ADRIAN SCHOOLCRAFT,

4                          Plaintiff,

5
                                        Case No:

6           - against -               10 CV 06005

7

    THE CITY OF NEW YORK, ET AL.,

8

9                          Defendants.

10  ----------------------------------------------X

11                      111 Broadway

                        New York, New York

12
                        January 13, 2014

13                      10:19 a.m.

14

15

16

17  DEPOSITION OF ELISE HANLON, pursuant to Subpoena,

18  taken at the above place, date and time, before

19  DENISE ZIVKU, a Notary Public within and for the

20  State of New York.

21

22

23

24

25

Page 77

```
 1                    ELISE HANLON
 2        A.      Not -- no.
 3        Q.      What is the protocol when a
 4   person wants to refuse medical attention?
 5        A.      If the patient has decisional
 6   capacity, they are alert and oriented times
 7   three, they understand what the situation
 8   is, they understand that the ramifications
 9   if they don't go to the hospital and they're
10   not under any influence of any alcohol,
11   drugs or anything that would alterer their
12   thought process.  And if they don't fit into
13   those categories and they still refuse to go
14   to the hospital, then we call our medical
15   control, our telemetry, which is the
16   physician.
17             MR. SMITH:  Can you just read
18        back that answer for me.
19             (Record read.)
20        Q.      In this circumstance where the
21   individual who you were going to the scene
22   of his house on October 31, 2009, was he
23   alert and oriented three times?
24             MR. SHAFFER:  Objection.
25        A.      Yes.
```

Page 78

1                          ELISE HANLON
2          Q.       And did he understand the
3     situation?
4                   MR. SHAFFER:  Objection.
5          A.       Yes.
6          Q.       And was he under the influence
7     of any drugs or alcohol that you could
8     determine?
9          A.       I don't know.
10         Q.       Well, did you draw a conclusion
11    that he was under the influence of any drugs
12    or alcohol?
13         A.       I did not do the patient
14    assessment.
15         Q.       You were at the scene, right?
16         A.       Yes.
17         Q.       You were the supervising
18    paramedic at the scene, right?
19         A.       Yes.
20         Q.       All right, so in your opinion,
21    did the individual who was at the scene, the
22    patient, have the ability to request medical
23    attention?
24         A.       Yes.
25         Q.       I am going to show you what's

Page 79

1                    ELISE HANLON

2   being marked as the next Exhibit, it's 65.

3   It's several different copies, form known as

4   the PCR and it does not have a Bates Stamp

5   number on it.  Which is a number that's put

6   on by the parties and I made a few copies of

7   the form, because I believe it's not an

8   eight and a half by eleven piece of paper

9   and some of copies that have been produced,

10  either by the plaintiff or by the hospital

11  aren't as clear as they could be.  So that's

12  why I have made this exhibit multiple

13  generations of the same document.  I believe

14  the original was in the hospital files or at

15  least an original was in the hospital file.

16              (Plaintiff's Exhibit 65,

17       document, was marked for identification

18       as of this date.)

19       Q.    Lieutenant, are you familiar

20  with this document?

21       A.    Am I familiar with these forms?

22       Q.    Yes.  I'm sorry.  That's right.

23  Thank you.  Are you familiar with this form

24  of documents?

25       A.    Yes.

Page 80

1                        ELISE HANLON

2        Q.      What is this document, the form

3    of documents?

4        A.      PCR.

5        Q.      What is the PCR?

6        A.      Patient care report.

7        Q.      What is the patient care report

8    created for?

9        A.      A record of the patient contact

10   with emergency medical services.

11       Q.      Is this a form that is required

12   to be filled by EMTs responding to a

13   situation out in the field.

14       A.      Yes.

15       Q.      Is this a form that's required

16   to be filled out by an EMT, whether they are

17   fire department EMTs or private EMTS?

18       A.      Yes.

19       Q.      Is it the same form, whether

20   fire department or a private ambulance?

21       A.      Relatively.

22       Q.      There are differences?

23       A.      Yes.

24       Q.      What are the differences?

25       A.      Some of their format is

Page 89

```
 1                    ELISE HANLON
 2   that was on the scene.
 3        Q.     Are you saying yes, I knew the
 4   EMTs at the scene?
 5        A.     Yes.
 6        Q.     Did you know nobody else who was
 7   at the scene?
 8        A.     No.
 9        Q.     How did you know the two EMTs
10   who were at the scene?
11               MR. SHAFFER:  Objection.
12        A.     They work in the neighborhood
13   that I work in.
14        Q.     When you got to the scene you
15   recognized them?
16        A.     Yes.
17        Q.     And you knew that they were
18   Jamaica EMTs?
19        A.     Yes.
20        Q.     When you got to the scene what
21   did you see?
22        A.     Many police vehicles.
23        Q.     How many police vehicles?
24        A.     More than five.
25        Q.     What kind of police vehicles did
```

Page 90

1                          ELISE HANLON

2    you see?

3         A.      ESU was there, marked RMPs were

4    there, I am sure there were unmarked RMPs

5    there.

6         Q.      Anything else?

7         A.      I don't recall anything else.

8         Q.      RMPs are radio patrol cars?

9         A.      Yes.

10         Q.      And there also was an ambulance

11    there, right?

12         A.      Yes.

13         Q.      Any other cars at the scene that

14    you saw?

15         A.      Not that I recall.

16         Q.      When you got to the scene how

17    many people did you see on the street?

18         A.      Numerous.

19         Q.      When you say numerous, what do

20    you mean?

21         A.      More than 15.

22         Q.      When you drove to the scene,

23    before you got to the scene, did you have

24    any discussion with anybody about the job?

25         A.      No.

Page 91

1                    ELISE HANLON
2         Q.    When you got the call from the
3    911 dispatcher, you got that call on the
4    radio?
5         A.    Yes.
6         Q.    Was that a call directed at you
7    or was it directed at an individual who fell
8    into the category requiring your response?
9         A.    Directed at me.
10        Q.    So the dispatcher Lieutenant
11   Hanlon, I need you to respond or words to
12   that effect?
13        A.    Using my radio designation, she
14   asked me -- I don't know if it was a she.
15   The dispatcher asked me to respond.
16        Q.    What's your understanding about
17   why the dispatcher asked you to respond?
18        A.    The call type that I received,
19   it as was a barricaded EDP, which requires
20   an officer's response.
21        Q.    A lieutenant's response?
22        A.    Yes.
23        Q.    And you were the lieutenant on
24   duty for that geographic area?
25        A.    The lieutenant apparently that

Page 124

                        ELISE HANLON

1

2        A.     No.

3        Q.     You said that Jamaica Hospital

4   was the closest facility, did you tell me

5   that earlier today?

6        A.     Yes.

7        Q.     When you say closest, you mean

8   in as crows fly or how did you make the

9   assessment about what the closest hospital

10  was?

11       A.     Should be mileage wise.

12       Q.     Mileage wise and is there a

13  program or software program that you use in

14  order to make that determination or is there

15  some sort of system that makes that

16  determination for you?

17       A.     Now in our computer system --

18  our dispatch system the hospital

19  recommendations come up.  So the closest

20  hospital comes up in the computer.

21       Q.     Was that true that there was a

22  system like that in October 2009?

23       A.     I don't remember if the same

24  system was in effect then.

25       Q.     So am I correct that you

Page 125

1                     ELISE HANLON

2    remember drawing a conclusion that Jamaica

3    Hospital was the closest hospital, but you

4    don't remember what the basis for that

5    statement is?

6         A.     That we've taken patients from

7    that area to Jamaica Hospital as using it as

8    the basis of being closer hospitals.  I

9    don't know if it came as -- if the system

10   allowed it to come up as the first

11   recommended.  I don't know if that was in

12   place then.  So past practice, we've taken

13   patients from that area to Jamaica Hospital.

14        Q.     How that far is that area to

15   Jamaica Hospital?

16        A.     I don't know.  Their PCRs have

17   it -- I don't think their PCRs have it.

18   It's a couple of miles.  I don't know.  Like

19   I said, now the computer tells you.  Our

20   PCRs are different than theirs are.

21        Q.     Okay.  Is it also true that

22   Forest Hills is a few miles away from the

23   scene?

24              MR. KRETZ:  Objection.

25              MR. SHAFFER:  Objection.

Page 126

ELISE HANLON

1

2       A.      Most hospitals are within a

3    couple of miles of each other, yes.

4       Q.      Well, I am asking for your

5    knowledge.  Isn't it true that Forest Hills

6    is within a couple of miles of this address

7    here set forth on the PCR, Exhibit 65, 82-60

8    88th Place, Glendale; isn't that right?

9       A.      I don't know the distance.

10   Couple of miles.  I don't know the distance.

11      Q.      Was it fair to say that Forest

12   Hills could be about the same distance as

13   Jamaica?

14              MR. SHAFFER:  Objection.

15      A.      Possibly a fair statement.  I

16   never did the mileage.  I don't know what

17   the mileage is.

18      Q.      Yeah, I know, but you've been

19   working in the fire department for 23 years.

20   This was within your area.  So I am curious

21   of what your knowledge of the distance is?

22              MR. SHAFFER:  Objection.

23      A.      Within -- that hospital is

24   within the response area of that call.  I

25   don't know what the exact mileage was.

Page 127

1              ELISE HANLON

2      Q.      When you say response area, what

3   do you mean?

4      A.      The area where the call was in

5   reference to where the hospitals are.

6      Q.      Do I understand you to be

7   telling me that Forest Hills and Jamaica

8   Hospital were two of the hospitals that were

9   within a certain geographic distance from

10  the scene of the apartment?

11              MR. SHAFFER:  Objection.

12     A.      Restate your question.

13     Q.      Well, what I want to know is if

14  they're both -- if Forest Hills and Jamaica

15  Hospitals are both within a few miles of the

16  apartment, and they're both within the

17  response area, is it correct that it makes

18  no difference whether you take a patient to

19  one facility or the other provided that both

20  facilities have the medical or psychiatric

21  requirements of the call?

22     A.      Yes.

23     Q.      Was the decision to take, in

24  this case, the person in the apartment,

25  Adrian Schoolcraft, to Jamaica Hospital, was

1                    ELISE HANLON

2    that decision made before the entry into the

3    apartment or after?

4         A.      After.

5         Q.      If the patient had requested to

6    go to Forest Hills, would Jamaica EMS crew

7    have taken him there?

8         A.      It they could.

9         Q.      Would they be required to do so

10   with conditions permitting it, even though

11   they worked for a different hospital?

12                MR. OSTERMAN:  Objection.

13                MR. SHAFFER:  Objection.

14        A.      They are not required to take a

15   patient to a specific hospital unless it

16   fits in the category that's best for the

17   patient.

18        Q.      There's nothing -- just because

19   they're working for Jamaica Hospital doesn't

20   mean that they have to take the patient to

21   Jamaica Hospital, right?

22                MR. OSTERMAN:  Objection.

23                MR. SHAFFER:  Objection.

24        A.      Correct.

25        Q.      Is it fair to say that there is

Page 129

1                    ELISE HANLON

2    a tendency for EMTs who work for a

3    particular hospital to bring patients back

4    to the hospitals they're associated with?

5               MR. OSTERMAN:  Objection.

6               MR. SHAFFER:  Objection.

7         A.     I can't make that assumption.

8    Our computer recommendations now tell you

9    what the closest hospitals are.

10        Q.     Well, they give you a choice

11   though, right?

12              MR. SHAFFER:  Objection.

13        A.     They tell you what the closest

14   hospitals are.  You're supposed to follow

15   the first recommended hospitals, suggestion.

16        Q.     So the decision to take Officer

17   Schoolcraft or Adrian Schoolcraft to Jamaica

18   Hospital, that decision was made in the

19   apartment?

20        A.     Yes.

21        Q.     What was that decision based on?

22        A.     It was based on proximity, it

23   was based on his blood pressure.  Then he

24   complained of chest pains.  He assented to

25   go to the hospital and then removed himself

Page 130

ELISE HANLON

1

2    from the ambulance.  So at that point it was

3    based on a psychiatric as well as a medical

4    aspect.

5        Q.      Did he complain of chest pains

6    while you were in the apartment?

7        A.      No.

8        Q.      When did he complain of chest

9    pains?

10       A.      After he removed himself from

11   the ambulance and went back up to his

12   apartment and apparently locked himself back

13   in his apartment.

14       Q.      Did you hear him complain about

15   chest pains?

16       A.      The police officer came out and

17   said he was complaining of chest pains.

18       Q.      You didn't know about chest pain

19   issues when the decision to take him to

20   Jamaica Hospital was made; is that right?

21       A.      Correct.

22       Q.      So the patient's complaints

23   about chest pain was irrelevant to the

24   decision to take him to Jamaica; isn't that

25   right?

```
 1                    ELISE HANLON
 2             MR. KRETZ:  Objection.
 3             MR. SHAFFER:  Objection.
 4      A.      At that point his chest pains
 5  were irrelevant.  His complaining of chest
 6  pains, Jamaica is a better choice.
 7      Q.      No, I understand that.  I just
 8  want to know what facts were available to
 9  the decision makers and what facts were not
10  available to the decision makers at the time
11  they made the decision.  Do you understand
12  my inquiry?
13      A.      They based their decision on
14  Jamaica being a closer facility, on the fact
15  that his blood pressure was abnormally high,
16  especially for his age.
17      Q.      Was there something about
18  Jamaica as opposed to Forest Hills or some
19  other hospital in the response area that
20  would be make Jamaica appropriate for high
21  blood pressure?
22             MR. SHAFFER:  Objection.
23             MR. OSTERMAN:  Objection.
24      A.      Not necessarily.  I don't work
25  for either hospital.  I have no basis on
```

Page 132

1                    ELISE HANLON

2    either hospital.

3        Q.    Who made the decision to take

4    him to Jamaica Hospital?

5        A.    The EMT crew on the scene.

6        Q.    Do you know which one of the two

7    people that you identified made the

8    decision?

9        A.    The recommendation to go to

10   Jamaica Hospital was done by Mr.

11   Sangianetti.

12       Q.    Do you know whether or not

13   anybody from the NYPD had any input into

14   that decision?

15       A.    No.

16       Q.    Can you turn your attention to

17   Exhibit 65, please, the PCR.  Do you see in

18   the upper right-hand corner of the first

19   page says reference to the call number?

20       A.    Blank.

21       Q.    Right.  You see that area right

22   there?

23       A.    Hmm-mm.

24       Q.    Is that what's also known as the

25   CAD number?

Page 138

1                    ELISE HANLON

2        A.      I cannot.

3        Q.      Is there a portion of this

4   document that would capture that information

5   that is not indicating what that priority

6   number was?

7        A.      Our PCRs don't denote the

8   priority number.  It does not tell me how

9   they received this job.  I don't know what

10  they got the call as.

11       Q.      The CAD number would help you

12  get that information, right?

13       A.      The CAD number itself, unless

14  you saw the job, the verbiage of the job,

15  the CAD number itself isn't going to tell

16  you.

17·       Q.      The CAD number plus the report

18  underlying the CAD number would give you the

19  information?

20       A.      Yes.

21       Q.      Can you, looking at this

22  document, determine whether or not lights

23  and sirens were used to take the person or

24  the patient to the hospital?

25       A.      I believe that what's the box

Page 139

1                    ELISE HANLON

2   underneath it is, but it's not clear on my

3   copy.  Does it say to destination?

4        Q.      That's what it looks like to me.

5        A.      So lights and sirens were not

6   used.

7        Q.      In that same row or box, there

8   was a transport to code and a 34.  Do you

9   see that?

10       A.      Hmm-mm.

11       Q.      You have to say yes or no.

12       A.      Yes.

13       Q.      What does transport code 34 mean

14   to you?

15       A.      The hospital number.

16       Q.      That's just a reference to

17   Jamaica?

18       A.      Yes.

19       Q.      In that same box there is a

20   category of run type emergency parenthesis

21   immediate or nonemergency.  You see that?

22       A.      Yes.

23       Q.      Is that an indication of how the

24   ambulance goes to the scene?

25       A.      All 911 calls received are

1                    ELISE HANLON
2    the reasons why his blood pressure was high.
3    What I want to know is, based on your
4    21 years of experience and training as an
5    EMT and a paramedic, if you have a 120 as
6    the bottom number on a blood pressure
7    reading, what does that indicate to you is
8    the possible issue that needs to be looked
9    at medically?
10          A.      It could be a blockage in any of
11   his arteries, it could be a blood clot, it
12   could be a medical -- family history that's
13   undiagnosed, it could be any number of
14   things.
15          Q.      Do you agree with me that a
16   recent traumatic event could also get that
17   number to 120?
18               MR. SHAFFER:  Objection.
19          A.      Anything's possible, possibly.
20   I don't know.  I don't have an answer for
21   you.
22          Q.      What does the top number 160
23   mean to you?
24          A.      That also is high.
25          Q.      What does it medically indicate

Page 167

ELISE HANLON

1
2  to you?
3             MR. SHAFFER:  Objection.
4       A.    It's the force that the heart is
5  working.  So it's the contraction of the
6  heart.
7       Q.    Do you agree with me that
8  trauma, mental or physical trauma will
9  affect both of these numbers?
10            MR. SHAFFER:  Objection.
11      A.    Yes.
12      Q.    Do you agree with me that fear
13  of physical injury will affect the numbers
14  reflected in the blood pressure reading of a
15  patient such as this?
16            MR. SHAFFER:  Objection.
17      A.    I can't make that assumption.
18      Q.    I am not asking you to make an
19  assumption.  I'm asking you for your opinion
20  about whether or not fear of physical injury
21  will increase somebody's blood pressure?
22            MR. LEE:  Just note my
23       objection.
24            MR. SHAFFER:  Objection.
25      A.    It will raise your blood

Page 168

```
 1                    ELISE HANLON
 2    pressure.
 3         Q.     Does a blood pressure reading of
 4    160 over 120 indicate that the patient is in
 5    cardiac arrest?
 6               MR. SHAFFER:  Objection.
 7         A.     Then his blood pressure would be
 8    zero.
 9         Q.     Then the answer is no, it
10    doesn't indicate cardiac arrest?
11         A.     Correct.
12         Q.     Does it indicate that there's a
13    possibility of cardiac arrest?
14               MR. SHAFFER:  Objection.
15         A.     I have no way to answer that.
16         Q.     All right, well, if you take a
17    reading of a white male, who is 34-years old
18    and you take their blood pressure and it's
19    160 over 120, do you believe that it's a
20    possibility that the person is going to die
21    of a heart attack?
22               MR. SHAFFER:  Objection.
23         A.     Not knowing the patient and not
24    really knowing his medical history, I can't
25    answer that.
```

Page 169

1                    ELISE HANLON

2         Q.      So the answer to my question is

3    no, you wouldn't draw a conclusion that

4    there's a possibility of a heart attack,

5    because you don't have enough information,

6    right?

7         A.      I don't know if I could answer

8    that.  Can he go into cardiac arrest from

9    his blood pressure being this high -- there

10   are other factors -- I can't answer --

11   you're asking me a question that's

12   multifaceted.

13        Q.      I'm not asking some person on

14   the street.  I'm asking you.  You've been in

15   this business for 23 years as an EMT and a

16   paramedic.  You have supervised both.  I

17   want to know whether or not if you take the

18   blood pressure of a white male who is

19   34 years old, does this blood pressure

20   reading of 160 over 120 indicate to you that

21   this person is at risk of a cardiac arrest

22   or a heart attack?

23              MR. SHAFFER:  Objection.  Asked

24        and answered.

25        A.      Is he at risk of a heart attack,

Page 170

                    ELISE HANLON

1
2    quite possibly.  There is no age limit on a
3    heart attack.  There are plenty of people
4    that are under 34 that have heart attacks.
5         Q.    Yeah, but that might be true.
6    What I want to know is whether or not if the
7    blood pressure readings that we have here of
8    160 over 120 indicate that there's a
9    possibility of a heart attack?
10        A.    Possibility.
11        Q.    Those numbers indicate a
12   possibility of a heart attack?
13        A.    It's a possibility.
14        Q.    In the event that you get a
15   reading of 160 over 120 for a white male who
16   is 34-years old, what are the protocols for
17   addressing that situation?
18        A.    Transport to the hospital.
19        Q.    Is that the only protocol?
20        A.    On the BLS level, yes, oxygen,
21   transport to the hospital.
22        Q.    What do you mean on the BLS
23   level?
24        A.    EMTs don't give medication other
25   than Aspirin for cardiac issues.

Page 171

1                    ELISE HANLON

2         Q.      Wouldn't it be consistent with

3    sound practices to lie the patient down and

4    try to calm the patient down and take their

5    blood pressure reading again?

6                    MR. SHAFFER:  Objection.

7         A.      They took a second blood

8    pressure.

9         Q.      You're not answering my

10   question.  My question is if you got 160

11   over 120 for a white male, wouldn't one of

12   the protocols suggest that you lie the

13   person down, calm them down and then in five

14   or ten minutes take their blood pressure

15   reading again?

16                   MR. SHAFFER:  Objection.

17        A.      We don't have a protocol that

18   says lie the patient down and retake their

19   blood pressure.  It's not part of our

20   protocol.

21        Q.      So your protocol is take them to

22   the hospital period, right?

23                   MR. SHAFFER:  Objection.

24        A.      There is no high blood pressure

25   protocol.  His vital signs were taken.

1              ELISE HANLON

2    According to the paper his vital signs were

3    retaken.  There is no written protocol that

4    says lay the patient down and retake his

5    blood pressure.

6         Q.    Is there a practice of sitting

7    or laying the patient down or getting the

8    patient in a more relaxed physical condition

9    and then retaking the person's blood

10   pressure?

11             MR. SHAFFER:  Objection.

12        A.    You're asking for -- is it

13   practice when he gets removed to the

14   ambulance and he's on a stretcher, is his

15   blood pressure retaken, sure.  Is he fully

16   laying down, no, he's sitting up.

17        Q.    You're not answering my

18   question, Lieutenant.  It's very simple.  Is

19   it a practice when you take somebody's blood

20   pressure and they give you a blood pressure

21   reading of 160 over 120 for somebody who is

22   a white male who is 34-years old, is there a

23   practice of retaking that person's blood

24   pressure within a few minutes shortly

25   thereafter after they've had a chance to

Page 173

ELISE HANLON

2  relax?

3         MR. SHAFFER:  Objection.

4     A.     His blood pressure was taken

5  several minutes after.

6     Q.     You and I can read the document

7  until we're blue in the face.  That's not

8  answering my question.  Is there a practice

9  of doing that?

10    A.     They're required to take two

11  sets of vital signs.  So they take two sets

12  of vital signs.  Is there a practice to

13  change his position if he is hypertensive.

14  There is no practice of changing his

15  position if he is hypertensive.

16    Q.     Why is there a requirement that

17  two vital signs be taken?

18    A.     That's the requirement that we

19  have.

20    Q.     So you don't know why that there

21  is a requirement that there be two vital

22  signs taken?

23    A.     To see if there is a change.

24    Q.     Is there a requirement that the

25  vital signs be taken from different arms?

Page 180

1                       ELISE HANLON

2          Q.      Do you know that officers from

3    ESU entered the apartment?

4          A.      I don't know which officers,

5    what command they were from entered the

6    apartment.

7          Q.      You saw people from the NYPD

8    enter the apartment?

9          A.      Yes.

10         Q.      You said to me that the EMTs

11   from 50E3 entered the apartment, right?

12         A.      Yes.

13         Q.      With you, right?

14         A.      Yes.

15         Q.      What's the reference to C513?

16         A.      That's me.

17         Q.      What is C513?

18         A.      Conditions five one and three is

19   the tour.

20         Q.      Can you explain that to me,

21   please?

22         A.      Conditions is the unit, five one

23   is the battalion area of the response and

24   three is the time period of which we work.

25         Q.      And what time period were you?

Page 216

1                   ELISE HANLON

2        Q.      You were a paramedic yourself,

3    right?

4        A.      Yes.

5        Q.      So, is that the reason you

6    needed a paramedic at the scene because they

7    have all the equipment they needed?

8        A.      Yes.

9        Q.      Do you recall how long out the

10   ETA was on the paramedics' arrival?

11       A.      I do not recall the exact time

12   off the top of my head.  Our protocol states

13   if you can get to the hospital in less time

14   than it takes for the paramedics to get

15   there, then go.

16       Q.      So based on that, you believe

17   that the ETA of the paramedics was greater

18   than the time that it would take to get to

19   the hospital?

20       A.      Yes.

21       Q.      Did the person in the apartment

22   get taken to the hospital under an emergency

23   situation?

24            MR. SHAFFER:  Objection.

25       A.      I don't understand what you're

Page 217

1                ELISE HANLON
2   -- rephrase your question.
3        Q.     Well, was it -- was the patient
4   under the risk of some sort of serious
5   medical condition or life-threatening
6   condition at the time he was taken to the
7   hospital?
8        A.     The EMTs on the scene deemed
9   that the patient was stable enough that
10  again, our protocol is if the patient is
11  stable, that the transport to the hospital
12  isn't life threatening.  So he was not under
13  a life threatening condition.
14       Q.     I'm going to play the recording
15  that you listened to Thursday and I have
16  some questions about that recording, but
17  before we do that, I just want to show you
18  what I am going to mark as Exhibit 67.  This
19  is a document Bates Stamped NYC5797 through
20  5799.  It's a summary of the interview that
21  you had with the IAB?
22            MR. SHAFFER:  Just going to note
23         for the record that document is marked
24         as confidential and this portion of the
25         transcript should be marked as such and

Page 218

                    ELISE HANLON

1

2    separately bound.

3         MR. SMITH:  Well, we haven't

4    been separately bounding it.  We have

5    just been labeling confidential on the

6    top.  Can we mark this as confidential

7    without separately bounding it?

8         MR. SHAFFER:  No, it's supposed

9    to be separately bound and I believe

10   that's what the confidentiality stip

11   contemplated when it was entered into

12   by the parties.  I know you may not

13   agree with that portion, but as it

14   stands now that's how it's supposed to

15   be.

16        MR. SMITH:  All right, well I'm

17   not going quibble with you about it.

18   It just seems to make a lot more sense

19   to just mark it confidential without

20   having a separate binding, but if you

21   all insist on that, that I guess is

22   your right.  I don't know.  I'm not

23   going to fight with you about it.  I'll

24   leave that up to you, if you want to

25   have it separately bound, we'll

Page 219

1                    ELISE HANLON

2          separately bounded and if you don't

3          really care, which I would urge you to

4          reconsider, then we will just mark it

5          as confidential the way the court

6          reporter indicated.

7                    MR. SHAFFER:  Separately bound

8          is our preference.

9                    MR. SMITH:  Okay.  Confidential.

10                   (WHEREUPON, THE FOLLOWING

11         CONFIDENTIAL PORTION, PAGES 219 THROUGH

12         222, WERE DESIGNATED CONFIDENTIAL BY

13         COUNSEL PURSUANT TO PROTECTIVE ORDER

14         AND BOUND UNDER SEPARATE COVER

15         DESIGNATED CONFIDENTIAL.)

16

17

18

19

20

21

22

23

24

25

Page 222

ELISE HANLON

1

2

3

4

5

6

7      Q.      Just go back to 65 for a second,

8   which is the PCR or the patient care report.

9   Going through that document for some detail

10   over the past hour so and you were witness

11   to a lot of the events that are set forth in

12   this document.  So with that backdrop, I'd

13   also like to know whether or not there is

14   anything in the PCR that you believe is

15   indicated here as incorrect?

16           MR. OSTERMAN:  Just note my

17       objection.

18       A.      I mean, they documented that he

19   said no chest pains.  We were told that he

20   had chest pains.  You know, I don't know

21   whether that's a correct statement or not.

22   I didn't ask the patient himself and I don't

23   know whether they did in the ambulance and

24   what the response was.  I was not privy to

25   that.

Page 223

ELISE HANLON

1

2          Q.      Okay.  So you're indicating to

3     me that that's one area that may or may not

4     be correct, right?

5          A.      I don't know.  Yes, that's the

6     indication.

7          Q.      Is there anything else on this

8     document the facts as you understand them

9     indicate maybe there is something incorrect

10    here on this form?

11               MR. OSTERMAN:  Objection.

12         A.      As I recall he was inside the

13    ambulance when he walked downstairs and this

14    document says he was outside the ambulance.

15    I recall him being inside the ambulance.

16         Q.      Okay.  Thank you.  Is there

17    anything else that's set forth in this

18    document, either on the first or the second

19    page, that you believe may be incorrect or

20    that you disagree with?

21               MR. OSTERMAN:  Objection.

22         A.      Not that's standing out in front

23    of me.

24         Q.      I'm just going to play the

25    recording that you listened to on Thursday.

Page 224

```
 1              ELISE HANLON
 2              MR. SMITH:  This is from
 3     plaintiff's production.  It's a tape
 4     that's identified as DS - -- DS.50_31
 5     and I will give you the full title in a
 6     second.  31 October 2009_ home
 7     invasion..WMA.
 8              I'm starting at 000.
 9              (Whereupon, a tape recording was
10     played.)
11              MR. SMITH:  I'm stopping this at
12     one minute and one second.
13     Q.      Lieutenant, is this the
14  recording that you listened to on Thursday?
15              MR. SHAFFER:  Objection.
16     A.      Yes.
17              MR. SMITH:  I will rephrase it.
18     Q.      Does this sound like the
19  recording that you listened to on Thursday?
20     A.      Yes.
21     Q.      When whoever it was that entered
22  the apartment and said let me see your
23  hands, were you present in the apartment
24  when those words were uttered to Officer
25  Schoolcraft?
```

Page 225

1                          ELISE HANLON

2          A.      No.

3          Q.      Did you hear those words

4      uttered, other than on the tape recording?

5          A.      No.

6                  MR. SMITH:  All right,

7          continuing with the recording.

8                  (Whereupon, a tape recording was

9          played.)

10                 MR. SMITH:  All right, I'm

11         stopping it at 117.

12         Q.      Did you hear on that day,

13     October 31, the exchange that you just heard

14     on the tape where the person in the

15     apartment said he took some Nyquil?

16         A.      I don't remember, no.

17         Q.      All right, I am going to

18     continue playing the recording, just to sort

19     of be efficient with all of our time, could

20     you let me know when it is that you in the

21     recording believe you were first in the

22     apartment; okay?

23         A.      Yes.

24         Q.      All right, thank you.

25                 (Whereupon, a tape recording was

Page 226

ELISE HANLON

2       played.)
3               MR. SMITH:  All right, I'm
4       stopping the recording at two minutes
5       and 13 seconds.
6       Q.      Are you in the room by this
7   time?
8       A.      I don't remember I'm in the
9   room.  I mean, I heard them talking -- him
10  talking to the chief or the captain,
11  somebody in a white shirt, but I don't
12  remember if I remember the conversation from
13  being in the room or in the tape.
14      Q.      Okay, fair enough.  So again,
15  with the same request not -- I don't want
16  your speculation about when you entered the
17  room, but listening to the recording, can
18  you tell me when for the first time you're
19  in the room?
20      A.      Okay.
21              (Whereupon, a tape recording was
22      played.)
23              MR. SMITH:  All right, I'm
24      stopping the recording at two minutes
25      and 44 seconds.

Page 227

1                    ELISE HANLON

2          Q.      Did you hear anybody say to

3    Officer Schoolcraft that somebody was

4    concerned about his safety or his wellbeing?

5          A.      I don't remember if we were in

6    the apartment or not.  I don't recall when

7    we got in there.

8          Q.      Okay.

9          A.      Again, this point everything

10   sounds...

11         Q.      All right, putting aside the

12   tape recording, did anybody at the scene

13   tell you before you entered the apartment

14   that there was concern about Officer

15   Schoolcraft's safety?

16         A.      No.

17                 MR. SMITH:  Resuming the

18         recording at 244.

19                 (Whereupon, a tape recording was

20         played.)

21                 MR. SMITH:  I am stopping the

22         recording at 305 or 306.

23         A.      I think we were in the room for

24   this.

25         Q.      When you say we, you mean you

ELISE HANLON

1

2     and the EMTs?

3         A.      Yes.

4         Q.      When you say in the room, do you

5     mean at the doorsill to the bedroom or do

6     you mean in the apartment?

7         A.      The doorsill to the bedroom.

8         Q.      So there was -- when you first

9     entered the apartment, you're entering into

10    what kind of room, if you remember?

11        A.      Very clustered.  The whole

12    apartment was very cluttered.

13        Q.      Okay, but what kind of a room

14    was it that you were entering into?

15        A.      Hallway and then to the left I

16    think it was the bedroom.

17        Q.      How long were you in that first

18    room before you got to the threshold of the

19    bedroom?

20        A.      I never went into -- I don't

21    think I ever fully went into the bedroom.

22        Q.      No, I understand that.  You told

23    me you got to the threshold or the doorsill

24    of the bedroom?

25        A.      Yes.

Page 229

1                    ELISE HANLON

2          Q.      How long were you in that room

3    at the threshold?

4          A.      I don't have no time.

5          Q.      Okay.  So do I understand you

6    to be saying around this time you believe

7    that you and the other EMTs are at the

8    threshold and you can hear what's being

9    said?

10         A.      Yes.

11                 MR. SMITH:  Continuing at 306.

12                 (Whereupon, a tape recording was

13         played.)

14         Q.      Did you hear anybody from the

15   New York City Police Department tell the

16   person in the apartment that they wanted him

17   to go back to the 81st Precinct to

18   investigate why he left?

19         A.      It wasn't something I was paying

20   attention to.

21         Q.      So sitting here today, you don't

22   have a recollection of whether or not you

23   heard those words, right?

24         A.      No, I don't recall.

25         Q.      Did you have any reason to doubt

Page 230

```
 1                    ELISE HANLON
 2   that those words weren't spoken?
 3              MR. SHAFFER:  Objection.
 4        A.     No.
 5        Q.     As of this point in the
 6   recording, does the person in the apartment
 7   appear to you to be acting in an emotionally
 8   disturbed fashion?
 9              MR. KRETZ:  What point are we
10         at, Nat?
11              MR. SMITH:  3.23.
12        A.     Not a -- doesn't appear to be
13   acting like an EDP.
14              MR. SMITH:  All right,
15         continuing the recording at 323.
16              (Whereupon, a tape recording was
17         played.)
18              MR. SMITH:  I'm going to stop
19         the recording here at four minutes and
20         36 seconds.
21        Q.     As of this time in the recording
22   are you still in the threshold of the
23   bedroom?
24        A.     I believe so.
25        Q.     All right, as of that part that
```

Page 231

1                    ELISE HANLON
2    I just stopped at four minutes and 36
3    seconds, was the person in the apartment,
4    Officer Schoolcraft, acting as an EDP?
5                MR. SHAFFER:  Objection.
6         A.        Although, it doesn't appear loud
7    on the tape, in person it appeared everybody
8    yelling at each other, it was loud.  You
9    know, was he acting like an EDP -- he was
10   acting agitated.
11        Q.        He was acting agitated, but he
12   wasn't acting like an EDP, right?
13                MR. SHAFFER:  Objection.
14        A.        Then again, there's different
15   degrees of EDP.  Was he an EDP --
16        Q.        Lieutenant, you told me --
17                MR. SHAFFER:  Let her finish.
18        Q.        You've told me that you have
19   experience with hundreds of EDPs and I'm
20   asking you a simple question.  As this point
21   in the recording, do you have an opinion
22   about whether or not the person in the
23   apartment is a acting like an EDP?
24                MR. SHAFFER:  Objection.
25        Q.        If you confine yourself to

Page 232

```
 1                ELISE HANLON
 2    answering my questions, we can all go home a
 3    little earlier today.
 4        A.      He was acting agitated.  He was
 5    acting uncooperative.  Does it make him an
 6    EDP, no.
 7        Q.      Did you see Officer Schoolcraft
 8    approach any of the police department
 9    personnel there in a belligerent manner,
10    physically get in their face?
11        A.      I did not see that.
12        Q.      Did you ever have any
13    discussions with anybody about the fact that
14    Officer Schoolcraft, the person in the
15    apartment, got in somebody's face?
16        A.      No, I did not.
17                MR. SMITH:  Continuing the
18        recording at four minutes and 36
19        seconds.
20                (Whereupon, a tape recording was
21        played.)
22                MR. SMITH:  Stopping the
23        recording at 528.
24        Q.      Did you witness the events that
25    we just heard on the tape?
```

Page 233

1                     ELISE HANLON

2          A.      Did I physically witness them --

3     I didn't think they did anything.  I was not

4     in the room.

5          Q.      Were you still at the threshold?

6          A.      Still where I was.  Whether I

7     was talking to my crew -- they're

8     interactions don't concern me.

9          Q.      Whose interactions --

10         A.      The police department's

11    interaction with the patient and what his

12    issues are with the police department don't

13    concern me, don't concern my crew, don't

14    concern his patient care.  I don't really

15    care what the conversation was.

16         Q.      As of this point in the

17    recording, 528, did you have any reason to

18    be concerned about Officer Schoolcraft's

19    medical condition?

20         A.      I didn't know what his medical

21    condition was.

22         Q.      So you didn't have any reason to

23    be concerned about it, right?

24         A.      Correct.

25                 MR. SMITH:  All right,

Page 234

1          ELISE HANLON

2     continuing the recording at 528.

3              (Whereupon, a tape recording was

4     played.)

5              MR. SMITH:  I'm going to stop

6     the recording at 641.

7     Q.      Did you see Officer Schoolcraft

8  talk on his cell or other phone?

9     A.      No, I did not.

10             MR. SMITH:  Continue the

11    recording at 641.

12             (Whereupon, a tape recording was

13    played.)

14             MR. SMITH:  I'm stopping the

15    recording at 826.

16    Q.      During this eight-minute period,

17 did you have any conversations with anybody

18 from NYPD while you were in that foyer or

19 adjoining room?

20    A.      No.

21    Q.      Did you hear Officer Schoolcraft

22 say he wasn't feeling well?

23    A.      I didn't hear it.

24             MR. SMITH:  Continue the

25    recording at 826.

Page 235

1                    ELISE HANLON
2              (Whereupon, a tape recording was
3       played.)
4              MR. SMITH:  I am stopping at
5       842.
6       Q.    Did you recognize any of the
7  voices that you just heard?
8       A.    No, I didn't recognize the voice
9  we heard, but he just said I have an
10 ambulance downstairs.  Maybe we weren't up
11 there yet, but the conversation that he had
12 between the commanding officers sounded
13 familiar.  So I'm not sure what the
14 timeframe was.
15      Q.    Are you telling me that you
16 weren't upstairs during this period of time?
17      A.    Now I'm unsure.
18      Q.    And you're unsure because you
19 overheard somebody say there is an ambulance
20 downstairs?
21      A.    Yeah, I'm unsure whether we were
22 there at that point.
23      Q.    I hear what you're saying.  I
24 just want to know is the reason why you're
25 saying you're unsure is because you heard

Page 236

```
 1                    ELISE HANLON
 2    somebody say we have an ambulance
 3    downstairs?
 4         A.      That question -- that's making
 5    me question whether we were there before
 6    that transpired.
 7         Q.      Okay.  Is there anything else
 8    that's making you question whether or not
 9    you or the other EMT crew were there before
10    those words were uttered?
11         A.      No.
12                 MR. SMITH:  All right,
13         continuing at 842.
14                 (Whereupon a tape recording was
15         played.)
16         Q.      Do you recognize that voice?
17         A.      Can you?
18                 MR. SMITH:  Sure I can bring it
19         back.  Going back panel to 900 or 901.
20                 (Whereupon, a tape recording was
21         played.)
22                 MR. SMITH:  I'm pausing it at
23         1027.
24         Q.      Do you recognize the voice of
25    the person speaking to Officer Schoolcraft?
```

Page 237

ELISE HANLON

1

2      A.      Yes.

3      Q.      Who is that?

4      A.      Sal Sangianetti.

5      Q.      How long had you known Sal

6   Sangianetti as of October 2009?

7      A.      Twenty years.

8              MR. SMITH:  Continuing at

9      1027 --

10     Q.      Before I start, do you recall

11  Sal approaching Officer Schoolcraft?

12     A.      Yes.

13     Q.      Where were you when Sal

14  approached Officer Schoolcraft?

15     A.      Behind him at some distance.

16     Q.      At what distance?

17     A.      He walked into the room, I was

18  somewhere again, the doorway or at the edge

19  of the room.

20     Q.      Did you cross the threshold into

21  his bedroom?

22     A.      I don't know.

23     Q.      How many feet were you from the

24  patient when Sal was asking you questions?

25     A.      I don't know.

Page 238

1                    ELISE HANLON

2        Q.    You have no way of measuring how

3    many feet you were from the patient?

4        A.    I don't know.

5        Q.    Was the patient sitting or

6    standing?

7        A.    I believe he was sitting.

8        Q.    What was he sitting on?

9        A.    I believe it was a bed.

10             MR. SMITH:  All right,

11        continuing at 1027 --

12        Q.    Where is the EMT at this point?

13        A.    I'm not sure if she's in the

14    room or she's behind me.  I don't know where

15    she is.

16             MR. SMITH:  All right,

17        continuing at 1027.

18             (Whereupon, a tape recording was

19        played.)

20             MR. SMITH:  I am stopping at

21        1121.

22        Q.    Is Sal taking Schoolcraft's

23    vitals at this point?

24        A.    I believe so.

25        Q.    So while Officer Schoolcraft is

Page 239

                        ELISE HANLON

1

2    sitting on his bed, Sal is taking his blood

3    pressure, right?

4         A.    I can't be sure what the

5    timeframe is of this conversation and his

6    blood pressure.  I don't know.

7         Q.    That's my question.

8         A.    I don't --

9         Q.    Is --

10        A.    I don't know.

11        Q.    -- Sal taking Officer

12   Schoolcraft's blood pressure during this

13   conversation that we just were listening to?

14             MR. SHAFFER:  Objection.

15        A.    I don't know.

16        Q.    Do you think the tone of the

17   NYPD chief's conversation with Officer

18   Schoolcraft was such that would elevator

19   someone's blood pressure?

20             MR. SHAFFER:  Objection.

21        A.    I can't answer that question.

22             MR. SMITH:  1121, continuing

23        with the recording.

24             (Whereupon, a tape recording was

25        played.)

Page 240

1                    ELISE HANLON

2          A.     He's taking it there.

3          Q.     Did you hear at 1142 the sound

4     of the blood pressure being taken?

5          A.     Yes.

6          Q.     That was just seconds before the

7     chief told him he was being suspended?

8          A.     The blood pressure was after he

9     said it.

10         Q.     He was told he was going to e

11    suspended and then you could hear the sound

12    of a blood pressure machine pumping, right?

13         A.     Yes.

14                MR. SMITH:   Continuing at 1142.

15                (Whereupon, a tape recording was

16         played.)

17                MR. SMITH:   I'm stopping at

18         1205.

19         Q.     Did you hear Sal say that

20    Officer Schoolcraft's blood pressure was 160

21    over 120?

22         A.     To the best of my memory, yes.

23         Q.     Do you think that the

24    circumstances that Officer Schoolcraft was

25    in at that time with all these officers

Page 241

1                    ELISE HANLON
2   standing in the apartment and him being told
3   he was going to be suspended contributed to
4   the high blood pressure reading?
5                MR. SHAFFER:  Objection.
6                MR. OSTERMAN:  Objection.
7                MR. KRETZ:  Objection.
8                MR. KOSTER:  Objection.
9                MR. LEE:  Objection.
10       A.       Possibility.  I don't know.
11       Q.       What further information would
12   you require in order to know whether or not
13   those circumstances would elevate somebody's
14   blood pressure?
15                MR. KRETZ:  Objection.
16                MR. SHAFFER:  Objection.
17       A.       It would depend on the person.
18   It depends on the history.  It would depend.
19   Not everybody's blood pressure gets
20   elevated.  I can't make that assumption.
21   You're asking me to make an assumption that
22   I cannot.
23       Q.       The assumption is what; what
24   assumption am I asking you to make?
25       A.       You are asking me to make an

Page 242

1                    ELISE HANLON
2    assumption that the interaction caused his
3    blood pressure to rise.
4         Q.    No.  No.  No.  I'm asking you
5    if, in your experience for the past 23 years
6    as an EMT and as a paramedic for the fire
7    department and before that as an EMT of
8    private ambulances, in your experience would
9    the circumstances just as you just heard
10   them with all these people standing in his
11   apartment and him being told that he was
12   being suspended, were those circumstances
13   consistent with somebody's blood pressure
14   being elevated?
15                MR. LEE:  Objection.
16                MR. SHAFFER:  Objection.
17                MR. KRETZ:  Objection.
18                MR. OSTERMAN:  Objection.
19        A.    Maybe.
20        Q.    Well, what would it depend on?
21                MR. SHAFFER:  Objection.
22        A.    I can't reiterate it enough
23   times.  It would depend on the person, it
24   would depend on the circumstances, it would
25   depend on history.  I can't answer that

Page 243

1                    ELISE HANLON

2     question.  I am not an expert on blood

3     pressures.

4          Q.    How many times have you taken

5     somebody's blood person?

6                    MR. SHAFFER:  Objection.

7          A.    A lot.

8          Q.    Over 1,000 I'd say, right?

9          A.    Probably.

10                   MR. SHAFFER:  Objection.

11         Q.    Who is an expert on blood

12    pressure if you're not?

13                   MR. SHAFFER:  Objection.

14         A.    Consult with a physician.

15                   MR. SMITH:  All right, 1205

16         continuing with the recording.

17                   (Whereupon, a tape recording was

18         played.)

19         Q.    Is that your voice in the

20    background saying Sal, Sal?

21         A.    Yes.

22         Q.    What are saying to Sal?

23         A.    I have no idea.

24         Q.    What is he saying back to you?

25         A.    I have no idea.

Page 244

1                          ELISE HANLON

2          Q.       Why were you calling out to him?

3          A.       I don't remember.  It was four

4     years ago, five years.

5          Q.       And listening to the tape

6     recording you don't have a recollection

7     about why you were saying Sal, Sal to him?

8          A.       I don't know.

9                   MR. SMITH:  Continuing at 1215.

10                  (Whereupon a tape recording was

11         played.)

12         Q.       What's the reference to

13    city-wide, do you know what that's a

14    reference to?

15         A.       The radio.

16         Q.       Is that relating to this job?

17         A.       No.

18         Q.       What's it relating to?

19         A.       Somebody else's job.

20         Q.       Does having a pulse rate of 115

21    consistent with the circumstances that were

22    facing Officer Schoolcraft?

23         A.       Possibly.  I don't know what his

24    normal blood pressure is or pulse is.

25         Q.       If you look at Exhibit 65, this

1                      ELISE HANLON

2     indicates that his pulse was taken at 21:45,

3     is that the time that the pulse was being

4     taken by Sal as indicated in the recording?

5                MR. SHAFFER:  Objection.

6          A.      Should be.

7          Q.      So the pulse rate here says in

8     the documents 165 and it's 120, that's an

9     error, right?

10               MR. OSTERMAN:  Objection.

11               MR. SHAFFER:  Objection.

12         A.      Okay.  I didn't write it.

13         Q.      Do you agree with me that it's

14    an error?

15               MR. OSTERMAN:  Objection.

16               MR. SHAFFER:  Objection.

17         A.      Yes.

18         Q.      Is the difference between a

19    pulse rate of 115 and 120 a significant

20    difference?

21               MR. SHAFFER:  Objection.

22         A.      Not significant.

23         Q.      Is it insignificant?

24         A.      It's five beats.  It depends on

25    how you add it or multiplied or how you felt

Page 246

```
 1                    ELISE HANLON
 2   them.  Maybe you took it and within ten,
 3   within five.
 4        Q.      Well, but the information set
 5   forth in the PCR is supposed to be right,
 6   isn't it?
 7                MR. SHAFFER:  Objection.
 8        A.      Yes.
 9                MR. SMITH:  All right,
10         continuing at 1230.
11                (Whereupon, a tape recording was
12         played.)
13                MR. SMITH:  Stopping at 1303.
14        Q.      After Sal said he's going to go
15   to the hospital, what did he say, we're
16   going to give him therapy, what did he say?
17   Did you make that out?
18        A.      I --
19        Q.      You didn't hear that.
20                MR. SMITH:  All right, I'm going
21         to go back to 1300, see if you can make
22         that out for me.
23                (Whereupon, a tape recording was
24         played.)
25                MR. SMITH:  So going to go back
```

Page 247

1                    ELISE HANLON

2        to 1250 and start there -- or 1249.

3        Q.      After he says he's going to go

4   to the hospital, Sal says something and I'm

5   trying to see if you can help me discern

6   what that is; okay?

7        A.      Yes.

8        Q.      Did he say oh, we're taking him

9   34?

10       A.      Yes.

11       Q.      And that's a reference to

12  Jamaica?

13       A.      Yes.

14       Q.      Thirty four is a code for

15  Jamaica?

16       A.      Yes.

17       Q.      Why, to your understanding, did

18  Sal say they were going to take him to

19  Jamaica?

20               MR. OSTERMAN:  Objection.

21               MR. SHAFFER:  Objection.

22       A.      We had this discussion hours

23  ago, closest hospital, first choice.

24       Q.      Okay, but you didn't have a

25  computer up in the room, did you?

Page 248

1                    ELISE HANLON

2              MR. SHAFFER:  Objection.

3       A.    No.

4       Q.    Did you know that you were going

5  to take him to Jamaica before you went into

6  the apartment?

7       A.    I personally, no.  No, I did

8  not.  Whether they again, whether the

9  computer recommendations come up in the

10  computer and they pulled it up before they

11  came up and it said they were the first

12  recommending unit -- hospital, I don't know.

13              MR. SMITH:  Okay, all right.  So

14      starting at 1301.

15              (Whereupon, a tape recording was

16      played.)

17      Q.    Is that your voice in the

18  background?

19      A.    Yes.

20      Q.    What are you saying?

21      A.    The location of the hospital.

22      Q.    What hospital?

23      A.    North Shore Forest Hills.

24      Q.    So you heard Officer Schoolcraft

25  say he wanted to go to Forest Hills?

ELISE HANLON

1

2     A.      Apparently I did.

3     Q.      No, it's not apparently.  Did

4  you hear him say that he wanted to go to

5  Forest Hills?

6             MR. SHAFFER:  Objection.

7     A.      As per the tape I did.  Did I

8  recall, it's five years ago, I didn't

9  recall.

10     Q.      Okay, all right.  So there is a

11  difference and it's important that the

12  record be clear about what it is you're

13  testifying about.  I understand if you don't

14  remember hearing or saying something five

15  years ago, but I am trying to find out what

16  you do recall and don't remember, what you

17  agree with me the tape says or what you

18  don't agree with me what the tape says;

19  okay?

20     A.      I agree that it was said in my

21  presence in the room.

22     Q.      And you agree with me that while

23  you were in the room you were providing

24  information about where Forest Hills was,

25  right?

Page 250

1                    ELISE HANLON

2        A.      Yes.

3        Q.      And you were providing that

4    information to Sal, right?

5        A.      I don't know -- he knows where

6    it is.  I don't know who I was providing the

7    information to.

8        Q.      Were you providing the

9    information so that it could be used to take

10   the patient to Forest Hills?

11              MR. SHAFFER:  Objection.

12       A.      It could have been a cop that

13   asked me.  It could have been -- I don't

14   know who asked me.

15              MR. SMITH:  All right.  1316

16       continuing.

17              (Whereupon a tape recording was

18       played.)

19       Q.      All right, was that you saying I

20   think Jamaica would be a better choice than

21   Forest Hills?

22       A.      Yes.

23       Q.      Why were you saying that?

24       A.      Just past experience, being a

25   patient their triage system is more

Page 251

1                    ELISE HANLON

2    efficient, it's a cardiac center, it's a

3    trauma center, it's a psych center, it's

4    just a bigger hospital.  It has more

5    facilities.

6         Q.      So the patient hadn't complained

7    about anything, other than not feeling well,

8    right, at that time point; isn't that

9    correct?

10        A.      That is correct.

11        Q.      At this point he was wasn't

12   acting in an emotionally disturbed manner,

13   was he?

14               MR. SHAFFER:  Objection.

15        A.      While we were in the room, no,

16   he was not.

17        Q.      As of this point in the tape, he

18   wasn't acting as an emotionally disturbed

19   person, right?

20               MR. SHAFFER:  Objection.

21        A.      No, he was not.

22        Q.      So if the patient asked to go to

23   Forest Hills, why wouldn't you abide by that

24   request?

25               MR. SHAFFER:  Objection.

Page 252

ELISE HANLON

1
2          MR. SMITH:  I will rephrase
3      that.
4      Q.      You heard Officer Schoolcraft
5  asking to be taken to Forest Hills, right?
6      A.      Yes.
7      Q.      You heard yourself saying that
8  he should go to Jamaica, right?
9      A.      Yes.
10     Q.      Why isn't the patient entitled
11  to make the decision about where to go?
12     A.      Given the events of why we were
13  there, given the events of the fact of how
14  many police officers were there, given the
15  fact I guess, just generally of the yelling
16  and screaming back and forth, being
17  uncooperative, you took Nyquil, but there
18  was nothing wrong with you.  Maybe he wasn't
19  completely being honest with us or he was in
20  denial of what was going on with him, my
21  view was that Jamaica was a better choice
22  for him.
23     Q.      Because there was a psych ward
24  there, right?
25     A.      Yes.

Page 253

1                    ELISE HANLON

2       Q.       And that's the only reason?

3                MR. KOSTER:   Objection.

4                MR. OSTERMAN:   Objection.

5       A.       Not the only reason.  Number

6    one, I believe closer to his house, they're

7    a cardiac center, they're a trauma center,

8    they're a full ER, they have a C-port if

9    needed and they have a psych facility.  So

10   they have more a --

11               MR. SHAFFER:   Services.

12      A.       Services than North Shore Forest

13   Hills does.

14               MR. SMITH:   I'd appreciate it,

15          Counsel, if you wouldn't supply answers

16          for the witness.  Okay.  It's really

17          improper to be doing that.

18               MR. SHAFFER:   Call the judge.  I

19          don't really care anymore, Nat.  You

20          have a problem with my actions, you can

21          call the judge.

22               MR. SMITH:   Continue the

23          recording at 1329.

24               (Whereupon, a tape recording was

25          played.)

Page 254

1                    ELISE HANLON

2        Q.      Is that your voice asking how
3    old he is?

4        A.      No.  Sal asked him how old he
5    was.

6        Q.      You didn't hear yourself asking
7    how old he was also?

8        A.      I -- I didn't hear.

9                MR. SMITH:  Continuing at 1355.

10               (Whereupon, a tape recording was
11       played.)

12       Q.      Who was speaking at that point
13   where Officer Schoolcraft asks about whether
14   or not information can be shared?

15       A.      That was me who said his blood
16   pressure to someone.  One of the officers in
17   the other room asked.

18       Q.      So another police officer asked
19   you what his blood pressure was?

20       A.      Yes.

21       Q.      And you told him?

22       A.      I did say it, yes.

23       Q.      Was that proper?

24               MR. SHAFFER:  Objection.

25       A.      Not a HIPAA violation.