Page 1

1    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------------------X

3    ADRIAN SCHOOLCRAFT,

4                        Plaintiff,

5

                                    Case No:

6        - against -                10 CV 06005

7

     THE CITY OF NEW YORK, ET AL.,

8

9                        Defendants.

10   ------------------------------------------X

11                   111 Broadway

                     New York, New York

12

                     May 14, 2014

13                   10:24 a.m.

14

15

16   DEPOSITION OF JESSICA MARQUEZ, pursuant to

17   Notice, taken at the above place, date and

18   time, before DENISE ZIVKU, a Notary Public

19   within and for the State of New York.

20

21

22

23

24

25

Page 56

1          JESSICA MARQUEZ

2          MR. LEE:  Thank you.

3          MR. SMITH:  I think this is so

4     much clearer than the copies that I

5     have.  Can we just go make copies for

6     everybody?

7          MR. RADOMISLI:  I think we could

8     do that later.  I think it's pretty

9     clear.  I would like to just get this

10    done.  You're going to have her read it

11    out loud anyway.

12         MR. SMITH:  The text, yes, for

13    sure I will have her read out the text,

14    because there's all these markings and

15    checks and...

16         MR. RADOMISLI:  Let's just

17    conduct the deposition.  We have

18    previously sent you of copies of the

19    chart.  I will make you another copy if

20    you want later.

21         MR. SMITH:  Okay, all right. We

22    will make a copy during the break,

23    okay.

24    Q.     All right, do you have in front

25 of you the original Jamaica Hospital PCR

1                    JESSICA MARQUEZ
2    form for Adrian Schoolcraft?
3              MR. RADOMISLI:   The one that's
4        contained in the chart?
5              MR. SMITH:   Yeah.
6        A.      Yes.
7        Q.      What is this document?
8        A.      This is the patient care report,
9    which contains patient personal information
10   and your medical findings.
11       Q.      And where does this form come
12   from?
13       A.      Comes from what?  What do you
14   mean?  Like who supplies it to me?
15       Q.      Yes, who supplies this document?
16       A.      Oh, Jamaica Hospital does.
17       Q.      And is this a document that you
18   are required to fill out as part of your
19   duties as an EMT at Jamaica Hospital?
20       A.      Yes, it is.
21       Q.      Why is this document created?
22       A.      It's created to generate reports
23   as to what you responded to and for the
24   hospital.
25       Q.      No, I understand that.  I

1                    JESSICA MARQUEZ

2    understand the information.  What's the

3    underlying reason for creating this report?

4         A.      To document your medical

5    findings.

6         Q.      Does this document get

7    transmitted to anybody?

8         A.      Yes, it does.  To the fire

9    department.

10        Q.      Why is it sent to the fire

11   department?

12        A.      Cause the fire department of New

13   York runs the EMS system.

14        Q.      So why is it sent to the fire

15   department?

16                MR. RADOMISLI:  She just

17        answered that.

18        Q.      Can you explain that answer to

19   me a little bit more?

20        A.      The fire department has to

21   document and have on record all paperwork

22   generated for every job that you respond to.

23        Q.      Is the copy of this PCR provided

24   to anybody else?

25        A.      I don't know that.

Page 59

1                    JESSICA MARQUEZ

2        Q.      Is a copy of the PCR provided to

3    anybody else at Jamaica Hospital?

4        A.      I know the hospital has either a

5    copy or this copy of the form attached to

6    the patient's folder.  The patient's medical

7    record.

8        Q.      Does this PCR constitute a part

9    of the patient chart?

10               MR. RADOMISLI:  Objection.  You

11          could answer.

12       A.      I believe so.

13       Q.      And is this a document that's

14   used by the hospital personnel to make

15   decisions about the patient?

16               MR. RADOMISLI:  Objection.  You

17          could you answer.

18       A.      I don't know that.

19       Q.      Well, is it important when

20   filling out this PCR to be accurate?

21       A.      You document your findings and

22   what the patient tells you.

23       Q.      So you agree with me that it's

24   important that this form be filled out

25   accurately, right?

Page 60

1                    JESSICA MARQUEZ

2        A.       Correct.

3        Q.       And it's important because the

4    information in here may be pertinent to use

5    in subsequent medical decisions; isn't that

6    right?

7                 MR. RADOMISLI:  Objection.  You

8        could answer.

9        A.       This document is not used to

10   diagnose a patient.  This document is used,

11   as to my opinion and what the patient tells

12   me.  A doctor -- I don't think a doctor is

13   going to treat a patient because of what I

14   said.  I am not -- he is of higher medical

15   authority than I.  I only write what the

16   patient tells me their symptoms and that's

17   it, so.

18       Q.       Thank you.  I am just asking you

19   questions.  I am not trying to suggest

20   anything, but I don't know -- well, I might

21   be suggesting something later, but right now

22   I am just trying to find out what your

23   understanding is about why this document is

24   created and for what purposes it is.  That's

25   what I am trying to get at.

Page 61

1                    JESSICA MARQUEZ

2        A.      Understood.

3        Q.      You believe that if any Jamaica

4    Hospital doctor gets this information

5    they're going to do their own independent

6    assessment about the patient; is that

7    correct?

8        A.      That's correct.

9        Q.      Did you fill out this entire

10   document yourself?

11       A.      Yes.

12       Q.      Is there any handwriting on this

13   document that's not yours?

14       A.      No, this is all my handwriting

15   besides the receiving nurse signature.

16   That's not mine, but everything else on this

17   document is mine.

18       Q.      Okay.  On the top of this

19   document says agency name and then there's

20   some scribbling over the word j-a-m. What is

21   that?

22       A.      The scribbling over it?

23       Q.      Yes.

24       A.      I don't know.

25       Q.      Whose handwriting is that?

Page 62

1              JESSICA MARQUEZ

2       A.     I couldn't tell you.

3       Q.     Is it yours?

4       A.     I don't recall if I wrote that.

5  This is a carbon, so anything that you write

6  on top of this with another sheet will

7  transfer over.  So I can't tell if I wrote

8  that.  I know I wrote Jamaica Hospital

9  Medical Center, but those numbers on top, I

10 couldn't tell you.

11             MR. RADOMISLI:  The numbers near

12        the box agency name, that's what he's

13        referring to.

14      A.     Is that where you're referring

15 to?

16      Q.     Yes.

17      A.     These -- 2, 3, 9, 1, 1?

18      Q.     So you have in front of you the

19 carbon copy.  Do you know where the original

20 is?

21             MR. LEE:  Objection to the form.

22      A.     I don't know.

23      Q.     Is the original sent to the fire

24 department?

25      A.     That's possible.

Page 80

1                    [!WITNESS NAME]

2

3

4

5        Q.      This is a summary of your

6    interview at the Queens DA's office, right?

7        A.      That's correct.

8        Q.      And do you recall going to the

9    Queens DA's office?

10       A.      Yes.

11       Q.      You went there with -- you had

12   counsel with you, a person by the name of

13   Thomas Mofilia; is that correct?

14       A.      That's correct.

15       Q.      Was that your own personal

16   counsel or was that supplied to you by your

17   job?

18       A.      By my job.

19       Q.      This was a Jamaica Hospital

20   supplied attorney?

21       A.      Yes.

22       Q.      You met with this individual by

23   the name of Bureau Chief Leander; is that

24   right?

25       A.      Yes.

Page 81

1                    [!WITNESS NAME]

2         Q.     And you also met with Sergeant

3    Scott from the IAB Unit of the police

4    department; is that right?

5         A.     That's correct.

6         Q.     How long did this interview

7    last?

8         A.     I don't recall.

9         Q.     Do you know if it was recorded

10   in any fashion?

11        A.     I don't remember.

12        Q.     Were you sworn to tell the

13   truth, like you were sworn to tell the truth

14   this morning?

15        A.     I don't remember if I was.

16        Q.     To the best your ability, did

17   the answers to the question that you

18   provided, were those true?

19        A.     Yes.

20        Q.     On the last page of this

21   document, actually, it's the bottom of page

22   2 going on to page 3, there is a statement

23   that says that EMT Marquez clarified that

24   Police Officer Schoolcraft did go into the

25   ambulance when he left voluntarily the first

Page 82

1                    [!WITNESS NAME]

2     time.   She acknowledged that the wording on

3     the PCR wasn't correct and maintained that

4     he was inside of the ambulance.   You see

5     that?

6          A.      Yes.

7          Q.      So that was one of the errors

8     that you mentioned earlier; is that right?

9                    MR. RADOMISLI:   Objection to the

10            form.

11         Q.      Let me just clarify that.   What

12    in the PCR, which you have in front of you,

13    was incorrect?

14         A.      My PCR, I stated that the

15    patient walked away even before --

16                    MR. RADOMISLI:   Read it.

17         A.      Before patient was detained,

18    patient walked down with 50 Eddie three and

19    NYPD.   As patient approached bus he turned

20    around and stated he did not need help and

21    walked way.   Patient was then detained and

22    transport resumed.   Patient is an officer

23    with the 81st Precinct.

24         Q.      So it there something in the

25    portion of the PCR that you just read into

Page 83

1                    [!WITNESS NAME]

2   the record that was incorrect?

3        A.      That's correct.

4        Q.      What was the error?

5                MR. RADOMISLI:  Just read the

6        portion that was incorrect.

7        A.      As patient approached the bus he

8   turned and stated he did not need help and

9   walked away.

10       Q.      How was that incorrect?

11       A.      Because the patient actually

12  walked in my ambulance with me, sat down on

13  the stretcher and let me reevaluate him and

14  then when he was told that he was not going

15  to go to Forest Hills Hospital, that is when

16  he stated he did not need our services.  He

17  stood up and walked out of the ambulance and

18  walked back to his residence.

19       Q.      And you saw him walk out of the

20  ambulance?

21       A.      Yes.

22       Q.      And the correction that you want

23  to make here is that the portion that you

24  just read suggests that he never got inside

25  the ambulance; is that correct?

Page 84

```
1                  [!WITNESS NAME]
2        A.      That is correct.
3        Q.      Further along in that paragraph
4    that I was just reading from says:   EMT
5    Marquez denied speaking to anyone in regards
6    to Police Officer Schoolcraft being -- it
7    says and, but it means an EDP, I think, when
8    they arrived at Jamaica Hospital, are you
9    with me?
10       A.      No, I'm not.  Going back to the
11   top paragraph?
12       Q.      No, we're on the third page of
13   Exhibit 124 there is a thing that says:  EMT
14   Marquez disclosed that she gave the triage
15   nurse at Jamaica Hospital her medical
16   findings.  Do you see that?
17             MR.  RADOMISLI:  Where are you
18        now?
19             MR.  SMITH:  I am trying to draw
20        her attention to the sentence that says
21        EMT Marquez disclosed that she gave the
22        triage nurse at Jamaica Hospital her
23        medical findings.
24             MR.  RADOMISLI:  Show me where
25        you're reading from.
```

Page 85

1                    [!WITNESS NAME]

2                 MR. SMITH:   EMT Marquez

3       disclosed.

4       A.      Yes.

5       Q.      That's where I'm at right now.

6  Do you see that portion?

7       A.      Okay.

8       Q.      So you told the Queens DA that

9  you gave the triage nurse your medical

10 findings; is that right?

11      A.      That's correct.

12      Q.      And was that correct that you

13 gave the triage nurse your medical findings?

14      A.      Yes, I did.

15      Q.      What were the medical findings

16 that you gave her?

17      A.      I told her that the patient was

18 in a hypertension crisis.

19      Q.      Did you tell her anything else?

20      A.      Yes, and I stated that patient

21 stated he had abdominal pain and that he

22 felt dizzy and I also told her that he drank

23 Nyquil because he said he wanted to sleep.

24      Q.      Did you tell her anything else?

25      A.      No, I did not.

Page 86

1                    [!WITNESS NAME]

2          Q.       Do you know the name of the

3    triage nurse that you spoke to about

4    Schoolcraft?

5          A.       No, I don't.

6          Q.       Can you describe her to me?

7          A.       I can't do that.

8          Q.       Male, female?

9          A.       I don't remember.

10         Q.       The sentence goes on to say:

11   Semi colon that police officer is agitated

12   and that she wasn't sure why he was

13   exhibiting signs of hypertension.  Is that

14   also information that you told the Queens DA

15   that you told the triage nurse?

16         A.       Yes.

17         Q.       Did you, in fact, tell the

18   triage nurse that Schoolcraft was agitated?

19         A.       That's correct.

20         Q.       Did you tell her that you

21   weren't sure why he was exhibiting signs of

22   hypertension?

23         A.       The reason I said that was

24   because patient stated he had no medical

25   history.  I explained to her he was in a

Page 87

1                    [!WITNESS NAME]

2    hypertension crisis and to what ideology I

3    had no idea, because he had stated he had no

4    hypertension history.  So it had to do with

5    either him being agitated or what was going

6    on possibly elevated his blood pressure to

7    that extent.

8         Q.     The next sentence says:  EMT

9    Marquez stated that Lieutenant Broschart

10   filled in the blanks as she left.  You see

11   that?

12        A.     Yes.

13        Q.     This is what you told the Queens

14   DA?

15        A.     After I told the triage nurse

16   what was going on.  He then began to speak

17   to the triage nurse.  What did he say, I

18   don't know.

19        Q.     Let me just clarify something

20   here for a second.  Did you tell the Queens

21   DA that a Lieutenant Broschart filled in the

22   blanks as you left?

23        A.     I didn't -- I don't know if

24   those are my exact words that he filled in

25   the blanks, but I did say whoever rode with

Page 88

```
 1                    [!WITNESS NAME]
 2    me on the ambulance was the one who told the
 3    nurse what was going on after I gave her my
 4    medical report on the patient.
 5         Q.     I see.  Who is Lieutenant
 6    Broschart?
 7         A.     As far as names I did not give
 8    any names, because I don't even know the
 9    names of any officer, lieutenant, captain,
10    chief, whoever was on scene with us.
11         Q.     When you were talking to the
12    triage nurse --
13         A.     Yes.
14         Q.     -- you were giving her your
15    medical findings, right?
16         A.     Correct.
17         Q.     And there was also a police
18    officer or member of the PD standing there
19    with you, correct?
20         A.     Correct.  That's correct.
21         Q.     And the three of you were
22    talking, is that what you're saying is that
23    the triage nurse and you and some member of
24    the police department were standing
25    providing information to the triage nurse?
```

Page 89

1                    [!WITNESS NAME]

2                    MR. RADOMISLI:  Objection to the

3          form.

4          A.       That's not what I'm saying.

5    What I'm saying is after I gave my report,

6    yes, this other member of PD was standing

7    there while I was giving the report.

8    Because the patient, at this point, is now

9    handcuffed, so someone has to be with him

10   and he was, this other person who was

11   watching the patient.

12         Q.       When it says here EMT Marquez

13   stated that Lieutenant Broschart filled in

14   the blanks as she left, what blanks was he

15   filling in?

16                   MR. RADOMISLI:  Objection to the

17         form.

18         A.       I don't know what filled in the

19   blanks means.  What I was trying to state

20   was once I gave my report, the officer who

21   was with us was now telling the triage nurse

22   what was going on as far as the patient

23   being agitated and that they want him to

24   have a psyche eval.

25         Q.       Whoever this cop was that was

Page 90

```
 1                    [!WITNESS NAME]
 2    with you was also providing information to
 3    the triage nurse?
 4          A.      That is correct.
 5          Q.      That information, as you recall
 6    it, was that he wanted the patient to be
 7    evaluated psychologically; is that correct?
 8          A.      That is correct.
 9          Q.      Did any of the police officers'
10    information get put into the PCR that you
11    prepared?
12                  MR. LEE:  Objection to the form.
13          A.      Yes, I see that.
14          Q.      What information?
15          A.      The captain's name.
16          Q.      In the narrative section of the
17    PCR it says among other things, upon entry
18    of ESU, NYPD 50 E 3 and C 513 patient was
19    agitated and resistant.  Do you see that?
20          A.      Yes, I do.
21          Q.      Did lieutenant Broschart or
22    somebody from the NYPD provide the
23    information about the patient being agitated
24    and resistant or was that information that
25    you observed with your own eyes?
```

Page 91

1                    [!WITNESS NAME]

2        A.        Captain never provided any
3   information to me.

4                    MR. RADOMISLI:   Just answer his
5        question.

6        A.        Yeah, he was agitated upon
7   coming back to the ambulance the second
8   time.

9        Q.        So the answer to my question is
10  that the lieutenant or anybody else from
11  NYPD, they didn't provide any of the
12  information that's set forth in this
13  narrative; is that correct?

14       A.        That's correct.

15       Q.        Okay.  Going back to the first
16  page of the PCR, underneath the name and
17  address information -- well, next to the
18  name and address information, there is a
19  assessment of the patient's weight, how did
20  you make that determination that he weighed
21  150 pounds?

22                   MS. PUBLICKER METTHAM:
23       Objection.

24       Q.        Two hundred and fifty pounds?

25       A.        He told me he weighed 250

Page 113

1                    JESSICA MARQUEZ
2     blood pressure is elevated.
3          Q.      What does the 160 number mean,
4     what does that refer to?
5          A.      The 160 tells me that the
6     patient's heart is overexerted because it's
7     meeting at 160 systolically.
8          Q.      What does the 120 mean?
9          A.      What the artery is now at rest
10    after the blood has rushed out of the heart.
11         Q.      Do I understand this form to
12    also say that at 9:55 you took Schoolcraft's
13    blood pressure and vital signs, as well?
14         A.      Yes, I did.
15         Q.      Where did that take place?
16         A.      In the ambulance at this point.
17         Q.      How many times was Schoolcraft
18    in the ambulance?
19         A.      Twice.
20         Q.      Did you take his blood pressure
21    the first time he was in the ambulance, as
22    indicated in this form, or the second time?
23         A.      The first time.
24         Q.      And did you take that blood
25    pressure reading at 10:55 -- I'm sorry,

Page 114

1                   JESSICA MARQUEZ

2    9:55?

3          A.      Yes.

4          Q.      Is that your handwriting on

5    there on the line 21:55?

6          A.      Yes, it is.

7          Q.      Did you make that entry in the

8    corresponding entry at 21:55 or did you

9    enter that information at sometime after

10   21:55?

11         A.      That information was inputted

12   inside the ambulance.

13         Q.      And the information above that

14   was taken at 21:45, was that information

15   about the time and the numbers recorded on

16   this PCR at the time that the blood pressure

17   and other vital readings were being taken or

18   sometime after the readings were taken?

19         A.      I don't remember when I put this

20   initial vital sign.

21         Q.      Did you have -- was this initial

22   vital taken of Schoolcraft in the apartment?

23         A.      Yes, it was.

24         Q.      Did you have the PCR form, the

25   original, with you in the apartment?