2    statement.

3            Q    Please continue.

4            A    I want to thank you, Judge Mollen, and the
5    members of the City of New York Commission to
6    Investigation Alleged Police Corruption for this
7    opportunity to testify today. I would ask that, in
8    addition to testifying, I have the opportunity before you
9    issue your final report to comment in writing and in
10   detail on a number of statements and assertions that were
11   presented in the course of the hearings.

12           Nothing is more important to the successful
13   policing of the nation's largest city than the integrity
14   and credibility of the members of its Police Department.
15   The corrupt act of even one police officer inflicts
16   incalculable damage on the rest. It undermines pride in
17   the professional, and it erodes public confidence in the
18   men and women from whom the people of New York have every
19   right to expect complete honesty and incorruptibility.

20           This is especially true as the Police
21   Department embraces community policing and enlists the
22   support of people who live and work in the neighborhoods
23   of this City. We can hardly ask the people to join the
24   police in a partnership to combat crime if they have
25   reason to believe that police officers themselves are

|   |   |   |
|---|---|---|
| 1 | KELLY | 196 |

engaged in it. We can hardly expect the overwhelming majority of honest police officers to take pride in their job -- in one of the toughest law enforcement environments anywhere in the world -- if the corrupt police officer easily escapes detection and punishment.

The people of New York City must know they can count on the members of their Police Department to be as honest as they are brave and able. They must know they can count on the Police Department to track down and drive from our ranks those who violate their oath and break the law.

It is fundamental to the honest operation of government that the police be honest. The most renowned of New York City's Police Commissioners understood this better than most. Police officers, Theodore Roosevelt said, "do not merely preserve order . . . but to a large portion of our population they stand as the embodiment as well as the representative of the law of the land." Roosevelt said, "No police force is worth anything if its members are not intelligent and honest." And that observation is as true today as when Roosevelt made it nearly a century ago.

In a police department soon to exceed 31,000 uniformed members -- some two and a half times bigger

than Chicago's and more than four times larger than Los angeles' -- the corrupt police officer is all but inevitable. However, tolerance for the corrupt police officer is neither inevitable nor acceptable. That is why you, Judge Mollen, and your fellow Commissioners perform a high public service in examining the extent of corruption in the Police Department and the extent of the Department's failure to combat it.

Over the last several months, the Police Department has supplied the investigative staff of the Commission with thousands of files in preparation for these hearings. I would like to note for the record that your investigators were at all times thorough and professional, and the Police Department takes pride in the fact that many of them are former members of the Department.

As familiar as I had become last year with the particulars of the Michael Dowd case, I was revolted nonetheless by the testimony of Dowd and the other corrupt ex-police officers who testified before you. None of them took personal responsibility for their depravity. If Dowd abused alcohol on the job, it was because his supervisor encouraged him. When he steals the savings of a hard-working woman, it is to win the

```
 1                       KELLY                      198
 2   acceptance of his new partner. Cawley beats people, not
 3   because he's a thug, but because his sergeant rewards
 4   him. The self-serving chorus was always the same:  The
 5   Police Department made me do it.
 6            Most galling of all was their insistence that
 7   they kept quiet about criminal activity they witnessed
 8   out of some unshakable bond with their brother officers,
 9   rather then the self-serving actions of corrupt hoodlums.
10   Cawley claimed he would never betray another cop, yet he
11   gladly sold guns to people who could use them to shoot
12   police officers. Beyond their self-confessed acts of
13   thievery, extortion, and brutality, the witnesses were
14   offensive in another respect:  They tried to paint
15   themselves as typical police officers gone astray.
16            The truth is something else. Most police
17   officers consider Dowd and Cawley and their ilk to be
18   despicable. They are, in the vernacular of the street,
19   "low lifes" who deserve to be in prison. Most police
20   officers I know would have locked them up themselves, and
21   most police officers I know were outraged by their
22   posturing. They never should have been police officers
23   in the first place, a subject to which I'll return later
24   in my testimony.
25            As shocking as they were, these witnesses
```

served a purpose in raising legitimate questions as to how they could function unimpeded for as long as they did. They raised questions that bear serious examination as to how well out supervisors are trained and deployed and whether they are tempted to close their eyes to suspected wrongdoing by officers under their command.

These were among the same questions first raised in a series of articles written by columnist Mike McAlary in June 1992. As a result of those stories, I undertook a review of how the Michael Dowd case was mishandled. I think it is important to know that we responded when these problems surfaced. We identified them publicly and began the job of correcting them. That process continues today.

On November 16, 1992, I reported a number of failures, including:

(1) The dual system of corruption investigation blurred responsibility and diminished accountability.

(2) IAD'S ability to determine its own workload was an obstacle to the efficient and effective conduct of investigations.

(3) The FIAU's were hampered by a lack of resources and by IAD's dismissive posture toward them.

```
 1                        KELLY                              200
 2            (4)  There was a failure to use time-honored
 3   investigative techniques to achieve results.
 4            (5)  IAD lacked a credible case management
 5   system.
 6            (6)  Access to important case information was
 7   too limited.
 8            (7)  The level of staffing for internal
 9   investigations was inadequate.
10            (8)  Internal investigative units had
11   difficulty recruiting and retaining qualified
12   investigators.
13            (9)  FIAU investigators conducted most
14   corruption investigations but were inadequately trained
15   and were provided inadequate equipment.
16            The central question to emerge from the Dowd
17   case was how could a corrupt police officer identified by
18   the system as a problem operate with such impunity for so
19   long without being caught by the Department. Dowd was
20   not protected as part of some conspiracy or coverup, but
21   Dowd was not stopped sooner because the anti-corruption
22   system in place was bifurcated and large ineffective when
23   it came to major investigations.
24            Before a clear, unified chain of command was
25   put in place, corruption investigations were the
```

KELLY                                       201

responsibility of both IAD and the Field Internal Affairs Units. The creation of the Field Internal Affairs Units in 1972 was well intentioned. It was intended to fix responsibility for corruption prevention at the command level. That's why the FIAU officers were answerable to separate field commanders, while IAD had oversight responsibilities. The effect was to obscure responsibility rather than reinforce it.

In my view, the best way to assure accountability is to make responsibility as clear cut and unambiguous as possible. In theory the former IAD would monitor FIAU investigators and run parallel investigations to check on the quality and integrity of their activities, but, in fact, very little of either occurred.

We found that the Field Internal Affairs Units suffered not only from a lack of IAD oversight support, but from a lack of equipment and personnel. They had case loads much larger than IAD's. IAD itself investigated only 5 percent of all corruption cases. We found that the FIAU's received little if any guidance as to which cases to close and which ones to devote more time.

We also found that there was an over-reliance

```
1                          KELLY                         203
```

2   choice among all candidates seeking assignments as

3   supervisors to any investigative arm of the Police

4   Department. In other words, the career path for

5   investigative supervisors in the New York City Police

6   Department is now through the Internal Affairs Bureau.

7   IAB gets whomever it deems the best, and we are providing

8   these outstanding supervisors with training that we found

9   lacking in the past.

10          We sought out a management consulting firm with

11  a worldwide reputation for excellence, McKinsey &

12  Company, and asked them to undertake a thorough

13  management review of the Department's corruption-fighting

14  systems. As a result of the firm's recommendations, we

15  installed new case management and quality control

16  systems. We are obtaining a new state-of-the-art

17  computerized information system to greatly improve the

18  quality of our investigations.

19          We established nine working groups comprised of

20  Police Department executives and experts from outside of

21  the Department to address specific areas of concern.

22  They included Process and Organization, Information

23  Systems, Investigative Techniques, Personnel Selection

24  and Career Path, Training, Equipment, Physical Plant,

25  Legal, and Transition.

We initiated weekly steering committee meetings within IAB for the purpose of continual case review, providing for problem solving and reinforcing accountability. We introduced a comprehensive training program for IAB personnel. Working with the Department of Investigations and the Police Department's Detective and Organized Crime Control bureaus, we developed a model package of equipment for investigative and surveillance teams and spent $2.7 million acquiring it for them. We also introduced a new vehicular fleet for IAB, making unobtrusive leased cars and special surveillance vehicles available to investigators.

We are working to reduce backlogs, to close cases without investigative merit, and to build evidence to prosecute all serious cases. While we are determined to move cases efficiently and expeditiously, we are also prepared to devote time and resources to long, complicated cases that merit such attention.

McKinsey & Company cited the "large reactive management" of corruption cases in the past, so we are taking an aggressive posture, putting into play sophisticated sting operations to bring corrupt police officers and others into our net.

We are using integrity tests, both targeted

tests against officers suspected of corruption, as well as random tests that could reach anyone. If there was ever a reluctance to turn corrupt officers against each other, I do not share it. We will turn them -- we may even give them a chance to redeem themselves -- in order to bring down the others.

We are debriefing drug dealers and confidential informants to determine whether they are aware of any police corruption. We will use criminal informants, and we will seek the district attorney's help in doing so. We will make the case for wire taps and use them.

We have examined the times of corruption-prone activities and provided additional IAB coverage from midnight to 8 a.m. Also, for the first time, IAB investigators are dispatched as a matter of course to incidents in which a person is shot by a police officer. We have established a special litigation unit to pursue allegations of wrongdoing when they first surface in notice of claims against the City. We are examining any correlation between corruption complaints and complaints of excessive force that are made with the Civilian Complaint Review Board.

After listening to the testimony of witnesses and Commission staff members, the Police Department is

making every effort to treat people who make corruption complaints -- whether members of the Department or members of the public -- with courtesy and encouragement. Toward that end, we are making the Language Line translation service available to the IAB Action Desk. In this way, complainants who do not speak or understand English may have immediate access by telephone to translators on the same line with IAB officers.

To encourage members of the Police Department, as well as the general public, to report corruption, we have established a new, easy-to-remember, toll-free number. It is 1-800-PRIDE PD. We are also encouraging complainants -- police and civilian -- to write either to a special IAB postal box -- Box 111 in Brooklyn 11201 -- or personally to me at Police Headquarters. I want every member of the Police Department to know that if they have any reservations about reporting corruption to a particular supervisor or commander, they always have the option of going directly to the Police Commissioner.

In testifying about the improvements we have made to our internal investigative systems, I don't want you to conclude that the issue of corruption-fighting ends there. Of course, it does not. It goes far beyond a reformation of Internal Affairs and even beyond the

3  Commission.

4   Beginning with recruitment and training, we
5  have to recognize that our commitment to integrity starts
6  with those we select as probationary police officers and
7  continue with the message we give them through training,
8  both in the Police Academy and in the field.

9   We have established a committee on police
10 culture to review the selection process for police
11 officers, their training, and other issues, all with an
12 eye toward enhancing an environment, or culture, that is
13 intolerant of corruption and supportive of efforts to
14 combat it.  I have asked the committee to review the
15 questions of maturity and education in determining
16 whether they may be factors in screening out corruption-
17 prone candidates.

18   Considering the enormous responsibility and
19 authority conferred upon police officers, we have to ask
20 ourselves whether the minimum age to become a New York
21 City police officer should be raised.  Right now a
22 candidate for the Police Department may take the police
23 officer examination at age sixteen and a half and be
24 appointed at age twenty.  Is that too young?  Are the
25 educational standards adequate in this day and age?  It

1  KELLY  208

2  may be time for the New York City Police Department to
3  raise the minimum education requirement for police
4  officer to an associate college degree.
5       We need to do all we can to make certain that
6  police officer feel confident to come forward to report
7  corruption. I am confident about any ethic that would
8  resist such reporting.
9       We need to pay special attention to our first
10 line supervisors and their responsibility for integrity
11 control. The transition from police officer to sergeant
12 is difficult and far too quick. There is little
13 opportunity for a new sergeant to assume command with the
14 confidence that further training would afford.
15      Therefore, we are exploring the possibility of
16 establishing a sergeant's academy. It would provide a
17 hiatus between the role of police officer and supervisor
18 and a base for increased training and support. It will
19 also provide an extended opportunity to instill in all
20 sergeants the fact that leadership carries with it the
21 responsibility to impose discipline fairly but
22 unwaveringly.
23      Simultaneously, I am ordering a review of our
24 supervisory staffing models. You have heard testimony
25 about the reported ese with which corrupt-minded police

```
1                          KELLY                         209
```

2   officers could elude their supervisors in busy precincts.

3   We need to look at that and determine whether the

4   Department should make staffing decisions beyond the

5   standard measure of police officers to sergeant ratios.

6   Right now we have 297 vacancies for sergeants, and we are

7   awaiting an examination to fill them, but even then we

8   have to ask ourselves whether the traditional ratio is

9   enough.

10              Throughout the chain of command, from sergeants

11  on up, we need to exploit every opportunity to make it

12  clear that supervisors and commanders who expose

13  corruption in their own commands will be rewarded, and

14  those who attempt to conceal it will be disciplined.

15  Corruption-fighting is like other issues in management --

16  you can be part of the problem or part of the solution.

17  The commitment must be made at the top, and I can affirm

18  to everyone in the Police Department that no one's career

19  will be diminished if he or she is part of the solution.

20  It can only be enhanced.

21              The Police Commissioner must be the number one

22  corruption fighter. For that reason, I and my executive

23  staff will e personally involved in the integrity

24  training of the current class in the Police Academy. Two

25  thousand six hundred probationary police officers are in

1            KELLY             210

2   training there -- the largest class in history -- and we

3   want to make the greatest impression possible, reminding

4   them that nothing is more important than their honor and

5   integrity.

6            The Police Department is a great and a strong

7   institution. We can take the so-called bad press. It

8   comes with the territory. What we can't afford is anyone

9   who thinks they are doing the Department a favor by

10  sweeping problems under the rug. Problems grow there and

11  come back with a vengeance, as these hearings have

12  demonstrated.

13           While I categorically reject the proposition of

14  some of the first Commission witnesses that police

15  officers are somehow trained to practice or accept

16  corruption, I believe the Police Department bears the

17  responsibility of reinforcing integrity at every turn.

18  We are doing so with revamped Police Academy curricula,

19  as well as in-service training. It is a message that

20  needs to be reinforced throughout a police career, if

21  only because the opportunities for corruption are

22  constant and inherent in law enforcement.

23           To help in that regard, we have convened groups

24  of police officers from various commands and various

25  tours to discuss ideas centering on integrity and

| | KELLY | 211 |
|---|---|---|

corruption. The focus groups include union representatives because of the important supportive role they can play in combatting corruption. We are also reaching out to the community in new ways. For example, we have established a pilot program that immerses police officers in the dominant cultures of a given police precinct. Language training is part of the program.

We have heard throughout the Commission hearings references to the Wall or Code of Silence. There is truth to it. There is a solidarity that grows out of the best of intentions and motivations, including the loyalty and sense of mission that binds people engaged in demanding and sometimes dangerous work. But there's a difference between a police officer who says "watch my back" and Michael Dowd's admonition to conceal corrupt activity.

In fact, the corrupt police officers who appeared were so self-damning and so good at being anti-role models that their testimony was videotaped by our Police Academy personnel who have been here filming since the beginning of the hearings. The witnesses' testimony, along with other portions of the Commission proceedings, will be used in training sessions for new recruits, as well as veteran police officers and supervisors.

| | KELLY | 21: |
|---|---|---|

1  
2       If the Mollen Commission had the distasteful  
3  but necessary duty to produce scoundrels as witnesses,  
4  you also produced heroes.  I concur with you, Judge  
5  Mollen, that Sergeant Joseph Trimboli fits that category.  
6  I have decided to promote Sergeant Trimboli at  
7  Departmental ceremonies at the end of this month.  And,  
8  no, the timing is not coincidental.  
9       In addition to recognizing his obvious talent  
10 and dedication as the lone investigator of the Dowd case,  
11 we are recognizing his cooperation with and testimony  
12 before the Mollen Commission as an act of sterling,  
13 lasting service to police officers everywhere.  And, yes,  
14 we are sending a message to all other police officers  
15 that Sergeant Trimboli is our definition of a "good cop."  
16      I have no illusions about the problem  
17 corruption poses.  Our efforts to combat corruption will  
18 produce more painful examples of people who violate their  
19 oath and betray the public trust.  So be it.  Nothing  
20 will be swept under the rug.  
21      Like other institutions, the Police Department,  
22 and law enforcement generally, are vulnerable to  
23 corruption in a city awash with cash from the illicit  
24 drug trade.  The morale and good order of the entire  
25 Police Department is at stake, and so is the public's

confidence in its police. The police must have the

confidence of the public to operate effectively.

As painful as I know this process has bene to

the police officers and other members of the Department,

I want them and the public to know that it will make for

a stronger, revitalized organization. Certainly, that

was the case when former Police Commissioner Patrick

Murphy took the opportunities created by the Knapp

Commission to build a stronger Department. But no

organization, no integrity controls, no matter how well

conceived, no matter how able the Commissioner who

implements them, will last forever. Teddy Roosevelt and

Pat Murphy could attest to that.

As you have heard in previous testimony, it was

a matter of faith that the reforms of the Knapp

Commission would work forever. No one really monitored

to see if that was so. No one looked to see how well the

system performed in light of the crack epidemic of the

80's. As we found in my report on the Dowd case, it

turned out to be blind faith.

We need to safeguard against complacency and

against whatever vagaries, be they crack cocaine or some

future unknown condition, conspire against the best of

intentions. For that reason, I would favor a formal

```
 1                          KELLY                            214
```

 2   monitoring process, independent of IAB, but one that

 3   preserves the authority and the accountability of the

 4   Police Commissioner to conduct investigations and impose

 5   discipline, and one that keeps the Police Commissioner

 6   fully informed and involved. To do otherwise is to

 7   undermine accountability and to invite a cure worse than

 8   the disease.

 9           In closing, I want to say how important it is

10   that the police officers of this City know we believe in

11   them. I do. The proudest day of my life came thirty

12   years ago when I took the oath as a New York City police

13   officer. Every day since then, my faith is restored by

14   the men and women I work with and whom I now have the

15   privilege to lead.

16           Judge Mollen said it best when he reported the

17   Commission finding that, "Each day throughout the year

18   the vast majority of police officers throughout the City

19   perform one of society's most important, sensitive, and

20   dangerous jobs with efficiency and integrity."

21           As difficult as I know these last two weeks

22   have been for the members of the Police Department and

23   the public, I am confident that the Commission's faith in

24   this City's police officers is well deserved and widely

25   embraced. As we look ahead, I am also drawn once more to

the words of Theodore Roosevelt when he said, "There is no good reason why we should fear the future, but there is every reason why we should face it seriously, neither hiding from ourselves the gravity of the problems before us, nor fearing to approach these problems with the unbending, unflinching purpose to solve them aright."

Thank you, Judge.

MR. CHAIRMAN: On behalf of the Commission, I want to thank you very much for your very broad, your very detailed and excellent statement. I also want to take this opportunity, and I think I can speak on behalf of all the members of the Commission, to congratulate you and to highly commend you for the steps that you have already taken to deal with this very serious, troublesome problem of corruption.

I also would hope that your statement and steps that you've taken to deal with the problem will help to restore public confidence and faith in the integrity of the Department from the Commissioner down. It is so important that the public have faith in the integrity and take recognition of the fact that you have alluded to and which I've alluded, as you pointed out, that the overwhelming majority of police officers are honest, incorruptible, and are doing a very difficult and