# POLICE CORRUPTION AND CULTURE :

## A Focus Group Methodology



## Internal Affairs Bureau

## Corruption Prevention and  Analysis Unit

EXD



# William J. Bratton
## Police Commissioner

# David W. Scott
## First Deputy Commissioner

# Walter Mack
## Deputy Commissioner
## Internal Affairs



# CORRUPTION PREVENTION
## AND
## ANALYSIS UNIT



# CORRUPTION PREVENTION AND ANALYSIS UNIT

## Project Staff

### Charles V. Campisi
Inspector
Commanding Officer

### Sgt. Vincent Henry
OMAP

### Sgt. Leopold Poje

### P.O. Derrick Pervis

### S.A. Jean Reilly

TABLE OF CONTENTS

| SUBJECT | PAGE |
|---|---|
| EXECUTIVE SUMMARY | 1 |
| INTRODUCTION | 14 |
| METHODOLOGY | 18 |
| CHANGES WITHIN THE DEPARTMENT (ISSUE # 1) | 26 |
| DEPARTMENT VALUES (ISSUE # 2) | 31 |
| DEPARTMENT DRUG TESTING POLICY (ISSUE # 3) | 33 |
| DEFINING CORRUPTION (ISSUE # 4) | 38 |
| INTEGRITY TESTING (ISSUE # 5) | 41 |
| REPORTING CORRUPTION (ISSUE # 6) | 43 |
| SUPERVISORY TRAINING ISSUES (ISSUE # 7) | 52 |
| CORRUPTION TRAINING (ISSUE # 8) | 54 |
| ANCILLARY ISSUES (ISSUE # 9) | 56 |
| CONCLUSION | 61 |
| SUMMARY OF RECOMMENDATIONS (ATTACHMENT "A") | 64 |
| FOCUS GROUP OUTLINES (ATTACHMENT "B") | 66 |
| BIBLIOGRAPHY | 68 |

EXECUTIVE SUMMARY

At the direction of Police Commissioner Raymond Kelly, the Internal Affairs Bureau's Corruption Prevention and Analysis Unit (CPAU) initiated a series of Focus Groups in order to identify and explore some of the prevailing attitudes, perceptions and opinions existing among members of the Department toward a range of integrity related issues. This research project, which commenced in early August and concluded in late December, 1993 ultimately involved twenty three (23) groups of officers of various ranks and assignments within the agency, and a total of over three hundred (300) members participated in the Focus Groups.

The project was undertaken in recognition of the fact that the informal demands and constraints of the police occupational culture often impact as potently upon police discretionary behavior as the formal policies and procedures promulgated by the agency. While the literature of policing and of police deviance have long emphasized the importance of cultural factors in determining police behavior, a great deal of that research on police culture is dated, and therefore of dubious value. In order to gain a more comprehensive and contemporary understanding of the attitudes, perceptions and belief systems which are subsumed by the police subculture, and to provide this data to the Police Commissioner in order to better inform his policy decisions, the research team adopted a Focus Group methodology.

Focus Groups involve interactive directed interviews of small groups of individuals of similar backgrounds, in order to develop information and to reach conclusions about other individuals and groups possessed of similar characteristics. Focus Group methodology was deemed a viable and appropriate format for eliciting data relative to integrity issues, since the enduring potential for police corruption appears inevitably to exist within the nexus of discretionary behavior, formal control policies, and the occupational culture's tolerance for members' deviance. Consistent with accepted practices of Focus Group research, each group was comprised of approximately fifteen (15) members, and twenty (20) of the twenty three (23) groups were randomly selected by computer from the population of officers possessing similar background characteristics. The relevant background characteristics, which included rank, tenure in the agency, type of assignment (i.e., patrol, Community Policing Unit, Field Training Unit, Police Academy recruits, supervisors and middle managers), and in some cases the platoon to which the officers were steadily assigned, were selected because these easily-operationalized variables appear most likely to play a powerful role in determining work-related attitudes and beliefs.

(2)

Thus, each of the officers attending a particular Focus Group session had a comparable career profile, and would therefore be expected to have similar attitudes. By eliminating selection bias through randomization techniques, by ensuring that all members of a particular Focus Group shared the same or essentially similar backgrounds and work experiences, and by probing deeply into the attitudinal data they elicited, the project staff are confident in generalizing these findings to other similarly situated groups and individuals within the Department. This level of confidence was further enhanced by slightly altering the selection criteria of successive groups, and by observing the slight differences in the beliefs and convictions espoused by those groups. The scope and duration of the project also permitted the research team to accumulate a wealth of general and specific data concerning officers' belief systems, as well as to discern many of the subtler and more nuanced dynamics of their self-reported behavior. Each of the Focus Groups was conducted in a "round-table" format, and participants were asked to respond to an identical series of open ended questions related to integrity and corruption. In order to ensure the reliability of the data, the facilitators refrained from introducing their own opinions, and made every effort to encourage candid discussion among participants. To that end, participants were assured that although notes would be taken by one member of the project staff, no names or identities would be recorded; at the end of each session, participants were asked to review the written notes to guarantee accuracy and anonymity. It should be emphasized that the facilitators encountered little reluctance on the part of officers to discuss the issues and questions posed to them. Indeed, the vast majority of participants seemed to appreciate the opportunity to share their views and opinions with the project staff, in apparent hope that their input would result in substantive and positive changes to Department policies and practices.

The following questions were posed to the Focus Group participants:

1. How has the job of Police Officer changed in the past years?
2. Are the Department values reasonable or unreasonable?
3. What is reasonable and unreasonable about the Department's Drug Testing policy and procedure?
4. How do Police Officers define corruption?
5. What role do integrity tests play in the Department's anti-corruption efforts?
6. How do we encourage the reporting of corruption?
7. What are the training needs for police supervisors? (question posed to supervisory groups)
8. How effective is corruption training?

(3)

As noted, participants' responses to these questions resulted in the compilation of an abundant base of diverse data concerning the depth, dimensions and prevalence of particular attitudes toward integrity and corruption within the agency and within specific populations of its personnel. The extensive and intricate nature of this data set, in fact, presented the project staff with some difficulty in distilling and condensing it to a format suitable for this report. Based upon the raw data obtained, however, the project staff have developed a host of findings and conclusions relative to the dynamics of the police culture and the level of integrity within this Department. These data have also resulted in a number of specific policy recommendations. While the bulk of these findings and recommendations are contained within the body of this report, some of the principal critical findings are summarized below. It should be noted that wherever possible the project staff have attempted to capture, in this summary and in the report, the typical language and connotations used by Focus Group participants.

## ISSUE #1 How has the job of Police Officer changed?

This initial "ice-breaker" question was intended to stimulate discussion among participants and to identify broad issues and trends which concern officers. In raising these issues early in the Focus Group process, project staff were able not only to gain insight into the general level of morale, but to prevent these issues from later intruding upon and distracting from discussions of integrity-specific issues. In virtually all of the groups, a similar set of perceptions and themes emerged; their recurring nature is evidence of their pervasiveness and of the fact that the culture holds them unquestionably as valid truths.

    — Among those in the Police Officer rank, Sergeants were roundly criticized for an increasing lack of interactive communication skills and job knowledge, as well as for their lack of impartiality and their poor decision-making skills. These sentiments were echoed by Captains as well.

    — Increasingly, Sergeants are young and inexperienced, and their practice of socializing off-duty with subordinates is detrimental to their on-duty command and control.

    — Precinct-based Field Training Units (FTU's) were harshly criticized for failing to adequately school rookie officers in the reality of police work. The now-defunct Neighborhood Stabilization Units (NSU's) are regarded as a more effective field training strategy in which senior patrol officers teach a common sense approach to police work, rather than the "by the book" style evident among Sergeants. The FTU concept stifles

(4)

initiative and maturity, and is almost universally characterized
as a "summons detail" designed primarily to generate revenue.
—     The steady tour concept has had a divisive and deleterious
impact,   fractionalizing  each  precinct  into  "four ·  separate
commands"  in  which  officers  have  no  relationships,   interactions,
or affinity for officers assigned to other platoons.   The concept
is  "destroying the job"  and creating conflict because  officers
have few inhibitions about "dumping jobs" on the following tour.
Officers  miss  the  informal  camaraderie  and  locker  room  banter,
and numerous cliques have formed.    Cliques facilitate misconduct
and   corruption  by  eroding  positive  peer  pressure  and   by
intensifying in-group loyalty bonds.
        Great    tension . and . animosity  exists  between   Community
Policing Unit (CPU) and sector officers.    The perception is that
CPU  Officers  spend  their  time  unsupervised,   socializing  with
residents while patrol officers do the bulk of police work.   They
do  not  respond to calls for service,  especially gun  runs  and
arrest situations.    CPU Officers constitute a privileged  class;
they benefit from the "dial-a-tour"  concept,  their requests for
days  off are more frequently granted,  and they do not  "fly"  to
details or backfill sectors.   CPU Officers do not dispute many of
these claims.
—     Recruitment  and  hiring  standards  have  fallen  dramatically,
and officers are outraged at the number of new hires who have had
felony  arrests  with  misdemeanor  convictions.    Many   patrol
officers  questioned the integrity and the character of  rookies,
and  are reluctant to work with them for this reason.    Applicant
investigators  are seen as processors of paperwork,  rather  than
investigators  who  conduct  credible  background  and  character
investigations.


Participants' Recommendations:


—       Revise  the  Basic  Management  Orientation  Course   to
emphasize   communication  skills,   leadership,   and   personnel
management.    Impose  a  higher  years-of-service  requirement  for
promotion to Sergeant.
—       Abandon  the  FTU concept in favor of the  NSU  training
concept.   Utilize the talents of senior patrol officers to mentor
rookies.    Give  rookies  more realistic  "hands-on"  training  in
"real" police work.
—       Re-introduce a scooter chart or some other rotating tour
system,  particularly for rookie officers.
—       Recruitment and hiring standards must be raised,  and the
applicant's  character  must be  of  primary  concern.    Applicant
investigators must conduct actual investigations,  unhampered by

(5)

quotas or other hiring mandates.

## ISSUE #2: Are the Department Values reasonable or unreasonable?

Many officers were completely unaware of the Department
Values, to the extent that project staff felt it necessary to
bring a copy of the Values to group sessions as an examplar.
  Many of those who were aware derided the values as
platitudes or a public relations gimmick, frequently stating that
the Department itself does not uphold them. In practice, overtime
concerns determine how aggressively violators will be pursued and
arrested; the agency shows little respect for the dignity of its
members; politics override impartiality in enforcing laws;
integrity is expected of officers, but ranking officers easily
receive disability pensions.
—   Values cannot be learned through public statements, or
taught to those who do not possess them prior to joining the
Department.
—   Other than Police Academy recruits, few believe that the
Values statement, per se, is of any practical use or that it
informs their every-day decisions.
—   Notwithstanding these criticisms, members almost universally
agreed that the values were reasonable standards of conduct.

## ISSUE #3: Are the Department's drug testing policies reasonable?

—   Numerous misconceptions and a great deal of misinformation
regarding drug testing policies and procedures were discerned, to
the extent that project staff felt compelled to preface this
question with an explanation of laboratory testing and
chain-of-custody procedures. Most notably, the true randomness
of the random selection process is doubted.
—   Every Focus Group displayed a complete intolerance for drug
use by MOS. Older officers of all ranks tended to favor
retention of pension rights for vested employees, but overall
most supported the policy of immediate termination with loss of
all pension rights. A few favored drug rehabilitation prior to
termination, and only a handful stated that drug users merit a
second chance.
—   Members were highly supportive of increased random drug
testing, despite their confusion about the administration of
tests. With the exception of the participants from the Guardians

(6)

Association, virtually all were satisfied with the "for cause" testing procedures as well.

Participants' Recommendations:

— Increase the number and percentage of members randomly tested, and consider random field tests of large groups of officers, e.g., at the outdoor range.
— Police applicants should also be subject to random drug testing, since the current practice of scheduling medicals in advance may afford them the opportunity to "clean up" temporarily.

Project Staff's Recommendations:

— The Department should initiate a formal campaign to dispel misconceptions about Dole Testing, including a brief film depicting the actual process from generation of daily random testing lists through laboratory testing.  This film should be viewed by members selected for testing, and incorporated into Precinct Level Training.
— Given the acceptance of Random Dole Testing among officers and their lack of tolerance for members using drugs, the Department should consider increasing the number and percentage of members tested.

ISSUE #4 How do Police Officers define corruption?

— Although participants experience great difficulty in articulating a precise definition of corruption, project staff obtained a fairly detailed understanding of the types of behavior officers consider corrupt.
— A criminal act, the active pursuit or solicitation of a benefit for personal gain, accepting money under any circumstances, or the explicit expectation of a benefit as the result of one's duties as a Police Officer clearly fell within the realm of corruption.
— Free coffee, and to a lesser extent, discounted meals, were not generally considered to be corrupt when no implicit or explicit expectation of reciprocity exists.  Officers are confident that they can distinguish situations where such

(7)

expectations exist.
— Officers had some difficulty in comprehending the current Board of Ethics ruling's distinction between accepting a light repast in a social or non-social setting, and many were unaware of the ruling itself.
— Overwhelmingly, participants voiced a favorable attitude toward a strong Internal Affairs function which would concentrate on "real corruption" rather than the petty, "white socks" infractions upon which it has previously focused. Concurrently, participants had a highly negative opinion of the Internal Affairs function as it has operated to date.
— Internal Affairs investigators, as a group, are seen as poorly skilled and inexperienced investigators who possess little knowledge of or empathy for practical policing or for other officers, and who are more content to field "ground ball" cases which result in "easy numbers" than to do real investigations of truly corrupt cops.


Participants' Recommendations:


— The Department should foster and facilitate candid and open discussions of corruption problems and issues, in order to inform, educate and sensitize officers. Such dialogue, in itself, may act as a deterrent to corruption if the "Slippery Slope" hypothesis is correct.


Project Staff's Recommendation:


— The Board of Ethics should meet to discuss and clarify the Department's Policy regarding the acceptance of a light repast in a social setting. Examples should be provided to avoid further confusion. This ruling should then be disseminated to all members of the service and incorporated into the training curriculum.


ISSUE #5 What role do Integrity Tests play in the Department's anti-corruption efforts?

(8)

—    Targeted   integrity   tests,   carefully   administered   and
directed toward officers who are reasonably suspected of  serious
misconduct or corruption, were seen as a legitimate investigative
tool.    Reservations   were   expressed   about   non-suspect   officers
"being in the wrong place at the wrong time," and  tests focusing
on administrative errors and minor misconduct.

—    Concerns  about random testing typically involved  anecdotes
about tests unfairly administered by Internal Affairs,  or  those
in   which  officers  were  punished  for  minor   administrative
violations. While  random tests may deter some members from minor
acts  of  corruption,  hard-core corrupt  officers  will  not  be
deterred.   Few officers trusted the integrity  of  the  random
tests  themselves,  and the issue of  entrapment  was  frequently
raised.   Some officers, including most of the Guardians  Focus
Group,  believed  that  the  tests have  been  directed  against
particular individuals (or groups) under the guise of randomness.
A  handful of officers believed that the tests imputed a lack  of
trust for an officer's integrity,  and they stated they would  be
offended if they knew they were tested.

Participants' Recommendations:

—    If  random  or  directed integrity tests  are  used  by  the
Department,  special pains must be taken to ensure that they  are
fairly  administered  and  carefully  controlled.    They  should
address  serious  corruption only, and any  minor  administrative
violations discovered should not result in disciplinary action.

—    Officers who pass a random or directed integrity test should
be notified of that fact,  and mention of successfully passing  a
random  test should be included in a members'  personnel and  CPI
files.

ISSUE #6 How can the reporting of corruption be encouraged?

—    Those in the Police Officer rank evinced great reluctance to
report acts of misconduct or corruption among their peers.   Only
the  most egregious cases,  e.g.,  an officer stealing or  selling
drugs, would typically result in an officer coming forward;  even
in those cases,  officers are reluctant to report corruption  and
would prefer to make their reports anonymously.   Police Officers
stated that they risked the ostracism of their peers and a

(9)

reputation as a "rat," and that they would be suspected of having reported minor misconduct as well.  Some officers stated outright that they would be afraid of physical reprisals against themselves and their families by corrupt officers or by drug dealers, and fear that even honest officers would not back them up on jobs.

–     Somewhat anomalously, several officers including all of the PBA delegates stated that they would have no hesitation in reporting serious corruption, and would have no fear of physical or social repercussions.  A few officers even stated that they would personally effect an arrest rather than to make a report to the Internal Affairs Bureau.  Project staff noted that these officers appeared to be the most self-confident of participants, as well as those with the highest status.

–     Participants were generally skeptical of IAB's capacity to ensure confidentiality, with several suggesting that IAB would not be averse to "burning" an informant officer.  They also believe that the Action Desk uses "Caller ID" and voice analysis.  Few were familiar with the corruption hotline – 212-CORRUPT.

–     Participants contemptuously characterized Internal Affairs as a "white socks and no hats outfit."  To maintain their batting average, investigators issue Command Disciplines for administrative violations and close out allegations as "Other Misconduct Noted" or "Unsubstantiated" rather than completing a full investigation which would result in exoneration.  Officers are concerned that these notations remain on their Central Personnel Index files and may be used to unfairly deny them detail assignments or promotions.  They remain skeptical about the restructured IAB's new image.

–     Sergeants were generally split on their reporting of corruption.  Approximately half indicated they would openly report corruption while the other half stated they would only report corruption anonymously.

–     In sharp contrast to the Police Officers' self-reported attitudes and behaviors, Lieutenants as a group believed that the Police Officers they supervise would have little reluctance to report corruption and serious misconduct.  They appeared very confident that officers would come forward, either openly or anonymously, if they knew of corruption.  Captains, however, believed it highly unlikely that Police Officers would come forward, even in serious cases.

(10)

Participants' Recommendations:

—    Information about the corruption hotline should be widely disseminated throughout the agency, and the notion that IAB utilizes technology to identify anonymous callers must be dispelled. Absolute confidentiality or anonymity must be assured to officers who report corruption.
—    If IAB is to gain credibility it must change its "white socks" image and concentrate only on serious misconduct and corruption. IAB personnel must be experienced investigators.
—    The practice of closing cases through "Unsubstantiated" or "Other Misconduct Noted" classifications must be curtailed, and an attempt must be made to fully investigate and exonerate officers when possible. IAB should be solely concerned with serious misconduct and corruption; minor misconduct and administrative violations should not be within IAB's purview, nor should IAB issue Command Disciplines for minor matters.
—    The quality and reputation of IAB investigators must be improved if the Bureau is to have credibility and gain the cooperation of officers. Investigators must be aggressive in identifying and arresting corrupt cops, but only corrupt cops.
—    An on-going precinct dialogue program with members of IAB should be initiated, as a means to sensitize both groups to the objectives and goals of the other, and to change the negative image of IAB.

ISSUE #7 What are the training needs of supervisors? (Asked of Sergeants and Lieutenants only)

—    Sergeants and Lieutenants were dismissive of the Basic Management Orientation Course (BMOC) and Lieutenants Orientation Course (LOC), which they characterized as a Patrol Guide refresher. These courses consist primarily of a series of "talking heads" who discuss the operations of their various units, and little effort is expended to impart leadership and effective management and supervisory skills. The content of the training modules were also criticized for failing to realistically address the practical issues facing supervisors today, and participants strongly emphasized the need for "hands-on" and interactive methods of instruction.
—    Police Academy staff in general, and BMOC/LOC instructors in particular, were criticized for their mediocre teaching abilities, their lack of practical experience, and their lack of

(11)

overall credibility.   Police Academy staff have little interest or aptitude in conveying the course material, and far too many breaks were given to students.   The courses themselves were characterized as a waste of time, and specific modules (e.g., computer training, report writing, leadership workshops) were either under-resourced or completely inadequate.
—   Participants believe that the BMOC/LOC courses are given primarily to allay the Department's training liability, rather than to actually provide supervisors with useful realistic training.
—   Supervisors also complained about an unmanageable span of control, stating that they are often responsible for supervising an entire precinct and are too frequently assigned to cover more than one precinct.   Particularly in the high crime precincts where effective supervision is most critical, they are frequently dispatched to handle 911 jobs during periods of backlog, in addition to their ordinary supervisory duties.   They complain that despite their high level of accountability for the actions of subordinates, these factors preclude effective supervision.
—   The more tenured supervisors also chided younger Sergeants for becoming overly friendly with subordinates off-duty and on. This issue should be addressed by training, since it jeopardizes their own position of authority and reduces respect for supervisors in general.
—   Lieutenants in the ICO group claimed to have received no training in their duties, much less in investigative techniques. They are overwhelmed with paperwork and under-resourced.   They are not apprised of any internal investigations taking place within their commands, and believe that their knowledge could be of great assistance to such internal investigations.   The ICO position is the least desirable or remunerative Lieutenant position in a precinct, and is consequently given to the least experienced Lieutenant.

Participants' Recommendations:

—   The BMOC and LOC courses require extensive revision in order to provide adequate instruction in practical issues faced by supervisors.
—   Lieutenant ICO's should receive special training in their particular duties and should receive the personnel and other resources they need; an incentive or reward system should be incorporated.   IAB should make fuller use of their knowledge and talents.

(12)

Project Staff's Recommendation:

  --   The role of the Precinct/Unit ICO needs to be reviewed.   An
in-depth   analysis of current duties and responsibilities   should
be conducted and a clear set of guidelines should be promulgated.


ISSUE #8 Ancillary Issues


  --   During   the   course   of the   Focus   Group   sessions,   issues
frequently   arose   which,   while   not   directly   related   to   the
project's goals and objectives, nevertheless merit mention.
  --   Officers   characterized   the Department's policy   on   wearing
hats as irrelevant, draconian and petty.   They related frequent
anecdotes   concerning   officers   on   emergency   runs   who   were
disciplined   for   not   wearing   hats.   It should be noted that   a
change   in Department policy regarding hats during the course   of
the project may render this issue moot.
  --   The   Police   Department   is   entirely   too   responsive   to
political   pressures,   despite   its   rhetoric   about   impartial
enforcement   of   the   law.   They   argue   forcefully   that   the
Department   and   its   officers   should   be   insulated   from   such
pressures, and that its actions should be directed at serving the
needs of the entire citizenry rather than the needs and whims   of
special interest groups.   The agency's policies are increasingly
shaped by external political agendas, rather than by the needs of
communities.   Community Policing has dangerously   extended   and
enhanced   this   political   control.   Participants   were   highly
resentful   and   cynical   about the politicization   of   the agency,
characterizing   it as pervasive, counter-productive,   and contrary
to   the   ideals that they and the Department   espouse.   Several
participants   equated   this politicization with   corruption,   and
quite   a   few   opined   that   politicization   fosters   and   protects
police corruption.   Officers have little hope that this trend in
politicization will be reversed.
  --   Participants in the Brooklyn North Focus Group asserted that
their   entire Patrol Borough and nearly all the precincts   within
it   are   regarded   as "dumping   grounds"   populated   by misfits,
malingerers and incompetents.   They take a perverse pride in this
deviant identity.   They reiterated a belief that ranking officers
and   internal   investigators   are   afraid   to   venture   into   the
"shithouse"   precincts,   and   that   they   receive   less   external
supervision.
  --   Overwhelmingly,   participants believed that the Department's
recruitment   and   hiring   practices   have   declined,   and   they

(13)

articulated a connection between this decline and corruption.
Many individuals arrested for felony crimes have become Police
Officers, as have many others with questionable backgrounds.
Participants believe that political pressures to hire large
numbers of officers militate against thorough background
investigations and disqualification of unsuitable officers.
Participants are highly distrustful of younger officers. Several
participants claimed to have personally arrested individuals who
are now Police Officers. Participants were not optimistic that
the Department will soon change its recruitment and hiring
practices.

Participants' Recommendations:

--    The Department must resist external political pressures and
focus upon the ideals of impartiality and fairness. Steps to
limit politicization occurring as the result of Community
Policing must be taken.
--    Brooklyn North should be used as a training ground, not a
dumping ground.
--    More stringent background investigations must be conducted
on all applicants, and those with questionable backgrounds must
be eliminated. Individuals with a criminal history should
receive the greatest scrutiny; the Department should not bear the
burden of disqualifying such applicants, but rather the
individual should bear the burden of proving his/her own
suitability.

Project Staffs' Recommendation:

--    The Department must take immediate affirmative steps to
change the deviant identity of Brooklyn North officers.

{14}

POLICE CORRUPTION AND CULTURE: A FOCUS GROUP METHODOLOGY

INTRODUCTION

At the direction of the Police Commissioner, the
Corruption Prevention and Analysis Unit (CPAU) of the Internal
Affairs Bureau recently convened a series of twenty-three (23)
Focus Groups to identify and explore some of the prevailing
attitudes, perceptions and opinions of Police Officers toward a
range of integrity-related issues. This research project was
undertaken in recognition of the fact that a great deal of
discretionary police behavior is shaped and determined both by
the formal rules and policy directions promulgated by the
organization and by the less formal but perhaps equally potent
demands and constraints of the police occupational culture. In
light of the fact that a great deal of police work is not
subject to direct supervision and takes place in ambiguous
circumstances, or in situations which may seem to present
compelling legitimate cause to deviate from formal policy, an
understanding of police behavior must take these informal
factors into account. When such behaviors fall within the
realm of ethical conduct, where pressures to deviate from
policy may be magnified, the subcultural determinants of police
behavior take on an increased salience.

While an agency's formal written policies or directives
are easily discerned and articulated, the subtler and
infinitely more complex dynamics of the police subculture are
less amenable to quantification and comprehension. Focus
Groups provide an appropriate and viable research methodology
with which to seek a more comprehensive understanding of the
complex determinants of police behavior, especially with regard
to integrity and corruption.

For several decades, Focus Groups have been widely used in
the social sciences and in market research to explore, to
describe, and to explain attitudes and behavioral dynamics
which defy simple quantification. Focus Groups are a
particularly effective research methodology when complex or
multifaceted attitudes and behaviors are the subject of
inquiry. Morgan (1988, p. 12) notes, for example, that the
sociologist Robert Merton initially developed Focus Groups as a
means of probing the practical impact and effect of wartime
domestic propaganda efforts upon behavior.

Focus Group methodology entails the formation of a group –
typically consisting of twelve (12) to fifteen (15) members –
who share some common and relevant attribute(s), and involves a
process of guided group discussion aimed at producing the type
of data and insights which might not be accessed without the

(15)

type of interaction found in a group setting. These group discussions afford participants an opportunity to respond, both individually and as a group, to focused questions posed by the facilitator/moderator. Based upon these responses the facilitator will frequently refine his/her questions to probe more deeply into the issues and opinions raised, and to explore their origins and intensity. The group dynamic also permits participants to question the responses of others, or to add important details and clarification to their own or another's response. Focus Groups permit the facilitator to glimpse many of the subtleties and emotional substance which underlies specific responses, and to draw appropriate inferences from them. As a result, the facilitator/moderator is provided with a richer and more refined set of data.

In pointing out the advantages of Focus Group methodology, Earl Babbie (1992) asserts that the technique is a flexible and relatively inexpensive means of capturing real-life data about social behavior, and that its results have a high degree of face validity (p. 255). A guiding principle in social science research is that data may be considered reliable when it has both face validity and empirical validity; the results must logically appear to make sense without a great deal of explanation or elaboration, and essentially similar results must be obtained from successive groups. As will be discussed more fully below, the data obtained from this series of Focus Groups meet both these criteria, and can therefore be considered reliable.

Focus Group methodology has in recent years come to be adapted for and extensively used in American industry, as well as in the public sector, particularly in service of participative management programs. These groups, which have also variously been referred to in the literature as "quality circles" and "ad hoc task forces," have been widely utilized in Japanese industry, where the remarkable gains made in producing high quality goods is widely attributed to their use. Within the past decade, participative management initiatives in a host of American police agencies have incorporated focus groups or quality circles to improve service delivery, to streamline administrative tasks and procedures, to gather relevant information from and stimulate communication among employees, and to establish cogent practical policies (FBI Bulletin; Brown, page 18, August 1993).

It must be emphasized that this series of Focus Groups were not designed or intended to produce specific factual data

(16)

concerning individuals or acts of corruption and misconduct. Rather, their intended goal was to probe the prevalent attitudes toward corruption within the police occupational culture and to solicit viable solutions to the integrity problems faced by this agency. The project sought to capitalize upon the experiences and expertise of Police Officers and to determine their perceptions of the Department and its policies regarding corruption, as well as their attitudes and perceptions of other members of the service. Specifically, the research mandate concerned the identification of those organizational policies, procedures, and conditions, as well as aspects of the police occupational culture which:

- facilitate corruption;
- inhibit discovery of corrupt activity; or
- create opportunities for corruption.

Further, the project sought insight into the prevailing attitudes, belief systems and behavioral norms which constitute the contemporary police culture in New York City, in order to provide the Police Commissioner with accurate current data which would inform his policy decisions and enhance his capacity to manage the culture. Various academic researchers have studied and expounded upon the critical and pervasive features of "the police culture," to the extent that the term has taken on a generic quality which assumes that an identical or highly similar occupational culture characterizes most or all of American policing. It must be acknowledged, however, that "the police culture" is not a singular or a static entity. Rather, the occupational culture varies somewhat from agency to agency, and moreover, the occupational culture within an agency is in a state of constant evolution as it responds to an interplay of innumerable factors and forces within the agency as well as outside it. Substantive changes in Department policy, in training and promotional practices, and in the work environment, for example, will impact the individual and shared attitudes of employees. Similarly, a great many of the attitudes held and shared by officers are reflective of, and emanate from, the dominant larger culture's value system. In this respect, the admixture of new officers into the agency will impart to the occupational culture a set of new, and potentially conflicting, preexisting attitudes and belief systems. Although these attitudes and perceptions of the occupational culture tend to be quite durable, they are mediated and modified by their contact and conflict with the existing attitudes and perceptions of the occupational culture. The introduction of new or different values will create culture

(17)

conflict, resulting in a dialectic process of redefinition and the emergence of a somewhat different shared value system. In summary, the police occupational culture in a given agency is a vibrant and vital culture which responds to a myriad of subtle and overt forces and pressures.

Two (2) conclusions emerge from this recognition of the transitory nature of an agency's occupational culture. First, management of the dynamics which shape the occupational culture are within the control of the police executive, holding open the potential for the executive to shape and direct the culture's development. Recognition must be given to the fact that virtually every alteration in the work environment will inevitably give rise to a corresponding change in the occupational culture. The establishment of the steady tours concept, for example, to some extent caused officers of similar backgrounds and interests to choose particular tours, concurrently limiting their interaction (and their exposure to differing attitudes and opinions) with other officers. As was evidenced by the stated opinions of successive focus groups, as well as by the perceptions of the project staff, the Police Department's occupational culture has been somewhat fractionalized by steady tours — officers simply do not have the opportunity to interact with members assigned to other tours, and to some extent each tour within a precinct has developed its own identity. In time, and under certain conditions, this isolation may result in the emergence of separate and quite disparate cultures within the system.

Secondly, we may conclude that much of the research and conventional wisdom regarding the dimensions and features of the occupational culture may no longer be valid. Much of the academic research concerning police culture, particularly that body of work relating culture to corruption, was conducted in the early 1970's. We must acknowledge the tremendous changes which have taken place since that research was conducted, and may need to reconsider some of the assumptions we make concerning the relationship between culture and corruption.

(18)

METHODOLOGY

Decisions concerning the methodology utilized in the present research were shaped in response to several operant constraints and logistic issues. One of the most salient issues was the problem of selecting participants who would reflect a fairly broad range of perspectives and attitudes, at the same time they would provide the project staff with meaningful and useful information. The project staff were therefore less concerned with achieving a truly random sample of the entire Department than with obtaining pertinent information. This decision was shaped by the recognition or caveat that in an empirical sense, the limited number of potential Focus Groups would preclude generalizing our findings and results to the entire population of the agency. As Morgan (1988) notes, the empirical issue of concern in large organizations is

> sample bias, not generalizability: 40 or so participants
> are never going to be representative of a large
> population. This is especially important when one's
> research goal is not to test hypotheses but to learn about
> others' experiences and perspectives. Using Focus Groups
> to learn about the full range of experience and
> perspectives in a broad population can be a fool's errand
> (pp. 44-45).

Rather than attempting to discern or measure the full range of attitudes and opinions existing within the entire agency, including each of its operational, administrative and investigative functions, project staff narrowed the selection criteria to choose subgroups which would be likely to provide the information most pertinent to our research - attitudes concerning integrity and corruption within the patrol force.

Decisions concerning the optimal size of the groups were again made in light of several logistical and practical considerations. According to Morgan (1988), smaller groups generally provide greater depth of information and insight, but overall they tend to be less productive and more costly. Larger groups pose problems of discussion management and group control for the facilitator, and important information can also be lost when participants become distracted by the comments of others. Combining both practical and substantive considerations, Morgan (1988, pp. 43-44) recommends that groups not generally exceed twelve (12) members, but that the moderators over-recruit by about 20% to account for no-shows.

(19)

A bifurcated methodology, in which two (2) rounds of Focus Groups would be conducted, was devised in order to refine both the dynamics of the process and the collection of data. Project staff were aware that the advent of steady tours and the establishment of precinct Community Policing Units in the past several years have resulted in the formation of four (4) separate work groups – and to some extent, perhaps four (4) separate occupational cultures – in each patrol command. Prior to the establishment of these concepts, officers assigned to rotating tours presumably interacted more frequently, if less intensely, with a larger number of officers, and inevitably the differential effects of these interactions must have an impact upon the attitudes and behavioral norms of the work group subculture. In order to discern the potential differences in attitudes among these four (4) subcultures, four (4) separate Focus Groups were conducted during the first round – one (1) for each of the three (3) platoons, and one (1) for Community Policing Unit officers. In the first round of Focus Groups, two (2) participants were chosen, in the manner described below, from each of the seven (7) Patrol Boroughs, as well as two (2) participants from the Detective Bureau. Thus four (4) Focus Groups of sixteen (16) participants were scheduled in the first round.

Participants for the second round of Focus Groups were chosen from within the same Patrol Borough, in order to ensure that each precinct had representation. A total of ten (10) Focus Groups were held in the second round, one (1) for each of the seven (7) Patrol Boroughs, one (1) consisting of Patrolmen's Benevolent Association delegates, and two (2) consisting of Patrol Sergeants. (Note: Patrol Sergeants were selected in the same manner as the first round of Focus Groups with two (2) Sergeants selected from each of the seven (7) Patrol Boroughs).

As noted, the project staff was less concerned with achieving a valid statistical sample of the entire Department than with obtaining useful information. To that end, several decisions were made concerning selection criteria for participation. Project staff were concerned that participants had sufficient experience and familiarity with Department policies and procedures, as well as knowledge of the police culture and the informal values, attitudes and practices that culture entails. Research, initially and most notably conducted by Niederhoffer (1967) and by others who have more recently replicated or expanded upon his work, indicates that the attitudes of Police Officers form in a process of

(20)

socialization lasting about five (5) years, and that these
attitudes remain fairly consistent until about the twelfth to
fifteenth year of service. Moreover, the project staff
recognized that the socialization process for officers
recruited in the early 1980's was significantly different than
for those hired prior to the fiscal crisis of the 1970's, and
that the vast majority of Police Officers currently assigned to
patrol fall into the post-1981 hiring cohort. In order to
measure, albeit to a limited extent, the attitudes extant
within the detective subculture, the project staff expanded
the selection criteria to include similarly qualified Detective
Investigators assigned to Precinct Detective Squads. Each of
the officers selected to participate therefore met each of the
following criteria:

1.  they were either Police Officers or Detective
    Investigators;
2.  they were assigned to patrol precincts or Precinct
    Detective Squads;
3.  they had a minimum of five (5) and a maximum of
    twelve (12) years of service in the agency. *(Due to a
notification error made by the precinct's roll call clerk, one
officer with only two and one-half years of service, less than
the required minimum, was sent in place of her partner, who had
received an unexpected court appearance notification).

A last group consisting of Sergeants assigned to Patrol
Services Bureau were randomly selected from all Patrol Boroughs
with no criteria to time in service or rank being considered.

To eliminate sample bias, a pool of approximately one
hundred (100) members who conformed to these criteria were
drawn from the Department's personnel database using a version
of the computer program used to select officers for the Random
Dole Testing program, adapted to consider the selection
criteria fields. This randomly generated list included members
of each of the seven (7) Patrol Boroughs. Telephone calls were
placed to each Police Officer's command to ascertain assignment
(radio motor patrol or Community Policing Unit, and/or steady
platoon), and to each Detective's squad to ascertain his or her
scheduled appearance days. From this master list, four
(4) separate lists were compiled – one (1) for each of the
three (3) platoons and one (1) for the Community Policing Unit
officers. Each list was consulted and two (2) members, either
two (2) Police Officers or a Police Officer and a Detective
Investigator, from each of the seven (7) Patrol Boroughs were
arbitrarily designated to appear at the scheduled Focus Group

(21)

meeting.   A total of fifty five (55) participants were present
at the following Focus Group meetings:

ROUND 1

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---------|------|----------------|-------------|---------|------|
| 1 | 08/10/93 | 14 | 10/4 | CPU | all |
| 2 | 08/12/93 | 15 | 9/6 | 2nd | all |
| 3 | 08/17/93 | 13 | 9/4 | 3rd | all |
| 4 | 08/20/93 | 13 | 12/1 | 1st | all |
| | | 55 | 40/15 | | |

A total of ten (10) additional Focus Group meetings took
place during the second round.   Selection criteria and
selection method (i.e., use of the adapted Random Dole computer
program) remained consistent, however, these groups were each
comprised of members from the same Patrol Borough.   As noted,
this process ensured that each of the seventy five (75) patrol
precincts were represented.   In addition, a Focus Group
comprised of seven (7) PBA Delegates was held, its members
selected by the Patrolmen's Benevolent Association.   A total of
one hundred twenty-six (126) participants were present at the
following Focus Group meetings:

ROUND 2

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---------|------|----------------|-------------|---------|------|
| 5 | 9/22/93 | 13 | 8/5 | 2nd | PBBX |
| 6 | 9/24/93 | 11 | 7/4 | 2nd | PBSI |
| 7 | 9/29/93 | 16 | 13/3 | CPU | PBBS |
| 8 | 10/1/93 | 10 | 8/2 | 1st | PBMS |
| 9 | 10/6/93 | 13 | 9/4 | 3rd | PBMN |
| 10 | 10/7/93 | 7 | 7/0 | PBA delegates | ALL |
| 11 | 10/8/93 | 16 | 13/3 | 1st | PBQ |
| 12 | 10/12/93 | 13 | 7/6 | 3rd | PBBN |
| *13 | 10/22/93 | 13 | 11/2 | 2nd | ALL |
| *14 | 12/3/93 | 14 | 12/12 | 2ND | ALL |
| | | 126 | 95/41 | | |

*     (As mentioned previously, a group of randomly selected
Sergeants assigned to the Patrol Services Bureau were assigned
to two (2) additional Focus Groups.   They were from all Patrol
Boroughs and assigned to the second platoon).

(22)

At the direction of the Police Commissioner,  and in order to  gain a more comprehensive and inclusive perspective on  the dynamics  of the police culture, a  third round of Focus Groups was  conducted.   These groups consisted of two (2)  panels  of fourteen (14) members assigned to Field Training Units  (FTU's) and  two   (2) groups of twelve (12) members  assigned  to  the Police  Academy Recruit Training Section (PARTS),  (Group #  17 consisted  of eleven (11) members),  and the  findings  derived from these groups are incorporated throughout the body of  this report.

A  total of four (4) Focus Group meetings  with  fifty—one (51)  participants were  conducted  during  the  third  round. Selection  criteria and selection method (i.e.,  use  of  the adapted  Random  Dole  computer  programs) remained  consistent for groups #15 and #16.   Each of these two (2) groups had  two (2) representatives from each of the seven (7) Patrol Boroughs. Groups  #17  and #18 were randomly selected (using a  table  of random numbers) by the  Police Academy Administrative Unit.

## ROUND 3

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---------|------|----------------|-------------|---------|------|
| 15 | 11/3/93 | 14 | 12/2 | FTU | ALL |
| 16 | 11/5/93 | 14 | 10/4 | FTU | ALL |
| 17 | 11/16/93 | 11 | 11/0 | P.A. | N/A |
| 18 | 11/22/93 | 12 | 11/1 | P.A. | N/A |
|    |         | 51 | 44/7 |      |     |

In  order to gain insight concerning the  perceptions  and attitudes of middle managers within the Department, a  series of Focus  Groups  consisting  of  Lieutenants and Captains  were incorporated into a fourth round.   A total of three (3)  Focus Group   meetings  with  forty—eight  (48)   participants   were conducted during this round.

A  group  comprised  of thirteen  (13)  Integrity  Control Officers (ICO's),  twelve (12) Lieutenants and one (1)  Sergeant representing  the  seven  (7)  Patrol Boroughs was   randomly selected  using  a  list of ICO's maintained  at  the  Internal Affairs Bureau.   This group was presented with the same issues as  previous  groups and also queried about  the  problems  and conditions  indigenous  to the position of  Integrity  Control Officer.

(23)

A Focus Group consisting of twelve (12) Captains assigned to patrol commands was also conducted.  The members of these groups were, predictably, somewhat older and more tenured than the average participants in previous groups.  Their perceptions and attitudes tended to generally mirror those of previous groups, with several exceptions.  These exceptions are noted throughout this report, under the appropriate issue selections.

A total of thirteen (13) Lieutenants, representing each of the seven (7) Patrol Boroughs, participated in a Focus Group session at which they discussed each of the issues and items presented to earlier groups of various ranks.  The computer-generated random selection method used to choose participants in previous groups was also used to select these Lieutenants.

ROUND 4

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---------|------|---------------|-------------|---------|------|
| 19 | 11/29/93 | 13 | 12/1 | ICO's | ALL |
| 20 | 12/7/93 | 13 | 12/1 | Lt's | ALL |
| 21 | 12/15/93 | 12 | 11/1 | Capt's | ALL |
|  |  | 48 | 35/3 |  |  |

A special Focus Group consisting of members of the Guardians Association was conducted in order to ascertain whether African-American officers' attitudes and perceptions of integrity issues differed significantly from those of the predominantly white focus groups previously held.  It should be noted that in contrast to the random sampling selection method used to generate participant lists for the previous Focus Groups, these participants were identified and selected by the Guardians Association's president.  As a result, the project staff cannot conclude with a high degree of certainty that the attitudes and perceptions discerned in this sample are generally representative of the entire population of African-American officers.

A second special Focus Group consisting of members of the Policewomen's Endowment Association (PEA) was conducted in order to ascertain whether female officers' attitudes and perceptions of integrity issues differed significantly from those of the predominantly male Focus Groups previously held. It should be noted that participants were selected by the PEA,

(24)

and as with the Guardians Association, project staff cannot conclude that the attitudes and perceptions discerned in this sample are generally representative of the entire population of female officers.

A total of two (2) Focus Group meetings with twenty-three (23) participants were conducted during the fifth round.

ROUND 5

| Group # | Date | # participants | Male/Female | Group | Boro |
|---------|------|----------------|-------------|-------|------|
| 22 | 12/20/93 | 14 | 6/8 | Guardians | All |
| 23 | 12/22/93 | 9 | 0/9 | PEA | All |
| | | 23 | 6/17 | | |

A grand total of three hundred and thirteen (313) members of the service participated during five (5) rounds of Focus Groups. The actual Focus Group meetings followed a standardized format designed to elicit comments on a successive series of issues. A copy of the meeting outline is included as an Appendix to this report, and the standardized format addressed, seriatim, the following issues:

ISSUE

#1  How has the job of Police Officer changed in the past years?
#2  Are the Department Values reasonable or unreasonable?
#3  What is reasonable and unreasonable about the Department's Drug Testing policy and procedure?
#4  How do Police Officers define corruption?
#5  What role do integrity tests play in the Department's anti-corruption efforts?
#6  How do we encourage the reporting of corruption?
#7  What are the training needs for police supervisors? (Question posed to Supervisory Groups)
#8  How effective is corruption training?
#9  Ancillary issues

At each session, the group facilitator introduced himself and gave a brief overview of the project's goals and objectives, stressing the confidentiality of participants' responses and emphasizing the fact that only one member of the project staff would be taking notes during the session. These notes were made available to the participants after the

(25)

meeting, and they were encouraged to scrutinize them for accuracy and for the fact that no identities were mentioned. Concurrently, the participants were assured that their comments would be passed along to the Police Commissioner as accurately as possible.

Each participant was asked to briefly introduce himself/herself to the group by first name and command, and to provide a brief summary of their tenure and experience in the Department. As an "icebreaker" exercise, each participant was asked to address the question, "How has the job changed since you began your career?" This relatively ambiguous and open-ended icebreaker question had a dual purpose: it set a tone of non-threatening self-disclosure, and it permitted project staff to gather and begin to assess general background information concerning the overall attitudes and perceptions of individuals and of the group as a whole.

Following this initial discussion, and having set a positive and relatively trusting tone, the remaining more substantive issues were raised and addressed in the order indicated in the appended outline.

(26)

ISSUE # 1 <u>Changes within the Department</u>

As an initial "icebreaker" question, the participants were
asked to discuss their perceptions of how the job of Police
Officer had changed during their tenure with the Department.
As intended, the open-ended and somewhat ambiguous nature of
this question elicited a broad range of responses relating to
various types and aspects of change the participants had
observed in both the subcultural and task environments.
Questions were relayed so they addressed both the changes in
the everyday tasks the participants perform and in the
individuals with whom they work.  It should also be noted that
despite the range of responses generated, several patterns of
perceptions and attitudes were discerned.  In virtually every
group, the participants identified a similar set of perceptions
and issues.  The pervasive and recurring nature of these
patterns across each of the Focus Groups, as well as the
vehemence with which they were expressed, lends credence to the
argument that these perceptions surpass mere opinion: they
have, in the participants' belief system, the full weight of
objective reality.  Regardless of the perceptions' objective
and factual basis, the police occupational culture
unquestioningly holds them to be true and valid.

One such pattern of perceptions concerned supervisors, and
in particular Sergeants, who were frequently seen as lacking in
interactive communication skills as well as job knowledge.
Supervisors were also criticized for their lack of impartiality
in dealing with subordinates and their poor decision making
skills.   The participants related the paucity of supervisory
skills to several factors, including the poor training they
receive at the Police Academy's Basic Management Orientation
Course  and the fact that many Sergeants are promoted to their
rank with little street experience.   Many Sergeants were seen
as lacking in the type of maturity which police experience and
general life experience brings,  and many officers voiced
resentment at Sergeants' failure to treat them as adults.   At
the same time, many of the younger Sergeants were seen as
overly friendly toward "rookie" officers, and as catering to
the rookies' "childish and petty" requests. Participants noted
that rookies frequently complain about being assigned to a foot
post or assigned to a DOA, and that a supervisor will often
accede to these complaints by changing their assignment.  These
changes are often made without regard to seniority or
experience.   The participants noted that the policy of
transferring Sergeants after their initial six months is an

(27)

inadequate period for Sergeants to become comfortable with and knowledgeable about the command and its officers. Because many of the Sergeants are younger and less experienced than some of the officers they supervise, they neither appreciate nor honor various informal Department traditions, leading to resentment among the more tenured officers. The examples they cited ranged from the fact that Sergeants often ignore seniority when assigning officers to sectors or to "fly" to details, to the fact that they permit Police Officers to indiscriminately come behind the desk. Several Detectives noted that Sergeants often unnecessarily exert their authority in a manner which interferes with Detective responsibilities at crime scenes. Overall, the participants felt that Sergeants are overly solicitous to rookies, who have not earned the right to special favors, and that this has a negative impact on senior officers' morale. It should be noted that these perceptions were particularly apparent among participants assigned to the busier high crime precincts, where supervisory skills are perhaps most critical. It is also noteworthy that the Focus Group of Sergeants reiterated these same beliefs and perceptions. (Discussed further in Issue # 7).

Proposed solutions to the problems with Sergeants included revision of the Basic Management Orientation Course (which is viewed as a Patrol Guide refresher course) and the Lieutenants Orientation Course, especially with regard to developing communication skills, leadership training, and proper procedure at police incidents. Participants also recommended raising the years of service requirement for promotion so that Sergeants can gain some practical street experience.

Another source of criticism concerned the activities of precinct Field Training Units. The general consensus was that the now-defunct Neighborhood Stabilization Units (NSU's) were more effective in training rookies, since training was conducted by veteran Detective/Field Training Officers. Unlike the FTU Sergeants, whose supervisory role demands that they train rookies solely "by the book", the Detectives were guided by experience and expedience, teaching rookie officers to use common sense and to handle jobs "the right way". Other criticisms concerned the fact that currently the Training RMP is not part of the 911 run-down, so the Sergeants pick and choose the jobs they want to handle. In the NSU concept, each RMP was assigned as a precinct sector, permitting officers to experience a full range of calls for service. The FTU system is seen as stifling the maturity of rookies and preventing them from having "hands-on" experience. Participants recommended

(28)

eliminating the present FTU system in favor of a training scheme modeled after the NSU's.

The vast majority of participants were of the opinion that the steady tour concept has had a severely negative and divisive impact upon their relationships with other officers, to the extent that four (4) separate precincts (each of the three (3) platoons and the CPU) have been created in every command. Depending upon precinct policy, CPU Officers may or may not be used to backfill vacancies in patrol sectors, exacerbating the existing tensions between patrol officers and CPU members. Patrol officers are resentful of that fact that they are often in a backlog while CPU Officers "have coffee with neighborhood residents," and that CPU Officers often do not back them up on such dangerous assignments as "gun runs." Many patrol officers believed that CPU Officers constitute a privileged class - their requests for days off or lost time are more frequently approved, for example, and they are exempted from "flying" to details. This sense of privilege is reputedly being cultivated at the Police Academy, where recruits are told (reportedly by instructors who are themselves "inexperienced rookies") both to ignore the advice of veteran officers ("the veterans only want to get you into trouble") and that patrol is not as valuable as the Community Policing Unit. The antagonism is especially apparent toward rookies in the CPU, whose requests for days off - particularly holidays - are granted without regard for seniority. Patrol officers feel that they are doing the vast majority of the work, and the most dangerous kind of work.

Participants also felt that the steady tour concept "is destroying the Job." They no longer see or work with officers assigned to other tours, and a potent form of social control - peer pressure - has been lost. The old adage, "leave it for the four-to-twelve" has become a modus vivendi - because they no longer see or know the officers on the following tour, many cops have no regard for the officers on the other tours and will no longer go out of their way for them. Prior to steady tours, for example, the prospect of working with an officer from another squad at some future date deterred many minor transgressions, such as failing to clean out the back seat of the radio car. The positive aspects of peer pressure have been lost due to a much smaller work group and the distinct improbability of having contact with officers from other squads during the work day. Other features of this fractionalization within the commands include the fact that officers miss the informal locker-room banter and camaraderie they once shared,

(29)

that many small cliques (often revolving around common age or ethnic identity) have emerged, and the fact that fewer officers attend precinct parties, or other functions. Several participants suggested that this fractionalization has impacted officer safety, since an off-duty officer may not be recognized by officers within his or her own command. Several participants also suggested that the steady tour concept may facilitate corruption, since work groups are smaller and "tighter", and therefore less amenable to supervisory intervention and the detection of misconduct. The emergence of close-knit cliques may also facilitate corruption and inhibit its discovery by fostering secrecy and creating an implicit or explicit expectation of protection by other clique members. In general, the participants reported a deep divisiveness within the culture, and widespread dissatisfaction with the impact the steady tour concept has had upon the cultural environment.

Although the participants voiced dissatisfaction with the impact of the steady tour concept, they also agreed that their private lives were impacted in a positive way. They recommended that some alternative to the steady tour concept be implemented. In particular, they recommended that a "scooter chart" be available but emphasized that it should be "on a voluntary basis".

The Captains were asked to describe the most significant change occurring within the Department during the course of their careers. They responded with a variety of trends and issues, including the fact that younger officers today have less loyalty to the Department and that they do not feel that they should have to "pay their dues" before attaining a choice assignment. The Captains saw a general decline in the level and quality of first-line supervision, a fact they attributed largely to younger and less experienced Sergeants who lack the capacity or interest to enforce discipline. The Captains, like other groups before them, believed that many Sergeants have become overly friendly with the officers they supervise, to the detriment of the Department and its overall level of discipline. Further, they felt that the first-line supervisors are relieved of a great deal of responsibility and decision-making by procedures which require the Duty Captain to respond to situations which should be handled by the supervisor at the scene. The on-scene supervisor should make the decisions in most of these instances, and he/she should be held accountable for them. The trend to increase the responsibilities of Duty Captains has relieved Sergeants of a great deal of accountability, placing it instead upon Captains.

(30)

One Captain stated that officers lack the sense of humor required to be an effective cop, and that they do not enjoy their work. Police work, he said, is supposed to be fun. Several Captains believed that the implementation of Community Policing occurred too rapidly, and without proper planning. At present, CPU officers reap all the rewards, while officers assigned to sectors are being neglected and overworked.

One Captain suggested that officers applying for Narcotics Division undercover positions should first be assigned to precinct SNEU units for ninety (90) days, and evaluated there. SNEU Sergeants should also receive OCCB training.

(31)

ISSUE # 2 Department Values

Questions were designed to elicit responses concerning the
Department Values. Participants were asked about their
knowledge of Department Values, applicability of the values in
the daily performance of their duty, and whether it was
reasonable to expect Police Officers to adhere to these values.

It was quite disconcerting to find out that many
participants were ignorant of the Department Values. There
were other participants who indicated a vague recollection that
a Values statement was posted in various Department facilities,
and only a few were actually aware of the contents of the
statement. Even officers stating that they are preparing for
the Sergeants exam generally were unaware of the Department
Values. In every session it was necessary to restate the
Values and in later sessions to post a sample of the Values in
order to stimulate discussion on this topic. It should be
noted that groups in Round Three (3) (Police Officers assigned
to FTU's and the Police Academy) were knowledgeable of
Department Values. In fact, the two (2) groups from the Police
Academy relate that Department Values are recited each day at
the beginning of the gym period.

Once the Department Values were stated, each group
concluded that it was reasonable to expect every member of the
service to adhere to them. Many participants felt these
Values were imparted to them early in their developmental
stages by parents, teachers, religious leaders and others. The
groups also believed that the vast majority of Police Officers
entered the profession with these values intact, while a few
members entered the Department with a complete lack of values.
The groups unanimously felt that Police Academy training cannot
instill values that are not present in the individual prior to
hire. Police Academy training was seen as perfunctory in
regards to ethics related topics; yet, the participants
indicated their belief that training cannot develop values
where none previously existed.

There were some members who questioned the purpose of
stating and posting Department Values. Many participants
believed that the Department Values statement is an extension
of a public relations campaign designed to address community
concerns. These same officers concluded that the Department
Values have little meaning in their decision making process.

(32)

Controversy and criticism concerning Department Values arose when some participants expressed what they believed to be contradictions between policy and practice.   While Department Values state that we will "...aggressively pursue violators of the law," in practice, selective enforcement curtails what are generally considered aggressive law enforcement efforts. References to overtime constraints were used to illustrate a perceived notion that an aggressive law enforcement policy is secondary to monetary considerations.

The majority opinion was that the public is unaware of the complexities of policing in New York City and expressed the need for public education on this issue.   Generally, the participants were supportive of the Department's "NEW YORK CITY COPS CARE" advertising campaign and expect it will have long term positive effects.

(33)

ISSUE # 3 Department Drug Testing Policy

In discussing the Department's drug testing policy, questions were prepared that would assist in determining underlying feelings concerning the administration of the Dole Test. Participants were asked about their knowledge of Department procedures, the reasonableness of the current policy, their satisfaction with safeguards and their opinions concerning entry tests, tests for cause, and random tests.

In the early stages of each Focus Group discussion it was evident that there were many misconceptions about the Department's drug testing policy. Participants did not understand terms such as "random" and "for cause." Misinformation about laboratory procedures and handling of evidence clouded the discussion. A brief synopsis of the Department's policy was presented to clarify issues and move the discussion along.

Each of the Focus Groups displayed an intolerance of drug use by members of the service. Their position was strongly stated that the Department should do all it can to seek out members who use drugs and remove them from police service. Their positions were firm on terminating any member, regardless of reason and seniority, who uses drugs. Some members believe that the Department, prior to termination, should offer rehabilitation to any member using drugs. Upon completion of a program, however, the member's services should be terminated. A small minority of participants suggested that pension rights should be preserved for members so qualified.

A.   Entry Level Tests – Drug screening tests for police applicants was overwhelmingly accepted by each Focus Group. Participants felt that applicants should be subjected to multiple random tests prior to being hired. The current procedure where an applicant is notified weeks in advance that he/she is scheduled for a medical examination which includes a drug screening test was criticized. Many participants felt that prior recreational drug use should automatically preclude an applicant from being hired.

Drug screening tests used as a prelude to promotion or entry into a specialized unit was also widely accepted as members continued to voice opposition with working with anyone who uses illegal drugs. This opposition to drug use by other members derived both from individual safety concerns, as well as from the frequently stated position that Police Officers

(34)

should be a "cut above" the general public, who are viewed as
immersed in the drug culture.

B.    For Cause Tests - Drug screening tests for cause met with
unanimous approval by each of the Focus Groups.   While some
group members stated that a level of proof less than reasonable
suspicion should be used to order a test, other members were
concerned about the violation of individual rights.   Although
the protection of Police Officers' rights was an issue it
seemed that the group's hard stance of "zero tolerance"
outweighed their concern about a violation of an individual's
rights.   There were a few instances, however, where
participants felt that an unchecked system of "for cause"
testing would lead to other violations of individual rights by
the Department.

C.    Random Tests - Their misinterpretation of the random
testing procedures not withstanding, each group supported
random drug screening tests.   Group concerns were centered on
the possibility of human error and false positives in the
testing process.   Those members who have been subjected to
random testing all stated they were satisfied with the
Department's efforts to maintain proper custody and handling of
samples.   Laboratory procedures however, were questioned and
confidence in lab technicians were at the heart of their
concern.   An on-site lab test with rapid results was suggested
by a few group members.   The individual would be informed of
the results and if there were any problems (a claim of a false
positive) additional tests could be performed to resolve the
issue.   Each group suggested an increase in the number of
random tests.   The suggested increase ranged from 25%
(currently the Department tests 20%) to 100%.

     Suggestions were made to conduct random testing in the
field rather than at Health Services.   The suggestion was for
Health Services to randomly select a command and a platoon
within that command for testing.   Personnel would be tested
during roll call with a minimum disruption of patrol
capabilities.

     Although these suggestions must be evaluated against many
different standards, the strong stance against drug use and the
suggestions to increase the number of random tests is more
significant than the methods suggested.   It is recommended that
information concerning the randomness of testing, the chain of
custody and testing procedures, and the results of drug tests
be more widely disseminated throughout the Department.   To

(35)

allay the Police Officers' suspicions about the accuracy of laboratory testing and the potential for misidentifying samples, a brief video presentation should be viewed by all Police Officers. The presentation can be made at Borough Based training and can be repeated at Health Services prior to the administration of a drug screening test. The video should contain up-to-date information about drug screening tests and can be used in conjunction with other training currently being considered by the Drug Prevention Task Force.

To a greater extent than had been found in Focus Groups comprised of less-tenured officers, the participating Lieutenants were of the strong opinion that pension rights should be preserved for those members with twenty (20) years of service who test positive in the random drug testing program. Moreover, several participants were of the opinion that a drug rehabilitation program, similar to the programs currently available to members who abuse alcohol, should be available to drug users. Regardless of whether these members are subsequently dismissed or retained, several Lieutenants believed that drug rehabilitation should be made available.

Their opinion regarding the preservation of pension rights seems to be reflective of a general trend among more-tenured officers regardless of rank: perhaps because they have a greater investment in their pension and their career, both financially and in terms of their years of service, older officers tend to be more concerned with the possibility of losing their vested pension rights. As a corollary, the older officers concurrently articulate less faith in the potential deterrent effect of harsh sanctions for drug abuse than do younger officers.

With regard to the Department's drug testing policies, all the participants of the Captains Focus Group agreed that the process was basically sound, but most indicated that the number or percentage of officers tested under the random procedure should be increased. Several participants also favored the development of a drug rehabilitation policy prior to dismissal, and a few indicated that members should be given one chance to enter a rehabilitation program and remain in the employ of the Department. No second chance should be afforded to drug users. Consistent with their tenure and the trend observed among other tenured officers, several members of this group also tended to favor a guarantee of pension rights, although others in the group were in adamant opposition to pension retention. They appeared to be about equally divided on this

(36)

issue.   The participants also indicated that   increased
unannounced random screening of candidates should take place
during the applicant investigation process; they observed that
the current practice of scheduling medical exams up to one  (1)
month   in   advance might permit some   candidates   enough
forewarning   to "clean themselves up" prior to the test.   The
Captains   also   proposed that large groups of officers   be
randomly tested en masse, perhaps testing entire platoons
within a precinct or while officers attend the Outdoor Range.
They evinced no concern, cynicism or difficulty with the
procedural aspects of the current policy.

     The Focus Group consisting of members of the Guardians was
also queried as to their opinions regarding the reasonableness
of the Department's drug testing procedures.   The participants
generally agreed that officers who are detected using drugs
should be terminated, regardless of the seniority or prior
disciplinary   record.   About one quarter (1/4) of   the
participants   in this group stated that notwithstanding the
termination policy, the pension rights of members who had
achieved twenty (20) years tenure in the agency should be
preserved.   The participants voiced numerous concerns that the
Department does not follow its own procedures in many drug
testing cases, specifically in regard to the chain of custody
for urine samples.   Participants recounted incidents in which
they alleged that urine samples had been left unattended for
several hours on a window sill, and female officers who were
permitted to provide their sample while unobserved.   Other
participants stated that the Organized Crime Control Bureau did
not always adhere to its own detoxification and sick leave
policies regarding undercover officers who were forced to
ingest a controlled substance. These officers were allegedly
told to continue in their undercover activities so that
on-going cases would not be compromised, and it was alleged
that at least one (1) such undercover officer was subsequently
fired for drug use after having been initially refused
detoxification treatment by the Department.   It must be
emphasized that with the exception of general concerns about
chain of custody, previous Focus Groups raised none of these
issues.   The participants also contended that the random drug
testing procedures are not truly random, and asserted that
minority individuals have been singled out for testing without
cause, under the guise of random selection. Participants also
evinced a belief that white superior officers have been
notified in advance of an impending random test, and have been
permitted to quietly retire prior to testing. In general, the
participants appeared to believe that both the random and

(37)

"for cause" drug testing policies are regularly used to target minorities, and that a tacit double standard exists.

Members of the Policewomen's Endowment Association Focus Group concurred with members of previous Focus Groups in asserting that the use of illicit drugs by members of the service cannot be condoned or tolerated, and that the Department's current drug testing policy requires little or no modification. Several members of the group indicated a belief that the current policy does not adequately address the problem of anabolic steroid use, and they believed that alcohol abuse is a far greater and more pervasive problem than drug abuse. As a group, they maintained that the number or percentage of members tested under the Random Dole Testing procedure should be increased, and that the Department should test for steroid use as well as for the more common narcotic drugs. In particular, this group felt that younger officers should be tested more frequently during their probationary period. To a greater extent than was evident in other groups, these participants tended to support the concept of providing drug rehabilitation for members prior to termination for drug abuse. This group did not raise the issue of forced ingestion of narcotics among members assigned to OCCB as the Guardians' Focus Group had, but upon the project staff's inquiry they stated that in such situations some women may be reluctant to report forced ingestion for fear that they would lose their hard-won OCCB assignment.

(38)

ISSUE # 4 Defining Corruption

Focus Group participants had some difficulty in articulating a precise definition of police corruption. This difficulty arose primarily from the fact that "corruption" is a fairly ambiguous term which can be used in several contexts, has multiple connotations, and is often mistakenly equated with misconduct, as well as from the fact that it deals with ethical issues which are often not easily articulated. After carefully guiding and structuring the questions posed to the group, the facilitators were able to obtain a fairly detailed understanding of the types of behavior Police Officers consider to be corrupt. To achieve this understanding, the participants were asked to provide examples of behavior that would and would not constitute police corruption.

Virtually all of the participants agreed that a Police Officer's commission of a criminal act, as defined in the Penal Law, constitutes corruption. Further, they stated that any behavior in which a Police Officer actively seeks a specific personal gain or benefit by virtue of the fact that he/she is a Police Officer clearly constitutes corruption. Officers tended to agree that the implicit or explicit expectation of reciprocity – the quid pro quo – is a critical factor in determining whether an act is corrupt. Participants were quick to address the issue of corruption by unanimously pointing out that they do not believe the acceptance of a free or discounted meal is corruption. In the case of a free cup of coffee, officers strongly agreed that a cup of coffee "freely given and freely taken" is not corruption. When, however, the officer believes that the benefit is accompanied by some overt or unstated expectation of reciprocity – that he/she will or will not do their job in return for the benefit – it becomes corrupt. The participants cited the scenario of an officer entering an establishment with no intention of paying as an example of corruption, but were less adamant about receiving a discount they had not expected or demanded. It is well worth noting that the participants evinced a strong belief that they were capable of comprehending when an implicit expectation occurred, and stated that they would not accept any benefit under such circumstances.

Participants had great difficulty separating an offer of free coffee (or other repast) in a social setting and a non-social setting. Officers were unable to clearly see the difference between the two settings. References to

(39)

"friendships" established over a period of time were used to
illustrate the belief that free or discounted meals were
offered and accepted unencumbered.

It is also worth noting that most of the participants were
unaware of the Board of Ethics ruling regarding a free cup of
coffee "and light repast" in a social setting. They agreed
that this and any subsequent rulings should be vigorously
disseminated to members of the service. The participants also
stated that the Internal Affairs Bureau should not be concerned
with these and other "minor" infractions, which clearly fall
outside their definition of corruption. Although they were
skeptical of the abilities and the motivations of Internal
Affairs Bureau investigators, the participants seemed to favor
the notion of a strong and effective Internal Affairs function
which would concentrate on "real" corruption, rather than the
petty infractions which they believed were the main focus of
concern. In their view, Internal Affairs Bureau investigators
have poor investigative skills and little experience or regard
for officers on the street.

In terms of providing an operational definition of
corruption, the participants in the ICO Focus Group generally
agreed with members of previous groups in asserting that Police
Officers can be considered corrupt when they commit criminal
acts or use their positions and powers as Police Officers to
obtain some substantive personal benefit. They did not consider
such minor acts of deviance as accepting a free cup of coffee
to constitute a corrupt act, although they agreed that such
behavior was a violation and might, in some circumstances,
constitute corruption. As was evident in previous groups, the
ICO's believe that the individual officer's intent in accepting
free coffee is a critical factor in their definition of
corruption: they consider officers who actively pursue or
solicit free coffee or free or discounted meals to be ethically
compromised and perhaps, in a technical sense, corrupt.
Nevertheless, they do not appear to feel that such ethical or
legal violations are particularly egregious offenses.

The Captains broadly defined corruption in terms of an
officer taking something to which they are not entitled, and
they favored a fairly subjective standard in evaluating
whether an act such as free coffee is corrupt. Each incident
should be judged, they said, on its individual merits and the
factual circumstances surrounding the situation, and the
specific intent of the officer should be assessed in making

(40)

this determination. They felt that free coffee and small amounts of food (i.e., "a light repast") have historically been seen as a form of social interaction, and would be more acceptable than the acceptance of free merchandise or non-food items, irrespective of their cost. Concurrently, though, they called for a more definitive and less ambiguous response on the part of the agency to acts which are deemed corruption or misconduct.

One Captain stated, and the others concurred, that the Department's policies toward corruption are not in synch with some of its other policies. He stated, for example, that the Department requires precinct commanders to convene an annual Fellowship Breakfast, providing about $360.00 for this event, an entirely insufficient amount in some commands. Commanders are constrained to rely upon the good graces of local caterers or meeting halls to provide a suitable venue, and they must do the best they can to provide a breakfast meal. Consequently, the commanders have little credibility when they admonish their officers not to accept free or discounted meals, coffee or other favors from local businesses or residents. Such policies breed cynicism and foster the perception of a double standard for superior officers.

The opinions and attitudes of the Guardians Focus Group members, as they specifically relate to the definition of corrupt activity, did not differ markedly from the opinions expressed in other groups.

As in other groups, these participants had difficulty in offering a precise definition of police corruption. Involvement with drugs and drug trafficking, as well as the receipt of bribes and gratuities, were certainly seen as corrupt activities. Some debate surrounded the question of free coffee and/or doughnuts as corrupt activity.

The members of the Policewomen's Endowment Association Focus Group were no less able to offer a clear operational definition of corruption than were previous groups. In general, they felt that the theft of anything of value, the use of police powers or authority to realize a personal gain, or the commission of an illegal act can be construed as corruption. They did state, though, that a "free cup of coffee" is acceptable so long as no expectations of preferential treatment accompany it. The PEA Focus Group members were also of the opinion that drug abuse by a member is likely to lead to further corruption.

(41).

ISSUE # 5 Integrity Testing

Random and targeted integrity tests were discussed with each group. Questions were geared to determine if integrity tests were perceived as reasonable or unreasonable. The Department's right to conduct tests and the level of intrusion was also discussed with each group.

A.  Targeted Tests.  Targeted integrity tests were widely accepted by each group as a legitimate investigative tool. Participants were supportive of "sting" operations designed to catch individuals who the Department "reasonably suspects" to be involved in corrupt activities.  A few members expressed concern about being "in the wrong place" when a targeted individual was tested and questioned whether they would be subjected to sweeping disciplinary action for minor violations (SCAN [Stop Corrupt Activities Now, an aggressive anti-corruption program that resulted in numerous Command Disciplines for minor administrative infractions] activities were cited).  Other participants felt that if an entire precinct or command were targeted many "good" Police Officers would be subjected to disciplinary action even if they were not involved in corrupt activity.

There was some concern about being present during a "test", observing a violation and not reporting the violation to the Internal Affairs Bureau.  Some officers expressed great reluctance to report deficiencies, even serious ones (this topic will be discussed at greater length in Issue #6).  There were some officers who complained that integrity tests made Police Officers suspicious of each other and hindered them in the performance of their duty, while other officers viewed integrity tests as a method of keeping everyone "on their toes".  After discussing several different tests each group favored an increase in targeted testing to catch those individuals who engaged in criminal conduct.

B.  Random Tests - Participants were split on their opinions of random integrity tests.  The majority opinion was favorable with officers relaying numerous personal and second hand tales of Internal Affairs Bureau tests (many reported tests are not substantiated in Department records).  These officers felt that random tests would deter some members of the service from ignoring Department procedures and taking short cuts.  Random tests however, were not considered to be a deterrent for hard-core corrupt cops.

The minority opinion revolved around the issue of lack of trust.  These participants felt that random tests questioned

(42)

their integrity and were therefore insulting. Some members expressed concern at being "entrapped" by random tests while others complained of being taken off patrol to process false calls for service. Even officers expressing the minority opinion concluded that random tests might be necessary to keep some officers honest and most agreed that continued testing is a "necessary evil".

Virtually all of the Captains agreed that the Department should pursue some form of random and directed integrity testing, but feelings were mixed regarding the advisability of a tangible reward system for those members who pass such random tests. They were less opposed to including mention of having passed an integrity test in an officer's Confidential Personnel Index (CPI) file, or a letter to that effect in the officer's personnel folder.

Members of the Guardians Focus Group were also surveyed regarding their opinions of the role of integrity tests in the Department's overall anti-corruption strategy. The participants agreed that targeted tests used to investigate specific allegations of corruption are useful and appropriate. Only two (2) participants approved of random tests, with the remainder objecting on the grounds that such tests were insulting and a waste of time. All participants related concerns that both random and targeted integrity tests may be used to unfairly target minority members.

Members of the Policewomen's Endowment Association Focus Group stated that integrity tests are a positive and useful strategy for the Department to pursue, so long as the tests do not focus on minor misconduct and petty issues. They compared the need for integrity tests with the need for Random Dole Testing, asserting that they are necessary and worthwhile, and participants stated that they would not be insulted if they learned that they had been the subject of a random or directed integrity test. The participants raised the notion that some members may appreciate knowing that they had been tested, if such notification takes the form of a "pat on the back." They indicated a belief that officers will perform better if the Department shows them respect and rewards them for proper performance of their duties, and they believed that the favorable results of random integrity tests should be placed in members' CPI files in order to offset some of the predominately negative data which currently comprises those files. The members of this Focus Group also recommended that the Internal Affairs Bureau track those individuals who make chronic corruption complaints against officers.

(43)

ISSUE # 6  Reporting Corruption

Within any organization, occupation or profession, the
individual ethical decision whether or not to officially report
misconduct or corruption is constrained by a variety of
factors, including the potential for social ostracism, personal
reluctance to breach organizational or cultural norms against
disclosure, and in some cases, fear for one's personal safety.
In the subculture of policing, these contraints may be
magnified by its members' high need for group identity and
affiliation, by the strength of the culture's disclosure norms,
and by the inherent dangers of police work which create a
compelling need for the support and trust of one's fellow
officers. These and other factors in the police occupational
culture, taken as a whole, are frequently and generically
referred to in the common vernacular as "the blue wall of
silence." This term is typically used in a disparaging manner,
especially by those critics who lack a firm understanding of
the forces and pressures which create and shape it, as well as
of its extent and dimensions. As was evidenced by the comments
of Focus Group participants, the "blue wall" is not an entirely
insurmountable or monolithic impediment to the disclosure of
organizational deviance, but rather it has many intricate
cracks and gaps.

The consensus of opinion in most of the Focus Groups was
that officers are highly reluctant to report acts of corruption
or misconduct. In the more egregious cases, for example an
officer engaged in stealing or selling drugs, most participants
related that if they would report these instances they would
only do so anonymously. One (1) group, (PBA delegates)
however, stated somewhat anomalously that they would not
hesitate to identify themselves in reporting a rogue officer
for "serious" corruption – a cop who sells drugs, they said,
"is a perp, not a cop, and deserves to be collared."
Interestingly, several participants stated that if they
observed such criminality they would make an arrest themselves
rather than notify the Internal Affairs Bureau, and that by
taking this action they would encounter less risk of ostracism
than if their anonymous report were somehow made public
knowledge. Within the police culture, it appears that the
cloak of anonymity connotes venality and deceit, two
(2)attributes which are anathema to the culture. Officers who
are "up front" in their actions may be less likely to incur the
wrath of others, or may encounter a lesser degree of ostracism.
In less serious instances, though (for example, free meals),

(44)

participants stated that by identifying themselves they ran a risk of ostracism and in some cases reprisals from other officers. Interestingly, the project staff noted that those officers who stated most vocally that the prospect of exposure would not deter them from reporting corruption or from taking individual action, concurrently appeared to be the most self-confident of the participants, and those with the greatest status in their groups. If the project staff's perception is accurate, and if these high status officers can be encouraged to speak out on corruption, significant inroads can be made in terms of shaping the occupational cultures' prevailing attitudes.

Extremely serious allegations including drugs and weapons were not viewed differently by most of the participants. Members were consistent in their reluctance to officially report these transgressions. Officers were of the opinion that the discovery and the official reporting of criminal allegations and serious misconduct would not elevate them in the eyes of their peers. These officers believed they would be perceived as "rats", not to be trusted. The consensus was that if an individual reported serious matters they would likely report minor infractions as well. The fear of being labeled a "rat" and subsequently divorced from the police culture has a seemingly powerful, negative impact upon reporting corruption.

Physical fear surfaced several times during the discussion on reporting corruption. There were numerous references made about rogue Police Officers (Michael Dowd in particular) having contacts with violent drug gangs and other organized crime figures and having access to confidential and personal information. It is this combination that caused concern among many of the officers who raised this point. Some officers were not necessarily concerned with their own safety, but they were concerned for the well being of their family.

The Focus Group of Patrol Sergeants were split on their responses to report corruption. Half of the group indicated they would report corruption (criminal acts or serious misconduct) while the other half of the group indicated they would only report corruption anonymously. It is interesting to point out that Patrol Sergeants share the Police Officers definition of corruption (see Issue # 4).

Participants also spoke of the fact that the Department, and in particular, the Internal Affairs Bureau, frustrate them from being as honest as they would like to be. If they fail to

(45)

report corruption, or if corruption occurs around them, it is not because they approve of it or are ambivalent to it. Rather, the potential costs of "going public", even in regard to egregious offenses, are too high. They are afraid of being seen as having cast their lot with the Internal Affairs Bureau, an insidious enemy which lacks credibility and which treats even the most honest officers unfairly and with suspicion.

Participants related their suspicions of the Internal Affairs Bureau's processes to ensure confidentiality – several suggested that members of the Internal Affairs Bureau would not be averse to "burning" an officer who made a confidential report. At least four (4) of the groups queried as to the integrity of the Internal Affair Bureau's Action Desk and the true anonymity of a caller's identity expressed skepticism. They believed that the modern technologies of "Caller ID" and voice identification could or would be used to determine a caller's identity. Most of the participants were unfamiliar with the Department's corruption hot line – 212-CORRUPT (or the new 1-800-PRIDE-PD). Participants suggested that the Department initiate an aggressive information campaign to publicize and promote the new 1-800-PRIDE-PD number, and to assure the public as well as officers that Caller Identification technology was not being used. Several participants favored an on-going precinct dialogue program with members of the Internal Affairs Bureau as a means to sensitize officers from both groups to the objectives and goals of the other.

Other participants suggested the strong need for the Internal Affairs Bureau to change its image and its methods of operation. In particular, they vocally criticized the Internal Affairs Bureau custom of issuing "no hats" and "white socks" complaints, characterizing this practice as "playing a numbers game" at the expense of hard working honest officers.

The Internal Affairs Bureau has been associated with a willingness to close out serious allegations either as "Unsubstantiated" or as "Other Misconduct Noted" through issuance of a Command Discipline for minor administrative infractions. Officers are concerned that these notations remain on their Central Personnel Index file and may be used to unfairly deny them detail assignments or promotions. Some characterized "Unsubstantiated" case closures as evidence of ineffective Internal Affairs Bureau investigators and of attempts to bolster performance indicators, even when a more complete investigation might result in exoneration. Although

(46)

project staff explained that administrative violation
complaints are no longer issued by the Internal Affairs Bureau,
many participants remained skeptical. They will believe it,
they said, "when they see it."

It was evident that trust plays a pivotal role in an
officers' decision to report corruption. Official and
anonymous reporting appears to be directly correlated to the
level of trust an individual has in the Internal Affairs Bureau
and the confidentiality of the reporting system.

Notwithstanding this essential caveat, two (2) frequent
and enduring features of the police occupational culture which
have frequently been noted in connection with corruption are
loyalty and secrecy. The etiology of these features are
extremely complex, and their dimension and boundaries can again
be expected to vary over time and in regard to specific
circumstances. Moreover, the larger culture outside the police
agency provides support for loyalty norms among peers in any
group, and the larger culture's antipathy toward informers and
"rats" has also been imported into the occupational culture,
where the realities of police work create a crucible in which
loyalty and secrecy norms are amplified and expanded. Loyalty
and secrecy norms in the police occupational culture derive
from several sources, including the close physical proximity in
which Police Officers frequently work for extended periods, the
real and perceived dangers of police work, and the inevitable
social isolation and alienation engendered by assuming the
police role in society.

These and other forces conspire to create a strong sense
of mutual interdependence and affinity among officers, and to
facilitate the creation of a powerful loyalty ethic. In
itself, the loyalty ethic is a highly functional and beneficial
attribute which usually contributes significantly to the
organization's pursuit of legitimate goals and objectives.
Taken to the extreme, however, this loyalty to fellow officers
can conflict with and in some cases overwhelm the officer's
sense of loyalty to the organization and to the rule of law.
In the extreme, this misplaced loyalty may induce some officers
to protect other deviant officers from official discovery.
When conflict occurs between loyalty to the organization and
loyalty to fellow officers, the informal subcultural ethic may
prevail, and some officers may close ranks behind the
proverbial "blue wall of silence".

(47)

It should be emphasized that the prevalence and scope of the "blue wall" of secrecy are frequently overstated by casual observers of police culture, particularly by those whose critical orientation or agenda overpowers their objectivity. These critics are usually either ignorant of or unconcerned with the positive and functional aspects of loyalty and its contribution to the attainment of legitimate goals. Too frequently perhaps, unrestrained or draconian efforts to destroy the occasional emergence of excessive secrecy has unforeseen deleterious impact upon the loyalty ethic, and ultimately both the organization and the public suffers the effects. A more cogent strategy is for the police executive to carefully monitor and manage the conditions under which secrecy can flourish, concomitantly nurturing the positive elements of group and organizational loyalty.

The Integrity Control Officers who participated in the Focus Group were very suprised that officers in previous Focus Groups were reluctant to officially report corruption, even when the offenses involved were of the order of those committed by Michael Dowd. They stated that they would not hesitate to officially report such behavior if they became aware of it, and they seemed to genuinely believe that most officers in their commands would also report such corruption without hesitation. The project staff surmises that the ICO's avowed willingness to take action in such cases is a function of their rank and position, and its attendant role definitions: the supervisory and ICO roles encompass and demand the reporting of corruption, and no expectations of complicity or silence is placed upon them. While both the task environment of the patrol officer and the dynamics of the specific "patrol officer culture" operate to encourage solidarity and to discourage officers from scrutinizing too closely the behavior of their peers, these features are not a part of the supervisory role. Supervisors, particularly ICO's, are not expected by their peers or by their subordinates to remain silent in the face of misconduct or corruption. Moreover, their functional exclusion from the specific "patrol officer culture" tends to immunize them from the subtle or overt sanctions that culture might impose, simply stated, supervisors and ICO's are expected to report misconduct and corruption, and they have little to lose by doing do.

The Lieutenants participating in this Focus Group stated that they would have no problem reporting an officer whose corrupt activities were of the type evident in the Michael Dowd case, and they were unconcerned with any repercussions which might result from reporting such an officer. Again, the

(48)

project team members attribute this lack of concern with repercussions or social stigma to the Lieutenants' supervisory role. Unlike those steeped in the patrol officer culture, the supervisory role entails no expectation of silence or complicity. On the contrary, their own social reference group as well as the patrol officer culture expects them to report any corruption or misconduct coming to their attention, almost without regard to the severity or extent of that misconduct or corruption.

It is important to emphasize that the participating Lieutenants believed quite strongly that the average officers would have little difficulty reporting corrupt acts committed by peers. The Lieutenants, like the Integrity Control Officers' and Sergeants' groups which preceded them, were quite suprised and dismayed when the project staff informed them that Police Officers convey a great reluctance to report corruption. Several important implications may be drawn from this misperception among supervisory personnel.

It is alarmingly apparent that our supervisory personnel are dreadfully out of touch with the opinions and attitudes of those they supervise, and it is unlikely that integrity is the only sphere in which such misapprehensions occur. Given the significance and gravity of integrity and corruption prevention within the agency, though, it should be quite reasonable to expect that superior officers would have an accurate perception of subordinates attitudes and beliefs in this area if they regularly discussed integrity matters with their subordinates. At least three (3) potential inferences can be drawn from the disparity between patrol officers' self-reported attitudes and their supervisors' perceptions of those attitudes.

First, we might infer that supervisors do not regularly engage in dialogue with their subordinates regarding integrity and corruption, either from a lack of concern or because they do not appreciate the gravity of the issue or its consequences. Implicit in this proposition is the viable assumption that patrol officers are culturally constrained not to raise integrity-related issues, while supervisors are complacent about it; the Focus Group findings tend to support the hypothesis that neither group feels compelled to raise or discuss the matter openly and honestly. This supervisory complacency may be explained as an artifact of the supervisors' tenure in the department, particularly if we are inclined to accept the view that the types and the extent of corruption

(49)

existing today were less prevalent when older supervisors were Police Officers. Many of today's Lieutenants and senior Sergeants were, in fact, products of the era immediately post-Knapp, when drug-related corruption was much less prominent and when tremendous attention was paid to shielding officers from exposure to corruption. It is therefore quite logical to expect that the cadre of officers who entered the Department during and after the era of Knapp reforms would have a markedly different view of the potential extent of corruption than those who entered fifteen (15) or twenty (20) years later.

In the alternative, we might surmise that such dialogue does occur, but that patrol officers actively mislead their supervisors into believing that they would report acts of corruption or serious misconduct coming to their attention. This unlikely scenario assumes, without credible evidence, that a pervasive form of conspiracy to mislead supervisors exists among patrol officers.

Finally, we might infer that when such dialogue occurs, it is of a superficial and pro forma nature, and that little real attention is paid to the substantive issues involved. This proposition, which is supported by informal observations as well as by an intuitive understanding of the dynamics of the supervisor-subordinate dialogue process, is highly plausible and may partially derive from and work in concert with the first scenario presented above. Despite the fact that the Department mandates annual integrity interviews and presents other passive reminders of the need for integrity, a perception prevails among many officers of all ranks that the agency became lax and did not pursue corruption or promote integrity as aggressively in the several years prior to the Mollen Commission as it did earlier.

RECOMMENDATION: It is highly recommended that the Department immediately adopt aggressive measures to dispel the prevalent attitude among senior supervisory personnel that patrol officers as a group are not averse to reporting corruption. Similarly, it is recommended that the Department aggressively pursue efforts to increase and enhance dialogue concerning corruption, and that such dialogue involve members of the service of all ranks. Such a program would have several beneficial effects, including the dissipation of misconceptions and misperceptions. Moreover, an increased awareness and realistic understanding of the corruption hazards faced by

(50)

officers may provide personnel with the prophylactic capacity to avoid them. Antecedent discussions of corruption and ethical behavior, in which officers project themselves into ethically problematic situations and consider the consequences of their actions, can be expected to act as a behavioral check when and if officers actually encounter those situations.

Slightly more than half the Captains believed that the average officer would turn in another officer whose corruption matched that of Michael Dowd. Of those, the Captains overwhelmingly felt that the officers would do so only with the assurance of anonymity. This perception, it should be noted, differs markedly from the perceptions of Sergeants and Lieutenants, who believed quite strongly that most officers would make the requisite notifications. The Captains stated that officers who turned in a "Michael Dowd" could have no expectation of support from their fellow officers, and would in fact be ostracized; this perception was more in line with the reported beliefs of Police Officer participants.

The Captains believed that the Department's system to encourage reporting of corruption could be strengthened if a totally anonymous system were devised and promulgated. They believe that the former Internal Affair Division's reputation for investigating minor misconduct ("white socks") while ignoring serious misconduct and corruption has negatively impacted the Internal Affair Bureau's credibility and capacity to gain the trust of officers, noting that this perception must be changed before substantive long-term gains can be made. In their opinion, the Internal Affairs Bureau should deal solely with cases of serious misconduct and corruption. It is critical to ensure that trust be established, and that the identity of officers who report corruption be kept absolutely secret, but those who do come forward should be rewarded. They suggested that the Internal Affairs Bureau change its image and attempt to gain trust through the honest and objective dissemination of information, and that this training be conducted by credible individuals. They also stated that an officer's Confidential Personnel Index (CPI) file should contain positive information in addition to the largely negative data currently retained there. The Captains also believed quite strongly that precinct Integrity Control Officers and commanders should, when possible and practicable, be made aware of on-going IAB investigations within their commands, and that IAB should utilize the knowledge and expertise of commanders and ICO's to a fuller extent.

(51)

Members of the Guardians Association Focus Group were generally in agreement with the attitudes and opinions expressed by other groups concerning the reporting of corruption. The participants stated that the reporting of corruption can be encouraged when the prospect of retribution from co-workers and supervisors is diminished. They debated the efficacy of a reward system to encourage the reporting of corruption, but the majority of participants stated that the Department is "sweeping corruption under the rug" by not pursuing it aggressively. Still, African-American officers are reluctant to come forward, although the participants stated that they were not part of the "blue fraternity."

In contrast to most of the previous and predominantly male Focus Groups, the members of the Policewomen's Endowment Association Focus Group unanimously stated that as individuals they would have no problem "turning in" an officer whose misconduct approached that of Michael Dowd. They did acknowledge, though, that other women might be reluctant to come forward with information, for fear that they would be labelled a "rat" and lose the support of their male peers. In light of the barriers they face, particularly with regard to their perceived credibility about male officers, women officers must expend significant effort in a process of "proving themselves," and some may be constrained by the fear of jeopardizing what credibility and status they have gained. Moreover, the group members noted that by virtue of their gender, female officers are prone to "labelling" for acts or omissions which they have not committed. As a result, they may be more circumspect about taking the risk of coming forward to report corruption.

(52)


ISSUE # 7 Supervisory Training Issues

The first-line supervisor plays an integral part in
detecting and preventing corruption. In recognition of the
important role Sergeants play in the Department's
anti-corruption programs a series of questions were presented
to the Focus Group of Sergeants in an effort to obtain
information concerning how well individuals are prepared for
the challenges of their new position. Participants were also
queried to determine the knowledge and skills they need to
perform their duties.

The Sergeants were very reproachful about supervisory
training in general and the Basic Management Orientation Course
(BMOC) in particular. The BMOC course was viewed as a Patrol
Guide refresher course designed to rehash the basic "do's" and
don'ts" of police procedure. The participants felt little
effort was made to impart leadership skills. Many Sergeants
suggested that guest speakers should speak on issues related to
the effective management of personnel and other resources and
not give them a "canned speech".

Police Academy instructors, especially those conducting
BMOC and Centralized Management Training Courses were
criticized for their teaching abilities and their lack of
credibility. During a recent training session one of the Focus
Group members had occasion to question the information being
presented. During the exchange the instructor is reported to
have justified his comments by stating that he "hasn't been on
patrol in a long time". Other instructors have admitted to
spending "very little time on patrol". The perceived lack of
credibility and training skills of Police Academy instructors
has had a detrimental effect on supervisory training.

During the discussion of this issue many supervisors
complained about an unmanageable span of control. Participants
stated that many times they are the only supervisor on patrol,
covering the entire precinct. Even during those times that
they are the sole Patrol Supervisor, they are routinely
dispatched to handle jobs. Group members felt they were not
given the opportunity to properly supervise their officers, yet
were held to a high standard of accountability.

(53)

It is interesting to note that group members chided their younger colleagues for becoming overly friendly with subordinates. Participants told of "car pools", and "drinking buddies" that included supervisors and the members of their squads. Sergeants felt their position as supervisors were jeopardized because of the actions of their peers.

The Lieutenants' Focus Group identified several training issues which the Department should address. The Lieutenants stated that the Basic Management Orientation Course (BMOC) and the Lieutenants' Orientation Course should be more realistic and "hands-on," particularly with regard to the deployment of personnel, conducting roll call, and handling desk duties. Such training, they stated, should not be conveyed by lecture in a classroom setting, but rather the trainees should be afforded the opportunity to practice these skills in a realistic and practical environment.

Specialized positions for Lieutenants – i.e., ICO and Administrative Lieutenant positions – require specialized training in preparation of forms, the proper flow of paperwork, etc. Such specialized training is not currently being provided, and Lieutenants newly assigned to these positions lack the resources to perform their duties adequately. The participants also decried the prevalent practice of assigning newly promoted Lieutenants to the ICO and Administrative Lieutenant positions, a practice which occur because these are the least desirable and least rewarding for Lieutenants in patrol commands.

The PEA group also believed that supervisors (especially Sergeants) are afraid to make decisions, and that supervisors too frequently distrust the officers who work for them; in general, they believed that the overall quality of supervision has declined substantially in recent years. They characterized the Police Academy training as inadequate and impractical, and they called for a return to a more "quasi-military" training style. In addition, the participants questioned the competency and experience of many Police Academy staff members.

(54)

Issue # 8 Corruption Training

In response to an issue that was identified during the
initial rounds of Focus Groups, project staff sought to probe
the perception of newly hired Police Officers concerning
integrity/corruption training being implemented.  Questions
were presented to evoke discussion of how well Police Academy
corruption training adequately prepared young officers for the
pitfalls they might encounter while on patrol.

Both groups of officers assigned to Field Training Units
believed the Academy training was unrealistic and repetitive.
Numerous officers were critical of a series of integrity films
being presented at the Academy (believed to be the "Erosion
Series" tapes).  The group members felt that the depiction of
an "honest cop" who obtained a discount for a meal early in the
film and shortly thereafter degenerated into a "criminal"
engaged in "corruption" and being led away in handcuffs, was
unrealistic.  In addition, officers felt the training program
could be shortened and cited that instructors repeated the same
information over and over again.  Moreover, members of the
Field Training Unit Focus Groups related that the examples and
scenarios presented for discussion were either overly
simplistic or extreme.  Some of the behaviors which instructors
characterized as corrupt were, in view of participants, more
properly characterized as minor misconduct.  As a result, the
distinction between corruption and minor breaches of
administrative rules became blurred for some students, leading
to some confusion over their own duties as well as the role of
the Internal Affairs Bureau. One participant, for example,
stated that an instructor related a case in which an officer
used a Police Department dumpster to dispose of personal trash,
and that this was characterized as corruption.

In conducting the discussion it became evident that
approximately half of the participants were instructed by
members of the Internal Affairs Bureau Training Unit while the
other half were instructed by Police Academy staff.  A recent
change in policy regarding corruption/integrity training has
been implemented.  Police Academy staff using Internal Affairs
Bureau Training Unit lesson plans and instructor guides is
currently presenting this block of training.

Academy instructors were perceived as not taking the
course material seriously. Illustrations of instructors who
read from their notes, could not (or would not) answer
questions, an instructor whose whole presentation was to place

(55)

and remove a series of overhead projector slides, a gym
instructor pressed into an academic situation who was
obviously nervous and unsure of himself, an instructor who
"rushed" through the material because the Company was behind in
"other" academic matters were given and confirmed by the group
members. "Let's get through this" and "We have to cover this"
were common phrases instructors were reported to have used
while introducing the topic to the Company. Academy staff were
reported to have advised recruits to "always have a story" and
to "C.Y.A.". Participants also relayed they were repeatedly
admonished to stay away from the "hairbags who will only get
you into trouble." The advice reported to be given to the
Field Training Unit groups was supported by the recruit Focus
Groups who added that many times academy instructors prefaced
their remarks with "for Academy purposes" leading them to
believe there is a chasm between theory (being taught at the
Police Academy) and reality (the street).

Internal Affair Bureau instructors on the other hand were
viewed more positively. The members felt the instructors were
sincere and took the issue of corruption more seriously than
Academy instructors. It appears the presence of the Internal
Affairs Bureau gave more importance to the lesson and more
credibility to the questions being answered.

(56)

ISSUE # 9 Ancillary Issues

In the course of conducting the Focus Group sessions, a number of issues arose which, while not directly related to the project's defined goals and objectives, are nevertheless worth mentioning.

One such issue concerned the Department's policy on wearing hats. When a participant would raise this perennial issue, a majority of the group members inevitably agreed that altogether too much emphasis was put on enforcement of this rule, and that this emphasis resulted in a waste of Department time and resources. They characterized the Department's posture regarding hats as draconian and petty, noting that a supervisor's time and effort would be more effectively spent addressing more substantive issues. Focus Group members recommended that the regulation hat should be optional equipment, at least during the summer months, and that officers be given some discretion in choosing when and under what circumstances to wear it.

Another concern was a widespread perception that the Department is overly responsive to political pressures and media influence. They believed quite strongly that the Department and its officers should be independent of such pressures, and that its actions and policies should be directed toward best serving the needs of the entire citizenry rather than the needs and whims of special interest groups and political officials. There exists a particularly strong feeling that the agency's policies are increasingly shaped by external political agendas, rather than by the true needs of communities, and these sentiments breed tremendous resentment and cynicism. Repeatedly, participants from varied groups referred to special "Operation All Out" posts as "Dinkins Re-Election Posts". They saw political influence upon the Department as pervasive, counterproductive, and contrary to the ideals that they and the Department espouse, and several participants equated such yielding with corruption.

Internal political influence was also a frequent topic among the various Focus Groups. Participants are of the opinion that merit and seniority are not as influential in determining choice assignments as the proverbial "hook" is. The "who you know, not what you know" belief was prevalent during each group discussion. Many officers expressed frustration at perceived favoritism in the selection of individuals for discretionary

(57)

promotions and special assignments. A clearly expressed
cynicism about Department-wide opportunities was quite
apparent.

One group in particular (group #12, from Brooklyn North)
believed that their Patrol Borough is considered a "dumping
ground" within the agency. They stated that they are regarded
by officers from other Boroughs, as well as by the Department's
executive cadre, as a collection of misfits, incompetents,
malingerers, and undesirables inhabiting a series of
"shithouses".  This perception coexists with, and perhaps has
created, a strong group identity marked by an undercurrent of
perverse pride in their deviant status.  Subtle evidence also
emerged that at times these officers act out their deviant
status for the benefit of other officers, often in a bid to
demonstrate affinity for the group identity.  Concurrently,
they speak of the fact that Brooklyn North cops are more
courageous than officers in other Boroughs, and that they deal
with a level of crime and disorder which other cops could not
tolerate.  This group reiterated their long-standing belief
that Brooklyn North Precincts receive less external supervision
than precincts in other Boroughs, because ranking officials are
afraid to come there.  As in the past, this consciousness
translates to a view that they are somewhat insulated from the
scrutiny of Internal Affairs officers, whom they denigrate as
timid and apprehensive officers who are unwilling to expose
themselves to the dangers of working in Brooklyn North.

The officers from Brooklyn North also believe that their
Patrol Borough should be considered a training ground for new
members of the service, rather than a repository of rejection.
This perception was quite strong within the group, and members
provided several potent anecdotes to describe the bases of
their assertions - at detail assignments, for example, they
contend that they are regularly assigned to the least desirable
posts, as far as possible from the public eye.  It is highly
recommended that positive action be quickly taken to dispel
this alarming set of perceptions and self-identities.

Focus Group participants believed that the Department's
recruitment and hiring practices and policies have declined in
recent years.  Many of the participants articulated a
connection between this decline in hiring standards and
corruption, predicting that the continued decline will
inevitably lead to the emergence of widespread corruption.  The
fact that the Department has hired individuals arrested for
felony crimes, which were pleaded to misdemeanor convictions,

(58)

alarmed them greatly.   They see these individuals as having  a
proven criminal mindset,  and they are similarly convinced that
many  individuals  who have become Police Officers  are  former
criminals  who simply were not identified,  either by  official
arrest  or by the Department's applicant  screening  processes.
They  believe that the Department should have the authority  to
flatly  turn  down  applicants whose character is  in  any  way
suspect  or who have been the subject of  police  intervention.
Several participants, it should be noted, claimed that they had
personally  arrested  felons who are now Police  Officers,  and
that  as a matter of policy Applicant Processing  Division  had
not  given  sufficient consideration to  their  recommendation
against hiring.

    The  Lieutenants  concurred  with  virtually  all  of  the
previous Focus Groups (with the exception of recruit  officers)
that entry-level standards have fallen within the agency in the
past several years.  Again, they raised the issue of inadequate
background  investigations  and  the  Department's  policy   of
permitting applicants with misdemeanor convictions for  serious
felony charges to be hired.   Overall,  they see the calibre of
younger  officers to be declining, and they find  the  officers
they  supervise to be unacceptably immature.   Rookie  officers
were  described as "cry-babies" who complain incessantly  about
minor issues.   The Lieutenants see an increased need for  more
remedial training of rookies by supervisors.  Participants also
raised the issue of their contract's five (5) year  stretch-out
provision,  which  they  characterized  as  demoralizing  and
inadequate.   They  strongly  believe that  their  level   of
compensation  is  not  commensurate with  the  extent   of
accountability and responsibility they hold, and for their span
of control within patrol commands.

    The participants from the third round were critical of the
Police   Academy   facility.    Officers   complained   about
insufficient  locker-room space and bathroom/shower  facilities
that  are  often  out  of  service  or  malfunctioning.    These
officers were also skeptical of an Academy disciplinary  system
that "does nothing"  when someone is the recipient of  numerous
"star cards" and/or Command Disciplines.

    Although none of these Ancillary issues were introduced by
the project staff, the fact that they were raised repeatedly by
officers  is  telling.   Perhaps more than some  of  the  other
issues  discussed elsewhere in this report,  participants  were
exceptionally vocal and vehement in introducing and  discussing
these.  The project staff believe that these issues are closely

(59)

linked to the development of cynicism, and to feelings of
antipathy for the Department. They certainly permit officers
to question and to denigrate the overall integrity of the
Department's policies and policy makers.

A number of ancillary issues were raised by the ICO group.
They perceive an inordinately high turnover rate among ICO's,
attributing this to the fact that the Platoon Commander's
position is much more attractive, in terms of responsibility,
accountability, and flexibility, than their own. Few ICO's,
they said, would not prefer assignment as a Platoon Commander,
and they attempt to secure such assignments when vacancies
occur. As a result, they believe that ICO's are also generally
the least tenured and least experienced Lieutenants within a
precinct command.

As noted, the ICO's feel that their knowledge, skills and
abilities are under-utilized, particularly in regard to
conducting investigations and liaison with the Internal Affairs
Bureau and Borough Inspections Units. They would like to see
some sort of career path credit toward investigative
assignments, and would like the same overtime and chart day
opportunities enjoyed by Platoon Commanders. The ICO's also
claim to be under-resourced. The clerical workload they
currently carry warrants the assignment of a supervisory
assistant and a civilian clerical staff member, as well as a
dedicated computer and unmarked car. With such resources, the
ICO's believe that they can devote more time to conducting
field observations and investigations, which are currently all
but precluded.

The ICO's also complained that they are overburdened with
clerical work, to the extent that they can rarely conduct
adequate field observations of the officers in their commands.
One ICO noted that he currently bears the responsibility and
the accountability for integrity in a high crime command of
over three hundred (300) officers, and that an additional sixty
(60) officers are expected to be assigned there in February
1994. Given the fact that the ICO's also report that
Commanding Officers often assign them additional clerical tasks
and responsibilities only marginally related to their ICO
duties, their complaints concerning inadequate time and
resources to do their job appear to have some merit.
Specifically, they called for the Department to provide them
with additional staff (an assistant ICO), computers and
computer training, and a dedicated vehicle. At present, they
state that the ICO's cars are frequently borrowed by Commanders
and Executive Officers.

(60)

Several ancillary issues arose during the course of the Guardians Association Focus Group, including the perception of unfair evaluation practices which adversely impact minority officers. The participants believe that in contrast to the old system of evaluation, the recently revised evaluation process is less fair to minority officers. As in previous groups, the problem of inexperienced supervisors arose again, as did the perception that morale and discipline have declined. The participants evinced a view that it is exceedingly difficult for minority officers to get into "detail" assignments, and that this is an artifact of the systematic racism and sexism existing within the Department. The participants believe that African-American and other minority officers are treated unfairly as a result of this racist and sexist posture, which pervades the recruitment, discipline, promotion and personnel assignment systems as well as almost every aspect of the Department and its policies. The redressal process, particularly the Office of Equal Employment Opportunity, does not work for African-American officers, the participants said.

(61)

CONCLUSION

The systematic use of Focus Group methodology as a management tool for the identification of organizational problems and employee concerns, and for the identification of cogent strategies to remedy these problems and concerns, provides executives with an appropriate and viable vehicle for implementing change. Focus Groups would seem to be a particularly effective management tool within the field of policing, since the dimensions and character of the police occupational culture impact tremendously upon the achievement of organizational goals and objectives. Proficient police executives are well aware of the culture's capacity to either facilitate or inhibit change, and of the need to manage and direct the culture as carefully as they would any other resource.

By providing opportunities for officers to participate in agency management through membership in Focus Groups or advisory panels, police executives concurrently encourage officers to assume "ownership" of the agency and of the changes taking place within it. Focus Groups engender cooperation in the process of implementing change, and they enhance the overall level of trust and unanimity within the organization. In this regard, Focus Groups constitute a far more effective modality for implementing change than mere executive fiat. Perhaps the most essential factors in the ultimate success or failure of those changes, however, are the chief executive's commitment to the process and to the underlying assumptions that process makes about the capacities and capabilities of employees to identify and generate solutions for the critical issues facing the agency. Focus Groups and quality circles inevitably entail the sharing of power and responsibility, but do not allay the executive's accountability for the changes which occur.

Perhaps the most important information to emerge from this set of Focus Groups is the fact that Police Officers seem genuinely interested in wanting corruption to be eliminated. They articulate very little tolerance for corruption or serious misconduct in their midst, and many speak openly to the pride they still feel in being Police Officers. They seem to believe wholeheartedly in the notion that they are fundamentally different from the public they police. They also speak of their embarrassment when officers such as Michael Dowd are exposed, and to their anger at him and at others who would tarnish their image. Their anger is evidence of the culture's

(62)

vitality  and of the high positive regard these  officers  have
for themselves and for their peers.

The  Focus Group process holds great promise as one of  an
array  of  tools available to police  executives  inclined  to
practice  participative management techniques.  The  process
provides  police executives with a useful and  altogether
necessary feedback mechanism,  and a means with which to assess
and measure the impact of new or proposed policy changes  among
the  work force and within the subculture.  By consulting with
employees regarding policy development,  management is afforded
ample opportunity to glean essential data which can inform  and
shape those policies, ultimately enhancing their effectiveness.

As has been demonstrated in this project,  Police Officers
and  Detectives  in this Department have a  low  tolerance  for
corrupt  behavior on the part of their peers,  a fact which  is
not   mitigated  by  their  reluctance  to  officially  report
corruption  without  full  assurance  of  confidentiality  or
anonymity.  Rather,  this finding points up several  areas  for
policy refinement,  and perhaps for major revision of  existing
policies.  Specifically,  the officers who participated in  the
Focus  Groups articulated a pressing need as well as  an  acute
desire  for policies and procedures which will permit  them  to
report corruption without the fear of consequence,  either from
the  agency's  hierarchy or from their peers.  To  allay  their
current  high level of cynicism and distrust for management  in
general and the internal investigative function in  particular,
they  must  first be convinced that the Department is  "on  the
level".   Police  Officers,  whose  working  environment  and
subculture  make them particularly attuned  to  deception  and
dissembly, must be convinced that management decisions are made
primarily  on  the  basis of fairness and  equity,  and  that
political  and  parochial issues only  minimally  impact  those
decisions.

In a heuristic sense,  the present Focus Group project has
also  identified a need for continued study and for  additional
Focus  Group sessions on these and other topics.  The value  of
these  additional sessions might well be augmented through  the
administration  of  various  survey  instruments  (e.g.,  the
Niederhoffer  Cynicism Scale,  the Fishman-McCormack  Scale  of
Police   Probity  and  Improbity,  the  Buzawa  Police  Job
Satisfaction  Questionnaire) to Focus Group members as well  as
to  other operational officers. Once established,  an  empirical
baseline for the Department and for various sub-samples of the

(63)

agency can be carefully monitored to measure the extent and
direction of attitude changes in response to policy
modifications. Future Focus Groups might also be comprised of
previous participants, reunited to discuss the changes they
have seen as a result of the project.

As police attitudes begin and continue to change,
participative management concepts demand that executives stay
abreast of the changes and their nuances. The management of
police culture, perhaps to greater extent than other resources,
requires consistent accurate feedback and constant attention on
the part of concerned executives who are committed to positive
change.

(64)

ATTACHMENT "A"

SUMMARY OF RECOMMENDATIONS FROM FOCUS GROUP PARTICIPANTS:

ISSUE # 1

- An increase in the years of service requirement for promotion so that Sergeants can gain some practical street experience.

- Elimination of the present FTU system in favor of a training scheme modeled after the NSU's.

- An alternative to the steady tour concept. A "scooter chart" available on a voluntary basis.

ISSUE # 2

- Department values need to be integrated into training to heighten awareness.

- A clear definition of corruption and ethical issues needs to be reviewed.

ISSUE # 3

- Random and for cause drug screening tests should be increased.

- Department policy on drug use by members should be reviewed and clarified.

- Training tape to inform all members on policies and procedures.

ISSUE # 4

- A clear policy statement (Board of Ethics Ruling) concerning free or discounted meals needs to be incorporated into training.

ISSUE # 5

- Integrity tests (targeted and random) should be increased.

(65)

ISSUE # 6

— Initiation of an aggressive information campaign to publicize and promote the new 1-800-PRIDE-PD number, and to assure the public as well as officers that Caller Identification technology is not being used.

— An on-going precinct dialogue program with members of the Internal Affairs Bureau as a means to sensitize officers from both groups to the objectives and goals of the other.

— The Internal Affairs Bureau change its image and its methods of operation.

— Changing the Internal Affairs Bureau real or perceived policy of permitting investigators to close out serious allegations either as "Unsubstantiated" or as "Other Misconduct Noted" through issuance of Command Disciplines for administrative infractions.

ISSUE # 7

— Supervisory training should emphasize leadership and management skills.

— Revise first line supervisory training.

ISSUE # 8

— The Internal Affairs Bureau should be involved in corruption training.

— Police Academy instructors need more training in corruption matters.

ISSUE # 9

— The regulation hat should be optional equipment, at least during the summer months, and that officers be given some discretion in choosing when and under what circumstances to wear it.

— Brooklyn North participants believe that their Patrol Borough should be considered a training ground for new members of the service, rather than a "dumping ground." This sentiment was quite strong within the group. Positive action should be quickly taken to dispel this set of perceptions and self-identities.

(66)

ATTACHMENT "B"

FOCUS GROUP OUTLINE

Subject                                    Estimated time

I    Introduction
            A — What is a Focus Group?
            B — Historical use of Focus Groups
               (quality circles — Ad Hoc Task Force)
            C — Random Selection Process
            D — Purpose of the Focus Group      10 minutes

II   Icebreaker
            A — Participant introduction
               (first name, brief job history)
            B — How has the job changed over the last
               few years?                       15 minutes

III  Department Values
            A — Awareness of Value Statement
            B — Are the Department Values Reasonable?
               (Unreasonable)   Why?
            C — Is it reasonable to hold Police Officers to
               a different standard?
               Why?  Why not?                   20 minutes

IV   Department Drug Testing Procedures
            A — Explanation of Random and "For Cause" tests
            B — Reasonableness of "For Cause Testing"
            C — Reasonableness of "Random Testing"
            D — Department Policy on positive findings
                                                20 minutes

V    Corruption
            A — Define corruption
            B — What effect does corruption have on honest
               Police Officers?
            C — Do minor violations lead to more serious
               violations? ("Slippery Slope" theory)
            D — What can be done to weed out corruption?
                                                20 minutes

VI   The Blue Wall of Silence
            A — Does it exist? Benefits and Negatives
            B — What will the average Police Officer do when
               corruption is observed?

(67)

```
        C - What can be done to encourage honest Police
            Officers to report corruption?
        D - What happens when an honest Police Officer
            reports corruption?              20 minutes

VII   Integrity Tests
        A - Targeted tests  - Reasonable? Unreasonable?
        B - Random Tests - Reasonable? Unreasonable?
                                            20 minutes

VIII  Supervisory Training Issues
        A - Quality of training
        B - Training needs
        C - Supervisory responsibilities    20 minutes

IX    Integrity Training
        A - Quality of training
        B - Instructors
        C - Training needs                  20 minutes

X     Ancillary Issues
        A - Topics suggested by Focus Groups
                                            15 minutes
```