```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------------------------X
      ADRIAN SCHOOLCRAFT,
 3
                                       PLAINTIFF,
 4
                 -against-            Case No.:
 5                                    10CIV 6005(RWS)

 6    THE CITY OF NEW YORK, ET AL, DEPUTY CHIEF MICHAEL MARINO
      TAX ID 873220, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY,
 7    ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH, GERALD
      NELSON, TAX ID 912370, INDIVIDUALLY AND IN HIS OFFICIAL
 8    CAPACITY, DEPUTY INSPECTOR STEVEN MAURIELLO TAX ID 895117,
      INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, CAPTAIN THEODORE
 9    LAUTERBORN, TAX ID 897840, INDIVIDUALLY AND IN HIS OFFICIAL
      CAPACITY, LIEUTENANT WILLIAM GOUGH, TAX ID 919124,
10    INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, SERGEANT
      FREDERICK SAWYER, SHIELD NUMBER 2576, INDIVIDUALLY AND IN
11    HIS OFFICIAL CAPACITY, SERGEANT KURT DUNCAN, SHIELD 2483,
      INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, LIEUTENANT
12    CHRISTOPHER BROSCHART TAX ID 915354, INDIVIDUALLY AND IN
      HIS OFFICIAL CAPACITY, LIEUTENANT TIMOTHY CAUGHEY, TAX ID
13    885374, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, SERGEANT
      SHANTEL JAMES, SHIELD NO. 3004 AND PO'S JOHN DOE 1-50
14    INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES, JAMAICA
      HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV, INDIVIDUALLY AND
15    IN HIS OFFICIALLY CAPACITY, DR. LILIAN ALDANA-BERNIER,
      INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AND JAMAICA
16    HOSPITAL MEDICAL CENTER EMPLOYEES JOHN DOE 1-50
      INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES (THE NAME
17    JOHN DOE BEING FICTITIOUS, AS THE TRUE NAMES ARE PRESENTLY
      UNKNOWN),
18
                                       DEFENDANTS.
19    ------------------------------------------------------------X

20

21                      DATE: June 5, 2014

22                      TIME: 10:16 A.M.

23

24              (DEPOSITION OF JOSEPH FERRARA.)

25
```

JOSEPH FERRARA

1    through.

2        Q.      And you -- why were you assigned to the 81st

3    Precinct in February of 2009?

4                    MR. SMITH:  Objection to form.

5        A.      As a result of the department charges that I

6    received.

7        Q.      Were you told why you were being transferred to

8    the 81 Precinct?

9        A.      Officially, no, but I knew why because when IAB

10   -- when a member of IAB gets charges and specifications the

11   higher-ups have an option of whether they want to transfer

12   people out of Internal Affairs or keep them in Internal

13   Affairs anyway and based on my history since March or April

14   of 2007 I was chosen to be removed from Internal Affairs

15   Bureau.

16       Q.      And you said you weren't told this officially,

17   were you told this unofficially?

18       A.      Well, it's known that there's a very good

19   likelihood that if you get jammed up in IAB that you get

20   kicked out of IAB, no one comes to you and says you got

21   jammed up, so you're getting kicked out of IAB, they just

22   come down with the orders that you're being transferred.

23   So, the transfer is official, but the reason behind the

24   transfer is not vocalized.

25       Q.      And so, you said generally if you're brought up

JOSEPH FERRARA

1    with charges and specs in IAB there's a good likelihood

2    you'll be transferred?

3        A.    50/50.

4        Q.    And on what do you base that 50/50 number?

5        A.    If you're liked or not liked.

6        Q.    Let me just be a little bit more clear which is,

7    how do you -- how did you come up with that number of 50/50

8    chances you'll -- you'll stay in IAB as opposed to being

9    transferred out?

10       A.    Because I knew several people who got in trouble

11   in IAB for misusing the computer or doing various other

12   misconduct and were allowed to stay and then I knew people

13   who weren't allowed to stay who did, you know, minor things

14   of misconduct.

15       Q.    So, that 50/50 number is based on people you

16   knew?

17       A.    Yes.

18       Q.    And how many people do you know who are in IAB

19   who were jammed up?

20       A.    I don't know.  I had given you a -- a list.  So

21   those are the people that I was aware of.

22       Q.    Okay.  So, that's what you're basing this number

23   on, is that list?

24       A.    Basically that list, yeah.  I really don't

25   remember what was on that list.  I just printed it out.

JOSEPH FERRARA

1    But, yeah, basically it was on that list that I was -- you

2    know, because I think I listed on that list people who were

3    able to stay and people who were removed from Internal

4    Affairs Bureau.

5        Q.    Well, we can -- we can go to that list.  I'm

6    handing you what has already been marked as Defendants'

7    Exhibit A.  This is a document bearing Bates numbers at the

8    bottom NYC12142 through NYC12182.  Please take as much time

9    as you need to review that.

10       A.    Okay.

11                  MR. SMITH:  This is Exhibit A?

12                  MS. PUBLICKER METTHAM:  Yes.

13       A.    Okay, I have the piece of paper.

14       Q.    And it appears that you're looking at the list on

15   NYC12182?

16       A.    Yes.

17       Q.    And this is the list of individuals that you knew

18   from IAB who had gotten in trouble and on which you base

19   your opinion that people are transferred out 50 percent of

20   the time?

21       A.    Yes.

22       Q.    Okay.  We'll come back to that.

23                  Just to get the background and you received a

24   subpoena from me in this case; is that correct?

25       A.    Yes.

52

JOSEPH FERRARA

1    Q.    And in response to my subpoena you sent an

2    envelope with multiple documents and a CD; is that correct?

3    A.    Yes.

4    Q.    The -- Exhibit A that I've just handed you, is

5    that a complete list of the -- a set of the documents you

6    provided to me?

7    A.    I believe so.

8    Q.    And as I mentioned, I added numbers to the bottom

9    but they have -- this is otherwise not been edited; is that

10   correct?

11   A.    Yes.

12   Q.    Starting on the first page I just want to go

13   through that to make sure that I understand your answers.

14   Okay?

15   A.    Okay.

16   Q.    Now, on the left-hand side you've written some --

17   some handwritten notes, correct?

18   A.    Yes.

19   Q.    So, by writing 2/18/10 and 4/1/10 next to

20   paragraphs numbered 1 through 4, were you indicating that

21   the only recordings you had responsive to those requests

22   were the two recordings you provided on the CD?

23   A.    Yes.

24   Q.    So, aside from the CD provided, do you have any

25   other recordings made by you of any NYPD employee regarding

53

JOSEPH FERRARA

1    misconduct or corruption?

2        A.    No.

3        Q.    Aside from the CD provided, do you have any other

4    recordings made by you of any interactions on NYPD property

5    regarding misconduct or corruption?

6        A.    No.

7        Q.    Aside from the CD provided, do you have any other

8    recordings in your possession of any NYPD employee

9    regarding any alleged misconduct or corruption?

10       A.    No.

11       Q.    And aside from the CD provided, do you have any

12   other recordings in your possession of any interactions

13   taking place on NYPD property regarding alleged misconduct

14   or corruption?

15       A.    No.

16       Q.    Now, next to paragraph number 5 you've written

17   e-mails.  Were you indicating that the e-mails you provided

18   were the only documents responsive to that request?

19       A.    Yes.

20       Q.    So, aside from the documents provided, do you

21   have any other documents in any form or format sent by you

22   or to you with an attorney for Adrian Schoolcraft?

23             MR. SMITH:  Objection to form.

24       A.    Can you repeat that.

25       Q.    Sure.  Aside from the e-mails and documents

54

JOSEPH FERRARA

1    you've given me, do you have any other documents that were

2    sent by you or given to you by an attorney for Adrian

3    School?

4        A.    No.

5              MR. SMITH:   Objection to the form.

6        Q.    Now, looking at paragraph number 6 you've written

7    n/a next to that.  By writing n/a were you indicating that

8    you had no documents responsive to that request?

9        A.    Yes.

10       Q.    So, aside from the documents provided, do you

11   have any other documents in any form or format of the

12   corruption you saw during your 15 years on the job that you

13   referenced in your e-mail to Jon Norinsberg on August 11,

14   2010?

15       A.    No, I don't have anything else.

16       Q.    Moving on to paragraph 7.  You've written next to

17   it n/a, precinct would have monthly activity reports and in

18   parentheses paper.  By writing that were you indicating

19   that you personally have no documents responsive to that

20   request?

21       A.    Yes.

22       Q.    And moving now to paragraph 8.  You've written

23   next to it precinct would have these records in

24   parentheses, paper.  Were you indicating that you

25   personally had no documents responsive to that request?

JOSEPH FERRARA

1    A.    Yes.

2    Q.    And I'm sorry, I also note that underneath that

3    you've written audio 2/18/10, thirty-nine minute mark or

4    thirty-nine minute.  Were you indicating that you believe

5    that recording, the 2/18/10 recording has something

6    responsive to this request?

7    A.    No, I just -- I think that had to do with -- I

8    think it had to do with when they were talking about weekly

9    breakdowns that it was mentioned on the audiotape that I

10   provided to the law department and at that -- timewise,

11   that's where the reference was made.

12   Q.    Okay.  When did you begin recording your

13   co-workers?

14   A.    February 18, 2010.

15   Q.    Did anyone suggest that you record your

16   co-workers?

17   A.    No.

18   Q.    Why did you continue recording your co-workers?

19   A.    I didn't feel in my opinion that the way Police

20   Officer Schoolcraft was being regarded to in the precinct

21   was appropriate by the commanding officer.

22            MS. PUBLICKER METTHAM:  All right.  We're

23            going to take a short break so that we can change

24            the videotape.  So, we're just going to go off

25            the record.

56

JOSEPH FERRARA

1               THE VIDEOGRAPHER:  We are now -- excuse me.

2       We are now off the record at 11:23 am.

3               (Whereupon, a short recess was taken.)

4               THE VIDEOGRAPHER:  This is tape two of the

5       deposition of Joseph Ferrera.  We are now on the

6       record at 11:40 a.m.

7       Q.    Okay.  So, before we took the break you stated

8   that you started recording because you didn't like the way

9   that Schoolcraft was -- was treated by Mauriello in the

10  precinct; is that correct?

11      A.    The way Mauriello --

12              MR. KRETZ:  Objection.  Sorry.

13      A.    The way Mauriello was referring to Schoolcraft in

14  the precinct.

15      Q.    And how was Inspector Mauriello referring to

16  Schoolcraft in the precinct?

17      A.    That he was a rat.

18      Q.    Did you think at the time you started making

19  these recordings that you would be suing the City at some

20  point?

21              MR. SMITH:  I'm sorry, the who?

22              MS. PUBLICKER METTHAM:  City.

23              THE COURT REPORTER:  At the time you were

24          making these recordings --

25              MR. SMITH:  Did you think that you --

JOSEPH FERRARA

1          MS. PUBLICKER METTHAM:  You would be suing

2      the City at some point.

3          MR. SMITH:  You meaning the witness?

4          MS. PUBLICKER METTHAM:  Yes.

5          MR. SMITH:  Objection to form.

6          MS. PUBLICKER METTHAM:  Is there another

7      definition of you that I'm not aware of?

8          MR. SMITH:  There's another definition of

9      suing.  Are you referring to the witness suing

10     the City?

11         MS. PUBLICKER METTHAM:  Yes, it's quite

12     plain from the question, Mr. Smith.

13  Q.     So, Mr. Ferrera, when you made these recordings,

14  did you think that you would be suing the City at some

15  later date?

16  A.     No.

17  Q.     How many recordings did you make of your

18  co-workers at the NYPD?

19  A.     Two.

20  Q.     Only two?

21  A.     Yes.

22  Q.     And you provided all the recordings you've ever

23  made of your co-workers to the City of New York?

24  A.     Yes.

25  Q.     How did you choose what to record?

58

JOSEPH FERRARA

1    A.    I chose the commanding officers' meeting to
2    record on those two instances.

3    Q.    Why did you choose the commanding officers'
4    meeting?

5    A.    Because that's where Deputy Inspector Mauriello
6    was able to speak somewhat freely because that meeting
7    consisted of all the supervisors of the precinct, there was
8    no -- there was no one lower than a sergeant present at
9    those meetings.

10   Q.    And why did you choose only February 18th and
11   April 1st of 2010 to record?

12   A.    Those were the two meetings, I believe, that were
13   back to back for the COs' meetings under February 18th was
14   the next meeting after I had heard in a previous CO meeting
15   him refer to -- Inspector Mauriello refer to Schoolcraft as
16   a rat.  So that very next meeting is when I started
17   recording.

18   Q.    Did you save every recording you made?

19   A.    Yes.

20   Q.    Did you delete any recordings?

21   A.    No.

22   Q.    Have you provided to anyone else a recording of
23   the NYPD that you have not provided to me?

24   A.    No.

25   Q.    Did any of your co-workers know that you were

73

JOSEPH FERRARA

1    and they started the training, the officers -- the training

2    sergeant would leave -- let's say hypothetically it was an

3    in-term order, he'd have copies of the in-term orders in

4    the -- where roll call was done.  So an officer can come by

5    later and get a copy of that in-term order and you know,

6    read it themselves.  So I didn't feel based on that that

7    there was anything wrong with that.

8        Q.    You were a -- a sergeant on patrol at some point,

9    correct?

10       A.    Yes.

11       Q.    Did you ever discuss new in-term orders or new

12   policies with officers under your command when you were a

13   sergeant on patrol?

14       A.    Not on patrol, no.

15       Q.    And why not?

16       A.    Because they had the training sergeant, he does

17   that.

18       Q.    As a member of the NYPD, are you required to

19   report misconduct that you personally observe?

20       A.    You are, yes.  Official misconduct.

21       Q.    In -- going back to your e-mail from August 11th,

22   you stated that downgrading crime reports this happens

23   everywhere.

24       A.    Yes.

25       Q.    What did you mean by this happens everywhere?

JOSEPH FERRARA

1    A.       All the commands do that.  When there's a report

2    taken for a specific crime, the -- the usual course is that

3    that complaint gets taken by the officer on patrol, it gets

4    handed into the desk officer to be signed off on.  It gets

5    put into the computer and it goes up to what's called crime

6    analysis.  Depending on the crime it gets referred to the

7    detective squad.  If it's something that's still open it

8    needs to be investigated.  Because of ComStat, as a result

9    of ComStat, commanding officers were being looked at as far

10   as their numbers in regards to seven major crimes and they

11   were looked at unfavorably if they had a spike in seven

12   major crimes.

13            So, it started to be done where a commanding

14   officer would tell the crime analysis people who were

15   supposed to put together the 61s and even the desk officers

16   at some point call up the complainant and let's go back

17   over what the complainant says in regards to their

18   allegation, let's see if it really is a robbery.  Let's see

19   if they really got their car stolen.  Let's see if somebody

20   was hit with a pipe for real, how do they know they were

21   hit with an object, how do they know it wasn't a fist.

22   That's in order to reduce the complaint for that category,

23   because if the complainant says well, I thought it was a

24   bat or I thought it was a pipe, and this person says to the

25   complainant well, are you sure and they turn around and say

JOSEPH FERRARA

1    well, no, I'm not sure, then it could have been a fist;

2    yeah, it could have been a fist.  Now that changes from an

3    assault two which is a seven major felony down to an

4    assault three which is playing with numbers.  Because if

5    the original complaint -- if the officer who took the

6    report out in the street listens to the complainant and

7    complainant says I got hit with a pipe, the officer is

8    going to write complainant states he got hit with a pipe.

9    We're going on what the complainant says out in the street

10   because that's what the cops are trained to do.  Now, later

11   on we want to -- we want to -- oh, we don't want another

12   felony assault, so -- in that area especially, if it

13   happened in a certain area that wasn't conducive to -- to,

14   you know, to the CO.  So then these phone calls would be

15   made and then reports would be changed.

16        Q.    How many times did you see reports changed?

17        A.    I didn't personally see reports changed.  I know

18   the process was done by talking to people, but I never

19   saw -- I was never asked to call anybody back to

20   re-interview anybody.

21        Q.    Did you ever downgrade any crime complaints?

22        A.    No.

23        Q.    And you were never asked by a supervisor to

24   downgrade any crime complaints?

25        A.    No.

76

JOSEPH FERRARA

1    Q.    Have you ever attended ComStat?

2    A.    Once.

3    Q.    And when was that?

4    A.    I think it was when I was in the 40 Precinct, I

5    think.

6    Q.    Why did you attend ComStat at that time?

7    A.    The CO wanted sergeants to get a feel of what

8    ComStat was like.

9    Q.    Did you have to speak at ComStat?

10   A.    No.  Actually, you know what, I went to ComStat

11   more than -- well, I went to TrafficStat, I went to ComStat

12   just to get a feel of what it was like, but I went to

13   TrafficStat I believe twice when I was a sergeant in the 40

14   when I was assistant ICO.

15   Q.    Have you ever worked in a supervisory position

16   before ComStat came to the NYPD?

17   A.    No.

18   Q.    Would it be appropriate for an officer on the

19   street to ask a victim are you sure it was a bat or a pipe?

20   A.    No.

21   Q.    You don't believe it would be appropriate for an

22   officer on the street to ask questions?

23   A.    Appropriate, yes, but does it happen, no, because

24   the radios are so busy in these commands, the officer wants

25   to take the report, give whatever kind of aid is needed and

JOSEPH FERRARA

1    go to the next job, because there's pressure from the COs

2    in regards to response time, for how long does it take a

3    cop to get to another job.

4        Q.    But if an officer did ask a victim on the scene

5    are you sure it was a pipe or a bat, do you believe that

6    would be an inappropriate question?

7        A.    No, that would be appropriate.

8        Q.    So, your -- your problem with this is -- is

9    calling later?

10       A.    Yes.  The NYPD teaches its officers to interact

11   with the community on various different levels and if an

12   officer goes to a job and the person says they got hit with

13   a bat and robbed, they got hit with a bat and robbed and

14   the officer puts that down.  I don't know why later on

15   there would be further questions in regards to that

16   complaint.  The only further question in my feeling and

17   really departmentallywise is that that will go to the squad

18   and a detective assigned to that case would investigate

19   that crime.

20       Q.    Who do you believe was responsible for this

21   downgrading of crime complaints?

22               MR. SMITH:  Objection to form.

23               MR. KRETZ:  Objection.

24       A.    Who actually did it or who gave the orders to do

25   it?

78

JOSEPH FERRARA

1     Q.     Both.

2     A.     Well, I believe it -- it -- it fell on crime

3  analysis people because they worked hand in hand with the

4  commanding officer in -- because crime analysis put

5  together all the complaints into a system and was able to

6  tally all the crimes up for the seven majors.  So they

7  worked hand in hand with the CO in all the precincts that's

8  the way it was.

9          In the 81 precinct it would be DI Mauriello, you

10 know, giving the orders to look at certain crimes.  He

11 would even say it at the -- at roll calls or COs' meetings

12 that the desk officers have to start looking at special

13 complaint reports that come in because the desk officer is

14 supposed to review the complaint reports, but it went on in

15 the -- in the 103.  It went on in the -- in the 40.  It was

16 just a general practice for commanding officers to try to

17 limit the amount of numbers that they have because the way

18 the job is if a CO has a rise in numbers and they want to

19 get promoted that will stop them from getting promoted.

20    Q.     Do you believe that this downgrading of crime

21 complaints was official misconduct?

22    A.     I don't know if it was official misconduct.  I

23 felt it was misconduct.

24    Q.     Did you ever report this misconduct to anyone?

25    A.     No.

79

JOSEPH FERRARA

1     Q.      Why not?

2     A.      Because if you -- if you go around reporting

3     stuff about your fellow workers or your commanding officer

4     then chances are you're going to get yourself jammed up

5     because there's -- there's that -- there's a perception in

6     the NYPD to punish people who try to do good stuff

7     sometimes.  So, I wasn't looking to get myself jammed up by

8     making any kind of enemies with anybody or -- you know, I

9     was trying to just keep myself out of trouble and do the

10    right thing like I'm supposed to do.

11    Q.      And you believe that this quote, unquote numbers

12    game happened because Commissioner Kelly and the commanding

13    officers wanted to see crime go down, right?

14            MR. SMITH:  Objection to form.

15    A.      Yes.

16            MR. SMITH:  What was the answer to that

17            question?

18            THE WITNESS:  Yes.

19    Q.      Now, again, in your -- in your e-mail to

20    Mr. Norinsberg from August 11th you stated that cops are

21    also directed to write certain moving summonses, they're

22    frowned upon if they issue a brake light, taillight,

23    headlight summons, the cops have to write seat belt, cell

24    phone summonses --

25    A.      Yes.

80

JOSEPH FERRARA

1    Q.     -- do you recall that?

2    A.     Uh-huh.

3    Q.     So, the supervisors didn't want officers to come

4    in with just any kind of summons?

5    A.     Yes.

6    Q.     Do you know why?

7    A.     There's numbers with that, too.  The -- the

8    executive officer of a command was in charge of traffic

9    conditions in the command.  The CO was in charge of crimes

10   in the command and he goes to ComStat.  The XO is in charge

11   of traffic conditions in the command and he goes to

12   TrafficStat.

13         So, the XO wanted to make sure that his numbers

14   looked good or better than last year's numbers in regards

15   to seat belts, cell phone summonses, because another part

16   of TrafficStat is accidents.  The number of accidents, the

17   number of injuries and there was pressure on the XOs from

18   the chief of traffic to reduce accidents, to reduce

19   injuries and to increase summonses because they felt if we

20   gave out more summonses for cell phones and for seat belts,

21   less people would get injured, there would be less

22   accidents.

23         In the -- in the 81 specifically on one of those

24   tapes Captain Perez who was the XO at the time has a whole

25   big thing about how he doesn't care, he wants his number.

81

JOSEPH FERRARA

1    They even had started in the 81 which I had never seen

2    before, they would make the supervisors on patrol document

3    as the patrol officers came in at the end of their tour

4    what did you write today, day by day, how many did you

5    write, what did you write.

6        Q.    And that was in reference to these seat belts and

7    cell phones?

8        A.    Yes.

9        Q.    Do you believe there was a quota policy in the

10   81st Precinct?

11       A.    No, I don't believe there was a quota, because

12   there was never a number set in stone, but there was

13   tremendous pressure put on officers to answer the radios,

14   write complaints, take care of people who needed, you know,

15   aid with hospitals and stuff, help with lost kids, help

16   finding people.  But then they also had pressure to write

17   summonses throughout their day.  They wanted to see those

18   numbers from those officers.  And they didn't care if the

19   officer answered 15 different jobs that day and didn't get

20   a meal, how many summonses did you write that day.

21       Q.    Did you believe there was a quota policy in the

22   81st Precinct requiring officers to issue a certain number

23   of UF-250s?

24           MR. SMITH:  Objection to form.

25       A.    There was never a set number, but there was

82

JOSEPH FERRARA

1    tremendous pressure for that, also, because that ended up

2    being statistic at ComStat number of 250s that were done.

3        Q.    But there was never a number of UF-250s that

4    officers in the 81st Precinct were required to issue?

5        A.    No.   Not a set number, no.

6        Q.    Have you ever issued a UF-250 without reasonable

7    suspicion?

8        A.    No.

9        Q.    Did any supervisor ever tell you to stop someone

10   even if you did not have reasonable suspicion?

11       A.    No.

12       Q.    Have you personally observed another officer stop

13   someone without reasonable suspicion?

14       A.    No.

15       Q.    Did you ever lose overtime for failing to issue a

16   certain number of UF-250s?

17       A.    No.

18       Q.    Did you ever suffer a change of tours as a result

19   of failing to issue a certain number of UF-250s?

20       A.    No.

21       Q.    Were you ever denied vacation days as a result

22   failing to issue a certain number of UF-250s?

23       A.    No.

24       Q.    Was there a quota policy regarding the number of

25   summonses officers in the 81st Precinct were required to

JOSEPH FERRARA

1    issue?

2                    MR. SMITH:  Objection to form.

3        A.     Not a specific number per officer, but I believe

4    Captain Perez makes reference to a certain number that he

5    wanted for a tour.

6        Q.     When you say for a tour, does that mean for the

7    whole squad?

8        A.     For that platoon.

9        Q.     For that platoon, I'm sorry?

10       A.     Yeah, a platoon would consist of two squads

11   usually working, so.  He would turn around and say I need

12   -- hypothetically, I need five cell summons today, cell

13   phone summonses from third platoon.

14       Q.     And when did Perez become the XO of the 81st

15   Precinct?

16       A.     I really don't remember.  When I got there in --

17   when I got there in 2009 I don't believe he was there yet.

18   Somebody else was there.  He left to go somewhere else and

19   I think Perez came in after.  I'm really not sure when he

20   got there.

21       Q.     So, if I told you that Captain Lauterborn was the

22   XO prior to Captain Perez, would that refresh your

23   recollection?

24       A.     Yeah, I remember Captain Lauterborn, yes, I just

25   don't remember the dates.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

JOSEPH FERRARA

1     Q.     Did you ever hear Captain Lauterborn give a quota

2     for summonses to officers in the 81st Precinct?

3     A.     No.

4     Q.     And you said that Captain Perez gave a number of

5     five summonses per platoon?

6     A.     Not every day.  I mean it depended on the day

7     what he needed, you know, because he would keep track of

8     his numbers on a daily basis platoon by platoon.  So if he

9     felt like oh, I had ten seat belt summonses last year this

10    day I need ten today, you know, so it would vary as to what

11    he wanted.

12    Q.     And when Captain Perez discussed summonses, was

13    he discussing As, Bs and Cs?

14    A.     No, he was strictly concerned with B summonses,

15    because that -- B summonses have to do with moving

16    violations which impact traffic conditions.

17    Q.     So, did you ever hear Captain Perez talk about a

18    specific number of C summonses that he wanted the platoon

19    to issue?

20    A.     No, no.

21    Q.     Have you ever issued a summons without probable

22    cause?

23    A.     No.

24    Q.     Did anyone ever tell you to issue a summons if

25    you did not have probable cause?

JOSEPH FERRARA

1     A.     No.

2     Q.     Have you ever personally observed another officer

3  issue you a summons without probable cause?

4     A.     No.

5     Q.     Did you ever lose overtime for failing to issue a

6  certain number of summonses?

7     A.     No.

8     Q.     Have you ever suffered a change of tour as a

9  result of failing to issue a certain number of summonses?

10    A.     No.

11    Q.     Have you ever been denied vacation days as a

12  result of failing to issue a certain number of summonses?

13    A.     No.

14    Q.     When you said that Captain Perez had this goal

15  of, for example, five seat belts on -- on a platoon, was

16  there ever any punishment if the platoon was not able to

17  reach that number?

18           MR. SMITH:  Objection to form.

19    A.     Not that I'm aware of, but he would get very

20  irate with the supervisors and come down on supervisors,

21  but I don't know if any actual punishment was ever mended

22  out.

23    Q.     Did you ever see any police officers get punished

24  for failing to bring in summonses for Captain Perez?

25    A.     No.

JOSEPH FERRARA

1    Q.    Was there a quota policy in the 81st Precinct

2    requiring officers to issue a certain number of arrests?

3              MR. SMITH:   Objection to form.

4    A.    Yes.

5    Q.    And what -- what is a quota to you?

6    A.    A set number that had to be seen by the

7    commanding officer during a specific period of time.

8    Q.    And what was -- I'm sorry, strike that.

9              How many arrests were officers in the 81st

10   Precinct required to make under this quota?

11   A.    At least one.

12   Q.    Per what period of time?

13   A.    I don't remember if it was quarterly or if it was

14   for the year, because I know they used to run the officers

15   for the COs' meetings to see who had zero arrests still and

16   Mauriello would talk to that squad sergeant and say hey,

17   Jones doesn't have an arrest yet, why and they would, you

18   know, question the sergeant as to why the person doesn't

19   have an arrest, the officer.

20   Q.    But you can't recall if it was one per quarter or

21   one per year?

22   A.    No, it used to be one per year and then I think

23   it got knocked to down to maybe one a quarter.  'Cause a

24   summons activity used to be monthly, you know, officers

25   would do a monthly activity report and that was it.  In the

JOSEPH FERRARA

1    81 Precinct it was down to daily, that they were taking

2    activity reports from officers on a daily basis there.

3        Q.    Who told you that officers at the 81st Precinct

4    were required to make one arrest per year or per quarter?

5        A.    Mauriello said it --

6              MR. SMITH:  Objection to form.  You can

7              answer.

8        A.    Mauriello said it at the COs' meetings, he wanted

9    every officer to have at least one arrest and that came

10   from the borough, he says it came from the borough because

11   the borough runs the officers, they don't want to see

12   anybody with no arrests.

13       Q.    When were you told this?

14       A.    Various different times in the 81 Precinct.

15       Q.    When was the first time you were told at the 81?

16       A.    Probably the first COs' meeting I went to which

17   had to be sometime after I got there, which sometime in

18   '09.

19       Q.    Have you ever made an arrest without probable

20   cause?

21       A.    No.

22       Q.    Were you ever told to arrest someone even if you

23   didn't have probable cause?

24       A.    No.

25       Q.    Did Inspector Mauriello ever tell officers that

192

JOSEPH FERRARA

1      A.      No.

2                    MR. SMITH:   Objection to form.

3      Q.      Is there any other misconduct in the 81st

4    Precinct that you are aware of that you have not yet

5    testified to today?

6                    MR. SMITH:   Objection to form.

7      A.      No.

8      Q.      Is there anything else relating to this lawsuit

9    that you haven't testified to that you would like to add

10   now?

11                   MR. SMITH:   Objection to form.

12     A.      Just that, you know, commanding officers

13   shouldn't go around labeling cops that report allegations

14   as rats, that's just retaliatory, it -- it causes other

15   supervisors to look at that officer in a different view and

16   they take actions against those officers based on that

17   perception.  I don't believe that that's something that

18   should be spoken about by a CO. If the CO feels that way,

19   the CO should just keep it to himself and -- I mean, the

20   officer who is reporting an allegation of corruption or

21   misconduct has a right to do so confidentially which is

22   where IAB messed up because it got out, apparently, that --

23   that Schoolcraft called up IAB and that's something that

24   that shouldn't have -- that's not supposed to happen in

25   IAB.

193

JOSEPH FERRARA

1              If a person reports something, especially

2      uniformed member of the service, if you're reporting

3      something against another uniformed member of the service,

4      that's supposed to remain confidential because right away

5      now you're going to have, you know, tension between the

6      officer who reported and -- and the -- you know, the

7      subject.  That's just not a fair tactic, it's why people

8      don't report things in the NYPD any quicker is because of

9      experiences like this, situations like this.

10        Q.     How do you know that someone in IAB was the one

11    who leaked Adrian Schoolcraft's name?

12        A.     People were talking in the command.

13        Q.     And what did they say?

14        A.     Apparently IAB, I think, called up the TS,

15    telephone switchboard operator, and left a message for

16    Schoolcraft to call back or something, that doesn't

17    normally happen.  That's what I think, you know, that's

18    what I, you know, remember being, you know, overhearing.

19        Q.     So, when individuals are called to IAB for a PG

20    hearing, how are they normally notified?

21        A.     I believe the ICO gets the phone call to notify

22    the subject in the precinct that they got to show up for a

23    PG hearing.

24        Q.     And on what do you base that opinion?

25        A.     My experience being in ICO's office when I was 41

194

JOSEPH FERRARA

1    -- 40 Precinct.

2        Q.    So, when you were a desk sergeant or a lieutenant

3    on the desk, you never got a call from IAB?

4        A.    No.  I don't -- I don't believe so.  And when I

5    was in IAB as a sergeant and a lieutenant the ICOs are the

6    ones we notified when we needed somebody to come down for a

7    PG hearing.  We didn't notify -- we didn't call the

8    person's command and say, hey, listen, this is IAB, we need

9    Joe Blow to come down to talk to us, it wasn't like that,

10   that's not confidential.

11           An ICO is supposed to remain confidential, that's

12   what their duties and responsibilities are, is they're not

13   supposed to broadcast to other members of the command hey,

14   Joe Blow got a PG hear -- a notification to come down for a

15   PG hearing, that's one of their specific duties, is that

16   they remain confidential with information that they

17   possess.

18       Q.    So, it's your belief that IAB does not call the

19   regular telephone switchboard to schedule PGs of officers

20   --

21       A.    Absolutely.

22       Q.    -- regardless of whether they're subject or

23   witness officer?

24       A.    Yes.

25       Q.    And so, it's your understanding based on what you

JOSEPH FERRARA

1    overheard that IAB leaked Schoolcraft's name by leaving a

2    message in the switchboard for Adrian Schoolcraft?

3        A.    Yes.

4        Q.    Is it your understanding that anyone from IAB

5    purposefully leaked his name?

6        A.    No, I don't know.

7        Q.    And when did you first hear about Adrian

8    Schoolcraft's name being linked with IAB?

9        A.    I don't recall.

10       Q.    Was it before October 31, 2009?

11            MR. SMITH:  Objection to form.

12       A.    I really don't remember when.

13       Q.    Was it before your surgery?

14       A.    Maybe, because I was out for a while after that

15   and Schoolcraft's name wasn't really coming up after I came

16   back to work, so it probably was before the surgery.

17       Q.    Was there any other conversations you overheard

18   about Adrian Schoolcraft in the precinct that you have not

19   testified to already?

20       A.    No.

21            MR. SMITH:  Objection to form.

22       A.    No.

23       Q.    Did Captain Monteleone ever call you a rat?

24       A.    No, I don't believe so.

25       Q.    Is the testimony you've given here today complete

196

JOSEPH FERRARA

1    and accurate?

2              MR. SMITH:  Objection to form.

3    A.    Yes.

4              MS. PUBLICKER METTHAM:  Thank you,

5         Mr. Ferrera.  I have no further questions at this

6         time.

7              MR. KRETZ:  I have some questions.

8    EXAMINATION BY

9    MR. KRETZ:

10    Q.    Mr. Ferrera, hi.  I'm Walter Kretz representing

11   Steven Mauriello.  I'd like to get the timeline straight on

12   your time at the 81st Precinct.

13             Directing your attention to Exhibit A page

14   stamped 12145 which is an e-mail, apparently, that you

15   wrote to Mr. Norinsberg in August of 2010.

16    A.    Okay.

17    Q.    In the second -- the third to last paragraph you

18   indicate that I got jammed up in April 2009 and transferred

19   to 81 Precinct.  Does that refresh your recollection as to

20   when you went to 81 Precinct?

21    A.    Yes.

22    Q.    Was it in April of 2009?

23    A.    Yes.

24    Q.    Just to make certain, directing your attention to

25   page, in Exhibit A, 12174 and 175.

JOSEPH FERRARA

1    Q.    Hello, Mr. Ferrera, how are you?

2    A.    Good.   Thank you.

3    Q.    I'm going to ask you a few more questions.   I

4    know it's been a long day.   If there's anything about the

5    question, the way I ask it, it's not clear, let me know and

6    I'll try and rephrase it, okay?

7    A.    Yes.

8    Q.    All right, great.

9          You were asked questions earlier about the two

10   recordings that you made at the 81 CO meetings.   And you

11   said that those were on February 18, 2010 and April 1,

12   2010; is that right?

13   A.    Yes.

14   Q.    And I think you said that you were at a meeting,

15   another COs' meeting prior to February 18, 2010 and at that

16   meeting DI Mauriello made some statements, right?

17   A.    Yes.

18   Q.    And those statements related to Schoolcraft; is

19   that right?

20   A.    Yes.

21   Q.    Can you tell me how many days, weeks, months or

22   whatever other way you can measure it that those statements

23   were made in relationship to the February 18, 2010 meeting

24   that you recorded?

25   A.    It probably would have been right before this

JOSEPH FERRARA

1    February 18th, so whatever CO meeting there was before that

2    it probably would have been at that meeting that I first

3    heard it or -- I don't know how -- you know, I don't recall

4    how often he had COs' meetings, but it probably would have

5    been the most recent one before that.

6        Q.    Okay.  So, sitting here today it's your belief

7    that that meeting which prompted you to make the recording

8    on February 18th happened two or four weeks, approximately,

9    before February 18, 2010?

10       A.    Yeah, probably.

11       Q.    Do you --

12             MR. LEE:  Objection to form.

13       Q.    Do you recall what Mauriello said at that

14   meeting, the one that preceded the February 18, 2010

15   meeting that you did record?

16       A.    Just that Schoolcraft's a rat, something to that

17   effect.  Schoolcraft and a rat.  I don't remember word for

18   word exactly what was said.

19       Q.    Did Mauriello say in your presence words to the

20   effect that he knew that Schoolcraft was a rat or that he

21   had been given information about that or anything like

22   that?

23       A.    I think he said something to the effect that I've

24   got a heads up, but I really don't remember and that would

25   have been prior to those -- those two recordings.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

JOSEPH FERRARA

1    Q.    The statement that Mauriello made about him

2    getting a heads up, was that the same meeting where he --

3    for that -- on that first occasion said that Schoolcraft is

4    a rat?

5    A.    You know, I don't remember.

6    Q.    Okay.  So, the -- let me ask you this question,

7    you -- there was talk at the 81 after Schoolcraft was taken

8    to the Jamaica Hospital psych ward, right?

9    A.    Yes.

10   Q.    Do you recall or do you know whether or not the

11   statement that Mauriello made that he got a heads up about

12   Schoolcraft, did that happen before or after Schoolcraft

13   was taken to the Jamaica Hospital psych ward?

14             MR. KRETZ:  Objection to form.

15   A.    Probably after the incident with him being taken

16   to the hospital.

17   Q.    All right.  Why do you say probably after?

18   A.    I really don't remember and the talk was that

19   Schoolcraft had a tape-recorder the night of this incident

20   with him going to the hospital, so I'm assuming that it

21   probably was after the incident that um, that he -- I mean,

22   I'm just assuming, you know, that he said it after that

23   because now they found a tape-recorder supposedly that

24   night and you know.

25   Q.    Okay.  So, it's fair to say that you're not

JOSEPH FERRARA

1    really sure, it's hard for to you in pin down exactly when

2    this statement by Mauriello that he got a heads up about

3    Schoolcraft when that was; is that fair to say?

4        A.    Yeah, it's hard to pin down.

5        Q.    Okay.  When you said that there was talk at the

6    81 about finding a tape-recorder, was that the same kind of

7    talk that you mentioned earlier in your testimony, you were

8    at the -- at the desk or near the desk and people were just

9    talking back and forth about what happened to Schoolcraft?

10       A.    Yes.

11       Q.    So, was -- is it fair to say that it was a

12   subject of discussion that Schoolcraft had a tape-recorder

13   on him the night that the commander officer at the 81 went

14   to his house?

15       A.    Oh, it was part of the discussion, I don't think

16   it was the subject.  The bigger thing was him going to the

17   hospital, you know, being taken to the hospital that night

18   was really the subject and I think this was just another

19   piece that, you know, came of it.

20       Q.    And when -- when Mauriello said that he got a

21   heads up, what is your understanding him to be saying?

22       A.    Well, my opinion was that somebody from either

23   quad or Internal Affairs Bureau told Mauriello hey, listen,

24   we're looking at your command and you know, heads up, you

25   know, we're looking at your command.

JOSEPH FERRARA

1    Q.    Would that be an appropriate thing for an

2    investigator of Quad or IAB to have done?

3    A.    Yeah, yeah, that shouldn't -- they are not

4    supposed to give COs a heads up to investigations, these

5    investigations are confidential.

6    Q.    So, it would be inappropriate for IAB or Quad to

7    give a heads up to the commanding officer, right?

8    A.    Yes, it would be inappropriate.

9    Q.    You mentioned that you were asked questions about

10   whether or not or why you would not trust an individual by

11   the name of del Pozo and I think what you said, I'm not

12   trying to characterize what you said, but I think what you

13   said was that he used to work for Campisi and on that basis

14   you said I wouldn't trust him.  Do you remember that?

15   A.    Yes.

16   Q.    Can you explain why it is that you felt that it

17   was not a good idea to trust somebody who had previously

18   worked for Chief Campisi?

19         MS. PUBLICKER METTHAM:  Objection.

20   A.    Captains and above stick together.  So, it's --

21   if you're below captain it is what it is and if you're

22   captain and above they all stick together.  So, I felt like

23   del Pozo worked for Campisi, he's captain and above, that

24   there's a more -- I guess more loyalty to Campisi than

25   really to anybody else outside of IAB because he directly

JOSEPH FERRARA

1    worked for him.

2            I believe he was the commanding officer of one of

3    the groups in IAB, so there was a close working

4    relationship between del Pozo and Campisi himself as well

5    as the other chiefs in the bureau.

6        Q.    Had you ever heard of other occasions where COs

7    got a heads up about investigations that were going on

8    about their commands?

9        A.    Yeah, I heard -- I've heard people talk that a CO

10   was given a heads up.

11       Q.    Where -- where were you when you heard this?

12       A.    I was in IAB because there was a group 56 CO who

13   was -- Captain -- his name slips my mind, but he was the

14   group 56 CO after Lunetta.  I think he had several

15   investigations on him, you know, allegations of corruption

16   and misconduct within his group that was against him and he

17   knew about every single one of them.  You know.  How does

18   somebody find out about it if somebody higher up in IAB is

19   not telling him?

20       Q.    I got a little bit jumbled up about your career,

21   I'm sure you covered it, I'm just not clear.  I hope you

22   bear with me.

23            For how years did you work at IAB?

24       A.    I believe all together it was five, I believe it

25   was probably close to three years as a sergeant and maybe

JOSEPH FERRARA

1    two years as a lieutenant.  Four plus years all together,

2    maybe.

3        Q.     Do you recall any other circumstances where COs

4    got heads up other than the ones you've mentioned today?

5        A.     Just -- no, that -- that's really hit.  I mean

6    people talk, you know, from group to group people talk

7    about this CO, that CO.  You know, I mean I can't say

8    definitely, you know, I know that the group 56 CO

9    definitely got a heads up because my wife worked in group

10   56 until she retired and she was made aware that, you know,

11   there was allegations being made against that commanding

12   officer, so that I definitely knew because she knew.

13             As far as anybody else, I mean there was always

14   word of -- you know, there was always word that oh, yeah,

15   IAB tipped off so and so and you know, because the job --

16   the job tries to protect who they like, you know.  There

17   are -- there are some COs who get hit for fudging numbers

18   and they get transferred.  There are some COs who hit for

19   fudging numbers and they get told you got to leave, you got

20   to retire.

21             Um, the -- the CO in group 56 before Captain

22   Lunetta was this woman Captain Ferman, she was

23   African-American woman, she got caught fudging numbers

24   which was tied into the whole Brohenny thing that we spoke

25   about earlier with the computer misuse that he ran a nephew

226

JOSEPH FERRARA

1    of a CO to see if he had a warrant, this was that captain.

2    So, she had this lieutenant run her nephew's name, but she

3    got caught up with fudging numbers.  Okay.  She was told

4    she got to go, she got to retire.  You know, there was no

5    we're going to move you somewhere else, you got -- you got

6    your 20 years in, you got to go.

7            Um, on patrol, certain COs -- there was a CO in

8    the 105 at some point who -- who ended up getting jammed up

9    for fudging numbers, he got moved.  You know.  So, it's --

10   they protect who they want to protect.  They let people

11   know when they want to let people know to protect those

12   people, hey, listen, just so you know.

13       Q.    Did you have any direct interaction with

14   Schoolcraft while you were at the 81 and he was at the 81?

15       A.    Just hello.

16       Q.    Did he ever do or say anything to you that --

17   that indicated to you that he was anything but just a

18   regular police officer?

19       A.    No.

20              MS. PUBLICKER METTHAM:  Objection.

21       A.    No.

22       Q.    I think you were asked this, but I'm not sure.

23   Do you -- well, let me just back up.

24              The incident where the CO went to Schoolcraft's

25   house that occurred on October 31, 2009.  And I think you

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

JOSEPH FERRARA

1    she would use her cell phone while she was working on the

2    desk?

3        A.    Well, I would say --

4              MS. PUBLICKER METTHAM:  Objection.

5        A.    I would say she used her cell phone more than

6    other people who would be assigned to the desk.  You really

7    don't have a lot of time to talk on the cell phone when

8    you're on the desk, there are so many things going on in

9    the precinct at that desk area and -- but I know she -- you

10   know, some people like to talk, you know, that was my --

11       Q.    Was she one of them?

12             MS. PUBLICKER METTHAM:  Objection.

13       A.    Yeah, that was my perception of her, was that she

14   -- she liked to talked on her cell phone, you know.  I

15   didn't see her, um, I didn't see her interact with people

16   in the -- in -- in the 81 as often as I've seen in the past

17   with other people.  You know, it kind of looked to me like

18   she spoke to whoever she spoke to on the phone, that was

19   her form of communicating with other people.

20       Q.    Do you have any recollection of her interacting

21   or speaking with anybody at the 81 about Schoolcraft?

22       A.    No.

23             MS. PUBLICKER METTHAM:  Objection.

24       A.    No, I don't.

25       Q.    You mentioned in your earlier testimony about how

JOSEPH FERRARA

1    the job sometimes punishes people.  In that context, have

2    you ever heard of an expression called the blue wall of

3    silence?

4         A.    Yes, I heard of that.

5         Q.    What is that?

6         A.    Well, my interpretation of the blue wall of

7    silence is cops don't talk about what other cops do.  If

8    something is done wrong, cops don't talk about it.

9         Q.    What happens to a cop in your perception who does

10   talk about what other cops do?

11               MS. PUBLICKER METTHAM:  Objection.

12        A.    Well, they get labeled a rat.  They get labeled a

13   rat and then their lives are made difficult by the other

14   members that they work with, whether it becomes people

15   don't want to work with that person anymore or cops are

16   known to flick -- flip other officers' lockers, so

17   everything that you have in your locker gets dumped upside

18   down.  You know.  You know, just general tension between

19   the cop who said something and the cops didn't say

20   something.

21        Q.    In the, I think you still have it in front of

22   you, Exhibit A, there's a memo or a 49 from you to Police

23   Commissioner Kelly.  It's got a Bates stamp number of

24   12153.  Could you put that document in front of you, sir?

25        A.    Yes.