D3J8FLO1

```
 1 │ UNITED STATES DISTRICT COURT
   │ SOUTHERN DISTRICT OF NEW YORK
 2 │ ------------------------------x
   │
 3 │ DAVID FLOYD, et al.,
   │
 4 │            Plaintiffs,
   │
 5 │        v.                          08 CV 1034(SAS)
   │
 6 │ CITY OF NEW YORK, et al.,
   │
 7 │            Defendants.
   │
 8 │ ------------------------------x
   │                                    New York, N.Y.
 9 │                                    March 19, 2013
   │                                    10:05 a.m.
10 │
   │ Before:
11 │
   │              HON. SHIRA A. SCHEINDLIN,
12 │
   │                                    District Judge
13 │
   │                      APPEARANCES
14 │
   │ BELDOCK LEVINE & HOFFMAN, LLP
15 │      Attorneys for Plaintiffs
   │ BY:  JENN ROLNICK BORCHETTA
16 │      JONATHAN MOORE
   │
17 │ COVINGTON & BURLING, LLP
   │      Attorneys for Plaintiffs
18 │ BY:  KASEY MARTINI
   │      GRETCHEN HOFF VARNER
19 │      ERIC HELLERMAN
   │      BRUCE COREY
20 │
   │ CENTER FOR CONSTITUTIONAL RIGHTS
21 │      Attorneys for Plaintiffs
   │ BY:  DARIUS CHARNEY
22 │      SUNITA PATEL
   │      BAHER AZMY
23 │
   │
24 │
   │
25 │
```

D3J8FLO5                    Peart – redirect

1  Q.  On that day, April 13, 2011, was every person coming out of
2  your building getting stopped?
3  A.  No.
4  Q.  Nicholas, do you believe the reasons the officers gave you
5  for stopping you?
6  A.  No.
7            MS. PATEL:  One moment.
8            That's it, your Honor.
9            THE COURT:  Thank you.
10            Any recross?
11            MS. PUBLICKER:  No, your Honor.
12            THE COURT:  OK.  Thank you, Mr. Peart.  You're done.
13            THE WITNESS:  Thank you.
14            THE COURT:  Who is your next witness?
15            MR. CHARNEY:  Officer Polanco.
16  ADHYL POLANCO,
17       called as a witness by the plaintiffs,
18       having been duly sworn, testified as follows:
19            THE COURT:  State your full name, first and last,
20  spelling both for the record.
21            THE WITNESS:  Adhyl Polanco, A-D-H-Y-L, P-O-L-A-N-C-O.
22  DIRECT EXAMINATION
23  BY MR. CHARNEY:
24  Q.  Good afternoon, Officer Polanco.
25  A.  Good afternoon.

1  Q.  Officer Polanco, by whom are you currently employed?

2  A.  New York City Police Department.

3  Q.  How long have you worked for the NYPD?

4  A.  About eight years.

5  Q.  So what year did you start working for them?

6  A.  2005.

7  Q.  What was your first assignment after you finished the

8  police academy?

9  A.  I went to the 46th precinct in the Bronx.

10  Q.  How long did you work there?

11  A.  About six months.  It was an impact assignment.

12  Q.  Can you explain what an impact assignment is?

13  A.  Impact is when they send officers straight out of the

14  academy to a high-crime area.

15  Q.  How long did you work this impact assignment?

16  A.  About five to six months.

17  Q.  After those five to six months, did your assignment change?

18  A.  Yes.

19  Q.  How did it change?

20  A.  I got permanently assigned to the 41st precinct in the

21  Bronx.

22  Q.  When you were assigned to the 41st precinct in the Bronx,

23  did you work in a particular unit?

24  A.  I was patrol most of the time.

25  Q.  So you were a patrol officer in the 41st precinct for how

D3J8FLO5                          Polanco - direct

1   long?

2   A.   From the beginning of 2006 to about December 2009.

3   Q.   As a patrol officer, were you assigned to a particular

4   unit, or how would you describe the group of officers you

5   worked with?

6   A.   It varies depending on the day.  You don't get an

7   assigned -- a permanent assignment.  Basically, when you're

8   new, you have the most busy sector they call it.  But I was not

9   the only one new so some day I would have one sector, some day

10  I would have the other.

11  Q.   Did you typically patrol with other officers or by

12  yourself?

13  A.   With other officers.

14  Q.   How many?

15  A.   At least one.

16  Q.   Did you work a particular tour of duty when you were in the

17  41st precinct?

18  A.   It was called the 4 to 12.  It's 3:00 by 11:35 p.m.

19  Q.   How many tours of duty are there in a 24-hour period for

20  NYPD officers?

21  A.   There's three main ones.  There can be a bunch of them, but

22  the three main ones for patrol will be day tours, 4 to 12 and

23  midnight.

24  Q.   If you can tell us to the best of your recollection, what

25  were your duties and responsibilities as a patrol officer in

1    the 41st precinct?

2    A.  Basically, look out for the community, help with their

3    needs.

4    Q.  How would you do that, if you can remember?

5    A.  It's many ways to do it.  When you're on patrol, every

6    radio run that come over brings something different.  Sometime

7    you be called to assist somebody to go up the steps.  Sometime

8    somebody is stabbed.  Most of the time we are referees,

9    Somebody is fighting the daughter or the daughter is fighting

10   the mother, and we are in between basically.

11   Q.  I want to show what has been marked as Plaintiffs' Exhibit

12   355.  I am going to put it on the elmo.

13           MR. CHARNEY:  Can I have a copy for the witness?

14           Can I show it to the witness or do you want me to move

15   it into evidence first?

16           THE COURT:  Either way.  Did you want to use it to

17   refresh his recollection?

18           MR. CHARNEY:  I was going to ask him about some of the

19   information in the document.

20           THE COURT:  Is there going to be objection to it?  Is

21   anybody going to object to this exhibit?

22           MS. COOKE:  It was not provided as one of the initial

23   exhibits so I need to pull a copy.

24           THE COURT:  He has it for you.  Then just tell me if

25   you're going to object to it.  If it's from the patrol guide, I

Case 1:10-cv-06005-RWS Document 491-1 Filed 02/12/15 Page 6 of 186
Case 1:08-cv-01034-AT-HBP Document 282 Filed 03/30/15 Page 190 of 219    413
D3J8FLO5                    Polanco - direct

 1   wouldn't think there would be an objection.

 2          MS. COOKE:  I just can't tell if it's complete.  No

 3   objection.

 4          MR. CHARNEY:  This is what was produced to us as the

 5   patrol guide section setting forth the duties and

 6   responsibilities of a police officer.

 7          THE COURT:  Current?

 8          MR. CHARNEY:  This is the most current one we were

 9   provided.

10          THE COURT:  That is the most current one the

11   plaintiffs were given.  I will take it for what it's worth.

12          What we are calling this?

13          MR. MOORE:  355.

14          THE COURT:  355 is received.

15          MR. CHARNEY:  I am going to hand this to the witness.

16          MS. COOKE:  We are going to need a minute to pull it.

17          I am going to make an objection.  This is three-page

18   document.  Mr. Charney has only provided one page.

19          THE COURT:  If you have the whole three-page document,

20   I will substitute it.

21          MR. CHARNEY:  The second page is a different patrol

22   guide section.  We can put it in, but it's a completely

23   separate patrol guide section.

24          THE COURT:  I think he only wants to offer this

25   section.  It does say page 1 of 1.

Case 1:08-cv-01034-AT-HBP   Document 292   Filed 03/30/15   Page 7 of 219   414
Case 1:10-cv-06005-RWS   Document 491-1   Filed 02/12/15   Page 197 of 219
D3J8FLO5                           Polanco - direct

 1          MS. COOKE:  For the record, 355 was provided on the

 2     plaintiffs' exhibit list as a three-page document.

 3          THE COURT:  This says page 1 of 1 in the upper

 4     right-hand corner, and this is the section of the patrol guide

 5     he wishes to offer.  So I will take this one page exhibit which

 6     is this section.

 7          Do you have a section number?

 8          MR. CHARNEY:  I believe it says 202-21.

 9          THE COURT:  So I am accepting 202-21, that's the

10     section, it's 1 of 1 page document, in evidence as 355.

11     Despite the fact that when you listed it on your exhibit list,

12     you called it a three-page document.

13          (Plaintiffs' Exhibit 355, Section 202-21, received in

14     evidence)

15          THE COURT:  Now that we have got past that.

16     BY MR. CHARNEY:

17     Q.  Officer Polanco, have you had a chance to review this

18     document, Exhibit 355?

19     A.  Yes.

20     Q.  Do you recognize this document?

21     A.  Yes.

22     Q.  Can you tell me what this document is based on your review?

23     A.  It's on paper what we supposed to do in the streets, on

24     paper.

25     Q.  When you say what you're supposed to do on the streets,

D3J8FLO5                         Polanco - direct

1    what do you mean by that?

2    A.   The police department have written policies and there's a

3    difference between written policies and what actually goes on

4    out there.

5    Q.   Based on your review of this document, is it fair to say

6    that this document includes the duties and responsibilities of

7    a police officer at least as they exist on paper in the police

8    department?

9    A.   Yes.

10   Q.   I want to draw your attention to number 8 on this list.  Do

11   you see number 8?

12   A.   Yes, I do.

13   Q.   Can you read for us what number 8 says?

14   A.   "Render all necessary police service in assigned area and

15   as otherwise directed."

16   Q.   What is your understanding of what "all necessary police

17   service in assigned area" includes?

18   A.   It means helping people.  It's the reason why I became a

19   cop.  It doesn't necessarily mean to produce.  I don't see the

20   word productivity here anywhere.  It can be from helping

21   somebody, to giving advice to somebody, from preventing a

22   fight.  It can go from various things.

23   Q.   So does it include more than simply making arrests?

24   A.   Of course.

25   Q.   Does it include more than simply writing tickets?

D3J8FLO5                          Polanco - direct

1    A.  Yes.

2    Q.  Does it include more than simply conducting stop, question

3    and frisk?

4    A.  Yes.  Those are the easy part of the job.

5    Q.  What other services -- you mentioned a couple.  Are there

6    other services that, based on your training and experience,

7    police officers are supposed to perform as part of their job?

8    A.  Sometime we have to sit on a dead body the whole day.

9    Sometime we have to bring a bad car accident to the hospital,

10   where people actually die on the way or die at the hospital.

11   Sometime we get rapes with minors, kids, rapes with female.

12   Sometime we get domestic dispute where sometime turn deadly.

13   It's very, very varied amount of police duty.

14   Q.  When you were a patrol officer in the 41st precinct, did

15   you have a direct supervisor?

16   A.  Yes, I did.

17   Q.  Who was that person?

18   A.  Sergeant Edgar Padilla.

19   Q.  What was his rank?

20   A.  He was a sergeant.

21   Q.  Were there any other sergeants that supervised you while

22   you were a patrol officer in the 41st precinct?

23   A.  Yes.  In the 4 to 12, it was Sergeant Padilla, Sergeant

24   Bennett, Sergeant Rodriguez, and occasionally we get one here

25   and there, but those were the three main sergeants.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/18/15 Page 10 of 186
Case 1:08-cv-01034-AT-HBP Document 282 Filed 05/30/15 Page 200 of 219   417
D3J8FLO5                    Polanco - direct

1   Q.  Do you know who those sergeants reported to?  Was there a
2   person in the precinct who was their direct supervisor?
3   A.  They had a platoon commander.  What time frame are we
4   speaking about?
5   Q.  That's a good question.  Let's focus on the year 2009.
6   A.  Yes.
7   Q.  During that year, who was the platoon commander that the
8   sergeants that supervised you reported to, if you know?
9   A.  It was Lieutenant Andrew Valenzano.
10  Q.  Can you spell the last name?
11  A.  V-A-L-E-N-Z-A-N-O.
12          MR. CHARNEY:  I want to show another exhibit.  This is
13  marked as Plaintiffs' Exhibit 419.
14          THE COURT:  Any objection to 419?
15          MS. COOKE:  All 12 pages?
16          MR. CHARNEY:  We were going to offer pages 2 through
17  12, but I have no objection to the whole thing coming in if
18  defendants think it needs to be complete.
19          MS. COOKE:  For completeness, yes.
20          THE COURT:  So now there is no objection?
21          MS. COOKE:  No.
22          THE COURT:  What is the exhibit number again?
23          MR. CHARNEY:  419.
24          THE COURT:  419 is received.
25          (Plaintiff's Exhibit 419 received in evidence)

D3J8FLO5                            Polanco - direct

1              MR. CHARNEY:  May I show it to the witness?

2              THE COURT:  Sure.

3   Q.  Officer Polanco, I want to draw your attention to the

4   second page of Exhibit 419, which is marked NYC underscore

5   18924.

6              Do you recognize that document on the second page?

7   A.  Yes.

8   Q.  Can you tell me what that document is?

9   A.  This is my monthly activity report for the month of January

10  2009.

11  Q.  Can you tell me what a monthly activity report is?

12  A.  It's where officers basically put down what they had done

13  for the month.

14  Q.  Did you complete a monthly activity report for every month

15  that you worked in the 41st precinct?

16  A.  I would say yes.  Maybe when I was on patrol, yes.

17  Q.  You said that officers on this form will write down what

18  they did during the month, is that right?

19  A.  Yes.

20  Q.  What kind of information did you typically include on this

21  form when you filled it out?

22  A.  You supposed to include everything, basically, everything

23  that is there.  You marked off whatever you did.

24  Q.  What kinds of activities that you did in a month are

25  included in this form?

D3J8FLO5                          Polanco - direct

1    A.   Domestic incident, complaint reports, juvenile reports,

2    summonses, complaint reports, parking, radio runs, vertical

3    patrols.

4    Q.   What about, for example, I think you gave an example

5    earlier of having to go to the hospital with an injured person.

6    Would that information be included on this form?

7    A.   It will be included, yes.

8    Q.   Where would you include that on this form?

9    A.   If we did an aided card, what is called an aided card, it

10   will be included.

11   Q.   What if you had to, as you mentioned, mediate like a

12   domestic dispute, would that be on this form?

13   A.   If we took a domestic report, yes, we will mark that we

14   took a domestic report.

15   Q.   Are there any activities amongst the ones you mentioned

16   earlier that a police officer would do that are not reflected

17   on this form?

18   A.   Sometime you do job like missing.  Basically, you start

19   doing your paperwork for missing.  As you're doing your

20   paperwork, a couple of hours later you might run into the

21   person, and then the report will be destroyed.  So, no, it

22   won't be listed anywhere.

23   Q.   After you completed this form, did you typically give it to

24   somebody else in the police department?

25   A.   The sergeant, your immediate supervisor will be the one to

D3J8FLO5                          Polanco - direct

1   collect it.

2   Q.  Was it your practice when you were a patrol officer in the

3   41st precinct to hand this in once a month to your sergeant?

4   A.  Yes.

5   Q.  Did you typically discuss the information on the form with

6   your sergeant?

7   A.  Not the whole thing.  They will discuss it with us.  We

8   wouldn't.

9   Q.  Did your sergeant, in fact, discuss your monthly activity

10  reports with you?

11  A.  Sometime, yes.

12  Q.  Were there particular topics that your sergeant discussed

13  with you?

14  A.  When it comes to activity, they only care about one thing,

15  and one thing only.  It's how many arrests you had, how many

16  summons you wrote, and how many 250s you have for that night.

17  Basically, that's all they care for.

18  Q.  You said for that night?

19  A.  For that month.  I'm sorry.

20  Q.  Did your sergeant ever ask you about the number of radio

21  runs that were listed on your monthly activity report?

22  A.  They don't care about that.

23  Q.  Did they ever ask you about the number of domestic

24  incidents that you responded to in a month?

25  A.  No.  They don't care about that.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 14 of 186
Case 1:08-cv-01034-AT-HBP Document 282 Filed 05/30/13 Page 204 of 219     421
D3J8FLO5                          Polanco - direct

1    Q.  Did they ever ask you about the number of injured persons

2    that you assisted in a given month?

3    A.  No.  They don't care.

4    Q.  So other than asking you about the number of arrests or

5    summonses or stops and frisks in a given month, did your

6    sergeant ever ask you about any of the other activity you

7    performed in a month?

8    A.  No.

9    Q.  What about your activity on a daily or weekly basis, did

10   your sergeant ever discuss that with you?

11   A.  There came a point in time in 2009 where they came very

12   hard with the quotas.  They call it productivity.  It is what

13   it is.  And they had a daily sheet.  Every day, after we came

14   back from patrol, we had to see the platoon commander and

15   specifically tell him what we had done for that night.  If I

16   explain myself, what we have done in terms of summonses, 250,

17   or arrests.

18   Q.  You said this was something that was done every tour?

19   A.  Yes.  On a daily recap they call it.

20   Q.  Was there a form you had to fill out at the end of the tour

21   with this information on it?

22   A.  No.  The platoon commander would fill it out according to

23   what we tell him or whatever he collects from us.

24   Q.  So when you would come back at the end of the tour, did you

25   have to turn in any paperwork to the platoon commander?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 15 of 186
Case 1:08-cv-01034-AT-HBP Document 282 Filed 05/30/13 Page 205 of 219    422
D3J8FLO5                        Polanco - direct

1  A.  He will be waiting for us one by one and he will ask us,

2  what have you got for me?  Basically, how many summonses, how

3  many 250s, how many arrests you have got for me?

4  Q.  Did you have to provide him with paperwork showing how many

5  arrests or summonses or 250s you did?

6  A.  Sometime you will tell him verbally, but he will check

7  anyway; he will check the box at the end of the night.  So it's

8  not like I can lie to him and say I got this, because at the

9  end of the night he going to go to the box and check it.  So

10  sometime we don't give him the physical evidence right away.

11  Maybe we have to sign off on it or something like that, but we

12  will tell him what we did for the night, what we got for the

13  night.

14  Q.  When you say platoon commander, are you referring to

15  Lieutenant Valenzano?

16  A.  Yes.

17  Q.  Other than Lieutenant Valenzano, did any of your other

18  supervisors ask you about your daily or weekly activity when

19  you were a patrol officer in the 41st precinct?

20  A.  Yes.

21  Q.  Who?

22  A.  Our own unit delegates used to ask.  The sergeant, Sergeant

23  Rodriguez used to ask.  Sergeant Bennett.  Inspector McHugh, he

24  was the commanding officer, he used to ask about activity very

25  often.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 16 of 186
Case 1:08-cv-01034-AT-HBP Document 282 Filed 05/30/13 Page 206 of 219   423
D3J8FLO5                         Polanco - direct

1   Q.  Now, when Lieutenant Valenzano asked for your daily
2   activity, did he ever ask you about whether or not an
3   individual arrest that you had done was based on probable
4   cause?
5   A.  They will never question the quality.  They will question
6   the quantity.  They are not checking the 250.  They are not
7   checking the summonses.  They just want to make sure we have
8   them.  How we got them, they don't really care about.
9   Q.  So were you ever asked by Lieutenant Valenzano, after you
10  had finished a tour and done a UF-250, whether or not the stop
11  and frisk that you recorded was based on reasonable suspicion?
12  A.  Never.
13  Q.  Were you ever asked by Lieutenant Valenzano at the end of a
14  tour, when you handed in a summons, a criminal summons, whether
15  or not the summons was based on probable cause?
16  A.  Never.
17  Q.  Officer Polanco, did there come a point in time during your
18  assignment to the 41st precinct when one or more of your
19  supervisors communicated to you a specific number of arrests
20  that they said you were required to do in a single month?
21  A.  Yes.
22  Q.  When did that happen?
23  A.  It happened several times.  It started maybe in the summer
24  of 2009.  I started recording it because I couldn't believe
25  what I was hearing, and I thought nobody will believe me unless

D3J8FLO5                          Polanco - direct

1   I record it.  I started recording maybe late August to

2   November, early December 2009.

3   Q.  We are going to get to those recordings in a little while.

4   I wanted to first find out from you, how many of your

5   supervisors communicated specific numbers of arrests that they

6   said you were required to do in a month?

7   A.  Sergeant Bennett, Sergeant Rodriguez, Inspector McHugh,

8   Lieutenant Valenzano, PBA delegate -- all of them -- Mansi, PBA

9   delegate Herran, PBA delegate Fundaro.

10  Q.  When you say PBA delegate, what do you mean by that?

11  A.  The union representative for us.

12  Q.  I think you may have already answered this, but Inspector

13  McHugh, what was his position in the 41st precinct?

14  A.  He was a commanding officer.

15  Q.  Do you know when he became the commanding officer?

16  A.  I'm sorry?

17  Q.  When did he become the commanding officer?

18  A.  I believe it was late 2008, 2009.  I'm not 100 percent sure

19  exactly when.

20  Q.  Was he the commanding officer from either late 2008, early

21  2009 until you left the 41st precinct?

22  A.  Yes, he was.

23  Q.  And you left in December 2010?

24  A.  Yes.

25  Q.  So you mentioned that they did communicate -- your

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 18 of 186
Case 1:08-cv-01034-AT-HBP  Document 262  Filed 05/30/15  Page 208 of 219    425
D3J8FLO5                           Polanco - direct

 1   supervisors communicated to you a specific number of arrests

 2   they said you were required to do in a month.  What was that

 3   number?

 4   A.   They wanted 20 and one.

 5   Q.   What does 20 and one mean?

 6   A.   20 summonses and one arrest per month, per officer, at

 7   least.

 8   Q.   How did they communicate the to 20 and one requirement to

 9   you?

10   A.   They were very clear about it.  They will say, it's either

11   you do it, it's non-negotiable, or you're going to become a

12   Pizza Hut delivery man.

13   Q.   So it was communicated to you verbally?

14   A.   Most of the time it was communicated as a group.  The

15   recording later you're going to hear, they are addressing the

16   whole group, the whole roll call, not only one individual.

17   Q.   The whole group at roll call you said?

18   A.   Yes.

19   Q.   What is a roll call?

20   A.   Roll call is a platoon usually have about 14, 15 officer.

21   Five, ten minutes before tour everybody get together, get their

22   assignment, get their training, or whatever the department have

23   to say for that day, before you go out.

24   Q.   Is it fair to say that you attended a roll call for every

25   tour you worked in the 41st precinct?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 19 of 186
Case 1:08-cv-01034-AT-HBP Document 282 Filed 05/30/13 Page 209 of 219    426
D3J8FLO5                        Polanco - direct

1    A.   It will be fair to say that.  There might be sometime that

2    I missed it.  Maybe I was in another precinct.  But for the

3    most part, yes, I was there.

4    Q.   Who typically attended roll calls in the 41st precinct?

5    A.   Sometime the training officers will come by, the training

6    officer, the commanding officer, the XO, the platoon commander,

7    the sergeants in charge of each different platoon.

8    Q.   Who typically addressed the officers at the roll calls that

9    you attended?

10   A.   All of them.  It could be any one of them on any given day.

11   Q.   Were there particular topics that were commonly discussed

12   at these roll calls?

13   A.   The quarter was a basic one.  What we need to bring back at

14   the end of the month, that was the most they repeat it.

15   Q.   Now, you mentioned the one and 20.  Did there come a point

16   in time -- I'm sorry.  The one and 20 refers to arrests and

17   summonses?

18   A.   Yes.

19   Q.   The one is one arrest per month?

20   A.   Yes.

21   Q.   The 20 was 20 summonses?

22   A.   20 summons, yes.

23   Q.   Did there come a point in time during your assignment in

24   the 41st precinct when one or more of your supervisors

25   communicated to you a specific number of stop, question and

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 20 of 196
Case 1:08-cv-01034-AT-HBP Document 262 Filed 03/30/15 Page 210 of 219    427
D3J8FLO5                        Polanco - direct

1   frisks that they expected you to conduct in a month?

2   A.  Yes.

3   Q.  When did that happen?

4   A.  Throughout the roll call, different roll calls, they say

5   that they want at least five.

6   Q.  Was that true the entire time you were in the 41st precinct

7   or only part of the time?

8   A.  Part of it.  I would say after 2009.

9   Q.  Which supervisors do you recall communicated this numerical

10  requirement for the stop and frisk to you?

11  A.  Captain McHugh at the time, Lieutenant Valenzano at the

12  time, Sergeant Rodriguez, Sergeant Bennett.  They all used to

13  mention it.

14  Q.  You said it was five?

15  A.  At least five 250s a month.

16  Q.  Per month?

17  A.  Per month.

18  Q.  Did there come a point in time when you worked in the 41st

19  precinct that one or more of your supervisors communicated to

20  you a specific number of arrests, summonses, or stop and frisks

21  that they expected you to conduct in a single tour?

22  A.  They said -- sometimes they said we needed at least one.

23  That in order for us to be productive out there, we have to at

24  least show one for the day.

25  Q.  One stop and frisk?

D3J8FLO5                        Polanco - direct

1    A.   One of either.  Our job was not successful out there unless

2    we came back with one of the above.

3    Q.   At any point during your work in the 41st precinct, did

4    your supervisors ever communicate to you a specific number of,

5    for example, radio runs they wanted you to answer?

6    A.   No.

7    Q.   Or domestic incidents they wanted you to mediate?

8    A.   They don't care about those.

9    Q.   So the answer is no?

10   A.   No.  I'm sorry.

11   Q.   Or emotionally disturbed persons they wanted you to assist?

12   A.   No.

13   Q.   Or juvenile crime victims that they wanted you to assist?

14   A.   No.

15   Q.   When they communicated -- when I say "they," your

16   supervisors communicated these numerical requirements to you,

17   you said that was during roll call?

18   A.   Yes.  Sometime it will be individual, but most of the time

19   it was in the roll call.

20   Q.   So when they communicated these requirements to you during

21   roll call, did they at any point tell you what the consequences

22   would be for not meeting these numerical requirements?

23   A.   Absolutely, yes.

24   Q.   What did they say those consequences would be?

25   A.   They said, if we were willing to keep working with our

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 22 of 186    429
Case 1:08-cv-01034-AT-HBP Document 262 Filed 05/30/13 Page 212 of 219
D3J8FLO5                          Polanco - direct

1    partners, we better come up with the numbers; that if we want

2    to ask for days off, we better come up with the numbers; that

3    if we wanted overtime, the chiefs control the overtime, and

4    that if we don't do our numbers, we are not going to get it.

5    We were told that it was non-negotiable, that they are going to

6    force us to do it if we didn't do it.  One sergeant

7    particularly told us that unless we want to become a Pizza Hut

8    delivery man, we better do what they say.

9    Q.  Which sergeant was that?

10   A.  Sergeant Bennett.

11   Q.  Were there any other consequences that they expressed to

12   you would occur if you didn't meet these numerical

13   requirements?

14   A.  They will change different tour.  If you have a family and

15   for some reason you were doing the tour, they will shift your

16   tour.  They will give you low evaluations.  They will put you

17   in performance monitoring.  They can send you for retraining.

18   They can make your life very miserable.

19   Q.  Were there any months in 2009 where you yourself did not

20   meet the numerical requirements that you described earlier?

21   A.  There might have been a few.  I don't know exactly how

22   many.  There might have been a few.

23   Q.  Did you suffer any consequences for not meeting those

24   numerical requirements?

25   A.  Most of the time, if I didn't meet it, for example, in

D3J8FLO5                          Polanco - direct

1    January, in February I have to make sure or they will make sure

2    that I have the numbers.

3    Q.   How did they make sure that you would have the numbers?

4    A.   They will come and check on me every day, and if in fact I

5    don't have it, by the middle of the month, they will throw

6    something at me.  What I mean when I say they will throw

7    something at me, they will go out there, stop anybody, anybody,

8    and call me over to the scene and either issue a summons or

9    arrest them.

10   Q.   Let's break that down.  You said they would call you over

11   to the scene.  Who is "they"?

12   A.   Most of the time it was Lieutenant Valenzano and Captain

13   McHugh.

14   Q.   They would call you over to what scene?

15   A.   Sometime it could be that they have male stops against the

16   wall.  Sometimes they have male in handcuffs, and they will

17   call for us to -- obviously, we were not there -- to come

18   either issue the summons, issue the 250, or even arrest the

19   person.

20   Q.   So they would ask you to write a summons for an incident

21   that you didn't observe?

22   A.   All the time, yes.

23   Q.   How many times did that happen in 2009?

24   A.   Very often.

25   Q.   More than ten?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 24 of 186
Case 1:08-cv-01034-AT-HBP Document 262 Filed 03/30/15 Page 214 of 249    431
D3J8FLO5                        Polanco - direct

1    A.  I say between ten.

2    Q.  Did they ever ask you to write a UF-250 for a stop and

3    frisk that you did not conduct?

4    A.  Yes.

5    Q.  Did they ever ask you to write a UF-250 for a stop and

6    frisk where the underlying facts you didn't observe?

7    A.  Yes.

8    Q.  How many times did that happen?

9    A.  Very often.

10   Q.  More than ten?

11   A.  More than 20 I would say.

12   Q.  So other than that kind of activity -- when I say activity,

13   other than being required to write summonses and 250s for

14   things you didn't see, were there any other consequences that

15   you suffered when you didn't meet the monthly activity

16   requirements that we have talked about earlier?

17   A.  Like I said, it's a lot.  They can switch your tour, take

18   your partner away.  They will deny you days off.  They will

19   deny you overtime.  They can even ship you out of command and

20   send to another precinct.

21   Q.  Were you ever denied days off?

22   A.  A few times.

23   Q.  How many times?

24   A.  I don't recall exactly.  I wouldn't be able to come up with

25   an exact number.

D3J8FLO5                          Polanco - direct

1   Q.   What year did this happen?

2   A.   2009.

3   Q.   Were you ever denied overtime when you requested it because

4   you didn't meet the numerical requirements?

5   A.   I wasn't too big on overtime.

6   Q.   Are you familiar with the term driving a sergeant or

7   driving a supervisor?

8   A.   Yes.

9   Q.   What does that mean?

10  A.   That means that whatever it seems like, it's going to be.

11  You have no discretion whatsoever.  If you're driving the

12  supervisor, if you're driving the sergeant in the 41st precinct

13  at that time, that means that they are going to drive around

14  and they are going to stop people for you, or tell you to go

15  250 this guy, go summons this guy, go arrest this guy.  You

16  have absolutely no discretion.

17  Q.   Is it correct that driving a supervisor means what it

18  sounds like, in other words, that you're driving around with

19  one of your supervisors on patrol?

20  A.   Yes.

21  Q.   Is this something that you were ever required to do when

22  you worked as a patrol officer in the 41st precinct?

23  A.   A few times.

24  Q.   How many times?

25  A.   Between three and five.  I don't know the exact number of

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 26 of 186    433
Case 1:08-cv-01034-AT-HBP Document 282 Filed 05/30/13 Page 216 of 219
D3J8FLO5                          Polanco - direct

1    times.  Maybe more, maybe less.

2    Q.  Were you ever told on those occasions when you did have to

3    drive with a supervisor why they were making you drive with a

4    supervisor?

5    A.  Yes.

6    Q.  What was the reason they gave you?

7    A.  Because the prior month you did not have your numbers.

8    Q.  When you say numbers, you mean the one and 20 we referred

9    to earlier?

10   A.  Yes.

11   Q.  Do you also mean the five stop and frisks that you referred

12   to earlier?

13   A.  Yes.

14            THE COURT:  It's 4:30.  We are going to stop for the

15   day.  Of course, that means you have to come back first thing

16   tomorrow morning to start at 10:00.

17            Everybody is excused for the day.  Thank you.

18            MR. KUNZ:  There was an outstanding issue with regard

19   to the Silverman data, the additional Silverman data.  We can

20   address it first thing tomorrow.

21            THE COURT:  I can try to be here.  I suggest you make

22   it here at quarter of 10, but I can't promise I will.

23            MR. CHARNEY:  On that issue, can I hand you a

24   declaration of Professor Silverman?

25            Defendants have a copy.

D3J8FLO5                          Polanco - direct

1            MR. KUNZ:  We can address it now.

2            THE COURT:  No.  I have got many matters.

3            (Adjourned to March 20, 2013, at 10:00 a.m.)

1                        INDEX OF EXAMINATION

2     Examination of:                              Page

3     DAVID FLOYD

4     Cross By Mr. Kunz  . . . . . . . . . . . 221

5     Redirect By Ms. Patel . . . . . . . . . 248

6     Recross By Mr. Kunz  . . . . . . . . . . 262

7      DEON DENNIS

8     Direct By Ms. Varner . . . . . . . . . . 262

9     Cross By Mr. Marutollo . . . . . . . . . 278

10    Redirect By Ms. Varner . . . . . . . . . 296

11    Recross By Mr. Marutollo . . . . . . . . 299

12     NICHOLAS PEART

13    Direct By Ms. Patel  . . . . . . . . . . 300

14    Cross By Ms. Publicker . . . . . . . . . 347

15    Redirect By Ms. Patel  . . . . . . . . . 407

16    ADHYL POLANCO

17    Direct By Mr. Charney . . . . . . . . . 409

18                       PLAINTIFF EXHIBITS

19    Exhibit No.                              Received

20     355, Section 202-21,   . . . . . . . . . 414

21     419  . . . . . . . . . . . . . . . . . 417

22                       DEFENDANT EXHIBITS

23    Exhibit No.                              Received

24     Q-10   . . . . . . . . . . . . . . . . 287

25      NYC_2_00025272  . . . . . . . . . . . . 299

1    I-7    . . . . . . . . . . . . . . . . . . . . 350

2    Recording . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .360

D3k9flo1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DAVID FLOYD, et al.,

 4                 Plaintiffs,

 5          v.                        08 CV 1034(SAS)

 6   CITY OF NEW YORK, et al.,

 7                 Defendants.

 8   ------------------------------x
                                     New York, N.Y.
 9                                   March 20, 2013
                                     10:00 a.m.
10
     Before:
11
                        HON. SHIRA A. SCHEINDLIN,
12
                                          District Judge
13
                              APPEARANCES
14
     BELDOCK LEVINE & HOFFMAN, LLP
15        Attorneys for Plaintiffs
     BY:  JENN ROLNICK BORCHETTA
16           JONATHAN MOORE

17   COVINGTON & BURLING, LLP
          Attorneys for Plaintiffs
18   BY:  KASEY MARTINI
          GRETCHEN HOFF VARNER
19        ERIC HELLERMAN
          BRUCE COREY
20
     CENTER FOR CONSTITUTIONAL RIGHTS
21        Attorneys for Plaintiffs
     BY:  DARIUS CHARNEY
22           SUNITA PATEL
             BAHER AZMY
23

24

25
```

D3k9flo1

```
 1                        APPEARANCES (Cont'd)

 2

    MICHAEL A. CARDOZO
 3       Corporation Counsel for the City of New York
         Attorney for Defendants
 4  BY:  HEIDI GROSSMAN
         BRENDA E. COOKE
 5       JOSEPH MARUTOLLO
         MORGAN D. KUNZ
 6       SUZANNA PUBLICKER
         LINDA DONAHUE
 7       LISA M. RICHARDSON
         JUDSON VICKERS

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 32 of 186
Case 1:08-cv-02034-RYHBP Document 284 Filed 05/30/13 Page 3 of 225    439
D3k9flo1

1        (In open court)

2        THE COURT:  What's the problem with the audiotapes?

3        MS. COOKE:  The plaintiffs have provided to us just a

4   few minutes ago transcripts of audiotapes that they had

5   prepared and available as, according to them, this past

6   weekend.  Some of the transcripts are for audiotapes that are

7   going to be used with the witness who had began testifying

8   yesterday, Officer Polanco.

9        We haven't had an opportunity to review the accuracy

10  of these transcripts.  There were inaudible portions of the

11  audio.  I'm not sure how the transcript has been able to

12  transcribe inaudibles or not.

13       So that the defendants' position is that these are

14  belated.  It's prejudiced us at this point with respect to the

15  cross-examination of the witness who is testifying.

16       THE COURT:  Then don't use them.

17       I'll take them after you've had a chance to verify

18  them.

19       We'll hear the tape without the transcript.  There is

20  no jury.  I won't have the benefit of the transcript.  I'll get

21  the transcript after you compare it to the tape.

22       MR. MOORE:  Just so you understand, we had a court

23  reporter sit down and transcribe them.

24       THE COURT:  That's good but she just got it.

25       I would have loved it.  But I can't do it because they

Case 1:08-cv-06005-RWS Document 401-1 Filed 03/13/15 Page 33 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 3 of 225    440

D3k9flo1

 1    haven't had the chance to compare it.  It's that simple.

 2           As soon as you've had the chance, I'd like to use it

 3    if you find it accurate.  It will make it easier for me.  I

 4    have difficulty understanding the tape.

 5           Now I came in hoping to talk about Professor

 6    Silverman.  I read the affidavit declaration that he wrote

 7    yesterday dated March 18.  I found it, generally speaking,

 8    offensive.  Essentially he was trying to tell me what to do.

 9    He doesn't like my rulings.  They're wrong for this reason that

10    reason.  That's really not his place.  Not his business.  He's

11    not a lawyer.  Not a judge.  And the whole tone of the thing

12    was offensive.

13           The bottomline, however, is I asked you -- I found the

14    transcript of the last conference and I asked you to explain

15    the burden.  That's all.  I didn't really want him to tell me

16    what to do, what's relevant and what's not relevant.  I just

17    wanted for you to tell me the burden.  Remember that.

18           I looked at the transcript.  I said get back to me and

19    tell me what's so burdensome.

20           I received an e-mail that you sent to my clerk last

21    night which said:  Just to be clear the only outstanding data

22    issue between the parties is the Ross survey response data for

23    the responses to questions 1C, D and F in the 2008 survey, and

24    questions 2D and E in the 2012 survey.  And that's right.  I

25    remember that.  There was five questions that I said at the end

D3k9flo1

1    of Thursday's conference that the defense could have the raw

2    data.

3          I really found his arguments not persuasive.  The

4    notion that nobody is going to publish this raw data that's

5    turned over to the defense under a confidentiality order is

6    nonsense.  This is going to make it more publishable because

7    it's going to be testified to at a high profile trial.  So

8    everybody is going to want his article.  That's nonsense.  Not

9    going to prevent his getting an academic publication.  I don't

10   believe it for a minute.

11         Now, I asked you about burden.  Tell me about burden.

12         MR. CHARNEY:  Your Honor, I think the declaration

13   refers to the fact that the data is actually in the possession

14   of Professor --

15         THE COURT:  That's true.  It did mention that.

16         MR. CHARNEY:  And Professor Eterno, it's our

17   understanding, is away this week at a conference in Texas.

18   Professor Silverman doesn't have the data.  That's just the

19   bottomline.

20         We can make efforts when Professor Eterno returns,

21   obviously, to get it as soon as possible.

22         But, again, we're still at a little bit of a loss as

23   to why that can prevent defendants from deposing him or

24   cross-examining him to the fullest extent on all of his methods

25   and all of his results and all his --

D3k9flo1

1           THE COURT:  I don't think it should prevent the

2    deposition.

3           Did you talk to Silverman?

4           MR. CHARNEY:  We spoke to defendants.  We're good to

5    go on Monday morning for the deposition so that can -- we're

6    ready to proceed.

7           THE COURT:  I think you have to.  I think this request

8    is a bit of a collateral matter.  I allowed it.  What I didn't

9    like in his declaration was his telling me I don't intend to

10   testify about that.  He doesn't get a choice.  Once he's on the

11   stand, if something is relevant and the subject of

12   cross-examination, he has to testify about it.  That's the

13   bottomline.  He doesn't get to choose what he testifies to.

14          So he may indeed end up testifying to it because he

15   may be asked about it.  But I can't postpone his deposition.

16   It has to go forward Monday.

17          As far as getting this raw data to the defendant, it

18   is under a confidentiality order, is it not?

19          MR. CHARNEY:  Yes.

20          THE COURT:  So you can't give it away to anybody else.

21   You can't give it to other academics or journals or anybody.

22   Right.

23          And it may never be admitted at a public trial.  So

24   I'm not concerned about that.  You may use it to do your own

25   analyses or run your own regressions or whatever, but I doubt

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 36 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 7 of 225     443
D3k9flol

1    that it's going to be an exhibit.  I don't believe his raw data

2    is going to be an exhibit that's going to somehow leak the

3    article before it's printed.  So I'm not concerned about that

4    in any event.

5           So the order stands, or at least you have to still

6    explain to me the burden, which you haven't, but maybe because

7    you haven't had a chance to talk to Dr. Eterno.

8           This may, in fact, when Silverman testifies, I don't

9    know when you plan, but since I've ordered it turned over, it

10   has to be turned over.

11          So when is he supposed to testify?

12          MR. CHARNEY:  We were hoping to put him on next week,

13   Wednesday, Thursday, or Friday.  But I guess we have to find

14   out when Professor Eterno is going to return.

15          THE COURT:  I don't know that it requires him.  He may

16   be able to instruct an assistant or Dr. Silverman as to how to

17   retrieve this stuff.  I still thought it sounded from the last

18   oral argument -- I did review this transcript -- that it

19   wouldn't be hard to gather.  So I don't know that it requires

20   him coming back.  But you need to look into it.  Because I've

21   ordered it, and I don't change my mind.

22          The deposition has to go forward.  I didn't find

23   anything in his declaration particularly persuasive other than

24   his views as to what's relevant or not, what he's going to

25   testify to or not, the ruling he would make if he were a judge,

D3k9flo1

1    etc.

2              Are we ready for --

3              MR. CHARNEY:  Yes, Officer Polanco, on direct

4    examination.

5              MR. MOORE:  Judge, did you decide what we're doing on

6    the 29th?

7              THE COURT:  No.  I wanted to play it by ear, see where

8    we're up to.

9              MR. MOORE:  How long were you going to play it by ear?

10             THE COURT:  We're finding out who can't be here, and

11   what witnesses it affects.  It may be a particular witness that

12   people can't be here, no problem.

13             MR. MOORE:  Just about scheduling.

14             THE COURT:  That's right.  So talking to each other

15   might help.  Because those who can't be here may not need to be

16   here that day.  I don't know.

17             You've got big teams.  Both sides have big teams.  Big

18   teams.  It may be that, to use the day or half the day --

19             MR. MOORE:  Okay.

20             THE COURT:  You can adjust who it is.

21             MR. MOORE:  It's no shorter than a half day, right?

22             THE COURT:  No shorter than a half day.

23             MR. MOORE:  No longer than a half day?

24             THE COURT:  Correct.  The worst case, we would stop at

25   1:00 for everybody's sake.

D3k9flo1

```
 1              But check it out.  If you can't get a witness for whom
 2    certain people are willing to miss something like that, if you
 3    can't get that kind of witness, then we can't go.  But I'm
 4    hoping we can because I have so many down days coming.  I know.
 5    It's a long trial.  I'm still trying to use it.  But, as I
 6    said, I'm not going to interfere with anybody's religious
 7    practices.
 8     ADHYL POLANCO, resumed.
 9    DIRECT EXAMINATION CONTINUED
10    BY MR. CHARNEY:
11    Q.  Good morning again, Officer Polanco.
12    A.  Good morning.
13    Q.  I just want to remind you that you're still under oath.
14    A.  I understand.
15              THE COURT:  Would you all speak up.  Everybody.
16    Everybody.
17    Q.  Officer Polanco yesterday you were looking at the second
18    page of Exhibit 419 and it was Bates number NYC_218924.
19              Can I approach the witness and give him a copy?
20              THE COURT:  You don't need to ask.
21              MR. CHARNEY:  Thank you.
22    Q.  Looking at the second page of this.
23              Do you see the categories of information on this
24    document.  I believe yesterday you testified that you hand this
25    form, the monthly officer activity form in to your supervisor
```

D3k9flo1                          Polanco

 1  every month; is that right?

 2  A.   Into the immediate supervisor, yes.

 3  Q.   And what information, again, if you can tell us do you

 4  record on this form?

 5  A.   Arrests, radio runs, violation, can be parking, moving,

 6  criminal.

 7  Q.   What information about an arrest would you put on this

 8  form?

 9  A.   How many, whether it's a felony or it's a misdemeanor.

10  Q.   Does this form include any information about the underlying

11  circumstances of an arrest that you do?

12  A.   No.

13  Q.   Does this form include any information about the underlying

14  circumstances of a stop and frisk that you conduct?

15  A.   No.

16  Q.   So -- I think you testified yesterday that you -- your

17  supervisor does discuss this information on this form with you

18  from time to time?

19  A.   Yes.

20  Q.   When he or she discusses the information on this form with

21  you, does he discuss with you the underlying circumstances of

22  any of the arrests that are notated on this form?

23  A.   No.

24  Q.   Does he or she discuss with you the underlying

25  circumstances of any stops and frisks that are notated on this

Case 1:10-cv-06005-RWS   Document 401-1   Filed 02/13/15   Page 40 of 186   447
Case 1:08-cv-01034-AT-HBP   Document 284   Filed 05/30/13   Page 11 of 225
D3k9flo1                        Polanco

1   form?

2   A.  No.

3   Q.  Officer Polanco are you familiar with the term checkpoint?

4   A.  Yes.

5   Q.  What does that term mean to you?

6   A.  Checkpoint is -- I'm sorry.

7   Q.  Go ahead.

8   A.  Checkpoint is a -- they will assign supposedly -- like I

9   say, what's in writing and what we do is two very different

10  things.

11       Supposedly, supposed to have a van with constant

12  flares.  You're supposed to have a spot car or a escape car.

13  You're supposed to have a spotter.  And I believe at least

14  three or four officers.

15       That's how it's written.  How we do it is very

16  different.

17  Q.  How do you do it?  When you say how you do it, are you

18  talking about when you were in the 41st precinct?

19  A.  Yes.

20  Q.  How did you do it when you were in the 41st precinct?

21  A.  One of -- going back to the last question.  You also

22  supposed to set out a pattern on which vehicle you're stopping.

23  To prevent profiling or anything like that, you're supposed to,

24  for example, stop every third car or every fourth car.  That

25  way you're not stopping individual based on what they look.

D3k9flol                              Polanco

1   You're just stopping every second or third car.  That's how

2   it's written.

3          How we do it, basically we get told by the lieutenant

4   or the sergeant:  You need X amount of numbers.  I don't care

5   how you get them, get them.

6          THE COURT:  Go ahead.

7          THE WITNESS:  Sometime they put two cops.  Sometime

8   they put three.

9          I don't remember ever seeing constant flares that

10  they're supposed to be.  Sometime we have escape car.  Sometime

11  we don't.  And definitely we almost never follow the pattern of

12  stopping every third vehicle.  We are free to stop whoever we

13  want.  And summons whoever we want.  Just to get the numbers

14  that they want.

15  Q.  So are these checkpoints vehicle checkpoints?

16  A.  Vehicle checkpoint, yes.

17  Q.  And what is the -- according to how you did it in the 41st

18  precinct, what was the purpose of the checkpoint according to

19  your supervisors?

20  A.  According to them would be to high incident area.

21         MS. COOKE:  Objection, your Honor.  The witness is

22  referring to speculative testimony about what the supervisor's

23  purpose was.

24         THE COURT:  No.  He said what was the purpose of the

25  checkpoint according to your supervisor.

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 42 of 186
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 03/30/13  Page 13 of 225    449
D3k9flo1                          Polanco

1          Were you fold?

2          THE WITNESS:  Yes.

3          THE COURT:  Go ahead.

4          THE WITNESS:  We were told that they needed the

5    numbers.  That's what they said.

6    Q.   Did they tell you what they meant by numbers?

7    A.   Summonses or arrests.

8    Q.   So -- summonses or arrest.  Okay.

9          And how often did you -- did you work or did you

10   perform any checkpoints during the time that you were a patrol

11   officer in the 41st precinct?

12   A.   Yes, I did.

13   Q.   How often did you do it, if you recall?

14   A.   At the beginning almost never did it for the first two or

15   three years.  After I reported what I reported to internal

16   affairs, it was a daily thing.

17   Q.   So let's break that down a little bit.  You said after you

18   reported what you reported to internal affairs.  What did you

19   report to internal affairs?

20   A.   Back in 2009 I was extremely bothered with what I was

21   seeing out there.  The racial profiling, the arresting people

22   for no reason, being called to scenes that did not observe a

23   violation and being forced to write a summon that I didn't

24   observe.

25          Complaint reports manipulation.  Basically a robbery

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/13/15 Page 43 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 14 of 225    450
D3k9fiol                    Polanco

 1    would come in and we would be told not to take it for robbery
 2    because the numbers for the week will be too high in order to
 3    keep crime as low as they say it is.  And that's what they told
 4    us.
 5    Q.  So you said that you were bothered by these problems.  And
 6    so you reported something to internal affairs?
 7    A.  Yes, I did.
 8    Q.  When did you do that?
 9    A.  I first did it informally.  It was about September 2009.  I
10    wrote a letter and I put it in the integrity control officer,
11    ICO, door.  And the letter I believe we have -- I don't know if
12    you guys have a copy of -- basically expressing my concern
13    about minorities in the community and how we treating them.
14    How I grew up in Washington Heights.  I know what it's like to
15    grow up in the hood.
16            Basically that not everybody who lives in a high crime
17    area is a criminal.  And we were handcuffing kids for no
18    reason.  They would just tell us handcuff them.
19            And boss, why are we handcuffing them?
20            Just handcuff them.  We'll make up the charge later.
21            Some of those kids were not doing anything.  Some of
22    those kids were just walking home.  Some of those kids were
23    just walking from school.
24            I remember one incident where one kid -- and I
25    reported this -- they stopped his brother.  He was 13.  And he

D3k9flo1                         Polanco

1    was waiting for him from school at the corner to bring him

2    home.

3            When he came to us, the officer -- Officer, what's

4    wrong with my little brother?  Was he acting out?

5            He wind up with handcuffs too.  For simply asking what

6    was going on with his brother.

7    Q.  Do you remember approximately when this incident occurred?

8    A.  2009.  I did report it to internal affairs.

9    Q.  Know what part of the year it was?

10   A.  No.  I don't recall.

11   Q.  And you said you observed this incident.

12   A.  I was called to the scene, yes.  I was actually the one

13   that transported a group of the kids back to the precinct.

14   Q.  And are you the one that spoke to the brother about this

15   incident?

16   A.  Yes.  He was in the back of my car when he -- when he told

17   me exactly what he did and what happened.

18   Q.  So you reported this incident to internal affairs?

19   A.  That and many others, yes.

20   Q.  What other incidents did you report to internal affairs?

21   A.  I reported that I was being forced to write summonses by

22   the commanding officer and Lieutenant Valenzano.

23           I reported to them specifically that on one occasion I

24   was called to a scene by the captain and I was instructed to

25   write a summons for a person for no dog license.  I reported to

D3k9flo1                              Polanco

1   internal affairs that under intimidation we have to write these

2   summonses.  But my problem was I did not observe a dog.  And I

3   was bothered by it.  And I reported it.

4   Q.  Now you said you were bothered by it.  Did you actually

5   write the summons?

6   A.  I had to.  I had no choice.

7   Q.  Why do you say you had no choice?

8   A.  He was the commanding officer.  We had been spoken in roll

9   call, as we're going to hear the audios, on what to do when our

10  supervisor comes and tells us when to do something.

11          He is the captain.  He knows that I'm not supposed to

12  be writing a summons for something I didn't observe.  Why is he

13  calling me to the scene?  And why when I get to the scene he's

14  telling me to write a summons?

15  Q.  When did you report these concerns -- first report these

16  concerns to internal affairs?

17  A.  It was in September of 2009.  Informally.

18          Then I make a phonecall in November, I believe.  I

19  made a call to internal affairs with the same allegations,

20  telling that the way we are being treated in the 41st precinct,

21  the way they were manipulating the crime statistics, the way

22  they were treating youth and minorities in the 41st precinct.

23  And that was in November.  And -- yes.  I'm sorry.

24  Q.  So the first time you contacted them in September how did

25  you contact them?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3k9flo1                        Polanco

 1   A.   It was a letter.  An anonymous letter that I wrote.  I was

 2   afraid.  It's not that easy to report corruption.  This

 3   precinct -- this police department is not as black and white as

 4   they paint it.  It's not that easy to report corruption.

 5   Q.   Why do you say it's not that easy?

 6   A.   You seen what happened to Agent Schoolcraft.

 7           MS. COOKE:  Objection, your Honor.  The witness is

 8   going to be testifying about information that's been precluded

 9   from this case by order of the court with respect to Officer

10   Schoolcraft.

11           THE COURT:  I don't know what he meant by what

12   happened to him.

13           Is he fired?

14           THE WITNESS:  Officer Schoolcraft was put in a psych

15   ward for three days.

16           THE COURT:  The discipline that was imposed can come

17   in.  I'm not trying the case as to why it happened, but I can

18   learn what happened.

19           So I'll take that evidence.  He was put on the

20   sidewalk for three days.  Go ahead.

21           THE WITNESS:  Psych ward.

22           THE COURT:  Side what?

23           THE WITNESS:  In the hospital, a mental --

24           MR. MOORE:  Psych ward, Judge.

25           THE COURT:  Psych ward.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 47 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/15 Page 18 of 225    454
D3k9f1o1                          Polanco

1   |   MR. CHARNEY: A psychiatric ward.

2   |   THE COURT: I'm sorry. He was assigned to work there?

3   |   MR. CHARNEY: He was committed to one.

4   |   THE COURT: Then I'm not taking it. I have no idea

5   | why he was committed to a psychiatric ward. So I'm striking

6   | that from the record. I thought it was a reassignment that you

7   | were talking about.

8   |   MS. COOKE: Thank you, your Honor.

9   | Q.  I'm sorry. Other than -- let's put Officer Schoolcraft to

10  | the side.

11  |       Is there any other reason why you were afraid to

12  | report these concerns that you had to IAB?

13  | A.  Retaliation. I definitely knew that my union was not going

14  | to back me up.

15  | Q.  And so that -- you sent an anonymous letter.

16  |       Now the second time you contacted them you said was

17  | November 2009?

18  | A.  Yeah, I believe in November 2009.

19  | Q.  And actually going back in September on the letter, did you

20  | address the letter to anyone, any specific person?

21  | A.  No.  I -- it was a letter with no date, no name, no

22  | anything. I was afraid that if they found out it was me that

23  | they were going to retaliate against me.

24  | Q.  So you didn't identify yourself in the letter.

25  |       Did you identify what precinct you worked in in the

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 48 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 19 of 225    455
D3k9flo1                    Polanco

1   letter?

2   A.  The South Bronx, yes.  Yes, I did.  The 41st precinct.  I

3   did, yes.

4   Q.  Between September and the second time you contacted them in

5   November, did anyone from IAB contact you?

6   A.  Not necessarily.  I don't recall anybody contacting me.

7   No.

8   Q.  And then in November you said you contacted them a second

9   time.  How did you contact them?

10  A.  I made a phonecall actually.

11  Q.  Did you call someone specific?

12  A.  I called the IAB number they gave us.

13  Q.  Did you speak to anybody?

14  A.  I spoke to an investigator, yes.

15  Q.  Do you remember the investigator's name?

16  A.  No, I don't.

17  Q.  After that phonecall in November did you ever communicate

18  with IAB again about these concerns?

19  A.  After my suspension on December 12, yes.

20  Q.  We'll come back to that.

21         Now, in September when you raised concerns with IAB in

22  your letter did you mention UF 250s at all in that letter?

23  A.  Yes.

24  Q.  What is a UF 250 again?

25  A.  Stop, question, and frisk.

D3k9flo1                        Polanco

1   Q.   What specifically did you say in the letter about the

2   UF 250s?

3   A.   That we are illegally stopping and we are illegally

4   searching young Blacks and Hispanic for no reason.

5   Q.   Did you give any specifics as to why you believed that was

6   happening?

7   A.   Yes.

8   Q.   What did you say specifically?

9   A.   It was CompStat.

10  Q.   What do you mean by that?

11  A.   It's the numeric system that the police department have to

12  hold police officers and supervisors accountable.

13  Q.   In your view, based on your experience why do you think

14  that CompStat is causing police officers to stop young Black

15  and Latino people illegally?

16  A.   Because they want numbers.  They want numbers at all costs.

17  They want to look good.  Which is hard for me to understand.

18  They want to arrest -- they have arrested more people than ever

19  but at the same time crime is more than ever.

20  Q.   When you worked in the 41st precinct did you ever observe a

21  41st precinct officer make a stop, question, and frisk that you

22  believed did not -- was not based on reasonable suspicion?

23  A.   Many times.

24  Q.   How many times do you think?

25  A.   Many times.  More than 10.  I would say more than 20 times.

D3k9flo1                          Polanco

1    Q.   Yesterday we talked about driving with a supervisor.  Do
2    you remember that?
3    A.   Yes.
4    Q.   And I believe you testified -- let me just make sure I
5    don't misstate that.  I can just read this is from yesterday's
6    transcript, your Honor, if your Honor will permit me.
7              This is page 432, line 6.
8    "Q.   Are you familiar with the term driving a sergeant or
9    driving a supervisor?
10   "A.   Yes.
11   "Q.   What does that mean?
12   "A.   That means that whatever it seems like it's going to be.
13   You have no discretion whatsoever.  If you're driving a
14   supervisor, if you're driving the sergeant in the 41st precinct
15   at that time, that means that they are going to drive around
16   and they are going to stop people for you, or tell you to go
17   250 this guy, go summons this guy, go arrest this guy.  You
18   have absolutely no discretion."
19             Do you recall testifying to that?
20   A.   Yes, I do.
21   Q.   So, when you mentioned "or tell you to go 250 this guy," is
22   your recollection that when you drove a supervisor in the 41st
23   precinct a supervisor directed you to conduct a stop and frisk
24   on one or more occasions?
25   A.   Yes.

Case 1:10-cv-06205-RWS Document 401-1 Filed 02/13/15 Page 51 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 22 of 225   458
D3k9f1o1                          Polanco

1  Q.  And how many times do you recall that happening?

2  A.  Many times.  I don't have a number on the top of my --

3  Q.  More than five?

4  A.  More than five, yes, definitely.

5         THE COURT:  Would the supervisor just point to

6  somebody on the street and say go stop that guy?

7         THE WITNESS:  Any group of black kids or Hispanic kids

8  on the corner, in the park, or anywhere, just go grab, go 250

9  them, go summons them.

10        Sometimes they will ask me to summons them.  We will

11  ask the supervisor why.  And they will say unlawful assembly or

12  something like that.

13        THE COURT:  What?

14        THE WITNESS:  Unlawful assembly.  Because there's more

15  than three of them on the corner.  And we will write a

16  summonses at the direction of the supervisor.

17  Q.  Do you recall which supervisor or supervisors gave you

18  these instructions?

19  A.  Sergeant Rodriguez, Lieutenant Valenzano, and Captain

20  McHugh, that was his special, that was what he did almost

21  everyday.

22  Q.  So, did you, in fact, yourself conduct any stop, question,

23  an frisks in the 41st precinct that you did not personally

24  believe you had a reasonable articulable suspicion for?

25  A.  Yes.  But I did not have the discretion not to do it.

D3k9flo1                           Polanco

1    Q.  So were the only times you did it when -- I'm sorry.

2    Strike that.

3            Why did you believe you didn't have the discretion?

4    A.  Because I had the supervisor next to me.  It wasn't a

5    choice.

6    Q.  Did you report any of these incidents to the internal

7    affairs bureau?

8    A.  Yes, I did.

9    Q.  When did you do that?

10   A.  I did it in the letter in September and I did it in

11   November, again.

12   Q.  Over the phone?

13   A.  Over the phone.

14   Q.  What specifically did you say in the letter about this

15   practice of a supervisor instructing you to conduct a stop,

16   question, and frisk?

17   A.  I told them that they had no basis to stop kids, that kids

18   were just walking up and down the street or coming home, coming

19   home from school or going to school.  With no reason

20   whatsoever, they will direct us to stop them.

21           I also pointed out a summons.  Sometimes they will ask

22   to even summons them.

23           THE COURT:  What did you do with the UF 250 if there

24   was no basis?  What was checked off?

25           THE WITNESS:  They would tell us what to do basically.

D3k9f1o1                         Polanco

1           THE COURT:  Check off what?

2           THE WITNESS:  In the police department, your Honor,

3   you do and then you articulate.

4           THE COURT:  Right.  So did you check off things like

5   high crime area?

6           THE WITNESS:  High crime area.  Burglary pattern.

7   Robbery pattern.

8           THE COURT:  Furtive movement?

9           THE WITNESS:  Furtive movement was the special of the

10  day.

11          Anything that can be justified after the stop.  Not

12  before.  After the stop.

13          I remember one of the recordings that I heard of

14  another precinct.  And I heard this, but I didn't record it.

15          MS. COOKE:  Objection, your Honor.

16          THE COURT:  Objection sustained as to what was said.

17          MR. CHARNEY:  You can't talk about -- let's just talk

18  about your precinct and your experience.

19  Q.  Did you -- when you complained about this practice of being

20  told to write 250s to IAB, did you give any specific examples

21  that you can recall?

22  A.  Yes.  I believe I did.

23  Q.  Can you remember any of those specific examples'today?

24  A.  Yes.  Like the kids with the brother, that came out to

25  check on his brother.  I gave him the address, the date, even

D3k9flo1                        Polanco

1    the person who issued the summonses.

2           One of those kids was actually 13.  And the commanding

3    officer was upset that he couldn't give him a summons.  So he

4    held him in the squad and told the squad to hold him for a few

5    hours to see if he had any information on guns or any drug

6    activity in the community.

7    Q.  So you said who was upset that they couldn't give him the

8    summons?

9    A.  The commanding officer.

10   Q.  Was that Inspector McHugh?

11   A.  Inspector McHugh.

12   Q.  And why couldn't he give him the summons, if you recall?

13   A.  Because he was 13.

14   Q.  So why -- can you tell --

15   A.  The law don't allow you to give a summons to somebody under

16   16, I believe.

17   Q.  So what did the commanding officer do instead?

18   A.  He asked the squad, the detective squad to bring him

19   upstairs and hold him there until he give him information about

20   guns or drugs.

21   Q.  And what would that information -- how would that make a

22   difference?

23   A.  He wanted -- basically wanted him to snitch or to give them

24   information.  That's what he wanted.

25   Q.  Now, you mentioned I think yesterday that, when we were

D3k9flo1                              Polanco

1   talking about roll calls, that you had recorded some of the

2   roll calls you attended in the 41st precinct?

3   A.  Yes, I did.

4   Q.  Approximately when did you do that?

5   A.  I believe I started in August, September.  Went through

6   maybe December of 2009.

7   Q.  And how did you record those roll calls?

8   A.  With a digital recorder, small digital recorder.

9   Q.  Do you know what kind of digital recorder it was?

10  A.  I got it at Radio Shack.  It's one of those smaller ones.

11  Q.  Did you know how to operate it when you used it to record

12  the roll calls?

13  A.  Yes, I did.

14  Q.  After you recorded the roll calls, what did you do with the

15  recordings?

16  A.  I kept them in my locker for a while.

17  Q.  You kept them in your locker?

18  A.  For a while, yes.

19  Q.  And how did you store them?

20  A.  I just put it on the shelf on top of my locker.

21  Q.  By -- you mean the recording device?

22  A.  Yes.

23  Q.  At any point in time did you provide copies of the

24  recordings to the police department?

25  A.  Yes, I did.

D3k9f1ol                        Polanco

1  Q.  When did you do that?

2  A.  I believe it was in December.  I believe it was in

3  December.

4  Q.  Of what year?

5  A.  Of 2009.

6  Q.  And who in the police department did you provide them to?

7  A.  Internal affairs.  There was -- at the time it was Sergeant

8  Carter.  And there was another female sergeant.  I forgot her

9  name.

10  Q.  And in what form did you provide them to the New York

11  police department?

12  A.  They took the actual -- they took an actual recording, the

13  recorder.

14  Q.  So you gave them the actual recorder?

15  A.  Yes.

16  Q.  Did you alter the recordings in any way before you gave

17  them to IAB?

18  A.  No.

19  Q.  I want to show the witness -- show the witness physically

20  the CD that we have marked as Exhibit 284 and I believe

21  defendants have a copy of it.  I have an extra copy if you want

22  to look at it.  Can I show the witness?

23           THE COURT:  Of course.

24  Q.  Officer Polanco, you have a CD in front of you marked

25  Exhibit 284.  Have you ever seen this CD before?

D3k9flo1                    Polanco

1  A.  Yes.

2  Q.  When did you see it?

3  A.  A couple of days ago we reviewed it.

4  Q.  Did you open -- in other words did you listen to the

5  contents of that CD?

6  A.  Yes, I did.

7  Q.  What was on the CD, if you can recall?

8  A.  It was the recording I made on roll call.  It was about

9  three or four of them.

10  Q.  And you listened to the entirety of those?

11  A.  Yes, I did.

12  Q.  Are those recordings true, accurate and complete copies of

13  the recordings that you gave to the internal affairs bureau?

14  A.  Absolutely, yes.

15        MR. CHARNEY:  One minute, your Honor.

16        (Pause)

17  Q.  Prior to giving your recording device to the internal

18  affairs bureau, did you provide any other person access to that

19  recorder that you know of?

20  A.  Maybe my partner.

21  Q.  When you say you provided him access, how did you provide

22  him access?

23  A.  I played it for him by the locker.

24  Q.  Other than that, did you provide access to anybody else?

25  A.  Maybe my lawyer.  I had a lawyer back then.  Yes, maybe.

D3k9flo1                         Polanco

1    Q.   How did you provide access to your lawyer?

2    A.   We actually review it together.

3    Q.   I think I've already asked you this.  I just want to make

4    sure.

5             Did you alter these recordings in any way before you

6    gave them to internal affairs?

7    A.   No.

8             MR. CHARNEY:  One more minute, your Honor.  Sorry.

9             (Pause)

10            Your Honor we would move for the admission of this

11   exhibit into evidence.

12            THE COURT:  Yes.  Any --

13            MS. COOKE:  No objection, your Honor.

14            THE COURT:  Right.  Received.

15            (Plaintiffs' Exhibit 284 received in evidence)

16            MR. CHARNEY:  We would like to play portions of these

17   recordings.  We've provided the list of the portions to the

18   defendant.  We will obviously announce it before we play each

19   portion, which track number and which portion.

20            So I believe we're going to start with track 1.  And

21   we're going to start at 3 minutes and 3 seconds and play it

22   to --

23            (Audio recording played)

24            Not yet.  We're going to start at 3 minutes and 3

25   seconds and play to 8 minutes and 1 second.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 59 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 30 of 225    466
D3k9flol                          Polanco

 1              I apologize, your Honor.  Hopefully this will work
 2      better than yesterday.
 3              (Audio recording played)
 4              MR. CHARNEY:  Your Honor, we think it might be easier
 5      if we play portions, stop it.  We'll tell you where we stopped
 6      it.  And then ask some questions and continue.
 7              THE COURT:  That's fine.
 8              MR. CHARNEY:  So we just played from 3:03 to -- where
 9      did we stop it -- I'm sorry, 3:03 to I guess 4:26.
10      Q.  Officer Polanco did you hear the recording we just played?
11      A.  Yes, I did.
12      Q.  Do you know who the speaker on that recording is?
13      A.  That is a union delegate from my squad.
14      Q.  Do you know that delegate's name?
15      A.  Officer Herran.
16      Q.  Do you recall being present at that -- first of all, was
17      that a roll call that you recorded?
18      A.  Yes.
19      Q.  Do you recall being present at that roll call?
20      A.  Yes.
21      Q.  Do you -- did you hear Officer Herran mention the term
22      twenty and one in that recording?
23      A.  Yes.
24      Q.  Again, what is your understanding of twenty and one?
25      A.  Twenty summonses and one arrest per month.

D3k9flo1                          Polanco

1    Q.  Did you hear Officer Herran say anything about what the

2    union -- in that recording about what the union's position was?

3    A.  He said that the union was backing it up and the trustees

4    were backing it up.

5         MR. CHARNEY:  I'm sorry, your Honor.

6         (Pause)

7    Q.  So we're actually going to go back 10 seconds to 4:16 and

8    then play it through.

9         (Audio recording played)

10   Q.  You heard that portion?

11   A.  Yes.

12   Q.  Did you hear Officer Herran say:  I got to go in there and

13   adjudicate -- and I apologize, your Honor -- fucking CDs on

14   your activity?

15   A.  Yes.

16   Q.  Do you know what that means?

17   A.  That he got to go adjudicate command discipline, if I may

18   explain?

19   Q.  Yes.  Tell us what command discipline is.

20   A.  Command discipline is when an officer get in trouble in the

21   precinct level, not wearing black socks, being late, not

22   showing up to court, any minor little infraction that a cop

23   does, you get basically the command -- your supervisor can

24   write you up for a CD, command discipline, where you can lose

25   vacation days.

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/18/15 Page 61 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 32 of 225    468
D3k9flo1                          Polanco

1  Q.  And do you -- what did you understand Officer Herran to

2  mean when he said:  I got to go in there and adjudicate CDs on

3  your activity?

4  A.  Basically the penalty that they're going to take is going

5  to depend on what activity we have.

6  Q.  What do you mean by that?

7  A.  That if we don't have the twenty and one, for example, and

8  I get a CD for X reason, I didn't have black socks on, the

9  penalty can be one and admonish, or it can be three or four

10  vacation days, depending on my activity, how my activity was

11  for the past basically three months.

12  Q.  And how do you know that's, in fact, how they do it, other

13  than what Officer Herran said?

14  A.  That's how the supervisor, that's how all the cops told us

15  they do it.

16          MR. CHARNEY:  Continue.

17          (Audio recording played)

18  Q.  Did you -- that was still Officer Herran?

19  A.  Yes.

20  Q.  Did you hear him referring to a sheet that a platoon

21  commander has?

22  A.  Yes.

23  Q.  Do you know what he was referring to?

24  A.  It's called the daily recap sheet.  The platoon commander,

25  lieutenant most of the time, he will, after every tour or in

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 62 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/15 Page 53 of 225     469
D3k9flo1                          Polanco

1   the middle of the tour he will call us or he will come up to us

2   and ask us what we have done for the day and he will write it

3   down.

4   Q.   When you say what you had done for the day, what do you

5   mean by that?

6   A.   Specifically he wanted to know how many 250s, how many C

7   summonses, how many B summonses we have written or how many

8   people we have arrested.

9           MS. COOKE:  Can you just announce the time.

10          MR. CHARNEY:  So that was 4:23 to 5:06.

11          So now we're going to start at 5:06 and keep going.

12  Thank you.

13          (Audio recording played)

14          MR. CHARNEY:  We stopped at 6:30.  So that was 5:06 to

15  6:30.

16  Q.   Officer Polanco you heard that portion?

17  A.   Unfortunately, yes.

18  Q.   And you heard mention of I believe was it a collar, your

19  collar is one collar.  What -- do you know what that means?

20  A.   Yeah, that you have to make one arrest.

21  Q.   And then I believe he said something about crush the -- and

22  again pardon my language -- fucking city.  Do you know what

23  that means?

24  A.   What he said was make it on your RDO.  Crush the fucking

25  city.

D3k9flo1                         Polanco

1    Q.  What does that mean to you?

2    A.  This is shameful that a cop is saying this.

3            When he's saying make it RDO.  If I work Monday to

4    Friday and Saturday will be my next day off, he's asking me to

5    make an arrest on Friday night so whoever I arrest on Friday

6    night for whatever reason, I'm guaranteed overtime the next day

7    and the city will have to pay me time-and-a-half to come in.

8    That's when my daily gets done, yes.

9            MR. CHARNEY:  Continue now from 6:30.

10           (Audio recording played)

11   Q.  Did you on that portion -- you heard that portion?

12   A.  Yes.

13   Q.  Did you hear a reference again to a daily recap?

14   A.  Yes.

15           MS. COOKE:  Can I get the end of that.

16           MR. CHARNEY:  7:26.

17   Q.  And what is the daily recap again?

18   A.  This is the -- a sheet that a platoon commander has that he

19   will go around to every officer under his platoon and ask him

20   what he had done for the day.

21   Q.  So we're at what -- where are we starting.

22           MR. AZMY:  7:26.

23           MR. CHARNEY:  So we got about 30 seconds left.  Start

24   from 7:26.

25           (Audio recording played)

D3k9flo1                          Polanco

1    Q.  Do you remember, Officer Polanco, approximately when this

2    roll call took place?

3    A.  I would say between September and November of 2009.

4    Q.  I think the next -- we're going to play another portion

5    from -- we stopped at 8 minutes and one second, I think.

6         We're going to play another portion on track 1.  This

7    is at 9:47 to 13:17.

8         (Audio recording played)

9    Q.  Can you just tell us first of all, Officer Polanco, who is

10   speaking on this portion of the recording?

11   A.  It's another union delegate.  It's Officer Fundaro.

12   Q.  Can you spell that.

13   A.  F-U-N-D-A-R-O.

14   Q.  Okay.  Thank you.  We're starting at what point?

15        MR. AZMY:  11:11.

16        MR. CHARNEY:  Go ahead.

17        (Audio recording played)

18   Q.  Did you hear mention of somebody named Mandy or Mancy and

19   Angel?

20   A.  Mancy.

21   Q.  Who is Mancy?

22   A.  Mancy is the third union delegate.

23   Q.  Who is Angel?

24   A.  Angel Herran is the person that spoke previously.

25   Q.  Is that the other union delegate?

D3k9flo1                          Polanco

1   A.   Yes.

2          MR. CHARNEY:   We're going to start again at -- we're

3   at 10:34 now.

4          (Audio recording played)

5   Q.   Did you just hear Officer Fundaro talk about the one and

6   twenty?

7   A.   Yes.

8   Q.   And did you hear him say that it was going to get a lot

9   worse?

10  A.   Yes.

11  Q.   Did you know what he meant by that?

12  A.   That today it's one and twenty.   That it's going to be more

13  later.   It's going to be more activity that's going to be

14  expected from us.

15  Q.   And then did you hear him refer to DVA?

16  A.   PBA.

17  Q.   PBA?

18  A.   The Patrolmen's Benevolent Association.

19  Q.   I think he said that's why the -- again pardon my

20  language -- the fucking PBA, he spoke to them in regards to

21  activity.

22          Did you hear him say that?

23  A.   Yes.

24  Q.   Based on your experience when you were in the 41st precinct

25  and do you know what, if any, conversations the PBA had with

D3k9flo1                          Polanco

1     NYPD management about these issues around activity?

2               MS. COOKE:  Object, your Honor.  To the extent it's

3     hearsay.  I'm going to object.  Conversations about the PBA.

4     That's certainly not an admission from the city.

5               THE COURT:  Sustained.

6               MS. COOKE:  Thank you, your Honor.

7               MR. CHARNEY:  So let's continue.  What time are we

8     starting at?

9               MR. AZMY:  10:58.

10              MR. CHARNEY:  10:58.  Okay.

11              (Audio recording played)

12              MR. CHARNEY:  Where did we stop?

13              Well, we'll tell you.

14    Q.  Did you hear Officer Fundaro say there at the end you're

15    fighting against the current?

16    A.  Yes.

17    Q.  Do you know what that means?

18    A.  He's -- I believe he's indirectly talking to me because at

19    that time it was known around the precinct that I called

20    internal affairs protesting about the numbers and the

21    profiling.

22    Q.  So is it your testimony that this particular recording,

23    track 1, was a roll call that took place after you had

24    contacted internal affairs?

25    A.  Yes, either by the letter or by phone, yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3k9flo1                         Polanco

1    Q.   And how do you know -- what is your basis for believing

2    that he was referring indirectly to you?

3    A.   My belief is that he said that you fighting the current.

4    Basically I'm a single officer, minority officer going against

5    the whole department.

6    Q.   Well let me ask you this.   What is your basis for believing

7    that he or anyone else in the 41st precinct knew that you had

8    contacted internal affairs?

9    A.   Because they in the precinct roster in the cafeteria next

10   to my name they wrote the name rat.

11              THE COURT:   They wrote what?

12              THE WITNESS:   Rat.

13              MR. CHARNEY:   We're starting at.

14              MR. AZMY:   11:31.

15              (Audio recording played)

16              MR. CHARNEY:   So we ended at I guess 13:17.

17   Q.   Officer Polanco, did you ever yourself go to your union

18   either delegate or somebody else in the PBA with these

19   concerns?

20   A.   Yes.

21   Q.   When did you do that?

22   A.   Several times.   In the precinct.   I went to Fundaro.   I

23   went to Herran.   I went to Mancy.

24   Q.   Do you know what period of time this was that you did that?

25   A.   Throughout 2009.

D3k9f1o1                         Polanco

1   Q.  And at any point -- I'm sorry.  What did you tell them

2   specifically?

3   A.  What's going on here?  What's up with these numbers?

4   What's up with this quota?

5          And I basically was told everything was dealt in the

6   last contract, that it was part of the contract, and that the

7   union was backing it up.

8          MR. CHARNEY:  I want to listen to track number two

9   now.  And we're going to go to -- those first two portions we

10  played were both from track one.  We're going to play from

11  track two from the beginning to 2:29.

12         (Audio recording played)

13  Q.  Can you just first of all tell us --

14         MS. COOKE:  Time.

15         MR. CHARNEY:  I'm sorry.  The time?

16         MR. AZMY:  Eleven seconds.

17  Q.  Do you recognize this as -- I'm sorry.  Do you recognize

18  the speaker on the recording?

19  A.  Yes, I do.

20  Q.  Who is that speaker?

21  A.  Sergeant Mervin Bennett.

22  Q.  How do you spell the last name?

23  A.  B-E-N-N-E-T-T.  Bennett.

24  Q.  I think you told us this yesterday, but who is Sergeant

25  Bennett?

Case 1:10-cv-06005-RWS Document 401-1 Filed 03/38/15 Page 69 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 03/30/15 Page 40 of 225     476
D3k9flo1                    Polanco

1    A.  He was one of the sergeants assigned to the platoon.  Not

2    directly my sergeant but he's a platoon sergeant also.

3    Q.  So it's correct that he does supervise patrol officers or

4    did supervise patrol officers in the 41st precinct in 2009?

5    A.  Yes.

6    Q.  And this recording that we're listening to, is this one of

7    the roll call recordings, to your recollection, that you made?

8    A.  Yes, it is.

9    Q.  And do you recall being present at this roll call?

10   A.  Yes, I do.

11          MR. CHARNEY:  Okay.  Let's continue at eleven seconds.

12          (Audio recording played)

13          MR. CHARNEY:  What time did we stop at.

14          38 seconds, okay.

15   Q.  In the portion we just listened to did you hear Sergeant

16   Bennett referring to the twenty and one?

17   A.  Yes.

18   Q.  Did you hear him refer to any other numbers in that part?

19   A.  Yes.

20   Q.  What other numbers did you hear him refer to?

21   A.  He said it could be thirty-five and one.  It could be

22   forty-five and one.

23   Q.  Did you hear him say anything else on that portion?

24   A.  He said that unless we want to become a Pizza Hut

25   deliveryman we better do as they say.

D3k9flo1                    Polanco

1              MR. CHARNEY:  Let's continue playing at 38 seconds.

2              (Audio recording played)

3    Q.   In that section did you hear Sergeant Bennett refer to

4    being a zero?

5    A.   Yes.

6    Q.   Do you know what he meant by that?

7    A.   Being a guy who doesn't do as he said, that doesn't meet

8    the quota.

9    Q.   How do you know that's what he meant?

10   A.   He said it before that if you want to fight the power and

11   fight the quota and want to be a zero, basically if you don't

12   do what they ask the one and twenty, you're a zero.  That's how

13   they consider you.

14             MR. CHARNEY:  We stopped at what time?

15             1:35.  Okay.  Let's continue at 1:35.

16             (Audio recording played)

17   Q.   So did you hear Sergeant Bennett on that portion say that

18   if you're a solid cop he will fight for you but if you're a

19   zero I'm not fighting?

20   A.   Once again, if you meet his numbers, he will talk for you.

21   He will stick his head out for you, which he didn't anyway.

22   But if you don't, then he won't back you up.  He won't

23   recommend you for anything.

24   Q.   When you say stick his neck out for you, what do you mean

25   by that?

D3k9flo1                        Polanco

1    A.  Basically if somebody else comes in with a complaint about

2    any officer.  And he sees that that officer have his numbers,

3    he will say:  No, no, this is one of my best cops.  Look at his

4    numbers.  Can you please leave him alone.  Or on the contrary,

5    he can say:  Yeah, this cop doesn't meet my numbers.  Do

6    whatever you want with him.

7            He doesn't have that power.

8    Q.  I'm sorry?

9    A.  He doesn't have that power, as you say.  He's a sergeant.

10   Q.  How do you know he doesn't have that power?

11   A.  Because what happens at the precinct level is beyond the

12   sergeant.  It's lieutenant and captains and inspector who

13   decide what's going to happen.

14   Q.  Let's -- we're starting at 2:19.  We're almost done.  So

15   let's play the last ten seconds.

16           (Audio recording played)

17   Q.  Move through this.  We're going to play now track three

18   starting at 4:50 and going to 8:33.

19           (Audio recording played)

20           MR. CHARNEY:  Can we stop a second.  Can we go back to

21   the beginning.  Start at 4:50.

22           (Audio recording played)

23           (Continued on next page)

24

25

D3K8FLO2                           Polanco - direct

1   Q.  First of all, do you recognize the voice on this recording?

2   A.  Yes.

3   Q.  Who is this person?

4   A.  At the time it was Captain McHugh.

5   Q.  Who is Captain McHugh?

6   A.  He was the commanding officer at the 41st Precinct.

7           MR. CHARNEY:  I apologize, your Honor.  Can we go back

8   and just start it again at 4:50?

9           (Audiotape played)

10  Q.  Did you hear Inspector McHugh there say, "The summonses are

11  coming full circle again.  The Bronx came in and" -- actually,

12  it says "broadest to the city," but that's not what I heard.

13  Do you understand what he said on that portion?

14  A.  Yes.  He said that the Bronx came lower in the city.

15          THE COURT:  The Bronx came what?

16          THE WITNESS:  Lower.

17  Q.  Do you know what he meant by "the summonses are going full

18  circle again"?

19  A.  A summons is a money generating machine for the city.  So

20  the more summonses were issued, the more money the city

21  generates.

22  Q.  Is that what you understood him to mean by that?

23  A.  That was my understanding.

24  Q.  Do you know what he meant by the Bronx came in worse or was

25  worse than the city?

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 72 of 186    480
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 44 of 225
D3K8FLO2                          Polanco – direct

1   A.   They compare all the boroughs, like all the summonses from

2   the Bronx, from Manhattan, and see which borough is having more

3   than others.  Apparently, the Bronx came out lower.

4   Q.   How do you know that they do that comparison?

5   A.   I used to do crime analysis.  I have a little understanding

6   of how they operate.

7   Q.   When you say "they," who are you speaking about?

8   A.   The chiefs.

9   Q.   Chiefs of?

10  A.   Borough, chief of personnel, chief of patrol.

11  Q.   Now, you said you did crime analysis.  What did you mean by

12  that?

13  A.   I used to be in the precinct where I used to do the audits

14  for the complaint reports.  In that office, they also did the

15  summonses.  I was also in charge of putting the summonses in

16  the system, putting the 250s in the system.

17  Q.   This was in the 41st Precinct?

18  A.   Yes.

19  Q.   What period of time did you do that?

20  A.   It was for a short period of time in 2009, about four, five

21  months.

22  Q.   We are going to continue at 4:57.

23           (Audiotape played)

24  Q.   Did you hear that portion?

25  A.   Yes, I did.

D3K8FLO2                          Polanco - direct

1    Q.  What did you hear Inspector McHugh -- Chief McHugh,

2    although he is now an inspector, correct?

3    A.  Something like that.  Yeah.

4    Q.  We will call him Inspector McHugh.  What did you hear

5    Inspector McHugh say on that portion?

6    A.  Chief Giannelli, who used to be the chief of the

7    department, together with Chief Purtell, Chief Purtell used to

8    be the chief of the Bronx, that he basically screamed at him.

9    That's what I understand.

10   Q.  Just to clarify the record, you said Chief Giannelli was

11   the chief of the department?

12   A.  I'm not sure.  He was not the borough chief.  He was the

13   one on top of Purtell, and Purtell was basically the chief of

14   the Bronx.

15   Q.  Do you know who Inspector McHugh would report to directly?

16   A.  I think borough chief Purtell.

17   Q.  Let's continue at 5:11.

18         (Audiotape played)

19   Q.  Did you hear at the end of that portion Inspector McHugh

20   say, "Headquarters is now yelling at Chief Purtell and he is

21   given the business"?

22   A.  Yes.

23   Q.  Do you know what Inspector McHugh meant by that?

24   A.  Headquarters is the one that control CompStat and the

25   numbers.  So when they don't like the number for certain

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 75 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 46 of 225    482
D3K8FLO2                        Polanco - direct

1    borough, they will call that chief and scream at him, whatever

2    he said.

3    Q.  Let's continue at 6:05.

4           (Audiotape played)

5    Q.  Did you hear at the end there Inspector McHugh say, "If you

6    don't do it now, I am going to have you work with the boss to

7    make sure it happens"?

8    A.  Yes.

9    Q.  Do you know what he meant by that?

10   A.  He also said it was nonnegotiable.

11   Q.  Yes.

12   A.  We didn't have a choice.  Basically, like I explain before,

13   he will have us drive a supervisor, and when you do that, your

14   discretion is out the door; you have to do what they say.

15   Q.  When you say "do what they say," what are you referring to?

16   A.  If they see a group of kids on the corner, they are going

17   to go summons them, to go 250 them, to go pat them down, to do

18   everything that I would normally not do if they weren't around,

19   if I didn't have reason to do it.

20   Q.  Did you also hear Inspector McHugh say, "What we can do,

21   though, to get some of our people that aren't chipping in to go

22   to some of the locations we are having problems and give them

23   the business, rightfully when they should."  What does "give

24   them the business" mean to your understanding?

25   A.  My understanding is again the summonses.  The business that

D3K8FLO2                        Polanco - direct

1    the city have, and it's a shame they call it a business, is

2    generate money through summonses.  We are supposed to hand them

3    the business.

4    Q.  We are going to start at 6:43.

5              (Audiotape played)

6    Q.  On that portion, did you hear Inspector McHugh say,

7    "Because you know what, they control the overtime too guys.  If

8    they think we are a bad borough, they won't give us overtime."

9    Do you know what he meant by that?

10   A.  Basically, if we don't come up with the numbers, we are not

11   going to get overtime.

12             MS. COOKE:  What is the time?

13   Q.  We are going to start at 7:11.

14             (Audiotape played)

15   Q.  On that last portion, and we stopped at the end 8:33, did

16   you hear Inspector McHugh saying, "But what it does help us is

17   it helps us, they know that we are going to get our fair share

18   of some resources like they have."  Did you hear him say that?

19   A.  Yes.

20   Q.  Do you know what he meant by that?

21   A.  I think, I believe he probably is referring to the

22   overtime.  If I might explain?

23   Q.  Sure.

24   A.  Overtime is one of the biggest thing for most of the

25   officers.  A lot of officers have family, have kids, multiple

D3K8FLO2                        Polanco - direct

 1    families, and a lot of officers depends on the overtime.  It

 2    will be embarrassing to say that most of the officers that get

 3    a lot of arrests, they make a lot of arrests, they make it for

 4    the overtime.

 5            MS. COOKE:  Objection.  The answer is speculative.

 6    A.  Based on my experience --

 7            THE COURT:  One moment.

 8            Only the sentence will be stricken where he mentions

 9    being embarrassing to say those that get a lot of arrests, they

10    make it for the overtime.  That part I will strike, but the

11    previous portion I will allow.  Basically, the previous

12    sentence that the people need overtime for their families.

13    Q.  Officer Polanco, yesterday you made a comment in your

14    testimony that you are not a fan of overtime.  When you worked

15    at the 41st Precinct, did you ever work any overtime tours?

16    A.  Occasionally, yes.

17    Q.  Can you explain what you meant by I am not a fan of it?

18    A.  There are certain types of overtime.  I am a father and

19    have three kids.  Any time I can spend with my kids, I am going

20    home.  But there's different type of overtime.  The one that

21    came most handy was the impact overtime.  The impact overtime

22    where they will assign officers that were supposed to be off

23    their day to high-crime areas.

24            When you assigned to impact overtime, the integrity

25    control officer will be in charge of it most of the time, and

D3K8FLO2                        Polanco - direct

 1    there will be a requirement for you to be assigned, to be given

 2    the overtime.  Most of the time you have to agree to write five

 3    summonses, five 250s, or an arrest in order to get the

 4    overtime.

 5    Q.  What is your basis for that statement?  How do you know

 6    that that was the requirement?

 7    A.  This is what the ICO used to call it.  This is what you

 8    need to do if you want the overtime.

 9    Q.  By ICO, you mean integrity control officer?

10    A.  Yes, a lieutenant.

11    Q.  That person is a lieutenant in the 41st Precinct?

12    A.  Yes.

13    Q.  Is it your testimony that your integrity control officer in

14    the 41st Precinct, in fact, told you that if you want to work

15    impact overtime, you have to either make five summonses, five

16    250s, or one arrest?

17    A.  Yes.

18    Q.  Do you recall when he or she said that to you?

19    A.  Throughout 2009.

20    Q.  What is that integrity control officer's name?

21    A.  Lieutenant Dominguez at the time.

22    Q.  Did you ever actually work an impact overtime tour?

23    A.  I did a few times, yes.

24    Q.  Did you comply with these requirements that Lieutenant

25    Dominguez communicated to you?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/18/15 Page 79 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 50 of 225   486
D3K8FLO2                        Polanco - direct

 1   A.   Sometime I did, sometime I didn't.  Because sometime they
 2   assign you the overtime based on whoever wants to do it.
 3   Sometime they didn't have the resources so they will force you
 4   to do the overtime.
 5   Q.   When you say forced you, what do you mean?
 6   A.   They will give you a notification you have to show up
 7   tomorrow, that you have no choice but to come in.
 8   Q.   So you said that there were times when you did fulfill the
 9   requirement of five summonses or five 250s or one arrest?
10   A.   Yes.
11   Q.   In any of those occasions, do you recall whether any of the
12   stops you made were without reasonable suspicion?
13   A.   Some of them were not because some of them -- like in
14   impact overtime, I will be driving the sergeant, and you
15   usually go from 6 to 2, 6 p.m. to 2 in the morning.  So if it
16   was like 11, 11:30, and we didn't have the four or five, we
17   will hop in a van or go in a car with a supervisor, and he will
18   just do the same, grab those kids, summons those kids, write
19   this one, 250 this one, and in some of those occasions it was
20   not warranted.
21   Q.   Then when you had finished the tours, impact overtime
22   tours, did you have to provide documentation of your activity
23   to anybody?
24   A.   Yes.
25   Q.   Who did you provide it to?

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 80 of 186
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 51 of 225      487
D3K8FLO2                        Polanco - direct

1    A.  If the ICO was there or the supervisor in charge of the

2    platoon that was doing the overtime.

3    Q.  Let's play track 5 on Exhibit 284.  We are going to play it

4    from the beginning to 1 minute and 9 seconds.

5            (Audiotape played)

6    Q.  We stopped at 13 seconds.

7            Do you recognize the voice on that recording?

8    A.  Yes, I do.

9    Q.  Who is that?

10   A.  Lieutenant Andrew Valenzano.  Now he is a captain.

11   Q.  At the time, this recording was made in the fall of 2009?

12   A.  Yes.

13   Q.  What was his position in 2009, if you recall?

14   A.  He was a platoon commander of the 41st Precinct.

15   Q.  Let's continue from 13 seconds.

16           (Audiotape played)

17           MR. CHARNEY:  Where did we stop?  44 seconds.

18   Q.  That was Lieutenant Valenzano still?

19   A.  Yes.

20   Q.  Did you hear him say, "But if you see people over there on

21   the bikes carrying the bags, you know, that's what we need,

22   good stops"?

23   A.  Yes.

24   Q.  Do you know what he meant by that?

25   A.  To stop them and frisk them, if they were simply on a bike

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/18/15 Page 81 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 52 of 225    488
D3K8FLO2                          Polanco - direct

1   carrying a bag.
2   Q.  Earlier did you hear him refer to certain locations, 165
3   area, Pine Avenue, "those are the areas, we want you guys over
4   there for that reason"?
5   A.  Yeah.
6   Q.  Do you know what he meant by that?
7   A.  No.
8   Q.  So the portion where he said, stop the guys on the bikes
9   carrying the bags, what did you understand him to mean by that?
10  A.  Simple as that.  Stop and frisk anybody who is on a bike
11  carrying a bag.
12  Q.  Did he ever tell you or did any of your supervisors ever
13  tell you why they wanted you to stop people on bikes or people
14  carrying bags?
15  A.  No.
16  Q.  Let's continue from 44 seconds.
17          (Audiotape played)
18  Q.  We stopped at the end, which was 1:09.
19          Can you tell me who that voice was?
20  A.  At the end, it was at the beginning of McHugh's track.
21  Q.  Did you hear him say, "Thank you for cooperating with, you
22  know, making sure we get everyone on board towards depressing
23  conditions"?
24  A.  Yes.
25  Q.  Do you know what he meant by that?

D3K8FLO2                          Polanco - direct

1   A.  By meeting the quota, by writing the amount of summons that

2   he wanted.

3   Q.  Is that what he meant by conditions?

4   A.  Yeah.

5   Q.  So now we are going to play from track 6 on this CD, from 1

6   minute to 2 minutes and 29 seconds.

7               (Audiotape played)

8   Q.  Do you recognize that voice?

9   A.  Yes.

10  Q.  Who is that?

11  A.  Delegate Angel Herran.

12  Q.  Who is Herran again?

13  A.  A union delegate.

14  Q.  You were present for this roll call, if you recall?

15  A.  Yes, I was.

16              MR. CHARNEY:  We stopped at what point in time?

17  Q.  We stopped at 1:39.  So we are going to continue from

18  there.

19              (Audiotape played)

20              MR. CHARNEY:  I apologize, your Honor.  I want to play

21  it from the beginning because I think we need to hear the whole

22  thing.  So we are going to start again from 1 minute.

23              (Audiotape played)

24  Q.  Did you hear Officer Herran say there, "We will pull over

25  the car.  So I pull over the car.  What do you want me to do?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 82 of 186    490
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 54 of 225
D3K8FLO2                          Polanco - direct

1    Give him a summons.  Well, I didn't observe it."

2    A.  Yes.

3    Q.  Do you know what he was talking about there?

4    A.  He was giving an example of one day that he was driving

5    with Valenzano.

6    Q.  How do you know that's the example he was giving?

7    A.  I was there.  He said one time he was in the car with him,

8    and he asked him to pull the car that made a left, and Herran

9    told him that he didn't see it, and he tell him to write a

10   summons.

11   Q.  Let's continue from 1:13.

12           (Audiotape played)

13   Q.  Did you hear Officer Herran on that portion?

14   A.  Yes.

15   Q.  What did you hear him say?

16   A.  According to Officer Herran, this is how I got in trouble

17   again, when the supervisor do that, when they ask you to write

18   a summons for something they didn't observe, they supposed to

19   scratch off the part they didn't observe and sign it.  That's

20   what he is referring to, that the supervisor is supposed to

21   scratch off the part that say I did observe, and they will sign

22   it.

23   Q.  In other words, the supervisor will sign it?

24   A.  He supposed to do it.

25   Q.  We are going to start at 1:21.

D3K8FLO2                    Polanco - direct

 1              (Audiotape played)

 2   Q.   Did you hear Officer Herran there say, "You have to show

 3   something, you have to show something to your police officer"?

 4   A.   Yes.

 5   Q.   Do you know what he meant by that?

 6   A.   Numbers, you have to show numbers.

 7   Q.   And we stopped at 1:38.  We are going to start again.

 8              (Audiotape played)

 9   Q.   We stopped at 1:55.

10              So did you hear Officer Herran in that section say,

11   "You meant to tell me for 30 fucking days" -- sorry -- "you

12   haven't seen any violations on parking, any violations and any

13   kind of arrests?  If you have 25 to 26 days on patrol, it's

14   impossible.  Show something."  Did you hear him say that?

15   A.   Yes.

16   Q.   What did you understand him to mean?

17   A.   He was talking that maybe some officers were not doing

18   absolutely anything.  That's not possible.  Like somebody turn

19   in a blank activity log, and he said that it's not possible,

20   you have to show something.  But he is not making reference to

21   the 1 and 20.  They want 1 and 20.  30 days of patrol, 25 days

22   of patrol.  For example, in January of 2009, I have five days

23   of patrol, and I am still required to bring the 1 and 20.

24   Q.   Was it your experience that, regardless of how many days

25   you worked in a given month, the numbers were the same?

Case 1:10-cv-06005-RWS   Document 401-1   Filed 02/13/15   Page 85 of 186
Case 1:08-cv-01034-AT-HBP   Document 284   Filed 05/30/13   Page 50 of 225      492
D3K8FLO2                          Polanco - direct

1    A.   Exactly, 20 and one.

2    Q.   How do you know that?

3    A.   That's what they said.  They didn't say get 20 and one if

4    you have ten days of patrol, if you have 15 days of patrol.

5    They basically say you have to get 20 and one.

6    Q.   Let's continue at 1:55.

7             (Audiotape played)

8             MR. CHARNEY:  Where did we stop?  2:06.

9    Q.   Did you hear Officer Herran in that portion refer to a

10   bible you have?

11   A.   Yes.

12   Q.   Do you know what he is referring to there?

13   A.   As I said before, the bible is the book with every officer

14   individual activity that a commanding officer holds in his

15   office.  It usually go back three months when you have to

16   adjudicate a command discipline.

17   Q.   When Officer Herran said they are going back to the bible

18   you have, do you know what he meant by that?

19   A.   Your CD is going to be adjudicated according to how the

20   book looks.

21   Q.   What do you mean by according to how the book looks?

22   A.   If you have been doing your numbers, you will be all right.

23   If you haven't, then you're going to have a problem.

24   Q.   Did you hear him say it's coming from IR?

25   A.   Higher up.

D3K8FLO2                        Polanco - direct

 1   Q.  Higher up?

 2   A.  Yes.

 3          MR. CHARNEY:  Can we play that portion again just so I

 4   can hear it.  We are going to play the same portion we just

 5   played.

 6          (Audiotape played)

 7          MR. CHARNEY:  That's the end at 2:29.

 8   Q.  So did you hear on that portion Officer Herran say, "It's

 9   not coming from me, it's coming from higher up"?

10   A.  Yes.

11   Q.  Then he mentioned the unions agreeing to it?

12   A.  Yes.

13   Q.  Do you know what he meant by that?

14   A.  That the union trustees and the union president all

15   acknowledge what is going on and they agree with it.

16   Q.  Just so we are clear, when you say "it," what are you

17   referring to?

18   A.  The quota.

19   Q.  I want to ask you again about some of the timing of when

20   you went to IAB.

21          You said you first went to them or you wrote to them

22   in September of 2009, is that right?

23   A.  Yes, around September.

24   Q.  When did you provide the recordings to them?

25   A.  I believe it was in December after my suspension.

D3K8FLO2                              Polanco - direct

```
 1    Q.  Why did you wait until December to provide the recordings

 2    to them?

 3    A.  I wasn't sure if I wanted to give it to IAB.  I didn't

 4    trust them.

 5    Q.  Why didn't you trust them?

 6    A.  They have no independency.  They are a police department.

 7    They have no independency.  I didn't think they wanted to hear

 8    me.

 9    Q.  Then how come after your suspension you did decide to turn

10    over the tapes?

11    A.  They came to my lawyer's office, and for some reason I felt

12    like I had to explain to them why I got suspended and listening

13    to the recording would help them understand what happened.

14    Q.  Let's talk about why you got suspended.

15             Can you tell me when you got suspended?

16    A.  It was December 12, 2009.

17    Q.  What happened on December 12, 2009?

18    A.  On that date I was assigned to a checkpoint again because

19    they knew that I had reported it.

20             MS. COOKE:  Objection, your Honor.  The witness said

21    "they knew."

22             THE COURT:  Sustained as to that part.  That is

23    stricken.

24    Q.  Let's just talk about what you were doing, not why you were

25    doing it.
```

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 88 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 59 of 225     495
D3K8FLO2                         Polanco - direct

1   A.   I was assigned to a checkpoint again.  It was about 6:00.

2   They wanted numbers.  The lieutenant wanted ten summonses from

3   me and my partner each.  So he assigned us to a checkpoint.

4   Once again, no cones, no flares, no safeguard, no pattern to be

5   followed, nothing.  The sergeant just told us the lieutenant

6   want ten summonses from you guys, let's get them and get out of

7   here.

8   Q.   Which sergeant was it?

9   A.   Rodriguez.

10  Q.   Which lieutenant was he referring to, if you remember?

11  A.   Andrew Valenzano.

12  Q.   So you were doing the checkpoint.  They told you that you

13  needed ten summonses.  What happened?

14  A.   It was a cold night and nothing was coming by.  We had a

15  few.  But then the lieutenant came like 40 minutes later to

16  check on what we had, and he wasn't satisfied with what we had.

17  So he started putting his driver to stop everybody that came

18  down the street, any car that came he asked for license and

19  registration.

20       While we were doing that, I notice that my partner,

21  Officer Pete Rodriguez, who I had been working for the past

22  five years, was pale.  He called me over and said, Polanco, I

23  am not feeling well.  I immediately called the sergeant.  I

24  took his jacket off.  He told me that his chest was killing

25  him, that he had very strong chest pain.  I was concerned

Case 1:80-cv-00205-RWS Document 401-1 Filed 08/18/15 Page 60 of 126
Case 1:08-cv-01034-AT-HBP Document 284 Filed 08/30/15 Page 60 of 125    496
D3K8FLO2                    Polanco - direct

1  because about a month or two before that an officer dropped

2  dead in the Bronx from a heart attack.  I lost my father four

3  months prior to that.

4          I proceeded -- we call an ambulance.  I proceeded to

5  the ambulance.  At no point was I told to go with my partner.

6  I went in the ambulance.  When the ambulance came, I got in the

7  ambulance.  About two minutes in, Lieutenant Valenzano asked me

8  to get out, and I did.  I wasn't too happy about it, but I

9  wasn't verbal or confrontational.  I asked the lieutenant, is

10 there any reason why I can't go with my partner?  He told me,

11 keep writing summonses, I will have the sector go.  OK.  I

12 walked out of the ambulance.  At no point I scream to him.  At

13 no point I say racial slurs or anything like that.  I just

14 walked out.

15         About five minutes later, I looked into the back of

16 the ambulance, between three and five minutes, and I saw my

17 partner on an oxygen mask.  He look even worse than what he

18 looked before.  He was really out of color.  I tried to call

19 his uncle.  I couldn't get in touch.  He told me not to call

20 his wife or his five daughters yet.

21         MS. COOKE:  Objection.

22         THE COURT:  It doesn't matter.

23         It's really time for the break so I am going to

24 interrupt him anyhow.  It's 11:30.  We will reconvene at 20 to

25 12.

D3K8FLO2                          Polanco - direct

1            (Recess)

2    BY MR. CHARNEY:

3    Q.  Officer Polanco, before the break we were discussing an

4    incident on December 12, 2009, involving you and your partner,

5    and I guess Lieutenant Valenzano.  I wanted to continue with

6    that discussion.  I believe you left off with your partner in

7    the back of the ambulance?

8    A.  Yes.  I approached the back of the ambulance on the

9    outside.  I saw his condition.  He was worse.  He had an oxygen

10   mask.  He was turning a little blue.  When I saw his condition,

11   I was extremely worried.

12           At that point, I approached the lieutenant and I told

13   him, lieutenant, you can do as you please, I am going with my

14   partner.  And he asked me again, what?  I said, you can do what

15   you please, I am going with my partner.  At that time, the

16   lieutenant grabbed me by the chest, twist me around, asked me

17   for my gun and shield and suspended me on the spot.

18   Q.  Did you in fact give him your gun and shield?

19   A.  Later on, yes.

20   Q.  Did you at any point in time say any derogatory remarks to

21   him?

22   A.  No, not at all.

23   Q.  Did you threaten him?

24   A.  No.

25   Q.  Did you physically assault him?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 81 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 82 of 225    498
D3K8FLO2                    Polanco - direct

1   A.  No.  I simply, when he grabbed me, after he grabbed me, I

2   simply push his hands off my chest.

3   Q.  After that, did you make any other physical contact with

4   him?

5   A.  Not at all, no.

6   Q.  This incident was December 12, 2009?

7   A.  Yes.

8   Q.  Earlier you testified about how you had seen the word rat

9   next to your name in the precinct cafeteria?

10   A.  Yes.

11   Q.  Do you know approximately what point in time you saw that?

12   A.  Mid-November, mid to late November 2009.

13   Q.  So is it correct that you saw that word written next to

14   your name before this incident with Lieutenant Valenzano?

15   A.  Yes.

16   Q.  Do you know whether or not any of your supervisors in the

17   41st Precinct were aware you had gone to Internal Affairs with

18   your complaints prior to this incident on December 12, 2009?

19   A.  Yes.

20   Q.  How do you know that?

21   A.  Sergeant Rodriguez told me to look out, that they were

22   looking to hurt me, that they know that I reported it, that I

23   went to IAB.

24   Q.  When did he tell you that?

25   A.  This was -- he told me a few time.  He told me I think a

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 92 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 83 of 225    499
D3K8FLO2                          Polanco - direct

 1   couple of hours before the checkpoint.  But also in the month

 2   of November he told me the same thing.

 3   Q.  Now, prior to this incident on December 12, 2009, had you

 4   ever been disciplined by the NYPD when you worked as a patrol

 5   officer in the 41st Precinct?

 6   A.  Disciplined, I was in an off duty incident where I was

 7   modified for four months.  It was a domestic incident where

 8   somebody made allegations.  The allegations went nowhere.  They

 9   were unsubstantiated.  I did not get any time taken off.  I did

10   not get -- I didn't even have to see the -- anything.  It was

11   unsubstantiated.  But I was modified for four months until the

12   investigation was being conducted.

13   Q.  During that modification, what were you doing?

14   A.  I was doing crime analysis.

15   Q.  Where?

16   A.  In the 41st Precinct.

17   Q.  So you were not reassigned to a different precinct during

18   that time?

19   A.  No.  The inspector actually wrote a letter to personnel to

20   keep me in the precinct.

21   Q.  Which inspector was that?

22   A.  McHugh.

23   Q.  Other than that four-month modification, did you receive

24   any other discipline prior to December 2009?

25   A.  The only thing I remember, again, I went to court because

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/18/15 Page 82 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/15 Page 84 of 225    500
D3K8FLO2                          Polanco - direct

 1   after they put me back on the four months, I was doing the job

 2   of two officers.  They didn't have nobody to do crime analysis

 3   so I used to do the crime analysis job and then jump on patrol.

 4   I used to do both.  So one day I had court, and when you do

 5   crime analysis administrative, you don't have to wear your vest

 6   or your uniform to court.  I show up to court without the vest.

 7   My lieutenant told me that it was OK.  And when I show up to

 8   court, the sergeant send me back to put my vest on.  When I

 9   came back to the court section, he issued me a command

10   discipline for not having the vest.  That's the only thing

11   other than that.

12   Q.  So other than that command discipline and the four-month

13   modification, did you receive any other discipline prior to

14   December 2009 when you worked in the 41st Precinct?

15   A.  No.

16   Q.  During your work as a patrol officer in the 41st Precinct,

17   did you ever receive a negative quarterly performance

18   evaluation?

19   A.  No.

20   Q.  Did you ever receive a negative annual performance

21   evaluation?

22   A.  No.

23   Q.  Officer Polanco, at any point in time, did you provide

24   copies of those recordings we listened to earlier to anybody

25   outside of the police department other than your lawyer?

D3K8FLO2                      Polanco - direct

1    A.  I don't recall.

2    Q.  Did you ever provide it, for example, to any members of the

3    media?

4    A.  I think I did.  I think -- or my lawyer did.  I'm not sure.

5    He provided them to Channel 7.

6    Q.  Do you know when that was?

7    A.  Actually, we were talking to Channel 7 in September of that

8    year.  Three months before my suspension we were looking to

9    expose everything.  We were just waiting for the right moment

10   and the right time to do it.

11   Q.  Why did you want to go to the press with these issues?

12   A.  Because the department is not willing to listen to me.

13   They are still not willing to listen to me.  They don't want to

14   hear it.

15   Q.  You mentioned earlier that one of the reasons why you

16   waited until you did to actually report a lot of this stuff is

17   you were worried about retaliation?

18   A.  Yes.

19   Q.  Are you worried about retaliation today?

20   A.  I cannot say I don't.  I'm not in fear, but I do worry

21   about what they are going to do next.

22   Q.  Why did you decide to testify as a witness in this case?

23   A.  The reason I decided to testify and come forward when I

24   did, I'm a father, I have three kids.  I grew up in the

25   Heights.  I grew up in the hood.  I come from a very poor

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 95 of 186
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 86 of 225    502
D3K8FLO2                        Polanco - direct

1    country.  I know what it's like when it's 95 degrees in an

2    apartment on the fifth floor and you go downstairs because you

3    had a fight with your sister because it's simply too hot.  And

4    for you to go downstairs and get arrested in your own building

5    for trespassing, as we have seen, get summons, get pat down,

6    get harassed by police, I don't believe that's why I joined the

7    police department.

8    Q.   Why did you join the police department?

9    A.   I joined the police department to help.  I was a baseball

10   coach in high school for about four years.  I worked with

11   youths.  I joined the police department because I wanted to

12   interact with my community.  Before the 90s, minority cops were

13   not abundant in the department.  It was in the early 90s, late

14   80s that they decided that it would be a good thing to

15   integrate the police department so we can help our own

16   community.  What was happening before that is my question.

17        So, unfortunately, a lot of us that come into the

18   police department forget where we come from.  I don't want my

19   kids to be harassed by anybody.  I don't need my kid to get

20   shot by any cop who was chasing him to fill out a 250.  And the

21   problem that we have is a lot of us, when we think of a male

22   black, a male Hispanic, we think of a third person.  I don't.

23   When I see an unarmed man get shot, I think of my kid.  My

24   scenario is coming home to my kid and finding my kid with a

25   bullet to the chest.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 86 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 87 of 225    503
D3K8FLO2                    Polanco - direct

1          Unfortunately, a lot of us have the luxury to live in

2     different communities, and when we hear of a male shot because

3     he was running from police, the law allows him to run from

4     police, but not when you're black or Hispanic, unfortunately.

5     When you hear of teenagers that get beaten by police.  When you

6     hear a cop testify that he --

7          MS. COOKE:  Objection.  I don't think this is any

8     longer responsive to the question.

9          THE COURT:  It's responsive, but it's a long speech,

10    and a courtroom is not a place for a long speech.  I think you

11    have made the point.  I think that's probably sufficient.

12    Q.  Officer Polanco, do you believe that stop, question and

13    frisk is an appropriate tool for police officers to use?

14    A.  Absolutely, yes.  Absolutely.  It's a great tool.

15         THE COURT:  Sorry?

16         THE WITNESS:  It is a great tool.

17    A.  We need it because I have no problem harassing criminals.

18    I have no problem harassing those that are committing the crime

19    or about to commit the crime.  I am not in denial that Hispanic

20    and blacks are the ones that are committing the crime.  I am

21    not in denial.  And we need help.  And I am here asking for

22    help.  How can we help this minority people drop the gun?  How

23    can we make them not carry the gun?  How can we help them?  I

24    am not in denial that we need help.  But my understanding is

25    that when somebody commit a crime, you don't bring the whole

D3K8FLO2                        Polanco - direct

 1   family to court.  So why should we bring the whole culture and

 2   hold the whole culture accountable for --

 3             MS. COOKE:  Objection.

 4             THE COURT:  That's responsive to the question because

 5   this one, I think, Mr. Charney would argue goes to the remedies

 6   question.  He is explaining his point of view.

 7   A.  What I was saying was that when somebody commit a crime in

 8   a family, you don't bring the whole family to court.  You bring

 9   the criminal.  So if some black or the majority of blacks are

10   committing the crime, we cannot hold the whole culture

11   responsible for what some of them are doing.

12             MR. CHARNEY:  One minute, your Honor.

13   Q.  Officer Polanco, you said you were suspended on December

14   12, 2009, correct?

15   A.  Yes.

16   Q.  Are you currently still suspended?

17   A.  I am on modified assignment still, three and a half years

18   later.

19   Q.  Where is your modified assignment?

20   A.  I'm in the VIPER unit in the 77th precinct on Utica Avenue.

21   Q.  Do you know whether or not any formal disciplinary charges

22   were filed against you?

23   A.  Yes, they did.

24   Q.  Do you know what the status of those charges are?

25   A.  My trial was done about two weeks ago.  Several people came

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/18/15 Page 98 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 98 of 225    505
D3K8FLO2                          Polanco - direct

1    to testify contrary of what the lieutenant allege I did.

2            MS. COOKE:  Objection.  He is testifying to hearsay.

3            THE COURT:  Sustained.

4    Q.  Has there been a finding or a ruling in that trial yet?

5    A.  No.  Three and a half years later, no.

6    Q.  Do you have any idea why it has taken three and a half

7    years since the incident to finish the trial in your

8    disciplinary case?

9    A.  It's very contradictory.  For example, the lieutenant gave

10   a story about what happened, not knowing that I had a recording

11   in my pocket.  When he gave the story, he say X, Y and Z.

12           MS. COOKE:  Objection.

13           THE COURT:  Sustained as to what he said.

14   Q.  Let me ask the question a little more narrowly.  Do you

15   know why it has taken three and a half years to finish the

16   disciplinary trial in your case?

17   A.  They know I am innocent.  That's my belief.

18   Q.  I want to show another exhibit.  This has been marked as

19   Plaintiffs' 98.

20           MR. CHARNEY:  Is there any objection to this exhibit,

21   the patrol guide section?

22           MS. COOKE:  No.

23           MR. CHARNEY:  This is the NYPD patrol guide section on

24   stop, question and frisk.  We would move for it to be admitted

25   in evidence.  We can pull it up on the screen so your Honor can

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 99 of 186
Case 1:08-cv-01034-AT-HBP  Document 264  Filed 05/30/13  Page 70 of 225      506
D3K8FLO2                        Polanco - direct

 1   see it.

 2              THE COURT:  Is there any objection before you put it

 3   on the screen?

 4              MS. COOKE:  No objection.

 5              THE COURT:  What is the exhibit number?

 6              MR. CHARNEY:  Plaintiffs' 98.

 7              THE COURT:  98 is received.

 8              (Plaintiff's Exhibit 98 received in evidence)

 9              MR. CHARNEY:  Can I give a copy to the witness?

10              THE COURT:  Yes.  Sure.

11   Q.  Officer Polanco, do you recognize this document Exhibit 98?

12   A.  Yes, I seen it.

13   Q.  What is this document?

14   A.  This is the patrol guide referring to stop, question and

15   frisk.

16   Q.  If you can look at the bottom of the first page.  Next to

17   paragraph number 9, you see where it says, "Submit stop,

18   question and frisk report work sheet to desk officer, precinct

19   of occurrence."  Do you see that?

20   A.  Yes.

21   Q.  Was that your practice when you worked as a patrol officer

22   in the 41st Precinct?

23   A.  No, not all the time.

24   Q.  Who, if anyone, did you submit the stop, question and frisk

25   report work sheet to when you completed it?

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 100 of 186   507
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 71 of 225
D3K8FLO2                        Polanco - direct

```
 1   A.  Sometime the desk officer, most of the time the platoon
 2   commander when he is doing his recap sheet, and sometime our
 3   immediate supervisors.  At some point, even to the crime
 4   analysis person who was in charge of putting it in, we hand it
 5   directly to that person.
 6   Q.  I'm sorry.  The crime analysis person was in charge of
 7   putting it into what?
 8   A.  The system.
 9   Q.  What do you mean by the system?
10   A.  Type it into the system.
11   Q.  Moving to the second page, see at the top it says,
12   paragraph number 10 next to "desk officer" it says, "Review
13   each stop, question and frisk report work sheet and (a)
14   instruct member preparing work sheet if necessary."
15        We already know the desk officer was not always the
16   person you handed it in to, but as a general matter, whether it
17   was the desk officer or a sergeant or a crime analysis person,
18   in your experience, did that person instruct you on what was on
19   the work sheet?
20   A.  Never, no.  If I might, the only thing they will make sure
21   is that your name, your tax number, the address is legible,
22   that they can read what was in it, the name is legible.  That's
23   what they will care about.
24   Q.  At any point when you worked in the 41st Precinct, were you
25   ever asked by a supervisor to explain the factual basis for a
```

D3K8FLO2                        Polanco - direct

1    stop, question and frisk that you had conducted?

2    A.  Never.

3    Q.  Officer Polanco, do you keep in touch with any officers in

4    the 41st Precinct?

5    A.  Not really.  Not really.

6    Q.  You said that your supervising sergeant was -- who was your

7    supervising sergeant?

8    A.  Sergeant Padilla, Edgar Padilla.

9    Q.  I can't remember, but you testified earlier about several

10   supervisors who had talked about the numbers.  Was he one of

11   those?

12   A.  Not really.  He would rarely mention it.  He wouldn't

13   mention it that much.

14            MR. CHARNEY:  One minute, your Honor.

15            No further questions, your Honor.

16            THE COURT:  All right.  Ms. Cooke.

17            MS. COOKE:  Yes.  Thank you.

18   CROSS-EXAMINATION

19   BY MS. COOKE:

20   Q.  Good afternoon, Officer Polanco.

21   A.  Good afternoon.

22   Q.  Prior to your report to IAB the first time, I believe you

23   said it happened in September 2009, is that correct?

24   A.  Yes.

25   Q.  Let me clarify first.  The report to IAB in September 2009,

Case 1:10-cv-06005-RWS Document 401-1 Filed 03/13/15 Page 102 of 186
Case 1:10-cv-06005-RWS-HBP Document 284 Filed 05/30/13 Page 73 of 225   509
D3K8FLO2                        Polanco - cross

1   that was the anonymous letter you posted on the ICO tour at the

2   41st precinct?

3   A.  Yes.

4   Q.  So it was the ICO of the precinct, not to Internal Affairs?

5   A.  Because it's my understanding that he have no choice but to

6   forward it to Internal affairs.

7   Q.  But you yourself didn't contact Internal Affairs when you

8   posted the anonymous letter?

9   A.  No.

10  Q.  And then the second time you contacted IAB was in November

11  of 2009?

12  A.  I believe, yes.

13  Q.  That was a telephone call?

14  A.  Yes.

15  Q.  It was an anonymous call, you didn't provide your name or

16  information of who you were, correct?

17  A.  I believe.

18  Q.  You believe it was anonymous?

19  A.  Yes.

20  Q.  So as of your second contact with IAB in 2009, you were

21  still remaining anonymous, as far as you were concerned,

22  correct?

23  A.  Yes.

24  Q.  But your call that you made to IAB on September 14, 2009,

25  after your incident with Lieutenant Valenzano on September 12,

D3K8FLO2                          Polanco - cross

1   you identified yourself to IAB in that call?

2   A.   Yes, I did.

3   Q.   In addition to repeating claims that you had made in your

4   anonymous letter, in your anonymous call in September and

5   November of 2009, in addition to repeating claims about quotas

6   and improper stops, you also added claims of retaliation by

7   Lieutenant Valenzano against you, correct?

8   A.   Yes.

9   Q.   That was because of the incident that had happened on

10  December 12?

11  A.   I'm sorry?

12  Q.   That was because of the incident that happened on December

13  12, 2009?

14  A.   Yes, and other stuff.

15  Q.   It's fair to say what prompted your call on September 14

16  was the incident on December 12?

17  A.   Yeah.

18  Q.   Let's talk a minute about that incident on December 12.

19          You were upset about your partner having chest pains

20  on December 12, 2009, right?

21  A.   Did I use the word upset?

22  Q.   I am asking, were you upset?

23  A.   No.  I wasn't upset.

24  Q.   Were you worried?

25  A.   I was worried, yes.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 104 of 186    511
Case 1:00-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 73 of 225
D3K8FLO2                        Polanco - cross

1   Q.  You were upset with the lieutenant when the lieutenant

2   asked you to step out of the ambulance?

3   A.  I did not use the word upset.

4              THE COURT:  Were you upset?

5              THE WITNESS:  No.

6              THE COURT:  How did you feel when he asked you to step

7   out of the vehicle?

8              THE WITNESS:  I was confused.

9   Q.  You testified on direct that you were asked to surrender

10  your gun and your badge while on the scene on December 12,

11  correct?

12  A.  Which time frame is this?  There's two versions of the

13  evidence.

14  Q.  I am asking if you testified on direct that you were asked

15  while at the scene to surrender your gun and your badge?

16  A.  Yes.

17  Q.  And you said you didn't do it at that time?

18  A.  Yes.

19  Q.  But you surrendered it later?

20  A.  Yes.

21  Q.  In fact, you were asked several times to surrender your gun

22  and badge at the scene, weren't you?

23  A.  No.

24  Q.  You in fact were angry with Lieutenant Valenzano when you

25  were at the scene, correct?

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 105 of 186
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 76 of 223     512
D3K8FLO2                       Polanco - cross

```
 1    A.  At one point I was.

 2    Q.  You were yelling?

 3    A.  At one point I was.

 4    Q.  You were yelling at Lieutenant Valenzano?

 5    A.  At one point, yes.

 6    Q.  You shoved Lieutenant Valenzano with your hands onto his

 7    chest?

 8    A.  I think you're skipping a point.  The reason I was

 9    yelling --

10    Q.  If you can answer my questions as I ask them.  You shoved

11    Lieutenant Valenzano with your hands onto his chest?

12    A.  I push him away from me, yes.

13    Q.  Your hands onto his chest?

14    A.  Yes, to take his hands away from me.

15              THE COURT:  Why did you do that?

16              THE WITNESS:  Because he had his hands on me.

17              THE COURT:  Did he have his hands on you before you

18    pushed him away?

19              THE WITNESS:  The only reason I push him was to take

20    his hands away from me.

21              THE COURT:  So he put his hands on you first?

22              THE WITNESS:  Yes.

23    Q.  The reason that Lieutenant Valenzano put his hands on you

24    was to stop you from getting back into the ambulance he ordered

25    you out of, isn't that right?
```

D3K8FLO2                          Polanco - cross

1   A.  I want to make sure I understand this question before I

2   answer it.

3           THE COURT:  The question is, this occurred after he

4   told you to get out of the ambulance, but you tried to get back

5   in, so he put his hands on your chest to stop you from going

6   back into the ambulance.

7           THE WITNESS:  That's not correct because that's not

8   what I testified to.  I never went back in the ambulance.

9           THE COURT:  Did you try to?

10          THE WITNESS:  I tried to get back in the ambulance.  I

11  wasn't allowed to.

12          THE COURT:  Did you try to?

13          THE WITNESS:  I made an attempt to go back in the

14  ambulance.

15          THE COURT:  Is that when he put his hands on your

16  chest?

17          THE WITNESS:  Yes.

18          THE COURT:  To stop you from going back in the

19  ambulance?

20          THE WITNESS:  Yes.

21  Q.  After he attempted to stop you from getting back in the

22  ambulance is when you shoved him with your hands on his chest?

23  A.  Yes.

24  Q.  And it was after that time you were asked to surrender your

25  gun and badge, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3K8FLO2                          Polanco - cross

1   A.   It was while he have his hands on me that he was asking me

2   for my firearm.

3   Q.   And you didn't give it to him at that time?

4   A.   Why should I?

5   Q.   In fact, you told him he didn't have the authority to do

6   that?

7   A.   He didn't have the authority to have his hands on me.

8   Q.   Then you were asked by additional officers at the scene to

9   surrender your gun and badge, correct?

10  A.   By who?  No.

11  Q.   By other officers at the scene you were not asked to

12  surrender your gun and badge?

13  A.   Can you give me the name of which officer?

14  Q.   I am asking you if other officers at the scene asked you to

15  surrender your gun and badge?

16  A.   The only person that asked me at the end was ESU, and I did

17  give them the firearm, yes.

18  Q.   So there were other officers who made the request at the

19  scene?

20  A.   They were carrying an order through the lieutenant.  The

21  lieutenant gave the ESU officer an order to treat me as an

22  emotionally disturbed person and remove my firearm, yes.

23  Q.   You also shouted slurs at Lieutenant Valenzano with respect

24  to his ethnicity, isn't that correct?

25  A.   That's not correct.

D3K8FLO2                          Polanco - cross

1   Q.  You were shouting at Lieutenant Valenzano at the scene for

2   several minutes, correct?

3   A.  Shouting what?

4           THE COURT:  Shouting anything.  Excuse me.  Were you

5   shouting at all?

6           THE WITNESS:  I was shouting, why do you have your

7   hands on me?  Why the F are you touching me?

8   Q.  Why the what?

9   A.  Why the F are you touching me.

10  Q.  You were using foul language, curse words?

11  A.  He touched me, yes.

12  Q.  You testified on direct examination that you had been in

13  contact with the television, the news, Channel 7 I think?

14  A.  Yes.

15  Q.  Beginning in September, early September 2009?

16  A.  Yes.

17  Q.  Before your suspension.  It was because you wanted to get

18  the story out, is that right?

19  A.  Yes.

20  Q.  So that was before you contacted the ICO with your

21  anonymous letter, is that right?

22  A.  It was actually after.

23  Q.  I thought you contacted the ICO in October of 2009?

24  A.  No.  The letter went out in September.

25  Q.  So you issued an anonymous letter and then you contacted

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Case 1:10-cv-06005-RWS  Document 401-4  Filed 02/12/15  Page 109 of 186    516
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 60 of 223
D3K8FLO2                        Polanco - cross

1    the television?

2    A.   Yes.

3    Q.   And ultimately you spoke with a reporter Jim Hoffer from

4    Channel 7, ABC News?

5    A.   Yes.

6    Q.   You spoke to him several times between September and when

7    the television interview aired in March 2010?

8    A.   A few times, yes.

9    Q.   The television interview aired in March of 2010 on Channel

10   7, correct?

11   A.   Yes.

12   Q.   In that interview, you discussed your allegations of quotas

13   and unlawful stops, is that correct?

14   A.   Yes.

15   Q.   And Channel 7 played audio of roll calls from the 41st

16   Precinct during that interview, isn't that correct?

17   A.   Yes.

18   Q.   Those were the audios that you had recorded at the 41st

19   Precinct?

20   A.   That I recorded, yes.

21   Q.   Some of the ones we heard today?

22   A.   Yes, I believe.

23   Q.   Because you had provided those audio recordings to Channel

24   7, correct?

25   A.   It might have been my lawyer.  I don't remember doing it

1   myself.

2   Q.  You provided them to your lawyer, correct?

3   A.  Yes.

4   Q.  Then your lawyer provided them to Channel 7?

5   A.  I would be speculating if I said.  I don't know what he

6   did.  He might have.

7   Q.  Are you aware that anyone else made those recordings that

8   were played with your interview on Channel 7?

9   A.  No.

10  Q.  So they were your recordings?

11  A.  The best of my belief, yes.

12  Q.  Is it fair to say that at the time you contacted Channel 7

13  in September 2009, you were dissatisfied with several of your

14  supervisors at the 41st precinct?

15  A.  The system, not only the supervisors.  It was the system,

16  the whole system itself.

17  Q.  Specifically, the supervisors, individual people, you were

18  dissatisfied with several people at the 41st Precinct?

19  A.  It wasn't particularly towards people once again.  It was

20  towards the system, the way the whole precinct was operating.

21  Q.  Inspector McHugh came to the 41st Precinct sometime in

22  2008, isn't that correct?

23  A.  I believe, yes.

24  Q.  Do you recall when?

25  A.  No, I don't.

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/20/15 Page 321 of 286    518
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 82 of 226
D3K8FLO2                    Polanco - cross

1  Q.  I believe your testimony at your deposition was, when
2  Inspector McHugh arrived, that's when the quotas were imposed
3  at the 41st precinct?
4  A.  They had numbers, but the 1 and 20 came when McHugh
5  arrived, later after his arrival.
6  Q.  The 1 and 20, meaning one arrest, 20 summonses?
7  A.  Yes.
8  Q.  Was the quota ever something lower, 1 and 10, 1 and 15?
9  A.  They used to -- it was not mandatory before.  It was with
10  McHugh.
11  Q.  So prior to Inspector McHugh, you're saying that there were
12  also quotas?
13  A.  There were numbers, but they were not mandatory.  So I
14  wouldn't call them quotas.
15  Q.  You actually knew Inspector McHugh from the 46th precinct,
16  didn't you?
17  A.  Not that I knew him.  I seen him.
18  Q.  You had worked at the 46th precinct prior to the 41st?
19  A.  Yes.
20  Q.  And Inspector McHugh was the commanding officer at the 46th
21  precinct?
22  A.  No.  He was executive officer for impact.
23  Q.  You aren't making any complaints that Inspector McHugh had
24  quotas while he was the executive officer at the 46th precinct
25  for impact?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/12/15 Page 112 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 83 of 225    519
D3K8FLO2                          Polanco - cross

1    A.   That was not his precinct.

2    Q.   You testified earlier today that actually Inspector McHugh

3    wrote a letter for you on your behalf when you had had the

4    domestic dispute incident?

5    A.   Yes.

6    Q.   To keep you at the command?

7    A.   Yes.

8    Q.   Because, in fact, you could have been transferred out of

9    the command at that point?

10   A.   Yes.

11   Q.   You testified that the supervisor of the 41st Precinct,

12   including the commanding officer, which would be Inspector

13   McHugh, would come to roll call and address the officers and

14   speak about quotas, is that right?

15   A.   Yes.  We heard it, yes.

16   Q.   But none of the audio recordings that we heard today had

17   Inspector McHugh discussing numbers and quotas on the

18   recordings, did they?

19   A.   Did you listen to the recording?

20   Q.   I am asking you.

21   A.   When he spoke about the summonses and how we are not going

22   to get overtime if we don't do the summons, he is talking about

23   quotas.

24   Q.   Did you hear Inspector McHugh on those audio recordings

25   saying one and twenty, or one and five, or one and ten, or

D3K8FLO2                          Polanco - cross

1    issuing a quota in the form of a number on those audio

2    recordings?

3    A.   No.

4              THE COURT:  Now, that's the audio recordings.  Did you

5    hear him do it at all?  Forget the audio.

6              THE WITNESS:  The inspector and the captain washed

7    their hands in the police department and they send a message

8    through channels.  They don't say it themselves.  They will say

9    it to the lieutenant.  The lieutenant will tell it to the

10   sergeant and the sergeant will come to us.

11             THE COURT:  So you never heard McHugh use the actual

12   numbers?

13             THE WITNESS:  No.  But if I may explain?  The delegate

14   said that he met with the CO and this is what he wanted.

15   That's how they communicated it.

16             THE COURT:  Thank you.

17   Q.   So none of the recordings we listened to included Inspector

18   McHugh making a statement with respect to numbers being a quota

19   that the officers were supposed to achieve, correct?

20   A.   I wouldn't agree with that, no.

21   Q.   Inspector McHugh wasn't on the audios discussing a number,

22   was he?

23   A.   Yes.  Indirectly he was, yes.

24   Q.   Did he use a number?

25             THE COURT:  We have already covered that.  He didn't

Case 1:08-cv-06085-RWS Document 401-4 Filed 05/13/13 Page 114 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 85 of 225    521
D3K8FLO2                      Polanco - cross

1  use a number, and he didn't use a number even if it wasn't

2  recorded.  He said that.  He didn't use numbers.

3           (Continued on next page)

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 115 of 186    522
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 86 of 225
D3k9f1o3                        Polanco - cross

1    Q.  Other than the recordings we've listened here to today, do

2    you have other recordings where Inspector McHugh does use a

3    number?

4    A.  No.

5                THE COURT:  And he told you McHugh never used numbers.

6                MS. COOKE:  Thank you, your Honor.

7                THE COURT:  Okay.

8    Q.  You also stated that there was a quota for UF 250s that was

9    imposed sometime in late 2009?

10   A.  Yes.

11   Q.  And that quota was five per month, right?

12   A.  Five per month.

13   Q.  You testified that Lieutenant Valenzano told you about that

14   quota?

15   A.  Many of them.  Lieutenant Valenzano, McHugh.  I said McHugh

16   not directly.  Through the -- Sergeant Rodriguez, Sergeant

17   Bennett, the PBA delegates.  Yes.

18   Q.  So Lieutenant Valenzano, we didn't hear him on any of the

19   audio recordings we listened to this morning?

20               MR. CHARNEY:  That's not true.  We did.

21               THE COURT:  Let me hear the question.

22   Q.  You did not hear Lieutenant Valenzano on any of the audio

23   recordings we heard this morning?

24               MR. CHARNEY:  That's not --

25               THE COURT:  Please, please.  Now we're going to do it

D3k9flo3                          Polanco - cross

1   a third time because I didn't hear the question.

2   Q.  We didn't hear Lieutenant Valenzano on any of the audio

3   recordings this morning discussing a quota of five UF 250s, did

4   we?

5   A.  No.

6   Q.  You testified that on several occasions a supervisor would

7   direct you to write a UF 250 for a stop that you didn't

8   observe; is that correct?

9   A.  Yes.

10  Q.  And in those situations you didn't observe the

11  circumstances leading up to the stop, correct?

12  A.  Yes.

13  Q.  But you didn't ask the supervisor what happened leading up

14  to the stop, did you?

15  A.  We're not allowed to do that.

16  Q.  So you didn't?

17  A.  No.  We're not allowed to question the supervisor.  That's

18  what they told us.  Don't question us.

19  Q.  Did you ever try asking the question?

20  A.  I remember sometime in October Lieutenant Valenzano came up

21  to me -- I was in the car with him.  And he said Polanco

22  whenever we call you to a scene to give you numbers it's

23  because you're not taking care of your own.  So don't put

24  inform by because if we give you a summons we are not going to

25  go testify on your behalf.

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/13/15 Page 117 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 66 of 225    524
D3k9flo3                    Polanco - cross

1  Q.  I'm asking you about 250s here.

2  A.  Or 250s.  It's the same, yes.

3  Q.  It's the same?

4  A.  Not the same because you don't testify for a 250.  But they

5  said don't question us.  Just do what we said.

6  Q.  You never asked the supervisor what the crime suspected to

7  be on the 250 you wrote for a stop you didn't observe?

8  A.  Sometime he say put anything.

9          THE COURT:  Sometime what?  I'm sorry.

10  A.  He will say put anything.  Fit the description.  Or

11  burglary pattern.  Whatever.  He say just put something in.

12  Q.  But the question was you never asked.

13  A.  Maybe a few times.  Basically we were told what to put.

14  Q.  And you don't have copies of these 250s that you were

15  directed to write by a supervisor for a stop you didn't

16  observe, do you?

17  A.  We don't keep copies of 250s.

18  Q.  Are you not allowed to keep copies?

19  A.  It's not our policy to keep copies.

20  Q.  But you don't have copies?

21  A.  No, I don't.

22  Q.  So you can't tell us the dates that these stops occurred or

23  the locations?

24  A.  I did give a few of them to internal affairs.  And I don't

25  know what they did with them up to this date.

D3k9flo3                          Polanco - cross

1    Q.  You gave them copies of UF 250s?  I thought you said you

2    don't keep them?

3    A.  I gave them locations and times of 250s.  I also gave them

4    copies for summonses that --

5    Q.  We'll get to the summonses in just a minute.

6              You also -- during -- do you recall giving a

7    deposition in this case?

8    A.  Yes.

9    Q.  And in that deposition you testified that there were also

10   quotas for anticrime cops; is that correct?

11   A.  Yes.

12   Q.  And the anticrime cop quota was what?

13   A.  How many pages was the deposition?

14   Q.  Several.

15   A.  How many questions?  It would be impossible for me to

16   remember everything.

17   Q.  If I told you that you said that the quota for anticrime

18   cops was higher than patrol officers, would you agree with

19   that?

20   A.  Yes.

21   Q.  You also had claimed the conditions teams cops had had

22   higher quotas; is that correct?

23   A.  Yes.

24   Q.  You never worked on anticrime or conditions at the 41, did

25   you?

D3k9flo3                    Polanco - cross

 1   A.   No.

 2   Q.   I believe you also at your deposition identified the school

 3   unit had quotas; is that correct?

 4   A.   Yes.

 5   Q.   And their quota, you identified, was arresting five people

 6   a month or summonsing 25?

 7   A.   Yes.

 8   Q.   You never worked in the school unit, did you?

 9   A.   No.

10   Q.   You never looked at the monthly activity reports for any of

11   those units, did you?

12   A.   No.

13   Q.   So you wouldn't actually know the activity of the

14   anticrime, conditions or school units?

15   A.   In a precinct like at 41 that would have a hundred cops, we

16   talk to each other, yes.

17   Q.   You didn't review their monthly activity reports, did you?

18   A.   It's not my job to review any officer's activity report.

19   Q.   You didn't review the monthly activity reports of officers

20   in your own unit, did you?

21   A.   It's not my job to do that, no.

22   Q.   So but you didn't review it?

23   A.   It's not -- no, I didn't.

24   Q.   So you only know about your activity when you were at the

25   41st precinct; is that correct?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 120 of 186    527
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 91 of 225
D3k9flo3                         Polanco - cross

1    A.  I only know about my activity, no.  I only review my own

2    activity.  But is, as cops, we speak.  And yes, I know

3    people -- yes, I know officers in the school unit.  Yes, I know

4    officers in anticrime.  And yes, I know officers in the

5    conditions unit.  And I was offered these positions a couple of

6    times.  And one of the supervisors told me that that's what

7    they wanted.

8    Q.  But at your deposition you couldn't recall a single name of

9    an anticrime officer who told you what the quota is; isn't that

10   correct?

11   A.  Up to today, I can't recall it.

12   Q.  At the time of your deposition you couldn't recall it

13   either, correct?

14   A.  Yeah.

15   Q.  You couldn't -- likewise, you couldn't recall the name of a

16   conditions officer who told you of a quota, correct?

17   A.  No.

18   Q.  And you couldn't recall the name of a school unit officer

19   who told of a quota, correct?

20   A.  There was a few of them.

21   Q.  You couldn't recall a name though, correct?

22   A.  No.

23   Q.  You couldn't recall the name of a supervisor from any of

24   those units who told you about quotas, correct?

25   A.  Like I said, it's a long deposition with a lot of answers.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 121 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 92 of 225    528
D3k9flo3                         Polanco - cross

1          MS. COOKE:  I'm handing the witness a copy of his

2     deposition from March 29, 2010.

3     Q.   Directing your attention to page 144, line 16.  I'll read

4     the following questions and answers.

5     "Q.  So when did they tell you about their quotas?

6     "A.  Did they tell me -- they offered me conditions.  They

7     offered me crime.  In order for you to go there, you know what

8     the numbers are.

9     "Q.  Who told you the numbers?

10    "A.  Supervisors.

11    "Q.  Which supervisors?

12    "A.  I don't recall.

13    "Q.  Who is the supervisor of conditions?

14    "A.  Sergeant Rafter R-A-F-T-E-R.

15    "Q.  Did Sergeant Rafter tell you what the quotas are for

16    conditions?

17    "A.  No.

18    "Q.  A different supervisor did?

19    "A.  No.

20    "Q.  Did a supervisor tell you what the quotas were for

21    conditions?

22    "A.  No.

23    "Q.  I'm not trying to be difficult.  I just don't understand

24    how you came to learn if a supervisor didn't tell you and none

25    of the officers on conditions team told you, who told you?

D3k9flo3                              Polanco - cross

1    "A.  Why is it so hard for you to believe that there's a quota.

2    I don't understand."

3              Did you give those answers to those questions at your

4    deposition?

5    A.  Yes, I did.

6    Q.  So you didn't provide the name of a supervisor who

7    identified the quotas for the conditions team at your

8    deposition in March of 2010?

9    A.  No.

10   Q.  When you were an officer at the 41st precinct would you

11   consider it to have been a busy precinct?

12   A.  Busy as of what?

13   Q.  In terms of numbers of jobs, 911 calls?

14   A.  On and off.

15   Q.  And you worked four to twelve the entire time you were

16   there?

17   A.  Yes.

18   Q.  Is four to twelve a busy tour?

19   A.  Yeah, can be considered busy.

20   Q.  More busy than a day tour?

21   A.  It depends.  Everyday.  Crime don't have happen on a

22   schedule.  Sometime it happen at night.  Sometime it happen at

23   day.  It depends.

24   Q.  Were you aware of gang activity in the 41st precinct when

25   you worked there?

D3k9flo3                      Polanco - cross

1   A.  There might have been, yes.

2   Q.  Do you recognize gang names MOB, a Block, Avenue St. John's

3   Boys, Moneymakers.

4         Do you recognize any of those gang names?

5   A.  It's been three-and-a-half years later.  I do not recall

6   any of those.

7   Q.  Were there drug dealing conditions in the 41st precinct?

8   A.  Probably yes.

9   Q.  Probably?

10  A.  Yeah, there were.

11  Q.  Did you ever make a drug arrest?

12  A.  Yes, I did.

13  Q.  Were there chop shops in the 41st precinct?

14  A.  What are chop shops?

15  Q.  Illegal car -- selling car parts?

16  A.  As a patrol officer, for me to know this illegal activity,

17  it's almost impossible.

18  Q.  You don't know about illegal activity in the 41st precinct

19  as a patrol officer?

20  A.  Not illegal activity.  About they're selling car parts.

21  Where I'm answering radio runs, it's hard to find out.  Yes.

22  Q.  So you weren't aware of that as a condition in the 41st

23  precinct?

24  A.  No, I wasn't.

25  Q.  What about burglaries and robberies?

1    A.   There is plenty of those.

2    Q.   What about domestic violence incidents?

3    A.   A lot of those, yes.

4    Q.   Shootings?

5    A.   Yeah, there were shootings.

6    Q.   What about problems with prostitution and pimps?

7    A.   We did the three to eleven.  From where I started to what

8    it is, it's not much.  It's not much of a problem like it used

9    to be.

10   Q.   What do you mean "like it used to be?"  Are you referring

11   to time period?

12   A.   When I was there in 2007, 2006 there was a lot of

13   prostitutes.  With time going by, I don't know whether they die

14   or whatever, but it's not the same.

15   Q.   Were there problems with strip clubs and the violence

16   attendant with strip clubs?

17   A.   I do three to eleven.  The clubs usually open after eleven.

18   I don't know.

19   Q.   What about commercial truck violations?  Speeding?  Trucks

20   speeding?

21   A.   Trucks speeding.  As a patrol officer, I would have to look

22   up to the highway to see the trucks, yes.  I wouldn't know

23   about that.

24   Q.   And you were expected to do work each day that you came to

25   the 41st precinct for your tour, correct?

D3k9flo3                              Polanco - cross

1    A.   What is your definition of work?

2    Q.   I'm asking you.  Were you expected to do work?

3    A.   What work are we talking about?

4    Q.   A police officer.  Law enforcement?

5    A.   A police officer's job starts when they leave their house.

6    Q.   So you worked then for, during your tour, while you were at

7    the 41st precinct?

8    A.   Yes.

9    Q.   Because you weren't getting paid for doing nothing; isn't

10   that right?

11   A.   What is your definition of nothing?  That's what I want to

12   understand.

13   Q.   You have duties and responsibilities as a police officer,

14   correct?

15   A.   Yes, I do.

16   Q.   I believe we looked at an exhibit yesterday.  Counsel

17   showed you an exhibit.  The duties and responsibilities of a

18   police officer; is that correct?

19   A.   Yes.

20   Q.   Would you like to look at that exhibit again?

21   A.   I remember it.

22   Q.   So those are some of your duties and responsibilities,

23   right?

24   A.   Yes.

25   Q.   Because you said, in fact, that list wasn't entirely

Case 1:18-cv-06095-RWS Document 401-4 Filed 02/13/15 Page 126 of 186
Case 1:08-cv-01034-RY-HBP Document 234 Filed 05/30/13 Page 97 of 225    533
D3k9flo3                         Polanco - cross

 1   complete, I believe -- there was other things as an officer you
 2   would do?
 3   A.  Yes.
 4   Q.  And those were the kinds of things you were getting paid
 5   for when you came to work to perform your job as a police
 6   officer, right?
 7   A.  I don't understand your question at all.
 8            Let me just clarify to you.  The definition of work --
 9            THE COURT:  Wait.  Wait.  If you don't understand the
10   question, let her rephrase it.
11            What are you asking, Ms. Cooke?
12            THE WITNESS:  I'm sorry.
13            THE COURT:  Would you rephrase.
14   Q.  You received a paycheck while you were an officer at the
15   41st precinct, correct?
16   A.  Yes.
17   Q.  And that paycheck was for the time you worked as an officer
18   in the 41st precinct, correct?
19   A.  Yes.
20   Q.  And you were expected to perform certain job duties and
21   responsibilities when you were working as an officer in the
22   41st precinct; is that correct?
23   A.  Yes.
24   Q.  And your tour was 8 hours and 35 minutes; is that correct?
25   A.  Yes.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 127 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 98 of 225    534
D3k9flo3                          Polanco - cross

 1  Q.  And would you work approximately 20 days a month?

 2  A.  Sometime, yes.  But not all the times.

 3  Q.  Not all the times because you would have vacation days or

 4  sick days?

 5  A.  Court.  Vacation.  Sent to another borough for other

 6  details.  There was many reasons, yes.

 7  Q.  But on the days when you are in court or you get sent to

 8  another precinct, you were working those days?

 9  A.  Not necessarily.

10  Q.  You were getting paid?

11  A.  If, for example, I have to go to court, that day I don't go

12  on patrol.

13  Q.  I'm distinguishing I suppose between RDOs, vacation days,

14  or sick days and days on patrol, days on assignment outside of

15  the command, days in court.

16          So the total number of days you would be on patrol, or

17  on assignment in another command, or in court would be an

18  average of about 20 days a month?

19  A.  Yes.

20  Q.  Would you say that more often than not you were on patrol

21  those 20 days?

22  A.  Yes.

23  Q.  In fact, in 2009 there were days where -- or there were

24  months where you had no 250 activity or no arrest activity for

25  the month, correct?

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 128 of 186
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 99 of 225    535
D3k9flo3                    Polanco - cross

1   A.  Yes.

2   Q.  And some days you wouldn't issue any summonses when you

3   were on patrol, correct?

4   A.  Yes.

5   Q.  You each day you arrived at work you would receive an

6   assignment as patrol officer; isn't that right?

7   A.  I'm sorry?

8   Q.  Each day you arrived at work you would receive an

9   assignment as patrol officer, right?

10  A.  A sector, yes.

11  Q.  Well not necessarily a sector, correct?

12  A.  Most --

13  Q.  Might be the telephone switchboard operator in the

14  precinct?

15  A.  Sometime, yes.

16  Q.  Or you might guard a prisoner at the hospital?

17  A.  Sometime, yes.

18  Q.  Guard a prisoner in the cells?

19  A.  Yeah, sometimes.

20  Q.  Or you might be driving a supervisor?

21  A.  In my case I didn't -- I did not do that much.

22  Q.  But you did sometimes drive a supervisor?

23  A.  But -- sometime but not too often.

24  Q.  But that's an assignment that an officer can receive?

25  A.  I'm sorry?

D3k9flo3                        Polanco - cross

1    Q.  That's an assignment an officer can receive for their tour,

2    drive a supervisor?

3    A.  Yes.  Yes.

4    Q.  You could also work a footpost; isn't that correct?

5    A.  Yes.

6    Q.  And, as you mentioned, you could be sent outside of the

7    command on some special assignment, correct?

8    A.  Yes.

9    Q.  Like CRV?

10   A.  Yes.

11   Q.  Critical vehicle response?

12   A.  Yes.

13   Q.  Critical response vehicle.  I'm sorry.

14           Or parade?

15   A.  Yes.  Details.

16   Q.  Some special detail.  Yes.

17   A.  Yes.

18   Q.  All and all these things we've just discussed, these are

19   assignments that need to be covered by a police officer; isn't

20   that correct?

21   A.  Yeah, but if I might explain when you're on patrol,

22   90 percent of the time that you come to the precinct you be on

23   patrol.

24   Q.  But these are all other assignments that you conducted

25   yourself as a police officer, correct?

D3k9flo3                         Polanco - cross

1   A.  Yes.

2   Q.  But you consider several of these assignments punishments;

3   isn't that right?

4   A.  Yes.

5   Q.  Particular footpost.  You consider that a punishment?

6   A.  Yes.  It's considered a punishment yes.

7   Q.  You consider it a punishment?

8   A.  Many officers consider it a punishment.

9   Q.  Well we're just talking about you.

10  A.  Okay.

11  Q.  You consider driving a supervisor a punishment?

12  A.  Depends.

13  Q.  Depends on which supervisor?

14  A.  No.  Depends on every supervisor have their own drivers.

15  They choose who drive them permanently.

16          If you are driving a supervisor for one day and one

17  purpose, yes, it's a punishment.

18  Q.  The supervisor needs a driver; isn't that correct?

19  A.  Yes.

20  Q.  You also consider working a checkpoint a punishment; isn't

21  that correct?

22  A.  Yes.

23  Q.  As a police officer is one of your responsibilities

24  enforcing the law?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  And issuing summonses is a means of enforcing the law;

2    isn't that correct?

3    A.  Sometime, yes.

4    Q.  Sometimes.  Is there a time when issuing a summons isn't

5    enforcing the law?

6    A.  When you break the law to issue a summons it's not

7    enforcing the law.

8    Q.  But -- and you've, in fact, issued summonses without

9    probable cause; isn't that correct?

10   A.  I might have.

11   Q.  You might have?

12   A.  I was called to scenes to write summons by supervisors --

13   other supervisors, yes.

14   Q.  Didn't you just have a department trial in which two

15   summonses you wrote lacked probable cause and the charges for

16   false statements?

17   A.  Would you like the details of that?

18          MR. CHARNEY:  Objection, your Honor.

19          THE COURT:  Would you like what did you say?

20          THE WITNESS:  The details.  I can give her the details

21   of those two summonses.

22          THE COURT:  You object to that?

23          MR. CHARNEY:  Because we tried --

24          THE COURT:  If you do, that's that.

25          MR. CHARNEY:  -- to ask questions about the details of

D3k9flo3                          Polanco - cross

1  the trial.

2          THE COURT:  Mr. Charney, if you object, I'm going to

3  sustain it.

4          MR. CHARNEY:  We do.

5          THE COURT:  If you don't object, he wants to provide

6  the details.

7          MR. CHARNEY:  I object.  I think the question should

8  be stricken.

9          THE COURT:  Nevermind.  Do you want the details or

10  not?

11          MR. CHARNEY:  I don't.

12          THE COURT:  You don't.  All right.

13          Objection sustained.

14          MS. COOKE:  If I may, it goes to false statements.

15          THE COURT:  You made the point already.  You said did

16  you participate in a trial for writing false summonses.  And I

17  thought you said, and you were found to write false summonses.

18  Then he said yes, but would you like the details.  There was an

19  objection to the details.  I sustained it.

20          MR. CHARNEY:  No.  My objection is to the question.

21  If you're going to allow the question, then I want the witness

22  to have the right to explain.

23          THE COURT:  That's what I thought.

24          MR. CHARNEY:  So you're not going to sustain the

25  objection to the question?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 133 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 104 of 225    540
D3k9flo3                    Polanco - cross

 1            THE COURT:  Correct.  I'm not going to sustain the

 2    objection to the question.

 3            MR. CHARNEY:  Well then I would like him to answer.

 4            THE COURT:  He can explain what happened.

 5            Go ahead.

 6            THE WITNESS:  Early when I started testifying, when I

 7    report to internal affairs with a letter, in that letter

 8    there's an incident of the no dog license that was I was forced

 9    to write that I provided to internal affairs.

10            When I anonymously called internal affairs, I provided

11    the same sample of the same no dog license that I was forced to

12    write and for them to please do something about it.

13            When I got interviewed with them in December I gave

14    them the copy of those two summonses saying yes, I wrote them

15    under intimidation because the boss called me over.  I was not

16    there.  I did not observe a dog.

17            A year later they took care of the investigation by

18    charging me with perjury for writing the summons and promoting

19    the supervisor.

20            THE COURT:  And promoting the supervisor?

21            THE WITNESS:  Promoting the supervisor.

22            THE COURT:  Oh, and they promoted.

23            THE WITNESS:  And they promoted, and charged me with

24    perjury, yes, the summons that I reported, yes.

25    Q.  So the first summons, the one for the lack of a dog

D3k9flo3                           Polanco - cross

1   license, you testified about that on your direct examination as

2   well; is that correct?

3   A.   Yes.

4   Q.   And you identified Inspector McHugh, the individual who

5   stopped and called you to the scene?

6   A.   Yes.

7   Q.   And when you arrived Inspector McHugh asked you to write a

8   summons for someone not having a dog license?

9   A.   Yes.

10  Q.   But he didn't give you anymore specifics about how to write

11  that summons up?

12  A.   Nope.

13  Q.   And you claim you did not see a dog, right?

14  A.   I did not see a dog.

15  Q.   But you wrote the summons for the person not having a dog

16  license?

17  A.   I was instructed by McHugh to write them a summons for no

18  dog license, yes.

19  Q.   And when you wrote that summons, you read the summons

20  carefully, and you knew that it indicated that if you did not

21  observe what you were recording you observed, you shouldn't

22  sign that summons; isn't that correct?

23  A.   I'm an officer.   Yes.   I knew that.

24           He was a captain.   He should have known better.

25  Q.   But you signed the summons; is that correct?

D3k9flo3                        Polanco - cross

1    A.  He asked me to write it, yes.

2    Q.  Did you ask the person where their dog was?

3    A.  I told the person to fight it and bring it to court and I

4    will see him there.

5             No, I didn't.

6    Q.  Officer Polanco my question is:  Did you ask the person you

7    were writing a summons for lack of a dog license where their

8    dog was?

9    A.  He said he didn't have no dog.

10   Q.  Did you ask him where his dog was?

11   A.  I asked him about the dog.  He said he didn't have one.

12   Q.  Did you ask Inspector McHugh where the dog was?

13   A.  Nope.

14   Q.  For the second summons that's the subject of your

15   department trial, that's what Inspector McHugh also called you

16   to the scene when he had individuals stopped?

17   A.  It was the same scenario.

18   Q.  It's not the same scenario.  It's not a dog license.

19             Isn't that correct?

20   A.  But it's the same scenario.

21   Q.  It's not a dog license, correct?

22   A.  No, it's not.

23             THE COURT:  What do you mean by the same scenario?

24             THE WITNESS:  It's the same incident.  There was two

25   individuals in the same incident.  That's what I'm trying to

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/12/15 Page 136 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 107 of 225    543
D3k9flo3                      Polanco - cross

1   say.

2   Q.   This one was a disorderly conduct summons; is that correct?

3   A.   Yes.

4   Q.   You claim the only reason that Inspector McHugh stopped

5   these people was because they were black?

6   A.   Yes.  Absolutely, yes.

7   Q.   But you weren't there at the time of the stop, were you?

8   A.   But I was there after, yes.

9   Q.   But you weren't there at the time of the stop, right?

10  A.   No, I wasn't.

11  Q.   And you don't know what the circumstances Inspector McHugh

12  observed leading to the stop, do you?

13  A.   He told me he saw a dog with no license.  That's why he

14  stopped him.  Supposedly.

15  Q.   You didn't know if there had been a radio run; is that

16  right?

17  A.   No.  Because that was my sector.  No radio runs.

18  Q.   You don't know if the person fit the description of a

19  perpetrator for crime, do you?

20  A.   That's not how they put it out over the radio, no.

21  Q.   You don't know that, do you?

22  A.   If, in fact, it would be a description of somebody of a

23  crime or anything like that, then he would have asked me to

24  write a 250 or something for it.

25  Q.   You don't know that those individuals that were stopped

D3k9flo3                              Polanco - cross

1   didn't fit the description of perpetrators of a crime, do you?

2   A.  I don't know it.  And I was not told by the commanding

3   officer, no.

4   Q.  You don't know if the people that were stopped were

5   identified by victims of a crime, do you?

6   A.  No.

7   Q.  And you wrote and signed that summons as well, correct?

8   A.  Yes.

9   Q.  You're aware that pursuant to department policy, summonses

10  are to be recorded in your memo book; isn't that correct?

11  A.  Yes.

12  Q.  But you don't always record the fact you've issued a

13  summons in your memo book, do you?

14  A.  Sometime I did.  Sometime I didn't.

15  Q.  You were trained on how to issue a summons when you were at

16  the police academy, correct?

17  A.  I'm sorry?

18  Q.  You were trained on how to issue a summons at the police

19  academy?

20  A.  Maybe.  I don't recall.

21  Q.  Trained on memo book entries?

22  A.  Probably, yes.

23  Q.  That would include memo book entries for the summons?

24  A.  Probably, yes.

25  Q.  And you understand, as we discussed, the summons has a

D3k9flo3                          Polanco - cross

1      statement at the bottom that says:  I personally observed the

2      commission of the offense charged; is that correct?

3      A.   Yes.

4      Q.   And then you, as the officer, would sign as the

5      complainant, as the person who observed the offense, correct?

6      A.   Yes.

7            If I may, do you have a copy of those summonses?

8      Q.   I don't have a copy of summonses.

9            There are instances in which the officer who fills out

10     the summons is not the complainant who signs the summons; isn't

11     that right?

12     A.   Yes.

13     Q.   In those instances the patrol guide instructs the officer

14     to draw a line through the phrase "I personally observed."

15     Isn't that correct?

16     A.   No.

17     Q.   No?

18     A.   No.

19     Q.   You're not familiar with the patrol guide section which

20     instructs an officer to do that?

21     A.   I'm not familiar with putting a line through an official

22     document, no.

23     Q.   So you've never reviewed patrol guide section 209-11?

24     A.   What I was told --

25     Q.   My question is if you've ever reviewed patrol guide section

D3k9flo3                          Polanco - cross

1    209-11?

2    A.   I don't remember reviewing it.

3    Q.   Signing the summons as the complainant when you don't

4    personally observe the violation is considered a false

5    statement under the law; isn't that right?

6    A.   Yes.

7    Q.   And only uniformed members of service below the rank of

8    captain are required to carry books of summonses; isn't that

9    correct?

10   A.   To carry the books of summonses.

11   Q.   To carry.

12   A.   Not to issue them.  To carry them.  Yes.

13   Q.   Yes.

14        So then if a captain or a deputy inspector or an

15   inspector or someone of higher rank wanted to issue a summons,

16   they would need to find an officer who does carry a book of

17   summonses; isn't that correct?

18   A.   Yes.

19   Q.   No supervisor at the 41st precinct ever told you to sign

20   the summons when you didn't personally observe it, did they?

21   A.   Lieutenant Valenzano a week before, yes.

22   Q.   Did a supervisor ever refuse to sign a summons that you

23   completed that you had not personally observed?

24   A.   They never asked for it.

25   Q.   My question is did a supervisor ever refuse to sign a

Case 1:10-cv-06005-RWS  Document 401-4  Filed 02/12/15  Page 149 of 186    547
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 111 of 223
D3k9flo3                    Polanco - cross

1   summons that you wrote out for a summonable offense you did not

2   observe?

3   A.  No.

4   Q.  You testified that you have observed officers making stops

5   in the 41st precinct that lacked reasonable suspicion; is that

6   correct?

7   A.  Yes.

8   Q.  But you never raised this issue with supervisors at the

9   41st precinct?

10  A.  Yes, I did.

11  Q.  Which supervisor?

12  A.  Sergeant Bennett.

13  Q.  Did you report the misconduct to IAB?

14  A.  Excuse me?

15  Q.  Did you report that misconduct to IAB?

16  A.  Yes.  In September and November and December.

17  Q.  Prior to September of 2009 in -- you joined the police

18  department in 2005, correct?

19  A.  Yes.

20  Q.  Between 2005 and 2009 you observed officers make stops

21  without reasonable suspicion; is that correct?

22  A.  Yes.

23  Q.  And you never reported that conduct until 2009; is that

24  correct?

25  A.  Yes.

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 141 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 112 of 225    548
D3k9flo3                          Polanco - cross

1   Q.  In these stops that you observed officers making stops
2   without reasonable suspicion, were you there at the time of the
3   stop?
4   A.  Some of them, yes.
5   Q.  So some of them you were not?
6   A.  Some of them I wasn't.
7   Q.  So some of them you weren't aware of the circumstances that
8   led to the stop?
9   A.  Some of them, no.  But I will hear.  I will listen to both
10  sides.
11  Q.  You weren't the partner of the officer making each of those
12  stops, were you?
13  A.  Maybe at some point, yeah.  Maybe.  I don't know.
14  Q.  You didn't record these suspicionless stops in your memo
15  books, did you?
16  A.  No.
17  Q.  The stops thank you weren't present for the circumstances
18  leading up to the stop, you weren't aware that there wasn't a
19  radio run prompting the stop, were you?
20  A.  Some of them.
21          Not some of them, no.  I'm sorry.
22  Q.  For the stops that you weren't present leading to the
23  circumstances, you weren't aware if there was a radio run?
24  A.  Some -- no.
25  Q.  You weren't aware whether or not the person stopped fit a

D3k9flo3                        Polanco - cross

1   description, were you?

2   A.  No.

3   Q.  You weren't aware of whether the person stopped was

4   suspected of carrying a weapon?

5   A.  No.

6   Q.  You weren't aware of whether the person stopped was

7   identified by a victim of a crime?

8   A.  No.

9   Q.  So your belief that these persons were stopped,

10  suspicionless stopped in the 41st precinct is because the

11  communities in which these stops took place are largely black

12  and Hispanic; isn't that right?

13  A.  Yes.  Absolutely.

14          MR. CHARNEY:  Objection.

15          THE COURT:  And it was also your own experience, is

16  that not right?

17          THE WITNESS:  Yes.  And I work in all the communities

18  where we don't interact with people that way.  We interact in

19  the Bronx.

20          THE COURT:  You've made those stops and filled out

21  those forms yourself --

22          THE WITNESS:  Some of them.

23          THE COURT:  -- like you're supposed to do; is that

24  right?

25          THE WITNESS:  Yes, some of them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3k9flo3                              Polanco - cross

1              THE COURT:  So that's part of your experience also,

2      right?

3              THE WITNESS:  Yes, your Honor.

4      Q.   During your time you worked in the 41st precinct, you were

5      aware that the residents of the 41st precinct were largely

6      black and Hispanic; is that correct?

7      A.   Yes.

8      Q.   And you would agree that at the same time the majority of

9      complainants of crime in the 412 precinct were also black and

10     Hispanic?

11     A.   The majority.  Not all of them.

12     Q.   The majority?

13     A.   Yes.  The majority I agree.

14             THE COURT:  Let me interrupt now.  It's 12:45.

15             I'm going to stop now for the luncheon recess and

16     reconvene at 2:00.  But I have a request.

17             Off the record.

18             (Discussion off the record)

19             (Luncheon recess)

20

21

22

23

24

25

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/12/15  Page 144 of 186   551
Case 1:05-cv-01034-RATT-HBP  Document 264  Filed 05/30/13  Page 115 of 225
D3k9flo3                    Polanco - cross

```
 1                    AFTERNOON SESSION

 2                       2:05 p.m.

 3          (Trial resumed)

 4          THE COURT:  Please be seated.

 5          Ms. Cooke.

 6  BY MS. COOKE:

 7  Q.  Officer Polanco?

 8  A.  Yes.

 9  Q.  Unlike the summons paperwork, there is no place on a UF 250

10  for an officer to sign that they personally observed the stop;

11  is that correct?

12  A.  I believe not.

13          THE COURT:  I can't hear you.

14          THE WITNESS:  I believe not.

15  Q.  I'm handing the witness what has been introduced into

16  evidence as Plaintiffs' Exhibit 19 -- 419 into evidence and

17  marked for identification Plaintiffs' Exhibit 420 and

18  Defendants' Exhibit X-11.  Three documents we're going to be

19  using.  Your Honor, paper copies for you.

20          THE COURT:  Is there any objection to receiving these?

21          MR. CHARNEY:  No.

22          THE COURT:  They're all received; 419, 420.  What's

23  the other one.

24          MS. COOKE:  Defendants' X-11.

25          THE COURT:  All right.  Those are the three that are
```

D3k9flo3                         Polanco - cross

1    received.

2                (Plaintiffs' Exhibits 419 and 420 received in

3    evidence)

4                (Defendants' Exhibit X-11 received in evidence)

5    Q.   Officer Polanco, do you recognize these documents?

6    A.   The top one, it's not one that I usually see because that

7    one is done by a supervisor.

8    Q.   Are you looking at Plaintiffs' Exhibit 419 when you're

9    saying the top one?

10   A.   The top one is 923?

11   Q.   Yes.

12   A.   419, yes.  That's filled out by a supervisor.

13   Q.   Then if you turn the page.  On the second page of this

14   exhibit, Plaintiffs' 419, the Bates stamp ending 924, that's

15   your monthly performance report for January 2009.  I think we

16   discussed yesterday with your counsel.

17   A.   I believe so, yes.

18   Q.   And the other documents that I've handed you that have been

19   admitted into evidence, Defendants' X-11, are these similar

20   documents for different months?

21   A.   Yes.

22   Q.   And Plaintiffs' 420, the third document, are those again

23   similar documents for different months?

24   A.   420?

25   Q.   Yes.  The one that says Bates stamp ending 944?

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/33/15 Page 146 of 186
Case 1:08-cv-01034-AT-HBP Document 264 Filed 05/30/15 Page 117 of 225    553
D3k9flo3                    Polanco - cross

1   A.  Yes, I believe so.

2   Q.  We're going to start with Plaintiffs' Exhibit 419 and the

3   Bates stamp the second page that begins -- that ends Bates

4   stamp 924.

5         That's your January 2009 monthly performance report,

6   correct?

7   A.  Yes.

8   Q.  And in January of 2009 what were the quotas for arrests,

9   summonses, and 250s at the 41st precinct?

10  A.  I don't recall -- for that particular -- I don't recall

11  exactly.

12  Q.  You don't recall?

13  A.  For that month.  For that particular month, no.

14  Q.  Were there quotas for arrests, summons, and 250s in January

15  of 2009?

16  A.  Yes, I believe so.

17  Q.  What's the first month that you do recall in 2009 that

18  there was a number for a quota?

19  A.  I don't recall a specific month.  But I will probably guess

20  February, March, maybe.

21  Q.  Okay.  You think February?

22  A.  To the best of my recollection.

23  Q.  Okay.  Let's turn to the Bates stamp in the same document

24  Bates stamp 18926 which is your February 2009 monthly

25  performance report; is that correct?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/33/15 Page 147 of 186
Case 1:05-cv-01034-AT-HBP Document 264 Filed 05/30/13 Page 118 of 225    554
D3k9flo3                          Polanco - cross

1   A.  Yes.

2   Q.  And what is it you recall were the quotas in February of

3   2009 at the 41st precinct?

4   A.  I believe it's 21.  I'm not sure.

5   Q.  Twenty-one?

6   A.  I believe.  I'm not --

7   Q.  All right.  And how -- 20 was for the number of summonses

8   for the month, correct?

9   A.  Yes.

10  Q.  And looking at this NYC_2_0018926 Bates stamped page of

11  Plaintiffs' Exhibit 419.  I see that you make zero arrests for

12  the month; is that correct?

13  A.  Yes.

14  Q.  And you issued zero summonses?

15  A.  According to this paper -- this is not a paper I've been

16  holding so I don't know what's been done to this paper.

17  Q.  You haven't been holding it but is this your handwriting on

18  this document?

19  A.  I couldn't even attest to that.  I'm sorry.

20  Q.  You don't believe you completed this paper?

21  A.  I might have.  I might have not.  I've been out of the

22  department for almost four years.  I don't know who wrote this.

23  Q.  Do you recognize your name at the top?

24  A.  It's definitely my name, yes.

25  Q.  Do you not believe you wrote this piece of paper?

D3k9flo3                          Polanco - cross

1   A.   I'm not saying I didn't.  I'm not say I did.

2           I'm saying this document was out of my hands for more

3   than four years.  So I don't know what's been done to it.  I

4   cannot testify to it.

5   Q.   Is there a document in here that you do recognize your

6   handwriting?

7   A.   No.  Not really.

8   Q.   Turning to Bates stamped page 8929 which is the March 2009

9   monthly performance report for Officer Polanco.

10          Do you see that page?

11  A.   Yes.

12  Q.   And you see for March 2009 you recorded one arrest?

13  A.   Like I said, I cannot testify to what's here.  This

14  document been out of my hands for almost four years.  I don't

15  know whether, through a warrant, if they did --

16  Q.   Does the document reflect one arrest for the month of

17  March?

18  A.   (No response).

19  Q.   As you look at it here?

20  A.   Yes, it does.

21  Q.   Does it reflect four summonses?

22  A.   Yes.  I believe that's what it reflects.

23  Q.   Turning to Bates stamped page 18931 -- I'm sorry.  18932

24  which is the April 2009 officer monthly performance report.

25  A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3k9f1o3                          Polanco - cross

1   Q.  Do you see that page?

2   A.  Yes.

3   Q.  Is this your handwriting?

4   A.  I cannot secure whether it is my handwriting.  I'm not

5   sure.

6   Q.  Is your name at the top?

7   A.  That's my name, yes.

8   Q.  Does this document reflect one arrest on a warrant for the

9   month?

10          MR. CHARNEY:  Which page is this?

11          MS. COOKE:  The Bates stamp is cut off but it's

12   189350.

13          THE COURT:  Well it says April 2009 on the upper

14   right-hand corner.  April 2009.

15   Q.  Does this April 2009 monthly performance report for you,

16   Officer Polanco, reflect one arrest made on a warrant?

17   A.  It reflects that, yes.

18   Q.  And it reflects 14 summonses?

19   A.  Where?

20   Q.  If you total, in the summons column, I see parking

21   violation, there's a total of one.

22          That's a summons, correct?

23   A.  Yes.  Like I said --

24   Q.  Moving violation.  There's a three?

25   A.  Yes.

1    Q.  And criminal court, you see summonses, there's a 10?

2    A.  That's what the paper says.

3    Q.  So that would total 14, correct?

4    A.  Yes.

5    Q.  And UF 250s for the month of April 2009 on the performance

6    report for Officer Polanco, it's four, correct?

7    A.  According to this paper, yes.

8    Q.  Do you have any reason to believe you had more activity for

9    the month of April 2009 than is reflected on this report?

10   A.  I know how capable this department is of doing wrong stuff

11   that I don't honestly put it past them that they just threw

12   numbers in here.  It's a possibility.

13   Q.  Do you recall filling out a monthly performance report for

14   each month you were at the 41st precinct?

15   A.  Yes.

16   Q.  Finally, the last page of this document, from May of 2009.

17   The Bates stamp is 18934.

18   A.  Yes.

19   Q.  Do you see that there are two arrests reflected on this

20   performance report for you, Officer Polanco, for May of 2009?

21   A.  According to this paper, yes.

22   Q.  Do you see there are ten -- a total of ten summonses and it

23   is hard to read.  I apologize.

24   A.  According to the paper, yes.

25   Q.  And three UF 250s for the month of May 2009?

D3k9flo3                          Polanco - cross

 1  A.  Yes.

 2  Q.  So for none of those months we just reviewed, January,

 3  February, March, April, or May of 2009 did you have 20

 4  summonses; is that correct?

 5  A.  According to this paper, no.

 6  Q.  Turning to Defendants' Exhibit X-11, Officer Polanco?

 7  A.  Yes.

 8  Q.  And the second page of the document which is Bates stamped

 9  18936.  It's a monthly performance report for you for June 2009

10  with your name at the top.  Do you see that?

11  A.  Yes.

12  Q.  Do you recognize this handwriting?

13  A.  No.

14  Q.  On this document do you see that it reflects one arrest for

15  you for the month of June 2009?

16  A.  Yes.

17  Q.  And do you see five summonses for the month?

18  A.  Yes.

19  Q.  And do you see one UF 250?

20  A.  Yes.

21  Q.  And that month you had eight days on patrol, correct?

22  A.  I'm going to speak according to the paper.  Yes.

23  Q.  The document reflects that this is monthly activity for

24  Officer Polanco and it indicates eight days on patrol.  That's

25  what the document reflects, correct?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/23/15 Page 153 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/15 Page 153 of 225    559
D3k9flo3                        Polanco - cross

1    A.   That's what the document reflects, yes.

2    Q.   Turning to the fourth page of this document or fifth page

3    Bates stamp 18938.  I'm sorry.  Wait.  Hold on.  18939.

4            18939.  I'm sorry.  August 2009.

5    A.   Yes.

6    Q.   Just one second.  Do you see that this has your name at the

7    top, Officer Polanco?

8    A.   Which one are we talking about?

9    Q.   August 2009.

10   A.   Yes.  Yes.

11   Q.   Do you recognize this handwriting?

12   A.   No.

13   Q.   You don't believe it's your handwriting?

14   A.   It can be.  It could be.  I'm not -- I cannot affirm that

15   it is.  No.

16   Q.   Do you recall filling out a monthly performance report for

17   August 2009 at the 41st precinct?

18   A.   Possible, yes.

19   Q.   Do you see that this document reflects had you seven days

20   on patrol this month?

21   A.   Yes.

22   Q.   And one arrest?

23   A.   Yes.

24   Q.   And four summonses?

25            They were all criminal court summonses?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 153 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 124 of 225    560
D3k9flo3                          Polanco - cross

1    A.   Yes.

2    Q.   And zero UF 250s?

3    A.   That's what the paper says.

4    Q.   So you didn't satisfy a summons quota of twenty in the

5    month of August 2009 according to this paperwork?

6    A.   According to this paper.

7             THE COURT:   What?

8             THE WITNESS:   According to the paper, no.

9    Q.   You didn't have any 250s.  So you didn't reach a quota for

10   the 250s for August 2009?

11   A.   According to this paperwork.

12   Q.   If I could direct your attention to Bates stamped page

13   18938 which is the squad supervisor's recapitulation for August

14   of 2009.

15            Was Sergeant Edgar Padilla your squad supervisor?

16   A.   Yes, he was.

17   Q.   Is that his name at the top of this document?

18   A.   I believe, yes.

19   Q.   And at the bottom of the document do you see a comment in

20   the section it says comments by squad supervisor?

21   A.   I can roughly see it.  Yes.

22   Q.   Do you see the handwriting appears to read, and I'll read

23   it out loud, 7 MOS.  What is MOS?

24   A.   Member of service.

25   Q.   So members of service in squad.  No SQFs.  Impossible with

D3k9flo3                    Polanco - cross

1    a car break pattern.

2           Do you see that?

3    A.  I cannot make it out just by seeing it.  I can't.  It's not

4    legible.

5    Q.  Okay.  Do you have a reason to think it doesn't read

6    "impossible with a car break pattern"?

7    A.  I cannot make it out.  I don't know how you can, but.

8    Q.  So the comment indicates that there was seven members of

9    service in this squad this month who had no UF 250s; is that

10   correct?

11   A.  Yes.

12   Q.  And you were one of those seven members of the squad with

13   no 250s this month, correct?

14   A.  According to the paper, yes.

15   Q.  I'd like to play track five of your audio recording roll

16   call.  It's one minute and nine seconds in total.  I'm going to

17   play the entire track.

18           MR. KUNZ:  I'll hit play right now.

19           (Audio recording played)

20           MS. COOKE:  What time did we stop that?

21           MR. KUNZ:  We stopped at 48 seconds.

22   Q.  The speaker you identified this morning that was Lieutenant

23   Valenzano, correct?

24   A.  Yes.

25   Q.  Did you hear Lieutenant Valenzano in that recording say:

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/13/15 Page 155 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 126 of 225    562
D3k9flo3                        Polanco - cross

1   We're still having problems with car break-ins, guys.  If you

2   see people over there on bikes carrying bags, you know, good

3   stops?

4   A.   Yeah.

5   Q.   Did you hear that?

6   A.   Yeah.

7   Q.   Do you believe this recording was made -- you believe these

8   recordings were made after September of 2009, correct?

9   A.   Yes.

10  Q.   Do you recall a car break-in pattern in the 41st precinct

11  in the fall of 2009?

12  A.   It's been a long time.  I don't recall, no.

13  Q.   Do you ever recall that there was a car break-in pattern in

14  the 41st precinct when you were there?

15  A.   Not to my recollection, no.

16  Q.   You don't recall a car break-in pattern focused in sectors

17  Frank and Charlie in late 2009?

18  A.   I don't recall.

19  Q.   Did you ever patrol in sectors Frank and Charlie?

20  A.   Frank and Charlie are not two sectors.  He doesn't even

21  know what he's talking about.

22          THE COURT:  Say that again.

23          THE WITNESS:  In the 41, sector Frank and Charlie

24  doesn't exist.

25          THE COURT:  Doesn't exist?

D3k9flo3                        Polanco - cross

1              THE WITNESS:  Nope.  He's talking out of I don't know

2      where.  It doesn't exist.

3      Q.  I said Frank and Charlie.

4      A.  He said Frank and Charlie also.  He did.  He's wrong.

5      Because it doesn't exist.

6      Q.  So there is no sector F and there is no sector C in the

7      41st precinct?

8      A.  No F and C.  There's Eddie, Frank, Ida.  And there's Boy

9      and Charlie.  There's no Frank -- F and C.

10     Q.  You mean that multiple alphabet letters are combined and

11     they form a sector.  Is that what you're telling us?

12     A.  Yes.  And he combined F and C, which they don't.

13     Q.  F and C geographically are not adjacent to each other?

14     A.  No.

15     Q.  But they exist.  They just are grouped E, F and G.  And

16     then B and C.  Correct?

17     A.  Yes.

18     Q.  You testified that one of the punishments for failing to

19     meet a quota would be driving a supervisor; is that right?

20     A.  There's two terms of driving a supervisor, yes.

21     Q.  But one of them you considered a punishment, correct?

22     A.  The one where you driving for that day, for one solely

23     purpose, yes, it's a punishment.

24     Q.  Looking at Plaintiffs' Exhibit 419, Bates stamped page

25     18926, which is your February 2009 -- well the February 2009

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 157 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 128 of 225    564
D3k9flo3                        Polanco - cross

1   monthly performance report for Officer Adhyl Polanco.

2          Do you see the assignments listed down the left-hand

3   column of the page?

4   A.  I'm still looking for it.

5   Q.  I'm sorry.  February 2009.

6   A.  Yes.

7   Q.  Do you see on the twenty -- am I correct that the numerical

8   column on the far left represents each day of the month.  So

9   one would indicate the first day; two the second day of the

10  month.  Correct?

11  A.  Yes.

12  Q.  And so down on 24 that would be the 24th day of February,

13  2009?

14  A.  Yes.

15  Q.  And it says there's SGT OP is that sergeant's operator?

16  A.  Yeah.

17  Q.  Is that your assignment for the day?

18  A.  According to this paper, yes.

19  Q.  And according to this paperwork on this day as sergeant's

20  operator you made ten radio runs?

21  A.  What was the date?  I'm sorry.

22  Q.  The 24th.

23  A.  Yes.

24  Q.  And no -- you issued -- you made no arrests?

25  A.  According to the paper, no.

D3k9flo3                         Polanco - cross

1   Q.   And issued no summonses, according to the paper?

2   A.   According to the paper.

3   Q.   And you conducted three stop and frisks, correct?

4   A.   Yes.

5   Q.   In fact, turning to March 2009 in the same document Bates

6   stamped page 18929, the monthly performance report for

7   Professor Polanco -- sorry, Officer Polanco.

8   A.   I wish.

9   Q.   March 2009?

10  A.   Yes.

11  Q.   Do you see on the fourth day of the month you have

12  assignment for sergeant operator?

13  A.   Yes.

14  Q.   And also on the 25th day of the month you were a

15  sergeant's operator; is that correct?

16  A.   Yes.

17  Q.   And looking at the fourth day of the month.  There were six

18  radio runs conducted as the sergeant's operator?

19  A.   According to this paper.

20  Q.   According to this paper.

21          And no other activity under any column on this report.

22  So that would be no arrests, no summons, and no UF 250s.

23          Is that correct?

24  A.   According to this paper, again, yes.

25  Q.   And down on the 25th day of the month, you were also the

D3k9flo3                          Polanco - cross

1     sergeant's operator.

2             There was no radio runs, correct?

3     A.  No.

4     Q.  No arrests?

5     A.  Nope.

6     Q.  One summons.

7             And no UF 250s.  Is that correct?

8     A.  According to this paper, again.

9     Q.  Officer Polanco, you were never denied a day off for

10    failure to meet a quota, were you?

11    A.  Very often.

12    Q.  Very often?

13    A.  Mm-hmm.

14    Q.  How many times?

15    A.  Plenty of times.  We were told simply not to put in for the

16    day if we didn't have the numbers.

17    Q.  Did you make a request for a day off that was denied?

18    A.  I asked the supervisor.  And he said don't -- if you don't

19    have the numbers, don't even bother.

20    Q.  To receive a day off, you have to complete a piece of

21    paper?

22    A.  Most of the time we'll ask the supervisor if we can put in

23    for it.

24    Q.  But to put in for a day off, there's a document you have to

25    submit?

D3k9flo3                          Polanco - cross

1    A.  Sometime, most of the time, in patrol before we even bother

2    with the paper we will ask the supervisor first.

3    Q.  But did you ever submit a piece of paper completed for a

4    day off and were denied because --

5    A.  I might have.  I might have.

6    Q.  You've never had a shift change because failure to meet a

7    quota, have you?

8    A.  Myself, no.

9    Q.  You do claim, though, that other officers were transferred

10   from the 41st precinct because of failure to meet quotas; is

11   that correct?

12   A.  I know of at least one, yes.

13   Q.  And the one you're referring to is Officer Velazquez?

14   A.  Yes.

15   Q.  In fact, you claim that he was sent to the firearms tactic

16   section because he failed to meet quotes; isn't that right?

17   A.  Yes.

18   Q.  But, in fact, Officer Velazquez wasn't transferred because

19   of failure to meet quotas; isn't that right?

20   A.  How would I know?

21   Q.  Well Officer Velazquez was transferred because he was on

22   restricted due to a line-of-duty injury; isn't that right?

23          MR. CHARNEY:  Objection, your Honor.  She's

24   testifying.

25          THE COURT:  Sustained.

D3k9flo3                              Polanco - cross

1   Q.  While you were at the 41st precinct, you never put in for

2   a recommendation and were denied, did you?

3   A.  Recommendation as of -- that's a poor question.  What is a

4   recommendation?

5   Q.  Well you've testified in this case in a deposition in

6   March 2010, correct?

7   A.  Yes.

8   Q.  So directing -- do you still have your deposition, correct?

9   A.  Yes, I do.

10  Q.  Directing your attention to page 156 of the deposition

11  transcript.

12  A.  What page are we looking at?

13  Q.  156.

14  A.  Yes.

15  Q.  Line 12.

16  "Q.  Was there ever an occasion where -- actually I couldn't

17  understand what you -- I wasn't sure what you were saying

18  earlier, whether you were saying that you need to show your

19  commanding officer your activity when you need a recommendation

20  signed or did you say an accommodation?

21  "A.  Accommodation -- or accommodation, if anything, if you're

22  applying for a unit, if you're applying to go to another

23  precinct, or if you're applying to get an off-duty job, if

24  you're applying to pay detail, those things he has to sign in

25  order for you to get.

Case 1:10-cv-06005-RWS   Document 401-4   Filed 02/12/15   Page 162 of 186
Case 1:08-cv-01034-AT-HBP   Document 284   Filed 05/30/13   Page 153 of 225   569
D3k9flo3                    Polanco - cross

 1    "Q.  Have you ever put in for a recommendation and been denied
 2    the recommendation?
 3    "A.  No.
 4    "Q.  Have you ever put in for an accommodation and been denied
 5    the accommodation?
 6          "No.
 7    "Q.  Have you ever put in for paid detail and been denied the
 8    paid deal.
 9          "No.
10    "Q.  Have you ever put in for off duty work and been denied off
11    duty work?
12    "A.  No."
13          Were you asked those questions and did you provide
14    those answers during your deposition?
15    A.  Yes.
16    Q.  I believe you testified this morning that you never
17    received a low performance evaluation at the 41st precinct;
18    is that correct?
19    A.  Not to my knowledge, no.
20    Q.  That was either on quarterly evaluation or an annual
21    evaluation?
22    A.  Not to my knowledge, no.
23    Q.  And you testified yesterday that you didn't ever seek
24    overtime and were denied because of failure to meet quotas?
25    A.  Seek?

D3k9flo3                          Polanco - cross

1    Q.   Request?

2    A.   I don't remember giving those exact words, no.

3    Q.   You said you weren't much of an overtime person?

4    A.   That I said.

5                 (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3K8FLO4                          Polanco - cross

1    Q.   Do you recall requesting overtime and getting denied
2    because of low activity?
3    A.   They basically told us, this is what you have to do, and if
4    you're not willing to do it, don't ask for it.
5    Q.   Did you ever ask for overtime and get denied?
6    A.   I didn't bother to ask for it.
7    Q.   So you never asked?
8    A.   Sometime, but like I said, they told me this is the
9    numbers, and if you don't agree to do these numbers, you don't
10   get it, simple as that.
11   Q.   Do you recall a time where you requested overtime and were
12   denied the opportunity to work overtime?
13   A.   No.  Overtime is not usually requested.
14   Q.   I understand.  But my question is, do you recall a time you
15   requested to work overtime and you were denied?
16   A.   No.
17   Q.   You did work impact overtime tours occasionally?
18   A.   Yes, I did.
19   Q.   During those tours, you didn't necessarily always meet the
20   quota for the tour, correct?
21   A.   I believe in some of them I didn't.
22   Q.   Some of them you did not?
23   A.   Yes.
24   Q.   But you still were able to work an overtime tour again
25   after that, correct?

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 165 of 186
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 196 of 225    572
D3K8FLO4                         Polanco - cross

 1  A.  After I don't do the five I have to wait till they forget

 2  about it to get it again.

 3  Q.  But you did work overtime again after you worked a tour

 4  where you failed to meet a quota?

 5  A.  I can't knowledgeably respond to that.  I don't recall

 6  that.

 7  Q.  Do you recall that there was a time you failed to meet a

 8  quota on overtime and then were never allowed to work overtime

 9  again?

10  A.  Never?  No.

11  Q.  Every time that you worked an overtime tour you were

12  compensated for the overtime, correct?

13  A.  There is a law for that, yes.

14  Q.  Officer Polanco, you testified yesterday that you didn't

15  think supervisors at the 41st Precinct cared about your

16  activities as an officer unless they involved a UF0-250, a

17  summons, or an arrest, is that right?

18  A.  Of course, yes.

19  Q.  You said supervisors don't care about how many radio runs

20  you conduct?

21  A.  They don't.

22  Q.  Or domestic violence calls you would go on?

23  A.  They don't.

24  Q.  But radio runs and domestic violence incidents are counted

25  on all those monthly activity reports we just reviewed,

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 166 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 137 of 225    573
D3K8FLO4                        Polanco - cross

1    correct?

2    A.  They are posted.

3    Q.  They are counted.  There is a box and a line and a column

4    and they are totaled for the month?

5    A.  Yes.

6    Q.  You don't know what kind of review takes place of this

7    monthly activity report after you submit it to your supervisor,

8    do you?

9    A.  They only want to know of one thing and one thing only.

10   Q.  My question, Officer Polanco, is, you don't know what

11   review takes place of this document after you submit it to your

12   supervisor, do you?

13   A.  To my knowledge and my experience, the review that takes

14   place is about the quantity of arrests, summonses, and 250s

15   that you write.

16   Q.  You don't know who looks at this document and for what

17   purpose, do you?

18   A.  The sergeant and the platoon commander and the CO.

19   Q.  In fact, isn't it true, Officer Polanco, that there are

20   some domestic violence situations where you can't, in fact,

21   mediate the incident, you must arrest?

22   A.  Yes, of course.

23   Q.  So, in fact, even if you wanted to use your discretion and

24   not take law enforcement action in a situation, you would be

25   required to take law enforcement action, isn't that correct?

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/12/15 Page 167 of 186
Case 1:00-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 158 of 225    574
D3K8FLO4                    Polanco - cross

1   A.  Yes.

2              MS. COOKE:  I have no further questions at this time.

3              THE COURT:  Mr. Charney.

4              MS. COOKE:  One moment.

5              A couple of more questions

6   Q.  Looking at Defendants' Exhibit X11, Officer Polanco.

7              This is the August 2009 monthly performance report?

8   A.  Yes.

9              MS. COOKE:  18939.

10  Q.  Looking at the column on the far left, which has your

11  assignments or absences for the month, do you see the beginning

12  on August 9, you were RDO, which means regular day off,

13  correct?

14  A.  Yes.

15  Q.  RDO means you're not working?

16  A.  Yes.

17  Q.  So you were RDO the 9th, the 10th, and the 11th, correct?

18  A.  Yes.

19  Q.  And then it says VAC, that's vacation?

20  A.  Yes.

21  Q.  You had vacation the 12th, the 13th, the 14th, the 15th,

22  the 16th, correct?

23  A.  Yes.

24  Q.  And then on the 17th, I believe that says RDO again?

25  A.  Yes.

D3K8FLO4                          Polanco - cross

1   Q.   And the 18th, RDO?

2   A.   Yes.

3   Q.   Then the 19th, it says VAC, so it's vacation again?

4   A.   Yes.

5   Q.   The 19th, the 20th, the 21st, the 22nd, the 23rd, correct?

6   A.   Yes.

7   Q.   Then the 24th and 25th say RDO, is that correct?

8   A.   Yes.

9   Q.   So according to this document, from the 9th to the 25th of

10  August 2009, you were out of the command and not working either

11  because of RDO or vacation day, correct?

12  A.   Yes.

13  Q.   So you weren't denied those days off in the month of August

14  2009?

15  A.   Those days cannot be denied.  That's my annual vacation.

16  Q.   Thank you.

17          THE COURT:  Mr. Charney, redirect.

18  REDIRECT EXAMINATION

19  BY MR. CHARNEY:

20  Q.   Officer Polanco, you testified earlier that you considered

21  getting foot post to be a punishment.  Do you remember that?

22  A.   Yes.

23  Q.   Why do you consider it to be a punishment?

24  A.   If you're a patrol officer who is used to a car for so many

25  years, and all of a sudden they want you to do a foot post,

Case 1:10-cv-06005-RWS  Document 401-1  Filed 02/13/15  Page 169 of 186
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 140 of 225    576
D3K8FLO4                     Polanco - redirect

1   when you have people with less seniority than you on the

2   command, it's because something is not right.

3   Q.  You also testified earlier that doing checkpoints you

4   considered to be a punishment.  Why is that?

5   A.  Because the checkpoints that we were doing were not legal.

6   They were checkpoints solely to get numbers and following

7   absolutely no legal pattern.

8   Q.  You also testified earlier that you believe that driving

9   the supervisors when you're doing it just on an assigned day,

10  that that was a punishment.  Why do you consider that to be a

11  punishment?

12  A.  Because if you are driving him -- there's occasion where

13  you're driving just because you're driving.  It happens once or

14  twice a month.  But there is occasion when you're driving him,

15  McHugh said that he will have you drive a supervisor, when he

16  does it under those terms, it's solely to get numbers.

17  Q.  We also heard defense counsel ask you whether or not

18  Officer McHugh referred to any specific numbers on the

19  recording that we heard him speak on.  Do you recall that?

20  A.  Yeah.

21  Q.  And you said he did not, right?

22  A.  Directly, I don't think he mentioned 20/1 directly, no.

23  Q.  Did you hear him use any language on that recording that

24  made you think that the numbers that you had heard from other

25  supervisors were mandatory?

D3K8FLO4                         Polanco - redirect

1    A.  Of course.

2    Q.  What language was that?

3    A.  When he said it was nonnegotiable.

4    Q.  You also testified, I think on cross-examination, that you

5    waited until September 2009 to report your concerns to Internal

6    Affairs?

7    A.  Yes.

8    Q.  Can you tell us why you waited till September 2009 to

9    report your concerns?

10   A.  I fear retaliation, and up to this day I do.

11   Q.  Why do you fear retaliation?

12   A.  Today or then?

13   Q.  Then.

14   A.  Then because every time a cop step out of the blue wall, as

15   they call it, we are considered rats.  That's what they call us

16   around the precinct.  They want you to see and be quiet; they

17   don't want you to open your mouth.

18   Q.  You also testified on cross-examination that the first two

19   times you spoke to IAB you did not identify your name, you

20   spoke to them anonymously.  Do you recall that?

21   A.  Yes.

22   Q.  At any point in time, did you speak to IAB and actually

23   give them your name?

24   A.  Yes.  In December 2009.

25   Q.  Did you speak to them at any point after that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D3K8FLO4                        Polanco - redirect

 1    A.  I believe it was the day after the Channel 7 stuff aired.

 2    All of a sudden IAB group one show up to my house, supposedly

 3    they needed to help me.  It was the day after the news aired.

 4    Q.  You had a meeting with them then?

 5    A.  Yeah.  They came to my lawyer's office.

 6    Q.  Do you remember what you discussed with them in that

 7    meeting?

 8    A.  I discussed with them all the evidence that I had provided.

 9    I told them that I was suspended based on an allegation that I

10    called racial slurs to our lieutenant, that I refused to leave

11    an ambulance.  And I provided them with an audio of the

12    incident, and they listened for themselves that such accusation

13    never happen.  I gave that to Internal Affairs also.

14    Q.  When you say that accusation, which accusation are you

15    referring to?

16    A.  The retaliation for me reporting corruption.  That's what I

17    believe I got suspended for.

18    Q.  What was on the recording that you provided IAB?

19    A.  It was the actual incident I had, the incident when the

20    ambulance happened, the lieutenant did not know that I had a

21    recorder in my pocket.  So he went and gave his version of what

22    happened without knowing it was recorded.

23    Q.  In your recollection, what did that recording in your view

24    and your recollection indicate about that incident?

25    A.  Basically --

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/12/15 Page 173 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/15 Page 143 of 225    579
D3K8FLO4                        Polanco - redirect

1      MS. COOKE: Objection, your Honor. To the extent that

2   he is going to be testifying about hearsay about a recording,

3   about statements from people.

4      MR. CHARNEY: I am not asking what was said on the

5   recording. I am asking for his recollection of what was

6   depicted. He testified that what was on the recording

7   contradicted what the lieutenant told IAB, and I am trying to

8   get an understanding of why he believes that.

9      THE COURT: Doesn't that inevitably call for him to

10   say what the lieutenant said on the recording?

11      MR. CHARNEY: There were things that were said and

12   things that were done during that incident by various people.

13      THE COURT: Things that were done he can describe.

14   It's not a statement.

15   Q.  So you provided them with this recording you said -- when

16   was this that you provided IAB with this recording?

17   A.  With that particular recording, they came in -- I believe

18   it was right after the media. It might have been before. It's

19   been a long time. I don't want to give you false information.

20   It might have been before.

21   Q.  Is it fair to say it was in March of 2010?

22   A.  Around that time, yes.

23   Q.  After March of 2010, did IAB ever speak to you about again

24   about the allegations you had made?

25   A.  They did. And what they did was they brought me to ask me

D3K8FLO4                        Polanco - redirect

 1    about the summonses that I reported; they asked me for a copy

 2    of them.  And that's when a year later IAB charged me with

 3    perjury.

 4    Q.  These are the two summons you testified about on

 5    cross-examination?

 6    A.  Yes.

 7    Q.  So, to your knowledge, does the Internal Affairs Bureau

 8    have a copy of the audio that you say was taken during the

 9    incident between you and Lieutenant Valenzano?

10    A.  Yes, they do.

11    Q.  Is it your testimony that there are statements made by

12    Lieutenant Valenzano on that recording?

13    A.  Yes.

14         MR. CHARNEY:  Your Honor, we believe that that's an

15    admission of a party opponent.  He is a pretty high-ranking

16    NYPD official making statements on a recording.  So it seems to

17    me that we should be allowed to ask what those statements are.

18         MS. COOKE:  That has to do with an incident involving

19    a partner in an ambulance.

20         THE COURT:  That's the point.  It's a statement of a

21    party opponent.  The question is, is that sufficient?

22         One minute.

23         801(d)(2), "A statement is offered against a party and

24    was made by the party in an individual or representative

25    capacity."  So it doesn't have to be an issue raised in this

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/12/15 Page 174 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 145 of 225    581
D3K8FLO4                     Polanco - redirect

1    lawsuit.  Of course, all evidence has to be relevant under 403,

2    but I think this has become relevant because we have heard a

3    lot of testimony about this incident.  You brought out who

4    pushed who first.  He stopped him from getting into the

5    ambulance.  I think it's relevant.  And since there is no

6    qualification under 801(d)(2)(A), it has to be about an issue

7    in the suit, then I can turn to 403, and under 403 it is

8    relevant, or 401.

9         MS. COOKE:  I still object.  I do believe it is

10   hearsay.

11        THE COURT:  It can't be.  Wait.  It's not hearsay.  I

12   just read you the rule.  Definitions that apply to this

13   article.  Exclusions from hearsay, right?  801(d), statements

14   that are not hearsay.  (d)(2)(A), opposing party statement.  "A

15   statement is offered against an opposing party and was made by

16   the party in an individual or representative capacity."  He was

17   being questioned about incident.

18        Then one just has to look at that point at 401.  It

19   says test for relevant evidence.  "Evidence is relevant if it

20   has a tendency to make a fact more or less probable than it

21   would be without the evidence."

22        MS. COOKE:  Respectfully, I disagree that it's an

23   admission by a party.

24        THE COURT:  It doesn't say the word admission.  Do you

25   want to hear it for a third time or do you want to pull out

D3K8FLO4                          Polanco - redirect

1   your copy?  801(d)(2).  A statement is offered against opposing

2   party, and it is, and was made by the party in an individual or

3   representative capacity.  And that's true.  He is a lieutenant.

4   That's all.  Of course it's not hearsay.  Bring it out because

5   I am allowing it.

6           Mr. Charney, let's go.

7   BY MR. CHARNEY:

8   Q.  On that recording, what did Lieutenant Valenzano say that

9   contradicts his version of the events?

10          MS. COOKE:  At this point is he testifying about a

11  document that is not in evidence or a recording that is not

12  before the Court?

13          THE COURT:  It's what the lieutenant said.  It happens

14  that it is also on a recording, but he probably remembers it

15  because he was there when he said it and he recorded it.  He is

16  testifying to what the lieutenant said.  It's just helpful that

17  it happens to be on a recording, but he also knows what he

18  said.

19          Do you remember what he said?

20          THE WITNESS:  Absolutely.

21          THE COURT:  What did he say?

22          THE WITNESS:  When I was in the ambulance, the

23  lieutenant said, Polanco, I have the sector going.

24          THE COURT:  Polanco what?

25          THE WITNESS:  I have the sector going.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  I have the sector going?

2          THE WITNESS:  Meaning the sector car.

3          THE COURT:  Sector car?

4          THE WITNESS:  I have the sector.  That's how we

5     understand.  He has the sector car going.

6          He was outside the ambulance.  I was inside.  So as I

7     was coming out he said, Polanco, I have the sector going.  I

8     said, What was that, lieutenant?  I got the sector going.  OK.

9     Lieutenant, is there any reason why I can't go with my partner?

10    He said, No, I told you I have the sector going.  He wrote the

11    summons.  So I walk away.

12         At that point there was no interaction, there was no

13    pushing, there was no racial.  How am I going to scream racial

14    if I have a recorder in my pocket?  That was what happened.

15         Five minutes later is when I came back to him and I

16    ask him, you can do as you please, I am going with my partner.

17    I am outside the ambulance.  This is when he assaulted me, a

18    criminal charge.  He put his hands on me.  And that's why I

19    push him.  I didn't punch him as I should have.  I didn't kick

20    him.  I push his hands off my chest because he assaulted me.

21    He gave me a reason for me to strike him.

22    Q.  Was this recording played at the disciplinary hearing you

23    concluded a couple of weeks ago?

24    A.  Yes.  Absolutely.

25    Q.  I want to ask you about Defendants' Exhibit X11.  Is that

1   still on the screen?  Do you have that in front of you X11, the

2   monthly report?

3   A.  Yes, I do.

4   Q.  I want to turn to page 18939, which was the August 2009 one

5   that we were looking at?

6   A.  Yes.

7   Q.  Do you see on the second page --

8           THE COURT:  What do you mean second page?

9   Q.  The page after that, where it says 18940.

10          THE COURT:  OK.

11  A.  Yes.  The last page.

12  Q.  Can you read what it says under number 7, additional

13  supervisory comments?

14  A.  "PO Polanco activity was low due to his administrative

15  assignment in crime analysis."

16  Q.  Do you know what that means?

17  A.  I was doing crime analysis work and that's why my --

18  administrative work.  I was working inside.

19  Q.  Was that as opposed to doing something else?

20  A.  Opposed to going on patrol.

21  Q.  How many days on patrol do you have for August according to

22  page 18939?

23  A.  I had seven.

24  Q.  In your experience as a patrol officer in the 41st

25  Precinct, if an officer is working full time as a patrol

Case 1:10-cv-06005-RWS Document 401-4 Filed 02/12/15 Page 178 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 149 of 225      585
D3K8FLO4                          Polanco - redirect

1  officer and not doing administrative duties, typically how many

2  days on patrol would he have?

3  A.  20, 25.  I'm sorry, if I could explain.  This is what I

4  doubt the legibility of this paperwork, because nowhere here it

5  says I do crime analysis.

6  Q.  What about again on page 18940, do you see what is written

7  under number 3 on that page?

8  A.  Yes.

9  Q.  What is written under that?

10  A.  "PO Polanco activity was low due to his administrative

11  assignment in crime analysis."

12          THE COURT:  That was number 7.  He said number 3.

13  A.  "PO Polanco is always courteous and respectful."

14  Q.  Earlier I think you were asked on cross-examination whether

15  or not you recorded how many radio runs you did in a month on

16  your monthly activity report, and I think you said yes.

17          My question is, when your supervisors would review

18  these monthly activity reports with you, did they ever discuss

19  with you your radio run activity for a month?

20  A.  No, absolutely not.

21          MS. COOKE:  Objection.  I don't believe the witness

22  ever testified he reviewed these reports with the supervisor.

23          MR. CHARNEY:  He did on direct, and I have the

24  transcript which I can read from.

25          THE COURT:  Did your supervisors review the monthly

activity reports with you?

THE WITNESS: Yes.

THE COURT: Go ahead.

So when they did, did they ever discuss with your radio run activity for a month?

THE WITNESS: Yes.

Q. They did discuss your radio run activity?

A. Repeat the question.

Q. When your supervisors would review your monthly activity reports with you, when you were in the 41st Precinct, did they ever discuss your radio run activity that was on those forms?

A. No.

Q. Did they ever discuss the number of domestic incidents you responded to?

A. No.

Q. Did they ever discuss the number of crime victims you assisted during a tour or a month?

A. No.

Q. Which, if any, categories of activity on the monthly activity report did your supervisor discuss with you when he would review this form with you?

A. Specifically, the daily recap did not include domestic, did not include radio runs. The daily recap is what they ask for us to fill out. It include activity on summonses, activity on 250, and activity on arrests solely.

Case 1:10-cv-06005-RWS   Document 401-1   Filed 02/23/15   Page 180 of 186
Case 1:08-cv-01034-AT-HBP   Document 284   Filed 05/30/13   Page 151 of 225     587
D3K8FLO4                        Polanco - redirect

1   Q.   That's daily.   I am talking about the monthly activity

2   report.

3   A.   It's the same.   That's what they would be looking for.

4   They would be looking for summonses, arrests, 250.

5   Q.   Just to be clear, when your supervisors discussed with you

6   the monthly activity reports, other than arrests, summonses and

7   stop and frisks, did they discuss any other activity categories

8   from those monthly reports?

9   A.   No.

10   Q.   On cross you were asked about the patrol guide section on

11   summonses.   Do you remember that?

12   A.   Yes.

13   Q.   I believe there is a provision in there that says you are

14   not to sign the summons saying you observed the incident if in

15   fact you didn't observe it?

16   A.   Yes.

17   Q.   But you also testified, right, that there were cases where

18   you did sign summonses for things you didn't observe?

19   A.   Yes.

20   Q.   Why did you do that?

21   A.   Because they trying to say that the reason captains don't

22   carry -- don't write them is because they don't carry them.   So

23   when McHugh called me to the scene, he should have asked me for

24   a blank summons for him to write it.   He shouldn't have told me

25   write the summons.   That's what he told me, write the summons.

D3K8FLO4                          Polanco – redirect

1   Q.  You would agree that patrol guide procedure prohibits you

2   from actually signing a summons saying you observed something

3   if you didn't observe it, right?

4   A.  Yes.  That's why I report it.

5   Q.  Why did you do it if you knew that it was in fact against

6   patrol guide procedure?

7   A.  It's intimidation.  I had nowhere to go.  I am a police

8   officer.  He is a captain.  If I go against his words, I can

9   promise you I probably will drown.

10  Q.  What do you mean by that?

11  A.  They are going to look for any reason to get me in trouble.

12  They are going to look for any reason to suspend me, like they

13  did, or for any reason to even suspend me with pay.  They

14  suspended me with pay for three years.

15           MR. CHARNEY:  One minute, your Honor.

16  Q.  A couple of more questions.

17           Turning to Exhibit X11.  Do you see that again?

18  A.  Give me one second, please.  Yes.  It's in front of me.

19  Q.  If you turn to the second page, 18936.  Do you see that?

20  A.  Yes.

21  Q.  If you go to the bottom of the page, can you tell me,

22  according to this document, how many patrol tours you did in

23  that month?

24  A.  According to them, eight.

25  Q.  How many radio runs did you conduct in that month?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS Document 401-1 Filed 02/13/15 Page 182 of 186
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 153 of 225    589
D3K8FLO4                       Polanco - redirect

 1    A.  54.

 2              MR. CHARNEY:  One more second.

 3    Q.  Turning back to Plaintiffs' Exhibit 419.  If you look at

 4    the second page.  Again, it's 18926.

 5    A.  419.  What month is that?

 6    Q.  The second page of the document, which is Bates stamp

 7    18926.

 8    A.  Is this February?

 9    Q.  Yes.

10    A.  I have it in front of me.

11    Q.  According to this document, how many patrol tours did you

12    work that month?

13    A.  Four.

14    Q.  How many radio runs did you do?

15    A.  36.

16    Q.  How many stop and frisks did you conduct?

17    A.  Five.

18              MR. CHARNEY:  One more minute, your Honor.

19              No further questions.

20              THE COURT:  Thank you, Mr. Charney.

21              Any recross?

22              MS. COOKE:  Just one minute, your Honor.

23    RECROSS-EXAMINATION

24    BY MS. COOKE:

25    Q.  Officer Polanco, you don't think a checkpoint is punishment

Case 1:10-cv-00605-RWS Document 401-4 Filed 03/30/15 Page 183 of 225
Case 1:08-cv-01034-AT-HBP Document 264 Filed 03/30/15 Page 154 of 225    590
D3K8FLO4                              Polanco - recross

1   if it's a legal checkpoint, correct?

2   A.  At least, yes.  It depends.  If there is a need for the

3   checkpoint, it's absolutely OK to do it.

4   Q.  If it's conducted in the manner as you described as legal,

5   it's not a punishment, correct?

6   A.  It could be a punishment.  But like I said, what is the

7   reason for the checkpoint?  Are we addressing a situation or

8   are we accumulating numbers?  Which one are we doing?  It

9   depends.

10  Q.  If the checkpoint is conducted legally and the summonses

11  are issued at the checkpoint, the summonses are legal, correct?

12  A.  Like I said, it depends.

13  Q.  Based on my question, if you can't answer my question, you

14  just need --

15          THE COURT:  He said it depends.  You could ask, it

16  depends on what?

17          MS. COOKE:  No further questions.

18          THE COURT:  I guess we are done with this witness?

19          OK.  Thank you.

20          Your next witness, Mr. Charney.

21          MS. BORCHETTA:  We are next going to have some

22  deposition designations, and as per the Court's stated

23  preferences, we are going to have an attorney from the

24  plaintiffs reading the questions from the transcript and an

25  attorney from the defendants representing the witness.

D3K8FLO4                        "Marrero"

 1              The first witness we will be doing in this matter is

 2    Victor Marrero, and we have transcripts that are marked with

 3    plaintiffs' designations in pink and defendants' designations

 4    in yellow.  There are some designations that the defendants

 5    have objected to and one of defendants' attorneys will object

 6    when that question is posed to address to that objection.

 7              MR. CHARNEY:  For the context, this witness is related

 8    to Officer Polanco.  He worked in the same precinct.

 9              THE COURT:  Why can't he be here live?

10              MS. BORCHETTA:  Pursuant to our request to the Court,

11    we are seeking to do some testimony through deposition

12    designations in the hopes of --

13              THE COURT:  Taking less time?

14              MS. BORCHETTA:  Yes.  Thank you.

15              THE COURT:  Remind me of the color code, Ms.

16    Borchetta.

17              MS. COOKE:  The pink is plaintiffs and the yellow is

18    defendants' designations.

19              THE COURT:  Ms. Martini.

20    "Q.  You said you joined the NYPD in 2007, is that right?

21    "A.  Yes.

22    "Q.  Why did you decide to join the New York Police Department?

23    "A.  I wanted to continue my professional law enforcement.

24    "Q.  What was your first -- "

25    "Q.  Could you please state your name for the record?

1              MS. RICHARDON:  My real name or the witness's name?

2              THE COURT:  This is Victor Marrero.

3              MS. RICHARDON:  This is from Victor Marrero's

4    transcript.

5              MS. MARTINI:  Thank you.

6    "Q.  What was your first assignment when you joined the NYPD?

7    "A.  Besides the academy, impact.

8    "Q.  Were you assigned to a particular precinct?

9    "A.  Yes.

10   "Q.  Which one?

11   "A.  52.

12   "Q.  How long did you work in the 52?

13   "A.  Six months.

14   "Q.  Then what was your next assignment after that?

15   "A.  I was transferred to the 41.

16   "Q.  Do you remember the month and the year of that transfer?

17   "A.  July 2008.

18   "Q.  July 2008?

19   "A.  Yes.

20   "Q.  Are you still assigned to the 41st Precinct?

21   "A.  Yes.

22   "Q.  What was your position when you were first assigned to the

23   41st Precinct?

24   "A.  Patrol.

25   "Q.  What is your position now?

D3K8FLO4                          "Marrero"

 1    "A.  Still in patrol.

 2    "Q.  So have you had the same job title and position since you

 3    have been in the 41st Precinct?

 4    "A.  Yes.

 5    "Q.  Have you been assigned to the same patrol squad the entire

 6    time you have been in the 41st Precinct?

 7    "A.  Yes.

 8    "Q.  So, Officer Marrero, I assume you know an officer by the

 9    name of Adhyl Polanco?

10    "A.  Yes.

11    "Q.  Did he at one point work with you in the 41st Precinct?

12    "A.  Once.

13    "Q.  Was he in a patrol squad?

14    "A.  Not the same squad, but we rotate days, yes.

15    "Q.  When you say that you rotate days, what do you mean by

16    that?

17    "A.  He's in a different squad.

18    "Q.  But are you guys in the same platoon, I guess?

19    "A.  Yes.

20    "Q.  So you guys usually work the same tour?

21    "A.  Yes.

22    "Q.  So then would it be fair to say that you were usually at

23    the same roll calls as Officer Polanco?

24    "A.  Yes.

25    "Q.  Who was your squad supervisor in the fall of 2009?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300