1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DAVID FLOYD, et al.,

4                  Plaintiffs,

5           v.                              08 CV 1034(SAS)

6    CITY OF NEW YORK, et al.,

7                  Defendants.

8    ------------------------------x
                                       New York, N.Y.
9                                      March 20, 2013
                                       10:00 a.m.
10
     Before:
11
                    HON. SHIRA A. SCHEINDLIN,
12
                                       District Judge
13
                         APPEARANCES
14
     BELDOCK LEVINE & HOFFMAN, LLP
15        Attorneys for Plaintiffs
     BY:  JENN ROLNICK BORCHETTA
16         JONATHAN MOORE

17   COVINGTON & BURLING, LLP
          Attorneys for Plaintiffs
18   BY:  KASEY MARTINI
          GRETCHEN HOFF VARNER
19        ERIC HELLERMAN
          BRUCE COREY
20
     CENTER FOR CONSTITUTIONAL RIGHTS
21        Attorneys for Plaintiffs
     BY:  DARIUS CHARNEY
22         SUNITA PATEL
           BAHER AZMY
23

24

25

D3k9flo5                              "E. Velazquez"

1              MR. MOORE:  The plaintiffs will call Pedro Serrano.

2    Officer Pedro Serrano.

3       PEDRO SERRANO, 40th precinct,

4          called as a witness by the Plaintiffs,

5          having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. MOORE:

8    Q.  Good afternoon, Officer Serrano.

9              Could you tell us a little bit about yourself.  Where

10   were you born?

11   A.  I was born in Quanto, Puerto Rico.

12   Q.  How old are you now?

13   A.  I'm 43.

14   Q.  And how far have you gotten in school?

15   A.  I have about 90 credits.  I have an associates degree in

16   liberal arts.

17   Q.  Where is your associate degree from?

18   A.  LaGuardia community college.

19   Q.  Are you currently in school?

20   A.  No.

21   Q.  Are you married?

22   A.  Yes.

23   Q.  What's your wife's name?

24   A.  Annabel Serrano.

25   Q.  Do you have any children?

Case 1:10-cv-06005-RWS   Document 481-2   Filed 03/13/15   Page 2 of 29
Case 1:08-cv-01034-AT-HBP   Document 284   Filed 05/30/13   Page 200 of 225    636
D3k9flo5                         Serrano - direct

 1    A.  Four.

 2    Q.  Boys, girls?

 3    A.  Two boys, two girls.

 4    Q.  And are you presently employed?

 5    A.  Yes.

 6    Q.  Where are you employed?

 7    A.  New York City Police Department.

 8    Q.  And how long have you been a New York City police officer?

 9    A.  Approximately nine years.

10    Q.  When did you first join?

11    A.  '04.  2007.  I did six months in the police academy and the

12    rest in 40 precinct to current.

13    Q.  The rest has been in the 40th precinct?

14    A.  Yes.

15    Q.  So you became a police officer in July of 2004,

16    approximately?

17    A.  Yes.

18    Q.  You spent six months in the academy.  Then you went to the

19    40th precinct?

20    A.  Yes.

21    Q.  Where is that located?

22    A.  257 Alexander Avenue, Bronx, New York.

23    Q.  In what capacity were you assigned to the 40th precinct?

24    A.  I have different capacities but right now I'm patrol.

25    Q.  When you first got there what were you?

Case 1:10-cv-06005-RWS    Document 401-2    Filed 02/12/15    Page 4 of 28
Case 1:08-cv-01034-AT-HBP    Document 284-2    Filed 03/30/15    Page 201 of 225    637
D3k9flo5                         Serrano - direct

 1   A.  I was first -- I was the first impact class in the 40

 2   precinct.

 3   Q.  When you say the first impact class, what do you mean by

 4   impact?

 5   A.  Impact is when a certain precinct gets a spike in crime,

 6   they get about --

 7   Q.  Actually Officer Serrano, if you could move a little closer

 8   to the mic, because I'm having a hard time hearing you.

 9   A.  How about now?

10   Q.  That's better.  If you could pull it towards you it

11   might -- don't pull it out of the thing.

12           Go ahead.  Tell us what operation impact is.

13   A.  Operation impact is when a precinct has a spike in crime.

14   It could be anything.  They request the bureau for some people,

15   for some officers.  The precincts -- the police academy usually

16   sends about 50 to 80 cops to a precinct.  They flood the zone

17   with police officers and try to lower the crime in that area.

18   I was the first one in the 40 precinct.

19   Q.  And were you doing your impact work just in the 40th

20   precinct?

21   A.  Yes.

22   Q.  Now, how long did you do the impact work?

23   A.  Approximately a year.  A year to two.

24   Q.  And then you became a regular patrol officer in the 40th

25   precinct?

D3k9flo5                    Serrano - direct

1   A.  Well, first -- about one to two years in impact.  Then I

2   went to the midnights.

3          And then from the midnights I went to a detail which

4   was a summons auto.

5          And then from there I became a transport auto, which

6   all you do in transport -- you're transporting prisoners from

7   the precinct to the 40 because we had so many prisoners.

8          Then from there I went to four to twelves.

9   Q.  Four to twelve tour.  When you say -- after you left

10  impact, you went to the midnight tour, correct?

11  A.  Yes.

12  Q.  And what was the one in between that and the transport

13  auto?

14  A.  I was the summons auto.

15  Q.  What's that?

16  A.  Get in the car.  You drive around and you write summonses.

17  Q.  For vehicular violations?

18  A.  Mostly movers.  For cars.

19  Q.  So, how long have you been on the four to twelve tour?

20  A.  Approximately -- I think since 2006 maybe.  I'm not too

21  sure.

22  Q.  And do you have a -- on the four to twelve tour have you

23  had a regular partner?

24  A.  I had several.  The current --

25  Q.  Typically you have a regular partner, correct?

```
 1    A.   Yes.

 2    Q.   And who's your partner at present?

 3    A.   Arroyo Perez.

 4    Q.   And he's a police officer?

 5    A.   Yes.

 6    Q.   Patrol officer.

 7              And how long has he been your regular partner?

 8    A.   About a year to two.

 9    Q.   And before that, did you have a regular partner?

10    A.   Officer Chae.

11    Q.   And that's spelled C-H-A-E?

12    A.   C-H-A-E.

13    Q.   What's his first name?

14    A.   Hyon.  I don't know how to spell-

15    Q.   H-Y-O-N?

16    A.   Something like that, yeah.

17    Q.   And how did it come that you left Officer Chae and became

18    Officer Perez's --

19    A.   I'm sorry.  Officer Chae passed the sergeant exam.  Became

20    a sergeant in Manhattan.

21    Q.   Okay.  So, would you say that you're pretty familiar with

22    the 40$^{\text{th}}$ precinct?

23    A.   Very.  Yes.

24    Q.   So, in fact, for the eight-and-a-half years that you've

25    actually been out of the academy you've been working in the
```

D3k9f1o5                          Serrano - direct

1    40th precinct, correct?

2    A.  Yes.

3    Q.  What is your present assignment in the 40th precinct?

4    A.  Patrol.

5    Q.  On the four to twelve, correct?

6    A.  Yes.  Four to twelve patrol.

7    Q.  And can you tell us what your main function is as a patrol

8    officer on the four to twelve shift?

9    A.  Okay.  Well as a patrol officer your main function is to

10   provide service.  And what I mean -- what I mean by saying that

11   is it's a very busy precinct.  And whenever you dial 911, the

12   911 operator contacts our central.  And then our central, via

13   two-way radio, contacts the sector in concern.

14          And just to give you a little more background on the

15   40, they -- when you have boundaries in the 40 they create a

16   grid.  And every square has a letter.  So there will be an Adam

17   or a Charlie.  Then there -- that's one sector.

18   Q.  Those are called sectors, right?

19   A.  Yes.  Exactly.  Then there's a David, Eddie, Frank.  Henry,

20   Ida, John, etc.

21   Q.  So you were here when Officer Polanco testified, correct?

22   A.  Yes.

23   Q.  And he -- let me just show you what -- a document that he

24   discussed which is Plaintiffs' Exhibit 355 which is in evidence

25   which sets out, in the patrol guide, the duties of a police

D3k9flo5                          Serrano - direct

1    officer.

2              Do you see that?

3    A.  Yes.

4    Q.  You're familiar with that document?

5    A.  Yes.

6    Q.  And with respect to the duties of a police officer, they

7    would be set forth in some general detail in this document,

8    correct?

9    A.  Yes.

10   Q.  And you heard Officer Polanco testify to what those general

11   duties are and you agree with that?

12   A.  Yes.

13   Q.  One of the provisions directs that -- number one, it says,

14   "Perform duty in uniform as indicated on roll call or as

15   directed by a competent authority."

16             Do you see that?

17   A.  Correct.

18   Q.  That's number one.

19             What does that mean, "competent authority"?

20   A.  That is a lawful order, the way I interpret it.

21   Q.  That means the lawful order given by a ranking officer?

22   A.  Correct.

23   Q.  Any officer above -- sergeant and above, correct?

24   A.  Yes.

25   Q.  Police department is sometimes referred to as a

 1   paramilitary organization, correct?

 2   A.  Yes.

 3   Q.  And when your supervisors tell you to do something, patrol

 4   officers or police officers are expected to do it, right?

 5   A.  Yes.

 6   Q.  That's how you were trained?

 7   A.  Yes.

 8   Q.  Both in theory and in practice, correct?

 9   A.  Yes.

10   Q.  And you see number eight it says, in this document, it

11   says, "Render all necessary police service in assigned area and

12   as otherwise directed."

13        Can you give us an example of the type of service you

14   render as a patrol officer in the 40?

15   A.  Well, in the 40 it's very busy, like I said.  A lot of

16   people dial 911.  And when you -- when you're in the sector you

17   get calls.  You get about 20 to 40 jobs a night in my precinct.

18   And it goes from backing up a -- or helping out a person who is

19   injured, car accident, deal with a car accident.  An emotional

20   disturbed person.  Some people have called me because their cat

21   was stuck in a pool table.  That actually happened.

22        It ranges.  Anything.  There are calls for everything.

23   And we go and we try our best to help them.  And if we can't

24   help them we give them -- we give them information to the

25   people that can help.

1    Q.  And --

2    A.  I'm sorry.  That takes about 90 percent of my time.

3    Q.  And so that would -- so that would be 90 percent of your

4    time is spent responding to radio runs?

5    A.  That is correct.

6    Q.  That would be typical of the duties of a patrol officer

7    patrolling in a police car, correct?

8    A.  That is correct.

9    Q.  And along the way in performing your duties are you asked

10   to on occasion make arrests -- not asked but do you have

11   occasion to make arrests?

12   A.  Yes.  I do make arrests.

13   Q.  And do you have occasion to issue summons?

14   A.  Yes.

15   Q.  And do you have occasion to write what are known as

16   UF 250s?

17   A.  Yes.

18   Q.  Tell us what a UF 250 is.

19   A.  UF 250 is a document that we fill out when we have a --

20   when a person is -- there's reasonable cause to suspect that a

21   person has committed, is committing, or will commit a crime.

22        And when I say "crime" I mean penal law misdemeanor

23   and felony.  Does not include violations.  And does not include

24   narcotics that's not out in the open.

25   Q.  Let me show you on the screen the first page of Plaintiffs'

 1    Exhibit 98 which I believe is in evidence, Judge.

 2            And have you ever seen this patrol guide provision

 3    before?

 4    A.  Yes.

 5    Q.  And this -- the patrol guide provision applies to stop and

 6    frisk, correct?

 7    A.  Correct.

 8    Q.  And is there a portion of this document that talks about

 9    how stop and frisk applies to a felony or a misdemeanor?

10            If you look on the third section it says procedure.

11    A.  Procedure.  Yeah.  "When a uniformed member of the service

12    reasonably suspects --"

13    Q.  Read slowly for the court reporter.

14    A.  I am so sorry.

15            "When a uniformed member of the service reasonably

16    suspects a person has committed, is committing or is about to

17    commit a felony or a penal law misdemeanor."

18    Q.  There's a definition section up there for a stop and frisk

19    and there's a definition of stop.  Can you read that for the

20    court.

21    A.  "To temporarily detain a person for questioning."

22    Q.  So if you walk up to individuals on the street to ask them

23    a question, is that a stop, according to what your

24    understanding is of the patrol guide?

25    A.  Just to ask them a question, no.

D3k9flo5                         Serrano - direct

1   Q.  Is it fair to say that to be a stop you have to intend to

2   temporarily detain a person for questioning.

3   A.  That's correct.

4   Q.  And there's also a definition for search.  Can you just

5   read that?

6   A.  "Search.  To place hands inside pockets or other interior

7   parts of clothing to determine if object felt is a weapon."

8   Q.  Now is it fair to say when you're doing a stop and frisk

9   that you can only do a search of a person if the frisk that you

10  conduct gives you some reason to believe the person has a

11  weapon?

12  A.  Yes.

13  Q.  And how sensitive of a search can you do if in frisking

14  somebody you come upon something that you believe is a weapon?

15  A.  Well it's supposed to be that area only.

16  Q.  Okay.

17  A.  So if there's a bulge on the right side of his waist and I

18  believe it to be a weapon, I search that area only.

19  Q.  If there is -- if in searching the individual you find a --

20  something that -- a bulge in the jacket, does that give you

21  permission to go through pockets of somebody?

22  A.  No.  Definitely not.

23          THE COURT:  I may have missed it but when did you say

24  you could do the frisk?

25          THE WITNESS:  The frisk.  He didn't ask me that.

D3k9flo5                          Serrano - direct

1              THE COURT:  I guess I am.

2              THE WITNESS:  Well the frisk is -- I frisk people when

3     there is a bulge.  And only in that area.  So if there is a

4     bulge on his right waist and I believe it to be a weapon, I

5     frisk that area only.

6              THE COURT:  So you wouldn't routinely frisk somebody

7     who is stopped for questioning?

8              THE WITNESS:  No.  Definitely not.

9     BY MR. MOORE:

10    Q.  So you would only frisk somebody when you have reason to

11    believe that the person might have a weapon?

12    A.  Yes.

13    Q.  And, in fact, the definition reads, "A running of the hands

14    over the clothing feeling for a weapon," correct?

15    A.  That is correct.

16    Q.  So it refers specifically to a weapon?

17    A.  Yes.

18    Q.  So simply stopping somebody does not give you the

19    permission to frisk somebody, correct?

20    A.  That's correct.

21             THE COURT:  The next paragraph says -- see where it

22    says, "Number two.  Frisk, if you reasonably suspect you or

23    others are in danger of physical injury."

24             THE WITNESS:  Right.

25             THE COURT:  And that's what you just said, right?

D3k9flo5                         Serrano - direct

```
 1              THE WITNESS:  Right.
 2   Q.  And the third -- the one right below that it says "Search,
 3   if frisk reveals object may be a weapon," correct?
 4   A.  Correct.
 5              THE COURT:  So in the frisk part you don't go inside
 6   the pocket?
 7              THE WITNESS:  No.
 8              THE COURT:  That's when you go outside?
 9              THE WITNESS:  Only time when you go in --
10              THE COURT:  That's the search.
11              THE WITNESS:  Right.  The only time you go in is if I
12   feel it and it's a gun.  Then I go in and I pull it out.  Or a
13   knife.  A weapon.
14   Q.  Now, over the course of your career as a police officer in
15   the New York City Police Department you've had occasion to
16   arrest people, correct?
17   A.  Yes.
18   Q.  And when do you believe you have the authority to arrest
19   somebody on the street?
20   A.  Probable cause.  When I have probable cause to believe that
21   they committed a crime.
22   Q.  And have you had occasion during your -- the time you've
23   been a police officer to issue summonses?
24   A.  Yes.
25   Q.  And when do you believe you have the authority to issue
```

1    somebody a summons?

2    A.  Same thing.  Probable cause that they committed the

3    violation.

4    Q.  And you've had occasion to conduct stop and frisks of

5    individuals, correct?

6    A.  Yes.

7    Q.  When do you believe that you have the authority to stop

8    somebody?

9    A.  When you have reasonable cause to believe they committed a

10   criminal misdemeanor or felony.

11   Q.  Is that also referred to sometimes as reasonable suspicion?

12   A.  Yes.

13   Q.  And have you received training on when you can make stop,

14   questions, and frisks?

15   A.  Multiple trainings.

16   Q.  You received training on that at the academy, correct?

17   A.  I received the first one in the academy and then others

18   following that.  One -- a couple at the precinct level.

19   Q.  And from time to time do you receive bulletins within the

20   police department about stop and frisk issues?

21   A.  At roll call we have a training officer who approaches us,

22   gives us a form just like this, shows us a bulletin here and

23   there, gives us a piece of paper, explains it short, you know,

24   briefly.  And that's the extent of that training.

25   Q.  Have you recently been sent, Officer Serrano, for

Case 1:10-cv-06005-RWS Document 401-2 Filed 02/13/15 Page 16 of 29
Case 1:08-cv-01034-AT-HBP Document 284 Filed 05/30/13 Page 215 of 225    649
D3k9flo5                              Serrano - direct

1    retraining on stop and frisk?

2    A.  Yes, I have.

3    Q.  When did that occur?

4    A.  Don't know the exact date, I'm sorry.  But it was within --

5    maybe like the last month.

6    Q.  We'll get to that in a minute.  I just want to bring up

7    that you did have the retraining.

8             Are you aware that the New York City Police Department

9    has a policy against racial profiling?

10   A.  Yes.

11   Q.  Have you ever received any training in the New York City

12   Police Department on that policy?

13   A.  Yes.

14   Q.  What was the extent of the training you received on that?

15   A.  Same like the 250.  At the academy they had a class on the

16   250.  They gave you bulletins and papers.  And had a speech

17   about it.  And then at the -- every now and then it pops up at

18   roll call with the training supervisor and hands out bulletins,

19   gives a quick description of the training and that's it.

20   Q.  When you say a description of the training, do you mean

21   that the training officer reads the policy against racial

22   profiling?

23   A.  Yes.  He reads it off the --

24   Q.  And beyond that, have you ever received any training beyond

25   just the reading of the policy?

1    A.  Not that I remember.

2    Q.  Tell us what the command structure of the 40th precinct

3    is.

4    A.  Well at the top is the commanding officer, Deputy Inspector

5    McCormack.

6    Q.  He's currently the commanding officer, Deputy Inspector

7    Christopher McCormack?

8    A.  Yes.  Christopher McCormack is the commanding officer.

9            Then right under him is the executive officer, which

10   is -- don't know her first name, but she's Captain Matarasso,

11   the executive officer.

12           After her is the admin lieutenant, which is Lieutenant

13   Patelli.

14           And after him is the integrity control officer,

15   Lieutenant Alba.

16           And then after them would be the lieutenant platoon

17   commanders.  The only one I know of is two of them which is

18   Lieutenant Bucci.  He's the -- he's in day tours.

19           And my lieutenant platoon commander is Lieutenant

20   Mack.

21   Q.  What's that last one?

22   A.  Mack M-A-C-K.  Like the Big Mack.

23   Q.  And then there are platoon commanders for the three tours

24   of duty?

25   A.  Yes.  I don't know who the midnight.

D3k9flo5                              Serrano - direct

1    Q.  Below that would be sergeants who are squad supervisors

2    within each platoon?

3    A.  Yes.  I'm sorry.  After the lieutenant there's the squad

4    supervisors.  They are sergeants.  There's one for every

5    platoon.

6    Q.  Let me ask you --

7    A.  Squad.

8    Q.  Who is your current supervisor?

9    A.  Sergeant Monroe.

10   Q.  And how long has he been your supervisor?

11   A.  Approximately two years.

12   Q.  Are you evaluated by the New York City Police Department?

13   A.  We -- right now -- if I may, I saw a monthly sheet there.

14   It has changed from -- since Officer Polanco has been active, I

15   guess, it's now -- that was a monthly.  Now they evaluate us on

16   a daily, weekly, monthly, quarterly, yearly level.  So they are

17   constantly monitoring us.

18   Q.  And on a monthly basis does the evaluation consist of

19   simply putting down numbers and requests for excellence report?

20   A.  That's it.  You put down what you did for that day, how

21   many complaints you wrote, how many ADA cards you wrote, how

22   many car accidents, how many summons, arrests, how many 250s.

23   It's just a bunch of numbers on a piece of paper depicting what

24   I did all day long.

25   Q.  Who gets that report?

Case 1:10-cv-06005-RWS  Document 491-2  Filed 02/13/15  Page 18 of 28
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 03/30/13  Page 218 of 225    652
D3k9flo5                        Serrano - direct

1    A.   On a weekly basis, the sergeant is supposed to -- every

2    seven days he's supposed to look at it.  And I think grade it

3    and see if I was an effective officer for that week.

4    Q.   And is the exchange with the -- with your squad supervisor,

5    is there any substance to it in terms of going through the

6    actual nature of an arrest or a stop and frisk or a summons or

7    is it just an evaluation of the numbers?

8    A.   What he normally does, he looks at it.  If I don't have a

9    specific amount of activity -- usually the first week he's not

10   going to bother you, because you have the whole month to catch

11   up.  But he will look at it and sign it.  And if it gets

12   towards the end, he'll let you know if you're lacking in

13   activity.

14   Q.   My question though is -- I appreciate that.  But my

15   question is:  Do you ever discuss with your squad supervisor,

16   say for instance, the underlying facts regarding a particular

17   stop and frisk?

18   A.   No.

19   Q.   That's not part of the process?

20   A.   No.

21   Q.   Let me ask you this directly, Officer Serrano.  To your

22   knowledge, has the NYPD imposed quotas for enforcement activity

23   on you and your fellow officers?

24   A.   Yes.

25   Q.   And can you tell us what kind of things that they say to

```
 1    you about your activity?

 2    A.  Well it's not enough.  It's too low.

 3    Q.  So essentially if your numbers are not high enough bring

 4    your numbers up?

 5    A.  Well if I'm going to be specific I was told once by

 6    lieutenant -- I'm trying to remember his name -- but he told --

 7    I had a real good month.  I had about three arrests, about 20

 8    summonses.  And you know A, B, C, a mixture.  And I didn't have

 9    any 250s.  And he mentioned it.  You know.  I had a very busy

10    week.  I answered a lot of jobs.  Did a lot of work.  And I

11    thought I was going to get praise that month.  And he came up

12    to me and said you need more 250s.  I was like really.

13    Q.  Who was that?

14    A.  I'm trying -- I don't know.  It's a lieutenant.  He

15    retired.  This happened a while ago.

16    Q.  Okay.  All right.  But while in the 40$^{th}$ precinct, right?

17    A.  Yes.

18    Q.  What is your basis for your knowledge that the NYPD, in

19    your judgment, imposes quotas for enforcement activity on you

20    and your fellow officers?  What's your basis for your knowledge

21    of that?

22    A.  The basis is they tell you to your face.  They tell you at

23    roll call.  They pull you to the side and tell you.  Also you

24    get retaliated against.  I've gotten retaliated against because

25    I didn't meet the quota.  Again, I might have enough arrests,
```

D3k9flo5                                 Serrano - direct

1    but I might not have enough C summonses for them.  So they go

2    after that.

3            But again it's -- they do retaliate.  And they tell

4    you that I need the specific number.

5    Q.  Is that also something that's reinforced by your union

6    delegates?

7    A.  Yes.  There were two trustees during an election.  And I

8    wrote an affidavit depicting that they were forcing me to --

9            MS. COOKE:  Objection, your Honor, to the extent the

10   witness is testifying about a written affidavit.  That's a

11   hearsay statement.

12           THE COURT:  Sustained.

13           MR. MOORE:  I'm sorry.

14           THE COURT:  She's objecting to his out-of-court

15   statement.

16           MR. MOORE:  To his out-of-court statement?

17           THE COURT:  Yes.

18   Q.  Leave out what you wrote and tell us what you -- tell us

19   what this example is.

20   A.  Okay.  Well I told him that I was being --

21           MS. COOKE:  No.

22           THE COURT:  Still the same thing.

23           MR. MOORE:  It's what he says, Judge.

24           THE COURT:  I know.  That's an out-of-court statement.

25           MR. MOORE:  They can cross-examine.

D3k9flo5                          Serrano - direct

1              THE COURT:  I understand that.  But it's still a

2       hearsay statement.

3              MR. MOORE:  All right.  Fine.

4  Q.  Can you tell me who of your supervisors that you mentioned

5  have told you that in sum and substance that there are quotas

6  within the New York City Police Department?

7  A.  Many.  I'm sorry.

8  Q.  Present squad supervisor, has he told you that?

9  A.  Sergeant Monroe.  Sergeant Bradway.  Sergeant Bloom --

10  lieutenant -- that name is going to come to me.

11  Q.  Dutae?

12  A.  I'm sorry.  Lieutenant Dutae.

13  Q.  I thought that was the one that was -- I don't mean to --

14  A.  There's another -- there's Lieutenant Dutae.  There's

15  lieutenant -- the ICO Lieutenant Barrett.  They have given me

16  specific numbers in a specific area within a specific

17  timeframe.  And if I don't write them I will be retaliated

18  against.

19  Q.  And when they talk to you -- does that also include Captain

20  Matarasso and Deputy Inspector McCormack?

21  A.  Yes.

22  Q.  When they talk to you about your numbers, is it other than

23  that or is it just basically your numbers?

24  A.  It's --

25  Q.  Do they go into the substance of what your activity is?

 1    A.  No.  They just -- they tell you exactly what you -- you

 2    don't have enough of.

 3              Can I speak about evaluation?

 4    Q.  I'm sorry?

 5    A.  I had the evaluation with Captain Matarasso.

 6    Q.  Right.  We'll get to that in a minute.

 7    A.  Well, yeah, they tell you specifically what you're lacking

 8    in.

 9    Q.  So, when do you believe that these -- when did you first

10    become aware that NYPD was, in your judgment, imposing quotas

11    on your -- for your enforcement activity?

12    A.  (No response).

13    Q.  When did you first become aware of that?

14    A.  Well it's immediately.  It shows up immediately when you

15    come out of the police academy.  But I would call that a soft

16    quota.  I wasn't really retaliated against.  They just give you

17    a number.  I remember the four and -- one arrest a quarter, and

18    20 summonses.  But they really didn't come after me then.

19              2007 is when the 1 and 20 came into play, which is one

20    arrest, twenty summonses.  And, again, the twenty summonses

21    were not anything.  They are specific.  They would say I need

22    five C summonses, which are criminal court summonses.  I need

23    five B summonses, which are movers.

24    Q.  When you say movers, what do you mean?

25    A.  When you're in a car and you have a cellphone and they give

D3k9flo5                          Serrano - direct

1    you a summons for that.  Anything in a car is basically -- when

2    I write a summons it's called a B summons, which in traffic

3    court is where you have to answer it.  And the other summons is

4    A summons which is a parker.  And they would say five, five,

5    and five.  And then the other five would be up to us.

6             But it would definitely be those summons, the 250s,

7    and the arrests.

8    Q.  So in addition to the summonses and arrests there's also --

9    you believe there's also a quota with respect to your 250

10   activity, correct?

11   A.  Yes.

12   Q.  Now, Officer Serrano, are you -- do you have any concern

13   about testifying here today?

14   A.  Oh, definitely.

15   Q.  What's that concern?

16   A.  Retaliation which it has already started.  And I fear that

17   they're going to try to set me up and get me fired somehow.

18   Q.  Why do you believe that?

19   A.  Again, it already started.  The minute -- 2007, again, I

20   was scared.  But I knew that certain things were wrong so I

21   started taking notes and just recording stuff.  But, again, too

22   scared to come out.

23            And recently when I finally mentioned something and I

24   called IAB, the minute -- I'm sorry.  The minute I made it, I

25   guess, known that I was going to testify in this court,

Case 1:10-cv-06005-RWS  Document 401-2  Filed 02/13/15  Page 25 of 28
Case 1:08-cv-01034-AT-HBP  Document 284  Filed 05/30/13  Page 222 of 225    658
D3k9flo5                        Serrano - direct

```
 1    captain -- Deputy Inspector McCormack when he came back from
 2    CompStat started to just do things.  And one of the things that
 3    he did was he immediately called me into his office and -- I
 4    appealed my evaluation.  So he said that that -- under the
 5    pretense of appealing my evaluation, he called me into his
 6    office with -- can I go into that?
 7    Q.  You can tell us who it was.  We'll get into your
 8    evaluation, some of which is on an audio recording but --
 9    A.  Well he did a lot of things to retaliate.
10    Q.  Okay.  My question really goes to you have some fear of
11    getting up here and testifying and the way you're testifying
12    about what's going on in the New York City Police Department,
13    correct?
14    A.  Yes.  I have fear to go -- my first day starts in three
15    days.  I can imagine what my first day is going to be like.
16    Q.  Your first what?
17    A.  My first day at work.
18    Q.  Your first day back at work?
19    A.  From my regular day off.
20    Q.  When you say that you have been retaliated against, can you
21    tell us in what ways you've suffered retaliation for --
22    withdraw that.
23         Have you expressed your opinion to your supervisors
24    that you believe that using quotas are illegal?
25    A.  Yes, I have.
```

1    Q.  And when did you first begin to do that?

2    A.  I've been protesting 2007, 2008.  I've been verbally

3    telling my supervisors that this is wrong, this is wrong, this

4    is wrong, and they're constantly telling me:  Hey this is the

5    way it is.  It's been done this way forever.  You can't fight

6    that losing battle.

7    Q.  And as a result of your coming forward and having that

8    discussion with your supervisors, do you feel that you've been

9    retaliated against?

10   A.  Yes.  Definitely.

11   Q.  In what ways?

12   A.  Well someone took my locker and they moved it so all the

13   contents were tossed everywhere.  They put a lot of stickers of

14   rodents on my locker.

15   Q.  What did that mean to you?

16   A.  That I was a rat.

17   Q.  And what's the significance of being labeled a rat when

18   you're a member of the New York City Police Department?

19   A.  Usually if you call IAB in reference to another police

20   officer, you're called a rat.  But the inspector has a lot of

21   friends.  And they are very upset about what I did.

22            MS. COOKE:  Objection, your Honor.  To the extent he's

23   testifying about --

24            THE COURT:  To the extent he's just describing they

25   were very upset.

D3k9flo5                              Serrano - direct

1           How do you know that?  Did you see the upset?  Did you

2    see it yourself?

3           THE WITNESS:  Yes, yes.

4           THE COURT:  What did you see?

5           THE WITNESS:  My, what do you call it, my PBA rep,

6    he -- we used to be good people.  Now he talks to me -- he

7    yells at me.  He has very smart -- smart -- as soon as it was

8    known that I did this, he's just -- doesn't even want to look

9    in my direction.

10          THE COURT:  I'll allow that.  That's what he observed.

11   Q.  So once you came forward you believe the -- at least

12   certainly the atmosphere for you within that precinct changed,

13   correct?

14   A.  Definitely.

15          MR. MOORE:  Judge, I notice it's 4:30.  It would be a

16   good point to --

17          THE COURT:  Okay.  Good.  We're done for the day.  See

18   everybody tomorrow at 10:00.  Thank you.

19          (Adjourned to March 21, 2013 at 10:00 a.m.)

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   ADHYL POLANCO

 4   Direct By Mr. Charney . . . . . . . . . . . 445

 5   Cross By Ms. Cooke . . . . . . . . . . . . . 508

 6   Redirect By Mr. Charney . . . . . . . . . . 575

 7   Recross By Ms. Cooke . . . . . . . . . . . . 589

 8    PEDRO SERRANO

 9   Direct By Mr. Moore . . . . . . . . . . . . 635

10                       PLAINTIFF EXHIBITS

11   Exhibit No.                               Received

12    284   . . . . . . . . . . . . . . . . . . 465

13    98    . . . . . . . . . . . . . . . . . . 506

14    419 and 420   . . . . . . . . . . . . . . 552

15                       DEFENDANT EXHIBITS

16   Exhibit No.                               Received

17    X-11 . . . . . . . . . . . . . . . . . . 552

18

19

20

21

22

23

24

25
```