UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

CRAIG MATTHEWS,

                Plaintiff,

        vs.

CITY OF NEW YORK; RAYMOND KELLY, as
Commissioner of the New York City
Police Department; JON BLOCH, a deputy
inspector in the New York City Police Department;
MARK SEDRAN, a lieutenant in the New York
City Police Department,

                Defendants.

-------------------------------------------------------------x

ECF Case

12 Civ. 1354 (PAE)

**AFFIDAVIT OF OFFICER
CRAIG MATTHEWS**

       Officer Craig Matthews declares under penalty of perjury and pursuant to 28 U.S.C. §

1746 that the following statements are true and correct:

      1.      The testimony contained in this Affidavit is based on my personal knowledge.

      2.      I am currently employed by the City of New York as a member of the New York

City Police Department ("NYPD").

      3.      My title and rank is "Police Officer."

      4.      I have been a police officer with the NYPD for 16 years.

      5.      I was assigned to the 42nd Precinct in 1999 and have been assigned there for 14

years.

      6.      My regular activities as a police officer involve (1) going on radio runs, which are

responses to 911 calls in the precinct, in addition to "311" requests, and requests that come

through the station house telephone switchboard, (2) patrolling the streets and vertical patrolling

of local housing, (3) filling out complaint reports and additional forms relating to criminal

activity, lost property, and missing persons, including interviewing witnesses, (4) responding to

traffic accidents, (5) transporting prisoners to and from the precinct house, courts, and hospitals, and (6) doing community visits with local businesses and organizations.

7.      I spend 95% of my time as a police officer doing the activities in paragraph 6.

8.      It was not part of my job as a police officer to make written reports to Inspector Bugge or Deputy Inspector Bloch, the 42nd Precinct commanding officers, while at the 42nd Precinct.

9.      It was not part of my job as a police officer to make oral reports to Inspector Bugge or Deputy Inspector Bloch, the 42nd Precinct commanding officers, while at the 42nd Precinct.

10.      It was not part of my job as a police officer to meet with Inspector Bugge or Deputy Inspector Bloch, the 42nd Precinct commanding officers, while at the 42nd Precinct.

11.      I did not regularly meet with Inspector Bugge or Deputy Inspector Bloch in my capacity as a police officer.

12.      I am not, nor have I ever been, an Integrity Control Officer.

13.      I did not report any particular unjustified arrest, unjustified stop, or unjustified summons or any particular group of unjustified arrests, unjustified stops, or unjustified summonses.

14.      I was not disciplined pursuant to NYPD Patrol Guide Section 207-21 for failing to report the quota system to the Internal Affairs Bureau.

15.      When I reported the quota system to the precinct commanding officers, I did not make the report pursuant to NYPD Patrol Guide Section 207-21.

2

By:  _____
     OFFICER CRAIG MATTHEWS

Dated: June 06, 2013
       New York, N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CRAIG MATTHEWS,                          :

                Plaintiff,          :

                                :

           vs.                 :          ECF Case

                                :

CITY OF NEW YORK; RAYMOND KELLY, as      :          12 Civ. 1354 (PAE)
Commissioner of the New York City        :
Police Department; JON BLOCH, a deputy   :          **DECLARATION OF**
inspector in the New York City Police Department; :  **ERIN BETH HARRIST**
MARK SEDRAN, a lieutenant in the New York :         **IN OPPOSITION TO**
City Police Department,                  :          **DEFENDANTS' MOTION FOR**
                                :          **SUMMARY JUDGMENT**

             Defendants.          :
------------------------------------------------------------x

       Erin Beth Harrist declares, pursuant to 28 U.S.C. § 1746 and subject to the penalties of

perjury, that the following is true and correct:

       1.      I am a Staff Attorney at the New York Civil Liberties Union and am co-counsel

for the plaintiff. I make this declaration to place certain documents and information before the

Court.

       2.      Annexed hereto as Exhibit 1 are excerpts from the Deposition of Plaintiff Officer

Craig Matthews dated April 23, 2013.

       3.      Annexed hereto as Exhibit 2 is the New York City Police Department Patrol

Guide Section 202-21.

       4.      Annexed hereto as Exhibit 3 are excerpts from the Deposition of Defendant

Deputy Inspector Jon Bloch dated March 11, 2013.

       5.      Annexed hereto as Exhibit 4 are excerpts from the Deposition of Inspector

Timothy Bugge dated March 5, 2013.

6.    Annexed hereto as Exhibit 5 are the following newspaper articles: Graham

Rayman, The NYPD Tapes: Inside Bed-Stuy's 81st Precinct, Village Voice, May 4, 2010;

William K. Rushbaum, Joseph Goldstein, and Al Baker, Experts Say N.Y. Police Dept. Isn't

Policing Itself, New York Times, Nov. 2, 2011.

7.    Annexed hereto as Exhibit 6 are excerpts from the Deposition of Deputy

Commissioner John Beirne dated April 24, 2013.

8.    Annexed hereto as Exhibit 7 is the New York Police Department Patrol Guide

Section 202-09.

9.    Annexed hereto as Exhibit 8 are documents produced by defendants with the

bates stamps NYPD 155-205 entitled: 42nd Precinct Community Council.

10.    Annexed hereto as Exhibit 9 are documents produced by defendants with the

bates stamps NYPD 206-300 entitled: 42nd Precinct Community Council.

11.    Annexed hereto as Exhibit 10 is plaintiff's Notice of 30(b)(6) Deposition served

on defendants dated February 15, 2013.

12.    Annexed hereto as Exhibit 11 is the New York Police Department Patrol Guide

Section 202-15.

13.    Attached hereto as Exhibit 12 is the Revised Case Management Plan dated

February 27, 2013.

14.    Attached hereto as Exhibit 13 is the Brief of Defendants-Appellees filed in the

Second Circuit on July 9, 2012 in opposition to plaintiff's appeal of the district court's decision

dismissing the Complaint.

15.    In response to Plaintiff's First Request for the Production of Documents pursuant

to Federal Rule of Civil Procedure 34 dated December 19, 2012, Defendants produced the New

2

York City Police Department Patrol Guide. That document bears bates stamps NYPD 1 – NYPD 2313.

16.     Plaintiff's Request No. 4 in Plaintiff's First Request for the Production of Documents pursuant to Federal Rule of Civil Procedure 34 dated December 19, 2012 requested "Documents sufficient to identify every instance since January 1, 2007 in which the NYPD has disciplined or attempted to discipline a member of the department for allegedly failing to report (whether to a Commanding Officer, the Internal Affairs Bureau, or any other member or part of the NYPD) noncriminal misconduct within the NYPD." In response, Defendants produced two charts marked with bates stamps NYPD 67-70 and NYPD 71-86. Those charts list 432 cases involving 364 members of the NYPD. I do not attach the documents themselves because they contain confidential information that is not necessary to compile the numbers herein.

By: _____
ERIN BETH HARRIST

Dated: June 7, 2013
       New York, N.Y.

3

**JUDGE JONES**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 12 CIV 1354

------------------------------------------------- x

CRAIG MATTHEWS,                                      :

             Plaintiff                     :

       -versus-                                    :

CITY OF NEW YORK; RAYMOND KELLY,          :
as Commissioner of the New York City Police
Department; JON BLOCH, a deputy inspector in    :
the New York City Police Department; MARK
SEDRAN, a lieutenant in the New York City Police :
Department,                                                      :

          Defendants                   :

------------------------------------------------- x

**COMPLAINT**
**JURY DEMANDED**

_[stamp: FEB 23 2012 U.S.D.C. S.D.N.Y. CASHIERS]_

## PRELIMINARY STATEMENT

1.     This is a civil rights action to vindicate the right of police officers in the New

York City Police Department ("NYPD") to speak out against the use of illegal quotas without

facing retaliation.   The plaintiff Craig Mathews is a 14-year veteran police officer with an

exemplary record who been subjected to a campaign of retaliation and harassment for having

reported the existence of a highly developed quota system in the 42nd Precinct in the Bronx.

This retaliation comes in the context of a city-wide controversy over the NYPD's use of illegal

quotas and the damage such quotas inflict on innocent people, policing, and police-community

relations.

2.     Since 2008, supervisors in the 42nd Precinct have developed and implemented a

system of quotas mandating numbers of arrests, summonses, and stop-and-frisks (with one

supervisor describing stop-and-frisks as being "worth their weight in gold").   As part of the

1

regime for enforcing these quotas, supervisors have developed a detailed monitoring system that includes computer reports that use color coding to categorize officers in terms of their compliance with quotas. Current reports use black ink to identify officers who are meeting quotas, silver ink to identify officers who are meeting only some quotas, and red ink to identify officers who are not meeting quotas. Officers in the precinct are constantly pressured to meet the quotas, and those do not are subject to punishment including undesirable assignments, the loss of overtime, denial of leave, separation from partners, and poor evaluations.


3.      Concerned about the impact of illegal quotas on policing and police-community relations, Officer Matthews on at least four occasions has notified commanding officers of the 42nd Precinct about the quota system being used by mid-level supervisors. In response to having spoken out about the precinct's quota system, Officer Matthews has been retaliated against in ways that are more severe and differ from the punishment being imposed on the many other officers not meeting the quotas. And at a roll call last month, a supervisor running the quota program said, "If you come after me, I will come back after you harder."


4.      The quota system in the 42nd Precinct has pitted police officers against each other, straining professional relationships and diverting resources away from law enforcement activities. Officers who comply with the quotas have had their precinct lockers dislodged and overturned, with the lockers sometimes being placed in the shower or their locks being plastered shut. This practice of "locker flipping" has escalated to the point where on-duty police officers are now assigned to guard the precinct's locker room around the clock.

5. The use of an illegal quota system in the 42nd Precinct reflects a larger crisis in the NYPD. For several years, the Department has been engulfed in a scandal about its use of quota systems that lead to innocent New Yorkers being stopped and frisked, given summonses, and even arrested. Through tape recordings, officer complaints and admissions, and newspaper reports, quota systems have been uncovered across the city.

6. The defendants have violated Officer Matthews' rights under the First Amendment and New York Constitution. He seeks an injunction requiring the defendants to cease all actions in retaliation for his protected speech, as well as an award of compensatory damages and attorney's fees.

## PARTIES

7. Plaintiff CRAIG MATTHEWS is a police officer employed by the New York City Police Department in the Bronx.

8. Defendant CITY OF NEW YORK is a municipality organized under the laws of the State of New York.

9. Defendant RAYMOND KELLY is the Commissioner of the New York City Police Department and has his office at 1 Police Plaza, New York, N.Y. 10038. Mr. Kelly is sued in his official capacity.

3

10.    Defendant JON BLOCH is the commanding officer of the 42nd Precinct of the
New York City Police Department.


11.    Defendant MARK SEDRAN is a lieutenant in the 42nd Precinct of the New York
City Police Department.

## FACTUAL ALLEGATIONS

12.    For several years, the New York City Police Department has been engulfed in a
scandal about its use of illegal quotas. The NYPD's use of illegal quotas was dramatically
exposed by a series of audio recordings made by an officer assigned to the 81st Precinct in
Brooklyn, which revealed his supervisors announcing mandated numbers for arrests,
summonses, and stop-and-frisks. Requiring officers to meet quotas inevitably leads them to
make arrests, issue summonses, and conduct stop-and-frisks of innocent people. Not
coincidentally, street stops conducted by NYPD officers have exploded in number in recent
years, going from fewer than 100,000 in 2002 to nearly 700,000 last year.


13.    Starting in May 2010, *The Village Voice* ran a series of articles focusing on the
quota system in the 81st Precinct. In August 2010 then-Gov. David Paterson signed legislation
expanding the scope of the state's anti-quota statute to ban retaliation for not meeting quotas for
tickets, summonses, arrests, and stop-and-frisk encounters. Before it was amended, the anti-quota
law only covered traffic violations.

4

14.     In just the last six months, several controversies about NYPD quotas have arisen. In January of this year, the NYPD was ordered to arbitrate a grievance brought by an officer who claims there is a pervasive quota system in the 20th Precinct on the Upper West Side of Manhattan. In October 2011 a narcotics detective in Queens admitted that the use of quotas by the NYPD led him and other officers to plant cocaine on innocent individuals in order to boost their arrest numbers. The officer, a former narcotics detective named Stephen Anderson, testified in court that he participated in the practice – called "flaking" – when his co-workers needed last-minute arrests to fulfill their quotas. Anderson testified that he and his partner had a "number to reach" and that they planted drugs on innocent people because his partner was "worried about getting sent back [to patrol] and . . . the supervisors getting on his case." And in August 2011 a federal judge in the Southern District of New York, in denying the NYPD's motion for summary judgment in a class-action challenge to the stop-and-frisk program, described the recordings from the 81st Precinct as "smoking gun" evidence of the existence of quotas.

15.     Despite the public controversy about its quota system and despite the recent quota legislation, the NYPD has refused to admit that illegal quotas exist while continuing to enforce them in precincts across the city. As a result, individual police officers face intense pressure to comply with orders to meet illegal quotas.

16.     Plaintiff Police Officer Craig Matthews is a 14-year veteran assigned to the 42nd Precinct in the Bronx, where he has been since 1999. During his time at the 42nd Precinct, Officer Matthews has received over 20 awards for his police work.

17.     Until recently, Officer Matthews consistently received positive annual reviews. For instance, his review for 2004 stated, "P.O. Matthews is incorruptible. He has the highest level of integrity and displays a great sense of morals." His 2005 review said, "P.O. Matthews is always desirous and willing to work, and is able to do his job with little or no direction"; and his 2007 review described him as "an experienced officer who is a valuable asset to this precinct . . . [and who] is able to complete his assignments with little or no instructions."

18.     In 2008 supervisors in the 42nd Precinct started to pressure officers to meet numerical quotas for arrests, summonses, and stop-and-frisks. For Officer Matthews' squad, this quota system was created by his platoon commander, Lieutenant Mark Sedran. In 2009 Sedran refined the quota system by putting in place a point system whereby he awarded points for what he considered "good" summonses – meaning hazardous summonses – and subtracted points for non-hazardous summonses. (Hazardous summonses refer to moving violations issued for traffic infractions that are more likely to cause accidents on the roadways, such as using a cell phone while driving or disobeying traffic signals.) Officers who did not meet the quotas were subjected to a wide range of punishment, including undesirable assignments, loss of overtime, and denial of requested days off.

19.     Officer Matthews recognized that such a quota system violates the NYPD's core mission and his own commitment as a police officer to protect and serve the public at large. As a result, he was unwilling to participate in a practice that would damage the communities he was entrusted to protect.

20.     In February 2009 Officer Matthews reported to the precinct's commanding

officer, Captain Timothy Bugge, that a quota system had been established in the precinct. When

the quotas continued, he again reported them to Captain Bugge in March and April 2009 and

reported them to the precinct executive officer in May 2009.


21.     In June 2009 Captain Bugge told Officer Matthews that he had spoken with

Lieutenant Sedran and that the situation was handled. In fact, the quota system continued, with

Lieutenant Sedran saying in a roll call that he would use it secretly. In addition, Lieutenant

Sedran embarked on a campaign of retaliating against Officer Matthews for having reported the

quota system to the precinct's commanding officers. As part of that campaign, Officer Matthews

has been given punitive assignments (such as footposts or prisoner transport), been denied

overtime, been denied leave, been separated from his career-long partner, and been the target of

humiliating treatment by his supervisors. Unlike the punishment imposed on the many other

officers who have failed to meet quotas, Lieutenant Sedran's harassment of Officer Matthews

was constant and personal. He treated Officer Matthews differently from other officers,

targeting him even for the most minor infractions.


22.     In October 2009 Captain Bugge informed Officer Matthews that he would not

interfere with how supervisors ran their platoons. At this point Officer Matthews concluded that

it was futile to notify Captain Bugge further about the quota system.


23.     In 2010 mid-level precinct supervisors began producing regular computer reports

with the number of summonses issued by each officer, with distinctions between types of

summonses that were considered more desirable and those considered less desirable. Officers

who did not make their quotas were highlighted in red on these activity reports, while officers

who had made their quotas were listed in black.

24.     In the spring of 2010 Sergeant Sean Wick, who supervised Officer Matthews'

squad, was explicitly instructed to deny all requests for emergency days off and vacation time

because of the squad's numbers.  On a May 2010 Compstat report, Lieutenant Sedran wrote the

following note: "Sean, your squad's activity is the worst in the command re. B's + C's. No E-

days, vac days or lost time are to be granted to anyone in your squad."  In police jargon, the

phrase "B's + C's" refers to violations and summonses of varying degrees of severity.

25.     Officer Matthews faced continued retaliation throughout 2010, causing him to

suffer both mentally and physically.  At the end of the year, he went to the emergency room for

what he thought was a heart attack, and his symptoms were ultimately attributed to extreme

stress.

26.     During the first week of January 2011, Officer Matthews twice asked Lieutenant

Sedran for a day off so he could get a cardiovascular test.  Lieutenant Sedran denied both

requests and stated he was surprised Officer Matthews had the nerve to request a day off after

"fighting" Lieutenant Sedran about activity every month.

27.     Officer Matthews' annual evaluation for 2010, which was completed by

Lieutenant Sedran and Sergeant Wick -- the platoon commander and sergeant whom Officer

Matthews had repeatedly implicated in the precinct's quota system -- rated Officer Matthews

lower than previous reviews in virtually every category. This review gave Officer Matthews an

overall evaluation score of three out of five, which is the lowest passing score and is significantly

below his normal rating. The review also included comments highly critical of his

outspokenness. For instance, the review stated that Officer Matthews is "difficult to work with,

he questions his assignments and wants to debate every issue." Lieutenant Sedran wrote that

Officer Matthews "has a contrarian attitude and can be abrasive when given instruction." Officer

Matthews understood these comments to refer specifically to his complaints to the precinct

commanding officer about the quota system.

28.     In January 2011 Officer Matthews met with defendant Deputy Inspector Jon

Bloch (then a captain), who had become the precinct commanding officer in 2010. In the

presence of another officer and the precinct's executive officer, Officer Matthews informed

Bloch about the quota system and that it was causing unjustified stops, arrests, and summonses

because police officers felt forced to abandon their discretion in order to meet their numbers.

Officer Matthews also told Bloch that the quota system was having an adverse effect on the

precinct's relationship with the community. Captain Bloch became irate and ordered Officer

Matthews and the others out of his office.

29.     In this meeting, as in all of his reports to Captains Bugge and Bloch, Officer

Matthews voiced precisely the sort of concern about policing practices that the NYPD

encourages New Yorkers to voice to the commanding officers of their precincts. Each precinct

has a community council run by local residents that meets each month, and commanding officers

regularly attend these meetings. In the 42nd Precinct, the community council meets on the

fourth Thursday of every month in the precinct's station house, and each meeting includes an

open microphone portion that allows citizens to discuss policing issues directly with precinct

supervisors. Deputy Inspector Bloch regularly attends these meetings in his capacity as the

precinct's commanding officer.

30. Local residents also can voice their concerns about police practices by walking

into the station house to meet with Deputy Inspector Bloch or by calling the precinct, where the

officers answering the phones can transfer anyone to Deputy Inspector Bloch's direct phone line.

31. Discussing concerns about police practices with residents of the precinct is an

integral part of the commanding officer's job. After the audio tapes revealing the quota system

in the 81st Precinct were released, Commissioner Raymond Kelly appointed Deputy Inspector

Juanita Holmes to be the commanding officer of the 81st Precinct. Deputy Inspector Holmes

attended a community meeting in the precinct to address concerns about the quota system.

32. Since his January 2011 meeting with Deputy Inspector Bloch, Officer Matthews

has been subjected to heightened retaliation that differs from the punishment inflicted on the

many other officers who have failed to meet quotas, making it clear that this retaliation is a result

of his speaking out against the quota system. For example, in late November 2011 Captain

Bloch and Lieutenant Sedran stopped Officer Matthews near the end of his shift and pulled him

from his assigned sector. In front of other officers, Lieutenant Sedran told Officer Matthews that

they were going to drive him around the precinct and gave him a "goal" of obtaining eight

10

arrests. This was an effort to humiliate Officer Matthews in front of his colleagues. Officer

Matthews was specifically targeted instead of other officers who failed to meet the quotas

because he spoke out against the quota system.

33.     Officer Matthews also has been assigned duties that present a risk to his personal

safety, such as transporting multiple prisoners without the standard number of back-up officers.

On January 15, 2012, for example, Lieutenant Sedran ordered the three officers who had

accompanied Officer Matthews on a prison transport to be reassigned, intentionally leaving

Officer Matthews alone to process thirteen prisoners.

34.     In addition, Officer Matthews has been denied overtime and time off and has been

deliberately barred from the sorts of job assignments that an officer of his seniority would

usually receive. For example, an officer of Officer Matthews' seniority would generally receive

Critical Response Vehicle ("C.R.V.") assignments, which guarantees overtime every shift.

Lieutenant Sedran has consistently denied Officer Matthews these assignments. When

Lieutenant Sedran was out sick for two days in December 2011, however, Officer Matthews

received C.R.V. assignments.

35.     In December 2011 the computer reports used in conjunction with the quota

system in the 42nd Precinct were changed to reflect an even more discriminating monitoring

system. Whereas prior reports had labeled officers in black and red ink depending upon their

compliance with quotas, the new reports add a silver category for officers who are meeting

quotas in some categories but not in others. A recent version of this report covering the first two

11

weeks of January 2012 provides figures for 155 individual officers, with 15 officers in black ink, 90 in silver ink, and 60 in red ink.

36.     On January 5, 2012, Officer Matthews was further targeted for disclosing the precinct's quota system when Sergeant Wick announced that Officer Matthews would be permanently separated from his career-long partner and that Sergeant Wick himself would be Officer Matthews' new partner. While additional officers failed to meet their assigned quotas, only Officer Matthews was permanently assigned to partner with a supervisor.

37.     During roll call on January 8, 2012, Lieutenant Sedran threatened Officer Matthews, stating: "If you come after me, I will come back after you harder."  Officer Matthews understood this threat was directed towards him for his having reported Lieutenant Sedran's illegal quota system to the precinct's commanding officers.

38.     On February 23, 2012 (the day of the filing of this lawsuit), Officer Matthews received his evaluation for 2011.  Completed by Deputy Inspector Bloch and Sergeant Wick, the evaluation gives Officer Matthews an overall rating of 2.5, an extraordinarily low rating that subjects him to close monitoring and puts him at risk of being fired.  Not surprisingly in light of their prior responses to Officer Matthews' complaints about the quota system, the review specifically notes that "[h]e needs to be directed to issue summons and make arrests" [sic] and claims he "is argumentative and questioning regarding his assignments." This evaluation grossly distorts Officer Matthews' performance and is in retaliation for his having spoken out about the quota system.

12

## JURISDICTION AND VENUE

39.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1343(a)(3)-(4).  This Court has supplemental jurisdiction over all state

constitutional and state law claims pursuant to 28 U.S.C. § 1367(a).

40.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) in that defendant City of New

York is located within the Southern District of New York.

41.     The defendants' actions have been taken under the color of law.

## CAUSES OF ACTION

### First Cause of Action

42.     The defendants have violated the plaintiff's rights under the First Amendment to

the United States Constitution and 42 U.S.C. § 1983.

### Second Cause of Action

43.     The defendants have violated the plaintiff's rights under Article I, § 8 of the New

York State Constitution.

### JURY DEMAND

44.     The plaintiff demands a jury for each of his claims.

WHEREFORE, the plaintiff requests that this Court:

(1) Assume jurisdiction over this matter;

(2) Issue a declaration that the defendants violated the plaintiff's rights under the First
Amendment of the United States Constitution and Art. I, § 8 of the New York State
Constitution;

(3) Issue an injunction ordering the defendants to cease from engaging in any further action
in retaliation for Officer Matthews' exercise of his free speech rights and ordering the
defendants to restore to Officer Matthews all benefits he lost as a result of adverse
employment action to reverse any retaliatory actions taken against Officer Matthews;

(4) Order the defendants to pay compensatory damages to the plaintiff;

(5) Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and

(6) Order any other relief the court deems appropriate.


Respectfully submitted,


CHRISTOPHER DUNN
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 607-3300

Dated: February 23, 2012
        New York, N.Y.                          Counsel for Plaintiff


On the Complaint:

KATE DONIGER*
Law Student
New York University School of Law
Civil Rights Clinic

HOLLY MOWFORTH*
Law Student
New York University School of Law
Civil Rights Clinic


14

JAKE TRACER*
Law Student
New York University School of Law
Civil Rights Clinic

* The Plaintiffs and the New York Civil Liberties Union Foundation will be seeking leave of
court to permit these students to serve as attorneys in this matter pursuant to the Southern
District's Student Practice Plan.