Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - - -
 5   ADRIAN SCHOOLCRAFT,
 6                        Plaintiff,
 7        -against- Index No.
                         10CIV-6005 (RWS)
 8
     THE CITY OF NEW YORK, DEPUTY CHIEF
 9   MICHAEL MARINO, Tax Id. 873220,
     Individually and in his Official
10   Capacity, ASSISTANT CHIEF PATROL
     BOROUGH BROOKLYN NORTH GERALD NELSON,
11   Tax Id. 912370, Individually and in his
     Official Capacity, DEPUTY INSPECTOR
12   STEVEN MAURIELLO, Tax Id. 895117,
     Individually and in his Official
13   Capacity, CAPTAIN THEODORE LAUTERBORN,
     Tax Id. 897840, Individually and in his
14   Official Capacity, LIEUTENANT JOSEPH
     GOFF, Tax Id. 894025, Individually and
15   in his Official Capacity, stg. Frederick
     Sawyer, Shield No. 2576, Individually
16   and in his Official Capacity, SERGEANT
     KURT DUNCAN, Shield No. 2483,
17   Individually and in his Official
     Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18   Tax Id. 885374, Individually and in his
     Official Capacity, SERGEANT SHANTEL
19   JAMES, Shield No. 3004, and P.O.'s "JOHN
     DOE" 1-50, Individually and in their
20   Official Capacity (the name John Doe
     being fictitious, as the true names are
21   presently unknown)(collectively referred
     to as "NYPD defendants"), JAMAICA
22   HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
     Individually and in his Official
23   Capacity, DR. LILIAN ALDANA-BERNIER,
     Individually and in her Official Capacity
24   and JAMAICA HOSPITAL MEDICAL CENTER
     EMPLOYEES "JOHN DOE" # 1-50, Individually
25
     (Continued)
```

Page 2

1
2    and in their Official Capacity (the name
     John Doe being fictitious, as the true
3    names are presently unknown),
4
     Defendants.
5
       - - - - - - - - - - - - - - - - - - -x
6
                         111 Broadway
7                        New York, New York
8                        February 11, 2014
                         10:30 a.m.
9
10      VIDEOTAPED DEPOSITION of DR. LILIAN
11   ALDANA-BERNIER, one of the Defendants in
12   the above-entitled action, held at the
13   above time and place, taken before
14   Margaret Scully-Ayers, a Shorthand
15   Reporter and Notary Public of the State
16   of New York, pursuant to the Federal
17   Rules of Civil Procedure.
18
19              *       *       *
20
21
22
23
24
25

Page 29

1                L. ALDANA-BERNIER

2        A.      When they bring in a patient

3    very agitated, combative, violent,

4    depending on the nature of their call,

5    I'm sure they were being brought by

6    handcuffs.

7        Q.      And do you recall as you sit

8    here any of names of any of those

9    patients?

10       A.      No.

11       Q.      And do you recall as you sit

12   here a gentleman named Adrian Schoolcraft

13   from only your memory?

14       A.      Hold on.  You're saying from my

15   memory?

16       Q.      Yes.

17       A.      Because I have been reading the

18   chart.

19       Q.      Independent of the records, do

20   you have any memory of Adrian

21   Schoolcraft?

22            MR. CALLAN:  Objection to the

23       form of the question.

24            You can answer.

25       A.      No, I don't.

Page 60

1               L. ALDANA-BERNIER
2               MR. CALLAN:  Objection to form.
3               MR. SMITH:  Objection to form.
4               There is a timing issue.
5         Q.    Was Mr. Schoolcraft's medical
6    chart as it existed at the time that you
7    saw him available to you at Jamaica
8    Hospital's emergency room?
9         A.    Yes.
10        Q.    Did you have physically Mr.
11   Schoolcraft's chart in your presence when
12   you evaluated him?
13               MR. CALLAN:  She already said
14          yes to that, Counsel.
15               MR. SMITH:  I don't think she
16          did.
17        Q.    Did you have it in your
18   presence when you evaluated him?
19        A.    I saw it before I saw him.
20        Q.    Where were the charts keep in
21   this psychiatric emergency room at least
22   as it was in November 2009?
23        A.    It's usually in the nursing
24   station.
25        Q.    Are you familiar with the

Page 61

```
 1              L. ALDANA-BERNIER
 2    policies and procedures for Jamaica
 3    Hospital with regard to the use of
 4    restraints as they existed in 2009?
 5        A.    Yes.
 6        Q.    What is your understanding of
 7    that?
 8        A.    A restraint a usually applied
 9    on a patient who is a danger to himself
10    or a danger to the other patients or
11    someone is very agitated, aggressive, or
12    violent.
13              They usually come in soft
14    restraint, four-point restraints usually
15    applied for two hours, and then staff has
16    to go monitor those restraints every 15
17    minutes to make sure there is no
18    impairment of circulation.
19        Q.    You described a type of
20    restraint.  I missed what you said.
21        A.    Soft restraint.
22        Q.    What is a soft restraint?
23        A.    They are not leather.  They
24    were like Velcro, like bandages, so that
25    they wouldn't be very constricting to the
```

Page 62

L. ALDANA-BERNIER

1
2    hand or the wrist of the patient.
3         Q.    Are those the only type of
4    restraints that Jamaica Hospital used in
5    2009?
6         A.    Yes.
7         Q.    And who makes the decision
8    regarding whether or not restraints are
9    to be applied to a patient?
10         A.    When the doctor is not present,
11    any nursing staff that's there can make a
12    decision if the patient should be
13    restrained.
14              What they do is call the doctor
15    and they will tell the doctor that a
16    patient is going to be restained, and in
17    30 minutes that doctor has to go and
18    check the patient.
19         Q.    When a patient was brought in
20    in handcuffs at Jamaica Hospital in 2009,
21    was there a procedure for assessment as
22    to whether or not that person should be
23    put into hospital restraints or not?
24         A.    Repeat that again.
25         Q.    Sure.

Page 63

1              L. ALDANA-BERNIER

2              When a patient was brought into

3    the hospital, Jamaica Hospital, in

4    handcuffs in 2009, was there a hospital

5    procedure for determining whether or not

6    that patient should be put in the soft

7    restraints that you described?

8        A.    Depends on the case.  If the

9    patient is in handcuffs taken to our

10   emergency room and the patient is

11   agitated or violent and a danger to that

12   community of the ER, then he will have to

13   be restained.  We usually restrain those

14   kind of patients, violent patients.

15       Q.    When a violent patient comes in

16   in handcuffs, they were then placed into

17   the soft restraints, correct?

18       A.    Yes.

19       Q.    Why is that?

20       A.    If they are violent, if we see

21   them as a potential danger, then we have

22   to restrain them.

23       Q.    Are the only appropriate

24   restraints to be used at Jamaica Hospital

25   in 2009 the soft restraints that you have

Page 64

```
 1              L. ALDANA-BERNIER
 2   been describing?
 3              MR. RADOMISLI:   Objection to
 4       form.
 5              MR. CALLAN:   I join the
 6       objection.
 7       Q.    Does good and accepted medical
 8   practice require when a patient was
 9   brought in in handcuffs that the hospital
10   replace those handcuffs with soft
11   restraints in 2009?
12              MR. RADOMISLI:   Objection to
13       form.
14       A.    Not all handcuffs are soft
15   restraints.  I'm trying to say if we
16   think they were violent and a danger or
17   if they are going to be destructive, we
18   have to put them in restraints.
19       Q.    When you say not all handcuffed
20   people are put in restraints, are all
21   people that need to be restrained removed
22   from handcuffs and put into soft
23   restraints?
24       A.    If they were violent.
25       Q.    How soon after admission in
```

Page 65

1              L. ALDANA-BERNIER
2     handcuffs should the patient be put into
3     soft restraints?
4         A.     They go through triage.  If
5     triage assess the patient and they assess
6     that the patient needs to be on
7     restraints because they were violent, as
8     soon as they come into the emergency
9     room, we have to take off the handcuffs
10    and put them on four-point restraints.
11        Q.     Why is that?
12        A.     Because they are dangerous.
13    That's after the assessment.  If we know
14    they are dangerous, we have to put them
15    on restraints.
16        Q.     Am I correct once a patient is
17    brought into Jamaica Hospital in
18    handcuffs and they become a patient of
19    the hospital, physicians are going to
20    make decisions about restraints and the
21    type of restraints to be used, correct?
22        A.     Yes.
23        Q.     Not the police officers,
24    correct?
25        A.     No, they don't have a role.

Page 66

```
1                  L. ALDANA-BERNIER
2         Q.    When you say "they don't have a
3    role," what do you mean?
4         A.    They don't have a role in
5    deciding if our patient should be
6    restrained or not.
7         Q.    If a patient is handcuff and
8    the hospital wants the handcuffs removed,
9    they should be removed, correct?
10             MR. RADOMISLI:   Objection to
11        form.
12             MR. CALLAN:   Objection to form.
13        A.    The handcuffs?
14        Q.    Yes.
15        A.    If we think they have to --
16   clarify that.   There are many, many -- go
17   ahead.   Can you clarify it?
18             MR. SUCKLE:   We will move onto
19        something else.
20        Q.    Did you have any role in
21   writing any written rules or regulations
22   with regards to restraints at Jamaica
23   Hospital?
24        A.    Do I have a role -- I may have
25   sit in in one of those sessions, yes.
```

Page 83

                    L. ALDANA-BERNIER

1

2    yes.

3        Q.      In order to comply with Section

4    9.39 of the Mental Hygiene Law, you have

5    to fill out a release of information

6    form?

7        A.      I have to go back.  I'm sorry.

8                In the emergency room, we do

9    not get release of information, only in

10   the inpatient unit.

11       Q.      Did you ever fill out any form

12   in order to comply with Section 9.39 of

13   the Mental Hygiene Law, as you understand

14   it?

15       A.      Just those forms, the 9.39

16   form.

17       Q.      What are those forms for?

18       A.      Those are legal forms.

19       Q.      What is the purpose of those

20   legal forms, do you know, as you

21   understand it?

22       A.      The purpose of those legal

23   forms is just for the reason that you

24   think:  if the patient is a danger to

25   himself and that he needs to be

Page 84

```
 1              L. ALDANA-BERNIER
 2   stabilized in a hospital.
 3       Q.    It's for your own benefit?
 4       A.    No.
 5             MR. CALLAN:  Objection to form.
 6       You're recharacterizing her answers.
 7             MR. SUCKLE:  I'm asking.
 8       A.    It's not for my benefit.
 9       Q.    Whose benefit is it for?
10       A.    For the benefit of the whole
11   society as well as the patient and whole
12   society.
13       Q.    Is it important to be accurate
14   in your recordkeeping in a hospital
15   chart?
16       A.    Repeat the question.
17       Q.    Is it important to be accurate
18   in your recordkeeping and note keeping in
19   a hospital chart?
20       A.    Yes.
21       Q.    As a physician?
22       A.    Yes.
23       Q.    Why?
24       A.    It's for the sake of patient.
25             MR. SUCKLE:  Do you need to take
```

```
 1                L. ALDANA-BERNIER
 2        a break?
 3                THE REPORTER:  No.
 4                MR. SMITH:  Let's take a break.
 5                We are going off the record at
 6        11:51.
 7                [Discussion held off the
 8        record.]
 9                [Whereupon, at 11:51 a.m., a
10        recess was taken.]
11                [Whereupon, at 12:13 p.m., the
12        testimony continued.]
13                MR. SMITH:  Back on the record
14        12:13.
15        Q.    Doctor, you had indicated to us
16   your first note in the chart was November
17   2nd, 2009, at 3:10 p.m.
18                And do you know whether or not
19   the patient had been evaluated from a
20   psychiatric prospective at any time prior
21   to your note?
22        A.    You're asking me if --
23        Q.    I'm asking do you know whether
24   or not the patient had to be evaluated
25   from a psychiatric prospective at any
```

Page 86

1          L.  ALDANA-BERNIER
2   time  prior  to  November  2,  2009,  at  any
3   time  before  you  made  your  note?
4        A.    Yes.
5        Q.    Did  you  review  the  chart  of  Mr.
6   Schoolcraft  prior  to  seeing  him  on
7   November  2nd,  2009,  at  3:10  p.m.?
8        A.    Yes.
9        Q.    Why  did  you  do  that?
10       A.    To  be  able  to  know  the  patient
11  and  see  what's  going  on  and  get
12  information  about  the  patient.
13       Q.    And  when  for  the  first  time  did
14  anybody  do  any  kind  of  psychiatric
15  examination  or  assessment  of  Mr.
16  Schoolcraft  in  Jamaica  Hospital  that
17  you're  aware  of?
18       A.    That  is  when  he  was  in  the
19  medical  ER.
20       Q.    And  did  you  see  a  note  of  that
21  evaluation?
22       A.    Yes,  it's  here  [indicating].
23       Q.    What  is  the  date  and  time  of
24  that  note?
25       A.    It's  11/1/2009  at  6:30  in  the

Page 87

1                L.  ALDANA-BERNIER
2    morning.
3               MR.  LEE:   At what time?
4               THE REPORTER:  6:30 in the
5         morning.
6               MR.  SUCKLE:   Just give me a
7         second.
8               MR.  SMITH:  Did you see 11/1?
9               THE WITNESS:  Yes, 11/1/2009 at
10        6:30 in the morning.
11        Q.     And this is a note by who?
12        A.     Dr. Lewin.
13        Q.     Spell that?
14        A.     L-E-W-I-N.
15        Q.     It says 1 of 3 on top, correct?
16        A.     Yes.
17        Q.     It's a three-page note,
18   correct?
19        A.     Yes.
20        Q.     And it ends and the three pages
21   end with a note on 11/1/09 at 6:30 a.m.,
22   correct?
23        A.     Yes.
24        Q.     This is called a "Consultation
25   Form."  What is that?

Page 88

1           L. ALDANA-BERNIER

2      A.    When the doctor calls for a

3   consult, this is the form that we use to

4   write our notes.

5      Q.    What was the purpose of having

6   Mr. Schoolcraft evaluated, if you recall,

7   from your review of the chart?

8      A.    Okay.  It said in here that a

9   psych consult was called and reported as

10  patient was acting bizarre.

11     Q.    Did you read this note prior to

12  your evaluation of the patient?

13     A.    Yes.

14     Q.    Is this one of notes that you

15  read prior to coming here to testify in

16  preparation for your testimony today?

17     A.    Yes.

18     Q.    And were you able to read the

19  note, the handwriting, when you read

20  it --

21     A.    Yes.

22     Q.    -- back in 2009?

23     A.    Yes.

24     Q.    Have you seen Dr. Lewin's

25  handwriting before?

Page 122

1              L. ALDANA-BERNIER

2    do you see that?

3        A.    Yes.

4        Q.    Doctor, when you wrote your

5    note of November 2nd, 2009, did you know

6    that a nurse noted "with redness on the

7    right wrist with the handcuff, police

8    officer made aware and requested to

9    loosen a little bit yet refused."

10            Did you know about that note

11   when you made your note of November 2nd,

12   2009?

13       A.    This is a medical ER note

14   [indicating].

15       Q.    So you did not know?

16       A.    I didn't have that note.

17       Q.    Just so I'm clear:  You did not

18   know that a nurse had asked a police

19   officer to loosen the handcuff, that the

20   police officer refused, you did not know

21   that?

22       A.    No, I did not know that.

23       Q.    Looking at that same note, the

24   nurse's assessment, November 1st, 2009,

25   5:54 a.m., do you see that note?

1            L. ALDANA-BERNIER

2       A.    Yes.

3       Q.    Were you aware when you first

4  saw Mr. Schoolcraft that he had reported

5  to the nurse, "My wrist is numb, I don't

6  feel anything now," did you know that

7  when you wrote your note on November 2nd,

8  2009?

9       A.    No, because I don't have this

10  record.

11       Q.    Did you see that this note,

12  that same note starts, "Psych consult in

13  progress"?

14       A.    Yes.

15       Q.    Do you know whose psych consult

16  that was, was that Dr. Tariq?

17       A.    No, this was Dr. Lewin.

18       Q.    And do you know if Dr. Lewin

19  wrote or made a note that you saw

20  regarding Mr. Schoolcraft's wrist being

21  numb and he doesn't feel anything?

22       A.    She didn't write anything.

23       Q.    And Doctor, does good and

24  accepted medical practice require

25  loosening of a handcuff when it's causing

```
 1              L. ALDANA-BERNIER
 2   redness to the wrist?
 3              MR. RADOMISLI:  Objection.
 4              MR. LEE:  Objection.
 5              MR. RADOMISLI:  Also under
 6         Karbala [phonetic].
 7              MR. SUCKLE:  This is prior, not
 8         subsequent.
 9         Q.    Does good and accepted medical
10   practice require the loosening --
11              MR. CALLAN:  This is a nursing
12         question as well.
13         Q.    Does good and accepted medical
14   practice require loosening of a handcuff
15   causing redness to the wrist?
16              MR. LEE:  Objection.
17              MR. CALLAN:  Objection.
18              You can answer if you can,
19         Doctor.  I mean is there a course in
20         --
21              MR. RADOMISLI:  Objection.
22              MR. CALLAN:  Is there a course
23         in medical school about handcuffs?
24              MR. SMITH:  You cannot coach the
25         Witness.  Cut it out.
```

Page 125

```
 1              L. ALDANA-BERNIER
 2              MR. SUCKLE:  We will attach this
 3       to our motion papers.
 4              MR. CALLAN:  Bring that to Judge
 5       Sweet.
 6              MR. SUCKLE:  So you are
 7       confident you can talk over us and
 8       make speaking objections?  Is that
 9       your position, Counsel?
10              MR. CALLAN:  No.  My position is
11       that you have --
12              MR. SUCKLE:  Is that the
13       disrespect that you have for the
14       Court?
15              MR. CALLAN:  Ask relevant
16       questions.  You have been doing this
17       long enough to know they do not teach
18       you about handcuffs in medical school.
19              MR. SMITH:  You cannot coach the
20       Witness.  It's totally improper.  It's
21       completely wrong.  You know it.
22              Should we call the Court and ask
23       them to tell you which you know you
24       are not entitled to do.  You are not a
25       law department kid that just got --
```

Page 126

1              L. ALDANA-BERNIER

2              MR. SHAFFER:  Objection.

3              MR. SMITH:  Come on.

4              MR. CALLAN:  I think that's a

5        smear on the law department of State

6        of New York.

7        Q.    Does good and accepted medical

8  practice require that a handcuff be

9  loosened if it's causing redness to the

10  wrist?

11             MR. RADOMISLI:  Objection.

12             MR. LEE:  Objection.

13             MR. SUCKLE:  You can answer.

14             MR. CALLAN:  You can, Doctor, go

15        ahead.

16        A.    If the patient complains, yes,

17  you have to release the restraints.

18             MR. RADOMISLI:  Move to strike.

19        Q.    When you say that you have to

20  release the restraints, what do you mean?

21        A.    Loosen it.

22        Q.    Going back to your previous

23  conversation about soft restraints, how

24  long had Mr. Schoolcraft been in the

25  hospital, if you know, prior to this note

```
 1              L. ALDANA-BERNIER
 2   of 2 a.m. on November 1st, 2009?
 3       A.    He was admitted, arrived at the
 4   hospital 10/31/2009 at 23:03.
 5       Q.    So at this point, it had been
 6   more than two hours he had been in the
 7   hospital by the time of that note of 2
 8   a.m., correct?
 9       A.    That's -- let me see, seven
10   hours.
11              MR. RADOMISLI:  Sorry.
12              THE REPORTER:  Seven hours.
13       Q.    Doctor, continuing on the
14   further nursing notes, here's the page I
15   am referring to.  Can you find that in
16   the hospital record?
17              MR. LEE:  What notes are we
18       talking about?
19              MR. SUCKLE:  November 1 through
20       November 3rd nursing notes.
21       Q.    Do you have it?
22       A.    Yes.
23       Q.    We are looking at a page in the
24   hospital chart.  At the top it's dated
25   11/1/2009.  And the first entry is
```

1          L. ALDANA-BERNIER

2     There is times that the patient comes,

3     and the nurse hasn't seen the patient,

4     and it's an emergency, we have to go see

5     the patient.

6          Q.     My question is:  Did you review

7     the records of psychiatric emergency room

8     that exist for a patient at the time that

9     you would examine the patient?

10          A.     I do review the records, yes.

11          Q.     So do you recall then that you

12     reviewed this nursing assessment?

13          A.     I do not recall that, but I

14     usually review the records.

15          Q.     So your habit and custom would

16     have been to review this form?

17          A.     Yes.

18          Q.     Doctor, on this form on the

19     first page it says, "circumstances

20     leading to admission."  Do you see that

21     on the first page of that form,

22     circumstances leading to admission?

23          A.     Yes.

24          Q.     Actually, let's go up the line

25     before, "patient's chief complaint," do

Page 170

1                L. ALDANA-BERNIER

2                MR. CALLAN:  Did you finish your

3        answer, or do you have more to say?

4                THE WITNESS:  Yes.  I was trying

5        to say that I agreed that he was calm,

6        but it was not only the decision that

7        you have to make or the decision that

8        I made.  I was looking at all factors

9        that brought him to the hospital.

10       Q.    So you were told about what

11   happened in his apartment?

12       A.    Everything, yes.

13       Q.    And you were considering what

14   you were told by the police when they

15   arrived in the hospital, correct?

16       A.    That's correct.

17       Q.    And do you know who Sergeant

18   James is?

19       A.    No, I don't.

20       Q.    Did you ever speak to Sergeant

21   James?

22       A.    No, I don't -- I did not.

23       Q.    Did you ever see any reference

24   to Sergeant James providing any

25   information that was recorded in the

```
 1              L. ALDANA-BERNIER
 2   hospital record?
 3       A.    It's in the record.
 4       Q.    In that context you know of
 5   Sergeant James because his name appears
 6   in the record, correct?
 7       A.    That's correct.
 8       Q.    And you know some of the things
 9   about the history about what took place
10   in the apartment came from Sergeant
11   James?
12       A.    That's what in the record.
13       Q.    When this patient was in front
14   of you, he was not in need of restraints,
15   correct?
16       A.    That's correct.
17       Q.    And when he was in front of
18   you, he was not exhibiting any of the
19   behaviors that would lead you to believe
20   he was homicidal?
21       A.    That's correct.
22       Q.    And he was leading you to --
23   not exhibiting any of the behaviors that
24   would lead you to believe he was
25   suicidal, correct?
```

Page 192

```
1              L. ALDANA-BERNIER
2     Q.    Am I correct?
3           MR. RADOMISLI:   Objection to
4     form.
5     A.    That's correct.
6     Q.    So the residents had evaluated
7  him and made notes, correct?
8     A.    Yes.
9     Q.    And you were the director of
10  the emergency room, correct?
11    A.    Correct.
12    Q.    And you had this patient in
13  front of you, correct?
14    A.    Yes.
15    Q.    And you had the wherewithal,
16  you had the chart in front of you,
17  correct, when you saw the patient?
18    A.    That's correct.
19    Q.    And you had the ability and did
20  in fact make notes in the chart, correct?
21    A.    That's correct.
22    Q.    Just so we are clear:  You did
23  not make any independent notes regarding
24  your own findings during your
25  examination, correct?
```

Page 193

1              L. ALDANA-BERNIER

2      A.    That's correct.  I agreed with

3   the notes of the resident.

4      Q.    Doctor, do you believe not

5   making any notes regarding your

6   examination and findings with regard to

7   Mr. Schoolcraft was in the bounds of good

8   and accepted medical practice?

9      A.    I have the residents that saw

10  that patient and I agreed with their

11  notes so that is my -- the agreement with

12  regards to the notes of the residents

13  since I agreed with the above, I

14  considered that as my notes.

15     Q.    I understand when you say you

16  considered it.

17            The question is:  Does good and

18  accepted medical practice require you to

19  make your own notes regarding your

20  examination and assessment of the

21  patient?

22            MR. CALLAN:  Objection to the

23      form of the question.

24            You can answer.

25     A.    If I'm agreeing with notes of

```
 1              L. ALDANA-BERNIER
 2    be cautious that he could be a danger to
 3    himself or to others.
 4        Q.    Is that the entirety of the
 5    reason that you came to the opinion he
 6    was a danger to himself and others?
 7              MR. CALLAN:  Objection to form.
 8              MR. LEE:  Objection to form.
 9        A.    The fact that he had to be
10    brought in from his house where he
11    barricaded himself and he had to be taken
12    away and he was bizarre and agitated at
13    the time when he was brought in from his
14    home, I think those are all the factors
15    that you have to take in consideration
16    because then I am trying to -- the reason
17    why I kept him is because I'm trying to
18    prevent a disaster.
19              MR. SMITH:  I'm sorry what was
20        the last part?
21              [The requested portion of the
22        record was read.]
23        Q.    Prevent a disaster to whom?
24        A.    Obviously, if you hear all of
25    the stories about the Navy yard disaster,
```

```
 1              L. ALDANA-BERNIER
 2    the Range Rover disaster with cops.  If
 3    you try to fast forward with an
 4    individual.  I'm trying to prevent things
 5    that will happened.
 6              As an emergency room doctor,
 7    you always have to think of all of the
 8    factors that will make a person a danger
 9    to others like presence of weapons, does
10    he have accessibility to weapons and he
11    was paranoid.
12              At the time I was thinking that
13    maybe he was really a danger to himself.
14       Q.    So a paranoid person,
15    accessible to weapons, made him a danger
16    to himself and others?
17       A.    Plus the other information that
18    we got when they went to his house:  They
19    have to take him out from his house; he
20    was barricaded in his house; and he was
21    agitated at the time when he was in the
22    emergency room.
23              You have to take all of those
24    into consideration and find out why was
25    he behaving this way.  You cannot see
```

```
1              L. ALDANA-BERNIER
2    anybody that he was going to need that
3    type of restraint and then injection,
4    correct?
5         A.    He was not agitated at the time
6    so I didn't have to inject him.
7         Q.    You indicated that you wanted a
8    second opinion earlier, correct?
9         A.    Yes.
10        Q.    Did you write a request for a
11   second opinion or a consult?
12        A.    No, I just have to call my
13   associate chairman and present to him the
14   case, and I spoke with him and he agreed
15   with me.
16        Q.    Who is the doctor that you
17   called?
18        A.    Associate chairman.
19        Q.    Who is the associate chairman
20   that you spoke with?
21        A.    Dr. Dhar, D-H-A-R.
22        Q.    Dr. Dhar is a psychiatrist?
23        A.    Yes.
24        Q.    Dr. Dhar is his associate
25   chairman.  What is that?
```

Page 208

1                L. ALDANA-BERNIER
2       A.      Next to the chairman.
3       Q.      Who is the chairman?
4       A.      Dr. Vivek.
5       Q.      Can you spell that?
6       A.      V-I-V-E-K.
7       Q.      When you say you spoke to him,
8  did you speak to him on the phone or you
9  don't recall?
10      A.      Call him downstairs and I
11 presented the case to him.
12      Q.      When you say "you presented the
13 case to him," did you tell him about the
14 history that you took?
15      A.      Yes.
16      Q.      Do you remember actually having
17 this conversation, or is that your
18 standard practice that you described?
19      A.      When it's a decision, like,
20 when a decision has to be made wherein --
21 I would say it's standard practice.
22      Q.      You don't recall actually
23 having the conversation?
24      A.      I recall that I spoke to him.
25      Q.      You recall in this case

Page 209

1                L. ALDANA-BERNIER
2    speaking to him?
3        A.    Speaking to him.
4        Q.    What time of day did you speak
5    to him?
6        A.    That was the afternoon.
7        Q.    And is the associate chairman
8    the person that you generally call to get
9    a second opinion for admission under the
10   Mental Hygiene Law?
11       A.    Yes.
12       Q.    Why do you recall this
13   particular incident with regard to Mr.
14   Schoolcraft when you got the second
15   opinion:  Is there anything that brings
16   it to your mind?
17       A.    I recall that because every
18   police officer that comes to our
19   hospital, I try to get second opinion.
20       Q.    When you say "every police
21   officer," how often have you had police
22   officers brought to your hospital to the
23   emergency psych ward?
24       A.    I could not recall how many.
25       Q.    Hundreds?

1              L. ALDANA-BERNIER
2    risk," can you quantify that for me at
3    all what you mean by potential?
4         A.    The patient comes in barricaded
5    himself, acting bizarre.  He was brought
6    in from his house.  It was a police
7    officer who may have access to weapons,
8    easy for him to have access to weapons.
9    He is paranoid.  I would think that maybe
10   it would be safe if the patient will be
11   admitted.
12        Q.    So your thought he might be
13   safe if he was admitted?
14        A.    If he was admitted.
15        Q.    That's what you were talking
16   about when you say potential risk,
17   correct?
18        A.    All of the above that I told
19   you.
20        Q.    Can you quantify what you mean
21   by potential risk as far as the
22   likelihood of risk?  This word
23   "potential" that you have been using, can
24   you quantify that for me?
25        A.    When you say "quantify," what

Page 248

```
 1              L. ALDANA-BERNIER
 2  do you mean?
 3      Q.    Sure.
 4              Well, you used the word
 5  "potential."  I would like to know what
 6  you mean by potential.
 7      A.    If you think of the navy yard
 8  disaster, was he an officer or army man?
 9  He was so quite, no one ever found out
10  what was going on with him.  So what
11  happened then?
12              Or if you look at all of those
13  -- the Range Rover.  Who are all of these
14  people that caused that?  They are all
15  police officers.
16              So if I think then I have to
17  make sure that when I see a patient in
18  the ER, I have to think in the future
19  that there will be no disaster, there
20  will be no destruction, or no one will
21  get harmed when they were discharged from
22  the ER.
23      Q.    I was asking about what you
24  meant by potential.
25      A.    That's the potential.
```

Page 249

```
 1              L. ALDANA-BERNIER
 2      Q.    So if there is any potential at
 3  all, you want to make sure that the
 4  patient is safe, correct?
 5      A.    Correct.
 6      Q.    And if there is any potential
 7  at all, you want to make sure the
 8  community is safe, correct?
 9      A.    That's correct.
10      Q.    And if there is any potential
11  at all, you were going to admit Mr.
12  Schoolcraft, correct?
13          MR. LEE:  Objection to form.
14      A.    With all of those reasons, yes,
15  I would have to admit him.
16      Q.    When you admitted him to the
17  emergency room, there were certain rules
18  and regulations --
19          MR. SUCKLE:  Withdrawn.
20      Q.    When he was admitted to the
21  psych floor, there were certain rules and
22  regulations in the psych ward, correct,
23  about clothes they wear, what hours
24  visitors can come, correct?
25      A.    Yes.
```

1                    L. ALDANA-BERNIER

2    and some aren't HMOs.

3              And does the federal government

4    require prior approval on their Medicare?

5         A.    If they are not HMOs, you don't

6    to ask for authorization.

7         Q.    How about Medicaid, is prior

8    approval required before admission?

9         A.    No.

10        Q.    Just as a housekeeping thing:

11   Are you paid for your overtime hours?

12        A.    No.

13        Q.    You have actually in front of

14   you, you know at some point IAB, internal

15   affairs from the New York City Police

16   Department did come to the hospital based

17   on the records in front of you, correct?

18              MR. CALLAN:  Is that a question,

19        does she know that?

20              MR. SUCKLE:  Yes.

21        Q.    Based on the record in front of

22   you?

23        A.    Yes, I know there is a note.

24        Q.    What is the date of that note?

25        A.    That's 11/2/2009, five o'clock

Page 277

```
 1              L. ALDANA-BERNIER
 2    in the afternoon.
 3        Q.    So that note was in the chart
 4    before you signed your November 3rd,
 5    mental hygiene admission form, correct?
 6        A.    That's correct.
 7        Q.    So you know that internal
 8    affairs had come to the hospital before
 9    you decided to admit Mr. Schoolcraft to
10    the hospital?
11            MR. CALLAN:  Objection.  She
12        testified earlier she made the
13        decision to admit him on the 2nd not
14        on the 3rd.  She filled out the form
15        on the 3rd.  You're mischaracterizing
16        testimony.
17        Q.    Before you filled out the form
18    to admit Mr. Schoolcraft under the Mental
19    Hygiene Law, you knew that IAB had come
20    to the hospital, correct?
21            MR. SHAFFER:  Objection.
22        A.    The notes are here from 11/2.
23        Q.    So the answer is yes, you knew
24    that IAB had come to the hospital before
25    you signed the admission forms on 11/3,
```

Page 278

```
 1            L. ALDANA-BERNIER
 2    correct?
 3        A.    I must have read the notes.
 4            MR. SMITH:  What was the answer?
 5            THE WITNESS:  I must have read
 6        the note.
 7        Q.    Did you speak to the officer
 8    from IAB and ask them whether or not Mr.
 9    Schoolcraft had told them the story about
10    the problem with his supervisor that Mr.
11    Schoolcraft told to you?
12            MR. SHAFFER:  Objection.
13        A.    It was at five o'clock.  I was
14    not there.  It was at 9:30.  I'm not
15    there anymore [indicating].
16        Q.    In fact one of the officers
17    from IAB stapled -- gave his card and it
18    was taped to the chart, correct?
19            MR. CALLAN:  She said she wasn't
20        there when they were there.
21        Q.    The chart you have in front of
22    you, correct?
23        A.    Yes.
24        Q.    Yes.  And when you went to sign
25    your admission under the Mental Hygiene
```

Page 279

1           L. ALDANA-BERNIER

2    Law on November 3rd, that card was in the

3    chart, correct?

4           MR. CALLAN:  How do we know when

5       the card was stapled in?

6           MR. SUCKLE:  Let her answer.  If

7       she doesn't know, she'll tell me.

8           MR. CALLAN:  You're making these

9       things up in your question.

10          MR. SUCKLE:  I'm making up

11      nothing.  I'm --

12          MR. CALLAN:  You are.  You said

13      the IAB officer stapled the card into

14      the card.

15          MR. SUCKLE:  I didn't say that.

16          MR. CALLAN:  Who stabled that

17      in?

18          MR. SUCKLE:  Nobody, it's taped.

19      Q.   Can we have an answer to the

20   question, please?

21      A.   I don't remember.  I do not

22   remember seeing this card.

23      Q.   If that card was in the chart,

24   would you have called that officer from

25   internal affairs to verify Mr.

Page 280

```
 1              L. ALDANA-BERNIER
 2    Schoolcraft's story?
 3              MR. CALLAN:  Objection.
 4              MR. SHAFFER:  Objection.
 5              MR. SMITH:  What was the answer?
 6              THE REPORTER:  I didn't get an
 7        answer yet.
 8        Q.    What's your answer.
 9        A.    I wouldn't know because I don't
10    know if I saw the card or not.
11        Q.    Had you seen the card before
12    you signed the mental hygiene admission
13    on the 3rd, would you have called
14    internal affairs?
15        A.    I did not see these cards
16    before so I don't know if I would have
17    called internal affairs.
18        Q.    So now you are saying you know
19    you did not see the cards?
20        A.    I do not know if I saw these
21    cards.  I don't remember seeing them.
22        Q.    And you don't remember if you
23    would have called internal affairs?
24        A.    I didn't see the card.
25        Q.    You know you did not see the
```

Page 281

1                 L. ALDANA-BERNIER

2    cards?

3        A.    I do not know.  I do not

4    remember.  It was that 2009.

5        Q.    So the answer is, am I correct,

6    you don't know if you saw the cards and

7    you don't know what you would have done

8    if you did see the cards, am I correct,

9    is that the answer?

10              MR. CALLAN:  Objection.

11       Q.    You can answer.

12       A.    I do not know if I would have

13   called them.

14       Q.    Looking at the note of November

15   2nd, 2009, at 9:30, do you see that note?

16       A.    P.m.?

17       Q.    Yes.

18             Do you see that note?

19       A.    Yes.

20       Q.    And that is before your

21   November 3rd, 1:20 note where you signed

22   the form, the mental hygiene admission,

23   correct?

24       A.    Yes.

25       Q.    And did you read the chart

Page 282

```
1                  L. ALDANA-BERNIER
2      where it says, "Patient has been seen and
3      interviewed by Detective Steven P. Wacter
4      [phonetic] and Sergeant Scott from
5      Internal Affairs Bureau"?
6          A.    Yes.
7          Q.    Would you want to know what
8      internal affairs had to see about Mr.
9      Schoolcraft in coming to your opinion
10     regarding whether or not he needed to be
11     admitted to the hospital?
12               MR. SHAFFER:   Objection.
13         A.    I was wondering why the
14     attending put this note and did not write
15     any note about what interaction happened
16     with internal affairs.
17         Q.    When you say you were wondering
18     about it --
19         A.    There's nothing.
20         Q.    When were you wondering about
21     it?
22         A.    Now.
23         Q.    Why were you wondering about
24     it?
25         A.    Should have written a note.
```

Page 283

L. ALDANA-BERNIER

1

2      Q.    When you say "should have

3  written a note," what should he have

4  written about?

5      A.    His interaction with internal

6  affairs.

7      Q.    Would that have been helpful to

8  you in your care and treatment with Mr.

9  Schoolcraft?

10     A.    In deciding to admit him or

11 not?

12     Q.    Yes.

13     A.    I already made my decision

14 before that.  On 11/1 I made the decision

15 of admission.

16     Q.    Was your decision irreversible

17 once you made it?

18     A.    I think that he would benefit

19 from inpatient admission.

20     Q.    When you say "he would

21 benefit," what do you mean?

22     A.    I thought at the time in 2009

23 that he would be a danger to himself or

24 others.

25     Q.    The question was:  Would the

```
 1              L. ALDANA-BERNIER
 2   notes that you think would have been
 3   helpful in coming to your decision as to
 4   whether or not Mr. Schoolcraft needed to
 5   be admitted?
 6              MR. RADOMISLI:  Objection to
 7        form.
 8              MR. CALLAN:  How would she know?
 9              MR. SUCKLE:  She was the one
10        that said something should have been
11        there.
12              MR. CALLAN:  You are the one
13        talking about cards stapled into a
14        chart.
15              MR. SUCKLE:  The record is what
16        the record is.  You are just playing
17        games now.
18              MR. CALLAN:  It's nonsense.
19              MR. SUCKLE:  It's nonsense?
20              MR. CALLAN:  Right.
21              MR. SUCKLE:  A doctor has a note
22        in front of her and she signs a day
23        later, you think it's nonsense.
24              MR. CALLAN:  It is.
25              MR. SUCKLE:  Let's go.
```

```
 1              L. ALDANA-BERNIER
 2              MR. CALLAN:  She's got one note
 3         in the chart, it's only taken us six
 4         hours to question her so....
 5              MR. SUCKLE:  Maybe we should
 6         have taken six hours to evaluate the
 7         patient.
 8         Q.    The notes you said should have
 9    been there, would that have been helpful
10    to you in your decision to admit Mr.
11    Schoolcraft?
12              MR. SHAFFER:  Objection to form.
13              MR. CALLAN:  Objection to form.
14              MR. SUCKLE:  It hasn't been
15         answered.
16              MR. RADOMISLI:  It has actually.
17              MR. CALLAN:  Asked and answered,
18         Counsel.
19              There is nothing in the note
20         except that IAB was there.
21              MR. SUCKLE:  The note she said
22         should have been there.
23              MR. CALLAN:  She is supposed to
24         make up a note now and answer a
25         hypothetical?
```

Page 286

1              L. ALDANA-BERNIER

2              MR. SUCKLE:  She said a note

3     should be there.  I'm asking about the

4     note that should have been there.

5     A.      Not my note.

6     Q.      I understand.

7              The note that should have been

8     there, would they have mattered in your

9     decision to admit Mr. Schoolcraft?

10             MR. SHAFFER:  Objection to form.

11             MR. RADOMISLI:  Objection to

12    form, asked and answered.

13             MR. SUCKLE:  I didn't get an

14    answer.  I've asked it.

15             MR. SHAFFER:  It's impossible to

16    answer the question.  The information

17    doesn't exist.  It's impossible to

18    answer.

19             Let's stop playing games and

20    move this along.  You cannot answer a

21    question about something that does not

22    exist.

23    Q.      Please answer the question?

24             MR. CALLAN:  Can you answer the

25    question, Doctor?

Page 287

```
 1              L. ALDANA-BERNIER
 2      A.     I already made my decision.  I
 3  cannot answer the question.
 4      Q.     Once your made your decision?
 5      A.     The patient needed admission.
 6  I felt that at that point on 11/1 that
 7  the patient needed inpatient
 8  stabilization.
 9      Q.     So just so we are clear here:
10  No information from IAB would have
11  changed your mind, correct, from internal
12  affairs?
13              MR. KRETZ:  Objection.
14              MR. CALLAN:  Same objection.
15      A.     Then I would have to make the
16  chairman make the decision.
17      Q.     So if IAB had information, you
18  would want the chairman to make the
19  decision?
20              MR. CALLAN:  Objection.  This is
21      ridiculous.
22              MR. SMITH:  Would you stop.
23      Would you please stop.  I'm sick and
24      tired of you interrupting this
25      examination.  You've been doing this
```

```
 1            L. ALDANA-BERNIER
 2       all day.
 3            MR. CALLAN:  Are you involved in
 4       this?
 5            MR. SMITH:  Yes, heavily and
 6       you're going to become more involved
 7       in this with this kind of
 8       irresponsible behavior.
 9            MR. CALLAN:  There is one
10       attorney designated to represent the
11       Plaintiff.  It's not you today.  You
12       are just running the home movie
13       camera.
14            MR. SMITH:  Would you please
15       stop interfering?
16            MR. SUCKLE:  Excuse me.  No
17       matter how much you pontificate, we
18       are not going home until we are done.
19            I'm going to keep asking until I
20       get an answer.  I'm going to keep
21       asking.
22            MR. CALLAN:  Try to ask a
23       relevant question.
24            MR. SUCKLE:  I haven't been able
25       to all day, that's why we're here.
```

```
 1              L. ALDANA-BERNIER
 2        I'm trying.
 3              MR. CALLAN:  Work harder at it.
 4              MR. SUCKLE:  Maybe you'll teach
 5        me one day.
 6        A.    What do the think internal
 7   affairs would tell me?
 8              MR. CALLAN:  Doctor, you have to
 9        wait for the question.
10        Q.    There was nothing internal
11   affairs could have told you to change
12   your mind, you already made your decision
13   and whatever internal affairs had to say,
14   you were not going to change your mind,
15   correct?
16        A.    Is internal affairs reliable?
17        Q.    That's a good questions.  Can
18   you answer my question?
19        A.    So I have to determine how
20   reliable internal affairs is.
21        Q.    How do you determine whether or
22   not internal affairs is reliable?
23        A.    Because I have to assess them
24   too.
25        Q.    In assessing them, how would
```

Page 290

```
 1              L. ALDANA-BERNIER
 2    you do that?
 3         A.    Collaborate what I have seen
 4    and what they tell me.
 5         Q.    So you would need to hear what
 6    internal affairs has to say and evaluate
 7    whether or not you can believe them or
 8    not, correct?
 9         A.    Yes.
10         Q.    Did you evaluate the police
11    officer who reported that Mr. Schoolcraft
12    had barricaded himself in his house, did
13    you evaluate that person?
14              MR. SHAFFER:  Objection.
15         A.    He wasn't there.  I didn't see
16    him.
17         Q.    So but you accepted his
18    information as part of the basis of your
19    diagnosis, correct?
20         A.    And the documentation.
21         Q.    Documentation somebody else
22    wrote in a chart, correct?
23         A.    That I saw Mr. Schoolcraft and
24    I agreed to whatever the documentation of
25    the resident was.
```

Page 291

1                L. ALDANA-BERNIER
2        Q.    When you saw Mr. Schoolcraft,
3    you agreed he had barricaded himself in
4    his house?
5        A.    That is the information given.
6        Q.    Written in the chart?
7        A.    Information given in the chart.
8        Q.    By some police officer or
9    sergeant from the police department,
10   correct?
11       A.    Hold on.  Also have the
12   documentation from the EMS.
13       Q.    Did you speak to EMS?
14       A.    Documentation is here.
15       Q.    Documentation meaning a note?
16       A.    Yes.
17       Q.    So EMS writes a note and you
18   accept what they say because it's written
19   in the chart, correct?
20       A.    They were there.  They went to
21   pick up the patient.
22       Q.    But you are not sure if you
23   would trust internal affairs; am I
24   correct?
25       A.    That's a big question.