Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------X
 4   ADRIAN SCHOOLCRAFT,
 5                        Plaintiff,
 6
                                       Case No:
 7        - against -                  10 CV 06005
 8
     THE CITY OF NEW YORK, ET AL.,
 9
10                        Defendants.
11   ------------------------------------------X
12                        220 East 42nd Street
                          New York, New York
13
                          July 7, 2014
14                        10:06 a.m.
15
16
17   DEPOSITION OF VINOD DHAR, M.D., pursuant to
18   Notice, taken at the above place, date and
19   time, before DENISE ZIVKU, a Notary Public
20   within and for the State of New York.
21
22
23
24
25
```

|   |   |
|---|---|
| 1 | VINOD DHAR, M.D. |
| 2 | information if at the time of trial or |
| 3 | some other hearing, I would need to |
| 4 | serve process on the doctor. |
| 5 | Given that, would you agree to |
| 6 | accept service of any papers that I |
| 7 | need to serve on the doctor for him to |
| 8 | appear as the 30(b)(6) witness in any |
| 9 | future proceedings. |
| 10 | MR. RADOMISLI: If he's still an |
| 11 | employee of Jamaica Hospital at the |
| 12 | time, we would accept service, but |
| 13 | otherwise we would not. If you just |
| 14 | want to ask him his address, you might |
| 15 | be better off. |
| 16 | Q.     All right, would you mind |
| 17 | providing us with your address, Doctor? |
| 18 | A.     My home address is 60, 6-0 |
| 19 | Juniper Lane, Syosset, New York. |
| 20 | Q.     Where are you currently working? |
| 21 | A.     I work at Jamaica Medical |
| 22 | Hospital. |
| 23 | Q.     What's your title? |
| 24 | A.     I am currently the associate |
| 25 | chairman of the department of psychiatry. |

```
                                              Page 9
 1                VINOD DHAR, M.D.
 2       Q.      How long have you had that
 3   position?
 4       A.      I have had that position for
 5   five -- almost nine years.  Actually at
 6   Jamaica Hospital it would be seven years.
 7       Q.      Have you had any other positions
 8   while working at Jamaica Hospital?
 9       A.      Yes.  I started as an attending.
10   Then the unit chief, and I went to Flushing
11   Hospital.  That's where I got my promotion
12   to associate chairman.
13       Q.      What's the relationship between
14   Flushing Hospital and Jamaica Hospital?
15               MR. RADOMISLI:  Objection to
16       form.  You can answer.
17       A.      In 1999 Jamaica Hospital took
18   over Flushing Hospital and came under the
19   umbrella Medisys Network.  So it was part of
20   the consortium in the same department.
21       Q.      When did you start working at
22   Jamaica as an attending?
23       A.      That was 1996.
24       Q.      And?
25       A.      To 1999 and then from 1999 to
```

```
                                            Page 10
 1              VINOD DHAR, M.D.
 2   2007, I was at Flushing.
 3        Q.     When you were attending, were
 4   you an attending in the psychiatric ward?
 5        A.     I was inpatient psychiatric
 6   unit.
 7        Q.     Is that the same thing as being
 8   in a ward?
 9        A.     Yeah.
10        Q.     You also mentioned that you were
11   unit chief, what was that?
12        A.     Well, unit chief is responsible
13   for the both administrative and clinical
14   aspects of the inpatient unit, one unit.
15        Q.     What was your title at Flushing
16   Hospital?
17        A.     It started with the unit chief
18   and as we progressed in Flushing, then I
19   became the assistant director of inpatient
20   services and then the associate chairman of
21   the entire department.
22        Q.     Prior to joining Jamaica
23   Hospital in 1999, did you have any other
24   work?
25        A.     Yes.  I was in Dayton, Dayton
```

```
                                                    Page 11
 1                   VINOD DHAR, M.D.
 2   Mental Health Center from 1990 to 1995, '96.
 3         Q.      What did you do in Dayton?
 4         A.      I was an attending there.
 5         Q.      Where is Dayton?
 6         A.      Dayton, Ohio.
 7         Q.      What did you do from 1996 -- so
 8   '96 you went to Jamaica?
 9         A.      Jamaica.
10         Q.      Before Dayton what did you do?
11         A.      I did my training at New York
12   Medical College, Valhalla.
13         Q.      What do you mean by saying you
14   did your training there?
15         A.      I did residency training in
16   psychiatry, general psychiatry.
17         Q.      How long was that?
18         A.      That was three years.  Then I
19   did two years of a fellowship in child
20   psychiatry.
21         Q.      Where?
22         A.      Same place, New York --
23   Westchester Medical Center.
24         Q.      Prior to being at New York
25   Medical College as a resident, what did you
```

```
                                              Page 12
 1                 VINOD DHAR, M.D.
 2   do?
 3        A.      I was in India.  I came here
 4   after I did medical schooling in India.
 5        Q.      So you went to medical school in
 6   India?
 7        A.      Yes.
 8        Q.      Which one?
 9        A.      It's called Medical College,
10   Government Medical in Kashmir.  State of
11   Kashmir.
12        Q.      What were the years of your
13   training at New York Medical College?
14        A.      That would be from 1981 to '86.
15        Q.      And from '86 to 90, what did you
16   do?
17        A.      I worked as an attending at
18   State Hospital, Harlem Valley Psychiatric
19   Center.
20        Q.      Where is that?
21        A.      It's Wingdale, Upstate,
22   New York.
23        Q.      Have you had any other forms of
24   employment, other than at State Hospital,
25   Dayton and Jamaica Hospital?
```

Page 13

VINOD DHAR, M.D.

1
2  A.     No.
3         MR. RADOMISLI:  And Flushing.
4  Q.     Right and Flushing.  I meant to
5  include Flushing in that since they merged
6  with Jamaica, right?
7  A.     Yes.
8  Q.     So I will just restate that
9  question just to make it clear.
10        Other than being at State
11 Hospital, Dayton, Flushing and Jamaica
12 Hospital, you had no other employment as a
13 psychiatrist?
14 A.     No.
15 Q.     Have you had any private
16 practice as a psychiatrist?
17 A.     I have -- I am currently in
18 private.  It is a part-time small practice,
19 been there since '92 or '93, not sure.
20 Q.     Where is that practice?
21 A.     That's in Forest Hills, Forest
22 Hills.
23 Q.     How much of your working time do
24 you spend at private practice, as opposed to
25 working at Jamaica?

```
                                                     Page 14
 1              VINOD DHAR, M.D.
 2      A.      I spend -- I have 40 hours of
 3  work at Jamaica and I spend 15 to 20 hours
 4  at the most private practice.
 5      Q.      So it's about a third of your
 6  working time is the private practice; is
 7  that fair to say?
 8      A.      Yes.
 9      Q.      Is it fair to say you have
10  experience making decisions about
11  involuntarily committing patients based on
12  your work experience with State, Dayton,
13  Flushing and Jamaica?
14      A.      Yes.  But mainly at Jamaica.
15      Q.      Can you give me an approximation
16  of the number of patients that you've made a
17  decision to involuntarily commit to a
18  psychiatric institution?
19              MR. RADOMISLI:  Objection.  This
20          witness is a 30(b)(6) witness and so he
21          could talk about the policy of the
22          hospital.  Anything he does personally
23          I am going to object.
24              MR. SMITH:  Are you instructing
25          him not to answer that question?
```

Page 26

1            VINOD DHAR, M.D.
2       A.     I don't know.  He is not there
3  now.  I think his name was Mr. Mule.
4       Q.     Can you spell that for me?
5       A.     M-u-l-e.
6       Q.     Who was the chair?
7       A.     No, he -- the chair was Vivek,
8  Dr. Vivek.
9       Q.     Did you personally have any roll
10 in the review and revising of department of
11 psychiatric, psychiatry admission
12 procedures?
13      A.     Yes, review.
14      Q.     Were you part of a committee
15 that would regularly review this or was it
16 on an ad hoc basis that you would review the
17 procedure?
18      A.     On ad hoc basis.
19      Q.     See the second page of this
20 exhibit?
21      A.     Yes.
22      Q.     There is another policy
23 statement called involuntary legal status?
24      A.     Yeah.
25      Q.     Can you tell me what that

Page 43

VINOD DHAR, M.D.

2  about looks like 20, 25 minutes I
3  called the court at 10:54, I spoke with
4  Judge Sweet's law clerk, Adam Chen. We
5  had a -- I think it was an on the
6  record discussion or an off the record
7  discussion about instructions not to
8  answer certain questions and Mr. Chen
9  said that since Judge Sweet is away, he
10 didn't know whether or not he was going
11 to be able to get back to us with a
12 ruling and we've waited or I've waited
13 approximately 25 minutes and there has
14 been no indication from the court that
15 we will get a ruling. So I am going to
16 proceed with my examination and note
17 that I object to the needless
18 interference with the order and
19 methodology with which I wanted to take
20 this witness' deposition.
21     Q.    Can you turn, sir, to
22 Exhibit 130. You have that still in front
23 of you?
24     A.    Yeah.
25     Q.    Do you have an emergency

VERITEXT REPORTING COMPANY
212-267-6868        www.veritext.com        516-608-2400

Page 44

1          VINOD DHAR, M.D.
2    admission status policy, which is the
3    fourth, fifth and the sixth page of the
4    exhibit?
5         A.     The page number?
6         Q.     It's page number -- start on
7    page 17 and it goes through 19.
8         A.     Okay.
9         Q.     Yes.
10               MR. RADOMISLI:  Starting at 17.
11        Q.     Starting with 17, please.
12        A.     Okay, sure.
13        Q.     Are you familiar with this
14   policy statement?
15        A.     Yes, I'm familiar.
16        Q.     When was the last time, other
17   than just now, that you've read this
18   statement?
19        A.     This I read recently when I
20   reviewed the policy on CPEP.
21        Q.     So this was one of the policy
22   statements that was part of the statements
23   that you reviewed?
24        A.     CPEP.
25        Q.     Did you have any role in the

Page 45

1           VINOD DHAR, M.D.
2   creation of this document, this three-page
3   document, which is pages 17, 18 and 19?
4        A.     No.
5        Q.     Who created this document?
6        A.     This is created by the
7   administration -- administrator and the
8   chairman.
9        Q.     Who are those people?
10       A.     Same people, Mr. Mule and Dr.
11  Vivek.
12       Q.     The administrator.  Is this what
13  we refer to as the 939 admission or
14  involuntary admission?
15       A.     That's correct.
16       Q.     In the second paragraph under
17  heading policy it says that the patient's
18  alleged to have a mental illness.  Do you
19  see that reference there to a mental
20  illness?
21       A.     Yeah.
22       Q.     Am I correct that one of things
23  that's required in order to admit somebody
24  involuntary is a medical or psychiatric
25  determination that an individual has a

Page 85

1  VINOD DHAR, M.D.
2          MR. RADOMISLI:  Then I will
3  because I am just going by what the
4  court order says and what you asked for
5  and what you asked for was a witness to
6  testify about the policy on involuntary
7  admissions.
8          MR. SMITH:  Right, okay, and so
9  you're telling me that the only time
10 that's relevant to make an inquiry
11 about the hospital's policy is the
12 moment that the staff physician signs
13 the piece of paper saying that yes, we
14 are going keep this person against
15 their will and that anything that
16 happens thereafter is completely
17 irrelevant to the scope of this
18 examination?  If you're saying that,
19 which is what I think you're saying
20 then you're taking an extremely narrow
21 view of the court order and needlessly
22 interfering with my deposition.
23          MR. RADOMISLI:  That isn't what
24 I'm saying.  Number two, it's not an
25 exceedingly narrow interpretation of

Case 1:10-cv-06005-RWS   Document 402-2   Filed 02/13/15   Page 14 of 16

Page 86

VINOD DHAR, M.D.

the court order, because when you applied to -- when you served the 30(b)(6) and when -- subject to the motion, you only asked about policies regarding involuntary admission. You didn't say anything about the discharge either in the application to the court or in response to my objection or during conference and therefore, there is no court order -- the court order is limited to involuntary admission.

    MR. SMITH:  The second page of the involuntary admission policy talks about the second evaluation needing to be done under the Jamaica policy. So you're telling me I can't ask questions about the second assessment because the patient has already been admitted. Then I think we should really stop the examination and I will make my application.

    MR. RADOMISLI:  I'm not saying that you can't ask questions about the second evaluation. You can ask the

VERITEXT REPORTING COMPANY
212-267-6868     www.veritext.com     516-608-2400

Page 133

1        VINOD DHAR, M.D.
2   somebody will go there and make an
3   assessment and if what they find there is
4   potentially a dangerous situation, they will
5   remove the patient and bring to the
6   emergency room. So there is a substantial,
7   as well as, potential.
8        Q.     Isn't there a difference in your
9   mind between any risk and substantial risk?
10            MR. RADOMISLI:  I'm going to
11       object to the extent you're asking for
12       his mind.  If you want to ask whether
13       it's a policy --
14            MR. SMITH:  Okay.  Fine.  I will
15       ask what the policy is and see if he
16       thinks there's any distinction either
17       because we are mincing words here.
18       Q.     Under the Jamaica Hospital
19   policy, is there any difference between a
20   potential or any potential risk of
21   dangerousness and a substantial risk of
22   dangerousness?
23       A.     Again, it's a clinical judgment.
24   I don't think it's defined in the policy.
25       Q.     In your opinion, is there a

Page 134

1            VINOD DHAR, M.D.
2  difference between any potential risk and a
3  substantial risk of dangerousness?
4            MR. RADOMISLI:  He is here as a
5       30(b)(6) witness.
6       Q.   Okay.  You can answer the
7  question.
8            MR. RADOMISLI:  No, he can't.
9            MR. SMITH:  You're instructing
10      him not to answer that question?
11           MR. RADOMISLI:  It's not proper
12      of a 30(b)(6) witness.  You know that.
13           MR. SMITH:  No, I don't.
14           MR. RADOMISLI:  I cited a case.
15      Don't answer that question.  It's not
16      proper.
17      Q.   Does the term substantial risk,
18  as defined in the Jamaica Hospital policy,
19  include any risk of harm?
20      A.   Yes.
21      Q.   So under Jamaica's policy, any
22  possible risk is a sufficient basis in which
23  to involuntary admit somebody, because of
24  the conclusion that they are dangerous to
25  themselves or others; is that correct?