Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - -
 5   ADRIAN SCHOOLCRAFT,
 6                        Plaintiff,
 7           -against- Index No.
                         10CIV-6005 (RWS)
 8
     THE CITY OF NEW YORK, DEPUTY CHIEF
 9   MICHAEL MARINO, Tax Id. 873220,
     Individually and in his Official
10   Capacity, ASSISTANT CHIEF PATROL
     BOROUGH BROOKLYN NORTH GERALD NELSON,
11   Tax Id. 912370, Individually and in his
     Official Capacity, DEPUTY INSPECTOR
12   STEVEN MAURIELLO, Tax Id. 895117,
     Individually and in his Official
13   Capacity, CAPTAIN THEODORE LAUTERBORN,
     Tax Id. 897840, Individually and in his
14   Official Capacity, LIEUTENANT JOSEPH
     GOFF, Tax Id. 894025, Individually and
15   in his Official Capacity, stg. Frederick
     Sawyer, Shield No. 2576, Individually
16   and in his Official Capacity, SERGEANT
     KURT DUNCAN, Shield No. 2483,
17   Individually and in his Official
     Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18   Tax Id. 885374, Individually and in his
     Official Capacity, SERGEANT SHANTEL
19   JAMES, Shield No. 3004, and P.O.'s "JOHN
     DOE" 1-50, Individually and in their
20   Official Capacity (the name John Doe
     being fictitious, as the true names are
21   presently unknown)(collectively referred
     to as "NYPD defendants"), JAMAICA
22   HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
     Individually and in his Official
23   Capacity, DR. LILIAN ALDANA-BERNIER,
     Individually and in her Official Capacity
24   and JAMAICA HOSPITAL MEDICAL CENTER
     EMPLOYEES "JOHN DOE" # 1-50, Individually
25
     (Continued)
```

1
2      and in their Official Capacity (the name
       John Doe being fictitious, as the true
3      names are presently unknown),
4
       Defendants.
5
           - - - - - - - - - - - - - - - - - - -x
6
                              111 Broadway
7                             New York, New York
8                             February 12, 2014
                              10:21 a.m.
9
10         VIDEOTAPED DEPOSITION of DR. ISAK
11     ISAKOV, one of the Defendants in the
12     above-entitled action, held at the above
13     time and place, taken before Margaret
14     Scully-Ayers, a Shorthand Reporter and
15     Notary Public of the State of New York,
16     pursuant to the Federal Rules of Civil
17     Procedure.
18
19                     *      *      *
20
21
22
23
24
25

1                    I. ISAKOV

2    not mention about my morning interaction.

3         Q.     So there is no note about the

4    morning interaction?

5                    MR. DEVINE:  Read your note,

6         Doctor, and answer his question.

7         A.     This is what I'm writing over

8    here, "On evaluation today patient

9    anxious, suspicious, guarded, demanded to

10   be discharged, and restless.

11                This is what I'm implying that

12   my interaction with him in the morning,

13   but I didn't specify the morning.

14                And he expressing questionable

15   paranoid ideas --

16        Q.     We are just asking about your

17   interaction in the morning.

18                Is there a note that says I had

19   an interaction in the morning or

20   something like that?

21        A.     No.

22        Q.     Doctor, why don't we do what

23   you were doing now:  have you read your

24   note into the record and I may interrupt

25   you to ask you question as you go along.

```
 1                  I. ISAKOV
 2            If you can read the note into
 3   the record?
 4            MR. SMITH:  Slowly.
 5       Q.    Slowly and clearly so she can
 6   take it down.
 7       A.    "Psychiatric admission note
 8   November 4, 2009, 2 p.m.
 9            "Patient is 34 years old white,
10   single male; police officer; without past
11   psychiatric history; not on any
12   psychotropic medication; no current or
13   previous history of drugs or alcohol
14   abuse.
15            "He stated he was working in
16   police department for approximately six
17   years from the beginning of his career."
18            He was not happy,
19   quote/unquote, with quote/unquote, with
20   how the precinct was, quote/unquote, run
21   and was making multiple complaints that
22   was not, quote/unquote, addressed.
23   Instead he was quote/unquote unstable and
24   his gun was taken away from him
25   approximately six months ago after
```

Page 148

1                     I.  ISAKOV

2      psychiatric evaluation by police

3      psychiatrist.

4          Q.     Let me stop you for a second.

5              That's a pretty detailed

6      history, correct, he was able to

7      communicate that.

8          A.     That happen afterward, not from

9      the first communication that I have with

10     him.

11         Q.     You can understand that a man

12     who just was locked into a psychiatric

13     ward might not be a happy to be there,

14     correct?

15         A.     Definitely.

16         Q.     And it may take him a couple of

17     hours to be willing to talk to you,

18     correct?

19         A.     Yes.

20         Q.     And now he was talking to you,

21     correct?

22         A.     Yes.

23         Q.     And now he is being pretty

24     detailed about what his thought processes

25     were?

Page 149

                         I. ISAKOV

1

2     A.    Yes.

3     Q.    He is not being guarded at all,

4  correct?

5     A.    When he was talking to me and

6  providing this information, yes.  He was

7  open, yes.

8     Q.    And he is cooperating with you

9  at that point?

10    A.    Yes.

11    Q.    Saying it in at least a calm

12 enough way for you to understand it so

13 you can write it down?

14    A.    He was anxious, not that he was

15 completely calm.  He had a lot of

16 anxiety, things going on the way he

17 doesn't want them to go on.

18    Q.    You say he had a lot of

19 anxiety, and he was anxious.  Did you

20 make a note he had anxiety?

21    A.    I put over here, "the patient

22 anxious, suspicious, guarded, demanded to

23 be discharge, restless."

24    Q.    Continue on.

25    A.    Since then he started to

Page 150

```
 1                    I. ISAKOV
 2   collect the, quote/unquote, evidence to
 3   prove his point.  And become suspicious
 4   they were after him, quote/unquote.
 5            On the day of admission he had
 6   verbal altercation with one of the
 7   officers who was, quote/unquote,
 8   threatening him, and he left his job
 9   before his shift was over with excuse
10   that he was not feeling well.
11            "He came home, took Nyquil and
12   fall asleep.  He was waken up by police
13   officer in his bedroom and was asked to
14   come with him to precinct.
15            "After he refused to going
16   voluntary and complain of stomach pain
17   and headache, patient was handcuffed and
18   brought to emergency room of Jamaica
19   Hospital by EMS."
20            "He was evaluated by ER
21   attending and psychiatrist and after
22   medical clearance transferred to
23   psychiatric emergency room with
24   questionable psychosis NOS."
25       Q.    Let me stop you for a second.
```

Page 151

I. ISAKOV

1
2          Question mark, psychosis, NOS,
3    that's your interpretation of his
4    condition or your interpretation of what
5    the physician in the emergency room
6    diagnosed?
7          A.    Yeah, that's I'm implying he
8    was transferred to psychiatric emergency
9    room with questionable psychosis.
10          Q.    Who made the questionable
11    diagnosis?
12              MR. RADOMISLI:  Objection to
13        form.
14          Q.    The psychiatric emergency room,
15    the medical emergency room, or a
16    resident, a psychiatric resident --
17              MR. RADOMISLI:  Objection to
18        form.
19              MR. SHAFFER:  I join in the
20        objection.
21              THE WITNESS:  Excuse me?
22              MR. CALLAN:  We are all joining
23        in the objection.
24          Q.    When you wrote that, what did
25    you mean?

Page 152

                        I. ISAKOV

1

2       A.      I mean that the process of

3   transfer to psychiatric emergency room

4   indication was made that he has symptom

5   of psychosis and need to be further

6   evaluated in psychiatric emergency room.

7       Q.      But did somebody write in the

8   medical unit --

9       A.      That's what I wrote.

10      Q.      -- questionable psychosis?

11      A.      Sorry?

12      Q.      Did somebody write in the

13  medical chart in the medical emergency

14  room questionable psychosis?

15      A.      I don't believe they wrote

16  questionable psychosis.  They wrote that

17  there is psychosis.

18      Q.      Where did you get the

19  impression it was a questionable

20  psychosis?

21      A.      Maybe I put my own impression

22  in this.  They did not question from what

23  I -- when I reviewed the chart yesterday,

24  they actually didn't have question having

25  that he had psychosis.

Page 153

1                   I.  ISAKOV

2        Q.     Sorry.  Continue.

3        A.     "Admitted Psychiatric No. 3 on

4    11/3/09 for further evaluation."

5        Q.     Okay.  Was that your impression

6    of the reason he was sent to the unit or

7    was that a thought that you were

8    referring to from the emergency room or

9    something else?

10             MR. RADOMISLI:  Objection to

11       form.

12       A.     I believe it's combination of

13   everything that I had information.

14       Q.     So he needed to be further

15   evaluated?

16       A.     Right.

17       Q.     That's why he was sent up to

18   the Y3 unit, correct?

19             MR. RADOMISLI:  Objection to

20       form.

21       A.     Yes, this is what I phrased his

22   admission that he need further

23   evaluation.

24             And if you read 9.39 what Dr.

25   Bernier wrote, it's not only for the

Page 154

                        I. ISAKOV

 1
 2   evaluation and treatment but because she
 3   feel he is dangerous to himself.
 4       Q.    But you are writing this and
 5   you're an independent doctor, correct?
 6       A.    I know, but I make my decision
 7   not on this sentence.  I making my
 8   decision to keep him or not to keep him
 9   by evaluating all evidence that I have.
10       Q.    When you wrote that, you had an
11   impression as to why that patient was in
12   your unit, correct?
13       A.    I don't think I mean only
14   evaluation.  I mean everything that he
15   has information in the chart.
16       Q.    So your note is not accurate?
17             MR. RADOMISLI:  Objection.
18       A.    It's accurate.  I don't think
19   this sentence is only real reason for his
20   admission.
21       Q.    So you wrote this, but it
22   wasn't the real reason?
23       A.    Not only the reason.
24       Q.    So there were other reasons
25   that you left out of your notes?

1                    I. ISAKOV
2              MR. RADOMISLI:  Objection.
3        A.    I have didn't leave out.  I
4    wrote in my 9.39.
5              MR. RADOMISLI:  Let him finish
6        the note.
7              MR. SUCKLE:  Why don't you stop
8        interrupting and speaking on the
9        record.
10             MR. SHAFFER:  I don't think he's
11       interrupted, for the record.  It
12       doesn't appear he has multiple times.
13             MR. SUCKLE:  One is more than
14       enough in federal court.
15             MR. RADOMISLI:  Stop badgering
16       him.
17             MR. SUCKLE:  Read back the last
18       question before I was interpreted by
19       counsel.
20             [The requested portion of the
21       record was read.]
22       Q.    Before you were interpreted,
23    you wrote in your 9.39, what does that
24    mean?
25             MR. RADOMISLI:  Objection.

Page 156

                        I. ISAKOV

1
2        A.      I think that the reason I feel
3    that he needed admission is not only
4    reflected in this note, but in all review
5    of the chart that I reviewed and note
6    that I made in second part of 9.39.
7        Q.      Was the patient sitting in
8    front of you when you wrote this note?
9        A.      No.
10       Q.      You met the patient?
11       A.      I met the patient and I went to
12   the nursing station and I write the note.
13       Q.      And you had the opportunity to
14   write whatever you wanted to write in
15   your note, correct?
16       A.      What I felt needed to be
17   written in the chart at that point, I
18   wrote.
19       Q.      And when you were writing what
20   you felt should be written in the chart,
21   you wrote that he was admitted for
22   further evaluation, correct?
23       A.      Correct.  Not only evaluation.
24       Q.      But that's what you wrote,
25   correct?

1                    I. ISAKOV

2        A.    You are reading one sentence of

3    my whole evaluation of patient, and I

4    don't believe it's accurate impression

5    why I felt he needed to be in the

6    hospital.

7        Q.    I understand that.  I'm just

8    asking what you wrote.

9        A.    This is the sentence I wrote,

10   yes, but you're implying if this is my

11   decision only for evaluation he was

12   admitted.  I will tell you no.

13       Q.    I didn't imply anything.

14       A.    You ask me.

15            MR. DEVINE:  Hold it, Doctor.

16       Q.    I'm asking is it the only

17   reason that you wrote that he was

18   admitted to Y3 in this note further

19   evaluation?

20            MR. RADOMISLI:  Objection.

21       A.    I don't think this sentence is

22   reflecting the reason why he was

23   admitted.

24       Q.    So the sentence would be

25   inaccurate then why --

Page 158

```
 1                    I. ISAKOV
 2           MR. RADOMISLI:  Objection.
 3      A.    It's accurate, but it's not
 4  reflecting the full reason for admission.
 5      Q.    So it's not complete?
 6           MR. RADOMISLI:  Objection.
 7      A.    The sentence doesn't have
 8  anything to do with the reason why he was
 9  admitted.  It's one of the reasons he was
10  admitted is evaluation, but that's the
11  only reason.
12      Q.    But you just chose not to write
13  those other reasons at that time?
14           MR. KRETZ:  Objection.
15           MR. RADOMISLI:  Objection.
16      A.    I didn't think about not
17  choosing to write that.
18      Q.    Well, is there a reason you
19  didn't write other reasons?
20           MR. RADOMISLI:  Objection to
21      form.
22      Q.    For his admission in that
23  sentence?
24      A.    I cannot tell you more than I
25  already told.
```

Page 159

1                    I.  ISAKOV

2        Q.     So you have no reasons that

3    come to mind as you sit here why you

4    didn't write more about why he was

5    admitted in that sentence, correct?

6              MR. RADOMISLI:   Objection.

7        A.     Yes.

8        Q.     Let's continue on reading.

9        A.     "On evaluation to date, patient

10   anxious, suspicious, guarded, demanding

11   to be discharged, and restless.

12             "He denied suicidal/homicidal

13   ideations.  Denied visual and auditory

14   hallucination.  Expressed questionable

15   paranoid quality ideas about conspiracy

16   and coverups."

17       Q.     Is that conspiracy or

18   corruption?

19       A.     Corruption.  Sorry.

20       Q.     Let's read.

21       A.     "Expressed questionable

22   paranoid quality ideas about corruption

23   and coverups in precinct."

24       Q.     So you have now said what we

25   talked about earlier that you don't have

```
 1              I.  ISAKOV
 2   a hundred percent comfort that he was
 3   paranoid, it was questionable in your
 4   mind at this point?
 5        A.    Right.
 6        Q.    Previously, you indicated that
 7   at least it was your impression in the
 8   emergency room the impression was a
 9   questionable psychosis, correct?
10        A.    Yes.
11        Q.    And what else was in your mind
12   or not in your mind, what you wrote was
13   that he was there for further evaluation,
14   correct?
15            MR. RADOMISLI:  Objection.
16        Q.    That's what you wrote?
17        A.    Repeat again.
18        Q.    Regardless of what you thought
19   or what you reviewed from other records,
20   what you wrote at that time at 2 p.m., he
21   was there for further evaluation, that's
22   what you wrote, correct?
23            MR. RADOMISLI:  Objection.
24            MR. KRETZ:  Objection.
25        A.    It's, again, even if I wrote
```

Page 161

1                    I.  ISAKOV

2    over here just word "evaluation," it

3    didn't mean that his admission was just

4    for evaluation.  It was

5    evaluation/treatment.

6         Q.    May I ask you this:  You are

7    questioning whether or not the diagnosis

8    of psychosis NOS in the emergency room,

9    and you are questioning whether or not

10   the diagnosis of paranoid is appropriate?

11        A.    Right.

12        Q.    And you need to evaluate those,

13   correct?

14             MR. RADOMISLI:  Objection to

15        form.

16        A.    I need to come to the

17   conclusion what then I will be

18   comfortable with, getting more and more

19   information.

20        Q.    So you needed more information;

21   that's why you wrote further evaluation?

22        A.    Right.

23        Q.    Continue reading after the word

24   "precinct."

25        A.    Cognition and memory intact.

1                   I. ISAKOV

2     Insight and judgment limited.

3         Q.     The insight and judgment

4     limited had to do with the questionable

5     paranoia?

6         A.     Right.

7         Q.     Diagnosis?

8         A.     "Psychosis NOS.  Rule out

9     adjustment disorder with anxiety."

10        Q.     What is an adjustment disorder

11    with anxiety?

12        A.     When the people under the

13    stress not able to deal with the

14    situation appropriately.

15        Q.     Why would you think that was a

16    possibility in Mr. Schoolcraft's case?

17        A.     I told you because I wasn't

18    hundred percent sure if it's paranoia or

19    it's reality.

20        Q.     Something he said to you, some

21    way he presented to you gave you some

22    pause as to whether or not he was

23    paranoid; is that fair?

24             MR. RADOMISLI:   Objection to

25        form.

Page 163

                    I. ISAKOV

1

2      A.     Was not or was?

3      Q.     Was not?

4      A.     Was not?

5      Q.     Yes.

6      A.     That's why I put to rule out

7   diagnosis.

8      Q.     The rest of this note.

9      A.     "Will obtain additional

10  information."

11     Q.     What was your intention in

12  writing that?

13     A.     To come to conclusion what to

14  do next and how to help him

15  appropriately.

16            I don't have enough information

17  in the chart that we already have.   I

18  need to get more information to finalize

19  my diagnosis and offer the appropriate

20  treatment.

21     Q.     You needed to finalized your

22  diagnosis of psychosis NOS?

23     A.     Or adjustment.

24     Q.     Or adjustment.

25            You needed more information?

Page 164

```
 1                    I. ISAKOV
 2       A.     More information.
 3              MR. SUCKLE:  We will stop for
 4       now.
 5              MR. SMITH:  Going off the
 6       record.  It is 1:35 p.m.
 7              [Discussion held off the
 8       record.]
 9              [Whereupon, at 1:35 p.m., a
10       recess was taken.]
11              [Whereupon, at 2:21 p.m., the
12       testimony continued.]
13              MR. SMITH:  It's 2:21.  We are
14       continuing the deposition of Dr.
15       Isakov.
16       Q.     Doctor, bringing your attention
17  to the form in the chart says, "Emergency
18  Admission Section 9.39 Mental Hygiene
19  Law."  Have you ever been able to find
20  that?
21       A.     Yes.
22       Q.     Did you make any notation on
23  that form?
24       A.     I filled out the second part of
25  it.
```

1               I.  ISAKOV

2               MR. DEVINE:  You mean the second

3       page, Doctor?

4               THE WITNESS:  The second page.

5       Q.     Doctor, why did you fill out

6    the second page?

7       A.     Because there is a Mental

8    Hygiene Law that it should be two

9    physicians' evaluation need to make the

10   statement that the patient need to be

11   admitted to the hospital involuntary.

12      Q.     Doctor, what time was the first

13   physician's determination to hold Mr.

14              MR. SUCKLE:  Withdrawn.

15      Q.     What date and time was the

16   first physician's decision to hold Mr.

17   Schoolcraft under the Mental Hygiene Law

18   Section 9.39?

19              MR. DEVINE:  Objection to the

20       form of the question.

21              Are you asking him -- well,

22       objection to the form.

23              Are you asking him Dr. Bernier?

24              MR. SUCKLE:  I will do it very

25       specifically.

1                    I. ISAKOV

2        Q.     When did Dr. Bernier invoke the

3    Section 9.39 of Mental Hygiene Law and

4    admit the patient pursuant to that

5    statute?

6                MR. RADOMISLI:  Objection to

7         form.

8                MR. CALLAN:  Same objection.

9        Q.     From your review of the chart?

10       A.     She was writing on 11/03/2009,

11   1:20, she made decision to admit the

12   patient.

13       Q.     Do you understand if there is

14   any time factor required for the second

15   physician's signature or approval?

16       A.      Forty-eight hours I believe.

17       Q.      Is it 48 hours from when the

18   decision is made by the first physician

19   to admit the patient, 48 hours, or

20   something else?

21                MR. CALLAN:  Objection to the

22        form of the question.

23       Q.     Your understanding of the

24   requirement, when does that 48 hours

25   begin.

Page 167

1                    I. ISAKOV

2        A.     The 48 hours I believe begins

3    from the time that the first psychiatrist

4    made decision to admit.

5        Q.     Once the psychiatrist made a

6    decision to admit, your understanding is

7    that the second physician must do what

8    within 48 hours?

9        A.     To do his own evaluation and

10   come to conclusion.

11       Q.     And did you do your own

12   evaluation and come to your own

13   conclusion?

14       A.     Yes.

15       Q.     We had previously read in a

16   note of yours from 2 p.m. on the 4th, is

17   that the time when you did your

18   evaluation and came to your own

19   conclusions?

20       A.     Yes.

21       Q.     When did you fill out this form

22   that we have in front of you now in the

23   hospital chart, the second page which

24   starts at the top "Emergency Admission

25   9.39 Mental Hygiene Law, starts with

Page 168

1                 I. ISAKOV
2      roman number III, "Examination to Confirm
3      Need for Extension of" --  I can't read
4      it because it's blocked out.
5                  When did you fill that form
6      out?
7          A.    I fill that at the time when I
8      read my note.
9          Q.    At 2 p.m.?
10         A.    Yes.
11         Q.    On the 4th?
12         A.    Yes.
13         Q.    So you made your determination
14     on November 4th, 2009, at 2 p.m.?
15         A.    I believe so.
16         Q.    Is there a reason why you
17     didn't put a time in the form 'cause it
18     does seem to ask for a time?  Is there a
19     reason you didn't put a time?
20         A.    I don't think it was a specific
21     purpose, maybe just I missed the time;
22     but I put the time in my note.
23         Q.    You wrote in the note before,
24     right after, at the same time as --
25         A.    Right after when I was sitting

Page 169

                    I. ISAKOV
1
2    writing my chart, I fill out my note and
3    I fill out evaluation.
4        Q.    So there was no new evaluation
5    before you filled this out other than the
6    one we just finished going through?
7        A.    No.
8        Q.    Let's go to what you wrote
9    under Section III (a).  You wrote what?
10       A.    Thirty-nine year old male
11   without past psychiatric history
12   presented to emergency room with,
13   quote/unquote, paranoid ideations and
14   admitted for further evaluation.
15       Q.    Let me ask you a question:  Why
16   did you put, quote/unquote, paranoid:  Is
17   that the same thing as you put before,
18   question mark, paranoid?
19       A.    Yes.
20       Q.    That's the same reason?
21       A.    Right, but I did not --
22   probably when I was writing, I was
23   reflecting my own understanding about his
24   real paranoia or questionable paranoia.
25       Q.    So you put quotations around

Page 170

I. ISAKOV

1 paranoid because at that point you hadn't

2 yet made up your mind that he was

3 paranoid, correct?

4 

5     A.    Yeah.

6           "Physical condition, stable."

7     Q.    So Section B was physical

8 condition, and you wrote "stable."

9     A.    Stable.

10    Q.    Mental condition?

11    A.    Mental condition, Patient very

12 anxious, suspicious, afraid that his

13 superiors in the police department wanted

14 to get rid of him, quote/unquote.

15          Part D, "The patient showed the

16 following psychiatric signs and symptoms:

17 anxiety and paranoid quality ideations."

18    Q.    Paranoid quality ideations,

19 what did you mean when you wrote that?

20    A.    The same questionable paranoid.

21    Q.    So now you have your diagnosis

22 of anxiety and questionable paranoid

23 ideations, correct?

24    A.    Right.

25    Q.    Can you keep reading?

Page 171

I. ISAKOV

1              MR. RADOMISLI:  Objection to the

3     form of the question.

4     A.    Part E, "Does the patient show

5   tendency to cause serious harm to

6   himself?"  I marked no.  "To others," I

7   marked no.

8     Q.    Let me just ask you:  That was

9   your opinion, Section E, that was your

10  opinion when you wrote this form,

11  correct?

12     A.    Yes.

13     Q.    And by checking those boxes,

14  you were expressing your opinion in

15  writing, correct?

16     A.    Yes, if he did not express any

17  suicidal or homicidal ideations.

18     Q.    And what did you write after

19  that?

20     A.    Okay.  "Mental diagnosis if

21  determined."  I put "psychosis NOS.  Rule

22  out adjustment disorder."

23     Q.    Which is what you wrote on your

24  note earlier, correct?

25     A.    Yes.