Page 1

```
UNITED STATES DISTRICT COURT.
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
ADRIAN SCHOOLCRAFT,

                    Plaintiff,

                                    Case No:
        - against -                 10 CV 06005


THE CITY OF NEW YORK, ET AL.,

                    Defendants.
------------------------------------------X
            100 Church Street
            New York, New York

            July 16, 2014
            2:35 p.m.



    DEPOSITION OF DOMINICK VALENTI, pursuant to
Notice, taken at the above place, date and
time, before DENISE ZIVKU, a Notary Public
within and for the State of New York.
```

Page 14

1  DOMINICK VALENTI
2  could be a whole of things.  So it may even
3  have started as a sick leave abuse and then
4  you found additional misconduct.
5      Q.    So if somebody sort falsifies a
6  sick report, and ends up playing golf or not
7  being sick at all or not being where they're
8  supposed to be, that would not constitute an
9  absence without leave in terms of charges or
10 disciplinary charges?
11     A.    It's really dependant on the
12 advocate, the attorneys in the department
13 advocate's office.  How they want to write
14 up a specific charge.  I may request five
15 different charges.  They would have to then
16 figure out if there's enough to support each
17 of those charges.  Then they would look at
18 the case law and figure out what they wanted
19 to charge specifically.
20     Q.    With regard to sick leave,
21 specifically, how does a uniformed member of
22 the service go sick?
23     A.    Well, you're going to call your
24 place of employment, your command, let's
25 say, the guides states that it should be

1        DOMINICK VALENTI
2   done two hours before the start of your tour
3   of duty and then in addition at the tail end
4   of 2010 it changed to where you'd also have
5   to call the sick desk and also report that
6   you had reported sick.
7        Q.    But in 2009, specifically --
8        A.    Right.
9        Q.    What --
10       A.    2009, you would just call your
11  command, speak to your supervisor and say I
12  am reporting sick and then the command would
13  be responsible to call the medical division.
14       Q.    So the member going sick would
15  not be required to call the sick desk?
16       A.    Not at that time, not in 2009.
17  Their only obligation was to call the
18  command.
19       Q.    And what is the response of the
20  command; does the command have like an
21  opportunity to say no, deny sick even though
22  somebody says I'm sick, I don't feel well;
23  or is it almost automatic, where they say
24  okay, then they fill out paperwork?
25            MR. KRETZ:  Objection.  You can

1            DOMINICK VALENTI
2      answer.
3      A.      You can't deny someone to go
4  sick.  The desk officer has the ability to
5  decide whether or not you would be granted
6  administrative sick or regular sick.
7  Administrative sick is a one-day sick event,
8  and you're not required to see a doctor, you
9  don't have to provide any records.  And
10 regular sick you're required to see our
11 police department surgeon.  The desk officer
12 has the ability to make a determination
13 which one of those you would be granted.
14     Q.      Administrative sick versus
15 regular sick?
16     A.      Correct.  You could have line of
17 duty sick, but that would be a workplace
18 accident.  You would already be at work for
19 that.  Then the administrative sick, you
20 could call in for day two.  So you could
21 actually get two days out sick, day one
22 administrative, day two administrative and
23 that doesn't require a doctor's visit,
24 doesn't require any medical documentation.
25     Q.      What is the -- so if the member

1                DOMINICK VALENTI
2        as of this date.)
3              MR. LENOIR:  This is, I will
4        represent, a copy of patrol guide
5        2016-13.  And I would just say that
6        highlighted version comes from the
7        source.  This is not my highlighting.
8        Q.     So you said if an investigation
9    rises to a point where you would need to
10   interrogate a subject of an investigation,
11   you would be guided by 206-13?
12       A.     Yes.
13       Q.     On the first page, in the
14   italicized part, which is italicized and
15   highlighted.  Again, the italics and
16   highlighting is in the original that we got
17   from the source.
18              Let me ask you to read into the
19   record the first paragraph there, where it
20   says all members of the service.
21       A.     All members of the service who
22   are the subject of an official investigation
23   or are a witness in the official
24   investigation shall be given a reasonable
25   period of time to obtain and confer with

1         DOMINICK VALENTI
2  counsel prior to questioning.
3  Interrogations of members in routine
4  noncritical matters should be scheduled
5  during business hours on a day when the
6  member is scheduled to work.
7       Q.    In the following paragraph where
8  it addresses interrogations in an emerging
9  investigation, where there's a need to
10 gather timely information -- let me just ask
11 you -- rather than me to parse out.  I know
12 it's a little longer, but let me ask you to
13 read that into the record, as well.
14      A.    Interrogations in emerging
15 investigations, where there is a need to
16 gather timely information should usually be
17 done after all preliminary steps and
18 conferrals have been completed and the
19 member to be questioned has been afforded a
20 reasonable time to obtain and confer with
21 counsel.  In determining what is a
22 reasonable period of time, consideration
23 should be given to the nature of the
24 investigation, the need for the department
25 to have the information possessed by the

Page 26

1    DOMINICK VALENTI
2    member in a timely manner and the stage the
3    investigation is at when the need to
4    question a member has been determined. The
5    emergent nature and exigent circumstances of
6    each investigation will determine a length
7    of time afforded the member before
8    questioning is conducted.
9              However, in all cases the
10   determination as to what is a reasonable
11   time will be made by the captain or above in
12   charge of the investigation.
13        Q.   Thank you. Lieutenant, have
14   you, either conducted or supervised
15   investigations of this nature where you have
16   noticed the subject of an investigation or
17   an interrogation?
18        A.   Have I conducted 206-13
19   investigations? Is that what you're asking?
20        Q.   Yes.
21        A.   Yes.
22        Q.   As a matter of practice, is this
23   policy followed in your experience?
24             MR. SHAFFER: Objection. That's
25        beyond the scope of the notice.

Page 27

1           DOMINICK VALENTI
2             MR. LENOIR:  We are talking
3      after the policies and practices of the
4      NYPD.  I have the policy.  I am asking
5      about the practice.
6             MR. SHAFFER:  As it pertains to
7      sick leave investigations.  If you want
8      to ask him more specific questions.
9             MR. LENOIR:  Investigations are
10     governed by 206-13, and I am speaking
11     specifically about 206-13
12     investigations.
13            MR. SHAFFER:  Note my objection.
14     If you want to ask the question again.
15     Go ahead.
16     A.     Can you repeat the question
17 again?
18     Q.     In your experience in conducting
19 and supervising 206-13 investigations, is it
20 the actual practice to afford a subject
21 officer time to confer with counsel or union
22 representation and things of that nature?
23     A.     Yes.
24     Q.     Have you ever been involved,
25 either as a supervisor or investigator, in

1    DOMINICK VALENTI
2    which you basically directed a subject of a
3    206-13 investigation forthwith immediately?
4         A.    Meaning what?  Without counsel?
5         Q.    Without counsel?
6         A.    No.
7         Q.    An officer who is found to have
8    violated the sick leave policy, does that
9    generally result in a command discipline or
10   specifications and charges?
11        A.    No, it would be charges and
12   specifications.
13        Q.    Is that due to the nature of the
14   offense, if it's a higher level of offense,
15   then a command discipline?
16             MR. SHAFFER:  Objection.  Go
17        ahead.
18        A.    Charges and specifications is a
19   higher level of offense.  The department has
20   a certain amount of time that could be
21   deducted on the lower level command
22   discipline, which is usually upwards of five
23   days or even eight days.  Anything beyond
24   that would have to be charges and
25   specifications.

Page 29

1       DOMINICK VALENTI
2       Q.      You mean five days or eight days
3    of unauthorized use of sick leave?
4       A.      No, in other words; if --
5    command discipline is lower level discipline
6    that a commanding officer can use against a
7    member to address routine -- things of the
8    routine nature that happened, you know, you
9    didn't sign out, you didn't properly fill
10   out a form, you missed a court appearance,
11   things of that nature, anything that rises
12   to a level of misconduct is normally going
13   to be handled as charges and specifications.
14      Q.      Typically, as a general matter,
15   the issues that you investigate, you and
16   your unit, result in charges and
17   specifications as opposed to command
18   disciplines?
19      A.      Yes.  The unit doesn't prepare a
20   lot of command disciplines.  The majority of
21   the disciplinary actions is charges and
22   specifications.
23      Q.      With regard to your unit's
24   taking on a case or investigation, how is
25   the matter brought to your attention; how do

1  DOMINICK VALENTI
2  you get the assignment?
3      A.    Could come a number of ways.  It
4  could come directly from internal affairs,
5  which most of the cases come that way, from
6  internal affairs.  Could come from a command
7  calling in directly, could come anonymously,
8  somebody just calling up or write a letter
9  or it could come from my own commanding
10 officer.
11     Q.    Is there a typical path to your
12 office; would you say that most cases come
13 from the internal affairs or from the
14 command or anonymous complaints?
15     A.    I would say that it's evenly
16 split.  You have commands calling in some
17 misconduct and have other allegations come
18 in through internal affairs.  Then, you
19 know, you get a small number that are
20 anonymous, where they refuse to leave their
21 name.
22     Q.    What are you talking about in
23 terms of volume; again, we are talking 2007,
24 2008, 2009 through 2010, just an approximate
25 number of cases that your unit would have