Page 201

1          L. ALDANA-BERNIER

2              MR. CALLAN:  Didn't she just say

3      she didn't speak to Dr. Lamstein?

4      Objection.

5      Q.    Did you ever tell Dr. Lamstein

6  that Mr. Schoolcraft did not need

7  psychiatric care?

8              MR. CALLAN:  Are you asking if

9      she used telepathy since she didn't

10     speak to the doctor?

11     Q.    Did you say that to --

12     A.    I haven't spoken to Dr.

13  Lamstein.

14     Q.    So if Dr. Lamstein said that

15  you told her that Mr. Schoolcraft did not

16  need psychiatric care, she would not be

17  telling the truth; is that what you're

18  saying?

19              MR. CALLAN:  Objection to the

20     form of the question.

21     A.    You are asking me if Dr.

22  Lamstein tells me that he doesn't need

23  admission, am I going to change my mind?

24     Q.    No.  If Dr. Lamstein testified

25  that you told Dr. Lamstein that Mr.

Page 202

1              L. ALDANA-BERNIER

2    Schoolcraft did not need psychiatric

3    admission, would she be lying?

4              MR. CALLAN:  Objection to the

5         form of the question.

6         A.    This is the first time I'm

7    hearing about Dr. Lamstein.

8         Q.    Did you ever hear the name Dr.

9    Lamstein before?

10        A.    No, the first time I'm hearing

11   about Lamstein.

12        Q.    Did you ever speak to anybody

13   from the internal affairs bureau of the

14   police department?

15        A.    Excuse me?

16        Q.    Did you ever speak to anybody

17   from the internal affairs bureau of the

18   police department?

19        A.    No.

20        Q.    Were you the admitting

21   physician for Mr. Schoolcraft to the

22   psych emergency room?

23        A.    In the emergency room, yes.

24        Q.    Do you know the name of the

25   person that brought Mr. Schoolcraft in?

Page 203

1                L. ALDANA-BERNIER

2        A.    No, I don't.

3        Q.    Did you prescribe any

4   medication for Mr. Schoolcraft?

5        A.    Risperdal, 0.5 milligrams.

6   That was written by the resident, but I

7   agreed; Risperdal 0.5 milligrams twice a

8   day.

9        Q.    What is that?

10       A.    That's an antipsychotic.

11       Q.    Antipsychotic?

12       A.    Paranoia, psychosis.

13       Q.    What was the dosage?

14       A.    It's 0.5.

15       Q.    What was his weight?

16       A.    Weight, 109 kilograms.

17       Q.    And the dosage that you

18   prescribed, is that an introductory dose?

19            MR. LEE:   Objection to form.

20       A.    Yes.

21       Q.    So it's not really therapeutic

22   at that level, correct?

23       A.    It's twice a day.  It should be

24   therapeutic.

25       Q.    When you say "it should be

Page 204

1          L. ALDANA-BERNIER

2    therapeutic," what do you mean?

3        A.    If you are getting 0.5

4    milligrams twice a day, 1 milligram, yes.

5        Q.    How long does it take before it

6    becomes effective to become therapeutic?

7              MR. CALLAN:  Objection.

8        Q.    At the dosage that you

9    prescribed at the weight that Mr.

10   Schoolcraft was?

11             MR. CALLAN:  Objection.

12       A.    Most likely a week.

13       Q.    And when people come in and are

14   dangerous, have you prescribed medication

15   that they have rejected and refused to

16   take?  Has that ever happened to you

17   where a patient refuses to take medicine

18   and you have decided the patient is a

19   danger to themselves or others?

20       A.    Before we start any medication,

21   you describe it with the patient which

22   you need informed consent and you talk

23   about the side effects, the consequences,

24   and the benefits of taking or not taking

25   medication.

Page 205

1              L. ALDANA-BERNIER

2       Q.    Have you ever medicated a

3   patient against their will because they

4   were a danger to themselves or others?

5       A.    They are a danger to

6   themselves, if they are agitated, they

7   are violent, yes, I medicated someone

8   against their will.

9       Q.    How did you do that?

10      A.    If they are becoming -- if the

11  emergency room is being chaotic and the

12  patient -- first you speak with the

13  patient and you try to redirect the

14  patient, try to calm him down.  If he

15  doesn't agree or if he doesn't listen to

16  your redirection, then you start telling

17  him that you are going to medicate him.

18      Q.    And physically, how do you do

19  that, how do you medicate the person who

20  resists taking the medicine?

21      A.    We give them intramuscular.

22      Q.    Someone will restrain them and

23  give them a shot, correct?

24      A.    Yes.

25      Q.    You did not have the opinion

Page 206

1                   L. ALDANA-BERNIER

2      that Mr. Schoolcraft needed to go through

3      the process of being medicated against

4      his will, correct?

5          A.     At the time in the ER, at that

6      point in time when he was in the ER, he

7      was not given any intramuscular

8      injection.

9          Q.     Mr. Schoolcraft refused to take

10     the medication that you prescribed,

11     correct?

12         A.     Yes.

13         Q.     And you did not go through this

14     process where you went through having him

15     restrained and giving him the shot, you

16     didn't go through that process with him,

17     correct?

18         A.     No, I didn't.

19         Q.     Because you didn't deem it

20     necessary to do that to Mr. Schoolcraft,

21     correct?

22         A.     At the point he was in the ER,

23     he was not agitated so I did not have to

24     give him an injection.

25         Q.     He wasn't such a threat to

Page 207

1          L. ALDANA-BERNIER
2    anybody that he was going to need that
3    type of restraint and then injection,
4    correct?
5        A.    He was not agitated at the time
6    so I didn't have to inject him.
7        Q.    You indicated that you wanted a
8    second opinion earlier, correct?
9        A.    Yes.
10       Q.    Did you write a request for a
11   second opinion or a consult?
12       A.    No, I just have to call my
13   associate chairman and present to him the
14   case, and I spoke with him and he agreed
15   with me.
16       Q.    Who is the doctor that you
17   called?
18       A.    Associate chairman.
19       Q.    Who is the associate chairman
20   that you spoke with?
21       A.    Dr. Dhar, D-H-A-R.
22       Q.    Dr. Dhar is a psychiatrist?
23       A.    Yes.
24       Q.    Dr. Dhar is his associate
25   chairman.  What is that?

Page 208

1                    L. ALDANA-BERNIER

2          A.     Next to the chairman.

3          Q.     Who is the chairman?

4          A.     Dr. Vivek.

5          Q.     Can you spell that?

6          A.     V-I-V-E-K.

7          Q.     When you say you spoke to him,

8     did you speak to him on the phone or you

9     don't recall?

10         A.     Call him downstairs and I

11    presented the case to him.

12         Q.     When you say "you presented the

13    case to him," did you tell him about the

14    history that you took?

15         A.     Yes.

16         Q.     Do you remember actually having

17    this conversation, or is that your

18    standard practice that you described?

19         A.     When it's a decision, like,

20    when a decision has to be made wherein --

21    I would say it's standard practice.

22         Q.     You don't recall actually

23    having the conversation?

24         A.     I recall that I spoke to him.

25         Q.     You recall in this case

Page 209

1              L.  ALDANA-BERNIER

2    speaking  to  him?

3         A.     Speaking  to  him.

4         Q.     What  time  of  day  did  you  speak

5    to  him?

6         A.     That  was  the  afternoon.

7         Q.     And  is  the  associate  chairman

8    the  person  that  you  generally  call  to  get

9    a  second  opinion  for  admission  under  the

10   Mental  Hygiene  Law?

11        A.     Yes.

12        Q.     Why  do  you  recall  this

13   particular  incident  with  regard  to  Mr.

14   Schoolcraft  when  you  got  the  second

15   opinion:   Is  there  anything  that  brings

16   it  to  your  mind?

17        A.     I  recall  that  because  every

18   police  officer  that  comes  to  our

19   hospital,  I  try  to  get  second  opinion.

20        Q.     When  you  say  "every  police

21   officer,"  how  often  have  you  had  police

22   officers  brought  to  your  hospital  to  the

23   emergency  psych  ward?

24        A.     I  could  not  recall  how  many.

25        Q.     Hundreds?

Page 210

1            L. ALDANA-BERNIER

2        A.    No.

3        Q.    Dozens?

4        A.    No.   That's why it came back in

5    memory because it's not 100, but I cannot

6    recall how many.

7        Q.    More than ten?

8        A.    I don't remember.

9        Q.    Less than 50?

10       A.    I would not remember.

11       Q.    On each of these occasions,

12   were they brought in by other members of

13   the New York City Police Department?

14       A.    Yes.

15            MR. RADOMISLI:   What?

16            THE WITNESS:   Yes.

17       Q.    On each of those occasions, did

18   you admit those patients to the psych ER?

19       A.    To the psych ER, yes.

20       Q.    On each of those occasions, did

21   the associate chairman agree with your

22   opinion to admit these police officers

23   under the --

24            MR. CALLAN:   Objection to the

25       question.   I don't know that she said

Page 211

1           L. ALDANA-BERNIER

2       she consulted with the associate

3       chairman on every case.

4           MR. SUCKLE:  I will clarify.

5       Q.     For each of those police

6  officers that were admitted under the

7  Mental Hygiene Law, did you consult with

8  a second opinion?

9       A.     Yes.

10      Q.     In each of those police

11  officers, did the person, the doctor you

12  consulted with, agree with your opinion

13  to admit under the Mental Hygiene Law?

14      A.     Yes.

15      Q.     And these times when police

16  officers were admitted under the Mental

17  Hygiene Law, did some of them occur

18  before Mr. Schoolcraft's admission?  I

19  mean in the year or months beforehand.

20      A.     Yes.

21      Q.     And did the police officers

22  come from any particular precinct that

23  you were talking about:  Did they come

24  from the 81st Precinct, if you know?

25      A.     I would not know that.

1              L. ALDANA-BERNIER

2        Q.    Do you know, did you get to see

3   any of the police officers on a recurring

4   basis that would bring these police

5   officer in; in other words, the police

6   officers that would bring the other

7   police officer in for evaluation, did you

8   see those police officers more than once?

9             MR. RADOMISLI:  Objection to

10       form.

11       A.    What do you mean more than

12   once?

13       Q.    Like in this case we know that

14   Sergeant James played some role in Mr.

15   Schoolcraft's history, correct?

16            MR. SHAFFER:  Objection.

17       A.    That's in the record.

18       Q.    Do you know if Sergeant James

19   was involved in any of the other police

20   officers who were admitted to Jamaica

21   Hospital who you admitted under the

22   Mental Hygiene Law?

23       A.    I don't know how Mr. James look

24   like.

25       Q.    Were there any police officers,

Page 213

1                    L. ALDANA-BERNIER

2       sergeants, lieutenants who you can

3       identify who would bring police officers

4       to Jamaica Hospital on a recurring basis?

5                    MR. RADOMISLI:  Objection to

6            form.

7                    MR. SHAFFER:  Objection.

8            Q.      That you know either by sight

9       or name?

10           A.      No, I wouldn't.

11           Q.      When the police officers are

12      brought in by the other members of the

13      New York City Police Department, do you

14      always have the same concerns that you

15      describe for us about the police officer

16      having access to weapons?

17                   MR. CALLAN:  Objection to the

18           form of the question.

19                   She didn't say they were brought

20           in by other members of the New York

21           City Police Department.

22                   MR. SUCKLE:  We've been told

23           that she did.

24           Q.      Does that concern that you

25      expressed about Mr. Schoolcraft and the

Page 214

1                L. ALDANA-BERNIER
2    access to weapons, did it apply to those
3    other police officers that you admitted
4    under the Mental Hygiene Law?
5        A.    I think you have to look at the
6    case.  It depends.  Every case is
7    different.  You have to look at it
8    differently.
9        Q.    So some police officers have
10   access to weapons and some don't?
11       A.    That I wouldn't know.
12       Q.    You indicated one of your
13   concerns for Mr. Schoolcraft's safety was
14   that he had access to weapons.
15       A.    In the notes he mentioned why
16   he cannot have access to his guns.
17       Q.    So were other police officers
18   brought in who did have access to weapons
19   that you are aware of?
20       A.    I do not remember that.
21       Q.    Did other police officers ever
22   bring in another police officer to the
23   emergency room who you did not admit
24   under the Mental Hygiene Law?
25       A.    That would be hard to remember.

Page 215

1                L. ALDANA-BERNIER

2        Q.    As you sit here today, you

3    don't recall any such situations; am I

4    correct?

5             MR. RADOMISLI:  Objection.

6             MR. CALLAN:  Objection to form.

7        What situation:  admitting or not?

8             MR. SUCKLE:  Not admitting.

9        Q.    As you sit here today, do you

10   recall any occurrence of a police officer

11   being brought in by other police officers

12   and you did not admit them under mental

13   hygiene?

14             MR. RADOMISLI:  Objection.

15       A.    It would be hard to remember.

16       Q.    So the answer is:  As you sit

17   here, no, you don't remember?

18             MR. RADOMISLI:  Objection to

19       form.

20       A.    I do not remember.

21       Q.    When is the last time you

22   admitted a police officer under the

23   Mental Hygiene Law into the psych

24   emergency room?

25       A.    Do not remember.

Page 216

1              L. ALDANA-BERNIER

2       Q.    Was Mr. Schoolcraft the last

3    police officer that you admitted under

4    the Mental Hygiene Law?

5       A.    I do not know if he was the

6    last one.

7              MR. RADOMISLI:  Read that back.

8              [The requested portion of the

9         record was read.]

10      Q.    But none come to memory since

11   Mr. Schoolcraft, correct?

12      A.    I'm not sure.  I don't

13   remember.

14      Q.    And going to your November 3rd

15   note where you fill out the mental status

16   exam form, can we turn to that, please.

17             [Witness complying.]

18      Q.    Look first at --

19      A.    Yes.

20      Q.    -- that's stamped at the top

21   "Emergency Admission Section 9.39 Mental

22   Hygiene Law."  At the bottom is your

23   signature?

24      A.    Yes.

25      Q.    Is that what we are all talking

Page 217

1              L. ALDANA-BERNIER
2    about, is that what you have in front of
3    you?
4         A.    Yes.
5         Q.    Is this all of your
6    handwriting?
7         A.    Yes.
8         Q.    And going to the part that
9    says, "record of admission," what did you
10   write there?
11        A.    "Patient is a danger to
12   himself.  Currently psychotic and
13   paranoid.  Would benefit from inpatient
14   stabilization."
15        Q.    I'm sorry.  I didn't get all of
16   that?
17        A.    Would benefit from inpatient
18   stabilization.
19        Q.    I didn't hear before will
20   benefit.
21              [The requested portion of the
22        record was read.]
23        Q.    When you say he would benefit
24   from it, what do you mean?
25        A.    Benefit from inpatient

1              L. ALDANA-BERNIER

2    stabilization because when you go up to

3    the inpatient unit, you will have a

4    psychiatrist, a therapist, and a team

5    that will work with you.  There are

6    groups in the inpatient unit and there

7    are other modalities of the kind of

8    treatment in the inpatient unit that will

9    be able to maybe find out why he was

10   behaving the way he was behaving or why

11   he was paranoid, and he will be able to

12   talk to a psychologist or the other

13   therapist.

14       Q.     The stabilization, was that a

15   stabilization of his affect, his

16   environment that was going to be

17   stabilized, what did you mean by that?

18              MR. CALLAN:   Objection to form.

19       A.     Stabilization means

20   stabilization of his psychosis and

21   stabilization of if there was any

22   emotional crisis that was he going on

23   [sic] or going through with the conflict

24   that he was having with the supervisors.

25       Q.     So some type of resolution of

Page 219

1              L. ALDANA-BERNIER

2     that conflict would be part of the

3     stabilization?

4          A.    Yes.

5          Q.    And that would have occurred

6     through the modalities that you just

7     described earlier?

8          A.    Yes.

9          Q.    And would the stabilization

10    also include limiting his access to

11    weapons?

12         A.    Stabilization, that will

13    include, yes, because they will have to

14    find out before he is discharged to

15    ascertain he doesn't have any access to

16    weapons or....

17         Q.    Is that stabilization something

18    that every police officer admitted under

19    the Mental Hygiene Law needs to go

20    through:  making sure they don't have

21    access to weapons?

22              MR. RADOMISLI:  Objection.

23              MR. CALLAN:  I join in the

24         objection.

25         A.    It's not only police officers

Page 220

1        L. ALDANA-BERNIER

2  but everyone that comes in who are a

3  danger that we know they have access to

4  weapons, then we try as much as possible.

5          I don't know if you know about

6  the New York SAFE Act wherein we have to

7  report everyone that has a weapon, we

8  have to make sure that they are

9  discharged before....

10     Q.     Usually you have to report

11  everyone that has a weapon, who do you

12  have to report that to?

13     A.     The Department of Health.

14     Q.     That's been the law for how

15  long?

16     A.     Maybe -- that's new, a new law.

17     Q.     Was that in effect in 2009?

18     A.     Not 2009.  What I was trying to

19  say that anyone we know that is a danger

20  to themselves, we try to make sure they

21  don't have any access to weapons.

22     Q.     Looking at the date that you

23  wrote in there -- we have gone through

24  this.  I don't want to spend too much

25  time on it; but did you actually cross

Page 221

1              L. ALDANA-BERNIER

2     out the date of the admission and then

3     rewrite it?

4          A.     I tried to put 11/1/2009.

5          Q.     Did you check a.m. or p.m. on

6     this?

7          A.     No, I did not check it, but

8     23:03 is --

9          Q.     Military time?

10         A.     -- military time, yes.

11         Q.     From the time of your note on

12    the 2nd at 3:10 until this note on the

13    3rd at 1:20, was Mr. Schoolcraft free to

14    leave?

15         A.     No, he was not.

16                I made my decision on the day

17    that I saw him.

18         Q.     You made your decision on that

19    date and then turn to the Notice of

20    Status of Rights in Emergency Admission

21    which your counsel clearly decided to

22    throw in front of you before --

23                MR. CALLAN:  Are we allowed to

24         look at it now because it's in the

25         record, Counsel?

Page 222

1                L. ALDANA-BERNIER
2        Q.    Did you sign that form?
3        A.    Yes.
4        Q.    On the 3rd, correct?
5        A.    On the 3rd, yes.
6        Q.    Did you sign that at the same
7    time that you signed the Emergency
8    Admission Section 9.39 Mental Hygiene
9    Law, that form?
10       A.    Yes.
11       Q.    What did you do with this form
12   once you signed it?
13       A.    One copy goes to the patient.
14       Q.    So Mr. Schoolcraft was given
15   this on the 3rd of November, 2009?
16       A.    Yes.
17       Q.    Did he sign it?
18       A.    No.  I am the one that signs
19   it.
20       Q.    Did Mr. Schoolcraft ask you to
21   -- did you have any contact with Mr.
22   Schoolcraft's father?
23       A.    No, I did not.
24       Q.    Did Mr. Schoolcraft say, call
25   my father and tell him about this?

Page 223

1              L. ALDANA-BERNIER

2       A.    No, he did not.  I don't know.

3   I don't have any notes about him allowing

4   me to speak to his father.

5       Q.    Do you know if you spoke to his

6   father while he was in the hospital?

7       A.    Regarding the notes if I spoke

8   to the father?

9       Q.    Did you write on here that his

10  father should be designated as the person

11  to be noticed of this admission?

12      A.    No, I didn't write anything

13  here.

14      Q.    Why not?

15      A.    Because this belongs to him.

16      Q.    When you say --

17      A.    This is the for the patient.

18      Q.    This is for the patient?

19      A.    Yes.

20      Q.    Do you know why there are these

21  lines indicating where copies should go?

22      A.    It says, above patient has been

23  given a copy of that notice.

24      Q.    Underneath that, what does it

25  say, it has your signature and underneath

Page 224

1              L. ALDANA-BERNIER

2    that, what does it say?  Can you read

3    that into the record, please?

4         A.     "Copies to persons designed by

5    patient to be informed of admission."

6         Q.     Continue.  "If," there is a

7    parenthesis there.

8         A.     "If none type in none."

9         Q.     Did you type in none?

10        A.     No, I did not.

11        Q.     Did you write in none?

12        A.     No, I did not.

13        Q.     Did you write in anybody's

14   name?

15        A.     It's there, "Schoolcraft,

16   Adrian."

17        Q.     Did you write anybody's name to

18   be designated by the patient to be

19   informed of his admission, did you write

20   any names there?

21        A.     No, I didn't write any names.

22        Q.     Do you have a recollection as

23   you sit here today independent of the

24   record, do you recall actually giving

25   this to Mr. Schoolcraft?

Page 225

1                 L. ALDANA-BERNIER

2          A.    I do not have an independent

3     recollection.  The nurse could have given

4     it to him.

5          Q.    So the nurse may have given it

6     to him?

7          A.    Yes.

8          Q.    Is this something that you

9     assigned the nurses to do from time to

10    time?

11         A.    Either the nurse or I do.  I do

12    not have a recollection if I gave it to

13    him.  I will not know.

14         Q.    Who is the person who write

15    none on it for people to designated if

16    none is the appropriate answer:  you, the

17    nurse, something else?

18         A.    I would.

19         Q.    The second page of that

20    emergency admission form -- hold on one

21    second.  Go back to that notice for the

22    second.

23               At the top of the notice there

24    appears to be a date.  Can you tell me

25    the date that you wrote there?

Page 226

1              L. ALDANA-BERNIER
2         A.    11/1/09.
3         Q.    What does the form say in that
4    box, what is the date of --
5         A.    "Date of arrival at hospital."
6         Q.    Did you first write 11/3 and
7    then cross it out and make it 1?
8         A.    No, that's 11/1.
9         Q.    Did you cross out that middle
10   number at all, the date?
11        A.    No, I put 1.
12        Q.    So there is no cross out or
13   block out of that 1 where the 1 is now?
14        A.    I put a 1 in there.
15        Q.    Again, you put the 1 there
16   because that's the date that you
17   understand him to arrive at the psych ER,
18   right?
19        A.    Yes.
20        Q.    As opposed to generally him
21   arriving at the hospital, yes?
22        A.    Yes.
23        Q.    Is that something that you do
24   when you fill out these forms when part
25   of the form asked for date of arrival,

1              L. ALDANA-BERNIER

2    did you put in the date they arrived at

3    the psych ER?

4         A.    Yes.

5         Q.    As opposed to the date they

6    actually arrive at the hospital itself?

7         A.    You're right.

8         Q.    Why do you do that?

9         A.    We usually put the date of the

10   arrival when they come to the emergency

11   room.

12        Q.    I understand that.

13              Why don't you put the date of

14   arrival at the hospital when that's what

15   the form asked for?

16        A.    We do not use this in the

17   medical ER.  We use this in the psych ER.

18        Q.    Did you have any hand in

19   creating this form as director?

20        A.    No.

21        Q.    This existed prior to you --

22        A.    Yes.

23        Q.    -- prior to you being director?

24        A.    Yes.

25        Q.    When did you stop being

```
 1              L. ALDANA-BERNIER
 2    director?
 3         A.    Yes.
 4         Q.    When did you stop?
 5         A.    October 2013.
 6         Q.    Was there a reason that you
 7    stopped being director?
 8         A.    There was a change of
 9    administration.
10         Q.    Has there been changes of
11    administration at any time in the ten
12    years that you were director?
13         A.    No.
14         Q.    Looking at the second page of
15    the emergency admission form, is any of
16    this your handwriting?
17         A.    That belong to Dr. Isakov.
18         Q.    Did Dr. Vivek make any notes in
19    the chart as to the associate chairman
20    that you spoke to?
21              MR. CALLAN:  Vivek is the
22         chairman.
23         Q.    I thought you said associate
24    chairman.
25         A.    Associate chairman is Dr. Dhar
```

```
                                      Page 229
 1               L. ALDANA-BERNIER
 2    and chairman and Dr. Vivek.
 3         Q.    You spoke to Dr. Dhar?
 4         A.    Yes.
 5         Q.    Did Dr. Dhar fill out any of
 6    these forms with regard to the mental
 7    hygiene admission?
 8         A.    No.
 9         Q.    So you just got a verbal on the
10    phone by Dr. Dhar; is that what you're
11    saying?
12               MR. RADOMISLI:  Objection.
13         Q.    Of your opinion?
14               MR. CALLAN:  Objection to the
15         form of the question.
16         Q.    Did you speak to Dr. Dhar on
17    the telephone?
18         A.    He came down.
19         Q.    He came down to the emergency
20    room?
21         A.    [Indicating.]
22         Q.    When Dr. Dhar came down to the
23    emergency room, you presented the case to
24    him, correct?
25         A.    Yes.
```

1                 L. ALDANA-BERNIER

2        Q.    And then what happened?

3        A.    And he agreed to my decision of

4    admitting the patient.

5        Q.    Did he become the second

6    physician under Mental Hygiene Law for

7    admission?

8        A.    You only the need one in an

9    emergency admission.

10       Q.    But it needs to be confirmed

11   eventually, correct?

12       A.    That is after 48 hours.

13       Q.    So you called him down just

14   because you wanted a second opinion, not

15   to confirm for the purposes of 48-hour

16   requirement, correct?

17       A.    To discuss this case, yes.

18       Q.    Was there something you were

19   unsure of, is that why you wanted Dr.

20   Dhar's opinion or something else?

21            MR. CALLAN:   You went through

22        this whole thing.  Asked and answered,

23        objection.

24            MR. SUCKLE:   Then her answer

25        should be the same.

Page 231

1              L. ALDANA-BERNIER

2        A.    I give you the same answer.

3        Q.    What is the same answer?

4        A.    I made the decision and I asked

5    for Dr. Dhar's opinion and Dr. Dhar

6    agreed.

7        Q.    Was there anything about Mr.

8    Schoolcraft's presentation to you that

9    made you unsure of your opinion?

10            MR. RADOMISLI:  Objection to

11        form; unsure.

12        A.    Once more I have to reiterate:

13    I was not only looking at that day when I

14    saw him, I was looking at the whole

15    picture; the whole picture from the time

16    that he came in to the time that I made

17    the decision that he needs to be

18    admitted.

19        Q.    Was there anything about that

20    whole picture as you say and the opinion

21    you formed as a result of that whole

22    picture of which you were unsure; that is

23    the question?

24        A.    That I was not, no.  I made a

25    decision so I had to admit him.

Page 232

1              L. ALDANA-BERNIER

2        Q.    And the second form, did you

3    review this at any time while Mr.

4    Schoolcraft was in the hospital or were

5    you done with Mr. Schoolcraft's care and

6    treatment after that?

7        A.    I did not review that.  I do

8    not go to the inpatient.  I was not in

9    the inpatient.

10       Q.    So this form was completed in

11   part by you in the emergency room, and

12   the rest was completed for the inpatient

13   by the second confirming physician?

14       A.    Yes.

15             MR. SUCKLE:  Mark this as

16        Plaintiff's Exhibit 70.

17             [The document was hereby marked

18        as Plaintiff's Exhibit 70 for

19        identification, as of this date.]

20       Q.    I show you what's been marked

21   Exhibit 70 for today's date and ask you

22   what that is?

23             MR. RADOMISLI:  Do you have one

24        at least?

25             MR. SUCKLE:  You produced it.

Page 233

1                    L. ALDANA-BERNIER

2                    MR. CALLAN:  What you are

3          showing is Emergency Admission Status.

4          Q.     Do you know what that is?

5                    MR. CALLAN:  Do you have a copy

6          machine?

7                    MR. SMITH:  I do.

8                    MR. CALLAN:  Before the end of

9          day?

10                   MR. SMITH:  For sure.

11                   MR. CALLAN:  It's only three

12         pages.

13                   MR. SMITH:  Everybody take a

14         break.  I'll make copies right now.

15                   It's 4:34.  We are taking a

16         break.

17                   [Discussion held off the

18         record.]

19                   [Whereupon, at 4:34 p.m., a

20         recess was taken.]

21                   [Whereupon, at 4:49 p.m., the

22         testimony continued.]

23                   [The documents were hereby

24         marked as Plaintiff's Exhibits 71

25         through 75 for identification, as of

Page 234

1                L. ALDANA-BERNIER

2        this date.]

3        Q.    Doctor, you have in front of

4     you Exhibit 70 I believe.

5        A.    Yeah.

6        Q.    Do you know what that is?

7        A.    Yes.

8        Q.    What is it?

9        A.    It's a policy on Emergency

10    Admission Status.

11       Q.    Did you have any hand in

12    creating this document?

13       A.    I do not remember.  I just

14    probably would see it, but I don't

15    remember crafting it or making all of

16    those policies.

17       Q.    I realize it's long and I know

18    you're tired, I appreciate that, but you

19    have to keep your voice up if you can.

20             When you were the director of

21    the emergency room, did you have a

22    supervisor that you answered to?

23       A.    Yes.

24       Q.    Who was that?

25       A.    Dr. Dhar and Dr. Vivek.

Page 235

1              L. ALDANA-BERNIER

2         Q.    So the chairman and the

3    associate chairman?

4         A.    Yes.

5         Q.    Did they have a hand in

6    creating this form?

7         A.    Yes.

8         Q.    So who else was involved in the

9    creation of this form?  You said you sat

10   in maybe?

11        A.    Yes.  It's all the

12   administrative leaders of the department:

13   the unit chief, Dr. Dhar, Dr. Vivek, and

14   the director of the nursing department.

15        Q.    Have you ever from time to time

16   had to reference this document for your

17   own information?

18             MR. RADOMISLI:  Objection to

19        form.

20        A.    You mean go back and read?

21        Q.    Yes, that's another way of

22   asking it.

23        A.    I see it every now and then if

24   we have administrative meetings, we have

25   to see it once again so I more or less

1            L. ALDANA-BERNIER

2    will listen to what is being changed or

3    being added.

4            MR. CALLAN:  Keep your voice up,

5        Doctor, louder.

6        Q.    Doctor, I know that the last

7    review was April of 2010.  Was anything

8    changed then?

9        A.    I would not remember.

10       Q.    It appears that the policy was

11   reviewed every April from 1999 through

12   2010.  What does the review entail, do

13   you know?

14       A.    Going back to all of this if

15   there is anything added that the

16   Department of Health would like to add.

17       Q.    What is on here, what is the

18   information on here, how would you

19   characterize that?

20       A.    Well, it's giving us all the

21   reasons about when we admit the patient.

22   It's the 9.39.

23       Q.    Do you know the vernacular,

24   CPEP, do you know what a CPEP is?

25       A.    Community --

Page 237

1              L. ALDANA-BERNIER

2        Q.    Community psyche emergency

3    protocol?

4        A.    Where are you?

5        Q.    It's not on here.

6              Do you know that vernacular, do

7    you know what that stands for, CPEP?

8              MR. RADOMISLI:  Did you say what

9         you thought it stood for on the

10        record?  I don't think you got it

11        right.

12        Q.    Do you know what CPEP stands

13    for?

14        A.    Referring to CPEP?

15        Q.    What is that?

16        A.    That is the holding a patient

17    in that department instead of sending the

18    patient to admission.

19        Q.    Holding them in that --

20        A.    It's a different department of

21    ER wherein you can hold a patient before

22    you could admit the patient to the

23    inpatient.

24        Q.    That's the psych ER, the

25    medical ER, or both?

Page 238

1              L. ALDANA-BERNIER

2       A.    The psych ER.

3       Q.    And that wasn't done with Mr.

4  Schoolcraft, correct?

5       A.    Because we did not have a CPEP

6  then.

7       Q.    What does that stand for?

8       A.    Community psychiatry emergency

9  -- I do not have the whole name, sorry.

10      Q.    But Jamaica Hospital has one

11 now?

12      A.    It has one, yes.

13      Q.    When looking at Exhibit 70, is

14 it your understanding this sets out what

15 is required under 9.39 of the mental

16 health law to admit someone under the

17 mental health law?

18            MR. CALLAN:  Objection to form.

19            MR. LEE:  Objection to the form.

20      A.    I want you to rephrase that

21 one.

22      Q.    Sure.

23            What is the standard set out in

24 this document, if you know?

25            MR. CALLAN:  Do you want her to

1            L. ALDANA-BERNIER

2      read the document, a summary?

3            MR. SUCKLE:  I want to know her

4      understanding of it.

5            MR. CALLAN:  I object.  It's a

6      three-page piece of paper.  It speaks

7      for itself.

8            Objection to the form of the

9      question.

10     Q.    Do you know what this is?

11     A.    Yes, it's a New York Mental

12  Hygiene Law, that's careful attention

13  with preservation of their legal rights

14  as well as their safety.

15     Q.    Is this the policy of Jamaica

16  Hospital?

17     A.    To do a 9.39?

18     Q.    Is this document a policy of

19  Jamaica Hospital?

20     A.    It's showing in here Jamaica

21  Hospital Department of Psychiatry Manual.

22     Q.    Is it a policy of Jamaica

23  Hospital, a written policy?

24     A.    A written policy, yes.

25     Q.    Do you endeavor to follow the

Page 240

1              L. ALDANA-BERNIER

2    policies of Jamaica Hospital, the written

3    ones?

4         A.    The written, yes.

5         Q.    In dealing with Mr.

6    Schoolcraft, did you endeavor to follow

7    the policy set forth here as Exhibit 70?

8              MR. CALLAN:  Well, this says it

9         was revised 4/10.

10             MR. SUCKLE:  I asked her if she

11        knew what --

12             MR. CALLAN:  Well, we don't

13        know.

14             MR. SUCKLE:  It doesn't say

15        revised.  It says reviewed.  Please

16        don't speak.  I asked her about --

17             MR. CALLAN:  Are you making a

18        representation this was the policy

19        that was in effect at the time that

20        Mr. Schoolcraft were seen?

21             MR. SUCKLE:  I'm asking if she

22        followed this policy, endeavored to

23        follow this policy, whether it was in

24        effect or not she can tell me.

25             MR. LEE:  Objection to form.

1               L. ALDANA-BERNIER

2        A.     It's saying in here, "Patient

3   alleged to have a mental illness for

4   which immediate observation, care, and

5   treatment in a hospital is appropriate

6   and which is likely to result in serious

7   harm to himself or others may be admitted

8   under this provision for a period of 15

9   days."

10       Q.     The question is:  Did you

11  endeavor to follow this policy in your

12  care and treatment of Mr. Schoolcraft?

13       A.     At that point in 2009, I

14  thought -- I believe that he may be a

15  danger to others or to himself because of

16  that point in time if you go back to the

17  story where he was brought to the

18  hospital because he was acting bizarre

19  and agitated and he was paranoid.  I

20  think he was a danger to others or to

21  himself.

22       Q.     Is your answer, yes, you tried

23  to --

24       A.     That's what I'm saying, yes.

25       Q.     Under this policy, under number

Page 242

1            L. ALDANA-BERNIER

2    1 is "a substantial risk of physical harm

3    to himself as manifested by threats of or

4    attempts at suicide."

5            Did he manifest threats or

6    attempts at suicide?

7            MR. SHAFFER:  Objection.

8            MR. CALLAN:  Objection.

9    Q.    Did Mr. Schoolcraft manifest

10   threats or attempts at suicide?

11   A.    You have to finish.

12   Q.    We are going to break it down.

13   We are going to go one by one?

14           MR. CALLAN:  Objection.

15           MR. SUCKLE:  That's the

16       question.

17           MR. CALLAN:  Objection to the

18       form of the question.

19           MR. SUCKLE:  Noted.  She can

20       answer.

21           MR. CALLAN:  The doctor said you

22       left something out.  You are reading

23       incomplete sentences from a three-page

24       document.

25           MR. SUCKLE:  I'm asking

Page 243

1              L. ALDANA-BERNIER

2        questions. In my horrific stumbling

3        way, I'm asking a question.

4        Q.    Doctor, did you admit Mr.

5    Schoolcraft because he was a substantial

6    risk of physical harm to himself as

7    manifested by a threat or attempt at

8    suicide?

9        A.    Sir --

10       Q.    Just yes or no.

11       A.    Sir, you have to complete the

12   statement.

13       Q.    I don't have to do anything.

14   You have to answer questions.

15            MR. SHAFFER: Objection.

16       A.    "Or other conduct demonstrating

17   he is a danger to himself."

18       Q.    We're going to get there.  I

19   know that part. I'm asking you a

20   question.

21       A.    That's what I based --

22       Q.    We are going to get to what you

23   based your opinion on. I'm asking you:

24   Did you base it on that he was a

25   substantial risk of physical harm to

1                L. ALDANA-BERNIER

2        himself as manifested by a threat of or

3        attempt at suicide?

4                MR. CALLAN:  Objection, asked

5            and answered.

6                MR. SUCKLE:  Not answered yet.

7        Q.    Yes or no?

8                MR. CALLAN:  Objection, asked

9            and answered.

10       Q.    Can you answer, please?

11       A.    A potential risk, yes.

12       Q.    So you say he manifest by a

13       threat or attempt at suicide; it that

14       what you're saying?

15       A.    A potential risk.

16       Q.    Did he manifest by a threat of

17       suicide?

18       A.    It's the behavior that he came

19       in with to the emergency room.  I saw he

20       was a potential risk that he might hurt

21       himself or hurt others.  That's a

22       potential risk.

23       Q.    So potential risk was the

24       reason that you held him, correct?

25       A.    That's the reason that I was

Page 245

1              L. ALDANA-BERNIER

2    thinking that he needs admission.

3        Q.    And the potential of that risk

4    you've described to us already today?

5        A.    I did, yes.

6        Q.    And this potential of a risk,

7    did the doctor who saw him within the

8    48-hour period to confirm his admission

9    also tell you that he was concerned about

10   the potential risk?

11             MR. RADOMISLI:  Objection.

12             MR. LEE:  Objection to the form.

13             MR. CALLAN:  I join in the

14       objection.

15       Q.    Did he tell you he was

16   concerned about the potential risk that

17   you've just described?

18             MR. LEE:  There's been no

19       testimony she ever talked to him.

20             MR. SUCKLE:  She can say that if

21       that's the answer.

22       A.    If you read the notes, I wasn't

23   there for him to tell me that.  As I read

24   his notes, I can see he was a potential

25   risk.

Page 246

1              L. ALDANA-BERNIER

2        Q.    This potential risk that you're

3   talking about, did he have this potential

4   risk when you last saw him?

5        A.    I'm not basing it only to one

6   day.  I'm basing it from the beginning

7   that he came into the hospital.

8        Q.    And this potential risk, is

9   there any other risk besides that

10  potential risk that you just described as

11  the reason that you held him?

12       A.    What risk are you thinking of?

13       Q.    I'm not thinking of any.

14             MR. CALLAN:  Do you want her to

15        repeat herself again?

16             MR. SUCKLE:  No, I want to make

17        sure there are no other ones.

18       Q.    Is that potential risk that you

19  just described the only reason that you

20  held him?

21       A.    The same reason I think when I

22  see a patient, it is a potential risk and

23  danger to others, and I make the decision

24  I have to admit the patient.

25       Q.    And when you say "potential

Page 247

1                L. ALDANA-BERNIER

2       risk," can you quantify that for me at

3       all what you mean by potential?

4          A.    The patient comes in barricaded

5       himself, acting bizarre.  He was brought

6       in from his house.  It was a police

7       officer who may have access to weapons,

8       easy for him to have access to weapons.

9       He is paranoid.  I would think that maybe

10      it would be safe if the patient will be

11      admitted.

12         Q.    So your thought he might be

13      safe if he was admitted?

14         A.    If he was admitted.

15         Q.    That's what you were talking

16      about when you say potential risk,

17      correct?

18         A.    All of the above that I told

19      you.

20         Q.    Can you quantify what you mean

21      by potential risk as far as the

22      likelihood of risk?  This word

23      "potential" that you have been using, can

24      you quantify that for me?

25         A.    When you say "quantify," what

1                L. ALDANA-BERNIER

2     do you mean?

3          Q.     Sure.

4                Well, you used the word

5     "potential."  I would like to know what

6     you mean by potential.

7          A.     If you think of the navy yard

8     disaster, was he an officer or army man?

9     He was so quite, no one ever found out

10    what was going on with him.  So what

11    happened then?

12               Or if you look at all of those

13    -- the Range Rover.  Who are all of these

14    people that caused that?  They are all

15    police officers.

16               So if I think then I have to

17    make sure that when I see a patient in

18    the ER, I have to think in the future

19    that there will be no disaster, there

20    will be no destruction, or no one will

21    get harmed when they were discharged from

22    the ER.

23         Q.     I was asking about what you

24    meant by potential.

25         A.     That's the potential.

Page 249

1              L. ALDANA-BERNIER

2      Q.    So if there is any potential at

3   all, you want to make sure that the

4   patient is safe, correct?

5      A.    Correct.

6      Q.    And if there is any potential

7   at all, you want to make sure the

8   community is safe, correct?

9      A.    That's correct.

10     Q.    And if there is any potential

11  at all, you were going to admit Mr.

12  Schoolcraft, correct?

13         MR. LEE:  Objection to form.

14     A.    With all of those reasons, yes,

15  I would have to admit him.

16     Q.    When you admitted him to the

17  emergency room, there were certain rules

18  and regulations --

19         MR. SUCKLE:  Withdrawn.

20     Q.    When he was admitted to the

21  psych floor, there were certain rules and

22  regulations in the psych ward, correct,

23  about clothes they wear, what hours

24  visitors can come, correct?

25     A.    Yes.

Page 250

1                    L. ALDANA-BERNIER

2        Q.    It's not like they are free to

3    have anybody come and visit any time they

4    want, correct; is that true?

5        A.    That's correct.

6        Q.    I will show you what's been

7    marked as Exhibit 71.

8              Now, do you know what that is?

9        A.    [No response.]

10       Q.    Do you know what that is?

11       A.    It's the policy of visiting

12   hours.

13       Q.    Were those the policies in

14   effect when Mr. Schoolcraft was on the

15   psychiatric floor at Jamaica Hospital in

16   2009?

17       A.    Okay, this policy is for the

18   inpatient unit.

19       Q.    During the time that Mr.

20   Schoolcraft was at Jamaica Hospital, was

21   he in the inpatient unit?

22       A.    I did not work in the inpatient

23   unit.

24       Q.    I understand.

25              Was he in the inpatient unit?

Page 251

1              L. ALDANA-BERNIER

2      A.    Yeah, he was in the inpatient

3  unit.

4      Q.    Were these documents created by

5  Jamaica Hospital, the visiting hours, do

6  you know about that?

7      A.    It's in here [indicating].

8      Q.    Were you sitting in on the

9  committee that created that document too?

10     A.    I don't remember that.

11     Q.    Do you agree that Mr.

12  Schoolcraft could have visitors from 2

13  p.m. and 3 p.m. and 6:30 p.m. to 8 p.m.

14  only?

15          MR. RADOMISLI:  Objection.

16          MR. CALLAN:  Objection.

17     Q.    While he was on the floor, do

18  you agree with that?

19          MR. CALLAN:  You know, Counsel,

20      she said she is not involved with the

21      inpatient.

22          Maybe you can ask her about

23      painting the hospital.  Maybe she

24      might know something about that.

25      Maybe she looked at it from her car

Page 252

1              L. ALDANA-BERNIER

2        when she drove by.

3              MR. SUCKLE:   I'll ask her about

4        it next.

5              MR. SHAFFER:   I will be leaving

6        if that is a question that's asked.

7        A.    Can you ask the question again?

8        Q.    What were the visiting hours on

9   the floor?

10       A.    Two to three, 6:30 to eight.

11       Q.    So Mr. Schoolcraft if his

12   father wanted to visit him at nine

13   o'clock in the morning, would not be able

14   to do that, correct?

15             MR. CALLAN:   Objection.

16             MR. RADOMISLI:   Objection.

17             MR. LEE:   Objection to form.

18       A.    I would not know what the

19   policy at the inpatient unit would be.

20             MR. SUCKLE:   Counsel wants me to

21       ask about painting, but I'm not going

22       to do that.

23             MR. CALLAN:   That's a relief.

24       Q.    Let's look at Exhibit 72.

25             MR. SMITH:   Which is --

Page 253

1                L. ALDANA-BERNIER
2        Q.    Which is the restriction of
3    visiting and communication and
4    correspondence, do you know about that,
5    what that document is?
6        A.    This is also for the inpatient
7    unit.
8        Q.    So you don't know anything
9    about it?
10       A.    I can read it to you.
11       Q.    Do you know anything about it?
12       A.    No, it's for the inpatient
13    unit.
14       Q.    So you only know about the
15    emergency room?
16       A.    Emergency room.
17             MR. CALLAN:  Aren't you doing
18        Isakov tomorrow?  Isn't he in the
19        inpatient room?
20       Q.    I'm showing you what's been
21    marked Exhibit 74 today's date.  Do you
22    know what this is?
23       A.    It's the rules and regulations
24    the patients have to comply with.
25       Q.    At Jamaica Hospital in the

1              L. ALDANA-BERNIER

2    psych unit?

3       A.    Psych Unit 3, yes.

4       Q.    What is Psych Unit 3?

5       A.    That's -- it's a unit which

6    patients are admitted; one is 2 and one

7    is 3.

8       Q.    What is the distinction, if

9    any, in treatment?

10      A.    None, it's the same.

11      Q.    Was Mr. Schoolcraft admitted to

12   Psych 3?

13      A.    Yes.

14      Q.    So these rules would apply to

15   him?

16      A.    Psych 3.

17            MR. RADOMISLI:  Mr. Suckle, is

18       this something we produced to you?

19            MR. SUCKLE:  I believe so.  I

20       don't know.

21            MR. RADOMISLI:  Do you know?

22            MR. SUCKLE:  Off the top of my

23       head, I don't remember but -- I don't

24       remember.

25            MR. RADOMISLI:  Would there be a

Page 255

```
 1            L. ALDANA-BERNIER
 2      way for you to get it in a fashion
 3      other than if we produced it?
 4            MR. SUCKLE:  I didn't do
 5      discovery in this case so you've got
 6      the wrong guy.
 7            MR. RADOMISLI:  Do you know
 8      whether this was produced to you by
 9      us?
10            MR. SUCKLE:  Off the top of my
11      head, I would assume it was.  In fact,
12      I know it came out of, I hit print on
13      your document response to discovery
14      inspection and this came out.  I can
15      tell you that.
16            MR. RADOMISLI:  Fair enough.
17      Thank you.
18            MR. CALLAN:  Or it could be
19      another hospital in Queens, who knows.
20      Q.    This document was created by
21   Jamaica Hospital, correct?
22            MR. CALLAN:  Objection.
23      A.    Correct.
24      Q.    She already said yes.
25            MR. CALLAN:  Do you know if that
```

1                L. ALDANA-BERNIER
2         was created by Jamaica Hospital, do
3         you have personal knowledge of that?
4                THE WITNESS:  It says Unit 3
5         so....
6                MR. CALLAN:  I'm not asking you
7         what it says.
8                Do you have personal knowledge
9         as to whether that document was
10        created by Jamaica Hospital?
11               If you do, you can say yes, if
12        no, say no.  Don't assume is all I'm
13        saying to you.
14               Do you know?
15               MR. SUCKLE:  Stop badgering your
16        own witness.
17               THE WITNESS:  I was just looking
18        at the top of it.
19        Q.    Do you recognize this document?
20        A.    Which one?
21        Q.    This one, have you seen it
22   before?
23        A.    I have to -- I don't think so
24   because it's inpatient unit.
25               MR. SMITH:  You don't think so?

Page 257

1              L. ALDANA-BERNIER

2              THE WITNESS:  It's in the

3      inpatient unit.  I work in the ER.

4      Q.     You work in the ER; am I

5   correct?

6      A.     Yes.

7      Q.     You have been doing this for

8   how many years, how long have you been

9   working in the ER?

10     A.     Eighteen years.

11     Q.     For 18 years people come into

12  the psychiatric ER, right, you evaluate

13  them, correct?

14     A.     Yes.

15     Q.     And you sign them in under

16  Mental Hygiene Law, they go upstairs,

17  correct?

18     A.     Yes.

19     Q.     And you never see them again;

20  is that true?

21             MR. CALLAN:  Objection.

22     Q.     While they were at the

23  hospital?

24             MR. CALLAN:  Does that have to

25      do with the piece of paper?

1              L. ALDANA-BERNIER

2              MR. SUCKLE:  I'm asking

3      questions about the paper because you

4      didn't like the paper.

5      Q.    Is that true?  When they go

6  upstairs on the psychiatric ward, you

7  don't see them again, correct?

8      A.    That depends if you follow the

9  patient on the outside, then you see them

10  again.

11      Q.    When you say "follow the

12  patient on the outside," do you follow

13  patients on the outside?

14      A.    If they refer them to me, yes.

15      Q.    Who is they?

16      A.    The inpatient Unit 3.

17      Q.    So inpatient can refer a

18  patient to you for private care?

19      A.    Yes.

20      Q.    Do you do your own private

21  practice?

22      A.    Yes.

23      Q.    Do you have an office outside

24  of Jamaica Hospital?

25      A.    I do.

Page 259

1           L. ALDANA-BERNIER

2       Q.    In this private practice, you

3   practice psychiatry I assume, correct?

4       A.    What else would I practice?

5       Q.    I don't know.  I'm just making

6   sure.

7             How many days a week do you

8   work in that private practice?

9       A.    One.

10      Q.    How many days a week did you

11  work at Jamaica Hospital in 2009?

12      A.    Five.

13      Q.    And you also had private

14  practice back in 2009?

15      A.    That's -- yes, one, one day.

16      Q.    So just to be clear:  You were

17  working six days a week back in 2009,

18  correct, five at Jamaica, one on your

19  own?

20      A.    I work with somebody.

21      Q.    So you are working six days a

22  week, five at Jamaica Hospital and one in

23  private practice in 2009?

24      A.    Five days a week after I come

25  -- after five o'clock on Friday.

Page 260

1              L. ALDANA-BERNIER
2       Q.    So five o'clock on Fridays you
3   see private patients in your own
4   practice; is that what you're saying?
5       A.    Yes.
6       Q.    How many hours do you usually
7   do that?
8       A.    Four hours.
9       Q.    Could you get referrals from
10  time to time from patients up on the
11  psych 3 unit?
12      A.    Yes.
13      Q.    Who refers them to you:  the
14  physicians up there, the nurses, anybody
15  else?
16      A.    Social worker.
17      Q.    Social workers?
18      A.    Yes.
19            MR. CALLAN:  Counsel, does this
20        have anything remotely to do with Mr.
21        Schoolcraft?
22            MR. SUCKLE:  I don't know yet.
23            MR. CALLAN:  Has he told you he
24        was seeing Dr. Aldana-Bernier in her
25        office?

1          L. ALDANA-BERNIER

2              MR. SUCKLE:  Are you saying her

3          resumé is not part of my questions?

4              MR. CALLAN:  I'm just asking.

5          You have been going for hours here and

6          now we have gone down this road to

7          nowhere.  I would kind of like to get

8          it back.

9              This all has to do with you

10         handing her a piece of paper if they

11         can smoke in the inpatient unit or not

12         which I will be willing to stipulate

13         by the way that no smoking is allowed.

14             I think it is Rule No. 1

15         assuming that's Psych Unit 3 is

16         Jamaica Hospital.

17             MR. SUCKLE:  Are you enjoying

18         extending our stay here?

19         Q.    So did you see Mr. Schoolcraft

20    in your private practice?

21         A.    No.

22         Q.    Did you see police officers in

23    your private practice?

24         A.    No.

25         Q.    Did a Captain Lauterborn tell

Page 262

1              L. ALDANA-BERNIER

2    you that from his observation of Mr.

3    Schoolcraft as he observed Mr.

4    Schoolcraft on October 31st, 2009, that

5    Mr. Schoolcraft was fit for duty?

6              MR. SHAFFER:  Objection.

7         Q.    Did he tell you that?

8         A.    I did not meet him.

9         Q.    So am I correct that you got

10   the history of Mr. Schoolcraft

11   barricading him [sic] from some police

12   officers, but you didn't get the

13   histories from other police officers like

14   Captain Lauterborn; am I correct?

15             MR. CALLAN:  Objection to form.

16             MR. LEE:  Objection to form.

17             MR. RADOMISLI:  Objection to

18        form.

19        A.    I don't know the officer.  I

20   haven't met him.

21        Q.    Well, it was Mr. Schoolcraft's

22   captain.  Are you aware that Captain

23   Lauterborn was his captain?

24             MR. SHAFFER:  Objection.

25        A.    No.

Page 263

1            L. ALDANA-BERNIER

2       Q.    So you were not aware when you

3   signed the form on November 3rd, to admit

4   Mr. Schoolcraft to the hospital that his

5   captain said that he was fit for duty?

6            MR. CALLAN:  Objection.

7            MR. SHAFFER:  Objection.

8            MR. RADOMISLI:  Objection.

9       Q.    You did not know that?

10           MR. SHAFFER:  Objection.

11      A.    No, I didn't know that.

12      Q.    Would you like to have known

13  that information, would it have helped

14  you in your assessment of Mr.

15  Schoolcraft?

16           MR. SHAFFER:  Objection.

17           MR. CALLAN:  I join in the

18      objection.

19      Q.    Would you have liked to know,

20  would that have helped you in your

21  assessment of Mr. Schoolcraft?

22           MR. CALLAN:  If it's true.

23      A.    I didn't even know when he came

24  to the hospital, I didn't see any

25  officer.  I don't remember if I seen an

Page 264

1                L. ALDANA-BERNIER
2    officer at the time when I saw Mr.
3    Schoolcraft.
4                MR. CALLAN:  Doctor, he didn't
5        say he came to the hospital.  I know
6        it's getting late in the day.  He is
7        asking you to make an assumption about
8        something.  He asking you a question.
9        He didn't say this person came to the
10       hospital so just listen carefully to
11       the question.
12               Go ahead, Counsel.
13               MR. SUCKLE:  Read that back.
14               [The requested portion of the
15       record was read.]
16       Q.    My question is:  Would you have
17   liked to know, would it have helped you
18   in your assessment of Mr. Schoolcraft
19   that his captain said he was fit for duty
20   on October 31st, 2009?
21               MR. KRETZ:  Objection.
22               MR. CALLAN:  On October 31st?
23               MR. SUCKLE:  Yes.
24               MR. CALLAN:  Objection.
25       A.    Yes, I would.

```
 1            L. ALDANA-BERNIER
 2      Q.    Would that have changed your
 3  opinion regarding whether or not Mr.
 4  Schoolcraft needed to be admitted to the
 5  hospital if you had known that Captain
 6  Lauterborn had said that Mr. Schoolcraft
 7  was fit for duty on October 31st, 2009?
 8            MR. RADOMISLI:  Can you just
 9        define when he said that?
10            MR. SUCKLE:  On that day,
11        October 31st, 2009.
12            MR. RADOMISLI:  Before Mr.
13        Schoolcraft left?
14            MR. SUCKLE:  I just want to ask
15        the question.  You can narrow it down
16        anyway you want when your turn comes.
17            Let's have a question and an
18        answer.
19            MR. RADOMISLI:  I would like a
20        time frame.
21            MR. SUCKLE:  I know what you
22        want.  I asked a question.
23            MR. RADOMISLI:  Objection to
24        form.
25            MR. SHAFFER:  I join in the
```

Page 266

1            L. ALDANA-BERNIER

2       objection.

3       Q.    Would you have changed your

4   opinion had you known on October 31st,

5   2009, at 21:30 hours, Captain Lauterborn

6   said that Mr. Schoolcraft was fit for

7   duty, would that have changed your

8   opinion?

9            MR. KRETZ:  Objection.

10           MR. CALLAN:  Objection.

11           MR. SHAFFER:  Objection.

12      Q.    Would you have admitted him is

13  the question?

14      A.    Yes, I would have admitted him.

15      Q.    How would it have changed your

16  opinion.  You said it would change your

17  opinion?

18           MR. CALLAN:  You asked if she

19      would have liked to have known.

20           MR. SUCKLE:  I did ask her.

21      Q.    Would it change your opinion if

22  you knew that Captain Lauterborn on

23  October 31st, 2009, at 21:30 hours,

24  deemed Mr. Schoolcraft fit for duty?

25      A.    It would not change my opinion.

Page 267

```
 1              L. ALDANA-BERNIER
 2    I would talk to maybe the captain, and I
 3    will tell him what is going on, and I
 4    will make a decision together again with
 5    the chairman if he should be admitted or
 6    discharged.
 7         Q.   And you would talk to the
 8    captain because you want to verify that
 9    information, correct?
10              MR. KRETZ:  Objection.
11              MR. CALLAN:  Same objection.
12         Q.   Is that why you would have
13    talked to the captain?
14              MR. CALLAN:  Verify what
15         information, what information,
16         Counsel?
17              MR. SUCKLE:  She said she would
18         talk to the captain.
19         Q.   Why would you have talked to
20    the captain?
21         A.   To verify that he said he was
22    fit for duty.
23         Q.   Did you speak to any officers
24    to verify that he had barricaded himself
25    in his house?
```

Page 268

1          L. ALDANA-BERNIER

2               MR. SHAFFER:  Objection.

3     A.    I get it from the information

4  in the report.

5     Q.    Did you speak to any police

6  officer to verify he was acting bizarre?

7               MR. SHAFFER:  Objection.

8               MR. CALLAN:  Asked and answered.

9     Q.    Did you speak to any officers?

10    A.    It's been reported and written

11  down in the document.

12               MR. KRETZ:  Read that back.

13               [The requested portion of the

14       record was read.]

15    Q.    Seroquel, do you know what that

16  is?

17    A.    Yes.

18    Q.    What is it?

19    A.    A second generation

20  antipsychotic.

21    Q.    Is that also used for sleep

22  disorders?

23    A.    Sleep, depression, bipolar,

24  used for psychosis.

25               MR. SMITH:  We are going to take

Page 269

```
 1            L. ALDANA-BERNIER
 2      a short break to see what we have
 3      left.
 4            It's 5:24.  We are going off the
 5      record.
 6            MR. CALLAN:  All right.
 7            [Discussion held off the
 8      record.]
 9            [Whereupon, at 5:24 p.m., a
10      recess was taken.]
11            [Whereupon, at 5:38 p.m., the
12      testimony continued.]
13            MR. SMITH:  Back on the record.
14      It is 5:38 p.m.
15            MR. RADOMISLI:  Just before you
16      start asking questions, I sent an
17      email to my associate at the office
18      asking him to do a search in our
19      system to determine if we ever
20      provided with you document Psych 3
21      Unit Rules, according to his search,
22      there is nothing on our system
23      indicating we ever did.
24            I ask you send us by within a
25      week an explanation how you obtained
```

Page 270

```
 1                  L. ALDANA-BERNIER
 2        this document.  I'm not saying we
 3        didn't give it to you, all I'm saying
 4        is according to my associate based on
 5        his search, there is no indication we
 6        did.
 7               MR. SUCKLE:  I will double-check
 8        my records, but I'm fairly confident
 9        that it came from you.
10               MR. CALLAN:  It didn't come from
11        me.  I can tell you that.
12               MR. SUCKLE:  Maybe the house
13        painter gave it.
14        Q.    Doctor, I know it's late.  We
15   are getting there.
16               Doctor, in your position as
17   employee of the hospital, do you get a
18   performance evaluation, do you get
19   evaluated in your performance?
20        A.    Yes.
21        Q.    Is that something done
22   annually, some other way?
23        A.    Annually.
24        Q.    Are they written evaluations?
25        A.    Are they written, yes.
```

Page 271

1              L. ALDANA-BERNIER

2       Q.     And in their evaluations,

3   without discussing at this point what the

4   evaluations were, can you tell me what

5   some of items are that are considered in

6   your evaluation?

7       A.     I don't have a copy so it's

8   hard for me to say.  We talk about

9   performance.  We talk about ability to

10  relate with other staff.  We talk about

11  clinical judgment.  We talk about if we

12  have this sense of cooperativeness with

13  the department.  We also talk about our

14  knowledge of medicine or psychiatry.

15  That's all I can remember.

16      Q.     In your evaluation has any of

17  your evaluations criticized your clinical

18  judgment?

19          MR. RADOMISLI:   Objection based

20      on the --

21          MR. CALLAN:   Yeah, objection.

22          MR. RADOMISLI:   -- and based on

23      Education Law 6527.

24          MR. CALLAN:   I join in the

25      objection, and you're directed not to

Page 272

1          L. ALDANA-BERNIER

2     answer that question.

3     Q.    When you talk about

4  performance, is there any relationship

5  between performance and the number of

6  patients seen in your evaluation?

7          MR. CALLAN:  Objection to the

8     question.

9          MR. SUCKLE:  Just generally not

10     only her.

11     Q.    Generally, is part of your

12  performance evaluation based on the

13  number of patients seen?

14          MR. RADOMISLI:  Objection based

15     on privilege, but I can't direct her

16     not to answer.

17          MR. SUCKLE:  I don't think

18     that's privileged.  She just gave me

19     generally categories of evaluations.

20          MR. RADOMISLI:  You're asking

21     her?

22          MR. SUCKLE:  I'm asking

23     generally.

24          MR. LEE:  Objection.

25     Q.    Generally, in the category of

Page 273

1              L. ALDANA-BERNIER

2  performance, does that include number of

3  patients seen?

4        A.    No.

5        Q.    Do you know how many patients

6  you saw last year at Jamaica Hospital?

7        A.    I would not remember that.

8        Q.    Is there a way that you can

9  ascertain that kind of information?

10       A.    I have to go to the financial

11 department and see how many patients I

12 have seen.  I don't know.

13       Q.    That would be the same for

14 patients that you saw in 2009?

15             MR. CALLAN:  You mean did she

16     see the exact number of patients?

17       Q.    In order to find out how many

18 you saw, you would have to go to the

19 financial department?

20       A.    Financial department because

21 they have to do the billing.  I don't

22 bill.

23       Q.    So in order to find out how

24 many patients you saw if you wanted, you

25 would have to go to the billing or

1              L. ALDANA-BERNIER

2     financial department, correct?

3              MR. CALLAN:  Do you know if they

4         can isolate it by doctor name or are

5         you assuming?

6              THE WITNESS:  I do not know how.

7              MR. CALLAN:  Just tell him that.

8              MR. SMITH:  Let her speak.

9         Don't interrupt.  Let her answer the

10        question for God's sake.

11             MR. CALLAN:  Do you know for a

12        fact if they have the software or

13        computer program to isolate it by

14        doctor per patient, do you know that?

15             THE WITNESS:  No, I don't.

16        Q.    Doctor, does Jamaica Hospital

17    have a billing department?

18        A.    They do.

19        Q.    When you see a patient, are you

20    required to fill out any paperwork so

21    that the patient's insurance company will

22    be billed if there is an insurance

23    company?

24        A.    I'm not the one that do the

25    billing.

1              L. ALDANA-BERNIER

2       Q.    Do you fill out any forms or

3   documents that go to billing so they can

4   bill the patient for your services?

5       A.    Yes, I fill out a form.

6       Q.    What is the nature of that

7   form, what is it?

8       A.    It's a form that I sign that I

9   saw the patient.

10      Q.    Do patients who come in with

11  private insurance, do they get admitted,

12  do you need approval from time to time

13  from private insurance before they get

14  admitted; just generally we're talking

15  about?

16      A.    Let me see.

17      Q.    I'm talking generally.

18      A.    Yes.

19      Q.    Not Mr. Schoolcraft.

20      A.    Yes.

21      Q.    What about for Medicare, do

22  they need approval before a patient is

23  admitted?

24      A.    That depends if it's an HMO.

25      Q.    So some HMOs require approval

Page 276

1              L. ALDANA-BERNIER

2    and some aren't HMOs.

3              And does the federal government

4    require prior approval on their Medicare?

5         A.    If they are not HMOs, you don't

6    to ask for authorization.

7         Q.    How about Medicaid, is prior

8    approval required before admission?

9         A.    No.

10         Q.    Just as a housekeeping thing:

11    Are you paid for your overtime hours?

12         A.    No.

13         Q.    You have actually in front of

14    you, you know at some point IAB, internal

15    affairs from the New York City Police

16    Department did come to the hospital based

17    on the records in front of you, correct?

18              MR. CALLAN:   Is that a question,

19         does she know that?

20              MR. SUCKLE:   Yes.

21         Q.    Based on the record in front of

22    you?

23         A.    Yes, I know there is a note.

24         Q.    What is the date of that note?

25         A.    That's 11/2/2009, five o'clock

Page 277

1              L. ALDANA-BERNIER

2    in the afternoon.

3        Q.    So that note was in the chart

4    before you signed your November 3rd,

5    mental hygiene admission form, correct?

6        A.    That's correct.

7        Q.    So you know that internal

8    affairs had come to the hospital before

9    you decided to admit Mr. Schoolcraft to

10   the hospital?

11            MR. CALLAN:  Objection.  She

12       testified earlier she made the

13       decision to admit him on the 2nd not

14       on the 3rd.  She filled out the form

15       on the 3rd.  You're mischaracterizing

16       testimony.

17       Q.    Before you filled out the form

18   to admit Mr. Schoolcraft under the Mental

19   Hygiene Law, you knew that IAB had come

20   to the hospital, correct?

21            MR. SHAFFER:  Objection.

22       A.    The notes are here from 11/2.

23       Q.    So the answer is yes, you knew

24   that IAB had come to the hospital before

25   you signed the admission forms on 11/3,

Page 278

1              L. ALDANA-BERNIER

2    correct?

3         A.    I must have read the notes.

4              MR. SMITH:  What was the answer?

5              THE WITNESS:  I must have read

6         the note.

7         Q.    Did you speak to the officer

8    from IAB and ask them whether or not Mr.

9    Schoolcraft had told them the story about

10   the problem with his supervisor that Mr.

11   Schoolcraft told to you?

12             MR. SHAFFER:  Objection.

13        A.    It was at five o'clock.  I was

14   not there.  It was at 9:30.  I'm not

15   there anymore [indicating].

16        Q.    In fact one of the officers

17   from IAB stapled -- gave his card and it

18   was taped to the chart, correct?

19             MR. CALLAN:  She said she wasn't

20        there when they were there.

21        Q.    The chart you have in front of

22   you, correct?

23        A.    Yes.

24        Q.    Yes.  And when you went to sign

25   your admission under the Mental Hygiene

Page 279

```
 1              L. ALDANA-BERNIER
 2   Law on November 3rd, that card was in the
 3   chart, correct?
 4              MR. CALLAN:  How do we know when
 5         the card was stapled in?
 6              MR. SUCKLE:  Let her answer.  If
 7         she doesn't know, she'll tell me.
 8              MR. CALLAN:  You're making these
 9         things up in your question.
10              MR. SUCKLE:  I'm making up
11         nothing.  I'm --
12              MR. CALLAN:  You are.  You said
13         the IAB officer stapled the card into
14         the card.
15              MR. SUCKLE:  I didn't say that.
16              MR. CALLAN:  Who stabled that
17         in?
18              MR. SUCKLE:  Nobody, it's taped.
19      Q.    Can we have an answer to the
20   question, please?
21      A.    I don't remember.  I do not
22   remember seeing this card.
23      Q.    If that card was in the chart,
24   would you have called that officer from
25   internal affairs to verify Mr.
```

Page 280

1              L. ALDANA-BERNIER
2    Schoolcraft's story?
3              MR. CALLAN:  Objection.
4              MR. SHAFFER:  Objection.
5              MR. SMITH:  What was the answer?
6              THE REPORTER:  I didn't get an
7         answer yet.
8         Q.    What's your answer.
9         A.    I wouldn't know because I don't
10   know if I saw the card or not.
11        Q.    Had you seen the card before
12   you signed the mental hygiene admission
13   on the 3rd, would you have called
14   internal affairs?
15        A.    I did not see these cards
16   before so I don't know if I would have
17   called internal affairs.
18        Q.    So now you are saying you know
19   you did not see the cards?
20        A.    I do not know if I saw these
21   cards.  I don't remember seeing them.
22        Q.    And you don't remember if you
23   would have called internal affairs?
24        A.    I didn't see the card.
25        Q.    You know you did not see the

Page 281

1              L. ALDANA-BERNIER
2    cards?
3         A.    I do not know.  I do not
4    remember.  It was that 2009.
5         Q.    So the answer is, am I correct,
6    you don't know if you saw the cards and
7    you don't know what you would have done
8    if you did see the cards, am I correct,
9    is that the answer?
10              MR. CALLAN:  Objection.
11        Q.    You can answer.
12        A.    I do not know if I would have
13   called them.
14        Q.    Looking at the note of November
15   2nd, 2009, at 9:30, do you see that note?
16        A.    P.m.?
17        Q.    Yes.
18              Do you see that note?
19        A.    Yes.
20        Q.    And that is before your
21   November 3rd, 1:20 note where you signed
22   the form, the mental hygiene admission,
23   correct?
24        A.    Yes.
25        Q.    And did you read the chart

Page 282

1              L. ALDANA-BERNIER

2   where it says, "Patient has been seen and

3   interviewed by Detective Steven P. Wacter

4   [phonetic] and Sergeant Scott from

5   Internal Affairs Bureau"?

6        A.    Yes.

7        Q.    Would you want to know what

8   internal affairs had to see about Mr.

9   Schoolcraft in coming to your opinion

10   regarding whether or not he needed to be

11   admitted to the hospital?

12            MR. SHAFFER:   Objection.

13        A.    I was wondering why the

14   attending put this note and did not write

15   any note about what interaction happened

16   with internal affairs.

17        Q.    When you say you were wondering

18   about it --

19        A.    There's nothing.

20        Q.    When were you wondering about

21   it?

22        A.    Now.

23        Q.    Why were you wondering about

24   it?

25        A.    Should have written a note.

Page 283

1              L. ALDANA-BERNIER

2      Q.     When you say "should have

3  written a note," what should he have

4  written about?

5      A.     His interaction with internal

6  affairs.

7      Q.     Would that have been helpful to

8  you in your care and treatment with Mr.

9  Schoolcraft?

10      A.     In deciding to admit him or

11  not?

12      Q.     Yes.

13      A.     I already made my decision

14  before that.  On 11/1 I made the decision

15  of admission.

16      Q.     Was your decision irreversible

17  once you made it?

18      A.     I think that he would benefit

19  from inpatient admission.

20      Q.     When you say "he would

21  benefit," what do you mean?

22      A.     I thought at the time in 2009

23  that he would be a danger to himself or

24  others.

25      Q.     The question was:  Would the

Page 284

1           L. ALDANA-BERNIER
2    notes that you think would have been
3    helpful in coming to your decision as to
4    whether or not Mr. Schoolcraft needed to
5    be admitted?
6              MR. RADOMISLI:  Objection to
7         form.
8              MR. CALLAN:  How would she know?
9              MR. SUCKLE:  She was the one
10        that said something should have been
11        there.
12             MR. CALLAN:  You are the one
13        talking about cards stapled into a
14        chart.
15             MR. SUCKLE:  The record is what
16        the record is.  You are just playing
17        games now.
18             MR. CALLAN:  It's nonsense.
19             MR. SUCKLE:  It's nonsense?
20             MR. CALLAN:  Right.
21             MR. SUCKLE:  A doctor has a note
22        in front of her and she signs a day
23        later, you think it's nonsense.
24             MR. CALLAN:  It is.
25             MR. SUCKLE:  Let's go.

Page 285

1              L. ALDANA-BERNIER

2              MR. CALLAN:  She's got one note

3      in the chart, it's only taken us six

4      hours to question her so....

5              MR. SUCKLE:  Maybe we should

6      have taken six hours to evaluate the

7      patient.

8      Q.    The notes you said should have

9  been there, would that have been helpful

10  to you in your decision to admit Mr.

11  Schoolcraft?

12              MR. SHAFFER:  Objection to form.

13              MR. CALLAN:  Objection to form.

14              MR. SUCKLE:  It hasn't been

15      answered.

16              MR. RADOMISLI:  It has actually.

17              MR. CALLAN:  Asked and answered,

18      Counsel.

19              There is nothing in the note

20      except that IAB was there.

21              MR. SUCKLE:  The note she said

22      should have been there.

23              MR. CALLAN:  She is supposed to

24      make up a note now and answer a

25      hypothetical?

Page 286

1              L. ALDANA-BERNIER

2              MR. SUCKLE:  She said a note

3        should be there.  I'm asking about the

4        note that should have been there.

5        A.     Not my note.

6        Q.     I understand.

7              The note that should have been

8        there, would they have mattered in your

9        decision to admit Mr. Schoolcraft?

10             MR. SHAFFER:  Objection to form.

11             MR. RADOMISLI:  Objection to

12        form, asked and answered.

13             MR. SUCKLE:  I didn't get an

14        answer.  I've asked it.

15             MR. SHAFFER:  It's impossible to

16        answer the question.  The information

17        doesn't exist.  It's impossible to

18        answer.

19             Let's stop playing games and

20        move this along.  You cannot answer a

21        question about something that does not

22        exist.

23        Q.     Please answer the question?

24             MR. CALLAN:  Can you answer the

25        question, Doctor?

Page 287

1              L. ALDANA-BERNIER

2      A.    I already made my decision.  I

3  cannot answer the question.

4      Q.    Once your made your decision?

5      A.    The patient needed admission.

6  I felt that at that point on 11/1 that

7  the patient needed inpatient

8  stabilization.

9      Q.    So just so we are clear here:

10  No information from IAB would have

11  changed your mind, correct, from internal

12  affairs?

13            MR. KRETZ:  Objection.

14            MR. CALLAN:  Same objection.

15      A.    Then I would have to make the

16  chairman make the decision.

17      Q.    So if IAB had information, you

18  would want the chairman to make the

19  decision?

20            MR. CALLAN:  Objection.  This is

21       ridiculous.

22            MR. SMITH:  Would you stop.

23       Would you please stop.  I'm sick and

24       tired of you interrupting this

25       examination.  You've been doing this

1    L. ALDANA-BERNIER

2    all day.

3         MR. CALLAN:  Are you involved in

4    this?

5         MR. SMITH:  Yes, heavily and

6    you're going to become more involved

7    in this with this kind of

8    irresponsible behavior.

9         MR. CALLAN:  There is one

10   attorney designated to represent the

11   Plaintiff.  It's not you today.  You

12   are just running the home movie

13   camera.

14        MR. SMITH:  Would you please

15   stop interfering?

16        MR. SUCKLE:  Excuse me.  No

17   matter how much you pontificate, we

18   are not going home until we are done.

19        I'm going to keep asking until I

20   get an answer.  I'm going to keep

21   asking.

22        MR. CALLAN:  Try to ask a

23   relevant question.

24        MR. SUCKLE:  I haven't been able

25   to all day, that's why we're here.

1              L. ALDANA-BERNIER

2        I'm trying.

3              MR. CALLAN:  Work harder at it.

4              MR. SUCKLE:  Maybe you'll teach

5        me one day.

6        A.     What do the think internal

7    affairs would tell me?

8              MR. CALLAN:  Doctor, you have to

9        wait for the question.

10       Q.     There was nothing internal

11   affairs could have told you to change

12   your mind, you already made your decision

13   and whatever internal affairs had to say,

14   you were not going to change your mind,

15   correct?

16       A.     Is internal affairs reliable?

17       Q.     That's a good questions.  Can

18   you answer my question?

19       A.     So I have to determine how

20   reliable internal affairs is.

21       Q.     How do you determine whether or

22   not internal affairs is reliable?

23       A.     Because I have to assess them

24   too.

25       Q.     In assessing them, how would

Page 290

1              L. ALDANA-BERNIER

2    you do that?

3         A.    Collaborate what I have seen

4    and what they tell me.

5         Q.    So you would need to hear what

6    internal affairs has to say and evaluate

7    whether or not you can believe them or

8    not, correct?

9         A.    Yes.

10        Q.    Did you evaluate the police

11   officer who reported that Mr. Schoolcraft

12   had barricaded himself in his house, did

13   you evaluate that person?

14             MR. SHAFFER:  Objection.

15        A.    He wasn't there.  I didn't see

16   him.

17        Q.    So but you accepted his

18   information as part of the basis of your

19   diagnosis, correct?

20        A.    And the documentation.

21        Q.    Documentation somebody else

22   wrote in a chart, correct?

23        A.    That I saw Mr. Schoolcraft and

24   I agreed to whatever the documentation of

25   the resident was.

1           L.  ALDANA-BERNIER

2      Q.     When you saw Mr. Schoolcraft,

3  you agreed he had barricaded himself in

4  his house?

5      A.     That is the information given.

6      Q.     Written in the chart?

7      A.     Information given in the chart.

8      Q.     By some police officer or

9  sergeant from the police department,

10  correct?

11      A.     Hold on.  Also have the

12  documentation from the EMS.

13      Q.     Did you speak to EMS?

14      A.     Documentation is here.

15      Q.     Documentation meaning a note?

16      A.     Yes.

17      Q.     So EMS writes a note and you

18  accept what they say because it's written

19  in the chart, correct?

20      A.     They were there.  They went to

21  pick up the patient.

22      Q.     But you are not sure if you

23  would trust internal affairs; am I

24  correct?

25      A.     That's a big question.

```
 1              L. ALDANA-BERNIER
 2       Q.    Do you have the duty as a
 3  physician in accordance with good and
 4  accepted medical practice to conduct your
 5  own evaluation of a patient?
 6       A.    I do.
 7       Q.    Do you as a physician have in
 8  accordance with good and accepted medical
 9  practice have to do a complete evaluation
10  of your patients?
11       A.    I agree with the evaluation of
12  the resident.  I saw the patient.  I
13  agree whatever evaluation of resident was
14  and that's it.  I have written in my
15  notes --
16       Q.    I understand.
17             My question is not quite that.
18             Do you have a duty, does good
19  and accepted medical practice require you
20  to do a complete evaluation of your
21  patients; that's the question?
22       A.    I'm in agreement with the
23  resident.
24       Q.    Yes or no, do you have a duty
25  within the bounds of good and accepted
```

1            L. ALDANA-BERNIER
2    medical practice to do a complete
3    evaluation of your patient?
4              MR. CALLAN:  Objection to form.
5              MR. LEE:  Objection.
6       Q.    Does good and accepted medical
7    practice require you to do a complete
8    evaluation of your patient?
9       A.    I did evaluation.  I'm in
10   agreement with the resident.
11             MR. CALLAN:  Objection.
12      Q.    You can't answer that question?
13      A.    I consider that in agreement
14   with my resident.
15      Q.    I'm not talking about conduct
16   here.  I'm talking about a standard of
17   practice.  The standard of practice is
18   what we are talking about now.
19             The question is:  Does good and
20   accepted medical practice require you to
21   do a complete evaluation; that's the
22   question?
23             MR. KRETZ:  Objection.
24      A.    I mention to you I did an
25   evaluation and I agree with whatever

1          L. ALDANA-BERNIER

2    evaluation of the resident.

3        Q.    I understand what you think you

4    did in Mr. Schoolcraft's situation.

5            I'm asking as a standard as a

6    physician what the standards are.

7            My question is:  Does good and

8    accepted medical practice require you to

9    do a complete evaluation of all of your

10   patients?

11       A.    Okay.  If you are saying in

12   general if we agree with the evaluation

13   of the residents, we usually say I agree

14   with the above evaluation of the patient.

15           Yes, we evaluate the patient.

16   If we agree with the assessment whatever

17   the residents say, that's what we

18   document.

19       Q.    Do you not understand my

20   question?

21       A.    I understand your question.

22       Q.    But you are just refusing to

23   answer?

24           MR. CALLAN:  Next question.

25       Move on.

1           L. ALDANA-BERNIER

2      Q.    Doctor, does good and accepted

3  medical practice require you to do an

4  independent evaluation of your patient?

5           MR. CALLAN:  We have been down

6       that road, Counsel.  She did an

7       independent.  She read --

8           MR. SUCKLE:  I'm asking about

9       standard in the field.  Maybe I

10      learned it, somewhere I must have

11      stumbled in somewhere about the

12      standard so I'm going to ask.  I might

13      be right.

14      Q.    Doctor, does good and accepted

15  medical practice require you to do an

16  independent evaluation of all of your

17  patients?

18      A.    I already answered you.  I said

19  I assessed the patient.  And if the

20  resident assessed also the patient, I

21  will say that I agree with the assessment

22  of the patient.

23      Q.    Do you know what good and

24  accepted medical practice means?

25      A.    I said I did assess the

Page 296

1            L. ALDANA-BERNIER

2   patient.

3        Q.    Do you know what medical

4   standards are, standards of practice, do

5   you understand that?

6        A.    But you --

7        Q.    I'm talking about general

8   standards of practice.  Do you

9   understand?

10       A.    Yes, I'm saying --

11       Q.    I'm not talking about what you

12   did with Mr. Schoolcraft.

13       A.    I'm not referring only to Mr.

14   Schoolcraft.

15       Q.    The question is:  Do you have,

16   a simple yes or no, does good and

17   accepted medical practice require you to

18   do your own independent evaluation of an

19   a patient?

20            MR. CALLAN:  Objection to the

21       form.

22       Q.    If it's no you can tell me no.

23            MR. CALLAN:  What do you mean,

24       your own independent evaluation as

25       opposed to speaking to a resident, as

Page 297

1          L. ALDANA-BERNIER
2      opposed to calling people?
3              MR. SUCKLE:  Yes.
4              MR. CALLAN:  Then ask it that
5      way.
6              MR. SUCKLE:  It's pretty clear.
7              MR. CALLAN:  They way you're
8      asking it is totally unclear.
9              MR. SUCKLE:  It's one of those
10     things I have to learn from you again.
11     Thanks for teaching me.
12     Q.    Can you please answer my
13  question, Doctor?  We are going to be
14  here all night if you don't answer these
15  few questions.
16             MR. CALLAN:  I can assure we are
17     not going to be here all night.  We're
18     getting very close to you being
19     abusive.
20     Q.    I'm entitled to be here.  We
21  will bring you back to answer this last
22  few series of questions which go to
23  standard of care.
24             MR. CALLAN:  Sure you will.
25             MR. SUCKLE:  I absolutely will

1            L. ALDANA-BERNIER

2       bring her back if she can't answer

3       standard of care questions.  I will.

4       You might want to ask her to answer

5       the questions.  I will bring her back

6       if she doesn't answer standard of care

7       questions.

8            MR. RADOMISLI:  Off the record.

9            MR. SMITH:  Off the record at

10      6:05 p.m.

11           [Discussion held off the

12      record.]

13           [Whereupon, at 6:05 p.m., a

14      recess was taken.]

15           [Whereupon, at 6:06 p.m., the

16      testimony continued.]

17           [Discussion held off the

18      record.]

19           MR. SMITH:  Back on the record

20      at 6:06.

21      Q.    Doctor, I'm not talking about

22  what you documented or didn't document.

23  I'm just talking about standard of care

24  as a physician.

25           The question is:  Does good and

Page 299

1          L. ALDANA-BERNIER

2    accepted medical practice require you to

3    do your own independent evaluation

4    regardless of how you document that

5    evaluation?

6              MR. CALLAN:  Objection to the

7         form of the question.

8              You can answer.

9       A.    When a resident sees the

10   patient, after the resident sees the

11   patient, I do go see the patient.  If I

12   can agree with the documentation, then I

13   write I agree with the documentation.

14      Q.    I understand your procedure.

15   Thank for telling me your procedure.

16             Does good and accepted medical

17   practice require you, forget what you do,

18   does it require you to do your own

19   independent evaluation?  That's a simple,

20   straightforward question, not about what

21   other people do, about what you do.

22      A.    I have to see every patient,

23   yes.

24             MR. SMITH:  What was the answer.

25             [The requested portion of the

1          L. ALDANA-BERNIER

2      record was read.]

3      Q.    And make your own independent

4   evaluation, correct?

5      A.    Yes.

6          MR. SHAFFER:  Is that a yes?

7          MR. CALLAN:   It's a yes.

8      Q.    Doctor, have you ever been

9   involved in any other lawsuits besides

10  this one?

11     A.    Yes.

12     Q.    The answer was yes?

13     A.    Yes.

14     Q.    When you say yes, how many?

15     A.    Two that I know of.

16     Q.    When you say that you know of,

17  why do you answer that way?

18     A.    That's what I know.

19     Q.    Do you keep open there is a

20  possibility that there are lawsuits that

21  you don't know about?

22     A.    That's what I know.  You are

23  asking me.

24     Q.    Do you know the names of those

25  people that are suing you?