1    C. LAMSTEIN-REISS, M.D.
2    believe you're 2899 and 282, Mr. Smith?
3          MR. SMITH:  I'm actually
4    referring to 2901, with the ledger and
5    pager.
6          MS. PUBLICKER METTHAM:  It is
7    D282, it is but 2901.
8    Q.     So is there a rather long entry
9    for 10/31 in your file, Doctor?
10   A.     I don't know what you consider
11   rather long, but it's --
12   Q.     Four pages?
13   A.     One, two, three, four and a
14   third, yes.
15   Q.     All right, can you just read
16   that into the record.
17   A.     Sure.  Pager duties regarding
18   P.O. Adrian Schoolcraft, 10/31/09, on left
19   of the page I noted that I was on at 17:40
20   hours.  Page number 455 refers to the sick
21   desk log of my being put on duty.  I noted
22   below that that I was off duty at 21:40
23   hours.  Back to the main text in the body.
24   10/31/09.  Telephone contact with sick desk
25   Sergeant Kloos.

Page 326

1  C. LAMSTEIN-REISS, M.D.
2  MS. PUBLICKER METTHAM:
3  K-l-o-o-s.
4  A.    Yes. I believe that's the
5  spelling. It's possible I'm wrong about the
6  spelling. MOS was at work today. He
7  slammed sick report on the sergeant's desk
8  and said he was going out sick. Sergeant
9  told him to stick around. He refused and
10 left. Didn't follow procedure. Typically,
11 they called sick desk and get authorization
12 and wait for command to arrange coverage.
13 MOS was working on the telephone
14 switchboard. MOS did not go straight home.
15 Cops are at his home waiting for his
16 arrival. They called MOS on his cell phone.
17 They think he picked up and then hung up.
18 Since then no answer. They are thinking of
19 suspending him, but they suspect it is more
20 of psych problem. XO of MOS's command, the
21 81 Precinct, is Captain Lauterborn and
22 requests response from PES and I signed my
23 name.
24     Q.    The is information that you
25 received from Sergeant Kloos from the sick

C. LAMSTEIN-REISS, M.D.

1
2  desk?
3      A.      Correct.
4      Q.      All right, please continue.
5      A.      It will be more clear as I'm
6  reading through the notes, but it's possible
7  that the part about possibly not suspending
8  him because they thought it might be more of
9  a psych problem, that may have come
10 secondhand through Sergeant Kloos.  If it
11 came directly, it would be the rest the
12 notes.
13              Telephone contact with Captain
14 Lauterborn.  MOS doing a 7 to 3 day tour
15 today at TS all day, meaning telephone
16 switchboard all day.  All was fine.  He
17 typically keeps to self and doesn't converse
18 much with other officer and did same today.
19 Nothing seemed out of ordinary.  2:00 p.m.,
20 he went down to locker room, changed and
21 then put a sick report on sergeant's desk
22 and said going sick.  He wrote that he had
23 stomach pain.  Sergeant tried to stop him,
24 but he left anyway.  Underlying issues.  MOS
25 has made allegations against others.

Page 328

1        C. LAMSTEIN-REISS, M.D.
2    Department's investigation of these
3    allegations picked up this week and it
4    snowballed from there.  This week about four
5    P.O.'s and two civilian people were called
6    down for questioning.  MOS goes up to them
7    and asked about it.  Notifications are in
8    telephone message log, so he knows who is
9    going.  When they return, he tries to
10   intercept them and get information from them
11   about what he was asked -- about -- it
12   should have been what they were asked.  Or
13   that thought the person was a he.  Anyway,
14   that's what it says what he was asked.
15   Today was first tour back after RDOs.  Not
16   sure what happened today that triggered him
17   to leave like that.
18             Delegates, peers, sergeants and
19   Captain Lauterborn all left him messages and
20   asked him to go back to command.  A
21   lieutenant is at him home.  His car is
22   there.  Landlord said MOS may have been
23   there earlier.  Can usually hear MOS's
24   footsteps when home.  MOS not home.
25             Next entry, I left a message on

```
 1              C. LAMSTEIN-REISS, M.D.
 2   MOS's cell phone.  I gave my cell number and
 3   Captain Lauterborn's cell phone.  I told him
 4   that the Captain said he could just return
 5   to his home if didn't want to go to the
 6   command.  I urged him to go home or call his
 7   captain, so this could be resolved quickly
 8   and easily without need for a city-wide
 9   mobilization to search for him or
10   disciplinary action, like suspension.  Much
11   easier to just resolve it quickly and easily
12   now.  I explained that everyone is just
13   concerned for his safety and they want to
14   make sure everyone is okay.
15              Next entry, telephone contact
16   with Captain Lauterborn.  I informed captain
17   that I left message on MOS's cell phone as
18   described above.  I suggested that captain
19   call MOS's father because that's the person
20   he is closest to and the person who is most
21   likely to know his whereabouts.  Captain
22   will call undersigned when locates or hears
23   from MOS, signed my name.
24              Next entry at 20:15 hours.
25   Telephone contact with Captain Lauterborn.
```

```
                                              Page 330
 1              C. LAMSTEIN-REISS, M.D.
 2    Still no word from MOS. Captain called MOS's
 3    father, who also hadn't heard from him.
 4    Father, quote, had some issues, end quote,
 5    over the phone -- over phone, but eventually
 6    understood captain's point of view and
 7    confirmed.  Hoping father will call MOS and
 8    encourage him to go home.  Captain will go
 9    to MOS's home.  It's possible he's home, but
10    not answering phone.  I asked if the
11    landlord has a spare key.  He said yes and
12    captain has it, but legal issues with using.
13    Have to have cause.  Hoping to avoid going
14    that route.
15         Q.     What were those legal issues?
16         A.     I didn't ask.  I don't know.
17                MS. PUBLICKER METTHAM:
18    Objection.
19         Q.     All right, go ahead?
20         A.     And I signed my name.  20:40
21    hours the next entry -- I'm sorry 21:40
22    hours is the next entry.  Telephone contact
23    with Sergeant Kloos.  Sick desk off duty
24    since not known when MOS might be located
25    and I signed my name.
```

1            C. LAMSTEIN-REISS, M.D.

2         Then next page on the top
3  regarding Adrian Schoolcraft addendum to
4  10/31/09 note of telephone contact with
5  Captain Lauterborn at approximately 17:50
6  hours. Delayed entry made on 10/14/10. In
7  reviewing folder, the below information was
8  found to not be documented in prior note,
9  but is clear in undersigned's memory.
10 Captain Lauterborn asked if MOS was suicidal
11 or depressed because he needed to know how
12 concerned they should be about MOS's safety
13 given his going AWOL. Not answering phone
14 calls, not answering door of home, but his
15 car was there, et cetera.
16     Q.    Can I stop you right there.
17 When did you make this entry?
18     A.    October 14, 2010.
19     Q.    October what?
20     A.    14, 2010.
21     Q.    Can I see the original that
22 you're reading from?
23     A.    Sure.
24     Q.    How do you know that you made
25 this entry on October 24, 2010?

```
 1              C. LAMSTEIN-REISS, M.D.
 2              MS. PUBLICKER METTHAM:
 3      Objection.  She said October 14th.
 4              MR. SMITH:  No, I'm sorry you're
 5      right.  The 14th.
 6      A.      Because that's what I wrote.
 7   It's there on the page.
 8              MS. PUBLICKER METTHAM:  She also
 9      read it out loud.
10      Q.      And what you read out loud was
11   the words delayed entry made on 10/14/10?
12      A.      Correct, that's what that means.
13      Q.      Why did you make a delayed entry
14   in the file?
15      A.      In reviewing the file I realized
16   that my initial notes of my telephone
17   contact with Captain Lauterborn were focused
18   on information he was telling me and I did
19   not document what I had told him regarding
20   that.  Since then or perhaps, I had become
21   aware just from interviews the officer did
22   with the media that mischaracterized that
23   conversation that said I told the captain
24   that there were I think no cause for concern
25   or something like, that he had no
```

Page 333

1   C. LAMSTEIN-REISS, M.D.
2   psychological problems. Something like
3   that. So at some point in the future, I was
4   reviewing the folder and I realized that my
5   telling the captain everything in that note
6   was not previously documented, but it was
7   very, very clear in my memory. So I felt it
8   important to add that note and I noted the
9   date that I added it.
10      Q.      So what was the statement in
11  what media that led you a year later to make
12  this entry?
13          MS. PUBLICKER METTHAM:
14      Objection.
15      A.      I don't remember which article.
16  I just recall there had been report that I
17  said that there was no -- that he had no
18  kind of psychological problem or anything,
19  implying that I said there was no cause for
20  concern that night and so as I was reading
21  it, I realized that was missing that I
22  really was writing what the captain was
23  telling me what was going on and I didn't
24  document what I had told the lieutenant --
25  I'm sorry, the captain. So at some point

VERITEXT REPORTING COMPANY
212-267-6868        www.veritext.com        516-608-2400

Page 334

C. LAMSTEIN-REISS, M.D.

when I was reviewing the folder and I realized that wasn't there, I deemed it important enough to make a delayed entry and put that in there. I think the report I had read was something that I said he was never suicidal or something like that, but it left out the part that my evaluation of that is only as good as the last time I saw him and if he was acting differently or if something more stressful happened after I saw him, then I can't comment on any -- on his mental status that date, only as of a few days ago. Someone could find out very upsetting and then kill themselves and three days earlier may not have been in their mind and that qualifier had not initially been reported.

    Q.    Did you ever have any discussions with anybody about making this entry, this delayed entry?

    MS. PUBLICKER METTHAM: Objection.

    A.    I don't believe I did. I don't recall.

    Q.    Did you talk with your

```
1                C. LAMSTEIN-REISS, M.D.
2    supervisors about making this entry?
3         A.     I don't think I did.  I know my
4    supervisor always reviews my folder.  So he
5    probably reviewed that at some point and saw
6    that.
7         Q.     It was made a year after the
8    event?
9         A.     Yeah, actually I think Dr. Knour
10   reviewed it at some point, as well --
11        Q.     Did you ever have any discussion
12   with Propper and Knour about this delayed
13   entry?
14        A.     I have no idea.  I don't
15   remember.
16        Q.     Did you ever have any discussion
17   with anybody at the 81st Precinct about this
18   delayed entry?
19        A.     No, that I did not.
20        Q.     Did ever have any discussion
21   with anybody employed by the City of New
22   York about this delayed entry?
23               MS. PUBLICKER METTHAM:
24        Objection.  Not including conversations
25        you've had with legal counsel.
```

Page 336

1  C. LAMSTEIN-REISS, M.D.
2      A.    Right.  Not including
3  conversations with legal counsel and I did
4  not have any other discussions with anybody.
5      Q.    Wait a minute, excluding any
6  conversations that you may have had with any
7  lawyers?
8      A.    Right.
9      Q.    Did you ever discuss this
10 delayed entry with anybody working for the
11 City of New York?
12     A.    It would be in the folder when I
13 met with IAB to go over my folder if that
14 conversation was -- if going over my case
15 folder was after that date, then yes, I
16 would have.
17     Q.    What I want to know is sitting
18 here today, do you have a recollection of
19 discussing this delayed entry with anybody
20 who is an employee of the City of New York,
21 other than maybe conversations you had with
22 your lawyer?
23         MS. PUBLICKER METTHAM:
24 Objection.
25     A.    I just answered that.  I do not

1           C. LAMSTEIN-REISS, M.D.
2    have any recollection.  What I am telling
3    you is I recall that at some point I
4    reviewed the case folder with IAB Group 1.
5    The date of that is in the case folder.  If
6    the date is after I made that entry, then I
7    would have discussed it with them.
8         Q.     I am not asking you about what
9    you would have done.  I am asking about what
10   you recall.  Do you understand the
11   difference?
12             MS. PUBLICKER METTHAM:  If you
13       want to give her her file, she can tell
14       you if it was before or after she met
15       with IAB.
16             MR. SMITH:  I'm not interested
17       in her inferences or your arguments--
18             MR. KRETZ:  She's given you an
19       answer, Nat.
20             MR. SMITH:  I just want to know
21       what you recall.  We can always draw
22       inferences based on facts and we can
23       draw more inferences based on more
24       facts.
25        Q.     I want to know what you know

Page 338

1         C. LAMSTEIN-REISS, M.D.
2   about discussing this delayed entry with
3   anybody?
4           MS. PUBLICKER METTHAM:
5       Objection.
6           MR. KRETZ:  She's answered that.
7           MR. SMITH:  I think she has --
8       A.      I only recall at some point --
9   at some point I reviewed all my notes with
10  IAB --
11      Q.      But you don't have a
12  recollection sitting here today --
13      A.      No.
14      Q.      -- of discussing?
15      A.      I don't recall if that was
16  before or after I made that entry.
17      Q.      Do you have a recollection
18  sitting here of discussing the delayed entry
19  with IAB?
20          MS. PUBLICKER METTHAM:
21      Objection.
22      A.      No.  I recall discussing the
23  full case and that would have been part of
24  it if that conversation was after that date.
25      Q.      All right, thank you.  I think I

Page 339

C. LAMSTEIN-REISS, M.D.

understand what you're telling me. Did you ever speak with anybody from the media about Schoolcraft?

  A.    No. We never speak to the media.

  Q.    Okay. So you never spoke to anybody from the media about Schoolcraft, right?

  A.    Correct.

  Q.    Continue reading the delayed entry.

  THE WITNESS: Do you have where I left off?

  Q.    The first sentence ends with in writer's memory.

  A.    Undersigned.

  Q.    Undersigned's memory, right. Can you go on from there?

  A.    From there, Captain Lauterborn asked if MOS was suicidal or depressed because he needed to know how concerned they should be about MOS's safety given his going AWOL, not answering phone calls, not answering door of home, but his car was

```
                                              Page 340
 1              C. LAMSTEIN-REISS, M.D.
 2   there, et cetera.  I informed captain that I
 3   last saw MOS at PES on 10/27/09 and at that
 4   time he looked okay and reported being
 5   asymptomatic.  At no time had he ever
 6   expressed thoughts of suicide, but he also
 7   never went AWOL before and acted the way he
 8   was acting on 10/31/09.  My assessment of
 9   his suicide risk is only as good as the last
10   time I saw him.  If something happened after
11   and led him to be so upset that he left work
12   without permission an hour before the end of
13   his tour, said he had stomach pains, et
14   cetera.  Then I am unable to say with any
15   reasonable amount of certainty that he is
16   not at risk for suicidal ideation under
17   present circumstances.
18              I provided captain with basic
19   information about reason MOS was on
20   restricted duty.  That he had significant
21   physical symptoms of stress insomnia, GI
22   symptoms, cardiac symptoms, et cetera.
23   Unclear if MOS was reporting openly on
24   10/27/09 when he said all of his symptoms
25   went away without treatment.  Motivation to
```

1          C. LAMSTEIN-REISS, M.D.
2   minimize is that he did not want to be
3   psychological restricted duty.  He was open
4   during initial evaluation, but denied any
5   and all symptoms in subsequent monitoring
6   sessions.  When also expressed being upset
7   about being on psychological restricted
8   duty.  His reporting on 10/31/09 that he had
9   stomach pains severe enough to warrant
10  leaving work before end of tour without
11  permission suggests either the symptoms
12  never did go away or they reoccurred on
13  10/31/09 due to his being really upset about
14  something.  It is also possible that there
15  was medical cause for the stomach pain, but
16  the angry manner in which he left work
17  suggests a psychological cause and I signed
18  my name.
19          MS. PUBLICKER METTHAM:  D284
20      and --
21          MR. OSTERMAN:  2890.
22      Q.     Had you, when you prepared this
23  note, any thoughts that there was going to
24  be litigation about what happened to
25  Schoolcraft on October 31, 2009?