10-CV-6005 (RWS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADRIAN SCHOOLCRAFT,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

## REPLY MEMORANDUM OF LAW IN SUPPORT OF CITY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Room 3-212*
*New York, N.Y.  10007*

*Of Counsel:  Ryan G. Shaffer*
*Alan H. Scheiner*
*Tel:  (212) 356-2386*
*Matter #:  2010-033074*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iv

PRELIMINARY STATEMENT ................................................................................... 1

POINT I

THE ENTRY AND SEARCH OF PLAINTIFF'S APARTMENT WAS LAWFUL AND BASED UPON EXIGENT CIRCUMSTANCES.............................................................. 1

POINT II

PLAINTIFF HAS ADDUCED EVIDENCE SUFFICIENT TO SUPPORT ANY CLAIMS AGAINST DEFENDANTS TRAINOR, SAWYER, JAMES, NELSON, OR CAUGHEY. ................................................................................... 5

A.    Captain Trainor ...................................................... 6

B.    Sergeants Sawyer and James .................................. 6

C.    Chief Nelson .......................................................... 7

D.    Lieutenant Caughey .............................................. 7

POINT III

IT WAS REASONABLE FOR THE DEFENDANTS TO BELIEVE THAT PLAINTIFF WAS EMOTIONALLY DISTURBED. ............................................................................ 8

POINT IV

PLAINTIFF'S FIRST AMENDMENT CLAIM SHOULD BE DISMISSED. ...................................................................... 11

A.    Changes in Law Require Grant of Qualified Immunity........................................................................ 11

B.    Plaintiff's Internal Speech is not Protected............................. 13

C.    There was No Intent to Restrain Plaintiff's Speech................................. 19

D.    Plaintiff Cannot Establish the Chilling Effect Required to State a Claim……………………………………….…………………………....22

**Page**

POINT V

        PLAINTIFF HAS NOT ESTABLISHED THAT CERTAIN DEFENDANTS WERE PERSONALLY INVOLVED. ............................................................................. 24

        A.     Captain Lauterborn ............................................................. 24

        B.     Captain Trainor, Chief Nelson, and Lieutenant Caughey. ............................................................................... 25

POINT VI

        PLAINTIFF CANNOT DEMONSTRATE A CONSPIRACY SUFFICIENT TO SURVIVE SUMMARY JUDGMENT. ................................................................... 26

        A.     There is no exception to the intra-corporate conspiracy doctrine where, as here, the co-conspirators with the same employer were all acting within the scope of employment. ................................ 26

        B.     There is no evidence of an agreement between City employees or NYPD officers and others to violate Schoolcraft's constitutional rights. ........................... 30

POINT VII

        INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CANNOT SUCCEED WHERE THE UNDERLYING CLAIMS FALL WITHIN TRADITIONAL TORT LIABILITY. ................................. 32

POINT VIII

        THE CLAIM FOR NEGLIGENT HIRING AND RETENTION AGAINST THE CITY MUST BE DISMISSED BECAUSE THE PLAINTIFF CONTENDS THAT THE INDIVIDUAL DEFENDANTS ACTED WITHIN THE SCOPE OF THEIR EMPLOYMENT. ........................ 34

POINT IX

        PLAINTIFF CANNOT ASSERT A CLAIM FOR MALICIOUS ABUSE OF PROCESS BECAUSE HE WAS NOT HELD PURSUANT TO LEGAL PROCESS. .................................... 35

- ii -

**Page**

POINT X

      PLAINTIFF   CANNOT   SURVIVE   SUMMARY
      JUDGMENT   ON   ANY   OF   HIS   THEORIES   OF
      MUNICIPAL LIABILITY ................................................................... 36

      A.     The defective expert testimony of Silverman and
              Eterno should not be      considered by the Court on
              this motion. ............................................................................ 37

      B.     The purported evidence of specific instances of
              retaliation are insufficient to establish a custom and
              practice or deliberate indifference. ........................................... 38

      C.     Plaintiff has failed to proffer evidence of deliberate
              indifference. ........................................................................... 43

CONCLUSION ................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

Alali v. DeBara,
    2008 U.S. Dist. LEXIS 86760 (S.D.N.Y. Oct. 24, 2008) ................................................... 24, 25

Alroy v. City of New York Law Dep't,
    2014 U.S. Dist. LEXIS 164114 (S.D.N.Y. Nov. 24, 2014) .................................................... 36

Amnesty Am. v. Town of W. Hartford
    361 F.3d 113, 129 (2d Cir. 2004)........................................................................................... 43

Anderson v. Creighton,
    483 U.S. 635 (1987)................................................................................................................ 12

Anemone v. Metro. Trans. Auth.,
    629 F.3d 97 (2d Cir. 2011)...................................................................................................... 15

Anemone v. Metropolitan Transp. Auth.,
    419 F. Supp. 2d 602 (S.D.N.Y. 2006)..................................................................................... 27

Anthony v. City of New York,
    339 F.3d 129 (2d Cir. 2003)...................................................................................................... 7

Aretakis v. Durivage,
    2009 U.S. Dist. LEXIS 7781 (N.D.N.Y Feb. 3, 2009) ........................................................... 33

Barclay v. Michalsky,
    368 Fed. App'x 266 (2d Cir. 2010) ........................................................................................ 15

Barry v. New York City Police Dep't,
    01 cv 10627 (CBM), 2004 U.S. Dist. LEXIS 5951 (S.D.N.Y. Apr. 6, 2004) .................. 42, 43

Blount v. Swiderski,
    2006 U.S. Dist. LEXIS 82889 (E.D.N.Y. Nov. 14, 2006)....................................................... 30

Blue v. Koren,
    72 F.3d 1075 (2d Cir. 1995)................................................................................................... 19

Bond v. Board of Educ.,
    97 CV1337, 1999 U.S. Dist. LEXIS 3164 (E.D.N.Y. Mar. 17, 1999) .................................... 29

Bradway v. Gonzales,
    26 F.3d 313 (2d Cir. 1994)..................................................................................................... 12

Brady v. County of Suffolk,
    657 F. Supp. 2d 331 (E.D.N.Y. 2009) .................................................................................... 15

**Cases**                                                                                                  **Pages**

Brigham City v. Stuart,
   547 U.S. 398 (2006) ............................................................... 5

Butler v. City of Batavia,
   545 F. Supp. 2d 289 (W.D.N.Y. 2008),
   aff'd, 323 F. App'x 21 (2d Cir. 2009) ..................................... 20

Carter v. Inc. Vill. of Ocean Beach,
   415 Fed. Appx. 290 (2d Cir. 2011) ....................................... 15

Chamberlain v. City of White Plains,
   986 F. Supp. 2d 363 (S.D.N.Y. 2013) ................................... 34

Chillemi v. Town of Southampton,
   943 F. Supp. 2d 365, 2013 WL 1876443 (E.D.N.Y. 2013) ...... 27

Chevron Corp. v. Donziger,
   974 F. Supp. 2d 362, 1560-62 (S.D.N.Y. 2014) .................... 39

City of Canton, Ohio v. Harris,
   489 U.S. 378, 391 (1989) ..................................................... 43

Cobb v. Pozzi,
   363 F.3d 89 (2d Cir. 2004) ................................................... 20

Connick v. Thompson,
   131 S. Ct. 1350, 1361 (2011) ............................................... 44

Cook v. Sheldon,
   41 F.3d 73 (2d Cir. 1994) ............................................... 35, 36

Copperweld Corp. v. Independence Tube Corp.,
   467 Y,S, 752 (1984) ............................................................. 30

Cuellar v. Love,
   2014 U.S. Dist. LEXIS 51622, (S.D.N.Y. Apr. 11, 2014) ...... 33

D'Olimpio v. Crisafi,
   718 F. Supp. 2d 340 (S.D.N.Y. 2010) ................................... 15

Dawson v. Cnty. of Westchester,
   373 F.3d 265 (2d Cir. 2004) ................................................. 20

Deal v. Seneca Cnty.,
   No. 07 Civ. 6497 (MAT), 2012 U.S. Dist. LEXIS 705, 2012 WL 13661
   (W.D.N.Y. Jan. 4, 2012) ...................................................... 20

**Cases**                                                  **Pages**

Dilworth v. Goldberg,
    914 F. Supp. 2d 433 (S.D.N.Y. 2012) ..................................................... 29

Dorn v. Maffei,
    386 F. Supp. 2d 479 (S.D.N.Y. 2005) ..................................................... 32

Dorsett-Felicelli, Inc. v. County of Clinton,
    371 F. Supp. 2d 183 (N.D.N.Y 2005) ...................................................... 20

Dunk v. Brower,
    2013 U.S. Dist. LEXIS 160667 (S.D.N.Y. Nov. 7, 2013) ....................... 20

Dunlop v. City of New York,
    2008 U.S. Dist. LEXIS 38250 (S.D.N.Y. May 6, 2008) .......................... 30

Economic Opportunity Comm'n of Nassau Cnty., Inc. v. Cnty. of Nassau,
    106 F. Supp. 2d 433 (E.D.N.Y. 2000) ..................................................... 20

Esmont v. City of New York,
    371 F. Supp. 2d 202 (E.D.N.Y. 2005) ..................................................... 25

Gagliardi v. Village of Pawling,
    18 F.3d 188 (2d Cir. 1994) ...................................................................... 19

Garcetti v. Ceballos,
    547 U.S. 410 (2006) ..................................................................... 13, 14, 19

Golphin v. City of New York,
    09-CV-1015, 2011 U.S. Dist. LEXIS 106272 (S.D.N.Y. Sept. 19, 2011) ............................... 7

Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013). ………………………… …12

Green v. Mattingly,
    585 F.3d 97 (2d Cir. 2009) ...................................................................... 35

Healy v. City of New York Dep't of Sanitation,
    286 F. App'x 744 (2d Cir. 2008) ............................................................. 15

Hagan v. City of New York,
    No. 13 Civ. 1108 (JPO), 2014 U.S. Dist. LEXIS 113847, (S.D.N.Y. August 15, 2014) ........ 18

Herrmann v. Moore,
    576 F.2d 453 (2d Cir. N.Y. 1978) ....................................................... 26, 27

Hill v. City of New York,
    03 CV 1283 (ARR), 2005 U.S. Dist. LEXIS 38926 (E.D.N.Y. Dec. 30, 2005) ..................... 29

**Cases**                                                                                           **Pages**

Howell v. New York Post., Inc.,
   81 N.Y.2d at 125 ................................................................................................. 33

Hunter v. Bryant,
   502 U.S. 224 (1991) ........................................................................................ 12

Hygh v. Jacobs,
   961 F.2d 359 (2nd Cir. 1992) ......................................................................... 37

In re Rezulin Prods. Liab. Lit.
   309 F. Supp. 2d 531 ....................................................................................... 37

Jeffes v Barnes, 208 F.3d 39, 61 (2nd Cir. 2000) ..............................................................40

Johnson v. Myers,
   10-CV-1964 (JS)(WDW), 2014 U.S. Dist. LEXIS 84379 (E.D.N.Y. June 16, 2014)............ 10

Katt v. City of New York,
   151 F. Supp. 2d 313 (S.D.N.Y. 2001),
   aff'd, 60 Fed. Appx. 357 (2d Cir. 2003) ...................................................... 38

Kerman v. City of New York,
   261 F.3d 229 (2d Cir. 2001)................................................................. 8, 9,10, 23

Kramer v. City of New York,
   No. 04 cv 106, 2004 U.S. Dist. LEXIS 21914 (S.D.N.Y. Nov. 1, 2004) ............................... 34

Kumho Tire v. Carmichael,
   526 U.S. 137 (1999) ........................................................................................ 37

Lane v. Franks,
   134 S. Ct. 2369 (2014) ................................................................... 13, 14, 16, 18

Lemmo v. McKoy,
   08-CV-4264, 2011 U.S. Dist. LEXIS 23075 (E.D.N.Y. Mar. 8, 2011)................................... 6

Lippe v. Bairnco Corp.,
   288 B.R. 678 (S.D.N.Y. 2003)....................................................................... 37

Malley v. Briggs,
   475 U.S. 335 (1986)........................................................................................ 13

Matthews v. City of New York,
   2015 U.S. App. LEXIS 3016 (2nd Cir. Feb. 26, 2015) ................. 11, 12,13, 14, 15, 16, 17, 18

**Cases**                                                                 **Pages**

McAardle v. Tronetti,
   961 F.2d 1083 (3d Cir. 1992)..................................................................... 36

McEvoy v. Spencer,
   49 F. Supp. 2d 224 (S.D.N.Y. 1999)........................................................ 29

Naccaratto v. Scarselli,
   124 F. Supp. 2d 36 (N.D.N.Y. 2000)....................................................... 32

People v. James,
   2001 N.Y. Misc. LEXIS 392 (N.Y. Sup. Ct. May 21, 2001)...................... 6

Randle v. Alexander,
   960 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................... 27

Rasmussen v. City of New York,
   766 F. Supp. 2d 399 (E.D.N.Y. 2011) ..................................................... 32

Reich v. Lopez,
   13-CV-5307 (JPO), 2014 U.S. Dist. LEXIS 115079 (S.D.N.Y. August 18, 2014)................ 28

Rini v. Zirwin ....................................................................................... 28

Rivers v. Towers, Perrin, Forster & Crosby, Inc.,
   2009 U.S. Dist. LEXIS 26301 (E.D.N.Y. Mar. 27, 2009)....................... 33

Rowley v. City of New York,
   2005 U.S. Dist. LEXIS 22241 (S.D.N.Y. Sept. 29, 2005)....................... 34

Saldana v. Port Chester,
   09-CV-6268 (SCR) (GAY), 2010 U.S. Dist. LEXIS 142099 (S.D.N.Y. July 21, 2010) ....... 32

Schoolcraft v. City of New York,
   10-CV-6005, 2012 U.S. Dist. LEXIS 128557
   (S.D.N.Y. Sept. 7, 2012)................................................... 12, 13, 14, 17, 19, 20, 21

Scott v. United States,
   436 U.S. 128 (1978).................................................................................. 5

Southwick Clothing LLC v. GFT (USA) Corp.,
   2004 U.S. Dist. LEXIS 25336, 2004 WL 2914093 (S.D.N.Y. Dec. 15, 2004) ............... 24, 25

Sun Min Lee v. J.B. Hunt Transp., Inc.,
   308 F. Supp. 2d 310 (S.D.N.Y. 2004)...................................................... 35

**Cases**                                                                       **Pages**

Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals,
812 F. Supp. 2d 357 (S.D.N.Y. 2011)............................................................ 19

Usavage v. Port Auth. of N.Y. & N.J.,
932 F. Supp. 2d 575 (S.D.N.Y. 2013)............................................................ 7

Vippolis v. Vill. of Haverstraw,
768 F.2d 40 (2d Cir. 1985)............................................................................ 40

Washington v. Cnty. of Rockland,
373 F.3d 310 (2d Cir. 2004).......................................................................... 20

Weintraub v. Board of Education,
593 F.3d 196 (2d Cir. 2010).................................................................... 14, 17

White v. City of N.Y.,
12 Civ. 7156 (ER), 2014 U.S. Dist. LEXIS 123255 (S.D.N.Y. Sept. 3, 2014) ...................... 27

Williams v. Town of Greenburgh,
535 F.3d 71 (2d Cir. 2008)...................................................................... 23, 24

Wilton Reassurance Life Ins. Co. v. Smith,
2015 U.S. Dist. LEXIS 18437 (E.D.N.Y. Jan. 21, 2015) ........................................ 20

Yeadon v. New York Transit Authority,
719 F. Supp. 204 (S.D.N.Y. 1989) ......................................................... 28, 29

Zieper v. Metzinger,
474 F.3d 60 (2d Cir. 2007)........................................................................... 24

**Statutes**

Fed. R. Civ. P. 56................................................................................... 46

C.P.L.R. § 1983............................................................... 6, 24, 26, 41, 45

Fed. R. Civ. P. 56.1........................................... 13, 14, 16, 19, 21, 22

Fed. R. Evid. 403 and 404(b)............................................................ 44

Fed. R. Evid. 702............................................................................... 37

Patrol Guide § 207-21....................................................................... 17

Rule 402............................................................................................ 37

Rule 403...................................................................................... 37, 42

**Cases**                                                                                       **Pages**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CITY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## PRELIMINARY STATEMENT

City defendants respectfully submit this memorandum of law in reply to plaintiff's opposition to the City defendants' motion for partial summary judgment.  For the reasons stated herein, plaintiff fails to controvert the positions set forth in defendants' moving papers, and accordingly the City defendants' motion should be granted in its entirety.  Based on the arguments stated herein as well as in City Defendants' original moving papers, and the accompanying declarations, exhibits and statement pursuant to Local Rule 56.1, it is respectfully submitted that City defendants are entitled to judgment as a matter of law with respect to the claims addressed herein.

## POINT I

**THE ENTRY AND SEARCH OF PLAINTIFF'S APARTMENT WAS LAWFUL AND BASED UPON EXIGENT CIRCUMSTANCES.**

Plaintiff argues that exigent circumstances did not exist on October 31, 2009 by intentionally selecting portions of Dr. Catherine Lamstein's deposition testimony while otherwise ignoring the relevant portions.  The crux of plaintiff's opposition is that Dr. Lamstein never told Captain Lauterborn to find plaintiff and ensure his safety, but instead testified at her deposition about a previously unexpressed personal opinion.  Notably, plaintiff does not dispute that if Dr. Lamstein told any of the defendants that they had to find plaintiff, then exigent circumstances existed.

Instead, he posits that the statements weren't made, because he knows full well that if they were, his claims would fail as a matter of law.

First, Dr. Lamstein has clarified and explained that her testimony regarding the directive to find plaintiff was not an unexpressed thought, but a statement that she actually made to Captain Lauterborn on October 31, 2009. See Affidavit of Dr. Catherine Lamstein, annexed to the Supplemental Declaration of Ryan G. Shaffer as Exhibit A (hereinafter Shaffer Supplemental Decl.). It is clear that plaintiff is attempting to benefit from the fact that he never allowed or asked Dr. Lamstein to explain her testimony about the directive to find plaintiff. Nonetheless, Dr. Lamstein's affidavit puts any doubt to rest. Accordingly, plaintiff's unlawful entry claim fails as a matter of law because exigent circumstances clearly existed at the time of entry on October 31, 2009 based upon Lamstein's directive to Captain Lauterborn.

Second, even if the Court is not inclined to credit Dr. Lamstein's affidavit, a complete reading of her deposition – as opposed to plaintiff's selective citations – shows unequivocally that she told Captain Lauterborn that plaintiff's safety was a concern and that he must be located. Plaintiff's opposition, and his own motion for summary judgment disingenuously ignores Dr. Lamstein's statements that the October 27, 2009 evaluation was meaningless to her assessment of plaintiff's mental health on October 31, 2009. See Exhibit B to the Shaffer Supplemental Decl. Lamstein Dep. p.334:7-13.

Notably, plaintiff's opposition and own summary judgment motion ignore the majority of Dr. Lamstein's testimony which clearly indicates that exigent circumstances existed and justified the entry into plaintiff's home. Specifically, plaintiff ignores the fact that: 1) Dr. Lamstein left him a voicemail explaining "everyone [was] just concerned for his safety and they want[ed] to make sure everyone [was] okay"; 2) Lauterborn and the defendants knew that they couldn't go into plaintiff's apartment just because they wanted to; 3) Lauterborn and the defendants needed to know how concerned they should be about plaintiff's safety given that plaintiff went AWOL,

and wasn't answering his phone, or the door to his apartment, even though it appeared that he was home. Id. at p. 328:25-331:15

Moreover, plaintiff ignores Dr. Lamstein's lengthy discussion of how his behavior on October 31, 2009 was a cause for concern. Specifically Lamstein testified at her deposition that although plaintiff had never previously expressed thoughts of suicide he had also "never went AWOL before, and acted the way he was acting on 10/31/09" and; "If something happened after and led him to be so upset that he left work without permission an hour before the end of his tour, said he had stomach pains, et cetera. Then I am _unable to say with any reasonable amount of certainty that he is not at risk for suicidal ideation under present circumstances_." Id. at p.339:20-340:17 emphasis added.  Lamstein continued, "[Plaintiff's] reporting on 10/31/09 that he had stomach pains severe enough to warrant leaving work before end of tour without permission suggests either the symptoms never did go away or they reoccurred on 10/31/09 due to his being really upset about something." Id. at p340:18-341:14. Lamstein even expressed skepticism that plaintiff's behavior was due to medical issues and not psychological concerns, stating "it is also possible that there was medical cause for the stomach pain, but the angry manner in which he left work suggests a psychological cause." Id. at p. 341:14-18.

Rather than stop at his disingenuous interpretation of Dr. Lamstein's clear and unambiguous testimony, plaintiff asks the Court to rely upon the absence of Dr. Lamstein's statements in various documents as proof that she never told the defendants to find plaintiff and ensure his safety.  First, plaintiff states that Dr. Lamstein's own notes do not mention the need to locate plaintiff. However, as set forth above, Dr. Lamstein's deposition testimony contained a complete recitation of her notes which plaintiff chose to cherry pick from in support of his opposition. Dr. Lamstein's complete notes and recitation of the same during her deposition,

noted above, clearly indicate that Lauterborn was told to find plaintiff and be concerned for his wellbeing.

Next, plaintiff posits that because Lauterborn did not testify about the specifics of his conversation with Lamstein during his own deposition, that no concern or need to find plaintiff was ever conveyed to him.   But this contention is without force because during plaintiffs' counsel's deposition of Lauterborn, he never asked about the substance of Lauterborn's conversation with Lamstein. Instead, Lauterborn was asked about a single sentence in a report prepared by him on October 31, 2009. <u>See</u>   PMX 6, Plaintiff's Opposition ("Pl. Opp") at 5. Plaintiff also asks the Court to rely upon that report as further evidence that Lamstein never conveyed a need to locate plaintiff.  However, the entire report contains only *one* sentence about the discussion between Lauterborn and Lamstein, and it is clear from Lamstein's testimony and notes that the conversation consisted of far more than one sentence worth of information.

Finally, plaintiff asks the Court to find that the conversation between Lauterborn and Lamstein contained no mention of a need to find plaintiff and ensure his safety because when Lauterborn spoke to the Internal Affairs Bureau he could not recall the substance of the conversation. However, it is clear from Lauterborn's testimony that he remembered speaking with a doctor about Schoolcraft. That he could not recall the substance of that conversation is by no means evidence that the conversation or its details did not occur as Lamstein testified. Accordingly, plaintiff is grasping at straws in order to create a dispute of fact where none exists. In fact, it is abundantly clear that plaintiff is aware that this single fact is fatal to his claim that his apartment was unlawfully entered.

As an additional matter, plaintiff also misconstrues the overwhelming case law declaring the defendants' subjective motivation for entering plaintiff's apartment irrelevant.  The Supreme

Court has repeatedly held that an "officer's subjective motivation is irrelevant" to a determination of whether exigent circumstances exist. Brigham City v. Stuart, 547 U.S. 398, 404 (2006) (citing Scott v. United States, 436 U.S. 128, 138 (1978)).  In Stuart the Court held that even if an officer's motives could be so neatly unraveled – whether they entered a home to make an arrest and gather evidence or to render aid is irrelevant so long as it was objectively reasonable to believe that exigent circumstances existed.  The "facts" cited by plaintiff in his own motion for summary judgment and in his opposition to City defendants' motion for summary judgment – namely that the defendants were engaged in a campaign of retaliation against him – point solely to the officers' subjective reason for entering the apartment.  None of the facts cited by plaintiff undercut the objective reasonableness of City defendants' actions.

As set forth above, because Dr. Lamstein conveyed her concern for plaintiff's safety it was reasonable for the defendants to adhere to her belief that they should and must locate him to ensure his wellbeing.  At a minimum, defendants are entitled to dismissal on the basis of qualified immunity for a claim based on the apartment entry, since there was at least an arguable basis for exigent circumstances.  See City Defendant's Memorandum of Law in Support ("City Mem.") at 4.

As such, City defendants' motion to dismiss plaintiff's unlawful entry claim must be dismissed.

## POINT II

### PLAINTIFF HAS ADDUCED EVIDENCE SUFFICIENT TO SUPPORT ANY CLAIMS AGAINST DEFENDANTS TRAINOR, SAWYER, JAMES, NELSON, OR CAUGHEY.

Plaintiff's opposition attempts to clarify his pleadings and set forth claims against defendants Trainor, Sawyer, James, Nelson, and Caughey. However, for the reasons set forth

herein, there can be no claims against those defendants any summary judgment must be granted in their favor.

### A.    Captain Trainor

Although plaintiff admits that there are no claims against defendant Trainor for unlawful search and seizure, he argues that Captain Trainor is liable for harassment in violation of the First Amendment.  However, as set forth in Point IV herein, plaintiff's First Amendment claims must be dismissed. As such summary judgment must be granted in Captain Trainor's favor.

### B.    Sergeants Sawyer and James

The entirety of plaintiff's claims against Sergeants Sawyer and James relate to plaintiff's allegation that he was handcuffed by them to a gurney between his arrival at Jamaica Hospital Medical Center on October 31, 2009 and the early morning hours of November 1, 2009. Plaintiff ostensibly claims that this conduct amounts to excessive force in violation of §1983, and assault and battery under New York State Law.

As set forth herein, and in City defendants' initial memorandum of law, plaintiff was properly taken into custody as an emotionally disturbed person pursuant to New York State's Mental Hygiene Law.  Accordingly, handcuffing plaintiff, both at his apartment, and in the hospital is an appropriate safety measure since the entire reason for taking plaintiff to the hospital in the first place was that he posed a potential threat to himself. See People v. James 2001 N.Y. Misc. LEXIS 392, at n.4 (N.Y. Sup. Ct. May 21, 2001).

Moreover, plaintiff has presented no evidence, other than testimony that he was temporarily uncomfortable and potentially bruised, that he suffered any harm as a result of being handcuffed by any of the defendants. It is clear that "[i]njuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising . . . brief numbness from tight handcuffing . . . [and] claims of minor discomfort from tight

handcuffing[.]"   Lemmo v. McKoy, 08-CV-4264, 2011 U.S. Dist. LEXIS 23075, at *5 (E.D.N.Y. Mar. 8, 2011) (collecting cases) (internal citations omitted).   By contrast, only handcuffing that causes "intense pain and long-lasting injury . . . falls far from the hazy border between excessive and acceptable force."   Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 598 (S.D.N.Y. 2013).

Accordingly, because plaintiff's handcuffing was justifiable, and only caused minor discomfort his claims against defendants Sawyer and James must be dismissed.

### C.    Chief Nelson

Although plaintiff challenges City defendants' contention that Chief Nelson did not authorize any of Chief Marino's actions on October 31, 2009, his opposition does nothing to challenge the fact that Nelson is shielded from liability for reasonably relying upon information from his fellow officers. See, e.g., Anthony v. City of New York, 339 F.3d 129, 138 (2d Cir. 2003).   Moreover, plaintiff ignores that Nelson is shielded by qualified immunity even if other officers were mistaken or dishonest, provided that he reasonably relied on their statements if he in fact acted upon their statements.   See Golphin v. City of New York, 09-CV-1015 (BSJ), 2011 U.S. Dist. LEXIS 106272, *5-6 (S.D.N.Y. Sept. 19, 2011). Accordingly, summary judgment must be granted in Chief Nelson's favor.

### D.    Lieutenant Caughey

Plaintiff also fails to controvert any of City defendants' reasons for requesting summary judgment in favor of Lieutenant Caughey.   Instead he simply restates actions taken by Caughey which City defendants have already addressed in their original memorandum of law. Accordingly, summary judgment must be granted in Lieutenant Caughey's favor.

## POINT III

## IT WAS REASONABLE FOR THE DEFENDANTS TO BELIEVE THAT PLAINTIFF WAS EMOTIONALLY DISTURBED.

As set forth in City defendants' original memorandum of law, plaintiff's false arrest and false imprisonment claims fail because there was probable cause to seize plaintiff pursuant to New York State's Mental Health and Hygiene Law (hereinafter "MHL").  Moreover, even if the Court were to find that probable cause to remove plaintiff to Jamaica Hospital did not exist, the defendants are entitled to qualified immunity because it was objectively reasonable for them to believe that plaintiff was emotionally disturbed.

Plaintiff argues alternatively that there are either issues of fact precluding summary judgment or undisputed facts that establish plaintiff is entitled to summary judgment on this claim.  Plaintiff's opposition relies primarily upon two Second Circuit decisions, Weyant v. Okst, and Kerman v. City of New York, which are both distinguishable from this matter.

First, plaintiff posits that Weyant establishes that summary judgment cannot be granted on a false arrest or false imprisonment claim when there is a dispute of fact "as to the nature of the plaintiff's conduct."  Pl. Opp. at 14.  Plaintiff's reliance upon Weyant is misplaced, because here there are no disputes of fact about plaintiff's conduct on October 31, 2009.  Instead plaintiff's dispute concerns the relevancy of each act or behavior exhibited by plaintiff.  Indeed, plaintiff does not dispute that he *inter alia*: 1) left work early; 2) had been placed on restricted duty following an evaluation by NYPD psychological services; 3) refused to open his door for hours after returning home; 4) had elevated blood pressure; 5) claimed to be suffering from stomach pains; and 6) initially agreed to go to the hospital but then retreated back into his apartment when he was told he wouldn't be taken to the hospital of his choosing.  Plaintiff

instead argues that those facts, and many others – most importantly Dr. Lamstein's belief that plaintiff might be a danger to himself – are not a sufficient basis for declaring the defendants' actions reasonable.  Plaintiff contends that those facts, combined with the fact that plaintiff had been reporting what he believed to be misconduct by his supervisors, render the decision to remove plaintiff for a mental health evaluation as unreasonable.

It is clear, however, that any officer, presented with the information known on October 31, 2009, and confronted with the behavior exhibited by plaintiff, would believe it was necessary to have a doctor evaluate plaintiff's mental health.  In fact, Dr. Lamstein specifically told Captain Lauterborn that the way plaintiff was acting was cause for concern and led her to believe that plaintiff might be at risk for suicidal behavior. See Exhibit B to the Shaffer Supplemental Decl. at p.340:2-17.

Similarly, plaintiff's reliance upon Kerman is also misplaced. The Kerman Court found that the defendants' decision to remove plaintiff to a hospital for a mental health evaluation was inappropriate because they ignored information available to them.  Specifically, the defendants in Kerman had an opportunity to consult with a mental health professional familiar with the plaintiff's health and refused to do so, instead hanging up on that doctor. 261 F.3d 229, 233 (2d Cir. 2001).  Indeed, the defendants here continually tried to obtain information about plaintiff's mental health, and when they did so, were told by a mental health professional that it was imperative to locate plaintiff to ensure his safety. *Supra* at 2-6.  It cannot be said that the defendants in this matter ignored information in the same manner that the officers in Kerman did.

Instead, it is clear that the officers evaluated the need to remove plaintiff to the hospital based upon a totality of the circumstances and in conjunction with an NYPD psychologist.  It is clear that even Dr. Lamstein, a trained mental health professional, felt that plaintiff's actions

throughout the day on October 31, 2009, were so unusual as to render her 3 day old evaluation of his mental status irrelevant. <u>Supra</u> at 2-3.   In fact, she testified that because her prior evaluation was insufficient and plaintiff's new behavior so concerning, she was unable to say with certainty that plaintiff was safe. <u>See</u> Exhibit B to the Shaffer Supplemental Decl. at p.340:14-17.

Finally, plaintiff contends that a question of fact exists concerning whether plaintiff's behavior was sufficiently erratic such that a mental health evaluation was required, or if plaintiff was just being foolishly stubborn.  Plaintiff's position in this regard is based entirely upon the holding of <u>Tsesarskaya v. City of New York</u>, 728 F.3d 149 (2nd Cir. 2013). In <u>Tsesarskaya</u>, like <u>Kerman</u> and unlike this case, the defendants never consulted with a mental health provider. <u>Id.</u> at 451-52. Instead they interpreted the plaintiff's behavior on their own without the assistance of a doctor who had treated plaintiff.  Here, because the defendants consulted with Dr. Lamstein who interpreted plaintiff's unusual behavior as a cause for concern about his safety, the decision to remove plaintiff to a hospital as an emotionally disturbed person was based upon probable cause.

At best plaintiff can say that he disagrees with the defendants' assessment.  But even if the Court were to find that there is a dispute about whether the facts were sufficient for the officers to treat plaintiff as an EDP, at a minimum the individual defendants are entitled to qualified immunity because probable cause was, at the very least, arguable.  <u>See</u> <u>Johnson v. Myers</u>, 10-CV-1964 (JS)(WDW), 2014 U.S. Dist. LEXIS 84379, *31-35 (E.D.N.Y. June 16, 2014) (granting qualified immunity to defendant police officer who removed plaintiff for a mental health evaluation because plaintiff was uncooperative and had displayed unusual behavior in the past).

Accordingly, plaintiff's false arrest and imprisonment claims must be dismissed.

## POINT IV

### PLAINTIFF'S FIRST AMENDMENT CLAIM
### SHOULD BE DISMISSED.

In opposition to City defendants' motion for summary judgment dismissing his First Amendment claims, plaintiff argues that: (1) his conduct prior to his public statements is protected speech; (2) he need not have suffered an *actual* chilling effect to his speech because he was subject to involuntary confinement; and (3) although there is no evidence that defendants knew or believed that plaintiff intended any public speech, a motive to chill his public speech may be imparted to the defendants.  For the reasons set forth herein plaintiff's First Amendment claims must be dismissed.

### A.      Changes in Law Require That the Court Grant Qualified Immunity to Defendants.

As an initial matter, although the Second Circuit's recent decision in Matthews v. City of New York changed the law in this Circuit by giving First Amendment protection to some internal police department complaints, it does not save plaintiff's First Amendment claim. 2015 U.S. App. LEXIS 3016 (2nd Cir. Feb. 26, 2015).  As set forth below, plaintiff's IAB complaints (including those referred to QAD) are distinguishable from the complaints in Matthews because they were made pursuant to an official internal procedure and concerned plaintiff's official duties. Id. at *13-14, *18-19.  Moreover, even under Matthews, plaintiff's administrative appeal of his performance evaluation – the only speech of which the defendants could have been aware on October 31, 2009 – remains unprotected by the First Amendment because the appeal was unquestionably made pursuant to plaintiff's official duties using a procedure available only to police officers.

The qualified immunity defense requires a three-step determination: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that

right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013).  Should the court find that the first step is satisfied and the plaintiff's internal complaints are now protected by the First Amendment, then the change in the law engendered by Matthews is the classic case for the application of the defense of qualified immunity.  This Court had previously held Schoolcraft's IAB complaints unprotected by the First Amendment.  Schoolcraft v. City of New York, 10-CV-6005 (RWS), 2012 U.S. Dist. LEXIS 128557, at 15-16 (S.D.N.Y. Sept. 7, 2012) (Schoolcraft II).   Obviously then, if those complaints are now protected by the First Amendment (which defendants do not concede), plaintiff's right was not "clearly established" and no "reasonable officer" could have known of it over five years ago.

Should the Court find that the scope of First Amendment protection has enlarged, then the defense of Qualified Immunity applies because the "contours" of First Amendment protection have changed: "[t]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987)); see also Bradway v. Gonzales, 26 F.3d 313, 317-18 (2d Cir. 1994) (the "doctrine of qualified immunity shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known") (internal citations and quotations omitted); Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'")(per

curiam) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  Indeed, plaintiff argues that as a result of <u>Lane v. Franks</u>, 134 S. Ct. 2369 (2014), there was a "change in the law" even before <u>Matthews</u>, narrowing the scope of government employee speech that is exempted from First Amendment protection. Accordingly, qualified immunity on plaintiff's First Amendment Claim must be granted.

> **B.      Plaintiff's Internal Speech is not Protected.**

Plaintiff's internal complaints remain unprotected by the First Amendment, even under <u>Matthews</u>.  In <u>Schoolcraft II</u>, this Court held that under <u>Garcetti v. Ceballos</u> plaintiff's First Amendment claim requires him to establish that the speech at issue was made as a "private citizen" rather than as part of his official duties.  547 U.S. 410, 418 (2006).  Plaintiff believes this means that any and all of the defendants' conduct after his suspension is actionable under the First Amendment.  This is not the law, or the Court's holding. The <u>Garcetti</u> test depends upon plaintiff's speech, not the defendants' conduct.  As the Court held, it is only plaintiff's "alleged intent to speak out to the media and public at large . . . that is not pursuant to [his] official duties and, as such, is protected by the First Amendment."  2014 U.S. Dist LEXIS 128557, at *17. Plaintiff admits that he did not even form the intent to speak to the press until *after* October 31, 2009.  Pl. Opp. at 25; Exhibit B to the Declaration of Suzanna Mettham ("Mettham Decl.") at 265:3-18.

Here, plaintiff points to various instances of expression all of which relate to his official duties: (i) he objected to his performance evaluation and initiated an administrative appeal of the evaluation, alleging that he was subjected to improper quotas for police activity;[1] (ii) his

---

[1] Plaintiff suggests that his low performance evaluation was an instance of retaliation for not meeting performance targets in levels of policing activity.  <u>See</u> Exhibit C to the Shaffer Supplemental Decl. at 262:21-263:3; Exhibit D to the Shaffer Supplemental Decl.; Exhibit E to

attorney, referred by the police union, sent a letter to Deputy Inspector Mauriello complaining about his employment evaluation and alleging that quotas for arrests and summonses caused his low evaluation; (ii) he complained by memo to IAB that two supervisors in his own precinct removed material from one of the supervisor's personnel folders; (iii) he reported to IAB and QAD that Deputy Inspector Mauriello was causing the improper downgrading and discarding of complaints of serious crimes and pressuring officers to make arrests and issue summonses, and that he was required to sign a training log although he did not receive adequate training; (iv) he made notations reflecting his observations and communications with IAB and QAD in his department-issued memo book.  See Plaintiff's Statement of Undisputed Facts Pursuant to Fed. R. Civ. P. 56.1 in support of his own motion for partial summary judgment ("Pl. 56.1") at ¶¶ 13, 20, 22, 25, 38, 40-42; Exhibit I to the Shaffer Supplemental Decl.

Even under Matthews, the activities cited by plaintiff are not protected by the First Amendment because they relate to plaintiff's official duties.  Under Garcetti and Lane v. Franks, 134 S. Ct. 2369 (2014), when a government employee speaks pursuant to his or her official duties – for example by making complaints within his or her agency about misconduct or working conditions – the employee does not speak as a "private citizen" and therefore has no First Amendment protection for such complaints.

The Second Circuit held in Weintraub v. Board of Education, that an employee speaks pursuant to their official duties when their complaints – like plaintiff's here – are "'part-and-parcel' of his concerns about his ability to properly execute his duties."  593 F.3d 196, 203 (2d Cir. 2010) (finding that teacher complaining and filing union grievance about a failure to discipline a student in his class spoke pursuant to official duties) (quotations and citations

---

the Shaffer Supplemental Decl.  As this Court previously held, Schoolcraft's alleged refusal to make arrests was not speech protected by the First Amendment.  Schoolcraft II, at 29-30.

omitted).  The Second Circuit also held that when police officers, "reported what they believed to be misconduct by a supervisor up the chain of command" which "they knew of only by virtue of their jobs as police officers and which they reported as 'part-and-parcel of [their] concerns about [their] ability to properly execute [their] duties,' then they were not engaging in constitutionally protected speech at any relevant time and cannot make out a First Amendment claim."  Carter v. Inc. Vill. of Ocean Beach, 415 Fed. Appx. 290, 293 (2d Cir. 2011); see also D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 353-354 (S.D.N.Y. 2010) (where officer complained of other officer's "violating suspects' rights and [] not performing his job properly, and by implication . . . interfering with [his] ability to perform his own duties" then the complaints were "directly or indirectly, 'part-and-parcel of his concerns' about his ability to 'properly execute his duties'" and not protected by the First Amendment); Barclay v. Michalsky, 368 Fed. App'x 266 (2d Cir. 2010) (speech unprotected where nurse reported abuse and other nurses sleeping on the job because she testified that this was her "job" and a work rule required employees to report violence against patients and employees not working).Thus, prior to Matthews it was well settled that public employee's reports of misconduct affecting his or her employment, through appropriate workplace channels, are not protected by the First Amendment.  See also Anemone v. Metro. Trans. Auth., 629 F.3d 97, 116 (2d Cir. 2011) (communications between former Security Director for the Metropolitan Transportation Authority ("MTA") and the District Attorney's office concerning MTA "was clearly pursuant to [plaintiff's] official duties" and the plaintiff had "regularly interacted with [DAs] and viewed cooperating with these offices as among his duties."); Healy v. City of New York Dep't of Sanitation, 286 F. App'x 744, 746 (2d Cir. 2008) (holding that it was expressly "within the scope" of Department of Sanitation employee's duties to report to his supervisor corruption discovered while performing a routine inventory check); Brady v. County of

Suffolk, 657 F. Supp. 2d 331, 348 (E.D.N.Y. 2009) *(*Bianco, J) (a police traffic officer complained internally about corruption, specifically that he was instructed not to issue summonses to off-duty law enforcement personnel and those with Police Benevolent Association cards).

On the other hand, in Lane v. Franks the Supreme Court held that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." 134 S. Ct. 2369 at 2379 (2014).   Nonetheless Lane does not help plaintiff because his speech was within his own agency, for the purported purpose of correcting conditions of his own employment, and used channels made available by the NYPD to officers for that purpose.

In Matthews, the Second Circuit focused on the nature and subject-matter of the officer's complaints and their "relationship" to the officer's job responsibilities.   2015 U.S. App. LEXIS at *13.   The court held that an officer's complaints about a quota policy to the commanding officer of his precinct were protected by the First Amendment, stating:   "[W]hen a public employee whose duties do not involve formulating, implementing or providing feedback on a policy that implicates matters of public concern, engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee."   Id. at *15.

However, plaintiff's speech in the instant matter was of a different character.   Unlike Matthews' complaints, plaintiff's speech generally concerned *his own* work:  *his own* complaint reports; *his own* training; *his own* employee evaluation; *his own* arrests and summons rates; and the conduct of supervisors within *his own* precinct.   The eleven 81st Precinct complaints that plaintiff claimed were downgraded or discarded were, in all but possibly two cases, complaints that Schoolcraft was personally involved in taking or handling at the 81st precinct.   See PMX 16,

D000517-32.[2]  Likewise, plaintiff's complaints about being forced to sign a training log for training he did not receive, and for receiving a bad evaluation for not meeting an alleged quota for summonses and arrests, clearly concerned his own duties.

Matthews also focused on the presence of a "civilian analogue" to the means of speech used by the officer to find that his complaints were protected by the First Amendment.  Because Matthews did not "follow internal grievance procedures," such as the teacher in Weintraub, "but rather went directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints," his speech was comparable to that of a private citizen.  Matthews 2015 U.S. App. LEXIS at *19.  But here, plaintiff did use "internal procedures."  Id. at *17.   In appealing his evaluation, plaintiff availed himself of administrative procedures unavailable to a member of the public.  See City defendants' 56.1 Statement ("City 56.1") ¶¶ 9. 10; Pl. 56.1 ¶¶ 13, 14.  Plaintiff's IAB complaints (some referred to QAD) were made pursuant to Patrol Guide § 207-21,[3] which the Second Circuit acknowledged was an "internal procedure."  Matthews  2015 U.S. LEXIS at *17.  Plaintiff himself testified that he felt he was documenting misconduct pursuant to his official duties as a police officer. See Exhibit C to the Shaffer Supplemental Decl. at 112:13-19.[4]   Other witnesses confirmed the

---

[2] Plaintiff relies on D000517-32 in opposing summary judgment, Pl. 56.1 ¶ 129, and accordingly defendants may rely upon it for the purposes of this motion.  However, by relying upon it defendants do not concede its accuracy or admissibility at trial.

[3] As this Court previously noted, Patrol Guide § 207-21 states: "All members of the service have an absolute duty to report any corruption or other misconduct, or allegation of corruption or other misconduct, of which they become aware."  Schoolcraft II, at *17.

[4] In Matthews, the Second Circuit stated in dicta that PG 207-21 alone would not render an internal complaint subject to the official duty exemption from the First Amendment, but it did not hold the provision irrelevant.  Id.  Rather, the undisputed facts in Matthews showed that PG 207-21 did not require a report of the "quota system" in that case, because no specific instances of misconduct were reported.  2015 U.S. LEXIS at *16.  There is no such evidence here, and several specific instances of purported misconduct were reported by plaintiff.

affirmative obligation of police officers to report misconduct.  Mauriello Deposition Transcript annexed to the Shaffer Supplemental Decl. as Exhibit F at 23:17-24:23; Ferrara Deposition Transcript annexed to the Smith Opp. Decl. as POX 39 at 73:18-20.  Unlike Matthews, there is no evidence in this case that Schoolcraft's reports, were they accurate, went beyond the duties required of him as an NYPD officer.  See Matthews, 2015 U.S. App. LEXIS at *13-17.

The district court authorities cited by plaintiff are likewise distinguishable.  In Hagan v. City of New York, the court found on a motion to dismiss, that when the plaintiff complained *outside of her own agency* about employment discrimination, the speech was protected by the First Amendment.  No. 13 Civ. 1108 (JPO), 2014 U.S. Dist. LEXIS 113847, *62 (S.D.N.Y. August 15, 2014).  As to complaints within the plaintiff's agency, the court concluded that on a motion to dismiss, relying on Lane v. Franks it could not presume that internal complaints were "actually expected or permitted . . . in practice."  Id., at *67-68.  But here, after discovery, despite plaintiff's unsupported assertions about a "Blue Wall of Silence," plaintiff cannot contend on this record that internal complaints to IAB did not *in practice* actually occur and lead to corrective action.  See *infra* at Point X.[5]

Likewise, Griffin v. City of New York held that if plaintiff could show that internal reporting was not a de facto part of his duties, or that the matter reported on did not concern his own job performance, then First Amendment protection would apply.  Id. ("[N]either officer was assigned to the case in which the victim interview was botched.  In short, McCarthy's alleged misconduct did not directly interfere with plaintiff's ability to perform his assigned duties as a police officer.")  As noted above, the misconduct reported by plaintiff here directly concerned his own

---

[5] Plaintiff himself made several internal complaints, some leading to NYPD action (PMX 15), and plaintiff proffers evidence of complaints by others, including testimony (albeit hearsay) that several commanding officers were reported-on and disciplined for conduct similar to that alleged by plaintiff ("fudging numbers").  Pl. Opp. at 75-79; POX 39 at 224:6-19, 226:6.

work.[6]  Accordingly, prior to plaintiff's statements to the press, his speech was made pursuant to his official duties and not protected by the First Amendment.  At the very least, the aforementioned developments and changes in the relevant case law are exactly the type that require the dismissal of plaintiff's First Amendment claim under the doctrine of qualified immunity.

### C.        There was No Intent to Restrain Plaintiff's Speech.

Plaintiff has no cause of action under the First Amendment because he cannot establish the required intent to restrict his speech.  His assertion that the intent can be inferred from the circumstances is flawed.   Plaintiff's argument that intent may be presumed is far from the law. Rather, plaintiff must prove that defendants' conduct "was motivated by or substantially caused by [Plaintiff's] exercise of free speech." Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 371 (S.D.N.Y. 2011) (quoting Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994)).   Plaintiff's proof is missing the key requirement that defendants know of plaintiff's protected activity.

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." Curley, 268 F.3d at 73 (citing Blue v. Koren, 72 F.3d 1075, 1082-83 (2d Cir. 1995)).   "[A] plaintiff may not rely on conclusory assertions of

---

[6] Plaintiff suggests that statements to his supervisors after he was "suspended" in his apartment were protected by the First Amendment, and that he was punished for them.  Schoolcraft was not suspended in his apartment, although he was told that he would eventually be suspended. PMX 11 at 11:16-12:11.  The Court in Schoolcraft II found the suspension relevant to the question of whether Schoolcraft spoke as a private citizen (not whether he was, in fact, a public employee), but his suspension is not dispositive of the issue.  A full-time employee, still subject to the rules and order of his agency, cannot be deemed a private citizen for all purposes as a matter of law. See City Mem. at 11.  Rather, the Court held that the suspension combined with plaintiff's absence from the NYPD's jurisdiction (at his residence upstate), allowed for his speech to the press to be deemed that of a private citizen.  Schoolcraft II, at 16, 23-24.  Moreover, plaintiff's statements to his supervisors at his apartment concerned his health and whether or not he would go to the hospital or the precinct, hardly matters of public concern as required for a First Amendment claim.  Garcetti, 547 U.S. at 410.

- 19 -

retaliatory motive to satisfy the causal link," and must produce "some tangible proof to demonstrate that [his] version of what occurred was not imaginary." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004) (citation omitted).   The mere existence of "a scintilla of evidence" in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for him.  See Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004) (citation omitted); accord Dunk v. Brower, 2013 U.S. Dist. LEXIS 160667, 24-26 (S.D.N.Y. Nov. 7, 2013) .

As set forth in Dunk v. Brower, "[t]o prove a causal connection [with the protected speech], the plaintiff must demonstrate that the individuals who engaged in retaliation had knowledge of the protected conduct." 2013 U.S. Dist. LEXIS 160667, 29 (S.D.N.Y. Nov. 7, 2013)(quoting Deal v. Seneca Cnty., No. 07 Civ. 6497 (MAT), 2012 U.S. Dist. LEXIS 705, 2012 WL 13661 (W.D.N.Y. Jan. 4, 2012); see also Washington v. Cnty. of Rockland, 373 F.3d 310, 321 (2d Cir. 2004).  To be sure, as this Court observed in Schoolcraft II, at 12, the required intent can sometimes be inferred from circumstances.  Most commonly, "[c]ircumstantial evidence of retaliation may be found when defendants are aware that plaintiff has engaged in protected speech and defendants' challenged behavior closely follows that protected speech," presuming defendants are aware of the speech. Butler v. City of Batavia, 545 F. Supp. 2d 289, 293 (W.D.N.Y. 2008) aff'd, 323 F. App'x 21 (2d Cir. 2009) (citing Economic Opportunity Comm'n of Nassau Cnty., Inc. v. Cnty. of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000)); Dorsett-Felicelli, Inc. v. County of Clinton, 371 F. Supp. 2d 183, 192 (N.D.N.Y 2005) (relying on allegation that retaliatory action followed soon after protected filing).

Plaintiff claims – without citation to any evidence (because there is none) – that his complaints to IAB and QAD were "common knowledge" within the 81st Precinct.  Pl. 56.1 ¶44. Wilton Reassurance Life Ins. Co. v. Smith, 2015 U.S. Dist. LEXIS 18437 (E.D.N.Y. Jan. 21,

2015) ("Rule 56(c)(1) explains that a party's factual positions on summary judgment <u>must be supported by</u> citations "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.").  The Court must disregard that claim because there is no evidence that any officer at plaintiff's apartment on October 31, 2008 knew the substance of his purported communications with QAD and IAB.  The Court should therefore disregard Schoolcraft's allegations that he was retaliated against for his complaints to IAB and QAD on October 31, 2009 or at any time beforehand as plaintiff's basis for establishing this motive is nothing more than conjecture.

Nonetheless, plaintiff attempts to ginny up an improper motive by arguing that the required intent to restrain speech – which he admits had not yet occurred nor was even intended – can be inferred from the totality of the circumstances.  Although this Court held that plaintiff's *allegations* of intent were sufficient, he has reached the point of having to provide evidence of same and has failed to do so.  <u>Schoolcraft II</u>, at 22.[7]

Indeed, plaintiff's own testimony belies his claim that there was intent to restrain his speech.  Plaintiff claims that the alleged retaliation was driven by his internal complaints, not statements to the press.  56.1 ¶69.  Indisputably, plaintiff's administrative appeal of his performance evaluation – the only thing defendants did know about – was not protected by the First Amendment.  Moreover, as set forth above defendants are entitled to qualified immunity on any allegations based upon plaintiff's internal complaints.

---

[7] In addition, the probable cause or arguable probable cause for concluding that Schoolcraft was an EDP is sufficient to dismiss any First Amendment claim for that conduct.  <u>See</u> <u>Dunk v. Brower</u>, 2013 U.S. Dist. LEXIS 160667, at 25.

Plaintiff does not even pretend to know when the defendants first came to believe that he might make disclosures to the press.  See Exhibit B to the Mettham Decl. at 265:19-25.  Plaintiff does not allege that defendants made statements to him or each other indicating an attempt to stop him from speaking to the press.  Nor does plaintiff provide any evidence that he made statements to defendants indicating a threat or intent to speak to the press.  Thus, there is simply no evidence that the defendants harbored any belief that plaintiff would speak to the press until February 1, 2010, when the first article was published citing him as a source.  See Exhibit M to the Mettham Decl.

Additionally, there is no evidence that the visits to plaintiff's home in Johnstown, New York, were intended to stop him from speaking to the press.  In fact, there was only one police visit to plaintiff's home after the February 1, 2010 publication, on February 3, 2010 – for the purpose of serving a notice of restoration to active duty to Schoolcraft (56.1 ¶67).

**D.      Plaintiff Cannot Establish the Chilling Effect Required to State a Claim.**

In order to proceed with his claim for "prior restraint" (Third Amended Complaint "TAC" ¶ 247), plaintiff must proffer evidence that he suffered an actual chilling effect to his speech from the defendants' actions, and he cannot do so.

The Court previously held that plaintiff had sufficiently met the pleading standards. However, at the summary judgment stage plaintiff must provide actual evidence which he has not done.  Plaintiff  never asserts that hi speech was chilled, or that he would have gone to the press sooner had the defendants' done nothing.  Pl. Opp. at 27-28.  Indeed, plaintiff admits that his speech was actually encouraged by the defendants' actions. See Plf. 56.1 at ¶¶91-92. Plaintiff's testimony proves the opposite of a chill: that he may *never* have gone to the press had defendants done nothing.  Plaintiff testified that as of October 31, 2009, "I don't believe it ever crossed my mind, going outside the department," and he "still believed that . . . once I brought the evidence forward,

that the department would have to resolve the issues of misconduct in the 81st Precinct.  And it would be handled inside -- inside the department." Exhibit B to the Mettham Decl. at 265:3-10.

Nonetheless, by February 2, 2010 plaintiff was the subject of a published article and communicated with the press with wild abandon. *Supra* at 13.; 56.1 ¶¶ 76-81.  The only reasonable inference is that, rather than chilling his speech, the defendants' instigated it, and the speech would not have occurred without the defendants' conduct.

Thus, there can be no inference that Schoolcraft suffered the "actual chill" that is required to set forth a prior restraint claim, regardless of the nature of the defendants' conduct.  Plaintiff's reliance on Kerman v. City of New York, 261 F.3d 229 (2d Cir. 2001) is misplaced, because in that retaliation claim –not a prior restraint claim as Schoolcraft purports to bring here  – there was no evidence, proving the absence of a chill.  Rather, Kerman concerned a one-time interaction with no opportunity for further speech. There the plaintiff alleged that "the police violated his First Amendment rights by taking him to Bellevue Hospital in retaliation for his derogatory remarks to the police and his threats to sue them." Id. at 242.  In Kerman, there is no evidence from which to judge the existence of a chilling effect; indeed, the question was nearly meaningless.  In contrast, here there is much evidence, and all of it points to the absence of a chill.

Since Kerman, the Second Circuit has clarified that "plaintiffs who allege a violation of their right to free speech" must prove that "(1) defendants silenced him or (2) defendants actions had some actual, non-speculative chilling effect on his speech."  Williams v. Town of Greenburgh, 535 F.3d 71, 78 (2d Cir. 2008).  Likewise, as with plaintiff, when there is evidence that the protected conduct continued after the alleged retaliatory act (or even in response to the retaliatory act), a plaintiff cannot establish a chilling effect.  Id.  (Because plaintiff petitioned for readmission after his allegedly

retaliatory expulsion from a community center, complaining of defendants' conduct, he could not establish a chilling effect).[8]

Accordingly, Schoolcraft's First Amendment claim should be dismissed.

**POINT V**

**PLAINTIFF HAS NOT ESTABLISHED THAT CERTAIN DEFENDANTS WERE PERSONALLY INVOLVED.**

As set forth in City defendants' original memorandum, Section 1983 imposes liability only upon a defendant who personally subjects, or causes to be subjected any person to the deprivation of any federal right. See, e.g., Williams, 781 F.2d at 323. For the reasons set forth herein, and in City defendants' original motion papers, certain claims brought by plaintiff must be dismissed for lack of personal involvement.

A.   **Captain Lauterborn**

Plaintiff's claims against Captain Lauterborn for excessive force, assault, and battery must be dismissed because he has belatedly alleged that Captain Lauterborn was personally involved in the use of force upon plaintiff inside of the apartment on October 31, 2009. Plaintiff

---

[8] Plaintiff's reliance on Zieper v. Metzinger, 474 F.3d 60 (2d Cir. 2007) is misplaced, because there the defendant  FBI agents asked the plaintiff to take down an internet file and he did so; in contrast here there is no evidence whatsoever that the defendants asked plaintiff to refrain from speech or even that he did so. Some courts do hold that where a plaintiff asserts a First Amendment workplace retaliation claim, adverse employment action may substitute for an actual chilling effect.  Greenburgh, 535 F.3d at 76.  However, in the instant matter plaintiff makes no First Amendment claim for retaliation by adverse employment action.  TAC ¶¶ 245-261.  Even if plaintiff wished to pursue such a claim, after three amendments to his complaint, it is too late to change it yet again, on the eve of trial and in the midst of summary judgment motions. Alali v. DeBara, 2008 U.S. Dist. LEXIS 86760, *3 n.6 (S.D.N.Y. Oct. 24, 2008). See also Southwick Clothing LLC v. GFT (USA) Corp., 2004 U.S. Dist. LEXIS 25336, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.")  Moreover, Schoolcraft was entitled to contest the adverse employment actions through administrative procedures provided to him by law and his public employee union contract; he declined to do so.  See City 56.1 ¶ 67.

does not dispute that his complaint is devoid of any specific allegation that Lauterborn used force against him. Instead he points out that there is evidence in the record that Lauterborn was involved. However, courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment.  Alali v. DeBara, 2008 U.S. Dist. LEXIS 86760, *3 n.6 (S.D.N.Y. Oct. 24, 2008). See also Southwick Clothing LLC v. GFT (USA) Corp., 2004 U.S. Dist. LEXIS 25336, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."). Accordingly, plaintiff's excessive force, assault, and battery claims against Lauterborn must be dismissed for lack of personal involvement.

Nonetheless, if the Court is inclined to consider plaintiff's untimely allegation of force against Captain Lauterborn, it is clear that the claim still must be dismissed because there was probable cause to remove plaintiff to the hospital for a mental health evaluation. See Esmont v. City of New York, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) ("Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out."). Because it is only alleged that Capt. Lauterborn assisted in handcuffing plaintiff, and the reason for handcuffing plaintiff was clearly permissible, plaintiff's claims against Capt. Lauterborn for excessive force, assault, and battery must be dismissed.

B.     **Captain Trainor, Chief Nelson, and Lieutenant Caughey.**

As set forth above, plaintiff has not properly alleged any claims against defendants Trainor, Nelson, or Caughey. Accordingly, summary judgment must be granted in their favor.

### POINT VI

### PLAINTIFF CANNOT DEMONSTRATE A CONSPIRACY SUFFICIENT TO SURVIVE SUMMARY JUDGMENT.

Plaintiff argues that his conspiracy claim should survive summary judgment because: (1) an intra-corporate conspiracy is permitted among City defendants because they were acting for personal interests; and (2) there is circumstantial evidence of a conspiracy between the City employees and the private employees of Jamaica Hospital.  These arguments fail because an intra-corporate conspiracy claim may not lie, where, as here, all defendants are alleged to be acting in the scope of their employment, and the scope of employment issue is conceded by defendants.  Moreover, there are no facts that would remove the actions of the defendants from the scope of employment.  Despite plaintiff's laundry list of alleged errors by Jamaica Hospital, there is no evidence of an agreement by, or even a motive for, Jamaica Hospital to violate plaintiff's constitutional rights, the *sine qua non* of conspiracy under §1983.

A.     **There is no exception to the intra-corporate conspiracy doctrine where, as here, the co-conspirators with the same employer were all acting within the scope of employment.**

Plaintiff's argument that an exception to the intra-corporate conspiracy doctrine must be made here fails because all the City defendants were acting within the scope of their employment.  It is well settled that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. N.Y. 1978).  Plaintiff alleges that all of the defendants were acting "within the scope of their employment by the City of New York" and "in furtherance of their employment by the City of New York," and "under the supervision of said department and

according to their official duties." TAC ¶¶ 11-16.  Defendants do not contest these allegations

and in any event there is no evidence to the contrary.

While a party is entitled to allege claims in the alternative, a plaintiff may not proceed

through summary judgment and on to trial on mutually exclusive contentions, where the

defendant concedes one of the contentions: here, that the defendants acted within the scope of

employment.  Arguably plaintiff may withdraw his claims that rely on defendants' acting within

the scope of employment, but he cannot at this stage try a claim inconsistent with that contention,

which is conceded by defendants.  See infra at 33.   In any event it is clear that defendants acted

within the scope of employment.

Although there is a personal interest exception to the intra-corporate conspiracy doctrine,

the Second Circuit has never altered its formulation in Herrmann that clearly bars an

intracorporate conspiracy claim where, as here, all the conspirators act within the scope of

employment.  See White v. City of N.Y., 12 Civ. 7156 (ER), 2014 U.S. Dist. LEXIS 123255, 46

(S.D.N.Y. Sept. 3, 2014) (agency employees who allegedly acted together within the scope of

employment to issue false disciplinary charges against teacher were covered by intracorporate

conspiracy doctrine) (citing Chillemi v. Town of Southampton, 943 F. Supp. 2d 365, 2013 WL

1876443, at *12 (E.D.N.Y. 2013)); Anemone v. Metropolitan Transp. Auth., 419 F. Supp. 2d

602, 604 (S.D.N.Y. 2006) (dismissing conspiracy claim, finding personal interested exception

"of no use" to plaintiff who alleges both scope of employment and Monell liability); [9] see also

Randle v. Alexander, 960 F. Supp. 2d 457, 475 (S.D.N.Y. 2013) (intracorporate conspiracy

---

[9] And while defendants contest the allegations in Schoolcraft's Monell claim, there also he
alleges that the defendants acted in conformity with a policy of the City of New York. TAC ¶¶
302-03.  Even if these scope of employment is not fatal to the conspiracy claim, the  Monell
allegations surely are, and Schoolcraft cannot proceed on both a Monell and intracorporate
conspiracy claim based on the personal interest exception.

doctrine applies to employees acting within the "scope of employment," and defendant correction officers who forced inmates to fight each other were acting beyond the "scope of their responsibilities as prison guards" and therefore not covered by the doctrine).

The case law upon which plaintiff relies in support of his conspiracy claim is not persuasive.  In Reich v. Lopez, the court found that one defendants' interest in protecting a bribery scheme from which a defendant allegedly derived "disproportionately great profit," "as compared to . . . or at the expense of" his employer, that could support an exception for that employee to the intracorporate conspiracy doctrine. No. 13-CV-5307 (JPO), 2014 U.S. Dist. LEXIS 115079, *53 (S.D.N.Y. August 18, 2014).  The Reich court did not consider whether the allegations were consistent with actions within the scope of employment, because the issue was irrelevant: the employer was not a defendant and scope of employment was apparently not alleged.  Id., at *2-3, *54.  In Rini v. Zirwin, the court held that the individual defendants acted within "the scope of their official duties" for the town, except for one who, although a town employee, took actions outside the scope of "his duties as an employee of the town," such as attending policy meetings that it was not his job to attend.  Id., at 54.  There is nothing comparable in this case to distinguish the actions of any defendant from their job duties, and there was no suggestion in Rini v. Zirwin that the defendant's actions were within the scope of employment.

Likewise, in Yeadon v. New York Transit Authority, no state law claims or scope of employment allegations were presented. 719 F. Supp. 204 (S.D.N.Y. 1989).  In distinguishing the intracorporate conspiracy doctrine, the court relied on case law concerning racial discrimination claims and authority from other circuits, to find that the individual defendants – alleged to have created false reports inventing complaining witnesses to justify false arrests –

"possessed independent, personal conspiratorial purposes." 719 F. Supp. at 212.  The principal grounds for Yeadon's holding – a "multiple acts" exception to the intracorporate conspiracy doctrine in discrimination cases – has since been rejected in the Southern District.  See, e.g., Dilworth v. Goldberg, 914 F. Supp. 2d 433, 466-467 (S.D.N.Y. 2012).  Lacking any discussion of the scope of employment, Yeadon is not authority that plaintiff may establish both scope of employment liability and the personal interest exception at the same time. [10]

Plaintiff also incorrectly suggests that the intracorporate conspiracy doctrine does not apply to dealings between NYPD and FDNY officers.  However, as alleged in the SAC, all of the individual City defendants work for the same municipal corporation – the City of New York, and their assignment to different agencies is irrelevant for the purposes of the intracorporate conspiracy doctrine, which applies even to separate corporate entities, such as parents and subsidiaries.  See McEvoy v. Spencer, 49 F. Supp. 2d 224, 226 (S.D.N.Y. 1999) (conspiracy claim against, inter alia, the Police Commissioner and an assistant Corporation Counsel for the City of Yonkers was barred, and noting that, although the defendants "work[ed] in different departments of the City," that fact was "of no more moment in the municipal context than it

---

[10] In Hill v. City of New York, also cited by plaintiff, the Eastern District court held that the personal interest exception to the intracorporate conspiracy doctrine applied because the defendant officer acted "other than in the normal course of [his] corporate duties" and "in his own personal interest," to cover up his illegal use of force: ramming a suspect on a stopped motorcycle with his squad car, in contravention of NYPD rules.  No. 03 CV 1283 (ARR), 2005 U.S. Dist. LEXIS 38926, *3 (E.D.N.Y. Dec. 30, 2005).  The court relied on another Eastern District decision, Bond v. Board of Educ., holding to the contrary, that the allegation that defendants were acting "in the ordinary course of employment" was inconsistent with the private interest exception.  No. 97 CV1337, 1999 U.S. Dist. LEXIS 3164, 6 (E.D.N.Y. Mar. 17, 1999).  While Hill also held, correctly, that a claim for negligent hiring and supervision should be dismissed because scope of employment was undisputed, the court did not consider an inconsistency with the personal interest exception, or the holding in Bond.  Id. at 36.  There is no evidence of personal interest here that is comparable to the Hill case, and in any event this Court should not follow its ruling on the issue of intracorporate conspiracy.

would be if the individual defendants worked for the Mainframe and Personnel Divisions of IBM"); Dunlop v. City of New York, 2008 U.S. Dist. LEXIS 38250, 30 (S.D.N.Y. May 6, 2008) (finding that separate City agencies were the same entity for the purposes of intracorporate conspiracy); Copperweld Corp. v. Independence Tube Corp., 467 Y,S, 752, 771 (1984) (applying doctrine to parents and subsidiaries).   Indeed, the NYPD and FDNY are not even cognizable juridical entities, thus plaintiff's conspiracy claim cannot survive on this basis.

**B.      There is no evidence of an agreement between City employees or NYPD officers and others to violate Schoolcraft's constitutional rights.**

Plaintiff argues that, notwithstanding the intracorporate conspiracy doctrine, a conspiracy claim may proceed against the City defendants and Jamaica Hospital, a private entity.  This argument fails because there is no evidence from which a reasonable jury could infer an agreement to violate plaintiff's rights.  While circumstantial evidence may sometimes be sufficient to prove a conspiracy, the litany of purported errors by the non-NYPD defendants in their handling of Schoolcraft does not support an inference of an agreement, in part because the essential element of any agreement is lacking.  Unlike the typical conspiracy case where the motive to conspire (usually financial) may be presumed, plaintiff has not pointed to any motive for the non-City defendants to enter into a conspiracy to violate Schoolcraft's rights.

Plaintiff's claim that two Jamaica Hospital EMTs, plus two Jamaica Hospital doctors, a nurse, and others (Pl. Opp. at 53-59, TAC ¶292 ) – all agreed to a plot to confine him without basis – without prior contact with the NYPD defendants, no reason for animus towards Schoolcraft, and for no apparent benefit to Jamaica Hospital – "strain[s] credulity beyond the breaking point." Blount v. Swiderski, 2006 U.S. Dist. LEXIS 82889, 58 (E.D.N.Y. Nov. 14, 2006) (finding that claim of conspiracy to present false testimony based on a conversation between the defendants and the allegedly false testimony itself is insufficient to raise a triable

issue of fact.)   As evidence, plaintiff points to the fact that Jamaica Hospital records reflect statements by NYPD personnel about him (which is obviously appropriate if the statements were made); and purported errors by the EMTs: the preference for Jamaica Hospital as the hospital that two EMTs testified was closer according to the 911 dispatch system (POX 10 annexed to the Declaration of Nathaniel B. Smith in Opposition to Defendants' Motion for Partial Summary Judgment ("Smith Opp. Decl.") at 107:18-108:10; POX 29 to the Smith Opp. Decl. at 124;7-20),[11] and which contained a full panoply of hospital services not found at Forest Hills, not just a psychiatric ward (Hanlon Deposition Transcript at 252:7-253:13 annexed to the   Shaffer Supplemental Decl. as Exhibit G), and discrepancies between recollection and paperwork about when the second blood-pressure readings were taken. Whatever the import of the alleged errors by the medical defendants, they do not support an inference of an agreement with the City defendants to violate plaintiff's constitutional rights.

---

[11] The court should disregard the unauthenticated "Google Map" report of the distance between Jamaica Hospital and Schoolcraft's apartment offered by Schoolcraft. First, it is irrelevant to the state of mind of the EMTs, because they did not consult Google that evening.  Second, internet information is hearsay and Schoolcraft cites no authority (and we are aware of none) that the Court may take "judicial notice" of Google Maps for the truth of the matters asserted therein. See Pl. Opp. at 51 n. 146.

## POINT VII

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CANNOT SUCCEED WHERE THE UNDERLYING CLAIMS FALL WITHIN TRADITIONAL TORT LIABILITY.**

Plaintiff's opposition incorrectly states that City defendants are asking that the IIED claim be dismissed because their conduct is not sufficiently outrageous. Although City defendants do not concede that their conduct was sufficiently outrageous, the reason City defendants are arguing that the claim must be dismissed is because "claims of intentional and negligent infliction of emotional distress cannot co-exist with claims of excessive force, assault, and battery." Saldana v. Port Chester, 09-CV-6268 (SCR)(GAY), 2010 U.S. Dist. LEXIS 142099, *13 (S.D.N.Y. July 21, 2010) (citing Dorn v. Maffei, 386 F. Supp. 2d 479, 486 n.5 (S.D.N.Y. 2005); Naccaratto v. Scarselli, 124 F. Supp. 2d 36, 44-45 (N.D.N.Y. 2000)); see also, Rasmussen v. City of New York, 766 F. Supp. 2d 399, 415 (E.D.N.Y. 2011) ("an intentional infliction claim is a gap-filling cause of action meant to address those few areas of outrageous anti-social behavior not addressed under any other cause of action."). Here, plaintiff maintains several claims, namely excessive force, unlawful search and seizure and New York State Law causes of assault and battery which undoubtedly preclude an IIED claim.

When he does address City defendants' actual argument in favor of dismissing the IIED claim, plaintiff argues that the claim survives because it does not pertain to his false arrest, assault and battery, unlawful entry, or other claims rooted in the events of October 31, 2009. Instead he argues that the IIED claims are rooted in the events that took place prior and subsequent to October 31, 2009, and his unending narrative of an ongoing – albeit unfounded – conspiracy to retaliate against him. Nonetheless, plaintiff's argument fails because he has presented no evidence that he suffered any emotional distress as a result of City defendants'

actions prior to or subsequent to October 31, 2009.  Instead the only evidence of any emotional injury at all are the statements contained within the report of plaintiff's expert Dr. Roy Lubit. Dr. Lubit's report clearly attributes any purported emotional injuries solely to the events of October 31, 2009.[12]

Indeed, where a plaintiff has not shown sufficient evidence of suffering severe emotional distress he cannot maintain an IIED claim. Cuellar v. Love, 2014 U.S. Dist. LEXIS 51622, **43-45, (S.D.N.Y. Apr. 11, 2014).  Moreover, the IIED claim must also be dismissed because the facts from which that claim allegedly arises are the same facts that purportedly give rise to plaintiff's myriad other claims.  See Rivers v. Towers, Perrin, Forster & Crosby, Inc., 2009 U.S. Dist. LEXIS 26301 (E.D.N.Y. Mar. 27, 2009).  Perhaps most importantly, " a party should not be able to argue intentional infliction as an "end run around a failed [] claim," especially when defendants acted within their legal rights." Aretakis v. Durivage, 2009 U.S. Dist. LEXIS 7781 (N.D.N.Y Feb. 3, 2009) citing Howell v. New York Post, Inc., 81 N.Y.2d at 125.  Accordingly, it is clear that to the extent plaintiff could bring an IIED claim at all it is precluded by his other causes of action.

---

[12] "Mr. Schoolcraft is suffering from post-traumatic stress disorder as a result of the abuse he suffered at the hands of the police and in the hospital. He feared for his life when the police were physically abusing him. He has intrusive recollections of the abuse and time in the hospital much of the time. His view of the world has been adversely affected and he no longer feels justice will be done or that wrongful behavior will remedied. He avoids talking about what occurred when he can and avoids NYC as much as he can. He is anxious when in NY if he is alone. He's not making close connections with people. He says he is in hiding. He is often on edge and has decreased concentration. He startles more than he used to. He is more irritable than he used to be." See PMX 30 annexed to the Declaration of Nathaniel B. Smith in Support of Plaintiff's Motion for Partial Summary Judgment ("Smith Decl.").

**POINT VIII**

**THE CLAIM FOR NEGLIGENT HIRING AND RETENTION AGAINST THE CITY MUST BE DISMISSED BECAUSE THE PLAINTIFF CONTENDS THAT THE INDIVIDUAL DEFENDANTS ACTED WITHIN THE SCOPE OF THEIR EMPLOYMENT.**

Plaintiff concedes as he must that he: 1) may not prosecute common law negligence claims against the City for actions by City employees done within the scope of employment; and 2) that he has alleged that all the conduct by City employees was done within the scope of employment. See P. Opp. at 66. Nevertheless plaintiff asserts that his claims should survive summary judgment on "alternative" theories because he may plead in the alternative,[13] although he has never alleged conduct outside the scope of employment.

The rule of New York law precluding negligence claims where scope of employment is undisputed is not a rule of pleading; it is a rule of substantive law grounded on a concern for judicial economy, crafted to bar irrelevant and redundant claims. Once scope of employment is conceded, the negligence claim must fall by the wayside: "[W]here a defendant employer admits its employees were acting within the scope of their employment, an employer may not be held liable for negligent hiring, training, and retention as a matter of law." Rowley v. City of New York, 2005 U.S. Dist. LEXIS 22241, 37-38 (S.D.N.Y. Sept. 29, 2005); see Kramer v. City of New York, No. 04 cv 106, 2004 U.S. Dist. LEXIS 21914, *37 (S.D.N.Y. Nov. 1, 2004) (where City stated that the individual defendants were employed by it on the date in question and acted

---

[13] Plaintiff cites a decision on a Rule 12(b)(6) motion to dismiss, where the complaint alleged both intentional and negligent torts. Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 399 (S.D.N.Y. 2013); Plf. Opp. at 66 n. 182. That circumstance is entirely inapposite to a motion for summary judgment where one of plaintiff's key contentions – scope of employment – has been conceded by the defendants, rendering another claim not only inconsistent but redundant.

within the scope of their employment, "in light of this concession" the negligent training and supervision claim must be dismissed). That is so because "where an employer has admitted that the employee acted within the course and scope of employment, evidence of negligent hiring, training, supervision or retention becomes unnecessary, irrelevant and prejudicial." Sun Min Lee v. J.B. Hunt Transp., Inc., 308 F. Supp. 2d 310, 313 (S.D.N.Y. 2004).

In other words, the plaintiff cannot use the negligence claim as an excuse to offer irrelevant and prejudicial evidence of unrelated purported misconduct. Id.; See TAC ¶¶ 347-358. Accordingly, the claim for negligent retention and supervision must be dismissed. In any event, there is no evidence to suggest anything other than conduct within the scope of employment, and therefore the plaintiff cannot proceed to trial on that theory.

## POINT IX

### PLAINTIFF CANNOT ASSERT A CLAIM FOR MALICIOUS ABUSE OF PROCESS BECAUSE HE WAS NOT HELD PURSUANT TO LEGAL PROCESS.

Plaintiff's opposition to City defendants' motion to dismiss his malicious abuse of process claim is premised upon a fundamental misunderstanding of: 1) the difference between criminal and civil process; and 2) what constitutes a liberty interest. As set forth in City defendants' original motion papers, only criminal abuse of process is cognizable under Section 1983 and civil abuse of process does not amount to a deprivation of rights. Green v. Mattingly, 585 F.3d 97, 104 (2d Cir. 2009)("'section 1983 liability . . . may not be predicated on a claim of malicious abuse of' . . . civil process,")(quoting Cook v. Sheldon, 41 F.3d 73, 79-80). In his opposition plaintiff relies upon Cook, a case in which the plaintiff was arrested and charged with a crime. Accordingly, unlike plaintiff here, the plaintiff in Cook was subjected to *criminal* legal process. Nonetheless, plaintiff posits that the Cook Court held that the underlying consideration

on a malicious abuse of process claim is not whether the process is criminal or civil, but whether it threatened a liberty interest.

Plaintiff is incorrect. In fact, it is abundantly clear that Section 1983 liability may not be predicated on a claim of malicious abuse of civil process. See Alroy v. City of New York Law Dep't, 2014 U.S. Dist. LEXIS 164114 (S.D.N.Y. Nov. 24, 2014) (citing Cook v. Sheldon, 41 F.3d 73, 79-80 (2d Cir. 1994)).

Even if plaintiff were correct that the focus of the inquiry is whether a liberty interest was threatened his reliance on McAardle v. Tronetti, in support of that proposition is flawed for at least two reasons.  First, McArdle, a Third Circuit case, deals with Pennsylvania State Law. 961 F.2d 1083, 1084 (3d Cir. 1992).  Therefore, because it is clear, according to Cook, that the elements of this claim derive from New York State law, plaintiff's reliance on McArdle is inapposite. Second, and perhaps the most egregious of all of plaintiff's misstatements and shortcomings, he fails to inform the Court that the malicious abuse of process claim in McArdle was *dismissed*. Accordingly, for all of the reasons stated herein, and in City defendants' original motion papers, plaintiff's malicious abuse of process claim must be dismissed.

## POINT X

### PLAINTIFF CANNOT SURVIVE SUMMARY JUDGMENT ON ANY OF HIS THEORIES OF MUNICIPAL LIABILITY.

Plaintiff contends that he has adduced evidence to support a Monell claim based on a supposed "persistent and widespread practice" and "deliberate indifference" to constitutional violations.  Pl. Opp. at 73.  In support, plaintiff cites: (i) an inadmissible and irrelevant expert report of Mssrs. Silverman and Eterno, which is no more than a vehicle to repeat hearsay and outdated reports of prior misconduct that are over 20 years old; (ii) a handful of purportedly similar incidents; and (iii) the alleged conduct of defendant Mauriello, as to which no policy

- 36 -

maker has been shown to be deliberately indifferent. This evidence is insufficient to support a Monell claim.[14]

### A. The Proffered Expert Testimony of Silverman or Eterno Does Not Support Plaintiff's Monell Claim.

The expert testimony of Silverman or Eterno does not preclude summary judgment dismissing plaintiff's Monell claim because it consists merely of a rendition of outdated information that is not relevant to this case, and anecdotal, anonymous hearsay.[15]

First, both plaintiff and his expert lean heavily on the Mollen Commission report *of 1994* to establish that there is a wide-spread culture of retaliation against those officers who complain about their colleagues: referred to as the "Blue Wall of Silence." Pl. Opp. at 74; Eterno and Silverman Report at 8-9 annexed as POX 11 to the Smith Opp. Decl. Indeed, Eterno's report goes back even further, to 1972. Id. at 8. Plaintiff also cites to an IAB report based on focus groups – that is, undocumented hearsay – which is undated and unauthenticated. IAB report at 1

---

[14] In the alternative, should this motion be denied, the City defendants will move to bifurcate Monell issues as confusing and prejudicial to the conduct of a fair trial on other issues.

[15] The City defendants reserve the right to move by motion in limine to preclude all of the experts' testimony under Rules 702, 402 and 403. For the purposes of this motion, we address only whether the testimony is sufficient to support plaintiff's Monell claim for summary judgment purposes, regardless of its admissibility, in general, as expert testimony. But as will be demonstrated in pre-trial motions, if need be, the testimony lacks the basic requirements of expert testimony under Fed. R. Evid. 702. See Kumho Tire v. Carmichael, 526 U.S. 137, 152 (1999). The testimony would also constitute an improper summation from the witness stand, subverting the functions of counsel, court and jury. See e.g., Hygh v. Jacobs, 961 F.2d 359, 363-64 (2nd Cir. 1992) (police practices expert's testimony that defendants conduct was "totally improper" and not "justified" or "warranted" should have been excluded because it "merely [told] the jury what result to reach"); In re Rezulin Prods. Liab. Lit., 309 F. Supp. 2d 531, 547, 546-50 (S.D.N.Y. 2004) (excluding expert testimony that purported to tell the jury the "real motives" behind defendants conduct and repeats the facts or opinions stated by other witnesses or reflected in documents produced in discovery). Lippe v. Bairnco Corp., 288 B.R. 678, 686-88 (S.D.N.Y. 2003) (excluding expert testimony on the motivations of defendants which "carried on the traditional functions of a lawyer-advocate")

annexed as POX 38 to the Smith Opp. Decl.; Pl. Opp. at 74.  The typewritten, faded report was commissioned during the first term of Commissioner Kelly, which ended in 1994, and dates from the first tenure of Police Commissioner Bratton, which ended in 1996.   Neither plaintiff nor his experts have evidence to offer on whether the so-called Blue Wall of Silence was a custom and practice of the NYPD in 2009, or whether it caused plaintiff's injuries.

Whatever the conditions over 20 years in the past, they are as a matter of law irrelevant to the events in 2009 that are at issue in this case.  Most of the authorities cited by plaintiff for the relevance of the Mollen Commission and Blue Wall of Silence date from the 1990s, or do not concern the City of New York, and are therefore inapposite.  See Pl. Opp. at 80-83 nn. 241, 242. The closest case in time cited by plaintiff concerned sexual harassment, not a quota system or other police corruption, was decided over 13 years ago, and concerned events occurring in *1992* (two years before the Mollen Commission report).  Id.; Katt v. City of New York, 151 F. Supp. 2d 313, 320 (S.D.N.Y. 2001), aff'd, 60 Fed. Appx. 357 (2d Cir. 2003).  Moreover, in Katt the so-called "Blue Wall of Silence" evidence was admitted solely to support plaintiff's subjective fear of retaliation (to explain why she did not utilize an internal complaint mechanism to report the sexual harassment), not to show a municipal policy of retaliation.  Id., 151 F. Supp. 2d at 358-59.

Accordingly, the Court should disregard the proffered expert testimony in determining whether summary judgment is appropriate.

### B.  The Purported Evidence of Specific Instances of Retaliation are Insufficient to Establish a Custom and Practice.

As the City defendants established in their moving brief, a handful of other incidents does not establish a policy, and plaintiff has offered no authority to the contrary.  City Mem. at 34-35. The policy of the NYPD, set forth in the Patrol Guide § 202-09, strictly prohibits retaliating against anyone for reporting misconduct, and states it "will not be tolerated."  Exhibit F to the

Shaffer Supplemental Decl. at 243:8-23.  Yet plaintiff persists in pointing to four officers that he claims had been treated similarly to himself.  Even if such evidence were admissible (and it is not), it is insufficient as a matter of law for <u>Monell</u> liability.  <u>Id.</u>; Pl. Opp. 80.[16]  That some of these officers may have the opinion that there is a culture of silence in the NYPD is irrelevant because it is inadmissible.  Plaintiff may not prove up a custom and practice sufficiently pervasive to support <u>Monell</u> liability through the say so of fact witnesses, never disclosed as experts, who can point to absolutely no independent evidence other than their own subjective impressions or their own individual cases.  Were plaintiff's approach admissible to prove <u>Monell</u> liability, every trial involving municipal liability under §1983 would be burdened with otherwise unrelated lay witnesses testifying as to personal opinions or their experience in unrelated cases.  The end result of such an approach would be a series of mini-trials aimed at assessing the credibility of these other witnesses.[17]

Additionally, there are specific defects in plaintiff's proffered evidence as well.  As an initial matter, plaintiff conflates the alleged "quota and downgrading system" – which could not have deprived Schoolcraft of any rights – and the supposed "system of retaliation." Pl. Opp. at 75.  Proof of the quota and downgrading system is not relevant to this case, and certainly not to <u>Monell</u> issues, since that is not a policy directed at depriving police officers such as Schoolcraft

---

[16] For one of these purported examples, Police Officer Craig Matthews, plaintiff relies upon a complaint and affidavit filed in separate litigation, and a court decision in that case.  Matthews Complaint and Affidavit annexed as POX42 to the Smith Opp. Decl.; Pl. Opp. at 80.  The affidavit does not speak at all to the issues of retaliation.  <u>See</u> POX42 to the Smith Opp. Decl. The complaint, unsworn and signed only by an attorney, is hearsay, as is the court's decision cited by plaintiff.  <u>See</u> <u>Chevron Corp. v. Donziger</u>, 974 F. Supp. 2d 362, 605-606 & nn. 1560-62 (S.D.N.Y. 2014) (judicial decisions are hearsay if offered to prove the truth of the matters stated therein).

[17] The City reserves the right to move to exclude the testimony of such witnesses on any and all grounds, via motion in limine or at trial.

of their constitutional rights.  As the City defendants previously established, and Schoolcraft has

not argued otherwise, Monell liability requires a strong and clear causal connection between the

alleged policy and the constitutional violation.  Pl. Opp. at 37-38; see Monell, 436 U.S. at 694;

Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985).  "Courts must apply rigorous

standards of culpability and causation … to ensure that' the indirect-causation theory not result

in the municipality's being 'held liable solely for the actions of its employee." Jeffes v Barnes,

208 F.3d 39, 61 (2nd Cir. 2000) (quotations omitted).

> The fact that plaintiff made comments and complaints about alleged quotas and
complaint downgrading, does not mean that those policies caused the constitutional violations he
alleges.  Rather, plaintiff must prove a policy of engaging in the constitutional violations of
which he complains, that caused the violation in his specific case: principally, allegedly sending
him to the hospital without cause.  Therefore, the testimony of others about a practice of quotas
or downgrading complaints is irrelevant to Schoolcraft's Monell claim, or any part of his claim.

> Moreover, Joseph Ferrara – one of the witnesses plaintiff proffered in support of his
Monell claim – did not give the testimony described by plaintiff.  Ferrara did not "witness first
hand" any quota, downgrading or retaliation: he admits he never witnessed it and knows of it
only by "talking to people."  Ferrara Transcript at 75:16-25 annexed to the Smith Opp. Decl. as
POX 39.   Thus, Ferrara's testimony on this supposed practice, including his unsupported
"belie[f]" that it "would be DI Mauriello" giving orders to further investigate complaints, is
speculation, without foundation, and inadmissible.  Id. at 77:24-78:19.  On the supposed calls
from IAB to the precinct asking for plaintiff (Pl. Opp. at 76), Ferrara offers only hearsay: that he
heard from unidentified others that IAB called to leave a message for plaintiff.  POX 39 at
193:10-18; 194:25-195:3.  (Contrary to Schoolcraft's misleading argument, Ferrara emphatically

testified that it was not the practice of IAB to call the precinct. Id. at 194:2-24.)  Ferrara's supposed testimony of "a policy" of leaking information to commanding officers about complaints (Plf. Opp. at 76) is likewise nothing of the sort, and consists of hearsay and speculation.  Ferrara heard "people talk" about *one* commanding officer and speculated "how does somebody find out about it" if they were not told.  Id. at 224:9-19.  Ferrara admitted that he had heard of only one instance ("no, that --- that's really []it") and expressly admitted that he lacked personal knowledge: "I mean I can't say definitely, you know," and related hearsay from his wife about another commanding officer being disciplined, not warned.  Id. at 225:3-226:6.:

Ferrara testified that he did not make a complaint of the downgrading system because "there's a perception in the NYPD to punish people who try to do good stuff sometimes."  Id. at 79:1-10.  While this statement may be admissible were Ferrara's personal intent relevant – which it is not – his testimony about his own unsupported perceptions, let alone testimony about others' beliefs, is not admissible to prove a policy or practice of the NYPD.  Nor did Ferrara witness any "retaliation" against plaintiff or anyone (which would be irrelevant to Monell issues in any event).  Pl. Opp. at 75-76.  Ferrara testified that sometime "right before" or "two to four weeks" before February 18, 2010 – after Schoolcraft was already suspended and had moved upstate – he heard Deputy Inspector Mauriello state that he had received a "heads up" about Schoolcraft.  POX 39 at 219:14-220:25.  Contrary to Schoolcraft's assertion, this is the only comment to the "effect" that plaintiff was a "rat" that Ferrara recalled.  Ferrara Deposition at 202:23-203:8 annexed to the Shaffer Supplemental Decl. as Exhibit H.  Indeed, Ferrara admitted that he could not testify that Mauriello even used the term "rat," as plaintiff claims.  Id. at 207:18-19 ("I wasn't sure exactly what was said. I wasn't sure if he used the word rat.")  This is hardly an instance of retaliation, and occurred long after any alleged instances of retaliation towards plaintiff.

Third, plaintiff offers no admissible evidence from Police Officers Polanco or Serrano, both of whom testified at the trial of another matter about a different precinct: the 40th Precinct in the Bronx.  Pl. Opp. at 77-79.  Even if these witnesses were to testify in this case (and there is no reason to think that they will)[18], their testimony about specific instances of retaliation against them would be insufficient to establish a department-wide policy as required by <u>Monell</u> (as well as generally inadmissible in a trial of this matter).  Moreover, the actual testimony of these witnesses is quite limited:  Polanco testified to his subjective belief that officers who report misconduct "are considered rats," and Serrano testified to his belief that such officers are "called a rat." Pl. Opp. at 78.   Even if true and admitted as evidence (and it should not be), this testimony does not establish a *department wide policy* of retaliation, let alone a policy of improper confinement of complainants as EDPs.  Individual instances of retaliation, or sweeping, unsupported assertions by complainants against the City, are no substitute for evidence in the form of scientifically tested data establishing a practice, or the testimony of policy-makers as to the actual policy of the department.  Accordingly, plaintiff has offered no admissible evidence of a policy of retaliation in the NYPD as of 2009.[19]

Plaintiff's sole authority that a summary judgment motion to dismiss a <u>Monell</u> claim may be denied on the basis of "Blue Wall of Silence" evidence is <u>Barry v. New York City Police Dep't</u>, 01 cv 10627 (CBM), 2004 U.S. Dist. LEXIS 5951 (S.D.N.Y. Apr. 6, 2004).  Pl. Opp. at

---

[18] The transcripts of their testimony at a separate trial are not admissible in this case.  Plaintiff in essence asks the Court to assume that the witnesses would give similar testimony in this case.

[19] Moreover, Polanco's testimony if offered at trial would be severely prejudicial because he claims to have been declared an EDP in retaliation for complaining about a quota system; as a purported instance of similar but otherwise irrelevant conduct, this evidence should be inadmissible under Fed. R. Evid. 403 and 404(b).  It would also entail a waste of time, as it would require a mini-trial on the facts alleged by Polanco, in the midst of the trial of this case.  If necessary, the City defendants reserve the right to address this issue more fully in motions in limine.

80.  Barry is inapposite.  First, Barry concerned events occurring in 1999, much closer in time to the Mollen Commission Report on which it relied.  2004 U.S. Dist. LEXIS 5951, at *4-5, *39-40.  Second, the witnesses on which the Barry court also relied were personally involved in the conduct of which the plaintiff complained and in responding to the allegations of misconduct, and they testified that they were motivated and affected by an alleged policy of retaliation.  Id., at *36-38.  While the court in Barry did not suggest that this alone would have been sufficient (and it is not), plaintiff, by comparison, presents no witnesses who participated in the events here to testify that the "Blue Wall of Silence" was a policy or a factor in their conduct.

### C.  Plaintiff has failed to proffer evidence of deliberate indifference.

Plaintiff fails to surmount the high hurdle for proof of deliberate indifference set forth in the City defendants' moving brief, or proffer evidence of deliberate indifference by a policy maker to constitutional violations here.  Plaintiff nowhere identifies any policy maker who was deliberately indifferent, nor any prior conduct of the defendants that came to their attention as to which they could be indifferent.  Nor does plaintiff proffer evidence of training programs that contained errors or omissions causing the constitutional violations alleged here.  Plaintiff identifies no defect in training that could be "closely related" as an "actual cause[]" of the conduct alleged, which is that defendants confined plaintiff for psychiatric treatment without cause.  Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989) (affirming summary judgment dismissing Monell claim because plaintiffs "have neglected to offer any evidence, however, as to the purported inadequacies in the Town's training program and the causal relationship between those inadequacies and the alleged constitutional violations").

Instead, plaintiff resorts to misstating Deputy Inspector Mauriello's testimony.  Plaintiff suggests that the witness did not know about the concept of the "Blue Wall of Silence," that

because did <u>not</u> condone the idea of a "Blue Wall of Silence"[20] and did not believe that it was widespread in the NYPD, then he must have been insufficiently trained in the matter.  Pl. Opp. at 82-83.[21]  This argument is circular: it posits the existence of the Blue Wall of Silence, assumes the witness is lying when he says he does not condone it, and then criticizes unspecified training and unspecified policy makers for the purported ignorance of the witness.  In short, plaintiff's deliberate indifference argument fails for the same reason as his custom and practice argument: he fails to proffer sufficient evidence of the practice, or any deficiency in training about it.  <u>See</u> <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1361 (2011).

Accordingly, plaintiff has not adduced sufficient evidence to support municipal liability and his claim against the City under Section 1983 should be dismissed.

---

[20] "I don't believe in the blue wall of silence.  If someone does something wrong, you report it, that's it."  POX 20 at 245:18-21.  Mauriello also testified that he was trained on the police officer's duty to report misconduct.   Exhibit F to the Shaffer Supplemental Decl. at 23:17-24:23.

[21] Schoolcraft again falsely asserts that Ferrara heard Mauriello refer to Schoolcraft as a "rat;" in fact he could not say that the term was used.  *Supra* at 42.  In any event, a single comment is not evidence of a failure to train or lack of supervision.

## <u>CONCLUSION</u>

For the foregoing reasons, City defendants respectfully request that the Court grant their motion for summary judgment pursuant to FED. R. CIV. P. 56.

Dated:      New York, New York
            March 6, 2015

                            Respectfully submitted,

                            ZACHARY W. CARTER
                            Corporation Counsel of the City of New York
                            *Attorneys for City Defendants*
                            100 Church Street, Room 3-212
                            New York, New York 10007
                            (212) 356-2386

                          By:              /s
                              Ryan Shaffer
                              Alan H. Scheiner
                              Senior Counsels