UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ADRIAN SCHOOLCRAFT,

                                          10–cv-6005 (RWS)

                    Plaintiff,

      -against-


THE CITY OF NEW YORK, *et al.*,
                        Defendants.
-------------------------------------------------------------x


*REPLY MEMORANDUM OF LAW IN SUPPORT OF*
*PLAINTIFF'S SUMMARY JUDGMENT MOTION*




                                          Nathaniel B. Smith
                                          John Lenoir
                                          111 Broadway – Suite 1305
                                          New York, New York 10006
                                          212-227-7062




Dated: March 6, 2014

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 5

1. DI MAURIELLO'S OPPOSITION................................................. 7

    *A.* Direct Interference and Causation ................................. 9

    B. Wrongful Means. ....................................................... 13

    C. Sole Motivation......................................................... 21

    D. *Brandt* Immunity ...................................................... 22

2. THE CITY DEFENDANTS' OPPOSITION ..................................... 23

  A.   The Rule 56.1 Statement Is Not Defective................................ 23

  B.  The Arguments About the City Defendants' Conduct at the Apartment
  Should Be Rejected…………………………………………………………. 24

    1. The Illegal Entry…………………………………………………25

    2. The Illegal Decision to Remain.. ........................................... 27

    3. The Decision to Place Officer Schoolcraft in Custody as an EDP……...30

3. THE MEDICAL DEFENDANTS' OPPOSITION ........................................... 30

    A.  Jamaica Hospital's Opposition ................................. 31

    B.  Dr. Bernier's Opposition....................................... 33

    C.  Dr. Isakov's Opposition......................................... 37

CONCLUSION.................................................................... 40

## TABLE OF AUTHORITIES

*Brigham City, Utah v. Stuart*, 547 U. S. 398, 403 (2006) ................................ 26, 28

*Carvel Corp. v. Noonan,* 3 N.Y. 2d 182, 190, 785 N.Y.S. 2d 359, 362 (2004). .... 15

*Catskill Dev., LLC v. Park Place Entertainment Corp.*, 547 F. 3d 115, 133
    (2d Cir. 2008).................................................................................................. 14

*Colon v. City of New York*, 2014 U.S. Dist. Lexis 46451 *13 (S.D.N.Y. April 2,
    2014) ................................................................................................................ 28

*Connolly v. Wood-Smith,* 2012 WL 7809099, at *11 (S.D.N.Y. May 14, 2012),
    *report and recommendation adopted as mod*, 2013 WL 1285168
    (S.D.N.Y. Mar. 28, 2013) ................................................................................ 14

*Demarco v. Sadiker,* 952 F. Supp. 2d 134 (E.D.N.Y. 1996) ............................... 33

*DiCosomo v. Getzoff*, 11 Misc. 3d 1063 (A), 816 N.Y.S. 2d
    (West. Sup. Ct. 2005) ................................................................................ 15, 21

*DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 115 (2d Cir. 2010) ................... 13

*Friedman v. Coldwater Creek, Inc.*, 321 Fed. Appx. 58,
    2009 U.S. App. Lexis 7514 (2d Cir. April 8, 2009), *affirming*,
    551 F. Supp. 2d 164 (S.D.N.Y. 2008) .............................................................. 20

*Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 171 (S.D.N.Y. 2008),
    *aff'd*, 321 Fed. Appx. 58, 2009 U.S. App. Lexis 7514
    (2d Cir. April 8, 2009) ..................................................................................... 21

*In re Bernard L. Madoff Investment Securities, LLC,* 440 B.R. 282, 296–97
    (Bankr.S.D.N.Y.2010) ..................................................................................... 15

*Jefferys v. City of New York*, 426 F. 3d 549 (2d Cir. 2005)............................ 27, 39

*Korn v. Princz,* 226 A.D.2d 278, 279, 641 N.Y.S.2d 283, 283 (1st Dep't 1996) ... 15

*MiniFrame Ltd. v. Microsoft Corp.,* 551 Fed. Appx. 1, 3 (2d Cir. 2013),
    *cert denied,* 135 S. Ct. 223, (2014)................................................................. 15

*Nadel v. Play–By–Play Toys & Novelties, Inc.,*
    208 F.3d 368, 382 (2d Cir. 2000) ................................................... 13

*Perma Research v Singer Co.*, 410 F. 2d 572, 578 (2d Cir. 1969) ......................... 27

*Posner v. Lewis* 18 N.Y. 3d 566, 942 N.Y.S. 2d 447 (2012) ................................. 23

*PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F. 2d 266, 270
    (2d Cir 1987).................................................................. 14

*Raskin v. Wyall Co.*, 125 F. 3d 55 (2d Cir. 1997)................................................... 11

*RFP LLC v. SCVNGR, Inc.,* 788 F. Supp. 2d 191, 198 (S.D.N.Y.2011) ............... 14

*Ritani, LLC v. Aghjayan,* 880 F. Supp. 2d 425, 452 (S.D.N.Y. 2012) .................. 14

*Rivera v. Leto*, 2008 U.S. Dist. Lexis 96680 at *12 (S.D.N.Y. Nov. 25, 2008)..... 28

*Rotter v. Leahy,* 93 F. Supp. 2d 487, 501 (S.D.N.Y. 2000).................................... 11

*Ruhlmann v. Ulster County Dept. of Social Services*, 234 F. Supp. 2d 140, 145
    (N.D.N.Y. 2002) ................................................................ 33

*Snyder v Sony Music Entertainment, Inc.,* 252 A.D. 2d 294, 300 (1st Dept 1999) 14

*Thompson v. Bosswick*, 855 F. Supp. 2d 67, 83 (S.D.N.Y. 2012) ......................... 14

*Timble v. Eli Lilly & Co.*, 429 Fed. Appx. 20 at *23, 2011 U.S. App. Lexis 1348
    (2d Cir. 2011.)................................................................. 13

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F. 2d 566, 572-73
    (2d Cir. 1991)................................................................. 27

*Treppel v. Biovail Corp.,* 2005 U. S. Dist. Lexis 18511 18511 at *15 (S.D.N.Y.
    Aug. 30, 2005) ................................................................ 15

*Treppel v. Biovail Corp.,* 2005 U. S. Dist. Lexis 18511 2737 at *8
    (S.D.N.Y. Feb. 22, 2005)................................................. 15

*Zellner v. Summerlin*, 494 F. 3d 344, 369 (2d Cir 2007)....................................... 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

ADRIAN SCHOOLCRAFT,

                                          10–cv-6005 (RWS)

                            Plaintiff,

      -against-                      *PLAINTIFF'S REPLY
                                        MEMORANDUM IN
                                        SUPPORT OF PLAINTIFF'S
                                        MOTIONS FOR SUMMARY
                                        JUDGMENT*

THE CITY OF NEW YORK, *et al.*,

                            Defendants.
----------------------------------------------------------------x

*PRELIMINARY STATEMENT*

      This complex, multi-party and multi-claim action is scheduled for trial on April 20, 2015.  We respectfully submit that summary judgment will dramatically reduce the number of issues that need to be tried before a jury.  By ruling on this motion for summary judgment, the Court can eliminate many of the claims or defenses that cannot hope to succeed and should be dismissed as a matter of law.  There are three basis points for which summary judgment is proper.

      First, the Court should dismiss Mauriello's counterclaims because he cannot satisfy the essential elements of his intentional interference and prima facie tort claims.  Prompt dismissal of these claims is particularly appropriate.  As demonstrated by his protracted opposition papers, DI Mauriello's claims about

Officer Schoolcraft's interference with his employment relationship with the NYPD and all the "evidence" that he claims is relevant to the "orchestration scheme" will create endless side-shows at trial having more to do with mud-slinging character attacks on Officer Schoolcraft rather than any genuine issue for trial.

Second, the Court should find as a matter of law that the City Defendants have not and cannot establish their heavy, Constitutional burden justifying their conduct on the night of October 31, 2009.  Thus, the Court should enter judgment as a matter of law against Chief Marino, DI Mauriello, Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough and Sergeant Duncan because their warrantless entry into Officer Schoolcraft's home was not justified by objectively reasonable facts demonstrating an  "emergency" or exigent circumstances.  And for the same reasons, the Court should enter judgment against those same NYPD defendants because when they entered Officer Schoolcraft's apartment and found him in bed watching television, the Constitution required them to leave and prohibited them from remaining, searching, or giving Officer Schoolcraft orders to return to the 81st Precinct (or to do anything else).  Similarly, their decision to re-enter the home after Officer Schoolcraft refused medical attention was unlawful – indeed, the City Defendants do not raise a substantial defense on that issue. Finally, the decision upon re-entry to place Officer Schoolcraft in custody as an

EDP was unlawful because no facts – as vividly shown by the audiotape – suggest that Officer Schoolcraft was mentally ill or dangerous to himself or others.   Since no rational person could, based on the undisputed facts, reasonably conclude that Officer Schoolcraft posed a threat to himself or others, summary judgment on that issue should also be granted.

Third, the Court should enter judgment as a matter of law against the Medical Defendants.  All three Medical Defendants (Jamaica Hospital, Dr. Benier, and Dr. Isakov) admitted at their depositions that Officer Schoolcraft was involuntarily committed and retained based on a determination that he presented only a mere potential or possible risk of dangerousness, not the substantial risk of dangerousness required by the Mental Hygiene Law.  While the Medical Defendants try to run away from their fatal admissions in their depositions, settled law does not permit a party to create a sham issue of fact by merely seeking to controvert clear and binding admissions under oath with a conflicting affidavit.

Our replies to the defendants' oppositions to these three points are set forth below.

## 1. DI MAURIELLO'S OPPOSITION

DI Mauriello's opposition attempts to cure fatal infirmities in his two counterclaims with endless overstatement about an "orchestrated scheme" by Officer Schoolcraft to "goad" the NYPD into breaking into his home, assaulting

him, and putting him in a psych ward for a week, all in service of a "premeditated plot" to bring a lawsuit.  Yet a jury need not sort though DI Mauriello's far-fetched theory of how Officer Schoolcraft played the master puppeteer and turned DI Mauriello and other high-ranking members of the NYPD into the "victim."   The tortious interference and the prima facie tort claims fail because of a simple absence of necessary proof on several essential elements of these claims.  Thus, DI Mauriello cannot show:

- *direct interference* by Officer Schoolcraft with any decision-maker at the NYPD or a *causal connection* between Officer Schoolcraft's alleged "lies" to QAD or IAB and any specific or concrete loss of an employment opportunity; or

- *wrongful means*, as that phrase has been defined by case law, such as criminal conduct or other conduct constituting tortious conduct; or

- the *sole motivation* for the alleged misconduct was disinterested malevolence towards DI Mauriello; or

- criminal conduct by Officer Schoolcraft that would vitiate *Brandt* immunity under the common law for reporting official misconduct.

DI Mauriello's attempts to raise a genuine issue of fact on each of these elements fail either because the undisputed facts do not support the claim as a matter of law or the "evidence" offered is inadmissible hearsay or rank speculation.

*     *     *

*A. Direct Interference and Causation*

DI Mauriello claims that Officer Schoolcraft's reports to IAB and QAD damaged his reputation, that he has not been promoted to the Inspector title for five years, and that the "loss" of this employment opportunity must be because of Officer Schoolcraft's "lies" to IAB and QAD. To support this claim, however, DI Mauriello does not offer any evidence from anyone at the NYPD in any kind of decision-making capacity over DI Mauriello's employment opportunities and that gap in his case is fatal.

As a counterclaim-plaintiff seeking damages for a lost employment opportunity, DI Mauriello must come forward with admissible evidence to defeat summary judgment. Under Rule 56 of the Federal Rules of Civil Procedure, "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[1] "[O]nly admissible evidence need be considered by a trial court in ruling on [a] motion for summary judgment."[2]

Yet in his opposing papers and his affidavit, DI Mauriello does not submit any admissible documents showing a lost employment opportunity. Nor does he

---

[1] Fed. R. Civ Pr. 56(e).
[2] *Raskin v. Wyall Co.*, 125 F. 3d 55, 66 (2d Cir. 1997).

submit an affidavit by any witness who attests to any such lost opportunity. Instead, he submits his own self-serving and unsupported affidavit, which fails to establish a foundation for his conclusions, and predicates his case based on speculation and hearsay.

DI Mauriello's Affidavit (Court Docket # 385) contains blatant hearsay.  For example, he states:  "I am confident, and *I have been told*, that if had not been for the lies and deceit engaged in by Adrian Schoolcraft to get revenge against me, I would have been promoted and re-assigned a long time ago."[3]  Since what he was "told" is an out-of-court statement being offered for the truth, it is hearsay and that is insufficient to defeat summary judgment.[4]

On the dispositive issue of the existence and cause of his alleged lost opportunity, DI Mauriello's case rests entirely on hearsay, speculation, and conclusory assertions about the thought processes of others.  As another example, he claims without basis that he has not "been considered" for a promotion and that it is "presumed" that individuals at his rank are promoted.[5]   Similarly, he contends that he is in a "dead-end" job based on the unsworn, out-of-court statement by a

---

[3] Mauriello Affidavit, 2-12-15, at p. 3 ¶ 7 (Dkt. # 385) (emphasis added).
[4] *See, e.g., Rotter v. Leahy,* 93 F. Supp. 2d 487, 501 (S.D.N.Y. 2000) (hearsay not sufficient to defeat summary judgment); *Sank v. City University of New York*, 2003 WL 1807142 at *4 (S.D.N.Y. April 7, 2003) (same)*, aff'd,* 112 Fed. Appx. 761 (2d Cir. 2004).
[5] Mauriello Aff. ¶¶ 6-7.

Captain Del Pozo, which is, in turn, based on a *media* account of that alleged statement.[6]

Absent *admissible* evidence of any lost opportunity, DI Mauriello instead offers a promise: "[w]e will demonstrate at trial that Mauriello would have been considered for promotion, and no doubt would have been promoted."[7]  But the salutary purpose of a summary judgment motion, however, is to weed out claims that lack sufficient evidence to *go* to trial.[8]   For that reason, a party opposing a motion for summary judgment must tender admissible evidence in *opposing* the motion, showing evidence of a genuine issue of fact for trial.

Rule 56(c) of the Federal Rules of Civil Procedure provides that an affidavit used to support or oppose a summary judgment motion must set out facts that would be admissible in evidence.[9]   Courts repeatedly hold that a plaintiff's naked speculation concerning an employer's motivations for making or not making an employment decision are insufficient to raise a genuine issue of fact on a summary judgment motion and should be disregarded.[10]   That same conclusion holds here because DI Mauriello lacks any admissible evidence that any decision-maker at the NYPD denied him an employment opportunity or that any lost opportunity had

---

[6] Mauriello Rule 56.1 Response Statement ¶ 28 at. P. 70 (Dkt. # 386).
[7] Mauriello Mem. at 13 (Dkt. # 387).
[8] *Weinstock v. Columbia University*, 224 F. 3d 33, 40 (2d Cir. 2000).
[9] *Timble v. Eli Lilly & Co.*, 429 Fed. Appx. 20 at *23, 2011 U.S. App. Lexis 1348 (2d Cir. 2011) (citing FRCP 56).
[10] *Id.*

anything to do with Officer Schoolcraft's statements to IAB, to QAD or to anyone else.

Mere suspicions and vague claims of tortious interference with prospective relations are simply insufficient.[11]  Indeed, vague allegations of interference that do not rise to the level of an actual breach or severance cannot amount to an injury sufficient to make out a tortious interference claim.[12]

Since DI Mauriello has not submitted admissible evidence that anything that Officer Schoolcraft did was directly injurious to him, he also cannot establish the specific type of causation required to establish a claim for tortious interference

---

[11] *See e.g., Scutti Enterprises, LLC v. Park Place Entertainment Corp.,* 322 F. 3d 211, 217 (2d Cir. 2003) ("mere suspicions are inadequate to support a claim for tortious interference with business relations"); *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 115 (2d Cir. 2010) (rejecting claims of tortious interference with business relations where the "allegations are too conclusory, vague, and lacking in a factual basis"); *Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000) (mere suspicions are inadequate to support a claim for tortious interference with business relations).

[12] *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F. 2d 266, 270 (2d Cir 1987) ("We fail to see how 'interference' with the benefits derived from a relationship that leaves the relationship itself unchanged in any way can also constitute interference with the underlying business relations"); *Connolly v Wood-Smith,* 2012 WL 7809099, at *11 (S.D.N.Y. May 14, 2012), *report and recommendation adopted as mod*, 2013 WL 1285168 (S.D.N.Y. Mar. 28, 2013) ("even if the plaintiff were found to have identified the allegedly interfered-with business relationships with adequate specificity, she has neither pled facts suggesting interference that 'rise[s] to the level of ... severance of the relationship,' nor identified a single business opportunity lost as a result of the alleged interference"); *RFP LLC v. SCVNGR, Inc.,* 788 F. Supp. 2d 191, 198 (S.D.N.Y.2011) ("Interference that does not rise to the level of a breach of agreement or severance of the relationship does not amount to an injury sufficient to make a tortious interference claim.").

with prospective relations.[13]   Accordingly, Mauriello's claim must be dismissed for

a lack of evidence of direct interference causing a lost opportunity.

    B. *Wrongful Means*.

    Nor can DI Mauriello establish that Officer Schoolcraft engaged in conduct

that falls within the meaning of the wrongful-means requirement, as defined by the

case law.   The New York Court of Appeals has established the general rule that

the defendant's conduct must amount to a crime or an independent tort to state a

---

[13] *Catskill Dev., LLC v. Park Place Entertainment Corp.*, 547 F. 3d 115, 133 (2d
Cir. 2008) (any connection to the alleged fraudulent misrepresentations by
defendant to gain an introduction had at most a tenuous connection to the harm
alleged); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 83 (S.D.N.Y. 2012) (direct
interference with a third party required:  "the defendant must direct some activities
toward the third party and convince the third party not to enter into a business
relationship with the plaintiff"); *see also Ritani, LLC v. Aghjayan,* 880 F. Supp. 2d
425, 452 (S.D.N.Y. 2012) (finding that "it is likely" that plaintiff might have
benefited from the initial contract insufficient); *Snyder v Sony Music
Entertainment, Inc.,* 252 A.D. 2d 294, 300 (1st Dept 1999) ( "the record show[ed]
that [plaintiff's] employment relationship with [employer] was placed in jeopardy
by his multiple violations of the firm's policy prohibiting outside employment,
rather than any interference on the part of defendants. Thus, it cannot be said that
'but for' defendants' interference, [plaintiff's] employment relationship with
[employer] would have continued); *Korn v. Princz,* 226 A.D.2d 278, 279, 641
N.Y.S.2d 283, 283 (1st Dep't 1996) ("[I]t is well settled under New York law that a
plaintiff must allege that he was 'actually and wrongfully prevented from entering
into or continuing in a *specific* business relationship."); *In re Bernard L. Madoff
Investment Securities, LLC,* 440 B. R. 282, 296–97 (Bankr.S.D.N.Y.2010)
(granting motion to dismiss where claimants pled only that interference resulted in
unspecified "lost opportunities"); *DiCosomo v. Getzoff*, 11 Misc. 3d 1063 (A), 816
N.Y.S.2d (West. Sup. Ct. 2005) (summary judgment granted to the defendant
dismissing tortious interference claim because of a lack of evidence that the
defendant made any statements to the third party and, like here, the evidence shows
that the third party conducted their own investigation into the defendants
allegations that led to the termination of the plaintiff's employment).

claim for tortious interference with prospective economic advantage.[14]  "Conduct

that is not criminal or tortious will generally be 'lawful' and thus insufficiently

'culpable' to create liability for interference with prospective contracts or other

nonbinding economic relations."[15]

In his Memorandum of Law, DI Mauriello attempts to set forth a list of the

"wrongful means" whereby Officer Schoolcraft caused damage to his relationship

with the NYPD.[16]  He claims that Officer Schoolcraft personally downgraded

crime reports; he "orchestrated" the events of October 31, 2009; he made

"misrepresentations" about his evaluation appeal; he made misrepresentations

---

[14] *Carvel Corp. v. Noonan,* 3 N.Y. 2d 182, 190, 785 N.Y.S. 2d 359, 362 (2004).
Thus, "where a suit is based on interference with a nonbinding relationship, ... as a
general rule, the defendant's conduct must amount to a crime or an independent
tort." *MiniFrame Ltd. v Microsoft Corp.,* 551 Fed. Appx. 1, 3 (2d Cir. 2013), *cert
denied,* 135 S. Ct. 223, (2014) (quoting *Carvel, supra); See also Treppel v. Biovail
Corp.,* 2005 U. S. Dist. Lexis 18511 2737 at *8 (S.D.N.Y. Feb.22, 2005)
(dismissing tortious interference claim where no statements by the defendants
"could sustain a claim for defamation or any other tort"); *Treppel v. Biovail Corp.,*
2005 U. S. Dist. Lexis 18511 at *15 (S.D.N.Y.  Aug. 30, 2005) ("vague and
conclusory amendments [to the prior complaint] do not transform plaintiff's
allegations of wrongful means into a tort or a crime).  Indeed, in *Treppel,* the court
aptly held that:  "A conclusory allegation of a larger tortious conspiracy does not
necessarily clothe the underlying conduct alleged – 'improper discovery,' 'secret'
provision of personal account records, and 'pressuring' plaintiff's employer – in
tortious or criminal cloth." *Treppel,* 2005 U. S. Dist. Lexis 18511 at *15.  That
analysis applies with equal force here because DI Mauriello repeatedly tries to
dress up his allegations and ad hominem attacks on Officer Schoolcraft's character
[15] *Id.*   The *Carvel* court left open the possibility that there could be conduct that,
although not a crime or a tort could be so culpable that it could be a basis for a
claim.
[16] Mauriello Mem. at 24; Dkt. # 387.

about being placed on restricted duty; he "reached out" or communicated with the media "selectively;" and he "lied" to QAD or IAB about "chronic" or "systemic" downgrading, about his "small sample" of downgrading examples, and about his "concern" for the community or other police officers.[17]

Other than the claims about the alleged "lies" to QAD, the other "conduct" now asserted to constitute wrongful means should be rejected procedurally because those claims were not raised in his counterclaims and leave to amend has not been sought or granted.[18]  Substantively, the claims are also insufficient as a matter of law.

DI Mauriello's attempts to cast and re-cast Officer Schoolcraft's "conduct" as wrongful means fail because none of that alleged conduct constitutes criminal behavior, an independent tort, or the kinds of other conduct that courts have held to be wrongful means.   The allegation that Officer Schoolcraft personally and "purposefully downgraded" crime reports is a trumped up charge lacking any evidentiary basis.  While DI Mauriello does attach to his papers copies of the crime reports that Officer Schoolcraft gave to QAD,[19] there is simply *no* evidence to suggest that Officer Schoolcraft engaged in any misconduct in connection with the

---

[17] *Id.*

[18] *Rojo v. Deutshe Bank*, 487 Fed. Appx. 586, 588-89, 2012 U.S. App. Lexis 10141 at *5 (2d Cir. May 21, 2012) (opposition to summary judgment not the place to raise new claims).

[19] Mauriello Rule 56.1 Response Statement, 2-12-15 ¶18 at p.67 (citing SM Exh. DD) (complaint reports)).

preparation of these reports.  Simply saying so simply doesn't make it so – in a courtroom or on a motion for summary judgment.  Thus, DI Mauriello needs *some* evidence to back up this claim that Office Schoolcraft "himself purposefully downgraded complaint reports as a means to cause unjustified harm to Mauriello's employment and career."[20]

But nothing in the mounds of Mauriello's papers or his endless allegations back up this claim with evidence.   And that it not surprising.  The QAD report, which was generated after QAD did its own independent assessment of the information provided by Officer Schoolcraft, states that Officer Schoolcraft prepared several of the downgraded crime reports he presented to QAD.  More important, the QAD Report substantiates Officer Schoolcraft's claims that he was directed by a supervisor to downgrade one of his report and that another report he prepared disappeared and that a supervisor improperly refused to take another report.[21]  Thus, there is no evidence that Officer Schoolcraft did anything culpable in preparing these crime reports.

The claim that Officer Schoolcraft engaged in wrongful means by "orchestrating" the events of October 31st is hopelessly meaningless and conclusory.  The law requires that a party be found liable for tortious *conduct* and while intent and motive may be helpful in understanding a party's conduct, the law

---

[20] *Id.*
[21] PMX 16 at NYC 5167, 5170, 5174, & 5179.

still requires that criminal or tortious acts be grounded in some sort of culpable conduct.[22]  No case, law or logic supports the notion that "orchestration" (whatever that means) is culpable or unlawful conduct.  One court aptly noted:  "A conclusory allegation of a larger tortious conspiracy does not necessarily clothe the underlying conduct alleged – 'improper discovery,' 'secret' provision of personal account records, and 'pressuring' plaintiff's employer – in tortious or criminal cloth."[23]

The allegation that Office Schoolcraft contacted the media – selectively or otherwise – cannot constitute wrongful means because there is nothing unlawful or culpable about speaking to the media.  Indeed, the First Amendment to the United States Constitution provides Officer Schoolcraft with an important right to freedom of speech.

Next, DI Mauriello claims that Officer Schoolcraft "lied" about his appeal, "lied" about the cause of his restricted duty status, and "lied" about the systemic downgrading at the 81st Precinct and the "small sample" he presented to QAD. Once again, DI Mauriello makes sweeping allegations that do not withstand analysis.

---

[22] *Carvel, supra*.
[23] *Treppel*, *supra*, 2005 U. S. Dist. Lexis 18511 at *15.

First, there is no specificity at all about the "lies" that Officer Schoolcraft made about his appeal or his restricted status.  No information is provided about when these "lies" were allegedly uttered or to whom the "lies" were uttered, and it appears that DI Mauriello predicates this portion of his argument on claims made by the parties during the course of this litigation.  Since the "lies" are ostensibly relevant to the alleged damage to DI Mauriello's career, DI Mauriello needs to connect these "lies" in some manner to his alleged damages; otherwise, the allegation are irrelevant -- which is precisely the case here.

Second, DI Mauriello contends that the "lies" about downgrading were made by Officer Schoolcraft to members of QAD on October 7, 2009, when Officer Schoolcraft presented QAD with copies of examples of improperly downgraded or suppressed crime reports.  Although DI Mauriello does provide *some* detail about this aspect of his argument, that cannot save his tortious interference claim because a mere misrepresentation does not constitute wrongful means.

In *Friedman v. Coldwater Creek, Inc.,*[24] the Second Circuit affirmed summary judgment dismissing an employee's claim that he was terminated based on false statements made by the defendant to his employer about his performance and conduct towards the third party, who was the employer's customer.  After noting the general rule under *Carvel* requiring a crime or a tort*,* the Second Circuit

---

[24] 321 Fed. Appx. 58, 2009 U.S. App. Lexis 7514 (2d Cir. April 8, 2009), *affirming*, 551 F. Supp. 2d 164 (S.D.N.Y. 2008).

held:  "The New York Court of Appeals has never held that *any* misrepresentation is sufficient to sustain a claim for tortious interference with prospective economic relations.  The conduct alleged here bears no resemblance to the 'more culpable' conduct discussed by the New York Court of Appeals in *Carvel.*  Under the circumstance of this case, defendant McConnell's alleged misrepresentation does not suffice to establish wrongful means."[25]

As aptly stated by the District Court in *Friedman*, "the presence of false statements alone is not enough to support a claim for tortious interference after *Carvel.*  As noted above, the false statements must constitute an independent crime or tort, be made solely out of malice, or amount to 'extreme and unfair' economic pressure."[26]  Accordingly, DI Mauriello cannot as a matter of law predicate his tortious interference claim on the alleged misrepresentations Officer Schoolcraft made to QAD, to IAB, or to anyone else.

But there are even more fatal defects in DI Mauriello's claims about "lies" told by Officer Schoolcraft.  The alleged "lies" to QAD about "samples" of crime reports and "chronic" downgrading are not matters of fact; they are matters of opinion that are not actionable under any possible legal theory.[27]  Indeed, the

---

[25] *Id.* at 560, 2009 U. S. App. Lexis 7514 at **4.

[26] *Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 171 (S.D.N.Y. 2008), *aff'd*, 321 Fed. Appx. 58, 2009 U.S. App. Lexis 7514 (2d Cir. April 8, 2009).

[27] *Catskill Dev., LLC v. Park Place Entertainment*, 547 F. 3d 115, 134 (2d Cir. 2008) (statements of opinion generally cannot constitute fraud); *Torain v. Liu*, 279

undisputed evidence shows that after interviewing Officer Schoolcraft, QAD conducted its own independent investigation into the allegations made by Officer Schoolcraft.[28]   Thus, DI Mauriello cannot hope to prove any NYPD reliance on Officer Schoolcraft's statements or a causal connection between the statements and any person at the NYPD making employment decisions about DI Mauriello.[29]

In sum, absent admissible evidence from a competent NYPD decision-maker about DI Mauriello's employment relationship with the NYPD, the claim that Officer Schoolcraft's statements actually caused Mauriello any injury is naked speculation.   And that speculation is exposed as a delusional hope in light of the undisputed evidence that (i) Mauriello's superiors at Patrol Borough Brooklyn North did not believe the allegations; (ii) both QAD and IAB conducted independent investigations; (iii) QAD confirmed the crime reporting allegations; and (iv) IAB proffered charges and specifications (still pending) against DI

---

Fed. Appx. 46, 47, 2008 U.S. App. Lexis 11168 (2d Cir. May 22, 2008) (pure opinion or rhetorical hyperbole not actionable as defamation).
[28] PMX 16 at 5153 & 5157 (reporting on Officer Schoolcraft's allegations) & 5158 (Officer Schoolcraft told his "complaints would be thoroughly investigated.).
[29] *DiCosomo v. Getzoff*, 11 Misc. 3d 1063 (A), 816 N.Y.S. 2d (West. Sup. Ct. 2005) (summary judgment granted to the defendant dismissing tortious interference claim because the undisputed evidence showed that the third party conducted their own investigation into the defendants allegations that led to the termination of the plaintiff's employment).

Mauriello for *his* statements made to IAB in the course of its investigation of his role in the events of October 31, 2009.[30]   None of these facts are disputed.[31]

C. *Sole Motivation*

As demonstrated in our opening memorandum of law, DI Mauriello's tortious interference and prima facie tort claims are also fatally defective because he cannot show that the sole reason for Office Schoolcraft's conduct was disinterested malevolence against him.[32]   In his opposition (Mauriello Mem. at 25), DI Mauriello repeats (again) his claims about Officer Schoolcraft's "revenge" motivation but completely fails to address the fact that in his pleadings, in his deposition, and even in his current papers, he takes the position that Officer Schoolcraft was motivated to "orchestrate events" in service of a lawsuit that he was planning.[33]   This admission is fatal to the sole motivation element.[34]

---

[30] Plaintiff's Summary Judgment Mem. at 31-32.

[31] Plaintiff's Consolidated Rule 56.1 Statement ¶¶ 119-120 & -125-129.  In an effort to simplify review of the various responses to the Plaintiff's Rule 56.1 Statement, we have consolidated the defendants' responses into a single document entitled Plaintiff's Consolidated Rule 56.1 Statement.

[32] Plaintiff's Summary Judgment Mem. at 33-34.

[33] Counterclaim ¶¶ 3(i) (Officer Schoolcraft was attempting to influence QAD "not only so Mauriello would be sanctions, *but also* to thereby create support for the claims plaintiff was planning to assert in a lawsuit he intended to bring against the NYPD); PMX 41:  Mauriello Tr. 613:7-614:2) (same); Mauriello Mem. at 3 (Dkt. # 387) ("We believe that by his deceitful acts Schoolcraft also was hoping to lay a foundation for frivolous claims that might reap him an undeserved recovery.").

[34] *Protic v. Dengler*, 46 F. Supp. 2d 277, 279 (S.D.N.Y. 1999) ("the presence of any other motive, even coupled with an intention to inflict harm, is fatal to a claim"), *aff'd*, 205 Fed. Appx. 1324 (2d Cir. 1999).

Although we dispute that Officer Schoolcraft was seeking to "orchestrate" a lawsuit, as noted in our opening memorandum of law, Officer Schoolcraft was seeking at the time to challenge his failing evaluation because it was based on an improper obsession with activity and numbers.[35]  In any event, Mauriello cannot satisfy the sole motivation requirement of his claims.

D. *Brandt* Immunity.

Finally, DI Mauriello cannot circumvent *Brandt* immunity, which bars his common law claims against public officers for reporting misconduct.  Although he attempts to fall within the exception set forth in *Posner v. Lewis,*[36] that argument should be rejected.

In *Posner*, the Court of Appeals created an exception to *Brandt* immunity because the defendant in that case had engaged in a criminal blackmail scheme.[37]  Since DI Mauriello does not claim that Officer Schoolcraft committed blackmail or engaged in any other kind of criminal conduct, his argument against *Brandt* immunity should be rejected.

---

[35] Plaintiff's Summary Judgment Mem. at 26-27 & n. 122.
[36] 18 N.Y. 3d 566, 942 N.Y.S. 2d 447 (2012).
[37] *Id.* at 571, 942 N.Y.S. 2d at 451 (complaint alleged more than just a malicious motive; it asserted in essence a blackmail scheme and that dispositive allegation "places this case outside the realm of *Brandt*").

## 2. THE CITY DEFENDANTS' OPPOSITION

The City Defendants submit a perfunctory memorandum of law in opposition to the motion for summary judgment against them.  First, they complain about minor, alleged defects in the Rule 56.1 Statement. (City Mem. Point I.) Second, they raise exceedingly weak and superficial arguments to avoid judgment on their conduct in entering, remaining and re-entering Office Schoolcraft's home and their decision to place Officer Schoolcraft in custody as an EDP. (City Mem. Point II.)  We address these points in turn.

A. *The Rule 56.1 Statement Is Not Defective*.

The City Defendants first point in opposing our motion for summary judgment is based on alleged violations of Local Rule 56.1.  They complain that our Rule 56.1 Statement does not on occasion cite evidence and that the Statement contains matters of fact that are not "relevant" to the motion.   The argument is meritless because the Court is free to disregard any matter not properly supported by the record, and the admissions in the Rule 56.1 Statement are relevant because the background facts leading up to the events of October 31, 2009 are important in assessing the claims and defenses by the City Defendants, by Mauriello, and by the Medical Defendants.

B.  *The Arguments About the City Defendants' Conduct at the Apartment Should Be Rejected.*

1.  *The Illegal Entry.* The City Defendants argue that Officer Schoolcraft's motion for summary judgment on the issue of the entry should be denied because of the "very critical fact" that Dr. Lamstein "told" Captain Lauterborn that he "absolutely needed" to find Officer Schoolcraft. (City Mem. at 7; Dkt. # 375.) This is simply another of those blatant fictions that the Court should reject as a matter of law.

As we set forth in our memorandum of law in opposition to the City Defendants' motion, Dr. Lamstein never *told* Captain Lauterborn that he needed to find Officer Schoolcraft.[38]  Instead, the record conclusively shows that five years after the event Dr. Lamstein testified at her deposition that she "thought" they needed to find him.[39]  *Nothing* in her deposition or her contemporaneous notes of her discussions that night with Captain Lauterborn support that claim; *nothing* in Captain Lauterborn's detailed, six-page, single space report prepared that night supports that claim; and *nothing* in Lauterborn sworn statements to IAB or at his deposition supports that claim.

Since this is the "very crucial fact" used to support the warrantless entry and since this "fact" is a blatant misrepresentation to the Court, summary judgment

---

[38] Plaintiff's Opp. Mem. at pp. 2-6.
[39] *Id.*

finding the entry to be unlawful should be granted.   Any possible doubt about the appropriateness of summary judgment on the issue was definitively resolved when the City Defendants submitted their response to our Rule 56.1 Statement.  In paragraphs 79 and 80, we asserted, based on Chief Marino's deposition testimony, that "Chief Marino admitted that he had no information that Officer Schoolcraft had threatened to hurt himself or others." The City Defendants have admitted those contentions.[40]

Lacking information that Officer Schoolcraft was a threat to himself or others is fatal to the City Defendants' claim that they entered his home lawfully "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."[41]  And the collective knowledge doctrine or the fellow officer rule cannot save the City Defendants for two basic reasons.

First, there is no basis for imputing Captain Lauterborn's knowledge to Chief Marino because Captain Lauterborn did not have the information the City Defendants claim that he had – that is, that Dr. Lamstein told him he "absolutely needed" to find Officer Schoolcraft.  The City Defendants simply invented that "fact."

Second, even if the Court were to accept a claim so utterly refuted and unsupported by the evidence and even if the Court could suspend the disbelief

---

[40] City Defendants' Response to Plaintiff's Rule 56.1 Statement at p. 6; Dkt. #376.
[41] *Brigham City, Utah v. Stuart*, 547 U. S. 398, 403 (2006).

necessary to credit that claim, the argument should nevertheless be rejected.  There is simply no evidence in the record that Captain Lauterborn actually communicated the "absolutely needed" discussion to Chief Marino.  None of the witnesses mentioned this fact in any of their testimony, and the City Defendants fail to cite any evidence to support such a claim.  Indeed, the claim by the City Defendants about what the NYPD psychologist told Captain Lauterborn is flatly inconsistent with Chief Marino's deposition testimony that he had no information about Officer Schoolcraft being a threat to himself or others.  Under the sham affidavit doctrine, a party cannot defeat a summary judgment motion by merely submitting an affidavit disputing his own prior sworn testimony.[42]

The collective knowledge doctrine cannot save the City Defendants from summary judgment.  That doctrine holds that one officer in the field is entitled to rely on information *communicated* from a fellow officer.[43]  The reason for the doctrine is that officers should be able to assume that information conveyed to

---

[42] *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F. 2d 566, 572-73 (2d Cir. 1991); *Perma Research v Singer Co.*, 410 F. 2d 572, 578 (2d Cir. 1969) (without the rule a party could raise an issue of fact by simply submitting a contradicting affidavit, greatly diminishing the utility of summary judgment to screen out sham issues of fact); *Jefferys v. City of New York*, 426 F. 3d 549, 555 (2d Cir. 2005) (absent a plausible explanation for the inconsistency, summary judgment properly granted).
[43] *Zellner v. Summerlin*, 494 F. 3d 344, 369 (2d Cir. 2007).

them by their colleagues is accurate and reliable.[44]   However, in order for the doctrine to apply, "there must have been *some* communication between the officers involved."[45]   Indeed, that reliance must be reasonable.[46]

Here, there is no evidence that Captain Lauterborn communicated in any way to Chief Marino (or anyone else) anything about what the NYPD psychologist allegedly told him.  Thus, there is no basis for concluding that Chief Marino was acting under some sort of direction from Dr. Lamstein to find Officer Schoolcraft.

2.  *The Illegal Decision to Remain*.  In opposition to our motion for summary judgment on the NYPD defendants' decision to remain in the apartment, the City Defendants claim that their decision was lawful because their "concern for plaintiff's well-being continued upon entry into plaintiff's apartment." (City Mem. at 8.)

There are several flaws in this argument.   First, the threshold question is not whether the NYPD officers had "continuing" subjective concern for Officer Schoolcraft's well-being.  The threshold question is whether that alleged concern was objectively reasonable.[47]

---

[44] *Colon v. City of New York*, 2014 U.S. Dist. Lexis 46451 *13 (S.D.N.Y. April 2, 2014).

[45] *Id.* at *14 (citing cases; emphasis added).

[46] *Id.*

[47] *Brigham City, Utah v. Stuart*, 547 U. S. 398, 403 (2006); *Rivera v. Leto*, 2008 U.S. Dist. Lexis 96680 at *12 (S.D.N.Y. Nov. 25, 2008) (citing *Hurlman v. Rice*, 927 F. 2d 74, 81 (2d Cir. 1992)).

Second, the City Defendants have admitted in their Rule 56.1 Response that upon entering the apartment they observed Officer Schoolcraft in his bed with the television on, looking like he just woke up.[48]  It is also undisputed that upon entering the apartment, DI Mauriello, Captain Lauterborn and Lieutenant Gough proceeded to issue orders and directions to Officer Schoolcraft to get dressed that moment and return to the 81st Precinct because other officers were standing by to conduct a "hearing" to suspend Officer Schoolcraft.[49]  These facts belie any claim that the NYPD defendants remained in Officer Schoolcraft's home out of concern for his "well-being."  Indeed, in light of the audio recording and the other undisputed evidence, the "continuing" well-being concern is precisely the type of visible fiction that should be shut down at the summary judgment stage.

Third, the City Defendants state in their memorandum of law that the officers' concern for Officer Schoolcraft's well-being continued upon entry, but the memorandum does not provide any *evidentiary* support for his claim.  Since it is well settled that a factual assertion by counsel is not evidence that can be used to defeat a summary judgment motion,[50]  the argument about "continuing concerns" is devoid of any evidentiary support and therefore must be rejected.

---

[48] City Response to Plaintiff's Rule 56.1 Statement ¶ 83 (Dkt. 376); *see also* Plaintiff's Consolidated Rule 56.1 Statement ¶ 83.

[49] Plaintiff's Consolidated Rule 56.1 Statement ¶ 85-86.

[50] *Kulhawik v. Holder*, 571 F. 3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence"); *Seivright v. Montefiore Medical Center*,

3.  *The Decision to Place Officer Schoolcraft in Custody as an EDP.*  The City Defendants make a superficial attempt to justify their decision to declare Officer Schoolcraft an EDP.

First, they argue that *Cameron* is not on point because in that case there was visual evidence whereas here there is only audio evidence of the events in the apartment.  That is a meaningless distinction.  The point of *Cameron* and *Scott* is not that the technology was visual or of high quality but that where a party opposing summary judgment makes claims that are flatly contradicted by the admissible evidence,  a court need not deny ta summary judgment motion merely because the opposing party makes a demonstrably false claim.   That rule applies with dispositive force here.

The City Defendants also make a half-hearted attempt to justify their decision to take Officer Schoolcraft into custody as an EDP.  They argue that he was mentally ill and a danger to himself because he refused medical treatment and that their decision was proper because of Dr. Lamstein's alleged "directive to find him." (City Mem. at 9.)   That is far too thin a claim to defeat our motion for several reasons.

First, there was no "directive" by Dr. Lamstein, as previously demonstrated.  Second, the FDNY Paramedic Lieutenant (Hanlon) and the Jamaica EMT

---

2014 U.S. Dist. Lexis 30137 at *24 (S.D.N.Y. Mar. 3, 2014) (statement by attorney in brief not sufficient to defeat summary judgment).

(Sangeniti) admitted that Officer Schoolcraft had the right to refuse medical

attention because he was orientated and had decisional capacity.[51]  Third, we

submitted evidence from our medical expert (Dr. Halpren-Ruder) that the blood

pressure reading taken in the apartment was medically meaningless.[52]

(Significantly, the City Defendants have failed to controvert that evidence with any

competent or conflicting evidence of a medical emergency.)  Fourth, the

admissions by the Jamaica EMT (Sangeniti) demonstrate that there simply was no

medical emergency.[53]  Finally and most important, the audio recording of the home

invasion vividly shows that there was no continuing "exigency" that required

placing Officer Schoolcraft in custody against his will for transportation to the

Jamaica Hospital psychiatric facility.  For all these reasons, the City Defendants'

arguments should be rejected.

### 3. THE MEDICAL DEFENDANTS' OPPOSITION

The Medical Defendants (Jamaica Hospital, Dr. Bernier and Dr. Isakov)

submit opposition to our motion for summary judgment, primarily arguing that

they are not bound by their deposition testimony and that the statements they made

---

[51] POX 10:  Sangeniti Tr. 102:7-16; POX 29: Hanlon Tr. 77:2-78:24.
[52] PMX 36 at p. 1.
[53] POX 10: Sangeniti Tr. 131:3-136:10 (lights and sirens were not used for trip to
Jamaica Hospital because the patient was in stable condition and transportation
regulations limit the use of lights and sirens to emergency situations); POX 29:
Hanlon Tr. 138:21-139:6 (lights and sirens not used for transport to hospital) &
216:21-217:13 (not taken to hospital under life-threatening conditions because the
patient was stable).

in their depositions were only "generalizations" that are irrelevant to the decisions that they made about Officer Schoolcraft. Since a party cannot defeat a summary judgment motion merely by controverting prior sworn testimony, this argument should be rejected. We address more specifically the oppositions by each of the Medical Defendants below.

A. *Jamaica Hospital's Opposition*

Jamaica Hospital repeats the same arguments that it made in support of its motion for summary judgment: it is not a person; it is not a state actor; it is not vicariously liable for its doctors' conduct; and its it not bound by the deposition testimony of its Rule 30(b)(6) witness, Dr. Dhar. In our joint opposition to the defendants' motions for summary judgment we refute in detail each of those legal points and refer the Court to our arguments on these issues. (Plaintiff's Opp. Mem. at 99-115.)

In brief, Jamaica Hospital is a person as a matter of settled law under Section 1983. And under the common law of New York, it is liable for the conduct of its agents as a matter of law. As for the state actor issue, Jamaica Hospital does not refute the basic factual matters showing its joint action with the NYPD and the

FDNY.[54]  Nor does it dispute that its facility was used to hold Officer Schoolcraft against his will while under the custody of the NYPD.[55]

On the other hand, Jamaica Hospital claims that two important decisions, *Ruhlmann* and *DeMarco,* do not apply because in those cases the hospitals were state-run facilities.  It is wrong.  *Ruhlmann* involved a private hospital,[56] and *Demarco* did not address the hospital's status as a state actor; it addressed only the roles of the private doctors.[57]

Regarding the substantive claims against it for false imprisonment, malpractice and negligence, Jamaica Hospital tries to escape from the fatal admissions by its corporate witness, Dr. Dhar.  At his deposition, Dr. Dhar testified that the hospital policy was to admit a patient involuntarily where the patient

---

[54] Plaintiff's Consolidated 56.1 Statement ¶¶ 78, 83, 88, 89, 91, 92, 93 & 99 (showing involvement of the NYPD, the FDNY and the Jamaica Hospital EMTs in the decision to place Officer Schoolcraft in custody.  See also PMX 11:  Home Invasion Recording; PMX 26: Sangeniti Tr. 98 (high blood pressure could be caused by the stress of the entry); POX 10:  Sangeniti Tr. 54-67 (discussed with Hanlon that Officer Schoolcraft was an EDP after Hanlon discussed the subject with the NYPD); & Tr. 115 (Officer Schoolcraft was designated an EDP as of the time he left his apartment voluntarily to go to Forest Hills); POX 19: Lauterborn Tr. 82:24-83:4 (NYPD and EMTs made the decision); POX 26:  Broschart Tr. 49-54 (EMTs were the ones who decided that Officer Schoolcraft had to go to the hospital); POX 29:  Hanlon Tr. 132:3-11 (EMTs made the decision); POX 8: Marino Tr. 331:24-332:22 (FDNY paramedic made the decision)
[55] Plaintiff's Consolidated 56.1 Statement ¶¶ 98-104.
[56] *Ruhlmann v. Ulster County Dept. of Social Services*, 234 F. Supp. 2d 140, 145 (N.D.N.Y. 2002).
[57] *Demarco v. Sadiker,* 952 F. Supp. 2d 134 (E.D.N.Y. 1996).

presented any possible risk of dangerousness.[58]   To escape from this flagrant

violation of the governing provision of the Mental Hygiene Law, Section 9.39,

Jamaica Hospital reverts to nonsense and verbal gymnastics.

First, it argues (Jamaica Mem. at 8) that "whether the risk of physical harm

is considered 'substantial' is not really defined in the policy, although the policy

clearly states that the risk of harm must be substantial."   Nonsense.   The policy

statement and the governing statute clearly require a substantial risk as manifested

by the patient's conduct or words.[59]

Since Dr. Dhar's testimony proves that the hospital violated the statutory

standard, it now proclaims that there is no standard:  "whether any risk is deemed

substantial is up to the individual clinician – it is not a policy issue." (*Id.*)   With a

few stokes at the keyboard everything -- including the statute and its written policy

-- disappears in the black hole called "clinical judgment."   The Court should reject

this argument as nonsense and find that the Hospital is liable as a matter of law for

its statutory violation.

B.  *Dr. Bernier's Opposition*

Like Jamaica Hospital, Dr. Bernier tries to run away from her deposition

testimony.  At her deposition, Dr. Bernier testified that any potential risk of

dangerousness was all that she required to commit Officer Schoolcraft:

---

[58] PMX 33:  Dhar Tr. 134:21-135:4.
[59] Mental Hygiene Law Section 9.39.

Q.  And if there is *any potential at all*, you were going to admit Mr. Schoolcraft, correct?
Mr. LEE: Objection to the form.
A.  With all of those reasons, yes, I would have to admit him.[60]

In her opposition papers, Dr. Bernier now suggests that there is a question of fact about whether she used the any-potential-risk standard in her actual decision to commit Officer Schoolcraft and whether her decision conformed to the substantial risk requirement of the statute.   Yet settled law under the sham issue rule prevents a party from defeating a summary judgment motion by seeking to contradict prior sworn testimony.[61]

Dr. Bernier was specifically asked at her deposition whether she applied the Jamaica Hospital written policy in making her decision to commit Officer Schoolcraft.[62]  She testified that she "believed that he [Officer Schoolcraft] may be a danger to others or himself,"[63] and when asked if she believed there was, in the words of the statute and the written policy, a substantial risk of dangerousness, Dr. Bernier repeatedly testified that Officer Schoolcraft presented only "a potential

---

[60] PMX 31: Bernier Tr. 248:3-249:15 (emphasis added).

[61] *See*  n. 42 *supra*.

[62] PMX 43:  Bernier Tr. 238-249; PMX 39 (Plaintiff's Deposition Exhibit 70) (policy statement).

[63] PMX 43:  Bernier Tr. 241:14.

risk."[64]   Then, when asked to quantify *her* term "potential risk," she explained in very clears terms that potential risk meant any potential risk at all.[65]

Based on this testimony, the argument (Bernier Mem. at 9) that there is no evidence that Dr. Bernier based her decision to commit Officer Schoolcraft upon a potential risk standard is meritless.   Indeed, Dr. Bernier appears to play word games:  "The word 'potential' appears, but there is no indication what 'potential' is referring to." (Bernier Mem. at 9.)    This is more nonsense by a defendant without a defense.

The affidavit by Bernier's expert giving a contrary (and revisionist) opinion about the plain meaning of her testimony cannot create an issue of fact where none exists.  Dr. Bernier's expert, under the cover of an advanced educational degree, seeks to amend her deposition testimony by stating that she made a judgment that Officer Schoolcraft was "potentially (foreseeably) dangerous."[66]  The expert also proclaims:  "Dr. Aldana-Bernier did not base her determination pursuant to New York Mental Hygiene Law § 9.39 using a potential risk standard in place of a substantial risk standard."[67]

No expert has a foundation for offering this kind of opinion about the thought processes of another person - - that is rank speculation.  More important,

---

[64] *Id.* at p. 244, lines 11, 15, 20 and 22; at 245, line 24
[65] *Id.* at Tr. 247:20-249:15.
[66] Dr. Tancredi Affidavit ¶ 11 (Dkt. # 380-5).
[67] *Id.* ¶ 19.

the sham issue doctrine precludes a party from seeking to create an issue of fact for trial through their own contradictory affidavit or the affidavit of their expert.[68]

Nor can Dr. Bernier argue that her testimony about her commitment decision was only "generalized" testimony and that there is no evidence about her specific thinking at the time of Officer Schoolcraft's commitment.  In her deposition she made clear that she had no personal recollection of Officer Schoolcraft and that her testimony was based on her review of the hospital chart.[69]  Therefore, all she was capable of stating was her general practice precisely because she acknowledged that she did not recall the specifics of her decision-making process.

Dr. Bernier next complains that Dr. Lubit's Report (PMX 30) was not properly sworn to.  Since Dr. Lubit was extensively examined under oath about his Report,[70] the argument is exceedingly weak, but to eliminate this objection we are submitting with this reply a declaration by Dr. Lubit confirming under the penalties of perjury that the statements he made in his report are true and correct to the best of his knowledge and belief.[71]

Finally, Dr. Bernier claims that the negligence per se theory of liability should not be addressed by the Court because the claim was not asserted in the Third Amended Complaint.  That is another meritless argument because the Third

---

[68] *In re Fosamax Prod. Liab. Lit.,* 707 F. 3d 189, 193 (2d Cir. 2013).
[69] PMX 43:  Bernier Tr. 29:7-30:20.
[70] PMX 45: Lubit Tr. 18-21 (report was a fair and objective opinion).
[71] PMX 44: Dr. Lubit Declaration, dated March 6, 2015.

Amended Complaint specifically asserts a negligence and a malpractice claim

against the Medical Defendants and specifically asserts that Dr. Bernier violated

the express terms of Mental Hygiene Law Section 9.39.[72]

   C. *Dr. Isakov's Opposition*

   Dr. Isakov also seeks to run away from his deposition testimony.  It is

undisputed that Dr. Isakov testified that a potential risk is the standard that he

employs in determining whether to commit the patient against his will.[73]  He also

testified that what "probably will pertain to this case" is that even if the patient did

not expressly make a violent threat, the patient can nevertheless be committed

based on a potential danger.[74] Thus, it does not matter what level of risk; so long as

Dr. Isakov perceives a risk, he will commit the patient.[75]

   In response to this testimony, Dr. Isakov now submits his affidavit and

argues that his prior testimony was only his "general" practice and that there is no

evidence that he followed his general practice in this case.  (Isakov Mem. at p. 1)

---

[72] Third Amended Complaint ¶¶ 204 & 365-68.  Paragraph 204 of the Third
Amended Complaint specifically alleges:  "Additionally, defendant ALDANA-
BERNIER violated the express provisions of Mental Hygiene Law § 9.39(a) when
she failed to perform the necessary tests and examinations in order to determine
that plaintiff was either 1) a "substantial risk of physical harm to himself as
manifested by threats or attempts at suicide or other conduct demonstrating that he
is dangerous to himself" or 2) "a substantial risk of physical harm to other persons
as manifested by homicidal or other violent behavior by which others are placed in
reasonable fear of serious physical harm."
[73] PMX 32: Isakov Tr. 95:9-17
[74] PMX 32: 97:18-22
[75] *Id. at* 98:15-18.

This is an exceedingly weak argument that should be rejected for at least three reasons.

First, the deposition testimony by Dr. Isakov specifically refers to how his general practice applied in this case. Indeed, he stated in his deposition that his general approach probably applied to this case, but offers no explanation for this inconsistency.[76]

Second, the fact that a doctor who sees thousands of patients a year[77] does not have a specific recall about his though processes in a single case five years ago cannot be a valid basis for concluding that the doctor's general practice was not followed in the particular case at hand. Indeed, a general practice is often more compelling evidence than a claimed specific recollection of a recurring event, such as a medical examination.

Third, in opposing the motion for summary judgment, Dr. Isakov now submits his own affidavit claiming that he made his commitment decision because of a "substantial risk" of dangerousness.[78] But as noted above, that affidavit contradicts his deposition testimony where he said that he generally committed patients based on any level of potential risk and that he probably employed that

---

[76] *Id.* at 97:18-22.
[77] PMX 42: Isakov Tr. 105.
[78] Isakov Affidavit, dated February 11, 2015, at p. 2.

practice in this case.  Since Dr. Isakov fails to explain this inconsistency, the Court should disregard his contradictory affidavit.[79]

Finally and most important, Dr. Isakov's recently hatched claim that Officer Schoolcraft presented a substantial risk of dangerousness is flatly contradicted by Dr. Isakov's certified statement contained in the hospital chart.  On November 4, 2009, Dr. Isakov executed Form 9.39, confirming that the facts stated and information contained in the document are true to the best of his knowledge and belief.[80]   That Form asked Dr. Isakov to certify:

**"Does the patient show a tendency to cause serious harm to himself?**   □Yes  □ **No to others?** □ **Yes**   □ **No** "[81]

Dr. Isakov admitted at his deposition what the document made obvious:  that he checked "*no*" to both questions.[82]  This admission is fatal to his claim that Officer Schoolcraft presented a "substantial risk of dangerousness" to himself or others.  Accordingly, the Court should reject the affidavit and grant summary judgment against Dr. Isakov based on his statutory violation of Section 9.39 of the Mental Hygiene Law.

---

[79] *Jeffreys v. City of New York*, 426 F. 3d 549, 554 n.2 (2d Cir. 2005) (failure to explain away an obvious inconsistency with any plausible explanation justifies summary judgment).
[80] POX 54 (Form 9.39) at p. 2; PMX 42: Isakov Tr. 169-172.
[81] POX 54 at p. 2.
[82] PMX 42:  Isakov Tr. 171:4-7.

CONCLUSION

The Mauriello counterclaims should be dismissed because there are numerous fatal defects in both claims.  The City Defendants' arguments about their entry, re-entry and EDP decisions are either based on non-existent or blatantly false factual claims.  The Medical Defendants committed Officer Schoolcraft involuntarily based on a standard and practice that only sought to determine whether there was any possible or potential risk that Officer Schoolcraft was danger to himself or others, a standard that clearly violates the statutory standard.  Based on their acknowledge statutory violations, the Medical Defendants are liable as a matter of law for false imprisonment, malpractice, and negligence *per se* for a statutory violation.  Summary judgment, therefore, should be granted as to these liability issues.

Dated:  March 6, 2015

*s/NBS*

_____
Nathaniel B. Smith

*s/JL*

_____
 John Lenoir