UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

ADRIAN SCHOOLCRAFT,

|  |  |  |
|---|---|---|
| | Plaintiff, | 10-CV-6005 (RWS) |
| -against- | | **PLAINTIFF'S RULE 56.1 STATEMENT CONSOLIDATED WITH DEFENDANTS' RESPONSES** |
| THE CITY OF NEW YORK, *et al*., | | |
| | Defendants. | |

-----------------------------------------------------------X

     Pursuant to the Local Rules of the Court, Plaintiff submits that the following as his Consolidated Statement of Facts, which entitle the Plaintiff to summary judgment in his favor as a matter of law.

1. On July 1, 2002, Officer Schoolcraft joined the New York City Police Department ("NYPD"), and for most of his career, he was assigned as a Patrol Officer in the 81st Precinct, which is located in the Bedford Stuyvesant neighborhood of Brooklyn.[1]

   *City Response:* Admit.

   *Mauriello Response:* Not disputed.

   *Jamaica Hospital Response:* Undisputed for purposes of this motion.

   *Bernier Response:* Not contested for the purposes of this motion only.

   *Isakov Response:* Undisputed for purposes of this motion.

2. The 81st Precinct is one of ten Precincts that are located in the geographical area known as "Patrol Borough Brooklyn North."   As a

---

[1] Plaintiff's Motion Exhibit 1 (hereinafter "PMX") at NYC 0001 (oath of office, dated 7-1-02).

Patrol Officer, Officer Schoolcraft was a fine officer who ably and satisfactorily performed his duties and received satisfactory or better performance reviews for most of his career.[2]

*City Response:* Admit.

*Maurriello Response:* Not disputed except with respect to the assertion that "[a]s a Patrol Officer, Officer Schoolcraft was a fine officer who ably and satisfactorily performed his duties." From 2006 through 2008 and continuing into 2009, Adrian Schoolcraft converted from being an officer performing at or above acceptable performance standards to a disaffected and ultimately malingering officer who failed and refused to satisfy his basic duties and responsibilities.  (See PMX 1.)

The evidence indicates Schoolcraft's transformation evolved in part as follows:   He took an extended leave of absence in the latter half of 2005 to attend to his father in upstate New York, who was sick at the time. (See SM Exhibit BJ.)  In 2006, Schoolcraft fell below an earlier rating of 4.0, but continued to perform reasonably well, and achieved a 3.5 rating (with 5 being the highest possible rating, and below 3 being unsatisfactory.) (See PMX 1.) He showed signs in 2006, however, of

---

[2] PMX 1:  NYC 005-007 (fine officer with great potential); 043-44 ("extremely competent" and an "asset for the department); 045-46 ("highly competent"); 087-91 ("fine officer with great potential"); 176-81 ("well-rounded officer" and a "steady and reliable performer").  For the years 2003, 2004, 2005 and 2006, Officer Schoolcraft received yearly performance evaluations of 3.5, 4.0, 3.5 and 3.5, respectively.  (NYC 398-400, 171-72; 176-78 & 179-81.)  It was only in 2007, after Defendant Maurriello became the Executive Officer and then the Commanding Officer of the 81st Precinct in 2007 and 2008 that Officer Schoolcraft's yearly performance ratings dropped to 3.0 in 2007 and 2.5 in 2008.  (NYC 186-88 & 173-75.)

anger and resentment toward the job, as displayed by his submission of a complaint against the Commanding Officer of the 81st Precinct, Robert Brower, regarding "forced overtime," claiming it was a "chronic safety issue." (See SM Ex. BK, Schoolcraft Report to Brower, April 10, 2006.) In June 2007, Schoolcraft again became upset with the job, and wrote to Robert Brower as the Commanding Officer of the 81st Precinct to complain about how he had been treated by a Lieutenant Jones when Schoolcraft sought additional time off to pick up his father after another hospital stay.  (SM Ex. BL, Schoolcraft Report to Brower, June 11, 2007.)

Around the same time, in March of 2007, Schoolcraft's father was hospitalized after being picked up in a public place by the local police in his upstate town on suspicion of intoxication, which the father later claimed was an adverse reaction to his medication.  The father claimed to have been left out in the cold on his porch by local law enforcement and to have remained there for perhaps two days, suffering permanent injuries.  (SM Ex.. BM, May 7, 2008 article from The Leader Herald.) Schoolcraft assisted his father in his recuperation after his release from the hospital.  The father then came to live with Schoolcraft in Queens, where the father remained until some time in early 2008. (SM Exhibit BM, Leader Herald; SM Exhibit BN, AS2 p. 88 ll. 6-25.) While the father was living with Schoolcraft, his upstate house was burglarized and, among other things, the ashes of Schoolcraft's deceased

mother were stolen. According to an article published by local media, Schoolcraft said the burglary of his mother's ashes "affects me every day" and "it's the last thing I think about before I go to sleep at night." (SM Exhibit BM, May 7, 2008 article from the Leader-Herald.) Schoolcraft was not pleased with the way the police and investigators handled the situation. (SM Exhibit BN, AS2 p. 88 ll. 20-25.)

Whether it was those troubles or other issues in Schoolcraft's life, it is clear that by early 2008 Schoolcraft had become a disaffected, under-performing cop. (See PMX 1.) As his supervisors described at the February 25, 2009, appeal meeting, Schoolcraft repeatedly was accompanied on tour with one of his supervisors and in each instance demonstrated he knew how to do the police work required of him. (SM Exhibit D at 22:30-23:15). Then, he would go back on patrol with another officer and not engage in any of the police enforcement work expected of him. Apparently Schoolcraft had a significant number of CCRB complaints against him in earlier years, and at the appeal meeting he alluded to them and to civil rights complaints against him, as well as an FBI investigation, as possible explanations for his failure to be engaged in his work. He indicated that his experience had caused him to become "more cautious." (SM Ex. D at 23:40-24:10; SM Ex. BO.)

One particularly good illustration of just how disaffected Schoolcraft had become about the job occurred in February, 2009. He appeared in court to testify, but was over an hour late and showed up

wearing jeans and sneakers. (SM Ex. BP, Command Discipline).  All

indications were he just was not engaged in doing police work anymore.

Other examples of troubles in Schoolcraft's life that might help

explain his failure to perform include the following:  i) according to his

father, Schoolcraft was always very "different" and "he just does not

talk about anything" (SM Ex. BQ, L; Schoolcraft Dep. p. 142-143 ll. 13-

11); ii) as Schoolcraft told his father in a recorded conversation in

October 2009, he had no friends in the NYPD (SM Ex. BR at 15:00-

15:20); in fact, at the appeal meeting in February 2009, he was unable to

identify any officer he would like to partner with so that he might be

more engaged in the job (SM Exhibit D at 51:00-52:00); iii) in his

earlier years in the 81st Precinct, Schoolcraft apparently lived for a time

in the basement of the precinct (SM Ex. BS at 2:00-2:30, IAB Interview

with PBA delegate Richard Braun); iv) Schoolcraft's mother died at the

end of 2003 causing Schoolcraft to take nearly a month off from work;

then, when his father was ill in 2005, he took at least three months off;

in 2007, he also took time off from work to tend to his father; as

Sergeant Weiss observed in the February 2009 appeal meeting,

Schoolcraft simply was not the same after that (SM Ex. D at 43:00-

44:00);  v) Schoolcraft had been placed on force monitoring for nearly a

year in 2004 and 2005 for his conduct on the job (SM Ex. BO,

Schoolcraft Employment Record); he was the subject of CCRB and civil

rights complaints by the public with whom he interacted on the job, as

he explained at the appeal meeting in February 2009 (SM Ex. D at 23:30-24:30; SM Ex. BO, Schoolcraft Employment History); vi) the public's complaints about him apparently were so troubling to Schoolcraft that he began to secretly record his time on the job, possibly starting in 2006 (SM Ex. BN, AS1 Dep. pp. 29-30 ll. 15-24); vii) the evidence, principally plaintiff's recordings, indicates his father, who had himself been involved in lawsuits against police departments for which he had worked, as well as a lawsuit against the local police in upstate New York for leaving him out in the cold (SM Ex. BQ, L. Schoolcraft Dep. pp. 10-18 ll. 20-9), at times appears to have aggressively attempted to influence Schoolcraft's conduct, including directing his actions as they attempted to orchestrate the events of September and October of 2009 (SM Exs. Q at 3:02.00-3:08.00, 5:24.00, 6:49.00-7:02.00; SM Exhibit R; and SM Exhibit BR at 0:00-15:00); and viii) Schoolcraft's family history indicates the family may have been very troubled, as revealed by his estranged sister to the NYPD during an Internal Affairs Interview. Schoolcraft's sister describes Larry Schoolcraft as a "leach" whose modus operandi was to create controversy where none existed to reap a monetary reward. Much to her dismay, Schoolcraft was once a "good kid" who had unfortunately, in her opinion, fallen under his father's influence.  (SM Ex. BT at 2:00-8:00, IAB Interview with Misty Schoolcraft.)

It is hard to know to what extent any or all of these conditions

came to influence Schoolcraft's attitude and emotional state, but, despite all of the instruction and encouragement he received from his supervisors in 2007 and throughout 2008, Schoolcraft simply failed to make a commitment to perform effectively on the job and refused to become engaged in his work.  He never revealed any of his personal struggles, and he never offered them as an excuse for any of his behavior other than at the appeal meeting on February 25, 2009, when he briefly alluded to complaints made against him and investigations conducted into his conduct as a possible cause for him becoming "more cautious."   Soon after the appeal meeting, as a result of ensuing events and Schoolcraft's distressed reaction to them (if even that can be believed), Schoolcraft was placed on restricted duty (SM Ex. K, Restricted Duty Memo), and never served as a patrol officer again.

Schoolcraft thus had gone from being a decent cop to being a malingering, disaffected cop, determined to get revenge. In his own words, spoken to his father on October 7, 2009, he stated "but you're right…this is the way to fuck him over" (SM Ex. BR at 7:10-7:40, Schoolcraft telephone conversation with father, who is mostly not heard, before Schoolcraft's October 7, 2009, QAD meeting.) Also in his own words, uttered to another officer on the morning of October 31, 2009, "that fat miserable fuck… If I could get [Mauriello]…if I could get him…I would sell him out faster than anything."  (SM Ex. Q at 46:00-47:30). Most notably, as Schoolcraft was about to enter his meeting with

QAD, he was advised by his father to "never, ever tell them this is about revenge", revealing that Schoolcraft's motivation was, in fact, about getting revenge. (SM Exhibit BR at 2:30-2:45, Schoolcraft conversation with father before QAD meeting.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

3.   In October of 2006, the NYPD assigned Defendant Steven Mauriello to be the Executive Officer of the 81st Precinct.[3]  As the Executive Officer, Mauriello was the second in command at the 81st Precinct.  According to Mauriello, he requested that transfer because it was his stated desire to become a commanding officer of an NYPD Precinct.[4]

*City Response:* Admit.

*Mauriello Response:* Not disputed, except to the extent it asserts Mauriello requested a transfer to the 81st Precinct.  Mauriello requested a transfer from his position as the Commanding Officer of the Brooklyn North Anti-Crime Unit to a position in a precinct that would enable him to earn an appointment as a Commanding Officer as well as a promotion to Inspector and perhaps Assistant Chief. (See SM Aff. in Opp. ¶ 2.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

---

[3] PMX 2:  SM 340-43.
[4] PMX 34:  Mauriello Tr. 48:15 ("I wanted to go back to be an XO and earn my way back up again.")

*Isakov Response:* Undisputed for purposes of this motion.

4.  After Defendant Mauriello's arrival at the 81st Precinct, Officer

Schoolcraft and other officers at the 81st Precinct began getting

increasingly greater pressure at roll calls to achieve quotas on their

number of arrests, summons and stops and to falsify documentation

about the receipt of training during roll calls.[5]

*City Response:* Deny. <u>See</u> Exhibit 4 to the Declaration of Nathaniel B.

Smith.

*Mauriello Response:* Disputed.  First, Mauriello rarely addressed roll

calls at the 81st Precinct as the Executive Officer (SM Aff. in Opp. ¶ 3).

Second, Deputy Inspector Brower was the Commanding Officer of the

81st Precinct in 2006 and 2007 and regularly addressed roll calls (SM.

Aff. In Opp. ¶ 3).  Third, quotas were not prohibited in any event, except

for traffic violations (see VTL section?)  In addition, Schoolcraft is the

only person assigned to the 81st Precinct during the tenures of Mauriello

and his predecessor Brower, as the Commanding Officers of the 81st

Precinct, who has made this assertion (note that it is only Schoolcraft's

testimony that is cited.)  In fact, Police Officer Joseph Ferrara was

assigned to the 81st Precinct in April 2009 and continued there through

2010.  He was deposed at plaintiff's request because he had expressed a

complaint to Schoolcraft's previous attorney that Mauriello had referred

to Schoolcraft as a rat when  the news reports first began to be published

---

[5] PMX 4:  Schoolcraft Tr.  29:13-30:12 & 32:24-33:5.

about Schoolcraft's allegations.  Ferrara explained that he thought such talk was inappropriate by a Commanding Officer.   He went on to say he did not know of any other wrongdoing in the 81st Precinct – no quotas, no pressure to misclassify crime, no inappropriate punishment of officers for failing to do their job effectively.  He also expressed high praise for Mauriello as a Commanding Officer.  (See SM Ex. DE, Ferrara Dep. pp. 56, 81—82, 188-89 and 209-13.)   Despite more than 18 months of secretly recording conversations at the 81st Precinct, plaintiff has been able to identify only a de minimus number of instances where any discussion of numbers of arrests, summonses and stops took place involving supervisors, and even more rarely involving Mauriello, and in each of those instances there is no indication anyone suffered any adverse consequences on the job for failing to achieve the numbers mentioned.  The numbers mentioned simply were not being imposed as quotas.

There also is only de minimus evidence in Schoolcraft's 18 months of recording roll calls of the training sergeant asking officers to sign the training log at roll call when the recording did not capture any training taking place during the roll call, which is when training often would be provided.  One explanation is that training often would take place before roll call and at times after.  There certainly is no indication of Mauriello being aware of any instance where the training log was signed without training taking place, and there is no evidence of anyone

benefitting from falsely reporting that training had been provided. Finally, the point Schoolcraft ultimately decides to make about the importance of the training log being signed if no training was provided was expressed by him at his only meeting with QAD on October 7, 2009, essentially as follows:  without training, the patrol officers did not know the elements of a crime and thus did not know how to challenge supervisors who allegedly told them to downgrade crimes on complaint reports (SM Exhibit BR at 56:30-57:00 and 1:19.10-1:19.30, Schoolcraft QAD meeting recording.) There is no evidence, and remarkably no recording, of anyone being told to downgrade a crime and no evidence of any officer not knowing the elements of a crime.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

5. Because Officer Schoolcraft had concerns about the lawfulness of these directions, he eventually began tape recording roll calls at the 81st Precinct.[6]

*City Response:* Deny. See Id.

*Mauriello Response:* Disputed.  Schoolcraft has acknowledged he began recording on the job as early as 2006 (SM Ex. BN, AS1 29:15-17) because he was regularly the subject of CCRB and civil rights complaints by members of the public with whom he interacted as an

---

[6] *Id.*

officer (SM Exhibit D at 23:40-24:10) – so much so that he was placed on force monitoring in 2004 for a full year (SM Ex. BO, Schoolcraft Employment History.)  Yet, Schoolcraft did not produce any recordings from 2006 or 2007.  His earliest produced recording is from April 2008, and the only portions of his tours of duty which have been produced -- with very few exceptions, when it apparently suited Schoolcraft -- are the roll calls.  Based upon the foregoing as well other evidence, including the data relating to the recordings as revealed by the digital files produced by Schoolcraft, Schoolcraft apparently has withheld not only the earlier recordings, but also recordings of the portions of his tours of duty other than the roll calls, as well as a number of roll call recordings during the period for which recordings were produced.  (See SM Ex. CY, a disk of the roll call recordings produced by Schoolcraft.)

One striking example of a recording being withheld is as follows:  Schoolcraft produced in discovery the recording he secretly made of his meeting with QAD on October 7, 2009, but deleted from the recording was the conversation he had with his father on his way to the meeting, which was part of one uninterrupted recording that continues through the end of the QAD meeting.  That deleted portion of the recording, which was independently retrieved and preserved by IAB, sheds a bright light on Schoolcraft's true feelings of revenge against Mauriello and disdain for the community and his fellow officers. (SM Ex. BR at 2:30-2:45, 3:45-4:15, 7:10-7:40, and 14:55-15:20; see

paragraph 42 below.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

6.   Coincident with Defendant Mauriello's arrival at the 81st Precinct,

Officer Schoolcraft's performance evaluations began to decline.[7]  For

2007, Officer Schoolcraft received a 3.0 rating, which was the

equivalent of a marginally satisfactory rating.[8]

*City Response:* Deny that any decline was related to Defendant

Mauriello's arrival at the 81st Precinct and that a 3.0 rating is the

equivalent of a "marginally satisfactory rating" but admit that in 2007

plaintiff's performance evaluation scores declined.  <u>See</u> Exhibit 1 to the

Declaration of Nathaniel B. Smith.

*Mauriello Response:* Disputed.  See response to paragraph 2.  There is

no correlation between Schoolcraft's performance evaluations in 2006

through 2008, and Steve Mauriello's appointment as Executive Officer

of the 81st Precinct in October 2006. First, Schoolcraft received a 3.5

rating in 2006 even though Mauriello had by then been in the 81st

Precinct for three months (see PMX 1.)  Second, as the Executive

Officer, Mauriello was subordinate to Inspector Brower, the

Commanding Officer and the person with overall responsibility for the

---

[7] *See* n. 2 *supra*.
[8] PMX 1:  NYC 065-69.

operations of the precinct.  As Executive Officer, Mauriello played no

role in Schoolcraft's evaluation for 2006 or 2007 -- as a direct

supervisor or as one of the raters or the reviewer (see PMX 1), and he

only occasionally addressed roll calls (SM Aff. in Opp. ¶ 3).  He also

did not set the tone for the law enforcement conducted in the 81st

Precinct.  As the Commanding Officer throughout 2008, Mauriello's

only role in evaluating Schoolcraft was as the person designated by the

Patrol Guide to serve as the reviewer of the evaluation provided by

Schoolcraft's supervisors because he received an unsatisfactory rating.

(See SM Ex. BU, Patrol Guide section 205-58, Appeal of Evaluation-

Uniformed Member of Service; SM Ex. BV, Mauriello Dep. p. 172 ll. 4-

7.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

7.  In that evaluation, Officer Schoolcraft was criticized for not achieving

"activity goals" and "performance goals," which are coded phrases that

refer to numerical quotas imposed on Patrol Officers.[9]

---

[9] *See generally Floyd v City of New York*, 959 F. Supp. 2d 540, 590, 596, 599 & n. 264
(S.D.N.Y.  2013) (increase in stops achieved by pressure on commanders at CompStat
meetings to increase numbers and commanders in turn pressures mid-level mangers and
line officers to generate numbers; abundant evidence that supervisors directed officers to
meet numerical goals for stops, arrests and other enforcement activity as well as threating
officers with negative consequences if they did not achieve those goals; "supervisors
must evaluate officers based on their activity numbers, with particular emphasis on
summons, stops, and arrests, [and] officers whose numbers are too low should be subject

*City Response:* Deny. <u>See</u> Exhibit 1 to the Declaration of Nathanial B. Smith.

*Mauriello Response:* Disputed.  A quota is understood to be a specified number that an officer is required to meet or suffer adverse consequences on the job (see SM Ex. BW), and there is no evidence of such adverse consequences being suffered in the 81st Precinct, and even if there were, New York law only prohibited quotas for traffic violations.  (See SM Ex. BW.)  It was not until 2010 that stops, summonses and arrests also could not be covered by quotas.  (See SM Ex. BW.)  Still, in 2008 and 2009, there was no punishment of officers for failing to achieve a stated number of stops, summonses and arrests. (See SM Ex. BX. IAB Interviews of officers, and SM Ex. DE, Ferrara Dep. pp. 82 and 188-89.)

In 2007, Schoolcraft exhibited modest commitment to his duties and responsibilities, and was minimally engaged in trying to satisfy those responsibilities (see PMX 2). He was not penalized, however, and instead, he received an appropriate rating and tremendous encouragement and support from his supervisors throughout 2008.  As became clear in 2008 and in the beginning of 2009, including at the appeal meeting in February 2009, Schoolcraft had no intention or interest in responding positively to the encouragement and support.  He alluded to problems he had experienced with the public on the job, but otherwise took no responsibility for his poor

---

to increasingly serious discipline if their low numbers persist")

performance and showed no signs of a desire to improve. (SM Exhibit D at 23:40-24:10.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

8.  After being the Executive Officer at the 81st Precinct for one year, "One Police Plaza" made the decision on December 1, 2007 to promote DI Mauriello to the position as Commanding Officer of the 81st Precinct, and later he received a promotion to the title of Deputy Inspector ("DI").[10]

    *City Response:* Admit.

    *Mauriello Response:* Not disputed.

    *Jamaica Hospital Response:* Undisputed for purposes of this motion.

    *Bernier Response:* Not contested for the purposes of this motion only.

    *Isakov Response:* Undisputed for purposes of this motion.

9.  Under the command of DI Mauriello, the pressure to maintain numbers increased and Officer Schoolcraft's performance evaluations came under even greater scrutiny.

    *City Response:* Deny. (no citation provided by plaintiff)

    *Mauriello Response:* Disputed, and plaintiff cites no support for the statement.  Plaintiff is the only person assigned to the 81st Precinct during the tenures of Steven Mauriello and his predecessor Robert

---

[10] PMX 3:  Mauriello Tr. 51:12-25.

Brower, as the Commanding Officers of the 81st Precinct, to make this assertion.  In fact, 81st Precinct police officers interviewed by the NYPD Internal Affairs Bureau summarily denied that there was increased pressure from Steven Mauriello or other supervisors that went beyond a desire to maintain an active enforcement presence in the precinct.  (See SM Exhibit BX, IAB Interviews of 81st precinct police officers.) There is no evidence of increased pressure being applied to Schoolcraft or any other officer to do anything other than the job they were employed to do, and there is no evidence Schoolcraft's performance evaluations came under even greater scrutiny, except to the extent Schoolcraft was less and less engaged in his work. Another officer received a 2.5 rating for 2008, and he took it as motivation to improve his performance, which he did.  (See SM Aff. in Opp. ¶ 4.)

Schoolcraft's performance simply was unsatisfactory throughout most of 2008, despite receiving encouragement and support from all of his supervisors, not only throughout that year, but also into the beginning of 2009.  (SM Exhibit D at 13:00-17:00.) He failed and refused to improve. As required by the NYPD Patrol Guide, a meeting was held, conducted by Steven Mauriello, as the Commanding Officer, in February 2009 to discuss Schoolcraft's evaluation before he had to decide whether to proceed with the appeal. (SM Exhibit BU, Patrol Guide section 205-58; SM Exhibit D.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

17

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

10.  During the course of second, third and fourth quarters of 2008, Officer Schoolcraft's supervisors persistently criticized him for his low "activity" and his failure to meet activity standards.[11]

*City Response:* Deny, except admit that plaintiff did not meet activity standards. See Exhibit 1 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Disputed to the extent it suggests the supervisors personally or openly criticized Schoolcraft or criticized Schoolcraft's numbers simply for numbers sake.  Not surprisingly, despite secretly recording on the job throughout at least most of 2008, there is not a single recording of any supervisor criticizing Schoolcraft.  The supervisors did make critical comments about Schoolcraft's performance in their monthly performance reports and quarterly ratings, which are essentially confidential communications. (See PX 5.)  As Plaintiff's own statement admits, Schoolcraft's supervisors were well aware of Schoolcraft's barely satisfactory performance during 2007 and his diminishing performance throughout 2008 and made repeated efforts to instruct, motivate, encourage and support him to become engaged in

---

[11] PMX (PX 21): NYC 106 (as of May 2, 2008, "needs improvement in area of activity"); NYC 110 (as of July 4, 2008, "activity is still substandard and is unacceptable" and was instructed "on productivity expectations'); NYC 116 (as of October 1, 2009, "does not meet activity standards" and has been told about his "low activity"); NYC 122 (as of January 1, 2009, Officer Schoolcraft has been counseled on "his poor activity which is unacceptable").

satisfying his duties and responsibilities.  (SM Ex. D; see plaintiff's

footnote 11.)  Despite all of their efforts, Schoolcraft failed and refused

to become engaged in the fundamental work of a law enforcement

officer or to improve his performance to at least a minimally satisfactory

level. (See PMX 5.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

11.  Based on these criticisms, in January of 2009, DI Mauriello gave

Officer Schoolcraft a failing evaluation of 2.5.[12]

*City Response:* Deny, except admit that plaintiff received an evaluation

score of 2.5 in January of 2009. See Exhibit 1 to the Declaration of

Nathaniel B. Smith.

*Mauriello Response:* Disputed.  Steven Mauriello reviewed the monthly,

quarterly and final evaluations by Schoolcraft's supervisors of

Schoolcraft's performance throughout 2008.  (See SM Ex. BV,

Mauriello Dep. p.174 ll.15-20.)  Then, after learning of the efforts of the

supervisors to encourage Schoolcraft's improvement and to support any

effort he made to do his job, as well as hearing Schoolcraft's response at

the appeal meeting, Mauriello decided to approve the final evaluation,

which contained the unsatisfactory rating.  (PMX 2; SM Ex. D at 32:20-

33:30, 57:00-1:00.00; SM Ex. BV,  Mauriello Dep. p. 193 ll. 2-21)  As

---

[12] PMX 5 (PX 51); PMX 3: Mauriello Tr. 190:23-196:25.

Mauriello wrote when finalizing the evaluation:  "Police Officer Schoolcraft has been counseled by both his Squad Supervisor and his Platoon Commander about his lack of drive.  He has yet to show any improvement.  I concur with the above evaluation." (SM Exhibit A, Plaintiff's Evaluation for 2008.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

12.  Tracking the negative comments during the course of the year, DI Mauriello's 2008 performance evaluation recommended that Officer Schoolcraft be transferred because of his "poor activity," for his "approach to meeting the performance standards" and for his disregard of the "activity standards" of an NYPD Police Officer.[13]

*City Response:* Deny. See Exhibit 1 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Disputed to the extent it indicates Steve Mauriello simply tracked or repeated negative comments made by Schoolcraft's supervisors throughout the year in their quarterly evaluations, and to the extent it suggests that the recommendation of a transfer of Schoolcraft was intended as punishment or criticism or was a sign of some personal or professional animus.  Steve Mauriello took into consideration the entire performance record of Schoolcraft, as well as the description by

---

[13] PMX 5 (PX 51) at NYC 071)

his supervisors of their efforts to help him improve, along with Schoolcraft's apparent unwillingness to take responsibility for his poor performance or to indicate a desire to improve. (SM Ex. BV, Mauriello Dep. pp. 199-206 ll.20-24.)  As reiterated in a subsequent conversation with Chief Marino, a transfer was recommended in the hope a change of circumstances might be more suitable for Schoolcraft or might help motivate him to do better. (SM Exhibit BV, Mauriello Dep. p. 277 ll. 2-15).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

13.  Officer Schoolcraft objected to this evaluation and informed his superiors that he wanted to appeal the failing evaluation.[14]

*City Response:* Admit.

*Mauriello Response:* Not disputed.  At the appeal meeting, after an extended discussion, Schoolcraft indicated he had already retained an attorney and would be appealing his evaluation (SM Exhibit D at 58:00-60:00).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

14.  The appeal process involved the transmission of paperwork to the next

---

[14] PMX 3:  Mauriello Tr. 190:18.

level of the command structure, which was the Brooklyn North Patrol Borough, headed by Defendant Chief Gerald Nelson and Defendant Deputy Chief Michael Marino.[15]

*City Response:* Admit.

*Mauriello Response:* Not disputed.  It was explained to Schoolcraft at the meeting that he had to submit his appeal, in accordance with the Patrol Guide procedures, in writing directly to Patrol Borough Brooklyn North. (SM Ex. D at 59:00-60:00); SM Ex. BY, Schoolcraft memo book entry noting he was informed of the appeal procedures.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

15.  At around this time, a poster appeared on Officer Schoolcraft's locker containing the words:  "IF YOU DON'T LIKE YOUR JOB, THEN MAYBE YOU SHOULD GET ANOTHER JOB."[16]

*City Response:* Admit.

*Mauriello Response:* Disputed to the extent this is intended to refer to an advertising poster for CareerBuilder.com with the tagline "If you don't like your job then maybe you should get another job. Start Building," or to suggest that the poster was placed on a locker used by Schoolcraft in response to him informing 81st Precincts supervisors that he wanted to

---

[15] PMX 3:  Mauriello Tr. 192:4 ("Chief Marino has an appeal board with borough inspectors").
[16]  PMX 1:  NYC 12003.

appeal. First, Schoolcraft's own recording indicates that 81st Precinct supervisors remained positive about their ability to motivate Schoolcraft and assist him through any difficulties he was having (SM Exhibit D at 28:00-28:30, 43:00-45:30, and 50:00-52:00). Second, nothing in the record indicates that Schoolcraft ever complained or expressed concern that he was being harassed or intimidated by anyone, including by the placement of this sign, because of his intention to appeal or otherwise. In fact, Schoolcraft's deposition testimony and his statements to QAD in October 2009 indicate he did not believe his supervisors or fellow officers were retaliating against him either at his appeal meeting or thereafter. (See SM Ex. BN, AS1 262:19-24 and AS2 55:13-20; SM Exhibit BR at 27:45-27:55.) Third, the earliest photograph taken of Schoolcraft's locker with the sign taped to his locker, apparently was taken by Schoolcraft on January 31, 2009 (SM Ex. BZ, IAB Locker/NYC ). Remarkably, though the picture easily could be removed, it remained taped to his locker until it was photographed by IAB some time in 2010, suggesting may have put it there in the first place. (SM Exhibit CA, NYC 12004.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

16. Another handwritten note that later appeared on his locker stated: "shut

up, you idiot."[17]

*City Response:* Admit.

*Mauriello Response:* Disputed to the extent the statement is intended to suggest the note was directed at Schoolcraft.  The photograph cited depicts a sticker on what was once Schoolcraft's locker.  The sticker is the same sticker depicted in earlier photos taken in January 2009 through January 2010.  The cited photo was taken as recently as 2013 and for the first time depicts the sticker with the scribbled note "shut up, you idiot."  By that time, Schoolcraft had not been back to work for three years or so and the locker had been reassigned multiple times to several different officers (SM Ex. CB NYC 11909-12002).  The note appears to simply be recent graffiti. The suggestion that this note was written on Schoolcraft's locker with the purpose of harassing him or attempting to silence him is simply wrong. (SM Exhibit CC, NYC 12005).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

17.  On February 25, 2009, Officer Schoolcraft met with several supervisors at the 81st Precinct, including DI Mauriello, and his new Executive Officer, Defendant Captain Theodore Lauterborn.[18]

---

[17] PMX 1:  NYC 12005.
[18] PMX 1:  NYC 191.

*City Response:* Admit.

*Mauriello Response:* Not disputed.  We have referred to this as the "appeal meeting." Also in attendance were Lieutenant DelaFuente, Lieutenant Mascol, Lieutenant Caughey, Sergeant Weiss, Sergeant Stukes and Schoolcraft's union delegate (SM Exhibit D).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

18.  During the meeting, Officer Schoolcraft confirmed his intent to appeal the failing 2008 performance evaluation and repeatedly asked for information about what numbers are required of him.[19]

*City Response:* Admit.

*Mauriello Response:* Not disputed except Schoolcraft did not confirm his intent to appeal until the last minute of a one-hour meeting at which supervisors repeatedly offered Schoolcraft multiple forms of assistance to help improve his performance. (SM Exhibit D at 59:40-61:00.) Also, as the appeal meeting recording indicates, Schoolcraft actually asked two or three times in the first few minutes of the meeting "what is the standard?" (SM Ex. D at 17:20-18:30)  In response, Mauriello responds "there is no standard" and "there is no line where I judge good activity and bad activity, I highlight everything…you've got to do something out there." (SM Exhibit D at 17:20-19:40.)  Schoolcraft's claim that his

---

[19] PMX 3:  Mauriello Tr. 190:18.

evaluation was based on numbers indicates he never took responsibility for his poor performance and instead is looking to blame Mauriello for demanding that Schoolcraft do his job.  It also shows Schoolcraft refused to understand he had an obligation to become engaged in doing his job not just get numbers for the sake of satisfying a standard.  It is important to note that Schoolcraft is complaining he was penalized for not achieving a certain number, but he does not know the number or whether there even is one, and he does not indicate what the number relates to – summonses, arrests, stops, verticals, radio runs, community visits, domestic violence runs, or anything else.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

19.  At the end of the meeting, another of the 81st Precinct supervisors, Defendant Steven Weiss specifically asked Officer Schoolcraft if he was recording the meeting.[20]

*City Response:* Admit.

*Mauriello Response:* Not disputed, but in response Schoolcraft lied that he was not recording the meeting.  He said his radio was off, which was a way of dissuading Weiss from any suspicion that Schoolcraft might

---

[20]  PMX 3:  Mauriello Tr. 326; PMX 6:  Weiss Tr. 111:7-114;12 (recalls believing that Schoolcraft was recording and recalled asking Schoolcraft if he was recording the meeting in February 2009 about the appeal but denies ever discussing that belief with Mauriello or Executive Officer Lauterborn or Lieutenant Caughey).

have been recording the meeting or had any idea how to go about recording such a meeting.  In fact, Schoolcraft by then had become quite skilled in using recorders as he had been secretly recording events in the precinct for nearly a year, and perhaps for as long as three years.  (SM Exhibit D at 1:01.20-1:01.30.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

20.  In either late February or March of 2009, Mauriello went to the main office for Patrol Borough Brooklyn North with Sergeant Weiss from the 81st Precinct and met with Deputy Chief Marino about Officer Schoolcraft's appeal of his failing 2008 evaluation and about Mauriello's wish to transfer Schoolcraft out of the Precinct.[21]

*City Response:* Admit.

*Mauriello Response:* Not disputed except to the extent the statement suggests the meeting was set up just to discuss Schoolcraft, and to the extent it suggests any impropriety in recommending that Schoolcraft be transferred.  The meeting was called because Chief Marino typically would discuss the evaluations of any officers in the precinct receiving a 3.0 or lower on their evaluations, which would have included Schoolcraft and another officer who received a 2.5 (SM Ex. BV,

---

[21] PMX 6:  Weiss Tr. 178:12-181:4; PMX 7:  Marino Tr. 196:13-200:6; PMX 3: Mauriello Tr. 276:15-277:15.

Mauriello Dep. p. 511 ll. 9-17).  With respect to the recommendation
that Schoolcraft be transferred, Mauriello believed a change might do
Schoolcraft some good, and he thought Schoolcraft might be better
suited to work in a slower precinct with a lower incidence of crime. (SM
Ex. BV, SM Dep. p. 277:2-15).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

21.  DI Mauriello requested that Officer Schoolcraft be transferred, and
Deputy Chief Marino denied that request at that time for lack of
paperwork.[22]

*City Response:* Admit.

*Mauriello Response:* Not disputed.  Mauriello recalls being told by
Chief Marino that an officer could not be transferred at the time of his
year-end evaluation unless the request had been initiated earlier in the
year.  (SM Aff. in Opp. ¶ 5.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

22.  On March 11, 2009, a labor attorney for Officer Schoolcraft, James A.
Brown, Esq., wrote DI Mauriello a letter about Officer Schoolcraft's

---

[22] *Id.*

28

appeal of his failing evaluation.[23]   Among other things, the letter documented previously-raised concerns about "numerical goals" being used improperly in performance evaluations:  "We are concerned that our client's negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of arrests and summons issued.[24]

*City Response:* Deny, and refer the Court to the letter referenced herein for an accurate recitation of its content. See Exhibit 8 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Not disputed that the letter was received, but dispute the statement in the letter that a concern had previously been raised about numerical goals being used improperly in performance evaluations.  Also the letter states the attorney's "understanding that a final decision from Command [i.e., the 81st Precinct] has not yet been rendered," thus indicating Schoolcraft had not told his attorney Mauriello made it quite clear at the end of the February 25, 2009, meeting – which Schoolcraft recorded – that he would not change Schoolcraft's evaluation (SM Ex. D at 57:45-60:00), and did not tell his attorney he was advised at the meeting that he had to submit his appeal to the Patrol Borough Brooklyn North office, as the Patrol Guide indicates. (SM Ex.BU Patrol Guide 205-58; SM Ex. BY (Schoolcraft's

---

[23] PMX 8 (PX 57 & 22).
[24] PMX 8:  *Id.* at p. 2.

Memo Book); and SM Ex. D at 59:00-60:00.)

The attorney's letter further states that "[w]e urge you to weigh the above considerations before issuing a decision related to our client's evaluation." Again, apparently the attorney was not told Mauriello had made his decision at the meeting, or that any further decision would have to be made not by Mauriello but by the Brooklyn North borough commanders. (SM Exhibit D at 57:15-58:00.) Mauriello forwarded the attorney's letter to the Brooklyn North office (SM Ex. BV, Mauriello Dep. p. 248 ll. 8-16.), and had no further role with respect to an appeal of Schoolcraft's evaluation.

Schoolcraft had prepared a draft of his appeal on February 27, 2009, but never submitted it (SM Exhibit CD, Rough Copy of Appeal), pretending ever since that he had done so while faulting others for the "appeal" being ignored. In fact, when Schoolcraft's evaluation was re-signed in April 2009, Schoolcraft thereafter spoke of it as being a finalizing or dismissal of his appeal, when the truth was and is that he never submitted an appeal, so the appeal never was dismissed, and the only thing that was finalized had been the evaluation itself. (SM Ex. M at 2:20- 3:00 (Schoolcraft recorded conversation with Dr. Lamstein on July 27, 2009; SM Ex. BR.) When Schoolcraft was called to a meeting with Sergeant Devino, the personnel officer for Brooklyn North, on October 29, 2009, she told him the 81st Precinct and Mauriello had done everything they were supposed to do, but Schoolcraft had never

30

submitted an appeal of his evaluation.  She also said he still could do so but he never did. (SM Exhibit CE at 5:25-8:15, Schoolcraft recording of 10/28/09 meeting with PBBN re: appeal)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

23.  After receiving the letter, DI Mauriello told Chief Nelson about it and forwarded it to Patrol Borough Brooklyn North as part of the appeal process.[25]

*City Response:* Admit.

*Mauriello Response:* Not disputed, though such a letter was not an actual required part of the appeal process.  Still, Chief Nelson informed Mauriello that he would send any received documents related to Schoolcraft's performance evaluation to the personnel department at Patrol Borough Brooklyn North. (SM Exhibit BV, Mauriello Dep. p. 248 ll. 8-16.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

24.  A few days later, on about March 15, 2009, while Officer Schoolcraft was on patrol, Defendant Weiss issued to Officer Schoolcraft a command discipline for being "off post" and having "unnecessary

---

[25] PMX 3:  Mauriello Tr. 247:11-254:16.

conversation" with another patrol officer.[26]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

25.  Officer Schoolcraft believed that he was being punished for the letter from his lawyer and for appealing his evaluation, and as a result, made a formal request on his radio that the Duty Captain for Patrol Borough Brooklyn North respond to the scene.[27]

*City Response:* Deny, except admit that plaintiff requested the presence of a Duty Captain.

*Mauriello Response:* Disputed, to the extent it purports to assert Schoolcraft's belief, and to the extent it suggests there was a basis for Schoolcraft to believe he suffered retaliation for commencing pursuit of his appeal.  As to Schoolcraft's stated belief, there is substantial evidence Schoolcraft was orchestrating events -- such as pretending to pursue an appeal of his evaluation (see responses to paragraphs 22 and 36), but not actually doing so, and perhaps even pretending to suffer stress and anxiety on the job, when not actually suffering at all (see responses to paragraphs 29 through 33) -- in an effort to either trigger or

---

[26] PMX 9 at NYC 00081 (PX 168 ).
[27] PMX 6:  Weiss Tr. 98:2-19; PMX 10:  Lauterborn Tr. 177:12-21 & 183:19-186:12

create the appearance of retaliation.  In any event, in this instance his

purported belief was unfounded.  Among other things, defendants would

have had no incentive to punish Schoolcraft for his appeal.  His poor

performance was well documented (see PMX 1), and all of his

supervisors had made a substantial effort to get him to improve.  In

addition, Schoolcraft's poor performance, whether he appealed his

evaluation or not, would already have been known by the borough

commanders – Deputy Chief Nelson and Assistant Chief Marino, so

there was no concern about them finding out about it (SM Exhibit BV,

Mauriello Dep. 155:13-23, 511:9-17).  Also, as plaintiff concedes, once

Mauriello received the attorney's letter he passed it on to the Brooklyn

North borough office (see response to paragraph 23 above).

Schoolcraft did allude at the time to the belief that he was being

punished for appealing his evaluation and for the letter from his lawyer,

but the evidence indicates the far greater likelihood is he did not believe

that at all.  Instead, he simply performed poorly, became angry when he

received a poor evaluation and then pretended to appeal, though not

actually doing so, no doubt aware it never would succeed.  He thus tried

to create the appearance of retaliation – in the way he was being treated

and in the fact his "appeal" was ignored, but instead, he simply was

being more closely supervised due to his unsatisfactory evaluation and

his apparent unwillingness to take responsibility for his poor

performance.  His appeal was not considered because he never filed it,

not because anyone was upset with him or retaliating against him. (SM Exhibit E at 0:45-1:00, 31:00-31:30, recorded conversation with Lauterborn on 3/16/09; see response to paragraph 36.)

In any event, the lawyer's letter was addressed to Mauriello, and Mauriello was not on duty that week, so no one would have been aware yet of the letter's content. (SM Exhibit E at 1:08-1:20.) Even if the content of the letter were known, it would not have provided any motivation to Schoolcraft's supervisors to penalize him. His performance was so poor that no appeal had any likelihood of success. It simply is not credible that Schoolcraft believed he was being punished for it.

Finally, a patrol officer calling over the borough-wide radio for the duty captain of the borough to come to a scene because the officer objects to action taken by a platoon sergeant was unprecedented. (See SM Ex. CF, Weiss Dep. Tr. 128:4-129:23.) It not only was an indication of Schoolcraft's unwillingness to take any responsibility for his poor performance while attributing wrongdoing to others, but also, in hindsight, a bold effort by Schoolcraft to create the appearance of retaliation. Perhaps most telling about Schoolcraft's assertion that he was being punished for appealing his evaluation and for hiring a lawyer to help him, is what Schoolcraft does not say – that he believed he was being punished for complaining about illegal quotas or downgrading of crime. The reason is clear – plaintiff never expressed any complaints

34

about such things until many months later. (SM Exhibit BN, AS1 95:12-16.) Thus, none of these earlier events have any bearing on the outcome of any of plaintiff's claims, all of which are tied to his supposed objection to illegal quotas and downgrading of crime.  On the other hand, all of the events since the date of the appeal meeting show just how far Schoolcraft was willing to go to get revenge against Mauriello by attributing fault to him where there was none.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

 *Isakov Response:* Undisputed for purposes of this motion.

26.  In response, Defendant Lauterborn, who claimed to have been the Duty Captain at the time, had Officer Schoolcraft brought back to the 81st Precinct.  According to Officer Schoolcraft's recording of the meeting with Captain Lauterborn, Lauterborn told Officer Schoolcraft that after the February meeting at the 81st Precinct to discuss his appeal, he should not be surprised by the fact that he was going to get a lot more "supervision" by the 81st Precinct supervisors and that the 81st Precinct supervisors were now paying "closer attention" to him.[28]

*City Response:* Deny, and refer the Court to the recording for an accurate recitation of its contents. <u>See</u> Exhibit 11 to the Declaration of Nathaniel B. Smith.

---

[28] PMX 11:  WS.310M_16MARCH2009_Report_Retaliation at 0:15-2:15, 5:45__28:50-31:30.   The recording is attached at part of a compact disk accompanying this motion together with other records relevant to the motion.

*Mauriello Response:* Not disputed except to the extent plaintiff intends to suggest that giving plaintiff more supervision and paying closer attention to him was in any way inappropriate or somehow constituted punishment.  Instead, such closer monitoring was required due to Schoolcraft's poor performance and his unwillingness to take any responsibility for it or make any effort to improve.  (SM Exhibit E at 6:00-7:30, 15:00-16:30). The other officer who received a 2.5 rating in his year-end evaluation for 2008 also was more closely monitored.  (See SM Aff. in Opp. ¶ 4.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

27.  Captain Lauterborn also told Officer Schoolcraft that "this is gonna go on;" that he has "a long road ahead" of him; that going forward, he needs to "cross your t's and dot your i's;" and that the "supervision" was "coming down hard" on him not just in the past two nights but since the day he walked out of the appeal meeting in February of 2009.[29]

*City Response:* Deny, and refer the Court to the recording for an accurate recitation of its contents. See Exhibit 11 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Not disputed except to the extent plaintiff intends to suggest that Captain Lauterborn was describing scrutiny of

---

[29] PMX 11:  Id. at 30:00-31:30.

Schoolcraft that was in some way inappropriate or somehow constituted punishment. Instead, such scrutiny was required due to Schoolcraft's poor performance and his unwillingness to take any responsibility for it or make any effort to improve. (SM Exhibit E at 2:35-2:50).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

28.  The same day that Officer Schoolcraft spoke to Captain Lauterborn, Sergeant Weiss began reviewing police procedures on how to have Officer Schoolcraft psychologically evaluated.[30]

*City Response:* Admit.

*Mauriello Response:* Not disputed except to the extent it suggests Sergeant Weiss reviewed police procedures regarding referring a fellow member of the service to the Psychological Evaluation Unit as a result of the conversation between Captain Lauterborn and Schoolcraft. Sergeant Weiss testified that a series of unusual and bizarre actions, culminating in Schoolcraft engaging in the highly unusual act of calling for a duty captain, led him to become concerned for Schoolcraft's well-being. (SM Exhibit CF, Weiss Dep. Tr. 128:4-129:23.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

[30] PMX 6:  Weiss Tr. 120:6-121:2.

29.  Shortly after that, Sergeant Weiss contacted the NYPD's Early
Intervention Unit and reported that he was "concerned" about the level
of Office Schoolcraft's "mental distress."[31]

*City Response:* Admit.

*Mauriello Response:* Not disputed, although Sergeant Weiss contacted
the early Intervention Unit not only after Schoolcraft called for a duty
captain, but also because Schoolcraft took time off from work following
that incident. Schoolcraft was out sick, having first visited a hospital
emergency room and receiving medication, and then visiting his primary
physician, allegedly due to continuing anxiety and stress.  In fact, during
that time period, Schoolcraft's father had reached out to NYPD because
he could not reach Schoolcraft and was concerned about his well-being
(SM Ex. CG at 11:00-11:40, Larry Schoolcraft recorded conversation
with Captain Lauterborn.) The 81st Precinct was not provided an
explanation of what happened, but Schoolcraft returned to work soon
thereafter.  Sergeant Weiss perceived that Schoolcraft was suffering
from some distress and was in need of intervention. (SM Exhibit CF,
Weiss Dep. Tr. 101:14-102:10; SM Exhibit G, Dr. Sure record: plaintiff
taking off from work; SM Exhibit I; SM Exhibit CI, Lamstein Dep. p.
56, ll. 14-21).  The date Weiss called EIU is not documented, but we
do know Schoolcraft was not interviewed by EIU until April 30, 2009,
more than two weeks after he was placed on restricted duty by Dr.

---

[31] PMX 6:  Weiss Tr. 99:14-101:4.

Lamstein, who worked in the Medical Division at Lefrak.  EIU is a unit

unto itself in One Police Plaza.  (SM Exhibit CH, NYC 13444.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

30.  Sergeant Weiss also did Internet research on Officer Schoolcraft and

found a news article in a local upstate newspaper about a burglary at his

father's home and forwarded that article to the Early Intervention Unit.[32]

*City Response:* Admit.

*Mauriello Response:* Not disputed. Concerned about Schoolcraft's well-

being, Sergeant Weiss found an article on-line in which Schoolcraft said

the burglary of his mother's ashes "affects me every day" and "it's the

last thing I think about before I go to sleep at night." (SM Exhibit BM,

May 7, 2008 article from the Leader-Herald; SM Exhibit CF, Weiss

Dep. Tr. 100:11-101:4.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

31.  Within a week or two of Sergeant Weiss' contacting the Early

Intervention Unit, Officer Schoolcraft was placed on modified or

restricted duty without any law enforcement or patrol duties and his gun

---

[32] PMX  6:  Weiss Tr. 103:6-109:3

and shield were removed.[33]

*City Response:* Admit.

*Mauriello Response:* Disputed to the extent it attempts to suggest that Schoolcraft was placed on restricted duty by the NYPD psychologist, Dr. Lamstein, because Sergeant Weiss had contacted the Early Intervention Unit (EIU).  There is no evidence at all that those two events were at all related.  The sequence of events resulting in Schoolcraft being placed on restricted duty is recited in paragraphs 8 through 15 of Defendant Mauriello's Statement of Material Facts in support of his motion for summary judgment seeking dismissal of Schoolcraft's claims, and those events have nothing to do with Sergeant Weiss contacting the EIU.   (Those facts also are recited in paragraphs 13 through 22 of the City Defendants' Statement of Material Facts in support of the City Defendants' motion for partial summary judgment.) Schoolcraft was not interviewed by EIU until nearly three weeks after he had been placed on restricted duty by Dr. Lamstein. It appears he was advised by EIU to see a psychologist (just as he earlier had been advised by his personal physician and by Dr. Lamstein).  (SM Exs. L, K and CH.) Yet, he never arranged to see a psychologist.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

[33] PMX  6:  Weiss Tr. 101:24-102:10.

32.  According to the NYPD psychologist who testified that she was directly involved in the decision to place Officer Schoolcraft on limited duty, Officer Schoolcraft was suffering from the physical manifestations of stress.[34]  Based on that opinion, she recommended cognitive behavioral therapy or stress management training to improve coping skills and to reduce the physical symptoms of stress.[35]

*City Response:* Admit.

*Mauriello Response:* Not disputed, except at his first meeting with the NYPD psychologist, Dr. Lamstein, on April 13, 2009, Schoolcraft was placed on restricted (not limited) duty, requiring that his gun and shield be taken.  He also was advised to see a psychologist for the needed therapy, as his personal physician had recommended less than two weeks earlier. (SM Exhibit K; SM Exhibit L.)

*Jamaica Hospital Response:* The NYPD psychologist, Dr. Catherine Lamstein, suggested "Psychotherapy Recommended Cognitive Behavioral Therapy" [sic] in order for the plaintiff to "learn the ways of reducing physical manifestations of stress, as well as the psychological manifestations of stress" (Exhibit 12, p. 106). Dr. Lamstein also recommended that the plaintiff see a psychiatrist for an evaluation because two previous treating physicians had prescribed him psychiatric medication, one of which was an antipsychotic (*Id.,* pp.

---

[34] PMX  12:  Lamstein Tr. 172:21-174:20
[35] PMX  12:  Lamstein Tr. 105:22-107:4.

113, 149).

*Bernier Response:* Dr. Catherine Lamstein-Reiss, the NYPD

psychologist referenced in Plaintiffs Statement No. 32, testified she

did only recommended treatment as an NYPD psychologist does not

mandate treatment. (Dr. Catherine Lamstein-Reiss' Deposition

Transcript is annexed to the Declaration of Matthew J. Koster

(hereinafter "Koster Decl.) as Exhibit C at pg 107 lns 5-13). No

response to the remainder of the statement.

*Isakov Response:* The NYPD psychologist, Dr. Catherine Lamstein,

suggested "Psychotherapy Recommended Cognitive Behavioral

Therapy" [sic] in order for the plaintiff to "learn the ways of reducing

physical manifestations of stress, as well as the psychological

manifestations of stress" (Exhibit 12, p. 106). Dr. Lamstein also

recommended that the plaintiff see a psychiatrist for an evaluation

because two previous treating physicians had prescribed him

psychiatric medication, one of which was an antipsychotic (Id., pp.

113, 149).

33. The NYPD psychologist did not recommend any medication, did not

believe that Officer Schoolcraft was psychotic, and did not believe that

Officer Schoolcraft was dangerous to himself or others.[36]

*City Response:* Deny. <u>See</u> Exhibit 12 to the Declaration of Nathaniel B.

Smith.

---

[36] PMX 12: Lamstein Tr. 113:15-115:2, 153:10-17, & 285:3-23.

*Mauriello Response:* Not disputed, although the NYPD psychologist was not authorized to prescribe any medication for a member of the service such as Schoolcraft, who was not her patient (SM Ex. N at 7:00-7:20, Schoolcraft recording of meeting with Dr. Lamstein, October 27, 2009; SM Exhibit CI, Lamstein Dep. p. 143 l. 19-25). When she first saw Schoolcraft in April 2009, she did recommend that he consult with a psychologist, which Schoolcraft's personal physician also had recommended just two weeks earlier (SM Exhibit CI, Lamstein Dep. p. 127 ll.7-20, 147-149). Schoolcraft's personal physician also had prescribed medication for Schoolcraft's stress, which was shortly after Schoolcraft had received a shot in a hospital emergency room to treat his stress. (SM Exhibit J, Lamstein notes; SM Exhibit CI, Lamstein Dep. pp. 149-150, ll.4-16).  The psychologist Schoolcraft was urged to see would have determined whether to renew Schoolcraft's prescription or prescribe additional medication. Schoolcraft, however, never made any arrangement to ever see a psychologist – not even after the NYPD psychologist repeated her recommendation when she saw Schoolcraft on two more occasions over the next six months (SM Exs. M and N; See SM Exhibit BN AS1 p 110, l.7-18). Finally, though the NYPD psychologist did not draw the conclusion Schoolcraft was a danger to himself on the three occasions she saw him, on the night of October 31, 2009, she was unable to say on that night whether he was a danger to himself.  She urged him to call her, but he chose not to do so. (see Mauriello SOF paragraph 75.)

*Jamaica Hospital Response:* Dr. Lamstein testified that she had no reason to think the plaintiff was a danger to himself and/or others, but that her "evaluation was only as good as the last time [she] saw him." (*Id.,* pp. 319-320).

*Bernier Response:* Dr. Lamstein-Reiss did not state she did not believe plaintiff was psychotic. Rather, she testified she did not observe any psychotic symptoms, but "Later on in the case I began to wonder if that was the case and I was not sure." (Exhibit C at pg 153 lns 9-23). Further, Dr. Lamstein-Reiss also testified that as time passed from her evaluation of plaintiff, she began to question her initial diagnosis as she received more information from plaintiff and other sources. (Exhibit C at pg 153 ln 24-pg 161 ln 5).

*Isakov Response:* Dr. Lamstein testified that she had no reason to think the plaintiff was a danger to himself and/or others, but that her "evaluation was only as good as the last time [she] saw him." (Id., pp. 319-320).

34. As a result of being placed on limited duty, Officer Schoolcraft was assigned to work at the 81st Precinct as the Telephone Switchboard operator, essentially taking calls to the Precinct and handling walk-ins by members of the public.[37]

*City Response:* Admit.

*Mauriello Response:* Not disputed, although Schoolcraft was placed on

---

[37] PMX 13: Huffman Tr. 46:10-25.

restricted duty, not limited duty, with the principal difference being that restricted duty requires that the officer's gun and shield be removed.

*Jamaica Hospital Response:* The plaintiff was placed on restricted duty and was also ordered to surrender his firearms as a result of having been placed on restrictive duty (*Id,* pp. 208, 289).

*Bernier Response: In* addition to the results plaintiff lists in Statement No. 34, plaintiff also had his firearms, ID and shield removed and vouchered at the medical division. (Exhibit C at pg 205 lns 10-23).

*Isakov Response:* The plaintiff was placed on restricted duty and was also ordered to surrender his firearms as a result of having been placed on restrictive duty (Id., pp. 208, 289).

35.  He held that position from April 2009 through the end of October 2009.

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

36.  While on limited duty, Officer Schoolcraft continued his attempts to challenge his failing 2008 performance evaluation.[38]

---

[38] On September 2, 20109, Officer Schoolcraft wrote a memorandum to DI Mauriello requesting (again) that his appeal be processed and Mauriello testified that he received the memorandum and forwarded it to the Sergeant at Patrol Borough Brooklyn North who handled the paperwork for appeals. (PMX 14: (PX 58) & PMX 3: Mauriello Tr.

*City Response:* Admit.

*Mauriello Response:* Disputed.  This is a remarkably deceitful assertion, and deconstructing it helps reveal that Schoolcraft was trying to orchestrate events to get revenge against Mauriello for signing off on the 2008 evaluation and for having Schoolcraft placed on restricted duty, while trying to make it appear he was being retaliated against and his appeal was being ignored.  Under NYPD Patrol Guide provisions, Schoolcraft had an affirmative duty to submit a report on typed letterhead stating that he wished to appeal his evaluation and giving the reasons for the appeal. (SM Exhibit BU, NYPD Patrol Guide 205-58(4), "Appeal of Evaluation- Uniformed Members of the Service").  Schoolcraft was made aware of this duty by Sergeant Weiss at his performance evaluation hearing conducted on February 25, 2009. (SM Exhibit D at 59:30-60:30; SM Ex. BY.)  Schoolcraft also was represented by a union delegate at the meeting who would have been available to assist him with any questions he might have had about the appeal process.   In response, Schoolcraft apparently prepared a "rough" copy of his appeal the following day (SM Exhibit CD, Schoolcraft "Rough Copy of Appeal), but did nothing with it.  On August 17, 2009, Schoolcraft was informed by PBA counsel David Morris that his appeal could not be resolved until he submitted this formal, typed report to the personnel department at Patrol Borough Brooklyn North. (SM Exhibit

269:4-274:14).

CJ, Letter from PBA to Schoolcraft re: appeal). Despite having any information he might need, however, and despite hiring an attorney to represent him, Schoolcraft failed to take the necessary steps to pursue the appeal. In fact, Schoolcraft's own recording of his meeting with a Sergeant at Patrol Borough Brooklyn North – eight months later -- confirms he was aware the he had not completed the steps necessary to formally appeal his performance evaluation. (SM Exhibit D at 5:00-5:30.)  Yet, all indications are Schoolcraft tried to create the false appearance he was doing what he needed to do to pursue his appeal, but purposefully did not do so, with the intention of later claiming the NYPD intentionally ignored his appeal and somehow refused to address it.  Schoolcraft so ineptly failed to follow the basic steps to have his appeal heard, that the conclusion is unavoidable, as the evidence fully suggests, that the failure was purposeful.  In any event, Schoolcraft has only himself to blame for failing to get his appeal considered.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

37.  He also started reporting misconduct by his supervisors at the 81st Precinct.

*City Response:* Admit.

*Mauriello Response:* Disputed.  For all of his purported, though unexpressed, concern about illegal quotas and the misclassifying of

crime, the first and only written complaint Schoolcraft made to the NYPD was made on August 20, 2009, and asserted that Lieutenant Caughey and Sergeant Weiss improperly gained access to the unofficial hard copy of Weiss' personnel file to the extent it was maintained in the 81st Precinct.  Schoolcraft indicated in the complaint that Weiss may have destroyed records that would have prevented him from being promoted to lieutenant.  First, it was determined by IAB that no documents had been removed from the file, and the file would not have been reviewed by those deciding whether to promote Weiss; instead they would have reviewed the computerized official NYPD records relating to Weiss.  More importantly, Schoolcraft's decision to file that complaint, rather than a written complaint about allegedly illegal quotas and misclassification of crime, provides some indication of just how unconcerned he was about those issues. (SM Exhibit BN, AS2 pp. 162-164.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Plaintiff does not cite to any evidence to support this claim.

*Isakov Response:* Undisputed for purposes of this motion.

38.  On August 20, 2009, Officer Schoolcraft reported to the Internal Affairs Bureau ("IAB") on "corruption involving the integrity control program" at the 81st Precinct by the Integrity Control Officer, Defendant Lieutenant Caughey and Assistant Integrity Control Officer, Defendant

Weiss.[39]

*City Response:* Admit.

*Mauriello Response:* Not disputed.  See Response to paragraph 37 above.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

39.  In addition, on August 31, 2009, a former member of the service, David Dirk, reported that Officer Schoolcraft was the victim of retaliation by his supervisors.[40]

*City Response:* Admit.

*Mauriello Response:* Not disputed, though it appears this may have been done by Durk (who is now deceased) at the urging of Schoolcraft's father, not Schoolcraft. (TAC ¶ 120.) It appears the father was trying to help Schoolcraft create the appearance of retaliation against him for complaining about quotas and downgrading of crime – except Schoolcraft had not yet made any complaint about such things.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

40.  On September 2, 2009, Officer Schoolcraft spoke with IAB and

---

[39] PMX 15:  Schoolcraft Report (PX 40).
[40] PMX 15 (NYC 4785-86) (Attorneys' Eyes Only ("AEO") designation, filed under seal).

reported that DI Mauriello was pressuring his staff to downgrade or suppress crime reporting and that under the direction of DI Mauriello police officers were being directed to make arrests and issue summonses "in violation of people's civil rights."[41]

*City Response:* Admit.

*Mauriello Response:* Not disputed that Schoolcraft expressed these objections, but this is the first time Schoolcraft expressed these objections to anyone in the NYPD.  It is not a coincidence that on the same date Schoolcraft wrote to Mauriello requesting that his appeal be processed. (See PX 14). In its own ways, each communication was a deceitful act in furtherance of Schoolcraft's revenge against Mauriello. (See responses to paragraphs 22 and 36.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

41.  According to the IAB report, Officer Schoolcraft also stated that he received his failing evaluation "because he doesn't believe in summons and arrest quotas" and that police officers "are being forced to sign the training log even though they don't get the necessary training."[42]

*City Response:* Admit.

*Mauriello Response:* Not disputed that Schoolcraft made the recorded

---

[41] PMX 16 (NYC 4316-18) (Confidential designation, filed under seal).
[42] *Id.*

statement.  Again, this is the first time Schoolcraft expressed these

objections to anyone in the NYPD – more than six months after the

appeal meeting.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

42.  On October 7, 2009, Officer Schoolcraft met with investigators from

the NYPD's Quality Assurance Division ("QAD").[43]  At the meeting,

Officer Schoolcraft reported in greater detail about the nature of the

downgrading and suppression of major crime reporting at the 81st

Precinct.[44]

*City Response:* Deny.  <u>See</u> Exhibit 16 to the Declaration of Nathaniel B.

Smith.

*Mauriello Response:* Not disputed except to the extent it suggests there

was a practice of downgrading and suppressing major crime in the 81st

Precinct, and to the extent it suggests Schoolcraft spoke truthfully to

QAD on that subject.  It also is disputed to the extent it says that at the

meeting Schoolcraft reported downgrading and suppression of crime to

QAD "in greater detail," thus suggesting he had previously reported to

QAD about downgrading or suppression of crime.  This simply was not

so.  It is in the conversation he recorded with his father on the way to

---

[43]  PMX 16 at NYC 5158 (PX 169; NYC 5153-5248).
[44]  *Id.* at 5158-60.

this meeting with QAD when Schoolcraft and his father spoke, among
other things, about:  i) not letting QAD know Schoolcraft was there to
get revenge against Mauriello (for Schoolcraft's poor performance
evaluation and for placing Schoolcraft on restricted duty) (SM Exhibit
BR at 2:30-2:45); ii) making misrepresentations to QAD in order to
"fuck [Mauriello] over;" (SM Exhibit BR at 7:10-7:45) and iii) telling
QAD at the meeting – the only time Schoolcraft met with QAD – that
Schoolcraft was providing only a small sample of the downgraded
crimes he had identified, indicating downgrading of crime was a
common occurrence and he had many more examples of its occurrence
to share with QAD, none of which was true. (SM Exhibit BR at 4:30-
5:10 and 43:45-43:55.)  Further, Schoolcraft told QAD investigators that
he became concerned with downgrading of crime after his father's home
was burglarized in 2007, and investigators failed to list certain stolen
property in the incident report. At that point, he finally realized how
harmful the practice of downgrading was because he "felt it." (SM
Exhibit BR at 45:00-46:00.)  Despite his concern that members of the
public were being harmed by this practice as early as January, 2008,
Schoolcraft did not complain about this alleged conduct to anyone in the
NYPD until 19 months later, and it wasn't even his central complaint.
Moreover, despite being aware of this practice for years, Schoolcraft
was able to produce only a total of no more than 13 complaint reports to
investigators, not all of which posed any concern. (See SM Exhibit CK.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

43.  While QAD undertook to conduct an investigation into those allegations, it also referred Officer Schoolcraft's other misconduct allegations to IAB.[45]

*City Response:* Admit.

*Mauriello Response:* Not disputed to the extent it states QAD indicated it would conduct an investigation only into the allegations of downgrading complaint reports.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

44.  By the end of October of 2009, it was common knowledge with the 81st Precinct that the Precinct was under investigation and that Officer Schoolcraft was involved in reporting the misconduct that led to that investigation.

*City Response:* Deny.

*Mauriello Response:* Disputed, and plaintiff cites no evidentiary support for the statement. QAD conducted semi-annual audits of the complaint reports of all precincts, including the 81st Precinct (SM Ex. CK, QAD semi-annual findings).  Anyone who might have later thought the semi-

---

[45] *Id.* at 5159 & 5220.

annual audit of the 81st Precinct in the summer of 2009 was related to the full-blown investigation later conducted by QAD in response to Schoolcraft's allegations would have been mistaken.  (See SM Ex. CL, Lauterborn Dep. pp. 278-79.)

It was not known by anyone by the end of October 2009 that the 81st Precinct was under investigation by QAD.  It was known by some that in the last week of October 2009 two officers had been called down to QAD for interviews, but it was not known by anyone in the 81st Precinct (apparently not even by Schoolcraft (SM Ex. BN, AS2 168-170)) why those two officers had been interviewed.  Captain Lauterborn has said that he was told by the two officers or by their supervisor that Schoolcraft had approached the two officers to find out why they had been called down (SM. Ex. CL, Lauterborn Dep. pp. 226, 3-20), but Schoolcraft denies doing so (SM Ex. BN, AS2 168-170).  When Steven Mauriello learned the two officers had been notified to report to QAD for interviews, he did not speak with them, but he did call Chief Mary Cronin, an Inspector at QAD, and asked if there was any problem he should be aware of.  Chief Cronin said "No," and briefly explained only that they had received an anonymous call and were simply following it up (SM Ex. BV, Mauriello Dep. p. 331 ll. 9-12-17).

In addition, on the morning of October 31, 2009, after Schoolcraft was formally placed on performance monitoring by NYPD headquarters 17 days earlier due to his unsatisfactory evaluation

(apparently having been mistakenly placed on force monitoring several months earlier (SM Ex. CE at 3:30-4:00, Schoolcraft/Devino), Lieutenant Caughey "scratched" Schoolcraft's memo book, which contained an entry on the upper sheet for that day indicating police officer Fadil Astor had called him and including Astor's tax and shield numbers. Astor had once been Schoolcraft's partner and was then assigned to IAB (SM Ex. BI). Caughey copied the memo book and left a copy for Mauriello in an envelope he placed in Mauriello's desk drawer, since Mauriello was not then on duty (SM Ex. CM, Caughey Dep. p. 128 ll. 5-15). Caughey left work at 12:00 noon on October 31, 2009 (SM Exhibit X, IAB Interview of Caughey, at 18:55-19:45), and did not bring the memo book to Mauriello's attention or discuss any of its content with him until the next time they were both on duty, November 2, 2009 (SM Ex. CM, Caughey Dep. p. 129 ll. 3-8; SM Ex. BV, Mauriello Dep. pp. 385-386).

It was not until after October 31, 2009, November that QAD began to call down many more officers for interviews (SM Ex. CK), and also not until November or December, or possibly even January, when QAD sought to review all of the complaint reports from the 81st Precinct for 2009 (SM Ex. CK). By then, it was apparent QAD was conducting an investigation, but even then, it was not known the investigation was triggered by communications Schoolcraft may have had with QAD. After October 31, 2009, Schoolcraft had not been heard from and had

not been the subject of any news reports or publicity, which did not start until February 2010 (see SM Ex.DC).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

45.  Sometime earlier that year, Captain Lauterborn learned from DI Mauriello of a QAD investigation of the 81st Precinct.[46]

*City Response:* Deny. <u>See</u> Exhibit 10 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Disputed.  See Response to paragraph 44. Mauriello does not recall, but it may be that he discussed with Lauterborn in the summer of 2009 that QAD was doing its semi-annual audit.  (See SM Ex. CL, Lauterborn Dep. pp. 278-79.)  Otherwise, Mauriello believes it was the 81st Precinct crime analysis Sergeant Seymour who told him that two officers were called down to QAD for interviews in the last week of October 2009 (SM Ex. BV, Mauriello Dep. p. 330 ll. 15-25), and, in any event, those two interviews and Mauriello's brief conversation with Chief Cronin was the full extent of Mauriello's awareness of any QAD activity prior to October 31, 2009.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

[46] PMX 10:  Lauterborn Tr. 278:17-280:19

46.  In addition, towards the end of October, an 81st Precinct Sergeant told DI Mauriello that QAD was calling down officers and based on that tip, DI Mauriello called up an Inspector from QAD, who confirmed that there was an investigation.[47]

*City Response:* Admit.

*Mauriello Response:* See responses to paragraphs 44 and 45.  Disputed to the extent it refers to Mauriello receiving a "tip", as if there was something sinister in Mauriello being advised two of his officers were directed to appear at QAD.  Also disputed to the extent it suggests the interview of two officers in the last week of October was known by anyone at the time to be the beginning of the investigation into the handling of complaint reports, which everyone later learned was taking place after October 31, 2009.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

47.  Earlier in the year, there was persistent speculation at the 81st Precinct that Officer Schoolcraft was tape recording at the Precinct.[48]

*City Response:* Deny. <u>See</u> Exhibit 10 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Disputed to the extent it suggests everyone in the

---

[47] PMX 3:  Mauriello Tr. 330:15-332:23 & 450:22-452:18.
[48] PMX 10:  Lauterborn Tr. 278:17-280:19.

81st Precinct participated in such speculation. If some officers engaged in such speculation, Mauriello was not one of them. (SM Exhibit BV, Mauriello Dep. p. 329.) There simply is no evidence anyone at the 81st Precinct ever <u>knew</u> Schoolcraft recorded even a single conversation in the 81st Precinct until the recordings were reported in the Village Voice in the second half of 2010.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

48. In addition, Captain Lauterborn testified that as the QAD investigation was heating up, he allegedly received complaints from other officers interviewed by QAD that Officer Schoolcraft was asking them questions about their QAD interviews and informed DI Mauriello about Officer Schoolcraft's alleged conduct.[49]

*City Response:* Admit.

*Mauriello Response:* Disputed. See responses to paragraphs 44 through 47. At no time prior to October 31, 2009, was it known by Mauriello, or anyone else as far as he knew, that the QAD investigation, which everyone later learned about, was already ongoing, or that any such investigation was "heating up." Only two officers were interviewed (SM Ex. BV, Mauriello Dep. p. 330 ll. 15-25); there is some evidence

---

[49] PMX 10: Lauterborn Tr. 86:22-95:2. While Officer Schoolcraft denies doing this, the fact that it was stated by Defendant Lauterborn goes to his state of mind and beliefs about Officer Schoolcraft.

Schoolcraft approached them to ask them what the interviews were about, though he has denied doing so  (see footnote 49 to plaintiff's statement 48); and Chief Cronin deflected Mauriello's inquiry by saying there was no problem he needed to be aware of, briefly explaining they interviewed the two officers as a follow-up to an anonymous call (SM Exhibit BV, Mauriello Dep. 331:9-12-17).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

49.  Moreover, supervisors at the 81st Precinct knew from their practice of inspecting or "scratching" memo books that Officer Schoolcraft's memo book contained the name of an IAB officer.[50]  Finally, on October 19th Lieutenant Caughey issued a written order to all officers in the command that all inquiries from IAB must be reported directly to him.[51]

*City Response:* Deny. See Exhibit 17 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* See responses to paragraphs 44 through 47.  The citations do not provide any support for, or even relate to, the subject of this statement.  The statement is disputed to the extent it intends to convey by innuendo that the matters described are somehow related or are an indication of wrongdoing by Lieutenant Caughey.  Lieutenant

---

[50] PMX 10:  Lauterborn Tr. 86:22-99:20 & 114:14-118:16
[51] PMX 17 (Caughey Memo).

Caughey is the only person who had scratched Schoolcraft's memo book in use on October 31, 2009, and he did so that morning. He thus was the only one to see the reference in the memo book to Schoolcraft apparently speaking with an officer formerly assigned to the 81st Precinct who had been a partner of Schoolcraft but who was then assigned to IAB (SM Ex. BI). Caughey did not know what to make of the entry and brought it to Mauriello's attention when they were both next on duty on November 2, 2009 (SM Ex. CM, Caughey Dep. p. 128 ll. 5-15; SM Exhibit BV, Mauriello Dep. 385-386).

With respect to IAB inquiries, Lieutenant Caughey was the Integrity Control Officer for the 81st Precinct, and his duties included approving requests for records or for officers to appear in court or elsewhere, including IAB (SM Ex. CN, NYPD Patrol Guide 202-15- "Command Integrity Control Officer"). There was nothing inappropriate about his instruction on October 19, 2009, which essentially was a reminder, that IAB inquiries should be directed to him. Certainly, if IAB did not think Caughey should be made aware of an inquiry, IAB would figure out how to reach the person they wanted to reach without Caughey knowing about it.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

50. On October 31, 2009 – the last day that Officer Schoolcraft reported to

the 81st Precinct – he worked the day tour and conducted his regular

duties at the Telephone Switchboard desk.

*City Response:* Admit.

*Mauriello Response:* Disputed.  Schoolcraft was assigned to work the

day tour on October 31, 2009, but left work -- without permission after

being directed not to leave -- more than an hour before his tour ended

(SM Exhibit Q at 7:30.25-7:30.45; SM Exhibit CO, Huffman Dep. Tr.

70:7-25). He then did not respond to any efforts to reach him during the

balance of his tour and for several more hours thereafter.

*Jamaica Hospital Response:* Plaintiff failed to work the entirety of the

day tour on October 31, 2009 because he left work early and did not

obtain the requisite permission necessary to leave work early, thereby

failing to follow required police procedure (Exhibit 10, pp. 235-236)

(Exhibit 4, p. 121) (Exhibit 13, pp. 68, 73).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Plaintiff failed to work the entirety of the day tour on

October 31, 2009 because he left work early and did not obtain the

requisite permission necessary to leave work early, thereby failing to

follow required police procedure (Exhibit 10, pp. 235-236) (Exhibit 4,

p. 121) (Exhibit 13, pp. 68, 73).

51.  During the course of that morning, Lieutenant Caughey took Officer

Schoolcraft's memo book to "scratch it" and instead, kept it for several

hours.[52]

*City Response:* Deny. See Exhibit 18 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

52.  While in his office, Lieutenant Caughey made two photocopies of the *entire* memo book because he saw "unusual" entries in it.[53]  Lieutenant Caughey kept one copy for himself and put the other copy in DI Inspector Mauriello's office desk.[54]

*City Response:* Admit.

*Mauriello Response:* Not disputed, but with the added explanation that there were only 20 pages to copy, some two-sided, and Caughey put the copy for Mauriello in an envelope and then put the envelope in Mauriello's desk drawer (SM Ex. CM, Caughey Dep. p. 128 ll. 5-15.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

53.  When he returned the memo book to Officer Schoolcraft later that day, Officer Schoolcraft noticed (and became alarmed) that several pages of

---

[52] PMX 4:  Schoolcraft Tr.  202:22-203:20; PMX 18:  Caughey Tr. 120:18-121:19.
[53] PMX 18:  Caughey Tr. 122:11-20.
[54] PMX 18:  Caughey Tr. 127:24-128:15.

the memo book containing his entries about corruption or misconduct were earmarked or folded down.[55]

*City Response:* Deny, except admit that plaintiff testified to his state of mind.

*Mauriello Response:* Disputed.  Caughey does not recall doing so (SM Ex. CM, Caughey Dep. p. 174:2-6), and there are no entries that can properly described as referring to corruption or misconduct (see SM Ex. CZ).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

54.  Officer Schoolcraft grew more alarmed during the course of the day when Lieutenant Caughey started acting toward Officer Schoolcraft in a menacing manner.[56]

*City Response:* Deny, except admit that plaintiff testified to his state of mind.

*Mauriello Response:* Disputed.  All of the evidence, especially the recordings secretly made by Schoolcraft throughout the day and evening of October 31, 2009, reveals that Schoolcraft was not alarmed by anything that happened on that date, and Caughey is never heard on the recording saying anything to Schoolcraft, much less saying anything

---

[55]PMX 4:  Schoolcrfaft Tr. 202:22-203-11.
[56] PMX 4:  Schoolcraft Tr. 118:3-25-120:10;

menacing.  In fact, Caughey left work at noon, more than two and a half hours before Schoolcraft (SM Exhibit X, IAB Interview of Caughey, at 18:55-19:45). The reality is that Schoolcraft, with the urging of his father, decided to seize the opportunity to put their apparent plan into action to bait the NYPD to take action against him that he could mischaracterize as retaliation for supposedly revealing wrongdoing. Schoolcraft's allegations of wrongdoing -- illegal quotas and rampant downgrading of crime -- were misrepresentations designed to cause harm to Mauriello, and perhaps others, in revenge for giving Schoolcraft a failing evaluation and for putting him on restricted duty.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

55.  One of the civilian workers at the Precinct, Police Administrative Aide ("PAA") Curtis Boston, saw Lieutenant Caughey walk by Officer Schoolcraft that day in an unusual manner and twice during the course of that morning PAA Boston and Officer Schoolcraft discussed Lieutenant Caughey's unusual behavior toward Officer Schoolcraft.[57]

*City Response:* Deny, except admit that PAA Boston testified in the manner set forth in ¶55.

*Mauriello Response:* Disputed.  Boston testified that part of Lieutenant Caughey's duties as 81st Precinct Integrity Control Officer is to ensure

---

[57] PMX 19:  Boston Tr. 64:17-65:5 & 77:15-86:13.

that both the precinct desk and telephone switchboard are functioning

properly. As part of that duty, Lieutenant Caughey regularly walks

around and observes both areas. (SM Exhibit CP, Boston Dep. Tr. 67

4:18, 78:6-79:20). In fact, when questioned about the incident, Boston

was unable to describe anything unusual about Caughey's behavior or

"manner" specifically toward Schoolcraft. (SM Exhibit CP, Boston Dep.

Tr. 68-70). The only thing Boston cited as unusual was that Schoolcraft

brought to her attention Caughey walking by the precinct desk two or

three times that morning. In retrospect, Boston was unable to say that

this behavior was, in fact, unusual because she never noticed how many

times Caughey usually walked by to make observations. (SM Exhibit

CQ at 11:40-12:40, PAA Boston IAB Interview). Despite Schoolcraft's

attempt to portray Boston as being concerned that Schoolcraft's "safety

may be in jeopardy" because of Caughey's "threatening behavior" (TAC

¶143-144), all indications are that Schoolcraft initiated conversation

with Boston to create the appearance that Caughey was being a

"menace."

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

56. PAA Boston specifically recalled that Officer Schoolcraft told her that

he felt uncomfortable about Lieutenant Caughey's behavior and that

Officer Schoolcraft asked her to document her reasons for why she

believed Lieutenant Caughey was acting in a suspicious manner.[58]

*City Response:* Deny, except admit that PAA Boston testified in the manner set forth in ¶56.

*Mauriello Response:* Disputed to the extent it suggests that Boston believed Caughey was acting in a suspicious manner toward Schoolcraft. While Schoolcraft encouraged Boston to "write down what you find suspicious; just write it down for your own notes" (SM Exhibit Q at 6:25.10-6:25.30), Boston never wrote any notes in regards to the incident. In regard to Caughey acting in a suspicious manner toward Schoolcraft, it seems that Schoolcraft was the only member of service who believed an 81st Precinct Officer inspecting an area under his control was suspicious; see response to Paragraph 55. Further, despite numerous statements that he believed Caughey was going to kill him and that "I would like to have at least a fucking chance to go in a gun battle with him" and "I think I am going to get whacked" (SM Exhibit Q at 5:24.00, lunch time call to Larry Schoolcraft), nothing in the recording suggests that Caughey was, in any way, posing a threat to Schoolcraft. Schoolcraft's deposition testimony supports the fact that he cannot point to a single specific incident where Caughey's words or actions made him afraid for his own safety. (SM Exhibit BN, AS1 118-120).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

---

[58] PMX 19:  Boston Tr. 77:15-86:13 & 109:16-112:5.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

57.  About one hour before the end of his scheduled day, Officer Schoolcraft told his supervisor, Sergeant Huffman that he was not feeling well and was going home.[59]  At the time, Sergeant Huffman told Officer Schoolcraft that that was "okay."[60]

*City Response:* Deny. See Exhibit 13 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Disputed. Sergeant Huffman responded "oh okay" as Schoolcraft dropped a sick report on her desk while walking away. Notwithstanding Schoolcraft's attempt to now show that this informal, surprised response by Huffman was an authorization to leave early, he understood fully he did not have permission to leave work early. First, Police Officer Rudy came down to the locker room and informed him that he would need to call the NYPD's centralized sick desk and get permission to leave before getting dressed. Schoolcraft refused to do so. (SM Exhibit Q at 7:25.40-7:26.00). Schoolcraft refused to even consider any attempt by Huffman to follow formal sick procedure. (SM Exhibit Q at 7:26.00-7:27.10). When Schoolcraft entered his vehicle to leave the precinct, he admits on the recording that he did not sign out sick but rather "I gave a sick slip to Sergeant Huffman at the desk, she said I had

---

[59] PMX 13:  Huffman Tr. 66:20-67:2 & 71:3-75:9.
[60] PMX 13:  Huffman Tr. 74:11-19.

to wait and had to get authorization from a lieutenant or something. I just said I felt sick and needed to go." (SM Exhibit Q at 7:30.25-7:30.45.)  Further, Schoolcraft later admitted to Captain Lauterborn that he left the 81st Precinct improperly by not waiting for permission from a supervisor. (SM Exhibit S at 3:00-4:30.)

*Jamaica Hospital Response:* Sergeant Huffman does not recall telling the plaintiff "okay" (Exhibit 13, p. 66).  Sergeant Huffman specifically testified that "[I] don't remember what I said in response" (*Id.,* p. 68).  Sergeant Huffman did recall that she did not give the plaintiff approval to leave (*Id.,* pp. 68, 73).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Sergeant Huffman does not recall telling the plaintiff "okay" (Exhibit 13, p. 66).  Sergeant Huffman specifically testified that "[I] don't remember what I said in response" (Id., p. 68).  Sergeant Huffman did recall that she did not give the plaintiff approval to leave (Id., pp. 68, 73).

58.  Officer Schoolcraft also submitted to Sergeant Huffman a sick report, which could have been a basis for authorizing him to take "administrative sick" for the day.[61]

*City Response:* Deny. <u>See</u> Exhibit 20 to the Declaration of Nathaniel B. Smith.

---

[61] PMX 13:  Huffman Tr. 68:6-15 (administrative sick can be approved by the desk sergeant); PMX 20:  Valenti Tr. 14:20-16:13 (same).

*Mauriello Response:* Disputed to the extent it suggests it would have been fine for Schoolcraft to walk out of the precinct if he simply said to Huffman he was taking "administrative sick" while placing a sick report on her desk. In that case, Schoolcraft still would have to wait for formal permission from either Sergeant Huffman or another supervisor.  (SM Exhibit CO, Huffman Dep. Tr. 70:7-25.)

*Jamaica Hospital Response:* There was no basis for authorizing the plaintiff to leave work because Sergeant Huffman did not give the plaintiff the requisite permission necessary to leave work early (*Id.,* pp. 68, 73).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* There was no basis for authorizing the plaintiff to leave work because Sergeant Huffman did not give the plaintiff the requisite permission necessary to leave work early (Id., pp. 68, 73).

59.  As Officer Schoolcraft was leaving the precinct, however, Sergeant Huffman told Officer Schoolcraft that he could take "lost time"[62] and Officer Schoolcraft told her that that would be fine, although he would have preferred sick time.[63]

*City Response:* Deny, except admit that Sergeant Huffman told Plaintiff he could take "lost time".

*Mauriello Response:* Disputed to the extent plaintiff purports to recite in

---

[62] PMX 13:  Huffman Tr. 80:12-20.
[63] PMX 4:  Schoolcraft Tr. 123:23-124:14

paragraphs 57 through 59 the essence or the entirety of his exchange with Sergeant Huffman or the events surrounding his early departure, which Schoolcraft himself substantially recorded.  Schoolcraft could have been approved for lost time had he requested it in writing and been approved by Sergeant Huffman. (SM Exhibit CO, Huffman Dep. Tr. 80-82).  As recited in response to paragraphs 57 through 59, Schoolcraft was well aware that the NYPD has established procedures for leaving before the end of a tour, and he failed to follow any proper procedure every step of the way.

*Jamaica Hospital Response:* Sergeant Huffman did not give the plaintiff the requisite permission necessary to leave work early (*Id.,* pp. 68, 73).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Sergeant Huffman did not give the plaintiff the requisite permission necessary to leave work early (Id., pp. 68, 73).

60. At about 3:30 pm, Officer Schoolcraft got home, which was located at 82-60 Eighty-Eighth Place, Queens, New York, and telephonically notified IAB of Lieutenant's Caughey's menacing behavior.[64]

*City Response:* Admit.

*Mauriello Response:* Disputed to the extent it alleges that Caughey was engaged in behavior that was menacing or threatening toward

---

[64] PMX 4:  Schoolcraft Tr. 126:3-127:18.   The call to IAB is also recorded and identified as DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma; PMX 11.

Schoolcraft. See responses to paragraphs 54-56.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

61.  Officer Schoolcraft specifically informed IAB that he felt threatened, retaliated against, and in danger as a result of Lieutenant Caughey's menacing behavior.[65]

*City Response:* Admit.

*Mauriello Response:* Disputed. See response to paragraphs 54-56.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

62.  About one hour later, at about 4:20 pm, a Sergeant Krohley, from the 104th Precinct, went to Officer Schoolcraft's home with his driver. Sergeant Krohley rang the bell for Officer Schoolcraft's apartment, which was on the second floor of a three-family house, and when there was no answer, he spoke to the landlady, Carol Stretmoyer, who told him that she believed that Officer Schoolcraft had left about thirty minutes ago.[66]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

---

[65] *Id.* at 19:40-26:10.
[66] PMX 16 (NYC 4643) (AEO designation).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

63.  Stretmoyer also informed Sergeant Krohley that Officer Schoolcraft

has a car, which was parked on the street.  Sergeant Krohley

determined that the car was registered in the name of Officer

Schoolcraft's father.[67]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

64.  At about 5:00 pm, Lieutenant Broschart from the 81st Precinct arrived

at the scene, and Sergeant Krohley briefed Lieutenant Broschart on the

facts he had determined since arriving at the scene.[68]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

[67] *Id.*
[68] PMX 16:  (NYC 4643) (AEO designation); *see also* PMX 11:
DS.50_31October2009_Notify_IAB_Lt.Cauhey_Menacing.wma at 40:52 (noting that at
4:18 pm a black Impala in front of Officer Schoolcraft's house and his door bell being
rung).

65. Lieutenant Broschart was under orders from DI Mauriello and Captain Lauterborn to go to Officer Schoolcraft's home and bring him back to the Precinct.[69]

*City Response:* Deny. <u>See</u> Exhibit 20 to the Declaration of Nathaniel B. Smith.

*Mauriello Response:* Disputed to the extent it is intended to suggest Broschart was told, without regard for the circumstances existing at Schoolcraft's home when he arrived, to force his way into Schoolcraft's apartment and forcefully take him from his apartment, put him in Broschart's car and bring him back to the precinct.  Instead, Broschart was instructed to go to Schoolcraft's home and, if he was able to communicate with Schoolcraft, tell Schoolcraft he should return to the precinct.  At the time, there was no expectation Schoolcraft would disregard such an instruction.  (SM Ex. CL, Lauterborn Dep. pp. 289-290 ll. 18-20.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

66. After arriving at the scene, Lieutenant Broschart also knocked on the door, and when there was no answer, he updated Captain Lauterborn by telephone that Officer Schoolcraft was not home and that the

---

[69] PMX 20:  Broschart Tr. 87:17-88:20.

landlady had told him that he might have left.[70]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

67.  Captain Lauterborn told Lieutenant Broschart to stand by and wait to see if Officer Schoolcraft returned.[71]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

68.  Later that evening, Captain Lauterborn spoke with NYPD Psychologist Lamstein.  According to Psychologist Lamstein's notes of the call, Captain Lauterborn told her that Officer Schoolcraft left early that day and the "underlying issue" was that Officer Schoolcraft "has made allegations against others" and the "dept's investigation of those allegations picked up this week & it snowballed from there."[72]

*City Response:* Deny, except refer the Court to Exhibit 22 to the declaration of Nathaniel B. Smith for an accurate recitation of its

---

[70] PMX 20:  Broschart Tr. 100:25-104:20.
[71] *Id.*
[72] PMX 22 at NYC 282(PX 29); PMX 12:  Lamstein Tr. 327:13-328:4.

contents.

*Mauriello Response:* Not disputed that Dr. Lamstein's notes contain those entries, which appear to refer not only to the fact that two officers had been called down to QAD for interviews (see responses above to statements/paragraphs 44-46, 48 and 49), but also to the fact that others, including two civilians employed at the 81st Precinct (SM Ex. CR), had been called down to IAB (SM Ex. J, Dr. Lamstein notes). Just as it was not known why the two officers were being interviewed by QAD, there is no evidence anyone knew why the others were being interviewed by IAB. (We now know it was about Schoolcraft's complaint that Caughey and Weiss had allegedly improperly accessed Weiss' personnel folder and removed documents, which IAB determined to be unfounded (SM Ex. CR, IAB Report on Personnel Room Incident).) There is no evidence anyone even knew of that complaint, but Lauterborn no doubt had seen that the civilian employees and possibly officers had been noticed to go to IAB. Lauterborn, having been alerted about Schoolcraft approaching the two officers who had been called down to QAD, and knowing others had been called down to IAB, apparently surmised, when speaking to Dr. Lamstein on the evening of October 31, 2009, when Schoolcraft could not be located, that Schoolcraft was feeling some anxiety about the QAD interviews and apparently about the IAB interviews as well. (See PMX 22.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

69.  Psychologist Lamstein told Captain Lauterborn that she had seen

Officer Schoolcraft just a few days ago and that she "had no reason to

think [Officer Schoolcraft] was a danger to himself or others."[73]

*City Response:* Deny.  <u>See</u> City Defendants' Statement of Undisputed

Facts at ¶30 (Dr. Lamstein told Captain Lauterborn that he "absolutely

needed" to find Plaintiff and "make sure that he was ok").

*Mauriello Response:* Disputed to the extent it is intended to suggest

Dr. Lamstein expressed the opinion that on the evening of October 31,

2009, there was no reason to believe Schoolcraft might be a danger to

himself or others.  Instead, Dr. Lamstein indicated that had been her

belief when she last saw Schoolcraft four days earlier, but she could

not say so "with any reasonable amount of certainty" on October 31,

2009.  As Dr. Lamstein explained to Captain Lauterborn and later

recorded in her notes, '[a]t no time had he ever expressed thoughts of

suicide, but he also never was AWOL before and acted the way he was

acting on 10/31/09.  My assessment of his suicide risk is only as good

as the last time I saw him.  If something happened after that and led

him to be so upset that he left work without permission an hour before

---

[73] PMX 12:  Lamstein Tr. 319:24-25; *see also* PMX 23 Lauterborn Report (PX 16), 10-31-09 at p. NYC 00095 ("She stated that although she did not believe he was an immediate threat to himself or others his firearms were removed because of emotional distress caused by issues of anger and resentment against the Department.").

the end of his tour, said to have stomach pains, etc., then I am unable to say with any reasonable amount of certainty that he is not at risk of S/I [suicidal ideation] under present circumstances."  (SM Ex. J, Lamstein note (D000284); SM Ex. CI, Lamstein Dep. p. 340.)

*Jamaica Hospital Response:* Psychologist Lamstein told Captain Lauterborn on October 31, 2009 that "as of the last time [she] saw [the plaintiff] . . . [she] had no reason to think he was a danger to himself or others", but that her "evaluation was only as good as the last time [she] saw him." (Exhibit 12, pp. 319-320). She further told Captain Lauterborn during this conversation that the plaintiff had never acted this way before and therefore she "did not know if that meant something new happened that led him to be so upset that he was acting in a different manner" (*Id.,* p. 320).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Psychologist Lamstein told Captain Lauterborn on October 31, 2009 that "as of the last time [she] saw [the plaintiff] . . . [she] had no reason to think he was a danger to himself or others", but that her "evaluation was only as good as the last time [she] saw him." (Exhibit 12, pp. 319-320).   She further told Captain Lauterborn during this conversation that the plaintiff had never acted this way before and therefore she "did not know if that meant something new happened that led him to be so upset that he was acting in a different manner" (Id., p. 320).

70.  At about 7:40 pm that night, after speaking with Psychologist

Lamstein, Captain Lauterborn also called Officer Schoolcraft's father

and told the father that Officer Schoolcraft left without permission and

had to return to the 81st Precinct that night.[74]

*City Response:* Admit.

*Mauriello Response:* Not disputed, although Lauterborn also told

Schoolcraft's father that they needed to see Schoolcraft in person and

check his condition because he was on restricted duty for unknown

reasons. (SM Exhibit CG, 8:45-10:00.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

71.  The father told Captain Lauterborn that he spoke to his son earlier that

day, that his son told him he felt sick in his stomach with a tummy

ache and was going home and would call him when he woke up.[75]

*City Response:* Admit.

*Mauriello Response:* It is not disputed Schoolcraft's father said such

things to Captain Lauterborn.  Captain Lauterborn wisely did not rely on

the father's representations as Schoolcraft's recordings reveal that the

things Schoolcraft's father said to Captain Lauterborn were not true, and

that the father knew them to be not true.  (SM Ex. R, at 6:00-6:25.)

---

[74] PMX 11:  WS.331M_31October2009_LCS_ReturnPhoneCall to Capt. Lauterborn at
3:38-5:15.
[75] *Id.*

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

72.  Lauterborn told the father that he needs to "physically talk to" Officer Schoolcraft and "resolve things" and the situation is not going to "wait until the morning."[76]  Lauterborn insisted that he had to talk to Officer Schoolcraft "in person" and not "over the phone."[77]  He also stated that the "situation was going to escalate as the night goes on " and that "no one is going in or out of that house he lives in because there are police all over it."[78]  If Officer Schoolcraft was there, Captain Lauterborn said that "eventually we are going to make our way in."[79]

*City Response:* Deny, except refer the Court to Plaintiff's Exhibit 11 annexed to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Not disputed.  Captain Lauterborn had been told by Dr. Lamstein that they had to find Schoolcraft (SM Ex. CI, Lamstein Dep. pp. 319:10-321:3).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

[76] *Id.* at 6:20-37.
[77] *Id.* at 8:00-05.
[78] *Id. 9:55-10:06*
[79] *Id*. at 10:10-20.

73.  Although the father assured Captain Lauterborn that his son was fine and was probably sleeping, Captain Lauterborn insisted that it was not going to "end here" and that Officer Schoolcraft should report to the Lieutenant on the scene outside his home.[80]

*City Response:* Admit.

*Mauriello Response:* Not disputed that Schoolcraft's father said such things to Captain Lauterborn, but Captain Lauterborn wisely did not rely on the father's representations, as Schoolcraft's recordings reveal that the things Schoolcraft's father said to Captain Lauterborn were not true, and that the father knew them to be not true.  (SM Exhibit R, 0:00-8:00.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

74.  At 9:45 pm that night, after waiting five hours outside Officer Schoolcraft's home, the NYPD took a key from the landlord and entered his home.[81]

*City Response:* Admit.

*Mauriello Response:* Not disputed, except to the extent it suggests the NYPD forcefully took the key from the landlord.  The NYPD asked if the landlord had a key and the landlord said yes and voluntarily gave it to them. (SM Exhibit CL, Lauterborn Dep. pp. 300-301 ll. 1-4, SM

---

[80] *Id.* at 10:55-11:00.
[81] PMX 16 at  NYC 00432 (2145 entry made into apartment).

Exhibit CS, Broschart Dep. p. 112 ll. 6-14).

*Jamaica Hospital Response:* The landlord provided the police officers

with a key.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* The landlord provided the police officers with a key.

75.  That entry, which was made without a warrant, was made by at least

ten supervisory NYPD officers.

*City Response:* Admit.

*Mauriello Response:* Disputed.  Actual entry to Schoolcraft's apartment

was made by a team of two to three ESU officers. Over a period of time

there were seven officers of authority who, over time, entered and left

Schoolcraft's apartment: Chief Marino, Deputy Inspector Mauriello,

Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough, Sergeant

Duncan, and Sergeant Hawkins. (SM Exhibit CT, Gough Dep. pp. 138-

141).

*Jamaica Hospital Response:* There is no indication in the record as to

the specific total number of NYPD officers that initially made entry

into the apartment.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* There is no indication in the record as to the specific

total number of NYPD officers that initially made entry into the

apartment.

76.  The entry team was led by three Emergency Services Unit officers,

who were followed by Deputy Chief Marino, DI Mauriello, Captain

Lauterborn, Lieutenant Broschart, and three members of the Brooklyn

North Investigation Unit (Lieutenant William Gough, Sergeant Kurt

Dunkin, and Sergeant Raymond Hawkins).[82]

*City Response:* Admit.

*Mauriello Response:* Disputed, to the extent this suggests <u>entry</u> was

made by all listed Officers at once (see response to paragraph 75).

*Jamaica Hospital Response:* There is no indication in the record as to

the specific total number of NYPD officers that initially made entry

into the apartment.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* There is no indication in the record as to the specific

total number of NYPD officers that initially made entry into the

apartment.

77.  At the time of their entry, the house was also surrounded by numerous

other members of the NYPD, including DI Keith Green, the

commanding officer of the 104th Precinct, Lieutenant Thomas

Crawford (81st Precinct); Sergeant Kevin Scanlon (104th Precinct); and

several Police Officers who were acting either as drivers for the

supervisors at the scene or had set up a barricade to block off street

traffic.[83]

---

[82] PMX 3:  Mauriello Tr. 349:13-350:21.
[83] *Id.* at NYC 000429.

*City Response:* Deny, except admit that Keith Green, Thomas
Crawford, Kevin Scanlon, and other police officers were outside of
plaintiff's home at some point on October 31, 2009. <u>See</u> Exhibit 16 to
the Declaration of Nathanial B. Smith.

*Mauriello Response:* Not disputed, except there never was a barricade
set up to block street traffic and the other officers did not "surround"
the house (despite Lauterborn saying "the police are all over it"). (SM
Exhibit CU, Marino Dep. p. 243 ll. 7-12.) They simply were waiting
outside pending a resolution of the situation inside Schoolcraft's
apartment. Crawford was Mauriello's driver, and DI Green and
Sergeant Scanlon were there because Schoolcraft's house was in their
precinct area.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

78. Also responding to the scene was FDNY Lieutenant Hanlon and two
Jamaica Hospital Emergency Medical Technicians ("EMT").[84]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

[84] PMX 16 at NYC 431.

79.  According to Deputy Chief Marino and DI Mauriello, the warrantless

entry into Officer Schoolcraft's home was justified by their concerns

for his "well-being."[85]

*City Response:* Admit. <u>See</u> Exhibits 3 and 7 to the Declaration of

Nathanial B. Smith; (Entry made out of concern for ***both*** safety and

well-being).

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

80.  Deputy Chief Marino admitted that he had no information that Officer

Schoolcraft had threatened to hurt himself or others.[86]

*City Response:* Admit.

*Mauriello Response:* Not disputed, although Marino said he had no

"specific" information of such a threat.  Clearly, however, he knew the

circumstances and what had transpired earlier in the day.  (See SM Ex.

CU, Marino Dep. p. 257 ll. 8-23).

*Jamaica Hospital Response:* Deputy Chief Marino believed the

plaintiff was an Emotionally Disturbed Person and may have been a

---

[85] PMX 7:  Marino Tr. 255:15 ("I was thinking about Schoolcraft's safety") & 256:9-18
(believed there was "a possibility of" him being an emotionally disturbed person); *but see
id*. at 258:5-16 (no information that Officer Schoolcraft had threatened to hurt himself or
others).  PMX 3:  Mauriello Tr.  357:24-358:22 (entry made out of concern for his well-
being and safety).
[86] PMX 7:  Marino Tr. at 258:5-16.

danger to himself or others because of his behavior and his actions that
day, his previous psychological history, the manner in which he left the
precinct against orders, his refusal to answer the many calls to his
phone and the knocks on his door, and that there was no movement
heard in his apartment in the past hour (Exhibit 7, pp. 256-257).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Deputy Chief Marino believed the plaintiff was an
Emotionally Disturbed Person and may have been a danger to himself
or others because of his behavior and his actions that day, his
previous psychological history, the manner in which he left the
precinct against orders, his refusal to answer the many calls to his
phone and the knocks on his door, and that there was no movement
heard in his apartment in the past hour (Exhibit 7, pp. 256-257).

81.  Psychologist Lamstein had told Captain Lauterborn that evening that
to her knowledge he was not a threat to himself or others, they
allegedly believed that he was "possibly" an emotionally disturbed
person because he had been sent (by them) to psychological services
earlier that year, had been put on restricted duty without a gun and had
left work early, allegedly against orders.[87]

*City Response:* Deny. See City Defendants' Statement of Undisputed
Facts at ¶30, (Dr. Lamstein told Captain Lauterborn that he "absolutely
needed" to find Plaintiff and "make sure that he was ok").

---

[87] PMX 3:  Mauriello Tr.  357:24-358:22.

*Mauriello Response:* Disputed. See response to statement 69 above. With respect to Dr. Lamstein, she did not express the opinion that on the evening of October 31, 2009, there was no reason to believe Schoolcraft might be a danger to himself or others. Instead, Dr. Lamstein indicated it had been her belief when she last saw Schoolcraft four days earlier, but she could not say so with any reasonable amount of certainty on October 31, 2009, because of what she had learned Schoolcraft had done that afternoon and evening (SM Ex. CI, Lamstein Dep. p. 340). With respect to what "they allegedly believed," if it is intended to refer to what Captain Lauterborn said about what he and others believed about Schoolcraft at that point in time on the evening of October 31, 2009, it is undisputed Lauterborn expressed the view Schoolcraft might be emotionally disturbed, but he did not say and certainly should not have said anyone from the 81st Precinct sent Schoolcraft to psychological services because that absolutely was not true (see Mauriello Statement of Material Facts ¶¶ 8-16 and responses to paragraphs 28-33). Everyone involved was aware Schoolcraft was on restricted duty and had left work early, against orders.

*Jamaica Hospital Response:* Psychologist Lamstein told Captain Lauterbom on October 31, 2009 that "as of the last time [she] saw [the plaintiff] . . . [she] had no reason to think he was a danger to himself or others", but that her "evaluation was only as good as the last time [she] saw him." (Exhibit 12, pp. 319-320). She further told Captain

Lauterborn during this conversation that the plaintiff had never acted this way before and therefore she "did not know if that meant something new happened that led him to be so upset that he was acting in a different manner" (*Id.*, p. 320). The officers believed the plaintiff may be an Emotionally Disturbed Person based in part on this conversation, as well as his behavior and his actions that day, his previous psychological history, the manner in which he left the precinct against orders, his refusal to answer the many calls to his phone and the knocks on his door, and that there was no movement heard in his apartment (Exhibit 7, pp. 256-257). The officers were worried about the plaintiff's well-being (Exhibit 21, pp. 101).

*Bernier Response:* Plaintiff cites to hearsay and this statement must be denied.  Plaintiff took  Dr. Lamstein's  deposition, cites  other portions  of  Dr. Lamstein's  transcript  in  this 56.1 statement yet fails to cite to Dr. Lamstein's testimony in support of this claim.  (Exhibit C)

*Isakov Response:* Psychologist Lamstein told Captain Lauterborn on October 31, 2009 that "as of the last time [she] saw [the plaintiff] . . . [she] had no reason to think he was a danger to himself or others", but that her "evaluation was only as good as the last time [she] saw him." (Exhibit 12, pp. 319-320).  She further told Captain Lauterborn during this conversation that the plaintiff had never acted this way before and therefore she "did not know if that meant something new happened that

led him to be so upset that he was acting in a different manner" (Id., p.

320).   The officers believed the plaintiff may be an Emotionally

Disturbed Person based in part on this conversation, as well as his

behavior and his actions that day, his previous psychological history,

the manner in which he left the precinct against orders, his refusal to

answer the many calls to his phone and the knocks on his door, and that

there was no movement heard in his apartment (Exhibit 7, pp. 256-257).

The officers were worried about the plaintiff's well-being (Exhibit 21,

pp. 101).

82. Upon entry, the Emergency Services Unit officers moved into Officer

Schoolcraft's' bedroom with their guns drawn, wearing bulletproof

vests and helmets and carrying tactical shields.[88]

*City Response:* Admit.

*Mauriello Response:* Disputed.  While there is differing testimony as to

what gear ESU was wearing, they did not have guns drawn.    (SM Ex.

BV, Mauriello Dep. p. 352 ll. 10-16; SM Ex. CL, Lauterborn  Dep. pp.

307-308 ll 22-10).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

83.  Officer Schoolcraft was lying on his bed and it appeared that he was

---

[88] PMX 24:  Duncan Tr.  119:4-120:19; PMX 25:  Gough Tr. 141:4-25.

either watching TV or had just woke up.[89]

*City Response:* Admit.

*Mauriello Response:* Disputed.  Schoolcraft was lying on his bed, but

he had not just woken up.  He had been awake in the dark for hours, as

revealed by all of the conversations he recorded during that time (SM

Ex. R, Schoolcraft Conversation with Larry Schoolcraft, SM Exhibit S.)

Also, the television was turned on for at least a portion of the time.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

84.  As reflected by the first moments of a recording captured by Officer

Schoolcraft's voice-activated digital recorder, one of the Emergency

Service Unit officers asked Officer Schoolcraft, "You okay?" to which

Officer Schoolcraft replied, "Yeah, I think so."

*City Response:* Admit.

*Mauriello Response:* Disputed.  The first moments of the recording after

ESU banged on the door to the apartment, while calling out "Adrian",

and then opening the door to the apartment, are of statements uttered in

whispers by the ESU officers, as follows:  One officer says "He's on the

bed."  The other officer responds, "Is he alright?"   (SM Exhibit S at

0:45-1:00.)

---

[89] PMX 24:  Duncan Tr. 127:11-20 (laying there on his bed watching TV); PMX 3:
Mauriello Tr. 359:2-5 (the TV was on).

*Jamaica Hospital Response:* The plaintiff complained he was sick and that his stomach hurt (Exhibit 7, p. 262) (Exhibit 37, pp. 110-111).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* The plaintiff complained he was sick and that his stomach hurt (Exhibit 7, p. 262) (Exhibit 37, pp. 110-111).

85.  Once DI Mauriello entered his bedroom, he ordered Officer Schoolcraft to return to the 81st Precinct.[90]

*City Response:* Admit.

*Mauriello Response:* Disputed.  The dialogue with Schoolcraft after ESU had conducted the initial exchange with Schoolcraft, was as follows:

As the ESU officers and Schoolcraft are speaking, Chief Marino apparently steps into the bedroom and speaks with Schoolcraft:

Marino: Adrian, you didn't hear us knocking on this door for a couple hours?

Schoolcraft: I drank some Nyquil.

Unidentified male voice: Adrian, sit up.

Marino: Adrian, you didn't hear us knocking on that door… for the last couple of hours?

Schoolcraft: No, why would I be expecting anyone knocking at my door Chief?

Marino: I don't know Adrian, but normally if you hear someone knocking you get up and answer it. They were kicking on that door loud and yelling.

---

[90] PMX 3:  Mauriello Tr. 356:11-357:15;  PMX 11:  (DS.50_31October 2009_HomeInvasion.wma at 2:48).

Schoolcraft: I wasn't feeling well.

Marino: You got a million people downstairs worried about your welfare, spending hours out here, worried about you. We've talked to your father, we've called your phone.

Schoolcraft: What did my father say?

Marino: I don't know Adrian, I didn't talk to him personally. Alright, sit down. (SM Exhibit S at 1:20-1:50.)

After speaking with Schoolcraft for less than a minute, Chief

Marino then said "Steve", indicating to Mauriello that Chief Marino

wanted him to step into the bedroom and deal with the situation.  (SM

Exhibit S at 1:20-1:55.)

After a few moments, Mauriello steps into the bedroom and

speaks to Schoolcraft.

The entire conversation between them lasted approximately forty-five

seconds, as follows:

Mauriello: Adrian, what happened today?

Adrian: I wasn't feeling well, I left.

Mauriello: That's it? You weren't feeling well. Your sergeant told you to stay, right?

Schoolcraft: No, she didn't say anything. She was talking on her cell phone.

Mauriello: You got everybody worried, we are worried about your safety.

Schoolcraft: Worried about what?

Mauriello: What do you mean, worried about what? They tried calling you, everybody(s) been calling you. Captain Lauterborn's been calling, everyone has been calling you, your father has been calling you. You're not answering. We were worried about anything that happens.

That's what we are worried about. God forbid. You just walk out of the precinct. I say hello to you today that was the last I saw you. You know, that's what we are worried about, your safety, your well-being.

Schoolcraft: Alright, I'm fine.

Mauriello: Well, you are going to come back to the precinct with us.

Schoolcraft: Well…if I'm forced to. It's against my will.

Mauriello: Against your will? OK Teddy [referring to Captain Lauterborn], you handle this.

(SM Exhibit S at 2:15-3:00.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

86.  As reflected by the recording, Officer Schoolcraft refused to return to the Precinct, notwithstanding numerous threats and orders.  Eventually, however, Officer Schoolcraft succumbed to threats by Captain Lauterborn and Lieutenant Gough, and said he would go under protest.[91]

*City Response:* Deny. See Exhibit 11 to the Declaration of Nathaniel B. Smith for an accurate recitation of its content.

*Mauriello Response:* Disputed.  While officers were giving orders to a subordinate, there were no threats made to Schoolcraft before he agreed to return to the precinct, though he said "it's against my will." (SM Ex. S at 2:45-3:00.) While preparing to leave, and while speaking

---

[91] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40

on his cell phone with his father, Schoolcraft then claimed not to feel
well.  He sat back down and was offered, and he accepted, medical
attention from EMS (SM Ex. S at 6:20-8:40.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

87.  Then a few moments later, Officer Schoolcraft stated that he had to to sit
down because he was not feeling well and agreed to receive medical
attention.[92]

*City Response:* Admit.

*Mauriello Response:* Not disputed, but Schoolcraft announced he was
not feeling well only while speaking on his cell phone with his father,
who apparently told him to say so (SM Exhibit S at 6:20-8:30).  In an
earlier conversation, before anyone entered the apartment, Schoolcraft
and his father had discussed what illness Schoolcraft should pretend to
have. Schoolcraft suggested cancer, but his father said "no, don't say
anything like that (inaudible) cause it's a big deal in a lawsuit. It will
come out and you will have to say you lied." The father recommended
diarrhea because "that's always a good one."  (SM Ex. R, at 6:00-6:25.)
In any event, Schoolcraft was offered medical attention and he accepted.
He then was examined by the EMTs.  (SM Ex. S at 8:30-9:00).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

---

[92] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 5:15-8:40.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

88.  While Officer Schoolcraft was being examined by Jamaica Hospital

EMT Salvatore Sangeniti, who had previously responded to the scene

with an FDNY EMT supervisor, Deputy Chief Marino returned to

Officer Schoolcraft's bedroom and berated Officer Schoolcraft about

feeling sick.[93]

*City Response:* Deny. See Exhibit 11 to the Declaration of Nathaniel B.

Smith for an accurate recitation of its contents.

*Mauriello Response:* Disputed.  First, the EMTs did not arrive at the

scene with the FDNT supervisor.  Second, the suggestion that Chief

Marino scolded or yelled at Schoolcraft is simply not supported by

Schoolcraft's own recording of the events. The dialogue was as follows

and recounts the events of the day and Chief Marino's decision to

suspend Schoolcraft based on those events:

Marino: I thought you did go sick today?

Schoolcraft: I did go sick.

Marino: Alright, then the Sergeant asked you to stay for a minute, right?
That she needed to speak with you first. So you disobeyed an order, and
now you have…

Schoolcraft: She was on the phone.

Marino: Listen to me. I'm a chief in the New York City Police
Department and you're a police officer. And then your have umpteen
people out here standing in the rain. And don't tell me you didn't hear

---

[93] PMX 11:DS.50_31October 2009_HomeInvasion.wma at 9:07-12:12.

them knocking on your door. OK and when they call your cell phone and
you hang up. So this is what's gonna happen my friend. You disobeyed
an order and the way you are acting is not right at the very least.

Schoolcraft: Chief, if you were woken up in your house.

Marino: Stop right there, son. Son, I'm doing the talking right
now, not you.

Schoolcraft: In my apartment.

Marino: In your apartment.

Schoolcraft: What is this Russia?

Marino: You are going to be suspended, alright. That's what's gonna
happen. You can go see the surgeon if you are sick. We will get you all
the medical attention that you need. At the end of it, you are suspended
son.

   Notably, while no one was denying Schoolcraft the medical

attention he requested, Chief Marino, quite correctly, believed

Schoolcraft was not being truthful. (SM Exhibit S at 10:45-11:45.)

*Jamaica Hospital Response:* Deputy Chief Marino was not speaking

to the plaintiff while EMT Sangeniti took the plaintiff's blood

pressure, but instead was walking out of the apartment (Exhibit 7, p.

275).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Deputy Chief Marino was not speaking to the

plaintiff while EMT Sangeniti took the plaintiff's blood pressure, but

instead was walking out of the apartment (Exhibit 7, p. 275).

89. And at the very moment when EMT Sangeniti started taking Officer

   Schoolcraft's blood pressure, Deputy Chief Marino, in a loud and

angry tone of voice, suspended Officer Schoolcraft.[94]

*City Response:* Deny. See Exhibit 11 to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Disputed, to the extent that this suggests that Chief Marino yelled at Schoolcraft or acted in any manner that was inappropriate. (see response to paragraph 89.) Further, the suggestion that Chief Marino contributed to Schoolcraft's ill-health or high blood pressure is belied by the fact that Schoolcraft himself asked for medical assistance, and acknowledged to EMTs that he already suffered from high blood pressure. (SM Exhibit S at 13:30-14:00.)

*Jamaica Hospital Response:* Deputy Chief Marino was not speaking to the plaintiff while EMT Sangeniti took the plaintiff's blood pressure, but instead was walking out of the apartment (Exhibit 7, p. 275).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Deputy Chief Marino was not speaking to the plaintiff while EMT Sangeniti took the plaintiff's blood pressure, but instead was walking out of the apartment (Exhibit 7, p. 275).

90.  Based on the circumstances confronting Officer Schoolcraft, he agreed to go to the hospital associated with his primary care physician, which

---

[94] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 11:00-12:12; PMX 26: Sangeniti Tr. 144:16-148:3 (Sangeniti confirming that at the point when Deputy Chief Marino suspends Officer Schoolcraft he was taking his blood pressure; testimony based on the sounds made when taking blood pressure).

was Forest Hills Hospital, to have his blood pressure checked out.[95]

*City Response:* Deny. See Exhibit 11 to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Not disputed that Schoolcraft agreed to go to the hospital to be medically examined, but the hospital to which Schoolcraft was to be taken was discussed with him and he was told it would be Jamaica Hospital, which was closer than Forest Hills and was the hospital where the ambulance had originated and where the EMT's worked (SM Ex. S at 13:20-14:05.)

*Jamaica Hospital Response:* The plaintiff agreed only to go to the hospital (Exhibit 25, p. 166) (Exhibit 37, p. 161).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* The plaintiff agreed only to go to the hospital (Exhibit 25, p. 166) (Exhibit 37, p. 161).

91.  When it became clear to Officer Schoolcraft, however, that the NYPD was going to take him to Jamaica Hospital (which has a psychiatric ward), Office Schoolcraft refused further medical attention and went back to his apartment.[96]

*City Response:* Deny, except admit that plaintiff eventually refused further medical attention and went back into his apartment.

*Mauriello Response:* Disputed.  During the first entry into Schoolcraft's

---

[95] PMX 11: DS.50_31October 2009_HomeInvasion.wma at 13:00-14:10.
[96] PMX 4:  Schoolcraft Tr.  149:7-151:2.

apartment it was agreed he needed medical attention, and he was told he would be taken to Jamaica Hospital.  He had not been declared an EDP, and there was no concern or discussion about which hospital had a psychiatric ward.  Schoolcraft turned around and went back inside his apartment not because he suddenly discovered he was going to be taken to Jamaica Hospital, but because he was again talking on his cell phone with his father and no doubt was told not to cooperate.  At the time, he did not offer any explanation for his decision to go back inside or any explanation for his supposed objection to Jamaica Hospital. (SM Ex. S at 18:00-20:00.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion insofar as the plaintiff was to be transported to Jamaica Hospital by ambulance.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion insofar as the plaintiff was to be transported to Jamaica Hospital by ambulance.

92.  As reflected in the second part of the recording of the events in his home that time, Officer Schoolcraft returned to his apartment, laid back down in his bed and refused further orders first by Captain Lauterborn and then by Deputy Chief Marino who returned again to his home and entered without permission.[97]

---

[97] PMX 4:   Schoolcraft Tr. 1:4-155:8 (Lauterborn pursued Schoolcraft back into his apartment and physically prevented him from shutting  the doors behind him as he

*City Response:* Deny. <u>See</u> Exhibit 11 to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

93.  Deputy Chief Marino declared Officer Schoolcraft an "emotionally disturbed person" (also known as an "EDP") and Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough and Sergeant Duncan grabbed Officer Schoolcraft from his bed, threw him on the floor of his bedroom and cuffed him with his hands behind his back.[98]

*City Response:* Deny. <u>See</u> Exhibit 11 to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

returned); PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 17:50-22:00.
[98] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 21:30 -23:51.

94.  While Officer Schoolcraft was prone on the floor and Gough and

Duncan were forcing his wrists into handcuffs, Broschart stepped on

the backs of his legs, Lauterborn held him down with his hands, and

Deputy Chief Marino put his boot on Officer Schoolcraft's face as he

tried to turn his neck around to see what was being done to his body.[99]

*City Response:* Deny. See Exhibits 10 and 21 to the Declaration of

Nathaniel B. Smith.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not

present and this paragraph does not relate to the claims against him or

his counterclaims.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

95.  After the handcuffs were secured, Officer Schoolcraft was then forced

into an ESU chair, taken to the ambulance, placed on a stretcher with

his hands cuffed behind his back, and driven to Jamaica Hospital by

the two Jamaica Hospital EMTs.

*City Response:* Deny.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not

present for much of what is described and this paragraph does not

relate to the claims against him or his counterclaims.

---

[99]  PMX 4:  Schoolcraft Tr. 166:21-168:19; PMX 21:  Broschart Tr. 167:16-169:17; PMX 10:  Lauterborn Tr. 322:23-323:9.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

96.  Lieutenant Broschart rode in the back of the ambulance to maintain custody of Officer Schoolcraft.[100]

*City Response:* Deny, except admit that Lieutenant Broschart rode in the ambulance with plaintiff and refer the Court to Exhibit 11 to the Declaration of Nathanial B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Disputed.  Lieutenant Broschart rode in the back of the ambulance to accompany Schoolcraft pending a further evaluation of Schoolcraft's condition as per NYPD Patrol Guide guidelines. (SM Exhibit CV, NYPD Patrol Guide 216-05(27).)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

97.  While the NYPD officers were in his apartment, they searched his person and his apartment and seized a voice-activated digital recorder taken from his pocket as well as several files belonging to Officer Schoolcraft, including copies of crime reports reflecting the downgrading of crimes he reported to IAB and notes in a folder

---

[100] PMX 11:  DS.50_31October 2009_HomeInvasion.wma at 22:00-28:27.

marked "Report to the Commissioner.[101]

*City Response:* Deny. See Exhibit A to the Shaffer Declaration in support of City Defendants' Opposition to Plaintiff's Motion for Summary Judgment (hereinafter "Shaffer Decl.") (Marino Dep. at 319:20-25).

*Mauriello Response:* Disputed.  During the three minutes or so Mauriello was present in Schoolcraft's apartment during the initial portion of the first entry into the apartment, neither Schoolcraft nor his apartment was searched and no property was seized.  There also is no evidence that any paper or property of Schoolcraft's was seized during the remainder of the first entry or during the second entry, and there is no evidence the so-called "Report to the Commissioner" ever existed. (SM Exhibit BV, Mauriello Dep. pp. 376-81.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

98.  Officer Schoolcraft arrived at Jamaica Hospital's Emergency Room later that night and spent the night handcuffed to a gurney in the Emergency Room.

*City Response:* Admit.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present and this paragraph does not relate to the claims against him or

---

[101] PMX 4:  Schoolcraft Tr. 173:12-177:17.

his counterclaims.

*Jamaica Hospital Response:* The plaintiff arrived at the Medical Emergency Room of Jamaica Hospital (Exhibit 27/Defendant's Exhibit U, pp. 4, 13, 16). Plaintiff's Statement cites to Exhibit 27, but because no Exhibit 27 was served or filed with plaintiff's motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* The plaintiff arrived at the Medical Emergency Room of Jamaica Hospital (Exhibit 27, pp. 4, 13, 16).

99.  Hospital medical records or the "chart" reflect that he was in custody of the NYPD the entire time.[102]

*City Response:* Deny. See  Exhibit 27 to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* The Jamaica Hospital records do not reflect that the plaintiff was in the custody of the NYPD the entire time, but only document that the plaintiff was "brought in per stretcher by EMT in police custody" (Exhibit 27/ Defendant's Exhibit U, p. 16). The records from the Medical Emergency Department indicate that the physicians thought that the plaintiff had been arrested (Exhibit 27/ Defendant's Exhibit U, pp. 4 and 13) (Defendant's Exhibit V, p. 43).

---

[102] PMX 27:  Jamaica Hospital Chart (PX 69 at JHMC 58) (Emergency Department Nursing Notes). Plaintiff's counsel has paginated the chart as "JHMC _."

Plaintiff's Statement cites to Exhibit 27, but because no Exhibit 27 was served or filed with plaintiff's motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Plaintiff fails to indicate the time span of the entire time.  He also fails to identify if he means  the medical emergency room  or  the medical  emergency  room and the psychiatric emergency room.

*Isakov Response:* The Jamaica Hospital records do not reflect that the plaintiff was in the custody of the NYPD the entire time, but only document that the plaintiff was "brought in per stretcher by EMT in police custody" (Exhibit 27, p. 16).  The records from the Medical Emergency  Department  indicate  that  the  patient  was  brought  into Jamaica  Hospital Medical Center in handcuffs (Exhibit 27, pp. 4 and 13).

100.   Officer Schoolcraft was cuffed and under the custody of Lieutenant Broschart until the Lieutenant was relieved at about midnight by Defendant, Sergeant James, who was also from the 81st Precinct, and Sergeant James remained there until the morning.[103]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Plaintiff's Statement cites to Exhibit 28, but because no Exhibit 28 was served or filed with plaintiff's motion,

---

[103] PMX 28:  James Tr. 53:18-20, 59:17-60:16 & 67:14-71:16.

plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

101.   On November 1, 2009, Defendant, Sergeant Frederick Sawyer, another supervisor from the 81st Precinct, was sent to Jamaica Hospital to relieve Sergeant James.  When Sawyer got to the hospital, he saw Officer Schoolcraft on the telephone and, according to Sawyer, he ordered him to get off the telephone.[104]

*City Response:* Admit.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against Mauriello or his counterclaims.

*Jamaica Hospital Response:* Plaintiff's Statement cites to Exhibit 29, but because no Exhibit 29 was served or filed with plaintiff's motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

102.   When Officer Schoolcraft did not comply with that order, Sergeant Sawyer, Sergeant James, and their two drivers physically forced Officer Schoolcraft onto the gurney and handcuffed his other hand to the gurney, leaving him in a fully shackled position on the gurney.[105]

---

[104] PMX 29:  Sawyer Tr. 139:25-146:15.
[105] PMX 29:  Sawyer Tr. 139:25-146:15 & 153:14-156:16.

*City Response:* Deny, except admit that plaintiff had to be "double cuffed" to the gurney. <u>See</u> Plaintiff's Exhibit 29 at p. 143:2-10.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Plaintiff's Statement cites to Exhibit 29, but because no Exhibit 29 was served or filed with plaintiff's motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

103.   When Sawyer applied the cuffs to Officer Schoolcraft, he used both hands to squeeze the cuffs tighter and said "this is what happens to rats."[106]

*City Response:* Deny. <u>See</u> Exhibit B to the Shaffer Decl. at p. 160:14-16 wherein Sgt. Sawyer flatly denies the conduct alleged.

*Mauriello Response;* Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

104.   Later that morning, the two sets of handcuffs were removed and

---

[106] PMX 4:  Schoolcraft Tr. 186:11-22.

Officer Schoolcraft was wheeled into the Jamaica Hospital Psychiatric
Emergency Room to be held against his will for further
"observation."[107]

*City Response:* Deny. <u>See</u> Plaintiff's Exhibit 27 for a thorough
explanation of the reasoning behind plaintiff's stay.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not
present for what is described and this paragraph does not relate to the
claims against him or his counterclaims.

*Jamaica Hospital Response:* Later that morning. Dr. Khin Mar Lwin, a
psychiatric resident, performed the psychiatric consultation, which had
been requested because the plaintiff had been acting "bizarre",
diagnosed the plaintiff with a Psychotic Disorder, Not Otherwise
Specified ("NOS"), and recommended continued one-to-one
observation due to the plaintiff's unpredictable behavior and escape
risk and that the plaintiff be transferred to the Psychiatric Emergency
Room for further observation after he was medically cleared (Exhibit
27/ Defendant's Exhibit U, p. 6.) (Defendant's Exhibit V, p. 47). Dr.
Indira Patel, a psychiatric attending physician, discussed the case with
Dr. Lwin and confirmed the diagnosis and treatment recommendations
(Defendant's Exhibit V, p. 47). The plaintiff himself expressed that he
had no complaints with regard to the care and treatment rendered by
Dr. Lwin (Exhibit 4, p. 497). Plaintiff's Statement cites to Exhibit 27,

---

[107] PMX 27:  Medical Chart (PX 69) at JHMC 45.

but because no Exhibit 27 was served or filed with plaintiff's motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Later that morning, Dr. Khin Mar Lwin, a psychiatric resident, performed the psychiatric consultation, which had been requested because the plaintiff had been acting "bizarre", diagnosed the plaintiff with a Psychotic Disorder, Not Otherwise Specified ("NOS"), and recommended continued one-to-one observation due to the plaintiff's unpredictable behavior and escape risk and that the plaintiff be transferred to the Psychiatric Emergency Room for further observation after he was medically cleared (Exhibit 27, p. 6.) (Defendant Jamaica Hospital's Exhibit V, p. 47). Dr. Indira Patel, a psychiatric attending physician, discussed the case with Dr. Lwin and confirmed the diagnosis and treatment recommendations (Defendant Jamaica Hospital's Exhibit V, p. 47). The plaintiff himself expressed that he had no complaints with regard to the care and treatment rendered by Dr. Lwin (Exhibit 4, p. 497).

105.   On November 3, 2009, Doctor Bernier ordered Officer Schoolcraft's involuntary hospitalization.

*City Response:* Admit.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present for what is described and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* The Jamaica Hospital chart indicates that the plaintiff was admitted to the Psychiatric Emergency Department under Dr. Aldana-Bernier's service on November 1, 2009, at 8:54 a.m. (Exhibit 27/ Defendant's Exhibit U, pp. 59-63). Plaintiff fails to support this statement as required by FRCP 56(c) as there is no citation to any material in the record.

*Bernier Response:* This statement is denied as plaintiff fails to cite to any evidence to support this statement.

*Isakov Response:* The Jamaica Hospital chart indicates that the plaintiff was admitted to the Psychiatric Emergency Department under Dr. Aldana-Bernier's service on November 1, 2009, at 8:54 a.m. (Exhibit 27, pp. 59-63).

106.   Dr. Bernier's decision was made even though there was nothing in the chart that suggested that Officer Schoolcraft was dangerous.

*City Response:* Deny.

*Mauriello Response:* Not disputed by Steven Mauriello as this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Dr. Aldana-Bernier, after an evaluation of the plaintiff, and in her clinical judgment, determined that the plaintiff was a danger to himself and/or others because he was psychotic and paranoid, would benefit from in-patient stabilization and met the criteria under the Mental Hygiene Law to be admitted (Exhibit

27/Defendant's Exhibit U, pp. 57-58) (Exhibit 31, pp. 198 and 217).

Plaintiff fails to support this statement as required by FRCP 56(c) as

there is no citation to any material in the record.

*Bernier Response:* This statement is denied as plaintiff fails to cite

to any evidence to support this statement.

*Isakov Response:* Dr. Aldana-Bernier, after an evaluation of the

plaintiff, and in her clinical judgment, determined that the plaintiff was

a danger to himself and/or others because he was psychotic and

paranoid, would benefit from in-patient stabilization and met the

criteria under the Mental Hygiene Law to be admitted (Exhibit 27, pp.

57-58) (Exhibit 31, pp. 198 and 217).

107.   After the paperwork was filled out, Officer Schoolcraft was taken

from the Psychiatric Emergency Room to a psychiatric ward in the

hospital.[108]

*City Response:* Admit.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not

present for what is described and this paragraph does not relate to the

claims against him or his counterclaims.

*Jamaica Hospital Response:* Plaintiff's Statement cites to Exhibit 27,

but because no Exhibit 27 was served or filed with plaintiff's motion,

plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* This statement is denied as the cited page was not

---

[108] *Id.* at 91.

attached by plaintiff's counsel as part of his exhibits through a hard

copy, electronic filing or email.

*Isakov Response:* Undisputed for purposes of this motion.

108.   On November 4, 2009, Doctor Isakov, who was an attending doctor

on the psychiatric ward, confirmed Dr. Bernier's decision to

involuntarily hospitalize Officer Schoolcraft.[109]

*City Response:* Admit.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not

present for what is described and this paragraph does not relate to the

claims against him or his counterclaims.

*Jamaica Hospital Response:* Plaintiff's Statement cites to Exhibit 27,

but because no Exhibit 27 was served or filed with plaintiff's motion,

plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Dr. Isakov admits in response to paragraph 108 that

Dr. Isakov confirmed the involuntary hospitalization of Adrian

Schoolcraft on November 4, 2015.  (Affidavit of Isak Isakov, M.D.

dated February 11, 2015.)

109.   That decision was reached even though there was nothing in the

chart that suggested that Officer Schoolcraft was dangerous to himself

or others.[110]

---

[109] PMX 27 (PX 69) at p. 46.

[110] *See* PMX 30:   Report of Dr. Roy Lubit at p. 13-14.

*City Response:* Deny. ("Statements and reports **[*34]** that are unsworn and not affirmed to be true under the penalty of perjury are inadmissible in opposition to a motion for summary judgment.") Jimenez v. Gubinski, 2012 U.S. Dist. LEXIS 11857, at *8 (S.D.N.Y. Jan. 30, 2012) (citing, *inter alia*, McLoyrd v. Pennypacker, 178 A.D.2d 227, 228, 577 N.Y.S.2d 272, 273 (1st Dep't 1991)).

*Mauriello Response:* Not disputed by Steven Mauriello as this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Dr. Isakov, after an evaluation of the plaintiff, and in his clinical judgment, found the plaintiff to be suspicious, guarded, restless, and demanding to be discharged (Exhibit 27/ Defendant's Exhibit U, p. 95). The plaintiff expressed questionably paranoid ideas about conspiracies and cover-ups in his precinct, his judgment and insight were limited, and that he met the criteria under the Mental Hygiene Law to be admitted (Exhibit 27/ Defendant's Exhibit U, p. 95). Plaintiff's Statement cites to Exhibit 30, but because no Exhibit 30 was served or filed with plaintiff's motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* This statement is denied as the cited "evidence", Plaintiff's Motion Exhibit 30 at pgs 13-14, does not support this proposition.  The cited portion of Dr. Lubit's report concerns alleged failures to collect information from collateral sources.  Further, Dr.

Lubit's report is not part of an affidavit, affirmation or other sworn statement and therefore is not sufficient evidence to support a motion for summary judgment.  This statement is also denied as plaintiff does not cite to the chart to support this contention.  This statement is denied as the chart does provide ample evidence to support a determination plaintiff was a substantial risk to himself or others. (A copy of the Jamaica Hospital chart is attached to Koster Decl. as Exhibit D).

*Isakov Response:* Dr. Isakov denies the allegations as set forth in paragraph 109.  Dr. Isakov confirmed the involuntary admission of Mr. Schoolcraft was because his conduct demonstrated that he had a mental illness for which immediate observation, care, and treatment in a hospital was appropriate and which was likely to result in serious harm to himself or others.   In this case, it was Dr. Isakov's opinion at the time of his decision that there was a substantial risk of physical harm to himself which was manifested by his presentation to the hospital, the fact that he had no family members to care for him, that he was found to have paranoid psychosis, and was anxious, suspicious, guarded, and restless.   His insight and judgment were limited which give rise to risk that he would not safely care for himself outside of the hospital and, again, without family or any other support in the vicinity.   The inability to care for oneself is a factor to consider in a dangerousness assessment, and is falls within the definition set forth in Mental Hygiene Law §9.39 (". . . or other

conduct demonstrating that he is a danger to himself."). Furthermore, the history given was that the police psychologist had taken his gun and his badge away and he had been placed on desk duty. In that regard Dr. Isakov asked the plaintiff for permission to speak to the police psychologist; but he refused. In addition, there was other troublesome history in the record given to Drs. Patel and Lwin in which the police indicated that Mr. Schoolcraft had left work early after getting agitated and cursing his employer, that he then barricaded himself in his home and the door had to be broken down. The history continued that he then agreed to go with the police but once outside his home he ran, had to be chased by the police, and was brought to the emergency room in handcuffs. I had to consider all of this in my dangerousness assessment leading to my conclusion that there was a substantial danger to himself and possibly others if his admission was not confirmed at that time. (Affidavit of Isak Isakov, M.D. dated February 11, 2015).

110.   Doctor Bernier and Doctor Isakov testified at their depositions that they admitted Officer Schoolcraft on the ground that any possible or potential risk of dangerousness was a sufficient basis for their commitment decision.[111]

*City Response:* Admit.

*Mauriello Response:* Not disputed by Steven Mauriello as this

---

[111] PMX 31:  Bernier Tr. 248-49; PMX 32:  Isakov Tr. 94-98

paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Dr. Isakov and Dr. Bernier both testified that their commitment decisions were a matter of their individual clinical judgments, respectively, and that in their clinical judgments they found the plaintiff to meet the criteria under the Mental Hygiene Law to justify admission (Exhibit 31/Defendant's Exhibit W, pp. 246-248) (Exhibit 32/Defendant's Exhibit X, pp. 93-98). Plaintiff's Statement cites to Exhibit 31 and Exhibit 32, but because Exhibit 31 and Exhibit 32 were not served or filed with plaintiff's motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* This statement is denied as Dr. Aldana-Bernier's deposition testimony does not support the "fact" that she admitted plaintiff on the grounds that any possible or potential risk of dangerousness was a sufficient basis for their commitment decision.

*Iskov Response:* Dr. Isakov denies  in response to paragraph 110 that there is any testimony that he admitted Adrian Schoolcraft on the ground that there was any possible or potential risk of dangerousness; and further denies that he admitted him on the ground that there was any possible or potential risk of dangerousness.   See also the further response to item 109, above.  (Affidavit of Isak Isakov, M.D. dated February 11, 2015, Exhibit 27.)

111.   Dr. Dhar, who was the Jamaica Hospital witness in this action, also

testified that it was the policy and practice of the hospital to

involuntarily commit a patient based on any possibility that the person

was dangerous.[112]

*City Response:* Admit.

*Mauriello Response:* Not disputed by Steven Mauriello as this

paragraph does not relate to the claims against him or his

counterclaims.

*Jamaica Hospital Response:* Dr. Dhar did not simply testify that it was

the policy and practice of the hospital to involuntarily commit a patient

based on any possibility that the person was dangerous. Rather, he

testified and explained that whether the risk of physical harm is

considered "substantial" is "not really defined. It's clinical judgment

and based on that clinical judgment, you make a determination"

(Exhibit 33, p. 128). Further, when asked whether there was "any

difference between a potential or any potential risk of dangerousness

and a substantial risk of dangerousness" under the Jamaica Hospital

policy. Dr. Dhar testified, "Again, it's a clinical judgment. I don't think

it's defined in the policy" (Exhibit 33/Defendant's Exhibit II, p. 133).

Plaintiff's Statement cites to Exhibit 33, but because no Exhibit 33 was

served or filed with plaintiff's motion, plaintiff has failed to support

this statement as required by FRCP 56(c).

*Bernier Response:* This statement is denied as the cited testimony does

---

[112] PMX 33:  Dhar Tr. 132-35.

not stand for the proposition cited. Further, the statement is also denied as Dr. Dhar's cited testimony does not state or indicate Dr. Aldana-Bernier followed the policy and practice plaintiff claims Dr. Dhar's testimony stands for.

*Isakov Response:* Dr. Dhar did not simply testify that it was the policy and practice of the hospital to involuntarily commit a patient based on any possibility that the person was dangerous.  Rather, he testified and explained that whether the risk of physical harm is considered "substantial" is "not really defined.  It's clinical judgment and based on that clinical judgment, you make a determination" (Exhibit 33, p. 128).  Further, when asked whether there was "any difference between a potential or any potential risk of dangerousness and a substantial risk of dangerousness" under the Jamaica Hospital policy, Dr. Dhar testified, "Again, it's a clinical judgment.  I don't think it's defined in the policy" (Exhibit 33, p. 133).

112.   On November 6, 2009, after a forced stay lasting six days, Jamaica Hospital released Officer Schoolcraft from its custody, the same day that insurance coverage for his forced stay expired.[113]

*City Response:* Deny, except admit that plaintiff was released from Jamaica Hospital on November 6, 2009. See Exhibit 27 to the Declaration of Nathanial B. Smith for an accurate recitation of the

---

[113] PMX 27 (Medical Chart) at JHMC 128 ("The case is certified from 11/3/09 through 11/6/09. Next review will be with Dan of Aetna….").

status of plaintiff's insurance benefits at the time he was released.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present for or involved in what is described and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* The plaintiff was discharged on November 6, 2009, only after Dr. Isakov performed a further evaluation of the plaintiff and requested that the plaintiff follow up with a psychotherapist and, if he became symptomatic, to see a psychiatrist for medication (Exhibit 27/ Defendant's Exhibit U, pp. 41-42). Plaintiff's Statement cites to Exhibit 27, but because no Exhibit 27 was served or filed with plaintiffs motion, plaintiff has failed to support this statement as required by FRCP 56(c).

*Bernier Response:* Dr. Aldana-Bernier admits plaintiff was discharged on November 6, 2009, and the remainder is not contested for the purposes of this motion only.

*Isakov Response:* The plaintiff was discharged on November 6, 2009 (affidavit of Isak Isakov, M.D. dated February 11, 2015).

113.   After Officer Schoolcraft was released from Jamaica Hospital, he moved to Johnstown, New York and for the next six months was relentlessly harassed by the NYPD, which sent NYPD and local police officers on at least twelve separate occasions to bang on his door, spy on him, and videotape him or his father.

*City Response:* Deny.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present for or involved in what is described and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Plaintiff fails to support this statement as required by FRCP 56(c) as there is no citation to any material in the record.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

114.   In January 2010 and in February 2010, Lieutenant Gough and Sergeant Duncan traveled with others north over 200 miles to his home to deliver papers to him that could have just as easily been sent to him by certified mail.[114]

*City Response:* Deny.  <u>See</u> Exhibit 16 to the Declaration of Nathanial B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Not disputed by Steven Mauriello as he was not present for or involved in what is described and this paragraph does not relate to the claims against him or his counterclaims.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

115.   DI Mauriello was a witnesses in the stop and frisk case recently tried in this Courthouse before District Court Judge Shira A.

---

[114] PMX 16 at 3876.

Scheindlin, *Floyd v. City of New York*, 08-cv-1034 (SAS) (Dkt. # 298).

In that testimony, DI Mauriello stated that *after* the quota allegations

were made against him as the commanding officer of the 81st Precinct,

he was transferred on July 3, 2010 to become the Executive Officer of

Transit Borough Brooklyn and Queens.  According to DI Mauriello's

testimony before Judge Scheindlin, at the time of the transfer, the

Chief of Patrol for the entire NYPD told DI Mauriello that he was

doing a "really good job at the 81st Precinct" and that he wanted to

reward him with the new position.[115]

*City Response:* Admit.

*Mauriello Response:* Disputed to the extent it misstates Mauriello's

testimony at the Floyd trial and ignores more recent testimony in this

case on that same subject.  Mauriello testified at the Floyd trial in May

2013 that he was transferred to his current position in July 2010, and at

the time he considered it to be just a transfer, not a step up or a

promotion or an appointment to a more important position, just a lateral

transfer (PMX 35 at 1829-1831).  In this case, Mauriello testified on

July 1, 2014 as follows:

Q: Did Hall tell you as a reward for doing a good job at the 81 that you

were getting this transfer?

A: He didn't say it was a reward. He said I did a very good job at the 81.

I guess he was trying to soften the blow. You could tell by my voice I

---

[115] PMX 35:  Mauriello *Floyd* Testimony (PX 48) at 1829:25-1831:11.

was disappointed. Had a lot going on in my life at the moment and probably was the last thing I wanted to hear.

Q: It was a blow?

A: It was a big, big blow.

(SM Exhibit BV, Mauriello Dep. pp. 480-481 ll. 20-7)

Further, Mauriello has learned his transfer to the Transit Division had nothing to do with his ability or his reputation, but was a reaction to the adverse publicity generated by Schoolcraft's efforts to get revenge against Mauriello by his lies to QAD and IAB and his selective release of his recordings. (SM Exhibit BV, Mauriello Dep. 458-460.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

116.    While Mauriello did not claim then that the transfer was a promotion, he did considered it a transfer to a position as "second commander to more officers."[116]

*City Response:* Admit.

*Mauriello Response:* Disputed.  Mauriello testified he did not consider it a promotion to a more important position.  He said, instead, it was just a transfer to a position as "second commander to more officers" (PMX 35 at 1829-1831) as further explained in the response to paragraph 115 above.

---

[116] *Id.* at 1831:17.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

117.   While technically not a "promotion," it was "a reward for the job [he] did at the 81st Precinct."[117]

*City Response:* Deny. <u>See</u> Exhibit 35 to the Declaration of Nathanial B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Disputed.  See response to paragraph 115.  Chief Hall indicated Mauriello did a good job at the 81st Precinct.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

118.   Mauriello has not suffered any damage to his status at the NYPD.

*City Response:* Deny knowledge and information sufficient to form a belief as to the truth of this allegation and note that defendant Mauriello is the party most capable of responding to same.

*Mauriello Response:* Disputed.  As Mauriello explained at his deposition, based on his career path he should have been promoted to inspector with a corresponding increase in salary of $9,000 per year plus additional retirement and pension benefits. Further, in 2009, Mauriello had been selected to attend special training at the Police Management Institute (PMI) at Columbia University. Every other

---

[117] *Id.* at 1836:25.

Deputy Inspector and Captain who attended PMI with Mauriello has

since received at least one promotion and the corresponding pay

increase.  (SM Exhibit BV, Mauriello Dep. 578-588 ll. 24-18; see SM

Aff. in Opp. ¶ 6.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

119.   In his deposition in this case, DI Mauriello testified that soon after

the news broke in a February 2010 *Daily News* article about the

investigation into downgrading major crimes at the 81st Precinct, he

attended a Patrol Borough Brooklyn North supervisors meeting.  At the

meeting his direct supervisor, Deputy Chief Marino, told DI Mauriello

not to worry about the negative press because he did not believe it.[118]

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

120.   In addition, according to Mauriello, Deputy Chief Marino and the

thirty-five other supervisors in the room told DI Mauriello that they

supported him.[119]

---

[118] PMX 3:  Mauriello Tr. 98:12-103:25.

[119] *Id.* at 103:16-25

*City Response:* Admit.

*Mauriello Response:* Not disputed.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

121.   Mauriello does not claim that he was denied some specific position or promotion.  At his deposition, DI Mauriello testified that he has not made *any* efforts to change his position at the NYPD since October 2009 and that he has not made any requests for any changes in his position since October 2009.[120]

*City Response:* Admit.

*Mauriello Response:* Disputed.  Mauriello's deposition testimony explained that there is no formalized process for an officer above captain to request a promotion. (SM Exhibit BV, Mauriello Dep. p. 419 ll. 18-25.) Nonetheless, Mauriello repeatedly said in his deposition that he approached his supervisors at the Transit Department, Chief Diaz and Chief Fox, on at least two occasions about a promotion and transfer. (SM Exhibit BV, Mauriello Dep. pp. 471-474 ll. 14-12.) Both supervisors indicated that the NYPD would not even consider any promotion for Mauriello as his career "was on hold" while Schoolcraft's lawsuit was proceeding. (SM Exhibit BV, Mauriello Dep. pp. 467-486 ll.15-8, 469-470 ll. 1-14.)  In addition, Mauriello has

---

[120] *Id.* at 419:4-420:10.

repeatedly discussed the subjects of promotion and transfer with the
president of his union.  (SM Aff. In Opp. ¶ 7.)

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

122.  The only information that Mauriello could provide at his deposition
was that he had discussions in the summer of 2011 with his now-
retired supervisor, Transit Bureau Chief Diaz, and his successor,
Joseph Fox, who told him that any transfers or promotions would
likely have to wait until the case is over and that until then they could
not "push for him."[121]

*City Response:* Deny.[1]  A complete copy of Defendant Mauriello's
deposition today, which spanned the course of 2 days and which
several hundred pages long, can be provided to the Court upon request
but is too voluminous to attach here.   There can be no dispute that
Mauriello testified extensively on many topics.

*Mauriello Response:* Disputed to the extent the statement includes the
phrase "[t]he only information that Mauriello could provide at his
deposition" the meaning of which is unclear.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

---

[121] *Id.* at 466:11-470:9.

123.   Mauriello has no evidence that Officer Schoolcraft's statements to

QAD or IAB were made for the *sole purpose* of intentionally inflicting

harm on Mauriello or that Officer Schoolcraft used wrongful means to

inflict that harm.

*City Response:* Deny knowledge and information sufficient to form a

belief as to the truth of this allegation and note that defendant

Mauriello is the party most capable of responding to same.

*Mauriello Response:* Disputed.  Schoolcraft's own recordings indicate

that he and his father were motivated to intentionally inflict harm on

Mauriello as revenge for signing off on Schoolcraft's 2008 evaluation

and for arranging to have Schoolcraft placed on restricted duty.

Schoolcraft got his misguided revenge by telling the lies he and his

father prepared to have him tell QAD, as well as IAB. Schoolcraft's

recording of a conversation with his father prior to the QAD meeting

(which was withheld in discovery, but had been retrieved by IAB)

indicates an insidious and continuing plan to cause career and

reputational harm to Mauriello. The fact that Schoolcraft told his father

that "this is the way we are going to fuck him over" suggests that

Schoolcraft and his father had finally, after earlier failed attempts,

found the way to inflict harm on Mauriello. (SM Ex. BR at 7:10-7:40.)

In just about every aspect of Schoolcraft's involvement with the

NYPD, he was engaged in deceit with the ultimate purpose of hurting

Mauriello, while creating a false basis for an undeserved recovery in a

lawsuit – whether it was about his performance in 2008, his desire to appeal his evaluation, his feelings of stress and anxiety, his purported ignorance of the reasons he was placed on restricted duty, his purported desire to be restored to full duty, his purported concern for the people of the community served by the 81st precinct, his purported concern for his fellow officers, his recording of his time on duty, his selective production of his recordings, and so on.  The evidence of his desire to get revenge against Mauriello pervades everything he has said and done.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

124.   Mauriello's Counterclaims say that Officer Schoolcraft was motivated by a lawsuit.

*City Response:* Deny.  See Counterclaims at Docket Entry No. 231 for an accurate recitation of their contents.

*Mauriello Response:* Disputed.  What the counterclaims allege is as follows, in paragraph 7:  "Thus, plaintiff held himself out to QAD and all others, including the NYPD Internal Affairs Bureau (IAB), members of the press, and the public generally, under extremely false pretenses for the purpose not of protecting his fellow officers or the rights of the residents of the Bedford Stuyvesant community, but for the purpose of getting revenge against Steven Mauriello -- interfering

in his employment relationship with the NYPD, and otherwise trying

to destroy his career and reputation – while also creating false support

for plaintiff's lawsuit against the NYPD."  (SM Ex. BR at 0-2.00)

(Larry Schoolcraft speaking to Adrian on October 7, 2009, alludes to

addressing the "ladies and gentlemen" of a jury in a future lawsuit);

(SM Ex. R) (Larry Schoolcraft speaking to Adrian on October 31,

2009, again refers to a future lawsuit they clearly were contemplating).

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

125.   Official findings by two NYPD investigative agencies – IAB and

QAD – show that DI Mauriello personally committed misconduct and

improperly permitted rampant downgrading and suppression of crime

reporting at the 81st Precinct while under his command.

*City Response:* Deny.

*Mauriello Response:* Disputed.  First, the former NYPD attorney

responsible for overseeing the investigations and deciding what

charges, if any, should be brought, said at a meeting of those involved

in the investigations, after being told there was no basis for bringing

charges against Mauriello, that she wanted them to bring her

something, anything, that could be used against Mauriello, and that is

what lead to the charges.  (SM Ex. BV, Mauriello Dep. pp.

444-448 ll. 10-7.)  The charges have not yet been heard.  When they are

heard, Mauriello will urge their dismissal and expects to prevail.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

126.    After October 31, 2009, IAB began an investigation into whether DI

Mauriello knew about or suspected at the time of his entry into Officer

Schoolcraft's home that IAB or QAD was investigating the 81st

Precinct.  IAB also made investigation into whether Mauriello knew

about the contents of Officer Schoolcraft's memo book at the time he

forced his way into his apartment.

*City Response:* Admit.

*Mauriello Response:* Disputed that Mauriello forced his way into

Schoolcraft's apartment.  Not disputed that IAB considered a number

of questions when investigating Schoolcraft's allegations, but it did not

address whether Mauriello knew about IAB's investigation, only

whether he knew about QAD's investigation.  In that regard, Mauriello

was charged as follows:  "On August 11, 2010, in an IAB interview

relating to 'retaliation, whistle blower,' Mauriello 'stated he was not

aware that the Quality Assurance Division was conducting an

investigation into the 81st Precinct's handling of Complaint Reports

until either sometime in February 2010, or when he was interviewed by

QAD on April 30, 2010, when in fact, the investigation disclosed that

he was aware prior to the aforementioned dates.'  This conduct was

"prejudicial to the good order, efficiency or discipline of the Department [as it] impede[d] an official Department investigation." This charge is unfounded and we expect it to be summarily dismissed at the administrative hearing.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

127.   During the course of those investigations, DI Mauriello was required to be interviewed under oath by IAB, and at his interview DI Mauriello made materially false statements about his knowledge about the existence of an investigation into his Precinct and Officer Schoolcraft's memo book.[122]

*City Response:* Deny. <u>See</u> Exhibit 15 to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Disputed.  Mauriello did not make any materially false statements and has not been charged with making any materially false statements.  See response to paragraph 126.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

128.   IAB has recommended that formal charges against Mauriello be filed, and those charges are still pending.

---

[122] PMX 15 (PX 144) (confidential designation)

*City Response:* Admit.

*Mauriello Response:* Not disputed.  See responses to paragraphs 125 through 127.  The charges have not yet been heard.  When they are heard, Mauriello will urge their dismissal and expects to prevail.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.

129.   In 2010, QAD issued a report on its investigation, stating: "In summary, although some upgrades were made during the course of 2008 and 2009, the findings illustrate severe deficiencies in the overall crime reporting process as a whole beginning with the initial interaction of complainants attempting to file reports, the supervisor's review and finalization of the reports submitted and continuing with inordinate delay in changing, improper classifications. These conclusions, coupled with the significant amount of reports found not to have been entered into the Omni-System is disturbing."[123]

*City Response:* Deny. See Exhibit 16 to the Declaration of Nathaniel B. Smith for an accurate recitation of its contents.

*Mauriello Response:* Not disputed that the quoted statement appears in the QAD report, and identifies administrative deficiencies that needed to be addressed in the 81st Precinct, for which Mauriello was

_____

[123] PMX 16 (PX 169) at NYC 5205 (AEO designation; filed under seal) (redacted ECF version).

131

responsible as the Commanding Officer.  The administrative

deficiencies, however, had been identified by QAD in 2008 and 2009,

as the quoted statement indicates, and the analysis of the data reviewed

in the 2010 investigation revealed a degree of crime misclassification

that was the same or better than what QAD had found in the semi-

annual audit covering six months of the ten-month period reviewed by

QAD in its investigation.

*Jamaica Hospital Response:* Undisputed for purposes of this motion.

*Bernier Response:* Not contested for the purposes of this motion only.

*Isakov Response:* Undisputed for purposes of this motion.


ADDITIONAL MATERIAL FACTS AS TO WHICH
MAURIELLO CONTENDS THERE EXIST
GENUINE ISSUES TO BE TRIED,
THUS REQUIRING DENIAL OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

Mauriello's Counterclaims

    1.    On October 7, 2009, in a recorded conversation with his father on

his way to his first and only meeting with QAD – a recording Schoolcraft

or his previous counsel deleted from the recordings Schoolcraft produced

in discovery (SM Ex. CV) -- Schoolcraft expressed his desire and intent to

"fuck [Mauriello] over" by providing QAD false information.  More

specifically, Schoolcraft told his father that "you're right, this is the way

to fuck [Mauriello] over", suggesting that in Schoolcraft's mind they had

finally come upon a way to hurt Mauriello. (SM Ex. BR at 7:10-7:40.)

2.      In the October 7, 2009, conversation with his father, Schoolcraft and his father discussed that Schoolcraft should provide QAD with false information without letting on in any way that Schoolcraft was seeking to get "revenge" against Mauriello (SM Ex. 2:30-2:45). Following his father's advice, Schoolcraft made one of his initial points to the QAD investigator that he was not looking to "burn anyone" or "for vengeance", and was not seeking a "retaliation claim." (SM Exhibit BR at 27:45-27:55.) In a particularly telling moment, Schoolcraft tells a QAD investigator "I kinda want to present… I don't wanna come in here as just some disgruntled employee that wants to burn somebody or something. I wanna present it as…let's fix the problem." (SM Exhibit BR at 43:45-44:15.) Schoolcraft's repetitive framing of this issue, which he had rehearsed with his father, and the fact that he felt the need to express concern for the integrity of the department to the QAD investigators, suggests that his real interests were quite different, as we now know. Schoolcraft further attempted to mask his true intentions at the end of the interview by saying to the investigators "this isn't because I don't like Inspector Mauriello, he is a jovial guy." (SM Exhibit BR at 2:57.45-2:57.55.)

3.      On the morning of October 31, 2009, while in conversation with other officers in the 81st Precinct that he secretly recorded, Schoolcraft complained "look at what they did to me… they fucked me over on my evaluation." Claiming that he asked supervisors to put it in writing but

they said "no, go fuck yourself. That's your buddy Mauriello."

Schoolcraft then said "That's your buddy Mauriello, that fat miserable

fuck.  If I could get him…If I could get him, I would fucking sell him out

faster than anything, for free.  I would give him away for free." (SM

Exhibit Q at 44:15 – 45:10.)

4.     In that conversation, the officer to whom Schoolcraft was speaking

responded "It's been like forever already. Can't get over that shit yet?"

Schoolcraft responded as if the officer had asked whether Mauriello had

gotten over Schoolcraft's evaluation and appeal, which seemingly was not

what the officer asked, as there was nothing for Mauriello to get over.

Schoolcraft, on the other hand, not only had not gotten over it, but he was

in the process of getting revenge.  (SM Exhibit Q at 45:15-45:25.)

5.     After speaking with his father on October 7, 2009, Schoolcraft then

met with QAD and lied to QAD that he was providing QAD only a

sample of the misclassified complaint reports he had gathered (SM

Exhibit BR at 43:45-43:55.)

6.     Schoolcraft also lied to QAD that he had many more misclassified

complaint reports to provide to QAD as the problem was "chronic" and

"systemic"  (SM Exhibit BR at 4:30-5:30.)  He had nothing more and

never provided anything more to QAD.

7.     Schoolcraft lied to QAD that the downgrading of complaints was a

rampant practice in the 81st Precinct, referring to it as "chronic" and

"systemic."  SM Ex. BR at 27:20-27:35.)

8.      The incidence of the misclassification or downgrading of crime in the 81st Precinct as determined by QAD after conducting a complete review of the complaint reports for a ten-month period ending September 30, 2009, triggered by Schoolcraft's allegations, was consistent with the City-wide average of errors in crime classification among all precincts (SM Ex. DC), and consistent with the results found by QAD in its earlier semi-annual audit of the 81st Precinct covering six out of the same ten months.  (See SM Ex. CK.)

9.      In Schoolcraft's October 7, 2009, conversation with his father, they discussed that Schoolcraft should lie to QAD and say he was speaking up because of his concern about the safety of his fellow officers (SM Ex. BR at 13:00-14:30.)

10.     In that same conversation, Schoolcraft told his father he had no friends in the NYPD and did not care if any of his fellow officers were harmed by what he was about to tell QAD (SM Ex. BR at 15:00-15:20.)

11.     Schoolcraft and his father also discussed that Schoolcraft should lie to QAD and say he was speaking up because of his concern about the rights of the people of the largely minority Bedford Stuyvesant community (SM Ex. BR at 13:45-14:30.)

12.     In fact, Schoolcraft had little or no regard for the people of the community, as exhibited by the following paragraphs (13-15).

13.     In that same conversation with his father, Schoolcraft said he and a former partner of his in the 81st Precinct only worked together because

"we just worked together so we didn't have to work with any n

_____[African Americans]."  (SM Exhibit BR at 15:10-15:30.)

14.    Schoolcraft has acknowledged that it was on account of the many

CCRB and civil rights complaints made against him by people in the

community – for which he was placed on force monitoring for one year,

from 2004 to 2005 -- that he started recording his time on the job as

early as 2006 (SM Ex. BN, AS1 29:15-17.)

15.    Schoolcraft is heard in the recordings he made on the job repeatedly

making disparaging remarks about minorities, including the following:  i)

on October 31, 2009, Schoolcraft observed an Asian officer outside his

home and recorded himself  twice referring to that officer as a "chinc"

(SM Ex. R at 17:30-18:00); ii) he is heard on his recording from earlier in

the day on October 31, 2009, referring to an African American female

officer as one who only could have advanced in the NYPD the way she

did by performing sexual favors for her male supervisors (SM Ex. Q at

6:00-6:45); iii) in the same day tour recording, mocking another police

officer's ethnic accent (SM Exhibit Q at 29:00-29:10; iv) also in the same

day tour recording, referring to member of the community who had come

into the precinct asking to use the bathroom as a "fucking retard" (SM

Ex. Q at 5:02.45-5:03.00); v) he is heard on another recordings saying to

another officer, when hearing music being played by someone in the

community, that the person was stealing the air of the officer's kids; and

vi) he is heard on one of his recordings, from October 29, 2009, saying to

the Borough Personnel Sergeant, who had called Schoolcraft to her office

to discuss his appeal, that it was not easy for him, as a white cop, to be working in a predominantly African American community because as a "white male in a black neighborhood, it was a fight every time." (SM Ex. CE at 23:00-23:19.)

16.    Schoolcraft's sole purpose for falsely reporting to QAD was to inflict harm on Mauriello by causing an inevitable impact on his career and employment with the NYPD as revenge for Mauriello's approval of Schoolcraft's unsatisfactory evaluation for 2008 and for somehow having Schoolcraft placed on restricted duty.  Unable to control his hostility for Mauriello, Schoolcraft also has blamed Mauriello for ignoring his appeal. (SM Exhibit Q at 44:35 – 47:30) though Schoolcraft never submitted an appeal.  In each instance, Schoolcraft has only himself to blame, but nonetheless seeks revenge against Mauriello.

17.    Even if Schoolcraft believed his lies to QAD could be justified by the fact that complaint reports occasionally were misclassified, which QAD already was well aware of, he lied about the extent of the misclassification, and he lied about the circumstances involved in certain instances, to make it sound like an extraordinary problem in the 81st Precinct.  (See paragraph 8 above.)

18.    To make the incidence of crime report misclassification seem like a serious problem, at least in the 81st Precinct, Schoolcraft himself purposefully downgraded complaint reports as a means to cause unjustified harm to Mauriello's employment and career. (See SM Ex.

DD.)

19.   Not satisfied that he had caused Mauriello enough harm,
Schoolcraft selectively released his recordings of roll calls at the 81st
Precinct more than six months after the events of October 31, 2009, for
the sole purpose of inflicting additional harm on Mauriello by further
damaging his employment and career with the NYPD -- again as revenge
for Mauriello's approval of Schoolcraft's unsatisfactory evaluation for
2008 and for Schoolcraft being placed on restricted duty.  (See SM Ex.
DC.)

20.   Even if there were some innocent justification for Schoolcraft's
release of his roll call recordings, he intentionally promoted a
misunderstanding of what was said in the recordings so that Mauriello
would be subjected to unjustified ridicule and scorn and ultimately
suffer further damage to his employment relationship and career with
NYPD.  For example, Mauriello is heard in one of the recordings on
Halloween night saying that the officers in his command, unlike under
normal circumstances, had zero discretion because of word from the
community leaders and the gang detectives that there would be gang
initiation that night. Mauriello had foot posts at one of the particularly
crime-ridden buildings that suffered from criminal gang activity, and
told the officers "I want you stopping everybody coming out of that
building, and I mean everybody."  There were over 1000 people living
in the building, and Mauriello did not mean, and his officers knew he
did not mean, they should stop everyone coming out of the building,

which would have been an impossible task.  Instead they were to stop only those they had a reasonable basis to stop.  Schoolcraft, however, knew Mauriello's statement would be taken literally and thus misconstrued by the general public when presented in a sensational way by the media, thus causing embarrassing publicity for the NYPD.  That is, in fact, what happened, which inevitably contributed to the damage caused to Mauriello's employment and career with the NYPD.

21.    Mauriello has performed in exemplary fashion since being transferred to the Queens and Bronx Transit Division in July 2010, and has received the highest performance scores possible during that time (SM Ex. DA).

22.    In March 2009, Mauriello was selected by the NYPD to attend the prestigious Police Management Institute (PMI) at Columbia University.  At the time, he was a Deputy Inspector.  All or substantially all of the other Deputy Inspectors, as well as every Captain (a rank below), who participated in Mauriello's PMI class has since been promoted to Inspector or above.  (See SM Aff. in Opp. ¶ 6.)

23.    The person who succeeded Mauriello as Commanding Officer of the 81st Precinct was promoted to Deputy Inspector after Mauriello, but has since been promoted to Inspector and then to Assistant Chief.  (See SM Aff. in Opp. ¶ 6.)

24.    In the ordinary course, had Schoolcraft not lied to QAD and the media about Mauriello and the 81st Precinct, Mauriello would not have

been transferred to the Queens and Bronx Transit Division, and, even if he had, he long ago would have been promoted to Inspector and perhaps to Assistant Chief, and would have received a new assignment. (See SM Aff. in Opp. ¶ 7.)

25.    Had Mauriello been promoted to Inspector in the ordinary course, he would have received an additional $9,000 to $10,000 in annual compensation.  (SM Exhibit BV, Mauriello Dep. 578-588 ll. 24-18.)

26.    All or substantially all of those who were Deputy Inspectors in 2008, when Mauriello was promoted, and are still employed with the NYPD, have been appointed Inspector or Assistant Chief.  Due to the extent of Schoolcraft's lies, and the effort he made to have them sensationalized in the media, Mauriello's employment relationship and career with the NYPD have been damaged, resulting in him not being promoted since 2008.  (See SM Aff. in Opp. ¶ 7.)

27.    An officer at the rank of Captain or above does not apply for a promotion in the NYPD.  The presumption, and the universal truth, is that anyone who is a Deputy Inspector is trying to earn a promotion to Inspector and then to Assistant Chief.  They are promotions one earns, and Mauriello has done everything he can possibly do to earn such a promotion for himself.  Because of Schoolcraft's interference, Mauriello has not been promoted in over six years despite a record that should have earned him at least one, if not two promotions during that time.  (See SM Aff. in Opp. ¶¶ 6-7; SM Exhibit BV, Mauriello Dep. p. 419 ll. 18-25; SM

Ex. DA.)

28.   Brandon Del Pozo, who in 2010 was a Captain in the NYPD assigned to the 50th Precinct, had been assigned to IAB in 2009.  He was contacted by David Durk in 2009 at the behest of Larry Schoolcraft, with whom Durk was acquainted.  In 2010, DelPozo was asked by the NYPD legal bureau to facilitate communications with Schoolcraft's attorney, and in that context was quoted in the media as saying Mauriello was in a "dead-end job" after being transferred to the NYPD Transit Division (SM Ex. BV, Mauriello Dep. 458-461.)

29.   As one final example of the orchestration and deceit by Schoolcraft, with the "guidance" of his father, the recording of their conversation on October 31, 2009, while Schoolcraft was in his apartment, reveals that Larry Schoolcraft called someone he refers to as Shakey or Shady.  He talks about how he told this person something that he thought would influence him to tell others, which he would have expected to trigger a response from the NYPD that was different from what was occurring. They seem to be aware that their conversation is being recorded, and their expressed reasoning does not make much sense, but it certainly appears that they were involved in an effort to somehow entice NYPD into taking action.  Their plan seemed to have failed, so they were discussing what ought be done next.  (SM Ex. R.)

30.   In that same conversation, Schoolcraft tells his father over the telephone while in his apartment watching police personnel gather outside his house – "I feel stupid" and "this is ridiculous," as his father coaches

him to say he has diarrhea if the police enter his apartment and want to

take him back to the precinct or the hospital.   (SM Ex. R.)

### ADDITIONAL UNDISPUTED CLAIMS

**Deposition  Testimony  of Dr. Aldana-Bernier**

1.     Dr. Aldana-Bernier is familiar with the Mental Hygiene Laws for

involuntarily admitting patients; Mental Hygiene Law §9.39 concerns

emergency involuntary admissions.  (Dr. Aldana-Bernier's Transcript is

annexed to Koster Decl. as Exhibit A) (Exhibit A at pg 69 ln 22-pg 71 ln

4).

2.     Dr. Aldana-Bernier is familiar with the procedures for involuntarily

admitting a patient to a hospital.  (Exhibit A at pg 71 lns 5-16).

3.     Dr. Aldana-Bernier has committed numerous individuals pursuant to

Mental Hygiene Law §9.39. (Exhibit A at pg 71 ln 17-pg 72 1n 22).

4.     Dr. Aldana-Bernier understands that procedures of Mental Hygiene

Law §9.39 must be complied with to involuntarily commit someone,

including plaintiff.  (Exhibit A at pg 79 lns 11-23).

5.     Dr. Aldana-Bernier's understanding of Mental Hygiene Law §9.39 is

that a patient can be admitted if they are a danger to themselves; a danger

to society; they are psychotic; not able to take care of themselves; if they

are depressed and not able to take care of themselves, and/or if they are

suicidal.  (Exhibit A at pg 79 ln 24- pg 80 ln 12).

6.     A mental status examination is part of the procedure for admitting a

patient pursuant to Mental Hygiene Law §9.39.  (Exhibit A at pg 80 lns 13-17).

7.    A person can be held if they are depressed and not able to take care of themselves, such as not eating, sleeping, or functioning.  This patient could be suicidal and a danger to themselves.  (Exhibit A at pg 80 ln 18-pg 81 ln 9).

8.    To admit someone under Mental Hygiene Law §9.39, Dr. Aldana-Bernier has to take a number of steps, including, review previous hospital records; contact a psychiatrist if the person is seeing one; contact a medical doctor only if the patient says they want their medical doctor to be contacted.  (Exhibit A at pg 81 ln 23-pg 82 ln 22).

9.    Dr. Aldana-Bernier also has to fill out the Mental Hygiene Law §9.39 form.  (Exhibit A at pg 83 lns 11-18).

10.    This form is not for Dr. Aldana-Bernier's benefit; rather it is for the benefit of the patient and society as a whole.  (Exhibit A at pg 84 lns 9-12.

11.    Dr. Aldana-Bernier reviewed Dr. Lwin's note.  Dr. Lwin determined plaintiff was paranoid about his supervisors and was agitated, uncooperative, verbally abusive in the medical emergency room.  They needed to determine why he was so agitated and acting in a bizarre manner.  The bizarre behavior included plaintiff barricading himself in his home, not opening the door and having·to have his apartment broken into. Dr. Lwin determined plaintiff needed further evaluation.  (Exhibit A at pg 87 ln 11-pg 93 ln 4).

12.    A patient can be held pursuant to Mental Hygiene Law §9.39 if they are behaving bizarrely and are potentially psychotic; such behavior can make a patient dangerous to themselves or others. (Exhibit A at pg 93 ln 5-pg 94 ln 13).

13.    Dr. Aldana-Bernier explicitly denied that plaintiff was committed under Mental Hygiene Law §9.39 solely because he was acting bizarrely. Plaintiff's bizarre behavior was simply one component of his general mental state.  (Exhibit A at pg 94 lns 14-24).

14.    In reviewing Dr. Lwin's note, Dr. Aldana-Bernier believed there was a question of whether plaintiff was going to hurt himself or if he was a danger to himself because he was agitated, exhibited bizarre behavior and barricaded himself in his apartment.  (Exhibit A at pg 94 ln 25-pg 95 ln 20).

15.    Dr. Aldana-Bernier was examining plaintiff's behavior not just at that particular moment, but also his prior behavior, including his barricading himself in his apartment.  (Exhibit A at pg 95 lns 8-20).

16.    Dr. Patel signed Dr. Lwin's note "I concur with the above doctor's treatment recommendations."  (Exhibit A at pg 99 lns 16-19).

17.    A psychiatric disorder is one of the categories of diagnosis wherein a patient is not in touch with reality.  This can manifest as symptoms such as agitation, aggressive behavior, delusions, hallucinations and impairment of reality testing. (Exhibit A at pg 99 ln 20-pg 100 ln 4).

18.    It was indicated plaintiff had a conflict with his supervisor.  (Exhibit

A at pg 100 ln 18-pg 101 ln 2).

19.    Dr. Slowick's note indicated plaintiff was guarded and not cooperative; did not know why he could not carry a gun; and that his supervisors did something to him. (Exhibit A at pg 117 ln 23-pg 119 ln 7).

20.    Being paranoid means the person had a false belief about what is occurring in their environment that is not in agreement with the culture; someone will say they feel they are being watched or followed; somebody saying there is a conspiracy against them; if someone will say someone is talking about them.  These are various forms of paranoia, jealousy and delusions.  (Exhibit A at pg 135 ln 19-pg 136 ln 6).

21.    Dr. Tariq diagnosed plaintiff as paranoid.  (Exhibit A at pg 136 lns 7-20).

22.    The nursing assessment indicated plaintiff was brought in by the NYPD after he was deemed paranoid and a danger to himself by his police sergeant.  (Exhibit A at pg 143 lns 4-25).

23.    Dr. Aldana-Bernier reviewed this nursing assessment and it was something she considered in making her determination regarding plaintiff. (Exhibit A at pg 144 ln 25-pg 146 ln 4).

24.    Pursuant to Mental Hygiene Law §9.39, Dr. Aldana-Bernier had to make her own evaluation of plaintiff.  (Exhibit A at pg 146 lns 5-11).

25.    Her assessment of plaintiff was based on the totality of the notes as well as her own assessment of plaintiff.  (Exhibit A at pg 146 ln 19-pg 147 ln 11).

26.   Dr. Aldana-Bernier sought a second opinion of her assessment of plaintiff.  (Exhibit A at pg 147 ln 25-pg 149 ln 16).

27.   Dr. Aldana-Bernier's opinion that plaintiff could be admitted pursuant to Mental Hygiene Law §9.39 was based on the events at his apartment, including barricading himself in his apartment; acting bizarrely; displaying agitation in the emergency room; plaintiff's occupation as a police officer; his access to guns even though his gun had been taken away; his delusions; and the increased chance of damage plaintiff could cause based on his training and occupation as a police officer.  (Exhibit A at pg 149 ln 17-pg 151 ln 3).

28.   When she personally evaluated plaintiff, he displayed paranoia by claiming he was being set up by a various police officers who were conspiring against him; paranoia is a form of psychosis; he also displayed persecutory delusions. (Exhibit A at pg 172 lns 6 22; pg 194 lns 18-24).

29.   Plaintiff's paranoia was manifested by his claims that there was a conspiracy against him.  He also believed he was being persecuted by his superiors and his co-workers.  (Exhibit A at pg 195 ln 21-pg 196 ln 17).

30.   Plaintiff was a threat to cause physical harm to himself or others because he was a police officer talking about conspiracies, had access to weapons, had to be brought from the apartment where he barricaded himself in, acting bizarre and agitated at this home and in then in the emergency room.  (Exhibit A at pg 196 In 18-pg 197 ln 18; pg 197 ln 23-pg 199 ln 3).

31.   Dr. Aldana-Bernier stated all relevant information has to be taken into account and the decision to commit pursuant to Mental Hygiene Law §9.39 is not just based on a single isolated second at the exact time the decision is  made.  (Exhibit A at pg 198 ln 14-pg 199 ln 3).

32.   Plaintiff consistently displayed paranoia that there was a conspiracy against him by numerous police officers.  (Exhibit A at pg 199 lns 16-24).

33.   In the "Emergency Admission Section 9.39 Mental Hygiene Law", in the section record of admission, Dr. Aldana-Bernier wrote "Patient is a danger to himself.  Currently psychotic and paranoid.  Would benefit from inpatient stabilization."  (Exhibit A at pg 216 ln 14-pg 217 ln 14; Exhibit D at pg 57).

34.   In formulating her decision concerning plaintiff pursuant to Mental Hygiene Law §9.39, Dr. Aldana-Bernier was not basing her decision just on how plaintiff presented to her during her face-to-face examination of him, but also all the prior events and determinations.  (Exhibit A at pg 231 lns 7-18).

35.   Dr. Aldana-Bernier based her opinion on her determination that plaintiff  was  a substantial risk to physically harm himself or others.  Specifically, she was asked:

Q.  We are going to get to what you based your opinion on.   I'm asking you: Did you base it on that he was a substantial risk of physical harm to himself as manifested by a threat of or attempt at suicide?
        MR. CALLAN: Objection, asked and answered.
        MR. SUCKLE: Not answered yet.
Q.  Yes or no?
        Mr. CALLAN: Objection, asked an answered.
Q.  Can you answer, please?

A.  A potential risk, yes.
Aldana-Bernier Transcript pg 243 ln 4-pg 244 ln 11.

36.    Plaintiff was a potential risk to harm himself or someone else

because he was acting bizarre, barricaded himself in his apartment, was

brought in from his home, was a police officer who may have access to

weapons, and is paranoid.  (Exhibit A at pg 246 ln 25-pg 247 ln 11).

37.    The only testimony cited by plaintiff in support of his motion for

summary judgment is as follows:

do you mean?

Q.  Sure.  Well, you used the word "potential."  I would like to know what

you mean by potential.

A.  If you think of the navy yard disaster, was he an officer or an army

man?  He was so quite, no one ever found out what was going on with

him.  So what happened then?  Or if you look at all of those - - the Range

Rover.  Who are all of these people that caused that?  They are all police

officers.

So if I think then I have to make sure that when I see a patient in the ER, I

have to think in the future that there will be no disaster, there will be no

destruction, or no one will get harmed when they were discharged from

the ER.

Q.  I was asking about what you meant by potential.
A.  That's the potential.
Q.  So if there is any potential at all, you want to make sure that the patient
is safe, correct?
A.  Correct.
Q.  And if there is any potential at all, you want to make sure the
community is safe, correct?

A.  That's correct.

Q.  And if there is any potential at all, you were going to admit Mr. Schoolcraft, correct?

MR. LEE: Objection to form.

A.  With all of those reasons, yes, I would have to admit him.

Q.  When you admitted him to the emergency room, there were certain rules and regulations --

MR. SUCKLE: Withdrawn.

Q.  When he was admitted to the psych floor, there were certain rules and regulations in the psych war, correct, about clothes they wear, what hours visitors can come, correct?

A. Yes.

(Exhibit A at pg 248 ln 2-pg 249 ln 25).

38.    Adjustment disorder is a psychiatric diagnosis for where someone goes under stress and will react to that stress within a period of time; this reaction will affect his functioning.  The person could be depressed, agitated, manifest itself through violence, depression or anxiety.  (Exhibit A at pg 318 ln 21-pg 319 ln 10).

39.    There is no evidence Dr. Aldana-Bernier based her determinations pursuant to New York Mental Hygiene Law §9.39 whether there was a potential risk plaintiff would psychically harm himself others as opposed to basing it on whether there was a substantial risk plaintiff  would physically harm himself or others.  (Exhibit A; A copy of Dr. Tancredi's Affidavit is attached to Koster Decl. as Exhibit B; and Exhibit D)

40.    There is no evidence Dr. Aldana-Bernier based her determinations pursuant to New York Mental Hygiene Law §9.39 using a potential risk standard in place of a substantial risk standard.  (Exhibit A; Exhibit B; and Exhibit D)

**Affidavit of Dr. Laurence Tancredi**

41.   Dr. Aldana-Bernier evaluated the plaintiff at the Jamaica Hospital on November 1, 2009, and on the basis of her review of the records and her evaluation of plaintiff concluded that he should be admitted to the hospital.  (Exhibit B at ¶ 4).

42.   Dr. Aldana-Bernier took all these factors into consideration, including the realization that as a policeman, plaintiff would likely have access to weapons, even though his gun had been removed; that he was living alone with few friends or available collaterals; and no doubt further appreciated that plaintiff was a big man, estimated 250 lbs, and could be bodily injurious to others, particularly given his compromised mental state as well as his manifested lack of judgment.  (Exhibit B at ¶ 5).

43.   On the basis of these facts, she concluded he was a foreseeable danger to himself or others and needed additional time in the hospital for medical stabilization.  She committed him under the Mental Hygiene Law Section 9.39, which provides for Emergency Admission when a person is deemed to have a "mental illness for which immediate observation, care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others."  The phrase "substantial risk of physical harm" is included in the language of the relevant statute.  Underlying these concepts is a notion of "foreseeability".  (Exhibit B at ¶ 6).

44.   This law, Section 9.39, allows for 48 hours observation during which

time the patient is further evaluated by others with more time available

and a detailed analysis is conducted to determine whether the more

"freedom  restricting" confinement--that of 15 days following the

assessment of a second physician, should be employed.  (Exhibit B at ¶ 7).

45.    The Emergency Admission (or commitment) is often done quickly in

an emergency room with frequently incomplete information available; it is

a judgment call as is the case with any "risk" analysis.  There is inevitably

uncertainty inherent in risk assessment.  (See: Buchanan A.; R. Binder; M.

Norko et al:  Psychiatric Violence Risk Assessment; Am J Psychiatry

2012, 169: 340 ff. for a detailed discussion of the conceptual problems of

risk assessment).  (Exhibit B at ¶ 8).

46. On the other hand, where factors, such as those in this case, lead to a

reasonable conclusion by the clinician that there is foreseeable

"substantial" risk of harm to self or others, it is essential to minimize

serious adverse outcomes and, therefore, commit the individual.  (Exhibit

B at ¶ 9).

47.    Dr. Aldana-Bernier's deposition reveals a general knowledge about

Section 9.39 of The Mental Hygiene Law.  She demonstrated the

appropriate understanding of the limited applicability of that law, the

importance of "dangerousness" to self and others, and her understanding

that she must do what is best for the patient and for society at large at that

specific moment of decision-making.  (Exhibit B at ¶ 10).

48.    Dr. Aldana-Bernier made a judgment call that the plaintiff was

potentially (foreseeably) dangerous.  And at the time when she made this judgment, she had to rely on the information that was readily available. The very recent history of bizarre behavior, uncooperativeness, paranoid ideation, agitation, general aggressiveness, and verbal confrontation (altercation with the officer earlier on 10/31/09, and cursing in the Medical ER),  along with an evaluation of emotional instability resulting in removal of his gun months earlier formed the basis for her triggering Section 9.39 of the Mental Hygiene Law.  (Exhibit B at¶ 11).

49.    She demonstrated in this judgment not only an adequate understanding of the law, but also a reasonable "judicious" application of the Emergency Admissions standard.  Additionally, Dr. Aldana-Bernier demonstrated her professionalism by presenting the case to the Associate Chairman of the Psychiatry Department, Dr. Dhar, who concurred with her analysis and decision for Emergency Admission.  It was reasonable for her to get a second opinion to obtain the perspective of someone taking a fresh look at the data.  In this case she obtained input from a top administrator in the department who has likely provided oversight for similar situations.  (Exhibit 8 at ¶ 12).

50.    Plaintiff was given an initial diagnosis of "Psychosis NOS", by the first psychiatrist who examined him in the emergency room at Jamaica Hospital.  This was subsequently used by Dr. Aldana-Bernier during the period of emergency admission until a final diagnosis of "Adjustment disorder with Anxious Mood" was made.  The diagnosis of "Psychosis

NOS" was essentially a working diagnosis.  This diagnosis is defined in DSM-IV-TR, which was the operating handbook for mental disorders in 2009.  The criteria for Psychotic Disorder Not  Otherwise Specified (NOS) (DSM-IV-TR #  298.9) states in its general description the following: "This category includes psychotic symptomatology (i.e.,  delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a  specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder".  (Exhibit B at ¶ 13).

51.   Note that not all of the symptoms must be present; in fact one of these, such as delusions, would fit.  For example, the description gives the following three illustrations (among others) which in part fit patterns in this case:

i.     Psychotic symptoms that have lasted for less than 1 month but that have not yet remitted, so that the criteria for Brief Psychotic Disorder are not met;

ii.    Persistent non-bizarre delusions with periods of overlapping mood episodes that have been present for a substantial portion of the delusional disturbance; and

iii.   Situations in which the clinician has concluded that a Psychotic disorder is present, but is unable to determine whether it is primary, due to a general medical condition, or substance induced.  (Exhibit B at ¶ 14).

52.     The presence, therefore, of paranoia (persecutory ideation and delusions), in addition to bizarre behavior, suspiciousness and guarded responses, agitation, and aggressive verbal confrontation (the bizarre behavior, agitation etc. may suggest a mood disorder) fit under the criteria of Psychotic Disorder-NOS.  (Exhibit B at ¶ 15).

53.     With regards to paranoid thinking and delusions there is no necessity that the objects of the paranoia be extra-terrestrial beings, aliens etc.  In fact, paranoid delusions most often involve abnormal configuring of the usual objects and images of everyday life into unrealistic systems. Paranoia often involves people in the very existence of an afflicted person's--for example, a boss, a lover, a parent or sibling.  The person suffering from paranoia will place these usual objects into bizarre, and threatening situations and relate the potential danger wholly to themselves. The paranoia expressed by Mr. Schoolcraft--conspiracy of the police, the perception that they are out "to get him"-- is in fact a usual form of paranoid delusion. (Exhibit B at ¶ 16).

54.     Dr. Aldana-Bernier's assessment of Mr. Schoolcraft was consistent with a good standard of psychiatric care, including her reliance on the reports of others working in the emergency room and those providing supplementary information, such as the police.  As an emergency room psychiatrist she is limited in her time for conducting a full investigation of the circumstances surrounding a patient's thinking and behavior.  She has a short time to quickly assess the mental status of a patient, and, in

particular, to determine if he or she is a danger to themselves or others. This is not an exact analysis by any means.  But given the factors that she examined as they combined to form a profile of a disturbed person, she used good judgment admitting the patient for 48 hours to allow for a more extensive gathering of the facts and a period of stabilization for a better opportunity to assess the patient's psychiatric condition.  (Exhibit B at ¶ 17).

55.    The symptoms displayed by Mr. Schoolcraft, and testified to by Dr. Aldana-Bernier were sufficient to satisfy the substantial risk requirement for committal under New York Hygiene Law §9.39.  (Exhibit B at ¶ 18).

56.    Based on the medical records and Dr. Aldana-Bernier's deposition testimony, Dr. Aldana-Bernier did not base her determination pursuant to New York Mental Hygiene Law §9.39 using a potential risk standard in place of a substantial risk standard. (Exhibit B at ¶ 19).

57.    Dr. Aldana-Bernier's deposition testimony and medical records demonstrate Dr. Aldana-Bernier considered Mr. Schoolcraft a substantial risk pursuant to Mental Hygiene Law §9.39.  (Exhibit B at ¶ 20).

58.    Her testimony indicates that she believed use of the phrase "potential risk" was made in relation to a substantial risk; that plaintiff demonstrated the potential for substantial risk of harm to himself or others.  (Exhibit B at ¶ 21).

59.    Dr. Aldana-Bernier''s examination of plaintiff comported with the requirements of Mental Hygiene Law §9.39  and therefore she did not

depart from accepted psychiatric standards in  hospitalizing the plaintiff

for 48 hours observation.  (Exhibit B at ¶ 22).

**DEFENDANT ISAK ISAKOV, M.D. SETS FORTH**
**THE FOLLOWING ADDITIONAL MATERIAL**
**FACTS AS TO WHICH IT IS CONTENDED THAT**
**A GENUINE ISSUE TO BE TRIED**

1.      There is no testimony that Dr. Isakov made a decision to involuntarily

admit Mr. Schoolcraft because of potential or possible risk of dangerousness.

2.      Dr. Isakov made the decision to confirm the involuntary admission of

Mr. Schoolcraft was because his conduct demonstrated that he had a mental illness for

which immediate observation, care, and treatment in a hospital was appropriate and

which was likely to result in serious harm to himself or others (Affidavit of Isak Isakov,

M.D. dated February 11, 2015).

3.      Furthermore, Dr. Isakov's decision that there was a substantial risk of

physical harm to himself or possibly others was manifested by his presentation to the

hospital, the fact that he had no family members to care for him, that he was found to have

paranoid psychosis, and was anxious, suspicious, guarded, and restless.   His insight and

judgment were limited which give rise to risk that he would not safely care for himself

outside of the hospital and, again, without family or any other support in the vicinity.   The

inability to care for oneself is a factor to consider in a dangerousness assessment, and is

falls within the definition  set forth in Mental Hygiene Law §9.39 (". . . or other conduct

demonstrating that he is a danger to himself.").   Furthermore, the history given was that

the police psychologist had taken his gun and his badge away and he had been placed on

desk duty.   In that regard Dr. Isakov asked the plaintiff for permission to speak to the

police psychologist; but he refused.  In addition, there was other troublesome history in the

record given to Drs. Patel and Lwin in which the police indicated that Mr. Schoolcraft

had left work early after getting agitated and cursing his employer, that he then

barricaded himself in his home and the door had to be broken down.  The history

continued that he then agreed to go with the police but once outside his home he ran, had to

be chased by the police, and was brought to the emergency room in handcuffs.   Dr. Isakov

considered all of this in his dangerousness assessment leading to my conclusion that there

was a substantial danger to himself and possibly others if his admission was not

confirmed at that time.  (Affidavit of Isak Isakov, M.D. dated February 11, 2015.)

Dated:  March 6, 2015

s/NBS

_____

Nathaniel B. Smith
111 Broadway – Suite 1305
New York, NY 10006
(212) 227-7062