L. ALDANA-BERNIER

A. When they bring in a patient very agitated, combative, violent, depending on the nature of their call, I'm sure they were being brought by handcuffs.

Q. And do you recall as you sit here any of names of any of those patients?

A. No.

Q. And do you recall as you sit here a gentleman named Adrian Schoolcraft from only your memory?

A. Hold on. You're saying from my memory?

Q. Yes.

A. Because I have been reading the chart.

Q. Independent of the records, do you have any memory of Adrian Schoolcraft?

MR. CALLAN: Objection to the form of the question.

You can answer.

A. No, I don't.

L. ALDANA-BERNIER

Q. Okay. Can't describe him physically, can you?

A. No.

Q. So am I correct that your entire memory of any care or treatment you may have rendered to Mr. Schoolcraft is contained in the hospital chart of Jamaica Hospital?

MR. RADOMISLI: Objection to form.

MR. CALLAN: I join in the objection.

You can answer.

A. From it, yes.

Q. So your memory of care and treatment of Mr. Schoolcraft comes from the notes contained in the hospital chart of Jamaica Hospital, correct?

A. Yes.

Q. And prior to coming here today, did you review any documents?

A. The same, yes.

Q. What did you review?

A. The records [indicating].

L. ALDANA-BERNIER

A. The psych ER.

Q. And that wasn't done with Mr. Schoolcraft, correct?

A. Because we did not have a CPEP then.

Q. What does that stand for?

A. Community psychiatry emergency -- I do not have the whole name, sorry.

Q. But Jamaica Hospital has one now?

A. It has one, yes.

Q. When looking at Exhibit 70, is it your understanding this sets out what is required under 9.39 of the mental health law to admit someone under the mental health law?

MR. CALLAN: Objection to form.

MR. LEE: Objection to the form.

A. I want you to rephrase that one.

Q. Sure.

What is the standard set out in this document, if you know?

MR. CALLAN: Do you want her to

L. ALDANA-BERNIER

read the document, a summary?

MR. SUCKLE: I want to know her understanding of it.

MR. CALLAN: I object. It's a three-page piece of paper. It speaks for itself.

Objection to the form of the question.

Q. Do you know what this is?

A. Yes, it's a New York Mental Hygiene Law, that's careful attention with preservation of their legal rights as well as their safety.

Q. Is this the policy of Jamaica Hospital?

A. To do a 9.39?

Q. Is this document a policy of Jamaica Hospital?

A. It's showing in here Jamaica Hospital Department of Psychiatry Manual.

Q. Is it a policy of Jamaica Hospital, a written policy?

A. A written policy, yes.

Q. Do you endeavor to follow the

L. ALDANA-BERNIER

policies of Jamaica Hospital, the written ones?

A. The written, yes.

Q. In dealing with Mr. Schoolcraft, did you endeavor to follow the policy set forth here as Exhibit 70?

MR. CALLAN: Well, this says it was revised 4/10.

MR. SUCKLE: I asked her if she knew what --

MR. CALLAN: Well, we don't know.

MR. SUCKLE: It doesn't say revised. It says reviewed. Please don't speak. I asked her about --

MR. CALLAN: Are you making a representation this was the policy that was in effect at the time that Mr. Schoolcraft were seen?

MR. SUCKLE: I'm asking if she followed this policy, endeavored to follow this policy, whether it was in effect or not she can tell me.

MR. LEE: Objection to form.

A. It's saying in here, "Patient alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others may be admitted under this provision for a period of 15 days."

Q. The question is: Did you endeavor to follow this policy in your care and treatment of Mr. Schoolcraft?

A. At that point in 2009, I thought -- I believe that he may be a danger to others or to himself because of that point in time if you go back to the story where he was brought to the hospital because he was acting bizarre and agitated and he was paranoid. I think he was a danger to others or to himself.

Q. Is your answer, yes, you tried to --

A. That's what I'm saying, yes.

Q. Under this policy, under number

1 is "a substantial risk of physical harm to himself as manifested by threats of or attempts at suicide."

Did he manifest threats or attempts at suicide?

MR. SHAFFER: Objection.

MR. CALLAN: Objection.

Q. Did Mr. Schoolcraft manifest threats or attempts at suicide?

A. You have to finish.

Q. We are going to break it down. We are going to go one by one?

MR. CALLAN: Objection.

MR. SUCKLE: That's the question.

MR. CALLAN: Objection to the form of the question.

MR. SUCKLE: Noted. She can answer.

MR. CALLAN: The doctor said you left something out. You are reading incomplete sentences from a three-page document.

MR. SUCKLE: I'm asking

L. ALDANA-BERNIER

questions. In my horrific stumbling way, I'm asking a question.

Q. Doctor, did you admit Mr. Schoolcraft because he was a substantial risk of physical harm to himself as manifested by a threat or attempt at suicide?

A. Sir --

Q. Just yes or no.

A. Sir, you have to complete the statement.

Q. I don't have to do anything. You have to answer questions.

MR. SHAFFER: Objection.

A. "Or other conduct demonstrating he is a danger to himself."

Q. We're going to get there. I know that part. I'm asking you a question.

A. That's what I based --

Q. We are going to get to what you based your opinion on. I'm asking you: Did you base it on that he was a substantial risk of physical harm to

himself as manifested by a threat of or attempt at suicide?

MR. CALLAN: Objection, asked and answered.

MR. SUCKLE: Not answered yet.

Q. Yes or no?

MR. CALLAN: Objection, asked and answered.

Q. Can you answer, please?

A. A potential risk, yes.

Q. So you say he manifest by a threat or attempt at suicide; it that what you're saying?

A. A potential risk.

Q. Did he manifest by a threat of suicide?

A. It's the behavior that he came in with to the emergency room. I saw he was a potential risk that he might hurt himself or hurt others. That's a potential risk.

Q. So potential risk was the reason that you held him, correct?

A. That's the reason that I was

L. ALDANA-BERNIER

thinking that he needs admission.

Q. And the potential of that risk you've described to us already today?

A. I did, yes.

Q. And this potential of a risk, did the doctor who saw him within the 48-hour period to confirm his admission also tell you that he was concerned about the potential risk?

MR. RADOMISLI: Objection.

MR. LEE: Objection to the form.

MR. CALLAN: I join in the objection.

Q. Did he tell you he was concerned about the potential risk that you've just described?

MR. LEE: There's been no testimony she ever talked to him.

MR. SUCKLE: She can say that if that's the answer.

A. If you read the notes, I wasn't there for him to tell me that. As I read his notes, I can see he was a potential risk.

L. ALDANA-BERNIER

Q. This potential risk that you're talking about, did he have this potential risk when you last saw him?

A. I'm not basing it only to one day. I'm basing it from the beginning that he came into the hospital.

Q. And this potential risk, is there any other risk besides that potential risk that you just described as the reason that you held him?

A. What risk are you thinking of?

Q. I'm not thinking of any.

MR. CALLAN: Do you want her to repeat herself again?

MR. SUCKLE: No, I want to make sure there are no other ones.

Q. Is that potential risk that you just described the only reason that you held him?

A. The same reason I think when I see a patient, it is a potential risk and danger to others, and I make the decision I have to admit the patient.

Q. And when you say "potential

L. ALDANA-BERNIER

risk," can you quantify that for me at all what you mean by potential?

A. The patient comes in barricaded himself, acting bizarre. He was brought in from his house. It was a police officer who may have access to weapons, easy for him to have access to weapons. He is paranoid. I would think that maybe it would be safe if the patient will be admitted.

Q. So your thought he might be safe if he was admitted?

A. If he was admitted.

Q. That's what you were talking about when you say potential risk, correct?

A. All of the above that I told you.

Q. Can you quantify what you mean by potential risk as far as the likelihood of risk? This word "potential" that you have been using, can you quantify that for me?

A. When you say "quantify," what

do you mean?

Q. Sure.

Well, you used the word "potential." I would like to know what you mean by potential.

A. If you think of the navy yard disaster, was he an officer or army man? He was so quite, no one ever found out what was going on with him. So what happened then?

Or if you look at all of those -- the Range Rover. Who are all of these people that caused that? They are all police officers.

So if I think then I have to make sure that when I see a patient in the ER, I have to think in the future that there will be no disaster, there will be no destruction, or no one will get harmed when they were discharged from the ER.

Q. I was asking about what you meant by potential.

A. That's the potential.

L. ALDANA-BERNIER

Q. So if there is any potential at all, you want to make sure that the patient is safe, correct?

A. Correct.

Q. And if there is any potential at all, you want to make sure the community is safe, correct?

A. That's correct.

Q. And if there is any potential at all, you were going to admit Mr. Schoolcraft, correct?

MR. LEE: Objection to form.

A. With all of those reasons, yes, I would have to admit him.

Q. When you admitted him to the emergency room, there were certain rules and regulations --

MR. SUCKLE: Withdrawn.

Q. When he was admitted to the psych floor, there were certain rules and regulations in the psych ward, correct, about clothes they wear, what hours visitors can come, correct?

A. Yes.

L. ALDANA-BERNIER

Q. It's not like they are free to have anybody come and visit any time they want, correct; is that true?

A. That's correct.

Q. I will show you what's been marked as Exhibit 71.

Now, do you know what that is?

A. [No response.]

Q. Do you know what that is?

A. It's the policy of visiting hours.

Q. Were those the policies in effect when Mr. Schoolcraft was on the psychiatric floor at Jamaica Hospital in 2009?

A. Okay, this policy is for the inpatient unit.

Q. During the time that Mr. Schoolcraft was at Jamaica Hospital, was he in the inpatient unit?

A. I did not work in the inpatient unit.

Q. I understand.

Was he in the inpatient unit?