SM EXHIBIT DF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                                        PLAINTIFF,
                                        Case No:
          -against-                     10 Civ. 6005

                    (RWS)

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
Tax Id. 873220, Individually and in his Official
Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
NORTH GERALD NELSON, Tax Id. 912370, Individually
And in his Official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax Id. 895117, Individually and
In his Official Capacity, CAPTAIN THEODORE
LAUTERBORN, Tax Id. 897840, Individually and in his
Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
919124, Individually and in his Official Capacity,
SGT. FREDERICK SAWYER, Shield No. 2576, Individually
and in his Official Capacity, SERGEANT KURT DUNCAN,
Shield No. 2483, Individually and in his Official
Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
915354, Individually and in his Official Capacity,
LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
Individually and in his Official Capacity, SERGEANT
SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
#1-50, Individually and in their Official Capacity
(the name John Doe being fictitious, as the true
names are presently unknown) (collectively referred
to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
CENTER, DR. ISAK ISAKOV, Individually and in his
Official Capacity, DR. LILIAN ALDANA-BERNIER,
Individually and in her Official Capacity and
JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
DOE" # 1-50, Individually and in their Official
Capacity (the name John Doe being fictitious, as
The true names are presently unknown),

                                        DEFENDANTS.
-------------------------------------------------X

                    DATE: October 11, 2012

                    TIME: 10:20 A.M.

(Continued  ...)

DIAMO͏       ͏NG   (718) 624-7200   info@diamondreporting.

1

1

2                    DATE: October 11, 2012

3                    TIME: 10:20 A.M.

4

5

6                  VIDEOTAPED DEPOSITION of the

7    Plaintiff, ADRIAN SCHOOLCRAFT, taken by the

8    Respective Parties, pursuant to a Notice and

9    to the Federal Rules of Civil Procedure, held at

10   the offices of the New York City Law Department,

11   100 Church Street, New York, New York 10007, before

12   Nathan MacCormack, a Notary Public of the State of

13   New York.

14

15

16

17

18

19

20

21

22

23

24

25

A. SCHOOLCRAFT

1      A.      I don't know if I did, specifically.  But I was

2  aware other officers that wanted overtime would have to

3  adhere to the policy in order to explain how they could

4  have that overtime.

5      Q.      But you personally, do you, sitting here today,

6  recall ever losing overtime for failing to issue a certain

7  number of summonses?

8      A.      As I sit here today, I don't recall losing

9  overtime.

10      Q.      What officers did you observe lose overtime for

11  failing to issue a certain number of summonses?

12      A.      I don't recall any specify officer.  I just

13  recall that that was the general -- if an officer wanted

14  overtime, they would have to explain it.  And when there

15  was overtime, I recall being addressed by supervisors.  It

16  was understood.

17          The number was "two and two"; two summonses and

18  two 250's.  If the officer made a collar, they wanted the

19  -- the supervisor wanted that collar, that arrest to be

20  250'd.  And I think they -- you still weren't required to

21  do the summonses.  But it was "two and two," that was the

22  phrase.

23      Q.      When you say "two and two," what do you mean?

24      A.      Two summonses, two 250's, two stop, question and

25  frisks.

A. SCHOOLCRAFT

1    Q.    Per month?

2    A.    Per that overtime, per when you are -- that

3  mandated overtime, or if you requested it.

4    Q.    So if I understand you, an officer who was given

5  overtime, was required to issue two summonses and make two

6  arrests during that overtime shift?

7              MR. NORINSBERG:  Objection.

8    A.    As a minimum, yes.

9    Q.    At a minimum.

10             MR. NORINSBERG:  I think you misjudged.  He

11  said two -

12             MS. PUBLICKER:  He just said yes.

13             MR. NORINSBERG:  No, but he said two

14  summonses and two 250's.

15             MR. COHEN:  He said it two times.

16             MR. NORINSBERG:  He said it two times, then

17  you rephrased it the wrong way.

18             MS. PUBLICKER:  And then he said "yes."  I

19  am sorry if I misphrased it, but --

20             MR. NORINSBERG:  Do you want to clarify,

21  Adrian?

22             THE WITNESS:  What was the question?

23    Q.    When you say "two and two," you are saying -- if

24  I misstated you, then -- two summonses and two 250's, or

25  two summonses and two arrests per overtime shift?

A. SCHOOLCRAFT

1       A.      Two summonses and two 250's, two and two.

2       Q.      Okay.  What happened if they did not make that

3    two and two during their overtime shift?

4       A.      I don't believe they would -- they would not be

5    able to ask for overtime anymore.

6       Q.      Can you name a single person who was subject to

7    that policy?

8       A.      Not specifically.  But I believe you can -- the

9    overtime is documented very well.  You could see a pattern

10   of certain officers that have become dependent on overtime.

11      Q.      But have you ever seen an officer be refused

12   overtime because they did not hit the quota policy for

13   summons, you referred to earlier?

14      A.      I don't specifically -- I don't specifically

15   recall any officer or exact time.  But that was general

16   knowledge.

17      Q.      Did you ever suffer a tour change as a result of

18   failing to issue a certain number of summonses per month?

19      A.      No. I don't -- I was on the same tour for --

20   maybe three years straight.

21      Q.      Do you observe another officer suffer that

22   penalty?

23      A.      I don't recall any specific officer.  But I

24   recall officers getting in trouble.  In order to get back

25   to their desired tour, they would have to produce summonses

A. SCHOOLCRAFT

1    and arrests, more.

2        Q.    When you say was "officers in trouble," what do

3    you mean?

4        A.    A command discipline; in trouble, any numerous

5    reasons, violations or misconduct of the patrol guide.

6        Q.    Are these unrelated to the summons quota policy

7    you have referred to?

8        A.    What do you mean, "unrelated"?

9        Q.    So as I understand what you are stating, is that

10   officers would get in trouble, in some way, receive a

11   command discipline for a violation of department rules and

12   they would have their tour changed.

13           And then in order for them to make it back to

14   their preferred time, the original tour, they would have to

15   issue a certain number of summons; is that correct?

16       A.    Correct.

17       Q.    To -- so it's not that the officers had a tour

18   change because they failed to meet the quota policy that

19   you referred to, but that they had to make more summonses

20   in order to go back to the original tour?

21           MR. NORINSBERG:   Objection.

22       A.    There were instances like that.  But I believe

23   there were officers that had tour changes, vacation days

24   denied, overtime denied, based on the illegal quota policy.

25       Q.    Can you name one officer who that happened to?

A. SCHOOLCRAFT

1      A.      I don't -- I can't recall any specific officer,

2    but -- or one specific time.  But it was general knowledge,

3    you don't get overtime if you don't pay the rent; you don't

4    get your days off granted if you don't pay the rent.   If

5    you get in trouble, you have got to pay more rent.

6      Q.      Would anything refresh your recollection as to an

7    officer who had his tour changed because of the quota

8    policy?

9                    MR. NORINSBERG:  Objection.

10     A.      There might be recordings or documents that I

11   haven't seen that could refresh -- it's possible.

12     Q.      Are there any that you have seen in the past, but

13   don't have in front of you, that would refresh your

14   recollection?

15                   MR. NORINSBERG:  Objection.

16     A.      To the best of my memory, I haven't.  But it's

17   possible.

18     Q.      Were you ever denied vacation days as a result of

19   failing to issue a certain number of summonses?

20     A.      Whether -- there were vacation picks.  I never

21   had a vacation pick denied, and I -- it was such general

22   knowledge that, if you are not paying the rent, you are not

23   going to be granted a day off when you request it.

24             So I don't recall me, myself specifically, being

25   denied a day off.  But it was general knowledge.  That was

A. SCHOOLCRAFT

1    one of the --

2        Q.    Can you name a single officer who was denied a

3    day off because of failing to meet the quota policy?

4        A.    I don't specifically recall a name or a specific

5    time when an officer told me or I overheard.

6        Q.    During the point in time when you were receiving

7    acceptable performance evaluations, were you issuing the

8    number of summonses necessary to meet the de facto summons

9    policy?

10              MR. NORINSBERG:   Objection.

11       A.    Again, I wasn't keeping track of -- I was going

12   out there and answering calls, whatever my duty was for

13   that tour.  I never kept track of the number of summonses

14   and arrests I was doing.

15              If I had an arrest, I processed the arrest.  And

16   if I was assigned to court, I went to court.  And whatever

17   detail I was part of, I just -- I didn't keep track of

18   that.

19       Q.    We need to take a break now to change the tape

20   and the recording.

21              THE VIDEOGRAPHER:   The time is 11:48 a.m.,

22              this is the end of tape one.  We are going off

23              the record.

24              (Whereupon, an off-the-record discussion was

25              held, and a break was had.)

A. SCHOOLCRAFT

1    stopped pushing the issue.

2        Q.    Every single named defendant from the N.Y.P.D.,

3    you believe, would have benefited, if you did not speak out

4    against the issues you just mentioned?

5                MR. NORINSBERG:  Objection.

6        A.    In some way or another, yes.

7        Q.    How did you intend to speak out about the issues

8    you just described?

9        A.    Well at first, I felt it could be resolved within

10   the department, with the investigations.  But after

11   Halloween night, I became aware that they weren't -- it

12   would -- I think that's what convinced me that the public

13   had to be made aware, directly.

14       Q.    Since you decided that the public needed to be

15   made aware directly, have any defendants taken any steps to

16   prevent you from speaking out?

17                MR. NORINSBERG:  Objection.

18       A.    I believe so, yes.

19       Q.    What steps have they taken?

20                MR. NORINSBERG:  Objection.

21       A.    The driving some 300 miles to bang on my door,

22   and stand outside or park outside my apartment and prevent

23   me from going anywhere, creating that fear that they were

24   going to come in.

25       Q.    Did you eventually speak out against the issues

A. SCHOOLCRAFT

1    A.    If I didn't ask it, I assumed it would be

2    anonymous.

3    Q.    Did anyone from I.A.B. ever ask you if you wanted

4    to remain anonymous?

5    A.    I'm sorry, back to the other question.

6    Q.    Sure.

7    A.    Anonymous -- not anonymous to them.  But I assume

8    no one else would know that I was talking to Internal

9    Affairs, that's what I meant.

10   Q.    Did you ask I.A.B. to not share your information

11   with anyone?

12   A.    Again, I would -- I would assume that they were

13   only going to share it with other investigators.  That's

14   what I assumed.

15   Q.    When you spoke to Q.A.D., did you ask that your

16   identity remain anonymous, outside of Q.A.D.?

17   A.    I can't think of a reason why I would have to

18   state that.  I assume it would be between me and the

19   investigators.

20   Q.    Did anyone from Q.A.D. ever ask you if you wanted

21   to remain anonymous?

22   A.    I don't believe so, no.

23   Q.    Was the basis of the evidence you were presenting

24   to Q.A.D. and I.A.B., audio recordings that you made?

25           MR. NORINSBERG:  Objection.

A. SCHOOLCRAFT

1      A.      What was that again?

2      Q.      Was the basis of the evidence you were presenting

3  to I.A.B. and Q.A.D., audio recordings that you had made?

4              MR. NORINSBERG:   Objection.

5      A.      No, I don't believe so.

6      Q.      You had no intention of providing I.A.B. or

7  Q.A.D. the audio recordings you had made?

8              MR. NORINSBERG:   Objection.

9      A.      To the best of my memory, the recordings -- I

10  wasn't -- no, not at that time, or any time.   I don't

11  recall thinking about giving the recordings to anyone.

12     Q.      Did your I.A.B. Complaint, prior to October 31,

13  2009, allege retaliation against you?

14     A.      The date again, or just the whole question,

15  please.

16     Q.      Did your I.A.B. Complaint, prior to October 31,

17  2009, allege retaliation against you?

18     A.      Can you be more specific on what Complaint.

19     Q.      Did you make any Complaints to I.A.B. that anyone

20  had retaliated against you?

21     A.      I believe so.   Off the top of my head, what was

22  the -- it wouldn't be -- I believe they were asking me

23  about my 2008 evaluation appeal.   But I didn't feel I had a

24  case of retaliation yet.

25              I was -- I was waiting for the appeal to be

A. SCHOOLCRAFT

1  A. SCHOOLCRAFT

2  told me about it.

3  Q.   But you can't do better than

4  that? A week, a month?

5  A.   Well, I don't even remember

6  when -- when Deck told me, you know, the

7  specific date.

8  Q.   Do you have any entry, any

9  record anywhere, in an activity log?

10  A.   It's possible.  It's possible.

11  Q.   How did you get the statement

12  from --

13  MR. SMITH:  Wait.  Slow down.

14  I know it's late.  I know we're at

15  the third day, the end of the day.

16  Please, take your time.  Let him ask

17  his whole question and then give an

18  answer.  Okay?

19  Q.   After Deck told you, do you

20  believe you made an entry in your activity

21  log?

22  A.   It's possible but I don't

23  remember.

24  Q.   After you spoke with

25  Mr. Covell, how did he get his statement to

1                        A. SCHOOLCRAFT

2    you that is included in this exhibit?

3         A.    It's possible he e-mailed it to

4    me.

5         Q.    So you think you might have

6    received an e-mail from him?

7         A.    Correct.

8         Q.    Do you think you sent any

9    e-mail messages to him?

10        A.    That's possible.

11        Q.    What e-mail address were you

12   using at the time?

13        A.    That would have been the Time

14   Warner cable address.

15        Q.    Did you have an e-mail address

16   you could use at the precinct, or a

17   department e-mail address?

18        A.    Not that I'm aware of, no.

19        Q.    You never used any

20   NYPD-provided e-mail address?

21        A.    Not that I'm -- not that I

22   recall, no.  I don't recall having one

23   assigned to me or requesting one.

24        Q.    How many times did you speak

25   with Covell?

A. SCHOOLCRAFT

1

2     A.     I think I met him in person

3  twice, and I may have talked to him on the

4  phone three times, maybe more.

5     Q.     So, you met him in person after

6  Deck told you what had happened?

7     A.     Correct.

8     Q.     Did you consider this activity

9  on your part to be part of your duties and

10  responsibilities as a police officer?

11     A.     Yes.

12     Q.     Did you consider your

13  responsibility to report to anybody what

14  you were doing?

15     A.     Yes.

16     Q.     Who did you report it to?

17     A.     QAD.

18     Q.     Well, you reported it to QAD

19  when, in October of 2009?

20     A.     Correct.

21     Q.     And from October 2008 until

22  then, you hadn't reported it to anybody?

23          MR. SMITH:  Whoa.  Don't answer

24     that question.

25          You've already gone around this

589

1                    A. SCHOOLCRAFT

2          how many times about when this thing

3          happened when he spoke to Deck.  He's

4          already told you he doesn't remember

5          those dates.

6               MR. KRETZ:  All right.  Come

7          on, please.

8               MR. SMITH:  No, you, please.

9          If you're going to badger the witness

10         with those kind of questions we'll

11         come to a close.

12              MR. KRETZ:  We're not

13         badgering.  We're trying to figure

14         out what he recalls.

15         Q.    This is a significant incident

16     in your mind, right?

17         A.    Yes.

18         Q.    Something you were very

19     compelled to follow up to get the report

20     generated by the supposed victim and report

21     it to QAD and you can't tell me when you

22     did all of that?

23              MR. SMITH:  Don't raise your

24         voice, please.

25              MR. KRETZ:  I was just trying

590

A. SCHOOLCRAFT

1

2    to talk over you because I couldn't

3    get a question out.

4         MR. SMITH:   I object to the

5    form of the question.

6         A.    Like I said, I think it was

7    yesterday.   I did not know what QAD was

8    until I showed up at Gold Street and

9    Lieutenant Brill explained to me off the

10   record or on the record -- I believe he

11   explained it on the recording, also, that

12   they were who you report something like

13   this to.

14        Q.    You knew what IAB was, right?

15        A.    Yes.

16        Q.    Did it ever occur to you that

17   something like this could be reported to

18   IAB?

19        A.    Absolutely.   That's who I was

20   thinking to report this pattern to.

21        Q.    But until October 2009 it never

22   occurred to you actually do that?

23        A.    I'm not sure -- I may have

24   found out in October 2009.

25        Q.    That's what I'm trying to find