UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                                         Plaintiff,

            -against-

                                                              10-CV-06005 (RWS)

THE CITY OF NEW YORK, et al.,

                                         Defendants.
-----------------------------------------------------------------X


### DEPUTY INSPECTOR STEVEN MAURIELLO'S REPLY
### MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT


SCOPPETTA SEIFF KRETZ & ABERCROMBIE
Attorneys for Defendant STEVEN MAURIELLO
444 Madison Avenue, 30th Floor
New York, NY 10022
wakretz@seiffkretz.com
212-371-4500

Walter A. Kretz, Jr., (WK-4645)
Of Counsel

TABLE OF CONTENTS

Table of Authorities ......................................................................... iv

Preliminary Statement ...................................................................... 1

A.   A New Conspiracy Theory ........................................................ 1

B.   Another New Theory – Defendants Were Not Acting
     Within The Scope of Their Employment .................................... 3

C.   A Continuing Deceit .................................................................. 4

     1.   Evaluation Was Never Appealed By Schoolcraft,
          And Thus Never Ignored By NYPD ..................................... 5

     2.   Appeal Meeting Secretly Recorded and Union
          Delegate Properly Appeared to Assist Schoolcraft .............. 6

     3.   Schoolcraft, March 2009 – Said he was Being
          Retaliated Against Because of Appeal; Now Denies ............. 6

     4.   Restricted Duty – No Evidence Process Was "Manipulated"   7

     5.   Schoolcraft to IAB, September 2009 – Not Being
          Retaliated Against .............................................................. 8

     6.   Schoolcraft Twice Admits Not Authorized to Leave Early     9

     7.   Marino in Charge on October 31, 2009 ............................... 10

     8.   Chief Nelson Told IAB Marino was in Charge ...................... 10

     9.   Schoolcraft Listened to and Recorded
          Dr. Lamstein's Message ..................................................... 10

     10.  Recorder Not Voice Activated – Had to be
          Turned on by Schoolcraft ................................................... 11

     11.  Ferrara's Testimony ........................................................... 12

     12.  The September 20, 2007, Compstat Meeting ....................... 13

     13.  Sergeant Sawyer's November 1, 2009 Conversation
          with Mauriello .................................................................... 15

Summary of Mauriello's Motion     16

The Material Facts Are Not Genuinely In Dispute     18

A.   Schoolcraft's "Theory" that Mauriello, not Marino, was in Charge of the NYPD Response to the Events of October 31, 2009, is Unfounded     18

1.   Marino was in Charge     19

2.   Schoolcraft's Only Cited Evidence does not Indicate Mauriello was in Charge     21

a. "OK Teddy, you handle this" – was not a Sign Mauriello was in Charge (and was not a Direction to Lauterborn to Engage in Wrongful Conduct)     22

b. "Teddy, stop him" – not a Sign Mauriello was in Charge, not the Reason Chief Marino Made the Second Entry and not a Direction to Those who Made the Second Entry to Engage in Wrongful Conduct     25

B.   Schoolcraft's Theory that he was Retaliated against Throughout 2009 for Complaining about Illegal Quotas is Unfounded     26

C.   Schoolcraft's Theory that he was Retaliated against Throughout 2009 for Complaining about Misclassification of Complaint Reports is Unsupported     28

D.   Even if Someone in the 81st Precinct Learned of Schoolcraft's September 2, 2009, Call to IAB to Complain about Illegal Quotas and Crime Misclassification, or his October 7, 2009, meeting with QAD, No Adverse Action was Taken Against Schoolcraft in Response     29

E.   Lieutenant Caughey Properly Scratched Schoolcraft's Memo Book and then Had no Further Involvement with Schoolcraft or the Events of October 31, 2009     30

F.   Having Schoolcraft Return to the Precinct for an Interview Was Not a Violation of PG 206-13 – at 2:30 in the Afternoon or 9:30 at Night     31

G.   The Pending Charges Against Mauriello     33

POINT I
SCHOOLCRAFT'S FIRST AMENDMENT RETALIATION
CLAIM FAILS AS A MATTER OF LAW AND PRIOR RESTRAINT
PROTECTION SHOULD BEGIN NO SOONER THAN HIS
SUSPENSION BY CHIEF MARINO                                      34

A.      Summary Judgment                                       35

B.      Lane is Distinguishable as it Involved Retaliation
        For Subpoenaed Sworn Testimony                         38

C.      Matthews Provides Important Guidance, but the Speech
        There was Protected for Reasons not Present Here       39

D.      Application of the Matthews' Analysis                  41

        1.      The Legal Framework                            41

                a.      Schoolcraft's Speech not Protected     41

                        i. Matter of Public Concern            42

                        ii. Speaking as a Public Employee      42

                                a. Schoolcraft's Speech was an Official
                                Responsibility                 42

                                b. No Civilian Analogue to QAD
                                or the Speech to IAB           44

                        iii. Justification for Treating Schoolcraft Differently   45

                b.      No Causal Connection between Schoolcraft's
                        Speech and the Alleged Adverse Action   47

POINT II
MAURIELLO WAS NOT PERSONALLY INVOLVED IN ANY
VIOLATION OF SCHOOLCRAFT'S RIGHTS AND DID NOT PROVIDE
DIRECT INSTRUCTIONS TO ANYONE ELSE TO ENGAGE IN
WRONGFUL CONDUCT HARMFUL TO SCHOOLCRAFT               47

POINT III
PLAINTIFF'S CONSPIRACY CLAIM AGAINST
MAURIELLO FAILS AS A MATTER OF LAW                    49

CONCLUSION                                            52

TABLE OF AUTHORITIES

<u>Anemone v. Metropolitan Transp. Authority</u>,
    419 F.Supp.2d 602 (S.D.N.Y. 2006), aff'd on other
    grounds, 629 F.3d 97 (2d Cir. 2011)      50

<u>Connick v. Myers</u>, 461 U.S. 138 (1983)

<u>Cox v. Warwick Valley Cent. School Dist.</u>, 654 F.3d 267
    (2d Cir. 2011)      41

<u>Danielak v. City of New York</u>, No. 02-CV-2349 KAM),
    2005 WL 2347095 (E.D.N.Y. 2005)      50

<u>Dilworth v. Goldberg</u>, 914 F.Supp.2d 433 (S.D.N.Y. 2012)      50

<u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006)      35, 39, 41-43

<u>Gonzalez v. Bratton</u>, 147 F.Supp. 2d 180 (S.D.N.Y. 2001).
    aff'd, 48 Fed. Appx. 363, 2002 U.S. Dist. Lexis 21521
    (2d Cir. Oct. 12, 2002)      47, 48

<u>Griffin v. City of New York</u>, 880 F.Supp. 2d. 384
    (E.D.N.Y. 2012)      36

<u>Hagan v. City of New York</u>, 2014 U.S. Dist. Lexis 113847
    (S.D.N.Y., Aug. 15, 2014)      35, 36, 39

<u>Hill v. The City of New York</u>, WL 3591719 (E.D.N.Y. 2005)      52

<u>Hoffman v. Nassau County Police Department</u>,
    06-CV-1947 (SJF) (AKT), 2008 U.S. Dist. LEXIS 8279
    (E.D.N.Y. April 30, 2008)      50

<u>Huth v. Haslun</u>, 598 F.3d 70 (2d Cir. 2010)      36

<u>Jackler v. Byrne</u>, 658 F.3d 225, 235 (2d Cir. 2011)      41

<u>K.D. v. White Plains School District</u>, 921 F.Supp.2d at 210
    (S.D.N.Y. 2013)      51

<u>Lane v. Franks,</u> 134 S.Ct. 2369 (2014)      34, 35, 38-39, 45

Matthews v. City of New York, No 13-2915-cv
    (2d. Cir. 2015)                                       16, 35, 36,
                                                  39-45, 47

Quinn v. Nassau Cnty. Police Dep't, 53 F.Supp.2d 347
    (E.D.N.Y. 1999)                                      52

Romer v. Morgenthau, 119 F.Supp.2d 346
    (S.D.N.Y. 2000)                                     49

Roniger v. McCall, 72 F.Supp.2d 433 (S.D.N.Y. 1999)    51

Salgado v. City of New York, 2001 WL 290051
    (S.D.N.Y. 2001)                                     50

Webb v. Goord, 340 F.3d 105 (2d Cir. 2003)    49

Weintraub v. Bd. Of Educ. Of City Sch. Distr. Of City of N.Y.,
    593 F.3d 196 (2d Cir. 2010)    36, 42-44

Williams v. Smith, 781 F.2d 319 (2d Cir. 1986)    48

Yeadon v. New York City Transit Authority, et. al.,
    729 F.Supp. 204 (S.D.N.Y. 1989)    52

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                                        Plaintiff,

            -against-

                                                        10-CV-06005 (RWS)

THE CITY OF NEW YORK, et al.,

                                        Defendants.
-------------------------------------------------------------X

## DEPUTY INSPECTOR STEVEN MAURIELLO'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

### Preliminary Statement

Steven Mauriello's three-minute entry into Schoolcraft's apartment was not unlawful, and in any event he reasonably believed entry was justified under the circumstances.  Mauriello did not participate in any of the other alleged wrongdoing, and he did not conspire with anyone to engage in such wrongdoing. The claims alleged against Mauriello should be dismissed in their entirety.

Plaintiff has adopted new theories to help preserve his claims and his papers are riddled with material misrepresentations blatantly made to create the false impression there are genuine disputes about the facts.  His claims against Mauriello should not be permitted to go to trial.

A.      A New Conspiracy Theory

Until the filing of Schoolcraft's papers in opposition to defendants' motions for summary judgment, it had been Schoolcraft's position in this case – reaffirmed in the Third Amended Complaint (TAC) filed after the close of discovery -- that the conspiracy engaged in by the defendants was to enter his apartment, declare him an EDP, and have him admitted to the psychiatric ward at

Jamaica Hospital (TAC ¶¶ 2, 289-291). Mauriello's motion attacked Schoolcraft's conspiracy claims in reliance on the conspiracy as alleged.

Schoolcraft, however, now disavows that theory and argues that from the moment he left the precinct the conspiracy was hatched -- to direct him to go back to the precinct for questioning so he then could be suspended regardless of his responses (AS Rule 56.1(b) to Mauriello SMF ¶¶ 110, 116, 120, and 132). Defendants' motions no doubt made Schoolcraft realize the absurdity of the conspiracy theory he had been adhering to -- that defendants had conspired to take the steps they took during the second entry into his apartment – because by all indications the second entry simply was a response to evolving, unusual circumstances of Schoolcraft's own doing that could not have been anticipated and did not involve Mauriello (Mauriello SMF ¶¶ 99-105).

The new theory, however, is equally and perhaps more severely flawed than the old theory. It is based purely upon speculation about what would have happened if Schoolcraft had been interviewed, and does not even amount to a conspiracy. Instead, the initial response to Schoolcraft's departure was simple and appropriate and provided Schoolcraft with an opportunity to be heard and avoid immediate suspension. He chose not to cooperate (Mauriello SMF ¶¶ 67-76). The appeal of the new conspiracy theory must be that it involves Mauriello's participation in the initial decision to have Broschart make contact with Schoolcraft and tell him to return to the precinct for an interview, as if that decision alone implicates Mauriello in the blame for any of the alleged wrongdoing that occurred thereafter.

Even so, Schoolcraft should not be permitted to get away with such an eleventh-hour change in the essence of his claim.  Instead, it should be seen for what it is -- a maneuver to try to salvage his case and preserve his conspiracy claim against Mauriello for trial.

In any event, we will address below Schoolcraft's new theory, and demonstrate that dismissal of his conspiracy claim against Mauriello is required under the new theory, just as, or even more so than it was under his old theory.

B.    Another New Theory – Defendants Were Not Acting
      Within The Scope of Their Employment

Just as troubling is Schoolcraft's assertion of another new theory relating to the capacity in which the individual defendants were acting. The Third Amended Complaint, filed at the end of all discovery, repeatedly alleges defendants acted at all times in the normal course of their duties and in furtherance of the NYPD's interests (TAC ¶¶ 2, 10, 11, 12, 51, 240-44, and 302-12). In response to our inclusion of this repeated allegation as an undisputed statement of fact in our Rule 56.1 Statement (see Mauriello SMF ¶ 151), Schoolcraft not only denies it, but objects "on the ground that this is argument, not a statement of material fact."  He cites in support the 22-page statement of facts in the memorandum in support of his motion for summary judgment, without any page reference, and Point VI of his Memorandum in Opposition.

Remarkably, not a single word is written in Schoolcraft's Statement of Facts in support of his motion that indicates an argument, much less a relevant bit of information, suggesting any individual defendant acted in other than the normal course of his or her duties and in furtherance of NYPD's interests – as the TAC repeatedly alleges.  In addition, Point VI of Schoolcraft's Memorandum in

Opposition, which addresses the intracorporate conspiracy doctrine (pp. 38-42),[1] merely recites Schoolcraft's theory that the individual defendants knew he was reporting wrongdoing to QAD and IAB and were taking action to stop him, though they do not identify any fact or cite any evidence in Point VI to support this.

Schoolcraft should not be permitted at this stage of the case to so drastically change his theory of the case with respect to such a fundamental element of his claims.  This is not a case of alternative theories being offered at the pleading stage.  Schoolcraft does not cite any evidence, only speculation, about Mauriello learning of his contact with QAD or IAB, and even if he did learn of it, Schoolcraft does not cite any evidence Mauriello took any action in response to that information.  Most importantly, there is no evidence Mauriello acted in response to Schoolcraft's early departure for any reason other than to agree with Lauterborn to send Broschart to Schoolcraft's house to make contact with him and have him come back to the precinct for questioning.

In any event, despite the prejudice to defendants -- caused largely by the creation of the false appearance of a dispute about the material facts, and by the fact that defendants now have to address a posture never before adopted by Schoolcraft – we will address this new theory below and demonstrate that dismissal of Schoolcraft's claims against Mauriello is required under that theory, just as it is under his original theory.

C.    <u>A Continuing Deceit</u>

In conjunction with the foregoing change in the nature of the alleged conspiracy and the reversal of position regarding the capacity in which

---

[1]There are two sections of plaintiff's Memorandum in Opposition that are designated Point VI, but the other one does not discuss the capacity in which defendants acted (see pp. 62-66).

defendants allegedly acted, we believe Adrian Schoolcraft is perpetrating

misrepresentations upon the Court, just as he did with the NYPD, and they

pervade his opposition to the defendants' motions for summary judgment.  In the

following pages, we will try to make this clear as it relates to Mauriello's motion

so Schoolcraft's claims against Mauriello are properly dismissed without a trial.

       First, we would like to identify some of the more egregious

examples of plaintiff's misrepresentations.   To be clear, these are not genuine

disputes about material facts; they are demonstrable falsehoods.

1.    Evaluation Was Never Appealed By Schoolcraft,
     And Thus Never Ignored By NYPD

       Plaintiff asserts that he appealed his evaluation (TAC ¶ 89; AS Rule

56.1 ¶ 13-14 and 25) and that it was ignored by the defendants (TAC ¶ 113-

114).  In the alternative, plaintiff suggests that officials in the 81st Precinct created

a hostile environment to prevent plaintiff from appealing to "avoid the

repercussions to defendants which would follow", specifically the discovery of

"illegal quotas" and "falsified training logs" (TAC ¶ 87-89).  The evidence

unequivocally establishes he never appealed his evaluation, had been told

several times what he needed to do to appeal it, was fully aware he never

submitted an appeal, and no one did anything to interfere with his submission of

an appeal or the processing of it (Mauriello Rule 56.1(b) ¶¶ 22 and 36). In fact,

plaintiff admits that Mauriello forwarded Schoolcraft's correspondence regarding

an appeal to Patrol Borough Brooklyn North (AS SMF ¶ 23). This is a perfect

illustration of how Schoolcraft wanted to make it appear Mauriello and Brooklyn

North were trying to prevent his appeal from being heard, as if they had

something to fear, when it was not at all true.  It also is an indication of

Schoolcraft's continuing desire to get revenge against Mauriello for signing off on his poor evaluation, while also realizing he got the evaluation he deserved and had no chance of succeeding on appeal.

2.   Appeal Meeting Secretly Recorded and Union
     Delegate Properly Appeared to Assist Schoolcraft

Schoolcraft oddly denies the following statement:  "Plaintiff secretly recorded the appeal meeting, which was attended by all of his supervisors as well as by Deputy Inspector Steven Mauriello . . . ."  (AS Rule 56.1(b) to Mauriello ¶ 2).  First, Schoolcraft was secretly recording the meeting, and the recording itself reveals not only that Schoolcraft was asked if he was recording the meeting, but also his denial that he was doing so (Plaintiff's SMF ¶ 19).  Also noteworthy is Schoolcraft's complaint in his response that those in attendance "included a PBA union delegate without knowledge and consent of Officer Schoolcraft."  In the NYPD, union delegates are designated in every precinct to be readily available to provide assistance to officers as needed.  In this instance, the union delegate met alone with Schoolcraft before the meeting with all of his supervisors, and Schoolcraft secretly recorded their conversation.  Schoolcraft expressed no objection to the delegate about him being there to assist and he freely discussed the matter with the delegate (SM Exhibit D at 0:00-12:00).

3.   Schoolcraft, March 2009 – Said he was Being
     Retaliated Against Because of Appeal; Now Denies

We accurately quoted a statement made by Schoolcraft when speaking to Captain Lauterborn in their recorded March 16, 2009, conversation, but Schoolcraft has denied it. (See Mauriello SMF ¶ 6 and AS Rule 56.1(b) response.)  The quoted statement is as follows:  "I just feel my safety and the

6

public's safety is [sic] being compromised because of acts of retaliation . . . because of [the] appeal," Schoolcraft's denial that he said this simply is false.  In fact, the complete statement by Schoolcraft is as follows:  "I just feel my safety and the public's safety is [sic] being compromised because of the acts of retaliation. I assume because I appealed my evaluation…In fact, I know it is." (SM Exhibit E at :08-:25.)  Schoolcraft disavows the statement no doubt for at least two reasons: i) it was established in discovery that he never appealed his evaluation (see Mauriello Rule 56.1(b) ¶¶ 22 and 36, and paragraph 1 above); and ii) he wants the Court to think his real belief was that he was being mistreated for his supposed objection to illegal quotas and crime misclassification, even though that is equally untrue as he had not expressed concern about such things until September (and only to IAB). (See Mauriello SMF ¶ 31 and Mauriello Rule 56.1(b) ¶¶ 37 and 40.)

4.     Restricted Duty – No Evidence Process Was "Manipulated"

Plaintiff asserts – without citing any evidence in support -- that defendants "manipulated" NYPD procedures to get Schoolcraft placed on restricted duty (AS Rule 56.1(b) response to Mauriello ¶ 10).  In fact, it is overwhelmingly clear he was placed on restricted duty as a direct result of seeking the clearance from the NYPD Medical Division to return to work after taking eight days off at the direction of his private physician.  Such clearance always is required of any member of the service who is out of work for a certain number of days (SM Exhibit H, NYPD's Patrol Guide section 205-01).  He was advised by his physician to take those days off due to stress and anxiety (AS Rule 56.1(b) response to Mauriello ¶¶10 – 15).  Dr. Lamstein, the NYPD

psychologist, made the determination to place Schoolcraft on restricted duty with no input from anyone at the 81st Precinct, after Schoolcraft was referred to her by the Department physician (SM Exhibit F, Lamstein Dep. pp. 56-57 ll. 14-17).

In paragraph 39 of Schoolcraft's responses to the City Defendants' Statement of Material Facts, he states the following: "Plaintiff contends, as noted above, that Defendant Mauriello initiated the series of disciplinary actions and medical and employee assistance program referrals that were designed to have Officer Schoolcraft 'psyched'." No evidence is cited in support of this fabricated theory, and none of the preceding responses ("noted above") make any reference to any action engaged in or initiated by Mauriello.

There also is no evidence cited by plaintiff indicating any action taken by anyone that had any bearing on Dr. Lamstein's decision to place Schoolcraft on restricted duty. In fact, plaintiff acknowledges not having any evidence that any of the defendants had any contact with the Medical Division or with Dr. Lamstein (AS Rule 56.1(b) response to Mauriello ¶ 21).

5.    Schoolcraft to IAB, September 2009 – Not Being Retaliated Against

We accurately quoted a statement made by Schoolcraft to IAB on September 2, 2009, but Schoolcraft has denied saying it. (See Mauriello SMF ¶ 27 and AS Response.) The quoted statement is as follows: Schoolcraft told IAB "he doesn't feel he is being retaliated against from the Members of his Command and has no problems with his supervisors and peers." There is no doubt Schoolcraft said this to IAB[2] (see SM Exhibit BG, NYC 4317) as it is the same position he and his father rehearsed for him to say a few weeks later to QAD

---

[2] We did not anticipate the denial of an obvious undisputed fact, so we attach Schoolcraft's deposition testimony on October 11, 2012 confirming that he did not feel he had a "case of retaliation" at the time he reported to IAB (SM Exhibit DF, AS1 p. 262 ll. 19-24).

(see Mauriello Rule 56.1(b) Additional Facts ¶¶ 9-12).  He probably denies it now not only because the recording of his conversation with his father reveals it is an inaccurate statement of how he feels.  He also denies it because the fact that he actually said it to IAB and QAD reveals how he was trying to deceive them.[3]

6.   Schoolcraft Twice Admits Not Authorized to Leave Early

We asserted that "Schoolcraft did not get authorization to leave work early" (see Mauriello SMF ¶ 42), but Schoolcraft denies the statement, which is simply wrong.

This particular lie is critical to understanding the events that followed Schoolcraft's early departure.  His recording of the events in the precinct confirms he was told not to leave (Mauriello SMF ¶¶ 42-44; Mauriello Rule 56.1 responses ¶¶ 57-59). His recorded statement in his car after he left confirms he understood he was told not to leave (Mauriello Rule 56.1(b) response ¶ 57; SM Exhibit Q at 7:30.25-7:30.45).  His recorded statement in his apartment to Captain Lauterborn confirms he understood he did not have permission to leave (Mauriello SMF ¶ 89; SM Exhibit S at 3:00-4:30). Sergeant Huffman explained in her P.G. interview at the end of the night of October 31, 2009, that she told him not to leave (Mauriello SMF ¶ 37; SM Exhibit T at 2:00-3:00 and 6:45-7:20).  The recorded interview of Police Officer Rodriguez at the end of the night indicates not only that she was told by Sergeant Huffman to tell Schoolcraft not to leave (Mauriello SMF ¶ 37; SM Exhibit U at 10:00-11:00), but also that she told Police Officer Rudy to go into the men's locker room and say so to Schoolcraft ( Mauriello 56.1(b) ¶ 57).  Finally, Schoolcraft's recording reveals that Police

---

[3] IAB pretty much figured this out (see SM Exhibit CR).  QAD, on the other hand, either did not figure it out, or did, but was improperly influenced to find "something"/"anything" wrong with Mauriello's conduct. (See Mauriello Rule 56.1(b) response ¶ 125.)

Officer Rudy told him not to leave (SM Exhibit Q at 7:25.40-7:26.00; Mauriello Rule 56.1(b) ¶ 57). (See generally Mauriello Rule 56.1(b) ¶¶ 57-59.)

Thus, there can not be the slightest doubt that at 2:30 in the afternoon it was appropriate to try to make contact with Schoolcraft to direct him to come back to the precinct for an interview.  (And seven hours later, it was even more appropriate to do so.)  (See discussion below regarding PG 206-13.)

7.    <u>Marino in Charge on October 31, 2009</u>

Plaintiff insists, without evidentiary support, that Mauriello, not Chief Marino, was in charge throughout the evening of October 31st (Plaintiff's Rule 56.1(b) responses to Mauriello SMF ¶¶ 83-84, and to City Defendants' SMF ¶ 31).  The overwhelming evidence, however, is to the contrary, which we recite in a separate section below (p. 18).

8.    <u>Chief Nelson Told IAB Marino was in Charge</u>

Plaintiff represents that Chief Nelson – who was not present for any of the events of October 31, 2009 -- told IAB that Chief Marino was not in charge on October 31, 2009, and plaintiff cites an IAB memo in support (AS Rule 56.1(b) response to Mauriello ¶ 83).  In fact, the cited IAB memo says that Nelson told IAB it was his understanding Marino was in charge (see POX 6).

9.    <u>Schoolcraft Listened to and Recorded Dr. Lamstein's Message</u>

We asserted that on October 31, 2009, "Schoolcraft listened to Dr. Lamstein's message -- [telling Schoolcraft to call her so everything "can be resolved in two minutes" (see Mauriello SMF ¶¶ 74-75)] -- then played it back to record it on one of his recorders."  (See Mauriello SMF ¶¶ 74-75.)  Schoolcraft's response is as follows: "Denied.  The cited evidence does not support the

10

assertion that he listened to it." The evidence we cited is SM Exhibit R, which is

a disk containing three recordings. The third recording, named

"DS500011.WMA" with a Date Modified of 10/31/2009 6:29 PM, is Schoolcraft's

recording of the telephone message left by Dr. Lamstein. As you hear the voice

of the answering machine in the background, Schoolcraft announces: "OK,

October 31st, Dr. Lamstein called." Next heard is the message of Dr. Lamstein,

which we set forth in Mauriello SMF ¶ 75. When the message from Dr. Lamstein

ends, we again hear the answering machine, and then Schoolcraft speaks, as

follows: "Alright, 31st of October 2009, that was Dr. Lamstein calling me."

Not only is it deceitful of Schoolcraft to respond the way he has –

that is, to say "the cited evidence does not support the assertion that he listened

to [Dr. Lamstein's message]" -- but it also highlights the fact that Schoolcraft has

not bothered to submit an affidavit on this or any other subject to address any of

the facts which he purports to dispute without citing any evidence. Of course, in

this particular instance, it also highlights that Schoolcraft was provided an

opportunity by Dr. Lamstein to resolve the situation "in two minutes" simply by

calling her back, but he chose to ignore it (Mauriello SMF ¶ 76).

10.   Recorder Not Voice Activated – Had to be Turned on by Schoolcraft

Schoolcraft claims the hidden recorder of the entries into his

apartment was "voice-activated" (AS Rule 56.1(b) response to Mauriello ¶¶ 78-

79), but this was not so, as is revealed by the recording itself (SM Exhibit S; see

Mauriello SMF ¶ 78-79). After the first entry into Schoolcraft's apartment had

ended, and everyone had left, and the apartment was vacant, the recorder

continued to record the near-silence until the second entry occurred two minutes

11

later. Then, after the second entry ended, and everyone had left, and the apartment again was vacant, the recorder again continued to record for another five and a half hours, until approximately 4 a.m., when it either reached capacity or its battery ran out (SM Ex. S 0:30.00-6:15.50. The directions for the recorder explain that when the recorder is in voice-activation mode, it will cease recording one second after audible sound ceases (see SM Exhibit DG, instructions for recorder owned by Schoolcraft.) So, why this lie by Schoolcraft that the recorder was operating in voice-activated mode?   For present purposes, it simply matters he again has lied in furtherance of his overall deceit.[4]

11.   Ferrara's Testimony

Plaintiff asserts that P.O Ferrara, assigned to the 81st Precinct in April 2009 through 2010, testified at his deposition that he "witnessed first-hand the quota and [crime report] downgrading system run by DI Mauriello and the system of retaliation that supported the quota system." Plaintiff made no specific reference to Ferrara's deposition transcript, however, because Ferrara denied there were quotas in the 81st Precinct (SM Exhibit DH, Ferrara Dep Tr. p. 81 ll. 9-20), and testified he never witnessed downgrading of crime and was never asked to change a crime classification. (See POX 39, Ferrara Dep. Tr. p. 75 ll. 16-20.)

---

[4] What the lie tells us is Schoolcraft had to turn the recorder on before NYPD entered his apartment, which contradicts his story he was sleeping and had taken Nyquil because he was sick. We know from his recordings that he was not sick and had no reason to take Nyquil. (see SM Ex. R, DS500010WMA at 6:05-8:00, Schoolcraft's discussion with his father about what ailment he should pretend to be suffering.) Thus, he no doubt was wide awake and turned on the recorder when the NYPD was preparing to enter, just as he was wide awake throughout the evening (see AS Rule 56.1(b) to Mauriello SMF ¶ 67).

12.    The September 20, 2007, Compstat Meeting

On what must be seen as another instance of purposeful misrepresentation, or in this instance, perhaps, convenient ignorance, plaintiff argues as follows at page 89 of his Memorandum in Opposition:

> The broader policy context for Mauriello's aggressive use of disciplinary charges and poor evaluations to intimidate officers to meet quotas was displayed at a September 20, 2007 meeting of Compstat . . . . At that meeting, Chief Nelson responded to questions about low arrests, summons and stop and frisk reports ('250s') by telling NYPD Chief Esposito that he has "problematic squads' in the Borough precincts. When Chief Esposito asked Chief Nelson what he was going to do about the 'problem,' Nelson replied that Chief Marino had taken a personal interest in the matter, and that we will tell them that their low activity will affect their evaluations.

Plaintiff cites in support of this argument the Compstat Video for September 20, 2007, at 58:00-120:00 (POX 44), but the video reveals plaintiff's story simply is wrong. First, Chief Nelson does not appear in the video. Second, he does not speak during the 62-minute span cited. Third, he only speaks during a 45 second span starting just after the two-minute mark of the video, and says nothing at all about what plaintiff attributes to him. Fourth, at about the six-minute mark, Chief Esposito asks a representative of the 88th Precinct – not Brooklyn North or the 81st Precinct -- if he has "problematic squads," and he says it does. That representative – not Chief Nelson – then speaks of taking the poor performance of the problematic squads in his precinct into account in the officers' evaluations. No mention is made of Chief Marino during any of that discussion.

> The continuation of plaintiff's story is as follows:

> At that same Compstat session, DI Mauriello described from the podium that he will 'micro manage' and review the activity for all squads at the end of each tour and described denying overtime for at least a month for a

13

sergeant whose squad produced 'minimal 250's and no C's.' This is an absolute distortion of the conversation.

First, at the time of the meeting, Mauriello was a captain and the executive officer of the 81st Precinct. He was at the podium at the Compstat meeting, however, in his capacity as what is known as the Impact Captain. As he explained at the meeting (POX 44 at 1:02 – 1:22), in that capacity, he was assigned to manage squads from six different precincts, each made up of a sergeant and eight officers. The squads were assigned by their precincts to work late shifts, referred to as Impact Overtime, under the direction of Mauriello. Mauriello explained that in that capacity he would review the activity of the Impact Overtime squads to make sure they were properly doing their jobs. In particular, he was responding to a concern expressed by Chief Esposito that officers were spending too much time in their station houses, rather than out on patrol, thus defeating the purpose of having them work overtime to address crime conditions. He did not mention any squad producing "minimal 250s and no Cs".

The discussion turned to faulting squad sergeants for allowing two or three officers at a time to wait in the station to process two or three related arrests, when one officer from each group was sufficient. Mauriello responded he would not want the commanding officer of such a sergeant to assign him to Impact Overtime for a month if he was not prepared to better manage his squad to do the Impact Overtime work they were assigned to do. Who was assigned, however, would be up to the commanding officers, not Mauriello.

14

13.   Sergeant Sawyer's November 1, 2009 Conversation with Mauriello

Another small, but troubling deceit in plaintiff's papers is as follows:

On November 1, 2009, Mauriello was not on duty, but apparently called the precinct and was told Sergeant Sawyer was at the hospital with Schoolcraft. Mauriello apparently asked that Sawyer call him. Sawyer testified that he called Mauriello while Sawyer was on his way back to the precinct. Mauriello does not recall speaking with Sawyer, but there is nothing surprising or sinister about him calling to check on the status of Schoolcraft after the bizarre events of the night before. Sawyer recalls calling Mauriello and telling him Schoolcraft was admitted to the hospital. Sawyer said he does not recall anything else said in the conversation. (See SM Exhibit DI, Sawyer Dep. pp. 111-12.) Plaintiff represents to the Court, however, that Sawyer testified as follows: "Mauriello wanted to know if Officer Schoolcraft had been successfully admitted to the psychiatric ward." (See AS Rule 56.1(b) response to Mauriello SMF ¶ 134.) That is not what Sawyer said or intimated, and there is no evidence of any kind that Mauriello was trying to get Schoolcraft admitted to the psychiatric ward, or thought that it would be a success if he were admitted.

The foregoing are not inadvertent errors or honest mistakes. They are misrepresentations about material facts designed to create the appearance yjere are genuine disputes about the material facts. What they actually illustrate, once the falsehood is revealed, is the lack of merit to Schoolcraft's claims against Mauriello, and the improper lengths to which he will go to try to preserve them.

<u>Summary of Mauriello's Motion</u>

Schoolcraft's First Claim For Relief pursuant to 42 U.S.C. section 1983, alleging prior restraint of his First Amendment rights, fails as a matter of law against Mauriello – whether First Amendment protection attaches as of the date Schoolcraft last met with IAB (November 9, 2009) and then went upstate, the moment he was told by Chief Marino on October 31, 2009, that he was going to be suspended once he received a medical exam at the hospital, or some earlier date (if this Court were to determine, though we think doing so would be incorrect, that an earlier date is called for by the decision just released by the Second Circuit in <u>Matthews v. City of New York</u>, which we discuss below). Mauriello simply did not participate in any of the alleged wrongful prior restraint, and nothing Schoolcraft has argued creates a genuine issue of any material fact related to his claim against Mauriello. (See Point I, <u>infra</u>.)

Schoolcraft's second through sixth claims for relief under 42 U.S.C. section 1983, for false arrest, malicious abuse of process, excessive force, failure to intercede and unlawful search and entry, fail as a matter of law against Mauriello, and none of the facts or the law cited by plaintiff should alter that conclusion. As each defendant is liable only for his own misconduct (see Point II and Mauriello's original Memorandum Point II, p. 17-19), Mauriello is not liable for Schoolcraft's alleged arrest as Mauriello was not present for nor involved in it, and Schoolcraft's Second Claim For Relief, to the extent it is asserted against Mauriello, should be dismissed. So, too, should Schoolcraft's Third Claim For Relief, alleging malicious abuse of process, his Fourth Claim For Relief, alleging unlawful use of force, and his Fifth Claim For Relief, alleging a failure to

intercede, be dismissed to the extent they are alleged against Mauriello. (See Point II and Mauriello's original Memorandum Point II, p.17-19.)

With respect to Schoolcraft's Sixth Claim For Relief, alleging an unlawful entry into and search of Schoolcraft's apartment, Mauriello's entry, as directed and led by Chief Marino, was justified under the circumstances, as fully discussed in our original memorandum.  Mauriello remained in the apartment for no more than three minutes, and during that time none of the other allegedly unlawful conduct occurred.  Even if the Court were to find that the initial entry into Schoolcraft's apartment was unlawful, Mauriello should have qualified immunity for his brief participation in that entry, and thus shielded from going to trial.  (See Mauriello's original Memorandum, Point II, v, p.21.)

Schoolcraft's Eighth Claim For Relief for conspiracy to violate his civil rights under 42 U.S.C. section 1983 fails as a matter of law against Mauriello pursuant to the intracorporate conspiracy doctrine and the absence of any viable conspiracy that was intended to cause of did cause a violation of Schoolcraft's constitutional rights.  This is so regardless of the conspiracy theory espoused by Schoolcraft – the original theory that the conspiracy was to engage in the acts taken during the second entry into Schoolcraft's apartment, or the newly asserted theory that the conspiracy was to have Schoolcraft brought back to the precinct for questioning and then suspended regardless of his answers.

Schoolcraft argues that the intracorporate conspiracy doctrine does not apply to the circumstances of this case, but the cases cited for that proposition are unavailing, as are his arguments that the personal interest exception should apply.  There is no evidence to support the original conspiracy

theory, and there is no evidence that the newly alleged conspiracy was a conspiracy at all.  (See Point III, infra.)

THE MATERIAL FACTS ARE NOT
GENUINELY IN DISPUTE

It becomes apparent from a review of Schoolcraft's response to Mauriello's Statement of Material Facts Schoolcraft's principal opposition to Mauriello's motion consists of his theories of what happened, typically bolstered by misrepresentations of the evidence, such as we have described above.  The responses thus falsely suggest genuine disputes about material facts.

There are other instances of unfounded theories espoused by Schoolcraft that require more lengthy discussion, as follows.

A.     Schoolcraft's "Theory" that Mauriello, not Marino, Was in Charge of
          the NYPD Response to the Events of October 31, 2009, is Unfounded

Schoolcraft continues to insist that Mauriello, not Assistant Chief Michael Marino, the Executive Officer of Patrol Borough Brooklyn North, was in charge of NYPD's response to Schoolcraft's actions on October 31, 2009.  (See Plaintiff's Rule 56.1(b) response to Mauriello SMF ¶ 41, 58, 59, and 83.) Schoolcraft disingenuously embraces this "theory" because he would have it provide a simple solution to his goal of blaming everything on Mauriello and keeping him in the case.  The record, however, is clear that once Chief Marino arrived at the 81st Precinct in the early evening of October 31, 2009, he was in charge of NYPD's response for the remainder of the evening.

Prior to Chief Marino's arrival at the 81st Precinct and his discussion with Captain Lauterborn, Lauterborn was in charge of the response, as Marino himself told IAB (SM Exhibit DJ at 30:30-31:00, Marino IAB interview).

18

In the early stages, Lauterborn consulted with Mauriello -- for example, about calls to be made and about having Lieutenant Broschart go out to Schoolcraft's house (SM Exhibit DJ at 7:50-8:00). Lauterborn was the Duty Captain for Patrol Borough Brooklyn North (see PMX Ex. 23, Lauterborn report referring to himself as "Duty Captain"), and in that capacity was responsible to respond to unusual incidents. As the afternoon and evening progressed, he called in officers from the Brooklyn North Special Investigations Unit (SIU) to go to Schoolcraft's house with him. Before they left, Chief Marino arrived at the precinct and directed them on what to do thereafter. There is no genuine dispute about any of this.

## 1. Marino was in Charge

Thus, the following can not genuinely be disputed:

a) Marino held a superior rank to Mauriello and, as an Assistant Chief and the Commanding Officer of Patrol Borough Brooklyn North, was Mauriello's boss (Mauriello SMF ¶ 53. SM Exhibit AD, Marino Dep. p. 219, ll. 4-11).

b) Without consulting Mauriello, Marino took charge of NYPD's response to the Schoolcraft matter when he arrived at the 81st Precinct in the early evening and met Lauterborn and the PBBN SIU officers, who Lauterborn had assembled to go to Schoolcraft's residence in Queens. (See Mauriello SMF ¶ 54. SM Exhibit AD, Marino Dep. pp. 223-31; SM Exhibit AC, Gough Dep. pp. 113-114.)

c) Without consulting with Mauriello, Marino directed Lauterborn and the SIU officers on how they should proceed once they arrived at Schoolcraft's residence, and told them to keep him informed. (See Mauriello SMF ¶ 55; SM Exhibit AD, Marino Dep. p. 230, ll. 4-11; SM Exhibit AC, Gough Dep. pp. 113-114; SM Exhibit AE, Duncan Dep. p. 87, ll.12-13.)

d)  Later in the evening, Marino entered the 81st Precinct and spoke to

Mauriello in his office and told Mauriello he was going out to Schoolcraft's

residence and he wanted Mauriello to go there.  (See Mauriello SMF ¶  57; SM

Exhibit C, Mauriello Dep. p. 336, ll. 16-23; Mauriello Affidavit ¶ 8.)

e)  When he arrived at Schoolcraft's residence, Marino took charge and

gathered the officers present, including Mauriello, who arrived at the same time

as Marino, and gave instructions on how the operation would proceed (Mauriello

SMF ¶ 66., SM Exhibit DJ at 26:20-26:30).

f)  Marino directed that entry was to be made into Schoolcraft's apartment

(Mauriello SMF ¶ 66).

g)  Marino directed how entry was to be made (SM Exhibit DJ at 29:50-

30:05).

h)  Marino earlier directed that ESU should be notified to respond to the

scene (SMF 55), and they arrived before entry was made (SM Ex. AJ, NYC 432).

i)  Marino also directed that EMS should be notified to respond to the scene

(see SM Exhibit DJ at 39:30-40:00);  they, too, arrived before entry was made

(SM Ex. AJ, NYC 432).

j)  Marino directed that if Schoolcraft was unharmed and fit to leave the

apartment, he would be directed to return to the precinct for questioning (see SM

Exhibit DK, Mauriello Dep. Tr. p. 366; SM Exhibit DL, Marino Dep. Tr. pp. 272-

274) with a legal representative present, just as two other officers remained at

the precinct for the same purpose (see SM Exhibit U); (earlier in the afternoon of

October 31st, when Schoolcraft had first left work early and could not

immediately be reached, Mauriello and Lauterborn sent Lieutenant Broschart to

make contact with Schoolcraft and to tell him to return to the precinct for questioning (see Mauriello 56.1(b) ¶ 65).

k)   During the first entry into Schoolcraft's apartment, but after Mauriello had already left, Marino decided, and told Schoolcraft, without consulting Mauriello, that Schoolcraft would be suspended after he was taken, as he agreed, to a hospital for a medical exam (Mauriello Rule 56.1(b) ¶ 88).

l)   When Schoolcraft went back inside his apartment, Marino, without consulting with Mauriello, made a second entry into the apartment, joined by PBBN Duty Captain Lauterborn and the PBBN SIU officers -- but not joined by Mauriello (Mauriello SMF ¶¶ 112-124).

m) While in the apartment during the second entry, Marino declared Schoolcraft an EDP, out of the presence of Mauriello and without consulting with Mauriello (Mauriello SMF ¶¶ 119-121 and SM Exhibit S at 18:00-23:00).

n)   While in the apartment during the second entry, Marino, without consulting Mauriello, directed that Schoolcraft be handcuffed, carried out of the apartment to the waiting ambulance, and taken to Jamaica Hospital (see Mauriello SMF 119-121 and 124).[5]

2. Schoolcraft's Only Cited Evidence does not
   Indicate Mauriello was in Charge

Despite all of the foregoing, Schoolcraft clings to the argument that Mauriello, not Chief Marino, was in charge of the NYPD response to Schoolcraft (Schoolcraft Memorandum in Opposition pp. 94-95 and AS Rule 56.1(b) response to Mauriello ¶¶ 83-84).  He falsely cites in support the IAB memo of its

---

[5] The references to Marino not consulting with Mauriello are not a criticism and do not suggest any impropriety.  Marino was the Executive Officer of Patrol Borough Brooklyn North and had the absolute authority to make the decisions he did without consulting with Mauriello.

interview of Chief Nelson, the Commanding Officer of PBBN, which we discussed above.  His only other support for the argument that Mauriello, not Marino, was in charge is two phrases uttered at the scene – one clearly uttered by Mauriello in Schoolcraft's apartment, and the other not uttered by Mauriello, though for purposes of this motion we do not dispute that it was uttered by him because one witness (Lauterborn) has testified it might have been him who uttered it.

### a. "OK Teddy, you handle this" – was not a Sign Mauriello was in Charge (and was not a Direction to Lauterborn to Engage in Wrongful Conduct)

The phrase clearly uttered by Mauriello, which Schoolcraft interprets as Mauriello being in charge and giving orders to engage in wrongdoing without regard for Marino, who was at his side, is "OK Teddy, you handle this." (See Mauriello SMF ¶¶ 85, 86.)  This was said by Mauriello to Lauterborn after Marino told Mauriello to speak with Schoolcraft and the following exchange between Schoolcraft and Mauriello took place:  Schoolcraft said "I'm fine".  Mauriello then said "Well, you are going to come back to the precinct with us," which is what Marino had directed and what Mauriello and Lauterborn had hoped to achieve at the inception of Schoolcraft's departure from the precinct. Schoolcraft then said "Well, if I'm forced to.  It's against my will."  At that moment, Mauriello said "OK Teddy, you handle this" and left the apartment. Marino, Lauterborn and the SIU officers remained, soon to be joined by the EMS personnel.  (See Mauriello SMF ¶¶ 84-87.)

Schoolcraft claims that by saying "OK Teddy, you handle this" Mauriello, in effect, was directing Lauterborn to forcibly remove Schoolcraft from his apartment and bring him to the precinct for an interview that would result in Schoolcraft's suspension regardless of his answers – the conspiracy that

supposedly was hatched when Schoolcraft first left the precinct seven hours earlier. Remarkably, however, what happened to Schoolcraft after Mauriello left the apartment (and while Marino remained there in charge) was that Schoolcraft was persuaded to cooperate and to leave his apartment voluntarily to return to the precinct (Mauriello SMF ¶ 97). When he then claimed (while talking on the phone with his father) to be sick (as he and his father had earlier rehearsed) (Mauriello SMF ¶ 98 and Mauriello Rule 56.1(b) ¶¶ 87 and 91), he was offered and accepted medical attention from the EMTs (Mauriello SMF ¶ 99). He then agreed to go to the hospital for a medical examination, and left the apartment voluntarily (Mauriello SMF ¶ 100).

While the events then took an erratic turn (Schoolcraft turned around and went back inside), Mauriello's statement "OK Teddy, you handle this" not only was not a sign he was in charge, since Marino was present and Mauriello was doing as Marino had directed, but also it did not mean Lauterborn should forcibly remove Schoolcraft from his apartment. Clearly that was not done until Schoolcraft went back inside, Marino, Lauterborn and the SIU officers followed him, and Marino declared him an EDP (Mauriello SMF ¶¶ 105-20).

In addition, Schoolcraft's insistence that he would have been suspended if he had agreed to return to the precinct and answered questions is unfounded speculation. Surely, suspension very well might have been the outcome of the interview, especially if it were conducted after Schoolcraft left early while disregarding an order not to leave, remained unresponsive for seven hours, and ultimately failed to provide an explanation for disregarding the

Sergeant's direction not to leave.[6]  On the other hand, if Schoolcraft were to have explained in an interview that he had left work early because he had been frightened by Lieutenant Caughey after Caughey scratched his memo book, and had called IAB from his apartment to complain about the way Caughey had acted, it is much less speculative, in fact it probably is an absolute certainty, that no further action would have been taken that night with respect to Schoolcraft, as all inevitably would have deferred to IAB's review of the matter.

If it is too speculative to say Schoolcraft would not have been suspended if he had cooperated and explained himself fully, including his call to IAB, it nonetheless cannot be said there was anything sinister or improper about directing Schoolcraft to come back to the precinct to be interviewed.  (See discussion below of Patrol Guide section 206-13.)  It is important to emphasize that if Schoolcraft had returned to the precinct, his interview would have been recorded, just as the interviews of the other officers were recorded that night, and Schoolcraft would have had a legal representative, provided by his union, present for the interview, just as one was present when the other officers were interviewed that night.   (See SM Exhibit T and U, interviews of Huffman and Rodriguez night of 10/31/09.) In other words, his interests would have been properly respected as NYPD tried to find out why Schoolcraft left early and disregarded the sergeant's order that he not leave until he had permission.

---

[6] We discuss above (pp. 1-3) and in Point III below plaintiff's new conspiracy theory – that the goal from the inception of the response to Schoolcraft's early departure from the precinct was to have him come back to the precinct for an interview and then suspend him regardless of his answers.  It is especially certain that if Schoolcraft returned immediately to the precinct and in his recorded interview told of how Caughey frightened him, so much so that he called IAB to report it, Schoolcraft would not have been suspended at that time, and all would have deferred to IAB's review of the matter.

b. "Teddy, stop him" – not a Sign Mauriello was in Charge,
not the Reason Chief Marino Made the Second Entry and
not a Direction to Those who Made the Second Entry to
Engage in Wrongful Conduct

Plaintiff repeatedly alludes to the phrase "Teddy stop him" as something Mauriello said when Schoolcraft started to head back inside his apartment, and as evidence Mauriello was in charge and responsible for everything that happened during the second entry. (See AS Responses to Mauriello SMF ¶¶ 87, 111, 112, 114 and 131.) For purposes of this motion, we do not dispute Lauterborn said it might have been Mauriello who said it (though Mauriello denies it). The only questions for now are whether it matters who said it and whether the statement has any significance. The answer to both is NO.

First, Lieutenant Gough, one of the SIU officers, told IAB in his interview on July 15, 2010, that when Schoolcraft turned around to head back inside, he called out to Chief Marino that Schoolcraft was running back inside and Chief Marino said "Billy, follow him" (SM Exhibit AG at 9:45-10:05). Gough did so, as did Lauterborn, the other two SIU officers, Hawkins and Duncan, as well as Chief Marino. Thus, Chief Marino, who was in charge, had decided Schoolcraft should be followed and Chief Marino was one who did so. Mauriello did not follow them back inside, and Chief Marino did not direct him to do so.

Of course, even if Mauriello also said to Lauterborn "Teddy stop him," it hardly was a direction that would override Chief Marino's decisions once he, Lauterborn and the SIU officers went back inside.

B.   Schoolcraft's Theory that he was Retaliated against
       Throughout 2009 for Complaining about Illegal Quotas is Unfounded

In his opposition papers, Schoolcraft has taken the position, essentially expressed as a "theory," that although he <u>never</u> mentioned "illegal quotas" to anyone at the 81st Precinct and never complained about illegal quotas to NYPD's IAB until September 2009, he and his attorney had indicated concern about reliance upon "numbers" in the 2008 evaluation of Schoolcraft, such that those spoken to would have known Schoolcraft was complaining about illegal quotas and consequently retaliated against him throughout 2009 for doing so. (see AS 56.1(b) response to Mauriello SMF ¶ 4.)

The record reveals no genuine disputes about any material facts relating to illegal quotas, but fatal flaws in plaintiff's argument, rendering it invalid:

1.   The only quotas illegal in 2008 and 2009 were quotas for traffic violations, and NYPD did not have a policy prohibiting quotas for any other violations or criminal activity (SM Exhibit BW; Mauriello Rule 56.1(b) ¶ 7).

2.   There were no quotas imposed on officers in the 81st Precinct in 2008 and 2009, as IAB later concluded, and as every officer who was questioned later testified (Mauriello Rule 56.1(b) ¶ 9).

3.   Schoolcraft himself did not know of any number for any kind of police activity that he was required to satisfy, and never was penalized for failing to achieve any specific number (SM Exhibit DF AS1 pp. 61-65 ll. 2- 5).

4.   There is no evidence anyone in the 81st Precinct knew or believed, even after Schoolcraft complained for the first time to IAB in September 2009, that Schoolcraft had a complaint about illegal quotas.

26

5.      Schoolcraft does not allege that his performance in 2008 was a protest against illegal quotas and does not allege that anyone understood his poor performance in 2008 to be a protest against illegal quotas.

6.      Though Schoolcraft now argues that he spoke at his February 2009 appeal meeting in a way that everyone should have understood to be a complaint about illegal quotas, his recording of that meeting reveals that argument simply is untrue (SM Exhibit D).  At the meeting, Schoolcraft was focused purely on his own evaluation, not any alleged practice by NYPD of imposing illegal quotas. Schoolcraft asked early in the meeting "what's the standard" by which he was being measured.  Assuming for purposes of this discussion that by "standard" he meant "number", he did not assert that it was inappropriate to have a number by which to measure his or any other officer's performance, but clearly suggested he needed to know the standard or the number so he would know what was expected of him.  He spoke of not being properly counseled, of his evaluation score not being properly calculated, and of his evaluation being based upon activity in the field without regard for anything else he did.  No mention or even insinuation was made about illegal quotas. Ultimately, and in a response to a question by Schoolcraft about a "standard," he was assured by Mauriello that "there is no standard." Mauriello added "there is no line where I judge good and bad activity, I highlight everything … you've got to do something out there." (See Mauriello 56.1(b) response ¶ 18.)

7.      Schoolcraft also argues that his attorney's letter to Mauriello several days after the appeal meeting (PMX 8) should have been understood to indicate that Schoolcraft was complaining about illegal quotas (AS Rule 56.1(b)

responses to Mauriello ¶¶ 24 and 26). To the contrary, the attorney's letter not only does not mention illegal quotas, but also does not speak in terms that could have been properly interpreted to mean illegal quotas. He explained that Schoolcraft's evaluation was based "on his alleged lack of 'activity' related to his number of arrests and summons issued," but that is not a description of an illegal quota, and surely in 2008 an officer's evaluation could properly take into account whether there were enough indications he was doing his job while out on patrol. In Schoolcraft's case, the consensus among his supervisors was that he was not adequately doing his job, but not because he failed to achieve specific numbers for specified activities (see SM Ex. D (appeal meeting recording) and SM Ex. A (Schoolcraft's 2008 evaluations)). In addition, the attorney clearly had not been fully informed by Schoolcraft about the status of his appeal or the discussion at the appeal meeting. If he had intended to allege that there were illegal quotas (which again only applied at the time to traffic violations), he failed to make that known; and, Schoolcraft ultimately never filed his appeal, so to the extent the basis of the appeal would be an ambiguous objection to illegal quotas, it never was asserted. (See discussion of evaluation above, at p. 5.)

C.    Schoolcraft's Theory that he was Retaliated against
      Throughout 2009 for Complaining about
      Misclassification of Complaint Reports is Unsupported

         Schoolcraft has taken the position his supervisors knew he was concerned about crime misclassification and retaliated against him for that concern throughout 2009 until he was taken to Jamaica Hospital on October 31st. However, he ignores the fact he never mentioned anything to anyone about crime misclassification, not even ambiguously at his appeal meeting or in

his attorney's letter following the meeting (SM Ex. D and PMX 8), until he spoke

to IAB in September 2009 (SM Exhibit BG).

D.    Even if Someone in the 81st Precinct Learned of Schoolcraft's
      September 2, 2009, Call to IAB to Complain about Illegal Quotas and
      Crime Misclassification, or his October 7, 2009, meeting with QAD, No
      Adverse Action was Taken Against Schoolcraft in Response

            Following Schoolcraft's call to IAB on September 2, 2009, when he

complained for the first time about illegal quotas and crime misclassification (see

SM Exhibit BG), there is no evidence of any "adverse" action taken against him

prior to October 31, 2009.  On October 27, 2009, Dr. Lamstein had him come to

her office because she was told Schoolcraft's father had called NYPD officials to

complain he did not know why he was on restricted duty.  Schoolcraft recorded

that meeting, which reveals he was reminded why he was placed on restricted

duty, and was again told to see a psychologist and undergo cognitive behavioral

therapy (Mauriello 56.1 (b) ¶ 33; SM Ex. N; SM Ex. L).

            Schoolcraft also made an appointment to see Sergeant Devino, the

personnel sergeant for Patrol Borough Brooklyn North. She explained, and he

acknowledged, that he had not submitted his appeal.  She also explained to him

he still could do so, and told him what he needed to do (SM Exhibit CE at 4:00-

5:00).  Devino also told Schoolcraft that he had many months earlier mistakenly

been placed on "force monitoring" when he should have been formally placed on

"performance monitoring" by the Employee Management Division at police

headquarters, which was the standard practice for anyone with an annual

evaluation below 3.0.  She indicated that he by then was properly placed on

performance monitoring (Mauriello 56.1(b) ¶ 22 and 26; SM Ex. CE At 3:00-6:00).

E.    Lieutenant Caughey Properly Scratched Schoolcraft's
      Memo Book and then Had no Further Involvement with
      Schoolcraft or the Events of October 31, 2009

        Lieutenant Caughey properly scratched Schoolcraft's memo book on the morning of October 31, 2009, and saw entries by Schoolcraft referring to QAD, IAB and police officer Astor, with telephone numbers, but nothing indicating whether they actually spoke or the substance of any communication they might have had (Mauriello Rule 56.1(b) ¶ 53). Caughey left work at 12:00, after leaving a copy of the memo book in a folder or envelope in Mauriello's desk drawer. Mauriello arrived at the precinct at 2:30, just as Schoolcraft was on his way down to the locker room on his way home, but Mauriello was unaware of the memo book and did not look at it (Mauriello 56.1(b) ¶¶ 54-56). Caughey spoke to Mauriello on November 1, 2009, about Schoolcraft leaving and what happened at his house, but not about the memo book. They spoke about the memo book for the first time when they were both next on duty on November 2, 2009 (SM Rule 56.1(b) ¶ 44). We, of course are skeptical that Schoolcraft left work at 2:30 because he was afraid of Caughey, who had left at noon. This is especially so since Schoolcraft's recording of his interaction with Caughey in the morning does not indicate anything audible uttered by Caughey that might be considered menacing and Schoolcraft doesn't allege any particular words or gestures that were menacing other than Caughey was wearing his gun in an unusual way.

        In any event, even accepting Schoolcraft's story as true, Caughey had no further involvement in the events of October 31, 2009, and no further communication with any of the participants regarding Schoolcraft on that day – and there is no evidence to the contrary (Mauriello Rule 56.1(b) ¶ 54).

F.     Having Schoolcraft Return to the Precinct for an Interview Was
       Not a Violation of PG 206-13 – at 2:30 in the Afternoon or 9:30 at Night

            Plaintiff claims that requiring him to return to the precinct for an

interview would have been a violation of his due process rights as it would have

violated Patrol Guide section 206-13.  (See Schoolcraft Response to Mauriello

SMF 95.)  He is wrong.  Section 206-13 provides that 1) "members of the service

who are the subject of an official investigation . . . shall be given a reasonable

period of time to obtain and confer with counsel prior to questioning," and 2)

"[i]nterrogations of members in routine noncritical matters should be scheduled

during business hours on a day when the member is scheduled to work."  (SM

Ex. BF, NYPD Patrol Guide 206-13.)  In this case, Mauriello (and the other

individual defendants) did not violate 206-13, and even if they did, they certainly

had a reasonable, good-faith basis for believing they were in compliance with it.

            When Schoolcraft left the precinct and Lauterborn and Mauriello

were told by the desk sergeant he disregarded her order not to leave until he

received proper authorization, it was 2:30 in the afternoon and an hour remained

on Schoolcraft's tour.  Deciding shortly thereafter that Schoolcraft should be told

to return to the precinct for an interview thus was consistent with when 206-13

says interviews should be conducted in routine noncritical matters.  In addition,

since it was only mid-afternoon when Schoolcraft left, he easily would have had

more than "a reasonable period of time to obtain and confer with counsel prior to

questioning" if he had returned to the precinct within a reasonable time.  Thus,

the decision to have Broschart try to establish contact with Schoolcraft and to tell

him to return to the precinct did not come close to running afoul of 206-13.

31

In the early moments after Schoolcraft's departure, it certainly could not be said that his behavior was routine. By the time Broschart was on his way to Schoolcraft's house, it was known that Schoolcraft was not responding to any calls, which added to the non-routine nature of the event. Then, when Broschart learned that Schoolcraft's car was in the neighborhood, but Schoolcraft was not responding to calls or knocks on his door, it became even less routine, especially since he claimed to be sick and would be expected to be home. As day began to turn into early evening without any contact being made with Schoolcraft, and there was an increasing appreciation of the fact Schoolcraft was on restricted duty, it began to appear that what might have been seen initially as "noncritical," was in fact becoming potentially very critical.

Captain Lauterborn reached out to Dr. Lamstein and to Schoolcraft's father, but they were ineffective in putting Lauterborn in contact with Schoolcraft. At that point, the level of concern was great enough (in the terms of 206-13, crossing over from noncritical to critical) such that Captain Lauterborn, as the Duty Captain for Patrol Borough Brooklyn North, decided to call in officers assigned to the NYPD's Special Investigations Unit (SIU) to go with him to Schoolcraft's house. As they were preparing to leave, Chief Marino arrived at the 81st Precinct and gave instructions to Lauterborn and the SIU officers.

Thus, for purposes of section 206-13, by the time Chief Marino arrived at the 81st Precinct, Schoolcraft's departure had evolved into a situation that clearly was not routine, and was increasingly becoming critical due to fear that he might be at risk of hurting himself (and, in the process, others). Therefore, it properly became the goal to locate and make contact with

Schoolcraft, to find out about his well-being, and, if he was in good condition, to require him to return to the precinct for an interview.

Since the situation thus became neither "routine," nor "noncritical", there was no requirement to have Schoolcraft's interview conducted at some later date when he was scheduled to be on duty. As for the requirement of 206-13 that Schoolcraft "be given a reasonable period of time to obtain and confer with counsel prior to questioning," there would be no difficulty complying, just as there was no difficulty complying with that requirement with respect to the interviews conducted of the two other officers. They were interviewed at approximately 11:30 p.m. with their union-provided attorney present.

As all of this relates as well to plaintiff's new conspiracy theory, it is clear that requiring an officer to appear for an interview pursuant to 206-13 – during his day tour when the matter is not routine, but not yet critical, or during the 4:00 to 12:00 tour when the matter has become potentially very critical and even less routine – is not a conspiratorial act. It is established NYPD procedure designed to let NYPD quickly and effectively investigate unusual incidents involving members of the service. What ever the outcome, Schoolcraft would have had the opportunity to challenge its validity, but he chose not to cooperate.

G.    The Pending Charges Against Mauriello

As we explained in our original memorandum (p.2) with respect to the pending administrative charges against Mauriello, Steven Mauriello emphatically denies any involvement in an alleged illegal NYPD quota policy or any alleged practice within the NYPD of falsifying complaint reports in order to distort COMPSTAT statistics. For purposes of this motion, he does not challenge

such allegations.  However, IAB found there were no illegal quotas imposed on the officers in the 81st Precinct. (See Mauriello Exhibit CR, the IAB Report.)  Five administrative charges were brought against him in October 2010 based in part on an audit conducted by QAD, apparently triggered by Schoolcraft's allegations, but for purposes of Schoolcraft's assertions, we point out that QAD reviewed approximately 1200 complaints prepared by the 81st Precinct over nearly a year and found that less than two percent were improperly prepared.  Mauriello's charges fault him for his role in only <u>one</u> of those reports.  (In other words, contrary to plaintiff's assertiion in his memorandum, there was no finding "that DI Mauriello . . . improperly permitted rampant downgrading and suppression of crime reporting.")  (See Plaintiff's Memorandum in Opposition p.98; and Mauriello Exhibit CK, the QAD report.)

Beyond that, the charges claim that Mauriello impeded the QAD investigation because they concluded his answers were not forthcoming in his QAD and IAB interviews.  There is a long list of reasons why the charges are unfounded, but for now, it need only be said that Mauriello ultimately expects to have the charges fully resolved in his favor.  Until then, we trust Schoolcraft would agree that just because you are the subject of an administrative charge does not mean the charge is true or will be resolved against you.

POINT I
SCHOOLCRAFT'S FIRST AMENDMENT RETALIATION CLAIM<br>FAILS AS A MATTER OF LAW AND PRIOR RESTRAINT PROTECTION<br>SHOULD BEGIN NO SOONER THAN HIS SUSPENSION BY CHIEF MARINO

In his memorandum in opposition to our motion and the City Defendants' motion, plaintiff claims we ignored a 2014 Supreme Court case, <u>Lane v. Franks,</u> 134 S.Ct. 2369 (2014), which should change this Court's

analysis as set forth in its 2012 ruling barring the plaintiff's First Amendment retaliation claim and setting the parameters for his First Amendment prior restraint claim. This Court properly was guided by the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410, 418 (2006), and for the reasons discussed below, we believe the decision in Lane should not change this Court's analysis or its rulings relating to plaintiff's First Amendment claims.

We bring to the Court's attention, however, a recent decision by the Second Circuit in Matthews v. City of New York, No. 13-2915-cv (2d Cir. 2015), which, though distinguishable from this case, does partially influence the analysis of the First Amendment issues. Ultimately, however, for the reasons discussed below, this Court's decision barring plaintiff's First Amendment retaliation claim, and attaching First Amendment prior restraint protection no sooner than the moment Schoolcraft was told by Chief Marino he would be suspended, should stand. As discussed in our original memorandum, we believe plaintiff's First Amendment protection actually should not have attached until his last meeting with IAB on November 9, 2009.

A.    Summary Judgment

As a primary matter, the plaintiff incorrectly claims that "courts are now denying motions for summary judgment where there are questions of fact about whether the reporting of misconduct was part of the employee's ordinary job functions." (See Plaintiff's Memorandum in Opposition p. 21.)  Plaintiff cites Hagan v. City of New York, 2014 U.S. Dist. Lexis 113847 (S.D.N.Y., Aug. 15, 2014), but reliance on Hagan clearly is misplaced. The court in Hagan was ruling on a motion to dismiss, not a motion for summary judgment. The court noted,

however, that once the record was developed, it would be in a position to rule on whether the plaintiff was performing ordinary job responsibilities and the discovery would reveal whether reporting alleged misconduct was "actually expected or permitted, much less tolerated, in practice." Id., quoting Griffin v. City of New York, 880 F. Supp. 2d. 384, 397 (E.D.N.Y. 2012.)

Second, the implication that summary judgment is not the proper procedure for deciding this issue is simply not the law. The record here is well developed as to whom Schoolcraft spoke (QAD and IAB), the subject matter of that speech (alleged illegal quotas and crime misclassification), the NYPD policy concerning such speech (officers are obligated to report wrongdoing by other officers), and Schoolcraft's understanding of that policy (he was obligated to report wrongdoing). Despite the issue being a mixed question of fact and law, the Second Circuit has consistently decided that the issue of whether an employee is speaking according to his official duties is a matter of law. (See, e.g., Huth v. Haslun, 598 F.3d 70, 74 (2d Cir. 2010);  and Weintraub v. Bd. Of Educ. Of City Sch. Distr. Of City of N.Y., 593 F.3d 196 (2d. Cir. 2010). See also Connick v. Myers, 461 U.S. 138, 148 n. 7 (1983) ("the protected status of speech is one of law, not fact").

Thus, because the legal issue of whether an employee is speaking according to his official duties is so fact sensitive, a careful reading of Lane and Matthews is necessary to properly apply their reasoning to plaintiff's First Amendment claims in this case.  For that purpose, we first summarize the record as to any speech identified by Schoolcraft and the NYPD policy relating to it.

When Schoolcraft received his poor evaluation for 2008, he was invited to a meeting, as required, with his 81st Precinct supervisors. (See Mauriello SMF ¶¶ 1-2.) During the meeting, held on February 25, 2009, Schoolcraft asked about the "standard" by which he was being evaluated, and he complained he was not properly counseled during the year; supervisors did not tabulate the evaluation number correctly; and supervisors were basing his evaluation on activity in the field without regard for everything else. (See SM Ex. D.) Schoolcraft never mentioned any objection to alleged illegal quotas or to the misclassification of crime or any broader social concerns about NYPD policy.[7]

The record indicates that following the appeal meeting, the only speech of any substance expressed by or for Schoolcraft through October 31, 2009, was as follows:  i) the follow-up letter from Schoolcraft's attorney in early March regarding his evaluation (PMX 8) ; ii) the March 16, 2009, call Schoolcraft made over the borough-wide radio channel asking for a duty captain to come to the location where he was faulted by Lieutenant Weiss for being off post for half an hour (for which we were not provided a recording),[8] and the following (secretly recorded) conversation Schoolcraft had with Lauterborn where he indicated he felt he was being retaliated against because of his (never-filed) appeal (SM Ex. E); iii) a confidential conversation he had with Dr. Lamstein in April 2009 regarding his stress and anxiety, which resulted in him being placed on restricted duty (Mauriello SMF ¶¶ 8-16 and 22 ; iv) the confidential complaint he filed with IAB on August 24, 2009 about Caughey and Weiss accessing Weiss's unofficial

---

[7]  Schoolcraft has not validly indicated any earlier occasion on which he expressed himself that relates in any way to any of the claims he has asserted.

[8]  Ignored by plaintiff is the fact that the police officer who was on his post speaking at length with Schoolcraft also was issued a command discipline for participating in unnecessary conversation with an officer (Schoolcraft) he knew to be off post.  (See SM Ex. DM, Command Discipline, NYC 10416.)

personnel file (which ultimately was found to be unsubstantiated) (SM Ex. AJ

and CR); v) David Durk's call to IAB on August 30, 2009, about the Caughey-

Weiss matter (SM Ex. CR); vi) Schoolcraft's confidential call to IAB on

September 2, 2009, where he spoke for the first time about illegal quotas and

misclassification of crime (SM Ex. BG; and vii) Schoolcraft's confidential meeting

with QAD on October 7, 2009. (SM Ex. BR)

      For different combinations of reasons, none of the identified speech

and none of the action allegedly taken to retaliate against Schoolcraft for it or

interfere with it provides a basis for a First Amendment retaliation claim while on

the job or a prior restraint claim once he was suspended (or last met with IAB).

Schoolcraft's First Amendment rights did not attach until he was suspended or

soon thereafter, when he was no longer on the job.  He thus could not suffer

retaliation.  He did, however, become entitled to prior restraint protection when

he was told he would be suspended, as this Court earlier ruled, (or after his

November 9, 2009, meeting with IAB).  Thereafter, he would be speaking as a

private citizen about some matters of public concern, including alleged illegal

quotas, alleged misclassification of crime, and the events of October 31, 2009.

B.     <u>Lane</u> is Distinguishable as it Involved Retaliation
        <u>For Subpoenaed Sworn Testimony</u>

      In <u>Lane</u>, a director of a statewide program was subpoenaed to

testify before a federal grand jury regarding a fraudulent, no-show job given to an

Alabama state representative. When Lane testified truthfully before the grand jury

regarding alleged graft, he was subsequently fired as the program's director. The

Supreme Court held that Lane's ordinary job requirements were not to give

sworn testimony in court, and that Lane had an independent obligation to testify

truthfully as a citizen. <u>Lane</u>, 134 S.Ct. 2369, 2379 (2014).  He therefore was

protected from retaliation by the First Amendment.

      Plaintiff attempts to cast the <u>Lane</u> decision as requiring a public

employer to specify on a performance evaluation form every possible duty an

employee might be asked to perform, or to otherwise ensure that the employee

performs the task regularly, in order to properly take any action in response to an

employee's speech or conduct.  (See Plaintiff's Memorandum in Oposition p.21-

22.)  Such an excessive and overbroad interpretation of <u>Lane</u> is simply

impractical and misguided.  See <u>Matthews</u> at 14.

      <u>Lane</u> was clear, the "speech at issue" must be "*ordinarily within the*

*scope* of an employee's duties." (<u>Id</u>. at 2373, *emphasis added*.) It does not

require an employee to perform the task as a routine or habit, or that the

employee receive some identifiable benefit for making the speech. Moreover, a

concurring opinion in <u>Lane</u> made clear that <u>Garcetti's</u> "pursuant to official duties"

standard remains good law.  <u>Hagan v. City of New York</u>, 39 F.Supp. 3d 481

(S.D.N.Y. 2014).  <u>See Lane</u>, 134 S.Ct. at 2383 (J. Thomas, concurring) (2014).

In other words, if the employee speaks in furtherance of his official duties, that is

sufficient, even if he does not regularly engage in such speech.

C.      Matthews Provides Important Guidance, but the Speech
          <u>There was Protected for Reasons not Present Here</u>

      In <u>Matthews</u>, a police officer complained over a two year period to

two separate commanding officers about an alleged quota system that he

believed was "damaging to the NYPD's core mission." <u>Matthews</u>, at 4. The

district court held that Matthews spoke pursuant to his duties as an NYPD officer

and was not entitled to First Amendment protection. The Second Circuit

disagreed and held that "when a public employee whose duties do not include formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." Matthews, at 18.  According to the Court, speaking to a Commanding Officer about an NYPD or precinct policy is something an ordinary citizen regularly got to do at the Commanding Officer's open public meetings with the people of the community.  Thus, Matthews is distinguishable from this case in critical ways and ultimately does not materially alter the conclusions this Court reached in its 2012 decision.

Here, Schoolcraft's duties also did not include participating in the formulation of policy, but, unlike in Matthews, he did not engage in speech with anyone responsible for formulating policy.  Instead, he complained to QAD and IAB about specific incidents of what he purportedly perceived to be wrongdoing, and identified as many supposed participants as allegedly were known to him.  In addition, Schoolcraft did not report to IAB, and especially did not report to QAD "in a manner in which ordinary citizens would be expected to engage," as we discuss below  Finally, he has acknowledged that he spoke to QAD and to IAB because he understood it was his obligation to do so as an NYPD police officer. (See Mauriello Ex. DF, AS3 pp. 586-588 ll. 8-20.)

In Matthews, the plaintiff officer spoke to his commanding officers about an arrest quota policy at his precinct.  The officer did not complain about specific instances of wrongdoing, did not contact IAB or QAD to report any wrongdoing, and did not complain about any participants in such wrongdoing.

The Second Circuit in Matthews set forth a structured analysis to arrive at its conclusion that Matthews' speech was protected. We apply that approach below, which yields the conclusion that Schoolcraft's speech prior to being told by Chief Marino he would be suspended or up to his last meeting with IAB on November 9, 2009, was not protected, as it was speech of a public employee, just as this Court ruled in its 2012 opinion.

D.    Application of the Matthews' Analysis

    1.    The Legal Framework

The "legal framework" starts with the elements of a First Amendment retaliation claim: "'(1) [the] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" Matthews, at 10, quoting Cox v. Warwick Valley Cent. School Dist., 654 F.3d 267, 272 (2d Cir. 2011). The Court in Matthews was asked to resolve only whether the speech was protected, and explained that making that determination "'first requires determining whether the employee spoke as a citizen on a matter of public concern.'" Matthews at 10-11, quoting Garcetti, 547 U.S. at 418.

a.    Schoolcraft's Speech not Protected

In other words, two questions are to be answered: "'(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee.'" Matthews at 11, quoting Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011). The Second

Circuit then explains that "[i]f the answer to either question is no, that is the end of the matter." Id.

    i.  <u>Matter of Public Concern</u>

        Here, Schoolcraft did not speak on a matter of public concern until he called IAB on September 2, 2009, and uttered his first complaints about illegal quotas and misclassification of crime. (See AS Rule 56.1 ¶ 40.) Prior to that time – from the date of the February 2009 meeting about his evaluation – Schoolcraft spoke only on matters relating to his evaluation and its aftermath – principally closer monitoring of his performance.

    ii.  <u>Speaking as a Public Employee</u>

        With respect to the second question relating to whether Schoolcraft's speech was protected, it cannot fairly be said – unlike Matthews' conversations with his commanding officers – that Schoolcraft spoke as a citizen when he spoke with IAB and QAD. As the Second Circuit instructed in <u>Matthews</u>, to decide whether one spoke as a citizen, there is a need to "ask two questions . . . :  (A) did the speech fall outside the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" <u>Matthews</u>, at 13 (citing <u>Weintraub v. Bd. Of Educ. Of City Sch. Distr. Of City of N.Y.</u>, 593 F.3d 196, 203-04 (2d Cir. 2010).

    a.  <u>Schoolcraft's Speech was an Official Responsibility</u>

        Here, Schoolcraft would be hard-pressed to argue that his speech to QAD and IAB fell outside his official responsibilities. In fact, he has acknowledged it was his responsibility to report the alleged wrongdoing to them. (See Mauriello Ex. B, AS3 pp. 586-588 ll. 8-20.) As the <u>Matthews</u> Court

recognized, the Supreme Court in <u>Garcetti</u> explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." <u>Matthews</u>, at 13, <u>quoting Garcetti</u>, 547 U.S. at 421.  The Second Circuit further explained that "we have held that speech is not protected if it is 'part-and-parcel of [the employee's] concerns about his ability to properly execute his duties.'" <u>Id.</u>, <u>quoting Weintraub</u>, 593 F.3d at 203.  In this case, Schoolcraft expressed that concern when he spoke with QAD. (SM Ex. CX at 2:17.40-2:18.30, Recording of Schoolcraft's October 7, 2009, meeting with QAD.)

If Schoolcraft's testimony and recorded statements are not enough, the opinion in <u>Weintraub</u> is especially useful in answering the question whether Schoolcraft spoke to IAB and QAD as an employee or as a citizen.  As the <u>Matthews</u> court explained, in <u>Weintraub</u>, the Second Circuit "held that a school teacher's formal grievance regarding the administration's refusal to discipline a student was unprotected speech because a teacher's need to discipline his own students is essential to his ability to effectively run a classroom as part of his day-to-day responsibilities." <u>Matthews,</u> at 15.  Here, Schoolcraft emphasized to QAD that one of the principal reasons he was speaking up was his concern that NYPD's failure to address this problem and discipline officers (and especially Mauriello) for illegal quotas and crime misclassification affected his ability to do his job as he thought it ought to be done, and to do so safely.  (See Ex. CX at 2:23.00-2:24.00.)  He insisted to QAD that he was there to help solve the problem so he could do his job properly (See SM Ex. CX at 2:18.00-2:18.30). Again, he also acknowledged at his deposition that it was his obligation as an

officer in the NYPD to report his concerns to QAD.  (See Mauriello Ex. DF, AS3 pp. 586-588 ll. 8-20.)  With respect to his speech to both IAB and QAD, Schoolcraft testified at his deposition that he believed, at the time, that these were departmental issues that could and should have been handled within the NYPD. (SM Ex. DF AS1 228: 7-13.)

Thus, Schoolcraft's speech to QAD and IAB clearly was "part-and-parcel of [his] concerns about his ability to properly execute his duties." Weintraub, 593 F.3d at 203.[9]  He therefore was speaking as an employee, as the speech fell within his official responsibilities, which is precisely how this Court ruled on the issue in its 2012 opinion.  That should be "the end of the matter" with respect to whether Schoolcraft's speech was protected.  Matthews, at 11.

b.  No Civilian Analogue to QAD or the Speech to IAB

If we take the Matthews' analysis a step further, assuming for purposes of the discussion that all other questions have been answered in favor of First Amendment protection, we must ask the second question that then would determine whether Schoolcraft spoke as a citizen.  The issue is whether a civilian analogue exists for Schoolcraft's speech to QAD and IAB.[10]  The answer with respect to each is No.

First, a private citizen never would be in a position to report to QAD or IAB about the internal NYPD communications allegedly revealing the imposition of illegal quotas, or information such as Caughey and Weiss

---

[9] That is so, of course, if Schoolcraft is to be believed.  For purposes of this argument, we assume he meant what he said.  We believe, however, his entire presentation to QAD and IAB was rehearsed and untrue.  He actually was out to get revenge against Mauriello, in which case his speech would be unprotected as it was not addressing a matter of public concern.

[10] Though the analysis does not even get that far, clearly there is no civilian analogue for any of the other speech events we have identified above regarding Schoolcraft's evaluation, his appeal meeting and its aftermath, or his evaluation by Dr. Lamstein resulting in him being placed on restricted duty.

44

accessing Weiss's unofficial personnel folder.  Second, a private citizen would

not be in a position to know about or gather documentation allegedly reflecting

incidents of crime misclassification that Schoolcraft purportedly presented to

QAD.  Third, apart from the content of Schoolcraft's speech to QAD and IAB,

QAD deals with NYPD's compliance with its own internal rules and procedures,

and not only is not a recipient of complaints from private citizens, but deals with

requirements a private citizen would not be aware of.  It essentially an internal

auditing and investigative unit.  (IAB, on the other hand, no doubt would receive

and process civilian complaints if they revealed conduct within IAB's jurisdiction,

though civilian complaints about police officers typically are submitted to the

Civilian Complaint Review Board.  Thus, there would appear to be a civilian

analogue for individual complaints about a police officer's behavior in public, but

that is not what Schoolcraft was complaining about.)

### iii. Justification for Treating Schoolcraft Differently

Even if this Court were to find that Schoolcraft spoke to QAD and

IAB as a citizen about matters of public concern, the Second Circuit instructs in

Matthews that attention then must be paid to "whether the relevant government

entity 'had an adequate justification for treating the employee differently from any

other member of the public based on the government's needs as an employer.'"

Matthews at 11, quoting Lane, 134 S.Ct. at 2380.

In this case, as we discuss below, none of the treatment of

Schoolcraft was causally connected to any protected speech, but we will discuss

whether he was treated differently than a private citizen would be treated under

the circumstances, and whether the difference was justified.

First, did it constitute different treatment of Schoolcraft to try to make contact with him and have him come back to the precinct pursuant to Patrol Guide section 206-13, as discussed above, because he left work early when told not to do so?  If so, was it justified?  Of course, the NYPD would not likely ever be in a position to respond to a private-sector employee leaving work early when told not to do so, but if it were in that position, there is no chance the private sector employer would have any procedure like 206-13 requiring the employee to return to work.  Thus, section 206-13 of the Patrol Guide in itself establishes a presumption that an officer under such circumstances would be treated differently than a private citizen, and directing compliance with section 206-13 by having the officer return to the precinct therefore would be justified.

With respect to whether the NYPD was justified in entering Schoolcraft's apartment, which we discuss in the context of our discussion of Schoolcraft's claim of a Fourth Amendment violation, it is not clear that Schoolcraft was treated any differently than how a private citizen would be treated under the same evolving circumstances which culminated in the entry – especially with respect to the first entry.  But even if he was treated differently, such treatment was justified, and certainly believed by the officers present to be justified, under the circumstances.

As to Schoolcraft's earlier speech events, all unrelated to matters of public concern, Schoolcraft's poor performance in 2008 and his corresponding poor evaluation required that he be more closely monitored.  This might be unique to supervision of law enforcement, but would not appear to be a significant instance of treating Schoolcraft differently than a private citizen.

46

Finally, being placed on restricted duty was an independent event, determined solely by Dr. Lamstein.  Being kept on restricted duty was a result of Schoolcraft failing to even attempt to get psychological help.  Given the power and authority of a full-duty police officer, and the access to firearms, restricted duty for one determined to be suffering stress and anxiety and in need of cognitive behavioral therapy, certainly might be unique to law enforcement, but it just as certainly is justified under such circumstances.

b.   No Causal Connection between Schoolcraft's Speech and the Alleged Adverse Action

Finally, for the sake of completing the discussion of the First Amendment retaliation claim, though it was not discussed in <u>Matthews</u>, plaintiff has not identified any causal connection between his speech to QAD and IAB, or any of the other earlier speech for that matter, and the allegedly adverse action of October 31, 2009.  With respect to Mauriello, the only action allegedly taken that was "adverse" to Schoolcraft was sending Broschart to Schoolcraft's house in the afternoon to make contact with him and tell him to return to the precinct, and his three-minute presence during the first entry into Schoolcraft's apartment six or seven hours later.  Each action by Mauriello was justified under all of the circumstances as we have discussed above and in our original memorandum.

**POINT II**
**MAURIELLO WAS NOT PERSONALLY**
**INVOLVED IN ANY VIOLATION OF SCHOOLCRAFT'S**
**RIGHTS AND DID NOT PROVIDE DIRECT**
**INSTRUCTIONS TO ANYONE ELSE TO ENGAGE**
**IN WRONGFUL CONDUCT HARMFUL TO SCHOOLCRAFT**

Plaintiff disingenuously relies on Judge Marrero's post-trial opinion in <u>Gonzalez v. Bratton</u>, 147 F.Supp. 2d 180 (S.D.N.Y. 2001). aff'd, 48 Fed. Appx.

47

363, 2002 U.S. Dist. Lexis 21521 (2d Cir. Oct. 12, 2002), as the basis for

countering the evidence of Mauriello's limited role in the events of October 31,

2009.  It is an attempt to deflect the reality that there is no basis for imposing

liability on Mauriello.  (See Plaintiff's Memorandum in Opposition pp. 88-89.)  In

particular, plaintiff refers to Judge Marrero's discussion of the jury's decision to

impose liability on a commanding officer of a precinct where Gonzalez, a former

NYPD officer, was strip-searched by an officer, which was only one of many

violations suffered by Gonzalez.  The officer who performed the strip search

testified that the commanding officer, who was present at the time, had directed

the officer to conduct the strip search.  The commanding officer denied giving the

order and sought a judgment dismissing the jury's verdict against him.  Gonzalez,

147 F.Supp. 2d at 202-203.

Judge Marrero quite rightly ridiculed the commanding officer's

posture, likening it to saying "The Butler did it."  Id. at 202.  The Court then

explained

> Although generally a defendant's personal involvement
> in a claimed deprivation of rights must be established, the
> requirement may be met in circumstances, such as those
> evidenced here, where the unlawful conduct was carried
> out by a subordinate acting under direct instructions of a
> principal violator who possessed the wrongful intent to
> cause the denial of the complainant's civil rights.

Id. at 203 (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Here, not only was Mauriello not personally involved in

Schoolcraft's claimed deprivation of his rights as occurred during the second

entry into his apartment, but there also was no unlawful conduct engaged in by

anyone subordinate to Mauriello who was acting under his direct instructions.

The actions taken in Schoolcraft's apartment during the second entry were taken under the direction of Chief Marino, and no one in the apartment was following any instructions from Mauriello. There simply are no facts cited by plaintiff that can fairly be considered evidence Mauriello was a "principal violator who possessed the wrongful intent to cause the denial of [Schoolcraft's] civil rights."

### POINT III
### PLAINTIFF'S CONSPIRACY CLAIM AGAINST MAURIELLO FAILS AS A MATTER OF LAW

Plaintiff argues that his 1983 conspiracy claim is not barred by the intracorporate conspiracy doctrine because: (1) the actions allegedly undertaken by Mauriello and fellow officers did not constitute a single, isolated decision or incident, and (2) Mauriello was not acting in the scope of his employment or in furtherance of his official duties. Neither of these assertions, however, overcomes the bar of the intracorporate conspiracy doctrine. As we discussed at length in our original memorandum, there simply is no evidence showing "a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the [allegedly] unlawful end." Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003), quoting Romer v. Morgenthau, 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000). This is so for the new conspiracy theory, just as it is for the original theory. Sending Lieutenant Broschart to try to make contact with Schoolcraft and tell him to return to the precinct simply is not a conspiratorial act, and had nothing to do with the events in Schoolcraft's apartment nearly seven hours later after Mauriello left the apartment after three minutes.

First, plaintiff claims that the intracorporate conspiracy doctrine only applies to alleged conspiracies that can be captured in a single moment in time,

are not too "far reaching," and involve "narrow circumstances."  If that were so, it clearly would bar the new conspiracy theory supposedly hatched when Broschart was sent to tell Schoolcraft to return to the precinct.  To the extent others joined that conspiracy as the night wore on, plaintiff's proposed restrictive application of the doctrine would still bar his conspiracy claim, plaintiff cites Hoffman, and Danielak as support for his position, but each of these cases involved alleged conspiracies that were incidentally narrow or incidentally involved limited circumstances. In fact, the intracorporate conspiracy doctrine has been applied to bar section 1983 claims alleged to have evolved over time, and that were claimed to be far-reaching or broad in nature.[11]

Thus, whether the conspiracy was hatched at the moment was sent to Schoolcraft's house and adhered to through the night, or was expanded as circumstances changed, it is bound by the intracorporate conspiracy doctrine.

The dispositive factor in such cases is, as this Court has stated, "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." Salgado v. City of New York, 2001 WL 290051 (S.D.N.Y. 2001).[12] Insofar as the plaintiff alleges a conspiracy to violate his civil rights before he requested medical attention in his apartment on October 31, 2009, all actors involved were

---

[11] See, e.g., Anemone v. Metropolitan Transp. Authority, 419 F.Supp.2d 602, 604 (S.D.N.Y. 2006), affirmed on other grounds, 629 F.3d 97 (2d Cir. 2011); Dilworth v. Goldberg, 914 F.Supp.2d 433 (S.D.N.Y. 2012).

[12] See Hoffman v. Nassau County Police Department, 06-CV-1947 (SJF) (AKT), 2008 U.S. Dist. LEXIS 8279 (E.D.N.Y. April 30, 2008) ("Plaintiff's § 1985(3) claim fails because the alleged conspirators are employees of a single organization, the Nassau County Police Department, and the alleged actions were taken in the course of their employment"); Danielak v. City of New York, No. 02-CV-2349 KAM), 2005 WL 2347095 (E.D.N.Y. 2005) ("The intra-corporate conspiracy doctrine bars plaintiff's conspiracy claims because all of the individual defendants were employees of the New York City Police Department, and were acting within the scope of their employment when they arrested Plaintiff").

employees and agents of the New York City Police Department and there is no basis for his claim to clear the bar of the intracorporate conspiracy doctrine.

Second, plaintiff claims an exception to the intracorporate conspiracy doctrine applies because Mauriello had "an independent personal stake beyond the entity's objectives." As discussed in our Memorandum of Law in support of Mauriello's Motion for Summary Judgment, the personal stake of an employee must be "wholly separate and apart from the entity'" by which they are employed.  K.D. v. White Plains School District, 921 F.Supp.2d 197, 210 (S.D.N.Y. 2013), quoting Quinn v. Nassau Cnty. Police Dep't, 53 F.Supp.2d 347, 360 (E.D.N.Y. 1999) (emphasis added). As this Court noted, the agent's interest must be "motivated solely by personal interest distinct from [their employer]." Roniger v. McCall,72 F.Supp.2d 433, 441 (S.D.N.Y. 1999).  This simply can not be said in this case, as we discussed in our original memorandum.

The TAC – filed after all discovery was completed -- specifically alleges "*[t]hat at all times hereinafter mentioned*, the individually named defendants…were duly sworn police officers of said department and *were acting under the supervision of said department and according to their official duties*." (TAC ¶ 9.)  Further, the TAC alleges that the individual defendants acted at all times "under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York" (TAC ¶ 10), and "[e]ach and *all of the acts* of the NYPD defendants alleged herein were done by said defendants while acting within the scope of their employment by defendant the City of New York" (TAC ¶ 11) and "in

furtherance of their employment" (TAC ¶ 12.)  These allegations are not a theory pleaded in the alternative, but facts pleaded without alternative from the outset.

Plaintiff uses the Hill and Yeadon cases to show that police officers may commit on the job acts that, at first glance, seem to be a part of official duties, but really are purely motivated by an officer's personal interest. However, in both Hill and Yeadon, the plaintiffs specifically and adequately alleged conduct by individual defendants that was independent of, and contrary to, their employer's interests.[13]  Here, the Plaintiff's complaint clearly alleges that the "...customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by plaintiff as alleged herein" (TAC ¶ 305). Plaintiff amended his complaint three times, but still adhered to the position – right down to the last amended complaint after the close of discovery -- that defendants were, at all times, acting in furtherance of their duties as members of the NYPD – and, again, this is not a theory pleaded in the alternative.

For these reasons and the reasons set forth in our original memorandum, Schoolcraft's conspiracy claim fails as a matter of law.

CONCLUSION

Based upon the foregoing, and Mauriello's original (corrected) Memorandum of Law, his Rule 56.1 Statement and the supporting exhibits, it is respectfully requested that Mauriello's motion for summary judgment seeking

---

[13] Hill v. The City of New York, WL 3591719 (E.D.N.Y. 2005) ("Here, plaintiff *clearly alleges that* defendant Barrett acted in his own personal interest, not in the interest of the police department or the city, . . ." (*emphasis added*)); Yeadon v. New York City Transit Authority, et. al., 729 F.Supp. 204, 212 (S.D.N.Y. 1989) ("Moreover, because plaintiffs have *adequately alleged that each defendant possessed independent, personal conspiratorial purposes*, the defense does not apply" (*emphasis added*)).

dismissal of plaintiff's claims against him be granted, and that the Court grant

such other relief as it deems just.

Dated: New York, New York
       March 6, 2015

SCOPPETTA SEIFF KRETZ & ABERCROMBIE
Attorneys for Defendant STEVEN MAURIELLO

By: _____
       Walter A. Kretz, Jr., (WK-4645)
    444 Madison Avenue, 30th Floor
    New York, NY 10022
    wakretz@seiffkretz.com
    212-371-4500