LAW OFFICE OF
# NATHANIEL B. SMITH

ATTORNEY AT LAW
111 BROADWAY
NEW YORK, NEW YORK 10006

NATHANIEL B. SMITH

TEL: (212) 227-7062
FAX: (212) 346-4665

March 17, 2015

## BY HAND

Honorable Robert W. Sweet
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> *Schoolcraft v. The City of New York, et al.,*
> *10-cv-6005 (RWS)*

Dear Judge Sweet:

As one of plaintiff's counsel, I am writing to the Court to request a pre-motion conference on the plaintiff's motion to strike the Declaration of Catherine Lamstein (Court Dkt. # 410-1) filed on March 6, 2015 by the City Defendants. The motion to strike is based on the fact that the Declaration is inconsistent with Lamstein's deposition testimony and is new evidence being submitted with reply papers on a motion for summary judgment.

I am also writing to object to the City Defendants' argument raised for the first time in their reply papers that the City Defendants are entitled to qualified immunity in connection with the plaintiff's First Amendment claims. The reason for the objection is that the issue was not raised in the City Defendants' initial motion papers and was first raised only in their reply papers.

### 1. *The Lamstein Reply Declaration*

On December 22, 2014, the City Defendants filed their motion for summary judgment seeking, among other things, dismissal of Officer Schoolcraft's claim that they violated Officer Schoolcraft's rights when they entered his home on October 31, 2009 without a warrant. The motion was based on the argument that

LAW OFFICE OF
NATHANIEL B. SMITH

an emergency existed at the time of the warrantless entry because Office
Schoolcraft left work sick without permission and NYPD Psychologist Catherine
Lamstein allegedly told Captain Theodore Lauterborn that the City Defendants
"absolutely needed to find" Officer Schoolcraft.[1]   During the same sequence of
dispositive motion practice, Officer Schoolcraft also filed his motion for summary
judgment, which requested a determination as a matter of law that the warrantless
entry was illegal because there were no facts genuinely suggesting an emergency.[2]

In opposing the City Defendants' summary judgment motion on the
warrantless entry issue, we argued that Lamstein did not testify at her deposition
that she told Lauterborn that he needed to find Officer Schoolcraft that night.[3]
Instead, the deposition shows that five years after the fact she testified that she
"*thought* that he absolutely did need to find him."[4]   The record also shows that
Lamstein's detailed notes of her discussions with Lauterborn did not reflect any
statement by Lamstein about a need to find Officer Schoolcraft.[5]   Since Lamstein's
unexpressed state of mind five years after the fact is irrelevant to the question of
whether the NYPD defendants had an emergency justification for their entry on the
evening of October 31, 2009, the defendants' argument was fatally flawed.

In reply, however, the City Defendants filed the Declaration of Lamstein,
which states that "this statement that 'I thought [Capt. Lauterborn] absolutely did
need to find [Adrian Schoolcraft] and make sure that he was okay' was not just my
opinion but a statement that I conveyed to Capt. Lauterborn on October 31, 2009."[6]
Thus, Lamstein seeks with her Declaration to make a significant alteration in her
testimony, changing the statement that she *thought* it was a good idea to find
Officer Schoolcraft into a statement in the form of a "directive" that she actually
told Lauterborn to find him on the evening of October 31, 2009.

The Lamstein Declaration should be stricken from the record and
disregarded by the Court for two reasons.  First, the Declaration is inconsistent
with her deposition testimony on the important issue of what she actually told
Lauterborn.  Second, the Declaration is new evidence being submitted in reply that

---

[1] City Mem., dated 12-22-14 (Dkt. # 300) at p. 3.

[2] Plaintiff's Mem., dated 12-23-14, at p. 34-39.

[3] Plaintiff's Opp. Mem., dated 2-11-15, at pp. 2-5.

[4] Lamstein Tr. 320:25-321:3; attached hereto as Exhibit A.

[5] Plaintiff's Opp. Mem. at 3-4.

[6] Lamstein Dec., dated 3-5-15, at p. 2 ¶ 6 (Dkt. #410-1).

should have been submitted at the time of the City Defendants' motion for summary judgment or in opposition to the plaintiff's motion for summary judgment.

### A. *The Sham Issue of Fact Doctrine Requires Striking the Declaration.*

At no point in the Lamstein deposition did she testify that on October 31, 2009 she made any statement that there was any kind of emergency that required Lauterborn to find Officer Schoolcraft that night. To the contrary, Lamstein testified that she told Lauterborn: "I *told* him that as of the last time I saw him, which was a few days earlier, I had *no reason* to think he was a danger to himself or others. Never expressed thoughts or suicide. *It didn't seem to be anything that serious that would lead me to be concerned.*"[7]

While she also volunteered information in her deposition about her alleged state of mind five years after the fact, her testimony (and her notes[8]) clearly state that she told Lauterborn that as of the time she last saw him (i.e., October 27, 2009), Officer Schoolcraft was fine and that she had no reason to believe he was a danger to himself or others. Indeed, Lamstein's testimony was based primarily on four pages of her notes about the events of October 31, 2009. Those notes and a type-written version she prepared after the fact to brief her supervisors are attached hereto as Exhibit B. Lamstein was extensively examined on the contexts of her notes for October 31, 2009, which she also read into the record verbatim.[9] Nothing in those notes or her deposition show or suggest that she gave Lauterborn a "directive" that he had to find Officer Schoolcraft or that there was some sort of psychiatric emergency authorizing extreme measures to find Officer Schoolcraft.

---

[7] Lamstein Tr. 319:22-320:2; Exh. A (emphasis added).

[8] The last entry that Lamstein made about the events of October 31, 2009 was made on October 14, 2010, about a year after the fact. Lamstein Tr. 331:2-339:9. She testified that this "delayed entry" was prompted by accounts of the matter in the media and that she wanted to make the entry in her file to reflect what she recalled about what she told Lauterborn because the existing notes reflected what he told her. *Id.* at 332:13-333:9. In fact, the "delayed entry" was added to her file the day after she was interviewed by IAB. *See* Scott Memorandum, dated 2/15/11 at p. 1; attached hereto as Exhibit D ("subsequent interview involving Dr. Lamstein on October 13, 2010").

[9] *Id* at 325:8-331:15 & 339:11-341:18.

Settled law in this Circuit prohibits a party from manufacturing a sham issue of fact to defeat a summary judgment motion. "A party may not create an issue of fact by submitting an affidavit in opposition to a motion for summary judgment that, by omission or addition, contradicts the affiant's previous deposition testimony."[10] If a party who has been examined at length could raise an issue of fact simply by submitting an affidavit contradicting the party's prior deposition testimony, the utility of summary judgment as a procedure would be greatly diminished.[11]

Barefaced contradictions are not the only kinds of shifts in testimony that can be disregarded. Thus, changes in the theory of a case or the flavor of the testimony can be disregarded.[12] In addition, Rule 30(e)(1)(B) of the Federal Rules of Civil Procedure provides an express procedure for a witness making changes or corrections to a deposition transcript 30 days after the transcript is made available to the witness, and a post-deposition affidavit seeking to make further changes to a deposition transcript in response to a summary judgment motion should be disregarded.[13]

Here, Lamstein reviewed her January 30, 2014 deposition transcript on April 24, 2014 and made numerous changes and corrections. A copy of her errata sheet is attached as Exhibit C, and it shows over 120 corrections or changes to the transcript. While the relevant portions of her deposition about her actual discussions with Lauterborn remained unchanged in her errata sheet, Lamstein's Declaration now seeks to make a radical alteration in the substance of her testimony – changes made long after the 30-day period, long after the close of discovery, and only after summary judgment motions on the issue have been filed. By a mere slight of hand she seeks to convert an unexpressed thought five years after the fact into an alleged statement by her to Lauterborn to "absolutely find him." Indeed, the dramatic shift in her testimony is made clear by the City Defendants. In their reply memorandum, the City Defendants now explicitly argue that the Lamstein Declaration shows that she gave Lauterborn a "directive" to find Officer Schoolcraft that night.[14]

---

[10] *Hayes v. NYC Dept. of Corrections*, 84 F. 3d 614, 619 (2d Cir. 1996); *accord Brown v. Henderson,* 257 F. 3d 246, 252 (2d Cir. 2001).

[11] *Hayes, supra*, at 619.

[12] *Smith v. Target Corp.*, 2012 U.S. Dist. Lexis 165256 at * 16 (N.D.N.Y. 2012).

[13] *Felix-Torres v. Graham*, 687 F. Supp. 2d 38, 50 (N.D.N.Y. 2009).

[14] City Def. Mem., dated 3-6-15, at p. 2 (Dkt. # 411).

This is not a minor modification to background facts; it goes directly to the City Defendants' legal basis and justification for breaking into Officer Schoolcraft's home. Indeed, in the City Defendants' memorandum of law in opposition to Officer Schoolcraft's motion for summary judgment, the City Defendants argued that our motion ignored "the very critical fact" that Lamstein allegedly told Lauterborn to find Officer Schoolcraft.[15] Thus, the Court should not permit the City Defendants to manufacture an issue on this "very critical fact" precisely because the "fact" simply does not exist and it is a mere sham created only in response to our summary judgment motion.

Nothing in the defendants' papers provides the Court with any justification for accepting or justifying the Lamstein Declaration. In their reply papers, the City Defendants claim that the Lamstein Declaration seeks to "clarify and explain" her deposition testimony.[16] But neither Lamstein in her perfunctory Declaration nor the City Defendants in their reply papers make any effort to explain why anything in her deposition needed "clarification" or "explanation." Nor do they make any effort to explain the reasons for the inconsistency between her Declaration and her deposition. While a party can certainly clarify ambiguous, confusing or incomplete testimony, where a post-deposition affidavit raises obvious inconsistencies, the proponent must provide some plausible explanation for them.[17] Here, the City Defendants failed to offer any explanation and Lamstein merely states in a conclusory fashion that "in fact" her deposition testimony "was not just my [unexpressed] opinion but a statement that I conveyed."[18]

In sum, the Declaration is inconsistent with her deposition testimony of what she actually said she told Lauterborn and with her detailed notes of her discussions with Lauterborn. And the City Defendants offer the Court no explanation whatsoever explaining her shifting versions of the events. Accordingly, the Court should strike the Lamstein Declaration from the record and disregard it.

In the event, however, that the Court does not strike the Declaration, then we

---

[15] City Def. Opp. Mem., dated 2-11-15 at p. 7 (Dkt. # 375).

[16] City Def. Reply Mem. at p. 2 (Dkt. # 411) ("Lamstein has clarified and explained that her testimony regarding the directive to find plaintiff was not an unexpressed thought, but a statement that she actually made to Captain Lauterborn on October 31, 2009.)

[17] *Jeffreys v. City of New York,*, 426 F. 3d 549, 555 n.2 (2d Cir. 2005)

[18] Lamstein Dec. ¶ 6 (Dkt. #410-1).

request the opportunity to response more fully to the tardy submission. For example, the Lamstein Declaration cannot save the City Defendants from having our motion for summary judgment granted against the City Defendants for their warrantless entry. Even if the Lamstein Declaration was accepted as evidence of what she allegedly told Lauterborn, there is no evidence in this record that *Lauterborn* was aware of this alleged "directive" at the time or acted upon it, and the fellow officer or collective knowledge doctrine requires some communication and only applies among police officers.[19] Moreover, Chief Marino testified at his deposition that he had no information at the time of the entry that Officer Schoolcraft was dangerous to himself or others. Finally, the City Defendants have not submitted any evidence from Chief Marino, DI Mauriello, Captain Lauterborn or anyone else at the scene that they were acting based on some "directive" from Lamstein to "absolutely find" Officer Schoolcraft.

## B. *The Declaration is New Evidence Improperly Submitted in Reply.*

The Lamstein Declaration should also be stuck on the ground that it is new evidence that the City Defendants did not submit in their initial motion for summary judgment and have filed only as part of their reply papers. Indeed, the City Defendants did not even submit the Lamstein Declaration as part of their opposition to Officer Schoolcraft's motion for summary judgment on the same issue regarding the existence of objective facts of an emergency justification for the warrantless entry.

A party cannot attempt to cure deficiencies in its moving papers by including new evidence in reply papers because that practice improperly deprives a party of the opportunity to response to the new evidence.[20] Judge Baer has aptly summarized the law on this issue:

---

[19] *Colon v. City of New York*, 2014 U.S. Dist. Lexis 46451 at *14 (S.D.N.Y. April 2, 2014) (some communication required); *United States v. Colon*, 250 F.3d 130, (2d Cir. 2001) (collective knowledge doctrine applies only to police officers or others with specialized police training; extending doctrine to civilian 911 operator would go beyond the doctrine's jurisprudential parameters).

[20] *See, e.g. United States ex rel. Karlin v Noble Jewelry Holdimngs, Ltd.*, 2012 U.S. Dist. Lexis 51675 at *13-14 (S.D.N.Y. April 9, 2012).

"[I]t is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply." *Murphy v. Village of Hoffman Estates, 1999 U.S. Dist. LEXIS 3320, at \*5-6 (N.D. Ill. 1999)* ("[p]roviding specifics in a reply in support of a general argument in an objection counts as new matter in reply"); *see also, e.g., Wike v. Vertrue, Inc., 2007 U.S. Dist. LEXIS 19843, at \*21-22 (M.D. Tenn. 2007)* ("the Court will not allow [movant] to sandbag the Plaintiff by first presenting the evidence in reply"); *Brennan v. AT&T Corp., 2006 U.S. Dist. LEXIS 8237, at \*26-27 (S.D. Ill. 2006)*. Typically, in such situations, the Court strikes the evidence presented for the first time in reply, and does not consider it for purposes of ruling on the motion. *See, e.g., Wike v. Vertrue, Inc., 2007 U.S. Dist. LEXIS 19843, at \*21-22; Brennan v. AT&T Corp., 2006 U.S. Dist. LEXIS 8237, at \*26-27.* This Court will adopt such a remedy here, and strike Plaintiff's evidence presented with its reply brief, and not consider it for the purposes of ruling on this motion.[21]

Since the Lamstein Declaration could have been submitted in support of the City Defendants' motion or even in opposition to our motion, it should be disregarded. And to the extent that the Court does decide to consider it, as noted above, we request an opportunity to submit further papers in response to it.

2. *The Qualified Immunity Argument*

The City Defendants also raise a new issue about qualified immunity for the first time in their reply papers. Claiming that the recent decision by the Second Circuit in *Matthews v. City of New York*,[22] represents a shift in the law, the City Defendants argue that the decision now also forms the basis for a qualified immunity defense because the NYPD defendants could not have anticipated the decision in 2009.[23]

Since this qualified immunity issue was not raised in the City Defendants' motion for summary judgment, the Court should not consider it. While the authorities cited above are controlling on the new argument issue, the decision in

---

[21] *Wolters Kluwer Fin Ser. Inc. v. Scivantage*, 2007 U.S. Dist. Lexis 27048 at \*2-3 (S.D.N.Y. 2007).

[22] 2015 U.S. App. Lexis 3016 (2d Cir. Feb. 26, 2015).

[23] City Reply Mem. (Dkt. # 411) at p. 11.

Law Office of
NATHANIEL B. SMITH

*Mateo v. Bristow*[24] is also directly relevant:

> Finally, in their Reply Memorandum, Defendants for the first time
> assert that Dean and Maldonado are entitled to qualified immunity in
> connection with their search of Plaintiff's cell. (Reply 8-9.) It is well
> established, however, that a court should not "consider arguments that are
> raised for the first time in a reply brief." *Clubside, Inc. v. Valentin*, 468 F.3d
> 144, 159 n.5 (2d Cir. 2006); *see ABN Amro Verzekeringen BV v.
> Geologistics Ams., Inc.*, 485 F.3d 85, 97 n. 12 (2d Cir. 2007) ("We decline to
> consider an argument raised for the first time in a reply brief."); *Patterson v.
> Balsamico*, 440 F.3d 104, 113 n.5 (2d Cir. 2006) ("This Court generally will
> not consider arguments raised for the first time in a reply brief."); *Fisher v.
> Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (finding that an argument
> raised for the first time in a reply brief was waived); *Playboy
> Enters. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments
> made for the first time in a reply brief need not be considered by a court.")
> (collecting cases). Defendants offer no reason why that rule should not apply
> here, and the Court perceives none. Accordingly, because Defendants failed
> to raise qualified immunity in their initial brief, the Court deems that
> argument waived for purposes of this motion and will not consider
> it. *See Rowley v. City of New York*, No. 00 Civ. 1793 (DAB), 2005 U.S. Dist.
> LEXIS 22241, 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30,
> 2005) (declining to consider a qualified immunity argument raised for the
> first time in a reply brief).

Thus, the Court should not consider this argument. In the alternative, the
Court should permit Officer Schoolcraft to demonstrate that the argument should
be rejected on the merits. Qualified immunity turns on the clearly established law
that existed at the time of the misconduct, not subsequent developments in the
law.[25] And for purposes of qualified immunity, the governing law was clearly
established as of 2009: under the First Amendment, a governmental actor could

---

[24] 2013 U.S. Dist. LEXIS 106478 at * 25-26 (S.D.N.Y. July 16, 2013).

[25] *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("This inquiry turns on the
objective legal reasonableness of the action, assessed in light of the legal rules that
were clearly established at the time it was taken"); *Golodner v. Security
Technology Systems LLC*, 770 F. 3d 196, 203  (2d Cir. 2014) (courts review the
clearly-established issue prior to and at the moment of the alleged violation).

LAW OFFICE OF
NATHANIEL B. SMITH

not lawfully take adverse actions against a public employee in retaliation for that
employee's speech on matters of public concern.[26]

Thus, the City Defendants' argument about *Matthews* should be rejected.
Moreover, the *Matthews* decision, which was decided after we submitted our last
memorandum of law to the Court on the First Amendment issue, makes clear that
Officer Schoolcraft's speech and conduct raising issues with IAB, QAD and his
supervisors at the 81st Precinct, as well as his plans to report that misconduct to the
Commissioner, are matters of public concern that are entitled to First Amendment
protection *before* his October 31, 2009 suspension.

\*       \*       \*

For these reasons, we request that the Court schedule this matter for a pre-
motion conference on our proposed motion to strike the Lamstein Declaration and
to disregard the City Defendants' qualified immunity defense.

Respectfully submitted,

Nathaniel B. Smith

All Counsel
(by email w/ encl.)

_____

[26] *Golodner v. Security Technology Systems LLC*, 770 F. 3d 196, 206 (2d Cir.
2014) (right to be free from retaliation for speech on matters of public concern was
firmly established well before 2009).

**EXHIBIT A**

1    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

2    --------------------------------------------X

3    ADRIAN SCHOOLCRAFT,

4                          Plaintiff,

5

                                    Case No:

6         - against -              10 CV 06005

7

     THE CITY OF NEW YORK, ET AL.,

8

9                     Defendants.

10   --------------------------------------------X

11                    100 Church Street

                      New York, New York

12

                      January 30, 2014

13                    10:22 a.m.

14

15

16

17   DEPOSITION OF CATHERINE LAMSTEIN-REISS, M.D.,

18   pursuant to Subpoena, taken at the above

19   place, date and time, before DENISE ZIVKU, a

20   Notary Public within and for the State of

21   New York.

22

23

24

25

```
 1                    C. LAMSTEIN-REISS, M.D.
 2    made a complaint contesting his annual
 3    performance evaluation and a complaint about
 4    them taking his memo book.
 5         Q.     He did not complain to you about
 6    what he perceived as retaliation by his
 7    supervisors at the 81 Precinct?
 8                    MR. KRETZ:  Objection.
 9                    MS. PUBLICKER METTHAM:
10         Objection.
11         A.     He did not tell me that he made
12    any kind of formal complaint about that.
13    That he made any kind of complaint --
14         Q.     Did he tell you that he was
15    getting retaliated against by supervisors?
16                    MS. PUBLICKER METTHAM:
17         Objection.
18         A.     Yes.
19         Q.     When did he tell you that?
20         A.     The first time I saw him.
21         Q.     April 13, 2009?
22         A.     Right.  That he thought they
23    were mad at him for contesting his
24    evaluation.
25         Q.     All right, can you turn to the
```

```
1                  C.  LAMSTEIN-REISS, M.D.
2      third page of Exhibit 68, please?
3           A.      What page?
4           Q.      The third page of the big fat
5      document?
6                  MR. CALLAN:   What's the Bates
7           Stamp?
8                  MR. SMITH:   It's 2895.
9           Q.      Have you ever seen this page
10     before?
11          A.      We're talking about the timeline
12     dated 2/21?
13          Q.      Correct.
14          A.      Yes.
15          Q.      Who prepared this?
16          A.      I did.
17          Q.      Why?
18          A.      My director asked me to put
19     together kind of a brief minimal timeline in
20     preparation for meeting with people at the
21     department advocates office.  I can't
22     remember if legal bureau was there too.  I
23     remember at least some people of department
24     advocates office who wanted an understanding
25     of our case with him and the timeline of
```

```
 1                    C.  LAMSTEIN-REISS, M.D.
 2    things.
 3         Q.     When --
 4         A.     February 21, 2010.  So instead
 5    of sitting in a meeting taking time going
 6    through a whole folder, it would help us to
 7    work more quickly discuss the main point.
 8         Q.     And was the basis for this
 9    timeline your notes?
10         A.     Yes.
11         Q.     Was there anything else, other
12    than your notes that formed the basis for
13    this timeline?
14                MS.  PUBLICKER METTHAM:
15         Objection.
16         A.     It's possible some things were
17    from my clear memory at the time that were
18    not in the notes or other information we
19    received from a hospital he had seen or --
20    but it's actually the time I wrote this that
21    also included information from IAB and from
22    his command and the duty captain on the
23    night of Halloween.  All of that is in the
24    notes.
25         Q.     Is this an accurate summary,
```

1                    C. LAMSTEIN-REISS, M.D.

2     this three-page document Bates Stamped 2895

3     through 2897?

4         A.     In it's briefest format.

5         Q.     Are there any errors in it that

6     you're aware of?

7                    MS. PUBLICKER METTHAM:

8         Objection.

9         A.     No, there are no errors.  I tend

10    to be more detailed, my directors prefer

11    things more brief --

12        Q.     -- I just want to know if there

13    are any errors --

14        A.     There are no errors there may be

15    things that I would have thought were

16    pertinent to put in and my director said ah,

17    we don't need that.  Stick to the basics.

18        Q.     Sitting here today there is no

19    mistakes in here, right?

20                   MS. PUBLICKER METTHAM:

21        Objection.

22        A.     To the best of my knowledge.

23        Q.     The first line says 4/13/09 MOS

24    referred to PES.

25                   MS. PUBLICKER METTHAM:  That's

1              C. LAMSTEIN-REISS, M.D.

2    report that gets sent out.  We have our case

3    records and we have like a fill in the blank

4    form that just says that the gun should be

5    removed.  Not any kind of evaluation, just

6    that the guns were removed and that we're

7    requesting a new ID card and so on.

8         Q.     Okay.  Going back to the

9    typewritten timeline that you've created.

10   The entry -- there's an entry 10/31/09.  You

11   were the psychologist on pager duty.  You

12   see that?

13        A.     I do.

14        Q.     And you got a call from Captain

15   Lauterborn?

16        A.     Yes.

17        Q.     Do you remember getting that

18   call from Captain Lauterborn?

19        A.     More specifically, Captain

20   Lauterborn called the sick desk supervisor,

21   who then called the psychologist on pager

22   duty requesting I respond and in response to

23   that request I called Captain Lauterborn

24   back.  So he didn't call me directly.

25        Q.     Did Captain Lauterborn know that

1                    C.  LAMSTEIN-REISS,  M.D.

2    you were the psychologist that had seen

3    Schoolcraft when he called?

4                    MS.  PUBLICKER METTHAM:

5          Objection.

6          A.     I don't believe he did.   What

7    happens is they call the sick desk

8    supervisor, who looks up and sees who is on

9    duty and they call whoever is on duty.

10         Q.     So on October 31, 2009, you

11   happened to be on pager duty?

12         A.     Correct.

13         Q.     So Captain Lauterborn called the

14   sick desk and he was looking for somebody

15   from the psychological evaluation services?

16                    MS.  PUBLICKER METTHAM:

17         Objection.

18         A.     Psychological evaluation

19   section.   Although, the psychological

20   services section, which does pre-employment

21   screening, they also do pager duty.  He was

22   looking for a department psychologist to

23   give him a call to consult about the

24   situation.

25         Q.     Did you tell Captain Lauterborn

1                    C. LAMSTEIN-REISS, M.D.

2        you had evaluated and met with Schoolcraft?

3            A.     Yes.

4            Q.     And told him that during the

5        conversation that you had with him on

6        October 31st?

7            A.     Yes.

8            Q.     What else did you tell Captain

9        Lauterborn?

10           A.     He was asking me if there was

11       any reason to be concerned about the fact

12       that he went AWOL and that he seemed to be

13       upset and said he had stomach pains and

14       should they be concerned, do they need to go

15       look for him, make sure he's okay.

16       Typically, in that situation they do.  He

17       said he wasn't sure they wanted to suspend

18       him, because they thought this was more of a

19       psychological problem as opposed to a

20       disciplinary one and so he wanted to consult

21       with me.

22                  I told him that as of the last

23       time I saw him, which was a few days

24       earlier, I had no reason to think he was a

25       danger to himself or others.  Never

```
1                C. LAMSTEIN-REISS, M.D.
2     expressed thoughts of suicide.  It didn't
3     seem to be anything that serious that would
4     lead me to be concerned.  However, he had
5     also never acted like that before.  He never
6     went AWOL, leaving even though he was told
7     to stay and was now saying he had stomach
8     pains, while being visibly upset.  So I did
9     not know if that meant something new
10    happened that led him to be so upset that he
11    was acting in a different manner going AWOL
12    and that kind of stuff and led to a
13    reoccurrence of stomach pains badly enough
14    that he did that or maybe the stomach pains
15    never went away to begin with and I wasn't
16    sure and that my evaluation is -- even
17    though, I was not saying this person is
18    suicidal, he's had these thoughts, you must
19    -- it was nothing like that.  I had no
20    reason to think he was, except my evaluation
21    was only as good as the last time I saw
22    them.
23                So if something happened since
24    then or they're acting different since then,
25    that may be different.  And so I thought he
```

```
 1                  C. LAMSTEIN-REISS, M.D.
 2    absolutely did need to find him and make
 3    sure that he was okay.
 4         Q.     Was your sharing of information
 5    about Schoolcraft with Lauterborn a
 6    violation of Schoolcraft's privacy?
 7                  MS. PUBLICKER METTHAM:
 8         Objection.
 9         A.     No.  This is -- they're not
10    treatment records.  Whenever they come to
11    our office before they -- before I allow
12    them to open their mouth on all, I make sure
13    that they know that the interview is on the
14    record only within the department and only
15    on a need to know basis, so within that it
16    is on the record.
17                  So in this case, someone is AWOL
18    and they're upset and they leave and they
19    say their stomach hurts and they're acting
20    in that manner, I deemed there was a need to
21    know, for him to know some basic information
22    about why he was on restricted duty.  Not
23    information like, you know, whether or not
24    his father used -- had any kind of drug
25    problem, whether or not he's had sex in the
```

```
 1                 C. LAMSTEIN-REISS, M.D.
 2    last few years.  I mean, like that's not his
 3    business.  He doesn't need to know that.
 4    That does not relate to the situation at
 5    hand.
 6                 What did relate was issues of do
 7    we need to be concerned about this guy and
 8    so I released information that I deemed
 9    pertinent to that, while keeping everything
10    else as confidential.  Like I said, even
11    though it's on the record within the
12    department, it's an NYPD evaluation.  It's
13    not private treatment records.  Not
14    everything needs to be known -- to be given
15    out rather.
16        Q.    The entry here says that Captain
17    Lauterborn kept you informed throughout the
18    night; is that right, he did that?
19        A.    Correct.
20        Q.    Did he tell you that he spoke
21    with Schoolcraft's father?
22        A.    I would have to reference my
23    notes, but I believe he did.  Yes, he
24    definitely did.
25        Q.    Did he tell you that
```

```
 1                C. LAMSTEIN-REISS, M.D.
 2    Schoolcraft's father told Lauterborn that he
 3    knew Schoolcraft was fine?
 4         A.     I believe the words were that
 5    there was nothing to worry about or
 6    something, yeah, to that effect.
 7         Q.     Lauterborn did report to you
 8    that he had a conversation with the father
 9    and the father was not concerned about the
10    son?
11                MS. PUBLICKER METTHAM:
12         Objection.
13         A.     The father was not concerned,
14    but I don't know that he had spoken with his
15    son that day or that he even knew everything
16    going on.  It seemed the father didn't know
17    why he was on restricted duty.  And it
18    seemed to me that maybe Officer Schoolcraft,
19    at the time, it seemed to me that he maybe
20    just didn't want his father to know why he
21    was on restricted duty.  That was my theory
22    at the time.  So the fact that the father
23    didn't know that, I didn't know if the
24    father knew he went to a hospital with heart
25    symptoms that were stress related.  I didn't
```

1                C. LAMSTEIN-REISS, M.D.

2      know if the father knew he'd been prescribed

3      Seroquel.  I didn't know.  It seemed like he

4      was not telling his father this stuff.

5           Q.     What I want to know is what did

6      Captain Lauterborn tell you about his

7      conversation with the father?

8           A.     My recollection -- I would have

9      to review my notes, but my recollection is

10     that the father said he was not concerned at

11     all, but he was explaining to the father the

12     reasons they were concerned and the reason

13     they were looking for him.

14          Q.     Okay.  If you want to look at

15     your notes, I would appreciate that.

16          A.     It's from the notes of October

17     31, 2009 the time of that conversation was

18     20:15 hours noted in the left-hand column of

19     the page, 20:15.

20                MS. PUBLICKER METTHAM:  That is

21          on D283.

22          Q.     Do you have the first page of

23     your 10/31/09 notes in front of you?

24          A.     Which page is that.

25                MS. PUBLICKER METTHAM:  I

```
 1                  C. LAMSTEIN-REISS, M.D.
 2         believe you're 2899 and 282, Mr. Smith?
 3                  MR. SMITH:  I'm actually
 4         referring to 2901, with the ledger and
 5         pager.
 6                  MS. PUBLICKER METTHAM:  It is
 7         D282, it is but 2901.
 8         Q.     So is there a rather long entry
 9    for 10/31 in your file, Doctor?
10         A.     I don't know what you consider
11    rather long, but it's --
12         Q.     Four pages?
13         A.     One, two, three, four and a
14    third, yes.
15         Q.     All right, can you just read
16    that into the record.
17         A.     Sure.  Pager duties regarding
18    P.O. Adrian Schoolcraft, 10/31/09, on left
19    of the page I noted that I was on at 17:40
20    hours.  Page number 455 refers to the sick
21    desk log of my being put on duty.  I noted
22    below that that I was off duty at 21:40
23    hours.  Back to the main text in the body.
24    10/31/09.  Telephone contact with sick desk
25    Sergeant Kloos.
```

```
 1                C. LAMSTEIN-REISS, M.D.
 2                   MS. PUBLICKER METTHAM:
 3         K-l-o-o-s.
 4         A.     Yes.  I believe that's the
 5   spelling.  It's possible I'm wrong about the
 6   spelling.  MOS was at work today.  He
 7   slammed sick report on the sergeant's desk
 8   and said he was going out sick.  Sergeant
 9   told him to stick around.  He refused and
10   left.  Didn't follow procedure.  Typically,
11   they called sick desk and get authorization
12   and wait for command to arrange coverage.
13   MOS was working on the telephone
14   switchboard.  MOS did not go straight home.
15   Cops are at his home waiting for his
16   arrival.  They called MOS on his cell phone.
17   They think he picked up and then hung up.
18   Since then no answer.  They are thinking of
19   suspending him, but they suspect it is more
20   of psych problem.  XO of MOS's command, the
21   81 Precinct, is Captain Lauterborn and
22   requests response from PES and I signed my
23   name.
24         Q.     The is information that you
25   received from Sergeant Kloos from the sick
```

```
 1                  C.  LAMSTEIN-REISS, M.D.
 2    desk?
 3         A.      Correct.
 4         Q.      All right, please continue.
 5         A.      It will be more clear as I'm
 6    reading through the notes, but it's possible
 7    that the part about possibly not suspending
 8    him because they thought it might be more of
 9    a psych problem, that may have come
10    secondhand through Sergeant Kloos.  If it
11    came directly, it would be the rest the
12    notes.
13                 Telephone contact with Captain
14    Lauterborn.  MOS doing a 7 to 3 day tour
15    today at TS all day, meaning telephone
16    switchboard all day.  All was fine.  He
17    typically keeps to self and doesn't converse
18    much with other officer and did same today.
19    Nothing seemed out of ordinary.  2:00 p.m.,
20    he went down to locker room, changed and
21    then put a sick report on sergeant's desk
22    and said going sick.  He wrote that he had
23    stomach pain.  Sergeant tried to stop him,
24    but he left anyway.  Underlying issues.  MOS
25    has made allegations against others.
```

```
 1              C. LAMSTEIN-REISS, M.D.
 2    Department's investigation of these
 3    allegations picked up this week and it
 4    snowballed from there.  This week about four
 5    P.O.'s and two civilian people were called
 6    down for questioning.  MOS goes up to them
 7    and asked about it.  Notifications are in
 8    telephone message log, so he knows who is
 9    going.  When they return, he tries to
10    intercept them and get information from them
11    about what he was asked -- about -- it
12    should have been what they were asked.  Or
13    that thought the person was a he.  Anyway,
14    that's what it says what he was asked.
15    Today was first tour back after RDOs.  Not
16    sure what happened today that triggered him
17    to leave like that.
18              Delegates, peers, sergeants and
19    Captain Lauterborn all left him messages and
20    asked him to go back to command.  A
21    lieutenant is at him home.  His car is
22    there.  Landlord said MOS may have been
23    there earlier.  Can usually hear MOS's
24    footsteps when home.  MOS not home.
25              Next entry, I left a message on
```

```
 1              C. LAMSTEIN-REISS, M.D.
 2   MOS's cell phone.  I gave my cell number and
 3   Captain Lauterborn's cell phone.  I told him
 4   that the Captain said he could just return
 5   to his home if didn't want to go to the
 6   command.  I urged him to go home or call his
 7   captain, so this could be resolved quickly
 8   and easily without need for a city-wide
 9   mobilization to search for him or
10   disciplinary action, like suspension.  Much
11   easier to just resolve it quickly and easily
12   now.  I explained that everyone is just
13   concerned for his safety and they want to
14   make sure everyone is okay.
15              Next entry, telephone contact
16   with Captain Lauterborn.  I informed captain
17   that I left message on MOS's cell phone as
18   described above.  I suggested that captain
19   call MOS's father because that's the person
20   he is closest to and the person who is most
21   likely to know his whereabouts.  Captain
22   will call undersigned when locates or hears
23   from MOS, signed my name.
24              Next entry at 20:15 hours.
25   Telephone contact with Captain Lauterborn.
```

```
 1                C. LAMSTEIN-REISS, M.D.
 2    Still no word from MOS. Captain called MOS's
 3    father, who also hadn't heard from him.
 4    Father, quote, had some issues, end quote,
 5    over the phone -- over phone, but eventually
 6    understood captain's point of view and
 7    confirmed.  Hoping father will call MOS and
 8    encourage him to go home.  Captain will go
 9    to MOS's home.  It's possible he's home, but
10    not answering phone.  I asked if the
11    landlord has a spare key.  He said yes and
12    captain has it, but legal issues with using.
13    Have to have cause.  Hoping to avoid going
14    that route.
15         Q.    What were those legal issues?
16         A.    I didn't ask.  I don't know.
17                MS. PUBLICKER METTHAM:
18         Objection.
19         Q.    All right, go ahead?
20         A.    And I signed my name.  20:40
21    hours the next entry -- I'm sorry 21:40
22    hours is the next entry.  Telephone contact
23    with Sergeant Kloos.  Sick desk off duty
24    since not known when MOS might be located
25    and I signed my name.
```

```
 1                 C. LAMSTEIN-REISS, M.D.
 2                 Then next page on the top
 3      regarding Adrian Schoolcraft addendum to
 4      10/31/09 note of telephone contact with
 5      Captain Lauterborn at approximately 17:50
 6      hours.  Delayed entry made on 10/14/10.  In
 7      reviewing folder, the below information was
 8      found to not be documented in prior note,
 9      but is clear in undersigned's memory.
10      Captain Lauterborn asked if MOS was suicidal
11      or depressed because he needed to know how
12      concerned they should be about MOS's safety
13      given his going AWOL.  Not answering phone
14      calls, not answering door of home, but his
15      car was there, et cetera.
16           Q.    Can I stop you right there.
17      When did you make this entry?
18           A.    October 14, 2010.
19           Q.    October what?
20           A.    14, 2010.
21           Q.    Can I see the original that
22      you're reading from?
23           A.    Sure.
24           Q.    How do you know that you made
25      this entry on October 24, 2010?
```

```
 1                C. LAMSTEIN-REISS, M.D.
 2              MS. PUBLICKER METTHAM:
 3         Objection.  She said October 14th.
 4              MR. SMITH:  No, I'm sorry you're
 5         right.  The 14th.
 6         A.    Because that's what I wrote.
 7    It's there on the page.
 8              MS. PUBLICKER METTHAM:  She also
 9         read it out loud.
10         Q.    And what you read out loud was
11    the words delayed entry made on 10/14/10?
12         A.    Correct, that's what that means.
13         Q.    Why did you make a delayed entry
14    in the file?
15         A.    In reviewing the file I realized
16    that my initial notes of my telephone
17    contact with Captain Lauterborn were focused
18    on information he was telling me and I did
19    not document what I had told him regarding
20    that.  Since then or perhaps, I had become
21    aware just from interviews the officer did
22    with the media that mischaracterized that
23    conversation that said I told the captain
24    that there were I think no cause for concern
25    or something like, that he had no
```

```
 1              C.  LAMSTEIN-REISS, M.D.
 2   psychological problems.  Something like
 3   that.  So at some point in the future, I was
 4   reviewing the folder and I realized that my
 5   telling the captain everything in that note
 6   was not previously documented, but it was
 7   very, very clear in my memory.  So I felt it
 8   important to add that note and I noted the
 9   date that I added it.
10       Q.    So what was the statement in
11   what media that led you a year later to make
12   this entry?
13              MS. PUBLICKER METTHAM:
14       Objection.
15       A.    I don't remember which article.
16   I just recall there had been report that I
17   said that there was no -- that he had no
18   kind of psychological problem or anything,
19   implying that I said there was no cause for
20   concern that night and so as I was reading
21   it, I realized that was missing that I
22   really was writing what the captain was
23   telling me what was going on and I didn't
24   document what I had told the lieutenant --
25   I'm sorry, the captain.  So at some point
```

```
 1              C. LAMSTEIN-REISS, M.D.
 2   when I was reviewing the folder and I
 3   realized that wasn't there, I deemed it
 4   important enough to make a delayed entry and
 5   put that in there.  I think the report I had
 6   read was something that I said he was never
 7   suicidal or something like that, but it left
 8   out the part that my evaluation of that is
 9   only as good as the last time I saw him and
10   if he was acting differently or if something
11   more stressful happened after I saw him,
12   then I can't comment on any -- on his mental
13   status that date, only as of a few days ago.
14   Someone could find out very upsetting and
15   then kill themselves and three days earlier
16   may not have been in their mind and that
17   qualifier had not initially been reported.
18        Q.    Did you ever have any
19   discussions with anybody about making this
20   entry, this delayed entry?
21              MS. PUBLICKER METTHAM:
22        Objection.
23        A.    I don't believe I did.  I don't
24   recall.
25        Q.    Did you talk with your
```

```
 1                C. LAMSTEIN-REISS, M.D.
 2   supervisors about making this entry?
 3        A.     I don't think I did.  I know my
 4   supervisor always reviews my folder.  So he
 5   probably reviewed that at some point and saw
 6   that.
 7        Q.     It was made a year after the
 8   event?
 9        A.     Yeah, actually I think Dr. Knour
10   reviewed it at some point, as well --
11        Q.     Did you ever have any discussion
12   with Propper and Knour about this delayed
13   entry?
14        A.     I have no idea.  I don't
15   remember.
16        Q.     Did you ever have any discussion
17   with anybody at the 81st Precinct about this
18   delayed entry?
19        A.     No, that I did not.
20        Q.     Did ever have any discussion
21   with anybody employed by the City of New
22   York about this delayed entry?
23               MS. PUBLICKER METTHAM:
24        Objection.  Not including conversations
25        you've had with legal counsel.
```

```
 1              C.  LAMSTEIN-REISS, M.D.
 2        A.       Right.  Not including
 3    conversations with legal counsel and I did
 4    not have any other discussions with anybody.
 5        Q.       Wait a minute, excluding any
 6    conversations that you may have had with any
 7    lawyers?
 8        A.       Right.
 9        Q.       Did you ever discuss this
10    delayed entry with anybody working for the
11    City of New York?
12        A.       It would be in the folder when I
13    met with IAB to go over my folder if that
14    conversation was -- if going over my case
15    folder was after that date, then yes, I
16    would have.
17        Q.       What I want to know is sitting
18    here today, do you have a recollection of
19    discussing this delayed entry with anybody
20    who is an employee of the City of New York,
21    other than maybe conversations you had with
22    your lawyer?
23              MS.  PUBLICKER METTHAM:
24        Objection.
25        A.       I just answered that.  I do not
```

```
 1              C. LAMSTEIN-REISS, M.D.
 2   have any recollection.  What I am telling
 3   you is I recall that at some point I
 4   reviewed the case folder with IAB Group 1.
 5   The date of that is in the case folder.  If
 6   the date is after I made that entry, then I
 7   would have discussed it with them.
 8        Q.    I am not asking you about what
 9   you would have done.  I am asking about what
10   you recall.  Do you understand the
11   difference?
12              MS. PUBLICKER METTHAM:  If you
13         want to give her her file, she can tell
14         you if it was before or after she met
15         with IAB.
16              MR. SMITH:  I'm not interested
17         in her inferences or your arguments--
18              MR. KRETZ:  She's given you an
19         answer, Nat.
20              MR. SMITH:  I just want to know
21         what you recall.  We can always draw
22         inferences based on facts and we can
23         draw more inferences based on more
24         facts.
25        Q.    I want to know what you know
```

1                    C. LAMSTEIN-REISS, M.D.

2      about discussing this delayed entry with

3      anybody?

4                    MS. PUBLICKER METTHAM:

5           Objection.

6                    MR. KRETZ:  She's answered that.

7                    MR. SMITH:  I think she has --

8           A.      I only recall at some point --

9      at some point I reviewed all my notes with

10     IAB --

11          Q.      But you don't have a

12     recollection sitting here today --

13          A.      No.

14          Q.      -- of discussing?

15          A.      I don't recall if that was

16     before or after I made that entry.

17          Q.      Do you have a recollection

18     sitting here of discussing the delayed entry

19     with IAB?

20                   MS. PUBLICKER METTHAM:

21          Objection.

22          A.      No.  I recall discussing the

23     full case and that would have been part of

24     it if that conversation was after that date.

25          Q.      All right, thank you.  I think I

```
 1                  C. LAMSTEIN-REISS, M.D.
 2   understand what you're telling me.  Did you
 3   ever speak with anybody from the media about
 4   Schoolcraft?
 5        A.    No.  We never speak to the
 6   media.
 7        Q.    Okay.  So you never spoke to
 8   anybody from the media about Schoolcraft,
 9   right?
10        A.    Correct.
11        Q.    Continue reading the delayed
12   entry.
13              THE WITNESS:  Do you have where
14        I left off?
15        Q.    The first sentence ends with in
16   writer's memory.
17        A.    Undersigned.
18        Q.    Undersigned's memory, right.
19   Can you go on from there?
20        A.    From there, Captain Lauterborn
21   asked if MOS was suicidal or depressed
22   because he needed to know how concerned they
23   should be about MOS's safety given his going
24   AWOL, not answering phone calls, not
25   answering door of home, but his car was
```

```
 1              C. LAMSTEIN-REISS, M.D.
 2    there, et cetera.  I informed captain that I
 3    last saw MOS at PES on 10/27/09 and at that
 4    time he looked okay and reported being
 5    asymptomatic.  At no time had he ever
 6    expressed thoughts of suicide, but he also
 7    never went AWOL before and acted the way he
 8    was acting on 10/31/09.  My assessment of
 9    his suicide risk is only as good as the last
10    time I saw him.  If something happened after
11    and led him to be so upset that he left work
12    without permission an hour before the end of
13    his tour, said he had stomach pains, et
14    cetera.  Then I am unable to say with any
15    reasonable amount of certainty that he is
16    not at risk for suicidal ideation under
17    present circumstances.
18              I provided captain with basic
19    information about reason MOS was on
20    restricted duty.  That he had significant
21    physical symptoms of stress insomnia, GI
22    symptoms, cardiac symptoms, et cetera.
23    Unclear if MOS was reporting openly on
24    10/27/09 when he said all of his symptoms
25    went away without treatment.  Motivation to
```

```
 1            C. LAMSTEIN-REISS, M.D.
 2   minimize is that he did not want to be
 3   psychological restricted duty.  He was open
 4   during initial evaluation, but denied any
 5   and all symptoms in subsequent monitoring
 6   sessions.  When also expressed being upset
 7   about being on psychological restricted
 8   duty.  His reporting on 10/31/09 that he had
 9   stomach pains severe enough to warrant
10   leaving work before end of tour without
11   permission suggests either the symptoms
12   never did go away or they reoccurred on
13   10/31/09 due to his being really upset about
14   something.  It is also possible that there
15   was medical cause for the stomach pain, but
16   the angry manner in which he left work
17   suggests a psychological cause and I signed
18   my name.
19            MS. PUBLICKER METTHAM:  D284
20        and --
21            MR. OSTERMAN:  2890.
22        Q.    Had you, when you prepared this
23   note, any thoughts that there was going to
24   be litigation about what happened to
25   Schoolcraft on October 31, 2009?
```

1          C. LAMSTEIN-REISS, M.D.

2             MS. PUBLICKER METTHAM:

3      Objection.

4      A.      I don't remember.  I would have

5 to refer to my full notes, including

6 redacted information.

7      Q.      When did it first occur --

8      A.      I don't recall.

9      Q.      You don't recall?

10     A.      I don't recall.

11     Q.      Had you been named as a

12 defendant in those two lawsuits Howard and

13 Nelson as of the time of this delayed entry?

14            MS. PUBLICKER METTHAM:

15     Objection.

16     A.      Howard -- this more recent than

17 that.  Actually, I am really not sure.  I

18 think -- I don't remember the dates of those

19 when they first started.

20     Q.      Have you ever made a delayed

21 entry like this in a patient's file or file

22 like this?

23            MS. PUBLICKER METTHAM:

24     Objection.

25     A.      Yes.

```
1                C. LAMSTEIN-REISS, M.D.
2          Q.    Have you ever made a delayed
3    entry of over a year?
4                MS. PUBLICKER METTHAM:
5          Objection.
6          A.    If I was reviewing a case over a
7    year later -- I mean, typically we don't
8    have people who have their cases open all
9    that long, unless they're put in for
10   disability.  If I refuted and I realized
11   there was information missing that was very
12   clear in my mind, I would have added it.  I
13   don't recall.  I don't recall with any
14   certainty.
15         Q.    So the answer to my question is
16   you don't remember ever doing this before,
17   right?
18               MS. PUBLICKER METTHAM:
19         Objection.  That's not what she
20         testified to.
21         Q.    Well, have you ever made a
22   delayed entry that was delayed by a year,
23   other than this one?
24         A.    I do not recall.
25         Q.    You don't recall ever doing it
```

```
 1                    C. LAMSTEIN-REISS, M.D.
 2     before, right?  Is that what you're saying?
 3                    MS. PUBLICKER METTHAM:
 4          Objection.
 5          A.     I definitely made delayed
 6     entries --
 7          Q.     I'm talking about a delay of a
 8     year, Doctor?
 9                    MS. PUBLICKER METTHAM:  Asked
10          and answered.
11          A.     Typically, cases are not open
12     more than a year --
13          Q.     Whether they're typically open
14     for 6,000 years is irrelevant to my
15     question.  My question is, do you have a
16     recollection of making a delayed entry of a
17     year or approximately a year ever before,
18     other than this entry?
19                    MS. PUBLICKER METTHAM:
20          Objection.  You've asked this twice.
21          She's answered it twice.  Stop
22          harassing my witness.  I'll allow her
23          to answer one more time.
24          Q.     Go ahead.
25          A.     I don't have any recollection of
```

C.  LAMSTEIN-REISS, M.D.

1
2     that.
3          Q.     Thank you.  Why did you make
4     this delayed entry?
5               MS. PUBLICKER METTHAM:
6          Objection.  Asked and answered.  You
7          can answer again for the third time.
8          A.     I did already answer that.
9          Q.     You answered it before I knew
10    what the entry was.  So why don't you answer
11    it again?
12         A.     Okay.  Because I was reviewing
13    the case folder and I realized that I had
14    left all of that out.  That my notes were
15    focused -- my notes, when I was on pager
16    duty, were focused on getting information
17    from Captain Lauterborn and documenting what
18    he was reporting on about what was going on
19    and I realized I did not adequately report
20    about what I told Captain Lauterborn and I
21    had some awareness that news articles or
22    interviews were saying that I said there was
23    -- he was definitely not suicidal or had no
24    concerns about that and that the department
25    -- kind of implying the department ignored

1                C. LAMSTEIN-REISS, M.D.
2    that and that was not the case.  So when I
3    realized I never documented that I felt
4    there was something missing from the report.
5    That was very clear in my mind.  So I added
6    the entry.  I noted the date that I added
7    the entry.  I don't --
8         Q.     So there's a media report about
9    the Schoolcraft matter that triggered this
10   entry, right?
11        A.     No.  The entry was triggered by
12   my realizing this information was missing.
13   It probably came to my attention more
14   because I realized this had all been
15   mischaracterized in the media and then I
16   realized it was never properly documented in
17   the folder and so because of that I made the
18   entry.  Not because of the media reports,
19   but because in reviewing the case folder, I
20   realized that information was missing.
21        Q.     Information that was
22   inconsistent with what was being described
23   in the media, correct?
24                MS. PUBLICKER METTHAM:
25        Objection.

```
 1                    C. LAMSTEIN-REISS, M.D.
 2        A.     Correct.
 3        Q.     Am I correct that you made this
 4   delayed entry based exclusively on the
 5   content of memory?
 6        A.     Yes.
 7        Q.     You didn't have any other
 8   paperwork that reflected or aided you in
 9   making this entry?
10        A.     No.
11        Q.     Can you continue reading the
12   entries dated 10/31/09?
13        A.     Yes.  The next page is the entry
14   that starts at 22:35 hours, top of the page
15   says regarding P.O. Adrian Schoolcraft
16   10/31/09.  At 22:35 hours telephone contact
17   with Captain Lauterborn.  Made entry using
18   key because landlord heard footsteps.  He
19   said he was sleeping whole time, but not
20   possible with the amount of banging and
21   yelling they were doing outside before going
22   in with the key to make sure he was okay.
23   It was bad scene.  He had admitted that
24   sergeant called him back and denied him the
25   sick leave, but that he left the command
```

| 1 | C. LAMSTEIN-REISS, M.D. |
|---|---|
| 2 | anyway.  Captain explained that they were |
| 3 | concerned because he says sick and they |
| 4 | didn't know why he left in such a huff that |
| 5 | way.  MOS said, quote, why worried when no |
| 6 | one was ever worried about me before, end |
| 7 | quote.  Let me correct, Captain Lauterborn |
| 8 | didn't say those were the exact words he |
| 9 | used.  He refused to go to command and kept |
| 10 | saying he didn't feel well.  Captain called |
| 11 | ambulance, EMTs took his vitals.  Blood |
| 12 | pressure very high 170 over 120.  EMT wanted |
| 13 | him to go to hospital because blood pressure |
| 14 | so high, not optional, MOS agreed, but then |
| 15 | refused. |
| 16 | Q.    What does that mean not |
| 17 | optional? |
| 18 | MS. PUBLICKER METTHAM: |
| 19 | Objection. |
| 20 | A.    My understanding is that the EMT |
| 21 | believed that his blood pressure was so high |
| 22 | that he absolutely had to go to the hospital |
| 23 | and that it was not optional. |
| 24 | Q.    Please continue. |
| 25 | A.    MOS agreed, but then refused. He |

```
 1              C. LAMSTEIN-REISS, M.D.
 2    ran back inside and had to be strapped down
 3    and forcibly taken to Jamaica Hospital.  I
 4    asked a follow-up question about that and he
 5    said MOS said he wanted to sleep at home and
 6    would go to ER on own the next day, but EMT
 7    couldn't allow that because blood pressure
 8    was so high.
 9              Chief Marino was there and
10    suspended him.  MOS was very disrespectful
11    in every way.  Chief gave him so much room,
12    but MOS out of control with total disregard
13    for supervisors.  Whole time talking with
14    father on cell phone, could hear father
15    yelling.  I asked if he was yelling at MOS
16    or to him about the situation.  He said not
17    at MOS.  Father angry about NYPD's handling
18    of this and other situations of MOS. Father
19    doesn't have accurate information in all
20    likelihood.  Top of the next page.  MOS at
21    Jamaica Hospital now.
22        Q.    Hold on a second I need to find
23    that page.
24              MS. PUBLICKER METTHAM:  D288.
25              MR. SMITH:  And is it also in
```

```
 1              C. LAMSTEIN-REISS, M.D.
 2      the regular production?
 3              MS. PUBLICKER METTHAM:  I'm
 4      looking.  I don't know, but it's
 5      definitely on D288.
 6              MR. SMITH:  The documents that
 7      are produced are out of order.
 8              MS. PUBLICKER METTHAM:  I never
 9      produced the files with the 29 Bates
10      Numbers as the complete file of PES.
11      That is how they're maintained by IAB.
12      The file bearing the D Bates Number is
13      are what I produced as representative
14      of the PES file.
15              MR. SMITH:  Okay.  Well, in any
16      event.  So that entry --
17              MR. PUBLICKER METTHAM:  It's on
18      --
19              MR. KRETZ:  2946.
20              MS. PUBLICKER METTHAM:  2946.
21      However there's an IAB note that covers
22      the relevant portion that she's reading
23      from at this time.
24              MR. SMITH:  That explains that.
25      Q.      All right.  So let's take a look
```

**EXHIBIT B**

"COPY"

PO Schoolcraft's PES folder 's

DR Lamstein
notes
PO Schoolcraft's
Tests

AH # 233 A



EXHIBIT
PES 68
1/30/2014

NYC00002693

NAME: Schoolcraft, Adrien   RANK PO   TAX# 931186   SHIELD # 12943

UNDER: Schoolcraft, Adrian   MEDICAL DISTRICT 17

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   DATE OF APPOINTMENT 1 July 02   DOB 6/21/75   MARITAL STATUS Single   CHILDREN 0

8260 88TH Place *2L Glendale NY 11385   PERMANENT ☒ TEMPORARY ☐

HOME PHONE 718 570-6224   ALT PHONE (718) 570-6224

104

81   COMMAND PHONE 718 574-0441   DIRECT SUPERVISOR Sgt. Stukes
Res can: ext 452

DO NOT WRITE BELOW THIS LINE

DATE REFERRED _____   DATE CLOSED _____

REFERRAL PHONE _____

REFERRAL RE: DOMESTIC, DISCIPLINARY, IOD8, SUICIDAL, ETC. _____

DATE REMOVED _____   DATE PSYCH HOLD _____

DATE PSYCH HOLD REMOVED _____   NOTIFIED _____

2/21/10 - Timeline of PES contacts with P.O. Adrian Schoolcraft

**4/13/09** – MOS referred to PES by District Surgeon Dr. Ciuffo for acute anxiety secondary to stress on job. Dr. Lamstein at PES interviewed MOS on same day. MOS complained of chest pains for over one year, stomach problems and trouble sleeping. There were no medical findings. PO Schoolcraft had been to an emergency room, and was prescribed psychotropic medications by his personal physician. Work problems were cited- getting below standards evaluations due to low activity; told to write more summonses and 250s that he disagreed with; claimed that he was assigned to a footpost in front of a building that generates lawsuits against cops. He alleged that other officers wrote false summonses. He hired a lawyer to fight his low evaluation. At Dr. Lamstein's request, PO Schoolcraft signed releases of information to speak with the physician who prescribed the medication, and to get records from the emergency room visit.

**4/14/09**- Dr. Lamstein discussed the case with Dr. Propper, supervising psychologist at PES. MOS placed on restricted duty due to his anxiety symptoms and use of psychotropic medications.

**4/15/09** – Dr. Lamstein spoke with MOS and informed him of psych R/D decision. MOS was not happy with the decision. MOS verbally withdrew releases of information he had signed. Dr. Lamstein asked him to put that request in writing as well.

**5/22/09** – MOS rescinded the ROI in writing in a formal legal statement signed by a notary.

**7/27/09** – Dr. Lamstein met with MOS at PES. He reported that he no longer felt stressed about anything, and that every one of his physical symptoms of stress was completely better. He denied taking medication for any reason. He said things were better at work since he was on restricted duty because he was left alone, was not getting written up, and they could no longer stick him on a foot post "in front of the most dangerous building in the precinct," or force him to do overtime. Dr. Lamstein urged PO Schoolcraft to get stress management counseling, and at the officer's request recommended two books.

**10/13/09** – Dr. Propper received a call from Sgt. Bonilla in the Police Commissioner's office informing PES that MOS' father called "City Hall" and complained to a Deputy Mayor's assistant that his son was never told why he is on R/D.

**10/27/09** – Dr. Lamstein returned from vacation and met with MOS to make sure he was clear about the reason he is on R/D. Dr. Lamstein again explained in detail that he was on restricted duty because he had significant physical manifestations of stress that were causing distress, and that he would benefit from treatment. He continued to report that he no longer had physical symptoms of stress and no longer felt stressed at work.  He said he called therapists Dr. Lamstein had recommended, but none took his insurance. Dr. Lamstein offered to help him find an in-network therapist who specializes in stress management, and he expressed appreciation for that assistance.  Dr. Lamstein soon mailed him a list of psychologists in his preferred location who accepted his insurance and specialized in anxiety and stress management.

NYC00002895

**10/31/09** – Dr. Lamstein was the psychologist on pager duty when MOS went AWOL. Capt. Lauterborn, MOS' XO at the 81 Pct., kept Dr. Lamstein informed throughout the night. Capt. Lauterborn reported underlying issues with MOS at the command that might have precipitated his going AWOL. He said MOS had made allegations against others and the Department's investigation of those allegations had picked up that week. About 4 PO's and 2 civilians were called down for questioning that week. Notifications were in telephone message log so MOS knew who was going. He went up to them upon their return, trying to get information from them about what they were asked. While MOS was still missing, Dr. Lamstein left a message on MOS' cell phone urging him to call her or his Captain, or return to his home or command.

**11/2/09** – Dr. Lamstein received a call from Sgt. DeGrabrizio, IAB Group 31. Dr. Lamstein provided general information about MOS and the reason he is on psych R/D.

**11/2/09** – Dr. Lamstein received a call from MOS' father, Larry Schoolcraft. He yelled throughout the conversation in an accusatory, threatening and insulting tone of voice. He was angry because of the events of 10/31. He vaguely threatened legal action and hung up on Dr. Lamstein.

**11/4/09** – Dr. Lamstein received a call from Sgt. Scott, IAB Group 1. Sgt. said he interviewed MOS at Jamaica Hospital and PO Schoolcraft signed a release of information authorizing the hospital to release information to the NYPD. Sgt. reported that MOS' father was still alleging that Dr. Lamstein never told MOS why he is on R/D.

    – Dr. Lamstein returned a call from MOS' father, Larry Schoolcraft. He was polite and friendly during this call. He said they just had a meeting at the hospital at 2 PM which he had hoped Dr. Lamstein would be able to attend. Dr. Lamstein said that she would be happy to speak with MOS' treatment providers at the hospital as long as PO Schoolcraft signed a release of information authorizing it. He thanked Dr. Lamstein and ended the call courteously.

**11/9/09** – Dr. Lamstein spoke with Jamaica Hospital, Christine McMahon, MSW after a few days of leaving each other messages. She said MOS refused to sign a release of information allowing NYPD to release information to the hospital. She said MOS was discharged on 11/6/09 with a follow-up plan of a scheduled appointment with a psychiatrist. She said he had some weird beliefs but was not a danger to himself or others.

    – Dr. Lamstein received a call from IAB Group 1, Sgt. Scott and Lt. Crisalli. They reported that they went to MOS' home on 11/6 after he was discharged from the hospital. MOS told IAB that he was kept at Jamaica Hospital because a counselor there used to work at the NYPD and is in cahoots with the NYPD, and the Department wanted him kept there. He had many digital recording devices in his home. He provided recordings to IAB as evidence of what he said was mistreatment by the NYPD on 10/31/09. The recordings included his side of phone conversations with his father and revealed that he had a rifle in his home (despite being on "no firearms" status) and was concerned that the NYPD might ask him to go to a hospital to take a drug test.

**11/30/09** – Dr. Lamstein spoke with IAB Group 1, Lt. Crisalli. Confirmed that IAB did recover the rifle.

**12/1/09** – At the request of Lt. Mascol of the 81 Pct., Dr. Lamstein tried calling MOS with the hope that perhaps he would return the call. This was part of ongoing efforts to notify MOS to report to IPP for reinstatement. It was unsuccessful.

**1/19/10** – Dr. Lamstein received a release of information from Fulton-Montgomery VA Primary Care Practice. It requested PES send them "last office notes" and a medication list. It said MOS had an appointment scheduled with them on 1/20/10. On 1/20/01, Dr. Lamstein spoke with Louis at the VA clinic and explained that PES only saw MOS for an evaluation of his psychological fitness to perform police work and that PES were not treatment providers. He did not think they needed this type of records.

NYC00002897

Received:
Fax:    Oct 14 2010 11:00am    Oct 14 2010 11:04am  P001/001

Re: Po Adrian Schoolcraft

[handwritten notes, largely illegible]

NYC00002898

Re: Po Adrian Schoolcraft

10/3/69

2235 - T/C to Capt Lauterborn

Made entry using key b/c landlord heard potatoes. He said he was sleeping while tire but not possible with the amount of banging + yelling they were doing outside before going in with the key to make sure he was ok at in a bad area.

He admitted that Sgt Callistro back + denies him the sick leave, but that he left the command anyway, Capt explained that they were concerned b/c he said sick + they didn't know why he left in such a huff that day, MOS sd "why concern now nobody has worried about me before" He refused to go to command + kept saying he didn't feel well. Called ambulance, EMT's took his vitals.

BP very high, 170/130, EMT wanted him to go to hosp. b/c BP so high. He + options then MOS agreed but then refused. He ran back inside + had to be stripped down + forceably taken to Jamaica Hosp. bl. (1) MOS said he wanted to sleep at home + will go to ER on own the next day, but EMT couldn't allow that b/c BP so high. Chief Marino on there + Suspended him. MOS was very disrespectful in every way, Chief gave him so much room but MOS out of control + total disregard for superiors.

Whole time talking + putting on cell phone could hear putting yelling, (at MOS or to him about situation?) Not at MOS, Father angry about NYPD handly of this whole situation + MOS, Father doesn't have accurate info + much likelihood.

NYC00002606

Deputy _____ Sgt & Cpt L, all left
him message & asked him to go back to command
a Lt is at his house. His Car is there.
_____ said MOS may have been there earlier. Currently
her MOS' _____ was here, MOS not _____ here.

- I left a msg on MOS' cell phone. I gave my
cell # - Cpt L's cell phone. I told him that Cpt
said he could just return his home if he didn't want to
go to the command, I urged him to go home or call Lt Cpt
so this could be resolved quickly & easily. I/o need
for a hospitalization & search of him, or simply
arte the suspension. Much easier to just resolve it
quickly & easily now. I explained that there is just
concern of his safety & they want to make sure he is ok.

✗ - I (c & Cpt Lautenborn - I asked Cpt that I left
msg on MOS' cell phone as discussed above. I suggested Sgt
call MOS' ____ b/c that's the person he is closest to & the
person who is most likely to know his whereabouts. Cpt will
call I/S him home or have for MOS.
_____ G ___

2015    I (c Cpt Lautenborn
Still no word from MOS, Cpt called MOS' father,
who also hadn't heard from him. Father had some concern
over phone but eventually understood Cpt's point of view &
concern. Hoping Father will call MOS & encourage him to go home.
Cpt will go to MOS' home. If possible he's home but not
answering phone (Landlord has spare key?) yes & Cpt has it, but
legal issues I say if he to her Came. Hoping he won't pay
that route.
_____ G ___

2140 -  I (c Sgt Klass, sick desk, off duty. since not known when
MOS might be located.
_____ C ___

NYC00002900

Page 2

Page Duty - Re: P.O. Adrian Schoolcraft

10/31/09- 7/C C sick body Sgt Kloos

on duty at     MOS was # work today, He slanned a sick report
1740          on the Sgt's desk + said he was going out sick. Sgt
rcv 455       told him to stick around + he refused + left. Didn't
              follow procedure. Typically, they call sick desk + wait for
offset        command to arrange coverage. MOS was working on T.S.
2140          MOS did not go straight home. Cops are at his
              home waiting for his arrival. They called MOS on
              his cell phone. They think he picked up + then hung up.
              Since then, no answer. They are thinking of arrangement
              him but they suspect it is more of a psych problem.
              XO of MOS' command (81 Pct) is Capt Lauterborn +
              request report for ISS. ————— C. Jordan Pryor

7/C C Capt Lauterborn
              MOS doing a 7-3 day tour today, at TS all day,
              all was fine. He typically keeps to self + doesn't
              converse much with other there, o didn't come today. Nothing
              seemed out of ordinary.
              2/PM- he sent down to take run, changed & the
              put a sick report on Sgt's desk & sd going sick.
              He wrote that he had stored items. Sgt tried to
              stop him but he left anyway.
              Underlying issue- MOS has made allegation against
              others. Dept's investigation of these allegation picked up this
              week + it must be balled for that, This week, about 4 POS +
              2 civilian people are called down for questioning. MOS goes
              up to them + asks about it, notifications are in telephone
              message log so he knows who is going, who they are, he tries to
              intercept them + get info from them about what he was asked.
              Today was 1st tour back after RDO's, Not sure what
              happened today that triggered him to leave like that.

NYC00002901

Re: P.O Adrian Schoolcraft

10/27/09 - F/F/C/MOS

I explained to MOS that I called him in immediately upon my return from a 2 wk vacation b/c I received my that his father made a complaint claiming that I never told MOS the reason why he is on R/D. Since we had discussed that in detail at his initial & subsequent visits, I emphatically expressed an incredulity of how he may not have wanted to tell his father the reason why he was on R/D. In make sure that he had a clear understanding of why he is on R/D, I again explained in detail that he is on R/D b/c he had significant physical manifestations of stress that were causing much discomfort & would benefit from treatment & further monitoring.

MOS said he no longer has these physical stress even though he is still facing the same stress as before. While on R/D, he is at first deal of PCT dealing with complete all day long — not stressful to him, he not any less stressful (in his opinion) as regular F/D work.

I again reassured stress mgt & relaxation training so that next time he is faced with new increased stress he won't have a recurrence of the Chest pain, headache, morning upset stomach, etc. that he had of caused much when he 1st come to PES. He said he bought both books I recommend & started reading them, but not that helpful. some not not he did't know before. He thought the Burns book was kind of corny & preferred the Ellis book. He brought both books to today's appt & had Bookmark in them & not very far into them (so haven't read much of them). He said he called a few people I recommend & got some calls & one costs $400/hour. I told him call help to find on Active Physes & I'm sure they not cover CBT for physical so of Anx. He said he would call later & his provider & & name of his exact HMO plan so I can make sure the provider in network. MOS expressed on appreciate of the session.

E. Smith Psy B

10/27/09 - Mos called with his health insurance info.
⸻ C Smith/PsP

10/27/09 - 7/C & Mos

I informed Mos that I found a number of psychologists in
Forest Hills (his preferred location) who accept Aetna Insc &
specialize in CBT, Anx, & Anger Mgt. He does not
have a private fax machine & offered to mail it to
him. I also gave him the Aetnabehavioralhealth.com
website for further referrals as well as educ. & self-
assessment tools. ⸻ C Smith/PsP

NYC00002903

**EXHIBIT C**



**THE CITY OF NEW YORK**

MICHAEL A. CARDOZO
*Corporation Counsel*

# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NEW YORK 10007

SUZANNA PUBLICKER METTHAM
*Assistant Corporation Counsel*
E-mail: smettham@law.nyc.gov
Phone: (212) 788-
Fax: (212) 788-9776

April 24, 2014

## BY HAND DELIVERY

Nathaniel Smith
*Attorney for Plaintiff*
111 Broadway, Suite 1305
New York, New York 10006

> Re: Schoolcraft v. The City of New York, et al.
> 10 CV 6005 (RWS)

Counsel.

Enclosed please also find the original transcript for Dr. Catherine Lamstein, Psy. D., in addition to her errata sheets and transcript signature page.

Encl.

Sincerely yours,

Suzanna Publicker Mettham
*Assistant Corporation Counsel*
Special Federal Litigation Division

cc

Gregory John Radomish (By Hand Delivery w/o Transcript)
MARTIN CLEARWATER & BELL LLP
*Attorneys for Jamaica Hospital Medical Center*
220 East 42nd Street 13th Floor
New York, NY 10017

Brian Lee (By First-Class Mail w/o Transcript)
IVONE, DEVINE & JENSEN, LLP
*Attorneys for Dr. Isak Isakov*
2001 Marcus Avenue, Suite N100
Lake Success, New York 11042

Bruce M. Brady  (By Hand Delivery w o Transcript)
CALLAN, KOSTER, BRADY & BRENNAN, LLP
*Attorneys for Lillian Aldana-Bernier*
1 Whitehall Street
New York, New York 10004

Walter A. Kretz , Jr.  (By Hand Delivery w/o Transcript)
SCOPPETTA SEIFF KRETZ & ABERCROMBIE
*Attorney for Defendant Mauriello*
444 Madison Avenue, 30th Floor
New York, NY 10022

Received                    Apr 24 2014 03:30pm
                    NYPD PSYCH        Fax:17187607589         Apr 24 2014 03:37pm  P002/016

Page 376

1              C. LAMSTEIN-REISS, M.D

2       A.      No.  They're informed of the

3    person's duty status change.  They're not

4    told the reason for it.  That's again what's

5    on a need to know basis and what's not.

6    They just need to know that he's on

7    restricted duty at that point

8              MS. PUBLICKER METTHAM.  And

9         we're off the record  Thank you

10             (Time noted   7:47 p.m )

11

12         CATHERINE LAMSTEIN-REISS, M.D. Ph.D

13

14

15  Subscribed and sworn to before me this

16

17   24th   day of   April           2014

18

19                                    , Notary

20  Public

21              MARILYN TORRES
              Notary Public, State of New York
22                 No. 01TC6068820
                Qualified in Kings County
              Commission Expires Jan 17  2015

23

24

25

Received

NYPD PSYCH                    Apr 24 2014 03:30pm
                    Fax: 718 760 0585      Apr 24 2014 03:37pm  P003/013

Page 379

```
 1              WITNESS'S CORRECTION SHEET

 2       PAGE \ LINE \ CORRECTION

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20              CATHERINE LAMSTEIN-REISS, M.D.

21

22       Subscribed and sworn to before me

23       this _____ day of _____ , 2014

24              _____ , Notary Public

25
```

MARILYN ____
Notary Public, State of New York
No. _____
Qualified in ___ County
Commission Expires _____

VERITEXT REPORTING COMPANY
212-267-6868          www.veritext.com          516-608-2400

Rent ved
NYPD PSYCH
Por 24 2014 05:31am
Fax:17187607585          Apr 24 2014 03:37pm  P004/010

Page 379

1          WITNESS'S CORRECTION SHEET

2     PAGE \ LINE \ CORRECTION

3        p 71, line 7,  a matter of severy (wrong word)

4        p 72, line 13,  that list, t (not "this")

5        p 74, line 6,  i must show (not "have")

6        p 87 line 20,  recall discussing (not "deciding")

7        p 88, line 21,  administrative inquiry was, (and the "about the "..."

8        p 92, line 23,  secondary re-stress or (not "distress")

9        p lost, line 3,  the turn no (no's) substance removed

10        p 104, line 20,  delete "a" in beginning of line

11        p 114, line 22,  no longer had (am issued a "accept of line)

12        p 127, line 3,  that is something (not "it")

13        p 130, line 2,  to address general (not "due 4")

14        p 146, line 17,  says (not "say")

15        p 146, line 19, p.  (not DE)

16        p 144, line 7,  stable (not "possible")

17        p 149, line 5,  gun and a p-lithin (not "in")

18        p. _____ _____ M. Ma      (not "M. Con")

19

20                    Catherine Lamstein-Reiss, M.D.
                      Ph.D.

21

22     Subscribed and sworn to before me

23     this 24th day of April, 2014

24     _____ , Notary Public

25  _____
Notary Public
No. _____
Qualified _____
Commission Expires Jan 17
212-767-6868

2015  VERITEXT REPORTING COMPANY
www.veritext.com                516-608-2400

1         WITNESS S CORRECTION SHEET

2    PAGE \ LINE \ CORRECTION

3    *[illegible handwriting]*

4    *[illegible handwriting]*

5    *[illegible handwriting]*

6    *[illegible handwriting]*

7    *[illegible handwriting]*

8    *[illegible handwriting]*

9    *[illegible handwriting]*

10    *[illegible handwriting]*

11    *[illegible handwriting]*

12    *[illegible handwriting]*

13    *[illegible handwriting]*

14    *[illegible handwriting]*

15    *[illegible handwriting]*

16    *[illegible handwriting]*

17    *[illegible handwriting]*

18    *[illegible handwriting]*

19

20    CATHERINE LAMSTEIN-REISS, M.D.
                     Psy.D.

21

22    Subscribed and sworn to before me

23    this _____ day of _____ 2014

24    _____ Notary Public

Received                                    Apr 24 2014 03:31pm
                    NYPD PSYCH          Fax:17187607589      Apr 24 2014 03:38pm  P006/010



Page 379

1              WITNESS'S CORRECTION SHEET

2       PAGE \ LINE \ CORRECTION

3       p. 197, line 5,    *nowas* (shows)

4       p. 197, line 6,    *was had*

5       p. 202, line 10, *emphasis the specializes in that (missing word)*

6       p. 204, line 9,  *I was still*

7       p. 205, line 3,  *I was off (delete the ")*

8       p. 205, line 18,  *calling*

9       p. 207, line 14,  *than to figure (missing "to")*

10      p. 212, line 19, *diversify or (add comma)*

11      p. 219, line 2   *and it's of such move into that (wrong words)*

12      p. 220, line 21, *de-rated (lost tense)*

13      p. 223, line 5,  *were raised (add "are")*

14      p. 223, line 14,  *had I taken (add "have")*

15      p. 224, line 9,   *dating or (not and)*

16      p. 224, line 9,   *moved to (not "a")*

17      p. 226, line 8,  *dancing, like the next day, were you told*

18      p. 228, line 14   *command and department (missing "and")*

19

20                  CATHERINE LAMSTEIN-REISS, M.D.
                                                Psy.D

21

22      Subscribed and sworn to before me

23      this  24th  day of  April  , 2014

24      _____, Notary Public

JARILYN TORRES
Notary Public State of New York
No. 01TO6006800
Qualified in Bronx County
Commission Expires Jan 17, 2015
     212-367-6868

VERITEXT REPORTING COMPANY
www.veritext.com

516-608-2400

Page 379

1           WITNESS'S CORRECTION SHEET

2     PAGE \ LINE \ CORRECTION

3     _(illegible handwriting)_

4     _(illegible handwriting)_

5     _(illegible handwriting)_

6     _(illegible handwriting)_

7     _(illegible handwriting)_

8     _(illegible handwriting)_

9     _(illegible handwriting)_

10    _(illegible handwriting)_

11    _(illegible handwriting)_

12    _(illegible handwriting)_

13    _(illegible handwriting)_

14    _(illegible handwriting)_

15    _(illegible handwriting)_

16    _(illegible handwriting)_

17    _(illegible handwriting)_

18    _(illegible handwriting)_

19

          _(signature)_

20              CATHERINE LAMBSTEIN REISS, M.D.

21

22    Subscribed and sworn to before me

23    this _____ day of _____ , 2014

24    _____ , Notary Public

25    _(illegible)_

Apr 24 2014 09:32pm
NYPD PSYCH        Fax 12587600565        Apr 24 2014 03:39pm  P104/07-

Page 379

1                WITNESS'S CORRECTION SHEET

2    PAGE \ LINE \ CORRECTION

3    p. 273, line 22, Herizeal (~my spelling)

4    p. 272, line 23, Scroquel. And the doctor (my prescription...)

5    p. 272, line 5, ...(illegible)

6    p. 271, line 6, to be putting (missing "be")

7    p. 272, line 10, out first (not outside)

8    p. 277, line 11, ...(illegible) (not "if")

9    p. 279, line 7, limited (not "lim")

10   p. 280, line 11, out tick (delete "to")

11   p. 282, line 13, ...(illegible) (delete "or")

12   p. 287, line 21, to get better (...ing "get")

13   2.292, line 24, ...(illegible) (delete "to", ...)

14   p. 300, line 18, after this amount (not "of")

15   ...(illegible) line 11, ...(illegible) ("receive")

16   p. 34, line 14, Methadone (not "methadon"), ...on this line

17   p. 34, line 21, ...(illegible)

18   p. 41, line 6, ...(illegible)

19

20                   CATHERINE ... REISS, ...

21

22   Subscribed and sworn to before me

23   this 24th day of April, 2014

24   ...    , Notary Public

25 MARILYN ...
Notary Public State of New York
...
Qualified in ...
Commission Expires ... 2015   VERITEXT REPORTING COMPANY
212-267-6868          www.veritext.com          516-608-2400

Received                    NYPD PSYCH        Apr 24 2014 03:32pm
                                              Fax:17187607535        Apr 24 2014 03:38pm  P003/010

Page 379

1              WITNESS'S CORRECTION SHEET

2    PAGE \ LINE \ CORRECTION

3    p. 31 5, line 6,   McMahon

4    p. ..., line 18,   ...

5    p. ..., line 4,   M. Mahon

6    p. 316, line 7,   didn't seem (delete "not")

7    p. 318, line 12,   month at all (not "on")

8    p. 321, line 15,   but within (not "so" within)

9    p. ..., ...   during their duties"

10   p. 324, ...   as (not called")

11   p. ..., line 13,   (present (given)

12   p. 441, line 5,   asks (not asked )

13   p. 328, line 18,   present (not plant )

14   p. 324, line 14,   ... he is (not eager )

15   p. Do, line 4,   ... (not "certified")

16   p. ..., line 12,   ...

17   p. ..., line 14,   ...

18   p. 377, line 14,   ... (not saying )

19

20                        CATHERINE LAMSTEIN-REISS, M.D.
                                                        Psy.D.

21

22   Subscribed and sworn to before me

23   this 24th day of March, 2014

24   ...Marie...          Notary Public.

25 MARIE ...
Notary ... New York
   No. 01 ...
   Qualified ... County
Commission Expires Jan 17 2015
   212-267-6868

VERITEXT REPORTING COMPANY
www.veritext.com                          516-608-2400

Received                                          Apr 24 2014 03:32pm
                    NYPD PSYCH           Fax:17187607589          Apr 24 2014 03:39pm   P010/010

Page 379

1              WITNESS'S CORRECTION SHEET

2      PAGE \ LINE \ CORRECTION

3      p.341, line 2,    to be on (missing "on")

4      p.343 line 10,   reviewed it (not "refuted")

5      p.347, line 23,   was a bad (missing "a")

6      p.347, line 23,   he admitted (delete "had")

7      p.347, line 3,    said (not "says")

8      p.349, line 18,   discussing with MoS (and "of")

9      p.362, line 10,   what if (not "would")

10     p.368, line 4,   At that point (not "that")

11     p.368, line 5,   duty (not "duty")

12     p.369, line 2,   delete "of"

13     p.371, line 16,   but they are (not "there")

14     p.371, line 4    Psy.D. (not M.D.)

15     p.378, line 8    Psy.D. (not M.D.)

16

17

18

19

20                      CATHERINE LAMSTEIN-REISS, M.D.
                                                 Psy.D.

21

22     Subscribed and sworn to before me

23     this 24th day of         April         , 2014

24     _____, Notary Public.

25 MARION TORRES
   Notary Public State of New York
        No. 01TO5032990
   Qualified in Kings County
   Commission Expires Jun 17 2015     VERITEXT REPORTING COMPANY
        212-267-6868                  www.veritext.com                    516-608-2400

**EXHIBIT D**

**POLICE DEPARTMENT**
**CITY OF NEW YORK**

M # 09-1973          Log# 09-41517          SIU# 01-148-09

**From:**      Sergeant Alroy Scott, Special Investigations Unit

**Date/Time:** February 15, 2011 / 1600 hrs.

**Allegation:** DRV-Other

**Subject:**   **Retrieval of Police Officer Schoolcraft Department Psyche Records /**
              **Interview of Dr. Lamstein**

(KD) 08/24/09 @ 1500 HRS***DRV-OTHER***Dt McGonagle, Group 1, forwarded the following complaint to the C/C by fax. letter reads as follows: PO Schoolcraft, Tax # 931186, 81 pct, reports that an unidentified person from DI Mauriello's, C.O. 81 Pct, Administrative Staff, has reported that S/O's Sgt Weiss, Tax #          , 81 pct and Lt Caughey, Tax #          , 81 pct, broke in and entered, without permission or authority, a looked office containing sensitive department files, and removed documents pertaining to Civilian Complaints that were inside of Sgt Weiss's Department Personnel Folder. The source states that the files would have been an obstacle to the evaluation and promotion of Sgt Weiss to NYPD lieutenant. Sgt Weiss has since been promoted to lieutenant. DI Grossi recommends OG back to Group 1. (KD)

1.          On the above date and approximate time, the undersigned Investigating Officer is documenting retrieval of a copy of Police Officer Schoolcraft Department Psychological Records on October 12, 2010 and a subsequent interview involving Dr. Lamstein on October 13, 2010.   The undersigned copied Police Officer Schoolcraft Department Psychological Records for review. Police Officer Schoolcraft's folder contained information relating to his initial psychological Department hiring interview and test. Additionally the folder contained notes by Dr. Lamstein relating to her and Police Officer Schoolcraft meetings and other department documents relating to Police Officer Schoolcraft being assigned to Restricted Duty due to stress an anxiety. Dr. Lamstein was interviewed in an attempt to bring a better understanding of Police Officer Schoolcraft's folder.
          At the start of the interview with Dr. Lamstein, she established that Police Officer Schoolcraft folder contained documents pertaining to his psychological history since his acceptance to the Department. She also stated that the folder contained her notes that she had made after each interaction with Police Officer Schoolcraft.   Dr. Lamstein read from her notes to the undersigned for clarity. The following is a summation of some of the important points that were discussed during her and Police Officer Schoolcraft's meeting that pertained to this case.
          Dr. Lamstein disclosed that her first meeting with Police Officer Schoolcraft was on April 13, 2009. Dr. Lamstein explained that Police Officer Schoolcraft was referred to her from District Surgeon, Dr. Cioffo because Police Schoolcraft was exhibiting signs of acute anxiety secondary to stress on the job.
          Dr. Lamstein explained that during their first meeting, Police Officer Schoolcraft informed her that he went to Forest Hills Hospital emergency room on April 3, 2009 because he felt weak at home and a thumping in his chest. She stated that Police Officer Schoolcraft informed her that he was diagnosed with having a "panic attack" and was given an injection of lorezapm (sedative).   Dr. Lamstein disclosed that Police Officer Schoolcraft informed her that he had stomach problems for the past six (6) month's; which included diarrhea.  He also reported to her that his primary care physician prescribed him seraqil. Dr. Lamstein continued to state that Police Officer Schoolcraft informed her that he has had trouble sleeping for about three (3) months and complained of chest pains for about a year. Police Officer Schoolcraft informed Dr. Lamstein that he felt run down.
          Dr. Lamstein informed the undersigned that she spoke with Police Officer Schoolcraft about work related issues and that he disclosed to her that he was told to write more summons and further explained that he had received a 2.5 on his recent annual evaluation with a recommendation of transfer; in which he informed her that he has appealed. She stated that Police Officer Schoolcraft had informed her that he had a big meeting that involved his delegate and about 8-9 other supervisors in which they discussed his work performance. Police Officer Schoolcraft stated to her that he has not had any problems with work until this year. Dr. Lamstein stated that he

CONFIDENTIAL

NYC00004556

reported to her that he didn't have any financial problems; however he hasn't filed his taxes in several years. Police Officer Schoolcraft stated that his mother prepare his taxes and made his doctors appointments before her death 5 years ago from cancer. Regarding the IRS, Police Officer Schoolcraft stated that he wasn't worried about it because the IRS owed him money.

Dr. Lamstein further discussed her first meeting with Police Officer Schoolcraft. She stated that Police Officer Schoolcraft disclosed to her that he likes the job (referring to the NYPD) but hates where he is assigned. She stated that Police Officer Schoolcraft described a situation when he was assigned to RDO overtime and received the call that his mother had a stroke. He stated that he wasn't able to be excused from his assignment and how he resented the job because of it. Dr. Lamstein also informed the undersigned that Police Officer Schoolcraft stated to her that he doesn't hallucinate nor is he paranoid, but wonders if he was assigned to the 81 to get jammed up. Dr. Lamstein stated that she recommended to Police Officer Schoolcraft that he speaks to someone regarding the continuation of CBT (Cognitive Behavioral Therapy) to help him and further recommended him to read a book called "Feeling Good". She stated that she had given Police Officer Schoolcraft a list of specialist that specializes in CBT that accepted his insurance (Aetna). Dr. Lamstein disclosed that she also informed Police Officer Schoolcraft that he was going to be on restricted duty temporarily and that it wasn't for disciplinary reasons. She stated that Police Officer Schoolcraft was cooperative in his demeanor; however he indicated that he didn't want to be on restricted duty. Dr. Lamstein recommended that Police Officer Schoolcraft get CBT to improve his cooping skills and to reduce his physical symptoms of stress.

Dr. Lamstein disclosed that her next face to face with Police Officer Schoolcraft was on July 27, 2009. She stated that the discussed how and what was Police Officer Schoolcraft was doing to get himself better. Dr. Lamstein stated that Police Officer Schoolcraft informed her that "their leaving him alone and that they aren't forcing him to do overtime and that there was no pressure on giving summons". (Referring to his work conditions at the 81 Precinct) Dr. Lamstein stated that it was way too early to give clearance to anyone who has been experiencing stress and anxiety symptoms as Police Officer Schoolcraft had exhibited to her.

Dr. Lamstein stated that her next face to face interview with Police Officer Schoolcraft was on October 27, 2010 when she returned from vacation. She stated that she wanted to meet with Police Officer Schoolcraft to make sure he understood why he was on Restricted Duty. (She explained that she wanted to do this quickly because Larry Schoolcraft had called City Hall and complained to the Deputy Mayor's Assistant that she never told Police Officer Schoolcraft why he was on Restricted Duty) Dr. Lamstein stated that the information that Larry Schoolcraft reported regarding her not informing Police Officer Schoolcraft why he was on Restricted Duty was not true. Dr. Lamstein stated that she explained to Police Officer Schoolcraft during this visit in detail why he was on Restricted Duty; because he has significant physical manifestations of stress that were causing him much discomfort and encouraged him that he would benefit from treatment. Dr. Lamstein disclosed that Police Officer Schoolcraft informed her that he no longer has physical symptoms of stress even though he is still facing the same stresses as before. She stated that she recommended stress management and relaxation training so that the next time he is faced with new increased stresses, he won't have a re-continuance of the chest pains, and headaches upset stomach, etc as he first had when he came to PES.

Dr. Lamstein identified that she had pager duty on October 31, 2009. Reading from her notes, Dr. Lamstein explained that at approximately 1740 hours she received a call from Sgt. Kloos, Sick Desk Supervisor who explained to her what had transpired with Police Officer Schoolcraft earlier in the day at the 81 Precinct. Dr. Lamstein stated that she subsequently called Captain Lauterbom who reiterated the information that she had received previously. She stated that Captain Lauterbom reported to her underlying issues with MOS at the command that might have precipitated Police Officer Schoolcraft going AWOL. He informed her that MOS had made allegations against others and the Department's investigation of those allegations had picked up that week. About 4 PO's and 2 Civilians were called down for questioning that week. Notifications were in the telephone message log so MOS knew who was going. He stated that her that Police Officer Schoolcraft went up to them upon their return, tying to get information from them about what they were asked.

NYC00004557

Dr. Lamstein disclosed that Captain Lauterborn asked her if Police Officer Schoolcraft was suicidal or depressed because he needed to know how concerned they were about his (Police Officer Schoolcraft) safety. She stated that he had informed Captain Lauterborn that she had last seen Police Officer Schoolcraft on 10/27/10 and at that time he looked okay. Dr. Lamstein stated that she informed Captain Lauterborn that at no time did Police Officer Schoolcraft express thoughts of suicide to her, but he also never went AWOL before or acted the way he has on this date. She stated that she told Captain Lauterborn that her assessment of Police Officer Schoolcraft was good based on the last time she seen him, but that she is unable to say for certainty that he was not at risk of seriously injuring himself under the present circumstances. Dr. Lamstein stated that she provided Captain Lauterborn with basic information about the reason why Police Officer Schoolcraft was on Restricted Duty-that he had displayed symptoms of stress; nausea, cardiac, etc.

Dr. Lamstein stated that after her telephone call with Captain Lauterborn, she called Police Officer Schoolcraft and informed him that the Captain Lauterborn was looking for him and for him to return to the Command so that this situation can be resolved without a need for a mobilization to search for him.

Dr. Lamstein stated that she did inform Captain Lauterborn that she did leave a message on Police Officer Schoolcraft's cell phone for him to contact someone. She stated that she suggested that Captain Lauterborn contact Police Officer Schoolcraft's father because he's close to him and most likely knows his whereabouts. Dr. Lamstein stated that she had spoke to Captain Lauterborn a couple of more times throughout the evening and later learned that Police Officer Schoolcraft was at home sleep. Dr. Lamstein stated that she had no contact with anyone at the 81 Precinct until Police Officer Schoolcraft went AWOL.

Before the conclusion of the interview, Dr. Lamstein disclosed that she had documented several other incidents relating to Police Officer Schoolcraft; speaking to IAB investigators, 81 Precinct Supervisors, Larry Schoolcraft, Jamaica Hospital, the Department Advocates Office and staff from Fulton-Montgomery VA Primary Care Practice. (The above interactions are listed in Dr. Lamstein notes which are included as an attachment) This case will remain open.

2.        For your INFORMATION.

Sgt. Aroy Scott
Case Investigator

Lt. John Crisalli
Team Leader / Case Supervisor

Inspector David A. Grossi
Commanding Officer

W/S# 233
ATT: A

CONFIDENTIAL