UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                                        Plaintiff,

                -against-

                                                        10-CV-06005 (RWS)

THE CITY OF NEW YORK, et al.,

                                        Defendants.
-------------------------------------------------------------X


### DEFENDANT MAURIELLO'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR RECONSIDERATION OF THIS COURT'S DISMISSAL OF HIS COUNTERCLAIMS AND FOR LEAVE TO AMEND THE COUNTERCLAIMS AS NECESSARY

SCOPPETTA SEIFF KRETZ & ABERCROMBIE
Attorneys for Defendant STEVEN MAURIELLO
444 Madison Avenue, 30th Floor
New York, NY  10022
wakretz@seiffkretz.com
212-371-4500

Walter A. Kretz, Jr., (WK-4645)
Patrick C. Nolan
                                        Of Counsel

TABLE OF CONTENTS

Table of Authorities                                                          iii

Preliminary Statement                                                          1

Argument

POINT I
MAURIELLO'S COUNTERCLAIM FOR TORTIOUS
INTERFERENCE WITH HIS EMPLOYMENT RELATIONSHIP
AT NYPD SHOULD BE RESOLVED AT TRIAL                                             4

A.   SCHOOLCRAFT'S PLAN TO MANIPULATE EVENTS TO
     PROVIDE A BASIS FOR HIM TO SUE NYPD WAS NOT
     A PURPOSE SEPARATE FROM HIS EFFORT TO GET
     REVENGE AGAINST MAURIELLO AND SHOULD NOT
     SERVE TO INSULATE HIM FROM MAURIELLO'S
     COUNTERCLAIM FOR TORTIOUS INTERFERENCE                                     5

B.   THE ALLEGATIONS OF SCHOOLCRAFT'S
     MISREPRESENTATIONS TO QAD ALONE CONSTITUTE
     WRONGFUL MEANS                                                             8

C.   CONTRARY TO THIS COURT'S OPINION, MAURIELLO'S
     OPPOSITION PAPERS DID NOT RECITE "NOVEL
     ALLEGATIONS" AND DID NOT ATTEMPT "TO CRAFT A
     NEW CLAIM BASED ON A SERIES OF [UNALLEGED]
     FACTS;" THE FACTS RELIED UPON IN THE OPPOSITION
     PAPERS ARE ADEQUATELY ALLEGED IN THE
     COUNTERCLAIMS OR OTHERWISE FULLY DISCLOSED
     IN DISCOVERY AND RELIANCE ON THEM AT TRIAL IS
     NOT A CAUSE FOR SURPRISE OR A CLAIM OF
     PREJUDICE BY SCHOOLCRAFT                                                   10

D.   IT SHOULD BE LEFT TO A JURY TO DECIDE WHETHER
     THE WRONGDOING ALLEGED IN THE COUNTERCLAIMS,
     INCLUDING THE FACTS ASSERTED IN MAURIELLO'S
     OPPOSITION PAPERS THAT THE OPINION INCORRECTLY
     DEEMED TO BE "NOVEL", CONSTITUTE "WRONGFUL
     MEANS" FOR PURPOSES OF MAURIELLO'S TORTIOUS
     INTERFERENCE CLAIM                                                         17

E.     THE WRONGFUL MEANS ALLEGEDLY ENGAGED IN
       BY SCHOOLCRAFT GIVE RISE TO A QUESTION OF FACT
       FOR A JURY AS TO WHETHER THEY DEFEAT
       SCHOOLCRAFT'S CLAIM OF <u>BRANDT</u> IMMUNITY                    19

POINT II
FOR SIMILAR REASONS, MAURIELLO'S
COUNTERCLAIM FOR PRIMA FACIE TORT
ALSO SHOULD BE REINSTATED                                          21

CONCLUSION                                                         22

TABLE OF AUTHORITIES

Advanced Global Technologies, LLC v. Sirius Radio, Inc.
    44 A.D. 3d 317 (1st Dept. 2007)       7

Carvel Corporation v. Noonan, 3 N.Y. 3d 182, 190 (2004)    9, 19

Friedman v. Coldwater Creek, 321 F. App'x 60 (2d Cir. 2009)    9, 19

Lion's Property Development Group, LLC v. New
York Regional Center, LLC.,
    115 A.D. 3d. 488 (1st Dept. 2014)    7

Nadel v. Play by Play Toys, 208 F.3d 368 (2d Cir. 2000)    8, 19

Posner v. Lewis, 18 N.Y. 3d 566 (2012)    20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                                    Plaintiff,

            -against-

                                                      10-CV-06005 (RWS)

THE CITY OF NEW YORK, et al.,

                                    Defendants.
-------------------------------------------------------------X

### DEFENDANT MAURIELLO'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR RECONSIDERATION OF THIS COURT'S DISMISSAL OF HIS COUNTERCLAIMS AND FOR LEAVE TO AMEND THE COUNTERCLAIMS AS NECESSARY

#### Preliminary Statement

Defendant Steven Mauriello, a Deputy Inspector in the New York City Police Department (NYPD), respectfully urges the Court's reconsideration of the dismissal of his counterclaims for tortious interference with his employment relationship with the New York City Police Department and for prima facie tort. Upon reconsideration, it is respectfully requested that Steven Mauriello's counterclaims be reinstated and presented to a jury to decide. (This Court's discussion of Mauriello's counterclaims is set forth at pages 151 through 160 of the May 5, 2015, Opinion and Order (Opinion).)

After reciting the elements of a claim for tortious interference with Mauriello's employment relationship, this Court found as follows:

   i.    there is a factual dispute as to whether Schoolcraft's allegations against Mauriello caused NYPD not to consider Mauriello for promotion (Opinion at 152-53); we do not challenge that finding;

ii.    there is a factual dispute as to whether Schoolcraft's claims against Mauriello resulted in Mauriello being passed over for promotion (Opinion at 153); we do not challenge that finding;

iii.    with respect to the requirement that Mauriello allege either that Schoolcraft acted with the "sole purpose" of harming Mauriello, or that Schoolcraft used "wrongful means", this Court found with respect to the first alternative – sole purpose -- that Mauriello inconsistently alleged that Schoolcraft acted "purely for the sake of getting revenge against Mauriello," "while also creating false support for [his] lawsuit against the NYPD;" the Court thus ruled Mauriello could not proceed with his counterclaim based upon the sole purpose alternative (Opinion at 153); we respectfully request the Court's reconsideration of this ruling (see Point I.A below);

iv.    with respect to the alternative basis for asserting a tortious interference claim – wrongful means – this Court addressed only the alleged misrepresentations by Schoolcraft to QAD on October 7, 2009; though the Court appeared to properly conclude that those misrepresentations constituted wrongful means, the Opinion does not say so; instead, the Court determined Schoolcraft is immune from liability for such conduct because QAD did an investigation and issued a report (Opinion at 154-55); we respectfully submit that the misrepresentations to QAD did constitute wrongful means, as the Court seemed to conclude, and that the Court erred in conferring immunity, even when limiting the wrongful means to

Schoolcraft's October 7, 2009, misrepresentations to QAD; those misrepresentations were in the nature of fraud and deceit and involved the falsification and distortion of NYPD records (see Point I.B below);

v.    we also respectfully submit that the Court erred in disregarding all other assertions in Mauriello's opposition papers as "novel allegations" made in an effort "to craft a new claim based upon a series of [unalleged] facts" (Opinion at 158-9); in fact, the matters asserted either were alleged in the counterclaims or are matters of record that do not constitute elements of the counterclaims, but provide factual support for them, though they need not be alleged in the pleadings; the support for each assertion was cited in Mauriello's papers; the parties have had the opportunity to fully explore them in discovery; and they simply are not a cause for Schoolcraft to claim surprise or prejudice (see Point I.C); at a minimum, taking into account all of Mauriello's allegations and the evidence that supports them, there clearly is a question of fact as to whether Schoolcraft engaged in wrongful means in an effort to get revenge against Mauriello (see Point I.C & I.D below);

vi.   this Court conferred Brandt immunity on Schoolcraft, insulating him from Mauriello's counterclaims, based solely upon Schoolcraft's misrepresentations to QAD on October 7, 2009, because the Court mistakenly found that Mauriello, "perhaps anticipating this impediment [of Brandt immunity] to his counterclaims[,] include[d] a

3

series of novel allegations in his papers in opposition to Schoolcraft's motion for summary judgment" (Opinion at 156); the Court interpreted this as an effort by Mauriello "to craft a new claim based on a series of facts known to him before [being granted leave to assert the counterclaims], and this time without filing a motion to replead as required under the Federal Rules of Civil Procedure" (Opinion at 158-59); we respectfully request the Court's reconsideration of its decision to confer <u>Brandt</u> immunity based solely on Schoolcraft's misrepresentations to QAD on October 7, 2009;  moreover, when all of the allegations in the counterclaims and the assertions of facts in Mauriello's opposition papers are taken into account, we respectfully submit that conferring <u>Brandt</u> immunity at the summary judgment stage is unwarranted (see Pt. I. D & E below);

vii.   for similar reasons, we also respectfully request that the Court reconsider the dismissal of Mauriello's counterclaim for prima facie tort (Opinion at 159) (see Point II).

<u>Argument</u>

<u>POINT I</u>

MAURIELLO'S COUNTERCLAIM FOR TORTIOUS
INTERFERENCE WITH HIS EMPLOYMENT RELATIONSHIP
AT NYPD SHOULD BE RESOLVED AT TRIAL

As this Court explained in its Opinion, in order for Mauriello to prevail on his claim of tortious interference, he will have to prove that Schoolcraft

acted with the sole purpose of harming Mauriello, or engaged in wrongful means that interfered with Mauriello's relationship with the NYPD (Opinion at 152).

We respectfully submit that there are genuine disputes about the material facts relating to Mauriello's claim of tortious interference requiring that the claim be resolved at trial. On the one hand, we believe it can properly be claimed that Schoolcraft acted throughout the relevant period for the sole purpose of causing Mauriello harm, and did so by telling lies to QAD and others, and by falsifying NYPD records.   He therefore would not be entitled to immunity and would be subject to liability.   On the other hand, if he were deemed to have acted for more than one purpose, Mauriello claims that Schoolcraft engaged in wrongful means that caused Mauriello harm for which Schoolcraft would be liable without any possible immunity.

A.   SCHOOLCRAFT'S PLAN TO MANIPULATE EVENTS TO PROVIDE A BASIS FOR HIM TO SUE NYPD WAS NOT A PURPOSE SEPARATE FROM HIS EFFORT TO GET REVENGE AGAINST MAURIELLO AND SHOULD NOT SERVE TO INSULATE HIM FROM MAURIELLO'S COUNTERCLAIM FOR TORTIOUS INTERFERENCE

In a ruling akin to saying "two wrongs make a right", the Court dismissed Mauriello's counterclaim for tortious interference due to "inconsistent" allegations of Schoolcraft's purpose in the pleading.  We urge the Court's reconsideration of this ruling for two reasons – first, Schoolcraft's goal of bringing a specious lawsuit apparently evolved during the course of his effort to get revenge against Mauriello and became part and parcel of the effort; and, second, allowing Schoolcraft to potentially escape liability for tortious interference because he had two allegedly wrongful pursuits in mind – revenge against

5

Mauriello and a specious lawsuit -- misapprehends the "sole purpose" requirement.

On October 7, 2009, well after Schoolcraft began to seek revenge against Mauriello, Schoolcraft and his father spoke of bringing a lawsuit against the NYPD, with the clear inference being that it would be in furtherance of and part and parcel of the scheme to get revenge against Mauriello by damaging his employment relationship with the NYPD. (See SM Exhibit BR at 7:20-7:35.) Schoolcraft and his father were planning to have Schoolcraft deceitfully report to QAD so that Mauriello could be the "sacrificial lamb" and be removed from his position, but also to commence a lawsuit to further damage Mauriello. (SM Exhibit BR at 5:40-6:00.)

At one point, Schoolcraft discusses the effectiveness of a potential lawsuit in harming Mauriello because he probably would have the protection of some "motherfucker from Corporate Counsel." (SM Exhibit BR at 6:55-7:20.) Schoolcraft ultimately surmises that the deceptive reporting to QAD could be beneficial if QAD were to issue a critical report without fully understanding the nature and extent of Schoolcraft's fraud, as he could hold it up in court to further damage Mauriello (SM Exhibit BR at 7:25-7:35). The conversation between Schoolcraft and his father also reveals there was no altruistic purpose in reporting to QAD; it was about revenge against Mauriello at any cost, which the father urged Schoolcraft not to reveal. (See Plaintiff's Consolidated Rule 56.1, Mauriello response to ¶ 42; SM Exhibit BR at 2:35-2:45, 5:30-5:50.)

Under such circumstances, with two wrongful pursuits intertwined, it would be a perversion of the sole purpose requirement to dismiss the tortious

interference claim because there were two wrongful pursuits rather than just one. New York courts apply the sole purpose requirement as a rule that protects competitive enterprise by allowing interference with prospective relations provided the motivation or purpose of the interference was, at least in part, "normal economic self-interest" or any other legitimate purpose (so long as wrongful means are not involved).   (See Advanced Global Tech., LLC v. Sirius Radio, Inc., 44 A.D. 3d 317, 318 [1st  Dept 2007]; Lion's Property Development Group, LLC v. New York Regional Center, LLC, et. al., 115 A.D.3d. 488, 489 [1 st Dept. 2014].)   So, here, if Schoolcraft proves at trial that he had a legitimate purpose in reporting to QAD, and in engaging in all of his other alleged conduct and communications that contributed to Mauriello's harm, and reported the truth, Mauriello's reliance on the sole purpose alternative as a basis for his counterclaims would fail.  We respectfully submit, however, that such a determination is a question of fact that must be left for the jury to decide at trial.

We intend to show that at the time of Schoolcraft's October 7, 2009, conversation with his father summarizing their plans to "fuck Mauriello over," Schoolcraft had no legitimate interest, economic or otherwise, but apparently contemplated notoriety or a windfall from a lawsuit against the NYPD based on specious claims.  In such an instance, a rigid interpretation of the sole purpose requirement does not serve the rule's intended purpose.  It would encourage interference with prospective relations by allowing a defendant to avoid liability merely by asserting there was a second purpose for his actions, even if that second purpose was wrongful, derivative of a malicious purpose, or part and parcel of a malicious scheme.

B.   THE ALLEGATIONS OF SCHOOLCRAFT'S
MISREPRESENTATIONS TO QAD ALONE CONSTITUTE
WRONGFUL MEANS

In the Opinion, this Court asked only "whether Schoolcraft's reports

to QAD constitute 'wrongful means' under New York Law" (Opinion at 154).  The

Opinion then explains that the Court disregarded all other information cited in

Mauriello's opposition papers as "novel allegations" not deserving of

consideration since they were not addressed in the counterclaims.  We discuss

below (see Point I.C, 1-7) that the so-called "novel" facts actually were

substantially alleged in the counterclaims and when properly considered require

a finding that a question of fact exists as to whether Schoolcraft engaged in

"wrongful means", such that the tortious interference claim should be resolved by

a jury.

Even if the so-called "novel allegations" are not considered,

however, we respectfully submit that the alleged misrepresentations made to

QAD alone would constitute wrongful means sufficient to give rise to a question

of fact for a jury to decide.

As the Opinion indicates, "wrongful means" alternatively has been

described as "dishonest, unfair, or improper means,"  Opinion at 152, citing

Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000),

and "include physical violence, fraud or misrepresentation, civil suits and criminal

prosecutions."  Opinion at 154, quoting Friedman v. Coldwater Creek, Inc., 321

F. App'x 58, 60 (2d Cir. 2009).  Finally, the Opinion explains that "'as a general

rule, the defendant's conduct must amount to a crime or an independent tort to

constitute wrongful means, such as breach of fiduciary duty or defamation."
Opinion at 155, quoting Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (N.Y. 2004).

Since this Court only considered the allegations in the counterclaims relating to what Schoolcraft alleged to QAD on October 7, 2009, the Opinion somewhat summarily concluded that since QAD conducted an investigation and issued a report which "found severe deficiencies in the overall crime reporting process . . . ," and since charges were brought against Mauriello that are still pending, Mauriello could not proceed on his tortious interference claim based upon the assertion Schoolcraft engaged in wrongful means.

We respectfully submit, and as we discuss below with respect to the issue of Brandt immunity, that the observations and conclusions in the QAD report are not binding on the parties, and certainly not Schoolcraft or Mauriello. The best that can be said is that questions of fact abound with respect to those observations and conclusions, and the pressures QAD may have been under to issue the report as written.  Therefore, the fact that QAD did an investigation and drew conclusions does not resolve whether Schoolcraft engaged in deceit of QAD or whether QAD made mistakes in its findings or otherwise mishandled the investigation.  These are matters at issue that can only be resolved at trial.

The same is true with respect to the fact that charges were brought against Mauriello and are still pending.  Mauriello intends to demonstrate at his departmental trial that the charges are unfounded and should be dismissed. Certainly, they involve facts that are in dispute for purposes of this case.

Consequently, we respectfully submit that based solely upon the alleged misrepresentations Schoolcraft made to QAD, there are questions of fact

as to whether they constitute wrongful means, and the subsequent "findings" of

QAD and related charges against Mauriello are only further disputed information

to be evaluated in resolving those questions of fact.  A determination simply can

not be made as to whether Schoolcraft is entitled to immunity until the material

facts in dispute have been resolved by a jury.

C.   CONTRARY TO THIS COURT'S OPINION, MAURIELLO'S OPPOSITION PAPERS DID NOT RECITE "NOVEL ALLEGATIONS" AND DID NOT ATTEMPT "TO CRAFT A NEW CLAIM BASED ON A SERIES OF [UNALLEGED] FACTS;" THE FACTS RELIED UPON IN THE OPPOSITION PAPERS ARE ADEQUATELY ALLEGED IN THE COUNTERCLAIMS OR OTHERWISE FULLY DISCLOSED IN DISCOVERY AND RELIANCE ON THEM AT TRIAL IS NOT A CAUSE FOR SURPRISE OR A CLAIM OF PREJUDICE BY SCHOOLCRAFT

The Opinion incorrectly recites the following "series of novel

allegations in [Mauriello's] papers in opposition," and disregards them for

purposes of deciding whether a question of fact exists as to whether Schoolcraft

engaged in wrongful means.  The matters asserted in the opposition papers,

however, actually are properly and adequately alleged in Mauriello's

counterclaims to the extent any rule of pleading would require.  Those not

specifically alleged in the counterclaims are not elements of the counterclaims,

but factual support for them that need not be alleged in the pleadings.  In

addition, they are supported by evidence exchanged in discovery and cited in

Mauriello's Rule 56.1(b) Statement.  There is no basis for Schoolcraft to argue

surprise or prejudice of any kind.

1.   "Novel Allegation" -- "Schoolcraft personally downgraded

complaint reports" (Opinion at 156); in fact, in paragraphs 3, 9 and 10 of

Mauriello's counterclaims, it is alleged as follows:

10

3.      i) . . . the expressed goal [was] to 'fuck [Mauriello] over,' without revealing that plaintiff himself had intentionally contributed to the incidence of improper crime reporting to try to make a more compelling showing of wrongdoing . . .

9.      With respect to plaintiff's false accusation that the 81st Precinct rampantly engaged in the downgrading of serious crime for which Mauriello inevitably would be blamed, again, plaintiff's surreptitious recordings do not provide any support for this accusation.  The documents plaintiff secretly accumulated also show nothing more than the incidental occurrence of incorrect crime reporting.  Moreover, only one such incident involved Mauriello.  Plaintiff, on the other hand, played a direct role in causing at least three incidents of grand larceny and burglary, reported directly to him, to be recorded instead as lost property, and causing at least three other incidents of crime not to be recorded at all.  In other words, plaintiff reported thirteen incidents of improper crime reporting for the entire precinct over a period of a year or more, while he alone was responsible for six such incidents during that same period.  Apparently, plaintiff's goal was that the victims he mishandled would later return to the 81st Precinct, and in some instances it appears he reached out to them to do so, to complain that their reports were not taken or not followed up, thus making it appear that the 81st Precinct was engaged in a pattern of not properly reporting crime.  [emphasis added]

10.      Plaintiff dishonestly reported to QAD that the eleven instances he identified where a crime report was improperly downgraded, plus two additional incidents reported in the press and attributed to plaintiff, were only a small sample of such downgrading in the 81st Precinct, when, in fact, plaintiff did not know of any other instances, and actually knew or should have known that incorrect crime reporting only rarely occurred in the 81st Precinct.  Indeed, it was later independently determined, after a thorough scrutiny of the 81st Precinct's records, that of more than 1100 crime reports prepared in the 81st Precinct over a period of approximately one year, only approximately two percent had been incorrectly classified – a total of 23, which was consistent with the City-wide average and far better than several other precincts throughout the City.  Despite the performance of the 81st Precinct with respect to the classification of crimes, it and, in particular, Steve Mauriello, became the target of ridicule in some media due to plaintiff's unfounded and exaggerated criticism, his manipulation of the records, the bizarre events of October 31, 2009, and the sensationalized and apparently selective release of the recordings plaintiff had made in the 81st Precinct.

In its simplest form, the underlined portion of paragraph 9, as well as paragraph 3(i), are allegations that Schoolcraft personally participated in the

downgrading of crime, which would appear to be especially egregious given that he exaggerated its occurrence to QAD to make it appear it was a rampant practice in the 81st Precinct. As it turned out, Schoolcraft may have been the most prolific participant in downgrading as part of his effort to get revenge (Mauriello Rule 56.1(b) Additional Facts ¶ 18). In fact, during the course of discovery, the City produced several additional incidents where Schoolcraft had prepared complaint reports that later had to be reclassified and upgraded. (See SM Exhibit DD.) The point for present purposes is that there was nothing "novel" about the assertion in Mauriello's papers in opposition to plaintiff's summary judgment motion that Schoolcraft personally downgraded complaint reports.

      2.    "Novel Allegation" -- Schoolcraft "orchestrated the October 31 incident" (Opinion at 156); in fact, paragraph 12 of Mauriello's counterclaims alleges as follows:

> There is no evidence that anyone acted out of a desire to retaliate against plaintiff on October 31, 2009. Instead, they acted out of a desire to prevent plaintiff from doing harm to himself and others. There is substantial reason to believe, on the other hand, that plaintiff's conduct on October 31, 2009, much of it revealed by surreptitious recordings made by plaintiff himself, was designed to provoke a response by the NYPD that plaintiff hoped to be able to point to as an act of retaliation in the lawsuit he had already planned to bring against the NYPD. It was a sinister, cynical and malicious effort by plaintiff and his father that has resulted in this action being brought before this Court.

Thus, while the word "orchestrated" is not used in the counterclaims, surely the allegations of paragraph 12 describe orchestration. In addition, the NYPD Internal Affairs Bureau observed in one of its reports relating to the Schoolcraft allegations, which was produced in discovery by the City defendants,

that Schoolcraft, and his father, had indeed "appear[ed] to have orchestrated the AWOL event." (See SM Exhibit CR, NYC 10148)

   3. "Novel Allegation" -- Schoolcraft "misrepresented the status of the appeal of his 2008 Performance Evaluation" (Opinion at 156); this is not specifically alleged in Mauriello's counterclaims, but the counterclaims do allege the following: in paragraph 3(i), that "plaintiff and his father were seeking revenge against Mauriello because Mauriello signed off on plaintiff's 2008 evaluation," which was to be the subject of plaintiff's appeal; in paragraph 3(ii), that "in a lawsuit [Schoolcraft] intended to bring against the NYPD . . . plaintiff would improperly allege, without foundation, as he has since alleged in this case, that he received a sub-standard evaluation because of his failure to comply with unlawful quotas, which he would falsely allege . . . existed in the 81st Precinct;" and in paragraph 8, that "[Schoolcraft secretly recorded the meetings he requested with his union delegate and his supervising officers . . . with respect to his appeal of his 2008 evaluation."

   Frankly, the evidence that Schoolcraft misrepresented the status of his appeal, which we will seek to use at trial whether or not Mauriello's counterclaims are reinstated, is not an element of Mauriello's counterclaims, but factual support for them as well as impeachment evidence that will help reveal the levels of deceit engaged in by Schoolcraft to achieve his desired result. The evidence of his misrepresentations has been produced in discovery by the City Defendants and by Schoolcraft himself, and the parties have had every opportunity to explore the evidence in discovery. (See TAC ¶¶112-115, Plaintiff's Consolidated Rule 56.1(b) ¶¶ 13-14, 17-24, 36.) If the Court believes the

counterclaims should be amended to specifically allege Schoolcraft's

misrepresentations of the status of his appeal, as recited in our opposition papers

(see Docket # 387, p. 18-19), we would welcome the opportunity to do so --

though we respectfully submit it should not be required.

        4.    "Novel Allegation" -- Schoolcraft "falsely denied being aware

of the reason he was placed on restricted leave [and] accused Mauriello of

placing him on restricted leave" (Opinion at 156-57); this, too, is not specifically

alleged in Mauriello's counterclaims, but, again, it is not at all novel and does not

create any surprise or prejudice. (See TAC ¶¶ 106-111; Plaintiff's Consolidated

Rule 56.1(b) ¶¶ 28-34.)   In fact, in a Reply Declaration submitted in support of

Mauriello's initial motion to amend his Answer to assert his counterclaims, it is

explained in paragraph 8 that "plaintiff was seeking revenge against Steve

Mauriello for signing off on his below-par evaluation, . . . and for somehow

orchestrating plaintiff's assignment to [restricted] duty, with his shield and gun

removed." (See Docket Entry 185, Filed 10/22/13.)   This has been maintained by

Schoolcraft throughout this litigation, and there is no doubt issue has been fully

joined on the subject for a long time.  (See TAC ¶¶ 106-111.)

        In addition, such facts are not elements of Mauriello's

counterclaims per se, but evidence of his conduct in furtherance of causing

Mauriello harm.  It also is impeachment evidence that we would expect to use at

trial whether or not the counterclaims are reinstated.  In any event, we know of

no requirement that all factual matter and all available supporting evidence be

specifically alleged in claims such as Mauriello's counterclaims.  Alleged

misconduct by Schoolcraft such as denying he was told why he was placed on

restricted duty simply is evidence of the lengths to which he was willing to go to help embellish his false accusations against Mauriello in the hope of getting revenge.

     5.    "Novel Allegation" -- Schoolcraft "contacted the media" (Opinion at 157); again, this is not novel, and is specifically alleged in paragraphs 7 and 10 of the counterclaims.

     6.    "Novel Allegation" -- Schoolcraft "falsely claimed he cared about the community served by the 81st Precinct, and falsely claimed he cared for his fellow officers" (Opinion at 157);  there was nothing novel at all about these allegations when they were recited in Mauriello's opposition papers; in fact, in paragraphs 4 through 7 of the counterclaims Mauriello alleged as follows:

> 4.    Plaintiff and his father also reveal in the October 7, 2009, conversation, which plaintiff recorded, that plaintiff should, and he ultimately did, deceive QAD about plaintiff's motives by falsely explaining to QAD that he had taken it upon himself to gather information about purported wrongdoing in the NYPD because he was concerned about the safety of the people in the community as well as the safety of police officers.  In fact, neither sentiment was true.

> 5.    In clear contradiction of those sentiments, plaintiff reveals while speaking to his father that "ain't nobody my friend" in the NYPD, and if any fellow officers in the NYPD were to suffer any consequences as a result of what plaintiff intended to report to QAD, "they asked for it" because "none of these guys came to my aid when [the NYPD was] coming at me."

> 6.    Plaintiff also expressed an even more stark contradiction of the sentiments he planned to express and did falsely express to QAD about his purported concern for the predominantly minority community served by the 81st precinct.  In response to an inaudible question from his father, apparently about whether one or more officers with whom plaintiff had worked would be supportive of plaintiff, plaintiff told his father the other officers and he "just worked together so we wouldn't have to work with any niggers."

7.     Thus, plaintiff held himself out to QAD and all others, including the NYPD Internal Affairs Bureau (IAB), members of the press, and the public generally, under extremely false pretenses for the purpose not of protecting his fellow officers or the rights of the residents of the Bedford Stuyvesant community, but for the purpose of getting revenge against Steven Mauriello -- interfering in his employment relationship with the NYPD, and otherwise trying to destroy his career and reputation – while also creating false support for plaintiff's lawsuit against the NYPD.

Finally, according to the Opinion, "[t]his interjection [of the allegations incorrectly deemed "novel"] is impermissible, and Mauriello's counterclaim remains related to [i.e., limited to] the October 7, 2009, investigation, as pled over a year ago" (Opinion at 159).

Based upon the foregoing, we respectfully submit that there were no novel allegations asserted in Mauriello's papers in opposition to plaintiff's motion for summary judgment and there was no effort to craft new claims based upon a series of unalleged facts.  Mauriello's counterclaim for tortious interference never was limited to Schoolcraft's misrepresentations to QAD on October 7, 2009, and, respectfully, the claim should be reinstated and left to the jury to decide.

We would like to clarify that October 7, 2009, is significant principally because it is the date of the conversation between plaintiff and his father (which was deleted from the recording of that date produced by plaintiff in discovery) in which Schoolcraft's desire to get revenge against Mauriello is expressed and preserved.  It is in the recording of the conversation on that date that we are provided with unequivocal proof of Schoolcraft's determination to get revenge, but by no means did Schoolcraft engage in his vengeful conduct on that

date alone.  His determination to get revenge infiltrated everything he said and did for many days before and after that date.

> D.      IT SHOULD BE LEFT TO A JURY TO DECIDE WHETHER THE WRONGDOING ALLEGED IN THE COUNTERCLAIMS, INCLUDING THE FACTS ASSERTED IN MAURIELLO'S OPPOSITION PAPERS THAT THE OPINION INCORRECTLY DEEMED TO BE  "NOVEL", CONSTITUTE "WRONGFUL MEANS" FOR PURPOSES OF MAURIELLO'S TORTIOUS INTERFERENCE CLAIM

We discussed above whether Mauriello's counterclaims satisfy the "sole purpose" requirement for stating a tortious interference claim.  In the event the Court is not persuaded the sole purpose requirement is satisfied, we seek reinstatement of the counterclaims on the alternative basis that all of the conduct allegedly engaged in by Schoolcraft constitutes "wrongful means" sufficient to have the counterclaims resolved by a jury.

In urging the Court's reconsideration of whether Schoolcraft engaged in wrongful means, we recite in abbreviated form the allegations of wrongdoing set forth in paragraphs 3 through 12 of the counterclaims, as follows:

> to get revenge against Mauriello, Schoolcraft falsely complained to QAD of routine downgrading of crime at the 81st Precinct; Schoolcraft intentionally contributed to the incidence of improper crime reporting to try to make a more compelling showing of wrongdoing at the 81st Precinct; Schoolcraft never revealed to QAD that he had recorded countless hours of conversation at the 81st Precinct for a period of three years or more, and that the recordings did not provide any support for plaintiff's accusations of improper crime reporting; Schoolcraft falsely complained to QAD and IAB that he had received a sub-standard evaluation for 2008 because of his failure to comply with unlawful quotas, which he falsely alleged existed in the 81st Precinct; Schoolcraft falsely asserted to QAD that he had taken it upon himself to gather information about purported wrongdoing in the NYPD because he was concerned about the safety of the people in the community as well as the safety of police officers, though neither sentiment was true.

Schoolcraft recorded himself saying to his father that if any officers in the NYPD were to suffer any consequences as a result of what Schoolcraft reported to QAD, "they asked for it" because they did not help Schoolcraft "when [the NYPD was] coming at me;" while expressing concern for the predominantly minority community served by the 81st precinct, Schoolcraft's true sentiment is revealed by his comment to his father that he and another officer "just worked together so we wouldn't have to work with any niggers;" Schoolcraft made false accusations that illegal quotas were imposed by Mauriello and that Schoolcraft's failure to comply with them was the basis for his sub-standard evaluation; yet Schoolcraft had surreptitiously recorded roll calls and other conversations in the 81st Precinct for perhaps three years or longer, and he secretly recorded the meetings he requested with his union delegate and his supervising officers from the 81st Precinct with respect to his appeal of his 2008 evaluation, and there is no evidence that unlawful quotas actually were imposed on plaintiff or anyone else or played any part in plaintiff's evaluation.

With respect to Schoolcraft's false accusation that the 81st Precinct rampantly engaged in the downgrading of serious crime for which Mauriello inevitably would be blamed, again, Schoolcraft's surreptitious recordings do not provide any support for this accusation; Schoolcraft played a direct role in causing at least three incidents of grand larceny and burglary, reported directly to him, to be recorded instead as lost property, and causing at least three other incidents of crime not to be recorded at all; thus Schoolcraft reported thirteen incidents of improper crime reporting for the entire precinct over a period of a year or more, while he alone was responsible for six such incidents during that same period; Schoolcraft dishonestly reported to QAD that the eleven instances he identified where a crime report was improperly downgraded, plus two additional incidents reported in the press and attributed to plaintiff, were only a small sample of such downgrading in the 81st Precinct, when, in fact, he did not know of any other instances, and actually knew or should have known that incorrect crime reporting only rarely occurred in the 81st Precinct.

Mauriello had de minimus involvement in the events of October 31, 2009, which are the principal subject of Schoolcraft's complaint, and did not engage in any of the wrongdoing that allegedly occurred in Schoolcraft's ap[artment, yet, Schoolcraft has targeted Mauriello with his accusations in furtherance of his attempt to get revenge; and , finally, there is no evidence anyone acted out of a desire to retaliate against Schoolcraft on October 31, 2009, and instead acted out of a desire to prevent Schoolcraft from doing harm to himself or others; on the other hand, Schoolcraft's conduct on October 31, 2009, was designed to provoke a response by the NYPD that Schoolcraft would claim was an act of retaliation.

The foregoing allegations of Schoolcraft's efforts to interfere with Mauriello's relationship with the NYPD surely must be seen as including wrongful means sufficient to have a jury decide the outcome of Mauriello's counterclaims. Clearly, there are allegations of dishonesty, unfairness and impropriety.  See Nadel, supra.  Though the allegations do not involve physical violence, they do involve fraud or misrepresentation.  They also involve the commencement of a civil suit.  See Friedman, supra.  Finally, some of the alleged conduct of Schoolcraft amounts to a crime (filing false complaint reports) and some constitute one or more independent torts, such as defamation, or, again, fraud or misrepresentation.  See Carvel Corp., supra.

E.  THE WRONGFUL MEANS ALLEGEDLY ENGAGED IN
BY SCHOOLCRAFT GIVE RISE TO A QUESTION OF FACT
FOR A JURY AS TO WHETHER THEY DEFEAT
SCHOOLCRAFT'S CLAIM OF BRANDT IMMUNITY

Just as this Court found that the "City Defendants' qualified immunity defense [with respect to Schoolcraft's Fourth Amendment claim] is premised on a disputed fact, requiring that it be resolved at trial" (Opinion at 95), so too, is Schoolcraft's assertion of Brandt immunity premised on disputed facts, requiring that it, too, be resolved at trial.  The material facts in dispute with respect to conferring Brandt immunity essentially include whether Schoolcraft made the alleged misrepresentations to QAD, which Mauriello asserts in his counterclaims, and whether Schoolcraft engaged in the other conduct and communications alleged by Mauriello in his counterclaims and in his opposition papers.  If so, such untruthfulness should preclude any immunity from being

conferred on Schoolcraft, whether or not his sole purpose was to cause Mauriello harm.  See Posner v. Lewis, 18 N.Y.3d 566, 573 (2012).

According to the New York State Court of Appeals in Posner, "Brandt recognized an 'immunity from civil suit' for truthful communications resulting in 'the exposure of those guilty of offenses against the public.'"  Id. (emphasis added).  Here, Mauriello disputes the truthfulness of Schoolcraft's allegations about him to QAD, and he disputes the truthfulness of Schoolcraft's other conduct, claims and accusations made about Mauriello as part of Schoolcraft's effort to get revenge.

As we have alleged, Schoolcraft also downgraded complaint reports, orchestrated the events of October 31, 2009, falsely claimed that Mauriello imposed illegal quotas, falsely claimed his 2008 evaluation was due to his protest about the imposition of quotas, denied knowing why he had been placed on restricted duty, contacted the media to have Mauriello portrayed in a disparaging light, falsely claimed he cared about the Bedford Stuyvesant community, falsely claimed he cared about his fellow officers, falsely claimed there was routine downgrading of crime in the 81st Precinct, falsely claimed that the incidents of downgrading he reported to QAD were only a small sample of such downgrading in the 81st Precinct, and engaged in countless other conversations and activities designed to deceive his fellow officers, his supervisors, QAD, IAB and the NYPD generally.

Thus, there can be no determination of whether Schoolcraft is entitled to immunity until these questions of fact are resolved at trial.

Also in dispute is the validity of QAD's report about its internal, non-adjudicatory investigation of Schoolcraft's allegations and the reliability and accuracy of its findings.  Those findings are not binding on this Court nor are they binding on the parties, especially Mauriello and Schoolcraft.  It is fraught with numerous facts that are genuinely in dispute between the parties.  Frankly, we expect to ask that the entire report not be admitted into evidence at trial.

Finally, the validity of the charges brought against Mauriello, based in part on QAD's investigation, is in dispute, and we again expect to ask that the charges not be admitted into evidence at trial.  When Mauriello's departmental trial takes place, we expect to have the charges dismissed in their entirety.


POINT II

FOR SIMILAR REASONS, MAURIELLO'S
COUNTERCLAIM FOR PRIMA FACIE TORT
ALSO SHOULD BE REINSTATED

Questions of fact exist with respect to whether Schoolcraft intentionally inflicted harm on Mauriello "without excuse or justification and motivated solely by malice" (Opinion at 159), and questions of fact exist that must be resolved before it can be determined whether Schoolcraft is entitled to Brandt immunity against liability on Mauriello's prima facie tort claim.  The claim therefore should be reinstated and presented at trial fro the jury to decide.

21

## CONCLUSION

Based upon the foregoing, and defendant Mauriello's original papers in opposition to plaintiff's motion for summary judgment, we respectfully urge the Court to reconsider defendant Mauriello's counterclaims and to reinstate them, together with such other relief as the Court deems just. To the extent the Court concludes that the counterclaims must be amended to properly assert Mauriello's claims as discussed above, we respectfully request leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2).

Dated:  New York, New York
        June 2, 2015

                        SCOPPETTA SEIFF KRETZ & ABERCROMBIE
                        Attorneys for Defendant STEVEN MAURIELLO


                        By:  _____
                             Walter A. Kretz, Jr., (WK-4645)
                        444 Madison Avenue, 30th Floor
                        New York, NY  10022
                        wakretz@seiffkretz.com
                        212-371-4500


Patrick C. Nolan,
        Of Counsel