SM EXHIBIT DN

A. SCHOOLCRAFT

1

2    Exhibit K for identification.  Could you

3    take a look at that document, please.

4                You reviewed it?  Thanks.

5                MR. KRETZ:  For the record it's

6    Bates stamped SM-1 through SM-4.

7        Q.    Is that right?

8        A.    Yes.

9        Q.    Does any of your handwriting

10   appear anywhere on any of the pages of that

11   exhibit?

12       A.    No.

13       Q.    Does your name appear anywhere

14   on the exhibit?

15       A.    Yes.  On SM-3, reporting

16   investigating MOS name.

17       Q.    Do you recall the incident that

18   is reflected in these documents?

19       A.    Not off the top of my head

20   right now, no.

21       Q.    Looking at the

22   computer-generated complaint form.  Do you

23   recognize that document, starting at SM-2?

24       A.    It doesn't look familiar.  I

25   don't --

A. SCHOOLCRAFT

1

2      Q.    You don't normally --

3      A.    I don't recall seeing this,

4  this electronic document.

5      Q.    Okay.

6      A.    (Continuing)  But I see it now.

7      Q.    You have no recollection of the

8  particular incident involved?

9      A.    No.  I see the report date,

10  10/26/2009 and the report, the actual

11  complaint report number 2009-081-06831.

12     Q.    You have no recollection of the

13  arrest that's -- of the complaint that's

14  reflected in those documents?

15     A.    I do not.  I see her name.  I

16  see the complainant's name and I see the

17  story, and I do not remember that actual

18  event.

19         MR. KRETZ:  For the record, my

20     understanding is that this is a

21     complaint that was initially entered

22     by you as a lost property complaint

23     and then upon review by QAD they

24     determined it should have been

25     entered as a grand larceny 4.  Have

A. SCHOOLCRAFT

1
2     you ever learned of that?
3          MR. SMITH:  Objection to the
4     characterization.
5          MR. KRETZ:  Just for the
6     record.
7          MR. SMITH:  Objection to the
8     characterization of the document.
9          A.    When you say inter, what do you
10    mean.
11         Q.    I'm sorry.
12         A.    When you say inter, what do you
13    mean?
14         Q.    Inter?
15         A.    It looks here complaint report
16    entered by PAA candidate.  I believe you
17    referred to me as entering the document.
18         Q.    It indicates on the form that
19    you were the reporting investigating member
20    of the service?
21         A.    And I would have filled out a
22    scratch handwritten copy which does not
23    appear to be here which would support what
24    I reported to QAD, that the -- what police
25    officer reported on scratch copies were not

A. SCHOOLCRAFT

1

2  getting into the computer-generated copies.

3       Q.    Do you know that that happened

4  in this case?

5       A.    I don't know.  It appeared to.

6  I read the victim's story and then I read

7  the story that is here, and I look at the

8  date.  This was after the QAD meeting.

9  That seemed kind of silly and I don't see

10 any reason why I would not put what she

11 told me.

12      Q.    Do you have the scratch copy of

13 the complaint report for this incident?

14      A.    I don't believe I do, but I

15 believe the vest -- it should -- it should

16 be -- it should -- the Police Department

17 should have it.

18      Q.    Of course.  But at the time

19 that this occurred, was it your custom to

20 copy the scratch reports that you prepared,

21 the complaints?

22      A.    Not all of them, but -- if I

23 have it I'm not aware of it.  But, again,

24 the copy machine was not the copy machine

25 that was there when -- during the

548

A. SCHOOLCRAFT

1

2    inspection.  That looked like a nice

3    brand-new copy machine.  It didn't appear

4    to be the one.  That one there broke down a

5    lot and I don't know if I had access to the

6    one in the back, so that could be a reason

7    why I didn't make a copy, but I would -- I

8    would want to compare this to the scratch

9    copy.

10       Q.    Okay.  Perhaps you can search

11   to see if you have it and we can do the

12   same.  But as we sit here today, you don't

13   know whether you recorded this as a lost

14   property complaint as opposed to a grand

15   larceny complaint?

16       A.    I don't recall, no.

17       Q.    Directing your attention to

18   what's been marked Defendant's Exhibit L

19   for identification.  I ask you to review

20   that document.

21            MR. SMITH:  This is VM-5

22       through 8.

23            MR. KRETZ:  I'm sorry, VM-5

24       through 8, yes.

25       Q.    Does your handwriting appear on

549

```
1                    A. SCHOOLCRAFT
2    any of those documents in that exhibit?
3        A.    No, but like on the other one,
4    reporting investigator -- reporting
5    investigating MOS name is Officer
6    Schoolcraft.
7        Q.    So, is it fair to say -- well,
8    do you recall this particular instance
9    debt?
10       A.    Can I just say the report
11   number?
12       Q.    Sure.
13       A.    Complaint report number
14   2009-081-03281.  I'm sorry.  What was the
15   question?
16       Q.    Do you recall the incident
17   that's reflected in this exhibit?
18       A.    I'm looking for her name.  This
19   sounds like a typical call for service.  I
20   don't recall the specific incident, and
21   again, I don't see the scratch copy.  It
22   appears to be -- and let me point out
23   something.  I don't know if I reported it
24   out to QAD.  I haven't heard the recording
25   in a while so I haven't reviewed.  This is
```

A. SCHOOLCRAFT

1
2  a walk in.  I believe at this time I had
3  been modified, restricted, and this why I
4  would have been -- this makes sense that I
5  took this report.
6       Q.    You were serving as the
7  telephone switchboard operator in the 81 at
8  the time?
9       A.    I'm assuming that's what was my
10 duty at the time.
11      Q.    Okay.
12      A.    This -- I would have -- an
13 officer taking a burglary report inside the
14 precinct, they would have -- they would
15 have said I couldn't do that, any
16 supervisor.  I don't know who the
17 supervisor was that day.
18      Q.    I appreciate what you've had to
19 say about things that went on, but I need
20 to know what you recall about this
21 particular incident.  Okay?
22      A.    About this particular incident.
23      Q.    Yes.
24      A.    I do not have any memory of it,
25 of only these documents.

551

1                    A. SCHOOLCRAFT

2          Q.    I understand.  Based on what's

3    presented to you right now, you don't

4    recall the incident?

5          A.    Correct.

6          Q.    Okay.

7          A.    But I just want -- we noted

8    that the scratch copy isn't with this one.

9          Q.    Yes, you did.  In fact, on the

10   front it says the scratch copy is not

11   required.  That doesn't mean it doesn't

12   exist though, right?  Do you know if you

13   would have a copy of the scratch copy of

14   the original report?

15         A.    I don't know why it would say

16   scratch copy not required, why they would

17   not, because that's what I alleged that

18   would be -- the entered -- let me just --

19   because it's confusing for me to explain it

20   without explaining.

21         Q.    Let's do it question by

22   question and then if I don't get it covered

23   well enough, you can tell me what I need to

24   know.  I was pointing out to you on the

25   first page the quality assurance complaint

552

A. SCHOOLCRAFT

1

2    report misclassification cover sheet

3    there's a box that said scratch copy not

4    required and that's checked off.  So that

5    just may explain why it's not attached to

6    this document, okay.  But, do you have any

7    recollection of preparing the scratch copy

8    of this complaint?

9         A.    Not sitting here now, no.

10        Q.    And at the time of this

11   particular complaint or on the date of this

12   particular complaint, which appears to be

13   May 27 of 2009, do you agree?

14        A.    Which one?

15        Q.    On the same exhibit?

16        A.    I'm reading 5/30/2009.  30,

17   May, 2009.  That's how I read it.  Are we

18   still on L?

19        Q.    Yes.

20             MR. BRADY:  Did we get the

21        Bates stamp for that on the record.

22             MR. SMITH:  SM 006 is the page.

23             MR. KRETZ:  The exhibit is 5

24        through 8.

25        Q.    It doesn't matter.  The

553

A. SCHOOLCRAFT

1

2    occurrence is from May 27 through May 30,

3    reported May 30.  At that time, was it your

4    custom or habit to copy scratch reports

5    that you prepared?

6              MR. SMITH:  Objection to form.

7         A.    As much as possible.

8         Q.    Can you search whatever records

9    you have to see if you have a copy of the

10   scratch report that relates to this

11   complaint?

12             MR. SMITH:  You don't have to

13        answer that.  You can address that

14        request to me in writing and I'll

15        deal with it at the appropriate time

16        in the appropriate manner.

17             MR. KRETZ:  Appreciate it.

18        Q.    Do you have what you believe to

19   be copies of complaint reports that you

20   copied in May of 2009?

21        A.    I don't -- I don't, no.

22             (Attorney-client discussion off

23        the record.

24             THE WITNESS:  That's what I'm

25        thinking.

1                    A. SCHOOLCRAFT

2        Q.      I'm sorry.  What are you

3    thinking?

4        A.      That these were copies that

5    were possibly in my locker.  This would

6    have been the time -- the time frame and

7    that's where I kept copies of the originals

8    that I turned in.

9        Q.      Do you believe you would have

10    had the scratch copy with the originals of

11    this document in your locker?

12        A.      Not with the original.  The

13    original would be turned in.

14        Q.      Okay.  So what would be in your

15    locker again?

16        A.      The copy that I made of the

17    original.

18        Q.      I see.  So, would you have with

19    the copy that you made of the original,

20    also a copy of the scratch copy of this

21    complaint report?

22             MR. SMITH:  I don't understand

23         that question at all.

24        Q.      Well, scratch copy is really an

25    original document?

555

A. SCHOOLCRAFT

1

2      A.      You're looking at this.  This

3  is after it's entered into the computer.

4      Q.      Right.

5              MR. SMITH:  This is referring

6      to --

7      A.      This has nothing to do with me

8  as a patrolman.  Even after I was

9  modified --

10     Q.      You said you would have the

11 original of something?

12             MR. SMITH:  Wait.  This, the

13     witness was referring to.

14             MR. BRADY:  Page two of Exhibit

15     L.

16             MR. SMITH:  Page two of Exhibit

17     L, which is SM-6.  Just slow it down.

18     I know everybody wants to get out of

19     here.  Let's just slow it down and

20     keep our record clean, please.

21     Q.      You're referring to the

22 computer-generated complaint form that's

23 part of that exhibit, is that right, page

24 SM-6?

25     A.      Correct.  This was generated by

556

1                   A. SCHOOLCRAFT

2      a computer and assigned a complaint number.

3           Q.    What is it that you had in your

4      locker that relates to this complaint?

5                   MR. SMITH:   Objection to the

6           form.

7                   You can answer.

8           A.    It would be the scratch that I

9      made, the original -- not the -- I am

10     sorry.  Maybe that's the -- the scratch, a

11     copy of the scratch -- a copy of the

12     original scratch 61 that I filled out when

13     I interviewed the victim.

14          Q.    So what I was asking you is, I

15     was asking you would you have had a copy of

16     the scratch copy in your locker, is that

17     what you were telling me, in effect?

18          A.    That's what we were just

19     discussing.  That's what I believe.

20          Q.    All right.

21          A.    Because the time here is so

22     close to October 31, 2009, it's possible

23     that that's where that scratch was.

24          Q.    So you believe that it's

25     possible that you had a copy of the scratch

A. SCHOOLCRAFT

1

2       copy of a May 2009 complaint report in your

3       locker still as of October 31 of 2009?

4            A.     Correct.

5            Q.     How many scratch -- copies of

6       scratch copies did you have in your locker

7       as of October 31, 2009?

8            A.     Maybe a stack about that high

9       on the top shelf (indicating).

10                  MR. KRETZ:  For the record that

11                  appears to be about three inches

12                  thick.

13                  MR. SMITH:  I'd say four, but

14                  it doesn't really matter.  Three or

15                  four inches.

16           A.     It -- I would say at least a

17      couple dozen.

18           Q.     All right.  And the ones,

19      whatever the number was and whatever

20      complaint reports they might have been, if

21      they were in your locker on October 31,

22      what happened to them after October 31 as

23      far as you know?

24           A.     I don't know.

25           Q.     So, did you have any other

A. SCHOOLCRAFT

1

2      copies of those complaint reports that

3      would have been in your locker on October

4      31?

5           A.    If I do.

6           Q.    Anywhere else?

7           A.    If I do I'm not aware of,

8      but --

9           Q.    When you went to QAD, did you

10     provide them with copies of any of the

11     complaint reports or scratch copies of

12     complaint reports you had in your locker?

13          A.    Whatever I provided to them, I

14     believe it was on the record on the

15     recording.  I don't -- I don't know if it

16     was this one because I would not be aware

17     of a change until -- I would see something

18     like this.

19          Q.    By "this" you mean?

20          A.    The computer, the entered

21     version after it receives the number.

22          Q.    They refer to that as the Omni

23     form printout?

24          A.    I believe that's arrest

25     paperwork.  Well, I think Omni form is the

559

1                    A. SCHOOLCRAFT

2    system that they're entered into.

3         Q.    So it's generated from that

4    program.  Okay.

5              My understanding is if this

6    helps you, that this is one of the

7    complaint report incidents referred to by

8    QAD in its report.  Okay?  So, if that is

9    so, would that be an indication that you

10   had provided them whatever documentation

11   you had about that complaint?

12        A.    Well, my complaint resulted in

13   their investigation.  I don't know if I

14   took -- um, this specific complaint, if I

15   was aware of it, it would have been -- if I

16   was aware of a change it would have been a

17   great example to give them.

18        Q.    You don't remember now as we

19   sit here today whether that was an example

20   that you complained about to QAD?

21        A.    The name doesn't look familiar.

22   I don't believe it was.  I believe there

23   are ten or 15 documents I gave them.

24        Q.    All right.  Going back.  To the

25   extent that you had copies of complaint

1                    A. SCHOOLCRAFT

2     reports or copies of scratch copies of

3     complaint reports in your locker as of the

4     date you went to QAD, would you have pulled

5     those copies from your locker and shown

6     them to QAD, or not?

7              MR. SMITH:  Objection to the

8         form.

9         A.    I am sorry, say that again.

10        Q.    You had copies in your locker

11    of complaint reports or of scratch copies

12    of complaint reports perhaps going back as

13    far as May of 2009 as of October of 2009,

14    is that what you said to us?

15        A.    What are you claiming that I

16    said?  The dates are just --

17        Q.    That particular complaint

18    report relates to May of '09.

19        A.    Right.

20        Q.    And you said it may have

21    been -- your copy of the scratch copy of

22    that complaint may have been in your locker

23    in October of 2009.

24        A.    Correct.  I believe it was.

25        Q.    Okay.  And my question to you

A. SCHOOLCRAFT

1

2  then was, would you have shown or raised

3  that complaint report to QAD when you went

4  to see them in October of 2009?

5  A.  If I was --

6  MR. SMITH:  Objection to form.

7  A.  If I was aware of the

8  difference between -- I believe there's a

9  difference between the scratch and this

10  computer-generated version, if I was aware

11  of that it definitely would have been a

12  candidate, but I -- to take to QAD.

13  Q.  Right.  Did you pull everything

14  from your locker to review in order to

15  determine what to show to QAD when you went

16  to see them?

17  MR. SMITH:  Objection to form.

18  A.  I probably reviewed them.

19  Q.  Was it custom to look at the

20  computer-generated printouts of the

21  complaint reports to see how they compared

22  with what had initially be reported?

23  A.  It was -- I believe you needed

24  a code or a password into the computer.  I

25  did not have that.  But that would have

1            A. SCHOOLCRAFT

2    been something I'd want -- that was an idea

3    I always tried to accomplish, but I don't

4    know if I retrieved the --

5            Q.    That particular complaint?

6            A.    I remember on one, Timothy

7    Covell did, after being told about it, I

8    asked the civilian in the back to track it

9    down and she gave me a copy of his report.

10   I remember that one, having that electronic

11   report and not the scratch one.

12            C-O-V-E-L-L, to the best of my

13   memory.

14            MR. SMITH:  It's up.

15            MR. LENOIR:  It's next.

16            Q.    Did you access the computer

17   system to review the finalized complaint

18   reports by any means other than having your

19   own personal access code?

20            MR. SMITH:  Objection to the

21        form.  He didn't say he had a

22        personal access code.

23            A.    Correct.  I didn't.

24            Q.    Meaning he didn't have one so

25   did he do it by some other ones?

563

A. SCHOOLCRAFT

1
2       MR. SMITH:  Other than what he
3       just said, asking a civilian to get
4       it.
5       Q.    Did you access them in any
6  other?
7       MR. SMITH:  Other than what
8       he's already said.
9       Q.    Other than asking somebody to
10  use their access code for them to get
11  access, did you ever access the information
12  on the computer using somebody else's
13  access code?
14       A.    Not that I remember, no.  I
15  didn't have anyone else's access code.
16       Q.    Did you ever get to a computer
17  that had already accessed that data bank
18  and was left open and accessible for you to
19  use?
20       A.    I don't -- if I did, I don't
21  recall.
22       Q.    So as far as you know, other
23  than someone else going into the system and
24  printing out the finalized complaint
25  report, you never were on that system and

564

A. SCHOOLCRAFT

1

2      looking at finalized complaint reports?

3             A.     To the -- sitting here right

4      now, I don't recall, no.

5             Q.     You don't recall ever having

6      that experience?

7             A.     I don't, no.

8             Q.     Directing your attention to

9      what's been marked Defendant's Exhibit M

10     for identification.

11                   MR. KRETZ:  Bates numbers are

12            SM-9 through 16.

13            Q.     Is that what you have?

14            A.     Yes.

15                   THE WITNESS:  Can I just put

16            the complaint number on the record,

17            what we're looking at right now.

18            Complaint number 2009-081-02522.

19            That's M.

20            Q.     Have you reviewed the documents

21     in that exhibit?

22            A.     Yes.

23            Q.     Okay.  Does your handwriting

24     appear anywhere on any of the sheets in

25     that exhibit?

565

                    A. SCHOOLCRAFT

1

2        A.    Yes, from SM-12 to SM-14.

3        Q.    What are those pages where your

4    handwriting appears?

5        A.    The first, SM-12 is the first

6    page of the complaint report, scratch.

7        Q.    Right.

8        A.    SM-13 is the -- I believe

9    that's the third page.  The second and the

10    fourth page are not here.  There's two

11    pages of the 61 missing -- of the scratch

12    61 missing.  The one that lists the

13    property and, I believe the other one would

14    list the perpetrator and the victim.

15        Q.    Well, is SM-14?

16        A.    SM-14 is a -- it's a -- I can't

17    read what it was called, but to the best of

18    my memory if someone claimed property was

19    stolen, you would attach this form to the

20    61.

21        Q.    The copy I have, and maybe it

22    got clipped on yours, it says at the top

23    lose offer stolen property identity theft?

24        A.    Yes, that's separate from the

25    61.

566

```
 1              A. SCHOOLCRAFT
 2          Q.    I understand.  I asked you what
 3      the form was.
 4              MR. SMITH:  Below that it says
 5          PD 313-1516.
 6          Q.    And that's your handwriting on
 7      that page, as well, SM-14?
 8          A.    Yes, sir.
 9          Q.    And that provides the name of
10      the victim and the property that -- is that
11      correct?
12          A.    The perpetrator.
13          Q.    The name of the perpetrator and
14      the property that was reported?
15              MR. SMITH:  What page are we
16          on?
17          A.    No, just the suspect and a
18      description of the suspect.
19              MR. SMITH:  What page are we
20          on?
21              MR. KRETZ:  SM-14.
22          A.    Okay, 14 is a list of the
23      property.  I'm sorry.
24          Q.    Whose name appears in the upper
25      left in handwriting?
```

A. SCHOOLCRAFT

1

2      A.      Brenda Donaldson.

3      Q.      Is that the victim or the

4  perpetrator?

5      A.      I believe it's the victim.

6      Q.      Do you recall this complaint?

7      A.      I believe so, yes.

8      Q.      What is it that you recall

9  about it?

10      A.      I recall -- after interviewing

11  the victim, after she clearly described

12  basically what's described on the QAD

13  sheet, at that time patrolmen were required

14  to notify a supervisor of an index crime.

15      Q.      Let me just -- indicate what

16  you pointed to.  You pointed to the first

17  page, the typewritten paragraph?

18      A.      The QAD report, I believe

19  that's what she stated to me, and this is

20  one of the incidents, it was an index crime

21  and at that time, I don't know if it was

22  actual policy or unofficial policy, but

23  patrolmen were supposed to notify

24  supervisors if anyone reported an index

25  crime.  I believe this was reported to

568

A. SCHOOLCRAFT

1
2    Sergeant Stukes, to the best of my memory.
3    And Stukes then informed me, like he's
4    informed many officers, if they didn't see
5    anyone take their property, then it's not
6    a -- it's not a crime, it's lost property.
7         Q.    You specifically recall that in
8    this instance?
9         A.    Yes, sir.
10        Q.    All right.  So you called
11   Stukes to the scene, is that what you're
12   saying?
13        A.    Well, it appears to be I was
14   stationed inside the --
15        Q.    Okay.
16        A.    Inside the 81 Precinct.
17             MR. SMITH:  Wait.  Let him
18          finish what he's saying.
19        A.     And at the time I was -- I
20   believe that date was before I was
21   modified.  Well, I don't know.  I'm not
22   sure if I was modified.  I'm not sure if I
23   was stationed inside the precinct or not
24   but it appears I'm inside the precinct
25   taking the report and Sergeant Stukes may

569

1                    A. SCHOOLCRAFT

2    have also been inside.

3          Q.    What indicates to you that you

4    were stationed inside?

5          A.    That it says complaint

6    received, walk in.  If I was on patrol it

7    would say, I believe it would say patrol.

8          Q.    On page SM-12, is the

9    handwriting that's entered on that page

10   your handwriting?

11         A.    Yes.

12         Q.    Do you see down below on the

13   lower left-hand side it says "supervisor on

14   scene" and the box is checked no?

15         A.    Correct.

16         Q.    Is that an indication that

17   there was no supervisor on the scene?

18         A.    Yes.

19         Q.    Okay.  So, does that refresh

20   your recollection as to whether Stukes gave

21   you any direction on how to handle this

22   complaint report?

23         A.    Oh, I definitely recall him

24   giving me direction, stating -- after he

25   deemed it wasn't -- after what he was

570

A. SCHOOLCRAFT

1

2 stating, that it wasn't an index crime.

3        Q.     Right.

4        A.     That it wasn't what she had

5 told me, then he was not required to be on

6 the scene, so that is why, very possible

7 why I put no, but I did approach him and he

8 told me, like he's told dozens of officers

9 and other sergeants have said this to

10 officers, if they didn't see anyone take

11 their property then it's lost property,

12 something to that effect.

13        Q.     So, you recall in this instance

14 that you didn't make that determination on

15 your own, that Stukes directed you to make

16 that determination?

17        A.     Correct.  And that is an issue

18 I brought up with QAD as to the confusion

19 created by supervisors in the 81 Precinct

20 confusing patrol officers as to what is a

21 crime or how to take the report.

22        Q.     Did you sign the scratch copy

23 of the complaint?

24        A.     I believe so.  Again, at the

25 time I had no reason -- he's -- he was a

A. SCHOOLCRAFT

1
2    sergeant.  I didn't believe it was correct
3    but I didn't have any reason to believe it
4    wasn't correct and --
5        Q.    So, you believed it was
6    appropriate for you to sign off on this
7    even though it wasn't written up the way
8    you thought it should have been written up?
9            MR. SMITH:  Objection to form.
10       A.    It was written up the way I was
11   told to write it up.
12       Q.    Did you think that was the
13   proper way to write it up?
14       A.    I informed Sergeant Stukes what
15   happened.  His reason for not letting it
16   become an index crime was that she didn't
17   see anyone take her property.  If they
18   didn't see -- if they didn't see them or
19   they can't describe a perp, it's not a
20   larceny.
21       Q.    I understand your explanation,
22   but you signed this scratch copy of the
23   report?
24       A.    Correct.
25       Q.    You indicated on that scratch

572

A. SCHOOLCRAFT

1

2   copy that there was no supervising officer

3   on the scene and you're telling us now you

4   have a specific recollection that, in fact,

5   there was an officer on the scene and the

6   report was different from what you actually

7   wrote it up to be?

8               MR. SMITH:  Objection to form.

9        Q.    Is that correct?

10       A.    The reason --

11              MR. SMITH:  Objection to form.

12       Q.    Is that correct?  Can you

13   answer my question?

14       A.    I'm sorry.  What was the

15   question then?

16       Q.    You signed the report.  You

17   checked off that the supervisor was not on

18   the scene.  Now you're telling us that the

19   description you provided in the report was

20   not accurate and the supervisor was on the

21   scene?

22       A.    Correct.

23              MR. SMITH:  Objection to form.

24       Q.    And you considered it

25   appropriate to operate in that fashion, to

573

1                    A. SCHOOLCRAFT

2    act in that fashion?

3                    MR. SMITH:  Objection to form.

4         A.    To act under a supervisor's

5    orders, or what he stated -- this is what

6    brought on me making the report to QAD,

7    this confusion.

8         Q.    Did Stukes tell you to check

9    off that there was no supervisor on the

10   scene?

11        A.    I don't recall if he

12   specifically said that, no.

13        Q.    Okay.  Let me direct your

14   attention to Defendants' Exhibit N for

15   identification.

16                MR. KRETZ:  These are Bates

17           stamped SM-17 through 30.

18        Q.    All set?

19        A.    I have N.  SM-17 through SM-30.

20        Q.    Okay.  Just to not confuse.

21   Going back to Defendant's Exhibit M.  Do

22   you believe copies of this complaint would

23   have been in your locker in October of '09?

24        A.    It's possible.

25                MR. SMITH:  Objection to form.

1                      A. SCHOOLCRAFT

2          Q.    Do you have a recollection of

3     discussing this particular incident

4     addressed in Defendant's Exhibit M with QAD

5     when you went for your first interview

6     there?

7          A.    It's possible that's one of

8     them.

9          Q.    Well, do you remember or not?

10         A.    I do not, no.

11         Q.    Is the name familiar to you,

12    Brend Donaldson?

13         A.    I think it's Brenda.

14              THE WITNESS:  Brenda Donaldson.

15              MR. SMITH:  But you've got to

16         answer the question which is.

17         Q.    Is the name familiar to you?

18              MR. SMITH:  Is it familiar to

19         you, as opposed to reading it off the

20         page.

21         A.    No, no, the name as much as the

22    incident or the familiar -- the familial --

23         Q.    Familiarity?

24         A.    Thank you.  Of what I tried to

25    explain to QAD and how --

A. SCHOOLCRAFT

1

2      Q.    Okay.  But do you remember the

3  specific incident?

4      A.    I believe so.  I believe it's

5  who I think -- who I'm thinking of in my

6  mind.

7      Q.    And do you believe you

8  discussed it with QAD, that incident

9  reflected in Exhibit M?

10     A.    I don't recall.

11     Q.    Did you make entries in your

12 memo book about these experiences to help

13 you recall what happened?

14            MR. SMITH:  Objection to form.

15     A.    It's possible.

16     Q.    Well, was that your custom?

17            MR. SMITH:  Objection to form.

18     A.    I wouldn't call it a custom,

19 but it is possible there would be some form

20 of documentation in my activity log.

21     Q.    Well, did you ever make a point

22 of recording in your activity log a

23 specific incident like that reflected in

24 Exhibit M, that you're just telling us

25 involved the supervisor telling you to

```
 1                      A. SCHOOLCRAFT
 2      change the report and indicate it was a
 3      different crime than the one you believed
 4      was reported?
 5            A.     Probably not at that time.
 6            Q.     That time being?
 7            A.     Of that report.
 8            Q.     Do you know what time that was?
 9            A.     May?  May, was it May 2009?
10            Q.     Okay.  So at what point in time
11      did you think that you should make a point
12      of recording such experiences in your memo
13      book or your activity log?
14            A.     It would be after several
15      incidents like that that I felt we should
16      have just been putting the statements that
17      the victims were giving into the summary,
18      and I didn't really -- I didn't agree with
19      the -- I don't know, it made sense if they
20      didn't see someone take it, then it's not a
21      crime I guess a little bit that made sense.
22            Q.     In May of '09, you had been
23      recording conversations at the 81 for
24      perhaps a year and a half or so; is that
25      right?
```

577

                    A. SCHOOLCRAFT

1

2        A.     That sounds right.

3        Q.     Approximately.  Were you also,

4    at any time during that year and a half, in

5    the habit or was it your custom to enter

6    information on your computer at home about

7    specific experiences you had on the job,

8    like those related to complaint reports

9    that you've been discussing?

10               MR. SMITH:  Objection to form.

11       A.     No.  The only record I would

12   have is if I -- if I had made a note in my

13   activity log or memo book or keep a copy.

14       Q.     So you didn't go home and --

15       A.     -- of a document.

16       Q.     You didn't go home in your

17   computer and create a log of your

18   experience, an Excel spreadsheet or any

19   other kind of log of what you observed and

20   so on?

21       A.     No.

22       Q.     Directing your attention to

23   Defendant's Exhibit N.  Have you reviewed

24   that document?

25       A.     I have it now.  I recognize the

A. SCHOOLCRAFT

1

2    name.  This is the -- this is the incident

3    that Officer Deck told me about.  Deck,

4    D-E-C-K.  And that's complaint report

5    number 2008-081-06723.

6              Q.    What do you claim that Officer

7    Deck told you about this incident?

8              A.    I recall him talking about how

9    the job was bullshit and how we're not

10   actually helping victims, and he informed

11   me of this victim that was bleeding from

12   the head and that he was -- that he was

13   told by a supervisor to not take the report

14   as a robbery.

15             Q.    Did he tell you what supervisor

16   told him that?

17             A.    He informed me that he called

18   the desk and that Sergeant Stukes told him,

19   we can't take another robbery, and he also

20   informed me that Lieutenant Charlson

21   arrived on the scene.

22             Q.    And what happened when he

23   arrived on the scene?

24             A.    That Lieutenant Charlson

25   reiterated the same thing that Sergeant

579

```
 1                    A. SCHOOLCRAFT
 2    Stukes told him.
 3         Q.    Did you record this
 4    conversation with --
 5         A.    I don't believe so.  I never
 6    heard that recording.
 7         Q.    No?
 8         A.    I don't believe so, no.
 9              MR. SMITH:  Did you record the
10         conversation, and he was referring to
11         Deck.
12         Q.    With Deck, yes.
13              MR. SMITH:  He never finished
14         his question.
15         Q.    The conversation with Deck you
16    didn't record?
17         A.    I don't believe so.
18         Q.    Did you make a record of it in
19    any other way, entry in your memo book or
20    anything else?
21         A.    I would have to see that memo
22    book.
23         Q.    So, does your handwriting
24    appear anywhere in any of the sheets of
25    this exhibit?
```

1        A. SCHOOLCRAFT

2        A.    SM 0029 appears to be my

3   handwriting, writing the complaint number

4   on what looks to be victim Covell's

5   typed-out statement of the actual events

6   that happened.

7        Q.    On page SM-21, the words "lost

8   property" are entered in the report

9   classification.  Do you know whose

10  handwriting that is?

11       A.    I don't know.

12       Q.    What did you do upon being told

13  by Deck about this experience?

14       A.    I don't recall how much

15  detailed information he gave me.  I believe

16  I got more -- oh, I got the location.  I

17  think that's how I tracked down the report,

18  and I had one of the ladies in the back

19  assist me in getting the -- I believe I had

20  the electronic printed version of this 61.

21       Q.    You had it, you mean you asked

22  someone to print it out for you?

23       A.    Correct, and it was based on

24  the location that Deck gave me.

25       Q.    So, when did you write the

```
 1                    A. SCHOOLCRAFT
 2   complaint number on page SM-29?
 3         A.     I don't recall.
 4         Q.     After you had the computer copy
 5   of the complaint report printed, what did
 6   you do?
 7         A.     I -- I'm not sure when I
 8   printed out that version, or if it was --
 9   how much time before the QAD report -- or
10   the QAD -- reporting to QAD.  I don't
11   recall when I printed it out.
12         Q.     Well, what's the date of the
13   occurrence, can you tell from the
14   documents?
15         A.     October 23, 2008.
16         Q.     When did you --
17              MR. SMITH:  The record should
18           reflect the witness is reading from
19           SM-18.
20         Q.     Is that consistent with your
21   recollection?
22              MR. SMITH:  Is what consistent
23           with your recollection.
24              MR. KRETZ:  That that was the
25           date of the occurrence.
```

A. SCHOOLCRAFT

1

2      A.     Sure.

3      Q.     How soon after the occurrence

4  did Deck tell you about it?

5      A.     I don't -- I don't recall when

6  he told me about it.

7      Q.     Do you recall when you --

8      A.     I recall where I was when he

9  told me about it.

10      Q.     Okay.  Where were you?

11      A.     I know the corner.  The streets

12  escape me right now.

13      Q.     You were on foot patrol?

14      A.     Yes, we were both on the same

15  corner, and it was raining.

16      Q.     That's all right.  I don't need

17  that.  I just thought if you remember.

18      A.     I remember him telling me.  I

19  don't remember the date.

20      Q.     Do you have any recollection of

21  how long after the incident it was,

22  approximately; a week, a month, six months?

23      A.     No, not sitting here right now,

24  no.  Not without any --

25      Q.     Do you have any recollection of

A. SCHOOLCRAFT

1

2  when you asked for a copy of the printout

3  of the complaint report or for the

4  complaint number?

5        A.    It would have been fairly

6  recent after that.

7        Q.    And then what did you do with

8  that information after you got it?

9        A.    I would have kept a copy, the

10  electronic copy, and it was probably in my

11  locker and that's one of the documents that

12  I reviewed when I decided to go to QAD,

13  when they contacted me.

14        Q.    And you did nothing more about

15  that complaint until that time?

16        A.    Oh, I believe I contacted the

17  complainant, Timothy Covell.

18        Q.    How did you do that?

19        A.    His phone number is on the

20  complaint.

21        Q.    Okay.  And did you reach him on

22  the telephone?

23        A.    I reached his parents, I

24  believe, and then they -- they either gave

25  him a message or they gave me another phone

584

1                    A. SCHOOLCRAFT

2    number to contact him with.

3         Q.    Did you exchange e-mails with

4    him, by any chance?

5         A.    I don't recall exchanging

6    e-mails with him but it's possible.  That's

7    possible how I got the written statement.

8         Q.    What written statement did you

9    get?

10        A.    I mean, not written statement.

11   The typed-out statement.

12        Q.    That was something you --

13        A.    Of his version of the events.

14        Q.    That was something you obtained

15   on your own?

16        A.    Yes.

17        Q.    On your own?

18        A.    What do you mean on your own?

19        Q.    Well, he reached out to you and

20   he provided it to you?

21        A.    Correct.

22        Q.    Did you encourage him to

23   provide you with such a statement?

24        A.    I asked him if he could write

25   out what actually happened, yes.

585

A. SCHOOLCRAFT

1

2      Q.    Did you tell anybody you were

3  doing this?

4      A.    No, I did not.

5      Q.    What did you do with that

6  statement once you received it?

7      A.    I put it in his folder and then

8  in my locker.

9      Q.    Does discussing --

10     A.    With the other pile.

11     Q.    Does discussing this refresh

12  your recollection as to how soon after the

13  incident you did all this?

14     A.    What incident, of him being

15  robbed or being told it?

16     Q.    The initial complaint.  How

17  soon --

18     A.    His complaint.

19     Q.    Yes, his initial complaint.

20  How soon after that were you in touch with

21  him?

22     A.    I don't remember.

23     Q.    You don't remember when he

24  provided you with his statement?

25     A.    It would have been after Deck

586

A. SCHOOLCRAFT

1

2      told me about it.

3            Q.    But you can't do better than

4      that? A week, a month?

5            A.    Well, I don't even remember

6      when -- when Deck told me, you know, the

7      specific date.

8            Q.    Do you have any entry, any

9      record anywhere, in an activity log?

10           A.    It's possible.   It's possible.

11           Q.    How did you get the statement

12     from --

13                 MR. SMITH:  Wait.  Slow down.

14           I know it's late.  I know we're at

15           the third day, the end of the day.

16           Please, take your time.  Let him ask

17           his whole question and then give an

18           answer.  Okay?

19           Q.    After Deck told you, do you

20     believe you made an entry in your activity

21     log?

22           A.    It's possible but I don't

23     remember.

24           Q.    After you spoke with

25     Mr. Covell, how did he get his statement to

587

1                    A. SCHOOLCRAFT

2    you that is included in this exhibit?

3         A.    It's possible he e-mailed it to

4    me.

5         Q.    So you think you might have

6    received an e-mail from him?

7         A.    Correct.

8         Q.    Do you think you sent any

9    e-mail messages to him?

10        A.    That's possible.

11        Q.    What e-mail address were you

12   using at the time?

13        A.    That would have been the Time

14   Warner cable address.

15        Q.    Did you have an e-mail address

16   you could use at the precinct, or a

17   department e-mail address?

18        A.    Not that I'm aware of, no.

19        Q.    You never used any

20   NYPD-provided e-mail address?

21        A.    Not that I'm -- not that I

22   recall, no.  I don't recall having one

23   assigned to me or requesting one.

24        Q.    How many times did you speak

25   with Covell?

588

A. SCHOOLCRAFT

1

2      A.     I think I met him in person

3   twice, and I may have talked to him on the

4   phone three times, maybe more.

5      Q.     So, you met him in person after

6   Deck told you what had happened?

7      A.     Correct.

8      Q.     Did you consider this activity

9   on your part to be part of your duties and

10  responsibilities as a police officer?

11     A.     Yes.

12     Q.     Did you consider your

13  responsibility to report to anybody what

14  you were doing?

15     A.     Yes.

16     Q.     Who did you report it to?

17     A.     QAD.

18     Q.     Well, you reported it to QAD

19  when, in October of 2009?

20     A.     Correct.

21     Q.     And from October 2008 until

22  then, you hadn't reported it to anybody?

23            MR. SMITH:  Whoa.  Don't answer

24         that question.

25            You've already gone around this

1          A. SCHOOLCRAFT

2     how many times about when this thing

3     happened when he spoke to Deck.  He's

4     already told you he doesn't remember

5     those dates.

6          MR. KRETZ:  All right.  Come

7     on, please.

8          MR. SMITH:  No, you, please.

9     If you're going to badger the witness

10    with those kind of questions we'll

11    come to a close.

12         MR. KRETZ:  We're not

13    badgering.  We're trying to figure

14    out what he recalls.

15    Q.    This is a significant incident

16 in your mind, right?

17    A.    Yes.

18    Q.    Something you were very

19 compelled to follow up to get the report

20 generated by the supposed victim and report

21 it to QAD and you can't tell me when you

22 did all of that?

23         MR. SMITH:  Don't raise your

24    voice, please.

25         MR. KRETZ:  I was just trying

590

1                    A. SCHOOLCRAFT

2        to talk over you because I couldn't

3        get a question out.

4               MR. SMITH:   I object to the

5        form of the question.

6        A.     Like I said, I think it was

7   yesterday.   I did not know what QAD was

8   until I showed up at Gold Street and

9   Lieutenant Brill explained to me off the

10  record or on the record -- I believe he

11  explained it on the recording, also, that

12  they were who you report something like

13  this to.

14       Q.     You knew what IAB was, right?

15       A.     Yes.

16       Q.     Did it ever occur to you that

17  something like this could be reported to

18  IAB?

19       A.     Absolutely.   That's who I was

20  thinking to report this pattern to.

21       Q.     But until October 2009 it never

22  occurred to you actually do that?

23       A.     I'm not sure -- I may have

24  found out in October 2009.

25       Q.     That's what I'm trying to find

591

```
1                    A. SCHOOLCRAFT
2     out.  You don't recall?
3          A.    But I don't believe it was
4     right away because I had his -- this case,
5     the Timothy Covell case was what compelled
6     me to look into other -- because I knew
7     there were more, I just didn't know how to
8     find them and that's what I reported, the
9     pattern.
10         Q.    After you found out about the
11    Timothy Covell case and you realized in
12    your mind it was a pattern, what did you do
13    to track down the other incidents that you
14    believed you knew about?
15         A.    Listened to other officers.
16    That's it, listened to other officers and
17    what they say and incidents of my own.
18         Q.    Did you approach particular
19    officers and ask them about incidents you
20    had already heard about, that is after the
21    Covell case came to your attention?
22         A.    That's possible.
23         Q.    Do you have any recollection of
24    doing that after --
25         A.    No.
```

592

1                    A. SCHOOLCRAFT

2         Q.     -- learning about the Covell

3    case?  You didn't actually approach anybody

4    to ask about an incident you had already

5    had heard about, is that right?

6         A.     It's possible but I don't

7    remember.

8         Q.     Well, the way you express your

9    reaction to the Covell case was that it

10   caused you to focus on what you already

11   understood to be a number of incidents that

12   had already occurred, right?  So I'm trying

13   to find out.  This is all by way of trying

14   to refresh your recollection whether that

15   triggered you, you know, to reach out to

16   people who you knew to be involved in past

17   incidents to find out what happened; do you

18   recall doing that or not?

19        A.     No.

20        Q.     When you say you listened to

21   officers, what does that mean, from that

22   point forward, after learning about Covell,

23   you listened to see if something like that

24   happened again, is that what you mean?

25        A.     And before.  I listened to

593

A. SCHOOLCRAFT

1

2    officers before, not for any specific

3    event.

4         Q.    I understand you listened to

5    them before, the question is did you

6    approach the ones you had heard of before,

7    did you approach the officers involved in

8    the incidents you had heard of before you

9    learned of Covell?

10        A.    It's possible but I don't

11   remember.

12        Q.    All right.  So after you

13   learned of Covell, you said you listened to

14   officers and you just said again you

15   listened to them afterward.  Do you recall

16   approaching any officers that you heard

17   mention of some incident involving

18   complaint reports that you thought you

19   should follow up on?

20        A.    Sitting here right now, I do

21   not have any recollection of any specific

22   event that you just asked about.

23        Q.    Do you believe you did that?

24        A.    I believe -- I -- I don't

25   recall how I -- how I collected the other

594

A. SCHOOLCRAFT

1
2   ones, but it would be similar to that.

3       Q.   So, you indicated, though, that
4   you listened to what officers said.  Based
5   upon what you heard what other officers
6   said, did you follow up without approaching
7   them?

8       A.   Follow up besides approaching
9   them.

10      Q.   Yes.  In other words, you heard
11  them you talking about something, did you
12  then take it upon yourself to figure out
13  what they were talking about and follow up
14  somehow based upon what you found?

15      A.   Like this one.

16      Q.   Yes, like Covell?

17      A.   Possibly, yes.  I believe --

18      Q.   Well, do you remember doing
19  that or not?

20      A.   I don't recall any specific
21  incident, but --

22      Q.   Do you recall any other
23  incident, after you learned of Covell,
24  where you asked someone to pull a formal
25  computerized complaint report, the final

595

A. SCHOOLCRAFT

1

2    report, so you could follow up as you did

3    with Covell?

4         A.    Other than Covell, do I have a

5    memory of a specific incident, no, I don't.

6    I do not.  Not sitting here right now.

7         Q.    Do you know if you had followed

8    up and you had gotten copies of the

9    complaint reports and the related scratch,

10   if you were able to get those, where you

11   had those documents in October of 2009?

12        A.    Say that again.  I got lost.

13        Q.    If you followed up and gathered

14   copies of the complaint reports, the final

15   one, the scratch one, whatever you could

16   get and you thought it deserved further

17   attention from you, where did you keep the

18   copies that you accumulated?

19        A.    In my locker.

20        Q.    And do you believe that

21   whatever complaint reports you had in your

22   locker that you thought deserved that kind

23   of follow-up, you then brought to the

24   attention of QAD?

25        A.    I believe so, yes.

596

1                     A. SCHOOLCRAFT

2          Q.    Directing your attention to

3    Defendant's Exhibit O, Bates stamped SM 31

4    through 40.  Could you please review that.

5                (6:03 p.m., evening session.)

6                THE WITNESS:  Complaint report

7          number 2009-081-05194.

8          Q.    By the way, Mr. Schoolcraft, I

9    don't know that anybody's asked you this

10   question.  Have you been recording any of

11   these sessions of your deposition?

12               MR. SMITH:  Don't answer that

13         question.

14               MR. KRETZ:  No, he's got to

15         answer that.

16               MR. SMITH:  Don't answer the

17         question.

18               MR. KRETZ:  No.  That's a fair

19         question.

20         Q.    Do you have a recorder on you?

21         A.    No.

22         Q.    Defendant's Exhibit O.  Do you

23   recall the incident that's reflected in

24   those documents?

25         A.    No.

1                    A. SCHOOLCRAFT

2        Q.    Does your handwriting appear

3    anywhere on any of those pages?

4        A.    No, I don't believe so.

5        Q.    Your handwriting doesn't appear

6    on there and you don't recall the incident?

7        A.    It doesn't look familiar, no.

8        Q.    And the name Juan Lord doesn't

9    sound familiar to you?

10       A.    No.  Sitting here right now, I

11   don't recall.

12       Q.    So you don't have any

13   recollection of discussing this with QAD?

14       A.    No, I would have to review the

15   recording.

16            MR. KRETZ:  Off the record.

17            (Whereupon, a discussion was

18        held off the record.)

19       Q.    On to the next report.

20            MR. SMITH:  The last report.

21            MR. KRETZ:  Defendant's Exhibit

22        P for identification.

23            MR. SMITH:  Which is SM 41

24        through 60.

25            MR. KRETZ:  Yes.

598

A. SCHOOLCRAFT

1

2      THE WITNESS:  This is the last

3      part.  This is the back.

4           MR. SMITH:  Oh, wait a minute.

5      That's your copy.  Go ahead.

6           Q.    Have you had a chance to review

7      the document?

8           A.    Wait.  What one am I on?

9           MR. SMITH:  P.  SM-41, 41

10     through 60.

11          Yes.  And here's the actual

12     sticker copy (handing).

13          Q.    Do you recall the complaint

14     that these documents relate to?

15          A.    I do.

16          Q.    Does your handwriting appear on

17     any of the sheets in this exhibit?

18          A.    Yes.

19          Q.    Please tell us what pages.

20          A.    SM 0044 through SM 0053.

21          Q.    Do you recognize the

22     handwriting on 54 and 55?

23          A.    And I'm sorry, SM 0057 and 58.

24     That's it.

25          Q.    Do you recognize the

1                    A. SCHOOLCRAFT

2     handwriting on 54 and 55?

3          A.    No.

4          Q.    Do you recall when this

5     complaint was originally taken?

6          A.    I can look on the date.

7          Q.    Well, let me direct your

8     attention to SM-44.  On the top of that

9     sheet, which is a complaint report

10    worksheet or a scratch copy, it says in

11    handwriting on the top "first report?"

12         A.    Correct.

13         Q.    Who wrote that?

14         A.    Me.

15         Q.    Did you take the original

16    complaint on this incident?

17         A.    Yes.

18         Q.    Did you then prepare a second

19    scratch copy of the complaint?

20         A.    Sergeant Stukes --

21         Q.    Hold on.  Let's just identify

22    it and then you can tell us what happened.

23         A.    Correct.

24         Q.    SM-46 is a scratch copy.  On

25    top it says "second report"?

600

                        A. SCHOOLCRAFT

1          A.     Where does it say second
2    report, which one?
3          Q.     It's in handwriting on the top
4    of page SM-46, do you see it?
5          A.     Yes, I see it.
6          Q.     Is that your handwriting?
7          A.     Yes.
8          Q.     And then there's a third
9    complaint report prepared further back in
10   the exhibit.  You tell me, is that so on
11   SM-50?
12         A.     SM-050, yes, correct.
13         Q.     That's your handwriting again?
14         A.     Yes.
15         Q.     And that's the third scratch
16   copy prepared?
17         A.     At least.  I believe it's the
18   third.  The third one that I did.
19         Q.     Can you explain to us why you
20   prepared three scratch copies?
21         A.     After responding to this call,
22   I took a report for robbery.  I can't
23   recall if I was called to the desk or --
24   any index crime needs to be turned in and

601

1                    A. SCHOOLCRAFT

2   entered into the computer immediately, so

3   given to the ladies in the back.   Sergeant

4   Stukes informed me that -- he said, we

5   can't take a robbery, so he -- he -- I'm

6   not exactly sure what he wanted me to --

7   how the second report came about, but he

8   wasn't happy with that one, either, but the

9   first report is the one I hand delivered

10  to, I believe it was -- his name might be

11  in here.   I hand delivered it upstairs to

12  the detective squad, the original report.

13       Q.    Let me stop you there.   So, you

14  prepared the original scratch report and

15  you took it to the people upstairs.   Who

16  were they?

17       A.    The detective squad.   It was a

18  black detective.   I can't think of his name

19  off the top of my head right now.

20       Q.    Why did you do that?

21       A.    I believe that was the

22  procedure at the time.   A robbery was a big

23  deal.

24       Q.    Before you tell me what

25  happened up there, who were the ladies in

602

1                    A. SCHOOLCRAFT

2    the back that you referred to?

3         A.    They are PAA's, the civilians

4    that do administrative work inside the

5    department.

6         Q.    Where do they sit?

7         A.    In the -- behind where the 81

8    desk is.

9         Q.    So, when we are at the site

10   visit for the 81, there was the telephone

11   switchboard, operator desk?

12        A.    Right.  Directly behind that.

13             MR. SMITH:  Slow down.  Let him

14        ask his question.

15        Q.    He explained.  Directly behind

16   that desk?

17        A.    Correct.

18        Q.    What's the function of the

19   people that sit in that room?

20        A.    They enter -- these reports --

21   they enter these reports into the computer.

22   They enter aided cards.  They enter missing

23   person reports into the computer, numerous.

24        Q.    Is that room referred to in any

25   other way, other than the ladies in the

603

1              A. SCHOOLCRAFT

2     back?

3         A.    Yeah, by a number but I can't

4     remember.

5         Q.    124?

6         A.    There you go.

7         Q.    So you prepare the scratch

8     copy, and what role did the people in the

9     124 room play?  You bypassed them, is that

10    what you're saying and went directly to the

11    detective squad?

12        A.    No.  This I went to my

13    supervisor, who is Sergeant Stukes on the

14    desk.

15        Q.    Right.

16        A.    (Continuing) and he informed me

17    we can't take a robbery, this is -- oh, I

18    don't think they acted in actually taking

19    the PSP, that's why he told me it wasn't a

20    robbery and it was just an assault.

21        Q.    The PSP is what?

22        A.    I believe it's a little game

23    player.

24        Q.    Play Station, is it Play

25    Station?

604

1                    A. SCHOOLCRAFT

2          A.    Something like that.  And the

3    second report I believe --

4          Q.    Wait.  I want to find out what

5    you did with that first report.  So, you

6    spoke to Stukes.  Then what happened?

7          A.    He said it's not a robbery.

8          Q.    Right.

9          A.    (Continuing) if -- wait a

10   minute, it's not a robbery if they didn't

11   actually get the property.  Oh, I think

12   attempted.  He told me there was no such

13   thing as an attempted robbery.  Someone

14   either gets robbed or they don't.

15         Q.    Then, what did you do after he

16   told you that?

17         A.    I believe I made a copy of the

18   report before I approached him.  So, I had

19   a copy of the scratch -- the original

20   scratch.

21         Q.    Well, that's what I'm asking

22   about, the original one.  So let's

23   distinguish.  You prepare the original one.

24   You speak to Stukes?

25         A.    Yes.

605

1                      A. SCHOOLCRAFT

2          Q.    He tells you what you just told

3    us he said.  Then what did you do?

4          A.    Basically it's filled out

5    properly.  He told me it wasn't a robbery.

6          Q.    Then what did you do?

7          A.    So I filled out a second

8    report.

9          Q.    That first one you didn't give

10   to anybody after Stukes said what he said?

11         A.    The first one I took upstairs,

12   the original one I took upstairs to the

13   detective squad and I informed them of what

14   Sergeant Stukes told me.

15         Q.    What did they say to you?

16         A.    Something like, typical, or

17   something to that effect.

18         Q.    And then what happened?

19         A.    And then --

20         Q.    Did you leave that scratch copy

21   with them?

22         A.    Yes.  I believe that was an

23   original.

24         Q.    Okay.  And then what happened

25   with respect to that complaint?

606

1                      A. SCHOOLCRAFT

2          A.    When I took this to QAD, the

3     detective I gave it to --

4          Q.    No, what happened to that

5     complaint when you went up to the detective

6     squad?

7          A.    I gave it to a detective.

8          Q.    Okay.  And then what happened

9     with respect to that complaint after you

10    gave it to the detective?

11         A.    I assume he worked it.  I don't

12    know.

13         Q.    How did it come about then that

14    you wrote a second scratch copy?

15         A.    At the behest of Sergeant

16    Stukes, and he wasn't happy with the second

17    one because it described a, I think a --

18    like an assault one or something, I'm not

19    sure, but it ended up he was happy with the

20    third one, assault three.

21         Q.    All right.  I want to take it

22    one at a time, okay.  So, on the first

23    one -- this was a walk-in?

24         A.    No.  I don't believe so.  I

25    recall showing up at this one.

607

1                    A. SCHOOLCRAFT

2          Q.     Did Stukes show up at the

3     scene, as well?

4          A.     No.

5          Q.     So this is only when you came

6     back to the 81 that he saw it?

7          A.     I believe he called -- right.

8     No supervisor on scene.  I believe he

9     called me to the 8 -- back into the house

10    or -- no, I had to -- once I'm aware a

11    robbery happened, I have to turn -- this

12    has to be entered into the computer.  I'm

13    aware of that.  A grand larceny, auto

14    robbery, rape.

15         Q.    Does that mean you went right

16    from the scene back to the precinct or did

17    you turn it in at the end of your tour?

18         A.     No, it would have been after

19    that incident.

20         Q.     So you went right in?

21         A.     Correct.

22         Q.     You show it to Stukes.  Take it

23    to the detective squad.  They say typical.

24         A.     He --

25         Q.     And then what?  When do you

                    A. SCHOOLCRAFT

1

2    hear from Stukes that you have to rewrite

3    the scratch?

4         A.    I'm sorry, what you're saying

5    implied that Stukes told me to go to the

6    squad.  He didn't.

7         Q.    I'm sorry, I didn't mean that.

8         A.    I went up there on my own.

9         Q.    When did you hear from Stukes

10   that you should write a second scratch copy

11   on have that report, how soon after?

12        A.    As soon as I showed it to him.

13        Q.    You turned in the first scratch

14   copy to the detective squad after Stukes

15   told you to prepare a second scratch copy?

16        A.    I informed the detective squad

17   that this is -- I don't know if they

18   received the changed one, but I said, this

19   is what happened.  Sergeant Stukes is

20   saying there are no attempted robberies and

21   I believe it was Detective White that I

22   handed it to.

23        Q.    All right.  I'm just trying to

24   get the order of things.  You prepared the

25   first scratch copy?

609

1                    A. SCHOOLCRAFT

2        A.     Right.

3        Q.     You show it to Stukes.  Stukes

4    says you can't write it up that way.  You

5    said you then took it up to the detective

6    squad.  Is that the order of things so far?

7        A.     Yes.  I believe, to the best of

8    my memory, yes.

9        Q.     Had you yet prepared the second

10   scratch copy?

11       A.     I don't remember.

12       Q.     So, do you remember going back

13   to the detective squad with a second

14   scratch copy?

15       A.     No, I do not remember doing

16   that.

17       Q.     And do you recall how long

18   after you showed the first scratch copy to

19   Stukes that you prepared the second scratch

20   copy?

21       A.     It would have been -- it was at

22   that time.  He offered to do it himself.

23       Q.     Okay.  But you didn't take it

24   up to the detective squad at that time?

25              MR. SMITH:  The second one.

610

```
 1                    A. SCHOOLCRAFT
 2          Q.     The second one?
 3          A.     I didn't take any of the
 4    previous ones.  I believed the first one to
 5    be -- I don't -- I don't recall asking the
 6    detective, you know, if the property isn't
 7    taken is it still a robbery?  It was an
 8    attempted robbery.
 9          Q.     So, you prepared a second
10    scratch copy to satisfy Stukes.  Did you
11    ever take that second scratch copy to the
12    detective squad?
13          A.     Not to satisfy Stukes.  He told
14    me there's no such thing as an attempted
15    robbery, this is not an attempted robbery
16    is what he said.
17          Q.     So you prepared a second --
18          A.     He told me I did the report
19    wrong.
20          Q.     Okay.  So you prepared a second
21    scratch copy in order to prepare it
22    correctly?
23          A.     It was an attempt, correct.
24          Q.     Did you ever take that second
25    scratch copy up to the detective squad?
```

611

1                      A. SCHOOLCRAFT

2              MR. SMITH:  Asked and answered.

3         A.    I don't believe so, no.

4         Q.    What did you do with that

5    second scratch copy?

6         A.    Gave it to Sergeant Stukes at

7    the desk.

8         Q.    And then what happened?

9         A.    I -- he -- well, there was a

10   third one, I don't recall --

11        Q.    What happened with the second

12   one, you showed it to Stukes?

13        A.    Seeing that there's a third

14   one, I don't -- he was not -- well, robbery

15   was the charge.

16        Q.    The question is what do you

17   remember happening when you handed the

18   second one?

19        A.    I left it attempted robbery

20   until he -- and again I was probably

21   admonished for, you know, not doing a

22   proper report.

23        Q.    What do you remember happening

24   when you handed the second scratch copy to

25   Stukes?

612

A. SCHOOLCRAFT

1

2      A.     He then said, this is still a

3      robbery, something to that effect.

4      Q.     Okay.  And then what did you

5      do?

6      A.     Then I did a third report as

7      assault three.

8      Q.     So you took back that second

9      report from him and then you prepared a

10     third one?

11     A.     Correct.

12     Q.     What happened with the third

13     one?

14     A.     I don't -- I don't know if

15     there was a fourth one.  I think he

16     accepted the assault three because there

17     was an assault that was completed.  The

18     aided to go to the hospital, aided card was

19     prepared.

20     Q.     Okay.  So the third one.  Let's

21     see if we can identify it in the exhibit.

22     Does that start at page SM-50?

23     A.     Right.

24     Q.     Does that indicate when it was

25     prepared?

613

1                    A. SCHOOLCRAFT

2              MR. SMITH:  Did you hear the

3          question?

4          A.    I don't understand the

5    question.

6          Q.    Does that third copy of the

7    scratch report indicate when you prepared

8    it?

9          A.    1800, January -- December 5th,

10   2008.

11         Q.    So, were all three reports

12   prepared on the same day?

13         A.    They appear to be, yes.

14             MR. SMITH:  The record should

15         reflect the witness was just looking

16         at SM-44, 46 and 50.

17         Q.    Does your signature appear

18   anywhere on any of these documents?  And

19   let me direct your attention to 53.

20             MR. SMITH:  So, is the question

21         a signature on 53 his?

22             MR. KRETZ:  That's another way

23         of asking the same question.

24             MR. SMITH:  A better one, I'd

25         say.

1                    A. SCHOOLCRAFT

2          A.    Just 53 right now?

3          Q.    Yes.  Well, there and anywhere

4     else you see it?

5          A.    53 appears to be my signature.

6          Q.    Does it indicate when you

7     signed?

8               MR. SMITH:  On 53?

9               MR. KRETZ:  Yes.

10         A.    It would have been the date of

11    the report.

12         Q.    Okay.  That's the date of the

13    third report, which is the same as all the

14    others.

15              Where else does your signature

16    appear?

17         A.    SM 0049.

18         Q.    And that's at the end of the

19    second report?

20         A.    No.  Where was the first one?

21    I only see two signatures.

22         Q.    So, you didn't sign the first

23    scratch copy but you signed the next two.

24    What happened after you prepared the third

25    one?

615

1                    A. SCHOOLCRAFT

2          A.     Wait.   I don't -- I don't see

3     where you're getting that I didn't sign the

4     first one.   I don't -- we don't see -- we

5     don't have the signature copy of the first

6     one.

7          Q.     Okay.  All right.

8          A.     I assume -- I assume it was

9     signed, like the other two.

10         Q.     What happened after you handed

11    up the third scratch copy?

12         A.     Then I believe it was

13    acceptable to him as a completed assault

14    three.

15         Q.     And then did you have any

16    further involvement with this complaint

17    after that?

18         A.     I believe this is one of the

19    complaints I reported to QAD.

20         Q.     Did you have any contact with

21    the victim?

22         A.     No.   There was a -- there was a

23    language barrier.

24                (Continued next page to include

25           jurat.)

616

```
 1                    A. SCHOOLCRAFT
 2          Q.    Do you know whether the
 3    detectives in the 81 interviewed the
 4    victim?
 5          A.    I'm not aware, no.
 6                MR. KRETZ:  All right.  I have
 7          no further questions.  Thank you.
 8                (Whereupon, at 6:30 P.M., the
 9          Examination of this Witness was
10          concluded.)
11
12
13                    ADRIAN SCHOOLCRAFT
14
15    Subscribed and sworn to before me
16    this _____ day of _____ 20___.
17
18        NOTARY PUBLIC
19
20
21
22
23
24
25
```