UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ADRIAN SCHOOLCRAFT,

                                       10–cv-6005 (RWS)

                         Plaintiff,

        -against-


THE CITY OF NEW YORK, *et al.*,
                         Defendants.
-----------------------------------------------------------------x


*REPLY MEMORANDUM OF LAW IN SUPPORT OF*
*PLAINTIFF'S RECONSIDERATION MOTION*


                                         Nathaniel B. Smith
                                         John Lenoir
                                         100 Wall Street – 23rd Floor
                                         New York, New York 10005
                                         212-227-7062


Dated:  July 24, 2015

## TABLE OF CONTENTS

Preliminary Statement ................................................................................... 4

Argument ....................................................................................................... 4

    1. Dr. Halpren-Ruder's Testimony. ........................................................ 4

    2.  The Qualified Immunity Defense by the Individual NYPD Defendants .......... 11

    3.  The Post-Suspension First Amendment Claim. ................................ 15

Conclusion .................................................................................................... 19

# TABLE OF AUTHORITIES

*Anderson v. Creighton*, 483 U.S. 635 (1987) .............................................................. 13

*Ernest v Boggs Lake Estates, Inc.,* 12 N.Y. 2d  416 (1963) ...................................... 11

*Golodner v. Security Technology Systems LLC*, 770 F. 3d 196  (2d Cir. 2014)........ 13

*Koller v Manhattan Eye, Ear & Throat Hosp.,* 168 A.D. 2d 671 (2d Dept. 1990) ... 11

*Pearson v. Callahan*, 555 U.S. 223 (2009)................................................................. 12

*Poe v. Leonard*, 282 F. 3d 123, 139 (2d Cir. 2002).................................................... 13

*Schoolcraft v. City of New York*, 2015 U.S. Dist. LEXIS 58831
   (S.D.N.Y. May 5, 2015) ......................................................................................... 5

*Young v. County of Fulton*, 160 F. 3d 899 (2d Cir. 1998) ........................................ 14

*Zahrey v. Coffey*, 221 F. 3d 342 (2d Cir. 2000)......................................................... 13

*Zeak v United States*, 2014 WL 5324319 (S.D.N.Y. Oct. 20, 2014)......................... 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ADRIAN SCHOOLCRAFT,

                                          10-cv-6005 (RWS)

                          Plaintiff,

            -against-                            **Reply Memorandum
                                              of Law In Further
                                              Support of Plaintiff's**
THE CITY OF NEW YORK, et al,                    **Motion To Amend**

                             Defendants.
---------------------------------------------------------------x

## Preliminary Statement

Plaintiff submits this reply memorandum in further support of his motion for reconsideration.

## Argument

The City Defendants and Jamaica Hospital make several arguments in opposition to the motion.   We briefly address those arguments below.

*1. Dr. Halpren-Ruder's Testimony.*

Jamaica Hospital ("JHMC") argues that there are insufficient grounds for the Court to reconsider its decision to exclude at trial the opinion of one of plaintiff's medical expert, Dr. Halpren-Ruder.  It contends that Dr. Halpren-Ruder's opinion should be excluded at trial because he testified that the failure to conduct a toxicology screen did not cause the plaintiff any direct physical injury to Plaintiff. JHMC also contends that the Court properly held that Dr. Halpren-Ruder's opinion

lacked foundation.

In its summary judgment decision,[1] the Court misapprehended the record when it found that the "only guidelines or literature [Dr. Halpren-Ruder] reviewed regarding the standard of care for the running of emergency departments were the post-2009 guidelines he cited in his report (Radomisli Decl. Ex. DD, pp. 131-132; Dkt. # 326), and that he did not review anything that was in effect in 2009. (Radomisli Decl. Ex. DD, pp. 132-133).[2]   This is simply not the case.

Dr. Halpren-Ruder is an emergency physician who was defining the standards of care based on his extensive work experience, not an academic review of literature. He was Clinical Instructor in Medicine at Brown University; is Board Certified by the American Board of Emergency Medicine, and is a member of the American College of Emergency Physicians and the American Board of Quality Assurance and Utilization Review Physicians.[3]   His active emergency medicine practice in 2009 was primarily as owner and manager of five urgent care enterprises in Rhode Island.

At this deposition, he testified that in Rhode Island there were no written guidelines for emergency physicians in evaluating potentially psychiatric patients, and that he would spend approximately five hours personally orienting new staff

---

[1] *Schoolcraft v. City of New York*, 2015 U.S. Dist. LEXIS 58831 at *176 (S.D.N.Y. May 5, 2015) (the "Summary Judgment Decision").
[2] *Id*.
[3] Halpren-Ruder CV; Dkt. # 326; Radomisli Dec.; Exh. CC.

physicians on these procedures.[4]  He further testified that in preparing his report, he searched for written material on standards of care for patients being considered for psychiatric commitment but found nothing regarding New York standards.  Instead, he found that New York largely left the commitment determination to the clinician.[5]

_____

[4] Halpren-Ruder Deposition at pp. 107-08 (Radomisli Dec. 1-5-15; Exh. DD)(Dkt. # 326):

| | |
|---|---|
| Radomisli: | Were you required, under Rhode Island Law, to have rules, regulations and/or protocols for that facility in 2009? |
| Halpren-Ruder: | No. |
| Radomisli: | Did you have rules, regulations and/or protocols for that facility in 2009? |
| Halpren-Ruder: | There was no written body of rules and regulations. There were suggested practice standards which people would use. |
| Radomisli: | Were those suggested practice standards in writing? |
| Halpren-Ruder: | No. |
| Radomisli: | Well, how would physicians who worked for you know what those suggested practice- |
| Halpren-Ruder: | I - |
| Radomisli: | Let me finish my question. Well, how would physicians who worked for you know what those suggested practice standards were in 2009? |
| Halpren-Ruder: | I spent a fair amount of time orienting physicians as a one-on-one. |
| Radomisli: | How much time would you spend with the average physician who worked for one of those facilities in 2009? |
| Halpren-Ruder: | Probably in the vicinity of five hours, before they practiced. |

[5] *Id;* Halpren-Ruder Deposition pp. 88-89:

| | |
|---|---|
| Radomisli: | At any point in time, have you ever reviewed any literature about the standard of care for a patient in New York State? |
| Mr. Smith: | Objection to form. |
| Halpren-Ruder: | So, early in this deposition I was asked if I reviewed -- what materials I reviewed. I did do a search, but was unable to find documents that would be useful. I may have, during that search, read, in assessing whether the data was there, snippets of this or that document that came up during that search, and I was then able to find one that I felt answered as many of the questions as the one I presented. |
| Radomisli: | What, in particular, were you looking for? |
| Halpren-Ruder: | Anything that would more closely define the issues that are -- that are present when somebody is going to be committed. |
| Radomisli: | And you weren't able to find anything that pertained to New York State standards in that regard? |

Importantly, Dr. Halpren-Ruder testified that there were "universally applied" standards of care regarding involuntary psychiatric commitment of patients.[6]  He based this opinion on "a principle in emergency medicine which is the reasonable patient criteria…"[7] He explained that "the American College of Emergency Physicians spent quite some time trying to figure out when an emergency department visit is appropriate or not, and so they promulgated the Principle of the Reasonable -- Reasonable Promulgation, and my opinion is based on that history. There was extensive conversations over that probably 15 to 20 years ago within ACEP."[8]

---

| Halpren-Ruder: | In my recollection? |
| Radomisli: | Correct. |
| Halpren-Ruder: | It largely left that determination to the clinician. |

[6] *Id;* Halpren-Ruder Deposition p. 85.

[7] *Id.*

[8] *Id.* at 86:

| Radomisli: | I believe it refers to the sentence prior, which reads "During my review of the audiotape, and in my conversations with the patient, there is evidence that the patient did not want to be transferred for an evaluation at a hospital." First, I guess, is there a law or a statute that requires that refusal to be documented somewhere? |
| Halpren-Ruder: | Yes. |
| Radomisli: | What law is that? |
| Halpren-Ruder: | Excuse me. In the State of Rhode Island, and in the States of Rhode Island and Massachusetts, if a patient refuses transport by an EMS to a facility, that refusal is to be documented. I can't say exactly what the criteria are in the State of New York. |
| Radomisli: | And this incident took place in the State of New York, correct? |
| Halpren-Ruder: | That is correct. |
| Radomisli: | Continuing on in that paragraph "Central to the action of intentionally overriding the patient's stated desires is demonstration that the patient is non compos mentis; that is, it must be documented that a condition was present where a person of average intelligence and reason would, given the situation, agree that transfer to a healthcare facility is an appropriate action." Do you see that? |
| Halpren-Ruder: | Yes. That's the final paragraph on page two. |
| Radomisli: | Correct. |
| Halpren-Ruder: | Two sentences or so from the end. |

Thus, Dr. Halpren-Ruder explained that the "standard of care" in evaluating

potentially psychiatric patients in a medical emergency department is a very complex

term, and that he merely cited the 2010 New Jersey guide in his report to reference

an example of what a group of reasonable doctors codified as appropriate protocols.[9]

It is simply incorrect that Dr. Halpren-Ruder based his expert report solely on this

2010 codification of guidelines, and Rule 702 of the Federal Rules of Evidence

permits expert testimony where the witness is "qualified as an expert by knowledge,

skill, experience, training, or education."  Moreover, JHMC did not make the

required showing that Dr. Halpren-Ruder's experience or the 2010 guidelines were

outdated or that the standards in emergency rooms in 2009 were somehow different

than at some other time.[10]

The Court noted in its summary judgment decision that an expert's failure to use

---

| Radomisli: | What is the source of that standard that that requires that, is that another Rhode Island standard? |
| Halpren-Ruder: | A. |
| MR. SMITH: | Objection to form. |
| Halpren-Ruder: | It is my belief that that standard would be universally applied. |
| Radomisli: | What is the basis for that belief? |
| Halpren-Ruder: | There is this -- there is a principle in emergency medicine which is the reasonable patient criteria, and basically, the emergency -- the American College of Emergency Physicians spent quite some time trying to figure out when an emergency department visit is appropriate or not, and so they promulgated the Principle of the Reasonable -- Reasonable Promulgation, and my opinion is based on that history. There was extensive conversations over that probably 15 to 20 years ago within ACEP. |

[9] *Id*. at p. 49.

[10] *See Betterbox Comm v. BB Techs*, 300 F. 3d 325, 328 (3d Cir. 2002) (lower court properly admitted testimony of witness whose expertise was based on experience that ended eight years before trial because opponent did not show that matters in field of expertise had changed sufficiently to make the witness's expert opinion outdated).

the language governing the law in expert testimony is not fatal to an expert's

opinion.[11]  Dr. Halpren-Ruder's report was short and did not include a lengthy

description of the standard of care.  His report did, however, succinctly describe

where the JHMC violated the standard of care:

- review of the audio record reveals that the hypertension was of greater concern.  Despite this concern, it should be noted that a third blood pressure was not obtained during the subsequent 30 minutes. … The standard of care is to repeat pressures of this nature with some frequency, usually 10 to 15 minutes.[12]

- central to the action of intentionally over riding the patient's stated desire is the demonstration that the patient is non compos mentis. That is, it must be documented that a condition was present wherein a person of average intelligence and reason would, given the situation, agree that transfer to a healthcare facility is an appropriate action.  Alternatively, it must be demonstrated that imminent danger to life is present.  Neither of these standards was met in evaluating the appropriateness of this patient's transfer to the Jamaica Hospital.[13]

- this standard evaluation includes the documented consideration of conditions that may mimic a psychiatric condition but in fact be due to other causes. My review of the documentation present reveals only that a CT scan of the head was ordered so as to rule out the presence of central nervous system lesions that could produce psychiatric-like presentation. This study was unrevealing. Not addressed was an evaluation for the presence of pharmacologic agents that could significantly alter this patient's mental status.  In my experience, a drug screen is a standard part of this evaluation.[14]

- progressing to the psychiatric aspect of the ED physician's duties, it is critical

_____

[11]  2015 U.S. Dist. LEXIS 58831 at *170-172

[12] PMX 36, p. 1

[13] *Id*.

[14] *Id.* at p. 3.

that the ED physicians convince themselves that a psychiatric emergency is present. That is, there needs to be a condition where the patient presents with historical or physical exam findings that would predict that the patient has a condition that rises to the standard of a substantial, immanent life threat to the patient or other persons. … In fact, I my opinion, and a reasonable degree of medical certainty, this patient should have been released from the ED as it was never demonstrated in the record that he was of substantial risk of danger to self or others.[15]

• the ED attending failed in his duty to appropriately evaluate this patient on two fronts.  First, usual and customary evaluations for conditions that may mimic a psychiatric presentation did not occur. Secondly, the ED attending failed to accomplish and communicate an adequate psychiatric evaluation on his own.[16]

Finally, JHMC repeats here their summary judgement motion argument that Dr. Halpren-Ruder's evidence should be excluded because he could not attribute specific injury to the patient by their ED's failure to perform the customary toxicology test. This argument should be rejected because the failure to conduct an essential test is evidence that JHMC was negligent in the way it conducted its evaluation of the plaintiff.  The mere fact that the plaintiff did not suffer a specific and concrete damage flowing from that act of negligence does not render evidence of a defendant's misconduct irrelevant.  The evidence is relevant as defined by Federal Rule of Evidence 401 because it has a tendency to show that JHMC failed to conduct an examination of the patient with the required rigor.

---

[15] *Id.*
[16] *Id.* at p. 4.

In sum, the plaintiff respectfully urges the Court to reconsider its ruling on the admissibility of Dr. Halpren-Ruder's evidence regarding the services provided at JHMC.  At the very least, the Court must permit the plaintiff to make an offer of proof at trial on the admissibility of the proposed testimony.  The Court's summary judgment ruling was premature and based on inaccurate facts about the basis for Dr. Halpren-Ruder's opinion.  On reconsideration, the Court will find that the whole record exhibits substantial evidence that there was a departure from the requisite standard of care.[17] Any questions about Dr. Halpren-Ruder's opinion are properly raised as issues of the weight of the evidence, not its admissibility.

### 2. *The Qualified Immunity Defense by the Individual NYPD Defendants*

In its summary judgment decision, the Court held that there were questions of fact on the issue of whether the City Defendants violated the plaintiff's First Amendment

---

[17] *Ernest v Boggs Lake Estates, Inc.,* 12 N.Y. 2d 414, 416 (1963); *Zeak v United States*, 2014 WL 5324319, at *9 (S.D. N.Y. Oct. 20, 2014) (finding plaintiff's expert was not required to use specific terms of art in his expert report or deposition testimony, only that, taken as a whole, the record contains evidence that there was a departure from the relevant standard of care); *Koller v Manhattan Eye, Ear & Throat Hosp.,* 168 A.D. 2d 671 (2d Dept. 1990) (finding the medical testimony "with a reasonable degree of medical certainty" and "under the prevailing standards and practices existing at the time for this operation" satisfied the first statutory element it was not necessary that the plaintiff's expert specifically enunciate the code words "reasonable medical practitioner" within the meaning of Public Health Law § 2805-d (1)).

rights by retaliating against him for reported misconduct to QAD and IAB.[18]  On the

other hand, however, the Court also ruled that the individual NYPD defendants were

entitled to qualified immunity because the plaintiff's First Amendment rights were not

clearly established, particularly in the light of the Court's prior ruling in 2012 that the

plaintiff's speech prior to his October 31, 2009 suspension was not protected speech

under a *Garcetti* analysis.[19]

    In plaintiff's reconsideration motion, we pointed out that the Court's qualified

immunity analysis must be based on the state of the law at the time of the official action

and that the Court overlooked judicial decisions that clearly established as of that time

that as a general proposition of law it was unlawful for a public officer to retaliate against

a public employee for speaking out on matters of public concern.  (Smith Letter, dated

June 2, 2015, at p. 3.)  In response, the City Defendants argue that the plaintiff has defined

the right at issue too generally for purposes of the qualified immunity analysis and that a

reasonable person in the shoes of the individual NYPD defendants would not have known

that their conduct was unlawful.   (City Opp. Mem. at 18; Dkt. 450).  The City

Defendants also argue that the Court's 2012 decision, which held that the plaintiff's

claims were insufficient as a matter of law, necessarily require a determination that the

individual defendants are entitled to qualified immunity as a matter of law. (*Id.)*

---

[18] Summary Judgment Decision, 2015 U. S. Dist. Lexis 58831 at * 106.
[19] *Id.* at * 112-13.

The Court should reject these arguments.  First, it is well-settled that the "clearly-established" analysis must be made at the time of the official action.[20]   Thus, later changes or shifts in the law are not relevant to the qualified immunity analysis.

Second, the City Defendants' definition of the right is too narrow for a proper qualified immunity analysis.  When the officials who are asserting a qualified immunity defense have engaged in intentional, tortious conduct, the level of particularity required in defining the right is lessened.[21]   As such, the definition of the nature of the right for qualified immunity purposes should not be as narrow as the City Defendants propose because it is not reasonable or necessary for an official to have a scholarly understanding of the complexity of a First Amendment rule under *Garcetti* and *Lane.*

As a general matter, the Supreme Court has instructed courts encountering a qualified immunity defense to consider carefully the level of generality at which the relevant legal rule is to be identified.[22]  The definition of the right should be neither too

---

[20] *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) ("This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken"); *Golodner v. Security Technology Systems LLC*, 770 F. 3d 196, 203  (2d Cir. 2014) (courts review the clearly-established issue prior to and at the moment of the alleged violation).

[21] *Poe v. Leonard*, 282 F. 3d 123, 139 (2d Cir. 2002) ("Although our prior cases have not presented exactly the same facts and the Supreme Court has advised that for qualified immunity purposes the right must be established "in a more particularized, and hence more relevant sense," as we did in Johnson, for claims based on intentionally tortious, harmful conduct employed in the absence of any legitimate government interest, the requisite degree of particularity is lessened.")

[22] *Zahrey v. Coffey*, 221 F. 3d 342, 348-49 (2d Cir. 2000) (citing *Anderson v.*

narrow or too broad.[23]  If the right is defined too narrowly then the qualified immunity defense would require that every case against a public officer be dismissed unless a prior case "on all fours" had already been decided; on the other hand, a right defined too broadly would eviscerate the qualified immunity defense.[24]

Here, the right should be defined as the right of a public employee (or former employee) to be free from retaliation for speaking out on matters of public concern.   That definition of the right is sufficiently particular to give reasonable notice that an official's retaliation against the plaintiff in this case would be unlawful.  In other words,  the contours of the right were sufficiently clear that a reasonable official would understand that the actions being taken against the plaintiff violated established First Amendment principles.[25]

When making this determination about the scope of the rule of law,  the depth of the analysis required of a public official is not that of a judge, lawyer or a law professor.   As acknowledged by the City Defendants, the question is not what a lawyer would learn from reading case law but what a reasonable person in the official's position "should know about the constitutionality of the conduct."[26]  Thus, even in the absence of binding

---

*Creighton*, 483 U.S. 635, 639 (1987)).

[23] *Id*.

[24] *Id*.

[25] *Young v. County of Fulton*, 160 F. 3d 899, 903 (2d Cir. 1998)

[26] City Opp. Mem at 18 (citing *Young v. County of Fulton*, 160 F. 3d 899, 903 (2d Cir. 1998)

precedent, a right is clearly established if "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right."[27]

For the reasons set forth above and in our prior submissions, the plaintiff contends that the contours of that right were sufficiently clear in October of 2009 so that a reasonable police officer in the shoes of the individual defendants should have known that breaking into Officer Schoolcraft's home, destroying evidence and dragging him off to a mental ward in retaliation for his reporting their misconduct to IAB and QAD would violate basic First Amendment rights.

   3.  *The Post-Suspension First Amendment Claim.*

In opposing the plaintiff's reconsideration motion on the post-suspension claim, the City Defendants implicitly acknowledge that actual chilling is not required.  In their opposition memorandum, the City Defendants do not attempt to defend this point in their opposition papers.  Instead, the City Defendants claim that the plaintiff "advances a new theory of retaliation" based on the claim that Officer Schoolcraft was a private citizen at the time, not a public employee.[28]

The City Defendants are wrong when they suggest that the plaintiff has "hatched" a new theory on this reconsideration motion based on the plaintiff's status as a citizen.  The Third Amendment Complaint, in the section pertaining specifically

---

[27] *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).
[28] City Def. Mem. at 4.

to the First Amendment claim, repeatedly refers to Officer Schoolcraft's speech as that of a "citizen."   For example, the Third Amended Complaint specifically alleges that the "NYPD defendants' actions violate plaintiff's First Amendment right to speak out *as a citizen* regarding matters of extreme public concern . . . ."[29]   The Third Amended Complaint also specifically alleges that the October 31, 2009 suspension "render[ed] disclosure of the evidence of corruption and misconduct with the police department not pursuant to any function as a police officer but *purely as a citizen* regarding matters of public concern."[30]   Finally, the Third Amended Complaint alleges that the "NYPD defendants' actions continued to deprive plaintiff's First Amendment right to speak out as [a] citizen regarding a matter of extreme public concern, namely widespread corruption and illegal practices by the very same individuals sworn to protect the public at large."[31]

In the light of these specific allegations in the Third Amended Complaint, the argument that the plaintiff has "hatched" a new theory is meritless.

The other arguments raised by the City Defendants are just as meritless.   First, the City Defendants argue that their post-suspension conduct was not an "adverse employment action."   This argument, which was never raised before, should be rejected as senseless and utterly beside the point.   After Officer Schoolcraft was

---

[29] Third Amended Complaint ¶ 253; emphasis added.
[30] *Id.* ¶ 254; emphasis added.
[31] *Id.* ¶ 259.

suspended, the NYPD defendants assaulted him, cuffed him, and dragged him off to

a mental ward where he was kept against his will for six days.  Promptly after his

release and retreat to upstate to live near his father, the NYPD defendants conducted

a three-month long harassment campaign against him.[32]

While the First Amendment claim arising from the post-suspension retaliation

does not require "adverse employment action," any such requirement would plainly

be satisfied by these facts.  The City Defendants' suggestion that their conduct was

not unlawful because they were merely "near" him or his "home" merely raises at

best a question of fact that cannot be resolved on a motion for summary judgment.

Indeed, this argument was never raised by the City Defendants in their initial motion

for summary judgment, the summary judgment record does not reflect all the

evidence relating to this claim, and a reconsideration motion, by its terms, must be

limited to those facts and issues of law that the movant contends were overlooked by

the Court.

The City Defendants also argue that there is "no evidence" that any of the

individual defendants had any knowledge about Officer Schoolcraft reporting

---

[32] *See* Summary Judgment Decision ¶¶ 300-301; see also Third Amended Complaint
¶¶ 215-220; Schoolcraft Deposition Vol. I at pp. 204-06 & Vol II. at pp. 199-210;
Dkt # 326; Exh. K & L to Raomisli Declaration.  Since the City Defendants never
raised any arguments about the nature of the upstate harassment of the plaintiff, the
summary judgment record is not as developed as the record will be made at trial.

misconduct to IAB or QAD.[33]  In the light of the ample evidence in the summary

judgment record, this argument should be rejected.   Indeed, in the Court's extensive

discussion of the facts in its Summary Judgment Decision, the Court noted the

following *undisputed* facts:

- Lauterborn admitted that before October 31, 2009 Mauriello and other supervisors at the 81st Precinct knew that Officer Schoolcraft's memo book contained the name of an IAB officer;
- On the day of October 31, 2009, Caughey made two photocopies of the memo book and put one copy in Mauriello's desk;
- Thereafter Caughey acted in an unusual manner toward Officer Schoolcraft later that day; and
- Lauterborn told Lamstein later that same day and before their illegal entry into his apartment that the "underlying issue was that Officer Schoolcraft has made allegations against others and the Department's investigation of those allegations picked up that week" and "it snowballed from there."[34]

These undisputed facts render the City Defendants's belated argument about

retaliatory motive frivolous.

---

[33] City Mem. at 15-16,

[34] Summary Judgment Decision ¶¶ 59, 65, 67 & 91.

**Conclusion**

For these reasons and the reasons previously set forth, the motion should be

granted.

Dated:  July 24, 2015

*s/NBS*

_____
Nathaniel B. Smith
John Lenoir
100 Wall Street -  23rd Floor
New York, New York 10005
(212) 227-7062
