10 CV 6005 (RWS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADRIAN SCHOOLCRAFT,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE EXPERT TESTIMONY UNDER FEDERAL RULES OF EVIDENCE 702, 703, 402 AND 403 AND FEDERAL RULES OF CIVIL PROCEDURE 26 AND 37.**

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Alan Scheiner*
*Tel:  (212) 356-2344*
*Cheryl Shammas*
*Tel: (212) 356-2406*
*Kavin Thadani*
*Tel: (212) 356-2351*
*Matter #:  2010-033074*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

ARGUMENT

     POINT I

          PLAINTIFF'S PROFFERED EXPERT
          TESTIMONY CONCERNING DEFENDANTS'
          CONDUCT AND NYPD POLICIES AND
          PRACTICES SHOULD BE PRECLUDED
          UNDER RULES 702, 402 AND 403. ....................................................... 1

          A.  The standard for the admission of expert
              testimony........................................................................................ 2

          B.  Eterno and Silverman's opinions are rife with
              legal conclusions and factual inferences that
              invade the province of the Court and the jury. ................................... 4

          C.  The experts' testimony should be precluded
              because it is a mere conduit for hearsay
              evidence. ........................................................................................ 8

          D.  Eterno and Silverman should not be permitted
              to testify about Department of Health and
              Mental Hygiene data that they cannot produce
              and have no expertise to understand. ................................................ 11

          E.  Eterno and Silverman use outdated
              information, unsupported narratives,
              incomplete information, and illogical leaps that
              should cause this Court to reject their testimony
              as inherently unreliable.................................................................... 12

              1.  Eterno and Silverman offer irrelevant
                  conjectures without any supporting
                  research or documentation. .......................................................12

              2.  The experts apply unsound and
                   unscientific methods that are less rigorous
                  than the methods applied in their field of
                  study. .....................................................................................13

**Page**

        a.    The experts use selective, unreliable evidence and non-scientific methods. ...............................13

        b.    The experts' purported scientific study of survey evidence does not comport with the standards of rigor they apply in social science work. ....................................15

    F.   The Experts' purported opinions on police procedure are also inadmissible. ..........................................17

    G.   The Court should exclude the proffered testimony under F.R.E. 403 and F.R.E. 703 because it will be more prejudicial and confusing than probative ...................................................18

**POINT II**

    BECAUSE SCHOOLCRAFT VIOLATED A COURT ORDER TO TURN OVER DATA WHICH ETERNO AND SILVERMAN CONSIDERED, AND THE EXPERTS LOST OR DESTROYED ADDITIONAL DATA ON WHICH THEY RELIED, THEIR TESTIMONY WHICH CONCERNS THE SUPPRESSED DATA SHOULD BE PRECLUDED. ..................................19

**POINT III**

    THE TESTIMONY OF MEDICAL EXPERTS SHOULD BE PRECLUDED WHERE IT CONTAINS  INADMISSIBLE OPINIONS ABOUT THE CONDUCT OF THE POLICE IN THIS CASE WHICH ARE BEYOND THEIR EXPERTISE AND WOULD INVADE THE PROVINCE OF THE COURT AND JURY ............................................23

    A.   Dr. Lubit's gives inadmissible opinions invading the province  of the Court and jury. ....................................23

    B.   Dr. Levy gives inadmissible opinions invading the province of the Court and jury. ....................................24

**CONCLUSION** ...........................................................................25

**Statutes**                                                                                  **Page**

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Pages**

*Advanced Analytics, Inc., v. Citigroup Global Markets, Inc.*,
   04 Civ. 3531(LTS)(HBP),
   2014 U.S. Dist. LEXIS 41291 (S.D.N.Y. Mar. 26, 2014) ......................................21

*Aetna Life Ins. Co. v. Ward*,
   140 U.S. 76, 35 L. Ed. 371, 11 S. Ct. 720 (1891) .....................................................6

*Allen v. City of New York*, 02 Civ. 4373,
   2006 U.S. Dist. LEXIS 95802  (S.D.N.Y. Mar. 28, 2007)  ......................................9

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
   222 F. Supp. 2d 423 (S.D.N.Y. 2002).......................................................................3

*Bank of N.Y. Mellon v. WMC Mortg., LLC*,
   2015 U.S. Dist. LEXIS 108320 (S.D.N.Y. Aug. 17, 2015).......................................9

*Bd. of Trs. of the Aftra Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   2011 U.S. Dist. LEXIS 144382 (S.D.N.Y. Dec. 14, 2011) ......................................6

*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*,
   141 F. Supp. 2d 320 (E.D.N.Y. 2001) ...................................................................10

*Bonton v. City of New York*,
   2004 U.S. Dist. LEXIS 22105 (S.D.N.Y. Nov. 3, 2004).........................................15

*Boucher v. United States Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) (per curiam).........................................................3-4, 12

*Bourjaily v. United States*,
   483 U.S. 171 (1987).................................................................................................3

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
   239 F.3d 179 (2d Cir. 2001).....................................................................................3

*Cayuga Indian Nation v. Pataki*,
   83 F. Supp. 2d 318 (N.D.N.Y. 2000) .......................................................................3

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (9th Cir. 1993)................................................................................3, 4

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006)...................................................................................22

**Page**

*Delrosario v. City of New York, 07 Civ. 2027,*
   2010 U.S. Dist. LEXIS 20923 (S.D.N.Y. Mar. 4, 2010) ........................................................9

*Di Bella v. County of Suffolk,*
   574 F. Supp. 151 (E.D.N.Y. 1983) ........................................................................................6

*Donnelly v. Ford Motor Co.,*
   No. CV-97-7405, 1999 U.S. Dist. LEXIS 20255 (E.D.N.Y. Dec. 30, 1999) ............................3

*Faryniarz v. Nike, Inc.,*
   00 Civ. 2623, 2002 U.S. Dist. LEXIS 15825 (S.D.N.Y. Aug. 23, 2002) ..................................4

*Floyd v. City of New York,*
   959 F. Supp. 2d 540 (S.D.N.Y. Aug. 12, 2013)...................................................................2, 9

*Garcia v. City of New York,*
   2013 U.S. Dist. LEXIS 147149 (E.D.N.Y. July 17, 2013) ......................................................18

*General Electric Co. v. Joiner,*
   522 U.S. 136 (1997)........................................................................................................3, 4

*Giles v. Rhodes,*
   94 Civ. 6385 (CSH), 2000 U.S. Dist. LEXIS 13980 (S.D.N.Y. Sept. 26, 2000)......................3

*GlobalRock Networks, Inc. v. MCI Communs. Servs.,*
   943 F. Supp. 2d 320 (N.D.N.Y 2013) ...................................................................................5

*Griffin v. City of N. Y.,*
   287 F. Supp. 2d 392 (S.D.N.Y. 2003) ..................................................................................9

*Grdinich v. Bradlees,*
   187 F.R.D. 77 (S.D.N.Y. 1999) ...........................................................................................6

*Great White Bear, LLC v. Mervyns, LLC,*
   2008 U.S. Dist. LEXIS 41977 (S.D.N.Y. May 27, 2008)......................................................22

*Hygh v. Jacobs,*
   961 F.2d 359 (2nd Cir. 1992).............................................................................................5

*In re Initial Pub. Offering Secs. Litig.,*
   174 F. Supp. 2d 61 (S.D.N.Y. 2001)....................................................................................6

*Kumho Tire v. Carmichael,*
   526 U.S. 137 (1999)................................................................................................3, 4, 15

**Page**

*Ligon v. City of New York (In re Reassignment of Cases),*
  736 F.3d 118 (2d Cir. 2013) ...................................................................10

*LinkCo, Inc. v. Fujitsu Ltd.,*
  2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. July 15, 2002) ...........................6

*Lippe v. Bairnco Corp.,*
  288 B.R. 678 (S.D.N.Y. 2003)...................................................................5

*Lyondell-Citgo Ref., LP v. Petroleos de Venez, S.A.,*
  No. 02 Civ. 0795 (CBM), 2005 U.S. Dist. LEXIS 3635 (S.D.N.Y. Mar. 9,
  2005) .........................................................................................................21

*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)...............................................10

*Marvel Characters, Inc. v. Kirby,*
  726 F.3d 119 (2d Cir. 2013)............................................................ 8, 10-11

*Marx & Co. v. Diners Club, Inc.,*
  550 F.2d 505 (2d Cir. 1976)........................................................................5

*Maurizio v. Goldsmith,*
  96 Civ. 4332 (RPP), 2002 U.S. Dist. LEXIS 6032 (S.D.N.Y. Apr. 9, 2002) ........................13

*McAllister v. N. Y. City Police Dep't,*
  49 F. Supp. 2d 688 (S.D.N.Y. 1999) ...........................................................9

*Media Alliance, Inc. v. Mirch,*
  2012 U.S. Dist. LEXIS 6332 (N.D.N.Y Jan. 19, 2012) ...............................9

*MTX Communs. Corp. v. LDDS/WorldCom, Inc.,*
  132 F. Supp. 2d 289 (S.D.N.Y. 2001).......................................................12

*Nimely v. City of New York,*
  414 F.3d 381 (2d Cir. 2005)............................................... 6-7, 7, 11, 18

*Nipper v. Snipes,*
  7 F.3d 415 (4th Cir. 1993) ........................................................................10

*Pan Am World Airways v. Port Authority,*
  995 F.2d 5 (2d Cir. 1993)..................................................................... 11-12

*Pluma v. City of New York,*
  2015 U.S. Dist. LEXIS 48134 (S.D.N.Y. Mar. 31, 2015) .........................14

**Page**

*Reilly v. Natwest Mkts. Grp. Inc.*,
    181 F/3d 253 (2d Cir. 1999) .......................................................................21

*R.F.M.A.S., Inc. v. Mimi So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010).......................................................15

*Retil Sundown, Inc. v. Ferrigo Co.*,
    651 F. Supp. 2d 9 (E.D.N.Y. 2009) ..........................................................10

*In re Rezulin PrShatods. Liab. Lit.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)...................................................6, 16

*Rizzo v. Edison, Inc.*,
    172 Fed. Appx. 391 (2d Cir. 2006)..............................................................6

*Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc.*,
    2011 U.S. Dist. LEXIS 97715 (S.D.N.Y. Aug. 31, 2011) .......................23

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. N.Y. 1999).............................................................11

*Scott v. City of New York*,
    591 F. Supp. 2d 554, 563 (S.D.N.Y. 2008*)* ...............................................9

*Shan Zhao v. Kaleida Health*,
    2007 U.S. Dist. LEXIS 103253 (W.D.N.Y. Aug. 8, 2007) ......................24

*Shatkin v. McDonnell Douglas Corp.*,
    727 F.2d 202 (2d Cir. 1984)........................................................................4

*Smith v. Xerox Corp.*,
    196 F.3d 358 (2d Cir. N.Y. 1999).............................................................15

*Song v. Yao Bros. Group LP*,
    2012 U.S. Dist. LEXIS 62235 (S.D.N.Y. May 1, 2012).........................13

*Stagl v. Delta Air Lines*,
    117 F.3d 76 (2d Cir. 1997)........................................................................12

*United States v. Charley*,
    189 F.3d 1251 (10th Cir. 1999) ..................................................................7

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2002).........................................................................12

**Page**

*United States v. Duncan,*
   42 F.3d 97 (2d Cir. 1994)............................................................................5

*United States v. Mejia,*
   545 F.3d 179 (2d Cir. 2008).....................................................................5, 9

*United States v. Scop,*
   846 F.2d 135 (2d Cir. 1998)........................................................................7

*Universal Calvary Church v. City of New York,*
   2000 U.S. Dist. LEXIS 15153 (S.D.N.Y. Oct. 13, 2000) ..........................6

*Update Art, Inc. v. Modin Publ'g, Ltd.,*
   843 F.2d 67 (2d Cir. 1988)........................................................................21

*Vanderwoude v. City of New York,*
   2014 U.S. Dist. LEXIS 79064 (S.D.N.Y. June 10, 2014).........................6

**Statutes**

4 Weinstein's Fed. Evid. § 702.04[6] ................................................................11

Mental Hygiene Law § 9.41............................................................................1, 5

Fed. R. Civ. P. 16 .............................................................................................21

Fed. R. Civ. P. 26(a) ........................................................................................22

Fed. R. Civ. P.  26(a)(2)(B) ..............................................................................12

Fed. R. Civ. P. 26(e)(2)................................................................................16, 22

Fed. R. Civ. P. 37 .............................................................................................21

Fed. R. Civ. P. 37(c)(1)....................................................................................22

Fed. R. Evid. 104(a) ...........................................................................................3

Fed. R. Evid. 402 .........................................................................................1, 24

Fed. R. Evid. 403 ....................................................................1, 2, 10, 17, 18

Fed. R. Evid. 702 ..............................................................1, 2, 3, 4, 7, 17

Fed. R. Evid. 703 ......................................................................10, 17, 18

**Treatises**

**Page**

30 Charles Alan Wright, *Arthur R. Miller & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence* § 6337 ........................................................................... 8-9

**Other Citations**

http://www.nyc.gov/html/nypd/html/faq/faq_police.shtml#1 .......................................................13

J. Eterno, A. Verman & E. Silverman, Police Manipulations of Crime Reporting: Insiders' Revelations, *Justice Quarterly* (published online Nov. 17, 2014)....14, 15, 16. 20, 21

The City defendants respectfully submit this Memorandum of Law in support of their motion to preclude the expert testimony specified herein.

## ARGUMENT

### POINT I

### PLAINTIFF'S PROFFERED EXPERT TESTIMONY CONCERNING DEFENDANTS' CONDUCT AND NYPD POLICIES AND PRACTICES SHOULD BE PRECLUDED UNDER RULES 702, 402 AND 403.

The plaintiff offers John Eterno and Eli Silverman[1] to testify on a potpourri of issues, as follows: (i) the expert's findings of fact and conclusions of law, based on a highly selective review of evidence, that the police violated the Fourth Amendment in entering Schoolcraft's apartment, suspending Schoolcraft, and taking him into custody for a mental health evaluation pursuant to Mental Hygiene Law § 9.41[2]; (i) media reports that the experts say indicate that the NYPD used quotas or manipulated crime statistics, and has retaliated against two specific officers other than Schoolcraft (Borelli and Polanco) for reporting that; (ii) a report from 1994 that the experts say shows an NYPD culture of corruption and retaliation in 1994; (iii) press releases of police unions that the experts say indicate that NYPD uses quotas and engages in crime statistics manipulation; (iv) media reports that the experts say reflect a "lack of transparency" of the NYPD; (v) the facts

---

[1] The Expert Report (cited as "Report") of John Eterno and Eli Silverman is submitted herewith as Exhibit A to the Declaration of Alan H. Scheiner in Support of the City Defendant's Motion to Preclude Expert Testimony (cited as "Scheiner Dec."); Exhibits to the Scheiner Dec. are referred to as "Ex."; plaintiff's trial exhibits are referred to as "PTX." Excerpts of the depositions of Silverman and Eterno are submitted herewith as Exs. B ("Silverman Dep.") and C ("Eterno Dep."). These experts – offered as a tag-team which authored a single report – are authors with recent writings critical of NYPD policies under Compstat. Eterno received a PhD in Criminal Justice from SUNY Albany in 1999 and has taught at Molloy College in Rockville Centre, New York since 1999. Report CV 1. Silverman is not employed, and received a PhD from Pennsylvania State University, but his *curriculum vitae* does not give the subject matter or the year it was received. Report, Silverman CV at 1. Neither is a lawyer, has any medical or mental health training, or recent training in police enforcement tactics (Silverman has no such training)**.** Report, Siverman CV, Eterno CV; Eterno Dep. 16:24-17:6, 174:15-175:1, 187:16-20; Silverman Dep. 32:17-22; 65:10-17, 177:12-178:21.

[2] New York's Mental Hygiene Law § 9.41 provides: "Any peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others."

and legal conclusions found in the court's decision after a bench trial in *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. Aug. 12, 2013); (vi) the expert's conclusions placed on purported health data that the expert's cannot provide and which they lack the expertise to understand; and (vii) the expert's conclusions that Compstat caused increased pressure to engage in police activity and downgrade criminal complaints, based on media reports and a flawed review of anonymous survey responses.

None of this blunderbuss attack is admissible in federal court.  The proffered expert testimony of John Eterno and Eli Silverman should be excluded because: (A) the testimony is riddled with conclusions of law and findings of fact invading the province of the court and jury, offering little more than a summation from the witness stand; (B) the experts offer to feed the jury a hearsay soup, without adding any expert analysis that would be helpful; (C) the testimony is based on absent or improper methodology that does not meet the standards of rigor in  the expert's putative field; and (D) the testimony is irrelevant or to the extent relevant, is inadmissible under Rule 403 because any probative value is outweighed by prejudice and the risk of juror confusion.[3]

### A.    The standard for the admission of expert testimony.

Rule 702 of the Federal Rules of Evidence sets out the standard of admissibility for experts.  The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[3] The City defendants also renew and incorporate their prior motion to require the plaintiff to designate one or the other expert for trial on the grounds that their testimony would be duplicative if both were offered.  *See* Docket No. 482.

Fed. R. Evid. 702.

In short, the Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999). This inquiry addresses the concern that "the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (9th Cir. 1993)).

The proponent of expert testimony must establish its admissibility. *See Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002) (citing Fed. R. Evid. 104(a) and *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)); *Cayuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318, 322 (N.D.N.Y. 2000) ("It is the proponent's burden . . . to establish admissibility, rather than the opponent's burden to establish inadmissibility." (internal quotations omitted)); *Giles v. Rhodes*, 94 Civ. 6385 (CSH), 2000 U.S. Dist. LEXIS 13980 (S.D.N.Y. Sept. 26, 2000) (proponent of expert testimony bears the burden of demonstrating that it is "competent and reliable").

The trial judge's "gate keeping" obligation applies not only to "scientific" testimony but to "technical" and "other specialized" knowledge as well. *Kumho Tire*, 526 U.S. at 141. Where there is "simply too great an analytical gap between the data and the opinion proffered," the testimony should be excluded. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see Donnelly v. Ford Motor Co.*, No. CV-97-7405, 1999 U.S. Dist. LEXIS 20255, at *9 (E.D.N.Y. Dec. 30, 1999). The qualification of a witness to testify as an expert is a determination to be made by the trial court. *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (per

curiam).[4]  "Opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should not be admitted.  *Kumho Tire*, 526 U.S. at 157 (citing *Joiner*, 522 U.S. at 146).

Speculative and conjectural expert testimony is inadmissible under *Daubert* and its progeny.  *See Boucher*, 73 F.3d at 21(citing *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)); *Faryniarz v. Nike, Inc.*, 00 Civ. 2623, 2002 U.S. Dist. LEXIS 15825, *3 (S.D.N.Y. Aug. 23, 2002).

### B. Eterno and Silverman's opinions are rife with legal conclusions and factual inferences that invade the province of the Court and the jury.

Eterno and Silverman's testimony should be precluded because it would invade the exclusive province of the court and jury.  The experts would testify, based on a selective review of the evidence plaintiff chose to give them, that the defendants violated the Fourth Amendment when they entered Schoolcraft's apartment and took him into custody under the Mental Health Law as an Emotionally Disturbed Person.  Report at 9-11.  Eterno declares that Schoolcraft's "basic 4th Amendment rights appear to have been violated," because there were no "exigent circumstances" and no reason to believe he was dangerous.  Report at 11.[5]  The experts appear to confuse the role of expert and advocate, offering the following closing argument, which is only one example of their proffered advocacy:

> Lastly, we also question the initial entry into the apartment. What was the exigent circumstance? If it was his health, once Officer Schoolcraft was seen in the apartment in good condition, the emergency no longer existed and the officers should have

---

[4] A court will usually consider the following factors in determining whether the expert's methodology meets the standards of Fed. R. Evid. 702 and *Daubert*: (a) whether a "theory or technique... can be (and has been) tested;" (b) whether it "has been subjected to peer review and publication;" (c) whether, in respect to a particular technique, there is a high "known potential rate of error" and whether there are "standards" controlling the application of the technique; and (d) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Kumho Tire*, 526 U.S. at 149 (citing *Daubert*, 509 U.S. at 592-94).

[5] Silverman admits that he has no expertise on which to base such an opinion and does not offer it.  Silverman Dep. 65:10-17; 177:12-178:15.

immediately vacated. If any actions appeared "emotionally disturbed" they occurred after they entered the apartment. *In fact, if they occurred, they apparently were the direct result of the actions of NYPD.* Having a team of armed officers and EMT's in your home, all refusing to leave, remaining in the apartment without permission would likely upset any normal person. *In fact, Officer Schoolcraft's basic 4th Amendment rights appeared to have been violated in terms of protecting his property (the tape recorder), armed officers and EMT's not leaving his apartment, and forcibly removing him from his apartment without justification.*

Report 11 (emphasis added).[6]

Plaintiff might as well have hired another trial lawyer to deliver this "summation from the witness stand." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (precluding expert whose testimony amounted to advocacy).  Advocate-witnesses that merely summarize evidence, draw inferences, and "tell the jury what result to reach" are not admissible.  *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2nd Cir. 1992) (police practices expert's testimony that defendants conduct was "totally improper" and not "justified" or "warranted" should have been excluded because it "merely [told] the jury what result to reach"); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994); *United States v. Mejia*, 545 F.3d 179, 196, 208 (2d Cir. 2008) (purported gang expert gave inadmissible "factual testimony about matters that required no specialized knowledge"); *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505, 508-12 (2d Cir. 1976) (expert testimony of business practices should have been excluded where testimony contained conclusions of law about the propriety of defendants' conduct and opinions on the relevance of factual evidence); *GlobalRock Networks, Inc. v. MCI Communs. Servs.*, 943 F. Supp. 2d 320, 343 (N.D.N.Y 2013) (expert witness may not invade the province of the jury on the facts or the court

---

[6] Even were the opinion couched in reference to the NYPD's Patrol Guide section applicable to Emotionally Disturbed Persons, because that section tracks the Mental Hygiene Law very closely, there is no difference between the expert saying that the Patrol Guide was violated and saying that the officers lacked probable cause.  *See* Ex. __ (PTX 159, EDP Patrol Guide Procedure 216-05); NY Mental Hygiene Law § 9.41.

on the law); *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. July 15, 2002)

(same); *In re Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (same);

*Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999) (same).

Conclusions of law, and specifically opinions on the presence or absence of probable cause

– the main issue in this case – are not admissible from experts. *See, e.g., Rizzo v. Edison, Inc.*, 172

Fed. Appx. 391, 395 (2d Cir. 2006) (summary order) ("The judge is both uniquely qualified and

uniquely tasked to make the legal determination of what constitutes probable cause; an expert

cannot assist in this task, at the summary judgment phase or at trial."); *Vanderwoude v. City of

New York*, 2014 U.S. Dist. LEXIS 79064, *31-34 (S.D.N.Y. June 10, 2014) (same); *Universal

Calvary Church v. City of New York*, 2000 U.S. Dist. LEXIS 15153, *28 (S.D.N.Y. Oct. 13, 2000)

(same); *Di Bella v. County of Suffolk*, 574 F. Supp. 151, 153 (E.D.N.Y. 1983) (same).

Moreover, "[i]nferences about the intent or motive of parties or others lie outside the

bounds of expert testimony." *In re Rezulin Prods. Liab. Lit.*, 309 F. Supp. 2d 531, 547, 546-50

(S.D.N.Y. 2004) (excluding expert testimony that purported to tell the jury the "real motives"

behind defendants conduct and repeats the facts or opinions stated by other witnesses or reflected

in documents produced in discovery); *Bd. of Trs. of the Aftra Ret. Fund v. JPMorgan Chase Bank,

N.A.*, 2011 U.S. Dist. LEXIS 144382, *26 (S.D.N.Y. Dec. 14, 2011) ("There is no dispute that

opinions concerning state of mind are an inappropriate topic for expert opinion. Accordingly, any

such statements will not be permitted at trial."). In addition, "[i]t is a well-recognized principle of

our trial system that "determining the weight and credibility of [a witness's] testimony. . . .

belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their

practical knowledge of men and the ways of men . . . ." *Nimely v. City of New York*, 414 F.3d 381,

397-398 (2d Cir. 2005) (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 35 L. Ed. 371, 11 S.

Ct. 720 (1891)); *see also United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1998) (same).  "Thus, [the Second Circuit], echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility . . . are inadmissible under Rule 702."  *Nimely*, 414 F.3d at 398; *see also, e.g., United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999).

The experts overstep these clear bounds so frequently that their advocacy taints their entire testimony. For example:

<u>Fully crediting without analysis testimony of the plaintiff</u>:



<u>Conclusions about the veracity, motives and intentions of the parties</u>:



<u>Arguing for inferences from evidence that would be intelligible to a layperson without the aid of expert testimony</u>:



All of these opinions are improper under the standards set forth above. [9]

**C.     The experts' testimony should be precluded because it is a mere conduit for hearsay evidence.**

As the Second Circuit has held, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citation omitted); *see* 30 Charles Alan Wright, *Arthur R. Miller & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence* § 6337 ("[A]n expert cannot be called solely as a conduit for smuggling

---

[7] This assertion is not founded in any NYPD procedure and is only the expert's opinion on what is "prudent." Report 11; Eterno Dep. 189:2-14.

[8] This conclusory factual testimony is not based on evidence, but rather "media reports." Eterno Dep. 116:13-17.  See *infra* at 9-10.

[9] Eterno's testimony was ruled partly admissible in only one case, brought under the Fair Labor Standards Act, and the Court ruled *inadmissible* the same "substitution of expert opinion for factual evidence," "unsubstantiated opinions or personal knowledge based on unidentifiable sources," and "common knowledge" that Eterno offers here.  *Scott v. City of New York*, 591 F. Supp. 2d 554, 563 (S.D.N.Y. 2008) (citations omitted). Silverman has never been qualified as an expert in court.

hearsay to the jury.").[10]  But that is precisely what plaintiff seeks to do here.

The expert report refers generally to "media reports" or "media accounts" – quoting a news report that quoted an anonymous email – and list citations to journalistic books and newspapers articles.  Report 4-8, 29; Eterno Dep. 82:8-12, 99:22-100:3. These media accounts are hearsay that are inadmissible to prove a municipal policy.[11]  The experts also rely on union advocacy statements that they quote in full. Report 5-6.  The experts resort even to citing "general knowledge." *Id*. 102:11-17.  Eterno opines that police officers make illegal stops due to the pressure of quotas, but refers only to "anecdote[es]," "media accounts," and union statements as the basis for his knowledge.  Eterno Dep. 91:14-92:4.  Eterno relies on alleged interviews with former police officers for which he provides no notes.  Eterno Dep. 69:6-15. In failing to produce supporting data, plaintiff's counsel admitted that the opinions about officers other than Schoolcraft were based only on "anecdotal evidence" and "common knowledge."  Ex. E (Email Chain) at 7. In all cases, the experts assume that the hearsay supporting their views is accurate. Eterno and Silverman also rely on "court decisions," although they mention one: *Floyd v. City of New York*.[12] Report 4.[13]  Court decisions are hearsay, and are not admissible in Court for the truth of their findings or recitations of the evidence found therein. *See Blue Cross and Blue Shield of New*

---

[10] *See also Bank of N.Y. Mellon v. WMC Mortg., LLC*, 2015 U.S. Dist. LEXIS 108320, *21 (S.D.N.Y. Aug. 17, 2015) (holding expert testimony inadmissible that relied on unreliable hearsay) (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citation omitted) (emphasis added)).

[11] "Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted. *Delrosario v. City of New York*, 07 Civ. 2027, 2010 U.S. Dist. LEXIS 20923, at *18-19 (S.D.N.Y. Mar. 4, 2010) (citing *Griffin v. City of N. Y.*, 287 F. Supp. 2d 392, 395 n,8 (S.D.N.Y. 2003) and *McAllister v. N. Y. City Police Dep't*, 49 F. Supp. 2d 688, 706 n.12 (S.D.N.Y. 1999)); *Media Alliance, Inc. v. Mirch*, 2012 U.S. Dist. LEXIS 6332, 3-4 (N.D.N.Y Jan. 19, 2012) (same)**;** *see also Allen v. City of New York*, 02 Civ. 4373, 2006 U.S. Dist. LEXIS 95802, at *77 (S.D.N.Y. Mar. 28, 2007) (CNN article is hearsay and also insufficient to establish a municipal policy or custom)**.**

[12] The Second Circuit removed the District Judge who issued the *Floyd* from the case to avoid an appearance of an absence of impartiality, and stayed the effect of the decision.  *Ligon v. City of New York (In re Reassignment of Cases)*, 736 F.3d 118, 126 (2d Cir. 2013).

[13] In addition to *Floyd*, the plaintiff lists a labor arbitration decision relating to quotas on his exhibit list as PTX 93; that decision should also be excluded from evidence as hearsay.

*Jersey, Inc. v. Philip Morris, Inc.,* 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001) ("Judicial findings in other cases proffered as evidence are generally characterized as inadmissible hearsay."); *Retil Sundown, Inc. v. Ferrigo Co.*, 651 F. Supp. 2d 9, 36 (E.D.N.Y. 2009) (same); see also *Nipper v. Snipes*, 7 F.3d 415, 417-18 (4th Cir. 1993) (same).[14]

While an expert may rely on hearsay if applying an expert methodology beyond the ken of the jury that would be helpful (e.g., interpretation of epidemiological data), the experts here apply no expertise or methodology to the hearsay other than to believe it without question and pass it on to the jury.  Eterno and Silverman's opinions are strikingly similar to the testimony of two putative historians ruled inadmissible by the district court and the Second Circuit in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. N.Y. 2013).  In *Marvel*, the plaintiff offered the historians to give testimony on *Marvel's* relationship with the illustrator Jack Kirby.  The Second Circuit held in a ruling fully applicable to Eterno and Silverman:

> Although the Rules permit experts some leeway with respect to hearsay evidence, Fed. R. Evid. 703, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007). ***The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events.***  And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder. *See Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005).

*Id*. (emphasis added).  This court should follow *Marvel* and exclude plaintiff's NYPD 'historians' here.[15]

---

[14] Even were the Court to find evidence of the *Floyd* decision admissible, which it is not, it should be precluded because its prejudicial effect would outweigh any probative value under Fed. R. Evid. 403.

[15] Even the expert's survey results here are a mere collection of hearsay, like a packet of anonymous letters, sorted in such a manner as to emphasize perceived trends.  A party may not prove the truth of a fact in dispute – here whether the NYPD had quotas or manipulated statistics – by citing survey responses for the truth of their views on  those questions. *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227-230 (2d Cir. N.Y. 1999) (distinguishing between

D.   **Eterno and Silverman should not be permitted to testify about Department of Health and Mental Hygiene data that they cannot produce and have no expertise to understand.**

Eterno and Silverman also rely heavily on data that they say was posted by the Department of Health and Mental Hygiene on the internet regarding the number of "assaults" and "firearms assaults" reported in emergency rooms.  Report 11-12.  Yet neither expert boasts any medical expertise whatsoever.  Eterno Dep. 187:14-15; Silverman Dep. 178:16-17; Silverman Dep. 179:24-180:4.  They cannot even find the alleged health data on which they rely.  Silverman Dep. 178:22-279:23; Ex E (Email Chain) at 7.  To fail to keep data relied upon for purportedly scientific purposes does not meet minimum standards of reliability.

But since the experts have no training or experience in medicine or public health, they could not even know how incomparable the data really is.  They do not know how the data was compiled; how "assaults" or "firearms assaults" are defined for the purposes of compiling the data.  Especially where the experts and plaintiff could not or would not provide the data set, the Court should not accept an expert's opinion that is no better than a laypersons uninformed, superficial inference from the word "assault."

The testimony is inadmissible because it takes the experts well beyond their declared field of expertise.  *See* 4 Weinstein's Fed. Evid. § 702.04[6] (an expert qualified in one area should not be permitted to testify in other areas where qualifications are insufficient) (*citing Pan Am World Airways v. Port Authority*, 995 F.2d 5, 13 (2d Cir. 1993)); *Stagl v. Delta Air Lines*, 117 F.3d 76, 81 (2d Cir. 1997) (expertise insufficiently tailored to the facts of this case); *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2002) (error for district court to admit testimony of expert which strayed from his expertise). Moreover, if an expert opinion includes assumptions that are in

---

surveys used to show state of mind and those used to show other facts which are inadmissible hearsay). That is exactly what plaintiff, through Eterno and Silverman, attempt to do here.

essence "apples and oranges comparison[s]" – such as that medical and crime data are comparable

– it should be precluded.  *Boucher*, 73 F.3d at 22; *see also MTX Commc'ns. Corp. v.*

*LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 291-93 (S.D.N.Y. 2001) (expert relied upon inapt

"analogs," unverified information and "unreasoned, untestable information" and was therefore

precluded).

>    **E.**    **Eterno and Silverman use outdated information, unsupported narratives, incomplete information, and illogical leaps that should cause this Court to reject their testimony as inherently unreliable.**

>    **1.**    **Eterno and Silverman offer irrelevant conjectures without any supporting research or documentation.**

Eterno and Silverman's main thesis is that the creation of Compstat in 1994 increased

pressure on commanders and therefore lower level officers to increase police activity and

manipulate crime statistics downward.  This theory is rendered in a broad historical and political

sweep having no connection to this case.  For example, they write in their Report:

>    Since 2002, political and police pressure mounted to sustain the crime
>    reduction phenomenon of previous years. Up until l2002, the first year
>    of Mr. Bloomberg's administration, crime was already down 60
>    percent. Leveling off was not considered an official option. Demands to
>    produce numbers have triggered the expansion of NYPD activities that
>    "work" but without maintaining an eye on the structural health of the
>    organization. . . . .Massive deployment to address quality-of-life
>    crimes becomes favored over more surgical strikes. Inadequate
>    evaluation and tactical intensification has also been accompanied by
>    increased centralization. . . . . But centralization now has a powerful
>    weapon in its arsenal—Compstat.

Report 24.  Nothing is cited for these and other sweeping assertions of fact.  Eterno and Silverman

make even more specific allegations without support, such as that commanders are reassigned because

of their lack of performance at Compstat meetings.  *See* Report 3; Eterno Dep. 71:6-72:24.  This does

not meet the standards for expert testimony because it is unsupported by anything but the experts' *ipse*

*dixit*.  *See Song v. Yao Bros. Group LP*, 2012 U.S. Dist. LEXIS 62235, *4 (S.D.N.Y. May 1, 2012)

(excluding expert where report did not cite data or sources and only conclusions) (citing *Maurizio*

*v. Goldsmith*, 96 Civ. 4332 (RPP), 2002 U.S. Dist. LEXIS 6032, at *12-13 (S.D.N.Y. Apr. 9, 2002) (permitting an expert to testify where "no supporting facts or data are provided, would make a mockery of Rule 26(a)(2)(B)")).

### 2.    The experts apply unsound and unscientific methods that are less rigorous than the methods applied in their field of study.

The experts betray in several respects that they are advocates not scientists in this case.

### a.    The experts use selective, unreliable evidence and non-scientific methods.



The experts' advocacy is also based on a highly selective review of the evidence. For example:





These examples of slipshod and selective methods undercut any claim of scientific techniques or any other admissible methodology.

---

[16] Schoolcraft lists as a trial exhibit Schoolcraft an undated IAB report which is undated and unauthenticated. Ex __ (PTX 81 "IAB Police Corruption Report"). The typewritten, faded report states that it was commissioned during the first term of Commissioner Kelly, which ended in 1994, and dates from the first tenure of Police Commissioner Bratton, which ended in 1996. This and any testimony based on it should also be excluded.

[17] *See Pluma v. City of New York*, 2015 U.S. Dist. LEXIS 48134, *31 (S.D.N.Y. Mar. 31, 2015) (dismissing *Monell* claim, in part because decade old CCRB report and single recent incident are "extremely unlikely" to support a pattern and practice as a matter of law).

> **b.    The experts' purported scientific study of survey evidence does not comport with the standards of rigor they apply in social science work.**

Even when purporting to use scientific methods such as survey evidence, the experts failed to adhere to the same "intellectual rigor" in forming their opinions in this case as they would in their field of study, as required under *Kumho Tire v. Carmichael*, 526 U.S. at 152.  After their depositions in this case, the experts published a study online that shows that when practicing as social scientists their methods are quite different.  *See* Ex. F, J. Eterno, A. Verman & E. Silverman, "Police Manipulations of Crime Reporting: Insiders' Revelations," *Justice Quarterly* (published online Nov. 17, 2014) ("*Justice Quarterly*").

For example, the experts here fail to consider whether the increased "pressure" they claim arose from Compstat could be due to other contributing factors.  When statistics are used to attempt to prove causation, courts demand at least some consideration of other variables that may explain the apparent correlation, usually in the form of multivariate regression analysis.  *See Bonton v. City of New York*, 2004 U.S. Dist. LEXIS 22105, *15-16 (S.D.N.Y. Nov. 3, 2004) ("Courts have repeatedly held that statistical analyses that fail, as Zellner's does, to control for any nondiscriminatory explanations are inadmissible.") (citations omitted); *see also Smith v. Xerox Corp.*, 196 F.3d 358, 371 (2d Cir. N.Y. 1999) (plaintiff's statistical evidence "fail[ed] to account for other possible causes"); *R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 273-74 (S.D.N.Y. 2010) (precluding expert testimony for failure to consider alternative causes).

In the 2012 survey, the experts obtained several data points from each respondent – the year of retirement of the survey respondent (which they have refused to disclose in this case, *see* Point II *infra*); level of education; age; rank; patrol assignment; commanding officer status; patrol/staff/investigation role – but they used *none of that data* in their testimony here.  *See* Report 16-23; Ex. H (2012 Survey Questions) at E&S Production 19-21.  Nor do they attempt to fit their

analysis to the facts of this case and determine what level of alleged "pressure" existed in the years that Schoolcraft claims he observed problems: 2008 and 2009.[18]

But when reporting on the data as social scientists, the experts did use the full data set and reached much more guarded conclusions. *See* Ex. F (*Justice Quarterly*) at 16-18. The experts admitted in their scientific publication there that regression model could explain only 39% of the variation in the response; i.e., they could not explain 61% of it. *Id*. at 17. In addition, their regression analysis showed a small coefficient of correlation (a "B" coefficient) of .038 for a respondents' retirement year as an explanation for a reported observation of downgrading criminal complaints: a weak correlation when compared to the much larger correlation between similar survey responses (in other words, "yes" answers to similar questions) of .102 and .307. *Id*. at 17. Rather than the certainty expressed here that increased "pressure" from Compstat is the root of all evil, in their journal article the experts concluded that "[t]ime of retirement is a good predictor of experience with report manipulation and, as indicated by the multivariate model, has an ***independent effect from the pressures on officers***." Ex. __ at 19 (emphasis added); *see also infra* at 22. When working as social scientists, the experts' conclusions are far more guarded: "These interpretations must await further study . . . . As with all social science . . . they are subject to limitations." *Id*. at 20. They offer no such qualification in this case.

These discrepancies do not go merely to the weight of the evidence, to be used on cross-examination, as plaintiff may be expected to argue, because the *Justice Quarterly* article proves that Eterno and Silverman did not apply the same rigor in this case as they do in their social science work. *See, e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)

---

[18] The 2008 survey elicited no year of retirement data except whether the officer retired prior to 1994, rendering the data useless for determining the conditions Schoolcraft faced in 2008 and 2009. *See* Ex. G (2008 Survey Questions). The survey responses are inadmissible for that reason as well.

(where expert "does not apply the same rigor in the courtroom that he would apply to his medical endeavors" the testimony should be precluded).[19]

### F.     The Experts' purported opinions on police procedure are also inadmissible.

Even when the experts purport to make a claim about police procedures, their testimony is inadmissible for lack of support or expertise, and the conflation of such procedures with constitutional standards.  The experts assert that the Patrol Guide requires the NYPD to explain why they "reasonably believe[d]" Officer Schoolcraft is "mentally ill or temporarily deranged" such that his conduct "is likely to result in serious injury to himself or others."  Report at 9.  But no citation to any of the hundreds of Patrol Guide sections is ever given. They assert that "proper police procedure" requires mention of a tape recorder found in Schoolcraft's apartment in a memorandum of the incident, but cites nothing for this proposition but their own *ipse dixit*.  Report 10.

Nor are the experts qualified to give these opinions.  Of Eterno's time at the NYPD, he was a sergeant or captain on patrol duties only 8 years out of 20 ½ on the job, the last time between 1998 and 1999, over nine years before October 31, 2009, and more than 15 years before today.  Report (Eterno CV) at CV2-CV3.   He was a supervisor on Patrol only four of those 8.  *Id*. He admits to having not taught courses on EDPs, except for general training of police science at the Police Academy where he was an instructor for *one year, 27 years ago*, 1987-1988.  Eterno Dep 13:8-10, 32:2-22; Report at CV3.  If Eterno is qualified to be an expert witness on EDP procedures, then virtually any cop, or at least any former police Captain, would be.[20]  The federal courts require more.

---

[19] It would be no answer for plaintiff to say that since Eterno and Silverman have now published more complete and correct work, they may use those results for their testimony.  The published account deals with only some of the survey at issue here and publishes only a single regression analysis.  Moreover, plaintiff did not include most of the published work in the expert's Report, and may not amend his expert disclosures to add any information at this late date, well after pre-trial disclosures were required to be made on August 21, 2015.  *See* Fed. R. Civ. P. 26(e)(2).

[20] Silverman does not claim any expertise in this area.  Silverman Dep. 65:10-17.

**G.     The Court should exclude the proffered testimony under F.R.E. 403 and F.R.E. 703 because it will be more prejudicial and confusing than probative.**

Even if the Court were to rule that some part of the Eterno and Silverman testimony meets the requirements of Rule 702, the testimony should still be precluded because it is more prejudicial and confusing than probative.  The Second Circuit has warned that the strictures of Federal Rule Evidence 403 have special importance in considering whether to admit expert testimony, which may carry undue weight with a jury.  *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  The Court should heed this warning and preclude the testimony here because it creates several extreme risks of prejudice and confusion.  As set forth in the City Defendants' Memorandum of Law in Support of Their Motions *in Limine*, Points II and V, the assumptions of plaintiff's *Monell* theory are illogical and the *Monell* evidence bears no relevance to determining the main issues before the jury.[21]  But even if marginally relevant, the expert's testimony is likely to cause undue prejudice and juror confusion on a number of points, conflating alleged unrelated misconduct with the events in this case; conflating alleged policy defects in the Compstat 'culture' with liability here; and conflating the existence of a quota or crime statistics manipulation with constitutional wrongdoing.  Addressing these problems through limiting instructions is not sufficient.

It is likewise with any opinion of the experts that the defendants acted wrongly in this case.  As set forth above, Eterno's opinion that the defendants acted inconsistently with "police procedures" is inadmissible.  *See supra* at 17.  But were it ruled marginally admissible, its probative value is slight because an expert's conclusion that police procedures were not followed is not relevant to whether probable cause was lacking.  *See supra* at 6; *See Garcia v. City of New*

---

[21] The experts' opinions about the NYPD's lack of "transparency" are also patently irrelevant and should be excluded. Report 12-13.

*York*, 2013 U.S. Dist. LEXIS 147149, *25 (E.D.N.Y. July 17, 2013) (admitting Patrol Guide as

relevant to *Monell* but instructing jury that it is not relevant to whether the constitution was

violated).  But should the Court rule such testimony (or related exhibits, such as PTX 159) is

marginally relevant, it should be excluded under Rule 403 because the danger of prejudice and

juror confusion of standards far outweighs any probative value.[22]

**POINT II**

**BECAUSE SCHOOLCRAFT VIOLATED A COURT ORDER
TO TURN OVER DATA WHICH ETERNO AND
SILVERMAN CONSIDERED, AND THE EXPERTS LOST OR
DESTROYED ADDITIONAL DATA ON WHICH THEY
RELIED, THEIR TESTIMONY WHICH CONCERNS THE
SUPPRESSED DATA SHOULD BE PRECLUDED.**

Eterno and Silverman contend that the results of their 2008 and 2012 surveys of police

supervisors show that Compstat created increasing pressure upon supervisors, and therefore police

officers, to engage in police activity but under-report complaints of criminal activity.  Report at

14-24.  As noted above, in the 2012 survey, the survey questionnaire asked each respondent to

state the year in which they retired.  *Supra* at 15-16.  The experts chose however, in presenting

their results, to combine the survey respondents from 2012 into three cohorts: 1994-1995, 1995-

2001, 2002-2012.  Report 16-19.

On September 17, 2015, this Court ordered the plaintiff to produce the survey response

data from the 2008 and 2012 surveys of former police supervisors.  *See* Report at 14-24; Ex. J (Tr.

Sept. 17, 2014 Hearing ("Sept. 17, 2014 Tr.")) 23:10-11.  The City defendants' specifically

requested the data concerning the year of retirement of the survey respondents.   Tr. Sept. 17, 2014

at 21:12, 21:21-25.  In response to the Court's Order, plaintiff produced two statistical databases,

---

[22] In addition, if the plaintiff is permitted to offer expert testimony based on hearsay, and it should not be, then the content of the hearsay should be excluded under Fed. R. Evid. 703.

19

one for each survey, along with a sample survey questionnaire and a collection of the narrative responses.  Scheiner Dec. ¶ 13.

Plaintiff, however, excised from the data the retirement year reported by the survey respondents, and produced only a variable indicating to which of the three cohorts selected by the experts the respondent belonged. Scheiner Dec. ¶ 14.  By omitting this crucial data, plaintiff deliberately undercut any thorough testing of the experts' principal claim: that the year of retirement correlated with increasing "pressure" on respondents to generate more police activity or better crime statistics, in a way that showed that Schoolcraft was subjected to increased pressure. Report 24.  In fact, the more probative question for this case is what pressure was reported in the period that Schoolcraft complained of (2008 and part of 2009), not whether it increased over time. Only the annual information could shed light on that question, since the cohorts created by Eterno and Silverman clump together 2002-20012.

After Eterno and  Silverman were deposed in this case, they revealed that they had chosen the cohorts based on the trends that they wanted to prove:

> **We examine the data by the officers' reported year of retirement.** For some analyses, we divide the sample into 3 key groups using 1981 as the earliest year proceeding to 1993 which is the last year prior to the introduction of NYPD's Compstat management system. We then examine 1994 until 2001—the Mayor Giuliani years. Lastly, we examined those who retired from 2002 until 2012—the Mayor Bloomberg years. ***This categorization emerged from trends we saw in the data.***

Ex. F (*Justice Quarterly*) at 6 (emphasis added).  In other words, the researchers admit that although they examined the yearly data, they manipulated its presentation to emphasize the "trends we saw in the data," which correspond to political organization of the data into three categories (the "earliest" year; the "Guiliani years"; and the "Bloomberg years").  *Id.*

Although the Court ordered all of the survey data to be disclosed, plaintiff failed to comply and continues to refuse to comply.  On June 23, 2015, by email, the City defendants pointed out to plaintiff's counsel that the retirement year of the respondents was not provided.  Ex. E (Email Chain) at 6.  The plaintiff's initial response was that all the data had been provided.  *Id.* at 3-5.  Counsel then argued that "discovery has closed" and therefore any obligation to produce the data previously ordered to be produced had expired.  *Id.* at 1-3.  Finally, plaintiff contended that the withheld data – which was the only survey response removed from the data produced – was merely "data-behind-data" and "trivial."  *Id.* at 1.  This is sophistry.  The close of discovery does not moot a violation of a discovery order, especially where, as here, it is obviously willful.

The Second Circuit has recognized "the importance we place on a party's compliance with discovery orders [as] [s]uch compliance is necessary to the integrity of our judicial process… A party who flouts such orders does so at his peril."  *Update Art, Inc. v. Modin Publ'g, Ltd.,* 843 F.2d 67, 68, 73 (2d Cir. 1988); *accord Lyondell-Citgo Ref., LP v. Petroleos de Venez, S.A.*, No. 02 Civ. 0795 (CBM), 2005 U.S. Dist. LEXIS 3635 (S.D.N.Y. Mar. 9, 2005)); s*ee also Advanced Analytics, Inc., v. Citigroup Global Markets, Inc*., 04 Civ. 3531(LTS)(HBP), 2014 U.S. Dist. LEXIS 41291, *22-23 (S.D.N.Y. Mar. 26, 2014) (preclusion and an award of costs and fees were warranted pursuant to Fed. R. Civ. P. 16 and 37 in view of party's untimely submission of evidence which violated the Scheduling order).  "Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."  *Advanced*, 2014 U.S. Dist. LEXIS 41291 at *10 (citing *Reilly v. Natwest Mkts. Grp. Inc.,* 181 F/3d 253, 267 (2d Cir. 1999)).

Plaintiff's contention, in counsel's emails, that the data was not required to be disclosed because it was "data-behind-data" (Ex. E at 1) is belied by the expert's own *Justice Quarterly*

article, which makes extensive use of the annual retirement data.  In addition to the regression

analysis using the year of retirement discussed above (*supra* at 15-16), the experts published

charts that tracked some but not all of the survey responses *by the specific year of retirement of the*

*respondent*, showing that there was little net change during the period of Schoolcraft's tenure from

2002 through 2009.  Ex F (*Justice Quarterly*) at 13-14.  The relevance of the withheld information

is clear from the experts' own social science work, and were it not probative the plaintiff would

not be so insistent on concealing it.[23]

Even in the absence of a court order – which there is for the survey data – under Rule

37(c)(1) of the Federal Rules of Civil Procedure, if "a party fails to provide information . . .

required by Rule 26(a) . . . , the party is not allowed to use that information . . . to supply evidence

on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

*Great White Bear, LLC v. Mervyns, LLC*, 2008 U.S. Dist. LEXIS 41977, *14-16 (S.D.N.Y. May

27, 2008).[24]  Preclusion is appropriate where "the trial court finds that there is no substantial

justification and the failure to disclose is not harmless." *Design Strategy, Inc. v. Davis*, 469 F.3d

284, 297 (2d Cir. 2006).  Here the failure to disclose is unjustified and the failure to disclose

cannot be harmless where the City defendants are unable to test the experts' opinions as a result.

---

[23] The article itself cannot substitute for the missing information because it concerns only the issue of crime statistics manipulation, not quotas or other survey responses; the experts' results cannot be tested without the data; and the article is not part of the experts' disclosure in this case and cannot be made part of it under Fed. R. Civ. P. 26(e)(2); it is far too late for that since the JPTO has already been filed.

[24] In addition to the court-ordered survey data, the experts did not retain or produce: (a) Purported health data on which they relied from an internet posting by the NYC Department of Health and Mental Hygiene, s*ee* Ex. E (Email Chain) at 7; Report 11-12; s*ee supra* at 11-12; (b) Any of  the audio recordings or media accounts on which their opinions rely, Eterno Dep. 113:14-19; 106:16-17; (c) notes of interviews on which the experts purport to rely, or (d) the single "Compstat book" that the experts claim to possess and rely upon, Silverman Dep. 81:2-85:13; Eterno Dep. 69:6-12.  These defalcations exacerbate the violation of the Court's order and provide further evidence that the plaintiff does not take seriously his obligations under the federal rules applicable to expert testimony, and the experts do not apply scientific standards requiring that they preserve their own data.

*See Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc.*, 2011 U.S. Dist. LEXIS 97715, *33-34 (S.D.N.Y. Aug. 31, 2011).

For these reasons also, Eterno and Silverman should be precluded from testifying.

**POINT III**

**THE TESTIMONY OF MEDICAL EXPERTS SHOULD BE PRECLUDED WHERE IT CONTAINS    INADMISSIBLE OPINIONS ABOUT THE CONDUCT OF THE POLICE IN THIS CASE WHICH ARE BEYOND THEIR EXPERTISE AND WOULD INVADE THE PROVINCE OF THE COURT AND JURY AND EXCEED THEIR EXPERTISE**

**A.     Dr. Lubit's gives inadmissible opinions invading the province of the Court and jury and exceeding his expertise.**

Plaintiff offers a medical expert Dr. Roy Lubit to testify not only as to medical matters, but also to testify to facts and legal conclusions regarding the conduct of the defendants in this case. The City defendants join in the motion of other defendants to exclude Mr. Lubit's testimony.  The City defendants in addition move to specifically preclude Dr. Lubit from offering opinions about the conduct of the police in this case.

In his report, Dr. Lubit offers a number of opinions about the police that invade the province of the court and jury, comment on the motives and intentions of the parties, and which are far outside any role as a medical expert. E.g.:



the police to use restraints in a way that was grossly inappropriate and abusive. *Id*. at 22-23.

These assertions are not medical judgments, they are factual conclusions or legal judgments that are inadmissible because they invade the province of the court and jury on matters where no medical expertise is called for.  *See supra* at 5-7; s*ee Shan Zhao v. Kaleida Health*, 2007 U.S. Dist. LEXIS 103253, *20 (W.D.N.Y. Aug. 8, 2007) (precluding admission of forensic psychiatrist's testimony because he accepted plaintiff's version of events given in interview without reference to actual record).

Even when purporting to opine as a physician about the NYPD, his opinion is inappropriate. Lubit says:



Lubit Report at 23.  This comment is not relevant under Fed. R. Evid. 402 because the there is no claim against the police for negligently causing medical harm to Schoolcraft's blood pressure; the claim is for unreasonable seizure under the Fourth Amendment.  That a doctor would not have handcuffed Schoolcraft when he had high blood pressure is irrelevant. This testimony is no more than an inadmissible lawyer's argument from the witness stand, discrediting the motives of the officers involved – not true medical testimony about a relevant medical question.  *Supra* at 5.

**B.      Dr. Levy gives inadmissible opinions invading the province of the Court and jury and exceeding his expertise.**

The medical expert of defendant Jamaica Hospital Medical Center also offers non-medical opinions about the NYPD that invade the province of the court and jury and should be precluded. In his Report (Ex. I, the "Levy Report"), Dr. Levy opines:

- "It is quite rare and not [a] generally credible scenario that the police would make systematic misrepresentations of this nature." Levy Report at 6.
- "The patient's current emotional condition is likely to be referable to the larger picture of his perceived victimization by the police department with the hospitalization playing a relatively small role, especially because this hospitalization concluded with an acknowledgement of the veracity of his statements. His difficulty finding work is also likely to be largely the result of this larger picture and is unfortunately consistent with the difficulties faced by many whistleblowers." Levy Report at 7.

In giving these opinions, Dr. Levy invades the province of the court and jury, making findings of fact that the police made "systematic misrepresentations" and that Schoolcraft was a "whistleblower." As with plaintiff's medical expert, Dr. Levy appears to rely entirely on plaintiff's version of events for these opinions, without even considering the other evidence. Levy Report at 1. *Supra* at 5-7; 11-12. Moreover, this cursory damages opinion is mere speculation; as is his entirely non-medical and unsupported assertion that whistleblowers often cannot get jobs. This testimony is without foundation in facts or expertise and should be precluded.

## CONCLUSION

For the reasons stated, the expert testimony challenged above should be precluded.

Dated:      New York, New York
            September 21 , 2015

                                    Respectfully submitted,

                                    ZACHARY W. CARTER
                                    Corporation Counsel of the City of New York
                                    *Attorneys for City defendants*
                                    100 Church Street, Room 3-174
                                    New York, New York 10007
                                    (212) 356-2344
                                    ascheiner@law.nyc.gov


                                    By:      _____/s/_____
                                             Alan Scheiner
                                             Senior Counsel