# EXHIBIT B

# ORIGINAL

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------------------X
     ADRIAN SCHOOLCRAFT,
3
                                        PLAINTIFF,
4
                  -against-            Case No:
5                                      10 Civ. 6005
                                       (RWS)
6

7    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
     Tax Id. 873220, Individually and in  his Official
8    Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
     NORTH GERALD NELSON, Tax Id. 912370, Individually
9    and in his Official Capacity, DEPUTY INSPECTOR
     STEVEN MAURIELLO, Tax Id. 895117, Individually and
10   in his Official Capacity, CAPTAIN THEODORE
     LAUTERBORN, Tax Id. 897840, Individually and in his
11   Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
     919124, Individually and in his Official Capacity,
12   SGT. FREDERICK SAWYER, Shield No. 2576, Individually
     and in his Official Capacity, SERGEANT KURT DUNCAN,
13   Shield No. 2483, Individually and in his Official
     Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
14   915354, Individually and in his Official Capacity,
     LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
15   Individually and in his Official Capacity, SERGEANT
     SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
16   #1-50, Individually and in their Official Capacity
     (the name John Doe being fictitious, as the true
17   names are presently unknown) (collectively referred
     to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
18   CENTER, DR. ISAK ISAKOV, Individually and in his
     Official Capacity, DR. LILIAN ALDANA-BERNIER,
19   Individually and in her Official Capacity and
     JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEES "JOHN
20   DOE" #1-50, Individually and in their Official
     Capacity (the name John Doe being fictitious, as
21   the true names are presently unknown),

22                                      DEFENDANTS.
     ------------------------------------------------X
23                           DATE: October 24, 2014
                             TIME: 10:14 A.M.
24

25        (Deposition of ELI B. SILVERMAN, PhD)

1

2                             DATE: October 24, 2014

3                             TIME: 10:14 A.M.

4

5

6               DEPOSITION of an Expert Witness,

7   DR. ELI B. SILVERMAN, PhD, taken by the Respective Parties,

8   Pursuant to a Notice and to the Federal Rules of

9   Civil Procedure, held at the offices of the New

10  York City Law Department, 100 Church Street,

11  New York, New York 10007, before John A. Lugo,

12  a Notary Public of the State of New York

13

14

15

16

17

18

19

20

21

22

23

24

25

DR. ELI B. SILVERMAN

1    Q.    Have you updated your CV since the one in front

2    of you right here?

3    A.    No, I have not.

4    Q.    From where did you receive your bachelor's

5    degree?

6    A.    Allegheny College.

7    Q.    And where is that?

8    A.    Pennsylvania; Meadville, Pennsylvania.

9    Q.    Do you hold any advanced degrees?

10   A.    I hold advanced degrees that are on my CV.

11   Q.    What advanced degrees do you hold?

12   A.    MA and a PhD.

13   Q.    And what is your masters's in?

14   A.    Public administration.

15   Q.    From where did you receive your PhD?

16   A.    Pennsylvania State University.

17   Q.    Have you ever attended law school?

18   A.    No.

19   Q.    Have you ever taken any courses at any law

20   school?

21   A.    In any law school, no.

22   Q.    Are you an attorney?

23   A.    No.

24   Q.    Have you attended classes as a student at any

25   university since you received your PhD?

DR. ELI B. SILVERMAN

1   of?

2               MR. SMITH:  Objection to form.  You can

3          answer.

4     A.    That's correct.

5     Q.    And the other sections Dr. Eterno did the initial

6   draft of?

7               MR. SMITH:  Objection to form.  You can

8          answer.

9     A.    Yes.

10    Q.    Are there any sections of this report which you

11  don't feel competent to answer questions?

12    A.    The section on Schoolcraft and the extent to

13  which that adhered to police procedures, that really is

14  within Dr. Eterno's bailiwick and based on his experience

15  within the police department and additionally as an

16  academic, so that -- he is competent in that area and not

17  me.

18    Q.    Are there any other areas about the report about

19  which you don't feel competent to answer questions?

20              MR. SMITH:  Objection to form.

21    A.    May I look at the report?

22    Q.    Yes, please.

23              (Whereupon, the Witness perused the

24          document.)

25    A.    No.

DR. ELI B. SILVERMAN

1    A.    The report offers an opinion.

2    Q.    And what is that opinion?

3    A.    That the police department violated its own

4    procedures.

5    Q.    And on what is that opinion based?

6    A.    It's based on Dr. Eterno's familiarity with the

7    procedures, his work in that field, and his expertise in

8    that field.

9    Q.    So, aside from Dr. Eterno's familiarity and work

10   in that field, can you tell me anything else on which your

11   opinion about the propriety of declaring Adrian Schoolcraft

12   an emotionally disturbed person was based?

13   A.    That's what I relied on, my previous answer.

14   Q.    Do you personally know what the NYPD's procedures

15   on emotionally disturbed persons are?

16   A.    I only know from Dr. -- I only know from this

17   report what Dr. Eterno conveyed to me.

18   Q.    Did you play any role in the creation of the

19   opinion about Adrian Schoolcraft being declared an

20   emotionally disturbed person?

21   A.    No.

22         MR. KRETZ:    Can you read that question back,

23         please.

24         (Whereupon, the referred to question was

25         read back by the Reporter.)

DR. ELI B. SILVERMAN

1      Q.    If you could turn to page 2 of your expert

2   report.  In the section titled Compstat as performance

3   management system you state that the range of information

4   in Compstat books expanded widely to include summonses --

5               MR. SMITH:  Where are you reading from?

6               MS. PUBLICKER METTHAM:  It begins at the end

7         of page 2 and goes on to page 3.

8      Q.    The range of information in Compstat books

9   expanded widely to include summonses, stop-and-frisk

10  encounters, quality of life violations and numerous other

11  activities.  Is that correct?

12              MR. SMITH:  Objection to form.  I don't

13         think you read the thing that you were purporting

14         to read correctly.

15              MS. PUBLICKER METTHAM:  What did I get

16         wrong, Mr. Smith?

17              MR. SMITH:  Well, the sentence you just

18         directed me to starts with, As the years

19         progressed the range of information expanded

20         widely.

21              I didn't hear that part of what you read.

22              MS. PUBLICKER METTHAM:  I didn't ask if that

23         was the complete sentence.  I asked if what I

24         read appears in your report.

25      Q.    Does it appear in your report?

DR. ELI B. SILVERMAN

1          MR. SMITH:  Well, I think it's misleading to

2          not tell the witness where you're reading from

3          and then read part of a sentence.  It's not a

4          memory test.  Why don't you point him to your

5          what you're asking.

6          MS. PUBLICKER METTHAM:  Mr. Smith, I did

7          point to him pages 2 to 3.

8          MR. SMITH:  No, you didn't.  Actually, you

9          said to turn to page 2 and then what you read was

10         the word "the" on page 2 and the rest of the

11         quote was supposedly from page 3.

12         So, my suggestion to you is that you direct

13         the witness to the part that you're trying to

14         read and then read it accurately after he's had

15         a chance to look at what you're reading from.

16    Q.    Dr. Silverman, what Compstat books did you review

17    in preparation of your opinion for this expert report?

18    A.    I didn't look at them in -- I've looked at them

19    over the years, so I'm aware of the Compstat book and I

20    know this is the case, so I didn't have to look at them.

21    Q.    Do you still have copies of the Compstat books

22    you've seen prior?

23    A.    Yes.

24         MS. PUBLICKER METTHAM:  I would call for

25         production of those Compstat books.

DR. ELI B. SILVERMAN

1          MR. SMITH:  Taken under advisement.

2     Q.    When was the last time you looked at a Compstat

3     book?

4     A.    Maybe 2008.

5     Q.    Have you ever seen a Compstat book with stop,

6     question and frisk activity listed?

7     A.    Yes.

8          MS. PUBLICKER METTHAM:  I will call for

9          production of that Compstat book.

10         MR. SMITH:  We will take it under

11         advisement.

12    Q.    What quality of life violations do you believe

13    are included on Compstat books?

14    A.    ECB, vehicle, C summonses.

15    Q.    What numerous other activities do you believe are

16    listed in Compstat books?

17    A.    It varies.  They're not always the same.

18    Sometimes they'll have domestic violence, sometimes they'll

19    have -- sometimes they'll have FADO reports.  Sometimes

20    they'll have civilian complaints.

21    Q.    When you say Compstat book, what do you mean?

22    A.    Each meeting -- Compstat book comes out every

23    28 days and each meeting there's a -- the inquisitors at

24    the Compstat meeting have a very thick book and that's what

25    I mean by the Compstat book.

DR. ELI B. SILVERMAN

```
 1     Q.    You said the last time you looked at a Compstat
 2    book was 2008.  For what year and month was that Compstat
 3    book prepared?
 4     A.    Oh, it was sometime in 2008.  I can't --
 5     Q.    And is it your understanding that that Compstat
 6    book included stop, question and frisk activity?
 7     A.    Yes.
 8     Q.    And that Compstat book included this other
 9    activity you referenced?
10     A.    I can't recall which activities were there, but I
11    can say that 250s are included.
12     Q.    How did you obtain that Compstat book?
13     A.    When I attended the meeting.
14     Q.    Your report states that Compstat meetings were
15    originally held twice weekly in 1994; is that correct?
16     A.    Yes.
17     Q.    Do you know how often the meetings are held now?
18     A.    I think they're now once a week, but there can be
19    meetings that occur for special purposes.  For example, if
20    there are spikes in certain precincts.  So special meetings
21    would come -- my understanding is -- let me rephrase, if I
22    may.
23           I'm talking about only since this -- prior to the
24    new administration.  I don't know what the new
25    administration is doing.  So, I would have to refer my
```

DR. ELI B. SILVERMAN

1     A.    I'm aware that there's great deal of controversy

2  in that literature.

3     Q.    So, you don't believe literature that states that

4  police officers have a higher rate of suicide than members

5  of the general public?

6     A.    I'm aware that some literature says that, I'm

7  also aware that some literature doesn't say that.

8     Q.    What literature?

9     A.    I don't recall the literature, but I know --

10    Q.    And which literature do you believe personally?

11    A.    I don't know, I never studied it.

12    Q.    On what basis could members of the NYPD remove

13  any property of Adrian Schoolcraft from his home without

14  his expressed consent?

15             MR. SMITH:  Objection to form.

16    A.    I don't know that police procedure.

17    Q.    Do you know legally whether police members may

18  remove evidence from a civilian's home without a warrant?

19             MR. SMITH:  Objection to form.

20    A.    It depends on the situation.  I can't make a

21  carte blanche whether or not.  I mean, you have to say is

22  very often that winds up in court, is that a violation of

23  the Fourth Amendment or not.

24    Q.    So, you can't say whether members of the NYPD had

25  any authority to remove any property from Adrian

DR. ELI B. SILVERMAN

1    Schoolcraft's home the night of October 31, 2009?

2                    MR. SMITH:  Objection to form.

3    A.    I have no way of assessing that.

4    Q.    And you stated that you personally can make no

5    opinion about the decision to declare Adrian Schoolcraft an

6    emotionally disturbed person that night, correct?

7    A.    The only -- I can make no decision?

8    Q.    Opinion.

9    A.    Oh, opinion.  No, the only opinion I have is I

10   have great confidence in the ability of Dr. Eterno to

11   assess this information.

12   Q.    But personally you don't hold an opinion?

13   A.    Personally, my opinion leans towards him based on

14   his expertise, but I don't have any independent basis for

15   making an opinion.

16   Q.    Do you have any medical training?

17   A.    No.

18   Q.    Do you have any psychological training?

19   A.    No.

20   Q.    Are you testifying here as a legal expert?

21   A.    No.

22   Q.    The next section in your report on page 11 is

23   hospital data.  To what hospital data specifically are you

24   referring in this section?

25   A.    This was hospital data that was available from

DR. ELI B. SILVERMAN

1    the New York City Department of Health and Mental Hygiene.

2        Q.    Are you in possession of that data?

3        A.    No.

4        Q.    When was the last time you looked at that data?

5        A.    Years ago.

6        Q.    You cite very specific numbers in this section,

7    correct?

8        A.    Yes.

9        Q.    How did you come up with those numbers if you no

10   longer have the data and the last time you looked at it was

11   years ago?

12       A.    Because we wrote about it in our book, The Crime

13   Numbers Game, management by manipulation.

14       Q.    And you kept no copies of that data after

15   creating --

16       A.    I -- I --

17       Q.    If you'll let me finish.

18             MR. SMITH:  Let her finish the question.

19       A.    I'm sorry.  I'm sorry.

20       Q.    You kept no copies of that data after writing

21   that book?

22       A.    I didn't write that part.  It was joint with John

23   Eterno, he wrote that part.

24       Q.    So, are you competent to testify about this

25   section of your report?

DR. ELI B. SILVERMAN

1      A.     No.

2      Q.     So, you can't tell me about the definitions of

3    assault by the health and mental hygiene or the NYPD?

4      A.     No.

5      Q.     The next section is titled lack of transparency

6    on page 12.

7      A.     Yes.

8      Q.     You mentioned Mark Pomerantz?

9      A.     Yes.

10     Q.     You state he resigned from the commission to

11   combat corruption in 2005; is that correct?

12     A.     Yes.

13     Q.     Was he seeking actual crime reports with victim

14   and perpetrator information?

15     A.     I don't remember exactly what he was looking at,

16   but he was wanting to examine -- he had been told

17   anecdotally by many police that the crime reports were not

18   accurate and my recollection, that was 2005.  My

19   recollection is he requested that from the police

20   department.  And the police department responded that that

21   was not within his ambit.  And that commission does not

22   have subpoena power.  So he could not secure that data and

23   there are press reports, several press reports on this.

24   And he couldn't get it and that he was a former federal

25   prosecutor of great respect at that time, and that's what

DR. ELI B. SILVERMAN

1    we said.

2        Q.    And it is your understanding of Mark Pomerantz

3    and the commission to combat corruption based solely on

4    media reports?

5        A.    I think I spoke to a couple of people.  I was at

6    one breakfast, I think I was -- I had a conversation with

7    Armstrong, who was the chief prosecutor in the Knapp

8    Commission, and I think I discussed -- my recollection is I

9    discussed this with him, and he had the same sense as I

10   did.

11       Q.    And was Armstrong on the commission to combat

12   corruption?

13       A.    No.

14       Q.    Do you know on what his opinions were based?

15       A.    He's a very wise man.  He's been around a long

16   time.  I didn't ask him what his opinions were based on.

17       Q.    So, this section that discusses the commission to

18   combat corruption and Mark Pomerantz is based on media

19   articles and a discussion with Armstrong who was not a

20   member of the commission; is that correct?

21       A.    Yes.

22       Q.    What other cities in the country make crime

23   complaints with victim and perpetrator information

24   available?

25       A.    Cincinnati, L.A. -- well, I have to take that

DR. ELI B. SILVERMAN

1    back.  When you say available, I'm not sure what you mean.

2        Q.    Do they make it available to the public?

3        A.    They make it available -- many of these cities

4    have independent bodies that review it and they often make

5    that available.  In New York there is no such body.

6        Q.    And these other cities that you're referring to

7    with an independent body, do they have subpoena power?

8        A.    Some do and some don't, I can't recall who does

9    and who doesn't.

10       Q.    Are you familiar with New York criminal procedure

11   law 160.50 and 160.55?

12       A.    We've established that I'm not a lawyer.  No, I'm

13   not.

14       Q.    The question is, are you familiar with those

15   sections?

16       A.    The answer is I'm not.

17       Q.    Are you aware of sealing provisions of New York

18   State law with criminal convictions?

19       A.    No.

20       Q.    Are you aware of laws that protect the identities

21   of sexual assault victims?

22       A.    I've heard about that.

23       Q.    Are you aware of New York State laws that protect

24   the identities of minors who are the victims of crime?

25       A.    I've heard about that.

1     Q.    On page 12, you reference the report of the crime

2     reporting committee to Commissioner Raymond W. Kelly

3     concerning Compstat auditing; is that right?

4     A.    Uh-huh.

5     Q.    Is that a yes?

6     A.    Yes.  Sorry.

7     Q.    Did you review that document in creating this

8     expert report?

9     A.    We reviewed that document when we wrote our book.

10    Q.    Is that a yes or no to my question?

11    A.    I tried to be responsive, not in creating this

12    report, but in writing the book.

13    Q.    And when did you write the book?

14    A.    The book came out in 2012.

15    Q.    So, when did you last read the report of the

16    crime reporting committee to Commissioner Raymond W. Kelly

17    concerning Compstat auditing?

18    A.    When we wrote some articles, I guess it wasn't in

19    the report.  It wasn't in the book, it was in articles

20    later.  So I read it when it came out in 2013.

21    Q.    Were you consulted in the creation of that

22    report?

23    A.    It depends what you mean by consulted.

24    Q.    Did you meet with the committee?

25    A.    Yes.

DR. ELI B. SILVERMAN

1    Q.    How would you characterize your meeting with the

2    committee?

3    A.    How would I characterize it?

4    Q.    Yes.

5    A.    What were my impressions of it?

6    Q.    What kind of meeting did you have with the

7    committee?

8    A.    John and I were invited to meet with the

9    committee, I can't tell you when.  There were two members

10   there, the third one wasn't there.  They were asking us

11   what our ideas were in assessing it in doing their job and

12   they shared with us some of their ways that they were going

13   to go about doing it.  They were very friendly and very

14   solicitous.

15   Q.    How many times did you meet with the committee?

16   A.    Once.

17   Q.    Did you believe that the committee took the

18   information you provided seriously?

19   A.    I believe they listened to us, but I also thought

20   that they were limited in to whether or not -- the were

21   limited in to what they can accomplish.

22   Q.    What do you mean by that?

23   A.    I mean that A, they were appointed by the

24   commissioner even though they were respected people.  They

25   weren't in an outside body.  They reported to the

DR. ELI B. SILVERMAN

1    commissioner.  They were dependent on the police department

2    for the resources and how do you address this.  So, they

3    said to us that they were essentially looking at the

4    auditing system.  And that's only part of the equation.

5            So, therefore, we concluded that this was --

6    could not -- no reflection on these people, they were very

7    competent people who had full-time jobs in law firms, both

8    the two people we met were in law firms, the third one was

9    also.  So there was a limit on how much they could do and

10   my sense of it I would characterize it as they knew that

11   this was an awesome task.  And that's the impression I got

12   from them, that's the impression I got from them.

13   Q.    Who were the two members with whom you met?

14   A.    McCarthy and the other -- the fellow who died, I

15   forget his name.  Italian name, I forget his name.  And the

16   third one, female, McCarthy couldn't make it.

17   Q.    Did the report generated by that committee

18   include any strengths with regard to the Compstat auditing

19   process?

20   A.    Yes.

21   Q.    What strengths were those?

22   A.    They felt that there was a good system, it was

23   being reviewed, they liked the way it was set up.

24   Q.    Do you agree with those conclusions by the

25   committee about the strengths of the Compstat auditing

DR. ELI B. SILVERMAN

1    process?

2        A.    I believe there are strengths.

3        Q.    But do you agree with what the committee said

4    were the strengths of the Compstat auditing process?

5        A.    Yes.

6        Q.    The committee found that misclassifications

7    generally fell within two categories, right?

8        A.    Sounds familiar.

9        Q.    Do you recall the committee stating that they

10   believe the first category of misclassifications were

11   errors surrounding identity theft, forgery and larceny in

12   cases involving stolen credit cards and Social Security

13   numbers?

14       A.    Sounds familiar.

15       Q.    And isn't it true that the committee did not

16   believe that those were intentional misclassifications?

17       A.    That's correct.

18       Q.    And the second category of misclassifications

19   found by the committee was the downgrading of complaint

20   reports with respect to robberies, burglaries and

21   larcenies.  Do you recall that?

22       A.    Yes.

23       Q.    And that the committee found that within that

24   category of misclassifications there was a pattern of

25   larcenies being downgraded to lost property in instances

DR. ELI B. SILVERMAN

1    where the complainants did not actually see their property

2    being stolen and did not feel that they were the victims of

3    crime.

4        A.    Yes.

5        Q.    Do you recall that?

6        A.    Yes.

7        Q.    So, did the committee's findings that many

8    instances of misclassifications were due to innocent

9    downgradings, so to speak, did that change your opinion

10   about Compstat in any way?

11       A.    This is not my opinion of Compstat.  This doesn't

12   relate to my opinion of Compstat.  This relates to my

13   opinion of the extent to which the crimes are categorized.

14   They could not -- they could not, for example, go into a

15   precinct and hire someone and report a crime and see

16   whether or not, in fact, that crime report was taken.  They

17   don't have that -- they didn't have that ability, that

18   ability to do that.  They acknowledged that to us.  They

19   cannot look at it.  They were looking at the formal

20   structure.  And so within the purview of what they looked

21   at, I agree.  But no one's actually gone deeper.  And

22   that's what we base our opinion on.

23       Q.    And your opinion is that much of the

24   misclassification, if not all, of crime complaints was due

25   to pressure from Compstat; is that correct?

DR. ELI B. SILVERMAN

1      A.    A good deal.

2      Q.    And the fact that the committee's report

3   indicated that many misclassifications were due to

4   misunderstandings doesn't change your opinion in any way?

5      A.    No, because I think it flies in the face of a

6   great deal of evidence.

7      Q.    Did you tell the committee that?

8      A.    I didn't meet with them after.  We only met with

9   them while they were preparing it, so how could I tell them

10  that?

11     Q.    My question was simply requesting a yes or no

12  answer, Dr. Silverman.

13     A.    Well, my answer is I can't answer that question

14  because I didn't meet with them.

15     Q.    So, the answer is no?

16     A.    Of course it's no.

17     Q.    Are you aware of any large city police

18  departments who have a better system of Compstat auditing

19  procedures?

20     A.    I'm aware of cities that release their

21  information to an independent third-party.  This is all

22  over the world.  This is not just New York City.  There are

23  cities all over the world that do this and there are cities

24  that don't do it.

25          When you finish this section, I need to run to

DR. ELI B. SILVERMAN

1    the bathroom.

2        Q.    If you'd like we can take a break right now.

3        A.    Okay.  Thank you.

4              MS. PUBLICKER METTHAM:  Time is 4:21.

5              (Whereupon, a brief recess was taken.)

6              MS. PUBLICKER METTHAM:  We are back on at

7        4:31.

8        Q.    You mentioned that cities do release information

9    to independent third-parties.  Can you name any of those

10   cities in the United States?

11       A.    Los Angeles, Pittsburgh, I can't recall any more

12   offhand.

13       Q.    And those cities are subject to department of

14   justice consent decree, correct?

15       A.    Well, I think Los Angeles is now no longer

16   subject to consent decree.

17       Q.    And Pittsburgh?

18       A.    I don't know if Pittsburgh is still under consent

19   decree.  I don't recall.  Newark is under consent decree.

20       Q.    And do they release their information to

21   independent third-parties?

22       A.    Yes.

23       Q.    In the next section, on page 13, is additional

24   information from audiotapes from Officer Schoolcraft,

25   plaintiff?

DR. ELI B. SILVERMAN

1    A.    Uh-huh.

2    Q.    Is that a yes?

3    A.    Yes.

4    Q.    You begin that section by mentioning your

5    recording of Sergeant Huffman and October 12, 2009; is that

6    right?

7    A.    October 12, 2009, I see that.

8    Q.    And you believe that her recording shows that she

9    clearly violated department guidelines; is that right?

10   A.    Yes.

11   Q.    Would you have to be an expert to understand that

12   what she said clearly violated department guidelines?

13   A.    An expert in what?

14   Q.    In policing.

15         MR. SMITH:  Objection to form.

16   A.    In police practices?

17   Q.    Yes.

18   A.    I would say that Dr. Eterno is an expert in

19   police practices.  So, I would say he does understand it.

20   Q.    Do you believe that you would have to be an

21   expert in police practices to understand that what Sergeant

22   Huffman said on October 12, 2009 clearly violated

23   department guidelines?

24   A.    I would say it depends on how you define the word

25   expert, seriously.

DR. ELI B. SILVERMAN

1      Q.    I define expert under the federal rules of civil

2   procedure.

3      A.    Which is?

4            MR. SMITH:  Well, he doesn't know what that

5            is.

6      Q.    Which is an expert akin to what you are here.

7            MR. SMITH:  I'll object to the form of that.

8            MS. PUBLICKER METTHAM:  That's fine, the

9            witness can answer.

10           MR. SMITH:  An expert is a term of art.

11           MS. PUBLICKER METTHAM:  That's fine, the

12           witness can answer.

13           MR. SMITH:  Okay.  Fine.  Given the fact

14           that there's been no definition, I object to the

15           form.

16     A.    I would say you have to be very knowledgeable to

17  answer that.  I don't know about the word expert.

18     Q.    Are you very knowledgeable about police

19  procedure?

20     A.    No.

21     Q.    Did you read Sergeant Huffman's deposition

22  transcript?

23     A.    No.

24     Q.    Have you heard any other recordings besides the

25  October 12, 2009 recording in which Sergeant Huffman is

DR. ELI B. SILVERMAN

1    heard?

2        A.    Not that I recall.

3        Q.    Do you know whether Sergeant Huffman is a

4    defendant?

5        A.    I do not know.

6        Q.    Have you heard any recordings in which Sergeant

7    Huffman explains that the reason she made those comments

8    was that a change had been made to cell phone provider

9    contracts and that people were claiming to have had a cell

10   phone stolen to get a replacement for a lost or broken

11   phone?

12       A.    I'm not aware of that.

13       Q.    If true, would Sergeant Huffman's statements be

14   an example of the downgrading of crime complaints for

15   Compstat purposes?

16             MR. SMITH:  Objection to form.

17       A.    I would have to see -- hear the transcript and

18   look at it and then make a judgment.

19       Q.    And you did not do that in this case?

20       A.    Well, since I didn't have it, I could not do it.

21       Q.    Your research was completely anonymous, correct?

22       A.    Yes.

23       Q.    You didn't gather the names of anyone surveyed in

24   2008 or 2012?

25       A.    No.

DR. ELI B. SILVERMAN

1    Q.    Who did the statistical analysis in your 2008 and

2    2012 surveys?

3    A.    It was primarily done by Professor Eterno.

4    Q.    What role did you play in the statistical

5    analysis of the 2008 and the 2012 surveys?

6    A.    I reviewed it, but he did the SPSS program.

7    Q.    So, you did not run the SPSS program?

8    A.    That's correct.

9    Q.    For either 2008 or 2012?

10   A.    That's correct.

11   Q.    Did you conduct your surveys using a random

12   sampling?

13   A.    It was a random sample, it was a sample of those

14   who were in the category that we surveyed.

15   Q.    And you surveyed retirees?

16   A.    That's correct.

17   Q.    Would a random sampling have given you a better

18   representative sample?

19   A.    Not necessarily because we didn't know the

20   categories of people, particularly for the second one, we

21   just sent it to all the retirees on the active list, so

22   that might not have been feasible.

23   Q.    I'm not asking you whether it was feasible.  I'm

24   asking whether a random sampling would have given you a

25   better representative sample of the NYPD as a whole?

DR. ELI B. SILVERMAN

1      A.     Only if we had a complete list of everyone, which

2   we didn't have.

3      Q.     Did you ask respondents in 2008 or 2012 when

4   pressure began for them?

5      A.     No, we asked them when they experienced it based

6   on the time they were in the police department.  Except, I

7   will say, that the only thing that really, I think,

8   addresses your question is, that we found that those who

9   were in the -- when we did the second survey, those who

10   were in the third year category, 2002 to 2012, were the

11   ones who indicated the most pressure.

12      Q.     But your survey didn't indicate when within 2002

13   to 2012 that pressure began?

14      A.     That's correct.

15      Q.     Did you ask any survey respondents whether they

16   violated anyone's rights?

17      A.     Whether they individually violated?  No, we never

18   looked at that as our purview, that's not our job.

19      Q.     What did you consider your job?

20      A.     Our job is to find out information, not to

21   prosecute people and not to find individual wrongdoing,

22   that's not our job, that's the police department's job.

23      Q.     But the survey was anonymous, correct?

24      A.     Yes.

25      Q.     So, it wouldn't be prosecution of survey

1   respondents if they indicated that they had violated

2   someone's rights?

3       A.      We asked individuals whether the pressure was

4   high, medium or low pressure to obey constitutional legal

5   rights, so that's one way of getting at your question.  But

6   as far as individual, we're not interested in individual

7   culpability.

8       Q.      But your question got at whether they felt

9   pressure not what they did as a result of that pressure,

10  correct?

11      A.      That's correct.

12      Q.      And you just stated that you asked them whether

13  they felt high, medium or low pressure, correct?

14      A.      Well, we gave them a Likert test of ten and as

15  you know -- L-I-K-E-R-T, that's a social psychologist who

16  first developed this scale.  So the high, medium and low is

17  a product of collapsing the one to ten scale.

18          So, to be more precise in responding to your

19  question, we didn't ask them high, medium, low, we asked

20  them the number and then we collapsed the number into high,

21  medium, low.

22      Q.      Why did you give numbers if you were going to

23  group the results by low, medium and high?

24      A.      Well, when you give numbers you give the people

25  an opportunity to indicate gradations of how they feel and

1    most people respond better on a scale of one to ten than

2    high, medium, low.  It's a more refined way of asking the

3    question.

4         Q.    Is it possible that if you had asked officers to

5    rate pressure low, medium or high you would have had

6    different results than how you rated low, medium or high?

7         A.    All I could say is anything is possible, but I

8    think ours is probably more accurate, our way, because

9    you're getting -- it's easier to get someone to focus on a

10   number and give them an option between three or four or

11   five and six or nine and ten or whatever, it's easier that

12   way.

13        Q.    Did you ever define the term pressure in your

14   surveys?

15        A.    No.

16        Q.    Why not?

17        A.    Because the word pressure is so well-known by

18   police and the police literature and there's a whole litany

19   of studies that use the word pressure in the organizational

20   literature and the police literature.

21        Q.    Do you believe that rank and file members of the

22   NYPD reviewed the police literature and litany of studies

23   you just mentioned?

24        A.    No, but I believe that they share the same

25   concepts of pressure that police have felt for years under

DR. ELI B. SILVERMAN

1    the same -- using that same term.

2        Q.    You gave individuals your contact information

3    with the survey in case they did not understand a question,

4    needed clarification or had any other questions; is that

5    correct?

6        A.    Yes.

7        Q.    How many people contacted you?

8              MR. SMITH:    As follow up for questions or

9              just in general?

10       Q.    How many people contacted you as a result of the

11   questionnaire?

12             MR. SMITH:    Objection to form.

13       A.    John's name was first.  So, you'd have to ask him

14   how many people.  I was not contacted.

15       Q.    So, did you speak to any individuals who had

16   questions about the questionnaire?

17       A.    No.  And I'm not sure there were any.

18       Q.    John never told you about any calls he received

19   as a result of listing his information on the

20   questionnaire?

21       A.    The only thing he shared with me is that people

22   wrote to him and said good for you for doing this, that's

23   the only thing I recall.

24       Q.    In your 2008 survey you asked for the respondents

25   served on the NYPD after 1994, correct?

DR. ELI B. SILVERMAN

1    A.    Yes.

2    Q.    Are you aware that the NYPD merged with New York

3  City Transit and New York City Housing in 1994?

4    A.    Yes.

5    Q.    And are you aware that at the time the New York

6  City Transit Police was the sixth largest police force in

7  the country?

8    A.    I didn't know that it was the sixth largest, no.

9    Q.    Are you aware that at that time the transit

10  police force had 4500 members?

11    A.    I knew -- I pretty well knew that.

12    Q.    Do you know whether captains and above who were

13  in the New York City Transit Police force are covered by

14  the current NYPD Captain's Endowment Association?

15    A.    Please repeat that.

16    Q.    Are you aware of whether captains and above who

17  were in the New York City Transit Police are covered by the

18  NYPD Captain Endowment's Association?

19    A.    I believe so.  I'm not sure.  I believe so.

20    Q.    Do you know whether captains and above who were

21  in the New York City Housing police force are covered by

22  the current NYPD Captain's endowment's Association?

23    A.    I believe so.

24    Q.    Is it possible that individuals who worked for

25  housing or transit had completely different jobs prior to

DR. ELI B. SILVERMAN

1    moving to the NYPD in 1994?

2        A.    It's possible.

3        Q.    And that the difference in jobs post 1994 merger

4    can explain the difference in pressure?

5        A.    Well, I would say anyone before 1994 would have

6    less pressure, whether they were in transit or housing or

7    the NYPD.

8        Q.    Why do you say that?

9        A.    Because that was -- 1994 was the advent of

10   Compstat.

11       Q.    And how do you know that the change in pressure

12   had to do with Compstat for certain individuals and not the

13   change from housing and transit to NYPD?

14             MR. SMITH:    Objection to form.

15       A.    I know there was -- I know Compstat was -- one of

16   the things that I noted is that Compstat was an excellent

17   way to integrate housing and transit into the police.    I

18   don't think the issue is whether or not you prior to '94

19   were in housing or transit.    I think the issue is the

20   advent in 1994 when this new system came in when

21   expectations were now created and transited and that

22   pertained to anyone who was in the police department

23   regardless of their previous service.

24       Q.    So, you believe no matter what their roles were

25   prior to 1994 every member of the NYPD's pressure increased

DR. ELI B. SILVERMAN

1    in 1994 as a result of Compstat?

2    A.    I believe it began to increase in 1994.

3    Q.    In your 2008 survey you instructed the

4    respondents to base their answers only on experiences that

5    occurred in 1994 and after; is that right?

6    A.    Yes.

7    Q.    And your survey was sent 14 years after 1994,

8    right?

9    A.    Yes.

10   Q.    Do you believe it could be difficult for someone

11   to differentiate between pre and post 1994 a decade and a

12   half later?

13   A.    It's always difficult.  You have that issue in

14   all survey research.  They call that in the literature

15   telescoping, you want them to focus on the most recent, we

16   ask them to, but that's an issue you inherit in these kind1

17   of surveys.  So I'm not suggesting that we're immune to the

18   limitations of all survey research.  Any survey, any survey

19   has limitations.  And you try to do the best you can,

20   acknowledge the limitations and move on and try to do other

21   surveys that may or may not confirm what you've done.

22   Q.    So, would you agree that it is a limitation of

23   your survey that you've asked officers to differentiate

24   between pre and post 1994 a decade and a half later?

25   A.    I agree that that's a limitation.

1    Q.    Did you ask the officers in the 2008 survey about

2    the differences between pre and post 1994 NYPD?

3    A.    Did we ask them to comment on the differences

4    between pre and post?

5    Q.    Yes.

6    A.    I don't recall if we did that.

7    Q.    Why not?

8    A.    Because we were -- you know, a survey, any survey

9    to be worth its salt has to be short.  We did a short

10   survey, anonymous survey, brief survey, and there's only so

11   much information you can capture in a survey.  So, there

12   are certain questions we did not ask.  But we tried to get

13   at that by asking them the issue of the pressures and other

14   items, but you can't capture everything in one survey,

15   that's why surveys are repeated.

16   Q.    And when you repeated the survey, did you find

17   out any differences pre and post 1994?

18   A.    Well, I think we tried to refine it and as you

19   know in the second survey we broke it up into three periods

20   instead of two periods.  And we broke it up into the first

21   pre-Compstat period and then the Compstat period of 2000 --

22   1995 to 2001 and then we introduced -- and then we broke up

23   that into a third category, 2002 to 2012, to capture the

24   administration at that time, that was the introduction of a

25   new administration, that was the Bloomberg/Kelly era, from

DR. ELI B. SILVERMAN

1    2002 to 2012.

2         So, maybe in an awkward way or backward way or

3    roundabout way, I think we did something in the direction

4    that you may be suggesting and that it tried to capture

5    distinctions in different periods.

6    Q.    I don't actually believe that answered the

7    question which is, whether the 2012 survey corrected the

8    limitation in the 2008 survey about determining what

9    differences existed pre-1994 and post 1994 in the NYPD.

10   A.    Well, then I guess I have to disagree with you

11   because we broke it down into three periods and we asked

12   them their experience, you know, to address those three

13   periods.  So, I don't know what else to say.

14   Q.    And what did that qualitatively tell you about

15   the differences pre-1994 and post?

16   A.    It told us that in the -- what the data told us

17   that if you look at -- there's -- it increased in the post

18   era up until 2001, but not to the extent that it increased

19   in the 2002 to 2012.

20   Q.    Yet again you're talking about 2002 to 2012 and

21   I'm asking you about 1994.

22   A.    It showed that 1994 to 2001 was higher than --

23   no, not all the areas, in some areas, than up until 1994.

24   Q.    Are all retired members of the service over the

25   rank of captain members of the CEA?

DR. ELI B. SILVERMAN

1    A.    No.

2    Q.    How many are not?

3    A.    Chiefs are not members.

4    Q.    Aside from chiefs, are all members of the service

5    over the rank of captain members of the CEA?

6    A.    Those who join the CEA, anyone who is above the

7    rank of captain is eligible to be a member of the CEA

8    except the chief.

9    Q.    So, retired members of the service who achieved

10   the rank of captain, are they automatically members of the

11   CEA post retirement?

12   A.    No, they have to join it.

13   Q.    And do they have to pay dues each year?

14   A.    I don't know.

15   Q.    Do you know whether the retirees that you

16   surveyed were dues paying members of the CEA?

17   A.    I don't know.

18   Q.    Do you think that was important information to

19   know?

20   A.    There may be, I can't think of a reason.

21   Q.    Do you believe there's any difference in retirees

22   who pay dues and choose to be affiliated with an endowment

23   association compared to those who choose not to?

24             MR. SMITH:  Objection to form.

25             THE WITNESS:  Do I answer that?

DR. ELI B. SILVERMAN

1           MR. SMITH:  Yes.

2      A.    My supposition is that those who choose to join

3  any union or affiliation after they retire would be more

4  inclined to be associated and have an affinity for the

5  organization that they left.

6      Q.    On what do you base that opinion?

7      A.    Well, the lawyers who go to join law groups after

8  they leave.  I know in my circle not everyone has joined

9  the -- I'm a professor of emeritus, retirees, I know the

10  ones who join, the retirees, are those who have a stronger

11  connection to the institution.

12           And, generally, if you don't have a -- like

13  people who belong to alumni associations or invited or

14  involved in an alumni association, they generally have a

15  stronger connection, they feel a stronger connection to the

16  institution that they left.

17           So they're more inclined to join organizations

18  where they'll find other people of the same ilk and people

19  that have something in common with them.

20      Q.    But unions are different than alumni groups and

21  groups of emeritus professors, correct?

22      A.    They are different and the same.

23      Q.    Well, unions actually can change pension

24  benefits, health and medical benefits for the retirees of

25  that union, correct?

DR. ELI B. SILVERMAN

1    A.    I don't know.  I don't know if retiree benefits

2    could be changed, I don't know.

3    Q.    Well, unions lobby on behalf of their members

4    including the retired members to get them the best benefits

5    available, correct?

6    A.    Right, but I don't know if they change the

7    benefits of those who are already retired, I'm not aware of

8    that.  They may change the benefits of those who are going

9    to retire.  I'm not aware of that they can change the

10   benefits of those who are already retired.  Maybe if you're

11   in Detroit, but I'm not aware that that's the case.

12   Q.    You are not aware of New York State law regarding

13   unions and retirees?

14   A.    That's correct.

15   Q.    Do either of your surveys identify whether a

16   respondent had ever held a position of commanding officer?

17   A.    Yes.

18   Q.    Which one?

19   A.    The second one.

20   Q.    And why did you include that question in the

21   second one?

22   A.    Because we were criticized by the police

23   department on the first one.

24   Q.    And did you analyze those responses?

25   A.    I don't recall.  I think we didn't do it for

DR. ELI B. SILVERMAN

1    this.  We will be working on it.

2       Q.    Have you done analysis of the question regarding

3    whether a respondent was commanding officer to date?

4       A.    No, that's on our agenda.

5       Q.    Do your surveys identify whether a respondent had

6    ever attended a Compstat meeting?

7       A.    I don't think so.  I would have to look at the

8    survey, if you permit me.  Would you permit me?

9       Q.    Yes.

10             MS. PUBLICKER METTHAM:  Actually, you know,

11             I have as a previous deposition exhibit from

12             Dr. Eterno, Exhibits C and D from the Eterno

13             deposition I'm handing to the witness.

14       A.    Number 17, were you ever the commanding officer

15    of a precinct.

16       Q.    And my question to you was not that.

17       A.    I'm sorry.  I misunderstood your question.

18       Q.    My question to you was whether either of your

19    surveys identified whether respondents had ever attended a

20    Compstat meeting?

21       A.    Well, my answer to that is if you were a

22    commanding officer of a precinct you attended a Compstat

23    meeting by definition.

24       Q.    That's your assumption?

25       A.    Well, it's an assumption I'll be willing to

DR. ELI B. SILVERMAN

1   defend in court.

2       Q.   Are you aware of all the different bureaus within

3   the NYPD?

4       A.   Yes.

5       Q.   Are you aware of bureaus that don't have law

6   enforcement functions?

7       A.   Yes.

8       Q.   And are you aware that each one of those bureaus

9   and commands within those bureaus have commanding officers?

10      A.   Yes.

11      Q.   And it's your understanding that every single

12  commanding officer attends Compstat?

13               MR. SMITH:  Objection to form.

14      A.   No, that's not what I said.

15      Q.   What did you say?

16      A.   I said every commanding officer of a precinct.

17      Q.   Okay.  That's the clarification, is that you're

18  talking about precinct?

19      A.   Well, I pointed to number 17.

20      Q.   But my question to you was whether the survey

21  asked whether they'd ever attended Compstat?

22               MR. SMITH:  The survey speaks for itself.

23      Q.   You can answer the question.

24      A.   I'm not trying to be difficult.  What I'm trying

25  to say is, if you're a commanding officer of a precinct and

DR. ELI B. SILVERMAN

1     then you have by definition attended a Compstat meeting.

2     Q.    That's your assumption?

3     A.    Well, you can call it an assumption.

4     Q.    Do you know that for a fact?

5     A.    If there is a commanding officer who never

6     attended a Compstat meeting, I would say he was -- he or

7     she was there for a very short time or was sick a lot.

8     Q.    And does your survey ask that question?

9     A.    No.

10          MR. SMITH:  Which one?  Short time or sick a

11          lot?

12          MS. PUBLICKER METTHAM:  He answered the

13          question.

14    Q.    To how many individuals was the 2012 survey sent?

15    A.    It was over 4,000, something like that.  I could

16    look it up.  It was something like 4,197.  I can't remember

17    the exact number.  I have it, if you want.

18    Q.    Yes, please.

19    A.    I don't have it with me.  It was over 4,000.

20    Q.    And what percentage of the entire population of

21    retired NYPD officers is reflected by that number to whom

22    the surveys were sent?

23          MR. SMITH:  You want to rephrase that.

24          MS. PUBLICKER METTHAM:  No.

25          MR. SMITH:  Objection to form.

DR. ELI B. SILVERMAN

1      A.     I don't know.

2      Q.     Do you know how many retired members of the

3    service there are?

4      A.     There is a lot.  I don't know the total number,

5    30, 40, I don't know what it is.

6      Q.     Did you ever seek the number of retired NYPD

7    officers in 2008 or 2012?

8      A.     Not personally.

9      Q.     Do you know what the breakdown in rank of the

10   respondents to your 2012 survey was?

11     A.     I don't have it memorized.

12     Q.     Do you know whether the breakdown in rank of the

13   respondents to your 2012 survey matches the breakdown of

14   ranks of retired NYPD officers for that same time period?

15     A.     It's not precise.

16     Q.     And how do you know that?

17     A.     Because I heard it somewhere, but I forget where.

18     Q.     Does it matter to you that it was not precise?

19     A.     Well, does it matter?  You always want to do the

20   best you can.  We didn't have access to the official data.

21   So, the way we proceeded was to do it the best way we

22   could.

23            Now, we knew that there were certain limitations

24   that's why we did a second study which was even larger,

25   over 4,000, we had, by the way, a 48 percent response rate,

DR. ELI B. SILVERMAN

1    48.2 which is exceedingly large by survey research

2    standards.  And we did the best we could.  Obviously there

3    are limitations, but the interesting thing is there's

4    limitations on every survey even nationally-known surveys

5    that are widely applauded.  I can give you an example if

6    you'd like.

7        Q.    Sure.

8        A.    The Gallup Pole, which is a nationally recognized

9    survey on political issues, surveys about a thousand

10   people, a thousand to 1500 by phone calls, by the way.

11   15 percent of the phone calls are on cell phones.  But the

12   population in America that solely relies on cell phones is

13   about 38 percent.  So just by that definition it's

14   distorted.

15            There are many -- even the well-respected

16   national crime victim services crime survey that's done by

17   the Bureau of Justice statistics does about 40,000

18   households, about 70,000 people, excludes the military

19   personnel, it excludes people in correctional institutions,

20   and others.

21            So, all I'm suggesting to you is that there are

22   weaknesses in all surveys and the fact that our two surveys

23   generally paralleled one another is an example of what they

24   call and classify in its research triangulation, where you

25   try to get at the same phenomena for different ways.

DR. ELI B. SILVERMAN

1    Q.    The Gallup Pole is a random pole, correct?

2    A.    That's correct.

3    Q.    Your survey is not?

4    A.    That's right.

5    Q.    Is the National --

6    A.    But it's a --

7    Q.    If you will let me finish my question.

8    A.    I'm sorry.

9    Q.    Is the NCVS survey a random survey?

10   A.    Yes.

11   Q.    Did you differentiate in your survey between

12   members assigned to the different bureaus?

13   A.    No.

14   Q.    Do you believe that officers in different bureaus

15   and assignments have the same pressure?

16   A.    No, it depends on your position.

17   Q.    So, is it possible that many of the individuals

18   who marked high pressure were in the same bureau?

19   A.    Well, most of them were -- I don't know, when

20   you're saying bureau, like in transit bureau; is that an

21   example of what you would say?

22   Q.    Are you familiar with the bureaus within the

23   NYPD?

24   A.    Yeah.  So, I don't know the answer to that

25   question.

DR. ELI B. SILVERMAN

1    Q.    Are you familiar with traffic stat?

2    A.    Yes.

3    Q.    And are you aware that those assigned to the

4    transit bureau attend traffic stat?

5    A.    Yes.

6    Q.    Is it possible that responses in many instances

7    are based on pressure from traffic stat and not based on

8    Compstat?

9    A.    In my lingo, traffic stat is an offshoot of

10   Compstat.  Traffic stat, Narc stat, they all evolve from

11   Compstat, they're offspring.  So if you want to make that

12   distinction, fine, but I would offer -- there's a --

13   they're generically the same and that's all I would say.

14   Q.    Are traffic stat, Narc stat and Compstat all led

15   by the same members of the service?

16   A.    Not usually.

17   Q.    Do you believe that pressure is the same at Narc

18   stat, traffic stat and Compstat?

19             MR. SMITH:  Objection to form.

20   A.    It can be the same.

21   Q.    It can also be different, correct?

22   A.    It depends on the time, it depends on the people.

23   Q.    You understand that certain precincts in the NYPD

24   have higher crime than others?

25   A.    Yes.

DR. ELI B. SILVERMAN

1      Q.    And you understand that certain precincts in the

2    NYPD have more civilian complaints and radio runs, correct?

3      A.    Yes.

4      Q.    And do you believe that precincts with higher

5    crime, higher radio runs may have greater pressures on

6    those officers than officers assigned to precincts with few

7    crimes and few radio runs?

8                MR. SMITH:  Objection to form.

9      A.    Yes.

10     Q.    And your survey has no questions that would get

11   to these differences in pressure, correct?

12     A.    No, that would be another survey.

13     Q.    Have you done that survey?

14     A.    No, but it would be -- it's an interesting

15   survey, I may take you up on that.

16     Q.    Did you analyze the narrative responses provided

17   with the surveys?

18     A.    Yeah, a long time ago, I did.

19     Q.    Did you notice complaints about the Compstat

20   meetings were based on complaints of ridicule and

21   embarrassment?

22     A.    There were some.

23     Q.    Did you see any narrative responses that stated

24   that certain questions could not be accurately answered as

25   written?

DR. ELI B. SILVERMAN

1    A.    You mean questions in our survey?

2    Q.    Yes.

3    A.    No, I didn't see that.

4    Q.    Did you see narrative responses from individuals

5    who explicitly stated that their ratings were based on what

6    they heard at CEA meetings and from individuals currently

7    not on the force?

8    A.    No.

9    Q.    Turn to page 24.  You claim that the

10   centralization of decision-making and reduction of lower

11   level flexibility, autonomy and discretion parallels a

12   national study of U.S. police departments not including the

13   NYPD which have adapted the Compstat system.

14   A.    Yes.

15   Q.    And in coming to that conclusion you cited a

16   study from 2001?

17   A.    As I said before, that's a study in 2001, but

18   that study has been updated later.

19   Q.    But you didn't cite to the updated study,

20   correct?

21   A.    No.

22   Q.    Why not?

23   A.    It's just an oversight.

24   Q.    And when was the new study released?

25   A.    Oh, I would say two, three years ago.

DR. ELI B. SILVERMAN

1    Q.    Did you rely on the updated study in coming to

2    the conclusions in your report?

3    A.    I'm aware of the updated study, I didn't look at

4    it.

5    Q.    So, you relied on the 2001 study for this expert

6    report; is that correct?

7              MR. SMITH:  Objection to form.

8    A.    Both studies say essentially the same thing, so I

9    can't tell you what I relied on.  I just probably had that

10   reference more handy.

11   Q.    What are the differences in the two studies?

12   A.    The latest studies refine it more.  They look at

13   -- they look at some additional cities.  They -- I can't

14   tell you which ones, they also talk about the diminution

15   of problem solving in those cities and they talk about the

16   diminution of officer discretion in those cities.

17   Q.    Did the updated study include the NYPD?

18   A.    No.

19   Q.    In this section you claim that the massive

20   deployment to address quality of life crimes became favored

21   over more surgical strikes; is that right?

22   A.    Yes.

23   Q.    On what do you base that opinion?

24   A.    I'm talking about the -- well, one would be an

25   example of the impact program, where you bring a lot of

1    rookie cops from outside a particular area and you place

2    them in an area where it's a very different area from where

3    they're used to from where they came with limited

4    supervision and it's a massive deployment of rookie cops

5    that are -- and where they go is determined from

6    headquarters.

7        Q.    Are you referring to operation impact --

8        A.    Yes.

9        Q.    -- or impact overtime?

10       A.    I don't know -- I don't know the difference.  I

11   mean, there is operation impact and they get overtime.  I'm

12   really referring to operation impact.

13       Q.    So, by operation impact you're referring to,

14   quote, unquote, rookie officers out of the police academy?

15       A.    Yes, ma'am.

16       Q.    And it's your understanding that the purpose of

17   impact is to place officers in a precinct that they're not

18   comfortable with or not familiar with?

19       A.    No, that's putting words in my mouth.

20       Q.    I'm sorry, I misunderstood what you said then.

21       A.    I said the purpose -- I said often they are

22   placed in areas they are not familiar with, they may come

23   from the suburbs, they may come from other areas, but they

24   are assigned to high crime areas, as you know and with

25   little tutelage right out of the academy and often are

DR. ELI B. SILVERMAN

1  asked to get X number of collars or summons or arrests with
2  little supervision of a supervisor.
3     Q.    Regardless of the operation impact officers who
4  live in the suburbs may be assigned to a precinct in the
5  city, correct?
6     A.    Oh, sure.
7     Q.    And the impact program, as you referred to it, or
8  operation impact, are you aware of what the officer to
9  supervisor ratio is?
10    A.    I've heard four to one, something like that.
11 I've also heard that that's the official and I've heard
12 that's not reality.
13    Q.    What have you heard the reality is?
14    A.    I've heard it's much higher.
15    Q.    Like what?
16    A.    Ten, twelve, fifteen to one, sometimes very
17 little, occasionally.
18    Q.    And from whom have you heard this?
19    A.    From people who have worked in that.
20    Q.    And you won't tell me any of those names?
21    A.    Of course not, I can't divulge that.
22    Q.    Are you aware that the ratio of supervisors to
23 officers in operation impact is significantly greater than
24 the ratio of supervisors to officers in regular patrol?
25    A.    If you're telling me what the official is, I

DR. ELI B. SILVERMAN

1    would have to accept it.

2         Q.    What is your understanding of what the supervisor

3    to officer ratio is in regular patrol?

4         A.    I don't know the official number.

5         Q.    Do you know what the unofficial number is?

6         A.    A lot of it -- it depends on how many supervisors

7    are available.  I find, frankly, the numbers are totally

8    irrelevant because I've looked at numbers in the police

9    department, I remember looking -- there's an official tally

10   of how many community policing officers there are in each

11   precinct, and they will tell you, but you go out in the

12   precinct, which I have, and there aren't those numbers.

13         So, frankly, I don't have much confidence in the

14   numbers.  And apparently the new police commissioner

15   doesn't either, because he spoke to the same point that I

16   just made.

17         Q.    What point is that?

18         A.    That recently before the city council he said

19   that there were too many rookie cops in impact zones

20   without sufficient supervision.

21         Q.    Do you know how large impact zones are?

22         A.    No.

23         Q.    Are you aware that many impact zones are just a

24   couple of blocks?

25         A.    Yes.

DR. ELI B. SILVERMAN

1      Q.    And you don't believe that flooding areas that

2    are only a couple of blocks in size would be a surgical

3    strike?

4      A.    Not if you -- in my definition, not if they're

5    instructed to get their numbers.

6      Q.    You also claim that inadequate evaluation and

7    tactical intensification has been accompanied by increased

8    centralization; is that right?

9      A.    Yes.

10     Q.    What do you mean by inadequate evaluation?

11     A.    There's a concept in organizations called double

12   loop learning.  Where you examine your premises and what

13   you've done.  And this was done in the early years of

14   Compstat.  And things were evaluated to see whether or not

15   it's worked and you would evaluate in terms of how

16   resources are allocated to various units.

17          So, for example, the program that I referred to

18   earlier, the Satcom program that was introduced in 1996

19   that I spoke to earlier, was disbanded -- it was a radical

20   relearning process and it was disbanded in 2004/2005 by the

21   commissioner, and it was based on what I would consider

22   inadequate evaluation.

23     Q.    So, when you refer to inadequate evaluation, are

24   you referring to evaluation of policies and practices or

25   are you referring to the evaluation of individual officers?

DR. ELI B. SILVERMAN

1     A.     I'm not talking about individual officers.  I'm
2   talking about the former.

3     Q.     So, when you say inadequate evaluation, you mean
4   inadequate evaluation of departmental policies and
5   practices?

6     A.     That's correct.

7     Q.     What do you mean by tactical intensification?

8     A.     Well, I think operation impact would be one
9   example.  It started off small in a few areas, and the
10  enlargement of the street crime unit would be another
11  example when it was tripled in size.  When the head of the
12  agency was against the tripling of the size of the street
13  crime unit because these people at that time were very
14  carefully selected and screened, but whenever you hire
15  people in a rushed fashion, certain people are going to
16  creep into that and wouldn't be the right people for those
17  positions.

18    Q.     How many Compstat meetings have you attended?

19    A.     I never counted.  I would say well over a

20  hundred.

21    Q.     Are those all within the NYPD?

22    A.     Yeah, within the hundred I attended, yeah, NYPD.

23    Q.     And what years did you attend those 100 Compstat

24  meetings?

25    A.     What periods, year periods?

DR. ELI B. SILVERMAN

1       Q.      What years?

2       A.      I started in 1994 and I think the last one was

3    2007, or 2008.

4       Q.      Did you attend the Compstat meetings regularly?

5       A.      At one period I did.

6       Q.      When did you attend the Compstat meetings

7    regularly?

8       A.      In the early years.

9       Q.      So, from 1994 until when?

10      A.      When you say regularly, you're not meaning every

11   meeting, are you?

12      Q.      No.

13      A.      Okay.  I would say from 1994 to around regularly

14   until around 2000, 2001.

15      Q.      How many Compstat meetings did you attend after

16   2001?

17      A.      Maybe six.  I'm guessing.

18      Q.      Do you recall which boroughs were presenting in

19   the six Compstat meetings you attended after 2001?

20      A.      No.

21      Q.      Do you recall any of the individuals presenting

22   at Compstat?

23      A.      Do I recall their names?

24      Q.      Yes.

25      A.      No.

DR. ELI B. SILVERMAN

1    Q.    Do you recall any of the chiefs who were present?

2              MR. SMITH:  At six, approximately, after

3              '01?

4              MS. PUBLICKER METTHAM:  Yes.

5    A.    I'd have to look whoever was chief at that time.

6    Well, there was Chief Esposito.

7              MR. SMITH:  She is requesting what your

8              recollection is not --

9              MS. PUBLICKER METTHAM:  He just testified as

10             to what he recalled, Mr. Smith.  Please don't

11             interrupt him.

12             MR. SMITH:  No, he didn't.

13             MS. PUBLICKER METTHAM:  He just said I

14             recall Chief Esposito.

15             MR. SMITH:  I should have cautioned you that

16             you can draw inferences --

17             MS. PUBLICKER METTHAM:  Mr. Smith, stop

18             coaching the witness in the middle of a question.

19             MR. SMITH:  You can draw all the inferences

20             you want, but if she's asking you for a

21             recollection, that's a very different thing.

22             Okay?

23             MS. PUBLICKER METTHAM:  Mr. Smith, he was in

24             the middle of a question.  He just testified to a

25             specific recollection and you interrupted and

DR. ELI B. SILVERMAN

```
 1              coached the witness.  I'm going to ask you again
 2              not to do so.
 3                   Please mark that for a ruling.
 4                   MR. SMITH:  I didn't coach the witness.  I
 5              didn't coach the witness.  I actually just gave
 6              him some pretty standard advice which was to
 7              make sure that he understood the difference
 8              between drawing an inference and responding to a
 9              question which called for what his recollection
10              was.
11         Q.   Could you, please, finish answering your
12    question.
13         A.   Can I ask you to repeat it.
14         Q.   Yes.  The question was, which chiefs were present
15    at the Compstats that you attended after 2001?
16         A.   I recall Chief Esposito.
17         Q.   Do you recall anyone else?
18         A.   I don't recall their names.
19         Q.   And what do you recall about those Compstat
20    meetings after 2001?
21         A.   They seemed like typical Compstat meetings.
22    Sometimes it was adversarial, sometimes it was collegial.
23              My observation is that over the years that a lot
24    of the meaning takes on the tone -- is guide by the tone of
25    whoever the inquisitors are.
```

DR. ELI B. SILVERMAN

1    Q.    Did you notice differences in the Compstat

2    meetings pre-2001 and post?

3    A.    I can't make that yearly description.  I can only

4    answer your question by saying did I notice differences in

5    Compstat meetings based on who were the chief inquisitors,

6    and you can figure out the years, if you would, but that's

7    the only way I could respond to that.

8    Q.    But you asked your survey respondents to answer

9    with a year and that year was 2001, correct?

10   A.    I'm sorry?

11   Q.    When you asked your survey respondents to respond

12   about pressures they experienced, you gave them a specific

13   year, correct?

14   A.    Yeah.

15   Q.    And one of those years was 2001?

16   A.    Yeah -- no, we said within a period.  We said

17   within a period.

18   Q.    Within a period?

19   A.    Yeah.

20   Q.    So, I'm asking you, prior to 2001 and after 2001,

21   did you experience differences?

22   A.    I experienced differences not based on years.  I

23   experienced differences based on who was asking the

24   questions.  So, if you -- if we could identify who was

25   asking the question in what year then I could --

DR. ELI B. SILVERMAN

1      Q.    So, if you were to take your own survey, and you

2    were asked about the pressure from Compstat from 1994 to

3    2000, what number would you rank it?

4      A.    It wasn't pressure on me.

5      Q.    What pressure did you observe at the Compstat

6    meeting?

7      A.    I don't feel that's a fair question to ask,

8    because pressure is something someone feels.  I can't tell

9    you what someone felt.  I can only tell you stories that

10   people tell me, but I can't tell you Mr. Joe Blow felt

11   eight pressure and Joe Smith -- I could surmise, maybe, but

12   I can't tell you what so-and-so felt at a particular

13   meeting.

14     Q.    You did testify earlier that you believe all

15   officers felt greater pressure after 1994, correct?

16     A.    Yes.

17     Q.    So, you can, in fact, talk about pressures on

18   individual officers, right?

19              MR. SMITH:  Objection to the argumentative

20         question.

21     A.    I don't follow that.

22     Q.    So, you can't tell me based on the year 2001 pre

23   or post whether you saw chiefs exerting greater pressure at

24   Compstat; is that correct?

25     A.    That's not the question I heard you ask.  The

DR. ELI B. SILVERMAN

1    question I heard you ask is whether they felt pressure.

2         Q.    I did not ask about whether anybody felt

3    pressure.

4         A.    Then I misheard.

5         Q.    Did you observe greater pressure prior to 2000 or

6    after 2000 at Compstat meetings?

7         A.    In some cases -- I was only in a few meetings

8    after 2002, as I testified to you.  So, it's very hard for

9    me to generalize on that.

10        Q.    So, you can't generalize?

11        A.    I can't generalize on a few meetings.  I can only

12   generalize on who I saw asking questions.

13        Q.    And what were the differences you saw based on

14   who was asking the questions at these Compstat meetings?

15        A.    Well, I saw when Police Commissioner McCarthy was

16   there, I saw -- when he was one of the inquisitors I saw

17   high pressure.  Which subsequent stories have indicated in

18   reports in Chicago where he is now the head of police

19   department suggesting that that's carried over.  So I saw

20   that.

21        Q.    And how was that greater pressure observed by you

22   at the Compstat meeting?

23        A.    I would say tone of voice, the degree of

24   civility.  The way someone was treated, the respect

25   accorded someone.  How you say it, what you want done.

DR. ELI B. SILVERMAN

1    Q.    Earlier I asked if you recalled the chiefs who
2   were present at the Compstat meetings you attended and you
3   stated you only recalled Chief Esposito; is that correct?
4       A.    I thought you said only in the last period.
5       Q.    So, Chief McCarthy you're referring to in the
6   pre-2001 period?
7       A.    I guess he -- when did he leave the department?
8   I think he was there the same -- he overlapped with
9   Esposito.  I recall previous chiefs, if that's what you're
10  asking me.
11      Q.    When did you observe Compstats in which Chief
12  McCarthy was present?
13      A.    He wasn't chief, he was a deputy -- he was the
14  head of policy or something.  I don't remember the year.
15      Q.    Was it pre or post 2001?
16      A.    I don't remember the year he left.  He went first
17  to Newark as chief of the department, so I don't remember.
18      Q.    So, a decade and a half later you're finding it
19  difficult to recall specifics of Compstat meetings you
20  attended?
21          MR. SMITH:  Objection to form.
22      A.    I can recall what I observed.  I would have to
23  look at when I actually -- I wasn't a regular participant.
24  I wasn't a recipient of pressure.  To think to equate me
25  with someone who regularly -- and which it sounds to me

DR. ELI B. SILVERMAN

1      what you're doing, is equating me with a participant who

2      has to go up every time that precinct is being called up in

3      terms of a Compstat meeting and then have to come up with a

4      plan is, I think, apples and oranges.  I don't think I'm in

5      the same boat that they are and they would say to me, you

6      know, we have to come here, why do you come here, you don't

7      have to come here.

8          Q.    Why did you go to the Compstat meetings?

9          A.    Because I was studying it.

10         Q.    So, the purpose of going there was to study these

11     Compstat meetings?

12         A.    Yes, because I was writing a book on it.

13         Q.    So, your stated purpose was to learn about the

14     Compstat process?

15         A.    Yes.

16         Q.    Do you know if anyone at Schoolcraft's apartment

17     on October 31, 2009 knew that he had reported misconduct?

18         A.    I'm sorry, anyone at his -- I'm sorry.

19         Q.    Do you know whether anyone who appeared at

20     Schoolcraft's apartment on October 31, 2009 knew that he

21     had reported misconduct?

22                    MR. SMITH:  Objection to form.

23         A.    I don't know.  I'm assuming people knew, I'm

24     assuming the precinct commander would have known that, but

25     I don't know that for a fact.

1      Q.    On what do you base that assumption?

2      A.    I'm assuming that this was known at the time, but

3   I'm willing to withdraw it, I don't know it for a fact.

4      Q.    And what do you base the assumption that people

5   knew?

6      A.    Because it's alleged that Quality Assurance

7   called the precinct and the precinct knew that he had gone

8   to Quality Assurance because they asked for him, that's my

9   assumption.

10      Q.    Are you aware that Adrian Schoolcraft was the

11   telephone switchboard operator and answered all calls at

12   the precinct?

13              MR. SMITH:  Objection to the form.

14      A.    No.

15      Q.    On what do you base the opinion that you just

16   stated, that Quality Assurance division called the precinct

17   and that the precinct knew?

18      A.    I think it was in one of the tapes or -- I think

19   it was in one of the tapes.

20      Q.    And when you say one of the tapes, do you mean

21   one of the tapes that was recorded and sent to the Village

22   Voice and Brian Lehrer Show?

23      A.    I'm not -- I'm not relating to the Brian Lehrer

24   Show, but --

25      Q.    I'm sorry, I meant, this American Life Show.

DR. ELI B. SILVERMAN

1      A.    Okay.  I don't remember which one.  I thought I
2    heard it.

3      Q.    So, you thought you heard it and it would have
4    been on one of those two --

5      A.    Yes.

6      Q.    -- sets of recordings?

7      A.    That's correct.

8      Q.    In your report claims that Schoolcraft is not an
9    EDP, but an honest, hardworking police officer trying to
10    expose misconduct; is that right?

11     A.    Uh-huh.

12     Q.    Is that a yes?

13     A.    Yes.  That's a yes.

14     Q.    How do you know that he's honest?

15     A.    Professor Eterno assessed that whole situation
16    and I have to defer to his judgment.

17     Q.    So, you have not made an assessment over whether
18    Adrian Schoolcraft is an honest, hardworking police
19    officer?

20     A.    I don't have information one way or the other.
21    I'm not commenting on his personality or his conduct.
22    That's not -- I don't envision that as my role.

23     Q.    So, that section of the report was written by
24    Dr. Eterno?

25     A.    That sentence.

DR. ELI B. SILVERMAN

```
 1                MS. PUBLICKER METTHAM:  Let's take a quick
 2           break.  It's 5:38.
 3                (Whereupon, a brief recess was taken.)
 4                MS. PUBLICKER METTHAM:  We're back on at
 5           5:46, and I have no further questions.
 6      EXAMINATION BY
 7      MR. KRETZ:
 8      Q.    So, we've met, and you know I represent Deputy
 9      Inspector Steven Mauriello?
10      A.    Yes.
11      Q.    And I have some follow-up questions for you.
12      A.    Sure.
13      Q.    I'll try to get through them quickly.  So, let me
14      start here.
15            Your report that you did with Dr. Eterno
16      addresses the decision to declare Adrian Schoolcraft an EDP
17      on October 31, 2009; is that right?
18      A.    Correct.
19      Q.    And you indicated that that portion of the report
20      was originally drafted by Mr. Eterno; is that correct?
21      A.    That's correct.
22      Q.    Did you review that portion of the report after
23      he drafted it?
24      A.    We review everything that the other person
25      writes.
```

DR. ELI B. SILVERMAN

1      Q.    Okay.  And do you believe you understood what was

2   written there?

3      A.    I understood what he said.

4      Q.    And the final version of it you understood?

5      A.    Yes.

6      Q.    And you agreed with it?

7      A.    As I said before, I agree because I don't have

8   confidence in this area and that he does and I have

9   confidence in his assessment.

10     Q.    What I want to know is whether your report draws

11   the collusion, that the representatives of the NYPD did not

12   adequately indicate the basis for declaring Schoolcraft an

13   EDP on October 31st?

14     A.    Can you show it to me.

15     Q.    You're welcome to look at it.

16              MR. SMITH:  Are you talking about the

17              report; you want to show him the report?

18              MR. KRETZ:  Yes, Exhibit A.

19     Q.    Page 9, I think, is where that subject is

20   discussed.

21     A.    Okay.  So, where are you on page 9?

22     Q.    Well, I really want to know your understanding,

23   so you can look anywhere throughout that section.  I want

24   to know, does the report conclude, is the opinion expressed

25   that NYPD did not properly explain in any documentation

DR. ELI B. SILVERMAN

1    what the basis was for declaring Schoolcraft an EDP?

2                MR. SMITH:  Objection to form.

3        A.    That's how I read this document.

4        Q.    Does the report express a view on whether or not

5    Schoolcraft was an EDP on October 31, 2009?

6        A.    I think the report suggests that there was no

7    basis for labeling him an EDP, that's how I read this

8    report.

9        Q.    And you can understand how I'd like to make sure

10   we all understand just what that means, right?

11              So, do you mean to say, based upon your or

12   Dr. Eterno's independent review and analysis of all

13   relevant information that you drew the conclusion together

14   that Schoolcraft was not an EDP on October 31, 2009 --

15              MR. SMITH:  Objection to form.

16       Q.    -- or alternatively did you just decide there was

17   inadequate information recorded on whether or not he was?

18       A.    I think the answer to your question, I'm trying

19   to be responsive, I think the answer is based on the

20   information that Dr. Eterno had coupled with his experience

21   in the police department led him to the conclusion that

22   there was not a reason to declare him an EDP.

23       Q.    So, the information relied upon Dr. Eterno to

24   draw that conclusion?

25       A.    Yes, based on the information that he had access

1    to.

2         Q.    And that's what's listed on Appendix B?

3         A.    That's correct.

4         Q.    And nothing else?

5         A.    That's correct.

6         Q.    Did either of you --

7         A.    Oh, based on his reading -- I'm sorry.  Based on

8    his reading of the patrolman's guide and his experience

9    teaching EDPs.

10        Q.    Understood.  As to what's required in order to

11   declare someone an EDP?

12        A.    Yes.

13        Q.    Did either of you ask for additional

14   documentation of anything relating to this case in order to

15   better inform that decision and any others you expressed in

16   your report?

17        A.    You know, it's hard to ask for information that

18   you don't know exists.

19        Q.    Did it occur to you that there might other

20   information that exists?

21        A.    We asked for any information that was relevant to

22   preparing this report, that's all we could do.  And it's

23   hard to request information, I don't know who was deposed.

24   I'm just brought in for one small part.  So, we don't have

25   access to the entire case.  So I'm assuming that -- I

235
DR. ELI B. SILVERMAN

1    assumed if you've had all these depositions they must be

2    voluminous, I'm assuming that.  So we don't have access to

3    that.  We never had access to it, so we used the material

4    that was available to us.

5         Q.   Upon receiving the information that was available

6    to you, did it occur to you that there is other information

7    as well based upon what you read?

8         A.   No.

9         Q.   So, you didn't think there were any other --

10        A.   I didn't know if there were others, I didn't know

11   who was deposed.

12        Q.   Did you ask?

13        A.   I asked for all relevant information that there

14   was, I don't know how else to ask.  I know I've asked -- I

15   did ask, for example, when we prepared our report, we were

16   told by the plaintiff's attorney --

17                  MR. SMITH:  Let's try and avoid waiving any

18             privileges here.

19                  THE WITNESS:  Okay.

20                  MR. SMITH:  Can I find out what he was about

21             to say and if it's not privileged --

22                  MR. KRETZ:  Sure.

23                  (Whereupon, an off-the-record

24             discussion was held.)

25                  MR. SMITH:  You can continue with your

DR. ELI B. SILVERMAN

1          answer.

2          A.    What I was going to say is that one thing I was

3    made aware of, that's not here, was that the city was going

4    to have an expert report in response to our expert report

5    on August 18th.  August 18th came and left and we never had

6    it and I asked for it because that would have been helpful

7    in our preparation.

8          So, if you're asking me if the track record of

9    trying to get information, it wasn't really that great, but

10   I didn't know of any other information.

11         Q.    Not even based upon the review of materials that

12   were provided to you?

13         A.    That's right.

14         Q.    It didn't occur there was anything else to

15   review?

16         A.    No, because I didn't know how far the case was

17   along, I didn't know anything about how far the case was

18   along.  I didn't know who had been deposed, who hasn't been

19   deposed.  So, I don't have that information.

20         Q.    Did you have anything else to say on that

21   subject?

22         A.    No.

23         Q.    You refer in your report to your research.

24         A.    Yes.

25         Q.    And I just want to make sure I understand.  First

1    of all, you didn't do any independent research for purposes

2    of preparing this report, right, any new independent

3    research?

4        A.    That's correct.

5        Q.    And you relied upon what you call your research

6    which was your 2008 and 2012 surveys; is that right?

7        A.    Correct.

8        Q.    I think you said a good deal of misclassification

9    of crime in your opinion is due to Compstat, right?  Not

10   all, but a good deal of it?

11       A.    Yes.

12       Q.    What are the other reasons for misclassification

13   of crime that aren't due to what you believe is the

14   pressure of Compstat?

15       A.    Well, there are honest errors, there are

16   inadvertent errors.  There's typographical errors.  There

17   are individual predilections of individual officers who

18   might want to do it on their own to look good.  So, there

19   are other factors.  There have always been other factors,

20   we never denied that.  There have been factors in virtually

21   every police department.

22            So, we're not -- to repeat, we're not maintaining

23   that it's solely due to Compstat, we're saying that this

24   numerical number system is emblematic of what police and

25   social scientists have documented for decades and that is

DR. ELI B. SILVERMAN

1  the more any management system relies primarily on numbers,

2  the more susceptible it is -- and this is quoting Donald

3  Campbell, a very famous social psychologist who worked in

4  this area, the more it's susceptible to manipulation and

5  the more likely it will corrupt the very process it's

6  intended to measure.  So we offer this as within that

7  framework.

8              MR. KRETZ:  Off the record.

9              (Whereupon, an off-the-record

10             discussion was held.)

11      Q.    You indicated in your testimony, Doctor, that you

12  did not define pressure in your survey or in your report

13  because it is so well-known what it means that there was no

14  need for you to do so.

15             Can you tell me, then, what is this well-known

16  definition of pressure?

17      A.    Well, now you're forcing me into my professorial

18  role.

19      Q.    Go ahead.

20      A.    Okay, I can't respond to your question without

21  doing that.  So, is that okay?

22      Q.    If you can give me your definition of pressure

23  that you believe everybody fully understands without having

24  to be told whether there is one when answering your survey,

25  yes.  What is that?

1              MR. SMITH: I'm going to object to the form

2         of this question. Can you get a question that he

3         can answer now.

4              MR. KRETZ: I asked him what is the

5         well-known definition of pressure that he said

6         everyone would understand when reading his survey

7         that, therefore, there was no need for him to

8         state what it is.

9    Q.   What is that definition?

10             MR. SMITH: Okay. Can you answer that

11        question?

12   A.   An obligation to meet -- this is my definition.

13   An obligation to meet expectations that are thrust from

14   above and at the risk of being penalized if you don't meet

15   those expectations.

16   Q.   So, there is nothing indicated in that definition

17   that says that pressure is an invitation to break the rules

18   in order to satisfy whatever that numerical expectation

19   might be --

20   A.   I would say --

21   Q.   -- is that right?

22   A.   -- in the definition itself, does it state that

23   one has to break the rules; is that your question?

24   Q.   Does the word pressure mean that you're pushing

25   somebody to the point where they have to break the rules to

DR. ELI B. SILVERMAN

1   satisfy what you're pressing them to do?

2       A.   I would say it's not in a definition, I would say

3   it creeps into practice in some cases.

4       Q.   Well, that's, I guess, what your surveys

5   supposedly are all about; is that right?

6       A.   Yes, sir.

7       Q.   Tell me, how many surveys have you formulated?

8       A.   Personally?

9       Q.   Yes.

10      A.   I've done a survey of the civilian complaint

11  system.  I did a survey of federal prisoners in non-federal

12  institutions.  I've done numerous surveys in the United

13  Kingdom when I was attached to the police staff college and

14  surveyed for police departments in terms of citizen

15  satisfactions.  So I've done my share of surveys.

16      Q.   So, you formulated those surveys?

17      A.   Yes, sir.

18      Q.   And then you compiled the results?

19      A.   Yes.

20      Q.   Did you then write reports indicating what the

21  results reveal?

22      A.   Yes.

23      Q.   And how many occasions have you done that?

24      A.   It's hard to -- I have to go back, I've done it

25  for four or five police departments in the UK.  I've done

DR. ELI B. SILVERMAN

1    it -- I did a survey with someone else that's in my

2    bibliography on mediation, in my bibliography, in my

3    reference for the -- on the New York City Police Department

4    mediation.

5         I did a survey on federal prisoners in

6    non-federal institutions when I worked in the Department of

7    Justice.  I did a survey when I worked for the National

8    Academy of Public Administration when I worked on Federal

9    HUD programs.

10   Q.   And in each instance, did you do those on your

11   own?

12   A.   Yes, sir.

13   Q.   The --

14   A.   Oh, wait.  I need to correct it.  In the UK some

15   of them were done jointly with other -- with UK police.

16   Q.   Let me just go back for a second.

17        In talking about Dr. Eterno's opinion as to

18   whether Schoolcraft was an EDP on the night of October 31,

19   2009, did you ever consider whether reasonable people could

20   disagree on whether or not he was an EDP on that occasion?

21   A.   I don't know how to answer that question.

22   Q.   Well, do you think that he's absolutely right or

23   do you think reasonable people could disagree on that

24   assessment?

25   A.   I think that a reasonable person would look at

1    all the evidence and make a judgment and that's the only

2    way I could answer that.

3        Q.    So, if you had all the evidence or Dr. Eterno had

4    all the evidence, do you think he would have an open mind

5    as to that determination?

6        A.    Oh, he definitely has an open mind.

7        Q.    In the Floyd case you testified as a fact witness

8    regarding responses to the surveys of 2008, 2012, right?

9        A.    Yes.

10       Q.    And you testified that when conducting a survey

11   one should have in mind what you called a null hypothesis;

12   is that right?

13       A.    Yes, sir.

14       Q.    What was your null hypothesis for the 2008

15   survey?

16       A.    The null hypothesis was there was very little --

17   there was little or no pressure placed on individuals in

18   the police department to manipulate the crime statistics or

19   pressure to increase summons, arrests and stop-and-frisk.

20       Q.    By the way, in 2008 and 2009, had you identified

21   what you considered to be a kind of average error rate in

22   the classification of crime by percentage of crime reports?

23       A.    Had we looked at crime reports; is that what

24   you're asking?

25       Q.    Had you identified what you considered to be an

1    average rate of error in classifying crime throughout the

2    NYPD in 2008, 2009?

3       A.    No.

4       Q.    Do you have any view on what such a number might

5    be?

6       A.    No.

7       Q.    And that's including intentional

8    misclassification of crime or innocent misclassification of

9    crime?

10      A.    I can't do that because I don't have access to

11   their information.

12      Q.    And you don't have a view whether there is some

13   error rate that you would consider to be a norm that one

14   would have to accept as just the nature of the police

15   practice?

16            MR. SMITH:  Objection to form.  Asked and

17            answered.

18      A.    No.

19      Q.    What was your null hypothesis for the 2012

20   survey?

21      A.    The same one I gave you for the 2008.

22      Q.    Was it your assumption as well as your null

23   hypothesis when you did the survey in 2012?

24      A.    No.

25      Q.    What was your assumption when you did the 2012

1    survey?

2         A.    No, I had no assumption.

3         Q.    In your own mind, did you have an assumption?

4         A.    No.

5         Q.    Sir, did you give any consideration in preparing

6    each survey to soliciting responses that would distinguish

7    what I'll call constructive pressure from destructive

8    pressure?

9               MR. SMITH:  Objection to form.

10        A.    We did in the first survey make a distinction

11   between the extent to which they felt pressure for

12   integrity in crime statistics and those that saw that there

13   was manipulation, those who said there was manipulation in

14   crime statistics and we know that there are changes that

15   are perfectly legitimate when you look at crime statistics,

16   we found that of those who acknowledged that they

17   personally experienced this two-thirds said that these

18   changes were moderately unethical and one-third said that

19   they were highly unethical.  So, those who experienced it

20   -- I'm not sure I'm responding, I'm trying to respond to

21   your question.

22        Q.    Go ahead and we'll see.

23        A.    Two-thirds of those who experienced this said

24   that they felt that these changes were not, to your use

25   word, positive, but they were negative, to use your words,

1  and I'm substituting for your word of negative, ethically

2  inappropriate.

3      Q.   So, the question was about whether there was

4  increased pressure?

5      A.   Yes.

6      Q.   And then you asked them whether they thought that

7  pressure was yielding an ethical or unethical result?

8      A.   Low, medium and high.

9      Q.   And did you ask any question that indicated what

10  was meant by pressure that yielded an unethical result --

11     A.   No.

12     Q.   -- or a result that was not ethical?

13     A.   No, we left it to them and actually in survey

14  research that's one of the advantages of doing anonymous

15  survey research, that you're not imposing your definition,

16  the person will raise their own definition.

17     Q.   Which question makes the reference to ethical

18  results?

19     A.   I don't have the survey.

20     Q.   Okay.  I'll show it to you.  This is the 2008

21  survey.

22          MR. SMITH:  That's been marked as Exhibit D.

23          This is ES production 42 through 45.

24     A.   Question 4.

25     Q.   What does it say?

DR. ELI B. SILVERMAN

1      A.      Extent to which changes were ethically

2  inappropriate.

3      Q.      And what changes are they referring to in that

4  question?

5      A.      Changes in the crime reports due to Compstat.

6      Q.      And what did you understand the answer to mean,

7  what changes were being imposed that were not ethically

8  appropriate?  Do you have any idea?

9      A.      I can only go by what people added to some

10  comments.

11      Q.      What comments were those?

12      A.      Downgrading grand larceny to petty larceny.

13  Changing robbery to lost property.  Changing a burglary to

14  criminal trespass.

15      Q.      As a result of your survey, do you have any

16  indication as to how many times those kind of things

17  occurred?

18      A.      No.

19      Q.      Do you have any indication as to whether any of

20  those things occurred in the 81st Precinct?

21      A.      No.

22      Q.      And that's not revealed to you by either survey,

23  the 2008 or the 2012?

24      A.      We didn't focus on precincts.

25      Q.      So, that's not revealed to you by either one of

DR. ELI B. SILVERMAN

1    those surveys; is that correct?

2        A.    That's correct.

3        Q.    Do you recall in the Floyd trial being asked this

4    question and giving this answer and this appears on 2570 of

5    that trial transcript.

6            Question:  So, then by far, the largest effect

7    that your survey showed was increased pressure to decrease

8    those serious crimes; isn't that correct?

9            Answer:  Yes.

10       A.    It's a year ago, so I'm not doubting it, but I

11   don't recall it.

12       Q.    And you agree with that answer to that question

13   today?

14       A.    The largest pressure was on to decrease index

15   crime?  Is that --

16       Q.    That's a fair --

17       A.    Is that what --

18       Q.    Yes, to decrease serious crimes.

19            MR. SMITH:  Serious or index?

20            MR. KRETZ:  Serious crimes.

21            MR. SMITH:  Objection to the form of the

22            question.

23       Q.    I'm sorry.  Let me go back.  The previous

24   question refers to index crimes and then it refers to those

25   serious crimes.  So, this is the question.

1           So, then by far, the largest effect that your

2   survey showed was increased pressure to decrease those

3   serious crimes; isn't that correct?

4       A.     Sounds familiar.

5       Q.     And decreasing crime doesn't mean misclassifying

6   crime?

7       A.     Not necessarily.

8       Q.     I think it was in the 2012 survey, you asked a

9   question about whether the respondent was pressured to obey

10  constitutional rights; is that correct?

11      A.     Yes.

12      Q.     You did not ask whether the respondents were

13  pressured to violate constitutional rights; isn't that so?

14      A.     Correct.

15      Q.     The same information is not provided by those two

16  questions; isn't that right?

17      A.     I'm a little tired, so I need you to run that by

18  me again.

19      Q.     Well, you asked were you pressured to obey

20  constitutional rights?

21      A.     Yes.

22      Q.     So, of course it's a police officer's

23  responsibility to obey constitutional rights, right?

24      A.     Yes.

25      Q.     You did not ask whether the respondent officers

DR. ELI B. SILVERMAN

1  were pressured to violate constitutional rights?

2      A.    That's correct.

3      Q.    So, you don't know whether anyone would say they

4  were asked to violate anyone's constitutional rights or any

5  rights; isn't that so?

6            MR. SMITH:  Objection to form.

7      A.    No.  My response is yes, but if there's less

8  pressure to obey constitutional rights you may -- one may

9  be more inclined to violate it.

10     Q.    You didn't ask any of the respondents how many

11  times they violated someone's constitutional rights, did

12  you?

13     A.    No.

14     Q.    And you didn't ask the respondents how many times

15  they are aware of that somebody's constitutional rights

16  were violated because they were pressured to do so; is that

17  right?

18     A.    No, I did not.

19     Q.    When you spoke with Dr. Eterno after he testified

20  at his deposition, was there anything he indicated to you

21  he forgot to say that he wished he had said?

22     A.    No, he just said he wished he had said things,

23  but I don't know what they are.

24     Q.    He didn't tell you what he wished he had said?

25     A.    No.  As sure as I will feel.

DR. ELI B. SILVERMAN

1      Q.      Is it your expectation that if this case goes to

2   trial or when this case goes to trial you will both be

3   called to testify?

4              MR. SMITH:  Don't answer that question.

5      Q.      Well, is it your understanding that neither of

6   you is capable of addressing all of the matters discussed

7   in your report as an expert?

8      A.      I think that's -- well, I know I'm not.  I'll

9   speak for myself.

10     Q.      Is there any section of the report that

11  Dr. Eterno did not draft?

12     A.      Oh, there are parts of the report that he did not

13  draft.

14     Q.      What parts did he not draft?

15     A.      He didn't draft the parts on Compstat.  He didn't

16  draft the parts on blue wall.

17     Q.      Do you understand him to be on expert on those

18  two subjects?

19     A.      Again, I'm puzzled by the word expert.  I

20  understand him to be knowledgeable on those two areas, if

21  that answers your question.

22     Q.      You understand him to be knowledgeable on those

23  two areas?

24     A.      Yes.

25     Q.      Is he as knowledgeable as you are in those two

1  areas, as far as you're concerned?

2      A.    I think he would say I'm more knowledgeable in

3  the area of Compstat since I spent more time with it.

4      Q.    How about the blue wall of silence?

5      A.    I don't know.  I don't have the answer to that.

6      Q.    In the references listed beginning on page 26 of

7  your report, Exhibit A, is there anything on that list that

8  you reviewed to assist you in preparing your report?

9              MR. SMITH:  Do you want me to put it in

10             front of him?

11             MR. KRETZ:  Sure.

12             MR. SMITH:  There's four pages here,

13             references, that he needs to look at.

14     Q.    Well, my question is:  Did you look at anything

15  on that list for purposes of preparing your report?

16     A.    It's hard to answer that question because we

17  review these materials, different parts, we've written a

18  lot and I can't tell you exactly when I've reviewed what.

19     Q.    So, you don't recall whether for purposes of

20  writing the report --

21     A.    I remember reviewing the Mollen Commission for

22  the purposes, the Mollen Commission report.

23     Q.    What information was in the Mollen Commission

24  report that you want ed to review for purposes of preparing

25  your report in this case?

DR. ELI B. SILVERMAN

1    A.    The blue wall of silence.

2    Q.    And did you make reference to information from

3    the Mollen report in your report for this case?

4    A.    Yes.

5    Q.    What else?

6    A.    I looked at some of the newspaper articles that

7    talked about police statistics.  The New York City public

8    advocates report.

9    Q.    What information did it provide?

10   A.    It provided information on the nonresponsiveness

11   in their view of the NYPD in terms of transparency.

12   Q.    Anything else?

13   A.    I looked at some of the Knapp Commission.

14   Q.    What information did that provide?

15   A.    Also on the blue wall.  Most of these sources are

16   referenced in here that we use all these sources, but I

17   can't tell you specifically that we then went and read

18   prior to this because we've read these sources.

19   Q.    I'm sure at some time or other in your career you

20   have, I'm sure.

21   A.    Yes.

22   Q.    For purposes of preparing your report, which one

23   did you review?

24   A.    Did we go back to -- I can't recall going back --

25   I did look at our book, The Crime Numbers Game.  I went to

1    the report of the crime review committee.  Crime reporting

2    review committee.  And a few of the articles, the Weisberg

3    one.

4        Q.   From 2002?

5        A.   Yeah.

6        Q.   Anything else?

7        A.   That's all I recall.

8        Q.   With respect to The Crime Numbers Game subtitled

9    management by manipulation --

10       A.   Yes.

11       Q.   -- what information in that book did you review

12   for purposes of preparing this report in this case?

13       A.   Some of the -- I just extracted a very brief

14   extraction in terms of what the media reports were.

15       Q.   On this case?

16       A.   No, on crime report manipulation.

17       Q.   What media reports?

18       A.   2004, 2005.

19       Q.   On page 27 there's a reference to the NYPD's

20   Compstat compare statistics or composed statistics?

21       A.   Yes.

22       Q.   What opinion did you express in that report?

23       A.   That's a journal article.

24       Q.   Right, that article.  I'm sorry.

25       A.   It came out in 2010, so we wrote it probably in

DR. ELI B. SILVERMAN

1    2008 or 2009.  So, it's hard to remember, but we -- I think

2    this article referenced -- this article referenced our

3    first survey because -- I did some analysis of our first

4    survey.  It also referenced -- since it was an

5    international journal it also referenced this phenomena in

6    other police departments around the world.

7        Q.    In any of your writings have you referred Steven

8    Mauriello?

9        A.    No.

10       Q.    Have you ever referred to the 81st precinct?

11       A.    I don't recall.  We might have.  We might have

12   mentioned Schoolcraft, but we didn't -- yes, we mentioned

13   Schoolcraft in the book, just the allegations, briefly.  I

14   can't recall whether Mauriello's name emerged.

15       Q.    In any of your presentations, did you mention

16   Mauriello or the 81st Precinct?

17       A.    No.

18       Q.    Is it your opinion that the NYPD considers the

19   matter of crime numbers to be a game?

20       A.    No.

21       Q.    Did you express the view that in the mind of some

22   it was a game in your book?

23       A.    Yes.

24       Q.    And whose minds do you think it was a game, if

25   anyone, in 2008 and 2009?

DR. ELI B. SILVERMAN

1      A.      To me a game is where there are role players and
2   each tries to advance their own interest.  And the interest
3   in this game was to advance the interest of looking,
4   putting the best possible face on what you present to the
5   public and in that sense we don't say it in New York City
6   Police Department had an official game policy, we never
7   make that claim.  But we say the result of that and the way
8   it's played out, not only with the police department, but
9   the political dictates from above, put pressure on the
10  police department which emanates down to make things look
11  in the best possible way.
12      Q.      So, what are we talking about here, are we
13  talking about corruption or are we talking About human
14  nature?  What is it that you think is driving this pressure
15  in the effect you say it has on everyone in the NYPD?
16      A.      Well, if you go back to my quotes that you, you
17  know, suggested were professorial, they would suggest
18  that's human nature.
19      Q.      They?
20      A.      They, well, Demming, the one I -- Campbell, the
21  one I said.  There's another person who would say it's
22  human nature would be Edward Demming, a very famous
23  business analyst who has looked at systems throughout the
24  world and widely regarded in the political world who said
25  that the more -- the extent that you primarily center on

DR. ELI B. SILVERMAN

1    numbers, the more likely you are less aware of what's going

2    on and the more likely you're managed by fear and he wasn't

3    thinking of the police at the point, he wasn't referring to

4    that, he was thinking of business models.

5            So, if you're asking me -- it's a tough question

6    you're asking me, but if you're asking me how human nature

7    operates under a certain environment, I would say most

8    people, many people, would react the way they did.  That's

9    why we say we don't focus on individuals, we don't say

10   individuals so-and-so is a bad guy or a corrupt guy.

11           We say the system provides perverse incentives

12   for people to go beyond the margins in some cases of

13   legitimacy.

14       Q.    Do you know of a system of policing that doesn't

15   have that effect?

16       A.    A system of policing that is more multilayered

17   looks at a wider variety of indicators, and doesn't just

18   look at your -- primarily your activity is less inclined to

19   do that.

20       Q.    So, you're saying NYPD only looks at activity?

21           MR. SMITH:  Objection to form.

22       A.    That's not what I said.  I said it's a primary

23   indices of your value.

24       Q.    Well, is NYPD a social services agency or is it a

25   law enforcement agency?

DR. ELI B. SILVERMAN

1                    MR. SMITH:  Objection to form.

2      Q.    What is its principal responsibility?

3                    MR. SMITH:  Ask a question.

4                    MR. KRETZ:  That's a question.

5                    MR. SMITH:  No, it's not.

6      Q.    Are they there to fight crime, are they there to

7  try to reduce crime or something else?

8                    MR. SMITH:  Objection to the form of the

9            question.  You can answer.

10     A.    The question is evident on its face.  Of course

11 it's a law enforcement agency, but I don't think that

12 relates to the point I was making.

13     Q.    So, tell me again, what is your point?

14     A.    My point is that you can have legitimate law

15 enforcement objectives, but at the same time you can have

16 activities that don't fall within that legitimacy or you

17 could put pressure on individuals to act in a certain

18 manner where they may trespass certain people's rights and

19 so while you're supposedly a law enforcement you're also

20 supposed to respect constitutional rights.  So I think your

21 dichotomy is kind of false.

22           You're supposed to enforce the law, but also

23 respect people's rights.  You're supposed to do both.

24     Q.    Do any of the survey results from your 2008 and

25 2012 surveys indicate that there was explicit pressure to

DR. ELI B. SILVERMAN

1    violate the constitutional rights or any other rights for

2    the sake of achieving certain performance goals?

3         A.    The survey doesn't explicitly say that except

4    that there are -- the second one says there was less

5    pressure to observe constitutional legal rights as the time

6    went on.  So, that's not precisely your question, I

7    understand, but I think it's in the ballpark.  I was going

8    to make another point, but I forgot it.

9         Q.    In 2008 and 2009, do you think the approach of

10   NYPD, generally, was to manage by manipulation of crime

11   numbers?

12        A.    No, there are other aspects to its management.

13        Q.    Other aspects to its management that you believe

14   caused others to manipulate crime numbers?

15        A.    I think the management, the top down pressure

16   that we allude to contributed to that, yes.  And I think it

17   was -- it's very understandable that individuals might

18   succumb to that pressure.

19        Q.    Prior to be retained in this case, had you

20   compiled any data or information regarding Steven

21   Mauriello?

22        A.    No.

23        Q.    Any data or information regarding the 81st

24   Precinct?

25        A.    No.

DR. ELI B. SILVERMAN

1      Q.    Had you reached any conclusions or formulated any
2   opinions regarding Steven Mauriello?

3      A.    No.

4      Q.    And how about the 81st Precinct?

5      A.    No.

6      Q.    Have you ever done so since you were retained?

7      A.    No, the only thing I can connect to is John
8   Eterno's description of what happened here, that's all I
9   can attest to.

10     Q.    And in Adrian Schoolcraft's apartment you mean?

11     A.    Yes.   That's the only thing I have information
12  on.

13     Q.    And you were asked about whether you have any
14  information to support the conclusion that the people in
15  Adrian Schoolcraft's apartment when he was declared an EDP
16  had knowledge that he had spoken to QAD and/or IAB and I
17  think the meaning of your answer is is that you have no
18  such knowledge; can you tell me what you do know?

19            MR. SMITH:   Objection to the form of the
20            question.   You can answer it.

21     A.    I tried to say I have a vague recollection of
22  hearing in some tape, but I don't want to be extremely
23  confident in it, because I'm confident in things I say I
24  am, that I thought I read somewhere where or saw somewhere
25  that they were aware that he had contacted QAD.

DR. ELI B. SILVERMAN

1    Q.    Well, this is as you might imagine a critical

2    question in this case, do you believe the police entering

3    his apartment was an act of retaliation for something he

4    had done?

5    A.    I'll try to restate --

6    Q.    Have you formulated an opinion on that question?

7    A.    The only opinion I have is is to subscribe to

8    what John Eterno, Dr. Eterno wrote.  That in so many words,

9    that entering his apartment was consistent with what has

10   happened to other people under the blue wall of silence.

11   Q.    So, in other words, you don't know whether it's

12   consistent with other incidents?

13   A.    It's consistent with behaviors that we've seen in

14   other instances -- other similar kind of behavior in blue

15   wall of silence.  Do I have a firsthand knowledge of it, if

16   that's your question, no.

17   Q.    Or any additional knowledge?

18   A.    I don't have any additional knowledge than this.

19   Q.    Other than what's in the report?

20   A.    That's right.

21   Q.    Do you believe declaring Schoolcraft an EDP was

22   an act of retaliation?

23   A.    I don't know.  I don't know.

24   Q.    Did you ever discuss that with Dr. Eterno?

25   A.    I don't recall.  I don't recall.

DR. ELI B. SILVERMAN

1    Q.    On page 3 of your report you state that

2    commanders are ranked and evaluated based on a comparative

3    crime statistics anticrime plans and it continues.

4          How do you know that commanders are ranked and

5    evaluated based on those factors that you list there?

6    A.    Because I have seen discussions, I've seen -- I

7    know each commander has a commander profile.  That came in,

8    I think, the second year, that commander profile has what

9    the commander has accomplished and not.  When the

10   leadership of the police department meets in terms of who

11   receives a promotion or who doesn't or who has transferred

12   or not, they look at that commander profile.

13   Q.    Have you ever participated in such meetings?

14   A.    No.

15   Q.    Has anyone told you who was in attendance at such

16   meetings if that's what they do?

17   A.    I was told the commissioner's inner circle.

18   Q.    I'm sorry?

19   A.    Commissioner's inner circle.

20   Q.    So, someone from the current commissioner's inner

21   circle?

22   A.    No, not from the current.

23   Q.    The previous commissioner's inner circle --

24   A.    Ye.

25   Q.    -- told you that they reviewed those profiles in

DR. ELI B. SILVERMAN

1    meetings --

2        A.    Yes.

3        Q.    -- as part of a discussion of whether to and

4    where to assign --

5        A.    Yeah.

6        Q.    -- an officer?

7        A.    Yes.

8        Q.    And who told you that?

9        A.    People at the time.  I can't go into that.

10       Q.    Is every conversation you have on every subject

11   confidential in your mind?

12       A.    In this regard, yes.

13       Q.    What research were you doing when you asked that

14   question or when you had that conversation?

15       A.    I was doing research on Compstat.

16       Q.    And you were about to write a book on the

17   subject?

18       A.    That's correct.

19       Q.    So, you consider that person what; a source that

20   doesn't have to be divulged?

21       A.    No one wants to be divulged.  When there is a

22   source that's willing to be divulged, I cite that source

23   and I have cited sources.

24       Q.    So, that person you just were referring to

25   indicated to you I don't want you telling anybody --

DR. ELI B. SILVERMAN

1    A.    That's right.

2    Q.    -- that I told you this?

3              MR. SMITH:  You have to let him ask the

4         question.

5              THE WITNESS:  I'm sorry.

6              MR. SMITH:  I know it's late.

7    Q.    Is that right?

8    A.    Correct.

9    Q.    Did that person also tell you or did you learn in

10   some other way that those profiles also indicated some

11   ranking of officers?

12   A.    No.

13   Q.    What is your basis, then, for saying that the

14   officers are ranked, commanders are ranked?

15   A.    Commanders at the time told me that they were

16   ranked.  They told me they were moved or promoted or not.

17   That's how I -- and I know many were reassigned, about

18   two-thirds were reassigned the very first year.

19   Q.    That's different from some sort of established

20   ranking system, that's what I'm trying to find out.

21             Did somebody ever tell you there is such a

22   ranking system that's recorded?

23   A.    Everything was ranked.

24   Q.    And you know that commanders were put down on a

25   list --

DR. ELI B. SILVERMAN

1    A.    You would have to be --

2          MR. SMITH:  You have to let him finish.

3          THE WITNESS:  Oh, I'm sorry.

4    Q.    -- in some sort of number order in ranking?

5    A.    I don't know how they did it.  I wasn't privied

6    to the process.  I do know that every precinct -- the

7    precincts were ranked on a weekly basis, top ten, bottom

8    ten.  Many of the precincts were ranked and that was

9    filtered into the process.

10    Q.    And how do you know that?

11    A.    Because I saw the rankings.

12    Q.    Of precincts?

13    A.    That's correct.

14    Q.    Were you ever present at a Compstat meeting where

15    Steve Mauriello was at the podium?

16    A.    No.

17          Do you think I can take a quick break while

18    you're looking?

19    Q.    Sure.

20          MS. PUBLICKER METTHAM:  The time is 6:41.

21          (Whereupon, a brief recess was taken.)

22          MS. PUBLICKER METTHAM:  We're back on the

23          record and it is 6:46 p.m.

24    Q.    Doctor, what other sources of income have you had

25    in 2009 other than serving as an expert witness or a

DR. ELI B. SILVERMAN

1    consultant on our end for lawyers in litigation?

2              MR. SMITH:  Don't answer that question.

3    Q.    Just sources, don't tell me the amount, I just

4    want to know how else you make a living.

5              MR. SMITH:  Oh, okay.  All right.  You can

6              answer that question.  Thank you.

7    A.    I have a pension and I have Social Security.

8    Q.    You've not done any work other than the kind of

9    work you're doing in this case for remuneration?

10   A.    I sometimes lecture at law schools.

11   Q.    So, you get a fee for your appearance?

12   A.    Yes, I documented them.

13   Q.    When you retired in 2003, was that your choice or

14   was that a mandatory retirement?

15   A.    No, it was my choice.

16   Q.    You talked earlier about material that you

17   reviewed from the Floyd case, I think it was in

18   preparation -- since you wrote the report before testifying

19   today.

20   A.    Yes.

21   Q.    What did you look at from the Floyd case?

22   A.    I looked at some of the judge's decisions, some

23   of the decision, and I looked at some of the -- I don't

24   think I looked at anything else.  I looked at a good part

25   of the decision.

DR. ELI B. SILVERMAN

1      Q.    You indicated that you read some of the testimony

2    provided at the Floyd trial?

3      A.    Yeah, but not in reference to your question.  I

4    read it way back.

5      Q.    Well, I thought you said that you looked at it

6    sometime in the past week or two?

7      A.    Yeah, but now on reflection I realize I didn't

8    look at testimony in the past week.  I just looked at some

9    of the decision which had -- I think the reason I said

10   testimony is because the judge's decision referred to some

11   of the testimony.  So, I believe in -- I'm glad you raised

12   that, I didn't actually go to the testimony.

13     Q.    You indicated that you took notes at your

14   meetings with counsel and Mr. Eterno regarding the case,

15   but then you said that you were not provided with any

16   additional factual information about the case.

17            Do I have that right?

18     A.    Well, the notes were about the basic -- I don't

19   remember, it was so long ago when we first met.

20     Q.    What we're interested in if you took notes that

21   contained representation about the facts we'd like copies

22   of those notes so we can see what you've been told.

23     A.    I'll have to defer to my counsel on that.

24            MR. KRETZ:  So, we will call for the

25            production of the notes.

DR. ELI B. SILVERMAN

1          MR. SMITH:  Right.  Taken under advisement.

2          I don't think we're going to get them.

3     Q.    In referring to the implementation of Compstat in

4     other police departments in other cities, you made a

5     reference to what you call Compstat light as the practice

6     elsewhere.  Can you tell me what that means?

7     A.    What I am referring to by Compstat light is you

8     make changes, you introduce the Compstat meetings, you

9     advance crime mapping, you advance statistical analysis and

10    you make it available to people, but what I'm referring to

11    light is that you don't also include the very fundamental

12    changes that were made in the police department when

13    Compstat started in New York which was doing away with the

14    level, which was giving more resources to local levels and

15    not centralizing it which was and with the commissioner at

16    the time and now calls reengineering and look a new of what

17    you've done rather than just superimposing this meeting

18    that's very attractive and when visitors were allowed

19    they're no longer allowed.  When visitors were from other

20    police departments were allowed they would be bedazzled and

21    impressed by it.  So that's in a short nutshell what I mean

22    by that.

23    Q.    Do you have any information that supports the

24    conclusion that illegal quotas were imposed on anyone in

25    the 81st Precinct in 2008 and 2009?

DR. ELI B. SILVERMAN

1     A.     Do I have information on that?

2     Q.     Yes.

3     A.     No.

4     Q.     Are you aware of any information that summonses

5     were issued without probable cause in the 81st Precinct in

6     2008 and 2009?

7     A.     I don't have any separate information.

8     Q.     With respect to the Schoolcraft recordings, you

9     said you listened to all or most of them when they were

10    made accessible by the Village Voice?

11    A.     Yes.

12    Q.     And you don't know that you listened to any of

13    those recordings ever again other than those that were

14    included in This American Life recording, that one

15    program --

16    A.     Yes.

17    Q.     -- that single program?  Okay.

18           Dr. Silverman, do you recall from reading the QAD

19    report that there were 13 complaint reports that were

20    brought to QAD's attention by or through Adrian

21    Schoolcraft?

22    A.     Yes.

23    Q.     And are you aware that they ruled or found that

24    three of those he was wrong about and had not been

25    incorrectly classified?

DR. ELI B. SILVERMAN

1    A.    Yes.

2    Q.    And are you aware of the remaining ten that in

3    five of those instances he was the one who initially took

4    the complaint report?

5    A.    I didn't remember the distribution of it.  I knew

6    he was involved in some of them, but I didn't recall how

7    many.

8    Q.    Did you ask anyone anything about those five

9    complaint reports and what his role was?

10   A.    No.

11   Q.    Do you know anything more about it other than

12   that he was the one that took those complaint reports?

13   A.    If there was more information made available to

14   me?

15   Q.    I'm asking, do you know anything more about it?

16   A.    Do I know anything more about it?

17   Q.    Yes.

18   A.    No.

19   Q.    So, if he were the one responsible for

20   downgrading five out of the ten complaint reports that he

21   brought to QAD's attention, would that affect your review

22   of the circumstances here?

23            MR. SMITH:  Objection to form.

24   A.    I need to know what you mean by circumstance.

25   Q.    Your assessment of whether he was a

DR. ELI B. SILVERMAN

1    whistle-blower, whether he's truthful as your report says

2    he is?  Anything else that you might have determined about

3    the circumstances of this case, are they affected by that

4    information?

5                  MR. SMITH:  Objection to the form.

6         A.    I don't know because I would need to know more.

7    I mean, I would need to know why an individual would want

8    to report on something that he -- if it's true that he

9    acknowledged and he was engaged in.  So he may say -- I

10   don't know what his response would be, that he was

11   compelled to do it, he was pressured to do it.  I don't

12   know why the reasons why he did it.  If you're asking me

13   would it be helpful for me to know more about it, I would

14   always look at it.

15        Q.    Was it ever brought to your attention that some

16   concluded that Mr. Schoolcraft was orchestrating the events

17   that led to what happened in his apartment on October 31,

18   2009?

19                 MR. SMITH:  Objection to form.

20        A.    No.

21        Q.    No one has ever mentioned that to you?

22                 MR. SMITH:  Objection to form.

23        A.    No.

24        Q.    Did you happen to notice that in at least six of

25   the thirteen incidents that he brought to the attention of

DR. ELI B. SILVERMAN

1  QAD, that those incidents, those six had not occurred until

2  after he spoke to QAD for the first time?

3      A.   Are you saying they happened in between two

4  conversations he had with QAD?

5      Q.   And October 31st.  From the time he first was in

6  touch with QAD until October 31st.

7      A.   I'm not following.  How can they be in that QAD

8  report if -- I'm not following the sequence.

9      Q.   From the time of his first contact with QAD until

10  October 31st, six of those incidents occurred, which would

11  mean, as you're suggesting, they occurred before his first

12  contact and his first meeting with them.

13      A.   I'm sorry --

14      Q.   That's not information made known to you?

15          MR. SMITH:  Wait.  Wait.  I'm going to

16          object to the form of the question.  I don't

17          think it's clear to the witness what you're

18          asking.

19          THE WITNESS:  No, it's not.

20      Q.   Did you pay any attention to when the complaint

21  reports were prepared of those 13 complaint reports

22  addressed by QAD?

23      A.   No.

24      Q.   Were you ever made aware that a memo was issued

25  in the 81st Precinct that the telephone switchboard

DR. ELI B. SILVERMAN

1    operator, one of whom was Schoolcraft, that the operators

2    were not to be the ones to prepare complaint reports?

3        A.    No.

4        Q.    Is it fair to say, then, that you were unaware

5    that six of the thirteen complaint reports were prepared by

6    Schoolcraft after that memo was issued?

7        A.    After the QAD memo?

8        Q.    No, after the memo was issued saying that the

9    telephone switchboard operators should not be the ones to

10   prepare complaint reports.

11       A.    I would have no way making that judgement if I

12   didn't know about the telephone --

13       Q.    Unless you had all the information that's been

14   developed in the case.

15       A.    The telephone I was not aware.

16       Q.    Are you aware that Adrian Schoolcraft prepared

17   six complaint reports in 2009 that were improperly or

18   incorrectly downgraded?

19       A.    Is this separate from the ones you told me about?

20       Q.    Yes.

21       A.    No.

22       Q.    Are you aware that three of those complaints were

23   prepared by him in the last two weeks of October 2009?

24       A.    No.

25       Q.    Are you familiar with the research of a

DR. ELI B. SILVERMAN

1   Mr. Frank Zimring?

2       A.   Yes.

3       Q.   Are you aware of his conclusion that any supposed

4   manipulation of crime statistics in NYPD was too miniscule

5   to significantly affect NYPD's overall crime statistics?

6       A.   I'm aware of that.

7       Q.   And what is your view of that research?

8       A.   That it was inadequate.

9       Q.   In what way?

10      A.   He relied solely on the police department.  All

11  the statistics came from the police department.  He didn't

12  do any independent assessment.  He neglected certain

13  information about the categorization of how you report a

14  stolen automobile, the policy changes, he ignored certain

15  policy changes or was unaware.

16           He researched at the end parrots, the NYPD's

17  assessment of our study, and his bibliography doesn't even

18  include our peer-review articles on this topic.  All he

19  does is have an appendix, a reference to our surveys and

20  says that clearly these must be disgruntled commanders,

21  which was the exact line of the police department.  So I

22  have great respect for him, a lot of his writing, but not

23  on this.

24      Q.   It's fair to say you don't know whether they were

25  just disgruntled commanders who responded?

DR. ELI B. SILVERMAN

1              MR. SMITH:  Objection to form.

2      Q.    You may answer.

3      A.    It's fair to say that I don't know if they were

4  just disgruntled.

5              I don't know for a fact and neither does he.  And

6  to base his information without looking at all the evidence

7  and the evidence that's the other way, without even

8  acknowledging it in a footnote, without even acknowledging

9  it in a bibliography suggests to me that that was not

10  thorough scholarship and I might add that in our book we do

11  address his points.

12              MR. KRETZ:  No further questions.

13  EXAMINATION BY

14  MR. LEE:

15      Q.    I'm Brian Lee.  I represent one of the doctors in

16  the case.

17      A.    Thank you.

18      Q.    Your null hypothesis for the 2008 and 2012

19  studies was what?

20      A.    That there was not -- commanders and others in

21  the police department did not feel substantial pressure.

22      Q.    No or little pressure?

23      A.    No or little pressure, yes.

24      Q.    Now, in your survey when you had your ten items,

25  -- if you look at Exhibit C, if you go to page ENS

DR. ELI B. SILVERMAN

 1  production page 9.

 2              MR. SMITH:  I don't know if he has C in

 3              front of him, Brian.  Now he does.

 4              THE WITNESS:  Thank you.

 5     Q.    If you go to ENS production 9.

 6              MR. SMITH:  Yes, he's got it.

 7     Q.    So, you have least pressure, one; most pressure,

 8  ten.

 9              What is low, what is medium and what is high

10  pressure?

11     A.    One to three is low, four through seven is medium

12  and eight through ten is high.

13     Q.    Do you think it's significant that there was no

14  option for someone taking this survey to choose part of

15  your null hypothesis that there was no pressure?

16              MR. SMITH:  Objection to form.

17     A.    This survey -- most people -- this survey is

18  based on research on how people best respond to surveys.

19  And studies have shown that most people are uncomfortable

20  putting zero, when they want little, they put one and

21  there's been a study by Acten (phonetic) and I forget the

22  other person who did the a study of the optimal responses

23  to put in the survey in terms of choices and most people

24  prefer one to ten.

25     Q.    That may well be the case, Doctor, but there's

DR. ELI B. SILVERMAN

1    no option for someone taking your survey to say there was

2    no pressure, is there?

3        A.    There is no option for that.

4        Q.    Did you read Mr. Schoolcraft's depositions in

5    this case?

6        A.    No, I already testified I had not seen it.

7        Q.    Would that be important for you in rendering your

8    opinions in this case to know what Mr. Schoolcraft

9    testified to?

10           MR. SMITH:  Objection to form.

11       A.    Would I be interested in seeing it, yes.

12       Q.    Would it be important for the opinions that you

13   have rendered in this case?

14           MR. SMITH:  Objection to form.

15       A.    I would have to ask you to ask that question to

16   Dr. Eterno because he's the one who made that judgment on

17   Schoolcraft.

18       Q.    Have you reviewed Mr. Schoolcraft's performance

19   reports at the 81st Precinct?

20       A.    No.

21       Q.    And would it be important for you if his

22   performance numbers were steady and then all of a sudden

23   dropped precipitously; would that be important?

24           MR. SMITH:  Objection to form.

25       A.    It would be one piece of information, it would

DR. ELI B. SILVERMAN

1    make me want to look into it even more.  I would want to

2    know the situation.  I would want to know the context.  I

3    would want to know what preceded it, that drop.

4        Q.    You didn't have that option, though, did you?

5              MR. SMITH:  Objection to form.

6        A.    I didn't have that material, if that's your

7    question.

8        Q.    Did you read the complaint in this case that was

9    filed?

10       A.    No.

11       Q.    Did you read the book The NYPD Tapes?

12       A.    Yes.

13       Q.    And did you read that while preparing your

14   report?

15       A.    No, no, I read it when it came out.

16       Q.    Now, you've mentioned and you dropped the names

17   of a lot of people would have performed statistical

18   analyses over the years and what you base some of your

19   research on.

20             Are you familiar with the work of Darrell Huff?

21             MR. SMITH:  Objection to form.

22       A.    No.

23       Q.    You are not aware of his seminal 1954 work on

24   statistics?

25             MR. SMITH:  Did you say 1954?

DR. ELI B. SILVERMAN

1              MR. LEE:  Correct.

2         A.    The books I'm familiar with are books on using

3    statistics for social research, that's the books we trained

4    in and the books we keep on.  If it's just a book on

5    statistics that would be probably something -- that's

6    someone who is a statistician would be familiar with.

7         Q.    So, you're not familiar with it?

8         A.    That's correct.

9              MR. LEE:  Okay, that's it for me.

10   EXAMINATION BY

11   MR. KOSTER:

12        Q.    Good evening, Doctor.  My name is Matthew Koster.

13   I represent one of the doctors in this matter.  I just have

14   a few questions for you.

15              In the data surveys that you received, was there

16   any breakdown on precinct or precincts or areas of command

17   that the respondents served in or on?

18        A.    No.

19        Q.    Do you have any knowledge whether the respondents

20   in your surveys sustained any adverse career effect as a

21   result of the Compstat?

22        A.    No, the only way I could peripherally respond to

23   that is that in some of the comments some have indicated

24   that, but I can't codify it and give you a graft and a

25   cross tab on it; that, I cannot do.

DR. ELI B. SILVERMAN

1    Q.    Are you aware of any articles critiquing your

2    work or findings in the areas that you've testified here

3    today?

4    A.    You mean -- can you say that again.

5              (Whereupon, the referred to question was

6              read back by the Reporter.)

7    A.    Well, I'm aware of Zimring, but I don't consider

8    that a critique.  I consider that a -- I don't know, I'll

9    leave it at that.

10             I'm aware of articles that have praised it, but

11   you said criticizing it?

12   Q.    Yes.

13   A.    No, I'm sure you'll call that to my attention.

14   Q.    Are you aware of any articles that critiqued the

15   methodology used for any of your studies or articles or

16   books in the areas that you testified about today?

17   A.    No.

18   Q.    Have you ever studied the relationship between

19   the New York City Fire Department and the New York City

20   Police Department?

21   A.    No.

22   Q.    Do you consider yourself qualified to testify

23   about the New York City Fire Department?

24   A.    No.

25   Q.    Have you read a report by a Dr. Lubin in this

DR. ELI B. SILVERMAN

1    Q.    You've just stated, correct, that --

2              MR. SMITH:  Rephrase your question.

3    Q.    Dr. Silverman, are there any other answers that

4    you need to correct at this time?

5    A.    Not that I'm aware of.  I would have to see the

6    transcript.  I'm sure there were some things I might want

7    to look at again.

8              MS. PUBLICKER METTHAM:  I have no further

9              questions.

10             MR. KRETZ:  No further questions.

11             MS. PUBLICKER METTHAM:  The time is 7:29.

12             (Whereupon, at 7:29 P.M., the Examination of

13             this Witness was concluded.)

14

15             _____

16             DR. ELI B. SILVERMAN

17

18   Subscribed and sworn to before me

19   this _____ day of _____ 20___.

20

21   _____
             NOTARY PUBLIC

22

23

24

25

DR. ELI B. SILVERMAN

1          C E R T I F I C A T E

2

3     STATE OF NEW YORK      )
                              :  SS.:
4     COUNTY OF NEW YORK     )

5

6          I, JOHN A. LUGO, a Notary Public for and within

7     the State of New York, do hereby certify:

8          That the witness whose examination is

9     hereinbefore set forth was duly sworn and that such

10    examination is a true record of the testimony given by that

11    witness.

12         I further certify that I am not related to any

13    of the parties to this action by blood or by marriage and

14    that I am in no way interested in the outcome of this

15    matter.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17    this 7th day of November 2014.

18

19                    _John A. Lugo_

20         _____

21                    JOHN A. LUGO

22

23

24

25