# EXHIBIT C

1    UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------------------------X
    ADRIAN SCHOOLCRAFT,
3
                                  PLAINTIFF,
4
               -against-        Case No:
5                                    10 Civ. 6005
                                    (RWS)
6
    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
7    Tax Id. 873220, Individually and in his Official
    Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
8    NORTH GERALD NELSON, Tax Id. 912370, Individually
    and in his Official Capacity, DEPUTY INSPECTOR
9    STEVEN MAURIELLO, Tax Id. 895117, Individually and
    in his Official Capacity, CAPTAIN THEODORE
10   LAUTERBORN, Tax Id. 897840, Individually and in his
    Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
11   919124, Individually and in his Official Capacity,
    SGT. FREDERICK SAWYER, Shield No. 2576, Individually
12   and in his Official Capacity, SERGEANT KURT DUNCAN,
    Shield No. 2483, Individually and in his Official
13   Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
    915354, Individually and in his Official Capacity,
14   LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
    Individually and in his Official Capacity, SERGEANT
15   SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
    #1-50, Individually and in their Official Capacity
16   (the name John Doe being fictitious, as the true
    names are presently unknown) (collectively referred
17   to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
    CENTER, DR. ISAK ISAKOV, Individually and in his
18   Official Capacity, DR. LILIAN ALDANA-BERNIER,
    Individually and in her Official Capacity and
19   JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEES "JOHN
    DOE" #1-50, Individually and in their Official
20   Capacity (the name John Doe being fictitious, as
    the true names are presently unknown),
21
                                    DEFENDANTS.
22   -------------------------------------------------X
                    DATE:  October 17, 2014
23                 TIME:  10:20 A.M.

24
        (Deposition of JOHN ETERNO, PhD)
25

1

2                             DATE:  October 17, 2014

3                             TIME:  10:20 A.M.

4

5

6

7           DEPOSITION of an Expert Witness,

8    JOHN ETERNO, PhD, taken by the Respective Parties,

9    Pursuant to a Notice and to the Federal Rules of

10   Civil Procedure, held at the offices of the New

11   York City Law Department, 100 Church Street,

12   New York, New York 10007, before Nathan MacCormack,

13   a Notary Public of the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

J. ETERNO

```
 1    that's included with police management.
 2         Q.    Have you ever qualified as an expert on the
 3    specific area of blue wall of silence?
 4         A.    No.
 5         Q.    Have you ever been qualified as an expert in the
 6    specific area of whistleblowers?
 7         A.    No.
 8         Q.    Have you ever been qualified as an expert in the
 9    specific area of emotionally disturbed persons?
10         A.    No.
11         Q.    Have you ever been qualified as an expert in the
12    specific area of the use of surveys and political science
13    research?
14         A.    No.
15         Q.    Have you ever been qualified as an expert in the
16    specific area of statistical analysis?
17         A.    No.
18         Q.    Have you ever been qualified as an expert in any
19    court in New York?
20         A.    New York State or Federal Court?
21         Q.    New York State or Federal Court.
22         A.    I was -- I, as I said earlier, I was an expert
23    witness in a case in the United States, Southern District.
24         Q.    That was the Daniels case?
25         A.    No, that was the Keenan case that I -- yeah.
```

J. ETERNO

1    C.V. than the one in Exhibit A?

2    A.      Yes.

3            MS. PUBLICKER METTHAM:   I'm going to call

4            for production of that C.V.

5            MR. SMITH:   We will take that under

6            advisement.

7    Q.      From where did you receive your Bachelor's

8    Degree?

9    A.      Queens College, City University of New York.

10   Q.      What was your degree?

11   A.      History.

12   Q.      What year did you receive that degree?

13   A.      I got that in 1981.

14           MR. SMITH:   Let the record reflect the

15           witness was reviewing his C.V., which is before

16           him.

17   Q.      Do you hold any advanced degrees?

18   A.      I do.

19   Q.      How many advanced degrees do you hold?

20   A.      Three.

21   Q.      What are those degrees?

22   A.      Master's in human relations, a Master's in

23   criminal justice, and a PhD in criminal justice.

24   Q.      Have you ever attended law school?

25   A.      No.  But I want to point out that one of my

J. ETERNO

1    areas -- you have to have an area of concentration in your

2    PhD program, one of my areas of concentrations was law.

3         Q.    Have you ever taken any course at a law school?

4         A.    No.

5         Q.    Are you an attorney?

6         A.    No.

7         Q.    Have you attended any classes at any university

8    since you received your PhD?

9         A.    That's a good question.  I can't recall.

10                   MR. SMITH:  You mean as a student?

11        Q.    As a student.

12        A.    No.

13        Q.    Do you attend any classes or trainings as a

14   student?

15        A.    No.  It's mostly in-service training.

16        Q.    In-service training that you received?

17        A.    That I would take, yes.

18        Q.    When was the last time you took in-service

19   training?

20        A.    I would say -- I don't know, maybe a year ago.

21        Q.    What was that training on?

22        A.    I don't recall.

23        Q.    How frequently do you receive in-service

24   training?

25        A.    I will go maybe once a year or so.

J. ETERNO

1     A.     That would be in police science.

2     Q.     So, when I asked earlier if you had ever taught

3  any course dealing with emotionally disturbed persons you

4  would add that to the list?

5     A.     I would.

6     Q.     When did you teach that course?

7     A.     This was 1987 through '88.

8     Q.     In what context did you teach that course?

9     A.     I taught recruits at the academy.

10    Q.     Was the course solely on emotionally disturbed

11  persons?

12    A.     No.

13    Q.     What was the context of the course?

14    A.     Police science.

15    Q.     How long was the section on emotionally disturbed

16  persons?

17    A.     I don't recall.

18    Q.     How long was the training that you gave to these

19  new recruits?

20    A.     Approximately six months.

21    Q.     What kind of training did you give with regard to

22  emotionally disturbed persons?

23    A.     There were very strict lectures that we do and

24  cover on emotionally disturbed people.  We sometimes do

25  role play, other types of activities for the recruits.

J. ETERNO

```
 1     A.     Can you repeat the question?

 2     Q.     Sure.

 3            It states that, "As the years progressed, the

 4     range of information expanded widely to include summonses,

 5     stop-and-frisk encounters, quality of life violations and

 6     numerous other activity;" is that correct?

 7     A.     Yes.

 8     Q.     What CompStat books did you review to come to

 9     this opinion?

10     A.     I have reviewed the initial CompStat books that

11     came out, and I am well aware of them.  And I also reviewed

12     the CompStat notes that were provided to me for this case.

13            We have also reviewed Dr. Silverman's book and

14     material from the initial CompStat meetings.  And also, my

15     knowledge of CompStat, and my awareness of what goes on at

16     that meetings, as well.

17     Q.     So, when was the last time you looked at a

18     CompStat book?

19            MR. SMITH:  Objection to the form.

20     A.     It's been back when I was on the police

21     department.

22     Q.     So, not since 2003 or 2004?

23     A.     Yes.

24     Q.     So, on what do you base your opinion that the

25     range of information in CompStat books now includes
```

J. ETERNO

1    stop-and-frisk encounters are in CompStat books?

2       A.    Well, we are also aware of this from our

3    research, our surveys.

4       Q.    And the surveys stated that stop-and-frisk

5    material is found in CompStat books, specifically?

6       A.    We did not ask that specific question.  However,

7    as part of our own research, we also interviewed some

8    commanders where this would come up.

9       Q.    So, commanders told you that stop-and-frisk

10   activity, and other activities, were found in CompStat

11   books?

12      A.    Yes.

13      Q.    When did you learn that?

14      A.    This was more recently, after the 2008 survey

15   came out.

16      Q.    Would it change your opinion, in any way, if I

17   told you that stop-and-frisk activity is not found in

18   CompStat books?

19              MR. SMITH:  Objection to the form.

20      A.    No.

21      Q.    Why not?

22      A.    Whether or not stop-and-frisk activities are in

23   the book, it's just one of many items.  CompStat notes have

24   indicated that stop-and-frisk activity is something that's

25   discussed.  And I am aware that it is something, or was

J. ETERNO

```
 1    about pressure from CompStat meetings?

 2         A.    No, not necessarily.

 3         Q.    Why not?

 4         A.    Length in time of a meeting is not necessarily

 5    indicative of the pressure that's put on commanders.

 6         Q.    The last sentence -- the second-to-last sentence

 7    in this section states that, "Commanders are ranked and

 8    evaluated based on their comparative crime statistics,

 9    anti-crime plan, related law enforcement activities and the

10    ability to articulate these at meetings."

11         A.    Yes.

12         Q.    "Commanders who do not measure up are often

13    reassigned to other positions."  Did I read that

14    accurately?

15         A.    You did.

16         Q.    Which commanders have been moved based on their

17    inability to measure up at CompStat meetings?

18         A.    You would have to get that information from my

19    colleagues, and Dr. Silverman.

20         Q.    So, you can't answer that question?

21         A.    Well, I can say that I am aware that commanders

22    have been changed due to CompStat meetings, but I cannot

23    specifically name people.

24               I do know that three commanders were fired due to

25    their playing with crime reports.  That's public
```

J. ETERNO

1    information.

2        Q.      On what did you base the opinion of the sentence

3    I just read?

4        A.      This was based on my discussions with

5    Dr. Silverman.

6        Q.      So, do you have any independent information on

7    which you based your opinion that these commanders were

8    moved based on their inability to measure up?

9        A.      I do know that we have -- we do know that

10   commanders feel a lot of pressure.  And we do know that

11   commanders have told us that they are worried about this.

12   Essentially, the informal message given at these meetings

13   is if you have a bad CompStat meeting, you don't have a

14   career.

15       Q.      But my question to you is, these three C.O.s that

16   you mentioned, or the C.O.s that you mentioned in your

17   report who are resigned, do you have any independent

18   knowledge that they were moved solely on their inability to

19   measure up and not based on other factors?

20       A.      No.

21       Q.      How often are commanders moved for the inability

22   to measure up at CompStat meetings?

23       A.      I don't know.  That's a question you would have

24   to ask the police department.

25       Q.      Do you believe it's inappropriate to rate a

J. ETERNO

1      A.      This would now be Commissioner Safir -- well,

2  starting with Commissioner Bratton, Commissioner Safir,

3  Commissioner Kerik and Commissioner Kelly.

4      Q.      And to what other government officials were you

5  referring?

6      A.      Where are you reading -- "Regardless of the

7  explanation" --

8      Q.      "The mayor, the police commissioner and other

9  government officials' rhetoric."

10      A.      I am referring to numerous media reports where we

11  have constantly seen it.  So, it would be police officials

12  and other officials who would have been in the media.

13      Q.      Can you name any specifically?

14      A.      Chiefs, Chief Esposito, perhaps, and others that

15  are in the police department.

16      Q.      The last sentence, the next one in this paragraph

17  you state, "It became the focal point, the narrative of

18  both the Giuliani and Bloomberg administration."

19              My question to you is, what is the "it" that you

20  were referring to?

21      A.      The reduction of crime.

22      Q.      So, you are not referring to the impact of

23  CompStat on the decrease on index crime?

24              MR. SMITH:  Objection to the form.

25      A.      I am referring to the reduction of crime.  The

J. ETERNO

```
1              MS. PUBLICKER METTHAM:  That was my
2         question, Mr. Smith.  Please stop interjecting
3         your comments.
4              MR. SMITH:  I was just making sure I heard
5         what you said.  Is that what you said, "Just the
6         judge's decision"?
7    Q.   Dr. Eterno, have you ever heard --
8              MR. SMITH:  Can you go back and repeat that
9         last question, please.
10             (Whereupon, the referred to question and
11        answer were read back by the Reporter.)
12   A.   I would like to change that.  And also, based on
13   my experience and knowledge of policing in New York City.
14   Q.   So, in your experience, you have seen police
15   officers make a stop of a citizen unlawfully just to meet a
16   quota?
17   A.   Anecdotally, I have got a lot of information on
18   that, media accounts and other information where that is
19   stated, yes.
20             I have also seen it on websites and other places.
21   And I have had informal and anecdotal conversations with
22   people where this has been mentioned.
23   Q.   Can you name a single person who has made a stop
24   of a citizen unlawfully just to meet a quota?
25   A.   I do know, again based on media accounts, that
```

J. ETERNO

1    the union has pointed out, and they have done a whole big

2    advertisement, "Don't blame the beat cop for what's

3    happening," and they say, "Blame management."

4         This was quite clear in their language and

5    rhetoric.  So, I would say based on those accounts, yes.

6    Q.     But my question to you is whether you can name a

7    single person who you know that stopped someone unlawfully

8    in order to meet a quota?

9    A.     No.

10   Q.     Can you name a single police officer who issued a

11   summons without probable cause solely to meet a quota?

12   A.     No.

13   Q.     Can you name a single police officer who made an

14   arrest solely to meet a quota?

15   A.     No.

16   Q.     Have you ever heard a chief say during CompStat,

17   "I don't want numbers for numbers"?

18   A.     I don't recall that exact statement being said.

19   Q.     Have you ever heard a chief say during CompStat,

20   "I don't want you pushing numbers just for the sake of

21   numbers"?

22   A.     Again, I don't recall that exact statement.

23   Q.     If I were to tell you, and you can assume it's

24   true for the purposes of this question, that chiefs have

25   said multiple times during CompStat, "I don't want numbers

J. ETERNO

1    A.    The date that I provided of 2004?  I would say

2    this.  What our research shows -- and this basically backs

3    it up -- is that there is this pressure and downgrading

4    that occurs.

5            It occurs, regardless of time period.  So, the

6    year 2004 is not that important to me.  I am just not sure

7    how this is important.

8    Q.    Would it be important to you to learn if Adrian

9    Schoolcraft did not start feeling pressure until 2007 or

10   2008?

11   A.    That's very possible, depending on where he

12   individually worked, and the commanders that he was working

13   on, and supervisors.

14   Q.    And the media reports that you refer to in this

15   Media Accounts section, they begin with claims from 2004

16   out of the 50th Precinct; is that correct?

17            MR. SMITH:  Objection to the form.

18   A.    Yes.

19   Q.    Do you know if the plaintiff ever worked in the

20   50th Precinct?

21   A.    I don't know.

22   Q.    You then state in here that your research

23   uncovered current occurrences of similar practices.  Are

24   you referring to just the 2008 and 2012 surveys when you

25   say "our research"?

J. ETERNO

1      A.      Yes.  Well, not just that, but also experience in

2   talking with officers, media accounts, all of this

3   information we gathered.

4      Q.      Has your research ever focused on the 81st

5   Precinct?

6      A.      Not specifically, no.

7      Q.      Why not?

8      A.      We were studying the police department, not

9   individual precincts.

10     Q.      Are you aware of accounts of pressure from within

11  the 81st Precinct aside from Adrian Schoolcraft?

12     A.      I am aware of statements made by other

13  supervisors there indicating that there was such pressure,

14  which was publicly acknowledged.

15     Q.      To which supervisors are you referring?

16     A.      It was either the X.O., or the lieutenant there,

17  that went to the supervisors' meeting there and taped it.

18     Q.      Is there any other information you have about

19  pressure in the 81st Precinct?

20     A.      Specifically the 81st Precinct?

21     Q.      Specifically.

22     A.      No.

23     Q.      On the next page, page 7, you cite to a 2004 New

24  York Times article reporting on 2003 FBI crime statistics

25  for New York City.

J. ETERNO

1    other examples of this in the media, sure.

2        Q.     So, would you say the materials you relied on in

3    forming this report, are those cited in this report and

4    also the media cited in your book?

5        A.     I would say certainly that's part of it, yeah.

6        Q.     Which book are you referring to?

7        A.     Crime Numbers, again.

8        Q.     Are there any other media accounts that you

9    considered that you have not listed in here?

10       A.     You can check the book.

11       Q.     Are there any media accounts that are not listed

12   in the book or the report that you considered in forming

13   your opinion in this case?

14       A.     Maybe some general knowledge of things I read in

15   the papers, of course.

16       Q.     But you can't specifically state any of those?

17       A.     No, not off the top of my head.

18       Q.     You also cite a Jim Hoffer 2010 article; is that

19   correct?

20       A.     Actually, he is ABC News investigative reporter,

21   Jim Hoffer.

22       Q.     I am sorry.

23              So, a Jim Hoffer 2010 report; is that correct?

24       A.     Yes.

25       Q.     And in that you claim to portray Commissioner

J. ETERNO

1      A.      No.   From what I understand, they are just people

2   in the precinct or others.   I know in the case of Borrelli,

3   actually, he had complainants on the tapes.

4      Q.      My question was about Officer Polanco's

5   recordings, Dr. Eterno.

6      A.      Sorry.

7      Q.      So, it's not your understanding that Officer

8   Angel Herran, who was the P.B.A. representative, was the

9   individual making the statements on Officer Polanco's

10  recording?

11     A.      I don't know.

12     Q.      So, you don't know who made any of the statements

13  on Officer Herran's recordings?

14     A.      I don't know.

15     Q.      How did you receive those recordings?

16     A.      Again, through media accounts.

17     Q.      When did you last listen to those recordings?

18     A.      I haven't listened to them in quite a while.

19     Q.      How long?

20     A.      Months.

21     Q.      What do you remember about his recordings?

22     A.      Not much.   Polanco's?

23     Q.      Polanco.

24     A.      Not much.

25     Q.      From what precinct did those recordings

J. ETERNO

```
 1      A.      Of course.  Or you might take a report for

 2   another reason.  For example, person says it's a robbery

 3   and then it could be something else.

 4      Q.      What audiotapes from Sergeant Robert Borrelli do

 5   you have?

 6      A.      I don't have any of his tapes, other than what

 7   the media has released.

 8      Q.      What tapes are those?

 9      A.      I think was a tape of the 100th Precinct where he

10   worked, some complainants that indicated things to him that

11   were not recorded on complaint reports.

12      Q.      And in what year were those recordings made?

13      A.      I don't recall.

14      Q.      Was it prior to 2010?

15      A.      I don't recall.

16      Q.      Do you recall when these tapes were made public?

17      A.      No.

18      Q.      When did you last listen to these tapes?

19      A.      Again, I don't recall the exact time and date.

20      Q.      Do you know when the tapes from Officer Polanco

21   were recorded?

22      A.      No, I don't know.  I don't remember the dates.  I

23   know, but I don't remember off the top my head, the dates.

24      Q.      Do you recall whether they were before 2010?

25      A.      I don't recall.
```

J. ETERNO

1    Q.    What else do you remember about the recordings of

2    Sergeant Robert Borrelli?

3    A.    I do remember that he was disciplined for it.  I

4    remember that he was sent to -- he was in the 100th

5    Precinct and then he was sent to, I think the Bronx from

6    the 100th Precinct.  So, he was disciplined right after

7    these recordings were released.

8    Q.    I am sorry, but you didn't answer my question,

9    which is, what do you remember about the recordings?

10   A.    I think I basically told you that.

11   Q.    That's all you recall, what you have already told

12   me?

13   A.    Yeah, that's what I remember.

14   Q.    Just to confirm, you stated you have no audio

15   recordings from any other members of the N.Y.P.D.?

16   A.    I don't have them, other than the media accounts

17   that are available publicly.  I don't have their personal

18   tape recordings, but I do have the publicly-available media

19   accounts from what's been released.

20   Q.    So, what other audiotape recordings from media

21   accounts do you rely on in your report that are not listed

22   here?

23   A.    Again, my book is listed in the references

24   section, with Eli, and all of these would be in that book,

25   so they are listed in the book.  If you want to read the

J. ETERNO

1   enforced.

2       Q.      When you were a member of the N.Y.P.D., you never

3   saw, personally, a quota being strictly enforced?

4       A.      Strictly, no.  I do know of people who were

5   disciplined for not doing any activity, things like that,

6   yes.

7       Q.      And do you believe it was inappropriate to

8   discipline those individuals for getting no activity?

9       A.      No.  If they had nothing, they should be doing

10  something.  As a supervisor, I would expect that.

11      Q.      Do you know why Officer Polanco was suspended?

12      A.      No.

13      Q.      Are you aware that Officer Polanco was suspended

14  for issuing a summons to a citizen for a violation he did

15  not observe?

16      A.      Actually, I remember reading something about that

17  in one of the news articles, yes.

18      Q.      Are you aware that he admitted to issuing a

19  summons for a violation he did not observe?

20      A.      If I remember correctly, and again this is based

21  on media accounts, he said that it was because he felt

22  pressures from the precinct to write these summonses.  But

23  I can't speak for Officer Polanco.

24      Q.      Do you believe it's inappropriate to suspend an

25  individual for admitting that they violated the

J. ETERNO

1    Q.    Is that to a reasonable degree of scientific

2    certainty?

3    A.    Yes.

4    Q.    And on what do you base that opinion?

5    A.    On what's in appendix B, and all the other

6    materials, my knowledge and expertise.

7    Q.    Did you read the depositions of any officers

8    involved in this case?

9    A.    Not in their entirety.

10   Q.    Did you read any in part?

11   A.    There was, I think, an Officer Duncan that I

12   looked at.

13   Q.    And earlier today, when I asked you about

14   documents, you did not mention Officer Duncan?

15   A.    Isn't that in appendix B?

16   Q.    I am sorry, that one is in appendix B.

17        MR. SMITH:  As is Finnegan.

18   Q.    So, the only depositions you reviewed would be

19   Finnegan and Duncan?

20   A.    Yes.

21        MR. SMITH:  But he did mention that there

22        were subsequent reports.

23        THE WITNESS:  Yes, the lieutenant's special

24        assignment from the medical division.

25   Q.    So, you did not review the complete deposition of

J. ETERNO

1    A.    Yes.  And that was from the Lauterborn memo.

2    Q.    Were you aware that he had a shotgun under his

3  bed?

4    A.    No.

5    Q.    Would that change your opinion in any way?

6    A.    As to?

7    Q.    As to any of your opinions in this case.

8    A.    Well, that should have been on his force record

9  card, which is all weapons that an officer has must be on

10  that record card.  So, that weapon should be taken.

11        As part of the patrol guide procedure, all

12  weapons should be vouchered from the medical -- previously

13  should have been vouchered.

14    Q.    Would it change your opinion about Adrian

15  Schoolcraft in any way if you learned that he had not

16  reported the shotgun to the medical division, had not

17  returned it after his weapons were removed from him?

18        MR. SMITH:  Objection to the form.

19    A.    Yes.  He should have reported that.

20    Q.    Would it change your opinion about this case in

21  any way?

22        MR. SMITH:  Objection to form.

23    A.    Perhaps.  I don't know.  Maybe.

24    Q.    Would it change your opinion about this case in

25  any way to learn that he had the gun under his bed during

J. ETERNO

1    the recording you listened to?

2    A.      Yeah.   It might be an important piece of

3    evidence.

4    Q.      Did plaintiff's counsel provide you with a

5    recording in which Adrian Schoolcraft spoke about the

6    shotgun to his father earlier in the day, on the date of

7    October 31, 2009?

8    A.      No.   The only thing I have is what's in appendix

9    B.

10    Q.      And were you provided with any documents

11    indicating that when I.A.B. went back to his home they did

12    voucher the shotgun found under his bed?

13    A.      No.

14    Q.      Have you heard any of the recordings Schoolcraft

15    took earlier in the day where he stated he wished he still

16    had his service weapon in case he got into a gun battle at

17    the precinct?

18    A.      No.

19    Q.      Assuming that's accurate, would that change your

20    opinion about this case in any way?

21          MR. SMITH:   Objection to the form.

22    A.      It might.

23    Q.      How so?

24    A.      Well, it does show a concern against his fellow

25    officers.   But we are starting to talk now about at least a

J. ETERNO

1    important I would have noted it.

2        Q.    So, again, you believe this is a direct quote

3    from that report?

4        A.    It's pretty close.  I think it's correct.  I

5    would need that report to confirm.

6        Q.    Did you have the report in front of you when you

7    wrote your report?

8        A.    I may have.  I don't recall.

9        Q.    So, you may have just paraphrased?

10       A.    It's possible.

11       Q.    Did you read Dr. Lambstein's deposition

12   transcript?

13       A.    It's not in appendix B, so I would not have read

14   it.

15       Q.    So, you didn't think it was important to know

16   what Dr. Lambstein believed on the night of the incident?

17       A.    My expert opinion is not regarding what the

18   doctor at the hospital did or did not do or whatever

19   statement that was made.  My expert opinion is based on the

20   police behavior at the scene and basic pressures that

21   happen to officers.

22            So, Dr. Lambstein's commentary to me is something

23   that I am not really commenting on, nor am I a psychologist

24   or a psychiatrist where I could comment on what a doctor, a

25   psychiatrist I am assuming, would say about Officer

J. ETERNO

 1   Schoolcraft at the time he entered the hospital.

 2            I am talking about at the scene, and what

 3   information that I have available, and what I am basing my

 4   decision on -- my expert opinion on is the information that

 5   is in appendix B, my expertise in police management.

 6       Q.    So, you don't understand, then, that

 7   Dr. Lambstein is the psychologist you are allegedly quoting

 8   here?

 9       A.    I am sorry.  I thought you were talking about the

10   person who entered the -- when he got to the hospital.

11       Q.    No, Dr. Lambstein is --

12       A.    I am sorry, I don't have the report in front of

13   me.  So, what is your question now regarding Dr. Lambstein?

14       Q.    Do you believe it would have been helpful to read

15   her transcript to understand what she believed and her

16   recollection of what she told Captain Lauterborn that night

17   was?

18       A.    Yes, that would be important.

19       Q.    But you didn't actually review that transcript?

20       A.    It's not in appendix B, I didn't read it.

21       Q.    Did you ask plaintiff's counsel for it?

22       A.    I didn't know she was involved.

23       Q.    If I told you that her opinion was that the last

24   time she saw him he did not appear to be a danger, but she

25   could not speak for him, and his mental state at the time

J. ETERNO

1      A.     I didn't say "only," but I do feel that that was

2   certainly a contributing factor.

3      Q.     I believe you do say it's a direct result.  On

4   page 11, "If any actions appeared emotionally disturbed

5   they occurred after they entered the apartment.  In fact,

6   if they occurred, they apparently were the direct result of

7   the actions of the N.Y.P.D."

8      A.     Apparently.

9      Q.     So, what do you mean by apparently, then?

10     A.     It appears that that was the direct reaction of

11  them staying in his living room, or bedroom, not sure

12  which.  But they stayed there against his wishes.  That

13  would drive anyone's blood pressure, I think, higher.

14     Q.     Do you have any medical background or training?

15     A.     Just what I had with the Police Academy.

16     Q.     So, are you qualified to make a determination

17  about the impact of others on an individual's mental or

18  physical health?

19     A.     I am a physical fitness instructor for law

20  enforcement, but I am not a qualified doctor of medicine.

21     Q.     And have you ever done any studies on the impact

22  of others on someone's physical and mental health?

23     A.     I actually did a study for the police department

24  on physical fitness standards and their effect on arrests

25  that went on to win an award.  It won a police foundation

J. ETERNO

1    not be it.

2         Q.    Your report indicates that it would have been

3    exceedingly prudent to contact the legal bureau for advice,

4    as well as notify them directly; is that correct?

5         A.    Yes.

6         Q.    Is it required that officers contact the legal

7    bureau before declaring someone an E.D.P.?

8         A.    It's not required to declare someone an E.D.P.

9    But this is an extremely unusual situation, where a

10   uniformed member of the service is being declared

11   emotionally disturbed.  It would have been extremely

12   prudent to contact the legal bureau on this.

13        Q.    But is it required?

14        A.    No.

15        Q.    Moving on to the next section, which is also on

16   page 11.  That's your section on hospital data; is that

17   right?

18        A.    Yes.

19        Q.    Mr. Smith has represented that the Health and

20   Hospital Corporation data is no longer available on the

21   website and no copy has been maintained by the expert; is

22   that accurate?

23        A.    Yes.

24        Q.    So, there is nothing --

25              MR. SMITH:  Just correct one thing.  I

J. ETERNO

1    how to do it.

2       Q.     But you did expect they would rely on the history

3    that you provided as one part of their overall evaluation

4    of that person, correct?

5       A.     Of course.

6                   MR. LEE:   Thank you.

7                   MS. PUBLICKER METTHAM:   The time is 6:46.

8                   (Whereupon, at 6:46 P.M., the Examination of

9            this Witness was concluded.)

10

11

12                   _____

                            JOHN ETERNO, PhD

13

14   Subscribed and sworn to before me

15   this _____ day of _____ 20___.

16

17   _____
            NOTARY PUBLIC

18

19

20

21

22

23

24

25

J. ETERNO

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK      )
                            :  SS.:
4    COUNTY OF NEW YORK     )

5

6             I, NATHAN MACCORMACK, a Notary Public for and

7    within the State of New York, do hereby certify:

8             That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of the testimony given by that

11   witness.

12            I further certify that I am not related to any

13   of the parties to this action by blood or by marriage and

14   that I am in no way interested in the outcome of this

15   matter.

16            IN WITNESS WHEREOF, I have hereunto set my hand

17   this 22nd day of October 2014.

18

19

20   _____
                NATHAN MACCORMACK

21

22

23

24

25