# PTX 81

EXHIBIT
81
tabbies



# POLICE CORRUPTION AND CULTURE:

## A Focus Group Methodology



## Internal Affairs Bureau

## Corruption Prevention and Analysis Unit

*EXD*



# William J. Bratton
## Police Commissioner

# David W. Scott
## First Deputy Commissioner

# Walter Mack
## Deputy Commissioner
### Internal Affairs



# CORRUPTION PREVENTION

## AND

## ANALYSIS UNIT



# Corruption Prevention and Analysis Unit

## Project Staff

### Charles V. Campisi
Inspector
Commanding Officer

### Sgt. Vincent Henry
OMAP

### Sgt. Leopold Poje

### P.O. Derrick Pervis

### S.A. Jean Reilly

TABLE OF CONTENTS

SUBJECT                                                          PAGE

EXECUTIVE SUMMARY                                                  1

INTRODUCTION                                                      14

METHODOLOGY                                                       18

CHANGES WITHIN THE DEPARTMENT (ISSUE # 1)                         26

DEPARTMENT VALUES (ISSUE # 2)                                     31

DEPARTMENT DRUG TESTING POLICY (ISSUE # 3)                        33

DEFINING CORRUPTION (ISSUE # 4)                                   38

INTEGRITY TESTING (ISSUE # 5)                                     41

REPORTING CORRUPTION (ISSUE # 6)                                  43

SUPERVISORY TRAINING ISSUES (ISSUE # 7)                           52

CORRUPTION TRAINING (ISSUE # 8)                                   54

ANCILLARY ISSUES (ISSUE # 9)                                      56

CONCLUSION                                                        61

SUMMARY OF RECOMMENDATIONS (ATTACHMENT "A")                       64

FOCUS GROUP OUTLINES (ATTACHMENT "B")                             66

BIBLIOGRAPHY                                                      68

EXECUTIVE SUMMARY

At the direction of Police Commissioner Raymond Kelly, the Internal Affairs Bureau's Corruption Prevention and Analysis Unit (CPAU) initiated a series of Focus Groups in order to identify and explore some of the prevailing attitudes, perceptions and opinions existing among members of the Department toward a range of integrity related issues. This research project, which commenced in early August and concluded in late December, 1993 ultimately involved twenty three (23) groups of officers of various ranks and assignments within the agency, and a total of over three hundred (300) members participated in the Focus Groups.

The project was undertaken in recognition of the fact that the informal demands and constraints of the police occupational culture often impact as potently upon police discretionary behavior as the formal policies and procedures promulgated by the agency. While the literature of policing and of police deviance have long emphasized the importance of cultural factors in determining police behavior, a great deal of that research on police culture is dated, and therefore of dubious value. In order to gain a more comprehensive and contemporary understanding of the attitudes, perceptions and belief systems which are subsumed by the police subculture, and to provide this data to the Police Commissioner in order to better inform his policy decisions, the research team adopted a Focus Group methodology.

Focus Groups involve interactive directed interviews of small groups of individuals of similar backgrounds, in order to develop information and to reach conclusions about other individuals and groups possessed of similar characteristics. Focus Group methodology was deemed a viable and appropriate format for eliciting data relative to integrity issues, since the enduring potential for police corruption appears inevitably to exist within the nexus of discretionary behavior, formal control policies, and the occupational culture's tolerance for members' deviance. Consistent with accepted practices of Focus Group research, each group was comprised of approximately fifteen (15) members, and twenty (20) of the twenty three (23) groups were randomly selected by computer from the population of officers possessing similar background characteristics. The relevant background characteristics, which included rank, tenure in the agency, type of assignment (i.e., patrol, Community Policing Unit, Field Training Unit, Police Academy recruits, supervisors and middle managers), and in some cases the platoon to which the officers were steadily assigned, were selected because these easily-operationalized variables appear most likely to play a powerful role in determining work-related attitudes and beliefs.

(2)

Thus, each of the officers attending a particular Focus Group session had a comparable career profile, and would therefore be expected to have similar attitudes. By eliminating selection bias through randomization techniques, by ensuring that all members of a particular Focus Group shared the same or essentially similar backgrounds and work experiences, and by probing deeply into the attitudinal data they elicited, the project staff are confident in generalizing these findings to other similarly situated groups and individuals within the Department. This level of confidence was further enhanced by slightly altering the selection criteria of successive groups, and by observing the slight differences in the beliefs and convictions espoused by those groups. The scope and duration of the project also permitted the research team to accumulate a wealth of general and specific data concerning officers' belief systems, as well as to discern many of the subtler and more nuanced dynamics of their self-reported behavior. Each of the Focus Groups was conducted in a "round-table" format, and participants were asked to respond to an identical series of open ended questions related to integrity and corruption. In order to ensure the reliability of the data, the facilitators refrained from introducing their own opinions, and made every effort to encourage candid discussion among participants. To that end, participants were assured that although notes would be taken by one member of the project staff, no names or identities would be recorded; at the end of each session, participants were asked to review the written notes to guarantee accuracy and anonymity. It should be emphasized that the facilitators encountered little reluctance on the part of officers to discuss the issues and questions posed to them. Indeed, the vast majority of participants seemed to appreciate the opportunity to share their views and opinions with the project staff, in apparent hope that their input would result in substantive and positive changes to Department policies and practices.

The following questions were posed to the Focus Group participants:

1. How has the job of Police Officer changed in the past years?
2. Are the Department values reasonable or unreasonable?
3. What is reasonable and unreasonable about the Department's Drug Testing policy and procedure?
4. How do Police Officers define corruption?
5. What role do integrity tests play in the Department's anti-corruption efforts?
6. How do we encourage the reporting of corruption?
7. What are the training needs for police supervisors? (question posed to supervisory groups)
8. How effective is corruption training?

(3)

As noted, participants' responses to these questions resulted in the compilation of an abundant base of diverse data concerning the depth, dimensions and prevalence of particular attitudes toward integrity and corruption within the agency and within specific populations of its personnel. The extensive and intricate nature of this data set, in fact, presented the project staff with some difficulty in distilling and condensing it to a format suitable for this report. Based upon the raw data obtained, however, the project staff have developed a host of findings and conclusions relative to the dynamics of the police culture and the level of integrity within this Department. These data have also resulted in a number of specific policy recommendations. While the bulk of these findings and recommendations are contained within the body of this report, some of the principal critical findings are summarized below.
It should be noted that wherever possible the project staff have attempted to capture, in this summary and in the report, the typical language and connotations used by Focus Group participants.

ISSUE #1 How has the job of Police Officer changed?

This initial "ice-breaker" question was intended to stimulate discussion among participants and to identify broad issues and trends which concern officers. In raising these issues early in the Focus Group process, project staff were able not only to gain insight into the general level of morale, but to prevent these issues from later intruding upon and distracting from discussions of integrity-specific issues. In virtually all of the groups, a similar set of perceptions and themes emerged; their recurring nature is evidence of their pervasiveness and of the fact that the culture holds them unquestionably as valid truths.
- Among those in the Police Officer rank, Sergeants were roundly criticized for an increasing lack of interactive communication skills and job knowledge, as well as for their lack of impartiality and their poor decision-making skills. These sentiments were echoed by Captains as well.
- Increasingly, Sergeants are young and inexperienced, and their practice of socializing off-duty with subordinates is detrimental to their on-duty command and control.
- Precinct-based Field Training Units (FTU's) were harshly criticized for failing to adequately school rookie officers in the reality of police work. The now-defunct Neighborhood Stabilization Units (NSU's) are regarded as a more effective field training strategy in which senior patrol officers teach a common sense approach to police work, rather than the "by the book" style evident among Sergeants. The FTU concept stifles

( 4 )

initiative and maturity, and is almost universally characterized as a "summons detail" designed primarily to generate revenue.
-    The steady tour concept has had a divisive and deleterious impact, fractionalizing each precinct into "four separate commands" in which officers have no relationships, interactions, or affinity for officers assigned to other platoons. The concept is "destroying the job" and creating conflict because officers have few inhibitions about "dumping jobs" on the following tour. Officers miss the informal camaraderie and locker room banter, and numerous cliques have formed. Cliques facilitate misconduct and corruption by eroding positive peer pressure and by intensifying in-group loyalty bonds.
       Great tension and animosity exists between Community Policing Unit (CPU) and sector officers. The perception is that CPU Officers spend their time unsupervised, socializing with residents while patrol officers do the bulk of police work. They do not respond to calls for service, especially gun runs and arrest situations. CPU Officers constitute a privileged class; they benefit from the "dial-a-tour" concept, their requests for days off are more frequently granted, and they do not "fly" to details or backfill sectors. CPU Officers do not dispute many of these claims.
-    Recruitment and hiring standards have fallen dramatically, and officers are outraged at the number of new hires who have had felony arrests with misdemeanor convictions. Many patrol officers questioned the integrity and the character of rookies, and are reluctant to work with them for this reason. Applicant investigators are seen as processors of paperwork, rather than investigators who conduct credible background and character investigations.


Participants' Recommendations:


-       Revise the Basic Management Orientation Course to emphasize communication skills, leadership, and personnel management. Impose a higher years-of-service requirement for promotion to Sergeant.
-       Abandon the FTU concept in favor of the NSU training concept. Utilize the talents of senior patrol officers to mentor rookies. Give rookies more realistic "hands-on" training in "real" police work.
-       Re-introduce a scooter chart or some other rotating tour system, particularly for rookie officers.
-       Recruitment and hiring standards must be raised, and the applicant's character must be of primary concern. Applicant investigators must conduct actual investigations, unhampered by

(5)

quotas or other hiring mandates.

ISSUE #2: Are the Department Values reasonable or unreasonable?

Many officers were completely unaware of the Department Values, to the extent that project staff felt it necessary to bring a copy of the Values to group sessions as an examplar.
- Many of those who were aware derided the values as platitudes or a public relations gimmick, frequently stating that the Department itself does not uphold them. In practice, overtime concerns determine how aggressively violators will be pursued and arrested; the agency shows little respect for the dignity of its members; politics override impartiality in enforcing laws; integrity is expected of officers, but ranking officers easily receive disability pensions.
- Values cannot be learned through public statements, or taught to those who do not possess them prior to joining the Department.
- Other than Police Academy recruits, few believe that the Values statement, per se, is of any practical use or that it informs their every-day decisions.
- Notwithstanding these criticisms, members almost universally agreed that the values were reasonable standards of conduct.

ISSUE #3: Are the Department's drug testing policies reasonable?

- Numerous misconceptions and a great deal of misinformation regarding drug testing policies and procedures were discerned, to the extent that project staff felt compelled to preface this question with an explanation of laboratory testing and chain-of-custody procedures. Most notably, the true randomness of the random selection process is doubted.
- Every Focus Group displayed a complete intolerance for drug use by MOS. Older officers of all ranks tended to favor retention of pension rights for vested employees, but overall most supported the policy of immediate termination with loss of all pension rights. A few favored drug rehabilitation prior to termination, and only a handful stated that drug users merit a second chance.
- Members were highly supportive of increased random drug testing, despite their confusion about the administration of tests. With the exception of the participants from the Guardians

(6)

Association, virtually all were satisfied with the "for cause" testing procedures as well.

Participants' Recommendations:

— Increase the number and percentage of members randomly tested, and consider random field tests of large groups of officers, e.g., at the outdoor range.
— Police applicants should also be subject to random drug testing, since the current practice of scheduling medicals in advance may afford them the opportunity to "clean up" temporarily.

Project Staff's Recommendations:

— The Department should initiate a formal campaign to dispel misconceptions about Dole Testing, including a brief film depicting the actual process from generation of daily random testing lists through laboratory testing. This film should be viewed by members selected for testing, and incorporated into Precinct Level Training.
— Given the acceptance of Random Dole Testing among officers and their lack of tolerance for members using drugs, the Department should consider increasing the number and percentage of members tested.

ISSUE #4 How do Police Officers define corruption?

— Although participants experience great difficulty in articulating a precise definition of corruption, project staff obtained a fairly detailed understanding of the types of behavior officers consider corrupt.
— A criminal act, the active pursuit or solicitation of a benefit for personal gain, accepting money under any circumstances, or the explicit expectation of a benefit as the result of one's duties as a Police Officer clearly fell within the realm of corruption.
— Free coffee, and to a lesser extent, discounted meals, were not generally considered to be corrupt when no implicit or explicit expectation of reciprocity exists. Officers are confident that they can distinguish situations where such

(7)

expectations exist.
—    Officers had some difficulty in comprehending the current Board of Ethics ruling's distinction between accepting a light repast in a social or non-social setting, and many were unaware of the ruling itself.
—    Overwhelmingly, participants voiced a favorable attitude toward a strong Internal Affairs function which would concentrate on "real corruption" rather than the petty, "white socks" infractions upon which it has previously focused. Concurrently, participants had a highly negative opinion of the Internal Affairs function as it has operated to date.
—    Internal Affairs investigators, as a group, are seen as poorly skilled and inexperienced investigators who possess little knowledge of or empathy for practical policing or for other officers, and who are more content to field "ground ball" cases which result in "easy numbers" than to do real investigations of truly corrupt cops.


Participants' Recommendations:


—    The Department should foster and facilitate candid and open discussions of corruption problems and issues, in order to inform, educate and sensitize officers. Such dialogue, in itself, may act as a deterrent to corruption if the "Slippery Slope" hypothesis is correct.


Project Staff's Recommendation:


—    The Board of Ethics should meet to discuss and clarify the Department's Policy regarding the acceptance of a light repast in a social setting. Examples should be provided to avoid further confusion. This ruling should then be disseminated to all members of the service and incorporated into the training curriculum.


ISSUE #5 What role do Integrity Tests play in the Department's anti-corruption efforts?

(8)

&mdash;   Targeted   integrity   tests,   carefully   administered   and directed toward officers who are reasonably suspected of  serious misconduct or corruption, were seen as a legitimate investigative tool.   Reservations   were   expressed   about   non-suspect   officers "being in the wrong place at the wrong time," and  tests focusing on administrative errors and minor misconduct.

&mdash;   Concerns  about random testing typically involved  anecdotes about tests unfairly administered by Internal Affairs, or  those in   which   officers   were   punished   for   minor   administrative violations. While  random tests may deter some members from minor acts  of  corruption,  hard-core corrupt  officers  will  not  be deterred.   Few  officers  trusted the integrity  of  the  random tests  themselves,  and  the issue  of  entrapment  was  frequently raised.   Some officers,  including most of the  Guardians  Focus Group,  believed  that  the  tests  have  been  directed  against particular individuals (or groups) under the guise of randomness. A  handful of officers believed that the tests imputed a lack  of trust for an officer's integrity,  and they stated they would  be offended if they knew they were tested.

Participants' Recommendations:

&mdash;   If  random  or  directed  integrity  tests  are  used  by  the Department,  special pains must be taken to ensure that they  are fairly  administered  and  carefully  controlled.    They  should address  serious  corruption only, and  any  minor  administrative violations discovered should not result in disciplinary action.

&mdash;   Officers who pass a random or directed integrity test should be notified of that fact,  and mention of successfully passing  a random  test should be included in a members'  personnel and  CPI files.

ISSUE #6 How can the reporting of corruption be encouraged?

&mdash;   Those in the Police Officer rank evinced great reluctance to report acts of misconduct or corruption among their peers.   Only the  most  egregious cases,  e.g., an officer stealing or  selling drugs,  would typically result in an officer coming forward;  even in those cases,  officers are reluctant to report corruption  and would prefer to make their reports anonymously.  Police Officers stated that they risked the ostracism of their peers and a

(9)

reputation as a "rat," and that they would be suspected of having
reported minor misconduct as well.  Some officers stated outright
that they would be afraid of physical reprisals against
themselves and their families by corrupt officers or by drug
dealers, and fear that even honest officers would not back them
up on jobs.
-    Somewhat anomalously, several officers including all of the
PBA delegates stated that they would have no hesitation in
reporting serious corruption, and would have no fear of physical
or social repercussions.  A few officers even stated that they
would personally effect an arrest rather than to make a report to
the Internal Affairs Bureau.  Project staff noted that these
officers appeared to be the most self-confident of participants,
as well as those with the highest status.
-    Participants were generally skeptical of IAB's capacity to
ensure confidentiality, with several suggesting that IAB would
not be averse to "burning" an informant officer.  They also
believe that the Action Desk uses "Caller ID" and voice analysis.
Few were familiar with the corruption hotline - 212-CORRUPT.
-    Participants contemptuously characterized Internal Affairs
as a "white socks and no hats outfit."  To maintain their batting
average, investigators issue Command Disciplines for
administrative violations and close out allegations as "Other
Misconduct Noted" or "Unsubstantiated" rather than completing a
full investigation which would result in exoneration.  Officers
are concerned that these notations remain on their Central
Personnel Index files and may be used to unfairly deny them
detail assignments or promotions.  They remain skeptical about
the restructured IAB's new image.
-    Sergeants were generally split on their reporting of
corruption.  Approximately half indicated they would openly
report corruption while the other half stated they would only
report corruption anonymously.
-    In sharp contrast to the Police Officers' self-reported
attitudes and behaviors, Lieutenants as a group believed that the
Police Officers they supervise would have little reluctance to
report corruption and serious misconduct.  They appeared very
confident that officers would come forward, either openly or
anonymously, if they knew of corruption.  Captains, however,
believed it highly unlikely that Police Officers would come
forward, even in serious cases.

(10)

Participants' Recommendations:

—   Information about the corruption hotline should be widely disseminated throughout the agency, and the notion that IAB utilizes technology to identify anonymous callers must be dispelled.  Absolute confidentiality or anonymity must be assured to officers who report corruption.
—   If IAB is to gain credibility it must change its "white socks" image and concentrate only on serious misconduct and corruption.  IAB personnel must be experienced investigators.
—   The practice of closing cases through "Unsubstantiated" or "Other Misconduct Noted" classifications must be curtailed, and an attempt must be made to fully investigate and exonerate officers when possible.  IAB should be solely concerned with serious misconduct and corruption; minor misconduct and administrative violations should not be within IAB's purview, nor should IAB issue Command Disciplines for minor matters.
—   The quality and reputation of IAB investigators must be improved if the Bureau is to have credibility and gain the cooperation of officers.  Investigators must be aggressive in identifying and arresting corrupt cops, but only corrupt cops.
—   An on-going precinct dialogue program with members of IAB should be initiated, as a means to sensitize both groups to the objectives and goals of the other, and to change the negative image of IAB.


ISSUE #7 What are the training needs of supervisors?  (Asked of Sergeants and Lieutenants only)


—   Sergeants and Lieutenants were dismissive of the Basic Management Orientation Course (BMOC) and Lieutenants Orientation Course (LOC), which they characterized as a Patrol Guide refresher.  These courses consist primarily of a series of "talking heads" who discuss the operations of their various units, and little effort is expended to impart leadership and effective management and supervisory skills.  The content of the training modules were also criticized for failing to realistically address the practical issues facing supervisors today, and participants strongly emphasized the need for "hands-on" and interactive methods of instruction.
—   Police Academy staff in general, and BMOC/LOC instructors in particular, were criticized for their mediocre teaching abilities, their lack of practical experience, and their lack of

(ii)

overall credibility.   Police Academy staff have little interest or aptitude in conveying the course material, and far too many breaks were given to students.   The courses themselves were characterized as a waste of time, and specific modules (e.g., computer training, report writing, leadership workshops) were either under-resourced or completely inadequate.

- Participants believe that the BMOC/LOC courses are given primarily to allay the Department's training liability, rather than to actually provide supervisors with useful realistic training.

- Supervisors also complained about an unmanageable span of control, stating that they are often responsible for supervising an entire precinct and are too frequently assigned to cover more than one precinct.   Particularly in the high crime precincts where effective supervision is most critical, they are frequently dispatched to handle 911 jobs during periods of backlog, in addition to their ordinary supervisory duties.   They complain that despite their high level of accountability for the actions of subordinates, these factors preclude effective supervision.

- The more tenured supervisors also chided younger Sergeants for becoming overly friendly with subordinates off-duty and on. This issue should be addressed by training, since it jeopardizes their own position of authority and reduces respect for supervisors in general.

- Lieutenants in the ICO group claimed to have received no training in their duties, much less in investigative techniques. They are overwhelmed with paperwork and under-resourced.   They are not apprised of any internal investigations taking place within their commands, and believe that their knowledge could be of great assistance to such internal investigations.   The ICO position is the least desirable or remunerative Lieutenant position in a precinct, and is consequently given to the least experienced Lieutenant.


Participants' Recommendations:


- The BMOC and LOC courses require extensive revision in order to provide adequate instruction in practical issues faced by supervisors.

- Lieutenant ICO's should receive special training in their particular duties and should receive the personnel and other resources they need; an incentive or reward system should be incorporated.   IAB should make fuller use of their knowledge and talents.

(12)

Project Staff's Recommendation:


-    The role of the Precinct/Unit ICO needs to be reviewed.    An
in-depth analysis of current duties and responsibilities should
be conducted and a clear set of guidelines should be promulgated.


ISSUE #8 Ancillary Issues


-    During the course of the Focus Group sessions, issues
frequently arose which, while not directly related to the
project's goals and objectives, nevertheless merit mention.
-    Officers characterized the Department's policy on wearing
hats as irrelevant, draconian and petty.    They related frequent
anecdotes concerning officers on emergency runs who were
disciplined for not wearing hats.    It should be noted that a
change in Department policy regarding hats during the course of
the project may render this issue moot.
-    The Police Department is entirely too responsive to
political pressures, despite its rhetoric about impartial
enforcement of the law.    They argue forcefully that the
Department and its officers should be insulated from such
pressures, and that its actions should be directed at serving the
needs of the entire citizenry rather than the needs and whims of
special interest groups.    The agency's policies are increasingly
shaped by external political agendas, rather than by the needs of
communities.    Community Policing has dangerously extended and
enhanced this political control.    Participants were highly
resentful and cynical about the politicization of the agency,
characterizing it as pervasive, counter-productive, and contrary
to the ideals that they and the Department espouse.    Several
participants equated this politicization with corruption, and
quite a few opined that politicization fosters and protects
police corruption.    Officers have little hope that this trend in
politicization will be reversed.
-    Participants in the Brooklyn North Focus Group asserted that
their entire Patrol Borough and nearly all the precincts within
it are regarded as "dumping grounds" populated by misfits,
malingerers and incompetents.    They take a perverse pride in this
deviant identity.    They reiterated a belief that ranking officers
and internal investigators are afraid to venture into the
"shithouse" precincts, and that they receive less external
supervision.
-    Overwhelmingly, participants believed that the Department's
recruitment and hiring practices have declined, and they

(13)

articulated a connection between this decline and corruption. Many individuals arrested for felony crimes have become Police Officers, as have many others with questionable backgrounds. Participants believe that political pressures to hire large numbers of officers militate against thorough background investigations and disqualification of unsuitable officers. Participants are highly distrustful of younger officers. Several participants claimed to have personally arrested individuals who are now Police Officers. Participants were not optimistic that the Department will soon change its recruitment and hiring practices.

Participants' Recommendations:

—    The Department must resist external political pressures and focus upon the ideals of impartiality and fairness.    Steps to limit politicization occurring as the result of Community Policing must be taken.
—    Brooklyn North should be used as a training ground, not a dumping ground.
—    More stringent background investigations must be conducted on all applicants, and those with questionable backgrounds must be eliminated.    Individuals with a criminal history should receive the greatest scrutiny; the Department should not bear the burden of disqualifying such applicants, but rather the individual should bear the burden of proving his/her own suitability.

Project Staffs' Recommendation:

—    The Department must take immediate affirmative steps to change the deviant identity of Brooklyn North officers.

{14}

## POLICE CORRUPTION AND CULTURE: A FOCUS GROUP METHODOLOGY

INTRODUCTION

At the direction of the Police Commissioner, the Corruption Prevention and Analysis Unit (CPAU) of the Internal Affairs Bureau recently convened a series of twenty-three (23) Focus Groups to identify and explore some of the prevailing attitudes, perceptions and opinions of Police Officers toward a range of integrity-related issues. This research project was undertaken in recognition of the fact that a great deal of discretionary police behavior is shaped and determined both by the formal rules and policy directions promulgated by the organization and by the less formal but perhaps equally potent demands and constraints of the police occupational culture. In light of the fact that a great deal of police work is not subject to direct supervision and takes place in ambiguous circumstances, or in situations which may seem to present compelling legitimate cause to deviate from formal policy, an understanding of police behavior must take these informal factors into account. When such behaviors fall within the realm of ethical conduct, where pressures to deviate from policy may be magnified, the subcultural determinants of police behavior take on an increased salience.

While an agency's formal written policies or directives are easily discerned and articulated, the subtler and infinitely more complex dynamics of the police subculture are less amenable to quantification and comprehension. Focus Groups provide an appropriate and viable research methodology with which to seek a more comprehensive understanding of the complex determinants of police behavior, especially with regard to integrity and corruption.

For several decades, Focus Groups have been widely used in the social sciences and in market research to explore, to describe, and to explain attitudes and behavioral dynamics which defy simple quantification. Focus Groups are a particularly effective research methodology when complex or multifaceted attitudes and behaviors are the subject of inquiry. Morgan (1988, p. 12) notes, for example, that the sociologist Robert Merton initially developed Focus Groups as a means of probing the practical impact and effect of wartime domestic propaganda efforts upon behavior.

Focus Group methodology entails the formation of a group – typically consisting of twelve (12) to fifteen (15) members – who share some common and relevant attribute(s), and involves a process of guided group discussion aimed at producing the type of data and insights which might not be accessed without the

(15)

type of interaction found in a group setting. These group discussions afford participants an opportunity to respond, both individually and as a group, to focused questions posed by the facilitator/moderator. Based upon these responses the facilitator will frequently refine his/her questions to probe more deeply into the issues and opinions raised, and to explore their origins and intensity. The group dynamic also permits participants to question the responses of others, or to add important details and clarification to their own or another's response. Focus Groups permit the facilitator to glimpse many of the subtleties and emotional substance which underlies specific responses, and to draw appropriate inferences from them. As a result, the facilitator/moderator is provided with a richer and more refined set of data.

In pointing out the advantages of Focus Group methodology, Earl Babbie (1992) asserts that the technique is a flexible and relatively inexpensive means of capturing real-life data about social behavior, and that its results have a high degree of face validity (p. 255). A guiding principle in social science research is that data may be considered reliable when it has both face validity and empirical validity; the results must logically appear to make sense without a great deal of explanation or elaboration, and essentially similar results must be obtained from successive groups. As will be discussed more fully below, the data obtained from this series of Focus Groups meet both these criteria, and can therefore be considered reliable.

Focus Group methodology has in recent years come to be adapted for and extensively used in American industry, as well as in the public sector, particularly in service of participative management programs. These groups, which have also variously been referred to in the literature as "quality circles" and "ad hoc task forces," have been widely utilized in Japanese industry, where the remarkable gains made in producing high quality goods is widely attributed to their use. Within the past decade, participative management initiatives in a host of American police agencies have incorporated focus groups or quality circles to improve service delivery, to streamline administrative tasks and procedures, to gather relevant information from and stimulate communication among employees, and to establish cogent practical policies (FBI Bulletin; Brown, page 18, August 1993).

It must be emphasized that this series of Focus Groups were not designed or intended to produce specific factual data

(16)

concerning individuals or acts of corruption and misconduct. Rather, their intended goal was to probe the prevalent attitudes toward corruption within the police occupational culture and to solicit viable solutions to the integrity problems faced by this agency. The project sought to capitalize upon the experiences and expertise of Police Officers and to determine their perceptions of the Department and its policies regarding corruption, as well as their attitudes and perceptions of other members of the service. Specifically, the research mandate concerned the identification of those organizational policies, procedures, and conditions, as well as aspects of the police occupational culture which:

- facilitate corruption;
- inhibit discovery of corrupt activity; or
- create opportunities for corruption.

Further, the project sought insight into the prevailing attitudes, belief systems and behavioral norms which constitute the contemporary police culture in New York City, in order to provide the Police Commissioner with accurate current data which would inform his policy decisions and enhance his capacity to manage the culture. Various academic researchers have studied and expounded upon the critical and pervasive features of "the police culture," to the extent that the term has taken on a generic quality which assumes that an identical or highly similar occupational culture characterizes most or all of American policing. It must be acknowledged, however, that "the police culture" is not a singular or a static entity. Rather, the occupational culture varies somewhat from agency to agency, and moreover, the occupational culture within an agency is in a state of constant evolution as it responds to an interplay of innumerable factors and forces within the agency as well as outside it. Substantive changes in Department policy, in training and promotional practices, and in the work environment, for example, will impact the individual and shared attitudes of employees. Similarly, a great many of the attitudes held and shared by officers are reflective of, and emanate from, the dominant larger culture's value system. In this respect, the admixture of new officers into the agency will impart to the occupational culture a set of new, and potentially conflicting, preexisting attitudes and belief systems. Although these attitudes and perceptions of the occupational culture tend to be quite durable, they are mediated and modified by their contact and conflict with the existing attitudes and perceptions of the occupational culture. The introduction of new or different values will create culture

(17)

conflict, resulting in a dialectic process of redefinition and the emergence of a somewhat different shared value system. In summary, the police occupational culture in a given agency is a vibrant and vital culture which responds to a myriad of subtle and overt forces and pressures.

Two (2) conclusions emerge from this recognition of the transitory nature of an agency's occupational culture. First, management of the dynamics which shape the occupational culture are within the control of the police executive, holding open the potential for the executive to shape and direct the culture's development. Recognition must be given to the fact that virtually every alteration in the work environment will inevitably give rise to a corresponding change in the occupational culture. The establishment of the steady tours concept, for example, to some extent caused officers of similar backgrounds and interests to choose particular tours, concurrently limiting their interaction (and their exposure to differing attitudes and opinions) with other officers. As was evidenced by the stated opinions of successive focus groups, as well as by the perceptions of the project staff, the Police Department's occupational culture has been somewhat fractionalized by steady tours — officers simply do not have the opportunity to interact with members assigned to other tours, and to some extent each tour within a precinct has developed its own identity. In time, and under certain conditions, this isolation may result in the emergence of separate and quite disparate cultures within the system.

Secondly, we may conclude that much of the research and conventional wisdom regarding the dimensions and features of the occupational culture may no longer be valid. Much of the academic research concerning police culture, particularly that body of work relating culture to corruption, was conducted in the early 1970's. We must acknowledge the tremendous changes which have taken place since that research was conducted, and may need to reconsider some of the assumptions we make concerning the relationship between culture and corruption.

(18)

## METHODOLOGY

Decisions concerning the methodology utilized in the present research were shaped in response to several operant constraints and logistic issues. One of the most salient issues was the problem of selecting participants who would reflect a fairly broad range of perspectives and attitudes, at the same time they would provide the project staff with meaningful and useful information. The project staff were therefore less concerned with achieving a truly random sample of the entire Department than with obtaining pertinent information. This decision was shaped by the recognition or caveat that in an empirical sense, the limited number of potential Focus Groups would preclude generalizing our findings and results to the entire population of the agency. As Morgan (1988) notes, the empirical issue of concern in large organizations is

> sample bias, not generalizability: 40 or so participants are never going to be representative of a large population. This is especially important when one's research goal is not to test hypotheses but to learn about others' experiences and perspectives. Using Focus Groups to learn about the full range of experience and perspectives in a broad population can be a fool's errand (pp. 44-45).

Rather than attempting to discern or measure the full range of attitudes and opinions existing within the entire agency, including each of its operational, administrative and investigative functions, project staff narrowed the selection criteria to choose subgroups which would be likely to provide the information most pertinent to our research - attitudes concerning integrity and corruption within the patrol force.

Decisions concerning the optimal size of the groups were again made in light of several logistical and practical considerations. According to Morgan (1988), smaller groups generally provide greater depth of information and insight, but overall they tend to be less productive and more costly. Larger groups pose problems of discussion management and group control for the facilitator, and important information can also be lost when participants become distracted by the comments of others. Combining both practical and substantive considerations, Morgan (1988, pp. 43-44) recommends that groups not generally exceed twelve (12) members, but that the moderators over-recruit by about 20% to account for no-shows.

(19)

A bifurcated methodology, in which two (2) rounds of Focus Groups would be conducted, was devised in order to refine both the dynamics of the process and the collection of data. Project staff were aware that the advent of steady tours and the establishment of precinct Community Policing Units in the past several years have resulted in the formation of four (4) separate work groups – and to some extent, perhaps four (4) separate occupational cultures – in each patrol command. Prior to the establishment of these concepts, officers assigned to rotating tours presumably interacted more frequently, if less intensely, with a larger number of officers, and inevitably the differential effects of these interactions must have an impact upon the attitudes and behavioral norms of the work group subculture. In order to discern the potential differences in attitudes among these four (4) subcultures, four (4) separate Focus Groups were conducted during the first round – one (1) for each of the three (3) platoons, and one (1) for Community Policing Unit officers. In the first round of Focus Groups, two (2) participants were chosen, in the manner described below, from each of the seven (7) Patrol Boroughs, as well as two (2) participants from the Detective Bureau. Thus four (4) Focus Groups of sixteen (16) participants were scheduled in the first round.

Participants for the second round of Focus Groups were chosen from within the same Patrol Borough, in order to ensure that each precinct had representation. A total of ten (10) Focus Groups were held in the second round, one (1) for each of the seven (7) Patrol Boroughs, one (1) consisting of Patrolmen's Benevolent Association delegates, and two (2) consisting of Patrol Sergeants. (Note: Patrol Sergeants were selected in the same manner as the first round of Focus Groups with two (2) Sergeants selected from each of the seven (7) Patrol Boroughs).

As noted, the project staff was less concerned with achieving a valid statistical sample of the entire Department than with obtaining useful information. To that end, several decisions were made concerning selection criteria for participation. Project staff were concerned that participants had sufficient experience and familiarity with Department policies and procedures, as well as knowledge of the police culture and the informal values, attitudes and practices that culture entails. Research, initially and most notably conducted by Niederhoffer (1967) and by others who have more recently replicated or expanded upon his work, indicates that the attitudes of Police Officers form in a process of

(20)

socialization lasting about five (5) years, and that these attitudes remain fairly consistent until about the twelfth to fifteenth year of service. Moreover, the project staff recognized that the socialization process for officers recruited in the early 1980's was significantly different than for those hired prior to the fiscal crisis of the 1970's, and that the vast majority of Police Officers currently assigned to patrol fall into the post-1981 hiring cohort. In order to measure, albeit to a limited extent, the attitudes extant within the detective subculture, the project staff expanded the selection criteria to include similarly qualified Detective Investigators assigned to Precinct Detective Squads. Each of the officers selected to participate therefore met each of the following criteria:

1.  they were either Police Officers or Detective Investigators;
2.  they were assigned to patrol precincts or Precinct Detective Squads;
3.  they had a minimum of five (5) and a maximum of twelve (12) years of service in the agency. *(Due to a notification error made by the precinct's roll call clerk, one officer with only two and one-half years of service, less than the required minimum, was sent in place of her partner, who had received an unexpected court appearance notification).

A last group consisting of Sergeants assigned to Patrol Services Bureau were randomly selected from all Patrol Boroughs with no criteria to time in service or rank being considered.

To eliminate sample bias, a pool of approximately one hundred (100) members who conformed to these criteria were drawn from the Department's personnel database using a version of the computer program used to select officers for the Random Dole Testing program, adapted to consider the selection criteria fields. This randomly generated list included members of each of the seven (7) Patrol Boroughs. Telephone calls were placed to each Police Officer's command to ascertain assignment (radio motor patrol or Community Policing Unit, and/or steady platoon), and to each Detective's squad to ascertain his or her scheduled appearance days. From this master list, four (4) separate lists were compiled — one (1) for each of the three (3) platoons and one (1) for the Community Policing Unit officers. Each list was consulted and two (2) members, either two (2) Police Officers or a Police Officer and a Detective Investigator, from each of the seven (7) Patrol Boroughs were arbitrarily designated to appear at the scheduled Focus Group

(21)

meeting.  A total of fifty five (55) participants were present at the following Focus Group meetings:

ROUND 1

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---|---|---|---|---|---|
| 1 | 08/10/93 | 14 | 10/4 | CPU | all |
| 2 | 08/12/93 | 15 | 9/6 | 2nd | all |
| 3 | 08/17/93 | 13 | 9/4 | 3rd | all |
| 4 | 08/20/93 | 13 | 12/1 | 1st | all |
|   |   | 55 | 40/15 |   |   |

A total of ten (10) additional Focus Group meetings took place during the second round.  Selection criteria and selection method (i.e., use of the adapted Random Dole computer program) remained consistent, however, these groups were each comprised of members from the same Patrol Borough.  As noted, this process ensured that each of the seventy five (75) patrol precincts were represented.  In addition, a Focus Group comprised of seven (7) PBA Delegates was held, its members selected by the Patrolmen's Benevolent Association.  A total of one hundred twenty-six (126) participants were present at the following Focus Group meetings:

ROUND 2

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---|---|---|---|---|---|
| 5 | 9/22/93 | 13 | 8/5 | 2nd | PBBX |
| 6 | 9/24/93 | 11 | 7/4 | 2nd | PBSI |
| 7 | 9/29/93 | 16 | 13/3 | CPU | PBBS |
| 8 | 10/1/93 | 10 | 8/2 | 1st | PBMS |
| 9 | 10/6/93 | 13 | 9/4 | 3rd | PBMN |
| 10 | 10/7/93 | 7 | 7/0 | PBA delegates | ALL |
| 11 | 10/8/93 | 16 | 13/3 | 1st | PBQ |
| 12 | 10/12/93 | 13 | 7/6 | 3rd | PBBN |
| *13 | 10/22/93 | 13 | 11/2 | 2nd | ALL |
| *14 | 12/3/93 | 14 | 12/12 | 2ND | ALL |
|   |   | 126 | 95/41 |   |   |

*    (As mentioned previously, a group of randomly selected Sergeants assigned to the Patrol Services Bureau were assigned to two (2) additional Focus Groups.  They were from all Patrol Boroughs and assigned to the second platoon).

(22)

At the direction of the Police Commissioner,  and in order to  gain a more comprehensive and inclusive perspective on  the dynamics  of the police culture, a  third round of Focus Groups was  conducted.    These groups consisted of two (2)  panels of fourteen (14) members assigned to Field Training Units  (FTU's) and  two   (2) groups of twelve (12) members  assigned  to  the Police  Academy Recruit Training Section (PARTS),  (Group #  17 consisted  of eleven (11) members),  and the  findings  derived from these groups are incorporated throughout the body of  this report.

A  total of four (4) Focus Group meetings  with  fifty-one (51)  participants were  conducted  during  the  third round. Selection  criteria and selection method (i.e.,  use  of  the adapted  Random Dole  computer  programs) remained  consistent for groups #15 and #16.   Each of these two (2) groups had  two (2) representatives from each of the seven (7) Patrol Boroughs. Groups  #17  and #18 were randomly selected (using a  table  of random numbers) by the  Police Academy Administrative Unit.

ROUND 3

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---------|------|----------------|-------------|---------|------|
| 15 | 11/3/93 | 14 | 12/2 | FTU | ALL |
| 16 | 11/5/93 | 14 | 10/4 | FTU | ALL |
| 17 | 11/16/93 | 11 | 11/0 | P.A. | N/A |
| 18 | 11/22/93 | 12 | 11/1 | P.A. | N/A |
|   |   | 51 | 44/7 |   |   |

In  order to gain insight concerning the  perceptions  and attitudes of middle managers within the Department, a series of Focus  Groups  consisting  of  Lieutenants  and  Captains  were incorporated into a fourth round.   A total of three (3)  Focus Group  meetings  with  forty-eight (48)  participants  were conducted during this round.

A  group comprised of thirteen (13)  Integrity  Control Officers (ICO's),  twelve (12) Lieutenants and one (1) Sergeant representing  the  seven (7)  Patrol Boroughs was  randomly selected  using  a  list of ICO's maintained  at  the  Internal Affairs Bureau.   This group was presented with the same issues as  previous  groups and also queried about  the  problems  and conditions  indigenous  to the position of  Integrity  Control Officer.

(23)

A Focus Group consisting of twelve (12) Captains assigned to patrol commands was also conducted. The members of these groups were, predictably, somewhat older and more tenured than the average participants in previous groups. Their perceptions and attitudes tended to generally mirror those of previous groups, with several exceptions. These exceptions are noted throughout this report, under the appropriate issue selections.

A total of thirteen (13) Lieutenants, representing each of the seven (7) Patrol Boroughs, participated in a Focus Group session at which they discussed each of the issues and items presented to earlier groups of various ranks. The computer-generated random selection method used to choose participants in previous groups was also used to select these Lieutenants.

ROUND 4

| Group # | Date | # participants | Male/Female | Platoon | Boro |
|---|---|---|---|---|---|
| 19 | 11/29/93 | 13 | 12/1 | ICO's | ALL |
| 20 | 12/7/93 | 13 | 12/1 | Lt's | ALL |
| 21 | 12/15/93 | 12 | 11/1 | Capt's | ALL |
| | | 48 | 35/3 | | |

A special Focus Group consisting of members of the Guardians Association was conducted in order to ascertain whether African-American officers' attitudes and perceptions of integrity issues differed significantly from those of the predominantly white focus groups previously held. It should be noted that in contrast to the random sampling selection method used to generate participant lists for the previous Focus Groups, these participants were identified and selected by the Guardians Association's president. As a result, the project staff cannot conclude with a high degree of certainty that the attitudes and perceptions discerned in this sample are generally representative of the entire population of African-American officers.

A second special Focus Group consisting of members of the Policewomen's Endowment Association (PEA) was conducted in order to ascertain whether female officers' attitudes and perceptions of integrity issues differed significantly from those of the predominantly male Focus Groups previously held. It should be noted that participants were selected by the PEA,

(24)

and as with the Guardians Association, project staff cannot conclude that the attitudes and perceptions discerned in this sample are generally representative of the entire population of female officers.

A total of two (2) Focus Group meetings with twenty-three (23) participants were conducted during the fifth round.

ROUND 5

| Group # | Date | # participants | Male/Female | Group | Boro |
|---------|------|----------------|-------------|-------|------|
| 22 | 12/20/93 | 14 | 6/8 | Guardians | All |
| 23 | 12/22/93 | 9 | 0/9 | PEA | All |
| | | 23 | 6/17 | | |

A grand total of three hundred and thirteen (313) members of the service participated during five (5) rounds of Focus Groups. The actual Focus Group meetings followed a standardized format designed to elicit comments on a successive series of issues. A copy of the meeting outline is included as an Appendix to this report, and the standardized format addressed, seriatim, the following issues:

ISSUE

#1  How has the job of Police Officer changed in the past years?
#2  Are the Department Values reasonable or unreasonable?
#3  What is reasonable and unreasonable about the Department's Drug Testing policy and procedure?
#4  How do Police Officers define corruption?
#5  What role do integrity tests play in the Department's anti-corruption efforts?
#6  How do we encourage the reporting of corruption?
#7  What are the training needs for police supervisors? (Question posed to Supervisory Groups)
#8  How effective is corruption training?
#9  Ancillary issues

At each session, the group facilitator introduced himself and gave a brief overview of the project's goals and objectives, stressing the confidentiality of participants' responses and emphasizing the fact that only one member of the project staff would be taking notes during the session. These notes were made available to the participants after the

(25)

meeting, and they were encouraged to scrutinize them for accuracy and for the fact that no identities were mentioned. Concurrently, the participants were assured that their comments would be passed along to the Police Commissioner as accurately as possible.

Each participant was asked to briefly introduce himself/herself to the group by first name and command, and to provide a brief summary of their tenure and experience in the Department. As an "icebreaker" exercise, each participant was asked to address the question, "How has the job changed since you began your career?" This relatively ambiguous and open-ended icebreaker question had a dual purpose: it set a tone of non-threatening self-disclosure, and it permitted project staff to gather and begin to assess general background information concerning the overall attitudes and perceptions of individuals and of the group as a whole.

Following this initial discussion, and having set a positive and relatively trusting tone, the remaining more substantive issues were raised and addressed in the order indicated in the appended outline.

(26)

ISSUE # 1 <u>Changes within the Department</u>

As an initial "icebreaker" question, the participants were asked to discuss their perceptions of how the job of Police Officer had changed during their tenure with the Department. As intended, the open-ended and somewhat ambiguous nature of this question elicited a broad range of responses relating to various types and aspects of change the participants had observed in both the subcultural and task environments. Questions were relayed so they addressed both the changes in the everyday tasks the participants perform and in the individuals with whom they work.   It should also be noted that despite the range of responses generated, several patterns of perceptions and attitudes were discerned.   In virtually every group, the participants identified a similar set of perceptions and issues.   The pervasive and recurring nature of these patterns across each of the Focus Groups, as well as the vehemence with which they were expressed, lends credence to the argument that these perceptions surpass mere opinion: they have, in the participants' belief system, the full weight of objective reality.   Regardless of the perceptions' objective and factual basis, the police occupational culture unquestioningly holds them to be true and valid.

One such pattern of perceptions concerned supervisors, and in particular Sergeants, who were frequently seen as lacking in interactive communication skills as well as job knowledge. Supervisors were also criticized for their lack of impartiality in dealing with subordinates and their poor decision making skills.   The participants related the paucity of supervisory skills to several factors, including the poor training they receive at the Police Academy's Basic Management Orientation Course and the fact that many Sergeants are promoted to their rank with little street experience.   Many Sergeants were seen as lacking in the type of maturity which police experience and general life experience brings, and many officers voiced resentment at Sergeants' failure to treat them as adults.   At the same time, many of the younger Sergeants were seen as overly friendly toward "rookie" officers, and as catering to the rookies' "childish and petty" requests.   Participants noted that rookies frequently complain about being assigned to a foot post or assigned to a DOA, and that a supervisor will often accede to these complaints by changing their assignment.   These changes are often made without regard to seniority or experience.   The participants noted that the policy of transferring Sergeants after their initial six months is an

(27)

inadequate period for Sergeants to become comfortable with and knowledgeable about the command and its officers. Because many of the Sergeants are younger and less experienced than some of the officers they supervise, they neither appreciate nor honor various informal Department traditions, leading to resentment among the more tenured officers. The examples they cited ranged from the fact that Sergeants often ignore seniority when assigning officers to sectors or to "fly" to details, to the fact that they permit Police Officers to indiscriminately come behind the desk. Several Detectives noted that Sergeants often unnecessarily exert their authority in a manner which interferes with Detective responsibilities at crime scenes. Overall, the participants felt that Sergeants are overly solicitous to rookies, who have not earned the right to special favors, and that this has a negative impact on senior officers' morale. It should be noted that these perceptions were particularly apparent among participants assigned to the busier high crime precincts, where supervisory skills are perhaps most critical. It is also noteworthy that the Focus Group of Sergeants reiterated these same beliefs and perceptions. (Discussed further in Issue # 7).

Proposed solutions to the problems with Sergeants included revision of the Basic Management Orientation Course (which is viewed as a Patrol Guide refresher course) and the Lieutenants Orientation Course, especially with regard to developing communication skills, leadership training, and proper procedure at police incidents. Participants also recommended raising the years of service requirement for promotion so that Sergeants can gain some practical street experience.

Another source of criticism concerned the activities of precinct Field Training Units. The general consensus was that the now-defunct Neighborhood Stabilization Units (NSU's) were more effective in training rookies, since training was conducted by veteran Detective/Field Training Officers. Unlike the FTU Sergeants, whose supervisory role demands that they train rookies solely "by the book", the Detectives were guided by experience and expedience, teaching rookie officers to use common sense and to handle jobs "the right way". Other criticisms concerned the fact that currently the Training RMP is not part of the 911 run-down, so the Sergeants pick and choose the jobs they want to handle. In the NSU concept, each RMP was assigned as a precinct sector, permitting officers to experience a full range of calls for service. The FTU system is seen as stifling the maturity of rookies and preventing them from having "hands-on" experience. Participants recommended

(28)

eliminating the present FTU system in favor of a training
scheme modeled after the NSU's.

The vast majority of participants were of the opinion that
the steady tour concept has had a severely negative and
divisive impact upon their relationships with other officers,
to the extent that four (4) separate precincts (each of the
three (3) platoons and the CPU) have been created in every
command. Depending upon precinct policy, CPU Officers may or
may not be used to backfill vacancies in patrol sectors,
exacerbating the existing tensions between patrol officers and
CPU members. Patrol officers are resentful of that fact that
they are often in a backlog while CPU Officers "have coffee
with neighborhood residents," and that CPU Officers often do
not back them up on such dangerous assignments as "gun runs."
Many patrol officers believed that CPU Officers constitute a
privileged class - their requests for days off or lost time are
more frequently approved, for example, and they are exempted
from "flying" to details. This sense of privilege is reputedly
being cultivated at the Police Academy, where recruits are told
(reportedly by instructors who are themselves "inexperienced
rookies") both to ignore the advice of veteran officers ("the
veterans only want to get you into trouble") and that patrol is
not as valuable as the Community Policing Unit. The antagonism
is especially apparent toward rookies in the CPU, whose
requests for days off - particularly holidays - are granted
without regard for seniority. Patrol officers feel that they
are doing the vast majority of the work, and the most dangerous
kind of work.

Participants also felt that the steady tour concept "is
destroying the Job." They no longer see or work with officers
assigned to other tours, and a potent form of social control —
peer pressure - has been lost. The old adage, "leave it for
the four-to-twelve" has become a modus vivendi - because they
no longer see or know the officers on the following tour, many
cops have no regard for the officers on the other tours and
will no longer go out of their way for them. Prior to steady
tours, for example, the prospect of working with an officer
from another squad at some future date deterred many minor
transgressions, such as failing to clean out the back seat of
the radio car. The positive aspects of peer pressure have been
lost due to a much smaller work group and the distinct
improbability of having contact with officers from other squads
during the work day. Other features of this fractionalization
within the commands include the fact that officers miss the
informal locker-room banter and camaraderie they once shared,