# PTX 93

EXHIBIT
93

JAN 1 7 2006

LABOR ARBITRATION TRIBUNAL

In The Matter of the Arbitration

between

PATROLMEN'S BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, INC.

and

THE CITY OF NEW YORK   NEW YORK CITY
POLICE DEPARTMENT

OPINION and AWARD
Case# A-10699-04
(Labor Law §215-a
at the 75th Precinct)

BEFORE:  Bonnie Siber Weinstock, Arbitrator

APPEARANCES:
 For the Union:

David M. Nicholson, Esq. - Assistant
 General Counsel
Robert McCarthy, Esq. and Clifford
 Scott, Esq. - Staff Attorney
Youngji Lee - Intern
Sgt. John Deodato, Jr. - Witness (by
 subpoena)
P.O. David Velez - Grievant
Sgt. Andrew Cunningham - Witness (by
 subpoena)
Sgt. Roger Lurch - Witness (by subpoena)
John Giangrasso - PBA Borough
 Representative
P.O. Chris Rykert - 75th Pct.
Joseph Alejandro - Treasurer
P.O. Anthony Sarrica - 75th Pct.
P.O. Peter Figoski - 75th Pct.

 For the Employer:

Jason R. Stanevich, Esq. - Assistant
 General Counsel, OLR
Deborah Gaines, Esq. - General Counsel,
 OLR
John Beirne - Deputy Commissioner
Deputy Chief George Anderson - Executive
 Officer, Personnel Bureau
Deputy Chief Michael Marino - Witness
Deputy Inspector Thomas Moran - Witness
Lt. Bernard Whalen - NYPD
Insp. James McCabe - NYPD

NYC00012475

2

Patrolmen's Benevolent Association of The City of New York, Inc. ("Union") and The City of New York - New York City Police Department ("Employer", "City", or "Department") are parties to a collective bargaining agreement effective 1999-2000, as amended ("Agreement"), which provides for the arbitration of unresolved grievances.  The grievance procedure of the Agreement was utilized pursuant to New York State Labor Law §215-a to adjudicate a claim under that statutory provision.  The parties appeared before the undersigned on June 16 and 17, 2005 for a hearing on the matter described below.  The hearing was transcribed.[1]  The parties had full and fair opportunity to present evidence and argument, to engage in the examination and cross-examination of sworn (or affirmed) witnesses, and otherwise to support their respective positions.  The record was declared closed upon the Arbitrator's receipt of the parties' closing Briefs.

## ISSUE

At the hearing on June 16, 2005, the parties were unable to agree upon the framing of the issue.  However, the parties did consent to allow the Arbitrator to frame the issue. (TR at 22-23).  Upon consideration of the arguments of the parties, the Arbitrator finds the issue in this proceeding to be:

---

[1]   References to the transcribed record of hearing appear herein as "TR at --."  Joint exhibits are referred to as "Joint--", Union exhibits are "U--" and City exhibits are "C--."

NYC00012476

3

Did the New York City Police Department violate New York State Labor Law Section 215-a by establishing and maintaining a summons quota for traffic violations in the 75th Precinct and by penalizing officers for failing to meet the stated number of traffic violations, including parking, standing and stopping? If so, what shall be the remedy?

## BACKGROUND

This case arises under Section 215-a of the New York State Labor Law, which permits alleged violations of that section to be brought to arbitration pursuant to the procedures contained in a collective bargaining agreement.  As quoted below, Section 215-a of the Labor Law makes it illegal "to transfer or otherwise penalize" an employee because of a failure to meet a quota for traffic violations.[2]

The Union contends that in the 75th Precinct (located in the East New York section of Brooklyn), the Police Department established quotas for: (a) moving violations, (b) parking tickets, (c) quality of life summonses and (d) arrests, and then penalized police officers when they did not meet those quotas. The Union alleges this to be a clear violation of Section 215-a and asks that the Department be directed to: (a) cease and desist from enforcing a traffic summons quota in the 75th Pct; (b) instruct its supervising officers about the statutory prohibition of traffic summons quotas; (c) expunge all negative performance

_____

[2]  For purposes of this Opinion and Award, the phrase "traffic violations" from Labor Law §215-a is used interchangeably with the phrase "vehicular offenses" from the Department's Performance Evaluation form.  Both include "parking, standing or stopping" infractions.

NYC00012477

4

evaluations from police officers' personnel files based on their failure to meet the traffic summons quota; (d) reverse any other penalties imposed against police officers based on such negative performance evaluations; (e) restore affected officers, if desired, to their previous assignments; (f) reimburse police officers for any lost wages; and (g) post notice of the violation in a location within the 75th Precinct.  (Brief at p. 7).

The City, on the other hand, first insists that it did not have any "quotas" for ticket writing.  While there may have been performance guidelines which included the number of summonses the supervisors expected the police officers to write, the City urges that no employee was transferred, reassigned or in any way penalized solely for failing to reach a target number of summonses.  The City further maintains that if any employees were transferred or reassigned, this personnel action was taken as result of the totality of their record and based on the decision of a Borough Review Board.

The City urges that Labor Law Section 215-a prohibits the Employer from affecting an employee's employment _solely_ for failing to meet a ticket quota for vehicular offenses.  The City insists that the performance evaluations have numerous performance areas, and it did not take any action based _solely_ on an officer's failure to write sufficient numbers of vehicular summonses.  Instead, any officers transferred or reassigned were moved because their overall performance was deficient, not just their level of ticket writing for traffic violations.  The

NYC00012478

5

Employer urges that it did not violate Labor Law Section 215-a and asks that the Union's claim be denied in its entirety.

## RELEVANT STATUTORY PROVISION

New York Sate Labor Law §215-a:[3]

1.   No employer or his duly authorized agent shall transfer or in any other manner penalize an employee as to his employment solely because such employee has failed to meet a quota, established by his employer or his duly authorized agent, of tickets or summonses issued within a specified period of time for traffic violations including parking, standing or stopping. Any employee so transferred or otherwise penalized may cause to be instituted a grievance proceeding pursuant to the provisions of a collective bargaining agreement if any, or pursuant to the provisions of section seventy-five-a of the civil service law if no collective bargaining agreement exists.  Any employee so transferred or otherwise penalized shall be restored to his previously assigned position of employment and shall be compensated by his employer for any loss of wages arising out of such transfer or other penalty, and shall have any penalty imposed restored; provided, that if such employee shall cease to be qualified to perform the duties of his employment he shall not be entitled to such restoration; and it shall be contrary to the public policy of this state for such employer to establish or hereafter maintain a quota policy of tickets or summonses issued for traffic violations including parking, standing, or stopping.

2.   For the purpose of this section a quota shall mean a specific number of tickets or summonses issued for traffic violations including parking, standing or stopping which are required to be issued within a specified period of time.

3.   Nothing provided in this section shall prohibit an employer or his duly authorized agent from transferring or taking any other job action against such employee for failure to satisfactorily perform his job

---

[3] This statute is effective until September 1, 2005 and is the only statutory provision litigated in this matter.  The statute effective thereafter has some significant changes which are discussed _infra_.

NYC00012479

6

assignment of issuing tickets or summonses for traffic
violations including parking, standing or stopping
except that the employment productivity of such
employee shall not be measured by such employee's
failure to satisfactorily comply with the requirement
of any quota, as that term is defined herein, which may
be established.

## DISCUSSION

As quoted above, New York State Labor Law Section 215-a

prohibits the Employer from transferring or penalizing an

employee solely for failing to meet a predetermined quota of

vehicle and traffic tickets.  Labor Law Section 215-a(2) defines

the term "quota" as "a specific number of tickets or summonses

issued <u>for traffic violations including parking, standing or

stopping</u> which are required to be issued within a specified

period of time" (emphasis added).  Clearly, Labor Law §215-a

deals <u>only</u> with traffic violations, and not with other categories

of police work.

The Arbitrator is constrained to note that much was

said in this proceeding about the Department's view of the

importance of writing "quality of life" summonses.  According to

the Department, when citizens are stopped for violations of

quality of life rules, the police often learn that those same

individuals are wanted for more serious crimes.[4]  Clearly, Labor

---

[4] Deputy Chief Marino explained that quality of life summons
became a priority of the Department because those who commit
"small" crimes or offenses often commit, or have committed, larger
crimes.     For example, an individual ticketed for jumping a
turnstile in the subways may have outstanding warrants for robbery.
(TR at 307-08).  For this reason, the City witnesses testified that
they were interested, as a matter of performance, in the number of

NYC00012480

Law §215-a does not deal with quality of life summonses; it
refers only to "tickets or summonses...for traffic violations
including parking, standing or stopping." Accordingly, this
Opinion and Award will address only the alleged quota for traffic
violations.  The legality of the Employer's alleged quota for
arrests, quality of life summonses ("C" summonses) and UF250s
("stop, question and frisk") are not covered by Labor Law §215-a
and are not before the Arbitrator in this proceeding.

Interpreting Labor Law §215-a, the Arbitrator takes
administrative notice of the "bill jacket" provided with the
Briefs in this matter.  The Memorandum in support of the Bill (S-
8297-B) in the New York State Senate stated the following as the
justification for the proposed law:

> The police officer as well as the public, need not be
> put under the pressure of a mandatory ticket quota.
> Such a policy can only hurt the effectiveness of the
> police officer in the performance of his other duties
> while he must give the driving public a rash of
> summonses to meet the quota.  This bill will not
> prevent the transfer of any police officer for failing
> to perform his duties as such.  It only prohibits the
> imposition of a ticket quota and any discriminatory
> practices which may arise therefrom.

The legislative history demonstrates that the legislature was
concerned that quotas caused police officers not to use their
discretion in writing tickets and, instead, caused police
officers to be guided by their need to meet a numerical quota.
It was understood that such conduct could result in a lack of

---

"C" summonses written and the number of UF250s ("stop, question and
frisk") performed.

NYC00012481

8

effectiveness of the police officers as they devoted their time to these (potentially) lesser infractions.  It also explains why Labor Law §215-a(1) concludes "...it shall be contrary to the public policy of this state for such employer to establish or hereafter maintain a quota policy of tickets or summonses issued for traffic violations including parking, standing, or stopping." Clearly, ticket quotas for vehicular violations are disfavored as a matter of policy and illegal if they result in transfers or other penalties to employees.

In applying Labor Law §215-a, the Arbitrator now looks to whether the Department established a quota within the definition of §215-a(2).  The record in this case contains numerous documents and ample testimony.  The Arbitrator will quote from only a few which clearly demonstrate that the Police Department established a quota system for the writing of traffic summonses and tickets in the 75th Precinct.

Police Officer David Velez testified to the oral instructions he received regarding ticket writing.  He testified that there is a monthly, a quarterly and an annual summons quota in the 75th Precinct, and that Commanding Officer ("CO") Michael Marino addressed the roll call one night and directed that there be a quota of 10 summons per month as follows: 4 "A" summonses (parking); 3 "B" summonses ("movers" or vehicle and traffic); and 3 "C" summonses (criminal court or "quality of life").  There is also a requirement for one arrest per month and 2 "UF250s" which

NYC00012482

are "stop, question and frisk."[5]  (TR at 49-51, 56-58).

Sergeant Andrew Cunningham confirmed that the 75th Pct. had a set number of summonses that each police officer was required to issue in a specific period of time, and he repeated the numbers quoted above, but noted that the annual number of "movers" was 33, and 44 parking violations were expected.[6]  Sergeant Cunningham testified that the quotas were communicated to him by Commanding Officer Marino, and that the police officers in squad A-1 received lower marks on their evaluations if the officers did not meet "this minimum requirement."  (TR at 95-96, 98-99, 101, 162-63).  Sergeant John Deodato, Jr. confirmed that there were quotas for summonses for his squad, the day tour (B-3), and that these quotas were told to him by the CO, who also directed him to let the patrol officers know of these numbers.  (TR at 169-71). Sergeant Roger Lurch confirmed the existence of quotas on the 4 to 12 shift.  (TR at 180-81).  Police Officer Velez testified that the 4-3-3 quota still exists.  (TR at 71).

In a writing dated January 2004, C.O. Marino wrote the following directive to his supervisors for their use in evaluating the performance of police officers:

---

[5]   Sergeant Lurch believed the UF250 quota was 4 or 5 per month, though he believed "there was leeway on that."  (TR at 181). C.O. Marino confirmed that he asked employees "to try to get a couple" of UF250s per month.  (TR at 282).

[6]   Sgt. Cunningham testified that since police officers have 25 tours they do not work, the annual "quota" is reduced from what would be the monthly quota of 3 per month for 12 months, or 36.

NYC00012483

10

(1)   35 or below = 2.5 - unless you can show significant improvement in last quarter.

(2)   Less than 11 collars = low or less in Performance Area #2 (Apprehension/Intervention).

(3)   Less than 33 movers = low or less in Performance Area #5 (Vehicular Offenses/Accidents).

(4)   Less than 33 QOL [quality of life] = low or less in Handling Specific Offenses (Performance Area #6).

(5)   Any two above = low or less in Behavioral Dimension #25 (Drive/Initiative) and/or Behavioral Dimension #18 (Problem Recognition)

(U-12).

Sergeant Roger Lurch wrote the following memo, dated March 11, 2004, entitled "Squad Activity Expectations," to P.O. Serrano (Joint-1):

|            | Month | YTD | Goal 1/2/3/(*) |
|------------|-------|-----|----------------|
| A Summons  |       | 9   | 4/12/48        |
| B Summons  |       | 6   | 3/09/36        |
| C Summons  |       | 7   | 3/09/36        |
| Arrest     |       | 1   | 1/03/11        |

Officers are reminded that failure to write the required amount of summonses and failure to make the required number of arrests for each rating period will result in substandard performance ratings and may result in poor annual performance evaluations.   (emphasis added)

The ratings periods are March, June, September and December

(*) this represents your goals monthly/quarterly/yearly

The Arbitrator finds that C.O. Marino's writing and Sergeant Lurch's memo could not have been clearer: "failure to write the required amount of summonses...will result in substandard performance ratings...."  Further, the asterisk in the "goal" column makes it clear that goals are monthly,

**NYC00012484**

11

quarterly and yearly.  The Arbitrator is completely persuaded
that the "goals" column on this memo meets the definition in
Labor Law Section 215-a for "quota," i.e., "a specific number of
tickets or summonses issued for traffic violations including
parking, standing or stopping which are required to be issued
within a specified period of time" (emphasis added).  Other
documents offered into the record reinforce this conclusion.

The Arbitrator is persuaded that Deputy Chief Marino
promulgated the above-quoted checklist (U-12) to assist his
sergeants in evaluating the employees in their commands.  This
writing had the effect of establishing quotas.  Though Chief
Marino was careful in his testimony that these were guidelines or
performance expectations, and not quotas (TR at 292-93), the
evidence in the record reveals that when police officers did not
meet these "guidelines," they often received lower ratings in
their periodic evaluations.  In fact, Commanding Officer Marino
acknowledged that he told the police officers in his command that
if they did not write 33 quality of life summonses, they risked
being rated "low," and that there could be ramifications for
failing to meet the numbers in his memo (U-12).  (TR at 294-95).

Upon thorough consideration of the evidence in the
record, the Arbitrator finds that the 75th Precinct established a
summons quota for traffic offenses in violation of Labor Law
§215-a.  The next question is whether the Department applied
those quotas in violation of Labor Law §215-a.

The Department promulgated a "Performance Evaluation

NYC00012485

Guide" (U-11) "to assist supervisors in evaluating the
performance of Police Officers" on the 27 performance areas/
behavioral dimensions.  Performance area number 5 is "vehicular
offenses/accidents."  The "Performance Evaluation Guide" states
the following about this performance area:

> This group of tasks involves dealing with crimes
> involving a vehicle, vehicular offenses, traffic
> accidents and disasters.
>
> The following tasks may be related to crimes
> involving a vehicle or vehicular offenses, or both:
> identifying vehicles based on a description or giving
> vehicle descriptions to others; following suspicious
> vehicles; pulling over vehicles; inspecting appropriate
> vehicle documentation; requesting the dispatcher to
> make license checks; completing Universal Summonses;
> and observing the occupants of stopped vehicles.
>
> With regard to vehicular accidents, the tasks might
> involve dealing with one vehicle, several vehicles, a
> pedestrian and one vehicle, or several pedestrians and
> several vehicles.  The specific tasks would include
> identifying the owners of the vehicles involved;
> identifying persons involved in the accident;
> diagramming the accident scene; locating and
> interviewing witnesses to the accident; completing
> accident reports; providing information to drivers;
> directing traffic; inspecting vehicles involved; and
> interviewing medical personnel to get information.
> Some of the tasks which are related to traffic
> accidents also apply to disasters.  These tasks include
> securing the accident or disaster scene and closing off
> the area to pedestrian and vehicular traffic.

The Arbitrator quotes this section of the manual in full, because
it demonstrates that performance area number 5 on the evaluation
speaks to tasks much more complicated than ticket writing, yet
this is the category in which C.O. Marino lowered the score of
Police Officer Velez solely because Velez did not meet his ticket
quota.

NYC00012486

13

Sergeant Cunningham testified that after he received U-12, he realized that his rating of Officer Velez as "competent" in category 5 (vehicle/traffic) was not in accord with this document, so it "kind of voided out my evaluation." (TR at 114-16). Sgt. Cunningham unequivocally testified that he understood Chief Marino's handwritten note (U-12) to mean that he <u>must</u> grade an employee as "low" in category number 5 if the employee wrote fewer than 33 summonses in the 12 month period. (TR at 118-19). Chief Marino confirmed that this was his intention. (TR at 292, 294-95). Further, the failure to meet the ticket quota of 33 summonses for moving violations meant that the employee should be rated "low" in "drive and initiative" (behavioral dimension number 25), and rated "low" in "problem recognition" (behavioral dimension number 18). (TR at 119). Sergeant Cunningham testified that he believed this note from C.O. Marino removed his discretion to evaluate police officers outside of these numerical parameters. (TR at 160-62). Despite the guidelines from C.O. Marino which tied the behavioral dimensions of "drive and initiative" and "problem recognition" to the quotas contained in vehicular offenses/accidents (performance area 5), Deputy Chief Anderson testified that the Performance Evaluation Guide (U-11) does not require these items to be rated the same. That is, a low score in ticket writing does not necessarily mean low in drive and initiative. (TR at 262).

The Union offered Police Officer David Velez as a case in point that illegal quotas exist and are being applied in the

NYC00012487

75th Precinct. Police Officer Velez testified that he has worked in the 75th Precinct since completing his training in January 1993. He works the midnight to 8 AM tour. (TR at 42-43). He has received "Department Recognitions" and "Medals of Excellence" for his performance. (TR at 47-48). According to Officer Velez, he never received a negative evaluation until Chief Marino became his Commanding Officer. Prior to 2003, he was never rated below "competent" in any performance area. (TR at 46). Further, in his 13 years on the job, he never called in sick or was late for work. (TR at 47, 111).

The quotas were applied to Police Officer Velez in the early part of 2004 when he was evaluated for the December 2002 to December 2003 period. Specifically, for the period December 16, 2002 to December 16, 2003, Sergeant Cunningham evaluated Officer Velez. (TR at 111-12). In performance area number 2, "Apprehension/Intervention", Officer Velez was rated "extremely competent" and Sergeant Cunningham wrote: "Officer did a superior job in apprehending suspects, he used sound judgment in planning a strategy of apprehension, searching for wanted persons and using only necessary force." In the rater's overall comments, Sergeant Cunningham wrote:

> During rating period supervisor would liked to have
> witnesses (sic) a slight improvement in summons
> enforcement. However, officer's arrest activity was
> well above standards, officer while assigned to a
> sector effected close to thirty arrests, the majority
> were felonies. Officer works well with the Starrett
> City Police. He is among the finest officers on the
> first platoon, he would excel in any assignment given
> to him and he is an asset to the Department....

NYC00012488

(U-9).  Sergeant Cunningham gave Officer Velez a score of 4.0, "highly competent."  Thereafter, Lt. Hilbert evaluated Officer Velez for the same period, and also rated him "extremely competent" for "apprehension/intervention."  However, he changed Officer's Velez's evaluation for performance area number 5, "Vehicular Offenses/Accidents" from "competent" to "low" and wrote, "This officer has failed to meet the performance standard set by the Commanding Officer on enforcing motor vehicle offenses."  In the "overall comments" section, Lt. Hilbert wrote, "Police Officer Velez has a high number of arrests for a patrol officer.  He has failed to meet the standards on vehicle offense and quality of life enforcement.  He is found to be low in drive and initiative."  Lieutenant Hilbert then rated P.O. Velez 3.5, rather than 4.0.  Commanding Officer Marino concurred in Lt. Hilbert's evaluation (U-10; C-5; TR at 238-40).

The Arbitrator finds the contrast between Sergeant Cunningham's evaluation and that of Lieutenant Hilbert to be quite stark.  The former gives Officer Velez credit for being a good officer because of the large number of felony arrests, while Lt. Hilbert seems to be concluding that the arrests were good, but even a large number of felony arrests do not mitigate the damage from failing to write the requisite number of tickets.  Sergeant Cunningham testified that Officer Velez "usually was among the tops in arrest activity in my squad and which required him to perform many hours of overtime...."  (TR at 111).  The Arbitrator finds that a preoccupation with ticket writing to the

NYC00012489

detriment of "fighting crime" is exactly what Labor Law §215-a
was designed to prevent.

Officer Velez related that he appealed his second
evaluation and was told that his "summonses were low." His squad
Sergeant, Andrew Cunningham, handed him a memo dated January 20,
2003 (U-7) which established a "declared condition" for his
sector. The memo stated, in pertinent part:

> 4. Overall, you should issue a minimum of (3) three
> Criminal Court Summonses, (3) three hazardous moving
> violations, and (4) parking summonses each month in
> order to meet standards on your quarterly evaluation.
> Failure to meet these standards may result in a below
> average Performance Evaluation issued at the end of the
> year.

(U-7). The Arbitrator finds the above quoted language to be
clear; the quota in the 75th Precinct was being enforced

Sergeant Cunningham testified that under the
Department's procedure for evaluations, if the reviewer (e.g.,
Lieutenant or Chief) disagrees with the evaluation of the rater
(e.g., Sergeant), then the reviewer would prepare a secondary
evaluation which would take into account the evaluation of the
initial rater, and both evaluations would go into the employee's
file. (TR at 128). Deputy Chief George Anderson testified that
the Annual Performance Evaluation is completed by the police
officer's immediate supervisor. (TR at 229-30; U-11; C-4). The
platoon commander reviews the evaluation and may comment on that
evaluation (TR at 232-33; C-4), and both evaluations should be
filed in the officer's personnel folder. (TR at 270-71). In the
case of Officer Velez, there is no indication that this procedure

NYC00012490

was followed.

The Arbitrator finds that the changing of the score on the evaluation was a negative consequence of failing to write enough tickets. One need only look to C.O. Marino's conclusion that Officer Velez was "low in drive and initiative" immediately following the conclusion, "He has failed to meet the standards on vehicle offense and quality of life enforcement." (U-10).

Though Officer Velez exceeded the arrest quota and averaged 10 summonses monthly, he did not meet the periodic quotas in each of the categories. (TR at 67). Officer Velez testified that Chief Marino told him there would be consequences for "failing to meet numbers." Sergeant Cunningham confirmed that there were consequences when he testified that if a patrolman wrote fewer than 33 summonses for "movers," the officer must receive a grade of "low" in that performance category. He further testified that he never heard C.O. Marino say that he would consider a patrolman's entire record in making evaluations. Rather, he heard Chief Marino say "these are the numbers" and then he explained the reasons for the numbers. (TR at 142-43). When C.O. Marino spoke to Officer Velez about the 2003 evaluation, he was told that he failed to meet the standard for moving violations and for "parkers." (TR at 85).

The Arbitrator credits the testimony of Sergeant Cunningham and finds that the application of the ticket quotas for moving violations and parking violations had a direct and deleterious impact on the performance evaluation of Police

NYC00012491

18

Officer David Velez.  Thus, the Arbitrator is persuaded that the Department had quotas for parking tickets ("A" summonses) and moving violations ("B" summonses).  These are quotas within the meaning of Labor Law §215-a.  The last sentence of Labor Law §215-a(1) declares it to be "contrary to the public policy of the state" to establish or maintain a quota policy of tickets for traffic violations.  Accordingly, the Arbitrator finds that the Department both established and maintained a quota system for vehicular violations.  (As indicated supra, the Department also had quotas for arrests and for quality of life infractions, but these are not controlled by Labor Law Section 215-a and, therefore, the Arbitrator has no authority to impact those quotas.)

Labor Law §215-a clearly and unambiguously prevents an employer from transferring or otherwise penalizing an employee solely for failure to meet a ticket quota for vehicular infractions.  In the instant case, the Department argued, and Police Officer Velez acknowledged on cross-examination, that he was not transferred, reassigned or placed on performance monitoring a result of his evaluations.  (TR at 73).

Sergeant Cunningham testified that no officers on squad A-1 were reassigned or transferred, though officers in other squads were transferred.[7]  (TR at 134-35, 152).  Sergeant Deodato and Sergeant Lurch each testified that police officers on

---

7   C.O. Marino testified that none of the police officers on the A-1 squad with Sgt. Cunningham met the 4-3-3 quota; and no officer was transferred or reassigned.  (TR at 346-47).

NYC00012492

their squads were transferred, removed from the day tour to the 4
to 12 tour, and some received performance monitoring for failing
to meet the announced quotas. (TR at 173-75). Sergeant Lurch
explained that when a police officer is transferred from the
evening to the day tour for failing to meet the quota of
summonses, that officer loses the night shift differential. (TR
at 182-83). Therefore, there is a direct monetary consequence
flowing from the failure to meet the quota of traffic summonses.

Chief Marino testified about certain employees who were
transferred or reassigned. The Arbitrator finds that Labor Law
§215-a makes it illegal to transfer or reassign an employee
solely for failing to meet a traffic ticket quota. The
Arbitrator is persuaded that the employees named in the record
had deficiencies other than failing to meet a traffic ticket
quota. Some had no quality of life summonses or arrests for all
or part of the year. Accordingly, the Arbitrator cannot find on
the record presented that the transferred or reassigned employees
had their rights under Labor Law §215-a violated.

The remaining question is whether a lowering of a
composite score on an evaluation is "penalizing" an employee
within the meaning of Labor Law Section 215-a. On this point,
Sgt. Cunningham testified that a low score on an evaluation can
affect the assignment the officer is given. (TR at 132). Deputy
Inspector Moran testified than an employee would not even be
considered by him for a specialized unit or detail if the
employee was marked "low" on his performance evaluation. (TR at

NYC00012493

402).  Accordingly, the Arbitrator finds that there were consequences, or at least potential consequences, to a police officer's employment based on a failure to meet a ticket quota. Since the City considered the number of vehicle and traffic violations (including parking, standing and stopping) written by the employee as part of its evaluation of the police officer's effectiveness, and since those evaluations are considered when making assignments to special details, the City has violated Section 215-a of the Labor Law.

Sergeant Cunningham testified to circumstances (other than Labor Law §215-a) which render adherence to quotas problematic.  He explained that as a desk officer, he sometimes had to take a patrol officer off patrol duties where s/he could be writing summonses, and assign the officer to a detail like guarding a prisoner at a hospital.  In that case, the police officer had reduced opportunities to write summonses, but that was not taken into account in evaluating whether the officer "met the numbers."  (TR at 130-32).

In addition, Sgt. Cunningham testified to a quota of 2 per month on "stop, question and frisk".  He opined that since there is a legal standard of "reasonable suspicion" for stopping and frisking, he did not want to give an incentive for officers to act on less than "reasonable suspicion."  (TR at 158-59). Though there is substantial appeal to this argument, it nevertheless is not within the Arbitrator's jurisdiction, as Labor Law Section 215-a deals only with vehicular ticket quotas.

NYC00012494

21

Again, the evaluation of Officer Velez amply demonstrates that a high number of felony arrests, as Velez had, did not cause Commanding Officer Marino to overlook the failure to meet traffic ticket quotas.

If there were any doubt whether the failure to meet a vehicular ticket quota had the effect of penalizing an employee, and the Arbitrator has no doubt, one need only look to Interim Order 105, dated July 17, 1995 (U-13) which states, in pertinent part:

> TO ALL COMMANDS
> Subject:  POLICE OFFICER'S MONTHLY/QUARTERLY
> PERFORMANCE REVIEW AND RATING SYSTEM AND THE
> DEPARTMENT'S COMPUTERIZED PERFORMANCE EVALUATION SYSTEM
>
> 1.  ...An important feature of this new form is the
> Quarterly Performance Rating Point System that will
> translate into Career Path Program points for active
> police officers on patrol.  This point system requires
> the designated supervisor to assign a point value for
> the quarterly performance of the police officer
> concerned measured against pre-stipulated precinct
> conditions.... (emphasis added)
>
> 2.  ...IT IS IMPORTANT THAT THE TOTAL POINTS EARNED BY
> A POLICE OFFICER FOR THE ENTIRE YEAR CORRELATE TO THE
> "OVERALL EVALUATION" RATING ASSIGNED TO THE OFFICER.
> For instance, a police officer who receives
> approximately the maximum number of points over the
> course of the year (e.g., sixty [60] to sixty-eight
> [68] points) utilizing the Quarterly Performance Rating
> Point System would most likely merit an annual
> performance designation of "Extremely Competent," i.e.,
> a rating of 4.5 or 5.0 on the computerized numerical
> scale.
>
> 3.  Therefore, in assigning quarterly points during the
> year, supervisors must expect to avoid any
> inconsistency between the sum of the quarterly points
> to be totalled at the end of the year for a police
> officer and the rating designated in the "Overall
> Evaluation" category on the PERFORMANCE EVALUATION
> POLICE OFFICER/DETECTIVE SPECIALIST to the officer
> concerned.

NYC00012495

22

4.   The following chart illustrates the expected
correlation between "Total Annual Points" earned and
the assignment of the annual "Overall Evaluation"
designation:

| ANNUAL POINTS<br>TOTALS OF QUARTERLY PERFORMANCE REVIEWS | OVERALL RATING<br>ANNUAL EVALUATION |
|---|---|
| 60-68 | 4.5 TO 5.0 |
| 55-59 | 4.0 TO 5.4 |
| 48-54 | 3.5 TO 4.0 |
| 40-47 | 3.0 |
| Below 40 | 2.5 and Below |

From point number 1, quoted above, it is clear that the
Department intended to use its numerical rating system to
"translate into Career Path Program points...."  The strict
adherence to the ticket quotas therefore has a residual effect on
an employee's overall performance evaluation which, in turn,
impacted the employee's standing when s/he was considered for a
detail or a special assignment.

To counter this evidence, Deputy Chief Marino
categorically denied that he evaluated police officers solely on
whether they met the quotas.  He testified that there were
officers who did not meet the quotas and who suffered no adverse
personnel actions.  (TR at 318, 363).  He also testified to two
police officers (Russo and March) who did not meet the quotas for
August through December, yet they were neither transferred nor
reassigned.  By contrast, Police Officer Martin Paolino issued
more summonses than Russo and March in certain periods, and he
was transferred.  (TR at 319-22; C-7).  From these examples and
others, the Employer argues that its personnel decisions are not
based solely on the ticket quotas.

NYC00012496

The Arbitrator finds that while Police Officers March and Russo may not have been penalized for failing to write enough tickets, Police Officer Velez was. Accordingly, a violation of Labor Law §215-a has been proven, at least as to Officer Velez.

Having found a violation of Labor Law §215-a, the Arbitrator now turns to the appropriate remedy. First, §215-a speaks to the matter of remedy. It states, in pertinent part:

> Any employee so transferred or otherwise penalized shall be restored to his previously assigned position of employment and shall be compensated by his employer for any loss of wages arising out of such transfer or other penalty, and shall have any penalty imposed restored; provided, that if such employee shall cease to be qualified to perform the duties of his employment he shall not be entitled to such restoration....

As indicated above, the Arbitrator is not persuaded that any of the employees mentioned in this proceeding who were transferred or reassigned had this action imposed solely because of their failure to meet the vehicle and traffic quotas. The Arbitrator is persuaded that the employees transferred or reassigned also had few arrests and had other performance problems unrelated to their failure to write adequate numbers of vehicular tickets or summonses. As quoted above, Labor Law §215-a provides for the restoration to a prior position for an employee improperly transferred, and also provides for affected employees to be made whole. The Arbitrator does not find that any employee in this proceeding is entitled to such a remedy, since no employee was improperly transferred or reassigned.

NYC00012497

24

However, the Arbitrator's inquiry does not end here.
Labor Law §215-a makes it illegal to

> ...in any other manner penalize an employee as to his
> employment solely because such employee has failed to
> meet a quota...of tickets or summonses issued within a
> specified period of time for traffic violations
> including parking, standing or stopping.

As indicated herein, the Arbitrator is persuaded that by marking an employee "low" in performance area number 5 (vehicular offenses/accidents) and then also tying behavioral dimensions 18 (problem recognition) and 25 (drive/initiative) to the failure to write sufficient traffic tickets, the City has penalized an employee in violation of the statute.  The record is abundantly clear that the performance evaluations are critical factors in considering an employee for a detail or special assignment. Accordingly, an employee suffers a penalty which follows the officer when the performance evaluation is predicated upon the failure to meet a vehicular ticket quota.

The Union has requested a number of remedies in this case.  The Union first asks the Arbitrator to direct that the City cease and desist from enforcing a traffic summons quota in the 75th Precinct.  The Arbitrator hereby grants that remedy. Labor Law §215-a clearly states that it is against the public policy of the State of New York for an employer to establish and thereafter maintain a quota policy for traffic violations including parking, standing or stopping.  The Employer has done so in violation of §215-a.  Accordingly, it must cease and desist from violating Labor Law §215-a by maintaining a quota for

NYC00012498

vehicular violations, including parking, standing or stopping.

The Union next asks that the City be directed to instruct its supervising officers about the statutory prohibition of traffic summons quotas. The Arbitrator declines to do so. The City will determine for itself the steps it must take to comply with the Award herein and to avoid future violations of Labor Law §215-a.

The Union also asks the City to expunge all negative performance evaluations from police officers' personnel files based on their failure to meet the traffic summons quota. The Arbitrator finds that this requested remedy fails to narrowly correct the violation found herein. That is, if the entire performance evaluation were expunged, then potentially complimentary information otherwise contained in the evaluation would be lost from the employee's file, thus causing a second harm to an employee already aggrieved. Instead, the Arbitrator will direct that all unit employees in the 75th Precinct who feel they have been unfairly evaluated because of the Employer's application of the vehicular ticket quota shall have a period of ninety (90) days from the date of this Award within which to contact the Employer and indicate that they wish to have their evaluations rescored without reference to the ticket quotas or any categories whose marks were lowered because of the ticket quotas (e.g., behavioral dimensions 18 and 25).

The Union had asked that the City be directed to reverse any other penalties imposed against police officers based

NYC00012499

on negative performance evaluations and restore affected officers, if desired, to their previous assignments. The Arbitrator finds that no employees were proven to be so affected. Accordingly, the Arbitrator declines to award these remedies. Similarly, the Arbitrator does not find that any police officers were shown to have lost wages as a result of a violation of Labor Law §215-a, since no transfers from shift differential hours were found to be caused by violations of the statute. Accordingly, no monetary remedy is appropriate on the facts of this case. The Union's request for a notice posting also is denied. The Union is free to communicate the results of this proceeding to the unit members as it would any other matter.

Finally, it should be noted that Labor Law §215-a was amended effective September 1, 2005. Where the statute at issue in this proceeding covered "traffic violations including parking, standing or stopping," the statute effective September 12, 2005 now defines a quota as "a specific number of tickets for summonses issued for traffic violations other than parking, standing or stopping...." (emphasis added). Accordingly, after September 1, 2005, a quota for "movers" is the only prohibited category. Since Performance Area number 5 (vehicular offenses/accidents) includes both "A" (parking) and "B" (movers) summonses, this portion of the performance evaluation will merit great scrutiny for purposes of Labor Law §215-a.

NYC00012500

## AWARD

The claim raised in this proceeding is sustained in accordance with the Opinion herein.  The New York City Police Department violated New York State Labor Law Section 215-a by establishing and maintaining a summons quota for traffic violations in the 75th Precinct and by penalizing officers for failing to meet the stated number of traffic violations, including parking, standing and stopping.  The City shall cease and desist from maintaining a vehicular ticket quota.  The City shall, upon request, revise the performance evaluation of any employee whose marks were reflective of a failure to meet the illegal ticket quota.  Employees in the 75th Precinct shall have ninety calendar (90) days from the date of this Award within which to contact the Employer and express a desire to have their performance evaluation(s) reviewed and revised.

January 14, 2006

Bonnie Siber Weinstock
Arbitrator

28

State of New York ] ss.:
County of Suffolk )

On this 14th day of January, 2006, before me personally came and appeared BONNIE SIBER WEINSTOCK, to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed the same.

_____
notary public

GARY ALAN WEINSTOCK
NOTARY PUBLIC, STATE OF NEW YORK
No. 01WE6090509
QUALIFIED IN SUFFOLK COUNTY
MY COMMISSION EXPIRES 9/15/07

NYC00012502