# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------X
     ADRIAN SCHOOLCRAFT,
 3
                                         PLAINTIFF,
 4               -against-              Case No:
                                        10 Civ. 6005
 5                       (RWS)

 6   THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO,
     Tax Id. 873220, Individually and in his Official
 7   Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN
     NORTH GERALD NELSON, Tax Id. 912370, Individually
 8   And in his Official Capacity, DEPUTY INSPECTOR
     STEVEN MAURIELLO, Tax Id. 895117, Individually and
 9   In his Official Capacity, CAPTAIN THEODORE
     LAUTERBORN, Tax Id. 897840, Individually and in his
10   Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id.
     919124, Individually and in his Official Capacity,
11   SGT. FREDERICK SAWYER, Shield No. 2576, Individually
     and in his Official Capacity, SERGEANT KURT DUNCAN,
12   Shield No. 2483, Individually and in his Official
     Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id.
13   915354, Individually and in his Official Capacity,
     LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374,
14   Individually and in his Official Capacity, SERGEANT
     SHANTEL JAMES, Shield No. 3004 and P.O.'s "JOHN DOE"
15   #1-50, Individually and in their Official Capacity
     (the name John Doe being fictitious, as the true
16   names are presently unknown) (collectively referred
     to as "NYPD defendants"), JAMAICA HOSPITAL MEDICAL
17   CENTER, DR. ISAK ISAKOV, Individually and in his
     Official Capacity, DR. LILIAN ALDANA-BERNIER,
18   Individually and in her Official Capacity and
     JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN
19   DOE" # 1-50, Individually and in their Official
     Capacity (the name John Doe being fictitious, as
20   The true names are presently unknown),

21                                       DEFENDANTS.
     ------------------------------------------------X
22

23                       DATE: October 11, 2012

24                       TIME: 10:20 A.M.

25   (Continued  ...)
```

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

1

```
 1

 2                       DATE: October 11, 2012

 3                       TIME: 10:20 A.M.

 4

 5

 6              VIDEOTAPED DEPOSITION of the

 7   Plaintiff, ADRIAN SCHOOLCRAFT, taken by the

 8   Respective Parties, pursuant to a Notice and

 9   to the Federal Rules of Civil Procedure, held at

10   the offices of the New York City Law Department,

11   100 Church Street, New York, New York 10007, before

12   Nathan MacCormack, a Notary Public of the State of

13   New York.

14

15

16

17

18

19

20

21

22

23

24

25
```

1    reports, I never -- it was just work.  I didn't keep track

2    of the numbers.

3        Q.    So you don't know?

4        A.    Not in my memory.

5        Q.    So no?

6              MR. NORINSBERG:  Objection.

7        A.    "No" to what?

8        Q.    You don't know how many summonses you have

9    issued?

10       A.    To the best of my memory, I don't.  I believe

11   it's on record, though.  I believe the data is there,

12   somewhere.

13       Q.    Have you ever issued a summons without probable

14   cause?

15       A.    No.

16       Q.    Has anyone ever told you to issue a summons, even

17   if you did not have probable cause?

18       A.    There were -- when Deputy Inspector Mauriello

19   took over the 81st Precinct, shortly after that, there

20   became a term that officers used, they were "Mauriello

21   specials."  These referred to collars that he would grab,

22   and then he would grab an officer to assign as the

23   arresting officer.

24             I believe I was -- I was involved in those a

25   couple times.  They had -- if you didn't meet the arrest

1  quotas, they put you on a -- to the best of my memory, it
2  was called "losing prop." And all the officers that didn't
3  have a certain number of arrests were -- they would have a
4  tour change for that day.
5         And he would send special units out to grab johns
6  off the street or other arrests, and Mauriello himself was
7  involved in the collars. He would pull an officer and
8  assign that officer that arrest that he supposedly
9  observed, as probable cause.
10     Q.    Okay. But I asked you, specifically, if you had
11  personally ever issued a summons to someone without
12  probable cause?
13             MR. NORINSBERG: Objection.
14     A.    If I issued a summons without witnessing it, I
15  believe -- to the best of my memory, I would have
16  documented it on the summons or the arrest paperwork as to
17  who the officer was. And I would designate -- designate
18  myself as the assigned officer on the arrest paperwork.
19     Q.    Were you trained to issue summonses if you did
20  not have probable cause?
21     A.    If the instruction received -- the unofficial --
22  I would consider unofficial training, the roll calls we
23  were instructed to lock people up and articulate a charge
24  later. I would consider those some form of training, as
25  instruction from a supervisor, yes.

A. SCHOOLCRAFT

1      Q.     Now, you said "lock people up."  That would be an
2   arrest, correct?
3      A.     Correct.
4      Q.     I am asking specifically about summonses, so I
5   ask that you please confine your answers just with
6   summonses.  Have you been trained to issue summonses
7   without probable cause?
8      A.     It's difficult for me to discern the difference
9   between the two.  Summonses are issued in lieu of an
10  arrest.  Summonses specifically, I believe -- I don't
11  recall any exact incident.
12             But again, I know there are recordings that
13  probably state that; summonses, arrests, 250's, what they
14  deemed activity.
15     Q.     And these recordings, you recall them stating
16  that a summons should be issued, even in the absence of
17  probable cause?
18             MR. NORINSBERG:  Objection.
19     A.     That's how I took some of the instructions.
20     Q.     Have you ever personally observed another officer
21  issue a summons, without probable cause?
22     A.     It's hard to go back to and give an exact time
23  and date.  But yes, I have seen it.
24     Q.     How many times?
25     A.     It's hard to approximate how many times.  There's

1   one incident that I observed from beginning to end that
2   involved Deputy Inspector Mauriello, himself.  I observed
3   two young men waiting outside of a bodega for their
4   sisters, and Inspector Mauriello pulled up in his car.
5           Two police officers and a lieutenant came out,
6   and Deputy Inspector Mauriello ordered then to be cuffed
7   and searched.  And they arrested them, took them to the
8   precinct and issued them a summons.
9       Q.      Where were you during this incident?
10      A.      I was standing right there.
11      Q.      You weren't involved in the arrests?
12      A.      No.
13      Q.      Where were you standing exactly?
14      A.      Ten feet away.
15      Q.      And you were watching the men outside, before
16  Defendant Mauriello arrived?
17      A.      Yeah.  I saw them from when they came down the
18  street.  The girls went inside the bodega and they waited
19  outside for them.
20      Q.      Do you know if Defendant Mauriello had received
21  any phone calls from the bodega before arriving at the
22  scene?
23              MR. NORINSBERG:  Objection.
24      A.      I am not aware of that, no.
25      Q.      Do you know what the summonses were issued for?

1    A.    I don't know if I did, specifically.  But I was
2  aware other officers that wanted overtime would have to
3  adhere to the policy in order to explain how they could
4  have that overtime.
5    Q.    But you personally, do you, sitting here today,
6  recall ever losing overtime for failing to issue a certain
7  number of summonses?
8    A.    As I sit here today, I don't recall losing
9  overtime.
10   Q.    What officers did you observe lose overtime for
11 failing to issue a certain number of summonses?
12   A.    I don't recall any specify officer.  I just
13 recall that that was the general -- if an officer wanted
14 overtime, they would have to explain it.  And when there
15 was overtime, I recall being addressed by supervisors.  It
16 was understood.
17         The number was "two and two"; two summonses and
18 two 250's.  If the officer made a collar, they wanted the
19 -- the supervisor wanted that collar, that arrest to be
20 250'd.  And I think they -- you still weren't required to
21 do the summonses.  But it was "two and two," that was the
22 phrase.
23   Q.    When you say "two and two," what do you mean?
24   A.    Two summonses, two 250's, two stop, question and
25 frisks.

A. SCHOOLCRAFT

1    Q.    Per month?

2    A.    Per that overtime, per when you are -- that

3  mandated overtime, or if you requested it.

4    Q.    So if I understand you, an officer who was given

5  overtime, was required to issue two summonses and make two

6  arrests during that overtime shift?

7            MR. NORINSBERG:  Objection.

8    A.    As a minimum, yes.

9    Q.    At a minimum.

10           MR. NORINSBERG:  I think you misjudged.  He

11       said two -

12           MS. PUBLICKER:  He just said yes.

13           MR. NORINSBERG:  No, but he said two

14       summonses and two 250's.

15           MR. COHEN:  He said it two times.

16           MR. NORINSBERG:  He said it two times, then

17       you rephrased it the wrong way.

18           MS. PUBLICKER:  And then he said "yes."  I

19       am sorry if I misphrased it, but --

20           MR. NORINSBERG:  Do you want to clarify,

21       Adrian?

22           THE WITNESS:  What was the question?

23   Q.    When you say "two and two," you are saying -- if

24  I misstated you, then -- two summonses and two 250's, or

25  two summonses and two arrests per overtime shift?

1      A.     Two summonses and two 250's, two and two.
2      Q.     Okay.  What happened if they did not make that
3   two and two during their overtime shift?
4      A.     I don't believe they would -- they would not be
5   able to ask for overtime anymore.
6      Q.     Can you name a single person who was subject to
7   that policy?
8      A.     Not specifically.  But I believe you can -- the
9   overtime is documented very well.  You could see a pattern
10  of certain officers that have become dependent on overtime.
11     Q.     But have you ever seen an officer be refused
12  overtime because they did not hit the quota policy for
13  summons, you referred to earlier?
14     A.     I don't specifically -- I don't specifically
15  recall any officer or exact time.  But that was general
16  knowledge.
17     Q.     Did you ever suffer a tour change as a result of
18  failing to issue a certain number of summonses per month?
19     A.     No. I don't -- I was on the same tour for --
20  maybe three years straight.
21     Q.     Do you observe another officer suffer that
22  penalty?
23     A.     I don't recall any specific officer.  But I
24  recall officers getting in trouble.  In order to get back
25  to their desired tour, they would have to produce summonses

1  and arrests, more.

2  Q.  When you say was "officers in trouble," what do
3  you mean?

4  A.  A command discipline; in trouble, any numerous
5  reasons, violations or misconduct of the patrol guide.

6  Q.  Are these unrelated to the summons quota policy
7  you have referred to?

8  A.  What do you mean, "unrelated"?

9  Q.  So as I understand what you are stating, is that
10 officers would get in trouble, in some way, receive a
11 command discipline for a violation of department rules and
12 they would have their tour changed.

13     And then in order for them to make it back to
14 their preferred time, the original tour, they would have to
15 issue a certain number of summons; is that correct?

16 A.  Correct.

17 Q.  To -- so it's not that the officers had a tour
18 change because they failed to meet the quota policy that
19 you referred to, but that they had to make more summonses
20 in order to go back to the original tour?

21     MR. NORINSBERG:  Objection.

22 A.  There were instances like that.  But I believe
23 there were officers that had tour changes, vacation days
24 denied, overtime denied, based on the illegal quota policy.

25 Q.  Can you name one officer who that happened to?

1    A.    I don't -- I can't recall any specific officer,
2    but -- or one specific time.  But it was general knowledge,
3    you don't get overtime if you don't pay the rent; you don't
4    get your days off granted if you don't pay the rent.  If
5    you get in trouble, you have got to pay more rent.
6    Q.    Would anything refresh your recollection as to an
7    officer who had his tour changed because of the quota
8    policy?
9              MR. NORINSBERG:  Objection.
10   A.    There might be recordings or documents that I
11   haven't seen that could refresh -- it's possible.
12   Q.    Are there any that you have seen in the past, but
13   don't have in front of you, that would refresh your
14   recollection?
15             MR. NORINSBERG:  Objection.
16   A.    To the best of my memory, I haven't.  But it's
17   possible.
18   Q.    Were you ever denied vacation days as a result of
19   failing to issue a certain number of summonses?
20   A.    Whether -- there were vacation picks.  I never
21   had a vacation pick denied, and I -- it was such general
22   knowledge that, if you are not paying the rent, you are not
23   going to be granted a day off when you request it.
24             So I don't recall me, myself specifically, being
25   denied a day off.  But it was general knowledge.  That was

1   one of the --

2      Q.    Can you name a single officer who was denied a

3   day off because of failing to meet the quota policy?

4      A.    I don't specifically recall a name or a specific

5   time when an officer told me or I overheard.

6      Q.    During the point in time when you were receiving

7   acceptable performance evaluations, were you issuing the

8   number of summonses necessary to meet the de facto summons

9   policy?

10            MR. NORINSBERG:  Objection.

11     A.    Again, I wasn't keeping track of -- I was going

12  out there and answering calls, whatever my duty was for

13  that tour.  I never kept track of the number of summonses

14  and arrests I was doing.

15            If I had an arrest, I processed the arrest.  And

16  if I was assigned to court, I went to court.  And whatever

17  detail I was part of, I just -- I didn't keep track of

18  that.

19     Q.    We need to take a break now to change the tape

20  and the recording.

21            THE VIDEOGRAPHER:  The time is 11:48 a.m.,

22          this is the end of tape one.  We are going off

23          the record.

24            (Whereupon, an off-the-record discussion was

25          held, and a break was had.)

1    A.    Officers are addressed at roll call.  Again,
2    those roll calls are recorded, those statements are
3    recorded; some of them are.
4    Q.    Have you ever personally observed another officer
5    make an arrest without probable cause?
6    A.    Yes.
7    Q.    Who?
8    A.    Specifically one incident, I think I said this
9    before, it was regarding the defendant, Tyrel, I don't
10   remember his last name.  But it was the one that involved
11   Inspector Mauriello ordering the officers to cuff -- I
12   believe the term he used was "cuff them and search them."
13   Q.    Besides that incident, have you ever observed
14   another officer make an arrest without probable cause?
15   A.    Off the top of my head, I don't specifically
16   recall any one incident, other than that one.  To the best
17   of my memory right now, I don't remember another incident.
18   Q.    As of October 31, 2009, did you have any
19   knowledge of how many arrests officers in other precincts
20   were required to make?
21   A.    I don't recall having any knowledge.
22   Q.    Did you ever lose overtime to for failing to
23   issue a certain number of arrests?
24         MR. NORINSBERG:  Objection to the form:
25   A.    Did I ever lose -- sorry, what was the question?

A. SCHOOLCRAFT

1    Q.    Did you ever lose overtime for failing to make a
2    certain number of arrests?
3    A.    Probably.
4    Q.    How many times?
5    A.    I don't recall -- I don't -- I don't know any --
6    I don't have a specific number.
7    Q.    When did this happen?
8    A.    If it happened, I am not -- I don't -- I don't
9    recall any specific date or time.
10   Q.    Do you have any proof of this, besides your
11   statements here today?
12   A.    Regarding the overtime?
13   Q.    Yes.
14   A.    I don't believe so.
15   Q.    How do you know that you lost overtime for
16   failing to issue a certain number of arrests?
17   A.    I don't believe I do know.
18   Q.    Have you ever observed another officer suffer
19   that penalty?
20   A.    I don't remember any specific officer or time.
21   But I remember general conversations, officers that did
22   want overtime, if they didn't -- they didn't have enough
23   activity, they would be denied overtime.
24   Q.    With whom did you have these conversations?
25   A.    Again, I don't recall any specific officer or any

A. SCHOOLCRAFT

1  specific date.
2      Q.      Did you record these conversations?
3      A.      If it was, my attorneys would have that
4  recording.
5      Q.      Did you ever suffer a change of tour as a result
6  of failing to make a certain number of arrests?
7      A.      With regards to the -- to the losing proposition,
8  that would be a -- that was a one time -- it would be for
9  one day.
10     Q.      Have you ever observed another officer suffer a
11 change of tour as a result of failing to make a certain
12 number of arrests?
13     A.      To the best of my memory, it was one -- it was
14 understood that that was one of the things, your tour would
15 be changed, eventually.  I don't recall any specific
16 officer, at any specific time.  But it was understood that
17 that's -- that unless the officer requested a tour change,
18 it was regarding activity.
19     Q.      Were you ever denied vacation days as a result of
20 failing to make a certain number of arrests?
21     A.      I don't believe so, no.
22     Q.      Have you ever personally observed any other
23 police officers who were denied vacation days from failing
24 to make a certain number of arrests?
25     A.      To the best of my memory, I don't believe anyone

A. SCHOOLCRAFT

1    has ever been denied their vacation picks, no.
2         Q.    While you were assigned to the 81st Precinct,
3    were you aware of officers being required to make a certain
4    number of stop, question and frisks, or UF-250 forms?
5         A.    What was that time frame again?  The same
6    question, you don't have to rephrase it.
7         Q.    While you were assigned to the 81st Precinct,
8    okay, yes?
9         A.    Please repeat the question.
10        Q.    While you were assigned to the 81st Precinct,
11   were you aware of other officers being required to make a
12   certain number of stop, question and frisks, or UF-250's?
13        A.    Yes.
14        Q.    How many stops were officers required to conduct?
15        A.    Again, it would depend on the officer, what unit
16   he is assigned with.  Off the top of my head, I don't
17   recall any specific number, but the recordings -- the
18   conversations, the roll calls, that did address the number
19   of 250's.  I believe I have recordings that state times and
20   dates and people involved.
21        Q.    How many stops was a patrol officer required to
22   conduct in the 81st Precinct?
23        A.    I don't recall ever being given a specific number
24   on 250's, other than the -- if you are assigned overtime,
25   it was two and two, two summonses, two 250's.  I don't

1   question.

2   Q. How many times did you request overtime but were
3   denied?

4   A. I don't recall ever requesting overtime.

5   Q. Did you observe any other officers lose overtime
6   for failing to issue a certain number of 250's?

7   A. I don't recall any specific officer or any
8   specific time. But it was general knowledge, if you didn't
9   pay the rent, you did not get what you asked for.

10  Q. Have you ever suffered a change of tour, as a
11  result of failing to issue a certain number of UF250's?

12  A. If you include the losing proposition collars, I
13  would say yes.

14  Q. How many times was your tour changed because you
15  failed to issue a certain number of 250's?

16  A. I don't recall how many times.

17  Q. What was the certain number of 250's you were
18  required to issue, when you had your tour changed for
19  failing to reach that number?

20          MR. NORINSBERG:  Objection.

21  A. What was that again?

22  Q. So you said that you did suffer a change of tour
23  for failing to issue a certain number of 250's; that is
24  correct?

25  A. That I stated what?