# EXHIBIT F

ORIGINAL

1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------------X
     ADRIAN SCHOOLCRAFT,
 3
                                    PLAINTIFF,
 4
                   -against-        Case No.:
 5                                  10CIV 6005(RWS)

 6   THE CITY OF NEW YORK, ET AL, DEPUTY CHIEF MICHAEL MARINO
     TAX ID 873220, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY,
 7   ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH, GERALD
     NELSON, TAX ID 912370, INDIVIDUALLY AND IN HIS OFFICIAL
 8   CAPACITY, DEPUTY INSPECTOR STEVEN MAURIELLO TAX ID 895117,
     INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, CAPTAIN THEODORE
 9   LAUTERBORN, TAX ID 897840, INDIVIDUALLY AND IN HIS OFFICIAL
     CAPACITY, LIEUTENANT WILLIAM GOUGH, TAX ID 919124,
10   INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, SERGEANT
     FREDERICK SAWYER, SHIELD NUMBER 2576, INDIVIDUALLY AND IN
11   HIS OFFICIAL CAPACITY, SERGEANT KURT DUNCAN, SHIELD 2483,
     INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, LIEUTENANT
12   CHRISTOPHER BROSCHART TAX ID 915354, INDIVIDUALLY AND IN
     HIS OFFICIAL CAPACITY, LIEUTENANT TIMOTHY CAUGHEY, TAX ID
13   885374, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, SERGEANT
     SHANTEL JAMES, SHIELD NO. 3004 AND PO'S JOHN DOE 1-50
14   INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES, JAMAICA
     HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV, INDIVIDUALLY AND
15   IN HIS OFFICIALLY CAPACITY, DR. LILIAN ALDANA-BERNIER,
     INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AND JAMAICA
16   HOSPITAL MEDICAL CENTER EMPLOYEES JOHN DOE 1-50
     INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES (THE NAME
17   JOHN DOE BEING FICTITIOUS, AS THE TRUE NAMES ARE PRESENTLY
     UNKNOWN),
18
                                    DEFENDANTS.
19   ------------------------------------------------------X

20

21                    DATE: June 5, 2014

22                    TIME: 10:16 A.M.

23

24           (DEPOSITION OF JOSEPH FERRARA.)

25
```

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

1

JOSEPH FERRARA

1  go to the next job, because there's pressure from the COs
2  in regards to response time, for how long does it take a
3  cop to get to another job.
4      Q.   But if an officer did ask a victim on the scene
5  are you sure it was a pipe or a bat, do you believe that
6  would be an inappropriate question?
7      A.   No, that would be appropriate.
8      Q.   So, your -- your problem with this is -- is
9  calling later?
10     A.   Yes.  The NYPD teaches its officers to interact
11 with the community on various different levels and if an
12 officer goes to a job and the person says they got hit with
13 a bat and robbed, they got hit with a bat and robbed and
14 the officer puts that down.  I don't know why later on
15 there would be further questions in regards to that
16 complaint.  The only further question in my feeling and
17 really departmentallywise is that that will go to the squad
18 and a detective assigned to that case would investigate
19 that crime.
20     Q.   Who do you believe was responsible for this
21 downgrading of crime complaints?
22          MR. SMITH:  Objection to form.
23          MR. KRETZ:  Objection.
24     A.   Who actually did it or who gave the orders to do
25 it?

JOSEPH FERRARA

1  Q.     Both.

2  A.     Well, I believe it -- it -- it fell on crime
3  analysis people because they worked hand in hand with the
4  commanding officer in -- because crime analysis put
5  together all the complaints into a system and was able to
6  tally all the crimes up for the seven majors.  So they
7  worked hand in hand with the CO in all the precincts that's
8  the way it was.

9         In the 81 precinct it would be DI Mauriello, you
10  know, giving the orders to look at certain crimes.  He
11  would even say it at the -- at roll calls or COs' meetings
12  that the desk officers have to start looking at special
13  complaint reports that come in because the desk officer is
14  supposed to review the complaint reports, but it went on in
15  the -- in the 103.  It went on in the -- in the 40.  It was
16  just a general practice for commanding officers to try to
17  limit the amount of numbers that they have because the way
18  the job is if a CO has a rise in numbers and they want to
19  get promoted that will stop them from getting promoted.

20  Q.     Do you believe that this downgrading of crime
21  complaints was official misconduct?

22  A.     I don't know if it was official misconduct.  I
23  felt it was misconduct.

24  Q.     Did you ever report this misconduct to anyone?
25  A.     No.

JOSEPH FERRARA

```
 1     Q.     Why not?
 2     A.     Because if you -- if you go around reporting
 3   stuff about your fellow workers or your commanding officer
 4   then chances are you're going to get yourself jammed up
 5   because there's -- there's that -- there's a perception in
 6   the NYPD to punish people who try to do good stuff
 7   sometimes.  So, I wasn't looking to get myself jammed up by
 8   making any kind of enemies with anybody or -- you know, I
 9   was trying to just keep myself out of trouble and do the
10   right thing like I'm supposed to do.
11     Q.     And you believe that this quote, unquote numbers
12   game happened because Commissioner Kelly and the commanding
13   officers wanted to see crime go down, right?
14            MR. SMITH:  Objection to form.
15     A.     Yes.
16            MR. SMITH:  What was the answer to that
17     question?
18            THE WITNESS:  Yes.
19     Q.     Now, again, in your -- in your e-mail to
20   Mr. Norinsberg from August 11th you stated that cops are
21   also directed to write certain moving summonses, they're
22   frowned upon if they issue a brake light, taillight,
23   headlight summons, the cops have to write seat belt, cell
24   phone summonses --
25     A.     Yes.
```

JOSEPH FERRARA

1      If a person reports something, especially
2 uniformed member of the service, if you're reporting
3 something against another uniformed member of the service,
4 that's supposed to remain confidential because right away
5 now you're going to have, you know, tension between the
6 officer who reported and -- and the -- you know, the
7 subject.  That's just not a fair tactic, it's why people
8 don't report things in the NYPD any quicker is because of
9 experiences like this, situations like this.
10     Q.    How do you know that someone in IAB was the one
11 who leaked Adrian Schoolcraft's name?
12     A.    People were talking in the command.
13     Q.    And what did they say?
14     A.    Apparently IAB, I think, called up the TS,
15 telephone switchboard operator, and left a message for
16 Schoolcraft to call back or something, that doesn't
17 normally happen.  That's what I think, you know, that's
18 what I, you know, remember being, you know, overhearing.
19     Q.    So, when individuals are called to IAB for a PG
20 hearing, how are they normally notified?
21     A.    I believe the ICO gets the phone call to notify
22 the subject in the precinct that they got to show up for a
23 PG hearing.
24     Q.    And on what do you base that opinion?
25     A.    My experience being in ICO's office when I was 41

JOSEPH FERRARA

1   -- 40 Precinct.

2   Q.   So, when you were a desk sergeant or a lieutenant
3   on the desk, you never got a call from IAB?

4   A.   No.  I don't -- I don't believe so.  And when I
5   was in IAB as a sergeant and a lieutenant the ICOs are the
6   ones we notified when we needed somebody to come down for a
7   PG hearing.  We didn't notify -- we didn't call the
8   person's command and say, hey, listen, this is IAB, we need
9   Joe Blow to come down to talk to us, it wasn't like that,
10  that's not confidential.

11            An ICO is supposed to remain confidential, that's
12  what their duties and responsibilities are, is they're not
13  supposed to broadcast to other members of the command hey,
14  Joe Blow got a PG hear -- a notification to come down for a
15  PG hearing, that's one of their specific duties, is that
16  they remain confidential with information that they
17  possess.

18  Q.   So, it's your belief that IAB does not call the
19  regular telephone switchboard to schedule PGs of officers
20  --

21  A.   Absolutely.

22  Q.   -- regardless of whether they're subject or
23  witness officer?

24  A.   Yes.

25  Q.   And so, it's your understanding based on what you

JOSEPH FERRARA

1    the 81 Precinct from April until your surgery let's say?
2        A.    No.
3        Q.    Did you ever discuss the troubles you had had as
4    a result of the things you told us about with Steve
5    Mauriello?
6        A.    I might have.
7        Q.    Do you have any recollection of it?
8        A.    No.
9        Q.    As one of the attorneys in this case responds in
10   saying anything is possible, but I just want to know --
11       A.    I might have.
12       Q.    -- what it is you recall.
13       A.    I might have.
14       Q.    But you don't have any recollection?
15       A.    No.
16       Q.    So, you don't have any recollection of anything
17   he might have said in response or anything of the sort?
18       A.    No, I really don't.
19       Q.    And you throughout your testimony were talking
20   and referring to a couple of different types of conduct,
21   official misconduct, misconduct or just generally
22   inappropriate behavior.
23             You've told us that you thought, I think these
24   were your words, that it was inappropriate for Mauriello to
25   refer to Schoolcraft as a rat.

JOSEPH FERRARA

1         Is that -- was there one -- more than two
2    recordings that you had search through to find out if there
3    was anything useful or has it always been that there were
4    only two?
5         A.   No, there was two.  What I was referring to by
6    searching, those meetings were an hour and ten minutes
7    each, I had to go through and listen to an hour and ten
8    minutes worth to see if there was anything that pertained.
9         Q.   Okay.  Were you -- your purpose in making the
10   recordings was to record Mauriello saying something
11   inappropriate about Schoolcraft you tell us, right?
12        A.   Yes.
13        Q.   And, so, when Norinsberg is asking you for
14   information you don't recall at that time whether the
15   recordings you made for the sole purpose of recording
16   Mauriello saying inappropriate things about Schoolcraft
17   contained such inappropriate things?
18        A.   I wasn't sure exactly what was said.  I wasn't
19   sure if he used the word rat.  I don't -- I wasn't sure how
20   he referred to Schoolcraft, so I had to go back and look
21   just to see because, you know, there's -- there's multiple
22   ways of referring to people and I just didn't want to say A
23   and it was B, so I had to go back and review it.
24        Q.   Directing your attention to page 12144,
25   Mr. Norinsberg writes to you on August 11, 2010.  I would

JOSEPH FERRARA

1   Q.   Hello, Mr. Ferrera, how are you?

2   A.   Good. Thank you.

3   Q.   I'm going to ask you a few more questions. I
4   know it's been a long day. If there's anything about the
5   question, the way I ask it, it's not clear, let me know and
6   I'll try and rephrase it, okay?

7   A.   Yes.

8   Q.   All right, great.

9        You were asked questions earlier about the two
10  recordings that you made at the 81 CO meetings. And you
11  said that those were on February 18, 2010 and April 1,
12  2010; is that right?

13  A.   Yes.

14  Q.   And I think you said that you were at a meeting,
15  another COs' meeting prior to February 18, 2010 and at that
16  meeting DI Mauriello made some statements, right?

17  A.   Yes.

18  Q.   And those statements related to Schoolcraft; is
19  that right?

20  A.   Yes.

21  Q.   Can you tell me how many days, weeks, months or
22  whatever other way you can measure it that those statements
23  were made in relationship to the February 18, 2010 meeting
24  that you recorded?

25  A.   It probably would have been right before this

JOSEPH FERRARA

1  February 18th, so whatever CO meeting there was before that
2  it probably would have been at that meeting that I first
3  heard it or -- I don't know how -- you know, I don't recall
4  how often he had COs' meetings, but it probably would have
5  been the most recent one before that.
6      Q.   Okay.  So, sitting here today it's your belief
7  that that meeting which prompted you to make the recording
8  on February 18th happened two or four weeks, approximately,
9  before February 18, 2010?
10     A.   Yeah, probably.
11     Q.   Do you --
12          MR. LEE:  Objection to form.
13     Q.   Do you recall what Mauriello said at that
14  meeting, the one that preceded the February 18, 2010
15  meeting that you did record?
16     A.   Just that Schoolcraft's a rat, something to that
17  effect.  Schoolcraft and a rat.  I don't remember word for
18  word exactly what was said.
19     Q.   Did Mauriello say in your presence words to the
20  effect that he knew that Schoolcraft was a rat or that he
21  had been given information about that or anything like
22  that?
23     A.   I think he said something to the effect that I've
24  got a heads up, but I really don't remember and that would
25  have been prior to those -- those two recordings.

JOSEPH FERRARA

1   worked for him.

2   　　　　I believe he was the commanding officer of one of
3   the groups in IAB, so there was a close working
4   relationship between del Pozo and Campisi himself as well
5   as the other chiefs in the bureau.

6   Q.   Had you ever heard of other occasions where COs
7   got a heads up about investigations that were going on
8   about their commands?

9   A.   Yeah, I heard -- I've heard people talk that a CO
10  was given a heads up.

11  Q.   Where -- where were you when you heard this?

12  A.   I was in IAB because there was a group 56 CO who
13  was -- Captain -- his name slips my mind, but he was the
14  group 56 CO after Lunetta.  I think he had several
15  investigations on him, you know, allegations of corruption
16  and misconduct within his group that was against him and he
17  knew about every single one of them.  You know.  How does
18  somebody find out about it if somebody higher up in IAB is
19  not telling him?

20  Q.   I got a little bit jumbled up about your career,
21  I'm sure you covered it, I'm just not clear.  I hope you
22  bear with me.

23  　　　　For how years did you work at IAB?

24  A.   I believe all together it was five, I believe it
25  was probably close to three years as a sergeant and maybe

JOSEPH FERRARA

```
 1   two years as a lieutenant.  Four plus years all together,
 2   maybe.
 3        Q.   Do you recall any other circumstances where COs
 4   got heads up other than the ones you've mentioned today?
 5        A.   Just -- no, that -- that's really hit.  I mean
 6   people talk, you know, from group to group people talk
 7   about this CO, that CO.  You know, I mean I can't say
 8   definitely, you know, I know that the group 56 CO
 9   definitely got a heads up because my wife worked in group
10   56 until she retired and she was made aware that, you know,
11   there was allegations being made against that commanding
12   officer, so that I definitely knew because she knew.
13             As far as anybody else, I mean there was always
14   word of -- you know, there was always word that oh, yeah,
15   IAB tipped off so and so and you know, because the job --
16   the job tries to protect who they like, you know.  There
17   are -- there are some COs who get hit for fudging numbers
18   and they get transferred.  There are some COs who hit for
19   fudging numbers and they get told you got to leave, you got
20   to retire.
21             Um, the -- the CO in group 56 before Captain
22   Lunetta was this woman Captain Ferman, she was
23   African-American woman, she got caught fudging numbers
24   which was tied into the whole Brohenny thing that we spoke
25   about earlier with the computer misuse that he ran a nephew
```

250

JOSEPH FERRARA

1   and lieutenant, I was a nobody in that bureau.
2        Q.    Thank you.
3              THE VIDEOGRAPHER:  Anything else?
4              MS. PUBLICKER METTHAM:  No.
5              THE VIDEOGRAPHER:  This concludes today's
6        deposition of Joseph Ferrera.  We are now off the
7        record at 4:53 p.m.
8              (Whereupon, at 4:53 P.M., the Examination of
9        this Witness was concluded.)
10
11
12                        _____
                                 JOSEPH FERRARA
13
14  Subscribed and sworn to before me
15  this ____ day of _____ 20___.
16
    _____
17         NOTARY PUBLIC
18
19
20
21
22
23
24
25