# PTX 79

The City of New York



## Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department

# COMMISSION REPORT

Milton Mollen
Chair

Harold Baer, Jr.
Herbert Evans
Roderick C. Lankler
Harold R. Tyler, Jr.

Joseph P. Armao
Chief Counsel

Leslie U. Cornfeld
Deputy Chief Counsel

July 7, 1994

# ANATOMY OF FAILURE:  A PATH FOR SUCCESS

## ACKNOWLEDGEMENTS

The Commission's work reflects the combined efforts of a great many people. Our findings, conclusions, and recommendations are the result of intensive investigations, countless interviews, painstaking collection and analysis of evidence, and many hours of writing and editing. So many people have so generously given us their time and expertise, it is impossible to recognize them all. Nevertheless, we must single out certain individuals and agencies for their special contribution to our work.

The people who conducted the daily work of the Commission were, of course, the Commission's very able full-time staff, headed by our chief counsel, Joseph P. Armao, deputy chief counsel, Leslie U. Cornfeld, and chief investigator, Brian M. Carroll. They provided outstanding skill and dedication in leading our investigative efforts, systems analysis, and the public hearings. We wish particularly to thank Mr. Armao and Ms. Cornfeld for applying their considerable talents over countless hours to the creation of this Report. We are grateful to the distinguished law firms of Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, and Paul, Weiss, Rifkind, Wharton & Garrison for their support of Mr. Armao and Ms. Cornfeld in performing this important public service.

Our investigators and analysts, whose tireless efforts, under the supervision of Mr. Carroll, generated many of the witnesses and much of the evidence underlying our findings and conclusions, were deputy chief investigators Frank O'Hara and Robert Machado, who were a constant source of insight and inspiration; investigators and analysts Frances Alexander, Marilyn Coleman, Marcia DeLeon, Alfred Fernandez, Brian T. Kelly, Samuel Nieves, Jody Pugach, Charmaine Raphael, Dorice J. Shea, and Gregory Thomas.

In addition, four of the Commission's investigators were loaned to us by federal and state agencies. The Commission is deeply indebted to Ronald Goldstock, the Director of the New York State Organized Crime Task Force, for loaning us the expert services of our deputy chief investigator Frank O'Hara. The Commission is also similarly indebted to the Regional Inspector of the Inspection Service of the Internal Revenue Service, William Gill and his predecessor Joseph Reinbold, for loaning us two of the Service's best agents, Thomas Hopkins and Frank Luce. We also wish to thank especially the New York Office of the Drug Enforcement Administration and its former and current Special Agents in Charge, Robert A. Bryden and Carlo Boccia, for providing us the valuable services of Intelligence Analyst Jose Guzman.

Commission attorneys, whose many functions included supervising investigations, interviewing witnesses, and preparing the hearings, were David A. Burns, Edward Cunningham, and Charles Guria. Special Counsels Jonny J. Frank and William Goodstein provided us and our staff with constant advice and guidance that were critical to the success of our projects. We are indeed grateful to former United States Attorney Andrew Maloney

and to United States Attorneys Mary Jo White and Zachary Carter for continuing Mr.
Frank's assignment to us. The Commission also received able assistance from two part-time
volunteer attorneys, Charles King of the firm of Fried, Frank, Harris, Shriver & Jacobson,
and Thomas Obermaier of the firm of Skadden, Arps, Slate, Meagher & Flom. In
particular, we thank Jeffrey Zimmerman, who served the Commission diligently for over
three months as an assistant counsel, and to the law firm of Patterson, Belknap, Webb &
Tyler for providing Mr. Zimmerman's valuable services to us *pro bono*.

We are also indebted to Professor Mark H. Moore and Mr. David M. Kennedy of
the Harvard University John F. Kennedy School of Government who acted as consultants
to the Commission. Their wisdom, experience, and judgment guided many aspects of our
work.

The members of the Commission's support staff, Anne Sherlock, Nancy Levine, and
Lourdes Sinisterra, supported the Commission in all phases of our endeavors. We thank
them (and their families) for the many nights and weekends dedicated to helping us
accomplish our tasks. In particular, we thank our public information director, Tom Kelly,
for his dedication, professionalism, and expertise in coordinating the Commission's public
information.

Many law enforcement officials and agencies gave us extraordinary assistance and
cooperation. In particular, we would like to extend our warm thanks to the Honorable Mary
Jo White and the staff of the United States Attorney's Office for the Southern District of
New York; the Honorable Robert M. Morgenthau and the staff of the District Attorney of
New York County; the Honorable Charles J. Hynes and the staff of the District Attorney
of Kings County; the Honorable Richard A. Brown and the staff of the District Attorney of
Queens County; the Honorable Robert Johnson and the staff of the District Attorney of
Bronx County; and the Honorable William Murphy and the staff of the District Attorney
of Richmond County; the Honorables Andrew Maloney and Zachary Carter and the staff
of the United States Attorney's Office for the Eastern District of New York; and the
Honorable James Catterson, the District Attorney of Suffolk County. We also wish to
extend special thanks to Thomas A. Coughlin III, the Commissioner of the New York State
Department of Correctional Services, and his Inspector General, Brian F. Malone, who were
a constant source of important assistance. In addition, we thank Mr. Joseph Yarrish, the
Regional Inspector General of the United States Department of Agriculture, Supervisory
Special Agent Richard Gallo, and Special Agent Michael Pagliughi for their important
assistance.

We are especially grateful to United States Attorney White and Assistant United
States Attorneys Michael Horowitz, Sarah Chapman, and Michelle Hirschmann for their
guidance and direction in our investigation of the 30th Precinct. Similarly, we express our
gratitude to District Attorney Hynes and Assistant District Attorneys Dennis Hawkins and
Wanda Lucibello for their assistance and guidance in the course of our 73rd Precinct

investigation, as well as United States Attorney Carter and Assistant United States Attorney Charles Gerber.

Others to whom the Commission is indebted for valuable cooperation, assistance, and advice are former Police Commissioners Patrick V. Murphy, Raymond W. Kelly, Robert J. McGuire, and Richard Condon, and former officers of the Department Joseph Trimboli, John Guido, Aaron Rosenthal, and Daniel Heggarty; James Fox, William Doran, Mark Codd, John O'Connor, and Roger Viadero of the Federal Bureau of Investigation; Judge John Keenan and Judge Whitman Knapp of the Southern District of New York; Michael F. Armstrong, former Chief Counsel, Knapp Commission; Richard Girgenti, Commissioner of the State Division of Criminal Justice Services, Gerald W. Lynch, president of John Jay College of Criminal Justice; Professor Lawrence W. Sherman; Paul Schechtman, Chief of the Criminal Division, United States Attorney's Office; Helene Gurian, chief counsel to the State Investigation Commission; Thomas A. Reppetto, president of the Citizens' Crime Commission; former Lieutenant David Durk; Edward T. Mechmann, former Assistant United States Attorney for the Eastern District of New York; Laurence A. Levy of the Office of the Corporation Counsel, and Grace de Fries and Mark McCreery of the Office of the Mayor.

The Commission worked in cooperation with and received much help from officials of the New York City Police Department. In particular, we thank Police Commissioner William J. Bratton, First Deputy Commissioner David Scott, Deputy Commissioner John E. Maple, Deputy Commissioner Walter Mack, Deputy Commissioner Elsie Scott, Chief of Personnel Michael Julian, Deputy Chief William Casey, Deputy Chief Joseph Raguso, and Inspector Charles Campisi. We should particularly note the outstanding cooperation given the Commission by former Police Commissioner Raymond W. Kelly, Police Commissioner Bratton, Deputy Commissioner Mack and Deputy Chief Casey in the course of the 30th Precinct investigation.

Special thanks are due to the Edna McConnell Clark Foundation and the New York Community Trust for their generosity in providing critical funds to support the Commission's work. We also wish to thank The Acorn Group, Ltd. for their excellent and generous services in preparing our public hearing exhibits and assisting in reproducing them in this Report.

We should particularly note the outstanding cooperation of the former Mayor of the City of New York, the Honorable David N. Dinkins, for his unwavering support and for the freedom he afforded the Commission to fulfill its mandate. We further express our deep appreciation to the Honorable Rudolph W. Giuliani, the Mayor of the City of New York, for the support and valuable insights he provided to us since the date of his election to the completion of our endeavors.

Last, but never least, we thank the many police officers and citizens of New York City and elsewhere who wrote or telephoned to express their support and encouragement for our often difficult work. In particular, many thanks go to the many committed and courageous members of the Police Department who came forward to provide this Commission with invaluable information, direction, and insight to guide our inquiries. Much of the Commission's work could not have been accomplished without these individuals, who choose not to be named. It was their commitment that confirmed for us early in our tenure how fortunate this City is to be served by the fine men and women who comprise the overwhelming majority of the finest Police Department in the world.

## Commission To Investigate Allegations of Police Corruption
## And The Anti-Corruption Procedures of the Police Department

#### Commissioners

Milton Mollen, Chair

Harold Baer, Jr.                                                    Roderick C. Lankler
Herbert Evans                                                      Harold Tyler

#### Commission Staff

Joseph P. Armao              Leslie U. Cornfeld
Chief Counsel                Deputy Chief Counsel

Brian Carroll
Director of Investigations

Robert A. Machado            Frank O'Hara
Deputy Chief Investigators

Counsel                                          Investigators and Analysts

David A. Burns                                   Frances Alexander
Edward Cunningham                                Marilyn Coleman
Charles M. Guria                                 Marcia DeLeon
Jeffrey Zimmerman                                Alfred Fernandez
                                                 Jose Guzman
Director of Media Relations                      Thomas Hopkins
                                                 Brian T. Kelly
Tom Kelly                                        Frank Luce
                                                 Samuel Nieves
Support Staff                                    Jody Pugach
                                                 Charmaine Raphael
Nancy Levine                                     Dorice J. Shea
Anne Sherlock                                    Gregory A. Thomas
Lourdes Sinisterra

#### Special Counsel

Jonny J. Frank                                   William Goodstein

#### Volunteer Attorneys

Charles King                                     Thomas M. Obermaier

v

# TABLE OF CONTENTS

Page

**CHAPTER ONE -- AN OVERVIEW AND SUMMARY OF
THE COMMISSION'S FINDINGS** ................................. 1

**CHAPTER TWO -- THE STATE OF MODERN POLICE
CORRUPTION** ................................................. 10

   I. THE COMMISSION'S INVESTIGATIONS ........................ 11

  II. THE NEW NATURE OF CORRUPTION: AN OVERVIEW .......... 15

     Corruption and Drugs ........................................ 15
     The New Character of Police Corruption ...................... 16
     "Crew" Corruption: The New Organization of Corruption ............. 17
     Methods to Create Corruption Opportunities ...................... 19
     Methods To Escape Detection ................................. 19
     Profile of Today's Corrupt Cop: The Erosion Factor .................. 20
     The Mixed Motives Behind Corruption: A New Framework
       for Analyzing Corruption ...................................... 21

  III. PATTERNS OF CORRUPTION ................................ 21

     SECTION 1: COPS COMMITTING THEFT ...................... 22

     Thefts From Street Dealers: "Shake Downs" ................... 22
     Thefts From Radio Runs ...................................... 23
     Theft From Unlawful Searches and Seizures:
       "Raids," "Doing Doors," "Booming Doors" ................... 25
     Thefts From Lawful Searches and Seizures ........................ 28
     Thefts From Car Stops and Drug Couriers ....................... 29
     Off-Duty Robberies ......................................... 30

     SECTION 2: COPS PROTECTING AND ASSISTING
     NARCOTICS TRAFFICKERS .................................. 31

     SECTION 3: COPS AS DRUG DEALERS AND USERS --
     DISTRIBUTING AND USING DRUGS ......................... 34

     SECTION 4: PERJURY AND FALSIFYING DOCUMENTS .......... 36

vi

Page

SECTION 5:  POLICE VIOLENCE AND BRUTALITY  . . . . . . . . . . . . .   44

The Link Between Brutality and Acts of Corruption  . . . . . . . . . . . . . . . . .   45
The Link Between Brutality And Police Culture  . . . . . . . . . . . . . . . . . . . . .   47

CHAPTER THREE -- POLICE CULTURE AND CORRUPTION  . . . . . . .   51

The Code of Silence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53
"Us vs. Them"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58
The Erosion Of Values And Pride  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60
Police Cynicism  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   63
Moral Character and Fitness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65
Police Unions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66
Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

CHAPTER FOUR -- THE COLLAPSE OF THE DEPARTMENT'S
CORRUPTION CONTROLS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

I.  THE CREATION AND CORRUPTION OF THE DEPARTMENT'S
INTEGRITY SYSTEM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

Spreading Accountability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74
The New Anti-Corruption Apparatus  . . . . . . . . . . . . . . . . . . . . . . . . . . .   76

II.  THE COLLAPSE OF COMMAND ACCOUNTABILITY  . . . . . . . . . . . . .   77

III.  INEFFECTIVE FIELD SUPERVISION . . . . . . . . . . . . . . . . . . . . . . . . . .   79

Willful Blindness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80
Performance Evaluations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81
Resource and Management Failures  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82
Integrity Control Officers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

IV.  THE DETERIORATION OF THE INVESTIGATIVE STRUCTURE:
THE COLLAPSE OF IAD AND THE FIAUS . . . . . . . . . . . . . . . . . . . . .   85

The Internal Affairs Division  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85
The Field Internal Affairs Units  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   89

Page

V. FRAGMENTING, MINIMIZING AND CONCEALING
POLICE CORRUPTION CASES ................................. 90

Minimizing Corruption Through Investigations ..................... 90
   *The Michael Dowd/75th Precinct Investigation* ................... 91
   *The Ninth Precinct Case* ...................................... 92
Concealing Corruption Through Filing and Classification Systems ........ 95
   *The Tickler File* ............................................ 95
   *Other Cases Not Sent to Prosecutors or Not Officially Recorded* ........ 98
Favoritism Toward High-Ranking Officers .......................... 99
   *Scalabrino Case* ............................................ 99
   *Simonetti Case* ........................................... 100

VI. THE DEPARTMENT'S FLAWED INVESTIGATIVE AND
INTELLIGENCE-GATHERING EFFORTS ........................ 101

The Failure to Employ Pro-Active Techniques ...................... 101
Failed Undercover Programs:  Field Associates and Undercover Operatives . 102
The IAD "Action Desk" ........................................ 103

VII. THE DEPARTMENT ABANDONED ITS RESPONSIBILITY TO
CHANGE THE CULTURE OF CORRUPTION ................... 107

CHAPTER FIVE -- RECOMMENDATIONS FOR REFORM OF THE
DEPARTMENT'S CORRUPTION CONTROL POLICIES AND
PROCEDURES ................................................ 110

I. POLICE CULTURE AND MANAGEMENT ....................... 112

Commitment to Integrity ...................................... 112
Recruitment and Screening ..................................... 112
Recruit And In-Service Performance Evaluations .................... 118
Integrity Training ............................................ 119
Police Personnel Management .................................. 123
Police Unions ............................................... 125
Drug Testing ............................................... 127
New York City Residency Requirement ........................... 128

viii

Page

II. COMMAND ACCOUNTABILITY ............................... 128

Enforcement of Command Accountability .......................... 128
Supervision ................................................ 133

III. INTERNAL INVESTIGATIONS ............................... 136

Internal Affairs Operations ..................................... 136
Recruitment of Qualified Investigators ........................... 138
Intelligence-Gathering Operations .............................. 139
Investigative Approach ....................................... 140
Organizational Structure ...................................... 141
Command Liaisons ........................................... 142
Civil Rights Investigations ..................................... 142

IV. SANCTIONS AND DETERRENCE ........................... 142

Discipline .................................................. 143
Disability Pension Abuse ..................................... 144

V. COMMUNITY OUTREACH .................................. 145

Community Policing and Community Outreach ...................... 145

CHAPTER SIX -- HELPING THE POLICE TO POLICE
THEMSELVES: THE NEED FOR INDEPENDENT, EXTERNAL
OVERSIGHT .................................................. 148

I. DEFICIENCIES OF THE OFFICE OF THE STATE
SPECIAL PROSECUTOR MODEL .............................. 150

II. DEFICIENCIES OF THE INSPECTOR GENERAL MODEL .......... 151

III. THE COMMISSION'S PROPOSED INDEPENDENT
OVERSIGHT MODEL ...................................... 152

Monitoring Performance of Anti-Corruption Systems ................. 154
Monitoring Cultural Conditions ................................ 156
Monitoring Corruption Trends ................................. 157
Conclusion ................................................. 157

# APPENDIX

**Exhibit One**

Executive Order No. 42 issued by The Honorable David N. Dinkins,
Mayor of the City of New York, on July 24, 1992,
Appointing the Commission to Investigate
Allegations of Police Corruption and the
Anti-Corruption Procedures of the New York
City Police Department

**Exhibit Two**

Opening Statement by The Honorable Milton Mollen,
Commission Public Hearings, September 27, 1993

**Exhibit Three**

Mid-Hearings Statement by The Honorable Milton Mollen,
Commission Public Hearings, October 4, 1993

**Exhibit Four**

Exhibits presented at the Commission Public Hearings,
September 27, 1993 through October 7, 1993

**Exhibit Five**

Letter dated December 27, 1993 to Mayor David N. Dinkins
from The Honorable Milton Mollen

**Exhibit Six**

Commission's Interim Report and Principal Recommendations,
dated December 27, 1993

**Exhibit Seven**

New York City Police Department, Map of Patrol Precincts

**Exhibit Eight**

The Failure to Apprehend Michael Dowd: The Dowd Case Revisited

- The Failure to Apprehend Michael Dowd
- Sergeant Trimboli and the Brooklyn North FIAU
- Trimboli and the 75th Precinct
- The R&T Grocery Store Robbery
- Corruption in the 75th Precinct
- The Trimboli Investigation
- The Pro-Active Plan
- The 79th Precinct Investigation
- The Yurkiw Investigation
- Final Developments
- Comments

## CHAPTER ONE

## AN OVERVIEW AND SUMMARY OF THE COMMISSION'S FINDINGS

This Commission has spent the past twenty-two months investigating the nature, extent and causes of police corruption today and the New York City Police Department's competence and commitment to prevent and detect it. When the Commission was created in July 1992 by Executive Order of Mayor David N. Dinkins we were given a three-fold mandate: to investigate the nature and extent of corruption in the Department; to evaluate the Department's procedures for preventing and detecting corruption; and to recommend changes and improvements in those procedures. What follows is the Commission's Report on the state of corruption we observed, the Department's ability and willingness to deal with it in recent years, and our recommendations for lasting change.

Part of what we found was uplifting, part was disheartening. But our fundamental conclusion is that this City has cause for faith in the future of our police department. Unlike the situation a generation ago, this Commission can confidently report that the vast majority of New York City police officers are honest and hard-working, and serve this City with skill and dedication each day. It also appears that the work of this Commission and the attitude of the Department's current leadership has resulted in a determined commitment to fighting police corruption. This is a critical achievement for the Department and the people of our City. Without such a commitment, no efforts to combat corruption will succeed. This Report is intended to help the Department maintain and carry out that commitment -- both today and in generations to come.

Despite our overall cause for optimism, we found that police corruption is a serious problem confronting our City. Our findings raise significant concerns about the nature of corruption today, the conditions that fuel it, the Department's willingness to confront and fight it and, perhaps most troubling, the potential for these problems to grow without sustained vigilance and oversight.

What we found is that the problem of police corruption extends far beyond the corrupt cop. It is a multi-faceted problem that has flourished in parts of our City not only because of opportunity and greed, but because of a police culture that exalts loyalty over integrity; because of the silence of honest officers who fear the consequences of "ratting" on another cop no matter how grave the crime; because of willfully blind supervisors who fear the consequences of a corruption scandal more than corruption itself; because of the demise of the principle of accountability that makes all commanders responsible for fighting corruption in their commands; because of a hostility and alienation between the police and community in certain precincts which breeds an "Us versus Them" mentality; and because

for years the New York City Police Department abandoned its responsibility to insure the integrity of its members.

All these factors contributed to the state of corruption we uncovered. While the systemic and institutionalized bribery schemes that plagued the Department a generation ago no longer exist, a new and often more invidious form of corruption has infected parts of this City, especially in high-crime precincts with an active narcotics trade. Its most prevalent form is not police taking money to accommodate criminals by closing their eyes to illegal activities such as bookmaking, as was the case twenty years ago, but police acting as criminals, especially in connection with the drug trade. Corruption occurred not only because of fortuitous opportunities and the frailties of human nature, but often because of created opportunities and premeditated, organized group effort.

Former police officer Michael Dowd, for example, did not just take bribes from drug traffickers to turn his head; he became a drug dealer himself and actually assisted and protected major drug operations. Former police officer Kevin Hembury did not only steal drugs, guns and money in the course of a series of unlawful searches; he was part of a gang of cops that raided drug locations almost daily for the sole purpose of lining their pockets with cash. Former police officer Bernard Cawley -- nicknamed "the Mechanic" by his sergeant because he so openly and frequently "tuned people up," or beat them -- not only used informants to identify drug locations for robberies, but beat people indiscriminately in crime-infested housing projects in his precinct. And it is alleged that former police officer Alfonso Compres, one of the fourteen officers arrested thus far in the Commission's year-long 30th Precinct investigation, did not just steal from drug dealers on the streets; he demanded regular payments to allow them to operate freely in his precinct and robbed those who did not pay -- he even used his service revolver to shoot a dealer while stealing a package of cocaine while in uniform. To cover up their corruption, officers created even more: they falsified official reports and perjured themselves to conceal their misdeeds. Thus, while more limited in extent, police corruption has become more serious and threatening than ever before.

In the face of this problem, the Department allowed its systems for fighting corruption virtually to collapse. It had become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than rooting it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted -- especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there was a strong institutional incentive to allow corruption efforts to fray and lose priority -- which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from

command accountability and supervision, to investigations, police culture, training and recruitment.

For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it. In a Department with a budget of over one billion dollars, the basic equipment and resources needed to investigate corruption successfully were routinely denied to corruption investigators; internal investigations were prematurely closed and fragmented and targeted petty misconduct more than serious corruption; intelligence-gathering was minimal; integrity training was antiquated and often non-existent; Internal Affairs undercover officers were often placed in precincts where corruption was least prevalent; reliable information from field associates was ignored; supervisors and commanders were not held accountable for corruption in their commands; and corruption investigators often lacked investigative experience and almost half had never taken the Department's "mandatory" basic investigative training course. Most Internal Affairs investigators and supervisors embraced a work ethic more dedicated to closing corruption cases than to investigating them. Most volunteered for Internal Affairs to get on a quick promotion track rather than to get corrupt cops off the job. Indeed, a survey of Internal Affairs investigators we conducted through an Internal Affairs "insider" revealed that over 50 percent of Internal Affairs investigators' time was spent on non-investigatory matters. And no one said a word about this state of affairs until this Commission commenced its investigations.

This was no accident. Weak corruption controls reduced the chances of uncovering serious corruption and protected police commanders' careers. Since no entity outside the Department was responsible for reviewing the Department's success in policing itself, years of self-protection continued unabated until this Commission commenced its independent inquiries.

This abandonment of effective anti-corruption efforts did more than avoid public exposure of corruption, it fueled it. It sent a message throughout the Department that integrity was not a high priority and that Department bosses did not really want to know about corruption. In short, it gave everyone in the Department an excuse for doing what was easiest: shutting their eyes to corruption around them.

And that is precisely what happened. The principle of command accountability, which holds commanders responsible for fighting corruption, completely collapsed. Supervisors and commanding officers were largely complacent about maintaining integrity. Few were concerned with corruption on their watch -- unless it exploded into an embarrassing corruption scandal. One officer in a high-crime precinct related how his commanding officer went so far as to announce at roll call that he knew his officers were committing acts of corruption, and gave them this bit of advice: if you get caught, keep your mouth shut. Obviously, any officer who hears that message will conclude that his bosses are content to let corruption continue -- despite the Department's rhetoric to the contrary.

3

Patrol officers, too, shut their eyes to corruption. Officers from various commands told this Commission that they would never report even serious corruption because they feared the consequence of being labeled a "rat" and lacked confidence in the Department's commitment to uncover corruption and maintain confidentiality. Indeed, so powerful is this code of silence that in dozens of Commission interviews and in recent group discussions held by the Department, police officers admitted that they would not openly report an officer as corrupt as Michael Dowd – though almost all of them would silently hope that he would be arrested and removed from the Department.

Even corruption investigators understood that avoiding scandal was often more important than uncovering corruption. As one Internal Affairs detective testified at a private hearing:

> They [IAD's commanders] didn't want us to be effective. . . .
> They didn't want us to uncover any serious misconduct or large-
> scale or any kind of misconduct that would bring bad press to
> the Department or would cause embarrassment *** [serious]
> cases were not aggressively pursued. There was no aggressive
> posture taken when it could have a potential to develop into
> something that would cause embarrassment to the Department.

This attitude began at the top. At the Commission's public hearings, Daniel F. Sullivan, the veteran chief of the Department's Inspectional Services Bureau – and the Department's top uniformed commander of its corruption controls – testified about the Department's view of corruption investigations:

> The Department [was] paranoid over bad press. . . . There was
> a message that went out to the field that maybe we shouldn't be
> so aggressive in fighting [police] corruption because the
> Department just does not want bad press. (Tr. 25)[1]

This attitude is no secret in the crime-ridden, narcotics-infested communities where police corruption is most prevalent. Numerous residents and leaders of these communities told us that they often do not know whom to suspect more: the cops or the criminals. Few civilians would ever turn to the Department to report corruption – because they believe the Department will invariably support even corrupt cops more than the public. They believe that no one with the same uniform really cares what cops do on the drug-ridden streets of North Brooklyn, Upper Manhattan, or the streets of any ghetto of this City. Regardless of the truth of this perception, it is the perception that often matters. And this perception poisons relations between the community and the police, compromising the credibility of the

---

[1]   Throughout this Report, references to "Tr." indicate pages in the transcript of the Commission's public hearings, held from September 27, 1993 through October 7, 1993.

4

vast majority of honest and dedicated cops who need the community's cooperation to carry out their difficult jobs effectively.

The Department also failed – or refused – to recognize that police corruption is a multi-dimensional problem that cannot be overcome by focusing solely on the corrupt cop and inadequate investigations. In so doing, the Department failed to insure that corruption controls operated on a variety of fronts and in the daily operations of the Department, including: recruitment, screening, integrity training, supervision, deterrence, accountability and police culture. Because of that failure, the Department abandoned some of its best tools for conquering corruption: the honest cop and the community.

Enlisting the support of the honest cop who comprises the bulk of the Department is critical to effective integrity controls. First, most corrupt officers start off as honest and idealistic. The focus must be on *keeping* them honest. We found that over time the constant and repeated exposure to certain conditions and temptations – especially those in high-crime and drug-ridden precincts – erodes the values and principles of many officers. This makes them more susceptible to corruption and to a culture that accepts and protects it. Second, it is honest cops who, by their silence, allow corruption to continue. Reforms must focus on making honest officers feel responsible for keeping their fellow officers honest, and ridding themselves of corrupt ones. Despite this, until recently no effort was made to encourage the honest cop to become part of the solution to corruption. To the contrary, honest cops, like the community, were often discouraged from doing so. Scores of officers told us that they believed the Department did not want them to report corruption, that such information was often ignored, and that their careers would be ruined if they did so. The evidence shows that this belief was not unfounded.

Convincing honest cops to help fight corruption will not be easy. The culture of group loyalty and protection is powerful – as it should be. It bolsters morale and is vital to successful policing. But too often an officer's loyalty to fellow officers – even corrupt ones – exceeds his loyalty to the Department and the law. The challenge is to redirect those otherwise admirable values away from cops who have tarnished the badge, and toward all those who honor it daily. We are convinced such a transformation is possible.

There is a strong basis for our optimism. First, history shows that a Department-wide tolerance for corruption can be turned into corruption intolerance with proper leadership and commitment. After the Knapp Commission's revelations of widespread police corruption, former Police Commissioner Patrick V. Murphy made integrity a centerpiece of his administration and held police commanders and supervisors personally accountable for combatting corruption. It worked. Successful integrity controls swiftly eliminated much of the corruption that had plagued the Department and a new code of ethics arose among the troops. That commitment eventually eroded because no mechanism was ever implemented to sustain it. But the point is that former Commissioner Murphy demonstrated that a

5

corruption-infested Department with a corruption-tolerant culture changed because of aggressive leadership and unwavering commitment.

An even more important basis for our sense of optimism is the essential values of the hundreds of honest officers of all ranks we interviewed over the past months. While they may yet be reluctant to turn in fellow officers who dishonor their badges, they silently hope that such officers are removed from the job. They despise corrupt cops and want the Department to root them out of their patrol cars and from their precincts. Their attitude gives rise to much hope. It shows us that the battle to change police culture is already half won. It shows us that the wall of silence is far from impenetrable and that the beginnings of widespread intolerance for corruption already exist.

We believe the Department has the leadership and commitment needed to transform the Department once again. We are confident that the current Police Commissioner has the skills and insights to accomplish his mission of driving corruption from the ranks of his Department. We have seen what appears to be a new era in the fight against police corruption. The Department, in partnership with this Commission, has begun to implement many of the reforms set forth in this Report. Much time, effort and resources have been devoted to strengthening corruption controls, signalling the Department's genuine commitment to fighting police corruption.

The challenge we face is to maintain that commitment long after this Commissioner departs and the glare of public scrutiny subsides. We believe the Department cannot maintain that commitment alone. If history proves anything, it is that when the glare of scrutiny shines on the Department, it can and will successfully police itself. But history also proves that left to its own devices the Department will backslide, and its commitment to integrity will erode. It is no coincidence that the only two times in the past twenty years that fighting corruption has been a priority in the Department was when an independent commission publicly reviewed and disclosed the Department's failures to keep its own house in order. This is because, in the words of former Police Commissioner Raymond Kelly and former Chief of Inspectional Services Daniel Sullivan, outside oversight "keeps the Department's feet to the fire." Indeed, law enforcement officials unanimously told us that the Department's heightened commitment and vigilance began only after the creation of this independent oversight Commission. Only a truly independent body, working with the Department but beyond its control, can sustain this commitment -- and make the fear of failed corruption controls more powerful than the fear of corruption's disclosure.

There is another benefit to outside oversight. It will provide assurance to the public, when justified, that the Department is using its best efforts in the fight against corruption. Often, the public incorrectly views the Department's success in uncovering corruption as evidence of widespread management and integrity failures. As happened in the wake of the recent 30th Precinct case, an independent monitor can tell the public when the arrests of police officers is evidence not of the Department's failure to fight corruption but of its

successful commitment to rooting it out. It can help turn what has been traditionally a matter of shame for the Department, into a cause for pride. It can help reduce the pain of corruption disclosures -- and thus the Department's reluctance to uncover it.

For these reasons, we recommend the establishment of a permanent independent oversight body so that the vigilance and determination to fight the police corruption we see in our City today does not again evaporate when public attention and political concerns turn elsewhere.

But independent oversight alone will not do the trick. The primary responsibility for combatting police corruption should and must remain with the Department. We are confident that the Department possesses the skills and the ability to fight corruption effectively. There are, however, numerous internal reforms and a new orientation to the approach of fighting corruption that must be adopted. We have recommended a wide-range of internal reforms and a new approach to combatting corruption that focuses on strengthening corruption detection and prevention, as well as on the conditions that nurture corruption and its tolerance. These include:

- improving screening and recruitment;
- improving recruit education and in-service integrity training;
- strengthening first-line supervision;
- reinventing the enforcement of command accountability;
- attacking corruption and brutality tolerance;
- challenging other aspects of police culture and conditions that breed corruption and brutality;
- enhancing sanctions and disincentives for corruption and brutality;
- strengthening intelligence-gathering efforts;
- preventing and detecting drug abuse;
- soliciting police union support for anti-corruption efforts;
- minimizing the corruption hazards of community policing; and
- legislative reforms.

External independent oversight will help insure that these reform efforts succeed. Ultimately, however, it is the Department's own officers, supervisors and commanders who will determine whether the battle is won or lost -- whether a culture that tolerates corruption can be transformed into one that drives it out. Therefore, it is imperative that both these elements are present to devise effective reforms: successful internal Department controls coupled with an independent outside entity to insure their lasting success.

\*                     \*                     \*

To reach the conclusions and recommendations in this Report, the Commission sought information from a wide variety of sources. We reviewed thousands of Department

documents and case files; interviewed a number of corrupt officers who agreed to cooperate with the Commission; conducted hundreds of private hearings and interviews of former and current police officers of all ranks; audited, investigated and conducted performance tests of the principal components of the Department's anti-corruption systems; conducted unannounced on-site systems inspections; conducted an anonymous survey of Internal Affairs investigations with the assistance of an Internal Affairs "insider"; analyzed hundreds of investigative and personnel files; interviewed private citizens, criminal defense attorneys, alleged victims of corruption and criminal informants; conducted an extensive literature review on police corruption and prevention; and held a series of roundtable discussions and other meetings with a variety of police management and corruption experts including local, state and federal law enforcement officials, prosecutors, former and current police chiefs and commissioners, inspectors general, academics and police union officials.

We also undertook a number of special projects and conducted a series of private hearings on various critical aspects of corruption control, including Internal Affairs' operations and performance, recruitment and screening, training, supervision and command accountability, integrity control officers, police perjury and falsifications, as well as an empirical study of the connection between brutality and corruption.

The Commission also initiated a number of its own field investigations in various precincts in the City, sometimes in conjunction with local and federal prosecutors, targeting areas where our analysis suggested police corruption existed. We were aided in all of our efforts by former and current members of the Department of all ranks who came forward to offer their assistance and insights about the state of corruption and corruption controls in the Department.

From September 27, through October 7, 1993, the Commission held two weeks of public hearings to present much of the information we had uncovered in the three primary areas of our mandate.

*          *          *

It was these investigations, audits and analyses that led to the conclusions presented in this Report. We believe that our findings and recommendations will strengthen the Department's ability and desire to fight corruption, not only today but in the future. We are not so naive as to believe that corruption can ever be completely eliminated among police officers, or in any other profession. Any occupation comprising large numbers will have some corruption. More than any other profession, however, the police face seductive opportunities to turn corrupt. Today, many neighborhoods of New York City are awash with drugs, money and guns, and our police are on the front lines. Potential for the misuse of power and strong temptations challenge many of our police officers to abandon their oaths every day. Given such circumstances, in a police department whose numbers will soon

# CHAPTER THREE

## POLICE CULTURE AND CORRUPTION

**"We must create an atmosphere in which the dishonest officer
fears the honest one, and not the other way around."**

> -- **Detective Frank Serpico,
> Testifying before the
> Knapp Commission, December 1971**

More than twenty years after Frank Serpico's testimony, this Commission found that the dishonest officers in the New York City Police Department still do not fear their honest colleagues. And for good reason. The vast majority of honest officers still protect the minority of corrupt officers through a code of silence few dare to break. The Knapp Commission predicted that the impact of their revelations would significantly weaken the characteristics of police culture that foster corruption. In particular, they hoped that their success in persuading a number of corrupt police officers to testify publicly about corruption would forever undermine the code of silence, the unwritten rule that an officer never incriminates a fellow officer. Unfortunately, their hope never became reality.

Police culture -- the attitudes and values that shape officers' behavior -- is a critical component of the problem of police corruption today. This Commission, therefore, was not satisfied simply to examine the types of police corruption we found to exist. The more difficult question we asked is why such corruption exists, what are the root causes and prevailing conditions that nurture and protect it, and how they can be effectively addressed. Only by examining the variety of influences and attitudes that contribute to corruption, can we assess and formulate strategies to stop it.

The code of silence and other attitudes of police officers that existed at the time of the Knapp Commission continue to nurture police corruption and impede efforts at corruption control. Scores of officers of every rank told the Commission that the code of silence pervades the Department and influences the vast majority of honest and corrupt officers alike. Although police officers who look the other way while colleagues steal property, sell drugs, or abuse citizens' civil rights may not be directly involved in corruption, they nonetheless support and perpetuate it by abandoning their professional obligations.

These aspects of police culture facilitate corruption primarily in two ways. First, they encourage corruption by setting a standard that nothing is more important than the unswerving loyalty of officers to one another -- not even stopping the most serious forms of corruption. This emboldens corrupt cops and those susceptible to corruption. Second, these attitudes thwart efforts to control corruption. They lead officers to protect or cover up for

others' crimes – even crimes of which they heartily disapprove. They lead to officers flooding Department radio channels with warnings when Internal Affairs investigators appear at precincts, and refusing to provide information about serious corruption in their commands. Changing these aspects of police culture must be a central task if corruption controls are ever to succeed.

The realities of police work bolster these corruptive features of police culture. As a society, we expect more of police officers than any other public servants. We call upon them daily to accomplish a variety of competing responsibilities. We expect them to be daring crime fighters as well as patient mediators. We call upon them to stop crime in our neighborhoods, to resolve our domestic disputes, and to act as obedient members of a paramilitary organization. Most of all, we expect them to confront physical danger and risk their lives to protect our lives and property. After a time, particularly in high-crime areas, they begin to identify the criminals they must confront every day with the community they must serve. They begin to close ranks against what they perceive as a hostile environment. Consequently, many officers lose sight of the majority of law-abiding citizens who live in their precincts. When this happens, corruption becomes easier to commit and to tolerate.

Citizens often return this hostility. With crime, drugs, and guns rampant in parts of our City, the public incorrectly faults the police. When incidents of police corruption are disclosed, the community incorrectly assumes that this is the norm. When police officers interfere with citizens' activities, the public often resents it. Police officers feel this resentment. What the Knapp Commission observed in its time is just as applicable today:

> Nobody, whether a burglar or a Sunday motorist, likes to have his activities interfered with. As a result most citizens, at one time or another, regard the police with varying degrees of hostility. The policeman feels, and naturally often returns, the hostility.[8]

Faced with this resentment, the dangers of their work, and their dependence on other officers for their mutual safety, police officers naturally band together. Often to such a degree that officers become isolated from the outside world. They socialize with and depend upon fellow officers not only on the job, but off. An intense group loyalty, fostered by shared experiences and the need to rely on each other in times of crisis, emerges as a predominant ethic of police culture.

---

[8] City of New York, Commission to Investigate Allegations of Police Corruption and the City's Anti-Corruption Procedures, *Commission Report* (New York:  December 26, 1972), p. 6.

This loyalty ethic itself is not corruptive. Loyalty and trust are vital attributes that promote effective and safe policing. We cannot ask police officers to abandon their loyalty to each other while simultaneously demanding that they confront danger for us.

But group loyalty often flourishes at the expense of an officer's sworn duty. It makes allegiance to fellow officers -- even corrupt ones -- more important than allegiance to the Department and the community. When this happens, loyalty itself becomes corrupt and erects the strongest barriers to corruption control: the code of silence and the "Us vs. Them" mentality.

### The Code of Silence

The pervasiveness of the code of silence is itself alarming. But what we found particularly troubling is that it often appears to be strongest where corruption is most frequent. This is because the loyalty ethic is particularly powerful in crime-ridden precincts where officers most depend upon each other for their safety each day -- and where fear and alienation from the community are most rampant. Thus, the code of silence influences honest officers in the very precincts where their assistance is needed most.

The pervasiveness of the code of silence is bolstered by the grave consequences for violating it: Officers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that they will be left alone on the streets in a time of crisis. This draconian enforcement of the code of silence fuels corruption because it makes corrupt cops feel protected and invulnerable. As former police officer Bernard Cawley testified at the public hearings:

> Question: Were you ever afraid that one of your fellow officers might turn you in?
>
> Answer: Never.
>
> Question: Why not?
>
> Answer: Because it was the Blue Wall of Silence. Cops don't tell on cops. And if they did tell on them, just say if a cop decided to tell on me, his career's ruined. He's going to be labeled as a rat. So if he's got fifteen more years to go on the job, he's going to be miserable because it follows you wherever you go. And he could be in a precinct, he's going to have nobody to work with. And

> chances are if it comes down to it, they're going
> to let him get hurt.  (Tr. 138)

In his public hearing testimony, another corrupt officer, Kevin Hembury, concurred:

> If you're labeled a rat, especially early in your career, you're
> going to have a difficult time for the remainder of your career
> in the New York City Police Department.  You do not want to
> be labeled a rat.  You will be the recipient of bad practical
> jokes, even things more serious than practical jokes.  Then, to
> leave or request to leave the environment that you were in,
> wouldn't be the end of this labeling that you had.  Phone calls
> would be made to wherever your final destination was in the
> Department.  Your name traveled with you.  It was something
> you couldn't shake.  (Tr. 87)

Dozens of honest officers similarly told the Commission about their fears of breaking the code of silence.  Lieutenant Robert McKenna, a highly decorated Lieutenant with twenty years experience in the Department, testified about this view at our public hearings:

> Question:  What is the consequence of breaking this silence?
>
> McKenna:  The cops are ostracized at times.  They're held
> away.  They're pushed off to one side.  They're
> kept away from the rest of the group.  I could
> almost say it'd be like the effects of a divorce.
> You're separated from your family.  You're alone
> over here.  Your family, the cops, are over there.
> (Tr. 80)

The Commission interviewed a number of officers who suffered the penalties of being labeled a rat.  Their names will be withheld for obvious reasons.  A captain we interviewed spent thirteen years as a police supervisor, a Field Internal Affairs Unit investigator, and a duty captain, or "shoefly," in Brooklyn.  He was a stern disciplinarian who often disciplined his subordinates for misconduct and reported allegations of corruption to Internal Affairs.  During the course of his career, he was assigned to thirty-eight different commands throughout the City.  In almost every case, on the very day he arrived to report for duty at his new command, he found evidence that his reputation had preceded him.  At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm.

In another case, a detective who served in Internal Affairs was transferred to a precinct detective squad.  In his first week, his new colleagues made sure he knew that he

would be alone on the street. They placed dead rats on his car windshield, stole or destroyed his personal property, and told him directly that he could not count on them in times of danger. The constant harassment eventually led the detective to seek psychological counseling and restricted duty.

The inculcation of police culture begins early in police officers' careers, as early as the Police Academy. Police Officer "Otto," an officer assigned to a high-crime precinct who agreed to testify publicly before the Commission only in disguise because of the code of silence, told us that he learned about the code of silence while he was still a recruit at the Police Academy:

> Question: How do police officers learn about this wall or code of silence?
>
> Otto: It starts in the Police Academy, and it just develops from there. . . . It starts with the instructors telling you never to be a rat, never give up your fellow officer. It starts with other recruits telling you they'll never give you up, and it just goes on down the line as you go through N.S.U. [Neighborhood Stabilization Units] and into a precinct. (Tr. 14)

And, while still recruits, police officers learn the harsh lessons of violating the code of silence. One former recruit told us that while in training at the Academy, she made a complaint to Internal Affairs about the lewd remarks an Academy instructor constantly made to her and other women recruits. Despite assurances of confidentiality, Internal Affairs informed Academy supervisors of her complaint. Within days, she was ostracized by her fellow recruits (even those who had been her friends) and Academy personnel. Her isolation was made so complete that she was forced to finish her Academy training on her own. When she graduated, the Department assigned her to Internal Affairs because it was unlikely she would be accepted anywhere else in the Department. Her dream to become a cop became a nightmare because she made a single complaint about a fellow cop. Within a year, she resigned from the Department.

The fear of violating the code of silence can even lead an officer to accept the blame and punishment for the acts of a fellow officer. Hembury testified to an incident when, still a rookie, he and a partner stopped a motorcycle for a number of traffic violations. Because the driver became irate, Hembury's partner thought he would teach him a lesson by removing a spark plug coil to disable the engine. Eventually charges for damaging the motorcycle were wrongly brought against Hembury, not his partner. But the code of silence compelled Hembury to accept the punishment -- a loss of fifteen vacation days -- for

55

something he did not do.  Hembury knew that the punishment for breaking his silence would be far worse than the punishment for police misconduct:

> Hembury: . . . And the spark plug I had nothing to do with. But yet these charges were brought against me. I took the hit [punishment], lost my fifteen days, and that was the end of it.
>
> Question: So you took a fifteen day hit all because you just could not be labeled a rat and tell the truth about who was really responsible for damaging the motorcycle?
>
> Hembury: That's correct. (Tr. 89)

There is a tragic irony to the code of silence which provides both the greatest challenge – and hope – in combatting corruption.  Although most honest cops will not report serious corruption, they despise corrupt cops and silently hope that they will be removed from the ranks.  Recently, the Internal Affairs Bureau's Corruption Prevention and Analysis Unit shared with the Commission the results of a series of enlightening discussions conducted with groups of police officers about their perception of police values and corruption.  Remarkably, although patrol officers openly expressed disgust over corruption and hoped corrupt officers would be fired, they nonetheless are highly reluctant to report corruption,  even if it involves drugs and weapons.  The Internal Affairs report states:

> Extremely serious allegations including drugs and weapons were not viewed differently by most of the participants.  Members were consistent in their reluctance to officially report these transgressions.  Officers were of the opinion that the discovery and the official reporting of criminal allegations and serious misconduct would not elevate them in the eyes of their peers.  These officers believed they would be perceived as 'rats,' not to be trusted.  The consensus was that if an individual reported serious matters they would likely report minor infractions as well.  The fear of being labeled a 'rat' and subsequently divorced from police culture has a seemingly powerful, negative impact on reporting corruption.  This reveals a whole new dimension to the code of silence: it does not always reflect solely tolerance for corruption or a misplaced group loyalty.  In many instances it is motivated purely by self-interest and self-protection:  a fear of the consequence of breaking the norms of loyalty and silence.

56

Thus the most devastating consequence of the code of silence is that it prevents the vast majority of honest officers from doing what they inwardly want to do:  help keep their Department corruption free.  It is not surprising that the honest cop wants corrupt cops off the job.  The consequences of corruption for honest cops are grave:  it taints their reputations, destroys their morale, and, most important, jeopardizes their very safety.

What is surprising is that despite these devastating consequences, honest cops refuse to help eliminate corrupt cops from their Department, even though they are the principal victims of police corruption.  Again, Police Officer Otto, like scores of his colleagues, made this point clear:

| Question: | What is the impact of corruption on honest cops? |
|---|---|
| Otto: | It hurts them.  It disheartens them.  It makes them not want to work. |
| Question: | Do you believe that it endangers their safety on the street? |
| Otto: | Well, put it this way.  I wouldn't want to run across a drug dealer who's been ripped off one time too many. |

Despite corruption's threat to their safety and their genuine desire to work in a corruption-free Department, officers view reporting corruption as an offense more heinous and dangerous than the corruption itself.

Honest officers who know about or suspect corruption among their colleagues, therefore, face an exasperating dilemma.  They perceive that they must either turn a blind eye to the corruption they deplore, or risk the dreadful consequences of reporting it.  The Commission's inquiries reveal that the overwhelming majority of officers choose to live with the corruption.

And they have not been reluctant to admit this to the Commission.  Indeed, the facts bear out what officers have been telling us for the past twenty-two months:  despite years of open and frequent corruption by officers like Michael Dowd, Bernard Cawley and others, virtually none of their colleagues or supervisors reported this corruption to Internal Affairs.

If the Department ever hopes to make lasting improvements in corruption control, it must do something it has failed to do in recent history:  acknowledge that the code of silence exists and take steps to overcome it.  It must rescue its members from the grip of their self-created predicament.  From first-line supervisors to Internal Affairs, it must provide constant support and recognition to officers who, by reporting corruption, choose

to do what is right rather than what their culture expects of them. The Police Commissioner must make it clear that those who expose corruption will be rewarded, and those who help conceal it punished.

Finally, the Department must provide the same confidentiality protections to officers who report other officers, as it does to civilians who provide information about criminals. There is a widespread perception among officers that this is not the case. Many officers told us that they would not report corruption because the Department does not provide the same basic protections to officers as it does to civilians assisting the Department. This communicates a powerful message: that the Department is not really interested in enlisting the police in the fight against corruption. Until this changes, no reforms will ever change the attitudes that underlie the code of silence.

## "Us vs. Them"

The code of the "blue fraternity" extends beyond the "blue" and into the communities they police. The loyalty ethic and insularity that breed the code of silence that protects officers from other officers also erects protective barriers between the police and the public. Far too many officers see the public as a source of trouble rather than as the people they are sworn to serve. Particularly in precincts overtaken with crime, officers sometimes view the public as the "enemy." Officer Otto explained:

>Question: Is there an attitude prevalent among police officers that . . . protects them against other people who might report corruption on their part?
>
>Otto: Yes. It's an 'Us vs. Them' mentality. See, we're all blue, and that we're in this together and we have to protect each other no matter what.
>
>Question: And I suppose what you're saying is the police officers are the 'us,' and who is the 'them'?
>
>Otto: Everybody else.

While the "Us vs. Them" mentality is most powerful in crime-ridden precincts, often with large minority populations, it is not confined to these precincts. We found that this attitude exists, in varying degrees, in many precincts in the City – and begins to develop early in an officer's career. The Commission's inquiries show that, like the code of silence, the "Us vs. Them" mentality starts when impressionable recruits and rookies are led to believe by veteran officers that the ordinary citizen fails to appreciate the police and that

58