(29)

that many small cliques (often revolving around common age or ethnic identity) have emerged, and the fact that fewer officers attend precinct parties, or other functions. Several participants suggested that this fractionalization has impacted officer safety, since an off-duty officer may not be recognized by officers within his or her own command. Several participants also suggested that the steady tour concept may facilitate corruption, since work groups are smaller and "tighter", and therefore less amenable to supervisory intervention and the detection of misconduct. The emergence of close-knit cliques may also facilitate corruption and inhibit its discovery by fostering secrecy and creating an implicit or explicit expectation of protection by other clique members. In general, the participants reported a deep divisiveness within the culture, and widespread dissatisfaction with the impact the steady tour concept has had upon the cultural environment.

Although the participants voiced dissatisfaction with the impact of the steady tour concept, they also agreed that their private lives were impacted in a positive way. They recommended that some alternative to the steady tour concept be implemented. In particular, they recommended that a "scooter chart" be available but emphasized that it should be "on a voluntary basis".

The Captains were asked to describe the most significant change occurring within the Department during the course of their careers. They responded with a variety of trends and issues, including the fact that younger officers today have less loyalty to the Department and that they do not feel that they should have to "pay their dues" before attaining a choice assignment. The Captains saw a general decline in the level and quality of first-line supervision, a fact they attributed largely to younger and less experienced Sergeants who lack the capacity or interest to enforce discipline. The Captains, like other groups before them, believed that many Sergeants have become overly friendly with the officers they supervise, to the detriment of the Department and its overall level of discipline. Further, they felt that the first-line supervisors are relieved of a great deal of responsibility and decision-making by procedures which require the Duty Captain to respond to situations which should be handled by the supervisor at the scene. The on-scene supervisor should make the decisions in most of these instances, and he/she should be held accountable for them. The trend to increase the responsibilities of Duty Captains has relieved Sergeants of a great deal of accountability, placing it instead upon Captains.

(30)

One   Captain   stated   that officers   lack   the   sense   of
humor  required to be an effective cop,  and that they  do  not
enjoy their work.   Police work, he said, is supposed to be fun.
Several Captains believed that the implementation of  Community
Policing occurred too rapidly, and without proper planning.   At
present,  CPU  officers  reap all the  rewards,  while  officers
assigned to sectors are being neglected and overworked.

One Captain suggested that officers applying for Narcotics
Division  undercover  positions  should first  be  assigned  to
precinct SNEU units for ninety (90) days,  and evaluated there.
SNEU Sergeants should also receive OCCB training.

(31)

ISSUE # 2 Department Values

   Questions were designed to elicit responses concerning the
Department Values.    Participants were asked about   their
knowledge of Department Values, applicability of the values in
the  daily  performance  of  their duty,  and  whether  it  was
reasonable to expect Police Officers to adhere to these values.

   It  was  quite  disconcerting  to  find  out  that  many
participants  were  ignorant  of  the Department  Values.    There
were other participants who indicated a vague recollection that
a Values statement was posted in various Department facilities,
and  only  a  few were  actually aware of the  contents  of  the
statement.   Even officers stating that they are preparing for
the  Sergeants  exam  generally were  unaware  of  the  Department
Values.   In  every  session it was necessary to  restate  the
Values and in later sessions to post a sample of the Values  in
order  to  stimulate  discussion on this topic.    It  should  be
noted that groups in Round Three (3) (Police Officers  assigned
to  FTU's  and  the  Police  Academy)  were  knowledgeable  of
Department Values.   In fact, the two (2) groups from the Police
Academy  relate that Department Values are recited each day  at
the beginning of the gym period.

   Once  the  Department  Values  were  stated,   each  group
concluded that it was reasonable to expect every member of  the
service  to  adhere  to them.   Many  participants  felt  these
Values  were  imparted to them early  in  their  developmental
stages by parents, teachers, religious leaders and others.   The
groups also believed that the vast majority of Police  Officers
entered  the  profession with these values intact,  while a  few
members entered the Department with a complete lack of  values.
The groups unanimously felt that Police Academy training cannot
instill values that are not present in the individual prior  to
hire.    Police  Academy  training  was  seen  as  perfunctory  in
regards  to  ethics  related  topics;   yet,   the  participants
indicated  their  belief that training  cannot  develop  values
where none previously existed.

   There  were  some members who questioned  the  purpose  of
stating  and  posting  Department  Values.    Many  participants
believed  that the Department Values statement is an  extension
of  a  public  relations  campaign designed to  address  community
concerns.   These same officers concluded that  the  Department
Values have little meaning in their decision making process.

(32)

Controversy and criticism concerning Department Values arose when some participants expressed what they believed to be contradictions between policy and practice.   While Department Values state that we will "...aggressively pursue violators of the law," in practice, selective enforcement curtails what are generally considered aggressive law enforcement efforts. References to overtime constraints were used to illustrate a perceived notion that an aggressive law enforcement policy is secondary to monetary considerations.

The majority opinion was that the public is unaware of the complexities of policing in New York City and expressed the need for public education on this issue.   Generally, the participants were supportive of the Department's "NEW YORK CITY COPS CARE" advertising campaign and expect it will have long term positive effects.

(33)

ISSUE # 3 <u>Department Drug Testing Policy</u>

In discussing the Department's drug testing policy, questions were prepared that would assist in determining underlying feelings concerning the administration of the Dole Test. Participants were asked about their knowledge of Department procedures, the reasonableness of the current policy, their satisfaction with safeguards and their opinions concerning entry tests, tests for cause, and random tests.

In the early stages of each Focus Group discussion it was evident that there were many misconceptions about the Department's drug testing policy. Participants did not understand terms such as "random" and "for cause." Misinformation about laboratory procedures and handling of evidence clouded the discussion. A brief synopsis of the Department's policy was presented to clarify issues and move the discussion along.

Each of the Focus Groups displayed an intolerance of drug use by members of the service. Their position was strongly stated that the Department should do all it can to seek out members who use drugs and remove them from police service. Their positions were firm on terminating any member, regardless of reason and seniority, who uses drugs. Some members believe that the Department, prior to termination, should offer rehabilitation to any member using drugs. Upon completion of a program, however, the member's services should be terminated. A small minority of participants suggested that pension rights should be preserved for members so qualified.

A. <u>Entry Level Tests</u> - Drug screening tests for police applicants was overwhelmingly accepted by each Focus Group. Participants felt that applicants should be subjected to multiple random tests prior to being hired. The current procedure where an applicant is notified weeks in advance that he/she is scheduled for a medical examination which includes a drug screening test was criticized. Many participants felt that prior recreational drug use should automatically preclude an applicant from being hired.

Drug screening tests used as a prelude to promotion or entry into a specialized unit was also widely accepted as members continued to voice opposition with working with anyone who uses illegal drugs. This opposition to drug use by other members derived both from individual safety concerns, as well as from the frequently stated position that Police Officers

(34)

should be a "cut above" the general public, who are viewed as immersed in the drug culture.

B.   <u>For Cause Tests</u> – Drug screening tests for cause met with unanimous approval by each of the Focus Groups.   While some group members stated that a level of proof less than reasonable suspicion should be used to order a test, other members were concerned about the violation of individual rights.   Although the protection of Police Officers' rights was an issue it seemed that the group's hard stance of "zero tolerance" outweighed their concern about a violation of an individual's rights.   There were a few instances, however, where participants felt that an unchecked system of "for cause" testing would lead to other violations of individual rights by the Department.

C.   <u>Random Tests</u> – Their misinterpretation of the random testing procedures not withstanding, each group supported random drug screening tests.   Group concerns were centered on the possibility of human error and false positives in the testing process.   Those members who have been subjected to random testing all stated they were satisfied with the Department's efforts to maintain proper custody and handling of samples.   Laboratory procedures however, were questioned and confidence in lab technicians were at the heart of their concern.   An on-site lab test with rapid results was suggested by a few group members.   The individual would be informed of the results and if there were any problems (a claim of a false positive) additional tests could be performed to resolve the issue.   Each group suggested an increase in the number of random tests.   The suggested increase ranged from 25% (currently the Department tests 20%) to 100%.

Suggestions were made to conduct random testing in the field rather than at Health Services.   The suggestion was for Health Services to randomly select a command and a platoon within that command for testing.   Personnel would be tested during roll call with a minimum disruption of patrol capabilities.

Although these suggestions must be evaluated against many different standards, the strong stance against drug use and the suggestions to increase the number of random tests is more significant than the methods suggested.   It is recommended that information concerning the randomness of testing, the chain of custody and testing procedures, and the results of drug tests be more widely disseminated throughout the Department.   To

(35)

allay the Police Officers' suspicions about the accuracy of laboratory testing and the potential for misidentifying samples, a brief video presentation should be viewed by all Police Officers. The presentation can be made at Borough Based training and can be repeated at Health Services prior to the administration of a drug screening test. The video should contain up-to-date information about drug screening tests and can be used in conjunction with other training currently being considered by the Drug Prevention Task Force.

To a greater extent than had been found in Focus Groups comprised of less-tenured officers, the participating Lieutenants were of the strong opinion that pension rights should be preserved for those members with twenty (20) years of service who test positive in the random drug testing program. Moreover, several participants were of the opinion that a drug rehabilitation program, similar to the programs currently available to members who abuse alcohol, should be available to drug users. Regardless of whether these members are subsequently dismissed or retained, several Lieutenants believed that drug rehabilitation should be made available.

Their opinion regarding the preservation of pension rights seems to be reflective of a general trend among more-tenured officers regardless of rank: perhaps because they have a greater investment in their pension and their career, both financially and in terms of their years of service, older officers tend to be more concerned with the possibility of losing their vested pension rights. As a corollary, the older officers concurrently articulate less faith in the potential deterrent effect of harsh sanctions for drug abuse than do younger officers.

With regard to the Department's drug testing policies, all the participants of the Captains Focus Group agreed that the process was basically sound, but most indicated that the number or percentage of officers tested under the random procedure should be increased. Several participants also favored the development of a drug rehabilitation policy prior to dismissal, and a few indicated that members should be given one chance to enter a rehabilitation program and remain in the employ of the Department. No second chance should be afforded to drug users. Consistent with their tenure and the trend observed among other tenured officers, several members of this group also tended to favor a guarantee of pension rights, although others in the group were in adamant opposition to pension retention. They appeared to be about equally divided on this

(36)

issue.   The participants also indicated that increased
unannounced random screening of candidates should take place
during the applicant investigation process;  they observed that
the current practice of scheduling medical exams up to one  (1)
month  in  advance might permit some  candidates  enough
forewarning  to "clean themselves up" prior to the test.   The
Captains  also  proposed  that  large  groups  of  officers  be
randomly  tested  en  masse,  perhaps  testing  entire  platoons
within  a  precinct  or  while officers attend the Outdoor  Range.
They  evinced  no  concern, cynicism or  difficulty  with  the
procedural aspects of the current policy.

The Focus Group consisting of members of the Guardians was
also queried as to their opinions regarding the  reasonableness
of the Department's drug testing procedures.   The participants
generally  agreed  that officers who are detected  using  drugs
should  be  terminated,  regardless of the seniority  or  prior
disciplinary   record.    About  one  quarter  (1/4)  of   the
participants  in  this group stated that notwithstanding  the
termination  policy,  the pension rights of  members  who  had
achieved  twenty  (20)  years tenure in the agency  should  be
preserved.   The participants voiced numerous concerns that the
Department  does  not follow its own procedures in  many  drug
testing cases,  specifically in regard to the chain of  custody
for urine samples.   Participants recounted incidents in  which
they  alleged  that urine samples had been left  unattended  for
several  hours on a window sill,  and female officers who  were
permitted  to  provide their sample while unobserved.    Other
participants  stated that the Organized Crime Control Bureau  did
not  always  adhere to its own detoxification and  sick  leave
policies  regarding  undercover officers who were  forced  to
ingest  a  controlled substance.   These officers were  allegedly
told  to  continue  in  their  undercover  activities  so  that
on-going  cases would not be compromised,  and it is  alleged
that at least one (1)  such undercover officer was  subsequently
fired  for  drug use after having been initially  refused
detoxification  treatment by the Department.   It  must  be
emphasized  that with the exception of general concerns  about
chain  of  custody,  previous Focus Groups raised none of  these
issues.    The participants also contended that the random  drug
testing procedures  are not truly random,  and  asserted  that
minority  individuals have been singled out for testing  without
cause,  under the guise of random selection.   Participants  also
evinced  a  belief  that white superior officers have  been
notified  in advance of an impending random test,  and have  been
permitted  to  quietly retire prior to testing.  In general,  the
participants  appeared  to  believe  that  both  the  random  and

(37)

"for cause" drug testing policies are regularly used to target
minorities, and that a tacit double standard exists.

Members of the Policewomen's Endowment Association Focus
Group concurred with members of previous Focus Groups in
asserting that the use of illicit drugs by members of the
service cannot be condoned or tolerated, and that the
Department's current drug testing policy requires little or no
modification. Several members of the group indicated a belief
that the current policy does not adequately address the problem
of anabolic steroid use, and they believed that alcohol abuse
is a far greater and more pervasive problem than drug abuse.
As a group, they maintained that the number or percentage of
members tested under the Random Dole Testing procedure should
be increased, and that the Department should test for steroid
use as well as for the more common narcotic drugs. In
particular, this group felt that younger officers should be
tested more frequently during their probationary period. To a
greater extent than was evident in other groups, these
participants tended to support the concept of providing drug
rehabilitation for members prior to termination for drug abuse.
This group did not raise the issue of forced ingestion of
narcotics among members assigned to OCCB as the Guardians'
Focus Group had, but upon the project staff's inquiry they
stated that in such situations some women may be reluctant to
report forced ingestion for fear that they would lose their
hard-won OCCB assignment.

(38)

ISSUE # 4 Defining Corruption

Focus Group participants had some difficulty in articulating a precise definition of police corruption. This difficulty arose primarily from the fact that "corruption" is a fairly ambiguous term which can be used in several contexts, has multiple connotations, and is often mistakenly equated with misconduct, as well as from the fact that it deals with ethical issues which are often not easily articulated. After carefully guiding and structuring the questions posed to the group, the facilitators were able to obtain a fairly detailed understanding of the types of behavior Police Officers consider to be corrupt. To achieve this understanding, the participants were asked to provide examples of behavior that would and would not constitute police corruption.

Virtually all of the participants agreed that a Police Officer's commission of a criminal act, as defined in the Penal Law, constitutes corruption. Further, they stated that any behavior in which a Police Officer actively seeks a specific personal gain or benefit by virtue of the fact that he/she is a Police Officer clearly constitutes corruption. Officers tended to agree that the implicit or explicit expectation of reciprocity – the quid pro quo – is a critical factor in determining whether an act is corrupt. Participants were quick to address the issue of corruption by unanimously pointing out that they do not believe the acceptance of a free or discounted meal is corruption. In the case of a free cup of coffee, officers strongly agreed that a cup of coffee "freely given and freely taken" is not corruption. When, however, the officer believes that the benefit is accompanied by some overt or unstated expectation of reciprocity – that he/she will or will not do their job in return for the benefit – it becomes corrupt. The participants cited the scenario of an officer entering an establishment with no intention of paying as an example of corruption, but were less adamant about receiving a discount they had not expected or demanded. It is well worth noting that the participants evinced a strong belief that they were capable of comprehending when an implicit expectation occurred, and stated that they would not accept any benefit under such circumstances.

Participants had great difficulty separating an offer of free coffee (or other repast) in a social setting and a non-social setting. Officers were unable to clearly see the difference between the two settings. References to

(39)

"friendships" established over a period of time were used to illustrate the belief that free or discounted meals were offered and accepted unencumbered.

It is also worth noting that most of the participants were unaware of the Board of Ethics ruling regarding a free cup of coffee "and light repast" in a social setting. They agreed that this and any subsequent rulings should be vigorously disseminated to members of the service. The participants also stated that the Internal Affairs Bureau should not be concerned with these and other "minor" infractions, which clearly fall outside their definition of corruption. Although they were skeptical of the abilities and the motivations of Internal Affairs Bureau investigators, the participants seemed to favor the notion of a strong and effective Internal Affairs function which would concentrate on "real" corruption, rather than the petty infractions which they believed were the main focus of concern. In their view, Internal Affairs Bureau investigators have poor investigative skills and little experience or regard for officers on the street.

In terms of providing an operational definition of corruption, the participants in the ICO Focus Group generally agreed with members of previous groups in asserting that Police Officers can be considered corrupt when they commit criminal acts or use their positions and powers as Police Officers to obtain some substantive personal benefit. They did not consider such minor acts of deviance as accepting a free cup of coffee to constitute a corrupt act, although they agreed that such behavior was a violation and might, in some circumstances, constitute corruption. As was evident in previous groups, the ICO's believe that the individual officer's intent in accepting free coffee is a critical factor in their definition of corruption: they consider officers who actively pursue or solicit free coffee or free or discounted meals to be ethically compromised and perhaps, in a technical sense, corrupt. Nevertheless, they do not appear to feel that such ethical or legal violations are particularly egregious offenses.

The Captains broadly defined corruption in terms of an officer taking something to which they are not entitled, and they favored a fairly subjective standard in evaluating whether an act such as free coffee is corrupt. Each incident should be judged, they said, on its individual merits and the factual circumstances surrounding the situation, and the specific intent of the officer should be assessed in making

(40)

this determination.  They felt that free coffee and small amounts of food (i.e., "a light repast") have historically been seen as a form of social interaction, and would be more acceptable than the acceptance of free merchandise or non-food items, irrespective of their cost.   Concurrently, though, they called for a more definitive and less ambiguous response on the part of the agency to acts which are deemed corruption or misconduct.

One Captain stated, and the others concurred, that the Department's policies toward corruption are not in synch with some of its other policies. He stated, for example, that the Department requires precinct commanders to convene an annual Fellowship Breakfast, providing about $360.00 for this event, an entirely insufficient amount in some commands.   Commanders are constrained to rely upon the good graces of local caterers or meeting halls to provide a suitable venue, and they must do the best they can to provide a breakfast meal.   Consequently, the commanders have little credibility when they admonish their officers not .to accept free or discounted meals, coffee or other favors from local businesses or residents.  Such policies breed cynicism and foster the perception of a double standard for superior officers.

The opinions and attitudes of the Guardians Focus Group members, as they specifically relate to the definition of corrupt activity, did not differ markedly from the opinions expressed in other groups.

As in other groups, these participants had difficulty in offering a precise definition of police corruption. Involvement with drugs and drug trafficking, as well as the receipt of bribes and gratuities, were certainly seen as corrupt activities.   Some debate surrounded the question of free coffee and/or doughnuts as corrupt activity.

The members of the Policewomen's Endowment Association Focus Group were no less able to offer a clear operational definition of corruption than were previous groups.   In general, they felt that the theft of anything of value, the use of police powers or authority to realize a personal gain, or the commission of an illegal act can be construed as corruption.   They did state, though, that a "free cup of coffee" is acceptable so long as no expectations of preferential treatment accompany it. The PEA Focus Group members were also of the opinion that drug abuse by a member is likely to lead to further corruption.

(41).

ISSUE # 5 Integrity Testing

Random and targeted integrity tests were discussed with each group. Questions were geared to determine if integrity tests were perceived as reasonable or unreasonable. The Department's right to conduct tests and the level of intrusion was also discussed with each group.

A. Targeted Tests. Targeted integrity tests were widely accepted by each group as a legitimate investigative tool. Participants were supportive of "sting" operations designed to catch individuals who the Department "reasonably suspects" to be involved in corrupt activities. A few members expressed concern about being "in the wrong place" when a targeted individual was tested and questioned whether they would be subjected to sweeping disciplinary action for minor violations (SCAN [Stop Corrupt Activities Now, an aggressive anti-corruption program that resulted in numerous Command Disciplines for minor administrative infractions] activities were cited). Other participants felt that if an entire precinct or command were targeted many "good" Police Officers would be subjected to disciplinary action even if they were not involved in corrupt activity.

There was some concern about being present during a "test", observing a violation and not reporting the violation to the Internal Affairs Bureau. Some officers expressed great reluctance to report deficiencies, even serious ones (this topic will be discussed at greater length in Issue #6). There were some officers who complained that integrity tests made Police Officers suspicious of each other and hindered them in the performance of their duty, while other officers viewed integrity tests as a method of keeping everyone "on their toes". After discussing several different tests each group favored an increase in targeted testing to catch those individuals who engaged in criminal conduct.

B. Random Tests - Participants were split on their opinions of random integrity tests. The majority opinion was favorable with officers relaying numerous personal and second hand tales of Internal Affairs Bureau tests (many reported tests are not substantiated in Department records). These officers felt that random tests would deter some members of the service from ignoring Department procedures and taking short cuts. Random tests however, were not considered to be a deterrent for hard-core corrupt cops.

The minority opinion revolved around the issue of lack of trust. These participants felt that random tests questioned

(42)

their integrity and were therefore insulting. Some members expressed concern at being "entrapped" by random tests while others complained of being taken off patrol to process false calls for service. Even officers expressing the minority opinion concluded that random tests might be necessary to keep some officers honest and most agreed that continued testing is a "necessary evil".

Virtually all of the Captains agreed that the Department should pursue some form of random and directed integrity testing, but feelings were mixed regarding the advisability of a tangible reward system for those members who pass such random tests. They were less opposed to including mention of having passed an integrity test in an officer's Confidential Personnel Index (CPI) file, or a letter to that effect in the officer's personnel folder.

Members of the Guardians Focus Group were also surveyed regarding their opinions of the role of integrity tests in the Department's overall anti-corruption strategy. The participants agreed that targeted tests used to investigate specific allegations of corruption are useful and appropriate. Only two (2) participants approved of random tests, with the remainder objecting on the grounds that such tests were insulting and a waste of time. All participants related concerns that both random and targeted integrity tests may be used to unfairly target minority members.

Members of the Policewomen's Endowment Association Focus Group stated that integrity tests are a positive and useful strategy for the Department to pursue, so long as the tests do not focus on minor misconduct and petty issues. They compared the need for integrity tests with the need for Random Dole Testing, asserting that they are necessary and worthwhile, and participants stated that they would not be insulted if they learned that they had been the subject of a random or directed integrity test. The participants raised the notion that some members may appreciate knowing that they had been tested, if such notification takes the form of a "pat on the back." They indicated a belief that officers will perform better if the Department shows them respect and rewards them for proper performance of their duties, and they believed that the favorable results of random integrity tests should be placed in members' CPI files in order to offset some of the predominately negative data which currently comprises those files. The members of this Focus Group also recommended that the Internal Affairs Bureau track those individuals who make chronic corruption complaints against officers.

(43)

ISSUE # 6   Reporting Corruption

Within any organization, occupation or profession, the individual ethical decision whether or not to officially report misconduct or corruption is constrained by a variety of factors, including the potential for social ostracism, personal reluctance to breach organizational or cultural norms against disclosure, and in some cases, fear for one's personal safety. In the subculture of policing, these contraints may be magnified by its members' high need for group identity and affiliation, by the strength of the culture's disclosure norms, and by the inherent dangers of police work which create a compelling need for the support and trust of one's fellow officers. These and other factors in the police occupational culture, taken as a whole, are frequently and generically referred to in the common vernacular as "the blue wall of silence." This term is typically used in a disparaging manner, especially by those critics who lack a firm understanding of the forces and pressures which create and shape it, as well as of its extent and dimensions. As was evidenced by the comments of Focus Group participants, the "blue wall" is not an entirely insurmountable or monolithic impediment to the disclosure of organizational deviance, but rather it has many intricate cracks and gaps.

The consensus of opinion in most of the Focus Groups was that officers are highly reluctant to report acts of corruption or misconduct. In the more egregious cases, for example an officer engaged in stealing or selling drugs, most participants related that if they would report these instances they would only do so anonymously. One (1) group, (PBA delegates) however, stated somewhat anomalously that they would not hesitate to identify themselves in reporting a rogue officer for "serious" corruption – a cop who sells drugs, they said, "is a perp, not a cop, and deserves to be collared." Interestingly, several participants stated that if they observed such criminality they would make an arrest themselves rather than notify the Internal Affairs Bureau, and that by taking this action they would encounter less risk of ostracism than if their anonymous report were somehow made public knowledge. Within the police culture, it appears that the cloak of anonymity connotes venality and deceit, two (2)attributes which are anathema to the culture. Officers who are "up front" in their actions may be less likely to incur the wrath of others, or may encounter a lesser degree of ostracism. In less serious instances, though (for example, free meals),

(44)

participants stated that by identifying themselves they ran a risk of ostracism and in some cases reprisals from other officers. Interestingly, the project staff noted that those officers who stated most vocally that the prospect of exposure would not deter them from reporting corruption or from taking individual action, concurrently appeared to be the most self-confident of the participants, and those with the greatest status in their groups. If the project staff's perception is accurate, and if these high status officers can be encouraged to speak out on corruption, significant inroads can be made in terms of shaping the occupational cultures' prevailing attitudes.

Extremely serious allegations including drugs and weapons were not viewed differently by most of the participants. Members were consistent in their reluctance to officially report these transgressions. Officers were of the opinion that the discovery and the official reporting of criminal allegations and serious misconduct would not elevate them in the eyes of their peers. These officers believed they would be perceived as "rats", not to be trusted. The consensus was that if an individual reported serious matters they would likely report minor infractions as well. The fear of being labeled a "rat" and subsequently divorced from the police culture has a seemingly powerful, negative impact upon reporting corruption.

Physical fear surfaced several times during the discussion on reporting corruption. There were numerous references made about rogue Police Officers (Michael Dowd in particular) having contacts with violent drug gangs and other organized crime figures and having access to confidential and personal information. It is this combination that caused concern among many of the officers who raised this point. Some officers were not necessarily concerned with their own safety, but they were concerned for the well being of their family.

The Focus Group of Patrol Sergeants were split on their responses to report corruption. Half of the group indicated they would report corruption (criminal acts or serious misconduct) while the other half of the group indicated they would only report corruption anonymously. It is interesting to point out that Patrol Sergeants share the Police Officers definition of corruption (see Issue # 4).

Participants also spoke of the fact that the Department, and in particular, the Internal Affairs Bureau, frustrate them from being as honest as they would like to be. If they fail to

(45)

report corruption, or if corruption occurs around them, it is
not because they approve of it or are ambivalent to it. Rather,
the potential costs of "going public", even in regard to
egregious offenses, are too high. They are afraid of being seen
as having cast their lot with the Internal Affairs Bureau, an
insidious enemy which lacks credibility and which treats even
the most honest officers unfairly and with suspicion.

Participants related their suspicions of the Internal
Affairs Bureau's processes to ensure confidentiality — several
suggested that members of the Internal Affairs Bureau would not
be averse to "burning" an officer who made a confidential
report. At least four (4) of the groups queried as to the
integrity of the Internal Affair Bureau's Action Desk and the
true anonymity of a caller's identity expressed skepticism.
They believed that the modern technologies of "Caller ID"
and voice identification could or would be used to determine a
caller's identity. Most of the participants were unfamiliar
with the Department's corruption hot line — 212-CORRUPT (or the
new 1-800-PRIDE-PD). Participants suggested that the
Department initiate an aggressive information campaign to
publicize and promote the new 1-800-PRIDE-PD number, and to
assure the public as well as officers that Caller
Identification technology was not being used. Several
participants favored an on-going precinct dialogue program with
members of the Internal Affairs Bureau as a means to sensitize
officers from both groups to the objectives and goals of the
other.

Other participants suggested the strong need for the
Internal Affairs Bureau to change its image and its methods of
operation. In particular, they vocally criticized the Internal
Affairs Bureau custom of issuing "no hats" and "white socks"
complaints, characterizing this practice as "playing a numbers
game" at the expense of hard working honest officers.

The Internal Affairs Bureau has been associated with a
willingness to close out serious allegations either as
"Unsubstantiated" or as "Other Misconduct Noted" through
issuance of a Command Discipline for minor administrative
infractions. Officers are concerned that these notations
remain on their Central Personnel Index file and may be used to
unfairly deny them detail assignments or promotions. Some
characterized "Unsubstantiated" case closures as evidence of
ineffective Internal Affairs Bureau investigators and of
attempts to bolster performance indicators, even when a more
complete investigation might result in exoneration. Although

(46)

project staff explained that administrative violation complaints are no longer issued by the Internal Affairs Bureau, many participants remained skeptical. They will believe it, they said, "when they see it."

It was evident that trust plays a pivotal role in an officers' decision to report corruption. Official and anonymous reporting appears to be directly correlated to the level of trust an individual has in the Internal Affairs Bureau and the confidentiality of the reporting system.

Notwithstanding this essential caveat, two (2) frequent and enduring features of the police occupational culture which have frequently been noted in connection with corruption are loyalty and secrecy. The etiology of these features are extremely complex, and their dimension and boundaries can again be expected to vary over time and in regard to specific circumstances. Moreover, the larger culture outside the police agency provides support for loyalty norms among peers in any group, and the larger culture's antipathy toward informers and "rats" has also been imported into the occupational culture, where the realities of police work create a crucible in which loyalty and secrecy norms are amplified and expanded. Loyalty and secrecy norms in the police occupational culture derive from several sources, including the close physical proximity in which Police Officers frequently work for extended periods, the real and perceived dangers of police work, and the inevitable social isolation and alienation engendered by assuming the police role in society.

These and other forces conspire to create a strong sense of mutual interdependence and affinity among officers, and to facilitate the creation of a powerful loyalty ethic. In itself, the loyalty ethic is a highly functional and beneficial attribute which usually contributes significantly to the organization's pursuit of legitimate goals and objectives. Taken to the extreme, however, this loyalty to fellow officers can conflict with and in some cases overwhelm the officer's sense of loyalty to the organization and to the rule of law. In the extreme, this misplaced loyalty may induce some officers to protect other deviant officers from official discovery. When conflict occurs between loyalty to the organization and loyalty to fellow officers, the informal subcultural ethic may prevail, and some officers may close ranks behind the proverbial "blue wall of silence".

(47)

It should be emphasized that the prevalence and scope of the "blue wall" of secrecy are frequently overstated by casual observers of police culture, particularly by those whose critical orientation or agenda overpowers their objectivity. These critics are usually either ignorant of or unconcerned with the positive and functional aspects of loyalty and its contribution to the attainment of legitimate goals. Too frequently perhaps, unrestrained or draconian efforts to destroy the occasional emergence of excessive secrecy has unforeseen deleterious impact upon the loyalty ethic, and ultimately both the organization and the public suffers the effects. A more cogent strategy is for the police executive to carefully monitor and manage the conditions under which secrecy can flourish, concomitantly nurturing the positive elements of group and organizational loyalty.

The Integrity Control Officers who participated in the Focus Group were very suprised that officers in previous Focus Groups were reluctant to officially report corruption, even when the offenses involved were of the order of those committed by Michael Dowd. They stated that they would not hesitate to officially report such behavior if they became aware of it, and they seemed to genuinely believe that most officers in their commands would also report such corruption without hesitation. The project staff surmises that the ICO's avowed willingness to take action in such cases is a function of their rank and position, and its attendant role definitions: the supervisory and ICO roles encompass and demand the reporting of corruption, and no expectations of complicity or silence is placed upon them. While both the task environment of the patrol officer and the dynamics of the specific "patrol officer culture" operate to encourage solidarity and to discourage officers from scrutinizing too closely the behavior of their peers, these features are not a part of the supervisory role. Supervisors, particularly ICO's, are not expected by their peers or by their subordinates to remain silent in the face of misconduct or corruption. Moreover, their functional exclusion from the specific "patrol officer culture" tends to immunize them from the subtle or overt sanctions that culture might impose, simply stated, supervisors and ICO's are expected to report misconduct and corruption, and they have little to lose by doing so.

The Lieutenants participating in this Focus Group stated that they would have no problem reporting an officer whose corrupt activities were of the type evident in the Michael Dowd case, and they were unconcerned with any repercussions which might result from reporting such an officer. Again, the

(48)

project team members attribute this lack of concern with repercussions or social stigma to the Lieutenants' supervisory role. Unlike those steeped in the patrol officer culture, the supervisory role entails no expectation of silence or complicity. On the contrary, their own social reference group as well as the patrol officer culture expects them to report any corruption or misconduct coming to their attention, almost without regard to the severity or extent of that misconduct or corruption.

It is important to emphasize that the participating Lieutenants believed quite strongly that the average officers would have little difficulty reporting corrupt acts committed by peers. The Lieutenants, like the Integrity Control Officers' and Sergeants' groups which preceded them, were quite suprised and dismayed when the project staff informed them that Police Officers convey a great reluctance to report corruption. Several important implications may be drawn from this misperception among supervisory personnel.

It is alarmingly apparent that our supervisory personnel are dreadfully out of touch with the opinions and attitudes of those they supervise, and it is unlikely that integrity is the only sphere in which such misapprehensions occur. Given the significance and gravity of integrity and corruption prevention within the agency, though, it should be quite reasonable to expect that superior officers would have an accurate perception of subordinates attitudes and beliefs in this area if they regularly discussed integrity matters with their subordinates. At least three (3) potential inferences can be drawn from the disparity between patrol officers' self-reported attitudes and their supervisors' perceptions of those attitudes.

First, we might infer that supervisors do not regularly engage in dialogue with their subordinates regarding integrity and corruption, either from a lack of concern or because they do not appreciate the gravity of the issue or its consequences. Implicit in this proposition is the viable assumption that patrol officers are culturally constrained not to raise integrity-related issues, while supervisors are complacent about it; the Focus Group findings tend to support the hypothesis that neither group feels compelled to raise or discuss the matter openly and honestly. This supervisory complacency may be explained as an artifact of the supervisors' tenure in the department, particularly if we are inclined to accept the view that the types and the extent of corruption

(49)

existing today were less prevalent when older supervisors were Police Officers. Many of today's Lieutenants and senior Sergeants were, in fact, products of the era immediately post-Knapp, when drug-related corruption was much less prominent and when tremendous attention was paid to shielding officers from exposure to corruption. It is therefore quite logical to expect that the cadre of officers who entered the Department during and after the era of Knapp reforms would have a markedly different view of the potential extent of corruption than those who entered fifteen (15) or twenty (20) years later.

In the alternative, we might surmise that such dialogue does occur, but that patrol officers actively mislead their supervisors into believing that they would report acts of corruption or serious misconduct coming to their attention. This unlikely scenario assumes, without credible evidence, that a pervasive form of conspiracy to mislead supervisors exists among patrol officers.

Finally, we might infer that when such dialogue occurs, it is of a superficial and pro forma nature, and that little real attention is paid to the substantive issues involved. This proposition, which is supported by informal observations as well as by an intuitive understanding of the dynamics of the supervisor-subordinate dialogue process, is highly plausible and may partially derive from and work in concert with the first scenario presented above. Despite the fact that the Department mandates annual integrity interviews and presents other passive reminders of the need for integrity, a perception prevails among many officers of all ranks that the agency became lax and did not pursue corruption or promote integrity as aggressively in the several years prior to the Mollen Commission as it did earlier.

RECOMMENDATION:   It is highly recommended that the Department immediately adopt aggressive measures to dispel the prevalent attitude among senior supervisory personnel that patrol officers as a group are not averse to reporting corruption. Similarly, it is recommended that the Department aggressively pursue efforts to increase and enhance dialogue concerning corruption, and that such dialogue involve members of the service of all ranks. Such a program would have several beneficial effects, including the dissipation of misconceptions and misperceptions. Moreover, an increased awareness and realistic understanding of the corruption hazards faced by

(50)

officers may provide personnel with the prophylactic capacity to avoid them. Antecedent *discussions of corruption and ethical behavior*, in which officers project themselves into ethically problematic situations and consider the consequences of their actions, can be expected to act as a behavioral check when and if officers actually encounter those situations.

Slightly more than half the Captains believed that the average officer would turn in another officer whose corruption matched that of Michael Dowd. Of those, the Captains overwhelmingly felt that the officers would do so only with the assurance of anonymity. *This perception*, it should be noted, differs markedly from the perceptions of Sergeants and Lieutenants, who believed quite strongly that most officers would make the requisite notifications. The Captains stated that officers who turned in a "Michael Dowd" could have no expectation of support from their fellow officers, and would in fact be ostracized; this perception was more in line with the reported beliefs of Police Officer participants.

The Captains believed that the Department's system to *encourage reporting of corruption* could be strengthened if a totally anonymous system were devised and promulgated. They believe that the former Internal Affair Division's reputation for investigating minor misconduct ("white socks") while ignoring serious misconduct and corruption has negatively impacted the Internal Affair Bureau's credibility and capacity to gain the trust of officers, noting that this perception must be changed before substantive long-term gains can be made. In their opinion, the Internal Affairs Bureau should deal solely with cases of serious misconduct and corruption. It is critical to ensure that trust be established, and that the identity of officers who report corruption be kept absolutely secret, but those who do come forward should be rewarded. They suggested that the Internal Affairs Bureau change its image and attempt to gain trust through the honest and objective dissemination of information, and that this training be conducted by credible individuals. They also stated that an officer's Confidential Personnel Index (CPI) file should contain positive information in addition to the largely negative data currently retained there. The Captains also believed quite strongly that precinct Integrity Control Officers and commanders should, when possible and practicable, be made aware of on-going IAB investigations within their commands, and that IAB should utilize the knowledge and expertise of commanders and ICO's to a fuller extent.

(51)

Members of the Guardians Association Focus Group were generally in agreement with the attitudes and opinions expressed by other groups concerning the reporting of corruption. The participants stated that the reporting of corruption can be encouraged when the prospect of retribution from co-workers and supervisors is diminished. They debated the efficacy of a reward system to encourage the reporting of corruption, but the majority of participants stated that the Department is "sweeping corruption under the rug" by not pursuing it aggressively. Still, African-American officers are reluctant to come forward, although the participants stated that they were not part of the "blue fraternity."

In contrast to most of the previous and predominantly male Focus Groups, the members of the Policewomen's Endowment Association Focus Group unanimously stated that as individuals they would have no problem "turning in" an officer whose misconduct approached that of Michael Dowd. They did acknowledge, though, that other women might be reluctant to come forward with information, for fear that they would be labelled a "rat" and lose the support of their male peers. In light of the barriers they face, particularly with regard to their perceived credibility about male officers, women officers must expend significant effort in a process of "proving themselves," and some may be constrained by the fear of jeopardizing what credibility and status they have gained. Moreover, the group members noted that by virtue of their gender, female officers are prone to "labelling" for acts or omissions which they have not committed. As a result, they may be more circumspect about taking the risk of coming forward to report corruption.

(52)

ISSUE # 7 Supervisory Training Issues

The first-line supervisor plays an integral part in detecting and preventing corruption. In recognition of the important role Sergeants play in the Department's anti-corruption programs a series of questions were presented to the Focus Group of Sergeants in an effort to obtain information concerning how well individuals are prepared for the challenges of their new position. Participants were also queried to determine the knowledge and skills they need to perform their duties.

The Sergeants were very reproachful about supervisory training in general and the Basic Management Orientation Course (BMOC) in particular. The BMOC course was viewed as a Patrol Guide refresher course designed to rehash the basic "do's" and don'ts" of police procedure. The participants felt little effort was made to impart leadership skills. Many Sergeants suggested that guest speakers should speak on issues related to the effective management of personnel and other resources and not give them a "canned speech".

Police Academy instructors, especially those conducting BMOC and Centralized Management Training Courses were criticized for their teaching abilities and their lack of credibility. During a recent training session one of the Focus Group members had occasion to question the information being presented. During the exchange the instructor is reported to have justified his comments by stating that he "hasn't been on patrol in a long time". Other instructors have admitted to spending "very little time on patrol". The perceived lack of credibility and training skills of Police Academy instructors has had a detrimental effect on supervisory training.

During the discussion of this issue many supervisors complained about an unmanageable span of control. Participants stated that many times they are the only supervisor on patrol, covering the entire precinct. Even during those times that they are the sole Patrol Supervisor, they are routinely dispatched to handle jobs. Group members felt they were not given the opportunity to properly supervise their officers, yet were held to a high standard of accountability.

(53)

It is interesting to note that group members chided their younger colleagues for becoming overly friendly with subordinates. Participants told of "car pools", and "drinking buddies" that included supervisors and the members of their squads. Sergeants felt their position as supervisors were jeopardized because of the actions of their peers.

The Lieutenants' Focus Group identified several training issues which the Department should address. The Lieutenants stated that the Basic Management Orientation Course (BMOC) and the Lieutenants' Orientation Course should be more realistic and "hands-on," particularly with regard to the deployment of personnel, conducting roll call, and handling desk duties. Such training, they stated, should not be conveyed by lecture in a classroom setting, but rather the trainees should be afforded the opportunity to practice these skills in a realistic and practical environment.

Specialized positions for Lieutenants — i.e., ICO and Administrative Lieutenant positions — require specialized training in preparation of forms, the proper flow of paperwork, etc. Such specialized training is not currently being provided, and Lieutenants newly assigned to these positions lack the resources to perform their duties adequately. The participants also decried the prevalent practice of assigning newly promoted Lieutenants to the ICO and Administrative Lieutenant positions, a practice which occur because these are the least desirable and least rewarding for Lieutenants in patrol commands.

The PEA group also believed that supervisors (especially Sergeants) are afraid to make decisions, and that supervisors too frequently distrust the officers who work for them; in general, they believed that the overall quality of supervision has declined substantially in recent years. They characterized the Police Academy training as inadequate and impractical, and they called for a return to a more "quasi-military" training style. In addition, the participants questioned the competency and experience of many Police Academy staff members.

(54)

Issue # 8 Corruption Training

In response to an issue that was identified during the initial rounds of Focus Groups, project staff sought to probe the perception of newly hired Police Officers concerning integrity/corruption training being implemented. Questions were presented to evoke discussion of how well Police Academy corruption training adequately prepared young officers for the pitfalls they might encounter while on patrol.

Both groups of officers assigned to Field Training Units believed the Academy training was unrealistic and repetitive. Numerous officers were critical of a series of integrity films being presented at the Academy (believed to be the "Erosion Series" tapes). The group members felt that the depiction of an "honest cop" who obtained a discount for a meal early in the film and shortly thereafter degenerated into a "criminal" engaged in "corruption" and being led away in handcuffs, was unrealistic. In addition, officers felt the training program could be shortened and cited that instructors repeated the same information over and over again. Moreover, members of the Field Training Unit Focus Groups related that the examples and scenarios presented for discussion were either overly simplistic or extreme. Some of the behaviors which instructors characterized as corrupt were, in view of participants, more properly characterized as minor misconduct. As a result, the distinction between corruption and minor breaches of administrative rules became blurred for some students, leading to some confusion over their own duties as well as the role of the Internal Affairs Bureau. One participant, for example, stated that an instructor related a case in which an officer used a Police Department dumpster to dispose of personal trash, and that this was characterized as corruption.

In conducting the discussion it became evident that approximately half of the participants were instructed by members of the Internal Affairs Bureau Training Unit while the other half were instructed by Police Academy staff. A recent change in policy regarding corruption/integrity training has been implemented. Police Academy staff using Internal Affairs Bureau Training Unit lesson plans and instructor guides is currently presenting this block of training.

Academy instructors were perceived as not taking the course material seriously. Illustrations of instructors who read from their notes, could not (or would not) answer questions, an instructor whose whole presentation was to place

(55)

and remove a series of overhead projector slides, a gym instructor pressed into an *academic situation* who was obviously nervous and unsure of himself, an instructor who "rushed" through the material because the Company was behind in "other" academic matters were *given and confirmed by the group* members. "Let's get through this" and "We have to cover this" were common phrases instructors were reported to have used while introducing the topic to the Company. *Academy staff were* reported to have advised recruits to "always have a story" and to "C.Y.A.". Participants also relayed they were repeatedly admonished to stay away from the "hairbags who will only get you into trouble." The advice reported to be given to the Field Training Unit groups was supported by the recruit Focus Groups who added that many times academy instructors prefaced their remarks with "for Academy purposes" leading them to believe there is a chasm between theory (being taught at the Police Academy) and reality (the street).

Internal Affair Bureau instructors on the other hand were viewed more positively. The members felt the instructors were sincere and took the issue of corruption more seriously than *Academy instructors.* It appears the presence of the Internal Affairs Bureau gave more importance to the lesson and more credibility to the questions being answered.

(56)

ISSUE # 9 <u>Ancillary Issues</u>

In the course of conducting the Focus Group sessions, a number of issues arose which, while not directly related to the project's defined goals and objectives, are nevertheless worth mentioning.

One such issue concerned the Department's policy on wearing hats. When a participant would raise this perennial issue, a majority of the group members inevitably agreed that altogether too much emphasis was put on enforcement of this rule, and that this emphasis resulted in a waste of Department time and resources. They characterized the Department's posture regarding hats as draconian and petty, noting that a supervisor's time and effort would be more effectively spent addressing more substantive issues. Focus Group members recommended that the regulation hat should be optional equipment, at least during the summer months, and that officers be given some discretion in choosing when and under what circumstances to wear it.

Another concern was a widespread perception that the Department is overly responsive to political pressures and media influence. They believed quite strongly that the Department and its officers should be independent of such pressures, and that its actions and policies should be directed toward best serving the needs of the entire citizenry rather than the needs and whims of special interest groups and political officials. There exists a particularly strong feeling that the agency's policies are increasingly shaped by external political agendas, rather than by the true needs of communities, and these sentiments breed tremendous resentment and cynicism. Repeatedly, participants from varied groups referred to special "Operation All Out" posts as "Dinkins Re-Election Posts". They saw political influence upon the Department as pervasive, counterproductive, and contrary to the ideals that they and the Department espouse, and several participants equated such yielding with corruption.

Internal political influence was also a frequent topic among the various Focus Groups. Participants are of the opinion that merit and seniority are not as influential in determining choice assignments as the proverbial "hook" is. The "who you know, not what you know" belief was prevalent during each group discussion. Many officers expressed frustration at perceived favoritism in the selection of individuals for discretionary

(57)

promotions and special assignments. A clearly expressed cynicism about Department-wide opportunities was quite apparent.

One group in particular (group #12, from Brooklyn North) believed that their Patrol Borough is considered a "dumping ground" within the agency. They stated that they are regarded by officers from other Boroughs, as well as by the Department's executive cadre, as a collection of misfits, incompetents, malingerers, and undesirables inhabiting a series of "shithouses". This perception coexists with, and perhaps has created, a strong group identity marked by an undercurrent of perverse pride in their deviant status. Subtle evidence also emerged that at times these officers act out their deviant status for the benefit of other officers, often in a bid to demonstrate affinity for the group identity. Concurrently, they speak of the fact that Brooklyn North cops are more courageous than officers in other Boroughs, and that they deal with a level of crime and disorder which other cops could not tolerate. This group reiterated their long-standing belief that Brooklyn North Precincts receive less external supervision than precincts in other Boroughs, because ranking officials are afraid to come there. As in the past, this consciousness translates to a view that they are somewhat insulated from the scrutiny of Internal Affairs officers, whom they denigrate as timid and apprehensive officers who are unwilling to expose themselves to the dangers of working in Brooklyn North.

The officers from Brooklyn North also believe that their Patrol Borough should be considered a training ground for new members of the service, rather than a repository of rejection. This perception was quite strong within the group, and members provided several potent anecdotes to describe the bases of their assertions – at detail assignments, for example, they contend that they are regularly assigned to the least desirable posts, as far as possible from the public eye. It is highly recommended that positive action be quickly taken to dispel this alarming set of perceptions and self-identities.

Focus Group participants believed that the Department's recruitment and hiring practices and policies have declined in recent years. Many of the participants articulated a connection between this decline in hiring standards and corruption, predicting that the continued decline will inevitably lead to the emergence of widespread corruption. The fact that the Department has hired individuals arrested for felony crimes, which were pleaded to misdemeanor convictions,

(58)

alarmed them greatly.  They see these individuals as having  a
proven criminal mindset,  and they are similarly convinced that
many  individuals  who have become Police Officers are  former
criminals  who simply were not identified,  either by official
arrest  or by the Department's applicant  screening processes.
They  believe that the Department should have the authority  to
flatly  turn  down  applicants whose character is  in  any  way
suspect  or who have been the subject of  police  intervention.
Several participants, it should be noted, claimed that they had
personally  arrested  felons who are now Police  Officers,  and
that  as a matter of policy Applicant  Processing  Division  had
not  given  sufficient  consideration  to  their  recommendation
against hiring.

     The  Lieutenants  concurred  with  virtually  all  of  the
previous Focus Groups (with the exception of recruit  officers)
that entry-level standards have fallen within the agency in the
past several years.  Again, they raised the issue of inadequate
background  investigations  and  the  Department's  policy  of
permitting applicants with misdemeanor convictions for  serious
felony charges to be hired.   Overall,  they see the calibre of
younger  officers  to be declining, and they find  the  officers
they  supervise to be unacceptably immature.   Rookie  officers
were  described as "cry-babies" who complain incessantly  about
minor issues.   The Lieutenants see an increased need for  more
remedial training of rookies by supervisors.  Participants also
raised the issue of their contract's five (5) year  stretch-out
provision,  which  they  characterized  as  demoralizing  and
inadequate.    They  strongly  believe  that  their  level  of
compensation  is  not  commensurate  with  the  extent  of
accountability and responsibility they hold, and for their span
of control within patrol commands.

     The participants from the third round were critical of the
Police   Academy   facility.    Officers   complained   about
insufficient  locker-room space and bathroom/shower  facilities
that  are  often  out  of  service  or  malfunctioning.    These
officers were also skeptical of an Academy disciplinary  system
that "does nothing"  when someone is the recipient of  numerous
"star cards" and/or Command Disciplines.

     Although none of these Ancillary issues were introduced by
the project staff, the fact that they were raised repeatedly by
officers  is  telling.   Perhaps more than some  of  the  other
issues  discussed elsewhere in this report,  participants  were
exceptionally vocal and vehement in introducing and  discussing
these.   The project staff believe that these issues are closely

(59)

linked to the development of cynicism, and to feelings of
antipathy for the Department. They certainly permit officers
to question and to denigrate the overall integrity of the
Department's policies and policy makers.

A number of ancillary issues were raised by the ICO group.
They perceive an inordinately high turnover rate among ICO's,
attributing this to the fact that the Platoon Commander's
position is much more attractive, in terms of responsibility,
accountability, and flexibility, than their own. Few ICO's,
they said, would not prefer assignment as a Platoon Commander,
and they attempt to secure such assignments when vacancies
occur. As a result, they believe that ICO's are also generally
the least tenured and least experienced Lieutenants within a
precinct command.

As noted, the ICO's feel that their knowledge, skills and
abilities are under-utilized, particularly in regard to
conducting investigations and liaison with the Internal Affairs
Bureau and Borough Inspections Units. They would like to see
some sort of career path credit toward investigative
assignments, and would like the same overtime and chart day
opportunities enjoyed by Platoon Commanders. The ICO's also
claim to be under-resourced. The clerical workload they
currently carry warrants the assignment of a supervisory
assistant and a civilian clerical staff member, as well as a
dedicated computer and unmarked car. With such resources, the
ICO's believe that they can devote more time to conducting
field observations and investigations, which are currently all
but precluded.

The ICO's also complained that they are overburdened with
clerical work, to the extent that they can rarely conduct
adequate field observations of the officers in their commands.
One ICO noted that he currently bears the responsibility and
the accountability for integrity in a high crime command of
over three hundred (300) officers, and that an additional sixty
(60) officers are expected to be assigned there in February
1994. Given the fact that the ICO's also report that
Commanding Officers often assign them additional clerical tasks
and responsibilities only marginally related to their ICO
duties, their complaints concerning inadequate time and
resources to do their job appear to have some merit.
Specifically, they called for the Department to provide them
with additional staff (an assistant ICO), computers and
computer training, and a dedicated vehicle. At present, they
state that the ICO's cars are frequently borrowed by Commanders
and Executive Officers.

(60)

Several ancillary issues arose during the course of the Guardians Association Focus Group, including the perception of unfair evaluation practices which adversely impact minority officers. The participants believe that in contrast to the old system of evaluation, the recently revised evaluation process is less fair to minority officers. As in previous groups, the problem of inexperienced supervisors arose again, as did the perception that morale and discipline have declined. The participants evinced a view that it is exceedingly difficult for minority officers to get into "detail" assignments, and that this is an artifact of the systematic racism and sexism existing within the Department. The participants believe that African-American and other minority officers are treated unfairly as a result of this racist and sexist posture, which pervades the recruitment, discipline, promotion and personnel assignment systems as well as almost every aspect of the Department and its policies. The redressal process, particularly the Office of Equal Employment Opportunity, does not work for African-American officers, the participants said.

(61)

CONCLUSION

The systematic use of Focus Group methodology as a management tool for the identification of organizational problems and employee concerns, and for the identification of cogent strategies to remedy these problems and concerns, provides executives with an appropriate and viable vehicle for implementing change. Focus Groups would seem to be a particularly effective management tool within the field of policing, since the dimensions and character of the police occupational culture impact tremendously upon the achievement of organizational goals and objectives. Proficient police executives are well aware of the culture's capacity to either facilitate or inhibit change, and of the need to manage and direct the culture as carefully as they would any other resource.

By providing opportunities for officers to participate in agency management through membership in Focus Groups or advisory panels, police executives concurrently encourage officers to assume "ownership" of the agency and of the changes taking place within it. Focus Groups engender cooperation in the process of implementing change, and they enhance the overall level of trust and unanimity within the organization. In this regard, Focus Groups constitute a far more effective modality for implementing change than mere executive fiat. Perhaps the most essential factors in the ultimate success or failure of those changes, however, are the chief executive's commitment to the process and to the underlying assumptions that process makes about the capacities and capabilities of employees to identify and generate solutions for the critical issues facing the agency. Focus Groups and quality circles inevitably entail the sharing of power and responsibility, but do not allay the executive's accountability for the changes which occur.

Perhaps the most important information to emerge from this set of Focus Groups is the fact that Police Officers seem genuinely interested in wanting corruption to be eliminated. They articulate very little tolerance for corruption or serious misconduct in their midst, and many speak openly to the pride they still feel in being Police Officers. They seem to believe wholeheartedly in the notion that they are fundamentally different from the public they police. They also speak of their embarrassment when officers such as Michael Dowd are exposed, and to their anger at him and at others who would tarnish their image. Their anger is evidence of the culture's

(62)

vitality  and of the high positive regard these  officers  have
for themselves and for their peers.

The  Focus Group process holds great promise as one of  an
array  of  tools  available to police executives  inclined  to
practice  participative  management  techniques.   The  process
provides  police executives  with a useful and  altogether
necessary feedback mechanism,  and a means with which to assess
and measure the impact of new or proposed policy changes  among
the  work force and within the subculture.  By consulting with
employees regarding policy development,  management is afforded
ample opportunity to glean essential data which can inform  and
shape those policies, ultimately enhancing their effectiveness.

As has been demonstrated in this project,  Police Officers
and  Detectives  in this Department have a  low  tolerance  for
corrupt  behavior on the part of their peers,  a fact which  is
not   mitigated  by  their  reluctance  to  officially   report
corruption  without  full  assurance  of  confidentiality   or
anonymity. Rather,  this finding points up several  areas  for
policy refinement,  and perhaps for major revision of  existing
policies.  Specifically,  the officers who participated in  the
Focus  Groups articulated a pressing need as well as  an  acute
desire  for policies and procedures which will permit  them  to
report corruption without the fear of consequence,  either from
the  agency's  hierarchy or from their peers.  To allay  their
current  high level of cynicism and distrust for management  in
general and the internal investigative function in  particular,
they  must  first be convinced that the Department is  "on  the
level".   Police  Officers,   whose  working  environment   and
subculture  make them particularly attuned to  deception  and
dissembly, must be convinced that management decisions are made
primarily  on  the  basis of fairness and  equity,  and  that
political  and  parochial issues only  minimally  impact  those
decisions.

In a heuristic sense,  the present Focus Group project has
also  identified a need for continued study and for  additional
Focus  Group sessions on these and other topics.  The value  of
these  additional sessions might well be augmented through  the
administration  of  various  survey  instruments  (e.g.,   the
Niederhoffer  Cynicism Scale,  the Fishman-McCormack  Scale  of
Police   Probity  and  Improbity,   the  Buzawa  Police   Job
Satisfaction  Questionnaire) to Focus Group members as well  as
to other operational officers. Once established,  an  empirical
baseline for the Department and for various sub-samples of the

(63)

agency can be carefully monitored to measure the extent and direction of attitude changes in response to policy modifications. Future Focus Groups might also be comprised of previous participants, reunited to discuss the changes they have seen as a result of the project.

As police attitudes begin and continue to change, participative management concepts demand that executives stay abreast of the changes and their nuances. The management of police culture, perhaps to greater extent than other resources, requires consistent accurate feedback and constant attention on the part of concerned executives who are committed to positive change.

(64)

## ATTACHMENT "A"

SUMMARY OF RECOMMENDATIONS FROM FOCUS GROUP PARTICIPANTS:

ISSUE # 1

- An increase in the years of service requirement for promotion so that Sergeants can gain some practical street experience.

- Elimination of the present FTU system in favor of a training scheme modeled after the NSU's.

- An alternative to the steady tour concept. A "scooter chart" available on a voluntary basis.

ISSUE # 2

- Department values need to be integrated into training to heighten awareness.

- A clear definition of corruption and ethical issues needs to be reviewed.

ISSUE # 3

- Random and for cause drug screening tests should be increased.

- Department policy on drug use by members should be reviewed and clarified.

- Training tape to inform all members on policies and procedures.

ISSUE # 4

- A clear policy statement (Board of Ethics Ruling) concerning free or discounted meals needs to be incorporated into training.

ISSUE # 5

- Integrity tests (targeted and random) should be increased.

(65)

ISSUE # 6

-- Initiation of an aggressive information campaign to publicize and promote the new 1-800-PRIDE-PD number, and to assure the public as well as officers that Caller Identification technology is not being used.

-- An on-going precinct dialogue program with members of the Internal Affairs Bureau as a means to sensitize officers from both groups to the objectives and goals of the other.

- The Internal Affairs Bureau change its image and its methods of operation.

- Changing the Internal Affairs Bureau real or perceived policy of permitting investigators to close out serious allegations either as "Unsubstantiated" or as "Other Misconduct Noted" through issuance of Command Disciplines for administrative infractions.

ISSUE # 7

- Supervisory training should emphasize leadership and management skills.

- Revise first line supervisory training.

ISSUE # 8

- The Internal Affairs Bureau should be involved in corruption training.

- Police Academy instructors need more training in corruption matters.

ISSUE # 9

- The regulation hat should be optional equipment, at least during the summer months, and that officers be given some discretion in choosing when and under what circumstances to wear it.

- Brooklyn North participants believe that their Patrol Borough should be considered a training ground for new members of the service, rather than a "dumping ground." This sentiment was quite strong within the group. Positive action should be quickly taken to dispel this set of perceptions and self-identities.