# PTX 410

D3M9FLO1                        Salmeron - redirect

PLAINTIFF'S
EXHIBIT
2
10813

1          THE COURT:  Thank you.

2          (Witness excused)

3          THE COURT:  Your next witness.

4          MR. MOORE:  The plaintiffs would call Deputy Chief

5     Michael Marino.

6       MICHAEL MARINO,

7          called as a witness by the Plaintiffs,

8          having been duly sworn, testified as follows:

9          THE COURT:  Thank you.

10    DIRECT EXAMINATION

11    BY MR. MOORE:

12    Q.  Good morning Chief Marino?

13    A.  Good morning, sir.

14    Q.  When did you join the NYPD?

15    A.  November 1979.

16    Q.  So you've been a police officer for almost 34 years?

17    A.  I'm in my 34th now, sir, correct.

18    Q.  And what's your current rank?

19    A.  Deputy chief.

20    Q.  When were you promoted to deputy chief?

21    A.  December of 2004.

22    Q.  Is it -- you agree -- withdraw that.

23          In 2007 you and two dozen police officers were accused

24    of buying steroids?

25          MS. PUBLICKER:  Objection, your Honor.

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 3 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 47 of 235    875
D3M9FLO1                         Marino - direct

```
 1               THE COURT:  Whoa, whoa.

 2               MS. PUBLICKER:  Objection.  He's getting into a

 3     disciplinary matter which has nothing to do with this matter.

 4     It has nothing to do with stop, question, frisk or false

 5     statement.  It involves a medical issue.  And if we're going to

 6     discuss it, I would ask that we clear the courtroom because it

 7     involves HIPAA issues.

 8               MR. MOORE:  It's a matter of public record.

 9               THE COURT:  That may be.  But I don't see why it's

10     relevant.

11               MR. MOORE:  I think it's relevant to show he was --

12               MS. GROSSMAN:  Your Honor, could we have a sidebar

13     since there are HIPAA issues.

14               THE COURT:  I think he can explain the relevance

15     without violating the HIPAA issues.

16               MR. MOORE:  The relevance is to show he was accused of

17     a serious infraction, disciplined.

18               THE COURT:  So what?

19               MR. MOORE:  And it didn't have any effect on his

20     career.

21               THE COURT:  No.  Not going to allow that.

22               MR. MOORE:  All right.

23     Q.  Are you familiar with the 75th precinct?

24     A.  Yes, sir, I am.

25     Q.  Where is that located?
```

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 4 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 48 of 235    876
D3M9FLO1                        Marino - direct

1    A.   East New York in Brooklyn.

2    Q.   What's the address of the 75 precinct?

3    A.   1000 Sutter Avenue.

4    Q.   Can you say it a little slower.

5    A.   1000 Sutter Avenue.

6    Q.   Sutter?

7    A.   Yes, sir.  S-U-T-T-E-R.

8    Q.   And you became the commander of the 75th precinct, did you

9    not, on or about September of 2002, correct?

10   A.   That would be correct.

11   Q.   And at that time you were a -- an inspector; is that

12   correct?

13   A.   That's correct.

14   Q.   And is it true -- is it accurate that within months of

15   becoming the commanding officer of the 75th precinct you

16   instituted a quota policy that required each officer assigned

17   to the 75th precinct to issue ten tickets and make one arrest

18   each month or face a low performance evaluation.  Is that

19   accurate?

20   A.   The low performance evaluations were not based upon failure

21   to meet a quota, no.

22             THE COURT:  That did not quite answer his question.

23             Was there a performance goal of -- what did you say?

24             MR. MOORE:  Quota.

25             THE COURT:  Ten what?

D3M9FLO1                         Marino - direct

1              MR. MOORE:   Ten tickets -- ten summonses and one

2    arrest.

3              THE COURT:   So was there a performance goal of ten

4    summonses and one arrest?

5              THE WITNESS:   As per an administrative guide that was

6    present at the time, I set the standards as was mandated to me

7    by the police department, yes.

8              THE COURT:   Were those standards ten summonses and one

9    arrest?

10             THE WITNESS:   Yes.

11             THE COURT:   Is that per month?

12             THE WITNESS:   Yes.

13             THE COURT:   Per month.   Okay thank you.

14   BY MR. MOORE:

15   Q.   And that was a quota, right?

16   A.   No.

17             THE COURT:   You call it a performance goal?

18             THE WITNESS:   Yes.

19             (Continued on next page)

20

21

22

23

24

25

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 6 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 50 of 235    878
D3M8FLO2                    Marino - direct

1          THE COURT:  Was there any consequence if the goal

2     wasn't met?

3          THE WITNESS:  Yes, there could be.

4          THE COURT:  What might that consequence be?

5          THE WITNESS:  They could suffer a low performance

6     evaluation for failure to perform their job.

7     Q.  As a result of that, their assignment could be changed,

8     correct?

9     A.  Yes.  As per the administrative guide procedure, that's

10    correct.

11    Q.  They could, in fact, be transferred out of the command,

12    correct?

13    A.  As per the administrative guide procedure, that's correct.

14    Q.  You don't have to add "as per the administrative guide."

15    If you agree with it, just say yes or no.

16         THE COURT:  If he wants to, that's OK with me.  What

17    section of the administrative guide deals with setting

18    performance goals?

19    A.  I don't remember the particular section and it's not in the

20    administrative guide anymore; it's now a patrol guide

21    procedure.

22    Q.  You testified, I thought, that as per the administrative

23    guide, you set performance goals in the 75th Precinct.  Isn't

24    that what you just testified to?

25    A.  Yes, sir.  At that time it was administrative.

D3M8FLO2                          Marino - direct

1    Q.   What section of the administrative guide allows you, in

2    your judgment, to set performance goals in the 75th Precinct,

3    if you can recall?

4    A.   I don't know the numerical section, sir.

5    Q.   Is there now a section of the patrol guide that permits you

6    to do that?

7    A.   Yes, sir.

8    Q.   What is that?

9    A.   I don't know the numerical section, sir.

10              THE COURT:  You could find that, couldn't you?

11              THE WITNESS:  Yes, I could.

12              MR. MOORE:  One second, Judge.

13              Can you bring up 285?

14              THE COURT:  Is this in evidence?

15              MR. MOORE:  It is, Judge.

16              THE WITNESS:  Does it come here?

17              THE COURT:  It will.  Let me know if it doesn't, but

18   it will I think.

19              Did it?

20              THE WITNESS:  Yes, it did.

21   Q.   Are you familiar with Operations Order 52 of the New York

22   City Police Department?

23   A.   Yes, sir, I am.

24   Q.   In your judgment, does this order permit you as a

25   commanding officer of a precinct or command to set numerical

D3M8FLO2                          Marino - direct

1   goals for police officers?

2   A.   No, nothing in the police department authorizes us to set

3   numerical goals.

4   Q.   Do you believe that Operations Order 52 allows you to set a

5   quota?

6   A.   Nothing in the police department authorizes us to set a

7   quota.

8   Q.   Do you believe that Operations Order 52 allows you to set

9   performance standards?

10  A.   May I?

11  Q.   Yes or no?

12  A.   Yes.

13         THE COURT:   Wait.   If he wants to read the document.

14  I think he started to say, may I look at the document?

15  A.   I know that it does.   I just couldn't remember the direct

16  wording, but I see it now.

17  Q.   Can you direct us to that language?

18  A.   "To provide guidance --

19         THE COURT:   Which paragraph are you in?

20         THE WITNESS:   Paragraph 3, ma'am.

21  A.   "To provide guidance to police officers concerning their

22  duties department managers can and must set performance goals."

23  Q.   You're also aware, are you not, that Operations Order 52

24  sets forth that officers who don't meet those performance goals

25  can have adverse employment consequences, correct?

```
         D3M8FLO2                    Marino - direct
```

 1   A.  I would have to read through it, sir.

 2              THE COURT:  Where is that?

 3   Q.  Go to the third page.

 4              THE COURT:  Paragraph?

 5              MR. MOORE:  Keep scrolling down.

 6              Try the fourth page.

 7   Q.  Look at number 14 and number 15.  Why don't you read those?

 8   A.  Yes, sir.  Out loud?

 9              THE COURT:  No.

10   Q.  Just to yourself.

11   A.  Yes, sir.

12   Q.  Let me put the question to you again.  Based on Operations

13   Order 52, is it your understanding that precinct commanders or

14   commanders of different commands can adversely affect the

15   employment of officers under the command if they fail to meet

16   the productivity standards that may be set?

17   A.  If they fail to take proper steps to correct conditions is

18   what it says, yes, sir.

19   Q.  So that if they are not meeting the goals that are set,

20   they can be subject to adverse employment consequences,

21   correct?

22   A.  If they fail to do their jobs in addressing conditions and

23   correcting them, yes.

24              THE COURT:  I think actually in 15 it says, "Or fails

25   to engage in proactive activity."  What is that?

D3M8FLO2                         Marino - direct

 1              THE WITNESS:  Any condition -- a different condition

 2      may take different steps.  Every condition is different.  So

 3      whatever the goals are, whatever steps need to be taken to

 4      correct a problem in the community, the officers have to take

 5      it.  It could be different depending on the condition.

 6      Q.  I am interested in whether, if a supervisor sets a

 7      performance goal -- are you following me so far?

 8      A.  I am, sir.

 9      Q.  If a supervisor sets a performance goal and the officer

10      fails to meet that performance goal, adverse employment

11      consequences can be brought against that officer.

12              I am only speaking about performance goals.  OK?  If

13      they fail to do that, that might subject them to adverse

14      employment consequences, is that correct?

15      A.  It's too broad of -- the statement you're making is too

16      broad to accurately answer.

17      Q.  You can't answer that yes or no?

18      A.  No, sir.

19              THE COURT:  I thought he had about ten minutes ago.

20      You remember a series of questions you asked about the numbers,

21      and if not, can you do this, can you do that?  He said yes to

22      all of them.  Could be reassigned.  Could have a different

23      command.  Could be assigned to a different precinct.  Do you

24      remember that?

25              MR. MOORE:  I do.  I am asking him about 52.  He

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 11 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 55 of 235   883
D3M8FLO2                           Marino - direct

1    started talking about conditions.

2              THE COURT:  I just want to make sure I remember the

3    same thing.

4    Q.  It's your testimony that you did not institute a quota

5    policy within the 75th Precinct when you were the CO there,

6    correct?

7    A.  That's correct.

8    Q.  But you were accused of having done that, correct?

9    A.  Yes, I was.

10   Q.  In fact, a grievance was filed by several officers in the

11   75th Precinct, correct?

12   A.  Yes, sir.

13   Q.  And those officers accused you of instituting a quota

14   policy that required each officer assigned to the 75th Precinct

15   to issue ten tickets, ten summonses, and make one arrest each

16   month or face a low performance evaluation score, correct?

17   A.  That is correct.

18             THE COURT:  Did you not tell us a few minutes ago that

19   you did, in fact, say that that was a performance goal for the

20   officers?

21             THE WITNESS:  It was, ma'am.  We are talking about two

22   different times and the laws have changed since.  At that time,

23   yes, I asked them for ten summonses a month and a collar a

24   month.

25             THE COURT:  There was a time that you did that?

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 12 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 56 of 235   884
D3M8FLO2                          Marino - direct

```
 1              THE WITNESS:  Yes, ma'am.
 2              THE COURT:  But no longer?
 3              THE WITNESS:  Yes, ma'am.
 4              THE COURT:  When did it change?
 5              THE WITNESS:  When the law changed.
 6              THE COURT:  When was that?
 7              THE WITNESS:  I believe it was 2011, if I am not
 8    mistaken.
 9              THE COURT:  What law changed in 2011?
10              THE WITNESS:  The quota law at the time that I had the
11    75 stated, in sum and substance, that it would be unlawful to
12    transfer an officer, discipline an officer, make him lose
13    overtime or suffer any loss for failure to meet solely a set
14    number of parking and moving violations.  Later it was changed
15    just to include movers.
16              The things that I asked the officers for were not
17    solely parkers and movers.  It was their aggregate efforts in
18    correcting the conditions in that community.
19    Q.  You say the power for a commanding officer to do that
20    changed in 2011?
21    A.  I believe that's when the quota law was changed to include
22    parkers, movers, quality of life summonses, arrests, and
23    UF-250s, yes.  I believe it was 2011.
24    Q.  Up until 2011, precinct commanders had the power to
25    adversely affect an officer's employment if they didn't meet
```

Case 1:10-cv-06005-RWS Document 500-13 Filed 09/21/15 Page 13 of 73
Case 1:08-cv-01034-SAS-HBP Document 288 Filed 05/30/13 Page 57 of 235    885
D3M8FLO2                         Marino - direct

 1  those standards or goals, correct?

 2  A.  Yes, as long as it wasn't based solely upon their failure

 3  to write a specified number of parkers and movers within a time

 4  frame, yes.

 5  Q.  I thought you said that was what changed in 2011?

 6  A.  You're not asking me about 2011.  You said prior to that.

 7       THE COURT:  He is saying up till then, if the person

 8  didn't meet those goals, they could be adversely affected.

 9       THE WITNESS:  Yes.

10  Q.  One of the allegations that was made by the 75th Precinct

11  officers was that officers who had previously received

12  competent or highly competent ratings began to receive below

13  competent ratings because they did not achieve the quota that

14  you set out for them.  That was one of their allegations in the

15  arbitration, correct?

16  A.  That's correct.

17  Q.  You recall an individual at the 75th Precinct named

18  Christopher Whitehead?

19  A.  Yes.

20  Q.  He worked at the 75th Precinct while you had these goals

21  in -- withdraw that.

22       He worked at the 75th Precinct during the time the

23  officers allege you were imposing a quota on them, correct?

24  A.  Yes, he did.

25  Q.  He was one of the officers who received a below competent

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 14 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 58 of 235   886
D3M8FLO2                        Marino - direct

1   rating because he did not meet what he believed was a quota,

2   correct?

3   A.   I don't specifically recall that, but if you say so, I will

4   take your word for it.

5   Q.   You recall that before he received a below competent

6   rating, he had a competent or a highly competent rating?

7   A.   No, I don't.

8   Q.   If I say so, you will agree with me?

9   A.   I assume you know, sir.  Yes, sir.

10  Q.   Thank you.

11         Do you recall specifically having a meeting with

12  Christopher Whitehead where he told you he couldn't meet the

13  quota policy because he was rarely assigned to patrol duty?  Do

14  you recall a meeting like that?

15  A.   I met with every officer who was below, but I don't

16  specifically remember any one officer, no.

17  Q.   You don't remember that particular meeting with Officer

18  Whitehead, correct?

19  A.   No, I do not.

20  Q.   Do you recall telling him that he would be placed on

21  performance monitoring or he would be terminated if he did not

22  comply with the quota policy?  Do you recall telling him that?

23  A.   No, I don't.

24  Q.   Do you recall at some point Officer Whitehead shortly

25  thereafter was placed on level 2 performance monitoring?

D3M8FLO2                          Marino - direct

1    A.  I don't remember exactly who was placed on performance

2    monitoring.

3    Q.  Do you remember if he was ever placed on performance

4    monitoring?

5    A.  I really don't know.

6    Q.  In addition to Officer Whitehead, there were other

7    officers, five other Brooklyn officers in the 75th Precinct,

8    who accused you of having transferred them out of the precinct

9    because they failed to meet what they alleged was a quota that

10   you set in the 75th Precinct.  Do you recall that?

11   A.  I remember that there were officers who said that.

12   Q.  I'm sorry?

13   A.  I remember that there were officers who said that, yes.

14   Q.  A grievance was filed in this matter by the Patrolmen's

15   Benevolent Association?

16   A.  That's correct.

17   Q.  That was filed in 2005.  Do you recall that?

18   A.  Yes, sir.

19   Q.  In 2005, were you still the commanding officer of the 75th?

20   A.  Until September of 2005 I was, yes, sir.

21   Q.  Well, when the grievance was filed by the officers, you

22   were still the commander, right?

23   A.  When it was filed, I believe I was, yes, sir.

24   Q.  When it was decided, you had moved on, correct?

25   A.  Yes, sir.

D3M8FLO2                          Marino - direct

 1   Q.  Because you had been promoted to deputy chief at that

 2   point?

 3   A.  I was promoted to deputy chief in December of 2004.

 4            THE COURT:  Deputy chief of the whole department?

 5            THE WITNESS:  No, ma'am.

 6            THE COURT:  Deputy chief of?

 7            THE WITNESS:  Deputy chief is a one star chief.

 8            THE COURT:  Deputy chief of what?

 9            THE WITNESS:  Typically, the one star chiefs are what

10   is called the executive officer of a borough.  The commanding

11   officer is a two star and his number two is a one star.

12            THE COURT:  Your borough was?

13            THE WITNESS:  I was Brooklyn North at that time.

14            THE COURT:  Now you are?

15            THE WITNESS:  Staten Island.

16            THE COURT:  But also deputy chief of that borough?

17            THE WITNESS:  Yes, ma'am.

18            THE COURT:  Thank you.

19   Q.  In 2005, after you were promoted to deputy chief, you were

20   still for a time the commanding officer of the 75th Precinct?

21   A.  Yes, sir.

22   Q.  They were waiting for an opening for you or something?

23   A.  Yes, sir.

24   Q.  At some point an arbitration hearing was held, correct?

25   A.  Yes, sir.

D3M8FLO2                          Marino - direct

1    Q.   You testified, right?

2    A.   Yes, sir.

3    Q.   You were represented by counsel at that hearing?

4    A.   Yes, sir.

5    Q.   In January of 2006, the arbitrator ruled that, in fact, you

6    had imposed a quota policy during the time you were commanding

7    officer of the 75th Precinct and that it violated Labor Law

8    Section 215-A, correct?

9    A.   That was part of her ruling, yes, sir.

10   Q.   The arbitration decision permitted officers, who felt they

11   were unfairly penalized under the policy that had been ruled in

12   violation of the labor law, that they could be reevaluated

13   without reference to the quota policy, correct?

14   A.   That's correct.

15   Q.   But by the time that ruling was made, you had moved on and

16   had become the executive officer --

17   A.   Executive officer.

18   Q.   Executive officer of the entire patrol borough Brooklyn

19   North, correct?

20   A.   Yes.

21   Q.   Sometimes I talk over you and sometimes you talk over me.

22   So it's better for the court reporter if we can both slow down

23   a little bit.  It will help her out.

24           Chief Marino, I know it's a different borough.  Where

25   is the 42nd Precinct?

D3M8FLO2                         Marino - direct

1    A.   It's in the Bronx.

2    Q.   Are you aware that since 2008, supervisors in the 42nd

3    Precinct have developed and implemented a system of quotas

4    mandating numbers for arrests, summonses, and stop and frisks?

5    A.   I only know what I read in the newspapers.

6    Q.   But you read about that in the newspaper, correct?

7    A.   Yes, sir.

8            THE COURT:  Is that your borough?  Where is the 42nd?

9            MR. MOORE:  It's in the Bronx, Judge.

10           THE COURT:  Go ahead.

11           The point is you had no chain of command at the Bronx?

12           THE WITNESS:  No.

13   Q.   You became aware of it through the newspapers, right?

14   A.   Yes, sir.

15   Q.   In 2008, do you know who the commanding officer of the 42nd

16   Precinct was?

17   A.   I do not.

18   Q.   The 42nd Precinct is in what borough?

19   A.   The Bronx.

20   Q.   It's just patrol borough Bronx, it's not divided up?

21   A.   No, sir.

22   Q.   Who was the executive officer of the patrol borough Bronx

23   in 2008?

24   A.   I believe, if I am not mistaken, it was Deputy Chief Kevin

25   Unick and Deputy Chief Terry Monahan.

D3M8FLO2                         Marino - direct

1    Q.   What is the first one?   I didn't get the last name.

2    A.   Kevin Unick, U-N-I-C-K.

3    Q.   Executive officers of the boroughs sometimes get together

4    and meet, correct, or do they?

5    A.   I'm sorry?

6              THE COURT:   Do you know these guys because sometimes

7    you have meetings of all the executive officers?

8              THE WITNESS:   No.   I came on the job with Kevin Unick.

9              THE COURT:   And the other fellow?

10             THE WITNESS:   I just know him from the job.

11             THE COURT:   You don't have meetings of executive

12   officers?

13             THE WITNESS:   No, ma'am, I don't.

14   Q.   Are there no command meetings where all the executive

15   officers might be meeting in one room together, maybe with

16   their borough chiefs?   Are there no such meetings, Deputy Chief

17   Marino that you can recall?

18   A.   Are you talking about from different boroughs?

19   Q.   Yes.

20   A.   No.   Other than social events, no.

21   Q.   Well, do you ever have occasion to go to CompStat?

22   A.   Yes, sir.

23   Q.   Do you recall that the alleged quota that was being imposed

24   in the 42nd Precinct was ever discussed at CompStat meetings?

25   A.   Not in my presence, no.

D3M8FLO2                        Marino - direct

1    Q.  You don't recall any mention of it while you were there?

2    A.  No, sir, I don't.

3    Q.  Do you recall that one of the -- maybe you read it in the

4    newspaper, that in order to enforce these quotas, supervisors

5    in the 42nd Precinct had developed a detailed monitoring system

6    that included computer reports that used color coding to

7    categorize officers in terms of their compliance with the

8    quotas?

9    A.  No, sir, I don't.

10   Q.  Did you ever have such a system when you were at the 75th

11   Precinct?

12   A.  No, sir.

13   Q.  To keep track of whether officers were meeting their

14   performance goals or numerical goals?

15   A.  Not a color code, no, sir.

16   Q.  Did you have some kind of system to track that?

17   A.  Yes, sir.

18   Q.  What was that system?

19   A.  At the end of each month, the commanding officer is

20   required to personally review every police officer's activity

21   sheet, monthly activity sheet.  And on the quarterlies, which

22   would be at the end of March, June, September and December,

23   you're required to look at the quarterly evaluations for the

24   previous quarter and sign off on them that you agree.

25   Q.  That's how you kept track of how officers did in terms of

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 21 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 65 of 235   893
D3M8FLO2                    Marino - direct

1   meeting their performance goals, correct?

2   A.   That based with the crime conditions and community

3   complaints gave me a good indication if the job was getting

4   done.

5   Q.   I am speaking specifically about the goals that were set,

6   whether they were meeting them.  I know that there are other

7   issues that you deal with, but with respect to whether officers

8   were meeting these performance goals that you set, that's how

9   you kept track of them, by looking at these monthly and

10  quarterly and annual reports, correct?

11  A.   Yes, sir.

12  Q.   If officers you believed fell below what you thought was

13  the goal that you had set for them, they would be spoken to,

14  correct?

15  A.   Yes, sir.

16  Q.   They would be told to get their numbers up?

17  A.   Told to do their job properly.

18  Q.   Told to get their numbers up?

19  A.   To do their job properly.

20          THE COURT:  Did that include getting the numbers where

21  you wanted them?

22          THE WITNESS:  If it was called for, yeah.

23  Q.   Now, in December of 2010, Deputy Chief Marino, once again,

24  at this point you're still the -- let me ask you, in December

25  2010, were you still the executive officer of patrol borough

D3M8FLO2                        Marino - direct

1    Brooklyn North?

2    A.  I was, sir.

3    Q.  In December 2010, did you become aware that officers

4    assigned to the 79th precinct became so upset over alleged

5    summons quotas, that they talked about not writing summonses

6    for a 24-hour period in protest?

7           MS. PUBLICKER:  Objection.  He is asking about other

8    precincts.

9           THE COURT:  Where is the 79th Precinct, what borough

10   is that?

11          MR. MOORE:  It is a borough in Brooklyn that he has

12   supervisory authority over.

13          THE COURT:  If it's Brooklyn, I am going to allow it.

14          MS. PUBLICKER:  At this time, he does not have

15   supervisory --

16          THE COURT:  I know not at this time.  He did up to a

17   point in time.

18   Q.  In December 2010, the 79th Precinct was one of the

19   precincts that you supervised as the executive officer of

20   patrol borough Brooklyn North, correct?

21   A.  Yes, sir, it is.

22          THE COURT:  That's why I am allowing it.

23   Q.  Where is the 79th Precinct?

24   A.  That's Bedford-Stuyvesant.

25   Q.  In Brooklyn?

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 23 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 67 of 235     895
D3M8FLO2                        Marino - direct

1   A.   Brooklyn North.

2   Q.   You heard about this protest, did you not?

3   A.   I read something in the paper, yes.

4   Q.   You heard about it and you went to the 79th Precinct,

5   correct?

6   A.   Yes, I did.

7   Q.   And you went to the 79th Precinct and you told the officers

8   there that if they did what they said they were going to do,

9   which was to go on a 24-hour protest, you could come down there

10  and make sure they wrote summonses?

11  A.   That's not accurate.

12  Q.   What is not accurate about that?

13  A.   That's not what I told them.

14  Q.   Is any of that accurate?

15  A.   No.

16  Q.   Do you recall what you said to them when you went down

17  there to talk to these officers?

18  A.   In sum and substance, yes, I do.

19  Q.   What did you say to them?

20  A.   I stood in front of roll call and I explained to them that

21  nothing was about numbers.  That these little dots on the wall

22  weren't numbers; they were people that had bad things happen to

23  them, and that it's a cop's job to stop it.  And I don't think

24  that any of us, morally or professionally, should reconcile

25  himself, because maybe we don't get enough money or we don't

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 24 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 68 of 235      896
D3M8FLO2                           Marino - direct

 1   like our boss, that we let a little kid get shot or a woman get

 2   robbed to further some kind of agenda.

 3   Q.   You didn't speak to them about numbers?

 4   A.   No, I did not.

 5   Q.   The protest was about them saying they were being forced to

 6   write a certain number of summonses, right, that was what the

 7   protest was about that drew you to go to the 79th Precinct,

 8   correct?

 9   A.   What drew me to go there is the officers saying they were

10   not going to do their jobs, which would put the community at

11   risk.

12              THE COURT:   What were they protesting?

13              THE WITNESS:   I don't remember what they were angry

14   about.   I don't think they liked their commanding officer, and

15   I think that's what it was about.

16              THE COURT:   You don't think they were protesting about

17   the numbers?

18              THE WITNESS:   No.

19   Q.   Let me show you if I can maybe refresh your recollection --

20              MS. PUBLICKER:   Can I see that exhibit?

21              MR. MOORE:   It's not an exhibit.   I am going to try to

22   refresh his recollection.

23              MS. PUBLICKER:   Even if he wants to refresh his

24   recollection.

25              THE COURT:   You are right.   Show her.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 25 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 69 of 235    897
D3M8FLO2                    Marino - direct

1           What are you going to show him to refresh his

2      recollection?

3           MR. MOORE:  I am going to show him a newspaper article

4      to see if it refreshes his recollection.

5           THE COURT:  You can show anything to see if it

6      refreshes his recollection.

7      Q.  Chief Marino, take a look at that and read it, and when you

8      finish reading it --

9           THE COURT:  He is going to ask you whether it

10     refreshes your recollection.  The answer is either yes or no.

11     A.  Yes, sir, I read it.

12          THE COURT:  Does it refresh your recollection?

13          THE WITNESS:  It refreshes my recollection as to what

14     was written after it happened.

15          THE COURT:  Does it refresh your recollection of the

16     actual events?

17          THE WITNESS:  Yes.

18          THE COURT:  So now that his recollection is refreshed,

19     what is your question?

20     Q.  So you now recall that when you went to the 79th Precinct,

21     you told these officers, in sum and substance, just try it --

22     referring to this not writing summonses for 24 hours -- I will

23     come down here and make sure you write them.  Do you now recall

24     saying that to them?

25     A.  That's inaccurate.  I never said that.

D3M8FLO2                         Marino - direct

 1                THE COURT:  It what does it refresh your recollection
 2      then?
 3                THE WITNESS:  It refreshes my recollection that that
 4      was somebody's account of what happened the day after.
 5                THE COURT:  I asked you if it refreshed your
 6      recollection as to what actually happened.
 7                THE WITNESS:  I think I told you what happened, when I
 8      said what I told them when I went down there.
 9                THE COURT:  The article does not refresh your
10      recollection as to what actually happened?
11                THE WITNESS:  No, it does not.
12                THE COURT:  Thank you.
13      Q.  So having read that, you don't recall having said that to
14      the officers in the 79th Precinct, what is quoted in the
15      newspaper there, correct?
16      A.  That's correct.
17      Q.  Now, during the time you were the executive officer of
18      patrol borough Brooklyn North, you also supervised the 81st
19      Precinct, correct?
20      A.  Yes, sir.
21      Q.  How many precincts were under your supervision?
22      A.  Ten.
23      Q.  During the time you were the executive officer, who was the
24      commanding officer of Brooklyn North patrol borough?
25      A.  Assistant Chief Joseph F.X. Cunneen.

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 27 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 71 of 235      899
D3M8FLO2                    Marino - direct

1    Q.   I'm sorry?

2    A.   Assistant Chief Joseph F.X. Cunneen.  And then he was

3    followed by Assistant Chief Gerald Nelson.

4    Q.   When did Nelson become the CO of patrol borough Brooklyn?

5    A.   I believe in November or December of 2005, I believe.

6    Q.   When did you leave to go to Staten Island?

7    A.   December of 2010.

8    Q.   So for over a little bit over five years, you were the

9    executive officer for patrol borough Brooklyn North, correct?

10   A.   That would be correct.

11   Q.   When you were the executive officer, were you aware of a

12   procedure that could be followed whereby officers could be

13   brought up to a personnel review board for potential transfer

14   due to being a substandard performer?  Were you aware of such a

15   procedure?

16   A.   Yes, sir.

17   Q.   Part of being substandard would include not being

18   productive in terms of the number of arrests, summonses, or

19   250s that are generated, that's part of it, right?

20   A.   That could contribute, yes.

21   Q.   Now, with regard to the 81st Precinct, while you were the

22   executive officer of patrol borough Brooklyn North, did you

23   become aware that there were quotas or productivity goals in

24   existence, with regard to summonses, arrests and 250s, at the

25   81st Precinct, did you become aware of that?

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 28 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 72 of 235   900
D3M8FLO2                     Marino - direct

```
 1    A.   I assume there were productivity goals, yes, sir.

 2    Q.   I am asking if you can answer the question whether there

 3    are quotas or productivity goals with regard to summonses,

 4    arrests and 250s.  Did you become aware of that?

 5    A.   No.

 6              THE COURT:  What precinct did you say?

 7              THE WITNESS:  81.

 8              THE COURT:  Is that in your borough?

 9              THE WITNESS:  It was at the time.

10              THE COURT:  You never became aware of that at any

11    time?

12              THE WITNESS:  No.

13    Q.   Do you recall giving a statement to the police department

14    on August 30, 2010 concerning matters arising out of the 81st

15    Precinct?

16    A.   No, sir.

17              THE COURT:  We will pick up there after.  We will have

18    a ten minute recess and reconvene at 20 of.

19              (Recess)

20    BY MR. MOORE:

21    Q.   Deputy Chief Marino, with regard to the 81st Precinct, did

22    you become aware that there are quotas, productivity goals with

23    regard to summonses, arrests and 250s, did you become aware of

24    that public?

25              MS. GROSSMAN:  Objection.  Compound question.  Is it
```

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 29 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 73 of 235      901
D3M8FLO2                              Marino - direct

 1   quotas, productivity goals?

 2            MR. MOORE:  It will be clear why the question is

 3   phrased that way, depending on his answer.

 4            THE COURT:  I agree with Ms. Grossman.  Don't use

 5   both.  Use one or the other or do them separately.

 6   Q.  With regard to the 81st Precinct, did you become aware that

 7   there were quotas with regard to summonses, arrests and 250s?

 8   A.  No.

 9   Q.  Did you become aware that there were productivity goals

10   with regard to summonses, arrests and 250s?

11   A.  No.

12            THE COURT:  In the 81st Precinct, there were not

13   number goals?

14            THE WITNESS:  I tried to answer before that I assume

15   there were.  I was not aware of any specific, no.

16            MR. MOORE:  Judge, let me just pose it this way then.

17   Q.  Did you become aware that certain numbers were expected

18   from the officers on a monthly basis?

19   A.  No.

20   Q.  Do you recall on August 30, 2010 giving a sworn statement

21   to a representative of the New York City Police Department

22   concerning matters having to do with the 81st Precinct?

23            MS. GROSSMAN:  Your Honor, plaintiffs and defendants

24   worked out an arrangement in terms of what the exhibit is that

25   Mr. Moore is going to show the witness, and it will probably

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 30 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 74 of 235    902
D3M8FLO2                    Marino - direct

1   facilitate if he can show the witness the exhibit to refresh

2   his memory.

3            MR. MOORE:  I am waiting for the answer.

4   A.  I don't know what you're talking about.

5            MS. GROSSMAN:  Plaintiffs' counsel and defendants'

6   counsel worked out something regarding this particular

7   document.

8            THE COURT:  I think Mr. Moore is planning to show it

9   to him.

10           MS. GROSSMAN:  He should show him.

11  Q.  Let me hand you what has been marked as Plaintiffs' Exhibit

12  299, Chief Marino.

13  A.  Thank you, sir.

14  Q.  And see if you can recognize that.

15  A.  I know what it's about now, sir.

16           MR. MOORE:  Do you want a hard copy, Judge?

17           THE COURT:  Sure.  Thank you.

18           MS. GROSSMAN:  I would just note this is not your

19  typical transcription of a deposition transcript, and there is

20  a lot of inaudibles and not everything is captured, and there

21  is a lot of misuse of words.  So I just wanted that to be clear

22  for the record.

23  Q.  This is a statement you gave back in August of 2010,

24  correct?

25  A.  Yes, sir.

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 31 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 75 of 235    903
D3M8FLO2                    Marino - direct

1   Q.  At the time, you had taken an oath to tell the truth,

2   correct?

3   A.  Yes, sir.

4   Q.  The same oath that you took when you got up here today to

5   testify, correct?

6   A.  Yes, sir.

7   Q.  Directing your attention to page 65 of the transcript,

8   which you can either look at it in terms of 65 of the

9   transcript or 24435, the Bates stamp number.

10  A.  Yes, sir, I have it.

11          MS. PUBLICKER:  I would object to this as this is

12  improper impeachment.  It's not in opposition to what Chief

13  Marino has just testified to, the portion that Mr. Moore would

14  like to read.

15          THE COURT:  I don't know that unless I read 24435.

16  Q.  Do you recall being asked this question --

17          THE COURT:  I am reading it to myself.

18          MR. MOORE:  Line 12 to line 19.

19          THE COURT:  That's where I am reading.

20          THE COURT:  It seems to be consistent.  He says he is

21  aware that there were goals, but he doesn't know the numbers.

22  That's what I think he just said here.  The last thing he said

23  was he knows that number goals were set, but he doesn't know

24  the numbers.

25          MR. MOORE:  He said he wasn't aware of quotas.  He

D3M8FLO2                          Marino - direct

1      wasn't aware of productivity goals.

2                  THE COURT:  Here today?

3                  MR. MOORE:  He just said that.

4                  THE COURT:  He also said, I was aware that there were

5      number goals set, but I don't know the numbers.

6                  MR. MOORE:  For what it's worth, I would like to ask

7      him whether he was asked that question and gave that answer.

8                  THE COURT:  I won't allow it.  He said the same thing

9      here.  That's my recollection.  That's improper.  I believe he

10     said the same thing here.  But we can find out.

11                 Did you just testify that you were aware that numbers

12     were set but you don't know the numbers?

13                 THE WITNESS:  Yes, ma'am, I did.

14                 THE COURT:  OK.

15     Q.  When you were asked that question, were you aware that

16     there were quotas, was your answer, I am aware that there were

17     quotas?

18                 THE COURT:  You didn't say you were aware of the word

19     quotas.  You said you knew that number goals were set, but you

20     didn't know the number, is that true?

21                 THE WITNESS:  Yes.

22                 THE COURT:  Here did you use the word quotas?

23                 MR. MOORE:  I am trying to explain why I think it's a

24     relevant question.

25                 THE COURT:  I am asking you, did he use the word

Case 1:10-cv-06005-RWS Document 500-13 Filed 09/21/15 Page 33 of 73
Case 1:08-cv-01034-SAS-HBP Document 288 Filed 05/30/13 Page 77 of 235    905
D3M8FLO2                        Marino - direct

1   quotas?

2            MR. MOORE:  Yes.

3            THE COURT:  What page is it?

4            MR. MOORE:  Page 65, line 12, going to the end of line

5   19.  It's a compound question.

6            THE COURT:  I see that.

7            All right.  I will let you read through the first

8   sentence of 17.  Go ahead.  Read from line 12 through the first

9   sentence of 17.

10  Q.  Do you recall being asked this question and giving, at

11  least in part, this answer on August 30, 2010, Chief Marino?

12  "Q.  I am going to direct your attention back to the 81st

13  Precinct.  With regard to the 81 itself, and we are going to go

14  with this time frame, did you become aware that there are

15  quotas, productivity goals with regard to summonses, arrests

16  and 250s, in other words, certain numbers they expect to on a

17  monthly basis?

18  "A.  I am aware of that."

19           Do you recall being asked that question and giving

20  that answer on August --

21           MS. PUBLICKER:  I just ask that he complete the

22  sentence in response.  He did not complete his response.

23           THE COURT:  Because I said he could only read through

24  the first sentence.  That was not Mr. Moore's fault.  If you

25  would like the whole answer read, that's fine with me, but he

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 34 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 78 of 235    906
D3M8FLO2                        Marino - direct

1    was only obeying my order.

2           Go ahead.  Read the whole answer.

3    "A.  I am aware of that.  Commanders have the right,

4    administrative guy, now it is the patrol guy, to set the

5    performance parameters in their own command units."

6    A.  It's guide.  I am just correcting it.

7    Q.  Do you recall being asked that question and giving that

8    answer in August of 2010?

9    A.  Yes, sir.

10   Q.  You were being examined at that point by a member of the

11   New York City Police Department, correct?

12   A.  Yes, sir.

13   Q.  Were you aware what the parameters were for the numbers in

14   the 81st Precinct?  Were you aware of that?

15   A.  As it says on the next page, no, I was not.

16   Q.  Without regard to the document at this point, just

17   independent of the document if you would, were you aware of

18   what the parameters were in the 81st Precinct?

19   A.  I was not.

20   Q.  During the period of time -- withdraw.

21          This is discussing the 81st Precinct while you were

22   the executive officer who supervised the 81st Precinct,

23   correct?

24   A.  Yes, sir.

25   Q.  And it's your testimony you weren't aware of what the

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 35 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 79 of 235      907
D3M8FLO2                        Marino - direct

1   numbers were?

2   A.   That's correct.

3   Q.   In your experience in the New York City Police Department,

4   would it be normal for a precinct commander to have certain

5   productivity expectations of his officers?

6   A.   It's actually mandated that he does, yes.

7   Q.   It's in the patrol guide now?

8   A.   It's in the order you just showed before, sir.

9   Q.   Operations Order 52?

10  A.   That would be correct.

11  Q.   That would be a normal thing for precinct commanders to

12  follow, right?

13  A.   Yes, sir.

14  Q.   When I say normal, what I am referring to is it would be

15  normal to have numerical numbers placed on those productivity

16  standards, correct?

17  A.   No, sir.

18  Q.   Directing your attention to page 66 of this document, on

19  line 7, do you recall being asked this question and giving this

20  answer to a representative of the New York City Police

21  Department on August 30, 2010:

22  "Q.   Would it be normal to have numerical numbers placed on

23  those productivity standards?

24  "A.   Yes, that is right."

25          Do you recall being asked that question and giving

D3M8FLO2                            Marino - direct

1    that answer in August of 2010?

2    A.  Yes, sir.

3    Q.  You're not aware, are you, of any precinct that doesn't do

4    the same thing?

5    A.  At this time or at that time?

6    Q.  When you were answering in August of 2010.

7    A.  I couldn't answer.  I was not aware of any precinct, but I

8    didn't have knowledge of every precinct in the city.

9    Q.  Let me direct your attention once again to page 66, line

10   10.

11   "Q.  Are you aware of a precinct commanding officer that

12   doesn't do that?

13   "A.  No, I'm really not."

14            Do you recall being asked that question and giving

15   that answer?

16   A.  Yes.

17   Q.  In your judgment, it's not only the prerogative, but it's

18   the policy of the police department for precinct commanders to

19   set numerical goals?

20   A.  No, sir.

21   Q.  Or numerical numbers?

22   A.  No, sir.

23   Q.  That's not the policy?

24   A.  No, sir.

25   Q.  That's not what Operations Order 52 says?

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 37 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 81 of 235   909
D3M8FLO2                          Marino - direct

1   A.   It does not say numerical numbers, no, sir.

2   Q.   Well, do you recall just answering the question, Would it

3   be normal to have numerical numbers placed on productivity

4   standards?, and the answer you gave at the time was, Yes, that

5   is right, do you recall that?

6   A.   At that time, yes, sir.

7   Q.   And you say it's now changed?

8   A.   Yes, sir.

9   Q.   When did it change?

10  A.   When the law changed.

11  Q.   When what law changed?

12  A.   The law regarding quotas.

13  Q.   When was that, in 2011?

14  A.   I believe it was 2011.

15  Q.   At least up until 2011, whenever that law changed, that was

16  the practice, that precinct commanders in all precincts could

17  set numerical goals for productivity standards, right?

18          MS. GROSSMAN:   The law changed in 2010.   So in terms

19  of the witness's testimony tethered to the law change, I just

20  want the record to be clear it's 2010.

21  Q.   Can you answer the question?

22  A.   I'm sorry, sir?

23  Q.   Whenever the law changed, 2010, 2011, up until that point,

24  it's your understanding that precinct commanders throughout the

25  New York City Police Department had the right to set numerical

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 38 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 82 of 235   910
D3M8FLO2                           Marino - direct

1    numbers for productivity standards, correct?

2    A.   Yes, sir.

3    Q.   But it's your testimony that that changed after that law

4    changed?

5    A.   Yes, sir.

6    Q.   Looking at Operations Order 52, do you believe that that

7    also gives the discretion to precinct commanders to set

8    numerical numbers for productivity standards, Operations Order

9    52?

10   A.   I don't have it in front of me, but as I recall, no, it

11   does not.

12   Q.   In fact, at the time you gave your testimony in August of

13   2010, you were not aware of a precinct that does not do this,

14   in other words, that does not set numerical goals for

15   productivity standards, correct?

16   A.   I wasn't aware or unaware.  I didn't know what other

17   precincts were doing.  I said, no, I'm really not.  I didn't

18   know either way.

19   Q.   Directing your attention again to --

20   A.   I couldn't be knowledgeable what a precinct in the Bronx

21   was doing or Staten Island or Brooklyn South or Queens or

22   Manhattan because that wasn't under my jurisdiction and it

23   didn't concern me.

24   Q.   Directing your attention to page 66, line 10 --

25            MS. PUBLICKER:  This is improper impeachment.  It's

D3M8FLO2                      Marino - direct

 1    not inconsistent with his testimony here today.

 2                 THE COURT:  Which sentence do you want to read now?

 3                 MR. MOORE:  I want to read a passage.

 4                 THE COURT:  Just tell me the page and line.

 5                 MR. MOORE:  Page 66, line 10.

 6    "Q.  Are you aware of a precinct CO that doesn't do that,

 7    referring to numerical numbers placed on productivity

 8    standards?

 9    "A.  No, I'm really not."

10                 THE COURT:  I will allow it.

11                 You gave that testimony, right?

12                 THE WITNESS:  Yes.

13    A.  Nobody ever came up to me and told me the precinct

14    commander wasn't doing it so I assumed they were.

15    Q.  So nobody in the police department ever told you don't set

16    numerical goals for productivity standards; is that what your

17    testimony is?

18    A.  No, it's not.

19    Q.  Isn't that what you just said?

20                 THE COURT:  What did you just say?

21    A.  What I said was no one ever came up to me and made me aware

22    of any precinct commander that was not setting goals.

23    Q.  Were you ever disciplined as a result of the arbitration

24    decision that found that while you were in the 75th Precinct

25    you had set quotas for the number of summonses officers were

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 40 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 84 of 235     912
D3M8FLO2                    Marino - direct

1   expected to get?

2   A.   No, I was not.

3   Q.   Did anybody in the police department ever discuss that with

4   you, that arbitration decision?

5   A.   Yes.

6   Q.   Who?

7   A.   Somebody from legal, I believe.  It may be deputy

8   commissioner of legal matters or somebody sat me down and

9   discussed it with me.

10   Q.   I won't go into that because there may be attorney/client

11   issues there, but did anybody in the command structure of the

12   police department, Chief Esposito, any assistant chiefs, ever

13   discuss with you that arbitration decision?

14   A.   I can't recall, no.

15   Q.   In the patrol borough structure, patrol borough COs report

16   to the chief of patrol, correct?

17   A.   Correct, sir.

18   Q.   At the time you were in patrol borough Brooklyn North, who

19   was the chief of patrol?  Was that Giannelli?

20   A.   I don't know if it was Chief Giannelli or Chief Estavillo.

21   I can't remember who it was at the time.

22   Q.   Well, Chief Esposito is the chief of department.

23   A.   No, Estavillo.  Nicholas Estavillo was the chief of patrol

24   preceding Chief Robert Giannelli.

25   Q.   Did either Chief Estavillo or Chief Giannelli ever discuss

D3M8FLO2                          Marino - direct

1   that arbitration decision with you?

2   A.  Not as I recall, no.

3   Q.  Your commanding officer in Brooklyn North, did they ever

4   discuss it with you?

5   A.  Not as I recall, no.

6   Q.  Your commanding officer at the time was who?

7   A.  That would have been Chief Gerald Nelson.

8   Q.  Did Nelson ever discuss that arbitration decision with you?

9   A.  Not as I recall.

10  Q.  Would you agree with me, Chief, that the NYPD is a

11  paramilitary organization?

12  A.  Yes, sir.

13  Q.  Discipline and adherence to orders from commanders is very

14  important in the functioning of the New York City Police

15  Department, correct?

16  A.  Yes, sir.

17  Q.  One of the duties of a police officer is to obey lawful

18  orders and instructions by supervising officers, right?

19  A.  Yes, sir.

20  Q.  And that is set forth right in the patrol guide, right?

21  A.  Yes, sir.

22          MR. MOORE:  Judge, before I forget, I move the

23  admission of Plaintiffs' Exhibit 299.

24          MS. PUBLICKER:  Objection, your Honor.

25          THE COURT:  Sustained.  I am not going to accept this

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 42 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 86 of 235    914
D3M8FLO2                          Marino - direct

1   in evidence.  You used it for impeachment.  Where you have used

2   it, it's been read into the record.  That's fine.

3   Q.  One of the ways officers are given guidance and

4   supervision, one of the principal ways is through the roll call

5   system, correct?

6   A.  Yes, sir.

7   Q.  That happens on a daily basis for every tour, correct?

8   A.  Yes, sir.

9   Q.  At roll calls officers are told what the conditions are for

10  the day, correct?

11  A.  Yes, sir.

12  Q.  They are sometimes given briefings on changes in the law,

13  correct?

14  A.  Yes, sir.

15  Q.  And new interim orders or policies that are adopted by the

16  police department, correct?

17  A.  At times, yes, sir.

18  Q.  And from time to time, precinct commanders appear at the

19  roll call and speak to the simple troops?

20  A.  Yes, sir.

21  Q.  Would you be concerned as a commanding officer if a

22  supervisor got up at a roll call and said, at a particular

23  location, no one is walking out of that location without being

24  stopped?  Would you be concerned about that?

25  A.  I might.

D3M8FLO2                         Marino - direct

1   Q.   That's because you can't just stop anybody walking out of a

2   house, right?

3   A.   No, sir.  That's correct, you can't.

4   Q.   I'm sorry?

5   A.   No, you can't.

6   Q.   In order to stop them, you have to have reasonable

7   suspicion, correct?

8   A.   Yes, sir.

9   Q.   Of course, if you see them committing a crime, you can stop

10  them, and if you have probable cause, you can arrest them,

11  correct?

12  A.   Yes, sir.

13  Q.   But just walking out of a house without anything more,

14  that's not a reason to stop anybody, correct?

15  A.   No, sir, it's not.

16  Q.   No, sir, you agree with that?

17  A.   I agree with what you just said.

18  Q.   So would you be concerned as a commanding officer if a

19  supervisor got up and said, I want everybody coming out of a

20  certain location, I want everybody stopped on this tour?  Would

21  you be concerned that that might lead to suspicionless stops

22  and frisks if the supervisor officer didn't say more than that,

23  would you be concerned about that?

24  A.   I might, yes.

25           MR. MOORE:  Nothing further, Judge.


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 44 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 88 of 235   916
D3M8FLO2                    Marino - direct

 1              THE COURT:  Ms. Publicker.

 2              MR. MOORE:  Thank you, Chief.

 3              THE WITNESS:  My pleasure.

 4    CROSS-EXAMINATION

 5    BY MS. PUBLICKER:

 6    Q.  Good afternoon, Chief.

 7    A.  Good afternoon, ma'am.

 8    Q.  Could you briefly describe your educational background?

 9    A.  I have a bachelor's in business administration from the

10    State University of New York.

11    Q.  When did you join the New York City Police Department?

12    A.  November 7, 1979.

13    Q.  Just a little while ago Mr. Moore read to you from a

14    transcript, is that correct?

15    A.  Yes, ma'am.

16    Q.  Did you ever have a chance to review that transcript?

17    A.  No, ma'am.

18    Q.  I believe you were trying to say something about the

19    statement, "Commanders have the right, administrative guy, now

20    it's the patrol guy, to set performance parameters in their own

21    command units"?

22    A.  Yes, ma'am.

23              MR. MOORE:  Object to the form of the question.

24              THE COURT:  I don't know what you just said.

25    Q.  You attempted to clarify something about that statement to

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 45 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 89 of 235     917
D3M8FLO2                          Marino - cross

1   Mr. Moore on your direct?

2   A.   Yes, ma'am.

3   Q.   What were you trying to clarify?

4   A.   The administrative guide was the original procedure, now

5   it's the patrol guide, not guy.

6   Q.   Do you have any personal knowledge of anything that you

7   heard or read about the 42nd Precinct issues that Mr. Moore

8   asked you about?

9   A.   None.

10   Q.   How long ago did you leave the 75th Precinct?

11   A.   Seven and a half years ago, September of 2005.

12   Q.   Are you familiar with officers' annual performance

13   evaluations?

14   A.   Yes, ma'am, I am.

15   Q.   There are 28 different subcategories for that evaluation,

16   are there not?

17   A.   Yes, ma'am.

18   Q.   Those are separated?

19   A.   Yes.   There are performance parameters and behavioral

20   parameters, dimensions they call them.

21   Q.   So when you were the commanding officer of the 75th

22   Precinct, did you assign mandatory numerical ratings triggered

23   by certain levels of activity?

24   A.   It was suggested, yes.

25   Q.   Was that for the overall evaluation score or for the

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 46 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 90 of 235   918
D3M8FLO2                    Marino - cross

1    subcategories?

2    A.   For the subcategories where I felt were affected by that

3    particular parameter.

4    Q.   Could you give an example?

5    A.   Yes, I can.  One of the ones I set was, there is something

6    in there with accidents and traffic, if an officer failed to

7    properly issue enough moving summonses in the right places to

8    stop people that were having accidents and injuries, he might

9    get low in that area.  If an officer failed to do much in the

10   way of arrests, proactive policing, hawkers, movers, he might

11   got low in initiative, or problem recognition if he or she

12   didn't have the ability to see these things that were happening

13   right in front of their face.

14   Q.   Why did you set these performance goals?

15   A.   The level of activity and the level of performance that the

16   officers in the 75 were producing when I first got there was so

17   low that it was actually a detriment to the community.  It was

18   doing nothing to improve the conditions in one of the precincts

19   that was probably one of the most crime ridden violent

20   precincts in the city.

21   Q.   What was the level of activity that you saw in the 75th

22   Precinct when you first arrived?

23   A.   Surprisingly enough, the 400 or so officers assigned to

24   patrol all saw exactly five summonses every month, no more, no

25   less, and that was movers, parkers, and quality of life

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 47 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 91 of 235      919
D3M8FLO2                    Marino - cross

1   summonses combined.  400 people all managed to seek exactly

2   five every month.

3   Q.   What did that signal to you?

4   A.   It told me that they had set their own quota.

5   Q.   Did you believe that was a problem?

6   A.   Yes, it was.

7   Q.   Why did you believe it was problematic?

8   A.   Working in Brooklyn North for 22 years, I knew in some

9   areas the level of violence and drugs and crime, and these

10  officers doing five combined, movers, parkers and quality of

11  life summonses a month was just not enough to fix the problems

12  there.  And, also, if an officer did that by the third or

13  fourth day of the month and no more, it kind of indicated that

14  they were driving by things, just not addressing it.  It was

15  almost a malfeasance to me.

16  Q.   What did you do in response, if anything?

17  A.   I analyzed all the crime in the 75th Precinct.  I drove

18  around for weeks, myself, in the street to see what I could

19  find and what I could see, arrests that I could make, summonses

20  that I could write, stops that I could perform, proper stops.

21  And I did some analysis about the quota law.  I did look into

22  the administrative guide and see exactly what was proper to do

23  and not to do.  And I did set numbers for them that I thought

24  would serve the community in a better manner.

25  Q.   What were the numbers that you set?

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 48 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 92 of 235   920
D3M8FLO2                          Marino - cross

1    A.   I asked them to increase their summons production from five

2    to ten.   I asked them to try to make two good stops a month and

3    to attempt to make one arrest a month.

4    Q.   Did you ever assign a mandatory numerical rating to be

5    triggered by low activity for UF-250s?

6    A.   No.

7    Q.   Why did you set the numbers that you did?

8    A.   When you ask people to do things, number one, the officers

9    ask for a number, they want one.   Most people come to work and

10   they want to know what do I have to do to be OK, what can I do

11   to meet standards, so they ask for a number.   And if you set a

12   number, you have to make one that is attainable, that will not

13   put an undue burden upon the officers or the community, and yet

14   meet the needs of that community at the same time.

15   Q.   What were the crime conditions in the 75th Precinct at that

16   time?

17   A.   The 75th Precinct historically and at that time still

18   almost every year led the city in shootings, robberies, up

19   there in murders.   It was heavy drugs.

20             THE COURT:   Where is this?

21             THE WITNESS:   That's East New York in Brooklyn.   It's

22   a five and a half square mile area that's heavily populated and

23   heavy crime.

24   Q.   I believe you stated that you were aware of a New York

25   State labor law that was in effect at the time?

D3M8FLO2                          Marino - cross

1    A.  Yes, ma'am, I was.

2    Q.  Did you believe that your mandatory ratings in certain

3    dimensions violated the New York State labor law at that time?

4    A.  No, I did not, and I still don't.

5    Q.  Was anyone transferred out of the 75th Precinct as a result

6    of the performance standards that you set?

7    A.  Yes, ma'am.

8    Q.  Was anyone denied overtime as a result of the performance

9    standards that you set?

10   A.  No.

11   Q.  Was anyone denied days off as a result of the performance

12   standards that you set?

13   A.  No.

14   Q.  You're aware that a grievance was filed against NYPD for

15   that practice?

16   A.  Yes, ma'am.

17   Q.  Do you recall when that grievance was filed?

18   A.  I believe it was in October of '10, according to the

19   document that the lawyer gave me, that counsel gave me.

20   Q.  When the grievance by the PBA was filed with regards to the

21   75th Precinct?

22   A.  I don't know when it was filed.  I know that I gave my

23   statement on August -- is that August 2010?  No, I'm sorry.  I

24   just confused it.  I don't remember when it was done.

25   Q.  What did you understand the grievance to include?

D3M8FLO2                          Marino - cross

1    A.   The officers grieved the fact that they were transferred or

2    taken off their tours and made to suffer a loss, or get

3    substandard evaluations, based solely on their refusal to write

4    a certain amount of moving or parking summonses within a

5    specified time frame.

6    Q.   Are you aware of the findings of the arbitrator?

7    A.   Yes, ma'am, I am.

8    Q.   How are you aware of those findings?

9    A.   Well, I read them, and then it was given to me also by the

10   department at some point in time.

11   Q.   When did the arbitrator release the findings, if you can

12   recall?

13   A.   I can't recall.

14   Q.   If I said it was 2006, would that refresh your

15   recollection?

16   A.   Yes, ma'am.

17   Q.   Did the arbitrator determine whether anyone had received a

18   low evaluation as a result of the alleged quota?

19   A.   I don't think she determined that anybody received a below

20   standard evaluation as a result of that, no.

21   Q.   Do you recall an Officer Velez?

22   A.   Yes, I do, David Velez.

23   Q.   Do you recall that he made a grievance against you?

24   A.   Yes, ma'am, I do.

25   Q.   As part of that same labor law grievance we were speaking

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 51 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 95 of 235    923
D3M8FLO2                          Marino - cross

1   of?

2   A.  Yes, ma'am.

3   Q.  Do you recall that he claimed that he received a low

4   evaluation?

5   A.  Yes, ma'am.

6   Q.  What was the low evaluation that he was alleged to have

7   received?

8   A.  He received a 3.5, which is above standards.

9   Q.  After you received the arbitration decision in 2006, did

10  you continue to impose those mandatory ratings for officers?

11  A.  No, ma'am.

12  Q.  You are aware that the labor law was amended again in 2010?

13  A.  Yes, ma'am.

14  Q.  What is your current understanding of the kinds of quotas

15  that are not permitted under New York State Labor Law?

16  A.  You cannot suffer any police officer, you cannot cause any

17  police officer to suffer any kind of monetary loss, change of

18  tour, change of assignment, for failure to produce a specified

19  number of moving summonses, parking summonses, quality of life

20  violations, UF-250s, or stop and frisks, or arrests within a

21  specified time frame.

22  Q.  Do you currently comply with the existing New York State

23  Labor Law?

24  A.  Yes, ma'am.

25  Q.  Are you aware if the arbitrator found that Officer

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 52 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 96 of 235      924
D3M8FLO2                           Marino - cross

1   Whitehead, which was mentioned by Mr. Moore, was retaliated

2   against in any way?

3   A.  No, she did not.

4   Q.  How many times have you attended CompStat?

5   A.  I would say over 100.

6   Q.  Has anyone at CompStat ever told you to increase the number

7   of stops officers under your command conduct?

8              MR. MOORE:  Object to the form, Judge.  He is on

9   direct.

10             THE COURT:  He is on cross.

11             MR. MOORE:  I called him as an adverse witness.

12             THE COURT:  It calls for a yes or no.  I will allow

13  it.

14             Did anyone from CompStat ever tell you that?

15  A.  No.  Not just to increase the number of stops, no.

16             MR. MOORE:  Can I just have the question read back?

17             THE COURT:  Sure.

18             (Record read)

19  A.  No.

20  Q.  Has anyone at CompStat ever told you to increase the number

21  of arrests officers under your command conduct?

22  A.  No, not just arbitrarily like that, no.

23  Q.  Has anyone at CompStat ever told you to increase the number

24  of summonses officers under your command conduct?

25  A.  No.

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 53 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 97 of 235   925
D3M8FLO2                    Marino - cross

1    Q.   What have they told you at CompStat about officer activity?

2    A.   The main thing that you hear a lot at CompStat is they talk

3    about quality over quantity.  Nobody from the top on down has

4    ever said they want more numbers for numbers' sake.  They can

5    do things like they can put up the computer maps and show

6    robberies up in this area.  And then they will show a lot of

7    activity in this area.  No, it should be here.  You're not

8    taking proper steps to stop the conditions.  Nobody would ever

9    just arbitrarily say they need to make more arrests, they need

10   to write more summonses.  They might say you're not doing

11   enough in this area to address this condition, and how come

12   you're not?  You're not deploying your men and women properly.

13   You're not taking the proper steps.  You're not doing your job

14   as a commanding officer of that precinct to fix the conditions

15   for the people that live there.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

D3m9flo3                          Marino - cross

1    Q.  Just to step back for a minute, for the time when you were

2    the commanding officer of the 75th precinct.  I believe you

3    stated that you drove around the precinct?

4    A.  Yes, I did, for quite a few weeks.

5    Q.  Did you find it difficult to identify crime conditions or

6    summonable offenses when you did that?

7              MR. MOORE:  Object to the form, judge.

8              THE COURT:  Are you objecting to the leading?

9              MR. MOORE:  Not only that.  She's asking him this

10   broad question about whether he saw illegal behavior.  I mean

11   did he stop and summons?

12             THE COURT:  She's not asking that.  She's just saying:

13   Did you notice it?  Did you see it?  Was it hard to see it?  I

14   guess that's the question.

15             MS. PUBLICKER:  Yes, your Honor.

16             THE WITNESS:  Actually honestly I found it hard to go

17   a couple of hours without seeing something.

18   Q.  Have you ever told supervisors under your command that they

19   could not set quotas?

20   A.  Yes, I have.

21   Q.  What did you tell them?

22   A.  I tell them whatever the law is at the time.  The things

23   that they can't do.

24   Q.  Have you ever told supervisors under your command that they

25   should not ask for numbers, for numbers' sake?

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 55 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 99 of 235   927
D3m9flo3                    Marino - cross

1   A.  I've been saying that since day one irregardless of what

2   the law stated.

3   Q.  And why do you say that to commanding officers under your

4   command?

5   A.  Because the perception sometimes is amongst the rank and

6   file that they think they have to get numbers for numbers' sake

7   and it doesn't help anything.

8         If I say I want you guys to write parkers, I don't

9   mean expired registration stickers or expired inspection

10  stickers that don't really do much.  But I would like you to

11  write some double parkers where they're selling drugs and the

12  people are double parking their cars.  Maybe it will kind of

13  induce them not to come back.  Or if you're coming to work and

14  you can't get down the block because there's a condition,

15  address that.

16        Quality of life summonses.  Address the things that

17  you wouldn't like in your neighborhood or for your family to

18  have to live with.

19        If you're going to give moving summonses, don't do a

20  thing like they stop a car with tinted windows and give them

21  four summonses, one for each window, and I'm done for the

22  month.  Make four good stops.  Go to where the accidents are

23  happening, people are getting hurt.  I'd rather see them write

24  summons fro no seat belt, or on the cellphone, or speeding, or

25  improper turn, or failure to yield to a pedestrian.  Because

D3m9flo3                       Marino - cross

 1   where I work now there's a lot of pedestrians that get rundown.

 2   It's a problem.  It's our job to fix this.

 3           The simple truth of the matter is that the average

 4   patrol cop, if you talk about productivity or numbers, as we

 5   keep saying, the numbers that they give are so low that it's

 6   incumbent upon them to make sure that everything they did

 7   actually go out and perform has a positive effect.

 8   Q.  When you were the commanding officer of the 75th precinct

 9   did you -- I'm sorry.  Were you involved with the community?

10   A.  Yes, ma'am.

11   Q.  How were you involved with the community?

12   A.  When you first go to a precinct you meet with all the

13   elected officials.  You meet with block association presidents.

14   You meet with elite clergy people.  And you have weekly -- I'm

15   sorry -- monthly precinct community council meetings where

16   everybody is invited to attend.

17           I also invited in elected officials and clergy people

18   early on in my tenure and asked them what they thought the

19   priorities in the community were, the problems that they

20   thought were the most important.  We discussed between us how

21   we could remedy them.  Because you can't go into a community

22   and just say well I'm going to tell you how to live and I'm

23   going to do this.

24           When I was in the 77, there was a bad area.  We

25   decided to go zero tolerance to fix it.  I invited all the

D3m9flo3                          Marino - cross

1    elected officials, all the community people in first because

2    I'm not going to subject them to that kind of thing unless they

3    all are on board and agree with it, and they were.  And they

4    agreed that that was what was necessary.  They have to be part

5    of the decision process.

6    Q.  Now moving on to the Operations Order 52 that you were

7    shown earlier, you testified I believe that officers pursuant

8    to Operations Order 52 are evaluated on effectiveness of

9    addressing conditions; is that correct?

10   A.  Yes, ma'am.

11   Q.  And I believe under Operations Order 52 you read some

12   portions of paragraph fifteen where it states that if officers

13   fail to address sector or post conditions and public safety

14   concerns after training, mentoring and hands-on instruction,

15   the officers could be placed in performance monitoring; is that

16   correct?

17   A.  Yes, ma'am.

18   Q.  Is that your understanding of the operations order?

19   A.  Yes.

20   Q.  Can you explain what your understanding is of how an

21   officer could fail to be effective at addressing conditions?

22   A.  Yes, ma'am.

23        If you have a drug condition in your precinct, say an

24   area it's a known drug location, and they don't do anything

25   with it.  And people are complaining that they're out there

D3m9flo3                         Marino - cross

 1    selling drugs, they're drinking beer, they're urinating in the
 2    street, they're playing loud radios and just generally causing
 3    a problem and it's in the officer's sector and he does nothing
 4    about it all month, he failed.  He failed in that respect.
 5              MS. PUBLICKER:  Your Honor, if I could have one
 6    minute.
 7              (Pause)
 8              Thank you, your Honor.  No further questions at this
 9    time.
10              THE COURT:  Redirect or cross, whatever you want to
11    call it?
12              MR. MOORE:  Re-something.  Just can I do it from here?
13              THE COURT:  If it's that short.
14              MR. MOORE:  It's going to be short.
15    REDIRECT EXAMINATION
16    BY MR. MOORE:
17    Q.  Chief Marino, you said that when you became the CO of the
18    75th precinct you reached out to the community, correct?
19    A.  Yes.
20    Q.  As any good precinct commander would do, correct?
21    A.  Yes, sir.
22    Q.  And for the five -- the precinct commander of the 75th for
23    five years, correct?
24    A.  Yes, sir -- I'm sorry, no, sir.  Three years, ten days, and
25    18 hours.

D3m9flo3                        Marino - redirect

 1              THE COURT:  Where is that?

 2              THE WITNESS:  East New York.  75.  Three years, ten

 3       days, and 18 hours.

 4              MR. MOORE:  You don't have it down to the minute?

 5              THE COURT:  Excuse me.  75?

 6              THE WITNESS:  Yes, ma'am.

 7              THE COURT:  Did you mention earlier 77?

 8              THE WITNESS:  77.

 9              THE COURT:  Where is that?

10              THE WITNESS:  That's in Crown Heights also in Brooklyn

11       North.

12       BY MR. MOORE:

13       Q.  Is it your testimony that during that time no one in the

14       community came to you to complain about stop and frisk?  Is

15       that your testimony?

16       A.  They may have, sir.

17              That is always a concern and a complaint in any

18       precinct I've worked in.

19       Q.  So from time to time community leaders, community members

20       would complain about what they believe to be suspicionless

21       stops and frisks taking place in the 75th precinct, correct

22       from time to time?

23       A.  Yes, sir.

24       Q.  And what would you do about that?

25       A.  We would discuss it.  We have a dialogue about it and see

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 60 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 104 of 235    932
D3m9flo3                    Marino - redirect

1    if they were right or wrong, you know -- sometimes people make

2    mistakes and sometimes the community is mistaken.  Sometimes

3    they come in and complain about it.  When I explain to them

4    what happened, they actually go:  Oh, you guys actually did a

5    good job.

6    Q.  Would you agree with me that communities like East New York

7    and Bed-Stuy and Crown Heights where there may be high

8    incidents of crime, that people in those communities want

9    officers deployed there to deal with those crime conditions?

10   A.  Of course they do.

11   Q.  And from time to time the police department sends extra

12   officers into those areas to deal with those crime conditions,

13   correct?

14   A.  I don't know what you --

15            THE COURT:  Sometimes police presence is increased.

16            THE WITNESS:  They assign more police officers to the

17   precinct?

18            THE COURT:  That's what he's asking.

19            THE WITNESS:  Yes.

20   Q.  Or to deal with a spike in conditions, say, to impact over

21   time.

22   A.  Oh, yes, sir.

23   Q.  And that -- and so members of the community want that to

24   happen, correct?

25   A.  Yes, sir, I believe they do.

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 61 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 105 of 235   933
D3m9flo3                    Marino - redirect

1   Q.   From your experience?

2   A.   I believe they do, yes, sir.

3   Q.   They don't want those officers to go into the community and

4   do suspicionless stops and frisks though, do they?

5   A.   I'm sorry?

6   Q.   They don't want those officers who they want deployed to

7   the community to come there and disregard the rights of the

8   people in that community with regard to stop and frisk, right?

9   They don't want that?

10  A.   Nobody wants illegality, sir.

11  Q.   So even though they may not -- they may want more officers,

12  they don't want the officers coming in and stopping and

13  frisking every young black or Hispanic male, correct?

14  A.   No.   That's correct.

15          MS. GROSSMAN:   Your Honor, it looks like there are a

16  few more questions.   Maybe Mr. Moore wants to take the podium.

17          THE COURT:   I have no trouble hearing him.

18          MR. MOORE:   Do you want me to stand --

19          THE COURT:   No, you're doing fine.

20          Actually finishing would be good.

21  Q.   You also testified just now that you thought when you got

22  to the 75th precinct that the numbers were very low, correct?

23  A.   Yes, sir.

24  Q.   From time to time you see in precincts low numbers,

25  correct?

D3m9flo3                        Marino - redirect

1   A.   I don't know about other precincts, sir.

2   Q.   We'll speak about the 75th.

3          So, if you see low numbers is there not then pressure

4   placed within the precinct to increase those numbers?

5   A.   I wouldn't call it pressure, sir, no.

6   Q.   What would you call it?

7   A.   Those numbers were so low they were almost stopped.  They

8   weren't doing their jobs.

9   Q.   So what would you call it?

10  A.   I suggested to them that their efforts were not enough to

11  serve that community like they were being paid to and that they

12  needed to do more proactive policing to stop the crime.

13  Q.   You didn't just suggest that.  You said essentially get

14  these numbers up or you're going to go to a different precinct

15  or there's going to be changes, right?

16  A.   I set a standard that said do your jobs or suffer the

17  consequences.  That's right.

18  Q.   Or suffer the consequences, right?

19  A.   That's right.

20  Q.   So pressure was put on officers to get their numbers up,

21  right?

22  A.   I don't know if you could call that pressure.

23  Q.   Well if you're a police officer and a deputy chief is

24  saying or an inspector is saying --

25  A.   The number.

D3m9flo3                     Marino - redirect

1   Q.  -- or deputy inspector is saying --

2   A.  The number I set was so low that I could do it in one day.

3   Q.  Okay.

4   A.  And reasonably do it without hurting anybody or picking on

5   anybody.

6   Q.  And did you do that when you went around for these months,

7   did you make stops?

8   A.  Yes, I did.

9   Q.  Did you make arrests?

10  A.  Yes, I did.

11  Q.  So if you saw the numbers were so low, you then made it

12  very clear to the members of that precinct that they had to get

13  their numbers up, correct?

14  A.  They had to do their jobs, yes.

15  Q.  And that's when you began to set higher numerical goals,

16  correct?

17  A.  Yes.

18  Q.  Now, you talked about CompStat.  Have there ever been a

19  time when in your experience of CompStat that assembled members

20  of the police department have discussed whether in a particular

21  instance an officer had reasonable suspicion to stop somebody

22  or not?  Had that ever been discussed in your experience?

23  A.  CompStat, yeah, they do discuss stopping -- not making

24  unreasonable or unnecessary or, you know, doing things just for

25  numbers.  And that has been discussed, yes.

D3m9flo3                        Marino - redirect

1    Q.  But you've never done it with an actual 250 there, correct?

2    A.  Not that I recall, no.

3    Q.  And the focus -- would you agree with me that at CompStat

4    one of the things that's discussed when the focus is on a

5    precinct is the number of arrests that are being done, correct,

6    in a period of time?

7    A.  No.  Not just in the context for the number of arrests, no.

8    Q.  I'm not putting it in context.  I'm saying is there a

9    discussion at CompStat about the number of arrests in a

10   precinct?

11   A.  In certain instances, yes.

12   Q.  And there's a discussion about the number of summonses as

13   well, correct?  In certain instances?

14   A.  In certain instances, yes.

15   Q.  Have you ever been present when they talked about 250s,

16   saying -- comparing last year's numbers to this year's numbers

17   to see if there's an increase or a decrease?

18   A.  No.

19   Q.  That's never happened?

20   A.  No.

21   Q.  Now you talked about -- you answered some questions about

22   this arbitration, this grievance.  You testified at that

23   arbitration, correct?

24   A.  Yeah, I did.

25   Q.  And you testified as a representative of the New York City

D3m9flo3                          Marino - redirect

1    Police Department, correct?

2    A.   Yes.

3    Q.   And the arbitrator ruled against the New York City Police

4    Department, correct?

5    A.   Yes and no.

6    Q.   Well the arbitrator found that there was a quota system in

7    the 75th precinct?

8    A.   Yes and no.

9    Q.   What do you mean yes or no?

10   A.   What makes a quota illegal is somebody being --

11   Q.   I'm not asking about illegal.  I'm saying was there --

12   A.   What makes --

13   Q.   Arbitrator found that a quota system in the 75th precinct,

14   correct?

15   A.   No.  Yes and no.

16   Q.   I'll accept a yes and no.

17            Did the city appeal that arbitration decision?

18   A.   Didn't have to.

19   Q.   Did the city appeal that arbitration --

20            THE COURT:  I guess the -- does that mean the answer

21   is no?

22            THE WITNESS:  No.

23   Q.   Now you said when you got to the 75th precinct the officers

24   were setting their own quotas, it appeared to you, correct?

25   A.   Yes.

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 66 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 110 of 235    938
D3m9flo3                    Marino - redirect

1    Q.  Five a month?

2    A.  Yes.

3    Q.  And that included what?

4    A.  Movers, parkers, quality of life summonses.

5    Q.  How long had that quota system been in place in the 75th

6    precinct?

7    A.  I have no idea.

8    Q.  For a long time though, correct?

9    A.  I have no idea.

10   Q.  Did you know whether the supervisors in the 75th precinct

11   were aware of that quota system?

12   A.  I have no idea.

13   Q.  Did you ask the departing CO whether -- anything about that

14   officer-imposed quota?

15   A.  Nope.

16   Q.  Did you ask -- did you discuss it with anybody in the 75th

17   precinct?

18   A.  They weren't open to discussion.

19   Q.  Well, it's not likely that the officers could have a

20   self-imposed five-a-month quota without their supervisors

21   knowing about it, correct?

22   A.  One would assume.

23   Q.  All you have to do is look at the reports, right?

24   A.  One would assume.

25   Q.  If a commanding officer said that in an evaluation of a

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 67 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 111 of 235    939
D3m9flo3                         Marino - redirect

1   employee -- of an officer, that 50 percent of your evaluation

2   is based on your numbers of arrests, summonses and 250s, that

3   would not be proper, would it?

4   A.   It's part of the evaluation process.  I don't know if you

5   put a percentage on it.

6   Q.   50 percent.  That wouldn't be proper, right?

7   A.   What's the officer doing?  What's his assignment?  I don't

8   know.

9   Q.   He's a patrol officer.

10  A.   It's a large part.

11        What an officer does everyday is a large part of his

12  evaluation.

13  Q.   Is it 50 percent?

14  A.   I don't know.

15  Q.   Have you ever imposed a 50 percent rule when evaluating

16  officers?

17  A.   No.  No.

18        MR. MOORE:   Judge, I think that's all I have.

19        I just want to go back to Exhibit 299.  There was a

20  stipulation made with the city, and this goes to the question

21  of notice to the City of New York, that the city had notice of

22  the entirety of the contents of Exhibit 299.  And because I

23  think it goes to the issue of notice of the city as to the

24  plaintiffs' Monell claim, I think it should be admitted into

25  evidence.

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 68 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 112 of 235   940
D3m9flo3                      Marino - redirect

 1            MS. GROSSMAN:  That's not what our agreement was but

 2       the witness has testified that the NYPD asked him these

 3       questions so that's.

 4            THE COURT:  Right.  But he's saying the whole

 5       transcript is what constitutes notice, and I should read it for

 6       that purpose, to look at what the city knew at that time.

 7       Because notice is an issue.

 8            MS. GROSSMAN:  That's not relevant, the whole

 9       transcript -- whatever it is that the witness has testified

10       to --

11            THE COURT:  It was only used here for impeachment.  Do

12       you remember being asked this question and giving this answer?

13       That's when I said it can't be admitted because we don't do

14       that.  We just have the question and answer read into the

15       record.

16            Now there's an different argument entirely, that the

17       city is receiving this transcript at a certain time which shows

18       notice.

19            MS. GROSSMAN:  It's not that we received it.  The

20       police department asked the questions.

21            THE COURT:  Same idea.  Whatever it is, he's saying

22       everything in that transcript is proof of notice of what the

23       city knew at a certain point in time.  And that's important to

24       the Monell issues, when the city knew certain things.

25            MR. MOORE:  And they stipulated to it.  That's why we

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 69 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 113 of 235   941
D3m9flo3                      Marino - redirect

1   redacted the whole thing and agreed to this whole procedure of

2   taking something out.  I'm quite shocked to hear that they

3   don't say they stipulated to it because I thought that's what

4   they stipulated to.

5          MS. GROSSMAN:  That's definitely not what --

6          THE COURT:  What do you think they stipulated to

7   again?

8          MR. MOORE:  That the entirety of the transcript would

9   be admitted --

10          MS. GROSSMAN:  It was all for impeachment.

11          MR. MOORE:  With respect to the city having notice of

12   the entirety of the transcript.

13          MS. BORCHETTA:  Your Honor, it's the redacted version

14   of the transcript that's Exhibit 299.

15          THE COURT:  I've looked at it.  It's very heavily

16   redacted.

17          MS. BORCHETTA:  It's the entirety of that.

18          THE COURT:  Where is this stipulation?  Is it in

19   e-mails or letters?

20          MS. BORCHETTA:  Your Honor, during the pre-- the

21   conference that we had right before the trial began about

22   various objections that the city had to our documents.  As the

23   court will remember, we had a break where we were able to talk.

24          THE COURT:  That's right.  You said we have nothing

25   further.

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 70 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 114 of 235    942
        D3m9flo3                    Marino - redirect

1           MS. BORCHETTA:  Yes.  We spoke with the city and

2    agreed to make additional redactions to Exhibit 299 based on

3    the city's representation that they would agree to stipulate

4    that the city had notice on the date of the interview of the

5    entirety of the unredacted contents of that interview.

6           MS. GROSSMAN:  That is not what was agreed to.

7           THE COURT:  Well I wasn't there.  This is a real

8    problem.  What am I supposed to do, figure out who said what

9    and who I believe?  I don't want to do that.

10          Who were you negotiating with?

11          MS. BORCHETTA:  Your Honor, I spoke with Ms. Grossman

12   about this.

13          THE COURT:  That's a very awkward thing.

14          The city, obviously, had notice of anything in the

15   transcript because as you said the city was -- it's a city

16   transcript.  The city was there.  So I'll take it for the

17   limited purpose then of notice, what the city knew at that

18   moment in time.  It's a different purpose than a moment ago

19   when I said I wouldn't take it because I usually don't take if

20   for impeachment.

21          MS. GROSSMAN:  Just so that the court notes, that this

22   is an ongoing matter, and it's related to another proceeding.

23          THE COURT:  Be it as it may, I'm only taking it for

24   the limited purpose of notice; just what they're saying, as of

25   a certain date, the date of the transcript which is August 30,

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 71 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 115 of 235    943
      D3m9flo3              Marino - redirect

1    2010, the city knew whatever it is in there that it says, in

2    the redacted transcript.

3         MS. GROSSMAN:  We would stipulate to that.  So there

4    is no need to actually offer the transcript.

5         THE COURT:  I have to know what it is they had notice

6    of.  It's in the transcript.

7         MS. GROSSMAN:  What was just discussed.

8         THE COURT:  No.  It's not just those questions and

9    answers.  It's everything in the unredacted transcript that

10   they say makes up the notice.  I have to take it for that

11   purpose.  It's completely different than the earlier argument

12   about impeachment.  I wouldn't have taken that.  But anyway.  I

13   guess so.  Okay.  All right.  So it's received as redacted for

14   that limited purpose.

15        Are we done with the witness?

16        (Plaintiffs' Exhibit 299 received in evidence)

17        THE COURT:  Recross.

18        MS. PUBLICKER:  Actually just briefly.

19        THE COURT:  Whatever it is.

20   RECROSS EXAMINATION

21   BY MS. PUBLICKER:

22   Q.   Chief Marino, what did you mean by yes and no to

23   Mr. Moore's statements about the arbitrator's decision?

24   A.   Reading the quota law what made a quota a quota, an illegal

25   quota, was suffering a police officer to -- causing a police

Case 1:10-cv-06005-RWS  Document 500-13  Filed 09/21/15  Page 72 of 73
Case 1:08-cv-01034-SAS-HBP  Document 288  Filed 05/30/13  Page 116 of 235    944
D3m9flo3                          Marino - recross

1    officer to suffer a loss for failure to meet suddenly required

2    amount of moving or parking summonses within a specified

3    timeframe.  That's what makes a quota a quota.  That's what

4    makes it illegal.

5           None of the transfers were rescinded.  None of the

6    evaluations were changed.  Nothing happened as a result.

7           So because the arbitrator felt that while I set

8    numbers -- I did set specific numbers, and I did, and I

9    admitted that -- that nobody was punished or suffered any loss

10   as a result failure to meet those numbers or stating a quota

11   law.  But rather it was on a conglomeration of their entire

12   effort.

13          So the transfers were upheld.  No evaluation was

14   changed.  Nothing happened as a result other than the fact that

15   the judge said don't set numbers anymore.

16          And the legal bureau put something out right

17   afterwards, or deputy commissioner --

18          MR. MOORE:  I'm going to object to what the legal

19   bureau did, Judge.

20          THE WITNESS:  Maybe the deputy commissioner of public

21   information.  I'm sorry, counselor.

22          MR. MOORE:  All right.  Fine.

23          THE WITNESS:  That they felt that the fact that

24   nothing was taken back, it kind of flew in the face of illegal

25   quotas.  If it was illegal, something would have been remedied.

Case 1:10-cv-06005-RWS   Document 500-13   Filed 09/21/15   Page 73 of 73
Case 1:08-cv-01034-SAS-HBP   Document 288   Filed 05/30/13   Page 117 of 235   945
D3m9flo3                           Marino - recross

1    It wasn't.  And that commanders are expected to set a

2    performance standard or they wouldn't be doing their job.

3          MS. PUBLICKER:  Thank you, Chief Marino.

4    REDIRECT EXAMINATION

5    BY MR. MOORE:

6    Q.  Not to beat a dead horse.  But the arbitrator heard the

7    testimony from you and several police officers, correct?

8    A.  Yes, sir.

9    Q.  And the arbitrator found that there was a quota in the 75th

10   precinct, yes or no?

11   A.  But nobody was punished --

12   Q.  The arbitrator found --

13          THE COURT:  Yes or no.

14          THE WITNESS:  Yes.

15          THE COURT:  We're done.  Thank you.

16          I know we won't do much of the next witness but I

17   don't want to lose the time.

18          MR. CHARNEY:  I believe it's Captain Mascol.

19          THE COURT:  We aren't going to get more than five

20   minutes, but we'll do it.

21     RAFAEL MASCOL,

22        called as a witness by the Plaintiffs,

23        having been duly sworn, testified as follows:

24          (Continued on next page)

25