# PTX 411

D429flol

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  DAVID FLOYD, et al.,

4               Plaintiffs,

5          v.                        08 CV 1034(SAS)

6  CITY OF NEW YORK, et al.,

7               Defendants.

8  ------------------------------x
                                    New York, N.Y.
9                                   April 2, 2013
                                    10:09 a.m.
10
   Before:
11
                    HON. SHIRA A. SCHEINDLIN,
12
                                         District Judge
13
                         APPEARANCES
14
   BELDOCK LEVINE & HOFFMAN, LLP
15      Attorneys for Plaintiffs
   BY:  JENN ROLNICK BORCHETTA
16      JONATHAN MOORE

17 COVINGTON & BURLING, LLP
        Attorneys for Plaintiffs
18 BY:  KASEY MARTINI
        GRETCHEN HOFF VARNER
19      ERIC HELLERMAN
        BRUCE COREY
20
   CENTER FOR CONSTITUTIONAL RIGHTS
21      Attorneys for Plaintiffs
   BY:  DARIUS CHARNEY
22      SUNITA PATEL
        BAHER AZMY
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300



PLAINTIFF'S
EXHIBIT
48
12/20/13  MBA

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 3 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 28 of 177   1828
D428FLO2

1     have a witness, although I don't know if your Honor wants to

2     start the witness now.

3                 THE COURT:   Let's take the witness.

4                 MR. MOORE:   The plaintiffs would call Steve Mauriello.

5     STEVEN MAURIELLO,

6          called as a witness by the plaintiffs,

7          having been duly sworn, testified as follows:

8                 THE COURT:   State your first name and last name,

9     spelling both of the names for the record.

10                THE WITNESS:   My name is Steven Mauriello,

11    S-T-E-V-E-N, M-A-U-R-I-E-L-L-O.

12    DIRECT EXAMINATION

13    BY MR. MOORE:

14    Q.   Good morning, Mr. Mauriello.   You're employed by the New

15    York City Police Department?

16    A.   Yes, I am.

17    Q.   How long have you been in the NYPD?

18    A.   24 years.

19    Q.   You rose from the rank of a patrol officer to now a deputy

20    inspector, is that correct?

21    A.   Yes.

22    Q.   What is your current position?

23    A.   Deputy inspector.   I am executive officer of Transit

24    Borough Bronx and Queens.

25    Q.   What position did you hold right before you became the

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 4 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 29 of 177 1829
D428FLO2                     Mauriello - direct

1   executive officer of the transit borough of Bronx and Queens?

2   A.   I was the commanding officer of the 81st Precinct.

3   Q.   Is it accurate that you became the commanding officer of

4   the 81st Precinct in December 2007?

5   A.   Yes, it is.

6   Q.   Before that you spent a year as the executive officer of

7   the 81st Precinct, correct?

8   A.   Yes.

9   Q.   Who was the CO when you were the executive officer?

10  A.   Deputy Inspector Robert Brower.

11  Q.   The 81st Precinct is in the patrol borough Brooklyn North,

12  correct?

13  A.   Yes.

14  Q.   As the commanding officer of the 81st Precinct, you

15  reported directly to Deputy Chief Marino, correct?

16  A.   I reported directly to Chief Gerald Nelson, who is the

17  commanding officer, and also Chief Marino, who is the executive

18  officer.

19  Q.   Deputy Chief Marino was the executive officer of patrol

20  borough Brooklyn North?

21  A.   Yes.

22  Q.   And Chief Nelson is a two star chief, he was the borough

23  commander for Brooklyn North?

24  A.   Yes.

25  Q.   You're aware, are you not, that an allegation was made

1    against you during your tenure at the 81st Precinct that quotas

2    were maintained in the 81st Precinct?  You're aware of that

3    allegation, correct?

4    A.   The allegation, yes.

5    Q.   You deny that allegation, is that correct?

6    A.   Of course.

7    Q.   But you know that that allegation was made against you,

8    correct?

9    A.   Yes.

10   Q.   At some point, you were investigated by the NYPD about

11   these allegations, were you not?

12   A.   Yes.

13   Q.   Subsequent to that -- well, let me ask you.

14          At some point you transferred from the 81st Precinct

15   to your new position as the executive officer of transit

16   borough Brooklyn and Queens, correct?

17   A.   Bronx and Queens.

18   Q.   Bronx and Queens.  I'm sorry.

19          That was on July 3, 2010 when that was communicated to

20   you?

21   A.   Yes.

22   Q.   That was told to you by Chief Hall, correct?

23   A.   Yes.  He called me up.

24   Q.   Chief Hall is the chief of patrol for the entire New York

25   City Police Department, correct?

1   A.  Yes.

2   Q.  When he talked to you on July 3, 2010, this was after

3   allegations had been made against you, correct?

4   A.  Yes.

5   Q.  When he talked to you, he said you were doing a really good

6   job at the 81st Precinct, right?

7   A.  Yes, he did.

8   Q.  In fact, he wanted to reward you by giving you the position

9   of executive officer of transit borough Bronx and Queens,

10  correct?

11  A.  Yes.

12  Q.  And you considered that a promotion, right?

13  A.  I considered it a transfer.

14  Q.  You considered it a promotion as well, right, in the sense

15  you're going to a more important position than what you were

16  in, correct?

17  A.  No.  I mean, I am going to be second commander to more

18  officers.

19  Q.  So that's a step up for you, correct?

20          THE COURT:  Did you view it that way?

21          THE WITNESS:  No.

22          THE COURT:  You thought it was lateral?

23          THE WITNESS:  Yes.

24  Q.  Did you view it as a demotion?

25  A.  No.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 7 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 32 of 177     1832
D428FLO2                          Mauriello - direct

1    Q.   Now, you're familiar with the Office of the Chief of

2    Department, correct?

3    A.   Yes, sir.

4    Q.   You're aware, are you not, that the Office of the Chief of

5    Department investigates some civilian complaints that are

6    referred to them either by CCRB or other agencies within the

7    police department, correct?

8    A.   Yes, sir.

9    Q.   Some of those allegations -- withdraw that.

10        Allegations of an improper stop and frisk are

11   investigated occasionally by the Office of the Chief of

12   Department, correct?

13   A.   Usually it's if someone got a summons.  It doesn't have to

14   do with force or abuse or discourtesy or offensive language.

15   Then it goes to the chief of department.

16   Q.   What about stop and frisk, is it your testimony that you

17   don't recall the Office of the Chief of Department

18   investigating allegations of improper stop and frisk?

19   A.   I don't recall reviewing any.

20   Q.   But you do know that when the Office of the Chief of

21   Department is investigating a case, that they refer the case to

22   the precinct where the allegation took place, correct?

23   A.   They refer it to the borough, and then the borough sends it

24   to the precinct.

25   Q.   So when you were the commanding officer of the 81st

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 8 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 33 of 177   1833
D428FLO2                    Mauriello - direct

 1   Precinct, investigations of officers by the Office of the Chief

 2   of Department at some point came across your desk, correct?

 3   A.   Yes.

 4   Q.   And you would refer those out within the precinct for

 5   investigation, correct?

 6   A.   They would get referred to my administrative lieutenant,

 7   and then he would give it to the ICO, or if it's an allegation

 8   against a lieutenant, my XO would do the investigation.

 9          MR. MOORE:   One second, your Honor.

10   Q.   When you say ICO, you're referring to a position known as

11   the integrity control officer, correct?

12   A.   Yes.

13   Q.   What does the integrity control officer of a precinct do?

14   A.   He is making sure all the officers are following the rules

15   and regulations.

16   Q.   Of the New York City Police Department, correct?

17   A.   Of the New York City Police Department.

18   Q.   As well as being ethical in how they are police officers,

19   correct?

20   A.   Of course.

21   Q.   Occasionally, the ICO would farm those investigations out

22   to sergeants as well?

23   A.   Yes.

24   Q.   So it wouldn't be uncommon for a sergeant who supervised an

25   officer to be asked to investigate an allegation against that

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 9 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 34 of 177    1834
D428FLO2                    Mauriello - direct

1    officer that he supervised, correct?

2    A.    As long as the sergeant wasn't personally on the scene when

3    the allegation was made.

4    Q.    But assuming he wasn't on the scene, he could still be

5    called to investigate an officer that he supervises, correct?

6    A.    Yes.

7    Q.    What you're saying is the only limitation would be, if in

8    fact he was on the scene, then you would find somebody else to

9    do the investigation, correct?

10   A.    Yes.

11   Q.    After that investigation was completed, they would come

12   back to your desk, right?

13   A.    When it was all done, it would come back to my desk.

14   Q.    And you would review it and send it back on to the borough?

15   A.    Yes.   Well, I review it, send it to my lieutenant, make

16   sure we have to file it, send it to the borough.

17   Q.    During the time you were the commanding officer of the 81st

18   Precinct, you don't ever recall receiving a recommendation from

19   the Office of the Chief of Department to discipline any officer

20   that had conducted an illegal stop and frisk, right?

21   A.    To the best of my knowledge, no.

22   Q.    You know what CompStat is, do you not?

23   A.    Yes, I do.

24   Q.    Tell us what CompStat is.

25   A.    CompStat is --

1   Q.   Just briefly.  I know it's a long process.

2   A.   CompStat brings down a borough.  If it's Brooklyn North, it

3   will bring down ten precincts, housing and transit, that work

4   in that area, and they would go over crime trends and crime

5   spikes and violence.

6   Q.   On occasion you would attend CompStat meetings in your role

7   as the commanding officer of the 81st Precinct, correct?

8   A.   Yes.  And I still go to CompStat.

9   Q.   I'm sorry?

10  A.   I still go there as an XO.

11  Q.   You still go there as the executive officer of the transit

12  borough, correct?

13  A.   Of course.

14  Q.   Is it your testimony that from time to time UF-250s would

15  be discussed at CompStat meetings?

16  A.   My testimony was that when we go to CompStat, we talk about

17  a crime trend, and they want to know what my plan is and my

18  deployment, and they will put it up on the map.  And then they

19  will see what time the crime was happening and what my

20  enforcement is and the violence around it.  And I did testify

21  saying the only time they talk about a 250 was if they did

22  their own -- I guess before we went to CompStat -- they ran a

23  sampling, and if somebody might have been wanted that we

24  stopped on a 250, then my officers might not have known it,

25  they might bring up, this guy you stopped was in the area, he

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 11 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 36 of 177   1836
D428FLO2                    Mauriello - direct

1   is a bad guy, he has got an active warrant, and put the picture

2   up.  That's the only time they ever talk about 250s.

3   Q.  In your experience, they don't actually pull out an

4   individual 250, generally, and discuss the circumstances of

5   what is in that document, correct?

6   A.  No, they don't do that.

7   Q.  And you said the purpose is to analyze crime trends and you

8   look at the location and then you match it with the

9   enforcement, correct?

10  A.  We do a plan.  They put it up on a map.  We have a robbery

11  spike in, say, a certain area, let's say Sector Allen, and I

12  might put a plan out, a foot post or anticrime.  They will look

13  at it.  If the robbery is happening between 3 in the afternoon

14  and 11 at night, they will look to see what kind of enforcement

15  I have between 3 in the afternoon and 11 at night.

16          THE COURT:  I would like to interrupt now just to stop

17  for the morning recess and reconvene at quarter of on that

18  clock.

19          (Recess)

20  BY MR. MOORE:

21  Q.  Inspector Mauriello, when Chief Hall told you were going to

22  the transit borough, he described it as a reward, correct?

23  A.  Yes.

24  Q.  So I suppose that's technically not a promotion, but it's a

25  reward for the job you did at the 81st Precinct, correct?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 12 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 37 of 177   1837
D428FLO2                     Mauriello - direct

1    A.   Yes.

2    Q.   Now, before the break you were talking about CompStat, and

3    if I understand what you were saying, CompStat involves the

4    process of locating crime trends and then pairing that up with

5    enforcement activity that is taken to deal with those crime

6    trends or spikes, correct?

7    A.   Yes.

8    Q.   And that activity that is being used that is identified as

9    relating to the crime trends, that's arrest activity, that's

10   summons activity, that's 250s, correct?

11   A.   Doing an overall plan, yes.

12   Q.   That's certainly part of the analysis, correct?

13   A.   Yes.

14   Q.   When you go to CompStat meetings, a precinct command

15   profile is prepared, right?

16   A.   Yes.

17   Q.   And you did that several times when you were the CO of the

18   81st Precinct, correct?

19   A.   Yes.

20   Q.   That summarizes the enforcement activity in the precinct,

21   correct?

22   A.   It summarizes the enforcement activity in the precinct

23   profile?   It's different stuff on the precinct profile compared

24   to a CompStat sheet.

25   Q.   Does the precinct command profile that's passed out of

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 13 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 38 of 177   1838
D428FLO2                    Mauriello - direct

1  CompStat, does that indicate for a certain period of time the

2  number of arrests, the number of summonses, the number of 250s?

3  A.  I have got to reflect.  I know there's 250s on there, I

4  know there's overtime and CCRBs.

5  Q.  What about arrests and summonses, you think that's there?

6  A.  It's on the CompStat sheet, our CompStat sheet.

7  Q.  Whether it's a precinct command profile or a CompStat

8  sheet, when you go to the CompStat meetings, you or somebody in

9  your position would be presenting CompStat with a summary of

10 your enforcement activity for the period that's being looked

11 at, correct?

12 A.  Yes.

13 Q.  And with respect to 250s, that would compare the number of

14 250s done at a certain point in the past to what is being done

15 at present, correct?

16 A.  I believe on the command profile.

17 Q.  You don't recall, do you, at those CompStat meetings that

18 there was ever a discussion about whether the stops and frisks

19 that would be recorded in those 250s are ever legal or

20 constitutional, you don't recall such a discussion at CompStat,

21 do you?

22 A.  No.

23 Q.  I didn't hear you.

24 A.  No.

25 Q.  And you don't recall discussing that in any other meetings

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 14 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 39 of 177   1839
D428FLO2                        Mauriello - direct

 1   that you had in the NYPD, correct?

 2   A.   I had a borough -- I had my own every payday meeting with

 3   my officers.

 4   Q.   You didn't discuss the legality or the constitutionality of

 5   stops and frisks at the borough commanders' meeting, did you?

 6   A.   I had my own payday meeting with my supervisors.

 7            THE COURT:  At that meeting, did you discuss the

 8   constitutionality of the stops?

 9            THE WITNESS:  No, we didn't talk about

10   constitutionality.  We went over 250s, if there was mistakes on

11   it.

12            THE COURT:  You didn't discuss the legality --

13            THE WITNESS:  No.

14            THE COURT:  -- of individual stops?

15   Q.   You have never had that kind of a discussion with the chief

16   of patrol, correct?

17   A.   No.

18   Q.   You have in the past, in your position as commanding

19   officer of the 81st Precinct, had occasions when you observed

20   that 250s had not been prepared properly, correct?

21   A.   Yes.

22   Q.   That typically in your experience involves the form not

23   being filled out properly, right?

24   A.   The form not being filled out properly.

25   Q.   Other than that, other than whether the form was filled out

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 15 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 40 of 177   1840
D428FLO2                        Mauriello - direct

1    properly, you don't recall any other issues at those precinct

2    meetings with your supervisors with respect to any discussion

3    about stop, question and frisk?

4    A.   No.  My supervisors know the law.

5    Q.   The question is you don't recall any discussions with your

6    supervisors about the legality or the constitutionality of a

7    particular stop and frisk at any of those meetings with your

8    supervisors, correct?

9    A.   No.

10   Q.   Now, you obviously know Deputy Chief Marino, correct?

11   A.   Yes.

12   Q.   He was your supervisor, at least one of your supervisors

13   for some period of time, correct?

14   A.   Yes.

15   Q.   Was he the executive officer the entire time you were in

16   the 81st Precinct?

17   A.   He might have been the commanding officer of the 75 before

18   I became the CO.  I'm not sure.

19   Q.   While you were in the 81st Precinct, was he the commanding

20   officer of the 75th Precinct for a period of time?

21   A.   He might have been -- when I was the XO, he might have been

22   the commanding officer.

23   Q.   You were aware that allegations had been made against him

24   in the 75th Precinct that he maintained quotas, correct, you

25   were aware of that?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 16 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 41 of 177    1841
D428FLO2                              Mauriello - direct

1    A.   Yes.

2    Q.   And you knew that an arbitrator had found, in fact, that he

3    had set quotas for enforcement activity in the 75th Precinct,

4    correct?

5    A.   Yes.

6    Q.   I'm sorry?

7    A.   Yes.   It was in the paper.

8    Q.   This is the same Chief Marino who you met with on a regular

9    basis while he was the executive officer of patrol borough

10   Brooklyn North?

11   A.   I didn't meet on a regular basis.

12   Q.   You met at least twice a month?

13   A.   Yes.   He is one of many in the room, yes.

14   Q.   Do you recall whether Chief Marino was ever disciplined for

15   having been found to have maintained quotas at the 75th

16   Precinct, do you know if he was ever disciplined?

17   A.   I don't know.

18   Q.   Not to your knowledge, right?

19   A.   Not to my knowledge.

20   Q.   When you met with Chief Marino -- withdraw that.

21            In those twice a month meetings when you met with the

22   executive officer of the patrol borough Brooklyn North, you

23   don't recall any issues of stop and frisk or racial profiling

24   being discussed, do you?

25   A.   No.

1    Q.   That's true even after that publicity about what was going

2    on in the 81st Precinct, even after all that publicity, there

3    was no discussion with Chief Marino about whether there was

4    racial profiling going on in the 81st Precinct?

5              MS. GROSSMAN:   Objection.  Foundation.  Publicity.  I

6    don't know what time period.

7              MR. MOORE:   I will lay a foundation.

8    Q.   Do you recall a series of articles in the Village Voice?

9    A.   I believe the first one was in May of 2010.

10   Q.   In May 2010, were you still the commanding officer of the

11   81st Precinct?

12   A.   Yes, I was.

13   Q.   Chief Marino was the executive officer of patrol borough

14   Brooklyn North, right?

15   A.   Yes.

16   Q.   The series of articles in the Village Voice, do you recall

17   that?

18   A.   Yes.

19   Q.   Those articles referred to or contained allegations that

20   quotas were being maintained in the 81st Precinct?

21   A.   The article, yes.

22   Q.   But you never discussed that with Chief Marino, right?

23   A.   No.

24   Q.   You were never present in a meeting with Chief Marino or

25   any of his supervisors where the allegations in that article

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 18 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 43 of 177   1843
D428FLO2                        Mauriello - direct

1   were discussed with him, correct?

2   A.  No one ever discussed the article with me.

3   Q.  Now, are you familiar with the concept of team led

4   enforcement?

5   A.  Yes.

6   Q.  Am I accurate in stating that team led enforcement is when

7   a sergeant or a lieutenant takes a group of police officers out

8   into the field and targets a specific area in the precinct,

9   correct?

10  A.  Yes.

11  Q.  The purpose of that is to try to get enforcement activity

12  at that location, correct?

13  A.  The purpose is he is going to the area where we are having

14  either shootings or a high rise in crime.  So omnipresence is

15  part of it.

16  Q.  One of the goals is to get activity in those locations,

17  right?

18  A.  If there is activity to be had, yes.  If there is no

19  activity, there is no activity.

20  Q.  One of the occasions when you do team led enforcement is

21  when the squad activity is too low, correct?

22  A.  We might do it if you have extra personnel, and we might do

23  team led enforcement if shootings are up, yes, we'd do it that

24  way.  Not lack of activity.  Not always.

25  Q.  I appreciate that answer, but my question is, is one of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 19 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 44 of 177    1844
D428FLO2                    Mauriello - direct

1  times when you do team led enforcement when the squad activity

2  is, in your judgment, too low?

3  A.  Again, a lot of times team led enforcement, I leave it up

4  to my platoon commander when he wants team led enforcement.

5  But if I have violence, I will tell them to do team led

6  enforcement.

7  Q.  I appreciate that, but if you can answer that question yes

8  or no, I would appreciate it.  Is one of the times when you do

9  team led enforcement when you believe that the squad activity

10  is too low?

11  A.  Yes.

12  Q.  So one of the purposes is to direct officers into a

13  location where their activity can increase, correct?

14  A.  We send them to the location where there is crime trends

15  and quality of life conditions.

16  Q.  So the purpose is to try to get the activity up, right?

17  A.  The purpose is to try to stop the crime.

18  Q.  One of the ways you do that is by increasing the

19  enforcement activity, correct?

20  A.  It's quality.  We want quality, not quantity, sir.

21  Q.  I understand that.  That also means you're trying to

22  increase the activity, whether it's quality or quantity, you're

23  trying to increase the activity there, correct?

24  A.  Yes.

25  Q.  Thank you.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 20 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 45 of 177  1845
D428FLO2                    Mauriello - direct

1    Do you recall, Inspector Mauriello, giving a statement

2    to individuals within the police department on August 11, 2010

3    involving allegations of quotas at the 81st Precinct?

4    A.   Yes.

5         MR. MOORE:  That's Exhibit 298.  We move the admission

6    of Exhibit 298.

7         MS. GROSSMAN:  We object on the same basis we objected

8    when the same type of transcript was offered with respect to

9    Chief Marino.  But given that we understand what the Court's

10   ruling is going to be, we accept it and admit it subject to our

11   objection.

12        THE COURT:  It's reserving your objection, but I am

13   admitting the document.

14        (Plaintiff's Exhibit 298 received in evidence)

15        MR. MOORE:  Can you pull up Exhibit 298, Plaintiffs'

16   Exhibit 298?

17        MS. GROSSMAN:  I just wanted to remind the Court that

18   the exhibit was only admitted for purposes of notice.  It had a

19   very narrow purpose.

20        THE COURT:  OK.

21        MR. MOORE:  You can leave it right there for the time

22   being.

23   BY MR. MOORE:

24   Q.   At this interview of you on August 11, 2010, you were

25   present and you were represented by an attorney, correct?

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 21 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 46 of 177    1846
D428FLO2                        Mauriello - direct

1    A.   Yes.

2    Q.   You were read certain rights that are given to all officers

3    who are under investigation, correct?

4    A.   Yes.

5    Q.   So you understood at that time that this was an

6    investigation, at least in part, of your conduct in the 81st

7    Precinct, correct?

8    A.   Allegations, yeah.

9    Q.   It was an investigation of allegations made against you,

10   correct?

11   A.   Yes.

12   Q.   You were asked questions and you gave answers to those

13   questions, right?

14   A.   Yes.

15        MS. GROSSMAN:   This appears to be set up for improper

16   impeachment.

17        THE COURT:   I thought so far he is just laying a

18   foundation that it is a sworn statement, a statement under

19   oath.

20        MR. MOORE:   Right.

21   Q.   You were under oath when you gave testimony on that

22   occasion, correct?

23   A.   Yes, sir.

24   Q.   One of the things you talked about in that statement was an

25   officer in the precinct who you believed was not a productive

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 22 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 47 of 177   1847
D428FLO2                    Mauriello - direct

1    member of the command, correct?

2    A.    They asked me about him, yes.

3    Q.    We don't have to get his name for the record, but they

4    asked you about that person's activity with respect to arrests,

5    summonses and 250s, correct?

6    A.    Yes.

7    Q.    And you told the NYPD at that point that that person was

8    not a productive member of the command, correct?

9    A.    Yes.

10   Q.    That was based, in your judgment, on his overall activity

11   in terms of summonses, arrests, and 250s, correct?

12   A.    I also said, if you read it, about his personality, he

13   wasn't taking direction well from his supervisors.

14   Q.    But with regard to his activity, the activity involved is

15   arrests, summonses, and 250 activity, correct?

16   A.    Yes.

17   Q.    On that occasion, in that meeting, you denied there were

18   quotas in the 81st Precinct, do you recall that?

19   A.    There are no quotas.

20   Q.    So the answer is, at that hearing, or at that meeting, or

21   however you want to describe it, you denied that there were

22   quotas, correct?

23   A.    Right.

24   Q.    But you did say that there were productivity standards that

25   officers were expected to meet, correct?

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 23 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 48 of 177   1848
D428FLO2                     Mauriello - direct

1   A.   Correct.

2   Q.   You also indicated that if they don't meet those

3   productivity standards, they can be disciplined in some

4   fashion, correct?

5   A.   Correct.

6   Q.   When you are referring to productivity standards, you're

7   referring to enforcement activity, correct?

8   A.   It's overall.  When we do evaluations, productivity, yes.

9   Q.   We are talking about productivity.  So I want you to focus

10  on the word productivity.  Is that referring to an officer's

11  enforcement activities?

12  A.   Yes.

13  Q.   That enforcement activity involves arrests, summonses, and

14  250s, correct?

15  A.   Yes.

16  Q.   So it's your opinion that if an officer doesn't meet

17  certain productivity standards with regard to arrests,

18  summonses and 250s, that that officer can be disciplined in

19  some fashion, correct?

20  A.   He gets counseled all year.  So he has an immediate

21  supervisor.  So by the time it comes to me at the end of the

22  year, the evaluation is already written.  So yes.

23  Q.   He can be disciplined, correct?

24  A.   Yes.

25  Q.   Now, Inspector Mauriello, you were in court just before you

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 24 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 49 of 177 1849
D428FLO2 Mauriello - direct

1   got on the stand where a series of tape recordings were played,

2   correct?

3   A.   Yes, sir.

4   Q.   You listened to those tape recordings, correct?

5   A.   Yes, sir.

6   Q.   It's not the first time you listened to them?

7   A.   Not the first time.

8   Q.   How many times have you listened to them?

9   A.   Probably too many.

10   Q.   We are going to go over in a minute what you said in some

11   of those meetings, but there was a lot of discussion in those

12   meetings about numbers, correct, on those tapes about numbers,

13   right?

14   A.   We want activity.  So it's not about numbers.  It's about

15   the officer working.  If there is a crime happening, I expect

16   him to make an arrest.

17   Q.   You heard the term numbers being said though, correct?

18   A.   On the tapes, yes.

19   Q.   Those tapes were actually made public sometime ago,

20   correct?

21   A.   I believe back in 2010.

22   Q.   You had never been actually questioned by the police

23   department with respect to any of the matters covered in any of

24   those tapes, correct?

25   A.   No.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 25 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 50 of 177   1850
D428FLO2                        Mauriello - direct

1    Q.   I'm sorry.  I didn't hear the answer.

2    A.   No.

3    Q.   You never discussed with anybody in the police department

4    any allegations about whether there was racial stereotyping or

5    racial profiling going on in any of those tapes, right?  You

6    never had a discussion with anybody in the police department

7    about that, right?

8    A.   Right.

9    Q.   You have never received any -- you were never disciplined

10   for any of those comments that we heard by any of the officers

11   on those tapes, right?

12   A.   Correct.

13   Q.   As far as you know, none of the other officers who spoke on

14   those tapes were disciplined for anything that occurred with

15   respect to what was on those tapes, right?

16   A.   Correct.

17   Q.   In fact, none of those officers were even interviewed about

18   any of the circumstances of what was on the tapes, right?

19   A.   I can't tell you that.  I don't know if they were.

20   Q.   To your knowledge.

21   A.   To my knowledge.

22   Q.   You certainly weren't asked that, right?

23   A.   Right.

24   Q.   Did you ever discuss what was on those tapes with

25   Lieutenant Delafuente?

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 26 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 51 of 177 1851
D428FLO2                    Mauriello - direct

1   A.   No.

2   Q.   Did you ever discuss anything on any of those tapes with

3   Sergeant, now Lieutenant Weiss?

4   A.   No.

5   Q.   Did you ever discuss anything that was on those tapes with

6   a Sergeant Rasheena Huffman?

7   A.   No.

8   Q.   Did you ever discuss anything that was on those tapes with

9   a Sergeant Raymond Stukes?

10  A.   No.

11  Q.   When those tapes first came out, you were still the

12  commanding officer of the 81st Precinct, correct?

13  A.   Correct.

14  Q.   Lieutenant Delafuente still worked for you at that time,

15  right?

16  A.   I'm not sure.  He went to harbor so I don't know if he was

17  already gone by then.

18  Q.   He what?

19  A.   He went to harbor.  I think he was already transferred.

20  Q.   I thought you said Harvard.

21  A.   Harbor.

22  Q.   Do you know what his rank is now?

23  A.   I think he is still a lieutenant.

24  Q.   We know Sergeant Weiss was promoted to lieutenant, and that

25  was after these tapes came out, correct?

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 27 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 52 of 177    1852
D428FLO2                    Mauriello - direct

1   A.  Correct.

2   Q.  Rasheena Huffman, is she still a sergeant?

3   A.  I believe so.

4   Q.  What about Raymond Stukes, has he been promoted from

5   sergeant?

6   A.  I believe he is still sergeant.

7   Q.  Did anyone ever tell you in the police department that some

8   of the statements made by you -- withdraw that.

9           You were the supervisor of Lieutenant Delafuente while

10  you were in the 81st Precinct, right?

11  A.  I was the commanding officer, yes.

12  Q.  He reported to you, correct?

13  A.  Yes.

14  Q.  You supervised all of those individuals, Raymond Stukes,

15  Rasheena Huffman, Sergeant Weiss and Lieutenant Delafuente, you

16  were the commanding officer for all of those individuals,

17  correct?

18  A.  Yes.

19  Q.  Did anybody ever say to you that some of the statements

20  contained in those tapes could be construed as quotas?

21  A.  No.

22  Q.  Before we hear some of the tapes, I want to ask you a

23  couple of questions.  I want to be clear about what your

24  position is with respect to some of the issues that we may hear

25  raised in those tapes.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 28 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 53 of 177   1853
D428FLO2                    Mauriello - direct

1    It's your position, is it not, that you don't use stop

2    and frisk to deter or to instill fear in a certain part of the

3    population, correct? Is that your position?

4    A.   We use 250s when you have a reasonable suspicion that the

5    person is about to commit, did commit, or will commit a penal

6    law, a misdemeanor or a felony.

7        THE COURT: You agree with Mr. Moore that you don't

8    use it to instill fear in certain parts of the population?

9        THE WITNESS: Of course not.

10   Q.   It's your position that as a CO of the 81st Precinct,

11   neither you nor any member of your command team set numerical

12   goals for officers to meet, correct?

13   A.   There was no --

14   Q.   Is that your position?

15   A.   Yes.   There were no numbers.

16   Q.   It's your position, as you sit here today, that as a

17   commanding officer, neither you nor any member of your team

18   used quotas in the 81st Precinct, correct?

19   A.   Yes.   No quotas.

20   Q.   It's your position that as a commanding officer of the 81st

21   Precinct, neither you nor any member of your team put pressure

22   on officers to get numbers up under threat of adverse job

23   consequences, that's your position as you sit here today,

24   correct?

25   A.   No pressure, just do your job.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 29 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 54 of 177   1854
D428FLO2                    Mauriello - direct

1   Q.  It's your position that neither you nor anybody else in the
2   81st Precinct -- withdraw that.

3          It's your position that as a member of the 81st
4   Precinct, you didn't feel pressure from your higher-ups in the
5   borough to increase your enforcement activity, correct?
6   A.  Correct.
7   Q.  It's your position, as you sit here today, that neither you
8   nor your subordinates engaged in any racial stereotyping or
9   racial profiling in any of the comments that we heard in those
10  tapes, correct?
11  A.  Correct.
12  Q.  Before we go to these tapes, I just want to go back to the
13  statement you made, which is Plaintiffs' Exhibit 298, for a
14  moment.

15         Do you recall telling the interviewer there --

16         MS. GROSSMAN:  Your Honor, if I could just have a page
17  and line?  He is obviously reading.

18         MR. MOORE:  If I need to impeach him with it, I will
19  give her the page and line, but I don't know what his answer is
20  going to be.

21         THE COURT:  It doesn't matter.  If you're reading from
22  it, tell her.

23         MR. MOORE:  I am not reading word for word.  I may be
24  using it as a guide.  If I use it to impeach, I will definitely
25  tell her.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 30 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 55 of 177   1855
D428FLO2                    Mauriello - direct

1    THE COURT:  If you read from it, tell her the page

2    number.

3    MR. MOORE:  Page 46, just to be safe.

4    Q.  Do you recall telling the interviewer there that

5    productivity standards were set with respect to arrests,

6    summonses and 250s in the 81st Precinct?

7    A.  Yes.

8    Q.  Is it your position that there were never any consequences

9    if members of the service weren't productive with regard to

10   those activities, is that your position?

11   A.  There would be a consequence if you didn't work all year

12   and you were counseled, mentored, team led, trained by a

13   supervisor, documented all year, and then you got a 2.5.  So

14   that's discipline.

15   Q.  If an officer fails to meet the productivity standards,

16   they can be disciplined, correct?

17   A.  That's part of your evaluation, productivity.  But there

18   are also other parts of the evaluation.

19   Q.  When I say discipline, I mean adverse employment actions

20   could be taken against them, right?

21   A.  Yes.

22   Q.  That includes being denied overtime, right?

23   A.  No.  No one ever got denied overtime.

24   Q.  Well, what about a change of tour or a change of

25   assignment?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 31 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 56 of 177   1856
D428FLO2                    Mauriello - direct

1   A.   That could be possible.  There is a list.  You could get
2   performance monitoring.  It could be a change of tour, a change
3   of -- a transfer out.  That's all part of the personnel review
4   board.
5   Q.   Those would be adverse employment consequences as a result
6   of not fulfilling the productivity standard, correct?
7   A.   We are just asking the guys and -- the fellows and the
8   women to work hard.  That's all.
9   Q.   I understand.  And I appreciate that, and I am sure you are
10  asking them to work hard, and I think that's in part why we are
11  here today.
12        What my question is, if they fail to meet the
13  productivity standards, adverse employment consequences could
14  follow, correct?  Maybe not right away, but at some point,
15  right?
16  A.   Correct.
17  Q.   Inspector Mauriello, I am going to now play some of the
18  tapes that we heard, that you just heard, and I am going to ask
19  you some questions about some of the things we heard on the
20  tapes.  OK?
21  A.   Yes, sir.
22  Q.   Everybody on the tape was somebody that you are familiar
23  with, correct?
24  A.   Correct.
25  Q.   Either a lieutenant under your supervision or a sergeant

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 32 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 57 of 177    1857
D428FLO2                     Mauriello - direct

1   under your supervision, correct?

2   A.   Correct.

3   Q.   In some cases on the tape we can hear your voice, correct?

4   A.   Correct.

5            MR. MOORE:  So if you can play the first track, the 12

6   December 2008 track.

7            MS. GROSSMAN:  What time?

8            MR. MOORE:  Start it at the beginning.  It goes from

9   2:20 to 4:30, I believe.

10            (Audiotape played)

11            THE COURT:  Stop that.

12            MS. GROSSMAN:  Can we give the witness a copy of the

13   transcript of that?

14            THE COURT:  That's a good idea.  I didn't find mine.

15   What is the date?  What date is it?

16            Mr. Moore, which date is it?

17            MR. MOORE:  The first one, 12 December 2008.

18            THE COURT:  The very first one.  OK.

19            (Continued on next page)

20

21

22

23

24

25

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 33 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 58 of 177    1858
D429flo3                    Mauriello - direct

1        MR. MOORE: I'm going to hand you, Inspector

2   Mauriello, the actual written transcripts. What I'd ask you to

3   do is listen to the recording and then if you need to -- if

4   you're confused about something you can refer to the

5   transcript. Okay.

6        THE COURT: You don't listen to him. It's really easy

7   to listen when you can read along. So if I were you, I would

8   read along.

9        MR. MOORE: Do both. Don't listen to me. Listen to

10  the judge.

11       THE COURT: There you go.

12       MR. MOORE: So if you could play the first recording

13  and I'll indicate when I want it stopped.

14            (Audio recording played)

15       MR. MOORE: That's Lieutenant Delafuente speaking,

16  correct?

17            THE WITNESS: Correct.

18  Q.   And he makes mention of specific numbers from each of the

19  people in the car, correct?

20  A.   Correct. But they weren't talked about specific numbers.

21  Q.   But they're talking about he expects at least two from each

22  of them -- each of the occupants of this quality of life car,

23  correct?

24  A.   That's what he said.

25  Q.   That's two enforcement activities, correct?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 34 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 59 of 177   1859
D429flo3                      Mauriello - direct

 1   A.   Yes.   That's what he said.

 2   Q.   Okay.   So that's a specific number that's being told to the

 3   officers at the role call, correct?

 4   A.   Correct.

 5           MR. MOORE:   Keep going.

 6           (Audio recording played)

 7   Q.   You heard that and followed that along, correct?

 8   A.   Yes.

 9   Q.   Now that's referring to enforcement activity with respect

10   to summonses and 250s, right?   That's what Delafuente mentions

11   there, correct?

12   A.   I believe community visits he said too.

13   Q.   I'm sorry?

14   A.   I believe community visits too.

15   Q.   I didn't hear?

16   A.   I've said I believe community visits.

17           THE COURT:   Community visits, he mentions.   But I

18   don't see that.

19           THE WITNESS:   250s and Cs, yeah.

20           Can I explain what a quality of life order is?

21           THE COURT:   Sure.   He wants to explain what a quality

22   of life order is.

23           THE WITNESS:   Thank you.   The judge said I could.

24           THE COURT:   If you can.

25           THE WITNESS:   So I'm going to explain.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 35 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 60 of 177   1860
D429flo3                        Mauriello - direct

 1              MR. MOORE:  She's the judge.  So if she wants to hear

 2     it, go ahead.

 3              THE WITNESS:  Yes.  We used to have impact outside

 4     personnel which was the borough officers, 50 officers.  And

 5     then they get moved at a certain time to another part of

 6     Brooklyn that's having crime problems.

 7              So I have to come up with a plan how to, when you move

 8     these officers out, they're in a very violent area where we had

 9     a lot of problems between three buildings, three different

10     areas with violence and robbery trends, how am I going to put

11     cops in there when I don't have 50 cops to put in like we used

12     to have.

13              So I come up with a plan.  And I have footposts put

14     out there.  Now I don't have that many footposts.  So I put in

15     a certain area, I come up with a quality of life order, which

16     is a mobile moving footpost.  I want that car to cover a

17     certain area.  At the time we're talking about, we're talking

18     about Marcus Garvey to Saratoga; Atlantic to Decatur.  We had

19     three very violent buildings that were at war with each other:

20     120 Chauncey complex, that's 110 Chauncey 94, and 1711 Fulton.

21     Then we had Breevort houses, which is a half a block away,

22     which is a public housing development.  And then we had another

23     building that's independent on -- between Atlantic and Fulton.

24     They call it the Smurf complex.  And then we had Chauncey

25     house, which is a block away.  And all four locations didn't

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 36 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 61 of 177    1861
D429flo3                    Mauriello - direct

1    like each other.  And this goes back for years and years like

2    the Hatfields and McCoys.  There was violence.  If it was

3    gang-related, if it was drug-related, or if it was just they

4    didn't like each other because you came from this block.

5    Q.  Are you still talking about what a quality of life order --

6    A.  Yes, I am, sir.

7        So I put out a quality of life order.  And it's a

8    mobile, moveable footpost.  But they're in a car.  And I expect

9    them to help out the footpost to cover a lot of area, to be

10   omnipresent.  All right.

11       Of course, if they observe a crime I expect, you know,

12   if you have probable cause, arrest somebody.  If they observe a

13   quality of life infraction, I want the condition corrected.  If

14   they are reasonable suspicion to stop somebody, I expect

15   someone to be stopped.  That's their job.

16       They're not on the radio.  They're not being assigned

17   911 jobs.  They're out there only on a major crime where they

18   backup on a 911 job.  They're off the radio.  So it's a mobile

19   footpost.

20       At times, if nothing is going on, I would want them in

21   the car with their lights on, directing patrol on the corner,

22   where people walking home from the subway to go home.

23       They were out there for omnipresence.

24       The people in the community loved it.  They

25   complimented my officers out there.  And also it kept the

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 37 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 62 of 177   1862
D429flo3                    Mauriello - direct

1   criminals, by moving the car back and forth with the lights on

2   and going and getting out of the car, the criminals thought we

3   had more personnel out there. And they thought better not to

4   commit crimes. That's what a quality of life order was.

5   Q.   You expected productivity from the officers in those

6   quality of life orders, correct? Can you just answer it yes or

7   no?

8   A.   If it was out there, yes.

9   Q.   And when Delafuente said we expected at least two from each

10  of you in the car he's not saying two from each of you in the

11  car if there's reasonable suspicion or if there's probable

12  cause, is he?

13       That's not in that transcript, correct? Yes or no?

14  A.   He's not saying that but --

15  Q.   He's not saying that?

16  A.   My officers know that. They're trained.

17  Q.   But it doesn't appear in the transcript?

18  A.   It doesn't appear in the transcript.

19  Q.   Thank you.

20       You say -- actually rather than play the tape and go

21  through a lot. Read, if you will, from page -- from on the

22  same page, the transcript, from line 16. Look at line 16. All

23  right?

24  A.   Yes.

25  Q.   You got that?

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 38 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 63 of 177    1863
D429flo3                    Mauriello - direct

1   A.  Yes, sir.

2   Q.  It says:  You know, your evaluations are based on your

3   activity.  So, you know, I can't give you a four -- a

4   four-and-a-half, a three-and-a-half if you have no activity.

5            That's what Delafuente said at that -- on that

6   occasion on December 12, 2008 in the 81st precinct, right?

7   A.  That's what he said.  But that's not all the activity is

8   based on -- evaluations are based on.

9   Q.  Evaluations are based, at least in part, on your activity,

10  correct?  And if you don't have activity, you're not going to

11  get a good evaluation?

12  A.  Part of it is based on activity.  You got crime.  You got

13  sick record.  Disciplinary record.  How well -- you take well

14  to supervision.

15  Q.  Go to the next tape, the 12 June 2008.  And play that one.

16            MS. GROSSMAN:  What's the timing, the excerpt?

17            MR. MARUTOLLO:  It's 12:10 as to 13:28.  And we'll

18  start at the beginning.

19            (Audio recording played)

20  Q.  That's Sergeant Stukes or Lieutenant Delafuente?

21  A.  I believe Lieutenant Delafuente.

22  Q.  And he's saying that the XO -- is that the XO of the

23  borough or the XO of the precinct?

24  A.  I believe the XO of the precinct.

25  Q.  Came in and said he laid down a number.  Do you see that?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 39 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 64 of 177   1864
D429flo3                    Mauriello - direct

1   He said laid down a number.  Right?  That's what it says?

2   A.   That's what it says but I don't know anything about the

3   so-called number.

4   Q.   But that's what it says in the tape, correct?

5   A.   Correct.

6   Q.   And that's a tape of a roll call?

7            THE COURT:  You know what, would you do me a favor.

8   Stop moving the mic.  Just leave it forward.  Leave it forward

9   the whole time.

10           THE WITNESS:  I talk too loud.

11           THE COURT:  That's okay.  Go ahead.

12   Q.   And that's -- that tape is a tape of a roll call done on

13   the 12th of June 2008 by Lieutenant Delafuente in the 81st

14   precinct, right?

15   A.   Yes.

16   Q.   And so he says:  The XO has a number but I'm not actually

17   going to tell you what it is.

18           But then he does give some numbers.  He said he wants

19   three seat belts, one cellphone, and eleven others.

20           Do you see that?

21   A.   I see that.

22   Q.   Pretty specific numbers, right?

23   A.   Yes.

24   Q.   And the others, what's that refer to?  Summonses?  250s?

25           Do you know?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 40 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 65 of 177   1865
D429flo3                     Mauriello - direct

 1   A.   This is news to me.   There is no such thing as set numbers
 2   in the precinct.
 3   Q.   And then he says, going forward, he says:   So if I was on
 4   patrol, I'd be sure to get three seatbelts, one cellphone, and
 5   then the eleven others.   That's what he says, right?
 6   A.   Yes.
 7   Q.   And then -- but it's your testimony that this is all news
 8   to you.   You never heard that discussion in the 81st precinct?
 9   A.   There was never a set number in the 81st precinct.
10   Q.   Well apparently on December -- on June 12, 2008 there was a
11   set number set by Lieutenant Delafuente in the roll call,
12   correct?
13   A.   That's what it says.
14            THE COURT:   That's what he says.
15            THE WITNESS:   That's what he says.
16            But that's not what I say.
17            THE COURT:   All right.
18   Q.   Lieutenant Delafuente held what position in June of 2008?
19   A.   He was platoon commander.
20   Q.   So he was a platoon commander of what platoon?
21   A.   I believe the third platoon.
22   Q.   What shift?
23   A.   Three to eleven, three in the afternoon to eleven at night.
24   Q.   And so he was one of your senior supervisors in the 81st
25   precinct, correct?

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 41 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 66 of 177  1866
D429flo3                    Mauriello - direct

1   A.   I guess, yes.

2   Q.   Why don't we go to the next recording which is 13th of

3   January, 2009 which is a roll call from the 3:02 to 4:26.

4              (Audio recording played)

5   Q.   Who is -- is that Sergeant Reade talking?

6   A.   That's Lieutenant Delafuente.

7   Q.   So Lieutenant Delafuente.  Okay.  So this -- this is on

8   13th of January 2009.  This is a roll call in the 81st

9   precinct, correct?

10  A.   Yes.

11  Q.   So continue playing if you would.

12             (Audio recording played)

13  Q.   GLA is what?  Grand larceny auto, right?

14  A.   Yes, sir.

15  Q.   And is it true that at some point while you were the

16  commander of the 81st precinct the borough began to supervise

17  the activity of the precinct in a more complete way?

18             Let me withdraw that question.

19             Is it true that at some point when you were the

20  commander of the 81st precinct that the borough began to get

21  more involved in finding out what was going on within the

22  precincts?

23  A.   Yes.  They had platoon command staff.

24  Q.   So what would happen was the platoon commanders of each

25  precinct would all go to a meeting at the borough office,

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 42 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 67 of 177   1867
D429flo3                    Mauriello - direct

1    correct?

2    A.   Yes.

3    Q.   And they would talk about everything, the activity,

4    everything?  It's all listed there, right?

5    A.   They broke down the person's platoon as a mini precinct.

6    And the lieutenant was almost like the commanding officer.  He

7    would talk about his personnel and the crime trends.

8    Q.   And you interpreted that as the borough getting tighter and

9    tighter in regards to the accountability of the precinct,

10   right?

11   A.   I don't believe I said that on tape but the borough was --

12   Q.   Do you agree with that?

13   A.   Holding them more accountable, yes.

14   Q.   But you agree they were getting tighter and tighter,

15   correct?

16   A.   Holding platoon commanders more accountable.

17   Q.   And being accountable in part meant being accountable for

18   their enforcement activity, correct?

19   A.   They were looking to see how they were working the platoon,

20   the whole platoon, how they were working.

21   Q.   And part of that was their enforcement activity?

22   A.   Enforcement to crime trends, yes.

23   Q.   And when we say enforcement activity, we're talking about

24   250s, C summonses, or summons and arrests, correct?

25   A.   Also looking at verticals, if you have problems with

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 43 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 68 of 177    1868
D429flo3               Mauriello - direct

1   building verticals. Radio runs. Domestic violence, very big.

2   Domestic incident reports. Are we making arrests on domestic.

3   It's a very big topic.

4   Q.  It included, did it not, looking at the numbers for 250s

5   and for summonses, correct?

6   A.  Looked at --

7   Q.  That's one of the things?

8   A.  Some of the things. That's some of the things.

9   Q.  If you could go to the next tape. Which is 15 July 2008.

10  Which I believe is a short tape of 35 seconds to 50 seconds.

11          (Audio recording played)

12  Q.  So this is the Lieutenant Delafuente again, correct?

13  A.  Correct.

14  Q.  At a roll call in the 81st precinct, correct?

15  A.  Correct.

16  Q.  Do you know -- do you recall if you were present for that

17  role call?

18  A.  Yes, I was.

19  Q.  So you recall being present for this particular role call?

20  A.  I was present. I talked on this roll call for like seven

21  minutes. But, again, I might have walked in right after this.

22  So I don't know.

23  Q.  So in this -- this excerpt he says: I want a couple of

24  250s out there.

25          Right? That's what he says, right?

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 44 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 69 of 177   1869
D429flo3                    Mauriello - direct

1    A.    Yes.   I could explain about the location, your Honor.

2                 THE COURT:   Go ahead.

3                 THE WITNESS:   Yeah, thank you.

4                 THE COURT:   Go ahead.

5                 THE WITNESS:   This is a week after we had five people

6    shot in the back of 969 Gates.   It was a barbecue that went on

7    until 3:00 in the morning.   There was DJs, double-parked cars.

8    We had five people shot.   An innocent young lady, 17-years-old,

9    lost her life.   You hear me talking on the tape at the same

10   time about other places in the city with the barbecues.   But we

11   had a lot of violence there.

12                And the crime went unsolved.   There was 35 witnesses.

13   No one stepped forward.   So, again, the building was very

14   nervous.   The community was very nervous.   I put officers out

15   there to make sure they felt very good.   And my officers, there

16   was a building across the street, all the same complex.   They

17   actually went across the street, in the same complex -- we had

18   two officers out there -- and they actually recovered a firearm

19   that's on this thing in the hallway.

20                So we get tips from the tenant board association.

21   They were very afraid what happened because the guy who they

22   believed who did the shooting, no one stepped forward, still

23   lived there.   He was shot.   He was in a wheelchair.   They were

24   afraid.

25                So my officers were put out there for a reason.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 45 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 70 of 177   1870
D429flo3                    Mauriello - direct

1        So, again, the 250, if they have reasonable suspicion

2   to stop someone, then they got to stop someone.  But their

3   orders are not out there just to do 250s.  They're out there to

4   be omnipresent and make sure the block is safe.

5        THE COURT:  The person does say I want a couple of

6   250s out there.

7        THE WITNESS:  He's says it.  Again, if it's out there,

8   it's out there.  If it's not out there, there is no punishment

9   coming back if there is no 250s.

10       THE COURT:  I thought you were going to stop doing

11  that.

12       THE WITNESS:  I'm so sorry.

13       THE COURT:  You're going to break it.  Leave it

14  forward.

15       THE WITNESS:  Okay.

16       THE COURT:  There you go.

17  Q.   You have a loud voice.

18  A.   I know I do.  It's a curse unfortunately, so.

19  Q.   Just sit up straight.  You don't have to keep going back

20  and forth.

21  A.   Sometimes I talk loud.

22  Q.   Whatever comfortable position you want to be in.

23       All right.  So, he says there:  I want a couple of

24  250s.  He doesn't say anything else about it.  He just says I

25  want a couple of 250s, right?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 47 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 71 of 177    1871
D429flo3                   Mauriello - direct

1   A.   But you hear me talk for eight minutes afterwards.  I

2   explain everything that's going on.  That's what I'm saying.

3   Q.   So that's, once again, at a roll call, the platoon

4   commander telling the troops that he wants a particular -- a

5   specific number, correct?

6   A.   He wants his officers engaged out there, yes.

7   Q.   But he said I want a couple of 250s.  So that's two 250s,

8   right?

9   A.   Yeah, he said that.  But, again, there was no punishment if

10  he didn't come back --

11  Q.   All I'm asking is whether he said that.

12            THE COURT:  You don't need to ask him.  I've heard it.

13  It's on the tape.  That's it.

14  Q.   But he didn't qualify it in any way, right?

15            THE COURT:  The tape says what it says, Mr. Moore.

16            MR. MOORE:  All right, Judge.

17            Why don't you go now to the 1st November 2008 tape.

18  And the passage is from 2:12 to 3:50.

19            (Audio recording played)

20  Q.   So that's Lieutenant Delafuente, correct?

21  A.   Correct.

22  Q.   And that's at a roll call in the 81st precinct on

23  November 1, 2008, correct?

24  A.   Correct.

25  Q.   Did you ever hear him make reference to the -- the

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 48 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 72 of 177  1872
D429flo3                      Mauriello - direct

 1   community, the people in the community of Bed-Stuy as "everyone
 2   probably got a warrant," ever hear him use that before?
 3   A.   Never heard him.  And if you listen to all my tapes, I say
 4   98 percent of the people in the community are hard-working
 5   people.  It's the two percent, the criminals my officers deal
 6   with.  I say it on every tape.
 7   Q.   I'm not asking about what you say.  I'm asking you about
 8   what Lieutenant Delafuente --
 9   A.   He never said that in front of me.
10   Q.   But he says it on the tape, correct?
11              THE COURT:  You don't need to --
12              THE WITNESS:  He says it on the tape.
13              MR. MOORE:  Judge --
14              THE COURT:  I just got to watch the time here.  I
15   don't want this to last two months if it doesn't have to.  I
16   see it on the tape.  He said it on the tape.  That's the end of
17   that question.
18              MR. MOORE:  I understand, Judge.
19              THE COURT:  I'm not going to allow you to ask him
20   anymore whether it's on the tape.  It's on the tape.
21              MR. MOORE:  I'm not --
22              THE COURT:  Mr. Moore, move on.  Don't fight with me.
23   You cannot ask him if it's on the tape.  That's the end of
24   that.
25   Q.   Did you ever hear any other officer in the precinct --

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 49 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 73 of 177   1873
D429flo3                    Mauriello - direct

1   withdraw that.

2          Do you think making a reference to somebody as

3   everybody -- you're working in Bed-Stuy where everyone's

4   probably got a warrant, that that's racial stereotyping.  Do

5   you think that?

6   A.  I don't agree with that statement.

7   Q.  Okay.

8   A.  We had a very good relationship with the community.  The

9   community --

10          THE COURT:  That wasn't his question.  Do you think

11   that statement is racial stereotyping?

12          THE WITNESS:  No.  I don't think he meant it as racial

13   stereotyping.

14          THE COURT:  No.  He doesn't think so.  Next question.

15   Q.  Go to 27 February 2009 roll call.  The time is 2:35 to

16   6:21.

17          THE COURT:  Would the defense mind if we work from the

18   transcript only at this point, didn't hear the tape anymore?

19          MS. GROSSMAN:  That's fine.

20          THE COURT:  So 27 February 2009.

21          MS. GROSSMAN:  2:35 to?

22          THE COURT:  2:35 to 6:21.

23          Now what part do you want to focus on first?  You can

24   read it.

25   Q.  This is Lieutenant Delafuente, correct, at this roll call?

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 50 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 74 of 177 1874
D429flo3                    Mauriello - direct

1    A.   Yes.

2    Q.   And it's on 27 February 2009.

3         And he says, um to reiterate what the sergeant touched

4    on --

5         MS. GROSSMAN:   Line number?

6         MR. MOORE:   The beginning.

7    Q.   If you out on the footpost, you need activity.  You got to

8    get 250s.  You got to get Cs.  But you got to get community

9    business, okay.

10        And then he says a couple lines down, Please get out,

11   get some activity.

12        Do you see that?

13   A.   Yes.

14   Q.   So Delafuente is telling the troops that he wants activity;

15   specifically, he wants 250s and Cs, correct?

16   A.   Yes.  He also said he doesn't want them sitting in the car

17   reading the newspaper.

18   Q.   And one of the reasons that they -- that he and you want

19   that activity is to be able to demonstrate to the command

20   structure that you're attempting to deal with crime patterns,

21   correct?

22   A.   We wanted to keep crime down.

23   Q.   Would you answer that yes or no?

24   A.   Crime down and quality of life conditions.  That's what

25   we're out there for.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 51 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 75 of 177    1875
D429flo3                         Mauriello - direct

1    Q.   So one of the reasons you and Delafuente would say go get

2    250s or go get Cs is so you can demonstrate to your superiors

3    that you're addressing crime conditions?

4    A.   No.

5    Q.   In your precinct.  Would you agree with that?

6    A.   No.  He's telling them he wants them to work.  If it's out

7    there, and he observes it, he wants them to work.  That's what

8    he's telling these officers.

9    Q.   Well he's also saying, if you look at line 24:  If you have

10   250s or if you have community visits, it shows that you are

11   making an attempt to deter crime, right?

12   A.   Where does it say that?

13   Q.   Do you see that?

14            THE COURT:  Beginning on line 24.

15            THE WITNESS:  Delafuente 701 all right.  That's

16   directly.  That's what it says on 24.

17   Q.   Did I read that correctly?

18   A.   No.  That's the wrong line.  I didn't know --

19            THE COURT:  I don't know where you are either.

20            MR. MOORE:  Line 24.  Going down the page.

21            THE COURT:  Line 24 says 701, all right.

22            Are you on a different --

23            MR. MOORE:  No, no.  That first part of line 24, the

24   first 24.

25            THE COURT:  The -- I see.  You have 250s or if you

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 52 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 76 of 177   1876
D429flo3                    Mauriello - direct

1    have community visits it shows that you are making an attempt

2    to deter crime.  The first 24.

3            THE WITNESS:  Yes.  Community visits, yes.

4    Q.   And 250s, right?

5    A.   That's what he said.

6    Q.   And you're making an attempt to deter crime and you're

7    making a -- and that would be conveying to your superiors at

8    the borough that you're making an attempt to deter crime,

9    right?

10   A.   He's telling the officers to do 250s.  Again, you have to

11   have reasonable suspicion to do 250s.  The officers know that.

12   He's saying if it's out there, do it.  But do community visits.

13   Q.   That's not what he said.  He doesn't say if it's out there

14   do a 250.  He says --

15   A.   That's how I'm taking this.  That's how I'm taking it.

16   He's talking to his officers.

17   Q.   If you have 250s, and we'll look good because it's making

18   an attempt to deter crime, right?

19   A.   You see before that it's about shootings.  They're out

20   there for shootings.  There was a shooting there the other day.

21   So he wants to make sure there is no more shootings.

22   Q.   Let me ask you if you agree with this.

23           When your superiors in the borough will discuss what's

24   going on in the precinct with you, they would want to see you

25   make what efforts are being made in the precinct to address

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 53 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 77 of 177    1877
D429flo3                    Mauriello - direct

 1   crime patterns, to deter crime, correct?

 2   A.   Yes.

 3   Q.   And one of the ways -- one of the things they'd look at is

 4   whether there's 250s, arrests, and summonses, correct?  That's

 5   one of the things that they look at?

 6   A.   They also look at in the area radio runs.

 7           THE COURT:  But that's not fair to not answer --

 8   that's one of the things.

 9           THE WITNESS:  One of the areas, sorry, your Honor.

10   That's one of the things they look at.

11           THE COURT:  Okay.

12           THE WITNESS:  Or one, two, three.

13   Q.   Move down to -- on this document to the sentence that

14   begins on line eleven, it's the second line eleven that appears

15   on the document.  And it says:  If you want to venture down and

16   talk to them, get a name, that's fine.  If you want to just

17   grab someone going in, one of the tenants going in, you know,

18   if they want to stop and talk to you, then get a name and a

19   number.

20           Do you see that?

21   A.   Yes.  I believe he's talking about community visits.

22   Q.   He's saying grab someone, one of the tenants going into the

23   building, right?  In other words, stop them, right?

24   A.   He's talking about community visits.  If they want to talk

25   to them, community visit -- put down a name on a piece of

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 54 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 78 of 177 1878
D429flo3          Mauriello - direct

1  paper. You did a community visit.

2       THE COURT: I don't think this whole line of question

3  is productive. He's telling us what he thinks the man is

4  saying. And generally I wouldn't allow that for a minute. The

5  man said what he said. He doesn't know what he meant. You

6  don't know what he meant. You're just arguing with each other.

7  This is what he said. For him to interpret to say what he

8  really meant was, that's not useful.

9       MR. MOORE: I agree, Judge. But I think, given that

10  these are people under his supervision.

11       THE COURT: You want an interpretation of a simple

12  English sentence, you're getting his gloss on what somebody

13  else said. That's not right.

14       It's an objectionable question. So I'm sustaining my

15  own objection.

16       MR. MOORE: I'll move on then.

17       THE COURT: That's good.

18  Q. Let's go to January 28, 2009. Which is the four to twelve

19  roll call. The time is 24:29 to 25:50.

20       THE COURT: You found it? You know where he is?

21       THE WITNESS: What line?

22       THE COURT: Sorry?

23       THE WITNESS: This one. I just want to see what line.

24       THE COURT: As long as you know where we are.

25       THE WITNESS: Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 55 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 79 of 177  1879
D429flo3                    Mauriello - direct

 1   Q.   Looking at line 19.  This is again -- who is speaking here.
 2   This is Delafuente?
 3   A.   Yes.
 4   Q.   He says, beginning on line 19:  So, you know, you're going
 5   to get some orders that you may not like.  You're going to get
 6   instructions.  You're going to get disciplinary action,
 7   whatever, you know, you got to just pick up your work because,
 8   like he said, I don't want to hurt you.  All right.
 9           Is he referring there to orders meaning -- I'm just
10   going to ask him.  And if he says --
11           THE COURT:  He doesn't know what he's referring --
12           MR. MOORE:  I don't know that he doesn't know.
13           THE COURT:  I know.  You can't be in somebody else's
14   mind.  He can start giving you his own theories and
15   interpretations.  I don't know how that helps, frankly, you or
16   anybody else.  But he doesn't know.  And we don't usually let
17   another person say what another person meant.
18           MR. MOORE:  All right.  So you can't -- you don't
19   know.
20           THE COURT:  I won't let him say what he thinks the
21   other fellow meant.  I'll figure out what I think he meant.
22   That's it.
23           MR. MOORE:  All right, Judge.
24           THE COURT:  He said what he said.
25           MR. MOORE:  Maybe what Delafuente comes if he

D429flo3                          Mauriello - direct

 1  testifies we can ask him.

 2          THE COURT:  That's right.  You can ask him what was in

 3  his mind.

 4          MR. MOORE:  Although he's the commander of the

 5  precinct.  So I think it's relevant.

 6          But I'll move on.

 7          THE COURT:  It's never relevant to ask him what he

 8  thinks somebody else meant.  We don't allow those questions and

 9  you'd be the first to object if the other side did it.

10          MR. MOORE:  My question wasn't what he thinks.  My

11  question is what he understands that language to mean.

12          THE COURT:  That's a rephrasing.  That's the first

13  time you phrased it that way.

14          MR. MOORE:  Well --

15          THE COURT:  Yeah, it is.

16          All of the other times it was:  What do you think he

17  meant when he said.  And that's just the wrong question.

18          MR. MOORE:  I'll move on, Judge.

19  Q.  January 29, 2009 roll call.  Do you see that?

20          THE COURT:  That's the next one.

21          MR. MOORE:  The time is 6:20 to 6:48.  It is the next

22  one on the list.

23          THE COURT:  Short one.  Do you see it?

24          MR. MOORE:  It's the short one.

25  Q.  Do you have that in front of you?

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 57 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 81 of 177    1881
D429flo3                    Mauriello - direct

 1              THE COURT:  January 29.

 2              THE WITNESS:  I don't have it.

 3              THE COURT:  Mixed them up.

 4              MR. CHARNEY:  I can try to help you.

 5              THE WITNESS:  This is where I left off.  This one.  So

 6    I think might have put it all the way in the back.

 7              MR. MOORE:  May I show him my copy, Judge, to speed it

 8    along, if that's okay.

 9              THE COURT:  Yes.  It's the one that says we need 250s.

10    We need arrests.

11              MR. MOORE:  Do you see that?

12              Just read that portion there that begins:  We need

13    250s.

14              THE WITNESS:  This is Lieutenant Delafuente, right?

15              MR. MOORE:  Yes.

16              THE WITNESS:  We need 250s.  We need arrests.  Quality

17    of life enforcement.  Community visits.  We need -- if you're

18    in a car, please get to them.  If you're on a foot, get three

19    please.  That's community visits.  That's about it.  What else

20    do we have?

21    Q.  So that's a mention of specific numbers at that roll call,

22    correct?

23              THE COURT:  Those are numbers.  Two and three are

24    numbers.

25              THE WITNESS:  Yes.  Two and three are numbers.

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 58 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 82 of 177    1882
D429flo3                      Mauriello - direct

1          THE COURT:  What does it mean to you that he said we

2    need 250s, we need arrests?

3          THE WITNESS:  But when he said two and three --

4          THE COURT:  Forget that.  I didn't ask that.  You got

5    to listen to my question.

6          What does it mean to you when he said:  We need 250s,

7    we need arrests.

8          What does that mean to you?

9          THE WITNESS:  He wants the officers to be out there

10   engaged.

11   Q.   In enforcement activity?

12   A.   Enforcement activity.

13   Q.   And when he says in the car, the two or the three, is

14   that -- do you -- do you understand that to mean community

15   visits or other enforcement activity?

16   A.   I think it meant community visits.

17         THE COURT:  No, not, again, what you think it meant.

18         THE WITNESS:  It meant community visits.

19         THE COURT:  What it means to you.

20         THE WITNESS:  To me it means community visits.

21         THE COURT:  All right.

22         THE WITNESS:  I got to start remembering to answer

23   that way.

24   Q.   Why don't you turn to the transcript of the tape on 30

25   October 2008 and it's a -- again, it's Lieutenant Delafuente

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 59 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 83 of 177   1883
D429flo3                    Mauriello - direct

 1    and it's from 4:20 to 6:30.

 2           Do you have that before you?  30 October 2008.

 3    A.  Yes.

 4    Q.  And he says here at the bottom --

 5           THE COURT:  What line?

 6           MR. MOORE:  Six lines up from the bottom beginning on

 7    line 13.

 8           THE COURT:  Okay.

 9    Q.  If you see something, just do some 250s get all the fucking

10    riffraff off the corner.

11           Do you see that?

12    A.  Yes, I do.

13    Q.  What does that mean to you?

14    A.  Again, if you see -- he's talking about when you do 250s,

15    he's talking to these guys, it's reasonable suspicion.  I don't

16    know what he meant about riffraff.  He's talking if the corners

17    are too populated, ask the people to move off the corner.

18    Q.  Ever hear him use that term?

19    A.  Riffraff, no.  I don't think I ever heard anybody use

20    riffraff before.

21    Q.  Did you ever use that term when you addressed the roll

22    calls in the 81st precinct?

23    A.  Riffraff, no.

24    Q.  But apparently Lieutenant Delafuente used it, correct?

25           THE COURT:  Well, that's established.  I heard it.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 60 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 84 of 177   1884
D429flo3                           Mauriello - direct

1        THE WITNESS:  That's the way it's transcribed.

2             THE COURT:  No.  No.  I heard it.  We're not

3    questioning the transcription anymore.  All the counsel have

4    listened.  They stipulated that's what it said.  Okay.

5    Q.  Now, the next entry on the 8th of November, 2008.  The --

6    it's a roll call with Delafuente and the time is 13:09 to

7    14:36?

8             MS. GROSSMAN:  What's the time?

9             MR. MOORE:  13:09 to 14:36 I believe.

10   Q.  Do you have that in front of you?

11   A.  Yes, I do.

12   Q.  If you go down to the -- begins on line 4 and about the

13   middle of the passage.  A sentence that begins:  You've got to

14   get.

15            Do you see that?

16   A.  Yeah, you got -- yeah.

17            THE COURT:  I'm sorry.  What line was that?

18            MR. MOORE:  Line 4.

19            THE WITNESS:  Yes, I see it.

20   Q.  Do you got that?

21            He says:  You've got to get them moving right from the

22   start because if you get too big of a crowd there, you know,

23   they're going to get out of control.  And they're going to

24   think that they own the block.  We own the block.  They don't

25   own the block.  All right.  They might live there but we own

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 61 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 85 of 177    1885
D429flo3                    Mauriello - direct

 1   the block.  All right.  We own the streets here.

 2              Do you agree with that?

 3   A.  No, I don't.  Could I answer -- how you feel, are you

 4   asking me?

 5   Q.  I'm asking whether you agreed with that.

 6   A.  I don't agree with that, no.

 7   Q.  And that would be inappropriate comments for a supervisor

 8   to make.

 9              You think it's funny?

10   A.  No.  I don't think it's funny.

11   Q.  You were laughing.

12              That would be an inappropriate comment to make for a

13   supervisor in the 81st precinct, correct?

14   A.  He didn't mean we own the block.

15   Q.  You don't know what he meant.

16   A.  You're asking me -- I'm telling you --

17              THE COURT:  What it meant to you is what you may

18   answer.  That's all you can answer.

19              THE WITNESS:  What it meant to me was the criminals

20   don't own the block.

21              If you read the whole testimony and the tape, Chauncey

22   and Howard the day before a cop got assaulted by three people.

23   They made arrests.  He's talking about that.

24              So he's talking the officers -- the criminals don't

25   own the block.

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 62 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 86 of 177   1886
D429flo3                     Mauriello - direct

1    The good people. We work for the people of the

2    community. They go to work everyday. That's who we're there

3    for. He's not -- we don't own the block. The criminals don't

4    own the block. That's what he's trying to tell them.

5    Q.  You're always certain when you see people in the community

6    who the good people are and who the criminals are? You're

7    always certain of that, right?

8    A.  No.

9              THE COURT:  Okay. So -- one more.

10             MR. MOORE:  You wanted to break for --

11             THE COURT:  Go ahead.

12             MR. MOORE:  Let me just ask one question.

13   Q.  When you see a group of kids on a street corner, three,

14   four, five kids, is your assumption that they are criminals or

15   they're just good people?

16   A.  I think you have to do an observation.

17   Q.  Right.

18             So you can't make an assumption one way or the other,

19   whether they're riffraff or whether they are good or bad

20   people?

21   A.  You're asking me if I see three or four kids on the corner,

22   are they good people or bad people.

23             I'm telling you, you have to make an observation for a

24   while before you know what's going on. You just don't move

25   into it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 63 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 87 of 177   1887
D429flo3                          Mauriello - direct

 1              THE COURT:  Okay.  With that we'll pick up at about

 2    five after two.

 3              THE WITNESS:  I'm sorry, your Honor.

 4              THE COURT:  No problem.  No problem.

 5              (Luncheon recess)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 64 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 88 of 177    1888
D429flo3                    Mauriello - direct

1              AFTERNOON SESSION

2                  2:10 p.m.

3           THE COURT:  Please be seated.

4           Mr. Moore.

5           MR. MOORE:  Thank you, Judge.

6   DIRECT EXAMINATION CONTINUED

7   BY MR. MOORE:

8   Q.  Inspector Mauriello, can you turn to the transcript for the

9   call -- the role call on January 29, 2009.  The time is 6:56 to

10  9:03?

11          THE COURT:  January 29, 2009?

12          MR. MOORE:  29 January 2009.

13          THE WITNESS:  I got it.

14  Q.  Sergeant Weiss was squad supervisor at the 81st precinct

15  when you were there?

16  A.  He was a squad supervisor and then he was an assistant ICO.

17  Q.  Do you see on the middle of the page there, beginning at

18  line 11 it says:  Any radio runs you go to, robbery or

19  burglary, you do a stop, or a show-up, or you stop somebody, do

20  the 250.  It takes two seconds to do the damn form.  They made

21  it damn near idiot proof from when I got on the job.

22          Do you see that?

23  A.  Yes, I do.

24  Q.  Did you understand those comments to mean -- do you

25  understand those comments to mean that if you're responding to

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 65 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 89 of 177   1889
D429flo3                        Mauriello - direct

1   a radio run about a robbery or a burglary it would be useful to

2   have the 250 to show some record of having responded to it?

3   A.  No.

4             THE COURT:  What does it mean to you?

5             THE WITNESS:  To me it means if you have a -- how can

6   I say -- you have a description of somebody, all right.  And

7   that person matches the description by height, the clothing,

8   then he expects somebody to be stopped if he matches the

9   description.  If you have a complainant in the back of the car

10  for the robbery, and they point out someone, then you go over

11  to talk to that person.  And if they say that's not the one, do

12  a 250.

13            THE COURT:  I'm sorry.  I didn't hear the end of what

14  you said.  If they say it's not --

15            THE WITNESS:  If they complainant says to the officers

16  I think that's the one who robbed me and then you get out of

17  the car and they say, Oh, no, it's not him, then you got to do

18  a stop, question and frisk anyway.

19            THE COURT:  Then you do a 250?

20            THE WITNESS:  You do a 250, yes.

21  Q.  It says you do a stop or a show-up or you stop somebody so

22  he's referring to a show-up and a stop of somebody.  Is that

23  how you understand that?

24  A.  The way I understand it is if you go to a radio run or you

25  go into a robbery in progress or a burglary in progress and

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 66 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 90 of 177   1890
D429flo3                    Mauriello - direct

1   there's someone there that matches a description of the 911

2   call, that's the one you're going to stop.

3   Q.  Do you agree --

4               THE COURT:  And you do a 250?

5               THE WITNESS:  And you do a 250, yes.

6   Q.  Do you agree that -- with his comments there that the 250

7   form is damn near idiot proof?

8   A.  I don't know.

9   Q.  It's a check-off form?

10  A.  It's a check-off form now.  It's mostly fill in boxes now.

11  Q.  If you could turn to the recording on 12 October 2009.

12  With sergeant Huffman.  And the time is 5:57 to seven?

13              MS. GROSSMAN:  Seven what?

14              MR. MOORE:  700 I think.  Let me see.  Yes.  7:00.

15  5:12 to seven minutes.

16              Do you have that?

17              THE WITNESS:  Yes, I do.

18  Q.  And at the beginning in the middle of the page it says,

19  Sergeant Huffman.  Sergeant Huffman was another supervisor in

20  the 81st?

21  A.  Yes.

22              MS. GROSSMAN:  Line, please.

23              MR. MOORE:  Line three.

24  Q.  You know, and if you all try to do a canvass or something,

25  try to get at least a couple of 250s and put robbery down just

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 67 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 91 of 177  1891
D429flo3                    Mauriello - direct

1    to say that we was out there.  If stopping somebody get a 250.

2            Do you understand him to mean there that if you're

3    responding to a robbery that it's important --

4            THE COURT:  Object to the form.  I've told you, you

5    can't do it that way.

6            MR. MOORE:  I'm sorry.

7    Q.  Do you understand him to mean --

8            THE COURT:  No.  What is your understanding?

9    Q.  What does it mean to you?

10           THE COURT:  Right.

11   Q.  When he says --

12   A.  She.

13   Q.  When she says, I'm sorry.  Thank you.

14           Withdraw that.

15           Does it mean to you that if you respond to a robbery

16   on a radio call or something like that, that it's important to

17   at least get some 250s to show that there was some police

18   response?

19   A.  Of course not.

20           THE COURT:  Of course not?

21           THE WITNESS:  No.

22   Q.  What does it mean to you?

23   A.  It means if you're going to a radio -- 911 call of someone

24   doing a robbery, and someone matches the description, then I

25   expect a 250 if the person matches the description, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 68 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 92 of 177    1892
D429flo3                      Mauriello - direct

 1   reasonably suspect that might have been the person that did it.

 2   Just not get a 250 for the sake of getting a 250.

 3            THE COURT:  No.  But it says just to say that we was

 4   out there.

 5            THE WITNESS:  Yeah.  I don't agree.

 6            THE COURT:  You what?

 7            THE WITNESS:  I don't agree with that.

 8            THE COURT:  Nobody asked you whether you agree.

 9            What does the statement mean to you?

10            She did seem to say, show the 250 to show we were out

11   there.

12            THE WITNESS:  Yeah.  And he said what do you think,

13   take out of that statement.

14            THE COURT:  No.  No.

15            THE WITNESS:  Okay.

16            THE COURT:  What did that statement mean to you?  It

17   seems pretty obvious.

18            THE WITNESS:  Yeah, it means if somebody matches the

19   description of the robbery, that's who you stop and do a 250.

20   Q.  Or it could mean there is police activity shown in response

21   to the robbery, even if there isn't a justification for a 250?

22   It could mean that as well, right?

23   A.  I don't agree with that, no.

24   Q.  No, you don't agree with it.  But it could mean that as

25   well?

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 69 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 93 of 177    1893
D429flo3                        Mauriello - direct

1        THE COURT: You're just in the wrong forum. I'm not

2   going to let you ask that question. All you can ask is what it

3   means to him. What does he understand it to mean. That's all

4   I'm going to take.

5        I don't know why you want to ask him, because it's

6   clear to me what that person said. Confusing was getting his

7   interpretation. I see what it means.

8   Q.  Why don't you turn to the 24 October 2009 roll call. And,

9   again, this is Sergeant Huffman. And the time is 4:41 to 5:30.

10  A.  I have it.

11  Q.  You have it?

12  A.  Yes.

13  Q.  And looking at the beginning at line 1 it says: But

14  regardless of what the sectors that's backing them or whatever,

15  we got to stop a couple of people whenever the description

16  comes over and do some 250s. Make it look good for him.

17  Because like you all know he's at home sleeping in his bed

18  listening to the radio.

19       Is that referring to you?

20  A.  I guess so, but that's not true.

21  Q.  Did you used to listen to the radio when you were at home?

22  A.  In bed sleeping, no.

23  Q.  Not necessarily sleeping but when you were at home.

24  A.  If I was going to work. If I'm driving into work, I listen

25  to the radio.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 70 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 94 of 177   1894
D429flo3                        Mauriello - direct

1   Q.   Does that -- does that statement mean to you that it's

2   important to simply, if you're responding -- if you have a

3   description, it's important to get some 250s to show that you

4   responded?

5   A.   Again, if you got a description, the person matches the

6   description, you should get a 250.   That's what she's saying.

7   I believe.

8   Q.   Let's go to --

9           THE COURT:   What's a 30 when it says:  Okay, so if you

10  hear a 30 come over, what's a 30?

11          THE WITNESS:   That's a robbery in progress.   Sometimes

12  with force or a weapon.

13          THE COURT:   Okay.

14  Q.   Now, turn to the 13th of March, 2009.

15          THE COURT:   Wait a minute.   This a good one.   It says

16  so --

17          MR. MOORE:   I'm sorry, Judge?

18          THE COURT:   This is a good one.   I don't know why

19  you're skipping this one.

20          You hear a 30 come over, you don't hear nobody being

21  stopped, nothing or whatever, and then he's going to feel like

22  nobody is giving a damn about 30s coming over.   Drop a couple

23  people.   Get 250s.   That's the activity in your activity

24  report.

25          Do you want to ask him about that one?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 71 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 95 of 177   1895
D429flo3                    Mauriello - direct

1     THE WITNESS:  I don't know what she's talking about.

2                    THE COURT:  Okay.

3                    MR. MOORE:  Thank you, Judge.

4                    THE COURT:  You're welcome.

5     Q.   Why don't you turn to 13 March 2009.  Roll call of Sergeant

6     Stukes.  And it goes from 4:32 to 5:20.

7                    MS. GROSSMAN:  March 13.

8                    MR. MOORE:  13 March 2009.

9                    MS. GROSSMAN:  The excerpt again?

10                   MR. MOORE:  4:32 to 5:20.

11    Q.   Do you have that?

12    A.   Yes, sir.

13    Q.   And it says:  If you see -- this is Sergeant Stukes

14    speaking, and he says at the roll call:  If you see guys

15    walking down the street, move them along.  Two or three guys

16    you can move.  You can't move fifteen, all right.  If you want

17    to be an asshole, whatever you want to call it, make a move.

18    If they won't move, call me over and lock them up dis con.  No

19    big deal.  We could leave them there all night.  Come get them.

20    Come get them.

21           Does that mean to you, reading that, when you see a

22    small group of people on the street, if you don't move them

23    you're going to get a larger group that's going to congregate?

24    A.   I think what -- what I'm interpreting this --

25    Q.   No.  What it means to you.

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 72 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 96 of 177    1896
D429flo3                    Mauriello - direct

1    A.   Two or three guys you can move.  You can't move fifteen.  I

2    think it says if you have fifteen people, you can't move them

3    by itself.  You gotta call for backup.  That's what it looks

4    like it means, reading this.  If you two or three people, he

5    wants to move it.  He doesn't want them congregating on the

6    corner.  But, again, it's observation.

7    Q.   Nothing illegal about congregating on the corner?

8    A.   No.

9         THE COURT:   What's a dis con?

10        THE WITNESS:   Disorderly conduct.

11        THE COURT:   So he's saying, does that mean to you,

12   lock them up and charge them with disorderly conduct?

13        THE WITNESS:   I guess what he means, disorderly

14   conduct, I guess blocking pedestrian is a subsection in

15   disorderly conduct.  But that's with a large group, a large

16   group.  I guess fifteen people he's talking about.

17   Q.   When he says you can leave them there all night, you don't

18   usually leave people in the precinct all night for disorderly

19   conduct, right?

20   A.   Of course not.

21   Q.   So you -- that's not something you would agree with in

22   terms of what to do, right?

23   A.   No.  But, again, it's a hypothetical.  And we don't know if

24   that person has a warrant, he's an arrest.  He might be in the

25   precinct all night, he goes down to central booking.  So I

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 73 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 97 of 177   1897
D429flo3                    Mauriello - direct

1    mean, you know, it's an open-end question.

2    Q.  Well, you don't usually lock people up for dis con?

3    A.  No, no.  I'm saying but you said would you leave him in all

4    night.  You don't know whether the guy is wanted.

5            THE COURT:  What about a couple lines down it says:

6    It's still a number.  It keeps the hounds off.

7            THE WITNESS:  He says hounds a lot.  One part hounds

8    means investigations.  They're in, coming in here.

9            Then he says hounds, I guess he means from barking,

10   from nagging.  You don't want to nag them to work.  So he says

11   it keeps the hounds off.  Hounds to him is nagging.  He says it

12   a lot.

13           THE COURT:  It's still a number.  It keeps the hounds

14   off.

15           What's he talking about?  What number?  What's does

16   that mean to you?

17           THE WITNESS:  Read the whole thing here.

18           THE COURT:  Somebody is stopped, they refuse, put down

19   refuse, put the description down, or whatever the case may be.

20   It's still a number.  It keeps the hounds off.

21           THE WITNESS:  We want -- again, what I expect or we

22   want the person stopped that we reasonably suspect committed a

23   crime had committed a crime.  That's what I take out of it.

24   That's what they know, so.

25   Q.  Does "keep the hounds off" also mean keep the borough off

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 74 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 98 of 177 1898
D429flo3               Mauriello - direct

1   you, keep the chief of -- the XO, Chief Marino and the other

2   people in the borough off your back?

3   A.   The one statement when he says, the borough, the hounds, he

4   meant inspections.  If you listen, the inspections are coming

5   in here.  I told you they're coming in here.

6   Q.   Does it mean something other than inspections to you?

7   A.   I don't even know what hounds are.  The bottomline is he

8   says it over and over, hounds is like hounding, hounding, he

9   didn't want to hound, he didn't want to nag, he doesn't want to

10  keep nagging guys.  He wants them to work, be engaged, be out

11  there working.  So I guess he means you're hounding, keep

12  repeating.

13  Q.   Why don't you turn to the 1 July 2008.  I don't know if you

14  have that one actually.

15  A.   January 2008?

16  Q.   1 July 2008.  6:58 to 8:00.

17       Do you have that?

18  A.   Who is supposed to be talking on that?

19       I got November and I got January.

20  Q.   Let me just show it to you.  All right.  Because I don't

21  think you have that in your pile there.

22  A.   Okay.

23  Q.   I'm going to call your attention to line seven where it

24  begins:  I don't care how many guys are out there.  They got to

25  move.  They won't move, I'll put them in handcuffs.  They want

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 75 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 99 of 177    1899
D429flo3                    Mauriello - direct

1   to roll, I'll roll with them. No biggie. They're going to

2   move all right. Let them know you're out there. Be an

3   asshole. They going to do something. Shine a light in their

4   face. Whatever the occasion. Inconvenience them. It saves

5   the trouble later on.

6              And that's --

7   A.   What line?

8   Q.   Beginning on line -- right there. I don't care.

9              And that's Sergeant Stukes again, right?

10  A.   I guess he's talking about, before that, Bainbridge 120

11  Chauncey. A large group there. So if he's talking about a

12  large group of eight, ten, twelve people. And you're asking

13  nicely, we want you guys to move off the corner, please.

14  Q.   There's nothing illegal about being on the corner, even a

15  group of eight people, right?

16  A.   No. No.

17             It gets to a point where it's blocking pedestrian

18  traffic.

19  Q.   He's not saying move them if they're blocking pedestrian

20  traffic, right?

21  A.   I understand.

22             This is all talk -- in roll call he's talking, he's

23  not explaining everything.

24  Q.   You would do a better job of explaining it, right?

25  A.   No. I mean there's a lot, when you come to me, I could

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 76 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 100 of 177   1900
D429flo3                 Mauriello - direct

 1   explain a little better what I meant.

 2   Q.   All right.

 3           The phrase that concerns me that I want you to tell me

 4   what it means is where he says:  Be an asshole.  Shine a light

 5   in their face.  Inconvenience them.

 6   A.   I don't know what he meant.

 7   Q.   What does he mean by that?

 8   A.   I don't know what he meant by that.

 9   Q.   What does that mean to you?

10   A.   What does that mean to me?

11   Q.   Mm--hmm.

12   A.   It means be a police officer.  You have a footpost.  You

13   walk your footpost.  And be omnipresent.  That's what it means

14   to me.

15           Nothing about shining something in someone's eyes.  We

16   don't know whether it's nighttime, daytime.  I don't know what

17   its means.

18   Q.   Does it mean to you to be rude and racist to people on the

19   street?

20   A.   No.

21           My civic complaints were down.  My officers --

22   Q.   I didn't hear what you said.

23   A.   All my roll calls, I talk to my officers, 98 percent of the

24   people in the community are hard-working people.  It's the two

25   percent we deal with, criminals that my officers deal with all

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 77 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 101 of 177  1901
D429flo3                   Mauriello - direct

1   the time.

2          And, again, just because they're two percent, they

3   still have to do something wrong.  My officers will stop them.

4   Reasonable suspicion.

5   Q.  And sometimes that 98 percent complain about stops and

6   frisks, right?

7   A.  Can I tell you honestly with this?  I was in there --

8   Q.  Do you recall --

9   A.  I can tell you right now.  I was in there over

10  two-and-a-half years.  All right.  Not one time did I have

11  anybody from politicians, community board, I could say

12  community council meetings when I went there, not one person

13  ever had a problem until an article came out.  And, again, they

14  didn't have a problem.  My officers are very respectful.  They

15  work hard out there.

16  Q.  And then when the article came out, then you started to get

17  complaints?

18  A.  No, you know when the article -- the tapes.  They had tape

19  recordings on there.

20  Q.  When the article came out, did the people in the community

21  start complaining about -- let me finish the question -- start

22  complaining about stop and frisk?

23  A.  You know what --

24  Q.  Can you answer that yes or no.

25  A.  To tell you the truth, I really don't know.  But I can tell

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 78 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 102 of 177   1902
D429flo3                         Mauriello - direct

 1    you honestly --

 2             THE COURT:   That's the answer.

 3             MR. MOORE:   If you don't know, you don't know.  So

 4    move on.

 5    Q.  And, again, looking at 23 November 2008, the roll call,

 6    5:46 to 6:28.

 7             MS. GROSSMAN:   I'm sorry.  What's the tape?

 8             MR. MOORE:   23 November 2008.

 9             MS. GROSSMAN:   And the excerpt.

10             MR. MOORE:   5:46 to 6:28.

11    Q.  That's apparently Sergeant Stukes, although it doesn't

12    reflect it on this particular page.

13             Look at line 16 where it says:  If they are on a

14    corner, make them move.  They don't want to move, you lock them

15    up.  Done deal.  You can always articulate later.

16    A.  If they're on the corner --

17             MS. GROSSMAN:   I'm sorry.  November 23, 2008?

18             MR. MOORE:   Yes.  5:46 to 6:28.

19    Q.  Do you have it in front of you, Officer?

20    A.  Yes, sir.

21    Q.  Does that mean to you that you -- the police can just go

22    and move people off the corner.  And if they don't want to

23    move, you can lock them up for no reason?

24    A.  No.

25    Q.  When it says you can always articulate later, does that

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 79 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 103 of 177  1903
D429flo3                        Mauriello - direct

 1    mean you can arrest them and then you can come up with a reason

 2    to justify the arrest later on?

 3    A.    I'd say no.

 4    Q.    Is that what it means to you, that -- these words, though?

 5    A.    Again, I don't know what he means with these words.  You

 6    have to ask him.

 7              THE COURT:  Right.  But what does it mean to you?  His

 8    words.  What do his words mean to you?

 9              THE WITNESS:  It looks to me -- again, you do it --

10    they don't want to move, you lock them up.  Again, CPR.

11    Courtesy, Professional, Respect.  You always treat them with

12    respect.

13              If the officer tells the guy to move and the guy gets

14    disrespectful, I guess this is what I'm reading into it, if

15    he's going to arrest him, he's going to arrest him.  That's

16    what you're asking me here.

17              Does it happen?  No, it doesn't happen.

18    Q.    I was referring to the statement that says:  You can always

19    articulate later.

20              Doesn't that mean to you that you can come up with a

21    justification for locking them up later?

22    A.    I guess he means do your paperwork later.  Articulate.

23    Online booking sheet.

24    Q.    It doesn't say you can fill out the paperwork.  It says

25    articulate, which means as I understand it to -- does it mean

D429flo3                    Mauriello - direct

1    to you to give a reason for why they were arrested later?

2    A.   (No response).

3    Q.   Is that what it means to you?

4    A.   Yes.  That's what it looks like.

5    Q.   I'm sorry.  You guess?

6    A.   Yes.  That's what it looks like.

7    Q.   I know we're -- want to just try to speed a little bit

8    through this.

9         Look at the -- at the entry for -- the transcript of 8

10   December of 2008.  Roll call at 12:20 to -- 12:20 to 15:00

11   Sergeant Stukes again.

12        Do you have that before you?

13   A.   Yes, I do.

14   Q.   And why don't you read to -- well let me read it into the

15   record here.  On line -- the second line ten, about the middle

16   of the page.

17        Do you see that?

18   A.   Second line ten?

19   Q.   Line ten up on the top and there's a line ten --

20   A.   Yes, I see.

21   Q.   It says:  You may leave here and think it's all well and

22   good, you don't like the 81, but you know that someone will

23   make a phonecall and it will put a jam in your whole wrench.

24   And now we're, Oh, yeah, this guy's trouble I gotta watch out

25   for this person.

D429flo3                        Mauriello - direct

1          Do you see that?

2    A.   Yes.

3              (Continued on next page)

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 82 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 106 of 177    1906
D428FLO4                    Mauriello - direct

1    Q.   Then going over again to the next page, again on line 10,

2    it says --

3              THE COURT:   Line 10 on the next page?

4              MR. MOORE:   On the back of the page.

5              THE WITNESS:   I have got it on the front.  It's on the

6    bottom I think.

7    Q.   Anyway, where it begins, "They could ship you somewhere and

8    then when you get there they make a phone call.  Yeah, yeah,

9    screw this guy over here, keep him on this boat, put him in the

10   cemetery.  You don't need that.  Give him a weird tour.  This

11   job is so easy, just keep the hounds off."

12             Does that mean to you that if you don't meet these

13   performance standards, the failure to do that is going to

14   follow you throughout your career in the police department?

15   A.   If you read before that, it says about, you want to be

16   labeled competent, not incompetent.  It says, If you're working

17   out there, you want to be labeled competent.  In any walk of

18   life, someone wants to be labeled competent, not incompetent,

19   because your reputation precedes you.

20   Q.   Actually, to be fair, he's referring to the activity that

21   you do.  He says up there, on line 1 he says, "The activity

22   works for you.  OK?"  You see that, you see where he says that?

23   A.   Yes.

24   Q.   What he is saying is, if you don't do the activity, that

25   reputation is going to follow you throughout your career, and

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 83 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 107 of 177   1907
D428FLO4                    Mauriello - direct

1    officers are going to make it difficult for you later on.  Is

2    that what that means to you?

3    A.  No.  Where does it say officers are going to make it

4    difficult for you?  I don't take that out of that.

5    Q.  Look at 8 December 2008, the roll call with Sergeant Stukes

6    form 1:20 to 1:38.  Do you have that before you?

7    A.  Yes, I do.

8    Q.  Sergeant Stukes saying, "You're going to be 120 Chauncey.

9    You're going to be a vehicle out there.  Shake everybody up.

10   Anybody moving, anybody coming out of that building, 250,

11   verticals, and give me a couple of community visits.  C summons

12   as well."

13            So does that mean to you that Sergeant Stukes is

14   saying anybody coming out of that building 120 Chauncey should

15   get stopped?

16   A.  No.  The officers are trained, if you have articulable

17   reason to approach, you approach; reasonable suspicion to stop

18   someone, you stop someone.  If you have probable cause to make

19   an arrest, I expect an arrest to be made.  If you have got a

20   summonable offense, I expect the condition to be corrected.  He

21   goes on and says, do 250s, do verticals.  He's telling them,

22   long story short, I want you out there, be engaged, be

23   respectful of the work.

24   Q.  He is saying, anybody coming out of that building,

25   basically take enforcement action, isn't that what that means

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 84 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 108 of 177 1908
D428FLO4                    Mauriello - direct

1    to you?

2    A.  It doesn't mean that to me.

3    Q.  120 Chauncey is a building that you said earlier you were

4    concerned about, right?

5    A.  Of course.  We had numerous people shot there.  We had cops

6    shot at in front of there, people stabbed.

7    Q.  Is that a public housing project?

8    A.  It's an independent building, four buildings together.

9    Q.  Is 98 percent of the population there good, decent people?

10   A.  Yes, it is.  There's over 1,000 people in there.

11   Q.  You don't want to stop everybody coming out of 120

12   Chauncey, right?

13   A.  Of course not.

14   Q.  So would you agree with me that's a poor choice of words by

15   Sergeant Stukes, anybody coming out of that building?

16   A.  It's a poor choice of words, but I know Sergeant Stukes,

17   from my experience and my officers, I know they didn't stop

18   everybody coming out of that building.

19   Q.  Let's go to 28 October 2008.  This is a roll call from 4:07

20   to 5:05, and it's you speaking, right?

21   A.  Yes.

22   Q.  DI Mauriello, that's you?

23   A.  Yes, sir.

24   Q.  You say at the roll call, line 15, "If you don't work and I

25   get the same names back again here, I'm moving you.  All right?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 85 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 109 of 177   1909
D428FLO4                    Mauriello - direct

1    You're going to go to another platoon.  That's how it's going

2    to be."

3    A.   Yes.

4    Q.   Those are your words at the roll call, correct?

5    A.   Yes.

6              THE WITNESS:  Could I explain, your Honor.

7              THE COURT:  Wait for the lawyer to ask a question.

8    A.   Those are my words, yes.

9    Q.   All right.  Explain what you mean by that.

10   A.   All right.  Again, we had an incident two days before that.

11   All right?  It's on another tape.  We had an incident two days

12   before that and four of my officers were caught off post by

13   inspections on midnight, and I had to move them to another tour

14   to be closely more supervised.  And I tell them, in the roll

15   call we play later, I want them to work harder, be more

16   engaged, if you want to get back to your platoon and work to

17   all of your capabilities.

18             Now, what I am saying, again, if you read the whole

19   context here, the sergeant is complaining that the cops on

20   overtime didn't want to get out of the car.  So an

21   investigation is working.  So I said, if I get those names

22   because they didn't get out of the car and weren't working, I

23   am going to transfer them like the other guys who are

24   transferred because of poor supervision on a platoon.

25             Now, was anybody transferred for this?  Nobody was

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 86 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 110 of 177  1910
D428FLO4                    Mauriello - direct

1   ever transferred to another platoon.

2   Q.   Turn to the roll call on January 28, 2009, and once again,

3   this is you speaking.  The time is 20:25 to 22:07.

4        You're speaking here about how many summonses the

5   squad writes, correct?

6   A.   It had to do with traffic stops.

7   Q.   You say there, going down to toward the bottom of the page,

8   line 8, you say, "Just do the old -- go through the motion and

9   get your numbers anyway, but don't be the one to be caught out

10  there.  Marino is taking it serious, looking at everybody's

11  evaluation.  He's yelling at me about the points and he's

12  yelling at every CO about who gave these points to this guy,

13  this guy, or this girl's no good."

14       Those are your words, correct?

15  A.   Yes.

16  Q.   So, basically, what you're saying, if I understand it

17  correctly, to your officers is, just do the numbers and that

18  will keep the hounds off, right?

19  A.   No.  That's not what I meant.

20  Q.   Go to the entry on 31 October 2008.  It's an excerpt from

21  9:05 to 9:50.  I'm sorry, 6:15 to 8:18.  Do you got that?

22  A.   OK.

23  Q.   You say here, beginning on line 14, "Just circle around.

24  Again, any groups, I expect you guys to bring in any groups.  I

25  want them cuffed, brought in here.  I got five sectors.  I got

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 87 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 111 of 177  1911
D428FLO4                    Mauriello - direct

1  guys on foot.  I got overtime.  I want them herded in here like

2  New Year's Eve."  Those are your words, correct?

3  A.  Yes.

4  Q.  So you are referring to bringing people in as herding them,

5  correct?

6  A.  No.  I can explain what I meant by herding.  The whole

7  thing, you want me to start from the first?

8            THE COURT:  I don't know that he has asked you a

9  question just yet.

10  Q.  Later on down in this passage, on line 6 you say, "You're

11  on a foot post, fuck it.  Take the first guy you got and lock

12  them all up.  120 Chauncey.  Boom.  Bring them in, lodge them.

13  You're going to go back out.  You can process them later on."

14            Those are your words, correct?

15  A.  Yes, it is.

16  Q.  Part of what you're trying to do there is instill fear in

17  the community that, if they come out and they congregate, they

18  are going to be run into the precinct, right?

19  A.  Absolutely not.  If you hear me from the beginning, again,

20  we are talking from 6:15, there were shots fired three days in

21  a row on the same block, and this happened again.  So I am

22  asking my cops, where do think is the best place to put them?

23            Now, I say, I want you to circle, I want the cars to

24  circle around.  The problem with that is Marcus Garvey, the

25  location, one half is 79 side, Bedford Stuyvesant; the other

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 88 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 112 of 177 1912
D428FLO4                    Mauriello - direct

1   half is 81, Bedford Stuyvesant side. 79 gang was, again, along

2   with the 81 side gang members, and we had shots fired for three

3   days straight. So I had an officer out there and I wanted the

4   officer to circle around.

5   Q.   I am talking about, bring them in, lodge them --

6   A.   You asked me three different things before that. So I want

7   to go down everything you asked me.

8           THE COURT:   There is really no question pending.   You

9   have to wait for question and answer.

10  A.   Repeat your question.

11  Q.   I am going to move on.

12          Go to 31 October 2008, the roll call where you're

13  speaking, from 9:05 to 9:50.

14          You say in here a couple of times, do you not,

15  "Everybody goes, everybody goes tonight," right?

16  A.   It's zero tolerance.

17  Q.   Everybody gets a summons, a 250, or arrested, correct?

18  A.   If they break the law, everybody goes tonight.

19  Q.   You don't say that, to be fair, you don't say that -- when

20  you're talking to the troops, you don't say, if they break the

21  law, bring them in; you just say, everybody goes, everybody

22  goes tonight, right?

23  A.   I say about throwing dice, if they are drinking.   I am

24  pointing out quality of life infractions. I am not saying just

25  take everybody for the sake of taking everybody. If they are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 89 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 113 of 177  1913
D428FLO4                 Mauriello - direct

1   breaking the law, a summonable offense, you either summons them

2   in the precinct or bring them in the house.  The computers are

3   down because they have a Halloween parade.  So you're going

4   bring people into the precinct and make sure they have no

5   warrants and summons them there.

6   Q.  Why don't you take a look at 8 December 2008.  Again, this

7   is you at the roll call.

8          You say here --

9          MS. GROSSMAN:  Excerpt.

10         MR. MOORE:  5:27 to 6:39.

11  Q.  You say in here at the top, "You gotta get your activity

12  up."  You see that?

13  A.  Yes, sir.

14  Q.  Down on line 14 you say, "How the hell do you want me to do

15  the right thing by you if you come in here five parkers, 3 As,

16  no Cs, and only 250 you do is when I force you to do overtime."

17  Do you see that?

18  A.  Yes.

19  Q.  You're referring to specific numbers of enforcement

20  activities, correct?

21  A.  No.

22  Q.  You said 3 As, five parkers, and no Cs, right?

23  A.  Again, this had to do with --

24  Q.  Is that what you said?

25  A.  There is a reason behind this.  You heard the whole tape.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 90 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 114 of 177   1914
D428FLO4                    Mauriello - direct

1    Q.   I am asking you if you used specific numbers in relation to

2    the different enforcement activities there?

3    A.   It was a hypothetical of numbers.

4    Q.   Then there is a transcript on 8 December 2008, from 7:07 to

5    7:42.

6         These are your words again, right?

7    A.   Yes.

8    Q.   You say, "I'm what separates the wolves from coming in here

9    and chewing on your bones." Do you see that?

10   A.   Yes.

11   Q.   You're referring to Chief Marino again, right?

12   A.   No.  Brooklyn North inspections I was talking about.  This

13   is right after an incident where I had four cops off post at

14   midnight.

15   Q.   When you say Brooklyn inspection, if you go down further,

16   it says, "All right.  I'm keeping Chief Marino at bay when he

17   pulls activity reports, he looks back the whole year, he says,

18   this guy or this girl is no good."

19        In fact, you were referring to Chief Marino, correct?

20   A.   I wasn't referring to Chief Marino.  It's two different

21   lines.

22   Q.   His name is there, right?

23   A.   The reason I said that is because evaluations are in now.

24   He is reviewing all the evaluations to see if the cops are

25   working.  He wants to see my sergeants reviewed properly, gave

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 91 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 115 of 177   1915
D428FLO4                    Mauriello - direct

1  them the correct score, and wanted to see if I reviewed them

2  properly.  That's why I brought that up.  They have nothing to

3  do with each other.

4  Q.  The last one is 8 November 2008, an excerpt from a roll

5  call with -- you're speaking and Delafuente is speaking, and

6  the time is 14:36 to 16:11 or thereabouts.

7        In the middle of the page, you say, speaking about

8  bandannas, "I'm tired of bandannas on their waist and I'm tired

9  of these beads.  Red and black beads means Bloods.  Their

10  bandannas -- if they're walking down the street and they've got

11  a bandanna sticking out of their ass, coming out there, they've

12  got to be stopped.  A 250 at least, at least."

13        Do you see that?

14  A.  Yes.

15  Q.  Is it your understanding that if you see somebody walking

16  down the street with a bandanna in their back pocket, that that

17  would give you cause to stop and frisk them?

18  A.  No.

19  Q.  Is that what you're saying there?

20  A.  No.  I want my officers to be engaged.  I want them to get

21  out of the car and walk around.  If they come across people, I

22  expect them to say hello.  If they have articulable reason to

23  approach them, I want them approached.  If you have a

24  reasonable suspicion to stop this person, I want them stopped.

25  Q.  Would you agree with me that somebody hearing that might

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 92 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 116 of 177   1916
D428FLO4                    Mauriello - direct

1   think that if they see somebody with a bandanna coming down the

2   street, they should be stopped or given a 250 at least?

3   A.   My officers know the laws.  They are trained and

4   experienced.  They know what I meant.

5   Q.   Just a couple of more questions, Deputy Inspector

6   Mauriello.

7        Let me hand you what previously has been marked as

8   Plaintiffs' Exhibit 290.

9        Have you ever seen this document, Plaintiffs' Exhibit

10  290?

11  A.   Yes.

12  Q.   This is a document sent from Chief Hall, chief of patrol,

13  right?

14  A.   2010, yeah.

15  Q.   Yes?

16  A.   Yes.

17  Q.   At the time?

18  A.   Yeah.

19  Q.   October 22, 2010?

20  A.   Yes.  I was in transit.

21  Q.   You received a copy of it, right?

22  A.   Yes.

23        MR. MOORE:   Judge, I move the admission of Exhibit

24  290.

25        MS. GROSSMAN:   No objection.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 93 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 117 of 177   1917
D428FLO4                    Mauriello - direct

1   THE COURT:  I don't think I have a copy of 290.  Are

2   you going to put it up?

3   (Plaintiffs' Exhibit 290 received in evidence)

4   Q.  This is a memorandum from James Hall, the same James Hall

5   who rewarded you for your work in the 81st Precinct, right?

6   A.  Yes, sir.

7   Q.  It's a memorandum regarding a quota bill, right?

8   A.  Yes, sir.

9   Q.  And if you turn to the next page of this document, you see

10  under the heading quotas there is a subheading called

11  "department policy"?

12  A.  First paragraph?

13  Q.  Yes.  I want to direct your attention to a line that says,

14  "In an effort to address crime and public safety conditions in

15  precincts, supervisors have made statements that could be

16  interpreted as the setting of quotas for enforcement activity."

17  Do you see that?

18  A.  Yes.

19  Q.  That's a statement from the chief of patrol of the New York

20  City Police Department, Chief Hall, correct?

21  A.  Yes.

22  Q.  So he is acknowledging that in some situations, at least it

23  has come to his attention, that some supervisors are making

24  statements that could be interpreted as setting of quotas?

25  A.  Yes.

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 94 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 118 of 177 1918
D428FLO4                          Mauriello - direct

1  Q.   Do you believe that you have ever made such statements that

2  can be interpreted as the setting of quotas?

3  A.   No.

4           MS. GROSSMAN:  Just for point of clarification, the

5  memo that was prepared by Chief Hall is October 22, 2010, and

6  the second page is the document that he attaches as a reference

7  that was prepared by the legal bureau.  I just wanted to make

8  that noted.

9           MR. MOORE:  It was attached to the document, right?

10          MS. GROSSMAN:  Yes.

11 A.   Yes.

12 Q.   Later on in this memo at the bottom, there is a subsection

13 that says "supervision and performance," right?

14 A.   Yes, sir.

15 Q.   It says, "The law does not prohibit the use of appropriate

16 managerial measures to maximize employee performance.  The

17 department and department managers can set performance goals

18 for the officers under their supervision and can insist that

19 officers take appropriate enforcement action to address crime

20 problems, quality of life conditions, and public safety issues

21 in the commands they are responsible for policing," right?

22 A.   Yes, sir.

23 Q.   So performance goals, that would include setting a goal for

24 the number of 250s that an officer is supposed to get in a

25 certain period of time, correct?  That could be a performance

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 95 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 119 of 177 1919
D428FLO4                          Mauriello - direct

1    goal, right?

2    A.   No.

3    Q.   Could a performance goal include the number of arrests that

4    an officer is supposed to make?

5    A.   No.

6    Q.   What about the number of summonses that the officer is

7    supposed to make?

8    A.   No.

9    Q.   If you turn to the next page, that first paragraph, it

10   says, "Officers can, depending upon their specific assignments,

11   and the conditions in the command in which they work, be

12   expected to make arrests, issue traffic and criminal court

13   summonses, conduct stops of individuals who are suspected of

14   criminal activity, and engage in other enforcement activities."

15   Do you see that?

16   A.   Yes.

17   Q.   So he is referring specifically to summonses, to arrests,

18   and to 250s, right?

19   A.   Yes.

20   Q.   When he says "stops of individuals," that means stops and

21   frisks, right?

22   A.   Yes, sir.

23   Q.   Then there is a reminder that such enforcement activity

24   must be based on the meaning of the appropriate legal standard,

25   correct?

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 96 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 120 of 177   1920
D428FLO4                    Mauriello - direct

1    A.   Yes, sir.

2    Q.   Referring to enforcement activity, this memo refers to

3    summonses, arrests and 250s, right?

4    A.   Yes.

5    Q.   How do you set a performance goal for 250s without giving

6    the officer a number?

7    A.   There is no such thing as giving an officer a number.  I

8    expect the officers, when they are working, if they see an

9    arrest situation, they are going to make the arrest.  If they

10   come across -- if they come across a summonable offense, I want

11   the condition corrected.

12   Q.   How do you set a performance goal for a 250 without giving

13   a number?  How do you set a goal without giving a number?  Can

14   you explain that to me?

15   A.   If the crime trends are out there and quality of life

16   conditions out there, on all tours, and other officers are

17   working out there and they observe it, I expect everybody to

18   observe it.

19   Q.   So the goal is just to go and enforce the law?

20   A.   The goal is to keep the community safe.

21   Q.   This is speaking about setting performance goals for

22   officers based upon their activity.  So tell me how you set a

23   performance goal for the activity of a 250 without suggesting

24   or indicating a number?

25   A.   A 250 -- if you have a complainant and they point out

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 97 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 121 of 177 1921
D428FLO4                    Mauriello - direct

1    someone, a 250 is going to be done. So a lot of times there

2    are 911 radio runs, an officer is going to respond to a radio

3    run and have a complainant, and they are going to do a 250,

4    because the complainant is going to say that so and so was in

5    my house.

6         MR. MOORE:  I am going to ask that that answer be

7    stricken. It's not responsive to my question.

8    Q. My question simply is, how do you set a performance goal

9    for the enforcement activity of issuing 250s? How do you set a

10   performance goal for that?

11   A.  I want the officers to work. That's it.  There is no set

12   goal or no set number for a 250. You have to have reasonable

13   suspicion.

14   Q.  If an officer doesn't have adequate numbers, upon looking

15   back, they can be disciplined for not having sufficient

16   numbers, correct?

17   A.  You look at everything. Activity or performance report is

18   everything. How many radio runs are returned, how many

19   verticals you're doing, how many arrests you're doing.  You

20   keep saying 250. It's not 250s.

21   Q.  Let me rephrase the question. Looking back, an officer can

22   be disciplined in part for his failure to meet performance

23   goals with respect to arrests, summonses and 250s, correct?

24   A.  If they are out there and they are not doing their job,

25   yes.

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 98 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 122 of 177 1922
D428FLO4                    Mauriello - direct

1  Q.  If you can answer that question.

2  A.  Correct.  Yes.

3  Q.  That would in common sense terms mean that they haven't met

4  the number that the supervisor thinks they should get, right?

5  A.  If you have a platoon and similar area they're working,

6  similar officers are working the same time, and similar

7  officers responding to crime conditions are seeing quality of

8  life infractions, or have reasonable suspicion to stop someone,

9  how could 99 percent of the cops do it, and now you tell me one

10  cop also can't do it?

11  Q.  So the performance goals are based upon the actual numbers

12  in terms of their activity, correct, at least in comparing

13  officers to officers, correct?

14  A.  Part of it, performance goals is part of it.  If there is

15  crime trends out there, I want the officers working.

16          MR. MOORE:  One second, Judge.

17          Nothing further.

18  CROSS-EXAMINATION

19  BY MS. GROSSMAN:

20  Q.  Good afternoon, Inspector.

21  A.  Good afternoon.

22  Q.  Just so that we are clear on some dates, I know we are

23  going a little bit backwards, to the beginning of when you

24  started working at the transit borough, that was July 3, 2010,

25  correct?

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 99 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 123 of 177   1923
D428FLO4                  Mauriello - cross

1    A.    Yes.

2    Q.    Can you just briefly describe some of the positions you

3    held with the police department up until you started working at

4    the 81st Precinct?

5    A.    I was a police officer in 1989. I got out of the academy,

6    went to NSU 5, 25, 28, 32, in Manhattan. From there I went to

7    the 34th Precinct. From there I went to Manhattan North

8    Narcotics for three months. Then I got promoted to sergeant,

9    and I ended up in the 79th Precinct in Bedford-Stuyvesant. And

10   I was there until I went to Brooklyn North warrants as a

11   sergeant. I made lieutenant. I went to the 83rd Precinct in

12   Brooklyn for a month. Then I went to the 88th Precinct in Fort

13   Greene as a lieutenant and then Williamsburg as a lieutenant in

14   the 90. From there I made captain. I went to the 77th

15   Precinct in Crown Heights. I went to the 94th Precinct in

16   Greenpoint. I was in Brooklyn North Borough Crime. Then I

17   became the executive officer of the 81st Precinct and then the

18   commanding officer of the 81st Precinct.

19   Q.    You became the XO from October '06 to December '07?

20   A.    Yes.

21   Q.    Then you were the CO of the 81st Precinct from December '07

22   to July 2010?

23   A.    Yes.

24   Q.    What were your duties and responsibilities as the

25   commanding officer at the 81st Precinct?

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 100 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 124 of 177    1924
D428FLO4                        Mauriello - cross

1    A.   I was there to make sure the day-to-day operations were

2    fulfilled, community directions with crime trends, and with the

3    rank and file.

4    Q.   What were the boundaries of the 81 Precinct?  What are the

5    boundaries?

6    A.   81st Precinct goes from Atlantic Avenue to Broadway, from

7    Marcus Garvey to Saratoga.

8    Q.   Now, Mr. Moore asked you a lot of questions about some

9    audiotapes from October 31, correct?

10   A.   Yes.

11   Q.   Can you explain what was going on?  That was Halloween,

12   correct?

13   A.   Yes.

14   Q.   Can you explain some of the intelligence you received on

15   October 31?

16   A.   Yes.  Prior to October 31 and up to October 31, I had

17   numerous phone calls from the community council, from the

18   community board, from principals of schools, from elected

19   officials, from the school safety agents and gang intelligence

20   that we are going to have initiations.

21           MR. MOORE:  Object.  I think that's hearsay.

22           THE COURT:  I don't think it's offered, again, for the

23   truth.  I think it's a state of mind thing.  This is what he

24   was told that he was responding to.  It frankly doesn't matter

25   whether it's true.  You can go ahead.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 101 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 125 of 177  1925
D428FLO4                    Mauriello - cross

1   A.    There are going to be gang initiations that day.  Gang
2   members were going to wear masks, run down the street, slice
3   people to become a gang member.  They were also going to rob
4   people, numerous robberies one after the other, and also a
5   group jump up and beat up people, one group beat up one person
6   and move on.
7           In the past, we also got intelligence, and it
8   happened, a lot of vandalism to community's property, their
9   cars, their houses.  Also, a lot of times we had vandalism to
10  department property, police cars' windows are broken, cops had
11  rocks thrown at them and bleach thrown at them.
12  Q.    During the October 31, 2008 roll call, at 9:05 to 9:50,
13  there is a reference to zero tolerance?
14  A.    Yes.
15  Q.    Can you explain what you meant by that?
16  A.    Yes.  Halloween, zero tolerance means I wanted my officers
17  to be out there, get out of the car, get engaged.  If they saw
18  a crime, I expect the person to be arrested that night.
19  Q.    Now, are there times when perhaps it's not Halloween where
20  there is discretion left to the officer to decide whether to
21  enforce a summonable offense?
22  A.    Yes.  Always.
23  Q.    So were you trying to communicate that that night on
24  Halloween that you didn't want officers to necessarily use
25  their discretion, you wanted them to actually take enforcement

D428FLO4          Mauriello - cross

1   action if they observed the behavior?

2   A.  Yes.

3            MR. MOORE:  Object to the form, Judge.  I think that's

4   a leading question.

5            THE COURT:  It was.

6   Q.  So you also mentioned popping champagne in that same

7   audiotape, right?

8   A.  Yes.

9   Q.  What were you referring to, what were you trying to explain

10  to the officers?

11  A.  Previously, on New Year's Eve, we had an incident in the

12  courtyard of 120 Chauncey, we had numerous radio runs of shots

13  fired inside the courtyard.  I responded with the officers.

14  When we got there, there was 20 people in the courtyard,

15  marijuana smoke, bottles all over, everybody was drinking.  Two

16  guys had run from us.  They had a firearm.  And I was talking

17  about that.  There is going to be jumping up.  We are going to

18  have problems over there.

19  Q.  Now, on one of the tapes you also made reference to the

20  term beads, and you used that in connection with the term

21  Bloods.  What did that mean?  What significance does that have

22  for you?

23  A.  We got information from gangs.  Gangs used to come down and

24  talk to my officers at roll call.  And the gang members were

25  getting smarter.  They weren't going to wear the bandannas to

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 103 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298   Filed 05/30/13  Page 127 of 177   1927
D428FLO4                    Mauriello - cross

1   show their colors.  They were going to start wearing different

2   color beads.  And the red and black were the Bloods, blue beads

3   were Crips, the Latin Kings had green and yellow.

4   Q.   Referring to the November 8, 2008 roll call at 14:36 to

5   15:34, there are references to --

6             MR. MOORE:  Hold on.  What date was it?

7             MS. GROSSMAN:  November 8, 2008, 14:36 to 15:34.

8             MR. MOORE:  Thank you.

9   Q.   Can you explain what you were referring to in that first

10  paragraph?

11  A.   Yes.  I was educating the officers.  We have a crime

12  information center in the roll call room when the officers are

13  getting ready, and we update it constantly every day.  On it we

14  had guys that were wanted for warrants, for robberies or

15  shootings, and Blood members that were wanted.  And I was

16  showing the officers the handouts and they had fliers that if

17  you see these people that are wanted out on the street, I

18  expect them to be arrested.

19            MR. MOORE:  Can you tell me the time?

20            MS. GROSSMAN:  14:36 to 15:34.

21  A.   I'm talking about one incident with Dequan Vance, which was

22  my officers on patrol at the time, they were at the roll call

23  too, they had a foot pursuit with him five months before that.

24  They made a gun arrest.  I was saying this young man did not go

25  back to court so there was an active warrant out for him.  So

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 104 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 128 of 177   1928
D428FLO4                          Mauriello - cross

1    if you see this young man, that he is wanted still for a

2    warrant for a gun arrest.

3    Q.   Mr. Moore on direct testimony referred to 120 Chauncey, and

4    this reference to stop everybody coming out of 120 Chauncey.

5    Can you explain?

6    A.   Yes.   120 Chauncey historically is a building that we had

7    problems before I got there and problems we had after.   We had

8    numerous shootings in there, numerous stabbings.   We had a cop

9    shot at over there.   Again, my officers, I wanted them to be

10   proactive.   It was a very busy building.   We had to put a

11   two-man foot post there.   This way when someone took a meal, we

12   had a cop out there at all times, because we had problems, when

13   we didn't cover that building or that corner, someone would get

14   shot away.

15        The 120 Chauncey we are talking about is a half block

16   from Brevoort Houses, public housing, and the Bloods were in

17   120 Chauncey, the Crips were in Brevoort Houses, and there was

18   a big problem with them too.   It was only half a block away so

19   we had to keep officers over there at all times.

20   Q.   Now, at the roll call on January 28, 2009, you referred to

21   Chief Scagnelli and TrafficStat?

22   A.   Yes.

23   Q.   What is the purpose of TrafficStat?

24   A.   TrafficStat is to look at accidents and where they are

25   happening and what is the causating factors, what leads to

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 105 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 129 of 177   1929
D428FLO4                    Mauriello - cross

1    accidents.  How can we prevent the accidents and how can we

2    prevent the injuries from the accidents?

3              MR. MOORE:  Can you just give the time you're

4    referring to?

5              MS. GROSSMAN:  I wasn't referring to a time.  January

6    28, 2009.

7    Q.  Now, at the January 28, 2009 roll call, you made reference

8    to Chief Marino looking at everyone's evaluation, correct?

9    A.  Yes.

10             MR. MOORE:  The time is 20:25 to 22:07?

11             MS. GROSSMAN:  Let me just check.

12             Mr. Moore, actually, I think this was on January 28,

13   2009, 20:25 to 22:07.  If you move all the way down to the very

14   bottom, there is a second line 11.

15   Q.  There was a reference to Chief Marino yelling, right?

16   A.  Yes.

17   Q.  Did Chief Marino yell?

18   A.  Chief Marino never yelled at me.

19   Q.  What were you trying to communicate --

20   A.  I was trying to tell my officers how important it is to

21   work all year because now it's January and Chief Marino -- the

22   evaluation is already done, he is looking over them.  Not only

23   do you got to do right for the community, you have got to work

24   every day, and everybody is looking at it, your activity, if

25   you're working.

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 106 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 130 of 177   1930
D428FLO4                 Mauriello - cross

1    Q.  Now, on the January 28, 2009 tape, at 23:24 to 24:10, at

2    line 17.  That's January 28, 2009, 23:24 to 24:10, line 17.

3               MR. MOORE:  Let me just --

4               MS. GROSSMAN:  I will read it, Mr. Moore.

5               MR. MOORE:  I want to find the document you're

6    referring to.  What is the date and time?

7               MS. GROSSMAN:  January 28, 2009, 23:24 to 24:10.

8    Q.  Let's start at line 14.  "You should be done by the first

9    of the month.  I always was, you know, rest of the month, you

10   can skate."

11              Now, what was being referred to in that statement, to

12   the best of your understanding?

13   A.  I believe the sergeant is saying that you should have --

14   you should be done with all of your activity the first of the

15   month, you should be done working.

16   Q.  What is your view about that idea of setting a number so

17   that you could be done at the very beginning of the month?

18   A.  I'm absolutely against it.  The officer should be out there

19   every day working.  The crime trends are daily and the officer

20   should be working daily every day.  If there is a crime, I

21   expect them to make an arrest.  If there is a summons, I expect

22   them to correct the condition.

23   Q.  What happens if a quota is actually set and it's something

24   that can be achieved very quickly, what happens to the rest of

25   the month?

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 107 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 131 of 177   1931
D428FLO4                    Mauriello - cross

1   A.   The community crime will go up, violence will go up, and

2   the officers won't be out there enforcing the law.

3   Q.   Now, on one of the tapes, the tape referring to zero

4   tolerance, that I believe was the October 31 tape.

5           MR. MOORE:   I need for you to identify it.

6           MS. GROSSMAN:   I know.

7           October 31, 2008, at 6:35 to 7:26, line 18.

8   Q.   Can you explain what you meant by the term "herded"?

9   A.   Yes.  Again, that night, along with New Year's Eve and July

10  4th, it's hard to do radio warrant checks, go up to the radio,

11  because it's a citywide frequency and on the citywide, on

12  Halloween is the parade, New Year's Eve is Times Square, 4th of

13  July is the fireworks.  It's hard to go up.  You can't do

14  warrant checks over the radio.  So when I said that, I wanted

15  my officers to understand that if it is a summonable offense, I

16  expect them to be brought into the precinct with their ID and

17  run right there and then released.  If they had a warrant, they

18  are going to stay and be arrested.

19  Q.   Now, Mr. Moore asked you some questions about is it an

20  offense to actually stand on the street corner.  When would it

21  be a summonable offense if someone was standing or a group of

22  people were standing on the street corner?

23  A.   If a large group was standing on a corner and the officer

24  is observing them for a while and the officer asked the large

25  group, could you do me a favor and please get off the corner,

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 108 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 132 of 177  1932
D428FLO4                  Mauriello - cross

1  there are problems over here, and the group refuses, then that

2  officer is going to tell them, if you don't move off the

3  corner, I could give you a summons for blocking pedestrian

4  traffic.  Then he gives them a second chance and usually

5  everybody moves.

6  Q.  So the key point here is blocking pedestrian traffic?

7  A.  Blocking pedestrian traffic.  Usually it's in front of a

8  store, they can't get in front of a store, usually a bodega.

9  Q.  Earlier you made reference to civilian complaints.  Did you

10  make any observations about the number of civilian complaints

11  against officers in the 81st Precinct from 2007 to 2008 when

12  you were the CO of the 81st Precinct?

13           MR. MOORE:  Objection, Judge.  That's beyond the scope

14  of the direct.

15           THE COURT:  Let me read that again.

16           Is that before or after that article?  Because you

17  brought out, Mr. Moore, he said there weren't any complaints

18  until the article in the paper.

19           MS. GROSSMAN:  It's prior to.  It's between 2007 and

20  2008.

21           THE COURT:  It's prior to.  He said there were no

22  complaints.  That's my recollection of the testimony.  There

23  weren't any complaints before the article.

24           MS. GROSSMAN:  Complaints from the community.

25           THE COURT:  About the police.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-06005-RWS  Document 500-14  Filed 09/21/15  Page 109 of 111
Case 1:08-cv-01034-SAS-HBP  Document 298  Filed 05/30/13  Page 133 of 177   1933
        D428FLO4                Mauriello - cross

1              MS. GROSSMAN:  Right.  From community council

2    meetings.

3              THE COURT:  Go ahead and answer it.

4              THE WITNESS:  When he asked me were there any

5    complaints about illegal stop and frisking and racial

6    profiling, I said not till the article, which was May 2010.

7    That's the first time we ever heard, nobody in the community

8    ever complained.

9    Q.   My question is, there are times as commanding officer of

10   the 81st Precinct that there may be civilian complaints filed

11   to the Civilian Complaint Review Board, correct?

12   A.   Yes.

13   Q.   And you would get notice of that as a commanding officer,

14   correct?

15   A.   Yes.

16   Q.   Did you make any observations in terms of the number of

17   civilian complaints that were filed with the Civilian Complaint

18   Review Board between 2007 and 2008?

19             MR. MOORE:  I am going to object.  First of all, it's

20   the period of time I believe before he was the CO.

21             THE COURT:  I don't see the relevance of this question

22   anyway.  I really don't.

23             MS. GROSSMAN:  He was the XO.

24             THE COURT:  I think it's an irrelevant issue, a

25   nonissue in this case, whether there were complaints or not

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Case 1:10-cv-06005-RWS   Document 500-14   Filed 09/21/15   Page 110 of 111
Case 1:08-cv-01034-SAS-HBP   Document 298   Filed 05/30/13   Page 134 of 177   1934
D428FLO4                    Mauriello - cross

1    complaints.  We are talking here about stop and frisk, not

2    about the police department, not generally about what the

3    community thinks of the police.  We are not doing that.  This

4    is not a trial about the police department.  It's a trial about

5    the stop and frisk policy only.  He said there weren't any stop

6    and frisk complaints until the article.

7              Please ask your next question.

8              MS. GROSSMAN:  Your Honor, I would just like to --

9              THE COURT:  Please ask your next question, Ms.

10   Grossman.  I don't need any further comment.  I made a ruling.

11   Lawyers, all sides, live with the rulings.  That's what

12   experienced trial counsel do.  They move on.  Next question,

13   please.

14   Q.  Now, Mr. Moore showed you what has been entered into

15   evidence as --

16             MS. GROSSMAN:  Mr. Moore, what was the number of the

17   plaintiffs' exhibit, department advocate?

18             THE WITNESS:  I think it was 298.

19             MR. MOORE:  298.

20   Q.  Exhibit 298, August 11, 2010 transcript.  Did you have a

21   chance to review that transcript?

22   A.  Yes.

23   Q.  Did you actually have a chance to review it in order to

24   make corrections to it?

25             MR. MOORE:  Objection to the form.

Case 1:10-cv-06005-RWS Document 500-14 Filed 09/21/15 Page 111 of 111
Case 1:08-cv-01034-SAS-HBP Document 298 Filed 05/30/13 Page 135 of 177 1935
D428FLO4                      Mauriello - cross

1   A.   Yes.

2              MR. MOORE:   I withdraw my objection.

3              THE COURT:   Overruled.

4              MS. GROSSMAN:   Can I have a minute?

5              I have no further questions, your Honor.

6              THE COURT:   Mr. Moore, anything further?

7              MR. MOORE:   Nothing, Judge.

8              THE COURT:   Thank you.

9              MR. MOORE:   Judge, our next witness is another police

10  officer.  I just want to advise the Court that I am doing the

11  examination, and I need to go to the hospital tomorrow morning

12  with my wife, as I explained to you earlier.  We can start now.

13  I think we can finish, but if for some reason --

14             THE COURT:   I have a doctor's appointment so I have to

15  leave earlier than 4:15, and I thought we might not take a

16  break.

17             MR. MOORE:   I think we can finish in an hour.

18             THE COURT:   If we start, we can finish.  So where is

19  the witness?

20             MR. MOORE:   The next witness is Sergeant Hegney,

21  Richard Hegney.

22   RICHARD HEGNEY,

23        called as a witness by the plaintiffs,

24        having been duly sworn, testified as follows:

25             THE COURT:   State your full name, first and last,