SM EXHIBIT H

```
 1
 2    UNITED STATES DISTRICT COURT
 3    EASTERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - -
 5    ADRIAN SCHOOLCRAFT,
 6                        Plaintiff,
 7           -against-  Index No.
                         10CIV-6005 (RWS)
 8
      THE CITY OF NEW YORK, DEPUTY CHIEF
 9    MICHAEL MARINO, Tax Id. 873220,
      Individually and in his Official
10    Capacity, ASSISTANT CHIEF PATROL
      BOROUGH BROOKLYN NORTH GERALD NELSON,
11    Tax Id. 912370, Individually and in his
      Official Capacity, DEPUTY INSPECTOR
12    STEVEN MAURIELLO, Tax Id. 895117,
      Individually and in his Official
13    Capacity, CAPTAIN THEODORE LAUTERBORN,
      Tax Id. 897840, Individually and in his
14    Official Capacity, LIEUTENANT JOSEPH
      GOFF, Tax Id. 894025, Individually and
15    in his Official Capacity, stg. Frederick
      Sawyer, Shield No. 2576, Individually
16    and in his Official Capacity, SERGEANT
      KURT DUNCAN, Shield No. 2483,
17    Individually and in his Official
      Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18    Tax Id. 885374, Individually and in his
      Official Capacity, SERGEANT SHANTEL
19    JAMES, Shield No. 3004, and P.O.'s "JOHN
      DOE" 1-50, Individually and in their
20    Official Capacity (the name John Doe
      being fictitious, as the true names are
21    presently unknown)(collectively referred
      to as "NYPD defendants"), JAMAICA
22    HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
      Individually and in his Official
23    Capacity, DR. LILIAN ALDANA-BERNIER,
      Individually and in her Official Capacity
24    and JAMAICA HOSPITAL MEDICAL CENTER
      EMPLOYEES "JOHN DOE" # 1-50, Individually
25
      (Continued)
```

Page 2

```
 1
 2   and in their Official Capacity (the name
     John Doe being fictitious, as the true
 3   names are presently unknown),
 4
     Defendants.
 5
         - - - - - - - - - - - - - - - - - - -x
 6
                         444 Madison Avenue
 7                       New York, New York
 8                       December 20, 2013
                         10:16 a.m.
 9
10       VIDEOTAPED DEPOSITION of DEPUTY
11   INSPECTOR STEVEN MAURIELLO, one of the
12   Defendants in the above-entitled action,
13   held at the above time and place, taken
14   before Margaret Scully-Ayers, a Shorthand
15   Reporter and Notary Public of the State
16   of New York, pursuant to the Federal
17   Rules of Civil Procedure.
18
19              *      *      *
20
21
22
23
24
25
```

```
                                              Page 112
 1              S. MAURIELLO
 2          MR. SMITH:  For the record this
 3     a one-page letter, October 28, 2008,
 4     Bates-stamped D819.
 5       Q.    Is this the letter of reprimand
 6  you were just referring to, Inspector?
 7          MR. LEE:  Objection to form.
 8     It's a letter of instruction.
 9          THE WITNESS:  Letter of
10     instruction, not a reprimand.
11       Q.    I wasn't trying to characterize
12  it.  That's what it says, "Re: Letter of
13  reprimand, letter of instruction."
14          It's the same thing, right?
15          MS. PUBLICKER METTHAM:
16     Objection.
17       A.    Yes.  I add that I was promoted
18  three days after this letter.  I was
19  promoted October 31st, 2008.
20       Q.    So this letter didn't
21  negatively impact your career, right?
22       A.    I don't know if we're allowed
23  to talk about the case.
24          THE WITNESS:  Are we allowed to
25     talk about the case?
```

1                S. MAURIELLO
2           MR. KRETZ: Answer his question
3      if you can. If you can't, tell him.
4      A.    I believe it did. A letter of
5   reprimand or instruction in my file so I
6   was promoted for my hard work and the
7   precinct's hard work.
8      Q.    This was a promotion to CO of
9   the eight one, right?
10     A.    No, I was already CO of the
11  eight one.
12     Q.    What was the promotion that you
13  got?
14     A.    Deputy inspector.
15     Q.    When did you receive that
16  promotion?
17     A.    October 31st, 2008.
18     Q.    According to this letter of
19  instruction or letter of reprimand, you
20  contacted CCRB investigators about an
21  allegation by a complainant.
22          Do you see that reference
23  there?
24     A.    Yes, I can explain the whole
25  thing if you want.

1          S. MAURIELLO
2     Q.    Is that true that you
3  telephoned them?
4     A.    I returned their phone call,
5  yes.
6     Q.    Can you explain it to me?
7     A.    Well, I had nothing to do with
8  the case.  It was an allegation I guess
9  discourtesy to one of my officers, two
10 officers that made an arrest.
11           They brought the person inside
12 the precinct.  The person under arrest
13 was African American.  The two officers
14 that made the arrest were African
15 American.  The desk officer was African
16 American.
17           Supposedly there was a
18 discourtesy one of the officers said
19 something, discourtesy that was witnessed
20 by everybody.  I was there.
21           The mother ends up called the
22 TS to switch to me and I didn't know.
23 And I talked to her.  I guess she was on
24 the job.  She is not on the job anymore,
25 a civilian.  That was it.  I returned --

```
 1              S. MAURIELLO
 2   the investigator left three calls on
 3   my -- 'cause I was a witness I guess. I
 4   talked to her. She was in South Carolina
 5   at the time. She had nothing to do with
 6   it.
 7              He left three messages with my
 8   secretary, and I called back the guy. I
 9   got his answering machine, if you are
10   calling about this case, this is what I
11   was told happened. That's all I said. I
12   didn't have any interaction with the
13   civilian complainant.
14              I guess he thought it was
15   inappropriate for me to put that on the
16   tape. I wasn't trying to be
17   inappropriate.
18        Q.    The statement in the last
19   sentence, quote, additionally during one
20   phone call, you left a voice message on
21   an answer machine questioning the
22   veracity of the CCRB investigators's
23   contact with the complainant, that is
24   inaccurate?
25        A.    All I left on the tape was that
```

Page 116

1                S. MAURIELLO
2      this is what happened and that is it.  I
3      wasn't the subject of the CCRB.  I had
4      nothing to do with the CCRB.
5          Q.    I understand that.
6                Is the statement here that you
7      left a voice message questioning the
8      veracity of the CCRB investigator's
9      contact, is that an accurate statement?
10         A.    I guess it's an accurate
11     statement.
12         Q.    It is an accurate statement?
13         A.    I don't know about the
14     veracity, but, yes.
15         Q.    That is the nature of the
16     concern you were leaving a message, a
17     voice message, questioning the veracity
18     of the CCRB investigator's contact with
19     the complainant.
20               What I want to know is whether
21     that is true:  You did leave a message
22     questioning that behavior?
23         A.    I didn't question the CCRB
24     investigator's behavior.  I just left a
25     message this is what I was told, that was

S. MAURIELLO

it, nothing to do with me.  I guess the CCRB investigator maybe thought I was trying to, you know, prove the cops were innocent.  I don't know.

I take fault there was a misunderstanding, a miscommunication.  I don't think there was anything intentional or anything -- there was nothing harsh by me to the investigator.

Q.	The last paragraph "You are directed to meet with the commanding officer control borough Brooklyn North to discuss this letter.  Did you do that?

A.	Yes, I did.

Q.	Who did you speak with?

A.	Chief Nelson.

Q.	Am I correct that you told me you never received any other form of disciplinary action against you, right?

A.	No.  I think I had two CCRBs about it in my whole career and no discipline.  That was it.  I never got command discipline my whole career up to these charges.