SM EXHIBIT I

GJR/da
667-82153
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

Plaintiff,

-against-

THE CITY OF NEW YORK, DEPUTY CHIEF
MICHAEL MARINO, Tax Id. 873220, Individually
and in his Official Capacity, ASSISTANT CHIEF
PATROL BOROUGH BROOKLYN NORTH
GERALD NELSON, Tax Id. 912370, Individually and
in his Official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax Id. 895117, Individually
and in his Official Capacity CAPTAIN THEODORE
LAUTERBORN, Tax Id. 897840, Individually and in
his Official Capacity, LIEUTENANT JOSEPH GOFF,
Tax Id. 894025, Individually and in his Official
Capacity, SGT. FREDERICK SAWYER, Shield No.
2576, Individually and in his Official Capacity,
SERGEANT KURT DUNCAN, Shield No. 2483,
Individually and in his Official Capacity,
LIEUTENANT CHRISTOPHER BROSCHART, Tax
Id. 915354, Individually and in his Official Capacity,
LIEUTENANT TIMOTHY CAUGHEY, Tax Id.
885374, Individually and in his Official Capacity,
SERGEANT SHANTEL JAMES, Shield No. 3004,
AND P.O.'s "JOHN DOE" #1-50, Individually and in
their Official Capacity (the name John Doe being
fictitious, as the true names are presently unknown)
(collectively referred to as "NYPD defendants"),
JAMAICA HOSPITAL MEDICAL CENTER, DR.
ISAK ISAKOV, Individually and in his Official
Capacity, DR. LILIAN ALDANA-BERNIER,
Individually and in her Official Capacity and
JAMAICA HOSPITAL MEDICAL CENTER
EMPLOYEE'S "JOHN DOE" # 1-50, Individually and
in their Official Capacity (the name John Doe being
fictitious, as the true names are presently unknown),

Defendants.
-------------------------------------------------------------X

**EXPERT DISCLOSURE**

Civil Action No.:
10 CIV 6005 (RWS)

**JURY TRIAL DEMANDED**

COUNSELORS:

  **PLEASE TAKE NOTICE**, that pursuant to Rules 26(a)(2)(B), the undersigned

attorneys provide the following expert witness disclosure on behalf of defendant JAMAICA

2388647_1

HOSPITAL MEDICAL CENTER:

1.   Statement of opinions by witness— see attached report as Exhibit "A."

2.   Information considered by witness— the documents to which the witness refers in the attached report as Exhibit "A."

3.   Exhibits to be used by witness— the documents to which the witness refers are listed in the attached report as Exhibit "A."

4.   Witness qualifications—see attached C.V. as Exhibit "B."

Testimony in the past four years:

> *Ballek v. Aldana-Bernier* (Queens County)
>
> *Acosta v. Southside* (Suffolk County)

5.   Fees:   $400/hour for review of records

$500/hour for testimony in Court

**PLEASE TAKE FURTHER NOTICE** that defendant reserves the right to supplement this disclosure at any time up to and including the time of trial.

Dated: New York, New York
September 17, 2014

Yours, etc.,

MARTIN CLEARWATER & BELL LLP

By:_____
GREGORY J. RADOMISLI (GJR-2670)
A Member of the Firm
Attorneys for Defendant
JAMAICA HOSPITAL MEDICAL CENTER
220 East 42nd Street
New York, New York 10017-5842
(212) 697-3122

Dr. Lubit also appears to believe that the content of Mr. Schoolcraft's statements was self-evidently non-delusional because they were not especially bizarre and that the bruises noted on him in the emergency room were incontrovertible evidence that the police had abused him.

I believe that these conclusions are made from the vantage point of hindsight and depend upon information that was not initially available to the Jamaica Hospital doctors.   Once this information was available, there was clear movement towards discharging the patient. Moreover, the conclusions overlook the way in which the patient's demeanor and choices may have unfortunately and unintendedly served to bolster the misrepresentations made by members of his precinct.  In addition, the patient was initially quite guarded and reticent, limiting the duration of the clinical interview and the depth of exploration.  He also withheld consent for obtaining the records of a prior mental health evaluation, thus limiting the ability of Jamaica Hospital staff to perform a full assessment and which, paradoxically, might have expedited his discharge (as the psychologist did not actually deem him psychotic or dangerous and her evaluation would have allayed some of the legitimate worries the Jamaica Hospital psychiatrist had).

**Conclusions:** I opine, with a reasonable degree of medical certainty that Jamaica Hospital did not deviate from acceptable community standards of care and did not violate the plaintiff's rights. I do so for the following reasons:

1) A number of factors coincided, which would quite reasonably lead to the conclusion that the patient was psychiatrically ill and acutely paranoid, largely based upon information given by his precinct to Jamaica Hospital staff.  It is a quite rare and not generally credible scenario that the police would make systematic misrepresentations of this nature.  This occurred in the context of a prior mental health evaluation, which resulted in restricted duty and the loss of his weapon and which has not been definitively proven to be linked to the conspiracy at his precinct. The initial diagnosis of Psychosis NOS was therefore warranted. It was also appropriate for the E.D. physician to rely upon the psychiatric consultant to make this judgement.

   The plaintiff was brought in as an EDP with police reporting that: he was agitated; had left work precipitously and had subsequently barricaded himself into his apartment; and was refusing medical attention for significantly elevated blood pressure (which, interestingly, the patient believed may have been exaggerated by the EMS) and the acute onset of abdominal pain.  He was initially hostile and abusive in the emergency room, which made it harder to obtain information and gave further credence to his precinct's misrepresentations.  He spoke of the police being out to get him and of their persecuting him, which could also appear quite paranoid without benefit of full contextual material. While his beliefs were not completely bizarre (i.e., no reports of aliens or expression of Schneiderian delusions), they were in no way inconsistent with how paranoia could reasonably present.

(Schoolcraft v. Jamaica Hospital)

Moreover, the bruises he sustained from the police could just as readily be understood as an artifact of his struggling with them as of proof that he was being abused.

Many individuals would have attempted to calmly and rationally explain to emergency room staff their version of events but the patient's pre-existing state of emotional distress may have prevented him from doing so, inadvertently compounding matters.

Moreover, this event was not without precedents in his family history, as his father was involved in a similar case when he was a police officer in Texas (allegations of bid rigging in this instance). This is likely to have heightened the plaintiff's distress and to have caused his father to give him advice that ultimately worked to the plaintiff's detriment (i.e., refusing to go to Jamaica Hospital). Although the plaintiff would have clearly preferred to go to Forest Hills Hospital, it is unclear that there was any rational reason to refuse to go to Jamaica Hospital. The patient apparently believed (and still does according to his deposition) that Jamaica Hospital was colluding with his precinct, although he acknowledges that no evidence has emerged that would support this.

2) The patient's admission was predicated on credible views of significant potential dangerousness, not just on agitation or paranoia. An individual who has an altercation with the police, is credibly reported to have barricaded himself in his apartment (there were no eyewitnesses to dispute the police account and, at that moment, the patient would simply not have seemed as credible as the police) and is refusing medical evaluation for potentially serious conditions at a nearby facility could be quite reasonably deemed a significant potential danger to self. In addition, the presence of agitation, irritability, paranoid ideation and possible access to weapons would be reasonable grounds to construe the patient a significant potential danger to others.

It is important to note that psychiatry has long grappled with the difficulty in predicting dangerousness. There are no quantifiable measures such as lab tests that have yet been found to predict dangerousness and factors associated with prediction of dangerousness are probabilistic and associational in nature and are more accurate in populations than in individuals. Thus, psychiatrists often err on the side of safety in weighing the difficult conflict between prevention of danger and abrogation of individual liberty. The weighing in on this case was within the margin of community standards for the practice of psychiatry.

3) The duration and depth of the patient's assessment were constrained by his guardedness and extreme emotional reaction to the situation as well as his refusal to permit the release of information from a prior mental health evaluation.

(Schoolcraft v. Jamaica Hospital)

-7-

Much has been made of the failure of the psychiatric emergency room to immediately contact the Internal Affairs Bureau, but this presupposes a level of familiarity with police infrastructure and procedures that the average psychiatrist would be unlikely to have. Moreover, Dr. Isakov did speak with the Internal Affairs Bureau shortly after the patient's admission and did correctly appreciate and weigh their input.     Thus, I opine that the assessment was done in an appropriate and timely fashion, with adequate weight accorded to information as it emerged.

4)  Regarding the assertion that Jamaica Hospital relied on hearsay, that is a legal term, not relevant to psychiatric practice. What would be construed as hearsay in a courtroom is considered collateral information in a psychiatric evaluation.

5)  In view of the patient's level of emotional distress about the larger situation, not just the hospitalization, it was appropriate to insist upon an aftercare referral prior to discharging the patient.

6)  The patient's current emotional condition is likely to be referable to the larger picture of his perceived victimization by the police department with the hospitalization playing a relatively small role, especially because this hospitalization concluded with an acknowledgement of the veracity of his statements. His difficulty finding work is also likely to be largely the result of this larger picture and is unfortunately consistent with the difficulties faced by many whistleblowers.

7)  For the foregoing reasons, I opine with a reasonable degree of medical certainty that there was no dereliction established in the conduct of Jamaica Hospital in the assessment and care it provided or in the training and retention of its staff. There is absolutely no evidence that Jamaica Hospital colluded with the 81st Precinct. It is also noteworthy that according to the deposition of the plaintiff's father, their prior attorney suggested that they discontinue the case against Jamaica Hospital.

*Robert H Levy MD*

Robert Levy, MD
License # 166649
NPI # 1942385489

(Schoolcraft v. Jamaica Hospital)

TO:   **BY E-MAIL**
      **AND REGULAR MAIL**

      LAW OFFICE OF NATHANIEL B. SMITH
      Attorneys for Plaintiff
      111 Broadway, Suite 1305
      New York, New York 10007
      (212) 227-7062

      CALLAN KOSTER BRADY & BRENNAN, LLP
      Attorneys for Defendant
      LILIAN ALDANA-BERNIER, M.D.
      One Whitehall Street, 10th Floor
      New York, New York 10004
      (212)  248-8800

      IVONE, DEVINE & JENSEN, LLP
      Attorneys for Defendant
      ISAK ISAKOV, M.D.
      2001 Marcus Avenue, Suite N100
      Lake Success, New York 11042
      (516)  326-2400

      MICHAEL A. CARDOZO
      CORPORATION COUNSEL
      Attorneys for Defendants
      NEW YORK CITY POLICE DEPARTMENT et. al.
      Law Department of the City of New York
      100 Church Street Room 2-124
      New York, New York 10007
      (212)  788-8703

      SCOPPETTA SEIFF KRETZ & ABERCROMBIE
      Attorney for Defendant
      DEPUTY INSPECTOR STEVEN MAURIELLO
      444 Madison Avenue, 30th Floor
      New York, NY  10022
      212-371-4500

2388647_1

Robert H. Levy, M.D.
19 West 34th Street – Suite 1200
New York, NY 10001
212-562-3440

Associate Professor of Clinical Psychiatry, NYU School of Medicine
Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Examiners

Expert Report: Psychiatry
Date: August 22, 2014
Case: Schoolcraft v. Jamaica Hospital
Materials Reviewed:

- Plaintiff's complaint and jury trial demand
- Jamaica Hospital Records
- Depositions: Dr. Aldana- Bernier, Dr. Isakov, Dr. Lamstein-Reiss, E.Hanlon, A Schoolcraft, J. Schoolcraft (plaintiff's father), Dr. Patel, Dr. Levin, Dr. Dhar
- Expert Reports -- Dr. Lubit (psychiatry), Dr. Halpren-Ruder (emergency medicine)

Allegation: Plaintiff alleges denial of due process concerning his voluntary commitment and medical malpractice (failure to recognize that he was not ill, use of hearsay, inadequate documentation, failure to request proper studies, staff incompetence.) He also alleges negligent hiring, training and retention of staff at Jamaica Hospital.

Background: Adrian Schoolcraft worked as a New York City police officer for approximately seven years, beginning 07/02/02. He was first assigned to the 75th Precinct in East New York and after six months was transferred to the 81st Precinct. The plaintiff has described increasing pressure to produce more summonses and arrests beginning in 2005.

By 2007, he observed concerted efforts to over-report crimes and under-report accidents. He refused to collude in such falsification and was not meeting quotas for arrests and summonses. Until 2008, he had received average evaluations, but was told then that he would receive a poor evaluation for not meeting these quotas, which he described as an "illegal tax on the public." He has reported a pattern of harassment by peers and supervisors and believed that his supervisors might intentionally be placing him in dangerous situations.

In January 2009, he received a failing evaluation, which he appealed. He was subsequently written up for other infractions, which he denies (not being on post, unnecessary conversation with another officer). He was assigned overtime duty on 04/09/09 and called in sick. He went to the emergency room of Forest Hills hospital (LIJ) and received Ativan for extreme anxiety in the context of work and family stressors (father was having various difficulties and mother had died of cancer five years earlier).

-2-

After this Mr. Schoolcraft saw his internist who prescribed Seroquel for insomnia and anxiety, which he took for several nights. His sick day and emergency room visit triggered an evaluation by the police department's district surgeon, who raised the question of malingering.

He referred him to a police department psychologist, Dr. Lamstein-Reiss, who made a diagnosis of stress and anxiety on 04/15/09. In her deposition, she stated that she found him non-psychotic at the time, but did subsequently wonder about this. He was placed on restricted (desk) duty and was required to surrender his gun.

On 10/07/09 he met with Internal Affairs following a referral from a retired lieutenant whom his father knew and who also complained to his union. Mr. Schoolcraft believes that this helped precipitate the events of 10/31/09, which will be described below.

Subsequent to 2009, Mr. Schoolcraft had been living with his father and reports some harassment there from his former precinct. He is involved in litigation against the police department and New York City, which has been widely covered in the news media. He has described a pattern of anxious, avoidant and dysphoric symptoms to Dr. Lubit. He describes an inability to find work apart from odd jobs, which he attributes to the notoriety of his case. He avoids returning to New York City.

**Events of 10/31/09:** Mr. Schoolcraft was on switchboard duty at his precinct on this date. Unexpectedly, he was asked by his lieutenant to produce his activity log, in which he had been documenting his observations about improper behavior at the precinct. He described to Dr. Lubit that his lieutenant was leaning over him with his gun in an unusual and possibly precarious position and was worried that he would be accused of attempting to take the gun should it have fallen. He called his father who advised him to go home. There was an idiosyncratic statement in his father's deposition about feelings that the patient's deceased mother was somehow warning the patient about his safety.

Mr. Schoolcraft told the desk officer that he was sick and reports that he was permitted to take "loss time." One hour later (3:00 pm) officers arrived at his home and demanded that he return to the precinct, claiming that he could "not just go out sick." He felt afraid of them and was disinclined to allow them in. He told them that he was unwell (he reported nausea and abdominal pain and had also taken some Nyquil) and agreed to their suggestion about an ambulance. The EMTs arrived and noted that Mr. Schoolcraft was quite hypertensive. He agreed to go to Forest Hills Hospital, with which his internist was affiliated. When told that he would be brought to Jamaica Hospital, he returned to his apartment. The police apparently obtained a key from his landlord, although they subsequently alleged to Jamaica Hospital staff that he had barricaded himself in and that they had to break down the door. Mr. Schoolcraft reports that he was reclining on his bed and refused to go with them but that they became aggressive (including slamming him on the floor and stepping on his back, producing bruises that were noted in the Jamaica Hospital emergency room) possibly in the hopes of provoking him to react. He arrived at Jamaica Hospital's emergency room late that evening.

(Schoolcraft v. Jamaica Hospital)

-3-

Jamaica Hospital Records and Staff Depositions: Mr. Schoolcraft was received in the medical emergency room on the evening of 10/31/09. He was described as a 34-year-old white male with a sudden onset of epigastric pain. It was also noted that he was brought in by police and EMS due to irrational behavioral (EDP status). There were concerns about the possibility of dangerous gastrointestinal pathology noted on 11/1/09, but he was deemed medically cleared by 11/03/09 with normal labs (and a normal head CT). A psychiatric consultation was obtained on 11/01/09 from Dr. Lwin, with the consultation report co-signed by Dr. Patel. Information was obtained from Sergeant James and from the plaintiff. The police reported that the patient had left work precipitously and that he was agitated and had barricaded himself in his apartment, forcing them to break down the door. They further reported that despite significantly elevated blood pressure he refused to go to the hospital and had to be brought in handcuffed as an EDP.

Moreover, they stated that a prior departmental psychology evaluation resulted in his desk assignment and being forced to surrender his gun. The patient was noted to be agitated, uncooperative and verbally abusive in the medical emergency room. He told Dr. Lwin that he felt the police were against him and persecuting him. He also reported having no close friends. His mental status examination was described as noteworthy for this question of paranoid ideation, an irritable affect and impaired insight and judgment. It was determined that the patient should be transferred to the psychiatric emergency room when medically cleared.

Mr. Schoolcraft was transferred from the psychiatric emergency room and was admitted on a 9.39 status on 11/03/09. The admission note reflected the patient's denial of homicidal and suicidal ideation but articulated concerns regarding dangerousness in the context of his recent behavior and apparent paranoid ideation. Dr. Aldana-Bernier admitted the patient but the patient refused to sign the admission form. The R.N. notes from that date also reported guardedness, paranoid ideation and non-attendance at group activities. Risperidone, 0.5 mg p.o. bid was ordered but was refused by the patient. The patient's father saw him on 11/03/09 and described his as looking "disheveled and confused," although later in the deposition he described the plaintiff as coherent.

A psychosocial history was obtained on 11/04/09 by C. McMahon, C.S.W. Dr. Isakov received Mr. Schoolcraft on the in-patient unit and continued the evaluation process. Mr. Schoolcraft refused to allow Jamaica Hospital to obtain the record of his psychological evaluation by Dr. Lamstein-Reiss. However, following a meeting with the patient's father and members of the Internal Affairs Bureau, Dr. Isakov was able to understand the patient's issues with the officers and supervisors of his precinct and to see that beliefs that had appeared to be strongly suggestive of paranoia were grounded in fact and that his precinct had artfully manipulated the situation to make the patient appear psychiatrically ill. Mr. Schoolcraft had also become more cooperative and interactive by 11/05/09.

(Schoolcraft v. Jamaica Hospital)

-4-

-4-

As per hospital policy and congruent with his concern about the stress this situation was causing the patient (reflected in the change of diagnosis from psychosis NOS to adjustment disorder with mixed anxiety and mood features), Dr. Isakov instructed his staff to arrange for psychiatric follow-up (psychotherapy). As the patient did not want to be seen at Jamaica Hospital's clinic, an appointment with an outside psychotherapist (Dr.Luell) was arranged. Mr. Schoolcraft apparently kept one appointment with this doctor. He was discharged on 11/06/09 with a GAF score of 65 (as opposed to 40 on admission).

The depositions of Drs. Lavin, Patel, Aldana-Bernier and Isakov focused on issues of dangerousness and interpretation of the 9.39 admission statute. While Drs. Aldan-Bernier and Isakov did not optimally articulate the 9.39 criteria, seeming to indicate that delusions and agitation would meet the threshold, their descriptions of their clinical concerns regarding Mr. Schoolcraft indicate that in this case they were correctly applying the statute. They were given good reason to believe that the patient had been decompensating over a period of time (resulting in the loss of his police gun), had been agitated, barricaded himself in his apartment and was combative with the police. Moreover, it appeared that he was declining medical evaluation for significant hypertension and possibly serious gastrointestinal complaints. Thus, he would quite reasonably be considered a significant potential danger to himself. Moreover, his reported combativeness with the police and concern about possible access to weapons would quite reasonably be considered evidence of significant potential danger to others.

The deposition of Dr. Dhar largely focused on the policies and procedures at Jamaica Hospital regarding admission and their congruence with the 9.39 statute. There is no evidence of any incongruence or of departures from these hospital policies and procedures by any clinical staff in this case.

**Expert Report – Dr. Halpren-Ruder:** This report focused on the medical emergency room's conduct and care. Regarding medical clearance for transfer to psychiatry, he acknowledges that laboratory tests and a head CT were obtained and were within normal limits. He correctly notes that urine toxicology screen was not obtained, however, which would be a final component of appropriate medical clearance. He states that the patient indicates he would have given urine for a toxicology screen. The record and depositions do not indicate if he was requested to do so or if he refused. Thus it is unclear if the cancelation of the toxicology screen was an error on the part of Jamaica Hospital, as the plaintiff's expert claims, or was due to the patient's refusal. Thus, no definitive conclusion can be drawn on this point.

**Expert Report – Dr. Lubit:** This report provides a detailed history of Mr. Schoolcraft's earlier history, the incident that is the subject of the current litigation and the plaintiff's current mental state. He concludes that there was no adequate medical or legal basis for the plaintiff's commitment to Jamaica Hospital, that there was a failure to obtain and adequately interpre information from the patient (including an overly-brief evaluation and a failure to explore bel with him) and that the patient has been greatly harmed by this admission (including diff obtaining employment).

(Schoolcraft v. Jamaica Hospital

-5-

## CURRICULUM VITAE

**NAME:**      Robert H. Levy, M.D.
**ADDRESS:**   315 West 23rd St, Apt# 12-C
                New York, NY  10011

**PLACE OF BIRTH:**   New York, NY

**EDUCATION:**        1981 B.A. Brown University
                      1985 M. D. Brown University School of Medicine

## POST DOCTORAL TRAINING:
1985 – 1989    Psychiatry Residency, New York University Medical Center

## LICENSURE AND CERTIFICATION:
1990           New York State License #166649-1
1990           Diplomate, American Board of Psychiatry and Neurology, Certificate #33255
1996           Diplomate, American College of Forensic Examiners

## ACADEMIC APPOINTMENTS:
1989 – 1996    Clinical Instructor in Psychiatry, New York University School of Medicine
1996 – 2000    Clinical Assistant Professor of Psychiatry, New York University School of Medicine
2000 - Present Clinical Associate Professor of Psychiatry, New York University School of Medicine

## HOSPITAL APPOINTMENTS:
1989 – 1992    Attending Psychiatrist, Project Help Unit (18-West), Bellevue Hospital Center
1992 – 1994    Unit Chief: 18-West, Bellevue Hospital Center
1994 –         Associate Director of Inpatient Psychiatry and Senior Clinical Coordinator, Bellevue Hospital Center
1999 –         Attending Psychiatrist, Tisch Hospital, New York University School of Medicine
1999 – 2004    Attending Psychiatrist, Gracie Square Hospital

## OTHER PROFESSIONAL POSITIONS:
1986 – 1997    Clinical investigator in Phase II and Phase III anxiolytic and antidepressant trials and psychopharmacology consultant for the treatment of refractory unipolar and bipolar patients, The Foundation for Depression and Manic Depression, New York, NY
1987 – 2003    Psychopharmacology consultant, the Postgraduate Center for Mental Health, New York, NY
1989 – 1996    Designee of New York City Mental Health Commissioner for evaluation and 9.37 Transport of homeless mentally ill individuals (Project Help Initiative)
1996 – 2007    Private Practice (Psychopharmacology): 133 East 73rd Street, New York, NY  10021
2007 -         Private Practice ( Psychopharmacology): 19 West 34th Street , Suite1200 New York , NY 10001
2003 –         Member, Scientific Advisory Board and Chief Affective Disorders Section, Mental Illness Prevention Center, New York University

## AWARDS AND HONORS:

1980           Phi Beta Kappa, Brown University
1981           Magna Cum Laude, Brown University
               Thomas Ratcliffe Hicks Premium, Brown University English Department (honor's thesis: "On the severance of the relationship between cause and effect in Shakespeare's romances").
1985           Honors Graduate, Brown University School of Medicine
1993           Clinical Excellence Award, Bellevue Hospital Center Department of Psychiatry

## MAJOR COMMITTEE ASSIGNMENTS:

## Regional

1992 – 1993    Member, City-State Task Force on the Homeless Mentally Ill, New York City

1994 – 1999    Member, New York State Office of Mental Health Assertive Community Treatment (ACT) NYCRO/DMH Advisory panel

1996 – 2000    Chairman, Psychopharmacology Protocols Subcommittee, HHC Taskforce for Development of Critical Pathways

2000 – 2001    Member, Psychopharmacology Formulary Advisory Committee, Health and Hospital Corporation

2003 –    DHS/HHC/HANYS committee on the Homeless Mentally Ill.

## Hospital

1992 – 1994    Member, Inpatient Psychiatry Quality Assessment Committee

1993 –    Member, Psychiatry Department Advisory Panel for Bellevue Hospital Formulary Committee. Duties have included authorship of guidelines for use of psychotropic medications and revision of hospital protocol for Lithium therapy.

1993 – 1998    Member, Psychiatry Department Steering Committee

1995 – 1998    Member, Steering Committee, Bellevue Outpatient Commitment Program

1999 –    Chairman, Department of Psychiatry Pharmacology Advisory Committee

2000 –    Member, JCACHO Preparation Task Force

## PROFESSIONAL SOCIETY MEMBERSHIP

1989 – 2003    Member, American Psychiatric Association
2003 –    Fellow, American Psychiatric Association

## MAJOR RESEARCH INTERESTS

1. Atypical antipsychotic medications, including participation in Phase II trial of RWJ37796, Phase III trials of sertindole and ziprasidone, and Phase IV trial of risperidone, as well as studies of plasma HVA levels during the course of treatment with haloperidol and risperidone.

2. Thymoleptic and anxiolytic medications including participation in phase II and Phase III trials of tamoxetine, paroxetine dothiepin, ondansetron, ipsapirone, zalospirone, and gepirone; also lamotrigine trials in bipolar depression and rapid-cycling bipolar disorder.

3. Community psychiatry – demographics and prevalence of psychiatric and medical illnesses in homeless individuals.

## PRINCIPAL CLINICAL AND HOSPITAL SERVICE RESPONSIBILITIES

See Hospital Appointments

## TEACHING EXPERIENCE:

1989 -    Psychopharmacology seminar for PGYII residents, Bellevue Hospital Center

1989 – 1994    Lecturer, New York University School of Medicine – Psychiatry clerkship – anxiety disorders, psychiatric manifestations of medical illnesses.

1989 -    Psychopharmacology supervision PGYIII and IV residents, Bellevue Hospital Center

1990 – 2002    Psychopharmacology clinic case conference, Bellevue Hospital Center

1994 -    Advanced psychopharmacology seminar PGY IV residents, Bellevue Hospital Center

1994 -    Seminar on biological issues in schizophrenia PGY I residents, Bellevue Hospital Center

1995 -    Guest faculty, Mid-Hudson Correctional Facility, Middletown, NY

1996 – 1998    Case Conference refractory psychosis and atypical neuroleptics, St. Vincent's Hospital, New York, NY (residents and medical students)

1997 -    Lecture for PGYII residents, Bellevue Hospital Center – Pharmacologic management of bipolar disorder

2000 -    Lecture for PGY I residents and psychology interns, Bellevue Hospital Center – treatment goals and modalities for inpatient psychiatric care.

## Invited Presentations

1993    Guest Faculty, St. Vincent's Hospital, New York, NY.
Topic: The Project Help Initiative. Perspectives on the homeless mentally ill and strategies for refractory psychosis.

1994    Grand Rounds, Brooklyn Veterans Hospital, Brooklyn, NY
Topic: Update on Antipsychotic medications and treatment strategies for refractory psychosis.

1997    Guest Faculty, New York University Medical Center Department of Psychiatry, Secret Service Training Program

1999    Grand Rounds, South Beach Psychiatric Center, NY
Topic: Pharmacologic Management of Agitation.

1999    Grand Rounds, Kingsboro Psychiatric Center, Brooklyn, NY
Grand Rounds, Jacobi Hospital, Bronx, NY
Grand Rounds, Holy Name Hospital, Teaneck, NJ
Grand Rounds, Elmhurst Hospital, Queens, NY
Topic: Treatment Algorithms for Bipolar Disorder

2000    Grand Rounds, Westchester County Medical Center, Valhalla, NY
Topic: Pharmacologic Management of Agitation

2001    Grand Rounds, St. John's Episcopal Hospital, Queens, NY
Grand Rounds, Bergen Regional Hospital, Paramus, NJ
Grand Rounds, Creedmoor Psychiatric Center, Queens, NY
Topic: Treatment Algorithms for Bipolar Disorder

2002    Grand Rounds, Bronx Lebanon Hospital, Bronx, NY
Topic: New Remission Data for Dual-Action Antidepressants

Grand Rounds, Brooklyn Veterans Hospital, Brooklyn, NY

Grand Rounds, St. Vincent's Hospital, Staten Island, NY
Grand Rounds, Lincoln Hospital, Bronx, NY
Grand Rounds, Bergen Regional Hospital, Paramus, NJ
Grand Rounds, Downstate Medical Center, Brooklyn, NY
Grand Rounds, Harlem Hospital, New York, NY
Grand Rounds, Kirby Forensic Hospital, New York, NY
Topic: Pharmacologic Management of Agitation

Grand Rounds, Overlook Hospital, Summit, NJ
Grand Rounds, Queens Hospital Center, Queens, NY
Grand Rounds, Metropolitan Hospital, New York, NY
Topic: Treatment Algorithms for Bipolar Disorder

2003
Grand Rounds, Friends Hospital, Philadelphia, PA
Grand Rounds, Harlem Hospital, New York, NY
Grand Rounds, Greystone Psychiatric Hospital, NJ
Grand Rounds, St. Luke's Hospital, New York, NY
Grand Rounds, Bailey-Seton Hospital, State Island, NY
Topic: Neurochemical Models of Schizophrenia

Grand Rounds, Queens Hospital Center, Queens, NY
Grand Rounds, Warren Psychiatric Center, Buffalo, NY
Grand Rounds, Elmhurst Hospital, Queens, NY
Grand Rounds, Bronx Psychiatric Center, Bronx, NY
Topic: Treatment Algorithms for Bipolar Disorder

Grand Rounds, Fordham-Tremont MHC, Bronx, NY
Topic: New Remission Data for Dual-Action Antidepressants

2004
Grand Rounds, Wright State University, Dayton, OH
Grand Rounds, Manhattan Psychiatric Center, New York, NY
Grand Rounds, Lancanau Hospital, Philadelphia, PA
Grand Rounds, Montefiore Hospital, Bronx, NY
Grand Rounds, Long Island College Hospital, Brooklyn, NY
Topic: Neurochemical Models of Schizophrenia

Grand Rounds, Brooklyn Veterans Hospital, Brooklyn, NY
Grand Rounds, St. Francis Hospital, Hartford, CT
Grand Rounds, Beth Israel Hospital, New York, NY
Grand Rounds, Manhattan Veterans Hospital, New York, NY
Keynote Lecture, meeting of APA District Branch, Binghamton, NY
Topic: Treatment Algorithms for Bipolar Disorder

Grand Rounds, Kirby Forensic Hospital, New York, NY
Grand Rounds, Rikers Island Forensic Service, New York, NY
Topic: Pharmacologic Management of Agitation

Grand Rounds, Bronx Lebanon Hospital, Bronx, NY
Topic: New Remission Data for Dual-Action Antidepressants

Grand Rounds, Napa Valley Psychiatric Center, Napa, CA
Grand Rounds, South Florida State Hospital, Pembroke Pines, FL
Grand Rounds, Rockland Psychiatric Center, Orangeburg, NY
Grand Rounds, South Beach Psychiatric Center, Staten Island, NY
Grand Rounds, St. Vincent's Hospital, Staten Island, NY

Topic: Atypical antipsychotic in bipolar disorder.

2005
Grand Rounds, Cabrini Hospital, New York, NY
Grand Rounds, Jersey Shore Hospital, Neptune, NJ
Grand Rounds, Salem Hospital, Salem, MA
Grand Rounds, Binghamton Psychiatric Center, Binghamton, NY
Grand Rounds, UMD NJ, Piscataway, NJ
Grand Rounds, Trenton Psychiatric Hospital, Trenton, NJ
Grand Rounds, Manchester VA Hospital, Manchester, NH
Grand Rounds, Overlook Hospital, Summit, NJ
Keynote Lecture, meeting of APA District Branch, Rumson, NJ
Topic: Atypical antipsychotics in bipolar disorder.

Grand Rounds, Bailey-Seton Hospital, State Island, NY
Grand Rounds, Hackensack Hospital, Hackensack, NJ
Grand Rounds, Tricounty MHC, Lewiston, ME
Topic: Treatment Algorithms for Bipolar Disorder

Grand Rounds, Brookdale Hospital, Brooklyn, NY
Grand Rounds, Bronx Hospital Center, Bronx, NY
Grand Rounds, Kirby Forensic Hospital, New York, NY
Topic: Neurochemical Models of Schizophrenia

Grand Rounds, Creedmoor Psychiatric Center, Queens, NY
Grand Rounds, South Beach Psychiatric Center, Staten Island, NY
Topic: New Remission Data for Dual-Action Antidepressants

2006
Grand Rounds, Coney Island Hospital, Brooklyn, NY
Grand Rounds, Kingsboro Psychiatric Center, Brooklyn, NY
Grand Rounds, Spring Grove Medical Center, Catonsville, MD
Grand Rounds, Trinitas Hospital, Elizabeth, NJ
Grand Rounds, Beth Israel Hospital, Newark, NJ
Grand Rounds, Jersey City Medical Center, Jersey City, NJ
Grand Rounds, Woodhull Hospital, Brooklyn, NY
Topic: Atypical antipsychotics in bipolar disorder.

Psychopharmacology Conference, Bellevue Hospital Center, New York, NY
Topic: Advances in Drug Delivery for the Treatment of Depression.

2007
Grand Rounds, Catholic Community Services, Newark, NJ
Topic: Treatment of bipolar depression

Grand Rounds, Four Winds Hospital ,Saratoga, NY
Topic: Metabolic disturbances associated with antipsychotic treatment

Grand Rounds, Oschsner Hospital, New Orleans, LA
Topic: Neurobiological models for schizophrenia

Grand Rounds, VA Hospital, Brooklyn, NY
Topic: Managing chronic depression –treatment to remission

2008
Grand Rounds, North General Hospital, New York, New York
Topic: Augmentation Strategies for treatment –resistant depression

Grand Rounds- Beth Israel Hospital , Beth Israel Hospital, Newark, NJ

Topic: Treatment of bipolar depression

Psychopharmacology Conference – Bellevue Hospital Center New York, NY
Topic : Practical issues in the treatment of schizophrenia

## Bibliography

Starling JR, Ferguson WM, Barnes V, Levy RH. Effect of thyrotropin on rat thyroid lysosomal enzymes. J Surgical Research 1973: 24:7-14.

Levy RH, Psychopharmacologic Interventions, in: Katz S, Nardacci D, and Sabatini A, eds. The Intensive Treatment of the Homeless Mentally Ill, Washington DC: American Psychiatric Association Press 1993: pg.120-165.

Nardacci D, Caro Y, Milstein, Schleimer H, Levy R, Bellevue Population: Demographics, in: Katz S, Nardacci D, and Sabatini A, eds. The Intensive Treatment of the Homeless Mentally Ill, Washington DC: American Psychiatric Association Press 1993: pg.51-70.

Castaneda R, Sussman N, Westreich L, Levy R. A review of the effects of moderate alcohol intake on the treatment of anxiety and mood disorders. J Clinical Psychiatry 1996: 57 (5): 207-212.

Levy R, Simkowitz P. Expressions of Selectivity: Interactive simulations showing the outward expressions of brain physiology and pathophysiology in schizophrenia. Abbott Laboratories Continuing Medical Education CD-ROM, 1996.

Levy RH. Clinical simulations in the treatment of psychosis: risperidone. Albert Einstein College of Medicine Continuing Medical Education Series 1996.

Castaneda R, Levy R, Sussman N, Westreich L. Drug craving and other negative reactions following abrupt substitution of nefazodone for other serotonergic agents. J Clinical Psychiatry 1996: 5: 485 – 486.

Levy RH. Sedation in the acute and chronic patient, what's too much and what's not enough. Pharmacotherapy 1996. 16 (6; 21): 1525 – 1535.

Sussman N, Castaneda R, Westreich L, Levy R. Switching from selective serotonin reuptake inhibitors to nefazodone: Three case reports. American J Neuropsychiatry 1997: 2(4): 56-60.

Castaneda R, Sussman N, Levy R, Westreich L. Effects of moderate alcohol intake in psychiatric and sleep disorders, in: Galanter M, ed. Recent Developments in Alcoholism. Volume 14: The consequences of Alcoholism. New York: Plenum Press 1998: 197 – 226.

Castaneda R, Sussman N, Levy R, Trujillo M. A treatment algorithm for attention deficit hyperactivity disorder in cocaine-dependent adults: A one-year private practice study with long-acting stimulants, fluoxetine, and bupropion. Substance Abuse 1999: 20(1):169-176.

Castaneda R, Levy R, Hardy M, Trujillo M. Long-acting stimulants for the treatment of attention deficit disorder in cocaine-dependent adults. Psychiatric Services, 200: 51(2):169 – 176.

Levy RH. Atypical antipsychotics in bipolar disorder. Practical Reviews Psychiatry 2005: 29(9):146-150

Levy RH. A review of the CATIE trial. Practical Reviews Psychiatry 2005: