SM EXHIBIT H

Page 1

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -
ADRIAN SCHOOLCRAFT,
                        Plaintiff,
        -against- Index No.
                 10CIV-6005 (RWS)

THE CITY OF NEW YORK, DEPUTY CHIEF
MICHAEL MARINO, Tax Id. 873220,
Individually and in his Official
Capacity, ASSISTANT CHIEF PATROL
BOROUGH BROOKLYN NORTH GERALD NELSON,
Tax Id. 912370, Individually and in his
Official Capacity, DEPUTY INSPECTOR
STEVEN MAURIELLO, Tax Id. 895117,
Individually and in his Official
Capacity, CAPTAIN THEODORE LAUTERBORN,
Tax Id. 897840, Individually and in his
Official Capacity, LIEUTENANT JOSEPH
GOFF, Tax Id. 894025, Individually and
in his Official Capacity, stg. Frederick
Sawyer, Shield No. 2576, Individually
and in his Official Capacity, SERGEANT
KURT DUNCAN, Shield No. 2483,
Individually and in his Official
Capacity, LIEUTENANT TIMOTHY CAUGHEY,
Tax Id. 885374, Individually and in his
Official Capacity, SERGEANT SHANTEL
JAMES, Shield No. 3004, and P.O.'s "JOHN
DOE" 1-50, Individually and in their
Official Capacity (the name John Doe
being fictitious, as the true names are
presently unknown)(collectively referred
to as "NYPD defendants"), JAMAICA
HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
Individually and in his Official
Capacity, DR. LILIAN ALDANA-BERNIER,
Individually and in her Official Capacity
and JAMAICA HOSPITAL MEDICAL CENTER
EMPLOYEES "JOHN DOE" # 1-50, Individually

(Continued)
```

Page 2

```
 1
 2    and in their Official Capacity (the name
      John Doe being fictitious, as the true
 3    names are presently unknown),
 4
      Defendants.
 5
            - - - - - - - - - - - - - - - - - - -x
 6
                              444 Madison Avenue
 7                            New York, New York
 8                            December 20, 2013
                              10:16 a.m.
 9
10         VIDEOTAPED DEPOSITION of DEPUTY
11    INSPECTOR STEVEN MAURIELLO, one of the
12    Defendants in the above-entitled action,
13    held at the above time and place, taken
14    before Margaret Scully-Ayers, a Shorthand
15    Reporter and Notary Public of the State
16    of New York, pursuant to the Federal
17    Rules of Civil Procedure.
18
19              *        *        *
20
21
22
23
24
25
```

```
                                           Page 112
 1              S. MAURIELLO
 2         MR. SMITH:  For the record this
 3    a one-page letter, October 28, 2008,
 4    Bates-stamped D819.
 5       Q.   Is this the letter of reprimand
 6  you were just referring to, Inspector?
 7         MR. LEE:  Objection to form.
 8    It's a letter of instruction.
 9         THE WITNESS:  Letter of
10    instruction, not a reprimand.
11       Q.   I wasn't trying to characterize
12  it.  That's what it says, "Re: Letter of
13  reprimand, letter of instruction."
14         It's the same thing, right?
15         MS. PUBLICKER METTHAM:
16    Objection.
17       A.   Yes.  I add that I was promoted
18  three days after this letter.  I was
19  promoted October 31st, 2008.
20       Q.   So this letter didn't
21  negatively impact your career, right?
22       A.   I don't know if we're allowed
23  to talk about the case.
24         THE WITNESS:  Are we allowed to
25    talk about the case?
```

Page 113

1           S. MAURIELLO
2           MR. KRETZ: Answer his question
3      if you can. If you can't, tell him.
4      A.    I believe it did. A letter of
5  reprimand or instruction in my file so I
6  was promoted for my hard work and the
7  precinct's hard work.
8      Q.    This was a promotion to CO of
9  the eight one, right?
10     A.    No, I was already CO of the
11 eight one.
12     Q.    What was the promotion that you
13 got?
14     A.    Deputy inspector.
15     Q.    When did you receive that
16 promotion?
17     A.    October 31st, 2008.
18     Q.    According to this letter of
19 instruction or letter of reprimand, you
20 contacted CCRB investigators about an
21 allegation by a complainant.
22           Do you see that reference
23 there?
24     A.    Yes, I can explain the whole
25 thing if you want.

```
                                            Page 114

 1              S. MAURIELLO
 2       Q.     Is that true that you
 3   telephoned them?
 4       A.     I returned their phone call,
 5   yes.
 6       Q.     Can you explain it to me?
 7       A.     Well, I had nothing to do with
 8   the case.  It was an allegation I guess
 9   discourtesy to one of my officers, two
10   officers that made an arrest.
11              They brought the person inside
12   the precinct.  The person under arrest
13   was African American.  The two officers
14   that made the arrest were African
15   American.  The desk officer was African
16   American.
17              Supposedly there was a
18   discourtesy one of the officers said
19   something, discourtesy that was witnessed
20   by everybody.  I was there.
21              The mother ends up called the
22   TS to switch to me and I didn't know.
23   And I talked to her.  I guess she was on
24   the job.  She is not on the job anymore,
25   a civilian.  That was it.  I returned --
```

```
                                              Page 115
 1              S. MAURIELLO
 2     the investigator left three calls on
 3     my -- 'cause I was a witness I guess.  I
 4     talked to her.  She was in South Carolina
 5     at the time.  She had nothing to do with
 6     it.
 7              He left three messages with my
 8     secretary, and I called back the guy.  I
 9     got his answering machine, if you are
10     calling about this case, this is what I
11     was told happened.  That's all I said.  I
12     didn't have any interaction with the
13     civilian complainant.
14              I guess he thought it was
15     inappropriate for me to put that on the
16     tape.  I wasn't trying to be
17     inappropriate.
18        Q.    The statement in the last
19     sentence, quote, additionally during one
20     phone call, you left a voice message on
21     an answer machine questioning the
22     veracity of the CCRB investigators's
23     contact with the complainant, that is
24     inaccurate?
25        A.    All I left on the tape was that
```

Page 116

1       S. MAURIELLO
2  this is what happened and that is it.  I
3  wasn't the subject of the CCRB.  I had
4  nothing to do with the CCRB.
5       Q.    I understand that.
6             Is the statement here that you
7  left a voice message questioning the
8  veracity of the CCRB investigator's
9  contact, is that an accurate statement?
10      A.    I guess it's an accurate
11 statement.
12      Q.    It is an accurate statement?
13      A.    I don't know about the
14 veracity, but, yes.
15      Q.    That is the nature of the
16 concern you were leaving a message, a
17 voice message, questioning the veracity
18 of the CCRB investigator's contact with
19 the complainant.
20            What I want to know is whether
21 that is true:  You did leave a message
22 questioning that behavior?
23      A.    I didn't question the CCRB
24 investigator's behavior.  I just left a
25 message this is what I was told, that was

Page 117

1       S. MAURIELLO
2  it, nothing to do with me.  I guess the
3  CCRB investigator maybe thought I was
4  trying to, you know, prove the cops were
5  innocent.  I don't know.
6          I take fault there was a
7  misunderstanding, a miscommunication.  I
8  don't think there was anything
9  intentional or anything -- there was
10 nothing harsh by me to the investigator.
11     Q.    The last paragraph "You are
12 directed to meet with the commanding
13 officer control borough Brooklyn North to
14 discuss this letter.  Did you do that?
15     A.    Yes, I did.
16     Q.    Who did you speak with?
17     A.    Chief Nelson.
18     Q.    Am I correct that you told me
19 you never received any other form of
20 disciplinary action against you, right?
21     A.    No.  I think I had two CCRBs
22 about it in my whole career and no
23 discipline.  That was it.  I never got
24 command discipline my whole career up to
25 these charges.