UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

ADRIAN SCHOOLCRAFT,

                    Plaintiff,

                                              10 Civ. 6005 (RWS)

        - against -
                                                    Opinion


CITY OF NEW YORK, ET AL.,

                    Defendants.
----------------------------------------X


A P P E A R A N C E S:


          Attorney for the Plaintiff

          LAW OFFICE OF NATHANIEL B. SMITH
          111 Broadway
          Suite 1305
          New York, NY 10006
          By:  Nathaniel B. Smith, Esq.


          Attorney for the City Defendants

          ZACHARY W. CARTER
          CORPORATION COUNSEL OF THE CITY OF NEW YORK
          100 Church Street
          New York, NY  10007
          By:  Ryan Shaffer, Esq.


          Attorneys for Defendant Stephen Mauriello

          SCOPPETTA SEIFF KRETZ & ABERCROMBIE, LLP.
          440 Madison Avenue, 30th Floor
          New York, NY  10022
          By:  Walter A. Kretz, Jr., Esq.

Attorneys for Defendant Jamaica Hospital Medical
Center

MARTIN CLEARWATER & BELL, LLP.
220 East 42nd Street
New York, NY  10017
By:  Gregory J. Radomisli, Esq.


Attorneys for Defendant Lillian Aldana-Bernier

CALLAN, KOSTER BRADY & BRENNAN, LLP
220 East 42nd Street
New York, NY  10017
By:  Matthew Joseph Koster, Esq.


Attorneys for Defendant Isak Isakov

IVONE, DEVINE & JENSEN, LLP
2001 Marcus Avenue, Suite N100
Lake Success, NY 11042
By:  Brian E. Lee, Esq.

I.   PRIOR PROCEEDINGS ......................................... 2
II.  FACTS ..................................................... 5
   A.   Schoolcraft's Career with NYPD ....................... 6
   B.   Schoolcraft's 2008 Performance Review ................ 7
   C.   March 2009 Disciplinary Incident .................... 11
   D.   Psychological Evaluation, Restricted Duty Placement ..... 13
   E.   Schoolcraft's Report to Internal Affairs and NYPD's
   Response .................................................. 18
   F.   October 31, 2009 – Schoolcraft's Tour of Duty ......... 22
   G.   October 31, 2009 – Events Subsequent to  Schoolcraft's
   Departure ................................................ 26
   H.   October 31, 2009 – NYPD's First Entry into  Schoolcraft's
   Apartment ................................................ 37
   I.   October 31, 2009 – NYPD's Second Entry into  Schoolcraft's
   Apartment ................................................ 49
   J.   Arrival at Jamaica Hospital .......................... 54
   K.   Events Subsequent to Release from Jamaica Hospital ...... 77
III. APPLICABLE STANDARD ...................................... 88
IV.  CONSTITUTIONAL LAW CLAIMS RELATING TO CITY DEFENDANTS AND DI
MAURIELLO ..................................................... 89
   A.   Fourth Amendment Claims Survive Summary Judgment ........ 89
      i.   NYPD's Initial Entry into Schoolcraft's Home .......... 89
      ii.  NYPD's Decision to Remain In Schoolcraft's Home ...... 96
      iii. Designation as an EDP................................. 98
   B.   First Amendment Claim Survives Summary Judgment ....... 104
      i.   Schoolcraft Engaged in Protected Speech .............. 105
      ii.  Post-Suspension Free Speech Claim is Not Established 118
      iii. Pre-Suspension Speech Claim Survives Summary Judgment 121
      iv.  Qualified Immunity Attaches to the First Amendment Claim
           123
   C.   Monell Claims against City Defendants Survive  Summary
   Judgment ................................................. 124
      i.   Well-Settled Custom ................................. 126
      ii.  Failure to Train.................................... 133
   D.   Section 1983 Conspiracy Claim is Dismissed ............ 134
      i.   Intra-Corporate Conspiracy Doctrine ................. 135
      ii.  Conspiracy Claims as Between the City Defendants and
      Jamaica Hospital are Dismissed.......................... 138
V.   REMAINING CLAIMS RELATING TO CITY DEFENDANTS AND DI
MAURIELLO.................................................... 142
   A.   False Arrest and Imprisonment Claims Survive  Summary
   Judgment ................................................. 142
   B.   Intentional Infliction of Emotional Distress Claim against
   City Defendants Survives Summary Judgment ................. 143

C. Common Law Negligent Hiring, Training, Supervision and Retention Claim against City Defendants is Dismissed........ 144

D. Negligent Disclosure of IAB Complaint Claim is Dismissed 145

    *i. Public Policy Does Not Bar Claim* ..................... 146

    *ii. Schoolcraft's Claim is Dismissed* ................... 148

E. Malicious Abuse of Process Claim is Dismissed .......... 150

F. DI Mauriello's Counterclaims are Dismissed ............. 151

G. DI Mauriello Remains a Defendant ...................... 160

    *i. False Arrest and Use of Force Claims, and their State Law Analogues against DI Mauriello are Dismissed* ............. 161

    *ii. Unlawful Search Claim Against DI Mauriello is Dismissed* 162

    *iii. Failure to Intercede Claim Against DI Mauriello Survives Summary Judgment* ......................................... 163

    *iv. Warrantless Entry Claim against DI Mauriello Survives Summary Judgment* ......................................... 163

H. Claims with Respect to Other NYPD Officer Defendants ... 164

    *i. Captain Trainor is Dismissed as a Defendant* .......... 164

    *ii. Captain Lauterborn Remains a Defendant* ............. 165

    *iii. Assistant Chief Nelson Remains a Defendant* ......... 165

    *iv. Lieutenant Caughey Remains a Defendant* ............. 168

VI. CLAIMS RELATING TO JAMAICA HOSPITAL MEDICAL CENTER ...... 170

A. Section 1983 Claims against JHMC are Dismissed ........ 170

B. State Law Medical Malpractice Claims against JHMC Survive Summary Judgment ......................................... 180

    *i. Expert Testimony Raises Triable Issues* ............... 180

    *ii. JHMC Liable for Physicians' Alleged Malpractice* ..... 190

C. Negligent Hiring, Retention, Training and Supervision Claim against JHMC is Dismissed ................................. 193

D. Negligence Per Se Claim against JHMC is Dismissed ...... 195

E. Intentional Infliction of Emotional Distress Claim against JHMC is Dismissed ......................................... 196

VII. CLAIMS RELATING TO THE ATTENDING PHYSICIANS ............. 198

A. Section 1983 Claims against the Attending Physicians are Dismissed ................................................. 198

B. Intentional Infliction of Emotional Distress Claims against the Attending Physicians are Dismissed ..................... 198

C. Declaratory Relief Claims Survive Summary Judgment ..... 198

D. State Law Claims Survive Summary Judgment ............. 199

E. False Arrest and Imprisonment Claims Survive Summary Judgment ................................................. 200

VIII. CONCLUSION .......................................... 202

**Sweet, D.J.**

Plaintiff Adrian Schoolcraft ("Schoolcraft" or "Plaintiff"); Defendants Christopher Broschart, Timothy Caughey, Kurt Duncan, Elise Hanlon, Theodore Lauterborn, Michael Marino, Gerald Nelson, Frederick Sawyer, The City Of New York, Timothy Trainer ("City Defendants"); Defendant Deputy Inspector Steven Mauriello ("DI Mauriello"); Defendant Jamaica Hospital Medical Center ("Jamaica Hospital" or "JHMC"); Defendant Dr. Lillian Aldana-Bernier ("Dr. Bernier"), and Defendant Dr. Isak Isakov ("Dr. Isakov") (collectively "the Attending Physicians"); all move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Based upon the facts and conclusions set forth below, the parties' motions are granted in part and denied in part.

1

I. **PRIOR PROCEEDINGS**

Plaintiff initiated this action alleging Section 1983 and a number of state law causes of action, by filing a summons and complaint on August 10, 2010. Plaintiff filing an Amended Complaint on September 13, 2010, in response to which Jamaica Hospital filed a motion to dismiss. The Court dismissed Schoolcraft's Section 1983 claim against Jamaica Hospital with leave to replead, and retained supplemental jurisdiction with respect to the state law claims against Jamaica Hospital. Schoolcraft v. City of New York, No. 10 CIV. 6005 RWS, 2011 WL 1758635 (S.D.N.Y. May 6, 2011).

On May 9, 2012, Schoolcraft submitted a motion seeking leave to amend his complaint to, inter alia, include a First Amendment claim under 42 U.S.C. § 1983 relating to his internal reporting of improper conduct at the 81st Precinct. That request was denied in this Court's Opinion dated June 14, 2012 on the basis that Schoolcraft's internal reporting was made in his capacity as a public employee, and therefore not protected under the First Amendment. Schoolcraft v. City of New York, No. 10 CIV. 6005 RWS, 2012 WL 2161596 (S.D.N.Y. June 14, 2012). On June 20, 2012, Plaintiff submitted a letter to the Court requesting reconsideration. The motion to reconsider was also denied in the Court's Opinion dated July 20, 2012 on the basis

2

that Plaintiff, in his briefing regarding the motion to amend,
never raised the issue of protected speech made after his
suspension on October 31, 2009 and did not raise the argument
that he had no duty to report misconduct following his
suspension.  Schoolcraft v. City of New York, No. 10 CIV. 6005
RWS, 2012 WL 2958176 (S.D.N.Y. July 20, 2012).  On August 1,
2012, Plaintiff wrote to the Court requesting leave to amend his
complaint to add a First Amendment claim relating to the NYPD's
alleged harassment after October 31, 2009 and for unlawful
seizure and detention on October 31, 2009.  The Court granted
him leave to plead a First Amendment claim with respect to the
instances of harassment and suspension.  Schoolcraft v. City of
New York, No. 10 CIV. 6005 RWS, 2012 WL 3960118 (S.D.N.Y. Sept.
10, 2012).

     On October 1, 2012, Schoolcraft filed a Second Amended
Complaint ("SAC") that included the First Amendment claim.  DI
Mauriello filed a motion seeking leave to amend his answer and
assert counterclaims against Schoolcraft on September 24, 2013.
The Court denied his request as part of an Opinion filed
November 21, 2013.  Schoolcraft v. City of New York, 296 F.R.D.
231, 233 (S.D.N.Y. 2013).  DI Mauriello moved for
reconsideration, and the Court granted his motion on March 14,
2014.  Schoolcraft v. City of New York, 298 F.R.D. 134, 136

3

(S.D.N.Y. 2014).  On March 18, 2014, DI Mauriello filed his amended Answer and Counterclaims.

The SAC remained the operative complaint through the end of 2014, including for the extensive period of fact and expert discovery.  On December 4, 2014, Plaintiff moved for permission to amend the SAC.  While that motion was pending, all parties moved for summary judgment.

Plaintiff received leave to file a Third Amended Complaint ("TAC") on January 16, 2015.  Schoolcraft v. City of New York, No. 10 CIV. 6005 RWS, 2015 WL 252413, at *1 (S.D.N.Y. Jan. 16, 2015).  Subsequently, all parties save Plaintiff filed amended motions for summary judgment.  The motions were heard on submission and marked fully submitted on March 6, 2015.

Subsequently, Plaintiff requested that a reply affidavit from Dr. Bernier be stricken, which City Defendants opposed, and DI Mauriello requested that he be allowed to reopen discovery to obtain information regarding Plaintiff's involvement in a film relating to the substance of this case.

4

## II.  **FACTS**

The facts are principally derived from Schoolcraft's
and Defendants' Statements of Undisputed Facts submitted in
support of their motions for summary judgment pursuant to Local
Rule 56.1, read in conjunction with the parties' responses to
the 56.1 Statements.[1]

Denials that the evidence cited in support of a
particular statement does not support that statement, in
instances where the evidence uncontrovertibly does support that
statement, are treated as admissions.  Denials without support
or explanation are treated as admissions.  Statements
characterized as "additional undisputed facts" included in Dr.
Bernier's responses to Schoolcraft's 56.1 statements but absent

---

[1] As part of Plaintiff's submissions in support of his and in opposition to
Defendants' summary judgment motions, Plaintiff generated two consolidated
documents.  The first, "Plaintiff's Rule 56.1 Statement Consolidated with
Defendants' Responses," filed March 6, 2015 (hereinafter cited as "Pl.'s
Consol. 56.1 Statement"), contains all of Plaintiff's 56.1 facts along with
all of Defendants' responses to each fact.  This document also contains a
section entitled "Additional Material Facts As To Which Mauriello Contends
There Exist Genuine Issues To Be Tried, Thus Requiring Denial Of Plaintiff's
Motion For Summary Judgment: Mauriello's Counterclaims."  References to
statements contained in that section will be cited as "Pl.'s Consol. 56.1
Statement Mauriello Countercl."

The second consolidate document, "Plaintiff's Rule 56.1 Responsive
Statement," filed February 11, 2015, contains all Defendants' 56.1 statements
along with all of Plaintiff's responses.  For the sake of simplicity,
references to Defendants' 56.1 statements will cite to the portion of the
Plaintiff's Rule 56.1 Responsive Statement, rather than Defendants'
individual filings.  Each citation will begin with the name of the Defendant,
followed by "Consol. 56.1 Statement" (e.g., the portion of Plaintiff's Rule
56.1 Responsive Statement corresponding to the City's 56.1 Statement will be
referred to as "City's Consol. 56.1 Statement").

from Dr. Bernier's 56.1 Statement are considered in dispute. (Compare Dr. Bernier's Response to Plaintiff's Rule 56.1 Statement and Statement of Additional Undisputed Facts, pp. 41-53, ¶¶ 1-53 with Dr. Bernier's Statement Pursuant to Local Civil Rule 56.1.)  Finally, the inclusion of statements in this Opinion that were challenged on admissibility grounds by the parties reflect a ruling that the admissibility challenge is overruled.

The following facts are not in material dispute except as noted below.

## A. Schoolcraft's Career with NYPD

1.    On July 1, 2002, Schoolcraft joined the New York City Police Department ("NYPD"), and for most of his career, he was assigned as a Patrol Officer in the 81st Precinct, which is located in the Bedford Stuyvesant neighborhood of Brooklyn. (Pl.'s Consol. 56.1 Statement, ¶ 1.)

2.    The 81st Precinct is one of ten precincts that are located in the geographical area known as "Patrol Borough Brooklyn North" ("PBBN").  All Defendants save DI Mauriello admit that, as a Patrol Officer, Schoolcraft was a fine officer who ably and satisfactorily performed his duties and received

satisfactory or better performance reviews for most of his career. (Pl.'s Consol. 56.1 Statement, ¶ 2.)

3. In October of 2006, the NYPD assigned DI Mauriello to be the Executive Officer of the 81st Precinct. As the Executive Officer, DI Mauriello was the second in command at the 81st Precinct. According to DI Mauriello, he requested that transfer because it was his stated desire to earn an appointment as a Commanding Officer as well as a promotion to Inspector and perhaps Assistant Chief. (Pl.'s Consol. 56.1 Statement, ¶ 3.)

4. After being the Executive Officer at the 81st Precinct for one year, DI Mauriello was promoted to Commanding Officer of the 81st Precinct on December 1, 2007, and he later received a promotion to the title of Deputy Inspector ("DI"). (Pl.'s Consol. 56.1 Statement, ¶ 8.)

## B. Schoolcraft's 2008 Performance Review

5. During the course of second, third, and fourth quarters of 2008, Schoolcraft's performance reviews referenced

7

his low "activity" and his failure to meet activity standards. (Pl.'s Consol. 56.1 Statement, ¶ 10.)

6. Schoolcraft received a failing evaluation of 2.5 in his 2008 performance evaluation, which was delivered in January of 2009. (Pl.'s Consol. 56.1 Statement, ¶ 11.)

7. DI Mauriello's 2008 performance evaluation recommended that Schoolcraft be transferred. (Pl.'s Consol. 56.1 Statement, ¶ 12.)

8. Schoolcraft objected to this evaluation and informed his superiors that he wanted to appeal the failing evaluation. (Pl.'s Consol. 56.1 Statement, ¶ 13.)

9. At around this time, a poster appeared on Schoolcraft's locker containing the words: "IF YOU DON'T LIKE YOUR JOB, THEN MAYBE YOU SHOULD GET ANOTHER JOB." (Pl.'s Consol. 56.1 Statement, ¶ 15.)

10. Another handwritten note that later appeared on his locker stated: "shut up, you idiot." (Pl.'s Consol. 56.1 Statement, ¶ 16.)

8

11.  Schoolcraft believes that he was isolated from his
fellow officers in the 81st Precinct.  (City's Consol. 56.1
Statement, ¶ 11.

12.  The appeal process involved the transmission of
paperwork to the next level of the command structure, which was
the Brooklyn North Patrol Borough, headed by Defendant
Assistant Chief Gerald Nelson and Defendant Deputy Chief
Michael Marino.  (Pl.'s Consol. 56.1 Statement, ¶ 14.)

13.  On February 25, 2009, Schoolcraft met with
several supervisors at the 81st Precinct (the "February Appeal
Meeting"), including DI Mauriello, and his new Executive
Officer, Defendant Captain Theodore Lauterborn.  (Pl.'s Consol.
56.1 Statement, ¶ 17.)

14.  At the February Appeal Meeting, Schoolcraft did
not expressly discuss illegal quotas and crime
misclassification.  Instead, he spoke about not knowing how
much activity was needed and that the numbers on his evaluation
were not adding up correctly.  (Mauriello's Consol. 56.1
Statement, ¶ 1.)

15.   During the February Appeal Meeting, Schoolcraft confirmed his intent to appeal the failing 2008 performance evaluation and repeatedly asked for information about what numbers were required of him.  (Pl.'s Consol. 56.1 Statement, ¶ 18.)

16.   At the end of the February Appeal Meeting, another of the 81st Precinct supervisors, Sergeant Steven Weiss specifically asked Schoolcraft if he was recording the meeting. (Pl.'s Consol. 56.1 Statement, ¶ 19.)

17.   In or around early March of 2009, DI Mauriello attended a meeting at the main office for Patrol Borough Brooklyn North with Deputy Chief Marino and Sergeant Weiss from the 81st Precinct (the "March Evaluation Meeting").  DI Mauriello discussed, inter alia, Schoolcraft's appeal of his failing 2008 evaluation and DI Mauriello's wish to transfer Schoolcraft out of the Precinct.  (Pl.'s Consol. 56.1 Statement, ¶ 20.)

18.   During the March Evaluation Meeting, DI Mauriello requested that Schoolcraft be transferred, and Deputy

Chief Marino denied that request at that time for lack of paperwork. (Pl.'s Consol. 56.1 Statement, ¶ 21.)

19.    On March 11, 2009, a labor attorney representing Schoolcraft, James A. Brown, Esq., wrote DI Mauriello a letter regarding Schoolcraft's appeal of his failing evaluation. Among other things, the letter stated:  "We are concerned that our client's negative evaluation is based not on the factors set forth in Patrol Guide 205-48, but rather on his alleged lack of 'activity' related to his number of arrests and summons issued. (Pl.'s Consol. 56.1 Statement, ¶ 22.)

20.    After receiving the letter, DI Mauriello told Assistant Chief Nelson about it and forwarded it to Patrol Borough Brooklyn North as part of the appeal process. (Pl.'s Consol. 56.1 Statement, ¶ 23.)

## C. March 2009 Disciplinary Incident

21.    On or about March 16, 2009, while Schoolcraft was on patrol, Sergeant Weiss issued a command discipline to Schoolcraft for being "off post" and having "unnecessary conversation" with another patrol officer. (Pl.'s Consol. 56.1 Statement, ¶ 24.)

11

22.   Schoolcraft believed that he was being punished for the letter from his labor attorney and for appealing his evaluation.  (Pl.'s Consol. 56.1 Statement, ¶ 25.)

23.   Schoolcraft made a formal request on his radio that the Duty Captain for Patrol Borough Brooklyn North respond to the scene.  (Pl.'s Consol. 56.1 Statement, ¶ 25.)

24.   In response to Schoolcraft's radio request, Captain Lauterborn, who was serving as Duty Captain at the time, had Schoolcraft brought back to the 81st Precinct. According to Schoolcraft's recording of the meeting with Captain Lauterborn, Captain Lauterborn told Schoolcraft that after the February Appeal Meeting.  Captain Lauterborn said that Schoolcraft should not be surprised by the fact that he was going to get a lot more "supervision" by the 81st Precinct supervisors and that the 81st Precinct supervisors were now paying "closer attention" to him as a result of Schoolcraft's performance.  (Pl.'s Consol. 56.1 Statement, ¶ 26.)

25.   During his conversation with Captain Lauterborn, Schoolcraft explained his feelings as follows:  "I just feel my

12

safety and the public's safety is being compromised because of the acts of retaliation . . . because of [the] appeal." (Mauriello's Consol. 56.1 Statement, ¶ 6.)

26.    Captain Lauterborn also told Schoolcraft that "this is gonna go on;" that he had "a long road ahead" of him; that going forward, he needed to "cross your t's and dot your i's;" and that the "supervision" was "coming down hard" on him not just in the past two nights but since the day he walked out of the February Appeal Meeting.  (Pl.'s Consol. 56.1 Statement, ¶ 27.)

### D. **Psychological Evaluation, Restricted Duty Placement**

27.    Schoolcraft believes that he was the victim of a conspiracy to falsely portray him as psychologically unbalanced.  (City's Consol. 56.1 Statement, ¶ 12.)

28.  On or about March 16, 2009, Sergeant Weiss began reviewing police procedures on how to have Schoolcraft psychologically evaluated.  (Pl.'s Consol. 56.1 Statement, ¶ 28.)

29.     Shortly after that, Sergeant Weiss contacted the
NYPD's Early Intervention Unit and reported that he was
"concerned" about the level of Office Schoolcraft's "mental
distress."  (Pl.'s Consol. 56.1 Statement, ¶ 29.)


30.     Sergeant Weiss also did Internet research on
Schoolcraft and found a news article in a local upstate
newspaper about a burglary at his father's home and forwarded
that article to the Early Intervention Unit.  (Pl.'s Consol.
56.1 Statement, ¶ 30.)


31.     On April 3, 2009, Schoolcraft went to a hospital
emergency room because of chest pain and received an injection
of medication commonly used to treat anxiety.  The hospital
also gave Schoolcraft a prescription for two more doses of the
same medication in pill form.  (Mauriello's Consol. 56.1
Statement, ¶ 8.)


32.     On April 6, 2009, Schoolcraft went to see his
private physician, Dr. Sure, who indicated Schoolcraft should
not return to work until April 14, 2009.  (Mauriello's Consol.
56.1 Statement, ¶ 9.)


14

33.    On April 6, 2009, Dr. Sure wrote a letter to the
NYPD excusing Schoolcraft from work for eight days.  (City's
Consol. 56.1 Statement, ¶ 15.)


34.    As required by NYPD procedures, after being out
sick on the advice of Dr. Sure, Schoolcraft then had to be seen
by an NYPD doctor before returning to work.  (Mauriello's
Consol. 56.1 Statement, ¶ 10.)


35.    Dr. Catherine Lamstein-Reiss ("Dr. Lamstein"), an
NYPD psychologist, testified that she was consulted in
connection with placing Schoolcraft on restricted duty on April
13, 2009.  She concluded that Schoolcraft was suffering from
the physical manifestations of stress.  Based on that opinion,
she recommended cognitive behavioral therapy or stress
management training to improve coping skills and to reduce the
physical symptoms of stress.  (Pl.'s Consol. 56.1 Statement, ¶
32.)


36.    According to Dr. Lamstein, Schoolcraft complained
that he had recently received a poor performance evaluation and
that his superiors had met with him in an effort to have
Schoolcraft be a more active police officer.  (Mauriello's

15

Consol. 56.1 Statement, ¶ 22.)

37.   Dr. Lamstein indicated in her Consultation Report a diagnosis of "stress/anxiety" and recommended "psychotherapy", specifically cognitive behavioral therapy "to improve coping skills [and] reduce physical symptoms of stress." Dr. Lamstein indicated that she was concerned that Schoolcraft's primary care physician had recently prescribed a medication known for being anti-psychotic, but still noted his prognosis was "good, with treatment." (Mauriello's Consol. 56.1 Statement, ¶ 14.)

38.   Dr. Lamstein also indicated in her notes that she urged Schoolcraft to see a psychologist. Schoolcraft disputes this, contending that she "suggested books on the topic of stress management, and therapies such as yoga." (Mauriello's Consol. 56.1 Statement, ¶ 16.)

39.   Schoolcraft was placed on restricted duty without any law enforcement or patrol duties, and his gun and shield were removed on April 13, 2009. (Pl.'s Consol. 56.1 Statement, ¶ 31.)

16

40.    As a result of being placed on restricted duty,
Schoolcraft was assigned to work at the 81st Precinct as the
Telephone Switchboard operator, essentially taking calls to the
Precinct and handling walk-ins from members of the public.
(Pl.'s Consol. 56.1 Statement, ¶ 34.)


41.    Schoolcraft held that position from April 2009
through the end of October 2009.  (Pl.'s Consol. 56.1
Statement, ¶ 35.)


42.    All defendants save DI Mauriello admit that while
on restricted duty, Schoolcraft continued his attempts to
challenge his failing 2008 performance evaluation.  (Pl.'s
Consol. 56.1 Statement, ¶ 36.)


43.    Schoolcraft returned to see Dr. Lamstein on July
27, 2009.  (Mauriello's Consol. 56.1 Statement, ¶ 17.)


44.    Schoolcraft returned again to see Dr. Lamstein on
October 27, 2009.  (Mauriello's Consol. 56.1 Statement, ¶ 18.)


45.    Dr. Lamstein concluded that Schoolcraft should
continue on restricted duty on July 27, 2009 and on October 27,

2009.  (Mauriello's Consol. 56.1 Statement, ¶ 19.)

46.  Dr. Lamstein testified that she repeated her recommendation that Schoolcraft see a psychologist on October 27, 2009.  (Mauriello's Consol. 56.1 Statement, ¶ 20.)

47.  Schoolcraft testified that he did not recall seeing a psychologist subsequent to his meetings with Dr. Lamstein.  (Mauriello's Consol. 56.1 Statement, ¶ 21.)

## E. Schoolcraft's Report to Internal Affairs and NYPD's Response

48.  On August 20, 2009, Schoolcraft reported to the Internal Affairs Bureau ("IAB" of "Internal Affairs") on "corruption involving the integrity control program" at the 81st Precinct by the Integrity Control Officer, Defendant Lieutenant Timothy Caughey and Assistant Integrity Control Officer, Sergeant Weiss.  (Pl.'s Consol. 56.1 Statement, ¶ 38.)

49.  On August 31, 2009, a former member of the NYPD, David Durk, reported that Schoolcraft was the victim of retaliation by his supervisors.  (Pl.'s Consol. 56.1 Statement, ¶ 39.)

50.   On September 2, 2009, Schoolcraft spoke with IAB
and reported that DI Mauriello was pressuring his staff to
downgrade or suppress crime reporting and that under the
direction of DI Mauriello, police officers were being directed
to make arrests and issue summonses "in violation of people's
civil rights." (Pl.'s Consol. 56.1 Statement, ¶ 40.)

51.   According to the IAB report, Schoolcraft also
stated that he received his failing evaluation "because he
doesn't believe in summons and arrest quotas" and that police
officers "are being forced to sign the training log even though
they don't get the necessary training." (Pl.'s Consol. 56.1
Statement, ¶ 41.)

52.   On October 7, 2009, Schoolcraft met with
investigators from the NYPD's Quality Assurance Division
("QAD"). At the meeting, Schoolcraft made assertions about the
nature of the alleged downgrading and suppression of major
crime reporting at the 81st Precinct. (Pl.'s Consol. 56.1
Statement, ¶ 42.) In a recorded conversation between
Schoolcraft and his father discussing the QAD meeting,
Schoolcraft stated that "this is the way to fuck [DI Mauriello]

19

over." (Pl.'s Consol. 56.1 Statement Mauriello Countercl. ¶ 1.)  At the actual meeting, Schoolcraft stated he was not looking to "burn anyone" or "for vengeance," and that "this isn't because I don't like Inspector Mauriello, he is a jovial guy." (Pl.'s Consol. 56.1 Statement Mauriello Countercl. ¶ 2.)

53.    While QAD undertook to conduct an investigation into those allegations, it also referred Schoolcraft's other misconduct allegations to IAB. (Pl.'s Consol. 56.1 Statement, ¶ 43.)

54.  During his recorded interviews with internal investigators at the NYPD, Schoolcraft told NYPD investigators that he was not reporting the alleged reporting abuses anonymously. (City's Consol. 56.1 Statement, ¶ 93.)

55.  According to an IAB report, on September 2, 2009, Schoolcraft told IAB that, "he doesn't feel he is being retaliated against from the Members of his Command and has no problems with his supervisors and peers." (Mauriello's Consol. 56.1 Statement, ¶ 27.)

56.   In addition, towards the end of October, an 81st Precinct Sergeant told DI Mauriello that QAD was calling down officers and DI Mauriello called up an Inspector from QAD, who confirmed that there was an investigation.

57.   Additionally, Captain Lauterborn testified that he allegedly received complaints from other officers interviewed by QAD that Schoolcraft was asking them questions about their QAD interviews and informed DI Mauriello[2] about Schoolcraft's alleged conduct.  (Pl.'s Consol. 56.1 Statement, ¶ 46.)

58.   Captain Lauterborn testified that he learned from DI Mauriello of a QAD investigation of the 81st Precinct. (Pl.'s Consol. 56.1 Statement, ¶ 45.)

59.   Captain Lauterborn testified that certain supervisors at the 81st Precinct, including DI Mauriello,[3] knew that Schoolcraft's memo book contained the name of an IAB officer prior to October 31, 2009.  On October 19th Lieutenant Caughey, as Integrity Control Officer, issued a written order

_____

[2] Mauriello denies knowledge of the QAD investigation prior to October 31, 2009.  (See Pl.'s Consol. 56.1 Statement, ¶ 48.)

[3] Mauriello denies knowledge of the QAD investigation prior to October 31, 2009.  (See Pl.'s Consol. 56.1 Statement, ¶ 49.)

to all officers in the command that all inquiries from IAB must be reported to the Integrity Control Officer.  (Pl.'s Consol. 56.1 Statement, ¶ 49.)

### F. October 31, 2009 – Schoolcraft's Tour of Duty

60.    Schoolcraft recorded his entire tour of duty on October 31, 2009.  (Mauriello's Consol. 56.1 Statement, ¶ 35.)

61.    October 31, 2009 was the last day that Schoolcraft reported to the 81st Precinct.  He worked the day tour and conducted his regular duties at the Telephone Switchboard desk before leaving work early.  (Pl.'s Consol. 56.1 Statement, ¶ 50.)

62.    In conversation with colleagues, Schoolcraft stated, "look at what they did to me . . . they fucked me over on my evaluation."  Schoolcraft also said that he asked supervisors to put it in writing to which they responded, "no, go fuck yourself.  That's your buddy Mauriello."  Schoolcraft then said "That's your buddy Mauriello, that fat miserable fuck.  If I could get him . . . . If I could get him, I would fucking sell him out faster than anything, for free.  I would

give him away for free." (Pl.'s Consol. 56.1 Statement
Mauriello Countercl. ¶ 3.)

63.    During the course of the morning of October 31,
2009, Lieutenant Caughey took Schoolcraft's memo book to
"scratch it," i.e., to make a copy of it. (Pl.'s Consol. 56.1
Statement, ¶ 51.)

64.    Schoolcraft's recording of his entire day tour
does not reveal anything said to Schoolcraft by Lieutenant
Caughey other than a request to see his memo book so Caughey
could "scratch" it. (Mauriello's Consol. 56.1 Statement, ¶
62.)

65.    While in his office, Lieutenant Caughey made two
photocopies of the entire memo book because he saw "unusual"
entries in it. Lieutenant Caughey kept one copy for himself
and put the other copy in DI Mauriello's office desk. (Pl.'s
Consol. 56.1 Statement, ¶ 52.)

66.    Schoolcraft testified that, when Lieutenant
Caughey returned the memo book to Schoolcraft later that day,
Schoolcraft noticed, and became alarmed, that several pages of

the memo book containing his entries about corruption or
misconduct were earmarked or folded down.  The City and DI
Mauriello dispute that several pages of the memo book
containing his entries about corruption or misconduct were
earmarked or folded down, and DI Mauriello disputes
characterization that pages reflected corruption or misconduct.
(Pl.'s Consol. 56.1 Statement, ¶ 57.)  Schoolcraft contends,
and City Defendants and DI Mauriello dispute, that Lieutenant
Caughey later started behaving in an unusual manner towards
Schoolcraft.  (Pl.'s Consol. 56.1 Statement, ¶¶ 54-56.)


67.  One of the civilian workers at the Precinct,
Police Administrative Aide ("PAA") Curtis Boston ("PAA Boston")
testified that she saw Lieutenant Caughey walk by Schoolcraft
that day in an unusual manner, and that twice during the course
of that morning, PAA Boston and Schoolcraft discussed
Lieutenant Caughey's unusual behavior toward Schoolcraft.
(Pl.'s Consol. 56.1 Statement, ¶ 55.)


68.  PAA Boston testified that Schoolcraft told her
that he felt uncomfortable about Lieutenant Caughey's behavior
and that Schoolcraft asked her to document her reasons for why
she believed Lieutenant Caughey was acting in a suspicious

manner.  (Pl.'s Consol. 56.1 Statement, ¶ 56.)

69.    About one hour before the end of his scheduled day, Schoolcraft told his supervisor, Sergeant Rasheena Huffman ("Sergeant Huffman") that he was not feeling well and was going home.

70.    Schoolcraft also submitted a sick report to Sergeant Huffman, which could have been a basis for Sergeant Huffman authorizing him to take "administrative sick" for the day.  (Pl.'s Consol. 56.1 Statement, ¶ 58.)

71.    As Schoolcraft was leaving the precinct, Sergeant Huffman told Schoolcraft that he had the option of taking "lost time," but did not give him written approval for either lost time or administrative sick time.  (Pl.'s Consol. 56.1 Statement, ¶ 59.)

72.    Sergeant Huffman called the NYPD centralized Sick Desk to inquire whether Schoolcraft had called for permission to leave work early, and was told he had not done so. (Mauriello's Consol. 56.1 Statement, ¶ 44.)

73.   As Schoolcraft walked out of the precinct, DI
Mauriello was walking in and said hello to Schoolcraft.
(Mauriello's Consol. 56.1 Statement, ¶ 41.)


### G. October 31, 2009 – Events Subsequent to
### Schoolcraft's Departure

74.   Following Schoolcraft's departure, Captain
Lauterborn contacted the NYPD sick desk supervisor.  (City's
Consol. 56.1 Statement, ¶ 26.)


75.   After leaving work on October 31, 2009, at
approximately 2:30 p.m., Schoolcraft recorded conversations and
events in his apartment throughout the rest of that day until
the first entry was made by NYPD into his apartment at
approximately 9:40 p.m.  (Mauriello's Consol. 56.1 Statement, ¶
36.)


76.   At about 3:30 p.m., Schoolcraft got home, which
was located at 82-60 Eighty-Eighth Place, Queens, New York, and
telephonically notified IAB of what Schoolcraft characterized
as Lieutenant Caughey's menacing behavior.  (Pl.'s Consol. 56.1
Statement, ¶ 60.)

77.    Schoolcraft specifically informed IAB that he felt threatened, retaliated against, and in danger as a result of what Schoolcraft characterized as Lieutenant Caughey's menacing behavior.  (Pl.'s Consol. 56.1 Statement, ¶ 61.)

78.    Shortly after Schoolcraft left the precinct, the desk officer called Schoolcraft's cell phone, but the calls were not answered.  (Mauriello's Consol. 56.1 Statement, ¶ 45.)

79.    The 104th Precinct was notified about Schoolcraft's status, and was asked to send an officer to his home.  (Mauriello's Consol. 56.1 Statement, ¶ 47.)

80.    About one hour later, at about 4:20 p.m., a Sergeant Krohley, from the 104th Precinct, went to Schoolcraft's home with his driver.  Sergeant Krohley rang the bell for Schoolcraft's apartment, which was on the second floor of a three-family house, and when there was no answer, he spoke to the landlady, Carol Stretmoyer ("Stretmoyer"), who told him that she believed that Schoolcraft had left about thirty minutes before.  (Pl.'s Consol. 56.1 Statement, ¶ 62.)

81.    Stretmoyer also informed Sergeant Krohley that
Schoolcraft had a car, which was parked on the street.
Sergeant Krohley determined that the car was registered in the
name of Schoolcraft's father.  (Pl.'s Consol. 56.1 Statement, ¶
63.)

82.  On October 31, 2009, Captain Lauterborn was the
Executive Officer of the 81st Precinct, i.e., the position
below Commanding Officer in the chain of authority.
(Mauriello's Consol. 56.1 Statement, ¶ 50.)

83.  On October 31, 2009, Captain Lauterborn was also
assigned for the day to be the PBBN Duty Captain, for the
entire Brooklyn North area.  (Declaration of Walter A. Kretz,
Jr. dated March 6, 2015, hereinafter "SM," Ex. AB, Brooklyn
North Duty Sheet; Mauriello's Consol. 56.1 Statement, ¶ 51.)

84.  At all relevant times, Deputy Chief Marino (now
retired) was the PBBN Assistant Chief, or second in command,
with supervisory authority over all of the precincts in PBBN,
including the 81st Precinct.  (Mauriello's Consol. 56.1
Statement, ¶ 53.)

28

85.   Defendant Lieutenant Christopher Broschart from
the 81st Precinct was instructed by Captain Lauterborn to go
with his driver to Schoolcraft's apartment and check to see if
Schoolcraft had returned home.  (Mauriello's Consol. 56.1
Statement, ¶ 46.)


86.   At about 5:00 p.m. Lieutenant Broschart arrived
at the scene, and Sergeant Krohley briefed Lieutenant Broschart
on the facts he had determined since arriving at the scene.
(Pl.'s Consol. 56.1 Statement, ¶ 64.)


87.   After Lieutenant Broschart and Captain Lauterborn
arrived at Schoolcraft's home, they periodically knocked on the
door from the early afternoon until it was dark out.  (City's
Consol. 56.1 Statement, ¶ 32.)


88.   Schoolcraft did not answer the door.  (City's
Consol. 56.1 Statement, ¶ 33.)


89.   Lieutenant Broschart updated Captain Lauterborn
by telephone that Schoolcraft was not home and that Stretmoyer
had told him that Schoolcraft might have left.  (Pl.'s Consol.
56.1 Statement, ¶ 66.)


29

90.    Captain Lauterborn told Lieutenant Broschart to
stand by and wait to see if Schoolcraft returned.  (Pl.'s
Consol. 56.1 Statement, ¶ 67.)


91.    Later that evening, Captain Lauterborn spoke with
Dr. Lamstein.  According to Dr. Lamstein's notes of the call,
Captain Lauterborn told her that Schoolcraft left early that
day and the "underlying issue" was that Schoolcraft "has made
allegations against others" and the "dept's investigation of
those allegations picked up this week & it snowballed from
there."  (Pl.'s Consol. 56.1 Statement, ¶ 68.)


92.    Dr. Lamstein told Captain Lauterborn that she had
seen Schoolcraft a few days ago and that she "had no reason to
think [Schoolcraft] was a danger to himself or others."  She
also stated that her "assessment of his suicide risk is only as
good as the last time [she] saw him.  If something happened
after that and led him to be so upset that he left work without
permission an hour before the end of his tour, said to have
stomach pains, etc., then [she is] unable to say with any
reasonable amount of certainty that he is not at risk of S/I
[suicidal ideation] under present circumstances."  While Dr.

Lamstein further testified that she thought the NYPD "absolutely needed" to find Plaintiff and "make sure that he was ok," Plaintiff contends that her testimony implies she did not so informed Captain Lauterborn, while City Defendants contend she explicitly communicated this impression to Captain Lauterborn. (Pl.'s Consol. 56.1 Statement, ¶ 69; City's Consol. 56.1 Statement, ¶ 30.)

93.   Captain Lauterborn asked Dr. Lamstein to see if she could try to reach Schoolcraft over the telephone. (Mauriello's Consol. 56.1 Statement, ¶ 70.)

94.   On October 31, 2009, Dr. Lamstein attempted to contact Schoolcraft by calling him on his cell phone. (City's Consol. 56.1 Statement, ¶ 34.)

95.   At about 7:40 p.m., after speaking with Dr. Lamstein, Captain Lauterborn also called Schoolcraft's father and told him that Schoolcraft left without permission and had to return to the 81st Precinct that night. (Pl.'s Consol. 56.1 Statement, ¶ 70.)

96.   Schoolcraft listened to Dr. Lamstein's message and

recorded it.  (Mauriello's Consol. 56.1 Statement, ¶ 74.)

      97.  Dr. Lamstein's message was as follows:

> Hi Schoolcraft, Dr. Lamstein.  I am the pager duty
> psychologist today and I got a call from Captain
> Lauterborn.  I know I'm not the first call you're
> receiving so I'm sure you're aware that they're all
> looking for you and very concerned because you ran off
> without doing proper procedure and they're not sure if
> you're OK.
>
> So right now they are trying to figure out if they
> supposed to do a whole city-wide high-level
> mobilization to find you or if you're OK and they're
> not sure if they are supposed to be doing that.  So
> there are other people who left you a message asking
> you to return to the 8-1.  I asked if it would also be
> OK if you just returned to your home and to send a Lt.
> there hoping to find you.
>
> So I don't know what to tell them because as long as
> I've known you, I've had no concerns about you having
> thoughts about hurting yourself, I really really want
> to urge you to return to your home or call your Captain
> or you can call me.  Whatever this is, if you just
> return to your home and just resolve whatever this is
> quickly and easily otherwise it's just going to blow up
> to a bigger mess than you would want and I would really
> really hate to see that happen.  I would much rather
> this, whatever this is, get reconciled very quickly and
> easily without a whole big city wide mobilization and
> suspensions and whatever else is being considered
> because this is not necessary, it can be resolved in
> two minutes.
>
> [Gives phone numbers].  You can also just return home
> and resolve it with you there instead of at the
> precinct because I suggested that might be embarrassing
> for you.
>
> So hope everything is OK and please give me a call.

(Mauriello's Consol. 56.1 Statement, ¶ 75.)

98.  Schoolcraft did not answer Dr. Lamstein's phone
call.  (City's Consol. 56.1 Statement, ¶ 35.)


99.  Captain Lauterborn also spoke with Schoolcraft's
father over the telephone.  Schoolcraft's father told him that
he had spoken to Schoolcraft earlier that day, that his son
told him he felt sick with a "tummy ache" and was going home
and would call Schoolcraft's father when Schoolcraft woke up.
(Pl.'s Consol. 56.1 Statement, ¶ 70.)


100.  Lauterborn told Schoolcraft's father that he
needed to "physically talk to" Schoolcraft and "resolve things"
and the situation was not going to "wait until the morning."
Captain Lauterborn insisted that he had to talk to Schoolcraft
"in person" and not "over the phone."  He also stated that the
"situation [is] going to escalate as the night goes on" and
that "no one is going in or out of that house he lives in
because there is police all over it."  If Schoolcraft was
there, Captain Lauterborn said that "we are eventually going to
make our way in."  (Pl.'s Consol. 56.1 Statement, ¶ 72.)


33

101.   Although Schoolcraft's father assured Captain Lauterborn that his son was fine and was probably sleeping, Captain Lauterborn insisted that it was not going to "end here" and that Schoolcraft should report to the Lieutenant on the scene outside his home.  (Pl.'s Consol. 56.1 Statement, ¶ 73.)

102. While alone in his apartment with NYPD personnel gathered outside on the street, Schoolcraft spoke several times over the telephone with his father, who was in upstate New York.  (Mauriello's Consol. 56.1 Statement, ¶ 68.)

103. Lieutenant Broschart remained outside of Schoolcraft's apartment for approximately four hours, and never saw or heard Schoolcraft.  (City's Consol. 56.1 Statement, ¶ 37.)  Deputy Chief Marino believed that Schoolcraft was still in his apartment.  (City's Consol. 56.1 Statement, ¶ 38.)

104. Despite knowing that various persons were attempting to reach him during that seven-hour period, Schoolcraft did not respond to any of the telephone calls or to the numerous knocks on his apartment door.  (Mauriello's Consol. 56.1 Statement, ¶ 71.)

34

105. The City Defendants and Plaintiff disagree as to the level of Assistant Chief Nelson's involvement during this time. Plaintiff contends that DI Mauriello kept Assistant Chief Nelson informed of the NYPD's activities throughout the evening, and understood the conduct to be in response to an "AWOL officer," i.e., and officer absent without leave. (See City's Consol. 56.1 Statement, ¶ 58.)

106. Lieutenant Broschart, Captain Lauterborn, and DI Mauriello were aware on October 31, 2009 that Schoolcraft's gun and shield had previously been removed from him. (City's Consol. 56.1 Statement, ¶ 39.)

107. Prior to arriving at Schoolcraft's apartment, Captain Lauterborn was informed by Lieutenant Broschart that Stretmoyer had heard creaking sounds from Schoolcraft's apartment, which was indication of activity in the apartment. (Mauriello's Consol. 56.1 Statement, ¶ 59.)

108. NYPD officers also noticed that Schoolcraft's television set was on. (Jamaica's Consol. 56.1 Statement, ¶ 23.)

35

109. At approximately 8:30 p.m., Captain Lauterborn and Lieutenant Gough, Sergeant Duncan, and Sergeant Hawkins, arrived at Schoolcraft's residence. (Mauriello's Consol. 56.1 Statement, ¶ 58.)

110. Deputy Chief Marino directed that the NYPD Operations division be notified and that arrangements be made to have an Emergency Services Unit ("ESU") also respond to Schoolcraft's residence. (Mauriello's Consol. 56.1 Statement, ¶ 55.)

111. The role of ESU is to provide specialized assistance to other units of the NYPD. (Mauriello's Consol. 56.1 Statement, ¶ 56.)

112. An NYPD ESU crew was requested at 9:09 p.m. (Mauriello's Consol. 56.1 Statement, ¶ 63.)

113. Deputy Chief Marino, driving his own car, and DI Mauriello, driven by Lieutenant Crawford, arrived at the scene at approximately 9:30 p.m. By the time Deputy Chief Marino arrived, ESU had already arrived at Schoolcraft's apartment. (Mauriello's Consol. 56.1 Statement, ¶ 64.)

114. Deputy Chief Marino met with Captain Lauterborn and ESU officers, Lieutenant Gough and Sergeant Duncan, who had gathered at the 81st Precinct, in the precinct parking lot, as they prepared to go to Schoolcraft's apartment. (Mauriello's Consol. 56.1 Statement, ¶ 54.)

## H. October 31, 2009 – NYPD's First Entry into Schoolcraft's Apartment

115. On October 31, 2009, Schoolcraft had a voice-activated recorder in his bedroom. (Mauriello's Consol. 56.1 Statement, ¶ 78.)

116. The hidden recorder recorded every sound heard in Schoolcraft's bedroom on the evening of October 31, 2009. (Mauriello's Consol. 56.1 Statement, ¶ 79.)

117. Captain Lauterborn obtained a key to Schoolcraft's apartment from Stretmoyer. (City's Consol. 56.1 Statement, ¶ 40; Mauriello's Consol. 56.1 Statement, ¶ 65.)

118. At 9:45 p.m. that night, after waiting approximately four or five hours outside Schoolcraft's home,

37

the NYPD used Stretmoyer's key to enter the apartment. (Pl.'s Consol. 56.1 Statement, ¶ 74.)

119.  Several supervisory NYPD officers, including Deputy Chief Marino, DI Mauriello, Captain Lauterborn, Lieutenant Broschart, and three members of the Brooklyn North Investigation Unit, Lieutenant William Gough, Sergeant Kurt Duncan, and Sergeant Raymond Hawkins, entered Schoolcraft's home without a warrant. (Pl.'s Consol. 56.1 Statement, ¶ 75.)

120.  At the time of their entry, several other members of the NYPD, including DI Keith Green, the commanding officer of the 104th Precinct, Lieutenant Thomas Crawford (81st Precinct); Sergeant Kevin Scanlon (104th Precinct); and several Police Officers were waiting outside of Schoolcraft's apartment. (Pl.'s Consol. 56.1 Statement, ¶ 77.)

121.  Also responding to the scene was FDNY Lieutenant Elise Hanlon and two Jamaica Hospital Emergency Medical Technicians ("EMTs"). (Pl.'s Consol. 56.1 Statement, ¶ 78.) Plaintiff contends that Lieutenant Hanlon testified that she reported in connection with a "barricaded EDP," while the 911

operator listed the purpose of the EMT dispatch as "unknown condition."

122.  According to Deputy Chief Marino and DI Mauriello, the warrantless entry into Schoolcraft's home was justified by their concerns for his "well-being." (Pl.'s Consol. 56.1 Statement, ¶ 79.)

123.  Deputy Chief Marino testified that he had no information that Schoolcraft had threatened to hurt himself or others, though Mauriello contends that he only lacked "specific" information and points to a portion of his testimony where he states that he had been briefed about the events of day and Schoolcraft's "psychological history." (Pl.'s Consol. 56.1 Statement, ¶ 80.)

124.  Upon entry, the ESU officers moved into Schoolcraft's bedroom wearing bulletproof vests and helmets and carrying tactical shields. (Pl.'s Consol. 56.1 Statement, ¶ 82.)

125. On the recording, ESU is heard knocking on the apartment door and calling out "Adrian." As the door apparently opens, a comment is made by one of the officers in a

low voice, saying "He's on the bed."  In response, another
officer asks "Is he alright?"  (Mauriello's Consol. 56.1
Statement, ¶ 80.)


126.  The Emergency Services Unit officers moved into
Schoolcraft's bedroom with their guns drawn.  DI Mauriello
disputes this statement.  (Pl.'s Consol. 56.1 Statement, ¶ 82.)


127.  Schoolcraft was awake lying on his bed.  (Pl.'s
Consol. 56.1 Statement, ¶ 83.)


128.  The ESU officers then addressed Schoolcraft
directly, asking him to show his hands and asking him to assure
them he was OK.  There is no indication of any aggressive
conduct or the exertion of any physical force against
Schoolcraft.  (Mauriello's Consol. 56.1 Statement, ¶ 81.)


129.  As reflected by the recording captured by
Schoolcraft's voice-activated digital recorder, one of the ESU
officers asked Schoolcraft, "You okay?" to which Schoolcraft
replied, "Yeah, I think so."  (Pl.'s Consol. 56.1 Statement, ¶
84.)

130. Once entry was made into the apartment and Schoolcraft appeared to be in reasonably good condition, Deputy Chief Marino, then DI Mauriello, and then Captain Lauterborn explained to him that he was being directed to return to the precinct. (Mauriello's Consol. 56.1 Statement, ¶ 91.)

131. The exchange between Deputy Chief Marino and Schoolcraft was as follows:

> Marino: Adrian, you didn't hear us knocking on this door for a couple hours?
>
> Schoolcraft: I drank some Nyquil.
>
> Unidentified male voice: Adrian, sit up.
>
> Marino: Adrian, you didn't hear us knocking on that door . . . for the last couple hours?
>
> Schoolcraft: No, why would I be expecting anyone knocking at my door Chief?
>
> Marino: I don't know Adrian, but normally if you hear someone knocking you get up and answer it. They were kicking on that door loud and yelling.
>
> Schoolcraft: I wasn't feeling well.
>
> Marino: You got a million people downstairs worried about your welfare, spending hours out here, worried about you. We've talked to your father, we've called your phone.
>
> Schoolcraft: What did my father say?
>
> Marino: I don't know Adrian, I didn't talk to him personally. Alright, sit down.

(Mauriello's Consol. 56.1 Statement, ¶ 82.)

41

132. After speaking with Schoolcraft for less than a minute, Deputy Chief Marino said "Steve," indicating to DI Mauriello that Deputy Chief Marino wanted him to step into the bedroom and deal with the situation. (Mauriello's Consol. 56.1 Statement, ¶ 84.)

133. DI Mauriello ordered Schoolcraft to return to the 81st Precinct along with two officers – Sergeant Huffman and a "Rodriguez" – who had witnessed his early departure from work and were being detained at the precinct. (Mauriello's Consol. 56.1 Statement, ¶¶ 85, 92.)

134. The exchange between DI Mauriello and Schoolcraft, lasting approximately forty-five seconds, was as follows:

> Mauriello: Adrian, what happened today?
>
> Adrian: I wasn't feeling well, I left.
>
> Mauriello: That's it? You weren't feeling well.  Your sergeant told you to stay, right?
>
> Schoolcraft: No, she didn't say anything.  She was talking on her cell phone.
>
> Mauriello: You got everybody worried, we are worried about your safety.
>
> Schoolcraft: Worried about what?

42

> Mauriello: What do you mean, worried about what?  They
> tried calling you, everybody(s) been calling you.
> Captain Lauterborn's been calling, everyone has been
> calling you, your father has been calling you.  You're
> not answering.  We were worried about anything that
> happens.  That's what we are worried about.  God
> forbid.  You just walk out of the precinct.  I say
> hello to you today that was the last I saw you.  You
> know, that's what we are worried about, your safety,
> your well-being.
>
> Schoolcraft: Alright, I'm fine.
>
> Mauriello: Well, you are going to come back to the
> precinct with us.
>
> Schoolcraft: Well . . . if I'm forced to.  It's
> against my will.
>
> Mauriello: Against your will?  OK Teddy [referring to
> Captain Lauterborn], you handle this.

(Mauriello's Consol. 56.1 Statement, ¶ 85.)


135. DI Mauriello did not have any physical contact

with Schoolcraft.  (Mauriello's Consol. 56.1 Statement, ¶ 88.)


136. Captain Lauterborn then spoke with Schoolcraft

over the course of the next several minutes.  Their

conversation included the following exchange:

> Lauterborn: Get your stuff on, we are going back to
> the precinct.
>
> Schoolcraft: I'm not going back to the precinct.

Lauterborn: Adrian, we are going to go back to the precinct.

Schoolcraft: For . . . ?

Lauterborn: Because we are going to do it the right way.  You can't just walk out of the command.

Schoolcraft: And do what?

Lauterborn: You can't just walk out of the command.

Schoolcraft: What's going to be done if I go back to the 8-1?

Lauterborn: What's gonna be done? We are going to investigate why you left.

Schoolcraft: I'm telling you why I left, I was feeling sick.

Lauterborn: Adrian, that's not the reason why you leave.  Alright, you know that.  You just don't put a thing on a desk, you ask for permission.

Schoolcraft: I did ask permission.

Lauterborn: No you didn't.

Schoolcraft: She denied it.

Lauterborn: Alright, so you can't leave.  You weren't given permission.

Schoolcraft: Well . . . I wasn't feeling well.

Lauterborn: She denied it, that's it.  You have to sit there and wait until your permission is granted.  Alright, if it's that bad then you're gonna go to the hospital from the precinct.  You know better than to just slap a sick report on a desk and walk out.

Schoolcraft: I didn't do that.  She embellished that I . . . she was on the cell phone.

44

Lauterborn: Alright, so then what did you do? Set it
down?  She told you [that] you can't leave and you
left anyway, right?

Schoolcraft: I was going sick.

Lauterborn: And you left anyway? She told you [that]
you can't leave?  Right.  You can't leave. That's the
way it rolls.  You can't go.  Alright? So we have to
go back.  So get your clothes on, whatever you have to
do.  People have been calling you all day, I talked to
your father.  Alright?

(Mauriello's Consol. 56.1 Statement, ¶ 89.)


137.  As reflected by the recording, Schoolcraft
refused to return to the Precinct.  After the colloquy with
Captain Lauterborn and Lieutenant Gough, Schoolcraft stated he
would go under protest.  (Pl.'s Consol. 56.1 Statement, ¶ 86.)


138. After agreeing to return the 81st Precinct,
Schoolcraft spoke on the phone with his father, then indicated
he did not feel well.  (Mauriello's Consol. 56.1 Statement, ¶
98.)


139.  Schoolcraft stated that he had to sit down
because he was not feeling well and agreed to receive medical
attention.  (Pl.'s Consol. 56.1 Statement, ¶ 87.)


45

140. Upon hearing that Schoolcraft was not feeling well, NYPD officers offered Schoolcraft medical aid. (Mauriello's Consol. 56.1 Statement, ¶ 99.)

141. Jamaica Hospital EMT Salvatore Sangeniti has been a trained EMT since 1980. (City's Consol. 56.1 Statement, ¶ 46.)

142. While Schoolcraft was being examined by EMT Sangeniti, Deputy Chief Marino spoke with Schoolcraft about his leaving the precinct and stated that Schoolcraft disobeyed an order, and informed him that he was suspended. (Pl.'s Consol. 56.1 Statement, ¶ 88.)

143. Immediately following Deputy Chief Marino's statement that Schoolcraft would be suspended, EMT Sangeniti measured Schoolcraft's blood pressure. When informed that his pressure was high, Schoolcraft responded that he had been feeling sick all day. (Pl.'s Consol. 56.1 Statement, ¶ 89.)

144. Schoolcraft's pulse was 120 beats per minute. (City's Consol. 56.1 Statement, ¶ 47.)

46

145. Schoolcraft's blood pressure was 160 over 120. (City's Consol. 56.1 Statement, ¶ 48.)

146. EMT Sangeniti told Lieutenant Hanlon that Schoolcraft's medical condition required medical attention at a hospital. (City's Consol. 56.1 Statement, ¶ 37.)

147. Schoolcraft agreed to go to the hospital for an evaluation. Medical personnel were recorded discussing Jamaica Hospital and Forest Hills Hospital (also referred to as LaGuardia) as potential options. Schoolcraft stated that he wanted to go to Forest Hills and EMT Sangeniti explained that Jamaica Hospital would be better. Schoolcraft reiterated that he wanted to go to Forest Hills. (Pl.'s Consol. 56.1 Statement, ¶ 90.)

148. A total of sixteen minutes had elapsed from the time ESU first opened the door to the apartment until the remaining officers and EMTs left the apartment with the expectation the ambulance would take Schoolcraft to the hospital for a medical exam. (Mauriello's Consol. 56.1 Statement, ¶ 104.)

47

149. Schoolcraft walked out of the apartment and approached the ambulance. (Mauriello's Consol. 56.1 Statement, ¶ 103.)

150. From a distance out on the street, DI Mauriello saw Schoolcraft walk out of the house and toward the ambulance. (Mauriello's Consol. 56.1 Statement, ¶ 108.)

151. Schoolcraft eventually refused further medical attention and went back to his apartment. (Pl.'s Consol. 56.1 Statement, ¶ 91.)

152. Schoolcraft did not suffer any physical harm during the period DI Mauriello was in the apartment during the first entry, and DI Mauriello is unaware of any such harm being suffered by Schoolcraft any time during the remainder of the first entry. (Mauriello's Consol. 56.1 Statement, ¶ 106.)

153. Defendants did not use any force against Schoolcraft prior to the second entry. (Mauriello's Consol. 56.1 Statement, ¶ 110.)

154. The EMTs remained by the ambulance, and did not enter Schoolcraft's apartment again. (Jamaica's Consol. 56.1 Statement, ¶ 30.)

I. **October 31, 2009 – NYPD's Second Entry into Schoolcraft's Apartment**

155. As reflected in the second part of the recording of the events in Schoolcraft's home on October 31, 2009, Schoolcraft returned to his apartment, laid back down in his bed and refused further orders first by Captain Lauterborn and then by Deputy Chief Marino who returned to the apartment and again entered without permission. (Pl.'s Consol. 56.1 Statement, ¶ 92.)

156. When Schoolcraft returned to his apartment, DI Mauriello saw Chief Marino, Captain Lauterborn and Sergeant Duncan, Sergeant Hawkins, and Lieutenant Gough, follow Schoolcraft back inside. (Mauriello's Consol. 56.1 Statement, ¶ 103.)

157. DI Mauriello did not re-enter the apartment. (Mauriello's Consol. 56.1 Statement, ¶ 115.)

49

158.   Deputy Chief Marino declared Schoolcraft an "emotionally disturbed person" (also known as an "EDP") and Captain Lauterborn, Lieutenant Broschart, Lieutenant Gough and Sergeant Duncan handcuffed Schoolcraft with his hands behind his back.  (Pl.'s Consol. 56.1 Statement, ¶ 93.)

159. After Schoolcraft was declared an EDP, Deputy Chief Marino was in charge at the scene as the highest ranking NYPD officer present.  Prior to that declaration, Schoolcraft disputes that Deputy Chief Marino was in charge.  (Mauriello's Consol. 56.1 Statement, ¶ 83.)

160.   While Schoolcraft was prone on the floor, Lieutenant Broschart held down his shoulders and Captain Lauterborn held him down by his legs.  All Defendants save the City also admit that Deputy Chief Marino put his boot on Schoolcraft's face as he tried to turn his neck around to see what was being done to his body.  (Pl.'s Consol. 56.1 Statement, ¶ 94.)

161. DI Mauriello did not arrest Schoolcraft, did not direct anyone to arrest him, and was not present when, if ever, he was placed under arrest.  However, Schoolcraft contends that

DI Mauriello ordered his Executive Officer, Captain Lauterborn, to "take care of this" when Schoolcraft refused to voluntarily return to the 81st Precinct immediately, which was, Schoolcraft contends, an order to bring Schoolcraft back to the precinct involuntarily. (Mauriello's Consol. 56.1 Statement, ¶ 120.)

162. DI Mauriello was not present when Schoolcraft was handcuffed, and he had not directed anyone to apply handcuffs. (Mauriello's Consol. 56.1 Statement, ¶ 117.)

163. DI Mauriello waited outside of the house until he saw everyone exit the house with Schoolcraft being carried in a chair to the ambulance. (Mauriello's Consol. 56.1 Statement, ¶ 124.)

164. The entire time that elapsed from the time Schoolcraft went back into his apartment until everyone left the apartment was approximately fifteen minutes. (Mauriello's Consol. 56.1 Statement, ¶ 125.)

165. DI Mauriello was not present when Schoolcraft was suspended. (Mauriello's Consol. 56.1 Statement, ¶ 117.)

51

166. DI Mauriello was not present when Schoolcraft was declared an EDP. (Mauriello's Consol. 56.1 Statement, ¶ 119.)

167. DI Mauriello was not in Schoolcraft's apartment when all of the events allegedly occurred that form the basis for Schoolcraft's claims, whether for the remainder of the first entry or during the second entry. (Mauriello's Consol. 56.1 Statement, ¶ 96.)

168. DI Mauriello did not know what had happened in the apartment during the second entry, and he did not ever again speak to or interact with Schoolcraft. (Mauriello's Consol. 56.1 Statement, ¶ 126.)

169. Lieutenant Broschart rode in the back of the ambulance with Schoolcraft. (Pl.'s Consol. 56.1 Statement, ¶ 96.)

170. While the NYPD officers were in Schoolcraft's apartment, they searched his person and his apartment and found a voice-activated digital recorder belonging to Schoolcraft. (Pl.'s Consol. 56.1 Statement, ¶ 97.)

171. DI Mauriello was not present for the removal of

any of Schoolcraft's personal property, including any alleged removal of evidence Schoolcraft claims to have gathered of NYPD corruption.  (Mauriello's Consol. 56.1 Statement, ¶ 122.)

172. DI Mauriello did not direct anyone to remove any property and did not direct or participate in the alleged forcible removal of Schoolcraft from his apartment during the second entry. (SM Ex. S, recording of first and second entries; SM Ex. C, Mauriello Dep. pp. 376-81; Mauriello Affidavit ¶ 123.)

173. There have been no substantiated incidents involving any allegation that any physical force whatsoever was used by Deputy Chief Marino in any incident.  Schoolcraft contends that City Defendants successfully precluded inquiry on this subject in discovery and should not be permitted to assert this contention.  (City's Consol. 56.1 Statement, ¶ 97.)

174. There are no substantiated allegations of unlawful search or seizure, conspiracy, or retaliation against Deputy Chief Marino, DI Mauriello, or Assistant Chief Nelson. Schoolcraft contends that City Defendants successfully precluded inquiry on this subject in discovery and should not

be permitted to assert this contention.  (City's Consol. 56.1

Statement, ¶ 98.)


## J. <u>Arrival at Jamaica Hospital</u>

175.  Schoolcraft was taken to Jamaica Hospital's

Emergency Room.  (Pl.'s Consol. 56.1 Statement, ¶ 98.)


176. Jamaica Hospital is a not-for-profit hospital.

(Jamaica's Consol. 56.1 Statement, ¶ 2.)


177. In 2009, Jamaica Hospital had a mental health

clinic, a psychiatric emergency department, and two psychiatric

inpatient units.  (Jamaica's Consol. 56.1 Statement, ¶ 3.)


178. Schoolcraft was held at Jamaica Hospital,

pretextually according to Schoolcraft, pursuant to New York

State Mental Hygiene Law Section 9.39 until November 6, 2009.

(City's Consol. 56.1 Statement, ¶ 51.)


179.  Hospital medical records, or the "chart," reflect

that Schoolcraft was in custody of the NYPD at the time he was

admitted.  (Pl.'s Consol. 56.1 Statement, ¶ 99.)

180. Medical records state that "EMS said the patient was behaving irrationally." (Jamaica's Consol. 56.1 Statement, ¶ 37.)

181. Following Schoolcraft's arrival at the Jamaica Hospital Medical Emergency Department, he was triaged at approximately 11:03 p.m. (Jamaica's Consol. 56.1 Statement, ¶ 36.)

182. Schoolcraft was handcuffed by one hand to a gurney and under the custody of Lieutenant Broschart until the Lieutenant was relieved at about midnight by Defendant Sergeant Shantel James. Sergeant James remained there until the morning. (Pl.'s Consol. 56.1 Statement, ¶ 100.)

183. On November 1, 2009, Defendant Sergeant Frederick Sawyer ("Sergeant Sawyer"), another supervisor from the 81st Precinct, was sent to Jamaica Hospital to relieve Sergeant James. When Sergeant Sawyer got to the hospital, he saw Schoolcraft on the telephone and, according to Sergeant Sawyer, he ordered him to get off the telephone. (Pl.'s Consol. 56.1 Statement, ¶ 101.)

184.   Subsequently, Sergeant Sawyer, Sergeant James, and two other officers forced Schoolcraft onto the gurney and handcuffed his other hand to the gurney, leaving him in a fully shackled position on the gurney.  (Pl.'s Consol. 56.1 Statement, ¶ 102.)  All parties save the City Defendants do not deny that when Sergeant Sawyer applied the cuffs to Schoolcraft, he used both hands to squeeze the cuffs tighter and said "this is what happens to rats."  (Pl.'s Consol. 56.1 Statement, ¶ 103.)

185. Schoolcraft was examined and laboratory tests were taken.  In addition, a CT scan was ordered.  (Jamaica's Consol. 56.1 Statement, ¶ 39.)

186. No physical problems were found, other than the impression of handcuffs on both wrists.  (Jamaica's Consol. 56.1 Statement, ¶ 40.)

187. At 12:03 a.m. on November 1, Dr. Silas Nwaishieny examined Schoolcraft and requested a psychiatric consultation.  (Jamaica's Consol. 56.1 Statement, ¶ 41.)

188.   In October and November 2009, non-party Dr. Khin

Mar Lwin ("Dr. Lwin") was a physician in the first year of her residency at Jamaica Hospital. (Jamaica's Consol. 56.1 Statement, ¶ 6.)

189. Dr. Lwin performed the psychiatric consultation, which had been requested because Schoolcraft had purportedly been acting "bizarre." (Jamaica's Consol. 56.1 Statement, ¶ 42.)

190.    Schoolcraft, underwent the initial psychiatric examination/assessment at approximately 6:30 a.m. on November 1, 2009. (Bernier's Consol. 56.1 Statement, ¶ 23.)

191. According to Dr. Lwin's notes, Schoolcraft told Dr. Lwin that he was "worried about the situation." He told her that "this is happening" because he had been discussing the internal affairs of the police department with his superiors and the Police Commissioner, that his supervisors were hiding information about robbery and assault cases to improve their statistics for their own advancement, that he has "documentation" about "this crime," and that he has been reporting his supervisors' actions for the past year. (Jamaica's Consol. 56.1 Statement, ¶ 43.)

192. Dr. Lwin's note indicated that as per a Sergeant James of the 81st Precinct, Schoolcraft complained about not feeling well the prior afternoon and left work early after becoming agitated and cursing a supervisor. The police followed Schoolcraft to his home. Schoolcraft barricaded himself in his apartment and the door had to be broken down to get him. Schoolcraft initially agreed to go with them for evaluation, but once outside, he ran and had to be chased and brought to the medical emergency room. (Bernier's Consol. 56.1 Statement, ¶ 24.)

193. The NYPD officers who remained with Schoolcraft at that time informed Dr. Lwin of Schoolcraft's history and the events that occurred throughout October 31st, and said that that Schoolcraft had left work early "after getting agitated and cursing [his] supervisor." (Jamaica's Consol. 56.1 Statement, ¶ 44.)

194. Dr. Lwin was also told that Schoolcraft had "barricaded himself" in his apartment, which required the NYPD to break the door down, and that Schoolcraft had initially agreed to go to the Hospital for evaluation, but that once he

was outside his house, he began to run, after which a chase
ensued, and he was brought to the Emergency Department ("ED")
in handcuffs. (Jamaica's Consol. 56.1 Statement, ¶ 45.)

195. Dr. Lwin was also advised that Schoolcraft had
previously been evaluated by an NYPD psychologist and that as a
result, Schoolcraft had not carried a gun or a badge for almost
a year. (Jamaica's Consol. 56.1 Statement, ¶ 46; Bernier's
Consol. 56.1 Statement, ¶ 25.)

196. Dr. Lwin noted that while Schoolcraft was in the
ED before Dr. Lwin saw him, Schoolcraft had become agitated,
uncooperative and verbally abusive due to a discussion about
using the telephone, and that he had told his treating
physician that "they are all against me." (Jamaica's Consol.
56.1 Statement, ¶ 47.)

197. Dr. Lwin performed a mental status examination and
determined that Schoolcraft was coherent and relevant, with
goal-directed speech (Exhibit U, p. 5). He was irritable with
appropriate affect. (Jamaica's Consol. 56.1 Statement, ¶ 48.)

198. Dr. Lwin noted that Schoolcraft denied suicidal

and homicidal ideation, but that he was "paranoid about his supervisors." (Jamaica's Consol. 56.1 Statement, ¶ 49.)

199. Dr. Lwin noted that Schoolcraft's memory and concentration were intact, that he was alert and oriented, but that his insight and judgment were, in Dr. Lwin's estimation, impaired. (Jamaica's Consol. 56.1 Statement, ¶ 50.)

200. Dr. Lwin diagnosed Schoolcraft with a Psychotic Disorder, Not Otherwise Specified ("NOS"). (Jamaica's Consol. 56.1 Statement, ¶ 51.)

201. Dr. Lwin recommended continued one-to-one observation due to Schoolcraft's unpredictable behavior and escape risk. (Jamaica's Consol. 56.1 Statement, ¶ 52.)

202. Dr. Lwin also recommended that Schoolcraft be transferred to the Psychiatric Emergency Room for further observation after he was medically cleared. (Jamaica's Consol. 56.1 Statement, ¶ 53.)

203. Schoolcraft testified that he had no complaints with regard to the treatment rendered by Dr. Lwin. (Jamaica's

Consol. 56.1 Statement, ¶ 55.)

204. Dr. Patel, a psychiatrist at Jamaica Hospital, subsequently reviewed Dr. Lwin's note and concurred with Dr. Lwin's findings. (Bernier's Consol. 56.1 Statement, ¶ 26.)

205. A Psychiatric Nursing Assessment Form was completed in the Psychiatric Emergency Department on November 1, 2009 at 9:00 a.m. (Jamaica's Consol. 56.1 Statement, ¶ 65.)

206. Dr. Khwaja Khusro Tariq ("Dr. Tariq"), a resident physician, performed a psychiatric evaluation in the Psychiatric Emergency Department at 12:00 p.m. (Jamaica's Consol. 56.1 Statement, ¶ 66.)

207. In the section marked chief complaints, Dr. Tariq wrote "they just came to my place and handcuffed me" and that according to the accompanying New York City Police Department Officer (Sergeant James as per the ER consult note), Schoolcraft had been acting bizarre. (Bernier's Consol. 56.1 Statement, ¶ 28.)

208. Hospital records state that Schoolcraft had been

61

brought to the "ED" because he had been "deemed to be paranoid and a danger to himself by his police sergeant." (Exhibit U, pp. 74-79). Contusions were noted on Schoolcraft's arms, but he was cooperative, with clear, spontaneous, and relevant speech. (Jamaica's Consol. 56.1 Statement, ¶ 67.)

209. Dr. Tariq's notes indicate that Schoolcraft had been reporting irregularities at work to IAB for over a year, that his supervisors had been under-reporting crime statistics to advance their careers, that he had documentary proof thereof, and that, as a result, he was being "persecuted." (Jamaica's Consol. 56.1 Statement, ¶ 69.)

210. Dr. Tariq's notes indicated that Sergeant James stated that Schoolcraft had been acting bizarre, but Sergeant James denied making that statement. (Jamaica's Consol. 56.1 Statement, ¶ 70.)

211. Dr. Tariq stated that Schoolcraft was cooperative, but that he was angry, with constricted affect. (Jamaica's Consol. 56.1 Statement, ¶ 71.)

212. Dr. Tariq noted that Schoolcraft had paranoid and

62

persecutory delusions because he believed that he was being persecuted for having reported his supervisors' irregularities and corruptive behavior. (Jamaica's Consol. 56.1 Statement, ¶ 72.)

213. Dr. Tariq also determined that Schoolcraft had poor insight and judgment. (Jamaica's Consol. 56.1 Statement, ¶ 73.)

214. Dr. Tariq diagnosed Schoolcraft as suffering from Psychosis, NOS, Rule Out Schizophrenia, Paranoid Type. (Jamaica's Consol. 56.1 Statement, ¶ 74.)

215. At 1:40 p.m., Dr. Tariq wrote an Order for a head CT to be performed. (Jamaica's Consol. 56.1 Statement, ¶ 75.)

216. It was noted that Schoolcraft had spoken with his father on the telephone twice. (Jamaica's Consol. 56.1 Statement, ¶ 76.)

217. On November 2, 2009, non-party physician Dr. Heron noted that Schoolcraft had been taken to the Hospital because the NYPD thought he was paranoid and was a danger to himself.

(Jamaica's Consol. 56.1 Statement, ¶ 77.)

218. Schoolcraft's head CT was read as normal, per the "11/2/0910:45 a.m." CT report. (Jamaica's Consol. 56.1 Statement, ¶ 78.)

219. Later that morning, the two sets of handcuffs were removed and Schoolcraft was wheeled into the Jamaica Hospital Psychiatric Emergency Room for further observation following a diagnosis of Psychotic Disorder, Not Otherwise Specified ("NOS"). (Pl.'s Consol. 56.1 Statement, ¶ 104.)

220. After the paperwork was filled out, Schoolcraft was taken from the Psychiatric Emergency Room to a psychiatric ward in the hospital. (Pl.'s Consol. 56.1 Statement, ¶ 107.)

221. A non-party physician, Dr. Slowik, examined Schoolcraft on November 2, 2009, at 2:15 p.m. (Bernier's Consol. 56.1 Statement, ¶ 29.)

222. Defendant Dr. Bernier is a physician duly licensed to practice medicine in the State of New York. (Bernier's Consol. 56.1 Statement, ¶ 20.)

223. Dr. Bernier was privately employed in October and November of 2009. (Bernier's Consol. 56.1 Statement, ¶ 22.)

224. In October and November of 2009, Dr. Bernier was also an attending physician at Jamaica Hospital. (Jamaica's Consol. 56.1 Statement, ¶ 4.)

225. In October and November of 2009, Dr. Bernier was director of JHMC's psychiatric emergency room. (Bernier's Consol. 56.1 Statement, ¶ 21.)

226. Dr. Bernier took over Schoolcraft's care as the attending psychiatrist while he was in the Psychiatric Emergency Department, prior to his admission to the psychiatric unit. (Jamaica's Consol. 56.1 Statement, ¶ 79.)

227. Prior to purportedly examining Schoolcraft, Dr. Bernier reviewed the notes created by prior treating physicians and nurses, including, but not limited to, Dr. Lwin, Dr. Patel, Dr. Tariq and Dr. Slowick. (Bernier's Consol. 56.1 Statement, ¶ 31.)

228. Dr. Bernier's notes suggest that she examined

65

Schoolcraft at Jamaica Hospital on November 2, 2009, at approximately 3:10 pm, but Schoolcraft denies she actually examined him.  (Bernier's Consol. 56.1 Statement, ¶ 30.)

229. Dr. Bernier sought a second opinion from Dr. Dhar concerning Schoolcraft.  (Bernier's Consol. 56.1 Statement, ¶ 33.)

230. Dr. Bernier was not directly told by anyone from the NYPD, or anyone acting on their behalf, to keep Schoolcraft at Jamaica Hospital against his will.  Schoolcraft contends that she reviewed Schoolcraft's hospital file which indicated the NYPD's wish to keep Schoolcraft in the hospital. (Bernier's Consol. 56.1 Statement, ¶ 34.)

231. Dr. Bernier never spoke with the Sergeant James, or any other officer, who is identified in the notes of prior treating physicians.  (Bernier's Consol. 56.1 Statement, ¶ 35.)

232. Dr. Bernier never spoke with any police officer concerning Schoolcraft.  (Bernier's Consol. 56.1 Statement, ¶ 36.)

233. Dr. Bernier never spoke with Dr. Lamstein concerning Schoolcraft. (Bernier's Consol. 56.1 Statement, ¶ 37.)

234. Dr. Bernier never falsified any medical records concerning Schoolcraft. (Bernier's Consol. 56.1 Statement, ¶ 42.)

235. As Schoolcraft's attending, Dr. Bernier supervised the residents who evaluated Schoolcraft in the Psychiatric Emergency Room prior to admission, and she had the ultimate responsibility to care for Schoolcraft during her shift. (Jamaica's Consol. 56.1 Statement, ¶ 80.)

236. On November 3, 2009 at 8:54 a.m., Dr. Bernier ordered Schoolcraft's involuntary hospitalization. (Pl.'s Consol. 56.1 Statement, ¶ 105.)

237. Dr. Bernier determined that Schoolcraft was a danger to himself because he was psychotic and paranoid, and would benefit from in-patient stabilization. Schoolcraft contends that her determination was not _bona_ _fide_ as it was not based on her own examination. (Jamaica's Consol. 56.1

67

Statement, ¶ 81.)

238. Dr. Bernier indicated that she agreed with the previous evaluation by resident Dr. Tariq. (Jamaica's Consol. 56.1 Statement, ¶ 82.)

239. Dr. Bernier made the decision to admit the patient to the psychiatric unit of Jamaica Hospital. (Jamaica's Consol. 56.1 Statement, ¶ 84.)

240. On November 3, 2009 at 1:20 p.m., Dr. Bernier completed the Emergency Admission Form mandated by Mental Hygiene Law §9.39. (Jamaica's Consol. 56.1 Statement, ¶ 83; Isakov's Consol. 56.1 Statement, ¶ 3.)

241. The Policies and Procedures regarding restraints are from the Policy and Procedure Manual from the Psychiatric Emergency Department of Jamaica Hospital. (Jamaica's Consol. 56.1 Statement, ¶ 109.)

242. The written policy regarding the criteria for involuntary hospitalization is identical to the language in the Mental Hygiene Law. (Jamaica's Consol. 56.1 Statement, ¶ 111.)

243. Dr. Bernier provided Schoolcraft with written notice of his status and rights as an admitted patient on November 3, 2009. (Jamaica's Consol. 56.1 Statement, ¶ 85.)

244. In October and November of 2009, Dr. Isakov was an attending physician at Jamaica Hospital. (Jamaica's Consol. 56.1 Statement, ¶ 5.)

245. On November 4, 2009, Dr. Isakov confirmed Dr. Bernier's decision to involuntarily hospitalize Schoolcraft. (Pl.'s Consol. 56.1 Statement, ¶ 108.)

246. On November 4, 2009, Dr. Isakov co-signed the Emergency Admission Form that was previously completed by Dr. Bernier. (Jamaica's Consol. 56.1 Statement, ¶ 86; Isakov's Consol. 56.1 Statement, ¶ 4.)

247. Dr. Isakov also wrote the psychiatric admission note on November 4, 2009. (Jamaica's Consol. 56.1 Statement, ¶ 87.)

248. IAB visited Schoolcraft twice while he was in Jamaica Hospital. (Mauriello's Consol. 56.1 Statement, ¶ 136.)

69

249. Dr. Isakov was at a family meeting with Schoolcraft and Schoolcraft's father ("Family Meeting"). Present at the Family Meeting was an officer from the IAB, who Schoolcraft had requested attend, and a licensed mental health social worker, Colleen McMahon. (Isakov's Consol. 56.1 Statement, ¶ 7; Jamaica's Consol. 56.1 Statement, ¶ 88.)

250. The Family Meeting was tape recorded. (Isakov Aff. 11.) The IAB officer did not request, pressure or influence Dr. Isakov's independent medical judgment concerning Schoolcraft. (Isakov's Consol. 56.1 Statement, ¶ 8.)

251. Dr. Isakov requested permission from Schoolcraft to obtain a copy of his prior records from the police psychologist who had ordered taking his gun away. That request was denied by Schoolcraft. (Isakov's Consol. 56.1 Statement, ¶ 9.)

252. Dr. Isakov noted that Schoolcraft told him that he had not been happy with how the police department was being run since his career started, that he had made multiple complaints which had not been addressed, and that, instead, he was

"declared" emotionally "unstable." (Jamaica's Consol. 56.1 Statement, ¶ 89.)

253. Dr. Isakov's notes indicate that Schoolcraft told Dr. Isakov that his gun had been taken away from him after a psychiatric evaluation was performed by an NYPD psychologist, and that, since then, he has started to collect the "evidence" to "prove his point," but then he became suspicious that "they are after him." (Jamaica's Consol. 56.1 Statement, ¶ 90.)

254. Dr. Isakov's notes indicate that Dr. Isakov found Schoolcraft to be suspicious, guarded, restless, and noted that Schoolcraft demanded to be discharged. Schoolcraft contends that this was not Dr. Isakov's genuine belief. (Jamaica's Consol. 56.1 Statement, ¶ 91.)

255. Dr. Isakov's notes indicate that Schoolcraft denied suicidal and homicidal ideation, but Dr. Isakov noted that Schoolcraft expressed questionably paranoid ideas about conspiracies and cover-ups in his precinct. Schoolcraft contends that this was not Dr. Isakov's genuine belief. (Jamaica's Consol. 56.1 Statement, ¶ 92.)

256. Dr. Isakov noted that Schoolcraft's cognition and memory were intact, but that his judgment and insight were limited. Schoolcraft contends that this was not Dr. Isakov's genuine belief. (Jamaica's Consol. 56.1 Statement, ¶ 93.)

257. Dr. Isakov's diagnosis was Psychosis NOS, Rule Out Adjustment Disorder with Anxiety. Schoolcraft contends that this was not Dr. Isakov's genuine belief. (Exhibit U, p. 95; Pl.'s R. 56.1 Responsive Statement p. 83, ¶ 94).

258. On November 5, 2009, Dr. Isakov performed an evaluation of Schoolcraft, which Schoolcraft contends was unnecessary and not properly performed. (Jamaica's Consol. 56.1 Statement, ¶ 95.)

259. Dr. Isakov noted that although Schoolcraft "reiterated his story" and still wanted "to take steps/action against his precinct," he did not express any physical threats to anyone. (Jamaica's Consol. 56.1 Statement, ¶ 96.)

260. Dr. Isakov's notes indicate that Schoolcraft refused to give permission for anyone at Jamaica Hospital to speak with the police psychiatrist who had previously evaluated

72

him, but agreed to see a psychotherapist after he was discharged. (Jamaica's Consol. 56.1 Statement, ¶ 97.)

261. On November 6, 2009, Dr. Isakov performed an evaluation of Schoolcraft, which Schoolcraft contends was unnecessary and not properly performed. (Jamaica's Consol. 56.1 Statement, ¶ 98.)

262. Dr. Isakov noted that Schoolcraft was compliant, was not in emotional distress, and was not expressing any paranoid ideation or making any threats. (Jamaica's Consol. 56.1 Statement, ¶ 99.)

263. Dr. Isakov indicated that Schoolcraft would be discharged after an appointment was made with an outside psychiatrist. (Jamaica's Consol. 56.1 Statement, ¶ 100.)

264. Dr. Isakov composed Schoolcraft's Discharge Summary. (Jamaica's Consol. 56.1 Statement, ¶ 101.)

265. Dr. Isakov's discharge diagnosis was Adjustment Disorder with Anxious Mood. (Jamaica's Consol. 56.1 Statement, ¶ 103.)

73

266. Dr. Isakov discharged Schoolcraft with a recommendation to follow up with a psychotherapist and, if he became symptomatic, to see a psychiatrist for medication. Schoolcraft contends that Dr. Isakov illegally conditioned release on Schoolcraft's agreeing to see a psychiatrist. (Jamaica's Consol. 56.1 Statement, ¶ 102.)

267. Dr. Isakov's notes indicate that Schoolcraft verbalized an understanding of the recommendation that Schoolcraft consult with a psychiatrist once discharged. (Jamaica's Consol. 56.1 Statement, ¶ 104.)

268. On November 6, 2009, Jamaica Hospital released Schoolcraft from its custody. (Pl.'s Consol. 56.1 Statement, ¶ 112.)

269. There is no direct evidence that Deputy Chief Michael Marino spoke to any personnel from Jamaica Hospital, beyond the EMTs that arrived at Schoolcraft's home on October 31st. (Jamaica's Consol. 56.1 Statement, ¶ 100.)

270. There is no direct evidence that Captain
Lauterborn spoke to any personnel from Jamaica Hospital, beyond
the EMTs that arrived at Schoolcraft's home on October 31st.
(Jamaica's Consol. 56.1 Statement, ¶ 113.)


271. There is no direct evidence that Lieutenant
Caughey spoke to any personnel from Jamaica Hospital.
(Jamaica's Consol. 56.1 Statement, ¶ 114.)


272. There is no direct evidence that DI Mauriello
spoke to any personnel from Jamaica Hospital, beyond the EMTs
that arrived at Schoolcraft's home on October 31st. (Jamaica's
Consol. 56.1 Statement, ¶ 115.)


273. There is no direct evidence that Sergeant Huffman
spoke to anyone at Jamaica Hospital regarding Schoolcraft.
(Jamaica's Consol. 56.1 Statement, ¶ 116.)


274. There is no direct evidence that Lieutenant Hanlon
spoke to anyone at Jamaica Hospital regarding Schoolcraft.
(Jamaica's Consol. 56.1 Statement, ¶ 117.)


275. There is no direct evidence that Captain Trainer

spoke to anyone at Jamaica Hospital about Schoolcraft. (Jamaica's Consol. 56.1 Statement, ¶ 118.)

276. There is no direct evidence that Lieutenant Gough spoke with anyone at Jamaica Hospital regarding Schoolcraft, beyond the EMTs that arrived at Schoolcraft's home on October 31st. (Jamaica's Consol. 56.1 Statement, ¶ 119.)

277. Sergeant Weiss never went to Jamaica Hospital and never directed anyone to say anything to anyone at Jamaica Hospital. (Jamaica's Consol. 56.1 Statement, ¶ 120.)

278. There is no direct evidence that Sergeant Duncan had any contact with anyone at Jamaica Hospital, beyond the EMTs that arrived at Schoolcraft's home on October 31st. (Jamaica's Consol. 56.1 Statement, ¶ 121.)

279. Lieutenant Broschart testified that until a physician evaluated Schoolcraft, he was in police custody. (Jamaica's Consol. 56.1 Statement, ¶ 123.)

280. Sergeant James denied having any contact with anyone at Jamaica Hospital. (Jamaica's Consol. 56.1 Statement,

¶ 124.)

281. Dr. Roy Lubit ("Dr. Lubit") has been retained by Schoolcraft as a psychiatric expert. Pursuant to his retention, Dr. Lubit issued an expert report. (Bernier's Consol. 56.1 Statement, ¶ 43.)

282. In his report, Dr. Lubit claims Dr. Bernier committed malpractice, in part, due to her failure to gather information about Mr. Schoolcraft, including speaking with IAB and other key collaterals such as the police. (Bernier's Consol. 56.1 Statement, ¶ 44.)

### K. Events Subsequent to Release from Jamaica Hospital

283. Schoolcraft was re-suspended for refusing to return to work after he was released from JHMC on November 6, 2009. (City's Consol. 56.1 Statement, ¶ 71.)

284. After his discharge, Schoolcraft consulted with Dr. Steven Luell ("Dr. Luell"), a private physician. (Jamaica's Consol. 56.1 Statement, ¶ 105.)

285. According to Dr. Luell's report, Schoolcraft

complained of stomach distress, anxiety, difficulty relaxing
and insomnia, and his mood was depressed.  (Jamaica's Consol.
56.1 Statement, ¶ 106.)

286. Dr. Luell diagnosed Schoolcraft with Adjustment
Disorder with Mixed Emotional Features, Rule Out Obsessive
Compulsive Personality Disorder, and recommended that
Schoolcraft undergo a comprehensive psychiatric evaluation and
counseling.  (Jamaica's Consol. 56.1 Statement, ¶ 107.)

287. Schoolcraft did not follow those recommendations.
(Jamaica's Consol. 56.1 Statement, ¶ 108.)

288. Schoolcraft met with NYPD representatives from IAB
in his Queens apartment on November 6, 2009.  (Mauriello's
Consol. 56.1 Statement, ¶ 137.)

289. At the meeting with IAB, Schoolcraft recounted the
events of October 31, 2009.  (Mauriello's Consol. 56.1
Statement, ¶ 138.)

290. Schoolcraft provided the IAB officers with the
recordings he had made of the events in his apartment on

October 31, 2009.  (Mauriello's Consol. 56.1 Statement, ¶ 139.)

291. Following the IAB meeting in his Queens apartment, Schoolcraft was contacted by IAB and told IAB wanted to re-visit his apartment.  They met again on November 9, 2009, together with Schoolcraft's father.  (Mauriello's Consol. 56.1 Statement, ¶ 140.)

292. The IAB officers discussed the existence of a weapon in the apartment.  IAB had learned of the weapon from the recording of the two NYPD entries on October 31, 2009, in which Schoolcraft discusses the weapon with his father and they agree he should hide it under his mattress before the NYPD makes its first entry.  After denying there were any weapons on the premises, Schoolcraft ultimately acknowledged he had a weapon.  (Mauriello's Consol. 56.1 Statement, ¶ 141.)

293. Schoolcraft turned the shotgun over to IAB. (Mauriello's Consol. 56.1 Statement, ¶ 142.)

294. After Schoolcraft was released from Jamaica Hospital, he moved to Johnstown, New York.  (Pl.'s Consol. 56.1 Statement, ¶ 113.)

295. In December 2009, the NYPD's Brooklyn North Investigations Unit ("BNIU") made its first attempt to contact Schoolcraft upstate (SAC ¶ 216), and continued to do so thereafter. (Mauriello's Consol. 56.1 Statement, ¶ 144.)

296. According to DI Mauriello, at no time did BNIU or IAB inform DI Mauriello of their actions or seek to consult with him in any way about their efforts to contact Schoolcraft. (Mauriello's Consol. 56.1 Statement, ¶ 147.)

297. Schoolcraft chose not to speak with the visiting NYPD personnel. It thus became clear he had no interest in communicating further with the NYPD. (Mauriello's Consol. 56.1 Statement, ¶ 146.)

298. Schoolcraft did not attend any disciplinary hearing for disclosing or attempting to disclose NYPD corruption and police misconduct. (City's Consol. 56.1 Statement, ¶ 101.)

299. Schoolcraft decided after his October 31, 2009 involuntary commitment to go to the media. (City's Consol.

56.1 Statement, ¶ 72.)

300. Schoolcraft contends that Brooklyn North Investigations Unit officers were sent to Officer Schoolcraft's Johnstown residence on eight separate occasions, while the City Defendants contend that they visited six times. Schoolcraft further contends that Captain Timothy Trainer ("Captain Trainer") also arranged for the local police on four occasions to "visit" Schoolcraft's upstate home. The parties agree that Schoolcraft opened the door of his upstate home only once to accept an NYPD delivery. (City's Consol. 56.1 Statement, ¶¶ 63, 65.)

301. In January 2010 and in February 2010, Lieutenant Gough and Sergeant Duncan traveled with others north over 200 miles to his home to deliver papers to him. (Pl.'s Consol. 56.1 Statement, ¶ 114.)

302. According to Schoolcraft, the Defendants' purported visits to his upstate residence spurred him to speak to the media. (See citations in City's Consol. 56.1 Statement, ¶ 83.)

81

303. A Daily News reporter contacted Schoolcraft within a month after Schoolcraft's suspension. (City's Consol. 56.1 Statement, ¶76.)

304. Schoolcraft corresponded with reporters and attorneys via e-mail for "a couple years" beginning in 2010. (City's Consol. 56.1 Statement, ¶ 77.)

305. Schoolcraft spoke numerous times with The Daily News, This American Life, and The Village Voice in late 2009 and/or early 2010 through 2012. (City's Consol. 56.1 Statement, ¶ 78.)

306. Schoolcraft wrote a summary of his JHMC confinement and provided that summary to The Village Voice, The Daily News, and his various attorneys. (City's Consol. 56.1 Statement, ¶ 79.)

307. Schoolcraft began communicating with The Village Voice reporter Graham Rayman ("Rayman") in early 2010 and continued to communicate with him through the summer of 2012. (City's Consol. 56.1 Statement, ¶ 80.)

308. Schoolcraft gave copies of recordings of individuals within his command to Rayman and Schoolcraft's attorneys. (City's Consol. 56.1 Statement, ¶ 81.)

309. Schoolcraft spoke with Rayman "a couple dozen times" from early 2010 through 2012. (City's Consol. 56.1 Statement, ¶ 83.)

310. As of October 2012, Schoolcraft had given at least six or seven interviews to the media. (City's Consol. 56.1 Statement, ¶ 84.)

311. Schoolcraft contacted State Senator Hugh T. Farley in 2010. (City's Consol. 56.1 Statement, ¶ 85.)

312. Schoolcraft contacted New York City Councilman Albert Vann in 2010. (City's Consol. 56.1 Statement, ¶ 86.)

313. Schoolcraft contacted New York City Councilman Peter Vallone in 2010. (City's Consol. 56.1 Statement, ¶ 87.)

314. Schoolcraft contacted the Queens District Attorney in late 2009 or early 2010. (City's Consol. 56.1 Statement, ¶

88.)

315. Schoolcraft contacted the United States Department
of Justice.  (City's Consol. 56.1 Statement, ¶ 89.).

316. Schoolcraft contacted plaintiff's counsel in a
stop-and-frisk case recently tried before the Honorable Shira
A. Scheindlin, <u>Floyd v. City of New York</u>, 08 CV 1034 (SAS), and
provided supporting affidavits.  (City's Consol. 56.1
Statement, ¶ 90.)

317. DI Mauriello was a witnesses in <u>Floyd</u>.  During
his testimony, DI Mauriello stated that after the quota
allegations were made against him as the commanding officer of
the 81st Precinct, he was transferred to become the Executive
Officer of Transit Borough Brooklyn and Queens on July 3, 2010.
According to DI Mauriello's testimony, at the time of the
transfer, the Chief of Patrol for the entire NYPD told DI
Mauriello that he was doing a "really good job at the 81st
Precinct."  However, Mauriello contends that the Chief of
Patrol's comments constituted a conciliatory gesture given
Mauriello's disappointment with the transfer, rather than a

statement suggesting that the transfer was a reward.  (Pl.'s
Consol. 56.1 Statement, ¶ 115.)


318.  DI Mauriello considered the transfer to Executive
Officer in Transit to be a position as "second commander to
more officers."  (Pl.'s Consol. 56.1 Statement, ¶ 116.)


319.  In his deposition in this case, DI Mauriello
testified that soon after the news broke in a February 2010
Daily News article about the investigation into downgrading
major crimes at the 81st Precinct, he attended a Patrol Borough
Brooklyn North supervisors' meeting.  At the meeting his direct
supervisor, Deputy Chief Marino, told DI Mauriello not to worry
about the negative press because he did not believe it.  (Pl.'s
Consol. 56.1 Statement, ¶ 119.)


320.  In addition, according to DI Mauriello, Deputy
Chief Marino and the thirty-five other supervisors in the room
told DI Mauriello that they supported him.  (Pl.'s Consol. 56.1
Statement, ¶ 120.)


321.  DI Mauriello testified that he had discussions in
the summer of 2011 with his now-retired supervisor, Transit

85

Bureau Chief Diaz, and his successor, Joseph Fox, who told him that any transfers or promotions would likely have to wait until the case is over and that until then they could not "push for him." (Pl.'s Consol. 56.1 Statement, ¶ 122.)

322.   All parties save DI Mauriello do not dispute that DI Mauriello has not suffered any damage to his status at the NYPD as a result of Schoolcraft's actions.  (Pl.'s Consol. 56.1 Statement, ¶ 118.)

323.   After October 31, 2009, IAB began an investigation into whether DI Mauriello knew about or suspected at the time of his entry into Schoolcraft's home that IAB or QAD was investigating the 81st Precinct.  IAB also investigated whether DI Mauriello knew about the contents of Schoolcraft's memo book at the time he entered the apartment.  (Pl.'s Consol. 56.1 Statement, ¶ 126.)

324.   IAB has recommended that formal charges against DI Mauriello be filed, and those charges are still pending. (Pl.'s Consol. 56.1 Statement, ¶ 128.)

325.  In 2010, QAD issued a report on its
investigation, stating: "In summary, although some upgrades
were made during the course of 2008 and 2009, the findings
illustrate severe deficiencies in the overall crime reporting
process as a whole beginning with the initial interaction of
complainants attempting to file reports, the supervisor's
review and finalization of the reports submitted and continuing
with inordinate delay in changing, improper classifications.
These conclusions, coupled with the significant amount of
reports found not to have been entered into the Omni-System is
disturbing."  (Pl.'s Consol. 56.1 Statement, ¶ 129.)

## III.  APPLICABLE STANDARD

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y. City Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249).

**IV.** **CONSTITUTIONAL LAW CLAIMS RELATING TO CITY DEFENDANTS AND DI MAURIELLO**

    **A.** **Fourth Amendment Claims Survive Summary Judgment**

        Plaintiff and City Defendants[4] both seek judgment as a matter of law with respect to Schoolcraft's Fourth Amendment claims relating to the NYPD's October 31st warrantless entry into Schoolcraft's home, the subsequent search and seizure of his apartment, and forcible removal of Schoolcraft from his apartment after classifying him as an Emotionally Disturbed Person. See generally Pl.'s Mem. in Supp't 34-44; City Defs.' Mem. in Supp't 1-6.

    **i. NYPD's Initial Entry into Schoolcraft's Home**

        As the Supreme Court has repeatedly instructed, warrantless entry inside a home is permitted only under exigent circumstances. See Georgia v. Randolph, 547 U.S. 103, 109 (2006) (warrantless entry per se unreasonable); Payton v. New York, 445 U.S. 573, 586, (1980) (same); Coolidge v. New Hampshire, 403 U.S. 443, 477-78 (1971) (same); see also Terry v. Ohio, 392 U.S. 1, 39 n.4 (1968) (warrantless search per se unreasonable); United States v. Martino, 664 F.2d 860, 869 (2d

---

[4] Mauriello joins City Defendants on this point of law, and the determinations below therefore apply equally to him. See Mauriello Mem. in Opp'n 27-28.

Cir. 1981). One category of exigent circumstances, at issue in this case, relates to instances where entry is reasonably believed necessary to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006); Minnesota v. Olson, 495 U.S. 91, 100 (1990); Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998). "[D]etermination of exigent circumstances is an objective one based on the totality of the circumstances confronting law enforcement agents." United States v. MacDonald, 916 F.2d 766, 772 (2d Cir. 1990); see also Tierney, 133 F.3d at 196. Courts consider "the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." United States v. Simmons, 661 F.3d 151, 157 (2d Cir. 2011) (internal quotations and citations omitted).

In this case, City Defendants contend Dr. Lamstein informed Captain Lauterborn that he "'absolutely needed' to find Plaintiff and 'make sure that he was ok,'" thus satisfying the objective reasonableness of entry under the emergency aid doctrine as a matter of law. City Defs.' Mem. in Opp'n 7; City Defs.' Mem. in Supp't 3. However, whether Dr. Lamstein actually made this statement to Captain Lauterborn is plainly in dispute.

90

See Section II of this Opinion (hereinafter "Facts") ¶ 92; see also Pl.'s Reply Mem. 24; Pl.'s Mem. in Opp'n 2-6.  Contrary to the City Defendants' position, Dr. Lamstein's deposition transcript does not establish that she made those statements, and her affidavit offered as part of the City Defendants' reply to their summary judgment motion does not render this issue indisputable.  Dr. Lamstein's recollection and her earlier deposition testimony arguably conflict.  Therefore, Dr. Lamstein's warning cannot serve as a basis for City Defendants' motion for summary judgment dismissing Schoolcraft's Fourth Amendment claim.

        In support of his motion for summary judgment on the same issue, Schoolcraft contends that, even if the conversation between Dr. Lamstein and Captain Lauterborn took place as City Defendants contend, the record establishes that Deputy Chief Marino was not actually made aware of this conversation.  Facts ¶ 123; Pl.'s Reply Mem. 25-26.  The City Defendants counter that under the collective or imputed knowledge doctrine, which permits an officer to conduct a warrantless search or seizure based upon a colleague's objectively reasonable belief of exigent circumstances, Dr. Lamstein's warning to Captain Lauterborn is imputed to Deputy Chief Marino.  City Defs.' Mem.

in Opp'n 7-8 (citing United States v. Colon, 250 F.3d 130, 135
(2d Cir. 2001)).

The collective knowledge doctrine is typically applied
to warrantless searches and seizures, rather than warrantless
entry, and the Second Circuit has not definitively ruled that
the doctrine applies to exigent circumstances, such as under the
emergency aid analysis at issue here. See Anthony v. City of
New York, 339 F.3d 129, 136 n.3 (2d Cir. 2003) ("[b]ecause the
record before us shows that [police officers] knew the substance
of the 911 call when they [entered an apartment without a
warrant], this case does not raise any issues regarding the
scope of the "collective knowledge" doctrine, and we need not
consider whether the warrantless entry would have been justified
by exigent circumstances if the information provided to the 911
operator was never transmitted either to the police dispatcher
or to the officers on the scene."). Nevertheless, other circuit
and district courts have applied the doctrine under similar
circumstances. See, e.g., United States v. Russell, 436 F.3d
1086, 1095 (9th Cir. 2006) (applying the doctrine to the
emergency aid situation); James v. Chavez, 830 F. Supp. 2d 1208,
1261 (D.N.M. 2011) aff'd, 511 F. App'x 742 (10th Cir. 2013)
(collecting cases from the Ninth and Tenth Circuits, together
with Anthony from the Second, and concluding: "Although the

92

parties have not directed the Court's attention to, and the Court has not found, cases which discuss whether the collective-knowledge doctrine can be used to impute knowledge of exigent circumstances, the only authority which the Court has found has suggested that the collective-knowledge doctrine can be used."). While not settled law in this Circuit, it is concluded that the collective knowledge doctrine may be applied to exigent circumstance analysis, just as it applied to warrantless searches and seizures.

However, City Defendants are incorrect that "it is of no moment . . . that Captain Lauterborn alone" knew of his conversation with Dr. Lamstein for the purpose of the collective knowledge doctrine. City Defs.' Mem. in Opp'n 7. The doctrine applies only where officers are in communication, sharing information relevant to the determination of exigent circumstances. United States v. Cruz, 834 F.2d 47, 51 (2d Cir. 1987) ("The determination of whether probable cause to arrest exists can be based on the collective knowledge of all of the officers involved in the surveillance efforts because the various law enforcement officers in this investigation were in communication with each other."); Toliver v. City of New York, No. 10 CIV. 3165 PAC JCF, 2012 WL 7782720, at *6 (S.D.N.Y. Dec. 10, 2012) report and recommendation adopted, No. 10 CIV. 3165

PAC JCF, 2013 WL 1155293 (S.D.N.Y. Mar. 21, 2013) ("The
[collective knowledge] doctrine applies if the officers involved
are in communication with each other."); Colon v. City of New
York, No. 11-CV-0173 MKB, 2014 WL 1338730, at *4 (E.D.N.Y. Apr.
2, 2014) (same).  Here, the record does not establish whether
other officers were aware of Dr. Lamstein's warning to Captain
Lauterborn.  See Facts ¶¶ 92, 123.  Consequently, whether Dr.
Lamstein made the statement to Captain Lauterborn, and whether
Captain Lauterborn in turn communicated that information to his
colleagues such that the collective knowledge doctrine may
apply, present questions of fact barring summary judgment for
the City Defendants.

Similarly, the question of whether the remaining basis
for the initial entry constitute an objectively reasonable basis
for warrantless entry cannot be resolved as a matter of law on
this record.  A jury could find that, "the facts, as they
appeared at the moment of entry, would lead a reasonable,
experienced officer, to believe that there was an urgent need to
render aid or take action."  United States v. Simmons, 661 F.3d
151, 157 (2d Cir. 2011).  A jury must determine whether the NYPD
acted reasonably given that Schoolcraft, who had been placed on
restricted leave without a gun or badge, had consulted a
psychiatrist, left the 81st without formal approval and did not

94

respond to telephone calls and numerous knocks on his door.  See
Facts ¶¶ 35, 39, 69-72, 104.  Whether the officers' conduct was
improperly motivated is a contended factual issue to be
determined by a jury.


    These issues of material fact apply equally to
Defendants' qualified immunity defense.  "Qualified immunity
will attach to an officer's decision to enter a dwelling in
response to perceived exigent circumstances so long as the
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known."  Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir.
2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102
S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotations omitted).
City Defendants' qualified immunity defense is premised on a
disputed fact: whether Dr. Lamstein instructed the NYPD to find
Schoolcraft.  See City Defs.' Mem. in Supp't 4 (citing Anthony
v. City of New York, 339 F.3d 129 (2d Cir. 2003)); City Defs.'
Reply Mem. 5.  As in Kerman, "objective reasonableness is a
mixed question of law and fact when, as here, material
historical facts are in dispute."  Kerman v. City of New York,
374 F.3d 93, 111 (2d Cir. 2004).  The Plaintiffs' and
Defendants' motions for summary judgment regarding Plaintiff's
Fourth Amendment claim are consequently denied.

### ii.  NYPD's Decision to Remain In Schoolcraft's Home

Similarly, judgment as a matter of law is inappropriate with respect to the NYPD's post-entry conduct. "The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry—the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance." Tierney v. Davidson, 133 F.3d 189, 197-98 (2d Cir. 1998); accord United States v. Andino, 768 F.3d 94, 99 (2d Cir. 2014). "For example, where officials enter private property to fight a fire, the scope of the warrantless search is limited to that reasonably necessary to extinguish the blaze, determine the cause and origin of a fire, and ensure against rekindling." Id. (quoting United States v. Klump, 536 F.3d 113, 118 (2d Cir. 2008) (internal quotations omitted)).  As was the case with respect to the initial decision to enter without a warrant, the decision to remain is evaluated on a reasonableness standard.

Material issues of fact remain with respect to the reasonableness of the NYPD's continued presence in Schoolcraft's apartment.  It is undisputed that when the NYPD asked Schoolcraft if he was all right within the first moments after warrantless entry, Schoolcraft responded "Yeah, I think so."

Facts ¶ 129. When asked why he did not respond to the door and
phone calls, Schoolcraft informed Deputy Chief Marino that he
had taken some Nyquil and had not expected anyone to knock at
his door. Facts ¶ 131. He then informed DI Mauriello that he
was "fine." Facts ¶ 134. A factual issue remains as to whether
continued presence by the NYPD was unreasonable.

The majority of justifications to which City
Defendants point, i.e., Schoolcraft's refusal of medical
treatment and his "rapid retreat" into his apartment after being
escorted toward the waiting ambulance (City Defs.' Mem. in Opp'n
9) occurred after a trier of fact might conclude that the NYPD
lacked a reasonably objective basis for remaining in
Schoolcraft's home. At the time he refused to return to the
81st Precinct, Schoolcraft was indisputably alert and
responsive, and he had not requested medical intervention beyond
saying he had taken Nyquil and had left work because he was not
feeling well. Facts ¶¶ 127-29, 131, 134. Following that
exchange, the officers present were not explicitly discussing
Schoolcraft's 'wellbeing,' rather, they were reprimanding
Schoolcraft for leaving without permission and ordering him back
to the 81st Precinct in order to "investigate" why he had left.
See, e.g., Facts ¶ 136.

However, summary judgment is only appropriate where the party opposing summary judgment tells a story "which is blatantly contradicted by the record, so that no reasonable jury could believe it." See Scott v. Harris, 550 U.S. 372, 380 (2007).  This is not the case here.  Contrary to Schoolcraft's contention, his situation was not analogous to that of the plaintiff in United States v. Sikut.  488 F. Supp. 2d 291, 312 (W.D.N.Y. 2007).  In Sikut, police officers unequivocally admitted that they remained in a residence following a warrantless entry after they stopped making an exigency determination.  Id.  It is under such circumstances that a court may, as a matter of law, hold that police officers' presence ceases being about the exigent circumstance.  See, e.g., id.  In Schoolcraft's case, City Defendants make no such admissions, and there is sufficient contradictory evidence in the record to require credibility determinations and weighing the evidence, precisely the type of analysis that cannot be undertaken on summary judgment.  Fischl v. Armitage, 128 F.3d 50, 55-56 (2d Cir. 1997).  Consequently, the constitutionality of Defendants' decision to remain in Schoolcraft's apartment presents a triable issue.

**iii. Designation as an EDP**

Finally, the validity of the NYPD's designation of Schoolcraft as an emotionally disturbed person ("EDP") also cannot be determined at the summary judgment stage.

Schoolcraft was declared an EDP pursuant to New York's Mental Hygiene Law. The statute permits an officer to place a person who "appears to be mentally ill and is conducting himself . . . in a manner which is likely to result in a serious harm to the person or others" into custody. N.Y. Mental Hyg. Law § 9.41. The phrase "likely to result in serious harm" is defined as:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

Id. § 9.01.

A likelihood of serious harm determination is evaluated under "the same objective reasonableness standard that is imposed by the Fourth Amendment." Kerman, 374 F.3d at 100. Likelihood of serious harm can be evidenced by overt acts, attempts or threats of harm, or by "other conduct" such as neglect or refusal to care for oneself. Boggs v. New York City

99

Health & Hospitals Corp., 523 N.Y.S.2d 71, 89 (N.Y. App. Div. 1987). However, refusal to accept medical treatment does not, by itself, establish that a person is dangerous to himself. See Green v. City of New York, 465 F.3d 65, 83 (2d Cir. 2006). In Green, the Second Circuit considered a New York City Fire Department Lieutenant's decision to involuntarily transport a patient with amyotrophic lateral sclerosis and pneumonia that explicitly, and repeatedly, declined to go to the hospital after an episode of labored breathing. See id. at 69-73. Though not in the context of New York's Mental Hygiene Law, the Second Circuit noted that "dangerousness to oneself justifying [involuntary transport to a hospital] does not include a refusal to accept medical treatment." Id. at 83.

Here, material issues of fact, specifically whether Schoolcraft's behavior rose to the level of "other conduct demonstrating" that he was a danger to himself, remain. See, Amato v. Hartnett, 936 F. Supp. 2d 416, 435 (S.D.N.Y. 2013) (legality of civil confinement under Section 9.41 survives summary judgment where parties dispute whether the patient refused medical care and whether he made a statement indicating intent to commit suicide); Thomas v. City of New York, No. 09 CIV 3162 CM HBP, 2010 WL 5490900, at *9 (S.D.N.Y. Dec. 22, 2010)

100

(summary judgment inappropriate where parties dispute, <u>inter
alia</u>, whether patient was yelling or cursing at officers).

The record is devoid of any homicidal or other violent
behavior, or of suicidal or self-harming behavior on
Schoolcraft's part.  <u>See</u> N.Y. Mental Hyg. Law § 9.01.
Therefore, as applied to Schoolcraft's case, the inquiry under
the applicable sections of the law is whether the NYPD had
probable cause to believe that: (1) Schoolcraft appeared to be
mentally ill; and (2) manifested conduct demonstrating that he
was dangerous to himself.  <u>See id.</u> §§ 9.01, 9.41.

Triable issues of fact remain as to both prongs of
this inquiry.[5]  As noted above, the questions of whether Dr.
Lamstein ever communicated her concerns to Captain Lauterborn,
or whether he then disseminated that information to colleagues
at the NYPD, are in dispute.  <u>See</u> Section IV.B.i of this
Opinion.  Moreover, the recordings do not contain video so that
evaluation of Schoolcraft's demeanor following the NYPD's
warrantless entry is at issue.  <u>See</u> <u>Cameron v. City of New York</u>,

---

[5] City Defendants' brief appears to reproduce portions of <u>Bayne v. Provost</u> in
support of the contention that these two inquiries "essentially become one"
in Schoolcraft's situation.  <u>Compare</u> Defs.' Mem. in Supp't 8 <u>with</u> <u>Bayne v.
Provost</u>, No. 1:04 CV 44, 2005 WL 1871182, at *7 (N.D.N.Y. Aug. 4, 2005).  In
<u>Bayne</u>, the court held that the two prongs become one where a nurse
practitioner confirmed her patient was suicidal.  Here, by contrast, it is
undisputed that Schoolcraft was never characterized as "suicidal" by a
medical professional or any other person.  The prongs in this case therefore
remain distinct.

598 F.3d 50, 60 (2d Cir. 2010) (blurry and incomplete video footage evidence cannot be used to determine legality of arrest as a matter of law, since a possibility existed that the basis for arrest existed but was not visible in the footage).

Summary judgment is also inappropriate where the evidence that is undisputed can reasonably be interpreted in opposing ways.  For example, a jury may find that Schoolcraft's calm tone for the duration of the recordings conflicts with his arguably erratic conduct.  Over the course of sixteen minutes, Schoolcraft stating he did not feel well, and then that he was fine, requesting medical care, walked to the ambulance following a diagnosis of elevated blood pressure, then turned around and reentered his home, again refusing medical care.  Facts ¶¶ 134, 136, 138, 147, 149, 151.  On the other hand, a jury may also find that such conduct was the result of having several officers in tactical gear enter his apartment and his suspension, so that Schoolcraft's conduct would not permit any reasonable officer to believe Schoolcraft satisfied either prongs of the substantial risk test.  Facts ¶¶ 126, 142.  Under such circumstances, a jury must determine whether the NYPD had probable cause to find Schoolcraft mentally ill and a danger to himself.  Cf. Higgins v. City of Oneonta, 617 N.Y.S.2d 566, 569 (N.Y. App. Div. 1994) (Holding as a matter of law that confinement was justified

"[g]iven [the police officers'] knowledge of plaintiff's longstanding hostility toward certain members of the Police Department and City officials, coupled with [his treating psychiatrist's] opinion that plaintiff was dangerous and the obvious threatening nature of plaintiff's phone calls"); Bayne v. Provost, No. 1:04 CV 44, 2005 WL 1871182, at *7 (N.D.N.Y. Aug. 4, 2005) (finding probable cause as a matter of law where a medical professional "persisted in her position that Plaintiff had made the threat of suicide").

City Defendants contend, in the alternative, that 'arguable probable cause' existed, rendering the NYPD's actions protected under qualified immunity.  See City Defs.' Mem. in Supp't 9.  "Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law."  Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007) (internal quotations and citations omitted).  A judicial finding of arguable probably cause can serve as the basis for granting summary judgment as to the affirmative defense of qualified immunity.  See generally id. at 367-72. However, "a court may grant a motion for judgment as a matter of law only if it can conclude that, with credibility assessments

103

made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." Id. at 370-71 (internal citations and quotations omitted). Here, the record does not permit such a finding, and the issue must be submitted to a jury. The Plaintiffs' and Defendants' motions for summary judgment on Plaintiff's Fourth Amendment claim are denied.

## B. First Amendment Claim Survives Summary Judgment

City Defendants contend that Schoolcraft's First Amendment claim should be dismissed as a matter of law. City Defs.' Mem. in Supp't 10-15. Schoolcraft alleges that the City Defendants violated his First Amendment rights to report "corruption, misconduct and fraud" at the 81st Precinct by seizing his notes and other effects, having him involuntarily committed as an EDP, and harassing him at his upstate residence. See TAC ¶¶ 245-61. The Second Circuit has tailored the elements of a First Amendment claim to the factual context alleged. Compare Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001) with Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005). In either formulation, the first requirement is protected speech. Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008) ("Regardless of the factual context, we have required

104

a plaintiff alleging retaliation to establish speech protected by the First Amendment.").

### i. Schoolcraft Engaged in Protected Speech

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). A public employee, however, must "by necessity . . . accept certain limitations on his or her freedom," because, his speech can "contravene governmental policies or impair the proper performance of governmental functions." Id. at 418-19. The Second Circuit recently set out the applicable inquiry for determining whether a public employee's speech is protected under the First Amendment:

> Initially, a court must determine "whether the employee spoke as a citizen on a matter of public concern. This step one inquiry in turn encompasses two separate subquestions: (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee.
>
> If the answer to either question is no, that is the end of the matter. If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the Pickering analysis: whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer."

Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015)
(hereinafter "Matthews IV")(citing Garcetti, 547 U.S. at 418;
Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011); Lane v.
Franks, --- U.S. ----, 134 S.Ct. 2369, 2380 (2014); Pickering v.
Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., 391 U.S.
563, 568 (1968) (internal quotations and citations omitted)).

        City Defendants first contend that Schoolcraft lacked
a protected interest with respect to his post-suspension speech
under the First Amendment because he was suspended rather than
terminated on October 31, 2009.  City Defs.' Mem. in Supp't 11.,
citing Anemone v. Metro. Transp. Auth., No. 05 CIV. 3170 (LAP),
2008 WL 1956284, at *16 (S.D.N.Y. May 2, 2008) aff'd, 629 F.3d
97 (2d Cir. 2011).  The facts in Anemone are distinguishable
from those in this case.  Unlike Schoolcraft, the plaintiff in
Anemone continued to describe himself as a "current" public
employee even after his suspension.  Id.  Moreover, unlike
Schoolcraft, the plaintiff in Anemone held the title of "Deputy
Executive Director and Director of Security for the MTA," and
the court found that he had engaged in speech pursuant to his
official duties relating to security.  Id. (internal quotations
omitted).  The City Defendants also do not attempt to square
this Court's September 10, 2012 Opinion with their current
argument.  See Schoolcraft v. City of New York, No. 10 CIV. 6005

RWS, 2012 WL 3960118, at *8 (S.D.N.Y. Sept. 10, 2012)

(hereinafter "September 2012 Opinion").  Indeed, the Court's

September 2012 holding remains unaltered with respect to

Schoolcraft's post-suspension speech:

> Although the City Defendants contend that Plaintiff,
> notwithstanding his suspension was still a sworn law
> enforcement officer and employee of the NYPD, the fact
> that Plaintiff was suspended and, for the substantial
> majority of the time period relevant to the prior
> restraint claim, was hundreds of miles outside the
> NYPD's jurisdiction provides a sufficient factual
> basis for Plaintiff to allege that he sought to
> exercise his First Amendment rights "as a citizen,"
> rather than "as a government employee."
>
> . . .
>
> Plaintiff intended to speak, following his suspension
> from the NYPD, to the media and public at large about
> the NYPD's summons policy.  This intended speech
> addressed a matter of public concern, and, because
> Plaintiff intended to speak to the media and public
> following his suspension, Plaintiff's speech was
> outside the scope of his official duties.
> Accordingly, the speech was protected by the First
> Amendment.

Schoolcraft September 2012 Opinion, 2012 WL 3960118, at *6, 8.


      In opposition to the City Defendants' motion,

Schoolcraft suggests that recent case law following the

September 2012 Opinion favors extending his First Amendment

claim to encompass "Schoolcraft's speech before his suspension."

Pl.'s Mem. in Opp'n 20-22 (citing Lane v. Franks, --- U.S. ----,

134 S.Ct. 2369, 2380 (2014) (the Garcetti test is whether the

speech falls within the scope of the employee's ordinary duties); <u>Hagan v. City of New York</u>, No. 13-CV-1108 JPO, 2014 WL 4058067 (S.D.N.Y. Aug. 15, 2014) (a public employee reporting improper conduct of supervisors and other official outside of the chain-of-command was not part of the employee's ordinary job responsibilities); and <u>Griffin v. City of New York</u>, 880 F. Supp. 2d 384, 400 (E.D.N.Y. 2012) (police officer's report of a colleague's misconduct to internal affairs not part of the chain of command and could qualify as protected speech)).

Though Schoolcraft does not detail the pre-suspension speech which he contends is now protected, he is presumably referring to Schoolcraft's pre-suspension internal reporting to his supervisors at the 81st Precinct and to his reports to IAB and QAD. <u>See</u> Pl.'s Ltr. dated March 17, 2015 requesting a pre-motion conference ("Schoolcraft's speech and conduct raising issues with IAB, QAD and his supervisors at the 81st Precinct, as well as his plans to report that misconduct to the Commissioner, are matters of public concern that are entitled to First Amendment protection before his October 31, 2009 suspension").[6]

---

[6] To the extent that he is referring to Schoolcraft's refusal to adhere to arrest or summons quotas, this Court's September 2012 opinion made clear that such behavior does not constitute speech. <u>September 2012 Opinion</u>, 2012 WL 3960118, at *10.

In the September 2012 Opinion, this Court ruled that Schoolcraft could not base his First Amendment claims on his reporting up the chain of command or his reporting to internal affairs. See September 2012 Opinion, 2012 WL 3960118, at *6. The September 2012 Opinion relied upon the district court opinion in Matthews v. City of New York, No. 12 Civ. 1354(BSJ), 2012 U.S. Dist. LEXIS 53213 (S.D.N.Y. Apr. 12, 2012) (hereinafter "Matthews I"), for the proposition that internal reporting of a quota policy is part of an officer's role and therefore not protected. When ultimately appealed, the Second Circuit recently vacated the District Court's ruling in Matthews I, holding that a patrolman's reporting on arrest and summons quota policy is not "part-and-parcel" of his role as a patrolman and therefore may constitute protected speech if the way in which the officer reported has a civilian analogue and if the speech relates to an issue of public concern. See Matthews v. City of New York, 779 F.3d 167, 171-76 (2d Cir. 2015) (hereinafter "Matthews IV").[7]

---

[7] The Matthews IV opinion was published after the parties' summary judgment briefs in support and opposition were due, but prior to the deadline for the parties' reply briefs. Procedurally, Matthews IV is an appeal of a second district court opinion, Matthews v. City of New York, 957 F. Supp. 2d 442, 445 (S.D.N.Y. 2013) (hereinafter "Matthews III"). Matthews III echoed the reasoning from Matthews I cited in this Court's September 2012 Opinion, that the Patrol Guide requirement made an officer's quota-related speech part of his duties as a public employee. See Matthews III, 957 F. Supp. 2d at 459.

Considering Schoolcraft's situation in light of the Second Circuit's guidance in Matthews IV, the following conclusions are reached.[8] First, the record available here does not indicate that Schoolcraft played any role in setting policy, was expected to speak on policy, or had been consulted to formulate policy. Indeed, both plaintiffs had the same title of Patrolman and presumably substantially similar responsibilities which would not relate to this type of speech. See Facts ¶ 1; Matthews IV, 779 F.3d at 174. Second, the fact that an officer's allegations resulted in negative performance evaluations and other professional difficulties for the reporting officer "is not relevant to the narrow question of whether the officer was speaking as citizen or as a public employee." Id. at 170. Third, the NYPD Patrol Guide's duty to report misconduct does not support the conclusion that reporting corruption is part of Schoolcraft's role as a police officer, and is therefore unprotected. Matthews IV, 779 F.3d at 175. Fourth, whether Schoolcraft engaged in speech that had a "comparable civilian analogue" is relevant to establishing whether his speech was protected. Id.

---

[8] Unlike in Matthews IV, discovery in this case was not geared specifically toward establishing the elements of this inquiry and judgment as a matter of law cannot be rendered. Cf. Matthews v. City of New York, 488 F. App'x 532, 533 (2d Cir. 2012) (hereinafter "Matthews II") (vacating and remanding Matthews I for discovery on whether the officer spoke pursuant to his official duties).

In light of _Mathews IV_, Schoolcraft's First Amendment claim extends to his pre-suspension speech. Like Officer Matthews, Schoolcraft's reports to QAD and Internal Affairs concerned precinct-wide summons and arrest quota policies. Compare _Matthews IV_, 779 F.3d at 174 with Facts ¶¶ 52-54. Also like Matthews, Schoolcraft raised issues of the quotas with his precinct's leadership. Compare _Matthews IV_, 779 F.3d at 169 (raising concerns about quotas twice with the precinct's commanding officer and once with another precinct executive) with Facts ¶¶ 13-17, 19-20 (raising the issue with 81st Precinct leadership at the February Appeal Meeting and with leadership in Brooklyn North command at the March Evaluation Meeting).

City Defendants' factual distinctions with respect the speech in which Matthews and Schoolcraft engaged do not alter the analysis above. Cf. City Defs.' Reply Mem. 13-19. On the issue of a civilian analog, it is admittedly difficult to imagine a civilian one for a patrolman's performance evaluation and appeal meetings. See _Weintraub v. Bd. of Educ. of City Sch. Distr. of City of. N.Y._, 593 F.3d 196, 203 (2d Cir. 2010) (a teacher's choice to pursue his complaint by following the employee grievance procedure had no civilian analogue). However, Schoolcraft's speech is not limited to those channels. He also raised these issues with IAB on August 20th and with QAD

111

on October 7th. Facts ¶¶ 48, 52. At minimum, with respect to IAB, "any citizen may report wrongdoing to the IAB. Citizens are able and directed to file reports with the IAB in the exact same manner as NYPD officers." Griffin v. City of New York, 880 F. Supp. 2d 384, 399 (E.D.N.Y. 2012). Thus the IAB reporting had a civilian analogue. Moreover, with respect to the QAD reporting, whether the public at large could have engaged in similar speech is not established on this record, and this will remain a question for trial. In sum, Schoolcraft's pre-suspension speech has civilian analogues.

The question of whether Schoolcraft's speech is part-and-parcel of his official duties is a more difficult one. The City Defendants contend that Schoolcraft's speech is distinguishable from Matthews's because Schoolcraft's pertained predominately to his own work, his own summons and arrest 'activity,' and to conduct at his own precinct. See City Defs.' Reply Mem. 16-17. They see Schoolcraft's speech as analogous to the teacher in Weintraub, whose "formal grievance regarding the administration's refusal to discipline a student was unprotected speech because a teacher's need to discipline his own students is essential to his ability to effectively run a classroom as part of his day-to-day responsibilities." Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York, 593 F.3d 196, 203

112

(2d Cir. 2010) (cited in Matthew IV, 779 F.3d at 173).  City

Defendants also point to another pre-Matthews district court

opinion, which held:

> [P]laintiffs' complaints to their superiors . . .
> related to their concerns about their ability to
> properly execute their duties as police officers, as
> they expressed concern, inter alia, that the
> assignment of officers to chauffeur intoxicated
> officers left [their police department] short-handed,
> that the hiring of uncertified officers and the
> retention of unqualified and/or corrupt officers
> affected their ability to perform their job
> assignments safely and that they were told not to
> issue summonses to certain individuals and businesses.
> Plaintiffs' speech in challenging the . . .
> defendants' alleged cover-ups of officer misconduct,
> including their complaints to the Suffolk County
> District Attorney's Office, was undertaken in the
> course of performing one of their core employment
> responsibilities of enforcing the law and, thus, was
> speech made pursuant to their official duties.
> Moreover, all of the relevant speech reflected
> plaintiffs' special knowledge about the [police]
> defendants which was gained as a result of plaintiffs'
> position as police officers for those defendants based
> upon what plaintiffs' observed or learned from their
> job.

Carter v. Inc. Vill. of Ocean Beach, 693 F. Supp. 2d 203, 211

(E.D.N.Y. 2010).  The Second Circuit affirmed the lower court's

ruling in Carter on the basis that "Plaintiffs' allegations

establish no more than that they reported what they believed to

be misconduct by a supervisor up the chain of command --

misconduct they knew of only by virtue of their jobs as police

officers and which they reported as "part-and-parcel of [their]

concerns about [their] ability to properly execute [their] duties." Carter v. Inc. Vill. of Ocean Beach, 415 F. App'x 290, 293 (2d Cir. 2011) (quoting Weintraub, 593 F.3d at 203). The Second Circuit cited Weintraub repeatedly in its Carter and Matthews IV opinions, and gave no indication of having invalidated or abrogated it. Consequently, the analysis here must apply both Weintraub and Matthews IV to Schoolcraft's facts.

A distinction between Matthews's and Schoolcraft's speech does exist. Matthews raised his concerns before he suffered professional backlash, while Schoolcraft reported the policies in the context of his professional evaluation, contending that he was being improperly faulted for failure to adhere to an invalid policy. Compare Matthews III, 957 F. Supp. at 446 with Facts ¶¶ 14-15, 17, 19, 48-52. Matthews "chose a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues with the Precinct commanders," while Schoolcraft initially spoke with commanders in relation to his performance evaluation. Matthews IV, 779 F.3d at 176; cf. Facts ¶¶ 14-15, 17, 19. In short, Schoolcraft's speech up the chain of command regarding his performance was closely related to his role as a public employee, focusing on the ramifications of the policy on his

114

performance reviews.  However, the same is not true with respect
to Schoolcraft's reporting to QAD and IAB.

     The QAD and IAB speech, in light of Matthews, is not
part-and-parcel of Schoolcraft's role and is therefore
protected.  Schoolcraft complained of "corruption involving the
integrity control program" in the 81st Precinct, mainly
attributable to DI Mauriello, resulting "in violation of
people's civil rights."  Facts ¶¶ 48, 50.  This is virtually
identical to Matthews's speech about his own precinct, when
Matthews stated that his own supervisors' policies were
resulting in "unjustified stops, arrests, and summonses because
police officers felt forced to abandon their discretion in order
to meet their numbers and [were] having an adverse effect on the
precinct's relationship with the community."  Matthews IV, 779
F.3d at 174 (internal quotations omitted).  Moreover,
Schoolcraft reported this activity outside the chain of command,
and separate from his appeal process.  These circumstances
distinguish Schoolcraft's speech from that in Weintraub and
warrant the conclusion that his IAB and QAD reports constituted
protectable speech outside of official duties under Matthews IV.

     Having established that Schoolcraft's speech is
protected, a Pickering analysis is required to determine

115

"whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." Matthews IV, 779 F.3d at 172. Under the Pickering test, a government employer may take adverse employment action against its employee for speaking on a matter of public concern if: (1) the employer reasonably predicts the speech is disruptive; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech. Locurto v. Safir, 264 F.3d 154, 166 (2d Cir. 2001).

It cannot be said that potential disruption stemming from reports of a quota policy outweigh the value of the speech. Imposition of quotas and manipulation of crime statistics, if true, are matters of general public concern that merit disclosure and discussion, whether through reports to internal affairs or larger dissemination to the media. Moreover, there is no indication on the record that the City Defendants took action due to the disruptive nature of Schoolcraft's speech. Indeed, the notion that such behavior would be disruptive to the NYPD is difficult to square with NYPD Patrol Guide § 207-21, which requires reporting of misconduct of this sort. See

116

September 2012 Opinion, 2012 WL 3960118, at *6. At minimum, determining whether the City Defendants actions were "based on the potential for disruption rather than because of his speech" is a factual question unresolvable on summary judgment. See Johnson v. Ganim, 342 F.3d 105, 115 (2d Cir. 2003)

Consequently, Schoolcraft's First Amendment claim now includes his pre-suspension speech to QAD and IAB, well as his post-suspension public statements to the press. A traditional First Amendment free speech claim survives summary judgment where genuine issues of fact exist with respect to whether: (1) plaintiff has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right. Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001). This standard applies to Schoolcraft's post-suspension speech, where he was acting as an ordinary citizen. See September 2012 Opinion, 2012 WL 3960118, at *6 ("the fact that Plaintiff was suspended and, for the substantial majority of the time period relevant to the prior restraint claim, was hundreds of miles outside the NYPD's jurisdiction provides a sufficient factual basis for Plaintiff to allege that he sought to exercise his First Amendment rights as a citizen, rather than as a government

117

employee") (internal quotations omitted).  However, where a
public employee alleges an adverse employment action, the Curley
formulation is disfavored.  Morrison v. Johnson, 429 F.3d 48, 51
(2d Cir. 2005) ("[w]here the plaintiff is a public employee
alleging that he suffered an adverse employment action as
retaliation for the exercise of his First Amendment rights, the
standard is not the principle applied in Curley.").  Rather, to
survive summary judgment, a public employee alleging an adverse
employment action must bring forth evidence showing that: (1) he
has engaged in protected First Amendment activity; (2) he
suffered an adverse employment action; and (3) there was a
causal connection between the protected activity and the adverse
employment action."  Id.; see also Anemone v. Metro. Transp.
Auth., 629 F.3d 97, 114 (2d Cir. 2011).  This is the standard
that applies to Schoolcraft's pre-suspension speech.

     As noted above, the first prong for both types of
speech has already been satisfied for the purpose of summary
judgment.  The analysis the follows addresses the remaining
elements of the two tests.

### ii.  Post-Suspension Free Speech Claim is Not Established

     City Defendants contend that the record is devoid of
proof of improper motivation, such that judgment as a matter of

law in their favor is warranted.  See City Defs.' Mem. in Supp't
11-13.  "[P]articularized evidence of improper motive may
include expressions by the officials involved regarding their
state of mind, circumstances suggesting in a substantial fashion
that the plaintiff has been singled out, or the highly unusual
nature of the actions taken."  Blue v. Koren, 72 F.3d 1075, 1084
(2d Cir. 1995).

According to City Defendants, "is illogical to
conclude that any defendant could have harbored an intent to
prevent Plaintiff from going to the media with his allegations
before his allegations became public in The Daily News on
February 1, 2010."  City Defs.' Mem. in Supp't 12.  Whether a
reasonable jury may conclude that the NYPD's numerous extra-
jurisdictional trips to Schoolcraft's Johnstown residence
following his release from Jamaica Hospital were unreasonable
and "highly unusual," and constituted circumstantial proof of an
improper motive, is a close question.  See Blue, 72 F.3d at
1083-84, see Facts ¶ 300.

"[C]ourts are reluctant to decide issues of intent on
a motion for summary judgment."  Vumbaca v. Terminal One Grp.
Ass'n L.P., 859 F. Supp. 2d 343, 380 (E.D.N.Y. 2012) (citing
Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003) (holding, in

a case involving a constitutional tort, that "[w]here a factual
issue exists on the issue of motive or intent, a defendant's
motion for summary judgment on the basis of qualified immunity
must fail"); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v.
Turtur, 892 F.2d 199, 205 (2d Cir. 1989) ("Questions of intent,
we note, are usually inappropriate for disposition on summary
judgment."); Orange Lake Assocs., Inc. v. Kirkpatrick, 825
F.Supp. 1169, 1177 (S.D.N.Y. 1993) ("Cases in which the
underlying issue is one of motivation, intent, or some other
subjective fact are particularly inappropriate for summary
judgment, as are those in which the issues turn on the
credibility of the affiants."), aff'd, 21 F.3d 1214 (2d Cir.
1994); Sorensen v. City of New York, No. 98 Civ. 3356, 2003 WL
169775, at *4 (S.D.N.Y. Jan. 23, 2003) ("It is well-settled that
questions of intent in a variety of contexts cannot be resolved
on a motion for summary judgment."). In this instance, the
motive prong need not be resolved since a separate basis
dismissal of the claim exists.

In the context of a private plaintiff, as Schoolcraft
is post-suspension, a triable issue must exist with respect to
an actual deprivation of the right of free speech in order for
the post-suspension claim. In other words, to survive summary
judgment, there must be evidence showing either that: (1)

defendants silenced the plaintiff or (2) defendants' actions had
some actual, non-speculative "chilling effect" on his speech.
Williams v. Town of Greenburgh, 535 F.3d 71, 78 (2d Cir. 2008).
The record indicates that Schoolcraft spoke to several media
outlets following the visits to his home.  Indeed, he testified
that the NYPD's conduct spurred him to action.  His behavior,
akin to the plaintiff in Curley, who exercised his First
Amendment right notwithstanding what he alleged was
unconstitutional government action coercion, justifies summary
judgment in the City Defendants' favor.  See Curley, 268 F.3d at
73.  It is likewise similar to the plaintiff in Williams v. Town
of Greenburgh, whose First Amendment claim dismissed on summary
judgment where record showed that he spoke out against
municipality after the municipality's allegedly unconstitutional
coercive conduct.  535 F.3d 71, 78 (2d Cir. 2008).
Schoolcraft's First Amendment claim with respect to his post-
suspension speech is consequently dismissed.

### iii. Pre-Suspension Speech Claim Survives Summary Judgment

     Conversely, Schoolcraft's First Amendment claim with
respect to his pre-suspension speech to IAB and QAD survives
summary judgment.  As found above, Schoolcraft's speech was
protected.  Consequently, the two prongs that remain to be
satisfied are whether he suffered an adverse employment action,

121

and whether there was a causal connection between the protected activity and the adverse employment action." See Anemone, 629 F.3d at 114.

"[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 226 (2d Cir. 2006). Action adverse for the purposes of the First Amendment includes "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Id. (internal quotations and citations omitted). On these facts, a reasonable jury may determine that Schoolcraft's suspension and the preceding conduct of the NYPD on October 31st would have dissuaded a reasonable officer from engaging in speech. See, e.g., Kerman v. City of New York, 261 F.3d 229, 242 (2d Cir. 2001) ("an involuntary overnight trip to Bellevue has an obvious chilling effect").

A reasonable jury may likewise determine that there was a causal connection between Schoolcraft's reporting to IAB and QAD and his subsequent suspension. At the time of his suspension, Schoolcraft received a failing evaluation from his NYPD supervisors for his failing to adhere to arrest quotas. See Facts ¶ 6. When Schoolcraft challenged his evaluation, he

122

alleges that he had been pretextually disciplined and placed on restricted duty. <u>See generally</u>, Facts ¶¶ 8, 27-47, 51. When Schoolcraft reported the existence of quotas and crime misclassifications to IAB, his supervisors were notified. Declaration of Nathaniel B. Smith dated February 11, 2015 Exhibit (hereinafter POX) 41 659:1-21. On October 31st, Schoolcraft's memo book containing entries which he believed reflected corruption was taken from him for several hours, and the officer that took the book began behaving strangely toward Schoolcraft. Facts ¶ 67. Later that day, the NYPD surrounded Schoolcraft's home, entered without a warrant, suspended him, and declared him an EDP. <u>See generally</u>, Facts ¶¶ 115-174.

In sum, Schoolcraft's First Amendment claim on the basis of his pre-suspension speech survives summary judgment.

### iv. Qualified Immunity Attaches to the First Amendment Claim

City Defendants contend that Schoolcraft's First Amendment retaliation claim is barred under the doctrine of qualified immunity. As the Second Circuit explained:

> Qualified immunity shields officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. A right is "clearly established"

when the contours of the right are sufficiently clear
that a reasonable official would understand that what
he is doing violates that right.  Though a mere
mistake in the performance of an official duty may not
deprive the officer of the defense, the qualified
immunity doctrine does not shield performance that
either was in violation of clearly established law or
was plainly incompetent.

Jackler v. Byrne, 658 F.3d 225, 242-43 (2d Cir. 2011).  As

discussed above, and particularly in light of this Court's

contrary September 2012 Opinion, Schoolcraft's protected First

Amendment right to report to IAB and QAD was not clearly

established at the time it was made.  Consequently, the First

Amendment Claim cannot be pleaded against any officers in their

individual capacities.


### C. Monell Claims against City Defendants Survive

### Summary Judgment


City Defendants contend that Plaintiff's municipal

liability claims should be dismissed as a matter of law for

failure to satisfy any of the bases of liability under Monell v.

Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978).

See generally, City Defs.' Mem. in Supp't 30-48; City Defs.'

Reply Mem. 36-44.  Plaintiff responds that the record supports

two of Monell's grounds for municipal liability and that

dismissal at this stage is therefore inappropriate.  See
generally, Pl.'s Mem. in Opp'n 72-83.

        The parties agree that a valid claim for municipal
liability under § 1983 exists under Monell if a plaintiff can
show, inter alia: (1) "the existence of an unlawful practice by
subordinate officials so permanent and well settled to
constitute 'custom or usage,' with proof that this practice was
so manifest as to imply the acquiescence of policy-making
officials; or (2) a failure to train or supervise that amounts
to 'deliberate indifference' to the rights of those with whom
the municipality's employees interact.  City Defs.' Mem. in
Supp't 31 (citing Monell, 436 U.S. at 690); Pl.'s Mem. in Opp'n
73 (citing Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 226
(2d Cir. 2004); Cash v. County of Erie, 654 F.3d 324, 334 (2d
Cir. 2011); Okin v. Village of Cornwall-On-Hudson Police Dep't,
577 F.3d 415, 439 (2d Cir. 2009)).  Additionally, a Plaintiff
must demonstrate that the municipality's policy or custom caused
the deprivation of the injured Plaintiff's federal or
constitutional rights.  See, e.g., Monell, 436 U.S. 658, 690-91;
City of Canton v. Harris, 489 U.S. 378 (1989); Sarus v. Rotundo,
831 F.2d 397, 400 (2d Cir. 1987).

125

Monell claims can be brought against a municipality notwithstanding the fact that the same claims were barred by the doctrine of qualified immunity as asserted against individual officers. See Askins v. Doe No. 1, 727 F.3d 248, 254 (2d Cir. 2013) ("[T]he entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is also irrelevant to the liability of the municipality . . . . Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights.") (internal citations and quotations omitted); Amore v. Novarro, 624 F.3d 522, 535–536 (2d Cir. 2010) (same); Vives v. City of New York, 524 F.3d 346, 350 (2d Cir. 2008) (same); see also Owen v. City of Independence, 445 U.S. 622, 650 (1980). Consequently, the analysis below applies to both the Fourth and First Amendment claims discussed in Sections IV.A and IV.B of this Opinion.

### i. Well-Settled Custom

Monell liability attaches where the existence of an unlawful practice by subordinate officials is so permanent and

126

well settled that it constitutes a "custom or usage," with proof
that this practice was so manifest as to imply the acquiescence
of policy-making officials.  See City of St. Louis v.
Praprotnik, 485 U.S. 112, 127-30 (1985); Sorlucco v. New York
City Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992).  "A
persistent practice may constitute municipal policy whether it
is carried out by the policymakers themselves, by other high-
ranking officials, or even by subordinate employees."  Id.
"However, before the actions of subordinate city employees can
give rise to § 1983 liability, their discriminatory practice
must be so manifest as to imply the constructive acquiescence of
senior policy-making officials."  Id.


        Schoolcraft points to two categories of evidence that
he contends demonstrates a policy or custom sufficient to
survive summary judgment.  The first relates to expert testimony
and reports regarding the existence of what has been termed the
"blue wall of silence" (or "Wall").  See POX 1.  Plaintiff's
experts, Drs. Eli B. Silverman and John A. Eterno described the
Wall as "a police culture that prizes intense loyalty, unity and
solidarity among police officers to the extent that any officer
reporting the wrongdoing of another officer would be in
violation of the code and subject to retaliation."  Id. at 8.
Officers that violate the code are labelled "rats."  Id. at 9.

The experts further testified that the Wall has been found to be an issue with the NYPD in the past, first in the 1970s by the Knapp Commission and then in the 1990s by the Mollen Commission. Id.  Plaintiff's experts also described their own 2008 and 2012 surveys of NYPD officers, which found "widespread pressure on officers" to write summonses, make arrests, and conduct forcible stops.  Id. at 14.  The report concludes that Schoolcraft was a "victim" of the Wall and of the pressure put on the NYPD to generate favorable crime statistics.  Id. at 25-26.

Schoolcraft also offered the Mollen Commission report, which found that officers reporting corruption at the NYPD were labeled "rats," and the label resulted in professional and interpersonal harm coming to the officer, as well as the testimony of former Police Commissioner Raymond Kelly regarding the Wall.  See POX 36 at 54-56 (providing examples of retaliatory conduct); POX 37 at 211 (Kelly testimony on Wall).  Schoolcraft next pointed to an IAB report entitled "Police Corruption and Culture," published by IAB's Corruption and Analysis Unit.  See POX 38.  In its report, IAB noted that "[p]hysical fear surfaced several times during the discussion on reporting corruption" in the context of police officer focus groups run by IAB.  Id. at 44.  The report noted views diverged by rank on the issue of whether officers were reluctant to

report misconduct.  Id. at 9.  This fear of retaliation related to both serious and less serious officer misconduct.  Id. at 8-9.

The second category of evidence offered by Schoolcraft to prove a custom or policy involves officer testimony and accounts of the Wall.  This category includes recent incidents of purported retaliatory conduct involving other NYPD officers who revealed crime statistics manipulation.  See generally, Pl.'s Mem. in Opp'n 77-80.  Schoolcraft points to the testimony of two officers from Floyd v. City of New York, 08 Civ. 1034.  See generally POX 40, POX 41.  Officer Adhyl Polanco testified in Floyd that he was declared an EDP, had his gun and shield taken away and was suspended after he reported on the quota system in September of 2011.  POX 40 540:1-22.  Officer Pedro Serrano testified that he was retaliated against and labeled a rat after he spoke out against quotas at his precinct, starting with internal discussions with precinct supervisors in 2007.  POX 41 659:1-21.  Schoolcraft further contends that Officer Craig Matthews, plaintiff in a separate case, was also retaliated against after voicing his concerns about quotas.  Id. at 79-80.  Finally, this category includes Lieutenant Joseph Ferrara's testimony relating to Schoolcraft's reporting to IAB and the NYPD's response.  See generally POX 39.  Ferrara

129

testified that Mauriello characterized Schoolcraft as a "rat" at
supervisory meetings of the 81st Precinct.  Id. at 56:15-17,
58:10-17, 192:8-25.  Ferrara also testified about his reluctance
to report officer misconduct, which was motivated by a concern
that he would be retaliated against by the NYPD.  Id. at 79:1-
10.  Finally, Ferrara testified that he overheard that the
precinct telephone switchboard operator left a message for
Schoolcraft improperly revealing that IAB had called him.  Id.
at 193:12-18.


City Defendants contend that the reports on
retaliation for reporting of police misconduct are too old to be
relevant as a matter of law, and they also raise several
admissibility objections to the reports.  See City Defs.' Reply
Mem. 37-38.  City Defendants also contend that the anecdotal
evidence of other police officers that were the subject of
retaliation is also inadequate as a basis for concluding a
custom existed, and inadmissible.  Id. at 39-43.  City
Defendants expounded the admissibility arguments in their reply
memorandum, leaving Plaintiff without an opportunity to respond.
They explicitly reserve the right to raise objections under
Rules 402, 403, 702 and, presumably the hearsay rules, of the
Federal Rules of Evidence in subsequent motions.  See City
Defs.' Reply Mem. 37 n. 14, 39 nn. 16-17.  Consequently,

admissibility issues, to the extent they persist,[9] will be addressed in later proceedings and will not bar consideration in connection with the instant motions.

The various reports, expert testimony and the testimony of other officers that were the purported victims or witnesses to this type of retaliation are sufficient to give rise to a question of fact as to whether a custom or policy of retaliation against "rats" existed and, if so, whether it was the direct cause of Schoolcraft's injuries brought pursuant to Section 1983.  While City Defendants are correct that "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates," the subsequent conduct testimony does not stand alone.  See City Defs.' Mem. in Supp't 37 (quoting Connick v. Thompson, 131 S. Ct. 1350, 1364 (2011)).  Similarly, a triable issue exists with respect to causation.  It is for a jury to decide whether DI Mauriello labelled Schoolcraft a "rat," and whether that

---

[9] City Defendants' dubious support for the contention that this District's "judicial decisions are hearsay" is a ruling that Ecuadorian court decisions are hearsay in Chevron Corp. v. Donziger, 974 F.Supp.2d 362, 605 (S.D.N.Y. 2014).  City Defendants also object to the admissibility of the Mollen Commission Report on hearsay grounds but do not explain why the public record exception in Fed. R. Evid. 803(8)(A)(iii) does not render the report admissible.

designation resulted in the alleged retaliatory conduct discussed above.

Several courts have found an issue of triable fact where, as here, "plaintiff produced records of the testimony of experts, fellow officers, and [a] former Police Commissioner . . . before the Mollen Commission to the code of silence that existed among police officers to prevent officers from breaking ranks"). Ariza v. City of New York, No. CV-93-5287, 1996 WL 118535, at *5 (E.D.N.Y. Mar. 7, 1996) (denying summary judgment on Monell claim because "plaintiff produced records of the testimony of experts, fellow officers, and [a] former Police Commissioner . . . before the Mollen Commission to the code of silence that existed among police officers to prevent officers from breaking ranks"); see also Barry v. New York City Police Dep't, No. 01 CIV. 10627 CBM, 2004 WL 758299, at **11-14 (S.D.N.Y. Apr. 7, 2004); White-Ruiz v. City of New York, No. 93CIV.7233 (DLC) (MHD), 1996 WL 603983, at *10 (S.D.N.Y. Oct. 22, 1996); cf. Domenech v. City of New York, 919 F. Supp. 702, 711 (S.D.N.Y. 1996) (where this Court held that the Mollen Commission report was not probative since an officer was alleging retaliation after reporting sexual harassment, i.e., conduct unrelated to corruption).

If this evidence is admissible, the arguments
propounded by the City Defendants in opposition to it can be
presented to the jury.  It is for a jury to decide whether the
commission and IAB reports, drafted several decades ago, are
persuasive indications of today's NYPD culture or whether
Schoolcraft's harm was the direct result of the NYPD's custom of
retaliation against "rats."  It remains a triable issue whether
the other officers' accounts of retaliation, viewed in light of
the Wall, are adequate indications of a larger trend.  Such
questions are not, however, resolvable as a matter of law.

### ii.  Failure to Train

A municipality may also be liable under Monell where
the Plaintiff demonstrates a failure to train or supervise that
amounts to "deliberate indifference" to the rights of those with
whom the municipality's employees interact.  City of Canton, 489
U.S. at 388.  "[D]eliberate indifference is a stringent standard
of fault, requiring proof that a municipal actor disregarded a
known or obvious consequence of his action." Bd. Of Cnty.
Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997)
(internal quotations and citations omitted).  Plaintiff must
show: (1) that the policymaker knows to a "moral certainty" that
the employees will confront a given situation, (2) that the
situation presents the employees with a difficult choice of the

sort that training will make less difficult or that there is a history of mishandling the situation, and (3) that the wrong choice by a city employee will frequently cause the deprivation of a citizen's constitutional rights.  Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotations and citations omitted).  However, as the Second Circuit explained:

> City of Canton requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation.

Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004).

Schoolcraft has not pointed to a "specific deficiencies in the city's training program."  Id.  Indeed, Schoolcraft does not mention the NYPD's training program at all in his opposition papers.  Consequently, the training prong is unsubstantiated.

## D. Section 1983 Conspiracy Claim is Dismissed

City Defendants contend that the intra-corporate conspiracy doctrine bars Schoolcraft's § 1983 conspiracy claim with respect to the NYPD and FDNY defendants, and that the conspiracy claims as between the City Defendants and Jamaica Hospital fail for lack of evidence indicating a conspiracy.  See City Defs.' Mem. in Supp't 18-19; City Defs.' Reply Mem. 26-30.

### i. Intra-Corporate Conspiracy Doctrine

Under the doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978).  City Defendants accurately note that all the NYPD and FDNY defendants are alleged to have engaged in illegal conduct "within the scope of their employment by the City of New York" and "in furtherance of their employment by the City of New York" and "under the supervision of the said department and according to their official duties."  TAC ¶¶ 9, 11-12.  City Defendants contend that the doctrine invalidates the conspiracy claim a matter of law as a result of Schoolcraft's pleadings.

In opposition, Plaintiff raises two arguments.  See generally Pl.'s Mem. in Opp'n 38-42.  The first relates to the

135

principle that the doctrine does not apply to actions taken by several policy-making bodies operating ostensibly within the same organization.  Girard v. 94th St. & Fifth Ave. Corp., 530 F.2d 66, 71 (2d Cir. 1976) (distinguishing between "one single business entity with a managerial policy implemented by the one governing board," which is covered by the doctrine, and one where "each department had its own disparate responsibilities and functions so that the actions complained of by the plaintiff were clearly not actions of only one policymaking body but of several bodies," which is not covered by the doctrine).  In Girard, "each department had its own disparate responsibilities and functions."  Id.  Here, conversely, Plaintiff's TAC states that all the NYPD defendants were "acting in furtherance of their employment" by the City of New York and under the "supervision of one department," the NYPD.  See TAC ¶¶ 9, 11 (emphasis added).  The same result applies to an FDNY-NYPD conspiracy.  The TAC alleges that the FDNY defendant acted in furtherance and within the scope of her employment by the City of New York.  TAC ¶¶ 15-16.  While Schoolcraft admittedly does not categorize the FDNY and NYPD as the same department, the record does not support a finding of divergent responsibilities and functions that would constitute an exception under this doctrine.  Indeed, a factual condition-precedent to Plaintiff's municipal liability theory is that all of the purported NYPD and

FDNY conspirators were acting in furtherance of the goals of one policy-making body, the City of New York.  Plaintiff's first argument therefore fails.

Plaintiff also argues that the personal-interest exception renders the doctrine inapplicable here.  That exception applies where a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose.  Everson v. New York City Transit Auth., 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002).  Here, Schoolcraft pleads the opposite as to both the NYPD and the FDNY defendants; namely, that they acted "in furtherance of their employment by the City of New York."  TAC ¶¶ 12, 15-16; see also McEvoy v. Spencer, 49 F. Supp. 2d 224, 226 (S.D.N.Y. 1999) ("The individual defendants here are employees of the defendant [municipality].  True, they work for different departments of the City, but that is of no more moment in the municipal context than it would be if the individual defendants worked for the Mainframe and Personnel Divisions of IBM and were accused of conspiring with their employer corporation to discriminate against another employee. Such a claim cannot, as a matter of law, be sustained.").  Though in his opposition papers, Plaintiff contends that this purported conspiracy is "far more complex and far reaching than" those contemplated by the intra-conspiracy doctrine, his claim

137

in the TAC is limited to the events of October 31, 2009.

Compare Pl.'s Mem. in Opp'n 39 with TAC ¶¶ 291-95.  Therefore,

this exception is also inapplicable.

The NYPD and FDNY defendants cannot be co-conspirators

under the facts presented.  If any conspiracy claim exists, it

is between the City of New York and Jamaica Hospital.

### ii.  Conspiracy Claims as Between the City Defendants and Jamaica Hospital are Dismissed

City Defendants contend that the conspiracy claim as

between the City Defendants and Jamaica Hospital should be

dismissed as a matter of law.  "To prove a § 1983 conspiracy, a

plaintiff must show: (1) an agreement between two or more state

actors or between a state actor and a private entity; (2) to act

in concert to inflict an unconstitutional injury; and (3) an

overt act done in furtherance of that goal causing damages."

Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999) (internal

quotations omitted).  "While conclusory allegations of a § 1983

conspiracy are insufficient, [. . .] such conspiracies are by

their very nature secretive operations, and may have to be

proven by circumstantial, rather than direct, evidence."  Id.

(internal quotations and citations omitted).

138

The fundamental point of contention on this claim is
whether evidence supporting an agreement exists.  Compare City
Defs.' Mem. in Supp't 19-21 and City Defs.' Reply Mem. 30-31
with Pl.'s Mem. in Opp'n 43-60.  Plaintiff provides an extensive
recitation of the context of the events of October 31, 2009 in
his opposition papers.  See generally, Pl.'s Mem. in Opp'n 43-60
(citing mainly to deposition testimony and documentary evidence
reflecting the City's and Jamaica Hospital's actions taken on
October 31, 2009 and following Schoolcraft's arrival at Jamaica
Hospital).

Viewed in the light most favorable to Schoolcraft as
the non-movant, the circumstantial evidence of an agreement,
besides that which was discussed in the Fourth Amendment Claims
Section above pertaining predominately to the NYPD defendants,
is that: (1) there existed a disparity between the 911
dispatcher's description of Schoolcraft as in "unknown
condition" versus Lieutenant Hanlon's testimony that she was
responding to a "barricaded EDP"; (2) EMT Sangeniti measured
Schoolcraft's blood pressure while Schoolcraft was being
disciplined by Chief Marino; (3) EMT Sangeniti urged Schoolcraft
to go to the hospital on the basis of the blood pressure
reading; (4) EMT Sangeniti and Lieutenant Hanlon insisted that
Schoolcraft be taken to Jamaica Hospital, which had a

psychiatric ward, rather than Forest Hills which did not; (5) Jamaica Hospital was not closer than Forest Hills Hospital; (6) Lieutenant Hanlon testified that one of the considerations making Jamaica Hospital a better choice was existence of the psychiatric ward; (7) the two EMTs offered conflicting testimony as to whether two or only one blood pressure test was performed, and when the second reading was taken; and (8) a second blood pressure reading was not taken, contrary to standard medical practice, and JHMC physicians conducted a psychological evaluation of Schoolcraft based upon the NYPD's representations and notwithstanding the fact that Schoolcraft was brought in due to high blood pressure. Id.

The above-summarized conduct may be interpreted as reasonable under the circumstances, or perhaps as indicating incompetence on the part of the first responders or JHMC's physicians. However, this record cannot be reasonably construed as circumstantial proof of an agreement. See Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778 (2d Cir. 2007) (while there was evidence to suggest that each individual acted with racial animus, there was no evidence to suggest that there was an understanding among the defendants to do so); Scotto v. Almenas, 143 F.3d 105 (2d Cir. 1998); Manbeck v. Micka, 640 F.Supp.2d 351, 379 (S.D.N.Y. 2009) (dismissing conspiracy claim where

140

there was no evidence that the state and private defendants had a "meeting of the minds" with the goal of depriving plaintiff of her constitutional rights). In the absence of "supporting operative facts" to show an agreement or concerted action to deprive the plaintiff of his civil rights, a conspiracy claim is properly dismissed. Johnson ex rel. Johnson v. Columbia Univ., No. 99 CIV. 3415 (GBD), 2003 WL 22743675, at *15 (S.D.N.Y. Nov. 19, 2003). Allegations of "joint conduct" are not sufficient. Id. Moreover, "private corporations can act only through natural persons, and their § 1983 liability arises through the conduct of their employees." Schoolcraft, 2011 WL 1758635, at *3 (internal quotations and citations omitted). Consequently, the agreement would have had to be between the City Defendants and Dr. Bernier, who committed Schoolcraft. See Facts ¶ 237. No evidence of an actual conversation between Dr. Bernier and the NYPD exists. See generally Facts ¶¶ 230-33. Even if her review of other physicians' notes reflecting NYPD's statements to JHMC's staff regarding Schoolcraft could be construed as circumstantial proof of an agreement, Schoolcraft's § 1983 claims against JHMC fail since JHMC is not a state actor, as discussed below. Consequently, the conspiracy claim that derives from those § 1983 claims must also fail. See Section VI.A of this Opinion.

141

## V. REMAINING CLAIMS RELATING TO CITY DEFENDANTS AND DI MAURIELLO

### A. False Arrest and Imprisonment Claims Survive Summary Judgment

Under New York law, the tort of false arrest is synonymous with that of false imprisonment. Kraft v. City of New York, 696 F.Supp.2d 403, 421, n.8 (S.D.N.Y. 2010) (citing Posr v. Doherty, 944 F.2d 91 (2d Cir. 1991)). To establish a cause of action for false imprisonment, a plaintiff must establish that: (1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. Smith v. County of Nassau, 34 N.Y.2d 18, 22 (1974); Hernandez v. City of New York, 953 N.Y.2d 199 (N.Y. App. Div. 2012).

The NYPD's decision to involuntarily hospitalize a plaintiff are privileged if taken in conformity with the New York's Mental Hygiene Law. Kerman v. City of New York, 261 F.3d 229, 240 n.8 (2d Cir. 2001). As discussed in detail in Section IV.A of this Opinion, questions of material fact remain as to whether the City Defendants declared Schoolcraft an EDP

consistent with the Mental Hygiene Law.  Consequently, summary judgment on this issue is inappropriate.

## B. Intentional Infliction of Emotional Distress Claim against City Defendants Survives Summary Judgment

City Defendants contend that Plaintiff's Intentional Infliction of Emotional Distress ("IIED") claim is duplicative of his search and seizure and excessive force claims, and should therefore be dismissed.  See City Defs.' Mem. in Supp't 21. Courts do not dismiss IIED claims whose substantiating conduct differs from those of other causes of action.  See, e.g., Sylvester v. City of New York, 385 F. Supp. 2d 431, 443 (S.D.N.Y. 2005); Levine v. Gurney, 539 N.Y.S.2d 967, 968 (N.Y. App. Div. 1989); Murphy v. Murphy, 486 N.Y.S.2d 457, 459 (N.Y. App. Div. 1985); cf. Bender v. City of New York, 78 F.3d 787, 792 (2d Cir. 1996) (noting that New York courts dismiss IIED claims whose conduct falls under the ambit of other torts but affirming lower court's decision to allow IIED claim where the IIED claim "could be found to involve additional elements not necessarily comprehended by the torts" alleged.).

Schoolcraft's IIED claim alleges, inter alia, that he was "publicly embarrassed and humiliated," "was caused to suffer

143

severe emotional distress," and "was forced to incur substantial expenses and had his professional reputation destroyed." Contrary to City Defendants' contention, these allegations do not overlap with Schoolcraft's Fourth Amendment and excessive force claims. The IIED claim extends beyond those claims and is not therefore dismissed on summary judgment. Compare TAC ¶¶ 340-48 with TAC ¶¶ 272-74, 280-84.

## C. Common Law Negligent Hiring, Training, Supervision and Retention Claim against City Defendants is Dismissed

City Defendants correctly note that New York law does not permit a claim for negligent hiring, training, retention or supervision where the defendants act in the scope of their employment. City Defs.' Mem. in Supp't 22-23 (citing Newton v. City of New York, 681 F. Supp. 2d 473, 488 (S.D.N.Y. 2010); Stokes v. City of New York, 05-CV-0007 (JFB)(MDG), 2007 U.S. Dist. LEXIS 32787, *53-54 (E.D.N.Y. May 3, 2007); Colodney v. Continuum Health Partners, Inc., 03-CV-7276 (DLC), 2004 U.S. Dist. LEXIS 6606, *27-28 (S.D.N.Y. Apr. 15, 2004); Sun Min Lee v. J.B. Hunt Transp., Inc., 308 F. Supp. 2d 310, 312 (S.D.N.Y. 1994); Karoon v. New York City Transit Authority, 241 A.D.2d 323, 324 (N.Y. App. Div. 1st Dept. 1997); Eifert v. Bush, 27

A.D.2d 950 (N.Y. App. Divi. 2d Dept. 1967), aff'd 22 N.Y.2d 681 (1968)).

Plaintiff responds that parties are permitted to plead inconsistent legal claims.  Pl.'s Mem. in Opp'n 66.  While Plaintiff is correct, this is not an inconsistent claim.  The TAC alleges, and City Defendants have admitted, that the individual defendants acted within the scope of their employment.  See TAC ¶¶ 11, 15; City Defs.' Mem in Supp't 23. "[W]here a defendant employer admits its employees were acting within the scope of their employment, an employer may not be held liable for negligent hiring, training, and retention as a matter of law." Rowley v. City of New York, No. 00 CIV. 1793 (DAB), 2005 WL 2429514, at *13 (S.D.N.Y. Sept. 30, 2005) (collecting cases).  Consequently, no issues of material fact exists for a jury to resolve, and this claim is dismissed.

### D. Negligent Disclosure of IAB Complaint Claim is Dismissed

Under New York law, a negligence claim requires: "(1) the existence of a duty on Defendant's part as to Plaintiff; (2) a breach of this duty; and (3) injury to the Plaintiff as a result thereof." Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000).  The City Defendants contend that the claim

145

is barred by New York's public policy, and, in the alternative, that each of its elements cannot be satisfied under this record. See generally City Defs.' Mem. in Supp't 23-29.

### i. Public Policy Does Not Bar Claim

City Defendants contend that Schoolcraft's claim for negligent disclosure of the IAB reports against Mauriello and Caughley are barred by public policy, but they have not cited to cases holding that public policy disfavors claims for negligent disclosure of IAB reports. City Defendants instead rely on New York's public policy rule disfavoring claims for negligent investigation or negligent prosecution. See, e.g., Russ v. State Employees Fed. Credit Union (SEFCU), 298 A.D.2d 791, 793, 750 N.Y.S.2d 658 (2002); Jenkins v. City of New York, No. 91 CIV. 3539 (RLC), 1992 WL 147647, at *8 (S.D.N.Y. June 15, 1992). However, aside from conclusory statements that the negligent disclosure claim is "little more than an attempt to evade the bar on claims for negligent investigation," the City Defendants do not provide support for their position that Schoolcraft's claim is akin to a negligent investigation or prosecution claim. That category of claims faults defendants for inadequately investigating a matter before bringing charges or causing them to be brought. Schoolcraft's claim faults the City Defendants

146

for negligently informing NYPD officers of Schoolcraft's
allegations against them.  The two types of claims are distinct.

Similarly, the City Defendants' contention that this
claim is a 'transmogrified' version of Schoolcraft's intentional
tort claim barred by New York law is unpersuasive.  The cases to
which City Defendants cite held that facts substantiating an
intentional assault or false arrest claims cannot be used to
plead a negligence claim.  See, e.g., Jenkins, 1992 WL 147647,
at *8 (plaintiff cannot rely on same set of facts substantiating
false arrest claim to plead negligence); Schmidt v. Bishop, 779
F. Supp. 321, 325 (S.D.N.Y. 1991) (allegations of assault cannot
be recast as negligence claim); Mitchell v. Cnty. of Nassau, No.
CV05-4957(SJF)(WDW), 2007 WL 1580068, at *13 (E.D.N.Y. May 24,
2007) (same); Naccarato v. Scarselli, 124 F. Supp. 2d 36, 45
(N.D.N.Y. 2000) (same); see also Marcano v. City of Schenectady,
38 F.Supp.3d 238, 265 n.23 (N.D.N.Y. Aug. 13, 2014) (dismissing
negligence claim where the complaint "contains no allegations of
negligent conduct, but merely reasserts the intentional tort
claims of assault and battery and intentional infliction of
emotional distress under a negligence heading.").  Schoolcraft's
is not an assault or wrongful arrest claim, and he pleads that
the City Defendants negligently leaked his IAB report.  His
claim is therefore not barred on this basis.

147

### ii. Schoolcraft's Claim is Dismissed

The existence of a "special relationship" between a municipality and a plaintiff establishes a duty for the purposes of a negligence claim. Pelaez v. Seide, 2 N.Y.3d 186, 199 (N.Y. 2004). A municipality creates a special relationship, inter alia, if it "voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty." Id. at 200. That is, if there is: "(1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of a municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." Id. at 202 citing Cuffy v. City of New York, 69 NY2d 255, 260 (N.Y. 1987).

The first three elements are met. In the tape-recorded conversation between Schoolcraft and Lieutenant Brill of the QAD, Brill makes clear that his team handles complaints confidentially and take precautions when contacting complainants. Exhibit PP to the December 22, 2014 Declaration of Suzanna P. Mettham (hereinafter "Mettham Decl. Ex. PP") 2:4-10;

148

3:15-18.  Such precautions included not speaking to complainants at work and avoiding official meetings so as not to reveal the complainant's identity.  Id. at 2:1-3:2.


However, the undisputed facts establish that Schoolcraft did not rely upon confidentiality in conjunction with his reporting to IAB.  See Facts ¶ 54.  When Brill expressed hesitation in having Schoolcraft appear before QAD would "breach confidentiality, Schoolcraft responded that that was not a problem, that "there's no confidentiality," "I'm not being anonymous at all," and that Schoolcraft "already notified the command officer," i.e., DI Mauriello.  Mettham Decl. Ex. PP at 3:3-5, 15-22.  In opposition to this point, Schoolcraft contends that "he was merely stating that he was willing to provide his name to QAD, not that he was agreeing with the notion that QAD could inform his supervisors that he was reporting their misconduct."  Pl.'s Mem. in Opp'n 70.  However, Schoolcraft's contention is plainly contradicted by his own recording.  Indeed, Schoolcraft had already provided his name and contact information, which is how Brill managed to reach Schoolcraft.  See Mettham Decl. Ex. PP at 1:1-15.  Since Schoolcraft did not rely upon the City's undertaking of confidentiality, his negligent disclosure claim fails as a matter of law.

149

### E. Malicious Abuse of Process Claim is Dismissed

The elements of a claim under § 1983 for malicious abuse of process are derived from state law. Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). Under New York law, an abuse of process claim has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective. Curiano v. Suozzi, 63 N.Y.2d 113, 116 (N.Y. 1984).

Warrantless arrest cannot form the basis for this claim. Sforza v. City of New York, No. 07CIV6122DLC, 2009 WL 857496, at *17 (S.D.N.Y. Mar. 31, 2009) (dismissing malicious abuse of process claim because Plaintiff's warrantless arrest "did not involve legal process."); Shmueli v. City of New York, 03-CV-1195 (PAC), 2007 U.S. Dist. LEXIS 42012, at *10 (S.D.N.Y. June 7, 2007) ("Without a warrant, a malicious prosecution claim against the ADAs for pre-arraignment conduct does not lie because any deprivation of [the plaintiff's] liberty was not effected "pursuant to a legal process."). Moreover, § 1983 liability is triggered by criminal, not civil, process. See

150

Alroy v. City of New York Law Dep't, No. 13-CV-6740 VEC, 2014 WL
6632982, at *6 (S.D.N.Y. Nov. 24, 2014).

As Schoolcraft's claim is based upon his civil
commitment without a warrant, it fails as a matter of law.

## F. DI Mauriello's Counterclaims are Dismissed

Plaintiff seeks dismissal of Mauriello's state law
claims for tortious interference with an employment relationship
and prima facie tort.  See generally Pl.'s Mem. in Supp't 25-34.
Mauriello alleges that Schoolcraft falsely reported that
Mauriello misclassified crimes and imposed arrest and summons
quotas at the 81st Precinct.  See Mauriello's Answer to SAC,
Amended with Counterclaims, filed March 18, 2014 ("Mauriello
Answer and Counterclaims"), 11-17.  Mauriello further alleges
that Schoolcraft's animus towards Mauriello was the sole
motivation for these reports.  Id.

New York courts apply the elements of tortious
interference with prospective economic advantage when evaluating
a claim of tortious interference relating to a prospective
employment opportunity.  See, e.g., Moynihan v. New York City
Health & Hospitals Corp., 993 N.Y.S.2d 260, 265 (N.Y. App. Div.

2014); Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)
(applying New York state law). Under New York law, the elements
of a claim for tortious interference with prospective business
relations are: (1) business relations with a third party; (2)
the defendant's interference with those business relations; (3)
that the defendant acted with the sole purpose of harming the
plaintiff or used dishonest, unfair, or improper means; and (4)
injury to the business relationship. Nadel v. Play-By-Play Toys
& Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000) (cited in
Thompson v. Bosswick, 855 F. Supp. 2d 67, 81-82 (S.D.N.Y.
2012)). To survive summary judgment, DI Mauriello must have
pled, and there must exist genuine questions of fact regarding:
the existence of a prospective employment opportunity for DI
Mauriello at the NYPD;[10] Schoolcraft's direct interference with
that opportunity; and that Schoolcraft either acted for the sole
purpose of inflicting intentional harm upon DI Mauriello or
employed "wrongful means."

Genuine issues of fact exist as to several elements of
the tortious interference claim. DI Mauriello points to

---

[10] DI Mauriello adopts Schoolcraft's recitation of the elements of the
tortious interference claim and associated case law, but then recasts the
first element as "existence of an employment relationship." See Mauriello's
Mem. in Opp'n 12. That characterization does not match Schoolcraft's
version, nor is it substantiated by the cases Mauriello cites. See Posner v.
Lewis, 18 N.Y.3d 566, 579 n.2 (N.Y. 2012) and Carvel Corp. v. Noonan, 3
N.Y.3d 182, 190 (N.Y. 2004). Indeed, the cause of action turns on the
"prospective" nature of the employment opportunity. Consequently,
Schoolcraft's version is applied.

testimony that he was not considered for promotion as a result of Schoolcraft's allegations against him, while Schoolcraft contends that Mauriello had the support of NYPD leadership. Compare Facts ¶ 321 with ¶¶ 320, 322. There is also a factual dispute as to whether Schoolcraft's claims against him, or other factors, resulted in DI Mauriello being passed over for promotion. Id.

As to the purpose element, however, Mauriello's contention that Schoolcraft reported him solely in order to harm him is contradicted by DI Mauriello's pleadings. In his Counterclaims, DI Mauriello inconsistently alleges both that Schoolcraft falsely complained to QAD "purely for the sake of getting revenge against Mauriello," and that Schoolcraft hoped to influence QAD in order to "create support for the claims plaintiff was planning to assert in a lawsuit he intended to bring against the NYPD." Compare Mauriello Answer and Counterclaims, 11-12, ¶ 3(i) with ¶ 3(ii); see also Mauriello Answer and Counterclaims, 13, ¶ 7 (alleging that Schoolcraft acted "for the purpose of getting revenge against Steven Mauriello -- interfering in his employment relationship with the NYPD, and otherwise trying to destroy his career and reputation -- while also creating false support for plaintiff's lawsuit against the NYPD.") (emphasis added). "Although Rule 8(d)(3)

[of the Federal Rules of Civil Procedure] allows parties to plead alternative legal theories, it does not permit inconsistent assertions of facts within the allegations." XL Specialty Ins. Co. v. Otto Naumann, Ltd., No. 12-CV-8224 DAB, 2015 WL 1499208, at *2 (S.D.N.Y. Mar. 31, 2015) (internal quotations omitted and citations omitted); In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 407 (S.D.N.Y. 2001) (Rule 8 does not "grant[] plaintiffs license to plead inconsistent assertions of facts within the allegations that serve as the factual predicates for an independent, unitary claim"). Here, the Mauriello's inconsistent statements are used to support the same counterclaim. See Mauriello Answer and Counterclaims, 11-16 (where the contradictory allegations are tied to both the tortious interference and prima facie claims).

Similarly, Mauriello's tortious claim fails as a matter of law on the issue of whether Schoolcraft's reports to QAD constitute "wrongful means" under New York law. "'Wrongful means' include physical violence, fraud or mis-representation, civil suits and criminal prosecutions." Friedman v. Coldwater Creek, Inc., 321 F. App'x 58, 60 (2d Cir. 2009) (citing Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191 (N.Y. 1980)). Not all misrepresentations rise to the level of "more culpable" conduct constituting "wrongful means."

<u>Friedman</u>, 321 F. App'x at 60.  Rather, "as a general rule, the defendant's conduct must amount to a crime or an independent tort" to constitute wrongful means, such as breach of fiduciary duty or defamation.  <u>See</u> <u>Carvel Corp. v. Noonan</u>, 3 N.Y.3d 182, 190 (N.Y. 2004); <u>see also</u> <u>EBC I, Inc. v. Goldman Sachs & Co.</u>, 5 N.Y.3d 11, 19, (N.Y. 2005) (discussing breach of fiduciary as constituting wrongful means); <u>Phillips v. Carter</u>, 872 N.Y.S.2d 22, 23 (N.Y. 2009) (noting that defamation would constitute wrongful means).  Here, Schoolcraft's allegations resulted in formal investigations into DI Mauriello's conduct and crime reporting at the 81st Precinct, and subsequent charges against DI Mauriello stemming from those investigations are currently pending.  Facts ¶¶ 324-25.  A report stemming from the investigations found "severe deficiencies in the overall crime reporting process as a whole beginning with the initial interaction of complainants attempting to file reports, the supervisor's review and finalization of the reports submitted and continuing with inordinate delay in changing, improper classifications."  Facts ¶ 325.

The New York Court of Appeals has extended immunity from civil suit under such circumstances.  In <u>Brandt v. Winchell</u>, it ruled that "[i]f the one who sets the agencies in motion is actuated by an evil motive[,] he may perhaps be

155

subject to judgment in the forum of morals but he is free from liability in a court of law." 3 N.Y.2d 628, 635 (1958). The court explained that "[t]he best interests of the public are advanced by the exposure of those guilty of offenses against the public and by the unfettered dissemination of the truth about such wrongdoers." Id. Brandt immunity remains good law today. See Posner v. Lewis, 18 N.Y.3d 566, 570 (N.Y. 2012) (adhering to the doctrine but declining to extend it to an individual that extorted and blackmailed an official prior to reporting him); Posner v. Lewis, 80 A.D.3d 308, 321, 912 N.Y.S.2d 53, 62 (N.Y. App. Div. 2010) (quoting ATI, Inc. v. Ruder & Finn, Inc., 42 N.Y.2d 454, 460 (N.Y. 1977) and noting that the privilege continues to be extended to "circumstances where allegations of possible wrongdoing are acted upon by government agencies."); see also Van Buskirk v. Bleiler, 360 N.Y.S.2d 88, 90 (N.Y. App. Div. 1974).

Perhaps anticipating this impediment to his counterclaim, DI Mauriello includes a series of novel allegations in his papers in opposition to Schoolcraft's motion for summary judgment, including contentions that Schoolcraft personally downgraded complaint reports, orchestrated the October 31 incident, misrepresented the status of the appeal of his 2008 Performance Evaluation, falsely denied being aware of

the reason he was placed on restricted leave, accused Mauriello
of placing him on restricted leave, contacted the media, falsely
claimed he cared about the community served by the 81st
Precinct, and falsely claimed he cared for his fellow officers,
all in furtherance of his scheme to tortiously infer with
Mauriello's career opportunities.  See generally, Mauriello's
Mem. in Opp'n 24-25.  None of these assertions were included in
Mauriello's Answer and Counterclaims.  While they substantiate
the same umbrella claim for tortious interference, the novel
allegations fundamentally alter its scope, from one based on
instigating the October 7, 2009 investigation to one involving a
slew of actions that purportedly constitute wrongful means or
were taken for the sole purpose of harming DI Mauriello.  See
Mauriello's Mem. in Opp'n 24-25.  "A complaint cannot be amended
merely by raising new facts and theories in [briefing], and
hence such new allegations and claims should not be considered
in resolving the [summary judgment] motion."  Southwick Clothing
LLC v. GFT (USA) Corp., No. 99 CV 10452 (GBD), 2004 WL 2914093,
at *6 (S.D.N.Y. Dec. 15, 2004) (holding that a party could not
introduce a different contract or series of contracts as a
different basis for its breach of contract claim for the first
time in its memorandum of law in opposition to a summary
judgment motion) ; see also Rojo v. Deutsche Bank, 487 F. App'x
586, 588 (2d Cir. 2012) (A court is "justified" in brush aside

further argument not alleged in complaint but raised for first time in opposition to summary judgment); Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F.Supp.2d 357, 363 n. 9 (S.D.N.Y. 2011) (declining to consider facts raised for first time in opposition to motion for summary judgment); Scott v. City of New York Dep't of Correction, 641 F.Supp.2d 211, 229 (S.D.N.Y. 2009), aff'd, 445 F. App'x 389 (2d Cir.2011) (same); Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 219 (N.D.N.Y. 2008) (same).

As mentioned in the Prior Proceedings section above, Mauriello's motion to interpose counterclaims was initially denied as it "would cause undue delay and prejudice to Plaintiff." Schoolcraft v. City of New York, 296 F.R.D. 231, 238 (S.D.N.Y. 2013). DI Mauriello was granted leave to interpose his counterclaim following his motion for reconsideration, in which he pointed to previously undisclosed recordings now in evidence of the October 7, 2009 conversation between Schoolcraft and his father, and contended that the recording demonstrates Schoolcraft's animus towards him. Schoolcraft v. City of New York, 298 F.R.D. 134, 137 (S.D.N.Y. 2014). By including different allegations in his opposition to summary judgment, DI Mauriello is effectively seeking to craft a new claim based on a series of facts known to him before March

2014, and this time without filing a motion to replead as required under the Federal Rules of Civil Procedure. See Fed. R. Civ. Pro. 15(a). This interjection is impermissible, and Mauriello's counterclaim remains related to the October 7, 2009 investigation, as pled over a year ago. Consequently, given DI Mauriello's admission that Schoolcraft did not act solely out of animus towards him, and in light of Brandt immunity, Mauriello's tortious interference claim fails as a matter of law, and is therefore dismissed.

For similar reasons, DI Mauriello's prima facie tort claim also fails. Under New York law, the elements of prima facie tort are: (1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful. McKenzie v. Dow Jones & Co., 355 F. App'x 533, 536 (2d Cir. 2009) (internal quotations omitted); Evergreen Pipeline Constr. Co. v. Merritt Meridian Const. Corp., 95 F.3d 153, 161 (2d Cir.1996); Belsky v. Lowenthal, 405 N.Y.S.2d 62, 64 (1978) aff'd, 47 N.Y.2d 820 (1979).

As discussed above, Mauriello's pleadings allege that Schoolcraft reported Mauriello in part to "create support for the claims plaintiff was planning to assert in a lawsuit he

intended to bring against the NYPD." See Mauriello Answer and
Counterclaims, 12, ¶ 3(ii); 13, ¶ 7. The second element is
therefore not met. As with the tortious interference claim,
Brandt immunity applies to this cause of action equally, and
protects Schoolcraft from suit. Brandt, 3 N.Y.2d at 635.
Mauriello's prima facie tort claim is therefore also denied as a
matter of law.

## G. DI Mauriello Remains a Defendant

DI Mauriello contends that he is not liable for
several of Plaintiff's claims, because he did not personally
engage in, or instruct subordinates to engage in, the conduct
which allegedly giving rise to Plaintiff's § 1983 claims. See
generally Mauriello's Mem. in Supp't 17-30.

"[I]t is well settled in this Circuit that personal
involvement of defendant in alleged constitutional deprivations
is a prerequisite to an award of damages under § 1983." Wright
v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); see also Farid v.
Ellen, 593 F.3d 233, 249 (2d Cir. 2010). Consequently, summary
judgment in DI Mauriello's favor is warranted where the factual
record indisputably establishes his lack of involvement.

160

### i. False Arrest and Use of Force Claims, and their State Law Analogues against DI Mauriello are Dismissed

The record establishes that DI Mauriello was not present when Schoolcraft was arrested, since he remained outside of Schoolcraft's apartment after Schoolcraft left his apartment and began walking towards the ambulance.  Facts ¶¶ 149-50.  He was indisputably not present for the second entry when Schoolcraft was declared an EDP and handcuffed.  Facts ¶ 157.

Schoolcraft nevertheless contends that DI Mauriello remains liable because he "set in motion the series of events at the 81st Precinct designed to prevent Schoolcraft" from reporting on corruption.  Pl.'s Mem. in Opp'n 89.  Plaintiff relies on one case, McDermott Gonzalez v. Bratton, in which a senior officer order his subordinate to perform an unconstitutional search.  147 F. Supp. 2d 180, 202 (S.D.N.Y. 2001) aff'd, 48 F. App'x 363 (2d Cir. 2002).

Plaintiff does not address the factual distinctions between McDermott and this case.  In McDermott, whether the defendant ordered his subordinate to conduct the search was in dispute and the subordinate officer testified that the defendant had ordered him.  Id.  Here, by contrast, there was no testimony that Mauriello ordered Schoolcraft's arrest.  Schoolcraft

161

contends that Mauriello ordered Captain Lauterborn to "take care of this" when the officers first spoke to Schoolcraft during the First Entry and ordered Captain Lauterborn to stop Schoolcraft when he turned back from the ambulance and reentered his apartment. See Pl.'s Mem. in Opp'n 89; Facts ¶ 161.

The record does not support the conclusion that the subsequent arrest was at Mauriello's behest notwithstanding the statements Plaintiff quotes. Rather, as Plaintiff's recording demonstrates, Deputy Chief Marino and Captain Lauterborn reentered Schoolcraft's home, and Deputy Chief Marino declared Schoolcraft an EDP. Facts ¶¶ 158-59. It was only after the EDP designation that Schoolcraft was arrested, assaulted, and imprisoned. Facts ¶ 160. This intervening event is a significant distinction as to McDermott that is fatal to Plaintiff's argument. Consequently, Mauriello is not liable for the false arrest claim as a matter of law, and he is also not liable for the use of force claim.

### ii. Unlawful Search Claim Against DI Mauriello is Dismissed

Similarly, the record establishes that DI Mauriello was not present when Schoolcraft's apartment was searched. Facts ¶ 171. This claim therefore also fails as a matter of law.

### iii. Failure to Intercede Claim Against DI Mauriello Survives Summary Judgment

Referencing the same facts, DI Mauriello further contends that he cannot be liable to Schoolcraft as a matter of law on the failure to intercede claim. The TAC contains the following allegation:

> Defendants further violated plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

TAC ¶ 277.

The failure to intercede claim is not limited to events occurring during the Second Entry, to which DI Mauriello was not a party. The allegation can also fairly extend to the Fourth Amendment claims discussed above, which survive summary judgment. See Section IV.A of this Opinion. Therefore, DI Mauriello remains a defendant with respect to this claim.

### iv. Warrantless Entry Claim against DI Mauriello Survives Summary Judgment

Finally, the claim arising out of the First Entry, namely the warrantless entry claim, survives against DI

Mauriello.  DI Mauriello was indisputably present during that
interaction, and an issue of fact remains as to whether DI
Mauriello or Deputy Chief Marino were in charge prior to
Schoolcraft's EDP designation.  See Facts ¶ 159.  DI Mauriello
also remains a defendant with respect to this claim.

## H. Claims with Respect to Other NYPD Officer Defendants

City Defendants contend that Plaintiff's claims
against several individual defendants should be dismissed
because Plaintiff does not establish their personal involvement
with respect to certain claims.  See generally, City Defs.' Mem.
in Supp't 15-18; City Defs.' Reply Mem. 24-26.

### i. Captain Trainor is Dismissed as a Defendant

City Defendants contend that Plaintiff has not
properly alleged excessive force and assault and battery claims
against Captain Trainor.  City Defs.' Mem. in Supp't 15.
Plaintiff is not alleging these claims against Captain Trainor.
Rather, his claim against Captain Trainor centers on his
involvement in the NYPD visits to Schoolcraft's Johnstown
residence, not the events in Schoolcraft's apartment on October
31, 2009.  See TAC ¶ 216; see also Pl.'s Mem. in Opp'n 31.
Since Schoolcraft's First Amendment claim with respect to his

164

post-suspension speech is dismissed, <u>see</u> Section IV.B.ii of this Opinion, his claim against Trainor also fails.

### ii. Captain Lauterborn Remains a Defendant

City Defendants contend that Plaintiff's excessive force and assault and battery claims against Captain Lauterborn should be dismissed for lack of a "specific allegation that Lauterborn used force against him." City Defs.' Reply Mem. 24-25. The TAC alleges, in relevant part, that:

> [S]everal <u>defendant police officers</u>, including defendants LT. WILLIAM GOUGH, SGT. KURT DUNCAN, and LT. CHRISTOPHER BROSCHART, pulled plaintiff out of his bed, physically assaulted him, tore his clothes as they threw him to the floor, illegally strip-searched him and violently handcuffed him with his arms behind his back, causing excruciating pain to his wrists, shoulders, arms, neck and back.

TAC ¶ 167 (emphasis added). Captain Lauterborn falls under the category of "defendant police officers" and the facts support the allegation that that Captain Lauterborn was indeed one of those officers engaging in the behavior alleged above. <u>See, e.g.</u>, Facts ¶ 160. Therefore, the claims against Captain Lauterborn survive summary judgment.

### iii. Assistant Chief Nelson Remains a Defendant

City Defendants next contend that Assistant Chief Nelson should be dismissed as a defendant because "no evidence

has been discovered that Gerard Nelson in fact was aware of, or authorized, Chief Marino's actions on October 31, 2009 beyond Plaintiff's suppositions." City Defs.' Mem. in Supp't 15-16. In the alternative, City Defendants contend that qualified immunity shields Chief Nelson, since he reasonably relied upon his officers' statements with respect to the October 31 events. Id.

      As the Second Circuit noted in Wright v. Smith:

> [A] defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutionally protected liberty interests in several ways:
>
> The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.
> [. . .]
>
> [However a supervisor cannot] be held personally responsible simply because he was in a high position of authority . . .

21 F.3d 496, 501 (2d Cir. 1994) (internal quotations and ellipses omitted).

166

Plaintiff contends that Assistant Chief Nelson was
"kept informed" of the October 31 events by DI Mauriello, was
the commanding officer under whose authority the NYPD planned to
suspended Schoolcraft, and signed off on the disciplinary
Charges and Specifications outlining Schoolcraft's purported
misconduct. Pl.'s Mem. in Opp'n 11-12. The parties dispute
Assistant Chief Nelson's level of involvement with respect to
the NYPD's conduct on the 31st of October and as to the NYPD's
subsequent interactions with Schoolcraft. Facts ¶ 105.
Contrary to the City Defendants' contentions, Schoolcraft has
adduced evidence that may lead a reasonable jury to conclude
that that Assistant Chief Nelson was aware of his subordinates'
allegedly illegal conduct against Schoolcraft and failed to
correct that conduct. See Facts ¶ 105.

The remaining basis for summary judgment dismissing
Assistant Chief Nelson, which Plaintiff does not address, is
qualified immunity. As discussed above, qualified immunity
attaches to "conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known." Kerman, 261 F.3d at 236. Assistant Chief
Nelson is immune as a matter of law if "a reasonable juror would
have been compelled to accept the view" that either the NYPD's
conduct was constitutional or that Assistant Chief Nelson lacked

167

the information necessary to conclude that the NYPD's conduct
was unconstitutional. See generally the Fourth Amendment Claim
discussion in Section IV.A of this Opinion; see also Zellner,
494 F.3d at 370; Golphin v. City of New York, No. 09 CIV. 1015
BSJ, 2011 WL 4375679, at *3 (S.D.N.Y. Sept. 19, 2011). This
determination presents a factual dispute. Consequently,
Assistant Chief Nelson is not dismissed as a defendant.


### iv. Lieutenant Caughey Remains a Defendant

City Defendants contend that Lieutenant Caughey should
be dismissed as a defendant because "it is clear that Caughey
had no personal involvement in any of the claimed misconduct."
City Defs.' Mem. in Supp't 16. Plaintiff disagrees, contending
that Caughey issued retaliatory command disciplines against him,
referred him to the Early Intervention Unit, confiscated and
kept Schoolcraft's memo book for several hours, menaced
Schoolcraft with his gun during his October 31, 2009 shift, and
conspired with Mauriello to retaliate against Schoolcraft. See
generally Pl.'s Mem. in Opp'n 32-38.


As discussed above, Schoolcraft's First Amendment
claim extends to his pre-suspension speech, and therefore so too
do his allegations with respect to Caughey's alleged
'retaliatory' conduct. Therefore, Caughey remains a defendant.

168

VI.     CLAIMS RELATING TO JAMAICA HOSPITAL MEDICAL CENTER

A. Section 1983 Claims against JHMC are Dismissed

Plaintiff brought involuntary confinement, due process violation and "municipal liability" claims pursuant to 42 U.S.C. § 1983 against Jamaica Hospital.  See TAC ¶¶ 285-290, 296-303. The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

Section 1983 allows a plaintiff to bring claims for constitutional law violations against a "person."  Id.  Jamaica Hospital correctly notes that a hospital is generally not a "person" for the purposes of § 1983.  Kearse v. Lincoln Hosp., No. 07 CIV. 4730 (PAC JCF), 2009 WL 1706554, at *2 (S.D.N.Y. June 17, 2009); Williams v. City of New York, No. 03 CIV. 5342 RWS, 2005 WL 901405, at *1 (S.D.N.Y. Apr. 19, 2005); Melani v.

170

Bd. of Higher Educ. of City of New York, No. 73 CIV. 5434, 1976
WL 589, at *2 (S.D.N.Y. June 23, 1976).  Consequently, direct
claims against JHMC under § 1983 fail as a matter of law.

Section 1983 liability is premised on state action.
See 42 U.S.C. § 1983 (requiring that the "person" act "under
color" of state law).  Though private conduct falls outside the
purview of the statute, private entities can be can still be
held liable as "state actors" where the conduct leading to the
constitutional violation is "fairly attributable" to a
municipality.  See Sybalski v. Indep. Grp. Home Living Program,
Inc., 546 F.3d 255, 257 (2d Cir. 2008).  Such conduct includes
when the: (1) the private entity acts pursuant to the "coercive
power" of the state or is "controlled" by the state ("the
compulsion test"); (2) when the state provides "significant
encouragement" to the private entity, the entity is a "willful
participant in joint activity with the [s]tate," or the entity's
functions are "entwined" with state policies ("the joint action
test" or "close nexus test"); or (3) when the entity "has been
delegated a public function by the [s]tate," ("the public
function test").  Id. (internal citations and quotations
omitted).

Plaintiff contends material questions of fact warrant denial of JHMC's summary judgment motion on the issue of state action. Specifically, Schoolcraft contends that JHMC's EMTs jointly decided along with City Defendants to declare Schoolcraft an EDP and forcibly transport him to Jamaica Hospital, and JHMC's decision to involuntarily commit Schoolcraft was significantly encouraged by City Defendants. Pl.'s Mem. in Opp'n 101. He also contends that JHMC satisfies the public function test because Schoolcraft was admitted in order to protect the public. Pl.'s Mem. in Opp'n 107. In support of his position, Plaintiff quotes a footnote in this Court's 2011 opinion on JHMC's motion to dismiss, noting that:

> [I]t does appear that JHMC is a state actor based on Plaintiff's allegations that the hospital's employees acted under the compulsion of, and in concert with, the NYPD. Furthermore, because Plaintiff contends that JHMC was used as a detention facility, JHMC can be seen as a state actor through its assumption of a traditional government function."

Schoolcraft, 2011 WL 1758635, at *2 n.2 (internal citations and quotations omitted). While perhaps sufficient to withstand a motion to dismiss, Plaintiff's state actor argument fails in light of the record.

There were two purportedly unconstitutional actions taken against Schoolcraft: his designation as an EDP, and his involuntary hospitalization following arrival at JHMC. See

172

Pl.'s Mem. in Opp'n 104-105 (contending that Jamaica Hospital and its employees "are state actors because of the joint action taken in Officer Schoolcraft's apartment and because of the significant encouragement by the NYPD and the EMTs to Jamaica Hospital's other staff to involuntarily commit him."). Neither of those can fairly construed as taken under color of state law.

Plaintiff's own recording unambiguously reflect that Deputy Chief Marino, not JHMC's EMTs, declared Schoolcraft an EDP. Facts ¶ 158. The EMTs were not present when the designation was made. Facts ¶ 154. Plaintiff's quotes from Captain Lauterborn's and Lieutenant Broschart's depositions do not contradict the fact that Marino classified Schoolcraft an EDP, because none of the deponents testified that the EMTs made the EDP designation. Indeed, EMTs cannot make EDP determinations, and to do so would constitute an ultra vires act that would not trigger JHMC's liability. See Declaration of Gregory J. Radomisli dated January 30, 2015 (hereinafter "Radomisli Decl.") Ex. K 156 ("NYPD is the only agency [the EMTs] work with that can declare someone an EDP."); Chonich v. Wayne Cnty. Cmty. Coll., 973 F.2d 1271, 1280 (6th Cir. 1992) (Community college was not liable, under § 1983, for alleged violations of college administrators' civil rights where ultra vires actions of an employee caused the constitutional harm);

173

see also <u>Doe v. Guthrie Clinic, Ltd.</u>, 710 F.3d 492, 494 (2d
Cir.) (noting that "direct corporate liability generally . . .
is not implicated by the <u>ultra vires</u> acts of employees"); <u>cf.</u>
<u>Florida Dep't of State v. Treasure Salvors, Inc.</u>, 458 U.S. 670,
697 (1982) (holding that sovereign immunity is not implicated
since "action of an officer of the sovereign . . . beyond the
officer's statutory authority is not action of the sovereign")
(internal quotations and citations omitted).  Finally,
Schoolcraft's responses to Mauriello's 56.1 statement includes
the admission that "Marino declared him an EDP."  Mauriello's
Consolidated 56.1 Statement, ¶ 119.  In sum, there is no genuine
issue of fact as to whether JHMC EMTs declared Schoolcraft an
EDP.  They did not.


        Similarly, no issue of material fact exists with
respect to whether JHMC's decision to hospitalize Schoolcraft
constituted state action.  Schoolcraft was taken to JHMC's
emergency room following Marino's EDP designation.  <u>See</u> Facts ¶
175.  His hospital chart reflected the JHMC's EMT's statement
that he was "behaving irrationally."  Facts ¶ 186.  He was
triaged and a psychiatric evaluation was performed at the
request of an emergency room physician at JHMC.  <u>See generally</u>
Facts ¶¶ 175, 183, 187.  The record does not indicate that the
emergency room doctor spoke to the NYPD prior to requesting the

174

psychiatric consult.  See Facts ¶ 187.  The record does,
however, indicate that the psychiatric resident that conducted
an initial interview with Schoolcraft was informed, or perhaps
misinformed, by the NYPD that Schoolcraft had behaved in a
bizarre manner, had cursed at his supervisor, was receiving
psychiatric treatment and had his gun taken away, and had
barricaded himself in his home on October 31st.  See Facts ¶¶
192-93.  She documented these NYPD statements in Schoolcraft's
file.  Id.  He was subsequently transferred to JHMC's
psychiatric emergency department and Dr. Bernier took over his
care.  See generally, Facts ¶¶ 201-26.  While in the psychiatric
emergency department, Schoolcraft was examined by Dr. Tariq,
whose also purportedly spoke with NYPD Sergeant James regarding
Schoolcraft's behavior.  Facts ¶ 207.  It was Dr. Bernier,
however, who made the decision to admit him pursuant to New
York's Mental Hygiene Law.  Facts ¶ 237, 241, 244.  She
indisputably did not speak to City Defendants, but reviewed
Schoolcraft's file memorializing other JHMC's staff
conversations with the NYPD.

       Contrary to Schoolcraft's position, a state actor
indirectly misinforming a private physician as to a patient's
behavior is not conduct that rises to the level of "significant
encouragement."  See Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)

175

(describing "significant encouragement" standard).  Providing
factual background to a physician is not tantamount to
encouraging that physician to undertake a certain action.  See
McGugan v. Aldana-Bernier, 752 F.3d 224, 230 (2d Cir. 2014)
cert. denied, No. 14-8048, 2015 WL 1400892 (U.S. Mar. 30, 2015)
(observing that state actors "did not request, much less compel"
involuntary hospitalization).  The link between the City Defs.'
statement and the involuntary hospitalization decision is all
the more attenuated because that decision was taken by Dr.
Bernier without any direct conversation with a state actor,
several days after the state actor statements were documented.
See Facts ¶¶ 230-32.  "It is not enough, however, for a
plaintiff to plead state involvement in some activity of the
institution alleged to have inflicted injury upon a plaintiff;
rather, the plaintiff must allege that the state was involved
with the activity that caused the injury giving rise to the
action."  Sybalski, 546 F.3d at 257-58 (internal quotations and
citations omitted).  To adopt Plaintiff's position would be to
convert any independent medical decision into state action, so
long as it was partly based upon the representations, or in this
case misrepresentations, of a state actor.

    In support of his "significant encouragement"
argument, Plaintiff cites two cases.  In Tewksbury v. Dowling, a

private physician failed to conduct an independent examination,
relying instead solely upon a state physician's determinations.
169 F. Supp. 2d 103, 109 (E.D.N.Y. 2001).  Here, Dr. Bernier and
her non-state-actor colleagues, Drs. Lwin, Patel, Tariq, and
Heron, indisputably examined Schoolcraft throughout his hospital
stay.  See generally Facts ¶ 227.  Plaintiff's contention that
the level of care and attention paid him by these private
physicians fell short of appropriate standards cannot alter the
fact that he was examined by a non-state physician who made the
decision to commit him.  In Ruhlmann v. Ulster Cnty. Dep't of
Soc. Servs., a private hospital had initially cleared a patient
that had been hospitalized as an EDP, but reversed its clearance
following pressured by state actors.  234 F. Supp. 2d 140, 163
(N.D.N.Y. 2002).  Here, Dr. Bernier's opinion was not changed by
direct conversations with state actors.  Moreover, the
extraordinary interventions of state actors who had a close
working relationship with the private physicians in Ruhlmann are
not found in this record, where state involvement in the
commitment decision is limited to two written statements by
police officers in the patient's chart regarding Schoolcraft's
mental state and behavior.  See id. at 161-63.  Relatedly, Dr.
Bernier held a position of authority relative to her colleagues
who had spoken to the NYPD.  She was not compelled to adopt her
residents' impressions and notations, indeed she was not even

obligated to credit them.  Facts ¶¶ 235, 239.  Conversely, the
involuntary confinement decision in Ruhlmann was made by a
relatively junior member of the private hospital's staff,
following pressure from state actors and non-state-actor
colleagues in positions of relative seniority.  See generally
Ruhlmann, 234 F. Supp. 2d at 147-57, 161-64.


     To find "significant encouragement" on basis of the
NYPD officer statements would do violence to the underlying
purpose of the test, which is to ascribe state actor status only
where the private conduct is "fairly attributable" to the state.
McGugan, 752 F.3d at 229.  Dr. Bernier's decision to admit
Schoolcraft is not fairly attributable to the state by virtue of
Schoolcraft's chart that contained two statements by state
actors.


     Plaintiff also contends that JHMC is a state actor
under the public functions test, since JHMC functioned as a
detention facility with respect to Schoolcraft and since Dr.
Bernier testified that she considered public safety when
admitted Schoolcraft.  Pl.'s Mem. in Opp'n 107-09.  "The fact
that [plaintiff] was brought to the hospital [in] police custody
and was released from the hospital into police custody is
insufficient to transform this private hospital and its staff

178

into state actors for section 1983 purposes." Morse v. City of
New York, No. 00 CIV. 2528 (TPG), 2001 WL 968996, at *8
(S.D.N.Y. Aug. 24, 2001). Similarly, considering harm to others
when admitting a patient is consistent with the Mental Hygiene
Law, and consequently, no state action attaches on that basis.
Antwi v. Montefiore Med. Ctr., No. 14 CIV. 840 ER, 2014 WL
6481996, at *5 (S.D.N.Y. Nov. 18, 2014) ("[I]t is well-settled
in the Second Circuit that a private hospital confining a
patient under the New York MHL is not acting under color of
state law.") (citing McGugan v. Aldana-Bernier, 752 F.3d 224,
229 (2d Cir.2014) (reaffirming the principle that "forcible
medication and hospitalization . . . by private health care
providers" cannot be attributed to the state); Hogan, 346 Fed.
App'x at 629 (affirming district court's grant of summary
judgment to private hospital and physician that involuntarily
committed patient, finding that conduct could not be attributed
to the state); see generally Doe v. Rosenberg, 166 F.3d 507 (2d
Cir. 1999) (holding that private health care professionals and a
private hospital had not functioned as state actors when they
involuntarily committed a patient to their psychiatric ward)).

Since JHMC was not a state actor, and also does not
qualify as a "person" for the purposes of § 1983, Schoolcraft's
claims for involuntary confinement, due process violations, and

municipal liability against JHMC fail as a matter of law.  TAC
¶¶ 285-90, 296-315.


## B. State Law Medical Malpractice Claims against JMHC Survive Summary Judgment

The TAC contains two state law negligence claims
against JHMC: a medical malpractice claim and a negligence
hiring, supervision, training and retention claim.  TAC ¶¶ 365-
68 (malpractice claim), 369-372 (negligent supervision claim).
JHMC makes several arguments in favor of summary dismissal of
Plaintiff's negligence claims against the hospital.


### i. Expert Testimony Raises Triable Issues

JHMC argues Plaintiff's expert reports are inadequate
as a matter of law, and warrant dismissal of the medical
malpractice claim.  Under New York law, a medical malpractice
claim requires a showing of: (1) a deviation or departure from
accepted practice, and (2) evidence that such departure was a
proximate cause of injury or damage.  Stukas v. Streiter, 918
N.Y.S.2d 176, 184 (N.Y. App. Div. 2011) (internal quotations and
citations omitted).  Expert medical opinions are typically
required to substantiate or defeat such claims.  See Fiore v.

Galang, 64 N.Y.2d 999, 1001, 478 N.E.2d 188, 189 (1985); Stukas,
918 N.Y.S.2d at 184; see also Sitts v. United States, 811 F.2d
736, 739 (2d Cir. 1987) ("It is well established in New York law
that unless the alleged act of malpractice falls within the
competence of a lay jury to evaluate, it is incumbent upon the
plaintiff to present expert testimony in support of the
allegations to establish a prima facie case of malpractice.")
(internal quotations and citations omitted); Bender v. Lowe, No.
08 CV. 0334 BSJ, 2011 WL 4001147, at *8 (S.D.N.Y. Aug. 31, 2011)
aff'd, 531 F. App'x 142 (2d Cir. 2013) (In determining whether a
physician's decision to commit someone involuntarily comports
with due process, the plaintiff bears the burden of producing
evidence, generally in the form of expert testimony, regarding
the applicable medical standards and the defendant's alleged
failure to meet those standards.") (internal quotations and
citations omitted).


     JHMC contends that Plaintiff's expert reports
improperly omit the standard of care which Plaintiff alleges was
violated and failed to establish a substantial departure from
accepted standards of care.  See generally, JHMC's Mem. in
Supp't 24-29.  In response to JHMC's contention, Plaintiff does
not deny the necessity of expert testimony on this issue.
Compare Pl.'s Mem. in Opp'n 119 with Sitts (noting possible

exception to expert testimony requirement where "act of malpractice falls within the competence of a lay jury to evaluate"). Rather, Plaintiff contends that the report authored by Dr. Lubit, one of two experts for Plaintiff, "sets forth the governing standards, sets forth the established procedures for examining patients, and explains in detail the reason why the examinations of Officer Schoolcraft grossly departed from the standard of care." Pl.'s Mem. in Opp'n 119 (citing PMX 30 (hereinafter "Lubit Rpt.") 10-21).

Courts dismissed malpractice claims on summary judgment where the plaintiff's expert fails to identify the standard of care which was allegedly violated. See Bender v. Lowe, No. 08 CV. 0334 BSJ, 2011 WL 4001147, at *9 (S.D.N.Y. Aug. 31, 2011) aff'd, 531 F. App'x 142 (2d Cir. 2013) (granting summary judgment where the plaintiff's expert "only states that defendants' decisions departed from accepted standards of medical/psychiatric care; he does not conclude that the treatment decisions constituted a substantial departure from such standards, as required by case law.") (internal citation and quotations omitted); Algarin v. New York City Dep't of Correction, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) aff'd, 267 F. App'x 24 (2d Cir. 2008) ("An anecdotal account of one expert's experience, however extensive or impressive the numbers

it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the scientific community.") (internal quotations and citations omitted); <u>Zeak v. United States</u>, No. 11 CIV. 4253 KPF, 2014 WL 5324319, at *9 (S.D.N.Y. Oct. 20, 2014) (granting summary judgment where plaintiff's expert "repeatedly disclaimed the ability to define the standard of care").

In his report for Plaintiff, Dr. Lubit wrote: "[a]ccepted clinical practice entails gathering all available relevant, significant information; applying current scientific knowledge; and analyzing the situation via structured professional judgment, as taught in residency programs." <u>Id.</u> at 10. Dr. Lubit describes these as "three bases for accepted clinical decision making." <u>Id.</u> When asked whether he described the applicable standard of care in his report, Dr. Lubit responded:

> It would be almost impossible to, because then you'd have to lay out what one would have to do exactly in every contingency. It's—I mean I do to some extent describe the standard of care and what doctors are supposed to do and how they don't do it. But I didn't write, a—I didn't write a book chapter on what the standard of care is. I put down key aspects of the standard of care and then explained why I did not think the doctors met that standard of care.

Radomisli Decl. Ex. AA, pp. 49-51. The balance of Dr. Lubit's

183

report details how JHMC's physicians: (1) failed to gather
adequate information; (2) failed to reasonably interpret the
information they had; (3) failed to independently establish the
truth of Schoolcraft's statements; (4) failed to establish
whether Schoolcraft's beliefs raised a risk of dangerous
behavior; (5) evidenced a lack of familiarity with appropriate
commitment policy; and (6) evidenced a lack of knowledge as to
the proper methodology for assessing dangerousness.  Lubit Rpt.
10-11.  According to Dr. Lubit, "[t]he failure of any of these
six means that the work was below accepted professional
standards."  Id. at 11.


        Unlike the reports in Bender and Algarin, Dr. Lubit's
report adequately sets out the standard of care and his opinion
that JHMC's doctors substantially departed from that standard.
Compare Bender, 2011 WL 4001147, at *9 and Algarin, 460 F. Supp.
2d at 477 with Lubit Rpt. 10-21 (which can be fairly read as
stating that an appropriate standard of care required the
opposite of what JHMC had done, i.e.,: (1) gathering adequate
information about what Mr. Schoolcraft had done and believed
concerning his allegation of corruption by superiors; (2)
reasonably interpreting the information gathered; (3) calling
and speaking with people in the Police Department's Internal
Affairs Bureau in order to see if Schoolcraft's statements of

184

corruption were paranoid, or a misperception, or were justified;
(4) determining whether his beliefs were likely to lead him to
engage in dangerous behavior; (5) being familiar with state law
and JHMC's written policies regarding involuntary confinement;
(6) being familiar with and applying proper methodology for
assessing dangerousness).

     Contrary to JHMC's contention, the court in <u>Bender</u> did
not dismiss a malpractice claim because the Plaintiff's expert
failed to cite authority for the contention that a physician
must corroborate police reports or third party accounts.
Rather, the <u>Bender</u> court dismissed the claim because the
plaintiff "produced no expert report establishing that this
[failure to verify] constituted a substantial departure from
generally accepted medical standards."  <u>Bender</u>, 2011 WL 4001147,
at *10.  In contrast to <u>Bender</u>, Dr. Lubit here stated that
"[f]ailing to call key collaterals (in this case, IAB) is
outside standard practice," as were the other criticisms he
identified.  Lubit Rpt. 10-21.  Unlike the expert in <u>Zeak</u>, Dr.
Lubit did not disclaim his ability to define the standard of
care.  Rather, he testified that his report described where the
standard of care was violated and that he did not provide a
lengthy description of the standard of care under myriad set of
facts.  <u>See</u> Radomisli Decl. Ex. AA, pp. 49-51.  This is not, as

185

JHMC would have it, a mere disagreement over a diagnosis or a course of treatment. Dr. Lubit's report states that Schoolcraft's treatment fell below the required standard of care. That Dr. Lubit's report does not have a section titled "standard of care" is no more fatal to his report than it is to the report of Dr. Levy, JHMC's expert. Compare Lubit Rpt. with Radomisli Decl. Ex. JJ (hereinafter "Levy Rpt."). Dr. Levy states that "I opine, with a reasonable degree of medical certainty that Jamaica Hospital did not deviate from acceptable community standards of care and did not violate the plaintiff's rights." Levy Rpt. 6. He then sets out JHMC's acts and his evaluation of their appropriateness. See generally, Levy Rpt. 6-7. He does not, however, proffer a discrete standard to which JHMC physicians adhered.

JHMC also notes that Dr. Lubit never claims the course of treatment fell "substantially below medical standards." See, e.g., JHMC's Mem. in Supp't 26 (emphasis added). Previous cases, in granting summary judgment in the physician-defendant's favor, have noted that the departure was not "substantial" among the reasons for granting summary judgment. See, e.g., Kulak v. City of New York, 88 F.3d 63, 75 (2d Cir. 1996); Kraft v. City of New York, 696 F. Supp. 2d 403, 414 (S.D.N.Y. 2010) aff'd, 441 F. App'x 24 (2d Cir. 2011); Bender, 2011 WL 4001147, at *10.

186

Rather than interpreting the above-cited opinions as turning on the existence of the word "substantial" in a plaintiff's expert report, the better reading is that they require <u>evidence</u> of a substantial departure, which creates a question of fact for a jury to decide.  <u>See, e.g.</u>, <u>Altamuro v. Cnty. of Nassau</u>, 33 F. App'x 556, 561 (2d Cir. 2002) (Plaintiff "<u>presented no evidence</u> that the defendants' conduct fell substantially below generally accepted standards in the medical community.") (emphasis added); <u>Kraft</u>, 696 F.Supp.2d at 415 ("Because <u>plaintiff fails to offer any evidence</u> that the doctor defendants' diagnoses, actions, and subsequent determinations . . . fell substantially below accepted medical standards, no reasonable jury could conclude that they violated plaintiff's substantive due process rights under the Fourteenth Amendment.") (emphasis added); <u>Hogan v. A.O. Fox Mem'l Hosp.</u>, 346 F. App'x 627, 630 (2d Cir. 2009) (allowing summary judgment where the plaintiff "<u>offers no evidence</u> as to the generally accepted medical practices applicable to a physician's recommendation of involuntary commitment") (emphasis added); <u>Bender</u>, 2011 WL 4001147, at *9 ("Plaintiff's expert report does not describe any professional standards governing the involuntary admission of a patient for psychiatric care.").

"A court's duty . . . is not to reject opinion evidence because non-lawyer witnesses answer questions that are not hypothetical or fail to use the words and phrases preferred by lawyers and judges, but rather to determine whether the whole record exhibits substantial evidence that there was a departure from the requisite standard of care." Knutson v. Sand, 725 N.Y.S.2d 350, 354-55 (N.Y. App. Div. 2001). Kulak is consistent with this principle. In Kulak, the Second Circuit noted an earlier opinion, where it had "decided that an expert affidavit asserting that the treating physicians made incorrect and objectively unreasonable decisions created an issue of fact for trial regarding whether the doctors acted within the realm of professional competence in treating the plaintiff." 88 F.3d 63, 76 (citing Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir. 1995)). The plaintiff's expert in Kulak failed to base his opinion on the conditions of the plaintiff at the time of the alleged malpractice: in other words, the report did not raise an issue of material fact regarding the decision to commit the plaintiff at the time of his commitment. Tellingly, the plaintiff's expert report in Kulak did, in fact, contain the phrase "substantially departed," yet the Second Circuit nevertheless affirmed summary judgment for lack of evidence of the substantial departure. Id. at 75; cf. Zeak v. United States, No. 11 CIV. 4253 KPF, 2014 WL 5324319, at *9 (S.D.N.Y.

188

Oct. 20, 2014) (noting that what matters is whether, "taken as a whole, the record contains evidence that there was a departure from the relevant standard of care . . . Plaintiff's expert was not required to use specific terms of art in his expert report or deposition testimony.").

By contrast, Plaintiff's second expert report, authored by Dr. Halpren-Ruder ("Dr. Ruder"), is inadmissible. Dr. Ruder's report is divided into two parts. See PMX 36. Part One relates to the care rendered by JHMC's EMTs prior to Schoolcraft's arrival at JHMC. Id. at 2. Section 9.59 of the New York Mental Hygiene Law extends immunity to EMTs from suits for damages that did not result from the EMTs' gross negligence. A municipal employee's immunity extends to the municipality. Shinn v. City of New York, 884 N.Y.S.2d 466, 467 (N.Y. App. Div. 2009) (citing Mental Hygiene Law § 9.59); cf. Woody v. Astoria Gen. Hosp., Inc., 264 A.D.2d 318, 319, 694 N.Y.S.2d 41, 42 (N.Y. 1999) (holding that the EMT's employer cannot invoke Section 9.59 with respect to a negligent hiring claim as opposed to a claim premised on vicarious liability). As the EMTs are immune from the malpractice claim, JHMC too cannot be held vicarious liable since that liability is derivative of its agent. Consequently, Part One of Dr. Ruder's report is irrelevant to a triable issue.

189

Part Two of Dr. Ruder's report relates to "services provided in the Emergency Department (ED)" of JHMC. PMX 36 at 3. The basis for his criticisms of JHMC's standard of care is the Consensus Statement on Medical Clearance Protocols for Acute Psychiatric Patients Referred for Inpatient Admissions. See Radomisli Decl. Ex. CC, p. 2; Ex. EE; Ex. DD, p. 49. At his deposition, however, Dr. Ruder acknowledged that the guidelines he cited in support of his opinion only came into effect after Plaintiff was hospitalized, and that he was not familiar with the standard of care in New York as of 2009. Radomisli Decl. Ex. DD, p. 72. Indeed, he testified that the only guidelines or literature he reviewed regarding the standard of care for the running of emergency departments were the post-2009 guidelines he cited in his report (Radomisli Decl. Ex. DD, pp. 131-132), and that he did not review anything that was in effect in 2009 (Radomisli Decl. Ex. DD, pp. 132-133). Accordingly, Dr. Ruder's opinion lacks the appropriate foundation and is inadmissible.

### ii. **JHMC Liable for Physicians' Alleged Malpractice**

The parties apparently dispute the nature of Plaintiff's malpractice claim against JHMC. JHMC contends that Schoolcraft failed to plead a "vicarious liability" malpractice claim against JHMC for the Attending Physicians' actions. See,

190

e.g., JHMC's Reply Mem. 31. JHMC notes that Plaintiff has been permitted to amend his complaint three times, and has never asserted a vicarious liability claim. The TAC alleges, in relevant part:

> JHMC, its agents, officials, doctors, nurses, physician's assistants, servants, employees, and/or independent contractors, including, but not limited to, DR. ISAK ISAKOV, and DR. LILIAN ALDANA-BERNIER, jointly and severally, and individually, departed from good and accepted standards of medical care, and were negligent and careless in the service rendered for and on behalf of plaintiff ADRIAN SCHOOLCRAFT

TAC ¶ 336 (emphasis added). JHMC has not cited, and this court has not independently found, case law requiring that the term "vicarious" be used in order to put forward a medical malpractice claim under New York law. The background principle of notice pleading, which requires a short and plain statement showing the pleader is entitled to relief, also militates against JHMC's contention. Vicarious liability is not a type of claim, it is a theory of liability associated with state law claims, including medical malpractice claims. While not using the term "vicariously liable," the formulation employed by Plaintiff is sufficient to put JHMC on notice that it is being held liable, "jointly and severally," for the alleged malpractice of Drs. Bernier and Isakov. And in any event, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded the

191

opportunity to test his claim on the merits." <u>Schoolcraft v.
City of New York</u>, No. 10 CIV. 6005 RWS, 2015 WL 252413, at *1
(S.D.N.Y. Jan. 16, 2015).  Consequently, this holding obviates
the need for another amendment of the complaint.

JHMC further contends that Schoolcraft "cannot sustain
an independent cause of action for medical malpractice against a
defendant hospital" if he "fails to state how specific members
of the hospital staff committed an act of malpractice
independent from the patient's attending physicians."  JHMC's
Mem. in Supp't 21 (citing <u>Suits v. Wyckoff Heights Med. Ctr.</u>, 84
A.D.3d 487, 488, 922 N.Y.S.2d 388 (N.Y. App. Div. 2011)).  <u>Suits</u>
is inapposite under these facts.[11]  The court in <u>Suits</u> held that
a "hospital may not be held concurrently liable for injuries
suffered by a patient who is under the care of a private
attending physician <u>chosen by the patient</u>.  <u>Id.</u> (emphasis
added).  Though it is true that hospitals are not normally
liable for the alleged malpractice of their attending
physicians, an exception exists where "a patient comes to the
emergency room seeking treatment from the hospital and not from
a particular physician of the patient's choosing."  <u>Muslim v.</u>

---

[11] Likewise, the two other trial court slip opinions JHMC cites in its reply
memorandum of law did not involve involuntary admissions.  <u>See</u> <u>Mercedes v.
Farrelly</u>, 2012 N.Y. Misc. LEXIS 2032 (N.Y. Sup. Ct. Apr. 27, 2012) (plaintiff
selected her allegedly negligent surgeon); <u>Dendariarena v. Mount Sinai
Hospital</u>, 2012 N.Y. Misc. LEXIS 2319 (N.Y. Sup. Ct. May 9, 2012) (same)(cited
in JHMC Reply Mem. 32).

Horizon Med. Grp., P.C., 988 N.Y.S.2d 628, 630 (N.Y. App. Div. 2014); Orgovan v. Bloom, 7 A.D.3d 770, 771, 776 N.Y.S.2d 879 (N.Y. App. Div. 2004) (collecting cases). Schoolcraft was involuntarily admitted JHMC's emergency room, involuntarily transferred to JHMC's psychiatric emergency department, and involuntarily committed by Dr. Bernier. See generally Facts ¶¶ 175-85, 237. There can be no question, under these facts, that Schoolcraft did not choose his physicians. See, e.g., Facts ¶ 147 (Schoolcraft specifically requested to be taken Forest Hills Hospital, not JHMC). Consequently, the exception described in Muslim applies and questions of fact, as found above, warrant denial of the summary judgment sought by JHMC.

## C. Negligent Hiring, Retention, Training and Supervision Claim against JHMC is Dismissed

        To state a cause of action for negligent hiring, training or supervision (hereinafter "negligent hiring") under New York law, "in addition to the standard elements of negligence, a plaintiff must show 1) that the tortfeasor and the defendant were in an employee-employer relationship; 2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and 3) that the tort was committed on the employer's

premises." <u>Ehrens v. Lutheran Church</u>, 385 F.3d 232, 235 (2d Cir. 2004) (citations and quotations omitted); <u>Kenneth R. v. Roman Catholic Diocese</u>, 229 A.D.2d 159 (N.Y. App. Div. 1997). "A negligent hiring claim, however, may be possible under an exception to the principle barring liability with respect to independent contractors where the defendant party itself was negligent in selecting, instructing, or supervising the contractor." <u>Corazzini v. Litton Loan Servicing LLP</u>, No. 1:09-CV-0199 (LEK RFT), 2010 WL 1132683, at *9 (N.D.N.Y. Mar. 23, 2010) (internal quotations and citations omitted).

In his opposition to JHMC's summary motion on this point, Plaintiff points the Court to the <u>negligence per se</u> argument from his moving papers. <u>See</u> Pl.'s Mem. in Opp'n 122-123 (referencing Pl.'s Mem. in Supp't 48-49). The gist of Plaintiff's argument there is that JHMC and the Attending Physicians involuntarily committed patients on the basis of any risk, as opposed to the statutorily-compliant level of "substantial risk." <u>See</u> Pl.'s Mem. in Supp't 48. This is insufficient to allege a negligent hiring claim. Plaintiff does not allege that JHMC "failed to investigate a prospective employee, notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." <u>Bouchard v. N.Y. Archdiocese</u>, 719 F.Supp.2d 255, 261

194

(S.D.N.Y. 2010) (citations and quotations omitted).  Plaintiff also does not allege that JHMC negligently instructed, supervised, or trained the Attending Physicians regarding involuntary commitment decisions.  See Corazzini, 2010 WL 1132683, at *9.  The fact that both JHMC and the Attending Physicians purportedly applied an incorrect commitment standard does not constitute evidence that JHMC knew or should have known that its independent contractors were applying the wrong standard.

### D. Negligence Per Se Claim against JHMC is Dismissed

As suggested above, Plaintiff's negligence per se claim cannot survive summary judgment.  His contention is that JHMC and the Attending Physicians violated the Mental Hygiene law, by committing Schoolcraft in the absence of a substantial risk.  See Pl.'s Mem. in Supp't 48.  Schoolcraft was admitted by the Attending Physicians, not JHMC.  Consequently, his claim against JHMC fails, since JHMC's purported breach of the law is not the proximate cause of Schoolcraft's injury.  See Anchundia v. Ne. Utilities Serv. Co., No. CV 07-4446 (AKT), 2010 WL 2400154, at *5 (E.D.N.Y. June 11, 2010) ("[T]he plaintiff must prove that the violation of the statute, that is, the breach of

duty imposed by the statute, was a proximate cause of the injury.") (internal quotations and citations omitted).

### E. <u>Intentional Infliction of Emotional Distress Claim against JHMC is Dismissed</u>

As discussed in Section V.B of this Opinion, IIED claims may be dismissed where they "fall within the ambit of traditional tort liability" and are in fact duplicates of other claims put forward.  <u>See</u> <u>Fischer v. Maloney</u>, 373 N.E.2d 1215, 1217 (N.Y. 1978); <u>Druschke v. Banana Republic</u>, 359 F.Supp.2d 308, 315-16 (S.D.N.Y.2005); <u>Herlihy v. Metro. Museum of Art</u>, 633 N.Y.S.2d 106, 114 (N.Y. App. Div. 1995); <u>see also</u> <u>McGrath v. Nassau Health Care Corp.</u>, 217 F.Supp.2d 319, 335 (E.D.N.Y.2002) ("New York courts do not allow IIED claims where 'the conduct complained of falls well within the ambit of other traditional tort liability.") (internal citations omitted); <u>Crews v. Cnty. of Nassau</u>, 996 F. Supp. 2d 186, 214 (E.D.N.Y. 2014) (same); <u>Franco v. Diaz</u>, No. 14-CV-1909 ILG RER, 2014 WL 4494470, at *4 (E.D.N.Y. Sept. 12, 2014) ("Because precisely the same conduct and the same injury fall within the ambit of defendants' proposed defamation counterclaim, their IIED counterclaim in the Amended Answer must be dismissed as duplicative."); <u>Druschke v. Banana Republic, Inc.</u>, 359 F. Supp. 2d 308, 316 (S.D.N.Y. 2005)

(dismissing IIED claim where "there are no allegations of injuries that may not be redressed through [plaintiff's] other causes of action.").

Unlike Plaintiff's IIED claim against the City Defendants, which involved injuries distinct from his other claims, his IIED claim against JHMC is premised on the same conduct and injuries giving rise to Schoolcraft's malpractice claim. Consequently, the IIED claim is dismissed.

VII.    CLAIMS RELATING TO THE ATTENDING PHYSICIANS

        Dr. Bernier and Dr. Isakov filed separate summary judgment motions and oppositions to Schoolcraft's summary judgment motion.  Where their arguments substantially overlap, they are treated jointly below.

A. Section 1983 Claims against the Attending Physicians
are Dismissed

        As discussed above, neither JHMC nor the Attending Physicians treating Schoolcraft were state actors. Consequently, these claims are dismissed.  See generally Section VI.A of this Opinion.

B. Intentional Infliction of Emotional Distress Claims
against the Attending Physicians are Dismissed

        The IIED claim against the Attending Physicians is premised on the same conduct giving rise to Schoolcraft's malpractice claim against them.  See generally Section VI.E of this Opinion.  Consequently, the IIED claims are dismissed.

C. Declaratory Relief Claims Survive Summary Judgment

198

The Attending Physicians contend that Plaintiff did
not receive permission to add declaratory judgement claims
against them in the TAC.  See Bernier's Reply Mem. 10; Isakov's
Mem. in Supp't 20.  In making his motion to amend, Plaintiff
included an exhibit reflecting the proposed changes to the
operative complaint.  See Exhibit 3 to Pl.'s Mem. of Law in
Supp't of Motion to Amend, filed December 4, 2014.  Neither of
the Attending Physicians objected to the proposed changes.
Though the Court's opinion on the motion to amend focused on the
dispute as to the proposed declaratory and injunctive relief
claim as brief by the City Defendants and Schoolcraft, that
description should not be read as an implicit limitation of the
proposed amendment.  Schoolcraft v. City of New York, No. 10
CIV. 6005 RWS, 2015 WL 252413, at *5 (S.D.N.Y. Jan. 16, 2015).
The then-proposed, now operative, TAC contains a request for
"[d]eclaratory judgment in favor of plaintiff and against each
of the defendants," which extends to the Attending Physicians.
See TAC ¶ 373(c).


### D. State Law Claims Survive Summary Judgment


The Attending Physicians contend that the state law
claims against them should be dismissed since the federal claims

199

fail.  Bernier's Mem. in Supp't 22; Isakov's Mem. in Supp't 18.
The Court rejected a substantially similar request by JHMC in
connection with its 2011 motion to dismiss.  See generally
Schoolcraft v. City of New York, No. 10 CIV. 6005 RWS, 2011 WL
1758635, at **4-5 (S.D.N.Y. May 6, 2011) (electing to exercise
supplemental jurisdiction because there exists a common nucleus
of overlapping facts).  The same reasoning applies with equal
force here, and the state claims are not dismissed.


### E. False Arrest and Imprisonment Claims Survive Summary Judgment


        As noted in Section V.A of this Opinion, to establish
a cause of action for false imprisonment or false arrest under
New York law, a plaintiff must establish that: (1) the defendant
intended to confine him; (2) the plaintiff was conscious of the
confinement; (3) the plaintiff did not consent to the
confinement; and (4) the confinement was not otherwise
privileged.  Smith v. County of Nassau, 34 N.Y.2d 18, 22 (N.Y.
1974); Hernandez v. City of New York, 953 N.Y.S.2d 199 (N.Y.
App. Div. 2012).


        A physician's decision to involuntary commit a patient
pursuant under the Mental Hygiene Law is privileged in the

absence of medical malpractice.  <u>Anthony v. City of New York</u>,
No. 00 CIV. 4688 (DLC), 2001 WL 741743, at *14 (S.D.N.Y. July 2,
2001) <u>aff'd</u>, 339 F.3d 129 (2d Cir. 2003); <u>Ferretti v. Town of
Greenburgh</u>, 191 AD2d 608, 610, 595 NYS2d 494 (2d Dept. 1993).
As discussed above in detail in Section VI.B.ii of this Opinion,
questions of material fact remain as to whether JHMC's
physicians engaged in malpractice by committing Schoolcraft.
Consequently, summary judgment on this issue is inappropriate as
to the Attending Physicians, as well as to JHMC, derivatively.

## VIII. CONCLUSION

Based upon the facts and conclusions of law set forth above, Plaintiff's, City Defendants', Mauriello's, JHMC's, Dr. Bernier's, and Dr. Isakov's motions are all granted in part and denied in part.

A pretrial conference to schedule further proceedings will be held at two o'clock in the afternoon on May 12, 2015 in Courtroom 18C.

It is so ordered.

New York, NY
May 5 , 2015

ROBERT W. SWEET
U.S.D.J.

202