UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ADRIAN SCHOOLCRAFT,

                                       10–cv-6005 (RWS)

                    Plaintiff,

          -against-

THE CITY OF NEW YORK, *et al.*,

                    Defendants.

-------------------------------------------------------------------x

### PLAINTIFF'S MEMORANDUM OF LAW
### IN OPPOSITION TO THE MEDICAL DEFENDANTS'
### MOTIONS IN LIMINE

Nathaniel B. Smith
John Lenoir
100 Wall Street – 23rd Floor
New York, New York 10005
212-227-7062
natbsmith@gmail.com

Law Offices Of Jon L. Norinsberg
225 Broadway, Suite 2700
New York, New York 10007
(212) 791-5396

Cohen & Fitch, LLP
Gerald Cohen
Joshua Fitch
225 Broadway, Suite 2700
New York, New York 10007
(212) 374-9115

Dated: October 12, 2015

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................5

ARGUMENT ...............................................................................................6

  1. Dr. Lubit's Diagnosis Is Admissible. ....................................................6

  2. Evidence on the Declaratory Judgment Claim is Admissible. ............16

  3. A Specific Dollar Amount Can Be Reference To The Jury .................20

  4. The Court Has No Authority to "Compel" the Plaintiff to "Make"
  His Father Available for Trial and The Request For A Missing
  Witness Charge Is Premature……………………………………….........23

  CONCLUSION .....................................................................................25

TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir 2002) ...................................................... 7

*Bachir v. Transoceanic Cable Ship Co.,* 2002 U.S. Dist. Lexis 4340
  (S.D.N.Y. 2002) ......................................................................................................... 15

*Bell v. Hood*, 327 U. S. 678 (1946) ............................................................................... 18

*Boggs v. New York City Health and Hosps. Corp.,* 70 N.Y.2d 972 (1988) ................ 10

*Borawick v. Shay,* 68 F.3d 597 (2d Cir. 1995) ............................................................... 7

*Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179 (2nd Cir.2001) ................... 16

*Carey v. Piphus*, 435 U.S. 247 (1978) .......................................................................... 20

*Chapman v. Capoccia,* 283 A.D. 2d 798 (2d Dept. 2001) ........................................... 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ........................ 7

*Demarco v. Sadiker,* 952 F. Supp. 134 (E.D.N.Y. 1996).............................................. 20

*Discepolo v. Gorgone,* 399 F. Supp. 2d 123 (D. Conn. 2005) ..................................... 10

*Duke Power Co. v. Carolina Env. Study Group*, 438 U. S. 59 (1978)......................... 19

*Edwards v. City of New York*, 2011 U.S. Dist. LEXIS 75300
  (E.D.N.Y. July 13, 2011). .......................................................................................... 21

*Hein v. Cuprum, S.A.*, 2002 WL 34453309 (S.D.N.Y. Jan. 23, 2002)......................... 18

*Hill v. Cash*, 117 A.D. 3d 1423 (4th Dept. 2014) ........................................................ 12

*Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y.  2001).................................. 8

*Krivit v. Pitula*, 79 A.D. 3d 1432, 1434-1435 (3rd Dept. 2010) .................................. 12

*Metro. Life Ins. v. Taylor,* 481 U. S. 58, 63 (1987)...................................................... 19

*NIC Holdings Corp. v. Lukoil,* 2009 U. S. Dist. Lexis 32580
  (S.D.N.Y. April 14, 2009).......................................................................................... 17

*Pastorello v. City of New York*, 2001 U.S. Dist. LEXIS 19919, 2001 WL 1543808
(S.D.N.Y. Nov. 30, 2001) ........................................................................20

*Rattigan v. Commodore Int'l Ltd.*, 1989 U.S. Dist. LEXIS 14645, 1989 WL 151678
(S.D.N.Y. Dec. 8, 1989) ..........................................................................18

*Rodriguez v. City of New York,* 72 F.3d 1051 (2d Cir. 1995) ......................................20

*Saladino v. Stewart & Stevenson Services, Inc.*, 2011 U.S. Dist. LEXIS 7566
(E.D.N.Y 2011) ........................................................................................22

*Shea v. Long Island Railroad*, 2009 U. S. Dist. Lexis 43748
(S.D.N.Y. May 21, 2009) .........................................................................11

*Thomas v. Kelly*, 903 F. Supp.2d 237 (S.D.N.Y. 2012) ..............................................22

*U.S. Underwriters Ins. Co. v. Falcon Constr. Corp.*, 2006 U.S. Dist. LEXIS 79329,
2006 WL 3146422 (S.D.N.Y. Oct. 30, 2006) ...........................................17

*United States v. Waters,* 23 F. 3d 29 (2d Cir. 1994) ..................................................19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ADRIAN SCHOOLCRAFT,

                                        10–cv-6005 (RWS)


                        Plaintiff,


            -against-



 THE CITY OF NEW YORK, et al.,


                        Defendants.
--------------------------------------------------------------x

## PRELIMINARY STATEMENT

Plaintiff, Police Officer Adrian Schoolcraft, submits this memorandum of law in opposition to the motions in limine by the medical defendants, Jamaica Hospital and Drs. Bernier and Isakov (collectively the "Medical Defendants"). The motions are as follows:

- To exclude testimony by Dr. Roy Lubit that Office Schoolcraft is suffering from post-traumatic stress disorder;

- To exclude any evidence on the declaratory judgment claim;

- To exclude any reference to a specific dollar amount in damages in the presence of the jury during the trial or in summations;

- To direct Officer Schoolcraft to "compel" his father to appear as a witness at trial.

Each of these arguments is addressed in order as set forth below.

ARGUMENT

*1. Dr. Lubit's Diagnosis Is Admissible.*

The Medical Defendants' counsel argue that Dr. Lubit's diagnosis of Officer Schoolcraft as suffering from post-traumatic stress disorder ("PTSD") is inadmissible on the grounds that it is "unreliable."  They do not attack the subject matter of a diagnosis of PTSD; nor do they attack Dr. Lubit's qualifications to render an opinion on that diagnosis.  Instead, they argue  – without any support in the law or science – that the analysis done by Dr. Lubit is not sufficient for a diagnosis to be made.

Yet the attorneys cite no rule of law, evidence or other expert opinion to support this claim.  They provide the Court with no science to demonstrate that the methods used by Dr. Lubit to render his opinion are unreliable as a matter of law, even though they have three retained experts who were hired to rebut Dr. Lubit's report.   Instead, they offer the *unqualified* conclusions of the lawyers in a misleading criticism of Dr. Lubit's opinion about PTSD, which is based on a well-established medical diagnosis. And in doing so, the lawyers raise at best exceedingly weak arguments about the weight, not the admissibility, of the diagnosis.

The motion in limine, therefore, cannot be granted.  Expert testimony is governed by Rule 702 of the Federal Rules of Evidence and by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  In *Daubert,* the Supreme Court

held that Rule 702 had replaced the former standard for admission of expert witness testimony with a "flexible" inquiry that focuses on whether the proffered expert testimony is both relevant and reliable. *Daubert,* 509 U.S. at 589 & 594-95.  In undertaking this flexible inquiry, a trial court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the trial court's belief as to the correctness of those conclusions. *Amorgianos v. Amtrak*, 303 F.3d 256, 265-268 (2d Cir 2002).  The flexible *Daubert* inquiry gives the trial court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. *Id.*

The Medical Defendants do not satisfy that standard.  Rule 702 mandates a liberal standard for the admissibility of expert testimony, *Daubert,* 509 U.S. at 588, thus "reinforcing the idea that there should be a presumption of admissibility" of expert testimony.  *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir. 1995).  As the Advisory Committee to the 2000 amendments to Rule 702 noted "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."

In many cases, "'the relevant reliability concerns may focus upon personal knowledge or experience." *Katt v City of New York*, 151 F. Supp. 2d 313, 353 (S.D.N.Y.  2001) (*quoting Kumho Tire Co*., 526 U.S. at 150)).  Accordingly,

"vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

Lacking any principled criticism of Dr. Lubit's analysis, the Medical Defendants employ distortion by misrepresenting the record on Dr. Lubit's time and work in connection with the preparation of his report and his conclusions about Officer Schoolcraft. A more correct understanding of the facts demonstrates that Dr. Lubit's work was extensive:

- Dr. Lubit reviewed Officer Schoolcraft's deposition; conducted one long interview of Officer Schoolcraft lasting at least and hour and a half; and had follow-up discussions with Officer Schoolcraft. (Lubit Report at p. 2; Lubit Deposition Transcript ("Tr.") at pp. 8-10, 221, 305-06, & 323; attached as Exhibits 1 & 2.) The very detailed notes of his interview and assessment of Officer Schoolcraft are set forth in his report. (Lubit Report at pp. 3-6; Exh.1.)

- Dr. Lubit reviewed the depositions of Doctors Bernier, Isakov, Patel and Dhar. (Report at p. 2; Exh 1.)

- Dr. Lubit reviewed the relevant medical records, including the Jamaica Hospital chart; the 2002 psychological evaluation of Officer Schoolcraft when he joined the NYPD; Dr. Lamstein's records on Officer

Schoolcraft; and the relevant sections of Jamaica Hospital's policy and procedure manual.  (Lubit Report at p. 2; Exh. 1.)

- Before his deposition, he also reviewed portions of Dr. Lamstein's deposition; the relevant portions of the Diagnostic and Statistical Manual ("DSM"); and the relevant Mental Hygiene Law provision, Mental Hygiene Law § 9.39. (Lubit Tr. 8-9; Exh. 2.)

- By the time of his deposition, Dr. Lubit had spent about 60 hours in total on the matter.  (Lubit Tr. 14.)

If this level of work and analysis is insufficient to render a psychiatric opinion or diagnosis of Officer Schoolcraft, then such a judicial finding in this case must have preclusive consequences for the Medical Defendants, who spend only a tiny fraction of that time in rendering their opinions of Officer Schoolcraft.  Dr. Lwin, the four-month resident who conducted the initial psychiatric consultation of Officer Schoolcraft, spent 30 to 60 minutes (*according to Dr. Lwin*[1]) interviewing Officer Schoolcraft and Sergeant James.  (Lwin Tr. 33-34; Exh. 3.)  That consultation then became the primary basis upon which Dr. Bernier made her decision to involuntarily commit Officer Schoolcraft.  (Bernier Tr. 87-96 & 190-193; Exh. 4) (relying on Dr. Lwin's report in making her decision).

---

[1] Other estimates of the time are "no more than ten minutes."  (*See* Lubit Tr. 125:17.)

If Dr. Lubit's far more extensive work is insufficient to form an opinion, then the 30-minute consult by a four-month resident surely cannot constitute the *clear and convincing* evidence that the Medical Defendants *must present* in order to establish the justification under Section 9.39 of the Mental Hygiene Law.  *Boggs v. New York City Health and Hosps. Corp.,* 70 N.Y.2d 972, 973 (1988) ("The only legal issue presented is whether the City established by clear and convincing evidence that petitioner … has a mental illness and is a danger to herself or others); *Francis v. Stone*, 221 F. 3d 100, 101 (2d Cir. 2000) ("Involuntary civil commitment procedures mandate numerous protections, including a requirement that the party proposing confinement must prove by clear and convincing evidence that the person is mentally ill and poses a danger to himself or others").

The Medical Defendants also suggest that Dr. Lubit's opinion is inadmissible because he did not administer tests that other doctors used in other cases involving PTSD.   Nothing in those cases holds that the diagnostic methods used in those cases are the *only* tests that can be used to diagnosis PTSD or that there is some precise litany that must be followed for a PTSD diagnosis.  Thus, the Medical Defendants' reliance on *Discepolo v. Gorgone,* 399 F. Supp. 2d 123 (D. Conn. 2005), is inapposite.

In *Discepolo,* the defendant sought to exclude expert testimony that plaintiff suffered from PTSD that was causally connected to sexual abuse when the plaintiff was a small child.  The expert in that case administered three psychological tests in

addition to reviewing records, and deposition transcripts of the plaintiff. While the *Discepolo* court found that the expert's methodology was reliable under *Daubert*, it did *not* hold that a departure from those stated methods would mean the testing was unreliable. In fact, the *Discepolo* court's only offered guidance on admissible methods for diagnosing PTSD was that that "reliability of the diagnosis is *bolstered* when" the methods stated above are undertaken. *Discepolo v. Gorgone*, 399 F Supp 2d 123, 125 (D. Conn 2005) (emphasis added).

Similarly, *Shea v. Long Island Railroad*, 2009 U. S. Dist. Lexis 43748 (S.D.N.Y. May 21, 2009) does not support the motion. There, a psychologist administered various test to the plaintiff, and the plaintiff sought to exclude the psychologist's interpretation of those test. The court denied the motion, finding no basis for excluding the expert's opinion because there was no reason to believe it was unreliable or different materially from the approach of others in the expert's field. *Id.* at *13.

Thus, the argument by the attorneys for the Medical Defendants that he tests discussed in *Discepolo* and *Shea* are the only methods for a PTSD analysis must be rejected. Indeed, when the attorneys for the Medical Defendants *asked* Dr. Lubit about those tests at his deposition, he told them that typically psychiatrists do *not* administer those tests. (Lubit Tr. 199:19-25).[2]

---

[2] PTSD may be demonstrated without diagnostic testing by symptoms objectively

The suggestion by the lawyers for the Medical Defendants that these tests are required by generally accepted practice, therefore, lacks any foundation in fact. Indeed, *none* of the three defense experts hired by the Medical Defendants to submit a rebuttal report to Dr. Lubit's report made any suggestion that Dr. Lubit's diagnosis lacks a foundation in accepted psychiatric practices.  (*See* Exhs. 5, 6 & 7; Reports of Drs. Levy, Dowling and Trancredi.)  *Cf. Krivit v Pitula*, 79 A.D. 3d 1432, 1434-1435 (3rd Dept. 2010) (defendants' expert neither opined that diagnostic tests are relied upon in diagnosing PTSD nor indicated that any such testing would be useful in doing so).

Rather than criticize the conclusion reached by Dr. Lubit that Officer Schoolcraft was currently suffering from PTSD, Jamaica Hospital's expert, Dr. Levy, embraced it:

> The patient's current emotional condition is likely to be referable to the larger picture of his perceived victimization by the police department with the hospitalization playing a relatively small role, especially because this hospitalization concluded with an acknowledgement of the veracity of his statements. His difficulty finding work is also likely to be largely the result of this larger picture and is unfortunately consistent with the difficulties faced by many whistleblowers.

Exh. 5; Dr. Levy Report at p. 7.)

---

observed by treating physicians and established by the testimony of the injured plaintiff and others who observe the plaintiff.  *Hill v Cash*, 117 A.D. 3d 1423, 1425 (4th Dept. 2014); *Krivit v Pitula*, 79 A.D. 3d 1432 (3rd Dept. 2010); *Chapman v. Capoccia,* 283 A.D. 2d 798, 799-800 (2d Dept. 2001).

The Medical Defendants also play a semantic game in their motion in a confused attempt to challenge Dr. Lubit's opinions.  Dr. Lubit testified that based on his examination of Officer Schoolcraft, he was suffering from the PTSD symptoms set forth in the Diagnostic and Statistical Manual of Mental Disorders (the "DSM"). (Lubit Tr. 197-199 & 206 & 382).  The DSM is an established tool for psychiatric diagnosis, and PTSD has been included in the DSM for over thirty years.[3]  The relevant section is attached as Exhibit 8.

Although Dr. Lubit testified that "as of" October 31, 2009, Officer Schoolcraft did not have PTSD, that conclusion was *not* because the events before that day were irrelevant to Officer Schoolcraft's mental health.  Instead, as Dr. Lubit explained, the PTSD diagnosis by definition requires that the person suffer from a traumatic event and that the symptoms persist for at least one month.  (Lubit Tr. 206, 309, 383 & 388; DSM at p. 468 (§ 309.81(E)).  Thus, Officer Schoolcraft's stress from the job before October 31, 2009 could cause acute stress, but not PTSD.  (*Id*.)

Moreover, Dr. Lubit testified that the events at Jamaica Hospital *worsened* Officer Schoolcraft's mental condition.  (*Id*. at 383.)  Far from helping him, the events at Jamaica Hospital intensified what happened to Officer Schoolcraft that night.  (*Id*.

---

[3] *See generally* Matthew J. Friedman, U.S. Dep't of Veteran Affairs, Posttraumatic Stress Disorder: An Overview, http://www.ptsd.va.gov/professional/pages/ptsd-overview.asp (noting that PTSD was added to the Diagnostic and Statistical Manual of Mental Disorders (DSM-III) in 1980).

at 566.)  Indeed, Dr. Lubit testified that "it is well know that when a bad situation and traumatic incident continues for a period and the person  . . . continues to have any difficult circumstances after a trauma, that is very negative for their recovery. . . . How the person is supported and treated after a trauma is likely as important as the intensity of the trauma itself in determining with the person will have Post Traumatic Stress Disorder."  (*Id*. at 567-68.)  And Jamaica Hospital was not a safe, benign or supportive environment; it was "the place he was being held against his will."  (*Id*. at 569.)

The Medical Defendants finally suggest that Officer Schoolcraft's deposition testimony somehow renders Dr. Lubit's opinion unreliable.  Based on very general and the vague questions put to Officer Schoolcraft at his deposition about his "injuries" and "damages" and the "consequences" of being committed, the Medical Defendants suggest that the symptoms reported to Dr. Lubit were created only for the purpose of this case.  Notably, however, the Medical Defendants never asked Officer Schoolcraft at his deposition the *specific* questions that are relevant to the PTSD diagnosis and were noted by Dr. Lubit as present, including intrusive and recurring memories of the event; efforts to avoid associations with the trauma; detachment; irritability; difficulty concentrating and exaggerated startle response.  (Lubit Tr. 198, 306-07, 384-88; DSM 309.81 (B)-(D).   Moreover, the Medical Defendants ignore the fact that Officer Schoolcraft *did* testify at his deposition about the emotional impact of

the events on him but that he is not a doctor and was not able to discuss diagnostic

symptoms:

> Q. Are you claiming any emotional injuries as a result of the incident?
> A. Yes.
> Q. What emotional injuries are you claiming as a result of the incident?
> A. I am not a doctor, I don't know what diagnosis. But I certainly feel different now than I did before October 31, 2009 and that entire week after. It's -- I don't feel as safe going outside. I feel safer at home until people come banging on my door, making me believe they are going to come in and haul me off again. I am not a doctor, I don't know -- I doubt there is a diagnosis. But there is certainly a difference between now and before October 31, 2009.
> Q. What symptoms do you feel as a result of these emotional injuries, aside from not feeling as safe, as you did before?
> MR. NORINSBERG: Objection.
> A. I am not a doctor, I don't know how to—I probably don't have all the terminology for diagnoses, and symptoms. I don't know; I definitely feel different.
> Q. How do you feel different?
> A. I feel more afraid leaving my home -- I feel safer at home, less guarded, less nervous, less stressful.

(Schoolcraft Tr. 233-234; Exh. 9.)

Under these circumstances, the arguments by the Medical Defendants only raise

weak arguments about the weight, not the admissibility of, Dr. Lubit's opinion.  *See,*

*e.g.*, *Bachir v. Transoceanic Cable Ship Co.,* 2002 U.S. Dist. Lexis 4340 at * 25

(S.D.N.Y. 2002) (motion in limine to exclude expert testimony on PTSD properly

denied because the challenge went to the expert's weight and credibility and any

shortcoming can be raised during cross-examination); *see also Katt v. City of New*

*York*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001) (defendants' challenges fail because

they tend to impugn the expert's skill and knowledge, thereby going to the weight and credibility, not the admissibility, of his testimony; shortcomings are grist for cross-examination, not exclusion under FRE 702) (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("[defendant's] quibble with [expert's] academic training . . . and his other alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility -- not its admissibility")).

Simply put, any gaps or inconsistencies in an expert's reasoning go to the weight of the expert evidence, not its admissibility. *See, e.g., Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2nd Cir.2001).

*Evidence on the Declaratory Judgment Claim is Admissible.*

The Medical Defendants argue in their "motion in limine" that any evidence relating to the declaratory judgment claim should be excluded on the ground that the only remaining claims in the case are state law claims over which the Court has supplemental jurisdiction.  The argument is procedurally and substantively flawed.

First, the argument against the claim for declaratory judgment is not properly a motion in limine to exclude evidence but a motion to dismiss or a motion for summary judgment on a legal claim for relief.  As such, the motion should be denied because the Medical Defendants have already had two opportunities to challenge the request for declaratory judgment relief.

First, they could have raised the issue in opposition to the plaintiff's request for leave to amend the Second Amended Complaint.  Second, they could have raised the issue on the Medical Defendant's motion for summary judgment, which sought dismissal of the declaratory judgment claim for relief on the ground that it did not apply to them.   Thus, this "in limine" motion is merely a second and belated summary judgment motion on a new ground, which is improper.   *See, e.g., NIC Holdings Corp. v. Lukoil,* 2009 U. S. Dist. Lexis 32580 at * 5 (S.D.N.Y.  April 14, 2009) (denying motion in limine seeking to exclude evidence of damages on the ground that the issue was in substance previously address on a prior motion for summary judgment)(citing *Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, 1998 U.S. Dist. LEXIS 15093, 1998 WL 665138, at *10 (S.D.N.Y. Sept. 25, 1998) (denying motion in limine where plaintiff's arguments regarding defendant's lost profits were "largely re-hashes of arguments made in its earlier summary judgment motion and rejected . . . because of fact disputes."); *U.S. Underwriters Ins. Co. v. Falcon Constr. Corp.*, 2006 U.S. Dist. LEXIS 79329, 2006 WL 3146422, at *2-3 (S.D.N.Y. Oct. 30, 2006) (denying motion in limine where party's argument was "an improper attempt to relitigate an issue that [the court] previously decided in her opinion denying [defendant's] prior motion for summary judgment"); *Rattigan v. Commodore Int'l Ltd*., 1989 U.S. Dist. LEXIS 14645, 1989 WL 151678, at *5 (S.D.N.Y. Dec. 8, 1989) (noting that plaintiff "has filed motion for summary judgment in the guise of a motion

in limine" despite the court's "previous denial of summary judgment motions to dismiss defendant's counterclaims" and denying request to preclude evidence based on defendant's failure to state a claim); *see also Hein v. Cuprum, S.A.*, 2002 WL 34453309 at *1 (S.D.N.Y. Jan. 23, 2002) (denying motions in limine concerning expert witness where defendant had pressed the same arguments in a prior summary judgment motion)).

Second, the motion is substantively meritless because it is predicated on a fundamental misunderstanding of the law governing the Court's subject matter jurisdiction. When this action was filed, the Court's subject matter jurisdiction was based on federal question jurisdiction because the Complaint asserted federal claims based on the First and Fourth Amendments to the Constitution. The Court also had supplemental jurisdiction over the state law claims pursuant to 28 U. S. C. § 1367.

The fact that the plaintiff has accepted the City Defendants' Offer of Judgment does not destroy the Court's subject matter jurisdiction, which even survives the entry of a final judgment and persists for appeal purposes and supplemental enforcement proceedings. Long ago the Supreme Court in *Bell v. Hood*, 327 U. S. 678, 682 (1946) held that subject matter jurisdiction is not defeated by the possibility that the claim may not state a claim and that the existence of subject matter jurisdiction was determined based on the nature of the claim as pleaded. *Accord Duke Power Co. v. Carolina Env. Study Group*, 438 U. S. 59, 69 (1978).

Thus, whether a District Court has subject matter jurisdiction is based on the well-pleaded complaint rule, which looks at the pleading to determine whether a federal question has been raised, not subsequent proceedings in the case. *Metro. Life Ins. v. Taylor,* 481 U. S. 58, 63 (1987).  Accordingly, determinations during the course of the litigation are irrelevant to the initial subject matter jurisdiction issue.

The Medical Defendants also suggest that Officer Schoolcraft lacks standing to assert a claim for declaratory judgment or that the claims for damages is duplicative of his claims for damages.  The Medical Defendants are wrong.  As a matter of federal law, once the Medical Defendants labeled Officer Schoolcraft a dangerous and mentally ill person who needed to be involuntarily hospitalized, he lost the important constitutional right to possess a firearm, a right having particular relevance to any law enforcement officer.

Pursuant to 18 U. S. C. § 922(g)(8), it is a crime for any person who has been committed to a mental institution to possess a firearm, and individuals involuntarily committed under the Mental Hygiene Law fall within the scope of the statutory ban and are subject to criminal prosecution.  *See United States v. Waters,* 23 F. 3d 29 (2d Cir. 1994) (affirming gun possession conviction of person committed under Section 9.41 of the New York Mental Hygiene Law).

Under these circumstances and to redress the loss of these rights, Officer Schoolcraft requests in his Third Amended Complaint (at ¶ 373(C); Dkt. # 341) that

the Court enter a declaratory judgment in his favor, finding that the Medical

Defendants' involuntary commitment of him in the Jamaica Hospital psychiatric ward

was improper and that he is entitled to expungement of those medical records.  Settled

law recognizes that expungement is an appropriate equitable remedy to correct an

improper involuntary commitment decision.  *See Rodriguez v. City of New York,* 72

F.3d 1051, 1065-66 (2d Cir. 1995); *Pastorello v. City of New York*, 2001 U.S. Dist.

LEXIS 19919, *42-43, 2001 WL 1543808 (S.D.N.Y. Nov. 30, 2001) (allowing claim

for equitable remedy of expungement to proceed on the basis that "[h]ospital

personnel's wrongful treatment of plaintiff generated written medical records about

plaintiff which are false, defamatory and embarrassing.").

Indeed, the remedy of expungement is a part of federal equity law, and "[a]s a

result, even when addressing state law claims, federal courts may always utilize

federal equity rules."  *Demarco v. Sadiker,* 952 F. Supp. 134, 142-43 (E.D.N.Y.

1996); *see Carey v. Piphus*, 435 U.S. 247, 259 (1978) (federal courts are capable of to

tailoring remedies to the injury involved).    Even though the remedy may not

available under New York law, this Court has the equitable power to grant that relief.

*Demarco*, 952 F. Supp. 2d at 142-43.

*Specific Dollars Amounts Are Important For the Jury*

Plaintiff should be allowed to recommend a dollar amount to the jury in his

summation. In his papers, the Medical Defendants suggests that specific dollar

amounts unlawfully anchor the jurors' expectations of a fair award at a place set by

counsel.   However, multiple district courts have rejected this same argument. *See,*

*e.g., Edwards v. City of New York*, 2011 U.S. Dist. LEXIS 75300 (E.D.N.Y. July 13,

2011). In *Edwards*, the Court stated as follows:

> Defendant asserts that plaintiff should be precluded from suggesting a
> specific dollar amount of damages to the jury. Although the Second
> Circuit has stated in the context of monetary awards for pain and
> suffering that "specifying target amounts for the jury to award is
> disfavored," *Consorti v. Armstrong World Industries, Inc.,* 72 F.3d 1003,
> 1016 (2d Cir. 1995), the Second Circuit has also stated that "it is best left
> to the discretion of the trial judge, who may either prohibit counsel from
> mentioning specific figures or impose reasonable limitations, including
> cautionary jury instructions." *Lightfoot v. Union Carbide Corp.,* 110 F.3d
> 898, 912 (2d Cir. 1997). Plaintiff's counsel will [thus] be permitted to
> suggest a specific dollar amount in his closing statement, but must do so
> in the first argument in order for defense counsel to respond if he chooses
> to do so, before plaintiff's counsel makes his final argument. The Court
> will instruct the jury, as it always does, that statements by lawyers are not
> evidence or the law that they are to follow when they begin their
> deliberations.

*Edwards*, 2011 U.S. Dist. Lexis at *5-6.

The Second Circuit affords wide discretion to trial courts to determine whether

or not such recommendations are appropriate.  *See Saladino v. Stewart & Stevenson*

*Services, Inc*., 2011 U.S. Dist. LEXIS 7566 at *25 (E.D.N.Y 2011). ("Indeed, the

Second Circuit has committed the decision to the discretion of the trial judge, who

may either prohibit counsel from mentioning specific figures or impose reasonable

limitations, including cautionary jury instructions." ) (internal citations omitted).

Courts in this District have previously held that recommending a specific

dollar amount to the jury does not unfairly influence the jury. *See Thomas v. Kelly*, 903 F. Supp.2d 237, 265 (S.D.N.Y. 2012) ("The Court also rejects the defendants' argument that the suggestion by plaintiff's counsel in his closing argument that the jury should award Thomas a specific dollar amount resulted in an excessive award. As the Court just determined, the jury's award was adequately supported by the record."). *See also Thomas v. Medco*, 1998 WL 542321 (S.D.N.Y. Aug. 26, 1998)("we also conclude that the suggestion by plaintiff's attorney that [plaintiff] be remunerated in the sum of $300,000 for her emotional injuries did not unfairly influence the jury… [t]he Circuit has not…ruled that it is an error to permit such recommendations.")

Further, the Court can, at its discretion, carefully craft a jury instruction to alleviate any potential prejudice to defendant.  In *Kelly*, the court gave a similar instruction: "To cure any potential prejudice, the Court reminded the jury that "[w]hat the lawyers have said the evidence shows in their opening statements, objections or questions, or have said in their closing arguments, is not evidence."" (*Id.* at 265). Therefore plaintiff respectfully requests that the Court allow him to propose a dollar figure to the jury, along with a jury instruction will eliminate any potential prejudice.

In the alternative, if the Court does grant this motion, we request that the Court also limit in limine the Medical Defendants from making any reference at trial to any specific demands for damages.

*The Court Has No Authority to "Compel" the Plaintiff to "Make" His Father Available for Trial and The Request For A Missing Witness Charge Is Premature.*

The Medical Defendants request an order directing the plaintiff to compel his father to appear as a witness at trial, or in the alternative, giving the jury a missing witness instruction.  The request for an order to compel must be denied because there is no authority for an order to compel a non-party to appear other than the authority based on the subpoena powers of Rule 45 of the Federal Rules of Civil Procedure, and the Medical Defendants have not presented the Court with any justification for this unprecedented request.

The Medical Defendants took the father's deposition and can use the deposition at trial, provided that the required foundation for the use of a deposition at trial has been established.  Fed. Rule Civ. Pro. 32(a)(4); Fed. Rule Evid. 804(b).  Since the father lives beyond the Court's subpoena range and since the father is currently very sick with osteomilitis in his foot and ulcer in his foot, his ability to travel is very limited and it may be medically impossible or ill advised for him to travel at the time of trial.

In the light of the resolution of the action against the NYPD, however, we also note that there does not even appear to be any significant reason for the father to testify.   Although the Medical Defendants claim in their motion that the father has knowledge about many of the events relevant to the case, they fail to point to any

specific evidence that they need from him.   Indeed, the defendants indicated in the

Joint Pre-Trial Order that they wanted to use the father's deposition at trial, but have

continued to fail to provide the plaintiff with any designations from the deposition,

notwithstanding the plaintiff's demands and objections for such designations.   (JPTO

at p. 19-20; Dkt. # 477.1.)

Thus, it appears that the Medical Defendants want to have the father appear at

trial for improper purposes, such as the claim that the father is litigious or a "racist" or

owned the rifle later found at the plaintiff's apartment.  (*See* Plaintiff's Motion In

Limine at pp. 3-9; Dkt. # 492.)  Absent any proffer by the Medical Defendants about

the specific reasons for their extraordinary request, the Court should deny the motion.

The request for a missing witness charge should also be denied as premature.

While the Medical Defendants are certainly entitled to submit to the Court a proposed

jury charge on the issue, the Court cannot and should not make any final

determination until (and unless) a proper foundation for such a charge has been

established at trial.

Generally, a missing witness charge requires evidence that the witness is in the

control of a party, that the party's absence has not been sufficiently explained, and that

the witness is likely to have important information.  Yet as noted above, the Medical

Defendants have failed to make the required showing and the father's poor health may

make such a charge inappropriate.  Thus, the motion should be denied at this point as premature.

CONCLUSION

For these reasons, the motions in limine by the Medical Defendants should be denied.

Dated:  October 12, 2015                     *s/NBS*

                                             _____
                                             Nathaniel B. Smith
                                             John Lenoir
                                             100 Wall Street – 23rd Floor
                                             New York, New York 10005
                                             212-227-7062
                                             natbsmith@gmail.com

                                             Law Offices Of Jon L. Norinsberg
                                             225 Broadway, Suite 2700
                                             New York, New York 10007
                                             (212) 791-5396

                                             Cohen & Fitch, LLP
                                             Gerald Cohen
                                             Joshua Fitch
                                             225 Broadway, Suite 2700
                                             New York, New York 10007
                                             (212) 374-9115

LIST OF EXHIBITS

1. Dr. Lubit's Report
2. Dr. Lubit's Deposition Excerpts
3. Dr. Lwin's Deposition Excerpts
4. Dr. Bernier's Deposition Excerpts
5. Dr. Levy's Report
6. Dr. Dowling's Report
7. Dr. Trancredi's Report
8. Diagnostic and Statistical Maunal – PTSD Excerpt
9. Schoolcraft Deposition Excerpt