1

ORIGINAL

1

2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
3    ------------------------------------------X
     ADRIAN SCHOOLCRAFT,
4
                                   PLAINTIFF,
5
                   -against-        Case No:
6                                   10-CIV-6005

7    THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL
     MARINO, Tax id. 873220, Individually and in
8    his official capacity, ASSISTANT CHIEF
     PATROL BOROUGH BROOKLYN NORTH GERALD
9    NELSON, Tax id. 912370, Individually and in
     his Official Capacity, DEPUTY INSPECTOR
10   STEVEN MAURIELLO, Tax Id. 895117,
     Individually and in his official Capacity,
11   CAPTAIN THEODORE LAUTERBORN, Tax Id.
     897840, Individually and in his Official
12   Capacity, LIEUTENANT JOSEPH GEOFF, Tax Id.
     894025, Individually and in his Official
13   Capacity, Sgt. Frederick Sawyer, Shield No.
     2576, Individually and in his Official
14   Capacity, SERGEANT KURT DUNCAN, Shield No.
     2483, Individually and in his Official
15   Capacity, LIEUTENANT TIMOTHY CAUGHEY, Tax
     Id. 885374, Individually and in his
16   Official Capacity, SERGEANT SHANTEL JAMES,
     Shield No. 3004, and P.O.'s "JOHN DOE"
17   1-50, Individually and in their Official
     Capacity (the name John Doe being
18   fictitious, as the true names are presently
     unknown) (collectively referred to as "NYPD
19   defendants")
     ------------------------------------------X
20

21                      Date:  September 23, 2014

22                      Time:  9:24 A.M.

23

24

25   (DEPOSITION OF ROY LUBIT, M.D., Ph.D.)

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

1

1

2       F E D E R A L   S T I P U L A T I O N S

3

4       IT IS HEREBY STIPULATED AND AGREED by and

5       between the counsel for the respective

6       parties herein that the sealing, filing and

7       certification of the within deposition be

8       waived; that the original of the deposition

9       may be signed and sworn to by the witness

10      before anyone authorized to administer an

11      oath, with the same effect as if signed

12      before a Judge of the Court; that an

13      unsigned copy of the deposition may be used

14      with the same force and effect as if signed

15      by the witness, 30 days after service of

16      the original & 1 copy of same upon counsel

17      for the witness.

18

19      IT IS FURTHER STIPULATED AND AGREED that

20      all objections except as to form, are

21      reserved to the time of trial.

22

23              *       *       *       *

24

25

```
 1              R. LUBIT, M.D., Ph.D.
 2    R O Y   L U B I T, called as a witness,
 3    having been first duly affirmed by a Notary
 4    Public of the State of New York, was
 5    examined and testified as follows:
 6    EXAMINATION BY:
 7    MR. RADOMISLI:
 8         Q.    Please state your name for the
 9    record.
10         A.    Roy Lubit.
11         Q.    What is your address?
12         A.    165 west End Avenue, 3K, New
13    York 10023.
14         Q.    Did you bring any materials you
15    with related to your --
16               MR. SMITH:  We're reserving the
17               right to read and sign the
18               transcript.
19         A.    I have a copy of my report.
20         Q.    Did you bring anything else
21    with you?
22         A.    Unless I accidently grabbed
23    other papers, no.
24         Q.    Do you have a file regarding
25    this case at your office or home somewhere?
```

```
 1                    R. LUBIT, M.D., Ph.D.

 2          A.    Yes.

 3          Q.    And what's in that file?

 4          A.    Transcripts of various

 5    depositions. I'm not -- I don't remember

 6    very well what I printed out, put on paper

 7    and kept electronically, so I can't tell

 8    you exactly which depositions, which papers

 9    I have electronically and which ones I have

10    in paper form.

11          Q.    Well, if you look at your

12    report now --

13              MR. RADOMISLI: Why don't we

14          have this Expert Disclosure marked as

15          Exhibit A?

16              (Whereupon, the aforementioned

17          document entitled Plaintiff's Expert

18          Disclosures dated August 11, 2014 was

19          marked as Defendants' Exhibit A for

20          identification as of this date by the

21          Reporter.)

22              MR. RADOMISLI:  Off the record.

23              (Whereupon, an off-the-record

24          discussion was held.)

25              MR. SMITH:  So Exhibit A is a
```

```
 1              R. LUBIT, M.D., Ph.D.
 2          document entitled Plaintiff's Expert
 3          Disclosures dated August 11, 2014,
 4          and one of the Exhibits to that is
 5          for Dr. Lubit, dated August 112014,
 6          which the witness has in front of
 7          him.
 8       Q.    If you could turn to page 2,
 9   under it says Sources of Information?
10       A.    Yes.
11       Q.    Do you have anything in your
12   file or did you look at anything in
13   relation to this case other than what's
14   listed under Sources of Information?
15              MR. SMITH:  As of what time?
16       Q.    As of today.
17       A.    I read through about half of
18   Dr. Lamstein's deposition. I wasn't able to
19   get through all of it, because I only got
20   it recently.
21       Q.    Anything else?
22       A.    I don't think so.
23       Q.    Any literature?
24       A.    I've looked over DSM-IV to
25   bring myself back up to speed on exactly
```

```
1                  R. LUBIT, M.D., Ph.D.
2     write down CT scan rather than asking a few
3     questions is not good medical practice.
4     It's sort of like saying, you know, is it
5     better to slap a child than to let him run
6     across the road? That doesn't give license
7     to hit the kid, a four-year-old, with a
8     stick until he's bleeding.
9              Q.    Look at page 5 of your report.
10    Can you look at the -- I don't know if
11    that's the first full paragraph?
12             MR. SMITH:   Yes.
13        A.   Yes.
14             MR. SMITH:   "He was brought"?
15        Q.    The third -- second sentence
16    says: "Mr. Schoolcraft then saw Dr. Lwin,
17    who spoke to him for no more than ten
18    minutes." Do you see that?
19        A.   Yes.
20        Q.    What is the basis for your
21    statement that they did not speak for more
22    than ten minutes?
23        A.    Mr. Schoolcraft's recollection.
24        Q.    Based on your interview with
25    him?
```

```
 1              R. LUBIT, M.D., Ph.D.
 2    disorder as a result of the events of
 3    October 31 through his discharge?
 4              MR. SMITH:  I'll object to the
 5        form of the question.
 6        A.    How? It was by assessing the
 7    presence of these symptoms, which fulfilled
 8    the diagnostic criteria, that he met the
 9    criteria as stated in DSM-IV and DSM-V.
10        Q.    Now, based on your report what
11    alternatives did you consider to explain
12    Plaintiff's symptoms?
13        A.    Well, I mean, if he hadn't met
14    the full criteria one could then diagnose
15    adjustments reaction. There's always the
16    possibility of malingering, but, you know,
17    there's always the possibility of anxiety
18    disorder, but when you meet the criteria
19    that tells you that that's the appropriate
20    diagnosis.
21        Q.    My question wasn't clear,
22    that's my fault. What alternative causes
23    did you consider to explain his post --
24    what you perceive to be his posttraumatic
25    stress disorder other than the events of
```

```
 1                 R. LUBIT, M.D., Ph.D.
 2      October 31 and following?
 3                 MR. SMITH:  Objection to the
 4          form.
 5          A.     There were no other events that
 6      would have met the criteria. You need to
 7      have an incident in which the person
 8      experiences great fear, horror or dread,
 9      which they're placed in severe jeopardy or
10      suffer sexual assault. I'm not aware of --
11      and that the symptoms begin with that. I'm
12      not aware of another event that would
13      fulfill those criteria and that led to
14      these symptoms.
15                 He has taken actions to avoid
16      exposure to traumatic triggers, and he
17      avoids New York, and he is uncomfortable
18      with the police. He thinks about the event
19      frequently.  He's got hyperarousal
20      symptoms, numbing. There isn't any other
21      event that I'm aware of that in any way
22      sort of fit these symptoms. He's, you know,
23      if he was bitten by a dog, you know, it's
24      not going -- he's not suffering -- let's
25      say he was bitten by a dog. That's
```

```
 1                R. LUBIT, M.D., Ph.D.
 2    certainly not the cause of it, because he's
 3    scared of the police in New York City, he's
 4    not scared of dogs.
 5         Q.    Did you engage in a
 6    differential diagnosis?
 7         A.    Yes, to the extent possible.
 8    You know, you see someone's stressed and
 9    well, maybe he's PTSD, maybe it's
10    depression, maybe it's anxiety disorder,
11    maybe it's adjustments reaction, maybe it's
12    malingering, but once he meets the
13    diagnostic criteria for PTSD, and if you
14    don't think it's malingering, then it's
15    that.
16         Q.    Did you administer a Life
17    Stressor Checklist?
18         A.    No.
19         Q.    Did you administer a Life
20    Experience Survey?
21         A.    I talked with him about
22    stresses in his life, but I did not give
23    him an -- it's not my style or the style
24    of -- in general of psychiatrists to give
25    those surveys.
```

1                R. LUBIT, M.D., Ph.D.

2       Q.    Did you administer the -- so

3  the answer's "No"?

4       A.    No, I did not.

5       Q.    Did you administer the Critical

6  Incident History Questionnaire?

7       A.    No.

8       Q.    Did you administer the Work

9  Environment Inventory?

10      A.    No. I did not, I did not have

11  him do any inventories.

12      Q.    Did you administer the Impact

13  of Event Scale?

14      A.    No, I did not.

15      Q.    Is there anywhere in your

16  report where you discuss potential

17  alternative causes for your diagnosis as to

18  cause potential alternative causes to

19  explain Plaintiff's symptoms?

20      A.    He fits -- there is nothing

21  else which fits the criteria. And even if

22  there was something, then he would be

23  diagnosed with both of them.

24      Q.    Do you consider that he might

25  be experiencing posttraumatic stress

```
 1              R. LUBIT, M.D., Ph.D.
 2    disorder because of his job stress that he
 3    had experienced in the past?
 4         A.    I certainly considered that,
 5    but I'm not aware of that being a
 6    reasonable explanation given the timing,
 7    and given the fact there was nothing else
 8    that was severely threatening, and given
 9    the fact that we said "Well, he got into a
10    gun fight with somebody, with a perp.  But
11    he's not scared of perps, he's scared of --
12    he's worried about his bosses and being
13    seen by his bosses and the people who drove
14    up to his area to in what appears to be
15    attempts at harassment.
16         Q.    So there are stressors as a
17    result of his working environment, correct?
18         A.    There were, but he also
19    hadn't -- yeah, there have been stresses,
20    yes.
21         Q.    And that would be like
22    unsuitable partners, in his opinion --
23              MR. SMITH:  Objection to form.
24         Q.    -- correct?
25         A.    That could be a stress, but
```

```
 1                    R. LUBIT, M.D., Ph.D.
 2      that's not causing PTSD.
 3            Q.    Or inequitable, his perception
 4      of in equitable workload, correct?
 5            A.    That's a stress, but it
 6      doesn't -- that doesn't create PTSD.
 7            Q.    Or supervision like, lack of
 8      feedback or unequal feedback, correct?
 9            A.    That's a stress, but it doesn't
10      cause PTSD.
11            Q.    Lack of recognition or
12      excessive paperwork?
13            A.    That's a stressor, but it
14      doesn't lead to PTSD.
15            Q.    So then do you agree that
16      research into PTSD has found that routine
17      work environment stressors may play an
18      important role in the development and
19      maintenance of psychological distress in
20      police officers; do you agree with that
21      statement?
22            A.    It can, but he hasn't been
23      working as a police officer since that
24      time, and so it's not, it's not being
25      maintained by his continuing to be in a
```

1                      R. LUBIT, M.D., Ph.D.

2        stressful environment.

3            Q.    Okay.  But you said it has

4        nothing -- withdrawn.

5                  Are you aware that there's one

6        study that found that the most highly

7        ranked stressors among police were not

8        related to critical incidents defined as

9        potentially traumatic events, which may

10       cause an individual's emotional resources

11       to be overdiagnosed, but rather to concerns

12       with the work environment, including a lack

13       of consultation and communication, lack of

14       control over workload, inadequate support,

15       and in general excessive workload, are you

16       aware of such study?

17                  MR. SMITH:  Objection to form.

18           A.    I'm not aware of the particular

19       study. May I see it?

20           Q.    I'm just asking if you're aware

21       of --

22           A.    What the name of --

23           Q.    Something by Collins & Gibbs,

24       2003.

25           A.    May I see it?

```
 1              R. LUBIT, M.D., Ph.D.
 2         Q.    No. I'm asking if you're aware
 3    of it sitting here today.
 4         A.    I don't recall the study.
 5         Q.    Are you aware of another study
 6    that found that work environment factors
 7    such as dissatisfaction with organizational
 8    support predicted PTSD symptoms in police
 9    officers?
10         A.    Can I refresh my recollection
11    by taking a look at the study?
12         Q.    Just sitting here today?
13         A.    Can I see the study to refresh
14    my recollection whether I've seen it or
15    not?
16         Q.    Are you aware that another
17    study --
18         A.    Is that a "No"?
19              MR. SMITH:  Are you withdrawing
20         your question?
21              MR. RADOMISLI:  I'm not
22         withdrawing the question.
23         Q.    Are you aware another study
24    found that routine work stressors were
25    associated with PTSD symptoms and that
```

```
 1              R. LUBIT, M.D., Ph.D.
 2    these effects were independent from and
 3    larger than the effect of cumulative
 4    critical incident exposure?
 5              MR. SMITH:  Objection to the
 6         form.
 7              You can answer.
 8         A.    I'd like to see the study.
 9         Q.    Are you aware of another study
10    called Routine Work Environment Stress and
11    PTSD Symptoms in Police Officers by Magnum,
12    which was published in the Journal of
13    Nervous Mental Disorders in 2009, found
14    that quote:  "Work environment had the
15    strongest association with PTSD symptoms
16    above and beyond the effects of exposure to
17    duty- related critical incidents and
18    negative life events outside the police
19    service"? Are you aware of that study?
20              MR. SMITH:  Objection to the
21         form.
22         A.    I would like to see the study
23    so can I comment, so I can refresh my
24    memory.
25         Q.    And yet nowhere in your report
```

```
 1                R. LUBIT, M.D., Ph.D.
 2      does it say that you considered those as
 3      potential causes of PTSD, correct?
 4                    MR. SMITH:  Objection to the
 5               form. Don't argue with the witness,
 6               please.
 7                    MR. RADOMISLI:  That's not an
 8               argument.
 9                    MR. SMITH:  Yeah, it is.  It's
10               an argument.
11           Q.    Is it correct that your report
12      does not say that you considered those
13      alternative potential causes of his PTSD?
14           A.    They are not causes of PTSD.
15      You are misunderstanding the literature.
16      You cannot get PTSD, you cannot be
17      diagnosed with PTSD unless you have an
18      incident in which there is serious threat
19      of injury or sexual assault and which
20      creates sense of horror, dread, great fear.
21      And it is true that your general life
22      situation and stress will make it more or
23      less likely that in the face of a, an
24      incident which could cause PTSD that, you
25      know, that people who are under high stress
```

```
  1                 R. LUBIT, M.D., Ph.D.
  2    confinement of Mr. Schoolcraft, correct?
  3         A.    Yes, sir.
  4         Q.    You interviewed the Plaintiff
  5    and spent at least more than an hour in one
  6    session and then other sessions as well
  7    questioning him and speaking with him about
  8    this case; am I correct?
  9         A.    Yes, sir.
 10         Q.    And you wrote a report with
 11    regard to those sessions, and in that
 12    report, Doctor, am I correct, that you put
 13    down the important points that both you and
 14    Mr. Schoolcraft made during the course of
 15    your discussion?
 16         A.    Yes.
 17         Q.    Did you ask him those questions
 18    that you say are important and should have
 19    been asked by the doctors at Jamaica
 20    Hospital?
 21         A.    That would take some thinking,
 22    because they're not necessarily -- because
 23    as information became clear it wasn't then
 24    necessary to ask him about it.
 25         Q.    Because they were not relevant
```

```
 1                  R. LUBIT, M.D., Ph.D.
 2        Q.      And the adults that you
 3   treated, did they fall into any particular
 4   category that you could talk about
 5   generically?  Were they professionals? Were
 6   they law enforcement people?  Were they
 7   academics?  Is there any way you could
 8   characterize who the patients consisted of?
 9        A.      Professionals.
10        Q.      Professionals. Any police
11   officers in that group?
12        A.      None that I recall.
13        Q.      Now, did you work in the
14   emergency room at St. Vincent's Hospital?
15        A.      Yes.
16        Q.      What did you do in the
17   emergency room?
18        A.      Supervise residents.
19        Q.      Now, after, why did you leave
20   St. Vincent's after 2003?
21        A.      Mount Sinai had been courting
22   me because of my work I had done in
23   posttraumatic stress disorder.
24        Q.      What work did you do on a
25   posttraumatic stress disorder?
```

1                    R. LUBIT, M.D., Ph.D.

2         A.    St. Vincent's was very involved

3    in 9/11, and Spencer Eth had been -- was,

4    is, was a specialist in PTSD.  And so there

5    were papers to write that he asked me to

6    write and lectures to give around the

7    country on it and intensive trainings,

8    supervising people who, you know, went to

9    the schools to see, you know, kids who had

10   been traumatized.

11        Q.    Have you written articles about

12   posttraumatic stress disorder?

13        A.    Yes.

14        Q.    How many such articles have

15   been published?

16        A.    A few.  I don't know the exact

17   number.

18        Q.    Do you know the names?  Can you

19   recall the names of any of the journals

20   that you published in?

21             THE WITNESS: (To Mr. Smith):

22   Could we just give him my CV --

23             MR. CALLAN: Yes.

24             MR. SMITH:  I think we did.

25        Q.    Now, after, did you move over

```
 1              R. LUBIT, M.D., Ph.D.
 2         Q.    Just a couple. How many police
 3    officers have you treated through the
 4    years?
 5         A.    I don't recall any.
 6         Q.    Now, you indicated that you had
 7    been retained by Mr. Smith to do an
 8    evaluation in this case including a damage
 9    evaluation in your report; is that correct,
10    sir?
11         A.    Yes.
12         Q.    Now, in your report you
13    indicated that it was your opinion that Mr.
14    Schoolcraft was suffering from
15    posttraumatic stress disorder as a result
16    of what happened to him in connection with
17    this case; is that right, sir?
18         A.    Yes.
19         Q.    Do you have an opinion based on
20    a reasonable degree of medical certainty as
21    to whether Mr. Schoolcraft was suffering
22    from posttraumatic stress disorder before
23    he was taken to Jamaica Hospital and
24    admitted for evaluation in -- we're talking
25    2009, right?
```

```
 1                R. LUBIT, M.D., Ph.D.
 2                MR. SMITH:  Objection to the
 3        form.
 4                MR. DEVINE: Objection.
 5        Q.    October 31, 2009?
 6                MR. SMITH:  Objection to the
 7        form.
 8        A.    Yes.
 9        Q.    He was suffering?
10        A.    No, I have an opinion.
11        Q.    Okay.  And what is that
12   opinion?
13        A.    He was not.
14        Q.    And do you believe that he is
15   currently suffering from posttraumatic
16   stress disorder?
17        A.    When I last saw him, yes.
18        Q.    Is he being treated for the
19   condition?
20        A.    No. Not to my knowledge.
21        Q.    When did you last see him?
22        A.    August was what -- I'm not -- I
23   mean I spoke to him at one of the depo's. I
24   would have to check when I saw him in
25   person and did an evaluation.
```

```
 1              R. LUBIT, M.D., Ph.D.

 2         Q.    When you saw him did you tell

 3    him that in your opinion he should be

 4    obtaining some kind of medical or

 5    psychiatric treatment for his condition?

 6         A.    I don't recall specifically

 7    whether we discussed it or not.

 8         Q.    Can you tell me, sir, do you

 9    have an opinion as to whether any of the

10    post trauma, continuing posttraumatic

11    stress disorder that you've diagnosed was

12    caused by the actions of the New York City

13    Police Department in going to his apartment

14    and entering his house and taking him to

15    Jamaica Hospital against his will, as you

16    say?

17         A.    Yes, I do.

18              MR. SMITH:   Objection to the

19         form.

20         A.    Yes.

21         Q.    And -- but before they entered

22    his house on that particular day he didn't

23    have posttraumatic stress disorder; is that

24    your testimony?

25         A.    Correct.
```

1               R. LUBIT, M.D., Ph.D.

2        Q.    Now, to reach that conclusion

3   did you review medical records relating to

4   any care and treatment he had received

5   prior to the police entering his house that

6   day?

7        A.    No.

8        Q.    Don't you think that would be

9   important in trying to determine when the

10  posttraumatic stress disorder began?

11       A.    No.

12       Q.    No. And did the -- withdrawn.

13             When you were reviewing

14  materials relating to this case did you

15  listen to any tape-recordings of his

16  encounter with the police at his house that

17  day?

18       A.    I haven't.

19       Q.    Were you aware that there were

20  tape-recordings of his encounter with the

21  police that day?

22       A.    Yes.

23       Q.    And why didn't you listen to

24  the tapes?

25       A.    I, you know, have a report of

1                R. LUBIT, M.D., Ph.D.

2    what happened, and if people -- if the jury

3    decides that report that he's given me is

4    inaccurate it throws everything up in the

5    air. But I went by the description of what

6    he reported, which is in certain ways

7    similar to that of the police, which is

8    that he didn't want to come in, he was

9    handcuffed, et cetera, et cetera. He was

10   bruised in the incident.

11       Q.    Well, I'm not asking you what

12   he reported to you.  I'm just asking you

13   whether you had the opportunity to listen

14   to or review --

15              MR. SMITH:  That's not -- you

16          asked him why he hadn't, and he was

17          answering the question when you

18          interrupted him, so I would

19          appreciate if you wouldn't interrupt

20          the witness when he's in the middle

21          of answering a question you put to

22          him.

23              MR. CALLAN:  I'll try not to

24          interrupt him if you stop

25          interrupting me, and we'll get

```
 1              R. LUBIT, M.D., Ph.D.

 2         through this whole thing.

 3              MR. SMITH:  You stop

 4         interrupting and I won't have to

 5         interrupt you interrupting him, which

 6         I think is something I heard

 7         recently.

 8         Q.    Did you finish, Doctor?

 9         A.    I think so.  I'm not sure what

10    the question is.

11         Q.    Let me go back.  Would you

12    agree with me, sir, that if there's a tape-

13    recording of an encounter in which you can

14    hear exactly what happened on the tape that

15    that would be a more accurate account than

16    somebody writing it down, yes?

17         A.    No, not necessarily at all.

18    It's not a videotape.  If I had a

19    videotape, yes.

20         Q.    All right. Were you aware that

21    Mr. Schoolcraft frequently tape-records

22    other people, including police officers,

23    that he has encounters with?

24         A.    Yes.

25              MR. SMITH:  Objection to the
```

```
 1                    R. LUBIT, M.D., Ph.D.

 2          form.

 3          A.     That he has tape-recorded

 4    meetings he's attended, yes.

 5          Q.     Was he, when you met with him

 6    was he tape-recording you?

 7          A.     Not that I'm aware of.

 8          Q.     Did you ask him if he was?

 9          A.     I don't think I asked.

10          Q.     Were you aware that when the

11    police came into his house on October 31 of

12    2009 he had a tape-recorder on him?

13          A.     Two tape-recorders, I believe.

14          Q.     We'll get to the second one in

15    a minute. Were you aware he had a tape-

16    recorder on his person --

17          A.     Yes.

18          Q.     Were you aware that when that

19    fell out of his pocket and was discovered

20    by the police inspector, who was present,

21    he was running a second tape-recorder as

22    well?

23          A.     Yes.

24                 MR. SMITH:   Objection to the

25          form.
```

```
 1              R. LUBIT, M.D., Ph.D.
 2         Q.    Do you know where the second
 3    tape-recorder was?
 4         A.    Somewhere in the room.
 5         Q.    Did you find anything odd about
 6    that behavior, that Mr. Schoolcraft is
 7    running two tape-recorders in his bedroom?
 8              MR. SMITH:  Objection to the
 9         form.
10         Q.    In the middle of the day?
11              MR. SMITH:  Objection to the
12         form.
13         A.    In the context of the situation
14    in which he is -- that his bosses have
15    found out that he was reporting on them to
16    IAB, that a number of officers and other
17    personnel, Fire, EMT's have come to his
18    house and demanding entrance, I think that
19    it was quite good judgment on his part to
20    have two tape-recorders going.
21         Q.    In all of your years of
22    practice have you run into any other
23    patients who generally keep two
24    tape-recorders running in their bedrooms?
25              MR. SMITH:  Objection to the
```

```
 1                  R. LUBIT, M.D., Ph.D.
 2          form.
 3          A.    I haven't -- I don't recall
 4    that, but I haven't run into a situation
 5    like this.
 6          Q.    Now, would you expect that a
 7    psychiatrist in an emergency room who would
 8    be evaluating Mr. Schoolcraft would take
 9    into consideration as part of the overall
10    analysis what Mr. Schoolcraft does for a
11    living?
12          A.    Yes, but...
13          Q.    Well --
14          A.    It's --
15          Q.    Yeah, the answer is "Yes"?
16          A.    -- but not just as a discrete
17    entity in terms --
18          Q.    Did I ask you about discrete,
19    did I say anything about discrete entities?
20    I said would you take into consideration
21    what his profession was? What his
22    occupation was?
23          A.    It might be relevant.
24          Q.    You mean it might not be
25    relevant?
```

```
 1                 R. LUBIT, M.D., Ph.D.
 2        A.    It might not be relevant.
 3        Q.    Really?
 4        A.    I don't know if it matters.
 5        Q.    Have you ever evaluated a
 6   patient for possible involuntary admission
 7   to a psychiatric facility without finding
 8   out whether they have a job or what they do
 9   for a living?
10        A.    I generally ask.
11        Q.    Why do you ask?
12        A.    It might be relevant.
13        Q.    Well, might it be relevant if
14   their job is in law enforcement and they
15   might have access to guns?
16        A.    It might be relevant.
17        Q.    Well, do you think it was
18   relevant in this case that he's a police
19   officer?
20        A.    It is relevant since if he had
21   delusions that the police were doing things
22   they weren't doing and he had no contact
23   with the police and it was totally made up
24   in his head that would certainly be
25   relevant, and the indication he was
```

```
 1              R. LUBIT, M.D., Ph.D.
 2  paranoid, but he had access to the
 3  information.
 4       Q.    He had access?
 5       A.    He had access to the
 6  information that the police were doing
 7  stuff that was inappropriate.
 8       Q.    Oh, you've decided that, you've
 9  decided that that's true independently?
10            MR. SMITH:  Objection to the
11        form of the question.
12       A.    I think it's reasonable to say
13  that there are police who -- there are
14  people who fudge numbers.  All you have to
15  do is look what happened in the VA system
16  recently.
17       Q.    Oh, really.  Does Mr.
18  Schoolcraft work for the VA system?
19       A.    No. But the point is that he
20  was in a position where people don't always
21  report things accurately.
22       Q.    Well, that basically puts him
23  in the same position as the 35,000 other
24  police officers who work for the New York
25  City Police Department; is that right?
```

                        R. LUBIT, M.D., Ph.D.

1

2       A.      Yes.

3       Q.      So there's nothing special

4  about Mr. Schoolcraft's access to

5  information, is there?

6       A.      Yes. Compared to a non-police

7  officer, yes.

8       Q.      All right. So we'll put him in

9  the category of police officer; is that

10  right?

11      A.      I agree with you.  He was a

12  police officer.

13      Q.      Yeah.  And do police officers

14  carry guns?

15      A.      Usually but not always.

16      Q.      And if a police officer fires a

17  gun at another person they could hurt that

18  person; would you agree with that?

19              MR. SMITH:  Objection to the

20         form.

21      A.      Any person fires a gun could

22  hurt that person.

23      Q.      And a police officer would

24  certainly have the capability of hurting

25  himself with a gun under certain

```
 1                R. LUBIT, M.D., Ph.D.
 2      circumstances --
 3                MR. SMITH:  Objection to the
 4           form.
 5           Q.    -- would you say that, sir?
 6                MR. SMITH:  Objection to the
 7           form.
 8           A.    Anyone with access to a gun
 9      could hurt themselves with that gun.
10           Q.    And I know you don't have any
11      experience with police officers, but are
12      you aware that they have a higher suicide
13      rate than members of other professions?
14                MR. SMITH:  Objection to the
15           form of the question.
16           A.    Yes.
17           Q.    How much higher?
18           A.    I don't know.
19           Q.    Well, don't you think it would
20      be important since you're going to be
21      testifying as an expert in federal court on
22      this issue of what the risk, the suicide
23      risk might have been in this case, to know
24      what the suicide rate is among law
25      enforcement people?
```

```
 1              R. LUBIT, M.D., Ph.D.

 2              MR. SMITH:  Objection to the

 3         form.

 4         A.    Not in this particular case,

 5    because if it was a borderline call, then

 6    that would be useful.  But when you've

 7    got -- but given the fact, given the data

 8    that's available in the case, given that it

 9    was so clear that he shouldn't have been --

10         Q.    It's so clear he shouldn't have

11    been released --

12              MR. SMITH:  Do not interrupt

13         him again; all right? Stop that.

14              I want you to read the question

15         back, please, and I want you to read

16         the answer.

17              And I want you to complete your

18         answer.

19              And you cut it out.

20              MR. CALLAN:  I'll phrase my

21         question as I wish to phrase my

22         question.

23              MR. SMITH:  No.  He's answering

24         the question that you put to him;

25         okay? No, no.
```

1               R. LUBIT, M.D., Ph.D.

2          Q.     Have you finished the question?

3     Go ahead --

4               MR. SMITH:  Please read the

5          question and please read the answer

6          that was interrupted back to the

7          witness.

8               Let him finish his answer.

9               MR. CALLAN:  Because we've been

10          having speechmaking done all day, and

11          it's time to stop the speechmaking,

12          Mr. Smith.

13               Go ahead, read the question

14          back, please.

15               (Whereupon, the referred to

16          question and answer were read back by

17          the Reporter.)

18          A.     Given that it was so clear that

19     he did not present a substantial risk to

20     himself or others, the suicide rate is not

21     really relevant in this case.  It would not

22     lead me even if it was 10 times normal.

23     Given the information available, I would

24     not have held him against his will.

25          Q.     So, if I understand you, then,

1              R. LUBIT, M.D., Ph.D.

2    you're saying that if police officers had a

3    suicide rate, hypothetically, that's 10

4    times higher than it actually is in real

5    life, on the facts of this case that would

6    have made no difference to you whatsoever

7    if you were working in the emergency room

8    that night?

9        A.    I would have gathered the

10   information, and given that, and if you're

11   asking key questions and speaking to IAB,

12   finding out in fact he was making

13   reasonable complaints about things that

14   happened; that he had no intention of

15   hurting anyone; that his plan of things

16   didn't go well, was to go to Texas and just

17   start over again, and with no history of

18   hurting himself or others and no thoughts

19   of doing it, I would not have held him in

20   the emergency room against his will or on

21   the ward against his will just because the

22   police have a high suicide rate.

23       Q.    Well, you didn't say -- for the

24   purposes of this question you didn't say

25   high, you said 10 times the rate that they

1             R. LUBIT, M.D., Ph.D.

2    have.  That would be totally irrelevant to

3    you as a psychiatrist; is that right?

4             MR. SMITH:  Objection to the

5        form.

6        A.    If the person is not -- if he

7    has no indications for suicide other than

8    some job stress, he's not paranoid, he's

9    not acting bizarrely, he is -- has plans on

10   what he's going to do that are positive, he

11   has no intention of hurting himself, then

12   I'm not going to put someone in the

13   hospital simply because they're, they're a

14   police officer.

15       Q.    Well, this diagnosis that you

16   say the doctors at Jamaica Hospital should

17   have made, you've taken into consideration

18   that he had previously seen a Police

19   Department psychologist, who after

20   evaluating him took his gun away --

21       A.    Yes.

22       Q.    -- you're aware of that?

23             And as you sit here today you

24   don't even know why the gun was taken away;

25   isn't that correct, sir --

```
 1              R. LUBIT, M.D., Ph.D.
 2              MR. SMITH:  Objection to the
 3         form.
 4         Q.    -- isn't that correct?
 5         A.    He was stressed.
 6         Q.    Oh, really? And you know,
 7    you've spoken to the police psychiatrist I
 8    take it, and that's how you know that the
 9    gun was taken away, because he was
10    stressed?
11         A.    Counselor, you have no -- I
12    didn't speak to the police psychologist.
13    If I did you would know it.
14         Q.    So where did the information
15    come from?
16         A.    I've read much but not all of
17    her deposition.
18         Q.    And she said she took the gun
19    away because he was stressed --
20         A.    My impression, in a general way
21    he was stressed.  He was having physical
22    symptoms, and that was my impression.
23         Q.    What was he stressed about?
24         A.    A variety of things.
25         Q.    Like what?
```

```
 1              R. LUBIT, M.D., Ph.D.
 2       A.    That he was in trouble, to say
 3  it loosely, with, with his superiors,
 4  because he wasn't making the numbers that
 5  they wanted him to make, because he felt
 6  what they were doing was wrong, and he was
 7  reporting it to people, because the job is
 8  stressful in itself.
 9       Q.    But he wasn't suffering from
10  posttraumatic stress disorder at that
11  point?
12       A.    No.
13            MR. SMITH:  Objection to the
14       form.
15       A.    He had not had an incident that
16  could cause it up until that point to my
17  knowledge.
18       Q.    Not to your knowledge, but you
19  haven't looked at his medical record or
20  interviewed any psychiatrists who treated
21  him previously, correct?
22            MR. SMITH:  Objection to the
23       form.
24            MR. CALLAN:  I'll withdraw the
25       question.
```

```
 1              R. LUBIT, M.D., Ph.D.
 2        Q.    So with respect to the decision
 3   of the Police Department psychologist to
 4   order that his gun be taken away, you have
 5   said that doesn't mean that she was worried
 6   that he might hurt himself or somebody
 7   else; is that your testimony?
 8              MR. SMITH:  Objection to the
 9         form.
10        A.    He was put on desk duty.  He
11   didn't need a gun for that. She felt
12   obviously that he should not be walking a
13   beat at this time --
14        Q.    I'm not talking about walking a
15   beat.  I'm talking about possessing a
16   firearm.
17              MR. SMITH:  That's again you've
18         interrupted him.
19              So please read the question
20         back and let him finish his answer.
21              THE WITNESS: After this
22         question I'm taking a two-minute
23         bathroom break.
24              (Whereupon, the referred to
25         question and answer were read back by
```

```
 1              R. LUBIT, M.D., Ph.D.

 2         the Reporter.)

 3      A.    She did not hospitalize him.

 4   She did not deem him dangerous, because if

 5   she had she would have hospitalized him.

 6      Q.    Did I ask you about

 7   hospitalization?

 8      A.    No, but I'm telling you anyway.

 9      Q.    Yeah, well, let's try to keep

10   it to the question.

11              Now, you testify in court.  You

12   do understand that there's a protocol where

13   you're supposed to respond to the question

14   that's asked?

15              MR. SMITH:  You got a question.

16         Don't answer that.

17              THE WITNESS:  I'm taking a

18         bathroom break.

19              (Whereupon, the witness left

20         the room at 4:07 P.M.)

21              MR. SMITH:  We're going off the

22         record at 1605.

23              (Whereupon, between 4:07 P.M.

24         and 4:26 P.M. a short recess was

25         taken.)
```

```
 1              R. LUBIT, M.D., Ph.D.
 2              MR. SMITH:  Back on the record
 3          at 1645 by my clock.
 4              MR. CALLAN:  Which is one
 5          minute --
 6              MR. SMITH:  Which has been
 7          stipulated to two minutes different
 8          from everybody else, so from the
 9          inception.
10      BY MR. CALLAN:
11          Q.    All right.  Now, Doctor, at
12      page 11 in your report, when you were
13      dealing with the damages, you say that Mr.
14      Schoolcraft is suffering from posttraumatic
15      stress disorder as a result of the abuse he
16      suffered at the hands of the police and the
17      hospital. And in the hospital. Yes. He
18      feared for his life when the police were
19      physically abusing him. He has had
20      intrusive recollections of the abuse.
21              MR. SMITH:  Has, has intrusive.
22          Q.    Has intrusive recollections of
23      the abuse and the time in the hospital much
24      of the time.
25              Now, I want to focus on that
```

1                R. LUBIT, M.D., Ph.D.

2       sentence in which you say he has intrusive

3       recollections of the abuse and time in the

4       hospital much of the time. How do you know

5       this, sir?

6            A.     He told me.

7            Q.     Well, and how many times did

8       you meet with him to discuss his symptoms?

9            A.     It was only one main time.

10           Q.     Once?

11           A.     There was one long interview,

12      and there were some other discussions.  I

13      can't recall whether exact -- what

14      information I may have gotten on the phone

15      or what I may have been told when I saw him

16      at a later time, but there was one long

17      primary interview.

18           Q.     And when was that?

19           A.     I don't recall the date, as I

20      said before.

21           Q.     Where was that long

22      interview --

23           A.     My office.

24                MR. SMITH:  Please let him

25           finish his whole question.

```
 1                  R. LUBIT, M.D., Ph.D.
 2        Q.     And how long did the interview
 3   last.
 4        A.     I'll have to check my notes.
 5        Q.     Was it more than an hour?
 6        A.     Way more than an hour.
 7        Q.     More than two hours?
 8        A.     I'll check my notes.
 9        Q.     Do you have your notes with
10   you?
11        A.     No.
12        Q.     And what do you define as an
13   intrusive recollection?
14        A.     Intrusive recollections are --
15   could be nightmares, they could be
16   flashbacks, they could be thinking about it
17   a lot. It could be having -- being very
18   upset emotionally or having physiologic
19   reaction to reminders of what occurred.
20        Q.     I'm not asking you what the
21   definition of intrusive recollections are.
22   I'm asking you, sir, in his case what are
23   the intrusive recollections?  Are they
24   nightmares? Are they physical symptoms?
25   What are they?
```

```
 1              R. LUBIT, M.D., Ph.D.
 2      A.    I'm go back and I'll check my
 3   report.
 4      Q.    It's page 11, but it doesn't
 5   say in the record.
 6      A.    Oh, I'm sure it does say in the
 7   report.
 8              When he sees the type of cars
 9   the police use to come up to his area he
10   thinks about his being hurt by the police,
11   including being restrained and physically
12   attacked in his apartment. Going out alone
13   also leads him to think about these times.
14   He feels that the police will come and
15   harass him again. When he took pictures of
16   the hospital and precinct with his lawyers
17   these memories were stirred up. Coming,
18   simply coming to New York City leads him to
19   feel anxious and on edge when he is not
20   with someone.
21      Q.    You don't think any of this has
22   to do with the fact that he's got a lawsuit
23   for money damages against any of the
24   parties in question, do you, sir?
25              MR. SMITH:  Objection to the
```

1                R. LUBIT, M.D., Ph.D.

2          form.

3          Q.     Could it be related to that?

4                MR. SMITH:  Objection to form.

5          A.     I don't -- there are lots of

6    people who have lawsuits.  I haven't had

7    someone before tell me that they were

8    scared of being in New York City.

9          Q.     You've never treated a New York

10   City police officer before, have you?

11         A.     No.

12         Q.     Now, the things that you list

13   include his fear of police cars; is that

14   right, sir?

15         A.     Yes.

16         Q.     Now --

17         A.     I'm not sure police cars. It's

18   the type of cars that people used.  Yeah.

19         Q.     All right. None of the doctors

20   in this lawsuit were driving police cars,

21   were they?

22         A.     Not that I'm aware of.

23         Q.     And you also -- the second

24   thing I think you listed that he's thinking

25   about his police harassment; is that right?

| 1 | R. LUBIT, M.D., Ph.D. |

1              R. LUBIT, M.D., Ph.D.

2      A.    Yes.

3      Q.    And the testimony in the case

4  indicates that he was taken to the hospital

5  by the police on October 31. He didn't see

6  my client, Dr. Bernier, until November 2;

7  is that correct, sir?

8      A.    Yes.

9              MR. SMITH:  Objection to the

10        form.

11      Q.    Could he have been suffering

12  from posttraumatic stress disorder before

13  he even saw Dr. Bernier as a result of his

14  being held in custody by the police from

15  the time he was picked up at his house

16  until November 2nd?

17              MR. SMITH:  Objection to form.

18              MR. LENOIR:  Objection.

19      A.    By definition, posttraumatic

20  stress disorder, you have to have symptoms

21  for a month. And so he was not suffering

22  from it at that time. He may have been

23  suffering from acute at that time, having

24  acute stress reaction.

25      Q.    Well, you've indicated that he

```
 1              R. LUBIT, M.D., Ph.D.
 2   previously was suffering from or at least
 3   had been diagnosed as having job-related
 4   stress by a Police Department psychologist,
 5   correct?
 6         A.    Yes.
 7         Q.    This incident where the police
 8   came to his house, took him into custody
 9   against his will, obviously increased his
10   stress level; would you say that that's
11   true, sir?
12         A.    Yes.
13         Q.    And at what point -- do you
14   have an opinion based on a reasonable
15   degree of medical certainty --
16         A.    I'm sorry, one of my kids is
17   sick.
18         Q.    Oh, go right ahead.
19              MR. SMITH:  We're going off the
20         record, it's 1633.
21              The record should reflect the
22         witness just took a phone call and
23         indicated one of his children was
24         sick.
25              (Whereupon, between 4:34 P.M.
```

```
 1              R. LUBIT, M.D., Ph.D.
 2       and 4:38 P.M. a short recess was
 3       taken.)
 4            MR. SMITH: Let's go on the
 5       record and close this up.
 6            MR. RADOMISLI:  So the Doctor
 7       has to leave, but more importantly,
 8       we've all agreed that we haven't
 9       reached our seven-hour limit, so
10       another day is going to be necessary
11       anyway, and we will schedule a
12       mutually convenient time.
13            MR. SMITH:  We haven't reached
14       a seven-hour limit, and we'll do our
15       best to try to complete this
16       deposition within the seven hours and
17       then discuss what is necessary if
18       anything should go on beyond that.
19       But we agree to come back for another
20       day, but not necessarily for a full
21       day.
22            MR. RADOMISLI:  That's not what
23       I meant.
24            MR. KRETZ:  We're at five hours
25       and 50 minutes.  Ryan and I each
```

```
1                    R. LUBIT
2        history of violence.  I would ask about --
3        to see if there was a pattern that would
4        indicate, let's say, bipolar disorder.  I
5        would ask about all of the different
6        indicators of risk of violence from
7        MacArthur Foundation Study, which is state
8        of the art; and I would've observed him
9        during the first couple of hours as I was
10       asking him questions.
11           Q.   Now, at page 11 in your report,
12       you talk about post-traumatic stress
13       disorder; and you say that, "Mr. Schoolcraft
14       is suffering from post-traumatic stress
15       disorder as a result of the abuse suffered
16       at the hands of the police and in the
17       hospital," in the first line underneath that
18       paragraph heading.  Now, you made this
19       diagnosis based upon a single meeting that
20       you had with Mr. Schoolcraft in your office;
21       is that right?
22           A.   Yes.
23           Q.   Did you prescribe any medication
24       for him based on that finding?
25           A.   I'm not his treating doctor.  It
```

```
 1                    R. LUBIT
 2    would have been inappropriate for me to
 3    prescribe him medication.
 4         Q.   Were you of the opinion that he
 5    should be medicated?
 6         A.   I did not even think about whether
 7    medication was necessary or not.  I think
 8    therapy would be useful.  Whether he needs
 9    medication or not, I would have to think
10    about that, and, you know, ask him how his
11    symptoms have been and how they're doing on
12    my first visit to see how therapy affected
13    him over a period.
14         Q.   Are there medications available to
15    treat post-trematic stress disorder?
16         A.   Not specifically.  Sometimes the
17    SSRIs, selective serotonin reuptake
18    inhibitors, can be helpful with some of the
19    symptoms.
20         Q.   Did you recommend continuing
21    therapy for him?
22         A.   I don't recall discussing it with
23    him.  I think I may have, and I don't
24    specifically recall.
25         Q.   As you sit -- I'm sorry go ahead?
```

```
 1                    R. LUBIT
 2         A.   It was possible I did, and he
 3    didn't have money.  I would have to check my
 4    notes.  I don't recall.
 5         Q.   If he didn't have money; what does
 6    that have to do with your answer?
 7         A.   Well, if he doesn't have money,
 8    that could be a reason; but it's not really
 9    that relevant to the case because it doesn't
10    mean that he doesn't have the symptoms
11    because most people with PTSD don't go for
12    therapy.  Part of the symptoms, prominent
13    symptoms of PTSD, are avoidance of talking
14    about it, so people more often than not
15    don't go for therapy for years.
16         Q.   My only question is, do you think
17    he needed therapy?
18         A.   Yes.  I think therapy might have
19    been helpful to him.
20         Q.   As you sit here today, do you know
21    if he ever got therapy?
22         A.   No, I do not.
23         Q.   Do you think if he got proper
24    therapy that could resolve his problems?
25         A.   I don't think it's going to
```

```
 1                          R. LUBIT
 2      resolve his problems.  I think that it might
 3      ameliorate some of his symptoms.
 4           Q.   Which symptoms might it
 5      ameliorate?
 6           A.   The interest of recollections
 7      might -- well, hopefully decrease.  His
 8      avoidance, some of his anxiety, but what
 9      happened to him was so serious and
10      particularly given the doctors at the
11      hospital in my professional opinion behaving
12      very inappropriately in light of the police
13      reportedly going to serve him with things
14      and having their cars go up to near his
15      house, that it's going to be very hard for
16      him to cease being very anxious anywhere
17      around New York.
18           Q.   Are you saying that he's going to
19      be afraid of cars; is that why you mention
20      cars?
21           A.   Police.
22           Q.   He's going to be afraid of police
23      cars?
24           A.   I think he's made anxious by the
25      fact that he believes the police drove up to
```

```
 1                       R. LUBIT
 2      his area to serve him with papers and may
 3      have been watching him.
 4           Q.   Are you saying that you think he
 5      has a fear of police cars or the police as a
 6      result specifically of this incident?
 7           A.   Yes, fear of police.
 8           Q.   Fear of police?
 9           A.   Yes.
10           Q.   And this is the fault of the
11      doctors at Jamaica Hospital?
12           A.   What I said was that what happened
13      at Jamaica Hospital made the PTSD worse.
14           Q.   So your testimony is that he had
15      PTSD before he ever went to Jamaica
16      Hospital?
17                MR. SMITH:   Objection to the form.
18           A.   No.   He didn't have PTSD before he
19      went to Jamaica Hospital.   You have to have
20      symptoms for a month for it to be PTSD; but
21      the events at Jamaica Hospital, I think,
22      made the PTSD worse than it would have been
23      had they believed him, listened to him, and
24      done a proper evaluation and appropriately
25      sent him on his way.
```

```
 1                    R. LUBIT
 2        Q.   If hypothetically they had
 3   appropriately sent him on his way, would
 4   you, in your opinion, think that he might
 5   still have PTSD based upon what the police
 6   department did to him or so he says?
 7             MR. SMITH:  Objection to form.
 8             MR. CALLAN:  I'll rephrase it.
 9        Q.   Accepting Mr. Schoolcraft's
10   allegations regarding what the police
11   department did to him before he came to
12   Jamaica Hospital, could that alone have been
13   enough in your opinion to cause PTSD in him?
14        A.   Yes.
15        Q.   Did you interview him about
16   whether he had ever had PTSD symptoms prior
17   to his employment at the New York City
18   Police Department?
19        A.   I don't specifically remember the
20   words I used, but it is certainly my custom
21   in these situations to ask about the
22   presence of the symptoms before and after
23   the event in question and to see how he has
24   changed so -- and I actually do,
25   specifically, say he startled more than he
```

DIAMOND REPORTING 718-624-7200 info@diamondreporting.com

                              R. LUBIT

1
2       used to, he is more irritable than he used
3       to be, and I would have made it clear that I
4       meant before the incident.  He's anxious
5       when in New York if he is alone.  He was a
6       policeman before, so that certainly
7       indicates it was after this event that he
8       became very anxious about being in New York.
9       He avoids talking about what occurred,
10      meaning with referring to the police in the
11      hospital, and he has intrusive recollections
12      of the abuse and time in the hospital; so
13      all of these indicate that there was a
14      marked change in him, a rapid development of
15      symptoms after the problems with the police
16      in the hospital.
17          Q.    Well, I think you said at the last
18      deposition in this case that you had
19      described the job of a New York City police
20      officer as an extremely difficult and
21      dangerous job; do you remember saying
22      anything along those lines?
23          A.    I don't recall what I said.  I
24      would be happy to review my deposition
25      transcript if you have it.

```
1                      R. LUBIT
2          Q.   Well, do you think being a New
3     York City police officer is a dangerous job?
4          A.   It can be.
5          Q.   Did you ask Mr. Schoolcraft if he
6     had ever felt anxious when he was out on the
7     street patrolling as a New York City police
8     officer prior to this incident?
9          A.   It's not relevant, and I don't
10    recall asking about that.  We all feel
11    anxious at times.  He is more globally
12    irritable, startles, dysphoric since this
13    event, and he reports intrusive
14    recollections of the abuse by police and the
15    time in the hospital.  He did not report
16    intrusive recollections of other things that
17    occurred while he was working as a police
18    officer or of any other things in his life.
19         Q.   And you asked him about that; you
20    asked him about prior, his prior life, and
21    whether he startled at all; did you ask him,
22    "Have you ever startled in the past?"  Have
23    you ever asked him that?
24              MR. SMITH:  Can we have one
25              question at a time, please.
```

DIAMOND REPORTING 718-624-7200 info@diamondreporting.com

```
 1                        R. LUBIT
 2          A.   I specifically wrote he startles
 3     more than he used to.  He is more irritable
 4     that he used to.
 5          Q.   How often did he startle in the
 6     past?
 7          A.   I don't have a specific number.
 8          Q.   How often was he anxious in the
 9     past?
10          A.   I don't have a specific number.
11          Q.   But he was anxious in the past?
12          A.   I assume that he was at times.
13          Q.   What was he anxious about in the
14     past?
15          A.   I don't know and it's --
16          Q.   Well, when he started, was he --
17               MR. SMITH:  Wait, let him answer
18          the question.
19               MR. CALLAN:  He said he doesn't
20          know, I think.
21          Q.   Was there something else you
22     wanted to add?
23          A.   I said he was anxious when in New
24     York if he is alone.  He was able to be in
25     New York before walking a beat and didn't
```

1                          R. LUBIT

2       report anxiety being problematic for him

3       then, and now he reports great anxiety with

4       specific fears about the police hassling

5       him.  Whether he was anxious before, doesn't

6       make a difference.  The fact is he has

7       specific anxieties, intrusive recollections,

8       and avoidance of things directly related to

9       the things that happened with the police and

10      in the hospital.

11              MR. CALLAN:  I have no further

12          questions.  Can we take a break for two

13          minutes.

14              (Whereupon, a short recess was

15          taken.)

16      EXAMINATION BY

17      MR. SHAFFER:

18          Q.   Good morning, Doctor.  My name is

19      Robert Shaffer.  I represent the City of New

20      York and most of its employees that are

21      named in this lawsuit with the exception of

22      one.

23              MR. SMITH:  Go on the record at

24          16:01.

25          Q.   I have a few questions for you.  I

```
 1                    R. LUBIT
 2    just ask if you don't understand my
 3    question, just let me know.  I'll try to
 4    rephrase it.  If you don't hear me, let me
 5    know.  I'll try to repeat it, understand?
 6         A.   Yes.
 7         Q.   Earlier when Mr. Callan was
 8    questioning you, you said that if you were
 9    in the emergency room when plaintiff was
10    brought to the hospital, you would ask
11    certain questions?
12         A.   I would ask many questions.  I
13    mentioned some of them at that time.
14         Q.   Understood.  And you would ask
15    various people these different questions?
16         A.   Yeah.  There were different
17    people.  I would've asked more from the
18    police, emergency medical people, as well as
19    the client.
20         Q.   And while you were asking all of
21    these questions and speaking to these
22    different people, plaintiff would have been
23    confined in the emergency room?
24         A.   Up until a certain point, yes.  I
25    mean, I would've up until the point that I
```

```
1                      R. LUBIT
2      thought he was -- did not meet commitment
3      criteria.
4            Q.    And you don't believe that he met
5      commitment criteria; is that correct?
6            A.    Yes.
7            Q.    And you're basing that upon what
8      he told you; is that correct?
9            A.    That's based upon what he told me.
10     It's based upon all the records that I
11     reviewed.  It is based upon -- to a large
12     extent, it's based upon the hospital record.
13           Q.    If what Mr. Schoolcraft told you
14     was not true, some or all of it was not
15     true, would your opinion have changed in any
16     way?
17                 MR. SMITH:  Objection to the form.
18           A.    It depends how it changed.  If I
19     were to find out that he had a history of
20     violence and a history of psychosis and of
21     rapid decompensation into psychosis and if
22     this was similar signs of what he usually
23     has, that would create a difficult situation
24     I would have to think more about; but the
25     things that he told me are in no way
```

```
 1                    R. LUBIT
 2    necessary.  If I was not able to speak to
 3    him and I was just able to read the
 4    depositions of the doctors and the hospital
 5    record, I would've concluded to a reasonable
 6    degree of medical certainty that he was not
 7    committable.
 8         Q.   So what you're saying is the
 9    opinion that you formed is based in no way
10    on what plaintiff told you?
11              MR. SMITH:  Objection to the form.
12         A.   I can't -- I didn't say in no way,
13    but the material that was most important to
14    me overwhelmingly was what I saw from the
15    hospital record and the depositions of the
16    doctors, what they saw, what they asked,
17    what they were thinking, the information
18    they gathered.  You know, if you were to
19    tell me -- if he had told me at an interview
20    that, you know, actually he had just bought
21    a gun that he had successfully hidden and he
22    was planning to shoot Lieutenant Caughey,
23    then I would've felt that, yup, he should be
24    committed at that time.  But -- though they
25    didn't have the data to do it; but his
```

```
 1                    R. LUBIT
 2      description of what occurred was of very
 3      little importance to me.  It was based on
 4      what they wrote and what they said.  They,
 5      meaning the doctors.
 6          Q.   Is any of what the doctors wrote
 7      and said as far as you understood it to be
 8      based upon what plaintiff told them?
 9          A.   I mean, they did interview him
10      albeit my understanding is that it was
11      brief.  Particularly the resident who
12      interviewed him did not spend a lot of time
13      with him.  Dr. Bernier and Patel (phonetic)
14      did not spend a lot of time with him when
15      they were first involved in the case; so I
16      certainly considered what they wrote he said
17      and also all the things that he had gotten
18      from other sources.
19          Q.   So assuming what they wrote about
20      what he said was transcribed accurately, but
21      that what he told them was not true so they
22      wrote down a false statement given by
23      plaintiff, would that change your opinion
24      about this in any way?
25              MR. SMITH:  Objection to the form.
```

```
 1                    R. LUBIT
 2        A.   I've gotten lost I'm afraid in
 3   terms of it's too -- you need to talk about
 4   specific things that he said that were
 5   false; but look at many, many different
 6   things before you make such a determination.
 7   And they failed to gather the basic
 8   information that one needs to get, and they
 9   failed to reasonably analyze the
10   information.
11        Q.   I'll ask my question again.  So
12   they took information from plaintiff,
13   correct?
14        A.   Yes.
15        Q.   At some point?
16        A.   Yes.
17        Q.   If plaintiff gave them information
18   that was untrue and you learned that
19   throughout your evaluation of him and of
20   this case, would that change your opinion?
21             MR. SMITH:  Objection to the form.
22        A.   I need to know what information he
23   gave them that was untrue.
24        Q.   So he could have been untruthful
25   about certain things and that wouldn't
```

```
 1                    R. LUBIT
 2      change your opinion at all?
 3               MR. SMITH:  Objection to the form.
 4          A.   At all, what do you mean by at all
 5      and what information?
 6          Q.   So you just said you would need to
 7      know what information he was untruthful
 8      about?
 9          A.   Yes.  I mean, if he said that he
10      never had a mental breakdown and had never
11      been violent with anyone and, in fact, he
12      was presently violent and had murderous
13      fantasies, if I were to find out that, that
14      would be of deep concern to me.
15          Q.   But there are certain other pieces
16      of information that if plaintiff was
17      intentionally untruthful about those pieces
18      of information, that would not change your
19      opinion?
20               MR. SMITH:  Objection to the form.
21          A.   They may be pieces of information
22      that would not change my ultimate opinion
23      that he did not need commitment.  What I am
24      sure about is that the data they collected
25      did not add up to a need for a commitment
```

```
 1                    R. LUBIT

 2      and that they grossly failed to gather

 3      crucial information.

 4            Q.   You mentioned that you took notes

 5      of your initial interview with plaintiff; is

 6      that right?

 7            A.   Yes.

 8            Q.   Do you recall how many pages of

 9      notes you took?

10            A.   No.

11            Q.   Was it more than one?

12            A.   Oh, yeah.

13            Q.   More than ten?

14            A.   Probably.

15            Q.   The handwritten or typed?

16            A.   Handwritten.

17            Q.   And you still have copies of those

18      notes?

19            A.   Did I bring them?  May I ask --

20                 MR. RADOMISLI:  You didn't bring

21            them?

22            Q.   Is that something you typically

23      discarded at any point in time?

24            A.   I usually do not discard that.

25            Q.   Now, you said you met with him,
```

```
 1                    R. LUBIT
 2     you think, one other time after your initial
 3     interview; is that right?
 4          A.   I spoke to him on the phone, I
 5     think, to fill in some pieces; and then I
 6     saw him at one of the depositions of one of
 7     the doctors; and again, I don't remember
 8     what -- whether I just said hello or whether
 9     I may have asked a couple of questions.  I
10     don't recall.
11          Q.   Do you recall if on either of
12     those occasions either on the phone or at
13     the deposition that you took any notes?
14          A.   I think if he told me something,
15     something of significance, I would normally
16     have written it down.
17          Q.   Now, you've been qualified as an
18     expert in other cases before, correct?
19          A.   Yes.
20          Q.   Have you ever been qualified as an
21     expert on police practices?
22          A.   No.
23          Q.   Have you ever taught any courses
24     on police practices or procedures?
25          A.   No.
```

```
 1                    R. LUBIT
 2         Q.    Have you ever written or published
 3    any articles about police practices and
 4    procedures?
 5         A.    No.
 6         Q.    On page 23 of your report, there's
 7    a heading, "Actions of the Police," on
 8    October 31, 2009; do you see that heading?
 9         A.    Yes.
10         Q.    And in there you give, I guess,
11    what I would describe as an opinion; but you
12    make statements about the actions of the
13    police; is that correct?
14         A.    Yes.
15         Q.    How did you arrive at the opinions
16    that you stated under the heading "Actions
17    of the Police" on October 31, 2009?
18         A.    I do know something about how to
19    handle patients, and I've seen many patients
20    handled by the police in the EMU personnel;
21    and, I think, it's pretty basic logic that
22    says if you've got somebody who has -- who
23    you believe has dangerously high levels of
24    blood pressure, the last thing in the world
25    you want to do is get involved in a physical
```

```
 1                         R. LUBIT
 2     altercation with the person.
 3          Q.   Is that opinion based on any
 4     knowledge of standard police practices or
 5     procedures?
 6          A.   It's based on medical procedures
 7     and medical knowledge.
 8          Q.   Do you have any knowledge of
 9     police practices as they pertain to
10     providing medical treatment to someone that
11     is in need?
12          A.   No.  But I think it stands to
13     reason that I would hate to say that -- I
14     would hate to have found out that police
15     practices are that it's okay to get into a
16     fight and assault a man who is doing nothing
17     other than having high blood pressure and
18     doesn't want to go into the emergency room.
19          Q.   Now, the opinions contained under
20     the heading at the middle of page 23, what
21     specific individuals are you referring to?
22               MR. SMITH:  Objection to the form.
23          A.   I do not -- am not referring to
24     specific individuals.  I'm simply saying
25     that if, in fact, the police roughed him up
```

1                        R. LUBIT

2         and it appears that they did give him

3         bruises that were reported in the emergency

4         room, that this was a horribly inappropriate

5         thing to do with someone who you think has

6         dangerously high levels of blood pressure,

7         much better to leave the person alone or

8         talk with him or get neighbors to talk with

9         them or get family or whatever than to

10        assault him, drive his blood pressure up

11        higher, and possibly cause him to stroke out

12        at that moment.

13             Q.   If the police would've left

14        Mr. Schoolcraft alone and if he were to have

15        either had a stroke or a heart attack, would

16        your opinion as to their actions be that it

17        was appropriate?

18             MR. SMITH:   Objection to form.

19             A.   Well, if he -- you know, in

20        hindsight, we know better what to do than at

21        the moment; and, you know, there are times

22        when we wish we had done something else.

23        It's -- if a parent refuses to let their

24        12-year-old go out to a friend's house and I

25        was doing a custody case, we would think

```
1                    R. LUBIT
2         Q.    Did Mr. Schoolcraft ever say to
3    you that he had been afraid that he would
4    be sexually assaulted?
5         A.    No.
6         Q.    In this case, when you
7    diagnosed Post Traumatic Stress Disorder to
8    Mr. Schoolcraft, what was the basis for
9    threat of severe injury or death?
10        A.    He thought he would be
11   physically injured by the police when they
12   took him off the bed, put him on the
13   ground, turned him over, et cetera.
14        Q.    Nothing that occurred in the
15   hospital then; is that correct?
16             MR. SMITH:   Objection to the
17        form.
18        A.    In the hospital, the issue of
19   his restraints were an issue.
20        Q.    Anything else other than the
21   handcuffs?
22        A.    I think the hospital issue also
23   just intensified what happened in his
24   apartment.  That rather than things being
25   quickly corrected, he continued to be
```

```
 1                    R. LUBIT
 2     restrained to the point that, and the
 3     police were continuing to be able to do --
 4     the wrist issue with the restraints is very
 5     concerning, they were able to continue to
 6     do that.  And I think all of this together
 7     put him in significant fear for his
 8     physical safety.
 9          Q.    Leaving aside the wrist
10     restraints for the moment, was there
11     anything else that occurred in the hospital
12     that he said to you led him to believe that
13     there was a threat of severe injury, i.e.,
14     fearing for his life or death?
15          A.    I don't think there was any
16     other incident in the hospital.  But the
17     fact that he was restrained in the hospital
18     rather than things being quickly corrected
19     and quickly ending did exacerbate what
20     would have happened to him had the hospital
21     said he's fine, let him go.
22          Q.    How do you know that?
23          A.    My clinic judgment that when,
24     it is well known that when a bad situation
25     and traumatic incident continues for a
```

```
 1                    R. LUBIT
 2    period and the person isn't, or the person
 3    continues to have any difficult
 4    circumstance after a trauma, that is very
 5    negative for their recovery.  And that it
 6    is extremely important to very quickly get
 7    someone into a, an environment in which
 8    they feel safe.  How the person is
 9    supported and treated after a trauma is
10    likely as important as the intensity of the
11    trauma itself in determining whether the
12    person will have Post Traumatic Stress
13    Disorder.  I think you will find that in my
14    writings.
15         Q.    He didn't have Post Traumatic
16    Stress Disorder on October 31st?
17              MR. SMITH:  Objection.
18         A.    Not at that moment.  He had the
19    trauma that led to the PTSD.  The point is
20    after the PTSD trauma, it is extremely
21    important that the person get into a
22    benign, safe atmosphere very quickly.  And
23    without that, the chance of them developing
24    PTSD is much higher.
25         Q.    Once the police left, wouldn't
```

569

1                    R. LUBIT

2    being in the hospital be a safe

3    environment?

4                    MR. SMITH:   Objection to the

5         form.

6         A.    I don't, he didn't experience

7    it as a safe, benign, supportive

8    environment.   That was a place he was being

9    held against his will.

10        Q.    Do you agree that paranoia

11   substantially increases the risk of

12   violence?

13        A.    Yes.

14        Q.    I referred to your book

15   earlier.  I guess that deals with conflict

16   in the workplace; is that fair to say?

17        A.    Yes.

18        Q.    And how people should deal with

19   their supervisors in the course of that

20   conflict?

21        A.    Yes.

22        Q.    Do you believe, in your

23   opinion, that Adrian Schoolcraft

24   appropriately dealt with his supervisors

25   based on his actions in the case?

```
 1                    R. LUBIT
 2            MR. SMITH:  Objection to the
 3        form.
 4        A.    It is too, I would need to have
 5   it narrowed down.  And specify what you
 6   mean by "dealt with."  What actions in
 7   terms of, it's too broad a question.
 8        Q.    Let's start with tape recording
 9   things; do you believe that, that was
10   appropriate?
11            MR. SMITH:  Objection to the
12        form.
13        A.    I, I do not believe that his
14   tape recording is a significant sign of
15   psychosis.
16        Q.    I am asking you, do you believe
17   it was an appropriate way for him to deal
18   with his workplace conflict?
19            MR. SMITH:  Objection to the
20        form.
21        A.    I am not sure that is an
22   appropriate question to ask me.
23        Q.    Does that mean you can't answer
24   it?
25        A.    Given what set of circumstances
```