```
 1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
 4    - - - - - - - - - - - - - - - - - - - -
 5   ADRIAN SCHOOLCRAFT,
 6                      Plaintiff,
 7         -against- Index No.
                      10CIV-6005 (RWS)
 8
     THE CITY OF NEW YORK, DEPUTY CHIEF
 9   MICHAEL MARINO, Tax Id. 873220,
     Individually and in his Official
10   Capacity, ASSISTANT CHIEF PATROL
     BOROUGH BROOKLYN NORTH GERALD NELSON,
11   Tax Id. 912370, Individually and in his
     Official Capacity, DEPUTY INSPECTOR
12   STEVEN MAURIELLO, Tax Id. 895117,
     Individually and in his Official
13   Capacity, CAPTAIN THEODORE LAUTERBORN,
     Tax Id. 897840, Individually and in his
14   Official Capacity, LIEUTENANT JOSEPH
     GOFF, Tax Id. 894025, Individually and
15   in his Official Capacity, stg. Frederick
     Sawyer, Shield No. 2576, Individually
16   and in his Official Capacity, SERGEANT
     KURT DUNCAN, Shield No. 2483,
17   Individually and in his Official
     Capacity, LIEUTENANT TIMOTHY CAUGHEY,
18   Tax Id. 885374, Individually and in his
     Official Capacity, SERGEANT SHANTEL
19   JAMES, Shield No. 3004, and P.O.'s "JOHN
     DOE" 1-50, Individually and in their
20   Official Capacity (the name John Doe
     being fictitious, as the true names are
21   presently unknown)(collectively referred
     to as "NYPD defendants"), JAMAICA
22   HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV,
     Individually and in his Official
23   Capacity, DR. LILIAN ALDANA-BERNIER,
     Individually and in her Official Capacity
24   and JAMAICA HOSPITAL MEDICAL CENTER
     EMPLOYEES "JOHN DOE" # 1-50, Individually
25
     (Continued)
```

Page 87

```
 1            L. ALDANA-BERNIER
 2   morning.
 3            MR. LEE:  At what time?
 4            THE REPORTER:  6:30 in the
 5      morning.
 6            MR. SUCKLE:  Just give me a
 7      second.
 8            MR. SMITH:  Did you see 11/1?
 9            THE WITNESS:  Yes, 11/1/2009 at
10      6:30 in the morning.
11      Q.    And this is a note by who?
12      A.    Dr. Lewin.
13      Q.    Spell that?
14      A.    L-E-W-I-N.
15      Q.    It says 1 of 3 on top, correct?
16      A.    Yes.
17      Q.    It's a three-page note,
18   correct?
19      A.    Yes.
20      Q.    And it ends and the three pages
21   end with a note on 11/1/09 at 6:30 a.m.,
22   correct?
23      A.    Yes.
24      Q.    This is called a "Consultation
25   Form."  What is that?
```

1            L. ALDANA-BERNIER

2       A.     When the doctor calls for a

3   consult, this is the form that we use to

4   write our notes.

5       Q.     What was the purpose of having

6   Mr. Schoolcraft evaluated, if you recall,

7   from your review of the chart?

8       A.     Okay.  It said in here that a

9   psych consult was called and reported as

10  patient was acting bizarre.

11      Q.     Did you read this note prior to

12  your evaluation of the patient?

13      A.     Yes.

14      Q.     Is this one of notes that you

15  read prior to coming here to testify in

16  preparation for your testimony today?

17      A.     Yes.

18      Q.     And were you able to read the

19  note, the handwriting, when you read

20  it --

21      A.     Yes.

22      Q.     -- back in 2009?

23      A.     Yes.

24      Q.     Have you seen Dr. Lewin's

25  handwriting before?

```
 1              L. ALDANA-BERNIER
 2       A.    Yes.
 3       Q.    And you had become familiar
 4  with it?
 5       A.    Yes.
 6       Q.    And if you go to the second
 7  page of that note, did you see from that
 8  note there had been no prior psychiatric
 9  history?
10       A.    It says in here, "Denied past
11  psych hospitalization or treatment."
12       Q.    Or suicidal attempt?
13       A.    Yes.
14       Q.    And after this note was
15  written, was Mr. Schoolcraft free to go
16  home?
17       A.    After this note was written,
18  she had recommendations.
19       Q.    I know.  But my question was:
20  Was Mr. Schoolcraft free to go home after
21  that note was written?
22       A.    No.
23       Q.    When you say "no," why not?
24       A.    Because then that was her
25  recommendation he needed one-to-one
```

```
 1              L. ALDANA-BERNIER

 2    observation for unpredictable behavior

 3    and escape risk.

 4        Q.     What was he escaping from, what

 5    was the escape risk from?

 6        A.     He might run out of the

 7    emergency room because it's unlocked

 8    door.

 9        Q.     He needed to be held because he

10    was an escape risk?

11        A.     He needed to be observed more.

12        Q.     He needed to be observed more?

13        A.     One-to-one, yes.

14        Q.     Did you also read in the note

15    on the second page, the last line on the

16    second page where the note reads, "He

17    denies suicidal ideations."  Do you see

18    that?

19        A.     Yes.

20        Q.     And "He denies homicidal

21    ideations."

22        A.     Yes.

23        Q.     Do you have any reason when you

24    read that note to believe that wasn't

25    true?
```

1              L. ALDANA-BERNIER

2              MR. LEE:  Objection to form.

3      A.     But you are missing the point

4   in there when he is paranoid about his

5   supervisors.

6      Q.     I asked you whether you had any

7   reason to believe he was not suicidal and

8   not homicidal?

9      A.     I think I need to know further

10  if he was suicidal or homicidal.  At that

11  point in time, I need to assess suicidal

12  or homicidal.

13     Q.     You didn't have enough

14  information by just reading suicidal or

15  homicidal, correct, you needed more

16  information, correct?

17     A.     Yes, it's saying here he was

18  paranoid about his supervisors.

19             MR. CALLAN:  Objection to form.

20     Q.     So he was being held because he

21  was paranoid?

22     A.     Not only that.  He became

23  agitated, uncooperative, verbally abusive

24  while he was in the medical ER so we have

25  to find out why there is agitation, why

```
 1              L. ALDANA-BERNIER
 2   is was behaving bizarre.
 3       Q.    Just so I understand.  He is
 4   been held because he is agitated?
 5       A.    Yes.
 6             MR. CALLAN:  Wait for the
 7       question.
 8       Q.    He was being held because you
 9   want to know more about him, correct?
10             MR. CALLAN:  Objection to form
11       of the question.
12       Q.    Is that correct?
13             MR. CALLAN:  That question
14       doesn't make any sense.  You are
15       talking about --
16             MR. SUCKLE:  You have your
17       objection.
18       Q.    Is that your understanding of
19   the note?
20       A.    There was more to that.  The
21   patient was behaving bizarre.
22       Q.    What action was he taking that
23   was bizarre?
24       A.    According to the note, when
25   they went to his house, the patient
```

```
 1              L. ALDANA-BERNIER
 2   barricaded himself and he will not open
 3   the door so they had to break into his
 4   apartment.
 5        Q.    Is it your understanding under
 6   9.39 of the Mental Hygiene Law, someone
 7   can be held because they are acting
 8   bizarre?
 9              MR. CALLAN:  Objection to form.
10              MR. LEE:  Objection to form.
11        Q.    Is that your understanding?
12        A.    That's my -- he can be bizarre
13   and he can be psychotic.
14        Q.    The question was:  Is it your
15   understanding of 9.39 of the Mental
16   Hygiene Law that a patient could be held
17   because they're acting bizarre?
18              MR. LEE:  Objection to form.
19        A.    He can be a danger to himself.
20        Q.    You have to answer my question.
21              Can a patient be held under
22   Section 9.39 of the Mental Hygiene Law
23   because they are acting bizarre?
24        A.    Yes.
25        Q.    Can they be held under Mental
```

1              L. ALDANA-BERNIER
2    Hygiene Law 9.39, as you understand it,
3    because they are agitated?
4        A.    Yes.
5        Q.    That's your understanding of
6    the law?
7              MR. CALLAN:  Objection to the
8        form of the question.
9        Q.    Correct?
10       A.    [No response.]
11       Q.    Am I correct that's your
12   understanding?
13       A.    My understanding, yes.
14       Q.    So a good and accepted medical
15   practice as you understand it allowed to
16   make a hospital to hold Mr. Schoolcraft
17   on November 1, 2009, 'cause he was acting
18   bizarre, correct?
19             MR. CALLAN:  Objection to form.
20             MR. LEE:  Objection to the form.
21       Q.    Correct?
22       A.    It's not only the behaving
23   bizarre.  It's the whole picture that was
24   going on at the time.  From the --
25       Q.    Did you see anything in this

```
 1              L. ALDANA-BERNIER
 2    note that Mr. Schoolcraft was exhibiting
 3    a threat to another person?
 4        A.    Not a threat to another person.
 5        Q.    Did you see anywhere in here
 6    that he was suicidal?
 7        A.    He is not suicidal.
 8        Q.    Did you see anywhere in here
 9    that he was going to harm himself in any
10    way?
11        A.    That I have to question if he
12    was going to hurt himself or if he was a
13    danger to himself because if I have
14    somebody in the emergency room, you have
15    a report that he was behaving bizarre or
16    he was agitated, and if I look at the
17    whole picture from the time that he was
18    taken away from his home where he was --
19    he barricaded himself, then I have to
20    consider him to be held against his will.
21        Q.    Did you see anything in this
22    record that Mr. Schoolcraft indicated to
23    the consulting physician that he was
24    going to harm himself?
25        A.    He said in here that he denied
```

```
 1              L. ALDANA-BERNIER
 2   that he was going to hurt himself.  There
 3   is nothing that he was going to hurt
 4   himself.
 5        Q.    Or hurt anybody else, correct?
 6        A.    Nope.
 7        Q.    Do you know the physician, the
 8   psychiatric resident, that signed that
 9   note?
10        A.    That is Dr. Lewin.  The
11   resident was Dr. Lewin, and the attending
12   Dr. Patel.
13        Q.    On the last page of that note,
14   it's a three-page note, is there a stamp
15   there for the resident?
16        A.    Yes.
17        Q.    So Dr. Lewin was a resident?
18        A.    Yes.
19        Q.    And did Dr. Lewin provide any
20   notice to Mr. Schoolcraft under 9.39 of
21   the Mental Hygiene Law?
22             MR. RADOMISLI:  Objection.
23        A.    I would not remember that.
24        Q.    Did Dr. Lewin, from your review
25   of the records, produce any forms, signed
```

Page 97

```
 1              L. ALDANA-BERNIER
 2   any form, under 9.39 of the Mental
 3   Hygiene Law in order to admit Mr.
 4   Schoolcraft against his will?
 5              MR. RADOMISLI:  Objection.
 6       Q.    Did you see any form?
 7              MR. RADOMISLI:  Objection.
 8              MR. CALLAN:  Objection.
 9       Q.    Did he fill out any such form?
10              MR. CALLAN:  She is supposed to
11       get into his mind and know what he
12       did?
13              MR. SUCKLE:  Forms, forms, did
14       you see any forms.
15              MR. CALLAN:  Did you see any
16       forms, that's fine.
17              Go right ahead.
18       A.    No.
19       Q.    Is there anything in the file
20   that suggests that Dr. Lewin actually
21   filled out any form with regard to 9.39
22   of the Mental Hygiene Law?
23              MR. RADOMISLI:  Objection.
24       Q.    Anything to suggest that?
25              MR. RADOMISLI:  Objection.
```

Page 98

```
 1              L. ALDANA-BERNIER
 2      Q.     From your prospective?
 3              MR. RADOMISLI:  Objection.
 4              MR. SUCKLE:  I heard it.
 5              MR. RADOMISLI:  I strenuously
 6      object.
 7              MR. SUCKLE:  I heard your
 8      strenuous objection.
 9              MR. CALLAN:  Do you want her to
10      look through the entire record?
11      A.     There are no forms.
12      Q.     Did Dr. Lewin, do you see
13  anything to suggest that Dr. Lewin then
14  ensured within 48 hours that another
15  physician evaluated Mr. Schoolcraft?
16              MR. RADOMISLI:  Objection.
17              MR. CALLAN:  Objection.
18      Q.     Does it say anything in there?
19      A.     She indicated in here he needs
20  to be transferred to the psych ER.
21      Q.     And after Dr. Lewin, there is
22  another signature.  Do you know who that
23  is?  Did I ask you that already?
24              In the note of November 1, that
25  Dr. Lewin wrote, underneath his signature
```

Page 99

```
 1              L. ALDANA-BERNIER
 2    is another signature.  Do you know whose
 3    signature that is?
 4        A.    That is Dr. Patel.
 5        Q.    Did Dr. Patel fill out any form
 6    that you are aware of in order to comply
 7    with 9.39 of the Mental Hygiene Law?
 8              MR. LEE:  Objection to form.
 9              MR. RADOMISLI:  Objection.
10              MR. CALLAN:  Same objection.
11        Q.    No?
12        A.    There is no form in here.
13        Q.    There is no form in the record,
14    correct?
15        A.    None.
16        Q.    Did you read Dr. Patel's note
17    at the end there where he signed?
18        A.    "I concur with above doctor's
19    treatment recommendations."
20        Q.    What is psychotic disorder,
21    what is that?
22        A.    Psychotic disorder is one of
23    the categories of diagnosis wherein
24    patient is not in touch with reality.
25              He can have the following
```

```
 1              L. ALDANA-BERNIER
 2   symptoms, like, agitation, aggressive
 3   behavior, delusions, hallucinations,
 4   impairment in reality testing.
 5       Q.    That's a pretty broad category,
 6   correct?
 7       A.    Yes.
 8       Q.    What does Axis I stand for?
 9       A.    Those are our DSM categories
10   when we are diagnosing patients.
11            Axis I is for psychotic
12   disorders or mental health disorders.
13   Axis II would be our personality
14   disorder.  Axis III is the medical
15   disorder.  Axis IV is the social
16   stressor.  And Axis V is the global
17   functioning.
18       Q.    So when you read that note, you
19   learned that there was some social
20   stressors; being, a conflict at the
21   worksite for Mr. Schoolcraft, correct?
22       A.    That's correct.
23       Q.    Do you know what the nature of
24   a that conflict was?
25       A.    Something -- a conflict between
```

1                    L. ALDANA-BERNIER

2        A.     It was the next day, yes.

3        Q.     Why did you wait till the next

4   day to fill out that form?

5        A.     That's when he was going

6   upstairs to the inpatient unit.

7        Q.     Where was he from November 2nd,

8   at 3:10 until he went upstairs?

9        A.     He was in the psych ER.

10       Q.     Why did he stay in the psych ER

11  after you saw him on November 2nd, 2009?

12       A.     Why did he stay in the psych

13  ER?  I do not know what happened in 2009.

14  Maybe there were no beds available, I

15  have to let him wait in the emergency

16  room.

17       Q.     Did you do your mental status

18  examination of Mr. Schoolcraft on

19  November 2nd, 2009, November 3rd, 2009

20  2009, or some other date?

21       A.     It was on November 2nd.

22       Q.     When you did your mental status

23  examination of Mr. Schoolcraft, did you

24  make -- let's go back.

25              Did you take a history of Mr.

```
 1              L. ALDANA-BERNIER
 2    Schoolcraft?
 3        A.    I spoke to Mr. Schoolcraft, and
 4    I did take a history on him.
 5        Q.    Did you write that history
 6    down?
 7        A.    No, because I did agree with
 8    the notes of the resident.
 9        Q.    Did you make a note of what Mr.
10    Schoolcraft told you regarding his
11    history?
12        A.    It's -- all of the notes was in
13    the resident notes.
14        Q.    And did you do a mental status
15    examination of Mr. Schoolcraft in your
16    presence?
17        A.    I did a mental status exam, and
18    I agreed to the notes of the resident.
19        Q.    Am I correct other than the
20    November 2nd, 2009 note, and the November
21    3rd 2009 mental hygiene form that you
22    filled out, you make no other notes in
23    this chart?
24              MR. RADOMISLI:  Objection to
25        form.
```

1              L. ALDANA-BERNIER

2      Q.    Am I correct?

3              MR. RADOMISLI:   Objection to

4      form.

5      A.    That's correct.

6      Q.    So the residents had evaluated

7   him and made notes, correct?

8      A.    Yes.

9      Q.    And you were the director of

10   the emergency room, correct?

11     A.    Correct.

12     Q.    And you had this patient in

13   front of you, correct?

14     A.    Yes.

15     Q.    And you had the wherewithal,

16   you had the chart in front of you,

17   correct, when you saw the patient?

18     A.    That's correct.

19     Q.    And you had the ability and did

20   in fact make notes in the chart, correct?

21     A.    That's correct.

22     Q.    Just so we are clear:  You did

23   not make any independent notes regarding

24   your own findings during your

25   examination, correct?

```
 1              L. ALDANA-BERNIER
 2     A.     That's correct.  I agreed with
 3  the notes of the resident.
 4     Q.     Doctor, do you believe not
 5  making any notes regarding your
 6  examination and findings with regard to
 7  Mr. Schoolcraft was in the bounds of good
 8  and accepted medical practice?
 9     A.     I have the residents that saw
10  that patient and I agreed with their
11  notes so that is my -- the agreement with
12  regards to the notes of the residents
13  since I agreed with the above, I
14  considered that as my notes.
15     Q.     I understand when you say you
16  considered it.
17            The question is:  Does good and
18  accepted medical practice require you to
19  make your own notes regarding your
20  examination and assessment of the
21  patient?
22            MR. CALLAN:  Objection to the
23       form of the question.
24            You can answer.
25     A.     If I'm agreeing with notes of
```