# EXHIBIT

# "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- X

ADRIAN SCHOOLCRAFT,

                           Plaintiff,

          -against-                    10-CV-6005 (RWS)

THE CITY OF NEW YORK et al.,

                          Defendants.

----------------------------------------------------------------------- X

## DECLARATION OF JON L. NORINSBERG IN SUPPORT OF
## MOTION FOR ATTORNEY'S FEES AND COSTS

JON L. NORINSBERG, an attorney admitted to practice in the State of New York, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, as follows:

1.      I am one of the attorneys of record for plaintiff Adrian Schoolcraft in the above-captioned action. As such, I am familiar with the facts and circumstances concerning the prosecution of this action, and I submit this Declaration in support of plaintiff's application, pursuant to 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54(d), for an order awarding plaintiff attorney's fees and costs as the prevailing party in this litigation.

## ATTORNEY BACKGROUND AND EXPERIENCE

2.      I am the sole proprietor in the Law Offices of Jon L. Norinsberg, PLLC, with offices at 225 Broadway, Suite 2700, New York, New York.

3.      My firm is dedicated to fighting against police misconduct.  The firm specializes in bringing civil rights actions to vindicate the rights of people who have been subjected to false

arrest, malicious prosecution and excessive force.  I have been litigating cases for almost twenty-five years.

4.      After finishing first in my class in 1990, I graduated *Magna Cum Laude* from the Georgetown University Law Center in 1991.  After graduation, I joined Proskauer, Rose, Goetz and Mendelsohn ("Proskauer"), a prominent commercial litigation firm in New York, where I was an associate in the firm's litigation department for almost two years. After leaving Proskauer in 1993, I joined the New York City Law Department ("Law Department"), where I became a trial lawyer in the City's Manhattan Trial Unit. During my five years at the Law Department, I became one of the City's top-level trial lawyers.  I also co-authored the Law Department's *Trial Notebook*, the City's trial training manual (which is still in use over eighteen years later), and I was instrumental in creating the City's trial training program.

5.      I am a member of the New York and Connecticut state bars.  I am also a member of the bar of the United States District Courts for the Southern and Eastern Districts of New York, and the Second Circuit Court of Appeals.

6.      In 1997, while at the Law Department, the *National Law Journal* declared one of my verdicts to be one of the top 10 defense verdicts of the year.

7.      In 1998, I left the New York City Law Department to open up my own law firm. Since that time, I have run a successful litigation practice, focusing almost exclusively on civil rights litigation and also serving as trial-counsel for other law firms in New York City.

8.      In 1999, I was featured on the front page of the New York Law Journal regarding my practice in civil rights litigation.

9.      Since its founding, my firm has litigated over 200 § 1983 civil rights cases in the Southern and Eastern Districts of New York, the vast majority of which involve claims of false arrest, excessive force and/or malicious prosecution. My experience in the field of civil rights litigation has previously been acknowledged by this Court in the case of <u>Stinson v. City of New York,</u> 10 Civ. 4228 (RWS), 2012, U.S. Dist. LEXIS 56748 *31 (SDNY April 23, 2012) (noting that "Jon L. Norinsberg is a civil rights attorney with nearly twenty years of civil litigation experience, including civil rights litigation against state and local governments," and Mr. Norinsberg is "competent and experienced in federal class action and federal civil rights litigation."). Similarly, in <u>Marshall v. City of New York, et al.,</u> 10cv2714 (JBW) (VVP) (E.D.N.Y. 2012), Magistrate Judge Pohorelsky noted that "Mr. Norinsberg has been practicing for over twenty years and has an extensive background in litigating complex civil rights and constitutional law cases."

10.     Apart from my extensive experience in civil rights litigation, I have substantial trial experience, having tried over 150 cases in my career, including trademark cases, products liability cases, medical malpractice cases, and personal injury cases (both as plaintiff's counsel and defense counsel). In the past three years, I have tried ten federal civil rights actions to verdict (prevailing on seven), and have also tried three state law cases during this same time period.  In the Fall of 2015, I was recognized as one of the top civil rights litigators in New York in the New York Times. (MEx. DD).[1]  Further, in the past two years, I have been nominated by the Trial Lawyers Board of Regents for special recognition as a top litigator in my field.

11.     My extensive experience as a trial lawyer has translated into significant victories for my clients in civil rights actions.   For example, I obtained a $7,700,000.00 verdict in <u>Morse</u>

---

[1] All exhibits referenced herein are annexed to the Master Declaration of Joshua P. Fitch.

v. Fusto, et.al., 07 CV 04793 (CBA) (RML) (Feb. 12, 2013 E.D.N.Y), a $2,474,000.00 verdict in Guzman v. Jay, 10 CV 6353(ALC) (Dec. 17, 2013 S.D.N.Y.), a $500,000.00 verdict in V.A., a minor, et.al., v. Sgt. Michael Marcucilli, 09 CV 2391(CM) (S.D.N.Y. July 30, 2012), a $400,000.00 verdict in Zomber v. Village of Garden City, et al., 09 CV 4637(LDW) (ETB)( E.D.N.Y. Oct. 17, 2011), and a $190,000.00 verdict in Marshall v. Randall, 10 CV 2714(JWB) (VVP) (E.D.N.Y. April 26, 2012).

12. In 2013, I obtained two verdicts that made the New York Law Journal's list of top verdicts in the entire State of New York. In fact, both the Guzman and Morse verdicts made the *top five* list of all government verdicts for the State of New York for the year of 2013. (Master Decl., Ex. CC).

13. In addition to my federal civil-rights trials, I have also obtained substantial verdicts in New York State Courts. For example, in Williams v. New York City Transit, (Sup. Ct. New York Cty., 11792-04), I obtained a $1,800,000.00 verdict. In Lema, et.al., v. New York Hospital Medical Center of Queens, (Sup. Ct. Queens Cty., 20568-08), I obtained a verdict of $1,692,000.00. In Montpeirous v. North Shore LIJ (Sup. Ct. Queens Cty., 17425/04), I obtained a verdict of $650,000.00 and in Winbush, et al. v. City of New York, et al., (Sup. Ct. Kings Cty.), I obtained a verdict of $600,000.00.

14. Apart from obtaining successful jury verdicts, I have also obtained substantial settlements in several cases that were resolved either during trial, or immediately before trial. For example, I obtained a $1,500,000.00 settlement in Dominguez v. Moskowitz, (Sup Ct. New York Cty.); a $1,400,000.00 settlement in Carvalho v. MonteFiore Medical Center, et.al.; a $1,400,000.00 settlement in Zambrano v. Sound Shore Medical Center, et.al., (Sup. Ct. Westchester Cty.); a $1,000,000.00 settlement in Richards v. City of New York, et.al., (Sup. Ct.

Richmond Cty.); and a $500,000.00 settlement in <u>Dortch v. Montefiore Medical Center</u>, (Sup. Ct. Bronx Cty.).

15.     In addition to my trial work, I have successfully argued a number of civil rights cases before the Second Circuit. In fact, some of these cases have become important precedents in the field of civil rights. <u>See, e.g.</u>, <u>Morse v. Fusto</u>, 2015 WL 5294862 (2d Cir. 2015) (holding that a fabricated evidence claim can be based on material omissions rather than affirmatively untruthful statements); <u>Marshall v. Randall</u>, 719 F3d 113 (2d Cir. 2013) (holding that a defendant police officer's false grand jury testimony can be used for impeachment purposes, even if the officer is immune from liability for such false testimony under <u>Rehberg v. Paulk</u>); and <u>Boyd v. City of New York</u>, 336 F.3d 72 (2d Cir. 2003) (holding that material inconsistencies in police paperwork may overcome presumption created by grand jury indictment).   Apart from these important precedents,  I have also successfully briefed and argued a number of other Second Circuit appeals, such as <u>Bertuglia v. City of New York</u>, 509 F. App'x 43, 44 (2d Cir. 2013) and <u>O'Hara v. City of New York</u>, 570 F. App'x 21, 24 (2d Cir. 2014).  In total, I have now argued nine cases before the Second Circuit Court of Appeals.

16.     Apart from my appellate work, several of district court cases have become important precedents in this jurisdiction. <u>See, e.g.</u>, <u>Jovanovic v. City of New York</u>, 2006 U.S. Dist. LEXIS 59165 (S.D.N.Y. Aug. 17, 2006); <u>Richardson v. City of New York</u>, 2006 U.S. Dist. LEXIS 69577 (E.D.N.Y. Sep. 27, 2006); <u>Benjamin Taylor v. City of New York</u>, 2003 U.S. Dist. LEXIS 13284 (E.D.N.Y. Jul. 29, 2003); <u>Horace Taylor v. City of New York</u>, 2006 U.S. Dist. LEXIS 41429 (S.D.N.Y. Jun. 19, 2006); <u>Hernandez v. City of New York</u>, 2003 U.S. Dist. LEXIS 21146 (S.D.N.Y. Nov. 18, 2003).

17.     The clients that I represent in civil rights cases typically can only afford to retain an attorney on a contingency basis, and all of my cases are handled that way.  I do not receive an initial retainer from any of my clients, nor do any of them make even a token contribution to litigation expenses.  I am compensated based upon a percentage of any judgment or settlement, or through § 1988 fee awards and settlements.

18.     I bear all the costs of litigation while the case is pending, and I have always released the client from any obligation to pay for expenses which have been advanced if there is no recovery. For example, In July of 2013, I litigated and lost the case of Figueroa v. City of New York, et.al., 11CV05384 (JBW) (VMS), absorbing over $5,000.00 in expenses. In February 2012, I litigated a case through trial and lost, absorbing over $10,000.00 in expenses. See Gardner v. County of Suffolk, et al., 09 CV 0471(JS) (WDW),

19.     Civil rights cases are extremely risky and involve complex issues of law.  The New York City Law Department describes law governing civil rights as "the Constitution of the United States and the vastly complex area of Federal law specific to 42 U.S.C. § 1983…, a complex, ever-changing area of law." [2] (Master Decl., Ex. BB).

20.     Because the chance of losing a police misconduct case is high, I and other civil rights lawyers in New York depend on the availability of a full "lodestar" recovery if we do prevail.  See Perdue v. Kenny A., 130 S. Ct. 1662 (2010) ("the 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence.").

---

[2] http://www.nyc.gov/html/law/html/about/divisions_federal.shtml (accessed December 14, 2015).

## THE COURSE OF THIS LITIGATION

21.     My law firm, along with the law firm of Cohen & Fitch, LLP (collectively, "Plaintiff's Counsel"), were the original attorneys of record in this action.  In this capacity, we represented Adrian Schoolcraft for the first two-and-one-half (2.5) years of this litigation, starting from June 2010 through November 14, 2012.  We were replaced by another law firm in November 2012, but we were subsequently rehired by Mr. Schoolcraft in January 2015.  Since that time, our firms collectively served as lead counsel in this matter, assuming the primary responsibility of getting prepared for, and trying, this case before a jury.

22.     During the three years that we were lead counsel on this case, our firms devoted a substantial amount of time, energy and resources to the prosecution of this action.  This litigation proved to be a monumental undertaking, dominating our respective practices, and requiring us to devote innumerable hours every day, every week and every month – causing us to forego representation of other matters in the process.  The level of intensive work that was required was far beyond any other civil matter that we have ever handled.

23.     At the outset, the investigation into this case required us to review hundreds of hours of recordings provided to us by Officer Schoolcraft, as well as over a thousand documents and multiple video recordings. This was a time-consuming, arduous task, requiring countless hours merely to familiarize ourselves with the evidence that could potentially be used to support plaintiff's claims in this action.

24.     Apart from reviewing the materials provided by Officer Schoolcraft, Plaintiff's Counsel expended substantial time and effort in finding additional NYPD officers to support plaintiff's Monell claims against the City of New York.  Toward this end, we set up a website on

behalf of plaintiff, www.schoolcraftjustice.com, to encourage other police officers to come forward and share their experiences about quotas and retaliation.

25.     The website proved to be extremely useful, as over six hundred police officers contacted our firms and shared their knowledge, experience and insight with us.  Many of these officers provided us with critical information regarding the NYPD's quota system, its retaliation against officers who fail to comply with quotas, and its manipulation of crime statistics in order to create a false impression of the NYPD's crime-fighting efficacy.

26.     Among the many police officers who contacted us and shared valuable information were: Adhyl Polanco, Lt. Joe Ferrara, P.O. Frank Palestro, P.O. Kevin Rodriguez, P.O. Chris Whitehead, P.O. Christopher Bienz, and P.O. Eddie Velasquez.

27.     Apart from the website, we also utilized the news media to develop additional evidence to support plaintiff's Monell claims against the City of New York.  Thus, we were in regular contact with reporters from the New York Times, Daily News, Village Voice,  This American Life, The Chief, Thee Rant and NYPD Confidential and ABC News, which resulted in substantial media coverage for the Schoolcraft case.  As a result of such coverage, many other police officers came forward and provided invaluable information and insights regarding the NYPD.

28.     Further, several prominent experts contacted us, including John Eterno, a former captain with the NYPD, and Eli Silverman, both of whom have co-authored several books and articles relating to the NYPD, crime statistics and Compstat.  We met with Professors Eterno and Silverman, and kept in frequent contact with them as the litigation progressed.  Eventually, Professors Eterno and Silverman became experts in this case, and submitted a detailed report

analyzing the events of October 31, 2009, and setting forth the multiple violations of proper police procedure.

29.    Once our preliminary investigation was complete, our firms set up upon the task of drafting a federal complaint on behalf of Officer Schoolcraft. The process of commencing this litigation posed a formidable challenge, requiring Plaintiff's Counsel to master a sprawling universe of facts, and research a wide variety of legal claims, many of which went beyond the scope of claims that our firms have typically asserted under Section 1983. For example, we conducted extensive research into Labor Law 215-a, Mental Hygiene Law Sections 9.39, 9.40, 9.41, Substantive Due Process claims, as well as First Amendment prior restraint jurisprudence.

30.    After commencing this litigation, Jamaica Hospital Medical Center ("JHMC") filed a motion to dismiss all federal claims and remand the malpractice claims to State Court. This motion was vigorously litigated, and was ultimately granted in part and denied inpart.

31.    Following the Court's decision in May 2011, and continuing until November 2012, Plaintiff's Counsel engaged in extensive discovery in this action.  Our firms reviewed and analyzed the prodigious amounts of discovery produced by the City of New York, consisting of thousands of pages of documents, and hundreds of hours of audio and video recordings.  Our firms also subpoenaed and reviewed hundreds of records from multiple non-parties, including but not limited to, the Fulton County Department of Social Services, the Johnstown Police Department Councilman Al Vann, Councilman Peter Vallone, medical providers such as Dr. Steven Luell, Dr. Hertzel Sure, and Forest Hills Hospital.

32.    Apart from reviewing discovery, our firms performed multiple other tasks during the pre-trial phase, including: preparing multiple sets of document demands, interrogatories and requests for admissions; responding to defendants extensive discovery demands; filing multiple

discovery motions; preparing plaintiff for his deposition, and then defending him at his all-day deposition; interviewing large numbers of NYPD officers who contacted our firms; reviewing transcripts and discovery materials from other quota-based civil actions against the NYPD, including Robinson v. City of New York, 05-CV-9545, Floyd v. City of New York., 08-CV-01034, and Velez v. the City of New York, A-10699-04 (Arbitration between PBA and the City of New York); meeting and conferring multiple times with experts John Eterno and Eli Silverman; meeting with representatives from the Queens District Attorney's Office and the United States Attorney's Office on multiple occasions, regarding pursuing state criminal charges and federal civil rights violations, respectively, against the defendants; meeting and speaking multiple times with the lead attorneys from other parallel civil-rights actions, including Darius Charney Esq. (Center of Constitutional Rights) and Christopher Dunn (New York Civil Liberties Union); traveling to upstate New York (over three hours each way) to meet in person multiple times with plaintiff; and countless telephone conversations with both plaintiff and his father regarding the status of the case, day-by-day developments and the next steps for moving forward in the case.[3]

33.    After working on the case for over two years, our firms were, as noted above, discharged by Mr. Schoolcraft in November 2012.  Thereafter, in January 2015, as the trial date neared, Mr. Schoolcraft contacted our firms – both of whom have extensive trial experience in civil rights actions – and requested us to take over as lead trial counsel in this action.

34.    The process of preparing for this trial was a massive undertaking, requiring an extraordinary amount of time, energy and commitment from all members of our team.  Among the many pressing tasks, Plaintiff's Counsel had to prepare extensive cross-examination outlines

---

[3] In the exercise of our billing discretion, we have elected not to bill for majority of these innumerable phone calls.

for over *twenty witnesses*, including Chief Marino, Captain Lauterborn, DI Mauriello, Lt. Caughey, Sgt. Weiss,  Captain Trainor, Sgt. James, Lt. Gough, Sgt. Gough, Sgt. Duncan, Sgt. Sawyer, Lt. Broschart, Sgt. Huffman, Detective Yeager, PAA Carter and PAA Boston, to name just a few.  The deposition transcripts for many of these witnesses were several hundred pages long (DI Mauriello's transcripts alone exceeded 800 pages) and often there were a large number of exhibits that were utilized during questioning and which would potentially provide fodder for cross-examination. It is difficult to describe how formidable the challenge was to prepare these outlines, which for many witnesses wound up being several hundred pages long.[4]

35.     Apart from preparing cross-examination outlines, Plaintiff's Counsel also had to prepare a highly detailed and comprehensive opening statement.  This required a mastery of a sprawling universe of facts and claims, as there were actually five separate claims that were intertwined into a single lawsuit.  First, there was a claim for unlawful retaliation,  as plaintiff's supervisors retaliated against him when he chose to appeal his 2008 low evaluation.  Second, there was a whistleblower claim which arose when plaintiff learned of corruption at the 81st Precinct by his supervisors, and faced severe consequences from his supervisors after he reported this corruption to Internal Affairs and the Quality Assurance Division. Third, there were the events which took place on October 31, 2009, when ten high-level NYPD supervisors unlawfully entered into plaintiff's apartment, declared him to be an emotionally disturbed person ("EDP") and then took him against his will to Jamaica Hospital. Fourth, there was a lengthy involuntary confinement at Jamaica Hospital, initiated by the NYPD but then continued by the medical staff at Jamaica Hospital for six days.  Fifth, there were the NYPD's repeated attempts at harassment

---

[4] We have retained bound copies of these cross-examination outlines for the Court's *in camera* inspection, so that the Court can readily verify our representations regarding the breadth and scope of these outlines.

and intimidation of Officer Schoolcraft at his home in upstate New York, implicating potential First Amendment violations as well as common law intentional tort claims.

36.     Combining these discrete claims into a single coherent and compelling narrative was an exceptionally difficult challenge, requiring the highest level of skill, experience and hard work.  The end result was an opening statement outline, and global case summary, that exceeded two-hundred and fifty pages in length.

37.     Apart from drafting over twenty cross-examination outlines and preparing a comprehensive case summary and opening statement, Plaintiff's Counsel also had to undertake the task of preparing Officer Schoolcraft for trial.  Given the vast array of potential impeachment material -- including multiple recorded interviews of Officer Schoolcraft with Internal Affairs and QAD, and his testimony at three prior depositions -- this was a massive undertaking, requiring an intensive review of all prior testimony, as well as a review of thousands of documents furnished during discovery.

38.     Plaintiff's Counsel also drafted a voluminous motion *in limine*, spanning close to fifty-pages in length, seeking to preclude various prejudicial evidence that defendants would have likely introduced at trial in the absence of such a motion. This motion proved to be largely successful, as the Court ruled in plaintiff's favor on most issues and reserved decision on a few other issues until the time of trial.

39.     Plaintiff's Counsel was also intimately involved with many other aspects of pre-trial preparation. Such tasks included, among other things: reviewing over 500 trial exhibits (which included 250 exhibits by plaintiff, 121 exhibits of the City, and 240 trial exhibits from Defendant Mauriello); reviewing lengthy and voluminous motions *in limine* and other pre-trial submissions filed by the City of New York and Defendant Mauriello; reviewing the JPTO filings

by all parties; reviewing, researching and revising applicable law for proposed jury instructions; and revising and editing the proposed verdict sheet.

40.     Plaintiff's Counsel now seeks attorneys' fees for all legal work performed in connection with this matter.[5] Specifically, plaintiff seeks attorneys' fees for the work performed by my firm from the date of the filing of the Complaint through the end of the trial. I have submitted contemporaneous, detailed time records specifying the work performed on this case by myself and my associate, John Meehan, Esq., in connection with this matter up until the time of filing this application.

41.     Plaintiff also seeks an award of paralegal fees for all worked performed by seniors paralegal Nicole Bursztyn.  Lastly, plaintiff seeks recovery of all costs reasonably expended in connection with this matter.

## NUMBER OF HOURS EXPENDED

42.     The Supreme Court has noted that a reasonable hourly fee will normally encompass all hours reasonably expended on the litigation. Hensley, 461 U.S. at 435.  A party seeking fees bears the burden of supporting its claim of hours expended by accurate, detailed and contemporaneous records.  See New York State Ass'n for Retarded Children v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983).  Annexed as Exhibit H to the Master Declaration, are detailed and contemporaneous time records maintained by plaintiff's counsel's firm. The records are sufficiently specific and detailed so that the Court can determine the nature of the work performed in the successful prosecution of this case. Mr. Norinsberg spent a total of 1451.85 hours on this litigation.  At his proposed hourly rate of $600.00 for legal work, Mr. Norinsberg is

---

[5] Since Cohen & Fitch, LLP are submitting their own records in support of their application for fees and costs, plaintiff will address herein only the fees and costs sought by Jon L. Norinsberg, Esq., his associate, John J. Meehan, Esq., and his senior paralegal, Nicole Bursztyn.

requesting $871,110.00 for his work. (Master Decl., Ex. H).   Mr. Norinsberg's Fourth Year

associate, John J. Meehan, Esq., spent a total of 137.8 hours on this litigation. At his proposed

hourly rate of $350.00 per hour, Mr. Meehan is requesting $48,230.00 for his work.  (Id.).

43.     Further, Nicole Burstyn – a senior paralegal in Mr. Norinsberg's office who has

over 17 years of experience – spent an additional 103.15 hours on this litigation. Plaintiff

respectfully submits that Ms. Burzstyn's billing rate should be set at $125.00 per hour, a rate

which has previously been approved by Magistrate Judge Pohorelsky. See Marshall v. City of

New York, et al., Index No. 10-CV-2714 (JBW) (VVP). Docket No. 103, at 10 (finding that

"$125 for the work of the paralegal Ms. Burstyn is what a reasonable paying client would pay for

[her] services."). At an hourly rate of $125.00 for paralegal work, Ms. Burstyn requests

$12,893.75 for her work performed in this matter.

## REASONABLE HOURLY RATES

## Mr. Norinsberg's Proposed Hourly Billing Rate

44.     Mr. Norinsberg's requested hourly rate is $600.00 per hour. Given Mr.

Norinsberg's vast experience in civil litigation  -- and his outstanding track record as a civil

rights litigator (see ¶¶ 10-14, supra.) -- it is respectfully submitted that Mr. Norinsberg's hourly

billing rate should be $600.00 per hour for the work that he performed in this case, which is well

within the range of hourly fees which have been upheld in the Southern District for experienced

civil rights litigators. See Barbour v. City of White Plains, 788 F. Supp. 2d 216, 225 (S.D.N.Y.

May 24, 2011), aff'd, 700 F.3d 631 (2d Cir. 2012) (awarding an hourly rate of $625)

("[Plaintiff's attorney] cites his extensive experience as a civil rights litigator...including

litigating approximately 150 civil rights cases...In view of [his] extensive experience and the

evidence presented that his claimed rate is within a standard range charged by other attorneys in

this District with similar levels of experience and skill... [his] rate of $625 is reasonable.); Rozell v. Ross-Holst, 576 F. Supp. 2d 527 (S.D.N.Y. 2008)($600.00 an hour was reasonable for a highly experienced attorney on a "relatively straightforward...single plaintiff" case.).  See also Restivo v. Nassau County, et al. No. 06-CV 6720 (JS) (SIL), 2015 U.S. Dist. LEXIS 160336 (E.D.N.Y. Nov. 30, 2015) (awarding $700.00 billing hourly billing rate to two senior civil rights attorneys) ("Although the $700.00 an hour rate requested by Messrs. Sheck and Neufield is high, the Court finds that it is a reasonable rate in light of the complexity of the issues involved in this dispute; the forty years of experience litigating civil rights that both attorneys brought to the case; and the market for legal services in the Southern District of New York, which supports a $700.00 per hour rate for senior partners.").

45.     Almost one year ago, Mr. Norinsberg was awarded an hourly rate of $550.00 in the Southern District by the Honorable Lorna G. Schofield for work performed in a routine civil rights case, Bernabe v. City of New York, 13 Civ. 5531 (LGS) (Master Decl., Ex. EE). However, given the unusual complexity of the issues involved in this case, and the high level of knowledge, skill and experience that was required to prepare this case for trial, it is respectfully submitted that a billing rate of $600.00 per hour is warranted for Mr. Norinsberg, who has almost twenty five years of experience in civil litigation.

46.     This billing rate is well within the range of hourly fees which have been upheld by Courts in the Southern District for lawyers with comparable experience to Mr. Norinsberg. See, e.g., Mawere v. Citco Fund Servs., (USA) Inc., No. 09-CV1342, 2011 WL 6779319, at *5 (S.D.N.Y. Sept. 16, 2011) report and recommendation adopted, No. 09-CV-1342, 2011 WL 6780909 (S.D.N.Y. Dec. 27, 2011) (awarding $650.00 an hour to an attorney with 32 years of experience in employment discrimination case);  Kim v. Kum Gang, Inc., No. 12-CV-6344, 2014

WL 2514705, at *2 (S.D.N.Y. June 2, 2014) (awarding an "experienced" litigator $600 per hour in a wage and hour case).

47.     Several older cases in the Southern District further support a billing rate of $600.00 per hour for an experienced civil rights litigator such as Mr. Norinsberg.  See, e.g., Adorno v. Port Authority of New York and New Jersey, 685 F. Supp. 2d 507 (S.D.N.Y. 2010)("A rate of $550.00 is also consistent with rates awarded in this district for experienced civil rights lawyers."); Smith v. Nagai, 2012 WL 2421740, *recommendation adopted*, Smith v. Saki Restaurant Corp., 2012 WL 2428929 (S.D.N.Y. 2012) (founding partner of a small firm "with more than twenty years of experience handling complex litigation" should be compensated at the rate of $550.00 per hour, finding that such a rate is "comparable to rates regularly approved in the Southern District of New York and ... therefore reasonable."); Amapropr Ltd. V. Indiabulls Fina. Servs. Ltd., No. 10-CV-1853, 2011 WL 1002439 at *5 (S.D.N.Y. Mar. 16, 2011) (approving an hourly rate of $761.00 for a senior partner in a case about compelling arbitration). See also Zahrey v. City of New York, et al., 98 Civ. 4546 (DCP) (JCF), Report and Recommendation, dated June 8, 2010 (Docket No. 264) (awarding experienced criminal defense attorney, who had litigated 20 civil rights claims in his career, a billing rate of $575.00 per hour in 2010).[6]

48.     Exhibits O, P and Q to the Master Declaration are the Declarations of Jonathan Abady, Esq., Christopher Galiardo, Esq., and Afsaan Saleem, Esq., all of whom are seasoned civil rights litigators with many years of experience and excellent professional reputations, in which they attest that $600.00 per hour is well within the bounds of hourly rates in the Southern District for a lawyer with Mr. Norinsberg's knowledge and experience.

---

[6] After the Report and Recommendation was issued, the parties subsequently settled the action.  Therefore, there is no reported decision by the District Court regarding this Report and Recommendation.

49.     Exhibit Z to the Master Declaration is the National Law Journal's 2013 annual survey of law firm hourly billing rates.[2] A summary of the partner billing rates for some of the New York law firms mentioned in the survey is set forth below:

| Firm Name | Partner Billing Rate – High | Partner Billing Rate – Low | Average Partner Billing Rate |
|---|---|---|---|
| Paul, Weiss, Rifkind, Wharton & Garrison | $1120 | $760 | $1040 |
| Fried, Frank, Harris, Shriver & Jacobson | $1100 | $930 | $1000 |
| Quinn Emanuel Urquhart & Sullivan | $1075 | $810 | $915 |
| Hughes Hubbard & Reed | $995 | $725 | $890 |
| Proskauer Rose | $950 | $725 | $880 |
| Kelley Drye &Warren | $815 | $435 | $640 |
| **Average Hourly Billing Rates** | **$1009** | **$731** | **$894** |

50.     The above chart is particularly significant since it shows the billing rates of three law firms that Plaintiff's Counsel has either worked for, or with, in handling other civil litigation matters. For example, both Mr. Norinsberg and Cohen and Fitch, LLP, are co-counsel with Quinn Emanuel Urquhart & Sullivan ("Quinn Emmanuel") in a class action currently pending before Your Honor, Stinson et al. v. City of New York, 10 Civ. 4228 (RWS).  As the above chart demonstrates, the *lowest* partner billing rate for a junior partner at Quinn Emmanuel -- i.e. for a partner with as little as eight (8) years of litigation experience – is $810.00 per hour.  It follows, *a fortiorari*, that the requested hourly rates for Plaintiffs' Counsel -- all of whom have significantly *more* than 8 years of litigation experience – is eminently reasonable and clearly warranted under the circumstances.

---

[2] The survey is often used by federal courts to determine appropriate hourly rates.  See, e.g., Integrated Marketing v. JEC Nutrition, 2007 WL 840304 at *2 (S.D.N.Y. Mar. 19, 2007); Banco Centrale v. Paraguay Humanitarian Found., 2007 WL 747814 at *2 (S.D.N.Y. Mar. 12, 2007); In re Merrill Lynch v. Research Securities Litig., 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007).

51.     Similarly, it should be further noted that Mr. Norinsberg previously worked for Proskaur Rose ("Proskauer") as a litigation associate for two years, and Nathaniel Smith, co-counsel in this action, previously worked for Paul Weiss Rifkind Wharton and Garrison ("Paul Weiss") for six years.  As the above chart demonstrates, the *lowest* billing rate for a junior partner at Proskauer is $725.00 per hour, and the lowest rate for a junior partner at Paul Weiss is $760.00 per hour. Thus, the requested hourly billing rates for Mr. Norinsberg ($600.00 per hour) and Mr. Smith ($575.00 per hour) are *significantly lower* the amounts charged by their respective former law firms for attorneys who have much less litigation experience than either Mr. Norinsberg or Mr. Smith.

52.     Lastly, a review of the average billing rates for partners in New York law firms lends further support for the requested rates for Plaintiff's Counsel.  In the 2013 National Law Journal Billing Survey, sixteen (16) of the twenty-five (25) firms listed senior partners in New York firms were charging over $1000 an hour: Gibson Dunn & Crutcher ($1800); Kasowitz, Benson, Torres & Friedman ($1195); Skadden Arps Slate Meacher & Flom ($1150); Paul, Weiss, Rifkind, Wharton & Garrison ($1120); Latham and Watkins ($1110); Fried Frank Harris Shriver & Jacobson ($1100); Dechert ($1095); Willkie Farr & Gallagher ($1090); Kaye Scholer ($1080); Debevoise & Plimpton ($1075); Quinn Emanuel Urquhart & Sullivan ($1075); Weil, Gotshal & Manges ($1075); Cadwalader, Wickersham & Taft ($1050); White & Case ($1050); DLA Piper ($1025); Kramer Levin Naftalis & Frankel ($1025). At seventeen (17) of these twenty-five (25) firms, senior associates were charging hourly rates greater than the $600 rate sought for Mr. Norinsberg and the $575.00 rate sought for Mr. Smith: White & Case ($1050); Davis Polk & Wardwell ($975); Gibson Dunn & Crutcher ($930); Skadden Arps Slate Meacher & Flom ($845); Weil, Gotshal & Manges ($790); Willkie Farr & Gallagher ($790); Curtis

Mallet-Prevost, Colt & Mosle ($785); Jones Day ($775); Debevoise & Plimpton ($760); Fried

Frank Harris Shriver & Jacobson ($760); Paul, Weiss, Rifkind, Wharton & Garrison ($760); Paul

Hastings ($755); Cadwalader, Wickersham & Taft ($750); DLA Piper ($750); Kramer Levin

Naftalis & Frankel ($750); Dechert ($735); Latham and Watkins ($725). (Master Declaration,

Ex. Z).

**The Billing Rates for John J. Meehan, Esq.**

53.     John J. Meehan, Esq.'s proposed hourly rate is $350.00 per hour.  Mr. Meehan is

now a fourth year associate at the Law Offices of Jon L. Norinsberg, PLLC. Prior to joining the

firm in October of 2012, Mr. Meehan worked in the Kings County District Attorney's office,

where he helped prosecute a wide array of crimes as part of a special program offered by his law

school. Apart from his work in the Brooklyn District Attorney's Office, Mr. Meehan spent

several years as a paralegal and legal intern in several New York law firms, gaining valuable

experience in a wide variety of civil litigation areas, including mass torts, employment

discrimination, and personal injury law. Mr. Meehan graduated from New York Law School in

May 2012. Since joining Mr. Norinsberg's firm, Mr. Meehan has  appeared as attorney of record

in dozens of federal § 1983 cases in the Eastern and Southern Districts of New York. Mr.

Meehan has been actively involved in all aspects of Mr. Norinsberg's civil rights practice, and in

fact, has tried two federal civil rights cases to verdict in the Southern District.

54.     Mr. Meehan has distinguished himself through his excellent work ethic, keen

legal insight and judgment, and relentless preparation and hard work. Mr. Meehan's requested

hourly rate is $350.00 an hour, which is consistent with the rates awarded in the Southern

District for associates with comparable experience. See, e.g., Nautilus Neurosciences v. Fares,

No. 13 Civ. 1078(SAS), 2014 WL 1492481, at *2–3 (S.D.N.Y. April 6, 2014) (approving hourly

rate of $337.50 for an associate with three years of experience); Canada Dry Delaware Valley
Bottling Co. v. Hornell Brewing, Inc., No. 11 Civ. 4308(PGG), 2013 WL 6171660, at *2– 3
(S.D.N.Y. Nov. 25, 2013) (approving hourly rates of $330–350 for a New York-based fifth year
associate); Kim v. Kung Gang, Inc., No. 12 Civ. 6344 (MHD), 2014 WL 2514705 at *2
(S.D.N.Y. June 2, 2014) (awarding $300 to a third-year associate). See also New York Dist.
Council of Carpenters Pension Fund v. Perimeter Interiors, Inc., 657 F.Supp.2d 410 (S.D.N.Y.
2009) (noting that $300 for an associate was "commensurate with those generally charged for
similar work in this district" in the year 2009).

### EXPENSES

55.    Pursuant to 42 U.S.C. § 1988, plaintiff seeks an award of reasonable out-of-
pocket costs expended in connection with this matter.  (Master Decl., Ex. H).  As a prevailing
party, plaintiff is entitled to recover such expenses incurred during the litigation that would
normally be charged to a fee-paying client.   Such costs are of the type routinely billed by
attorneys to fee-paying clients, and were actual and necessary costs incurred to prosecute this
case.  As such, these costs are recoverable under 42 U.S.C. §1988(c).  See Le Blanc-Sternberg,
143 F.3d at 763; U.S. Football League v. National Football League, 887 F.2d 408, 416 (2d Cir.
1989). The total out-of-pocket expenses are $ 10,021.25 (Master Decl., Ex. H).[7]

### CONCLUSION

56.    All of the time expended and expenses incurred were reasonable and necessary to
properly represent plaintiff in this case. As set forth more fully in the accompanying
Memorandum of Law, the hourly rates of Plaintiff's Counsel are reasonable and conform to the

---

[7] The total amount of disbursements is $15,021.25.  However, Mr. Norinsberg's law firm received a check for
$5,000.00 when Gilbert & Levine briefly took over this matter in November 2012. Accordingly, the amount of costs
sought by Mr. Norinsberg has been adjusted to reflect this payment.

prevailing market rates in this district. Plaintiff therefore respectfully submits that the full "lodestar" fee is warranted and should be awarded by this Court, and that plaintiff, as the "prevailing party" in this action, is entitled to recover all costs and expert fees reasonably expended pursuant to Section 1988 and Rule 54(d).

Dated: New York, New York
      December 16, 2015

                     Respectfully submitted,

                     Jon L. Norinsberg, Esq.
                     Law Offices of Jon L. Norinsberg
                     225 Broadway, Suite 2700
                     New York, NY 10007
                     (212) 791-5396
                     *Attorneys for Plaintiff*