UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                            Plaintiff,

              -against-                         **10 CV 6005**

THE CITY OF NEW YORK, DEPUTY CHIEF MICHAEL MARINO, Tax Id. 873220, Individually and in his Official Capacity, ASSISTANT CHIEF PATROL BOROUGH BROOKLYN NORTH GERALD NELSON, Tax Id. 912370, Individually and in his Official Capacity, DEPUTY INSPECTOR STEVEN MAURIELLO, Tax Id. 895117, Individually and in his Official Capacity, CAPTAIN THEODORE LAUTERBORN, Tax Id. 897840, Individually and in his Official Capacity, LIEUTENANT WILLIAM GOUGH, Tax Id. 919124, Individually and in his Official Capacity, SGT. FREDERICK SAWYER, Shield No. 2576, Individually and in his Official Capacity,  SERGEANT KURT DUNCAN, Shield No. 2483, Individually and in his Official Capacity, LIEUTENANT CHRISTOPHER BROSCHART, Tax Id. 915354, Individually and in his Official Capacity, LIEUTENANT TIMOTHY CAUGHEY, Tax Id. 885374, Individually and in his Official Capacity, SERGEANT SHANTEL JAMES, Shield No. 3004, Individually and in her Official Capacity, , CAPTAIN TIMOTHY TRAINER, Tax Id. 899922, Individually and in his Official Capacity, and P.O.'s "JOHN DOE" #1-50, Individually and in their Official Capacity (the name John Doe being fictitious, as the true names are presently unknown), (collectively referred to as "NYPD defendants"), FDNY LIEUTENANT ELISE HANLON, individually and in her official capacity as a lieutenant with the New York City Fire Department, JAMAICA HOSPITAL MEDICAL CENTER, DR. ISAK ISAKOV, Individually and in his Official Capacity, DR. LILIAN ALDANA-BERNIER, Individually and in her Official Capacity  and JAMAICA HOSPITAL MEDICAL CENTER EMPLOYEE'S "JOHN DOE" # 1-50, Individually and in their Official Capacity (the name John Doe being fictitious, as  the true names are presently unknown),

**AFFIRMATION OF PETER J. GLEASON IN SUPPORT OF PLAINTIFF'S APPLICATION FOR ATTORNEY'S FEES AND COSTS**

                            Defendants.
-----------------------------------------------------------------------------------X

Peter J. Gleason, being an attorney admitted to practice law in this State and before this Court, hereby states and declares under the penalties of perjury that the foregoing is true and correct.

1. As the attorney for the plaintiff in the above-referenced action, I am submitting this affirmation in support of the plaintiff's application for costs and expenses, pursuant to the Rule 68 Judgment entered October 16, 2015.

2. In this affirmation, I set forth my legal background and a summary description of the time charges incurred in representing plaintiff. Attached as **Exhibit A** is a detailed breakdown of my time charges in this matter.

*My Background:*

3. I have substantial experience in law enforcement matters through a 20-year career in the United States Coast Guard Reserve,[1] as a sworn Police Officer in the NYPD (1983 to 1986), and a FDNY Fire Marshal (1994 to 1996).[2]

7. I am a graduate from The City University of New York Law School and was admitted to practice law in this State and in this district in 2004. Additionally, I am admitted to practice in the United States District Court in the Eastern District of New York, The United States Court of Appeals for the Armed Forces, The United States Court of Appeals for the Second Circuit and the United States Supreme Court. By the time of the Rule 68 Judgment entered October 16, 2015, I had been practicing law for over 10 years, primarily as litigator with a focus on representing members of the NYPD, FDNY and members of the US Military.

---

[1] I retired from the USCG Reserve in 2001 as a commissioned officer. Pursuant to 14 U.S.C. §89, all members of the US Coast Guard above the rank of E-4, third class Petty Officer, are deemed Federal Law Enforcement Officers.
[2] A Fire Marshal, as per N.Y. CPL. LAW § 1.20, is a Police Officer.

8. While in law school, I was a member of the Immigration Law Clinic where I successfully represented an individual from West Africa in his application for asylum based on a credible fear of persecution based on his political beliefs. Additionally, I spent a summer semester at the University of Oslo where I studied international law and published a paper comparing and contrasting the American criminal justice system with that of Norway.

9. After law school, I worked as an associate at the firm of Levine and Gilbert for four years where I am still of counsel to the firm. As an associate with Levine and Gilbert I worked on a variety of matters involving members of the NYPD, FDNY and members of the US Military. Some of these matters involved personal injury, disciplinary matters, civil rights, employment law, criminal law, and disability pension applications. One of my retaliation cases, *New York City Department of Education v. Kielbasa,* involved a steamfitter for the New York City Department of Education, who was disciplined for reporting loose friable asbestos in various New York City schools. Through my representation, pending disciplinary charges against my client were dismissed and the asbestos cover-up was brought to light.

9. In 2008, I started my own law practice, Peter J. Gleason, PC, which I have developed over the past 7 years. I have primarily been involved in general litigation and trial work with an emphasis on civil rights, employment disciplinary matters, criminal law and personal injury. Notable cases include the representation of several plaintiffs from the class action lawsuit, *United States and Vulcan Society v. City of New York.* One of my clients from the Vulcan litigation settled with the City for compensatory damages. I was

awarded attorney fees in the amount of $340 per hour. Another Vulcan litigant who I represented regarding continued retaliation, compensated me at a rate of $450 per hour.

10. I was initially contacted in the instant matter by Plaintiff's father, Larry Schoolcraft, in mid-November 2012. He informed me that his son Adrian Schoolcraft (Plaintiff) had discharged his attorney in this litigation and was seeking new counsel to prosecute the lawsuit commenced on behalf of his son against the NYPD and Jamaica Hospital and counsel Plaintiff with regard to his employment/disciplinary status. Mr. Schoolcraft informed me that he had the authority to speak on Plaintiff's behalf, a fact which was later confirmed to me personally by Plaintiff. After the initial extensive telephone conversation with Plaintiff's father, which is not included in my billing statement as billable hours, my colleague Richard Gilbert (partner at Levine and Gilbert) and I traveled to upstate New York to meet directly with Mr. Schoolcraft. Since starting my own firm I have been "Of Counsel" to my former employer Levine and Gilbert. As a result of this meeting with Mr. Schoolcraft, both myself and Levine and Gilbert were retained as Plaintiff's counsel.

11. Thereafter, I worked extensively with Levine & Gilbert in securing the files from outgoing counsel, reviewing the contents of the files, conferring regularly with both counsel and client regarding litigation strategies and in otherwise engaging in extensive client contact necessitated by the myriad questions, concerns and opinions expressed by Plaintiff and his father, if not on an hourly, most certainly on a daily basis, all of which will be further detailed herein. While the substance of these voluminous conversations cannot be disclosed without breaching privilege, suffice to say that the litigation team could not progress with the client's cooperation without having these concerns addressed on a timely and satisfactory basis. In or about February, 2013, attorneys Levine & Gilbert each experienced some difficulties in communicating with Plaintiff's father, resulting in a

cessation of direct client contact with both Plaintiff and his father. However, while Mr. Gilbert continued to represent Plaintiff at appearances through April, 2013, I maintained the relationship with Plaintiff while endeavoring to assemble the legal team to prosecute what was clearly a substantial and complex case for a demanding client. I exerted great time and energy in identifying and recruiting members of this legal team. I recommended to Plaintiff and his father that he retain Nathaniel B. Smith, Esq. a solo practitioner colleague with whom I had worked on other Section1983 civil rights matters, and John Lenoir, a former career federal prosecutor with litigation and investigative experience in civil rights matters. After extensive discussions and meetings over the next few weeks, Mr. Schoolcraft and Plaintiff on my advice, added first Nathaniel Smith and later John Lenoir as co-counsel. The introduction of the Smith/Lenoir combination resulted in the phasing out of Levine & Gilbert's participation in the day to day activities of the litigation[3].

*The necessity to oversee an investigation:*

12. It was clear to this new legal team that the complexity of the case, the interests of the client, and the contentious nature of the defense guaranteed that there would be no quick or easy resolution of this matter. Accordingly, we began extensive preparations for a difficult and protracted litigation. My responsibility, in addition to assembling a strong, highly competent litigation team, was primarily to engage investigators and consultants who had knowledge and experience with the NYPD, and the manner in which the Department and police officials respond to members of the service, like Plaintiff, who break rank to reveal wrong doing within the NYPD. My responsibilities also included extensive consultation with the Plaintiff and his father to establish their trust and confidence in the new legal team during a very difficult transition. My attached billing statement reflects the many hours spent conferring with investigators and the client.

---

[3]. In fact the only additional participation by the Levine & Gilbert firm was by way of telephone consultation with Mr. Levine by counsel on the issue of limitations associated with ensuring Mr. Schoolcraft was able to secure his NYPD pension, an issue critical to the ultimate settlement of this matter

5

13. In addition to the litigation team, I assembled a group of three different investigators, all of whom focused on different issues and brought with them a unique perspective that benefitted the Plaintiff. I also consulted with retired NYPD detective and recipient of the NYPD's medal of honor, Frank Serpico, who was able to provide unique insight into techniques and strategies employed by the NYPD hierarchy in response to "whistle blowers" within their ranks which proved to be of benefit to Plaintiff and for which Mr. Serpico declined remuneration.

14. As the enclosed billable hours of itemized services indicates, a retired second grade detective (D2) also assisted in this matter. His ability to cultivate intelligence was invaluable. After D2, looked into the matter, he like Serpico, opted to not put in a claim for services rendered. In the case of D2, after he spoke to some of his former NYPD colleagues, his decision to refuse any compensation was a combination of outrage on how the Plaintiff was treated and D2's realization that he would be alienated by some in the NYPD community.

15. Another investigator, Vincent Parco, also contributed invaluable insight, through his investigation, to the instant matter. His investigation resulted in impeachment material regarding individual defendants that would have been important had the matter gone to trial. I have attached as **Exhibit B**, Mr. Parco's itemized bill for services rendered.

16. Like my colleagues at Levine & Gilbert, I too experienced a breakdown in communication with Plaintiff during the Spring of 2013. This resulted in the full responsibility for the conduct of the litigation from that point on being entrusted to the Smith/Lenoir team.

17. During the period: 5/2/13 – 10/15/15 I received and sent a total of 575 e-mails concerning this matter. No claims for compensation is submitted for payment of reading or responding to e-mails that were perfunctory in nature. Additionally, during the period: 10/15/13 – 12/20/15, I reviewed files and drafted the instant affirmation and the

annexed billing statement. This totaled 9.5 hrs. compensation for which is not being claimed here.

*My Time Charges Are Fully Recoverable:*

19. My time charges, which are attached as Exhibit A, reflect *** hours at the rate of $500 per hour. Travel time is billed at one-half, or $250 per hour. Additionally, Investigator Parco's billable hours, heretofore attached and marked Exhibit B totals $3,581.25 and my expenses, heretofore attached and marked Exhibit C, total $7,485; for those expenses claimed that do not have receipts.

20. As this Court is aware, the instant litigation was highly complex on both a legal and emotional level. As the individual who came to the aid of Plaintiff when he had terminated his relationship with his then attorney, assembled a strong legal team with the knowledge, experience and expertise to walk him through this very challenging litigation which involved claims of civil rights violations, medical malpractice, internal disciplinary charges, employment law and pension rights, my time sheets reflect real time devoted to moving this case forward and ensuring a successful prosecution of all Plaintiff's claims. Since my time charges were, I submit, necessarily incurred in connection with the successful prosecution of this action, all those time charges are compensable.

Dated: New York, New York
December 21, 2015

PETER J. GLEASON PC

//PJG//

_____
Peter J. Gleason
115 Christopher St., Suite 2
New York, New York 10014
(212) 431-5030
PJGleason@aol.com