UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
-------------------------------------------------------------x
ADRIAN SCHOOLCRAFT,

                                       10–cv-6005 (RWS)

                        Plaintiff,

       -against-


THE CITY OF NEW YORK, *et al.*,
                         Defendants.
-------------------------------------------------------------x


### *SMITH GROUP'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES, COSTS AND EXPENSES*

Nathaniel B. Smith
John Lenoir
100 Wall Street – 23rd Floor
New York, New York 10005
212-227-7062

Dated: April 29, 2016

# TABLE OF CONTENTS

I.  Introduction ........................................................................................... 6

II.  All Work Done On the Ten Federal Claims, Including the Claims Against the Medical Defendants, Is Compensable ……………….……………………....... .... 9

III.  All the Work Done by the Smith Group Is Compensable Time and There Was No Excessive Billing or Duplication of Effort Other Than Time Spend Getting Up to Speed……………………………………………………………………… .. 15

IV.   The Hourly Rates for the Smith Group Are ..Reasonable…….…….…......*28*

VI.  The Smith Group Is Entitled To Fees on Fees and Interest............................ 36

VIII. Conclusion ....................................................................................... 38

Smith Group's Adjusted Billing Chart................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Aiello v. Town of Brookhaven*, 2005 U.S. Dist. LEXIS 11462 at *30, 2005 WL 1397202 (E.D.N.Y. 2005) ............ 38

*Altman v. Port Authority*, 879 F. Supp. 345, 354-55 (1995) ........................................................................ 26

*Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, 2011 WL 1002439 at *8 (S.D.N.Y. Mar. 16, 2011), *aff'd*, 483 Fed.
    Appx. 634 (2d Cir. 2012) ......................................................................................................... 26

*Baird v. Boies Schiller & Flexner*, 219 F. Supp. 2d 510, 521–22 (S.D.N.Y. 2002) ..................................... 11

*Barbour v. City of White Plains*, 788 F. Supp. 2d 216, 225 (S.D.N.Y. May 24, 2011), *aff'd*, 700 F.3d 631 (2d Cir.
    2012) ................................................................................................................................. 32

*Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) ................................... 6

*Barile v. Allied Interstate, Inc.*, 2013 U.S. Dist. Lexis 32483 (S.D.N.Y. Jan. 30, 2013) ............................... 32

*Berrian v. City of New York*, 2014 U.S. Dist. Lexis 104255 (S.D.N.Y. July 28, 2014), *adopt*ed, 2014 U.S. Dist. Lexis
    163445 (S.D.N.Y. Nov. 21, 2014) ........................................................................................... 10,36

*Blum v. Stenson*, 465 U.S. 886, 895–96 & n.11 (1984) ........................................................................... 31

*City of Riverside v. Rivera*, 477 U.S. 561, 581 n.11 (1986) ..................................................................... 22

*Commercial Union Assurance Co. v. Milken*, 17 F. 3d 608, 613-14 (2d Cir. 1994) ..................................... 38

*Cruceta v City of New York*, 2012 U.S. Dist Lexis  97740 at *16-17 (E.D.N.Y. Feb. 7, 2012) ...................... 28

*Demonschaux v. Unitedheathcare Oxford*, 2014 U.S. Dist. Lexis 43954 at *9-10 (S.D.N.Y. Mar. 27, 2014) ......... 32

*Dominic v. Consol. Edison Co. of N.Y., Inc.*, 822 F.2d 1249, 1259 (2d Cir. 1987) ...................................... 13

*Etna Prods. Co. v. Q Mktg. Grp., Ltd.*, 2005 U.S. Dist. Lexis 36926 at *4 (S.D.N.Y. June 6, 2005) .................. 28

*Farbotko v. Clinton Cnty.*, 433 F.3d 204, 209 (2d Cir. 2005) ................................................................. 31

*Floyd v. City of New York*, 813 F. Supp. 2d 417, 449 (S.D.N.Y. 2011), *on reconsideration*, 813 F. Supp. 2d 457
    (S.D.N.Y. 2011) .................................................................................................................... 24

*Floyd v. City of New York*, 959 F. Supp. 2d 540, 596-599 (S.D.N.Y. 2013) ................................................ 23

*Grant v. Martinez*, 973 F. 2d 96, 99 (2d Cir. 1992) .............................................................................. 16

*Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) .................................................................................. 13

*Hargroves v. City of New York*, 2014 U.S. Dist. Lexis 42534 at *65 (E.D.N.Y. Jan. 6, 2014), *adopted*, 2014 U.S. Dist. Lexis 41657 (E.D.N.Y. March 26, 2014) ................................................................................28,28

*Hines v. City of Albany*, 613 Fed. Appx. 52, 2015 U.S. App. Lexis 9201 (2d Cir. June 3, 2015) .............................13

*Hnot v. Willis Grp. Holdings Ltd.*, 2008 WL 1166309, at *6 (S.D.N.Y. Apr. 7, 2008) ........................................30

*In re Nassau Cnty. Strip Search*, 12 F. Supp. 3d 485, 498–500 (E.D.N.Y. 2014) ........................................24

*ING Global v. United Parcel Service Oasis Supply Corp.*, 2014 U. S. Dist. Lexis 118891 at *10  (S.D.N.Y. Aug. 19, 2014).........................................................................................................................................23

*Kim v. Kum Gang, Inc.*, No. 12-CV-6344, 2014 WL 2514705, at *2 (S.D.N.Y. June 2, 2014) .................................32

*Knoeffler v. Town of Mamakating*, 126 F. Supp. 2d 305, 318 (S.D.N.Y. 2000) ........................................14

*Lee v. Santiago*, 2013 WL 4830951 at *13 (S.D.N.Y. 2013) ........................................................................37

*Lightfoot v. Walker*, 826 F. 2d 516, 524 (7th Cir. 1987) .........................................................................16

*Lochren v. County of Suffolk*, 2010 WL 1207418, at *3 (E.D.N.Y. Mar. 23, 2010) ...................................26

*LV v. New York City Dept. of Educ.*, 700 F. Supp. 2d 510, 523-524 (S.D.N.Y. 2010) ........................................32

*M.C. ex rel. E.C. v. Dep't of Educ.*, 2013 U.S. Dist. Lexis 78605 at *26 (S.D.N.Y. June 4, 2013) .........................32

*Marathon Ashland Petroleum LLC v. Equili Co., L.P.*, 2003 WL 21355216 at *2 (S.D.N.Y. June 10, 2003)...........28

*Marisol A. v. Giuliani*, 111 F. Supp. 2d 381, 401 (S.D.N.Y. 2000) ........................................................24

*Mawere v. Citco Fund Servs., (USA) Inc.*, No. 09-CV1342, 2011 WL 6779319, at *5 (S.D.N.Y. Sept. 16, 2011)
     *report and recommendation adopted*, No. 09-CV-1342, 2011 WL 6780909 (S.D.N.Y. Dec. 27, 2011)..............32

*Merck Eprova AG v Brookstone Pharms, LLC.*, 2013 U.S. Dist. Lexis 90474 at *10 (S.D.N.Y. June 10, 2013) .......28

*Missouri v. Jenkins by Agyei*, 491 U.S. 274, 276–77 (1989)........................................................................24

*Moon v. Gab Kwon*, 2002 U.S. Dist. Lexis 21775 at *5- *6 & n.12 (S.D.N.Y. Nov. 8, 2002)..................................28

*Moran v. Sasso*, 2009 WL 1940785 *7 (E.D.N.Y. 2009)..............................................................................38

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). ........................................................25

*New York State Ass'n v. Carey*, 711 F. 2d 1136, 1146 (2d Cir. 1983) .........................................................23

*Nicholson v. Williams*, 2004 WL 4760138 at *3–4 (E.D.N.Y. 2004) ..............................................................38

*Penley v. City of New York*, 2015 U. S. Dist. Lexis 119808 at *3 (S.D.N.Y. Sept. 8. 2015) ......................................36

*Perdue v. Kenny A.*, 559 U.S. 542, 554–55 (2010)..........................................................................................31

*Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)..........................................................................14

*Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996) ...............................................13

*Restivo v. Nassau County,* 2015 U.S. Dist. Lexis 160336 (E.D.N.Y. Nov. 30, 2015) ..........................30,32

*Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 425–26 (S.D.N.Y. 1999) ..................26

*Rosado v. City of New York*, 2012 WL 955510, at *6 (S.D.N.Y. 2012)......................................37

*Rozell v. Ross-Holst*, 576 F. Supp. 2d 527 (S.D.N.Y. 2008) ....................................................32

*Ruhlmann v. Smith*, 323 F. Supp. 2d 356 (N.D.N.Y. 2004)......................................................8

*Steiner v. Lewmar, Inc.*, 2016 U.S. App. Lexis 4232 at *6 (2d Cir. Mar. 7, 2016) ................10

*Sugarman v. Village of Chester*, 213 F. Supp. 2d 304, 311 (S.D.N.Y. 2002) .......................28

*Tottey v. Life Ins. Co. of N. Am.*, 2009 WL 3764222 at *3 (N.D.N.Y. Nov. 10, 2009)...........29

*United States v. City of New York*, 2013 WL 5542459 at *15 (E.D.N.Y. Aug. 30, 2013) .........26

*Weil v. Long Island Sav. Bank, FSB*, 188 F. Supp. 2d 265, 269 (E.D.N.Y. 2002) ...................24

*West Virgina Univ. Hop. v. Casey,* 499 U. S. 83, 102 (1991).................................................35

*Zahrey v. City of New York*, 98-cv-4546 (DCP) (JCF) (S.D.N.Y. June 8, 2010) ......................8

*Zahrey v. City of New York,* Slip Op. 98-cv-4546 at 26-27 & 32; Dkt. # 264 (DCP) (JCF) (S.D.N.Y. June 8, 2010) 32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ADRIAN SCHOOLCRAFT,                                    10-cv-6005 (RWS)

                 Plaintiff,

                                        **REPLY MEMORANDUM OF
LAW IN SUPPORT OF FEE
MOTION ON BEHALF OF
THE SMITH GROUP**

       -v-

CITY OF NEW YORK, et al.,

                 Defendants.
-------------------------------------------------------X

*I. Introduction*

"The most critical factor in a district court's determination of what constitutes reasonable attorney's fees in a given case is the degree of success obtained by the plaintiff."[1]  "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee."[2] And a fully compensatory fee will "[n]ormally . . . encompass all hours reasonably expended on the litigation."[3]

Despite the many pages of the City Defendants' opposition papers (including a 90 page memorandum and a 295 page "expert" report), the City

---

[1] *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).
[2] *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).
[3] *Hensley*, 461 U.S. at 435.

Defendants and their self-anointed "expert" fail to come to grips with this critical

factor -- the results obtained.   Since the plaintiff achieved undisputed success in

this case – a recovery for the plaintiff so far worth more than $2.0 million – this

fact justifies a full fee for all the hours that the plaintiff's counsel reasonably spent

in this heavily litigated case.

The Judgment against the City Defendants achieved, *without the risk of trial,*

the following for the plaintiff:

- $600,001.00 in cash;
- back pay for the six-year period from October 31, 2009 through December 31, 2015, in the total amount of $602,287.10;
- reinstatement to the NYPD as a Police Officer and the dismissal of all pending charges against him;
- vested pension benefits with a current or present value of about $603,680;
- life-time medical benefits worth $7,236 a year for the plaintiff's lifetime, based on the City of New York's current out-of-pocket costs for that benefit;
- discharge of all claims by Counterclaim Defendant Mauriello against the plaintiff;
- full reimbursement for reasonable attorney's fees, costs and expenses incurred in this litigation; and
- the opportunity to apply, as a vested pension beneficiary, for ordinary disability pension benefits that would increase the plaintiff's annual pension benefit from $30,334 a year on a taxable basis to $50,772 on a non-taxable basis with the valuable right to receive those benefits starting in 2016 as a opposed to receiving regular retirement benefits starting in 2022.

These benefits have a direct current value to the plaintiff of over $2.0 million dollars,[4] which is well above the sustainable level of damages in a case like this.[5]  Since the results achieved exceeded the amount that the plaintiff was reasonably likely to obtain and sustain in the event that he prevailed at trial, we submit that the attorneys working on behalf of the plaintiff achieved on their client's behalf an excellent result.

The City Defendants half-heartedly argue that the plaintiff's success should be measured by the demand in the plaintiff's initial Complaint, conveniently gliding over the fact that a specific dollar demand was removed from the operative pleading, the Third Amended Complaint.[6]  And in any event, the City Defendants' superficial  -- and exceedingly weak[7] -- point about a discarded demand in an old

---

[4] Smith Reply Dec. ¶¶ 26-27.

[5] One of the major components of the plaintiff's damages was his involuntary commitment at Jamaica Hospital for six days.  Our research shows that the maximum sustainable damages for that claim are in the range of $500,000 to $1,00,000.  *See Marion v. LaFargue*, 2004 U.S. Dist. Lexis 2601 (S.D.N.Y. Feb. 25, 2004) (reducing $1.0 million award to $150,000 for six days involuntarily commitment at Bellevue as excessive due to the plaintiff's prior psychiatric history, noting that cases often award in the range from $75,000 to $150,000 per day, depending on the circumstances); *Ruhlmann v. Smith*, 323 F. Supp. 2d 356 (N.D.N.Y. 2004) (summarizing damages awards in involuntarily hospitization cases and reducing 1.0 million verdict to $450,000 for four days involuntary commitment).

[6] Dkt. # 341 ¶ 373 at p. 62.

[7] *Zahrey v. City of New York*, 98-cv-4546 (DCP) (JCF) (S.D.N.Y. June 8, 2010); SDNY Dkt. # 264 at p. 45 ("Nor is it particularly helpful to compare the amount of the judgment to the ad damnum clause in the complaint, since the latter figure is entirely speculative in a case such as this"); *Smith v. D.C.*, 466 F. Supp. 2d 151, 160 (D.D.C. 2006)("The District of Columbia argues that Plaintiff's degree of success-the award of $72,000-should be measured against the *ad damnum* clause in her Complaint. That is just plain foolish. *Ad damnum* requests, as all judges and litigants know, rarely bear any relationship to reality or expectations."); *Berkley Trace, LLC v. Food Lion*, LLC, 2013 WL 5718867 at *10 (D. Md. Oct. 18, 2013)(rejecting "such a

pleading ought not to distract the Court from the stark economic truth – a $2.0 million plus recovery is an excellent result.  Accordingly, the Court should award the plaintiff a full lodestar recovery without any discount beyond those amounts that ought to be adjusted in the exercise of sound billing judgment, as set forth below and in our initial motion papers.

*II.  All Work Done On the Ten Federal Claims, Including the Claims Against the Medical Defendants, Is Compensable.*

The City Defendants argue that significant parts of the time charges are non-compensable time relating to the Medical Defendants.  Although they acknowledge that the facts relating to the involuntary hospitalization of Medical Defendants are at least in part compensatory, the City Defendants claim without any reasoning that huge chunks of mysteriously-derived time pertaining to the Medical Defendants should not be recovered.   The Court should reject this argument for two related reasons.

First, the Offer of Judgment expressly provides:  "Should plaintiff accept this offer of judgment, plaintiff shall be entitled to reasonable attorneys' fees, expenses, and costs to the date of this offer for plaintiffs federal claims."  (Dkt. #

---

mechanical approach of comparing the amount of the *ad damnum* clause in the Second Amended Complaint to the ultimate recovery against Defendants ESM and Camellia").

.

538-1 at p. 2.)   The plaintiff's federal claims asserted in the Third Amended Complaint, the operative pleading at the time, included claims under Section 1983 against *all* of the defendants, including the NYPD and the Medical Defendants, for false imprisonment and for their joint action in connection with the decisions to take the plaintiff against his will to the Jamaica Hospital psychiatric ward as an "EDP" and to confine him there as a dangerous and emotionally disturbed person. As such, the Offer of Judgment by its terms, upon acceptance, became a contractual obligation to pay – without qualification or limitation -- the plaintiff's legal fees for his federal claims.

While it may be correct that on May 5, 2015 the Court granted the defendants' motion for summary judgment on the Section 1983 claims against the Medical Defendants, the Offer of Judgment did not limit the City Defendants' undertaking to pay legal fees only on the federal claims that had survived summary judgment.  As such, any silence or ambiguity in the terms of a Rule 68 Offer must be construed against the City Defendants, as the Rule 68 offerors.[8]

Indeed, the Offer by its terms obtained a *release* of the plaintiff's federal (and state) claims, a release that precluded the plaintiff from seeking further review of the federal claims dismissed by the Court's interlocutory summary judgment

---

[8] *Steiner v. Lewmar, Inc.*, 2016 U.S. App. Lexis 4232 at *6 (2d Cir. Mar. 7, 2016); *see also Berrian v. City of New York*, 2014 U.S. Dist. Lexis 104255 at *15 (S.D.N.Y. July 28, 2014), *adopted*, 2014 U.S. Dist. Lexis 163445 (S.D.N.Y. Nov. 21, 2014) (strictly enforcing contractual terms of Rule 68 Offer to award plaintiff attorney's fees).

order.  Thus, the City Defendants obtained a release by the plaintiff that precluded further litigation against them on those claims at trial, after trial or on appeal, after the entry of a final judgment by the Court.  Simply put, the City Defendants contractually obligated themselves to pay the legal fees on the federal claims without qualification, and the Court should require them to pay for the bargain they struck.  The after-the-fact limitations suggested by the City on its obligation to pay legal fees should be rejected.

Second, all the claims (federal and state) against all the defendants involved a common core of facts and related legal theories.[9]  For example, in discovery we learned that the determination by the Medical Defendants that the plaintiff was "dangerous" was based entirely on bogus statements the NYPD made to the hospital staff.[10]

The integrity and underlying reasons for the Medical Defendants' medical determination needed to be investigated and challenged by the plaintiff because the

---

[9] Where, as here, state law claims arise from a common core of facts or related legal issues as the federal claims, hours on all claims are compensable.  *Baird v. Boies Schiller & Flexner*, 219 F. Supp. 2d 510, 521–22 (S.D.N.Y. 2002) ("[A]ll of plaintiffs' claims—whether styled as Equal Pay Act, Title VII, or state law claims—involve a common core of facts resulting in one injury.").  Since the state and federal law claims of false imprisonment against the Medical Defendants depended on a violation of Section 9.39 of the Mental Hygiene Law, which in turn required a showing that the Medical Defendants departed from good and accepted medical practices in making a dangerousness assessment of the plaintiff, all the claims (state and federal) are intertwined.
[10] *See generally Schoolcraft v. City of New York*, 2015 U.S.Dist. Lexis 58831 at * 49-66 (S.D.N.Y. May 5, 2015) (in the Court's summary judgment decision, the Court sets forth the facts pertaining to the events at the hospital).

NYPD defendants claimed that their decision to deem the plaintiff an emotionally

disturbed person was supported by what they claimed was the "independent"

Medical Defendants' decision to confine the plaintiff for six days at the Jamaica

psychiatric ward.   In their Answer, the City Defendants asserted the affirmative

defense that "[t]here was probable cause for placing plaintiff in protective

custody."[11] And in the City Defendant's motion for summary judgment, the NYPD

defendants specifically argued that the Medical Defendants' hospitalization

decision demonstrated the reasonableness of the NYPD's actions.[12]   Thus, the City

Defendants in their pleading put in issue as a defense the validity of the Medical

Defendants' involuntary commitment decision.  Similarly, in his claims, the

plaintiff pointed out that NYPD officers and Jamaica Hospital staff were involved

in, participated in, or acquiesced in, the decisions to shackle the plaintiff at the

hospital, to initially admit him to the hospital and to release him six days later.

Other facts demonstrate the intertwining of the events and claims in this

case.  Both NYPD officers and Jamaica Hospital EMTs were present at the

plaintiff's home at the time of his arrest.  Thus, discovery was required from the

EMTs about what they saw and about what information, if any, was passed on to

---

[11] Answer at ¶ 438; Dkt. # 110.
[12] City Defendants' Memorandum of Law, dated 12-22-14, at p. 9 (Dkt. # 300) ("However, the fact that Plaintiff was admitted to Jamaica Hospital Medical Center for approximately six days pursuant to the MHL [Mental Hygiene Law] can only serve to indicate the reasonableness of the defendants' decision to remove Plaintiff from his apartment out of concern for his well being.").

the Jamaica Hospital medical staff, particularly because Defendant Chief Marino was claiming that it was the EMTs who were insisting that the plaintiff be taken to the hospital with or without the plaintiff's consent.

Simply put, what happened at Jamaica Hospital was central to the liability claims, the NYPD's defense, and the plaintiff's damages claims against both the NYPD Defendants and the Medical Defendants.  Without question, the events at Jamaica Hospital were an integral part of the story of this case that required thorough investigation, regardless of who was named as a defendant.

Under these circumstances, where all of the plaintiff's claims were intertwined, arose from the same common core of facts, and cannot now be neatly segregated, a full fee should be awarded.  The Second Circuit has consistently held that a full fee is proper where the claims arise from a common core of facts or the claims are based on related legal theories.[13]

Judge Ward in *Pickman v. Dole*, 671 F. Supp. 982, 991 (S.D.N.Y. 1987) aptly summed up the matter of compensable time spent by a prevailing plaintiff where there are multiple parties and attorney's fees must be assessed against only one of the defendants:

---

[13] *Hines v. City of Albany*, 613 Fed. Appx. 52, 2015 U.S. App. Lexis 9201 (2d Cir. June 3, 2015); *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996); *Dominic v. Consol. Edison Co. of N.Y., Inc.*, 822 F.2d 1249, 1259 (2d Cir. 1987).

Defendants assert that it is inappropriate to assess against them the entire fee award, since there were multiple defendants in the case. However, a full assessment is appropriate in this case, because plaintiffs obtained from the Authority Defendants essentially the entire relief desired. Furthermore, plaintiffs' claims against the other defendants all arose out of the same common factual core, and time spent investigating or preparing one or another aspect of the case could not be neatly separated from time spent on winning the claim. [citations omitted] The Court, therefore, rejects the argument of the Authority Defendants that plaintiffs' fee request must be reduced because plaintiffs are seeking fees from only some of the defendants originally named in this action.

Since a "fully compensatory fee" will "[n]ormally . . . encompass all hours reasonably expended on the litigation"[14] the plaintiff is presumptively entitled to compensation for all hours "reasonably expended on the litigation."  And the Supreme Court has made clear, "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters."[15]  For these reasons, fees should be awarded for all the federal claims (regardless of success) because they are inextricably intertwined, involve a common core of facts, and are based on related legal theories.[16]

---

[14] *Hensley*, 461 U.S. at 435.

[15] *Id.*

[16] *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999) (quotation omitted); *see also Knoeffler v. Town of Mamakating*, 126 F. Supp. 2d 305, 318 (S.D.N.Y. 2000) (declining to reduce fees for time spent litigating claims that were not "completely unrelated"). *See also Marisol A. ex rel. Forbes v. Giuliani*, 111 F. Supp. 2d 381, 392 (S.D.N.Y. 2000) ("It is a reality of complex litigation such as this that both parties will engage in a great deal of case preparation which will not necessarily lead to information that will be used at trial. . . . So long as a reasonable attorney would engage in the work under similar circumstances, the Court will not prevent plaintiffs from recovering their fees.").

*III.  All the Work Done by the Smith Group Is Compensable Time and There Was No Excessive Billing or Duplication of Effort Other Than Time Spent Getting Up to Speed.*

The City Defendants argue that the work was excessive and as "proof" of this assertion they offer their own after-the-fact assessment of the reasonableness of the work done.  Importantly, the City Defendants do not point to any specific piece of work by the Smith group, other than minor complaints about the work on jury instructions, a time-line project, and deposition digesting.  The vast bulk of the City Defendants' arguments rely on *ad hominem* attacks on counsel and gross generalities based only on hindsight criticisms of the total number of hours spent working on this case.

"The relevant issue, however, is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.[17]  "As is always true in determining a fee award, [the] fuzziness of the criteria . . . ensures that people seeking opportunities to contest the fees will not need to search hard."[18]

Thus, in hindsight the City Defendants seek to re-write history by characterizing this case as a "simple" one involving a single incident on October

---

[17] *Grant v. Martinez*, 973 F. 2d 96, 99 (2d Cir. 1992) (quoting *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990)).
[18] *Lightfoot v. Walker*, 826 F. 2d 516, 524 (7th Cir. 1987) (quoting *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986)).

31, 2009.  Without pointing to a single motion or deposition, the City Defendants

suggest that the case could have been handled with less work, less document

discovery and fewer depositions.  This contention – which is nothing more than an

empty generality -- should be rejected.

The Court's extensive summary judgment decision, detailing the facts and

legal issues in this action, demonstrates that this was not a simple run-of-the-mill

civil rights or employment lawsuit.  *Hundreds* of important witnesses and *dozens*

of important events occurred during the two-year period from the summer of 2010

(when the plaintiff was first formally criticized in his performance evaluation)

through the summer of 2010 (when the NYPD's spying and harassing conduct

upstate ceased).  (*See generally* Summary Judgment Decision, date May 5, 2015, at

pp. 6-77; Dkt. # 436; reported at 2015 U. S. Dist. Lexis 58831) (summarizing the

facts).

While the course of events from the summer of 2008 through the summer of

2010 are complex and multifaceted, the underlying reasons for the NYPD's

dramatic actions against the plaintiff are even more complex, requiring specialized

and expert information about why and how the NYPD manipulated crime statistics

downward on certain violent crimes and at the same time maintained and enforced

a quota system for stops-and-frisks and arrests for lower level or "quality-of-life"

crimes.  Indeed, these institution-driven motivations in large part explain the very

strong reasons why the NYPD wanted to discredit and retaliate against the plaintiff as the "rat" who broke from the pack and made official complaints about illegal downgrading and quota practices, thereby threatening to expose to the public these NYPD practices.  While this evidence was important to show retaliatory intent and motive, this same evidence was also central to the plaintiff's *Monell* claims, which hinged on the NYPD's policies and practices.

The staggering number of witnesses identified for discovery and for trial by the parties is proof alone that this was not just a simple case, requiring just a hand-full of depositions.   The plaintiff's pleadings and the plaintiff's Rule 26(a) initial and supplemental disclosures identified 57 individual defendants or other individuals with knowledge relevant to the claims and defenses in this action.  (*See* Third Amended Complaint; Dkt. # 341; Plaintiff's Initial and Supplemental Disclosures at pp. 002 & 010-011; attached as Smith Reply Exh. 1.)   The City Defendants' initial and supplemental disclosures identified 49 individuals with knowledge of the claims and defenses in this action.  (City Defendants' Initial and Supplemental Disclosures; Smith Reply Exh. 1 at pp. 004, 014-016, 020-021, 035, 037-038, 042 & 045.)   The City Defendants' co-defendant, NYPD Deputy Inspector Mauriello, who was initially represented by the Law Department and then separately represented by conflict counsel, Walter Kretz, identified 79 witnesses in his responses to an interrogatory seeking the identity of his witnesses

with knowledge.  (*Id*. at p. 048-049.)

Similarly, the Joint Pre-Trial Order in this case demonstrates that this was far from a simple case.   On August 14, 2015, just prior to the second scheduled trial date, the defendants' version of the Joint Pre-Trial Order estimated that the trial would last *40 trial days*.  (JPTO at p. 12; Dkt. # 477-1.)   In that document, the plaintiff listed 56 witnesses and 184 exhibits (*id.* at pp. 13-14 & 20-22), and the City Defendants listed (with some overlap) 41 witnesses and 96 exhibits (*id.* at 14-15 & 27-33).   The other NYPD defendant, Mauriello, listed (with some overlap) 81 witnesses and 242 exhibits (*id.* at 15-17 & 33-41).  Finally, the Medical Defendants collectively listed 19 witnesses and 5 exhibits (*id.* at 17-18 & 41-42).  Given the complex factual and legal issues and the tenacious way the defendants litigated this case, 40 trial days could easily have become a gross understatement.

The City Defendants and their "expert" also claim that the attorneys for the plaintiff spent "too much" time reviewing the audio and video evidence in this case.  Again, they only offer generalities and conclusory statements.  Since the current Law Department attorney (the latest of nine Law Department attorney's who appeared in this action) only became involved in this case about a year ago and since the City Defendants' "expert" admittedly did not review any of this evidence, it appears that the City Defendants do not have any actual knowledge of the magnitude of the audio and video evidence in this case.  Over the past weekend

the undersigned counsel spent four hours (on a non-billable basis) reviewing the data contained in the plaintiff's digital files, which show the number of witnesses, the number of recordings, and the length of each audio or video recording.  The actual facts are important in assessing the City Defendants' claims.

As a result of the allegations made by the plaintiff about downgrading, quotas and retaliation, the NYPD conducted two extensive internal investigations. The first investigation was conducted by the Quality Assurance Division ("QAD") into the downgrading claims made by the plaintiff, and during the course of that investigation QAD interviewed 43 witnesses.  (Smith Reply Exh. 2; QAD Report at pp. NYC 5161-62.)[19]   The second investigation was conducted by the Internal Affairs Bureau ("IAB"), and during the course of that investigation, IAB interviewed 59 witnesses. (Smith Reply Exh. 2; IAB Index Worksheet at NYC 10107, 08, 10-18.)[20]  Since the NYPD's practices generally required that these interviews be recorded, the discovery record of these interviews included copies of the recordings.   The plaintiff's discovery files contain 71 separate tape-recorded interviews totaling 25.96 hours of recordings.

---

[19] The QAD report and the IAB Worksheets are being submitted to the Court under seal because those documents are subject to a protective order in this action.
[20] The IAB Index Worksheet identifies the interviews of members of the NYPD, using the term "PG" to refer to the formal, tape-recorded process under the Patrol Guide for conducting interviews.

In addition, soon after the plaintiff moved upstate, the Brooklyn North Investigations Unit also conducted its own "investigation" of the plaintiff, which included extensive video surveillance on the plaintiff and his father in, at, or outside their upstate residence.  During the course of discovery, the NYPD produced 58 separate video clips of this surveillance (identified as M2U078.mpg through M2U151.mpg) totaling 43.66 minutes of total video time.

Since the downgrading and stop-and-frisk policies relevant to the action emanated from the top brass at the NYPD, the Court also authorized the production of relevant recordings of COMPSTAT session times when any one of the central defendants (Deputy Chief Marino, Deputy Inspector Mauriello, and Captain Lauterborn) appeared at a COMPSTAT session.  In total we obtained, reviewed and studied 37 separate COMPSTAT sessions with a total elapse time of 105 hours.

Finally, the discovery record in this case consisted of all the recordings that the plaintiff took or obtained over the course of the time he was subject to retaliation.   The plaintiff produced recordings for 118 separate roll calls during the years 2008 and 2009 with a total elapse time of 16.43 hours.  The plaintiff also produced 71 separate recordings totaling 31.79 hours for specific events that occurred during that same period, including supervisor's meetings at the 81st Precinct; meetings or telephone calls with NYPD doctors and investigators;

discussions with union and others about the appeal of his 2008 failing evaluation; the events of October 31, 2009; and the events upstate, when NYPD officials repeatedly banged on his door, demanding entry.

In the light of this extensive record, the total time the plaintiff's counsel spent reviewing, analyzing and digesting the evidence was practical, necessary and reasonable, and the City Defendants simply fail to come to grips with the actual facts, hiding instead behind the shelter of generalities tossed up by their "expert."

Lacking any real substance to their objections, the City Defendants cite several fee decisions where courts dramatically reduced the number of compensable hours.   Yet the work that is necessarily involved in each lawsuit depends mainly on the nature of the factual and legal claims, the intensity of the litigation, and conduct of the parties.  Accordingly, these kinds of comparisons are of little help, and the City Defendants fail to present the Court with any substantially similar case and we know of none.  And the contentious history of this litigation (as described in our initial motion papers) and the magnitude of the record (set forth above) demonstrates that this was in fact an exceedingly complex action that was litigated tenaciously by the City Defendants.  As aptly noted by the Supreme Court, in *City of Riverside v. Rivera*, 477 U.S. 561, 581 n.11 (1986), a defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."

Since the City Defendants fail to come forward with anything concrete to rebut the presumption that a reasonable fee in this case ought to be based on the work done, as reflected by the billing records, the Court should not engage in the wholesale fee slashing urged upon the Court by the City Defendants. While the Court certainly has the discretion to make across-the-board percentage reductions, that authority is designed to give the Court the ability to "trim fat" from a fee application in the face of *detailed* claims of excessive and duplicative hours.[21]

This was a complex and heavily litigated case with high stakes for the plaintiff and for the NYPD. Indeed, it is important to note that the Law Department tenaciously fought this case against Officer Schoolcraft at the same time that it was fighting the related "stop-and-frisk" case that was also pending in this Courthouse before Judge Scheindlin. In Judge Scheindlin's findings of fact after the stop-and-frisk trial, Officer Schoolcraft's roll call tapes played a central role in the District Court's determination that the NYPD had engaged in a system-wide and quota-based stop and frisk policy.[22] Among other things important to

---

[21] *See New York State Ass'n v. Carey*, 711 F. 2d 1136, 1146 (2d Cir. 1983) (noting that the lower court had the discretion to make percentage reductions "in response to defendants' detailed claims that the fee application contained excessive and duplicative hours"). *Accord ING Global v. United Parcel Service Oasis Supply Corp.,* 2014 U. S. Dist. Lexis 118891 at *10 (S.D.N.Y. Aug. 19, 2014) ("As the district court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary, so should be the objections and proof from fee opponents.") (quoting *Norman v. Housing Authority,* 836 F. 2d 1292, 1301 (11th Cir. 1988).

[22] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 596-599 (S.D.N.Y. 2013) ("In particular, three NYPD officers from three precincts made secret recordings revealing institutional pressure to increase enforcement numbers: Officers Adrian Schoolcraft, Adhyl Polanco, and Pedro

note about the tapes, the District Court in *Floyd* found that "[t]he most striking aspect of the Schoolcraft recordings is the contempt and hostility of supervisors toward the local population."[23]  And in a prior ruling on the City's motion for summary judgment, the *Floyd* court stated that the Schoolcraft roll call recordings were the "smoking gun" that raised questions of fact about whether the NYPD had a custom or practice of imposing quotas on officer activity and whether such quotas can be said to be the moving force behind widespread suspicionless stops.[24]

This background shows why the NYPD had powerful reasons for tenaciously fighting Officer Schoolcraft tooth-and-nail in this case, using every tool available to discredit him, his recordings and his lawsuit.  Thus, while we certainly agree that this case required a tremendous effort and thousands of hours of billable time, we disagree that those hours were excessive, wasteful or duplicative.

While the City Defendants cite several cases where application for fees based on thousands of hours were cut, there are, of course, plenty of other cases

---

Serrano. The three officers' recordings provide a rare window into how the NYPD's policies are actually carried out. I give great weight to the contents of these recordings.")  Regarding the Schoolcraft recordings, the District Court noted that they "reveal[ed] a virulent precinct culture that the NYPD failed to address until forced to do so by the publication of the recordings."  *Id.*
[23] *Id.* at 597.
[24] *Floyd v. City of New York*, 813 F. Supp. 2d 417, 449 (S.D.N.Y. 2011), *on reconsideration*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011).

approving hours equal to or well in excess of the hours incurred here.[25]  Indeed,

under the circumstances of this case, where the plaintiff's attorneys were facing

five sets of well-financed and well-motivated defense attorneys, it is simply silly to

suggest that attorneys working on a contingent-fee basis would waste their time on

needless or duplicative work.

Judge Kozinski of the Ninth Circuit has noted that, given the financial

realities of contingency fee cases, where time is invested years before it may lead

to any payment, "[i]t would . . . be the highly atypical civil rights case where

plaintiff's lawyer engages in churning."[26]  That is certainly the case here: this

litigation has been going on for over six years, and plaintiff's attorneys have not

been paid a dime by the City Defendants.  Thus, in assessing the work done in this

case we request that the Court conclude, as Judge Kozinski concluded:   "[b]y and

large, a court should defer to the winning lawyer's professional judgment as to

how much time he was required to spend on the case; after all, he won, and might

not have, had he been more of a slacker."[27]

---

[25] *See, e.g., Marisol A. v. Giuliani*, 111 F. Supp. 2d 381, 401 (S.D.N.Y. 2000) (approving over 30,000 hours in a litigation lasting less than five years and without a trial); *In re Nassau Cnty. Strip Search*, 12 F. Supp. 3d 485, 498–500 (E.D.N.Y. 2014) (approving 9,000 hours in case with only one, 11-day bench trial); *Weil v. Long Island Sav. Bank, FSB*, 188 F. Supp. 2d 265, 269 (E.D.N.Y. 2002) (finding 9,000 hours over four years reasonable "in light of the size, complexity and duration of this case"); *see also Missouri v. Jenkins by Agyei*, 491 U.S. 274, 276–77 (1989) (in 10-year litigation, approving nearly 20,000 hours of attorney time and an additional 15,000 hours of paralegal and law clerk time).
[26] *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).
[27] *Moreno*, 534 F.3d at 1112.

The City Defendants also criticize the plaintiff because of the number of attorneys he had working on his action during the course of its five-year history. Yet the docket sheet in this case shows that nine attorneys have appeared on behalf of the City Defendants,[28] a fact that proves that in a hard-fought and lengthy case some turnover is to be expected.  For this reason, courts have repeatedly noted that the number of attorneys who have done work on the case, standing alone, is no indication of overstaffing.[29]

The City Defendants also criticize the Smith group because both Lenoir and Smith attended most of the depositions that were noticed and taken by the plaintiff. This argument should be rejected because it is common practice for two attorneys to work together at a deposition. In *Altman v. Port Authority*, 879 F. Supp. 345, 354-55 (1995), Judge Chin stated:

> "[T]he Port Authority's argument that Altman should not be reimbursed for the participation of two attorneys is also rejected. As Judge Tenney has held, 'The use of multiple attorneys . . . is not unreasonable per se. Indeed, division of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings. Multiple attorneys may

---

[28] *Schoolcraft v. City of New York,* 10-cv-6005 (RWS); Docket Sheet at pp. 3-6.

[29] *See, e.g., Lochren v. County of Suffolk*, 2010 WL 1207418, at *3 (E.D.N.Y. Mar. 23, 2010) (awarding fees to 13 lawyers who worked on merits); *United States v. City of New York*, 2013 WL 5542459 at *15 (E.D.N.Y. Aug. 30, 2013) (compensating 14 lawyers for work on merits); *In re Nassau Cnty. Strip Search*, 12 F. Supp. 3d at 498–500 (awarding fees for 20 lawyers and 19 paralegals); *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 425–26 (S.D.N.Y. 1999) (rejecting defendants' argument that use of 21 attorneys and 16 legal assistants on case proves overstaffing).  *See also Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, 2011 WL 1002439  at *8 (S.D.N.Y. Mar. 16, 2011), *aff'd*, 483 Fed. Appx. 634 (2d Cir. 2012) (noting that staffing of four attorneys at a hearing was not excessive where "hearing was the culmination of extensive motion practice and was critical to the outcome" of the case).

be essential for planning strategy, eliciting testimony or evaluating facts or law. *Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*, 599 F. Supp. 509, 518 (S.D.N.Y. 1984) (citations omitted). *Accord New York Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983) ("prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist").[14]

Judge Chin also noted that having two lawyers at depositions improves trial efficiencies and that consultation among lawyers at depositions ensures that they do not overlook significant facts or inquiries.[30]

Moreover, the need for two lawyers to appear for the plaintiff at these depositions was particularly appropriate in this case.  This case had sixteen named defendants and five separate teams of attorneys representing the defendants.  The City Defendants were represented by the Law Department, and the Law Department also provided separate conflict counsel for one of the NYPD officials named as a defendant, Deputy Inspector Mauriello, who was also at all of the depositions with one or more Law Department lawyers.  The hospital and the two doctor defendants, whose interests were often aligned with the City Defendants and Mauriello, were also separately represented at the depositions.  Each defense team came from either a very large or a well-established mid-size firm.   And the Court may recall that many of the depositions were exceedingly contentious, were needlessly interrupted, and often required applications by plaintiff's counsel during

---

[30] *Altman*, 879 F. Supp. at 355 n. 14

or after the depositions for judicial intervention to prevent the defendants' counsel

from impeding our examinations.

Under these circumstances, it was reasonable to have two attorneys

(primarily Nathaniel Smith and John Lenoir) attend the depositions taken on behalf

of the plaintiff.   As noted, numerous cases within this Circuit acknowledge that it

is common and acceptable practice for two attorneys in a complex case to attend

depositions of opposing parties or important witnessed[31] and to otherwise work

---

[31] *Merck Eprova AG v Brookstone Pharms, LLC.,* 2013 U.S. Dist. Lexis 90474 at *10 (S.D.N.Y.
June 10, 2013*)* ("Defendants' objection to the appearance of two attorneys at a deposition is,
plainly, absurd. To support their request for a deduction, Defendants point to
sixteen depositions where two attorneys appeared on Plaintiff's behalf. However, "it is common
practice for a lawyer to bring a colleague to assist at a deposition." (quoting *Robinson v. City of
New York*, 2009 U.S. Dist. LEXIS 89981 at * 24-25 (S.D.N.Y. Sept. 29, 2009);  *see also
Hargroves v. City of New York*, 2014 U.S. Dist. Lexis 42534 at *65 (E.D.N.Y. Jan. 6, 2014),
*adopted*, 2014 U.S. Dist. Lexis 41657 (E.D.N.Y. March 26, 2014) ("it was reasonable for
Plaintiffs to have two attorneys attend the depositions of these three key witnesses") (citing
*N.Y.S. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146 (2d Cir.
1983) ("[P]revailing parties are not barred as a matter of law from receiving fees for sending a
second attorney to depositions . . . ."); *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527,541 (S.D.N.Y.
2008); (it was "entirely appropriate" for two attorneys to attend the depositions of key
witnesses)); *Cruceta v City of New York*, 2012 U.S. Dist Lexis  97740 at *16-17 (E.D.N.Y. Feb.
7, 2012) ("The City — which has not acknowledged its practice in that regard in its briefing in
this case — does not even attempt to explain why it is sometimes willing to engage multiple
attorneys from different law offices to litigate a single case and yet finds it unreasonable for its
adversary here to do the same."); *see also Zahrey v. City of New York*, Slip Op. 98-cv-4546 at p.
41; Dkt. # 264 (DCP) (JCF) (S.D.N.Y. June 8, 2010) (report and recommendation by MJ
Francis); *Etna Prods. Co. v. Q Mktg. Grp., Ltd.,* 2005 U.S. Dist. Lexis 36926 at *4 (S.D.N.Y.
June 6, 2005) ("There similarly is no problem with both [attorneys] participating in the same
conference with the Court or their client."); *Moon v. Gab Kwon*, 2002 U.S. Dist. Lexis 21775 at
*5- *6 & n.12 (S.D.N.Y. Nov. 8, 2002) (Lynch, D.J.) (rejecting overstaffing objection based on
court attendance by two supervising attorneys and one law student intern); *Sugarman v. Village
of Chester*, 213 F. Supp. 2d 304, 311 (S.D.N.Y. 2002) ("the mere fact that two attorneys assisted
on a certain case with respect to similar matters does not necessarily lead to the conclusion that
the tasks performed were duplicative"); *Bridges v. Eastman Kodak Co.,* 1996 U.S. Dist. Lexis
809 at *6 (S.D.N.Y. Feb. 6, 1996) ("While it is true that redundant work should not be billed,
many tasks in fact require or benefit from the attention of more than one attorney.").

together in preparing a case.[32]   Thus, the City Defendants' objection to two lawyers

appearing at depositions should be overruled.

The City Defendants' objections about so-called "block billing" should also

be rejected for two reasons.  First, the City Defendants and their expert do not

provide any foundation for the conclusory claims about the existence and

magnitude of block billing.  Thus, there is no basis for cutting the hours,

particularly because all the work in this case was compensable and the context of

the billing entries read together (not in isolation, as regenerated by the City

Defendants' expert) provide the Court with sufficient ground to determine the

reasonableness of the work.[33]   Indeed, it is far from clear how the City Defendants

---

[32] "[C]onferences among attorneys, especially in a complex case such as this one, are "essential to . . . competent preparation." *Marathon Ashland Petroleum LLC v. Equili Co., L.P.*, 2003 WL 21355216 at *2 (S.D.N.Y. June 10, 2003) (rejecting argument that attorney conference hours in discovery were excessive); *Rodriguez*, 84 F. Supp. 2d at 426 (rejecting argument plaintiffs should be "penalized . . . for frequent intra-office conferences").

[33] *See, e.g. Tottey v. Life Ins. Co. of N. Am.*, 2009 WL 3764222 at *3 (N.D.N.Y. Nov. 10, 2009) (no reduction warranted where "[t]he examples of block billing to which Defendant directs the Court's attention are not vague and the tasks included in those entries are either related to a single process or to related processes").  Counsel seeking fees "is not required to record in great detail how each minute of his time was expended"; he need only "identify the general subject matter of his time expenditures." *Hensley, 461 U.S. at 437 n.12; see also Hargroves v. City of New York*, 2014 WL 1270585, at *18 (E.D.N.Y. Jan. 6, 2014), *report and recommendation adopted*, 2014 WL 1271039 (E.D.N.Y. Mar. 26, 2014) ("[T]he four contested time entries include three entries stating "[r]ead, review, digest [transcript(s)]," and one entry describing multiple tasks related to deposition preparation. There is no difficulty in determining the reasonableness of the time expended on those dates because the entries are sufficiently detailed.").

even define block billing because they offer no explanation of how they reached their conclusions.

Second, although Ms. Bronsther proclaims that block billing is not an accepted billing practice, she does not provide any support for this blanket assertion and apparently has never read any of the governing decisions in this District.  If she had, she would know that block billing is not prohibited and in fact is a common and accepted billing practice, at least according to Southern and Eastern District Court Judges, who do have very specific and relevant experience. *See, e.g., Hnot v. Willis Grp. Holdings Ltd*., 2008 WL 1166309, at *6 (S.D.N.Y. Apr. 7, 2008) (emphasis added), where Judge Lynch stated about block billing: "[T]he Court will not impose an across-the-board penalty simply because a law firm has engaged in a *generally accepted* billing practice."   To the same effect is Judge Seybert's decision *Restivo v. Nassau County,* 2015 U.S. Dist. Lexis 160336 at *12 (E.D.N.Y. Nov. 30, 2015) (emphasis added), where the court stated:  "The Court will not penalize NSB for work it completed based on such a trivial issue as block billing, *which is pervasive in the legal industry*."

Bronsther's utter disregard for direct, authoritative and contrary information about accepted billing practices will be more fully addressed in our reply papers on the plaintiff's motion to strike the Bronsther report.   As stated in our motion to

strike, the Bronsther report should be held inadmissible and should be rejected as unreliable.

IV. *The Hourly Rates for the Smith Group Are Reasonable.*

To set appropriate hourly rates, District Courts must use a "prevailing market rate," meaning the rates for "similar services by lawyers of reasonably comparable skill, experience and reputation."[34] Ultimately, the goal is to award a rate reflecting the "attorney's true market value," so that "an attorney is compensated at the rate the attorney would receive in cases not governed by the federal fee-shifting statutes."[35] As the Second Circuit has explained, this fact-finding "contemplates a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel. . . . [which] requires an evaluation of evidence proffered by the parties."[36]

Here, the City Defendants argue that the rates requested by the Smith group are too high and that the Court should award dramatically lower rates. Specifically, the City Defendants contend that the $575 an hour rates for Smith, Lenoir and Suckle should be reduced to $450, $300, and $300 an hour, respectively. The City also contends that the $150 hourly rate for Ms. Bauza, our

---

[34] *Blum v. Stenson*, 465 U.S. 886, 895–96 & n.11 (1984).

[35] *Perdue v. Kenny A.*, 559 U.S. 542, 554–55 (2010).

[36] *Farbotko v. Clinton Cnty.*, 433 F.3d 204, 209 (2d Cir. 2005).

law graduate, should be $100 an hour and that the $125 hourly rate for the

paralegals should also be reduced to $100 an hour.[37]

    As set forth in our opening and our reply declarations, we contend that the

Smith group's requested rates are in line with the prevailing rates in this District

for similar services.   Attorneys with thirty to forty years experience now command

fees in the Southern District in the range of $575 to $700 per hour;[38] law graduates

command in the range of $150 an hour;[39] and paralegal time is currently

compensated in the range of $125 an hour.[40]

---

[37] Scheiner Dec. Exh. O; Dkt. # 598-15.

[38] *See, e.g. Barbour v. City of White Plains*, 788 F. Supp. 2d 216, 225 (S.D.N.Y. May 24, 2011), *aff'd*, 700 F.3d 631 (2d Cir. 2012) (awarding an hourly rate of $625); *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527 (S.D.N.Y. 2008)($600.00 an hour was reasonable for a highly experienced attorney on a "relatively straightforward...single plaintiff" case.)*; Restivo v. Nassau County,* 2015 U.S. Dist. Lexis 160336 (E.D.N.Y. Nov. 30, 2015) (awarding $700.00 billing hourly billing rate to two senior civil rights attorneys) (although the $700.00 an hour rate was high, the court found that it is a reasonable rate in light of the complexity of the issues involved in this dispute and the level and quality of the attorneys); *Mawere v. Citco Fund Servs., (USA) Inc*., No. 09-CV1342, 2011 WL 6779319, at *5 (S.D.N.Y. Sept. 16, 2011), *report and recommendation adopted*, 2011 WL 6780909 (S.D.N.Y. Dec. 27, 2011) (awarding $650.00 an hour to an attorney with 32 years of experience in employment discrimination case);  *Kim v. Kum Gang, Inc.*, No. 12-CV-6344, 2014 WL 2514705, at *2 (S.D.N.Y. June 2, 2014) (awarding an "experienced" litigator $600 per hour in a wage and hour case); *Zahrey v. City of New York*, et al., 98 Civ. 4546 (DCP) (JCF), (Report and Recommendation, dated June 8, 2010 (Docket No. 264) (awarding experienced criminal defense attorney, who had litigated 20 civil rights claims in his career, a billing rate of $575.00 per hour in 2010).

[39] *Zahrey v. City of New York*, Slip Op. 98-cv-4546 at 26-27 & 32; Dkt. # 264 (DCP) (JCF) (S.D.N.Y. June 8, 2010) (concluding that $150 per hour was a reasonable hourly rate as of 2010 for a law graduate); *Barile v. Allied Interstate, Inc*., 2013 U.S. Dist. Lexis 32483 (S.D.N.Y. Jan. 30, 2013); accord *M.C. ex rel. E.C. v. Dep't of Educ*., 2013 U.S. Dist. Lexis 78605 at *26 (S.D.N.Y. June 4, 2013) (concluding that $125 is a reasonable hourly rate for the law student interns).

[40] *Demonschaux v. Unitedheathcare Oxford*, 2014 U.S. Dist. Lexis 43954 at *9-10 (S.D.N.Y. Mar. 27, 2014) (in ERISA case, paralegal rates in the range of $150 per hour approved); *LV v. New York City Dept. of Educ*., 700 F. Supp. 2d 510, 523-524 (S.D.N.Y. 2010) ("$150 is within the range of rates awarded for such work").

Our reply declarations also provide additional information in response to the claims and arguments by the City Defendants about our hourly rates.  Smith notes that since filing this motion he and Ms. Bauza have been retained on a civil rights matter by a financial asset manger to assess a potential Section 1983 claim against certain state taxing authorities for violation of the client's due process rights.  In that matter, the client has agreed to the hourly rates of $575 and $150 per hour for Smith and Bauza, respectively, thereby providing additional information about reasonable market rates.[41]  In addition, Lenoir notes that he has far more relevant experience than the "two years" that the City Defendants claim is the extent of his relevant civil rights work.  Finally, Suckle notes that he also has extensive civil rights experience, contrary to the uninformed and flatly wrong assertions by the City Defendants; that his billing rate is $575 per hour; and that he has not charged the $300 an hour rate since 1998.[42]

As noted in John Lenoir's accompanying reply declaration, we believe that an issue raised by Magistrate Judge Freeman requires a partial adjustment to his hourly rate.  During the settlement process, Magistrate Judge Freeman made the point that typically the person who is the "second seat" at depositions is billed out at a lower hourly rate than the person who is asking the questions.  Based on that point and in an attempt to further exercise our billing judgment, Lenoir has reduced

---

[41] Smith Reply Dec. ¶ 11.
[42] Suckle Reply Dec. ¶¶ 3-5.

his hourly rate from $575 per hour to $475 per hour for the 189.5 hours he spent as the second seat at the depositions.[43]   Accordingly, we request that this adjustment also be made to the award.

V.     *The Offer of Judgment Obligates the City Defendants to Pay the Expenses of the Litigation.*

In the Offer of Judgment, the City Defendants expressly agreed to pay the plaintiff's reasonable attorney's fees, costs and expenses for the federal claims. Now, the City Defendants are trying to renege on their contractual obligation to pay for the expenses of the litigation, a promise that they made to induce the plaintiff to accept the Offer and to obtain a release on their behalf from all claims.

The City Defendants argue that expert expenses and investigator's fees are not compensable under Section 1988 as "costs."  While that may be correct as a matter of statutory law, it is beside the point.  As a matter of basic contract law, the City Defendants are obligated by the terms of their Rule 68 Offer to pay the costs *and expenses* of the litigation.

Section 1988 authorizes District Courts to award a prevailing party in Section 1983 actions reasonable attorney's fees as part of the *costs* of the action. The statute provides:

(b) *Attorney's fees*. In any action or proceeding to enforce a provision of sections 1977, 1977A, 1978, 1979, 1980, and 1981 of the Revised Statutes [42 USCS §§ 1981-1983, 1985, 1986], title IX of Public Law 92-318 [20

---

[43] Lenoir Reply Dec. ¶¶ 12.

USCS §§ 1681 et seq.], the Religious Freedom Restoration Act of 1993, the Religious Land Use and Institutionalized Persons Act of 2000, title VI of the Civil Rights Act of 1964 [42 USCS §§ 2000d et seq.], or section 40302 of the Violence Against Women Act of 1994, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.[44]

It is certainly correct that courts have held that expert and other common expenses of litigation are not compensable costs in Section 1983 actions because the term "costs" is a term of art having a very specific statutory definition, setting forth precisely which outlays incurred during the course of an action are taxable costs.[45]  But here the City Defendants did not in their Rule 68 Offer undertake to pay only costs; they specifically agreed to pay costs *and expenses* for the federal claims, which as noted above consisted of ten separate claims against all the defendants covering all aspects of this litigation.

Under the City Defendants' strained re-reading of their Offer, which they admit is a binding contractual obligation,[46] they are effectively seeking to whiteout after-the-fact their offer to pay "expenses" by now claiming that they were only offering to pay those "costs" recoverable under Section 1988(b).  Yet the Offer does not say that.  And the City Defendants were the drafters of the document.

---

[44] 42 U. S. C. § 1988(b).
[45] *West Virginia Univ. Hop. v. Casey,* 499 U. S. 83, 102 (1991).
[46] Def. Mem. at p. 72 n. 77 ("Smith is correct that the Rule 68 is to be construed like a contract….").

Indeed, there is a purposefully-coercive aspect to the Rule 68 procedure utilized by the City Defendants.  Under the Rule 68 procedure and the Offer's express terms, the plaintiff had to accept or reject the Offer within 14 days, and rejection would have put him at risk for future costs of the action, including his attorney's fees, in the event he prevailed at trial but did not beat the Offer.   Under these circumstances, it is particularly appropriate to hold the Rule 68 Offeror to the precise terms of the Offer and not permit the Offeror to limit its obligations based on unexpressed terms or hidden meanings.

As a matter of basic contract law, when the terms of a contract are clear and unambiguous, the Court must not "alter or go beyond the express terms" of the parties' agreement.[47]   Accordingly, the City Defendants should be required to pay for the benefit of the bargain that they struck and pay all expenses of the litigation, including the quite substantial expert and investigator's fees.

## VI.   *The Smith Group Is Entitled To Fees on Fees and Interest*

We agree with the City Defendants that a prevailing party is not entitled to recover reasonable attorney's fees incurred in connection with a motion for fees under Section 1988. However, in the exercise of our billing judgment, both the

---

[47] *Penley v. City of New York*, 2015 U. S. Dist. Lexis 119808 at *3 (S.D.N.Y. Sept. 8. 2015) ("Offers of judgment pursuant to [Rule] 68 are construed according to ordinary contract principles") (citing *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999)). *See also Berrian v. City of New York*, 2014 U.S. Dist. Lexis 104255 (S.D.N.Y. July 28, 2014), *adopte*d, 2014 U.S. Dist. Lexis 163445 (S.D.N.Y. Nov. 21, 2014) (strictly enforcing terms of Rule 68 Offer to award plaintiff attorney's fees).

Smith and Norinsberg groups stated that they were not seeking fees for the time incurred in preparing their fee application.[48]  We also reserved the right to seek further fees in this case because the City Defendants had tenaciously litigated this case and there was a significant likelihood that that the City Defendants would continue to do so.[49]

Since filing this fee application in December of 2015, the City Defendants obtained (with our consent) a two-month adjournment, allegedly to review the papers and engage in good-faith settlement discussions that never took place. Instead, the City Defendants made blunderbuss discovery demands, which were rejected by the plaintiff's counsel, followed by a motion to compel discovery, which was denied by the Court.  Thereafter, the City Defendants requested further delay in the submission of their opposition papers to have a belated settlement conference, which failed and further delayed the resolution of the case.  And finally, the City Defendants have improperly bolstered their opposition papers with an "expert" on the reasonableness of fees, which required a separate motion to strike.

Under these circumstances, we will request at oral argument that the Court consider awarding us the reasonable fees incurred after this motion for fees was

---

[48] Joint Memorandum of Law in Support of Fee Motion at p. 36 n.27; Dkt. # 561.
[49] *Id.*

filed in December of 2015,[50] as well as interest at the New York contract rate of

nine percent from the date the City Defendants' liability for fees, costs and

expenses became fixed as a matter of law.[51]

VIII. *Conclusion*

The rates and hours that the Smith group request are reasonable in the light

of the history of this case.  The success was extraordinary, and the work on all the

federal and state claims were intertwined.  The Court should award the full fees,

---

[50] As a matter of equity, the court "retains discretion to award reasonable compensation for this work" even though it occurred after the Rule 68 offer was made.  *Lee v. Santiago*, 2013 WL 4830951 at *13 (S.D.N.Y. 2013) (awarding fees in connection with an attorney's fee application made *after* the acceptance of the Rule 68 Offer of Judgment); *see also* Rosado v. City of New York, 2012 WL 955510, at *6 (S.D.N.Y. 2012)("[A]s a matter of equity, plaintiff should be awarded some amount for the time his counsel spent in preparing the instant fee application. By not settling the attorneys' fees issue, the City was put *on notice* that time spent by counsel in seeking fees would become *a component* of 'reasonable attorney's fees.'"); *Hargroves v. City of New York*, 2014 WL 1270585, at *23 (E.D.N.Y. 2014), *report and recommendation adopted*, 2014 WL 1271039 (E.D.N.Y. 2014) (recognizing that "courts allow such fee awards, when reasonable").

[51] *Nicholson v. Williams*, 2004 WL 4760138 at *3–4 (E.D.N.Y. 2004) ("An award of attorneys' fees is considered a 'money judgment' and is treated in the same manner as any other money judgment."); *Aiello v. Town of Brookhaven*, 2005 U.S. Dist. LEXIS 11462 at *30, 2005 WL 1397202 (E.D.N.Y. 2005)(awarding post-judgment interest on award of attorney's fees); *Commercial Union Assurance Co. v. Milken,* 17 F. 3d 608, 613-14 (2d Cir. 1994) (decision to award pre-judgment interest is an equitable remedy designed to fully compensate the party based on considerations of fairness and the relative equities and other principles deemed relevant by the lower court).   Here, interest on this award should accrue from September 29, 2015, the date that the Notice of Acceptance of the Offer was filed.  Dkt. # 531 (notice of acceptance filed).  That is the appropriate accrual date for interest on an attorney's fees award in the Second Circuit.  *See Moran v. Sasso*, 2009 WL 1940785 *7 (E.D.N.Y. 2009)("Under the 'majority rule, followed in the Fifth, Sixth, Eighth, Ninth, Eleventh and Federal Circuits,' interest accrues 'from the date the party becomes entitled to the award even if that award is not quantified until a later point'...[and] [c]ourts within the Second Circuit routinely adhere to the 'majority rule' that post-judgment interest accrues from the date the party becomes entitled to the award of attorney's fees.").  *See also* CPLR § 5001(a) & 5004 (pre-judgment interest for contract claims accrue at New York's legal rate of nine percent).

hv

costs and expenses as provided for in the Rule 68 Offer in accordance with the

adjustments set forth in the following chart:

### Smith Group Adjusted Billing Chart

| Attorney | Total Hours | Cost of Substitution | Law Enforcement Contacts | Hourly Rate | Adjusted Hours | Adjusted Bill |
|---|---|---|---|---|---|---|
| Smith | 2217.5 | 54.5 | 16.95 | $575 | 2146.05 | $1,233,978.70 |
| Lenoir | 1281 | 6.25 | 13.13 | $575 | 1261.62 | $706,481.50[52] |
| Bauza[53] | 1287 | 18.5 | 0 | $150 | 1268.5 | $190,275.00 |
| Suckle | 108.9 | 0 | 0 | $575 | 108.9 | $62,617.50 |
| McCutcheon | 23.38 | 0 | 0 | $250 | 23.38 | $5,845.00 |
| Paralegals | 442.18 | 0 | 0 | $125 | 442.18 | $55,272.50 |
| Expenses | $135,235.75 | | | | | $135,235.75 |
| Total | | | | | | $2,389,705.95 |

Dated: April 29, 2016
        New York, New York


                                              *s/NBS*

                                              _____
                                              NATHANIEL B. SMITH
                                              *Attorneys for Plaintiff*
                                              100 Wall Street – 23rd Floor
                                              New York, New York 10006
                                              (212) 227-7062

Of Counsel,
John Lenoir
Howard Suckle
Magdalena Bauza
   (law graduate)

_____

[52] As noted in Lenoir's reply declaration, he has agreed to reduce his hourly rate to $475 for 189.5 hours second seating the depositions in this case, thereby reducing his bill $18,950 from $725,431.50 to $706,481.50.
[53] Ms. Bauza is a law graduate.