UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

ADRIAN SCHOOLCRAFT,                                    10-cv-6005 (RWS)

                            Plaintiff,

                                                      **REPLY AFFIRMATION OF**
                                                      **NATHANIEL B. SMITH**

               -v-

CITY OF NEW YORK, et al.,

                            Defendants.
--------------------------------------------------------X

        Nathaniel B. Smith, being an attorney admitted to practice law in this State and

before this Court, hereby states and declares under the penalties of perjury that the

foregoing is true and correct.

        *Introduction*

        1.  As one of the attorneys for the plaintiff in the above-referenced action, I am

submitting this reply declaration on behalf of the Smith group of attorneys[1] in response

to the papers submitted by the City Defendants in opposition to the motion.   All the

significant issues raised by the City Defendants and their purported "expert" should be

rejected by the Court.

        2.  First, the City Defendants' Offer of Judgment contractually bound the City

Defendants to pay all of the plaintiff's "reasonable attorney's fees expense, and costs

_____

[1] John Lenoir, Howard Suckle, James McCutcheon, law graduate, Magdalena Bauza, and myself.

to the date of this offer for the plaintiff's federal claims." (Offer of Judgment at p. 2; attached as part of the Judgment, dated October 15, 2015; Dkt. # 541.)  The federal claims asserted pursuant to 42 U.S.C. Section 1983 in the Third Amended Complaint, which was the governing pleading at the time of the Offer of Judgment, were claims for:  (1) first amendment retaliation; (2) false arrest; (3) malicious abuse of process; (4) excessive force; (5) failure to intercede; (6) unlawful search and entry; (7) involuntary confinement; (8) conspiracy to violates civil rights; (9) substantive and procedural due process; and (10) *Monell*-type liability.  (Third Amd. Complt; Dkt. # 341 at pp. 42-54.)

3.    All of the time spent on this case, including the time spent regarding the Medical Defendants, related directly to these ten federal claims, and the plaintiff's Acceptance of the Offer of Judgment extinguished all of these federal claims as a matter of law.  (Offer of Judgment at p. 2; Dkt. 541) (acceptance will release and discharge the City Defendants of any and all claims arising out of the facts and circumstances of the action).   Nothing in the Offer of Judgment limited the scope of the release of the claims, and nothing in the Offer limited the scope of the obligation to pay reasonable attorney's fees (or expenses) for the federal claims.   In advising the plaintiff about the Offer of Judgment, I relied on the broad language about fees, costs and expenses and to the extent that the City Defendants are now seeking limit the broad scope of the Offer, they are in effect trying to take back a significant part of the bargain that was struck when the plaintiff accepted the Offer. Thus, all work and all

2

expenses, including the work relating to the Medical Defendants, are fully compensable.

4.  Second, the City Defendants' claim that the work done in this case was duplicative is grossly exaggerated.  Although we do make certain minor adjustments relating to having new counsel get up to speed on the case and the second seating at depositions, there is no merit to the claim that attorneys did duplicative or needless work and are now double billing.  From February 2013 through January 2015, the Smith group worked on the case exclusively throughout the fact discovery, fact depositions, expert discovery, expert depositions, and the summary judgment phases, and during each of those phases of the litigation, I gave each lawyer in our group discrete tasks to perform, tasks that are specifically described in our contemporaneous billing records.  And when the plaintiff in January of 2015 brought back the Norinsberg group to gear up for an April 2015 trial estimated by the City Defendants to last at least two months with well over 50 witnesses, all the pre-trial work was divided up among the attorneys.  We had neither the time nor the willingness to have two attorneys performing the same tasks, a fact that becomes all the more obvious in the light of the fact that we were all working on a contingent-fee basis with no guarantee of payment for our work.

5.  Finally, the argument that the plaintiff's attorneys overworked the case is belied by the broad scope of the claims in this action and by the fact that the City

Defendants fought us tooth-and-nail with a scorched-earth approach throughout this hard-fought litigation.  As the Supreme Court long ago noted, a defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986).

6.  Although the major objections by the City Defendants to the fee application are meritless, we have made certain adjustments in our billing to address some of the objections and points raised by the City Defendants.  We agree that some adjustment should be made for the time the Smith group took to get up to speed on the file in February and March of 2013 (Smith, 54.50 hours; Lenoir, 6.25 hours; Bauza, 18.50 hours, and Suckle, 2.50 hours).[6]  We also agree that communications with other law enforcement agencies require an adjustment, and request that my time and Mr. Lenoir's time be reduced by 16.95 hours and 13.13 hours, respectively.[7]   And John Lenoir has agreed to a reduction of his hourly rate for the time he "second sat" the depositions we took from $575 an hour to $475 an hour to reflect the observation made by Magistrate Judge Freeman that a second attorney at depositions is often charged out at a lower rate.[8]

7.  Accordingly, I respectfully request that the Court award the Smith group the attorney's fees, costs and expenses as set for more fully below.  I also request that the

---

[6] *See* Bronsther Report at p. 30; Scheiner Exh. D
[7] *See* Bronsther Report at p. 39; Scheiner Exh. D.
[8] Lenoir Reply Dec. ¶ 12.

Court direct that the award be made directly to the lawyers working with me on this case because our agreement with the plaintiff provides that in the event of a fee application all such fees shall be paid directly to us and shall belong to us.

*The Factual Misstatements, Distortions and Inadmissible Claims by the City Defendants' "Expert."*

8.    Throughout the City Defendants' memorandum of law and the "expert report" submitted by Judith Bronsther, there are dozens of factual mistakes, conclusory claims without back-up, and over-the-top distortions of the facts.  To the extent that the Court finds any credence with these claims, I am submitting this declaration to respond to each of these claims.

*Billing for Secretarial or Clerical Work*

9.    In their memorandum and report, the City Defendants claim that I billed my time at $575 an hour for secretarial and clerical work.  (Bronsther Report at p. 8 & 71-73; Def. Mem. at p. 25.)  The claim is utterly false.  On page 72 of the Bronsther report, Bronsther reprints a list of over three dozen billing entries by "NB," erroneously claiming that "NB" refers to me.  In fact, the initials "NB" stand for Nicole Bursztyn, who is a paralegal who works for Jon Norinsberg.   My initials are "NBS," yet in an apparent rush to sling mud rather than present facts, the City Defendants and their "expert" -- who claims to be conducting an "audit" -- did not bother to check the actual billing records that formed the underlying basis for this

provocative claim.  Had the "auditor" done a simple citation check, she would have realized that the "NB" entities that she re-created for her report were derived from Jon Norinsberg's billings for his *paralegal*, not my billing records.  Indeed, in the same section of the report there is one billing entry that refers to "NBS" and *is* derived from my billing records.  (*Id*. at p. 72) (NBS:  "preparing documents for client").   That entry, which pertained to me providing the plaintiff with a status report on then-outstanding discovery demands and responsive documents produced, would have informed a genuinely-independent auditor that "NB" did not refer to me and that "NBS" and "NB" referred to different individuals.

10.  While this mistake could be simply written off as a minor clerical error, when viewed in the light of all the other issues about Bronsther's report, the mistake raises serious doubts about the integrity and reliability of any of Bronsther's claims and conclusions.  We will address these issues in reply on our motion to strike the Bronsther report, after the City Defendants file their opposition to that motion.

*The "Cash" Wire Transfers*

11.  The City Defendants make the false and inflammatory claim that I wired cash to the plaintiff and to other "unknown" persons and billed for hotel charges at times not relevant to this case.  (Def. Mem. at p. 2.)   This is yet another example of specious mud slinging without any basis.  There is simply no evidence that I or anyone else in the Smith group wired cash to the plaintiff or any other "unknown" persons for

stays at hotels or anything else.   Although there are two entries contained in Jon Norinsberg's billings for the wiring of a small amount for funds ($212 and $329) to the plaintiff (*see* Report at p. 17), there is nothing improper about those charges, which reflect that funds were sent to the plaintiff to cover *travel* expenses to New York City. For most of the time this action was pending, the plaintiff was unemployed and living in an impoverish state with his father in the Southern Adirondacks.  On several occasions, the circumstances of the case required the plaintiff to travel for extended periods of time to New York City for purposes associated with this action and all of my travel and all of my meetings with the plaintiff were for that purpose.

*My Hourly Rate*

12.   The City Defendants argue that my hourly rate of $575 an hour is inflated and well above the market rate for my services.  The City Defendants, I respectfully submit, are wrong.  The Court's own knowledge and the other evidence submitted in support of this fee motion shows that my requested rate is with the reasonable range of market rates for attorneys with similar experience.  Moreover, in the past four months since submitting this fee application I have been retained on two matters that are relevant to the market rate issue at hand.

13.  In the first matter, a successful asset manger retained me and my colleague, Ms. Magdalena Bauza, last month to analyze the viability of asserting a Section 1983 action in federal court against certain out-of-state tax collection authorities who may

be abusing their power under state law in violation of the client's due process rights. The client is paying me $575 per hour for my time and $150 per hour for Ms. Bauza's time, which will be primarily doing the basic Section 1983 legal research, as she did in this action.  While this recent hourly retainer is only one matter, it is a civil rights retainer for a potential Section 1983 action and as such does provide directly relevant and objective evidence of what actual hourly rates Ms. Bauza and I can command in the legal services marketplace in Manhattan for that legal work.

14.  In the second matter, which is a corporate litigation between former shareholders, I was retained this month at the rate of $550 an hour.  That rate was slightly reduced by me to that rate because $550 an hour was the rate that the client's corporate counsel, who referred the matter to me, was charging the client. Again, while this is also only one matter, it does provide further support that my request rate is reasonable and within the range of market rates for attorneys with my level of experience.[9]

---

[9] The City Defendants argue that I should have produced the retainer agreement with the plaintiff in this case to support my assertion that the default rate provided for in that agreement was $575 per hour.  Similarly, they will likely argue that I should have attached the retainer agreements with these other recent clients.  I resist doing so out of respect for the confidences and privacy of my clients. Since any such production would require substantial redactions, it makes little sense to provide copies of these redacted documents, which would necessarily have to redact out authenticating information. Nevertheless, in the event that the Court is willing to receive these documents for *in camera* inspection by the Court I will provide them *in camera*.

*The Complexity of This Action*

15.   The City Defendants argue that this was a "simple" case involving one plaintiff about an isolated event on October 31, 2009 and that the case should have been handled with less document and deposition discovery.   The City Defendants could not be more wrong.

16.   The Court's extensive summary judgment decision, detailing the complex facts and legal issues in this action, demonstrates that this was not a simple run-of-the-mill civil rights or employment lawsuit.   The plaintiff was harassed by his superiors for over a year prior to the dramatic events of October 31, 2009, when they broke their way into his home, assaulted him, declared him a dangerous and emotional disturbed person, and forcibly took him to Jamaica Hospital in handcuffs, where he was further abused by them and held involuntarily as a dangerous and mentally ill person for a week.   And upon his release, the NYPD pursued the plaintiff upstate to his father's home where he had retreated, only to be further harassed, monitored and videotaped over the course of the next six months.  *Hundreds* of witnesses and *dozens* of important events relevant to liability and damages issues occurred during the two-year period from the summer of 2008 when the plaintiff was first formally criticized in his performance evaluation for failing to satisfy the quota through the summer of 2010 when the NYPD's spying and harassing conduct upstate ceased.  (*See generally*

Summary Judgment Decision, date May 5, 2015, at pp. 6-77; Dkt. # 436)

(summarizing the facts).

17.  While those basic facts are complex, the underlying reasons for the NYPD's

actions against the plaintiff are even more complex, requiring specialized and expert

information about why and how the NYPD wanted to manipulate the statistics

downward on certain violent crimes and at the same time maintain and enforce a quota

system City-wide for stops-and-frisks and arrests for lower level or "quality-of-life"

crimes.  Thus, this action raised serious questions about whether and how the NYPD

was engaging in a "numbers game" to manipulate downward the reported number of

serious crimes occurring in the City of New York to make the City appear safer to the

public than the actual numbers justified.  This action also raised serious questions

about whether and how the NYPD was engaging in a systematic "stop-and-frisk

campaign" that was driven by an illegal quota system.  Indeed, these institutionally-

driven motivations in large part explain the very strong reasons why the NYPD wanted

to discredit and retaliate against the plaintiff as the "rat" who broke from the pack and

made official complaints about illegal downgrading and quota practices, thereby

threatening to expose to the public these NYPD practices.  This evidence was also

central to the plaintiff's *Monell* claims, which also hinged on the NYPD's policies and

practices.

18.    In the light of this background, the City Defendants' after-the-fact argument now about the legal cost and extent of document and deposition discovery is meritless.  The number of witnesses identified for discovery and for trial is proof alone that this was not just a simple event case requiring just a few depositions, as the City Defendants now causally suggests.   The plaintiff's pleadings and the plaintiff's Rule 26(a) initial and supplemental disclosures identified 57 individual individuals with knowledge relevant to the claims and defenses in this action.  (*See* Third Amended Complaint; Dkt. # 341; Plaintiff's Initial and Supplemental Disclosures at pp. 002 & 010-011; attached as Smith Reply Exh. 1.)    The City Defendants' initial and supplemental disclosures (with overlap) identified 49 individuals with knowledge of the claims and defenses in this action.  (City Defendants' Initial and Supplemental Disclosures; Smith Reply Exh. 1 at pp. 004, 014-016, 020-021, 035, 037-038, 042 & 045.)   And the City Defendants' co-defendant, Deputy Inspector Mauriello, who was initially represented by the Law Department and then separately represented by conflict counsel, Walter Kretz, identified 79 witnesses in his responses to an interrogatory seeking the identity of witnesses with knowledge.  (*Id.* at p. 048-049.)

19.    Similarly, the Joint Pre-Trial Order in this case demonstrates that this was far from a "simple" case.   On August 14, 2015, just prior to the second scheduled trial date, the defendants' version of the Joint Pre-Trial Order estimated that the trial would last 40 *trial* days.  (JPTO at p. 12; Dkt. # 477-1.)   In that document, the plaintiff listed

56 witnesses and 184 exhibits (*id.* at pp. 13-14 & 20-22), and the City Defendants

listed (with overlap) 41 witnesses and 96 exhibits (*id.* at 14-15 & 27-33).   The other

NYPD defendant, Deputy Inspector Mauriello also listed (with overlap) 81 witnesses

and 242 exhibits (*id.* at 15-17 & 33-41).   Finally, the Medical Defendants collectively

listed 19 witnesses and 5 exhibits (*id.* at 17-18 & 41-42).   Given the number of

expected witnesses and complex issues in this case, 40 trial days could have easily

have become a gross understatement.

20.   The City Defendants and their "expert" also claim that the plaintiff's

attorneys spent "too much" time reviewing the audio and video evidence in this case.

Since the current Law Department attorney (the latest of nine Law Department

attorneys who appeared in this action) only became involved in this case about a year

ago and since the City Defendants so-called "expert" admittedly did not review any of

this evidence, it appears that the City Defendants do not have any actually knowledge

of the magnitude of the audio and video evidence in this case.   Over the past weekend I

spent four hours (on a non-billable basis) reviewing the data contained in the plaintiff's

digital discovery files, which show the number of witnesses, the number of recordings

and the length of each recording or video.   The facts are important.

21.   As a result of the allegations made by the plaintiff about downgrading,

quotas and retaliation, the NYPD conducted two extensive internal investigations.   The

first investigation was conducted by the Quality Assurance Division ("QAD") into the

downgrading claims made by the plaintiff, and during the course of that investigation

QAD interviewed 43 witnesses.  (Smith Reply Exh. 2; QAD Report at pp. NYC 5161-

62.)[10]   The second investigation was conducted by the Internal Affairs Bureau

("IAB"), and during the course of that investigation, IAB interviewed 59 witnesses.

(Smith Reply Exh. 2; IAB Index Worksheet at NYC 10107, 08, 10-18.)[11]  Since the

NYPD's practices generally required that these interviews be recorded, the discovery

record of these interviews included digital copies of the recordings.   My discovery

files contain 71 separate tape-recorded interviews totaling 25.96 hours of recordings

for these witness interviews.

22.   In addition, soon after the plaintiff moved upstate, the Brooklyn North

Investigations Unit also conducted its own "investigation" of the plaintiff, which

included extensive video surveillance on the plaintiff and his father in, at, or outside

their upstate residence.  During the course of discovery, the NYPD produced 58

separate video clips of this surveillance (identified as M2U078.mpg through

M2U151.mpg) totaling 43.66 minutes of total video time taken over the course of three

months.

23.  Since the downgrading and stop-and-frisk policies relevant to the action

emanated from the top brass at the NYPD, the Court directed the production of

---

[10] The QAD report and the IAB Worksheets are being submitted to the Court under seal because those documents are subject to a protective order in this action.

[11] The IAB Index Worksheet identifies the interviews of member of the NYPD, using the term "PG" to refer to the formal and tape recorded process under the Patrol Guide for conducting interviews.

relevant recordings of COMPSTAT session times when any one of the central defendants (Deputy Chief Marino, Deputy Inspector Mauriello, and Captain Lauterborn) appeared at a COMPSTAT session.  In total we obtained, reviewed and studied 37 separate COMPSTAT sessions with a total elapse time of 105 hours.

24.   Finally, the discovery record in this case consisted of all the recordings that the plaintiff took or obtained over the course of the time he was subject to retaliation. The plaintiff produced recordings for 118 separate roll calls during the years 2008 and 2009 with a total elapse time of 16.43 hours.  The plaintiff also produced 71 separate recordings totaling 31.79 hours for specific events that occurred during that same period, including supervisor's meetings at the 81st Precinct; meetings or telephone calls with NYPD doctors and investigators; discussions with union and others about the appeal of his 2008 failing evaluation; the events of October 31, 2009; and the events upstate when NYPD officials repeatedly banged on his door, demanding entry.

25.   I have marshaled these facts because they demonstrate that the City Defendants' claims about this case being a "simple" case that was needlessly over-litigated by plaintiff's counsel are without merit.

*The Results Achieved*

26.   Although settled law holds that the most critical factor in a District Court's determination of what constitutes reasonable attorney's fees is the degree of success

obtained by the plaintiff, [12] the City Defendants' opposition papers (including a 90

page memorandum and a 295 page "expert" report), fail to address this critical factor.

The plaintiff's success in this case – a recovery worth more than $2.0 million --

justifies a full fee for all the hours that plaintiff's counsel reasonably spent in this

heavily litigated case.

27. The Judgment against the City Defendants achieved, without the risk of trial,

the following for the plaintiff:

- $600,001.00 in cash;
- back pay for the six-year period from October 31, 2009 through December 31, 2015, in the total amount of $602,287.10;
- reinstatement to the NYPD as a Police Officer and the dismissal of all pending charges against him;
- vested pension benefits with a current or present value of about $603,680;
- life-time medical benefits worth $7,236 a year for the plaintiff's lifetime, based on the City of New York's current out-of-pocket costs for that benefit;
- recovery for all costs and expenses of the action, including reasonable attorney's fees;
- discharge of all claims by Counterclaim Defendant Mauriello against the plaintiff; and
- The opportunity to apply, as a vested pension beneficiary, for ordinary disability pension benefits that would increase the plaintiff's annual pension benefit from $30,334 a year on a taxable basis to $50,772 on a non-taxable basis with the right to receive those benefits in 2016 as a opposed to receiving regular retirement benefits commencing as of 2022.

---

[12] *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting Farrar v. Hobby, 506 U.S. 103, 114 (1992)).

28.   These benefits have a total current value to the plaintiff of at least $2.0 million dollars, which is in my opinion well above the sustainable level of damages in a case like this.[13]   Since the results achieved exceeded the amount that the plaintiff was reasonably likely to obtain in the event that he prevailed at trial, the attorneys working on behalf of the plaintiff achieved *without risk of loss at trial* an "excellent result."   Accordingly, the Court should award the plaintiff a full lodestar recovery without any discount beyond those amounts that ought to be adjusted in the exercise of sound billing judgment, as set forth below.

*The Division of Responsibilities in This Action*

29.   The City Defendants and their expert repeatedly make conclusory claims without any foundation or factual basis for their assertion that the plaintiff's attorneys billed twice for the same work or needlessly were duplicative in their work on the plaintiff's behalf.    With one minor exception, the City Defendants are wrong.

30.   It is correct that the Norinsberg group handled this action from its inception until the end of 2012 and that the file was transferred to the Gilbert group.  It is also correct that over the course of the next five months John Lenoir and I became the

---

[13]   One of the major components of the plaintiff's damages was his involuntary commitment at Jamaica Hospital for six days.  Our research shows that the maximum sustainable damages for that claim are in the range of $500,000 to $900,000.  *See Marion v. LaFargue*, 2004 U.S. Dist. Lexis 2601 (S.D.N.Y. Feb. 25, 2004) (reducing $1.0 million award to $150,000 for six days involuntary commitment at Bellevue as excessive due to the plaintiff's prior psychiatric history, noting that cases generally award in the range from $75,000 to $150,000 per day, depending on the circumstances); *Ruhlmann v. Smith*, 323 F. Supp. 2d 356 (N.D.N.Y. 2004) (summarizing damages awards in involuntarily hospitization cases and reducing 1.0 million verdict to $450,000 for four days involuntary commitment).

senior lawyers working on the case extensively for the next two and a half years and that the lawyers who formed the Gilbert group became less involved in the prosecution of the action.  As a result, there were several hours that the Smith group did spend reviewing the file to get up to speed, and accordingly we agree to adjust our requested hours to compensate for this objection.  These hours, which are termed the "cost of substitution" are estimated to be 54 hours for me, 18.5 hours for Ms. Bauza, 6.25 hours for Mr. Lenoir and 2.5 hours for Mr. Suckle,[14] and at the end of our reply papers is a table, listing the Smith group's proposed compensable hours and reflecting these adjustments.

31.  There are, however, several other matters raised by the City Defendants and their expert that are incorrect.  First, Ms. Bronsther claims that "the Plaintiff changed legal teams five (5) times."[15]  As noted above, that is a gross exaggeration of the facts.

32.  More substantively, Ms. Bronsther claims that the Norinsberg and the Smith groups failed to divide up the pre-trial and trial preparation work in this case and engaged in duplicative effort.  That is incorrect.  The Norinsberg group exclusively handled the case from its inception through the end of 2012 and the Smith group was handled the case exclusively from early 2013 until January of 2015, when the plaintiff brought back the Norinsberg group to gear up for a trial that was scheduled to begin in April of 2015 and expected to last two months.   Clearly, there was no duplication

---

[14] Scheiner Dec. Exh. D; Bronsther Report at p. 30.
[15] *Id.* at p. 4.

between the two groups during these times, other than the time we spent getting up to speed on the matter, an adjustment we agree to make to this application.

33.   For the period from February 2015 through September 2015, when both groups were very busy getting ready for a trial (first set for April 2015 and then adjourned to October 2015) we agreed that with at least 25 to 35 likely witnesses to be called on the plaintiff's case and cross-examined on the defendants' case, division of labor was precisely what the case required.  Accordingly, the four attorneys who we planned to have speaking roles in the case (Jon Norinsberg, Gerald Cohen, John Lenoir and me) divided up the witness list so that each one of us would focus our own attention to our assigned witnesses.  In addition, Josuha Fitch took on the lead role in prepared and opposing the numerous motions in limine; Magdalena Bauza focused her attention on the jury instructions and the preparation of detailed time lines for trial, and I took on a lead role for the pre-trial order and preparing and opposing the various motions for reconsideration, which were filed shortly after the Court issued on May 5, 2015 its Summary Judgment Decision.  There was no duplicative effort to get ready for trial, and nothing in any of the billings support that bald conclusory claim by Ms. Bronsther.

34.   Ms. Bronsther also claims that there was duplication of effort between the Norinsberg and Smith groups in connection with the summary judgment papers.  She is wrong, and the specific event that she uses to support this otherwise conclusory

claim does not support the claim.  In her report, Ms. Bronsther claims that Gerald Cohen and Jon Norinsberg billed 3.8 hours on the preparation of the consolidated Rule 56.1 Statements filed by the plaintiff in connection with the six summary judgment motions.

35.  In fact, I prepared the two consolidated 56.1 Statements.  The first one, filed on February 11, 2015, contained the defendants' contentions of fact with evidentiary support and each of the plaintiff's responses and counter-statements with evidentiary support.  The second one, filed on March 6, 2015, set forth and consolidated the plaintiff's contentions of fact with evidentiary support and each of the defendants' responses and counter-statements with evidentiary support.    The two documents, which totaled 256 pages, were an extensive statement of the parties' contentions of fact and the evidentiary support for each such contention.  As such, I told Mr. Norinsberg and Mr. Cohen that they should *review* these documents because they collected in one place the evidentiary support for the defendants' numerous factual contentions. Neither of them had any role in the preparation of these documents or any of the other summary judgment papers, a task that was performed by the Smith group.

*The Complaints About the Depositions and the Deposition Digests*

36.  The City Defendants argue that it was wasteful for both me and Mr. Lenoir to attend those depositions that we took in this case.  Mr. Lenoir more specifically addresses this objection in his accompanying reply declaration.  In short, it is common

practice for two attorneys to work together at depositions, and our assessment and understanding of the case was greatly improved by having us both present for the depositions.   While an additional attorney is obviously helpful during the midst of an examination, it is also of great value to have more than one set of eyes evaluating the testimony of a witness for trial.

37.   On the other hand, the City Defendants do correctly point out three typographical errors in my billings regarding the depositions and with great fanfare greatly overblow the significance of these errors.   On page 57 of the Bronsther Report, she points out that my April 23, 2014 billing entry states "Drafting opposition to Jamaica Hospital motion for protective order; prepare for and attend examination before trial of Bernier."[16]  That is my error because the Bernier deposition took place several months earlier, and the deposition that I was preparing for that day was the examination of 81st Precinct Sergeant Sawyer.[17]

38.   Attached as Smith Reply Exhibit 3 is a true and correct copy of my original time sheet for that day, which states in full "Schoolcraft - drafting opp to Jam Hosp motion for protective order; prep for ebts."   On the same page is a note by my assistant on a post-it, reflecting that she made an entry that same day in the billing software for the cost of the Bernier deposition.  In fact, the expense portion of my billing records

---

[16] Scheiner Dec. Exh. D; Report p. 56
[17]  Sergeant Sawyer was the officer who double cuffed the plaintiff at Jamaica Hospital on the morning of November 1, 2009 and personally informed Defendant Mauriello that same morning that Jamaica Hospital doctors involuntarily committed the plaintiff earlier that day.

reflect that on April 23, 2014, my assistant made an entry for "Bernier Dep Tr." for

$2,238.70 for the cost of that deposition transcript.[18]   Thus, it is clear to me that the

billing sheet for April 23rd simply contains a data entry error and that I spent the time

that day preparing for the Sawyer deposition, which was taken two days later, not the

Bernier deposition.

39.   The Bronsther Report also points out that my billing entry for September

17, 2015 states that I prepared for and took the Purpi deposition on that day when in

fact the deposition was held on another day.   Attached as part of Smith Reply Exhibit 3

is a true and correct copy of my original billing sheet, which reflects that I spent one

hour that day on "prep for Purpi ebt."   Thus, the mistake was that the transcribed entry

states that I also *attended* the deposition that day, when in fact it is undisputed that I

attended the deposition on another date.   Thus, this is merely another data entry error.

Similarly, the third identified billing entry for September 19, 2015 states that on that

day I prepared for and attended the Carrasco deposition, when in fact it was the Purpi

deposition that I took that day.

40.   Since the billed work was actually done and the transcripts of the

depositions plainly reflect that fact, I do not believe that these three typographical

errors require any deduction for the work.   More important, these isolated data entry

errors are insignificant in the light of the fact that I worked on this case steadily over

---

[18] Smith Dec Exh. 1; Billing Sheets at p. 38.

entire period from February 2013 through October 2015, logging in about 600 separate daily entries for my time and expense charges.

41.   The City Defendants also claim that the work done by the paralegals in summarizing the deposition testimony should not be compensated.  Without any basis whatsoever, Ms. Bronsther states that the digests were not used in this case and that "clients" will not pay for digests.  Ms. Bronsther, once again, is simply wrong.  As the primary author of most of the papers submitted in connection with the summary judgment motions I can specifically attest to my *extensive* use of those deposition digests.  Indeed, for at least a solid month I carried with me wherever I went a single binder containing all the digests, and I repeatedly read and referred to them over the course of the winter of 2014-15, when I was writing the summary judgment motion papers.

42.   Ms. Bronsther is also simply wrong when she states that billing for deposition digest in not an acceptable practice because of the ability to scan a deposition transcript.  Word indexes have been around the practice of law since at least the mid-1980s when I worked as a litigation clerk for a larger New York City firm before and while attending law school.  And my thirty years of experience since confirms that in large and complex cases deposition digests are a common, if not prevailing practice.  In fact, Magistrate Judge Francis  issued a fee application decision in 2010 where he awarded a senior attorney his time charges for digesting deposition

transcripts at a reduced rate for a junior attorney ($200 an hour).[19]  Thus, the objection

about deposition digests should be rejected.

43.  Based on the billing adjustments mentioned above, I request that the Court

grant this motion in accordance with the following table:

| Attorney | Total Hours | Cost of Substitution | Law Enforcement Contacts | Hourly Rate | Adjusted Hours | Adjusted Bill |
|---|---|---|---|---|---|---|
| Smith | 2217.5 | 54.5 | 16.95 | $575 | 2146.05 | $1,233,978.70 |
| Lenoir | 1281 | 6.25 | 13.13 | $575 | 1261.62 | $706,481.50[20] |
| Bauza[21] | 1287 | 18.5 | 0 | $150 | 1268.5 | $190,275.00 |
| Suckle | 108.9 | 0 | 0 | $575 | 108.9 | $62,617.50 |
| McCutcheon | 23.38 | 0 | 0 | $250 | 23.38 | $5,845.00 |
| Paralegals | 442.18 | 0 | 0 | $125 | 442.18 | $55,272.50 |
| Expenses | $135,235.75 | | | | | $135,235.75 |
| Total | | | | | | $2,389,705.95 |

*Conclusion*

44.  For the foregoing reasons, the reasons set forth in the accompanying

memorandum of law, and the supporting exhibits and declarations, I request that the

Court grant this application for fees, costs and expenses.

Dated:   April 29, 2015

*s/NBS*

_____,_____

Nathaniel B. Smith

---

[19] *Zahrey v City of New York*, 98-cv-4546 (DCP) (JCF) (S.D.N.Y. June 8, 2010); SDNY Dkt. # 264 at p. 37.

[20] As noted in Lenoir's reply declaration, he has agreed to reduce his hourly rate to $475 for 189.5 hours second seating the depositions in this case, thereby reducing his bill $18,950 from $725,431.50 to $706,481.50.

[21] Ms. Bauza is a law graduate.