UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X
ADRIAN SCHOOLCRAFT,

                Plaintiff,


                -against-                     **10 CV 6005 (RWS)**


  THE  CITY  OF  NEW  YORK,  et al.


                Defendants.

--------------------------------------------------------------------------------X


**REPLY MEMORANDUM OF LAW ON BEHALF OF THE NORINSBERG
TEAM IN FURTHER SUPPORT OF PLAINTIFF'S MOTION
FOR ATTORNEY'S FEES, COSTS AND DISBURSEMENTS**


JOSHUA P. FITCH
COHEN & FITCH LLP
*Attorneys for Plaintiff*
233 Broadway, Suite 1800
New York, N.Y. 10279
(212) 374-9115
jfitch@cohenfitch.com
gcohen@cohenfitch.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT ........................................................................................................1

I.     DEFENDANTS VASTLY UNDERESTIMATE THE COMPLEXITY AND SCOPE OF THE SCHOOLCRAFT MATTER ...........................................................1

II.    DEFENDANTS' FORMULAIC COMPARISON TO OTHER "SIMILAR" CASES IS NEITHER RELEVANT NOR USEFUL IN DETERMINING THE REASONABLENESS OF THE FEES SOUGH HERE ................................................2

     A. The Cases Relied Upon By Defendants Fail to Provide an Accurate Comparison .3

     B. Defendants' Boilerplate Objections to the "Unprecedented" Size of Plaintiff's Fee Petition Should Be Rejected ...................................................................5

III.    DEFENDANTS' "EXPERT" REPORT IS NOT ADMISSIBLE UNDER RULE 702 AND SHOULD BE DISREGARDED BY THE COURT ...........................................6

     A. Ms. Bronsther's Self-Serving and Conclusory Opinions Do Not Help the Court "Understand the Evidence" or "Determine a Fact in Issue" ...................................6

     B. Ms. Bronsther's Opinions Are Not Based on Generally Accepted Billing Practices... ..............................................................................................7

     C. Ms. Bronsther's Report is Rife with Erroneous Facts and Mistaken Assumptions.8

     D. Defendants' Mere Parroting of Their Expert's Findings Does Not Satisfy Their Burden in Opposing the Fee Application.................................................................9

IV.    DEFENDANTS SEEK A REDUCTION OF FEES BASED ON IMPROPER LEGAL GROUNDS ........................................................................................10

     A. Where the *Ultimate* Success is Not Disputed, Success on Individual Claims or Against Individual Defendants is Irrelevant to the Lodestar Calculation..............10

     B. Since All Claims Share a Common Core of Facts and Legal Issues, There is No Basis to Reduce Fees for the "Unsuccessful" Claims.............................................11

     C. Defendants' Proposed Reductions Based on Claims Allegedly "Unrelated" to the Municipal Defendants Fail as a Matter of Law ....................................................13

        i. Defendants Cannot Propose Reductions in Contravention of the Plain Language of the Rule 68 Offer ...............................................................13

        ii. All Work Relating To The Medical Defendants Must Be Compensated, As

Such Work Was Inextricably Intertwined With The Claims Against The
Municipal Defendants ..............................................................................14

a.  The NYPD Was Directly Involved with, and Responsible for, the
JHMC's Decision to Confine Officer Schoolcraft .........................17

b.  The NYPD Was Present at JHMC Throughout Officer
Schoolcraft's Involuntary Confinement .........................................19

c.  NYPD Psychologist Catherine Lamstein Spoke to a Hospital
Social Worker on at least Two Separate Occasions .......................20

V.  DEFENDANTS' HODGEPODGE ATTACKS ON THE REASONABLENESS OF
PLAINTIFF'S FEE APPLICATION ARE BASELESS AND SHOULD BE
REJECTED ............................................................................................22

A.  Defendants' "Billing Judgment" Argument is Frivolous .......................22

B.  Defendants' Objection to the Use of Multiple Attorneys is Baseless ...................23

C.  Defendants' Attacks on Strategy Meetings Are Meritless .....................26

D.  Defendants' Claim of Duplicative Work Is Particularly Specious As It Relates to
the Work Performed by Plaintiff's Initial Attorneys For the First 2.5 Years of
Litigation ..............................................................................................27

E.  The Work Performed by the Norinsberg Team and the Smith Team Was Very
Clearly Delineated Throughout this Litigation .......................................28

F.  The Collaborative Efforts of Mr. Norinsberg and Mr. Meehan Are Fully
Compensable ..........................................................................................30

G.  The Work spent of Trial Preparation was Essential Given the Scope of this
Litigation ..............................................................................................31

H.  Defendants have Mischaracterized the Hours Spent Related to "Media
Activity" ................................................................................................32

VI.  DEFENDANTS' OBJECTIONS TO PLAINTIFF'S BILLING PRACTICES ARE
FACTUALLY INACCURATE AND LEGALLY UNSUBSTANTIATED .............34

A.  Defendants' Reductions Regarding Alleged "Block Billing" Are Based on a
Mischaracterization of Counsels' Billing Entries ...................................34

B.  Defendants' Claims Regarding "Vague" Billing Entries Are Unfounded ............35

C.  Defendants' Claims of Improper Billing Increments and Unnecessary Client
Communications Are Without Merit ........................................................36

D.  Defendants' Objections to Plaintiff's Use of .1 Increments For Discrete Tasks Are
Baseless .................................................................................................37

E. Defendants' Accusations Regarding the Contemporaneity of Plaintiff's Records Are Baseless and Have Already Been Rejected By the Court.............................40

VII. DEFENDANTS' PROPOSED REDUCTION AMOUNT TO IMPERMISSIBLE DOUBLE-COUNTING .................................................................................42

A. Defendants Seek to Penalize Plaintiff's Counsel Twice For the Same "Flawed" Entries ..........................................................................................42

B. Defendants Seek Across-the-Board Percentage Reductions on Top of the Reductions Already Made for Work That is Claimed to be Non-Compensable ...44

VIII. COUNSELS' PROPOSED HOURLY RATES ARE REASONABLE AND COMMENSURATE WITH THE LEVEL OF SKILL AND EXPERIENCE BROUGHT TO BEAR IN THIS CASE.................................................................45

A. Hourly Rates in the Southern District Are Significantly Higher Than Those in the Eastern District..................................................................................45

B. Cohen & Fitch LLP's Hourly Rates are Reasonable ..............................................47

C. Given Mr. Norinsberg's Outstanding Track Record of Multiple Million Dollar Verdicts, His Proposed Billing Rate Is Reasonable and Well Supported by Existing Law ......................................................................................51

i. Mr. Norinsberg Was Awarded $550 An Hour in the Southern District in 2015.........................................................................................52

ii. The Stanczyk Hourly Rate Was Fact-Specific And Should Be Disregarded.....................................................................................53

iii. Defendants' *Ad Hominem* Attacks on Mr. Norinsberg and Innuendo About His "Reputation" Are Improper and Baseless ...........................................54

iv. Mr. Norinsberg's Practice Is Devoted Almost Exclusively to Federal Civil Rights Cases.........................................................................55

v. Mr. Norinsberg's Proposed Billing Rate is Well Within the Range of Rates Upheld in the Southern District ..............................................55

D. The Proposed Billing Rate of Mr. Meehan is Reasonable.....................................56

CONCLUSION......................................................................................58

## <u>TABLE OF AUTHORITIES</u>

Adorno v. Port Auth. of New York & New Jersey, 685 F. Supp. 2d 507 (S.D.N.Y. 2010), <u>on reconsideration in part</u>, 2010 WL 727480 (S.D.N.Y. 2010) ................................................*Passim*

Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd., 2011 WL 1002439 (S.D.N.Y. 2011) aff'd, 483 F. App'x 634 (2d Cir. 2012) ..............................................................................................56

Ambac Assur. Corp. v. Adelanto Pub. Util. Auth., 2013 WL 4615404 (S.D.N.Y. 2013) ............28

Ansoumana v. Gristede's Operating Corp., 2004 WL 504319 (S.D.N.Y. 2004) ..........................32

Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cty. of Albany, 2005 WL 670307 (N.D.N.Y. 2005) ..........................................................................................................................48

A.R. ex rel. R.V. v. New York City Dep't of Educ., 407 F.3d 65 (2d Cir. 2005) ........................46

Baird v. Boies, Schiller & Flexner LLP, 219 F. Supp. 2d 510 (S.D.N.Y. 2002) .........................12

Barbour v. City of White Plains, 788 F. Supp. 2d 216 (S.D.N.Y. 2011), <u>aff'd</u>, 700 F.3d 631 (2d Cir. 2012) ...........................................................................................................................*Passim*

Bivins v. Wrap It Up, Inc., 548 F.3d 1348 (11th Cir. 2008) ...................................................42, 44

Bjornson v. Dave Smith Motors Leasing & Sales, 578 F. Supp. 2d 1269 (D. Idaho 2008) .........51

B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co., 2011 WL 6151507 (N.D. Fla. 2011), report and recommendation adopted, 2011 WL 6152082 (N.D. Fla. 2011) ...................................9

Blanchard v. Bergeron, 489 U.S. 87 (1989) ..............................................................................49

Blanco-Jimenez v. Puerto Rico, 2015 WL 4064737 (D.P.R. 2015) ...........................................36

Bridges v. Eastman Kodak Co., 1996 WL 47304 (S.D.N.Y. 1996) aff'd, 102 F.3d 56 (2d Cir. 1996) ..................................................................................................................................27, 41

Brown v. City of New York, 2012 WL 628496 (E.D.N.Y. 2012) report and recommendation adopted, 2012 WL 626395 (E.D.N.Y. 2012) .............................................................................58

Brown v. Patelco Credit Union, 2011 WL 4375865 (N.D. Ill. 2011) ..........................................37

Cabral v. City of New York, 2015 WL 4750675 (S.D.N.Y. Aug. 2015) .....................................15

Cairns v. Franklin Mint Co., 292 F.3d 1139 (9th Cir. 2002) .......................................................5

Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing, Inc., 2013 WL 6171660 (S.D.N.Y. 2013) ........................................................................................57

CARCO GROUP, Inc. v. Maconachy, 718 F.3d 72, 88 (2d Cir. 2013) .......................................58

Castelluccio v. Int'l Bus. Machines Corp., 2014 WL 3696371 (D. Conn. 2014) .......................24

Catanzano v. Doar, 378 F. Supp. 2d 309 (W.D.N.Y. 2005) ......................................................25

Chu v. Boeing Co., 497 F. App'x 978 (Fed. Cir. 2012) ...............................................................15

City of Riverside v. Rivera, 477 U.S. 561 (1986) .................................................................26, 50

Clark v. Bend-La Pine Sch. Dist., 2013 WL 5536884 (D. Or. 2013) ...........................................38

Cohen v. Brown University, 2001 U. S. Dist. Lexis 22438 (D.R. I. 2001) ....................................9

Concrete Flotation Sys., Inc. v. Tadco Const. Corp., 2010 WL 2539771 (E.D.N.Y. 2010), report and recommendation adopted, 2010 WL 2539661 (E.D.N.Y. 2010) ...........................................46

Correjter v. Port Authority of New York and New Jersey et. al., 11 Civ. 7847 (PGG) ..............57

Cronin v. Executive House Realty, 1982 WL 1303 (S.D.N.Y. 1982) ..........................................58

Davis v. New York City Hous. Auth., 2002 WL 31748586 (S.D.N.Y. 2002) ......................49, 50

DeCurtis v. Upward Bound Intern., Inc., 2011 WL 4549412 (S.D.N.Y. 2011) .........................51

De La Riva Const., Inc. v. Marcon Eng'g, Inc., 2014 WL 794807 (S.D. Cal. 2014) ..................43

Delph v. Dr. Pepper Bottling Co. of Paragould, 1997 WL 16067 (E.D. Mo. 1997), aff'd, 130 F.3d 349 (8th Cir. 1997) ....................................................................................................................43

Deocampo v. Potts, 2014 WL 788429 (E.D. Cal. 2014) ...........................................................44

E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs, 724 F.3d 561 (4th Cir. 2013) ..............................................................................................................................................5

Espinosa v. Wells Fargo Bank, N.A., 2014 WL 1017912 (Bankr. D. Or. 2014) ........................58

Evans v. Lafayette Ins. Co., 2008 WL 6928250 (E.D. La. Jan. 2008) ..........................................8

Fantasy, Inc. v. Fogerty, 94 F.3d 553 (9th Cir. 1996) .................................................................3

Fox ex rel. Fox v. Barnes, 2013 WL 4401802 (N.D. Ill. 2013) ..................................................48

Frenkel v. New York City Off–Track Betting Corp., 611 F.Supp.2d 391 (S.D.N.Y.2009)..........58

Gay Officers Action League v. Puerto Rico, 247 F.3d 288 (1st Cir. 2001) ...........................24, 26

George v. GTE Directories Corp., 114 F. Supp. 2d 1281 (M.D. Fla. 2000) ...............................50

Goodheart Clothing Co., Inc. v. Laura Goodman Enterprises, Inc., 962 F.2d 268 (2d Cir.1992) 13

Goos v. Nat'l Ass'n of Realtors, 68 F.3d 1380 (D.C. Cir. 1995), decision clarified on denial of reh'g, 74 F.3d 300 (D.C. Cir. 1996) ......................................................................................12

Groben v. City of New York, et al., No. 11 CV 6823 (S.D.N.Y.) .................................................25

Hardaway v. Ridgewood Corp., 706 F. Supp. 2d 436 (S.D.N.Y. 2010) ......................................11

Harris v. Superior Court of Arizona in & for Cty. of Maricopa, 2009 WL 775462 (D. Ariz. 2009), vacated sub nom. Harris v. Maricopa Cty. Superior Court, 631 F.3d 963 (9th Cir. 2011) .2

Heng Chan v. Sung Yue Tung Corp., 2007 WL 1373118 (S.D.N.Y. 2007) ...............................50

Hensley v. Eckerhart, 461 U.S. 424(1983) ................................................................................10

Hernandez v. Grullense,, 2014 WL 1724356 (N.D. Cal. 2014), appeal dismissed (July 2014) ...43

Hicks v. City of New York, Index No. 307045/2012 (N.Y. Sup. Ct.) ..........................................25

Hnot v. Willis Grp. Holdings Ltd., 2008 WL 1166309 (S.D.N.Y. 2008) ....................................35

Hurley v. Coombe,1996 WL 46889 (S.D.N.Y. 1996) .................................................................35

Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs, 2013 WL 598390, (N.D. Tex. 2013), rev'd and remanded, 747 F.3d 275 (5th Cir. 2014), aff'd and remanded, 135 S. Ct. 2507 (2015) .................................................................................................................34

ING Glob. v. United Parcel Serv. Oasis Supply Corp., 2014 WL 4090552 (S.D.N.Y. 2014) .......9

In re Cendant Corp. PRIDES Litig., 243 F.3d 722 (3d Cir. 2001) .................................................4

In re Clinkscale, 525 B.R. 399 (Bankr. W.D. Mich. 2015) ........................................................28

In re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness, 265 F. Supp. 2d 321 (S.D.N.Y. 2003) ..................................................33

In re Monahan Ford Corp. of Flushing, 390 B.R. 493 (Bankr. E.D.N.Y. 2008) ...........................8

Jackson v. Jump, No. 2014 WL 10558844 (S.D. Ga. 2014) ......................................................44

Johnson v. City of New York, 2016 WL 590457 (E.D.N.Y. 2016)  ........................................23, 41

Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714 (5th Cir. 1974)  ........................................49

Kahlil v. Original Old Homestead Rest., Inc., 657 F. Supp. 2d 470 (S.D.N.Y.2009)  .................28

Kassim v. City of Schenectady, 415 F.3d 246 (2d Cir. 2005)  ........................................................10

Kauffman v. Maxim Healthcare Servs., Inc., 2008 WL 4223616 (E.D.N.Y. 2008)  ...................45

Kennelly v. State of Rhode Island, 682 F.2d 282 (1st Cir.1982) ..................................................16

K.F. v. New York City Dep't of Educ., 2011 WL 3586142 (S.D.N.Y. 2011), adhered to as amended, 2011 WL 4684361 (S.D.N.Y. 2011)  .....................................................................31, 48

Kim v. Kum Gang, Inc., 2015 WL 3536593 (S.D.N.Y. 2015)  .....................................................24

Kovach v. City Univ. of New York, 2015 WL 3540798 (S.D.N.Y. June 2015)  .........................48

Kurzweil v. Philip Morris Companies, Inc., 1999 WL 1076105 (S.D.N.Y. Nov. 1999)  ..............5

Lane v. Grant Cty., 2013 WL 5306986 (E.D. Wash. 2013) aff'd, 610 F. App'x 698 (9th Cir. 2015) ..........................................................................................................................................15

Legrand v. City of New York, 2010 WL 742584 (S.D.N.Y. 2010)  .............................................46

Lenihan v. City of New York, 640 F. Supp. 822 (S.D.N.Y. 1986)  ..............................................26

Lightfoot v. Walker, 619 F. Supp. 1481 (S.D. Ill. 1985), aff'd, 826 F.2d 516 (7th Cir. 1987) .6, 26

Lilienthal v. City of Suffolk, 322 F. Supp. 2d 667 (E.D. Va. 2004) .............................................36

Lochren v. Cty. of Suffolk, 2008 WL 2039458 (E.D.N.Y. 2008)  ..................................................3

Luca v. Cty. of Nassau, 2008 WL 2435569 (E.D.N.Y. 2008), aff'd in part, vacated in part, remanded, 344 F. App'x 637 (2d Cir. 2009) ................................................................................36

Lunday v. City of Albany, 42 F.3d 131 (2d Cir.1994)  ..................................................................11

LV v. New York City Dep't of Educ., 700 F. Supp. 2d 510 (S.D.N.Y. 2010)  .............................51

Makinen v. City of New York, 2016 WL 1451543 (S.D.N.Y. 2016) ............................................35

Marisol A. ex rel. Forbes v. Giuliani, 111 F. Supp. 2d 381 (S.D.N.Y. 2000)  ........................48, 49

Marshall v. Randall, et ano., 10 CV 2714 (JBW) (VVP) (E.D.N.Y. 2013) ..................................47

Martinez v. Port Auth. of N.Y. & N.J., 2005 WL 2143333 (S.D.N.Y. 2005), aff'd sub nom. Martinez v. The Port Auth. of New York & New Jersey, 445 F.3d 158 (2d Cir. 2006) ..............16

Matthews v. City of New York, et al., No. 12 CV 1354 (S.D.N.Y.) ............................................25

McCown v. City of Fontana, 565 F.3d 1097 (9th Cir. 2009) ................................................15, 16

Meriwether v. Coughlin, 727 F. Supp. 823 (S.D.N.Y. 1989) ......................................................23

Merrick v. D.C., 2015 WL 5732105 (D.D.C. Sept. 2015) ..........................................................12

Messer v. Astrue, 2012 WL 136270 (D. Neb. 2012) ....................................................................4

Millea v. Metro N. R. Co., 658 F.3d 154 (2d Cir. 2011) .............................................................52

Moreno v. City of Sacramento, 534 F.3d 1106 (9th Cir. 2008) ...................................................30

Moriarty v. Muzyka, 2006 WL 224098 (N.D. Ill. 2006) .............................................................48

Munson v. Milwaukee Bd. of Sch. Directors, 969 F.2d 266 (7th Cir. 1992) ..............................15

Mugavero v. Arms Acres, Inc., 2010 WL 451045 (S.D.N.Y. 2010) .....................................11, 47

Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319 (D.C.Cir.1982)...............9, 26

Nautilus Neurosciences v. Fares, 2014 WL 1492481 (S.D.N.Y. 2014) ......................................57

New York Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc., 657 F.Supp.2d 410 (S.D.N.Y. 2009) ...................................................................................................................57

New York State Nat. Org. for Women v. Terry, 94 F. Supp. 2d 465 (S.D.N.Y. 2000) ...............49

Norman v. Hous. Auth. of City of Montgomery, 836 F.2d 1292 (11th Cir. 1988) ......................30

Norwood v. City of Yonkers, et al., 12 Civ. 8828 (LMS) ...........................................................57

Oakley v. City of Memphis, 2012 WL 2682755 (W.D. Tenn. 2012), report and recommendation adopted, 2012 WL 2681822 (W.D. Tenn. 2012), aff'd, 566 F. App'x 425 (6th Cir. 2014) ..........37

O'Hara v. City of New York, et. al., 11 Civ. 3990 (TLM) (RML) (March 16, 2015 E.D.N.Y.) ..53

Perez v. Siragusa, 2008 WL 2704402 (E.D.N.Y. 2008) ..............................................................44

Pers. v. NCO Fin. Sys., Inc., 2011 WL 3654452 (D. Kan. 2011) ...............................................13

Pilkington v. Bevilacqua, 522 F. Supp. 906 (D.R.I. 1981) ..........................................................49

Playtex Prods. v. Procter & Gamble Co., 2003 U.S. Dist. LEXIS 8913, (S.D.N.Y. 2003) ...........7

Proctor v. Educ. Credit Mgmt. Corp., 2010 WL 4919670 (S.D. Ohio Nov. 2010) .......................8

Quaratino v. Tiffany & Co., 166 F.3d 422 (2d Cir. 1999) ..........................................................15

Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481 (2d Cir.1999) ........................13

Restivo v. Nassau Cty., 2015 WL 7734100 (E.D.N.Y. 2015) ...............................................*Passim*

Richards v. New York City Bd. of Educ., 1988 WL 70209 (S.D.N.Y. 1988) .............................26

Ricks v. Barnes, 2007 WL 956940 (D.D.C. 2007) ........................................................................5

RJM v. Astrue, 2009 WL 2382679 (S.D. Ind. 2009) .....................................................................3

Robinson v. City of New York, 2009 WL 3109846 (S.D.N.Y. 2009) ...................................11, 51

Rodriguez v. Puerto Rico, 764 F. Supp. 2d 338 (D.P.R. 2011) ...................................................38

Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848 (1st Cir. 1998) ................................24, 26

Rodriguez ex rel. Kelly v. McLoughlin, 84 F. Supp. 2d 417 (S.D.N.Y. 1999) ...................*Passim*

Rogers v. Cofield, 935 F. Supp. 2d 351 (D. Mass. 2013) .............................................................38

Rozell v. Ross-Holst, 576 F. Supp. 2d 527 (S.D.N.Y. 2008) .................................................51, 56

Scott v. City of New York, 643 F.3d 56 (2d Cir. 2011) ...............................................................51

Siracuse v. Program for the Dev. of Human Potential, 2012 WL 1624291 (E.D.N.Y. 2012) ......46

Simmons v. New York City Transit Auth., 575 F.3d 170 (2d Cir. 2009) ...........................*Passim*

Slabaugh v. State Farm Fire & Cas. Co., 2014 WL 1767088 (S.D. Ind. 2014) ............................5

Stanczyk v. City of New York, 990 F.Supp. 2d 242 (E.D.N.Y. 2013) ........................................53

Statler v. Buffalo-Bodega Complex, Inc., 2008 WL 4695118 (D.S.D. 2008) .............................15

Steiner v. Lewmar, Inc., 2016 WL 860359 (2d Cir. Mar. 7, 2016) .............................................13

Stinson v. City of New York, 2012, U.S. Dist. LEXIS 56748 (S.D.N.Y. 2012) ...................25, 55

Sugarman v. Vill. of Chester, 213 F. Supp. 2d 304 (S.D.N.Y. 2002) ............................................35

Takeda Chemical Industries v. Mylan Laboratories, Inc., 2007 U. S. Dist. Lexis 19614 (S.D.N.Y. 2007) ...............................................................................................................................................7

Tchemkou v. Mukasey, 517 F.3d 506 (7th Cir. 2008) ....................................................................4

Torres v. Walker, 356 F.3d 238 (2d Cir. 2004) ......................................................................13, 14

Tottey v. Life Ins. Co. of N. Am., 2009 WL 3764222 (N.D.N.Y. 2009) .....................................34

Townes v. City of New York, 2013 WL 153726 (E.D.N.Y. 2013) ...............................................39

Tucker v. City of New York, 704 F. Supp. 2d 347 (S.D.N.Y. 2010) ...........................................22

Uniroyal Goodrich Tire Co. v. Mut. Trading Corp., 63 F.3d 516 (7th Cir. 1995) ......................11

U.S. Football League v. Nat'l Football League, 704 F. Supp. 474 (S.D.N.Y.) aff'd, 887 F.2d 408 (2d Cir. 1989) .......................................................................................................................32, 33

Valdez v. Squier, 676 F.3d 935 (10th Cir. 2012) .........................................................................14

Veterans Educ. Project v. Secretary of the Air Force, 515 F.Supp. 993 (D.D.C.1981) .........26, 27

Welch v. Metro. Life Ins. Co., 480 F.3d 942 (9th Cir. 2007) ......................................................51

Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp., 599 F. Supp. 509 (S.D.N.Y. 1984) ........................................................................................................................................24, 26

Wise v. Kelly, 620 F.Supp.2d 435 (S.D.N.Y.2008) ...............................................................50, 56

Zahrey v. City of New York, et al., 98 Civ. 4546 (DCP) (JCF) ...................................................51

## PRELIMINARY STATEMENT

Plaintiff Adrian Schoolcraft respectfully submits this Memorandum of Law in Reply to defendants' brief in opposition to plaintiff's fee petition.[1] ("Def. Mem."). In their opposition brief, defendants attack virtually every conceivable aspect of plaintiff's fee petition in order to support their drastic reduction of plaintiff's fees (78% of the total amount). Yet, as detailed below, defendants' analysis is plagued with erroneous factual assertions, mistaken assumptions, and incorrect statements of law. In place of a proper substantive analysis, defendants have chosen to launch *ad hominem* attacks against plaintiff's counsel and have vastly understated the complexity of this case. Moreover, defendants have wholly disregarded plaintiff's *undisputed success* in this case, which the Supreme Court has held is the single most important factor in assessing a fee petition.  In sum, defendants' vitriolic attacks and hyperbole cannot alter a simple fact: defendants have *contractually obligated* themselves to pay reasonable attorneys' fees in this action. Defendants are now bound by this decision, and their personal attacks on counsel and flawed legal analysis cannot help them avoid this obligation.

## ARGUMENT

### I.   DEFENDANTS VASTLY UNDERSTATE THE COMPLEXITY AND SCOPE OF THE SCHOOLCRAFT MATTER.

In seeking a massive fee reduction, defendants attempt to minimize the complexity of this matter, referring to it as a "single-plaintiff civil rights action," which was "centered on a single incident" and involved only "one individual."  (Def. Mem. at 1, 10-12).  In fact, nothing could be further from the truth. This case did not begin and end with the events of October 31, 2009. Rather, it involved a series of complicated and interrelated events that spanned a period of *one-*

---

[1] This Memorandum of Law relates solely to the hours and fees submitted by the Norinsberg Team.  The Smith team has submitted a separate reply brief to address the specific attacks made on their bills.

*and-one-half years*, from January 2009 until June 2010. It involved allegations of serious misconduct against some of the highest-ranking members of the NYPD. It spawned lengthy investigations by three separate NYPD agencies – the Quality Assurance Division ("QAD"), Internal Affairs, and the Brooklyn North Investigations Unit – regarding P.O. Schoolcraft's allegations of downgrading, quotas and retaliation.[2] And it involved repeated attempts at harassment and retaliation by the NYPD against Officer Schoolcraft at his home in upstate New York, long after he was discharged from Jamaica Hospital.

A review of court filings on the Docket Sheet further confirms the magnitude and complexity of this case. The Court's summary judgment opinion alone was *over 200 pages* long, with 71 pages of facts set forth in individually numbered paragraphs. The defendants' JPTO, which itself was 40 pages long, listed over 500 exhibits and over 100 potential witnesses from all parties. (Docket No. 477-1). In fact, defendants represented to the Court that "the trial is expected to last forty (40) trial days," or *8 weeks*. (<u>Id</u>.). In short, this was simply *not* a "single-plaintiff civil rights action" nor did it involve a "single incident", as defendants falsely suggest.

## II. DEFENDANTS' FORMULAIC COMPARISON TO OTHER "SIMILAR" CASES IS NEITHER RELEVANT NOR USEFUL IN DETERMINING THE REASONABLENESS OF THE FEES SOUGHT HERE.

Defendants' legal analysis is based on irrelevant, unhelpful and distorted comparisons to other civil rights cases in order to support the drastic fee reduction that they seek.  As courts have recognized, however, such an approach is "*pointless* because each case is unique and requires different work." <u>Harris v. Superior Court of Arizona in & for Cty. of Maricopa</u>, 2009 WL 775462, at *15 (D. Ariz. 2009), <u>vacated sub nom.</u> <u>Harris v. Maricopa Cty. Superior Court</u>, 631

---

[2] The QAD investigation alone involved interviewing 43 police officers and reviewing over 1,000 crime reports, culminating in a 95 page single-spaced report that corroborated P.O. Schoolcraft's allegations and concluded, <u>inter alia</u>, that defendants had, in fact, engaged in a "concerted effort to deliberately underreport crime in the 81st Precinct."

F.3d 963 (9th Cir. 2011) (emphasis supplied).  Indeed, the reasonableness of a fee application is inherently fact-specific and must be decided on a case-by-case basis.  See Fantasy, Inc. v. Fogerty, 94 F.3d 553, 561 (9th Cir. 1996) ("Fantasy's comparisons to fee awards in other cases are largely *irrelevant*, and *certainly not determinative*, inasmuch as the reasonableness of a particular fee award depends on a *case-by-case* analysis.") (emphasis supplied).  Accordingly, defendants' comparison to "other cases solely on the number of attorney hours expended, without more, does nothing to support a finding of reasonableness in this case [because] [t]he complexity, number and types of issues, the size of the underlying record, and other factors cannot be compared based *only on the numbers of hours spent*." RJM v. Astrue, 2009 WL 2382679, at *1 (S.D. Ind. 2009) (emphasis supplied).

## A.     The Cases Relied Upon By Defendants Fail to Provide an Accurate Comparison.

Defendants principally rely on Adorno v. Port Auth. of New York & New Jersey, 685 F. Supp. 2d 507, 516 (S.D.N.Y. 2010), on reconsideration in part, 2010 WL 727480 (S.D.N.Y. 2010) and Lochren v. Cty. of Suffolk, 2008 WL 2039458, at *5 (E.D.N.Y. 2008), vacated, 344 F. App'x 706 (2d Cir. 2009), in an overly simplistic attempt to argue that reductions should be made here because they were made in those cases.   (Def. Br. at 7, 8, 22, 23, 33, 59).   These comparisons fail for several reasons.

First, a simple review of the docket entries in both Adorno and Lochran reveal that – as a matter of mathematical proportions – this matter was *six times* the size of Adorno (101 entries, versus 616 in this case) and at least *three times* the size of Lochran (208 entries).  Further, unlike the present matter, Adorno was a straightforward Title VII discrimination case and contained no Monell claim for pervasive and massive departmental corruption.  Adorno, 685 F. Supp. at 510.

It had *only three* defendants, all of whom were represented by the *same* legal team, versus *seventeen* defendants represented by *five separate legal teams*. Id. The trial lasted only "ten days," versus the City Defendants' estimate that the trial here would last "forty (40) trial days," with over 100 proposed witnesses on the JPTO. (Docket No. 477-1). There were 24 depositions in Adorno, versus 38 depositions in this case.  There were 11,000 documents in Adorno, versus over 15,000 documents here, as well as hundreds of hours of audio/visual evidence. (Id.) at 15.

A similar disparity is also present in the facts of Lochren, which involved a claim of pregnancy discrimination based on a single employment policy that applied to all plaintiffs. Lochran pales in comparison to the complexity and novelty of the instant matter. Indeed, the Lochran court "question[ed] why the plaintiffs required four attorneys to try *a week long* civil rights case," and the necessity of *sixteen* plaintiff's attorneys (as opposed to five in this matter)[3] "given the [minimal] number of plaintiffs [and] witnesses" Id. at *5.

In sum, defendants' attempt to reduce the fees here by using a "formulaic" comparison of the hours spent in "other civil rights cases" is baseless. In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 736 (3d Cir. 2001); Tchemkou v. Mukasey, 517 F.3d 506, 511 (7th Cir. 2008) ("We do not believe that a comparison of raw numbers of hours is helpful in determining whether the hours here were "reasonably expended."). Accordingly, this Court should reject defendants' suggestion to "reduce the attorney's fee award based solely on its relationship to awards that were approved in other cases." Messer v. Astrue, 2012 WL 136270, at *2 (D. Neb. 2012).

---

[3] Although there were 8 overall attorneys who performed some amount of billable work over the six years that this case was litigated, only five attorneys (i.e., Jon Norinsberg, Nathaniel Smith, John Lenoir, Joshua Fitch and Gerald Cohen) accounted for 96% of the legal work submitted in the fee application (76% of the total work overall including paralegal time).

**B. Defendants' Boilerplate Objections to the "Unprecedented" Size of Plaintiff's Fee Petition Should Be Rejected.**

Defendants argue that an enormous fee reduction is warranted simply because plaintiff's fee application "is without precedent for a single-plaintiff civil rights action." (Def. Mem. at 1). However, contrary to defendants' contentions, "[t]he allegedly 'unprecedented size of the award' does not automatically make it unreasonable." Cairns v. Franklin Mint Co., 292 F.3d 1139, 1158-59 (9th Cir. 2002). Instead, "it is the duty of the Court to examine the reasonableness of the allegations in the motion before it, not to make a finding based on allegations that have been brought before *other* courts." Slabaugh v. State Farm Fire & Cas. Co., 2014 WL 1767088, at *3 (S.D. Ind. 2014).

Here, defendants' brief consists largely of boilerplate claims that counsel took excessive time to perform each and every task alleged. However, this generic attack is wholly inadequate, and if accepted, would "improperly [] escalate a fee applicant's present burden" and would render the analysis of reasonable fees meaningless in any given context. E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs, 724 F.3d 561, 577 (4th Cir. 2013). Without a substantive analysis by defendants as to *why* such work was excessive – notwithstanding the vast scope and complexity of this case – this Court should "reject [such] conclusory arguments in opposition to a fee petition." Ricks v. Barnes, 2007 WL 956940, at *8 (D.D.C. 2007); see also, Kurzweil v. Philip Morris Companies, Inc., 1999 WL 1076105, at *3 (S.D.N.Y. 1999):

> Although I have an independent obligation to determine a reasonable fee in this case, I see no need to reduce arbitrarily the amount requested by able and diligent counsel merely to demonstrate that I have fulfilled that obligation. Plaintiffs' counsel have requested a reasonable fee and they will receive it.
>
> Id.

In short, defendants' arguments regarding the excessiveness of the hours spent by counsel "consists of abstract references to specific attorneys' hours during various time periods," which is simply insufficient to establish that the hours were excessive or that the case was overstaffed. <u>Restivo v. Nassau Cty</u>., 2015 WL 7734100, at *4 (E.D.N.Y. 2015). [4]

## III. DEFENDANTS' "EXPERT" REPORT IS NOT ADMISSIBLE UNDER RULE 702 AND SHOULD BE DISREGARDED BY THE COURT.

### A. Ms. Bronsther's Self-Serving and Conclusory Opinions Do Not Help the Court "Understand the Evidence" or "Determine a Fact in Issue."

Under the guise of providing "help" to the Court in deciding this motion, defendants offer the "expert" opinion of Judith Bronsther. However, Ms. Bronsther's report consists of little more than unsupported and conclusory "expert" opinions, such as: i) "this work did not advance the interests of the litigation"; ii) this work was an "unnecessary time expenditure;" iii) this work "was not related to the litigation;" or iv) "this duplication of effort was especially wasteful." Simply put, Ms. Bronsther's subjective opinions about the reasonableness of counsels' fees and their billing practices are *not* proper subjects of expert testimony, and cannot survive the <u>Daubert</u> analysis, which is a threshold admissibility issue. [5]  Since Ms. Bronsther's opinions fail to meet the threshold requirements for admissibility under Rule 702, they should be disregarded in their entirety by the Court. [6]

---

[4] Moreover, defendants' claim that the fee amount sought here is "without precedent" is simply wrong. Both <u>Restivo v. Nassau Cty.</u>, 2015 WL 7734100, at *4 (E.D.N.Y. 2015) and <u>Lightfoot v. Walker</u>, 619 F. Supp. 1481, 1488 (S.D. Ill. 1985), <u>aff'd,</u> 826 F.2d 516 (7th Cir. 1987), involve comparable hours and litigation. Specifically, the court in <u>Lightfoot</u> not only found that over 6000 hours was reasonable, but that this amount was actually "conservative" and that "a great deal of time [was] greatly understated or totally excluded." <u>Id.</u> at 1487. Likewise, in <u>Restivo,</u> the Court found that 11,000 hours was reasonable. Thus, defendants' claim that the fee request here is unprecedented is wrong and should be rejected.

[5] Defendants implicitly acknowledge that Ms. Bronsther's "opinions" are most likely not admissible:  "Even if the [Report] is *not deemed admissible* as expert testimony *per se,* it is a useful guide for the Court to the contents of plaintiff's submission and counsel's billing practices." (Def. Mem at 2, n. 4.) (emphasis supplied).

[6] Plaintiff has filed a separate motion to strike the expert report of Ms. Bronsther (Docket No. 605), which is currently pending before the Court.

**B.** **Ms. Bronsther's Opinions Are Not Based on Generally Accepted Billing Practices.**

Ms. Bronsther does not employ any objective methodology to support her conclusions. Rather, her "expert" opinions are based on her own subjective views about the reasonableness of the fees and the bills. Yet, purely subjective opinions are improper under Rule 702. See Playtex Prods. v. Procter & Gamble Co., 2003 U.S. Dist. LEXIS 8913, (S.D.N.Y. 2003) (holding that "heavy reliance on [a party's] subjective view, without analysis of the basis for that party's conclusion, is wholly insufficient to survive a Daubert motion"). Indeed, Ms. Bronsther's Report does not cite any established or peer-based standards about which there are any generally accepted methodologies. Instead, Ms. Bronsther claims to have read some of the materials filed in the public record in this action, and offers her own conclusions as a lawyer about the reasonableness of the fees and bills submitted. Yet, courts have repeatedly rejected this type of opinion evidence. See, e.g., Takeda Chemical Industries v. Mylan Laboratories, Inc., 2007 U. S. Dist. Lexis 19614 (S.D.N.Y. 2007) ("legal fee auditor" opinion in a fee application was inadmissible under Daubert).

Further, Ms. Bronsther fails to identify *any* cognizable standard to support the conclusions in her expert report. Instead, Ms. Bronsther simply opines that "*most* lawyers do not pass the auditor's tests of efficiency, reasonableness and cost-effectiveness." *Watching the Clock*, by Judith Bronsther, LOS ANGELES DAILY JOURNAL, May 4, 1999 at p. 8 (emphasis supplied). Thus, while Ms. Bronsther "purports to apply generally accepted billing practices," in fact, she "has failed to show that there is *any such standard*, or that [she] has followed *any recognized standard* in preparing his evaluation of [plaintiff's] fee request," which is fatal to her "expert" analysis. Takeda, 2007 WL 840368 at *7 (emphasis added).

In sum, whether labeled an "expert opinion" or a "useful guide" (Def. Mem. at 2, n.4), Ms. Bronsther's opinions are not admissible on this motion.  See Evans v. Lafayette Ins. Co., 2008 WL 6928250, at *1 (E.D. La. 2008) (excluding attorney's fees expert because "[t]he issue of amount of attorneys' fees will be decided by the court rather than the jury."); In re Monahan Ford Corp. of Flushing, 390 B.R. 493, 504 (Bankr. E.D.N.Y. 2008) ("a judge, who routinely observes and evaluates the professional performance of attorneys in bankruptcy cases, is better situated than a law professor to judge the professional competence of debtor's counsel"); Proctor v. Educ. Credit Mgmt. Corp., 2010 WL 4919670, at *6 (S.D. Ohio 2010) ("Indeed, it is not even necessary for defendant to provide an expert witness regarding the reasonableness of its attorneys fees because the court "is itself an expert on the question.' ").  Rather, it is this Court who must decide the issues on this fee motion – based on the Court's decades of experience and based on the Court's direct and personal knowledge of the this action, which has been pending before Your Honor for the past six years – and *not* a non-practicing, non-civil rights attorney hired by the City of New York to admittedly "reduc[e] their legal fees." *Accountability Services, Inc. website at http://www.legalbills.com/*, visited April 29, 2016.

### C. Ms. Bronsther's Report is Rife with Erroneous Facts and Mistaken Assumptions.

Apart from the conclusory nature of Ms. Bronsther's opinions, her "expert" opinion is riddled with erroneous factual assertions, mistaken assumptions and unsupported conclusions. These fundamental flaws – which are discussed in detail below, see Pt. V(A), Pt. VI, and Pt. VII, infra. – provide further reason to doubt the accuracy of her report and the validity of her findings. In fact, this is not the first time such issues have plagued a report produced by Ms. Bronsther.

See e.g., Cohen v. Brown University, 2001 U. S. Dist. Lexis 22438 at * 32-33 (D.R. I. 2001). In that case, the court rejected her report about the legal fees as unreliable, stating:

> Plaintiffs assert that [Bronsther's report] is *completely unreliable and full of errors*. 'The errors range from apparent transcription and coding errors to wholesale rewriting of plaintiffs' actual records. The labeling and categorization by Brown also exhibited a lack of familiarity with the record, the witnesses and the proceedings.' After comparing Brown's App. B, Ex. B-1 with [plaintiffs' counsel's] time records, *the court agrees that Plaintiffs' criticism* of Brown's App. B, Ex. B-1 is *valid*.

Id. (Ms. Bronsther was the individual who had prepared the analysis relied upon by defendant Brown University).

Ms. Bronsther's report in this case is likewise "completely unreliable and full of errors," (id.), should be rejected by the Court here as well.

### D. Defendants' Mere Parroting of Their Expert's Findings Does Not Satisfy Their Burden in Opposing the Fee Application.

Defendants' brief largely parrots the flawed conclusion of their expert.  As a result, defendants' arguments are equally flawed, and defendants have failed to meet their burden in opposing plaintiff's fee application.  Just "[a]s the district court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary, so [too] should be the objections and proof from fee opponents." ING Glob. v. United Parcel Serv. Oasis Supply Corp., 2014 WL 4090552, at *4 (S.D.N.Y. 2014); B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co., 2011 WL 6151507, at *2 (N.D. Fla. 2011), report and recommendation adopted, 2011 WL 6152082 (N.D. Fla. 2011) (rejecting defendants' "arbitrar[y] [request to] reduce the corresponding fees by one-third" because they "fail[ed] to specify why these entries are excessive, redundant, or otherwise unnecessary"); Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1337-38 (D.C.Cir.1982) ("Just as the [fee] applicant cannot submit a conclusory application, an

opposing party does not meet his burden merely by asserting broad challenges to the application.").

## IV.   DEFENDANTS SEEK A REDUCTION OF FEES BASED ON IMPROPER LEGAL GROUNDS.

### A.   Where the *Ultimate* Success is Not Disputed, Success on Individual Claims or Against Individual Defendants is Irrelevant to the Lodestar Calculation.

It is well-settled that "[w]here a plaintiff has obtained excellent results, his attorney should recover a *fully compensatory* fee...encompass[ing] *all hours reasonably expended*...[and] should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Kassim v. City of Schenectady, 415 F.3d 246, 253 (2d Cir. 2005) (emphasis supplied).  Thus, "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The *result* is what matters."  Hensley v. Eckerhart, 461 U.S. 424, 435 (1983) (emphasis supplied).

Here, defendants have implicitly conceded plaintiff's overall success in this case. In fact, defendants have expressly disavowed any reduction of fees based on degree of success. (See Def. Mem. at 16) ("the City does not argue for a reduction in the fee award as a result of the plaintiff's mixed success"). Nevertheless defendants argue that plaintiff's hours must be reduced for time spent on the claims involving the Medical Defendants, or on claims against defendants that were "unsuccessful" as part of the *initial* lodestar analysis. (Def. Br. at 13-16; 26-30). However, it is well-settled that the degree of success calculation is *not included* within the Johnson factors used to first calculate the lodestar, or presumptively reasonable fee, but rather, that "[f]ollowing the determination of the *presumptively reasonable fee*, the court must *then* consider whether an upward or downward adjustment of the fee is warranted based on factors

such as the *extent of plaintiff's success* in the litigation." Robinson v. City of New York, 2009 WL 3109846, at *3 (S.D.N.Y. 2009); Mugavero v. Arms Acres, Inc., 2010 WL 451045, at *3 (S.D.N.Y. Feb. 9, 2010)(same) (citing Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir.1994); Hardaway v. Ridgewood Corp., 706 F. Supp. 2d 436, 439 (S.D.N.Y. 2010)("courts in the Second Circuit have continued the traditional practice of calculating a 'reasonable fee' *first*, and *then* considering whether *limited success* mandates a percentage reduction.").

Indeed, it is *only*, where "a plaintiff has achieved only *partial* or *limited* success" that the lodestar may be *later* reduced "by considering the relationship of successful and unsuccessful claims to the amount of success achieved." Kassim, 415 F.3d at 253. Similarly, while courts may "exclude time spent on *unsuccessfully* pursued, distinct claims" when they are "*distinctly* different claims for relief that are based on different facts *and* legal theories," they can *only* do so in "situations in which a Court [] reduce[s] fees for *limited success.*" Hardaway, 706 F. Supp. 2d at 439. *A fortiori*, since defendants have expressly disclaimed any *post*-lodestar reduction based on any purported lack of success, they cannot attempt to discount any of plaintiffs' hours on a per-claim or per-defendant basis as part of the initial lodestar calculation.

**B.    Since All Claims Share a Common Core of Facts and Legal Issues, There is No Basis to Reduce Fees for the "Unsuccessful" Claims.**

Even assuming, *arguendo*, that this Court were to ignore the defendants' concession regarding plaintiff's success, the time spent on losing theories or on losing issues is *still* compensable if plaintiff is found to be a prevailing party in the case as a whole. In particular, so long as the suit as a whole involved a "common core of facts" and involved "related legal theories," all the time spent on the case—including time spent on losing motions—must be compensated. See Kassim, 415 F.3d at 253; see also Uniroyal Goodrich Tire Co. v. Mut. Trading

Corp., 63 F.3d 516, 526 (7th Cir. 1995) ("[The defendant] seeks to exclude fees incurred for any work performed by Uniroyal's attorneys on motions which were eventually denied… Common sense, however, informs us that such a rule is inappropriate.").  Thus, where – as here – "the claims all share a common core of facts and legal issues; counsel's time spent pursuing 'alternative ways to obtain relief' is therefore compensable." Baird v. Boies, Schiller & Flexner LLP, 219 F. Supp. 2d 510, 522 (S.D.N.Y. 2002).

Indeed, it is only "[w]here a related claim would potentially have yielded the plaintiff *additional* relief [that] the failure on that claim will of course be relevant in determining the plaintiff's overall success." Goos v. Nat'l Ass'n of Realtors, 68 F.3d 1380, 1387 (D.C. Cir. 1995), decision clarified on denial of reh'g, 74 F.3d 300 (D.C. Cir. 1996). Accordingly, if "the unsuccessful claim could not have given relief beyond the scope of the successful claim, th[at] fact of failure is not an independent basis for a reduction." Merrick v. D.C., 2015 WL 5732105, at *4 (D.D.C. 2015).

In the present case, defendants have never argued – nor could they – that any of the claims dismissed on summary judgment would have given plaintiff relief beyond the scope of what he obtained through the Rule 68, to wit, compensatory damages for his loss of liberty and emotional distress, as well as back pay and future pension benefits. Therefore, defendants cannot seek a reduction of fees on that basis.  As such, even if any alleged lack of success on any individual claims could be considered in this case – which it cannot –  defendants' proposed reductions that rely on distinguishing work on a per defendant, or per claim, basis must fail.

**C.   Defendants' Proposed Reductions Based on Claims Allegedly "Unrelated" to the Municipal Defendants Fail as a Matter of Law**

   **i.   Defendants Cannot Propose Reductions in Contravention of the Plain Language of the Rule 68 Offer.**

Defendants claim that plaintiff should not be compensated for time spent on any work relating to the Medical Defendants or any work performed on claims unrelated to his federal claims against the Municipal defendants.  However, it is well-settled that "Offers of judgment pursuant to Fed.R.Civ.P. 68 are construed according to ordinary contract principles." Goodheart Clothing Co., Inc. v. Laura Goodman Enterprises, Inc., 962 F.2d 268, 272 (2d Cir.1992). Further, "courts must 'take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself.'" Steiner v. Lewmar, Inc., 2016 WL 860359, at *3 (2d Cir. 2016); Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir.1999) (same). Therefore, "[t]he court's authority to award attorneys' fees and costs in this case is a function of the parties' agreement reached through the Rule 68 procedure [, and the] court is to enforce a Rule 68 agreement guided by common principles of contract law," based on the express terms of the Rule 68 offer. Pers. v. NCO Fin. Sys., Inc., 2011 WL 3654452, at *1 (D. Kan. 2011).

Here, defendants' Rule 68 offer of judgment states that "[s]hould plaintiff accept this offer of judgment, plaintiff *shall be entitled* to reasonable attorneys' fees, expenses, and costs to the date of this offer for plaintiff's federal claims." (Dkt. 531). The language of the Rule 68 made no limitation on fees that accrued in connection with certain defendants, claims or on the basis of which claims or defendants succeeded. Consequently, having incorporated no express limitations on fees within the Rule 68 itself, defendants cannot now suggest – as they do in their opposition brief – that such limitations should be impliedly read into the terms of the contract. Torres v.

<u>Walker</u>, 356 F.3d 238, 245-46 (2d Cir. 2004) ("a party cannot create an ambiguity in an otherwise plain agreement merely by urg[ing] different interpretations in the litigation.").

In other words, defendants could have easily written into the Rule 68 that they would only pay reasonable attorney's fees on "successful claims," "successful motions," "claims related solely to the City defendants," but they chose not to do so. <u>See</u> <u>e.g.</u>, <u>Steiner</u>, 2016 WL 860359, at *3. ("The simplest way for parties to avoid ambiguity—and the risk of further litigation—is to refer explicitly to "attorneys' fees" in the written Rule 68 offer."). Accordingly, since no such limitation was included in the express terms of the agreement, none can be incorporated now into the plain language of the contract – against plaintiff who *did not draft it* – and serve as a basis for a fee reduction. <u>See</u> <u>e.g.</u>, <u>Torres v. Walker</u>, 356 F.3d 238, 245-246 ("[E]ven assuming the language in the stipulation regarding payment of reasonable attorneys' fees to be ambiguous, any ambiguity therein must be construed *against* Defendants, who *drafted* the stipulation."); <u>Valdez v. Squier</u>, 676 F.3d 935, 949 (10th Cir. 2012) ("[T]he Secretary of State argues that, 'because [plaintiffs] did not segregate their fees on a defendant-by-defendant basis, [plaintiffs] failed to provide an adequate lodestar justification...however, nothing in the parties' settlement agreement required plaintiffs to segregate their fees on this basis."). Thus, defendants should not be allowed to make reductions for categories of work (i.e., against certain defendants or for certain claims) that were *never incorporated* into the Rule 68 offer.

### ii. All Work Relating To The Medical Defendants Must Be Compensated, As Such Work Was Inextricably Intertwined With The Claims Against The Municipal Defendants

Setting aside the impropriety of defendants' proposed reduction under the plain language of the Rule 68, the mechanical method of reducing fees suggested by defendants ignores the general rule that "if a plaintiff prevails on a claim that generates a fee award, he may recover for

work done on other claims if they were substantially related to the claim on which he prevailed." Cabral v. City of New York, 2015 WL 4750675, at *10 (S.D.N.Y. 2015) (citation omitted).  As one Circuit court noted, "separating out the legal services rendered with respect to these overlapping claims would be an exercise in futility.'" Chu v. Boeing Co., 497 F. App'x 978, 988 (Fed. Cir. 2012); see also McCown v. City of Fontana, 565 F.3d 1097, 1103 (9th Cir. 2009) ("in a lawsuit where the plaintiff presents different claims for relief that "involve a common core of facts" or are based on 'related legal theories,' the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis.").   Indeed, it is well established that "[a]ttorney's fees may be awarded for unsuccessful claims as well as successful ones, however, where they are 'inextricably intertwined' and 'involve a common core of facts or are based on related legal theories.'" Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999); Munson v. Milwaukee Bd. of Sch. Directors, 969 F.2d 266, 271-72 (7th Cir. 1992) ("denying the prevailing plaintiff compensation for work done on unsuccessful pendent state law claims in a civil rights action, even if the pendent claims were not directly compensable under a fee-shifting statute, would be "contrary to the precepts established in *Hensley* ... because it [would fail] to consider the interrelated nature of the lawsuit as a whole.") (citation omitted).

Similarly, defendants cannot exclude claims on a *per defendant* basis where the lawsuit as a whole is − as it was here − was based on a unified and connected set of facts and claims. Lane v. Grant Cty., 2013 WL 5306986, at *6 (E.D. Wash. 2013) aff'd, 610 F. App'x 698 (9th Cir. 2015) ("Claims are related for purposes of determining attorney's fees even though they are brought on the basis of different legal theories against *different defendants* if the claims arose from a common core of facts.")(emphasis added); Statler v. Buffalo-Bodega Complex, Inc., 2008 WL 4695118, at *1 (D.S.D. 2008) (finding that the work done in connection with state law

claims against *different defendants* compensable because the work was "subsumed within the attorney fees generated in establishing a Title VII violation.").

In this case, the claims against the Medical Defendants and the work done in connection therewith was essential and inseparable from the federal claims, and is thus compensable. McCown, 565 F.3d at 1103:

> Each of McCown's claims, though brought on the basis of different legal theories against *different defendants*, arose from a common core of facts, namely, his arrest on June 2, 2004. Therefore, the district court did not abuse its discretion when it treated all the claims, successful and unsuccessful, as arising out of a common core of facts.
>
> Id. (emphasis added).

Finally, since during "the course of pretrial discovery it [is] incumbent upon plaintiffs' counsel to explore the degree of participation" of related defendants in order to successfully pursue the claim, this work should not be discounted.  Kennelly v. State of Rhode Island, 682 F.2d 282, 283 (1st Cir.1982) (per curiam) (refusing to "fractionalize[]" plaintiff's hours "into successful and unsuccessful claims" where the discovery obtained against non-successful defendants "was useful in challenging the credibility of the state troopers' testimony."); Martinez v. Port Auth. of N.Y. & N.J., 2005 WL 2143333, at *24 (S.D.N.Y. 2005), aff'd sub nom. Martinez v. The Port Auth. of New York & New Jersey, 445 F.3d 158 (2d Cir. 2006) (citations omitted):

> Although the trial court has discretion to reduce a lodestar fee based on the number of hours expended on a severable, unsuccessful claim[s]…Pretrial discovery into the Port Authority was necessary for the prosecution of this action, and the plaintiff contends that the round of discovery that defendants frame as meritless yielded documents that were introduced as trial exhibits, and helped to frame counsel's questioning of witnesses at trial…Although that round of document discovery may not have yielded a smoking gun, there is no evidence indicating that it was frivolous, dilatory or otherwise constituted harassment.

Based on the record before me, I conclude that plaintiff's attorneys' fees should not be reduced based on the results of this round of document discovery.

Id.

> **a.    The NYPD Was Directly Involved with, and Responsible for, the JHMC's Decision to Confine Officer Schoolcraft.**

The interrelationship between the Medical and Municipal defendants here is beyond cavil.  While the City acknowledges that there was an "initial statement attributed to Sgt. James" in the hospital chart, they nevertheless attempt to downplay the significance of her damaging statements. (Def. Br. at 34). However, Sgt. James's false statements to the hospital – namely, that Schoolcraft "barricaded himself and the door had to be broken to get to him," and that "he ran and had to be chased and brought to the medical ER, handcuffed" (Reply Declaration of Joshua Fitch ("Reply Dec."), Ex. A) – were *repeatedly cited* by JHMC doctors as a critical factor in detaining Schoolcraft.  For example,  Indira Patel, M.D., the attending physician in Jamaica Hospital's Emergency Room, testified that she believed that Schoolcraft was a danger to himself because, <u>inter</u> <u>alia</u>:

> The patient had barricaded himself.  They had to break up his door to bring him out.  When in he was [outside the apartment] – they had to chase him – he tried to run away.  They had to chase him to bring him to the medical emergency room.

> (Patel Dep. at 41, Reply Dec., Ex. B).

Similarly, Dr. Bernier, the Director of the Psychiatric ER who made the decision to involuntarily confine Schoolcraft in the psychiatric ward at JHMC, referred to Sgt. James' statements as a basis for her decision to confine him:

> Q:     So you were told about what happened in his apartment?
> A:     Everything, yes.
> Q:     And *you were considering what you were told by the police* when they arrived at the hospital.
> A:     That's correct.

(Bernier Dep. at 170, Reply Dec., Ex. C).

Likewise, Dr. Tariq, a psychiatric resident who evaluated Schoolcraft – and whose note was relied upon by Dr. Bernier – wrote as follows: "As per ER consult done earlier today, the accompanying NYPD officer, Sergeant James of the 81st Precinct, [Schoolcraft] barricaded himself in his room and refused to come out so the door had to be broken down.  He initially agreed to go with them but once outside he made a run for it and had to be chased and handcuffed." (Reply Dec., Ex. D).   Dr. Lwin similarly testified that "according to Sgt. James, [] he had to barricaded himself and the door had to be broken to get him." (Lwin Dep. at 45, Reply Dec., Ex. E).   Thus, at least *four* different doctors at JHMC cited Sgt. James' statements as a basis for their decision to involuntarily confine Officer Schoolcraft. Accordingly, defendants' attempt to minimize the impact of the "initial statement" by Sgt. James is both disingenuous and misleading.

Sgt. James false statements were *also* directly relevant to the medical malpractice claims. In fact, the Medical Defendants' experts repeatedly cited Sgt. James' statements as a basis for concluding that the doctors had acted appropriately in deciding to involuntarily confine P.O. Schoolcraft.  See, e.g., Report of Frank Dowling, M.D., Reply Dec., Ex. F, at 3 (opining that Dr. Isakov was "justified in considering the information in the hospital record, including statements made by police officers that the patient locked himself in his apartment and refused to open the door when the police directed him to do so; that he ran away from them and had to be chased down and put into handcuffs [and] had to be brought to the hospital by force ...."); Report of Laurence R. Tancredi, M.D., Reply Dec., Ex. G, at 1, 2 ("Members of the NYPD went to his home, where he barricaded himself in his room," which was "bizarre behavior" and evidence of

"paranoid ideation") (emphasis supplied); Robert H. Levy, M.D.,  Reply Dec., Ex. H, at 4, 6 ("The police reported that the patient had left work precipitously and that he was agitated and had barricaded himself in his apartment, forcing them to break down the door."). Thus, there was a clear overlap between plaintiff's civil rights claims against the NYPD and plaintiff's malpractice claims against the Medical Defendants.

> **b.      The NYPD Was Present at JHMC Throughout Officer Schoolcraft's Involuntary Confinement.**

Apart from Sgt. James, there were multiple other police officers who were present throughout Officer Schoolcraft's involuntary stay at the hospital. For example, on the night that P.O. Schoolcraft was first brought to JHMC, Lt. Broschart, Sgt. Sawyer, P.O. Sadowski, and P.O. Miller were all present and were all involved in various interactions with P.O. Schoolcraft and the hospital staff on that night or early in the morning on November 1, 2009. In fact, the abusive conduct of these officers formed the basis of one of plaintiff's claims against JHMC, namely, that the hospital violated its duty toward P.O. Schoolcraft, and its own internal policies, by allowing him to be restrained in handcuffs and strapped to a  gurney for over nine hours.  See Report of Roy Lubit, M.D., Reply Dec., Ex. I at 23 ("It was inappropriate of the hospital staff to allow the police to control the patient's restraints and a dereliction of their duty to allow the police to use restraints in a way that was grossly inappropriate and abusive. The hospital staff had a fiduciary responsibility to the patient once he was in their care.").

There was also evidence that at least two of the officers present at JHMC – Sgt. James and Sgt. Sawyer – were in *direct contact* with their superiors at the 81st Precinct regarding Schoolcraft's confinement at JHMC. Specifically, Sgt. James spoke to Captain Lauterborne regarding Schoolcraft, and Captain Lauterborne told her that Schoolcraft "can't leave" the

hospital. (Dept. Adv. Tr. at 108).  Similarly, Sgt. Sawyer called DI Mauriello at his home – after receiving a message that "DI Mauriello wanted me to call him" – to advise Mauriello that Schoolcraft had, in fact, been "admitted to Jamaica Hospital."  (Sawyer Dep. at 111-112, Reply Dec., Ex. J).  Thus, there is ample evidence of the NYPD's involvement with JHMC's decision to confine Schoolcraft at the hospital.

While defendants suggest that "there was no indication of NYPD involvement" after the first day at JHMC, this is simply wrong. (Def. Br. at 34). In fact, at least *five* different NYPD officers were present at various times throughout Schoolcraft's stay at JHMC.  For example, Sgt. Frost and Sgt. Brennan, both of whom were from the Internal Affairs Bureau, were present in the hospital and interviewed Officer Schoolcraft on November 2, 2009 at 5:00 p.m., as reflected in the hospital chart. (Reply Dec., Ex. K). Similarly, Detective Wachter and Sgt. Scott were present at the hospital and interviewed Officer Schoolcraft on November 2, 2009 at 9:30 p.m.  (Reply Dec., Ex. L). In fact, Detective Wachter's business card is actually copied into the hospital chart. (Id.) Further, on November 5, 2009, Sgt. Chu interviewed Officer Schoolcraft and his father, Larry, in the presence of Dr. Isakov and Christine McMahon, a JHMC social worker. (Reply Dec., Ex.  M). Sgt. Chu's summary of this interview (id.), as well as the actual transcript of the interview (Ex. N), was listed on defendants' JPTO and was going to be relied upon by the Medical Defendants in their defense of this action. (Ex. O).

### c.   NYPD Psychologist Catherine Lamstein Spoke to a Hospital Social Worker on at least Two Separate Occasions.

Apart from the officers who were physically present at the hospital, another NYPD employee – Catherine Lamstein, Ph.D., the psychologist who removed Schoolcraft's gun and placed him on restricted duty – was *also* in contact with JHMC.  Specifically, Dr. Lamstein had

two separate conversations with Christine McMahon – who herself had previously worked at the NYPD and who was present during Sgt. Chu's interview of P.O. Schoolcraft on November 5, 2009, and who had interviewed P.O. Schoolcraft three times at hospital – regarding Schoolcraft's mental status at the hospital. (Lamstein Dep. at 309, 313, Reply Dec., Ex. P).   These conversations took place on November 6, 2009 and November 9, 2009.

Based on the above evidence, it is clear that defendants' argument that "the claim against the Medical Defendants concerned the conduct of medical personnel – *not the police* – most of which occurred outside of the presence of City employees over the course of Schoolcraft's six-day stay at JHMC," is baseless. (Def. Br. at 33) (emphasis supplied).  Further, defendants claim that "[a]side from that initial statement attributed to Sgt. James" (Def. Br. at 34), the NYPD had no involvement with Officer Schoolcraft's stay at the hospital – is demonstrably false.  At least 10 different police officers were physically present at the hospital[7]; two other NYPD supervisors were in phone contact with officers at the hospital and kept apprised of Schoolcraft's status; Dr. Lamstein, the NYPD psychologist who removed plaintiff's gun, was in phone contact with the hospital social worker, Christine McMahon; Officer Schoolcraft was interviewed on *three* separate occasions by IAB officers while at Jamaica Hospital – as documented in the hospital chart – and these interviews became important evidence in this case;  and, above all, the false statements attributed to the NYPD were *repeatedly cited* by doctors as *directly influencing* the hospital's decision to involuntarily confine Schoolcraft to the psychiatric ward, as confirmed by Dr. Bernier, Dr.Patel,  Lwin, Dr. Tariq, and by defense experts, Robert Levy, M.D., Frank Dawling, M.D., and Laurence Tancredi, M.D.

---

[7] Detective Yeager from ESU was also present at JHMC and spoke to various JHMC nurses, who directly contradicted Sgt. James' claims regarding Schoolcraft's behavior in the ER.

In short, the record is rife with evidence showing the extensive interrelationship – both factually and legally – between the Municipal Defendants and Medical Defendants in this case, and it would be improper to artificially dissect the work that counsel performed relating to the Medical Defendants from the work that counsel performed relating to the claims against the NYPD.  Thus, as a matter of trial, discovery and settlement analysis, working diligently on these related hospital defendants in the case – and fending off their motion to dismiss at the outset – was essential work that facilitated the resolution in this case against the City Defendants and should therefore be compensable.  See e.g., Tucker v. City of New York, 704 F. Supp. 2d 347, 358 (S.D.N.Y. 2010):

> [T]he assertion of the state-law claims in this suit can fairly be viewed as a reasonable strategy by counsel for maximizing the likelihood of a successful outcome in two related respects. First, some of the state common-law claims impose a potentially less demanding standard on the plaintiff, and therefore might give him a greater likelihood of achieving success even if he could not prevail on the federal claims. Second, *and more crucially*, that very fact means that inclusion of those claims in the complaint *potentially increased plaintiff's bargaining leverage* in seeking to resolve the entire suit, even if-as occurred here-on the basis of a settlement designated as being predicated on the federal claims.

Id. (emphasis added). Accordingly, *all* of the legal work performed in connection with such events is compensable and no deductions should be made for work relating to the medical defendants.

## V.   DEFENDANTS' HODGEPODGE ATTACKS ON THE REASONABLENESS OF PLAINTIFF'S FEE APPLICATION ARE BASELESS AND SHOULD BE REJECTED.

### A.   Defendants' "Billing Judgment" Argument is Frivolous.

Defendants propose a drastic 50% reduction (on top of the 15% reduction for billing practices and the specific hourly reduction for allegedly "non-compensable" work) for plaintiff's

purported lack of "billing judgment" in this case.[8] In other words, Ms. Bronsther "concludes" that plaintiff's counsel doubled the amount of work that was *actually* necessary in this case. This argument is premised exclusively on their "expert's" summary conclusions that time spent on certain tasks throughout this litigation (i.e., trial preparation, depositions, communications, intra-office attorney conferences, preparing the complaint, etc.) was excessive, unnecessary, and that staffing decisions caused duplication of effort. As is apparent from the "expert" report, Ms. Bronsther's "conclusions" consist solely on tallying up the number of hours spend on a given task and saying it was unreasonable, without a shred of factual or legal basis for believing that the time was, in fact, unnecessary.   Defendant's "billing judgment" argument is thus wholly unsupported, and should be rejected.

### B.   Defendants' Objection to the Use of Multiple Attorneys is Baseless.

Defendants contend that having multiple attorneys on the case was "wasteful" and resulted in duplication of efforts.  However, as courts have repeatedly recognized, "[t]he practice of dividing work among various attorneys in a complex and lengthy case is a common and practice," and should not be deemed *per se* duplicative. Meriwether v. Coughlin, 727 F. Supp. 823, 827-28 (S.D.N.Y. 1989). Further, where multiple lawyers or "legal teams [are] conducting [the] litigation some duplication is unavoidable." Johnson v. City of New York, 2016 WL 590457, at *4 (E.D.N.Y. 2016).

---

[8] Defendants aver that, apart from eliminating phone hundreds of phone calls between plaintiff and counsel, plaintiff has exercised "no billing judgment."  However, not only is this argument belied by the records discussed herein, but plaintiff has also exercised a great deal of billing judgment with respect to the 355.3 hours spent in connection with the fee application – nearly 85% of which was spent in defense of the application *after* it was filed – none of which has been sought in this case.  Notwithstanding, should defendants continue to protract the resolution of this application with, inter alia, requests for a sur-opposition, appeal of any decision made on this application or additional requests for discovery or evidentiary hearings in connection herewith, plaintiff reserves the right to supplement this application with those additional hours and fees.

Moreover, it is well settled that "[t]ime spent by two attorneys on the same general task is not, however, *per se* duplicative [because ] careful preparation often requires collaboration and rehearsal." Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 860 (1st Cir. 1998); Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp., 599 F. Supp. 509, 518 (S.D.N.Y. 1984) ("The use of multiple attorneys, however, is not unreasonable per se.").  Indeed, "there is no...authority for allowing only one lawyer to charge for time that more than one lawyer justifiably spent." Ricks, 2007 WL 956940, at *8. As one Circuit Court has noted:

> Given the complexity of modern litigation, the deployment of multiple attorneys is sometimes an eminently reasonable tactic…[thus] the mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing... ...[e]ffective preparation and presentation of a case often involve the kind of collaboration that only occurs when several attorneys are working on a single issue.

Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 297 (1st Cir. 2001).

More importantly, "in a case as factually and legally complex as this, we would expect plaintiffs to be represented by more than one or two lawyers, as a matter of good practice." Kim v. Kum Gang, Inc., 2015 WL 3536593, at *4 (S.D.N.Y. 2015).  Therefore, "[i]t is not uncommon for parties to recover attorney's fees for the collaboration of multiple attorney's on a case when the district court decides that such collaboration is appropriate given the scope and complexity of the litigation." Castelluccio v. Int'l Bus. Machines Corp., 2014 WL 3696371, at *7-8 (D. Conn. 2014).

As previously stated, this case was truly exceptional; Schoolcraft's allegations were the *first* ever significant allegations by a police officer with personal knowledge of the illegal use of quotas within the NYPD for law enforcement activity and the first to bring the policies of statistical fraud to the forefront within the NYPD. Plaintiff's recordings alone shaped the face of

the *Floyd* litigation, which in turn led to a change in the policy of the NYPD regarding its stop-

and-frisk practices. Further, plaintiff's recordings spawned one of the largest class actions in

New York City history involving the illegal use of summons quotas, as well as numerous first

amendment retaliation lawsuits brought by the NYPD's own rank and file members.[9] Thus, it is

hardly surprising that a significant number of attorneys and hours were necessary for a case of

this scope and complexity. Defendants' attempts to oversimplify this case are both disingenuous

and indicative of the fact that defense counsel *himself* only worked the last eight months on this

six-year litigation. See e.g., Catanzano v. Doar, 378 F. Supp. 2d 309, 322 (W.D.N.Y. 2005):

> It is also worth noting that this was a lengthy case involving complex issues of
> considerable significance to many members of the public…No less than fourteen
> decisions (not including this one) on substantive issues have been rendered by this
> Court and the Court of Appeals over the course of this action, and there have also
> been six appeals argued before the Second Circuit, and dozens of motions of
> various types. Given the Byzantine statutory and regulatory schemes involved, it
> should come as no surprise that this case took many years to litigate. Likewise, it
> is hardly surprising that many attorneys would end up working on this case at one
> time or another…

Id.  Therefore, "[i]n light of the importance of these matters to the successful prosecution

of this case, and the skill with which the case was prosecuted, the Court [should] not penalize

counsel for plaintiffs for doing their job thoroughly." Rodriguez ex rel. Kelly v. McLoughlin, 84

F. Supp. 2d 417, 425-26 (S.D.N.Y. 1999).

Lastly, the City's "overstaffing" arguments reveal a double-standard that wholly

undermines their position on this issue – namely, that while it was reasonable for the City to

heavily staff this case (nine attorneys have appeared on behalf of the City defendants, see Docket

---

[9] Stinson v. City of New York, 282 F.R.D. 360, 378 (S.D.N.Y. 2012); Matthews v. City of New York, et al., No. 12-cv-1354 (S.D.N.Y.); Groben v. City of New York, et al., No. 11-cv-6823 (S.D.N.Y.)(same), Hicks v. City of New York, Index No. 307045/2012 (N.Y. Sup. Ct.); Raymond et al v. City of New York, No. 15-cv-6885 (S.D.N.Y.) (LTS).

Sheet at pp. 3-6), this Court should nevertheless punish plaintiff for doing the same. In fact, courts have previously rejected such hypocritical positions from the City. See e.g. Richards v. New York City Bd. of Educ., 1988 WL 70209, at *8 (S.D.N.Y. June 27, 1988) (the court rejected "a similar argument" regarding "duplicative efforts "as "meritless."); Lenihan v. City of New York, 640 F. Supp. 822, 825 (S.D.N.Y. 1986):

> I do not agree that these activities reflect unnecessary duplication on the part of Lenihan's counsel. The City evidently felt that the pretrial conferences, the preliminary injunction hearing, and the trial warranted the presence of more than one attorney; it frequently sent two or more attorneys to pretrial conferences, and three attorneys sat at its counsel table throughout most if not all of the trial. *I do not doubt that the City would seek compensation for these attorneys were it in a position to do so.*

Id. (emphasis supplied).   Accordingly, it should "amaz[e] this court to hear the defendants now argue that so much of this time was *unnecessary* when so much of this time was caused *directly* by the defendants." Lightfoot, 619 F. Supp. at 1488.[10]

## C.  Defendants' Attacks on Strategy Meetings Are Meritless.

Defendants further argue that plaintiff's counsel engaged in too many meetings during the course of this 5 year litigation. However, in a case of this magnitude, "attorneys must spend at least some of their time conferring with colleagues," as such work in an indispensable part of "ensur[ing] that a case is managed in an effective as well as efficient manner.  Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1337 (D.C. Cir. 1982); Veterans Educ.

---

[10] Moreover, the use of multiple attorneys might appear even more reasonable where – as here – there are multiple defendants represented by multiple opposing counsel, such that "[t]he defendants' use of multiple attorneys may have, in itself, contributed to the plaintiffs' need for representation by more than one attorney." Williamsburg Fair Hous. Comm., 599 F. Supp. at 518; City of Riverside v. Rivera, 477 U.S. 561, 581 n.11 (1986) (a defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response."); Rodriguez-Hernandez, 132 F.3d at 860 ("Indeed, because a litigant's staffing needs and preparation time will often 'vary in direct proportion to the ferocity of her adversaries' handling of the case, this factor weighs heavily in the balance.'")(citations omitted). Gay Officers Action League, 247 F.3d at 298 ("it seems disingenuous for the [defendant] to castigate the plaintiffs for putting too many troops into the field…the court should not reward defendants for their vehement 'Stalingrad defense,'").

<u>Project v. Secretary of the Air Force</u>, 515 F.Supp. 993, 994 (D.D.C.1981) ("intra-office conferences among attorneys familiar with and working on particular litigation enhance the possibility of competent and efficient litigation, and hours spent in such conferences are not reduced under the rubric of 'billing judgment' unless the result is unproductive").

Further, for "each [attorney] to bill time" for a "conference [that] seems [to] have been a meeting between the two" is not a basis for reduction. <u>Bridges v. Eastman Kodak Co.</u>, 1996 WL 47304, at *6-7 (S.D.N.Y. Feb. 6, 1996) <u>aff'd.</u> 102 F.3d 56 (2d Cir. 1996) ("the time spent by two attorneys discussing the case with one another is properly billed"). To that end, plaintiffs should "not be penalized, as defendants suggest, for frequent intra-office conferences." <u>Rodriguez ex rel. Kelly</u>, 84 F. Supp. 2d at 426. Indeed, defendants' claim that, in hindsight, counsel should not have spent as much time meeting with one another throughout this litigation, is baseless, since "determining whether hours should be excluded, the inquiry is not based on what effort appears necessary in hindsight." <u>Barbour v. City of White Plains</u>, 788 F. Supp. 2d 216, 222 (S.D.N.Y. 2011), <u>aff'd.</u> 700 F.3d 631 (2d Cir. 2012); <u>Restivo</u>, 2015 WL 7734100 at *5 ("[A]t the conclusion of this litigation saga, rendering an opinion on how long a strategy meeting should take in a complicated case does not seem productive.").

**D.    Defendants' Claim of Duplicative Work Is Particularly Specious As It Relates to the Work Performed by Plaintiff's Initial Attorneys For the First 2.5 Years of Litigation.**

Apart from the flaws discussed above, defendants' "duplication of work" argument is especially suspect when it is used to subtract hours from the first two-and-a-half years of this litigation. This is so because the three attorneys on the Norinsberg Team were the *only* attorneys who litigated this case during this time period. *A fortiori*, since any work done by this team was the *very first work done* on the case, it could not be – by definition – "duplicative" of any other

attorney's work performed on the case. For example, Ms. Bronsther alleges that the work being performed in connection with Schoolcraft's original retention of the Norinsberg team is redundant or otherwise non-compensable. However, for defendants' expert to claim that the work spent in connection with the *initial* retention of the Norinsberg team – the very first attorneys who worked on the case[11] – is redundant or unnecessary is simply illogical, since those activities are undoubtedly compensable under the law and were never previously billed by any attorney in this case. Kahlil v. Original Old Homestead Rest., Inc., 657 F. Supp. 2d 470, 477 (S.D.N.Y.2009) ("[c]ourts in this circuit typically award attorneys' fees for pre-filing preparations."); In re Clinkscale, 525 B.R. 399, 407 (Bankr. W.D. Mich. 2015) ("Fee Petitions include customary and reasonable charges for initial consultations, preparation of schedules, client meetings and similar activities" and these charges should "naturally, dr[a]w no objection."). Therefore, there can be no credible argument that the Norinsberg Team engaged in any duplicative billing during the first 2.5 years of this litigation.

### E. The Work Performed by the Norinsberg Team and the Smith Team Was Very Clearly Delineated Throughout this Litigation.

In support of their massive 78% proposed hourly reduction in this case, defendants' brief focuses on the global number of hours expended over the course of this litigation up to the Rule 68 Offer of Judgment (63 months).  However, this ignores the fact that work expended by the Norinsberg Team and the Smith Team were very clearly delineated, and were limited to specific periods of time throughout the course of this litigation.  Specifically, for the first 28 months, the three attorneys from the Norinsberg Team were the *only* attorneys working on this case. During

---

[11] Although prior to retaining the Norinsberg Team, Schoolcraft had retained the services of Jonathan Moore, at the time he contacted the Norinsberg Team, no work whatsoever had been performed by Mr. Moore and plaintiff has not claimed any of the "time" spent by Mr. Moore as a basis for fees in this case.

that time period, they collectively expended 1,888.55 hours. Thus, when properly broken down in that manner, it is revealed that for the first 28 months, each of the three attorneys in the Norinsberg Team *only* spent – on average – approximately 45 minutes per day working on this case, an abundantly reasonable amount. Further, during the last nine (9) months of trial preparation, in which each team had very specific roles and work responsibilities, the Norinsberg Team collectively spent 1,264.75 hours.  This represents a per day work expenditure of only 1.5 hours (11 hours per week) for each of the three attorneys – whose responsibilities included, <u>inter alia</u>, the examination of over thirty witnesses, the opening statement, the motions *in limine* and collaborating with the Smith team on their portion of the trial work. Without doubt, a reasonable paying client would have had no objection paying for this amount of work – and might have even considered this somewhat insufficient – to adequately prepare this case for trial.

By contrast, under defendants' proposal, each of the attorneys on the Norinsberg Team would have been restricted to spending only *15 minutes* per day on this case for the first 28 months.[12]  A reasonable paying client might well have wondered what possible amount of work could have been performed in 15 minutes a day (5.5. hours per week) on a case of such scope and magnitude.   Moreover, during the trial preparation phase, defendants' proposal would have limited the three attorneys to a mere 30 minutes per day to prepare for trial.  There is simply no credible argument that any attorneys who wished to be successful in this case would only need to spend 15 minutes per day (2 hours per week) for the first two plus years of litigation and only 30 minutes per day (or approximately 4 hours per week) on such a massive undertaking. No

---

[12] These figures were reached by taking 60% of the total number of hours proposed by defendants' reduction and applying it to the first 28 months of the case (which is the percentage of total hours - 1888.55 of 3153 hours - actually expended during that period for the Norinsberg team) and applying remaining 40% of their proposal to the nine (9) months of trial preparation work (which is the percentage of total hours - 1264.75 of 3153 hours - actually expended during that period by the Norinsberg team).

reasonable paying client would have expected such a limited commitment to this case. <u>See</u> <u>e.g.</u>, <u>Moreno v. City of Sacramento</u>, 534 F.3d 1106, 1112 (9th Cir. 2008) ("the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker."); <u>Norman v. Hous. Auth. of City of Montgomery</u>, 836 F.2d 1292, 1306 (11th Cir. 1988)("the measure of reasonable hours is determined by the profession's judgment of the time that may be conscionably billed and not the least time in which it might *theoretically* have been done.").

> **F.** **The Collaborative Efforts of Mr. Norinsberg and Mr. Meehan Are Fully Compensable.**

Defendants' attack on the billing entries of Mr. Norinsberg and Mr. Meehan – as "wasted effort" (Def. Mem. at 21) – is based on erroneous assumptions and is simply wrong. Specifically, defendant takes issue with the manner in which Mr. Norinsberg and Mr. Meehan collaborated in preparing the cross-examination outlines for several police witnesses (Lt. Caughey, Lt. Weiss, Capt. Trainor), arguing that  Mr. Meehan spent a certain number of hours on the outline and then Mr. Norinsberg "started" working on it. (Scheiner Decl.., Ex. D, 93 - 96).  However, such arguments merely confirm that defense counsel – and more importantly their expert – lacks even the most basic understanding of this case and what it takes to prepare for, and win, at trial.

The collaborative process employed by Mr. Norinsberg and Mr. Meehan is about dividing up labor amongst the trial team, so as to maximize the contributions of each team member. Mr. Meehan's role is to provide the *foundation* for what becomes the eventual cross-examination outline used at trial. Mr. Meehan culls through the witness's prior testimony and extracts all potential points that the witness may be questioned about. Mr. Meehan then drafts a

*preliminary* cross-examination outline.[13]  Then, once Mr. Meehan is done with his preliminary outline, Mr. Norinsberg then takes over the cross-examination and makes substantial edits and additions in order to ensure that the witness has *no avenue of escape*.  This is an extremely arduous and time-consuming process; there are simply are no short-cuts to preparing an effective cross-examination. Indeed, as the chart below illustrates, Mr. Norinsberg's work actually *doubled* each cross-examination outline that Mr. Meehan had started:

| Cross examination | Length of Meehan's outline | Length of Norinsberg's Final Outline |
|---|---|---|
| Lt. Caughey | 150 pages | 268 pages |
| Lt. Weiss | 63 pages | 115 pages |
| Captain Trainor | 55 pages | 117 pages |

Thus, the work done by Mr. Meehan and Mr. Norinsberg was *not* duplicative in any manner.

### G.    The Work spent of Trial Preparation was Essential Given the Scope of this Litigation.

While defendants acknowledge that the Schoolcraft trial would have been "a long trial of 30-40 days for all claims and parties" (Def. Mem. at 20), defendants nonetheless take issue with the global amount of hours spent on trial preparation.  However, simply tallying up the hours of trial preparation to further a claim of "excessive billing" is misleading. The trial of this case was a *massive undertaking*, and involved the marshalling of over 15,000 documents, hundreds of

---

[13] While defense counsel takes issue with this collaborative effort, the simple fact is that *someone* at plaintiff's firm *must* do the foundational work that Mr. Meehan performed. If Mr. Norinsberg had done this work himself – instead of Mr. Meehan – then the billing rates for this same work would have been much higher. See K.F. v. New York City Dep't Educ., 2011 WL 3586142 at *6 (S.D.N.Y. 2011) (using junior attorneys to perform certain tasks "often leads to lawyers with lower billing rates completing tasks rather than a more senior lawyer with a higher rate."). Thus, defendants actually *saved* money by having an associate attorney prepare the foundation of the cross examination outlines.

audio recordings and thousands of pages of deposition testimony.  Indeed, a snapshot into the enormous amounts of work that the Norinsberg Team had to spend on trial preparation can be seen in the cross examination outlines for the three main NYPD defendants, Chief Marino, Captain Lauterborn, and Deputy Inspector Mauriello. Each cross-examination outline was literally *hundreds of pages* long, and the three outlines – consisting of eight separate bound volumes – totaled over *1,100 pages* in length.   The chart below gives the Court some idea of the prodigious amount of work that was required to prepare just for these three witnesses:

| Cross-examination | No. of volumes | Total pages |
| --- | --- | --- |
| Chief Marino | 2 | 306 |
| Deputy Inspector Mauriello | 4 | 510 |
| Captain  Lauterborn | 2 | 275 |

Similarly, the Norinsberg Team prepared similar outlines for all of the NYPD witnesses in this case – approximately 20 in total.[14]  Thus, the idea that the time spent for trial prep of this matter was unreasonable is entirely without merit.

### H.     Defendants have Mischaracterized the Hours Spent Related to "Media Activity"

Defendants have attempted to discount any hours spent on media related activities. However, apart from the fact that "many courts[15] have compensated lawyers, in making fee

---

[14] Plaintiff's counsel has maintained all of these cross-examination outlines and can readily provide them to the Court for an *in camera* inspection.

[15] "There is precedent for awarding fees for media work, as informing the public about court proceedings is often necessary to fully vindicate the public interest implicated by the case [and] [c]ompensation for these hours should therefore be allowed." Rodriguez ex rel. Kelly, 84 F. Supp. 2d at 425. Further, given that "'media coverage...helped the Plaintiffs' efforts'[][,] – in terms of obtaining evidence and other whistleblower witnesses – "controlling case law permits such services to be compensated." Ansoumana v. Gristede's Operating Corp., 2004 WL 504319, at *3 (S.D.N.Y. 2004). Accordingly, since "[t]he substantial public interest in this case required counsel to deal extensively with the media. The nature of the lawsuit necessitated this activity; the comparatively few hours spent on required media relations are fully compensable." U.S. Football League v. Nat'l Football League, 704 F. Supp. 474, 481-82 (S.D.N.Y.) aff'd. 887 F.2d 408 (2d Cir. 1989).

awards under civil rights and other statutes, for public relations efforts in recognition of the importance of such work in the clients' interests" (In re Grand Jury Subpoenas Dated Mar. 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness, 265 F. Supp. 2d 321, 327 (S.D.N.Y. 2003)), the hours that defendants have attributed to counsels' "media work" are grossly exaggerated. For example, many entries that defendants and their "expert" attributes to this work was actually time spent reviewing the variety of media information that was already being disseminated about this case, including stories that revealed important facts, witnesses, evidence and statements regarding the claims in this case. (Expert Report, Page 38)("Read Voice articles on Schoolcraft"; Discussion with JF re: location of witnesses from This American Life Interview"; Reviewed Schoolcraft Graham Raymond Materials made summary of most important points from clients email and chronological summary").

Accordingly, to say that these were "media activities" that might plausibly be excludable (i.e. press releases, interviews, etc.) is not even remotely accurate. It would have been malpractice for counsel to not familiarize themselves with the evidence and stories already being published – both good and bad – in order to be fully aware of the strengths and weaknesses and to help develop litigation and discovery strategies. [16]

---

[16] Defendants also object to time spent dealing with state and federal prosecutors who were investigating this case. However, monitoring and supervising such activities and contacts between plaintiff and these individuals and organizations was unequivocally necessary to protect his interests in this litigation.  Therefore, since "competent representation would require such monitoring," those hours are also compensable.  U.S. Football League, 704 F. Supp. at 481 aff'd. 887 F.2d 408 (2d Cir. 1989).

**VI.    DEFENDANTS' OBJECTIONS TO PLAINTIFF'S BILLING PRACTICES ARE FACTUALLY INACCURATE AND LEGALLY UNSUBSTANTIATED.**

> **A.    Defendants' Reductions Regarding Alleged "Block Billing" Are Based on a Mischaracterization of Counsels' Billing Entries.**

A review of plaintiff's billing records will confirm that what Ms. Bronsther has labeled as "block billing" does not even come close to meeting that definition. For example, whenever a member of the Norinsberg Team reviewed a series of documents, or listened to a recording and took notes while doing so, Ms. Bronsther labeled that activity as "block billing." (See, e.g., Exhibit 9 of Expert report) ("Reviewed transcript of Polanco tapes; took notes re: same" or "Continued review of Schoolcraft roll calls (2009); took notes on same"). However, an attorney's review of documents or recordings that simultaneously includes taking notes during that process, is a *single* task and does not require a separate time entry and is therefore not "block billing" by definition. See e.g., Tottey v. Life Ins. Co. of N. Am., 2009 WL 3764222, at *3 (N.D.N.Y. 2009) (no reduction warranted where "[t] examples of block billing to which Defendant directs the Courts attention are not vague and the tasks included in those entries either related to a single process or to related processes"); Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs, 2013 WL 598390, at *4 (N.D. Tex. 2013), rev'd and remanded, 747 F.3d 275 (5th Cir. 2014), aff'd and remanded, 135 S. Ct. 2507 (2015) ("[B]illing entries for "analysis, research, drafting" are not block billing because these tasks are sufficiently intertwined to be treated as one task.").

Similarly, Ms. Bronsther labeled entries that identify distinct tasks such as "Review of Schoolcraft recordings (2008 roll calls)" as block billing. (See Exhibit 9 of Expert Report). As this Court is well aware, this case involved hundreds of hours digitally recorded evidence, which the attorneys had to review in order to draft the complaint, turn over in discovery, and to be

familiar with the overall evidence in the case. The notion that such a time-consuming task is considered "block billing" -- simply because plaintiff's counsel did not identify each and every recording (out of hundreds) that they listened to -- is absurd.  Such a rule would "require plaintiff to maintain the exceedingly detailed fee logs" which "would be overly burdensome and would only serve to unnecessarily inflate the ultimate fee application." Sugarman v. Vill. of Chester, 213 F. Supp. 2d 304, 312-13 (S.D.N.Y. 2002).

**B.    Defendants' Claims Regarding "Vague" Billing Entries Are Unfounded.**

Defendants further claim that substantial reductions should be made for counsel's "vague" billing entries.  However, "[p]laintiffs need not describe in meticulous detail the particularities of every task." Hurley v. Coombe, 1996 WL 46889, at *3 (S.D.N.Y. 1996). Moreover, "[w]hile it may be true that, read in isolation, some entries appear vague," if "the nature or purpose becomes clear from reading the time entries immediately preceding or following them," or from the court's knowledge of what stage of the litigation was at during that period, then the facial vagueness of these entries will *not* provide a basis for a fee reduction. Hnot v. Willis Grp. Holdings Ltd., 2008 WL 1166309, at *5 (S.D.N.Y. 2008). Thus, only those entries that are "stated in the sparest of terms" will violate this rule. Makinen v. City of New York, 2016 WL 1451543, at *5 (S.D.N.Y. 2016).

Here, despite Ms. Bronsther's classification of 191 entries as "vague," anyone who was *actually involved* in this case would know exactly what work was being described. For example, while Ms. Bronsther believed that the entries that stated "Review of deposition exhibits," which were logged in February and March of 2015, were too vague (See Expert Report at 54), it would be   clear   to   anyone   who   participated   in   this   case   that   the   Smith

Team had introduced 174 deposition exhibits, and meticulously kept them in order, so that these exhibits could be reviewed in preparation for trial.

Ms. Bronsther also claimed as "vague" the following entry from Mr. Cohen: "Reviewed JN cross outlines and updated my own witness examinations." (See Expert Report at 55). Not only is the plain text of this entry clear, but also, the context of the surrounding entries makes it clear that counsel were exchanging their cross-examination outlines so as to conform their trial strategy for each witness.  There is nothing vague or ambiguous about this entry whatsoever. In fact, *all* of the "vague" entries identified by Ms. Bronsther can be readily understood simply by looking at the surrounding entries, or to the work being done at that stage of the case. Since this "is all that is required," defendants' objections must fail. Luca v. Cty. of Nassau, 2008 WL 2435569, at *8 (E.D.N.Y. 2008), aff'd in part, vacated in part, remanded, 344 F. App'x 637 (2d Cir. 2009).

### C.   Defendants' Claims of Improper Billing Increments and Unnecessary Client Communications Are Without Merit.

Defendants propose across-the-board percentage reductions for plaintiff's use of certain billing increments in connection with emails and other communications. However, other than generically attacking the time spent on communications, defendants have failed to provide any reason to believe that this time was excessive. In particular, an attorney's "'commitment to work closely with his client is [] laudable...and attorney time reasonably spent with clients in preparing a case should be part of the hours compensated in an attorney's fee award.'" Lilienthal v. City of Suffolk, 322 F. Supp. 2d 667, 673 (E.D. Va. 2004). Indeed, the necessity of such communication is virtually academic – namely, "for a competent attorney to identify the alleged wrong, craft appropriate documents, and adequately prepare a case". Blanco-Jimenez v. Puerto Rico, 2015

WL 4064737, at *2 (D.P.R. 2015); <u>Brown v. Patelco Credit Union</u>, 2011 WL 4375865, at *6 (N.D. Ill. 2011) ("telephone correspondence with the client should be expected to properly prosecute the case—and in most cases turns out to be much less expensive than face-to-face meetings between attorney and client that might be necessary absent telephone or e-mail contacts").

In the present matter, frequent communication with plaintiff was not only important,  it was *essential* to the successful prosecution of this case, especially since plaintiff had a far more intimate knowledge of the inner workings of the NYPD than any member of his legal team. Further, a large number of telephone consultations were needed because plaintiff had moved upstate, thereby making the in-person meetings the exception rather than the rule.  Moreover, the need for frequent contact and discussion with plaintiff was also necessitated by the fact that defendants themselves spent a large portion of the case attempting to prevent plaintiff from viewing document discovery which would have undoubtedly alleviated much of the need to spend so much time in consult with plaintiff.  Accordingly, defendants' argument that counsel spent too much time communicating with plaintiff – without any supporting analysis (once again) – is simply insufficient, and should be rejected. <u>See</u> <u>e.g.</u>, <u>Oakley v. City of Memphis</u>, 2012 WL 2682755, at *5 (W.D. Tenn. 2012), <u>report and recommendation adopted</u>, 2012 WL 2681822 (W.D. Tenn. 2012), <u>aff'd,</u> 566 F. App'x 425 (6th Cir. 2014) ("The court also rejects the City's argument that plaintiffs' counsel spent an excessive amount of time communicating with their clients…") (holding that *106.30 hours* of client communication over the course of approximately one year was not excessive).

### D.     Defendants' Objections to Plaintiff's Use of .1 Increments For Discrete Tasks Are Baseless.

Defendants also take issue with the use of .1 increments for minor, discrete tasks. Specifically, defendants allege that "too much" time was spent on emails and/or that using billing increments of .1 for reviewing or sending brief emails was improper.[17] However, there is no basis to support the proposition that .1 increments – the lowest possible billing increment – are somehow *per se* unreasonable for emails.   Indeed, courts have held that "[n]o serious attorney can claim to be able to write and edit every email sent to a client or other counsel in six minutes or less." Rodriguez v. Puerto Rico, 764 F. Supp. 2d 338, 345 (D.P.R. 2011); Clark v. Bend-La Pine Sch. Dist., 2013 WL 5536884, at *3 (D. Or. 2013) ("Defendant primarily takes issue with the minimum billing unit of 6 minutes used to bill the e-mails. Of course it is reasonable for counsel and her paralegal to communicate during the course of litigation and a minimum billing unit of .1 hours is also reasonable."); Rogers v. Cofield, 935 F. Supp. 2d 351, 371 (D. Mass. 2013)("The .20 hours expended on writing the email is reduced to .10 hours to reflect the amount of time reasonably spent on the task.").

Further, contrary to defendants' assertion, the Norinsberg Team did *not* bill for review of every email it sent and received. In fact, the Norinsberg group's practice to bill .1 was really to average out the *actual* time it took to respond to the *thousands* of emails it received over the course of this case. Specifically, there were innumerable times that the Norinsberg group did not bill at all for emails that it sent or received, a fact that would have been readily apparent to defense counsel, Alan Scheiner, Esq., had he bothered to look at many of his *own* email

---

[17] This is somewhat peculiar since Ms. Bronsther herself has previously testified in federal court that "generally accepted [billing increments are] *quarter-hour increments*," thereby illustrating the incredulity of her suggestion that .1 billing increments for such tasks are improper. Ambac Assur. Corp. v. Adelanto Pub. Util. Auth., 2013 WL 4615404, at *2 (S.D.N.Y. 2013) (Bronsther objected to the use entries billed in "increments of thirty minutes").

correspondence with counsel, which *never* appeared on the bill. (See e.g. Alan Scheiner emails May 5, 2015, June 2, 2015, June 11, 2015, August 12, 2015, August 31, 2015, Reply Dec., Ex. Q).[18]  Indeed, there were hundreds of emails that the Norinsberg group spent time drafting and/or reviewing that were not included in the bill, or were merely reduced to .1 for billing as a discount, even though they took much longer to review.  For example, on March 11, 2015, June 25, 2010 and August 31, 2015, Ms. Bronsther identifies entries in which Jon Norinsberg and Gerald Cohen both bill for emails that she suggests did not reasonably reflect the time the Norinsberg Team actually spent on these tasks. (See Expert Report Exhibit 7). However, an examination of the *actual* emails exchanged on that date show that the Norinsberg Teams exchanged and reviewed many more emails than they actually billed for. (See Reply Dec., Ex. R). Even a cursory comparison of Mr. Scheiner's email box, alongside the Norinsberg Team time entries, would have shown that Ms. Bronsther's assessment of these "formulaic billing" practices is simply false.

As such, much of what defendants claim to be excessive is in reality a *lower* amount of time than was actually spent reviewing and drafting the thousands of emails sent and received in this case – or at minimum, the overall time averaged out.  See e.g., Townes v. City of New York, 2013 WL 153726, at *3 (E.D.N.Y. 2013):

> The problem with defendants' argument is that even assuming they are correct and these discrete activities should not have each taken up to six minutes, Mr. Harvis was entitled to round up and bill six minutes for each activity, whether it took two minutes or an actual six minutes…this Court's experience on the bench and in practice confirms happens generally, there are lots of times when a lawyer spends a minute or two or three, or even five or ten, and does not make any time entry at all. The practice of rounding to the nearest 1/10 of an hour does not concern me because in the end, it generally averages out.

---

[18] This is only a representative sample of innumerable emails that the Norinsberg Team received and reviewed, but did not include in its billing entries.

Id.

**E.    Defendants' Accusations Regarding the Contemporaneity of Plaintiff's Records Are Baseless and Have Already Been Rejected By the Court.**

As this Court is aware, defendants' "suspicions" regarding plaintiff's alleged failure to keep "contemporaneous" records was already raised, briefed, argued and rejected by this Court before defendants filed their opposition. (Docket No. 586). Nevertheless, the City raises this identical objection based on what they now claim is "additional evidence" of a lack of contemporaneity. However, this "additional evidence" is the *exact same evidence* put before Your Honor in the first instance – namely that certain entries on the Norinsberg Team are similar in description. These arguments fail for the same reasons that they previously did.

As was explained at oral argument, the firms of Jon L. Norinsberg, Esq. and Cohen & Fitch worked together intimately on this case and shared an office for the period of their original retention in this case (i.e., 2010 to 2012) – and even for the period following 2012, the Norinsberg Teams' offices remain next door to each other. Thus, when the efforts were collaborative like this, counsel made an effort to ensure that the descriptions of the work reflected in the hourly records were the same, and therefore "rightfully overlap because the three shared an office at the time *and* worked on the case together."   (Decision, Dkt, 586 at 7). Moreover, these "duplicate" entries are all instances where the parties were not only working together but in fact were *simultaneously* working together (i.e. conferences, meetings, discussing and reviewing evidence together on the *same date and time*). As such, while "the records therefore appear *duplicative*" they are nonetheless "accurate reflections of time spent that do not give rise to an inference that they were not recorded contemporaneously." (Id.). Consequently, "the time spent by two attorneys discussing the case with one another is properly billed" and for

"each to bill time" for a "conference [that] seems [to] have been a meeting between the two" is not a basis for reduction. <u>Bridges</u>, 1996 WL 47304 at *6-7; <u>Johnson</u>, 2016 WL 590457 at *4 (where "legal teams [are] conducting [the] litigation some duplication is unavoidable."). Accordingly, since the City has "thus far been unable to point to any particular records or evidence tending to show the records are not contemporaneous," and has simply regurgitated the same arguments previously made on this very issue, any request to reduce or deny fees on this basis should be rejected. (<u>Id</u>.).

The only other "evidence" the City points to is, quite simply, no evidence at all. While the City presumably refers to their "expert" opinion as being the "additional evidence," that "opinion" is nothing more than a parroting of the exact same arguments that defendants made in the first instance – and indeed highlights the same entries that were put before this Court at that time.[19] For example, defendants and their expert opine as "suspicious" certain entries showing counsel "doing the exact same thing independently for the exact same amount of time."[20] (Def. Mem. at 46). To be clear, out of 3,242 entries – solely for the Norinsberg team – defendants and their "expert" have pointed to 27, or .008% of the total entries, where this has occurred. Moreover, of those 27 entries, 11 of them are indeed group collaborative tasks such as "Revised and help draft proposed AEO stip w[ith]…[members of the Norinsberg Team]"; Read and Review of defendants letter to quash and discussion w[ith] [members of the Norinsberg Team]"; and, "Review of witness/exhibit list and discuss with [members of the Norinsberg Team]." (Expert Rep. at 53). Consequently when these 11 entries are removed, the occurrence of this

---

[19] Indeed even defendants "expert's" opinion equivocates in her conclusion regarding contemporaneity, stating that the Norinsberg Team "did not record their own time *and/or* keep their contemporaneous records."

[20] Defendants also point to a single date of 8/9/10 to suggest that it was "standard operating procedure [for] counsel [] to have met or communicated about virtually every event occurring that day." Not only is reference to this single day of billing grossly insufficient to establish a "standard operating procedure," but that argument is neither relevant nor probative of their contention that the records were not kept contemporaneously.

"suspicious" activity amounts to 16 of the total entries – or *less than half of a percent* (.0049%). In other words, defendants have raised no objection regarding contemporaneity for over *99%* of counsel's time entries.    In light of this fact, defendants' rank speculation and false accusations should be rejected by the Court.[21]

## VII.   DEFENDANTS' PROPOSED REDUCTIONS AMOUNT TO IMPERMISSIBLE DOUBLE-COUNTING.

### A.   Defendants Seek to Penalize Plaintiff's Counsel Twice For the Same "Flawed" Entries.

Defendants propose drastic reductions of the total hours (globally over 65%) submitted by plaintiff in the form of a 15% across-the-board percentage reduction for alleged issues such as block billing, vagueness, and other deviations from "acceptable billing practices"; 50% across-the-board reductions for other purported errors in billing judgment; and then specific hourly reductions for certain claims and for certain activities (i.e. claims against medical defendants and "media activities"). In addition, defendants then propose large reductions in the proposed billing rates of all counsel and their staff.  In total, these reductions multiplied by the proposed hourly rate reductions amount to a 78% reduction in the total fees sought in connection with this case – an unprecedented amount where plaintiff's success is undisputed. See e.g., Bivins v. Wrap It Up, Inc., 548 F.3d 1348, 1352 (11th Cir. 2008) ("[T]he district court erred in adjusting the lodestar downward by 50%. Such an adjustment is warranted *only* if the plaintiff was partially successful in his claims.") (emphasis added). Thus, it is clear that defendants' are proposing reductions upon reductions for the same time entries, which is clearly impermissible.

---

[21] We wish to reiterate, however, that if the Court has any concerns about the contemporaneity of our time entries, all members of the Norinsberg Team are willing – as we previously stated in open Court -- to submit our handwritten timesheets for the Court's *in camera* review.

This same flawed analysis is found throughout Ms. Bronsther's report. For example, Ms. Bronsther alleges that approximately 270 hours of the Norinsberg Team's bill should have been allocated exclusively to the Medical Defendants and should not be compensated. In support of this assertion, Ms. Bronsther lists the specific entries that she claims can only be attributed to work done against the Medical Defendants. (See Expert Report at 28 and Exhibit 3). However, upon examination of these entries, it becomes apparent that many of the *same entries* are then used again in other the sections of the report as support for other alleged deficiencies. For example, in Exhibit 3 (Billing for Medical Defendants), the report lists "Discussion with JN re: arguments to make in response to JHMC motion" and then that *same exact entry* is used again in Exhibit 10 to show that the Norinsberg group did not use proper billing judgment.

Similarly, Ms. Bronsther lists "Email Response to GC re statements from Jamaica Hospital to Village Voice" in Exhibit 7 to support its claim that the Norinsberg group engaged in formulaic billing, but also includes this same entry in Exhibit 3 as well. (See Report Exhibits 3 and 7). In fact, Ms. Bronsther's report is replete with this type of double counting "deficiencies" in the bill. Worse still, the report also purports to show the percentage of the aggregate bill each alleged deficiency represents.  Such *ad hoc* calculations using the same time entries over and over again – but labeling them differently – is emblematic of the deeply flawed analysis that Ms. Bronsther has conducted. Accordingly, the Court should disregard Ms. Bronsther's report in its entirety, or, at minimum should reject such proposed reductions as impermissible double counting – i.e.  "penalizing [counsel] twice for the same entry." Hernandez v. Grullense., 2014 WL 1724356, at *9 (N.D. Cal. 2014), appeal dismissed (July 2014); De La Riva Const., Inc. v. Marcon Eng'g, Inc., 2014 WL 794807, at *7 (S.D. Cal. 2014) (granting reconsideration regarding plaintiff's claim of double counting because "upon further review of the billing records, it

appears that certain billing entries totaling 11 of Mr. Andrade's hours were reduced for *both* excessive deposition times *and* for block billing."); Delph v. Dr. Pepper Bottling Co. of Paragould, 1997 WL 16067, at *1 (E.D. Mo. 1997), aff'd, 130 F.3d 349 (8th Cir. 1997)("the court should not engage in 'double counting' by considering essentially the same factors twice to arrive at a total award."); Deocampo v. Potts, 2014 WL 788429, at *5 (E.D. Cal. 2014)("The Ninth Circuit has explicitly *admonished* courts that imposing this sort of *double penalty* on billed hours is *improper*.").

      **B.**      **Defendants Seek Across-the-Board Percentage Reductions on Top of the Reductions Already Made for Work That is Claimed to be Non-Compensable.**

A similar problem arises in the context of specific hourly reductions *in addition to* percentage reductions.  Specifically, defendants propose that the court impose *both* specific reductions to the number of hours spent on certain issues, claims and defendants and also proposes *two* across-the- board percentage reductions.  The inherent flaw in this calculus – apart from the substance of the requested reductions – is that where a district court finds that certain hours were unreasonable, it may *either* "exclude these hours from the calculation of fees, *or* impose an across the board percentage cut." Perez v. Siragusa, 2008 WL 2704402, at *8 (E.D.N.Y. 2008). However, "the district court may not use *both* methods (hour-by–hour analysis and an across-the-board cut), as this may result in *double discounting* of the requested hours." Jackson v. Jump, No. 2014 WL 10558844, at *3 (S.D. Ga. Sept. 30, 2014); Bivins, 548 F.3d at 1351-52:

> We conclude that the district court erred in two ways. First, in arriving at the lodestar, the district court conducted both an hour-by-hour analysis *and* applied an across-the-board reduction of the requested compensable hours…the district court is to apply either method, *not both*. The reason for this is easy to understand: by requiring the district court to conduct either analysis instead of both, we ensure

-44-

that the district court does not doubly-discount the requested hours, as was the case here.

Id. (emphasis added).

Accordingly, having requested multiple across-the-board reductions for categories that contain overlapping time entries constitutes impermissible double-counting; and, requesting specific hourly reductions in addition to multiple across the board percentage reductions constitutes impermissible double counting.  Therefore, since the only way to achieve the 78% percentage fee reduction that defendants propose is to manipulate the data presented to this Court, and perform reductions in contravention of the law, defendants' flawed analysis should be rejected.

## VIII. COUNSELS' PROPOSED HOURLY RATES ARE REASONABLE AND COMMENSURATE WITH THE LEVEL OF SKILL AND EXPERIENCE BROUGHT TO BEAR IN THIS CASE.

As will be discussed herein, the Norinsberg Team's hourly rates are reasonable and commensurate with attorneys of their skill, reputation and experience. Defendants' vitriolic attacks on counsel – consisting largely of name-calling and hyperbole – are based on erroneous factual assumptions and improper statements of law, and should be rejected.[22]

### A.    Hourly Rates in the Southern District Are Significantly Higher Than Those in the Eastern District.

First, contrary to defendants' assertions, it is well settled that "the prevailing hourly [in the Eastern District] are *substantially lower*" than those in the Southern District.  Simmons v. New

---

[22] Any argument that any of the attorneys on the Norinsberg Team should receive no fee or a reduced fee or lower rate because they "w[ere] terminated" by plaintiff should be rejected. The fact is that the plaintiff thought so highly of the Norinsberg Team that when it was time to actually try the case, the Norinsberg Team – *of all the lawyers available in New York City* – was the plaintiff's top choice.  Further, all of the cases referenced by defendants apply solely in the context of fee disputes between clients and their discharged attorney and have literally no bearing on plaintiff's right to recover all reasonable attorney's fees in connection with this case especially where there is no dispute between plaintiff and these attorneys and indeed they were *re-hired* and *currently* represent him in connection with this application.

York City Transit Auth., 575 F.3d 170, 172 (2d Cir. 2009) (emphasis supplied); Kauffman v.

Maxim Healthcare Servs., Inc., 2008 WL 4223616, at *9 (E.D.N.Y. Sept. 9, 2008) ("the

Bernbach Law Firm is located in the Southern District of New York where attorneys' hourly

rates are recognized to be higher than in the Eastern District of New York"). Indeed, Second

Circuit has "reinforced a *sharp distinction* in rates for attorneys' fees between these two districts"

such that an attorney Concrete Flotation Sys., Inc. v. Tadco Const. Corp., 2010 WL 2539771, at

*3 (E.D.N.Y. 2010), report and recommendation adopted, 2010 WL 2539661 (E.D.N.Y.

2010)(emphasis added); A.R. ex rel. R.V. v. New York City Dep't of Educ., 407 F.3d 65, 80 (2d

Cir. 2005) ("The same lawyer may be paid at different rates with respect to otherwise identical

legal services provided in cases heard in the Southern District of New York from those at which

he or she is paid with respect to legal services provided in cases heard in the Eastern District of

New York."). Thus there is no real question – despite defendants' suggestion to the contrary –

"that it is more lucrative for plaintiffs' attorneys to file civil rights lawsuits against the City in the

Southern rather than the Eastern District of New York due to higher prevailing rates for

attorney's fees in the Southern District." Legrand v. City of New York, 2010 WL 742584, at *3

(S.D.N.Y. 2010).

     Further, although defendants contend that there is "no case cited by plaintiff (or known to

the City) [that] quantifies the supposed difference, so there is no basis to" quantify this difference

at all, this is both illogical and without merit. Specifically, Simmons – the very case cited by

plaintiff's in their moving brief – contains such a quantification.  In fact the Second Circuit in

that case gave the distinction a precise numerical value – namely, "reduc[ing] the attorney's fee

award by $45,000, [to] *account[] for the difference* between the prevailing rates in the Southern

and Eastern Districts." Siracuse v. Program for the Dev. of Human Potential, 2012 WL 1624291,

at *27 (E.D.N.Y. 2012); <u>Simmons</u>, 575 F.3d at177 (remanding the case the "to reduce the attorney's fees award [of $213,085.25] by $45,000, *which represents the difference* between the prevailing hourly rates of the Southern District and Eastern District.").  As such, since the original award in <u>Simmons</u> was $213,085.25 and the reduction to account for the rate difference was $45,000.00, it is axiomatic that the Southern District rates are 21% higher than those in the Eastern District. This is particularly important in light of defendants suggestion that Messiers Norinsberg and Cohen & Fitch LLP be billed at the same rate as there Eastern District billing rate from *four years ago*, which even *at that time* would have logically been 21% higher in this District.

**B.    Cohen & Fitch LLP's Hourly Rates are Reasonable.**

*Almost four years ago*, both Mr. Fitch and Mr. Cohen were approved at a rate of $325.00 per hour in the *Eastern District*.  <u>See</u> Report & Recomm., <u>Marshall v. Randall, et ano.</u>, 10 CV 2714 (JBW) (VVP) (E.D.N.Y. 2013) (Dkt. No. 103); Order, 10 CV 2714 (JBW)(VVP) (E.D.N.Y. April 9, 2013).  Defendants nevertheless argue that this should remain the billing rate for Cohen & Fitch LLP, an argument, which quite frankly strains the bounds of credibility. Indeed as mentioned previously, under the Second Circuit precedent of <u>Simmons</u>, *even at the time* of the <u>Marshall</u> decision, the fees for Cohen & Fitch LLP would have been 21% higher in the Southern District – namely, $393.25 per hour.  Therefore, it simply defies logic and the law for defendants to even suggest that Cohen & Fitch LLP should be billed at $325 per hour for their work in this case.

Further, since Cohen & Fitch LLP Southern District rate would have been at least approximately $400.00 at the end of 2012, it is not unreasonable to suggests that they command a current rate of $500 as "it is now understood that awarding fees based on current rates is an

-47-

appropriate means of compensating attorneys in protracted litigation such as this." <u>Mugavero</u>, 2010 WL 451045, at *5 (S.D.N.Y. 2010).  This necessarily accounts for the fact that billing rates are "*presumed* [to] increase with the passage of time." <u>Kovach v. City Univ. of New York</u>, 2015 WL 3540798, at *5 (S.D.N.Y. 2015); <u>see also</u> <u>K.F. v. New York City Dep't of Educ.</u>, 2011 WL 3586142, at *2 (S.D.N.Y. 2011), <u>adhered to as amended,</u> 2011 WL 4684361 (S.D.N.Y. 2011)("In each instance of a citation to an hourly rate in a reported decision, the Court has remained mindful of the likely increase in rates during the passage of time since the reported decision and the present."); <u>Moriarty v. Muzyka</u>, 2006 WL 224098, at *2 (N.D. Ill. Jan. 25, 2006)("taking into account the passage of time and the escalation of market rates over the years-firmly support the requested hourly levels"); <u>Fox ex rel. Fox v. Barnes</u>, 2013 WL 4401802, at *3 (N.D. Ill. 2013) ("Indeed, hourly fees often increase over time, both because of inflation and because of the increasing skill and reputation of the attorney, suggesting that *rates higher than those awarded three years ago are appropriate.*")(emphasis added). For example, the court in <u>Arbor Hill Concerned Citizens Neighborhood Ass'n. v. Cty. of Albany</u>, 2005 WL 670307 (N.D.N.Y. 2005)(parallel citations omitted) acknowledged that in a litigation in the *Northern District* that spanned the course of six years – the same length of time as the instance case – the current rates should have accounted for "an increase of approximately 20% over that previously found and reasonably." <u>Id</u>. at *6.  Accordingly, even at what presumably would be considered a moderate increase in the Southern District simply due to the passage of time, Cohen & Fitch LLP's current rates in 2016 versus 2012 should represent a similar 20% increase thereby making their reasonable hourly rate $480 per hour, at minimum.

While defendants have cited the decision in <u>Marisol A. ex rel. Forbes v. Giuliani</u>, 111 F. Supp. 2d 381, 387 (S.D.N.Y. 2000) for the proposition that counsel should "receive fees based

on the average of his or her level of experience over the course of the litigation, as opposed to their current level of experience," this decision is easily distinguishable from the facts of this case. <u>Marisol A.</u>, 111 F. Supp. 2d at 387. Specifically, that proposition derives from situations where the position of the attorney has changed over the course of the litigation and that in such instances attorneys are "not entitled to compensation based on their current positions." <u>New York State Nat. Org. for Women v. Terry</u>, 94 F. Supp. 2d 465, 473 (S.D.N.Y. 2000). Indeed as Your Honor has recognized, the "average" rule is meant to deal with a situation where an "attorney who starts a litigation as a first-year associate and continues with that litigation over the course of a decade, should not then be entitled to be billed out as a tenth-year associate." <u>Davis v. New York City Hous. Auth.</u>, 2002 WL 31748586, at *2 (S.D.N.Y. 2002). Conversely, one "who is billing as a mid-level partner should be billed out at the current rate for mid-level partners as opposed to a sliding scale of fees over the course of the litigation." <u>Id</u>. at *2.

In the present case, Cohen & Fitch LLP's positions have never changed over the course of this litigation, they were and still remain founding partners of a recognized and successful civil rights firm. In addition, defendants cannot simply use years of experience – of which the partners have twelve, not eight as defendants suggest[23] – to establish that Cohen & Fitch LLP should be presumed to be billed at a lower rate since "the number of years before the bar is not the touchstone that determines the worth of an attorney's fee." <u>Pilkington v. Bevilacqua</u>, 522 F. Supp. 906, 909 (D.R.I. 1981). Consequently, "longevity *per se []* should not dictate the higher fee[, and] [i]f a young attorney demonstrates the skill and ability, he should not be penalized…"

---

[23] Defendants attempt to discount as relevant the years of experience the partners of Cohen & Fitch LLP have as prosecutors in the calculation of their fees as if this experience had *no* relevance to their civil rights and/or trial experience. However, it is this law enforcement background that attracts clients to the firm because they possess intimate knowledge of the criminal justice system – from all sides – in a way that many other civil rights attorneys simply do not.

Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714, 719 (5th Cir. 1974) abrogated by
Blanchard v. Bergeron, 489 U.S. 87 (1989); Page v. Astrue, 2009 WL 1798070, at *1 (D.N.H.
June 23, 2009)("an attorney's age would not appear to be relevant to that determination" of their
reasonable fee); City of Riverside, 477 U.S. at 570 ("counsel's excellent performances in this
case entitled them to be compensated at prevailing market rates, even though they were relatively
young when this litigation began."). Indeed "experience and reputation 'are only proxies for
skill'" of which Cohen & Fitch LLP certainly had enough of to attract a client – twice – with
such a highly desirable case as defendants suggest.  George v. GTE Directories Corp., 114 F.
Supp. 2d 1281, 1287 (M.D. Fla. 2000).  Accordingly, Cohen & Fitch LLP's hourly rate should
not be determined – as defendants suggest – simply by referenced to their cumulative years of
experience.

Notwithstanding, there is ample precedent to support an award at the rates requests for
attorneys with commensurate years of experience.  For example, in Restivo, the court awarded
two attorneys with nearly identical – and in one instance fewer – years of experience $500 per
hour in 2015.  See Restivo, 2015 WL 7734100 at *5 (Anna Benvenutti Hoffman compensated at
$500.00, admitted to the bar in 2005; Deborah Cornwall admitted to the bar in 2001).  Indeed,
even Your Honor awarded an attorney with only fifteen years' experience – only three more than
counsel here – $375 per hour twelve years ago. See Davis, 2002 WL 31748586 at *2–3.  Similar
cases in this district have awarded commensurate compensation almost ten years ago. See e.g.,
Wise v. Kelly, 620 F.Supp.2d 435, 447 (S.D.N.Y.2008) (Scheindlin, J.) ($425 for a founding
partner with eighteen years of experience in 2008); Heng Chan v. Sung Yue Tung Corp., 2007
WL 1373118, at *3–4 (S.D.N.Y. May 8, 2007) (Lynch, J.) ($450 an hour for partner at private
firm with sixteen years of experience in 2007).

Thus, despite their comparably fewer *years* of experience than some of the other attorneys in this case, Gerald M. Cohen and Joshua P. Fitch's requested hourly rate of $500 is commensurate with attorneys of their *skill* who possess a similar *extent* of relevant civil rights litigation experience and expertise.[24] See, e.g., Adorno, 685 F. Supp. 507 ("A rate of $550.00 is also consistent with rates awarded in this district for experienced civil rights lawyers."); See also Zahrey v. City of New York, et al., 98 Civ. 4546 (DCP) (JCF), Report and Recommendation, dated June 8, 2010 (Docket No. 264) (awarding experienced criminal defense attorney, who had litigated *only* 20 civil rights claims in his career, a billing rate of $575.00 per hour in 2010); Scott v. City of New York, 643 F.3d 56, 59 (2d Cir. 2011) (holding $550 per hour rate in FLSA case to be reasonable); Barbour, 788 F.Supp.2d at 225 (awarding rate of $625 to experienced civil rights litigator); Rozell v. Ross-Holst, 576 F. Supp. 2d 527, 546 (S.D.N.Y. 2008)(awarding $600 per hour partner in employment discrimination case); Robinson, 2009 WL 3109846, *5 (S.D.N.Y. 2009) (approving 500 per hour for a partner in 2009 in an employment litigation case); DeCurtis v. Upward Bound Intern., Inc., 2011 WL 4549412 (S.D.N.Y. 2011) (approving $550 for a partner in labor and employment litigation); LV v. New York City Dep't of Educ., 700 F. Supp. 2d 510, 519 (S.D.N.Y. 2010) (finding $600 per hour a reasonable rate for experienced litigators).

---

[24] To the extent that defendants claim that hourly rates need to be supported with evidence of bills from paying clients, this argument is a non sequitur because "the determination of a reasonable hourly rate "is not made by reference to the rates actually charged the prevailing party." Welch v. Metro. Life Ins. Co., 480 F.3d 942, 946 (9th Cir. 2007); Bjornson v. Dave Smith Motors/Frontier Leasing & Sales, 578 F. Supp. 2d 1269, 1286 (D. Idaho 2008) ("The determination of a reasonable hourly rate is guided not by the rates actually charged").

C.    **Given Mr. Norinsberg's Outstanding Track Record of Multiple Million Dollar Verdicts, His Proposed Billing Rate Is Reasonable and Well Supported by Existing Law.**

Defendants acknowledge that Mr. Norinsberg has "significant experience in the field of civil rights litigation," is "successful and competent" and has "substantial" litigation experience. (Def. Mem. at 53, 61).   Nonetheless, defendants insist that Mr. Norinsberg's hourly billing rate should be reduced to $400.00 – the same rate he was awarded *four years* ago in the Eastern District – because he is "no Barry Scheck."   (Id. at 61).   Yet, apart from this improper *ad hominem* attack, defendants' argument fails on the merits. Mr. Norinsberg has an outstanding track record of success, and a reasonable paying client most certainly would (and in this case, *did*) seek out his talents to handle this complex and challenging trial. Since 2011, Mr. Norinsberg has obtained *five* verdicts in excess of one million dollars.[25]   In 2013 alone,  Mr. Norinsberg obtained two multimillion dollar civil rights verdicts  – one for $7,724,936  dollars and one for $2,474,000 – both of which made the New York Law Journal's list of top verdicts in the entire State of New York for that year.  In fact, both the Guzman verdict and the Morse verdict made the *top five* list of all government verdicts for the State of New York for the year of 2013. Defendants wholly fail to mention such accomplishments in their attack on Mr. Norinsberg.

i.    **Mr. Norinsberg Was Awarded $550 An Hour in the Southern District in 2015.**

Defendants argue that the proposed billing rate for Mr. Norinsberg ($600.00 per hour) is "excessive," and that a rate of $400 per hour should be awarded. (Def. Mem. at 53). However, in April 2015, Mr. Norinsberg received a $550 per hour award in the Southern District in an Order by the Honorable Lorna Schofield. (See Norinsberg Decl., Ex. A, Order, dated April 20, 2015).

---

[25] Most recently, on April 12, 2016 Mr. Norinsberg won a $1,200,000.00 verdict in Manhattan Supreme Court in Balfour v. Quest Diagnostics, et. al., Index No. 106531/11, an employment discrimination action.

Defendants seek to minimize the importance of this Court Order – referencing it once only via footnote (n. 53) in their 73 page brief – by suggesting that the award of $16,107.50 was too "minuscule" to contest. (id.). However, $16,107.50 is *not* "minuscule" by any standard. See Millea v. Metro N. R. Co., 658 F.3d 154, 168 (2d Cir. 2011) ("The $612.50 award was not de minimis"). The fact of the matter is that the City of New York – represented by the same office as Mr. Scheiner – had an opportunity to contest Mr. Norinsberg's billing rate of $550.00 per hour, but chose not to do so. The City's failure to challenge this $550.00 billing rate is an implicit concession that this was an *appropriate billing rate* for Mr. Norinsberg in the Southern District in 2015. Accordingly, any determination of Mr. Norinsberg's billing rate should be based on the $550.00 an hour rate ordered by Judge Schofield in 2015, not the $400.00 billing rate ordered four years ago in the Eastern District.

> **ii.   The Stanczyk Hourly Rate Was Fact-Specific And Should Be Disregarded.**

Defendants' argue that Stanczyk v. City of New York, 990 F.Supp. 2d 242 (E.D.N.Y. 2013) militates against the proposed rate here. (Def. Mem. at 61). However, this same argument was made – and rejected – in O'Hara v. City of New York, et. al., 11 Civ. 3990 (TLM) (RML) (March 16, 2015 E.D.N.Y.) ("Defendants' reliance on Stanczyk v. City of New York is misplaced ... The Stanczyk decision, as plaintiff argues, is *fact-specific* ....") (emphasis supplied). Moreover, in Stanczyk, Judge Block actually agreed that Mr. Norinsberg's billing rate in the Eastern District in 2013 would *normally* have been $450.00 per hour. Stanczyk, 990 F.Supp. 2d at 248 ("[C]ounsels' requested hourly rates are consistent with prevailing rates in this district for attorneys of similar experience and skill.") (citations omitted). Further Judge Block noted that "Norinsberg is a seasoned civil rights litigator with over 20 years of experience. During his career, he has successfully litigated over 200 § 1983 cases." Id., 990 F.Supp. 2d at 254, n.2.

However, Judge Block concluded that Mr. Norinsberg's  $450.00  hourly rate required a "*downward adjustment*" in that particular case, due to plaintiff's counsel's alleged "failure to provide the jury with any monetary semblance of guidance" and his alleged "laissez-faire summation."[26] (Id., 990 F. Supp. 2d at 248) (emphasis supplied).

In the instant matter, *none* of the factors that the Court considered Stanczyk are applicable.  As Magistrate Judge Levy concluded, the Stanczyk holding is "fact specific" and has no application whatsoever to this case.  O'Hara, 11 Civ. 3990 (TLM) (RML).

### iii.    Defendants' *Ad Hominem* Attacks on Mr. Norinsberg and Innuendo About His "Reputation" Are Improper and Baseless.

Rather than acknowledge Mr. Norinsberg's outstanding track record, defendants resort to defamatory attacks on Mr. Norinsberg, casting aspersions about his alleged "reputation" in the legal community. (Def.  Mem. at 61)  Not only is this *ad hominem* attack improper, it is utterly baseless. If anything, Mr. Norinsberg enjoys a *stellar reputation* in the legal community.  In fact, Mr. Norinsberg is often sought out by other highly experienced attorneys for his advice and judgment on complex legal issues and trial matters. Most tellingly, Mr. Norinsberg was recently recognized – for the first time in his 25 year career – as a "Superlawyer" in New York in the field of civil rights litigation.  Mr. Norinsberg did not seek out this recognition, and had *nothing to do* with the selection process. Rather, this selection was made by his peers in New York City who have come to recognize Mr. Norinsberg as a preeminent and highly successful attorney in the field of civil rights litigation. Since 95% of the attorneys in New York City did *not* receive this distinction (as the City implicitly acknowledges, Def. Br. at 61, n.62), Mr. Norinsberg is honored to have received such professional recognition by his peers.

---

[26] This impression was not shared by defense counsel, Andrew Wenzel, Esq., who described Mr. Norinsberg's summation as having "a lot of energy," and "a lot of emotion," and altogether a "very seasoned summation."

### iv.     Mr. Norinsberg's Practice Is Devoted Almost Exclusively to Federal Civil Rights Cases.

Defendants argue that Mr. Norinsberg "does not practice exclusively in the area of civil rights, and appears [to] have a very active practice in the area of medical malpractice and state court torts," (Def. Mem. at 53). However, as *defendants well know*, Mr. Norinsberg's practice is devoted almost exclusively to civil rights cases in Federal courts. (Norinsberg Decl., ¶9). Indeed, as Your Honor noted four years ago,  "Jon L. Norinsberg is a civil rights attorney with nearly twenty years of civil litigation experience, including civil rights litigation against state and local governments," and is "competent and experienced in federal class action and federal civil rights litigation."). Stinson v. City of New York, 2012, U.S. Dist. LEXIS 56748 *31 (S.D.N.Y. 2012). Further, "[d]uring his career, [Mr. Norinsberg] has successfully litigated over 200 § 1983 cases," Stanczyk, 990 F.Supp. 2d at 254, n.2.

To the extent that defendants argue otherwise, defendants erroneously conflate Mr. Norinsberg's extensive t*rial experience* with the specialty areas of his law practice.  Yet, the vast scope of Mr. Norinsberg's trial experience – which includes not only civil rights cases, but also medical malpractice cases, trademark cases, employment discrimination cases, and products liability cases – cannot possibly be a basis for *lowering* Mr. Norinsberg's billing rate.  To the contrary, such extensive trial experience only further supports Mr. Norinsberg's requested hourly rate, as few civil rights attorneys in New York, if any, have a comparable level of  trial experience, much less the same track record of success that Mr. Norinsberg has enjoyed.

### v.     Mr. Norinsberg's Proposed Billing Rate is Well Within the Range of Rates Upheld in the Southern District.

Mr. Norinsberg's proposed rate is *well within* the range of fees which have been upheld by Courts in the Southern District for experienced civil rights attorneys with Mr. Norinsberg's

resume and track record.  <u>See, e.g.</u>, <u>Restivo</u>, 2015 WL 7734100 at *3 (Awarding $700 an Hour to senior partners based on, *inter alia,* "the market for legal services in the Southern District of New York, which supports a $700 per hour rate for senior partners."); <u>Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.</u>, 2011 WL 1002439, at *5 (S.D.N.Y. 2011) aff'd, 483 F. App'x 634 (2d Cir. 2012) (approving an hourly rate of $761 for a senior partner in a case about compelling arbitration); <u>Rozell v. Ross-Holst</u>, 576 F. Supp. 2d 527, 546 (S.D.N.Y. 2008) ("Based on all of these factors, a reasonable rate for partners and counsel is $600"); <u>Barbour v. City of White Plains</u>, 788 F. Supp. 2d 216, 226 (S.D.N.Y. 2011), <u>aff'd</u>, 700 F.3d 631 (2d Cir. 2012) (upholding billing rate of $625.00 per hour, and finding that plaintiff's attorney's rate "within the range of rates paid to civil rights lawyers in the Southern District of New York of similar skill and experience");[27] <u>Rozell</u>, 576 F. Supp. 2d 527 (upholding billing rate of $600.00 per hour); <u>Adorno</u>, 685 F. Supp. 2d 507 (awarding $550.00 per hour to an "experienced civil rights lawyer"); <u>Wise</u>, 620 F. Supp. 2d 435 (S.D.N.Y. 2008) (awarding civil rights litigator with 18 years of experience a rate of $425 hour).

In sum, while the City claims that Mr. Norinsberg "is no Barry Scheck," (<u>id</u> at. 61), he nevertheless is a highly experienced, widely regarded civil rights practitioner – as noted by the New York Law Journal and Super Lawyers – as well as a highly successful trial attorney, who routinely wins multi-million dollar verdicts. As such, Mr. Norinsberg should be awarded $600 an hour for the work performed on the instant matter.

### D.    The Proposed Billing Rate of Mr. Meehan is Reasonable.

While defendants argue that Mr. Meehan's billing rate should be $250 an hour, Mr. Meehan was awarded $300 an hour in 2015 by the Hon. Lorna Schofield. (<u>See</u> Ex. A, Order,

---

[27] Mr. Norinsberg actually has two years more experience in the field of civil rights litigation than the plaintiff's attorney in Barbour, Michael Spiegal, Esq.

dated April 20, 2015). Mr. Meehan's requested hourly rate is $350.00 an hour, which is consistent with the rates awarded in the Southern District for associates with comparable experience. See, e.g., Nautilus Neurosciences v. Fares, 2014 WL 1492481, at *2–3 (S.D.N.Y. 2014) (approving hourly rate of $337.50 for an associate with three years of experience); Canada Dry Delaware Valley Bottling Co. v. Hornell Brewing, Inc., 2013 WL 6171660, at *2– 3 (S.D.N.Y. 2013) (approving hourly rates of $330–350 for a New York-based fifth year associate); Kim, 2014 WL 2514705 at *2 (awarding $300 to a third-year associate). See also New York Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc., 657 F.Supp.2d 410 (S.D.N.Y. 2009) (noting that $300 for an associate was "commensurate with those generally charged for similar work in this district" in the year 2009).

Mr. Meehan has tried multiple civil-rights cases to verdict in the Southern District. See Correjter v. Port Authority of New York and New Jersey et. al., 11 Civ. 7847 (PGG), Norwood v. City of Yonkers, et al., 12 Civ. 8828 (LMS). Mr. Meehan has also had an active role (i.e., questioning witnesses, handling charge conferences, drafting motions *in limine*) in nine different trials where Mr. Norinsberg was lead counsel. Accordingly, a reasonable paying client would pay $350 an hour to retain Mr. Meehan's services, especially preparing for trial, the area in which the majority of Mr. Meehan's work on the instant matter took place.[28]

---

[28] As defendants have conceded in their opposition, Ms. Bursztyn should receive $125 an hour. Ms. Bursztyn was previously award $125 an hour in Marshall. As such "the City allows for a $125 rate [] for Bursztyn." (Def. Mem. At 68, n. 73). Accordingly, as her rate is unopposed, Ms. Bursztyn should be awarded $125 an hour.

**CONCLUSION**[29]

**WHEREFORE**, plaintiff respectfully requests that this Honorable Court grant plaintiff's

motion for attorneys' fees, costs[30], and expenses, plus New York statutory interest at a rate of

9% running from October 16, 2015.[31]

Dated: New York, New York
April 29, 2016

Respectfully submitted,

_____/S_____
JOSHUA P. FITCH
GERALD M. COHEN
COHEN & FITCH LLP

---

[29] On April 26, 2016, all plaintiffs' counsel requested permission to file separate, oversized briefs in connection with their respective replies to defendants' voluminous submissions, including a 73-page opposition brief and a 195-page expert report. (Docket No. 617). At the time of this filing, however, plaintiff's application is still pending. If this Court should deny or otherwise impose limitations on plaintiff's reply in connection with that application that should have affected the length or format of this brief, plaintiff respectfully requests permission to re-file this reply in accordance with any such ruling.

[30] Since the only challenge mounted against the 3,800.00 in costs by Cohen & Fitch LLP is a lack of documentation, a copy of the Veritext bill is attached hereto.  See Reply Dec., Ex. S.

[31] Since the "district court cases examining this question have concluded that disputes over federal settlements, even those that resolve federal claims, are 'quintessentially...of contractual interpretation and performance and wholly governed by state law.'"  Brown v. City of New York, 2012 WL 628496, at *2 (E.D.N.Y. 2012) report and recommendation adopted, No. 09-CV-1809, 2012 WL 626395 (E.D.N.Y. 2012); Frenkel v. New York City Off–Track Betting Corp., 611 F.Supp.2d 391, 396–97 (S.D.N.Y.2009)(characterizing plaintiff's claim for breach of a federal settlement as "alleg[ing] a state law breach of contract claim").  Therefore, since "'usual rules of contract construction' apply to a Rule 68 offer of judgment[,] [and] State law applies to the interpretation of contracts generally, even if the underlying cause of action is federal" the interest rate on any fee award in this case must apply the New York statutory rate of 9% from October 16, 2015. Espinosa v. Wells Fargo Bank, N.A., 2014 WL 1017912, at *1 (Bankr. D. Or. 2014); Cronin v. Executive House Realty, 1982 WL 1303, at *15 (S.D.N.Y. 1982) ("in New York, the statutory rate of postjudgment interest is 9%,"); CARCO GROUP, Inc. v. Maconachy, 718 F.3d 72, 88 (2d Cir. 2013)("interest on any attorneys' fees awarded [] [] should be calculated from the date on which Carco was found to be the prevailing party.").

Attorneys for Plaintiff
233 Broadway, Suite 1800
New York, N.Y. 10279
(212) 374-9115
gcohen@cohenfitch.com
jfitch@cohenfitch.com

JON L. NORINSBERG
Attorney for Plaintiff
225 Broadway, Suite 2700
New York, New York 10007
(212) 791-5396
Norinsberg@aol.com

59