**Long Island Behavioral Medicine, PC**
1727 Veterans Memorial Highway – Suite 300
Islandia, NY 11749
Phone: 631-656-0472
Fax: 631-656-0634

September 18, 2014

Robert Devine, Esq.
Ivone, Devine & Jensen, LLP
2001 Marcus Avenue – Suite N100
Lake Success, NY 11042

Dear Mr. Devine:

1. I have been asked by the firm of Ivone, Devine & Jensen, LLP, attorneys for Isak Isakov, M.D., to give my opinions with regard to the psychiatric care given to Adrian Schoolcraft, a patient at Jamaica Hospital Medical Center. I have reviewed multiple records including the Jamaica Hospital Medical Center chart, the depositions of various individuals including Adrian Schoolcraft, Dr. Aldana-Bernier and Dr. Isakov, the report of plaintiff's psychiatry expert, Dr. Roy Lubit, and the Complaint in this matter. After the review, I have come to the conclusion that the care rendered by Dr. Isakov was excellent and conformed to good and accepted medical and psychiatric practice.

2. The grounds for my opinions are set forth herein. The record of Jamaica Hospital Medical Center demonstrates that on the evening of 10/31/09, police officers in the New York City Police Department brought the plaintiff Adrian Schoolcraft, age 34, also a New York City police officer, to Jamaica Hospital Medical Center in

1

handcuffs. Reportedly, the police had gone to the patient's home requesting him to come back to the precinct, which he refused. He went into his apartment and refused to obey the order of the police to open his door. He eventually ran away and had to be chased down and upon his capture, was brought to the medical emergency room of the hospital where he stayed until he was transferred to the psychiatric emergency room on 11/2/09. He was seen by Dr. Aldana-Bernier, an attending psychiatrist practicing at that hospital on 11/3/09. Dr. Aldana-Bernier, according to the record, wrote that the patient was a danger to himself or others and the patient was confined to the psychiatric unit for treatment and observation. On the following day, 11/4/09 the patient was seen and evaluated by Isak Isakov, M.D., also an attending psychiatrist who practiced at Jamaica Hospital. The patient refused to give Dr. Isakov information that he requested in conducting a psychiatric assessment and refused to give Dr. Isakov an authorization to speak to the psychologist of the New York City Police Department, who had previously conducted a psychological evaluation and recommended that the patient be placed on desk duty and that his gun be taken from him. He refused to give Dr. Isakov information as to the reason or reasons that his gun was taken from him.

3. A review of the hospital record indicates that the patient was reported to exhibit signs of paranoia, agitation, psychosis, anxiety and stress that he was unable to deal with. He stated, in substance, that the police, including his superiors in the Police Department, were out to get him. He appeared suspicious and did not cooperate with Dr. Isakov in providing him with answers to the questions that he asked, thereby

2

making it difficult to evaluate the versions of the events. It was not possible at that time for Dr. Isakov to determine if the reported fears that the department was out to get him were true or if they were delusional. In addition, it was reported that the patient had acted bizarre, was agitated, paranoid and combative. The history was consistent with someone who was delusional or who was decompensating in the setting of severe, catastrophic stress. It is my opinion that Dr. Isakov was justified in making his clinical judgment to continue the confinement of this patient under the circumstances that existed at the time. He was justified in considering the information in the hospital record, including statements made by police officers that the patient locked himself in his apartment and refused to open the door when the police directed him to do so; that he ran away from them and had to be chased down and put into handcuffs; and that the patient, himself a police officer, had to be brought to the hospital by force, arriving in handcuffs, at the hospital. Dr. Isakov had the right to consider evaluations by other medical personnel and other psychiatrists with respect to their opinions regarding this patient. He had the right to consider the fact that the patient refused to give him the information that he needed to make his evaluation. He had the right to consider the fact that the patient was reported to be engaged in bizarre conduct; emotionally unstable; suspicious and exhibited possible symptoms of psychosis; appeared paranoid, and acted paranoid, making statements that the police were out to get him. He had the right to consider his own observations of the patient and the fact that the patient would not name a family member on that first day that Dr. Isakov saw him, who could confirm

3

that the patient did not have a past psychiatric history. It is my opinion that Dr. Isakov, considering all the circumstances, including the entries in the record, was well justified and conformed to accepted medical and psychiatric practice in reaching a clinical judgment to keep the patient in the hospital for observation and treatment. This would be a benefit to the patient if he was delusional or if he was under severe stress to help remove some of that stress, where he would be in a safe environment with the hospital staff caring for him and ready to intervene if necessary. In addition, there was the opportunity to clarify further if he was delusional or reacting to severe stress and to develop the proper treatment and support plan to assist him in the hospital and after discharge.

4.  It is my opinion further that the bizarre conduct of the patient, his refusal to cooperate with the psychiatrist evaluating him at the time, his symptoms of paranoia and psychosis with statements demonstrating both conditions, as well as his appearance of being under stress and agitation, was conduct that demonstrated that this patient was a danger to himself which authorizes his involuntary commitment under Section 9:39 of the Mental Hygiene Law of the State of New York.

5.  I have treated hundreds of police officers with post-traumatic stress disorder, depression, and other conditions related to the duties that police officers must perform on the job. They are in a stressful environment and can be called on to make instantaneous decisions regarding life and death. This stress can cause anxiety, depression, agitation, suicidal thoughts and behaviors. In my opinion it would have

4

been a departure from good and accepted medical and psychiatric practice for Dr. Isakov to discharge this patient. There was no family member or other person known to Dr. Isakov, who could give the patient the level of daily observation, support and assistance available on an inpatient psychiatric unit. He lived alone. He was emotionally unstable at the time. With symptoms of paranoia and psychosis, the danger to an individual if he were discharged would be significant.

6. There was no obligation on the part of Dr. Isakov to interview every police officer who had brought the patient to the hospital himself. He was justified in reading the statements made by police officers to others as reflected by the hospital record. The patient refused to authorize Dr. Isakov to speak with the psychologist from the police department who had recommended that Mr. Schoolcraft have his firearm taken from him. The hospital record indicates that a social worker who was part of the inpatient evaluation and treatment team with Dr. Isakov contacted the police psychologist but was given no information with regard to the patient. Dr. Isakov understandably wanted to know the reason that the psychologist felt that the patient should have his firearm taken from him. Did she feel that there was a danger that he would use it on himself, or others? When she saw the patient, she recommended that he be treated for the stress that he was under at the time. He did not do so. Dr. Isakov was in a position at the time where he was trying to evaluate whether the patient had realistic complaints or delusional concerns. It is to the patient's interest under these circumstances, to be in a safe environment, while all these issues are sorted out.

7.      On November 5, 2009 Dr. Isakov engaged in a conference with the father of the patient, the patient, and a representative from Internal Affairs from the Police Department. The patient did not appear as symptomatic that day as he had the previous day. The patient's father confirmed that the patient did not have a previous psychiatric history on that day, as well. It was appropriate, for the continuation of psychiatric care for the patient, particularly given the severe stress that he was facing, to have the patient evaluated after he would be discharged, by a competent psychiatrist, within a reasonably short time following discharge from the hospital. The patient was told that if he would see a psychiatrist in the Jamaica Hospital clinic, within a short time after discharge, he would be discharged on 11/5/09. The patient refused. However, on the following day, where an arrangement was made for evaluation by a psychiatrist shortly after discharge, in fact the patient was discharged on that day, 11/6/09.

8.      In all, it is my opinion stated with reasonable medical certainty, as are all the opinions expressed above, that the evaluation, care and treatment of this patient by Dr. Isakov conformed to good and accepted medical and psychiatric practice, and was not a competent producing cause of any injury or damage to the patient. With a patient suffering from symptoms of stress, emotional instability, paranoia, and psychosis, he benefitted from continued confinement in the hospital with observation by trained personnel, so that he calmed down, gave Dr. Isakov the information he needed on the second day under his care, had his father present to confirm a negative psychiatric history and provided support for the patient so that, with continued psychiatric care

6

available shortly after discharge, the hospitalization of this patient in the interim, benefitted him to a substantial degree.

9. My curriculum vitae is attached.

Very truly yours,

Frank Dowling, M.D.