1

**Laurence R. Tancredi, MD, JD**
129-B East 71st. Street
New York, N.Y. 10021

September 18, 2014

Paul F. Callan, Esq.
Callan, Koster, Brady & Brennan, LLP
One Whitehall Street
New York, NY 10004

Re: <u>Liliana Aldana-Bernier, M.D. adv. Adrian Schoolcraft</u>
    Your File No.: 090.155440

Dear. Mr. Callan:

    I have reviewed portions of the Jamaica Hospital records available to Dr. Liliana Aldana-Bernier at the time she examined the plaintiff Adrian Schoolcraft. In addition, I have reviewed relevant portions of her deposition transcript, and the report of the Plaintiff's expert, Roy Lubit, MD, Ph.D.

    Dr. Liliana Aldana-Bernier evaluated the Plaintiff, Adrian Schoolcraft, at the Jamaica Hospital on November 1, 2009, and on the basis of her review of the following she concluded that he should be admitted to the hospital:

    1. EMS records and those from his evaluation in the Medical Emergency Room. Mr. Schoolcraft was brought into the Medical ER of Jamaica Hospital on October 31, 2009, by members of the New York Police Department. Early that day he had an altercation with an officer, felt threatened, and claiming that he was not feeling well with abdominal pain and discomfort, left his job prior to completion of his shift. Members of the NYPD went to his home, where he had barricaded himself in his room. Apparently the policemen were able to gain entrance into his room. One version is that they broke down the door; a second states that the police got the landlord to open the door. In any case, he was requested to accompany them to the precinct. He refused, whereupon the police put him in handcuffs and involuntarily had him taken to the emergency room of Jamaica Hospital for evaluation.

    The records revealed that he was bizarre in his behavior, uncooperative, suspicious, guarded and agitated before, on entering the hospital and during the medical evaluation. Furthermore, he manifested paranoid thinking. After medical clearance, a psychiatrist evaluated him and transferred him to the Psychiatric Emergency Room with a tentative diagnosis of psychosis NOS.

2. Dr. Aldana-Bernier, who was the Director of the Psychiatric ER, also read the psychiatric evaluation of the resident, and evaluated Mr. Schoolcraft herself noting his paranoid and persecutory thinking about police conspiracies, cover-ups, and claims that the police were "after him." Her concerns were further augmented by information that six months or more previously he was evaluated by a psychiatrist in the police department and found to be emotionally unstable. As a result, his gun was taken away from him at that time.

She took all these factors into consideration including the realization that as a policeman he would likely have access to weapons, even though his gun had been removed, that he was living alone with few friends or available collaterals, and no doubt further appreciated that he was a big man, estimated 250 lbs, and could be bodily injurious to others, particularly given his compromised mental state and manifested lack of judgment. On the basis of these facts, she concluded that he was a foreseeable danger to himself or others and needed additional time in the hospital for medical stabilization. She committed him under the Mental Hygiene Law Section 9.39, which provides for Emergency Admission when a person is deemed to have a "mental illness for which immediate observation, care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others." The phrase "substantial risk of physical harm" is included in the language of the relevant statute. Underlying these concepts is a notion of "foreseeability".

This law, Section 9.39, allows for 48 hours observation during which time the patient is further evaluated, others are contacted with more time available and a detailed analysis is conducted to determine whether the more "freedom restricting" confinement— that of 15 days following the assessment of a second physician, should be conducted. The Emergency Admission (or commitment) is often done quickly in an emergency room with frequently inadequate information available; it is a judgment call as is the case with any "risk" analysis. There is inevitably uncertainty inherent in risk assessment. (See: Buchanan A.; R. Binder; M. Norko et al: Psychiatric Violence Risk Assessment; *Am J Psychiatry* 2012, 169: 340 ff. for a detailed discussion of the conceptual problems of risk assessment): On the other hand, where factors, such as those in this case, lead to a reasonable conclusion by the clinician that there is foreseeable "substantial" risk of harm to self or others, it is essential to minimize serious adverse outcomes and, therefore, commit the individual.

Dr. Aldana-Bernier's deposition reveals a general knowledge about Section 9.39 of The Mental Hygiene Law. She showed that she understood the limited applicability of that law, the importance of "dangerousness" to self and others, and her understanding that she must do at that moment of decision-making what is best for the patient and for society at large. She made a judgment call that he was potentially (foreseeably) dangerous. And at the time when she did that she was forced to rely on only that information, which was readily available. The very recent history of bizarre behavior, uncooperativeness, paranoid ideation, agitation, general aggressiveness, and verbal confrontation (altercation with the officer earlier on 10.31.09, and cursing in the Medical

3

ER), along with an evaluation of emotional instability resulting in removal of his gun months earlier formed the basis of her triggering Section 9.39 of the Mental Hygiene Law. She demonstrated in this judgment not only an adequate understanding of the law, but in addition a reasonable "judicious" application of the Emergency Admissions standard. Dr. Aldana-Bernier was additionally professional by presenting the case to the Associate Chairman of the Psychiatry Department, Dr. Dhar, who concurred with her analysis and decision for Emergency Admission. It is very important to get a second opinion, the perspective of someone to provide a fresh look at the data, and someone who as a top administrator in the department has likely provided oversight for similar situations.

The diagnosis, Psychosis NOS", was given initially when Mr. Schoolcraft was first seen by the psychiatrist in the ER and subsequently used by Dr. Aldana-Bernier during the period of emergency admission until a final diagnosis of "Adjustment disorder with Anxious Mood". The diagnosis of "Psychosis NOS" was essentially a working diagnosis. This diagnosis was present in DSM-IV-TR, which was the operating handbook for mental disorders in 2009. This diagnosis is not explicitly designated in the most recent DSM-V-TM. The criteria for Psychotic Disorder Not Otherwise Specified (NOS) (DSM-IV-TR # 298.9) states in its general description the following:

"This category includes psychotic symptomatology (i.e., delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder".

Note that not all of the symptoms must be present; in fact one of these, such as delusions, would fit. For example, the description gives the following three illustrations (among others) which in part fit patterns in this case:

1. Psychotic symptoms that have lasted for less than 1 month but that have not yet remitted, so that the criteria for Brief Psychotic Disorder are not met.

2. Persistent nonbizarre delusions with periods of overlapping mood episodes that have been present for a substantial portion of the delusional disturbance

3. Situations in which the clinician has concluded that a Psychotic disorder is present, but is unable to determine whether it is primary, due to a general medical condition, or substance induced.

The presence, therefore of paranoid (persecutory ideation and delusions), in addition to bizarre behavior, suspiciousness and guarded responses, agitation, and aggressive verbal confrontation (the bizarre behavior, agitation etc. may suggest a mood disorder) would most likely fit under the criteria of Psychotic Disorder-NOS

With regards to paranoid thinking and delusions there is no necessity that the objects of the paranoia be extra-terrestrial beings, aliens etc. In fact paranoid delusions most often involve abnormal configuring of the usual objects and images of everyday life into unrealistic systems. Paranoia often involves people in the very existence of an afflicted persons-- for examples, a boss, a lover, a parent or sib. The person suffering from paranoia will place these usual objects into bizarre, and threatening situations and relate the potential danger wholly to themselves. The paranoia expressed by Mr. Schoolcraft--conspiracy of the police, the perception that they are out "to get him"-- is in fact a usual form of paranoid delusion.

CONCLUSION

In effect Dr. Aldana-Bernier's assessment of Mr. Schoolcraft was consistent with a good standard of psychiatric care, including her reliance on the reports of others working in the emergency room and providing supplementary information, such as the police. As an emergency room psychiatrist she is limited in her time for conducting a full investigation of the circumstances surrounding a patient's thinking and behavior. She has a short time to quickly assess the mental status of a patient, and, in particular, to determine if he or she is a danger to themselves or others. This is not an exact analysis by any means. But given the factors that she examined as they combine to form a profile of a disturbed person, she used good judgment admitting the patient for 48 hours to allow for a more extensive gathering of the facts and a period of stabilization for a better opportunity to assess the patient's psychiatric condition.

**As a result it is my conclusion that to a reasonable degree of medical certainty Dr. Aldana-Bernier met acceptable standards of psychiatric practice in her evaluation of Mr. Schoolcraft and in her decision to apply Section 9.39 of the Mental Hygiene Law to have him admitted for a 48 hour period for further evaluation and stabilization.**

Sincerely yours,

*[signature]*

Laurence R. Tancredi, MD, JD