**Robert H. Levy, M.D.**
**19 West 34ᵗʰ Street – Suite 1200**
**New York, NY 10001**
**212-562-3440**

Associate Professor of Clinical Psychiatry, NYU School of Medicine
Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Examiners

---

**Expert Report:** Psychiatry
**Date:** August 22, 2014
**Case:** Schoolcraft v. Jamaica Hospital
**Materials Reviewed:**

- Plaintiff's complaint and jury trial demand
- Jamaica Hospital Records
- Depositions: Dr. Aldana- Bernier, Dr. Isakov, Dr. Lamstein-Reiss, E.Hanlon, A Schoolcraft, J. Schoolcraft (plaintiff's father), Dr. Patel, Dr. Levin, Dr. Dhar
- Expert Reports – Dr. Lubit (psychiatry), Dr. Halpren-Ruder (emergency medicine)

**Allegation:** Plaintiff alleges denial of due process concerning his voluntary commitment and medical malpractice (failure to recognize that he was not ill, use of hearsay, inadequate documentation, failure to request proper studies, staff incompetence.) He also alleges negligent hiring, training and retention of staff at Jamaica Hospital.

**Background:** Adrian Schoolcraft worked as a New York City police officer for approximately seven years, beginning 07/02/02. He was first assigned to the 75ᵗʰ Precinct in East New York and after six months was transferred to the 81ˢᵗ Precinct. The plaintiff has described increasing pressure to produce more summonses and arrests beginning in 2005.

By 2007, he observed concerted efforts to over-report crimes and under-report accidents. He refused to collude in such falsification and was not meeting quotas for arrests and summonses. Until 2008, he had received average evaluations, but was told then that he would receive a poor evaluation for not meeting these quotas, which he described as an "illegal tax on the public." He has reported a pattern of harassment by peers and supervisors and believed that his supervisors might intentionally be placing him in dangerous situations.

In January 2009, he received a failing evaluation, which he appealed. He was subsequently written up for other infractions, which he denies (not being on post, unnecessary conversation with another officer). He was assigned overtime duty on 04/09/09 and called in sick. He went to the emergency room of Forest Hills hospital (LIJ) and received Ativan for extreme anxiety in the context of work and family stressors (father was having various difficulties and mother had died of cancer five years earlier).

-2-

After this Mr. Schoolcraft saw his internist who prescribed Seroquel for insomnia and anxiety, which he took for several nights. His sick day and emergency room visit triggered an evaluation by the police department's district surgeon, who raised the question of malingering.

He referred him to a police department psychologist, Dr. Lamstein-Reiss, who made a diagnosis of stress and anxiety on 04/15/09. In her deposition, she stated that she found him non-psychotic at the time, but did subsequently wonder about this. He was placed on restricted (desk) duty and was required to surrender his gun.

On 10/07/09 he met with Internal Affairs following a referral from a retired lieutenant whom his father knew and who also complained to his union. Mr. Schoolcraft believes that this helped precipitate the events of 10/31/09, which will be described below.

Subsequent to 2009, Mr. Schoolcraft had been living with his father and reports some harassment there from his former precinct. He is involved in litigation against the police department and New York City, which has been widely covered in the news media. He has described a pattern of anxious, avoidant and dysphoric symptoms to Dr. Lubit. He describes an inability to find work apart from odd jobs, which he attributes to the notoriety of his case. He avoids returning to New York City.

Events of 10/31/09: Mr. Schoolcraft was on switchboard duty at his precinct on this date. Unexpectedly, he was asked by his lieutenant to produce his activity log, in which he had been documenting his observations about improper behavior at the precinct. He described to Dr. Lubit that his lieutenant was leaning over him with his gun in an unusual and possibly precarious position and was worried that he would be accused of attempting to take the gun should it have fallen. He called his father who advised him to go home. There was an idiosyncratic statement in his father's deposition about feelings that the patient's deceased mother was somehow warning the patient about his safety.

Mr. Schoolcraft told the desk officer that he was sick and reports that he was permitted to take "loss time." One hour later (3:00 pm) officers arrived at his home and demanded that he return to the precinct, claiming that he could "not just go out sick." He felt afraid of them and was disinclined to allow them in. He told them that he was unwell (he reported nausea and abdominal pain and had also taken some Nyquil) and agreed to their suggestion about an ambulance. The EMTs arrived and noted that Mr. Schoolcraft was quite hypertensive. He agreed to go to Forest Hills Hospital, with which his internist was affiliated. When told that he would be brought to Jamaica Hospital, he returned to his apartment. The police apparently obtained a key from his landlord, although they subsequently alleged to Jamaica Hospital staff that he had barricaded himself in and that they had to break down the door. Mr. Schoolcraft reports that he was reclining on his bed and refused to go with them but that they became aggressive (including slamming him on the floor and stepping on his back, producing bruises that were noted in the Jamaica Hospital emergency room) possibly in the hopes of provoking him to react. He arrived at Jamaica Hospital's emergency room late that evening.

(Schoolcraft v. Jamaica Hospital)

-3-

**Jamaica Hospital Records and Staff Depositions:** Mr. Schoolcraft was received in the medical emergency room on the evening of 10/31/09. He was described as a 34-year-old white male with a sudden onset of epigastric pain. It was also noted that he was brought in by police and EMS due to irrational behavioral (EDP status). There were concerns about the possibility of dangerous gastrointestinal pathology noted on 11/1/09, but he was deemed medically cleared by 11/03/09 with normal labs (and a normal head CT). A psychiatric consultation was obtained on 11/01/09 from Dr. Lwin, with the consultation report co-signed by Dr. Patel. Information was obtained from Sergeant James and from the plaintiff. The police reported that the patient had left work precipitously and that he was agitated and had barricaded himself in his apartment, forcing them to break down the door. They further reported that despite significantly elevated blood pressure he refused to go to the hospital and had to be brought in handcuffed as an EDP.

Moreover, they stated that a prior departmental psychology evaluation resulted in his desk assignment and being forced to surrender his gun. The patient was noted to be agitated, uncooperative and verbally abusive in the medical emergency room. He told Dr. Lwin that he felt the police were against him and persecuting him. He also reported having no close friends. His mental status examination was described as noteworthy for this question of paranoid ideation, an irritable affect and impaired insight and judgment. It was determined that the patient should be transferred to the psychiatric emergency room when medically cleared.

Mr. Schoolcraft was transferred from the psychiatric emergency room and was admitted on a 9.39 status on 11/03/09. The admission note reflected the patient's denial of homicidal and suicidal ideation but articulated concerns regarding dangerousness in the context of his recent behavior and apparent paranoid ideation. Dr. Aldana-Bernier admitted the patient but the patient refused to sign the admission form. The R.N. notes from that date also reported guardedness, paranoid ideation and non-attendance at group activities. Risperidone, 0.5 mg p.o. bid was ordered but was refused by the patient. The patient's father saw him on 11/03/09 and described his as looking "disheveled and confused," although later in the deposition he described the plaintiff as coherent.

A psychosocial history was obtained on 11/04/09 by C. McMahon, C.S.W. Dr. Isakov received Mr. Schoolcraft on the in-patient unit and continued the evaluation process. Mr. Schoolcraft refused to sign the admission form. However, following a meeting with the patient's father and members of the Internal Affairs Bureau, Dr. Isakov was able to understand the patient's issues with the officers and supervisors of his precinct and to see that beliefs that had appeared to be strongly suggestive of paranoia were grounded in fact and that his precinct had artfully manipulated the situation to make the patient appear psychiatrically ill. Mr. Schoolcraft had also become more cooperative and interactive by 11/05/09.

(Schoolcraft v. Jamaica Hospital)

-4-

-4-

As per hospital policy and congruent with his concern about the stress this situation was causing the patient (reflected in the change of diagnosis from psychosis NOS to adjustment disorder with mixed anxiety and mood features), Dr. Isakov instructed his staff to arrange for psychiatric follow-up (psychotherapy). As the patient did not want to be seen at Jamaica Hospital's clinic, an appointment with an outside psychotherapist (Dr.Luell) was arranged. Mr. Schoolcraft apparently kept one appointment with this doctor. He was discharged on 11/06/09 with a GAF score of 65 (as opposed to 40 on admission).

The depositions of Drs. Levin, Patel, Aldana-Bernier and Isakov focused on issues of dangerousness and interpretation of the 9.39 admission statute. While Drs. Aldan-Bernier and Isakov did not optimally articulate the 9.39 criteria, seeming to indicate that delusions and agitation would meet the threshold, their descriptions of their clinical concerns regarding Mr. Schoolcraft indicate that in this case they were correctly applying the statute. They were given good reason to believe that the patient had been decompensating over a period of time (resulting in the loss of his police gun), had been agitated, barricaded himself in his apartment and was combative with the police. Moreover, it appeared that he was declining medical evaluation for significant hypertension and possibly serious gastrointestinal complaints. Thus, he would quite reasonably be considered a significant potential danger to himself. Moreover, his reported combativeness with the police and concern about possible access to weapons would quite reasonably be considered evidence of significant potential danger to others.

The deposition of Dr. Dhar largely focused on the policies and procedures at Jamaica Hospital regarding admission and their congruence with the 9.39 statute. There is no evidence of any incongruence or of departures from these hospital policies and procedures by any clinical staff in this case.

**Expert Report – Dr. Halpren-Ruder:** This report focused on the medical emergency room's conduct and care. Regarding medical clearance for transfer to psychiatry, he acknowledges that laboratory tests and a head CT were obtained and were within normal limits. He correctly notes that urine toxicology screen was not obtained, however, which would be a final component of appropriate medical clearance. He states that the patient indicates he would have given urine for a toxicology screen. The record and depositions do not indicate if he was requested to do so or if he refused. Thus it is unclear if the cancelation of the toxicology screen was an error on the part of Jamaica Hospital, as the plaintiff's expert claims, or was due to the patient's refusal. Thus, no definitive conclusion can be drawn on this point.

**Expert Report – Dr. Lubit:** This report provides a detailed history of Mr. Schoolcraft's earlier history, the incident that is the subject of the current litigation and the plaintiff's current mental state. He concludes that there was no adequate medical or legal basis for the plaintiff's commitment to Jamaica Hospital, that there was a failure to obtain and adequately interpret information from the patient (including an overly-brief evaluation and a failure to explore beliefs with him) and that the patient has been greatly harmed by this admission (including difficulty obtaining employment).

{Schoolcraft v. Jamaica Hospital

-5-

Dr. Lubit also appears to believe that the content of Mr. Schoolcraft's statements was self-evidently non-delusional because they were not especially bizarre and that the bruises noted on him in the emergency room were incontrovertible evidence that the police had abused him.

I believe that these conclusions are made from the vantage point of hindsight and depend upon information that was not initially available to the Jamaica Hospital doctors. Once this information was available, there was clear movement towards discharging the patient. Moreover, the conclusions overlook the way in which the patient's demeanor and choices may have unfortunately and unintendedly served to bolster the misrepresentations made by members of his precinct. In addition, the patient was initially quite guarded and reticent, limiting the duration of the clinical interview and the depth of exploration. He also withheld consent for obtaining the records of a prior mental health evaluation, thus limiting the ability of Jamaica Hospital staff to perform a full assessment and which, paradoxically, might have expedited his discharge (as the psychologist did not actually deem him psychotic or dangerous and her evaluation would have allayed some of the legitimate worries the Jamaica Hospital psychiatrist had).

Conclusions: I opine, with a reasonable degree of medical certainty that Jamaica Hospital did not deviate from acceptable community standards of care and did not violate the plaintiff's rights. I do so for the following reasons:

1) A number of factors coincided, which would quite reasonably lead to the conclusion that the patient was psychiatrically ill and acutely paranoid, largely based upon information given by his precinct to Jamaica Hospital staff. It is a quite rare and not generally credible scenario that the police would make systematic misrepresentations of this nature. This occurred in the context of a prior mental health evaluation, which resulted in restricted duty and the loss of his weapon and which has not been definitively proven to be linked to the conspiracy at his precinct. The initial diagnosis of Psychosis NOS was therefore warranted. It was also appropriate for the E.D. physician to rely upon the psychiatric consultant to make this judgement.

The plaintiff was brought in as an EDP with police reporting that: he was agitated; had left work precipitously and had subsequently barricaded himself into his apartment; and was refusing medical attention for significantly elevated blood pressure (which, interestingly, the patient believed may have been exaggerated by the EMS) and the acute onset of abdominal pain. He was initially hostile and abusive in the emergency room, which made it harder to obtain information and gave further credence to his precinct's misrepresentations. He spoke of the police being out to get him and of their persecuting him, which could also appear quite paranoid without benefit of full contextual material. While his beliefs were not completely bizarre (i.e., no reports of aliens or expression of Schneiderian delusions), they were in no way inconsistent with how paranoia could reasonably present.

(Schoolcraft v. Jamaica Hospital)

Moreover, the bruises he sustained from the police could just as readily be understood as an artifact of his struggling with them as of proof that he was being abused.

Many individuals would have attempted to calmly and rationally explain to emergency room staff their version of events but the patient's pre-existing state of emotional distress may have prevented him from doing so, inadvertently compounding matters.

Moreover, this event was not without precedents in his family history, as his father was involved in a similar case when he was a police officer in Texas (allegations of bid rigging in this instance). This is likely to have heightened the plaintiff's distress and to have caused his father to give him advice that ultimately worked to the plaintiff's detriment (i.e., refusing to go to Jamaica Hospital). Although the plaintiff would have clearly preferred to go to Forest Hills Hospital, it is unclear that there was any rational reason to refuse to go to Jamaica Hospital. The patient apparently believed (and still does according to his deposition) that Jamaica Hospital was colluding with his precinct, although he acknowledges that no evidence has emerged that would support this.

2) The patient's admission was predicated on credible views of significant potential dangerousness, not just on agitation or paranoia. An individual who has an altercation with the police, is credibly reported to have barricaded himself in his apartment (there were no eyewitnesses to dispute the police account and, at that moment, the patient would simply not have seemed as credible as the police) and is refusing medical evaluation for potentially serious conditions at a nearby facility could be quite reasonably deemed a significant potential danger to self. In addition, the presence of agitation, irritability, paranoid ideation and possible access to weapons would be reasonable grounds to construe the patient a significant potential danger to others.

It is important to note that psychiatry has long grappled with the difficulty in predicting dangerousness. There are no quantifiable measures such as lab tests that have yet been found to predict dangerousness and factors associated with prediction of dangerousness are probabilistic and associational in nature and are more accurate in populations than in individuals. Thus, psychiatrists often err on the side of safety in weighing the difficult conflict between prevention of danger and abrogation of individual liberty. The weighing in on this case was within the margin of community standards for the practice of psychiatry.

3) The duration and depth of the patient's assessment were constrained by his guardedness and extreme emotional reaction to the situation as well as his refusal to permit the release of information from a prior mental health evaluation.

(Schoolcraft v. Jamaica Hospital)

-7-

Much has been made of the failure of the psychiatric emergency room to immediately contact the Internal Affairs Bureau, but this presupposes a level of familiarity with police infrastructure and procedures that the average psychiatrist would be unlikely to have. Moreover, Dr. Isakov did speak with the Internal Affairs Bureau shortly after the patient's admission and did correctly appreciate and weigh their input.   Thus, I opine that the assessment was done in an appropriate and timely fashion, with adequate weight accorded to information as it emerged.

4) Regarding the assertion that Jamaica Hospital relied on hearsay, that is a legal term, not relevant to psychiatric practice. What would be construed as hearsay in a courtroom is considered collateral information in a psychiatric evaluation.

5) In view of the patient's level of emotional distress about the larger situation, not just the hospitalization, it was appropriate to insist upon an aftercare referral prior to discharging the patient.

6) The patient's current emotional condition is likely to be referable to the larger picture of his perceived victimization by the police department with the hospitalization playing a relatively small role, especially because this hospitalization concluded with an acknowledgement of the veracity of his statements. His difficulty finding work is also likely to be largely the result of this larger picture and is unfortunately consistent with the difficulties faced by many whistleblowers.

7) For the foregoing reasons, I opine with a reasonable degree of medical certainty that there was no dereliction established in the conduct of Jamaica Hospital in the assessment and care it provided or in the training and retention of its staff. There is absolutely no evidence that Jamaica Hospital colluded with the 81st Precinct. It is also noteworthy that according to the deposition of the plaintiff's father, their prior attorney suggested that they discontinue the case against Jamaica Hospital.

*Robert H Levy MD*

(Schoolcraft v. Jamaica Hospital)

Robert Levy, MD
License # 166649
NPI # 1942385489